Lee Gelernt
Judy Rabinovitz
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioner-Plaintiff*, | |
| v. | Date Filed: March 3, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE, Otay Detention Facility; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field Director, CBP; Fred Figueroa, Warden, Otay Mesa Detention Center; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **PETITIONER-PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION WITH (CORRECTED) EXHIBITS** |
| *Respondents-Defendants*. | |

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ....................................................................................2

ARGUMENT .........................................................................................................4

   I.  MS. L. IS LIKELY TO SUCCED ON THE MERITS OF HER CLAIMS.....5

     A. The Government's Separation of Ms. L. and Her Child Violates Due Process............................................................................................................5

       1.  Ms. L. is protected by due process.........................................................5

       2.  The separation of Ms. L. and her child is unconstitutional because there is no evidence of abuse or neglect. ..............................................8

     B. The Government's Separation of Petitioner and Her Child Violates the APA Because It Is Arbitrary and Capricious. ...........................................10

  II. SEPARATION OF PETITIONER FROM HER DAUGHTER HAS CAUSED AND WILL CONTINUE TO CAUSE IRREPARABLE INJURY. ..................................................................................................11

 III.THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH DECIDELY IN FAVOR OF REUNITING PETITIONER WITH HER DAUGHTER. ....................................................................................14

CONCLUSION.....................................................................................................16

i

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)..........................................................4

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ........................................................................15

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014)......................................................4, 15

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) .......................................................10

*Chi Thon Ngo v. INS*,
192 F.3d 390 (3d Cir. 1999)..............................................................7

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .......................................................10

*Duchesne v. Sugarman*,
566 F.2d 817 (2d Cir. 1977)..............................................................8

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................11

*Encinco Motorcars, LCC v. Navarro*,
136 S. Ct. 2117 (2016) ...................................................................10

*Halet v. Wend Investment Co*,
672 F.2d 1305 (9th Cir. 1982)...........................................................9

*Hawaii v. Trump*,
878 F.3d 662 (9th Cir. 2017)...........................................................15

*Heartland Acad. Comm. Church v. Waddle*,
427 F.3d 525 (8th Cir. 2005).............................................................9

*Int'l Refugee Assistance Project v. Trump*,
--- F.3d ---, 2018 WL 894413 (4th Cir. Feb. 15, 2018) ...........13, 14

*J.B. v. Washington County*,
127 F.3d 919 (10th Cir.1997)..........................................................13

*Jordan by Jordan v. Jackson*,
15 F.3d 333 (4th Cir. 1994)...............................................................9

*Kaszuba v. Fidelity Nat'l Default Servs.*,
2011 WL 601525 (S.D. Cal. Feb. 10, 2011) (Sabraw, J.)................4

*Kwai Fun Wong v. United States*,
373 F.3d 952 (9th Cir. 2004).....................................................6, 7, 8

*Lassiter v. Dep't of Social Servs.*,
  452 U.S. 18 (1981) ........................................................................9

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .......................................................8

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .....................................................12

*Lynch v. Cannatella*,
  810 F.2d 1363 (5th Cir.1987) .....................................................7

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ......................................................................5

*McLaughlin v. Pernsley*,
  876 F.2d 308 (3d Cir. 1989) ......................................................13

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...............................................11, 15

*Mt. St. Helens Mining & Recovery Ltd. Partnership v. United States*,
  384 F.3d 721 (9th Cir. 2004) .....................................................10

*Nicolson v. Pappalardo*,
  685 F.Supp.2d 142 (D. Me. 2010) ............................................13

*Plyler v. Doe*,
  457 U.S. 202 (1982) ....................................................................5

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013).....................................................15

*Rodriguez-Fernandez v. Wilkinson*,
  654 F.2d 1382 (10th Cir. 1981)....................................................7

*Rosales-Garcia v. Holland*,
  322 F.3d 386 (6th Cir. 2003) (en banc), *cert. denied*, 539 U.S. 941 (2003)..........7

*Sammartano v. First Judicial District Court*,
  303 F.3d 959 (9th Cir. 2002).......................................................15

*Santosky v. Kramer*,
  455 U.S. 745 (1982) ....................................................................8

*Southerland v. City of New York*,
  680 F.3d 127 (2d Cir. 2012).........................................................9

*Stanley v. Illinois*,
  405 U.S. 645 (1972) ..............................................................11, 12

*Troxel v. Granville*,
  530 U.S. 57 (2000) (plurality op.)................................................8

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001)..............................................................................9
*United States v. Wolf Child*,
   699 F.3d 1082 (9th Cir. 2012)..........................................................................9
*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005)..........................................................................11
*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................4
*Wong Wing v. United States*,
   163 U.S. 228 (1896) ........................................................................................6
*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ........................................................................................6
*Zadvydas v. Davis*,
   533 U.S. 678 (2001) (Scalia, J., dissenting)....................................................6

**Statutes**
5 U.S.C. § 706(2)(A) ..........................................................................................10

**Other Authorities**
Policy Statement, Am. Acad. of Pediatrics, *Detention of Immigrant* Children, Mar.
   2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-
   0483 ...............................................................................................................12

**INTRODUCTION**

This case involves the government's forcible separation of Petitioner Ms. L., a Congolese asylum seeker, from her daughter, S.S.[1]  S.S., a seven (7) year-old little girl, was taken from her mother nearly four months ago, frantically screaming that she did not want to leave her mommy.  Since that time, S.S. has been held in a facility in Chicago (where she celebrated her seventh birthday alone), while Ms. L. has been detained in San Diego.  There was no accusation that Ms. L. was an unfit parent, much less that she had engaged in abusive behavior toward her daughter.  Nor has Ms. L. ever even been told why her petrified daughter was taken from her.  Ms. L. brings this action to reunite with her daughter.  The government can release both mother and daughter to a non-governmental shelter specializing in the care of asylum-seeking families.   Alternatively, if the government feels compelled to continue detaining this mother and small child, it can detain them together in a government family detention center.  But one way or the other the government may not continue to keep them apart.

Ms. L. has a substantial likelihood of prevailing on the merits of her due process claim.  It has long been settled that all "persons" are entitled to due process under the Fifth Amendment, regardless of their immigration status.   It has likewise been established for more than a century that the Due Process Clause prohibits the

---

[1] As set forth in Petitioner's previously-filed motion to proceed under a pseudonym, Ms. L. is using only her initial for fear that exposure will result in harm to her.  As a minor, her daughter is also proceeding under her initials.  A photograph of S.S. is attached to the (restricted) declaration of Elizabeth Lopez. *See* Ex. 11.

government from separating a parent from her child absent the most compelling reasons. And the only reason the law recognizes as sufficiently compelling to tear a young child away from her parent is to protect the child in extreme circumstances when staying with the parent endangers the child. That has not even been alleged here, much less demonstrated. The government's forcible separation also violates the Administrative Procedure Act, because the government has provided no reason at all for taking the drastic step of separating Petitioner from her child.

Ms. L. also satisfies the other preliminary injunction factors. Any conceivable harm that the government might try to claim in this case would be far outweighed by the ongoing and potentially permanent harm to this 7 year-old little girl. The American Academy of Pediatrics has roundly denounced the recent practice of separating immigrant children from their parents, and nine respected medical experts from around the country have submitted declarations in this case similarly condemning the practice, noting the overwhelming scientific consensus that separating young children from their parents causes severe and potentially lasting damage. Ms. L. thus respectfully requests that the Court preliminarily enjoin the government from continuing to keep her away from her daughter, and allow them to be reunited in either a governmental or non-governmental facility.

## STATEMENT OF FACTS

Ms. L. and her daughter fled their home in the Democratic Republic of Congo in fear for their lives. Ms. L. is Catholic so sought shelter with S.S. in a

church for a few days before eventually escaping the Congo.  Upon arriving in the United States, Ms. L. and her daughter presented themselves to border guards at the San Ysidro Port of Entry on November 1, 2017.  Although their native language is Lingala, they were able to communicate to the border guards in broken Spanish that they feared returning to their country.  Based on her expression of fear of returning to the Congo, Ms. L. was referred for an initial asylum screening interview (called a "credible fear interview").  Because the asylum officer determined that she had a significant possibility of ultimately obtaining asylum, she was placed into full immigration proceedings to formally apply for asylum, a lengthy process.  *See* Ms. L. Decl., Ex. 10 ¶ 2; Lopez Decl., Ex. 9 ¶ 4.

For approximately the first 4 days after arriving in the United States, Ms. L. and S.S. were detained together, in what Ms. L. understood to be some sort of motel.  They were then brought to an immigration office and placed into separate rooms.  Ms. L. heard her daughter frantically screaming that she did not want to leave her mommy.  That is the last time Ms. L. saw her daughter.  Since that day, Ms. L. has been detained in the Otay Mesa Detention Center in the San Diego area.  Her 7 year-old daughter was sent to Chicago, where she has remained in a facility ever since, without her mother or anyone else she knows.  Ms. L. was not told why her daughter was taken from her or where she had been sent.  About four days later, the government finally arranged a phone call with S.S.  Since that first call, there have only been a handful of additional calls over the almost 4 months S.S. and her

1    mother have been separated (and not a single video conference so that S.S. can
2    actually see her mother).  S.S. cries during these calls and is scared, both for herself
3
4    and her mother, repeatedly asking how her mother is doing in prison.  Ms. L. is
5    likewise scared and depressed, constantly worried about her daughter, making it
6    difficult for her to eat or sleep.  *See* Ms. L. Decl., Ex. 10 ¶¶ 3-6.
7
8         The government has never offered any reason why Ms. L.'s daughter was
9    taken from her.  Yet, almost 4 months later, 7 year-old S.S. remains detained 2,000
10   miles away in Chicago, without her mother.
11
12                                    **ARGUMENT**
13        To obtain a preliminary injunction, a plaintiff must establish (1) "that he is
14   likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in
15
16   the absence of preliminary relief," (3) "that the balance of equities tips in his
17   favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat'l Res.*
18   *Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts evaluate these factors on a
19
20   "sliding scale."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014)
21   (quotation marks omitted).  A "stronger showing of irreparable harm to plaintiff
22   might offset a lesser showing of likelihood of success on the merits."  *Alliance for*
23
24   *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, where the
25   balance of hardships "tips sharply towards the plaintiff," the plaintiff need only
26   demonstrate "serious questions going to the merits."  *Kaszuba v. Fidelity Nat'l*
27
28   *Default Servs.*, 2011 WL 601525, at *1 (S.D. Cal. Feb. 10, 2011) (Sabraw, J.)

(quotation marks omitted).

## I.  MS. L. IS LIKELY TO SUCCED ON THE MERITS OF HER CLAIMS.

Ms. L. is likely to succeed on her due process claim.  *See infra* Section A. She is also likely to succeed on her "arbitrary and capricious" claim under the Administrative Procedure Act (APA).  *See infra* Section B.  Accordingly, this case can be decided on either constitutional or non-constitutional grounds.[2]

### A.    The Government's Separation of Ms. L. and Her Child Violates Due Process.

The Fifth Amendment applies to all "persons" and thus applies to Ms. L.  *See infra* Section A.1.  And the separation of Ms. L. from her daughter patently violates substantive due process because there has been no allegation, much less evidence, that Ms. L. is an unfit mother.  *See infra* Section A.2.

