Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*          *Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: March 19, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **Memorandum in Support of Classwide Preliminary Injunction**<br><br>CLASS ACTION<br><br>Hearing Date: April 27, 2018<br>Time: TBD<br>Courtroom: 13A<br>Judge: Hon. Dana Sabraw |
| *Respondents-Defendants*. | |

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ............................................................................ 3

  A.  Plaintiff Ms. L. ................................................................................. 4

  B.  Plaintiff Ms. C. ................................................................................. 6

ARGUMENT ........................................................................................................ 7

    I.   THE CLASS MEMBERS ARE LIKELY TO SUCCED ON THE
        MERITS OF THEIR CLAIMS. ................................................................ 8

      A. The Government's Separation of Class Members and Their
         Children Violates Due Process. ............................................................ 8

         1.   The class members are protected by due process. ....................... 8

         2.   The separation of class members and their children is
             unconstitutional absent a demonstration in a hearing that the
             parent is unfit or presents a danger to the child. ........................ 11

      B. The Government's Separation of Class Members and Their
         Children Violates the APA Because It Is Arbitrary and Capricious. .. 13

    II.  THE GOVERNMENT'S SEPARATION OF CLASS MEMBERS
        FROM THEIR CHILDREN HAS CAUSED AND WILL CONTINUE
        TO CAUSE IRREPARABLE INJURY ................................................ 15

    III. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST
        WEIGH DECIDELY IN FAVOR OF REUNITING CLASS
        MEMBERS WITH THEIR CHILDREN ............................................ 18

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).................................................................8

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ...........................................................................18

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014)...........................................................7, 18

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008)............................................................14

*Baharona-Gomez v. Reno*, 167 F.3d 1228, 1233 (9th Cir. 1999) .............3

*Carrillo v. Schneider Logistics, Inc.*, No. 11-cv-8557, 2012 WL 556309, at *9
(C.D. Cal. Jan. 31, 2012)......................................................................3

*cert. denied*,
539 U.S. 941 (2003) ...........................................................................10

*Chi Thon Ngo v. INS*,
192 F.3d 390 (3d Cir. 1999)................................................................10

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008)............................................................14

*Duchesne v. Sugarman*,
566 F.2d 817 (2d Cir. 1977)................................................................12

*Elrod v. Burns*,
427 U.S. 347 (1976) ...........................................................................15

*Encinco Motorcars, LCC v. Navarro*,
136 S. Ct. 2117 (2016) .......................................................................14

*Halet v. Wend Investment Co*,
672 F.2d 1305 (9th Cir. 1982).............................................................12

*Heartland Acad. Comm. Church v. Waddle*,
427 F.3d 525 (8th Cir. 2005)..............................................................13

*Int'l Refugee Assistance Project v. Trump*,
--- F.3d ---, 2018 WL 894413, at *18 (4th Cir. Feb. 15, 2018) ...........17

*J.B. v. Washington County*,
127 F.3d 919 (10th Cir.1997)..............................................................17

*Jordan by Jordan v. Jackson*,
15 F.3d 333 (4th Cir. 1994).................................................................12

*Judulang v. Holder*, 132 S. Ct. 476, 487 (2011) ......................................14

18cv0428

*Kaszuba v. Fidelity Nat'l Default Servs.*,
   2011 WL 601525 (S.D. Cal. Feb. 10, 2011) (Sabraw, J.)......................8

*Kwai Fun Wong v. United States*,
   373 F.3d 952 (9th Cir. 2004)...........................................9, 10, 11

*Lassiter v. Dep't of Social Servs.*,
   452 U.S. 18 (1981) ...................................................................12

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001)...................................................12

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011)...................................................15

*Lynch v. Cannatella*,
   810 F.2d 1363 (5th Cir.1987)..................................................10

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ......................................................................9

*McLaughlin v. Pernsley*,
   876 F.2d 308 (3d Cir. 1989)....................................................17

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012)..............................................15, 19

*Mt. St. Helens Mining & Recovery Ltd. Partnership v. United States*,
   384 F.3d 721 (9th Cir. 2004)....................................................13

*Nicolson v. Pappalardo*,
   685 F.Supp.2d 142 (D. Me. 2010) ...........................................17

*Plyler v. Doe*,
   457 U.S. 202 (1982) ....................................................................9

*Quillon v. Walcott*, 434 U.S. 246, 255 (1978)........................................12

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013)..................................................19

*Rodriguez-Fernandez v. Wilkinson*,
   654 F.2d 1382 (10th Cir. 1981).................................................11

*Rosales-Garcia v. Holland*,
   322 F.3d 386 (6th Cir. 2003) (en banc)......................................10

*Sammartano v. First Judicial District Court*,
   303 F.3d 959 (9th Cir. 2002)....................................................19

*Santosky v. Kramer*,
   455 U.S. 745 (1982) ..................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Southerland v. City of New York*,
   680 F.3d 127 (2d Cir. 2012) ............................................................... 13

*Stanley v. Illinois*,
   405 U.S. 645 (1972) ........................................................................... 15

*Troxel v. Granville*,
   530 U.S. 57 (2000) (plurality op.) ...................................................... 12

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001) ............................................................... 13

*United States v. Wolf Child*,
   699 F.3d 1082 (9th Cir. 2012) ........................................................... 12

*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ............................................................. 15

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................. 7

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ............................................................................. 9

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................................. 9

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) (Scalia, J., dissenting) ..................................... 10

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................ 13

**Other Authorities**

Policy Statement, Am. Acad. of Pediatrics, *Detention of Immigrant* Children, Mar.
   2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-
   0483 ................................................................................................... 16

**INTRODUCTION**

This case involves the government's forcible separation of parents from their minor children. Hundreds of immigrant parents who have just arrived in the United States are having their children taken away from them. Many of these parents and their children are seeking asylum, and have been found by the government to have a credible fear of persecution in their home countries. And yet, without any demonstration that the parents pose any danger to their children, the government is separating these families, transferring the children to detention centers around the country and forcing them to sit in detention alone and afraid. This cruel practice inflicts enormous psychological harm, and could do lasting damage to the children's emotional and cognitive well-being.

The Plaintiffs are a proposed class of noncitizen parents whose children were taken from them and placed in detention facilities, often thousands of miles away, despite the lack of any demonstration by the government that Plaintiffs pose a danger to their children. There are hundreds of such cases around the country, and the numbers of such cases have increased dramatically in recent months.

The experiences of the two Named Plaintiffs, Ms. L. and Ms. C., illustrate the government's family separation practice. Ms. L., a Congolese asylum seeker, arrived in the United States with her 7 year-old daughter, S.S. Although Ms. L expressed her desire to apply for asylum—and subsequently passed a credible fear interview—her daughter was forcibly taken from her, with no explanation, and

18cv0428

certainly no demonstration by the government that Ms. L. was a danger to S.S. They were kept apart for more than four months.  After this lawsuit was filed, the government abruptly released Ms. L. and performed a DNA test, which confirmed that she is S.S.'s mother.  Late in the night on March 16th, the government finally reunified Ms. L. and her daughter.

Likewise, Ms. C. is a Brazilian asylum seeker who came to the United States with her 14 year-old son, J.  Although she told border guards that she planned to seek asylum—and subsequently passed a credible fear interview—she was prosecuted for the misdemeanor of illegal entry and her son was taken from her. After she served a brief sentence, she was returned to immigration custody. However, without explanation, and certainly no demonstration by the government that Ms. C. is a danger to J., the government has refused to reunite them for the last five months.

The proposed class is likely to succeed on the merits of its claims.  As set forth below, and in an amicus brief by the country's top immigration law professors, it has long been settled that all "persons" present in the United States are entitled to due process under the Fifth Amendment, regardless of their immigration status.  It has likewise been established for more than a century that the Due Process Clause protects family unity, especially a parent and child.  And, as explained in an amicus brief signed by dozens of children's rights groups throughout the country, as well as a declaration submitted by the country's

foremost children's law expert, the only reason the law recognizes as sufficient to tear a young child away from her parent is clear evidence of parental abuse or unfitness.  The government has not demonstrated any such evidence for any of the class members.

