**EXHIBIT A**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L,, et al.<br><br>　　　　Petitioners-Plaintiffs,<br><br>　vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>　　　　Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>Hon. Dana M. Sabraw |

**DECLARATION OF JALLYN N. SUALOG, ACTING DEPUTY DIRECTOR FOR CHILDREN'S PROGRAMS OFFICE OF REFUGEE RESETTLEMENT, ADMINISTRATION FOR CHILDREN AND FAMILIES, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn N. Sualog, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows:

1. I am the Acting Deputy Director for Children's Programs for the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), Department of Health and Human Services ("HHS"). I manage the program serving unaccompanied alien children ("UAC") within ORR. The following statements are based on my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of HHS, and information supplied to me by current HHS employees. I am located in Washington, D.C.

1

2. Generally, when UAC are apprehended by officers working for the Department of Homeland Security ("DHS"), DHS refers them to ORR as UAC per applicable law.

3. In this case, S.S., a seven-year old girl reportedly from the Congo, was referred to ORR on November 5, 2017 by DHS as an "unaccompanied alien child."

4. Also in this case, J., a 14-year old boy from Brazil, was referred to ORR on August 27, 2017 by DHS also as an "unaccompanied alien child."

5. Once a referring agency such as DHS refers a child as a UAC, it is the general policy of HHS/ORR not to revisit their "unaccompanied" status. Rather, HHS/ORR policy is to adhere to the requirements in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232(c)(3), to determine the suitability of a sponsor prior to release. *See* ¶ Paragraph 13, *infra*, explaining the process whereby ORR reunifies a child with a sponsor, including a parent.

6. Also in accordance with the TVPRA, ORR follows child welfare best practices to place a child in the "least restrictive setting that is in the best interest of the child," taking into account factors such as the child's age and gender, as well as considerations of danger to self or to the community. 8 U.S.C. § 1232(c)(2)(A); ORR Guide to Children Entering the United States Unaccompanied (ORR Guide), at Section 1.1 (Summary of Policies for Placement and Transfer of Unaccompanied Alien Children in ORR Care Provider Facilities) (available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied, last visited April 20, 2018).

ORR provides grants to numerous types of care providers, including foster care providers and shelter-care group home type shelters in order to meet the individual needs of UAC in ORR care and custody. *See* ORR Guide, at Section 1.2 (ORR Standards for Placement and Transfer Decisions). ORR facilities are all licensed by the state in which they are located to care for minors.

7. The majority of care providers operate one of three types of facilities: shelter-type facilities, staff secure facilities, or secure facilities. ORR Guide § 1.1. Shelter care is the most common type of placement for UAC in ORR custody, and is a residential care facility in which all programs are administered on-site in the least restrictive setting. *See* ORR Guide: Guide to terms. Staff secure facilities maintain stricter security measures than shelter care, such as a higher staff to UAC ratio for supervision and a secure perimeter with a "no climb" fence. *Id.* These facilities have a more shelter, home-like setting than secure detention, and do not have locked pods or cell units. *Id.* Secure facilities are the most restrictive level of care. They are physically secure structures with staff able to control violent behavior and may be a licensed juvenile detention center or a highly structured therapeutic facility. *Id.* The following tables show, first, the breakdown of total admissions into shelter, staff secure, and secure programs in Fiscal Year 2017 ("admissions" counts all admissions, so it would reflect a re-counting of UAC whom ORR transferred to different placements); and, second, four snapshots indicating total UAC in ORR custody, broken down by placement level, on four specific dates.

| Program Type | FY17 Total Admissions # of UAC | % of Total Admissions |
|---|---|---|
| Shelter | 45,594 | 90% |
| Secure | 197 | .38% |
| Staff Secure | 612 | 1.2% |
| Total Admissions* | 50,834 | 100% |

