Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*      **Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: April 20, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (Doc. #56)**<br><br>**Hearing Date: May 4, 2018**<br>**Time: 1:30 p.m.**<br>**Courtroom: 13A**<br>**Judge: Dana M. Sabraw** |

CBP; Pete Flores, San Diego Field Director,
CBP; Hector A. Mancha Jr., El Paso Field
Director, CBP; Alex Azar, Secretary of the
Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

                    *Respondents-Defendants.*

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 2

ARGUMENT .................................................................................................... 5

   I.   THE CASE IS JUSTICIABLE. ....................................................... 5

     A.  Ms. L.'s Claims Are Not Moot ................................................. 5

     B.  Venue Is Proper for Ms. C. in This District. ............................ 6

     C. The Court Has Habeas Jurisdiction Over Ms. C.'s Claims. ....... 9

     D. The INA Does Not Bar Review. ................................................ 10

     E. The APA Does Not Bar Review. ............................................... 13

     F. The Separation of Plaintiffs' Families Is Final Agency Action. .............. 14

  II. PLAINTIFFS HAVE STATED A DUE PROCESS CLAIM ...................... 15

     A. Plaintiffs Have Stated a Substantive Due Process Claim ........................ 15

     B. The Government's Justifications for Its Separation Practice Are Shifting and Unpersuasive. ........................................................ 16

       1. Any supposed doubts about parental relationships do not justify the government's separation practice. .................................... 17

       2. Family separation is not required by statute. ................................ 18

       3. Plaintiffs have a due process right to remain together. ........................ 20

       4. The government's separation practice also violates Plaintiffs' procedural due process rights ................................................ 22

  III.  PLAINTIFFS HAVE STATED AN APA CLAIM. .................................... 23

  IV. PLAINTIFFS STATE A CLAIM UNDER THE ASYLUM STATUTE ..... 24

CONCLUSION ................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) .......................................................... 11, 21

*Alaka v. Att'y Gen.*, 456 F.3d 88 (3d Cir. 2006) ........................................................ 12

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) ......................................... 20

*Arbid v. Holder*, 700 F.3d 379 (9th Cir. 2012) ........................................................ 12

*Armentero v. INS*, 340 F.3d 1058 (9th Cir. 2003) .................................................... 10

*Armster v. U.S. Dist. Ct.*, 806 F.2d 1347 (9th Cir. 1986) ........................................... 6

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................... 14

*Bogarin-Flores v. Napolitano*, 2012 WL 3283287 (S.D. Cal. Aug. 10, 2012) ........ 10

*Bunikyte ex rel. Bunikiene v. Chertoff*,
   2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) ....................................................... 19

*Californians for Renewable Energy v. EPA*, 2018 WL 1586211 (N.D. Cal. Mar. 30,
   2018) ....................................................................................................................... 7

*Campos v. Nail*, 43 F.3d 1285 (9th Cir. 1994) ......................................................... 24

*Chehazeh v. Att'y Gen.*, 666 F.3d 118 (3d Cir. 2012) ................................................. 9

*Chen v. Allstate Ins. Co.*, 819 F.3d 1136 (9th Cir. 2016) ........................................... 5

*Ctr. for Bio. Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir.
   2008) ..................................................................................................................... 23

*Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) ................................................... 11

*Doe v. Trump*, 2017 WL 6551491 (W.D. Wash. Dec. 23, 2017) .............................. 15

*Dukes v. Wal-Mart Stores, Inc.*, 2001 WL 1902806 (N.D. Cal. Dec. 3, 2001) ......... 8

*Dunn v. U.S. Parole Comm'n*, 818 F.2d 742 (10th Cir. 1987) ................................. 10

*EEOC v. FedEx Corp.*, 558 F.3d 842 (9th Cir. 2009) ................................................. 6

*Exxon Corp. v. FTC*, 588 F.2d 895 (3d Cir. 1978) ..................................................... 7

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................24

*F.L.B. v. Lynch*, 180 F. Supp. 3d 811 (W.D. Wash. 2016) ........................................7

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ........................................................................................5, 6

*Gallanosa by Gallanosa v. United States*, 785 F.2d 116 (4th Cir. 1986) ...............21

*Garcia-Mir v. Civiletti*, 1981 WL 380696 (D. Kan. May 12, 1981).........................7

*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994) ....................................................13

*Hernandez v. Lynch*, 2016 WL 7116611 (C.D. Cal. Nov. 10, 2016)........................9

*Holtzman v. Richardson*, 361 F. Supp. 544 (E.D.N.Y. 1973) ..................................8

*In re United States*, 791 F.3d 945 (9th Cir. 2015)....................................................6

*Jarpa v. Mumford*, 211 F. Supp. 3d 706 (D. Md. 2016) .........................................10

*Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004)..................................................17, 22

*King v. Burwell*, 135 S. Ct. 2480 (2015) ................................................................19

*Knox v. SEIU, Local 1000*, 567 U.S. 298 (2012) .....................................................6

*Kucana v. Holder*, 558 U.S. 233 (2010)............................................................11, 12

*Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004) .............................12

*Matsuo v. United States*, 416 F. Supp. 2d 982 (D. Haw. 2006) ................................7

*McNeary-Calloway v. JP Morgan Chase Bank*, 863 F. Supp. 2d 928 (N.D. Cal.
    2012)......................................................................................................................9

*Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865 (9th Cir. 2003) .................................13

*Milan-Rodriguez v. Sessions*, 2018 WL 400317 (E.D. Cal. Jan. 12, 2018)............21

*Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29 (1983) .......................23, 24

*Orantes-Hernandez v. Holder*, 321 Fed. App'x 625 (9th Cir. 2009).....................24

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990).........................24

*Overton v. Bazetta*, 539 U.S. 126 (2003) ...............................................................22

iii

*Quilloin v. Walcott*, 434 U.S. 246 (1978)................................................................16

