Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*        *\*Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al.,<br><br>                    *Petitioners-Plaintiffs*,<br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of | Case No. 18-cv-00428-DMS-MDD<br><br><br>Date Filed: April 27, 2018<br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**<br><br><br>**Hearing Date: May 4, 2018**<br>**Time: 1:30 p.m.**<br>**Courtroom: 13A**<br>**Judge: Dana M. Sabraw** |

1   CBP; Pete Flores, San Diego Field Director,
    CBP; Hector A. Mancha Jr., El Paso Field
2   Director, CBP; Alex Azar, Secretary of the
    Department of Health and Human Services;
3   Scott Lloyd, Director of the Office of Refugee
    Resettlement,
4

5

6                          *Respondents-Defendants.*

7

8

9

10   Spencer E. Amdur (SBN 320069)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11   IMMIGRANTS' RIGHTS PROJECT
     39 Drumm Street
12   San Francisco, CA 94111
     T:  (415) 343-1198
13   F:  (415) 395-0950
     *samdur@aclu.org*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

The government does not deny that it now has a widespread practice of separating hundreds of children from their parents, or that the practice applies even to babies and toddlers.  *See* Caitlin Dickerson, *Hundreds of Children Have Been Taken from Parents at U.S. Border*, N.Y. Times, Apr. 20, 2018, *available at* https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html ("a spokesman for [HHS] . . . acknowledged in a statement that there were 'approximately 700'" families forcibly separated since October 2017; "more than 100 children under the age of 4" have been taken away).  The government also does not deny that this practice is unprecedented and that no previous administration routinely separated immigrant families.  The government does not claim that the class members are unfit parents, or that they have been given any chance to contest the alleged bases for their separation.  Nor does the government deny that it has numerous easy ways to verify parentage, like DNA tests.  The government further concedes that it has numerous family facilities designed precisely to ensure that parents are detained *together* with their children.

Although the government notes that it sometimes needs to move quickly to verify parentage, it offers no counter to Plaintiffs' evidence that parentage can be verified quickly (and certainly in less than months).  The government also repeatedly states that many parents are subject to mandatory detention, but that argument is wholly unresponsive.  Plaintiffs do not argue that they cannot be detained, but only that if the government believes if it is necessary to detain parents and young children, it must detain them *together* in one of the family detention centers established specifically for this purpose.

The government additionally argues that the TVPRA *requires* family separation.  But it is perverse to interpret the TVPRA—which was intended to *protect* vulnerable children—to instead require their re-traumatization.  Moreover, if the TVPRA actually required the separation of families, then the family detention

centers would be empty; thus, even the government apparently does not believe the TVPRA requires separation.  Ultimately, the government's attempts to justify its family separation practices do not withstand *any* scrutiny, much less the heightened scrutiny that applies when children are taken from parents.

The government argues that the balance of harms tips in their favor, acknowledging only that the separated children may suffer "some" harm.  The overwhelming evidence in the record, however, shows that there is more than "some" harm being done to these children, some as young as 2 years old.  *See* Decl. of Mirian, Ex. 25 ¶¶ 2, 7 (asylum-seeking parent separated from 18 month old and not even allowed to comfort child when the baby was taken away).  The Court should restore the decade-long status quo that existed prior to this Administration's decision to implement its current family separation practice and enjoin the government from continuing to separate class members from their children.[1]

## ARGUMENT

## I.  THE CASE IS JUSTICIABLE.

The government repeats its justiciability arguments in their motion to dismiss and class certification opposition.  ECF Nos. 56, 59.  To avoid repetition, Plaintiffs

---

[1] Defendants claim that Plaintiffs are seeking a "mandatory injunction that should be subject to heightened scrutiny," because it allegedly "goes beyond maintaining the status quo."  PI Opp., ECF No. 57 at 11.  To the contrary, the "status quo" for these purposes "refers to the legally relevant relationship between the parties before the controversy arose."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014).  Here, that is the period of time before Defendants unlawfully took Plaintiffs' children away from them.  In any event, the Court need not decide which standard governs here, because Plaintiffs satisfy the requirements for mandatory relief given the extreme harm they are suffering from the separations.  *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201 (N.D. Cal. 2017) (granting preliminary relief even assuming that plaintiff sought "mandatory" injunction because "[t]he detention of minors without due process results in 'extreme or very serious damage' to this vulnerable population").

will not address those arguments again, and instead incorporate their previous responses.[2]

