1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al.,<br><br>              Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs Enforcement ("ICE"); et al.,<br><br>            Respondents-Defendants. | Case No.:  18cv0428 DMS (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

      This case involves the Government's alleged practice of separating migrant parents and children held in immigration detention without a showing that the parent is unfit or presents a danger to the minor child.  According to Plaintiffs, prior administrations detained migrant families, but did not have a practice of forcibly separating fit parents from their young children.  Plaintiffs allege there are reports the Government may soon adopt a formal national policy of separating migrant families, and placing the children in government facilities for "unaccompanied minors" to deter others from coming to the United States. The Government denies it has a family separation policy and concedes such a policy would be "antithetical to the child welfare values" imposed on government actors responsible for the care and custody of migrant children who are separated from their parents as a result of the Government's enforcement of criminal and immigration law.  Instead, the Government

asserts it considers each case on the facts available at the time a placement decision is made, and that when separation occurs, it is the result of the Government taking lawful immigration enforcement and detention actions.

Plaintiffs Ms. L. and Ms. C. allege immigration officials separated them from their minor children without determining they were unfit or presented a danger to their children, and that hundreds of other migrant families have been subjected to the same treatment. Plaintiffs, on behalf of themselves and putative class members, allege the conduct at issue violates their due process rights under the Fifth Amendment to the United States Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Asylum Statute, 8 U.S.C. § 1158.

The Government's alleged practice has garnered the attention of numerous groups interested in child advocacy and welfare, immigration law and constitutional law, as evidenced by the *amicus* briefs filed in this case.  Whether there is such a practice, and if so, whether that practice is lawful, is not presently before the Court.  The only issues presently before the Court are whether this Court has jurisdiction to hear the case, whether this Court is the proper venue for the case, and whether Plaintiffs Ms. L. and Ms. C. have alleged sufficient facts and a sufficient legal basis to state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  As explained below, the Court finds it has jurisdiction over the case and venue is proper in this Court.  The Court also finds Plaintiffs have set forth sufficient facts and a sufficient legal basis to state a claim that separation from their children while they are contesting their removal and without a determination they are unfit or present a danger to their children violates due process.  The Court further finds that Plaintiffs have failed to state a claim under the APA or the Asylum Statute.

# I.

## FACTUAL BACKGROUND

Plaintiff Ms. L. is a citizen of the Democratic Republic of the Congo.  She is Catholic.  On November 1, 2017, she and her then 6-year-old daughter S.S. arrived at the San Ysidro Port of Entry seeking asylum based on religious persecution.  Ms. L. and her

daughter were detained by immigration officials at the border, and housed together until November 5, 2017, at which time immigration officials "forcibly separated" S.S. from her mother and sent S.S. to Chicago—over a thousand miles away—where "she was housed in a detention facility for 'unaccompanied' minors run by the Office of Refugee Resettlement [ORR]." (Am. Compl. ¶ 42.) "When S.S. was taken away from her mother, she was screaming and crying, pleading with guards not to take her away from her mother." (*Id.* ¶ 43.) During their detention and while they were separated, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (*Id.* ¶ 44.) Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.) Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.)

After being separated from her daughter for nearly four months, Ms. L. filed the present case against numerous governmental entities and individual actors.[1] Five days after filing the original Complaint, Ms. L. filed a motion for preliminary injunction and motion to expedite hearing of the motion. Three days later, Ms. L. was "paroled," *i.e.*, released, from ICE detention. (*See infra* n.3 (discussing removal proceedings, asylum and parole)). In response to Ms. L.'s motion to expedite hearing of her motion for preliminary injunction, the Government stated it was attempting to "expeditiously resolve current doubts about whether [Ms. L.] is the mother of S.S. to the satisfaction of [ORR]." (Opp'n to Mot. to Expedite at 1.) That effort involved ORR taking a DNA saliva sample (or swab) from S.S., which it did on March 7, 2018. On March 8, 2018, the Court held a telephonic status

---

[1] Defendants include the U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Department of Health and Human Services ("HHS"), a non-law enforcement agency, ORR, a sub-agency of HHS, and a host of individuals, including the Attorney General of the United States. The Attorney General is named in his official capacity as he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Plaintiffs. (*Id.* ¶ 24.)

conference with counsel, and thereafter ordered the parties to collect a DNA sample from Ms. L. and to complete the DNA testing by March 14, 2018.  The testing was completed on March 12, 2018, and established maternity.  Four days later, and more than four months after they were separated, S.S. was released to her mother after ORR determined Ms. L. was capable of providing for S.S.'s physical and mental well-being.  (*See infra* n.2 (discussing child welfare provisions relating to immigrant children)).

