Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs      *Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., <br><br> *Petitioners-Plaintiffs,* <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); et al., <br><br> *Respondents-Defendants.* | Case No. 18-cv-00428-DMS-MDD <br><br> Date Filed: June 25, 2018 <br><br> **PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CLASSWIDE PRELIMINARY INJUNCTION** <br><br> NO HEARING DATE |

1
2
Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
3
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
4
39 Drumm Street
5
San Francisco, CA 94111
T:  (415) 343-1198
6
F:  (415) 395-0950
7
*samdur@aclu.org*
8
*skang@aclu.org*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................... 1

I.   Recent Events: The Government Has Now Separated More Than Two
     Thousand Children from Their Parents. ........................................ 2

II.  There is No System To Reunify Separated Families Expeditiously, and
     the Government's Existing "Reunification" Process Is Not Designed to
     Address the Current Crisis. ............................................ 4

III. The Flores Settlement Agreement Does Not Prohibit the Reunification of
     Separated Children with Their Detained Parents. ........................... 7

IV.    Any Injunction Should Ensure That Parents in DHS Custody Can
       Remain Detained with Their Children, Even if the Parents Are Facing
       Criminal Prosecution. .................................................. 8

V.  An Injunction to Prevent Future Separations Remains Necessary, and the
    Court Should Order the Government to Follow Well-Established Child
    Welfare Standards. ..................................................... 9

VI.    Parents Facing Imminent Deportation Require Safeguards to Ensure
       that They Are Not Removed Without Their Children. ................................. 11

VII.   Plaintiffs' Order Provides the Appropriate Framework for Expeditious
       Reunification. ......................................................... 11

CONCLUSION ................................................... 14

1

# TABLE OF AUTHORITIES

2

**Cases**

*Armstrong v. Schwarzenegger*,
  2007 WL 2694243 (N.D. Cal. Sept. 11, 2007) ..................................................... 12

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .............................................................................. 12

*Saravia v. Sessions*,
  280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................................................ 12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

On March 9, when Plaintiffs first sought classwide relief, the government had already taken hundreds of children from their parents. When this case was argued before the Court on May 4, the number of separated children had grown to more than 700. The government has since confirmed that between May 5 and June 9 alone, over 2,300 children were separated from their parents. More than 2,000 of those children remain separated. This follows the government's "zero tolerance" policy announced on May 7, three days after this Court held arguments.

On June 20, President Trump signed an Executive Order that purports to end further separations. It does not. The Order contains explicit loopholes, including an exception for separations that the government deems in the "interests" of the child. Because the government interprets that best-interest standard in a way that would allow separations that are inconsistent with this Court's prior due process opinion—and with universally accepted child welfare norms—a preliminary injunction remains critical to prevent future unlawful separations.

Even more pressing, the Order does not address the reunification of already-separated families at all, and the government has no meaningful plan for swiftly ensuring that such reunifications occur. Thus, thousands of families remain separated, and many parents have no idea where their children are or how to find them. With each added day of separation, the terrible trauma inflicted by the government on both parents and children continues to mount. Many of the children are babies and toddlers who every night are crying themselves to sleep wondering if they will ever see their parents again. Indeed, one separated child was only 4 months old and another was still breastfeeding. *See, e.g.*, Declaration of Laura Tuell ("Tuell Decl."), Ex. 32, ¶ 17b (noting child who was taken from her mother while breastfeeding); *id.*, ¶ 17a (mother told that daughter would be waiting for her after court appearance; daughter was gone when mother came back); Declaration of

Manoj Govindaiah ("Govindaiah Decl."), Ex. 36, ¶ 6(b) (father separated from *four-month-old baby*, then deported without baby).

Without immediate action from this Court, these families will remain separated. The Office of Refugee Resettlement's ("ORR") normal release process for children in its care will not swiftly reunify most separated families, because that process is not designed to reunify children with detained parents. Having spent months cruelly separating families and defending its right to do so—including for weeks after this Court declared that practice "brutal, offensive" and contrary to "traditional notions of fair play and decency"—the government cannot be left on its own to end the suffering it has intentionally caused. This Court's intervention is necessary to ensure that these due process violations are swiftly corrected.

As set forth more fully in the proposed Order submitted with this brief, Plaintiffs respectfully request that the Court require Defendants to:

1) reunify all children with their parents within 30 days, and within 10 days for children under 5 years old, except where the government has clear evidence that the parent is unfit or a danger to the child, or the parent is in a criminal facility that does not house minors;

2) provide parents, within 7 days, telephonic contact with their children;

3) stop separating children from their parents except where there is clear evidence that the parent is unfit or a danger to the child, or the parent is in a criminal facility that does not house minors;

4) not remove separated parents from the United States without their children, unless the parent affirmatively, knowingly, and voluntarily waives the right to reunification before removal.

## I. Recent Events: The Government Has Now Separated More Than Two Thousand Children from Their Parents.

Defendants have been separating thousands of families throughout the last year. Even before the government formally announced its zero tolerance policy, it

2

had separated hundreds of children from their family members.  *See* Decl. of Stephen B. Kang ("Kang Decl."), Ex. 38, ¶ 3.

On May 7, 2018, Attorney General Sessions announced an initiative to refer "100 percent" of immigrants who cross the Southwest border for criminal immigration prosecutions, also known as the "zero-tolerance policy."  Kang Decl., Ex. 38, ¶ 4.  Attorney General Sessions stated that as part of that prosecution, the parent's child "will be separated from you as required by law."  *Id.*

In early May, the pace of family separations increased. At a Senate Judiciary Committee hearing in May, a deputy chief of U.S. Customs and Border Protection ("CBP") testified that between May 6 and May 19 alone, a total of 658 children were separated from their family members.  Kang Decl., Ex. 38, ¶ 5.  In June 2018, the Department of Homeland Security ("DHS") reported that in the six weeks between April 19 and May 31, the administration took around 2,000 children away from their parents.  *Id.*, ¶ 6.  And on June 19, CBP officials confirmed that "[o]ver 2,300 children were separated from their parents at the U.S.-Mexico border between May 5 and June 9."  *Id.*, ¶ 8; *see also id.*, ¶ 7 (documenting cases of separated children living in cages and being cared for by other children).

On June 20, President Trump issued an Executive Order ("EO"), Section 3 of which provides that DHS "shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members."  Kang Decl., Ex. 38, ¶ 9, Sec. 3(a).

The EO contains exceptions that will allow the continued unlawful family separation of families.  Kang Decl., Ex. 38, ¶ 9, Sec. 3(b).  And significantly, the EO makes *no* mention of how the government intends to reunify already-separated children with their parents, even though thousands of parents and children remain apart.  The government has since claimed in a public statement that it has begun to

put in place efforts to reunite.  As set forth below, however, those measures are wholly inadequate.  Kang Decl., Ex. 38, ¶ 10.[1]

## II. There is No System To Reunify Separated Families Expeditiously, and the Government's Existing "Reunification" Process Is Not Designed to Address the Current Crisis.

At the June 22 telephonic hearing, the government's counsel could not clarify whether Defendants intend to quickly reunify already-separated parents.  As to parents who had been separated from their children as a result of the government's decision to prosecute them for illegal entry, government counsel admitted that she "can't speak to the . . . further effect of the executive order on that detention":

> [The Court asked before:] when a parent is released from criminal custody and taken into ICE custody, is the practice to reunite them in family detention?  And at that time I said no, that was not the practice.  I think my answer on that narrow question would be the same.

Kang Decl., Ex. 38, ¶ 22 ("June 22 Hearing Transcript"), at 29:25-30:12.

In response to the Court's questions about whether any system exists that would allow separated parents to reunite with their children, government counsel relied entirely on ORR's *preexisting* processes for releasing immigrant children from its custody, which do not address parents who remain in DHS custody:

> MS. FABIAN: There are procedures by which O.R.R. then releases minors to the custody of a parent *who has been released from custody*, and those are the procedures . . . . Whether there is . . . additional procedures that can be put in place to improve those procedures or expedite [them], I think that is something that is the subject of ongoing discussion. But at the moment the process is the same . . . .

June 22 Hearing Transcript at 30:18-31:1 (emphasis added).

The core problem is that ORR's preexisting process for releasing children from custody is not adequate to meet the current need for swift reunification.  For starters, as the government's counsel explained at the June 22 hearing, ORR's process only addresses release to *non*-detained parents.  June 22 Hearing Transcript at 33:2-22.  But DHS continues to detain hundreds, if not thousands, of the parents

---

[1] The Order could of course be rescinded at any time.

1    whose children have been taken away.  ORR's existing process will not facilitate

2    their reunification at all.  Declaration of Robert Carey (former head of ORR)

3    ("Carey Decl."), Ex. 33, ¶¶ 7-9.

4         More broadly, ORR's sponsorship and reunification processes were designed

5    for the entirely different situation of a child who comes to the border *alone*, where

6    ORR must look for a sponsor (family member or otherwise), and investigate that

7    sponsor.  *See* Carey Decl., Ex. 33, ¶¶ 2-7 (describing purpose and function of

8    preexisting reunification processes).  Here, in contrast, the child was forcibly taken

9    from his or her own parent.  In this situation, ORR must simply give the child back

10   (absent clear evidence the parent is unfit or a danger).  But that is not happening.

11   ORR's preexisting process is simply not set up to quickly reunite an unlawfully

12   separated child.  *See* Kang Decl., Ex. 38, ¶ 23 (describing a separated parent's

13   attempt to reunite with her child using ORR's existing process).

14        For example, ORR has no systems designed to flag a child as having been

15   separated from a parent at or near the time of the family's arrest; track the identity

16   and detention location of the separated child's parent after the separation; ensure

17   regular contact between a separated detained child and her detained parent; or

18   reunify the child and parent in an ICE family detention facility.  *See* Carey Decl.,

19   Ex. 33 ¶¶ 8-9; Supplemental Declaration of Michelle Brané ("Supp. Brané Decl."),

20   Ex. 31, ¶¶ 4-5, 8-11; Supplemental Declaration of Jennifer Podkul ("Supp. Podkul

21   Decl."), Ex. 30, ¶¶ 3-5, 12; Tuell Decl., Ex. 32, ¶¶ 7-17 (numerous parents

22   separated from kids and given no information about their kids' locations).

23        Now that the government is aware that its actions are under scrutiny, it is

24   likely to point to hastily-created and ad hoc procedures to show that it is addressing

25   the current crisis.  But its June 23 DHS Fact Sheet only describes a process by

26   which "adults who are subject to removal are reunited with their children for the

27   purposes of removal."  Kang Decl., Ex. 38, ¶ 10 ("DHS Fact Sheet"); *see id.*

28   (describing "removal coordination").  It does not show the existence of any process

to swiftly reunify all detained parents with their children.  *See also* Supp. Brané Decl., Ex. 31, ¶ 12 (explaining why the processes described in the Fact Sheet will not reunify detained parents); Supp. Podkul Decl., Ex. 30, ¶ 14 (same).

Moreover, the evidence demonstrates that these recent steps are woefully inadequate even to allow *communication* between parents and children, much less to reunite them.  For instance, ORR has created a 1-800 hotline number that supposedly allows parents to find the children that have been taken from them.  But ORR's hotline regularly puts people on hold for 30 minute periods, and it is infeasible for detained parents to stay on the line that long.  *See* Supp. Brané Decl., Ex. 31, ¶¶ 5-6; Supp. Podkul Decl., Ex. 30, ¶¶ 6-8.  Moreover, ORR's hotline is now generating a constant busy signal.  *Id.*  Similarly, DHS has created a hotline for ORR caseworkers or attorneys trying to find parents. But that hotline merely permits a caller to request contact with a detained parent, and field offices can decline to respond to such requests.  Supp. Podkul Decl., Ex. 30, ¶¶ 10-11; *see also* Govindaiah Decl., Ex. 36, ¶ 6(c) (describing detained separated parents who could not access ORR/DHS communications systems to contact children).

Thus, if the government is left to follow its existing practices – which put the onus on parents to request reunification with their children, and without any reliable system in place for them to do so -- the overwhelming majority of children will not be reunited any time in the near future.  That will mean that more and more children will suffer irreparable harm.  As Plaintiffs' preliminary injunction briefs explained, the forcible separation of children can permanently traumatize children, and the effects can last through the child's lifetime.  Over the past month, the scientific and professional condemnation of the administration's practice has only grown, with *thousands* of experts joining to describe the lasting harm that every day of separation inflicts on children.  Major medical associations—including the American Medical Association, the American College of Physicians, the American Academy of Pediatrics, the American Psychological Association, the American

Psychiatric Association, and a group of over 5,000 medical professionals and experts—have voiced their vehement and unified opposition to this brutal practice. Kang Decl., Ex. 38, ¶¶ 11-19.

Nor is there any question that the assessment of the medical community is correct. One of the parents who submitted a declaration in this case, J.I.L., was finally reunited with her 4 and 10 year-old boys after months of separation, but both boys constantly ask whether someone will come to take them from their mother again. Declaration of Lisette Diaz, Ex. 35, ¶¶ 2-3. The 4 year-old is having nightmares, and often wakes in the night to search for his mother. *Id.*, ¶ 3. That deep-seated, potentially permanent trauma and sense of vulnerability is precisely what the medical community predicted would occur. This little boy, and thousands of other small children, will be forever scarred. And this is to say nothing of the harm that parents are suffering. *See* Kang Decl., Ex. 38, ¶ 20 (reporting on father who committed suicide after being separated from his family).

Immediate injunctive relief is necessary to ensure that the daily irreparable harm of separation ends promptly.

**III.   The Flores Settlement Agreement Does Not Prohibit the Reunification of Separated Children with Their Detained Parents.**

At the June 22 hearing, this Court inquired whether any injunctive relief would "be good for only a 20-day period in light of the *Flores* Settlement . . . ." June 22 Hearing Transcript at 13:5-10. As Plaintiffs explained, even if the *Flores* settlement rigidly required release of children on the 20th day, which it does not, it would still mean the government should be reuniting children with their detained parents for that 20-day period, which the government is not doing. *Id.* at 13:20-14:1. Moreover, many families are released by or before the 20-day mark, because they are able to show they have bona fide asylum claims and are not a flight risk or danger. *Id.* at 14:2-5; Declaration of Carlos Holguin ("Holguin Decl."), Ex. 37, ¶ 9. Most fundamentally, the *Flores* Settlement does not remotely abrogate or remove a

parent's existing right to make decisions concerning the care and custody of their own children.  *See* June 22 Hearing Transcript at 14:6-16:10.  The Settlement is for the benefit of the children and in no way would require the forcible release of a child where the parent believes it is not in the child's best interests.  Thus, where a parent and child are detained together in a family detention center, a parent may choose to keep the child with her, especially where the child is of a tender age.  *See* Holguin Decl., Ex. 37, ¶¶ 5-8, 10 (*Flores* Class Counsel explaining that the settlement does not require release over the parent's objection).  In short, the *Flores* Settlement poses no bar to ordering reunification of children with detained parents.[2]

## IV.  Any Injunction Should Ensure That Parents in DHS Custody Can Remain Detained with Their Children, Even if the Parents Are Facing Criminal Prosecution.

Plaintiffs wish to clarify a point of confusion that may have arisen as a consequence of the government's shifting practice regarding the detention of parents facing criminal prosecution.  Plaintiffs continue not to challenge the separation of a parent from a child for the period that the parent is in a criminal facility that does not permit children.  However, the mere fact that the parent is being prosecuted for illegal entry does not mean that separation is required.  If the parent is being prosecuted but is nonetheless being held in a DHS facility, then there is no need to separate the family, because DHS can house families.  And indeed, the June 20 Executive Order directs DHS to detain parents with their children "during the pendency of any criminal improper entry or immigration

---

[2] Plaintiffs' claim in this case, and this discussion of *Flores*, pertain only to those parents who came to the United States with their minor children, and were separated from their children by DHS.  This case does not address the rights of children who come to the United States alone.  In addition, any knowing and voluntary waiver by the parent of their child's release rights under *Flores* would apply narrowly to the child's right to be released or held in a licensed facility after 20 days.  The parent would not, of course, waive any other rights that *Flores* provides.

proceedings . . . ."  EO Sec. 3(a).  Accordingly, a plaintiff parent and child should have the ability to remain together, even if the parent is currently undergoing criminal prosecution, as long as the parent is detained in a DHS facility, rather than a criminal facility that does not permit children.

## V. An Injunction to Prevent Future Separations Remains Necessary, and the Court Should Order the Government to Follow Well-Established Child Welfare Standards.

Plaintiffs also request that this Court preliminarily enjoin future separations. Although the June 20 Executive Order purports to end future separations, it contains a significant carve-out that authorizes family separation "when there is a *concern* that detention of an alien child with the child's alien parent would pose a risk to the child's welfare."  Kang Decl., Ex. 38, ¶ 9, EO Sec. 3(b) (emphasis added).  Those vague terms are not defined, and allow DHS officers enormous leeway to effect separations for unconstitutional reasons.[3]

The example of S.S., who was taken from Ms. L. based on a mere allegation that they were not related, is illustrative.  As the Court is aware, Defendants have claimed that it was in the 6 year-old's own interests to be separated from her mother, because Ms. L did not have her documents with her by the time she reached the United States after a 10-country journey from the Congo (a common occurrence for asylum seekers, *see* Anker and Gilman Declarations, Dkt. 48-1, Exs. 19-20). Yet rather than verify parentage through a DNA test or other means, the government separated the child for close to 5 months.  This ran contrary to well-settled child welfare practices.  As explained by one the country's leading child welfare experts, it would never be in a child's interests to separate the child *before* taking basic steps to verify parentage, even where the government genuinely had

---

[3] Lawyers representing separated parents testify that separations are continuing to occur in cases, like Ms. L.'s, where the parent has not been prosecuted.  *See* Tuell Decl., Ex. 32, ¶¶ 7-12, 13a, 13c, 14-15, 16d, 16f, 16h, 16i, 16l-16p, 16r-16s.

18cv0428

doubts about parentage (something that would have seemed unlikely in Ms. L.'s case given that the child was frantically pleading with officers not to take her away from her mother).  *See* Guggenheim Decl., Ex. 17, Dkt. 48-1, ¶¶ 14-20.

Critically, Defendants have continued to defend the legality of Ms. L.'s separation from her daughter.  Thus, because the EO allows the government to separate when it deems it in the interests of the child, the EO does not eliminate the need for an injunction to prevent future separations.  To the contrary, the EO is an explicit grant of authority for the government to continue separations like Ms. L.'s.

At the June 22 hearing, the Court also asked if it would be appropriate to separate children on the basis of criminal history.  It is not, unless the criminal history is indicative of a parent's danger to his or her child.  Professor Guggenheim's supplemental declaration explains that "the only basis for separating children from parents in American law is when it is done to protect them from imminent danger that could result from being allowed to continue to reside with the parent."  Supp. Guggenheim Decl., Ex. 34, ¶ 6.  Therefore, "[c]riminal convictions are relevant only insofar as they bear on the fitness of the parent, and even then must be considered in combination with a totality of the factors that go to the best interests of the child."  *Id.*; *see id.*, ¶¶ 8-9 (citing state case law explaining that under a proper application of the best-interest standard, mere fact of criminal record does not make a parent unfit).  Otherwise, a parent could lose her child merely because she made a mistake in the past.[4]

_____

[4] Indeed, the June 23 DHS Fact Sheet underscores the need for an injunction, because it explains that even its limited reunification procedures may not apply whenever "the adult is a criminal alien."  Kang Decl., Ex. 38, ¶ 10.  This broad, undefined term is deeply at odds with the best-interest standard, as it does not provide any individual assessment of the severity of the criminal record, let alone whether that record bears on the fitness of the parent.

1   Applying this universally-accepted understanding, Plaintiffs' proposed order

2   would still permit the government to separate children when there is a genuine

3   reason for believing that the parent is a danger to the child, but would not permit the

4   government to separate a family whenever it simply declared it in the child's

5   interests."

6   **VI.   Parents Facing Imminent Deportation Require Safeguards to Ensure**

7   **that They Are Not Removed Without Their Children.**

8   Parents who are facing imminent deportation without their separated children

9   are in particularly grave need of immediate relief.  As the Court observed, parents

10   facing deportation without their accompanying children are "part and parcel" of this

11   case. June 22 Hearing Transcript at 41:16-22; Am. Compl., Dkt. 32, at 12.

12   There is evidence that parents have been deported without their children.  *See*

13   Govindaiah Decl., Ex. 36, ¶ 6(b) (father separated from four-month-old baby, both

14   deported separately); Kang Decl., Ex. 38, ¶ 21 (father separated from six-year-old

15   daughter, then deported without her); Tuell Decl., Ex. 32, ¶ 16k (parent who was

16   deported without her child).  There is a real risk of this continuing to occur given

17   the lack of tracking, and parents are terrified that this will happen to them.  *See*

18   Declaration of Kristin Greer Love, Ex. 29, ¶¶ 4-18 (describing cases of fathers at

19   risk of imminent deportation who remain separated from young children).  This

20   Court should therefore prohibit the government from removing any parent without

21   their minor child where the parent requests to be deported with the child.

22   **VII.   Plaintiffs' Order Provides the Appropriate Framework for**

23   **Expeditious Reunification.**

24   Plaintiffs have attached a Proposed Order that sets forth their requested relief

25   in greater detail.  The Proposed Order includes three key components.

26   First, it sets clear deadlines for reunifying already-separated children with

27   their parents.  Without timetables, it is impossible to ensure compliance with the

28   injunction.  For example, in this case, Ms. L. was separated from her daughter on

11

November 5 and was not reunited until March 16—five months of separation resulting from the government's failure to take simple steps to confirm her relationship with her daughter.  Ms. C. was reunited in June, more than *eight months* after her release from criminal custody.  Mr. U., another parent declarant in this case, has still not been reunited after eight months.  The length of these separations is typical of the class.

Thirty days is an appropriate general deadline for the government to mobilize its substantial resources to fix a problem that it deliberately created, and reunify all parents—whether detained or not—with their children (absent clear evidence of neglect, abuse or unfitness or a detained parent's stated desire that the child not be reunified with them).  A shorter deadline—10 days—is appropriate for children under age five, since they are particularly vulnerable.  *See, e.g., Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) (affirming injunction requiring DHS to provide class members bond hearings within 45 days); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1205-06 (N.D. Cal. 2017) (ordering agency to grant hearings for detained youth within 7 days of rearrest); *Armstrong v. Schwarzenegger*, 2007 WL 2694243, at *6 (N.D. Cal. Sept. 11, 2007) (ordering agency to implement new tracking system for parole proceedings within 14 days).

Second, the Court should order the government to provide Class Members with a way to contact their children telephonically within one week of the order. Many of the parents do not even know where their children are, and have not had any chance to reassure their children that reunification will happen.  *See, e.g.*, Tuell Decl., Ex. 32, ¶¶ 7-17 (describing dozens of cases at one detention center alone in which parents were not told where their separated children were taken).

Third, the Court should ensure that any future separations comply with well-settled constitutional due process standards.  Importantly, the mere presence of criminal history cannot be a categorical bar to reunification, nor can the government

fail to take basic steps to verify parentage prior to separation (as it did in Ms. L.'s case).  *See* Supp. Guggenheim Decl., Ex. 34, ¶¶ 5-6.[5]

\*        \*        \*

Defendants may claim in their upcoming filings that they intend to create a plan for reunification and to stop future separations.  The time for vague promises has passed, especially given that this Court put the government on notice three weeks ago that the practice of separating fit parents from their children was "brutal [and] offensive," in violation of due process.

Despite the Court's warning, the government continued to separate hundreds of additional children each week, and, as importantly, has failed to reunify those it has separated.  Indeed, for those separations that occurred due to a prosecution (such as Ms. C.'s), the government does not even offer a justification for continuing the separation once the parent is released from jail.  It simply argues that the initial separation was justified while the parent was in criminal custody.. But that is wholly unresponsive to Plaintiffs' claim that the *continued* separation is unconstitutional without a clear demonstration of unfitness or danger to the child.

Only this Court can immediately remedy the severe harm that the government's unconstitutional policies have wreaked on these vulnerable children and their parents.  No more parents and children should have to go sleep wondering if and when they will ever see each other again.

_____

[5] The Court asked if Plaintiffs currently sought to enjoin separations occurring in the interior of the United States.  June 22 Hearing Transcript at 19:17-22.  Plaintiffs maintain that all unlawful separations should be enjoined.  But if the Court determines that further record development would be necessary regarding the interior, the Court can reserve that issue and order relief for all class members who were apprehended at or within 100 miles of the U.S.-Mexico border.

1

## CONCLUSION

2

For these reasons, this Court should grant Plaintiffs' request for a preliminary

3

injunction.

4

5

Dated: June 25, 2018                         Respectfully Submitted,

6

                                             */s/ Lee Gelernt*

7

Bardis Vakili (SBN 247783)                   Lee Gelernt*

ACLU FOUNDATION OF SAN                       Judy Rabinovitz*

8

DIEGO & IMPERIAL COUNTIES                    Anand Balakrishnan*

9

P.O. Box 87131                               AMERICAN CIVIL LIBERTIES

San Diego, CA 92138-7131                     UNION FOUNDATION

10

T: (619) 398-4485                            IMMIGRANTS' RIGHTS PROJECT

11

F: (619) 232-0036                            125 Broad St., 18th Floor

*bvakili@aclusandiego.org*                   New York, NY 10004

12

                                             T: (212) 549-2660

13

Spencer E. Amdur (SBN 320069)                F: (212) 549-2654

Stephen B. Kang (SBN 292280)                 *lgelernt@aclu.org*

14

AMERICAN CIVIL LIBERTIES                     *jrabinovitz@aclu.org*

15

UNION FOUNDATION                             *abalakrishnan@aclu.org*

IMMIGRANTS' RIGHTS PROJECT

16

39 Drumm Street

17

San Francisco, CA 94111

T:  (415) 343-1198

18

F:  (415) 395-0950                           *Admitted Pro Hac Vice*

19

*samdur@aclu.org*

*skang@aclu.org*

20

21

22

23

24

25

26

27

28

14                                  18cv0428

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' SUPPLMENTAL MEMORANDUM IN SUPPORT OF CLASS-WIDE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---|---|---|
| 29 | Declaration of Kristin Greer Love | 17-22 |
| 30 | Declaration of Jennifer Podkul | 23-27 |
| 31 | Declaration of Michelle Brane | 28-32 |
| 32 | Declaration of Laura K. Tuell | 33-50 |
| 33 | Declaration of Robert Carey | 51-54 |
| 34 | Declaration of Martin Guggenheim | 55-59 |
| 35 | Declaration of Lisette Diaz | 60-62 |
| 36 | Declaration of Manoj Govindaiah | 63-67 |
| 37 | Declaration of Carlos Holgium | 68-124 |
| 38 | Declaration of Stephen Kang | 125-254 |

18cv0428

# Exhibit 29

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                 *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

                 *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF KRISTIN GREER LOVE**

CLASS ACTION

1.      I, Kristin Greer Love, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am a Staff Attorney with the ACLU of New Mexico. I am an active member of the State Bar of New Mexico and an inactive member of the State Bar of California.

3.      On June 21, 2018, I visited the Otero County Processing Center, a private prison where people in ICE custody are detained, in Chaparral, New Mexico. There, I met with three fathers from Honduras (Mr. S., Mr. J., and Mr. M.) who are separated from their children and are now facing imminent deportation. All three fathers have signed forms ordering their removals from the United States. But they remain separated from their children and fear being imminently removed without their children.

### Mr. S.

4.      Mr. S, a 27-year-old father, has been separated from his 6½-year-old son, J., since May 26, 2018. He has only spoken with his son twice by phone since then. He wept throughout our meetings and fears that he will never see his son again.

5.      Mr. S and his son came to the United States on May 23, 2018. Border Patrol kept them in cold temporary detention cells—known as *hieleras* or freezers—for three days. On May 26, government agents arrived and lined up the children on one side of the *hielera* and the parents on the other side. The agents took J., and did not say anything about where they were going to take him. He was devastated and feared for his son's safety. Mr. S struggles to sleep and thinks constantly about his son.

6.      Mr. S. was then sent to a prison in El Paso, Texas. Mr. S. was convicted of illegal entry and sentenced to "time served." Mr. S was then transferred to ICE custody in Otero.

7.     Mr. S. knows that his 6-year-old son is detained at a children's shelter in Miami, Florida. But he has had difficulty speaking with his son or his son's caseworker. Mr. S. said that he has to pay for calls to ORR and the shelter, and was not aware of any way that he could communicate with ORR or the shelter without paying by the minute for calls on the private prison phones.

8.     On June 21, the day after the President issued the Executive Order on family separation, Border Patrol agents visited Mr. S. and told him that he had three options: (1) sign a deportation order and be reunited with his child; (2) sign a deportation order and request to be deported *without* his child; (3) refuse to sign the order and be sent to a "federal prison," where he would be jailed "indefinitely" with his child.

9.     Mr. S. chose the first option. But he is very scared that the government will not reunify his son with him before the government deports him to Honduras. The government and the private prison guards refuse to give him any information.

### Mr. J.

10.     Mr. J. and his seven-year-old son, L., came to the United States on May 10, 2018, and turned themselves in to Border Patrol. Border Patrol agents told Mr. J. that he would be transferred to federal custody and that his son would be placed in a foster home until he (Mr. J) completed his sentence. The agents asked for Mr. J's identification card and L's birth certificate, which Mr. J provided.

11.     Mr. J asked the agent why they were separating him and his young son and the agent told him he was "foolish" for bringing his son.

12.     In the *hielera*, when they agents came to take the children, Mr. J. told L. that he was going to play with the other children. The agents took the children away from the holding cell, leaving the parents behind. That was the last time Mr. J saw L.

13.     Mr. J spoke with L. once, on June 20, 2018. He believes that his son is in Phoenix, but he is not sure. Mr. J and L's family members completed paperwork so

that L could go and live with them. But L. refuses to live with those family members because he wants to be with his father.

14.     On June 21, Border Patrol agents visited Mr. J. (as they did Mr. S.) and gave him the same choice between accepting his deportation and being sent to a federal facility with his son. Mr. J. chose to be deported with his son.

15.     L.'s caseworker has contacted Mr. J. and told him that she is waiting for Mr. J.'s deportation paperwork so they can be deported together. But Mr. J. has heard of other parents being deported without their children, and he fears this will happen to him. Mr. J is overwhelmed with grief and sadness and is desperate to be reunified with his son.

**Mr. M.**

16.     Mr. M is 38 years old and the father of 13-year-old L. They came to the United States on May 12, 2018. They spent three days together in a cold holding cell. On the third day, a government agent told Mr. M.: "You will go to a prison for zero to six months," the agent said. "The boy will go to a shelter." They agent allowed the father and son to hug before they took his son away.

17.     That was the last day that Mr. M saw L. He has not spoken with his son since and does not know where his son is. No one at Otero has told him how he can locate his son. Mr. M spoke with the Honduran consulate and pleaded for help. The consular official said that they could not help and that his son is in the hands of the U.S. government.

18.     Mr. M. agreed to his deportation more than a week ago and begged the Border Patrol agent who presented him with the form to help reunify him with his son. Mr. M is desperate to be reunified with his son before he or his son is deported. He fears that he will never see his son again.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 24th day of June, 2018, in Albuquerque, New Mexico.

_____

KRISTIN GREER LOVE

# Exhibit 30

1   Lee Gelernt*
    Judy Rabinovitz*
2   Anand Balakrishnan*
    AMERICAN CIVIL LIBERTIES
3   UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
4   125 Broad St., 18th Floor
    New York, NY 10004
5   T:  (212) 549-2660
    F:  (212) 549-2654
6   lgelernt@aclu.org
    jrabinovitz@aclu.org
7   abalakrishnan@aclu.org

8   Attorneys for Petitioners-Plaintiffs
9   Additional counsel on next page

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); et al., <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **SUPPLEMENTAL DECLARATION OF JENNIFER PODKUL** <br><br> CLASS ACTION |

1.     I, Jennifer Podkul, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an attorney and Director of Policy at Kids in Need of Defense ("KIND"), a national organization that represents children in immigration matters throughout the United States, promotes pro bono representation of immigrant children, and advocates for laws and policies that ensure the protection of children and promotes their rights to due process and fundamental fairness. I am a member of the State Bar of Maryland.

3.     KIND represents or coordinates the representation of thousands of immigrant children throughout the United States, including children who are held in the custody of the Office of Refugee Resettlement ("ORR"), as well as those who have been reunified with a sponsor in the United States. KIND is representing children detained in Washington who have been separated from their parents. KIND runs a return and reintegration program in Guatemala and Honduras for children wishing to return to their country of origin. We provide technical assistance to lawyers for immigrant children.

4.     Since the government began separating children from their accompanying parents, we have begun representing several such children. We have received numerous requests from other lawyers and advocates who are working with this population and seeking to reunite the children with their parents. Accordingly, our organization is familiar with the issues faced by separated children, including barriers to reunifying them with their accompanying parents.

5.     To my knowledge, the government currently has no automatic system for reuniting children the government has separated from their parents. My understanding is that the government has no method for even identifying the parents of separated children.

6.     Currently, there are two general methods for reuniting separated children with their parents, depending on whether the parent remains in ICE custody or has been released from immigration detention.

7.     A parent can only seek to find out where their separated child has been taken by calling a hotline. The parent can call that number, explain who they are, and try to obtain information about their child. Supposedly, an ORR case worker will try to match the parent to a separated child in its custody, and then call the parent back.

8.     This system is not functioning in practice, however. This hotline is now completely overburdened with phone calls, and KIND was receiving reports that persons calling that number were put on hold for as long as 30 minutes. Parents in detention have restricted phone access, and cannot stay on the line nearly that long.

9.     Moreover, the toll free number does not work from outside of the country.  That means for parents who have already been deported they cannot call this number to try and find out where their child is being detained.

10.    Alternatively, the separated child can attempt to find out where their detained parent is located, either through an ORR case worker or the child's attorney. Of course, this is only possible if the child is old enough to communicate relevant information; a very young child cannot even do that much. Sometimes, but not always, there is information in the child's case file that will indicate who the parent is and where they might be detained.

11.    As stated above, this ORR worker or child's attorney cannot directly call a detained parent. Instead, ICE has provided its own hotline number for parents seeking to find out where their separated children are located. So an ORR worker or attorney must call that hotline and leave a message with ICE. The ICE hotline worker then sends a message to the local ICE field office where the parent is detained, and requests that the field office arrange communication between parent and child. Sometimes the field office refuses that request or is too overburdened to timely respond.

12.     If the parent has been released from custody, but the child remains detained in ORR custody, the parent can ask ORR to become a sponsor of the child. That parent must go through ORR's usual reunification process. My understanding is that there is no special process in place for ORR to reunify separated children with their parents. The usual ORR reunification process can take weeks or months, depending on the child's circumstances.

13.     If a parent is deported, there is no automatic alert to ORR of the parents removal from the United States. KIND has received requests from non-governmental organizations in Guatemala asking for assistance locating a child who was sent to ORR custody. Moreover, there is no system to expedite repatriations of children who have been separated from parent once parent has been deported.

14.     I have reviewed public statements released by government agencies since the Executive Order was issued, such as the DHS "Fact Sheet: Zero-Tolerance Prosecution and family Reunification." They reaffirm that ORR will use its preexisting processes for reuniting children with their parents, but those processes only apply to parents who are not in detention. As to parents who remain in ICE detention, the government's statements indicate that they will only reunite parents "at time of removal." But removal proceedings can often take significant time, and these statements do not speak to what will happen to parents in ICE custody who have not completed their removal proceedings.

15.     I declare under penalty of perjury under the laws of the United States of America and Maryland that the foregoing is true and correct, based on my personal knowledge. Executed in Silver Spring, Maryland on June 25, 2018.

_____

JENNIFER PODKUL

# Exhibit 31

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br>           *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); et al., <br><br>           *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **SUPPLEMENTAL DECLARATION OF MICHELLE BRANE** <br><br> CLASS ACTION |

1.      I, Michelle Brané, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am an attorney and Director of the Migrant Rights and Justice Program at the Women's Refugee Commission ("WRC"). WRC is a national research and policy advocacy organization that protects the rights of women, children, and youth displaced by conflict and crisis. I am expert in U.S. immigration policies and detention, particularly the custody and detention of young children and families fleeing persecution. I am a member of the State Bar of New York.

3.      Since the U.S. government began separating children from their accompanying family members, WRC has been attempting to identify systems for tracking parents and children, attempting to track and document identified cases, and advocating for better systems to reunify separated children with their parents.

4.      My understanding is that the government currently has no system in place for automatically reunifying a separated child with her parent. Either the parent or the child (working through an Office of Refugee Resettlement ("ORR") case worker or an attorney) must request to make contact or for reunification with their family members.

5.      My understanding also is that the government has no method for even tracking or identifying the separated child's parents. When a family comes to the border, and the Department of Homeland Security ("DHS") or Customs and Border Patrol ("CBP") takes the child, the parent is currently given no information about where the child will be sent. In some cases parents are told to call a 1-800 hotline number for information, but no other detail is provided.  Similarly, when the child is referred to ORR custody, the child is given no information about where their parent is detained.

6.      We have received reports from parents who attempt to call the 1-800 hotline that it is ineffective.  Some report that they get only busy signals when they call, others report being placed on hold for over 30 minutes which results in being

Exhibit 31, Page 30

disconnected due to limited phone access from ICE detention. Others have not even been informed of this hotline. Even if contact is made through the hotline, they are instructed to leave a message with their identifying information and relationship to the child, and a number where they can be reached.  ICE detainees are not able to receive phone calls in detention. Thus, the only method of obtaining information or communicating with their child is through one-on-one requests and cooperation from an ICE Detention Officer.

7.     Of course, both children and parents are frequently transferred among different facilities. So even if a person knew where their family member was at a specific point in time, that information will likely be out of date in a matter of days or weeks.

8.     My understanding is that U.S. Customs and Border Protection (which is responsible for apprehending and processing families arrested at or near the border), and Immigration and Customs Enforcement (which is responsible for maintaining long-term immigration detention facilities) do not share a database. The two agencies also have no way of accessing information contained in the other agency's database. So when CBP sends a separated parent to ICE, there is no way for ICE to tell whether the parent was apprehended with minor children, or what happened to those minor children.

9.     It is also my understanding that neither the CBP nor the ICE databases are coordinated with the Department of Health and Human Safety ("HHS") or the Office of Refugee Resettlement ("ORR").

10.     While it is my understanding that CBP has developed an identifying number for families that have been apprehended together, my understanding is that this number is not transferred into the ICE or HHS-ORR databases.

11.     It is my understanding that even where contact between a parent and a child is made, ICE has no plans or procedures in place to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration

case is concluded.  I am not aware of any directive instructing Deportation Officers to facilitate reunification while the immigration case is pending.

12.     I have seen and reviewed public statements by government agencies since the Executive Order was issued, such as the DHS "Fact Sheet" on family separation. These statements simply confirm that ORR will use its preexisting processes for reuniting children with their parents, which only apply to nondetained parents. As to parents in ICE detention, the Fact Sheet, for example, indicates only that they will reunite parents "at time of removal." But removal proceedings can take months or even years to resolve, particularly if a parent is requesting asylum, and the government's recent statements do not address what will happen to parents in ICE custody awaiting the conclusion of their proceedings.

13.     I declare under penalty of perjury under the laws of the United States of America and Maryland that the foregoing is true and correct, based on my personal knowledge. Executed in Hyattsville, Maryland on June 25, 2018.


_____

MICHELLE BRANE

# Exhibit 32

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                            *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

                            *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**SUPPLEMENTAL
DECLARATION OF LAURA K.
TUELL**

CLASS ACTION

1.     I, Laura K. Tuell, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am Firmwide Pro Bono Counsel with the law firm Jones Day.  In my capacity as Firmwide Pro Bono Counsel, I manage Jones Day's Laredo Project, which aims to provide, on a pro bono basis, information and Know Your Rights ("KYR") presentations as well as, on a more limited basis, full direct representation to women in the custody of Immigration Customs and Enforcement ("ICE") at the Laredo Detention Facility in Laredo, Texas.

3.     As part of this ongoing project, the firm's attorneys offer KYR presentations to detained women and then meet with as many of the women who request an interview as possible to screen their cases for full representation.

4.     We obtained the information in this declaration during these KYR presentations and screening interviews.

5.     Beginning in approximately March 2018, we began to see an increase in the separations of mothers and children while giving KYR  presentations in Laredo and screening interviews in Laredo and surrounding detention centers.

6.     Below summarizes, on a week-by-week basis, the pertinent information obtained from mothers we encountered through our Project who were separated from their children.

7.     The week of March 19 to March 25, we encountered through our Project one (1) mother separated from her children:

     a.   A mother, J.I.L.M. (AXXXXXX849), was separated from her sons, 10-years-old and 3-years-old.  The government did not provide J.I.L.M. information regarding her separated sons' location(s).  Upon information and belief, J.I.L.M. had not been criminally prosecuted.

8.     The week of March 26 to April 1, we encountered through our Project one (1) mother separated from her child:

     a.   A mother, M.I.Q.L. (AXXXXXX043), was separated from her 3-year-old son, J.A.A.Q.  The government did not provide M.I.Q.L. information regarding her separated son's location.  M.I.Q.L. had not been criminally prosecuted.

9.     The week of April 16 to April 22, we encountered through our Project two (2) mothers separated from their children, including the following:

     a.   A mother, J.L.G.G. (AXXXXXX916), was separated from her 14-year-old son, J.J.V.  J.L.G.G. presented at the port of entry on April 7, 2018.  The government did not provide J.L.G.G. information regarding her separated son's location.  J.L.G.G. had not been criminally prosecuted.

     b.   A mother, Y.C.M. (AXXXXXX307), was separated from her 6-year-old daughter, K.E.S.M.  She presented with her husband and her daughter at

-2-

the border on the Reynosa Bridge on April 11, 2018. The government did not provide Y.C.M. information regarding her separated daughter's location.  Y.S.M. had not been criminally prosecuted.

10.     The week of April 23 to April 29, we encountered through our Project two (2) mothers separated from their children:

    a.  A mother, S.Y.C.R. (AXXXXXX966), was separated from her 6-year-old daughter, A.V.C.R., and 17-year-old son, J.A.M.C.  The government did not provide S.Y.C.R. information regarding her separated daughter's or son's location.  Upon information and belief, S.Y.C.R. had not been criminally prosecuted.

    b.  A mother, D.G.M.Z. (AXXXXXX171), was separated from her 12-year-old daughter, D.A.S.S. She was also separated from her 1-year-old grandson, Y.D.S.S., 12-year-old granddaughter, K.A.M.S., and 10-year-old grandson, A.B.C.H.  D.G.M.Z. presented at a port of entry on April 15, 2018.  The government did not provide D.G.M.Z. information regarding her separated daughter's or grandchildren's locations.  Upon information and belief, D.G.M.Z. had not been criminally prosecuted.

11.     The week of April 30 to May 6, we encountered through our Project three (3) mothers separated from children, including the following:

Exhibit 32, Page 37

   a.  A mother, M.M.C.B. (AXXXXXX143), was separated from her 3-year-old daughter, M.N.P.C.  The mother and child presented at the border on April 18, 2018.  The government did not provide M.M.C.B. information regarding her separated daughter's location.  M.M.C.B. had not been criminally prosecuted.

   b.  A mother, A.M.B.A. (AXXXXXX503), was separated from her 1-year-old son, E.D.M.P.  The government did not provide A.M.B.A. information regarding her separated son's location.  Upon information and belief, A.M.B.A. had not been criminally prosecuted.

   c.  A mother, S.M.L.M. (AXXXXXX050), was separated from her 15-year-old daughter, M.O.F.L., and her 17-year-old daughter, H.G.F.L.  The government did not provide S.M.L.M. information regarding her separated daughters' location(s).  Upon information and belief, S.M.L.M. had not been criminally prosecuted.

12.   The week of May 7 to May 13, we encountered through our Project two (2) mothers separated from their children, including the following:

   a.  A mother, C.C.D.H. (AXXXXXX869), was separated from her 3-year-old daughter, A.V.C.D.  The government did not provide C.C.D.H. information regarding her separated daughter's location.  Upon information and belief, C.C.D.H. had not been criminally prosecuted.

-4-

b.  A mother, M.M.S.N. (AXXXXXX081), was separated from her 12-year-old son, H.Y.P.S.  The government did not provide M.M.S.N. information regarding her separated son's location.  Upon information and belief, M.M.S.N. had not been criminally prosecuted.

13.  The week of May 14 to May 20, we encountered through our Project three (3) mothers separated from their children, including the following:

a.  A mother, M.S.R.M. (AXXXXXX334), was separated from her 17-year-old daughter, S.M.R.M.  The government did not provide M.S.R.M. information regarding her separated daughter's location.  Upon information and belief, M.S.R.M. had not been criminally prosecuted.

b.  A mother, R.M.A.V. (AXXXXXX036), was separated from her 5-year-old son, O.M.R.A., on or about May 8, 2018.  The government did not provide R.M.A.V. information regarding her separated son's location.  R.M.A.V. was criminally prosecuted.  At the time of her apprehension by Border Patrol agents, R.M.A.V. reported to us that the agents told her that she would be separated from her son and she would be deported while he would remain in the United States.  As of May 15, 2018, the mother still had no contact with her son.

c.  A mother, L.N.A.N. (AXXXXXX095), was separated from her 4-year-old son, L.A.R.A.  The government did not provide L.N.A.N.

Exhibit 32, Page 39

information regarding her separated son's location.  Upon information and belief, L.N.A.N. had not been criminally prosecuted.

14.   The week of May 21 to May 27, we encountered through our Project five (5) mothers separated from their children, including the following:

a.  A mother, D.I.P.R. (AXXXXXX758), was separated from her minor daughter.  The government did not provide D.I.P.R. information regarding her separated daughter's location.  Upon information and belief, D.I.P.R. had not been criminally prosecuted.

b.  A mother, D.D.M.P. (AXXXXXX487), was separated from her 5-year-old son, J.A.S.M.  The government did not provide D.D.M.P. information regarding her separated son's location.  Upon information and belief, D.D.M.P. had not been criminally prosecuted.

c.  A mother, M.L.R.Q.R. (AXXXXXX849), was separated from her 9-year-old daughter, L.S.R.R.  The government did not provide M.L.R.Q.R. information regarding her separated daughter's location.  Upon information and belief, M.L.R.Q.R. had not been criminally prosecuted.

d.  A mother, E.X.M.Y. (AXXXXXX818), was separated from her 7-year-old son, V.A.Y.M.  The government did not provide E.X.M.Y information regarding her separated son's location.  Upon information and belief, E.X.M.Y. had not been criminally prosecuted.

Exhibit 32, Page 40

e. A mother, A.V.B.G. (AXXXXXX810), was separated from her 11-year-old son, O.D.G.B.  The government did not provide A.V.B.G. information regarding her separated son's location.  Upon information and belief, A.V.B.G. had not been criminally prosecuted.

15. The week of May 28 to June 3, we encountered through our Project twelve (12) mothers separated from their children, including the following:

a. A mother, J.I.C.M. (AXXXXXX335), was separated from her 8-year-old son, M.J.C.M.  The government did not provide J.I.C.M. information regarding her separated son's location.  Upon information and belief, J.I.C.M. had not been criminally prosecuted.

b. A mother, L.M.V.V. (AXXXXXX953), was separated from her 10-year-old son, D.Y.G.V. The government did not provide L.M.V.V. information regarding her separated son's location.  Upon information and belief, L.M.V.V. had not been criminally prosecuted.

c. A mother, M.C.B. (AXXXXXX709), was separated from her 8-year-old son, J.A.L.B.  The government did not provide M.C.B. information regarding her separated son's location.  Upon information and belief, M.C.B. had not been criminally prosecuted.

d. A mother, D.I.L.O. (AXXXXXX628), was separated from her 15-year-old son, S.R.V.L.  The government did not provide D.I.L.O. information

Exhibit 32, Page 41

regarding her separated son's location.  Upon information and belief,

D.I.L.O. had not been criminally prosecuted.

e.  A mother, P.M.D. (AXXXXXX354), was separated from her 5-year-old

son, E.O.C.M.  The government did not provide P.M.D. information

regarding her separated son's location.  Upon information and belief,

P.M.D. had not been criminally prosecuted.

f.  A mother, M.A.M.M. (AXXXXXX114), was separated from her 12-

year-old son, J.E.B.M., and 6-year-old son, A.E.B.M.  The government

did not provide M.A.M.M. information regarding her separated sons'

locations.  Upon information and belief, M.A.M.M. had not been

criminally prosecuted.

g.  A mother, L.M.M.S. (AXXXXXX038), was separated from her 10-year-

old daughter, B.M.H.M., and 6-year-old son, B.D.H.M.  The government

did not provide L.M.M.S. information regarding her separated children's

locations.  Upon information and belief, L.M.M.S. had not been

criminally prosecuted.

h.  A mother, N.C.C.O. (AXXXXXX853), was separated from her 10-year-

old son, A.A.L.C., and 7-year-old son, S.N.L.C.  The government did not

provide N.C.C.O. information regarding her separated sons' location.

Upon information and belief, N.C.C.O. had not been criminally prosecuted.

    i.   A mother, D.M.A.P. (AXXXXXX680), was separated from her 7-year-old daughter, E.A.V.A.P.  The government did not provide D.M.A.P. information regarding her separated daughter's location.  Upon information and belief, D.M.A.P. had not been criminally prosecuted.

    j.   A mother, M.A.A.M. (AXXXXXX542), was separated from her 9-year-old daughter, E.E.H.A.  The government did not provide M.A.A.M. information regarding her separated daughter's location.  Upon information and belief, M.A.A.M. had not been criminally prosecuted.

    k.   A mother, S.M.R.C. (AXXXXXX179), was separated from her 9-year-old son, J.S.A.R.  The government did not provide S.M.R.C. information regarding her separated son's location.  Upon information and belief, S.M.R.C. had not been criminally prosecuted.

    l.   A mother, M.E.D.M. (AXXXXXX110), was separated from her 11-year-old son, D.N.M.D.  The government did not provide M.E.D.M. information regarding her separated son's location.  Upon information and belief, M.E.D.M. had not been criminally prosecuted.

16.   The week of June 4 to 10, we encountered through our Project nineteen (19) mothers separated from their children, including:

a.  A mother, D.Y.S.G. (AXXXXXX114), was separated from her 13-year-old daughter, M.Y.M.S.  The government did not provide D.Y.S.G. information regarding her separated daughter's location.  D.Y.S.G. was criminally prosecuted.

b.  A mother, M.S.H.A. (AXXXXXX496), was separated from her minor son, E.J.E.H.  The government did not provide M.S.H.A. information regarding her separated son's location.  M.S.H.A. was criminally prosecuted.

c.  A mother, M.L.C.R. (AXXXXXX052), was separated from her 6-year-old son, A.Y.B.C.  The government did not provide M.L.C.R. information regarding her separated son's location.  M.L.C.R. was criminally prosecuted.

d.  A mother, S.P.C.L. (AXXXXXX969), was separated from her 5-year-old daughter, A.M.M.L.C.  The government did not provide S.P.C.L. information regarding her separated daughter's location.  Upon information and belief, S.P.C.L. had not been criminally prosecuted.

e.  A mother, C.M.G.N. (AXXXXXX199), was separated from her 8-year-old son J.E.A.G.  The government did not provide C.M.G.N. information regarding her separated son's location.  C.M.G.N. has been criminally prosecuted.

Exhibit 32, Page 44

f.  A mother, M.P.M. (AXXXXXX224), was separated from her 5-year-old son, J.J.P.M.  The government did not provide M.P.M. information regarding her separated son's location.  Upon information and belief, M.P.M. had not been criminally prosecuted.

g.  A mother, A.G.H. (AXXXXXX222), was separated from her 9-year-old daughter, N.J.H.G.  The government did not provide A.G.H. information regarding her separated daughter's location.  A.G.H. was criminally prosecuted.

h.  A mother, Y.C.R.L. (AXXXXXX080), was separated from her 15-year-old daughter, S.F.C.R.  The government did not provide Y.C.R.L. information regarding her separated daughter's location.  Upon information and belief, Y.C.R.L. had not been criminally prosecuted.

i.  A mother, K.W.R.A. (AXXXXXX071) was separated from her six-year-old son, K.A.M.R.  The government did not provide K.W.R.A. information regarding her separated son's location.  Upon information and belief, K.W.R.A. had not been criminally prosecuted.

j.  A mother, N.X.B. (AXXXXXX082), was separated from her 12-year-old daughter, D.C.G.B.  The government did not provide N.X.B. information regarding her separated son.  N.X.B. was criminally prosecuted.

k.  A mother, E.J.O.E. (AXXXXXX510), was separated from her 8-year-old son, A.T.B.O.  E.J.O.E. reported to us that, after she was separated from her son, the government told her that she would be reunited with her son if she renounced her statement of fear.  E.J.O.E. did so, but before boarding the plane she informed us that ICE officials told her that she was misinformed and that her deportation would go forward without her son.

l.  A mother, S.L.G.M. (AXXXXXX097), was separated from her 12-year-old son, R.A.M.G.  The government did not provide S.L.G.M. information regarding her separated son's location.  Upon information and belief, S.L.G.M. had not been criminally prosecuted.

m. A mother, L.N.F.A. (AXXXXXX271), was separated from her 11-year-old daughter, O.S.F.A.  The government did not provide L.N.F.A. information regarding her separated daughter's location.  Upon information and belief, L.N.F.A. had not been criminally prosecuted.

n.  A mother, M.U.P. (AXXXXXX435), was separated from her 11-year-old son, E.F.C.U.  The government did not provide M.U.P. with information regarding her son.  Upon information and belief, M.U.P. had not been criminally prosecuted.

Exhibit 32, Page 46

o. A mother, G.C.H. (AXXXXXX203), was separated from her 7-year-old son, A.E.M.C. The government did not provide G.C.H. with information regarding her son. Upon information and belief, G.C.H. had not been criminally prosecuted.

p. A mother, R.V.A.L. (AXXXXXX636), was separated from her 9-year-old daughter, K.M.C.A. The government did not provide R.V.A.L. with information regarding her daughter. Upon information and belief, R.V.A.L. had not been criminally prosecuted.

q. A mother, W.T.H.P. (AXXXXXX212), was separated from her 9-year-old daughter, E.H.O.P. The government did not provide W.T.H.P. information regarding her daughter. W.T.H.P. was criminally prosecuted.

r. A mother, E.R.M.D. (AXXXXXX025), was separated from her 12-year-old son, J.A.C.M. The government did not provide E.R.M.D. with information regarding her son. Upon information and belief, E.R.M.D. had not been criminally prosecuted.

s. A mother, M.M.Z.C. (AXXXXXX325), was separated from her 6-year-old daughter, M.D.C.Z.C. The government did not provide M.M.Z.C. with information about her daughter. Upon information and belief, M.M.Z.C. had not been criminally prosecuted.

17.     The week of June 11 to 17, we encountered through our Project nine (9) mothers separated from their children, including the following:

   a.   A mother, S.M.C.G. (AXXXXXX620), was separated from her 6-year-old daughter, G.M.C.C.  S.M.C.G. was criminally prosecuted.  S.M.C.G. reported to us that she was taken to court and told that her daughter would be waiting for her when she returned.  When S.M.C.G. returned from court, however, her daughter was gone.  The government did not provide S.M.C.G. information regarding her separated daughter's location.

   b.   A mother, B.Y.M.T. (AXXXXXX535), was separated from her 5-year-old daughter, V.A.R.M.  B.Y.M.T. was still breastfeeding V.A.R.M.  The government did not provide B.Y.M.T. information regarding her separated daughter's location.  B.Y.M.T. was criminal prosecuted.

   c.   A mother, M.C.M.Z. (AXXXXXX855), was separated from her 9-year-old daughter, G.V.Z.M.  The government did not provide M.C.M.Z. information regarding her separated daughter's location.  M.C.M.Z. was criminally prosecuted.

   d.   A mother, M.S.A. (AXXXXXX271), was separated from her 15-year-old daughter, G.M.R.S.  The government did not provide M.S.A. information

-14-

regarding her separated daughter's location.  M.S.A. was criminally prosecuted.

e. A mother, C.E.C.S. (AXXXXXX001), was separated from her 15-year-old son, J.A.C.C.  The government did not provide C.E.C.S. information regarding her separated son's location.  C.E.C.S. was criminally prosecuted.

f. A mother, R.F.C.B. (AXXXXXX464), was separated from her 5-year-old daughter, C.M.R.C.  R.F.C.B. was told she would see her daughter again after her court hearing.  The government did not provide R.F.C.B. information regarding her separated daughter's location.  R.F.C.B. was criminally prosecuted.

g. A mother, E.I.C.V. (AXXXXXX398), was separated from her 15-year-old son, R.J.C.C.  The government did not provide E.I.C.V. information regarding her separated son's location.  E.I.C.V. was criminally prosecuted.

h. A mother, L.M.M. (AXXXXXX589), was separated from her 7-year-old son, E.N.C.M.  The government did not provide L.M.M. information regarding her separated son's location.  L.M.M. was criminally prosecuted.

Exhibit 32, Page 49

i.   A mother, M.C.C. (AXXXXXX099), was separated from her 8-year-old daughter, K.E.P.C.  M.C.C. informed us that she was taken to see a judge, and her daughter was gone when she returned.  The government did not provide M.D.C. information regarding her separated daughter's location.  M.D.C. was criminally prosecuted.

18.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Laredo, Texas, on June 24, 2018.

Laura K. Tuell

-16-

# Exhibit 33

1    Lee Gelernt*
     Judy Rabinovitz*
2    Anand Balakrishnan*
     AMERICAN CIVIL LIBERTIES
3    UNION FOUNDATION
     IMMIGRANTS' RIGHTS PROJECT
4    125 Broad St., 18th Floor
     New York, NY 10004
5    T:  (212) 549-2660
     F:  (212) 549-2654
6    lgelernt@aclu.org
     jrabinovitz@aclu.org
7    abalakrishnan@aclu.org

8    *Attorneys for Petitioners-Plaintiffs*
     *Additional counsel on next page*
9

     Bardis Vakili (SBN 247783)
     ACLU FOUNDATION OF SAN
     DIEGO & IMPERIAL COUNTIES
     P.O. Box 87131
     San Diego, CA 92138-7131
     T: (619) 398-4485
     F: (619) 232-0036
     bvakili@aclusandiego.org

     Spencer E. Amdur (SBN 320069)
     Stephen B. Kang (SBK 292280)
     AMERICAN CIVIL LIBERTIES
     UNION FOUNDATION
     IMMIGRANTS' RIGHTS PROJECT
     39 Drumm Street
     San Francisco, CA 94111
     T:  (415) 343-1198
     F:  (415) 395-0950
     samdur@aclu.org
     skang@aclu.org

     *Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **SUPPLEMENTAL DECLARATION OF ROBERT CAREY** |
| U.S. Immigration and Customs Enforcement ("ICE"); et al., | |
| *Respondents-Defendants*. | CLASS ACTION |

1.    I, Robert Carey, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.    I previously served as Director of the Office of Refugee Resettlement ("ORR") in the Department of Health and Human Services ("HHS") from March, 2015 to January, 2017.

3.    As Director of ORR, I oversaw all of ORR's programs, including the Unaccompanied Immigration Minor ("UC") program. In my capacity as Director, I became deeply familiar with the ORR policies and procedures for identifying, vetting and approving sponsors for UCs in the legal custody of ORR, and how this process operates in practice. I am also deeply familiar with ORR's policies and procedures for communicating and exchanging information with other government agencies, including the Department of Homeland Security ("DHS"), concerning children who come into ORR custody.

4.    ORR's existing process for releasing children from custody is called the "reunification" process. It involves identifying, contacting, vetting and approving a qualified "sponsor" for a child, meaning an individual in the community who can provide care and custody for the child.

5.    ORR's reunification policies are publicly available on the ORR website. *See* ORR, Children Entering the United States Unaccompanied: Section 2, Safe and Timely Release from ORR Care, (hereinafter, "ORR Policies"), *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2.

6.    ORR's reunification process was designed to address the situation of children who come to the border or are apprehended outside the company of a parent or legal guardian. In such circumstances, it is important to engage in a careful process of identifying and vetting potential sponsors to ensure that the child is being released to a

safe and secure environment. That process can take weeks, and sometimes months, depending on the minor's individual facts and circumstances.

7.       However, ORR's reunification process was not designed to deal with the situation of children who come to the United States with their parents, and then are removed from their parents' care by DHS. My understanding is that such parents are then detained in adult DHS facilities or federal criminal custody. ORR's reunification processes were not set up to reunify parents with children in such circumstances. Similarly, any information-sharing policies between ORR and DHS are not designed for this situation.

8.       For example, ORR previously had no policies or systems designed to flag a child as having been separated from a parent at or near the time of the family's arrest; track the identity and detention location of the separated child's parent after the separation; ensure regular contact between a separated detained child and his or her detained parent; or reunify the child and parent in an ICE family detention facility.

9.       If a separated parent is released from DHS custody, but the separated child remains in ORR custody, the parent can request to have the child released to his or her care. But they would have to go through ORR's regular reunification processes, which could take weeks or months to finish. And again, those processes are not designed to deal with the special situation of children separated from their accompanying parents by DHS.

10.      I declare under penalty of perjury under the laws of the United States of America and ~~I~~ *~~per Jersey~~* that the foregoing is true and correct, based on my personal knowledge. Executed in South Orange, New Jersey on June 25, 2018.

ROBERT CAREY

Exhibit 33, Page54

# Exhibit 34

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*      *\*Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al.,<br><br>                    *Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>                    *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>**SUPPLEMENTAL DECLARATION OF MARTIN GUGGENHEIM**<br><br>CLASS ACTION<br><br>No Hearing Date |

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org

I, Martin Guggenheim, hereby declare, pursuant to 28 U.S.C. § 1746:

1. I am the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and a Founding Board Member of the Center for Family Representation. I have already submitted a declaration in this case, Dkt. No. 48-1, and incorporate my educational and professional background and opinions as set out there.

2. I write to address the impact of a criminal record on custodial rights.

3. Children and parents are commonly separated when parents are convicted of crimes, but only because the parent is sentenced to a prison.

4. When a defendant who is a parent does not receive a sentence of incarceration after a conviction, or after the parent has completed serving any sentence, the only way under state or federal law to separate a child from the parent because of the criminal act is to bring a separate proceeding in juvenile court charging the parent with maltreatment of the child based on the criminal behavior itself. In that new proceeding, the question would be whether the state can prove that the child would be endangered if permitted to remain in the parent's custody.

5. As this indicates, the only basis for separating children from parents in American law is when it is done to protect them from imminent danger that could result from being allowed to continue to reside with the parent. And as I explained in my previous declaration, this generally can only be the case when the parent is abusing or neglecting the child. It may also occur when the parent has a very serious and contagious disease that is likely to harm the child.

6. Thus, the presence of a criminal record does not displace the general rule that "[a]bsent a finding of unfitness, it is presumed that children are best served by remaining with their natural parents." *In re Termination of Parental Rights to Max G.W.*, 716 N.W.2d 845, 857 (Wis. 2006) (citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)). Criminal convictions are relevant only insofar as they bear on the

fitness of the parent, and even then must be considered in combination with a totality of the factors that go to the best interests of the child.

7. State law confirms this principle.  "[A] parent's criminal history is not an absolute bar to custody and must, as with any other factor, be considered in the totality of the circumstances." *Jones v. Pagan*, 947 N.Y.S.2d 580, 582 (N.Y. App. Div. 2012) (internal citations and quotations omitted). The mere "existence of a felony conviction or even the existence of multiple felony convictions" is insufficient to render the parent unfit to raise the child. *In re Baby Girl M.*, 135 Cal. App. 4th 1528, 1542 (Cal. Ct. App. 2006) (finding three felony drug and burglary convictions did not warrant termination of parental rights); *see also In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App. 2002) ("Although appellant's criminal history is a factor in determining the best interest of the children, it is not dispositive.")

8. This principle holds even where a criminal conviction is for the most serious crimes. *See, e.g.*, *In re James M.*, 65 Cal. App. 3d 254 (Cal. Ct. App. 1976) (finding a conviction for murder did not necessarily demonstrate that a father was an unfit parent); *In re Terry E.*, 180 Cal. App. 3d 932 (Cal. Ct. App. 1986) (convictions for false imprisonment and sex crimes did not provide sufficient grounds for termination of a mother's parental rights nearly four years later).

9. In conclusion, criminal history is not a dispositive factor in determining whether remaining with a parent is in the best interest of a child. Determining what is in the best interest of a child requires a fact-specific, individualized inquiry.

I declare under penalty of perjury under the laws of the United States of America and New York State that the foregoing is true and correct, based on my personal knowledge. Executed in NYC, on June 23, 2018.

_____
MARTIN GUGGENHEIM

# Exhibit 35

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al.,<br><br>　　　　　　*Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>　　　　　　*Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>**DECLARATION OF LISETTE DIAZ**<br><br>CLASS ACTION |

I, Lisette Diaz, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a paralegal at the American Civil Liberties Union Immigrants' Rights Project.

2. I visited J.I.L. shortly after she was reunited with her kids. Her declaration was filed in this case as Exhibit 24, attached to Dkt. 62, pages 28-34.

3. During the visit, J.I.L. said that her children are still feeling the effects of the separation. Both of her children constantly ask if and when someone will be coming to take them away from their mother again. Her youngest child, 4 year-old D.A.P.L., continues to suffer from nightmares. He often wakes up in the middle of the night and begins nervously searching for his mother in the bedroom they share.

Executed in New York, NY, on June 25, 2018.

_____

LISETTE DIAZ

# Exhibit 36

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., <br><br> *Petitioners-Plaintiffs,* <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, <br><br> *Respondents-Defendants.* | Case No. 18-cv-00428-DMS-MDD <br><br> Date Filed: June 25, 2018 <br><br> **DECLARATION OF MANOJ GOVINDAIAH** <br><br> Class Action <br><br> **NO HEARING DATE** |

1

2   Stephen Kang (SBN 292280)
    Spencer E. Amdur (SBN 320069)
3   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
4   39 Drumm Street
    San Francisco, CA 94111
5   T: (415) 343-1198
    F: (415) 395-0950
6   *skang@aclu.org*
    *samdur@aclu.org*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.   I, Manoj Govindaiah, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.   I am an attorney licensed and admitted in the State of Texas since April 2015. Since 2006 and 2012, respectively, I have also been licensed in Illinois and in Florida. I have been practicing law for twelve years.

3.   In August 2014, I began working at the Refugee and Immigrant Center for Education and Legal Services ("RAICES") based in San Antonio, Texas, and have served at the Director of Family Detention Services since January 2016. I oversee a staff of approximately 10 employees and supervise all of RAICES' immigrant family detention work. Due to the nature of the work, I am also heavily involved in case strategy and supervision of cases involving detained adults and detained unaccompanied children.

4.   Since January 2017, RAICES has been tracking separations of immigrant children from their parents.

5.   When we meet with children classified as unaccompanied and in ORR custody, we track those that indicate they were separated from a parent. We have identified approximately 330 children placed in ORR detention centers served by RAICES that were separated from their parents. When we meet with children, we receive limited information about their parents (typically because either the child is too young to provide the information, or the ORR detention center staff does not have it) and so we cannot always be certain of the cause, nature, or details of the separation. However we believe that at least 150 of those children identified as being separated were separated by U.S. Department of Homeland Security officials at or around the time of apprehension.

6.   Through our work in adult detention centers, we have also seen a high volume of separated families. Since May 24, 2018, we are aware of approximately 390 parents who were separated from their children upon entry to the United States

by Department of Homeland Security officials.  Many of these parents were criminally prosecuted and separated during their criminal proceeding.

7.    The following are examples of family separation cases where RAICES has provided legal services.

    a.  In March 2018, a RAICES attorney visited a gentleman at the South Texas Detention Complex in Pearsall, Texas. At that time, he indicated that upon entry to the United States, he and his four-month-old child were separated and that he wanted to be removed from the United States as quickly as possible. We confirmed that the baby was in ORR custody and informed the father. On or about June 11, 2018, we confirmed that the father had been removed but the baby remained in ORR custody. Our understanding is that the baby has since been removed.

    b.  On June 6, 2018, I met with a Salvadoran man who was detained at the Rio Grande Detention Center in Laredo, Texas. He had been separated from his 16-year-old son on or about May 24, 2018 upon entry to the United States. He began crying as he relayed to me that he had not received any information about the whereabouts of his child and had been unable to communicate with his son. At that visit, he retained me to represent him in his immigration case. The following day I located his son in ORR custody in South Texas. When I attempted to speak with my client at the detention center, I learned that he been transferred to a detention center in Lumpkin, Georgia. I have since been attempting to locate a local attorney to continue representing him, and provide him information on his son's whereabouts.

    c.  On or about June 19, 2018, two RAICES staff members visited with approximately seven parents at the South Texas Detention Complex in Pearsall, Texas. All parents reported that they had been separated from

their children at or around the time they entered the United States.
None of them knew where their children were and had not
communicated with their children. They also reported that they were
unable to access the internal communication system established
between ORR and ICE for parents to locate their children or able to
obtain any information about their children.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 25th day of June, 2018, in San Antonio, Texas.

MANOJ GOVINDAIAH

# Exhibit 37

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
Additional counsel on next page

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

               *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

             *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF CARLOS HOLGUIN**

CLASS ACTION

1.      I, Carlos Holguin, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am General Counsel for the Center for Human Rights and Constitutional Law, and a member of the State Bar of California.

3.      I am counsel for Plaintiffs in *Flores v. Sessions*, No. 85-04544 (C.D. Cal.), a long running class action concerning the rights of immigrant children held in government custody. I have been counsel for the *Flores* class since the mid-1980s. As counsel for the *Flores* class, I am versed with the history of the litigation and the terms of the *Flores* Settlement Agreement. The *Flores* Settlement Agreement is attached as Exhibit A.

4.      *Flores* was initially brought to insure that minors would not be detained for lengthy periods in subpar conditions, and that they would be released promptly to parents and other reputable custodians. The Ninth Circuit has held that the settlement applies to all minors, including those who are apprehended with their parents. *See Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016).

5.      The settlement requires that minors who are not released to a parent, family member, or other responsible custodian must generally be held in "licensed facilities," meaning that a state child welfare agency must license them to provide care and custody for dependent, as opposed to delinquent, children. See Ex. A, ¶¶ 6, 12.A, 14, 19.

6.      The agreement generally requires federal immigration authorities to place children in a licensed dependent care facility within 72 hours following arrest. The consent decree allows juvenile to be detained longer in unlicensed facilities in the event of an unexpected influx of minors entering immigration-related custody, but even then requires that a child be transferred to a licensed facility "as expeditiously as possible." *Id.*, ¶ 12.A.

7.     In the case of class members apprehended with a parent, the district court overseeing the *Flores* settlement held that ICE does not necessarily breach ¶ 12A of the agreement if, in good faith and in the exercise of due diligence, it keeps class members in unlicensed facilities for longer than 72 hours while screening family members for reasonable or credible fear of persecution should they be returned to their countries of origin. *See Flores v. Lynch*, 212 F. Supp. 3d 907, 913-14 (C.D. Cal. 2015). Upon establishing a reasonable or credible fear, class members' parents become eligible for release on bond, and ICE would thereafter generally release the family together.

8.     To the best of my knowledge, ICE's principal and largest family detention centers, which are located in Karnes and Dilley in Texas, are not licensed to care for dependent minors. Accordingly, the settlement generally obliges ICE to exercise due dilligence and good faith efforts to make a licensed placement available to juveniles detained in such facilities as quickly as possible.

9.     In practice, ICE has been releasing most families detained at Karnes and Dilley within 20 days. This is because the federal government is able to determine within that time whether families have a credible or reasonable fear of being persecuted should they be returned to their countries of origin. However, the apposite standard for making licensed placements available to class members under the settlement remains the same: ICE must exercise good faith and due diligence to make licensed placements available to class members as promptly as practicable, which may be more or fewer than 20 days under prevailing circumstances.

10.    When parents are detained more than 20 days, I know of nothing in the *Flores* settlement that stops families from waiving their rights under the agreement and electing to remain in an unlicensed family detention center together. The settlement was intended to promote family reunification and give children the right to placement in a licensed dependent care facility. It was not intended to usurp the right of parents

to decide that it would be better to waive that right than suffer the trauma of family separation.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct, based on my personal knowledge. Executed in Santa Clarita, California on June 25, 2018.

_____

CARLOS HOLGUIN

# Exhibit A

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104
(415) 453-3307



FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 1997

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

Attorneys for Defendants

Additional counsel listed next page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Exhibit 37, Page74

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA  90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ  85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC  20536
/ / /

2

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement

Exhibit 37, Page76

(the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I      DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs.  As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office.  As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS.  This Agreement shall cease to apply to any person who has reached the age of eighteen years.  The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult.  The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors.  A licensed program must also meet those standards for licensed programs set forth in

4

Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities

for special needs minors, shall be non-secure as required under state law; provided, however, that a

facility for special needs minors may maintain that level of security permitted under state law which is

necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a

minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide

licensed placements in those geographical areas where the majority of minors are apprehended, such as

southern California, southeast Texas, southern Florida and the northeast corridor.

7. The term "special needs minor" shall refer to a minor whose mental and/or physical

condition requires special services and treatment by staff. A minor may have special needs due to drug

or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or

chronic illness that requires special services or treatment. A minor who has suffered serious neglect or

abuse may be considered a minor with special needs if the minor requires special services or treatment

as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs

and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places

children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program,

agency or organization licensed by an appropriate State agency and that meets those standards set forth

in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close

supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake

supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff

supervision, than a facility operated by a licensed program in order to control problem behavior and to

prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with

major restraining construction or procedures typically associated with correctional facilities.

II        SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9.  This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement.  This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented.  The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement.  However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts.  Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void.  However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate.  Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation.  The final regulations shall not be inconsistent with the terms of this Agreement.  Within 30 days of final court approval of this

6

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles.  Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III     CLASS DEFINITION

10.  The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV     STATEMENTS OF GENERAL APPLICABILITY

11.  The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors.  The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others.  Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V     PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A.  Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable.  Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the  particular vulnerability of minors.  Facilities will provide access  to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

7

protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

1.   as otherwise provided under Paragraph 13 or Paragraph 21;

2.   as otherwise required by any court decree or court-approved settlement;

3.   in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4.   where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B.   For purposes of this paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such

8

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI    GENERAL POLICY FAVORING RELEASE

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that

9

Exhibit 37, Page82

of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

A.   a parent;

B.   a legal guardian;

C.   an adult relative (brother, sister, aunt, uncle, or grandparent);

D.   an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

E.   a licensed program willing to accept legal custody; or

F.   an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

15.   Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

A.   provide for the minor's physical, mental, and financial well-being;

B.   ensure the minor's presence at all future proceedings before the INS and the immigration court;

C.   notify the INS of any change of address within five (5) days following a move;

D.   in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

10

E.      notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.      if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

11

18.  Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.  Such efforts at family reunification shall continue so long as the minor is in INS custody.

VII    INS CUSTODY

19.  In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody.  Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier.  All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20.  Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21.  A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.      has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i.   Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.  This list is not exhaustive.);

ii.  Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.  This list is not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

B.   has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

C.   has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);

D.   is an escape-risk; or

E.   must be held in a secure facility for his or her own safety, such as when the INS has

Exhibit 37, Page86

reason to believe that a smuggler would abduct or coerce a particular minor to secure

payment of smuggling fees.

22.   The term "escape-risk" means that there is a serious risk that the minor will attempt to

escape from custody.  Factors to consider when determining whether a minor is an escape-risk or not

include, but are not limited to, whether:

A.   the minor is currently under a final order of deportation or exclusion;

B.   the minor's immigration history includes: a prior breach of a bond; a failure to appear

before the INS or the immigration court; evidence that the minor is indebted to

organized smugglers for his transport; or a voluntary departure or a previous removal

from the United States pursuant to a final order of deportation or exclusion;

C.   the minor has previously absconded or attempted to abscond from INS custody.

23.   The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less

restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a

medium security facility which would provide intensive staff supervision and counseling services or (b)

another licensed program.  All determinations to place a minor in a secure facility will be reviewed and

approved by the regional juvenile coordinator.

24.A.   A minor in deportation proceedings shall be afforded a bond redetermination hearing

before an immigration judge in every case, unless the minor indicates on the Notice of Custody

Determination form that he or she refuses such a hearing.

B.   Any minor who disagrees with the INS's determination to place that minor in a particular

type of facility, or who asserts that the licensed program in which he or she has been placed does not

comply with the standards set forth in Exhibit 1 attached hereto, may  seek judicial review in any

14

Exhibit 37, Page87

United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII    TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except:

A. when being transported from the place of arrest or apprehension to an INS office, or

15

Exhibit 37, Page88

B.  where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults.  The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26.  The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14.  The INS may, in its discretion, provide transportation to minors.

IX     TRANSFER OF MINORS

27.  Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner.  No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

X MONITORING AND REPORTS

28A.  An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours.  Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations.  Statistical information will include at least the following: (1)

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

17

Exhibit 37, Page90

terms of this Agreement.  The Coordinator shall file these reports with the court and provide copies to

the parties, including the final report referenced in Paragraph 35, so that they can submit comments on

the report to the court.  In each report, the Coordinator shall state to the court whether or not the INS is

in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial

compliance, explain the reasons for the lack of compliance.  The Coordinator shall continue to report on

an annual basis until three years after the court determines that the INS has achieved substantial

compliance with the terms of this Agreement.

31.  One year after the court's approval of this Agreement, the Defendants may ask the court to

determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI   ATTORNEY-CLIENT VISITS

32.A.  Plaintiffs' counsel are entitled to attorney-client visits with class members even though

they may not have the names of class members who are housed at a particular location.  All visits shall

occur in accordance with generally applicable policies and procedures relating to attorney-client visits at

the facility in question.  Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the

facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the

minors housed at that facility.  In all instances, in order to memorialize any visit to a minor by

Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any

attorney-client meeting.  Plaintiffs' counsel may limit any such notice of appearance to representation

of the minor in connection with this Agreement.  Plaintiffs' counsel must submit a copy of the notice of

appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of

the facility.

B.  Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

Exhibit 37, Page91

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period.  Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C.  Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D.  Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel.  Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

XII    FACILITY VISITS

33.  In addition to the attorney-client visits permitted pursuant to Paragraph 32,  Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23.  Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit.   The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff.  In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

## XIII  TRAINING

34.  Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training.  Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

## XIV  DISMISSAL

35.  After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action.  Until such dismissal, the court shall retain jurisdiction over this action.

## XV  RESERVATION OF RIGHTS

36.  Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

## XVI  NOTICE AND DISPUTE RESOLUTION

37.  This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24.  The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement.  Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

XVII   PUBLICITY

38.  Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement.
The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by
the parties, as set forth in Exhibit 5 attached.  The parties shall pursue such other public dissemination
of information regarding this Agreement as the parties shall agree.

XVIII ATTORNEYS' FEES AND COSTS

39.  Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs
the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

Exhibit 37, Page94

XIX    TERMINATION

40.  All terms of this Agreement shall terminate the earlier of  five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

XX    REPRESENTATIONS AND WARRANTY

41.  Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law.  Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation.  Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation.  The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants:  Signed: _Doris Meissner_  Title: _Commissioner, INS_

Dated: _9/16/96_

For Plaintiffs:  Signed: _per next page_  Title:_____

Dated:_____

22

Exhibit 37, Page95

The foregoing stipulated settlement is approved as to form and content:

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos Holguin
Peter Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta

STEICH LANG
Susan G. Boswell
Jeffery Willis

Date: 1/13/97          By _____

Date: 11/13/96         By _____

23

Exhibit 37, Page96

**Exhibit 1**

Exhibit 37, Page97

EXHIBIT 1

MINIMUM STANDARDS FOR LICENSED PROGRAMS

A.  Licensed programs shall comply with all applicable state child welfare laws and regulations
and all state and local building, fire, health and safety codes and shall provide or arrange for the
following services for each minor in its care:

1.  Proper physical care and maintenance, including suitable living accommodations, food,
appropriate clothing, and personal grooming items.

2.  Appropriate routine medical and dental care, family planning services, and emergency
health care services, including a complete medical examination (including screening for
infectious disease) within 48 hours of admission, excluding weekends and holidays,
unless the minor was recently examined at another facility; appropriate immunizations in
accordance with the U.S. Public Health Service (PHS), Center for Disease Control;
administration of prescribed medication and special diets; appropriate mental health
interventions when necessary.

3.  An individualized needs assessment which shall include: (a) various initial intake forms;
(b) essential data relating to the identification and history of the minor and family; (c)
identification of the minors' special needs including any specific problem(s) which
appear to require immediate intervention; (d) an educational assessment and plan; (e) an
assessment of family relationships and interaction with adults, peers and authority
figures; (f) a statement of religious preference and practice; (g) an assessment of the
minor's personal goals, strengths and weaknesses; and (h) identifying information
regarding immediate family members, other relatives, godparents or friends who may be

1

Exhibit 37, Page98

residing in the United States and may be able to assist in family reunification.

4.  Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with appropriate reading materials in languages other than English for use during the minor's leisure time.

5.  Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6.  At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7.  Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management

Exhibit 37, Page99

is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8.   Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9.   Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10.   Whenever possible, access to religious services of the minor's choice.

11.   Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12.   A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13.   Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14.   Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or

3

exclusion hearing before an immigration judge, the right to apply for political asylum or to request voluntary departure in lieu of deportation.

B. Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language and the complex needs of each minor.

C. Program rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed shall not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

D. A comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment. Individual plans shall be implemented and closely coordinated through an operative case management system.

E. Programs shall develop, maintain and safeguard individual client case records. Agencies and organizations are required to develop a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure.

F. Programs shall maintain adequate records and make regular reports as required by the INS that permit the INS to monitor and enforce this order and other requirements and standards as the INS may determine are in the best interests of the minors.

**Exhibit 2**

EXHIBIT 2

INSTRUCTIONS TO SERVICE OFFICERS RE:
PROCESSING, TREATMENT, AND PLACEMENT OF MINORS

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treats, and will continue to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the juvenile cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in

1

INS custody from delinquent offenders. The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

**(d) Release.** The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released, in the following order of preference, to:

(i) a parent;

(ii) a legal guardian;

(iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

(iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

(v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

(vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e) Certification of custodian.** Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

(i) provide for the minor's physical, mental, and financial well-being;

(ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

(iii) notify the INS of any change of address within five (5) days following a move;

(iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

(v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

2

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours. Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement. However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f) Suitability assessment.** An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program. A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. The assessment will also take into consideration the wishes and concerns of the minor.

**(g) Family reunification.** Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above. Such efforts at family reunification will continue as long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h) Placement in licensed programs.** A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. Exhibit 1 of the *Flores v. Reno* Settlement Agreement describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

   (i) the minor is an escape risk or delinquent, as defined in Paragraph (i) below;

   (ii) a court decree or court-approved settlement requires otherwise;

   (iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

   (iv) the minor must be transported from remote areas for processing or speaks an unusual

3

language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor —

> (i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is
>
>> (a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc.); or
>>
>> (b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);
>
> (ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;
>
> (iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);
>
> (iv) is an escape-risk; or
>
> (v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

4

(b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

(c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program.  All determinations to place a minor in a secure facility will be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.**  A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.  A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review as set out in Exhibit 6 of the *Flores v. Reno* Settlement Agreement, and (2) the list of free legal services providers compiled pursuant to INS regulations (unless previously given to the minor.

**(k)  Transportation and transfer.**  Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults.  INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released.  The INS may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner.  No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l)  Periodic reporting.**  Statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours must be reported to the Juvenile Coordinator by all INS district offices and Border Patrol stations.  Information will include:  (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration

5

status, and (f) hearing dates. INS officers should also inform the Juvenile Coordinator of the reasons for placing a minor in a medium-security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.** The INS will permit the lawyers for the *Flores v. Reno* plaintiff class to visit minors, even though they may not have the names of minors who are housed at a particular location. A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**(n) Visits to licensed facilities.** In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed. The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit. The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement, unless Plaintiffs' counsel and the facility's staff agree otherwise. In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

**Exhibit 3**

EXHIBIT 3

CONTINGENCY PLAN

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in programs licensed by an appropriate state agency as expeditiously as possible. An "emergency" is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities. An "influx" is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1. The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that the INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses. The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the List. The Emergency Placement List will include the facility name; the number of beds potentially available at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age); and any special services that are available.

2. The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, (3) date placed in INS custody, and (4)

1

Exhibit 37, Page110

place and date of current placement.

3.   Within one business day of the emergency or influx the Juvenile Coordinator or his or her designee will contact the programs on the Emergency Placement List to determine available placements.  As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their availability.  To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4.   In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5.   Each year the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs.  However, any decision to increase the number of placements available shall be subject to the availability of INS resources.  The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6.   The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.

Exhibit 37, Page111

**Exhibit 4**

EXHIBIT 4

AGREEMENT CONCERNING FACILITY VISITS UNDER PARAGRAPH 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.

1

**Exhibit 5**

EXHIBIT 5

LIST OF ORGANIZATIONS TO RECEIVE INFORMATION RE: SETTLEMENT AGREEMENT

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE  Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

1

Exhibit 37, Page115

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101  , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W.  4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX  78550

**Exhibit 6**

EXHIBIT 6
NOTICE OF RIGHT TO JUDICIAL REVIEW

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities.  If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case.  You may call a lawyer to help you do this.  If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

### PROOF OF SERVICE BY MAIL

I, Sonia Fuentes, declare and say as follows:

1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state.

2. On January ___, 1997, I served the attached STIPULATED SETTLEMENT AGREEMENT on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

> Mr. Michael Johnson
> Assistant U.S. Attorney
> 300 N. Los Angeles St. #7516
> Los Angeles, CA 90012

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___th day of January, 1997, at Los Angeles, California.

/ / /

-3-

LODGED

1   CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
    Carlos Holguin
2   Peter A. Schey
    Charles Song
3   256 South Occidental Boulevard
    Los Angeles, CA 90057
4   Telephone: (213) 388-8693; Fax: (213) 386-9484

5
    LATHAM & WATKINS
6   Steven Schulman
    555 Eleventh St., NW, Suite 1000
7   Washington, DC 20004
    Telephone: (202) 637-2184
8
    Of counsel:
9
    YOUTH LAW CENTER
10  Alice Bussiere
    417 Montgomery Street, Suite 900
11  San Francisco, CA 94104
    Telephone: (415) 543-3379 x 3903
12
13  Attorneys for plaintiffs

14

15                  UNITED STATES DISTRICT COURT

16                  CENTRAL DISTRICT OF CALIFORNIA

17  JENNY LISETTE FLORES, et al.,          )  Case No. CV 85-4544-RJK(Px)
                                           )
18          Plaintiffs,                     )  STIPULATION EXTENDING
                                           )  SETTLEMENT AGREEMENT AND FOR
19  –vs–                                    )  OTHER PURPOSES; AND ORDER
                                           )  THEREON
20  JANET RENO, Attorney General           )
    of the United States, et al.           )
21                                          )
22          Defendants.                     )
                                           )
23

24

25

26

27

28

IT IS HEREBY STIPULATED by and between the parties as follows:

1. Paragraph 40 of the Stipulation filed herein on January 17, 1997, is modified to read as follows:

"All terms of this Agreement shall terminate ~~the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement,~~ *45 days following defendants' publication of final regulations implementing this Agreement* ~~except that~~ *Notwithstanding the foregoing,* the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."

/ / /

2  For a period of six months from the date this Stipulation is filed, plaintiffs shall not initiate legal proceedings to compel publication of final regulations implementing this Agreement  Plaintiffs agree to work with defendants cooperatively toward resolving disputes regarding compliance with the Settlement. The parties agree to confer regularly no less frequently than once monthly for the purpose of discussing the implementation of and compliance with the settlement agreement  However, nothing herein shall require plaintiffs to forebear legal action to compel compliance with this Agreement where plaintiff class members are suffering irreparable injury

Dated: December 7, 2001.

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A  Schey

LATHAM & WATKINS
Steven Schulman

YOUTH LAW CENTER
Alice Bussière

Carlos Holguín, *for plaintiffs*.

Dated: December 7, 2001

Arthur Strathern
Office of the General Counsel
U. S. Immigration & Naturalization Service

Arthur Strathern, *for defendants*
Per his authorization

IT IS SO ORDERED

Dated: December _____ 2001

UNITED STATES DISTRICT JUDGE

1        2. For a period of six months from the date this Stipulation is filed, plaintiffs shall not

2    initiate legal proceedings to compel publication of final regulations implementing this

3    Agreement. Plaintiffs agree to work with defendants cooperatively toward resolving

4    disputes regarding compliance with the Settlement. The parties agree to confer regularly no

5    less frequently than once monthly for the purpose of discussing the implementation of and

6    compliance with the settlement agreement. However, nothing herein shall require plaintiffs

7    to forebear legal action to compel compliance with this Agreement where plaintiff class

8    members are suffering irreparable injury.

9    Dated: December 7, 2001.

        CENTER FOR HUMAN RIGHTS &
        CONSTITUTIONAL LAW

10           Carlos Holguín
        Peter A. Schey

11

12           LATHAM & WATKINS
        Steven Schulman

13

14           YOUTH LAW CENTER
        Alice Bussiere

15

16

17           _____
        Carlos Holguín, *for plaintiffs*

18   Dated: December 7, 2001.

        Arthur Strathern

19           Office of the General Counsel
        U.S. Immigration & Naturalization Service

20

21

22           _____
        Arthur Strathern, *for defendants*

23           Per fax authorization

24

25   IT IS SO ORDERED

26   Dated: December 7, 2001.

        _____

27           UNITED STATES DISTRICT JUDGE

28

Exhibit 37, Page123

PROOF OF SERVICE BY MAIL

1   I, Carlos Holguin, declare and say as follows:

1   I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 South Occidental Boulevard, Los Angeles, California 90057, in said county and state

2   On December 7, 2001, I served the attached STIPULATION on defendants in this proceeding by placing a true copy thereof in a sealed envelope addressed to their attorneys of record as follows:

Arthur Strathern
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC 20536

and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the mail at Los Angeles, California; that there is regular delivery of mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 7th day of December, 2001, at Los Angeles, California

/ / /

# Exhibit 38

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF STEPHEN B. KANG** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | CLASS ACTION |

1.      I, Stephen B. Kang, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am a Detention Attorney for the ACLU Immigrants' Rights Project, and a member of the State Bar of California. I am counsel for Plaintiffs in this case.

3.      Attached as Exhibit A is an April 20, 2018 article from the *New York Times* titled "Hundreds of Immigrant Children Have Been Taken from Parents at U.S. Border," available at https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html. This article reported that government data showed that "more than 700 children have been taken from adults claiming to be their parents since October, including more than 100 children under the age of 4."

4.      Attached as Exhibit B is a May 7, 2018 announcement from Attorney General Jefferson B. Sessions III, titled "U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference," available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-association-state-criminal-investigative.

5.      Attached as Exhibit C is a May 30, 2018, Los Angeles Times article titled "Trump's zero tolerance at U.S.-Mexico border is filling child shelters," available at http://www.latimes.com/nation/la-na-trump-zero-tolerance-migrant-children-20180530-story.html?utm_source=Recent%20Postings%20Alert&utm_medium=Email&utm_campaign=RP%20Daily. This article quotes a Customs and Border Protection official's testimony to the Senate Judiciary Committee, which confirmed that between May 6 and May 19 alone, a total of 658 children were separated from their family members.[1]

---

[1] The video of the relevant Senate Judiciary Committee hearing testimony is available at https://www.judiciary.senate.gov/meetings/tvpra-and-exploited-loopholes-affecting-unaccompanied-alien-children.

6.     Attached as Exhibit D is a June 16, 2018, CNN article titled "2,000 children separated from parents at border," available at https://www.cnn.com/2018/06/15/politics/dhs-family-separation-numbers/index.htm. This article states that "[t]he US government has separated at least 2,000 children from parents at the border since implementing a policy that results in such family separations, the Department of Homeland Security confirmed Friday."

7.     Attached as Exhibit E is a June 18, 2018, Associated Press article titled "Hundreds of Children Wait in Border Patrol Facility in Texas," available at https://www.apnews.com/9794de32d39d4c6f89fbefaea3780769.

8.     Attached as Exhibit F is a June 19, 2018, Reuters article titled "Hurdles facing parents and children separated at U.S. border," available at https://www.reuters.com/article/us-usa-immigration-reunification-explain/hurdles-facing-parents-and-children-separated-at-us-border-idUSKBN1JF39I. This article reports that "[o]ver 2,300 children were separated from their parents at the U.S.-Mexico border between May 5 and June 9 under the Trump administration's 'zero tolerance' policy, U.S. Customs and Border Protection said . . . ."

9.     Attached as Exhibit G is an Executive Order dated June 20, 2018, titled "Affording Congress an Opportunity to Address Family Separation."

10.     Attached as Exhibit H is a DHS-HHS Fact Sheet titled "Zero-Tolerance Prosecution and Family Reunification," available at https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

11.     Attached as Exhibit I is a June 14, 2018 Letter from Physicians for Human Rights to Secretary Nielsen and Attorney General Sessions, available at https://s3.amazonaws.com/PHR_other/Separation_Letter_FINAL.pdf. Over 5000 medical professionals and experts signed this letter, which urges the administration to "immediately end the practice of family separation and take all measures to ensure

that currently separated families are reunited without delay" on the basis of evidence that the "practice is profoundly harmful to children and to families."

12.     Attached as Exhibit J is a June 14, 2018 Letter from the American Psychological Association to President Trump, available at http://www.apa.org/advocacy/immigration/separating-families-letter.pdf?utm_content=1529093770&utm_medium=social&utm_source=multiple. The Letter urges an end to family separation and cites "empirical evidence of the psychological harm that children and parents experience when separated."

13.     Attached as Exhibit K is a June 19, 2018, Letter from the American Medical Association, June 19 Letter to Secretary Nielsen, Secretary Azar, and Attorney General Sessions, available at https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2018-6-19-Final-Letter-to-The-Administrations-zero-tolerance-prosecution-policy.pdf. The Letter explains that "childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last an individual's entire lifespan."

14.     Attached as Exhibit L is a May 31, 2018 Statement by the American College of Physicians, titled ACP Objects to Separation of Children from their Parents at Border, available at https://www.acponline.org/acp-newsroom/acp-objects-to-separation-of-children-from-their-parents-at-border. The Statement urges an end to the separation practice because inflicting separation on children will "create negative health impacts that will last an individual's entire lifespan."

15.     Attached as Exhibit M is a June 19, 2018 Statement by the American College of Emergency Physicians, "ACEP Opposes Current DHS 'Zero Tolerance' Immigration Policy," available at https://www.acep.org/federal-advocacy/federal-advocacy-overview/children-immigration-statement/#sm.0000xos7uy5dpe7x112vqpxa33tqr. It

states that "separations will significantly escalate mental and physical health risks for both children and their parents."

16.     Attached as Exhibit N is a May 30, 2018 Statement by the American Psychiatric Association Opposing Separation of Children from Parents at the Border, available at https://www.psychiatry.org/newsroom/news-releases/apa-statement-opposing-separation-of-children-from-parents-at-the-border.  The statement urges an end to separations because the "evidence is clear that this level of trauma also results in serious medical and health consequences for these children and their caregivers."

17.     Attached as Exhibit O is a May 8, 2018 Statement by the American Academy of Pediatrics Opposing Separation of Children and Parents at the Border, available at https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx. The statement urges an end to separations, and explains that the practice "can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health."

18.     Attached as Exhibit P is a American Public Health Association, Separating parents and children at US border is inhumane and sets the stage for a public health crisis, available at https://www.apha.org/news-and-media/news-releases/apha-news-releases/2018/parent-child-separation. The statement urges an end to separations and explains that the practice places children at heightened risk of experiencing adverse childhood events and trauma, which research has definitively linked to poorer long-term health."

19.     Attached as Exhibit Q is a Statement by the National Academy of Science, Engineering, and Medicine on the Harmful Consequences of Separating Families at the U.S. Border, available at http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=06202018&_ga=2.158375806.559449867.1529328563-861433489.1524492203. The statement

urges an immediate end to separations based on "an extensive body of evidence" that "points to the danger of current immigration enforcement actions that separate children from their parents."

20.     Attached as Exhibit R is a June 9, 2018 Washington Post article titled "A family was separated at the border, and this distraught father took his own life," available at https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.38a3e92283df.  It tells the story of a 39-year old Honduran father who, after separation from his family, committed suicide while detained.

21.     Attached as Exhibit S is a June 23, 2018 Washington Post article titled "U.S. officials separated him from his child. Then he was deported to El Salvador," available at https://www.washingtonpost.com/world/the_americas/u-s-officials-separated-him-from-his-child-then-he-was-deported-to-el-salvador/2018/06/23/37b6940a-7663-11e8-bda1-18e53a448a14_story.html?noredirect=on&utm_term=.801ab72b4426. The article tells the story of a father separated from his six-year old daughter after entering the United States who was deported without her, and without knowing where she had been placed.  The first time he spoke to her was after his deportation.

22.     Attached as Exhibit T are excerpts from the transcript of the status conference the Court held in this case on Friday, June 22, 2018.

23.     Attached as Exhibit U is a June 24, 2018, New York Times article titled "Torn Apart by Zero Tolerance, Kept Apart by Red tape, available at https://www.nytimes.com/2018/06/24/us/family-separation-brazil.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region&region=top-news&WT.nav=top-news. The

article describes the case of a separated parent who is attempting to reunite with her son through the ORR reunification process.

24.     I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct, based on my personal knowledge. Executed in San Francisco, California on June 25, 2018.


                                    /s/Stephen B. Kang_____
                                    STEPHEN B. KANG

# Exhibit A

## The New York Times

# Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border

**By Caitlin Dickerson**

April 20, 2018

On Feb. 20, a young woman named Mirian arrived at the Texas border carrying her 18-month-old son. They had fled their home in Honduras through a cloud of tear gas, she told border agents, and needed protection from the political violence there.

She had hoped she and her son would find refuge together. Instead, the agents ordered her to place her son in the back seat of a government vehicle, she said later in a sworn declaration to a federal court. They both cried as the boy was driven away.

For months, members of Congress have been demanding answers about how many families are being separated as they are processed at stations along the southwest border, in part because the Trump administration has in the past said it was considering taking children from their parents as a way to deter migrants from coming here.

Officials have repeatedly declined to provide data on how many families have been separated, but suggested that the number was relatively low.

But new data reviewed by The New York Times shows that more than 700 children have been taken from adults claiming to be their parents since October, including more than 100 children under the age of 4.

The data was prepared by the Office of Refugee Resettlement, a division of the Department of Health and Human Services that takes custody of children who have been removed from migrant parents. Senior officials at the Department of Homeland Security, which processes migrants at the border, initially denied that the numbers were so high. But after they were confirmed to The Times by three federal officials who work closely with these cases, a spokesman for the health and human services department on Friday acknowledged in a statement that there were "approximately 700."

Homeland security officials said the agency does not separate families at the border for deterrence purposes. "As required by law, D.H.S. must protect the best interests of minor children crossing our borders, and occasionally this results in separating children from an adult they are traveling with if we cannot ascertain the parental relationship, or if we think the child is otherwise in danger," a spokesman for the agency said in a statement.

Exhibit 38, Page134

Case 3:18-cv-00428-DMS-MDD Document 78 Filed 06/23/18 PageID.1546 Page 140 of 259

But Trump administration officials have suggested publicly in the past that they were, indeed, considering a deterrence policy. Last year, John F. Kelly, President Trump's chief of staff, floated the idea while he was serving as homeland security secretary.

If approved, the plan would have closed detention facilities that are designed to house families and replaced them with separate shelters for adults and children. The White House supported the move and convened a group of officials from several federal agencies to consider its merits. But the Department of Homeland Security has said the policy was never adopted.

Children removed from their families are taken to shelters run by nongovernmental organizations. There, workers seek to identify a relative or guardian in the United States who can take over the child's care. But if no such adult is available, the children can languish in custody indefinitely. Operators of these facilities say they are often unable to locate the parents of separated children because the children arrive without proper records.

Once a child has entered the shelter system, there is no firm process to determine whether they have been separated from someone who was legitimately their parent, or for reuniting parents and children who had been mistakenly separated, said a Border Patrol official, who was not authorized to discuss the agency's policies publicly.

"The idea of punishing parents who are trying to save their children's lives, and punishing children for being brought to safety by their parents by separating them, is fundamentally cruel and un-American," said Michelle Brané, director of the Migrant Rights and Justice program at the Women's Refugee Commission, an advocacy group that conducts interviews and monitoring at immigration detention centers, including those that house children. "It really to me is just a horrific 'Sophie's Choice' for a mom."

Mirian has pinballed across Texas, held at various times in three other detention centers. She is part of a lawsuit filed by the American Civil Liberties Union on behalf of many immigrant parents seeking to prohibit family separations at the border.

Her son's name, along with Mirian's surname, are being withheld for their safety. But in a declaration she filed in that case, she said she was never told why her son was being taken away from her. Since February, the only word she has received about him has come from a case manager at the facility in San Antonio where he is being held. Her son asked about her and "cried all the time" in the days after he arrived at the facility, the case worker said, adding that the boy had developed an ear infection and a cough.

Exhibit 38, Page135

Case 3:18-cv-00428-DMS-MDD Document 78 Filed 06/23/18 PageID.1547 Page 141 of 259



A woman was reunited with her 7-year-old daughter in Chicago in March after they had been separated for four months in immigration detention.  Hope Hall/Aclu

"I had no idea that I would be separated from my child for seeking help," Mirian said in her sworn statement. "I am so anxious to be reunited with him."

Protecting children at the border is complicated because there have, indeed, been instances of fraud. Tens of thousands of migrants arrive there every year, and those with children in tow are often released into the United States more quickly than adults who come alone, because of restrictions on the amount of time that minors can be held in custody. Some migrants have admitted they brought their children not only to remove them from danger in such places as Central America and Africa, but because they believed it would cause the authorities to release them from custody sooner.

Others have admitted to posing falsely with children who are not their own, and Border Patrol officials say that such instances of fraud are increasing.

As the debate carries on, pressure from the White House to enact a separation policy has continued. In conversations this month with Kirstjen Nielsen, the homeland security secretary, Mr. Trump has repeatedly expressed frustration that the agency has not been aggressive enough in policing the border, according to a person at the White House who is familiar with the discussions.

Exhibit 38, Page136

Officials presented Mr. Trump with a list of proposals, including the plan to routinely separate immigrant adults from their children. The president urged Ms. Nielsen to move forward with the policies, the person said.

But even groups that support stricter immigration policies have stopped short of endorsing a family separation policy. Jessica M. Vaughan, the director of policy studies for the Center for Immigration Studies, one such group, said that family separation should only be used as a "last resort."

However, she said that some migrants were using children as "human shields" in order to get out of immigration custody faster.

"It makes no sense at all for the government to just accept these attempts at fraud," Ms. Vaughan said. "If it appears that the child is being used in this way, it is in the best interest of the child to be kept separately from the parent, for the parent to be prosecuted, because it's a crime and it's one that has to be deterred and prosecuted."

Ron Nixon and Michael D. Shear contributed reporting.

A version of this article appears in print on April 21, 2018, on Page A1 of the New York edition with the headline: Over 700 Children Taken From Parents at Border

Exhibit 38, Page137

# Exhibit B

# JUSTICE NEWS

**Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference**

Scottsdale, AZ ~ Monday, May 7, 2018

---

**Remarks as prepared for delivery**

Thank you, Mark, for that kind introduction.  And thank you for your more than 30 years of service in law enforcement.

I also want to thank Bob McConnell for putting on this event, and the Arizona Department of Public Safety for hosting us.  The Association of State Criminal Investigative Agencies and its members are an essential part of the law enforcement community, and this conference is an opportunity for more collaboration and information sharing.  That makes all of us better at our shared task of protecting our country from violence and crime.

I want to thank Bob and the Association for your friendship and for your strong support for me personally going back to my days in the Senate.  I also appreciate the support you have given for a number of the initiatives that I have taken as Attorney General.

I'm pleased to see that my home state of Alabama is well-represented here today.  Clay Barnes is here, the Chief of the Investigation Division at the Alabama Bureau of Investigation.  I worked with the Investigation Division a lot during my 14 years as a prosecutor and I was always impressed with their professionalism and their dedication.

The chief executives of 39 other state investigative agencies are here in this room, as well.

Tom Homan and David Bowdich are also here with us.  I'll be brief so that we can get to their remarks.

But before I say anything else, I want to take a moment to remember an officer this community is mourning right now.  Officer Jesus Cordova of the Nogales Police Department was pursuing an alleged carjacker last Friday when he was shot to death.  He was an 11-year veteran of the force.  He left behind two daughters and a son, all under the age of 8.  His wife is five months pregnant—with a son who has already been named in honor of his dad.

That son will never know his father.  But he will know that his father was a man of courage and dedicated to service – for law, peace and order.

My thoughts and prayers are with his family at this difficult time and I know that yours are, too.

Officer Cordova's passing is a tragic reminder of what is at stake in law enforcement.

And so I am here today on behalf of President Trump to say to each one of you: thank you for your service to this country.

In this administration, we know whose side we are on.  We're on the side of law-and-order.

We understand the risks you take and the tools you need to be effective.

This is not business as usual.  This is the Trump era.

Our explicit goals for 2018 are to bring down violent crime, homicides, opioid prescriptions, and overdose deaths.

Exhibit 38, Page139

And with your help, that's what we're going to do.

The key to our success now will be the same as it was over those more than 20 years of declining crime: the 85 percent of law enforcement officers who serve at the state, local, and tribal level.

They use the investigative work that you do to take violent criminals off of our streets.  And so it is no exaggeration to say that we are counting on you.

That's why we need to ensure that you remain successful.

I understand that you've got a backlog right now and that some of you are probably feeling overwhelmed.

This has been an important issue to me for many years.

That's why over the past year I have taken a number of steps to bring down the backlog at our crime labs.

In 2018, we will invest more than $100 million in state and local labs to make you faster, more efficient, and more effective.  These funds will help reduce the backlog and free up other resources we can use to reduce violent crime and drug abuse.

We will also provide grant funding to identify previously un-submitted Sexual Assault Kits, test them, and then assign personnel to pursue any new investigative leads.  This will help provide closure for sexual assault victims throughout the country and help put their assailants behind bars.

It is also critical that we deal with the growing encryption or the "going dark" problem.

And the stakes are high.  Last year the FBI was unable to access investigation-related content on more than ** devices—even though they had the legal authority to do so.  Each of those devices was tied to a threat to the American people.

This is a large number, but it is small compared to the number that your agencies are unable to access because of encryption.

That's why we are working with stakeholders in the private sector, in law enforcement, and in Congress to find a solution to this problem.  Ultimately, we may need Congress to take action on this issue.  I would appreciate your valuable input as we continue this process.

Reducing the backlog, improving Sexual Assault Kits, and solving the encryption problem will help you succeed.

We are also restoring the rule of law with regard to immigration.  That will reduce crime.

Eleven million people are already here illegally.  That's more than the population of Portugal or the state of Georgia.

But, right now we are dealing with a massive influx of illegal aliens across our Southwest Border.  In April we saw triple the number from last April.

But we're not going to stand for this.  We are not going to let this country be invaded. We will not be stampeded. We will not capitulate to lawlessness.

President Trump has made that clear to every agency and to Congress – and we need a wall.

Last month, I put in place a "zero tolerance" policy for illegal entries on our Southwest border referred by the Department of Homeland Security.

Exhibit 38, Page140

6/24/2018 Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference | OPA | ...

Case 3:18-cv-00428-DMS-MDD Document 78 Filed 06/25/18 PageID.1552 Page 146 of 259

Today, the Department of Homeland Security is partnering with us and will begin a new initiative that will result in referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up as many of those cases as humanly possible until we get to 100 percent.

If you cross this border unlawfully, then we will prosecute you. It's that simple.

If you smuggle illegal aliens across our border, then we will prosecute you.

If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law. If you don't like that, then don't smuggle children over our border.

If you make false statements to an immigration officer or commit fraud in our system to obtain an immigration benefit, that's a felony. We will put you in jail.

If you help others to do so, that's a felony, too.

In order to carry out these important new enforcement policies, I have sent 35 prosecutors to the Southwest and moved 18 immigration judges to the border. These are supervisory judges that don't have existing caseloads and will be able to function full time on moving these cases. That will be about a 50 percent increase in the number of immigration judges who will be handling the asylum claims.

Everything we do at the Department of Justice is dedicated to reducing crime in America. Perhaps the most important thing we can do toward that end is to improve our relationships with state and local partners like you.

We want to be a force-multiplier for you. We can help you—because we can reach defendants across state lines, across national borders, and even across oceans.

The work that you do – that you have dedicated your lives to – is essential. I believe it. The Department of Justice believes it. And President Trump believes it.

And so I want to close by thanking each of you once again for your service.

You can be certain about this: we have your back and you have our thanks.


** Due to an error in the FBI's methodology, an earlier version of this speech incorrectly stated that the FBI had been unable to access 7,800 devices. The correct number will be substantially lower.

---

**Speaker:**
Attorney General Jeff Sessions

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated May 23, 2018*

# Exhibit C

TOPICS

**3 FREE MONTHS**
Offer ends 6/27

LOG IN

**FREE TRIAL** | TRY 3 FREE MONTHS!

Fed up with violence and corruption, Mexican voters embrace a seasoned leftist...



Asian Americans need to wise up and end our blind loyalty to the Democratic...



Lakers' latest comm show the must hot dog

ADVERTISEMENT



NATION

# Trump's 'zero tolerance' at U.S.-Mexico border is filling child shelters



By **MOLLY HENNESSY-FISKE**
MAY 30, 2018   |   HOUSTON

  



**FREE TRIAL**

**TRY 3 FREE MONTHS!**
Hurry, offer ends 6/27

**START TRIAL**

6/24/2018    Trump's 'zero tolerance' at U.S.-Mexico border is filling up child shelters
Case 3:18-cv-00428-DMS-MDD   Document 78   Filed 06/25/18   PageID.1555   Page 149 of 259
START TRIAL

A U.S. Border Patrol agent detains juvenile immigrants in L
in 2015. (John Moore / Getty)

Family separations on the southern border due to President Trump's "zero-
tolerance" policy increased the number of immigrant children in government
shelters 22% during the last month, officials said.

As of Wednesday, 10,852 migrant children were being held at shelters run by the
Department of Health and Human Services, compared with 8,886 at the end of last
month, said agency spokesman Kenneth Wolfe. The average time such children spent
at government shelters has also increased, from 51 to 56 days.

inRead invented by Tea...



ADVERTISEMENT

FREE TRIAL

TRY 3 FREE MONTHS!
Hurry, offer ends 6/27

START TRIAL

Exhibit 38, Page144

ADVERT

The new zero-tolerance policy piloted in Arizona and west Texas last year was extended border-wide last month. Under the policy, migrants who enter the United States illegally face misdemeanor charges in federal criminal court, felony charges if they have crossed illegally before; parents are sent to federal detention, their children to shelters. In the past, such cases were often handled administratively, not in criminal court.

Trump tweeted inaccurately over the weekend that a "horrible law" was prompting the migrant family separations. Immigrant advocates insisted the administration was to blame for pursuing criminal charges against migrants, instead of handling their cases administratively.

Health and Human Services has 100 shelters in 14 states, and "additional temporary housing is only sought as a last resort when current locations are reaching capacity," said Wolfe, a spokesman for the department's Administration for Children and Families.

That's what's happening now that the shelters are 95% full, he said. The agency has

FREE TRIAL          TRY 3 FREE MONTHS!
                    Hurry, offer ends 6/27

                    START TRIAL

Exhibit 38, Page145

Unaccompanied minors now include children who cross the border without an adult and those separated from adults charged in federal criminal court under the new policy. At least 638 migrants who crossed with 658 children were charged under the policy between May 6 and May 19, a U.S. Customs and Border Protection official told a Senate committee last week.

Last year, Health and Human Services assumed custody of more than 40,000 immigrant children, releasing 93% to family members and other sponsors (half were parents, 40% close relatives). The department has a responsibility to assume custody within 72 hours and try to place children, but it is not required to track sponsors.

Last week, Health and Human Services drew criticism after reports that 1,475 of the children they placed last year were "missing," according to a phone survey 30 days later. Trump administration officials responded by announcing an agreement by Health and Human Services to give the Department of Homeland Security access to information about sponsors they're still vetting, and to improve the process, fingerprinting parents who attempt to claim children. Homeland Security officials said the new coordination will better protect migrant children, but some migrant advocates worry it could deter families from claiming children.

"If somebody is unwilling to claim their child from custody because they're concerned about their own immigration status, I think that de facto calls into question whether they're an adequate sponsor and whether we should be releasing a child to that person," Steven Wagner, acting assistant secretary of the Administration for Children and Families, told reporters in a telephone briefing Tuesday.

Wagner added that the department plans to increase sponsor screening because "we have the problem of people fraudulently claiming to be parents when, in fact, they're not."

Immigrants advocates said the added oversight could increase the number of

FREE TRIAL    TRY 3 FREE MONTHS!
Hurry, offer ends 6/27

START TRIAL

Exhibit 38, Page146

6/24/2018                     Trump's 'zero tolerance' at U.S.-Mexico border is filling up shelters
Case 3:18-cv-00428-DMS-MDD   Document 78   Filed 06/25/18   PageID.1558   Page 152 of 259
START TRIAL

"Their workload has grown significantly, and they're not equipped to be handling children who have been orphaned by these new policies," said Ben Johnson, executive director of the Washington-based American Immigration Lawyers Assn.

∧

Johnson also criticized the department's short-term solution to the space crunch.

"Commandeering these military bases to house children has never turned out well," Johnson said. "It's resulted in more lawsuits and more inhumane conduct and treatment of people housed there. ... Those facilities are not designed for these kinds of people."

Migrant parents already appear less willing to claim their children, according to Leah Chavla, a policy advisor at the Washington-based Women's Refugee Commission.

∨

ADVERTISEMENT

Three years ago, 60% of unaccompanied youths were claimed by parents, but that dropped to 41% this fiscal year following immigration crackdowns by the administration, including raids on sponsors last summer that resulted in 400 people being detained in the Midwest and southern United States. Chavla's group and other advocates filed a complaint about the raids with Homeland Security's Office for Civil Rights and Civil Liberties and its Office of inspector general alleging unlawful

FREE TRIAL        TRY 3 FREE MONTHS!
Hurry, offer ends 6/27

START TRIAL

"Families are more reluctant to come forward," she said. Parents have been reluctant to identify their parents to Health and Human Services for fear they will be deported.

"They're going to languish in custody. We're going to see the length of stay creep up" for unaccompanied children, she said.

Lee Gelernt, an immigration attorney with the American Civil Liberties Union, filed a lawsuit to force the government to stop separating families at the border, and a federal judge in California is considering it.

Gelernt was in El Paso on Wednesday meeting with one of the plaintiffs, a Brazilian mother charged and jailed near the border and separated last August from her 14-year-old son, who was sent to Illinois. They are still not reunited.

"There's just going to be hundreds of parents and kids that fall into the Brazilian mom's situation," Gelernt said. She asserts that the government is separating families to deter immigration.

In March and April, more than 50,000 people were detained per month trying to cross the southwest border illegally, levels similar to those during the Obama administration, according to U.S. government figures. During those two months about 8,400 unaccompanied minors were caught on the border.

Soon after Trump's inauguration in January 2017, border crossings briefly dropped to record lows before creeping back up again at the end of last year. The increase has frustrated the president, who has repeatedly called for more action to seal the border.

**5:10 p.m.:** This article was updated with comments from Lee Gelernt of the ACLU.
**3:55 p.m.:** This article was updated throughout with Los Angeles Times staff reporting and comments from Leah Chavla of the Women's Refugee Commission.
*This article was originally published at 9:20 a.m.*

FREE TRIAL        TRY 3 FREE MONTHS!
                  Hurry, offer ends 6/27

                                          START TRIAL

ENTER YOUR EMAIL ADDRESS

START TRIAL

## Molly Hennessy-Fiske

  

Molly Hennessy-Fiske is a staff writer for the Los Angeles Times, where she has spent a dozen years covering foreign, national, metro and business news, including reporting rotations in Afghanistan, Egypt, Iraq and Lebanon. She won an Overseas Press Club award in 2015, a Dart award from Columbia University in 2014, was a finalist for the Livingston Awards and Casey Medal and won state awards for her work in California, Florida, New York and North Carolina. She completed a Thomson Reuters fellowship in Lebanon in 2006 and a Pew fellowship reporting from Mexico in 2004. She has reported for newspapers in Boston, Miami, Raleigh, Schenectady, Syracuse, Washington and West Palm Beach. Hennessy-Fiske grew up in Upstate New York before attending Harvard College, graduating with a bachelor's degree in social studies in 1999. She spent last year as Middle East bureau chief before returning to cover foreign/national news as Houston bureau chief.

ADVERTISEMENT

COMMENTS (23)

**LATEST NEWS**

Transgender rights battle returns to North Carolina courts

FREE TRIAL     TRY 3 FREE MONTHS!
               Hurry, offer ends 6/27

START TRIAL

# Exhibit D

# DHS: 2,000 children separated from parents at border

By Tal Kopan, CNN

Updated 2:44 AM ET, Sat June 16, 2018

**Surge in family separation at border** 01:52

**Washington (CNN)** — The US government has separated at least 2,000 children from parents at the border since implementing a policy that results in such family separations, the Department of Homeland Security confirmed Friday.

From April 19 through May 31 of this year, 1,995 minors traveling with 1,940 adults who said they were the children's guardians were separated due to the policy, Department of Homeland Security spokesman Jonathan Hoffman told reporters on a conference call.



The call was largely to defend the administration's decision to charge every adult caught crossing the border illegally with federal crimes, as opposed to referring those with children mainly to immigration courts, as previous administrations did. The officials used the opportunity, otherwise on the condition of anonymity, to accuse the press of spreading falsehoods about the policy.

Because the government is charging the parents in the criminal justice system, children are separated from them, with no clear procedure for their reunification aside from

Exhibit 38, Page151



**Related Article:** Sessions cites Bible to defend immigration policies resulting in family separations

hotlines the parents can call to try to track their children down.

The policy to refer all adults for charges was publicly announced May 7, though the Justice Department announced it would prosecute 100% of the cases referred to it at the beginning of April.

On the call, Department of Homeland Security also said that prosecutions have more than doubled, but acknowledges they are not currently at 100%. Asked why they are prioritizing families in this effort as opposed to single adults, as they get closer to 100%, officials declined to explain how they choose whom to refer.

"We make decisions based on the ability to detain and the ability of courts to take these cases, but we no longer exempt categories or classes of individuals," a Department of Homeland Security official said.

"By and large, we are accepting nearly all of the referrals that we get from our counterparts at DHS, we continue to work with the federal judiciary on practical solutions to differing caps that they have," said a Justice Department official. "In terms of declining prosecution, we're not going to get into specifics."

**Related Article:** Trump again falsely blames the Democrats for his administration's family separations



## James Bond museum opens on Austrian mountain

 Tom Arnold says he has tapes of the President that have yet to be heard by...

Johnny Depp addresses his pricey wine tab and that acting earpiece you've...

Exhibit 38, Page152

# Exhibit E



**Hundreds of children wait in Border Patrol facility in Texas**

AP NEWS          Log in | Sign up

AP Top News   Sports   Entertainment   Explore ⌄



By NOMAAN MERCHANT

Jun. 18, 2018



https://ww

**RELATED TOPICS**

McAllen

Border patrols

North America

Texas

U.S. News

More from
**AP Top News**

McALLEN, Texas (AP) — Inside an old warehouse in South Texas, hundreds of children wait in a series of cages created by metal fencing. One cage had 20 children inside. Scattered about are bottles of water, bags of chips and large foil sheets intended to serve as blankets.

One teenager told an advocate who visited that she was helping care for a young child she didn't know because the child's aunt was somewhere else in the facility. She said she had to show others in her cell how to change the girl's diaper.

The U.S. Border Patrol on Sunday allowed report
facility where it holds families arrested at the sou
responding to new criticism and protests over the
"zero tolerance" policy and resulting separation



More than 1,100 people were inside the large, dark facility that's divided into separate wings for unaccompanied children, adults on their own, and mothers and fathers with children. The cages in each wing open out into common areas to use portable restrooms. The overhead lighting in the warehouse stays on around the clock.

The Border Patrol said close to 200 people inside the facility were minors unaccompanied by a parent. Another 500 were "family units," parents and children. Many adults who crossed the border without legal permission could be charged with illegal entry and placed in jail, away from their children.

Reporters were not allowed by agents to interview any of the detainees or take photos.

Nearly 2,000 children have been taken from their parents since Attorney General Jeff Sessions announced the policy, which directs Homeland Security officials to refer all cases of illegal entry into the United States for prosecution. Church groups and human rights advocates have sharply criticized the policy, calling it inhumane.

Stories have spread of children being torn from their parents' arms, and parents not being able to find where their kids have gone. A group of congressional lawmakers visited the same facility Sunday and were set to visit a longer-term shelter holding around 1,500 children — many of whom were separated from their parents.

"Those kids inside who have been separated from their parents are already being traumatized," said Democratic Sen. Jeff Merkley of Oregon, who was denied entry earlier this month to children's shelter. "It doesn't matter whether the floor is swept and the bedsheets tucked in tight."



Romeo Santos GOLD TOUR

OCTOBER 4
PRUDENTIAL CENTER

LIVE NATION

In Texas' Rio Grande Valley, the busiest corridor for people trying to enter the U.S., Border Patrol officials argue that they have to crack down on migrants and separate adults from children as a deterrent to others.

"When you exempt a group of people from the law ... that creates a draw," said Manuel Padilla, the Border Patrol's chief agent here. "That creates the trends right here."

Agents running the holding facility — generally known as "Ursula" for the name of the street it's on — said everyone detained is given adequate food, access to showers and laundered clothes, and medical care. People are supposed to move through the facility quickly. Under U.S. law, children are

required to be turned over within three days to shelters funded by the Department of Health and Human Services.

Padilla said agents in the Rio Grande Valley have allowed families with children under the age of 5 to stay together in most cases.

An advocate who spent several hours in the facility Friday said she was deeply troubled by what she found.

Michelle Brane, director of migrant rights at the Women's Refugee Commission, met with a 16-year-old girl who had been taking care of a young girl for three days. The teen and others in their cage thought the girl was 2 years old.

"She had to teach other kids in the cell to change her diaper," Brane said.

Brane said that after an attorney started to ask questions, agents found the girl's aunt and reunited the two. It turned out that the girl was actually 4 years old. Part of the problem was that she didn't speak Spanish, but K'iche, a language indigenous to Guatemala.

"She was so traumatized that she wasn't talking," Brane said. "She was just curled up in a little ball."

Brane said she also saw officials at the facility scold a group of 5-year-olds for playing around in their cage, telling them to settle down. There are no toys or books.

But one boy nearby wasn't playing with the rest. According to Brane, he was quiet, clutching a piece of paper that was a photocopy of his mother's ID card.

"The government is literally taking kids away from their parents and leaving them in inappropriate conditions," Brane said. "If a parent left a child in a cage with no supervision with other 5-year-olds, they'd be held accountable."

Dr. Colleen Kraft, the head of the American Academy of Pediatrics, said that she visited a small shelter in Texas recently, which she declined to identity. A toddler inside the 60-bed facility caught her eye — she was crying uncontrollably and pounding her little fists on mat.

Staff members tried to console the child, who looked to be about 2 years old, Kraft said. She had been taken from her mother the night before and brought to the shelter.

The staff gave her books and toys — but they weren't allowed to pick her up, to hold her or hug her to try to calm her. As a rule, staff aren't allowed to touch the children there, she said.

https://www.apnews.com/9794de32d39d4c6f89fbefaea3780769                                                3/6

"The stress is overwhelming," she said. "The focus needs to be on the welfare of these children, absent of politics."

## More From AP

by Taboola

**Immigrant kids seen held in fenced cages at border facility**

**At least 3 tender age shelters set up for child migrants**

**'Say bye to him': Detainee recounts agents taking her son**

**The Latest: About 30 parents separated from kids released**

## Ad Content

Sponsored Links by Taboola

**See The Facial That Can Take 10 Years Off Your Appearance**
InStyle | Hanacure

**20 Places Where $200K is Enough to Retire**
MoneyWise.com

**Girlfriend Requests A Hug. Then Boyfriend Realizes Something Is Wrong About Her**
DomesticatedCompanion

**Embarrassingly Incorrect Phrases Even Smart People Misuse**
Work + Money

**Take a Peek at 2018's Top Rated SUVs**
Edmunds

**We Can Guess Your Education Level In The First 5 Questions**
Definition

**See The 2018 SUVs That (Might) Take The Country By Storm**
SUV | Sponsored Links

Exhibit 38, Page157

# Exhibit F



REUTERS

Detained In Myanmar    Energy & Environment    Brexit    North Korea    Charged: The Future of Autos

WORLD NEWS

JUNE 19, 2018 / 6:50 PM / 5 DAYS AGO

# Hurdles facing parents and children separated at U.S. border

Reuters Staff

(Reuters) - Over 2,300 children were separated from their parents at the U.S.-Mexico border between May 5 and June 9 under the Trump administration's "zero tolerance" policy, U.S. Customs and Border Protection said on Tuesday, and immigration advocates and legal experts say there is no clear system in place to reunite them.

Exhibit 38, Page159

A flyer released by the U.S. Department of Homeland Security (DHS) June 19, 2018, shows information being distributed in U.S.-Mexico border facilities at which immigrant parents are being detained. U.S. Department of Homeland Security/Handout via REUTERS

The policy directs border officials to refer for prosecution all immigrants apprehended while crossing the U.S.-Mexico border illegally.

Parents who are no longer detained "are entitled to get their kids back through a documented process," U.S. Department of Homeland Security Secretary Kirstjen Nielsen said.

When are children and parents separated?

Immigrants arrested near the southwestern border are taken to processing centers where officials refer some to federal court to be prosecuted under the U.S. criminal entry statute. Parents referred for prosecution are transferred into U.S. Marshals custody and separated from their children.

Immigrants charged with the misdemeanor crime of illegal entry often plead guilty in group hearings and receive a sentence of a few days in prison or "time served," at which point they are transferred back to a processing facility and quickly deported unless they claim a "credible fear" of returning to their home country.

Meanwhile, their children are transferred into the custody of the Office of Refugee Resettlement (ORR), part of the Department of Health and Human Services, which manages facilities that care for minors. There are 100 sites scattered across 17 states and they can be on the other side of the country from their parents.

Children get their own case in immigration court and are entitled to a full hearing by an immigration judge, a process that can take months.

How can parents contact their children?

Exhibit 38, Page160

U.S. Immigration and Customs Enforcement (ICE) said it has posted information in all facilities at which parents are detained for over 72 hours, advising them to call a hotline for assistance in finding their child. The agency said it will work together with ORR to locate separated children, verify the relationship and set up regular communication and removal coordination if necessary.

There are two hotlines, one run by ICE and one by ORR. Advocates say the wait times on these calls can be upwards of 30 minutes and parents are required to call back when a child cannot immediately be located.

How can the parents be reunited with their children?

ICE said it "will make every effort to reunite the child with the parent" once the parent's case has been adjudicated.

If the parent is being deported, ICE said it will work with ORR to reunite them with their child at the time of deportation and with the consulate representing their country to assist the parent with obtaining a travel document for the child.

In some cases, the parent may decide they want their child to stay in the United States to pursue their own asylum claim, or the child may themselves choose to seek asylum. In other cases, children may ask to return to their home countries to be reunited with their parents.

Advocates said the reunification process is ad hoc.

Anthony Enriquez, director of the unaccompanied minors program for Catholic Charities Community Services in New York said there was no systematic effort in place to ensure the children and their parents are reunited.

"I go to court to tell the judges this under oath," Enriquez said. "There's no process."

He said reunification relies on individual government officials who go above and beyond their duties to help the families reunite or a lawyer from a non-governmental legal organization doing that work.

Exhibit 38, Page161

Robert Carey, who ran the Office for Refugee Resettlement under President Barack Obama said he would be surprised if systems were in place for reunifying families as the new zero tolerance policy was put in place quickly and "it takes time to coordinate across multiple agencies."

Have parents been deported without their children?

Immigration attorneys say there have been many cases of parents deported without their children. The advocacy group Kids In Need of Defense (KIND) said of the 40 case referrals involving family separation they have received since July 2017 through their child migrant return and reintegration project, 32 involved parents deported before their children and 15 of those cases involved children who were five years old or younger.

In some cases, parents are deported before finding their children in ORR custody, said Lisa Frydman, a KIND attorney.

"We've had other cases where the child goes to ORR and they do not know where parent is, and the parent doesn't know where child is," Frydman said.

Some children remain in the United States months after their parents are being deported, she said. Parents who have been deported back to countries such as Guatemala and Honduras without their children are reaching out to local organizations asking for help locating them.

Reporting by Kristina Cooke in San Francisco, Reade Levinson in New York and Yeganeh Torbati in Washington; editing by Grant McCool

*Our Standards:*   *The Thomson Reuters Trust Principles.*

Apps    Newsletters    Advertise with Us    Advertising Guidelines    Cookies    Terms of Use    Privacy



Exhibit 38, Page162

# Exhibit G



**EXECUTIVE ORDERS**

# Affording Congress an Opportunity to Address Family Separation

**——  IMMIGRATION**

Issued on: **June 20, 2018**



By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq*., it is hereby ordered as follows:

Section 1.  Policy.  It is the policy of this Administration to rigorously enforce our immigration laws. Under our laws, the only legal way for an alien to enter this country is at a designated port of entry at an appropriate time.  When an alien enters or attempts to enter the country anywhere else, that alien has committed at least the crime of improper entry and is subject to a fine or imprisonment under section 1325(a) of title 8, United States Code.  This Administration will initiate proceedings to enforce this and other criminal provisions of the INA until and unless Congress directs otherwise.  It is also the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources.  It is unfortunate that Congress's failure to act and court orders have put the Administration in the position of separating alien families to effectively enforce the law.

Sec. 2.  Definitions.  For purposes of this order, the following definitions apply:

(a)  "Alien family" means

(i)  any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an

Exhibit 38, Page164

alien child or alien children at or between designated ports of entry and who was detained; and

(ii)  that person's alien child or alien children.

(b)  "Alien child" means any person not a citizen or national of the United States who

(i)   has not been admitted into, or is not authorized to enter or remain in, the United States;

(ii)  is under the age of 18; and

(iii) has a legal parent-child relationship to an alien who entered the United States with the alien child at or between designated ports of entry and who was detained.

Sec. 3.  Temporary Detention Policy for Families Entering this Country Illegally.  (a)  The Secretary of Homeland Security (Secretary), shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members.

(b)  The Secretary shall not, however, detain an alien family together when there is a concern that detention of an alien child with the child's alien parent would pose a risk to the child's welfare.

(c)  The Secretary of Defense shall take all legally available measures to provide to the Secretary, upon request, any existing facilities available for the housing and care of alien families, and shall construct such facilities if necessary and consistent with law.  The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

(d)  Heads of executive departments and agencies shall, to the extent consistent with law, make available to the Secretary, for the housing and care of alien families pending court proceedings for improper entry, any facilities that are appropriate for such purposes.  The Secretary, to the extent permitted by law, shall be responsible for reimbursement for the use of these facilities.

(e)  The Attorney General shall promptly file a request with the U.S. District Court for the Central District of California to modify the Settlement Agreement in *Flores v. Sessions*, CV 85-4544 ("*Flores* settlement"), in a manner that would permit the Secretary, under present resource constraints, to

detain alien families together throughout the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings.

Sec. 4.  <u>Prioritization of Immigration Proceedings Involving Alien Families</u>.  The Attorney General shall, to the extent practicable, prioritize the adjudication of cases involving detained families.

Sec. 5.  <u>General Provisions</u>.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

    (i)  the authority granted by law to an executive department or agency, or the head thereof; or

    (ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

June 20, 2018.

Exhibit 38, Page166

# Exhibit H



🇺🇸 Official website of the Department of Homeland Security



**U.S. Department of Homeland Security**

# Fact Sheet: Zero-Tolerance Prosecution and Family Reunification

**Release Date:** June 23, 2018

The Department of Homeland Security (DHS) and Health and Human Services (HHS) have a process established to ensure that family members know the location of their children and have regular communication after separation to ensure that those adults who are subject to removal are reunited with their children for the purposes of removal. The United States government knows the location of all children in its custody and is working to reunite them with their families.

As part of the apprehension, detention and prosecution process, illegal aliens, adults and children, are initially detained by U.S. Customs and Border Protection (CBP) before the children are sent to HHS' Office of Refugee Resettlement (ORR) and parents to Immigration and Customs Enforcement (ICE) custody. Each entity plays a role in reunification. This process is well coordinated.

## U.S. Customs and Border Protection

- CBP has reunited 522 Unaccompanied Alien Children (UAC) in their custody who were separated from adults as part of the Zero Tolerance initiative. The reunions of an additional 16 UAC who were scheduled to be reunited on June 22, 2018 were delayed due to weather affecting travel and we expect they will all be reunited with their parents within the next 24 hours. There will be a small number of children who were separated for reasons other than zero tolerance that will remain separated: generally only if the familial relationship cannot be confirmed, we believe the adult is a threat to the safety of the child, or the adult is a criminal alien.

- Because of the speed in which adults completed their criminal proceedings, some children were still present at a United States Border Patrol (USBP) station at the time

Exhibit 38, Page168

their parent(s) returned from court proceedings. In these cases, the USBP reunited the family and transferred them, together, to ICE custody as a family unit.

# U.S. Immigration and Customs Enforcement

- ICE has dedicated the Port Isabel Service Processing Center (https://www.ice.gov/detention-facility/port-isabel-service-processing-center) as the primary family reunification and removal center for adults in their custody.

- A parent who is ordered removed from the U.S. may request that his or her minor child accompany them. It should be noted that in the past many parents have elected to be removed without their children.

- ICE has posted information in all of its facilities advising detained parents who are trying to locate, and/or communicate with, a child in the custody of HHS to call the Detention Reporting and Information Line for assistance, which is staffed by live operators Monday through Friday from 8 AM to 8 PM.

- The information provided by these parents to the call operators will be forwarded to HHS for action. ICE and HHS will coordinate a review of their custodial data to identify where each child is located, verify the parent/child relationship, and set up regular communication and removal coordination, if necessary.

- Each ICE Field Office has Juvenile Coordinators who manage these cases throughout the immigration court proceedings.

- Further, ICE maintains a publicly available online detainee locator which can be used to locate adults detained by ICE. This site can be accessed at: https://locator.ice.gov/odls/#/index (https://locator.ice.gov/odls/#/index)

ICE has completed the following steps toward reunification:

- Implemented an identification mechanism to ensure on-going tracking of linked family members throughout the detention and removal process;

- Designated detention locations for separated parents and will enhance current processes to ensure communication with children in HHS custody;

- Worked closely with foreign consulates to ensure that travel documents are issued for both the parent and child at time of removal; and

- Coordinated with HHS for the reuniting of the child prior to the parents' departure from the United States.

# U.S. Health and Human Services Office of Refugee Resettlement

- Minors come into HHS custody with information provided by DHS regarding how they illegally entered the country and whether or not they were with a parent or adult and, to the extent possible, the parent(s) or guardian(s) information and location. There is a central database which HHS and DHS can access and update when a parent(s) or minor(s) location information changes.

- As of June 20th HHS has 2,053 separated minors being cared for in HHS funded facilities, and is working with relevant agency partners to foster communications and work towards reuniting every minor and every parent or guardian via well-established reunification processes. Currently only 17% of minors in HHS funded facilities were placed there as a result of Zero Tolerance enforcement, and the remaining 83% percent arrived to the United States without a parent or guardian.

- Parent(s) or guardian(s) attempting to determine if their child is in the custody of the Office of Refugee Resettlement (ORR) in HHS Administration for Children and Families should contact the ORR National Call Center (www.acf.hhs.gov/orr/resource/orr-national-call-center (http://www.acf.hhs.gov/orr/resource/orr-national-call-center) ) at 1-800-203-7001, or via email information@ORRNCC.com (mailto:information@ORRNCC.com) . Information will be collected and sent to HHS funded facility where minor is located. The ORR National Call Center has numerous resources available for children, parent(s), guardian(s) and sponsors.

- Within 24 hours of arriving at an HHS funded facility minors are given the opportunity to communicate with a vetted parent, guardian or relative. While in HHS funded facilities' care, every effort is made to ensure minors are able to communicate (either telephonic or video depending on the circumstances) with their parent or guardian (at least twice per week). However, reasonable safety precautions are in place to ensure that an adult wishing to communicate with a minor is in fact that minor's parent or guardian.

- Minors in HHS funded facilities are permitted to call both family members and/or sponsors living in the United States and abroad. Attorneys representing minors have unlimited telephone access and the minor may speak to other appropriate stakeholders, such as their consulate, the case coordinator, or child advocate. Additional information on telephone calls, visitation, and mail policies are available in the policy guide. (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied)

Exhibit 38, Page170

- Under HHS' publicly available (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied) policy guide for Unaccompanied Alien Children, the Office of Refugee Resettlement (ORR) releases minors to sponsors in the following order of preference: parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody.

Topics:  Border Security (/topics/border-security) ,  Immigration Enforcement (/topics/immigration-enforcement)

Keywords:  Border Security (/keywords/border-security) ,  Family detention (/keywords/family-detention) ,  immigration enforcement (/keywords/immigration-enforcement) ,  UAC (/keywords/uac) ,  Unaccompanied Alien Children (/keywords/unaccompanied-alien-children)

Last Published Date: June 24, 2018

Exhibit 38, Page171

# Exhibit I

June 14, 2018

The Honorable Kirstjen Nielsen                    The Honorable Jeff Sessions
Secretary                                          Attorney General
U.S. Department of Homeland Security               U.S. Department of Justice
245 Murray Lane, S.W.                              950 Pennsylvania Avenue, N.W.
Washington, D.C. 20528                             Washington, D.C. 20530


Dear Secretary Nielsen and Attorney General Sessions,

As medical and mental health professionals and researchers working in the United States, we are gravely concerned about the Trump administration's practice of separating migrant and asylum-seeking families at the U.S.-Mexico border. Such a practice is profoundly harmful to children and to families, in addition to violating fundamental human rights. We urge you to immediately end forced separation of families at the border, and instead keep families together in community-based settings while their immigration proceedings are pending.

The Trump administration has stated that its goal in separating children from their parents is to deter people from crossing the border between ports of entry. According to statements by Attorney General Jeff Sessions, this policy is intended to be punitive, to serve as such deterrence.[1] The child welfare implications appear to be secondary at best. White House Chief of Staff and former Department of Homeland Security secretary John Kelly has stated, "The children will be taken care of — put into foster care or whatever. But the big point is they elected to come illegally into the United States and this is a technique that no one hopes will be used extensively or for very long.[2]" Media reports indicate that government mechanisms for ensuring that parents and children are in contact and know each other's whereabouts are non-functional.[3]

Using children as leverage to punish their parents is unconscionable, both with respect to the health and well-being of children and as treatment of migrants and asylum seekers. The right to family unity is enshrined in U.S. and international law, which recognize that families are the foundation of society. The relationship of children and parents is the strongest social tie most people experience, and a threat to that tie is among the most traumatic events people can experience.

Forced separation of children and parents, especially in connection with the detention of a parent, can constitute an adverse childhood experience (ACE). ACEs are linked with disrupted

[1] Attorney General Jeff Sessions, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Speech, May 7, 2018, https://www.justice.gov/opa/speech/ attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.
[2] Transcript: White House Chief Of Staff John Kelly's Interview with NPR, *NPR*, May 11, 2018, https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.
[3] Michael E. Miller, "'They just took them?' Frantic parents separated from their kids fill courts on the border," *Washington Post*, June 11, 2018, https://www.washingtonpost.com/local/they-just-took-them-frantic-parents-separated-from-their-kids-fill-courts-on-the-border/2018/06/09/e3f5170c-6aa9-11e8-bea7-c8eb28bc52b1_story.html.

neurodevelopment, resulting in social, emotional, and cognitive impairment,[4] and have even been linked with negative intergenerational effects.[5] Extreme and repetitive stress --  known as toxic stress -- such as that experienced when a person is suddenly separated from parents, adversely affects brain development and is correlated with increased risk of developing chronic mental health conditions, such as depression and post-traumatic stress disorder (PTSD) and even physical conditions such as cancer, stroke, diabetes, and heart disease.[6]

Separation from parents has been shown to be linked with higher rates of PTSD in the affected children.[7] For children, separation results in a low-support environment which places them at increased risk of PTSD and depressive disorders.[8] The negative impact on the cognitive and emotional functioning of the affected children can continue into adulthood, and contribute to lower academic achievement, attachment difficulties, and poor mental health.[9]

Among refugees, one research study shows that individuals separated from their families had worse mental health outcomes in terms of depression, PTSD, and psychological quality of life than those who remained with their families, after controlling for trauma. After testing the contribution of 26 types of trauma to these outcomes, only the experience of being beaten and tortured had a similar impact on all three mental health measures as family separation.[10]

According to the new U.S. policy, children arriving with their parents will be placed in the custody of the Office of Refugee Resettlement in foster families after separation. However, foster care is not an appropriate substitute to a child remaining with his or her parents, and studies of refugee children in foster care have shown that children fare worse when placed in foster families than when cared for by their parents.[11] Placing these children into foster care will strain the U.S. child welfare system and set these children up for worsened health and social outcomes.[12]

The best interests of the child is the recognized legal standard for the treatment of children across a range of domains, including parental custody and immigration proceedings. This standard requires that children not be separated from their parents except in extreme circumstances, if required for the child's protection. Indeed, the literature shows that parents

[4] Vincent J. Felitti et al., "Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study," *American Journal of Preventive Medicine* 14, no. 4 (1998); Debora L. Oh et al., "Systematic Review of Pediatric Health Outcomes Associated with Adverse Childhood Experiences." *Pediatrics* 141, no. 1 (2018).
[5] Felice Le-Scherban et al. "Intergenerational Associations of Parent Adverse Childhood Experiences and Child Health Outcomes," *Pediatrics* 141, no. 6 (2018).
[6] Vincent J. Felitti et al. "Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults," *American Journal of Preventive Medicine* 14, no. 4 (1998).
[7] Paul L. Geltman et al. "The 'lost boys of Sudan': functional and behavioral health of unaccompanied refugee minors re-settled in the United States," *Archives of Pediatric and Adolescent Medicine* 159, no. 6 (2005).
[8] Matthew Hodes, "Psychopathology in refugee and asylum seeking children," in Michael Rutter et al. (eds.), *Rutter's Child and Adolescent Psychiatry* (Wiley-Blackwell, 2009).
[9] Israel Bronstein and Paul Montgomery, "Psychological distress in refugee children: a systematic review," *Clinical Child and Family Psychology Review* 14, no. 1 (2010).
[10] Alexander Miller at al. "Understanding the mental health consequences of family separation for refugees: Implications for policy and practice," *American Journal of Orthopsychiatry*, 88, no. 1 (2018).
[11] Amy Holtan et al. "A comparison of mental health problems in kinship and nonkinship foster care," *European Child & Adolescent Psychiatry* 14, no. 4 (2005); Geltman et al., "The 'Lost Boys of Sudan.'"
[12] Kym R. Ahrens, Michelle M. Garrison, and Mark E. Courtney. "Health outcomes in young adults from foster care and economically diverse backgrounds," *Pediatrics* 134, no. 6 (2014); Amy Dworsky, Laura Napolitano, and Mark E. Courtney. "Homelessness during the transition from foster care to adulthood," *American Journal of Public Health*, 103, no. S2 (2013).

are a vital buffer for children coping with severe stress.[13] A strong predictor of successful adaptation for children is family support.[14] Separation from their parents denies these children this vital resource, leaving them alone to face extremely stressful and likely frightening conditions. It increases the risk that these children will experience severe and long-lasting psychological problems, and may even contribute to the development of physical health issues.[15]

The United States should follow the "best interests of the child" standard and immediately stop the practice of forced separation. It should not be U.S. policy to traumatize children, especially not as a form of indirect punishment of their parents. The intentional infliction of pain on children and their families is not just inhumane, it also fails to meet the stated goals of deterrence. Punishing parents with family separation may cause damage to their children, and it will not change the realities that drove the parents to seek safe haven in the United States.

As experts committed to promoting health and well-being, including of children, we ask you to immediately end the practice of family separation and take all measures to ensure that currently separated families are reunited without delay.

Sincerely,

Homer Venters, M.D., M.S., Director of Programs, Physicians for Human Rights, New York

Kerry J. Sulkowicz, M.D., Chair, Board of Directors, Physicians for Human Rights, New York

Eli Newberger, M.D., Pediatrics, Massachusetts

Elizabeth B. Ford, M.D., Psychiatry, New York

Kathleen Foley, M.D., Neurology, New York

Stephen Soldz, Ph.D, Psychology, Massachusetts

Edward Ameen, Ph.D, Psychology, Washington DC

Annalise Keen, M.D., Psychiatry, Utah

Roya Ijadi-Maghsoodi, MD, MSHPM, California

American Psychological Association (APA)

Coalition for an Ethical Psychology (CEP)

International Association of Forensic Nurses (IAFN)

---

[13] John Bowlby, *A secure base: Parent-child attachment and healthy human development* (New York: Basic Books, 1988); Steven M. Weine et al. "Fostering resilience; protective agents, resources, and mechanisms for adolescent refugees' psychosocial well-being," *Adolescent Psychiatry* 4, no. 4 (1988).
[14] Tammy Bean et al. "Comparing psychological distress, traumatic stress reactions, and experiences of unaccompanied refugee minors with experiences of adolescents accompanied by parents," *Journal of Nervous and Mental Disease* 195, no. 4 (2007).
[15] Shanta R. Dube et al. "The impact of adverse childhood experiences on health problems: evidence from four birth cohorts dating back to 1900," *Preventive Medicine* 37, no. 3 (2003).

Jena Abaria
Linda Abeles Ph.D. Psychologist
Sara Abelson MPH Public Health
Jamie Abenroth
Aviva Abeshaus Social Work
Lilit Ablabutyan Physician
Steven Ablon Psychiatrist
Diane Aboushi
Melissa Abraham Ph.D. Psychologist
Jonathan Abraham M.D. Physician
Holly Abraham
Tanya Abraham
Joshua Abrahams Social Work
Stacy Abrams Other Health Professional
Lauren Abrams Other Health Professional
Jane Abrams D.S.W. Social Work
Randi Abramson Physician
Asma Abu-Dahab Social Work
Bayan Abunar
Rohan Achar
Amy Ackroyd Social Work
Alexander Acosta
Sylvia Acosta Ph.D. Psychologist
Maria Alexandra Acunzo Psychologist
Jill Adaman Ph.D. Psychologist
Felicity Adams M.D. Psychiatrist
Helen Adams Administrator
Joan Adams Social Work
Deborah Adams Administrator
Mary Jane  Adams Ph.D. Psychologist
Christy Adams LMHC Other Health
Professional
Eve Adams Ph.D. Psychologist
Sabrina Adams M.D. Physician
Stephanie Addikis
Tessa Addison LCSW-R Social Work
Sheila Addison Ph.D.
Veronica Ades M.D. Physician
Molly Adler LCSW Social Work
Susan Adlere ACSW Social Work
Monica Agarwal M.D. Physician
Reena Agarwal Physician
Radha Agepati M.D. Psychiatrist
James Agolia
Grettel Aguilar ACRC
Alicia Aguilar CCRN Nurse
Cheryl Aguilar LICSW Social Work
Irene Aguilera
Nicole Aguirre Physician
Negin Ahadi M.D. Physician
Tasnia Ahamed Social Work
Julia Ahern Social Work
Amy Ahlfeld Psychologist
Saba Ahmad M.D. Physician
Yasir Ahmed
Joanne Ahola M.D. Psychiatrist
Theresa Aiello Ph.D. Social Work
Ruth Airhart LPC
Jenny Ajl Social Work
Fatma Akmese M.D. Physician
Eloho Akpovi Medical Student
Maria Beatriz Al Social Work
Kim Alaburda Public Health
Erin Albers M.D. Physician
Susan Albert
Jessica Albertson Psychologist
Joseph Albietz M.D. Physician
Erinn Alcabes
Adam Alcabes
Amanda Aldrich Nurse
Philip Alex Ph.D. Psychologist
Dorian Alexander MD  Physician
Hannah Alex-Glasser
Rachel Alexis Social Work
Lisa Alexoff LCPC
Jill Alger-James LCSW Social Work
Laila Ali Administrator

Randall Alifano Ph.D.
Nicole Alifante
Saira Alimohamed M.D. Physician
Erika Alkhawaldeh Nurse
Scott Allen M.D. Physician
Karen Allen Ph.D. Psychologist
Molly Allen Psychologist
Bruce Allen
Julie Allender ADTR Psychologist
Annette Allison D.S.W. Social Work
Richard Almond Physician
Joy Almquist RN Nurse
Janet Alperstein
Nuar Alsadir Ph.D.
Rebecca Alschuler Physician
Stephen Alsdorf Physician
Maria Alshamma Social Work
Barbara Alter Ph.D. Psychologist
Allison Alter Social Work
Susan Altfeld Ph.D. Public Health
Gretchen Alther
Mary Alumbaugh Ph.D. Psychologist
Shelly Alvarado APRN Nurse
Claudia Alvarez D.O. Physician
Kiara Alvarez Ph.D. Psychologist
Emily Alvarez
Carolina Alvayay M.D. Physician
Maria Alves Public Health
Morgane Amat
Paola Amaya Social Work
Paro Ambardar Ph.D. Psychologist
Laura Ambler D.O. Physician
May Ambrogi LCSW Social Work
Nusheen Ameenuddin  M.D. Physician
Christine Amidon RN
Anik Amin  M.D. Physician
Amira Simha-Alpern Ph.D. Psychologist
Cecilia Amisial M.D. Physician
Francena Amparo
Donna Amundson LCSW Social Work
Sandra Anderson Ph.D. Nurse
Wayne Anderson Nurse
Emily Anderson
Sarah Anderson
Jennifer Anderson LCSW-R Social Work
Lynn Anderson
Kerri Anderson LMFT
Jessica Andrade
Melanie Andrews M.D. Physician
Arthur Andrews III Ph.D. Psychologist
Catalina Angel
Charles Angelo
Larry Angert
Evelyn Angulo Physician
George David Annas M.D. Psychiatrist
Mary Annas Ph.D.
George Annas Public Health
Marcia Annenberg
Elvira Anselmi Ph.D. Psychologist
Stacey Anstaett D.V.M.
Julie Antilla Ph.D.
Korina Antina
Mildred Antonelli
Mildred Antonelli Dr.PH. Psychologist
Claudette Antuna Psychologist
Roberta Apfel Psychiatrist
Elizabeth Aponte Social Work
Vivianne Aponte Rivera M.D. Psychiatrist
Kristin Applebaum
Secil Arac-Orhun Ph.D. Psychologist
Maria Aranda Ph.D. Psychologist
Saulo Araujo
Ta Arb
Natalie Arbid
Linda Arbus Social Work
Magali Aresu
Ellen Arfin Social Work

Jane Ariel Psychologist
Vina Ariyaprakai M.D.
Maria Arizmendi M.D.  Physician
Linda Arkin LCSW Social Work
Ronald Arky M.D. Physician
Regina Armas Ph.D. Psychologist
Christine Armstrong
Weronika Armstrong M.D. Physician
Deborah Armstrong Ph.D.
Amy Armstrong Social Work
Heidi Arnholm Administrator
Margo Aron Social Work
David Around MPH Physician
Chaya Aronson
Ritika Arora M.D. Physician
Jean Maria Arrigo Ph.D. Psychologist
Luz Arroyo M.D. Physician
Robert Arroyo LISW Social Work
Karla Arroyo LCSW Social Work
Dolly Arroyo CAE Social Work
Kathie Arthursson RN  Nurse
Bonnie Arzuaga Physician
Deborah Ascheim M.D. Physician
Linda Ashbaugh
Catherine  Ashby LPC
Noa Ashman LCSW-C Social Work
Rose Ashraf Psychologist
Sadia Ashraf-Benson D.O. Physician
Maren Askins Psychologist
Terese Atallah
Celeste Atallah-Gutierrez Psychologist
Helit Atar-Greenfield Ph.D. Psychologist
Helit Atar-Greenfield Ph.D. Psychologist
Imaz Athar
Daniel Atkins Psychologist
Thomas Atkins M.D. Psychiatrist
Holly Atkinson M.D. Physician
Eva Atsalis LCSW-R Social Work
Sharon Attardo Nurse
Ilana Attie Ph.D. Psychologist
Kathern Auer D.O. Physician
John Auerbach Ph.D. Psychologist
Jennifer  auf der Springe M.D. Physician
Robin Aupperle Ph.D. Psychologist
April Autry Physician Assistant
Andrew Avault Social Work
Catherine Avener M.D. Physician
Jolenta Averill
Lily Awad M.D. Psychiatrist
Erin Awerkamp Social Work
Jeffrey Axelbank Psy.D. Psychologist
Steven Axelrod Ph.D. Psychologist
Lorena Aynalem Social Work
Naomi Azar Psychologist
Victoria Azara Ph.D. Psychologist
Codi Azuela LMHC
Allison Azus Psy.D. Psychologist
Mariel B Social Work
Deidre B D.O. Physician
Bhavana Babber Physician
Sheldon Bach Ph.D. Psychologist
Janet Bachant Ph.D. Psychologist
Ann Bacharach Social Work
Judith Bachay LMHC
Danielle Back Physician
Allison Bacon M.D. Physician
Briahn Baclde LCSWSocial Work
Beverly Badger
Charlotte Badler RN Nurse
Navroop Badyal Physician
Carl Bagnini LCSW-R Social Work
Kandy Bahadur Physician
Muna Bahsali RN Nurse
Sunhye Bai Ph.D. Physician
Paola Bailey Psy.D. Psychologist
Emily Bailey Social Work
Meghan Bailey

Terra Bailey D.V.M.
Parvathi Rau Bains Physician
Laura Baird Psy.D. Psychologist
Meera Bajwa M.D. Physician
Nida Bajwa
Emily Bakaj Public Health
Jennifer Bakalar Ph.D.
BeatriceBaker
Amy Baker
Kelley Baker Psychologist
Amelia Baker M.D. Physician
Judith Baker
Lucas Baker-Siroty Psy.D.
Eliza Bakken Physician
Susie Baldwin Physician
Richard Baldwin
Viola Baldwin
Elizabeth Baldwin Psy.D.
Erin Baldwin Social Work
Jenn Baldwin
Miranda Balkin M.D. Physician
Alexis Ball  M.D. Physician
Laurel Ball RNC Nurse
Michele Ballet Psy.D.   Psychologist
Arthi Balu M.D. Physician
Somalee Banerjee M.D. Physician
Rona Bank ABPP Psychologist
Laura Banks M.D. Physician
Emma Banks
Pamela Bannan RN Nurse
Sarah Bannister D.O. Physician
Sarah Bansen APRN-BC Nurse
Julie Barajas RN Nurse
Kim Baranowski Ph.D. Psychologist
Tia Baratelle Administrator
Kelly Barbour M.D. Physician
Jill Barbre LCSW Social Work
Cathy Bargar RN Nurse
Lucille Barish Social Work
Allison Barker-Ford Social Work
Alicia Barmon Social Work
Jeanne Barnard Nurse
Bill Barnes
Tina Barnet
Heather Barnett Physician
Eve Barnett LCSW Social Work
Linda Barnhurst Psy.D.
Joshua Barocas Physician
Michael Baron Ph.D. Psychologist
Erica Baron
Corey Barr
Romina Barral M.D. Physician
Charmaine Barredo M.D. Physician
Sandra Barreto
Anastasia Barros Physician
Daniela Bartalini
Pat Bartels APRN-BC Nurse
Thomas A Bartlett Psychologist
Jessica Bartlett Ph.D.
Bob Bartlett Ph.D. Psychologist
Kira Bartlett Psy.D. Psychologist
Kristy Kenyon Bartley   Psychologist
Michele Bartnett Ph.D. Psychologist
Nicole Bartolini LCSW Social Work
Kathleen Bar-Tur Social Work
Amanda Barusch Ph.D. Social Work
Amanda Bashir M.D. Physician
Sabrina Basquez Social Work
Daisy Bassen M.D. Psychiatrist
Katie Bassoli LCSW Social Work
Helene Bass-Wichelhaus Ph.D. Social
Work
Nicole Bates MSW Social Work
Geoff Bathje Ph.D. Psychologist
L.  Batra Ph.D. Psychologist
Jill Battalen Social Work
Delia Battin

Nerissa Bauer Physician
Karyn Baum M.D. Physician
Peter Baum D.O. Physician
Susann Bauman
Cynthia Baum-Baicker Ph.D. Psychologist
Tondy Baumgartner M.D.
Kelle Baxter Nurse
Joseph Bayley
Dr. Bronwyn Baz M.D. Physician
Rebecca Bazell
Daphne Beal
Allison Bean M.D. Physician
 Barbara Beard D.O. Physician
Jasjit Beausang M.D. Physician
Lindsey Beaven Ph.D.
Henry Beck Ph.D. Social Work
Erin Beck Pharmacist
Amy Beck M.D. Physician
Tim BeckerM.D. Physician
Jordan Becker M.D. Physician
Jen Becker
Janice Beckert LPC
Lauren Becton M.D. Physician
David Bedell M.D. Physician
Rachel Bedick LICSW Social Work
Kaycee Beglau  Psy.D.  Psychologist
Kasra Behizad Physician
Nicole Kellan Behnke M.D. Physician
Deanna Behrens M.D. Physician
Jack Beinashowitz Ph.D. Psychologist
Flor Beleniski Physician
Gail Bell Ph.D. Psychologist
Keisha Bell M.D. Physician
Michelle Bell Psy.D. Psychologist
Christine Bell
Christi Bell Social Work
Danielle Bellavance Medical Student
Lauren Belleville
Stacey Belliard
Victoria Belliard
Juan Carlos Belliard Public Health
Stefanie Belnavis
Alexander Belser Ph.D. Psychologist
Jennifer Beltz
Ken Benau Psychologist
Thomas Bender
Cara Benedetto
Trude Bennett Dr.PH. Public Health
Alyssa Bennett D.O. Physician
Catherine Benoist
Marilyn Benoit M.D. Psychiatrist
Michele Benoit-Wilson M.D.
Doris Benrey Psychologist
Maryann Bens Psychologist
Peter Bensen D.C.
Megan Tracy Benson MSW Social Work
Ruth Benson LCSW Social Work
Stephen Benson Ph.D. Psychologist
Dawn Bent Social Work
Suzanne Benton M.D. Physician
Alexandra Berardi
Phyllis Beren Ph.D. Social Work
Emily Berg
Kiley Berg
Katherine Berg M.D. Physician
Melinda Berg Nurse
Salli Berg Seeley
Sasha Berger Ph.D. Psychologist
Cherylynne Berger Social Work
Suzann Bergeron
Christina Bergin M.D. Physician
Marion Bergman, MD
Brandon Bergman Ph.D. Psychologist
Margaret Bergmann-Ness Social Work
Sandra Berher
Susan Berkhout Social Work
Bonnie Berkovitz

Joan Berkowitz LCSW Social Work
Sarah Berkson M.D. Physician
Amanda Berling M.D.   Physician
Ellen Berman M.D. Psychiatrist
Ariel Berman Psychologist
Sheri Bernal Social Work
Monica Bernheim LCSW-R Social Work
Elizabeth Bernstein Ph.D. Psychologist
Alice Bernstein Ph.D. Psychologist
Amy Bernstein
Anne Bernstein Ph.D. Psychologist
Rebecca Bernstein M.D. Physician
Stacey Bernstein-Haas M.D. Psychiatrist
Julia Berreth
Jennifer Berz Ph.D. Psychologist
Luana Bessa Ph.D. Psychologist
Katie Best LCSW Social Work
Paul Betty
Melissa Beveridge-Massard
Meenakshi Bewtra M.D. Physician
Rebecca Beyda M.D. Physician
Chris Beyrer M.D. Physician
Amit Bhardwaj Physician
Maya Bhatia M.D. Psychiatrist
Karunya Bhattacharya
Catherine Bianchi Ph.D. Psychologist
Sara Bickerstaff
Rebekah Bickford Psy.D. Psychologist
Sarah Biederman
Heather Biedrzycki LMHC
Matthew Biel M.D. Psychiatrist
Nina Bien Psychologist
Thomas Bien Ph.D. Psychologist
Britt Bilal
Eva Bilderbeck Nurse
Julie Bindeman Psy.D. Psychologist
Marian Birch D.M.H. Psychologist
Brenda Birmann Public Health
Amahl Bishara
Natalie Bishop M.D. Physician
Michael Bishop M.D. Physician
John Bishop Psychologist
Joleen Bishop
Ruth Bittner Social Work
Anne Biwen Ph.D. Psychologist
Melissa Black Ph.D. Psychologist
Chame Blackburn M.D. Physician
Faith Blackmore Nurse
Judith Blackwell
Joy Blackwood Public Health
Shirley Blaha Nurse
Amy Blair M.D. Physician
Lynne Blaisdell Social Work
Leigh Blake
Mary Blakeslee Ph.D. Psychologist
Heather Blanchard
Christiane Blanco-Oilar Ph.D.
Psychologist
Lily Blank Psychologist
Kevin Blank
Susan Blank LPC
Terry Blanken Ph.D. Psychologist
Christine Blasey Ph.D. Psychologist
Courtney Blashki Social Work
Mindy Blatt Administrator
Andrew Blatter Social Work
Richard Bliss M.D. Physician
Elizabeth Bliss
M. Gregg Bloche Psychiatrist
Katie Bloom Social Work
Joyce Bluestone LCSW-R Social Work
Cori Blum AAHIVS Physician
Maria Blum Social Work
Lawrence Blum Psychiatrist
June Blum
James Blum
Raia Blum

Dana Blyth M.D. Physician
Amy Boardman LPN Nurse
Judith Bobbe Social Work
Kate Bock  LCSW
Maria Bodic Physician
Kira Boesch Ph.D. Psychologist
Joelle Boeve M.D. Physician
Terri Bogage Social Work
Nicole Bokat
Tammy Bolin Nurse
Nicole Bologniin LCSW Social Work
Andrea Bomgaars D.V.M.
Rachael Bonawitz Physician
Trudy Bond Psychologist
Rhonda Bonett Ph.D.
Lorena Bonilla M.D. Physician
Ja,es Bonnar M.D. Psychiatrist
Arielle Bonne Social Work
Brittany Bonner Social Work
Aaron Bonner-Jackson Ph.D. Psychologist
Alice Bontempo Dr.PH. Psychologist
Andrew Bontemps Psychologist
Annie Bonz
Claire Boogaard Physician
Barbara Booker CSW Social Work
Susan Booth-Daniels Social Work
David Bor Physician
Christina Borba Ph.D.
Kathi Borden Ph.D. Psychologist
Alena Borgatti Medical Student
Psychologist
Néstor Borrero  Ph.D.   Psychologist
Clari Borrero Physician
Rachel Bosch Scientist
Pauline Boss Ph.D. Psychologist
Kristie Bosworth Psychiatrist
Naomi Botkin M.D. Physician
Steven Botticelli Ph.D. Psychologist
Ghislaine Boulanger Ph.D. Psychologist
Mirna Boumitri Physician
Missy Bourassa
Bernadette Bourassa CED
Marianne Bouthilette
Mary Bowers Ph.D. Psychologist
Colleen Bowers
Sacharitha  Bowers  M.D. Physician
Kristin Bowles Social Work
Jan Bowman Ph.D. Psychologist
Sandy Bowman
Jessica Boyatt Psychologist
Jessica Boyatt Psychologist
J. Wesley Boyd M.D. Physician
Andrew Boyd Physician
Rhonda Boyd Ph.D. Psychologist
Darcy Boyd Nurse
Sara Boyles Nurse
Linda Bozza CM
Yelena Bracchini M.D. Physician
Juliet Bradley M.D. Physician
Mary Brady Public Health
Lorri Brady
Gail Bragg  Social Work
Martha Bragin Social Work
Deana Bramley Social Work
Melissa Brand Psy.D. Psychologist
Stephanie Brandt M.D.Psychiatrist
Heather Branham LCSW Social Work
Irina Bransteter Ph.D. Psychologist
Jeanie Brasie
Lucinda Bratini Ph.D. Psychologist
Christine Bratton PT
Jacqueline  Brauer Social Work
Elizabeth Braunreuther
Teresa Bray
Mary Braza Physician
Susanne Breckwoldt Ph.D. Psychologist
Leela Breitman

Sarah Bren Ph.D. Psychologist
Sharon Brennan Ph.D. Psychologist
Mary Brennan Psychologist
Sarah Brennan Ph.D. Psychologist
Cameron Brennan M.D. Physician
Liz Brenner LICSW Social Work
Yocasta Brens
Kerri Bresnan Psy.D. Psychologist
Cheryl Brewer Nurse
Noel Brewer Ph.D. Public Health
Loretto Brickfield Ph.D. Psychologist
Christine Bridges M.D. Physician
Amanda Bridges MSEdPsychologist
Jeralee Briggs Ph.D. Psychologist
Kathryn Brigham Physician
Aaron Brinen Psy.D. Psychologist
Rachel Bring M.D. Physician
Katie Britton Social Work
Kate Brizzi M.D. Physician
Janan Broadbent Psychologist
Jeanne Brock MHP Social Work
Julia Brockway M.D. Physician
Bari Brodsky M.D. Physician
Stephanie Brody Psy.D. Psychologist
Leslie Brody Psychologist
Yosef Brody, Ph.D., Clinical Psychology
Mary Beth  Brogan MSEd
Samuel Broida
Jessica Brokaw LCSW-C Social Work
Keith Brooks
Mary Brooks Nurse
Dominique Brossard
Marge Broward
Jen Brown LICSW Social Work
Tara Brown Social Work
Kathleen Brown Ph.D. Psychologist
Julia Brown Ph.D.
Ida Brown LMHC
Colleen Brown M.D. Physician
Susan Brown Psy.D. Psychologist
Wayne Brown
Danielle Brown Public Health
Barbara Brown M.D. Physician
Kathryn Brown
Dr Pat Brown Ph.D. Psychologist
Rebecca Brown Psychologist
Melanie Brown Medical Student
Mary Brown Nurse
Jane Brown
Marybeth Brown
Allison Brown
Joedrecka Brown Speights M.D. Physician
Jessica Browne Social Work
Joshua Brownlee M.D. Physician
Vered Brownstein Social Work
Linda Brown-Tiritilli LMFT
Thomas Bruce Psy.D. Psychologist
Julie Brueggemann
Diane Bruessow, PA-C
April Brumson APRN Nurse
Kristen Bruneau
Frank Bruno
Sarah Brunt
Cathe Bruso LCAT Social Work
Linda Bryant
Mariel Bryden Physician
Beverly Brysk Ph.D. Psychologist
Wilma Bucci Ph.D. Psychologist
Lisa Buchberg Psychologist
Gretchen Buchenholz Administrator
Susan Buck Scientist
Carol Buckley
Ayanna Bucker Physician
Karen Budd Ph.D. Psychologist
Anne Buechl
Joseph Buffone Social Work

Quynh  Bui Physician
Lydia Buki Ph.D. Psychologist
Jennifer Bumpus Psy.D. Psychologist
Jessica Buonocore
Janet Burak LCSW-R Social Work
Emma Burbank Physician
Benjamin Burenstein
Suzanne Burger Psy.D. Psychologist
Lisa Burger Nurse
Jacqueline  Burgos
Nancy Burke Ph.D. Psychologist
Laura Burke M.D.
Tracy Daniel Burke Psy.D. Psychologist
Jennifer Burnett
Mikaela Burnham M.D. Physician
Erin Burns
Sarah Burns M.D. Physician
Cheryl Burns LPC Psychologist
Autumn Burris
Adam Burrows Physician
Marcy Burstein Psychologist
Rebecca Burton LMFT
Bettina Buschel LMHC
Kevin Bush Ph.D.
Bob Bussel
Rianne Bustamante RNC Nurse
Melissa Butler Ph.D. Psychologist
Reagan Butler
Nola Butler-Byrd Ph.D.
Brenda S Butzel Social Work
Leonce Byimana MPH  Administrator
Aliya Bynum M.D. Physician
David Byrom Ph.D. Psychologist
Jaehyun Byun M.D. Physician
Nancy Cabelus APRN-BC Forensics
Cynthia Cabral Ph.D. Psychologist
Jane Caflisch Ph.D. Psychologist
Laura Caghan Psy.D. Psychologist
Laura Caghan Psy.D. Psychologist
Pat Cahill Watson
Nicole Cain Ph.D. Psychologist
Dotty Caldwell LCPC
Susan Caldwell
Archna Calfee M.D. Physician
Cristina Calhoon
Eric Caliendo
Pamela Calkins
Megan Callahan Ph.D.
Elena Callahan
Kathryn Callahan Physician
Janet Callum
Jose Camerino LISW Social Work
Anicea Campanale
Amber Campbell LMHC
Megan Campbell LMSW Social Work
Michael Campbell
Willa Campbell
Anna Campion Ph.D. Psychologist
Amelia Campos M.D. Physician
Lynae Canales M.D. Physician
Julia Candela Psychologist
Lucy Candib M.D. Physician
Lynn Cannici
Gail Canzano Ph.D. Psychologist
Rebecca Capasso M.D. Psychiatrist
Tracy Capes M.D. Physician
Alexis Capestany
Nancy Caporaso
Melisa Caprio
Rose Capurso Psychologist
Daniela Caraballo Social Work
Carolyn Carbone Ph.D. Psychologist
Cheryl Card Ph.D. Psychologist
Linda Carden Nurse
Alondra Cardenas Physician
Alonso Cardenas M.D. Psychiatrist
Dana Cardin M.D. Physician

Jinyen Carey
Sandra Carey Psy.D. Psychologist
Michele Carfiello Public Health
Elizabeth Caritj LCSW-C Social Work
Elizabeth Carley
Vanessa Carlo Physician
Megan Carlos Ph.D. Psychologist
Martha Carlough Physician
Cindy Carlson Ph.D. Psychologist
Laura Carlson M.D. Physician
Laurie Carmichael CPNP Nurse
James Carnelia Ph.D. Psychologist
Ann Carnevale Medical Student Physician
Yvette Caro Ph.D. Psychologist
Sarah Carpenter M.D. Physician
Erica Carr LCSW Social Work
Daisy Carrasquillo Social Work
Heidi Carrillo
Lisanne Carr-Jos CHFS
Monique Carroll APRN Physician
Maureen Carroll
Larkin Carroll Social Work
Monica Carsky Ph.D. Psychologist
Lesley Carson Physician
Denise Carter Nurse
Stephanie  Carter LCSW Social Work
Nicole Carter  M.D. Physician
Marie Caruso-Teresi, ATR-BC
Alan Carver M.D. Physician
Ilene Carver
Deborah Carver M.D. Psychiatrist
Alfred Casale
Lauren Casapulla  MAOM Psychologist
Kristy Case LCSW Social Work
Gretchen Case Ph.D.
Consuelo Casillas M.D. Physician
R. Omar Casimire
Taymy Caso
Julio Casoy Physician
Flavio Casoy M.D. Psychiatrist
Patricia Cassidy Nurse
Kate Cassidy-DeVito CNM
Veronica Castaldi
Lourdes Castañon-Ditillo M.D. Physician
April Castillo M.D. Physician
Betsy Catalano Social Work
Alexandra  Cattaruzza  Psychologist
Marissa Caudill Psychiatrist
Kelsey Cavanagh-Strong Social Work
Patricia Cavanaugh
William Cayley M.D. Physician
Traci Caywood RN Nurse
Diana Cejas M.D. Physician
Marianne Celano Ph.D. Psychologist
Armand R  Cerbone Ph.D. Psychologist
Colleen Ceremuga M.D. Physician
Lilia Cervantes Physician
Eunice Cervantes
Christine Cesa Social Work
Brittany Cesar Physician
Elizabeth Cestero Social Work
Smitha Chadaga M.D. Physician
Jeanne Cizdick M.D. Public Health
Melissa Chai
Rachel Chalmer M.D. Physician
Anne Chamberlain Physician
Linda Chamberlin Scientist
Renae Chambers
Vivian Chan Medical Student Physician
Wendy Chan Psy.D. Psychologist
Karen Chandler M.D. Physician
Jane Chandley NP
Sam Chang Physician
Jennifer Chang
Kimberly Chang M.D. Physician
Doreen Chang
Catina Chang Ph.D. Psychologist

Lorena Chang
Dorothy Chao Nurse
Natalie Chap MSW Social Work
Claudia Chapa M.D. Physician
Teresa Chapa Ph.D. Psychologist
Lisa Chapman
Paige Chapman-Layland
Mitchell Charap M.D. Physician
Dana Charatan Psy.D. Psychologist
KC Charette Psy.D. Psychologist
Julie Charette Nunn
Kimberly Charlebois LPN Nurse
Kimberly   Charlebois  LPN Nurse
John Charles
Emily Charvis LCSW Social Work
Alison Chase ANP
Avik Chatterjee Physician
Bithi Chatterjee Scientist
Akshata Chaudhary
Nila Chauhan M.D Physician
Felicia Chavando
Krishna Chavda
Gerald Chavez Ph.D. Psychologist
Mira Chavez
Lorna Cheifetz Psy.D. Psychologist
Emily Chen Physician
Stephanie Chen Physician
Leian Chen M.D. Physician
Austin Chen
Isabelle Chesley Nurse
Serana Chester Psychologist
Laura Chester LMHC
Zahra Chevannes Social Work
Gurbir Chhabra Physician
Jennifer Chia M.D. Physician
Natasha Chida Physician
Lucy Chie M.D. Physician
Donna Chimera Ph.D. Psychologist
Mary Chiou M.D. Physician
Beth Chirillo
Makini Chisolm-Straker
Alison Chizum Nurse
Anne Chmilewski M.D. Physician
Deborah Choate M.D. Psychiatrist
Komal Choksi Ph.D. Psychologist
Sapna Chopra Psychologist
Eve Chou Nurse
Alice Christensen Ph.D. Psychologist
Laura Christensen LCSW Social Work
Mary Christensen Ph.D. Social Work
Nicole Christian-Brathwaite M.D.
Physician
Teresa Christmas PC
Paulette Christopher Psychologist
Ilia Christy Physician
Krista Chronister Psychologist
Michelle Chu Physician
Tina Chu M.D. Physician
Cheryl Church
Elizabeth Cieri Psychologist
Pamela Cipriano Ph.D. Nurse
Phoebe Cirio LCSW Social Work
Lauren Ciszak M.D. Physician
Eleba Clamen
Megan Clapp MACP Psychologist
Melissa Clapp
Elizabeth Clark Psychologist
Goiselle Clark M.D. Physician
Renea Clark Nurse
Sarah Clark
Twyla Clark PA-C
Dorothy Clarke
John Clarkin Ph.D. Psychologist
Megan Clary Ph.D. Psychologist
Christina Clasp Social Work
Philip Claus Social Work
Lance Clawson M.D. Psychiatrist

Gillian Claycomb
Sarah Cleary Ph.D. Psychologist
Erin Cleary M.D. Physician
Monica Clement Psychologist
Anne Clements Social Work
Courtney Clifford
Elayne Clift
Jim Clopton Ph.D. Psychologist
Cynthia Closs D.S.W. Social Work
Autumn Cloud-Ingram LMSW Social
Work
Kai Clough
Erin Clowes Scientist
Mary Coakley-Welch Ph.D. Psychologist
Ashley Coats Psychiatrist
Ali Cobb
Mary Cobb Nurse
Rachel Cobb
Margaret  Coble
Catherine  Coble LCSW-C Social Work
Daniel Cochrane
Laura Coffey LCSW-R Social Work
Ellen Coffey Ph.D. Psychologist
Erica Coffin M.D. Physician
Alison Cogan Scientist
Robert Cohen M.D. Physician
Sarah Cohen M.D. Psychiatrist
Mardge Cohen M.D. Physician
Elise Cohen Ph.D.
Samuel Cohen Physician
Rebecca Cohen AAHIVS Physician
Terri Cohen
Lisa Cohen Ph.D. Psychologist
Rebecca Cohen Ph.D. Psychologist
Barbara Cohen Psychologist
B. Beth Cohen Ph.D. Psychologist
Naomi Cohen
Janice Cohen
Julie Cohen Nurse
Robyn Cohen Psychologist
Gwen Cohen-Brown D.D.S.
Shara Cohn M.D. Physician
Richard Cohn-Lee
Jesse Cole Physician
Jennifer Coleman
Stephanie Coleman LMFT
Linda Collazo M.D. Physician
Crystal Collier Psy.D. Psychologist
Meaghan Colling Physician
Cheryl Collins M.D. Psychiatrist
Kevin Collins RN Nurse
Sara Colm
Niki Colombino Ph.D. Psychologist
Cassie Colwell Physician
Gene Combs M.D. Psychiatrist
Allegra Condiotte
Alissa Conklin M.D. Physician
MaryAnn Conley
Lynette Connell M.D. Physician
Jennifer Connell Social Work
Mark and Nancy Jo Connell

Patrick Connelly Psy.D. Psychologist
Karin Connelly Ph.D. Psychologist
Meghan Connett Physician
Sara Connolly M.D. Physician
Kristen Connolly M.D. Physician
Daniel Connolly
Shae Connor M.D. Physician
Brenna Conroy Physician
Shilpa Constantinides Public Health
Stephanie Constantino M.D. Physician
Kimberly Contant Nurse
Veronica Contreras D.O. Physician
Paola Contreras Psy.D. Psychologist
Keith Cook Ed.D. Psychologist
Keith Cook Ed.D. Psychologist

Lisa Cook
Kristopher Coontz Physician
Katherine Cooper LCSW Social Work
Anna Cooper Social Work
Jesanna Cooper M.D. Physician
Jolie Cooperman
Carmen Coots
Teresa Coppola Social Work
Maureen Corbett Psychologist
Janet Cordell RN Nurse
Claudia Cordoba Physician
McKenna Corlis
Dana Corman Social Work
Maria Corona
Elizabeth Corsale
Sara Cortes Physician
MaryAnn Cortez-Jesse Nurse
William Cosgrove M.D. Physician
Shari Coskey, Ph.D. Psychologist
Saba Cossor M.D. Physician
Gerard Coste M.D. Physician
Margaret Costello
Christie Cotcher
Emily Cotter M.D. Physician
Deborah Cotton Physician
Maripat Cottone Nurse
Ailish Coughlan
Kelly Coulehan Ph.D. Psychologist
Kimberley Coup
Christine Courtney M.D. Physician
Michael Cover
Shannon Covitz D.O. Physician
J Carolyn Cowan Ph.D. Psychologist
Mackenzie Cox Social Work
Valerie Cox Pharmacist
Lisa Cox MSW Social Work
Susan Coyle Scientist
Stephanie Coyne Ph.D. Psychologist
Erik Craig Psychologist
Joy Crandall D.O. Physician
Leilani Crane Psychologist
Susan Crane Nurse
Lisa Cranmer Physician
Thomas Crawford Psychologist
Jennifer Creedon M.D. Physician
Allison Cressy Public Health
Julie Ann Crewalk M.D. Physician
Janice Crist Nurse
Diane Critchlow
Kelly Cromer Psychologist
Hope Cromer Psychiatrist
Jay Crosby  Ph.D. Psychologist
Sondra Crosby M.D. Physician
Meghan Crosby Budinger LCPC
Amanda Crosier-Riffle M.D. Psychiatrist
Michael Crouch
Allison Croucher D.O. Physician
Denise Crowther
Brendan Crumley
Craig Cruzan Ph.D. Psychologist
Zandra Cruz-Paul Social Work
Brigette Cuffia
Nancy Culhane Psychologist
Rachel Cull Psy.D. Psychologist
Ellen Cullen Social Work
Rebecca Culver
Charles Cuneo Physician
Tiffany Cunningham LICSW Forensics
Thomas Cunningham Physician
Juanita Curran Social Work
Anjuli Curran Social Work
Linda Curreri
Katrina Curry LMFT
Colleen Curtin Physician
Judy Curtis Psychologist
Sharon Cushman Dr.PH. Psychologist
Michelle Cushman Psychologist

Adele Cuthbert Ph.D. Psychologist
Beverly Cutler Psychologist
Michelle Cutler Ph.D.   Psychologist
Mona Cutolo
Alexandra Cyr
Andrea Cyr LPC
Bruce Czuchna Psy.D. Psychologist
Laura Czulada D.O. Physician
Cassandra D'Accordo Ph.D. Psychologist
Ann D'Ercole D.Phil.Psychologist
Kathy Da Silva Social Work
Laura DaBruzzi Social Work
Clifford Dacso Physician
Mara Dacso M.D. Physician
Matthew Dacso M.D.   Physician
Kirsten Dahl Ph.D. Non-MD
Amber Daigle
Jamila Dakhari Psy.D. Psychologist
Mona DalalM.D. Physician
Tammy Dale Psychologist
Renee Daley Social Work
Sara Daly LCSW-C Social Work
Megan Daly
Mike Daly
Amy Damashek Psychologist
Elisheva Dan Ph.D. Psychologist
Lisa Danaczko
Megan D'Andrea
Ellyn Daniels Ph.D. Psychologist
Ron Daniels
Valerie Danielson M.D. Physician
Barbara Danish
Nancy Dankiw
David Dantzker, MD
Kelly Dardeen Ph.D. Psychologist
Sherry Darr
Allison Darrow Administrator
Katherine Darwish Psychologist
Moupali Das M.D. Physician
Debesh Das Public Health
Arijit Dasgupta Physician
Heather Data and Planning Manager
    Administrator
Rachelle Dattner Ph.D. Psychologist
John Dauer Social Work
Sigrid DaVeiga M.D. Physician
Edward DaVeiga Physician
Sonya Davey
Lance Davidson Ph.D.
Kristin Davidson
Jenny Davidson
Leslie Davidson M.D. Physician
Leela Davies M.D. Physician
Tammara Davis M.D. Psychiatrist
Kristin Davis
Mary Davis
Stacie Davis
Martha Davis Ph.D. Psychologist
Heather Davis
Diane Davis LCSW Social Work
Elizabeth Davis LICSW Social Work
Dawn Davis Physician
Deborah Dawson Psy.D. Psychologist
Stephanie Dawson
Bria Day
Deborah Day Psy.D. Psychologist
Zara Day MPH Public Health
Manisha Dayal Psy.D. Psychologist
Trish Dayan Social Work
Cathy Dayan
Cecile de Lardemelle Psy.D. Psychologist
Cynthia de las Fuentes  Psychologist
Amanda De Laurentiis
Angeles de Leon MSW Social Work
Rafael De Leon
Nicholas De Los Reyes Ph.D. Psychologist
Christine De Luca Administrator

Daphne de Marneffe Ph.D. Psychologist
Lauren De Nitto Social Work
Helene De Rengerve Administrator
Isak de Vries LCSW Social Work
Ellen DeBiase
Katrina Debs
Lisa Deck  Social Work
Norman Decker M.D. Psychiatrist
Chelsea Decker Nurse
Bahney Dedolph Social Work
Gina DeGiovanni M.D. Physician
Caitlin Deighan
Marla Dekker
Dina del Amo Psy.D. Psychologist
Leslie Delavan
Mona Delavan Ph.D. Psychologist
Mercedes Delgado M.D. Physician
Mary Delgado MPH Public Health
Mercedes Delgado-Lantigua Th.D.
Chantè DeLoach Psy.D. Psychologist
Leyland DelRe RN Nurse
Anthony DeLuca
Gloria Demby LCSW-R Social Work
Gisela Demko Psychologist
Elizabeth Demma RRT
Colleen Dempsey Social Work
Mark Denison Ph.D. Psychologist
Miriam Denmark Social Work
Lauren Dennehy Social Work
Kathy Dennis Nurse
Al Dennis Nurse
Marc Dentico-Olin M.D. Physician
Carole Denton
Elizabeth Derkes  MPH Public Health
Aimee Dershowitz Psychologist
Peggy Dervitz Social Work
Purnahamsi Desai Physician
Malini Desai
Sheetal Desai D.O. Physician
Kristin DeSantis Physician
Robin Deutsch Psychologist
Robin Deutsch Ph.D. Psychologist
Josephine Deutsch Nurse
Rosalyn Deutsche
Michael Devlin M.D. Psychiatrist
Elizabeth DeVries Nurse
Madeline DeWane
Mavis DeWees
Raphael Deykin
Kristin Dezen Psychologist
Ramandeep Dhillon M.D. Physician
Harinder Dhindsa Physician
Elizabeth Diamond Ph.D. Psychologist
Ellen Diamond Psychologist
Caroline Dias Physician
Kevin Diasti M.D. Physician
Erick Diaz
Chanelle Diaz Physician
Monique Diaz M.D. Physician
Sara Diaz Physician
Donna DiCello Psy.D. Psychologist
Lyn Dickert-Leonard M.D. Physician
Agnes Dickson Ph.D. Psychologist
Amy Dierberger Ph.D. Psychologist
JoAnn Difede Ph.D. Psychologist
Una Diffley Public Health
Abigail Dillaha Scientist
Mark Dilley
Colleen Dillon Ph.D. Psychologist
Oscar Dimant Medical Student Physician
Amy Dimun
Adriana DiNardo LCSW-R Social Work
Matthew Diner Ph.D. Social Work
Khanh Dinh Ph.D. Psychologist
Joan Dinkelspiel
Danielle Dion M.D. Physician
Patricia Dion

Maryanne DiPasquale
Lori DiPrete Brown MSPH Public Health
Aislyn DiRisio
Rachel Dishong RN Nurse
Jessica Disney
Michael Ditillo D.O. Physician
Floyd Dix MSW Social Work
Tristen Dixey
Thomas Dixon Psychiatrist
Jessa Dmytryszyn Psychologist
Stephanie Doane Ph.D.Psychologist
Betsy Dobbins Social Work
Bruce Dobkin M.D. Physician
Diana Dodds Nurse
Chelsea Dodgen LCSW Social Work
Katharine Doel LCSW Social Work
Barbara Doggett
Paul Doherty M.D. Physician
Terrance Dolan
Ellen Dolce LCSW Social Work
Eszter Domjan
Julia Donahue-Wait RN Public Health
Emily Donaldson-Fletcher M.D. Physician
Carol Donalson LPC
Elizabeth Donger Public Health
Cathy Donnenwirth LPC
Michael Donner Ph.D.  Psychologist
Lynn Donoghue
Lucas Donovan Nurse
Molly Donovan Ph.D. Psychologist
Samuel Donovan M.D. Physician
Katherine Donovan
Melissa Donovick Psychologist
Anne Marie Dooley Social Work
Aliza Dorevitch
Benjamin Dorevitch
Robert Dorfman
Lori Dorfman Dr.PH. Public Health
Caroline Dorsen Nurse
Amrit Dosanjh
Laura Doty Ph.D. Psychologist
Susan Doty
Ann Douglas Psychologist
Nina Douglass LICSW Social Work
Hillary Douin Social Work
Meredith Dove Ph.D. Psychologist
Patricia Dowds Ph.D. Psychologist
Kristin Dowell
Elizabeth Downing
Jennifer Downs Psychiatrist
Mary Cele Doyle
Kathleen Doyle Physician
Ina Doyle
Allison Doyle Public Health
Michelle Doyle
Reinhild Draeger-Muenke Psychologist
Mihaela Dranoff Psychologist
Albana Dreshaj Physician
Amy Drever Social Work
Carmel Drewes Social Work
Lisa Drexler Ph.D. Psychologist
Rebecca Drill Ph.D. Psychologist
Jennifer Driscoll LMFT
Patrice Drolte Nurse
Howard Drutman Ph.D. Psychologist
Joy Dryer Ph.D. Psychologist
Becca Dryer
Robin Du
Fang Duan Dr.PH. Social Work
Lisa Dubinsky Psy.D. Psychologist
Joanna Dubinsky
Andy Duffy Social Work
Martha Dugan Ph.D. Psychologist
Kelly Duggan Psychologist
AJ Dugger Ph.D. Psychologist
Alison Duncan M.D. Psychiatrist
Lesford Duncan Administrator

Joan Duncan Ph.D. Psychologist
Deborah Dunevant
Elizabeth Dunford Nurse
Kathleen Dunn Psychologist
Linda Dunwoodie LMFT Psychologist
Melina Dupin-Girod
Vanessa Durand DO Physician
Alejandra Durango Psychiatrist
Rosemary Durousseau Psychologist
Audrey Durrant M.D. Physician
Silvia Dutchevici LCSW-R Social Work
Erica Dwyer M.D. Physician
Carol Ann Dyer M.D.   Psychiatrist
Robert Dyer LMHC
Ilene Dyller Ph.D. Psychologist
Ann Dypiangco Social Work
Anna Dzierzgowska
Shawna  Eaddy Administrator
Linda Earley Psy.D. Psychologist
Lauren Earls Ph.D. Psychologist
Derek Easley Social Work
Ann Easterbrooks Ph.D.
Merle Eaton LPN Nurse
Devon Ebberly M.D. Physician
Art Eccleston Psy.D. Psychologist
Kelsey Echols M.D. Physician
Jennifer Eckersley
William Eddy
Sara Edelstein
Madison Edens Medical Student Physician
Anna Eder LISW Social Work
Karli Edholm M.D. Physician
Jen Edman M.D. Physician
Mark Edwards
Beverly Edwards M.D.  Physician
Erin Egan Social Work
Cameron Egan Social Work
Jonas Ehudin Social Work
Luise Eichenbaum Social Work
Meredith Eicken Physician
Roy Eidelson Ph.D. Psychologist
Danielle Eigner DO Physician
Nancy Einbinder
Elizabeth Einhart
Jay Einhorn Ph.D. Psychologist
Laura Eisdorfet Psy.D. Psychologist
Lynne Eisenberg Social Work
Vivien Eisenberg M.D. Psychiatrist
Mark Eisenberg ANP Physician
Janie Eisenberg ACSW Social Work
Leo Eisenstein Medical Student
Barbara Eisold Ph.D. Psychologist
Gina Eixhenbaum-Pikser
Carolina Ekonomo MHP Psychologist
Carolina Ekonomo MBA Psychologist
Omer Elad MSW
Sarah Eley Social Work
Sarah Elgart NP-C Nurse
Mirret El-Hagrassy Physician
Alison Elia
R. Hope Eliasof LICSW Social Work
Ori Elis Psychologist
Jenny Elizabeth
Rosalie Elkinton Nurse
Meira Ellias LCSW-C Social Work
Kayleera Ellins Psychologist
Laura Elliott FNP-BC   Nurse
John Elliott LMFT
Daniel Goldy Psychiatrist
Wendy Most LCSW Social Work
Stepam Tenda Ph.D. Psychologist
Charles Elliot Ph.D., Psychologist
Elizabeth Elliott, Nurse
Lucia Ellis, LCSW
Christine Ellis
Lauren Ellis, APN

Carolyn Ellman Ph.D., Psychologist
Nancy Elman Ph.D., Psychologist
Allison Elmer CPH, Public Health
Britt Elsing LMHC
Parisa Emam
Jo Emerald, Nurse
Jessica Emerson, Social Work
Eleanor Emery M.D., Physician
Kasie Emery
Michelle Emrich M.D.,  Physician
Alicia Enciso Ph.D., Psychologist
Nonso Enekwechi M.D., Psychiatrist
Melissa Engel, Physician
Rachel Engelberg M.D., Physician
Elizabeth  Engelberg Psychologist
Diane Engelman Ph.D., Psychologist
Abigail English
Cristina English, Nurse
Laura Ennis
Ruth Enriquez PT
Dee Enst
D. E-Platt LMT
Ronald Epstein M.D., Physician
Sue Epstein Ph.D., Psychologist
Daniel Epstein
Tamar Epstein-Kaye Psy.D., Psychologist
Anne Erde
Lisa Erlanger M.D., Physician
Suzanne Ernst Psy.D., Psychologist
Emily Eruysal
Cynthia Ervin Ph.D., Psychologist
Sabrina Esbitt Ph.D., Psychologist
Leo Esclamado, Social Work
Susan Esquilin Ph.D., Psychologist
Jenna Essakow, Physician
Todd Essig Ph.D., Psychologist
Roberta Estar Ph.D., Psychologist
Karen Estefane Ph.D., Psychologist
Joey Estrada Ph.D., Social Work
Erin Etzel Ph.D., Psychologist
Lindsay Eun M.D., Physician
Diane Evano
Mary Evans M.D., Physician
Emily Evans
Jeanne Even, Social Work
Sandra Everlove
Elizabeth Evert LCSW-R, Social Work
Nate Ewigman, Psychologist
Daniel Ezzo Medical Student Physician
Laurence Fabre-Welmond, Social Work
Mary Fabri Psy.D., Psychologist
Rebecca Fadil LCSW, Social Work
Sharon Fagin Ph.D., Psychologist
Karen Faherty Rosen Ph.D., Psychologist
Nancy Fair Ph.D.
Dana Fairbanks M.D., Physician
Deborah Fairbanks
Angela Fairweather, Psychologist
Dorothy Falarski
Liz Falco RN, Nurse
Marissa Falkiewicz M.D., Physician
Olivia Familusi, Medical Student
Physician
Nicole Fanarjian Physician
Nora Fandino Social Work
Beverly Fang, Psychiatrist
Shelli Farhadian, Physician
Anthony Farley
Anthony Farley
Elizabeth Farmer, Social Work
Michelle Farmer
Caroline Farnham, Social Work
Minnah Farook, Psychologist
Rachel Farr, Psychologist
Pamela Farrell LCSW, Social Work
Catherine Farrell
MaryCate Farwell

Elizabeth Faus Psy.D., Forensics
Nathan Favini M.D., Physician
Rachel Fay
Shaena Fazal
Piergiuseppe Fedele M.D., Psychiatrist
June Feder Ph.D., Psychologist
Naomi Feiman M.D., Physician
Eric Fein M.D., Physician
Deborah Fein M.D., Physician
Kenneth Feiner, Psychologist
Susan Feingold Psy.D., Psychologist
Ron Feintech Ph.D., Psychologist
Luz Felix-Marquez M.D., Physician
Stephanie Fellenberg Psy.D., Psychologist
Samuel Fels
Joyce Felsenfeld
Jamie Fenimore
Lenore Fenn
Tim Fenton
Hope Ferdowsian M.D., Physician
Robin Ferguson
Luz Fernandez M.D., Physician
Wendy Fernandez
Pamela Fernandez
Marialys Fernandez RDH
Rebecca Fero, Social Work
Aliya Feroe , Physician
Natalie Ferraiolo M.D., Physician
Rebecca Ferri
Chris Ferrill
Ellen Fetchiet, Social Work
Sue Ellen Feuerstein
Jill Fieleke, Nurse
Megan Fiero, Social Work
Sarah Filer RN, Nurse
Beryl Filton Ph.D., Psychologist
Alan Filzer D.D.S.
Meaghen Finan, Physician
Suzann Finch
Nika Finelt M.D., Physician
Mary JohannaFink M.D., Physician
Jo-Ann Finkelstein Ph.D., Psychologist
Toby Finneman
Ellen Finney M.D., Physician
Joan Fiorello Ph.D., Psychologist
Lia Fioroni
Kim Firn
Jennifer Cecilia Fish M.D., Physician
Rachel Fish Psy.D., Psychologist
Angella Fish Pharm.D., Pharmacist
Jessica Fish, Public Health
Anne Fishel Ph.D., Psychologist
Celia Fisher Ph.D., Psychologist
Janet Fisher Ph.D., Social Work
Judy Fisher, Social Work
Josie Fisher
Lana Fishkin, Psychiatrist
Anna Fishzon Ph.D.
Stephanie Fitting CNM, Nurse
Lindsay Fitzgerald LMSW, Social Work
Morgan Fitzpatrick ANP-BC
Megha Fitzpatrick, Physician
William Flack Ph.D., Psychologist
Michelle Fladebo RN, Nurse
Cynthia Flannery LCSW-C, Social Work
Brittany Flemming
Sarah Flemming M.D., Physician
Mark Flescher Ph.D., Psychologist
Ryan Flinn, Psychologist
Monica Flint
Kathleen Flinton LICSW, Social Work
Juan Flores D.O., Physician
 Vanessa Flores M.D.
Sharon Flory LCSW-R, Social Work
Rebecca Flugrad
Beth Flumignan

Milana Flusberg, Physician
Eugene Flynn, Social Work
Ann Flynn  Ed.D. Psychologist
Mary Flynn M.D., Physician
Sharon Flynn M.D., Physician
Monica Fogarty M.D., Physician
Katie Fogel , Public Health
Jennifer Fojtik
Sara Folden LICSW Social Work
Kathleen Foley M.D., Physician
Suzanne Foley
Virginia Fonner Ph.D., Public Health
Noemi Ford, Psychologist
Laura Ford, Social Work
Terence Ford, Psychologist
Elizabeth Ford M.D., Psychiatrist
Kathryn Ford Ph.D., Psychologist
Denisse Forghani M.D., Physician
Jenny Forman Sarno, Social Work
Evan Formosa, Medical Student
Miriam Fors FNP-BC, Nurse
Lisa Fortuna M.D., Psychiatrist
Shelly Foster
Amanda Foster Ph.D., Psychologist
Teresa Foster DO, Physician
Jennie Foster, Physician
Charissa Fotinos M.D., Physician
Eric Fox, Physician
Peter Fraenkel Ph.D., Psychologist
John Frampton Psy.D., Psychologist
Kathy Franchek M.D., Physician
Stephanie Francis
Diana Franco, Social Work
Wendy Franco Ph.D., Psychologist
Marion Frank Ed.D., Psychologist
Arlene Frank Ph.D., Psychologist
Jodi Frankel Ph.D., Psychologist
Steven Frankel M.D., Psychiatrist
Randy Frankel LCSW, Social Work
Heather Frankfort
Katie Franko
Alhambra Frarey, Physician
Elise Fraser
Chris Fraser, Social Work
Elio Frattaroli, Psychiatrist
Jennifer Fray Psy.D., Psychologist
Stacy Frazier, Psychologist
Heather Frechette Psy.D., Psychologist
Karla Fredricks, Physician
Alexis Freedberg M.D., Physician
Wendy Freedman Ph.D., Psychologist
Robin Freedman LPC
Michael Freedman M.D., Physician
Carol Freedman-Doan, Psychologist
Bryony Freij LCSW, Social Work
Shelby French, Social Work
Katherine French, Nurse
Elizabeth Frenette
Erin Frick Psy.D., Psychologist
Joanna Fried M.D., Physician
Jill Frieders PNP, Nurse
Stephen Friedman Ph.D., Psychologist
Jaime Friedman M.D., Physician
Joy Friedman M.D., Physician
Jean Friedman LCSW, Social Work
Jeanne Friedman, Nurse
Heather Frost, Social Work
Lindsay Fry, D.V.M.
Sandra Fryrear LCSW-R, Social Work
Milton Fuentes Psy.D., Psychologist
Annie Fukushima Ph.D., Social Work
Hina Fullar MBBS, Psychiatrist
Jennifer Fuller Psychologist
Ashley Fuller M.D., Physician
Amy Funkenstein M.D., Psychiatrist
Toby Furash, Public Health
Crea Fusco M.D., Physician

Ilaria Fusina, Social Work
Stephanie Gabriel LICSW, Social Work
Sonya Gabrielian M.D., Psychiatrist
Susan Gadoua LCSW, Social Work
Vandy Gaffney M.D., Physician
Deborah Gage, Physician
Anne Gaglioti M.D., Physician
Vivian Gainer
Faith Galderisi D.O., Physician
Miriam Galescu M.D., Psychiatrist
Giselle Galindez
Katharine Gallagher, Social Work
Judith Gallant LCSW-C, Social Work
Kathy Gallardo M.D., Psychiatrist
Dolores Gallegos RN, Nurse
Deborah Gallegos, Nurse
Diane Galleher
Aileen Galley, Social Work
Jacqueline Gallios, Physician
Kelly Gallivan, Nurse
Ashley Gallo, Public Health
Karen Galvan
Laura Galvan
Maria Galvez
Ximena Galvan
Alice Gambardella
Barbara Gamble, Psychologist
Simone Gamble, Social Work
Christopher Gamboa, Public Health
Ingrid Gamez
Joanna Gan M.D., Physician
Laurie Ganberg LICSW, Social Work
Nathalie Gangel
David Gangsei Ph.D., Psychologist
Catherine Gannage
Wendy Garabedian, Physician
Melinda A  Garcia Ph.D., Psychologist
Eric Garcia
Stephanie Garcia AAHIVS, Physician
Cristina Garcia, Physician
Jorge A. Garcia M.D., Physician
Krysti Garcia
Lydia Garcia D.O., Physician
Ximena Garcia M.D., Physician
Ruth Garfield M.D., Physician
Bonnie Garfield, Psychologist
Tracy Garrett Ph.D., Psychologist
Elaine Garrod Psy.D., Psychologist
Theresa Garvin LICSW, Social Work
Leticia Garza
Erin Garza M.D., Physician
Camille Garza Ph.D., Psychologist
Alvaro Garza M.D., Public Health
Aviva Gaskill Ph.D., Psychologist
Cynthia Gasper M.D., Physician
Dafna Gatmon Ph.D., Psychologist
Tami Gatta
Mason Gauss D.V.M.
Brenda Gauthier, Social Work
Tania Gauvin
Athena Gavaris, Social Work
Megan Gaydos, Public Health
Helen K. Gediman Ph.D., Psychologist
Nan Gefen  Ph.D., Social Work
Kristi Geissler Ph.D., Psychologist
Jenny Geller, Social Work
Marx Genovez M.D., Physician
Jill Gentile Ph.D., Psychologist
Emily Georges
Lisa George-Svahn Nurse
Jean Geran Ph.D.
Susan Gerber M.D., Physician
Jaime Gerber M.D., Physician
Lisa Gerdes, Nurse
Margie Gerena Lewis M.D., Physician
Ann Gerhardt M.D., Physician
Mindy Gershon

Samuel Gerson Ph.D., Psychologist
Ruth Gerson M.D., Psychiatrist
Barbara Gerson Ph.D., Psychologist
Meg Gerstenblith, Physician
Erin Gertz  M.D., Physician
Frances Geteles Ph.D., Psychologist
Lindsay Gezinski Ph.D., Social Work
Sogand Ghassemi M.D., Psychiatrist
Lia Giannosa
Elizabeth Gibbons, Social Work
Joanna Gibbons D.O., Physician
Matthew Gibson, Psychiatrist
Samantha Gibson
Randall Gicker RN, Nurse
Victoria  Giffi M.D., Physician
Jonathan Giftos M.D., Physician
Shawn Gilbert
Sara Gilbert Ph.D., Psychologist
Jill Gilbert  M.D., Physician
Jacqueline Gilbert Psy.D., Psychologist
William Gilbert Ph.D., Social Work
Laelia Gilborn, MPH, LICSW
Kelly Gilbreth, Social Work
Ashu Gill M.D., Psychiatrist
Lily Gill
Alissa Gilles, Physician
Linda Gillespie
Kristina Gilley LCSW, Social Work
Theresa Gillis M.D., Physician
Martha Gilmore Ph.D., Psychologist
Katherina Gindinova
Larry W Gingold Psy.D., Psychologist
Janice Ginsberg, Social Work
Taania Girgla
Blean Girma MPH, Public Health
Caroline Giroux M.D., Psychiatrist
Deborah Giroux, Psychologist
Sarah Girresch-Ward
Marguerite Girton
Hannah Gissel
Bonnie Gitlin LCSW-R, Social Work
Andrea Gitter
Deborah Glasofer Ph.D., Psychologist
Chsrles Glasser
Jane Glassman Ph.D., Psychologist
Kira Glassman, Social Work
Heather Glaze
Kate Glazer LCSW, Social Work
Aaron Gleason Ph.D., Psychologist
Sarah Gleason
Ariel Glick  Psy.D., Psychologist
Rosalyn Glicklich, Psychologist
Jason Glover M.D., Physician
Karen Gluck, Physician
Monica Gocial LCSW, Social Work
Emma Godfrey
Nicolette Godlove
Anju Goel, Physician
Brooke Gogel
Claudia Gold, Physician
Linda Gold
Denise Gold
Gina Gold, Psychologist
Aryeh Goldberg M.D., Psychiatrist
David Goldberg Psy.D., Psychologist
Joan Goldberg Ph.D., Psychologist
Gary Goldberg Ph.D., Psychologist
David Goldberg M.D., Physician
Alyssa Goldberg, Social Work
Inna Goldberg, Social Work
Andrea B. Goldberg LCSW, Social Work
David Goldberg M.D., Physician
Judith Goldberger RN, Nurse
Roberta Golden Ph.D., Psychologist
Lisa Goldenberg
Ranny Goldfarb LCSW-R, Social Work
Lorrie Goldin LCSW, Social Work

Laurie Goldman
Daniel Goldman Ph.D., Psychologist
David Goldman M.D., Physician
Gretchen Goldman Ph.D.
Angela Goldman
William Goldman
Andrew Goldstein M.D., Physician
Debra Goldstein
Theresa Goldstein
Janice Goldwater ANP-HIV, Social Work
Amy Golightly Ph.D., Psychologist
April Goller D.O., Physician
Meilan Goller, Social Work
Jolie Golom, Social Work
Linda Golumbia Ph.D., Psychologist
Insiyah Gomberawalla, Physician
Richard Gomberg, Psychiatrist
Lynda Gomberg
LeslieAnn Gomes
Ruth Gomez, Public Health
Rebecca Gomez M.D., Physician
Maria Gomez Soler
Cristina Gomez-Vidal MSW, Social Work
Tara Gomez-Vidal, Nurse
Carmela Gonzales M.D., Physician
Duvis Gonzalez, Social Work
Paola Gonzalez Psy.D., Psychologist
Monique Gonzalez Psy.D., Psychologist
Paola Gonzalez, Physician
Chris Gonzalez Ph.D.
Yvette Gonzalez LCSW, Social Work
Erin Gonzalez M.D., Physician
Sandra Gonzalez M.D., Physician
Joanna Good
Sue Goodell
Joanna Goodman Ph.D., Social Work
Geoff Goodman, Psychologist
Michaele Goodman, Psychologist
Sharon Goodman, Social Work
Nichole Goodsmith M.D., Psychiatrist
Rutmi Goradia
Michelle Gordon M.D., Physician
Carol Gordon Psy.D., Psychologist
Lynn Gordon
Emma Gordon, Physician
Carolyn Gordon, Ph.D.
Patricia Gordon MSN, Nurse
Timothy Gordon
Amanda Gordon, Social Work
Jessica Gorelick, Social Work
Katherine Gorell
Laurie Goren Psy.D., Psychologist
Susan Gorey LCSW, Social Work
Amy Gorman
William Gorman Ph.D. Psychologist
Irena Gorski MPH, Public Health
Victoria Gosy, Physician
Katherine Gotch, Psychologist
William Gottdiener Ph.D., Psychologist
Michelle Gottlieb
Robert Gould M.D., Physician
Elaine Gould Ph.D., Psychologist
Edith Gould, MSW
Andrea Gouze
Susan Grabenstatter
Brian Graber
Amanda Graber
Jacqueline  Grace, Public Health
Zach Grady Medical Student Physician
Francoise Graf Ph.D., Psychologist
Amy Graf Psy.D., Psychologist
Ashleigh Graham
Monica Grandy Ph.D., Psychologist
Arthur Grant, Physician
Julieann Grant M.D., Physician
Elaine Grant
Judith Grant

Ashley Grant DO, Physician
Sharmila Grant LCSW, Social Work
Erin Graves, Nurse
Julie Gravs M.D., Physician
Lorraine Gray, Psychologist
Brandon Gray, Psychologist
Staci Gray  PA-C
Barbara Gray Ph.D., Psychologist
Susan Greco, Physician
Stacy Green Ph.D., Social Work
Ilene Green Ph.D., Psychologist
Monica Green Ph.D., Psychologist
Katrina Green M.D., Physician
Jane Green , Nurse
Ann Green APRN, Nurse
Brittany Greenbaum
Suzan Greenberg Psy.D., Psychologist
Melissa Greenberg, Psychologist
Henry Greenberg, Physician
Nancy Greenberg MSW, Social Work
Traci Greenberg
Ronnie Greenberg Psy.D., Psychologist
Rena Greenblatt Ph.D., Psychologist
Jennifer Greene-Hall, Social Work
Linda Greenfielf
B Greenstein
Ruth Greenthal Ph.D., Psychologist
Astrea Greig Psy.D., Psychologist
Andrea Greiner M.D., Physician
Lori Gresham, Ph.D.
Catharine Grey
Susan Griffin, Social Work
Jennifer Griffin, Social Work
Thea Griffin
Annette Griffin, Social Work
Kelly Griffin M.D., Physician
Jan Griffin
Jessica Griffith
Amanda Griffiths CSW Forensics
Henry Grinberg Ph.D.
Christina Gringeri, Social Work
Kim Griswold M.D., Physician
Meg Griswold
Kira Gritsman M.D., Physician
Jerry Grodin
Allison Grolnick M.D., Psychiatrist
Amber Groomes Ph.D.,Psychologist
Amanda Gropp, Social Work
Mark Grosch
Richard Grose
Sarah Jane Grossbard, Psychiatrist
Luanne Grossman Psy.D., Psychologist
Katherine Groundwater, Nurse
Brie Grousebeck, MD
Sasha Growick
Shelly Gruenbacher  M.D., Physician
Ruth Gruenthal, Social Work
Ethan Grumbach
Sarah Gubits LSW, Social Work
Omar Gudino, Psychologist
Brandon Guenthart M.D., Physician
Jacqueline Guerrero
Christina Guerrier
Corinne Guest LSW, Social Work
Natalie Guevara Lehman LCSW-C, Social Work
Jennifer Guglia, Nurse
Sharon Guld Stitt LMSW, Social Work
Gypsy Guillen Kaiser
Judith Gulko, Psychologist
Adriane Gullotta-Gsell Ph.D., Psychologist
Nancy Gump LMT, Psychologist
Martina Gunaratnam M.D., Psychiatrist
Traci Gunn
Megan Gunnell, Social Work
Johanna Gunther
Michelle Guo, Medical Student, Physician

Parul Gupta M.D., Physician
Stephen Gurley, Physician
Jessica Gutchess, Social Work
Elisabeth Guthrie M.D., Physician
Ivonne Gutierres
Amy Gutierrez, Physician
Alisa Gutman, Physician
Gail Guttman LCSW-C, Social Work
Terilye Guzman, Social Work
Shelly H LCSW, Social Work
Michelle Haas M.D., Physician
Eric Haas Ph.D. Psychologist
Danielle Haber M.D., Psychiatrist
Sue Hacker
Barbara Haddeb
Jack Davis Haden LCSW, Social Work
Erin Hadley Ph.D., Psychologist
Julia Hadley
April Haefner
Ana Hagstrand, Psychologist
Emily Hahn M.D., Physician
Mara Haight LMHC, Administrator
Margaret Hainer LCSW-R, Social Work
Mona Halket
Nicole Hall
Linda Hall
Timothy Hall M.D., Physician
Madhura Hallman M.D., Physician
Jaclyn Halpern Psy.D.
Antonia Halton Ph.D., Psychologist
Erin Hambrick Ph.D., Psychologist
Horace Rhodes Hambrick M.D., Physician
Kristin Hambridge LICSW, Social Work
Paul Hamburg, Psychiatrist
Fran Hamburg, Social Work
Susan Hameline-Kasznay
Lou Hamilton LCSW, Social Work
Katie Hamilton
Lori Hamilton
Dianna Hamilton
Cyndrita Hamilton D.O., Physician
Ashley Hamm LPC
Jacquelyn Hammel, Nurse
Susan Hammond
Magni Hamso M.D., Physician
Christine Hancock M.D., Physician
Stanley Handmaker M.D., Physician
Scott Handy
Kiley Hanish
Kelly Hankins M.D., Physician
Lauren Hanley M.D., Physician
Tricia Hanley Ph.D., Psychologist
Judith Hanlon Ph.D., Psychologist
Sylvia Hanlon
Betsy Hanna, Psychologist
Rebekah Hanna, Nurse
Meredith Hannan M.D., Psychiatrist
Claire Hannes
Andrea Hannold LCSW, Social Work
Melissa Hansen
Katie Hansen
Diana Hansen, Physician
Anita Haravon Ph.D.
Corey Hardin Ph.D., Physician
Laurie Hardin LPN, Nurse
James Harding, Psychologist
Susan Hardy, Social Work
Allison Hare, Physician
April Harger
Nicole Harkin M.D., Physician
Madeline Harms Ph.D., Psychologist
Mary Harrel M.D., Physician
Aimee Harrington, Public Health
Rschel Harrington-Levey Ph.D.,
Psychologist
Kathleen Harris MSW, Social Work
Natasha Harris, Nurse

Frances Harris Ph.D., Psychologist
Celeste Harris, Social Work
Amber Harris, Psychologist
Jennifer Harris
Lauren Harris
Meghan Harris Psy.D., Psychologist
Jane Harrison
Georgette Q. Harrison
Angie Harrison
Mary Harrison
Dana Harron Psy.D., Psychologist
Kelly Hart PA-C
Rachel Hartline M.D., Physician
Jessica Harwick
Mary Lou Harwood
Genevieve Hasek M.D., Physician
Walaika Haskins
Geri Hason PA-C
Giselle Hass Psy.D., Psychologist
Teresa Hassay
Jane Hassinger, Social Work
Shannon Hassler MSEd
Samar Hassouneh, Physician
Khoiviet Hathuc, Psychiatrist
Kale Hatsushi M.D., Psychiatrist
Lisa Hauck-Loy
Samantha Hauff M.D., Physician
Martin Hauser
Tatiana Havryliuk, Physician
Pamela Hawkesworth
Kristin Hawkin
Donna Hawxhurst Ph.D., Psychologist
Johannah Hay M.D., Physician
Amber Hayes Psy.D., Psychologist
Kathy Hayes-Bloch, Social Work
Jennifer Hayslett
David Hayward Ph.D.
Maria Hazen
Jane Hazen
Helen Healy, Physician
Amy Heberle, Psychologist
Michele Hecker Ph.D.,Psychologist
Kristin Hedgeock, Nurse
Elizabeth Hegeman Ph.D., Psychologist
Claudia Heilbrunn
Doug Heimburger M.D., Public Health
Elizabeth Heimburger RN, Nurse
Trina Heinisch, Social Work
Arthur Heiserman Dr.PH., Psychologist
Michele Heisler, Physician
Asal Hejazi
Alisa Helfgott D.O., Physician
Gabriel Heller
Deborah Hellerstein
Iris Hellner Ph.D., Psychologist
Paul Helman M.D., Physician
Sara Henderson
Jo Henderson-Frost M.D., Physician
Steven Hendrin Ph.D., Psychologist
Bridget Hendricks
Rebecca Hendrickson, Psychiatrist
Michael Hendrickson Ph.D., Psychologist
Karen Henley, Psychiatrist
Jewell Henley M.D., Physician
Kathi Hennessey LICSW, Social Work
David Henning
Dell Henriksen-DelVerne, Nurse
Cassis Henry, Physician
Alyson Henry Ph.D., Psychologist
Linda Henry
Sara Henry M.D., Physician
Rachel Henry M.D., Physician
Anne Herdman Royal M.D., Physician
Barbara Herman, Psychologist
Susan Herman Ph.D., Psychologist
Leticia Hernadwz, Physician
Mary Hernandez

Nicholas Hernandez
Juliana Hernandez, Nurse
Cinthia Hernandez
Guadalupe Hernandez, Psychologist
Laura Hernandez M.D., Physician
Emily Hernandez Pounds, Social Work
Kristina Herold, Social Work
Linda Herreid Psy.D., Psychologist
Elizabeth Herring, Social Work
Anita Herron, Psychologist
Philip Herschenfeld LMSW, Physician
Owen Hershey
Brooke Hersh-Thompson, Psychologist
Justin Hersom LCSW, Social Work
Kate Herts, Psychologist
James Herzog M.D. Psychiatrist
Joseph Herzog
Kali Hess
Arlene Heyman M.D., Psychiatrist
Simone Heyward Psy.D., Psychologist
Julie Hibbs, Social Work
Leslie Hibdon
Janelle Hickey, LMHC
Cristina Hidrobo
Michelle Higgins, Physician
Linda Higley Ph.D., Psychologist
Joan Hill
Kevin Hill
Tisa Hill MPH
Carol Hillson
Laura Himmelstein, Social Work
Jessica Himmelstein, Physician
Tatiana Hinds
Adam Hines
Denise Hines Ph.D., Psychologist
Rachel Hines, Physician
Danielle Hines
Virginia Hines
Virginia Hines, PA, LMHC, Psychologist
Natalie Hinojosa, Social Work
Stephanie Hinojosa M.D., Physician
Carla Hinson
Katya Hirose
Karyn Hirsch MPH, Physician
Britta Hirsch
Harriet Hirsch
Miriam Hirschstein, Psychologist
Lauren Hittner, Physician
Todd Hixson
Tazley Hobbs M.D., Psychiatrist
Jennifer Hobbs
Shelley Hoberman, Social Work
Jay Hochheiser, Social Work
Alissa Hochman, Psychologist
Kayce Hodos LPC
Jennifer Hoffman, Physician
Tim Hoffman
Jennifer Hoffmann M.D. Physician
Alexander Hogan M.D., Physician
Vijaya Hogan, Public Health
Julia Hoke, Psychologist
Karen Holland
Joy Holland
Karen Holland
Amanda Holland-Yang  M.D., Physician
Heather Holley D.O., Physician
James Holmes Dr.PH.
Thomas Holmes, Social Work
Molly Holshouser ANP-BC, Nurse
Russell Holstein Ph.D.,Psychologist
Keren Holt, Social Work
Layra Holt, Physician
Amanda Holt, Administrator
Roberta Holtz
Margaret Holtzman, Social Work
Barbara L. Holzman LICSW, Social Work
Jessica Hong LMSW, Social Work

Maria Hood, Social Work
Filippine Hoogland, Nurse
Kathryn Hooker Ed.S.
Walter Hoops
Jennifer Hope Ph.D., Psychologist
Karen Hopenwasser M.D., Psychiatrist
Phyllis Hopkins Ph.D., Psychologist
Erin Hopkins, Psychiatrist
Brittany Horan
Evelyn Horn M.D., Physician
Jessica Horowitz
Beth Horowitz, Physician
Sharon Horowitz Ph.D. , Psychologist
Tammy Horowitz M.D., Psychiatrist
Susan Horrell, Nurse
Sarah Horsley
Helen Horton
Christy Horton M.D., Physician
Danielle Horwich, Social Work
Mark Horwitz Ph.D., Social Work
Jill Horwitz, Social Work
Peggy Horwitz
Jan Horwitz, Social Work
Ava Hosseini, Nurse
Elizabeth Hossfeld
Marion Houghton LMFT
Wendy Hounsel, Nurse
Jonathan House M.D., Psychiatrist
Donna Housman Ed.D., Psychologist
Stephanie Houston, Physician
Margaret Howard LCSW, Social Work
Sarah Howard
Celeste Howard
Mary Howe
Amanda Howell
Stefanie Hoye, Psychologist
Nicole Hsiang
Sheng Hsu ANP-BC
Julie Hsu Ph.D., Psychologist
Tiffany Hu
Sofia Hu
Judy Hu, Psychologist
Jennifer Huang M.D., Physician
Jacqueline Hubbard
Olivia Hudis
Stephanie Hudson
Sara Huffer M.D., Physician
DiShonda Hughes
Wilson Hughes
Larissa Hughes
Joy Hughes M.D., Physician
Julie Hughes M.D., Physician
Sandra Hughes
Katherine Hughes, Social Work
Margaret Hughes, Social Work
Katherine Hull Psy.D., Psychologist
Jane Hull-McIntire M.D., Physician
Odile Hullot-Kentor, Psychologist
Leslie Hulvershorn M.D., Physician
Ed Humenay LMSW, Social Work
Kenneth Hung, Psychiatrist
Amber Hunt D.O., Psychiatrist
Margaret Hunter, Social Work
Rene Hunter M.D., Physician
Ellesa Hunter, Non-MD
John Hunziker Ph.D., Psychologist
Tracey Hurd Ph.D., Psychologist
Irene Hurford M.D., Psychiatrist
Samantha Hurst Ph.D.
Taisha Husbands
Melissa Huser
Amber Hussain M.D., Physician
Mohammed Hussain, Physician
Ewa Hut
Charkivia Hutchinson
Jeff Hutchinson, Physician
Ciara Hutchison

Stacy Hutton Ph.D., Psychologist
Carolee Hutton
Elizabeth Huynh LICSW, Social Work
Cathy Hwang M.D., Physician
Irene Hwang M.D., Physician
Juliet Hwang, Physician
Daniel Hynan Ph.D., Psychologist
Viola Hysa
Kristen Hysell M.D., Physician
June Hyun Ph.D.
Vince Iacopino, MD
Habiba Ibrahim, Social Work
Deborah Igielnik, Public Health
Cindy Iglesias
Lynne Iijima
Roya Ijadi-Maghsoodi  M.D., Psychiatrist
Aleksandra Ikanowicz
Christina Illarmo, Social Work
Julia Imig
Pec Indman, LMFT
Sarah Ingerman, Social Work
Mary Intermaggio, R.N., Nurse
Olga Iof
Muneeza Iqbal MPH, Public Health
Khadija Irshad M.D., Physician
Angela Irvine Ph.D.
Anne Irza-Leggat
Kathleen Isaac Ph.D., Psychologist
Ellen Isaacs M.D., Physician
Jeri Isaacson, Psychologist
Amy Isenberg M.D., Physician
Genoveva Islas, Public Health
Ellen Israel CNM, Public Health
Carol Israel Ph.D., Psychologist
Janet Isserlis
Meg Itoh M.D. ,Physician
Louise Ivers M.D., Public Health
Gayle Iwamasa Ph.D., Psychologist
Casie Iwata LICSW, Social Work
Preetha Iyengar, Physician
William Jackson
Cara Jacob M.D., Physician
Sneha Jacob M.D., Physician
Lisa Jacobs, Psychologist
Leah Jacobs, Social Work
Mary Jacobs LMSW, Social Work
Barbara Jacobsberg, Social Work
Lawrence Jacobsberg, Psychiatrist
Erin Jacobsen
Lauren Jacobson, Nurse
Louis Jacobson Dr.PH., Psychologist
Melissa Jacobson LCSW, Social Work
Anne Jacobson  M.D., Physician
Alexandra Jacobus LCSW, Social Work
Veta Jacqulin
Tracey Jaeger, Nurse
Felipe Jain, Psychiatrist
Chandni Jain, Medical Student Physician
Juhi Jain M.D., Physician
Amy Jakobson Psy.D., Psychologist
Otana Jakpor
Karen Jakpor M.D., Physician
Rima Jakuc, Psychologist
Beatriz Jamaica
Megan James
Aisha James, Physician
Steven James Ph.D., Psychologist
Lynn James
Elizabeth James
Sara Jamison, Social Work
Anna Jannack LMHC
Laura Jannack M.D., Physician
Kathleen Janocko Ph.D., Psychologist
Eliza Jaquez, Psychologist
Ivan Jaramillo
Karen Jaranowski M.D., Physician
Leila Jarrahi Ph.D., Psychologist

Lekeshia Jarrett, Physician
Susan Jasko LICSW, Social Work
Cynthia Jauregui, Psychologist
Laura Javsicas
D. Jay Psy.D., Psychologist
Patty Jay
Robert Jayes M.D., Physician
Abhishek Jaywant Ph.D., Psychologist
Elizabeth Jefferson
Tereza Jelenova LMHC, Other Health
Professional
Susan Jenkins
Sara Jennings, Forensics
Laurel Jennings M.D., Physician
Lisa Jensen-Albino, Nurse
Jennifer Jerome M.D., Physician
B Jesrani, Psychologist
Jamie Jessar Psy.D., Psychologist
Mariell Jessup M.D., Physician
Toni Jett
Greg Jew
Christina Jewell, Nurse
Elena Jimenez Gutierrez M.D., Physician
Lara Jirmanus M.D., Physician
Brian Jo Ph.D., Psychologist
Anne Jobman M.D., Physician
Steven Joffe M.D., Physician
Richard Johansen, Nurse
Veronica Johnson Ph.D., Psychologist
Anthony Johnson
Christina Johnson, Social Work
Estefana Johnson LMSW, Social Work
Carrie Johnson LCSW, Social Work
Wendy Johnson M.D., Physician
Steve Johnson
Benjamin Johnson
Meghan Johnson
Nathan Johnson, Social Work
Ann Johnson D.V.M.
Christie Johnson RN, Nurse
Amy Johnson M.D., Physician
Claudine Johnson M.D., Physician
Laurie Johnson M.D., Physician
Amy Johnson-Colwell Ph.D., Psychologist
Emily Johnston, Physician
Julie Johnston M.D., Physician
Cameron Jones
Jennifer Jones, Social Work
Lisa Jones M.D., Physician
Liz Jones, Nurse
Julie Jones Ph.D., Psychologist
Lori Jones  LPN, Nurse
Raina Jones, Psychologist
Darrah Jones
Patricia Jones
Charles Jones RN, Nurse
Michelle Jones
Kelly Jones Ph.D., Psychologist
Taiya Jones-Castillo LSW, Public Health
Pablo Joo M.D., Physician
Hilary Jordan LCSW, Social Work
Jayne Jordan PA-C
Paula Jordan
Katie Jorstad, Social Work
Jessica A. Joseph Ph.D., Psychologist
Giliane Joseph M.D., Physician
Melissa Joseph, Physician
Meghna Joshi M.D., Physician
Margarita Jovel M.D., Physician
Marianne Joyce, Social Work
Kelly Joyce M.D., Physician
Sheena Joychan M.D., Psychiatrist
Kasey Joyner M.D., Physician
Alana Ju M.D., Physician
Werner Ju  M.D., Physician
Silvia Juarez-Marazzo, Social Work
Stephanie Jucker

Laura Judd-Glossy Ph.D., Psychologist
Elyse Julian D.O., Physician
Janice Juliano LCSW, Social Work
Stefanie Juliano
Vonda Jump Norman   Ph.D., Social Work
Nadia Juneja M.D., Physician
Jeff Juris
Elliot Jurist Ph.D., Psychologist
Samantha Jurman, Social Work
Maryann Juska Ph.D., Psychologist
Renee Kabbaby LMT, Psychiatrist
Rizowana Kabir
Sarah Kacic PT
Tessy Kadavil M.D., Physician
Pamela Kaden
Elizabeth Kadlub J.D.
Lindsey Kadrmas, Physician
Dalia Kahn Ph.D., Psychologist
Ellen Kahn LICSW, Social Work
Justine Kahn M.D., Physician
Ellen Kahn
Kendra Kain
Manvinder Kainth M.D., Physician
Laura Kair M.D., Physician
Wendy Kaiser, Social Work
Justine Kalas Reeves Dr.PH., Psychologist
Michelle Kalehzan Ph.D., Psychologist
Thomas Kalman M.D., Psychiatrist
Amanda Kalstabakken Ph.D.
Syamala Kalyanasundaram MScPH
Amy Kamel, Social Work
Sarah Kamens, Psychologist
Dianne Kaminsky, Social Work
Dede Kammerling LCSW, Social Work
Pallavi Kamra MBBS, Physician
Barbara Kane
Jyoti Kaneria
Taryn Kanick
Jacqueline Kann LICSW, Social Work
Mounika Kanneganti, Medical Student
Jamie Kantola M.D., Physician
Abbey Kanzer Psy.D., Psychologist
Maureen Kapatkin, APRN-BC
Navah Kaplan, Non-MD
Judy Kaplan, Social Work
Leslie Kaplan
Shari Kaplan, Social Work
Stuart Kaplan
Deborah Kaplan Dr.PH., Public Health
Emma Kaplan-Lewis, Physician
Rifka Kaplan-Peck
Neeti Kapur M.D., Physician
Sarah Kardelen
Shahrzad Kardooni M.D., Physician
Saima Karim D.O., Physician
Marcus Karim, Medical Student
Sanjana Karim M.D., Physician
Farah Karipineni M.D., Physician
Lisa Karlin LCSW, Social Work
Lisa Karlin LCSW, Social Work
Cassie Karlsson M.D., Physician
Mel Karmen Ph.D., Other Health Professional
Sophie Karp Ph.D., Psychologist
Amie Karp LCSW-R, Social Work
Ian Karrington, Medical Student Physician
Justin Karter
Virginia Kartha M.D., Physician
Lisa Kartiganer, Social Work
Kumari Karunaratne
Elizabeth Kaselitz MSW, Social Work
Susan Kashubeck-West Ph.D., Psychologist
Alexa Kaskowitz M.D., Physician
Florence Kaslow Ph.D., Psychologist
Amelia Kasper M.D., Physician
John G. Kassakian, Sc.D, Scientist

Beth Kastner, Psychologist
Ravi Katari M.D., Physician
Craig Katz  M.D., Psychiatrist
Dr. Robert  Katz Ph.D., Psychologist
Maureen Katz M.D., Physician
Jacklyn Katz M.D.
Jill Katz Psy.D., Psychologist
Gil Katz Ph.D., Psychologist
Sheba Katz Ph.D., Psychologist
Nina Katz
Janice Katz, Social Work
Theresa Kaub Psy.D., Psychologist
Priscilla Kauff C-GNP, Psychologist
Gus Kaufman Ph.D., Psychologist
Marlene Kaufman LCSW, Social Work
Judy Kaufman Ph.D.
Limor Kaufman Ph.D., Psychologist
Toby Kaufman Dr.PH., Psychologist
Peggy Kaufman, Social Work
Elizabeth Kaufman
Kirandeep Kaur D.O., Psychiatrist
Kenneth Kavanagh ARNP, Nurse
Alison Kavanaugh, Physician
Elaine Kaur M.D., Physician
Babe Kawaii Ph.D., Psychologist
Erica Kaye, Physician
Susan Kaye-Huntington, Psychologist
Ralph Kaywin D.M.H., Psychologist
Jack Keane
Karla Keaney, Physician
Lisa Kearns
Sandra Kearns Ph.D., Psychologist
Terence Kearse Ph.D., Psychologist
Jane Keat Psy.D., Psychologist
Victoria Keck
Samantha Keeble Ph.D., Other Scientist
Christina Keefe, Psychologist
Annalise Keen M.D., Psychiatrist
Melissa Keene M.D., Physician
Courtney Keene, Physician
Jennifer Kehl, Nurse
Sylvia Kehlenbrink, Physician
Jennifer Keihner, Physician
Ralph Keith, Psychologist
Briony Keith
Heather Kelker, Physician
Margaret Kell
Mary Kelleher LMFT, Psychologist
Stacy Keller
Elizabeth Kelliher, Nurse
Katherine Kelling
Donna Kelly, LCPC
Mary Kelso Ph.D., Psychologist
Colleen Kemp RN, Nurse
Emily Kemper M.D., Physician
Jill Kempner
Rachna Kenia M.D., Physician
Eva Kennedy, Nurse
Wendy Kennedy
Lois Kennedy Psy.D., Psychologist
Jane Kenner Ph.D., Psychologist
Keelia Kentor
Mary Ellen Keough
Michael Keren, Physician
Carol Kessler
Libby Kessman LCSW, Social Work
Billy Ketchum
Kathleen Ketofsky, Social Work
Sue Ann Kettelkamp Ornelas
Alisha Ketterer, Physician
Alex Kettner Psy.D., Psychologist
Hanaa Khadraoui
Urooj Khalid
Asma Khalid M.D., Physician
Abdul Khaliq
Sahib Khalsa M.D., Physician
Aleem Khan, Medical Student

Anna Kharaz
Deepa Khoday D.O., Physician
Lama Khouri, Social Work
Michael Khoury, Physician
Stephanie Khoury D.Phil., Non-MD
Kiranpreet Khurana, Physician
Christina Kiel Psy.D., Psychologist
Kathleen Kilcline, Social Work
Terrence Killian, Social Work
Kyle Killian LMFT
Krista Kim M.D., Physician
Jean Kim   M.D., Psychiatrist
Christie Kim
Grace Kim  Ph.D., Psychologist
Inkyu Kim
Mike Kim, Physician
Simeon Kimmel M.D., Physician
Georgia King, Social Work
Margaret King Psy.D.
Jessie King M.D., Physician
Kevin L King M.D., Physician
Daniella Kington M.D., Physician
Anne Kinnaman MSN
Kelly Kirby LCSW-R, Social Work
Anne Kirchhoff Ph.D.
Jessica Kirkwood M.D., Physician
Judith Kirschner
Jennifer Kirshner
Naomi Kirtner
Gretchen Kishbaugh Ph.D., Psychologist
Paul Klaene
Karen Klarquist
Margreta Klassen, Psychologist
Annegret Klaus
Judith Klein, Social Work
Judith Klein, Social Work
Scott Klein
Roxanne Klein
Jennifer Kleindienst
Laura Kleinerman
Sidney Kleinman Ph.D., Psychologist
Sarah Klee, Medical Student
John Kleschinsky Dr.PH., Public Health
Marcie Klevens
Judith Klimoff Psy.D., Psychologist
Barbara Kline LCSW-C, Social Work
Nolan Kline Ph.D., Public Health
Denise B. Klinkner M.D., Physician
Ted Kluger
Philip Knapp M.D., Physician
Kimberly Knesting Ph.D., Psychologist
Paula Knight
Alexander Knops
Dennis Kobray
Lindsey Koch
Seema Kochhar M.D., Psychiatrist
Julia Koehler, Physician
Kathleen Koenigs
Debra Koenigsberger M.D., Physician
Laura Kogan Psy.D., Psychologist
Irina Kogan Ph.D.
Laura Kogel LCSW, Social Work
Jacqueline Kohl M.D., Physician
Teresa Kohlenberg M.D., Psychiatrist
Sharad Kohli M.D., Physician
Deborah Kohn
Nancy Koke LCSW, Social Work
Avani Kolla
Donald Kollisch M.D., Physician
Russell Kolts Ph.D., Psychologist
Udit Kondal M.D., Physician
Tracy Kondla, Social Work
Elizabeth Kooperkamp, Social Work
Diane Kopan, Social Work
Dawn Kopp OB/GYN, Physician
Mary Ann Kopydlowski RN, Nurse
Dorit Koren, Physician

Cathie Korey M.D., Physician
Alfred Kornfy Ph.D., Psychologist
Jennifer Kornreich Ph.D., Psychologist
Kathyrn Korte, Nurse
Deborah Kory Psy.D., Psychologist
Elizabeth Koryciak RN, Nurse
Todd Koser Psy.D., Psychologist
Sindhu Koshy M.D., Physician
Kenneth Kosik M.D., Physician
Adrianne Kotecki, Psychologist
Stefanie Kotzen LCSW, Social Work
Sommer Kraft-Purvis LMHC
Laurie Kramer Ph.D., Psychologist
Thomas Kramer M.D., Psychiatrist
Loren Krane Ph.D., Psychologist
Rita Krane, Physician
Erin Kratz D.O., Physician
Caroline Krause
Lisa Kraushaar
Rachel Kraut, Nurse
Kerry Kravitz M.D., Psychiatrist
Erika Kreider
Ruth Kreitzman, Social Work
Pamela Krell
Sheila Krishna M.D., Physician
Sheila Krishnan MPH, Public Health
Dena Krishnan D.O., Physician
Brian Kroener, Physician
Karen Krongold, Psychologist
Debbie Kroopkin, Social Work
Delores Kropf
Nancy Krtek LCSW-R, Social Work
Joseph Kruft, Psychologist
Jean Kruger
Scott Krugman M.D., Physician
Elizabth Kubik Ph.D., Psychologist
Alison Kuchta M.D.
Alexis Kuerbis LCSW, Social Work
Robert Kuisis Ph.D., Psychologist
Michele Kulbel, Nurse
Bridget Kulbel
Jaime Kulbel, Nurse
Nikhil Kulkarni M.D., Physician
Divya Kumar, Psychologist
Anika Kumar M.D., Physician
Sanaz Kumar, Physician
Vaishali Kumaraguru
Justin Kung M.D., Psychiatrist
Howard Kunin, Psychologist
Tracli Kunkel Ph.D., Psychologist
Natasha Kurchanova
Sarah Kureshi M.D., Physician
Traci Kurtzer M.D., Physician
Andrea Kurtzman, Nurse
Judith Kurzer, Social Work
Arielle Kushman
Naama Kushnir Barash Ph.D.,
Psychologist
Jonathan Kusner
Katherine Kuvalanka Ph.D.
Nina Kvaratskhelia, Physician
June Lee Kwon, Psychologist
Daniel Kyle
Jade La Rochelle
Mona LaBar MBBS, Physician
Amy Labar
Emily Labudde
Joseph Lacy, Social Work
Alice Ladas Ed.D., Psychologist
Miri Lader M.D., Physician
Diana LaFontaine M.D., Physician
Gina LaGalbo M.D., Physician
Andrew Lagomasino, Psychologist
Tiffany Lahr M.D., Physician
Alexandra Laifer Neumann Ph.D.,
Psychologist
Jeannine Lain

Christopher Laine
Tamra Laird RN, Nurse
AeuMuro Lake M.D., Physician
Michael Lakin Ph.D., Psychologist
Maria Lakis LCSW-R, Social Work
Sudesna Lakshman M.D., Physician
Lila Lamar
Michael Lamb, Physician
Everett Lamm M.D., Physician
Emily Lamont
Katharine Lamperti, Physician
Cecilia Land, Social Work
Helen Landon Ph.D., Psychologist
Jasmine Landry,
Mieke Lane D.O., Physician
Jeffrey Lanfear Psy.D., Psychologist
Frances Lang LICSW, Social Work
Molly Lang LMSW, Social Work
Elaine Lang, Psychologist
Robin Lang, Psychologist
Jason Lang, Psychologist
Holly Lang
Kelly Lange LMSW, Social Work
Regina Langhout Ph.D., Scientist
Cathey Lanham, Psychologist
Tracey Lanier, Nurse
Christopher Lanoue M.D., Physician
Jayette Lansbury
Melanie Lantz Ph.D., Psychologist
Fruzsina Lanyi
Kerry Lao MSW, Social Work
Carole Lapidus LCSW-R, Social Work
Regina LaRocque, Physician
Roxi Larsen
Todd Larsen Ph.D., Psychologist
Camilla Larsen M.D., Physician
Korsica Lassiter M.D., Physician
Tamara Latawiec Psy.D., Psychologist
Finza Latif, Psychiatrist
Katherine Lau
Theresa Lau, Psychiatrist
Jami Laughlih
Linda R Laughlin Ph.D., Psychologist
Casey Laukkanen D.V.M.
Gerald Lauria M.D., Physician
Vanessa Lauzon M.D., Psychiatrist
Audrey LaVallee,
Monica Lavayen
Barbara Lavi Psy.D., Psychologist
Stephanie Law Psy.D., Psychologist
Anica Law M.D., Physician
Robert Lawrence MAOM, Physician
Nancy Lawroski, Psychologist
Karin Lawson Psy.D., Psychologist
Robert Lawrence, MD
Lynne Layton Ph.D., Psychologist
Flora Lazar, Social Work
T Domi Le M.D., Physician
Michael Leach, Social Work
Jody Leader Ph.D., Psychologist
Kimberly Leak, Nurse
Diane Leamy, Social Work
Michael Leavell M.D., Physician
Annette Leavy LCSW, Social Work
Jeanne LeBlanc Ph.D., Psychologist
Wendy Lebowitz Ph.D., Psychologist
Maria Lechich, Psychologist
Nathan Leclair Medical Student, Physician
Sharon Lee M.D., Physician
Marissa Lee LCSW, Social Work
Sherrylynn Lee M.D., Physician
Donald Lee Ed.D., Psychologist
Susan Lee Psy.D., Psychologist
Ling Lee
Peter Lee
Kristina Lehman, Physician
Elizabeth Lehmann LCSW-R, Social Work

Lucy Lehrer LCSW, Social Work
Lynn Leibowitz Ph.D., Psychologist
Virginia Leigh, Social Work
Mary Leith
Briana Lemieix, Social Work
Melissa Lenge LMFT, Social Work
Abigail Lenhart M.D., Physician
Sara Lennox M.D., Physician
Stacy Lenny, Social Work
Denise Lensky Ph.D., Psychologist
Mia Lentinello, Social Work
Stephanie Leonard M.D., Physician
Alecia Leonard, Social Work
Lilaine Leonardo M.D., Physician
Abby LePage
Rita Lepe, Physician
Amber Lerma M.D., Psychiatrist
Shulamit Lerner, Physician
Ariel Lesh
Marissa Leslie M.D., Psychiatrist
Leigh Leslie Ph.D., Psychologist
Harry Lesmana M.D., Physician
Ronnie Lesser Ph.D., Psychologist
Sylvia Lester Ph.D., Scientist
Sue Lester, Social Work
Bethany Letiecq Ph.D., Scientist
Alyssa Letourneau M.D., Physician
Arlene Lev LCSW-R, Social Work
Judy Kaplan Levan Psy.D., Psychologist
Don Levan
Ximena Levander, Physician
Anne Levenson M.D., Physician
Janis Leventhal CSW, Social Work
Tessa Levey, Nurse
Betty Wolder Levin Ph.D., Public Health
Janice Levin J.D.
Kay Levine M.D., Psychologist
Mark Levine M.D., Physician
Ellen Levine, Psychologist
Joan Levine Ph.D., Psychologist
Michelle Levine Ph.D., Psychologist
Ben Levine Ph.D., Psychologist
Lauren Levine Ph.D., Psychologist
Michael Levine
Francine Levine RN, Nurse
Lacey Levitt Ph.D., Psychologist
Judy Levitz Ph.D., Psychologist
Julia Lev-Rosenfeld LMHC, Psychologist
Carla Levy
James Levy Ph.D., Psychologist
Daniel Levy M.D., Physician
Jeff Levy, Social Work
Brenda Levy, Pharmacist
Matthew Lewin
Gregory Lewis Psy.D., Psychologist
Elizabeth Lewis MBA
Jacklyn Lewis Ph.D., Psychologist
Terri Lewis Ph.D.
Sarada Lewis RN, Nurse
Victoria Lewis
Tamorah Lewis M.D., Physician
Felicia Lewis, Physician
Mary Ann Lewis, Social Work
Mary Lewis, Nurse
Ellen Lewis M.D., Psychiatrist
Lin Li M.D., Physician
Blaci Lice
Alexander Lichtenberg
Whitney Lieb, Physician
Rita Lieberman Ph.D., Physician
Alicia Lieberman Ph.D., Psychologist
Alice Lieberman, Social Work
Dana Liebowitz
Ingrid Lift, Physician
Robert Lifton M.D., Psychiatrist
Denisha Liggett
Cindy Lignar RN, Nurse

Mamie Ligon
Ruth Lijtmaer, Psychologist
Michael Likiet Ph.D., Psychologist
Jessica Lilley M.D., Physician
Brenna Lille, Physician
Robin Lillis, Nurse
Lissa Lim, Psychologist
Nancy Lin, Psychologist
Melissa Lin M.D., Physician
Maria Linden M.D., Physician
Joyce Lindenbaum LCSW, Social Work
Vivian Linder LCSW-R, Social Work
Diane Lindner, Social Work
Holly Linendoll
Dina Linfoot M.D., Physician
Veena Lingan, Physician
Alexis Link M.D., Physician
Patrick Link M.D., Psychiatrist
Casey Linke FNP-C, Nurse
Theresa Linsner, Physician
Julie Linton M.D., Physician
Donna Linvog M.D., Physician
Ryan Lion Medical Student, Public Health
Madeline Lippman Ph.D., Psychologist
Ryan Lipscomb, Administrator
Susan Lipsett M.D., Physician
Tamara Lipshie, Psychiatrist
Madeleine Lipshie-Williams, Physician
Stan Lipsitz Ph.D., Psychologist
Peter Lipson M.D., Physician
Joan Lipton Ph.D., Psychologist
Stephanie Lirio, Psychiatrist
Phoebe Lithgow CNM, Nurse
Arlene Litt, Social Work
Annie Liu M.D., Physician
Serena Liu
Kellen Livermore
Martha Livingston Ph.D., Public Health
Nicole Livingston LMFT
Zully Lizarazo, Psychologist
Alejandro Lizarraga RN, Nurse
Paula Llaneza
Cayla Lloyd, Social Work
Janet Lo M.D., Physician
Amelia Lo FNP-BC
Seth Lobdell Ph.D., Social Work
Joanna Locke, Physician
Julianne Lockwood Ph.D., Psychologist
Maria Loesell, Nurse
Mary Ann LoFrumento M.D., Physician
Katrina Lokken Psy.D., Psychologist
Lisa Lombard Ph.D., Psychologist
Loren Lomme, Social Work
Bronwyn Long
Maureen Longeway M.D., Physician
Virginia Longoria Ph.D., Psychologist
Andrea Lopes, Social Work
Steven Lopez Ph.D., Psychologist
Daniel Lopez
Natalia Lopez Mendez
Caitlin Lord
Andrea Lorenze M.D., Physician
Tasher Losenegger
Lia Losonczy, Physician
Jennifer Lott LMHC
Elizabeth Loux Psy.D., Psychologist
Eden Love
Sean Love M.D., Physician
Bianca LoVerde, Physician
Holly Low
Janet Lowe
AnnaLowell D.O., Physician
David Lowenstein Ph.D., Psychologist
Mark Lowenthal, Psychologist
Jessica Lu M.D., Psychiatrist
Kim Lu M.D., Physician
Shirley Luban LCSW, Social Work

Wendy Lubin Ph.D., Psychologist
Erica Lublin M.D., Psychiatrist
Gene Lubow Ph.D., Psychologist
Barbara Lucas, Nurse
Lauren Lucente
Carly Lucier
Krista Ludwig, Nurse
Marta Ludwig LCSW, Social Work
Linda Ludwig Ph.D., Psychologist
Ellen Luepker LICSW, Psychologist
Jessica Luitjohan, Psychologist
Ludovica Lumer D.O.
Ann Lundberg, Social Work
Helen Lundgren, Nurse
Jared Lunkenheimer M.D., Physician
Sarah Lusk, Psychologist
Riad Lutfi, Physician
Emily Lutz, Nurse
Jennifer Luu Psy.D., Psychologist
Steven Luz-Alterman Ph.D., Psychologist
Anna Lyapis M.D.
M.Brinton Lykes, Psychologist
Corinne Lykins, Psychologist
Meghan Lynch, Psychologist
Nicholas Lynch M.D., Physician
Margaret Lynch, Physician
Bridget Lynch
June Lynds, Social Work
Lisa Lyns, Psychologist
Taina Lyons, Social Work
Marriah Mabe LCSW
Elaine Maccio Ph.D., Social Work
Ross MacDonald M.D., Physician
Rick MacDonald M.D., Physician
Mindy MacDougall, Social Work
Marti MacGibbon CADC-II, ACRP
Julieta Macias Ph.D., Social Work
Juan Macias, Physician
Brigid Mack M.D., Physician
Richard Mack LCSW, Administrator
Kellie Mackenzie
Lee MacKinnon, Public Health
Adele Mackintosh Ph.D., Psychologist
Sarah MacLean
Rachel MacNair Ph.D., Psychologist
Kate Madden M.D., Physician
Sonja Maddox M.D., Physician
Michelle Madore Ph.D., Psychologist
Erin Madriago M.D., Physician
Elise Madrid M.D., Physician
Tonya Madrigal, Social Work
Olivia Madrigal
Leah Madsen M.D., Physician
Tamar Magdovitz
Rhonda Magee
Rachel Magida, Social Work
Angana Mahapatra, Physician
Sarah Maher, Social Work
Zoe Maher M.D., Physician
Stephanie Mahler CED
Adrian Mahlstede, Public Health
Tamara Mahmood PA-C
 Brian Mahon Ph.D., Psychologist
Heather Mahoney, Social Work
Trinh Mai. Social Work
Johanna Mailloux M.D., Physician
Toby Mailman, Social Work
Rebecca Mair Ph.D., Psychologist
Abby Maitland, Social Work
Adnan Majid, Psychiatrist
Katrina Majstorovic M.D., Physician
Mona Makki, Administrator
Maria Maldonado M.D., Physician
Olivia Maldonado Psy.D., Psychologist
Amanda Malik M.D., Physician
Stacy Malin Ph.D., Psychologist
Sharon Malinowski LMHC

Katie Malinski, Social Work
Max Malitzky Psy.D., Psychologist
Justine Maller M.D., Physician
Kathleen Malley-Morrison, Psychologist
Monica Malone, Psychologist
Ellen Maloney PT
Edizen Malonzo
Krista Malott Ph.D.
Marjorie Maltin Ed.D., Psychologist
Jeannette Maluf Ph.D., Psychologist
Anna Manatis M.D., Physician
Richelle Mancewicz,, Psychologist
Andrea Mancinelli D.O., Physician
Shreya Mandal, Forensics
Olivia Mandelbaum, Psychologist
Joanna Mandell M.D., Physician
Megan Manor MSW, Social Work
Marc Manseau M.D., Psychiatrist
Nadine Mansour
Mounir Mansour
Sharon Mansur
Cheryl Mantle LMHC, Psychologist
Carol Manzi
Amanda Maradiaga, Social Work
Ellen Maradowitz Ph.D.
Abby Maranga
Elizabeth Maranzano M.D., Physician
Carol Marcus Ph.D., Psychologist
Lynn Ellen Marcus LMFT
Sam Marcus Ph.D., Psychologist
Kate Marder
Maxine Margolies Psy.D., Psychologist
Alida Margolin, Social Work
Elizabeth Margoshes Ph.D., Psychologist
Alex Margosian LICSW, Social Work
Merranda Marin LMFT, Psychologist
Ryan Marino M.D., Physician
Thomas Marino Ed.D., Psychologist
Karen Marisak Ph.D., Psychologist
Xhorlina Marko, Physician
Laurie Markoff Ph.D., Psychologist
Talia Markowitz, Public Health
Abigail Marks Ph.D., Psychologist
Laura Markuson Ph.D., Psychologist
Robert P.Marlin, MD, PhD, MPH,
Physician
Shelley Marlow Esq.
Ellen Marmur M.D., Physician
Christopher Marnell, Physician
Mabel Marotta M.D., Physician
Sylvia Marotta-Walters ABPP,
Psychologist
Denise Marques, Psychologist
Mateo Marquez, Administrator
Regina Marranzini M.D., Physician
Beth Marron LICSW, Social Work
Erika Marroquin
Nancy Marshall M.D., Physician
Hannah Marshall
Leslie Marshall M.D., Physician
Marie-Eve Martel Psy.D., Psychologist
Lauren Martin, Physician
April Martin Ph.D., Psychologist
Beth Martin LCSW, Social Work
Lauren Martin
Gina Martin
Margaret Martin, Nurse
Landon Martin
Alison Martin LPN
Ashley Martin-Casler
William Martinez, Psychologist
Jill Martinez M.D., Psychiatrist
Susan Martinez LCSW, Social Work
Tomas Martinez Ph.D., Psychologist
Maria Martinez, Nurse
Raquel Martinez, Nurse
Katherine Martinez, Nurse

Cristina Martinez
Cristin Martinez M.D., Physician
LeslieAnn Martinez
Dora Martinez M.D., Physician
Cynthia Martinez
Ingrid Martinez, Nurse
Martha Martinez-Bravo Psy.D.,
Psychologist
Sonya Martinez-Ortiz CSW, Social Work
Mary Martone Psy.D., Psychologist
Lenna Martyak M.D., Physician
Sheela Maru M.D., Physician
Joyce Marusarz
Janice Marvel, Nurse
Terry Marx, Physician
Wendy Marx M.D., Physician
Ethan Maryon CSW, Social Work
Maria Masciandaro Psy.D., Psychologist
Maria Masciandaro Psy.D., Psychologist
Christina Maser M.D., Physician
Gina Masessa Psy.D., Psychologist
Lauren Mason Psy.D., Psychologist
Daniel Mason, Physician
Alyssa Mass LMFT
Luisa Massari M.D., Physician
Joann Massey Psy.D., Psychologist
Clare Masson, Social Work
Elli Mastrangelo, Scientist
Cynthia Mastro, Nurse
Corinne Masur, Psychologist
Christina Matheney
Belle Matheson, Nurse
Minu Mathew LCSW, Social Work
Katherine Mathew
Dominique Mathews
Bristol Mathez
Jaime Matorras
Julie Matthaei
Andria Matthews
Dan Matthews, Psychologist
Anne Mattingly M.D., Physician
Allison Mattison Psy.D., Psychologist
Jim Matto-Shepard Ph.D., Psychologist
Felicia Matto-Shepard, Psychologist
Lisa Maurel LMFT
Joel Mausner Ph.D., Psychologist
Valerie Maxey
Richard Maxfield Ph.D., Psychologist
Teresa Maxwell LMSW, Social Work
Deborah May FNP-BC, Nurse
Shirley Mazourek, Social Work
David Mazumder, Physician
Sara Mazzoni M.D., Physician
Lindsey McAmis Gouge M.D., Physician
Jean McAuliffe, Nurse
Patrick McAuliffe, Ph.D.
Elizabeth Mcauliffe
Mary McBride NP-C, Nurse
Dorothy McBrien RN-BC, Nurse
Kerry McCabe, Physician
Allyssa McCabe-Cuneo, Psychologist
Ann Marie McCafferty
Mary McCaffrey, Social Work
Palmer McCall
Laura Mccarthy LCSW-R, Social Work
Ledra McClinton, Administrator
Tammey McCloud RN, Nurse
Patrick McColloster M.D., Physician
David McConaghay
Sarah Mccormick D.O., Physician
Kathleen McCormick
Noelle McCown Psy.D., Psychologist
Karen McCUmiskey MSN, Nurse
Mary Mccurnin
Robert McDonald Ph.D., Psychologist
Megan McDonald D.O., Physician
Amanda McDonald, Social Work

Marsha McDonough Ph.D., Psychologist
Stephen McElroy, Physician
Taylor Ryan McFarland CNAA
Jodi McGahan, Social Work
Fiona McGarry, Social Work
Christine McGinnis, Psychologist
Tracy McGivern
Eartha McGoldrick
Amy McGuire J.D., Scientist
Elizabeth McGuire, Psychiatrist
Miranda McGuire-Schwartz, Social Work
Jill Mcilroy, Social Work
Elizabeth McIntire
Elizabeth McKamy MSW, Social Work
Elizabeth McKamy, Social Work
Eliana McKee M.D., Physician
Fedelma McKenna, Nurse
Patricia McKenna
Sarah Mckeon CANP, Nurse
Teresa McKeon
Daniel Mckitrick
Anne Mckuhen
Terrance McLarnan
Lauren McLaughlin
Abigail McLaughlin
Kara McLaughlin
John McLean M.D., Physician
Molly McMahon Social Work
Thomas McMahon Ph.D., Psychologist
Brian McMahon, Social Work
Adrienne McManus
Laura McMullen M.D., Physician
Siobhan McNally M.D., Physician
Nora McNamara M.D., Physician
Fawn McNeil-Haber Ph.D., Psychologist
Brian McNeill Ph.D., Psychologist
Molly McRae, Social Work
Maureen McSwiggin
Ben McVane M.D., Physician
Stephanie McWethy
Ellen McWhirter Ph.D., Psychologist
Nancy McWilliams Ph.D., Psychologist
Alex Means M.D., Physician
Alexa Meara, Physician
Jesica Medina LCSW, Social Work
Adriana Medina O.D.
Monica L Meerbaum Ph.D., Psychologist
Nivedita Meethan, Public Health
Emily Megas-Russell LICSW, Social Work
Edie Mehanna Medical Student
Adele Meir, Social Work
Ayesha Mehrotra, Public Health
Naaman Mehta Medical Student
Sapna Mehta, Physician
Puja Mehta Medical Student
Lina Mehta M.D., Physician
Gia Meicher
Adrienne Meier Ph.D., Psychologist
Emily Meier, Physician
Joanna Melia, Physician
Karen Melikian, Social Work
Yelena Melnikova
Bengi Melton M.D., Psychiatrist
Melanie Melville M.D., Psychiatrist
Glends Mendelsohn, Social Work
Elissa Mendenhall, Physician
Martha Mendes, Social Work
Melissa Mendez M.D.
Dianelys Mendez
Dawn Mendoza RN, Nurse
Carmen Mendoza
Miguel Mendoza Medical Student
Miriam Mendoza, Psychologist
Claudia Menjivar
Catharine Mennes Ph.D., Social Work
Christina Mentes Ph.D., Psychologist
Theresa Meotti M.D., Physician

Alfonso Mercado Ph.D., Psychologist
Corinne Mercado RN, Nurse
Liza Mermelstein Ph.D., Psychologist
Gloria Merriam
Sheri Merritt MBBS
Debra Merskin Ph.D.
Leslie Merwin, Nurse
Allison Merz
Kim Mesiti
Luke Messac M.D., Physician
Catherine Metzenberg LMFT
Danielle Metzger LCSW, Social Work
Ilan Meyer Ph.D., Public Health
Penny Meyer
George Meyer MACP, Physician
Stephanie Meyer, Physician
Brittany Meyers
Jane Charna Meyers, Social Work
Alan Meyers M.D., Physician
Sandra Meyers Ed.D.
Judith Meyers Ph.D., Psychologist
Linda Michaels Psy.D., Psychologist
Ken Michaels LCSW, Social Work
Christine Michaud M.D., Psychiatrist
Monica Michell M.D., Physician
Golda Michelson
Sae Mickelson
Jessica Miesfeld, Physician
Alexandra Mihalek, Physician
Gaia Mika Ph.D., Psychologist
Stephanie Mikulski D.O., Physician
Gregory Milbourne Psy.D., Psychologist
Jennifer Milchenko MPH, Public Health
Andrew Milewski Ph.D.
Alexandra Miley
Lisa Milford
Naomi Miller Ph.D., Social Work
Ash Miller  M.D., Physician
Lisa Miller  LCSW-R, Social Work
Alison Miller Psy.D., Psychologist
Jen Miller, Social Work
Laura Miller M.D., Physician
Robin Miller
James Miller, Physician
Martha Miller, Nurse
Claudia Sharda Miller
Kathryn Miller
Theresa Miller Ph.D., Psychologist
Taylor Miller D.V.M.
Tohari Miller M.D., Physician
Holly Millheiser PT
Marlene Millinan, Social Work
Uma Millner, Psychologist
Rebecca Millner, Public Health
Eva Millona
Victoria Mills, Social Work
Victoria Mills, Social Work
Kim Mills ANP-BC, Nurse
Jennifer Mills M.D., Physician
Alice Min Simpkins
Sara Mindel LICSW, Social Work
Peggy Miner, Social Work
C Miner
Rebecca Minnick CSW, Social Work
Mary Beth Miotto M.D., Physician
Karen Miranda Psy.D.
Marsha Mirkin Ph.D., Psychologist
Marci Mirther, Nurse
Ranit Mishori M.D., Physician
Hannah Mitchell, Social Work
Raymond Mitchell
Kara Mitchell, Physician
Amanda Mittman, Public Health
Keiko Mizuguchi
Sarah Moberg
Julia Moench-Parent
Rich Moffitt, Social Work

Jacqueline Moga Ph.D., Scientist
AC Mogal, Physician
Zoya Mohiuddin, Physician
Arpana Mohnani M.D., Physician
Sarah Mohr, Administrator
Joseph Moldover Psy.D., Psychologist
Jonathan Moldover M.D., Physician
Connie Moler ARNP
Brittainey Molina
Patricia Molina M.D., Physician
Matthew Molloy M.D., Physician
Merle Molofsky
Vicktoria Molokin LCPC
Gloria Monahan, Nurse
Ana Monas
Liz Mongillo-Herman Ph.D., Psychologist
Heidi Monroe Ph.D., Nurse
Pamela Montano Arteaga, Psychiatrist
Gloria Montes Ph.D., Psychologist
Nadyne Montiel, Social Work
Yesika Montoya, Social Work
Andre Montoya-Barthelemy M.D.,
Physician
Diana Montoya-Williams M.D., Physician
Molly Moody
Krystal Moon, Social Work
Cary Moore
Christopher Moore M.D., Physician
Janice Moore Ph.D., Social Work
Lisa Moore Ph.D., Public Health
Jacqueline Moore M.D., Physician
Susan Moore-Motily, Psychologist
Mufadal Moosabhoy ACRB
Jaime Moo-Young M.D., Physician
Eduardo Morales Ph.D., Psychologist
Xavier Morales, Public Health
Claudia Morales, Social Work
Amanda Morales Clarke Psy.D.,
Psychologist
Teresa Moreira, Social Work
Roberta Morell
Jonathan Moreno Ph.D.
Lisa Moreno MSW, Social Work
Amber Morgan M.D., Physician
Rhea Morgan D.V.M.
Sharon Morgan PA
Julia Morgan
Kelly Morgan M.D., Physician
Richard Morhaime Psy.D., Psychologist
Cari Morphet
Melinda Morrill Ph.D., Psychologist
Marsha Morris Ph.D., Psychologist
Mark Morris LSW, Social Work
Leonette Morrison M.D., Psychiatrist
Helene Morse Ph.D., Psychologist
Linda Morse, Nurse
Lisa Moscatiello, Psychologist
Lisa Moschello LCSW, Social Work
Erica Moses ABPP, Psychologist
Michael Moskowitz Ph.D., Psychologist
Sally Moskowtiz Ph.D., Psychologist
Denise Mosqueda, Public Health
Marcela Mota Aversa
Ferrell Motlow M.D., Physician
Angelica Motta Physician
Marlene Mouttet
Hawnyeu Moy M.D., Physician
Diane Moya
Jennifer Moyer, Nurse
Nancy Mramor, Psychologist
Rebecca Mueller M.D., Physician
Mary Mueting
Amy Mugg M.D., Physician
Janice Muhr Ph.D., Psychologist
Romita Mukerjee M.D., Physician
Angela Mukherjee D.O., Physician
Emily Mukherji, Psychiatrist

Hayyah Muller M.D., Psychiatrist
Maria Mulligan-Buckmiller
Erin Mullin Ph.D., Psychologist
Julie Mumford, Social Work
Lawrence Mumm M.D., Physician
Sarah Munday
Arturo Mundigo Social Work
Kristen Mungcal, Social Work
Melissa Munoz
Gabriela Munoz Ph.D., Psychologist
Zaide Muñoz, Administrator
John Munsell M.D., Physician
Carol Munter
Catherine Murak M.D., Physician
Jessica Murakami-Brundage Ph.D.,
Psychologist
Kavitha Muralidharan MB, ChB
Tessa Murdock-Bell, Social Work
Steph Muro, Social Work
Sarah Murphy M.D., Physician
Joan Murphy LPC
Elissa Murphy Ph.D., Social Work
Theodore Murray M.D., Psychiatrist
Kelly Murray M.D., Physician
Morgan Murray Ph.D., Psychologist
Amy Murrell, Psychologist
Maram Museitif
Joan Musitano LCSW, Social Work
Hattie Myers Ph.D., Social Work
Laura Myhr Ph.D., Psychologist
Kirstin Nackers M.D., Physician
Nancy Nadel
Janet Nader
Hani Naga, Physician
Karen Nagy RRT
Jennifer Nail Ph.D., Psychologist
Anastasia Najarian, Scientist
Linda Najjar Ph.D., Psychologist
Kemi Nakabayashi M.D., Physician
Nadine Nakamura, Psychologist
Laura Naman Ph.D., Psychologist
Meghna Nandi Medical Student, Physician
MaryBeth Napier, Psychologist
Laura Naranjo, Nurse
Rashmi Narayan M.D., Physician
Nicole Nardone LSW
Neha Narula, Physician
Samera Nasereddin
Maureen Naset
Rand Nashi, Physician
Caroline Nason MBA, Administrator
Scott Nass M.D., Physician
Paul Nassar M.D., Psychiatrist
Shelley Nathans Ph.D., Psychologist
Marie Naumann Ph.D., Psychologist
Dipesh Navsaria M.D., Physician
Sarah Nayeem, Physician
Deborah Nazarian, Psychologist
Sarah Nazarkhan M.D., Physician
Idara Ndon
Minal Nebhnani
Angela Neese Ph.D., Psychologist
Brian Neff, Psychologist
Daniel Neghassi, Physician
Maria Nei
Azine Neiman, Psychologist
Nick Nelson M.D., Physician
Sharon Nelson, Psychologist
Steven Nelson Ph.D., Psychologist
James Nelson
Amy Nelson, Nurse
Delphine Nelson, Physician
Meredith Nelson, Nurse
Terri Nelson, Social Work
Elena Nelson
Amber Nemeth Ph.D., Psychologist
Ron Nemirow

Melinda Nestor
Shivaun Nestor, Public Health
Betsy Nettleton, Psychologist
Roda Neugebauer LCSW
Chelsea Neumann M.D., Psychiatrist
Iliana Neumann M.D., Physician
Ninfa Neuser Psy.D., Psychologist
Juliana Nenspiel, Psychologist
Lynn Nevins CCC-SLP
Priscilla Newcomb, Social Work
Jane Newell Ph.D., Administrator
Carly Newhouse, Social Work
Michelle Newman
Erica Newton, Social Work
Bonnie Nezaj, Psychologist
Waitz Ngan M.D., Physician
Deklerk Ngankam
Christine Nguyen D.O., Physician
Sanh Nguyen D.O., Psychiatrist
Lily Nguyen M.D., Physician
Bang Chau Nguyen PA-C
Danielle Nichols
Martina Nicholson M.D., Physician
Chloe Nicksic, Psychologist
Sara Nielsen
Sheila Nielsen Esq.
Denise Niemira M.D., Physician
Elena Nightingale M.D., Physician
Maria Niitepold, Psychologist
Natalia Nikolova Ph.D., Psychologist
McKenzie Nino, Social Work
Stephanie Nitzschke M.D., Physician
Janice Niver M.D., Psychiatrist
Eleanor Nixon, Nurse
Anjali Niyogi, Physician
Krystal Nizar, Psychiatrist
J Noe
Eri Noguchi Ph.D., Social Work
Lyndsey Nolan, Public Health
Patricia Noon, Social Work
Soledad Norin
Carmen Rosa Norona, Social Work
Laura Norris
Dustianne North Ph.D., Social Work
Jennifer Northridge M.D., Physician
Michael Northrop M.D., Physician
Andrea Northwood Ph.D., Psychologist
Erin Nortrup LCSW-C, Social Work
Shannon Norwitz, Social Work
Jesse Novak
Jennifer Novello LMSW, Social Work
Kerry Novick
Cristy Novotney, Social Work
Dawn Novotny, Social Work
Heidi Nowak, Nurse
Kristin Nowak CNM, Public Health
Nicole Nugent Ph.D., Psychologist
Anchi Numfor
Erika Nurmi Ph.D., Psychiatrist
Karen Nuthals, Scientist
Bruce Nystrom Ph.D., Psychologist
Kristen O'Brien, Public Health
Carlos O'Bryan M.D., Physician
Kelly O'Connell-Seagraves
Erin O'Connor-Thygeson , Nurse
Louise O'Hanley
Michelle O'Regan
Janette O'Sullivan
Ariel Oakes, Nurse
June Oates
Aura Obando M.D., Physician
Samantha Ober M.D., Physician
Austin Oberlin, Physician
Kelley OConnell
John OConnor Psy.D., Psychologist
Kathleen O'Connor LCSW, Social Work
Sharon O'Connor Ed.D., Psychologist

Tessie October, Physician
Mary Gail O'Dea, Psychologist
Kathleen ODonnell Burrows MSW, Social Work
Lisa O'Donovan
Danna Ogden D.O., Physician
Robert Ogner, Social Work
Taylor O'Grady Ph.D.,
Nicole Okezie M.D., Psychiatrist
Yemi Okunseinde M.D., Physician
Heidi Olander M.D., Physician
Kerrie O'Leary
Joseph Olejak
Christy Olezeski Ph.D., Psychologist
Mary Olin
Stephanie Oliva, Physician
Gabrielle Oliveira, Scientist
Rachel Oliver Young
William Olsen
Brad Olson Ph.D., Psychologist
Naomi Olson LCSW, Social Work
MaryEllen Olson, Social Work
Erin Ondercin Ph.D., Psychologist
Lara ONeil APRN
Ilonka O'Neil RN, Nurse
Meagan ONeill, Physician
Genoveva O'Neill M.D., , Physician
Mary Kay O'Neill M.D., Physician
Tamar Opler LCSW, Social Work
Susan Opotow, Ph.D.
Susan Orbach Ph.D., Psychologist
Maureen O'Reilly-Landry Ph.D.,
Psychologist
Spyros D Orfanos, Psychologist
Alyssa Orinstein, Psychologist
Manuela Orjuela-Grimm M.D., Physician
Evelyn Orlando
Joel Ornelas, Physician
Kelly Orringer M.D., Physician
Shelby Ortega Ph.D., Psychologist
Jennifer Orthmann Murphy, Physician
Aracely Ortiz
Kim Ortiz, Social Work
Chantel Osman, Psychologist
Luisa Ospina, Social Work
Patrice Ostmeywr ADTR
Greg Oswald Ph.D., Psychologist
Paige Oszmanski LCSW, Social Work
Teresa Otoya-Mcadams
Deborah Ottenheimer M.D., Physician
Sarita Overton Ph.D., Psychologist
Gavin Ovsak Medical Student
Kristal C. Owens Ph.D., Psychologist
Donna Ozawa
Cyrille P
Maria Pacheco
Brenda Padilla Psy.D., Psychologist
Savita Pa, Physician
Melinda Paige Ph.D.
Joquetta Paige M.D., Physician
Karen Pakula, Social Work
Ria Pal, Physician
Yelennia Palacios, Physician
Samantha Palmaccio, Physician
Carter Palmer
Rebecca Palmer
Sara Palmer Ph.D., Psychologist
Lee Palmer
Rea Panares, Public Health
Deepa Panchang NP-C, Nurse
Diana Pandey M.D., Physician
Karen Pando-Mars
Heather Pane Seifert Ph.D., Psychologist
Wendy J Panken, Social Work
Tina Panteleakos Ph.D., Psychologist
Pranati Panuganti
Joe Panzner LSW, Social Work

Kathleen Pape, Psychologist
Carol Paradis
Molly Paras, Physician
Seymour Pardo, Psychologist
Emmanuelle Pare M.D., Physician
Anish Parekh Medical Student, Physician
Monika Parikh, Administrator
Shermi Parikh DPM, Physician
Deborah Paris, Social Work
Manuel Paris Psy.D., Psychologist
Paul Park, Psychologist
Heejung Park CPNP, Physician
Beth Parker LICSW, Social Work
Ann Parker, Physician
Kelly Parker-Guilbert, Psychologist
Sharon Parkinson Psy.D., Psychologist
Parveen Parmar M.D., Physician
Carla Parola LPC
Jennifer Parrish D.O., Physician
Gretchen Parrott MPH, Public Health
Danielle Parsell Psy.D., Psychologist
Amanda Parsons M.D., Public Health
Amy Pasternack, Physician
Nisha Patel M.D., Physician
Kevin Patel M.D., Physician
Premal Patel M.D., Physician
Nishant Patel Psy.D., Psychologist
Laura Patel M.D., Physician
Ami Patel
Vaidehi Patel M.D., Physician
Anna Maria Patino-Fernandez Ph.D.,
Psychologist
Terence Patterson, Psychologist
Mark Patterson, MD, PhD, Physician
Catherine Patteson, Social Work
Sarah Patz, Psychologist
Jennifer Pauk, Social Work
Nat Paul
Yasmerlin Paulino, Social Work
Jeree Pawl Ph.D., Psychologist
Julia Paz, Physician
Julia Pazniokas, Physician
Gwen Pearl, Social Work
Ellen Pearlman
Stephanie Pearson M.D., Physician
Farrokh Pebdani
Margaret Pechota Ph.D., Psychologist
Kristen Peck Ph.D., Psychologist
Lydia Pecker M.D., Physician
Mark Pecker M.D., Physician
Janet Peden Ph.D., Psychologist
Annelisa Pedersen Ph.D., Psychologist
Katherine Peeler M.D., Physician
Joanna Peery Polyn, Nurse
Rebecca Peil FNP-BC, Nurse
Ann Pellegrini Ph.D.
Lori Pellegrino M.D., Psychiatrist
Lisa Pelton, Social Work
Nina Pelton APRN
Sheryl Pelton, Nurse
Mary Pelton Cooper, Psychologist
Rachael Peltz Ph.D., Psychologist
Katherine Penebre FNP-C, Nurse
Tagasichani Peralta, Social Work
Brenda Pereda M.D., Physician
Joy Pereths
Vanessa Perez Medical Student
Nissa PerezM.D., Psychiatrist
Georgina Perez, Social Work
Emiliana Perez APRN-BC, Nurse
Marisa Perez, Physician
Carla Perez Martinez Ph.D., Psychologist
Maris Perez Johnson D.O., Physician
Helen Perille Psy.D., Psychologist
Uma Periyanayagam M.D., Physician
Kacey Perkins
Sarah Perkins M.D., Physician

Sheri Perlman
Jacob Perlman Medical Student, Physician
Lauren Permenter MSW, Social Work
Liza Perpuse M.D., Physician
Carmela Perri CNS
Sharon Perrotta Psy.D., Psychologist
Barbara Perry LSW, Social Work
Sebastian Perumbilly Ph.D.
Angeliki Pesiridou M.D., Psychiatrist
Deborah Peters Ph.D., Psychologist
Rebecca Petersen, Social Work
Christine Peterson Ph.D., Psychologist
Jaime Peterson, Physician
Janice Petix LCSW, Social Work
Kimberly Petko M.D., Physician
Michelle Petnov-Sherman LCSW, Social
Work
Sueli Petry Ph.D., Psychologist
Mariah Pettapiece-Phillips, Public Health
Barbara Petterson LMFT
Nora Pfaff M.D., Physician
Margaret Pfeffer M.D., Physician
Anne Phan-Huy M.D., Psychiatrist
Mara Pheister M.D., Physician
Raina Phillips M.D., Physician
Suzanne Phillips Psy.D., Psychologist
Sharon Phillips, Physician
Natasha Phillips, Administrator
Sarah Phillips LMSW, Social Work
Aurora Phillips
Teresa Phillips, Physician
Carrissa Phipps Ph.D., Psychologist
Mojabeng Phoofolo, Physician
Michele Piccolo Ph.D., Psychologist
Nancy Pienta PT
Robert Pierce Jr.
Jane Pierce
Amanda Pierce
Cathy Pierce
Faradia Pierre, Physician
Anna Pineda
Alex Pino
Alexandra Pinon M.D., Physician
Laura Pinsky, Social Work
Naomi Pinson
Renee Pinto Ph.D., Psychologist
Alex Pirie
Elliot Pittel M.D., Psychiatrist
Lauren Pittman
William Pittman Ed.S., Administrator
Matthew Pius M.D., Physician
Lin Piwowarczyk M.D., Psychiatrist
Stuart Pizer Ph.D., Psychologist
Jessica Piziali
Julia Plascencia
Rebecca Platt, Psychologist
Erin Plews-Ogan
Janet Plotkin-Bornstein Ph.D.,
Psychologist
Angela Pluguez
Ellen Plumb M.D., Physician
Pierrette Poinsett M.D., Physician
Nicholas Pokoj
Deborah Polacek, Nurse
Emily Polak Ph.D., Psychologist
Laura Polania M.D., Psychiatrist
Peter Polatin M.D., Psychiatrist
Lisa Polenberg LCSW-R, Social Work
Carly Policha, Nurse
Laura Polito M.D., Physician
Maria Pollack
Lise Pomerleau
Arthur Pomponio Ph.D.
JoAnn Ponder Ph.D., Psychologist
Eleanor Pope, Social Work
Keren Porat, Psychologist
Maria Portela, Physician

Jennifer Porter M.D.
Jennifer Porter M.D., Physician
Alesia Porter
Natalie Porter Ph.D., Psychologist
Gina Posner M.D., Physician
Rebecca Post CSW, Social Work
Tonia Poteat, Public Health
Carol Potter
Maria Pouria M.D., Physician
Kate Pourshariati
Chelsea Powell M.D., Physician
Kavitha Prakash M.D., Physician
Mark Prasad
Nathan Praschan M.D., Physician
Nancy Pratt
Nancy Prendergast M.D., Physician
Carol Present, Social Work
Diana L Prescott Ph.D., Psychologist
Jennifer Presnall-Shvorin Ph.D.,
Psychologist
Dan Prezant Ph.D., Psychologist
Barbara Prezelin Ph.D., Scientist
Alice Priano, Psychologist
Norma Price M.D., Physician
Maggi Price Ph.D., Psychologist
Sean Price
Patricia Priest RN, Nurse
Anthony Primavera
David Prince Psy.D., Psychologist
Jean Prince M.D., Physician
Alisa Prinos
Betty Pristera, Social Work
Karen Proner MSEd, Psychologist
Shakira Provasoli
Audrey Provenzano M.D., Physician
Rebecca Pruitt
Sarah Prysock, Nurse
Kira Pullig, Social Work
Ronda Pulse M.D., Physician
Dianne Pulte, Physician
Amy Pumo LCSW, Social Work
Laurie Punch, M.D.
Paul Puri M.D., Physician
Emily Puterbaugh M.D., Physician
Frank Putnam M.D., Psychiatrist
Karen Putnam
Maripat Putzer
Scott Pytluk ABPP, Psychologist
Diane Qi
Sami Qreini, Social Work
Kathleen Quinn, Social Work
Germán Quiñonez
Luis Quintero Medical Student
Jessamine Quinzon, Nurse
Josh Quirk
Zeeshan Qureshi D.O., Physician
Matt R, Social Work
Tracy Rabin M.D., Physician
Mara Rabin M.D., Physician
Rebecca Rabin, Psychologist
Ariana Rabinowitsch Medical Student
Donna Racines CNM, Nurse
Amy Rackear, Social Work
Greg Raczkowski
Shannon Radak, Nurse
Audrey Raden LCPC
Stephanie Radke M.D., Physician
Nicole Rafanello Ph.D., Psychologist
Sandra Rafman, Psychologist
Cristy Ragland LPC
Katie Raher Ph.D., Psychologist
Tabassum Rahman LMSW, Social Work
Aurnee Rahman
Hannah Raila Ph.D., Psychologist
Ashley Rainford, Psychologist
Vinutha Rajesh M.D., Physician
Vinutha Rajesh M.D., Physician

Elsa Raker, Public Health
Susana Ramirez M.D., Physician
Sandra Ramirez LCSW, Social Work
Maria Ramirez, Social Work
Mark Ramirez LMFT, Psychologist
Mari Ramos, Public Health
Brenda Ramos LVN, Nurse
Victoria Ramos, Psychologist
Allison Ramsey
Sonal Rana M.D., Psychiatrist
Sheena Ranade M.D., Physician
Kathryn Randall M.D., Physician
Jocelyn Randall LCSW, Social Work
Catherine Raney, Physician
Linda Rangel
Lena Ransohoff, Public Health
Tucker Ranson LCSW, Social Work
Kavitha Rao, Psychologist
Wendy Rapaport Psy.D., Psychologist
Evelyn Rappoport Psy.D., Psychologist
Christopher Raso RN, Nurse
Stephen Ratcliff, Social Work
Elizabeth Rathbun
Margaret Ratiner Ph.D., Psychologist
Daniel Ratner, Psychologist
Barbara Rauch LCSW, Social Work
Stefanie Raue
Margaret Rauen Ph.D., Psychologist
Girindra Raval M.D., Physician
Sheila Ravendhran M.D., Physician
Simha Ravven M.D., Psychiatrist
Anita Ray M.D., Physician
Moira Ray M.D., Physician
Maggie Ray
Jennifer Raymond M.D., Physician
Molly Raynor
Cathleen Rea Ph.D., Psychologist
Romy Reading Ph.D., Psychologist
Eleanor Reardon
Lisa Reaves M.D., Physician
Sylvia Reaves LMSW, Social Work
Marcus Reboa
James Recht M.D., Psychiatrist
Tam Redd, Psychiatrist
Melissa Redden
Cherkaleyna Redder-Haga D.O., Physician
Lila Redmount, Social Work
Michele Reed, Psychologist
John Reed
Karolin Reed, Physician
Anne Reed-Weston
Daniel Reef
Ann Reese Psy.D., Psychologist
Nicholas Reeves, Physician
Deborah Reeves, Psychologist
Jill Reich
Brenna Reichman, Nurse
Marian Reiff Ph.D., Public Health
Barb Reilly RN, Nurse
Laura Reinacher, Public Health
Simba Reinhold
Diane Reis M.D., Psychiatrist
Wendy Reisor D.O., Psychiatrist
Steven Reisner Ph.D., Psychologist
Joanne Reith RN, Nurse
Christine Reitmeyer
Meegan Remillard M.D., Physician
Marcus Rempel, Physician
Michele Renchner Ph.D., Psychologist
Michelle Reno
Erika Rentas M.D., Physician
Liza Restifo, Social Work
Carolina Retamero M.D., Physician
Neelambika Revadigar, Psychiatrist
Elizabeth Revere, Physician
Dinoska Reyes
Claudia Reyes LCSW, Social Work

Sr. Mary Sonia Reyes
Jane Reynolds Ph.D., Psychologist
Michele Reynolds, Physician
Angie Reynolds M.D., Physician
Dorca Reynoso
Samina Reza M.D., Physician
Wayne Reznick, Psychologist
Donya Rhett Ph.D., Psychologist
Ginger Rhodes Ph.D., Psychologist
Madeline Rhum Ph.D., Psychologist
Michele Ribeiro Ed.D., Psychologist
Steven Riccoboni M.D., Physician
Roberta Rice, Social Work
Susan Rich M.D., Psychiatrist
Nancy Richard, Administrator
Arlene Richards
D Roxanne Richards M.D., Physician
Adam Richards M.D., Physician
Wynn Richards
Claire Richards, Nurse
Dorothy Richardson Ph.D., Psychologist
Hannah Richardson Ph.D., Psychologist
Hilary Richardson, Psychologist
Reg Richburg LMSW, Social Work
Kristin Richey, Nurse
Sophia Richman Ph.D., Psychologist
Lisa Richman M.D., Physician
Elizabeth Ridgway M.D. FAAP
Amy Riek M.D., Physician
Robert Riethmiller Ph.D., Psychologist
Arleen Rifkind M.D., Physician
Brandon Rigby Ph.D.
Rebeca Rinehart Medical Student
Krista Ring
Rachael Ringwood LCSW, Social Work
Lisa Rinker, Physician
Monisha Rios MSW, Social Work
Luis Ripoll M.D., Psychiatrist
Robin Risler Psy.D., Psychologist
Ana Risse, Physician
Susan Ritterman
Phyllis Rittner
Jomarie Rivera M.D., Physician
Nancy Rivera M.D., Physician
Krissia Rivera Perla
Denise Rizzo, Nurse
Lina Roa, Physician
TC Robbins, Physician
Jeanette Robbins, Social Work
Lynn Roberts Ph.D., Public Health
Mary Roberts M.D., Physician
Laura Roberts LCSW, Social Work
Jill Robertson
Tracy Robin, Social Work
Colin Robinson M.D.
Ruby Robinson
Lori Robinson CCC-SLP
Kahlila Robinson Ph.D., Psychologist
Barbara Robinson LCSW-R, Social Work
Elizabeth Robinson
Lisa Robinson M.D., Psychiatrist
Marva Robinson Psy.D., Psychologist
Rachel Robitz M.D., Physician
Elizabeth Rocco M.D., Physician
Maya Rockeymoore Ph.D., Public Health
Cristina Rodrigues
Marlene Rodriguez M.D., Physician
Nina Rodriguez, Physician
Gabriela Rodriguez Ph.D., Psychologist
Jacqueline Rodriguez, Nurse
Yari Rodriguez
Ingrid Rodriguez Ph.D., Psychologist
Jaclyn Rodriguez, Forensics
Von Marie Rodriguez-Guzman Ph.D.,
Psychologist
Cynthia Roe MPH, Public Health
Lizabeth Roemer Ph.D., Psychologist

Soraya Rofagha, Physician
Wesley Rogers
Juliet Rohde-Brown Ph.D., Psychologist
Sarah Rojas M.D., Physician
Kathryn Rolland Ed.D., Public Health
Emily Romano
Amy Romashko M.D., Physician
Sandra Romero M.D., Physician
Robin Romine
Sylvia Romm M.D., Physician
Rebecca Romo Psy.D., Psychologist
Suzanne Roniger, Social Work
Beth Rontal, Social Work
MaryEllen Rooney Ed.D., Administrator
Rebecca Rooney, Psychologist
Danielle Rooney M.D., Physician
Lindsey Rosa, Social Work
Andrew Rosales, Medical Student
Rachel Shira Rosan RN, Nurse
Gabriela Rosas-Garcia M.D., Physician
Thomas Rosbrow Ph.D., Psychologist
Patricia Rosbrow Ph.D., Psychologist
Elizabeth Rose, Administrator
Teresa Rose Ph.D., Psychologist
Susan Rose Ph.D., Psychologist
Anthony Rose
Abigail Rose M.D., Physician
Christian Roselund
Penny Rosen LCSW-R, Social Work
Barbara Rosen, Social Work
Laura Rosen Ph.D., Psychologist
Diane Rosenbaum Ph.D., Psychologist
Marion Rosenbaum Ph.D., Psychologist
Ruth Rosenbaum
Larry Rosenberg Ph.D., Psychologist
David Rosenberg Ph.D., Psychologist
Linda Rosenberg LCSW-R, Social Work
Michele Rosenberg M.D., Psychiatrist
Mindy Rosenberg Ph.D., Psychologist
Lynne Rosenberg
Ellen Rosenblum RN, Nurse
Julia Rosenfield LICSW, Social Work
Andrea Rosenstein AAHIVS, Psychologist
Elizabeth Rosenthal M.D., Physician
Vicki Rosenthal MSW, Social Work
Joshua Rosenthal Dr.PH.
Nancy Rosenwasser
Erika Roshanravan M.D., Physician
Esther Rosha-Stadtler, Psychologist
Julie Rosinski, Social Work
Samantha Rosman, Physician
Zach Rosner M.D., Physician
David Rosner Ph.D., Public Health
Randall Ross M.D., Psychiatrist
Ellen Ross Psy.D., Psychologist
Joellyn Ross Ph.D., Psychologist
Marianne Ross Ph.D., Psychologist
Valerie Ross LMFT, Psychologist
Jonathan Ross M.D., Physician
Whitney Ross, Physician
Tamica Ross
Steve Ross
Kevin Michael Ross, MS, LMFT
Laura Rossillo
Kerry Rossitto
Ragna Rostad, Physician
Brad Roter M.D., Physician
Katalin Roth M.D., Physician
Judy Roth Ph.D., Psychologist
Scott Roth Psy.D., Psychologist
Lisa Roth, Psychologist
Jan Roth Ph.D., Psychologist
Jonathan Rothberg M.D., Physician
Barbara Rothberg D.S.W., Social Work
Ben Rotter, Physician
Dana Rous LICSW, Social Work
Deborah Rowden

Florence Rowe ACRN, Social Work
Kevin Rowe, Psychiatrist
Laurel Rowen Ph.D., Psychologist
Nora Rowley M.D., Forensics
Kevin Roy Ph.D., Public Health
Ingrid Roze Ph.D., Psychologist
Desiree Rozier Psy.D., Psychologist
Hadassah Rsmin, Social Work
Nancy Rubico
Susan Rubin, Physician
Lori Rubin M.D., Physician
Penny Rubinfine D.S.W., Social Work
Marie Rudden M.D., Psychiatrist
Ginger Ruddy, Physician
Susan Rudolph, Psychologist
Dr. Dean Rudoy Ph.D., Psychologist
Carrie E Ruggieri, Psychologist
Maritza Ruiz M.D., Physician
Elena Ruiz-Rios M.D., Physician
Daniel Runde M.D., Physician
Jennifer Rupert, Physician
Patricia Rush M.D., Physician
Judy Russell
Rachel Russell Psy.D., Psychologist
Judith Ruszkowski
Elizabeth Rutten-Turner LCSW, Social
Work
Adriana Ruvalcaba LMSW, Social Work
Avery RyanLMSW, Social Work
Julie Ryan Ph.D., Psychologist
Karen Ryan
Deborah Ryan Ph.D.
Tracy Ryaru Ph.D., Psychologist
Kayce Ryberg PNP, Nurse
Thalia Ryer LMHC, Psychologist
Inna Ryvkin M.D., Physician
Anuja S
Moizah Saad D.O., Physician
Altaf Saadi M.D., Physician
Karen Saakvitne Ph.D., Psychologist
Fred Sabb Ph.D.
Raha Sabet
Marlene Sabio Ed.D.
Miranda Sacharin
Anita Sacks LCSW-R, Social Work
David Sacks Psy.D. Psychologist
Sehrish Saeed
Sara Safarzadeh-Amiri M.D., Physician
Luisa Saffiotti Ph.D., Psychologist
Ellen Safier
Stella Safo, Physician
Angela Sagar M.D., Psychiatrist
Elahe Sagar M.D., Psychiatrist
Kristin Sagert Ph.D., Social Work
Priyanka Saha, Medical Student, Physician
Sara Sahl Physician
Thorayya Said Giovannelli, Psychologist
Gina Salamone MPHTM, Public Health
Kathleen Salandrea ASHS, Social Work
Silvia Salas
Claudia Salazar Psy.D., Psychologist
Alle Salazar, Social Work
Melissa Salazar PA-C
Sandra Salerno, Social Work
Tonya Salerno
Amy Salins, Social Work
Kelsie Salmen Psy.D., Psychologist
Saurabh Saluja M.D., Physician
Sarah-Jeanne Salvy, Psychologist
Yasmina Samaha, Medical Student
Phillip Samayoa
Maura Sammon M.D., Physician
Ray Samoa M.D., Physician
Karen Samuels Ph.D., Psychologist
Rachel Samuelson M.D., Physician
Ana San Martin M.D., Psychiatrist
Diana Sanabria, Social Work

Judith Sanchez M.D., Physician
Dayana Sanchez MPH
Henry Sanchez Medical Student
Amy Sanchez, Psychologist
Antonio Sanchez Psychiatrist
Antonio Sanchez
Shara Sand Psy.D, Psychologist
Janay Sander Ph.D., Psychologist
Kirsten Sandgren Social Work
Hollie Sandlin Physician
Sabrina Sandoval M.D., Psychiatrist
Eric Sandoval M.D., Physician
Maria Sandvik
Rosa Sanluis
Tracy Sanson M.D., Physician
Patricia Santivanez
Sebastiano Santostefano Psy.D.,
Psychologist
Anmol Satiani Ph.D., Psychologist
Alicia Sattler APRN-BC, Nurse
Erica Sauer LICSW, Social Work
Danielle Savage M.D., Physician
Esther Savitz LCSW-R, Social Work
Annita Sawyer Ph.D., Psychologist
Keegan Sawyer
Suzan Sayder
Shannon Scanlan
Polly Scarvalone Ph.D., Psychologist
Skyla Scarzella
Laurie Scgwartzer LCSW-R, Social Work
Milton Schaefer Ph.D., Psychologist
Stephanie Schafer, Social Work
Katherine Schaff Dr.PH, Public Health
Michael Schaffer Ph.D., Psychologist
Michelle Schaffner, Social Work
Phyllis Schalet, Social Work
Kathy Jo Schanner
Elaine Schattner M.D., Physician
A Schatz
Gillian Schauer Ph.D., Public Health
Elizabeth Schauer
Diane S. Schaupp PHD
Joshua Schechtel, Physician
Andrew Schechterman Ph.D.
Jessica Schemm M.D.
Kellie Schenk M.D., Physician
Carol Scherer
Abigail Schiff, Medical Student Physician
Gordon Schiff M.D., Physician
Eliza Schiffrin Social Work
Naomi Schiller
Emily Schindler M.D., Physician
Barbara Schinzinger, Physician
Anthony Schlaff, Physician
Lauren Schleimer, Medical Student
Morley Schloss
Judy Schmauss
Luanne Schmidt RN, Nurse
Ann Schmit RN, Nurse
Malea Schmitt, Administrator
Carol Schneebaum M.D., Physician
Alexis Schneider
Stephen Schneider Ph.D., Psychologist
Leah Schneider, Social Work
Celeste Schneider Ph.D., Psychologist
Jana Schneider
Alina Schneider, Nurse
Peter Schneider Ph.D., Psychologist
Muayan Schoeman
Erica Schoenberg Ph.D., Psychologist
Nancy Schoenborn, Physician
Benjamin Schoendorff, Psychologist
Kitturah Schomberg-Klaiss D.O. Physician
Julia Schonberg, Nurse
Stephanie Schonholz
Leah Schraga M.D., Physician
Selena Schreyer

Naia Schroder
Meadow Schroeder, CCRP
Seran Schug, Ph.D.
Gene Schulze Ph.D., Psychologist
Peter Schuntermann M.D., Psychiatrist
Leah Schupp M.D., Psychiatrist
Lisa Schwartz ANP-C, Nurse
Sarah Schwartz, Psychologist
Dorothy Schwartz, Nurse
Michele Schwartz LCSW-R, Psychologist
Stephanie   Schwartz
Henry Schwartz MD, Psychiatrist
Hanna Schwartzbaum, Psychologist
Erin Schwarz D.O., Physician
Megan Schwarzman M.D., Physician
Erika Schwilk M.D., Physician
Elena Schwolsky, Nurse
Andres Sciolla, Psychiatrist
Bruce Scott M.D., Physician
Kerry Scott, Social Work
Alison Scott LPC
Jennifer Scott
Kate Scribner, Social Work
Sara Scripp
Joe Scroppo Ph.D., Psychologist
Laurie Scudder PNP
Sara Scull, Psychologist
Amy Scurlock M.D., Physician
Cheryl Seaman M.D., Physician
Mark Seamon, Physician
Regine Anna Seckinger Ph.D., Psychologist
Trina Seefeldt Ph.D., Psychologist
Margaret Seely, Social Work
Erin Seery M.D., Psychiatrist
Jackie Segarra Social Work
Sally Segel M.D. Physician
Rachel Seitz RN-BC, Nurse
Emily Seltzer
Anne, Selvey Ph.D., Psychologist
Erin Semcken J.D.
Andrew Semegram APRN, Nurse
Nancie Senet Ph.D., Psychologist
Caroline Sennett Esq.
Naomi Senser M.D., Physician
Paola Sepulveda-Miranda, Public Health
Lecia Sequist M.D., Physician
Jordan Serchuk
Jennifer Serlin Ph.D., Psychologist
Steve Serlin M.D., Physician
Mary Serlin
Margo Serlin, Nurse
Megan Serrano, Social Work
Esmeralda  Serrano M.D., Physician
Valeria Servranckx
Lara Setti M.D., Physician
David Shaddock, Psychologist
Betsy Shadid M.D., Psychiatrist
Emily Shaffer
Umber Shafique M.D., Physician
Simon Shagrin Ph.D., Psychologist
Priti Shah Ph.D., Psychologist
Sural Shah, Physician
Ami Shah M.D., Physician
Farhana Shah Ph.D., Psychologist
Shivani Shah, Physician
Niki Shah, Administrator
Mohammad Shaikh M.D., Physician
Iram Shaikh-Abbasi M.D., Physician
Laura Shail
Beverly Shalom LCSW, Social Work
Rose Shalom LMFT, Psychologist
Kristin Shanahan, Psychologist
LeAnn Shannon M.D., Physician
Kate Shanovich
Kathleen Shanovich, Nurse
Alicia Shapinsky Ph.D., Psychologist
Caren Shapiro, Social Work

Michael Shapiro M.D., Physician
Betsy Shapiro
Mia Shapiro LCSW, Social Work
Mindy Shapiro, Physician
Cappy Shapiro, Social Work
Sue A. Shapiro PhD, Psychologist
Aimee Shariat M.D., Physician
Hilda Sharifi M.D., Physician
Jaskiran Sharkey, Physician
Shreya Sharma
Manisha Sharma M.D., Physician
Susan B Sharp
Kristen Sharp, Physician
Michelle Shasha Ph.D., Psychologist
Gabrielle Shatan, Psychologist
Sharon Shatil Ph.D., Psychologist
Paula Shatsky, Social Work
Amy Shattuck, Social Work
Alice Shaw Ph.D., Psychologist
Stephanie Shaw, Physician
Jennifer Shaw M.D., Physician
Victoria Shaw Ph.D., Psychologist
Katherine Shea, Social Work
Marie Shebeck, Social Work
Meghan Sheehan, Physician
Kate Sheehan, Social Work
Jennifer Sheflin LCSW, Social Work
Steven Shein M.D., Physician
Evelyn Sheldon
Jeminie Shell, Social Work
Donna Shelley, MD
Sara Shenker Psy.D., Psychologist
Rachel Shepard, Psychologist
Heather Sher M.D.
Audrey Sheridan M.D., Physician
Benna Sherman, Psychologist
Mark Sherman Ph.D., Psychologist
Patricia Sherman, Social Work
Rachel Shey, Public Health
Carol Shilliday Psy.D., Psychologist
Kevin Shilling, Physician
Ruth Shim M.D., Physician
Suzanne Shimoyama M.D., Psychiatrist
Joseph Shin M.D., Physician
Yael Shinar, Physician
William Shinefield Psy.D., Psychologist
Kate Shirley
Erica Shoemaker, Psychiatrist
Starla Sholl LCSW-C, Social Work
Jessica Shore, Psychologist
Lauren Shores, Psychologist
Judith Shotwell
Whitney Showler
Kayleigh Shrader
Sharon Shrensel ACRC, Psychologist
Rhodara Shreve
Diane Shrier M.D., Psychiatrist
Devki Shukla, Medical Student
Barton Shulman, LCPC
Trysa Shulman Psy.D., Psychologist
Lisa Shwartz RN, Nurse
Monica Sicilia, Psychologist
Mary Sickles M.D., Psychiatrist
Alexandra Sideroff
Jeri Sides Ph.D., Psychologist
Shawn Sidhu, Psychiatrist
Feroze Sidhwa M.D., Physician
Karin Siebenmorgen, Nurse
Ben Siegel M.D., Physician
Jill Siegel Ph.D.
Mari Siegel
Audrey Siegel LCSW, Social Work
Roberta Siegel
Mark Siegert Ph.D., Psychologist
Mary Siemes Ph.D., Psychologist
Rachel Sienko Ph.D., Psychologist
Neha Sikka

Alexis Silas Psy.D, Psychologist
Richard Silberg M.D., Physician
Lynette Silva, Psychologist
Manel Silva M.D.
Alison Silver LCSW, Social Work
Talya Silver, Social Work
Mary Silverberg
Sandra Silverman, Social Work
Louise Silverstein Ph.D., Psychologist
Stephanie Sim M.D., Psychiatrist
Zoya Simakhodskaya Ph.D., Psychologist
Daphne Simeon M.D., Psychiatrist
Andrew Simmons M.D., Physician
Leigh Simmons M.D., Physician
Iris Simon
Jack Simons Ph.D., Psychologist
Virginia Simons, Social Work
Rebecca Simpkin M.D., Physician
John Simpkin RN, Nurse
Douglas Simpkin Ph.D.
Amy Simpson, Physician
Elizabeth M Simpson LCSW, Social Work
Melanie Sims, Social Work
Elizabeth Singer, Physician
Jayne Singer Ph.D., Psychologist
Meredith Singer Ph.D., Psychologist
Mark Singer M.D., Psychiatrist
Rachel Singer, Psychologist
Michael Sinha M.D., Physician
Joel Sjerven, Social Work
Katy Sjerven
Anne Skamai Ph.D., Psychologist
Julia Skapik, Physician
Karen Skean, Psychologist
Amanda Skiff, Social Work
Jared Skillings Ph.D., Psychologist
Kate Skolnick
Judy Skolnick, Social Work
Licia Sky
Anne Slanina Psy.D., Psychologist
Michelle Slapion-Foote, Psychologist
Sunnetta Slaughter, Public Health
Barry Slavis, Social Work
Sharon Sloan, Physician
Phyllis L. Sloate Ph.D., Psychologist
M Slobetz, Social Work
Joyce Slochower Ph.D., Psychologist
Monica Slote, Nurse
Jonathan Slutzman M.D., Physician
Sarah Smalley
Rhaina Smeds Psy.D., Psychologist
Janet Smeltz CADC
Damion Smith, Psychologist
Emily Smith MSN, Nurse
Cabrini Smith
Bea Smith
Andrew Smith, Pharmacist
Vicki Smith
David Smith, Social Work
Amy Smith Ph.D., Psychologist
Charlene Smith
Vernon Smith Ph.D., Psychologist
Olivia Smith, NP
Mark Smith
Sidney Smith, Social Work
Jenny Smith, RN
Lawry Smith, Social Work
Anne Smith, Nurse
Lauren Smith, Administrator
Nicole Smith M.D., Physician
Stacey Smith, Administrator
April Smith D.Phil., Psychologist
Emily Smith M.D., Physician
Keri Smith M.D., Physician
Sacheen Smith
Amy Smith Edwards LCSW, Social Work
Melissa Smith-Parrish M.D., Physician

Marcella Smithson MPH, Public Health
Maya Smolarek, Psychiatrist
Stephanie Snell
Jane Snyder Ph.D., Psychologist
Elizabeth Snyder MSW, Social Work
Ramona Soberanis, Nurse
Lilien Socorro
Lauren Soderstrom
Vanessa Soetanto M.D., Physician
Keren Sofer Psy.D., Psychologist
Kim Sogge Ph.D., Psychologist
Nicole Soileau
Lara Sokoloff
Martine Solages M.D., Psychiatrist
Deana Solaiman M.D., Physician
Alidra Solday LCSW-R, Social Work
Stephen Soldz Ph.D., Psychologist
Ellen Solomon M.D., Physician
Alex Solomon LCSW, Social Work
Rebecca Solomon
Caren Solomon
Valerie Solorzano
Amythis Soltani
Deborah Sommers D.S.W., Social Work
Leslie Sommers
Kristin Sommerville
Soon-IL Song M.D., Physician
Sam Song ANP-HIV, Physician
Mary Songster-Alpin D.V.M.
Lily Sonis LCSW, Social Work
Daniel Sonkin Ph.D., Psychologist
Sheila Sontag M.D., Psychiatrist
CharuSood Psy.D, Psychologist
Kimberly Sorensen LCSW, Social Work
Rachel Sosland, Social Work
Joseph Sotomayor
Jerry Soucy Ph.D., Psychologist
Michael Southworth M.D., Physician
Renya Spak
Susan Spalding
Eve Spangler
Kate Sparks, Social Work
Carly Sparks LCSW, Social Work
Jessica Sparks RN, Nurse
Lauren Spears Ph.D., Psychologist
Chris Spears-Batunek
Jennie Spector, Social Work
Paula Spector, Nurse
Valeriya Spektor Ph.D, Psychologist
Leah Spelman Public Health
Ken Sperber M.D., Physician
Paul Speziale J.D.
Natalie Spicyn M.D., Physician
Paul Spiegel Dr.PH, Physician
Margaret Spier Ph.D., Psychologist
Cara Spitalewitz Ph.D., Psychologist
Deborah Spitz M.D., Psychiatrist
Greta Spoering LICSW,Social Work
Amanda Spray Ph.D., Psychologist
Frank Spring
Judith Springer, Psychologist
Susan St. John MSEd
B.F. St.AngeloVictor
Sta. Ana M.D., Physician
Christina Stableford
Margaret Stager M.D., Physician
Emily Stagg APRN-BC, Nurse
Jessica Stahl Ph.D., Psychologist
Juliet Stamperdahl Ph.D., Psychologist
Geraldine Stampf, Social Work
Carol Stampfer, Nurse
Flavia Stanley, Social Work
Hannah Starobin, Social Work
Karen Starr Psy.D., Psychologist
Judith Staub
Sarah M Stearns Ph.D., Psychologist
Nancy Steckler Ph.D., Psychologist

Carmen Steckline, Physician
Courtney Steer-Masaro CNM
Joann Stefano, Nurse
Lauren Steffel, Psychologist
Catherine Steffens
Carrie Stein, Social Work
Alyson Stein
Lauren Stein, Social Work
Jane Stein
Carolyn Steinberg M.D., Physician
Brenda Steinberg Ph.D., Psychologist
Brenda Steinberg Ph.D., Psychologist
Michelle Steinberg
Beian Steiner, Psychologist
Marlene Steiner
Aimee Steiniger, Physician
Christopher Stephano LMSW, Social
Work
Alice Stephens, Social Work
Tricia Stephens, Social Work
Linda Story Stephenson, Social Work
Laura Stephenson, Psychologist
Katrina Sterba
Marina Stern, Physician
Alexis Stern
Rebecca Stern
Donnel Stern Ph.D., Psychologist
George Stern
Lee Stern
Rhonda Sternberg Ph.D., Psychologist
Corinne Stevens RN, Nurse
Deana Stevens Psy.D., Psychologist
Stacey Stevens LMHC
Rae Stevenson, Physician
Alice Steward
Karen Stewart, Social Work
Caroline Stewart LCSW, Social Work
Amanda Stewart M.D., Physician
Stella Stewart, Social Work
Lacey Stewart, Social Work
Alejandra Stewart M.D., Physician
Arlene Stiffman Ph.D., Social Work
Claire Stiles Ph.D.
Kathryn Stinson, Social Work
Michael Stocker Ph.D.
Sandor Stockfleth, Psychologist
Sasha Stok, Psychologist
Hanni Stoklosa
Katherine Stolarz, Physician
Glenda Stoller LCSW-R, Social Work
James Stoltzfus M.D., Physician
Elizabeth Stone
Geren Stone, Physician
Patricia Stone
Ann Stoneson
Michael Stoppiello, Psychologist
Anne Stormorken M.D., Physician
Bethany Storz ANP-BC, Nurse
Jeffrey Stovall M.D., Physician
John Stracks M.D., Physician
Anne Strain, Social Work
Angela Strain, Psychiatrist
Kee Straits Ph.D., Psychologist
Molly Stranahan Psy.D., Psychologist
Elspeth Strang LCSW-R, Social Work
Yorgos Strangas M.D., Physician
Adam Strassberg, Psychiatrist
Thomas Stratton, Physician
Susan Straus
Paula Strauss Psy.D., Psychologist
Jona Strauss, Physician
Barbara Streeter
Johanna Strobel, Psychologist
Matthew Strobel Psy.D., Psychologist
Lenore Strocchia-Rivera Ph.D.,
Psychologist
James Strohl Ed.D., Psychologist

Susan Strom
Mark Stroman, Nurse
Msrgaret Strosser
Jennfer Strumwasser
Krysttel Stryczek
Jessica Stults, Social Work
Lee Sturdivant
Gabrielle Stutman Ph.D., Psychologist
Lauren Suarez, Psychologist
Seymour Sub
Jennifer Subasic-Marks
Elaine Suben LCSW-R, Social Work
Rani Subramaniam
Aditi Subramaniam
Asha Subramanian M.D., Physician
Sujatha Subramanian Ph.D., Psychologist
Alvin Sugarman
Iris Sugarman, CSW
Kate Sugarman, Physician
Mark Sullivan, Social Work
Katie Sullivan, Medical Student
Meghan Sullivan, Physician
Elise Sullivan, Physician
Maggie Sullivan, Nurse
Lei Sun MSEd
Anisha Sunkerneni
Soksophea Suong
Alicia Supernault
Rajat Suri, Physician
Paola Susan M.D., Physician
Shea Suskin M.D., Physician
Donna Sutter M.D., Physician
C. Jay Sutton, Psychologist
Jessica Suzuki, Psychologist
Laura Suzuki, Nurse
Deanna Sverdlov OB/GYN, Physician
Stephanie Swafford, Administrator
Sara Swain, Physician
Nicole Swain, LPC
Padma Swamy, Physician
Suzanne Swanson Ph.D., Psychologist
Lianne Swanson
Kinya Swanson Psy.D., Psychologist
Sarah Swanson-Damon
Lauren Swartz
Zarana Swarup M.D., Physician
Nancy Sweeney Psy.D., Psychologist
Carolyn Swenson, Physician
Eve Switzer M.D., Physician
Monica Swords, Social Work
Ricci Sylla M.D., Physician
Joanna SymeonPsy.D., Psychologist
Shonda Szabo
Dorota Szczepaniak M.D., Physician
Julio Szmuilowicz, Psychiatrist
Sharon Szmuilowicz M.D., Psychiatrist
Stephanie Tabashneck Psy.D.,
Psychologist
Beth Tabor-lev Ph.D., Psychologist
Linda Tafapolsky Psy.D., Psychologist
Leah Taffel, Physician
Waqqas Tai, Physician
BReena Taira M.D., Physician
Virginia Takagi M.D., Physician
Lucy S. Takagi, Psy.D. Psychologist
Wajma Talib RN-BC, Nurse
Kaaren Tam M.D., Physician
Jennifer Tamir, Nurse
Paige Tang O.D.
Aswita Tan-McGrory, Public Health
Nazeela Tanweer
Shannon Tapia M.D., Physician
Kim Tappen Psy.D., Psychologist
Cristian Taraschi, Social Work
Aparna Tarc
Shamyla Tareen, Social Work
Lucila Tarin M.D., Physician

Yael Tarshish M.D., Physician
Jeanne Tate MSN, Nurse
Emilia Taubic
Cathy Tauscher, Nurse
Gabrielle Taylor Ph.D., Psychologist
Brent Taylor Ph.D.
Ellen Taylor, Psychologist
Nicole Taylor Ph.D., Psychologist
Brooke Taylor LMSW, Social Work
May Taylor Ph.D, Psychologist
Joy Taylor, Social Work
Sara Teasdale, Physician
Kam Tecaya, Physician
Linda Techell LMSW, Social Work
Alice Teich M.D., Physician
Christina Temes, Ph.D.
Lisa Temkin
Betsy Templeton
Linda Tennies
Debra Teplin PA-C
Vincenzo Teran Psy.D., Psychologist
Jill Terrell-Ouazzani
Nancy Terres Ph.D., Nurse
Anna Terry M.D., Physician
Melissa Tesher M.D., Physician
Baylah Tessier-Sherman, Public Health
Maria Testa, Psychologist
Susan Thackrey Ph.D., Psychologist
Reshma Thadani, Physician
Bob Thaden
Susan Thau Ph.D., Psychologist
Micaela Theisen FNP-BC
Makani Themba, Public Health
Karin Theurer-Kaufman Ph.D.,
Psychologist
Kelly Thibeault LCSW, Social Work
Catharine Thomann Ph.D., Psychologist
Nina Thomas Ph.D., Psychologist
Catherine Thomas PNP, Nurse
Marlene Thomas MHA, Nurse
Martha Thomas, Physician
Allie Thomas-Fannin M.D., Psychiatrist
Nicole Thomasian, Physician
Tamara Thome. Physician
JJ Thomlinson, Social Work
Jason Thompson, Psychologist
Nellie Thompson
Gretchen Thompson
Celena Thompson Psy.D., Psychologist
Julia Thompson CSW, Social Work
Valerie Thompson
Craig Thompson M.D., Physician
Marnie Thompson
Thomas Thompson Ph.D, Psychologist
Janet Thompson LPN
Ann Thompson Cook. Social Work
Ariana Thompson-Lastad Ph.D., Public
Health
Kerry Thon
Liviya Thoreson-Whyte D.O., Physician
Patricia Thrasher, Social Work
Benjamin Tiano
Alanna Ticali
Wendy Tien M.D., Physician
May Tift LMFT
Blair Tilghman, Nurse
Jane Tillman Ph.D., Psychologist
Jaci Timmons M.D., Physician
Ulrika Timvik-Abreau, Scientist
Beth Tinker RN, Public Health
Jannett Tirado
Dennis Tirch Ph.D., Psychologist
Elizabeth Tisei M.D., Physician
Sigrid Tishler M.D., Physician
Mirjam Tkalcic, Psychologist
Matt Tobey M.D., Physician
Valerie Tobia

Valerie Tobin APN, Scientist
Mary Tobin-Anderson M.D., Physician
Lauren Tobing-Puente, Psychologist
Cynthia Tocman
Tahisha Tolbert M.D., Physician
Terry Tolk Ph.D., Psychologist
Elizabeth Toll, Physician
Pat Tomasello, Public Health
Allison Tom-Yunger, Social Work
LeeAnn Toolan
Felice Toonkel
Jeremy Topin M.D., Physician
Paula Toribio
Mary Tornabene, Nurse
Gina Torres, Social Work
Amanda Torres, Social Work
Bianca Torres
Melissa Torres Ph.D., Social Work
Randi Torstenson Psy.D., Psychologist
Angela Tougas, Nurse
Kim Tousignant, Psychologist
Sima Toussi M.D., Physician
Luz Towns-Miranda Ph.D., Psychologist
Heather Tracey, Social Work
Jamie Tracktenberg LCSW, Social Work
Celina Tracy
Carol Tracy Ph.D., Psychologist
Patricia Trainor Ph.D., Psychologist
Vy Tran, Public Health
My Tuyet (Virginia) Tran
Aminata Traore, Physician
Colleen Traud APRN-BC
Matt Travis
Jennifer Trebbin
Amanda Trecartin
Diane Trees -Clay
George Tremblay Ph.D., Psychologist
Jackie Treneer
Robin Treptog Ph.D., Psychologist
Sylvia Trevino M.D., Physician
Melissa Tribuzio M.D., Physician
Dr. David Trimble, Psychologist
Catherine Trimbur M.D., Physician
Christy Trombley Psy.D., Psychologist
Lucianna Trujillo, Physician
Samantha Truong, Medical Student
Linda Tsai D.O., Physician
Elizabeth Tschoegl, Social Work
Steven Tuber Ph.D., Psychologist
Richard Tuck Psy.D. Psychologist
Bethany Tucker M.D. Psychiatrist
Jane Tucker Ph.D. Psychologist
Sondra Tuckfelt Ph.D. Psychologist
Michelle Tully, Social Work
Shirley Tung, Social Work
Angela Tunno Ph.D. Psychologist
Robert Turer, Physician
Michael Turken M.D. Physician
William Turner M.D. Physician
Cathuryn Turner M.D. Psychiatrist
Ray Turner Psy.D. Psychologist
Sarah Turney LMHC
Karen Tuttle, Social Work
Evelyn Twentyman M.D. Physician
Jeanne Tyan M.D. Physician
Dale Tylor M.D. Physician
Gabrielle Tynes-Labonte
Grayce Tyszko
Efstathia Tzatha
Hala Ubaid D.O. Physician
Gianna Ubinas Dr.PH. Physician
Molly Uhlenhake D.O. Physician
Sarah Ullman Ph.D. Psychologist
Claudia Unger Ph.D. Psychologist
Jennifer Unterberg Ph.D. Psychologist
Nina Urban M.D. Psychiatrist
Miren Uriarte Ph.D. Social Work

Michelle Urman
Sebastian Urrea
Mayur Urva
Kathy Usher
Kelly Uusitalo
Shantel Vachani, Social Work
Melanie Vaira
Laura Valdes
Juanita Valdez-Cox
Kristin Valentino Ph.D. Psychologist
Barbara Valenza
Sarah Valeri
Holly Valerio M.D. Psychiatrist
Lisa Vallejos Ph.D. Psychologist
Charleen Valli, Nurse
Carol Valoris
Elizabeth Van Dyke, Physician
Joyce Van Huis
Heather Van Wagner
Hima Bindu Vanapalli M.D. Physician
Lisa M Vandemark Ph.D. Nurse
Kay Vandenberg M.D.Physician
Elizabeth Vandermark M.D. Physician
Jeffrey Vanderploeg Ph.D. Psychologist
Lennie Rae Vangorder
Noelle VanHendrick
Kristin Vann Sands, Nurse
Tamara, Vanover
Ted VanSickle
Kate VanZanten, Public Health
Eliza Varadi M.D. Physician
Ruth Varkovitzky Ph.D. Psychologist
Samantha Varner M.D. Physician
Jessica Vasquez M.D. Physician
Melba Vasquez Ph.D. Psychologist
Sheryl Vassallo M.D. Physician
Jessica Vaughn Physician
Linnea Vaurio Ph.D. Psychologist
Sara Vazquez M.D. Physician
Lilliana Vazquez M.D. Physician
Desiree Vega, Psychologist
Farah Vega M.D. Physician
Aurea Vega
Natan Vega Potler
Manasa Velagapudi
Larissa Velez, Physician
Joann Veloudis
David Venarde Psy.D. Psychologist
Laura Venuto Psy.D. Psychologist
Zoe Vercelli
Noushin Verdi, Psychologist
Raluca Veres
Juan Vernon M.D. Physician
Diana Vernon
Anne Vestergaard LISW, Physician
Maureen Vetter
Yorleny Vicioso, Scientist
Craig Vickstrom M.D. Physician
Alejandro Victores
Anne Victory MSN, Nurse
Alexis Vidaurri D.V.M.
Julie Vieth MB ChB, Physician
Nicole Vigoda Psy.D. Psychologist
Bianca Villalobos, Psychologist
Kathy Villalovos
Rodrigo Villar M.D. Physician
Camila Villasante
Nina Vinson, Scientist
Elena Visconti MSEd
Tamar Vishlitzky LICSW, Social Work
Kirsten Vitrikas, Physician
Miguel Angel Viveros, Psychologist
Jennine Vizcaino
William Vlach Ph.D., Psychologist
William Vlach Ph.D., Psychologist
Michelle Vo M.D. Physician
Diana Voellinger

Martha Vogel Ph.D. Psychologist
Monica Vohra M.D. Physician
Erin Volpe Ph.D. Psychologist
Bettina Volz Ph.D. Psychologist
Gloria Von Oiste, Social Work
Barbara VonKlemperer Ed.D. Psychologist
Katie Voorhees
Susan Voorhees Psy.D. Psychologist
Rajvee Vora M.D. Psychiatrist
Petra Vospernik Ph.D. Psychologist
Raluca Vrabie, Physician
Maria Vukovich Ph.D. Scientist
Michael Vurek, Social Work
Carol Wachs Psy.D. Psychologist
Paul Wachtel Ph.D. Psychologist
Karen Wachtel, Psychologist
Kristen Wade-Kempiak M.D. Physician
Lauren Wadsworth Dr.PH.
Linda Wagner M.D. Physician
Lorryn Wahler
Barbara Wainberg
Amanda Wakefield, Psychologist
Karen Walant Ph.D. Social Work
Richard Waldhorn M.D. Physician
Kate Waldman
Amy Waldner
Melissa Walker LCSW-R, Social Work
Susan Walker-Matthews Ph.D.
Psychologist
Tami Walkup
Anuhea Wall MSW, Social Work
Joseph Wall
Jennifer Wallach, Psychologist
Hannah Wallerstein Ph.D. Psychologist
David Wallin Ph.D. Psychologist
Stephanie Wallio Ph.D. Psychologist
Bill Walter, Physician
Anne Walters Ph.D. Psychologist
Lynn Walters Ph.D.
Heather Walton Ph.D. Psychologist
Sheshali Wanchoo D.O. Physician
Karen Wang M.D. Physician
Leah Wang Ph.D. Psychologist
Holly Wanic
Saman Waquad
Margaret E. Ward Ph.D.
Elizabeth Ward, Psychologist
Kimiora Ward, CNO
Karlyn Ward LCSW, Social Work
Deborah Warden LCSW, Social Work
Meredith Warden M.D. Physician
Jessica Ware, Social Work
Layla Ware de Luria LCSW, Social Work
Leslie Warfield Psy.D. Psychologist
Ellie Warner-Rousseau
Colleen Warnesky, Psychologist
Kristan Warnick, Social Work
Barbara Warren MSEd, Psychologist
Erin Warren D.V.M.
Susan Warshaw Ed.D. Psychologist
Deborah Washburn, Social Work
Linda Washburn CSW Social Work
Ashley Waterberg, Social Work
Patricia Waterman
Deirdre Waters Psy.D. Psychologist
Gregory Waters Ph.D.
Melanie Wathugala
Mary Watkins Ph.D. Psychologist
Danielle Watson
Fiona Watson LCSW-R Social Work
Laurel Watson Dr.PH. Psychologist
Morgan Watson, Social Work
Terry Watson
Sara Watson M.D. Physician
Deborah Waxenberg, Psychologist
Judith Weatherly LMFT
Gina Weaver, Social Work

Jenna Weaver D.V.M.
Marcia Webb
Sara Weber Ph.D. Psychologist
Megan Webster M.D. Psychiatrist
John Wechter Ed.D. Psychologist
Elizabeth Weeks, Physician
Jane Weese, Nurse
Julie Wegener M.D. Psychiatrist
Amelie Wegner, Physician
Lori Weichenthal, Physician
Steven Wein, M.D. Psychiatrist
Kristy Weinberg, Social Work
Kaethe Weingarten, Psychologist
Radhule Weininger Ph.D. Psychologist
Anne Weinrich M.D. Physician
Marie Weinstein, Psychologist
Lissa Weinstein Ph.D. Psychologist
Rev. Edie Weinstein, Social Work
Zoe Weinstein M.D. Physician
Joanna Weinstock M.D. Physician
Katrina Weirauch DO Physician
Laura Weisberg Psychologist
Lise Weisberger M.D. Physician
Anat Weisenfreund, Administrator
Deborah Weisinger Psy.D. Psychologist
Tanya Weisman M.D. Psychiatrist
Andrea Weiss Ph.D. Psychologist
Howard Weiss Ph.D. Psychologist
Lois Weithorn Ph.D. Psychologist
Ashley S.  Weitz
Anna Welch MSEd
Bryant Welch, Psychologist
Christauria Welland, Psychologist
Nicole Wellbaum, Physician
Karen Welling, Social Work
Risa Wells Ph.D. Psychologist
Mariah Wells, Nurse
Jessica Welt-Betensky Psy.D. Psychologist
Amy Wenger, Nurse
Carol Wenzel-Rideout Psy.D. Psychologist
Marisa Werner M.D. Physician
Amy Wesh Ph.D. Psychologist
Elissa West LCSW-R, Social Work
Druesella West LMFT
Sarah West
Emily West
C. William Wester M.D. Physician
Tammy Westergaard LMHC, Psychologist
Ariel Westerman, Psychologist
MarWesthead Psy.D. Psychologist
Ellen Westrich Ph.D. Psychologist
Karen Wexler Ph.D. Social Work
Marly Wexler
Susan Whedbee LCSW-R, Psychologist
Rachel Wheeler M.D. Physician
Elizabeth Wheeler Ph.D. Psychologist
Ann Wheeler LICSW, Social Work
Kathy Whelan
Scott Whipple LCSW Social Work
Cortnee Whipple D.C.
Ray White, Forensics
Katherine White Th.D. Nurse
Lina White RN, Nurse
Erika White Ph.D. Psychologist
Amy White
Darden White LPC
Stefanie White M.D. Physician
Tyrone White, Social Work
Kaylin White
Kristen White, Administrator
Gary Whited, Psychologist
Carolanne Whitfield
Chris Whitman
Chelsea Whitney MPH, Nurse
Lindsay Whittington, Nurse
Byron Whyte M.D. Physician
Alison Whyte, Social Work

Karen Wickline, Social Work
Chana Widawski LMSW, Social Work
Robert Widner
Susie Wie M.D. Psychiatrist
Gina Wiggins, Psychologist
Katharine Wilcox
Dayle Wild LCSW-R Social Work
Rose Wilde MPH, Public Health
Howard Wilinsky M.D. Psychiatrist
Risa Wilkerson, Public Health
Beena Wilkins, Physician
Shannon Wilks LCSW, Social Work
Cynthia Willard M.D. Physician
Karen Willatt, Nurse
Karen Willatt
Dayna Willems D.V.M. Physician
Monique Willett, Social Work
Ingrid Willgren LMHC, Social Work
Kira Williams M.D. Psychiatrist
Steven Williams, Physician
Jenifer Williams Ed.D. Psychologist
Brie Williams, Physician
Risa Williams
Shenoa Williams CRNP
Natalie Williams
Shanna Williams, Social Work
Sherril, Willis
Miryam Wilson, Physician
Laurie J. Wilson, Psychologist
Frederic Wilson M.D. Physician
Kristen Wilson, Nurse
Hinda Winawer LCSW Social Work
Elizabeth Winchell, Social Work
M Margit Winckler Ph.D. Psychologist
Jyoti Wind
Rebekah Windmiller
Jennifer Wineke
Daniel Winetsky, Physician
Anna Wing
Rebecca Winkel Ph.D. Psychologist
Jessica Winkels, Medical Student
Taryn Winkle M.D. Physician
Jon Winkle
Kristin Winnor, Nurse
Wendy Winograd D.S.W. Social Work
Marcia Winter Ph.D. Psychologist
Terry Winter Nurse
Bernadette Winter-Villaluz, Social Work
Randi Wirth, Psychologist
Annamarie Wise MPH, Public Health
Gabriel Wishik M.D. Physician
Susan Siegeltuch Witkin LCSW-C, Social
Work
Agnieszka Witkowski M.D. Physician
Renee Witlen M.D. Psychiatrist
Emily Witt
Kirsten Wittenborn Psy.D. Psychologist
Jack Wiuse
Cynthia Woelfel Ph.D. Psychologist
Diana Wohler M.D. Physician
Kimberly Wolf Physician
Astrid Wolf-O'Hern
Abigail Wolfson, Nurse
Andrea Wollenberg
Todd Wolynn M.D. Physician
Philip Wong, Psychologist
Haeinn Woo, Physician
Sally Wood Ph.D. Psychologist
Ashley Woodhull, Psychologist
Lindsay Woodruff
Tracy Woodruff
Monika Woods M.D. Physician
Jared Woods
Alicia Woodsby, Social Work
Catherine Worden M.D. Physician
Jennifer Workman M.D. Physician
Hilary Worthen M.D. Physician

Catherine Wraight M.D. Physician
Lisa Wray M.D. Physician
Darrell Wright M.D. Physician
JD Wright, Psychologist
Tricia Wright M.D. Physician
Joe Wright, Physician
Bessy Wrights, Public Health
Frances Wrle LMT
Wendell Wu, Physician
Synphen Wu M.D. Physician
Ashley Wu
James Wulach Ph.D. Psychologist
Marijo Wunderlich Dr.PH. Public Health
Andy Wurl, Psychologist
Rachel Wyner Ph.D. Psychologist
Matthew Wynia M.D. Physician
Stephen N. Xenakis M.D. Physician
Ilya Yacevich LMFT Psychologist
Carolina Yahne Ph.D. Psychologist
Laura Yahr Nelson M.D. Psychiatrist
Inna Yalovetskaya, Physician
Stephanie Yamout, Physician
Lanbo Yang
Yvonne Yang, Psychiatrist
Susan Yanow, Social Work
Margaret Yard Ph.D. Psychologist
Sarah Yasmin, Psychiatrist
Joannie Yeh M.D. Physician
Mary Yerkes Ph.D. Psychologist
Brooke Yetter Psy.D. Psychologist
Alexis Yetwin Ph.D. Psychologist
Katie Yoast
Rachel Yoder, Psychiatrist

Eva Young
Catherine Young
Jackie Young LMHC
Janine Young, M.D.Physician
Stuart Youngner, Psychiatrist
Sidra Younus M.D. Physician
Aisha Yousafzai Ph.D. Public Health
Albert Yu, Physician
Doris Yu M.D. Physician
Kate Yun, Physician
Ilana Zablow, Social Work
Rachel Zack Ishikawa Ph.D. Psychologist
Alexandra Zagoloff, Psychologist
Hengameh Zahed, Physician
Sarah Zaheer M.D. Physician
Nora Zaizar LPC
Amy Zajakowski Uhll LCPC, Psychologist
Angela Zallen M.D. Physician
Ellen Zaltzberg, Public Health
Tauheed Zaman M.D. Psychiatrist
Moneeka Zaman M.D. Physician
Milagros Zambrano-Rishel Psy.D.
Psychologist
Eleana Zamora M.D. Physician
Anuradha Zangri
Ana Luiza Zaninotto Ph.D. Psychologist
Cassidy Zanko M.D. Physician
Mary Zanko, Social Work
Andrea Zanko
Robert Zannoni
Lela Zaphiropoulos LCSW, Social Work
Michael Zaretsky LCSW-R, Social Work
MichellZarowitz Psy.D. Psychologist

Rebecca Zash M.D. Physician
Lynne Zeavin Psy.D. Psychologist
Miriam Zehavi, Social Work
Paula Zerfoss, Social Work
Sarah Zerull
Heidi Zetzer Ph.D. Psychologist
Judith Zevin Psy.D. Social Work
Cindy Zhao, Physician
Emily Zhou
Elaine Zickler LCSW, Social Work
Christine Zidell, Scientist
Denise Zielinski
Suzanne Zilber Ph.D. Psychologist
Carol Zimmer
Anna Zimmer, Physician
Linda Zimmerman
Randi Zimmerman, Social Work
Ellen Zimmerman, Social Work
Kathleen Zimmerman, Nurse
Peter Zimmermann Ph.D.
Alissa Zingman M.D. Physician
Nancy Zintak, Administrator
Ruth Zitner, Psychologist
Kate Zona Ph.D. Psychologist
Jeannine Zoppi Ph.D. Psychologist
Cindy Zou
Laura Zucker
Amy Zuckerman LCSW-R, Social Work
Lauren Zurenda Ph.D. Psychologist
Fiona True, Social Work

# Exhibit J

June 14, 2018

President Donald Trump
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

Dear President Trump:

On behalf of the American Psychological Association (APA), we are writing to express our deep concern and strong opposition to the Administration's new policy of separating immigrant parents and children who are detained while crossing the border. We previously wrote to then Secretary of Homeland Security John Kelly on April 5, 2017, about this matter. Based on empirical evidence of the psychological harm that children and parents experience when separated, we implore you to reconsider this policy and commit to the more humane practice of housing families together pending immigration proceedings to protect them from further trauma.

APA is the leading scientific and professional organization representing psychology in the United States. Our membership includes researchers, educators, clinicians, consultants, and students. APA works to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives. We have 115,700 members and affiliates across the United States and in many other countries, many of whom serve immigrant youth and adults in a wide range of settings, including schools, community centers, hospitals and refugee resettlement centers.

The current policy calls for children to be removed from their parents and placed for an often indeterminate period of time in the custody of the Office of Refugee Resettlement. Decades of psychological research have determined that it is in the best interest of the child and the family to keep families together. Families fleeing their homes to seek sanctuary in the United States are already under a tremendous amount of stress.[1] Sudden and unexpected family separation, such as separating families at the border, can add to that stress, leading to emotional trauma in children.[2] Research also suggests that the longer that parents and children are separated, the greater the reported symptoms of anxiety and depression are for children.[3] Adverse childhood experiences, such as parent-

---

[1] Chaudry, A. (2011). Children in the aftermath of immigration enforcement. *The Journal of the History of Childhood and Youth,* 4 (1), 137-154.
[2] Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family,*74, 829-845. Doi:10.1111/j.1741-3737.2012.00989x
[3] Suárez-Orozco, C., Bang, H.J. & Kim, H.Y (2010). I felt like my heart was staying behind: Psychological implications of family separations and reunifications for immigrant youth. *Journal of Adolescent Research 26(2),* 222-257.

child separation, are important social determinants of mental disorders. For children, traumatic events can lead to the development of post-traumatic stress disorder and other mental health disorders that can cause long lasting effects.[4] Furthermore, immigration policies, such as separating families at the border, can also adversely impact those immigrants who are already in the United States. They can suffer from feelings of stigmatization, social exclusion, anger, and hopelessness, as well as fear for the future.[5]

As a tragic example of the current policy's serious potential for harm, a Honduran man who was separated from his wife and 3-year-old son after he crossed the border into Texas recently took his own life while detained in a holding cell, according to the Customs and Border Protection officials, public records, and media reports.[6] There are also reports of detained immigrants foregoing legitimate claims for asylum by pleading guilty to expedite the return of their separated children and reports of parents being deported while their children, including infants, remain in custody. These incidents serve to highlight the mental health crisis for many families caused by the Administration's policy.

Given these considerations, a change in immigration policy regarding the detention of immigrant families at the border is desperately needed – from separating parents and children to housing them together and providing needed physical and mental health services. As psychologists, we have documented multiple harmful effects of parent-child separation on children's emotional and psychological development and well-being and urge that the current policy of family separation be reversed. Should you have any questions regarding these comments, please contact Serena Dávila, J.D., with our Public Interest Directorate at sdavila@apa.org or 202-336-6061.

Sincerely,

Jessica Henderson Daniel, Ph.D., ABPP          Arthur C. Evans, Jr., Ph. D.
President                                       Chief Executive Officer

cc:     U.S. Attorney General Jeff Sessions
        U.S. Secretary of Homeland Security Kirstjen Nielsen

[4] Rojas-Flores, L., Clements, M., Koo, J. London, J. (2017). Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation. *Psychological Trauma: Theory, Research, Practice, and Policy,* Vol 9, No. 3, 352.

[5] Suárez-Orozco, C., (2017). Conferring Disadvantage: Behavioral and Developmental Implications for Children Growing up in the Shadow of Undocumented Immigration Status. *Wolters Kluwer Health, Inc., 426.*

[6] Mays J. & Stevens M. (2018, June 10). Honduran Man Kills Himself After Being Separated From Family at U.S. Border, Reports Say. *The New York Times.* Retrieved from https://www.nytimes.com/2018/06/10/us/border-patrol-texas-family-separated-suicide.html.

# Exhibit K



**JAMES L. MADARA, MD**
EXECUTIVE VICE PRESIDENT, CEO

ama-assn.org
t  (312) 464-5000

June 19, 2018

The Honorable Kirstjen M. Nielsen
Secretary of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20528

The Honorable Jefferson B. Sessions, III
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Alex M. Azar, II
Secretary
U.S. Department of Health & Human Services
Hubert H. Humphrey Building
200 Independence Avenue, SW
Washington, DC 20201

Dear Secretary Nielsen, Secretary Azar, and Attorney General Sessions:

On behalf of the physician and medical student members of the American Medical Association (AMA), I am writing to strongly urge the federal government to withdraw its "zero tolerance" policy that requires the separation of migrating children from their parents or caregivers. Instead, we urge the Administration to give priority to supporting families and protecting the health and well-being of the children within those families.

The Administration's "zero tolerance" policy was a topic recently discussed at the AMA's Annual Meeting, which includes delegates representing over 170 state and national medical specialty societies. During this meeting we heard from delegates that the Administration's policy will do great harm to children and their parents or caregivers, who felt compelled to make a dangerous and uncertain journey because of safety concerns in their own countries. Families seeking refuge in the U.S. already endure emotional and physical stress, which is only exacerbated when they are separated from one another. It is well known that childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last an individual's entire lifespan. Therefore, the AMA believes strongly that, in the absence of immediate physical or emotional threats to the child's well-being, migrating children should not be separated from their parents or caregivers.

We urge you to take prompt action on this matter.

Sincerely,

James L. Madara, MD

cc: Office of Refugee Resettlement, U.S. Department of Health & Human Services

Exhibit 38, Page203

# Exhibit L



HOME  >  ACP NEWSROOM  >  ACP OBJECTS TO SEPARATION OF CHILDREN FROM THEIR PARENTS AT BORDER

# ACP Objects to Separation of Children from their Parents at Border

*Statement attributable to:*
*Ana María López, MD, MPH, FACP*
*President, American College of Physicians*

Washington, DC (May 31, 2018)—The American College of Physicians strongly objects to the Department of Homeland Security's "zero tolerance ⧉" policy that requires that all unlawful border crossers be referred to the Department of Justice for prosecution as a misdemeanor of illegal entry, *including parents seeking asylum from persecution who enter the U.S. with their children*. Their children will be treated as if they were "unaccompanied minors," separated from their parents and sent into facilities administered by the federal government.

In a 2017 position statement 🗎 on U.S. immigration policy, ACP expressed our concern about immigration policies that would split up families. While ACP policy recognizes the right of the U.S. to control who enters its borders, a policy of universally separating children from their parents entering U.S. borders will do great harm to children, their parents, and their families.

Childhood trauma and adverse childhood experiences create negative health impacts ⧉ that will last an individual's entire lifespan. Separating a child from his or her parents triggers a level of stress consistent with trauma. Families seeking refuge in the U.S. already endure emotional and physical stress, and separating family members from each other only serves to dramatically exacerbate that stress.

The American College of Physicians calls on the Department of Homeland Security, Attorney General Sessions, and President Trump to withdraw its new policy to require separation of children from their parents, and instead, give priority to supporting families and protecting the health and well-being of the children within those families.

\*\*\*

*About the American College of Physicians*

*The American College of Physicians is the largest medical specialty organization in the United States with members in more than 145 countries worldwide. ACP membership includes 152,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists*

Exhibit 38, Page205

*who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness. Follow ACP on Twitter ⊡ and Facebook ⊡.*

# Exhibit M



**(http://www.acep.org/)**

Search Newsroom

Search

🏠 **(http://newsroom.acep.org/newsroom_home)**

**News Releases (http://newsroom.acep.org/news_releases)**

**ACEP In the News (http://newsroom.acep.org/in-the-news)**

**Multimedia (image_gallery)**

**Resources (http://newsroom.acep.org/resources)**

**Social Media (http://newsroom.acep.org/acep_social_media)**

**Contact Us (http://newsroom.acep.org/contact_us)**

# ACEP Opposes Current DHS "Zero Tolerance" Immigration Policy

Jun 19, 2018

WASHINGTON — In response to a Department of Homeland Security (DHS) "zero tolerance" policy for addressing illegal border crossings in the Southern United States, Paul Kivela, MD, FACEP, president of the American College of Emergency Physicians (ACEP) released the following statement opposing the federal policy:

"ACEP recognizes the right of the United States to regulate immigration and secure its borders, but as emergency physicians, a policy of separating children and parents suspected of entering the U.S. illegally is cruel and will do great harm to the children.

"These separations result in significant health risks for both children and their parents.  Children without criminal records or increased security concerns whose parents seek haven in the United States should never be placed in detention facilities.

"We join other professional medical organizations in opposing this current policy and call on the federal government to immediately change course regarding separation of immigrant families with children, and instead, give priority to protecting the health and well-being of the vulnerable

Exhibit 38, Page208

children within these families."

ACEP is the national medical specialty society representing emergency medicine. ACEP is committed to advancing  emergency care through continuing education, research and public education. Headquartered in Dallas, Texas, ACEP  has 53 chapters representing each state, as well as Puerto Rico and the District of Columbia. A Government Services Chapter represents emergency physicians employed by military branches and other government agencies.

For further information: Mike Baldyga | 202-370-9288 | mbaldyga@acep.org | newsroom.acep.org

**Annals of Emergency Medicine (http://www.annemergmed.com/) | EMAF Website (http://www.acep.org/emactionfund/) | ACEP Policy Statements (http://www.acep.org/policystatements/) | ACEP Now (http://www.acepnow.com/) | ACEP State Chapters (http://www.acep.org/chapters/) | Letters to CMS (http://www.acep.org/regulatory/) | About ACEP (http://www.acep.org/aboutus/about/) | Events (http://www.acep.org/meetings-events/)**

Exhibit 38, Page209

# Exhibit N



‹ News Releases

May 30, 2018

# APA Statement Opposing Separation of Children from Parents at the Border

**WASHINGTON, D.C. —** The American Psychiatric Association issued the following statement from President Altha Stewart, M.D.:

"As physician experts in mental health, the American Psychiatric Association opposes any policy that separates children from their parents at the United States border. Children depend on their parents for safety and support. Any forced separation is highly stressful for children and can cause lifelong trauma, as well as an increased risk of other mental illnesses, such as depression, anxiety, and posttraumatic stress disorder (PTSD). The evidence is clear that this level of trauma also results in serious medical and health consequences for these children and their caregivers. Many families crossing the United States border are fleeing war and violence in their home countries and are already coping with the effects of stress and trauma. These children deserve our protection and should remain with their families as they seek asylum. The APA recommends an immediate halt to the policy of separating children from their parents."

## American Psychiatric Association

The American Psychiatric Association, founded in 1844, is the oldest medical association in the country. The APA is also the largest psychiatric association in the world with more than 37,800 physician members specializing in the diagnosis, treatment, prevention and research of mental illnesses. APA's vision is to ensure access to quality psychiatric diagnosis and treatment. For more information please visit www.psychiatry.org.

## Media Contacts

Glenn O'Neal, 202-459-9732
press@psych.org

Exhibit 38, Page211

Erin Connors, 202-609-7113

econnors@psych.org

- Terms of Use and Privacy Policy
- Contact
- Copyright

© 2018 American Psychiatric Association. All Rights Reserved.

800 Maine Avenue, S.W., Suite 900, Washington, DC 20024

📞 202-559-3900    ✉ apa@psych.org

Exhibit 38, Page212

# Exhibit O



American Academy
of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

Early Career     Pediatric Trainees     Medical Students     International     HealthyChildren.org

Become a Member     Log In

**Professional Resources**

**Professional Education**

**Advocacy & Policy**

**shopAAP**

**About the AAP**

Search...

AAP.org > English > About the AAP > News Room > AAP Statement Opposing Separation of Children and Parents at the Border

AAP Facts

Committees, Councils & Sections

Chapters & Districts

**News Room**

   News Releases

   Health & Safety Tips

   AAP in the News

   AAP Press Room Media Center

   AAP Conferences Press Information

   Media Kits

   Embargoed Media Content

   Social Media Toolkit

Donate Now

Corporate Relationships

Advertise with AAP

Help/Feedback

a  a  a          print          email          share

Exhibit 38, Page214

# AAP Statement Opposing Separation of Children and Parents at the Border

5/8/2018 by: Colleen Kraft, MD, MBA, FAAP, President, American Academy of Pediatrics

"As a pediatrician, as a parent, as the president of the American Academy of Pediatrics (AAP), I am appalled by a new policy reportedly signed by Department of Homeland Security that will forcibly separate children from their parents, a practice that this Administration has already been carrying out for months. In fact, during my recent trip to the border, I saw its impact with my own eyes, and I am not alone in my outrage and dismay at its sweeping cruelty. The AAP is opposed to this policy and will continue to urge the Department of Homeland Security and the Department of Justice to reverse it immediately.

"So many of these parents are fleeing for their lives. So many of these children know no other adult than the parent who brought them here. They can be as young as infants and toddlers.

"Separating children from their parents contradicts everything we stand for as pediatricians – protecting and promoting children's health. In fact, highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children.

"The new policy is the latest example of harmful actions by the Department of Homeland Security against immigrant families, hindering their right to seek asylum in our country and denying parents the right to remain with their children. We can and must do better for these families. We can and must remember that immigrant children are still children; they need our protection, not prosecution."

###

*The American Academy of Pediatrics is an organization of 66,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents and young adults. For more information, visit www.aap.org and follow us on Twitter @AmerAcadPeds.*

**Professional Resources**

**Practice Transformation**
**Clinical Support**
**Quality Improvement**
**AAP Policy**
**Research**
**Journals & Publications**
**Webinars**
**Pediatrics as a Profession**
**National Conference & Exhibition (NCE)**

**Professional Education**

**PediaLink/Online Education**
**Maintenance of Certification**
**Professional Education Publications**
**Education in Quality Improvement for Pediatric Practice (EQIPP)**
**Life Support Programs**

Exhibit 38, Page215

Live Activities

National Conference & Exhibition (NCE)

## Advocacy & Policy

AAP Policy

Federal Advocacy

State Advocacy

Community Advocacy

AAP Health Initiatives

## shopAAP

Access My Account

Renew Membership

Purchase Books & eBooks

Subscribe to Journals & Periodicals

Patient Education

Point-of-Care Solutions

PREP Self Assessments

Register for Live Activities

Register for Online Courses

## About the AAP

AAP Leadership

AAP Facts

Get Involved

Committees, Councils & Sections

Chapters & Districts

News Room

Donate Now

Employment at AAP

Advertise with AAP

Corporate Relationships

Help/Feedback

Digital Transformation Initiative

Privacy Statement     Contact Us     Terms of Use     Support Center

©Copyright 2018 American Academy of Pediatrics. All rights reserved.

Exhibit 38, Page216

# Exhibit P



APHA  >  News & Media  >  News Releases  >  APHA News Releases  >  Parent child separation TFAH statement

# Separating parents and children at US border is inhumane and sets the stage for a public health crisis

**Date:** Jun 15 2018
APHA Contact: Megan Lowry, 202-777-3913
TFAH Contact: Becky Salay, 202-864-5945

*Statement from the American Public Health Association and Trust for America's Health*

Become a Member            >

Donate Now                 >

Newsletter sign up         >

 

*Washington, D.C., June 15, 2018* — "The Trump administration's policy of separating parents and children at the U.S.-Mexico border will have a dire impact on their health, both now and into the future.

"As public health professionals we know that children living without their parents face immediate and long-term health consequences. Risks include the acute mental trauma of separation, the loss of critical health information that only parents would know about their children's health status, and in the case of breastfeeding children, the significant loss of maternal child bonding essential for normal development. Parents' health would also be affected by this unjust separation.

"More alarming is the interruption of these children's chance at achieving a stable childhood. Decades of public health research have shown that family structure, stability and environment are key social determinants of a child's and a community's health.

"Furthermore, this practice places children at heightened risk of experiencing adverse childhood events and trauma, which research has definitively linked to poorer long-term health. Negative outcomes associated with adverse childhood events include some of society's most intractable health issues: alcoholism, substance misuse, depression, suicide, poor physical health and obesity.

"There is no law requiring the separation of parents and children at the border. This policy violates fundamental human rights. We urge the administration to immediately stop the practice of separating immigrant children and parents and ensure those who have been separated are rapidly reunited, to ensure the health and well-being of these children."

### ###

*APHA champions the health of all people and all communities. We strengthen the public health profession. We speak out for public health issues and policies backed by science. We are the only organization that influences federal policy, has a nearly 150-year perspective and brings together members from all fields of public health. Visit us at www.apha.org.*

2018 © American Public Health Association

# Exhibit Q

70                    7

June 20, 2018

**Statement on Harmful Consequences of Separating Families at the U.S. Border**

We urge the U.S. Department of Homeland Security to immediately stop separating migrant children from their families, based on the body of scientific evidence that underscores the potential for lifelong, harmful consequences for these children and based on human rights considerations.

Reports from the National Academies of Sciences, Engineering, and Medicine contain an extensive body of evidence on the factors that affect the welfare of children – evidence that points to the danger of current immigration enforcement actions that separate children from their parents. Research indicates that these family separations jeopardize the short- and long-term health and well-being of the children involved. In addition, the Committee on Human Rights (http://www7.nationalacademies.org/humanrights/) of the National Academies, which has a long history of addressing issues at the intersection of human rights, science, and health, stresses that the practice of separating parents from their children at the border is inconsistent with U.S. obligations under the International Covenant on Civil and Political Rights.

Parents' impact on their children's well-being may never be greater than during the earliest years of life, when a child's brain is developing rapidly and when nearly all of her or his experiences are shaped by parents and the family environment (NASEM, 2016, p. 1 (https://www.nap.edu/read/21868/chapter/2)).  Young children who are separated from their primary caregivers may potentially suffer mental health disorders and other adverse outcomes over the course of their lives (NASEM, 2016, p. 21-22 (https://www.nap.edu/read/21868/chapter/3#21)). Child development involves complex interactions among genetic, biological, psychological, and social processes (NRC and IOM, 2009, p. 74 (https://www.nap.edu/read/12480/chapter/7#74)), and a disruption in any of these – such as family disruption – hinders healthy development and increases the risk for future disorders (NRC and IOM, 2009, p.102-104 (https://www.nap.edu/read/12480/chapter/7#102)).  Young children are capable of deep and lasting sadness, grief, and disorganization in response to trauma and loss (NRC and IOM, 2000, p. 387 (https://www.nap.edu/read/9824/chapter/20#387)).  Indeed, most mental, emotional, and behavioral disorders have their roots in childhood and adolescence (NRC and IOM, 2009, p. 1 (https://www.nap.edu/read/12480/chapter/2)), and childhood trauma has emerged as a strong risk factor for later suicidal behavior (IOM, 2002, p. 3 (https://www.nap.edu/read/10398/chapter/2#3)).

Decades of research have demonstrated that the parent-child relationship and the family environment are at the

Exhibit 38, Page220

foundation of children's well-being and healthy development. We call upon the Department of Homeland Security to stop family separations immediately based on this evidence.

**Marcia McNutt**
President, National Academy of Sciences

**C. D. Mote, Jr.**
President, National Academy of Engineering

**Victor J. Dzau**
President, National Academy of Medicine

- *Parenting Matters: Supporting Parents of Children Ages 0-8* (https://www.nap.edu/catalog/21868/parenting-matters-supporting-parents-of-children-ages-0-8) (2016)
- *Preventing Mental, Emotional, and Behavioral Disorders Among Young People: Progress and Possibilities* (https://www.nap.edu/catalog/12480/preventing-mental-emotional-and-behavioral-disorders-among-young-people-progress) (2009)
- *Psychosocial Concepts in Humanitarian Work with Children: A Review of the Concepts and Related Literature* (https://www.nap.edu/catalog/10698/psychosocial-concepts-in-humanitarian-work-with-children-a-review-of) (2003)
- *Reducing Suicide: A National Imperative* (https://www.nap.edu/catalog/10398/reducing-suicide-a-national-imperative) (2002)
- *Early Childhood Development and Learning: New Knowledge for Policy* (https://www.nap.edu/catalog/10067/early-childhood-development-and-learning-new-knowledge-for-policy) (2001)
- *From Neurons to Neighborhoods: The Science of Early Childhood Development* (https://www.nap.edu/catalog/9824/from-neurons-to-neighborhoods-the-science-of-early-childhood-development) (2000)

**Contact:**
Jennifer Walsh, Director of Media Relations
Office of News and Public Information
202-334-2138; e-mail news@nas.edu

(mailto:news@nas.edu)**Social Media**:
Follow us on Twitter: @theNASEM (https://twitter.com/theNASEM)
Follow us on Instagram: @theNASEM

**The National Academies of Sciences, Engineering, and Medicine** National Academies 500 Fifth Street, NW | Washington, DC 20001 | T. 202.334.2000

Privacy Statement (http://www.nationalacademies.org/legal/privacy/index.html) | DMCA Policy (http://www.nationalacademies.org/legal/policy/index.html) | Terms of Use (http://www.nationalacademies.org/legal/terms/index.html) | Site Map (http://www.nationalacademies.org/sitemap/index.html)

Copyright © 2017 National Academy of Sciences. All rights reserved.

Follow Us:  (http://www.nationalacademies.org/rss/index.html)

Exhibit 38, Page221

(https://www.facebook.com/NationalAcademies/)  (https://twitter.com/TheNASEM) | E-Newsletters

(http://www.nationalacademies.org/subscribe/index.html)

(http://www.nationalacademies.org)

Exhibit 38, Page222

# Exhibit R

The Washington Post

National Security

A family was separated at the border, and this distraught father took his own life

by Nick Miroff June 9 ✉Email the author

A Honduran father separated from his wife and child suffered a breakdown at a Texas jail and killed himself in a padded cell last month, according to Border Patrol agents and an incident report filed by sheriff's deputies.

The death of Marco Antonio Muñoz, 39, has not been publicly disclosed by the Department of Homeland Security, and it did not appear in any local news accounts. But according to a copy of a sheriff's department report obtained by The Washington Post, Muñoz was found on the floor of his cell May 13 in a pool of blood with an item of clothing twisted around his neck.

Starr County sheriff's deputies recorded the incident as a "suicide in custody."

Muñoz's death occurred not long after the Trump administration began implementing its "zero-tolerance" crackdown on illegal migration, measures that include separating parents from their children and the threat of criminal prosecution for anyone who enters the United States unlawfully.

[Trump's 'zero tolerance' at the border is causing child shelters to fill up fast]

Much of the controversy generated by the approach has centered on its potentially traumatic impact for migrant children, but the government has said little about how it handles parents who become mentally unstable or violent after authorities split up their families.

Officials at U.S. Customs and Border Protection in Washington, which oversees border enforcement, had no immediate comment on Muñoz's death nor the whereabouts of his wife and child. Starr County authorities refused to provide a copy of Muñoz's autopsy report and did not respond to several phone messages requesting more information about the cause of death.

An official at the Embassy of Honduras in Washington, Assunta Garcia, said the nation's ambassador was the only person authorized to comment on Muñoz's death. But Garcia said he was too busy attending to a visit from President Juan Orlando Hernández.

According to Border Patrol agents with detailed knowledge of what occurred, Muñoz crossed the Rio Grande with his wife and 3-year-old son on May 12 near the tiny town of Granjeno, Tex. The area is a popular crossing point for Central American families and teenagers who turn themselves in to apply for asylum in the United States.

Soon after Muñoz and his family were taken into custody, they arrived at a processing station in nearby McAllen and said they wanted to apply for asylum. Border Patrol agents told the family they would be separated. That's when Muñoz "lost it," according to one agent, speaking on the condition of anonymity to discuss the incident.

"The guy lost his s—," the agent said. "They had to use physical force to take the child out of his hands."

Muñoz was placed in a chain-link detention cell, but he began punching the metal and shaking it violently, agents said.

[Illegal border crossings remained high in May despite Trump's crackdown]

Though Muñoz did not attempt to assault Border Patrol staff, he was at that point considered to be "pre-assault" because he was so agitated. As one agent described it, Muñoz "had the look of a guy at a bar who wanted to fight someone."

"We had to get him out," the agent said. "Those cells are about as secure as a dog kennel. He could have hurt someone."

Unruly detainees typically are taken to local jails, where they can be placed in more secure settings or isolation cells, known as administrative segregation. Border Patrol agents found a vacant cell for Muñoz 40 miles away at

the Starr County Jail in Rio Grande City. When they attempted to place Muñoz in the van, he tried to run away and had to be captured and restrained.

"He yelled and kicked at the windows on the ride to the jail," an agent said. Shackled and handcuffed, Muñoz attempted to escape again upon arrival and once more had to be restrained.

According to the sheriff's department report, Muñoz was booked into the jail at 9:40 p.m. He remained combative and was placed in a padded isolation cell, it says.

Guards said they checked on Muñoz every 30 minutes and observed him praying in a corner of his cell the following morning.

A guard who walked by the cell at 9:50 a.m. said he noticed Muñoz lying in the center of the floor, unresponsive and without a pulse. The guard "noticed a small pool of blood by his nose" and "a piece of clothing twisted around his neck which was tied to the drainage location in the center of the cell," according to the incident report filed by the sheriff's department that morning.

Paramedics found Muñoz dead, his electrocardiogram showing a "flat line," according to the report. The sheriff's department said it attempted to contact Honduran authorities who could reclaim Muñoz's body, but they received no answer at a consulate. Muñoz's wife and son were later released from Border Patrol custody, according to one agent.

Another agent familiar with what happened said he couldn't understand why Muñoz "would choose to separate himself from his family forever" by taking his own life. Homeland Security officials say they are doing more to explain the separation process to parents and have set up a special hotline to help them locate their children after several reports of migrants being sent back to Central America while their children remain in U.S. foster care thousands of miles away.

💬 **2274 Comments**

Nick Miroff covers immigration enforcement, drug trafficking and the Department of Homeland Security on The Washington Post's National Security desk. He was a Post foreign correspondent in Latin America from 2010 to 2017, and has been a staff writer since 2006. 🐦 Follow @NickMiroff

**The Washington Post**

# The story must be told.

Your subscription supports journalism that matters.

**Try 1 month for $1**

# Exhibit S

U.S. officials separated him from his child. Then he was deported to El Salvador. - The W... Page 1 of 5

Case 3:18-cv-00428-DMS-MDD   Document 78   Filed 06/25/18   PageID.1638   Page 232 of 259

The Washington Post

The Americas
U.S. officials separated him from his child. Then he was deported to El Salvador.

by Joshua Partlow June 23 at 11:25 PM ✉Email the author
CORRAL DE MULAS, El Salvador — Arnovis Guidos Portillo remembers the authorities in green uniforms telling him that this would only be temporary.

They told him that his 6-year-old daughter, Meybelin, should really go with them, he recalled. The holding cell was cold, he said he was told, and the child was not sleeping well. Don't worry, he was assured, she would take the first bus, and he would follow soon.

"What's best is we take her to another place," he recalled a U.S. official telling him.

It's a conversation this 26-year-old farmer from El Salvador has replayed for nearly a month. His daughter was taken from him on his second day in U.S. immigration custody in Texas, he and his lawyers said, and she remains somewhere in the United States.

Guidos was deported Thursday back to this small Central American nation, where he lives in a one-room, dirt-floor shack with no electricity and two goats in the yard.

He and his daughter are one of more than 2,000 migrant families who have firsthand experience with President Trump's "zero tolerance" immigration policy. The decision to prosecute all those caught crossing illegally into the United States meant that parents and children were sent to separate detention centers and shelters. Although Trump ended family separations in an executive order last week, many parents are still trapped in a bureaucratic nightmare, far from their children and unsure how they will be reunited.

[The chaotic effort to reunite immigrant parents with their separated kids]
"I would advise anyone who wants to travel to the United States with their children not to do it," he said. "I would never want them to have to walk in my shoes."

And yet, Guidos is ready to travel again, if he cannot find Meybelin soon, even if he must retrace his recent 1,500-mile journey: crossing Mexico crammed in the back of a refrigerated cargo truck after weeks in U.S. detention with frigid rooms and scalding showers and mocking guards.

Details of Guidos's case were confirmed by court documents and his lawyers.

A U.S. Customs and Border Protection spokesman said in a statement that the agency takes all allegations of mistreatment seriously and that its men and women "perform their duties professionally and treat everyone equally with dignity and respect."

"Children represent the most vulnerable population and as such every CBP employee carries the fundamental ethical and moral belief as well as a legal obligation to put the welfare of any child first," the statement said.

A spokeswoman for ICE, Sarah Rodriguez, said that Guidos, on June 19, "submitted a written request that he be removed to El Salvador without his child."

Parents in ICE custody "have the opportunity to wait in detention for a coordinated removal with a child or may waive their right to such coordination," she said.

Guidos arrived home Friday evening in the coastal province of Usulutan, far out on a remote peninsula jutting into the Pacific Ocean. He works on a corn farm, earning $7 a day, and helps a local organization hatch baby sea turtles from eggs laid on the beach.

He built his house from scrap wood his brother gave him. It has two mattresses — one for him, one for Meybelin — a hammock, a pink dresser for her clothes. A few minutes after arriving home, he had taken her best white dress out

of its plastic bag, a reminder of her, when his cellphone rang and Meybelin's tiny voice, from wherever she was, entered the room.

Guidos was holding back tears from the first moments. He asked her how she was, whether she had eaten. Was she playing or studying or going to church? Despite endless requests over the past month, no one had told him her location or when she might be freed, and she was too young to know.

Had the people there bathed her, he asked? Combed her hair? Given her toys?
"Papa," she said. "When are you going to take me out of here?"
And that's when he really began to cry.

## Years of troubles

Guidos's problems began two years ago on a soccer field cut out of the jungle behind his house, he said. He got into a fight with a player whose brother was a top member of the Barrio 18 gang in Puerto El Triunfo, the town across the bay.

In recent years, gangs seized control of the one paved road running down this rural peninsula. Teenagers manned checkpoints with rifles slung over their shoulders and extorted passersby. It could cost $100 in $5 and $10 payments just to get off the peninsula, he said.

Two years ago, El Salvador had one of the highest murder rates in the world. Gang violence has displaced hundreds of thousands of Salvadorans, many of whom seek refuge in the United States. But Attorney General Jeff Sessions said in a ruling earlier this month that immigration judges generally cannot consider gang violence as grounds for asylum.

After the fight on the soccer field, Guidos went into hiding. Gang members lived within sight of his shack, and they hauled away a brother-in-law at one point and put a pistol in his mouth, he said.

Twice Guidos fled north, hoping for asylum, but was deported once from Mexico and once from Louisiana. By then, he had separated from Meybelin's mother. He decided to take his daughter out of kindergarten and make one more try. His brother lived in Kansas, and he hoped to make it there.

"It's hard to hide here," he said of Corral de Mulas. "Everyone knows you."

On May 26, after nearly a week of travel, Guidos and Meybelin boarded a raft, floated the Rio Grande, and walked into the scrub near Hidalgo, Tex., to turn themselves in to the Border Patrol and ask for asylum.

He did not know exactly where they were taken, but normally migrants are processed at CBP facilities before going to court and moving on to a longer-term detention center. On their first day in detention, they were given Mylar blankets and ham sandwiches every six hours, he said.

Now, he considers this his best day in detention because Meybelin was still with him.

Once she was taken away, yelling and crying, he could get no answers about where she had gone. On May 29, three days after arriving, he pleaded guilty to crossing the border illegally and was sentenced to time served, according to federal court documents.

Afterward, he begged for information about his daughter. He recalled one U.S. official telling him: "They may have taken her to Florida or New York."

"That's when I really felt hell come down on me," he said.

Guidos was transferred to an ICE detention center outside of Laredo, Tex., after his court appearance, according to paperwork he was given. Authorities there would regularly ask migrants if they wanted to sign papers approving their own deportation, he said. For two weeks, he declined, insisting he would not leave the United States without Meybelin. Eventually, he said, he was told that nothing would change. He lost all hope and signed the document for his removal.

U.S. officials separated him from his child. Then he was deported to El Salvador. - The W... Page 5 of 5

Case 3:18-cv-00428-DMS-MDD   Document 78   Filed 06/25/18   PageID.1640   Page 234 of 259

"He told me, 'You're never going to get information about your daughter here,' " Guidos recalled one official saying. "It's better to go back to your country."

## A sorrowful arrival

Guidos was in tears when he walked out of the deportee processing center in San Salvador on Thursday afternoon, carrying his belongings in a plastic bag.

"Imagine, all of her life she's been with me and now she's not," he said of his daughter. "And I don't even know where she is."

He got into the bed of a pickup truck with his other relatives for the three-hour drive to his village.

The day he arrived in El Salvador, he received his first call from Meybelin since their separation. It's unclear whether she knew her relatives' phone numbers or was given them by shelter staff.

When Meybelin called again the next evening, she used a phone number that is associated with a shelter in Phoenix, run by Southwest Key Programs, a Texas-based nonprofit organization that has received $1.1 billion in federal contracts to house migrant children since 2014.

A Southwest Key Programs spokeswoman said she could not confirm if Meybelin was at the Phoenix shelter and referred queries to the Office of Refugee Resettlement, part of the Department of Health and Human Services. An HHS spokesman said it would take days to confirm her location and, even then, the department might not be able to speak about her case because of privacy concerns.

Immigration lawyers working with detained families say that family reunification is an expensive process that can take years due to the difficulty of obtaining information across various government agencies.

"There is no clear path made by the administration to reunite the 2,300 children already taken from their parents," said Jennifer Falcon, communications director at RAICES, an organization that is representing Meybelin through her family. "And every day, it gets more difficult as they continue mass deportation of their parents."

Falcon spoke before a late Saturday announcement by the Trump administration about a plan to reunify the migrant families.

Meybelin has been able to periodically call relatives in the United States and El Salvador, but the family has had trouble getting answers from shelter staff.

"They won't let her pass the phone to anyone," said her grandmother, Sonia de Jesus Portillo. "I've run out of tissues, I've been crying so much. We're desperate."

When Meybelin called on Friday evening, Guidos tried to stay calm.

"How are you, mi amor?" he asked.

"Good."

"What are you doing?"

"I don't know."

She told him she wanted her clothes and didn't like the food. She said she had tried to call her mother twice but no one answered.

"Mi amor, don't worry. We're going to get you, do you hear?"

He promised to take her to the park when she was home.

"Meybelin," he said as the tears ran down his face. "I love you, mi amor."

"Me too, papa."

When the call ended, he sat down on his mattress, three countries away from this 6-year-old girl, and cried into his hands.

*Anna-Catherine Brigida in San Salvador, Kevin Sieff in Brownsville, Tex., and Michael Miller in Nogales, Ariz., contributed to this report.*

### **Read more**

Trump's crackdown may deter some border-crossers — but others say they'll keep trying

The story behind the girl in the recording who begs for her aunt after being separated from her migrant mother

Today's coverage from Post correspondents around the world

Like Washington Post World on Facebook and stay updated on foreign news

💬 **1575 Comments**

Joshua Partlow is The Washington Post's bureau chief in Mexico. He has served previously as the bureau chief in Kabul and as a correspondent in Brazil and Iraq. 🐦 Follow @partlowj

### The Washington Post

# The story must be told.

Your subscription supports journalism that matters.

**Try 1 month for $1**

# Exhibit T

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
          PETITIONERS-PLAINTIFFS,       )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            ) FRIDAY JUNE 22, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    )  12:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
          RESPONDENTS-DEFENDANTS.       )
-----------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
**TELEPHONIC STATUS CONFERENCE**

```
COUNSEL APPEARING TELEPHONICALLY:

FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004

                           BADIS VAKILI, ESQ.
                           ACLU FOUNDATION OF SAN DIEGO
                           AND IMPERIAL COUNTIES
                           P.O. BOX 87131
                           SAN DIEGO, CALIFORNIA 92138

FOR DEFENDANT:             SARAH B. FABIAN, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044

                           ADAM L. BRAVERMAN
                           INTERIM UNITED STATES ATTORNEY
                           BY:  SAM BETTWY
                           ASSISTANT U.S. ATTORNEY
                           880 FRONT STREET
                           SAN DIEGO, CALIFORNIA 92101




REPORTED BY:               LEE ANN PENCE,
                           OFFICIAL COURT REPORTER
                           UNITED STATES COURTHOUSE
                           333 WEST BROADWAY, ROOM 1393
                           SAN DIEGO, CALIFORNIA 92101
```

Exhibit 38, Page233

```
 1      SAN DIEGO, CALIFORNIA - FRIDAY, JUNE 22, 2018 - 12:10 P.M.

 2                           *   *   *

 3           THE CLERK:  NO. 12 ON CALENDAR, CASE NO. 18CV0428,

 4    MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

 5    A STATUS CONFERENCE.

 6           THE COURT:  GOOD AFTERNOON.  THIS IS JUDGE SABRAW.

 7           IF COUNSEL CAN HEAR ME, CAN YOU ENTER YOUR

 8    APPEARANCES, PLEASE.

 9           MR. GELERNT:  YES, YOUR HONOR.  THIS IS LEE GELERNT

10    FROM THE ACLU FOR PLAINTIFFS.

11           MR. VAKILI:  GOOD AFTERNOON, YOUR HONOR.  THIS IS

12    BARDIS VAKILI FROM THE ACLU SAN DIEGO FOR PLAINTIFFS.

13           MS. FABIAN:  GOOD AFTERNOON, YOUR HONOR.  SARAH

14    FABIAN WITH THE DEPARTMENT OF JUSTICE FOR DEFENDANTS.

15           MR. BETTWY:  GOOD AFTERNOON, YOUR HONOR.  SAM BETTWY

16    WITH THE U.S. ATTORNEY'S OFFICE FOR DEFENDANTS.

17           THE COURT:  OKAY.  IS THAT ALL COUNSEL?

18           MR. GELERNT:  YOUR HONOR, WE HAVE SOME COUNSEL HERE

19    BUT THEY ARE NOT GOING TO BE SPEAKING.  I DON'T KNOW WHETHER

20    YOU WOULD LIKE US TO ANNOUNCE ALL OF THEM.

21           THE COURT:  NO, THAT'S OKAY.

22           MR. GELERNT:  OKAY.

23           THE COURT:  I JUST WANTED A RECORD FOR TODAY'S

24    APPEARANCES.

25           AND I KNOW WE HAVE A NUMBER OF MEDIA ONLINE, AND I
```

JUNE 22, 2018

13

```
 1   THE BEGINNING, THE TEN DOCTORS' AFFIDAVITS.  THEY SHOW THE
 2   HARM ACUTELY AND THEY PREDICTED WHAT WAS GOING TO HAPPEN, AND
 3   SO WHAT HAS HAPPENED AFTER IS JUST CONSISTENT WITH WHAT THEY
 4   TOLD YOU.
 5            THE COURT:  WITH REGARD TO ONE OF THE FORMS OF
 6   RELIEF YOU ARE REQUESTING, AND THAT IS INJUNCTIVE RELIEF TO
 7   REUNIFY THE CHILDREN WHO HAVE ALREADY BEEN SEPARATED SO THAT
 8   THE FAMILIES CAN BE DETAINED TOGETHER; IF THAT RELIEF WERE
 9   GRANTED, WOULDN'T THAT BE GOOD FOR ONLY A 20-DAY PERIOD IN
10   LIGHT OF THE FLORES SETTLEMENT, ABSENT JUDGE GEE MODIFYING.
11            MR. GELERNT:  RIGHT.  YOUR HONOR, I AM GLAD YOU
12   ASKED ABOUT THAT, BECAUSE I DO THINK THE GOVERNMENT HAS BEEN
13   PUSHING THAT NARRATIVE AND I THINK THERE IS SOME CONFUSION IN
14   THE MEDIA.  SO I WANT TO BE AS ABSOLUTELY CLEAR AS POSSIBLE
15   ABOUT THE FLORES SETTLEMENT.
16            AND I THINK, YOU KNOW, AS A LEGAL MATTER I AM NOT
17   SURE THAT THE GOVERNMENT FULLY BELIEVES IT, AND I THINK THAT
18   IS WHY THEY RELEGATED THE FLORES DISCUSSION IN THEIR PAPERS
19   BEFORE YOU TO ONE SENTENCE IN A FOOTNOTE.
20            BUT HERE IS, I THINK, THE SITUATION WITH FLORES.
21            FIRST OF ALL, AT A MINIMUM THEY SHOULD BE DETAINING
22   THE CHILDREN FOR THE 20 DAYS.  SO EVEN UNDER THE GOVERNMENT'S
23   UNDERSTANDING OF FLORES THE FAMILIES NEED TO BE REUNITED, AND
24   THEN PEOPLE CAN SEE WHAT HAPPENS AT 20 DAYS.  BUT I DON'T EVEN
25   THINK THE 20 DAYS WILL ULTIMATELY BE RELEVANT FOR THE
```

JUNE 22, 2018

1    FOLLOWING REASONS.

2            MOST FAMILIES ARE RELEASED BEFORE 20 DAYS BECAUSE

3    THEY ARE NOT A FLIGHT RISK OR A DANGER.  AS YOUR HONOR

4    PROPERLY NOTED IN HIS OPINION, THESE ARE ASYLUM SEEKERS, THEY

5    ARE CREDIBLE FEAR, SO MOST ARE GOING TO BE RELEASED.

6            THE OTHER CRITICAL POINT THAT I THINK HAS GOTTEN

7    LOST IN THE MEDIA ACCOUNTS AND GOVERNMENT'S NARRATIVE IS

8    FLORES IS ULTIMATELY, AT THE END OF THE DAY, A SETTLEMENT FOR

9    THE BEST INTEREST OF THE CHILD.  IF A MOTHER IS GOING TO HAVE

10   HER BOND HEARING AT THE 34TH DAY SHE CAN SAY, I DON'T WANT MY

11   TWO-YEAR-OLD CHILD SENT TO SOME FACILITY IN CHICAGO, I WOULD

12   RATHER HAVE MY CHILD STAY WITH ME IN THIS FACILITY.

13           THE FACT THAT THE FACILITY IN CHICAGO MAY HAVE

14   BETTER CRAYONS AND TOYS DOES NOT MEAN SHE HAS TO ALLOW HER

15   CHILD, UNDER FLORES, TO BE FORCED -- TO BE SENT TO CHICAGO,

16   SHE CAN KEEP HER CHILD WITH HER.  I THINK THAT IS SORT OF

17   BASIC SETTLEMENT LAW.  AND THAT THE PARENT CAN ALWAYS SAY,

18   LOOK, THE BEST INTEREST OF MY CHILD IS TO REMAIN WITH ME.

19           FLORES WAS SET UP FOR SITUATIONS WHERE KIDS ARE

20   UNACCOMPANIED OR THE PARENT SAYS, LOOK, THE CHILD IS 15 YEARS

21   OLD AND HE KNOWS HIS UNCLE VERY WELL IN ST. LOUIS, I AM FINE

22   WITH HIM GOING IN 19 DAYS.

23           BUT NOTHING ABOUT FLORES REQUIRED THE RELEASE OF A

24   CHILD AT 19 DAYS OVER A PARENT'S OBJECTION, SO THAT AGAIN

25   BABIES WILL BE RIPPED OUT OF THEIR PARENT'S ARMS AT THE 19TH

JUNE 22, 2018

1   DAY IN THE DETENTION CENTER.

2          **THE COURT:**  BUT HOW DOES FLORES PROVIDE PARENTS WITH

3   ANY RIGHTS.  AS I UNDERSTAND IT, IT IS A DOCUMENT CREATED FOR

4   THE MINOR ONLY.

5          **MR. GELERNT:**  YOUR HONOR, I THINK THAT IS A GOOD

6   QUESTION.  WHAT I UNDERSTAND FLORES TO DO, I MEAN WHAT, YOU

7   KNOW -- AND THE NINTH CIRCUIT HAS SAID THIS, HAS SAID IT

8   DOESN'T PROVIDE THE PARENT WITH ANY RELEASE RIGHTS.  BUT IT

9   CERTAINLY DOESN'T TAKE AWAY THE PARENT'S RIGHT TO MAKE

10  DECISIONS FOR THE CHILD, YOU KNOW, ESPECIALLY FOR YOUNG

11  CHILDREN.

12         SO THERE IS NO QUESTION THE PARENT CAN SAY, YEAH,

13  MAYBE I CAN'T CITE FLORES TO GET OUT MYSELF, BUT I CERTAINLY

14  CAN SAY, I HAVE -- I MAKE THE DECISIONS FOR MY CHILD AND KNOW

15  WHAT IS IN THE BEST INTEREST OF MY CHILD, AND CAN WAIVE THE

16  FLORES RIGHT TO RELEASE AT THE 19TH DAY.

17         SO YOUR HONOR IS ABSOLUTELY RIGHT, IT DOESN'T

18  PROVIDE RELEASE FOR THE PARENTS, BUT IT DOESN'T REMOTELY

19  SUGGEST A PARENT IS STILL NOT MAKING DECISIONS FOR THE CHILD'S

20  BEST INTEREST SO THAT THE CHILD DOESN'T HAVE TO BE TORN AWAY.

21         AND AGAIN I WOULD CIRCLE BACK, YOUR HONOR, TO WHAT I

22  SAID IN THE BEGINNING, IS THAT WE ARE NOT EVEN AT THAT

23  SITUATION.  I MEAN, THE GOVERNMENT IS NOT SAYING, WE ARE

24  SENDING KIDS TO BE REUNITED FOR 19 DAYS AND THEN THERE IS THE

25  PROBLEM.

JUNE 22, 2018

```
 1              I THINK THIS WHOLE -- THIS WHOLE IDEA OF FLORES IS
 2    REALLY TO GET RID OF FLORES' OTHER PROTECTIONS FOR KIDS, THAT
 3    FACILITIES HAVE TO BE LICENSED AND ALL OF THAT, AND THEY ARE
 4    USING THE 19-DAY THING AS SORT OF A TRANSPARENT LOOPHOLE.
 5              SO AGAIN, BECAUSE THE PARENT CAN WAIVE THE 19-DAY
 6    RELEASE, ESPECIALLY WHEN IT IS A YOUNG CHILD, BECAUSE THE
 7    GOVERNMENT DOES AND CAN RELEASE PARENTS WHO ARE NOT A FLIGHT
 8    RISK OR A DANGER, ESPECIALLY THE PARENTS WHO HAVE PASSED THE
 9    INITIAL ASYLUM SCREENING, I DON'T THINK FLORES IS AN
10    IMPEDIMENT.
11              THE COURT:  WITH REGARD TO THE RELIEF THAT YOU ARE
12    REQUESTING AND THE CLASS CERTIFICATION, IF WE CAN MOVE TO THAT
13    FOR A MOMENT.
14              DO YOU CONCEDE THAT THE GOVERNMENT CAN PROPERLY
15    SEPARATE A PARENT FROM A CHILD IF THERE ARE OTHER LEGITIMATE
16    CONSIDERATIONS BEYOND DANGER TO THE CHILD.  THOSE COULD
17    INCLUDE, FOR EXAMPLE, CRIMINAL HISTORY, CONTAGIOUS OR
18    COMMUNICABLE DISEASES, THINGS LIKE THAT.  DO YOU CONCEDE THAT?
19              MR. GELERNT:  WELL, YOUR HONOR, I THINK WHAT THAT
20    WOULD DO IS -- I THINK THOSE THINGS, YOU WOULD PUT THEM UNDER
21    THE BEST INTEREST OF THE CHILD OR IF THERE IS A DANGER TO THE
22    CHILD.  SO IF THE PARENT, YOU KNOW, IN THE RARE CASE, HAD A
23    CONTAGIOUS DISEASE THAT WAS GOING TO BE HARMFUL TO THE CHILD
24    AND THERE WAS, YOU KNOW, CLEAR EVIDENCE OF THAT, THEN I THINK
25    OF COURSE, YOUR HONOR.
```

JUNE 22, 2018

```
 1           WHAT WE WOULD SAY IS, THE PARENT AND CHILD HAVE TO
 2   BE REUNITED, AND THEN ULTIMATELY THE PARENT WILL HAVE TO PASS
 3   THEIR PAROLE OR BOND HEARING.  AND CRIMINAL CONVICTIONS ARE
 4   TAKEN INTO ACCOUNT, AND OTHER INDICIA OF FLIGHT RISK ARE TAKEN
 5   INTO ACCOUNT, AND THOSE WILL BE INDIVIDUALIZED.  WE ARE SIMPLY
 6   SAYING THAT MOST PARENTS WILL GET OUT.
 7           BUT I DON'T THINK YOUR INJUNCTION HAS TO GO ANYWHERE
 8   NEAR DECIDING WHETHER THE GOVERNMENT HAS TO RELEASE A
 9   PARTICULAR PARENT.  I THINK THERE ARE GUIDELINES IN PLACE, AND
10   THOSE GUIDELINES WILL GOVERN WHETHER ANY PARTICULAR PARENT
11   GETS OUT.  WE ARE SIMPLY SAYING THAT MOST PARENTS, ESPECIALLY
12   ASYLUM SEEKERS, WILL GET OUT BECAUSE THEY ARE AT LEAST SHOWN
13   NOT TO BE A FLIGHT RISK OR A DANGER.  BUT I DON'T THINK YOU
14   NEED TO GO SAY ANYTHING ONE WAY OR THE OTHER ABOUT EXACTLY
15   WHAT TYPE OF CRIMINAL CONVICTION MAY LEAD THE GOVERNMENT TO
16   DENY PAROLE OR NOT.
17           THE COURT:  WHAT ABOUT CLASS DEFINITION PURPOSES.
18   DO YOU ARGUE THAT IT SHOULD REMAIN AS DEFINED WHICH COULD
19   INCLUDE PARENTS WITH SOME CRIMINAL HISTORY OR COMMUNICABLE
20   DISEASES.  IT COULD INCLUDE NON ASYLUM SEEKERS WITHIN THE
21   INTERIOR OF THE COUNTRY.  DO YOU STAND ON THE PRESENT
22   DEFINITION?
23           MR. GELERNT:  YOUR HONOR, IF I COULD TAKE THOSE ONE
24   AT A TIME.  I THINK I AM JUST STARTING FROM THE LAST ONE,
25   ABOUT ASYLUM SEEKERS.
```

JUNE 22, 2018

```
1          YOU ARE RIGHT, WE DID NOT DEFINE THE CLASS AS ONLY

2    ASYLUM SEEKERS.  WE THINK THAT MOST OF THESE INDIVIDUALS ARE

3    ASYLUM SEEKERS.  WE WOULD ASK YOUR HONOR NOT TO LIMIT IT TO

4    ASYLUM SEEKERS ONLY.

5          WE UNDERSTAND THAT YOU FEEL THAT THE ASYLUM SEEKERS

6    ARE A PARTICULARLY POWERFUL CASE.  WE DO THINK, HOWEVER, THERE

7    MAY BE PARENTS WITH OTHER TYPES OF CLAIMS.  AND, YOU KNOW,

8    MAYBE THEY ARE GOING TO LOSE, MAYBE THEY ARE GOING TO WIN, BUT

9    ULTIMATELY TAKING A CHILD AWAY IS ITS OWN DISTINCT HARM.

10         IN TERMS OF THE INJUNCTION NOT ALLOWING YOU -- NOT

11   ALLOWING THE GOVERNMENT TO SEPARATE WHERE THERE IS A DANGER TO

12   THE CHILD, I THINK THAT THAT IS SOMETHING, YOU ARE RIGHT,

13   YOUR HONOR, MAYBE WE DIDN'T DO AS CAREFUL ENOUGH JOB IN

14   SETTING FORTH THE CLASS DEFINITION.  BUT I THINK IF YOUR HONOR

15   WANTS TO MAKE CLEAR THAT THE PARENT IS A DANGER TO THE CHILD

16   WHERE THEY MAY BE ABUSIVE OR NEGLECTFUL OR HAVE A CONTAGIOUS

17   DISEASE OR SOMETHING ALONG THOSE LINES THAT WOULD CONSTITUTE A

18   PERMISSIBLE BASIS FOR SEPARATION UNDER STANDARD CHILD

19   PRACTICES EXERCISED BY THE STATES OR THE FEDERAL GOVERNMENT IN

20   OTHER CONTEXTS, I THINK THAT WOULD BE ABSOLUTELY FINE, YOUR

21   HONOR.

22              THE COURT:  ALL RIGHT.  AND THEN ON THE CLASS

23   DEFINITION WITH RESPECT TO CRIMINAL HISTORY, I UNDERSTAND YOU

24   TO BE ARGUING THAT TO THE EXTENT ANY CLASS DEFINITION INCLUDES

25   PARENTS WHO HAVE SOME CRIMINAL HISTORY, HOWEVER MINOR, THEY
```

JUNE 22, 2018

1              **THE COURT:**  ALL RIGHT.

2              **MR. VAKILI:**  MR. VAKILI IS ON, YOUR HONOR.  THANK

3    YOU.

4              **MS. FABIAN:**  THIS IS SARAH FABIAN, I AM ON.

5              **THE COURT:**  ALL RIGHT.  IS MR. BETTWY WITH US?

6         OKAY.  THEN WE WILL PROCEED WITH JUST MS. FABIAN.

7         I BELIEVE WE HAVE MOST, IF NOT ALL, OF THE MEDIA

8    BACK ON, SO I AM GRATEFUL THAT WE WERE ABLE TO GET THE

9    CONFERENCE CALL BACK IN ORDER.

10        WHERE WE LEFT OFF, MS. FABIAN WAS ADDRESSING SOME

11   ISSUES.  NOW, BEFORE I ASK THE NEXT QUESTION, MS. FABIAN, DID

12   YOU WANT TO COMPLETE ANYTHING YOU WERE SAYING BEFORE WE WERE

13   INTERRUPTED?

14             **MS. FABIAN:**  NOT THAT I RECALL, YOUR HONOR.  I

15   APOLOGIZE.

16             **THE COURT:**  ALL RIGHT.

17        WITH RESPECT TO THE EXECUTIVE ORDER, IT PUTS AN END

18   TO FAMILY SEPARATION.  IT ALSO CONTEMPLATES THAT CRIMINAL

19   PROSECUTION WILL CONTINUE.  AND THAT IF FAMILIES ARE

20   APPREHENDED AT THE BORDER THAT I AM ASSUMING THE GOVERNMENT IS

21   SUGGESTING, THROUGH THE EXECUTIVE ORDER, THAT THE FAMILIES

22   WILL BE DETAINED TOGETHER IN SOME FASHION.  IF SO, HOW IS THAT

23   GOING TO WORK, BECAUSE ONE OF THE CENTRAL ISSUES IN THIS CASE

24   AND ONE OF THE CENTRAL CONCESSIONS IN THIS CASE AS TO

25   PLAINTIFF MS. C. WAS THAT SHE WAS NOT CONTESTING HER INITIAL

JUNE 22, 2018

1   SEPARATION, CONCEDING THAT UNDER EXISTING LAW IF THE

2   GOVERNMENT ELECTED TO PROSECUTE FOR CRIMINAL ILLEGAL ENTRY IT

3   WOULD NECESSARILY EFFECTUATE A SEPARATION BETWEEN PARENT AND

4   CHILD FOR THE PERIOD OF TIME THAT MS. C. WAS IN CRIMINAL

5   CUSTODY.  AND THEN, OF COURSE, THE ARGUMENT WAS ONCE SHE

6   COMPLETED HER CRIMINAL SENTENCE AND WAS RETURNED TO

7   IMMIGRATION DETENTION SHE WAS ENTITLED TO REUNIFICATION.

8        SO I GUESS THE INITIAL QUESTION IS, IS THIS ZERO

9   TOLERANCE POLICY CONTINUING; AND, IF SO, HOW DOES THE

10   GOVERNMENT NOT SEPARATE PARENT AND CHILD UNDER THE CURRENT

11   STATUTORY MECHANISM WHICH PROVIDES, OF COURSE, THAT CHILDREN

12   CANNOT BE DETAINED IN CUSTODY WITH THEIR PARENTS WHILE THEY

13   ARE UNDERGOING CRIMINAL PROCEEDINGS.

14        **MS. FABIAN:**  I AM NOT SURE I CAN ANSWER ALL OF THOSE

15   QUESTIONS TODAY, YOUR HONOR.  I THINK THAT IS -- SOME OF THE

16   IMPLEMENTATION QUESTIONS ARE STILL UNDERWAY.  AND THAT I JUST

17   DON'T HAVE THE INFORMATION TO ANSWER ALL OF THOSE QUESTIONS

18   TODAY.

19        WHAT I WOULD SAY IS THAT TO THE EXTENT THE POLICY

20   THAT WE ARE TALKING ABOUT WAS IMPLEMENTED SINCE THIS CASE WAS

21   BRIEFED AND ARGUED THAT THAT IS -- IF THAT IS SOMETHING THAT

22   THE COURT WANTS PUT BEFORE THE COURT FOR CONSIDERATION, I

23   THINK THAT THAT NEEDS TO BE BROUGHT INTO THE CASE THROUGH

24   BRIEFING BY THE PLAINTIFFS AND RESPONSIVE BRIEFING BY THE

25   DEFENDANT.

JUNE 22, 2018

1          BUT I TAKE THE COURT'S POINT THAT AT THE TIME WHEN

2     WE WERE TALKING ABOUT MS. C.'S CASE, MS. C. WAS SEPARATED DUE

3     TO A PROSECUTION.  MY RECOLLECTION IS THAT SHE WAS SENTENCED

4     TO A PERIOD OF THREE DAYS, AND THAT AT THAT TIME IT WAS

5     NECESSARY TO EFFECTUATE A SEPARATION.

6          I JUST CAN'T SPEAK TO THE CHANGES WITH THE NEW

7     POLICY AND TO THE EXTENT THAT THAT CREATED ADDITIONAL

8     PROSECUTIONS, AND THEN THE FURTHER EFFECT OF THE EXECUTIVE

9     ORDER ON THAT DETENTION.  I CAN'T SPEAK TO THAT TODAY.

10          **THE COURT:**  ALL RIGHT.

11          WITH RESPECT TO THE REUNIFICATION ISSUE, I INQUIRED

12    LAST TIME WHETHER THERE WAS ANY MECHANISM THAT THE GOVERNMENT

13    HAS BETWEEN AND AMONG ITS AGENCIES TO AFFIRMATIVELY REUNIFY;

14    THAT IS H.H.S. AND O.R.R. COMMUNICATING IN SOME INTELLIGENT

15    MANNER WITH OTHER GOVERNMENT AGENCIES UNDER THE UMBRELLA OF

16    D.H.S., LIKE ICE OR B.O.P., SUCH THAT THE PARENT IS AWARE

17    WHERE HIS OR HER CHILD IS.  AND THAT THERE IS A MECHANISM UPON

18    COMPLETION OF HIS OR HER CRIMINAL SENTENCE THAT THE GOVERNMENT

19    CAN BEGIN A REUNIFICATION PROCESS.

20          SO THERE ARE TWO QUESTIONS HERE.  ONE, IS THERE

21    CURRENTLY ANY COMMUNICATION BETWEEN H.H.S. AND, FOR EXAMPLE,

22    D.H.S. OR B.O.P.; AND, NUMBER TWO, IS THERE ANY AFFIRMATIVE

23    REUNIFICATION PROCESS THAT THE GOVERNMENT HAS IN PLACE ONCE

24    PARENT AND CHILD ARE SEPARATED.

25          **MS. FABIAN:**  I WOULD SAY, YOUR HONOR, WHEN WE SPOKE

JUNE 22, 2018

```
 1   ABOUT THAT INITIALLY, I THINK MY ANSWER -- I RECALL THAT IT
 2   WAS A MORE NARROW QUESTION; AND THAT WAS, WHEN A PARENT IS
 3   RELEASED FROM CRIMINAL CUSTODY AND TAKEN INTO ICE CUSTODY IS
 4   THE PRACTICE TO REUNITE THEM IN FAMILY DETENTION.  AND AT THAT
 5   TIME I SAID NO, THAT THAT WAS NOT THE PRACTICE.
 6            I THINK MY ANSWER ON THAT NARROW QUESTION WOULD BE
 7   THE SAME.  I THINK WHAT YOU ARE ASKING NOW IS A BROADER
 8   QUESTION.  AND ONE THING THAT HAS TO BE CONSIDERED WITH THAT
 9   QUESTION IS THE NUMBER OF DIFFERENT WAYS, AGAIN, THAT A
10   SEPARATION COULD BE EFFECTED, AND THAT IS A SEPARATION DUE TO
11   A DETERMINATION OF DANGER AS OPPOSED TO A SEPARATION THAT MAY
12   RESULT FROM PROSECUTION.
13            ALL OF WHICH GOES TO SAY I STILL THINK ON A BROAD --
14   AS A BROAD MATTER THERE IS NOT A SINGULAR ACTION OF SEPARATION
15   THAT -- IN WHICH, THEN, THE RESPONSE FOR PROCEDURALLY WOULD
16   BE -- WOULD BE THE SAME FOR ALL CASES.  SO THAT IS SORT OF THE
17   PRECURSOR TO MY ANSWER.
18            THERE ARE PROCEDURES BY WHICH O.R.R. THEN RELEASES
19   MINORS TO THE CUSTODY OF A PARENT WHO HAS BEEN RELEASED FROM
20   CUSTODY, AND THOSE ARE THE PROCEDURES UNDER THE T.V.P.R.A. FOR
21   REUNIFICATION.  WHETHER THERE IS -- IN LIGHT OF ADDITIONAL
22   SEPARATIONS WHETHER THERE ARE ADDITIONAL PROCEDURES THAT CAN
23   BE PUT IN PLACE TO IMPROVE THOSE PROCEDURES OR EXPEDITE THOSE
24   PROCEDURES, I THINK THAT IS SOMETHING THAT IS THE SUBJECT OF
25   ONGOING DISCUSSION.  BUT AT THE MOMENT THE PROCESS IS THE
```

JUNE 22, 2018

```
 1   SAME, AND IT IS THE RELEASE PROCESS UNDER THE T.V.P.R.A.
 2              AS FAR AS COMMUNICATIONS BETWEEN O.R.R. AND D.H.S.,
 3   I THINK -- I KNOW THAT THERE ARE COMMUNICATIONS.  I THINK TO
 4   THE EXTENT THAT THAT IS SOMETHING THE COURT WANTS TO CONSIDER,
 5   I THINK -- AS WITH MUCH OF THIS, I THINK THAT THIS IS
 6   SOMETHING THAT THE COURT WOULD -- WHAT THE GOVERNMENT WOULD
 7   SUGGEST IS THAT THE COURT SHOULD TAKE -- GIVE THE OPPORTUNITY
 8   FOR BRIEFING AND PERHAPS THE SUBMISSION OF EVIDENCE OR A
 9   HEARING OR SOMETHING TO THAT EXTENT.  BECAUSE I DON'T THINK
10   THAT I CAN MAKE ANY REPRESENTATIONS TODAY THAT WOULD BE
11   SUFFICIENT FOR THE COURT TO BE ABLE TO RELY ON.
12              THE COURT:  YOU MENTIONED THAT THERE IS SOME
13   COMMUNICATION BETWEEN O.R.R. AND D.H.S. AGENCIES.  WHAT ARE
14   THOSE?
15              MS. FABIAN:  WHEN A CHILD IS SEPARATED OR IS --
16   REGARDLESS, WHEN D.H.S. IS GOING TO TRANSFER A CHILD TO THE
17   CUSTODY OF O.R.R. THERE IS A PORTAL THAT IS USED TO
18   ESSENTIALLY MAKE THAT REQUEST FOR A SPACE TO BE PROVIDED BY
19   O.R.R.
20              SO IN THAT D.H.S. WILL PUT THE INFORMATION REGARDING
21   THE CHILD, REGARDING -- GENERALLY THAT WILL NOTATE THAT.  IF
22   IT HAS BEEN A SEPARATION THE SAME PORTAL WOULD ALSO BE USED
23   FOR A U.A.C., BUT GENERALLY IN THAT THERE WOULD BE PROVIDED
24   INFORMATION OF A SEPARATION.  SO THAT INFORMATION, THEN, IS
25   ABLE TO BE SHARED WITH O.R.R. AND O.R.R. IS ABLE TO BE AWARE
```

JUNE 22, 2018

1    OF THAT.

2           I DO KNOW THAT O.R.R. WILL THEN, WHEN THEY TAKE

3    CUSTODY OF THE CHILD, WHEN THEY ARE AWARE THAT THE CHILD WAS

4    SEPARATED FROM THE PARENT, FOLLOW UP AND MAKE EFFORTS TO ALLOW

5    THE CHILD TO COMMUNICATE BACK WITH THEIR PARENT THROUGH D.H.S.

6           **THE COURT:**  DO YOU KNOW WHETHER THAT IS OCCURRING?

7    WHAT YOU HAVE OUTLINED IS A MECHANISM BY WHICH D.H.S.

8    COMMUNICATES WITH O.R.R., BUT IS THERE COMMUNICATION FROM

9    O.R.R. TO D.H.S. WHICH WOULD HELP ASSIST REUNIFICATION?  DO

10   YOU KNOW THAT TO BE A FACT?

11          **MS. FABIAN:**  THERE IS A RECENT MEMORANDUM OF

12   UNDERSTANDING BETWEEN O.R.R. AND D.H.S. IN WHICH D.H.S. DOES

13   ASSIST O.R.R. IN OBTAINING INFORMATION FOR THE SUITABILITY

14   ANALYSIS WHEN O.R.R. IS RELEASING A MINOR.  SO TO SOME EXTENT

15   THAT DOES PROVIDE SOME AVENUE FOR COMMUNICATION.

16          I DON'T -- TODAY I DON'T WANT TO MISREPRESENT

17   EXACTLY WHETHER THERE IS A FORMAL POLICY.  I BELIEVE THERE IS

18   COMMUNICATION, BUT WHETHER THERE IS SORT OF A FORMAL AVENUE OF

19   COMMUNICATION, I CAN'T SPEAK TO THAT TODAY.

20          AGAIN, I WOULD SAY -- ASK FOR THE OPPORTUNITY TO

21   SUBMIT TO THE COURT SOMETHING IN THE FORM OF BRIEFING OR

22   ANOTHER EVIDENTIARY SUBMISSION ON THAT.

23          **THE COURT:**  BUT WHEN THE O.R.R. CONSIDERS RELEASE TO

24   THE PARENT OR AN APPROPRIATE GUARDIAN UNDER THE T.V.P.R.A.,

25   THAT OFTEN OCCURS.  AND WITH RESPECT TO RELEASE TO A PARENT IT

JUNE 22, 2018

1    ONLY OCCURS, FROM MY UNDERSTANDING, WHEN THE PARENT INITIATES

2    THE EFFORT TO REUNIFY.  IS THAT CORRECT?

3              **MS. FABIAN:**  I BELIEVE THAT IS THE TRADITIONAL WAY,

4    AND IT IS FREQUENTLY THE WAY THAT THAT IS INITIATED.

5              I UNDERSTAND THAT O.R.R. WILL ALSO, IF THEY ARE

6    AWARE THAT THE CHILD HAS A PARENT, THEY WILL MAKE EFFORTS TO

7    REACH OUT TO THE PARENTS.

8              NOW, WHETHER O.R.R. HAS THE MECHANISM TO DISCOVER

9    WHEN THE PARENT IS RELEASED FROM CUSTODY, I DON'T BELIEVE THEY

10   DO.  BUT O.R.R. WILL MAKE EFFORT IF THE CASE WORKER AT O.R.R.

11   IS AWARE THAT THE CHILD HAS BEEN SEPARATED FROM A PARENT.  OR

12   EVEN THAT, FOR EXAMPLE, IF THE CHILD COMES INTO THE COUNTRY

13   WITH THE PHONE NUMBER OF A RELATIVE, O.R.R. WILL MAKE EFFORTS

14   TO REACH OUT TO THAT RELATIVE AND FACILITATE THE

15   REUNIFICATION.

16             SO I THINK THE SAME PROCESS WOULD BE USED IF O.R.R.

17   IS AWARE THAT THE CHILD WAS SEPARATED FROM A PARENT, O.R.R.

18   WILL MAKE SIMILAR EFFORTS TO LOCATE THE PARENTS AND TO

19   FACILITATE REUNIFICATION THAT WAY.

20             **THE COURT:**  O.R.R. IS NOT NOTIFIED BY D.H.S. OR

21   B.O.P. WHEN A PARENT IS RELEASED FROM CRIMINAL CUSTODY, IS IT?

22             **MS. FABIAN:**  NOT TO MY KNOWLEDGE.

23             **THE COURT:**  THE REUNIFICATION PROCESS, THEN, OCCURS,

24   IF AT ALL, BASED ON THE PARENT'S EFFORT TO LOCATE AND TRACK

25   DOWN THEIR CHILD.  AM I CORRECT?

JUNE 22, 2018

```
 1          I WANT TO ADD THAT SOME OF THE ISSUES THAT THE COURT
 2   HAS BEEN ASKING ABOUT, THIS ABILITY TO LOCATE, AND I THINK
 3   YOUR HONOR ASKED ABOUT THE QUESTION OF PARENTS BEING REMOVED
 4   WITHOUT THEIR CHILD.  WELL, I AGREE THAT THOSE ARE DIFFICULT
 5   ISSUES AND IMPORTANT ISSUES TO TALK ABOUT.  I AM NOT SURE THAT
 6   THEY ARE A PART OF THIS CASE IN TERMS OF THEY WERE NOT PLED IN
 7   THE ORIGINAL COMPLAINTS AND THEY ARE NOT SITUATIONS THAT ARE
 8   ENCOMPASSED BY THE NAMED PLAINTIFFS.
 9          SO I THINK I WOULD REITERATE MY CONCERNS WITH
10   ENCOMPASSING TOO MUCH -- WITH BRINGING THESE ISSUES INTO THE
11   CASE AT THIS TIME AND WITHOUT THE OPPORTUNITY FOR PUTTING IN
12   SOME EVIDENCE OF THAT TO SORT OF REACH DECISIONS IN THIS CASE
13   BASED ON NEWS REPORTS.  WHILE I UNDERSTAND THAT THE COURT IS
14   CONCERNED WITH THOSE AND MAY BE INTERESTED IN THOSE, I THINK
15   WE NEED TO CONSIDER WHAT HAS BEEN BRIEFED IN THIS CASE.
16          THE COURT:  THAT WAS ONE OF THE CLAIMS FOR RELIEF,
17   THOUGH, SET OUT EITHER IN THE AMENDED COMPLAINT OR IN THE
18   MOTION FOR PRELIMINARY INJUNCTION WAS FOR REQUESTING THE COURT
19   TO ORDER AN INJUNCTION TO PROHIBIT THE REMOVAL OF PARENT AND
20   CHILD AT SEPARATE TIMES.  SO IT SEEMED TO ME THAT IT WAS PART
21   AND PARCEL OF THIS REUNIFICATION ISSUE AS IT RELATES TO, FOR
22   EXAMPLE, MS. C.'S CASE.  DO YOU DISAGREE?
23          MS. FABIAN:  NO.  I AGREE.  AND AS YOUR HONOR SAYS,
24   I DO RECALL THAT THAT IS -- PART OF THE CHALLENGE HERE IS THAT
25   THERE WAS NOT -- WITHOUT A PROPOSED ORDER I THINK THERE WAS
```

JUNE 22, 2018

# Exhibit U

# The New York Times

## *Torn Apart by Zero Tolerance, Kept Apart by Red Tape*

**By Miriam Jordan**

June 24, 2018

Mother and son last spoke on the child's ninth birthday, a week ago. This was no celebratory call.

Lidia Karina Souza had been released from immigration detention nearly two weeks earlier. But she could not tell Diogo, who was separated from her shortly after they reached the United States, when they would see each other again.

"Don't cry. You are going to get a Nintendo, a birthday party. Don't worry," Ms. Souza, who is from Brazil, told her son. The telephone conversation was recorded and later provided to The New York Times.

They had parted ways at the southwest border on May 30. Ms. Souza was locked up. Diogo was flown to Chicago, where he was placed in a shelter. Ms. Souza was released on June 9 and allowed to join relatives in Hyannis, Mass., but it is still not clear when her son will rejoin her.

"I am going to do everything to get you out of there," she told him on the call. "It's so many papers they need."

President Trump has officially ended the policy of separating families when parents are being prosecuted under the "zero tolerance" border enforcement program that took effect in May. But frustrating stories like that of the Souza family are playing out across the country, as parents of more than 2,300 children who were separated after their arrival in the United States now face lengthy bureaucratic delays in recovering them.

While some of the children have been reunited with their parents in recent days, interviews with immigration lawyers and government officials suggest that most of the children are likely to remain parked in group facilities or foster homes for some time to come.

"There was clearly no plan for reuniting the families," said Karen Hoffmann, an immigration attorney at Aldea-The People's Justice Center in Reading, Penn., who is suing the government to reunite three migrants with their children.

Part of the problem is that in many cases, parents and children are being detained thousands of miles apart, and the parents do not know exactly where their children are. Though federal agencies have registered each child with an identification number and set up hotlines for parents,

immigrant advocates say that many parents have trouble getting through or are not given answers when they call.

Late Saturday, the departments of Homeland Security and Health and Human Services announced that they had a "well-coordinated" process for reuniting families. As of June 20, their statement said, there were 2,053 separated minors in government custody. It said that another 522 children who had not yet been sent by the Border Patrol to a shelter or a foster family were returned to their parents at the border.

"A parent who is ordered removed from the U.S. may request that his or her minor child accompany them," the statement said. "It should be noted that in the past, many parents have elected to be removed without their children."

If a parent is released from detention, the authorities say, he or she will be reunited with a separated child once the parent fulfills requirements set by the government. But as Ms. Souza's case illustrates, the red tape can cause lengthy delays.

Senator Chuck Schumer, Democrat of New York, called on the Trump administration on Sunday to appoint a "czar" to be in charge of coordinating federal agencies to quickly reunite families.

"You don't need to be a foreign relations expert to know that the situation created by zero tolerance has left many people with zero confidence that the administration will be able to quickly reunite the kids," Mr. Schumer said at a news conference.

Noting that three different cabinet departments had a role in the situation, Mr. Schumer said, "No one is really in charge if there are three people in charge."

Shortly before the government officially announced the zero tolerance policy, it issued a memorandum setting stringent new rules for vetting parents, relatives and other potential sponsors who wish to get children from government custody.

For one thing, the memo said that Health and Human Services must obtain the "citizenship, immigration status, criminal history and immigration history" of the potential sponsor. It also said that the department must collect the names, dates of birth, addresses, fingerprints and identification documents of the potential sponsor and "all adult members in the potential sponsor's household," and provide that information to Immigration and Customs Enforcement, the agency that oversees deportation.

Previously, Health and Human Services did not share such information with ICE; other members of the household were not typically screened as part of the process; and parents did not have to be fingerprinted to get their children back.

Exhibit 38, Page251

"We have cases of Brazilian minors who remain in a shelter because of the new demands, which ended up intimidating relatives who wanted to bring them home," said Luisa Lopes, the director of consular affairs for Brazilians abroad. Ms. Lopes said she is aware of 49 Brazilian children who were separated from their parents.

Ms. Souza, 27, and her son turned themselves in to the Border Patrol on May 29, declaring that they had a fear of returning to their home country and wished to obtain asylum in the United States. The following day, an agent used Google Translate, she said, to explain to her — as Diogo erupted in tears — that because she had not presented herself at an official port of entry, she had entered the United States illegally; therefore she would go to jail, and he would go to a shelter. The son saw his mother being handcuffed.

"I told him, I'm not going to jail," she recalled in an interview conducted in Portuguese. "I am going to a place with other mothers. You are going to a place for children."

Ms. Souza appeared soon after in federal court in El Paso, where she pleaded guilty to illegal entry, a misdemeanor, and was sentenced to time served. Three detention centers and 10 days later, she was allowed to join a relative in Massachusetts, having passed an interview meant to ascertain whether she had a credible reason to fear returning to Brazil.

Before the authorities dropped her off in Dallas for her flight to Boston, they handed her a toll-free number she could call to locate Diogo.

She tried the number when she reached Massachusetts, but she could not get through to anyone.

"I was devastated, desperate, crazed," she said.

Ms. Souza, an evangelical Christian, said she sought strength in prayer.

She also searched on Facebook for a Brazilian woman she had met in detention whose child had also been removed from her. The woman, who is now in Pennsylvania, told Ms. Souza that her daughter had been at a shelter in Chicago called Casa Guadalupe and had befriended a Brazilian boy there named Diogo. She gave Ms. Souza the number.

Mother and son spoke for the first time in more than two weeks. She learned that Diogo had contracted chickenpox and, as a result, was isolated from other children. He sobbed, pleading for his mother to come get him.

Since then, they have been allowed to speak to each other by phone twice a week, for 10 minutes at a time.

"It has been 16 days, but don't worry," Ms. Souza told her son over one call that was recorded. "It's coming to an end. Be well. Stay with Jesus. With God on our side, it will all work out."

Exhibit 38, Page252

To get her son back, Ms. Souza learned, she would have to provide the shelter, which is run by Heartland Alliance, with a mountain of documents.

Assisted by a lawyer, Ms. Souza filled out a 36-page packet and submitted documents attesting to her relationship to Diogo. But "every day, they wanted something else," Ms. Souza in an interview on Saturday.

For example, the adults in the family with whom she lives in Hyannis also had to submit five pages of personal information for a background check.

On another call, Diogo urged his mother to hurry his release. With his voice breaking, the boy begged, "Ai, Mom, get the papers done fast."

"It isn't up to me," she tried to explain. "I am doing everything, but it's a lot of paperwork to handle."

But more days passed, and more requirements had to be met.

The last straw, she said, was the fingerprint request last week. A case worker notified Ms. Souza that she and two other adults in the household would have to visit a designated location in their area to be fingerprinted — on July 6. Her request to get back her son would then take 22 days to be approved, she was told.

"They said she can only get the child in August," said Jesse Bless, her lawyer. "That is completely unacceptable. What kind of process for reunification is this?"

"It was zero tolerance, zero planning, zero thought," said Mr. Bless, a senior counsel at Jeff Goldman Immigration, based in Boston, who has taken Ms. Souza's case pro bono.

He expressed outrage to shelter managers, telling them that Ms. Souza had already been fingerprinted at the border. In response, a Health and Human Services official emailed Mr. Bless, saying: "Policy and Procedures recently changed and requires all household members and sponsor's to fingerprint. I can assure you that while at Heartland, Diogo is not isolated.

"Case Managers at Heartland truly care about our children and are working diligently to ensure all of our minors are safely released."

Mr. Bless said that after he threatened to sue the shelter, "they agreed to a more expedited, but undefined schedule." Unsatisfied, he said on Sunday that he intended to travel to Chicago to press the matter further.

Meanwhile, Ms. Souza is next scheduled to speak with her son on Wednesday.

Her last words to him on his tear-filled birthday were: "Don't cry. I want you to be okay. Please be strong. O.K., son? Stay with Jesus, my son. Tchau. I love you."

"I love you too," the boy responded.

*Correction: June 23, 2018*
*Because of an editing error, a picture caption with an earlier version of this article misspelled Lidia Souza's middle name. It is Karina, not Karine.*

Nikita Stewart contributed reporting.

A version of this article appears in print on June 24, 2018, on Page A14 of the New York edition with the headline: Torn Apart at the Border, Kept Apart by Red Tape

Exhibit 38, Page254