1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al.,<br><br>               Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs Enforcement ("ICE"); et al.,<br><br>            Respondents-Defendants. | Case No.:  18cv0428 DMS (MDD)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION** |

Eleven weeks ago, Plaintiffs leveled the serious accusation that our Government was engaged in a widespread practice of separating migrant families, and placing minor children who were separated from their parents in government facilities for "unaccompanied minors."   According to Plaintiffs, the practice was applied indiscriminately, and separated even those families with small children and infants—many of whom were seeking asylum.  Plaintiffs noted reports that the practice would become national policy.  Recent events confirm these allegations.  Extraordinary relief is requested, and is warranted under the circumstances.

On May 7, 2018, the Attorney General of the United States announced a "zero tolerance policy," under which all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be

separated from the parent.[1]  Over the ensuing weeks, hundreds of migrant children were separated from their parents, sparking international condemnation of the practice.  Six days ago on June 20, 2018, the President of the United States signed an Executive Order ("EO") to address the situation and to require preservation of the "family unit" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining "rigorous[]" enforcement of immigration laws.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).  The EO did not address reunification of the burgeoning population of over 2,000 children separated from their parents.  Public outrage remained at a fever pitch.  Three days ago on Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a "Fact Sheet" outlining the government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal."[2]

Plaintiffs assert the EO does not eliminate the need for the requested injunction, and the Fact Sheet does not address the circumstances of this case.  Defendants disagree with those assertions, but there is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children.  There was no reunification plan in place, and families have been separated for months.  Some parents were deported at separate times and from

---

[1]  *See* U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[2]  *See* U.S. Dep't of Homeland Sec.*, Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

different locations than their children. Migrant families that lawfully entered the United States at a port of entry seeking asylum were separated. And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.

This Court previously entered an order finding Plaintiffs had stated a legally cognizable claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on their allegations the Government had separated Plaintiffs from their minor children while Plaintiffs were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children. *See Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 2018 WL 2725736, at \*7-12 (S.D. Cal. June 6, 2018). A class action has been certified to include similarly situated migrant parents. Plaintiffs now request classwide injunctive relief to prohibit separation of class members from their children in the future absent a finding the parent is unfit or presents a danger to the child, and to require reunification of these families once the parent is returned to immigration custody unless the parent is determined to be unfit or presents a danger to the child.

Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest weigh in their favor, thus warranting issuance of a preliminary injunction. This Order does not implicate the Government's discretionary authority to enforce immigration or other criminal laws, including its decisions to release or detain class members. Rather, the Order addresses only the circumstances under which the Government may separate class members from their children, as well as the reunification of class members who are returned to immigration custody upon completion of any criminal proceedings.

/ / /

/ / /

/ / /

1

## I.

2

## BACKGROUND

3         This case started with the filing of a Complaint by Ms. L., a Catholic citizen of the

4  Democratic Republic of the Congo fleeing persecution from her home country because of

5  her religious beliefs.  The specific facts of Ms. L.'s case are set out in the Complaint and

6  this Court's June 6, 2018 Order on Defendants' motion to dismiss.  *See Ms. L.*, 2018 WL

7  2725736, at *1-3.   In brief, Ms. L. and her then-six-year-old daughter S.S., lawfully

8  presented themselves at the San Ysidro Port of Entry seeking asylum based on religious

9  persecution.  They were initially detained together, but after a few days S.S. was "forcibly

10 separated" from her mother.  When S.S. was taken away from her mother, "she was

11 screaming and crying, pleading with guards not to take her away from her mother."  (Am.

12 Compl. ¶ 43.)  Immigration officials claimed they had concerns whether Ms. L. was S.S.'s

13 mother, despite Ms. L.'s protestations to the contrary and S.S.'s behavior.  So Ms. L. was

14 placed in immigration custody and scheduled for expedited removal, thus rendering S.S.

15 an "unaccompanied minor" under the Trafficking Victims Protection and Reauthorization

16 Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), and subjecting her to the "care and

17 custody" of the Office of Refugee Resettlement ("ORR").[3]  S.S. was placed in a facility in

18

19  _____

20 [3]  The TVPRA provides that "the care and custody of all unaccompanied alien children,

21 including responsibility for their detention, where appropriate, shall be the responsibility

22 of" HHS and its sub-agency, ORR.  8 U.S.C. § 1232(b)(1).  An "unaccompanied alien

23 child" ("UAC") is a child under 18 years of age with no lawful immigration status in the

   United States who has neither a parent nor legal guardian in the United States nor a parent

24 nor legal guardian in the United States "available" to care for them.  6 U.S.C § 279(g)(2).

