CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation

U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

               Petitioners-Plaintiffs,

     vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

             Respondents-Defendants.

Case No. 18cv428 DMS MDD

**RESPONDENTS' NOTICE
REGARDING COMPLIANCE AND
REQUEST FOR CLARIFICATION
AND/OR RELIEF**

## I.      NOTICE REGARDING COMPLIANCE

On June 26, 2018, this Court issued orders granting Plaintiffs' motion to certify a class, ECF No. 82, and ordering a preliminary injunction on behalf of that class, ECF No. 83. After receiving the Court's preliminary-injunction order, Defendants immediately acted to implement and comply with it. As a result of that prompt action, Defendants believe that they are in compliance with all aspects of the Court's injunctive order regarding the forward-looking policies on separation and communication. Defendants have been working diligently on complying with the Court's reunification directives. Defendants understand the urgent concerns underpinning the Court's order. Defendants have dedicated immense resources and effort to reunifying families, and personnel at the highest levels of the agencies have been involved in implementing the Court's directives. Defendants are submitting declarations to explain the extensive efforts of the U.S. Department of Health and Human Services ("HHS") (declaration attached hereto) and U.S. Immigration and Customs Enforcement ("ICE") (declaration to follow) to identify class members and their children and to reunify class members with their children.

In the preliminary-injunction order, the Court set a status conference for July 6. *Id.* Defendants have plans to comply with the injunction, and are prepared to discuss those plans at the conference. To fully implement these plans, however, Defendants may need clarification on or relief from certain parts of the order, so that Defendants can safely reunite families. Among other issues, Defendants need

this Court's guidance on issues that arise because of HHS's understanding of its statutory obligations to ensure the safety of children before transferring them out of HHS custody. The processes that HHS has developed in order to fulfill its statutory obligations are critical to protecting children against the well-documented risk of trafficking or abuse, but they also require HHS to follow procedures that are time-consuming, even in this unique context. Defendants thus seek confirmation about the Court's intent in its order as it relates to those procedures and, as appropriate, relief from the Court's deadlines.[1] Defendants also seek clarification regarding the definition of the class certified by this Court.

## II.   REQUEST FOR CLARIFICATION AND/OR RELIEF

The Government respectfully requests the Court's prompt resolution of several critical implementation issues, at or soon after the July 6 status conference. The Government anticipates that additional clarification or relief may be requested as its implementation of the Court's injunction proceeds. The Government will bring any additional such requests to the Court's attention promptly.

---

[1] The Government also has advised the court in *Flores v. Sessions*, No. 85-4544 (C.D. Cal.), that the Flores Settlement Agreement permits the Government to use ICE family residential centers to hold families together while in Government custody. *See Flores*, ECF No. 447 (attached).

A. <u>Releasing Children From HHS Custody.</u>

As this Court is aware, the class definition includes "[a]ll adult parents who enter the United States," whether at or between ports of entry, "who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody." Class-Certification Order, ECF No. 82 at 17. The class excludes parents if there is "a determination that the parent is unfit or presents a danger to the child." *Id*. It also excludes parents "with criminal history that prevents them from being released into the community along with their child or housed together in a [family] detention center," parents "with some kind of communicable disease" raising safety concerns, or "parents who fall within the [Family Separation Executive Order]." *Id.* at 4 n.5, 10. The Court's preliminary injunction, in turn, directs Defendants to "reunify all Class members with their minor children" within 14 days for children under age 5 and within 30 days for minor children age 5 and over, "[u]nless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child." Preliminary-Injunction Order, ECF No. 83 at 23 ¶ (3).

As explained in the attached declaration of Jonathan White, HHS understands the Court's order in light of its statutory mission, which requires HHS

to ensure child welfare and the safety of minors released from its custody. More specifically, considering the order in light of its statutory obligations relating to the release of unaccompanied alien children (UACs), *see* 6 U.S.C. § 279; 8 U.S.C. § 1232, HHS understands the order to require three distinct findings before a child can be released.

