CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

              Petitioners-Plaintiffs,

      vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

           Respondents-Defendants.

Case No. 18cv428 DMS MDD

**DECLARATION OF
JONATHAN WHITE**

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1.      I am a career officer in the United States Public Health Service Commissioned Corps and have served in the Department of Health & Human Services in three Administrations.  I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response, and previously served as the Deputy Director of the Office of Refugee Resettlement for the Unaccompanied Alien Children's Program.

2.      I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.).  President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

**KEY HHS ACTIONS ON REUNIFICATION**

3.      Focus on Child Safety:  The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so.

4.      Deployment of Additional Personnel:  On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS reunify children in ORR custody with parents.

5.      Determination of Class Members:  HHS has worked closely with U.S. Department of Homeland Security (DHS)—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—to try to determine all individuals who meet the

Court's criteria for class members.  The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; determine location of DHS apprehension and separation; determine parental fitness; and evaluate whether reunification would present a danger to the child.  Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons (BOP) (or vice-versa), and newly-acquired information.

6.     <u>Facilitation of Regular Communication Between Class Members and Children in ORR Custody</u>:  HHS has deployed field personnel to help putative class members communicate with children in ORR care.

**DEPLOYMENT OF ADDITIONAL PERSONNEL**

7.     As noted above, on June 22, 2018, the Secretary of Health and Human Services activated ASPR to augment the resources that ORR had already devoted to expeditiously discharge children from ORR care.  ORR has had to continue performing core program functions for minors who cross the border without parents (and who far outnumber separated children in ORR care).  The augmenting of resources has helped ORR continue performing those core functions.

8.     The activating of ASPR included the Secretary's Operation Center (SOC), which is a command center that operates 24 hours per day, 365 days per year.  The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government.  While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations.

9.     ASPR activated an Incident Management Team.  As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC).  It works full-time to provide logistical and administrative support.

10.     ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody.  Those personnel—who are organized into four field

teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT). The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

11. Finally, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support. HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations. They too will engage directly with putative class members in ICE custody.

**DETERMINATION OF CLASS MEMBERS**

12. ORR has a process for placing unaccompanied alien children (UAC) with parents or other sponsors that is designed to comply with the 1997 Flores Settlement Agreement, the Homeland Security Act of 2002 (HSA), and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), as described in more detail below. This process ensures the care and safety of children who are apprehended in the United States and then referred to HHS as unaccompanied children.

13. HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.

14. Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage. Also, HHS determines the putative class member's immigration history to confirm where they were apprehended and separated from their child. Finally, HHS collects and analyzes criminal, medical (e.g., communicable disease), and other information to

determine the parental fitness of the putative class member and confirm that reunification would not present a danger to the child.  HHS generally performs these checks concurrently.

15.     Putative class members who are not verified as parents are not included in the class by HHS.  Putative class members apprehended in the interior, who have relevant criminal history, have a communicable disease, or are otherwise parentally unfit or present a danger to a child, are not included in the class either.

16.     In general, HHS knows the names and locations of all children who are in ORR care and custody at all times because ORR maintains that data in its online case management portal.  The ORR portal includes data about each child that DHS provided when DHS transferred the child to ORR custody.  It also includes health and social data collected or entered by ORR personnel, grantees, or contractors.  While the ORR portal may contain some data about the child's parents, the ORR portal was not designed to determine class membership or facilitate reunification under the criteria and deadlines established by the Court's Order.  Some of the data required to determine the class membership of a putative class member resides with DHS, while HHS must collect some data directly from the putative class member.

17.     The data collection, sharing, and analysis required to determine class membership is extraordinarily time and resource intensive.  There are myriad reasons for this.  For instance, DHS has different information systems, and those systems were not designed to neatly capture and readily share all of the data required to determine class membership.  The departments must therefore map their data manually.  Also, the class potentially encompasses parents who were separated from their children *before* the Administration implemented the zero-tolerance policy, and those groups may not have received the same family unit identifiers from DHS as the groups separated *after* the Administration implemented the zero-tolerance policy.  Absent reliable and consistent identifiers, HHS must glean the separations of class members and children (and related details) from the case

18cv428 DMS MDD

management files on the ORR portal.  On top of these variables, a parent's class membership can change if the parent is transferred between ICE and the Bureau of Prisons (BOP), or if information obtained directly from the parent affects the class membership analysis.

18.     To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has had each grantee at one of ORR's approximately 110 shelters certify the separated children who the grantee reasonably believes are in its care.  HHS has also conducted a full manual review of the case management file for each one of the approximate 11,800 children in ORR custody—the substantial majority of whom were not separated from a putative parent at the border—to confirm or rule out any indicia of separation.  The manual review was conducted by dozens of HHS personnel working nights and over the weekend.  The results of both the manual review and the grantee certifications are undergoing validation.

19.     As of July 5, 2018, we have identified approximately 101 minors under age 5, within ORR care, whose records contain indicia of separation.  Class membership analysis for putative class members associated with the larger group of minors 5 through 18 is ongoing.  Also, some of the identified minors may have been separated prior to crossing the border, or there may be other factors that need to be explored that would not make their parents members of the class.  HHS has received confirmation from DHS that approximately 40 parents of children in the under-5 group are in DHS custody and another 9 are in U.S. Marshal's custody.  The class membership analysis for putative class members associated with the remaining children in the group of 101 is ongoing.

