CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

          Petitioners-Plaintiffs,

   vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

         Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING SUITABILITY
PROCESS FOR RELEASE OF UAC
TO POTENTIAL PLAINTIFFS IN THE
GENERAL PUBLIC**

## I.      JOINT STATUS REPORT

On July 9, 2018, this Court instructed the parties to confer on the processes

bearing on the reunification of class members with their children. The parties

submit this joint status report in compliance with the Court's instruction. In areas

where the parties disagree, the federal government requests clear guidance from

the Court on those steps that must be taken prior to reunification so that it can

comply with the Court's order on timing consistent with its statutory and

regulatory obligations under existing law. Each of these actions will affect the

speed with which the government can reunify families. The actions concern the

following:

- First, may HHS conduct DNA testing in every case to confirm each parent-
  child relationship?

- Second, must HHS use only information already obtained prior to the reunification deadlines to determine if the parent will put the child at an imminent risk of danger, abuse, or neglect?

- Third, may HHS run fingerprint background checks on unrelated adults in the anticipated domicile of the child, before placing a child with a released parent?

- Fourth, may HHS require released parents to submit proof of address and a sponsor care plan?

- Fifth, may HHS require released parents to sign a Sponsor Care Agreement and attend legal orientation trainings?

- Sixth, must HHS reunify children who are themselves determined to present a danger?

## II.   ISSUES ON WHICH THE PARTIES AGREE

### 1.   Vetting Parent-Child Relationships

The parties agree that the federal government may screen a putative class members to confirm that he or she is, in fact, the parent of the child(ren) with whom he or she seeks to reunify. The parties also agree that when HHS conducts DNA testing to verify parentage, the federal government will not use the DNA samples or test results for any purpose besides verifying parentage, and will ensure that the DNA samples and test results are destroyed afterwards. The parties have

not been able to agree on whether HHS can use DNA testing in every case concurrent with other methods of verifying parentage to try to complete the verification process within the court's deadlines.

### 2.      Background Checks on Purported Parents

The parties agree HHS may conduct fingerprint background checks on potential class members while parentage is being verified, to ensure that the person is actually a class member without pertinent criminal history as set forth in the Court's class definition, and to ensure that the parent is neither unfit nor presents a danger to the child presenting an obstacle to release. The parties further agree that HHS will in all possible cases use information already obtained by ICE when it collected the fingerprints of the potential class members and ran checks on them. HHS cannot, however, exclude the possibility that in a small number of cases HHS will need to collect potential class members' fingerprints again to run the checks necessary to ensure child safety and sponsor suitability. HHS believes that fingerprinting may be appropriate in some situations to ensure child welfare where there are objective indications of child endangerment.

### 3.  Home Studies

The parties agree that HHS will conduct home studies for purposes of reunification only when required by the TVPRA. The TVPRA states that home studies:

18cv428 DMS MDD

shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence.

8 U.S.C. § 1232(c)(3)(B).

## III.   ISSUES ON WHICH THE PARTIES DISAGREE

### A. <u>Plaintiffs' Position</u>

The crux of Plaintiffs' position is that the Government should not be allowed to delay reunification to conduct procedures that would not have been used if the child had not been forcibly taken from the parent. If a Class Member parent and child had showed up at the border together, and had *not* been separated, then the parent would not be required to undergo the extensive procedures proposed by the Government to maintain custody of the child.

Plaintiffs thus believe that streamlined procedures are appropriate and lawful in this unique context. The TVPRA, by its terms, does not mandate any particular procedures for reunification, except for a small subset of cases where home studies are required because there have been, inter alia, indications of abuse or trafficking. 8 U.S.C. 1232(c)(3)(B). There are also no regulations that ORR has promulgated pursuant to the TVPRA that address reunification procedures. The Government, however, as a matter of policy has created procedures for vetting sponsors (the

"normal" reunification process). The Court need not, however, decide whether these normal reunification procedures are required by the TVPRA. Even assuming that these procedures are required by the TVPRA for certain children who come to the United States without their parents, the TVPRA plainly does not preclude the use of streamlined procedures in this unique context, where the Government has forcibly taken children from their parents and is simply being asked to return children to their parents.

