CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al.,<br><br>　　　　　Petitioners-Plaintiffs,<br><br>　vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>　　　　　Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>**DECLARATION OF CHRIS MEEKINS** |

I, Chris Meekins, declare under penalty of perjury, pursuant to 28 U.S.C. § 1745, that my testimony below is true and correct.

1. I am the Deputy Assistant Secretary for Preparedness and Response, and the Chief of Staff for the Office of the Assistant Secretary for Preparedness and Response (ASPR) at the U.S. Department of Health and Human Services (HHS). ASPR leads HHS' medical and public health preparedness for, response to, and recovery from health emergencies. ASPR collaborates with federal agencies, state and local governments, healthcare providers, and other stakeholders on responses to such emergencies.

2. I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.). President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

3. My testimony is based on my personal knowledge, information acquired by me in the course of my employment, and information supplied by or contained in the records of federal government entities, grantees, or contractors.

**HHS ACTIONS TO REUNIFY CHILDREN UNDER AGE 5**

4. Before the Court issued its order on July 10, 2018, HHS determined class membership—namely, parentage, parental fitness, and child safety—by streamlining its ordinary safety and suitability assessment under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). Those streamlined processes are described in the

declaration executed by Jonathan White on July 5, 2018. They included reviews of summaries of criminal background checks of putative class members furnished by U.S. Immigration and Customs Enforcement (ICE).

5. After the Court issued its order on July 10, 2018, HHS truncated its streamlined processes for determining class membership to align with the Court's instructions on vetting procedures for class members, and to comply with the Court's deadlines for reunifying class members with children under 5.

6. HHS, for example, suspended further efforts to affirmatively verify the parentage of putative class members with children under 5. And while HHS continued reviewing summaries of criminal background checks, HHS generally stopped collecting and analyzing additional background information on class members for the under-5 cohort—as well as background information on those class members' cohabitants— through the completion of family reunification packets. Unless the records available to HHS at the time suggested that parentage was lacking, or that the individual putative class member was unfit or presented a danger to the child, HHS reunified.

7. In their status report dated July 10, 2018, Defendants identified 102 children under age 5 who, upon initial review by HHS, were determined potentially to have been separated from a parent, and who therefore were potentially the children of class

members. Details about parental class membership, the eligibility of class members for reunification, and completed reunifications for those 102 children are set forth below.[1]

*Ten Putative Class Members Ineligible Due to Criminal History*

8. HHS found that 10 putative class members—one of whom is the parent of two of the 102 children—had criminal histories that made them unfit or presented a danger to the child. Specifically:

- One of the adults is wanted in Guatemala for murder.

- One of the adults has a criminal warrant for their arrest in El Salvador, which implicates kidnaping and gang related activity.

- One of the adults has child cruelty and narcotics convictions.

- One of the adults has criminal charges including human smuggling.

- Two of the adults have domestic violence charges.

- One of the adults has an outstanding warrant in Florida for a DUI.

- Three of the adults have other disqualifying criminal histories.

*Seven Putative Class Members Ineligible for Lack of Parentage*

9. HHS determined that three putative class members were not parents because these individuals stated that they were relatives and not parents of the children.

10. HHS determined that one putative class member was not a parent through a negative DNA match. The adult also indicated that he is not the child's parent.

---

[1] Defendants' status report dated July 12, 2013 identified a 103rd child. The status of that specific child is not addressed here.

11. HHS determined that one putative class member was not a parent because she disclosed during DNA testing that she was not the child's mother.

12. HHS determined that one putative class member had a negative DNA match and is presently ineligible. HHS is still investigating parentage.

13. HHS determined that one putative class member was ineligible for reunification because she presented HHS with a false birth certificate for the child. HHS is still investigating the parentage of the child.

*One Putative Class Member Ineligible Due to Cohabitant's Criminal History*

14. Before the Court issued its order on July 10, 2018, HHS conducted streamlined safety and suitability assessments of putative class members who were released into the interior of the United States by the U.S. Department of Homeland Security (DHS). The assessments included reviews of completed family reunification packets, which sought information on other adults in the household where the putative class member planned to live with the child. The packets required that those cohabitants submit their fingerprints so HHS could run background checks on them.

15. HHS obtained a completed family reunification packet from one of the putative class members in the interior, and conducted background checks on her adult cohabitants. The background check of one cohabitant showed that he has an outstanding warrant from Illinois for aggravated criminal sexual abuse committed against a 10-year-old girl. HHS has since reviewed copies of the police report and court records.

16. HHS determined that the putative class member presented a danger to the child—and was ineligible for reunification—given her expressed intent for her child to live in the same household as someone with an outstanding warrant for committing aggravated criminal sexual abuse against a 10-year-old girl.

