Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"), et al.,

             *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

Date Filed: July 16, 2018

**PLAINTIFFS' MOTION FOR
STAY OF REMOVAL AND
EMERGENCY TRO PENDING
RULING ON THE STAY
MOTION**

**INTRODUCTION**

Plaintiffs respectfully request that the Court order Defendants not to remove parents until one (1) week <u>after</u> they have been reunited with their children given the persistent and increasing rumors – which Defendants have refused to deny – that mass deportations may be carried out imminently and immediately upon reunification.

Plaintiffs also request that if the Court is not prepared to issue the 7-day stay before receiving a response from Defendants, then it issue a TRO to stay removals while it decides the stay motion, thereby preserving the status quo in the interim. Defendants oppose this motion.  Accordingly, there is no assurance that removals will not begin as early as Monday, July 16.[1]

One of the central premises of this Court's rulings has been that if a parent loses his or her case, they be able to make fully informed and voluntary decisions about whether to leave their children behind in the United States.  *See* Dkt. 83 at 24 (enjoining the government "from removing any Class Members without their child, unless the Class member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation").

As the Court has recognized, it is difficult to imagine a more momentous decision for any parent.  That decision, however, is not only momentous, but

---

[1] Defendants stated at the Friday July 13 hearing that they believed the Court lacked jurisdiction to stay removals.  That issue is addressed below.  But there can be no real dispute that this Court has jurisdiction and the power to issue the interim stay so that it can determine its own jurisdiction to grant the 7-day stay.  "'[A] federal court always has jurisdiction to determine its own jurisdiction.'" *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1018 (9th Cir. 2016) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).  Courts also have the authority to grant stays to preserve the status quo while they determine whether they have jurisdiction. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 290 (1947) ("[T]he District Court unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction.").

exceedingly complex.  It cannot be made until parents not only have had time to fully discuss the ramifications with their children, but also to hear from the child's advocate or counsel, who can explain to the parent the likelihood of the child ultimately prevailing in his or her own asylum case if left behind in the U.S. (as well as where the child is likely to end up living).

Moreover, the decision has become much more complex in recent weeks because the Attorney General has issued a decision that purports to restrict asylum protection for individuals who fear so-called "private violence," including domestic violence and violence by brutal gangs.  *Matter of A-B-*, 27 I&N Dec. 316 (A.G. June 11, 2018).  As the court is aware, many of the families fled their countries precisely to escape notorious gangs.  As a result of the Attorney General's (patently unlawful) asylum decision, it will be that much more difficult to advise families about whether a child will ultimately prevail in his or her asylum claim, or instead will spend years by themselves in the United States fighting their case in the immigration courts, only to be removed at the end of the day.

After the Court issued its preliminary injunction, Plaintiffs assumed that there would be sufficient time (and at least a week) for parents to make this decision after reunifications occurred.  But that has apparently changed. In fact, according to the reunification plan Defendants just presented this afternoon to Plaintiffs and the Court (Dkt. 109-1), it appears that the government is contemplating that parents will be forced to make the choice whether to leave their children behind in advance of seeing their children, even for a few hours. If Plaintiffs are wrong, and parents will have at least 7 days after reunification to make the decision as a family, then the 7-day stay will not affect Defendants' plans, and a stay should be of little consequence to them.

At Friday's hearing, Defendants suggested that a stay was beyond the scope of this case.  It is not.  It is directly related to effectuating the Court's ruling that parents make an informed, non-coerced decision if they are going to leave their

children behind.  Defendants also suggested that the Court lacks authority to issue a stay of removal.  But a court always has jurisdiction and authority to provide relief necessary to ensure that its orders are properly effectuated.  That is particularly so where the court is exercising its habeas authority to protect liberty.

In short, the reason that the 7-day stay is needed is because of the actions of *Defendants*.  Had the families not been separated in the first place, they would have been together to discuss their options, and their cases would have remained on the same track, without a separate child advocate assigned to assess the child's case.  A one-week stay is a reasonable and appropriate remedy to ensure that the unimaginable trauma these families have suffered does not turn even worse because parents made an uninformed decision about the fate of their child.

**I.    Class Members and their children face the real risk of deportation, without ever being properly advised as to their rights under this injunction or the effect of a waiver of the rights on their children.**

1. This Court has recognized that Class Members' rights to the care and custody of their children cannot be conditioned on giving up their claims for relief. It is, in part, for this reason that the Court ordered that counsel be provided with class lists, ordered the government to provide Class Members with notice of their rights, and directed that the notice advise Class Members that they have the opportunity to speak to an attorney before they make a choice under the injunction.

Under this Court's injunction, Class Members have the right to be reunified with their children while they contest their removal and also to be reunified when they are removed.  Parents may waive these rights.  Parents can choose to be separated from their children during the course of their immigration proceedings or to be removed separately from their children.

