Christopher T. Casamassima (SBN #211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
HALE & DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

Noah A. Levine (*pro hac vice* to be filed)
Jamie S. Dycus (*pro hac vice* to be filed)
Adriel I. Cepeda Derieux (*pro hac vice* to be filed)
WILMER CUTLER PICKERING
HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 212 230-8800
Facsimile: (212) 230-8888

*Attorneys for* Amici Curiae *Scholars of Habeas Corpus and Constitutional Law*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.,<br><br>    Petitioner-Plaintiff,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement, *et al*.,<br><br>    Respondents-Defendants. | Case No.: 3:18-CV-0428<br><br>**BRIEF OF SCHOLARS OF HABEAS CORPUS AND CONSTITUTIONAL LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY OF REMOVAL AND EMERGENCY TRO PENDING RULING ON THE STAY MOTION**<br><br>District Judge: Dana M. Sabraw<br>Courtroom: 13A |

1

## INTEREST OF *AMICI CURIAE*

Amici curiae are nine scholars of habeas corpus and constitutional law, including authors of leading textbooks in immigration and constitutional law. Amici have written and edited numerous works about the writ of habeas corpus and immigration law upon which federal courts—including the U.S. Supreme Court—have relied. Amici are:[1]

Erwin Chemerinsky, Jesse H. Choper Distinguished Professor of Law and Dean, University of California, Berkeley School of Law.

Lee Kovarsky, Professor of Law, University of Maryland Francis King Carey School of Law.

Christopher N. Lasch, Associate Professor of Law, University of Denver Sturm College of Law.

James S. Liebman, Simon H. Rifkind Professor, Columbia Law School.

Hiroshi Motomura, Susan Westerberg Prager Distinguished Professor of Law, UCLA School of Law.

Gerald L. Neuman, J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law, Harvard Law School.

Judith Resnik, Arthur Liman Professor of Law, Yale Law School.

Michael Wishnie, William O. Douglas Clinical Professor of Law, Yale Law School.

Stephen I. Vladeck, A. Dalton Cross Professor in Law, University of Texas School of Law.

## ARGUMENT

Amici curiae file this brief to address an issue that arose at the conference before the Court last Friday, July 13, 2018. Counsel for the class, Mr. Gelernt, noted on-the-ground reports of imminent plans by the government to reunite families and remove them

---

[1] Amici appear in their individual capacities. Respective institutional affiliations are provided for identification purposes only.

immediately, before each family can have an informed discussion of any claims the child or the parent may have to seek relief from removal.  Based on the Second Amended Complaint and this Court's orders, Amici understand that some family members have potentially meritorious claims for avoiding removal, including because they are likely to face persecution upon return to their countries of origin.  Counsel for the government suggested that this Court lacks authority to address class counsel's stated concern.  Amici file this short brief to explain why, contrary to the government's suggestion, this Court must have that power in order to ensure its own ability to provide effective and timely reunification relief in this case, including to ensure the ability of class members and their children, upon reunification, to communicate and fairly present any claims for relief from removal they may have.

The government's position that this Court is powerless to require timely reunification, sufficiently in advance of any physical act of removal, cannot be reconciled with the Suspension Clause of Article I, Section 9 of the Constitution.  This Court's order granting classwide preliminary injunctive relief describes a key problem with the government's conduct as its failure to reunite families until the time of removal.  *See* Dkt. 83, at 11, 15.  It was in part that failure and the resulting effect on the ability of parents and children to present their claims for relief from removal—a "number of different scenarios, all of which are negative – some profoundly so," *id.* at 15—that led this Court to enter the preliminary injunction notwithstanding the June 20, 2018 Executive Order, *id.* at 11.

The Suspension Clause forbids the government from denying class members and their children, through the delay of reunification until the eve of physical removal from the country, an effective means to fairly consider and present valid grounds for relief from removal.  As an initial matter, it is by now well settled that the Suspension Clause applies to judicial review of government actions to remove immigrants from the United States.  *See INS v. St. Cyr*, 533 U.S. 289, 300 (2001) ("Because of [the Suspension] Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by

the Constitution.'" (quoting *Heikkila v. Barber*, 345 U.S. 229, 235 (1953))). The writ of habeas corpus is, "[a]t its historical core," fundamentally a tool to "review[] the legality of Executive detention," *St. Cyr*, 533 U.S. at 301, and removal of an immigrant from the United States by the Executive Branch implicates detention in at least two respects. Not only does the government, as here, physically detain persons in contemplation of future removal, but also, as long recognized, the act of removal itself inherently involves confinement and restraint of the person's physical liberty. *See Chin Yow v. United States*, 208 U.S. 8, 12 (1908) ("It would be difficult to say that [an alien] was not imprisoned, theoretically as well as practically, when to turn him back meant that he must get into a vessel against his wish and be carried to China.").

The suggestion that the government can reunite parents and children only at the last moment before removal, with the result that families have no effective means to consider and present claims for relief, including credible asylum claims, flouts the Suspension Clause. Supreme Court jurisprudence and the history of the writ of habeas corpus demonstrate that an essential attribute of the Great Writ is the power of the habeas court to grant effective relief. The Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), confirms that the privilege of habeas corpus, and thus the minimum attribute of any adequate substitute, entails the power of the court to grant effective relief to the habeas petitioner. There, the Court held both that a petitioner is entitled "to a meaningful opportunity to demonstrate that he is being held" unlawfully and that "the habeas court must have the power to order the conditional release of an individual unlawfully detained," calling these "the easily identified attributes of any constitutionally adequate habeas corpus proceeding." *Id.* at 779. Ultimately, what is essential is that "the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." *Id.* at 787. Those conditions cannot be met if, as here, the government has detained a child separately from the person

responsible for safeguarding the child's legal rights—her parent—until it is too late for the parent to do so.

