UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                              )
MS. L. AND MS. C.,                            )
                                              )CASE NO. 18CV0428-DMS
            PETITIONERS-PLAINTIFFS,           )
                                              )
VS.                                           )
                                              )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS                  ) MONDAY JULY 16, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT          )  9:30 A.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.            )
CUSTOMS AND BORDER PROTECTION ("CBP");        )
U.S. CITIZENSHIP AND IMMIGRATION              )
SERVICES ("USCIS"); U.S. DEPARTMENT           )
OF HEALTH AND HUMAN SERVICES ("HHS");         )
OFFICE OF REFUGEE RESETTLEMENT ("ORR");       )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;         )
GREG ARCHAMBEAULT, SAN DIEGO FIELD            )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS,       )
EL PASO FIELD DIRECTOR, ICE; FRANCES M.       )
JACKSON, EL PASO ASSISTANT FIELD              )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN,       )
SECRETARY OF DHS; JEFFERSON BEAUREGARD        )
SESSIONS III, ATTORNEY GENERAL OF THE         )
UNITED STATES; L. FRANCIS CISSNA,             )
DIRECTOR OF USCIS; KEVIN K.                   )
MCALEENAN, ACTING COMMISSIONER OF             )
CBP; PETE FLORES, SAN DIEGO FIELD             )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,          )
EL PASO FIELD DIRECTOR, CBP;                  )
ALEX AZAR, SECRETARY OF THE                   )
DEPARTMENT OF HEALTH AND HUMAN                )
SERVICES; SCOTT LLOYD, DIRECTOR               )
OF THE OFFICE OF REFUGEE RESETTLEMENT,        )
                                              )
            RESPONDENTS-DEFENDANTS.           )
-----------------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

COUNSEL APPEARING:

FOR PLAINTIFF:                    LEE GELERNT, ESQ.
                                 ACLU IMMIGRANT RIGHTS PROJECT
                                 125 BROAD STREET 18TH FLOOR
                                 NEW YORK, NEW YORK 10004

                                 SPENCER AMDUR, ESQ.
                                 ACLU OF NORTHERN CALIFORNIA
                                 39 DRUMM STREET
                                 SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:                   SARAH B. FABIAN, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
                                 OFFICE OF IMMIGRATION LITIGATION
                                 P.O. BOX 868
                                 BEN FRANKLIN STATION
                                 WASHINGTON, DC 20044

                                 SCOTT G. STEWART,
                                 BRIAN STIMSON,
                                 OFFICE OF IMMIGRATION LITIGATION
                                 950 PENNSYLVANIA AVENUE NW
                                 WASHINGTON, DC 20530

ALSO PRESENT:                    COMMANDER JONATHAN WHITE

REPORTED BY:                     LEE ANN PENCE,
                                 OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY, ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101

```
 1        SAN DIEGO, CALIFORNIA — MONDAY, JULY 16, 2018 — 9:35 A.M.

 2                              *   *   *

 3             THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 18CV0428,

 4   MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

 5   STATUS CONFERENCE.

 6             THE COURT:  GOOD MORNING.

 7             MAY I HAVE APPEARANCES, PLEASE?

 8             MR. GELERNT:  LEE GELERNT FROM THE ACLU, YOUR HONOR,

 9   FOR PLAINTIFFS.  GOOD MORNING.

10             THE COURT:  GOOD MORNING.

11             MR. AMDUR:  GOOD MORNING.  SPENCER AMDUR FOR ACLU

12   FOR PLAINTIFFS.

13             THE COURT:  THANK YOU.  GOOD MORNING.

14             MR. STEWART:  SCOTT STEWART FOR THE DEFENDANTS, YOUR

15   HONOR.  GOOD MORNING.

16             MR. STIMSON:  SARAH FABIAN, DEPARTMENT OF JUSTICE,

17   FOR THE DEFENDANTS.

18             THE COURT:  THANK YOU, AND GOOD MORNING.

19             MR. STEWART:  IN ADDITION, YOUR HONOR, MAY I ALSO

20   MENTION -- AND I WILL BE HAPPY TO GIVE A MORE FULSOME

21   DESCRIPTION.  BUT IN LINE WITH YOUR HONOR'S MOST RECENT ORDER

22   WE ALSO HAVE COMMANDER JONATHAN WHITE WITH HHS HERE TO

23   PERSONALLY APPEAR AND ADDRESS QUESTIONS, CONCERNS, WHATEVER.

24   I CAN GIVE MORE BACKGROUND AS APPROPRIATE, YOUR HONOR.

25             THE COURT:  THANK YOU, AND GOOD MORNING.  WELCOME.
```

JULY 16, 2018

```
1            LET'S START WITH THE PLAINTIFFS' FILING THIS MORNING
2   SEEKING A TEMPORARY RESTRAINING ORDER ON INDIVIDUALS WHO THE
3   PLAINTIFFS HAVE CONCERNS MAY BE REUNIFIED AND THEN QUICKLY
4   REMOVED.
5            DOES THE GOVERNMENT OPPOSE THAT REQUEST?
6       MR. STEWART:  THE GOVERNMENT DOES OPPOSE THAT
7   REQUEST, YOUR HONOR.
8            THE COURT:  WOULD YOU LIKE TIME TO BRIEF THAT ISSUE?
9       MR. STEWART:  WE WOULD, YOUR HONOR.  WE -- AS YOU
10  KNOW THE BRIEF WAS FILED ONLY RECENTLY AND WE ONLY HEARD ABOUT
11  IT -- THE REQUEST AT ABOUT 9:00 O'CLOCK PACIFIC LAST NIGHT.
12  SO WE WOULD APPRECIATE THAT.
13           THE COURT:  I WOULD BE PREPARED, IN LIGHT OF THE
14  BRIEFING, TO ACCOMMODATE THE GOVERNMENT'S REQUEST TO RESPOND
15  IN WRITING SO THAT THERE IS A FULL RECORD, BUT TO ISSUE A STAY
16  PENDING A DETERMINATION OF THE MOTION.  I THINK THE PLAINTIFFS
17  HAVE CITED ABUNDANT AUTHORITY IN SUPPORT OF THAT PROPOSITION.
18           SO I WOULD BE PREPARED TO ISSUE THAT STAY NOW,
19  PENDING THE BRIEFING AND THE HEARING.
20           WITH RESPECT TO THE BRIEFING, HOW MUCH TIME DOES THE
21  GOVERNMENT REQUEST?
22       MR. STEWART:  IT WOULD BE -- IT WOULD BE OPTIMAL TO
23  HAVE AT LEAST THREE DAYS, YOUR HONOR.
24           THE COURT:  IF THERE IS A STAY IN PLACE THERE
25  WOULDN'T BE ANY OPPOSITION TO THAT, WOULD THERE?
```

                              JULY 16, 2018

```
 1              MR. GELERNT:  NO, YOUR HONOR.

 2              MR. STEWART:  IF THERE IS A STAY, YOUR HONOR, COULD

 3    WE HAVE ANY MORE TIME?  WE ARE TRYING VERY HARD TO

 4    OPERATIONALIZE.

 5              AND ALTHOUGH WE DON'T -- WE DISAGREE WITH THE STAY

 6    BUT IF YOUR HONOR WOULD -- DO OBJECT TO A STAY.  BUT IF YOUR

 7    HONOR PUTS A STAY IN PLACE WE WOULD LOVE A WEEK, IF FEASIBLE,

 8    TO MAKE SURE WE ADDRESS THE -- AND JUST MAKE SURE WE HAVE A

 9    FULL RECORD AND EVERYTHING FOR YOUR HONOR.

10              THE COURT:  THAT WOULD BE FILING BY JULY 23.

11              ANY OBJECTION?

12              MR. GELERNT:  YOUR HONOR, AS LONG AS THE INTERIM

13    STAY IS, I THINK YOU ARE RIGHT, THERE WOULDN'T BE ANY

14    PREJUDICE.  WE WOULD JUST MAKE SURE THAT THE REUNIFICATIONS

15    CONTINUE ON PACE AND THAT THEY NOT BE SLOWED UP IN THIS CASE.

16              THE COURT:  YES.

17              LET'S HAVE THE GOVERNMENT'S FILING BY JULY 23.  WE

18    CAN SET IT AT FILING BY 9:00 A.M., WHICH IS ABOUT THE TIME

19    THAT THE PLAINTIFFS' TRO REQUEST CAME IN.  AND THEN WE CAN

20    ADDRESS THAT TRO REQUEST.

21              I WON'T NEED A REPLY UNLESS REQUESTED.  SO I WOULD

22    LIKE TO READ THE OPPOSITION, AND THEN IF A REPLY IS NECESSARY

23    I WILL INDICATE AS MUCH.  AND WE CAN THEN ADDRESS THAT MATTER.

24              WE HAVE A STATUS CONFERENCE SET LATER THAT WEEK, ON

25    JULY 24 AT 4:00 P.M., SO WE CAN ADDRESS THE MATTER AT THAT
```

