CHAD A. READLER
Acting Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
District Court Section
Office of Immigration Litigation
ANN M. WELHAF
Attorney
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4090
Fax: (202) 616-9366
Email: ann.welhaf@usdoj.gov

*Attorneys for Federal Respondents*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.T.C., et al.<br><br>Petitioner-Plaintiff,<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Respondents-Defendants. | Case No. 18cv1626 DMS JLB<br><br>NOTICE OF RELATED CASES |

MS. L,, et al.

                    Petitioner-Plaintiff,

        vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

                    Respondents-Defendants.

Case No. 18cv428 DMS MDD


        The Government Respondents-Defendants in this case hereby notify the Court

that the two captioned cases are related to each other.  We also notify that Court that

plaintiffs' attorneys in the *N.T.C.* case recently filed emergency habeas petitions in

the Southern District of New York seeking to prevent the reunification of certain

children with their parents – relief that in the Government's view would be better

addressed by this Court in the *N.T.C.* matter.  Plaintiffs' attorneys have not been

appointed guardians ad litem for the children under Federal Rule 17, and do not

represent their parents.  The relief which plaintiffs' attorneys now seek in the

Southern District of New York would likely prevent reunifications under this

Court's order in *Ms. L.*, in direct conflict with the stated wishes of the *Ms. L.* class

members during HHS interviews to reunify with their children.  The Government is

prepared to discuss these matters further at the status conference currently scheduled

in the *Ms. L.* case for 3:00pm Pacific, today, July 24, 2018.

*N.T.C.* was case was originally filed on July 16, 2018, in the United States District Court, Southern District of New York. By order of the district court in the Southern District of New York issued on July 19, 2018, venue in this case was transferred to this Court on the following grounds: (1) "the classes in the two cases concern the same families: Plaintiffs in this case seek relief on behalf of children whose parents are class members in Ms. L;" (2) "the relief Plaintiffs seek in this case is, at bottom, directly related to the reunification process being supervised by Judge Sabraw" in *Ms. L*, and "Judge Sabraw is in a better position than [the S.D. N.Y.] to decide those questions and to modify his own orders if appropriate;" and (3) "in the absence of a single judge presiding over both cases, there is a real risk of inconsistent decisions and conflicting orders — a particularly intolerable risk given the gravity and urgency of the issues in these cases (and the prospect of similar litigation being filed in other states where children separated from their parents are being held)." *N.T.C.*, ECF 20.

On that same date, July 19, 2018, this Court filed and docketed *N.T.C.* and assigned it to Judge Sabraw, who is also presiding over the *Ms. L.* litigation. At the time of the transfer and filing in this Court, a Temporary Restraining Order (TRO) issued by the S.D. N.Y had been issued and remains in effect. See ECF 9 (TRO); ECF 20 (extending TRO). The TRO prohibits the transfer of the children of class

members in *Ms. L* for the purpose of reunification with their parents unless certain conditions are met – inducing 48 hour notice of transfer.   *See N.T.C.*, ECF 9.

Counsel in *N.T.C.* advised the government on July 23, 2018 that they would be filing habeas petitions on behalf of nine individual children. The government indicated that it believed relief should be sought in this Court in the *N.T.C.* matter, and that the government had satisfied the requirements of the *N.T.C.* TRO by providing 48 hour notice of transfer.  The government also advised the NTC counsel that the parents of the nine individuals continued to seek reunification – and specifically requested it during their HHS interviews.  On July 24, 2018, a group of purported next friends – who are not the parents of the children -- filed an emergency habeas petition seeking to halt the reunifications.  *See* Petition (attached).  A hearing on that petition was held today at 2:30 p.m. EDT in the Southern District of New York.

Because the claims in *N.T.C.* and *Ms. L.* are intertwined, the Government hereby gives notice that these two cases are related.  We believe it makes sense to consolidate the two matters.  In addition, we are prepared to discuss the implications of the two actions, and the latest habeas filings in the Southern District of New York and proceedings, during the status conference today in *Ms. L.*  We submit that the Court may want to consider inviting counsel in *N.T.C.* to also participate in the conference.  We have been complying with the TRO in *N.T.C.*, but this Court may

want to consider whether it is consistent with the *Ms. L.* injunction.  The individual

habeas petitions purportedly filed on behalf of the minors in New York may,

however, make it impossible to comply with this Court's injunction. The

Government is prepared to discuss these matter further at the status conference

currently scheduled in the *Ms. L.* case for 3:00pm Pacific, today, July 24, 2018.

DATED: July 24, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        SCOTT G. STEWART
                                        Deputy Assistant Attorney General

                                        */s/ August E. Flentje*
                                        AUGUST E. FLENTJE
                                        Special Counsel
                                        Civil Division, U.S. Department of Justice
                                        950 Pennsylvania Avenue, Room 3613
                                        Washington, D.C. 20530
                                        Phone: (202) 514-3309
                                        Fax: (202) 307-6777
                                        Email: august.flentje@usdoj.gov

                                        WILLIAM C. PEACHEY
                                        Director
                                        WILLIAM C. SILVIS
                                        Assistant Director
                                        SARAH B. FABIAN
                                        Senior Litigation Counsel
                                        NICOLE MURLEY
                                        Trial Attorney
                                        Office of Immigration Litigation
                                        Civil Division, U.S. Department of Justice


                                        ADAM L. BRAVERMAN

United States Attorney

SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.T.C., et al. | Case No. 18cv1626 DMS JLB |
| Petitioner-Plaintiff, | |
| vs. | NOTICE OF RELATED CASES |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |
| MS. L., et al. | Case No. 18-cv-428 DMS MDD |
| Petitioner-Plaintiff, | |
| vs. | **CERTIFICATE OF SERVICE** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 950 Pennsylvania Avenue, NW, Washington, DC 20530. I am not a party to the above-entitled action. I have caused service of the accompanying NOTICE OF RELATED CASES on all counsel of record, by

1    electronically filing the foregoing with the Clerk of the District Court using its ECF

2    System, which electronically provides notice.

3    I declare under penalty of perjury that the foregoing is true and correct.

4

5    DATED: July 24, 2018

                                        */s/ August E. Flentje*
6                                       AUGUST E. FLENTJE
                                              Special Counsel
7                                       Civil Division, U.S. Department of Justice
8                                       950 Pennsylvania Avenue, Room 3613
                                        Washington, D.C. 20530
9                                       Phone: (202) 514-3309
                                        Email: august.flentje@usdoj.gov
10

11                                      *Attorney for Respondents-Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Scott Rosenberg, General Counsel
Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Law Reform Unit
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit ("ILU")
Jennifer Williams, Deputy Attorney-in-Charge, ILU
Gregory Copeland, Supervising Attorney, ILU
Sarah Gillman, Supervising Attorney, ILU
Beth Krause, Supervising Attorney, ILU
Elizabeth Rieser-Murphy, Of Counsel, ILU
THE LEGAL AID SOCIETY
199 Water Street – 3rd Floor
New York, NY 10038
Tel: 212-577- 3968
Fax: 646-365-9369
gcopeland@legal-aid.org

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E.S.R.B. by and through his next friend Meryl Ranzer, J.E.C.M. by and through his next friend Carline Pinto, R.M.S.C.by and through his next friend Melissa Borja, K.M.G., K.D.G., S.G.G., and F.E.O.G. by and through their next friend Rev. Elizabeth G. Maxwell, I.M.Q.S. by and through her next friend Senator Brad Benjamin, and K.C.A. by and through her next friend Letitia James,<br><br>                  Plaintiff-Petitioners,<br><br>vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States; DEPARTMENT OF HOMELAND SECURITY ("DHS"); KIRSTJEN NIELSEN, Secretary of DHS; U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); KEVIN K. MCALEENAN, Commissioner of CBP; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); RONALD D. VITIELLO, Acting Director of ICE; U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); L. FRANCIS CISSNA, Director of USCIS; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES ("HHS"); ALEX AZAR, Secretary | Case No.: _____<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF & PETITION FOR WRIT OF HABEAS CORPUS** |

1

of the Department of Health and Human
Services; OFFICE OF REFUGEE
RESETTLEMENT ("ORR"); and SCOTT
LLOYD, Director of ORR,,

                Defendants-Respondents.

### **Preliminary Statement**

1.      The instant proceeding is a joint application for writs of *habeas corpus* and *testificandum* on behalf of 9 children who were forcibly separated from their parents at the Southern border of the United States. Most have received notice via counsel of their impending reunification with their parents, but have not been told whether the purposes of the reunification is immediate deportation or indefinite detention in a facility that is not meant, or permitted, to house children and families. They seek the opportunity to consult, in a meaningful manner, with their parents. Thus, they are asking the court to produce their parents to testify in their immigration matters.