### 1.    Ms. L. is protected by due process.

The Due Process Clause, by its terms, applies to any "person," not just citizens.  And the Supreme Court has further held that the Clause applies to *all* noncitizens.  *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional

---

[2] At this time, Ms. L. is not moving on her two other claims in the complaint: that her separation violates the asylum statutes (Count II), and that she has a right to release under ICE's parole guidelines (Count IV).

protection."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (explaining that "all persons within the territory of the United States are entitled to the protection" the Due Process Clause); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (explaining that due process protections are "universal in their application, to all persons within the territorial jurisdiction").

The fact that Ms. L. and S.S. presented themselves at a port of entry and did not enter the country is of no consequence for purposes of the due process analysis in this case. Individuals who present themselves at a port of entry are considered "arriving" noncitizens and lack certain procedural due process rights to challenge their exclusion from the country. *See*, *e.g.*, *Kwai Fun Wong v. United States*, 373 F.3d 952, 971-72 (9th Cir. 2004). Here, however, Ms. L.'s right to remain with her daughter is a substantive due process right, and has nothing to do with her eligibility to be formally admitted into the United States. And there is no question that all persons, whether arriving or not, have substantive due process rights. Indeed, as Justice Scalia pointed out, if arriving noncitizens, who are physically on U.S. soil, lacked substantive due process rights, it would mean border agents could literally do anything, including "tortur[ing]" such individuals. *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting) ("I am sure [that people with no right to enter the country] cannot be tortured . . . .").[3]

---

[3] Arriving noncitizens like Ms. L. are actually on U.S. soil, because Ports of Entry are physically located on U.S. territory. Thus, the idea that such individuals have not actually entered the United States is understood as a "legal fiction." *See Kwai*

Accordingly, the Ninth Circuit and other courts have made clear that arriving noncitizens stopped at a port of entry have substantive due process rights. *Kwai Fun Wong*, 373 F.3d at 973 (holding that non-admitted aliens, who may lack certain procedural due process rights with respect to admission, are nonetheless protected by the due process clause); *Chi Thon Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) ("Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process."); *Rosales-Garcia v. Holland*, 322 F.3d 386, 410 (6th Cir. 2003) (en banc) ("The fact that excludable aliens are entitled to less process . . . does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments."), *cert. denied*, 539 U.S. 941 (2003); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir.1987) (the Constitution "does not limit the right of excludable aliens detained within United States territory to humane treatment"); *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981) ("[A]n excluded alien in physical custody within the United States may not be 'punished' without being accorded the substantive and procedural due process guarantees of the Fifth Amendment.").[4]

---

*Fun Wong*, 373 F.3d at 970-71 (explaining the "entry fiction" by which an arriving noncitizen may be physically present on U.S. soil while still being deemed to not have "entered" for certain immigration purposes).

[4] In the circumstances of this case, Ms. L.'s substantive due process right also carries with it a corresponding right to procedural due process. Arriving noncitizens lack procedural due process rights in the context of challenging their exclusion, since they have no absolute substantive constitutional right not to be excluded. *Kwai Wong*, 373 F.3d at 971 ("The entry fiction thus appears determinative of the *procedural* rights of aliens with respect to their applications for

**2.    The separation of Ms. L. and her child is unconstitutional because there is no evidence of abuse or neglect.**

The Due Process Clause forbids the government from separating a child from her parents absent a clear showing that the parent is endangering the child, and that separation is necessary to protect the child.  That is not the case here.

The Supreme Court has long recognized family integrity to be one of the most fundamental liberty interests that the Constitution protects.  *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality op.) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (collecting cases); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child.") (quotation marks omitted); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state.").

admission.") (emphasis in original); *see also id.* ("The entry doctrine has not, however, been applied, by the Supreme Court or by this court, to deny all constitutional rights to non-admitted aliens.").  Thus, in this case, if the government were ever to come forward with any actual grounds to justify taking S.S. away from Ms. L., Ms. L. would certainly be entitled to a hearing.  Otherwise, the government could simply allege that Ms. L. and other asylum seekers were unfit parents and rip their children away, without any process.

In light of this fundamental liberty interest, the courts have been loath to allow the government to separate a child from her parent (particularly a child as young as 7-years-old).  *See, e.g.*, *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) ("Interference with" the "fundamental right to familial association" "requires 'a powerful countervailing interest.'") (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27 (1981)); *Halet v. Wend Investment Co*, 672 F.2d 1305, 1310-11 (9th Cir. 1982) (requiring compelling interest to deprive parents of their "fundamental right" to "live with their children"); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) ("[T]he relationship between parent and child [is] inviolable except for the most compelling reasons.").

And as the courts have further made clear, in practice, this means that separation may not occur absent a clear demonstration that the parent is abusing or neglecting the child, or is a threat to the child's safety in some way.  *See, e.g.*, *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional."); *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (family-integrity interest "is counterbalanced by the compelling governmental interest in the protection of minor children"); *Heartland Acad. Comm. Church v. Waddle*, 427 F.3d 525, 534 (8th Cir. 2005) ("[T]he right to family integrity cannot be absolute when the state has a

compelling interest in protecting children from abuse.").

In short, in this case, the government has offered no legitimate basis, for taking a 7 year-old child away from her mother for nearly 4 months. There's been no evidence that Ms. L. has abused or neglected her daughter, or that she's an unfit parent. The separation thus violates due process.

**B.     The Government's Separation of Petitioner and Her Child Violates the APA Because It Is Arbitrary and Capricious.**

Courts must "set aside" an agency decision that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  Under this standard, "a reviewing court must determine whether . . . there has been a clear error of judgment." *Mt. St. Helens Mining & Recovery Ltd. Partnership v. United States*, 384 F.3d 721, 728 (9th Cir. 2004).  And the agency must "supply a reasoned basis for the agency's action." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008) (quotation marks omitted).

The government has provided *no reason at all* for separating Ms. L. and her child.  *See* Ms. L. Decl., Ex. 10 ¶ 3.  Its complete failure to explain such a consequential decision is quintessential arbitrary government action.  *See Encinco Motorcars, LCC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (agency decision fails this standard when "the agency . . . gave almost no reasons at all"); *Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (where agency "failed to set forth a rationale for its decision," the agency's "lack of explanation for its choice renders its decision arbitrary and capricious").   The government has facilities designed

precisely to house mothers and daughters together, not to mention the non-governmental shelters that exist for this purpose.  There is no suggestion that Petitioner is an unfit caretaker.  And the government has provided no other reason why Petitioner's 7 year-old daughter should be detained alone, thousands of miles from her mother.

## II.   SEPARATION OF PETITIONER FROM HER DAUGHTER HAS CAUSED AND WILL CONTINUE TO CAUSE IRREPARABLE INJURY.

Defendants have violated and—unless enjoined—will continue to violate Petitioner's constitutional rights.  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (indicating that only a "colorable claim" of constitutional violation is needed to establish irreparable harm at the preliminary injunction stage) (quotations and citation omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

But the injury here is not just the harm that generally flows from a constitutional violation.  The government in this case has forcibly separated a 7 year-old child from her mother.  The trauma of that separation causes especially severe irreparable injuries.  *See Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[] suffer[s]

11                                18cv0428

from uncertainty and dislocation."); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) ("separation from family members" constitutes irreparable harm) (quotation marks omitted).

The American Academy of Pediatrics has denounced the recent practice of separating immigrant children from their parents, explaining that the "[s]eparation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for [the] safety of the child at the hand of [the] parent."[5]  That view is echoed in the declarations in this case of nine medical and mental health professionals across multiple fields from around the country, including pediatricians, psychiatrists, psychologists, and social workers, with a combined 174 years of experience working with families, including immigrant families.  *See* Oo & Schmidt Decl., Ex. 1 ¶ 1; Pena Decl., Ex. 2 ¶ 1; Griffin Decl., Ex. 3 ¶ 1; Carter Decl., Ex. 4, ¶ 1; Linton Decl., Ex. 5 ¶ 1; Shapiro Decl., Ex. 6 ¶ 1; Fortuna Decl., Ex. 7 ¶ 1; Melikian Decl., Ex. 8 ¶ 1.

As these medical experts observe, there is an "overwhelming body of scientific literature" that is "replete with evidence of the irreparable harm and trauma to children caused by separation from their parents."  Shapiro Decl., Ex. 6 ¶ 13.  This research makes clear that "separating children from their parents has a real and substantial risk of leading to long-term (and irreversible) physiological,

---

[5] Policy Statement, Am. Acad. of Pediatrics, *Detention of Immigrant* Children, Mar. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

developmental and psychological problems."  Fortuna Decl., Ex. 7 ¶ 21; *see id.* ¶¶ 13, 20 (describing a "significant risk for irreparable harm in regards to brain development, psychological health and thus a trajectory of poor mental health, learning and development throughout their life"); Carter Decl., Ex. 4 ¶ 6 ("The psychological effect of traumatic parent-child separation does not end when a child is reunited with her parent.  Its effect can create permanent harm that influences them for the remainder of their lifespan.").

Courts have therefore held that *any* separation of parents and children visits irreparable harm on both.  *See McLaughlin v. Pernsley*, 876 F.2d 308, 315 (3d Cir. 1989) (holding that family separation causes irreparable harm because "the bonds between the [parents] and their foster child will weaken continuously with the passage of time apart"); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (internal quotations removed); *Nicolson v. Pappalardo*, 685 F.Supp.2d 142, 145-46 (D. Me. 2010) (holding that "[e]very additional day" of separation causes further harm).  As the Fourth Circuit recently explained, "[p]rolonged and indefinite separation of parents [and] children . . . create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships."  *Int'l Refugee Assistance Project v. Trump*, --- F.3d ---, 2018 WL 894413, at *18 (4th Cir. Feb. 15, 2018).

These harms are magnified by other traumatic events recently experienced by Ms. L. and her child, including the fact that they had to flee from their home, and are now detained in a foreign country.  Children who have faced recent trauma have a "heightened risk" of long-term emotional damage when they are separated from their parents.  Fortuna Decl., Ex. 7 ¶ 8; *see* Shapiro Decl., Ex. 6 ¶¶ 8-9 (describing traumatic context of detention).  The reasons are clear to any parent and confirmed by the scientific literature.  "Children need their parent's physical presence to successfully recover from traumatic events in their lives."  Melikian Decl., Ex. 8 ¶ 6.  When they lose that parental buffer, they are susceptible to what pediatricians and psychiatrists have termed "toxic stress," Linton Decl., Ex. 4 ¶ 4.b, which "threatens the developing brain and is associated with subsequent development of physical health problems such as diabetes and heart disease, mental health problems, and school failure," Linton Decl., Ex. 4 ¶ 4.c.

Defendants' actions are thus "doubly harmful," because they impose the new trauma of separation while robbing Petitioner's little daughter of her parental buffer to cope with that and other traumas.  Shapiro Decl., Ex. 6 ¶ 13.  Every day they are separated increases this harm and the risk of lasting damage.  *See* Pena Decl., Ex 2 ¶ 9; Oo & Schmidt Decl., Ex. 1 ¶ 7.

**III.** **THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH DECIDELY IN FAVOR OF REUNITING PETITIONER WITH HER**

**DAUGHTER.**

When ruling on a preliminary injunction motion, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Arc of Cal.*, 757 F.3d at 991 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  The relief requested here would cause no injury to Defendants, since a government agency "cannot suffer harm from an injunction that merely ends an unlawful practice . . . ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citation omitted).  And the Ninth Circuit has repeatedly held that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Moreover, irrespective of the general harm caused by any constitutional violation, the particular and ongoing harms to Petitioner and her little girl in this case far outweigh any injury Defendants might claim to suffer.  *See Hawaii v. Trump*, 878 F.3d 662, 699 (9th Cir. 2017) (holding that plaintiffs' "prolonged separation from family members" outweighed any harm to the government) (quotation marks omitted).  Given this harm, documented by medical experts, the balance of harms and public interest militate strongly in favor of immediately reuniting this little girl and her mother.