The government's separation practice also violates the Administrative Procedure Act (APA) because it is arbitrary and capricious.  The government has given no reason for its family separation practice, much less a reasoned explanation that would justify such an extraordinary measure.  Defendants' harmful and unexplained practice therefore contravenes the APA's basic requirement of reasoned government action.

Plaintiffs have moved for class certification.  *See* ECF No. 42.  In this motion, Plaintiffs seek a classwide preliminary injunction, upon this Court either granting or provisionally granting the class certification motion.  *See, e.g.*, *Carrillo v. Schneider Logistics, Inc.*, No. 11-cv-8557, 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) ("courts routinely grant provisional class certification for purposes of entering [preliminary] injunctive relief" under Rule 23(b)(2)) (citing *Baharona-Gomez v. Reno*, 167 F.3d 1228, 1233 (9th Cir. 1999)).

## STATEMENT OF FACTS

Plaintiffs are a proposed class of immigrant parents who have been forcibly separated from their children upon entering the United States.  The proposed Rule 23(b) class is defined as:

1
2
3
4

> All adult parents nationwide who (1) are or will be detained in immigration custody by the Department of Homeland Security, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

5
6
7
8
9
10
11
12
13
14
15
16

There are hundreds of class members across the country. *See* Declaration of Michelle Brané, ECF No. 42-1, Ex. 14, ¶ 5 (noting more than 400 cases of parent-child separation); Declaration of Shalyn Fluharty, ECF No. 42-1, Ex. 15, ¶ 2. (estimating hundreds of children who have been separated from a parent at the border); Declaration of Mayra Jimenez, Director of the Children's Program at RAICES, ECF No. 42-1, Ex. 13, ¶ 4 ("We have seen over 100 situations of children separated from their parents at the time of apprehension and continue to see more."); Declaration of Jessica Jones, Ex. 18, ¶ 5-8 (describing marked increase since August 2017).

17
18
19
20

The Plaintiff Class is represented by two Representative Plaintiffs, Ms. L and Ms. C, whose stories are emblematic of other class members' experiences.

**A. Plaintiff Ms. L.**

21
22
23
24
25
26
27

After fleeing the Democratic Republic of Congo with her 7 year-old daughter, Ms. L. presented herself to border guards at the San Ysidro Port of Entry on November 1, 2017. She expressed fear of returning to the Congo, was given a credible fear interview, and the asylum officer determined that she had a credible fear of persecution. Ms. L. was therefore placed into formal removal proceedings

28

1
2

to pursue her asylum claim.  *See* Ms. L. Decl., ECF No. 13-1, Ex. 10 ¶ 2; Lopez

Decl., ECF No. 13-1, Ex. 9 ¶ 4.[1]

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

When they initially arrived in the United States, Ms. L. and her daughter,

S.S., were detained together.  Four days later, however, Ms. L.'s child was taken

from her.  Defendants did not tell Ms. L. why they were taking her child away.

They nonetheless removed S.S. from her mother and transferred her 2,000 miles

away to a detention facility in Chicago, with the little girl frantically screaming that

she did not want to leave her mommy.  The government has never alleged that S.S.

would not be safe with her mother, or that Ms. L. is not a fit parent.  And yet

Defendants did not allow Ms. L. and her child to see each other for over four

months.  Each time they were able to speak on the phone, S.S. was crying and

afraid.  Ms. L. was likewise frightened, depressed, and unable to eat or sleep.  *See*

Ms. L. Decl. ¶¶ 3-6.

18
19
20
21
22
23
24

After Ms. L. filed this lawsuit and moved for a preliminary injunction,

Defendants released her from custody on March 6, 2018.  They informed her that

she would be released mere hours in advance, with no arrangements for where she

would stay.  Her daughter remained in custody alone in Chicago, until they finally

released her the night of March 16.

25
26

In response to this lawsuit, Defendants suggested that they had separated Ms.

27
28

---

[1] Because Ms. L inadvertently waived her rights in her immigration proceeding, she is currently in the process of requesting that the immigration judge reconsider and reopen her case.

L. and S.S. to ensure that there was a genuine parental relationship.  *See* Defs'
Response to Pl. Mot. To Expedite, ECF No. 28, at 3.  Yet Defendants did not ever
tell Ms. L. they had doubts about the relationship, nor did they attempt to conduct a
DNA test during the four months Ms. L. and S.S. were separated.  Only after this
lawsuit was filed was a DNA test conducted, which establishes that Ms. L. is S.S.'s
mother.  *See* Notice of DNA Test Results, ECF No. 44.

**B. Plaintiff Ms. C.**

Ms. C. and her 14 year-old son, J., fled Brazil to seek asylum and came to the
United States in late August 2017.  After she entered the United States a few feet, a
border guard approached her, and she explained that she wanted to apply for
asylum.  Although she was seeking asylum, Ms. C. was nonetheless prosecuted for
entering the country illegally, a misdemeanor for which she spent approximately 25
days in jail.  When Ms. C. was sent to jail for this misdemeanor conviction, her son
J. was taken away from her and sent to a detention facility in Chicago.

When she was finished serving her misdemeanor sentence on September 22,
2017, Ms. C. was transferred to an immigration detention facility, the El Paso
Processing Center.  She was given, and passed, a credible fear asylum interview,
and was put in removal proceedings, where she is applying for asylum.  In early
January she was transferred again to the West Texas Detention Facility, which is
also known as Sierra Blanca.  *See* Ms. C. Decl., ECF No. 42-1, Ex. 12, ¶ 2-4.[2]

---

[2] The exhibits are numbered continuously from the beginning of the case.

Ms. C. has not seen her son J. since he was taken from her last year.  Even after Ms. C. was released from jail and sent to an immigration detention facility, Defendants did not reunite her with her son.  The government has never alleged, much less demonstrated, that J. would not be safe with his mother or that Ms. C. is an unfit parent.[3]  *See* Ms. C. Decl. ¶ 5-7.

Ms. C. is desperate to be reunited with her son, who has been having a difficult time emotionally since being separated from his mother.  Ms. C. worries about him constantly and does not know when she will be able to see him.  They have only spoken on the phone a handful of times since they were forcibly separated by Defendants.  *See* Ms. C. Decl. ¶ 7-10.

**ARGUMENT**

To obtain a preliminary injunction, a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Courts evaluate these factors on a "sliding scale."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quotation marks omitted).  A "stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of

---

[3] This case concerns only the time in which Ms. C. and other class members are separated from their children while the parent is in immigration custody, and not the period of separation while the parent is in jail for a criminal conviction.

18cv0428

success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, where the balance of hardships "tips sharply towards the plaintiff," the plaintiff need only demonstrate "serious questions going to the merits." *Kaszuba v. Fidelity Nat'l Default Servs.*, 2011 WL 601525, at *1 (S.D. Cal. Feb. 10, 2011) (Sabraw, J.) (quotation marks omitted).

## I.   THE CLASS MEMBERS ARE LIKELY TO SUCCED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs are likely to succeed on the merits of their due process claim.  *See infra* Section A. They are also likely to succeed on their arbitrary–and-capricious claim under the Administrative Procedure Act (APA).  *See infra* Section B. Accordingly, this case can be decided on either constitutional or non-constitutional grounds.[4]

### A.   The Government's Separation of Class Members and Their Children Violates Due Process.

The Fifth Amendment applies to all "persons" and thus applies to Ms. L., Ms. C., and the proposed class.  *See infra* Section A.1.  The separation of Plaintiffs from their children patently violates due process because there has been no demonstration that the class members are unfit parents.  *See infra* Section A.2.