*This is the total of UAC in ORR care on the given date, all program types are not represented in the table

| Census Snapshot in time | | | | |
|---|---|---|---|---|
| FY17 | Shelter | Secure | Staff Secure | Total in Care* |
| 11-Nov-16 | 6,964 | 51 | 131 | 10,765 |
|  | 64.7% | 0.5% | 1.2% | 100.0% |
| 14-Feb-17 | 5,219 | 51 | 112 | 7,059 |
|  | 73.9% | 0.7% | 1.6% | 100.0% |
| 12-May-17 | 1,779 | 35 | 109 | 2,407 |
|  | 73.9% | 1.5% | 4.5% | 100.0% |
| 11-Aug-17 | 2,776 | 52 | 117 | 3,667 |
|  | 75.7% | 1.4% | 3.2% | 100.0% |

*This is the total of UAC in ORR care on the given date, all program types are not represented in the table

8. The Settlement Agreement in *Flores v. Reno*, Case CV-85-4544-RJK(px) (C.D. Cal.) ("Flores Agreement") sets forth at Exhibit 1 minimum standards for licensed programs, including the provision of various services such as health care, mental health care, education, and recreation, in order to ensure the well-being of minors in Federal custody.

9. S.S. was in the care and custody of ORR from November 5, 2017 until March 16, 2018 when she was released to the care of her mother, Ms. L, and was housed during that time by Heartland ICC, a non-secure shelter care facility located in Chicago, Illinois. The shelter is licensed by the State of Illinois to provide residential care to children. The

4

facility is one which is capacitated to shelter young children such as S.S. and is routinely used for such children. The facility is unique in that it provides developmentally appropriate care which is culturally sensitive to many young children like S.S. from diverse non-Central American countries such as the Congo, Guinea, Nepal, Haiti, Kyrgyzstan, China, Vietnam, India, Bangladesh, and Romania. At Heartland ICC, S.S. received many services, including case management, clinical, educational and medical services throughout the duration of her stay in ORR care.

10. J. has been in the care and custody of ORR since August 28, 2017. Initially he was housed by Heartland International Children's Center (RC) located in Chicago, Illinois, a less restrictive shelter care facility, but was transferred on December 8, 2017 to a more restrictive staff-secure facility, Heartland International Youth Center, also located in Chicago, Illinois, due to aggressive behavior against peers and staff, and inappropriate sexual behavior. While in ORR care, J. has received many services, including psychological services such as individual and group therapy, psychiatric services, and case management services, as well as educational services and recreation.

11. The services provided to S.S. and J. at their respective ORR shelter care and staff-secure facility placements are typical of those provided in ORR facilities which are designed to provide care to minors in the least restrictive setting that takes their individual needs into account.

12. Although the minor J.'s mother, Ms. C, was recently released from DHS custody, ORR must still follow its usual release policy and procedures before releasing

her son, J., to her. Under the TVPRA, *see* 8 U.S.C. § 1232(c)(3)(A), HHS (ORR) is required to "make[] a determination that a proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."

13. Correspondingly, ORR policy requires the timely release of UAC to qualified parents, guardians, relatives, or other adults, referred to collectively as "sponsors." ORR Guide, at Section 2.1 (Summary of Safe and Timely Release Process). Consistent with the TVPRA's mandate, *see* 8 U.S.C. § 1232(c)(3)(A), ORR evaluates the ability of any potential sponsor, including the child's parent, to provide for the child's physical and mental well-being, in order to protect him or her from "smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity." ORR Guide, at Section 2.1. According to ORR policy: "The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including: the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release." *Id.* While ORR's preference is to release a child to an appropriate sponsor who is verified to be the child's parent (*see* ORR Guide, Section

2.2.1), each of these steps apply to *all* sponsors prior to release, including the parent of a child such as S.S. or J.

14. The suitability determination process is well underway for J.'s mother, Ms. C. The Case Manager at the Heartland International Youth Center where J. is currently housed has already reviewed Ms. C's sponsorship application and made a positive recommendation for release (with post-release only services). A recommendation concerning release is expected this week from the independent Case Coordinator with which ORR contracts for a third-party assessment of suitability. The Federal Field Specialist (FFS) then makes the final decision about Ms. C's suitability and release of J. to her. ORR expects the FFS to make this decision soon.

I, Jallyn N. Sualog, declare under penalty of perjury that the foregoing is true and correct. Executed on April 20, 2018.

_____

Jallyn Sualog