*Railway Labor Execs.' Ass'n v. ICC*, 958 F.2d 252 (9th Cir. 1991).....................6, 7

*Rasul v. Bush*, 542 U.S. 466 (2004)........................................................................9

*Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018) .............23

*Safe Air for Everyone v. EPA*, 488 F.3d 1088 (9th Cir. 2007)................................23

*Sanchez-Penunuri v. Longshore*, 7 F. Supp. 3d 1136 (D. Colo. 2013)...................10

*Santos v. Smith*, 2017 WL 2389722 (W.D. Va. June 1, 2017)................................10

*Santosky v. Kramer*, 455 U.S. 745 (1982)...............................................................15

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017)...............................8, 9

*Selgeka v. Carroll*, 184 F.3d 337 (4th. Cir. 1999)....................................................9

*Sidney Coal Co., Inc. v. SSA*, 427 F.3d 336 (6th Cir. 2005) ....................................8

*Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011)......................................................12

*Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2012) ..............................16

*Spencer Enters., Inc. v. United States*, 345 F.3d 683 (9th Cir. 2003) .....................11

*Troxel v. Granville*, 530 U.S. 57 (2000)..................................................................15

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016)...............15

*United States v. Loy*, 237 F.3d 251 (3d Cir. 2001)..................................................16

*Webster v. Doe*, 486 U.S. 592 (1988)......................................................................14

**Statutes**

5 U.S.C. § 701(a)(2) .................................................................................................13

5 U.S.C. § 704..........................................................................................................14

6 U.S.C. § 279(g)(2)(ii) ...........................................................................................19

8 U.S.C. § 1158(a)(1) ...............................................................................................24

8 U.S.C. § 1231(g)(1) .....................................................................................10, 11, 14

8 U.S.C. § 1232(b)(3) ...........................................................................19

8 U.S.C. § 1252(a)(2)(B)(ii) ......................................................10, 11, 12

8 U.S.C. § 1325.....................................................................................4

28 U.S.C. § 1331....................................................................................9

28 U.S.C. § 2241....................................................................................9

**Other Authorities**

7A Wright & Miller, Fed. Prac. & Proc. § 1757 (3d ed., Apr. 2017) ........................7

Caitlin Dickerson & Ron Nixon, *Trump Administration Considers Separating Families to Combat Illegal Immigration*, N.Y. Times, Dec. 21, 2017 ................16

Caitlin Dickerson, *Hundreds of Immigrant Children Haven Been Taken from Parents at U.S. Border*, N.Y. Times, Apr. 20, 2018.....................................3

Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN, Mar. 7, 2017. .......................................16

*Gratuitous Cruelty by Homeland Security: Separating a 7-Year-Old from Her Mother*, Wash. Post, Mar. 4, 2018 ...........................................................1

Rafael Bernal, *DHS Head Confirms He's Considering Separating Families at Border*, The Hill, Mar. 6, 2017 .................................................................16

**Legislative History**

H.R. Rep. No. 110-430, § 236(h)(2) (Nov. 6, 2007) ..................................19

House Approp. Comm., *Dep't of Homeland Sec. Approp. Bill of 2006*, 109th Cong., 1st Sess .............................................................................................19

# INTRODUCTION

The amended complaint alleges that Defendants have a nationwide practice of taking children away from their parents without a legitimate justification, much less a showing that the parent is endangering the child.  Defendants offer a kitchen sink of justiciability arguments, but none is correct.  On the merits, what is most striking about Defendants' position is the shifting rationales they offer in an effort to retroactively justify their "gratuitously cruel" practice.  Washington Post Editorial (March 4, 2018).[1]

In the initial stages of this case, Defendants focused on the possibility that Ms. L. and others were not actually the parents they claimed to be, and that it was therefore necessary to separate the children for their own sake.  In their motion to dismiss, however, Defendants relegate this argument to a footnote, presumably because it is plain that there are multiple, easy ways to verify parentage, including a quick DNA swab (as this Court noted during the first status conference).  Now, Defendants seek to pin the blame on *Congress* and argue that the Trafficking Victims Protection Act (TVPRA) *mandates* the separation of families.  But nothing in the TVPRA's text supports that argument.  Moreover, the purpose of the TVPRA was to *help* children; it would be perverse to read the statute as requiring Defendants to inflict traumatic harm on children by tearing them away from their parents.  Most importantly, the TVPRA has been in existence for years and the

---

[1] *Gratuitous Cruelty by Homeland Security: Separating a 7-Year-Old from Her Mother*, Wash. Post, Mar. 4, 2018.

government has routinely detained parents and children together in family immigration detention centers.  Thus, the government itself has never understood the statute to mandate family separation.

Ultimately, the government falls back on the remarkable argument that Plaintiffs do not have a due process right to the integrity of their families, and that the government therefore need not provide any meaningful justification for its practice.  But due process has long been understood to require not just a justification, but a strong justification for separating a parent and child, especially children of a tender age.  Here, the government has not offered even a remotely persuasive justification for declining to use the facilities that exist for detaining families together.  The government should not be permitted to insulate its practice from judicial scrutiny and from any factual development.  The motion to dismiss should be denied.