## II. SECTION 1252(f)(1) DOES NOT BAR CLASSWIDE RELIEF.

The government claims that 8 U.S.C. § 1252(f)(1) bars part of Plaintiffs' request for preliminary relief because it would enjoin "DHS's operations relative to Sections 1225(b) and 1231." PI Opp., ECF No. 57, at 13-14. But enjoining the government's family separation practice would not interfere with the lawful "operation of" Sections 1225(b) or 1231. That is because Plaintiffs do not challenge the government's authority to detain them; rather, they seek to "enjoin Defendants from continuing to separate . . . the [] class members from their children." Am. Compl., ECF No. 32, at 12.D. The government can thus effectuate the requested injunction simply by detaining the plaintiff families together. Indeed, that is exactly what the government has done for almost a decade using its family detention facilities.[3]

Moreover, even if Plaintiffs' requested relief did implicate "the operation of" Sections 1225(b) and 1231–which it clearly does not–Section 1252(f)(1) would still not apply. By its terms, Section 1252(f)(1) prohibits the issuance of an individual

---

[2] Insofar as the government suggests any modification to their justiciability arguments, they suggest (PI Opp., ECF No. 57, at 12) that once Ms. C. was released from detention, she could no longer obtain any relief because she is not seeking to be re-detained in an ICE family residential facility. But the requested injunction is designed to reunify parents with their children. If the government chooses to detain parents, they must detain them with their children, in family detention facilities. If Defendants choose to release parents, they must release their children as well; indeed, even Defendants admit that ORR is not supposed to continue holding children where there is a suitable placement for the child (which obviously would be the case if the parent was released).

[3] Of course, the government could also effectuate Plaintiffs requested relief by simply releasing them and their children from custody pursuant to its existing release authority. *See*, *e.g.*, 8 U.S.C. § 1226(a); 8 U.S.C. § 1182(d)(5). Doing so would not inhibit "the operation of" the relevant statutes either.

or class-wide injunction *only* where immigration "proceedings" have not "been initiated." Thus, the statute does not bar a classwide injunction where, as here, all the individuals in the class *have* been or will be in immigration proceedings.[4] *Cf. Califano v. Yamasaki*, 442 U.S. 682, 700 (1979) (observing "a wide variety of federal jurisdictional provisions speak in terms of individual plaintiffs, but class relief has never been thought to be unavailable under them").

Finally, Section 1252(f)(1) does not limit the Court's ability to issue classwide *declaratory* relief. *See Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D.Mass. 2014) ("At a minimum, class-wide declaratory relief is available . . . . [because] the statute, by its own terms, does not proscribe a class-wide declaratory remedy.").[5]

## III. THE GOVERNMENT'S NEW AND WIDESPREAD SEPARATION PRACTICES VIOLATE DUE PROCESS AND THE APA.

The original (and actual) rationale for the government's separation practice is the one they announced to the media repeatedly: Taking children away from their

---

[4] In *Jennings v Rodriguez*, 138 S. Ct. 830 (2018), on which the government relies, the majority did not reach the question of the proper interpretation of 1252(f)(1). In dissent, however, Justice Breyer, joined by two other Justices, emphasized that Section 1252(f)(1) would not have barred classwide relief in that case, because "[e]very member of the classes . . . is an 'individual alien against whom proceedings under such part have been initiated.'" 138 S. Ct. at 875 (Breyer, J., dissenting).

[5] Additionally, Plaintiffs have asserted jurisdiction under both federal-question jurisdiction and habeas jurisdiction. Section 1252(f)(1) does not apply to habeas actions because it makes no specific reference to repealing habeas corpus, and "[i]mplications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives. . . ." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299 (2001) (internal citation omitted); *compare* 8 U.S.C. §1252(f)(1), *with* 8 U.S.C. §§ 1252(a)(2)(A), (B), (C), 1252(a)(4), (5), 1252(g) (specifically repealing habeas jurisdiction).

parents will deter future asylum-seeking families from coming to this country to seek a safe haven.  *See* Plaintiffs' MTD Opp., ECF 58 at, 16 n.12 (citing government statements).  Defendants have now shied away from that clearly unconstitutional justification for separating families.  As a result, Defendants have been forced to offer a series of shifting rationales to retroactively justify its unprecedented practice.  None of the explanations Defendants have provided in this litigation is a remotely sufficient justification, and all of them fail to explain why the government cannot use the same family detention facilities and methods for determining parentage that it has been using for decades.