While the DNA testing was underway, Ms. L. filed an Amended Complaint that realleges the claims in the original Petition/Complaint with minor modifications, and adds a new Plaintiff, Ms. C.  Ms. C. is a citizen of Brazil, and unlike Ms. L., she crossed into the United States with her 14-year-old son J. "between ports of entry[.]"  (Mem. of P. & A. in Supp. of Mot. to Dismiss at 5.)  Ms. C. and her son were apprehended by U.S. Border Patrol, and Ms. C. explained to the agent they were seeking asylum.  (Am. Compl. ¶ 55.) Ms. C. was prosecuted for entering the country illegally, and J. was taken away from her and sent to an ORR facility in Chicago—hundreds of miles away—for "unaccompanied" children.  (*Id.* ¶ 56.)  Ms. C. was convicted of misdemeanor illegal entry and served 25 days in federal custody.  (*Id.* ¶ 57.)  She completed her sentence on September 22, 2017, and was then taken into ICE detention for removal proceedings and consideration of her asylum claim.  She was first held at the El Paso Processing Center before being transferred to the West Texas Detention Center.  (*Id.*)  Ms. C. was released on bond from ICE detention on April 9, 2018, after the Amended Complaint was filed, but she has yet to be reunited with her son.  During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]"  (*Id.* ¶ 58.)  Ms. C. "is desperate" to be reunited with her son, "worries about him constantly and does not know when she will be able to see him."  (*Id.*)  "J. has been having a difficult time emotionally since being separated from his mother."  (*Id.* ¶ 59.)  Indeed, "[e]very day that J. is separated from his mother causes him greater emotional and psychological harm and could potentially lead to permanent emotional trauma."  (*Id.* ¶ 60.)  Plaintiffs allege "[t]he government has no legitimate interest in separating Ms. C. and her child[,]" there has been "no evidence, or

even accusation, that J. was abused or neglected by Ms. C.[,]" and "[t]here is no evidence that Ms. C. is an unfit parent or that she is not acting in the best interests of her child." (*Id.* ¶¶ 61-63.)

Together, Ms. L. and Ms. C. seek to represent the following nationwide class on all of their claims for relief:

> All adult parents nationwide who (1) are or will be detained in immigration custody by the Department of Homeland Security, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

(*Id.* ¶ 65.) In their Amended Complaint, Plaintiffs seek, among other things, a preliminary and permanent injunction preventing Defendants from continuing to separate them and the other class members from their children, and an order requiring Defendants to either "release class members along with their children, or to detain them together in the same facility[.]" (*Id.* at 12.)

Three motions are pending before the Court: Defendants' motion to dismiss, and Plaintiffs' motion for class certification and motion for classwide preliminary injunction. These motions came on for hearing on May 4, 2018. Lee Gelernt, Anand Balakrishnan and Bardis Vakili appeared for Plaintiffs, and Sarah Fabian and Nicole Murley appeared for Defendants. This Order addresses Defendants' motion to dismiss. Plaintiffs' motions for class certification and preliminary injunction will be addressed in separate orders.

## II.

## DISCUSSION

Defendants raise a number of arguments in their motion to dismiss. First, they argue Ms. L.'s claims are moot because she has been released from ICE detention and reunited with her daughter. Second, Defendants assert the Court lacks jurisdiction over Ms. C.'s habeas claim and that venue is improper for Ms. C.'s other claims. Third, Defendants claim the Court lacks jurisdiction to review ICE's decision to detain rather than parole Plaintiffs, and also lacks jurisdiction to review ICE's decision about where to detain Plaintiffs or to

order ICE to detain Plaintiffs in a particular facility.  Fourth, Defendants contend separation of Plaintiffs from their children does not violate the Fifth Amendment.  Fifth, Defendants argue Plaintiffs have failed to state a claim under the APA.  And finally, Defendants assert Plaintiffs have failed to state a claim under the Asylum Act.

**A.     Mootness**

Defendants' first argument in support of their motion to dismiss is that Ms. L.'s claims are moot in light of her release from detention and reunification with her daughter. Plaintiffs disagree that either of these events renders Ms. L.'s claims moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (internal quotation marks omitted).  The mootness doctrine is subject to certain exceptions, however.  In this case, Plaintiffs invoke the voluntary cessation exception, which provides,

> that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982).  Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.

*Id.*

Defendants argue the voluntary cessation exception does not apply because Ms. L. was released from detention and reunited with her daughter for reasons other than this litigation.  Specifically, they assert Ms. L.'s release and reunification with her daughter "occurred through the operation of the applicable laws governing her detention and the custody of S.S.[,]" (Reply in Supp. of Mot. to Dismiss at 1), namely Ms. L.'s parole from

/ / /

/ / /

/ / /

ICE detention and the release of S.S. in accordance with ORR procedures and the Trafficking Victims Protection and Reauthorization Act ("TVPRA").[2]  (*Id.* at 2.)

The Ninth Circuit has held that in order for the voluntary cessation exception to apply, "the voluntary cessation 'must have arisen *because of* the litigation.'" *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998) (quoting *Public Utilities Comm'n of State of Cal. v. Fed. Energy Regulatory Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996)).  *See also ACLU of Mass. v. United States Conf. of Catholic Bishops*, 705 F.3d 44, 55 (1st Cir. 2013) (quoting M. Redish, *Moore's Fed. Practice*, § 101.99[2]) ("'The voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation.'").  Here, both sides offer competing explanations for Ms. L.'s parole from detention and reunification with her daughter, with Plaintiffs asserting these actions were the result of "Defendants' own decision to end" Ms. L.'s separation from her daughter "before this Court could rule[,]" (Opp'n to Mot. to Dismiss at 5), and Defendants arguing to the contrary.