   According to the TVPRA, a UAC "may not be placed with a person or entity unless the

25 Secretary of Health and Human Services makes a determination that the proposed

26 custodian is capable of providing for the child's physical and mental well-being.  Such

   determination shall, at a minimum, include verification of the custodian's identity and

27 relationship to the child, if any, as well as an independent finding that the individual has

28 not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. §

   1232(c)(3)(A).

Chicago over a thousand miles away from her mother.  Immigration officials later determined Ms. L. had a credible fear of persecution and placed her in removal proceedings, where she could pursue her asylum claim.  During this period, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (Am. Compl. ¶ 45.)  Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.)  Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.)  After the present lawsuit was filed, Ms. L. was released from ICE detention into the community.  The Court ordered the Government to take a DNA saliva sample (or swab), which confirmed that Ms. L. was the mother of S.S.  Four days later, Ms. L. and S.S. were reunited after being separated for nearly five months.

In an Amended Complaint filed on March 9, 2018, this case was expanded to include another Plaintiff, Ms. C.  She is a citizen of Brazil, and unlike Ms. L., she did not present at a port of entry.  Instead, she and her 14-year-old son J. crossed into the United States "between ports of entry," after which they were apprehended by U.S. Border Patrol.  Ms. C. explained to the agent that she and her son were seeking asylum, but the Government, as was its right under federal law, charged Ms. C. with entering the country illegally and placed her in criminal custody.  This rendered J. an "unaccompanied minor" and he, like S.S., was transferred to the custody of ORR, where he, too, was housed in a facility in Chicago several hundred miles away from his mother.  Ms. C. was thereafter convicted of misdemeanor illegal entry and served 25 days in criminal custody.  After completing that sentence, Ms. C. was transferred to immigration detention for removal proceedings and consideration of her asylum claim, as she too had passed a credible fear screening.  Despite being returned to immigration custody, Ms. C. was not reunited with J.  During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]" (*Id.* ¶ 58.)  Ms. C. was "desperate" to be reunited with her son, worried about him constantly and did not know when she would be able to see him.  (*Id.*)  J. had a difficult time emotionally during the period of separation from his mother.  (*Id.* ¶ 59.)  Ms. C. was eventually released from immigration detention on bond, and only recently reunited

with J.  Their separation lasted more than eight months despite the lack of any allegations or evidence that Ms. C. was unfit or otherwise presented a danger to her son.[4]

Ms. L. and Ms. C. are not the only migrant parents who have been separated from their children at the border.  Hundreds of others, who have both lawfully presented at ports of entry (like Ms. L.) and unlawfully crossed into the country (like Ms. C.), have also been separated.  Because this practice is affecting large numbers of people, Plaintiffs sought certification of a class consisting of similarly situated individuals.  The Court certified that class with minor modifications,[5] and now turns to the important question of whether Plaintiffs are entitled to a classwide preliminary injunction that (1) halts the separation of class members from their children absent a determination that the parent is unfit or presents a danger to the child, and (2) reunites class members who are returned to immigration custody upon completion of any criminal proceedings absent a determination that the parent is unfit or presents a danger to the child.

Since the present motion was filed, several important developments occurred, as previously noted.  First, on May 7, 2018, the Government announced its zero tolerance policy for all adult persons crossing the border illegally, which resulted in the separation of hundreds of children who had crossed with their parents.  This is what happened with Ms. C., though she crossed prior to the public announcement of the zero tolerance policy.

---

[4]  As stated in the Court's Order on Defendants' motion to dismiss, Plaintiffs do not challenge Ms. C.'s initial separation from J. as a result of the criminal charge filed against her.  Plaintiffs' only complaint with regard to Ms. C. concerns the Government's failure to reunite her with J. after she was returned to immigration custody.

[5]  The class is defined to include: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child."  (*See* Order Granting in Part Mot. for Class Cert. at 17.)  The class does not include parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the EO.  (*See id.* at 4 n.5.)

She is not alone.  There are hundreds of similarly situated parents, and there are more than 2,000 children that have now been separated from their parents.