First, to confirm that an individual is, in fact, a class member as well as a "parent" within the meaning of 6 U.S.C. § 279(g)(2), HHS first must determine that the individual is the parent of the child with whom he or she seeks to be reunified. White Declaration ¶¶ 20-26. HHS believes that this requirement applies regardless of whether the parent is in federal custody or has been released into the interior. To determine parentage, HHS is using DNA swab testing because it is a reasonably prompt and efficient method for determining biological parentage in a significant number of cases. White Declaration ¶¶ 21, 25. HHS is working diligently to minimize the burdens of confirming parentage, and is expediting DNA verification. White Declaration ¶¶ 20-24. But given the possibility of false claims of parentage, confirming parentage is critical to ensure that children are returned to their parents, not to potential traffickers. White Declaration ¶ 25. Although HHS is moving expeditiously to undertake these DNA tests, that process takes meaningful time, even when it is expedited—as this Court has implicitly recognized. *See* Order on Motion to Dismiss 3-4, 8 (noting that on March 8, 2018,

the Court ordered that a DNA test for Ms. L. be completed by March 14—which the Court described as "order[ing] an expedited DNA test").

In many cases involving parents who are detained, this process will not interfere with the Government's ability to reunify families within the timelines provided by the Court. In some cases, however, this process may not be conclusive in establishing parentage, and further evaluation of available documentation may be required. White Declaration ¶¶ 20, 45. Confirming parentage for adults who have already been released may also take additional time, including for the parent to appear for DNA testing or other confirmation. In those cases, it may be harder to reunify some families within the Court's timeline.

Accordingly, the Government respectfully requests clarification from the Court as to whether the process for confirming parentage implemented by HHS is consistent with the Court's understanding of its mandate, and seeks clarification that in cases where parentage cannot be confirmed quickly, HHS will not be in violation of the Court's order if reunification occurs outside of the timelines provided by the Court. The Government can for the Court's consideration prepare a proposal for an alternative timeline.

Second, to confirm that an individual is neither "unfit [n]or presents a danger to the child," that the parent is "available to provide care and physical custody," 6 U.S.C. § 279(g)(2), and that the parent "has not engaged in any activity that would

indicate a potential risk to the child," 8 U.S.C. §1232(c)(3)(A), ICE and HHS must confirm whether an individual has any criminal history, including a history indicative of abuse. White Declaration ¶¶ 27, 29. To expedite those determinations in the unusual context of reunification following government separation, the agencies are relying on summaries of criminal background checks run by ICE, which are in turn shared with HHS. White Declaration ¶ 29. That process is not currently anticipated to delay reunification.

Third, before releasing any child to a class member who is not in government custody, HHS understands that the determination that a parent is not "unfit or presents a danger to the child," Preliminary-Injunction Order at 23 ¶ 2, must be read in conjunction with the TVPRA, 8 U.S.C. § 1232, which imposes additional safety requirements before "plac[ing]" a child with someone outside federal custody. Specifically, a UAC "may not be placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which must include "an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). HHS believes that, in the context of reunifying a parent with a child following government separation, when the parent has since been released into the interior and the child remains in HHS custody, HHS remains obligated to apply existing HHS procedures under the

TVPRA. *See* White Declaration ¶¶ 33-44 for an explanation of such procedures. The processes involved in applying these provisions have developed to ensure that HHS does not inadvertently release a child in its custody into a situation that will expose him or her to trafficking or abuse. White Declaration ¶¶ 45-46.

      HHS has worked diligently to expedite these processes to enable the Government to comply with the timelines in the Court's order. HHS anticipates, however, in some instances it will not be able to complete the additional processes within the timelines the Court prescribed, particularly with regard to class members who are already not in Government custody (*e.g.*, because they have previously been paroled or released). White Declaration ¶¶ 45-46.

      Accordingly, HHS seeks clarification from this Court that it intended for HHS to follow such procedures in the somewhat unique context of reunification following government separation, and in particular for reunification with class members who have been released into the interior. If the Court intended for HHS to follow a different approach, the Government requests clarification regarding the precise inquiry that HHS should be making in these circumstances.[2]

---

[2] HHS's aim it to comply with the Court's injunction, while also following its normal processes under the TVPRA that HHS has implemented to ensure the safety of children upon placement by HHS with a parent or other sponsor. Accordingly, HHS asks that if the Court concludes that HHS must truncate those normal TVPRA processes to meet court-ordered deadlines, then the Court should so order in a manner that provides HHS full clarity with regard to its court-ordered obligations.

Further, if the Court concludes that HHS is properly proceeding in light of the Court's order and the relevant statutory provisions, then HHS seeks partial relief from the timelines in the Court's order to allow HHS to comply with these obligations and to safely achieve the reunifications that the order directs, particularly for parents who have previously been released. The Government does not wish to unnecessarily delay reunifications or burden class members. At the same time, however, the Government has a strong interest in ensuring that any release of a child from Government custody occurs in a manner that ensures the safety of that child. The Government can, for the Court's consideration, prepare a proposal for an alternative timeline that that takes HHS's procedures into account.