Verifying Parentage

20.     HHS is using DNA testing to try to verify parentage of _all_ putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member.  HHS is conducting the DNA testing concurrent with collecting and reviewing

documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.

21.     DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information.  When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort.  HHS has dual-tracked global DNA testing to ensure child safety and to expedite parentage verifications to try to comply with the deadlines in the Court's order.

22.     ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody.  The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing.  The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees.  HHS will use the results only for verifying parentage.

23.     The DNA testing process takes nearly one week to complete for each putative class member and child.  Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and swab cheeks. It may then take up to three days for laboratory services provider to collect the sample and conduct the test.  Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams.

24.     The field teams are concurrently facilitating the completion of reunification applications by putative class members.  The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment.  A copy of a blank reunification application is attached at Tab 1.

25.     My opinion is that DNA testing is the method of parental verification most likely to protect children from harm given the compressed timeframe imposed by the court's order.  The risk of placing children with adults who are not their parents is a real and significant child welfare concern for HHS because the experience of ORR is that children are smuggled across the border or trafficked by adults who fraudulently hold themselves out as parents.  The children may not disclose the situation to CBP, ICE, or ORR because they may fear retaliation by the adults who brought them across the border.  In some instances, they may fear retaliation by their parents in their home country, who have given them to the smuggler or trafficker so that they may earn money in the United States.  My opinion is that DNA testing mitigates the risk of the United States Government placing children back with adults who are not their parents and who would endanger them.

26.     If, however, HHS concludes that it can reliably and more quickly determine the parentage of a putative class member based on documentation or anecdotal information collected from the putative class member, then HHS will make that determination to try to comply with the Court's reunification deadlines.

Background Checks for Parental Fitness

27.     HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE.  Already such background check information has come back with two results that show that two putative parents of children under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed.

Parental Fitness and Child Endangerment

28.     As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances.  These checks can sometimes take weeks or months.

18cv428 DMS MDD

29.     HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody.  For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect.  If there are no such indicia, then HHS will not conduct further assessment.

30.     When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare.

31.     For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care – and that the potential sponsor's cohabitants do not endanger the child—after placement. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members.  But HHS does not believe that it can streamline background checks.

32.     UAC sponsors have always included the parents of UACs , and close to half of the sponsors to whom ORR ordinarily releases UACs are parents.

33.     The *Flores* settlement agreement ("FSA") prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger. *See* FSA paragraphs 14-18.

34.     The FSA describes a variety of criteria to consider before the government releases a UAC to a parent (or other sponsor). *See* FSA paragraphs 14-18. These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial well-being;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

35.     Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected. These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1 .

36.     The policies include identifying the sponsor; submitting the application for release and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release.

9

37.     ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release.  The fingerprints are used to run background checks of databases involving criminal history. ORR also checks sexual abuse information, child abuse information, and other public record sources.

38.     ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks.  This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release.

39.     ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable.  These adult caregivers must also be identified and undergo background checks.

40.     To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

    a.  The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

    b.  The sponsor's motivation for wanting to sponsor the child or youth.

    c.  The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not  the sponsor).

    d.  The child or youth's views on the release and whether he or she wants to be released to the individual.

    e.  The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

f.  The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

g.  The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

h.  The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

i.  The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.

j.  The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

41.  In certain cases, the TVPRA requires a home study, prior to release.  8 U.S.C. § 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence."  In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case

Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

42.     ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan.  Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation.  It also includes a safety plan in some circumstances.

43.     Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child.  The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on https://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-1-1 number in emergency situations.

44.     Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

      a.  Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

      b.  Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

c. Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.10 A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d. Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ar-11.

e. Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

f. Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g. Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h. Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

18cv428 DMS MDD

i.   Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

j.   In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

k.   In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

45.   If HHS cannot reasonably complete processes that are material to ensuring the welfare of the children presently in ORR custody within the deadlines ordered by the Court, then HHS has no choice but to make class membership determinations with incomplete information.  The use of incomplete information increases the risk of not only incorrect class membership determinations, but also reunifications that endanger the welfare of the children presently in ORR care.

46.   My opinion is that some relaxing of the Court's deadlines is needed to allow HHS, on a case-by-case basis, to complete processes that HHS determines are necessary to make informed class membership determinations and to protect the welfare of the children presently in ORR custody.

**FACILITATION OF CLASS MEMBER COMMUNIATIONS**

47.   HHS has facilitated communication between putative class members by helping putative class members connect with case managers.  HHS has directed field staff to help facilitate a conversation between a putative class member and his or her child.  For example, field staff may call

1   a case manager in a minor's shelter and ask the case manager to call or contact the detained parent.

2   In other instances, the detained adult may be given the shelter case manager's telephone number.

3       48.     The ORR Helpline is a bilingual call center that ordinarily works with ORR grantees

4   to facilitate communications between potential sponsors and the children in the care of the grantees.

5   *See* https://www.acf.hhs.gov/orr/about/ucs/contact-info (last visited July 5, 2018).  Potential sponsors

6   who call the ORR Helpline provide their name, contact information, relationship to the child, and

7   other information to the ORR Helpline representative, who communicates the information to the ORR

8   grantee caring for the child.  The ORR grantee then responds to the potential sponsor and facilitates

9   direct communications with the child and a case worker.  The ORR Helpline does not verify parentage

10  or make determinations regarding parental fitness or child endangerment.

11      49.     HHS operates with the goal of facilitating communications between putative class

12  members and children in ORR custody twice a week.

17      I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 5,

18  2018.

Jonathan White,

18cv428 DMS MDD