Indeed, the purpose of the TVPRA is to promote the best interests of the child and to reunite families. Delayed reunification, especially for babies and toddlers, is not in the best interests of the child.

In short, there is nothing in the language or purpose of the TVPRA that precludes this Court from ordering that in this unique context, and only for purposes of this case, the Government use the streamlined procedures suggested by Plaintiffs. The procedures that Plaintiffs are proposing—parental verification and pursuing any red flags known to the Government at the time of the reunification deadline—are entirely consistent with the TVPRA.[1]

### 1. DNA Vetting of All Families.

---

[1] Plaintiffs' position that streamlined procedures are both appropriate and lawful in this unique context, and not precluded by the TVPRA, is supported by the Women's Refugee Commission and Kids in Need of Defense ("KIND"), who have years of experience working with unaccompanied children and the reunification process. They will be submitting a declaration in conjunction with this filing, and have both previously filed declarations in this case.

Plaintiffs' position with respect specifically to DNA testing is that the Government should use DNA testing to verify parentage only where necessary, meaning that there is no other reliable documentary, testimonial, or other evidence of parentage.  That way no further delays in reunification will occur as a result of the need to DNA test every family.  Had the families not been separated, they would not routinely have been subjected to DNA testing.[2]

In addition to any delays caused by DNA testing of every class member, the Class Members and their children also have powerful interests in the privacy of their DNA information. As the Ninth Circuit has said, "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998).

The circumstances of this case also render it inherently coercive for the Government to require parents to submit to DNA testing to get back the children that were unlawfully taken from them. Parents should not have to sacrifice their privacy rights, and face the risk of having their DNA information collected in a Government database, to be reunified with their children. Moreover, the

---

[2] The Government states that three individuals were identified as non-parents during the HHS verification process, but does not state that DNA testing was the basis for that determination, and in fact notes that the adults actually told the Government they were not the parents.

Government proposes routine DNA testing of young children, some of whom are mere weeks or months old.

If, however, the Court concludes that the Government may use DNA testing of parents and children to effectuate the injunction, at the absolute minimum the Court should order the Government to:

(1) exhaust first all other means of establishing or verifying parent-child relationships, including through the use of techniques commonly used by U.S. courts to determine family relationship—including official documents, representations from a witness, parent, and/or child, and/or observation of behaviors of the adult and child toward each other;

(2) only conduct a DNA test on those adults who have agreed to undergo a test;

(3) to ensure that all samples and data collected are not shared with any other federal agency outside of HHS and that all such samples, data, and any results are destroyed upon completion of the required matching tests and, in any event within 7 days.

(4) To the extent that the Government employs outside contractors or medical providers to conduct the DNA tests, such contractors must also be forbidden from retaining any results and test samples and must destroy them within seven days of producing a testing result. This will prevent the Government from maintaining a database of samples and will ensure that any results are

not used for any purposes other than facilitating reunification pursuant to the Court's injunction.

Finally, the Court should also make clear that the lack of a DNA match is not conclusive proof of the lack of a parent-child relationship, in recognition that many parents are not the biological parents of their children. For example, some parents may not be aware that they have no biological relationship to their child in cases of undisclosed rape or adultery.

## 2. Restrictions on HHS Information Gathering and Decision Making about Child Welfare

Plaintiffs' position is that if the Government becomes aware of evidence *prior to the reunification deadline* that the parent is abusive, neglectful, or otherwise poses a risk of danger to the child, Plaintiffs have no objection to the Government taking additional time to verify the fitness of the parent before releasing the child to his or her custody. For example, as set forth above, Plaintiffs have no objection to the Government using information obtained from already-performed fingerprint and background checks on Class Members to evaluate parental fitness. In addition, if ORR workers have spoken with the child during the child's custody and learned information that calls the parent's fitness into question, that could be a basis to delay reunification. What Plaintiffs object to is permitting the Government to drag out the reunification process by imposing procedures or conducting additional investigation that is not required by statute.

Plaintiffs acknowledge that any evaluation of parental fitness must rely to some extent on "professional judgment." But in the context of this case, and in light of constitutional standards governing the separation of children from their parents, that judgment must be based on actual, verifiable *facts* – not the untested and subjective opinions of unknown Government case workers. Given that the Government has already forcibly separated Class Members from their children, it should be subjected to a rigorous burden to justify maintaining that separation. The government should not be permitted to delay reunification any longer to conduct a background check that would not have occurred had the parents not been separated from their children.  (Criminal background checks would of course already have been done at the time of apprehension when the parent was initially fingerprinted.)