*One Putative Class Member Ineligible Due to Allegations of Abuse*

17. HHS determined that one putative class member is ineligible because the child made credible allegations of abuse against the putative class member.

*One Putative Class Member Ineligible Due to Communicable Disease*

18. HHS determined that one putative class member is ineligible (at least for now) because that putative class member is undergoing treatment for a communicable disease in ICE custody.

*Twenty-Two Putative Class Members Could not be Reunified*

19. Twelve putative class members were deported, 7 were in the custody of the U.S. Marshals Service (two of whom were each a parent of 2 of 102 children), 2 were in state jails, and 1 could not be reunified for other reasons.

*HHS Reunified 8 Class Members in the Interior Using Truncated Vetting*

20. As of July 10, 2018, an additional 8 class members who had been released into the interior had not submitted information and fingerprints from adult cohabitants. Nor had they submitted a sponsor care plan outlining their ability to provide for the child's welfare and identifying an alternative care giver in the event they were removed from the

country for immigration violations.[2] The process for affirmatively verifying parentage through either documents or DNA testing was not complete either.

21. HHS nevertheless complied with the Court's order—and reunified those 8 class members in the interior with their 8 children—because the records available to HHS at the time did not provide HHS with a basis to question the class member's parentage, parental fitness, or child safety.

<u>HHS Reunified 47 Class Members in ICE Custody Using Truncated Vetting</u>

22. HHS used the available results from DNA tests performed before July 10, 2018 to determine the class membership of the remaining 47 adults in ICE custody. DNA test results were available for only 35 of those 47 adults. HHS also considered any available documents related to parentage (*e.g.*, birth certificates) when determining class membership. Documents related to parentage, however, were unavailable for some of the 49 adults when HHS determined class membership.

23. HHS determined that all 47 adults were class members under the Court's orders. This included the 35 adults with affirmative verification of parentage through positive DNA test results. It also included the 12 adults for whom there were no DNA test results, since the records available to HHS at the time did not provide a basis for questioning the adult's assertion of parentage, parental fitness, or child safety.

---

[2] HHS performs background checks on adult care givers or alternate care givers that that are identified in a sponsor care plan.

*HHS Previously Reunified Two Additional Class Members*

24. HHS reunified a class member with their child immediately prior to removal. HHS also reunified a class member with their child by discharging their child to them.

**HHS' PRIOR ACTIONS TO REUNIFY CHILDREN AGES 5 AND UP**

25. Before July 10, 2018, HHS took the actions to determine class membership that Jonathan White described in Paragraphs 7 through 29 of his declaration. HHS prioritized class membership determinations for the under-5 cohort.

26. The Incident Management Team (IMT) for the Secretary's Operation Center (SOC) drove those actions. Specifically, the IMT:

- Directed field teams to interview putative class members in DHS custody, help the putative class members complete family reunification packets, and conduct sponsor assessments;

- Consolidated and analyzed background check and child safety information gathered from ICE, putative class members, and other sources;

- Ordered and compiled results of DNA tests to confirm parentage;

- Worked with ICE and ORR to coordinate movements of class members and children around the country for physical reunification; and

- Developed and implemented an operational plan for the physical reunification of families, considering logistical and child safety issues.

Again, the IMT's primary focus was on the under-5 cohort.

27. The field teams worked with putative class members for both cohorts daily. Each field team had a geographic focus based on specific DHS detention sites. The IMT provided a daily list of putative class members for the under-5 cohort to each field team.

If the field team completed its work on that list, then they shifted to performing similar work with the 5-and-up cohort for the balance of the day. Consequently, as of July 10, 2018, the IMT had received from the field teams approximately 471 completed family reunification applications, approximately 203 letters of designation,[3] approximately 243 sponsor declarations, and approximately 521 sponsor assessments for putative class members for the 5-and-up cohort.

28. As of July 10, 2018, the IMT had received summaries of criminal background checks for approximately 2,300 putative class members from ICE. HHS has completed its preliminary review of those ICE summaries and is now conducting further vetting based on concerns that surfaced during the review.

29. As of July 10, 2018, HHS had reviewed the case management records for all children in the 5-and-up cohort. The information in those records bears on class membership. Because the records change daily, the review is continuous.

30. Since the Court issued its order on July 10, 2018, HHS has stopped DNA testing of putative class members notwithstanding the value of DNA testing as an objective tool for verifying biological parentage.