Critically, a parent is making choices not only for themselves as an individual, but for their minor children as well.  As this Court has recognized, the separation of Class Members from their children "has [] had a profoundly negative effect on the parents' . . . immigration proceedings, as well as the children's

immigration proceedings." Dkt. 83 at 15-16.  Because of the government's decision to separate families, children and parents' removal cases have been placed on separate tracks.  Govindaiah Decl., Ex. 40 ¶ 9; Kurzban Decl., Ex. 41 ¶ 11. Children now have removal cases independent of their parents, and may have independent defenses to removal.  Odom Decl., Ex. 39 ¶¶ 11-13; Govindaiah Decl., Ex. 40 ¶ 9 Children also have independent rights under the *Flores* agreement. Govindaiah Decl., Ex. 40 ¶¶ 10-11.

Due to their unlawful separations, parents and children have had no chance to have meaningful conversations with one another about the family's collective options.  Odom Decl., Ex. 39 ¶¶ 9, 10; Govindaiah Decl., Ex. 40 ¶ 12.  A parent's decision to waive any claims for relief that they hold as an individual and to be deported with their child could extinguish any independent claims under the asylum statute or under the *Flores* agreement the child may have.  Parents cannot make such momentous decisions on behalf of their families without knowing what claims their children may have, or even that their children may have independent claims.

The Attorney General's recent decision in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018), makes it more important that class members have sufficient time after consultation with their child to understand the avenues available for them and their children.  Kurzban Decl., Ex. 41 ¶¶ 17-19; Lee Decl., Ex. 42 ¶¶ 8-9.  *A-B-* overruled an earlier BIA decision, *Matter of A-R-C-G-,* 26 I&N Dec. 338 (BIA 2014), which had supported asylum claims of certain individuals fleeing domestic violence.  *Id.*  And the opinion in *A-B-* more broadly addressed, often in sweeping terms, numerous legal facets of potential asylum claims, such as which "particular social groups" should be entitled to protection under the asylum laws, the standards for assessing claims involving non-governmental persecutors (such as gangs), and the required evidentiary showing for various prongs of the asylum analysis.  USCIS followed up with final guidance regarding *A-B-* (https://www.aila.org/infonet/uscis-guidance-processing-fear-matter-of-a-b-) on July 11, and has indicated that *A-B-*

will be immediately and fully implemented in the credible fear interviews as part of the expedited removal system – even if there is contrary circuit precedent.  It is therefore urgent that class members be counseled about the effect of this new decision on their potential claims – and as importantly are advised of the avenues for challenging any denials predicated on *A-B-* in federal court.

The Class Members' children have been detained at ORR facilities – some for months – apart from their parents.  During this time, many have received legal screenings or representation from lawyers.  Odom Decl., Ex. 39 ¶ 12; Govindaiah Decl., Ex. 40 ¶ 13.  These lawyers have examined and perhaps even developed the children's legal claims during this time.  At this point, given the months-long separations that have occurred, the only way for a parent to understand the choices available to the family is to have adequate communication with their child and their child's lawyer.  Odom Decl., Ex. 39 ¶ 12; Govindaiah Decl., Ex. 40 ¶ 15.

Volunteer attorneys have organized and are ready to meet with hopefully every parent to ensure that they are properly informed of their rights under the Court's injunction.  These lawyers can also talk with the children's lawyers, and help the family come to a decision that is best for both parent and child.  But this cannot occur in any meaningful manner until after reunification occurs.

2. Moreover, even if were somehow possible prior to reunification for parents to be properly advised of their rights and their child's rights, which it is not, the government has made it exceedingly difficult for even that to occur.  First, the government has delayed giving Plaintiffs usable class lists.  Plaintiffs first requested a class list on July 2.  On July 6, the Court ordered it to be provided for the parents of under-five children by Saturday, July 7.  The government did not provide a list with the names and locations of parents until Sunday, July 8, with the deadline for reunification only two days later, on July 10.

Class counsel still does not have a useable class list of the remaining 2,000 plus class members.  While the government provided two lists on July 14, one of

adult Class Members and one of children, the lists contain numerous discrepancies that raise serious questions concerning their completeness and accuracy.  For example, the list of children contains approximately 2,500 names, whereas the Class Member list contains approximately 1,600. Although it is possible that many Class Members have multiple separated children, it is equally possible that the parent and child lists have not been reconciled in key respects.  Without accurate information concerning the Class Members, it is impossible to ensure that they all can meet with a lawyer, even prior to their reunification.

Second, the government has created impediments to lawyers meeting clients or Class Members that they know of.  Many facilities – which otherwise have limited room for legal visits – have prohibited lawyers from holding group presentations to class members of their rights.  Odom Decl. ¶ 6.  Class Members have been transferred across multiple facilities, sometimes in a matter of days. These transfers can occur with no prior notice to their counsel.

Third, the government has not provided class members with adequate communication with their children, even by phone, prior to reunification.  The Court ordered that Class Members be allowed to communicate with their children by July 6, but Plaintiffs still have not been given a formal, adequate assurance that each child has had contact with his or her parent.  Regardless, even if the government has now provided phone contact to every single child, many parents have not had more than one phone call with their children, let alone enough communication to ensure that a fully informed decision can be made to assess both the parent's and the child's options.  Odom Decl. ¶ 10; Govindaiah Decl. ¶ 12.