Importantly, the historical scope of the writ reached not just the court's jurisdiction to rule upon the lawfulness of the petitioner's restraint, but also the court's power to ensure effective relief by, as is especially important in this case, controlling the location of the petitioner.  For example, to preserve their remedial power over pending habeas petitions, United States courts issued orders to respondent custodians and held in contempt those who attempted to transfer petitioners outside the realm of the writ. *See, e.g.*, *Ex parte Young*, 50 F. 526 (C.C.E.D. Tenn. 1892) (confirming lawfulness of holding father in contempt for transferring his child out of state to avoid habeas); *United States v. Davis*, 25 F. Cas. 775 (C.C.D.C. 1840) (No. 14,926) (ordering imprisonment of a custodian until he produced enslaved persons he had allegedly removed from the District of Columbia to avoid writ for their freedom); *United States v. Green*, 26 F. Cas. 30 (C.C.D.R.I. 1824) (No. 15,256) (bypassing attachment where custodian was in court and could be compelled to testify); Hurd, *A Treatise on the Right of Personal Liberty and on the Writ of Habeas Corpus and the Practice Connected with It* 240-42 (1858).

Nineteenth-century state statutes provided for punishment of the same types of acts, making it a crime to conceal or transfer custody of a prisoner with the intent to evade a writ of habeas corpus.  For example, in 1825, Missouri law made it a punishable offense for a custodian to transfer a prisoner to the custody of another or to conceal him, "with intent to avoid the operation of [the] writ."  1825 Mo. Laws 426 (1825).  And in 1845, the Illinois legislature likewise provided for punishment for the transfer or concealment of a prisoner with "the intent to avoid the operation of [the habeas corpus] writ."  48 Ill. Rev. Stat. § 14 (1845).  An 1858 treatise catalogued similar statutes in several states: "In Maine, Massachusetts and Delaware, the concealing of the prisoner or changing his custody, with the intent to elude the service of the writ of habeas corpus, is prohibited under severe penalties …. In Indiana, Arkansas and Alabama, the act is declared a misdemeanor, and the offender subject to fine and imprisonment."  Hurd,

*supra*, at 237.  The federal decisions and state statutes reflect a common, fundamental objective of the law of habeas corpus: controlling the location of the prisoner to ensure the ability of the habeas court to render effective relief.

Far from an ancillary feature, control over the custody of a petitioner was thought essential to the courts' remedial power under the Great Writ.  After all, a court could not very well "direct[] the prisoner's release" or issue other "appropriate orders for relief," *Boumediene*, 553 U.S. at 787, if the prisoner was beyond the reach of the writ and the court's jurisdiction.  The Supreme Court has consistently acknowledged this point.  For example, in *Lonchar v. Thomas*, 517 U.S. 314 (1996), the Supreme Court recognized that denying a stay necessary to prevent a petitioner's execution would effectively amount to a dismissal of his petition and thus a denial of "the protection of the Great Writ entirely, risking injury to an important interest in human liberty."  *Id.* at 319, 324.

Just as denying a stay necessary to prevent a petitioner's execution vitiates "the protection of the Great Writ," so too would removal here of class members or their children before the intact families can communicate about and present their potential grounds for relief from removal, including likely persecution upon return to their countries of origin.  Forcing the parents to waive their rights, or the rights of their children, by delaying reunification until the eve of their immediate removal, all free from judicial intervention, would deprive this Court of its ability to issue "appropriate orders for relief," *Boumediene*, 553 U.S. at 787, and deprive the family members of their right to a "meaningful opportunity to demonstrate" that their detention is unlawful.  The Suspension Clause forbids such a result and preserves to this Court the power to issue appropriate orders of relief, including if necessary, a stay of removal.

Finally, and distinct from the considerations related to habeas corpus outlined above, it is well settled that a court has "'inherent power to enforce compliance with [its own] lawful orders.'"  *United States v. Yacoubian*, 24 F.3d 1, 5 (9th Cir. 1994) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)).  This inherent authority is "governed not by rule or statute but by the control necessarily vested in courts to manage

their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Here, as the Court has explained, class members' potential claims for relief from removal are "entitled to careful consideration by government officials." Dkt. #83, at 14. As the Court has also found, however, "[t]he lack of effective methods for communication between parents and children who have been separated has … had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the children's' immigration proceedings." *Id.* at 15. Because the Court's order granting a preliminary injunction seeks to avert such harms, the Court's inherent authority to enforce that ruling easily encompasses Plaintiffs' request to protect them from the same harms.

DATED: July 16, 2018　　　　　　　WILMER CUTLER PICKERING
　　　　　　　　　　　　　　　　　HALE & DORR LLP

　　　　　　　　　　　　　　　　　By:  /s/ Christopher T. Casamassima
　　　　　　　　　　　　　　　　　　　  Christopher T. Casamassima
　　　　　　　　　　　　　　　　　*Attorneys for* Amici Curiae *Scholars*
　　　　　　　　　　　　　　　　　*of Habeas Corpus and Constitutional Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on this sixteenth day of July, 2018, I electronically transmitted the foregoing **BRIEF OF SCHOLARS OF HABEAS CORPUS AND CONSTITUTIONAL LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY OF REMOVAL AND EMERGENCY TRO PENDING RULING ON THE STAY MOTION** to the Clerk's office using the CM/ECF system, which will send a notice of filing to all counsel of record.

/s/ *Chris Casamassima*
Christopher T. Casamassima