JULY 16, 2018

1   TIME AND I CAN ISSUE A RULING.

2          IF THERE IS DISAGREEMENT ABOUT THE COURT HAVING

3   JURISDICTION AT ALL TO EVEN STAY PENDING BRIEFING, I WOULD

4   LIKE THE GOVERNMENT TO MAKE THAT FILING IMMEDIATELY.  BUT THE

5   CASE LAW SEEMS ABUNDANTLY CLEAR THAT THE COURT HAS

6   JURISDICTION TO ISSUE A STAY PENDING A DETERMINATION ON THE

7   ISSUE.

8          **MR. STEWART:**  YOUR HONOR, LET ME CLARIFY.  YOU ARE

9   SAYING IF THE GOVERNMENT HAS AN OBJECTION TO THE INTERIM STAY

10  TO ALLOW BRIEFING.

11         **THE COURT:**  YES.  IF THE ARGUMENT IS THAT THE COURT

12  HAS NO JURISDICTION TO EVEN ENTER AN INTERIM STAY PENDING

13  BRIEFING AND DETERMINATION, I WOULD LIKE TO KNOW THAT NOW.

14         LET'S MOVE TO THE MORE PRESSING ISSUES WITH RESPECT

15  TO REUNIFICATION.  AND I WOULD START BY MAKING SOME GENERAL

16  OBSERVATIONS, AND THEN WE CAN ADDRESS WHERE WE ARE.

17         FIRST, ON THE GOVERNMENT'S FILING SUNDAY, I THINK

18  THAT WENT A LONG WAY TO ADDRESSING THE COURT'S CONCERNS FRIDAY

19  EVENING.  THE DECLARATION FILED BY MR. MEEKINS, AS I STATED ON

20  THE RECORD IN THE TELEPHONIC CONFERENCE, WAS DEEPLY TROUBLING

21  IN MANY RESPECTS.

22         THE FIRST CONCERN IS THAT IT WAS WRITTEN IN A MANNER

23  THAT SEEMED TO BE WHOLLY DIVORCED OF THE CONTEXT OF THIS CASE.

24  SO I AM GOING TO START AGAIN AND REPEAT A CONCEPT THAT HAS

25  BEEN STATED, THIS I THINK WILL BE THE THIRD OR FOURTH TIME.


                        JULY 16, 2018

1   AND WE NOW HAVE A REPRESENTATIVE FROM HHS, WHICH I APPRECIATE.

2          I THINK THE CONTEXT IS CLEAR, THE GOVERNMENT HAS

3   MADE THAT CLEAR IN ITS SUNDAY FILING, BUT I WANT TO REITERATE

4   IT BECAUSE IT IS VITALLY IMPORTANT.

5          THE OBSERVATION THAT THE COURT HAD IN READING

6   MR. MEEKINS' DECLARATION IS THAT THERE IS A FUNDAMENTAL

7   MISAPPREHENSION OF THE CONTEXT OF THIS CASE.

8          THIS CASE IS NOT THE ORDINARY TVPRA CASE.  IT IS NOT

9   THE CASE WHERE TRULY UNACCOMPANIED CHILDREN ARE BEING

10  PRESENTED TO O.R.R., HHS.  O.R.R. THEN HAS THE VERY

11  SIGNIFICANT AND IMPORTANT TASK OF PLACING THOSE CHILDREN WITH

12  A SUITABLE CUSTODIAN OR PARENT OR RELATIVE.  IT IS VERY

13  SIMILAR TO A FOSTER CARE PLACEMENT, A CPS SETTING.  THAT

14  PROCESS TAKES MONTHS, AND IT HAS TO HAVE A CAREFUL VETTING.

15         THAT IS NOT THIS CASE.  THIS CASE IS 180 DEGREES

16  FROM THAT.

17         THE DECLARATION WRITTEN BY MR. MEEKINS IS IN THE

18  BUBBLE OF THE ORDINARY TVPRA CASE, WITH APPEARS TO BE A

19  HYPOTHETICAL CONSTRUCT WITHIN THAT BUBBLE, AND THEN AN

20  EXPRESSION OF RIGHTEOUS INDIGNATION AS TO THE PROCESS THAT IS

21  UNDERWAY.  IT IS COMPLETELY UNHELPFUL, AND DOESN'T GET TO THE

22  ISSUES IN THIS CASE.

23         WHAT WE HAVE HERE IS A SITUATION WHERE THE

24  PLAINTIFFS HAVE PRESENTED A CASE WHERE FAMILIES ARE BEING

25  SEPARATED, AND THE COURT HAS MADE A DETERMINATION OF A


                        JULY 16, 2018

1   LIKELIHOOD OF SUCCESS WHERE FAMILIES ARE BEING SEPARATED

2   WITHOUT ANY FINDING OR DETERMINATION OF PARENTAGE, FITNESS, OR

3   DANGER.

4            AND THAT PARTICULARLY BECAME THE CASE WHEN THE ZERO

5   TOLERANCE POLICY CAME INTO EFFECT.  THERE WAS NO DETERMINATION

6   OF ANY KIND BY ICE OR CBP, FAMILIES WERE JUST BEING SEPARATED.

7   THE CHILDREN WERE THEN BEING PLACED WITH O.R.R. OR HHS.  SO

8   O.R.R. WAS RECEIVING CHILDREN WHERE THERE WAS NO INDICATION

9   THAT THERE WAS A LACK OF PARENTAGE OR DANGER OR FITNESS

10   CONCERNS.  THE TASK HERE IS NOW TO REUNIFY THOSE CHILDREN WITH

11   THEIR PARENTS.

12            THE TVPRA PROCESS THAT MR. MEEKINS SPEAKS TO IS

13   COMPLETELY UNRELATED TO THIS CONTEXT.  HERE, MOST INDIVIDUALS,

14   PARENTS WHO FALL WITHIN THE CLASS, ARE PARENTS WITHOUT

15   CRIMINAL HISTORY, WITHOUT ANY INDICATION OF LACK OF FITNESS OR

16   DANGER.  SO THE PROCESS THAT OUGHT TO BE IN PLACE SHOULD BE

17   ONE REALLY OF DESELECTION.  IT SHOULD BE ASSUMING THAT THE

18   GOVERNMENT HAS IMPROPERLY SEPARATED PARENT AND CHILD.  THERE

19   IS NO INFORMATION OF A LACK OF PARENTAGE OR DANGER OR FITNESS

20   FOR MOST CASES.  THAT LARGE GROUP OF INDIVIDUALS SHOULD BE

21   REUNITED, AND QUICKLY.

22            WHAT HHS NEEDS TO BE LOOKING FOR ARE THE RED FLAGS.

23   SO WHEN A CASE COMES UP AND THERE IS A CONCERN ABOUT PARENTAGE

24   OR FITNESS OR DANGER, THEN THE NEXT STEP COMES INTO PLAY,

25   BECAUSE CHILD WELFARE IS A PARAMOUNT CONSIDERATION.


JULY 16, 2018

1           THIS IS NOT A COOKIE-CUTTER CASE.  IT IS NOT A TVPRA

2    WE RUN UP AND DOWN THE FLAG POLE AND WE TAKE SEVERAL MONTHS.

3    IT IS NOT THE ICE CASE WHERE THEY ARE MAKING DETERMINATIONS AT

4    THE FIELD LEVEL WHEN FAMILIES SHOW UP TOGETHER.  IT IS

5    SOMEWHERE IN BETWEEN, THOUGH IT IS MUCH CLOSER TO THE ICE

6    SITUATION WHERE THEY HAVE STATED, UNDER PENALTY OF PERJURY,

7    THAT THEY HAVE HAD A PRACTICE IN PLACE, APPARENTLY FOR YEARS,

8    WHERE ON THE GROUND THEY MAKE DETERMINATIONS OF PARENTAGE AND

9    DANGER.  AND THEY DO SO QUICKLY.  AND THEY HAVE BEEN GOOD AT

10   IT, SO FAR AS THE COURT KNOWS.

11          AND BASED ON THAT INFORMATION, IF THERE ARE CONCERNS

12   THEY SEPARATE THE FAMILY.  IF THERE ARE NOT CONCERNS THEY

13   DETAIN THEM TOGETHER OR THEY RELEASE THEM TOGETHER IN THE

14   COMMUNITY.

15          IN THIS CASE THE TWO REPRESENTATIVE PLAINTIFFS ARE

16   GOOD STARTING POINTS.

17          MS. C., FOR EXAMPLE, WAS IN CUSTODY, PROPERLY SO,

18   PURSUANT TO GOVERNMENTAL POWERS, A DECISION TO CHARGE HER,

19   PROSECUTE HER, AND PLACE HER IN CUSTODY.  SHE SPENT 25 DAYS IN

20   CUSTODY, AND THEN SHE SERVED HER CRIMINAL SENTENCE AND WAS

21   PLACED BACK IN IMMIGRATION DETENTION.

22          AT THAT POINT THERE IS THE RIGHT OF FAMILY

23   INTEGRITY, AND THE DUE PROCESS CONSIDERATIONS ENTITLE A

24   REUNIFICATION PROCESS.  AND THE REALITY IS, BECAUSE O.R.R. WAS

25   OPERATING UNDER ITS TVPRA PROCEDURES, IT TOOK NEARLY EIGHT


                        JULY 16, 2018

1    MONTHS.

2            THAT WAS AT THE EXPENSE OF THE CHILD AND THE PARENT,

3    AND IT RAISES CONSTITUTIONAL CONCERNS.  THAT PROCESS WILL NOT

4    DO IN THIS KIND OF SETTING.

5            MS. L. ARRIVED AT THE PORT OF ENTRY LAWFULLY SEEKING

6    ASYLUM.  SHE DID NOTHING WRONG.  SHE WAS PURSUING ASYLUM

7    PURSUANT TO THE LAWS OF THIS COUNTRY, AND SHE WAS SEPARATED

8    FROM HER CHILD WITHOUT AN ADEQUATE DETERMINATION OF PARENTAGE.

9            I UNDERSTAND AND I ACCEPT ICE'S REPRESENTATION THAT

10   THEY HAD A CONCERN REGARDING PARENTAGE, AND THAT'S WHY THEY

11   SPLIT THE FAMILY.

12           ICE ALSO DOES NOT HAVE THE ABILITY TO DO DNA

13   TESTING.  IT SHOULD, BECAUSE THERE IS A FUNDAMENTAL RIGHT OF

14   PARENTS, IN THIS CONTEXT.  AND SO BEFORE ICE CAN SEPARATE

15   FAMILIES IT SHOULD TAKE THAT EXTRA STEP, IF THERE IS A CONCERN

16   ABOUT PARENTAGE, AND DO A DNA TEST.

17           MR. GELERNT, FROM DAY ONE, SAID THERE IS NO QUESTION

18   THAT MS. L. IS THE MOTHER.  IF THE GOVERNMENT WOULD JUST DO

19   THE DNA TEST THEY WILL HAVE A CONFIRMATION IMMEDIATELY.

20           THAT WAS EXACTLY RIGHT.

21           THAT TOOK FIVE MONTHS, AND IT TOOK A COURT ORDER TO

22   DO IT.  THAT IS UNACCEPTABLE.

23           SO WE ARE IN AN AREA WHERE HHS HAS TO REDIRECT.  IT

24   HAS TO VIEW THIS CASE IN THE REAL CIRCUMSTANCES OF THE CASE,

25   NOT IN THE TVPRA BUBBLE WHERE IT IS DEALING WITH

JULY 16, 2018

1    UNACCOMPANIED, TRULY UNACCOMPANIED CHILDREN AND DOING A FOSTER

2    CARE TYPE PLACEMENT.

3             I DON'T KNOW HOW MANY TIMES I HAVE SAID THAT, BUT

4    THAT IS NOT THIS CASE.  AND MR. MEEKINS' DECLARATION STARTS

5    AND ENDS WITH THAT FUNDAMENTAL MISUNDERSTANDING.

6             THIS CASE REQUIRES THE GOVERNMENT, AND HHS IN

7    PARTICULAR, TO HAVE AN OPEN MIND, TO USE COMMON SENSE.  THIS

8    IS NOT HARD STUFF; IT IS LABORIOUS BUT IT IS NOT DIFFICULT TO

9    DO.

10            MOST OF THESE PARENTS AND CHILDREN, AS I STATED,

11   THERE IS NOT GOING TO BE ANY ISSUE OR ANY CONCERN ABOUT

12   PARENTAGE, FITNESS, OR DANGER, AND REUNIFICATION CAN OCCUR

13   QUICKLY.

14            SO WHERE WE ARE, AND WHERE THE TENSION WAS, I THINK,

15   ON FRIDAY EVENING, WAS IN THIS AREA OF IF THERE IS A RED FLAG.

16   AND THE COURT HAD MADE IT CLEAR THAT IF THERE IS A RED FLAG,

17   THEN O.R.R. CAN DO A DNA TESTING, AND CAN QUICKLY VERIFY

18   WHETHER THERE IS A CONTINUED CONCERN OF PARENTAGE OR NOT, OR

19   IT CAN COMPLETELY RULE IT OUT.  DNA, AS EVERYONE AGREES, IS

20   THE MOST POWERFUL TOOL FOR AT LEAST MAKING A BIOLOGICAL

21   DETERMINATION.

22            IT WAS CLEAR THAT IF THERE WERE RED FLAGS THAT

23   WAS THE PROCESS BY WHICH O.R.R. WOULD OPERATE BEFORE

24   REUNIFYING.

25            WHAT I GOT FROM MR. MEEKINS WAS SIMPLY A DECLARATION


                          JULY 16, 2018

```
1    THAT THEY ARE NOT DOING THAT.  THEY ARE NOT GOING TO DO DNA
2    TESTING.  AND THAT WITH THE GROUP OF PARENTS WITH THE
3    UNDER-FIVE CHILDREN, EIGHT OF THEM -- OR SEVEN OF THEM WHO THE
4    PARENTS HAD BEEN PAROLED OUT, AND I THINK 13 OTHERS WHO WERE
5    IN ICE DETENTION, THEY JUST SIMPLY REUNIFIED THEM WITHOUT
6    FINISHING THE PROCESS.  THAT IS DEEPLY TROUBLING.
7            I THINK THE ORDERS HAVE BEEN CLEAR.  I DON'T HAVE
8    ANY DOUBT THAT GOVERNMENT COUNSEL UNDERSTOOD THE FRAMEWORK.
9    PLAINTIFFS CERTAINLY UNDERSTOOD THE FRAMEWORK.  THE COURT MADE
10   IT AS CLEAR AS IT COULD.  AND YET ON FRIDAY AFTERNOON I
11   RECEIVED A DECLARATION FROM MR. MEEKINS WHICH WAS
12   EXASPERATING, TO PUT IT PLAINLY.
13           THE FINAL POINT I WOULD MAKE IS HHS IS A DEFENDANT
14   IN THIS CASE.  HHS'S MISSION IS THE INTEREST OF THE CHILD, AND
15   IT DOES IT WELL IN THE CONTEXT OF THE ORDINARY TVPRA CASE WHEN
16   IT IS PLACING MINORS WITH AN UNKNOWN PERSON OR RELATIVE,
17   SOMETHING LIKE THAT.
18           IT IS FAILING IN THIS CONTEXT IN THIS CASE BECAUSE
19   IT IS SO WED TO THE TVPRA PROCESS AND SO UNWILLING TO LET GO
20   OF IT -- AS I READ MR. MEEKINS'S DECLARATION -- THAT THE
21   BOTTOM LINE IS THEY -- MR. MEEKINS, APPARENTLY, WANTS TO HOLD
22   CHILDREN FOR MONTHS WHILE THE ORDINARY TVPRA PROCESS IS
23   COMPLETED.
24           THE PROBLEM WITH THAT IS THAT IT DOESN'T COMPORT
25   WITH THESE FUNDAMENTAL DUE PROCESS RIGHTS IN A CONTEXT WHERE
```

JULY 16, 2018

1   THE VAST MAJORITY OF THESE INDIVIDUALS WHO ARE CLASS MEMBERS,

2   THERE IS NO INDICATION, NO CONCERN OF PARENTAGE, FITNESS, OR

3   DANGER.

4          AND SO BY HHS BEING WED TO A SYSTEM THAT IS NOT

5   MEANT FOR THIS KIND OF CASE, THIS CONTEXT, IT IS INVITING A

6   PROCESS OF DELAY AT THE EXPENSE OF CHILDREN AND PARENTS, WHICH

7   IS NOT IN THE BEST INTEREST OF CHILDREN.  THAT'S THE PLAIN

8   REALITY.

9          AND I GO BACK TO MS. C.  SHE SHOULD HAVE BEEN

10  REUNITED MONTHS EARLIER.  SHE WAS REUNITED WITH HER CHILD AT

11  THE EIGHT-MONTH MARK BECAUSE THE OLD TRADITIONAL TVPRA PROCESS

12  WAS BEING USED, WHEN THE EVIDENCE SHOWED THERE WAS NO

13  INDICATION OF A LACK OF PARENTAGE OR FITNESS OR DANGER; BUT

14  YET THE PROCESS TOOK MONTHS.  THAT WON'T DO IN THIS SETTING.

15         WHAT THE GOVERNMENT HAS PROPOSED ON SUNDAY, I WOULD

16  LIKE TO HEAR FROM MR. GELERNT, BUT IT SEEMED TO ME, IN MY

17  READING OF IT, WAS A GOOD PLAN.  IT IS A REALLY GOOD STEP.  IT

18  DOES ALL OF THE THINGS THAT I THOUGHT THE COURT HAD MADE CLEAR

19  FROM DAY ONE, WHERE THERE IS A STREAMLINED PROCESS, WHERE

20  REUNIFICATION CAN HAPPEN QUICKLY, AND SAFELY.  THE TWO ARE NOT

21  DIVORCED FROM ONE ANOTHER.

22         HHS CAN DO IT.  IT IS THE AGENCY RESPONSIBLE FOR

23  THIS, AND IT CAN DO IT WELL, BUT IT HAS TO CHANGE ITS LENS.

24  AND I THINK WE ARE HERE NOW.

25         AND I WANTED TO TAKE TIME TO GO THROUGH THAT BECAUSE

JULY 16, 2018

14

1   I APPRECIATE YOUR BEING HERE, SO THAT YOU HEAR IT DIRECTLY.

2              AND I APPRECIATE THE GOVERNMENT'S SUBMISSION ON

3   SUNDAY WHICH TO ME INDICATED A CLEAR UNDERSTANDING OF HOW WE

4   ARE PROCEEDING.  IT IS NOT THE ORDINARY TVPRA STEP.  IT IS NOT

5   THE BARE-BONES ICE STEP, BUT IT IS MUCH CLOSER TO THAT KIND OF

6   STREAMLINED PROCEDURE THAT ICE USED.

7              WE HAVE NEVER BEEN IN THIS CONTEXT BEFORE, SO FAR AS

8   I AM AWARE.  THAT DOESN'T MEAN THAT WE RESORT TO A DEFAULT

9   POSITION OF TAKING MONTHS UNDER THE ORDINARY TVPRA PROCESS.

10  IT JUST CAN'T BE.  SO I THINK WHAT IS NOW IN PLACE, IT IS THE

11  RIGHT STEP.

12             IN THAT REGARD, PERHAPS I CAN HEAR FROM THE WITNESS.

13  I WANT TO MAKE SURE THAT I HAVE HHS'S POSITION.

14             AND, SIR, YOU ARE WELCOME TO COME TO THE PODIUM AND

15  STATE YOUR POSITION, OR WE CAN DO THAT THROUGH COUNSEL.

16             **MR. STEWART:**  MAY I?

17             YOUR HONOR, MAY I JUST QUICKLY GIVE YOU A LITTLE

18  BACKGROUND ON THE WITNESS, AND ALSO INTRODUCE MY COLLEAGUE

19  ALSO FROM HHS FROM THE GENERAL COUNSEL'S OFFICE, BRIAN

20  STIMSON, WHO MAY HELP A LITTLE WITH THE WITNESS HERE.

21             **THE COURT:**  YES.

22             **MR. STEWART:**  THANK YOU, YOUR HONOR.  THANK YOU

23  FOR -- I AM GLAD THAT SUNDAY'S -- YESTERDAY'S FILING WAS

24  HELPFUL AND ADDED SOME CLARITY.

25             I AM VERY HAPPY TO HAVE HERE TODAY WITH US, YOUR

JULY 16, 2018

1  HONOR, COMMANDER JONATHAN WHITE.  HE IS A COMMANDER WITH THE

2  U.S. PUBLIC HEALTH SYSTEM COMMISSION CORPS.  HE IS A CAREER

3  OFFICER IN THE CORPS, A LICENSED CLINICAL SOCIAL WORKER, AN

4  EMERGENCY MANAGER.  HE IS AN EXPERT IN CRISIS MANAGEMENT

5  FOCUSED ON VULNERABLE CHILDREN.  THE FORMER DEPUTY DIRECTOR OF

6  O.R.R. WHO WAS RESPONSIBLE FOR THE UNACCOMPANIED ALIEN CHILD

7  PROGRAM.

8          AND FINALLY I WILL JUST NOTE THAT HE HAS HAD AN HHS

9  LEADERSHIP ROLE THE UNACCOMPANIED MINOR RESPONSES TO

10 IMMIGRATION INFLUXES IN 2012, 2014, 2016, 2017.  AND HE IS THE

11 ARCHITECT OF THE REUNIFICATION PLAN, SO HE IS VERY WELL

12 POSITIONED TO HELP ADDRESS QUESTIONS THAT YOUR HONOR MAY HAVE.

13 WE ARE HAPPY TO HAVE COMMANDER WHITE AND MR. STIMSON HERE, AS

14 WELL, TODAY.

15          THANK YOU, YOUR HONOR.

16          **THE COURT:**  I AM HAPPY TO HEAR FROM EITHER OR BOTH

17 OF THE GENTLEMEN.

18          **MR. STIMSON:**  YOUR HONOR, WE THOUGHT IT MIGHT BE

19 HELPFUL JUST TO DO A LITTLE QUESTION-AND-ANSWER WITH COMMANDER

20 WHITE ON SOME OF THE DETAILS OF THE PLAN THAT MIGHT SHOW YOU

21 HOW WE THINK IT FULFILLS YOUR VISION FOR AN EXPEDITED BUT SAFE

22 PROCESS.  IF THAT WOULD BE ACCEPTABLE TO YOU.

23          **THE COURT:**  YES, THAT WOULD BE FINE.