### **Plaintiffs' Facts**

#### **E.S.R.B.**

2.      E.S.R.B., A#xxx-xx1-843, is a 9 year-old boy who traveled from Honduras to the United States with his mother, Ms. C.L.B.C., A#xxx-xx1-147. *See* Rieser-Murphy Decl. ¶ 2.

3.      E.S.R.B. is currently in the custody of the Office of Refugee Resettlement ("ORR"). He resides with a foster family contracted through an ORR-licensed child care facility called Cayuga Center ("Cayuga"). *See* Rieser-Murphy Decl. ¶ 3.

4.      In approximately May of 2018 near the U.S.-Mexico border, immigration officials took E.S.R.B. and Ms. C.L.B.C. into custody, and then, separated them from one another. E.S.R.B. was 9 years old at the time that he was separated from his mother. *See* Rieser-Murphy Decl. ¶ 4.

5.      When E.S.R.B's mother was in Border Patrol custody, she was told by officials that there was a new policy that her son would be taken from her and the official could not tell her where

2

the child would be taken. That evening, as Ms. C.L.B.C. slept with her child E.S.R.B. in her arms, Border Patrol officials entered the room and roused her awake. The officials told Ms. C.L.B.C. that they had come to take her child. Ms. C.L.B.C. refused to let E.S.R.B. go until officials told her where they were taking him. Border Patrol officials threatened to use physical force to remove the child, and at one point, pried her arms open and pinning one arm back so they could remove E.S.R.B. Ms. C.L.B.C. stated she was hysterically crying and so was her child. E.S.R.B. has been unable to speak to me about the conditions of his removal because it is too hard to talk about. *See* Rieser-Murphy Decl. ¶ 5.

6.      When interviewed, E.S.R.B. expressed that he wanted to reunify with his mother and he was very sad without her. *See* Rieser-Murphy Decl. ¶ 6, Ex. A.

7.      E.S.R.B.'s mother has indicated that she feared for her and her son's life if they were to be returned to their home country and she wanted to be able to help her son fight his case in New York, if possible. *See* Rieser-Murphy Decl. ¶ 7.

8.      E.S.R.B.'s ORR file indicates that E.S.R.B. suffers from A.D.H.D. and was prescribed Ritalin on May 22, 2018. The ORR file indicated that E.S.R.B. has been disciplined by ORR staff due to his hyperactivity. The file also indicated that E.S.R.B. has repeatedly told staff that he misses his mother. He is having trouble integrating with other children and, at times, externalizes his frustration regarding his detention towards others, which is consistent with his disability. *See* Rieser-Murphy Decl. ¶ 8, Ex. B. The ORR file indicated that on May 30, 2018, E.S.R.B.'s mother told E.S.R.B.'s case manager that the mother wanted the child to remain at Cayuga until she was either released or deported. *See* Rieser-Murphy Decl. ¶ 8.

9.      On or about July 10, 2018, E.S.R.B's mother's attorney confirmed that he had filed a motion to reopen Ms. C.L.R.C.'s underlying in absentia order. He also indicated that he would

not oppose Ms. C.L.R.C.'s transfer to New York, if it were possible. *See* Rieser-Murphy Decl. ¶ 9.

10.     On the afternoon of Sunday, July 22, 2018, the Legal Aid Society received notice that ES.R.B. was to be reunified with his mother at South Texas Processing Center in Pearsall, Texas. *See* Rieser-Murphy Decl. ¶ 10.

11.     On July 23, 2018, Ms. C.L.R.C.'s attorney confirmed that motion to reopen is still pending for Ms. C.L.R.C., a stay of removal is in force, and Ms. C.L.R.C. is still awaiting a reasonable fear interview. He is unsure when she will see an Asylum Officer in South Texas. *See* Rieser-Murphy Decl. ¶ 11.

12.     E.S.R.B. wants to do what his mother wants. His  mother is concerned for her child's wellbeing due to his medical needs if he were to be transferred to family detention at this time and requested that a *habeas* petition be filed to prevent that outcome. *See* Rieser-Murphy Decl. ¶ ¶ 12, 14.

**J.E.C.M.**

13.     Plaintiff-Petitioner J.E.C.M. ("Plaintiff" or "J.E.C.M.") is a 12-year-old boy from Honduras.  J.E.C.M. fled persecution in Honduras with his father.  J.E.C.M. and his father sought refuge from Honduras in the United States.  On or about May 24, 2018, and his father arrived at the southern border of the United States and were detained by Defendants-Respondents ("Defendants"). Krause Dec. ¶ 16.

14.     Despite there being no evidence of J.E.C.M.'s father being an unfit parent, on or about May 24,2018, pursuant to the Defendants' unconscionable policy of separated families on the pretext of a "zero tolerance policy" subjecting migrants to prosecution for unlawful entry in an

effort to deter those fleeing persecution from coming to the United States, J.E.C.M.  and his were separated. Krause Dec. ¶ 16.

15.     J.E.C.M.  was transferred to an Office of Refugee Resettlement (ORR) Facility in New York and his father is, upon information and belief, being held in custody at Bossier Medium Security Facility, 1400 miles away.

16.      J.E.C.M. has been designated by Defendants as an "unaccompanied alien child" ("UAC") under 6 U.S.C. § 279, as demonstrated by his detention by the Office of Refugee Resettlement ("ORR") under the 2008 Trafficking Victims Protection Reauthorization Act (the "TVPRA"), 8 U.S.C. § 1232.

17.     On or about July 9, 2018, J.E.C.M.  met with Mariella Martinez and obtained *pro bono* representation from The Legal Aid Society (LAS Attorney).

18.     J.E.C.M.  has expressed to his attorney his desire to remain in the United States if his father is to be deported. *See* Krause Dec. ¶ ¶ 18, 20.

19.     Since the separation, J.E.C.M.  and his father have only been able to speak once on July 6, 2018. During that conversation, upon information and belief, J.E.C.M.'s father stated that J.E.C.M. should seek to remain in the United States and claim any available relief if he, the father, were deported. *See* Krause Dec. ¶ 17.

20.     Upon information and belief, Defendants have taken no steps to reunite J.E.C.M. and his father in a lawful manner.  Defendants have provided J.E.C.M.  no concrete information concerning his father's future custody, or prospective reunification.  The sole information that J.E.C.M. has is that he is being reunited and detained and that his father is subject to an order of removal. This lack of process in providing even minimal information has further traumatized and harmed J.E.C.M.

5

**R.M.S.C.**

21.    Plaintiff-Petitioner R.M.S.C. is currently being held in the custody of the Office of Refugee Resettlement ("ORR") at the Rising Ground facility.

22.    R.M.S.C. is a ten-year-old boy from Guatemala and is not able to speak either English or Spanish.  He is only able to speak K'iche.  Krause Dec. ¶ 24.

23.    R.M.S.C. was separated from his father, A.S.G..  It is unclear the exact date of separation but R.M.S.C. did come to the border with his father and at some time thereafter the parties were separated.  Krause Dec. ¶ 24.

24.    R.M.S.C. has not been able to speak with his father for approximately two weeks. Krause Dec. ¶ 25.

25.    R.M.S.C. would like to be reunified with his father and but does not want to do so if it means he must be detained with his father in a federal detention facility.  Krause Dec. ¶ 26.

26. R.M.S.C. fears return to Guatemala. Krause Dec. ¶ 27.

27. R.M.S.C. has suffered trauma as a result of being forcibly removed from his family. Krause Dec. ¶ 28.  He reports significant trauma, difficulty sleeping, eating and concentrating. He worries about his safety.

28. R.M.S.C. does not want to be sent to a Sponsor but would rather be reunified with his father. Krause Dec. ¶ 29.

29. R.M.S.C does not know whether his Father is represented by an attorney.   Krause Dec. ¶ 30.

30. Because of the separation from his Father, it has been difficult for R.M.S.C. Krause Dec. ¶ 31.

31. He would like to be reunified with his Father but does not want to do so if it means that he has to be in a Federal Detention Facility.  Krause Dec. ¶ 31.

**K.M.G., K.D.G., S.G.G., and F.E.O.G.**

32.     K.M.G., K.D.G., S.G.G., and F.E.O.G., are siblings who are currently being held in the custody of the Office of Refugee Resettlement ("ORR") at the Cayuga facility. *See* Krause Dec. ¶ 32.