*       *       *

Ms. L. respectfully requests that she and her daughter be released so they can

be reunited in a non-governmental shelter, or alternatively, that they be

detained <u>together</u> in a government family detention center.  But one way or the

other, she and her daughter should be reunited, to end this nearly four-month ordeal

that no parent and child should ever have to endure.

## CONCLUSION

The Court should grant the preliminary injunction and reunite Ms. L. and her

daughter.

Dated: March 3, 2018                    Respectfully Submitted,

                                        */s/Lee Gelernt*
Bardis Vakili (SBN 247783)              Lee Gelernt*
ACLU FOUNDATION OF SAN                  Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES               Anand Balakrishnan*
P.O. Box 87131                          AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131                UNION FOUNDATION
T: (619) 398-4485                       IMMIGRANTS' RIGHTS PROJECT
F: (619) 232-0036                       125 Broad St., 18th Floor
*bvakili@aclusandiego.org*              New York, NY 10004
                                        T:  (212) 549-2660
Spencer E. Amdur (SBN 320069)           F:  (212) 549-2654
AMERICAN CIVIL LIBERTIES                *lgelernt@aclu.org*
UNION FOUNDATION                        *jrabinovitz@aclu.org*
IMMIGRANTS' RIGHTS PROJECT              *abalakrishnan@aclu.org*
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate C M/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.

*Ms. L. v. U.S. Immigration and Customs Enforcement, et al.*

## EXHIBITS TO COMPLAINT

### TABLE OF CONTENTS

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| 1. | Declaration of Heyman Oo and Caren Schmidt | 19-26 |
| 2. | Declaration of Cristina Muniz de la Pena | 27-34 |
| 3. | Declaration of  Marsha R. Griffin | 35-41 |
| 4. | Declaration of Lee Carter | 42-48 |
| 5. | Declaration of Julie M. Linton | 49-54 |
| 6. | Declaration of Alan Shapiro | 55-64 |
| 7. | Declaration of Lisa R. Fortuna | 65-77 |
| 8. | Declaration of Karen Melikian | 78-82 |
| 9. | Unrestricted Declaration of Elizabeth Lopez | 83-86 |
| 10. | Declaration of Ms. L. | 87-90 |
| 11. | Restricted Declaration of Elizabeth Lopez (filed separately) | 91-96 |

# **Exhibit 1**

1   Lee Gelernt*                          Bardis Vakili (SBN 247783)
    Judy Rabinovitz*                      ACLU FOUNDATION OF SAN
2   Anand Balakrishnan*                   DIEGO &
3   AMERICAN CIVIL LIBERTIES              IMPERIAL COUNTIES
    UNION FOUNDATION                      P.O. Box 87131
4   IMMIGRANTS' RIGHTS PROJECT            San Diego, CA 92138-7131
5   125 Broad St., 18th Floor             T: (619) 398-4485
    New York, NY 10004                    F: (619) 232-0036
6   T:  (212) 549-2660                    *bvakili@aclusandiego.org*
7   F:  (212) 549-2654
    *lgelernt@aclu.org*
8   *jrabinovitz@aclu.org*
9   *abalakrishnan@aclu.org*
                                          *Admitted pro hac vice*
10
    *Attorneys for Petitioner-Plaintiff*
11  *Additional counsel on next page*

12              **UNITED STATES DISTRICT COURT**
13              **SOUTHERN DISTRICT OF CALIFORNIA**

14
    Ms. L.,
15
16                          *Petitioner-Plaintiff,*
17  v.                                             Case No. 18-cv-00428-DMS-
                                                   MDD
18  U.S. Immigration and Customs Enforcement
    ("ICE"); U.S. Department of Homeland Security
19  ("DHS"); U.S. Customs and Border Protection
20  ("CBP"); U.S. Citizenship and Immigration      **JOINT DECLARATION OF**
    Services ("USCIS"); U.S. Department of Health  **HEYMAN OO AND CAREN**
21  and Human Services ("HHS"); Office of          **SCHMIDT**
22  Refugee Resettlement ("ORR"); Thomas
    Homan, Acting Director of ICE; Greg
23  Archambeault, San Diego Field Office Director,
24  ICE; Joseph Greene, San Diego Assistant Field
    Office Director, ICE, Otay Detention Facility;
25  Kirstjen Nielsen, Secretary of DHS; Jefferson
26  Beauregard Sessions III, Attorney General of the
    United States; Kevin K. McAleenan, Acting
27  Commissioner of CBP; L. Francis Cissna,
28  Director of USCIS; Pete Flores, San Diego Field

Director, CBP; Fred Figueroa, Warden, Otay
Mesa Detention Center; Alex Azar, Secretary of
the Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

                    *Respondents-Defendants.*

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.,<br><br>                                *Petitioner*,<br><br>       v.<br><br>U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; Thomas Homan, Acting Director of ICE; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field Director, CBP; Greg Archambeault, San Diego Field Office Director, ICE; Fred Figueroa, Warden, Otay Mesa Detention Center,<br><br>                              *Respondents*. | CASE NO. _____ |

### JOINT DECLARATION OF HEYMAN OO AND CAREN SCHMIDT

I, Heyman Oo, MD, MPH and I, Caren Schmidt, Psy D, make the following declaration based on

our personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746

that the following is true and correct:

1.  We have not directly treated the Petitioner but were asked to give this declaration based

     on our collective knowledge and over 25 years of combined experience working with

     vulnerable children and families, including immigrants and trauma survivors.

1

2.  We are currently employed at Marin Community Clinics (MCC) in Novato, CA as a
    primary care pediatrician and the lead pediatric behavioral health provider, respectively,
    though we are not speaking on behalf of our employer.  In these roles we predominantly
    care for recent immigrants.

3.  I, Dr. Heyman Oo, received my BA in Psychology and Neuroscience from Yale
    University, my Doctorate in Medicine from University of California San Diego, and my
    Master's in Public Health from Harvard University's T.H. Chan School of Public Health
    in Healthcare Policy and Administration. I completed my Pediatrics residency at
    Zuckerberg San Francisco General Hospital and University of California, San Francisco
    (UCSF) Benioff Children's Hospital. I am currently a Board-Certified Pediatrician
    through the American Board of Pediatrics and a licensed physician in the state of
    California. I have experience providing direct medical services as well as leading public
    health initiatives for a wide variety of immigrant populations from refugees on the Thai-
    Burma border, to rural migrant workers in China, to unaccompanied minors fleeing
    violence in their home countries in Central America.  In addition to my role at MCC, I
    am also an Associate Physician and Clinical Instructor for Pediatrics at UCSF.  Over the
    last five years, I have worked extensively with local public health departments, social
    services agencies, and school districts in the Bay Area to develop increased mental health
    services for recently arrived unaccompanied minors and other youth who are reunifying
    with families after prolonged family separation.

4.  I, Dr. Caren Schmidt, received my BA in Psychology from Boston College and my
    Doctor of Psychology from Alliant International University-San Francisco Bay Area
    within the Child and Family Track.  I completed my post-doctoral fellowship at The

Trauma Center in Massachusetts.  Professionally, I have worked at Stanford University and the WestCoast Children's Clinic. I also spent eight years at the combined Zuckerberg San Francisco General Hospital and the University of California San Francisco, where I was an Assistant Clinical Professor and Director of Clinical Services for Child and Adolescent Services.  My training and experience has focused on the effects of trauma and toxic stress on children and families, as well as factors that contribute to resilience and prevention.  I co-authored a study on the effects of a youth violence prevention program for inner city youth with my colleagues at Trauma Center and am currently involved in a pilot project with Dr. Oo and the Center for Youth Wellness screening for Adverse Childhood Experiences (ACEs) in a pediatric population. I served on the Marin County Child Care Commission from 2012-2015 and have been overseeing the Pediatric Behavioral Health Services at Marin Community Clinics since 2015.

5. Separation from a parent can lead to a significant deterioration in mental and physical health.  Children may experience depression, anxiety, or post-traumatic stress.  This is especially true in cases in which children were abruptly separated from their caregivers, witnessed their caregivers being forcibly taken, and/or when the possibility of reunification is unknown.  In these cases, children remain in a constant state of fear and worry regarding the well-being of their parent, which can affect their concentration, sleep, social engagement, and overall functioning.  This can in turn often lead to decreased academic performance and social difficulties, beyond the psychological suffering.

6. Parental separation can further exacerbate immigration-related stressors while conversely, family cohesion can serve as a protective factor. Studies have demonstrated

3

that unaccompanied minors have greater mental health and social services needs compared to children who remain with their parents through the immigration process. ("Fostering resilience: protective agents, resources, and mechanisms for adolescent refugees' psychosocial well-being," *Adolescent Psychiatry*, 2014, Volume 4, Issue 4, pages 164-176; and "Comparing psychological distress, traumatic stress reactions, and experiences of unaccompanied refugee minors with experiences of adolescents accompanied by parents." *The Journal of Nervous and Mental Disease*, April 2007, Volume 195, Issue 4, pages 288-297.)

7.  Trauma has a compounding and lasting effect into adulthood. Research has shown that traumatic experiences in childhood, specifically around parent-child separation, has a dose-dependent relationship with adverse health outcomes into adulthood such as cancer, stroke, diabetes and heart disease. ("Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults," *American Journal of Preventive Medicine,* 1998, Volume 14, pages 245–258.)

8.  Separation from a parent constitutes an attachment loss, which may negatively impact a child's social and behavioral development.  Successful development relies on attachment figures to aid children in emotional regulation, interpersonal interactions, and mastering new skills. When a child loses an attachment figure, it is common to see regression in development, which may lead to lasting negative effects in adulthood.

9.  Based on our combined clinical experiences in caring for the physical and mental well-being of children and families, we strongly believe that prolonged separation from a parent can have detrimental effects on a child's physical and psychological health.  We declare under penalty of perjury under the laws of the United States of America that the

4

foregoing is true and correct, based on our personal knowledge. Executed in Novato, California on February 27, 2018.


Heyman Oo, MD MPH                           Caren Schmidt, PsyD

5

# Exhibit 2

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Admitted pro hac vice

Attorneys for Petitioner-Plaintiff
Additional counsel on next page

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

　　　　　　　　　*Petitioner-Plaintiff*,

v.

U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE, Otay Detention Facility; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF CRISTINA MUNIZ DE LA PENA**

1   Director, CBP; Fred Figueroa, Warden, Otay
2   Mesa Detention Center; Alex Azar, Secretary of
    the Department of Health and Human Services;
3   Scott Lloyd, Director of the Office of Refugee
    Resettlement,
4
5                      *Respondents-Defendants.*

6
7
8
9
10  Spencer E. Amdur (SBN 320069)
11  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
12  39 Drumm Street
    San Francisco, CA 94111
13  T:  (415) 343-1198
14  F:  (415) 395-0950
    *samdur@aclu.org*
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.,<br><br>     v.<br><br>U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; Thomas Homan, Acting Director of ICE; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field Director, CBP; Greg Archambeault, San Diego Field Office Director, ICE; Fred Figueroa, Warden, Otay Mesa Detention Center,<br><br>     *Respondents.* | CASE NO. _____ |

## DECLARATION OF CRISTINA MUNIZ DE LA PENA

I, Cristina Muñiz de la Peña, MD, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I have not directly treated the Petitioner but was asked to give this declaration based on my knowledge as a psychologist with over 10 years of experience working with vulnerable children and families, including immigrants and trauma survivors.