#### 1.   The class members are protected by due process.

The Due Process Clause, by its terms, applies to any "person," not just citizens.  And the Supreme Court has further held that the Clause applies to *all*

---

[4] At this time, Plaintiffs are not moving on the other claim in the complaint: that family separation violates the asylum statutes (Count II).

noncitizens.  *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (explaining that "all persons within the territory of the United States are entitled to the protection" the Due Process Clause); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (explaining that due process protections are "universal in their application, to all persons within the territorial jurisdiction").

For purposes of the due process analysis in this case, it is of no consequence that Ms. L. and S.S., and some class members, presented themselves at a port of entry before the government detained them.  Individuals who present themselves at a port of entry are considered "arriving" noncitizens and lack certain procedural due process rights to challenge their exclusion from the country.  *See*, *e.g.*, *Kwai Fun Wong v. United States*, 373 F.3d 952, 971-72 (9th Cir. 2004).  Here, however, detained arriving noncitizens' right to remain with their children is a substantive due process right, and has nothing to do with their eligibility to be formally admitted into the United States.  And there is no question that all persons, whether arriving or not, have substantive due process rights.  Indeed, as Justice Scalia pointed out, if arriving noncitizens, who are physically on U.S. soil, lacked

substantive due process rights, it would mean border agents could literally do anything, including "tortur[ing]" such individuals. *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting) ("I am sure [that people with no right to enter the country] cannot be tortured . . . ."). [5]

Accordingly, the Ninth Circuit and other courts have made clear that even arriving noncitizens stopped at a port of entry have substantive due process rights. *See* Law Professors' Amicus Br., ECF No. 23-1, at 3-7; *Kwai Fun Wong*, 373 F.3d at 973 (holding that non-admitted aliens, who may lack certain procedural due process rights with respect to admission, are nonetheless protected by the due process clause); *Chi Thon Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) ("Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process."); *Rosales-Garcia v. Holland*, 322 F.3d 386, 410 (6th Cir. 2003) (en banc) ("The fact that excludable aliens are entitled to less process . . . does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments."), *cert. denied*, 539 U.S. 941 (2003); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir.1987) (the Constitution "does not limit the right of excludable aliens detained within United States territory

---

[5] Arriving noncitizens like Ms. L. are actually on U.S. soil when they present themselves, because Ports of Entry are physically located on U.S. territory. Thus, the idea that such individuals have not actually entered the United States is understood as a "legal fiction." *See Kwai Fun Wong*, 373 F.3d at 970-71 (explaining the "entry fiction" by which an arriving noncitizen may be physically present on U.S. soil while still being deemed to not have "entered" for certain immigration purposes).

to humane treatment"); *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387

(10th Cir. 1981) ("[A]n excluded alien in physical custody within the United States

may not be 'punished' without being accorded the substantive and procedural due

process guarantees of the Fifth Amendment.").[6]

> ## 2. The separation of class members and their children is unconstitutional absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

The Due Process Clause forbids the government from separating children

from their parents absent a clear showing that the parent is unfit or is endangering

the child, and that separation is thus necessary to protect the child. The government

has not made that showing for any of the class members.

The Supreme Court has long recognized family integrity to be a core interest

protected by the Constitution. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753

(1982) (there is "a fundamental liberty interest of natural parents in the care,

custody, and management of their child"); *Troxel v. Granville*, 530 U.S. 57, 65-66

---

[6] In the circumstances of this case, Ms. L.'s and other arriving aliens' substantive due process rights also carry with them a corresponding right to procedural due process. Arriving noncitizens lack procedural due process rights in the context of challenging their exclusion, since they have no absolute substantive constitutional right not to be excluded. *Kwai Fun Wong*, 373 F.3d at 971 ("The entry fiction thus appears determinative of the *procedural* rights of aliens with respect to their applications for admission.") (emphasis in original); *see also id.* ("The entry doctrine has not, however, been applied, by the Supreme Court or by this court, to deny all constitutional rights to non-admitted aliens."). Thus, if the government were ever to come forward with any actual grounds to justify taking away a child from a parent who presented herself at the border, the parent would certainly be entitled to a hearing. Otherwise, the government could simply *allege* that Plaintiffs were unfit caretakers and rip their children away, without any process.

(2000) (plurality op.) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (collecting cases); *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child.") (quotation marks omitted); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("[T]he most essential and basic aspect of familial privacy [is] the right of the family to remain together without the coercive interference of the awesome power of the state.").

Courts have thus been loath to allow the government to separate children from their parents (particularly children as young as 7 years old). *See, e.g.*, *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) ("Interference with" the "fundamental right to familial association" "requires 'a powerful countervailing interest.'") (quoting *Lassiter v. Dep't of Social Servs.*, 452 U.S. 18, 27 (1981)); *Halet v. Wend Investment Co*, 672 F.2d 1305, 1310-11 (9th Cir. 1982) (same); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) ("[T]he relationship between parent and child [is] inviolable except for the most compelling reasons.").

As the courts have further made clear, separation may not occur absent a clear demonstration that the parent is unfit or is abusing or neglecting the child. *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the sole reason that to do so

was thought to be in the children's best interest."); *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional."); *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (family-integrity interest "is counterbalanced by the compelling governmental interest in the protection of minor children"); *Heartland Acad. Comm. Church v. Waddle*, 427 F.3d 525, 534 (8th Cir. 2005).

The government has offered no legitimate basis for taking Plaintiffs' children away. The government provided no evidence that Ms. L. or Ms. C. abused or neglected their children, or that they are unfit parents, to justify their separation from their children for four and five months, respectively. And for other class members, by definition, the government has not demonstrated abuse, neglect, or other unfitness in any kind of hearing.

The Plaintiffs and class members' separation thus violates due process.

**B.   The Government's Separation of Class Members and Their Children Violates the APA Because It Is Arbitrary and Capricious.**

Courts must "set aside" an agency decision that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). Under this standard, "a reviewing court must determine whether . . . there has been a clear error of judgment." *Mt. St. Helens Mining & Recovery Ltd. Partnership v. United States*, 384 F.3d 721, 728 (9th Cir. 2004). And the agency must "supply a reasoned basis for the agency's action." *Ctr. for*

*Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008) (quotation marks omitted).

The government has provided *no reason at all* for its family separation practice. *See, e.g.*, Ms. L. Decl., Ex. 10 ¶ 3 (explaining that when Defendants took Ms. L.'s 7 year-old child away from her, they did not tell her why); Ms. C. Decl., Ex. 12, ¶ 7-10.  Defendants complete failure to explain such consequential decisions is quintessential arbitrary government action.  *See Encinco Motorcars, LCC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (agency decision fails this standard when "the agency . . . gave almost no reasons at all"); *Arrington v. Daniels*, 516 F.3d 1106, 1114 (9th Cir. 2008) (where agency "failed to set forth a rationale for its decision," the agency's "lack of explanation for its choice renders its decision arbitrary and capricious").  The government has facilities designed precisely to house mothers and daughters together, not to mention the non-governmental shelters that exist for this purpose.

Where "high stakes" are involved, as is the case in the separation of families, an agency policy must provide a rational explanation that takes all relevant factors into account.  *See Judulang v. Holder*, 132 S. Ct. 476, 487 (2011) (finding Board of Immigration Appeals policy "arbitrary and capricious" where rules bore "no connection to the goals of the deportation process or the rational operation of the immigration laws").  The government has failed to provide any reasons that could possibly justify the trauma it is inflicting on young children and their parents.

## II. THE GOVERNMENT'S SEPARATION OF CLASS MEMBERS FROM THEIR CHILDREN HAS CAUSED AND WILL CONTINUE TO CAUSE IRREPARABLE INJURY.

Defendants have violated and—unless enjoined—will continue to violate the constitutional rights of Plaintiffs and the class they seek to represent. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (indicating that only a "colorable claim" of constitutional violation is needed to establish irreparable harm at the preliminary injunction stage) (quotations and citation omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

But the injury here is not just the harm that generally flows from a constitutional violation. The trauma of family separation causes especially severe irreparable injuries, particularly where it involves young children. *See Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation."); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) ("separation from family members" constitutes irreparable harm) (quotation marks omitted).