## BACKGROUND

Throughout the last year, DHS officials have publicly stated that they were considering a policy to separate families of asylum seekers at the border.  The administration explained that it believed separating families would deter others from coming to the United States.  Am. Compl., ECF No. 32, ¶ 34b[2]; *see infra* n.12 (collecting public statements).  As it turns out, the government *has* been separating hundreds of parents from their children as a matter of practice, even if it has chosen

---

[2] The amended complaint lists paragraphs 33 and 34 twice.  To distinguish them, this filing refers to those four paragraphs as 33a, 34a, 33b, and 34b.

not to label it a "policy."  Am. Compl. ¶ 4, 31-32, 68; *see* Caitlin Dickerson,

*Hundreds of Immigrant Children Haven Been Taken from Parents at U.S. Border*,

N.Y. Times, Apr. 20, 2018 (administration officials confirming 700 family

separations since October, "including more than 100 children under the age of 4").[3]

These separations serve no compelling (or even legitimate) governmental purpose,

as there is no allegation that the parents are unfit or otherwise pose a danger to their

children.  *Id.* ¶ 31-32, 50-52, 61-63, 70.  Separating children from their parents

causes devastating harm to both the parent and child, and may inflict long-term

psychological injuries on the children.  *Id.* ¶ 33a.  The practice has therefore been

widely condemned across the medical community.  *Id.* ¶ 34a.  It is also

unprecedented:  No prior administration maintained a widespread practice of

forcibly separating migrant children from their fit parents.  *Id.* ¶ 33b.

    The named Plaintiffs' experiences demonstrate how this practice plays out on

the ground.  Ms. L. arrived at the border with her daughter, S.S., and asked to apply

for asylum.  *Id.* ¶ 40.  An asylum officer later determined that she had a credible

fear of persecution if she were sent back to the Congo.  *Id.* ¶ 41.  But Defendants

did not place Ms. L. with her daughter in one of its immigration family detention

facilities.  Instead, Defendants took her then 6 year-old daughter away and shipped

her across the country to a separate facility in Chicago, where she celebrated her

seventh birthday without her mother.  *Id.* ¶ 46.  When they took her away, S.S. was

---

[3] https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

frantically begging not to be separated from her mother. *Id.* ¶ 42-43. Defendants did not tell Ms. L. why they were taking her daughter away, but after she filed this lawsuit, they claimed that they were motivated by doubts about parentage (though Defendants never communicated those doubts to Ms. L.). *See* ECF No. 28, at 2. Defendants did not conduct a DNA test prior to separating Ms. L. and S.S., and they did not conduct one during the four months prior to this lawsuit. Only after Ms. L. filed a motion for preliminary injunction did Defendants conduct a DNA test, which proved that S.S. is in fact Ms. L.'s daughter. ECF No. 44; Am. Compl. ¶ 43. While they were separated, Ms. L. and S.S. suffered severe emotional distress. *Id.* ¶ 46-48. Each time they spoke on the phone, S.S. was crying. *Id.* ¶ 43.

Ms. C., also an asylum seeker, arrived at the border with her 14 year-old son, J. Am. Compl. ¶ 54. Ms. C subsequently passed a credible fear asylum interview. *Id.* ¶ 55. Despite being an asylum seeker, Ms. C. was prosecuted for the misdemeanor of illegal entry, for which she served 25 days. *Id.* ¶ 55-56; *see* 8 U.S.C. § 1325. The government took Ms. C.'s son away from her while she was in jail for illegal entry, but instead of reuniting them once Ms. C. returned to ICE custody, the government has kept her separated from her son for 6 months and counting. Am. Compl. ¶ 58. Ms. C. and J. are suffering severe emotional consequences because of their prolonged separation. *Id.* ¶ 58-60.[4]

---

[4] After the complaint was filed, the government released Ms. C. on April 9, 2018, but she has not yet been reunited with her son, who remains detained in Chicago.

**ARGUMENT**

**I.    THE CASE IS JUSTICIABLE.**

    **A.  Ms. L.'s Claims Are Not Moot.**

      The government is incorrect that Ms. L.'s claims are moot.  MTD 6.  Her

reunification with S.S. was entirely the result of Defendants' voluntary cessation.

Defendants could once again separate her from her child at any moment.[5]

      "It is well settled that a defendant's voluntary cessation of a challenged

practice does not deprive a federal court of its power to determine the legality of the

practice."  *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S.

167, 189 (2000) (quotation marks omitted).  "[T]he party asserting mootness" bears

a "heavy burden" to establish that "it [is] absolutely clear that the allegedly

wrongful behavior could not" recur.  *Id.* (quotation marks omitted).  Defendants

plainly cannot meet that burden.  Ms. L.'s reunification with S.S. was the result of

Defendants' own decision to end their separation before this Court could rule.  And

Defendants have not identified what would prevent them from re-detaining and

separating Ms. L. and her daughter if this case were dismissed.  In those

circumstances, the voluntary-cessation rule ensures that the Court does not "leave

---

[5]  Even if Ms. L.'s individual claims were moot—which they are not—Plaintiffs' class claims would still remain justiciable.  *See Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1142-43 (9th Cir. 2016) (holding that even if the named plaintiff's claims were moot, the plaintiff "still would be entitled to seek certification" because "certification relates back to the filing of the complaint") (quotation marks omitted).  Here, reunification occurred after the filing of both the amended class complaint *and* the class certification motion.

the defendant free to return to his old ways." *Id.* (quotation marks and alterations omitted); *see EEOC v. FedEx Corp.*, 558 F.3d 842, 848 (9th Cir. 2009) (no mootness because defendant could "return to the challenged conduct at any time").

Mootness is especially unwarranted where a defendant "continues to defend the legality of" its voluntarily abandoned practice. *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012); *see In re United States*, 791 F.3d 945, 952 (9th Cir. 2015) (no mootness where defendant "continued to defend the practice's legality"); *Armster v. U.S. Dist. Ct.*, 806 F.2d 1347, 1359-60 (9th Cir. 1986) (no mootness where "defendant failed to acknowledge illegality of conduct"). That is the case here, because Defendants have never admitted that Ms. L.'s separation from S.S. was illegal, and they continue to defend their nationwide separation practice, which affects hundreds of other families. *See* MTD 10-21; Brané Decl., ECF No. 42-1, Ex. 14, ¶ 5. Defendants cannot satisfy their "formidable burden" to establish that separation cannot occur in the future. *Friends of the Earth*, 528 U.S. at 190.