### A. Children Cannot Be Taken Away Unless Their Parents Present Dangers To Them.

As explained in Plaintiffs' opening brief and opposition to the motion to dismiss, the government is violating the class members' fundamental rights to family integrity by keeping them separated from their children, without any demonstration that the class members pose a danger to their children.  Class PI Mem., ECF No. 48-1, at 8-13; MTD Opp., ECF No. 58, at 15-16.  The government cites no relevant authority that authorizes this practice, and instead relies on (1) cases where separation was a necessary incident of the parent's own detention or deportation, because the child was not simultaneously being detained or deported, MTD, ECF No. 48-1, at 15; and (2) cases where separation was justified by a compelling security interest that overcome family visitation rights, *id.,* at 16 & n.4.  None of these cases hold that parents' "fundamental liberty interests" somehow disappear because of civil detention.  *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality op.).  And none of them apply to this case, where separation is not justified by any security interest and is not a necessary incident of detention.  *See* MTD Opp., ECF No. 58, at 20-22 (addressing these cases).

### B. The Government's Ever-Shifting Rationales Are Inadequate.

The government has at different times offered a variety of rationales for its separation practices.  *See* MTD Opp., ECF No. 58, at 16-17.  As noted above,

outside this lawsuit, government officials have explained that the practice of "routinely separat[ing] immigrant adults from their children" is designed to be "aggressive" about "policing the border."  Dickerson, *Hundreds of Immigrant Children*, *supra*; *see* MTD Opp., ECF No. 58, at 16 n.12.

In this litigation, the government has pivoted away from any "ulterior law enforcement purposes."  Initially, Defendants claimed that Ms. L. was separated from S.S. because of "suspicions" that the two were not related."  Defs.' Individual PI Opp., ECF No. 46, at 3; Opp. Mot. to Expedite, ECF No. 28, at 2.  Then, in its motion to dismiss, the government dropped this rationale, arguing instead that Congress had "*required* ICE to transfer" S.S. simply because "Ms. L. was detained by ICE" MTD, ECF 48-1, at 10, 4 (emphasis added); *see id.* at 11 (same for Ms. C.).  Now, in its opposition to the preliminary injunction motion, the government states that "various reasons" may justify taking children from their parents.  PI Opp., ECF 57, at 15.  But none of Defendants' ever-shifting rationales is persuasive.

Defendants begin by reviving their contention that doubts about parentage may require family separation.  But there are multiple ways to quickly verify a parental relationship, including interviews, observational techniques, and DNA tests.  Guggenheim Decl., ECF No. 48-1 ¶¶ 18-20; Gilman Decl., ECF No. 48-3 ¶ 13.  These accepted techniques belie the government's suggestion that it needs to separate all immigrant families who lack "identity documents" in order to "protect children from exploitation."  PI Opp., ECF 57, at 15, 16.  Moreover, the government is even separating families that *do* have identity documents proving parentage.  *See* Decl. of Mirian, Ex. 25 ¶ 5.  Even if concerns about parentage were truly the reason for its practices, the government's "separate first" approach would be an irrational way to protect child welfare.  As one of the nation's foremost child welfare experts has explained, "it violates fundamental principles of child welfare

to remove children based merely on an unproven suspicion . . . ."  Guggenheim Decl., ECF No. 48-1 ¶ 17.

The government's treatment of Ms. L. and S.S. illustrates the inadequacy of this rationale.  When the government tore S.S. away from Ms. L., S.S. was screaming and frantically begging not to be separated from her mother.  And yet the government failed to do a basic DNA test before inflicting the trauma of forced separation (or even tell Ms. L. that it harbored doubts, if it truly did).  In fact, Defendants did not conduct a DNA test for *four months*, and did so only after Ms. L. filed this lawsuit (which proved parentage).

None of the government's remaining justifications fare any better.  It asserts that children like J. are validly sent to ORR custody while their parents serve their misdemeanor sentences for illegal entry.  PI Opp., ECF 57, at 16.  But it does not explain why J. was not immediately reunited with Ms. C. after she was returned to immigration detention.  There is no justification for continuing their separation—the government invokes no doubts about parentage, fitness, or anything else.