Neither party has presented any evidence, however, as to the reason for Ms. L.'s parole from detention and reunification with her daughter.  The timing of Ms. L.'s release and reunification with her daughter, both of which occurred after this case was filed and

---

[2]  The TVPRA, Pub. L. No. 110-457 (Dec. 23, 2008), provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR.  8 U.S.C. § 1232(b)(1).  An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent or legal guardian in the United States nor a parent or legal guardian in the United States "available" to care for them.  6 U.S.C § 279(g)(2).  According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. § 1232(c)(3)(A).

after the Court ordered an expedited DNA test, support Plaintiffs' assertion.  Defendants, meanwhile, have failed to present any evidence to support their assertion that they were simply complying with the statutes, and would have paroled Ms. L. and reunited her with her daughter pursuant to the TVPRA absent this litigation, such as declarations from individuals involved in those decisions who could attest that the decisions were in process prior to this litigation. *See ACLU of Mass.*, 705 F.3d at 55 (finding voluntary cessation exception did not apply where contract at issue "expired according to its terms.  HHS did nothing to hasten its expiration, much less do so to terminate litigation; ... Moreover, the expiration date, options, and task order extension were all built into the contract's terms before this litigation began.").  Defendants also have failed to offer any evidence to explain why DNA testing of Ms. L. and S.S. was not completed during the four months that Ms. L. and S.S. were detained and during which time Ms. L. consistently maintained parentage, but occurred only after the Court ordered it.

Because Defendants have not shown that Ms. L. was released from detention and reunited with her daughter for reasons other than this litigation, the Court finds the voluntary cessation exception applies to this case.  Applying that exception, Ms. L.'s claims are not moot.

**B.   Habeas Jurisdiction**

Defendants' second argument in support of dismissal is that the Court lacks jurisdiction over Ms. C.'s habeas claim because she did not name the warden of the institution in which she was detained.  "[L]ongstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).  Here, Ms. C. is not raising a "core challenge."  This is especially so now that she has been released on bond.  Rather, her habeas claim, like her other claims, is directed to the continued separation from her child.  (*See* Am. Compl. at 12) (asking the Court to "[o]rder defendants either to release class members along with their children, or

to detain them together in the same facility[.]").   Since Ms. C. is not raising a "core challenge," she is not subject to the default rule set out above.   Absent this showing, the Court has jurisdiction over Ms. C.'s habeas claim.

## C.   Venue

Defendants' third argument in support of dismissal is that this Court is the improper venue for adjudication of Ms. C.'s claims because Ms. C. does not reside in this district nor did the events giving rise to her claim occur in this district.   Plaintiffs respond that regardless of Ms. C.'s claims, this is the proper venue for Ms. L.'s claims, and that is sufficient in this putative class case against the Government.   Plaintiffs rely on 28 U.S.C. § 1391(e)(1) for the proposition that if any plaintiff resides in the district in which an action is brought against government entities, venue is proper in that district.   Section 1391(e)(1) states:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1).   In *Sidney Coal Co. v. Soc. Security Admin.*, 427 F.3d 336 (6th Cir. 2005), the court was asked to decide whether the term "the plaintiff" in subsection (C) of this statute referred to only one plaintiff or all plaintiffs.   *Id.* at 344.   After reviewing the "plethora of case law interpreting the statute," the court refused to interpret the statute to require all plaintiffs to reside in the relevant district, finding the statute "contains no requirement that all plaintiffs must reside in the same district."   *Id.*   The court found that to hold otherwise "would substantially limit the statute's breadth[.]"   *Id.*   It also found "[e]ach court faced with the same issue has interpreted 'the plaintiff' to mean 'any plaintiff,' finding that Congress intended to broaden the number of districts in which suits could be brought against government entities."   *Id.* at 344-45.   Ultimately, the court held "that the

residency requirement of [28 U.S.C. § 1391(e)(1)(C)] is satisfied if at least one plaintiff resides in the district in which the action has been brought." *Id.* at 345-46. This reasoning is persuasive.

There is no dispute Ms. L. was resident in this district when the original Complaint was filed. Thus, venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(C).

**D.    Jurisdiction to Review "Discretionary" Decisions**

Defendants' fourth argument in support of dismissal is that this Court lacks jurisdiction to review the Government's decision to either detain or parole Plaintiffs, and also lacks jurisdiction to review where Plaintiffs will be detained or to order ICE to detain Plaintiffs in a particular facility.    Plaintiffs dispute that the Court lacks jurisdiction to review these decisions.

As to Defendants' first argument about the decision to detain or parole, Plaintiffs are not challenging that particular decision.  (*See* Opp'n to Mot. to Dismiss at 12) (stating Amended Complaint "does not seek an injunction ordering Defendants to grant parole; rather, it seeks an injunction to *reunite* Plaintiffs with their children, 'either' by 'detain[ing] them together in the same facility,' *or* by 'releas[ing] class members along with their children.'").[3]    Rather, Plaintiffs are challenging the Government's practice of separating

---

[3] There are sound reasons for not challenging this decision.  Individuals in the expedited removal process who have not been found to have a "credible fear of persecution" for asylum purposes are subject to mandatory detention.  8 U.S.C. § 1225(b)(1)(B)(iii)(IV). These individuals may be released only if they are granted parole, *i.e.,* released under narrowly prescribed circumstances, such as "urgent humanitarian reasons or significant public benefit[,]" 8 U.S.C. § 1182(d)(5)(A), medical emergency or a "legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii).  Furthermore, an alien who is subject to expedited removal and who is seeking to establish that he or she has a credible fear of persecution, is not eligible for release on bond.  8 C.F.R. §§ 235.3(c), 1003.19(h)(2)(i)(B). If the asylum officer or Immigration Judge ("IJ") determines that the alien has a credible fear of persecution, expedited removal proceedings are vacated and the alien is referred for removal proceedings before an IJ under 8 U.S.C. § 1229a.  8 C.F.R. § 208.30(f).  These aliens may be released from detention through a grant of parole under narrowly prescribed

minor children from their parents without legitimate reason, irrespective of the Government's general authority to detain or release. Defendants' argument, therefore, does not warrant dismissal of Plaintiffs' claims.