When a parent is charged with a criminal offense, the law ordinarily requires separation of the family.  This separation generally occurs regardless of whether the parent is charged with a state or federal offense.  The repercussions on the children, however, can vary greatly depending on status.  For citizens, there is an established system of social service agencies ready to provide for the care and well-being of the children, if necessary, including child protective services and the foster care system.  This is in addition to any family members that may be available to provide shelter for these minor children.  Grandparents and siblings are frequently called upon.  Non-citizens may not have this kind of support system, such as other family members who can provide shelter for their children in the event the parent is detained at the border.  This results in immigrant children going into the custody of the federal government, which is presently not well equipped to handle that important task.

For children placed in federal custody, there are two options.  One of those options is ORR, but it was established to address a different problem, namely minor children who were apprehended at the border without their parents, *i.e.*, true "unaccompanied alien children."  It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents.  The second option is family detention facilities, but the options there are limited.  Indeed, at the time of oral argument on this motion, Government counsel represented to the Court that the "total capacity in [family] residential centers" was "less than 2,700."  (Rep. Tr. at 9, May 9, 2018, ECF No. 70.)  For male heads of households, *i.e.*, fathers traveling with their children, there was only one facility with "86 beds."  (*Id.* at 43.)

The recently issued EO confirms the government is inundated by the influx of children essentially orphaned as a result of family separation.  The EO now directs "[h]eads of executive departments and agencies" to make available "any facilities … appropriate" for the housing and care of alien families.  EO § 3(d).  The EO also calls upon the *military*

by directing the Secretary of Defense to make available "any existing" facility and to "construct such facilities[,]" if necessary, *id.* § 3(c), which is an extraordinary measure. Meanwhile, "tent cities" and other make-shift facilities are springing up.  That was the situation into which Plaintiffs, and hundreds of other families that were separated at the border in the past several months, were placed.

This situation has reached a crisis level.  The news media is saturated with stories of immigrant families being separated at the border.  People are protesting.  Elected officials are weighing in.  Congress is threatening action.  Seventeen states have now filed a complaint against the Federal Government challenging the family separation practice.  *See State of Washington v. United States*, Case No. 18cv0939, United States District Court for the Western District of Washington.  And the President has taken action.

Specifically, on June 20, 2018, the President signed the EO referenced above.  The EO states it is the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." *Id.* § 1.[6]  In furtherance of that policy, the EO indicates that parents and children who are apprehended together at the border will be detained together "during the pendency of any criminal improper entry or immigration proceedings" to the extent permitted by law.  *Id.* § 3.  The language of the EO is not absolute, however, as it states that family unity shall be maintained "where appropriate and consistent with law and available resources[,]" *id.* § 1, and "to the extent permitted by law and subject to the availability of appropriations[.]"  *Id.* § 3.  The EO also indicates rigorous enforcement of illegal border crossers will continue. *Id.* § 1 ("It is the policy of this Administration to rigorously enforce our immigration laws.").  And finally, although the Order speaks to a policy of "maintain[ing] family unity,"

---

[6] The Order defines "alien family" as "any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an alien child or alien children at or between designated ports of entry and who was detained[.]"  *Id.* § 2(a)(i).

it is silent on the issue of reuniting families that have already been separated or will be separated in the future." *Id.*

In light of these recent developments, and in particular the EO, the Court held a telephonic status conference with counsel on June 22, 2018.  During that conference, the Court inquired about communication between ORR and DHS, and ORR and the Department of Justice ("DOJ"), including the Bureau of Prisons ("BOP"), as it relates to these separated families.  Reunification procedures were also discussed, specifically whether there was any affirmative reunification procedure for parents and children after parents were returned to immigration detention following completion of criminal proceedings.  Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families.[7]

The day after the status conference, Saturday, June 23, DHS issued the Fact Sheet referenced above.  This document focuses on several issues addressed during the status conference, *e.g.*, processes for enhanced communication between separated parents and children, but only "for the purposes of removal."  It also addresses coordination between and among three agencies, CBP, ICE, and HHS agency ORR, but again for the purpose of removal.  The Fact Sheet does not address reunification for other purposes, such as immigration or asylum proceedings, which can take months.  It also does not mention other vital agencies frequently involved during criminal proceedings: DOJ and BOP.