Thus, Defendants seek clarification to ensure that the Government can comply with and implement the Court's order consistent with federal laws protecting child safety in implementing reunification plans.

### B. ICE's Obligations Under Paragraph (1) Of The Preliminary Injunction.

As described in the Government's declarations, the reunification process implemented by ICE and HHS for parents who are now in ICE custody requires extensive and careful coordination between the two agencies so that HHS can reunify the child with his or her parent in ICE custody. White Declaration ¶¶ 13-14, 29. HHS is able to reunify families in such cases much faster than it is able to do so for class members who have already been released from ICE custody. *Id.*

Paragraph (1) of the Court's preliminary-injunction order prohibits ICE "from detaining Class Members in DHS custody without and apart from their minor children." Preliminary-Injunction Order at 22 ¶ (1). Consistent with that command, reunification could occur in ICE custody in a family residential center, or by reunifying the parent and child at release. But this paragraph could potentially be read to require that if HHS has not been able to reunify a child with a parent in ICE custody by the deadlines ordered by the Court, ICE would still be required to release the parent from custody before that deadline even without reunification. Such a requirement would, in most cases, delay reunification because release of a parent before HHS completes its suitability determination would trigger additional obligations for HHS to comply with the procedures it has developed to ensure safe release in accordance with the TVPRA. White Declaration ¶¶ 33-45.

If, as discussed above, the Court determines that HHS should continue to follow its TVPRA procedures in making its release decisions, then the Government further asks the Court to clarify whether: (a) Paragraph (1) of the preliminary-injunction order requires that ICE release the parent by the compliance deadlines even if HHS has not completed its processes and where such release might slow reunification; or (b) ICE may continue to hold parents beyond the current deadlines until HHS's processes are complete.

18cv428 DMS MDD

### C. Scope Of The Class Definition.

The Government also respectfully requests clarification on the scope of the Court's class definition.

First, as issued, the class definition contains no date limitations. It thus could be read to cover individuals who were separated from their children long before this case began, and long before the May 2018 policy that prompted the Court's injunction. The absence of any date limitations, moreover, makes it difficult for the Government to ensure that it has identified all class members.

Accordingly, the Government respectfully requests that the Court clarify a start date for separations that would result in class membership for the separated parent. The Government proposes that the Court use March 9, 2018, as the starting point for the reunification requirement, because that is the date of filing for Plaintiffs' amended complaint which added the class claims in this case.

Relatedly, the class definition does not specify whether it includes parents who had been removed from the United States prior to the issuance of the Court's class-certification order. The order itself does not address such individuals, nor did either named Plaintiff experience such a situation. Moreover, the timelines for the relief ordered by the Court could not encompass such a scenario given the complexities involved in locating individuals who have been removed, determining whether they wish to be reunified with their child, and facilitating such a

reunification outside of the United States. Accordingly, the Government requests that the Court clarify that such individuals are not included within the class definition or, if the Court believes that they are, that the Court allow the Government the opportunity to brief the matter or that the Court at least provide the Government relief from the timelines in the order with regard to the reunification of such individuals, and instead allow the Government the opportunity to propose a timeline to pursue reunifications for removed individuals.

18cv428 DMS MDD

DATED: July 5, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L., et al. | Case No. 18-cv-428 DMS MDD |
| Petitioner-Plaintiff, | |
| vs. | **CERTIFICATE OF SERVICE** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 450 Fifth Street, NW, Washington, DC 20001. I am not a party to the above-entitled action. I have caused service of the accompanying RESPONDENTS' NOTICE REGARDING COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 5, 2018

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Department of
Justice

*Attorney for Respondents-Defendants*

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | **DECLARATION OF JONATHAN WHITE** |
| vs. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1.     I am a career officer in the United States Public Health Service Commissioned Corps and have served in the Department of Health & Human Services in three Administrations.  I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response, and previously served as the Deputy Director of the Office of Refugee Resettlement for the Unaccompanied Alien Children's Program.

2.     I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.).  President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

**<u>KEY HHS ACTIONS ON REUNIFICATION</u>**

3.     <u>Focus on Child Safety</u>:  The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so.

4.     <u>Deployment of Additional Personnel</u>:  On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS reunify children in ORR custody with parents.