### 3. Background Checks on Other Adults in the Household

Nothing in the TVPRA requires the Government to conduct background checks of nonparent adults in the household, or alternate care givers, before releasing a child from ORR custody. And the Government cites no applicable statutory provision that so requires. Nor does the *Flores* Agreement contain any language demanding that the agencies fingerprint and run checks on individuals who live in the parent's household.

Requiring these background checks will impose needless delay on the process by requiring household members to submit to checks. Moreover, DHS has recently revised its regulations to allow information it collects from ORR during the sponsor reunification process, including background checks of household members, for the purposes of conducting immigration enforcement activities. As a result, those household members may rightfully have concerns about sharing information with DHS in light of its stated intent to use that information to come after them.

In sum, nothing in the statute requires background checks of other adults or alternate care givers, and it will only add further needless delay to this process. If the Government had *not* separated Class Members from their children, they would not have been required to undergo any of these procedures prior to obtaining release. There is no reason to make them go through those processes here. [3]

### 4. Proof of Address, Sponsor Care Plans and Alternate Care Givers

Plaintiffs do not object to Class Members submitting a proof of address of where they will live with the child. But Plaintiffs object to any requirement that the Plaintiff provide a "sponsor care plan" or identify alternate care givers prior to

---

[3] Indeed, the government itself recognizes that this procedure is not required. They are currently planning on reuniting parents and children tomorrow without conducting background checks on all household members, even assuming the Class Member knows at this point where she will be living and with whom.

18cv428 DMS MDD

obtaining release of their children.  Reunification should not be delayed because of these unnecessary procedures.

The key here is in the first sentence of the Government's position—"in the *ordinary* operation of the UAC program." Nothing about this particular context is "ordinary," and the Government is wrong to apply procedures that were developed for an entirely separate context to this one.

The Government cites Section 1232(c)(3)(A), but that statute merely requires ORR to make a "determination" that the proposed custodian is capable of caring for the child. The statute does not compel that "determination" to be made in a certain way, much less that this determination must take the same form in all cases. Thus, there is nothing in the statute that precludes the Government from adopting, in the unique circumstances of this case, streamlined procedures to return separated children to their parents' care.

The Government wants parents—whose children were unlawfully taken from them—to fill out long paper applications and identify other caregivers for them before it returns their children. The TVPRA was not intended to inhibit family reunification—in fact, just the opposite. The Government cannot use it as a sword to prohibit or delay reunification by throwing up such needless bureaucratic roadblocks.

### 5. Legal Orientation and Sponsor Care Agreement

Plaintiffs do not object to requesting Class Members to attend legal orientation programs or sign "sponsor care agreements" that are consistent with the requirements set forth in Plaintiffs' positions above, so long as reunification by the Court's deadlines is not made contingent on fulfilling those conditions. For example, there is no reason why Class Members cannot sign streamlined sponsor care agreements as the child is released to their care pursuant to the Court's deadlines. In addition, Class Members can attend legal orientation programs after reuniting with their children. But reunification of children should not be delayed past the Court's deadlines by requiring attendance at a legal orientation program or the signing of a sponsor care agreement.[4]

### 6. Children Presenting a Danger

Plaintiffs respectfully request additional time to respond to this point, unless the Government represents that there are children under five years old who fall into this category and present risks to the safety of themselves or others.

### B. Defendants' Positions

### 1.      Vetting Parent-Child Relationships

Despite the points of agreement noted above on this issue, the parties have not been able to agree on the necessity of using DNA testing overall. In particular,

---

[4] Plaintiffs note, however, that if the parents had never been separated from their children, they would not have to sign sponsor care agreements or attend legal orientation program to maintain custody of their children.

HHS believes that, to reliably verify parentage and to do so within or close to the Court's deadlines, HHS must be able to use DNA testing generally to determine parentage.