31. While the Court's order would apparently allow for DNA testing of at least some putative class members, my opinion is that the use of DNA testing to verify parentage for the 5-and-up cohort is not practicable. As Jonathan White indicated in his

---

[3] A letter of designation is one in which a parent designates another adult to care for their child.

declaration, the lead time required to complete DNA testing in a single case may be between five and seven days. This assumes that the locations of both the putative class member and the child are static, and that the appropriate agency personnel or contractors can be physically present to swab them. Those assumptions are not reasonable under the present circumstances because, as explained below, HHS and DHS must move hundreds of class members and children towards the same physical locations for reunification each day. The logistics of obtaining cheek swabs—and the time required to receive and assess each DNA test result, and take any additional steps necessary to determine legal parentage following a negative DNA test result—are not compatible operationally with daily, rolling reunifications of hundreds of class members. The use of widespread DNA testing for the 5-and-up cohort would likely increase the risks of operational failure, and likely prevent the agencies from complying fully with the Court's reunification deadline. My tentative estimate is that widespread DNA testing for the 5-and-up cohort would stretch the time required to comply by months (not just days or weeks).

32. HHS policy has been to not charge class members or putative class members for DNA testing. HHS has instructed its laboratory services vendor to not charge class members or putative class members for DNA testing.

33. Since July 10, 2018, HHS has also suspended further mandatory document collection from putative class members (*e.g.*, document collection for family reunification packets), as review of these records is incompatible with the Court's instructions or deadlines for reunification.

## HHS AND DHS' CURRENT REUNIFICATION PLAN

34. Since the Court issued its order on July 10, 2018 and truncated the vetting process for putative class members, HHS and DHS have amended their plan to complete reunifications of the remaining class members on or before the Court's deadline of July 26, 2018. They have started operationalizing that amended plan today.

35. The crux of the amended plan is:

- ICE identifies between six to eight locations for reunification.

- HHS conducts truncated vetting of the putative class members consistent with the Court's order. As HHS confirms putative class membership, HHS creates and continually updates a list of putative class members for ICE.

- If necessary, ICE moves the putative class members to those locations for reunification.

- HHS field teams conduct further interviews of the putative class members at ICE locations to complete the truncated vetting process for class membership.

- HHS anticipates that interviews will last approximately 15 minutes. During interviews, HHS seeks verbal confirmation from the putative class member of parentage as well as the desire to reunify with the child.

- Once the HHS field team confirms class membership under the truncated vetting process and based on the available records, the HHS IMT executes a logistical plan to move the class member's child to the same location as the parent within 24-48 hours.

- When the child arrives at the ICE location, HHS transfers custody and jurisdiction over the child to ICE, which completes the reunification.

36. The truncated vetting of putative class members consists of two basic checks. First, HHS confirms that the putative class member has no disqualifying criminal history based on the ICE summaries and any other available information. Second, HHS reviews

the available records to confirm that they raise no questions regarding parentage, parental fitness, or child safety. The available records for a putative class member will typically consist of the case management records for the child (which are kept on the online portal maintained by the Office of Refugee Resettlement (ORR)), plus any records collected by the IMT or the HHS field teams on or before July 10, 2018, plus any records provided by the class member voluntarily.

37. If truncated vetting raises concerns regarding parentage, parental fitness, or child safety, then HHS conducts further assessment within the parameters of the Court's orders to determine class membership.

38. If truncated vetting triggers the home study requirement under 8 U.S.C. § 1232(c)(3)(B), then HHS conducts a home study.

39. Consistent with the Court's orders, truncated vetting will ***not*** include:

- Affirmative verification of parentage, unless available records suggest that the putative class member's documentation or representation of parentage is inaccurate or fraudulent based on a time-limited review;

- DNA testing;

- Full background investigations of putative class members under the TVPRA (including the completion of family reunification packets);

- Background investigations of potential adult cohabitants;

- Review of sponsor care plans, or background investigations of any alternative care givers who might ordinarily be identified in such plans; or

- Further mandatory collection and review of documents or information from putative class members or their relatives or home countries.

40. Once the current plan is fully operationalized, HHS will seek to move up to approximately 200 children per day for reunification with class members.

41. HHS and DHS expect to modify the current plan as appropriate based on operational considerations and any instructions from the Court.

42. My opinion is that the current plan is the best available option for completing reunifications in compliance with the truncated vetting and deadlines required by the Court. In many cases, reunification under the Court's orders will be swift, but it does involve increased risks to child welfare. Those risks are detailed below.

## INCREASED RISKS TO CHILD WELFARE

43. My opinion is that complying with the Court's orders involves increased risks to child welfare in at least four respects. First, there is an increased risk that HHS will place a child with someone who falsely claimed to be a parent but is not (and could be a single adult bundled with the child by a human smuggler or trafficker). Second, there is an increased risk that HHS will place a child with a parent who has no disqualifying criminal history but nevertheless presents a danger to the child. Third, there is an increased risk that HHS will place a child with a parent who resides with a cohabitant who presents a danger to the child. Fourth, there is an increased risk that HHS will place a child with a parent who may rely on alternative care givers who are abusive.