Fourth, many Class Members may have already been misled or misinformed by the government's previous election form, which presented them with the false choice to remain separate from their children *or* to be reunified and deported. Govindaiah Decl, Ex. 40 ¶¶ 5-7.  The government has not clarified whether elections made on its previous flawed form are still honored, or whether Class

Members presented with it will be re-canvassed.  In either case, in the absence of further clarification, exposure to the old form may have led many to believe that they had to waive any defenses to removal for both themselves and their children in order to be reunified. Plaintiffs have sought to mitigate this risk by requiring the Government to distribute a new notice form, which allows the Class Member to express his or her interest in consulting with counsel before making a decision on reunification. *See* July 10 Hearing Transcript at 4:3-5 (Court "adopt[ing] the Plaintiffs' version of the class notice," and directing that it "issue in accordance with the Plaintiffs' proposal").  However, Defendants have not been providing those completed forms to Plaintiffs' counsel, so they have no way of knowing whether or how many Class Members have asked to speak with lawyers. Moreover, when Plaintiffs proposed these forms, there was no thought that the government was contemplating the drastic step of removing parents immediately after reunification, without the parents having even a week to make perhaps the biggest decision of their lives.

Fifth, Plaintiffs have recently received reports that reunifications of children age five and over has already begun in some cases, and reunification for the remainder of the Class will begin imminently.   But Plaintiffs did not receive the required warning of this action.  In conjunction with the government's distribution of misleading information and waiver forms, and the inability of class counsel to arrange legal consultations with parents, there is a grave risk that families will be reunited only to be immediately deported, without full information.

In short, nothing about this case involves the normal situation where parents and children remain together, and have time to make profound, potentially life and death family decisions.  Given the fact that parents and children cannot make a fully informed decision without some time together, a short 7-day stay is necessary and more than warranted as a remedy to ensure that no further harm occurs to these families because of the unconstitutional separations carried out by Defendants.

18cv0428

## II. The Court has the authority to enter a brief stay to effectuate its orders and ensure that any waivers are knowing, intelligent, and voluntary.

The Court has the authority to issue all orders necessary to ensure the orderly implementation of its injunction. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong"). The power to stay government action to preserve the status quo is clearly within the court's inherent equitable powers.

The Ninth Circuit has specifically affirmed the power of district courts to enter stays of deportation in order to protect litigants' rights. *See Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001) (affirming district court's stay of deportation of class of noncitizens to allow them to pursue challenges to regulations); *Walters v. Reno*, 145 F.3d 1032, 1053 (9th Cir. 1998) ("because the district court clearly had jurisdiction to hear the claims regarding constitutional violations . . . it had jurisdiction to order adequate remedial measures" including a stay of removal for class members).

The government, however, will likely argue, as it unsuccessfully has in other cases, that the court has no power to stay deportations. The government will point to a subsection of the Immigration and Nationality Act – 8 U.S.C. § 1252(g) – to argue that Congress has restricted the power of district courts to stay deportation. However, the Ninth Circuit and district courts have consistently rejected the government's argument in this specific context, where the court is acting to ensure the implementation of a preliminary injunction which it already found it had jurisdiction to provide. *See, e.g., Sied v. Nielsen*, No. 17-cv-06785, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2, 2018) (granting stay of removal, rejecting government reliance on 8 U.S.C. § 1252(g)); *Chhoeun v. Marin*, No. 17-cv-01898, 2018 WL 566821, at *8-9 (C.D. Cal. Jan. 25, 2018) (same, for class of Cambodian nationals).

Section 1252(g) states:

> Except as provided in this section and notwithstanding any other provision of law. . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

But section 1252(g) does not remove the inherent power of this Court to stay removal in service of its injunction, for several reasons.

First, Plaintiffs' claims do not "arise from" the decision to execute removal orders, and therefore fall outside the plain terms of Section 1252(g). Plaintiffs' claims arise from the government's decision to separate them from their children – a claim over which this court plainly had jurisdiction. The Court's injunction is designed to remedy that violation. In *Walters v. Reno*, the Ninth Circuit held that Section 1252(g) did not prevent a court from enjoining the removal of a class of non-citizens. That case also involved ensuring that noncitizens had proper notice of their rights. The Ninth Circuit stated that because "the district court clearly had jurisdiction to hear the claims regarding constitutional violations [that did not arise from the decision to execute removal orders], it had jurisdiction to order adequate remedial measures, including injunctive provisions that ensure that the effects of the violation do not continue." 145 F.3d 1032, 1053 (9th Cir. 1998).

Similarly, in *Barahona-Gomez v. Reno*, the Ninth Circuit rejected a government argument that, under Section 1252(g), a "district court did not have jurisdiction to order any relief that interferes with its attempt to execute deportation orders against the class members." 167 F.3d 122, 1234 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001). *Barahona-Gomez* concluded that the case was not brought to obtain judicial review of the merits of their immigration proceedings, but "rather to enforce their constitutional rights to due process" and that the district court had authority to enter "injunctive relief staying deportation pending resolution of their constitutional claims."