24          **MR. STIMSON:**  SO COMMANDER WHITE, WOULD YOU LIKE TO

25 --


                    JULY 16, 2018

```
 1              WOULD IT BE PERMISSIBLE, YOUR HONOR, IF HE SAT IN
 2    THE WITNESS CHAIR?
 3              THE COURT:  THAT WOULD BE FINE.  IF WE DO THAT, I
 4    WOULD BE PREPARED TO HAVE COMMANDER WHITE SWORN, AND YOU CAN
 5    ASK HIM QUESTIONS.
 6              MR. STEWART:  I THINK THAT WOULD BE HELPFUL.
 7              THE COURT:  IF YOU WOULD PLEASE STEP FORWARD, WE
 8    WILL HAVE YOU SWORN AT THIS TIME.
 9              THE WITNESS:  OF COURSE, YOUR HONOR.
10              THE CLERK:  SIR, PLEASE RAISE YOUR RIGHT HAND.
11              DO YOU SOLEMNLY SWEAR OR AFFIRM THAT THE EVIDENCE
12    YOU SHALL GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE
13    TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?
14              THE WITNESS:  YES, I DO.
15              THE CLERK:  PLEASE TAKE THE STAND.
16              MR. STIMSON:  SIR, WOULD YOU PLEASE STATE YOUR FULL
17    NAME FOR THE COURT.
18              THE WITNESS:  I'M COMMANDER JONATHAN WHITE.
19              THE COURT:  THANK YOU.
20              COUNSEL.
21                        DIRECT EXAMINATION
22    Q.    (MR. STIMSON) :  YOU ARE A COMMANDER IN THE PUBLIC
23    HEALTH SERVICE?
24    A.    YES.  I AM A CAREER OFFICER IN THE U.S. PUBLIC HEALTH
25    SERVICE COMMISSION CORPS.
```

JULY 16, 2018

1 **Q.**    WHEN DID YOU BEGIN WORKING ON UAC ISSUES?

2 **A.**    I FIRST BECAME INVOLVED IN UAC ISSUES IN THE FIRST

3 OF THE INFLUX CRISIS EVENTS.  THAT WAS IN THE SUMMER OF 2012.

4 **Q.**    WHAT HAVE YOU DONE WITH THE UAC PROGRAM SINCE THEN?

5 **A.**    IN EACH OF THE SUBSEQUENT INFLUX EVENTS, I WAS IN A

6 POSITION OF EITHER ADVISING HHS SENIOR LEADERSHIP OR IN

7 CHARGE OF OPERATIONS, EMERGENCY OPERATIONS FOR THAT INFLUX

8 EVENT.

9       THEN FROM THE 6TH OF JANUARY 2017 TO THE 19TH OF MARCH

10 2018, I WAS DEPUTY DIRECTER OF O.R.R.  I WAS THE SENIOR CAREER

11 OFFICIAL OVER THE UAC PROGRAM.  I AM CURRENTLY THE FEDERAL

12 HEALTH COORDINATING OFFICIAL AND INCIDENT MANAGER, MEANING I

13 AM IN CHARGE OF THE OPERATION FOR UAC REUNIFICATION CURRENTLY

14 FOR HHS.

15 **Q.**    MR. STEWART INDICATED EARLIER THAT THE HHS, DHS

16 UNIFIED PLAN OF OPERATIONS, WHICH WAS THE ATTACHMENT TO OUR

17 SUNDAY FILING, IS SOMETHING THAT YOU WORKED ON; IS THAT

18 CORRECT?

19 **A.**    IT WAS A TEAM EFFORT.  THE ORIGINAL -- I DEVELOPED THE

20 STRATEGY OF THE PLAN.  IT WAS BASED, IN FACT, ON UNDERSTANDING

21 THE PROGRAM AND ALSO THE COURT'S DIRECTION FROM THE BEGINNING

22 OF THE WEEK.  I DEVELOPED A STRATEGY THAT I BELIEVED WOULD

23 EXPEDITE THE SAFE REUNIFICATION OF MINORS.

24       AFTER I LAID OUT THE STRATEGY A TEAM OF OPERATIONAL

25 PLANNERS BUILT OUT THE DETAILS OF THE OPERATIONAL PLAN, AND IT

JULY 16, 2018

1    WAS SOCIALIZED ALSO WITH ICE WHO ADDED THEIR PIECES TO IT TO

2    FORM THE UNIFIED PLAN THAT YOU SEE TODAY.

3    **Q.**    GREAT.

4         **MR. STIMSON:**  SO TO CUT TO THE CHASE, I WANT TO

5    TALK, IF YOUR HONOR IS OKAY WITH IT, ABOUT THE RED FLAG

6    COMPONENT OF THAT PROCESS AND DRILL DOWN ON THE SPECIFIC

7    RECORDS THAT ARE CONSIDERED AND HOW THEY ARE CONSIDERED, IF

8    THAT WOULD BE HELPFUL TO YOU.

9         **THE COURT:**  YES.  THANK YOU.

10   **Q.**   **(MR. STIMSON)** :  SO, COMMANDER WHITE, ON PAGE 2 OF THE

11   PLAN, UNDER OPERATIONAL REQUIREMENTS AND PLANNING EFFORTS,

12   THERE IS A PARAGRAPH B THAT SAYS:  O.R.R. TO REVIEW CASE FILE

13   TO IDENTIFY ANY PERTINENT RED FLAGS.

14         ARE YOU WITH ME?

15   **A.**   YES, SIR.

16   **Q.**   CAN YOU DESCRIBE THE CASE FILES THAT O.R.R. WOULD REVIEW

17   DURING THAT PHASE OF THE PROCESS.

18   **A.**   SURE.  SO, EVERY CHILD IN THE CUSTODY OF O.R.R. AND

19   O.R.R. CARE HAS A COMPREHENSIVE RECORD IN AN ELECTRONIC SYSTEM

20   CALLED THE UAC PORTAL.  THESE HAVE BEEN -- IN THE CASE OF THE

21   MINORS INVOLVED HERE, THE SEPARATED MINORS, THESE -- WE HAVE

22   GONE BACK AND REVIEWED THESE MANUALLY.

23         WHAT WE ARE LOOKING FOR IS ANY INDICATION, BASED ON THE

24   INTERACTIONS THAT WE HAVE HAD WITH THE CHILD WHILE THE CHILD

25   HAS BEEN IN O.R.R. CARE, OF EITHER ANY REASON TO DOUBT


JULY 16, 2018

1   PARENTAGE, AS HAS BEEN SORT OF PUTATIVELY ESTABLISHED, OR ANY

2   REASON TO THINK THAT THE REUNIFICATION WOULD POSE A SAFETY

3   RISK TO THE CHILD.

4        AND IF IT IS USEFUL, I CAN TALK ABOUT SPECIFICALLY WHERE

5   WE LOOK AND HOW WE LOOK, WHAT WE ARE LOOKING FOR.  BUT WHAT WE

6   ARE DOING IS A MANUAL REVIEW OF WHAT IS ACTUALLY A VERY

7   COMPREHENSIVE RECORD FOR EVERY MOMENT THAT THE CHILD HAS BEEN

8   IN THE CARE OF O.R.R.

9   **Q.**   MY UNDERSTANDING IS THAT RECORD CAPTURES INFORMATION

10  COLLECTED PRIMARILY AT TWO POINTS DURING THE CARE OF THE

11  MINOR.  THE FIRST WOULD BE THE INTAKE PROCESS, AND THEN THE

12  SECOND WOULD BE ANY SERIOUS INCIDENT REPORTS.  IS THAT

13  CORRECT?

14  **A.**   THAT'S CORRECT.  SO WHEN ANY MINOR ENTERS THE CARE OF

15  O.R.R. WITHIN 24 HOURS THERE IS A COMPREHENSIVE ASSESSMENT

16  DONE.  THIS ASSESSMENT SERVES A NUMBER OF PURPOSES, BUT ONE IS

17  TO IDENTIFY ANY TRAFFICKING ISSUES OR OTHER ISSUES RELATED TO

18  THE SAFETY OF THE CHILD.

19       DURING THE ASSESSMENT PROCESS, AMONG THE INFORMATION IN

20  ANY CHILD'S, IF YOU WILL -- WE DON'T CALL IT INTAKE PROCESS

21  BUT IT IS IN THEIR FIRST 24 HOURS IN O.R.R. CARE, WOULD

22  INCLUDE QUESTIONS SUCH AS:  DESCRIBE WHY YOU CAME TO THE

23  UNITED STATES.  DESCRIBE WHO SENT YOU.  WITH WHOM DID YOU

24  TRAVEL.  WHERE DID YOU TRAVEL.  DESCRIBE THE CIRCUMSTANCES OF

25  YOUR APPREHENSION.  WHO PAID FOR YOU TO COME.  WHO WERE YOU


JULY 16, 2018

1    COMING TO BE WITH.

2         THESE ARE AMONG THE THINGS.  IF YOU PRINTED IT OUT IT

3    WOULD BE TEN PAGES LONG, THE QUESTIONS.  THERE IS A GREAT DEAL

4    OF INFORMATION ABOUT THE CHILD, THE CHILD'S FAMILY.  THE

5    CHILD'S FAMILY SYSTEM IN THE HOME COUNTRY, AS WELL AS ANY

6    FAMILY THEY HAVE HERE IN THE U.S., AND ABOUT THE CHILD'S

7    JOURNEY.

8         SO IT IS AT THAT POINT THAT ISSUES INCLUDING, FOR

9    EXAMPLE, IF THE CHILD HAS EVER BEEN HARMED.  AMONG THE

10   QUESTIONS THAT WE ASK IS TO IDENTIFY IF ANYONE -- THE CHILD

11   HAS ANY EXPERIENCE OF VIOLENCE, EITHER FROM A FAMILY MEMBER OR

12   ANOTHER INDIVIDUAL IN THE HOME COUNTRY, OR SMUGGLERS OR

13   TRAFFICKERS OR OTHERS EN ROUTE.

14        NOW, THAT ASSESSMENT, THAT CERTAINLY IS SOMETHING THAT

15   WE ARE LOOKING AT, BUT THAT DOESN'T EXHAUST EVERYTHING WE ARE

16   LOOKING AT.  AND THIS IS ALSO REALLY IMPORTANT TO UNDERSTAND

17   IN THE CONTEXT OF JUST THE PROCESS OF WHAT HAPPENS FOR KIDS IN

18   O.R.R. CARE.

19        BECAUSE THERE ARE CHILDREN WHO DO NOT SAY AT THAT

20   INITIAL ASSESSMENT EVERYTHING THAT THEY WILL SAY LATER.  THEY

21   MAY -- AS THEY DEVELOP A THERAPEUTIC ALLIANCE WITH THE SOCIAL

22   WORK PROFESSIONAL OR PARAPROFESSIONALS THEY ARE WORKING

23   WITH -- BECAUSE EVERY CHILD HAS A CASE MANAGER AND EVERY CHILD

24   HAS A CLINICIAN.

25        SUBSEQUENTLY IF THE CHILD MAKES ANY OTHER STATEMENTS


                              JULY 16, 2018

1    RELATED TO -- THAT WOULD LEAD TO SORT OF DOUBTS ABOUT

2    PARENTAGE, INDICATIONS THAT THE CHILD HAD BEEN TRAFFICKED.

3    INDICATION THAT THE CHILD HAD BEEN ABUSED, PHYSICALLY OR

4    SEXUALLY OR OTHERWISE, BY AN INDIVIDUAL, OR EXPLOITED BY ANY

5    INDIVIDUAL IN THE HOME COUNTRY AND EN ROUTE, LATER ON WHILE

6    THE CHILD IS IN O.R.R. CARE, IF THEY MAKE THAT STATEMENT TO

7    ANYONE IT TRIGGERS -- IT IS ONE OF THE THINGS THAT CAN

8    TRIGGER WHAT IS CALLED AN S.I.R., A SIGNIFICANT INCIDENT

9    REPORT.

10        UNDER O.R.R. POLICY THOSE MUST BE ENTERED INTO THE

11   SYSTEM BY THE PERSON WHO HEARD THE CHILD MAKE THAT STATEMENT

12   OR WHO OBSERVED ANY OTHER EVIDENCE OR INDICATION THAT THE

13   CHILD HAD HAD THOSE KINDS OF HISTORIES.  AND IT MUST BE

14   ENTERED WITHIN FOUR HOURS.

15        FOR THOSE WHO HAVE WORKED IN THAT PROGRAM, THIS IS ONE

16   OF THE MAJOR SORT OF FOCUSES OF MONITORING THE PROGRAMS TO

17   ENFORCE THAT STANDARD.

18        SO AMONG THE PLACES IN THE CHILD'S RECORD WHERE WE HAVE

19   LOOKED FOR THESE CHILDREN AS PART OF SEARCHING FOR THESE RED

20   FLAGS ARE THOSE INITIAL ASSESSMENTS, ALL SUBSEQUENT

21   SIGNIFICANT INCIDENT REPORTS, ANYTHING ELSE THAT MIGHT BE IN

22   THE MEDICAL OR CLINICAL HISTORY.

23        AND, ADDITIONALLY, ANY INFORMATION THAT WE RECEIVE FROM

24   THE FAMILY ABOUT THE SPONSOR, EVEN IF IT WAS AT ONE POINT A

25   POTENTIAL SPONSOR OTHER THAN THE DETAINED PARENT.


                    JULY 16, 2018

1      SO YOU WILL FORGIVE ME, IT MAY BE HELPFUL IF I GIVE A

2  FOR INSTANCE.

3      IF, FOR EXAMPLE, AN AUNT IN THE U.S. HAD INITIALLY BEEN

4  IDENTIFIED AS A POTENTIAL SPONSOR FOR THE CHILD, PRIOR TO THIS

5  CASE, FOR EXAMPLE, SOMETIME IN THE PAST, ANY INFORMATION WE

6  LEARN FROM THE AUNT THROUGH INTERVIEWS OR THROUGH DOCUMENTS,

7  ANYTHING ABOUT THE FAMILY SYSTEM, THOSE THINGS TOO WERE LOOKED

8  AT IN THIS REVIEW.

9      SO WHEN WE SAY WE ARE LOOKING FOR RED FLAGS IN THE

10  CHILD'S RECORD WE ARE LOOKING FOR ANYTHING ALREADY CAPTURED IN

11  THE COURSE OF THE CARE AND SERVICES PROVIDED TO THE CHILD BY

12  THEIR CASE MANAGER OR THEIR CLINICIAN THAT WOULD INDICATE TO

13  US THAT WE HAVE ANY REASON TO DOUBT PARENTAGE OR ANY REASON TO

14  THINK THAT EVEN IF THIS IS A PARENT THERE IS A REAL CHILD

15  SAFETY RISK HERE.

16      SO THOSE ARE WHAT WE MEAN WHEN WE TALK ABOUT RED FLAGS

17  ON THE CHILD'S RECORD.

18  **Q.**    COMMANDER WHITE, IF I MAY.  WHAT KINDS OF SPECIFIC FACTS

19  WOULD O.R.R. CONSIDER TO BE A RED FLAG ON PARENTAGE WHEN

20  GOING THROUGH THAT TYPE OF CASE REVIEW DURING ITS CURRENT

21  PROCESS?

22  **A.**    INCONSISTENT STATEMENTS ABOUT FAMILY RELATIONSHIP,

23  INCLUDING CONTRADICTORY STATEMENTS ABOUT THE NAMES OF PARENTS,

24  CONTRADICTORY INFORMATION ABOUT OTHER KINDS OF FAMILY

25  RELATIONSHIPS.  STATEMENTS BY THE CHILD ABOUT WHO THEY

JULY 16, 2018

1  TRAVELED WITH THAT ARE INCONSISTENT.  OTHER THINGS.

2       SO ESSENTIALLY WHAT WE ARE LOOKING FOR IS EITHER A

3  STATEMENT BY THE CHILD THAT IS -- I MEAN, THE EASIEST ONE

4  WOULD BE THE CHILD WOULD SAY, WELL, THAT IS NOT REALLY MY MOM.

5       BUT BEYOND THAT THERE IS ALSO SIMPLE, YOU KNOW, EVIDENCE

6  OF INCONSISTENCY.

7       AND AGAIN, JUST TO DEAL IN A FOR INSTANCE, IF THE CHILD

8  SAYS -- OR IF PREVIOUSLY INTERVIEWING WITH A KNOWN AUNT OR

9  SOMETHING LIKE THAT THEY SAY THE MOM'S NAME IS MARIA SOLEDAD,

10  AND THE DETAINED PUTATIVE MOM HAS A DIFFERENT NAME, THAT IS AN

11  EXAMPLE OF A RED FLAG.

12       THESE ARE BASED ON THE INFORMATION THAT IS THERE IN THE

13  CHILD'S CASE RECORD, WHICH IS A PRETTY ROBUST BODY OF

14  INFORMATION.

15  **Q.**   IF O.R.R. SPOTS ONE OF THOSE RED FLAGS FOR A PARTICULAR

16  CHILD, IT MOVES THE CHILD INTO THE NEXT STEP IN THE

17  OPERATIONAL REQUIREMENTS WHICH IS FURTHER REVIEW, RIGHT?

18  **A.**   CORRECT.