33.     K.M.G., K.D.G., S.G.G., and F.E.O.G. are from Honduras and are not able to speak English.  They are only able to speak Spanish.  K.M.G. is 17 years old, K.D.G. is 15 years old, S.G.G. is 12 years old, and F.E.O.G. is 8 years old.   Krause Dec. ¶ 33.

34.     K.M.G., K.D.G., S.G.G., and F.E.O.G. were separated from their mother, O.G..  It is unclear the exact date of separation but K.M.G., K.D.G., S.G.G., and F.E.O.G. did come to the border with their mother and at some time thereafter the parties were separated. Krause Dec. ¶ 34.

35.     K.M.G., K.D.G., S.G.G., and F.E.O.G. have been able to speak with their mother through their case manager approximately six times. Krause Dec. ¶ 35.

36.     K.M.G., K.D.G., S.G.G., and F.E.O.G. would like to be reunified with their mother but do not want to do so if it means they must be detained with their mother in a federal detention facility.  Krause Dec. ¶ 36.

37.     K.M.G., K.D.G., S.G.G., and F.E.O.G. fear return to Honduras.    Krause Dec. ¶ 37.

**I.M.Q.S.**

38.     I.M.Q.S. is currently being held in the custody of the Office of Refugee Resettlement ("ORR") at the Lutheran facility.   I.M.Q.S. is from Honduras and is not able to speak English.  She is only able to speak Spanish.  I.M.Q.S. is 14 years old.   Krause Dec. ¶¶ 40–41.

39.   I.M.Q.S. was separated from her father, S.Q.G..  It is unclear the exact date of separation but I.M.Q.S. did come to the border with her father and at some time thereafter the parties were separated.    Krause Dec. ¶ 42.

40.   I.M.Q.S. has only been able to speak with her father once since July 10, 2018.  Krause Dec. ¶ 43.

41.   I.M.Q.S. would like to be reunified with her father but does not want to do so if it means reunification in Texas. Krause Dec. ¶ 44.

**K.C.A.**

42. K.C.A., A#xxx-xx7-637, is a 9 year-old girl who traveled from El Salvador to the United States with her mother, Ms. R.V.A.L., A#xxx-xx7-636.

43. K.C.A. is currently in the custody of the Office of Refugee Resettlement ("ORR"). She resides with a foster family contracted through an ORR-licensed child care facility called Lutheran Social Services ("LSS"). Krause Dec. ¶ 49.

44. In approximately May of 2018 near the U.S.-Mexico border, immigration officials took K.C.A. and Ms. R.V.A.L. into custody, and then, separated them from one another. K.C.A. was 9 years old at the time that she was separated from her mother. Krause Dec. ¶ 50.

45. K.C.A. said that when she first entered the United States she was taken to a facility that was very cold and spent approximately two days there. She did not have a bed to sleep on and was not given any clean clothes. She was then taken to another facility that was surrounded by fences. She did not get enough food to eat at this facility and said that the little food she was given was horrible, though she still ate it. She was not allowed to leave the facility for any reason or go outside, which made her feel sad. Krause Dec. ¶¶ 51–52.

46. Officers told K.C.A. that her mother had to go to court. When K.C.A. asked when her mother would return, officers told her that it would be at around noon. K.C.A. kept looking at the clock, waiting for her mother to return. She never saw her mother again. When K.C.A. asked officers when her mother would return, the officers only responded by saying: "later." Krause Dec. ¶ 53.

47. K.C.A. spent days in this facility after she was separated from her mother. K.C.A. cried herself to sleep and she was not able to sleep much at all. Other older children who were also detained tried to comfort K.C.A., telling her that everything would be ok and that she would see her mother again. K.C.A. was then placed in ORR custody and sent to New York. Krause Dec. ¶ 54.

48. At her first interview with her attorney, K.C.A. expressed that she very much wanted to reunify with her mother. Krause Dec. ¶ 55.

49. The ORR case manager assigned to K.C.A.'s case said that to her knowledge K.C.A.'s mother wanted her to reunify and repatriate with K.C.A. She said that to her knowledge, K.C.A.'s mother was unrepresented by counsel, had a credible fear interview, and had sought review of a negative result. K.C.A. through counsel has not been able to verify the expressed wishes of K.C.A.'s mother. Krause Dec. ¶ 56.

50. Two days later, K.C.A.'s ORR case manager said that she was not sure how or when the reunification between K.C.A. and Ms. R.V.A.L. would take place, but that it would occur prior to July 26, 2018. Krause Dec. ¶ 57.

51. On the morning of July 16, 2018, counsel for K.C.A. made several attempts to contact K.C.A.'s mother through ICE, with no success. Krause Dec. ¶ 58.

9

52. On the evening of July 16, 2018, K.C.A. counsel received notice that K.C.A. was being transferred to an ICE detention center to be reunified with her parent. Krause Dec. ¶ 59.

53. K.C.A. does not wish to be reunified with her mother in the context of a detention facility. She had very bad memories of her time spent in a detention facility and did not wish to be returned to that context. Krause Dec. ¶ 60.

54. Counsel for K.C.A. has not been able to speak with Ms. R.V.A.L. since the time she began representing K.C.A. on July 10, 2018. Krause Dec. ¶ 65.

55. During the time that K.C.A. has been in ORR custody, she has had weekly calls with her mother, but she does not understand that legal posture of her mother's case. The last call she had with her mother was last week and she estimates that it lasted only about 5 minutes because her mother said that she was running out of time on her account. Krause Dec. ¶ 66.

56. K.C.A. is desperate to see her mother, and she fears that she will never see her mother again. K.C.A. said that if she sees her mother again, the first thing she will do is hug her mother and cry with happiness. Krause Dec. ¶ 67.

## **Background Facts**

57.     On June 26, 2018, the District Court for the Southern District of California ordered that Defendants reunite separated children with their parents by July 26, 2018 and take all steps necessary to facilitate regular communication between the detained children and their parents. *See Ms. L. v. ICE*, __ F. Supp. 3d __, 2018 WL 3129486, at *5 (S.D. Cal. June 26, 2018) (internal quotations omitted).

58.     As of July 20, 2018, Defendants represented during a status conference in the Ms. L litigation that approximately 450 of 2,551 children separated from parents had been reunited.

59.     On July 16, 2018, the District Court for the Southern District of New York ordered that children in New York State separated from their parents in Defendants custody be provided 48-hours-notice in order to permit consultation among children, parents, and legal counsel for the separated children who are clients of The Legal Aid Society in New York State, and information concerning whether transfers of children represented by The Legal Aid Society out of the state in which they are represented by counsel "is for the purpose of release, detention, and/or repatriation[.]"  *N.T.C. v. ICE*, 18-cv-6428, Order (J. Swain S.D.N.Y. July 16, 2018); *see also id.* ECF No. 20, Memorandum and Order (J. Furman July 19, 2018) (extending the order, noting that it is to provide "an opportunity for the Plaintiff class member to consult with a parent or close family member and counsel in order to protect the child's ability to make informed decisions about his or her legal rights and potential claims.")

60.     Defendants have not provided that opportunity to consult with parents, and, upon information and belief, seek to remove J.E.C.M.  from New York without permitting (him/her) the opportunity to consult with counsel and his parent.

61.     Defendants conscience shocking offensive and unconstitutional conduct has and will continue to cause J.E.C.M. irreparable harm in violation of the United States Constitution, statutory and regulatory law, and  the *Flores* settlement agreement.[1]

## **JURISDICTION & VENUE**

62.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 2201-2202 2241, Art. I § 9, cl. 2 and Art. III of the United States Constitution.  The action arises under

---

[1] *Flores v. Reno*, No. CV-85-4544-RJK (C.D. Cal. Jan. 17, 1997), available at https://tinyurl.com/y9fxrbsp (hereinafter "Flores Settlement").

the Due Process Clause of the Fifth Amendment, Equal Protection under the Fifth Amendment, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Administrative Procedure Act ("APA"), the Eighth Amendment, and the Immigration and National Act of 1952 ("INA").

63.    The Court may grant relief under the habeas corpus statutes, 28 U.S.C. § 2241 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the All Writs Act, 28 U.S.C. § 1651.

64.    Plaintiff's current detention as enforced by Defendants constitutes a "severe restraint[]" on [Petitioner's] individual liberty," such that Plaintiff is "in custody in violation of the . . . laws . . . of the United States." *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241.

65.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.  It is also proper because Plaintiff is presently detained under the authority of the Defendants within the jurisdiction of the Southern District of New York.