2. I am a graduate of the State University of New York (SUNY) at Albany's Counseling Psychology Doctoral Program. From September 2008 to September 2011, I worked as a Psychologist in Northwestern Spain at the Unidad de Investigación en Intervención y Cuidado Familiar (UIICF), a university affiliated training site focusing

on providing and investigating evidence-based therapy interventions with at-risk immigrant and national youth and their families. My position included providing psychological services, designing, implementing and researching interventions for traumatized children, and training mental health and social service professionals. Most children in the program were referred by the regional child protective services department and many had experienced some sort of separation from primary caretakers.

3.  I have been a licensed clinical psychologist in the state of New York since 2012. Since then, I have been working at the Center for Child Health and Resiliency (CCHR), an outpatient primary care clinic of the Community Pediatrics Programming in the South Bronx, which provides psychological services to children and adults. The Community Pediatrics Program has been providing access to health care to some of New York's most impoverished children since 1987. All patients are served regardless of their ability to pay.

4.  I am also the co-founder and director of mental health for the Terra Firma Immigrant Youth Clinic, a program specifically serving unaccompanied immigrant youth, since its inception in September 2013. Terra Firma is embedded in the Center for Child Health and Resiliency (CCHR) a Federally Qualified Community Health Center (FQHC) of The Children's Hospital at Montefiore and the Children's Health Fund. I am responsible for the design, coordination and management of mental health services to recently arrived immigrant youth. The Terra Firma Immigrant Youth Clinic provides coordinated and comprehensive medical, legal, and mental health services designed especially for immigrant youth. We offer individual, family, and

group therapy interventions that aim at healing the impact of traumatic experiences, alleviating the levels of acute stress associated with immigration and adjustment to a new culture, and facilitating healthy reunification of children with caretakers.

5. I am making this declaration to express my opinions concerning the psychological and developmental impact that separation from primary caregivers has on children.

**Separation from Primary Caretakers Severely Disrupts Childrens' Psychological Functioning**

6. Unwanted and unexpected separation from parents may have severe consequences in a child's developmental processes and psychosocial functioning. When separated from their parents, high levels of anxiety and distress occur which impair the developmental trajectories in otherwise healthy children. The intense fear, sense of helplessness and vulnerability associated with forced separation from a parent causes a state of hyperarousal, attention deficits, depressive symptoms, and interference in their ability to communicate and relate to others. These difficulties may severely impact their cognitive functioning and, hence, their educational paths. Consequently, these children are more likely to have increased difficulty in school. Children who experience traumatic separation from a parent are more likely to develop negative perceptions of the world as unsafe and uncontrollable and of themselves as helpless and endangered. These perceptions affect how children navigate the world, how they communicate with others, and how they develop relationships with peers and other adults in their life.

7. Separation from the primary caregiver causes damaging ruptures in the attachment trajectory of these children. Attachment is the emotional bond that typically forms between infant and caregiver. It is the means by which the helpless infant gets

Exhibit 2, Page 32
18cv0428

primary needs met. It then becomes the engine of subsequent social, emotional, and cognitive development. The early experience of the infant stimulates growth of neural pathways that will sculpt enduring patterns of response to many things. The attachment experience affects personality development, particularly a sense of security, and research shows that it influences the ability to form stable relationships throughout life. It is said that the attachment system is the platform from which the child can develop and survive independently. When this system is ruptured, this ability is severed and it is likely to lead to long-term personality, interpersonal, cognitive and emotional sequelae. (Bowlby, J. (1988). A secure base: Parent-child attachment and healthy human development. New York: Basic Books).

8. In my clinical experience, the difficulties associated with separation are evident in the greater rate observed in these children of post-traumatic stress symptoms, depression and anxiety disorders, attention and hyperactivity, interpersonal challenges, poorer performance in school, and greater vulnerability to re-victimization and abuse than in the general population. Supporting my clinical observations is the accumulating research looking at the impact of separation from caregivers as a result of immigration issues, which shows greater levels of depression, greater anxiety, behavioral adjustment, attention deficit, and lower self-concept and sense of happiness in these children. Even living under the threat of separation has been shown to have a negative effect on children. There is the constant sense of vulnerability to losing a parent and the foundational needs of protection, safety, and nurturance that only the main attachment figure can provide, causing high levels of stress and resulting effects on children's development.

9. According to the American Psychological Association, the leading professional organization in the field of psychology, data suggests that the longer parents and children are separated, the greater the reported symptoms of anxiety and depression are for children. Sustained parental separation also predicts ongoing difficulty trusting adults and institutions, as well as reduced educational attainment. These negative outcomes of separation reflect the disruption of the parent-child relationship – a relationship that is a central part of healthy psychological development and a source of resilience for children exposed to traumatic life experiences. Sudden and unexpected family separation is also associated with negative outcomes for children, including housing instability, food insecurity, interrupted schooling and behavioral/emotional responses such as fear, anxiety, aggression, and changes to sleep and appetite. Separation from caregivers can have a long-term negative impact on children into adulthood (see http://www.apa.org/advocacy/immigration/fact-sheet.pdf).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in New York, NY on February 20, 2018.

**Cristina Muñiz de la Peña, Ph. D.**
Licensed Clinical Psychologist
Center for Child Health and Resiliency
Children's Hospital at Montefiore
890 Prospect Avenue, Bronx NY 10459
Phone 718-991-0605, Fax 347-498-2751
crmuniz@montefiore.org

# Exhibit 3

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Admitted Pro Hac Vice

Attorneys for Petitioner-Plaintiff
Additional counsel on next page

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

                    *Petitioner-Plaintiff*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE, Otay Detention Facility;
Kirstjen Nielsen, Secretary of DHS; Jefferson
Beauregard Sessions III, Attorney General of the
United States; Kevin K. McAleenan, Acting
Commissioner of CBP; L. Francis Cissna,
Director of USCIS; Pete Flores, San Diego Field

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF
MARSHA R. GRIFFIN**

Director, CBP; Fred Figueroa, Warden, Otay
Mesa Detention Center; Alex Azar, Secretary of
the Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

              *Respondents-Defendants.*

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*samdur@aclu.org*

## <u>DECLARATION OF MARSHA R. GRIFFIN</u>

I, Marsha R. Griffin, MD, make the following declaration based on my personal knowledge and declare under the penalty of perjury as set forth in 28 U.S.C. § 1746 that the following is true and correct.

1. I am a Board Certified Pediatrician through the American Board of Pediatrics (since 2006) and a licensed physician in the state of Texas. I am a Professor of Pediatrics at the University of Texas Rio Grande Valley School of Medicine (UTRGV SOM). I am the Co-Chair of the American Academy of Pediatrics (AAP) Immigrant Health Special Interest Group and a member of the AAP Council on Community Pediatrics. I am a co-author of the AAP Policy Statement "Detention of Immigrant Children," and a contributing author of the AAP Immigrant Health Toolkit. I am also the Director of the UTRGV SOM Division of Child and Family Health and the Director of the UTRGV SOM Department of Pediatrics Community for Children Program. My clinical and academic work is focused on the care of immigrant children along the border of Texas and Mexico.

2. I completed my M.D. degree at the University of Texas Health Science Center at San Antonio (UTHSCSA) in 2003, followed by pediatric residency at Baylor College of Medicine, Texas Children's Hospital from 2003 through 2005 and a final year of pediatric residency at UTHSCSA in 2006. I then spent over ten years serving in a Federally Qualified Health Center,

1

Brownsville Community Health Center in Brownsville, Texas, caring for the poorest of the poor along the southern border.  Most of my patients and their families were Spanish speaking only immigrant families.  Since 2014, I have volunteered my services at the Catholic Charities Humanitarian Center for recently released immigrants from the Customs and Border Protection Processing Center in McAllen, Texas.

3.  I am making this declaration based on my clinical experience as a pediatrician providing clinical care to immigrant children and academic expertise serving children and families.   This statement is my own and not on behalf of any group with whom I am affiliated.

4.  I have not personally met with the child in this lawsuit.  The following are my concerns, in general, about how separating a child from his or her parent would adversely affect his or her health, development and well-being, especially where there has already been trauma.

5.  Unless the child's safety is at risk from the parent, the separation of a child from the parent is harmful to the child.  This harm can be serious and long-lasting in the setting of previous trauma.

6.  Prolonged stress in the absence of a supportive relationship, such as his or her primary caregiver, can cause what is known as toxic stress.

7.  Medical research has provided evidence that childhood toxic stress can damage the developing brain and is associated with subsequent development

2

of physical health problems such as diabetes and heart disease, mental health problems, behavioral problems and school failure.

8. In my role as a physician, I attest that the separation of a child from a loving parent places a child at risk for the long-term serious impacts of toxic stress.

9. I have witnessed the painful effects of parental separation in the immigration setting. I examined a six-year-old girl exhibiting symptoms of possible PTSD and separation anxiety with hyperarousal, excessive clinginess and aggressive behavior after witnessing violence in her home country of Guatemala, and who was then subsequently separated from her father at the Rio Grande Valley Sector Customs and Border Processing Center. I have seen 10-year old boys held in locked chain-link enclosures at the same CBP Processing Center sobbing and reaching through the chain-link fencing screaming for their mothers, who were being held in separate enclosures approximately 50 feet away. There may be nothing more frightening for a vulnerable child than to be forcibly separated from their parent. Even this short-term separation will have lasting impact on their physical and emotional well-being.

10. Separation of children from their parents threatens the parent-child relationship, especially if the child believes that the parent should have been capable of preventing the separation and thus any imagined or real subsequent injury. In a child's mind, a parent is supposed to protect them

3

from evil and dangers.  When the parent or primary caregiver is seen as impotent in a dangerous situation, this threatens their trust in that caregiver and will be difficult to restore.

11. Based on my medical experience and training, I believe that, if at all possible, it is never in the best interest of a child to be separated from their parent, especially any child who was forced to flee their home country.

12. Prolonged separation from a parent can only exacerbate the irreparable short- and long-term damage to a child's health and wellbeing.

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Brownsville, Texas, on February 28, 2018.