The American Academy of Pediatrics has denounced Defendants' practice of separating immigrant children from their parents, explaining that the "[s]eparation

of a parent or primary caregiver from his or her children should never occur, unless there are concerns for [the] safety of the child at the hand of [the] parent."[7]   That view is echoed in the declarations in this case of nine medical and mental health professionals across multiple fields from around the country, including pediatricians, psychiatrists, psychologists, and social workers, with a combined 174 years of experience working with families, including immigrant families.   *See* Oo & Schmidt Decl., Ex. 1 ¶ 1; Pena Decl., Ex. 2 ¶ 1; Griffin Decl., Ex. 3 ¶ 1; Carter Decl., Ex. 4, ¶ 1; Linton Decl., Ex. 5 ¶ 1; Shapiro Decl., Ex. 6 ¶ 1; Fortuna Decl., Ex. 7 ¶ 1; Melikian Decl., Ex. 8 ¶ 1.

As these medical experts observe, there is an "overwhelming body of scientific literature" that is "replete with evidence of the irreparable harm and trauma to children caused by separation from their parents."  Shapiro Decl., Ex. 6 ¶ 13.  This research makes clear that "separating children from their parents has a real and substantial risk of leading to long-term (and irreversible) physiological, developmental and psychological problems."  Fortuna Decl., Ex. 7 ¶ 21; *see id.* ¶¶ 13, 20 (describing a "significant risk for irreparable harm in regards to brain development, psychological health and thus a trajectory of poor mental health, learning and development throughout their life"); Carter Decl., Ex. 4 ¶ 6 ("The psychological effect of traumatic parent-child separation does not end when a child

---

[7] Policy Statement, Am. Acad. of Pediatrics, *Detention of Immigrant* Children, Mar. 2017, http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483.

is reunited with her parent.  Its effect can create permanent harm that influences

them for the remainder of their lifespan.").

Courts have therefore held that *any* separation of parents and children visits

irreparable harm on both.  *See McLaughlin v. Pernsley*, 876 F.2d 308, 315 (3d Cir.

1989) (holding that family separation causes irreparable harm because "the bonds

between the [parents] and their foster child will weaken continuously with the

passage of time apart"); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th

Cir.1997) ("[F]orced separation of parent from child, even for a short time,

represents a serious infringement upon both the parents' and child's rights.")

(internal quotations removed); *Nicolson v. Pappalardo*, 685 F.Supp.2d 142, 145-46

(D. Me. 2010) (holding that "[e]very additional day" of separation causes further

harm).  As the Fourth Circuit recently explained, "[p]rolonged and indefinite

separation of parents [and] children . . . create not only temporary feelings of

anxiety but also lasting strains on the most basic human relationships."  *Int'l

Refugee Assistance Project v. Trump*, --- F.3d ---, 2018 WL 894413, at *18 (4th

Cir. Feb. 15, 2018).

These harms are magnified by other traumatic events recently experienced by

Ms. L., Ms. C., other class members, and their children, including the fact that they

had to flee from their homes, and are now detained in a foreign country.  Children

who have faced recent trauma have a "heightened risk" of long-term emotional

damage when they are separated from their parents.  Fortuna Decl., Ex. 7 ¶ 8; *see*

Shapiro Decl., Ex. 6 ¶¶ 8-9 (describing traumatic context of detention).  The

reasons are clear to any parent and confirmed by the scientific literature.  "Children

need their parent's physical presence to successfully recover from traumatic events

in their lives."  Melikian Decl., Ex. 8 ¶ 6.  When they lose that parental buffer, they

are susceptible to what pediatricians and psychiatrists have termed "toxic stress,"

Linton Decl., Ex. 4 ¶ 4.b, which "threatens the developing brain and is associated

with subsequent development of physical health problems such as diabetes and

heart disease, mental health problems, and school failure," Linton Decl., Ex. 4 ¶

4.c.

Defendants' actions are thus "doubly harmful," because they impose the new

trauma of separation while robbing Plaintiffs' and class members' young children

of the parental buffer to cope with that and other traumas.  Shapiro Decl., Ex. 6 ¶

13.  Every day they are separated increases this harm and risks lasting damage.  *See*

Pena Decl., Ex 2 ¶ 9; Oo & Schmidt Decl., Ex. 1 ¶ 7.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH DECIDELY IN FAVOR OF REUNITING CLASS MEMBERS WITH THEIR CHILDREN.

When ruling on a preliminary injunction motion, "a court must balance the

competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief."  *Arc of Cal*., 757 F.3d at 991

(quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  The

relief requested here would cause no injury to Defendants, since a government

agency "cannot suffer harm from an injunction that merely ends an unlawful practice . . . ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citation omitted).  And the Ninth Circuit has repeatedly held that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Moreover, the particular and ongoing harms to Plaintiffs and other class members and their young children in this case far outweigh any injury Defendants might claim to suffer.  Given this harm, documented by medical experts, the balance of harms and public interest militate strongly in favor of immediately reuniting the class members with their children, and barring Defendants from continuing to separate families in the absence of a demonstration in a hearing that the parent is unfit or presents a danger to the child.

\*       \*       \*

Plaintiffs respectfully request that they and their children—along with other class members and their children—be released so they can be reunited in a non-governmental shelter, or alternatively, that they be detained <u>together </u>in a government family detention center.  But one way or the other, they should be reunited, to end an ordeal that no parent and child should ever have to endure. Plaintiffs also respectfully request that the court preliminarily enjoin Defendants' practice of separating families in the absence of a demonstration in a hearing that

the parent is unfit or presents a danger to the child.

## CONCLUSION

The Court should grant the preliminary injunction and order Defendants to reunite Plaintiffs and other class members with their children, and to discontinue their family separation practice.

Dated: March 19, 2018                          Respectfully Submitted,

*/s/Lee Gelernt*
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.

*Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO MEMORANDUM IN SUPPORT OF MOTION FOR CLASSWIDE PRELIMINARY INJUNCTIVE RELIEF**

**TABLE OF CONTENTS**

| Exhibit | Document | Pages |
|---------|----------|-------|
| 17 | Declaration of Martin Guggenheim | 23 - 34 |
| 18 | Declaration of Jessica Jones | 35 - 44 |
| 19 | Declaration of Denis Gilman | 45 - 51 |
| 20 | Declaration of Deborah Anker | 52 - 56 |

22

18cv0428

# EXHIBIT 17

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioner-Plaintiff*        *Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF PROFESSOR MARTIN GUGGENHEIM** |
| *Respondents-Defendants*. | |

1

2     Spencer E. Amdur (SBN 320069)
      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
3     IMMIGRANTS' RIGHTS PROJECT
      39 Drumm Street
4     San Francisco, CA 94111
      T:  (415) 343-1198
5     F:  (415) 395-0950
      *samdur@aclu.org*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          I, Martin Guggenheim, hereby declare, pursuant to 28 U.S.C. § 1746:

2          1.      I am the Fiorello LaGuardia Professor of Clinical Law at New

3   York University School of Law and a Founding Board Member of the Center for

4   Family Representation.  I have argued leading cases on the termination of parental

5   rights in the Supreme Court of the United States and am the author of seven books

6   and more than fifty book chapters and articles on children and parents.

7   Throughout the years, I have provided legislative testimony, including before the

8   United States House of Representatives Judiciary Committee, Subcommittee on

9   the Constitution and Civil Justice; the former United States Senate Committee on

10  the Judiciary, Subcommittee on Juvenile Justice; and the New York State

11  Assembly Standing Committee on Children and Families.

12         2.      I am familiar with the Amended Complaint for Declaratory and

13  Injunctive Relief with Class Action Allegations (ECF No. 32) (the "Amended

14  Complaint") filed in this action and with the Government's Response in

15  Opposition to Petitioner-Plaintiff's Motion to Expedite the Preliminary Injunction

16  Schedule (ECF No. 28) (the "Response").

17         3.      I am personally familiar with the facts and opinions set forth in

18  this declaration.  If called as a witness, I could and would competently testify to the

19  matters stated herein.