## B.  Venue Is Proper for Ms. C. in This District.

The government argues that Ms. C. cannot bring her claims in this district, because at the time the complaint was filed she was detained in Texas. MTD 8-9. But venue is undoubtedly proper as to Ms. L., who was detained and separated from her daughter in this district, and the government has never argued otherwise. And for suits against the government, "venue need be proper for only one plaintiff." *Railway Labor Execs.' Ass'n v. ICC*, 958 F.2d 252, 256 (9th Cir. 1991); *Exxon*

*Corp. v. FTC*, 588 F.2d 895, 898-99 (3d Cir. 1978) ("[R]equiring every plaintiff in an action against the federal government or an agent thereof to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation. The language of the statute itself mandates no such narrow construction."); *Californians for Renewable Energy v. EPA*, 2018 WL 1586211, at *5 (N.D. Cal. Mar. 30, 2018) (same).

The government suggests that this rule does not apply in class actions, MTD 7, but "[v]enue in a class action is governed by the same principles that apply in any comparable action."  7A Wright & Miller, Fed. Prac. & Proc. § 1757 (3d ed., Apr. 2017).  The government provides no reason why the Ninth Circuit's rule that "venue need be proper for only one plaintiff" in suits against the federal government should apply differently in a class action.  *Railway Labor Execs.' Ass'n*, 958 F.2d at 256 (citing *Exxon* with approval).  Thus, in class actions against the government, courts have affirmed venue when *any* named plaintiff satisfies venue.  *See, e.g.*, *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 814-15 (W.D. Wash. 2016) (finding in class action that "venue is proper because at least one plaintiff resides in Washington"); *Matsuo v. United States*, 416 F. Supp. 2d 982, 997 (D. Haw. 2006) (same); *Garcia-Mir v. Civiletti*, 1981 WL 380696, at *4 (D. Kan. May 12, 1981) (finding venue in class action and noting that "[t]here is no requirement . . . that venue be proven to be independently proper for each named plaintiff"); *Holtzman v.*

*Richardson*, 361 F. Supp. 544, 552 (E.D.N.Y. 1973) (same), *rev'd on other grounds*, 484 F.2d 1307 (2d Cir. 1973).

At bottom, the government misses that courts have uniformly given a "broad interpretation" to the venue statute for suits against federal officials. *Sidney Coal Co., Inc. v. SSA*, 427 F.3d 336, 345 (6th Cir. 2005). That interpretation "is not only the majority view—it is the *only* view adopted by the federal courts" in the last four decades. *Id.* (emphasis added, quotation marks omitted). Even in other contexts, where courts have concluded that *different* venue statutes require each named plaintiff to satisfy venue, courts have expressly distinguished suits against federal officials under § 1391(e). For instance, in *Dukes v. Wal-Mart Stores, Inc.*, the district court analyzed the issue at length and concluded that while every named plaintiff needs venue under Title VII's venue rules, the *opposite* rule applies under § 1391(e). 2001 WL 1902806, at *6 (N.D. Cal. Dec. 3, 2001) (explaining that in suits against the government, "the proposition that every plaintiff must satisfy venue" has been correctly rejected).[6]

---

[6] The government cites *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1193 (N.D. Cal. 2017), to suggest that *all* named plaintiffs independently need to establish venue in a class action against the government. But *Saravia* ultimately concluded that *none* of the named plaintiffs' injunctive relief claims were properly venued under § 1391(e). *Id.* at 1191. *Saravia* therefore did not address this context, where one named plaintiff (Ms. L.) indisputably has venue under § 1391(e). In any event, *Saravia* ultimately rejected the government's overall challenge to venue, 280 F. Supp. 3d at 1193, and certified a nationwide class, *id.* at 1205. Here also, because the Court has uncontested venue over Ms. L., it can certify a class regardless of whether it concludes it has venue over Ms. C.

1
2
3
4
5
6
7
8

   In any case, even if venue were not proper for Ms. C., the Court can hear her claims under the doctrine of pendent venue.  Ms. L.'s and Ms. C.'s legal claims are "closely related"—indeed, almost identical.  *McNeary-Calloway v. JP Morgan Chase*, 863 F. Supp. 2d 928, 965 (N.D. Cal. 2012) (permitting additional plaintiff to bring claims under pendent venue).  And their claims "challenge one course of conduct, carried out by various federal actors."  *Saravia*, 280 F. Supp. 3d at 1193.

9

**C. The Court Has Habeas Jurisdiction Over Ms. C.'s Claims.**

10
11
12
13
14
15
16
17
18

   The government does not dispute that the Court had habeas jurisdiction over Ms. L. given that she was detained in this district.  Critically, moreover, the government does not contest that the court has jurisdiction over all the declaratory and injunctive claims brought by Plaintiffs and the putative class under 28 U.S.C. § 1331.  *See* MTD 8-9 (contesting habeas venue but not § 1331 jurisdiction).  Thus, regardless of whether the court additionally has habeas jurisdiction over Ms. C.'s claims, it plainly has jurisdiction to reach all of the claims in this case.

19
20
21
22
23

   That said, Ms. C.'s habeas claim is properly before this Court under 28 U.S.C. § 2241.[7]  The government argues that the Court "does not have venue over" Ms. C.'s habeas claim, because Ms. C. has not sued a respondent who has

24
25
26
27
28

---

[7] Suits seeking both habeas and injunctive remedies are common, particularly in the immigration context. *See, e.g.*, *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 125 (3d Cir. 2012); *Hernandez v. Lynch*, 2016 WL 7116611, at *1 (C.D. Cal. Nov. 10, 2016); *see also Rasul v. Bush*, 542 U.S. 466, 479-85 (2004) (entertaining claims brought under habeas and federal question statutes in same case); *Selgeka v. Carroll*, 184 F.3d 337, 342 (4th. Cir. 1999) (finding that the Court's ability to hear the case was "founded on 28 U.S.C. §§ 2241 and 1331").