Defendants additionally argue that the TVPRA requires mandatory separation, because once parents are detained, they become "unavailable" to care for their child.  But nowhere does the text of the statute say that parents who are detained are "unavailable" to care for their child.  If the TVPRA actually required the separation of families, then neither this Administration, nor prior ones, could have held families together in family detention centers.  Yet those detention centers currently hold numerous families and have routinely done so in the past—all while the TVPRA was in effect.  Thus, it does not appear that Defendants themselves believe the TVPRA requires separation.[6]  The government also invokes unspecified

---

[6] Indeed, the government suggests that Ms. L was separated from her then 6 year-old daughter because there were doubts about whether she was the real parent.  Yet if the government actually believed that the TVPRA requires separation, it would not be suggesting that Ms. L. and her daughter could have remained together had there not been doubts about parentage.

"legal and operational challenges" to detaining families in family residential centers, PI Opp., ECF 57, at 17, but does not elaborate, much less show that these challenges are different than those in prior years when family detention centers were routinely used.[7]

The government spends considerable space outlining the various statutes that require detention of parents, including, most prominently, the expedited removal statute.  PI Opp., ECF No. 57, at 17-18.  But the fact that certain statutes may require the detention of the parent misses the point.  Plaintiffs do not claim that parents cannot be detained, only that they should be detained with their children unless there is a showing that they present a danger to the child.  In fact, most families detained in DHS's family facilities over the last decade were in expedited removal proceedings.  And, notably, the government has argued vigorously to keep families in those facilities, and offers no explanation for its sudden change in position.  *See* Defs' Response to Order to Show Cause, *Flores v. Lynch*, No. 85-cv-4544, ECF No. 184, at 23 (C.D. Cal. Aug. 6, 2015) ("family facilities [is] consistent with the requirements of the INA.").  *See also* Declaration of Barbara Hines, Ex. 27 ¶7 (explaining that family detention facilities at Karnes and Berks hold parents subject to the same detention provisions as the named plaintiffs).[8]

At bottom, none of the government's ever-changing reasons set forth in this litigation accounts for the fact that it has been using family detention for over a decade.  All of its alleged rationales have existed throughout that time—parentage

---

[7] Defendants cryptically claim that the requirements of a settlement in another case (*Flores*) bear on this case, PI Opp., ECF No. 57, at 17 n.2, but fail to explain those requirements, much less show why any of them would bar Plaintiffs' requested relief.

[8] The government makes a similar argument as to parents whose prior removal orders are being reinstated under 8 U.S.C. § 1231(a)(5), but again, numerous such parents have been detained in family residential centers (along with their children) for years.  *See* Hines Decl., Ex. 27 ¶ 7.

questions, the immigration detention statutes, the TVPRA, the illegal entry statute, and expedited removal.  And yet none has ever necessitated widespread family separation.

### C. The New Separation Practice Violates the APA.

The failure to explain the change in policy likewise violates the APA's requirement of reasoned decisionmaking.  5 U.S.C. § 706(2)(a).  The government identifies no "good reasons for the new policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Citing long-extant statutes does not explain why a change in practice is now required.  Nor does the perennial need to verify family relationships.  The government has completely ignored the "facts and circumstances that underlay . . . the prior policy" of not separating families, including the terrible trauma that separation inflicts.  *Id.* at 516.

In addition, to the extent the government relies on doubts about parentage, it has entirely failed to explain (1) why it cannot continue to use the many accepted methods for quickly verifying familial relationships, or (2) why it must now separate families *before* taking steps as basic as a DNA test.  Guggenheim Decl., ECF No. 48-1 ¶¶ 13, 17-20.  The failure to consider obvious and less-damaging "alternative[s]" are further reason why the government's practice is arbitrary and capricious.  *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 48 (1983).  *See also* MTD Opp., ECF 58, 23-24.

### IV.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH DECIDELY IN PLAINTIFFS' FAVOR.

The government acknowledges only that its separation practice may be doing "some" harm to children.  Yet, as Plaintiffs and multiple medical experts have explained, this practice is in fact doing untold harm to hundreds of children across the country.  More than 100 of the children the government is depriving of parents are younger than 4 years old.  Dickerson, *supra*.  The harms that Defendants are inflicting will last a long time, perhaps forever, as children cope with the trauma and terror of being separated from their parents while detained in a foreign country.

PI Mem., ECF No. 48-1, at 15-18. *See also* Declaration of Jennifer Podkul, Ex. 28, ¶¶ 5,7 (describing the traumatization of separated children and the impediments separation poses to their asylum claims).  And although the government claims a "significant" interest in the enforcement of the immigration laws, PI Opp., ECF No. 57, at 19-20, it has long administered those laws without routinely separating fit parents from their children.  Plaintiffs' requested injunction would merely restore the status quo that has existed for years.[9]

## CONCLUSION

The Court should grant Plaintiffs' motion for a classwide preliminary injunction to (1) reunite separated families, and (2) stop the practice prospectively.