Next, Defendants argue the Court lacks jurisdiction to review where Plaintiffs will be detained or to order ICE to detain Plaintiffs in a particular facility. In support of this argument, Defendants rely on 8 U.S.C. § 1252(a)(2)(B)(ii) and 8 U.S.C. § 1231(g)(1). Section 1252(a)(2)(B)(ii) precludes courts from reviewing decisions of the Attorney General or Secretary of DHS if the conduct at issue is specified in the particular statute to be in their discretion. It states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review— ...

> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is *specified* under this title *to be in the discretion* of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 208(a).

8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added). Defendants assert the Attorney General's decisions about where aliens will be detained falls within this statute. Specifically, they assert that 8 U.S.C. § 1231(g)(1), which provides, "The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[,]" *id.*, grants the Attorney General discretion to make those decisions, and under § 1252(a)(2)(B)(ii), those decisions are not subject to review by the courts.

This is not the first time the Government has raised this argument. *See Aguilar v. United States Immig. & Customs Enf't Div. of the Dep't of Homeland Sec.*, 510 F.3d 1 (1st

---

circumstances, such as an "urgent humanitarian reason or significant public benefit." 8 U.S.C. § 1182(b)(5); 8 C.F.R. § 212.5(b).

Cir. 2007).   In *Aguilar*, the court rejected the Government's "sprawling construction of section 1252(a)(2)(B)(ii)[,]" stating "so broad a reading is not evident from the statute's text."  *Id.* at 20.   Instead, the court found "section 1231(g)(1) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion."  *Id.*  The court contrasted the language of section 1231(g)(1) with "other sections of the [Immigration and Nationality Act ("INA")]" in which that discretion is explicitly provided, specifically 8 U.S.C. §§ 1157(c)(1), 1181(a)(9)(B)(v), 1184(c)(6)(F) and 1229b(b)(2)(D).  *Id.*  The court also cited to *Alaka v. Att'y Gen.*, 456 F.3d 88 (3d Cir. 2006), which states "there are no less than thirty-two additional provisions in the very subchapter of the INA referenced by 8 U.S.C. § 1252(a)(2)(B)(ii) that make explicit the grant of 'discretion' to the Attorney General or the Secretary of Homeland Security[.]"  *Id.* at 97.  In light of this authority, the *Aguilar* court held, "[i]f a statute does not explicitly specify a particular authority as discretionary, section 1252(a)(2)(B)(ii) does not bar judicial review of an ensuing agency action."  510 F.3d at 20; *see also Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (stating "the plain language of § 1252(a)(2)(B)(ii) requires that discretionary *authority* be *specified* by statute[.]").   Ultimately, the *Aguilar* court held "section 1252(a)(2)(B)(ii) does not strip the district courts of jurisdiction over substantive due process claims that are collateral to removal proceedings when those claims challenge decisions about the detention and transfer of aliens on family integrity grounds."  510 F.3d at 21.

Defendants do not explain why this reasoning should not apply here.  Instead, they rely on a decision from the Ninth Circuit finding the Attorney General has broad discretion in deciding where to house deportable aliens.  *See Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir. 1986).   That decision, however, predates 8 U.S.C. § 1252(a)(2)(B)(ii), which is the starting point for Defendants' jurisdiction-stripping argument.  Moreover, in *Comm. of Cent. Am. Refugees*, the Ninth Circuit addressed the

/ / /

/ / /

merits of the plaintiffs' claim, which assumes jurisdiction. 795 F.2d at 1437-41.[4] *Aguilar*, by contrast, addresses 8 U.S.C. § 1252(a)(2)(B)(ii), the leading Supreme Court case interpreting that statute, *Kucana v. Holder*, 558 U.S. 233 (2010), and the other statute forming the basis for Defendants' argument, 8 U.S.C. § 1231(g)(1). The *Aguilar* court's analysis of these statutes is faithful to statutory text and persuasive. This Court, therefore, concludes it has jurisdiction to review the Government's conduct at issue.[5]

## E.    Due Process

Next, Defendants argue Plaintiffs have failed to state a claim for violation of their due process rights. In reviewing this argument, the Court is bound to accept all well-pleaded factual allegations in the Amended Complaint as true, construe those allegations "in the light most favorable to the nonmoving party," *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008) (citation omitted), and "then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The parties do not dispute the following bedrock principles. The Constitution protects everyone within the territory of the United States, regardless of citizenship. (Br. of Scholars of Immig. and Const. Law as *Amici Curiae* at 3, ECF No. 23-1) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 368-69(1886)). "Repeatedly and consistently, the Supreme Court and the Ninth Circuit have held that non-citizens physically on U.S. soil have constitutional rights, including the right to due process of law." (*Id.* at 4) (citing, among

---

[4] In *Comm. of Cent. Am. Refugees*, the Ninth Circuit held that the government's policy of transferring unrepresented aliens to remote detention facilities "did not violate the due process clause or any statutory privilege[,]" and "prudential considerations precluded interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be detained. 795 F.2d at 1439-40.