At the conclusion of the recent status conference, the Court requested supplemental briefing from the parties.  Those briefs have now been submitted.  After thoroughly

_____

[7]  The Court: "Is there currently any affirmative reunification process that the government has in place once parent and child are separated?  Government counsel: I would say … when a parent is released from criminal custody and taken into ICE custody is the practice to reunite them in family detention[?]  And at that [previous hearing] I said no, that that was not the practice.  I think my answer on that narrow question would be the same." (Rep. Tr. at 29-30, June 22, 2018, ECF No. 77.)

considering all of the parties' briefs and the record in this case, and after hearing argument from counsel on these important issues, the Court grants Plaintiffs' motion for a classwide preliminary injunction.

## II.

## DISCUSSION

Plaintiffs seek classwide preliminary relief that (1) enjoins Defendants' practice of separating class members from their children absent a determination that the parent is unfit or presents a danger to their child, and (2) orders the government to reunite class members with their children when the parent is returned to immigration custody after their criminal proceedings conclude, absent a determination that the parent is unfit or presents a danger to the child. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[8]

---

[8] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.*, whether they prevent future conduct, or mandatory, *i.e.*, "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). The standard set out above applies to prohibitory injunctions, which is what Plaintiffs seek here. To the extent Plaintiffs are also requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. Suffice it to say that to the extent some portion of Plaintiffs' requested relief is subject to a standard higher than

Before turning to these factors, the Court addresses directly Defendants' argument that an injunction is not necessary here in light of the EO and the recently released Fact Sheet.  Although these documents reflect some attempts by the Government to address some of the issues in this case, neither obviates the need for injunctive relief here.  As indicated throughout this Order, the EO is subject to various qualifications.  For instance, Plaintiffs correctly assert the EO allows the government to separate a migrant parent from his or her child "where there is a *concern* that detention of an alien child with the child's alien parent would pose a risk to the child's welfare."  EO § 3(b) (emphasis added).  Objective standards are necessary, not subjective ones, particularly in light of the history of this case.  Furthermore, the Fact Sheet focuses on reunification "at time of removal[,]" U.S. Dep't of Homeland Sec., *supra*, note 2, stating that the parent slated for removal will be matched up with their child at a location in Texas and then removed.  It says nothing about reunification during the intervening time between return from criminal proceedings to ICE detention or the time in ICE detention prior to actual removal, which can take months.  Indeed, it is undisputed "ICE has no plans or procedures in place to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded."  (Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 31 ¶ 11.)  Thus, neither of these directives eliminates the need for an injunction in this case. With this finding, the Court now turns to the *Winter* factors.

## A.     Likelihood of Success

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).  While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

------------------------

the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons set out below.

Here, the only claim currently at issue is Plaintiffs' due process claim.[9]  Specifically, Plaintiffs contend the Government's practice of separating class members from their children, and failing to reunite those parents who have been separated, without a determination that the parent is unfit or presents a danger to the child violates the parents' substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution.  To prevail on this claim, Plaintiffs must show that the Government practice "shocks the conscience."  In the Order on Defendants' motion to dismiss, the Court found Plaintiffs had set forth sufficient facts to support that claim.  *Ms. L.*, 2018 WL 2725736, at *7-12.  The evidence submitted since that time supports that finding, and demonstrates Plaintiffs are likely to succeed on this claim.

As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the conscience" standard is not subject to a rigid list of established elements.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (stating "[r]ules of due process are not … subject to mechanical application in unfamiliar territory.")  On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements[.]"  *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

Here, each Plaintiff presents different circumstances, but both were subjected to the same government practice of family separation without a determination that the parent was unfit or presented a danger to the child.  Ms. L. was separated from her child without a determination she was unfit or presented a danger to her child, and Ms. C. was not reunited with her child despite the absence of any finding that she was unfit or presented a danger

---

[9]  In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on events that transpired after the Complaints were filed, *e.g.*, the announcement of the zero tolerance policy and the EO.  The Court disagrees.  Plaintiffs' claims are not based on these events, but are based on the practice of separating class members from their children.  The subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim itself, which remains focused on the practice of separation.

to her child.  Outside of the context of this case, namely an international border, Plaintiffs would have a high likelihood of success on a claim premised on such a practice.  *See D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children from religious school absent evidence the students were "at immediate risk of child abuse or neglect" was violation of clearly established constitutional right); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.")