5.     <u>Determination of Class Members</u>:  HHS has worked closely with U.S. Department of Homeland Security (DHS)—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—to try to determine all individuals who meet the

Court's criteria for class members.  The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; determine location of DHS apprehension and separation; determine parental fitness; and evaluate whether reunification would present a danger to the child.  Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons (BOP) (or vice-versa), and newly-acquired information.

6.     Facilitation of Regular Communication Between Class Members and Children in ORR Custody:  HHS has deployed field personnel to help putative class members communicate with children in ORR care.

**DEPLOYMENT OF ADDITIONAL PERSONNEL**

7.     As noted above, on June 22, 2018, the Secretary of Health and Human Services activated ASPR to augment the resources that ORR had already devoted to expeditiously discharge children from ORR care.  ORR has had to continue performing core program functions for minors who cross the border without parents (and who far outnumber separated children in ORR care).  The augmenting of resources has helped ORR continue performing those core functions.

8.     The activating of ASPR included the Secretary's Operation Center (SOC), which is a command center that operates 24 hours per day, 365 days per year.  The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government.  While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations.

9.     ASPR activated an Incident Management Team.  As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC).  It works full-time to provide logistical and administrative support.

10.     ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody.  Those personnel—who are organized into four field

teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT).  The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

11.     Finally, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support. HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations. They too will engage directly with putative class members in ICE custody.

**DETERMINATION OF CLASS MEMBERS**

12.     ORR has a process for placing unaccompanied alien children (UAC) with parents or other sponsors that is designed to comply with the 1997 Flores Settlement Agreement, the Homeland Security Act of 2002 (HSA), and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), as described in more detail below.  This process ensures the care and safety of children who are apprehended in the United States and then referred to HHS as unaccompanied children.

13.     HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.

14.     Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage.  Also, HHS determines the putative class member's immigration history to confirm where they were apprehended and separated from their child.  Finally, HHS collects and analyzes criminal, medical (e.g., communicable disease), and other information to

determine the parental fitness of the putative class member and confirm that reunification would not present a danger to the child.  HHS generally performs these checks concurrently.

15.     Putative class members who are not verified as parents are not included in the class by HHS.  Putative class members apprehended in the interior, who have relevant criminal history, have a communicable disease, or are otherwise parentally unfit or present a danger to a child, are not included in the class either.

16.     In general, HHS knows the names and locations of all children who are in ORR care and custody at all times because ORR maintains that data in its online case management portal.  The ORR portal includes data about each child that DHS provided when DHS transferred the child to ORR custody.  It also includes health and social data collected or entered by ORR personnel, grantees, or contractors.  While the ORR portal may contain some data about the child's parents, the ORR portal was not designed to determine class membership or facilitate reunification under the criteria and deadlines established by the Court's Order.  Some of the data required to determine the class membership of a putative class member resides with DHS, while HHS must collect some data directly from the putative class member.

17.     The data collection, sharing, and analysis required to determine class membership is extraordinarily time and resource intensive.  There are myriad reasons for this.  For instance, DHS has different information systems, and those systems were not designed to neatly capture and readily share all of the data required to determine class membership.  The departments must therefore map their data manually.  Also, the class potentially encompasses parents who were separated from their children *before* the Administration implemented the zero-tolerance policy, and those groups may not have received the same family unit identifiers from DHS as the groups separated *after* the Administration implemented the zero-tolerance policy.  Absent reliable and consistent identifiers, HHS must glean the separations of class members and children (and related details) from the case

management files on the ORR portal.  On top of these variables, a parent's class membership can change if the parent is transferred between ICE and the Bureau of Prisons (BOP), or if information obtained directly from the parent affects the class membership analysis.

18.     To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has had each grantee at one of ORR's approximately 110 shelters certify the separated children who the grantee reasonably believes are in its care.  HHS has also conducted a full manual review of the case management file for each one of the approximate 11,800 children in ORR custody—the substantial majority of whom were not separated from a putative parent at the border—to confirm or rule out any indicia of separation.  The manual review was conducted by dozens of HHS personnel working nights and over the weekend.  The results of both the manual review and the grantee certifications are undergoing validation.

19.     As of July 5, 2018, we have identified approximately 101 minors under age 5, within ORR care, whose records contain indicia of separation.  Class membership analysis for putative class members associated with the larger group of minors 5 through 18 is ongoing.  Also, some of the identified minors may have been separated prior to crossing the border, or there may be other factors that need to be explored that would not make their parents members of the class.  HHS has received confirmation from DHS that approximately 40 parents of children in the under-5 group are in DHS custody and another 9 are in U.S. Marshal's custody.  The class membership analysis for putative class members associated with the remaining children in the group of 101 is ongoing.