Sound verification of parentage is critical. HHS is charged with faithfully implementing the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). To do so, HHS must be sure in all cases that a putative class member is a child's parent, including through DNA testing, before it forever releases the child to the custody and care of that person. As HHS stated previously, ORR's experience is that children are smuggled across the border or trafficked by adults who fraudulently or inaccurately hold themselves out as parents. *See* White Dec. ¶ 25. Consistent with that experience, HHS reports that it found that three putative class members seeking release of children aged 0–4 were not the parents of the children. Indeed, some of the putative class members admitted as much during HHS's verification-of-parentage process.

To verify parentage of a potential sponsor claiming to be a parent, HHS commonly uses overlapping methods of comparing documents submitted by the sponsor, consulting with the consulate of the home country, interviewing the prospective sponsor and child, and obtaining results from DNA tests. To more quickly implement the Court's order, HHS has coordinated between its staff, its grantees, and ICE, to obtain DNA test results on all the possible plaintiffs and

children through cheek swabs. HHS is simultaneously checking documents and conducting interviews, but many potential plaintiffs do not have adequate documentation, and HHS does not control how fast other countries' consulates will provide documentation. The normal length of stay of a UAC in HHS custody before release is 28 days, which is almost twice as long as the time the Court has given HHS to complete reunifications with some class members.

In short, HHS does not believe that it can both expedite its processes and ensure parentage if it foregoes the use of DNA testing to help verify parentage. Nor would it be a good use of agency resources for HHS to spend more hours per case reviewing documents only to find that DNA tests are ultimately required to resolve questions arising from poor documentation. HHS thus respectfully submits that Plaintiffs' restriction of "necessity" does not promote the aims of the Court's order.

### 2. Restrictions on HHS Information Gathering and Decision Making about Child Welfare

HHS believes that it is important for the Court to permit it to evaluate all reasonably available and relevant information to allow HHS to make sound judgments about child welfare.

It would therefore be a mistake, in HHS's view, to adopt Plaintiffs' proposed limitation on the information that HHS can consider only evidence that it obtains prior to the reunification deadline. This restriction could endanger children welfare by preventing HHS from considering information material to assessing parental

fitness. As discussed below, HHS may need additional information from prospective sponsors to ensure child safety and sponsor suitability, and HHS believes this to be the case even where the prospective sponsor is a parent. HHS should not be prevented from obtaining this information simply because a reunification deadline has passed.

HHS also does not believe that the Court should adopt the restriction that it must release the UAC unless its finding of child endangerment is based on "actual, verifiable facts." The test is attractive in formulation, but unworkable given the critical calls of professional judgment that HHS must make in promoting child safety and wellbeing. The test that Congress chose for HHS is the interests of the child. 6 U.S.C. § 279(b)(1)(B). HHS determines what is in the interests of the child based on common forms of information used in child welfare contexts, including interviews and assessments of children by ORR and clinicians, interviews by ORR of relatives and friends, documents, background checks, and information presented by the prospective sponsor. These determinations necessarily rest on sound professional judgment, and do not lend themselves to easy review by wooden resort to "actual, verifiable" information. HHS believes that the better approach is for HHS to make informed decisions about an individual child's interest, and for Plaintiffs to petition this Court if they believe HHS has denied a release on grounds that do not actually show danger to that child. This would accommodate the

18cv428 DMS MDD

competing interests—and would provide a critical safety valve for the affected children.

### 3. Background Checks on Other Adults in the Household

In the interests of child welfare, HHS believes that the Court should allow for sound background checks of non-sponsor adults with whom a UAC may be released to live. HHS has implemented the TVPRA by requiring background checks—including fingerprinting of other adults in the household and alternate care givers where a sponsor parent will take a UAC to live. The importance of background checks was borne out in the past week, during HHS' screening of potential class members for reunification of the separated children aged 0–4. HHS reports that the checks showed three parents with criminal histories involving human smuggling, child cruelty and narcotics convictions, and alleged murder, respectively. When a parent plans to house a child with one or more other adults, who might not even be relatives, those adults are no less likely to have significant criminal histories.