*Increased Risk of Placement with Adults who are not Parents*

44. The risk of placing children with adults who are not parents is material under the Court's orders because HHS will generally have to accept representations of parentage

by putative class members at face value. Only if the available records raise questions about parentage will HHS be able to probe those representations. And even then, resolution of parentage through an adequate review of documentation or DNA testing will be operationally impracticable in most, if not all cases.

45. The Court suggested in its Order that HHS may rely on parentage assessments conducted by ICE during the intake process. While it is true that ICE assesses aliens for parentage, the vast majority of the class members were separated from children at the border and sent directly to HHS by U.S. Customs and Border Protection (CBP). To my knowledge, CBP does not have a process for assessing parentage in the same way that HHS or even ICE does. When CBP processes a group of aliens holding themselves out as a family unit, absent some indication that the representation is false, CBP typically notes that representation in its file, which then flows into the ORR case management record for the child. If CBP has a reason to question parentage at the time of separation, then it might note that question in the file.

46. The review of home country documents (*e.g.*, birth certificates) is not a viable method for quickly resolving parentage questions for hundreds of putative class members and children. This is because very few putative class members cross the border with documents. And the consulates of their home countries have only limited capacity to collect and provide documents relevant to parentage. Obtaining such documentation through consulates is a process that typically takes months—not days—for a single alien. And even then, the documentation obtained through consulates is often sparse. My

opinion is that it is not practicable to resolve parentage questions for large numbers of putative class members through a review of home country documents.

47. As discussed previously, it is likewise impracticable to quickly resolve parentage questions for large numbers of putative class members through DNA testing.

48. My opinion is that if HHS had applied truncated vetting of parentage to the entire under-5 cohort, HHS likely would have placed up to 7 of 102 children (6.86%) with adults who were not their parents. If that ratio holds true for the 5-and-up cohort—which encompasses approximately 2,551 putative class members—then truncated vetting for class membership would result in HHS placing up to approximately 175 children with adults who are not their parents in the next 13 days.

*Increased Risk of Placement with an Abusive Parent*

49. The experience of HHS is that information gathered about a parent during safety and suitability assessments under the TVPRA sometimes reveals abusive conduct that disqualifies the parent from serving as a sponsor for their child. This occurs even if the parent has no disqualifying history in a criminal background check.

50. Before July 10, 2018, HHS did not identify indicia of abuse in the information that it was able to gather directly from putative class members in the under-5 cohort with no disqualifying criminal history.

51. Nevertheless, my opinion is that the Court's necessary truncating of the vetting process for class membership—including the suspension of critical information-

gathering through mandatory completion of family reunification packets—materially increases the risk that HHS will reunify a child with a parent who will abuse them.

*Increased Risk of Placement with an Abusive Cohabitant*

52. As previously discussed, HHS investigated the cohabitants of a putative class member, and learned that one of them had an outstanding warrant for sexually abusing a 10-year old girl. HHS would not have discovered the danger presented by that cohabitant under the Court's truncated vetting process for class membership because HHS could not have required the completion of the family reunification packet, much less conducted background investigations of the putative class member's cohabitants.

53. While this case represented approximately 1% of the under-5 cohort, it nevertheless raises significant concerns about the risks of placing children in the 5-and-up cohort into households with dangerous adult cohabitants within the next 13 days.

*Increased Risk of Harm Due to Parental Limitations or Abusive Care Givers*

54. The experience of HHS is that information gathered about parents and alternative care givers through sponsor care plans under the TVPRA sometimes reveals materials risks of harm to children. Those risks include the lack of an alternative care giver in the instance the parent is removed from the country (and voluntarily, knowingly, and affirmatively declines to be removed with their child), and the involvement of an alternative care giver who has a disqualifying criminal history or is otherwise dangerous.

55. My opinion is that the Court's truncating of the vetting process for class membership—including the elimination of the critical requirement for sponsor care plans—materially increases the risk of harm to children.

\*\*\*

56. I recognize that the likely result of implementing the Court's order through the current inter-departmental reunification plan will be faster reunifications of a significant number of children with their parents. At the same time, however, that process will likely result in the placing of children with adults who falsely claimed to be their parents or into potentially abusive environments. While I am fully committed to complying with this Court's order, I do not believe that the placing of children into such situations is consistent with the mission of HHS or my core values.

This 13th day of July, 2018.

*/s/ Christopher Meekins*
Christopher Meekins