Second, at a minimum, Section 1252(g) is not sufficiently clear to eliminate

9

18cv0428

the inherent powers of the Court to implement its orders.  Federal courts have "inherent power" to issue necessary orders in a pending case. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *see id.* at 58 (Scalia, J., dissenting) ("Some elements of that inherent authority are so essential to the [Article III] judicial Power, that they are indefeasible, among which is a court's ability to enter orders protecting the integrity of its proceedings.").  As such, Article III courts' inherent powers can be limited by only the clearest statutes or rules. *See id.* at 47 ("We do not lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power.); *Califano v. Yamaski*, 422 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions….").

Third, the Ninth Circuit has instructed (and numerous courts have agreed) that Section 1252(g) is to be interpreted narrowly to apply only to challenges to the executive's *discretion* to execute a removal order.  Section 1252(g) "'was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.'" *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc) (quoting *Reno v. AADC*, 525 U.S. 471, 485 n. 9 (1999)).  Thus, it does not bar "consideration of a purely legal question, which does not challenge the Attorney General's discretionary authority." *Accord Sied v. Nielsen*, No. 17-cv-06785, 2018 WL 1142202, at *21 (N.D. Cal. Mar. 2, 2018); *Chhoeun v. Marin*, No. 17-cv-01898, 2018 WL 566821, at *8-9 (C.D. Cal. Jan. 25, 2018)).  The executive does not have discretion to remove class members without a knowing and intelligent waiver of their rights and the rights of their children to pursue relief from removal.

## CONCLUSION

For the foregoing reasons, the Court should prohibit Defendants from removing parents until 7 days after reunification and, if necessary, enter a temporary restraining order staying such removals until this motion is decided.

Dated: July 16, 2018

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 2922080)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

Respectfully Submitted,

*/s/Lee Gelernt*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Admitted Pro Hac Vice*

18cv0428

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: July 16, 2018

18cv0428

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' MOTION FOR STAY AND OTHER RELIEF**

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| 39 | Declaration of Maria Odom | 14-20 |
| 40 | Declaration of Manoj Govindaiah | 21-29 |
| 41 | Declaration of Ira Kurzban | 30-35 |
| 42 | Declaration of Eunice Lee | 36-42 |

13

18cv0428

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 39

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

       *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement ("ICE"), et al.,

       *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF MARIA ODOM**

CLASS ACTION

1.      I, Maria Odom, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I currently serve as Vice President for Legal Services at Kids in Need of Defense (KIND).  KIND is a national non-profit organization with ten field offices providing free legal services to unaccompanied immigrant children who face removal proceedings in Immigration Court.

3.      I have been an immigration attorney for over twenty years and have served in positions across all sectors, including as Assistant District Counsel for the legacy Immigration and Naturalization Service (INS), 10 years in private practice, as Executive Director of the Catholic Legal Immigration Network, and, most recently, as the appointed Citizenship and Immigration Services Ombudsman at the U.S. Department of Homeland Security.

4.      Since June 27, I have supervised teams of KIND attorneys, also in collaboration with other volunteer attorneys, in locating and counseling parents and children separated by the government.

5.      Our work with separated parents focuses on those held by Immigration and Customs Enforcement (ICE) at Port Isabel Service Processing Center in Texas. Our teams have met with close to 200 separated parents in Port Isabel.  I have personally met with at least five separated parents held at Port Isabel.

6.      It has been difficult to locate and meet with parents at Port Isabel, particularly before the Court began ordering the government to provide lists of Class Members to Plaintiffs.  Without such information, we are unable to obtain a complete list of separated parents at Port Isabel and have no way of learning of new arrivals. Instead, we have relied on lists compiled by private and nonprofit attorneys in the area. Detainees also referred other separated parents to us when they encountered us at the facility via word of mouth. We also learned of names of separated parents from other

Exhibit 39, Page 16

advocates and from the media who received phone calls from separated parents held at Port Isabel looking for assistance.

7.     The facility did not allow us to hold group meetings or group presentations. I personally requested the use of space to conduct group orientations and an ICE officer denied the request. In my experience, legal orientation in the detainee pods is one of the most effective ways to provide legal orientation, but that legal access is not permitted at Port Isabel Detention Center.  This further slowed down the process of locating and providing basic information to, these parents.

8.     Communication between parents and children continues to be limited. While many parents we met at Port Isabel have had contact with their children since the Court's preliminary injunction, it is rare that a parent will have had extensive conversations with the child or multiple calls.  Communication is also contingent upon the children's shelter staff answering their phones, to which there have been barriers. Other parents with whom we met had yet to have any contact with their children at the time we spoke to them.

9.     This limited communication means that parents do not have a meaningful opportunity to talk to their children or their children's counsel to understand their cases.  After weeks or months of separation, the few minutes they had on the phone were emotional and not conducive to discussing legal rights and options.