19  **Q.**   AND WHAT MIGHT FURTHER INVOLVE FOR A CHILD WHO HAS A RED

20  FLAG FOR PARENTAGE UNDER THE 50 STANDARD THAT YOU HAVE JUST

21  DESCRIBED.

22  **A.**   SO UNDER PARENTAGE, THE NEXT STEP WOULD BE EITHER --

23  DEPENDING ON THE CIRCUMSTANCES, EITHER THE USE OF A DNA TEST

24  TO DETERMINE BIOLOGICAL PATERNITY OR MATERNITY AND/OR THE USE

25  OF CONSULATE VERIFIED BIRTH CERTIFICATES OR OTHER LEGAL

JULY 16, 2018

1   DOCUMENTS FROM THE HOME COUNTRY.

2        AND IF YOU INDULGE ME.

3        THE STANDARD -- THE SORT OF GOLD STANDARD IN ORDINARY

4   COURSE IN THE PROGRAM IS CONSULATE VERIFIED BIRTH

5   CERTIFICATES.  IN THE ORDINARY WORLD WE ONLY USE DNA REALLY

6   WHEN THOSE AREN'T AVAILABLE.

7        I ACTUALLY BELIEVE THAT THE CONSULATE VERIFIED BIRTH

8   CERTIFICATES ARE STRONGER PROOF THAN DNA; HOWEVER, IT IS ALSO

9   SLOWER PROOF.

10        SO WHERE WE HAVE AN ACTUAL INDICATION THAT WOULD LEAD TO

11   DOUBT, WHICH IS A CHANGE FROM THE PROGRAM'S USUAL STANDARD,

12   WHICH IS CONFIRMED VERIFICATION OF PARENTAL RELATIONSHIPS.  SO

13   BASED ON WHAT WE UNDERSTAND TO BE THE COURT'S DIRECTION TO US,

14   OUR STANDARDS WHERE THERE IS SOMETHING IN THE RECORD THAT

15   GIVES US OBJECTIVE CAUSE FOR DOUBT, WE WILL VERIFY.  WHERE

16   POSSIBLE BY DNA BECAUSE IT IS FASTEST.

17        IN SOME CASES DNA ALONE WILL NOT BE SUFFICIENT, AND WE

18   WILL NEED TO CONTINUE WITH CONSULAR VERIFICATION OF BIRTH

19   CERTIFICATES.

20   **Q.**   WHAT ARE THE SPECIFIC CRITERIA THAT THE O.R.R. CASE

21   MANAGERS USE WHEN MOVING A CHILD WHO HAS BEEN FLAGGED FOR

22   PARENTAGE TO A DNA TEST AS OPPOSED TO A CONSULAR DOCUMENT

23   REVIEW?

24   **A.**   SO, AMONG OTHER THINGS IT WOULD BE, FOR EXAMPLE, IF THE

25   PUTATIVE PARENTAGE IS NONBIOLOGICAL, THIS IS MY ADOPTED CHILD

JULY 16, 2018

25

```
 1  OR I AM THE LEGAL GUARDIAN BUT NOT THE BIOLOGICAL PARENT, DNA
 2  HAS NO VALUE FOR US THEN.
 3        BUT I WILL SAY, IN SOME CIRCUMSTANCES, EVEN WHERE THE
 4  DNA RESULT WOULD SAY THAT PATERNITY, IN PARTICULAR, IS
 5  EXCLUDED, THAT DOES NOT CONCLUSIVELY PROVE THAT IS NOT A
 6  PARENT.  SO THERE ARE PEOPLE IN EVERY COUNTRY WHOSE BIOLOGICAL
 7  FATHER IS NOT DAD, IS NOT THE MAN WHO WAS THERE WHEN THE
 8  CHILD WAS BORN AND HAS RAISED THE CHILD AS HIS SON OR
 9  DAUGHTER.
10        SO IN THE CASE OF A PERSON EXCLUDED BY DNA FOR
11  PATERNITY, WE WOULD THEN WANT TO DO ADDITIONAL, YOU KNOW,
12  THERE WOULD BE ADDITIONAL WORK WE WOULD PROBABLY WANT TO DO IN
13  THAT CASE.
14        BUT DNA IS THE BEST MECHANISM FOR A SUBSET OF THE TOTAL
15  POPULATION, BECAUSE LOGISTICALLY THERE IS A WORLD OF
16  DIFFERENCE BETWEEN DOING IT FOR KIDS WHERE THERE IS AN
17  INDICATION AND DOING IT FOR ALL KIDS IN TERMS OF THIS
18  COMPRESSED TIME FRAME.
19  Q.  WHO ARE THE SPECIFIC CASE MANAGERS WHO DO THOSE REVIEWS
20  FOR PURPOSES OF DETERMINING WHETHER TO PROCEED TO DNA TESTING?
21  A.  SO, THAT IS BEING DONE BOTH BY THE ACTUAL CASE MANAGER,
22  WHO IS THE PERSON WORKING WITH THE CHILD IN THE SHELTER
23  PROGRAM.  THE CASE REVIEW WE ARE TALKING ABOUT IS PRIMARILY
24  BEING DONE BY O.R.R. PERSONNEL, FEDERAL PERSONNEL.
25        ONE OF THE SORT OF -- I THINK BROADLY ONE OF THE
```

JULY 16, 2018

1    HALLMARKS OF THE PLAN IS THAT FOR KIDS WHO BECOME -- FROM ANY

2    RED FLAGS, EITHER ON SAFETY OR ON PARENTAGE, WE MOVE THEIR

3    CASE TO A HIGHER LEVEL OF SORT OF PROFESSIONAL EXPERTISE,

4    USING PEOPLE WHO WORK IN AND REALLY KNOW THE O.R.R. PROGRAM.

5         THE KIDS WHO ARE ON THE SORT OF GREEN LINE, IF YOU WILL,

6    THOSE WHO ARE FAST TRACKED, THOSE WHO HAVE -- WHERE WE HAVE NO

7    INDICATIONS OF CONCERN FOR PARENTAGE OR SAFETY, THOSE WE --

8    WITH OUR EXPEDITED PROCESS, THOSE DON'T REQUIRE THE SAME LEVEL

9    OF ENGAGEMENT BY SEASONED PROFESSIONALS.  WE ARE DOING THAT

10   USING AN EXPEDITED AND ENLARGED WORK FORCE COORDINATED BY THE

11   INCIDENT MANAGEMENT TEAM.

12   **Q.**   HOW LONG CAN THE DNA TESTING TAKE ONCE YOU DECIDED TO

13   PROCEED DOWN THAT TRACK, AND WHY DOES IT TAKE THAT LONG?

14   **A.**   SO, THE TEST ITSELF IS THE SMALLEST PART OF THE PROCESS.

15   THIS IS AN -- EXCUSE ME.  THE CORRECT TERM OF ART IS I THINK

16   -- I THINK IT IS EXPEDITED.  BUT IT IS A -- THE DNA ANALYSIS

17   ITSELF IS ACCOMPLISHED IN UNDER 24 HOURS.  THE LOGISTICAL TAIL

18   IN TERMS OF TIME IS THE STEPS BEFORE THAT IN ORDER TO, NUMBER

19   ONE, ENSURE THAT THE REQUIRED KIT IS BOTH WITH THE CHILD WHERE

20   THE CHILD IS AND WITH THE PARENT WHERE THE PARENT IS.

21        SECOND, THAT THE SWAB IS COLLECTED.  AND THEN IT IS

22   TRANSMITTED BY FEDERAL EXPRESS BACK TO THE LAB.

23        SO THE ACTUAL ANALYSIS IS SHORT.

24        AS WE SAW WHEN WE WERE DOING THIS WITH ZERO-TO-FIVES,

25   AMONG THE THINGS THAT CAN AFFECT THE TIME FRAME ARE SIMPLY

JULY 16, 2018

27

1   SHIPPING REALITIES.  FOR ZERO-TO-FIVES WE HAD SIGNIFICANT TIME
2   EFFECT BECAUSE THE JULY 4TH HOLIDAY FELL IN THE MIDDLE OF THE
3   SHIPPING PERIOD.
4        SO THE KEY VARIABLES ON HOW LONG IT TAKES ARE, NUMBER
5   ONE, ARE BOTH PARENT AND CHILD WHERE WE ALREADY HAVE A
6   PRE-POSITIONED KIT, WHICH WILL SOMETIMES BE TRUE AND SOMETIMES
7   NOT.  IF NOT IT WILL TAKE A DAY TO GET THE KIT OUT TO THEM,
8   SHIPPED OUT TO THEM.
9        THEN WE WILL MOVE EXPEDITIOUSLY TO COLLECT THE SWAB, AND
10  THEN PUT IT IN THE MAIL.  THERE IS A DAY OF SHIPPING.  AND IT
11  COULD BE LONGER IF THE SHIPPING DOESN'T OPERATE DUE TO A
12  WEEKEND OR SUNDAY OR HOLIDAY, SOMETHING LIKE THAT.  IT WILL
13  MOVE BACK TO THE CONTRACTOR.  THEN THEY HAVE A DAY TO ANALYZE
14  IT, AND THEY SHARE THE RESULTS WITH US.
15       SO, THE TIME FRAME IS LONGER IF WE WERE DNA TESTING A
16  VERY LARGE POPULATION AND A VERY DIFFUSE POPULATION.  THE
17  CHILDREN ARE PRETTY DIFFUSE GEOGRAPHICALLY NOW.  AT LAST COUNT
18  THEY ARE IN 106 LOCATIONS NATIONWIDE.  HOWEVER, WE HAVE THE
19  ABILITY -- WE HAVE HEALTH CARE PROFESSIONALS IN EVERY PROGRAM,
20  SO WE HAVE THE ABILITY TO SWAB THEM ONCE THEY HAVE A KIT.
21       I WOULD THEREFORE SAY THAT FOR THIS SMALLER UNIVERSE OF
22  THOSE REQUIRING DNA MY LOGISTICIANS PROJECTION OF THE TIME
23  FRAME IS MORE ON THE ORDER OF FOUR TO FIVE DAYS.  THAT IS A
24  SHORTER TIME FRAME THAN THE TIME FRAME THAT WE WERE LOOKING AT
25  WHEN WE WERE CONTEMPLATING UNIVERSAL DNA.


JULY 16, 2018

1  **Q.**    IS THE PREDOMINANT RED FLAG THAT YOU ARE SEEING WHEN WE

2  DO RED FLAG CHECKS PARENTAGE OR IS IT PARENTAL FITNESS OR

3  DANGER TO THE CHILD?

4  **A.**    WELL, I DON'T HAVE THE EXACT NUMBERS WITH ME.  THE

5  PREDOMINANT RED FLAG ISSUES ARE CHILD SAFETY ISSUES.  AND THE

6  PRINCIPAL DRIVER OF THAT IS THE NCIC FINGERPRINT BASED

7  CRIMINAL BACKGROUND CHECK SUMMARY.

8        SO, AGAIN, ICE HAS ALREADY CONDUCTED THE CRIMINAL

9  BACKGROUND CHECK.  THEY HAVE PROVIDED SUMMARY INFORMATION TO

10  US.  SO PRELIMINARY RED FLAGS FOR CHILD SAFETY OCCUR WHEN

11  THOSE INDICATE A CRIMINAL HISTORY THAT IS REALLY INCOMPATIBLE

12  WITH CHILD SAFETY.

13        AND WITH EVERYONE'S PERMISSION, I SHOULD CLARIFY THAT.

14        IT IS NOT THE CASE THAT ALL CRIMINAL HISTORY IS

15  INHERENTLY -- SORT OF, YOU KNOW, CONTRAINDICATES

16  REUNIFICATION.  CERTAIN KINDS OF CRIMINAL HISTORY ARE SO

17  CONCERNING THAT THEY ESSENTIALLY WILL CREATE A FULL STOP, AND

18  I WILL GIVE EXAMPLES.

19        CRIMINAL HISTORY INVOLVING CONVICTIONS FOR CHILD ABUSE,

20  FOR THE SEXUAL EXPLOITATION OF CHILDREN, FOR HUMAN

21  TRAFFICKING, FOR CRIMES OF SEXUAL ASSAULT OR MURDER.

22        THESE ARE SORT OF THE CLEAREST-CUT CASES.

23  UNFORTUNATELY, MOST OF THE CASES REQUIRE MORE INVESTIGATION

24  AND ANALYSIS TO DETERMINE WHETHER CRIMINAL HISTORY THAT

25  APPEARS ON THE SUMMARY REALLY IS ENOUGH TO MAKE REUNIFICATION


JULY 16, 2018

1   IMPOSSIBLE.

2        SO MANY OF THOSE ARE MORE, IF YOU WILL, THOSE RED FLAGS

3   TURN INTO KIND OF THE YELLOW PATH WHERE ADDITIONAL INFORMATION

4   IS REQUIRED.

5        THE OTHER WAY THAT CHILD SAFETY RED FLAGS CAN OCCUR IS

6   NOT ON THE CRIMINAL BACKGROUND CHECK SIDE, IT IS ON THE

7   CHILD'S CASE RECORD SIDE.  THE CHILD HAS PRESENTED SOME

8   EVIDENCE OF OR MADE SOME STATEMENT OF ABUSE IN HOME COUNTRY

9   ASSOCIATED WITH A FAMILY MEMBER.  THAT WILL REQUIRE

10  INVESTIGATION.  THAT WILL REQUIRE SOMETHING WE NEED TO LOOK

11  INTO.

12  **Q.**   I KNOW WE PASSED A COHORT OF CHILDREN UNDER FIVE INTO

13  REUNIFICATION LAST WEEK.

14  **A.**   CORRECT.

15  **Q.**   THE CHILDREN THAT WERE REUNIFIED IN THAT COHORT WERE

16  ONES FOR WHOM ALL SIGNS WERE GREEN, CORRECT?

17  **A.**   THEY WERE ONES FOR WHOM -- IN TERMS OF THE PLAN WE HAVE

18  NOW, FOR THE PROCESSES WE HAVE NOW, THESE WERE MINORS WHO DID

19  NOT HAVE THE RED FLAGS THAT WE ARE TALKING ABOUT NOW FOR

20  SAFETY OR PARENTAGE.

21       THERE WERE AMONG SOME OF THOSE ZERO-TO-FIVE SOME WHO

22  WERE NOT REUNIFIED BECAUSE, FOR EXAMPLE, ONE PARENT HAD

23  CRIMINAL HISTORY OF RAPE AND KIDNAPPING CHARGES, ONE PARENT

24  HAD CRIMINAL HISTORY OF CHILD CRUELTY.

25       AGAIN, THAT'S A FULL STOP, BUT THAT'S WHERE THERE IS AN

JULY 16, 2018

1    AFFIRMATIVE RED FLAG.

2              **MR. STIMSON:**  I THINK, YOUR HONOR, THAT COVERS THE

3    RED FLAG ANALYSIS COMPONENT.  THERE IS ANOTHER COMPONENT OF

4    THE PROCESS AT THE TAIL END THAT INVOLVES AN INTERVIEW OF THE

5    PARENT, WHICH MAY ALSO INFORM YOUR ASSESSMENT OF THE KIND OF

6    CONCERNS THAT WE KNOW ARE ON YOUR MIND.  AND IF YOU LIKE, I

7    CAN TALK WITH MR. WHITE ABOUT THAT AS WELL.

8              **THE COURT:**  A BRIEF DISCUSSION?