## EXHAUSTION OF REMEDIES

66.    No exhaustion requirement applies to the claims raised in this proceeding, because no administrative agency exists to entertain PLAINTIFFS constitutional challenges.  *See Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995); *Arango–Aradondo v. INS*, 13 F.3d 610, 614 (2d Cir. 1994).

67.    Any prudential exhaustion requirement may be excused where, as here, "requiring resort to the administrative remedy may occasion undue prejudice[.]" *McCarthy v. Madigan,* 503 U.S. 140, 146–47 (1992).  "[I]rreparable harm is presumed where there is an alleged deprivation of constitutional rights."  *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of

irreparable harm is necessary").  The irreparable harm being needlessly inflicted on Plaintiff by the Defendants conduct is clear, invidious, and patently unconstitutional.

## PARTIES

68.     Plaintiff, E.S.R.B. is a E.S.R.B., A#xxx-xx1-843, is a 9 year-old boy who traveled from Honduras to the United States with his mother. E.S.R.B. is currently in the custody of the Office of Refugee Resettlement ("ORR"). He resides with a foster family contracted through an ORR-licensed child care facility called Cayuga Center. He brings this lawsuit through a next friend because of his incapacity due to his minor status.


69. Meryl Ranzer resides with her family in New York, New York, and volunteers at the New

Sanctuary Coalition of NYC. Previously, she worked for 30 years as a fashion designer and

taught as an adjunct professor at Parsons School of Design, the Fashion Institute of

Technology, and Kent State University. Ms. Ranzer brings this suit as next friend on behalf

of E.S.R.B. in order to protect E.S.R.B.'s rights.

70.     Plaintiff, J.E.C.M.  is a 12 year old national of Honduras.  He has been in custody of the Defendants since May 24, 2018.  J.E.C.M.  brings this lawsuit through a next friend because of his incapacity due to his minor status and his inability – due to Defendants conduct – to speak to his father.

 71. Carline Pinto is an organizer and social justice advocate for immigration and criminal justice reform, and is currently the Manager of Member Engagement for the New York Immigration Coalition. Before joining the NYIC, Carlene worked with the Riverside Church as the Coordinator of Mission and Social Justice Programming. Carlene also served as the outreach liaison for the Justice League NYC. She has helped organize hundreds of direct actions and

mobilizations. Ms. Pinto brings this suit as next friend on behalf of J.E.C.M. in order to protect J.E.C.M.'s rights.

72.     PLAINTIFFS K.M.G., K.D.G., S.G.G., and F.E.O.G. are siblings who are currently being held in the custody of the Office of Refugee Resettlement ("ORR") at the Cayuga facility. They bring this lawsuit through a next friend because of their incapacity due to their minor status.

73. Reverend Elizabeth G. Maxwell has served as the Rector of the Church of Ascension since 2015. She has lived in New York for nearly 30 years and previously worked at St. Michael's Church. Reverend Maxwell brings this suit as next friend on behalf of K.M.G., K.D.G., S.G.G., and F.E.O.G. in order to protect K.M.G., K.D.G., S.G.G., and F.E.O.G.'s rights.

1. Plaintiff K.C.A. is a 9 year-old girl who traveled from El Salvador to the United States with her mother. She brings this lawsuit through a next friend because of her incapacity due to her minor status.

2. Letitia James is the Public Advocate for the City of New York, a city-wide elected official. In this capacity, she is charged with overseeing the functions and efficacy of New York City agencies. She brings this in her personal capacity. She has been a public defender, New York City Council Member, and assistant attorney general.

3.     Defendant Jefferson B. Sessions III is named in his official capacity as the Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 as exercised by the Executive Office for Immigration Review. Respondent Sessions routinely transacts business in the Southern District of New York, is legally responsible for administering Petitioner's removal proceedings and the standards used in those proceedings, and as such is a legal custodian of Petitioner. Respondent

Sessions' address is Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, District of Columbia 20530.

4.     Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

5.     Defendant Kirstjen Nielsen is the Secretary of DHS and is sued in her official capacity. She directs each of the component agencies within DHS, including ICE. Defendant Nielsen is responsible for implementing U.S. immigration laws and policies, including policies related to family separation and family detention at the U.S. southern border.

6.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for enforcement operations along the borders of the United States, including the southern border.

7.     Defendant Kevin K. McAleenan is the Commissioner of CBP and is sued in his official capacity. He oversees the apprehension and detention of individuals, including asylum seekers, who enter the United States at or near the U.S. border.

8.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for the detention and removal operations of DHS.

9.     Defendant Ronald D. Vitiello is the Acting Director of ICE and is sued in his official capacity. He directs the nation's immigration detention system and oversees the removal of families ordered deported at ICE detention facilities. Defendant Vitiello plays a critical role in setting detention policies that affect asylum seekers who are held in detention while they await the first steps of the asylum process.

10.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its asylum officers, conducts interviews of certain individuals apprehended at

15

or near the border to determine whether they have a credible fear of persecution and must be permitted to apply for asylum.

11.     Defendant L. Francis Cissna is the Director of USCIS and is sued in his official capacity.

12.     Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch that is responsible for "unaccompanied" non-citizen minor children.

13.     Alex Azar is the Secretary of HHS and is sued in his official capacity.

14.     Defendant Office of Refugee Resettlement ("ORR") is the component of HHS which provides placement and care for "unaccompanied" non-citizen minor children and holds legal custody of J.E.C.M.  .

15.     Scott Lloyd is the director of ORR and is sued in his official capacity.

### FACTUAL BACKGROUND

*Family Separation Policy*

16.     The Defendants have separated thousands of families pursuant to a "zero tolerance policy," a policy expressly designed to deter future asylum-seekers from coming to the United States by subjecting them to criminal prosecution and separation from their children.

17.     In March 2017, then-DHS Secretary John Kelly stated that the government was considering separating arriving children from their parents "in order to deter more movement" into the United States. *See* Copeland Decl. Ex. A, (NPR All things considered, How The Trump Administration's Family Separation Policy Is Playing Out (May 28, 2018)).

18.     On May 7, 2018, Defendant Attorney General Jefferson Sessions announced the "zero tolerance policy" of prosecution of all asylum seekers and other migrants entering the country without inspection and coercive family separation of parents and children in order to deter asylum seekers and other migrants from crossing into the United States. Defendant Sessions

16

explained, "If you cross this border unlawfully, then we will prosecute you. It's that simple. . . . If you are smuggling a child, then we will prosecute you and that child will be separated from you . . . ." Copeland Decl. Ex. B.

19.     The policy, by design, targeted only those family units crossing the southern U.S. border, not families entering the U.S. by other means, virtually all of whom are Latino, and a growing share of whom have origins in the "Northern Triangle" countries of Honduras, El Salvador, and Guatemala.  Defendants have forcibly separated over 2,550 children from their parents while crossing the border, some only months old.  *See Ms. L v. ICE*, 18-cv-428 ECF No. 124, Joint Status Report (S.D. Cal. July 19, 2018).  Children forcibly separated from their parents were transferred to the custody of Defendant Office of Refugee Resettlement ("ORR"), a component of Defendant U.S. Department of Health and Human Services, and sent to shelters and temporary housing.

20. Overwhelmingly, psychological experts warn that separating children from parents at the border causes both immediate and long-lasting psychological harm to children. Copeland Decl., Ex. C (Dylan Gee, *I study kids who were separated from their parents. The trauma could change their brains forever. The psychological impact is well-documented*, VOX.COM (June 20, 2018)).

21. When a child is initially separated from a parent at the border, the child's brain goes into fight or flight mode causing a surge in stress hormones. *Id.*  Over time after a child is separated from a parent, the child's "body and brain are being shaped to anticipate danger and prepare for the worst. This state of hypervigilance, often accompanied by alterations in cognition and emotion, makes healthy functioning a major challenge." *Id.*   The long-term effects of this early childhood trauma include becoming "at risk for academic or occupational

failure, substance abuse, and health problems such as heart disease and diabetes." Already, recently reunified parents have indicated concerns regarding the mental health and well-being of their children. Copeland Decl., Ex. D (Michael E. Miller, *How Children are Still Suffering the Trauma of Trump's Family Separation Policy*, THE IND. (July 21, 2018)). For instance, some children have anxiety about return to detention and do not recognize their parents. *Id.* Experts agree that these separated children may be deeply traumatized by forced separation. *Id.*

22.     In the face of widespread public condemnation of coerced family separation, President Trump purportedly retracted the "zero tolerance policy" by Executive Order on June 20, 2018. Copeland Decl. Ex. E, Executive Order called "Affording Congress an Opportunity to Address Family Separation," issued on June 20, 2018. The EO continued the policy of initiating criminal proceedings for all individuals who crossed the border without authorization; however, in place of systematic separation of families, the EO called for indefinite detention of families in camps and makeshift facilities. *Id.* The EO did not include any provisions to reunite families that had been separated at the border, nor did it purport to remediate the trauma or other harms caused by family separation.