Marsha R. Griffin, MD FAAP

# Exhibit 4

1   Lee Gelernt*                    Bardis Vakili (SBN 247783)
    Judy Rabinovitz*                ACLU FOUNDATION OF SAN
2   Anand Balakrishnan*             DIEGO &
3   AMERICAN CIVIL LIBERTIES        IMPERIAL COUNTIES
    UNION FOUNDATION                P.O. Box 87131
4   IMMIGRANTS' RIGHTS PROJECT      San Diego, CA 92138-7131
5   125 Broad St., 18th Floor       T: (619) 398-4485
    New York, NY 10004              F: (619) 232-0036
6   T:  (212) 549-2660              *bvakili@aclusandiego.org*
7   F:  (212) 549-2654
    *lgelernt@aclu.org*
8   *jrabinovitz@aclu.org*          *Admitted Pro Hac Vice*
9   *abalakrishnan@aclu.org*

10  *Attorneys for Petitioner-Plaintiff*
11  *Additional counsel on next page*

12              **UNITED STATES DISTRICT COURT**
13              **SOUTHERN DISTRICT OF CALIFORNIA**

14
15  Ms. L.,

16                      *Petitioner-Plaintiff,*
17  v.                                          Case No. 18-cv-00428-DMS-
                                                MDD
18  U.S. Immigration and Customs Enforcement
    ("ICE"); U.S. Department of Homeland Security
19  ("DHS"); U.S. Customs and Border Protection
    ("CBP"); U.S. Citizenship and Immigration
20  Services ("USCIS"); U.S. Department of Health    **DECLARATION OF LEE**
    and Human Services ("HHS"); Office of            **CARTER**
21  Refugee Resettlement ("ORR"); Thomas
22  Homan, Acting Director of ICE; Greg
    Archambeault, San Diego Field Office Director,
23  ICE; Joseph Greene, San Diego Assistant Field
24  Office Director, ICE, Otay Detention Facility;
    Kirstjen Nielsen, Secretary of DHS; Jefferson
25  Beauregard Sessions III, Attorney General of the
26  United States; Kevin K. McAleenan, Acting
    Commissioner of CBP; L. Francis Cissna,
27  Director of USCIS; Pete Flores, San Diego Field
28

1   Director, CBP; Fred Figueroa, Warden, Otay
2   Mesa Detention Center; Alex Azar, Secretary of
    the Department of Health and Human Services;
3   Scott Lloyd, Director of the Office of Refugee
    Resettlement,
4
5                           *Respondents-Defendants.*

6

7

8

9

10  Spencer E. Amdur (SBN 320069)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11  IMMIGRANTS' RIGHTS PROJECT
12  39 Drumm Street
    San Francisco, CA 94111
13  T:  (415) 343-1198
    F:  (415) 395-0950
14  *samdur@aclu.org*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

Ms. L.,

*Petitioner,*

v.

U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border
Protection ("CBP"); U.S. Citizenship and
Immigration Services ("USCIS"); U.S.
Immigration and Customs Enforcement
("ICE"); Kirstjen Nielsen, Secretary of DHS;
Jefferson Beauregard Sessions III, Attorney
General of the United States; Kevin K.
McAleenan, Acting Commissioner of CBP;
Thomas Homan, Acting Director of ICE; L.
Francis Cissna, Director of USCIS; Pete
Flores, San Diego Field Director, CBP; Greg
Archambeault, San Diego Field Office
Director, ICE; Fred Figueroa, Warden, Otay
Mesa Detention Center,

*Respondents.*

CASE NO. _____

## DECLARATION OF LEE CARTER

I, Lee Carter, Ed.D., make the following declaration based on my personal knowledge and

declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and

correct:

1. I have not directly treated the Petitioner but was asked to give this declaration based on

   my knowledge as a psychologist with over 35 years of experience working with

   vulnerable children and families, including immigrants and trauma survivors.

2. I am a Licensed Psychologist in the state of Texas and have been licensed since 1983. I

   have a solo practice at Cen-Tex Psychological Services and previously worked as a

   Psychologist at Waco Psychological Associates. In my current work I provide a wide

1

range of services including: psychological evaluation services to children, adolescents, and adults; consultation services to area child placement agencies, detention centers, courts, and attorneys; evaluations in settings including county jails, state prisons, shelters, juvenile detention centers, and outpatient settings; and expert courtroom testimony.

3. To all mental health professionals, the relationship between parent and child is considered the child's paramount link to psychological normalcy. It is through a lasting and meaningful bond with a parent that a child learns to trust self and others, develops a sense of permanence and belonging, and achieves the capacity for self-care and for showing empathy to others.

4. Forcibly separating a child from their parent is nothing short of overwhelming and deleterious to their well-being--emotionally, physically, and spiritually. Factors that could adversely and traumatically impact a child separated from their parent include, but are not limited to, the following: the suddenness of parent-child separation; the unexpected nature of the separation; use of force, threats, or intimidation; accessibility to the parent and/or other trusted caregivers; length of the forced separation; physical moves to locales too distant for parent-child contact; the child's familiarity (or lack thereof) with the environs to which they are relocated; the nature of the interactions between the child and those who are responsible for their forced removal; and the quality of physical, emotional, and psychological care offered while in confinement.

5. Virtually universally, traumatic separation from a parent will cause a child fear-based psychological injuries akin to deep loss and grieving. It is reasonable to assume that a displaced child will fear that their separation will be long lasting or permanent. A child may believe the worst about their parent's fate, to say nothing about the assumptions they

2

may make about their own pending circumstances. Their trauma will be made more intense if they have witnessed or have reason to believe their caregiver was mistreated or threatened by those responsible for their forced disconnection. Following a frightening event, a traumatized child may experience some or all of the following psychological symptoms: unwanted intrusive thoughts; sleep disturbance, including nightmares; re-living disturbing images of the separation; distorted assumptions about others, including those who could help them; accepting responsibility for the separation; broad changes in mood, including shame, depression, fear, guilt, anxiety, and depression; broad changes in behavior, including anger outbursts, defiance, aggression toward self and others, withdrawal; suicidal ideation; loss of pleasure in living; difficulty sustaining attention and concentration; and physical illnesses associated with psychological distress.

6. Children forcibly separated from a parent commonly struggle greatly to interpret their experience. Armed with assumptions and/or inaccurate information, confusion will dominate their thoughts and emotions. Ineffective coping strategies, such as denial, creating fantasy beliefs, repressing thoughts and feelings, acting out, reverting to an earlier developmental stage, overcompensation, or identifying with those responsible for their trauma may develop. The psychological effect of traumatic parent-child separation does not end when a child is reunited with her parent. Its effect can create permanent harm that influences them for the remainder of their lifespan.

3

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct, based on my personal knowledge. Executed in Waco, Texas on

February 21, 2018.


*Wm Lee Carter Ed.D.* 2/21/18

Lee Carter, Ed.D., Psychologist
Cen-Tex Psychological Associates
2921 Washington Ave.
Waco, TX 76710
(254) 732-3733
Wmleecarer@msn.com

4

# Exhibit 5

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Admitted pro hac vice*

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

*Petitioner-Plaintiff,*

v.

U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE, Otay Detention Facility; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF JULIE M. LINTON**

1
2
3
4
5

Director, CBP; Fred Figueroa, Warden, Otay
Mesa Detention Center; Alex Azar, Secretary of
the Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

*Respondents-Defendants.*

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*


**Wake Forest™**
School of Medicine

**Department of Pediatrics**

### DECLARATION OF JULIE M. LINTON, MD, FAAP

I, Julie M. Linton, MD, make the following declaration based on my personal knowledge and declare under the penalty of perjury as set forth in 28 U.S.C. § 1746 that the following is true and correct.

1. I am a Board Certified Pediatrician through the American Board of Pediatrics (since 2010) and a licensed physician in the state of North Carolina. I am an Assistant Professor of Pediatrics at the Wake Forest School of Medicine. I am the Co-Chair of the American Academy of Pediatrics (AAP) Immigrant Health Special Interest Group and a member of the AAP Executive Committee for the Council on Community Pediatrics. I am a co-author of the AAP Policy Statement "Detention of Immigrant Children," the AAP Policy Statement "Promoting Food Security for All Children," and the AAP Immigrant Health Toolkit. In the community, I co-founded and co-chair the Forsyth County Refugee Health Collaborative, and I am an active member of the Forsyth Adolescent Health Coalition. I am an Associate Director of the Integrating Special Populations Program at the Maya Angelou Center for Health Equity at Wake Forest. My clinical and academic work is focused on the care of immigrant children in North Carolina.

2. I completed my M.D. degree at the University of Pennsylvania School of Medicine in 2007, followed by pediatric residency at the Children's Hospital of Philadelphia in 2010. Throughout the seven years I spent in Philadelphia, I worked extensively with the Latino immigrant community as both a certified medical interpreter (Spanish-English) and a volunteer medical provider. Before joining the faculty at Wake Forest, I gained experience in academic and community pediatrics in rural and urban settings in Greenville, SC and in Winston-Salem, NC, with emphasis on medically underserved populations, including immigrant children.

3. I am making this declaration based on my clinical experience as a pediatrician providing medical care to children and clinical and academic expertise serving immigrant children and families. This statement is my own and not on behalf of any group with whom I am affiliated.

4. I have not personally met with the child in this lawsuit. The following are myt my general concerns about how separating a child from his or her parent would adversely affect his or her health, development and well-being, compounded when the child has an established history of trauma.

   a. Separation of children from parents, unless the child's safety is at risk at the hands of the parent, is indisputably harmful to children.[1-3]

   b. Prolonged stress in the absence of the buffering protection afforded by stable, responsive relationships is known as toxic stress.[4]

*Wake Forest University Health Sciences*
Medical Center Boulevard  • Winston-Salem, NC 27157-1063
(336) 713-5080• fax (336) 716-7554

Exhibit 5, Page 52
18cv0428

c. A growing body of evidence has demonstrated that childhood toxic stress threatens the developing brain and is associated with subsequent development of physical health problems such as diabetes and heart disease, mental health problems, and school failure.[4]

d. In my role as a physician, I attest that the separation of a child from a loving parent would place a child at risk for the impact of toxic stress.

e. In my clinical work in North Carolina, I have witnessed the ill effects of parental separation in the immigration setting. A teenage girl who fled her country of origin with her mother and younger brother was separated from her mother and brother for two days being reunited while being processed by immigration officials. When I saw this girl in my clinic and asked her about her journey, she became tearful and jittery. She reported that her mother and brother had been held in one "cage" with other mothers and young children, and the older children were kept in another "cage." Even this short-term separation had a lasting impact on her physical and emotional well-being.

f. Separation of children from their parents threatens the parent-child relationship. Two children I care for were separated from their mother for three months before being reunited. Both children (ages two and five years at the time of separation) suffered significant behavioral problems upon reunification, including sleep disturbances, withdrawal, and impulsivity. The five-year-old child blamed her mother for their separation, and it took her several months to recover trust in her family.

5. Based on my clinical experience and medical training, I feel that it is in the best interest of children who are seeking safe haven to be with their parent(s) at all times.

Prolonged separation from a parent can result in irreparable short- and long-term damage to a child's health and wellbeing.

_____ MD
Julie M. Linton, MD

2/16/18
February 16, 2018

Sources
1. Dreby J. U.S. immigration policy and family separation: the consequences for children's well-being. *Soc Sci Med.* 2014;132:245-251.
2. Suarez-Orozco C, Todorova I, Louie J. Making up for lost time: the experience of separation and reunification among immigrant families. *Fam Process.* 2002;41(4):625-643.
3. Linton J, Griffin M, Shapiro A. Detention of Immigrant Children. *Pediatrics.* 2017.
4. Garner AS, Shonkoff JP, Committee on Psychosocial Aspects of C, et al. Early childhood adversity, toxic stress, and the role of the pediatrician: translating developmental science into lifelong health. *Pediatrics.* 2012;129(1):e224-231.
5. Lorek A, Ehntholt K, Nesbitt A, et al. The mental and physical health difficulties of children held within a British immigration detention center: a pilot study. *Child abuse & neglect.* 2009;33(9):573-585.
6. Kronick R, Rousseau C, Cleveland J. Asylum-seeking children's experiences of detention in Canada: A qualitative study. *Am J Orthopsychiatry.* 2015;85(3):287-294.
7. Mares S, Jureidini J. Psychiatric assessment of children and families in immigration detention--clinical, administrative and ethical issues. *Australian and New Zealand journal of public health.* 2004;28(6):520-526.
8. Dudley M, Steel Z, Mares S, Newman L. Children and young people in immigration detention. *Current opinion in psychiatry.* 2012;25(4):285-292.