20         **EDUCATION AND PROFESSIONAL BACKGROUND**

21         4.      I attended and graduated from the State University of New

22  York (Buffalo) in 1968, where I earned a Bachelor of Arts in sociology.  Following

23  graduation, I enrolled in the New York University School of Law ("NYU Law"),

24  and I graduated with a Juris Doctor in 1971.

25         5.      Thereafter, I joined The Legal Aid Society's Juvenile Rights

26  Division.  I served as Staff Counsel in the Trial Division from 1971 to 1972, and as

27  Trial Attorney for the Special Litigation Unit from 1972 to 1974.  I then joined the

American Civil Liberties Union's Juvenile Rights Project and, from 1975 to 1976, I served as Acting Director of the Project.

6.       I began teaching at NYU Law in 1973, first as a Clinical Instructor in Law, then as an Assistant Clinical Professor of Law, then as an Associate Clinical Professor of Law, and then as a Professor of Clinical Law. At NYU Law, I have taught the Family Defense Clinic, the Advanced Family Defense Clinic, and a seminar titled "Child, Parent & State." Presently, I serve with Christine Gottlieb as Co-Director of the NYU Law Family Defense Clinic (the "Family Defense Clinic"). In 2015, I received the Podell Distinguished Teaching Award from NYU Law, and in 2017, I received the Kathryn A. McDonald Award from the New York City Bar Association for excellence in service to the Family Court.

7.       The Family Defense Clinic, which I founded in 1990, pioneered a model of representation in which lawyers and social workers collaborate on interdisciplinary teams to protect family integrity and help families access services that keep children safe and out of foster care. As Co-Director of the Clinic, I represent parents and foster parents in child abuse and neglect cases, termination of parental rights proceedings, and cases involving records in the New York Statewide Central Register of Child Abuse and Maltreatment. I also regularly draft and consult on appeals of child abuse and neglect matters and amicus briefs in cases involving children's and parents' rights. In addition, I regularly train lawyers throughout the country on child welfare law and practice. I consult with and provide litigation support to public interest organizations and law firms providing *pro bono* counsel to families involved with the child welfare system.

8.       My publications in the field of child welfare law include: *What's Wrong With Children's Rights* (2005); *Somebody's Children: Sustaining the Family's Place in Child Welfare Policy*, 113 Harv. L. Rev. 1716 (2000) (reviewing Elizabeth Bartholet, *Nobody's Children: Abuse and Neglect, Foster*

*Drift, and the Adoption Alternative* (1999)); *The Right to be Represented but Not Heard: Reflections on Counsel for Children in Judicial Proceedings*, 59 N.Y.U. L. Rev. 76 (1984), *reprinted in* David Westfall, *Family Law* (1994); *The Foster Care Dilemma and What to Do About It: Is the Problem that Too Many Children Are Not Being Adopted Out of Foster Care or that Too Many Children Are Entering Foster Care?*, 2 U. Pa. J. Con. L. 141 (1999); *Parental Rights in Child Welfare Cases in New York City Family Courts*, 40 Colum. J.L. & Soc. Probs. 507 (2007); "*When Should Courts Be Empowered to Make Child-Rearing Decisions?*", in *A Handbook of Divorce and Custody: Forensic, Developmental and Clinical Perspectives* (Linda Gunsberg & Paul Hymowitz eds., 2005); "*Child Welfare Policy and Practice in the United States 1950–2000,*" in *Cross-Currents: Family Law in the United States and England* (Sanford N. Katz, John Eekelaar & Mavis Maclean eds., 2000); "*Termination of Parental Rights,*" in *The Praeger Handbook of Adoption* (Vern L. Bullough & Kathy Shepherd Stolley eds., 2006); and Symposium, *The Rights of Parents with Children in Foster Care: Removals Arising from Economic Hardship and Predictive Power of Race*, 6 N.Y. City L. Rev. 61 (2000).

9.     I currently serve as an Advisor to the American Law Institute's Restatement of the Law, Children and the Law project and as a member of the Juvenile Justice Subcommittee for the American Bar Association Section on Criminal Justice.  I am the Founding Organizer for the National Alliance for Parent Representation of the American Bar Association.

10.     As a practitioner representing parents and children involved in the child welfare system and as Co-Director and professor of clinical law of the Family Defense Clinic, I have spent decades studying the norms that U.S. family law applies to the recognition of parent-child relationships and the protection of parental rights.

**HIGH LEGAL STANDARD FOR SEPARATING FAMILIES**

11.   As a threshold matter, U.S. family law strictly limits the circumstances in which state officials may remove children from the custody of the adults raising them.  New York law well illustrates the organizing principles of child welfare law:  "[P]arents are entitled to bring up their own children unless the best interests of the child would be thereby endangered . . . [T]he state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home."  N.Y. Soc. Serv. Law § 384-B(1)(a)(ii–iii) (2015) (statement of legislative findings and intent for New York's termination of parental rights statute).

12.   Absent indications of maltreatment or wrongful custody, American law forbids government officials from removing children from the custody of the adults raising them.[1]  No jurisdiction in the United States recognizes a cause of action that permits the State to remove a child from a guardian solely on the grounds that they are not legally related.

13.   In this action, the Government appears to contend that it was in the best of interests of asylum-seeking children to separate them from the adult with whom they arrived in the United States, who is also seeking asylum, "until parentage has been established to [the Office of Refugee Resettlement's]

---

[1] *See, e.g.*, U.S. Dep't of Health & Human Servs. [hereinafter HHS], Admin. for Children & Families, *Child Welfare Information Gateway, Determining the Best Interests of the Child* 2 (2016), https://www.childwelfare.gov/pubPDFs/best_interest.pdf (identifying "[t]he importance of family integrity and preference for avoiding removal of the child from his/her home" as a principle guiding best interest determinations for children in 28 states); *id.* at 1 ("All States . . . have statutes requiring that the child's best interests be considered whenever specified types of decisions are made regarding a child's custody, placement, or other critical life issues."); *see also* HHS, Admin. for Children & Families, *Reunifying Families*, https://www.childwelfare.gov/topics/permanency/reunification ("When children must be removed from their families to ensure their safety, the first goal is to reunite them with their families as soon as possible.") (last visited Mar. 16, 2018).

satisfaction."[2]  The Government suggests that prolonged separation of these adults and children is justified by a hypothetical risk of smuggling or trafficking.[3]  This suggestion stands diametrically opposed to U.S. family law jurisprudence.

14.    Under U.S. family law, the State may separate a child from his or her parents or legal guardians <u>only</u> when the State has satisfied its burden to show that the child is at imminent risk of serious harm or that the child is illegally in someone's custody.  It violates fundamental tenets of U.S. law to place the burden on parents or guardians to demonstrate that they are fit or that they have lawful custody of children.

15.    U.S. law involving the custody of children is based on the principle of First Do No Harm.  Removing children from the custody of their parents and caregivers is a deeply dangerous action that should only be undertaken when necessary to protect children from greater harm, that is, when leaving them with their caregivers would subject them to imminent risk of harm.  Even a short removal from a child's family can have devastating effects on the child.  *See* Vivek S. Sankaran & Christopher Church, *Easy Come Easy Go: The Plight of Children Who Spend Less than Thirty Days in Foster Care*, 19 U. Pa. J.L. & Soc. Change 207, 210–13 (2017).

16.    For this reason, federal law requires that states make reasonable efforts to prevent the need for removal before placing children in foster care.  42 U.S.C. § 671(a)(15)(B) (requiring that states make such efforts as a precondition to federal reimbursement for the cost of foster care with very limited exceptions).  Accordingly, whenever a child is removed from his or her home, many states, such as New York, require that there be a prompt judicial hearing at which the court must find both that reasonable efforts to prevent the placement were attempted and that removal is necessary to avoid imminent risk to the child's life or health.  *See*

---

[2] *See* Response at 2.