"custody" over her.  MTD 7-8.  But in the immigration context, courts have recognized that supervisory officials are proper custodians for habeas purposes. *See Armentero v. INS*, 340 F.3d 1058, 1069-70 (9th Cir. 2003) (not precedential), *withdrawn on other grounds*, 382 F.3d 1153 (9th Cir. 2004) ("[A]s long as the petitioner names as respondent a person or entity with power to release [the habeas petitioner], a court should not avoid reaching the merits of his petition.") (citing *Dunn v. U.S. Parole Comm'n*, 818 F.2d 742, 744 (10th Cir. 1987)); *Bogarin-Flores v. Napolitano*, 2012 WL 3283287, at *2 (S.D. Cal. Aug. 10, 2012) (holding that "the Attorney General and the Department of Homeland Security" were "proper respondent[s]").[8]  In this case, Ms. C. has sued custodians who have full authority to order her reunification with J., including the Secretaries of Homeland Security and HHS, the Director of ICE, and the Director of ORR.

## D. The INA Does Not Bar Review.

Defendants contend that no court can review their separation practice, because review is precluded by 8 U.S.C. § 1252(a)(2)(B)(ii), which bars challenges to a "decision or action . . . the authority for which is specified under this subchapter to be in the discretion of" the government.  MTD 12-14.  Defendants claim this jurisdictional provision applies to 8 U.S.C. § 1231(g)(1), which directs that "[t]he Attorney General shall arrange for appropriate places of detention."  But

---

[8] *See also Santos v. Smith*, No. 17-cv-0020, 2017 WL 2389722, at *8 (W.D. Va. June 1, 2017); *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 723-25 (D. Md. 2016); *Sanchez-Penunuri v. Longshore*, 7 F. Supp. 3d 1136, 1148 (D. Colo. 2013).

Defendants' own case rejected that very argument.  *See* MTD 15 (citing *Aguilar v. ICE*, 510 F.3d 1, 20-21 (1st Cir. 2007)) ("We reject the government's sprawling construction [that] section 1252(a)(2)(B)(ii)" applies to § 1231(g)(1)).

Section 1252(a)(2)(B)(ii) does not apply to a statute "unless the statute *explicitly* refers to the discretion of the Attorney General."  *Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc) (emphasis added).  In other words, the statute must "contain[] language indicating that the decision is entrusted to the Attorney General's discretion."  *Kucana v. Holder*, 558 U.S. 233, 246 (2010).  This means that the statute must refer to the Executive's "sole and unreviewable discretion," or otherwise specify that the decision is entirely discretionary.  *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 690 (9th Cir. 2003); *see also Kucana*, 558 U.S. at 245-46 & nn.13-14 (describing types of statutes that are covered).

Section 1231(g)(1) does not refer to the Attorney General's "discretion" or contain any similar formulation.  Just the opposite:  It directs that "[t]he Attorney General *shall* arrange for *appropriate* places of detention."  8 U.S.C. § 1231(g)(1) (emphasis added).  The statute thus fails to satisfy the clear criteria that are required to invoke § 1252(a)(2)(B)(ii).  *See Aguilar*, 510 F.3d at 20 (explaining that "section 1231(g) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion").  In short, § 1252(a)(2)(B)(ii) "applies not to all decisions the Attorney General is entitled to make, but to a narrower category of decisions where Congress has taken the *additional* step to *specify* that the sole authority for the

1
2

action is in the Attorney General's discretion." *Alaka v. Att'y Gen.*, 456 F.3d 88, 95 (3d Cir. 2006) (emphasis added).[9]

3
4
5
6
7
8
9
10
11
12
13
14
15

Moreover, even if § 1252(a)(2)(B)(ii) did generally apply to § 1231(g)(1), Plaintiffs' particular claims would still be reviewable, because "decisions that violate the Constitution cannot be 'discretionary'" and § 1252(a)(2)(B)(ii) precludes review only of certain *discretionary* decisions. *Kwai Fun Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004) (holding that "constitutional or purely legal" claims "are not barred by § 1252(a)(2)(B)"); *see Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) (holding that § 1252(a)(2)(B)(ii) does not bar "jurisdiction over questions of law"). Defendants have no discretion to adopt a practice that violates the Due Process Clause or federal statutes.[10]

16
17
18
19
20
21
22
23
24

[9] The government incorrectly cites pre-*Kucana* decisions stating that the Attorney General generally has discretion to choose where to detain immigrants. MTD 13-14. Plaintiffs do not dispute that the Attorney General has some discretion within legal bounds regarding placement decisions. But as *Kucana* and *Delgado* make clear, even where an official has discretion under a statute, § 1252(a)(2)(B)(ii) still does not apply unless the statute explicitly specifies that discretion. Thus, a "decision can still be discretionary without triggering § 1252(a)(2)(B)(ii)'s discretionary review bar." *Arbid v. Holder*, 700 F.3d 379, 384 (9th Cir. 2012). Indeed, in *Kucana*, although the Supreme Court acknowledged that the BIA has "broad discretion" over motions to reopen, the Court nonetheless held that § 1252(a)(2)(B)(ii) did not apply to motions to reopen because the statute's terms did not *expressly* provide for discretion. 558 U.S. at 838.

25
26
27
28

[10] For the same reason, contrary to the government's argument (MTD 11-12), § 1252(a)(2)(B)(ii) does not bar legal claims challenging parole decisions. In any event, the amended complaint does not seek an injunction ordering Defendants to grant parole; rather, it seeks an injunction to *reunite* Plaintiffs with their children, "either" by "detain[ing] them together in the same facility," *or* by "releas[ing] class members along with their children." Am. Compl. at 12.