Dated: April 27, 2018                      Respectfully Submitted,

*/s/ Lee Gelernt*

Bardis Vakili (SBN 247783)               Lee Gelernt*
ACLU FOUNDATION OF SAN                   Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES                Anand Balakrishnan*
P.O. Box 87131                           AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131                 UNION FOUNDATION
T: (619) 398-4485                        IMMIGRANTS' RIGHTS PROJECT
F: (619) 232-0036                        125 Broad St., 18th Floor
*bvakili@aclusandiego.org*               New York, NY 10004
                                         T: (212) 549-2660
Spencer E. Amdur (SBN 320069)            F: (212) 549-2654
AMERICAN CIVIL LIBERTIES                 *lgelernt@aclu.org*
UNION FOUNDATION                         *jrabinovitz@aclu.org*
IMMIGRANTS' RIGHTS PROJECT               *abalakrishnan@aclu.org*
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198                       *\*Admitted Pro Hac Vice*
F:  (415) 395-0950
*samdur@aclu.org*

---

[9] Defendants cite *Planned Parenthood of Greater Tex. v. Abbott*, 734 F.3d 406 (5th Cir. 2013), for the view that enjoining a statute inherently causes the government irreparable harm, PI Opp., ECF No. 57 at 20, but the Ninth Circuit has never adopted that rule.  *See Latta v. Otter*, 771 F.3d 496, 500 & n.1 (9th Cir. 2014).  In any event, Plaintiffs do not seek to enjoin any statute here, but rather seek to require Defendants to comply with their legal obligations.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.


/s/ Lee Gelernt
Lee Gelernt, Esq.

*Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

| Exhibit | Document | Pages |
|---------|----------|-------|
| 27 | Declaration of Barbara Hines | 13-18 |
| 28 | Declaration of Jennifer Podkul | 19-26 |

12

18cv0428

# EXHIBIT 27

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs       *Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br>     *Petitioners-Plaintiffs*, <br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | Case No. 18-cv-00428-DMS-MDD <br><br><br> **DECLARATION OF BARBARA HINES** <br><br><br> CLASS ACTION <br><br><br> Hearing Date: May 4, 2018 <br> Time: 1:30 pm <br> Courtroom: 13A <br> Judge: Hon. Dana Sabraw |

1

2

*Respondents-Defendants.*

3    Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
4    IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
5    San Francisco, CA 94111
T:  (415) 343-1198
6    F:  (415) 395-0950
*samdur@aclu.org*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.    I, Barbara Hines, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.    I have been a licensed attorney in Texas since 1975, and have practiced immigration law since that time.  I am currently an Adjunct Professor of Law at the University of Texas Law School and a retired Clinical Professor of Law.  I directed the law school's immigration clinic between January of 1999 and December 2014.

3.    I have been recognized for my work in teaching and practicing immigration law; among the awards I have received are:  the 2007 American Immigration Lawyers Association (AILA) Elmer Fried Excellence in Teaching Award; the 1993 AILA Texas Chapter Litigation Award; and the 1992 AILA Jack Wasserman Award for Excellence in Litigation. In 2000, I was named one of the 100 best lawyers in the state by the Texas Lawyer publication.

4.    I have represented countless non-citizens in removal, bond and asylum proceedings in my decades of practice.  I was one of the founders and coordinating committee members of the Karnes pro bono project, which was developed to provide legal representation to women and children detained at the immigration detention center in Karnes City, Texas. I continue to volunteer with the project.

5.    Through my experience practicing immigration law in Texas, representing detained families in Texas, and my interactions with national immigration

organizations and immigration attorneys practicing throughout the United States, I

have knowledge of the government's policies and practices with respect to

immigration detention of families.

6.      I have reviewed the government's submissions in this case.

7.      The government currently detains families at Karnes family detention facility

in Texas and the Berks family detention facility in Pennsylvania.  Many of the parents

in those facilities are subject to the same detention statutes as the government claims

were applicable to the named plaintiffs in this case, namely, 8 U.S.C. §

1225(b)(1)(B)(iii)(IV) and § 1226(a).  Some parents in those facilities were also

subject to reinstatement of removal under 8 U.S.C. 1231(a)(5).