[5] Even if § 1252(a)(2)(B)(ii) acted as a statutory bar to Plaintiffs' claims, the Ninth Circuit has held "decisions that violate the Constitution cannot be 'discretionary,' so claims of constitutional violations are not barred by § 1252(a)(2)(B)." *Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004). Plaintiffs have clearly alleged separation from their children violated their due process rights. Thus, this rule would apply, and would allow for judicial review.

other cases, *Matthews v. Diaz*, 426 U.S. 67, 77 (1976) (stating "there 'are literally millions of aliens within the jurisdiction of the United States'" and "'the Fifth Amendment . . . protects every one of these persons[.]'")).   "Aliens," therefore, have substantive due process rights under the Constitution.  *Id.* (collecting cases).[6]

Further, it has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association.  *See* U.S. Const. amend. V (stating no person shall "be deprived of life, liberty, or property, without due process of law."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected.").  Indeed, "[t]he liberty interest at issue in this case–the interest of parents in the care, custody, and control of their children– is perhaps the oldest of the fundamental liberty interests recognized by" the Court.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); s*ee also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").  In sum, there is no dispute the constitutional right to family integrity applies to aliens like Ms. L. and Ms. C.

Rather, the dispute here is twofold: (1) whether the substantive due process right to family integrity applies not to Plaintiffs, generally, but in the particular circumstances alleged; and (2) if so, whether the conduct attributed to the Government violates that right. It bears repeating that at this stage of the case, Plaintiffs need not prove either of these questions should be resolved in their favor.  The only issue here is whether Plaintiffs have alleged sufficient facts and a cognizable legal theory giving rise to a "plausible claim for relief."  *Iqbal*, 556 U.S. at 679.  In this context, the Court addresses these two issues in turn.

---

[6]  At oral argument, Government counsel conceded the point, "The Court:  So you would agree that because these individuals [Ms. L. and Ms. C.] are present in the United States that substantive due process attaches[?]  . . . [Gov't counsel]:  That's correct[.]"  (Rep.'s Tr. at 4-5, May 9, 2018, ECF No. 70.)

1        1.    <u>Does the Constitutional Right to Family Integrity Apply in the Circumstances</u>
2               <u>Alleged?</u>

3          The constitutional right to family integrity "is entirely judge-made: it does not appear
4    in the text of the Constitution itself." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).
5    Furthermore, the "right to family integrity has been recognized in only a narrow subset of
6    circumstances." *Aguilar*, 510 F.3d at 23 (stating alien "petitioners have not demonstrated
7    that this guarantee of substantive due process [the liberty interest in family integrity]
8    encompasses their assertions."); *see also Washington v. Glucksberg*, 521 U.S. 702, 720
9    (1997) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)) (noting courts must
10   be "'reluctant to expand the concept of substantive due process.'").  Plaintiffs, therefore,
11   must show that their generally held constitutional right to family integrity applies in the
12   particular circumstances alleged here.

13         In determining whether the right to family integrity encompasses the circumstances
14   alleged here, it is important to note what Plaintiffs do not challenge.  They do not challenge
15   the Government's initial separation of parent and child when the parent is arrested for
16   violating the nation's criminal laws.  Nor do Plaintiffs challenge the Government's decision
17   to separate families when there are legitimate questions regarding parentage, fitness, or
18   danger to the child.  Nor do they challenge the Government's powers to deport or detain
19   aliens.  What Plaintiffs challenge is the Government's separation of migrant parents and
20   their minor children when both are held in immigration detention and when there has been
21   no showing the parent is unfit or poses a danger to the child.  Plaintiffs assert separation of
22   parents and minor children under such circumstances violates their due process rights.

23         Defendants argue the contours of the right to family integrity are different depending
24   on the circumstances, and that under the circumstances of this case, which involve the
25   Government's enforcement of criminal and immigration laws, there is no constitutional
26   violation.  Specifically, the Government argues that when a parent is detained for removal
27   or criminal prosecution, the minor child becomes "unaccompanied" and must be placed in
28   the "care and custody" of ORR.  Separation of the family unit, therefore, is simply a

consequence of the lawful detention of the parent.  In support of this argument, Defendants rely on a number of cases dealing with immigration detainees and convicts who have been separated from their families without constitutional implication, but those cases are distinguishable from this case.  *See, e.g., Milan-Rodriguez v. Sessions*, No. 1:16-cv-01578-AWI-SAB-HC, 2018 WL 400317, at *10 (E.D. Cal. Jan. 12, 2018) (stating transfer of petitioner convicted of crime to remote facility is "ordinary incident of immigration detention" and does not violate right to familial association); *Gordon v. Mule*, 153 Fed. Appx. 39 (2d Cir. 2005) (stating right to family unity not violated when petitioner ordered removed after conviction of crime).  Plaintiffs argue those cases involve challenges to a parent's detention and transfer away from children who were not themselves initially detained with their parents.  According to Plaintiffs, the practice alleged here "is not a necessary incident of detention; it is the result of an *unnecessary* governmental action intended to separate family units who were arrested *together*[.]"  (Opp'n to Mot. to Dismiss at 21.)