The context of this case is different.  The Executive Branch, which is tasked with enforcement of the country's criminal and immigration laws, is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country.  However, as the Court explained in its Order on Defendants' motion to dismiss, the right to family integrity still applies here.  The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.

On the contrary, the context and circumstances in which this practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim.  First, although parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum. In that situation, the parent has committed no crime, and absent a finding the parent is unfit or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated class members would be necessary.  Here, many of the family separations have been the result of the Executive Branch's zero tolerance policy, but the record also reflects that the

practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.  Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone.  (*See, e.g.*, Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry)).

As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials.  Particularly so if they have a credible fear of persecution.  We are a country of laws, and of compassion.  We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum.  *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980).  The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence.  This is a startling reality.  The government readily keeps track of personal property of detainees in criminal and immigration proceedings.  Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not

accounted for with the same efficiency and accuracy as *property*.  Certainly, that cannot satisfy the requirements of due process.  *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (quoting *Lassiter v. Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18, (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.")  (internal quotation marks omitted).

The lack of effective methods for communication between parents and children who have been separated has also had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the childrens' immigration proceedings.  *See United States v. Dominguez-Portillo*, No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D. Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any paperwork or information concerning the whereabouts or well-being of" their children).  In effect, these parents have been left "in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves."  *Id.* at *14.  This situation may result in a number of different scenarios, all of which are negative – some profoundly so.  For example, "[i]f parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue."  *Id.*  Furthermore, " a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous to, or after their child, or whether they would have the opportunity to even discuss their deportations[.]"  *Id.*  Indeed, some parents have already been deported without their children, who remain in government facilities in the United States.[10]

---

[10]  *See*, *e.g.*, Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a; Nelson Renteria, *El Salvador demands U.S. return child taken from deported father*,

The absence of established procedures for dealing with families that have been separated at the border, and the effects of that void on the families involved, is borne out in the cases of Plaintiffs here.  Ms. L. was separated from her child when immigration officials claimed they could not verify she was S.S.'s mother, and detained her for expedited removal proceedings.  That rendered S.S. "unaccompanied" under the TVPRA and subject to immediate transfer to ORR, which accepted responsibility for S.S.  There was no further communication between the agencies, ICE and ORR.  The filing of the present lawsuit prompted release and reunification of Ms. L. and her daughter, a process that took close to five months and court involvement.  Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son.  She, too, had to file suit to regain custody of her son from ORR.

These situations confirm what the Government has already stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes other than removal.  Outside of deportation, the onus is on the parents, who, for the most part, are themselves in either criminal or immigration proceedings, to contact ORR or otherwise search for their children and make application for reunification under the TVPRA.  However, this reunification procedure was not designed to deal with the present circumstances.  (*See* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.) Rather, "ORR's reunification process was designed to address the situation of children who come to the border or are apprehended outside the company of a parent or legal guardian." (*Id.* ¶ 6.)  Placing the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards.  When children are

---

REUTERS (June 21, 2018, 4:03 PM),  https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER; Miriam Jordan, *'I Can't Go Without My Son': A Deported Mother's Plea*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html.

separated from their parents under these circumstances, the Government has an affirmative obligation to track and promptly reunify these family members.

This practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim.  When combined with the manner in which that practice is being implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the parents about their childrens' whereabouts or ensuring communication between the parents and children, and the use of the children as tools in the parents' criminal and immigration proceedings, (*see* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a finding of likelihood of success is assured.  A practice of this sort implemented in this way is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency."  *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs' due process claim.

**B.    Irreparable Injury**

Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20).  "'It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'"  *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).  As explained, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

The injury in this case, however, deserves special mention.  That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm.  *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).

Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them.  One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack."  (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.)  Another asylum-seeking parent from El Salvador who was separated from her two sons writes,

> The separation from my sons has been incredibly hard, because I have never been away from them before.  I do not want my children to think that I abandoned them.  [My children] are so attached to me.  [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.… It hurts me to think how anxious and distressed they must be without me.

(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.)  And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away."  (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.)  There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child.  *See* Molly Hennessy-Fiske, *Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide*, L.A. Times (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide-20180609-story.html.

The parents, however, are not the only ones suffering from the separations.  One of the *amici* in this case, Children's Defense Fund, states,

there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development. Forced separation disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness....  And the psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation— even after eventual reunification with a parent or other family.