Verifying Parentage

20.     HHS is using DNA testing to try to verify parentage of *all* putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member.  HHS is conducting the DNA testing concurrent with collecting and reviewing

documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.

21.    DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information.  When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort.  HHS has dual-tracked global DNA testing to ensure child safety and to expedite parentage verifications to try to comply with the deadlines in the Court's order.

22.    ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody.  The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing.  The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees.  HHS will use the results only for verifying parentage.

23.    The DNA testing process takes nearly one week to complete for each putative class member and child.  Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and swab cheeks. It may then take up to three days for laboratory services provider to collect the sample and conduct the test.  Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams.

24.    The field teams are concurrently facilitating the completion of reunification applications by putative class members.  The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment.  A copy of a blank reunification application is attached at Tab 1.

25.     My opinion is that DNA testing is the method of parental verification most likely to protect children from harm given the compressed timeframe imposed by the court's order.  The risk of placing children with adults who are not their parents is a real and significant child welfare concern for HHS because the experience of ORR is that children are smuggled across the border or trafficked by adults who fraudulently hold themselves out as parents.  The children may not disclose the situation to CBP, ICE, or ORR because they may fear retaliation by the adults who brought them across the border.  In some instances, they may fear retaliation by their parents in their home country, who have given them to the smuggler or trafficker so that they may earn money in the United States.  My opinion is that DNA testing mitigates the risk of the United States Government placing children back with adults who are not their parents and who would endanger them.

26.     If, however, HHS concludes that it can reliably and more quickly determine the parentage of a putative class member based on documentation or anecdotal information collected from the putative class member, then HHS will make that determination to try to comply with the Court's reunification deadlines.

Background Checks for Parental Fitness

27.     HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE.  Already such background check information has come back with two results that show that two putative parents of children under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed.

Parental Fitness and Child Endangerment

28.     As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances.  These checks can sometimes take weeks or months.

29.     HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody.  For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect.  If there are no such indicia, then HHS will not conduct further assessment.

30.     When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare.

31.     For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care – and that the potential sponsor's cohabitants do not endanger the child— after placement. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members.  But HHS does not believe that it can streamline background checks.

32.     UAC sponsors have always included the parents of UACs , and close to half of the sponsors to whom ORR ordinarily releases UACs are parents.

33.     The *Flores* settlement agreement ("FSA") prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger.  *See* FSA paragraphs 14-18.

34.     The FSA describes a variety of criteria to consider before the government releases a UAC to a parent (or other sponsor).  *See* FSA paragraphs 14-18.  These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial well-being;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

35.     Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected.  These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at:

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1 .

36.     The policies include identifying the sponsor; submitting the application for release and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release.

37.     ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release.  The fingerprints are used to run background checks of databases involving criminal history. ORR also checks sexual abuse information, child abuse information, and other public record sources.

38.     ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks.  This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release.

39.     ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable.  These adult caregivers must also be identified and undergo background checks.

40.     To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

    a.  The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

    b.  The sponsor's motivation for wanting to sponsor the child or youth.

    c.  The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not  the sponsor).

    d.  The child or youth's views on the release and whether he or she wants to be released to the individual.

    e.  The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

18cv428 DMS MDD

f.   The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

g.   The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

h.   The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

i.   The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.

j.   The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such  as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

41.   In certain cases, the TVPRA requires a home study, prior to release.  8 U.S.C. § 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence."  In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case

Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

42.     ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan.  Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation.  It also includes a safety plan in some circumstances.

43.     Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child.  The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on https://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-1-1 number in emergency situations.

44.     Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

> a.  Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
>
> b.  Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

c. Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.10 A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d. Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ar-11.

e. Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

f. Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g. Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h. Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

13

18cv428 DMS MDD

     i.   Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

     j.   In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

     k.   In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

45.     If HHS cannot reasonably complete processes that are material to ensuring the welfare of the children presently in ORR custody within the deadlines ordered by the Court, then HHS has no choice but to make class membership determinations with incomplete information.  The use of incomplete information increases the risk of not only incorrect class membership determinations, but also reunifications that endanger the welfare of the children presently in ORR care.