Plaintiffs ask the Court to require HHS to release children directly into such a situation without first running fingerprint background checks on those adults. HHS submits that this would needlessly risk these children's safety and wellbeing. The Flores Settlement Agreement (see paragraphs 14–18) has long authorized the government to conduct safety and suitability assessments before releasing UACs to

parents in the general public who seek sponsorship. Legislating on this background, the TVPRA requires HHS "to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity," and to "make[] a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(1) & (c)(3)(A). The TVPRA in turn requires HHS to "establish policies … to ensure" these child safety measures are satisfied. *Id.* at 1232(c)(1). HHS has established those policies in ORR's UAC Policy Guide, "Children Entering the United States Unaccompanied, Section 2: Safe and Timely Release from ORR Care."[5] The guide requires "[p]roof of identify of adult household members and adult care givers identified in a sponsor care plan." *Id.* "In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints, and provided a copy of a valid government issued photo identification." *Id.* HHS has

---

[5] Available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1

conducted background checks of adult household members since January 2016, when the Senate Committee on Homeland Security and Government Affairs, Permanent Subcommittee on Investigations, majority and minority staff report, concluded that failing to require background checks on non-sponsor adult household members or on backup sponsors led to child abuse and exploitation, including when the sponsor was a parent.[6]

For these reasons, HHS respectfully submits that the Court should permit HHS to continue to require background checks of other household adults where the released parent will take the UAC to live.

### 4. Proof of Address, Sponsor Care Plans and Alternate Care Givers

HHS believes that the Court should, in accordance with the ordinary operation of the UAC program, permit HHS to require released sponsor parents to submit proof of address and a sponsor care plan. Consistent with the statutory requirement that "the proposed custodian [be] capable of providing for the child's physical and mental well-being," 8 U.S.C. § 1232(c)(3), proof of address and a sponsor care plan ensures the child will not be homeless or live in harmful

---

[6] Available at
https://www.hsgac.senate.gov/imo/media/doc/Majority%20&%20Minority%20Staff%20Report%20-%20Protecting%20Unaccompanied%20Alien%20Children%20from%20Trafficking%20and%20Other%20Abuses%202016-01-282.pdf

conditions (it is easy to imagine many such conditions). And because class members are likely to be without immigration status at this time, the sponsor care plan is particularly appropriate so the parent would identify an alternate care giver in the event that the parent, but not the child, is removed or deported. Fingerprints and background checks are also required for those alternate care givers. HHS understands that Plaintiffs' proposal would preclude these child safety measures. This would be a mistake.

### 5.  Legal Orientation and Sponsor Care Agreement

The TVPRA declares that before release of a UAC to a sponsor in the general public, "[t]he Secretary of Health and Human Services shall cooperate with the Executive Office for Immigration Review to ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by the Executive Office for Immigration Review." 8 U.S.C. § 1232(c)(4). The Homeland Security Act of 2002 requires that before HHS releases a UAC, it "shall … ensure" that UACs "(i) are likely to appear for all hearings or proceedings in which they are involved; (ii) are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity; and (iii) are placed in a setting in which they are not likely to pose a danger to themselves or others." 6 U.S.C. § 279(b)(2). HHS's policy guide thus requires sponsors—including verified

parents—to sign a sponsor care agreement to ensure UAC attend their immigration and other proceedings and follow certain guidance in case the UAC runs away or an emergency occurs. These statutory requirements are important—including for released class members—and so should be retained here.

### 6.  Children Presenting a Danger

The parties disagree on whether HHS may decline to release a UAC to a class member based on danger presented by the UAC to himself or herself. HHS believes that it should retain its ability to protect children and the community in these circumstances.

Since before the Flores Settlement Agreement, the government has held a small percentage of UACs in secure custody because of the UAC's own history demonstrating they present a risk to the safety of themselves or others. In reviewing the files of separated children over age five, HHS has identified children with serious issues that would support a finding of dangerousness for that child. Under cases implementing the Flores Settlement Agreement, any UAC in secure custody with ORR is entitled to a bond hearing with an administrative law judge, if the UAC contends that he or she is not a danger and should not be held in secure custody.

HHS's position is that if a UAC is in secure custody, and has not asked for a bond hearing, or has had a bond hearing and lost the right to leave secure custody,

then that child is properly detained. And the government does not have facilities for detaining children who are security risks together with their parents. HHS submits that it would be a particular mistake to order HHS to release such a UAC into the general public when the UAC is already being provided with a bond hearing on that issue under the implementation of the Flores Settlement Agreement.

DATED: July 9, 2018     Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*  *Admitted Pro Hac Vice*

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*