10.    For parents with small children, a single (or even multiple) phone calls with the child offers parents little to no understanding of their child's legal options. Small children likely have very little, if any understanding of their rights, particularly amid the ongoing harm of being separated from their caretaker.

11.    Many parents with whom we have met now understand that to the Court has ordered reunification.  However, they often struggle to understand the logistics of how reunification will occur.  They need counsel's assistance to fully understand the rights of their children or how those rights will be affected by any decisions they may make

about reunification.  They often lack complete information about whether their child has a lawyer or has any avenues for relief from removal.  Counseling parents on their rights and options has also been challenging given the lack of information regarding the government's plans for reunification.

12.    In addition to counseling separated parents, my team has screened at least 49 separated children in ORR custody in New York in the last few weeks. The majority are ages 5 to 9.  Many of the children we have interviewed are traumatized and unable to fully comprehend the complicated and shifting options before them. A number of these children simply expressed a desire to see or be with a parent, while others only wanted to make a decision after consulting with a parent.  Others cried or avoided discussing their case and were only able to convey concern over their parents' whereabouts and/or a desire to see or talk to a parent. To be properly counseled about their options and have meaningful defense of their claims, these children need to be with their parents.

13.    In order to provide adequate legal representation to children in removal proceedings, it is important for the attorney to have a thorough understanding of the child's situation in the country of origin.  Attorneys must ask difficult questions about abuse, abandonment, neglect, violence, persecution, or other harms suffered by children and their families.  Children may qualify for humanitarian protection on several grounds, and past harm to the child or to family members may support eligibility for legal relief. A child may have limited memory and understanding of complex or violent situations, making it important for the attorney to speak with members of a child's family who may corroborate information, fill in gaps, and provide additional facts the child might not know or comprehend.

14.    Separation from parents makes it harder for the child to provide the evidence necessary to prove their defense from removal.  Many times, the parent has important paperwork, such as notarized affidavits, birth certificates, or police records.  Obtaining

these documents from a parent who is detained or deported is difficult and resource-intensive.

15.     There are instances in which after proper legal screening of the child and consultation with case workers it may not be appropriate for child's counsel to work with the parent, often resulting in the bifurcation of cases. However, absent suitability concerns or other protection needs, parents need some understanding of their children's legal situation before they make a decision about whether they want to be deported with or without their children.  In some cases, a parent who does not have a claim to remain in the United States may have a child who does.  In others, a parent may have a claim but incorrectly believe that they have to relinquish their own claims as well as any independent claims the child may have in order to be reunified.  In order for them to make knowing and voluntary decisions concerning what is best for their families, these parents need an opportunity to consult with their own counsel, and meaningful access to their children and potentially their children's lawyers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 15th day of July 2018, in New York, NY.

_Maria M. Odom_

MARIA ODOM

Exhibit 39, Page 20

18cv0428

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 40

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al.,<br><br>　　　　　*Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.,<br><br>　　　　　*Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>**DECLARATION OF MANOJ GOVINDAIAH**<br><br>CLASS ACTION |

1.      I, Manoj Govindaiah, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am the Director of Family Detention Services at RAICES, a nonprofit agency that promotes justice by providing free and low-cost legal services to underserved immigrant children, families, and refugees in Texas. RAICES is the largest immigration legal services provider in Texas. As Director of Family Detention Services, I oversee RAICES' work at Texas' family detention centers—in particular, its work at the Karnes County Residential Center in Karnes City, Texas.

3.      Since DOJ's zero tolerance policy began in May 2018, I have also supervised RAICES' response to family separation, and our work with separated families. RAICES provides legal services to unaccompanied children at 13 ORR locations in the San Antonio and Corpus Christi areas. RAICES also provides legal services at detention centers throughout the State of Texas and has encountered hundreds of separated parents through our legal services, data processing, and volunteer coordination efforts with other legal services providers.

4.      I am gravely concerned by the possibility that parents already have or will unknowingly waive away their rights and the rights of their children in their desperation be reunified.  The grave risk of this occurring is amplified by the

government's failure to provide any clarity on the process by which reunification is going to occur.

5.      My concern begins with the government's use of a waiver form that appeared to give separated parents incentive to agree to waivers of their own, or their children's, rights as a way of reuniting with their children.  A copy of this form is attached to my declaration.  It is my understanding that separated parents have in the past been asked by the government to sign a form ("Separated Parent's Removal Form") with two options: 1) that the parent wishes to be removed from the United States with their child, or 2) that the parent wishes to be removed from the United States without their child.

6.      The form was problematic in myriad ways. Although parents may have "administratively final orders of removal" (as described in the form), those orders can be held in abeyance when a parent is proceeding through expedited removal proceedings and the credible fear process, which is the typical process an asylum-seeker would undergo. If a parent successfully navigates credible fear, they are eligible for release from detention, and eligible to apply for legal relief in the United States.