9              **MR. STIMSON:**  VERY BRIEF.

10             **THE COURT:**  YES.

11   **Q.    (MR. STIMSON) :**  COMMANDER WHITE, CAN YOU ARTICULATE

12   THE PURPOSE OF THE INTERVIEW OF THE PARENT, THE PUTATIVE

13   PARENT AT THE LATE PHASE OF THE PROCESS BEFORE REUNIFICATION.

14   **A.**    SO, UNDER THE PLAN AFTER ALL OF THE OTHER CHECKS ARE

15   CLEARED, THE LAST STEP PRIOR TO ORDERING THE TRAVEL OF THE

16   CHILD FOR PHYSICAL REUNIFICATION IS A FACE-TO-FACE INTERVIEW

17   WITH THE PARENT IN ONE OF THE EIGHT DESIGNATED ICE SITES BY

18   THAN A DEPLOYED PERSONNEL, EITHER HHS OR ITS CONTRACTOR.

19        AND THE PURPOSE OF THIS INTERVIEW, WHICH IS VERY BRIEF,

20   IS REALLY FUNDAMENTALLY AGAIN FOR THE PARENT TO CONFIRM, YEAH,

21   THAT'S MY KID.  AND MOST IMPORTANTLY, FROM MY POINT OF VIEW IN

22   TERMS OF DESIGNING THE PLAN, AND THAT THE PARENT VERBALIZE IN

23   SOME WAY, AND I WANT THAT CHILD REUNIFIED WITH ME.

24        AND THE REASON THAT THAT IS IN THERE IS TO PREVENT

25   SITUATIONS WHERE A CHILD IS TAKEN OUT OF O.R.R. CARE, TRAVELED

JULY 16, 2018

1   ACROSS THE COUNTRY, EXPECTING REUNIFICATION WITH A PARENT, AND

2   TURNED AWAY BY THE PARENT IN ICE CUSTODY.

3        SO IT WAS VERY IMPORTANT TO ME IN THE DESIGN OF THE PLAN

4   THAT THE LAST PERSON TO GIVE THE GREEN LIGHT TO MOVE A CHILD

5   IS THE PARENT HIMSELF OR HERSELF.  AND SO THAT IS WHY WE ARE

6   DOING THAT INTERVIEW PROCESS.

7   **Q.**   THAT IS A FINAL CHECK TO CONFIRM THAT WE ARE PLACING THE

8   CHILD WITH THEIR PARENT.

9   **A.**   CORRECT.  WHEN THAT IS GREEN, THAT IS ACTUALLY THE

10  SIGNAL THAT -- THOSE RESULTS ARE COLLECTED HOURLY IN EACH

11  FIELD SITE, TRANSMITTED TO MY TEAM IN WASHINGTON, THE HHS

12  INCIDENT MANAGEMENT TEAM WHICH IN TURN IS UPDATING THAT HOURLY

13  TO O.R.R.  THAT IS THE GREEN LIGHT TO O.R.R. TO INITIATE

14  O.R.R.'S ADMINISTRATIVE PROCESS AND TRAVEL PROCESS TO MOVE THE

15  CHILD.

16       SO IN THE PLAN, DEPENDING ON JUST GEOGRAPHICALLY WHERE

17  THE CHILD IS, IT WOULD BE MY -- IT IS MY PLANNING FACTOR THAT

18  FROM THAT MOMENT ANYWHERE -- DEPENDING ON THE GEOGRAPHIC

19  PROXIMITY OF THE CHILD, ANYWHERE FROM 6 TO 48 HOURS LATER THE

20  CHILD WILL BE THERE AT THAT ICE FACILITY FOR PHYSICAL

21  REUNIFICATION.

22            **MR. STIMSON:**  YOUR HONOR, I THINK THOSE ARE THE

23  POINTS MOST RELEVANT TO THE CONCERNS YOU HAVE ARTICULATED

24  ABOUT SAFETY AND PARENTAGE AND FITNESS.  SO UNLESS YOU WOULD

25  LIKE US TO ADDRESS OTHER TOPICS, I THINK WE ARE DONE.


                              JULY 16, 2018

1      **THE COURT:**  THANK YOU VERY MUCH.

2          COMMANDER WHITE, JUST SO I AM CLEAR.  YOU AND YOUR

3   TEAM ARE THE ONES RESPONSIBLE FOR THE FILING SUNDAY WITH THE

4   PLAN AND THE CHART?

5      **THE WITNESS:**  THE PLAN THAT YOU SEE WAS DEVELOPED BY

6   OUR OPERATIONAL PLANNERS.  IT IS BASED ON MY STRATEGY, AND AN

7   INTERAGENCY TEAM ACTUALLY BUILT OUT THE PLAN.  THAT WAS SHARED

8   WITH THE COUNSEL WHO PRESENTED IT TO YOU.

9          TO BE CLEAR, WHAT YOU ARE SEEING IS -- THAT IS OUR

10  PLAN.  THAT IS WHAT WE ARE DOING, YES, SIR.

11     **THE COURT:**  AND YOU ARE IN CHARGE OF THIS

12  REUNIFICATION OVER THE NEXT SEVERAL DAYS.

13     **THE WITNESS:**  I AM IN CHARGE OF THE UAC

14  REUNIFICATION MISSION.  OBVIOUSLY, THERE ARE PROGRAMMATIC

15  SPACES WHERE ICE HAS CONTROL OF ITS PROCESSES AND O.R.R. HAS

16  CONTROL OF ITS PROCESSES; BUT THE MISSION, THE PLAN THAT YOU

17  SEE, I AM OPERATIONALLY IN CHARGE, YES, SIR.

18     **THE COURT:**  ALL RIGHT.

19          MR. GELERNT, DO YOU HAVE ANY QUESTIONS?

20     **MR. GELERNT:**  YOUR HONOR, I THINK WE HAVE JUST A FEW

21  CLARIFYING QUESTIONS.  BUT THEN IF I COULD ASK, IT MAY NOT BE

22  NECESSARY, BUT TO TAKE A FIVE-MINUTE BREAK TO TALK TO MY TEAM.

23  BECAUSE WE WEREN'T EXPECTING THERE TO BE A WITNESS WHO IS

24  SWORN UNDER OATH.

25  ///

JULY 16, 2018

### CROSS-EXAMINATION

1
2  **Q.    (MR. GELERNT):** THANK YOU, COMMANDER, FOR BEING HERE.
3  I SORT OF JUST HAD A FEW CLARIFYING QUESTIONS.

4          HAVE THE REUNIFICATIONS FOR CHILDREN FIVE AND ABOVE
5  ALREADY STARTED?  NOT THE PROCESS, BUT HAVE THERE BEEN ACTUAL
6  REUNIFICATIONS?

7  **A.**    YES, SIR.

8  **Q.**    OKAY.  WE RECEIVED THE LIST OF -- AS YOU KNOW, A LIST OF
9  INFORMATION ABOUT ALL OF THE PARENTS AND CHILDREN.  IS IT
10  CORRECT THAT 70 -- FOR 70 CHILDREN YOU DON'T -- HAVE NOT
11  IDENTIFIED WHO THE PARENT IS YET?

12  **A.**    I DON'T HAVE WITH ME THE NUMBER FOR WHOM THERE HAS NOT
13  BEEN A PARENT MATCHING.

14  **Q.**    OKAY.

15  **A.**    WE CERTAINLY CAN FOLLOW UP WITH THAT.  I APOLOGIZE, I
16  DON'T KEEP THESE NUMBERS IN MY HEAD.

17  **Q.**    RIGHT.

18  **A.**    THERE ARE SOME CHILDREN THAT WE BELIEVE ARE SEPARATED
19  FOR WHOM WE HAVE NOT IDENTIFIED THE PARENT, THAT IS CORRECT.

20  **Q.**    OKAY.  THANK YOU.  AND IF YOU COULD HAVE YOUR COUNSEL
21  FOLLOW UP WITH US, THAT WOULD BE GREAT.

22          WHAT'S THE PROCESS FOR ATTEMPTING TO DETERMINE WHO THOSE
23  PARENTS ARE, OR IS THERE A PROCESS?

24  **A.**    THERE IS A PROCESS.  SO SINCE, I BELIEVE THE 22ND OF
25  JUNE, THERE HAS BEEN AN INTERAGENCY DATA TEAM COMPOSED OF A

JULY 16, 2018

DATA ANALYST FROM O.R.R., CBP, ICE, AND A NUMBER OF DATA
EXPERTS BROUGHT FROM ALL OVER HHS TO SUPPORT.

     AND THAT TEAM HAS BEEN CONSOLIDATING -- ANALYZING AND
CONSOLIDATING THE DATA SETS FROM ALL THREE AGENCIES TO MAKE
THIS MATCH.

     I CAN PROVIDE TWO NUMBERS, AND MAYBE OTHERS CAN DO THE
MATH, THAT MAY BE RESPONSIVE TO YOUR QUESTION.

     WE HAVE IDENTIFIED 2,551 MINORS AGED FIVE TO 17 IN
O.R.R. CARE.  OF THOSE, PARENTAL MATCHES HAVE BEEN CONFIRMED
2,480.  SO THAT IS LIKELY -- I AM NOT GOOD AT MATH IN MY HEAD,
I THINK THAT IS 71.  SO THAT IS LIKELY THE NUMBER TO WHICH YOU
ARE ALLUDING, SIR.  YES.

     SO EFFORTS CONTINUE ON ALL OF THE OTHERS.  AGAIN, THE
INTERAGENCY DATA TEAM HAS BEEN WORKING TO CONSOLIDATE THESE
DATA.

**Q.**    THANK YOU, COMMANDER.

     TO YOUR KNOWLEDGE, ARE THERE CHILDREN WHO ARE FIVE
THROUGH 17 WHO HAVE BEEN SEPARATED FROM THEIR PARENT WHO ARE
NOT YET ON THE LIST PROVIDED TO US, SO THE 2551?

          **MR. STIMSON:**  I OBJECT TO SOME OF THIS AS BEYOND THE
SCOPE OF THE DIRECT.

          **THE COURT:**  I WOULD OVERRULE THAT OBJECTION.

          YOU CAN ANSWER.

          **THE WITNESS:**  I APOLOGIZE.  COULD YOU ASK IT -- I AM
JUST NOT TOTALLY SURE I UNDERSTOOD.  COULD YOU ASK AGAIN?


                         JULY 16, 2018

1    Q.    **(MR. GELERNT)** :  YES, COMMANDER.  I AM SORRY IF IT

2    WASN'T CLEAR.

3            WE HAD A LIST OF 2551 -- A LIST YOU PROVIDED US,

4    YOUR COUNSEL PROVIDED US, OF 2,551 CHILDREN BETWEEN FIVE AND

5    17 WHO HAVE BEEN SEPARATED FROM THEIR PARENTS.

6            TO YOUR KNOWLEDGE ARE THERE ANY CHILDREN BETWEEN

7    FIVE AND 17 IN O.R.R. CUSTODY WHO HAVE ALREADY BEEN -- O.R.R.

8    WHO HAVE BEEN GIVEN TO A SPONSOR OR A FOSTER PARENT WHO ARE

9    NOT ON THAT LIST?

10   **A.**    SO --

11   **Q.**    AND THEY HAVE BEEN SEPARATED FROM THEIR PARENTS.

12   **A.**    SO, THE 2551, I MEAN, THAT IS -- THE 2551 REPRESENTS A

13   NUMBER THAT WAS ANALYZED AT THAT POINT IN TIME.  I REALLY

14   CAN'T SPEAK TO IF THEY WERE SEPARATED MINORS PRIOR TO THAT,

15   OTHERS WOULD HAVE TO PROVIDE THAT ANALYSIS, IN OTHER WORDS,

16   WHO WEREN'T IN O.R.R. CARE.  I AM NOT AWARE OF ANY, OTHER THAN

17   THE 2551.

18       THERE HAVE BEEN A NUMBER OF CHILDREN -- BECAUSE WE TRIED

19   TO CAPTURE THE MAXIMUM POSSIBLE UNIVERSE TO ENSURE THAT WE

20   DIDN'T MISS ANY SEPARATED KIDS, THERE WERE A NUMBER OF

21   CHILDREN THAT OVER TIME WE WERE ABLE TO DETERMINE WERE NOT

22   SEPARATED, ALTHOUGH THEY HAD SOME INDICATION OF SEPARATION.

23       SO 2551 IS, TO MY KNOWLEDGE, THE COMPLETE SET OF THOSE

24   IN O.R.R. CARE.

25   **Q.**    THANKS, COMMANDER.


                    JULY 16, 2018

1    **A.**    YES, SIR.

2    **Q.**    AS FAR AS YOU KNOW, ALL OF THE CHILDREN ON THAT LIST,

3    THE 2551, NONE OF THEM HAVE FINAL ORDERS OF REMOVAL; IS THAT

4    CORRECT?  OR IS THAT BEYOND THE SCOPE OF YOUR --

5    **A.**    NONE OF THE CHILDREN?  I WOULD HAVE NO WAY OF KNOWING

6    WHO HAS A FINAL ORDER.  I APOLOGIZE, I JUST DON'T KNOW THAT.

7    **Q.**    THE LIST THAT WE ARE RECEIVING DOES NOT INDICATE WHETHER

8    THE PARENT HAS A FINAL ORDER OF REMOVAL OR NOT.  IS IT

9    POSSIBLE TO INCLUDE THAT, BECAUSE THAT IS CRITICAL INFORMATION

10   FOR US.

11        I CAN FOLLOW UP WITH YOUR COUNSEL.

12        **MR. GELERNT:**  YOUR HONOR, I DON'T WANT TO ASK THE

13   WITNESS QUESTIONS THAT MAY BE BEYOND THE SCOPE OF HIS

14   EXPERTISE.  COUNSEL, I THINK, FOR THE GOVERNMENT WANTED ME TO

15   ASK, BUT I CAN FOLLOW UP WITH THE GOVERNMENT COUNSEL IF THAT

16   IS PREFERABLE.

17        **THE WITNESS:**  I DO NOT HAVE -- WITHIN MY INCIDENT

18   MANAGEMENT TEAM I DO NOT HAVE THAT INFORMATION.  THE HHS

19   INCIDENT MANAGEMENT TEAM DOES NOT KNOW WHO HAS FINAL ORDERS OF

20   REMOVAL.  THAT WOULD BE DHS INFORMATION.

21   **Q.    (MR. GELERNT)** :  RIGHT.  SO I KNOW THAT HHS DOESN'T

22   HAVE THAT INFORMATION, BUT I ALSO -- THE COURT ASKED WHETHER

23   YOU WERE SORT OF IN CHARGE.  I THINK WHAT THE COURT WAS

24   GETTING AT IS ARE YOU SORT OF OVERSEEING THIS PLAN.  SO IS

25   THAT INFORMATION YOU CAN ENSURE THAT WE GET AND IS PUT ON THE

JULY 16, 2018

1  LIST?

2          **MR. STEWART:**  YOUR HONOR, IF I MAY.  I OBJECT TO THE

3  QUESTION BECAUSE I BELIEVE THIS IS AN ISSUE ON WHICH THE

4  PARTIES SHOULD CONFER BEFOREHAND -- APOLOGIES -- CONFER TO

5  FEASIBILITY, ALL OF THESE KINDS OF THINGS, PARTICULARLY

6  BECAUSE THEY ARE REALLY ICE, DHS TYPE QUESTIONS.

7          **THE COURT:**  YES.  I AM GOING TO SUSTAIN THAT

8  OBJECTION.

9          **MR. GELERNT:**  THAT'S FINE, YOUR HONOR.