### *Court Orders*

23.     In litigation in the U.S. District Court for the Southern District of California, representatives for Defendant Immigration and Customs Enforcement ("ICE") did not dispute that they had "no plans or procedures to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded." *Ms. L. v. ICE*, __ F. Supp. 3d __, 2018 WL 3129486, at *5 (S.D. Cal. June 26, 2018) (internal quotations omitted).

The court found that "under the present system migrant children are not accounted for with the same efficiency and accuracy as property." *Id*. at *7 (emphasis in original).

24.     The court in *Ms. L.* ordered, inter alia, that the government reunify all class members with their minor children by July 26, 2018 and take all steps necessary to facilitate regular communication between a detained parent and child.  However, the court did not itself require the government to release any parent or child from federal custody. More importantly, the *Ms. L* class was *not* comprised of detained children, and as such, the court order did not address any issues relating to the release of children from federal custody altogether; any process to involve the parent in decisions regarding placement of their child; or any process for expediting release of children to relatives or other caretakers where the parent together with the child determines that is in the best interest of the child.

25.     On July 16, 2018, District Judge Laura Taylor Swain of the Southern District of New York, ordered that children in New York State separated from their parents in Defendants' custody be provided 48-hours-notice in order to permit consultation among children, parents, and legal counsel for the separated children who are clients of The Legal Aid Society in New York State, and information concerning whether transfers of children represented by The Legal Aid Society out of the state in which they are represented by counsel "is for the purpose of release, detention, and/or repatriation[.]"  *N.T.C. v. ICE*, 18-cv-6428, Order (J. Swain S.D.N.Y. July 16, 2018); *see also id*. ECF No. 20, Memorandum and Order (J. Furman July 19, 2018) (extending the order, noting that it is to provide "an opportunity for the Plaintiff class member to consult with a parent or close family member and counsel in order to protect the child's ability to make informed decisions about his or her legal rights and potential claims.")

19

26.     In the case of Plaintiff-Petitioner, the government has failed to take all steps necessary to facilitate regular communication between the detained children and his parent, and in communications relating to transferring J.E.C.M. have failed to offer concrete information as to the purpose of the reunification.

## LEGAL FRAMEWORK

### *Right to Seek Asylum*

27.     Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to obtain asylum in the United States.  8 U.S.C. § 1158(a).  In addition, noncitizens have a mandatory statutory entitlement to withholding of removal where the noncitizen would face a probability of persecution if removed to his or her country of nationality, 8 U.S.C. § 1231(b)(3).

28.     Noncitizens have a further mandatory statutory entitlement to withholding or deferral of removal where they would face a probability of torture.  Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231).

29.     Since 1996, immigration law has provided authority for "expedited removal," or the removal of certain individuals from the United States without a removal hearing. *Id.* § 1225(b)(1)(A)(i).

30.     Even an individual subject to expedited removal, however, must receive a removal hearing if the person "indicates either an intention to apply for asylum . . . or a fear of persecution." *Id*. Under such circumstances, an asylum officer evaluates whether the individual has a "credible fear" of persecution in their home country. *Id*. § 1225(b)(1)(A)(ii). If an asylum officer determines that there is a "significant possibility" that such an individual could prove

20

eligibility for fear-based relief, *id*. § 1225(b)(1)(B)(v), then the asylum seeker is placed into regular – non-expedited – removal proceedings. *Id*. § 1225(b)(1)(B)(ii).

### *Flores Settlement*

31.     When the government decides to detain children for immigration purposes, it is subject to the *Flores* Settlement, which implements a "general policy favoring release" of minors.  The *Flores* Settlement "unambiguously applies both to accompanied and unaccompanied minors" in DHS custody.  *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016), and requires the government to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs . . ." *Flores* Settlement ¶ 11.

32.     The *Flores* Settlement provides minors with a presumption of release, *Flores* Settlement ¶14, and, for those who are detained, a placement in "the least restrictive setting appropriate to the minor's age and special needs," and those are required to be state-licensed. *Flores* Settlement, ¶11, ¶19.

33.     Under the settlement, children must be released from detention within five days, or within twenty days in certain emergency circumstances, to a parent, legal guardian, adult relative, adult designated by a legal guardian, or (if none of these individuals are available) a licensed program willing to accept legal custody. *See id*. ¶¶ 12, 14.

34.      Immigrant children in the custody of the government are entitled to holistic services including educational services appropriate to the development of the child, legal services, recreational time, routine medical & dental care as well as mental health services on a weekly basis (individual counseling at least once a week and group counseling at least twice a week). *See id*. ¶¶ 2, 4, 5, 6, 7, 14. The *Flores* Settlement guarantees a child's reasonable right to privacy,

1  including the ability to wear one's own clothes, talk privately on the phone, and receive

2  uncensored mail.  *Id.* ¶ 12.

3  ***The TVPRA***

4

5  35.    In 2008, Congress recognized the vulnerability of unaccompanied children and created

6  special statutory protections for these children through the TVPRA.  The TVPRA provided

7  important protections for unaccompanied children.  The TVPRA also codified portions of the

8  *Flores* Settlement, e.g. 8 U.S.C. § 1232(c)(2)(A), requiring that an unaccompanied alien child

9  "shall be promptly placed in the least restrictive setting that is in the best interest of the child[.]"

10  36.    The TVPRA also provided important legal venue for unaccompanied children. The

11  TVPRA gave USCIS initial jurisdiction of unaccompanied children's asylum cases which allows

12  unaccompanied children to pursue their asylum claims in a non-adversarial, child-friendly

13  setting. *See* TVPRA § 235(d)(7)(B). It also exempts unaccompanied children from the one-year

14  asylum filing deadline to unaccompanied children. TVPRA § 235(d)(7)(A). The TVPRA also

15  requires the government to promulgate "regulations which take into account the specialized

16  needs of unaccompanied alien children and which address both procedural and substantive

17  aspects of handling unaccompanied alien children's cases." the government to issue regulations

18  that take into account the "specialized needs" of unaccompanied children and address both

19  substantive and procedural aspects of UAC asylum claims." 8 U.S.C.§ 1232 (d)(8).  Placing

20  initial jurisdiction with USCIS gives unaccompanied children two opportunities to pursue

21  asylum: first before USCIS in a non-adversarial setting, with adjudicators who have been trained

22  on interviewing children  and then de novo before an immigration judge, should the child not be

23  successful before USCIS. This is important because it often takes traumatized children time to

24  open up about the harmful experiences they have had.

37.     According to a 2013 USCIS memo, once a child was deemed unaccompanied by DHS, that determination would remain in place for jurisdictional purposes unless there was an affirmative act by ICE, HHS, or CBP which removed the unaccompanied child status.  In practice, the government has interpreted the transfer of a child from HHS custody to DHS custody as an affirmative act terminating unaccompanied child status. Thus, once a separated child is reunified with his/her parents in ICE detention, the child will lose the opportunity to pursue his/her claim before USCIS, and perhaps even before a judge , thereby decreasing the chances that he/she will win asylum.

### *Procedural Due Process*

38.     "The Due Process Clause 'imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning' of the Fifth Amendment." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zavydas v. Davis*, 533 U.S. 678, 693 (2001).

39.     The determination of what procedures are required under the Fifth Amendment requires consideration of: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### *Substantive Due Process*

40.     The substantive component of due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *See Daniels v. Williams*, 474 U.S.

23

327, 331 (1986).  There are "two strands of the substantive due process doctrine." *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). The first strand protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience." Id.

41.     For the fundamental rights strand of substantive due process, the identification of those rights that implicate substantive due process "has not been reduced to any formula." *Obergefell v. Hodges*, ⸺ U.S. ⸺, 135 S.Ct. 2584, 2598, (2015) (internal quotation marks omitted).  At minimum, however, they include those "deeply rooted in this Nation's history and tradition." *See Washington v. Glucksberg*, 521 U.S. 702, 721, (1997) (internal quotation marks omitted).

42.     "[P]erhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court is "the interest of parents in the care, custody, and control of their children." *See Troxel v. Granville*, 530 U.S. 57, 65 (2000).  In 1923, the Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), held that the "liberty" protected by the Due Process Clause includes the right of parents to raise their children.  The Supreme Court has also recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.  *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 651 (1972).