9. Fazel M, Stein A. Mental health of refugee children: comparative study. *British Medical Journal.* 2003;327:134.

10. Bailey C. The psychosocial context of mental health needs of unaccompanied children in United States immigration proceedings. *Graduate Student Journal of Psychology.* 2011;13(4-11).

11. Society for Community Research and Action - Community Psychology DotAPA. Policy statement on the incarceration of undocumented migrant families. *Am J Community Psychol.* 2016;57:255-263.

# Exhibit 6

1   Lee Gelernt*                         Bardis Vakili (SBN 247783)
2   Judy Rabinovitz*                     ACLU FOUNDATION OF SAN
    Anand Balakrishnan*                  DIEGO &
3   AMERICAN CIVIL LIBERTIES             IMPERIAL COUNTIES
    UNION FOUNDATION                     P.O. Box 87131
4   IMMIGRANTS' RIGHTS PROJECT           San Diego, CA 92138-7131
5   125 Broad St., 18th Floor            T: (619) 398-4485
    New York, NY 10004                   F: (619) 232-0036
6   T:  (212) 549-2660                   *bvakili@aclusandiego.org*
7   F:  (212) 549-2654
    *lgelernt@aclu.org*
8   *jrabinovitz@aclu.org*
9   *abalakrishnan@aclu.org*
                                         *Admitted pro hac vice*
10
    *Attorneys for Petitioner-Plaintiff*
11  *Additional counsel on next page*

12              **UNITED STATES DISTRICT COURT**
13            **SOUTHERN DISTRICT OF CALIFORNIA**

14  Ms. L.,
15
                     *Petitioner-Plaintiff*,
16
    v.
17                                          Case No. 18-cv-00428-DMS-
                                            MDD
18  U.S. Immigration and Customs Enforcement
    ("ICE"); U.S. Department of Homeland Security
19  ("DHS"); U.S. Customs and Border Protection
    ("CBP"); U.S. Citizenship and Immigration
20  Services ("USCIS"); U.S. Department of Health   **DECLARATION OF ALAN
21  and Human Services ("HHS"); Office of           SHAPIRO**
    Refugee Resettlement ("ORR"); Thomas
22  Homan, Acting Director of ICE; Greg
    Archambeault, San Diego Field Office Director,
23  ICE; Joseph Greene, San Diego Assistant Field
24  Office Director, ICE, Otay Detention Facility;
    Kirstjen Nielsen, Secretary of DHS; Jefferson
25  Beauregard Sessions III, Attorney General of the
26  United States; Kevin K. McAleenan, Acting
    Commissioner of CBP; L. Francis Cissna,
27  Director of USCIS; Pete Flores, San Diego Field
28

1 | Director, CBP; Fred Figueroa, Warden, Otay
2 | Mesa Detention Center; Alex Azar, Secretary of
  | the Department of Health and Human Services;
3 | Scott Lloyd, Director of the Office of Refugee
  | Resettlement,
4 |
5 | *Respondents-Defendants.*

6
7
8
9
10 | Spencer E. Amdur (SBN 320069)
   | AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11 | IMMIGRANTS' RIGHTS PROJECT
12 | 39 Drumm Street
   | San Francisco, CA 94111
13 | T: (415) 343-1198
14 | F: (415) 395-0950
   | *samdur@aclu.org*
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

                    *Petitioner,*

      v.

U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border
Protection ("CBP"); U.S. Citizenship and
Immigration Services ("USCIS"); U.S.
Immigration and Customs Enforcement
("ICE"); Kirstjen Nielsen, Secretary of DHS;
Jefferson Beauregard Sessions III, Attorney
General of the United States; Kevin K.
McAleenan, Acting Commissioner of CBP;
Thomas Homan, Acting Director of ICE; L.
Francis Cissna, Director of USCIS; Pete
Flores, San Diego Field Director, CBP; Greg
Archambeault, San Diego Field Office
Director, ICE; Fred Figueroa, Warden, Otay
Mesa Detention Center,

                    *Respondents.*

CASE NO. _____

## DECLARATION OF ALAN SHAPIRO

I, Alan Shapiro, MD, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I have not directly treated the Petitioner but was asked to give this declaration based on my knowledge as a pediatrician with over 28 years of experience working with immigrant families.

### Practice Treating Undocumented Immigrant Children and their Families

2. I am Pediatrician in the state of New York and have been licensed since 1990. I serve as an Assistant Clinical Professor of Pediatrics at Montefiore Medical Center and the Albert

1

Einstein College of Medicine. I have been employed as the Senior Medical Director for Community Pediatric Programs at the Children's Hospital at Montefiore for over ten years. Community Pediatric Programs, founded in 1987, provides comprehensive primary care to children and families at its federally qualified community health center, South Bronx Health Center/Center for Child Resiliency and its homeless health care program serving the NYC family shelter system.  I have personally provided pediatric care to under-served children since beginning my career with Community Pediatric Programs in 1990.

3.  In 2013, I co-founded Terra Firma, a medical-legal partnership program designed to provide integrated medical, mental health, and legal services for undocumented immigrant children, both unaccompanied and in family units.  This program was established to facilitate access to the above-mentioned services and improve medical, mental health and legal outcomes for undocumented immigrant children. Integral to our program is a psycho-educational support group designed to assist youth in acculturation and to help develop healthy behaviors and social networks.

4.  Terra Firma was founded to respond to the rise in unaccompanied immigrant children crossing the United States border, particularly from the Northern Triangle of Central America.  While 85 % of our patients come from Honduras, El Salvador and Guatemala, the other 15% come from predominantly South America and Africa.

5.  Our program is situated in a federally qualified community health center in the South Bronx where there is a large community of Central Americans and West Africans. As such, many of the unaccompanied immigrant children and newly arrived immigrant

2

families are moving into this community re-uniting with family members.  To date we have care for over 420 newly arrived immigrant children.

6.  The vast majority of patients we see in our program have lacked comprehensive medical care for the entirety of their lives. None have had mental health care in their countries of origin despite significant histories of trauma that they have sustained either directly or indirectly (e.g. having their lives threatened, being tortured or abused, witnessing the murder of a family member or friend). Since our program began we have also seen a rise in the number of families (predominantly women and children) who have also fled to the United States seeking safe haven. Many are escaping community and domestic violence and, most critically, lack of State protection. Most unaccompanied minors and newly arrived immigrant families state that they are fleeing for their lives.

7.  Depression, anxiety, adjustment disorders and post-traumatic stress disorder are common mental health diagnoses among this population. In a recent review of over 100 newly arrived patients, sixty eight percent have one or more mental health diagnosis.

8.  Once the decision has been made to flee, the family must make the perilous journey to the United States - Mexican border traveling thousands of miles and through many countries. Families endure hunger, exposure to the elements, injuries and sickness, extortion, physical assault, sexual violence and even kidnapping. These histories are frequently elicited in our work with children and families seen in our program as the majority of children and families have histories of compounded trauma when they arrive in the US and are placed in the immigration detention system.

Exhibit 6, Page 60
18cv0428

**Practice Interviewing Children and Families in Immigrant Detention**

9.  I also have significant experience visiting and interviewing children and families detained

    in immigrant detention centers in the United States from August 2015 – November 2017.

    I co-authored, *Detention of Immigrant Children*, (Linton JM, Griffin M, Shapiro AJ,

    AAP Council on Community Pediatrics. Detention of Immigrant Children. Pediatrics.

    2017;139(5):e20170483), that was endorsed by the American Academy of Pediatrics as a

    policy statement and published March 2017.  Our paper was based on an extensive

    literature review and first-hand visits to various detention sites (i.e. Customs and Border

    Protection Processing Centers, Office of Refugee Resettlement Children's Shelters and

    Family Detention Centers).  Our findings were alarming and showed that the US system

    of immigration detention is re-traumatizing to women and children, that medical care and

    especially mental health care was inconsistent and frequently inadequate, and that the

    practice of family separation was especially harmful.

10. Interviews I conducted with children and parents in family detention centers pointed to

    the importance of family unity as a key factor in their well-being. I personally

    interviewed families in Berks County Family Detention (Leesburg Pennsylvania) who

    were given the choice of family separation which would entail changing the child's

    immigration status into that of an *unaccompanied alien child* with a transfer to an ORR

    children's shelter while their parent would be placed in an adult immigration detention or

    removed. Not surprising, not one parent or child agreed to this offer. Typically, I would

    be told by children, "I would rather die than be separated from my mother," or "My

    mother is the only reason that I want to live."

## Published Research on Family Separation

11. Family separation is not only ineffective as a proposed deterrent strategy but also egregiously harmful to the welfare of children and their parents. In fact, leading medical and mental health professional organizations in the U.S. have pushed back against this policy.

12. The American Academy of Pediatrics has been vehemently opposed to immigrant family separation and family detention altogether and has characterized detention policy as "harsh and counterproductive" (American Academy of Pediatrics, *AAP Statement Opposing of Mothers and Children at the Border*, Mar. 4, 2017, https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx). The American Medical Association also adopted policies that oppose the detention and separation of families seeking refuge in the US (American Medical Association, AMA Adopts New Policies to Improve Health of Immigrants and Refugees (Jun. 12, 2017), https://www.ama-assn.org/ama-adopts-new-policies-improve-health-immigrants-and-refugees).

13. Family separation policy is an affront to the overwhelming body of scientific literature, which is replete with evidence of the irreparable harm and trauma to children caused by separation from their parents. Moreover, a parent or caregiver's role is to mitigate stress in a child's life. Family separation is doubly harmful; first traumatizing the child and then robbing them of that buffer. This type of unmitigated stress and can lead to what is known in the pediatric literature as *toxic stress*.

14. Researchers have shown how *toxic stress* can adversely affect brain development and leads to chronic mental health and medical conditions such as depression, post-traumatic

stress disorder and heart disease (Shonkoff, JP & Garner, AS, Committee on

Psychosocial Aspects of Child and Family Health; Committee on Early Childhood,

Adoption, and Dependent Care; Section on Developmental and Behavioral Pediatrics.

Early childhood adversity, toxic stress, and the role of the pediatrician:  translating

developmental science into lifelong health.  Pediatrics 2012;129(1),

http://pediatrics.aappublications. org/content/early /2011/12/21/ peds.2011-2663).

15. The practice of family separation has also been decried by child-welfare experts who

signed onto a letter demanding that this practice be abandoned (Young Center for

Immigrant Children's Rights, "More Than 200 Experts in Child Welfare, Juvenile Justice

Oppose Government Plans to Take Children From Parents at Border," Jan. 23, 2018,

https://www.theyoungcenter.org/stories/2018/1/16/experts-oppose-plans-to-take-children-

from-parents-at-border).

**Physician Recommendation**

16. It is my understanding that in this case, the mother and her seven year old child were

separated after making an arduous journey through many countries having escaped

threats against their lives in their home country of the Democratic Republic of Congo. It

is inconceivable to me as a pediatrician that this mother and child were separated. Based

on my vast experience working with children and families who have fled violence and

life threatening circumstances in their countries of origin, I can see no possible reason not

to maintain family unity. In fact, I can say confidently that separation can lead to further

trauma of this child (and her mother) with possible irreparable damage.

17. My recommendation for this family is to have immediate reunification and ideally release

from the immigration detention system altogether pending their asylum hearing.

6

18. I am available to provide further information.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct, based on my personal knowledge. Executed in New York, NY on

February 15, 2018.