[3] *See* Julissa Portales Banzon's Decl. in Supp. of the Response (ECF No. 28) ¶ 10.

*Nicholson* v. *Scoppetta*, 820 N.E.2d 840, 849–52 (N.Y. 2004).  Children are at risk of suffering great emotional harm when they are removed from their loved ones.  And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.

17.    Although federal officials have a legitimate interest in protecting children from circumstances in which they have been kidnapped or wrongfully removed from their families, it violates fundamental principles of child welfare to remove children based merely on an unproven suspicion that they do not belong to the adults in their care.  Such a removal exposes the child to certain harm in order to protect the child from potential harm he or she may never have experienced.  This practice turns child welfare best practices on their head.  It amounts to First Do Harm.

## METHODS OF DETERMINING FAMILY RELATIONSHIPS

18.    Courts often accept an adult's representation that he or she is the child's parent.  In addition, courts in many states credit a mother's testimony about the paternity of her child—even when the father's name is not reflected on the child's birth certificate.

19.    Where a State has grounds for deeming such representations insufficient, the State has numerous other techniques to establish the parent-child relationship.  One such technique is to conduct separate interviews of the parent and the child to allow them to speak independently.  This allows an interviewer to confirm that the parent and child can separately respond to questions with information verifying a common family narrative.[4]    Another technique is to

---

[4] Notably, ORR already credits information provided by unaccompanied minors in order to find family members who can serve as sponsors.  HHS, ORR, *ORR Guide: Children Entering the United States Unaccompanied* § 2.2.1 (Apr. 11,

1   observe the behaviors of the parent and child toward each other, which can confirm

2   the claimed familial relationship.  This relationship is often apparent when the

3   child or parent acts in a way that suggests they are emotionally bonded to each

4   other.

5          20.    If reasonable suspicions about a familial relationship remain

6   even after use of the above techniques, DNA testing is available to establish the

7   validity of a genetic parent-child relationship.  Buccal (cheek) swabs to obtain

8   samples from both the parent and child are commonly used to determine paternity,[5]

9   and are quick,[6] easy,[7] and inexpensive.[8]  Notably, the U.S. Department of State

10  Foreign Affairs Manual identifies these cheek swabs as the "preferred collection

11  method for immigration cases" where there are reasons for doubting the validity of

12  parental relationships.[9]  And DHS has estimated that the processing time takes as

2016),     https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.2.1.

[5] *See, e.g.*, *Flomo* v. *Bridgestone Ams. Holding, Inc.*, No. 1:06-cv-000627-WTL-JMS, 2009 WL 4728021, at *3 (S.D. Ind. Dec. 2, 2009) (ordering minor plaintiff to submit to cheek swab in order to determine paternity for claim under Alien Tort Statute); *see also* 1 Linda D. Elrod, *Kansas Law and Practice, Family Law* § 7:12 (2017) (recognizing buccal swab as method for DNA testing); Laura Gahn, *Genetic Marker Testing*, in 1 *Paternity and the Law of Parentage in Massachusetts* § 5.2.2 (2d ed. 2009) (same); 15 Rachel M. Kane, *Summary of Pennsylvania Jurisprudence Family Law* § 8:27 (2d ed. 2018) (same).

[6]      LabCorp   DNA   Identity,   *DNA   Testing   FAQS*, https://www.labcorpdna.com/understanding-your-results/dna-testing-faqs (identifying standard processing time of paternity tests, including buccal swabs as "3–5 business days once all samples are received in our DNA testing laboratory");

[7] Linda D. Elrod & Robert G. Spector, *A Review of the Year in Family Law: A Search for Definitions and Policy*, 31 Fam. L.Q. 613, 647 (1998) ("DNA testing using a buccal swab is about as easy as it gets.").

[8] Vanessa S. Browne-Barbour, *"Mama's Baby, Papa's Maybe": Disestablishment of Paternity*, 48 Akron L. Rev. 263, 303 (2015) (describing buccal swabs as a "relatively inexpensive means of establishing paternity").

[9] *See* 9 U.S. Dep't of State, *Foreign Affairs Manual* § 601.11 (updated April 13, 2017).

1   little as eight to ten hours, excluding transportation time.[10]  With the use of a Rapid

2   DNA System, that time may be reduced to fewer than two hours.[11]  Pursuant to the

3   Rapid DNA Act of 2017, the Federal Bureau of Investigation is in the process of

4   incorporating Rapid DNA in the collection of reference samples.[12]

5                           **CONCLUSIONS**

6          21.    The Government's apparent policy of separating asylum-

7   seeking children from their purported asylum-seeking parents is flagrantly at odds

8   with long-standing U.S. family law principles that forbid government officials

9   from separating children from their parents or caregivers except to prevent a

10   greater imminent risk of harm by keeping children as they found them.

11          22.    When appropriate and necessary to verify the legitimacy of a

12   parent-child relationship, the Government has numerous readily available, quick,

13   and inexpensive techniques at its disposal.  None of these techniques require the

14   prolonged separation of the parent or guardian and the child, which has been

15   uniformly recognized to be extraordinarily traumatic for everyone involved.

16          23.    I reserve the right to make additional observations about the

17   adequacy of the Government's policy.

---

[10] DHS, *Privacy Impact Assessment for the Rapid DNA System* 2 (Feb. 8, 2013), https://www.dhs.gov/sites/default/files/publications/privacy/PIAs/privacy-pia-rapiddna-20130208.pdf [hereinafter Rapid DNA System Assessment].  In the case of Ms. L, the Government conducted DNA testing and confirmed to the Court that Ms. L is the biological mother of S.S. only five days after S.S.'s DNA was collected.  *See* Response at 3 ("S.S.'s appointment to collect DNA (by swabbing) was scheduled for today, March 7, 2018."); Defs.' Notice of DNA Results at 2 (ECF No. 44) ("[M]aternity has been established to the satisfaction of the Office of Refugee Resettlement.").  No explanation was given for why this did not happen four months earlier.

[11] *See* DHS, Rapid DNA System Assessment, *supra* note 10, at 2; Erin R. Steward, *Discussion and Evaluation: The Legality and Use of Rapid DNA Technologies*, 84 UMKC L. Rev. 1133, 1134 (2016).

[12] *See* Rapid DNA Act, Pub. L. No. 115-50, 131 Stat. 1001 (2017); FBI, *Rapid DNA*, https://www.fbi.gov/services/laboratory/biometric-analysis/codis/rapid-dna (last visited March 16, 2018).

1    In accordance with 28 U.S.C. § 1746, I declare under penalty of

2    perjury that the foregoing is true and correct.

3

4    Dated:        New York, New York

5                  March 16, 2018

6

7                  _____

8                  Martin Guggenheim

# EXHIBIT 18

1  Lee Gelernt*
   Judy Rabinovitz*
2  Anand Balakrishnan*
   AMERICAN CIVIL LIBERTIES
3  UNION FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
4  125 Broad St., 18th Floor
   New York, NY 10004
5  T:  (212) 549-2660
   F:  (212) 549-2654
6  lgelernt@aclu.org
   jrabinovitz@aclu.org
7  abalakrishnan@aclu.org

   Bardis Vakili (SBN 247783)
   ACLU FOUNDATION OF SAN
   DIEGO & IMPERIAL COUNTIES
   P.O. Box 87131
   San Diego, CA 92138-7131
   T: (619) 398-4485
   F: (619) 232-0036
   bvakili@aclusandiego.org

8  Attorneys for Petitioners-Plaintiffs      *Admitted Pro Hac Vice
   Additional counsel on next page
9

10

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

11

12

Ms. L. et. al,                                          Case No. 18-cv-00428-DMS-MDD

                    *Petitioners-Plaintiffs*,

13   v.