**E.  The APA Does Not Bar Review.**

The government also asserts that, no matter how arbitrary, its decisions to separate parents from their children are not subject to APA review, because such decisions are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); MTD 18.[11]  Plaintiffs' claims are not committed to agency discretion within the meaning of the APA.  Section 701(a)(2) is a "narrow exception to the presumption of reviewability of agency actions," and applies only "in those rare instances" when "there is no meaningful standard against which to judge the agency's exercise of discretion."  *Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003).  Meaningful standards can come from "statutes, regulations, established agency policies, or judicial decisions."  *Id.*  Here, there is a voluminous body of due process decisions, statutes, and child welfare practices that supply standards for when it is lawful to separate families.  *See infra* Part II.A; Amicus Brief of Children's Rights Groups, ECF No. 17-3 (explaining standards).  Moreover, defendants themselves have long had a policy of detaining arriving families together.  Am. Compl. ¶ 33b.  As the Ninth Circuit has held, even "an irrational departure from established policy" is enough to defeat a § 701(a)(2) defense.  *Mendez-Gutierrez*, 340 F.3d at 868.

---

[11] The government's conclusory assertion—confined to a single sentence and a single unexplained citation—is insufficient to preserve this argument.  *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("[A] bare assertion does not preserve a claim.").

The one case the government cites proves the point.  MTD 18.  In *Webster v. Doe*, 486 U.S. 592, 600 (1988), the Supreme Court held that the CIA Director's decision to terminate his employee was committed to unreviewable agency discretion because the statute provided that the CIA Director "may, in his discretion," terminate CIA employees whenever he "shall *deem* such termination necessary or advisable"—"not simply when the dismissal *is* necessary or advisable."  486 U.S. at 600 (emphases in original) (quoting statute).  In contrast, § 1231(g)(1) does not allow the Attorney General to take any action he "deems" appropriate; rather, it directs that he *shall* choose "places of detention" that *are* "appropriate," with no mention of discretion.

**F.  The Separation of Plaintiffs' Families Is Final Agency Action.**

The government suggests that its separation practice is not "final agency action" under the APA.  MTD 19 (no citations); *see* 5 U.S.C. § 704.  But the government's decision to separate families is not "merely tentative."  It is *already* being carried out against the Plaintiffs and proposed class members.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  And separation has a "direct and appreciable" impact on Plaintiffs' "rights"—it takes away their basic right to family unity.  *Id.* at 178.  The government responds that it might one day reunite the Plaintiffs' families, MTD 19, but it does not deny that it has made a definitive decision to separate the Plaintiffs from their children during their detention—a decision that will have lasting and likely permanent consequences.  Am. Compl. ¶ 33a, 34a; *see Doe v.*

*Trump*, 2017 WL 6551491, at *13 (W.D. Wash. Dec. 23, 2017) (holding that agency action was final because it "has significant real-world impacts," regardless of whether action is mere "suspension" or "indefinite"). The "possibility" that the government eventually "may revise" its separation decisions "based on new information" does not defeat finality. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1814 (2016). Indeed, if Defendants' position were correct, parents and their young children could be separated whenever the government chooses and no court could ever review the separation, because Defendants could always say that the separation might eventually end. That extraordinary position is not the law.

## II.   PLAINTIFFS HAVE STATED A DUE PROCESS CLAIM.

### A. Plaintiffs Have Stated a Substantive Due Process Claim.

The Supreme Court has long recognized family integrity to be a core interest protected by the Constitution. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality op.) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (collecting cases). Courts have thus been loath to allow the government to separate children from their parents (particularly children as young as 7 years old), and have made clear that separation may not occur absent a clear

demonstration that the parent is unfit or is otherwise endangering the child.  *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("[T]he Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.") (quotation marks omitted); *United States v. Loy*, 237 F.3d 251, 269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,' and thus interference in the family relationship is unconstitutional."); *cf. Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012).

### B. The Government's Justifications for Its Separation Practice Are Shifting and Unpersuasive.

The government cannot even settle on a reason why it needs to subject hundreds of families to this separation practice.  In public statements over the last year, DHS officials have said that they would start separating families as a way "to deter" future asylum seekers and other families from coming to the United States.[12]

---

[12] Rafael Bernal, *DHS Head Confirms He's Considering Separating Families at Border*, The Hill, Mar. 6, 2017, http://thehill.com/latino/322608-dhs-head-confirms-hes-considering-separating-families-at-border; *see also* Caitlin Dickerson & Ron Nixon, *Trump Administration Considers Separating Families to Combat Illegal Immigration*, N.Y. Times, Dec. 21, 2017, https://www.nytimes.com/2017/12/21/us/trump-immigrant-families-separate.html; Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN, Mar. 7, 2017, https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.

But after this lawsuit was filed, the government shifted to new justifications, denying any claim that Plaintiffs' separations were motivated by "ulterior law enforcement purposes," as such motives would be "antithetical to the child welfare values of ORR."  Opp. to PI Mot., ECF No. 46, at 3.[13]

Defendants have now offered a series of rationales to retroactively justify the legality of their separation practice: (1) doubts about parental relationships; (2) Congress has mandated family separation; and (3) the parents and children have no due process right to be together.  None of these rationales has merit.

### 1.  Any supposed doubts about parental relationships do not justify the government's separation practice.

The initial papers Defendants filed in this case largely sought to justify their practice on the ground that separating parents from their small children was necessary to ensure that children were not housed with adults who are not actually the child's parents.  Defendants thus represented that they took S.S. away "due to ICE's suspicions about [Ms. L.'s] claim to be her mother."  Opp. Mot. to Expedite, ECF No. 28, at 2.  Yet Defendants never told Ms. L. they harbored any doubts about the relationship (assuming they actually did).  And Defendants disregarded obvious indications of parentage, including that S.S. was screaming for her mother as she was taken away.  Defendants also failed to perform a simple DNA test until

---

[13] The government's shift is not surprising.  If the purpose of separating families *were* to deter legitimate asylum seekers by subjecting young children to this cruel practice, the practice would clearly violate the Due Process Clause, which "at a bare minimum" prohibits the government from punishing  "an individual detained under civil process."  *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

more than *four months* after separating them (and only after this lawsuit was filed). Am. Compl. ¶ 42-53.