1        I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct, based on my personal knowledge.

3

4  Executed in Austin, TX, on April 27, 2018.

5

6

7                                        Barbara Hines

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 28

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*        *Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

Petitioners-Plaintiffs,

v.

U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement,

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF JENNIFER PODKUL**

CLASS ACTION

Hearing Date: May 4, 2018
Time: 1:30 pm
Courtroom: 13A
Judge: Hon. Dana Sabraw

1

2
*Respondents-Defendants.*

3  Spencer E. Amdur (SBN 320069)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
4  IMMIGRANTS' RIGHTS PROJECT
   39 Drumm Street
5  San Francisco, CA 94111
   T:  (415) 343-1198
6  F:  (415) 395-0950
   *samdur@aclu.org*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      I, Jennifer Podkul, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am the director of policy at Kids in Need of Defense (KIND).  KIND is a national non-profit organization with ten field offices providing free legal services to immigrant children who reach the United States unaccompanied by a parent or legal guardian, and face removal proceedings in Immigration Court.  Since 2009, KIND has received referrals for over 15,800 children from 70 countries, and has partnered with pro bono counsel at over 500 law firms, corporations, law schools, and bar associations.  KIND also advocates for changes in law, policy, and practice to enhance protections for unaccompanied children.  Since 2010, KIND has also run a return and reintegration program for children who return to their country of origin.

3.      KIND has served children who have been separated from their parents during removal proceedings.

4.      During initial interviews, KIND staff seek to determine whether children entered the country with a family member.  If children indicate that they were separated from a family member, KIND staff will inquire whether the child knows where the relative is and has been able to communicate with the relative.

5.      Several children have reported experiencing distress and confusion at being separated from family members.  For example, a seven-year-old girl reported crying

throughout two days spent in a Border Patrol holding facility, and asking to be reunited with her mother.  Other children have reported worrying about their parents, because they did not know what happened to them after the separation.

6.     Through our work representing the children in legal proceedings, as well as supporting those who return to the country of origin, it is evident to KIND that there is no consistent policy for ensuring communication among separated family members. Some children served by KIND were allowed to communicate with parents by telephone after separation, but other children report that the government did not allow any communication with a parent while the child was in detention.  In those cases, children did not know the whereabouts of their parents.

7.     In order to provide adequate legal representation to children in removal proceedings, it is important for the attorney to have a thorough understanding of the child's situation in the country of origin.  Attorneys must ask difficult questions about abuse, abandonment, neglect, violence, or persecution suffered by children and their families in the country of origin.  Children may qualify for humanitarian protection on several grounds, and past harm to the child or to family members may support eligibility for legal relief. A child may have limited memory and understanding of complex and violent situations, making it important for the attorney to speak with members of a child's family who may corroborate information, fill in gaps, and provide additional facts the child might not know or comprehend.

8.      Children who were separated from their parents following DHS apprehension may not know where the parent is or how to contact them.  Parents of KIND clients may be held in the custody of Immigration and Customs Enforcement or the U.S. Marshall, or may even be back in the country of origin when the child begins working with an attorney.

9.      Separation from parents makes it harder for the child to provide the evidence necessary to prove their defense from removal.  Many times, the parent has important paperwork, such as notarized affidavits, birth certificates, or police records.  Obtaining these documents from a parent who is detained or deported is difficult and resource-intensive.

10.     KIND's Return and Reintegration Project has worked with several children who were separated from their parents following apprehension, and sought voluntary departure from the Immigration Judge in order to reunite with a parent and return to their home country together.  In several such cases, the government was unable to coordinate the return of the parent and child, and the children had to face the return journey alone. Several of these cases involved very young children.

11.     When a child is separated from a parent and rendered unaccompanied, the child's legal case is generally severed from the parent's.  Under the Trafficking Victims Protection Reauthorization Act of 2008, unaccompanied children are entitled to be heard in removal proceedings before an immigration judge.  A separated child

has his or her own removal case, separate from the parent's.  The separate cases are referred to the Immigration Court as two separate matters, often in different courts, although the family members may share in common underlying claims, forms of relief, and evidence may be the same.

12.     Under the current immigration court backlog, many KIND clients are scheduled for individual hearings one or more years in the future.  Having children's cases needlessly severed during border separations is placing a burden on the already overwhelmed system.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct, based on my personal knowledge.

Executed in Washington, D.C., on April 27, 2018.

Jennifer Podkul

18cv0428