The Government also cites cases that subordinate the right to family integrity of citizen children when their non-citizen parents are deported.  *See, e.g., Gallanosa by Gallanosa v. United States*, 785 F.2d 116 (4th Cir. 1986) (parents ordered deported after overstaying visa causing family separation).  But Plaintiffs are not contesting the grounds for their potential removal—only their treatment by the Government *during* their immigration proceedings.

The Government also cites cases where interference with the right to family integrity was upheld in furtherance of identified safety or other penological interests.  *See, e.g., Overton v. Bazetta*, 539 U.S. 126, 133 (2003) (upholding restrictions on family visitation of sentenced prisoners for security reasons and "to protect[ ] child visitors from exposure to sexual or other misconduct[.]").  However, Plaintiffs argue the Government is acting without determining parentage, fitness or danger to the child (or any other legitimate reason), let alone for a stated security reason.

16

The case that provides the most support for Defendants' argument that Plaintiffs' constitutional right to familial association is not implicated here is *Aguilar*.  But it, too, is factually distinguishable.  In that case, ICE agents conducted a raid of the plaintiffs' workplace as part of an investigation into the employment practices of a government contractor "suspected of employing large numbers of illegal aliens."  *Aguilar*, 510 F.3d at 6.  As part of the raid, ICE agents "took more than 300 rank-and-file employees into custody for civil immigration infractions."  *Id.*  In the days following the raid, approximately 200 of those employees were transferred from a holding facility in Massachusetts, where the raid took place, to detention centers in Texas for removal.  *Id.* Because of the surprise nature of the raid, "a substantial number of the detainees' minor children were left for varying periods of time without adult supervision."  *Id.*  As a result, the plaintiffs filed a complaint in district court alleging "in essence that their immediate detention and swift transfer to distant [detention and removal operations centers] wreaked havoc with their right to make decisions about the care, custody, and control of their minor children, leaving many minors unattended."  *Id.* at 22.  The court in *Aguilar* looked to the nature of the right at issue, and expressed concern for expanding that right to the facts of the case, and concluded plaintiffs had not demonstrated that the right to family integrity "encompasse[d]" their claims.  *Id.* at 23-24.

However, unlike Plaintiffs in this case, none of the plaintiffs in *Aguilar* were detained *with their children*.  Instead, the plaintiffs in *Aguilar* appear to have been detained at the worksite while their children were elsewhere in the community.[7]  Because the context

---

[7]  The court in *Aguilar* noted, "ICE attempted to coordinate with social services agencies to assure the adequate care of dependent children[,] … took affirmative steps before and after the raid to attend to family needs[,] …[and] immediately released thirty-five persons who had been apprehended due to 'pressing humanitarian needs' (such as being the sole caregiver of one or more minor children)."  510 F.3d at 22 n.5 (citing findings of the district court).  In light of the differences with *Aguilar*, Plaintiffs have disavowed that the class alleged in the Amended Complaint would include parents like those in *Aguilar*, suggesting

17

and details of the present case are different from those presented in *Aguilar*, that court's analysis of the plaintiffs' substantive due process rights has limited application here. *See id.* at 22 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005)) (noting "the jurisprudence of substantive due process is an exercise that is 'highly dependent on context and detail.'").

Here, the Court is faced with Plaintiffs who present different circumstances, but each Plaintiff has demonstrated that the right to family integrity encompasses her particular situation. According to the allegations in the Amended Complaint, Ms. L. did everything right. She and her child presented at the port of entry and requested asylum. She passed a credible fear screening interview, was taken out of expedited removal proceedings, and placed in removal proceedings before an IJ to pursue her asylum claim. Ms. C., by contrast, did not do everything right. She committed a crime by entering the United States illegally, and was prosecuted and imprisoned for her transgression: 25 days in custody for misdemeanor violation of 8 U.S.C. § 1325 (illegal entry). However, having served her sentence, Ms. C. was then returned to ICE detention to pursue her asylum claim, as she too had passed a credible fear screening. Ms. C., therefore, is on equal footing with Ms. L. for purposes of pursuing her due process claim. Ms. L.'s claim is based on the initial separation from her child, while Ms. C.'s claim is based on the continued separation from her child. Both claims focus on government conduct in separating families during removal proceedings.

Although Plaintiffs do not limit this case to asylum seekers, that each of the named Plaintiffs is seeking asylum is important to the due process analysis. "U.S. asylum law arises largely out of international agreements that have been incorporated into immigration law." Kevin R. Johnson, *Understanding Immigration Law*, 2d. Ed. (2015), at 353. Those international agreements came about after World War II displaced millions of people and

_____

that the facts in *Aguilar* are "more analogous to a pretrial criminal case." (Rep.'s Tr. at 35, May 9, 2018, ECF No. 70.)

18cv0428 DMS (MDD)

created the need for international collaboration to address the refugee crisis.  *See id.*  In the early 1950s, the United Nations Convention Relating to Status of Refugees ("Convention") attempted to provide a uniform protocol for refugee policy, and the United States is now a signatory to that Convention.  *See id.*  According to the Convention, a "refugee" is someone who (1) is outside his or her country of nationality, (2) has fled that country and cannot return home because he or she faces the reality or the risk of persecution, and (3) faces persecution due to his or her political opinion, race, religion, nationality, or membership in a particular social group.  *See id.* at 353-54.  These concepts have been incorporated into U.S. law, specifically the INA.  *See*, *e.g.*, INA § 101(a)(42) (adopting definition of refugee); 8 U.S.C. § 1101(a)(42).