(ECF No. 17-11 at 3.)  Other evidence before the Court reflects that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."  (ECF No. 17-13 at 2.)  That evidence reflects:

Separation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting.  In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development.  Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years.  Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.

(ECF No. 17-13 at 2.)  And Martin Guggenheim, the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and Founding Member of the Center for Family Representation, states:

Children are at risk of suffering great emotional harm when they are removed from their loved ones.  And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.

(Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.)  All of this evidence, combined with the constitutional violation alleged here, conclusively shows that Plaintiffs and the

class members are likely to suffer irreparable injury if a preliminary injunction does not issue.

## C.    Balance of Equities

Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20).  As with irreparable injury, when a plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

Plaintiffs here assert the balance of equities weighs in favor of an injunction in this case.  Specifically, Plaintiffs argue Defendants would not suffer any hardship if the preliminary injunction is issued because the Government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (stating balance of equities favors "'prevent[ing] the violation of a party's constitutional rights.'").  When the absence of harm to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue this factor weighs in their favor.  The Court agrees.

The primary harm Defendants assert here is the possibility that an injunction would have a negative impact on their ability to enforce the criminal and immigration laws. However, the injunction here—preventing the separation of parents from their children and ordering the reunification of parents and children that have been separated—would do nothing of the sort.  The Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law.  *See EO §§ 1, 3(a) & (e) (discussing Flores v. Sessions*, CV 85-4544); *see also Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1439-40 (9th Cir. 1986) (stating "prudential considerations preclude[] interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be

18cv0428 DMS (MDD)

detained).   It would just have to do so in a way that preserves the class members' constitutional rights to family association and integrity.  *See Rodriguez*, 715 F.3d at 1146 ("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must do so in a manner consistent with our constitutional values.")  Thus, this factor also weighs in favor of issuing the injunction.

**D.    Public Interest**

The final factor for consideration is the public interest.  *See Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.'")  To obtain the requested relief, "Plaintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] *likely* consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'"  *Id.* (quoting *Stormans*, 586 F.3d at 1139).  "'Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'"  *Id.* (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

This case involves two important public interests: the interest in enforcing the country's criminal and immigration laws and the constitutional liberty interest "of parents in the care, custody, and control of their children[,]" which "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court.  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Both of these interests are valid and important, and both can be served by the issuance of an injunction in this case.

As stated, the public's interest in enforcing the criminal and immigration laws of this country would be unaffected by issuance of the requested injunction.  The Executive Branch is free to prosecute illegal border crossers and institute immigration proceedings against aliens, and would remain free to do so if an injunction were issued.  Plaintiffs do not seek to enjoin the Executive Branch from carrying out its duties in that regard.

What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and "well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction. *See Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.'") Accordingly, this factor, too, weighs in favor of issuing the injunction.

## III.

## CONCLUSION

The unfolding events—the zero tolerance policy, EO and DHS Fact Sheet—serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:

(1)     Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the

child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody.[11]

(2)   If Defendants choose to release Class Members from DHS custody, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are preliminary enjoined from continuing to detain the minor children of the Class Members and must release the minor child to the custody of the Class Member, unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child.

(3)   Unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child:

(a)   Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and

(b)   Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.

(4)   Defendants must immediately take all steps necessary to facilitate regular communication between Class Members and their children who remain in ORR custody, ORR foster care, or DHS custody. Within ten (10) days, Defendants must provide parents telephonic contact with their children if the parent is not already in contact with his or her child.

---

[11] "Fitness" is an important factor in determining whether to separate parent from child. In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (*see* EO § 1), among other matters. Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.

(5)   Defendants must immediately take all steps necessary to facilitate regular communication between and among all executive agencies responsible for the custody, detention or shelter of Class Members and the custody and care of their children, including at least ICE, CBP, BOP, and ORR, regarding the location and well-being of the Class Members' children.

(6)   Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child.

(7)   This Court retains jurisdiction to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Order and Preliminary Injunction.

A status conference will be held on **July 6, 2018**, at **12:00 noon**, to discuss all necessary matters.  A notice of teleconference information sheet will be provided in a separate order.

**IT IS SO ORDERED.**

Dated:  June 26, 2018

Hon. Dana M. Sabraw
United States District Judge

24