46.     My opinion is that some relaxing of the Court's deadlines is needed to allow HHS, on a case-by-case basis, to complete processes that HHS determines are necessary to make informed class membership determinations and to protect the welfare of the children presently in ORR custody.

**FACILITATION OF CLASS MEMBER COMMUNIATIONS**

47.     HHS has facilitated communication between putative class members by helping putative class members connect with case managers.  HHS has directed field staff to help facilitate a conversation between a putative class member and his or her child.  For example, field staff may call

a case manager in a minor's shelter and ask the case manager to call or contact the detained parent. In other instances, the detained adult may be given the shelter case manager's telephone number.

48.     The ORR Helpline is a bilingual call center that ordinarily works with ORR grantees to facilitate communications between potential sponsors and the children in the care of the grantees. *See* https://www.acf.hhs.gov/orr/about/ucs/contact-info (last visited July 5, 2018).  Potential sponsors who call the ORR Helpline provide their name, contact information, relationship to the child, and other information to the ORR Helpline representative, who communicates the information to the ORR grantee caring for the child.  The ORR grantee then responds to the potential sponsor and facilitates direct communications with the child and a case worker.  The ORR Helpline does not verify parentage or make determinations regarding parental fitness or child endangerment.

49.     HHS operates with the goal of facilitating communications between putative class members and children in ORR custody twice a week.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 5, 2018.

Jonathan White,

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.

CHAD A. READLER
Acting Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| | ) |
| Plaintiffs, | ) **DEFENDANTS' NOTICE OF** |
| | ) **COMPLIANCE** |
| v. | ) |
| | ) |
| JEFFERSON B. SESSIONS III, | ) |
| Attorney General of the | ) |
| United States; *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

The Government's June 21, 2018, ex parte application explained that the Flores Agreement—as interpreted by this Court and the Ninth Circuit—put the Government in the difficult position of having to separate families if it decides it should detain parents for immigration purposes. Defendants wish to inform the Court that, following the filing of our application to this Court, a federal district court in the Ninth Circuit held that such separation likely violates substantive due process under the Fifth Amendment. *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018) (attached as exhibit). The *Ms. L* court certified a class and entered a class-wide preliminary injunction requiring reunification—both for parents released into the interior of the United States and for parents in DHS custody— and barring future separations for families in DHS custody.

Defendants are submitting this notice of compliance to explain how the government is applying the Flores Agreement in light of this injunction. To comply with the *Ms. L* injunction barring parents in DHS custody from being separated from their children, the Government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry. As explained below, we believe that the Flores Agreement permits the Government to detain families together to comply with the nationwide order in *Ms. L*. We nevertheless continue to believe that an

amendment of the Flores Agreement is appropriate to address this issue. Until that amendment, this submission sets out the Government's interpretation and application of the Agreement in light of *Ms. L.*

**A.** There are many legitimate justifications for detaining arriving aliens under the immigration laws, including well-established rules that allow arriving aliens at the border to be detained pending a determination of whether they may legally be admitted to the United States. Such detention, which Congress has made mandatory in many circumstances under 8 U.S.C. § 1225(b), is essential to protecting our southwest border, discouraging families that are not entitled to remain in this country from making the dangerous journey to the border, and returning families promptly when they are not entitled to relief in this country. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *cf. Demore v. Kim*, 538 U.S. 510, 526 (2003) (discussing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings").

We have explained over a period of years that one impact of the *Flores* requirements, if applied to minors that come into DHS custody accompanied by their parents, would be the separation of parents from their children. In construing the Flores Agreement, over the government's objection, to apply to children taken into custody with their families, the Ninth Circuit understood that the separation of

2

parents from their children was a direct consequence of its holding. *Flores v. Lynch*, 828 F.3d 898, 908-09 (9th Cir. 2016). But the Ninth Circuit also made clear that neither the Flores Agreement nor court rulings applying it impose any legal barrier on the critical authority of DHS to detain adults who come into immigration custody at the border with their children. *Flores*, 828 F.3d at 908-09.