7.      Additionally, the form provided only two options, both of which result in the deportation of the parent from the United States. The form did not contemplate the possibility that a parent may ultimately be released from federal custody, even though

the Department of Homeland Security maintains broad discretion over release from custody—even of those individuals with administratively final orders of removal.

8.      Parents generally have authority to make decisions on behalf of their children. However, these decisions must be made with full information as to their children's rights.  The separated families have unique rights and needs that parents must understand before making any waivers.

9.      By separating children from their parents, the government classified the children as "unaccompanied" and sent them to ORR custody.  Unaccompanied children are afforded certain protections that differ from those of adults or accompanied children. Among them are the right to apply for asylum affirmatively in a non-adversarial setting and if denied, the opportunity for an additional review before an Immigration Judge, the right to removal proceedings in front an immigration judge (without the need to go through a credible fear hearing).  Additionally, children generally may be eligible for Special Immigrant Juvenile Status under 8 U.S.C. § 1101(a)(27)(J), which is available to certain abused, abandoned, or neglected children. Many of the unaccompanied children that RAICES works with are eligible for asylum, Special Immigrant Juvenile Status, other immigration relief, and typically a combination of forms of relief.  Even accompanied children have the right to assert an independent asylum claim from their parents.

10.     Pursuant to the *Flores* Settlement Agreement, children generally are also afforded additional rights not available to adults. These rights include the right to expeditious release from government custody, the right to be placed in a licensed, non-secure facility, and the right to bond hearings in every case, among others.

11.     In our recent work with separated parents, it is clear that they do not typically understand that, their children may have additional rights and legal options available to them, or that because their children are not yet adults, *Flores* rights may also apply to them.

12.     It is also clear that while the parents have had limited chances to communicate with their children, those conversations have typically been about the child's living conditions, whether they are eating properly, whether they are having nightmares, etc. Most of the parents have not discussed with the child the child's legal options or child's desires with respect to the child's independent immigration case.

13.     Indeed such conversations are of utmost importance. RAICES is currently working with approximately 130 separated children that are in ORR custody in the San Antonio and Corpus Christi area. Of those 130 children, many have independent claims that they have indicated they may like to pursue. The vast majority of those children have not yet had an opportunity to discuss their desires with their parents.

14.     Additionally, I do not believe any of the separated parents that RAICES is working with have had an opportunity to speak with their child's immigration lawyer regarding the child's legal rights or legal options.

15.     In my experience working in detention centers for several years, and with detained families, I do not believe that parents can make informed decisions on behalf of their families without adequate communication with their children and their children's representatives.  Nor do I think that most separated parents have had adequate communication.  A parent's waiver of their child's rights – whether those rights arise under *Flores* or the immigration and asylum statutes – without receiving accurate, effective information on those rights, without discussing those rights with their child's attorney, or discussing those rights with their child him/herself, cannot be considered a voluntary, informed, and knowing waiver of the child's rights.

16.     While we at RAICES, along with other advocates, have the resources and experience necessary to meet with and advise parents upon their reunification, it is difficult to deploy these resources in the absence of information from the government as to the logistics of reunification, or without a period of time to ensure we can meet with parents together with their children.

Exhibit 40, Page 27

17.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in San Antonio, Texas, on July 15, 2018.

  */s/ Manoj Govindaiah*
MANOJ GOVINDAIAH

U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations



## Separated Parent's Removal Form

**Purpose:** This form is for detained alien parents with administratively final orders of removal who are class members in the *Ms. L. v. I.C.E.*, No. 18-0428, (S.D. Cal. Filed Feb. 26, 2018) lawsuit. Class members are entitled to be reunited with their child(ren) and may choose for their child(ren) to accompany them on their removal or may choose to be removed without their child(ren).  Any such decision must be made affirmatively, knowingly, and voluntarily.

**Instructions:** This form must be read to the alien parent in a language that he/she understands. The alien parent should indicate which option he/she is choosing by signing the appropriate box below.

**Parent Name / Nombre de Padre:** _____
**Parent A # / A # de Padre:** _____
**Country of Citizenship / Pais de Ciudadania:** _____
**Detention Facility / El Centro de Detención:** _____

**Child(ren) Name(s) / Nombre de Hijo:**
_____
**Child(ren) A # / A # de Hijo:** _____
**Shelter / Albergue:** _____

---

**English:** *I am requesting to reunite with my child(ren) for the purpose of repatriation to my country of citizenship.*

**Signature / Firma:** _____

---

**English:** *I am affirmatively, knowingly, and voluntarily requesting to return to my country of citizenship without my minor child(ren) who I understand will remain in the United States to pursue available claims of relief.*

**Signature / Firma:** _____

---

### Certificate of Service

I hereby certify that this form was served by me at_____
(Location)

on _____ on _____, and the contents of this
(Name of Alien)                                    (Date of Service)

notice were read to him or her in the _____ language.
(Language)

_____      _____
Name and Signature of Officer                Name or Number of Interpreter (if applicable)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 41

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

        *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"), et al.,

        *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF IRA KURZBAN**

CLASS ACTION

1.     I, Ira Kurzban, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am the author of *Kurzban's Immigration Law Sourcebook*, the most widely used one-volume immigration source in the United States that has been cited authoritatively by numerous Federal Circuit Courts of Appeals, the Board of Immigration Appeals and state Supreme Courts.