10          **THE COURT:**  THIS IS AN AREA THAT IS NOT WITHIN THE

11  EXPERTISE OF THIS WITNESS.

12          **MR. GELERNT:**  THAT'S FINE, YOUR HONOR.

13  **Q.    (MR. GELERNT):**  THERE HAS BEEN SOME CONCERN THAT

14  REUNIFICATIONS OCCURRED AT NIGHT FOR THE CHILDREN UNDER FIVE.

15  WILL REUNIFICATIONS OCCUR LATE AT NIGHT FOR THE CHILDREN FIVE

16  TO 17, AS FAR AS YOU KNOW?

17  **A.**    SOME WILL OCCUR AT NIGHT, AND I CAN EXPLAIN THE

18  LOGISTICAL REASONS FOR THAT.

19          IT IS OUR INTENTION TO REUNIFY CHILDREN PROMPTLY, AND

20  FOR MY TEAM PROMPTLY IS DEFINED AS AS QUICKLY AS FEASIBLE

21  AFTER ALL LIGHTS ARE GREEN.

22          MINORS HAVE TO BE TRAVELED FROM POINTS ALL OVER THE

23  COUNTRY.  SO, FOR EXAMPLE, IT HAS BEEN OPERATIONALLY NECESSARY

24  FOR US TO ASK ICE TO EXTEND ITS HOURS BECAUSE, FOR EXAMPLE,

25  THERE IS NO WAY TO TRAVEL CHILDREN FROM, FOR EXAMPLE, PROGRAMS

JULY 16, 2018

1   IN NEW YORK AND HAVE THEM ARRIVE AT A.O.R.'S. NEAR

2   BROWNSVILLE, TEXAS AT -- YOU KNOW, IN BANKERS HOURS.

3         SO WE UNDERSTAND OUR OPERATIONAL DIRECTION TO BE TO

4   EXPEDITE REUNIFICATION OF CHILDREN, AND THAT'S WHAT WE ARE

5   DOING.

6   **Q.**   OKAY.  THANK YOU.

7         ON THE LIST WE HAVE BEEN PROVIDED, AS FAR AS WE

8   UNDERSTAND IT THOSE ARE PARENTS, SO FAR, WHO ARE IN ICE

9   CUSTODY.  THAT'S CORRECT?  THE UPDATED DAILY LIST WE ARE

10  RECEIVING?

11  **A.**   FOR THE LIST THAT YOU ARE RECEIVING THAT -- WE HAVE A

12  LOT OF LISTS.

13  **Q.**   RIGHT.

14  **A.**   BUT MY UNDERSTANDING OF THE LIST YOU ARE RECEIVING --

15  AND I KNOW THE LIST, COUNSEL KNOW WHAT YOU ARE GETTING.  THAT

16  WOULD REFER TO THOSE MINORS WHO HAVE PARENTS CURRENTLY IN ICE

17  CUSTODY, THAT IS CORRECT.

18  **Q.**   AND THAT WOULD INCLUDE PARENTS IN ICE CUSTODY WHO HAVE

19  REMOVAL ORDERS AS WELL AS PARENTS WHO DO NOT HAVE REMOVAL

20  ORDERS, OR IS THAT BEYOND WHAT --

21  **A.**   LET ME PUT IT THIS WAY.

22         **MR. STEWART:**  SIMILAR OBJECTION, YOUR HONOR.  JUST,

23  AGAIN, EXPERTISE OF THE WITNESS.

24         **MR. GELERNT:**  THIS IS JUST A YES OR NO ANSWER SINCE

25  HE IS IN CHARGE OF THE PROCESS.


                        JULY 16, 2018

```
1              THE COURT:  YES.
2    Q.   (MR. GELERNT):  DO YOU KNOW WHETHER THE PARENTS ON THE
3    LIST THAT WE RECEIVED, THE PARENTS IN CUSTODY INCLUDE BOTH
4    PARENTS WITH FINAL ORDERS AS WELL AS PARENTS WITHOUT FINAL
5    ORDERS?
6    A.   I BELIEVE WHAT YOU ARE RECEIVING IS O.R.R. PRE-CLEARED
7    LIST, AND O.R.R. HAS NO WAY OF KNOWING, NOR DOES MY TEAM HAVE,
8    AT THIS TIME, KNOWING WHO HAS REMOVAL ORDERS.  WE HAVE TAKEN
9    NO ONE OFF OF THAT LIST ON THE BASIS OF REMOVAL ORDERS IF IT
10   IS THE O.R.R. PRE-CLEARED LIST WHICH YOU ARE RECEIVING.  SO IT
11   WOULD INCLUDE THE FULL SET OF CHILD-PARENT MATCHES WHERE THE
12   PARENT IS IN ICE CUSTODY.
13   Q.   RIGHT.  OKAY.  THANK YOU.
14            MR. GELERNT:  AND I JUST HAVE ONE FINAL QUESTION,
15   YOUR HONOR, IF THAT'S OKAY?
16            THE COURT:  YES.
17   Q.   (MR. GELERNT):  SO THE REUNIFICATIONS WILL CONTINUE TO
18   OCCUR, AND SO YOU WERE IN THE COURT WHEN THE JUDGE SAID THAT
19   THERE IS GOING TO BE AN INTERIM STAY AND THERE IS GOING TO BE
20   BRIEFING BY YOUR SIDE ON THE 23RD.  AND THAT REUNIFICATIONS
21   WILL CONTINUE TO OCCUR.
22            SO THAT MEANS THAT REUNIFICATIONS WILL CONTINUE TO
23   OCCUR REGARDLESS OF WHETHER A PARENT HAS A FINAL ORDER OR NOT,
24   ALL REUNIFICATIONS THAT HAVE BEEN CLEARED WILL CONTINUE.
25   A.   WE ARE GOING TO -- MY TEAM IS GOING TO REUNIFY EVERY
```

JULY 16, 2018

1   CHILD THAT CAN SAFELY BE REUNIFIED WITH A PARENT PURSUANT TO

2   THE PLAN YOU SEE HERE.

3   **Q.**   OKAY.

4   **A.**   WE RESPOND TO DIRECTION FROM COUNSEL ON WHAT THE OUTER

5   LIMITS OF THAT ARE.  WE DON'T, OURSELVES, INTERPRET THE

6   JUDGE'S INSTRUCTIONS.  BUT MY MISSION IS TO SAFELY AND

7   EXPEDITIOUSLY REUNIFY KIDS, AND THAT'S WHAT WE ARE DOING.

8           **MR. GELERNT:**  I WILL FOLLOW UP WITH COUNSEL FOR

9   GOVERNMENT ON THAT MAYBE IN COURT HERE.

10          **THE COURT:**  OKAY.

11          **MR. GELERNT:**  THANK YOU, COMMANDER.

12          **THE COURT:**  I HAVE JUST A COUPLE OF FOLLOW-UP

13  QUESTIONS.

14          I UNDERSTOOD YOU TO SAY THAT OF THE PARENTS IN ICE

15  DETENTION THERE ARE APPROXIMATELY 1600.  YOU HAVE IDENTIFIED

16  2,551 CHILDREN, AND OF THOSE YOU HAVE THE PARENTAL MATCH OF

17  2,480?

18          **THE WITNESS:**  THAT'S THE DATA THAT I HAVE AS OF THIS

19  MORNING.  THESE NUMBERS CHANGE AT LEAST I THINK TWICE DAILY.

20  THAT IS THE MOST RECENT INFORMATION AS OF 08:00 EASTERN TODAY,

21  YES, SIR.

22          **THE COURT:**  SO THAT IS A STAGGERING NUMBER IN SOME

23  WAYS, IN THAT IT INDICATES HOW MANY OF THE CHILDREN WHO WERE

24  SEPARATED WERE IN FACT SEPARATED FROM THEIR PARENT, THERE IS

25  NO ISSUE.  CORRECT?


                        JULY 16, 2018

1          **THE WITNESS:**  THE 2551 IS THE STATIC NUMBER.  THE

2    2480 IS A STATIC NUMBER EXCEPT INSOFAR AS WE ESTABLISH

3    ADDITIONAL MATCHES.  THE NUMBER THAT -- NUMBERS THAT ARE

4    CHANGING ARE THE NUMBER OF PARENTS IN ICE CUSTODY AND THE

5    NUMBER OF KIDS FOR US TO REUNIFY.

6          SO, YES, OUR OPERATIONAL PLAN, WHICH IS ONLY

7    BEGINNING TO RAMP UP NOW, IS DESIGNED TO REUNIFYING A LARGE

8    NUMBER OF KIDS PER DAY.  AND OVER THE NEXT SEVERAL DAYS THAT

9    PLAN IS GOING TO BE IMPLEMENTED TO ACHIEVE THAT KIND OF

10   THROUGHPUT IN ORDER TO REUNIFY THOSE CHILDREN WHO ARE

11   REUNIFIABLE PER THIS PLAN WITHIN THE TIME FRAME SET BY YOUR

12   ORDER, SIR.

13         **THE COURT:**  SO OF THESE 2,480 WHERE THERE IS NO

14   ISSUE AS TO PARENTAGE YOU ARE NOW FOCUSING ON DANGER AND

15   FITNESS CONSIDERATIONS.

16         **THE WITNESS:**  I'M SORRY, SIR.  MAYBE THE WAY I SAID

17   IT WAS UNCLEAR.

18         THE 2,480 IS MATCHED, MEANING THERE IS A PUTATIVE

19   PARENT ASSOCIATION AS OPPOSED TO THE 71 THAT WE BELIEVE ARE

20   SEPARATED BUT THE PARENT -- THERE IS NO IDENTIFIED PARENT.

21   THAT IS SEPARATE FROM THE -- I THINK THE NUMBERS THAT MAY BE

22   HELPFUL FOR THE QUESTION YOU ARE ASKING, SIR, IS OF THE 1,609

23   PARENTS IN ICE CUSTODY AS OF LAST REPORT, THE O.R.R.

24   PRE-CLEARED LIST THAT WE ARE GOOD FOR PARENTAGE, WE ARE GOOD

25   FOR SAFETY, IS FOR 1,317 OF THEM.  THAT NUMBER, I EXPECT, WILL

JULY 16, 2018

1    GROW TOMORROW.

2            THAT NUMBER HAS BEEN CONVEYED TO ICE, AND ICE DOES

3    ITS OWN CLEARING, THAT IS A SUBSEQUENT LIST.

4            OF THAT 1,317, AS OF THE LATEST REPORT I HAVE 918

5    HAVE BEEN ICE CLEARED.  51 HAVE BEEN DETERMINED NOT CLEARED BY

6    ICE.  AND 348 ARE PENDING ICE CLEARANCE.

7            SO OF THE 1609, 1317 THUS FAR HAVE BEEN PRE-CLEARED

8    BY O.R.R., AND THAT NUMBER, I AM SURE, WILL GROW AS, IF YOU

9    WILL, SORT OF YELLOW SITUATIONS OR AMBER SITUATIONS GET

10   RESOLVED IN FAVOR OF GREEN.  AND JUST AS WE WORK THROUGH THE

11   PROCESS OVER THE NEXT FEW DAYS THAT NUMBER WILL GROW FURTHER.

12           IS THIS HELPFUL TO YOU, YOUR HONOR?

13           **THE COURT:**  VERY MUCH.  THANK YOU.

14           THANK YOU.  YOU ARE FREE TO STEP DOWN.  I GREATLY

15   APPRECIATE THE TESTIMONY, IT WAS VERY HELPFUL AND INSIGHTFUL.

16           LET'S KEEP MOVING, BUT FIRST LET ME INQUIRE OF MR.

17   GELERNT.

18           BASED ON WHAT YOU HAVE HEARD, THE PLAN YOU HAVE

19   REVIEWED, THE GOVERNMENT'S FILING ON SUNDAY, DO YOU HAVE ANY

20   CRITICISMS OR CONCERNS ABOUT THE REUNIFICATION PLAN THAT IS

21   UNDERWAY?

22           **MR. GELERNT:**  YOUR HONOR, I THINK IT BASICALLY SEEMS

23   GOOD.  IF WE COULD HAVE FIVE MINUTES IN LIGHT OF COMMANDER

24   WHITE'S TESTIMONY TO TALK OUTSIDE.

25           BUT I THINK THE ONLY THINGS THAT WE HAVE BEEN TOLD


                         JULY 16, 2018

1   THERE ARE SOME CONCERNS ABOUT IS THE NIGHTTIME, AND MAYBE THAT
2   IS GOING TO NOT BE FEASIBLE TO NOT HAVE VERY LATE.

3           **THE COURT:**  COULDN'T THAT BE ADDRESSED ADEQUATELY IF
4   THERE IS 12 HOURS' NOTICE?  IT MAY BE LATE, BUT IF PEOPLE ARE
5   NOTIFIED AND THEY CAN BE PRESENT.

6           **MR. GELERNT:**  RIGHT.  I THINK WE MAY HAVE TO DEAL
7   WITH THAT, WITH COUNSEL FOR THE GOVERNMENT, THE LOGISTICS.

8           THAT'S THE OTHER QUESTION MAYBE I SHOULD HAVE ASKED
9   THE COMMANDER, BUT I CAN ASK NOW, HE IS STILL HERE IS, WE ARE
10  GETTING -- WHAT WE ARE GETTING IS, FROM OUR UNDERSTANDING,
11  NOTICE THAT PEOPLE HAVE BEEN PRE-CLEARED.

12          BUT AT THAT POINT WE DON'T KNOW -- AND THEN THEY ARE
13  SAYING THERE IS GOING TO BE A 4-TO-48-HOUR PERIOD WHERE THEY
14  ARE GOING TO BE INTERVIEWED, AND IF EVERYTHING GOES FINE THE
15  CHILD IS GOING TO BE BROUGHT.  SO THAT 4-TO-48-HOUR PERIOD IS
16  FAIRLY LONG, BUT WE CAN MANAGE THAT.

17          BUT WE ARE NOT GETTING NOTICE OF WHEN THAT
18  4-TO-48-HOUR PERIOD WILL START.  SO I THINK IT IS BASICALLY --
19  AND I DON'T KNOW WHETHER THIS IS CONSISTENT WITH WHAT YOUR
20  HONOR WAS SAYING, BUT BASICALLY NOW THEY ARE SAYING, BE ON THE
21  LOOKOUT AT ANY TIME BETWEEN NOW AND THE 26TH FOR ALL OF THESE
22  CHILDREN.  SO IT MAKES IT VERY HARD TO SORT OF INDIVIDUALIZE
23  IT.

24          IN ADDITION -- SO THAT IS ONE THING I THINK THE
25  GOVERNMENT WAS GOING TO TRY TO CLARIFY WITH US, ABOUT WHETHER

JULY 16, 2018

44

1  THE NOTICE COULD BE CLOSER TO WHEN THAT 4-TO-48-HOUR PERIOD

2  STARTS.

3          I THINK THE OTHER QUESTION IS WHETHER WE CAN BE

4  ALERTED TO -- I THINK THIS IS MORE FOR THE FAITH-BASED GROUPS

5  GOING TO YOUR HONOR'S QUESTION.

6          SO THIS INDIVIDUAL IS GOING TO BE RELEASED AT 3:00

7  IN THE MORNING TONIGHT.  SO THERE IS NO GAP IN THE FAITH-BASED

8  COVERAGE THAT THEY ARE NOT ACTUALLY AT THE SITE TO BE THERE,

9  BECAUSE MAYBE THEY ARE GOING TO BE ABLE TO MAN IT 24/7, BUT I

10 DON'T KNOW WHETHER THERE IS GOING TO BE GAPS BETWEEN, FOR

11 EXAMPLE, 2:00 IN THE MORNING AND 5:00 IN THE MORNING.  AND SO

12 I THINK THOSE ARE AMONG THE QUESTIONS I WAS HOPING TO GET

13 CLARIFIED.

14         **THE COURT:**  MS. FABIAN.