43.     The "right to the preservation of family integrity encompasses the reciprocal rights of both parent and children." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). Children have a "constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." Kia P. v. McIntyre, 235 F.3d 749, 759 (2d Cir. 2000) (internal quotation marks and alteration omitted); *see also Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (parents "have a

constitutionally protected liberty interest in the care, custody and management of their children"

(quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999)).

44.     The Due Process Clause of the Fifth Amendment also protects the substantive right to be

free from unjustified deprivations of liberty. *Zadvydas*, 533 U.S. at 690. This right extends to

both "removable and inadmissible" non-citizens. *Id*. at 721 (Kennedy, J. dissenting) (holding that

both "removable and inadmissible aliens are entitled to be free from detention that is arbitrary or

capricious").

45.     The "freedom from imprisonment—from government custody, detention, or other forms

of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Id*. at

690; see also id. at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause

includes protection against unlawful or arbitrary personal restraint or detention.").

46.     Conduct that shocks the judicial conscience is deliberate government action that is

"arbitrary" and "unrestrained by the established principles of private right and distributive

justice." *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting Hurtado v. California,

110 U.S. 516, 527 (1884)).  This strand of substantive due process is concerned with preventing

government officials from "abusing their power, or employing it as an instrument of oppression."

Id. (internal marks omitted).

        ***The APA***

47.     Under the Administrative Procedures Act, a "final agency action for which there is no

other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing

court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to

be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or

"unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

25

48.     The Supreme Court explained in *Bowen v. Massachusetts* that judicial review of administrative actions "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action" and that any alternative remedy advanced by the agency will not be adequate under § 704 where the remedy offers only "doubtful and limited relief." 487 U.S. 879, 901 (1988).

49.     As to finality of agency action, the "core question" is "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting *Dalton v. Specter*, 511 U.S. 462, 470 (1994) ).

50.     "As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision-making process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined or from which legal consequences will flow." See *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

51.     The Supreme Court has provided that "if an agency has issued a definitive statement of its position, determining the rights and obligations of the parties, the agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would not disrupt the administrative process." *Sharkey v. Quarantillo*, 541 F.3d 75, 88 (2d Cir. 2008) (citing *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983) ) (internal quotation marks and alterations omitted).

### *Section 504 of the Rehabilitation Act*

52.     Section 504 provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

53.    Disability is defined to include "(A) a physical or mental impairment that substantially limits one or more major life activities . . ." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102.

### *Writs of Habeas Corpus Ad Testificandum*

54.    Federal statute and the common law authorize this Court to issue a writ of habeas corpus *ad testificandum*, a "lesser writ" that directs a witness's custodian to permit or bring that witness to appear at a proceeding and give testimony. 28 U.S.C. §§ 2241(c)(1), (c)(5); *Barber v. Page*, 390 U.S. 719, 724 (1968) (noting that "federal courts [have] the power to issue writs of habeas corpus *ad testificandum*" in "case of a prospective witness currently in federal custody" where testimony is necessary); *Rivera v. Santirocco*, 814 F.2d 859, 860, 864 (2d Cir. 1987) (recognizing authority of federal courts to issue *testificandum* writ). Issuance of a writ of habeas corpus *ad testificandum* does not challenge or disturb the underlying custodial order, but merely facilitates testimony from or the presence of a person who remains in custody.

55.    A federal court may issue a writ of habeas corpus *ad testificandum* to bring a witness in state or federal custody into court. *U.S. v. Cruz-Jiminez*, 977 F.2d 95 (3d Cir. 1992); *Sampley v. Duckworth*, 72 F.3d 528 (7th Cir. 1995); *Bistram v. U.S.*, 248 F.2d 343 (8th Cir. 1957).

56.    Second, the reach of the writ of habeas corpus *ad testificandum* is not subject to geographical constraints in the same manner as is the writ of habeas corpus ad subjiciendum, the more familiar "Great Writ" that inquires into the lawfulness of the underlying custody itself. Because the *ad testificandum* writ is an administrative writ that does not contest the lawfulness of custody, it is more flexible and is not dependent on the geographic location of the physical custodian. As the Fourth Circuit explained in *United States v. Moussaoui*, "[i]t is . . . clear that a

27

district court can reach beyond the boundaries of its own district in order to issue a testimonial writ." 382 F.3d 453, 466 (4th Cir. 2004); *see also Barnes v. Black*, 544 F.3d 807, 809 (7th Cir. 2008) ("Section 2241(c)(5) of the Judicial Code authorizes the district court to issue a writ of habeas corpus commanding that the prisoner be delivered to the court 'to testify or for trial.' The section codifies the common law authority of federal courts to issue writs of habeas corpus *ad testificandum* and *ad prosequendum*. . . These writs can be used to get a prisoner into the district court from anywhere in the country."). The writ enables the Court to obtain an individual in the State's custody from both state and federal facilities. *Barnes*, 544 F.3d at 809 (collecting cases). This Court therefore has jurisdiction to reach all of the Defendants here, and to compel Defendants to produce the father of J.E.C.M.

57.     The Supreme Court has similarly explained that the usual "the territorial limitation" on habeas petitions "refers *solely* to issuance of the Great Writ." *See, e.g., Carbo v. United States*, 364 U.S. 611, 619 (1961) (emphasis added) (finding no geographical limit for habeas corpus *ad prosequendum*). "A consensus among the courts [thus] indicates support for the extraterritorial issuance of writs of habeas corpus *ad testificandum*." *Williams v. Beauregard Par.*, No. 2:08-CV-355, 2014 WL 1030042, at *3 (W.D. La. Mar. 17, 2014); *see also ITEL Capital Corp. v. Dennis Mining Supply and Equip., Inc.*, 651 F.2d 405, 406–07 (5th Cir. 1981); *Roe v. Operation Rescue*, 920 F.2d 213, 218 n. 4 (3d Cir. 1990); *Atkins v. City of New York*, 856 F. Supp. 755, 758-59 (E.D.N.Y. 1994); *Greene v. Prunty*, 938 F. Supp. 637, 638-39 (S.D. Cal. 1996). Defendant Nielsen, as well as the physical custodians of the father of J.E.C.M., are thus within the *ad testificandum* writ jurisdiction of this Court.

58.     This Court's power to issue the writ of habeas corpus *ad testificandum* is also derived from the common law, for this writ is a "common law writ of ancient origin." *Gilmore v. United*

28

*States*, 129 F.2d 199, 202 (10th Cir. 1942). The Supreme Court has indicated that federal courts today must look to the historic usage of habeas corpus writs when defining their authority to issue such writs. *See, e.g., Carbo v. United States*, 364 U.S. 611, 617-620 (1961) (tracing common law and subsequent history of writ of habeas corpus *ad prosequendum*).

### *Immediate Release Under Mapp v. Reno*

59.     The Court's authority to release habeas corpus petitioners during the pendency of their petitions is governed by *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining the REAL ID Act of 2005 "did not qualify our inherent authority to admit to bail petitioners in immigrations cases").

60.     Under *Mapp*, "a court considering a habeas petitioner's fitness for bail must inquire into whether 'the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective.'" *Id*. at 230 (alterations omitted) (quoting *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)).

61.     For the purposes of a *Mapp* inquiry, "the Court considers three factors: (1) whether substantial claims are set forth in the habeas corpus petition; (2) whether the petitioner has demonstrated a likelihood of success on the merits of his or her petition; and (3) whether there are extraordinary circumstances attending the petitioner's situation which would require release on bail in order to make the writ of habeas corpus effective." *Boddie v. New York State Div. of Parole*, No 08 Civ. 9287, 2009 WL 1531595, at *1 (S.D.N.Y. May 28, 2009).

62.     Plaintiff has demonstrated substantial constitutional claims, a likelihood of success on the multitude of constitutional violations caused by Defendants' extraordinary conscience shocking conduct – such that Plaintiff should be immediately released, into the custody of (his/her) fit parent pending adjudication of these proceedings.

29

**<u>CLAIMS FOR RELIEF</u>**

**FIRST CAUSE OF ACTION**

**(Violation of Substantive Due Process)**

63.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

64.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to PLAINTIFFS.

65.     PLAINTIFFS have a liberty interest under the Due Process Clause in family unity, and remaining united with his fit parent, part of the reciprocal rights to family unity, and PLAINTIFFS' right to remain free from unjustified deprivation of liberty.

66.     The separation of PLAINTIFFS from their fit parents violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest, and it shocks the judicial conscience.