Alan Shapiro, MD
Senior Medical Director
Community Pediatric Programs
Children's Hospital at Montefiore

Terra Firma: Healthcare and Justice for Immigrant Children
Co-Founder and Medical Director

853 Longwood Avenue
Bronx, N.Y. 10459
ashapiro@montefiore.org

7

# Exhibit 7

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*\*Admitted pro hac vice*

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

Ms. L.,

     *Petitioner-Plaintiff,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE, Otay Detention Facility;
Kirstjen Nielsen, Secretary of DHS; Jefferson
Beauregard Sessions III, Attorney General of the
United States; Kevin K. McAleenan, Acting
Commissioner of CBP; L. Francis Cissna,
Director of USCIS; Pete Flores, San Diego Field

Case No. 18-cv-00428-DMS-
MDD

**DECLARATION OF LISA R.
FORTUNA**

1    Director, CBP; Fred Figueroa, Warden, Otay
     Mesa Detention Center; Alex Azar, Secretary of
2    the Department of Health and Human Services;
     Scott Lloyd, Director of the Office of Refugee
3    Resettlement,
4
                          *Respondents-Defendants.*
5

6

7

8

9

10   Spencer E. Amdur (SBN 320069)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11   IMMIGRANTS' RIGHTS PROJECT
12   39 Drumm Street
     San Francisco, CA 94111
13   T:  (415) 343-1198
     F:  (415) 395-0950
14   *samdur@aclu.org*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

Ms. L.,

*Petitioner*,

v.

U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border
Protection ("CBP"); U.S. Citizenship and
Immigration Services ("USCIS"); U.S.
Immigration and Customs Enforcement
("ICE"); Kirstjen Nielsen, Secretary of DHS;
Jefferson Beauregard Sessions III, Attorney
General of the United States; Kevin K.
McAleenan, Acting Commissioner of CBP;
Thomas Homan, Acting Director of ICE; L.
Francis Cissna, Director of USCIS; Pete
Flores, San Diego Field Director, CBP; Greg
Archambeault, San Diego Field Office
Director, ICE; Fred Figueroa, Warden, Otay
Mesa Detention Center,

*Respondents*.

CASE NO. _____

<u>**DECLARATION OF LISA R. FORTUNA**</u>

I, Lisa R. Fortuna, MD, MPH, M.Div., make the following declaration based on my personal

knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the

following is true and correct:

1. I have not directly treated the Petitioner but was asked to give this declaration based
   on my knowledge as a psychiatrist with over 20 years of experience working with
   vulnerable children and families, including immigrants and trauma survivors.

2. I am a graduate of Yale University (BA in Psychology 1991); I earned a Doctor of
   Medicine (MD) degree from New Jersey Medical School in 1996; a Masters of Public
   Health (MPH) from Hunter College School of Public Health, City University of New
   York in 2000, a Masters of Divinity in 2012 and I completed a Pediatric Health

Services Research Fellowship at Harvard Medical School, Boston in 2003.

3. I am board certified in general psychiatry and child and adolescent psychiatry (Diplomat of the American Board of Psychiatry and Neurology), and addiction medicine. I am a health services researcher and have been an investigator on both national and international studies of immigrant and refugee mental health and the impact of trauma and post-traumatic stress in children. My work has contributed to the field's understanding of treatment needs and interventions for immigrant and refugee children and adults. My clinical training and experience in the practice of psychiatry and child and adolescent psychiatry offers me skills and specialization in the psychological and social development of individuals across the life span and the impact of biology, traumatic stress and environment on mental health.

4. I am the Director of the Section (Division) of Child and Adolescent Psychiatry for the Boston Medical Center (BMC), and Assistant Professor in the Department of Psychiatry at Boston University School of Medicine, where I conduct child behavioral health and disparities research and practice clinical psychiatry (treating children and youth ages 3 to 21). Our clinical division includes offering child-parent psychotherapy, a dyadic approach for young children (0-5 years of age) and parents who have both experienced trauma. In this latter context I have developed clinical experience in working with young immigrant and refugee children who have experienced trauma, including witnessing violence and traumatic separations.

5. My clinical career has focused on treating a range of childhood psychiatric disorders and I have particular interest and expertise in Post-Traumatic Stress Disorder (PTSD), access to care, and quality of treatment for underserved and vulnerable populations

including children, immigrant and refugee populations. I am a cofounder of the Refugee Immigrant Assistance Center Community Counseling (RIAC-CC), a mental health clinic in Boston. My clinical work at RIAC involves the mental health assessment and treatment of immigrant and refugee patients. I have served as a clinical investigator on several National Institutes of Health funded research projects with most of this work focused on immigrant mental health. I conduct collaborative research with colleagues both nationally and internationally, including most recently a clinical intervention research study of Latino immigrants in the United States and Spain.

6.   I have published several articles and a book in the field of psychiatry, largely on issues related to immigrant (including unaccompanied minors) and minority mental health, PTSD and adolescent substance use disorders. I have included my curriculum vitae with this declaration, attached hereto as Appendix 1. The following are select publications relevant to this declaration:

a.   **Fortuna LR**, Porche MV, Alegria M. Political violence, psychosocial trauma, and the context of mental health services use among immigrant Latinos in the United States. *Ethnicity & Health* 2008 Nov;13(5):435-63. PMCID: PMC2771411.

b.   Porche, MV, **Fortuna, LR,** Lin, J. & Alegria M. (2011) Childhood trauma events and psychiatric disorders as correlates of school dropout in a national sample of young adults, *Child Development. 82,* 982-998. PMCID: PMC3089672.

c.   **Fortuna LR**, Alvarez K, Ramos Ortiz Z, Wang Y, Mozo Alegría X, Cook

BL, Alegría M. Mental health, migration stressors and suicidal ideation among Latino immigrants in Spain and the United States. *European Psychiatry*. 2016 Aug; 36:15-22. PMID: 27311103.

d.     Ramos Z, **Fortuna L.R,** Porche MV, Wang Y, Shrout PE, Loder S, McPeck S, Noyola N, Toro M, Carmona R, Alegría M. Posttraumatic Stress Symptoms and their Relationship to Drug and Alcohol use in an International Sample of Latino Immigrants. J *Immigrant and Minority Health*. 2016 May 5. PMID: 27150593.

7.   To prepare this declaration, I reviewed the scientific literature in addition to relying on the knowledge accumulated during my education, research and clinical experience described above.

8.   It is my opinion that immigrant and refugee young children who have faced psychological trauma are at heightened risk of suffering from irreversible, psychological harm and especially if a child also experiences a traumatic separation from their parent. Based on my review of scientific and medical literature, as well as my practice in the field, my opinions are as follows.

**Separation for a Primary Attachment Figure is Psychologically Hazardous for Young Immigrant and Refugee Children**

9.    Children who are detained are at risk of a variety of psychosocial and developmental problems linked to their detention experiences. A variety of factors contribute to the distress experienced by children who are held in detention, including previous trauma experienced in their home country or during migration, disruption of the family unit, separation from parents and poor and unsafe conditions of detention (Young & Gordon,

2016).[1]

10. The study of attachment has illuminated the critical role of early caregiving relationships in fostering healthy development and forming a basis for future relationships and mental health well-being (Ainsworth, Blehar, Waters, & Wall, 2015; Bowlby, 1988; Freud & Burlingham, 1943; Lyons-Ruth, 1996; Lyons-Ruth, Zoll, Connell, & Grunebaum, 1986). The loss of a parent is a severe hardship for any child; children who have suffered traumatic stress and other losses as many refugee/ asylum seeking children have, are particularly vulnerable to negative psychological consequences related to separation from parent.

11. Risk factors known to be especially hazardous for children include separations from their primary attachment figure and loss or disappearance of a parent, exposure to traumatic events such as abuse, and damaging social environments (Carlson, 2012).

12. In my clinical practice, I have evaluated several children asylum seekers whose anxiety, depression and post-traumatic stress are worsened during periods of uncertainty, times of separation from primary caregiver and when he or she is unable to have the physical and emotional protection from his or her parent.

**Children Who Have Experienced Traumatic Loss are at Risk of Suffering Irreparable Harm to Their Brain Development**

13. Severe stress such as traumatic separations in infancy and childhood may have serious, long-lasting effects on a child's brain development, affecting future manifestations of negative emotions, maladaptive behaviors, and conflictual attachments. As a result, children thus affected operate in a survival mode, rather than learning to flexibly adapt

---

[1] Complete citations for medical literature cited herein is referenced in Appendix 2.

to environmental demands

14. Factors such as the level of supervision, familial and social support make a difference in the level of distress children experience. Hodes et al., (2008) discovered that PTSD and depressive disorders were significantly higher in children with low-support living arrangements as compared to those with good social supports and attachments.

15. In addition to the issue of support, a host of risks and influences create and exacerbate mental distress among children including if children have lost their home, belongings, family and friends (Carlson et al., 2012). Other influences on stress include language barriers, uncertainty about asylum status, fears of deportation, the process of immigration itself, and the lack of personal and structural support all contribute to the distress experienced by a child and the long-term risk to their cognitive and emotional development (Bronstein & Montgomery, 2011).

16. The mental health risks thus far described may surface or be aggravated when children are placed in confined, institutional settings and are also separated from family members (Lee, 2012). Social isolation and being deprived of ones caretakers are risk factors for poor psychological outcomes (Ehnthold & Yule, 2006; Ellis, et al., 2008; Grove & Zwi, 2006).

**Children Who Have Experienced Traumatic Loss Are at Risk of Suffering Irreparable Harm to their Mental Health**

17. Traumatic exposures, especially long term and recurrent, combined with the loss of attachment figures and social instability can impede personality and identity development and subsequently impair functioning (Howard et al, 2011; Smid et al., 2011).

18. Bronstein and Montgomery (2011) examined the developmental impact on refugee immigrant children highlighting the uncertainty that is created for these children due to separations from attachment figures and the challenges this presents to their learning, functioning and well-being. Without parents, family and others who care about them to fill emotional needs, a child's adaptive processes are impaired by their uncertain future prospects (Chavez & Menjivar, 2010). In the long term, this can result in school failure, drop out, persistent poverty and hopelessness and even suicidality later in life (Fortuna et al., 2016; Porche et al., 2011).

19. Children of families seeking asylum have by definition experienced traumatic stress, often severe in nature. The more terror inducing the trauma is and the longer its duration is, particularly when combined with the absence of a parent, the more devastating its effects on children (Boothby, 1994). Trauma exposure in children and adolescents can impede personality development, causing disturbances in sense of self, impairment of basic trust, attachment disorders, and sharp deterioration in functioning (van der Kolk, 1996; Carlson, 2012). This adversely impacts interpersonal attachments and developments in the future (Moro, 2003).

20. It is my opinion that when refugee and immigrant children, especially young children are separated from their parent and primary attachment figure, they are placed at significant risk for irreparable harm in regards to brain development, psychological health and thus a trajectory of poor mental health, learning and development throughout their life. I treat children in my clinical practice who range the ages of 3 to 17 years old who are still recovering from past separations and traumatic losses. Children who are seeking asylum who are accompanied by their parents, should be maintained together

with their parent/ primary attachment figure. Imposing a traumatic separation upon a child and their parent further increases the risk that the child will develop long-term psychological consequences and that the dyadic relationship will be harmed.

**Clinical Recommendation**

21. Based on my clinical experience and the foregoing analysis, it is my opinion that separating children from their parents has a real and substantial risk of leading to long-term (and irreversible) physiological, developmental and psychological problems. If children and parents are detained it is absolutely necessary, that they are not separated from one another.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Boston, Massachusetts on February 17, 2018

_____

Lisa R. Fortuna, MD, MPH, M.Div.