14   U.S. Immigration and Customs Enforcement
     ("ICE"); U.S. Department of Homeland Security
15   ("DHS"); U.S. Customs and Border Protection
     ("CBP"); U.S. Citizenship and Immigration
16   Services ("USCIS"); U.S. Department of Health
     and Human Services ("HHS"); Office of
17   Refugee Resettlement ("ORR"); Thomas
     Homan, Acting Director of ICE; Greg
18   Archambeault, San Diego Field Office Director,
     ICE; Joseph Greene, San Diego Assistant Field
19   Office Director, ICE; Adrian P. Macias, El Paso
     Field Director, ICE; Frances M. Jackson, El Paso
20   Assistant Field Office Director, ICE; Kirstjen
     Nielsen, Secretary of DHS; Jefferson Beauregard
21   Sessions III, Attorney General of the United
     States; L. Francis Cissna, Director of USCIS;
22   Kevin K. McAleenan, Acting Commissioner of
     CBP; Pete Flores, San Diego Field Director,
23   CBP; Hector A. Mancha Jr., El Paso Field
     Director, CBP; Alex Azar, Secretary of the
24   Department of Health and Human Services;
     Scott Lloyd, Director of the Office of Refugee
25   Resettlement,

**DECLARATION OF JESSICA
JONES**

26

27                    *Respondents-Defendants*.

28

1   Spencer E. Amdur (SBN 320069)
    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
2   IMMIGRANTS' RIGHTS PROJECT
    39 Drumm Street
3   San Francisco, CA 94111
    T:  (415) 343-1198
4   F:  (415) 395-0950
    *samdur@aclu.org*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Jessica Jones, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney licensed to practice law in the state of New York, where I am a member of the bar in good standing. I graduated from the Beasley School of Law, Temple University in 2011. I specialize in child welfare, human rights and immigration law impacting children.

2.      I have worked on unaccompanied alien children's issues close to eight years. From July 1, 2014 until March 15, 2018, I have worked as a Policy Counsel for the Lutheran Immigration and Refugee Service (LIRS).  In my work, I have developed expertise on ORR policies and LIRS's programs for unaccompanied children. I am familiar with LIRS family cases during the fiscal years of 2014 through 2018 in LIRS's Transitional Foster Care Programs for unaccompanied children. As such, I prepared this affidavit to account the experiences of our Children's Services Program and implementing partners.

3.      LIRS is a service provider for the Department of Health and Human Services' Office of Refugee Resettlement (ORR). LIRS is the only ORR service provider that provides the full spectrum of services to unaccompanied alien children (UACs): short-term foster care, home studies, post-release case management, long-term foster care, unaccompanied refugee minor foster care, and safe release sites

1    where ORR sponsors can get background checks completed and receive assistance

2    with family reunification procedures.

3

4        4.     LIRS works with only a very small fraction of the children for whom

5    ORR provides transitional care and custody.  While ORR places most children in large

6    shelters, LIRS is one of the partners that serves the much smaller segment of

7

8    unaccompanied children placed in ORR transitional foster care. Many of the children

9    placed in ORR transitional care are children of "tender age," usually 10 years old or

10   younger.

11

12       5.     LIRS has noticed a dramatic increase in the number of cases of

13   immigrant children separated from their parents.  During the five month period from

14   May 2017 through September 2017, LIRS documented 22 cases of children separated

15

16   from parents, with the majority occurring in the months of August and September.

17       6.     The ages of the children separated from their parents ranged from 2 to 15,

18

19   with an average child age of 8

20       7.     This trend continued in fiscal year 2018. During the first five months—

21

22   October 2017 through February 2018—we saw 20 parent-child family separations.

23       8.     This represents only a small number of the family separations that

24

25   occurred during this period, since LIRS serves a relatively small percentage of these

26   children.   However, I have spoken to providers who serve other unaccompanied

27

28

children and they have noted a similar dramatic increase in family separations during the last year.

9.     In the separation cases we have seen over the last year, the government has not told LIRS about any concerns regarding the veracity of the parent-child relationship.

10.     Many of the parent-child separation cases LIRS has seen are due to Customs and Border Patrol (CBP) referring a parent for criminal prosecution for the misdemeanor of illegal entry, without considering humanitarian factors that warrant keeping a family unit together, and without taking into account whether the family are bona fide asylum-seekers.  Despite LIRS's conversations with CBP about these concerns, it appears that CBP continues to refer and transfer custody of asylum-seekers to the U.S. Marshall Service (USMS) for criminal prosecution before first ascertaining whether the individual or family has been determined by an asylum officer to have a credible fear or reasonable fear of persecution—even though the result is that the child gets transferred to ORR custody.

11.     Moreover, ICE does not attempt to reunify children with their parents when the reasons for separation no longer exist.  If the separation was due to the parent being placed in U.S. Marshall's custody for purpose of criminal prosecution— usually for the misdemeanor of unlawful entry—these prosecutions are often resolved within several weeks, at which point the parent is returned to ICE custody.  Yet,

according to our child caseworkers, they are never informed when a parent is back in immigration custody, even though at this point, the basis for separation no longer exists.   Nor are our caseworkers aware of any efforts to try to reunify children with parents who have been returned to ICE custody.

12.    Separation of minor children from their parents can cause significant trauma, hinder psycho-social development, and cause physical harm.

13.    After separating the parent and the child—often detaining the children thousands of miles away—caseworkers often find it challenging to locate parents in ICE custody, schedule calls between children and parents in ICE custody, and obtain other information from parents that will assist in providing care and support to their children.

14.    Because the parent is often the person who has best knowledge of any immigration claims the child can bring, the separation of parent and child often hampers the ability of caseworkers and attorneys to advocate and pursue immigration claims on behalf of the children.

15.    Furthermore, separation of the child from the parent puts enormous pressure on parents to give up their asylum cases, because of the emotional distress and despair the separation engenders.  In many of the family separation cases LIRS has seen recently, parents with a genuine fear of persecution in their home countries nonetheless choose not to seek asylum because the parents would face prolonged

family separation away from their children. In LIRS's experience, for parents this is often a very difficult choice to make, as the family may have fled due to real threats of persecution. Yet for a parent and child, a prolonged family separation lasting many months can cause serious emotional and physical distress and harm.

16.     Unfortunately, in those situations where a parent decides to give up their claims and agree to removal, it usually takes at least several months after a parent's deportation before the child can be processed through removal proceedings and allowed to leave the country.  During this time the child remains in ORR custody, separated from their parent, even though the parent has been returned to their home country and wants to be reunited with their child.

17.     LIRS program social workers have expressed concern that ICE does not appreciate the urgency of trying to expedite removal proceedings in these children's cases so that they can be more promptly reunified with their parents.

18.     Of particular concern are children of tender age, for whom placement in foster care for several months represents a significant portion of their life and can create strong attachments. When these attachments need to be broken, the children experience additional trauma.

19.     One example of the type of case LIRS is encountering involves a parent who arrived at the border with a U.S. citizen child and an undocumented child. Even though the parent was seeking asylum, and even though this was the parent's first time

1 coming to the U.S., upon apprehension by Border Patrol the parent's children were
2
3 taken away. The parent's U.S. citizen child was transferred to the state child protective
4 services agency and the undocumented child was transferred to ORR custody. As a
5 result, the parent was forced to face the possibility not only of the noncitizen child
6
7 being detained alone, in ORR custody, but also a possible child welfare proceeding for
8 the U.S. citizen child. The parent was told that the parent would have to stay in ICE
9 detention for over 6 months if the parent wished to pursue asylum. The parent
10
11 ultimately decided not to pursue an asylum claim because it would have required
12 prolonged separation from the two children. The parent was ultimately deported with
13
14 the USC child. However, because ICE was unable to expedite removal proceedings
15 for the noncitizen child, this child remained in ORR custody after the parent was
16 deported.
17
18 I declare under penalty of perjury under the laws of the United States of
19 America that the foregoing is true and correct, based on my personal knowledge.
20
21
22
23
24
25
26
27
28

Executed in Washington, DC on March 15, 2018.