Given that there are so many quick and effective tools to verify a parental relationship, the government has, unsurprisingly, largely abandoned its parental relationship argument, relegating it to a footnote.  MTD 14 n.3.  Indeed, the government has never questioned that Ms. C. is the mother of her 14 year-old son.

### 2.  Family separation is not required by statute.

Defendants now assert that federal statutes require them to separate parents from their children, and that it is therefore *Congress*, not DHS, who bears responsibility.  MTD 4, 6, 10.  Defendants' attempt to shift responsibility to Congress is unpersuasive.  For starters, Defendants' new justification contradicts their own actions over the last decade, as well as their representations in this very case.  Defendants claim that, under the relevant statutes, they must separate every detained parent and child.  *See* MTD 10.  But if that were true, no parent and child could *ever* be detained together in family detention.  Yet the government has been detaining thousands of parents and children together in family detention for over a decade.  *See* Am. Compl. ¶ 35; MTD 14 n.3 (acknowledging that Defendants maintain "family residential centers").  In fact, the government's own declarant confirmed that parents and children "may be detained at a family residential center" together.  Ortiz Decl., ECF No. 46-1, ¶ 3.

Not surprisingly, then, there is nothing in the relevant statutes that remotely requires Defendants to separate young children from their parents.   Defendants rely on the TVPRA. 6 U.S.C. § 279; 8 U.S.C. § 1232.  But the TVPRA seeks to *protect* children.  *See* H.R. REP. 110-430(I), 57 (TVPRA enacted to ensure "better care and custody of unaccompanied alien children").  The same statute cannot be a justification for *harming* children by subjecting them to the trauma of separation from their parents.  *See King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) ("We cannot interpret federal statutes to negate their own stated purposes.").

The government points to 6 U.S.C. § 279(g)(2)(ii), which defines certain children as "unaccompanied," who must then be placed in ORR custody.  MTD 10, 11; *see* 8 U.S.C. § 1232(b)(3).  But "children who are apprehended by DHS while in the company of their parents are not in fact 'unaccompanied' and if their welfare is not at issue, they should not be placed in ORR custody."  *Bunikyte ex rel. Bunikiene v. Chertoff*, 2007 WL 1074070, at \*2 (W.D. Tex. Apr. 9, 2007)  (quoting House Approp. Comm., *Dep't of Homeland Sec. Approp. Bill of 2006*, 109th Cong., 1st Sess.); *id.* ("When detention of family units is necessary, the Committee directs DHS to use appropriate detention space to house them together."); *accord* H.R. Rep. No. 110-430, § 236(h)(2), at 27 (Nov. 6, 2007) (a child need not be treated as unaccompanied when her "parent is in [her] physical presence . . . at the time of such child's apprehension and during the child's detention").

In short, Congress has not directed Defendants to separate parents and children like Ms. L. and her 7 year-old daughter.  Nor does the statute remotely prevent Defendants from reuniting families like Ms. C. and her son J., who also came to the United States together.  Even if J. was validly sent to an ORR facility while his mother spent 25 days in criminal custody for the misdemeanor of illegal entry—which Plaintiffs do not challenge in this lawsuit—the government should have reunited them once Ms. C. returned to ICE custody.  No statute would have prohibited that reunification.  Indeed, in that situation, ORR's "child welfare values" undoubtedly allow it to do what due process and universal child welfare practice require: reunite parents and children as soon as possible.  Opp. to PI Mot., ECF No. 46, at 3.

Moreover, even if a statute told them otherwise, Defendants would still be required to follow the dictates of due process, because "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973).  But nothing Congress has done remotely required DHS to cause harm to children by separating them from their parents.  Defendants' retroactive attempt to find some explanation only underscores how arbitrary their separation practice really is.

### 3.  Plaintiffs have a due process right to remain together.

The government adopts the fallback position that it need not offer a legitimate justification for its separation practice because (in its view) Plaintiffs

lack a due process right to be with their children.  The cases on which the government relies are inapposite.  MTD 14-16.   First, the government cites cases involving challenges to a parent's detention and transfer away from children who were *not* themselves arrested and detained.  *See*, *e.g*., *Milan-Rodriguez v. Sessions*, 2018 WL 400317, at *10 (E.D. Cal. Jan. 12, 2018) (stating that separation in such circumstances is the "ordinary incident of immigration detention"); *Aguilar*, 510 F.3d at 22 (same).  But even if those cases were rightly decided, the practice here is not a necessary incident of detention; it is the result of an *unnecessary* governmental action intended to separate family units who were arrested *together*, and who are being detained far apart despite the availability of family detention facilities that were specifically established to house families together.  Similarly, the government cites cases subordinating the right of family integrity to Congress's power to deport noncitizens, where courts have rejected a claim that the deportation of a parent violates the constitutional rights of citizen children.  *See*, *e.g*., *Gallanosa by Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir. 1986).  But Plaintiffs are not contesting the grounds for their removal—only their treatment by the government while they contest their removal.