Asylum "has been a formal part of U.S. domestic law for 38 years."  Deborah Anker, *Law of Asylum, in the United States* § 1.1 (2018).  The Refugee Act, PL 96-212, 94 Stat. 102 (1980), in particular, "codified provisions for persons to apply for asylum status[.]"  *Id.*  According to its provisions, "a person who applies for asylum protection must be physically present or 'arriving' in the United States."  *Id.* at § 1.6 (citing 8 U.S.C. § 1158).  The act of seeking *sanctuary* from persecution in accordance with our country's own asylum laws is significant given that due process is particularly concerned with "ordered liberty" and "fundamental fairness."  *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 24 (1981).  Arriving on United States soil with one's minor child to pursue relief extended by U.S. law—as well as international law to which the United States has acceded—calls out for careful assessment of how governmental actors treat such people and whether constitutional protections should apply.

In this case, both Ms. L. and Ms. C. allege they are seeking asylum in the United States, and that they were separated from their children upon arriving at our nation's border without any determination they were unfit or presented a danger to their children.  They allege they are victims of a wide-spread government practice to separate migrant families "for no legitimate reason and notwithstanding the threat of irreparable psychological damage that separation has been universally recognized to cause young children."  (Am.

Compl. ¶ 1.)  They allege this practice may soon become "formal national policy" for purposes of deterring others from coming to the United States.  (*Id.* ¶ 34b;[8] *see also* Opp'n to Mot. to Dismiss at 2 & 16 n.12) (citations omitted)).

Notably, Plaintiffs' allegations are similar to those pointed out by the court in *Aguilar* as being sufficient to demonstrate that the guarantee of substantive due process encompasses their assertions:  "Were a substantial number of young children knowingly placed in harm's way, it is easy to imagine how viable [due process] claims might lie." 510 F.3d at 22.  The allegations here present that "narrow subset of circumstances[,]" *id.*, at 23, where the right to family integrity ought to apply.  The Court finds it does.

2.   Does the Alleged Governmental Conduct "Shock the Conscience" and Violate the Right to Family Integrity?

Where substantive due process applies to the particular circumstances alleged, as here, the "threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  Plaintiffs dispute that the "shock the conscience" test applies, (*see* Opp'n to Mot. to Dismiss at 22), but they fail to explain what test should apply.  Plaintiffs appear to argue they have "[s]tated a substantive due process claim" simply by alleging facts that show the government is separating children from their parents "absent a clear demonstration that the parent is unfit or is otherwise endangering the child."  (*Id.* at 15-16.)  In support, Plaintiffs cite *Quillon* for the settled principle that "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness[.]" 434 U.S. at 255 (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-63 (1977)).  But the Supreme Court has also made clear that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be

---

[8] The Amended Complaint lists Paragraphs 33 and 34 twice.  The Court refers to the second paragraphs as Paragraphs 33b and 34b.

characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Lewis,* 523 U.S. at 847 (quoting *Collins,* 503 U.S. at 128). *See also Aguilar,* 510 F.3d at 21 (applying "shock the conscience" standard to determine whether plaintiffs stated substantive due process claim based on government's separation of parents from minor children). Defendant has relied on that standard in arguing Plaintiffs have failed to state a substantive due process claim, and Plaintiffs have briefed why the alleged government conduct meets the standard (though they dispute the standard applies at all). On the present motion, the Court applies the "shocks the conscience" standard to determine whether Plaintiffs have alleged sufficient facts to state a plausible claim for violation of their substantive due process rights.[9]

The "touchstone of due process is protection of the individual against arbitrary action of government," *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974), and the "exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Lewis*, 523 U.S. at 846. The due process guarantee bars certain offensive government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). It targets governmental conduct that violates the "decencies of civilized conduct[,]" *Rochin v. California*, 342 U.S. 165, 173 (1952), interferes with rights "'implicit in the concept of ordered liberty[,]'" *id.* at 169 (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[.]" *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). Thus, substantive due process protects against government power arbitrarily and oppressively exercised. *Daniels,* 474 U.S. at 331. "Historically, this guarantee of due process has been applied to *deliberate* decisions

---

[9] The Court reserves on whether a different test might apply as the case develops and the issues are more clearly framed through discovery and other substantive motions. *See, e.g., Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1310-11 (9th Cir. 1982) (policy precluding renting to families with children analyzed under strict scrutiny test).

of government officials to deprive a person of life, liberty, or property." *Id.* Accordingly, "the 'shock the conscience' standard erects a high hurdle for would-be claimants." *Aguilar*, 510 F.3d at 21. Plaintiffs have set forth sufficient facts to satisfy this requirement and to survive the present motion.

Plaintiffs allege they both suffered wrenching separation from their children for "no legitimate purpose" and in furtherance of a wide-spread government practice that soon may become "national policy." (Am. Compl. ¶¶ 31, 34b.) A policy of family separation to serve "ulterior law enforcement goals" admittedly would be "antithetical to the child welfare values" imposed on government actors by the TVPRA. (Opp'n to Mot. for Prelim. Inj. at 3, ECF No. 46.) Yet, Plaintiffs allege that practice is being implemented in full view of the "devastating negative impact" that separation has on a "child's well-being, especially where there are other traumatic factors at work, and that this damage can be permanent." (Am. Compl. ¶ 33.) (*See also* Br. by *Amici Curiae* in Supp. of Pl.'s Habeas Corpus Pet. and Compl. at 2-3, ECF No. 17-3 (describing psychological and emotional trauma that is visited upon young children when they are separated from their parents)). As for their own children, Plaintiffs allege S.S. was screaming, crying, and "pleading with guards not to take her away from her mother[,]" (Am. Compl. ¶ 43), and J. is struggling emotionally. (*Id.* ¶ 59.) Plaintiffs also allege they, themselves, are consumed by feelings of desperation and worry. (*Id.* ¶¶ 48, 58.)