The *Ms. L* court reached the same conclusion in considering the situation of the separation of accompanied children from their parents, this time from the point of view of the parents, who were not parties to the *Flores* case or the Settlement Agreement. The *Ms. L* court issued class-wide relief requiring that, in most circumstances, parents be kept with their children during the pendency of immigration proceedings. Notably, like the Ninth Circuit, the court in *Ms. L* recognized the authority of DHS to detain parents in immigration custody pending resolution of their immigration cases. As the court emphasized, even in light of the court's injunction requiring families to be kept together and reunified, the "Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law." Order at 20; *see also id*. at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members."). Thus, while the Government must keep families together when it chooses to exercise its discretion to detain or release a

parent under the INA, the court cited the *Flores* in explaining that the Government otherwise remains "free" to exercise "discretion in matters of release and detention." *Id* at 20 (citing *Flores*); *see id*. at 7 (for "children placed in federal custody, there are two options," the first option is separating the family and placing the child alone in ORR custody and "the second option is family detention").

**B.**  Reading the Flores Agreement together with the subsequent nationwide order in *Ms. L*, we understand the courts to have provided that minors who are apprehended with families may not be separated from their parents where it is determined that continued detention is appropriate for the parent.  The Flores Agreement allows this result for two reasons.

*First*, the Agreement's express terms accommodate court orders like the one recently issued in *Ms. L*.  Paragraph 12A of the Flores Agreement provides for the release of minors to a parent (or others) when possible under Paragraph 14 or, alternatively, transfer to an appropriate facility with a licensed program under Paragraph 19.  *See Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) ("Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards").  But these provisions include exceptions to releasing or transferring minors to accommodate a ruling like that in *Ms. L* requiring families to be kept together, and those exceptions permit family detention in these circumstances.

4

*Release provision*.  In Paragraph 14, the Flores Agreement specifies that a minor should be "release[d] from its custody *without unnecessary delay*" to a parent or other relative.  Flores Agreement ¶ 14 (emphasis added).  The court's order in *Ms. L*, which requires that the minor be kept with the parent, makes delay necessary in these circumstances.  The minor cannot be released under Paragraph 14 without separating him or her from their parent, as such a separation would violate the injunction issued in *Ms. L.  See Ms. L* Order at 22 (DHS is "enjoined from detaining Class Members in DHS custody without and apart from their minor children").  Under those circumstances, the release of the minor from custody must be "delay[ed]" pursuant to the Agreement during the period the parent is detained by DHS.  Flores Agreement ¶ 14.  Indeed, the court's order in *Ms. L* envisions that a parent would be "reunited with the child *in DHS custody*" and that a child would be released only "*[i]f Defendants choose* to release Class Members [*i.e.*, parents] from DHS custody" or if a parent consents.  Order at 23 (emphasis added).  This application of the Flores Agreement is also consistent with another aspect of Paragraph 14 of the Agreement – which sets placing the minor with "a parent" as the first "order of preference."  Flores Agreement ¶ 14; *id*. ¶ 18 (requiring "continuous efforts . . . *toward family reunification* and . . . release") (emphasis added); *see Flores*, 828 F.3d at 903 ("[t]he settlement creates a presumption in favor of release *and favors family reunification*") (emphasis added).

5

*Transfer provision.* The Flores Agreement also permits transfer of a child to a licensed program under Paragraph 19. *See* Flores Agreement ¶ 12A. Under Paragraph 12A, during an influx DHS is required to transfer a minor for placement in a licensed program "as expeditiously as possible." *Id.* ¶ 12A.3. But the obligation to transfer applies "except . . . as otherwise required by any court decree or court-approved settlement." *Id.* ¶ 12A.2. Here, the court decree in *Ms. L* prohibits the transfer of the minor to a licensed program, because such a transfer would separate the child from his or her parent. *Ms. L* Order at 22. A transfer therefore cannot occur consistent with that court decree.[1]

**Second**, both *Ms. L* and *Flores* expressly envision that adults who arrive at the United States with children are properly subject to detention – a critical aspect of border enforcement. Given that express conclusion in each decision, it would be remarkable to read the orders together as mandating the opposite conclusion – that detention may never occur. Doing so would undermine the express holdings in both cases. *Ms. L*, for its part, held that DHS would retain the same authority to detain the parent as it had before – it simply required that such detention be of the

---

[1] The issue regarding how the Flores Agreement licensing provisions apply to family detention centers is the subject of ongoing litigation. But to the extent that family detention centers are treated as licensed consistent with the Flores Agreement, a transfer under this provision could occur consistent with *Ms. L*. We have also asked this Court to modify the Agreement to permit the transfer of families together to family residential centers without requiring a state license.

family as a unit.  *See Ms. L* Order at 3 ("Order does not implicate the

Government's discretionary authority to enforce immigration laws . . . including its

decision to release or detain class members"); *id*. at 22 (DHS may "choose to

release" class members).