3.     I am currently and have been a partner in the law firm of Kurzban, Kurzban, Weinger, Tetzeli, & Pratt P.A. of Miami, Florida for over four decades and I am chair of the firm's immigration department.

4.     I am a past-national President and former General Counsel of the American Immigration Lawyers Association.  I am also a Fellow of the American Bar Association and was the first recipient of the Tobias Simon Award given by the Chief Justice of the Florida Supreme Court for my pro bono service on behalf of immigrants. I was also named as an Honorary Fellow of the University of Pennsylvania School of Law for my work on behalf of Haitians seeking refuge in the United States.

5.      I have been named by the National Law Journal as one of the top twenty immigration lawyers in the United States. I have been listed for over thirty-five years in the Best Lawyers in America for my work in immigration and employment law, and Lawdragon has listed me as one of the top 500 lawyers in the United States.  I also have received the Lawyers of the Americas Award for my work on behalf of human rights in this hemisphere given by the University of Miami, the Jack Wasserman Award for excellence in federal litigation, the Edith Lowenstein Memorial Award for excellence in the advancement of immigration law given by the American Immigration Lawyers Association, and the Carol King Award for my efforts in immigration law given by the National Lawyers Guild.  In 1986, I was selected by

Newsweek Magazine in their commemorative issue on the hundredth anniversary of the Statue of Liberty as one of 100 American heroes for my work on behalf of immigrants. Both myself individually and my firm have been listed in Chambers as first-tier lawyers in immigration law since 2010.

6.     I have litigated over fifty federal cases concerning the rights of aliens before the U.S. Supreme Court, including *Jean* v. *Nelson*, *Commissioner* v. *Jean*, and *McNary* v. *Haitian Refugee Center, Inc*.  I have also litigated numerous cases under the Alien Tort Claims Act and the Torture Victim Protection Act, including one that resulted in a $500-million judgment against Jean-Claude Duvalier, the former dictator Haiti.

7.     In my immigration practice of almost forty years, I have litigated hundreds of cases before the immigration courts in the United States. I have represented hundreds of asylum applicants and other applicants seeking relief in the immigration courts.

8.     I am an adjunct faculty member in Immigration and Nationality Law at the University of Miami School of Law and have lectured and published extensively in the field of immigration law, including articles in the Harvard Law Review, San Diego Law Review.

9.     I make this affidavit to explain what steps are necessary to ensure that a parent understands the choices available to them and their families when deciding to be reunified for removal.

10.     The government's decision to separate children from their parents and to declare children as unaccompanied alien children means that parents and children will have independent immigration proceedings.

11.     The decision to accept removal or litigate available claims for relief is a complex one, even for an individual.  An asylum-seeking adult placed in expedited removal proceedings, for example, will have to assess their chances of prevailing at a credible fear proceeding, and then – when placed in plenary removal proceedings pursuant to Section 240 of the Immigration and Nationality Act – their chances of

prevailing at an asylum hearing and on appeal. Even an individual who may have received a negative credible fear finding has avenues of relief available: for example, they can appeal a denial to an Immigration Judge, seek reconsideration, or challenge the denial in federal court.

12.    Children will have their own independent claims for relief. Because the government has rendered them "unaccompanied," these children are not in expedited removal proceedings. Instead, they have the opportunity to seek asylum without going through the credible fear process.

13.    Children's asylum claims may overlap with or be independent of those of their parents. For example, a child may have an asylum claim as a shared victim or witness to a parent's persecution. A child may also have asylum claims that arise independently from the child's own experiences as a victim of persecution.

14.    A parent's decision to be removed with their child will waive two sets of asylum claims: that of the parent and that of the child.

15.    In my experience counseling families in this context, it is necessary that decisions be made together or at least with the benefit of substantial communication. Parents cannot make a decision without understanding the options available to a child and without speaking with their children.

16.    Moreover, because asylum claims rely on the recollection of traumatic events, children often rely on the support of their parents to help them express a fear of return.

17.    For many of the Class Members in this case, decisions about removal have recently become more complex because of the Attorney General's decision in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018) on June 11 and an implementing guidance issued by USCIS on July 11.

18.    *Matter of A-B-* overruled an earlier decision, *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014), which had supported asylum claims of certain individuals fleeing domestic violence. The opinion in *A-B-* more broadly addressed, often in sweeping

terms, numerous legal facets of potential asylum claims, such as which "particular social groups" should be entitled to protection under the asylum laws, the standards for assessing claims involving non-governmental persecutors, and the required evidentiary showing for various prongs of the asylum analysis.  The July 11 guidance indicates that *A-B-* will be immediately and fully implemented in the credible fear interviews as part of the expedited removal system—even where there is contrary circuit precedent.