15         **MS. FABIAN:**  SO, I AM GOING TO SPEAK.  AND THEN IF

16 COMMANDER WHITE WAVES HIS ARMS, LET ME KNOW AND I WILL HAVE

17 HIM SAY IF I AM SAYING ANYTHING INCORRECTLY.

18         BUT THE LIST -- WHAT WE HAVE BEEN DOING IS -- THE

19 LIST -- THE CLEARED LIST IS WHAT WE TALKED ABOUT.  WE ARE

20 PROVIDING THAT, THAT IS DAILY.  AND IF WE HAVE IT MORE

21 FREQUENTLY WE ARE PROVIDING IT MORE FREQUENTLY.  BUT THAT IS

22 THE LIST WE HAVE SO FAR BEEN PROVIDING TO PLAINTIFFS' COUNSEL.

23 THAT IS INDIVIDUALS WHO WILL -- WHO MAY BE REUNIFIED.  IT WILL

24 BE -- IF THEY ARE IT WILL BE MORE THAN 12 HOURS FROM THERE.

25 SO IT DOES -- TO THE BEST OF OUR ABILITY WITHIN THE

JULY 16, 2018

1   INFORMATION THAT IS BEING GATHERED IN THE PROCESS PROVIDE THAT

2   12 HOURS' NOTICE.

3         WHAT WE ARE STILL WORKING ON -- AND WE SPOKE WITH

4   COUNSEL ABOUT THIS LAST NIGHT, AND WE ARE TRYING TO FIGURE

5   OUT, IS THE SECOND LIST IS THAT GREEN-LIGHT LIST AFTER THE

6   INTERVIEW.  AND THAT, AS COMMANDER WHITE EXPLAINED, IS WHERE

7   REUNIFICATIONS WILL THEN OCCUR WITHIN 6-TO-48 HOURS.  THAT

8   LIST, BECAUSE IT IS GENERATED ON AN HOURLY BASIS, IT IS TOO

9   MUCH TO TRY TO BE EMAILING EVERY HOUR.

10        BUT WE ARE HOPEFUL TO FIND A WAY TO PROVIDE THAT IN

11  MORE REAL TIME, AND THEREFORE THAT WOULD SORT OF BRIDGE THAT

12  GAP BETWEEN KNOWING WELL IN ADVANCE ON THE INITIAL CLEARED

13  LIST, AND THEN KNOWING IN THAT 6 TO 48-HOUR TIME FRAME OF THE

14  CLEARED FOLKS WHO THEN WILL BE REUNIFIED.

15        **THE COURT:**  IS THERE ANY CONCERN ABOUT MEETING THIS

16  12-HOUR MINIMUM TIME FRAME NOTICE?

17        **MS. FABIAN:**  WHAT WE ARE HOPEFUL -- AND THIS IS I

18  THINK WHAT WE WERE -- I AM GOING TO LET COMMANDER WHITE.

19        THIS IS JUST TO SORT OF -- THIS WAS -- AS WE TALKED

20  ABOUT ON FRIDAY, I THINK, OUR GOAL IS TO PROVIDE A LIST -- THE

21  EXISTING LISTS, AND TO WORK WITHIN WHAT PLAINTIFFS NEED RATHER

22  THAN TO CREATE A REQUIREMENT FOR THE DEVELOPMENT OF A NEW

23  LIST.

24        THERE IS NO 12-HOUR MARKER IN THE CURRENT PLAN, AND

25  THAT IS WHAT I WILL LET COMMANDER WHITE EXPLAIN.


                        JULY 16, 2018

1      BUT OUR CONCERN IS THAT THAT WOULD SUBSTANTIALLY

2  INTERFERE WITH THE PROCESS TO CREATE A NEW MARKER IN THAT

3  PLAN.

4      **THE COURT:**  ALL RIGHT.

5      COMMANDER.

6      **COMMANDER WHITE:**  YOUR HONOR, THE LOGISTICAL

7  CHALLENGES IN MOVING THESE CHILDREN TO MEET THEIR PARENTS ARE

8  ACTUALLY MUCH GREATER IN REALITY THAN THEY APPEAR ON PAPER.

9      THE FASTEST WAY, AND THE MOST EXPEDITIOUS WAY TO

10  DELIVER CHILDREN IS LITERALLY AS QUICKLY AS THEY CAN GET

11  THERE.  INTRODUCING A 12-HOUR ADVANCE NOTICE CREATES GREATER

12  THAN 12-HOUR DELAY.  AND I CAN EXPLAIN THIS IN THIS WAY.

13      SO A NUMBER OF MINORS, FIRST OF ALL, ARE ACTUALLY

14  SHELTERED IN PROXIMITY TO THE EIGHT SITES IN THE THREE ICE

15  A.O.R.'S WHICH ICE HAS DESIGNATED TO US AS REUNIFICATION

16  SITES.  A SMALL NUMBER, NOT TO EXCEED 50, OF CHILDREN

17  NATIONWIDE WILL BE REUNIFIED IN OTHER SITES.  SO THE VAST

18  MAJORITY WILL TAKE PLACE AT THOSE SITES.

19      EACH CHILD, DUE TO O.R.R.'S PROCESS -- O.R.R.'S

20  PROCESS IS BUILT TO REUNIFY CHILDREN SINGLY, NOT IN BULK.  WE

21  ARE BUILDING A NOVEL LOGISTICAL PROCESS TO DO THAT.

22      SO EACH CHILD MUST BE -- SEPARATELY HAVE A RELEASE

23  REQUEST INITIATED AND THEN EXECUTED.  AND THE INSTRUCTION IS:

24  MOVE THIS CHILD AS QUICKLY AS POSSIBLE TO THIS PARTICULAR

25  DESIGNATED SITE.


JULY 16, 2018

```
 1              IF I INTRODUCE A ELEMENT OF ATTEMPTING TO TIME
 2    ARRIVAL, IT GREATLY INCREASES THE LOGISTICAL OVERHEAD THAT
 3    CREATES NOT ONLY DELAY BUT FURTHER CHALLENGE TO OUR BANDWIDTH.
 4              SO THIS IS A VERY SIGNIFICANT LOGISTICAL CHALLENGE
 5    TO DO THIS WITH THE EXPEDITIOUSNESS THAT YOUR ORDER AND INDEED
 6    THE CIRCUMSTANCES FOR THESE CHILDREN REQUIRE.  WHICH IS WHY I
 7    WOULD STRONGLY PREFER, FROM AN OPERATIONAL POINT OF VIEW, THAT
 8    WE SIMPLY SHARE AN EARLIER STAGE IN OUR PIPELINE PROCESS,
 9    THROUGH OUR COUNSEL TO THAT OF THE PLAINTIFFS', SO THAT --
10    FRANKLY SO THAT THE LEGAL PROCESS DOES NOT IMPEDE MY
11    OPERATIONAL PROCESS.  AND THAT IS MY REQUIREMENT.
12              THE COURT:  YOU WOULD GIVE NOTICE TO YOUR COUNSEL,
13    MS. FABIAN AND THE GOVERNMENT ATTORNEYS, AS TO WHEN YOU
14    ANTICIPATE REUNIFICATION WILL OCCUR.  AND THEN THEY CAN
15    CONTACT PLAINTIFFS' COUNSEL.  IS THAT --
16              COMMANDER WHITE:  WHAT I BELIEVE WE ARE TRYING TO DO
17    IS TO SHARE AN EARLIER STAGE IN THE PROCESS, RATHER THAN THE
18    ACTUAL SORT OF GO SIGNAL FOR REUNIFICATION, BECAUSE A NUMBER
19    OF THOSE WILL ACTUALLY TAKE LESS THAN 12 HOURS.  SO WE ARE
20    TRYING TO PROVIDE A LITTLE MORE ADVANCE NOTICE SO THERE IS AT
21    LEAST 12 HOURS' NOTICE.  IT MAY INCLUDE -- THE LIST MAY
22    INCLUDE A FEW MINORS WHO DON'T MOVE, DUE TO A LATER SORT OF
23    FLAG.
24              THE COURT:  DO YOU HAVE A SUGGESTION?  BECAUSE,
25    REALLY, ALL WE ARE TRYING TO GET IS NOTICE, SO THAT WHEN THE
```

                              JULY 16, 2018

1   REUNIFICATION OCCURS THERE IS SUFFICIENT NOTICE WHERE CARE

2   PROVIDERS ARE PRESENT AND CAN MAKE THIS REUNIFICATION SEAMLESS

3   AS FAR AS THE PARENT-CHILD REINTEGRATION INTO THE COMMUNITY.

4      **MS. FABIAN:**  I WAS GOING TO EXPLAIN THIS, YOUR

5   HONOR, BUT I THINK IF COMMANDER WHITE COULD EXPLAIN THE

6   PROCESS WITH THE CARE PROVIDERS AS WELL THAT IS ALREADY IN

7   PLACE, I THINK THAT MIGHT ASSIST.

8      **THE COURT:**  ALL RIGHT.

9      **COMMANDER WHITE:**  SO, THIS IS SOMETHING THAT ICE IS

10  DOING.  AS EVERYONE KNOWS, O.R.R. TRANSFERRED -- FOR THOSE

11  CASES WHERE PARENTS ARE DETAINED, O.R.R. TRANSFERS THE CHILD

12  INTO THE CUSTODY OF ICE.  ICE PHYSICALLY REUNIFIES THE FAMILY

13  BACK INTO ONE FAMILY UNIT, AND THEN PROCESSES THE RELEASE OF

14  THE FAMILY UNIT PURSUANT TO ICE'S SAFE RELEASE PLANNING

15  PROCESS, WHICH IS THEIR TERM FOR IT.

16     IN THIS CASE THAT IS INCLUDING A REFERRAL TO NGO'S

17  THAT CAN HELP PROVIDE SERVICES AND SAFE ENTRY INTO AMERICAN

18  COMMUNITIES.  AND THE TWO NGO'S AT THE NATIONAL LEVEL WITH

19  WHOM THEY ARE WORKING ARE THE U.S. CONFERENCE OF CATHOLIC

20  BISHOPS AND LUTHERAN FAMILY SERVICES, AND WITHIN THAT LUTHERAN

21  IMMIGRANT AND REFUGEE SERVICES.  THOSE GROUPS IN TURN ARE

22  WORKING WITH LOCAL AFFILIATES.

23     I THINK AS WE DO THIS THERE WILL BE CONTINUAL

24  REFINEMENT OF THE PROCESS OF ENGAGEMENT WITH SERVICE DELIVERY

25  PROVIDERS.


        JULY 16, 2018

```
1              I WOULD SAY IN RESPONSE TO A QUESTION THAT WHAT I
2    HAVE RECOMMENDED TO OUR COUNSEL IS THAT WE PROVIDE, AS I
3    BELIEVE WE ARE DOING, THE O.R.R. PRE-CLEARED LIST, WHICH IS
4    GOING TO ICE.  BECAUSE IN OUR TIMELINE I EXPECT THAT ANY CHILD
5    WHO IS REUNIFIED OFF THAT LIST WILL TAKE NO BRIEFER THAN 12
6    HOURS.
7              SO WHILE IT MIGHT INCLUDE SOME CHILDREN WHO WILL NOT
8    BE REUNIFIED, IT WILL EXHAUSTIVELY INCLUDE ALL THE CHILDREN
9    WHO ARE TO BE REUNIFIED.  AND IT WILL GIVE 12 OR BETTER HOURS'
10   NOTICE TO PLAINTIFFS.
11             I THINK WE ARE READY TO WORK, AND GIVE WITHIN OUR
12   EXISTING OPERATIONAL PROCESS, I AM COMFORTABLE SHARING ANY OF
13   OUR PROCESS STEPS AS THEY EXIST NOW THROUGH OUR COUNSEL THAT
14   THE GOVERNMENT AND PLAINTIFFS AGREE UPON.
15             WHAT I AM LOATH TO DO IS CREATE AN ADDITIONAL
16   PROCESS STEP, AND PARTICULARLY ONE THAT CREATES A TIME
17   SPECIFIC REQUIREMENT FOR ARRIVAL, BECAUSE OUR PRESENT PLAN IS
18   LITERALLY AS FAST AS THEY CAN GET THERE.
19             THE COURT:  WHAT I WOULD SUGGEST, SO THAT WE DON'T
20   GET BOGGED DOWN IN THE WEEDS HERE, IS THAT THE PARTIES MEET
21   AND CONFER.
22             I THINK WHAT COMMANDER WHITE IS PROPOSING AND THE
23   IDEAS HE HAD WILL PROVIDE SUFFICIENT NOTICE.  I DON'T KNOW
24   EXACTLY WHAT THAT LOOKS LIKE, BUT I DON'T THINK I NEED TO BE
25   INVOLVED.  I THINK IT CAN HAPPEN, AND THEN THERE CAN BE A
```