**SECOND CAUSE OF ACTION**

**(Violation of Procedural Due Process)**

67.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

68.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to PLAINTIFFS.

69.     PLAINTIFFS have a liberty interest under the Due Process Clause in family unity, and remaining united with his fit parent, part of the reciprocal rights to family unity, and PLAINTIFFS' right to remain free from unjustified deprivation of liberty.

70.     The separation of PLAINTIFFS from their parents violates procedural due process because it deprived PLAINTIFFS of their protected liberty interests without notice or any opportunity to be heard – let alone a meaningful opportunity to be heard at a meaningful time.

71.     PLAINTIFFS are being deprived of his rights to seek asylum under the INA, rights under the *Flores* Settlement, and the TVPRA, and violated PLAINTIFFS' procedural due process rights.


**THIRD CAUSE OF ACTION**

**(Violation of Section 504 of the Rehabilitation Act)**

72.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

73.     PLAINTIFFS are "otherwise qualified" to participate in any removal proceedings currently pending against him and in affirmative asylum proceedings, as well as in the programs and activities of his temporary placement by ORR in a children's shelter.

74.     The children's shelter at which PLAINTIFFS are currently detained by ORR has received substantial federal financial assistance. Immigration proceedings, including asylum adjudications before USCIS and removal proceedings prosecuted by ICE before an Immigration Judge, are federal programs.

75.     The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the

31

objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

76.    In separating PLAINTIFFS  from their parents them a thousand miles apart, the Defendants have interfered with their ability to meaningfully participate in immigration proceedings, excluded them from the protections afforded by the asylum statutes, and discriminated against PLAINTIFFS  on the basis of a disability created by them.

77.    Defendants have a legal duty to provide reasonable accommodations to PLAINTIFFS  to ensure their meaningful access to the federal program of asylum and removal proceedings.

78.    PLAINTIFFS  have provided Defendants with notice of his disabilities and requested reasonable accommodations no later than service of this pleading. Defendants have not granted these requests.

79.    There are effective reasonable accommodations that Defendants could implement. In particular, Defendants could immediately cease the forced separation of PLAINTIFFS  from their parents. Defendants have failed to implement any reasonable accommodations.

80.    The reasonable accommodation requested by PLAINTIFFS  would not be unduly burdensome nor would it require a fundamental alteration in the program. The burden of showing that any such relief or accommodation would require a fundamental alteration or pose an undue burden rests with Defendants. 6 C.F.R. § 15.50(a)(2).

81.    By forcibly separating PLAINTIFFS  from their parents, Defendants have denied PLAINTIFFS  equal and effective access to a federal program.

82.    As a result of this discrimination and failure to reasonably accommodate PLAINTIFFS's disabilities, and solely based on his disability, PLAINTIFFS  cannot receive the benefits of the asylum process or the placement by Defendants in a children's shelter in New York.

32

## FOURTH CAUSE OF ACTION

### (Violation of Administrative Procedure Act)

83.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

84.     The Administrative Procedure Act ("APA") prohibits agency action that is arbitrary and capricious.

85.     The forcible separation of PLAINTIFFS  from their parents and the decision to detain them thousands of miles from one another constitutes final agency action under the APA.

86.     Defendants' separation of PLAINTIFFS from their parents without a legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. § 706.

87.     Defendants' decision to detain PLAINTIFFS  at an unlicensed facility is in violation of *Flores*.

## FIFTH CAUSE OF ACTION

### (Violation of Equal Protection Guarantee)

88.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

89.     The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.

90.     Defendants' decisions to separate families from Central and South America arriving at the southern border seeking asylum, and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin. This intentional discrimination includes bias against immigrants perceived to come from Central or South American countries.

91.     As a result of these decisions, including the decisions that have caused the separation of PLAINTIFFS  from their parents, PLAINTIFFS have been and are being denied equal protection.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment Act)

92.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

93.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

94.     There is an actual controversy between the parties because Defendants have refused to immediately release PLAINTIFFS  The Court should exercise its authority under the Declaratory Judgment Act to declare that Defendants have no basis to refuse to release PLAINTIFFS and to order Defendants to immediately release PLAINTIFFS, into the custody of their parents or another suitable relative as directed by J.S.G.

## **PRAYER FOR RELIEF**

WHEEFORE, Plaintiffs respectfully requests that the Court enter a judgment against Defendants and award the following relief:

1. Assume jurisdiction over this matter;

2. Enjoin Respondents from moving the Petitioners from the New York City area while habeas proceedings are pending;

3. Declare that Defendants' failure to reasonably accommodate Plaintiffs' disabilities, or their failure to provide Plaintiffs equal and effective access to a federal program, violates Section 504 of the Rehabilitation Act of 1973;

4. Declare that Defendants must immediately release PLAINTIFFS into the custody of their parents or to such other suitable adult as their parents may direct;

5. Order PLAINTIFFS' immediate release into the custody of their parents pursuant to *Mapp v. Reno* pending resolution of these proceedings;

6. Order Defendants to produce PLAINTIFFS' parents in the Southern District of New York, on a writ of habeas corpus *ad testificandum* or otherwise, so that they may visit in person with PLAINTIFFS so as to advise this Court whether the parents  request their  immediate release to another suitable relative or continued detention, together, for as long as Defendants detain them both;

7. Preliminarily and permanently enjoin Defendants from continuing to separate PLAINTIFFS from their parents and from refusing to release PLAINTIFFS into the custody of their parents, or to such other suitable adult as their parents may direct;

8. Grant a writ of Habeas Corpus requiring Defendants to release PLAINTIFFS immediately to the custody of their parents or such other suitable relative as their parents may direct, or issue

35

1    an order directing the Defendants to show cause within three days why the writ should not be

2    granted, pursuant to 28 U.S.C. § 2243;

3
9.  Require Defendants to pay Plaintiffs' reasonable attorneys' fees and costs; and

4
10. Grant all other relief that is just and proper.

5
6                    Dated this 23rd of July, 2018.

7
8                         Respectfully submitted,

9                              */s/ Gregory P. Copeland (GC 1931)*
                              Scott Rosenberg, General Counsel
10                            Adriene Holder, Attorney-in-Charge, Civil Practice
                              Judith Goldiner, Attorney-in-Charge, Law Reform Unit
11                            Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit ("ILU")
                              Jennifer Williams, Deputy Attorney-in-Charge, ILU
12                            Gregory Copeland, Supervising Attorney, ILU
                              Sarah Gillman, Supervising Attorney, ILU
13                            Beth Krause, Supervising Attorney, ILU
                              Jennifer Levy, Supervising Attorney, Law Reform Unit
14                            Elizabeth Rieser-Murphy, Of Counsel, ILU
                              THE LEGAL AID SOCIETY
15                            199 Water Street – 3rd Floor
                              New York, NY 10038
16                            Tel: 212-577- 3968
                              Fax: 646-365-9369
17                            gcopeland@legal-aid.org

18

19

20

21

22

23

24

25

26

27

28

36

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner's legal team the events described in this Petition. On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in the attached Verified Complaint for Declaratory and Injunctive Relief & Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated July 23, 2018

*/s/ Gregory P. Copeland (GC 1931)*
Gregory P. Copeland
Counsel for Plaintiff-Petitioner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

N.T.C. et al.,

       Plaintiffs,

-v-

US Immigration and Customs Enforcement et al.,

       Defendants.