## Appendix 2

Ainsworth, M. D. S., Blehar, M. C., Waters, E., Wall, S. N. (2015). Patterns of attachment: A psychological study of the strange situation. New York: Psychology Press.

Boothby, N. (1994). Trauma and violence among refugee children. In A. J. Marsella, T. Bornmann, S. Ekblad,& J. Orley (Eds.), Amidst peril and pain: The mental health and well-being of the world's refugees (pp.239–259). Washington, DC: American Psychological Association.

Bowlby, J. (1988). A secure base. New York: Routledge.

Bronstein, I., & Montgomery, P. (2011). Psychological distress in refugee children: a systematic review. *Clin Child Fam Psychol Rev, 14*(1), 44-56. doi:10.1007/s10567-010-0081-0

Carlson, B. E., Cacciatore, J., & Klimek, B. (2012). A risk and resilience perspective on unaccompanied refugee minors. *Social Work, 57*(3), 259-269. doi:10.1093/sw/sws003

Chavez, L. and Menjívar, L. (2010). Children Without Borders: A Mapping of the Literature on Unaccompanied Migrant Children to the United States."*Migraciones Internacionales*, 5 (3): 71-111.

Ehntholt, K. A., & Yule, W. (2006). Practitioner review: assessment and treatment of refugee children and adolescents who have experienced war-related trauma. *J Child Psychol Psychiatry, 47*(12), 1197-1210. doi:10.1111/j.1469-7610.2006.01638.x

Fortuna, L. R., Alvarez, K., Ramos Ortiz, Z., Wang, Y., Mozo Alegria, X., Cook, B. L., & Alegria, M. (2016). Mental health, migration stressors and suicidal ideation among Latino immigrants in Spain and the United States. *Eur Psychiatry, 36*, 15-22. doi:10.1016/j.eurpsy.2016.03.001

Freud, A. & Burlingham, D. T. (1943). War and children. New York: Medical War Books.

Hodes, M. (2008). Psychopathology in refugee and asylum seeking children. In M. Rutter, D. Bishop, D. Pine, S. Scott, J. Stevenson, E. Taylor, A. Thapar, M. Rutter, D. Bishop, D. Pine, S. Scott, J. Stevenson, E. Taylor, & A. Thapar (Eds.), *Rutter's child and adolescent psychiatry.* (pp. 474-486): Wiley-Blackwell.

Howard, K., Martin, A., Berlin, L. J., & Brooks-Gunn, J. (2011). Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families. *Attachment & Human Development*, *13*(1), 5–26. http://doi.org/10.1080/14616734.2010.488119

Lyons-Ruth, K. (1996). Attachment relationships among children with aggressive behavior problems: the role of disorganized early attachment patterns. *J Consult Clin Psychol, 64*(1), 64-73.

Lyons-Ruth, K., Zoll, D., Connell, D., & Grunebaum, H. U. (1986). The depressed mother and her one-year-old infant: environment, interaction, attachment, and infant development. *New Dir Child De v*(34), 61-82.

Porche, M. V., Fortuna, L. R., Lin, J., & Alegria, M. (2011). Childhood trauma and psychiatric disorders as correlates of school dropout in a national sample of young adults. *Child Dev, 82*(3),

982-998. doi:10.1111/j.1467-8624.2010.01534.x

Van der Kolk, B.A., Pelcovitz, D., Roth, S., Mandel, F., McFarlane, A., & Herman, J.L. (1996). Dissociation, somatization, and affect dysregulation: The complexity of adaptation to trauma. *American Journal of Psychiatry, 153*(7), 83–93.

# Exhibit 8

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Admitted pro hac vice*

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., <br><br> *Petitioner-Plaintiff,* <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE, Otay Detention Facility; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field | Case No. 18-cv-00428-DMS-MDD <br><br><br> **DECLARATION OF KAREN MELIKIAN** |

1  Director, CBP; Fred Figueroa, Warden, Otay
   Mesa Detention Center; Alex Azar, Secretary of
2  the Department of Health and Human Services;
   Scott Lloyd, Director of the Office of Refugee
3  Resettlement,
4
                        *Respondents-Defendants.*
5

6

7

8

9

10  Spencer E. Amdur (SBN 320069)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11  IMMIGRANTS' RIGHTS PROJECT
12  39 Drumm Street
    San Francisco, CA 94111
13  T:  (415) 343-1198
    F:  (415) 395-0950
14  *samdur@aclu.org*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L.,<br><br>     *Petitioner,*<br>  v.<br><br>U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; Thomas Homan, Acting Director of ICE; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field Director, CBP; Greg Archambeault, San Diego Field Office Director, ICE; Fred Figueroa, Warden, Otay Mesa Detention Center,<br><br>     *Respondents.* | CASE NO. _____ |

## DECLARATION OF KAREN MELIKIAN

I, Karen Melikian, PhD, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I have not directly treated the Petitioner but was asked to give this declaration based on my knowledge as a licensed social worker with 36 years of experience working with vulnerable children and families, including immigrants and trauma survivors.

2. I am a Social Worker in the state of Massachusetts and have been licensed since 1982. I earned my MSW at the University of Pennsylvania School of Social Work in 1980 and my PhD from Simmons College School of Social Work in 1996. I have worked as a Teaching Associate in Psychiatry at McLean Hospital since 2005 and as a faculty member for the Child and Adult Graduate Programs at the Boston Psychoanalytic Society and Institute since 2015.

3. My professional experience includes crisis and long term clinical work with children and families at different developmental stages and in various medical and community based settings. In these roles, I have been involved with countless immigrant families as well as a variety of situations where children and parents have been separated. Additionally, I have assessed numerous children and adults who are seeking asylum through my volunteer work with Physicians for Human Rights]

4. It is my understanding that, in this case, the Petitioner and 7-year-old daughter presented at the United States border requesting asylum after fleeing the Democratic Republic of the Congo. Mother and daughter were subsequently separated, with mother now in a detention center in San Diego and the daughter, unaccompanied by any family member, now residing in an ORR facility in Chicago.

5. Based on my work experience, I can attest that the separation of any child from their parent presents complicated obstacles for healthy functioning and development. Separating asylum-seeking parents and their children who are already fleeing traumatic circumstances will have severe negative medical consequences. It is my professional opinion that this current situation perpetuates extreme emotional destabilization and purposeful neglect of this child's basic needs.

6. Parents provide stability, containment, and comfort to their children to enable healthy functioning and growth. Communities in chaos create an already fragile environment for the developing child. Parental relationships help to ameliorate the impact of strife on children by modeling unity in the face of stressors. Children need their parent's physical presence to successfully recover from traumatic events in their lives.

7. In the absence of secure attachments to known and trustworthy adults, children become confused and overwhelmed with the effects of sadness, fear, and guilt, making it difficult for them to think clearly and maintain realistic hope for the future. Even the most resilient child will experience debilitating effects of trauma, including anxiety, despair, disturbance of sleep and hyper arousal, when separated from their parent.

8. Parental protection, nurturance, and guidance speeds recovery and supports better coping skills for traumatized children. State of the art treatment for parents and children who have experienced trauma places the family itself at the center of the service delivery. Adaptation to demanding situations is facilitated by remaining connected to the individual that the child loves and depends on for a sense of continuity.

9. Awareness of the destructive consequences of disrupted family ties and faith in the ameliorative value of family unity is a proven prerequisite for both the child's and the parent's mental and physical survival.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Boston, Massachusetts on [DATE]

2.17.18

Karen Melikian, PhD
NPI 1023096633
EIN 27-1074333
1577 Beacon Street
Brookline, MA 02446
(617) 734-0089
kmelikian@partners.org

1

# Exhibit 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Ms. L.,

*Petitioner-Plaintiff,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE, Otay Detention Facility;
Kirstjen Nielsen, Secretary of DHS; Jefferson
Beauregard Sessions III, Attorney General of the
United States; Kevin K. McAleenan, Acting
Commissioner of CBP; L. Francis Cissna,
Director of USCIS; Pete Flores, San Diego Field
Director, CBP; Fred Figueroa, Warden, Otay
Mesa Detention Center; Alex Azar, Secretary of
the Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

*Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**UNRESTRICTED DECLARATION OF ELIZABETH LOPEZ**

I, Elizabeth Lopez, make the following declaration based on my personal

knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746

that the following is true and correct:

1. I am the immigration attorney for Plaintiff-Petitioner, Ms. L, and represent

her in her immigration proceedings. I was retained on February 12, 2018.

Prior to that date, Ms. L. had no legal representation.

Exhibit 9, Page 84
18cv0428

2.  I am currently employed at the Southern California Immigration Project in San Diego, CA.

3.  During one of my visits with Ms. L. in the Otay Mesa Detention Center in San Diego, CA, she provided me with a copy of her daughter, S.S.'s, school identification card. This ID is from S.S.'s school in the Democratic Republic of the Congo and has a picture of S.S. The picture is attached as an addendum to this declaration (restricted).

4.  On or about November 1, 2017, Ms. L. and her daughter, S.S., presented themselves at a port of entry and expressed a fear of returning to the Congo. Although Ms. L. and S.S. speak only Lingala, they were able to communicate their fear of returning to the Congo in the little bit of Spanish they knew. Sometime after arriving in the United States, Ms. L. was given a credible fear interview by an asylum officer. To satisfy the credible fear standard, an asylum applicant must demonstrate a significant possibility that she will ultimately obtain asylum in the United States. Ms. L. passed her credible fear interview, and was then placed into full immigration proceedings. Ms. L. fled her home in the Democratic Republic of the Congo in fear of her life. She is catholic and sought shelter with S.S. in a church for several days before eventually escaping the Congo.

I declare under penalty of perjury under the laws of the United States of

1    America that the foregoing is true and correct, based on my personal knowledge.

2    Executed in San Diego, California on March 1, 2018.

3

4

5    _____
     Elizabeth Lopez
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 10

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*\*Admitted Pro Hac Vice*

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

          *Petitioner-Plaintiff*,

v.

U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE, Otay Detention Facility; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; Kevin K. McAleenan, Acting Commissioner of CBP; L. Francis Cissna, Director of USCIS; Pete Flores, San Diego Field

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF MS. L.**

1    Director, CBP; Fred Figueroa, Warden, Otay
     Mesa Detention Center; Alex Azar, Secretary of
2    the Department of Health and Human Services;
     Scott Lloyd, Director of the Office of Refugee
3    Resettlement,

4
                         *Respondents-Defendants.*
5

6

7

8

9

10   Spencer E. Amdur (SBN 320069)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11   IMMIGRANTS' RIGHTS PROJECT
12   39 Drumm Street
     San Francisco, CA 94111
13   T:  (415) 343-1198
     F:  (415) 395-0950
14   *samdur@aclu.org*
15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                Exhibit 10, Page 89
                                                18cv0428

## **DECLARATION OF MS. L.**

I, Ms. L, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Plaintiff-Petitioner in this case.

2. S.S. is my biological daughter.

3. S.S. was taken from me approximately 4 days after we arrived at the United States border and were detained. I do not know why we were separated. She was taken into another room and then I heard her screaming: Don't take me away from my mommy!

4. I worry about SS. constantly and don't know when I will see her. We have talked on the phone only a few times since she was taken away from me. When we talk she is crying and very scared.

5. Because S.S. was taken away from me, I am depressed. It is hard for me to sleep at night and I do not have the appetite to eat.

6. I hope I can be with my daughter as soon as possible. I miss her so much and am scared for her.

7. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in San Diego, California on March 1, 2018.



Ms. L