Jessica Jones

9

# EXHIBIT 19

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioner-Plaintiff*          *Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs,* | |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF DENISE GILMAN** |
| *Respondents-Defendants.* | |

1

2    Spencer E. Amdur (SBN 320069)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
3    IMMIGRANTS' RIGHTS PROJECT
     39 Drumm Street
4    San Francisco, CA 94111
     T: (415) 343-1198
5    F: (415) 395-0950
     *samdur@aclu.org*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Denise Gilman, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I have been a licensed attorney since 1994.  I am an active member of the State Bar of Texas and am also an inactive member of the Bar of the District of Columbia.  I am a clinical professor of law and director of the immigration clinic at the University of Texas School of Law.  I have been employed on the clinical faculty at the University of Texas School of Law since 2007.  Previously I taught in an asylum clinic at Georgetown University Law Center.  I have also held positions with the Washington Lawyers Committee for Civil Rights and Urban Affairs, Human Rights First and the Inter-American Commission on Human Rights of the Organization of American States.

2.    I have won awards for my work on human rights and migrants' rights including the MALDEF Excellence in Legal Services Award and the D.C. Court of Appeals Community Outreach Award.  I was appointed by the President of the American Bar Association ("ABA") to serve as a member of the ABA Commission on Immigration for two terms.  I have written law review articles in the immigration field, including *To Loose the Bonds:  The Deceptive Promise of Freedom from Pretrial Immigration Detention*, 92 Indiana L. J. 157 (2016); and *Realizing Liberty: The Use Of International Human Rights Law To Realign Immigration Detention In The United States*, 36 Fordham Int'l L.J. 243 (2013).

3.    The immigration clinic, which I direct, represents immigrants in removal proceedings.  Through the clinic, I have supervised students handling dozens of Immigration Court cases, including asylum cases, over the last 11 years.  In addition, I occasionally teach a law school seminar on Refugee Law and Policy.  I have spoken at numerous continuing legal education seminars on issues relating to

asylum and Immigration Court proceedings.  I also mentor other attorneys in these areas of immigration practice.

4.     Through the immigration clinic, I have represented many families who traveled to the southern border of the United States in order to seek asylum.  The immigration clinic students and I have represented these families during their time in detention and after release.

5.     The clinic represented families who were detained at the T. Don Hutto detention facility in Taylor, Texas until the facility stopped holding families in 2009.  When the Karnes family detention center opened in August 2014, the immigration clinic was involved in setting up a pro bono project at the facility and also took on direct representation in certain cases.  Since then, the clinic has continued to provide legal services to families detained at the Karnes facility before and after their release.  The clinic has represented families in credible fear proceedings, custody proceedings, and on the merits of their claims.

6.     In addition, clinic students  travel to the Karnes family detention facility to provide volunteer assistance to families who will be proceeding pro se.  I regularly accompany the students and provide supervision for these volunteer trips to the Karnes facility.  Thus, I meet with women and children at the facility on a regular basis.

7.     Furthermore, since ICE stopped detaining families at the T. Don Hutto detention center in 2009 and began holding adult women at the facility, the immigration clinic has represented and otherwise provided assistance to women detained at the T. Don Hutto facility.  As such, I regularly visit the T. Don Hutto facility and also interact with women after release from the facility.  In recent months, I have interacted with several women detained at the T. Don Hutto facility who arrived at the border with their children in a family unit but were separated from their children at the border.  In these cases, the mothers were sent to the T.

EXHIBIT 19, Page 49
18cv0428

1   Don Hutto adult detention center while their children were sent to unaccompanied

2   minors shelters.

3       8.      Almost all of the families and adult women at the Karnes and Hutto

4   detention centers were apprehended at or near the southern U.S. border with

5   Mexico.  They were initially apprehended and processed by U.S. Customs and

6   Border Protection, and were then were placed in the custody of Immigration and

7   Customs Enforcement.

8       9.      As a result of the above experiences, I am very familiar with patterns

9   regarding the numbers of families who travel to the United States southern border,

10  the types of families who arrive, and the circumstances in which they arrive.  I am

11  also familiar with the policies and practices of DHS at the border with regard to

12  family units who reach the southern U.S. border.

13      10.     Based on my experience, many parents who reach the southern U.S.

14  border with their children do not have birth certificates for their children or similar

15  identification documents that establish parentage.  Families regularly report that,

16  although they left their home countries with birth certificates or similar documents

17  for their children, those documents were lost or stolen during the difficult journey

18  to the United States.

19      11.     Other families indicate that they did not have birth certificates or

20  similar documents for the children before leaving their home countries.  In my

21  experience, parents from rural or poor areas of Central America, such as indigenous

22  communities in Guatemala, may not have registered the birth of a child or may not

23  have received a birth certificate or similar documentation even if the birth was

24  registered.  The registration process and the issuance of a birth certificate are two

25  separate processes in some countries.  Similarly, parents from certain countries in

26  Africa may have been unable to register the birth of a child or obtain documentation

27  such as a birth certificate.

28

EXHIBIT 19, Page 50
18cv0428

3

12.     If a birth registry exists but the family is not in possession of a birth certificate or similar document before leaving the home country, the circumstances of the family's flight often make it impossible to obtain such a document from the authorities before travelling to the United States.  Families fleeing danger must leave their home countries quickly and with little time or no time for preparation. Parents have indicated that it was not possible for them to wait to go through the paperwork process to obtain birth certificates before leaving their home countries because of the danger they faced.  Once a family has left the home country, it is very difficult to obtain a birth certificate or similar document, if it exists at all. Communication with relatives and friends who might be able to obtain documents is slow, difficult, and costly.

13.     As a result of this reality, families may not have documents with them proving familial relationships when they reach the southern U.S. border to seek asylum.  In my experience working with families, however, the relationship between parent and children is generally quite obvious.  Children, even toddlers, refer to their mothers and fathers as such.  The children also appear evidently attached to their parents, often crying or showing distress during any physical separation, even if temporary.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 14th day of March, 2018 in Austin, TX.

Denise Gilman, Esq.

# EXHIBIT 20

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioner-Plaintiff*          *\*Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs,* | |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF DEBORAH ANKER** |
| *Respondents-Defendants.* | |

1

2  Spencer E. Amdur (SBN 320069)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
3  IMMIGRANTS' RIGHTS PROJECT
   39 Drumm Street
4  San Francisco, CA 94111
   T:  (415) 343-1198
5  F:  (415) 395-0950
   *samdur@aclu.org*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Deborah Anker, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a Clinical Professor of Law at Harvard Law School and Founder and Director of the Harvard Law School Immigration and Refugee Clinical Program.  In that capacity, I have supervisory responsibility for a staff of ten persons; I both supervise students working on asylum cases and represent persons seeking asylum in the United States. I have taught immigration, refugee and asylum law to students at Harvard Law School for over thirty years. I am the author of the well-known treatise "Law of Asylum in the United States," and I have published various articles and amicus briefs related to U.S. and international refugee law.  I keep regularly apprised of practices and developments in the field of asylum, refugee law and immigration law generally.

2.      Refugees seeking asylum protection frequently do not have regular travel documentation, birth certificates or other documentation because they leave quickly and under emergent circumstances not leaving them time to gather proper documentation.   Sometimes they have been in hiding before they leave and it is too dangerous for them to return to their homes to obtain such documentation.  In some circumstances identifying documentation is stolen from them on their way to the United States.

3.      After they arrive here, refugees will sometimes contact family members or friends in their home countries to have identity documents and documents needed as evidence in their claims sent to them.  However, this can be a difficult and slow process, especially for refugees who are detained and unrepresented.

4.      Among commentators on refugee law it is almost axiomatic that refugees often arrive in countries of asylum without documents.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge.  Executed in Cambridge, Massachusetts on March 9, 2018.


_____

DEBORAH ANKER