Defendants also cite cases where interference with family integrity was justified by safety interests, and where the plaintiffs could identify no "obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Overton v.*

*Bazetta*, 539 U.S. 126, 136 (2003); *see id.* at 126-27 (upholding restrictions on the family visitation rights of sentenced prisoners because of "valid interests in maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from accidental injury"). Here, the government has claimed no security rationale, and family detention centers provide a clear alternative to separation. [14]

Finally, Defendants assert that their practice of separating young children from their parents does not "shock the conscience" and thus does not violate substantive due process. MTD 17. That is not the test governing a challenge to a practice of separating children. In any event, Plaintiffs easily meet this test. The government's decision to forcibly separate parents and children, in service of no compelling or even legitimate purpose, clearly shocks the conscience. That is abundantly illustrated by cases like Ms. L.'s. Not only was she separated from her 7 year-old daughter for months, but she had to listen to her daughter frantically begging not to be taken away.

### 4. The government's separation practice also violates Plaintiffs' procedural due process rights.

The government argues that Plaintiffs cannot state a procedural due process violation because its separation practice violates no protected liberty interest. MTD 18. But, as set out above, the practice *does* implicate a substantive due process

---

[14] Moreover, insofar as the government relies on criminal cases, that reliance is misplaced for the additional reason that civil detainees have rights than criminal detainees. *See Jones*, 393 F.3d at 931-32.

interest.  And it is uncontested that the government is separating families without any process to determine whether the separation is justified by parental abuse, unfitness, or any other reason.  Nor is there any question that process is critical. For example, had Defendants told Ms. L. that they had doubts about her parental relationship (assuming they genuinely did), an expeditious process was critical to inform Ms. L. of the doubts and allow her to request a DNA test.

**III.   PLAINTIFFS HAVE STATED AN APA CLAIM.**

An agency action is arbitrary and capricious under the APA (1) if the agency has failed to provide a reasoned explanation, *Ctr. for Bio. Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008); (2) if its explanation is based on an erroneous legal premise, *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); or (3) if the government fails to account for reasonable "alternative[s]," *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 48 (1983). The government argues its actions are not arbitrary and capricious because separation is required by statute.  MTD 18-19.  But, as explained above, Congress has not remotely required that families be separated.  *See supra* Part II.A.2.  Thus, because the legal premise underlying its actions is incorrect, its separation practice is necessarily arbitrary.  *See Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1037 (N.D. Cal. 2018).

As importantly, the government has not even acknowledged or explained its change in policy from previous years, when there was no widespread separation of

families.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 51 (2009) ("An agency may not . . . depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy.").  In addition to this failure to explain its policy change, the government has failed to explain why it is not using the available alternative of family detention.  *State Farm*, 463 U.S. at 48.  The government's shifting rationale is a classic example of arbitrary action.

## IV.   PLAINTIFFS STATE A CLAIM UNDER THE ASYLUM STATUTE.

Noncitizens have "a statutory right to apply for asylum."  *Campos v. Nail*, 43 F.3d 1285, 1288 (9th Cir. 1994) (citing 8 U.S.C. § 1158(a)(1)).  "That right may be violated by a pattern or practice that forecloses the opportunity to apply," *id.*, or that "interfere[s] with plaintiff class members' exercise of their right to apply." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990) (upholding permanent injunction against unlawful interference with opportunity to meaningfully apply for asylum); *Orantes-Hernandez v. Holder*, 321 Fed. App'x 625, 626-27 (9th Cir. 2009) (refusing to dissolve the injunction); *Campos*, 43 F.3d at 1287(affirming an injunction against a practice that interfered with the statutory right to apply for asylum: an immigration judge's practice of denying transfer motions to asylum seekers who had moved across the country).[15]

---

[15] Because this claim is statutory, the government's due process cases are beside the point.  MTD 20-21 (citing only due process cases); *see Campos*, 43 F.3d at 1288-89 (resolving impediment claim based on asylum statute, without due process).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The government claims that the Plaintiffs' allegations do not "establish that their rights have been interfered with or that they have experienced any harm." MTD 19-20.  But the Plaintiffs have alleged both harm and interference with their right to apply for asylum.  As for harm, Plaintiffs' forced separation from their children has caused them enormous trauma.  Am. Compl. ¶ 43-48.  They have lost weight, grown depressed, and been made to fear that they would never see their children again.  *Id.* ¶ 45, 48.  The complaint also contains allegations about the general harms that family separation causes to all class members.  *Id.* ¶ 33a-34a. And the complaint explains, for instance, how these harms have impeded Ms. L.'s asylum application: "in one moment of extreme despair and confusion, Ms. L. told an immigration judge that she wanted to withdraw her application for asylum, realizing her mistake only a few days later."  *Id.* ¶ 49.  The complaint further explains that Defendants have impeded the Plaintiffs' asylum applications by denying them the ability to speak with their children more than a handful of times, and even then only for a few minutes.  *Id.* ¶ 45, 58.

## CONCLUSION

The motion to dismiss should be denied.

1

Dated: April 20, 2018                          Respectfully Submitted,

2
                                               */s/ Lee Gelernt*
3
Bardis Vakili (SBN 247783)                     Lee Gelernt*
ACLU FOUNDATION OF SAN                         Judy Rabinovitz*
4
DIEGO & IMPERIAL COUNTIES                      Anand Balakrishnan*
5
P.O. Box 87131                                 AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131                       UNION FOUNDATION
6
T: (619) 398-4485                              IMMIGRANTS' RIGHTS PROJECT
7
F: (619) 232-0036                              125 Broad St., 18th Floor
*bvakili@aclusandiego.org*                     New York, NY 10004
8
                                               T: (212) 549-2660
9
Spencer E. Amdur (SBN 320069)                  F: (212) 549-2654
AMERICAN CIVIL LIBERTIES                       *lgelernt@aclu.org*
10
UNION FOUNDATION                               *jrabinovitz@aclu.org*
11
IMMIGRANTS' RIGHTS PROJECT                     *abalakrishnan@aclu.org*
39 Drumm Street
12
San Francisco, CA 94111
13
T:  (415) 343-1198
F:  (415) 395-0950
14
*samdur@aclu.org*
15

16

17
*Admitted Pro Hac Vice*
18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.