These allegations call sharply into question the separations of Plaintiffs from their minor children. This is especially so because Plaintiffs allegedly came to the United States seeking shelter from persecution in their home countries, and are seeking asylum here. For Plaintiffs, the government actors responsible for the "care and custody" of migrant children have, in fact, become their persecutors. This is even more problematic given Plaintiffs' allegations and assertions that there is a government practice, and possibly a forthcoming policy, to separate parents from their minor children in an effort to deter others from coming to the United States. This alleged practice is being implemented even when parents like Ms. L. and Ms. C. have passed credible fear interviews, and therefore, are positioned

to present asylum claims meriting consideration by an IJ in their removal proceedings. These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the "exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective[.]" *Lewis*, 523 U.S. at 846.  Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency.  At a minimum, the facts alleged are sufficient to show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity.  Accordingly, Defendants' motion to dismiss Plaintiffs' due process claim is denied.[10]

**F.    The APA**

Next, Defendants argue Plaintiffs have not stated a claim under the APA. Defendants assert the APA does not provide for judicial review of discretionary decisions. Defendants also contend their decisions to separate Plaintiffs from their minor children was not arbitrary or capricious, those decisions do not constitute "final agency actions," and there are other adequate remedies available.

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5

---

[10]  The above discussion is focused on whether Plaintiffs have stated a claim for violation of their substantive due process rights.  Plaintiffs also allege a claim for violation of their procedural due process rights in light of the Government's practice of "separating families without any process to determine whether the separation is justified by parental abuse, unfitness, or any other reason."  (Opp'n to Mot. to Dismiss at 23.)  Defendants move to dismiss on the ground there is no substantive due process right to familial association under these circumstances, and assert Plaintiffs' procedural due process argument "is really [a] 'substantive due process argument recast in procedural terms.'"  (Mem. of P. & A. in Supp. of Mot. to Dismiss at 18) (quoting *Reno v. Flores,* 507 U.S. 292, 293 (1993)) (internal quotation marks omitted).  In light of the above discussion, the Court declines to address further Plaintiffs' procedural due process claim.

U.S.C. § 704.  The conduct at issue in this case, separation of parents from their minor children when both are in immigration detention and when there is no showing the parent is unfit or presents a danger to the child, is not reviewable by statute.  Thus, the issue is whether this conduct is a "final agency action for which there is no other adequate remedy in a court."  There are two conditions that:

> must be satisfied for agency action to be "final" under the APA.  "First, the action must mark the consummation of the agency's decisionmaking process - it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*United States Army Corps of Engineers v. Hawkes Co.*, ___ U.S. ___, 136 S.Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Here, Plaintiffs have not alleged separation from their children satisfies either of these requirements.  Nor did they address these requirements in their opposition brief.  Furthermore, since the filing of the Complaint Ms. L. has been reunited with her daughter, and the Government claims in its briefing that it is in the process of deciding whether to reunify Ms. C. and her son pursuant to the TVPRA.  Under these circumstances, Plaintiffs have failed to allege facts sufficient to show "final agency action" subject to review under the APA.  Based on this failure, the Court grants Defendants' motion to dismiss this claim.

## G.    The Asylum Act

Finally, Defendants argue Plaintiffs have failed to state a claim under the Asylum Act.  Defendants assert Plaintiffs lack standing to bring a claim under the Act, and have failed to allege sufficient facts to state a claim under the Act.

Initially, it is unclear what portion of the Asylum Statute Plaintiffs are relying on as the basis for this claim.  They cite 8 U.S.C. § 1158 in their Amended Complaint, and allege separation from their children violates the statute "because it impedes their ability to pursue their asylum claims."  (Am. Compl. ¶ 85.)  However, 8 U.S.C. § 1158(d), which sets out the procedure for applying for asylum, states: "Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable

24

by any party against the United States or its agencies or officers or any other person."  8 U.S.C. § 1158(d)(7).  Although no party addressed this subsection of the statute on the present motion, it is unclear to the Court whether Plaintiffs have a private right of action under the Asylum Statute in the first instance.  Absent any authority that a private right of action exists, the Court grants Defendants' motion to dismiss this claim.

## III.

## CONCLUSION AND ORDER

For the reasons set out above, the Court grants in part and denies in part Defendants' motion to dismiss.  Specifically, the Court grants Defendants' motion to dismiss Plaintiffs' claims under the APA and the Asylum Statute, and denies Defendants' motion to dismiss Plaintiffs' due process claim.  Although Plaintiffs did not request leave to amend in the event any portion of Defendants' motion was granted, the Court grants Plaintiffs leave to file a Second Amended Complaint that cures the pleading deficiencies set out above.  If Plaintiffs wish to do so, they shall file their Second Amended Complaint on or before July 3, 2018.

**IT IS SO ORDERED**.

Dated:  June 6, 2018

_____
Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)