Likewise, the Ninth Circuit ruling in *Flores* held that the "settlement does

not require the government to release parents."  *Flores*, 828 F.3d at 908; *see also*

*Bunikyte v. Chretoff*, 2007 WL 1074070, at *16 (W.D. Tex. 2007) (rejecting

argument that Flores Agreement required release of both minors and parents).  As

the Ninth Circuit explained, providing rights to minors under the agreement "does

not mean that the government must also make a parent available" by releasing the

parent with the child.  *Flores*, 828 F.3d at 908; *id*. at 909 ("parents were not

plaintiffs in the *Flores* action, nor are they members of the certified class," and the

settlement "therefore provides no affirmative releases rights for parents").  Because

the Flores Agreement does not require the release of parents, and *Ms. L* requires

DHS to keep parents and children together when the parents are in detention, the

rulings work together to permit detention of parents with their minor children with

whom they are apprehended.

**C.**  No other aspect of the Flores Agreement or *Ms. L* require the United

States to release all individuals held in border-related detention when they arrive at

the border with children.  Instead, other aspects of the rulings lead to the opposite

conclusion. The *Ms. L* ruling addresses reunification of children with their parents, and specifically requires reunification "when the parent is returned to immigration custody" after a release from criminal custody. Order at 10; *see id*. at 11 (court order provides for "reunification during intervening . . . ICE detention prior to actual removal, which can take months"). But this aspect of the *Ms. L* ruling would make little sense if that reunification would necessitate an immediate release of the parents from immigration custody under the Flores Agreement.

The *Ms. L* decree also provides that the parent may consent to the release of the child without the parent. Order at 23 (parent may "affirmatively, knowingly, and voluntarily decline[] to be reunited with the child in DHS custody"). This authority permits the continued operation of the provisions of the Flores Agreement governing release of the child – albeit with the accompanying parent's consent before they go into effect. Relying on a parent's consent in these circumstances where the family is together makes sense, particularly because plaintiffs in this case have always agreed that detention of the family together is permissible if the parent consents. *See Flores*, Transcript at 37-38 (April 24, 2015) (in response to question whether the "agreement allows[s] for an accommodation to . . . a parent who wishes to remain in the [family residential] facility," "the plaintiffs' positions is . . . a class member is entitled to waive those rights" and that waiver may "parents speak for children all the time") (relevant

pages attached as exhibit); *see also*

https://www.npr.org/2018/06/22/622678753/the-history-of-the-flores-settlement-and-its-effects-on-immigration (June 22, 2018) (last visited June 29, 2018) (counsel for plaintiffs explaining that "choice" to remain in family detention "is not something the Flores settlement itself addresses or prevents"). That is a preference expressed by other plaintiffs who have challenged family separation.[2] This aspect of the *Ms. L* order – allowing release of the child with the consent of the parent – would make little sense if the Government was under an affirmative obligation to release the entire family together.

   **D.**  Accordingly, for the reasons explained, the Flores Agreement permits the Government to detain families together given the nationwide order in *Ms. L* that bars the separation of families in DHS custody.  To comply with the *Ms. L* injunction, the government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry and therefore subject to the *Ms. L* injunction.

---

[2] *See Mejia-Mejia v. ICE*, No. 18-1445, Complaint ¶ 4 (D.D.C. filed June 19, 2018) ("If, however, the government feels compelled to continue detaining these parents and young children, it should at a minimum detain them together in one of its immigration family detention centers"); *Padilla v. ICE*, NO. 18-928 (W.D. Wash), Complaint ¶ 12 ("If, however, the government insists on continuing to detain these parents and children, it must at a minimum detain them together in one of its immigration family detention centers.").

DATED:    June 29, 2018                    Respectfully submitted,


                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            /s/ August E. Flentje
                                            AUGUST E. FLENTJE
                                            Special Counsel to the Assistant Attorney
                                            General
                                            Civil Division

                                            WILLIAM C. PEACHEY
                                            Director
                                            COLIN KISOR
                                            Deputy Director
                                            SARAH B. FABIAN
                                            Senior Litigation Counsel
                                            U.S. Department of Justice
                                            Office of Immigration Litigation
                                            District Court Section
                                            Box 868, Ben Franklin Station
                                            Washington, DC 20442
                                            Telephone: (202) 532-4824
                                            Fax: (202) 616-8962



                                            *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ August E. Flentje
August E. Flentje
Attorney for Defendants