19.     These recent developments increases the importance of families understanding the options available to them before a parent makes any ultimate choice regarding removal.  Children who have lawyers must be able to communicate with children's parents, whether or not they themselves are counseled, to ensure that the parent is making choices for their child based on a correct understanding of the options available to their family.


     I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 15th day of July 2018, in Miami, Florida.


                                        _____
                                        IRA KURZBAN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 42

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al.,<br><br>       *Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.,<br><br>       *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>**DECLARATION OF EUNICE LEE**<br><br>CLASS ACTION |

1.      I, Eunice Lee, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.       I am licensed to practice law by the States of New York and California, and am currently Co-Legal Director of the Center for Gender & Refugee Studies ("CGRS" or "Center") at University of California Hastings College of the Law. I have knowledge of the facts set forth herein, and if called upon to testify as a witness thereto, I could and would competently do so under oath

3.      CGRS engages in a range of litigation, policy work, and technical assistance in the area of asylum law, with a core mission of furthering the human rights of refugees and asylum seekers. We have expertise in U.S. asylum law and international refugee law particularly with regard to the claims of women, children, and LGBTQ individuals. CGRS provides technical assistance and training for attorneys representing asylum seekers at all levels of the immigration system in thousands of cases each year.

4.      On June 11, 2018, the Attorney General issued a precedential decision, *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). Invoking his certification authority under 8 C.F.R. § 1003.1(h)(1)(i), the Attorney General in *Matter of A-B-* overruled an earlier Board of Immigration Appeals precedent decision, *Matter of A-R-C-G-*, 26 I&N Dec. 338 (BIA 2014). *Matter of A-R-C-G-* had recognized that individuals fleeing domestic

violence could establish asylum eligibility via the "particular social group" ground for asylum. In *Matter of A-B-*, the Attorney General overruled that earlier Board decision and also addressed—in often sweeping terms—numerous elements of asylum law. For example, the *A-B-* decision discussed standards for social group claims, the state action requirement for cases involving non-governmental persecutors, and evidentiary showings for various aspects of asylum analysis. The Attorney General in *A-B-* also broadly opined that claims for asylum based on domestic violence and gang violence (in his view "private violence") should "generally" not qualify for asylum. 27 I&N Dec. at 319-20.

5.      On July 11, 2018, USCIS issued final guidance regarding *A-B-*. USCIS, *Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with* Matter of A-B- (July 11, 2018), *available at* https://www.aila.org/infonet/uscis-guidance-processing-fear-matter-of-a-b-. That guidance indicates that USCIS will immediately and fully implement *A-B-* in credible fear interviews as part of the expedited removal system—even in the face of contrary circuit precedent. *See id.* at 8-9. Troublingly, the guidance also appears to codify into formal agency practice numerous aspects of the *A-B-* decision that were merely conjecture or dicta

6.      My office, CGRS, currently represents Ms. A-B- in her case for asylum and related relief, and also represented her before the Attorney General, together with

other co-counsel. In her case before the Attorney General, we as counsel for Ms. A-B- argued that the invocation of certification procedures was improper, and also addressed why and how domestic violence claims should be recognized as a basis for asylum under prevailing case law, statutory standards, and international guidance. Following the Attorney General's decision, Ms. A-B- has retained our office to continue litigating her case in subsequent stages as necessary, including before the Fourth Circuit. We have every intention to challenge the Attorney General's adverse decision and seek its overruling on behalf of our client.

7.      Moreover, in our Center's view, the decision in *Matter of A-B-* was flawed and erroneous in numerous ways. In our view, it gives rise to strong legal arguments for overturning by the federal courts not just in Ms. A-B-'s case but in other cases, including but not limited to arguments against *Chevron* deference to the agency. We are aware of numerous cases arising in jurisdictions across the United States for other asylum seekers in which attorneys are advancing, or anticipate advancing, arguments for overruling *Matter of A-B-*.

8.      The *A-B-* decision also injects considerable confusion into settled areas of asylum law.  Our Center has seen this confusion firsthand. In the weeks since issuance of *Matter of A-B*, CGRS has fielded hundreds of requests from attorneys for our technical assistance and resources. Attorneys have expressed to us serious difficulty in parsing both the language of the *A-B-* decision and its ramifications.

9.      I anticipate that that *A-B-* decision, as implemented via USCIS formal guidance, will result in erroneous negative credible fear findings as well as erroneous asylum denials. It will likely have an especially broad impact on individuals raising claims related to domestic violence and gang violence, including many asylum seekers from Central America. In my view, asylum seekers facing credible fear interviews impacted by *A-B-* should be advised of their rights and should have an opportunity to consult with an attorney about the ramifications of the decision on their case, especially in the event of an adverse credible fear finding. Attorney advice on the potential impact of *A-B-* on individuals' claims is especially essential given that the law in this area is now in a considerable state of confusion and flux.

10.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge.

Executed in San Diego, CA, on July 15, 2018.

_____

EUNICE LEE