JULY 16, 2018

1   JOINT MOTION AND ORDER, OR SIMPLY A MUTUAL UNDERSTANDING.

2            THE OBSERVATION I WOULD MAKE IS THAT COMMANDER WHITE

3   IS EXACTLY THE PERSON THAT IS NEEDED.

4            AND I'M VERY APPRECIATIVE THAT YOU ARE HERE, THAT

5   YOU HAVE EXPLAINED THIS PROCESS.  THERE IS NO QUESTION THAT

6   YOU UNDERSTAND THE CONTEXT OF THIS CASE, THE UNDISPUTED FACTS

7   THAT HAVE LED TO THIS DIFFICULT SITUATION.  THE RESPONSIBILITY

8   OF THE GOVERNMENT AND HHS TO MAKE IT RIGHT THROUGH

9   REUNIFICATION, IN A SAFE AND EFFICIENT MANNER.

10           I HAVE EVERY CONFIDENCE THAT YOU ARE THE RIGHT

11  PERSON TO DO THIS.  WHEN I HEAR YOUR TESTIMONY AND I LOOK AT

12  THE PLAN, IT PROVIDES A GREAT DEAL OF COMFORT.

13           I ALSO HAVE THE IMPRESSION THAT YOU ARE OPERATING IN

14  ABSOLUTE GOOD FAITH ON THESE ISSUES OF NOTICE AND OTHER

15  THINGS.  I AM COUNTING ON YOU TO MAKE THAT RIGHT.  BECAUSE IT

16  IS ONLY FAIR, IT IS ONLY REALLY JUST A MATTER OF COMMON

17  COURTESY TO PROVIDE SUFFICIENT NOTICE SO THAT WHEN FAMILIES

18  ARE REUNIFIED THERE IS SOMEONE THERE TO MEET THEM AND MAKE THE

19  PLACEMENT AS SEAMLESS AS POSSIBLE.

20           I THINK WHAT IS IN PLACE IS A GREAT START TO MAKING

21  A LARGE NUMBER OF REUNIFICATIONS HAPPEN VERY, VERY QUICKLY.

22  AND I THINK WITH COMMANDER WHITE IN CHARGE, THERE IS A GREAT

23  DEAL OF COMFORT THAT THE COURT HAS THAT THIS IS WORKING THE

24  WAY IT IS INTENDED TO WORK.

25           IF ISSUES ARISE, WHICH I AM SURE THERE WILL BE, WE

JULY 16, 2018

1 HAVE THE MECHANISM IN PLACE WHERE THEY CAN BE ADDRESSED, CASE

2 BY CASE IF NECESSARY.  THERE ARE CERTAINLY GOING TO BE MANY

3 SITUATIONS WHERE HHS DETERMINES THAT THERE ARE ISSUES OF

4 PARENTAGE, FITNESS, DANGER, AND THEY HOLD BACK.  AND THAT

5 WOULD BE COMPLETELY APPROPRIATE, ASSUMING AGAIN IT IS DONE IN

6 GOOD FAITH AND WITH ARTICULABLE REASONS.  AND THEN, IF

7 NECESSARY, WE CAN WORK THINGS OUT.

8         I GO BACK TO THE POINT, HERE AGAIN, OF OBJECTIVE

9 STANDARDS CLEARLY DEFINED FROM DAY ONE WITH RESPECT TO THE

10 CLASS, CLASS MEMBERS, THE DEFINITION, AND THE MANNER IN WHICH

11 CHILDREN CAN BE SAFELY REUNIFIED.  AND I THINK COMMANDER WHITE

12 HAS THAT FRONT AND CENTER AND HAS A PLAN IN PLACE.

13         **MR. GELERNT:**  YOUR HONOR, WE AGREE WITH WHAT YOU

14 SAID AND WE WILL -- AND I AGREE WE ARE GETTING INTO THE WEEDS

15 ABOUT THE NOTICE, AND WE WILL WORK WITH THEM.

16         JUST TO BE CLEAR, AND THEN WE CAN -- WE ARE NOT

17 ASKING FOR SORT OF PRECISE NOTICE:  AT 8:34 THE CHILD IS GOING

18 TO SHOW UP.

19         I THINK WHAT WE HAVE NOW, AS YOU WOULD PROBABLY

20 AGREE, IS WE HAVE NOTICE RIGHT NOW THAT 1300-PLUS ARE GOING TO

21 BE REUNIFIED AT SOME POINT BEFORE THE 26TH.  SO THAT IS SO

22 MUCH NOTICE THAT IT DOESN'T --

23         SO I THINK WHAT WE WOULD WANT TO WORK WITH YOU ABOUT

24 IS WHETHER YOU CAN GIVE THE FAITH-BASED GROUPS AT LEAST NOTICE

25 THAT THE 6-TO-48-HOUR PERIOD HAS NOW STARTED AND THEY AT LEAST

JULY 16, 2018

52

```
 1   KNOW THAT THEY HAVE A 42-HOUR BLOCK IN WHICH TO BE EXPECTING
 2   SOMEBODY TO SHOW UP.  WE CAN WORK WITH THAT.
 3               MS. FABIAN:  I THINK WE CAN WORK WITH THAT, YOUR
 4   HONOR.
 5               COMMANDER WHITE IS NODDING.
 6               THE COURT:  THANK YOU.
 7               MR. GELERNT:  THANK YOU, YOUR HONOR.
 8               WE JUST HAD A FEW VERY QUICK CLARIFYING QUESTIONS,
 9   AND MAYBE THEY ARE FOR COMMANDER WHITE AND MAYBE THEY ARE FOR
10   GOVERNMENT COUNSEL.
11               I WAS WONDERING IF COMMANDER WHITE KNEW ABOUT HOW
12   MANY CHILDREN HAVE BEEN REUNIFIED UP TO THIS POINT.  I MEAN,
13   THOSE ARE INDIVIDUALS WE DID NOT GET 12 HOURS' NOTICE FROM.
14   AND MAYBE THAT IS NOW, YOU KNOW, UNDER THE --
15               BUT IF, COMMANDER, YOU KNEW HOW MANY HAVE BEEN
16   REUNIFIED UP TO THIS POINT WE WOULD BE INTERESTED IN KNOWING,
17   OR IF COUNSEL COULD PROVIDE IT TO US LATER TODAY.  BUT
18   PRESUMABLY YOU DO KNOW THAT NUMBER.
19               MR. STEWART:  WE CAN TRY TO GET THE LATEST NUMBERS,
20   YOUR HONOR.
21               THE COURT:  OKAY.
22               MR. GELERNT:  THE TWO OTHER CLARIFYING QUESTIONS I
23   HAD WERE, I THINK THAT THERE SEEMS -- WE WERE INTERESTED IN
24   WHETHER THE GOVERNMENT IS EXCLUDING FROM THE CLASS INDIVIDUALS
25   WHO HAVE AN ILLEGAL ENTRY VIOLATION UNDER 8, USC, 1326.  YOUR
```

JULY 16, 2018

1    HONOR SPECIFICALLY CARVED OUT 8, USC, 1325 OF ILLEGAL ENTRY.

2    AND I THINK THAT MAY HAVE BEEN BECAUSE THE PARTIES WERE

3    TALKING ABOUT 1325.  BUT WE TAKE THE SPIRIT OF YOUR ORDER TO

4    BE ILLEGAL ENTRY SHOULD NOT CARVE OUT PEOPLE.

5              AND SO INDIVIDUALS CAN BE CHARGED UNDER ILLEGAL

6    ENTRY UNDER BOTH 1325 OR 1326.  1326 IS USUALLY A SECOND TIME,

7    BUT IT IS STILL ILLEGAL ENTRY.  AND IT COULD BE EVEN AN

8    ILLEGAL ENTRY FROM DECADES AGO.

9              WE WERE JUST INTERESTED IF THE GOVERNMENT IS

10   INCLUDING WITHIN THE CLASS ALL INDIVIDUALS WITH ILLEGAL ENTRY

11   VIOLATIONS, WHETHER THEY ARE 1325 OR 1326.

12             THAT MAY BE A QUESTION FOR MS. FABIAN.

13             **MR. STEWART:**  I BELIEVE, YOUR HONOR, TO THE BEST OF

14   MY KNOWLEDGE, THAT THIS IS THE FIRST WE HAVE HEARD OF THAT,

15   BUT WE CAN LOOK INTO IT AND ALSO WORK WITH MR. GELERNT.

16             **THE COURT:**  BASED ON WHAT I HAVE BEEN HEARING,

17   ESPECIALLY FROM COMMANDER WHITE TODAY, THAT I WOULD BE MAKING

18   THE ASSUMPTION THAT 1325, 1326 COLLECTIVELY WOULD NOT EXCLUDE.

19             **MR. GELERNT:**  RIGHT.

20             **THE COURT:**  BUT I THINK COUNSEL CAN ADDRESS THAT.

21             **MR. GELERNT:**  THANK YOU, YOUR HONOR.

22             AND THEN THE FINAL QUESTION I JUST HAD, I THINK THIS

23   MAY ALSO BE FOR COUNSEL, NOT FOR COMMANDER WHITE, IT MAY GO

24   BEYOND COMMANDER WHITE.

25             WE TAKE IT THAT THE REMOVALS THAT ARE OCCURRING, THE

JULY 16, 2018

```
 1  PRE-CLEARANCE GROUP OF 1300-PLUS NOW INCLUDES BOTH PARENTS IN
 2  ICE CUSTODY WHO DO NOT HAVE REMOVAL ORDERS AND PARENTS WHO DO
 3  HAVE REMOVAL ORDERS, AND ALL OF THOSE WILL CONTINUE PER THE
 4  COURT'S ORDER DURING THE INTERIM STAY.
 5            THE COURT:  YES.  I THINK THAT IS CLEAR.
 6            MR. GELERNT:  OKAY.  THANK YOU, YOUR HONOR.
 7            THE COURT:  THE NEXT MATTER -- AND THEN WE WILL
 8  RECESS HERE SHORTLY.  THERE IS A LIST.
 9            MS. FABIAN:  YOUR HONOR, I AM SORRY.
10            THE COURT:  YES.
11            MS. FABIAN:  I BELIEVE THAT IS TRUE.  WE DON'T
12  INTEND TO STOP REUNIFICATIONS, BUT I THINK WE WILL HAVE TO GO
13  WITH OUR FOLKS AND TALK ABOUT THE EFFECT OF THE INTERIM STAY
14  ON THE REUNIFICATION PROCESS.  OUR HOPE IS THAT IT HAS NO
15  EFFECT.  I THINK IF WE FIND THAT IT DOES HAVE EFFECT, WE WOULD
16  COME BACK TO THE COURT IMMEDIATELY.
17            THE COURT:  WHY WOULD IT HAVE ANY EFFECT?  IT
18  SHOULDN'T HAVE ANY EFFECT.
19            MS. FABIAN:  I THINK IT WOULD BE RELATED TO THE
20  SPACE AVAILABLE.  SO IF FOLKS -- IF THE INTENTION WAS THAT
21  FOLKS WOULD BE REUNIFIED AND OUT OF THE ICE SPACES BEING USED,
22  AND BECAUSE THEY CAN'T BE REMOVED THEY MIGHT REMAIN IN THOSE
23  ICE SPACES.  IT IS -- IT IS AN OPERATIONAL FIX, BUT I CAN'T
24  GUARANTEE AT THIS TIME THAT THERE WOULDN'T BE SOME SLOW DOWN
25  THAT WOULD RESULT.  I WOULD HOPE -- AND I AM NOT -- I CAN'T
```

JULY 16, 2018

1  CONFIRM THAT RIGHT NOW.  I JUST WANT TO BE CLEAR THAT WE WILL

2  NEED TO -- AND WE CAN TAKE A BREAK NOW AND TALK TO FOLKS.

3          BUT I THINK WE WILL HAVE TO LOOK QUICKLY AT THE

4  EFFECT OF A STAY OF THE REMOVAL PART OF THE PROCESS ON THE

5  OPERATIONS AND GET BACK TO THE COURT AS SOON AS WE CAN IF

6  THERE IS A PROBLEM.

7          **THE COURT:**  OKAY.  I DON'T THINK THIS IS GOING TO BE

8  A PROBLEM.  THE REUNIFICATION SHOULD CONTINUE IN ACCORDANCE

9  WITH COMMANDER WHITE'S PLAN.  AND THE IDEA THAT IT WOULD SLOW

10  DOWN OR STOP FOR OTHER LOGISTICAL REASONS DUE TO A STAY OF

11  TRYING TO DEPORT FAMILIES IMMEDIATELY UPON REUNIFICATION,

12  THAT'S NOT AN OPTION.  THAT JUST SHOULDN'T BE HAPPENING.

13          THERE IS NO REASON THAT I CAN THINK OF WHERE THAT

14  WOULD RESULT IN UNHINGING THE REUNIFICATIONS UNDERWAY.  IF

15  SPACE IS AN ISSUE, THE GOVERNMENT WILL HAVE TO MAKE SPACE.

16          ABSENT SOME CLEAR INFORMATION THAT'S NOT PRESENTLY

17  BEFORE THE COURT, I DON'T SEE THAT AS AN ISSUE.

18          **MS. FABIAN:**  UNDERSTOOD, YOUR HONOR.  AND WE WILL

19  RELAY THAT MESSAGE.  AND CERTAINLY IF WE HAVE ANY INFORMATION

20  WE WILL BRING IT BACK TO THE COURT AS QUICKLY AS POSSIBLE.

21          **THE COURT:**  ALL RIGHT.

22          THE NEXT SUBMISSION -- WELL, FIRST IS THE -- WELL,

23  THE NEXT SUBMISSION I THINK IS ON JULY 18, WITH A STATUS ON

24  THE 19TH.

25          AND THERE I AM UNDERSTANDING THE GOVERNMENT WILL BE

JULY 16, 2018

1   IDENTIFYING PARENTS, CLASS MEMBERS, WHO HAVE BEEN PAROLED, AND

2   WE ARE FOCUSING ON THAT GROUP NEXT.

3           AND I SEE COMMANDER WHITE IS NODDING AFFIRMATIVELY.

4           AND THEN WE WILL BE ADDRESSING THE NEXT BUCKET OF

5   CLASS MEMBERS, THOSE IN STATE OR MARSHAL DETENTION AND

6   CRIMINAL PROCEEDINGS.  AND, OF COURSE, THOSE THAT HAVE BEEN

7   REMOVED ALREADY.

8           SO WE WILL BE ADDRESSING THOSE CLASS MEMBERS

9   HOPEFULLY AT THE NEXT STATUS CONFERENCE.

10          ARE THERE ANY OTHER ISSUES WE NEED TO ADDRESS NOW

11  BEFORE WE RECESS?

12          **MR. STEWART:**  YOUR HONOR, THIS WILL BE VERY QUICK,

13  AND HOPEFULLY A HAPPY ONE.  BUT I JUST -- YOU KNOW, WE ARE

14  VERY FORTUNATE THAT COMMANDER WHITE WAS ABLE TO JOIN US HERE.

15  WE ARE GLAD IT HAS BEEN HELPFUL AND TRANSPARENT.

16          IN A SIMILAR SPIRIT, ALTHOUGH WE ARE MOVING VERY

17  QUICKLY FOR REUNIFICATIONS, WHILE THOSE OCCUR SOME CHILDREN

18  REMAIN IN CUSTODY.  I WANTED TO CONVEY TO YOU TODAY THAT THE

19  GOVERNMENT WANTS TO ASSURE YOU THESE CHILDREN ARE BEING WELL

20  CARED FOR.

21          AND JUST AN INVITATION, IF IT WOULD BE OF INTEREST

22  TO YOUR HONOR AT SOME POINT IN TIME, WE WOULD INVITE YOUR

23  HONOR TO VISIT A LOCATION, IF IT BECOMES SOMETHING, YOU KNOW,

24  YOU WOULD WANT TO DO.  I JUST RAISE IT FOR A POSSIBILITY, YOU

25  KNOW.  BUT WE WILL CONTINUE JUST PROCEEDING QUICKLY, BUT I


                        JULY 16, 2018

57

1  JUST WANTED TO BE TRANSPARENT AND GIVE -- RAISE THAT AS AN
2  INVITATION.
3              **THE COURT:**  YES.  THANK YOU.
4          **MR. STEWART:**  WE WOULD BE GLAD TO ACCOMMODATE.
5          **THE COURT:**  I DO APPRECIATE THAT.
6              OBVIOUSLY THE CONCERN THAT HAS BEEN AT ISSUE IS
7  SIMPLY THE PASSAGE OF TIME.  NO MATTER HOW NICE THE
8  ENVIRONMENT IS, IT IS THE ACT OF SEPARATION FROM A PARENT,
9  PARTICULARLY WITH YOUNG CHILDREN, THAT MATTERS.  AND IT IS
10 TIME THAT IS AT ISSUE.
11             SO THAT'S THE PRINCIPAL ISSUE WE ARE TRYING TO DEAL
12 WITH.  AND OF COURSE THE SAFE ENVIRONMENT IS ASSUMED, AND I
13 APPRECIATE THE COMMENTS YOU HAVE MADE HERE TODAY.
14         **MR. STEWART:**  THANK YOU, YOUR HONOR.  I APPRECIATE
15 IT.
16         **THE COURT:**  I THINK WE HAVE ACCOMPLISHED A GREAT
17 DEAL TODAY.
18             WHAT IS IMPORTANT AND WHAT HAS OCCURRED TODAY IS A
19 COMPLETELY TRANSPARENT PROCESS IN GOING FORWARD.  THAT IS WHAT
20 IS REQUIRED.  AND AS WE MOVE FORWARD THE CONSTANT
21 COMMUNICATION BETWEEN COUNSEL AND PARTIES, AND PARTICULARLY
22 WITH COMMANDER WHITE DIRECTING THIS, IS VERY, VERY IMPORTANT.
23             SO MUCH OF THE COURT'S INVOLVEMENT CAN BE RENDERED
24 UNNECESSARY JUST THROUGH COMMUNICATION AND WORKING THROUGH
25 THESE THINGS.


                        JULY 16, 2018

1          I THINK WE WILL RECESS NOW.  I WILL ISSUE JUST A

2   BRIEF ORDER DOING THE STAY PENDING THE BRIEFING AND HEARING.

3   AND THEN WE HAVE IN PLACE THE BALANCE OF THE STATUS REPORTS

4   THAT ARE DUE, AS WELL AS THE CONFERENCES THAT WILL OCCUR LATER

5   THIS WEEK AND NEXT.

6          THANK YOU VERY MUCH.

7          **MR. GELERNT:**  THANK YOU, YOUR HONOR.

8

9                        *   *   *

10         I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
11         IN THE ABOVE-ENTITLED MATTER.

12         S/LEEANN PENCE                        7/16/2018
           LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
13

14

15

16

17

18

19

20

21

22

23

24

25

                        JULY 16, 2018