----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-17-2018

No. 18 cv 6428 (JMF)

ORDER

       This case, in which the Complaint was filed in Chambers of the undersigned this evening, came before the Court on Plaintiffs' application for an order to show cause as to why injunctive relief ought not to be entered, with an application for a temporary restraining order. The Court reviewed the complaint, Plaintiffs' memorandum of law, declarations and exhibits and proposed order to show cause, and heard representations and arguments from counsel for Plaintiffs and counsel for the government Defendants. The Court having determined that limited injunctive relief is warranted based on Plaintiffs' representations that minor children who have been forcibly separated from their parents, are in New York in the custody of the federal Office of Refugee Resettlement ("ORR") and have been referred for representation by the Legal Aid Society have been, and are expected to be, removed from New York without notice to their counsel and thereby deprived of the ability to receive legal advice and consult with counsel regarding their rights to make applications for asylum and enforce other substantive rights, and prosecute such claims and applications on their own behalf, and that parents are being solicited to consent on behalf of such children to removal without due process, and in order to afford the parties time to make further factual and legal investigations and to afford the judge to whom this case will be assigned tomorrow time to hold necessary proceedings, it is hereby

       ORDERED, that Defendants ARE HEREBY RESTRAINED from taking any action to remove minor children clients of the Legal Aid Society from New York State who are in ORR custody without providing forty-eight (48) hours' advance notice of such forthcoming action to children and their counsel (including, without limitation, the location to which the minor child client will be moved, the location where the child's parent or parents currently reside, and whether the movement is for the purpose of release, detention, and/or repatriation), in order to permit consultation among the child, the child's parent or other close family member(s), and counsel to protect the child's ability to make informed decisions about his or her legal rights and potential claims. It is further

ORDERED, that the injunction set forth in the foregoing paragraph is in effect from the time of issuance of this order until 10:00 a.m. on Thursday, July 19, 2018, subject to extension, other modification or vacatur by further order of the assigned judge. It is further

ORDERED, that Plaintiffs' counsel shall deliver to Defendants' counsel a list of the names of the client children by 9:00 a.m. on Tuesday, July 17, 2018, and that, pending such delivery, Defendants shall assume that all minor children in New York in ORR custody who have been forcibly separated from their parents are clients of the Legal Aid Society. It is further

ORDERED, that no bond is required. It is further

ORDERED, that Plaintiffs shall file their Complaint in the office of the Clerk of Court by 9:30 a.m. on Tuesday July 17, 2018, and promptly inform Defendants' counsel of the name of the assigned judge.

SO ORDERED.

Dated:     New York, New York
          July 16, 2018
          Issued: 9:15 p.m.

Laura Taylor Swain
United States District Judge
Part I

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
:
N.T.C. et al., :
:
                                  Plaintiffs, :
:
                        -v-                       :
:
U.S. IMMIGRATION AND CUSTOMS :
ENFORCEMENT et al., :
:
                                  Defendants. :
:
-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  07/19/2018

18-CV-6428 (JMF)

MEMORANDUM OPINION
AND ORDER

JESSE M. FURMAN, United States District Judge:

 This case, which was filed on the evening of July 16, 2018, arises out of the

Government's much-criticized decision earlier this year to separate immigrant parents who enter

the United States from their children.  The policy has been the subject of intense political debate

and litigation, most prominently in a class action brought on behalf of immigrant parents in the

Southern District of California captioned *Ms. L. v. U.S. Immigration and Customs Enforcement*,

No. 18-CV-0428 (S.D. Cal.).  On June 6, 2018, the Honorable Dana M. Sabraw, who is ably

presiding over that litigation, concluded that the plaintiffs stated a legally cognizable claim for

violation of their substantive due process rights to family integrity, and on June 26, 2018, he

granted a class-wide preliminary injunction requiring the Government to reunite parents with

their minor children by July 26, 2018.  Since that time, Judge Sabraw has closely supervised the

reunification process and related matters.  Most relevant for present purposes, on July 16, 2018,

he temporarily imposed a seven-day waiting period before members of reunified families could

be removed from the country, relief that had been sought by the plaintiffs to ensure that parents

could consult with their children and counsel about legal options prior to removal.

This case differs from *Ms. L.* in at least one significant respect: It is brought on behalf of *children* who were separated from their parents and are now being held in New York State. Plaintiffs in this case argue that the Government plans to detain them in facilities that do not meet applicable legal standards or to repatriate them as a family unit with their parents, "thereby depriving each child of his or her ability to pursue [his or her own] individual asylum and other child immigrant claims." (Docket No. 1 ("Compl."), ¶ 3). Plaintiffs further claim that the Government has taken to moving children across state lines without warning to counsel and coercing parents into signing insufficiently informative waivers of their children's due process, asylum, and child immigrant rights. (*Id.*). Plaintiffs ultimately seek to ensure that each class member has a meaningful opportunity to pursue asylum or other claims or, in the alternative, that each class member has the opportunity to voluntarily, intelligently, and knowingly waive those claims; they also seek to preserve class members' ability to consult with their parents, close family, and counsel about these decisions. More immediately, they seek injunctive relief barring Defendants from removing any Plaintiff from New York State without providing (1) forty-eight hours' notice of the pending transfer and certain related information to the Plaintiff and his or her counsel; and (2) an opportunity for the Plaintiff class member to consult with a parent or close family member and counsel in order to protect the child's ability to make informed decisions about his or her legal rights and potential claims.[1]

---

[1]     On the evening of July 16, 2018, Judge Laura Taylor Swain, sitting in Part I, held a hearing on Plaintiffs' application for emergency relief and granted the application in part, prohibiting the Government from removing putative class members represented by Legal Aid from New York State without providing forty-eight hours' notice of the forthcoming removal to Plaintiffs and their counsel. The temporary restraining order expires today at 10 a.m. absent

These are substantial claims, but the question right now is not whether they have merit.

Instead, the question is whether they should considered in this forum or by Judge Sabraw in the

Southern District of California. Having considered the parties' arguments — made during a

hearing held on the record on July 17, 2018, and in letters submitted the next day, (Docket Nos.

14-16; *see also* Docket No. 11) — and (with the parties' consent) having consulted with Judge

Sabraw, the Court concludes for several reasons that Plaintiffs' claims should be transferred to

the Southern District of California to be considered in conjunction with the claims in *Ms. L.*

*First*, the classes in the two cases concern the same families: Plaintiffs in this case seek relief on

behalf of children whose parents are class members in *Ms. L.* (*Compare* Order, *Ms. L.*, ECF No.

82, at 17, *with* Compl., ¶ 66). *Second*, the relief Plaintiffs seek in this case is, at bottom, *directly*

related to the reunification process being supervised by Judge Sabraw. In essence, Plaintiffs here

contend that they have rights and interests distinct from the rights and interests of their parents

and that the reunification process, and Judge Sabraw's own orders, do not adequately take their

distinct rights and interests into account.[2] That may or may not be the case, but Judge Sabraw is

in a better position than this Court to decide those questions and to modify his own orders if

appropriate. And *third*, in the absence of a single judge presiding over both cases, there is a real

---

extension, modification, or vacatur by the undersigned.

[2] For example, Plaintiffs claim that the mere act of reunification mandated by Judge Sabraw's orders may deprive them of access to protections set forth in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044, as those protections apply only to unaccompanied minors (which they are now) and not to accompanied minors (which they would become upon reunification). (*See* Docket No. 14 ("Pls.' Letter"), at 3-4). Further, Plaintiffs contend that they "have independent rights . . . that are being extinguished, through apparent waivers" being signed by their parents — waivers that may have been approved by the *Ms. L.* Court. (*Id.* at 7-8).

risk of inconsistent decisions and conflicting orders — a particularly intolerable risk given the gravity and urgency of the issues in these cases (and the prospect of similar litigation being filed in other states where children separated from their parents are being held).

The Court is, of course, mindful of the deference that is owed to a plaintiff's choice of forum. *See, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006). The Court is also aware that transferring this case will cause some inconvenience to Plaintiffs and Plaintiffs' counsel, who are located in New York. (*See* Pls.' Letter 9). Nevertheless, the Court is confident that Judge Sabraw can and will take steps to mitigate that inconvenience. And in any event, the inconvenience to Plaintiffs and Plaintiffs' counsel is vastly outweighed by the interests of justice, fairness, efficiency, and avoidance of conflict advanced by having a single judge presiding over both cases. Accordingly, pursuant to Title 28, United States Code, Section 1404(a), the Court transfers this case to the Southern District of California. *See, e.g.*, *Cont'l Grain Co. v. The Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968) (recognizing a "strong policy favoring the litigation of related claims in the same tribunal"); *Stroud Prods. & Enters. v. Castle Rock Entm't*, No. 07-CV-8638 (HB), 2009 WL 2391676, at *3 (S.D.N.Y. Aug. 4, 2009) ("[T]rial efficiency and the interests of justice weigh heavily in favor of litigating all related causes of action . . . in a single forum." (citation omitted)). Further, to preserve the status quo, the temporary relief granted by this Court on July 17, 2018, (Docket No. 9), is extended to give Judge Sabraw an opportunity to consider Plaintiffs' request for broader emergency relief. The

4

parties should promptly present those issues to Judge Sabraw so that he can decide whether to maintain, modify, or vacate the order granting temporary relief.

The Clerk of Court is directed to transfer this action forthwith to the United States District Court for the Southern District of California, to be assigned to Judge Sabraw. The Clerk of Court is directed to effectuate the transfer immediately, notwithstanding Local Rule 83.1, and then to close the case in this Court.

SO ORDERED.

Dated: July 19, 2018
       New York, New York

_____
JESSE M. FURMAN
United States District Judge