Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioner-Plaintiff
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioner-Plaintiff,* | |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | Date Filed: July 25, 2018 |
| *Respondents-Defendants.* | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR STAY OF REMOVAL** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

   I.   Settlement Discussions...........................................................................2

   II.  A Seven-Day Stay of Removals Is Urgently Needed. ......................3

      A.   Class Members Cannot Make Knowing and Informed Decisions Concerning Reunification Before Seeing Their Children. ..................4

      B. After Reunification, Lawyers Need Time to Counsel Parents and Children Effectively..........................................................................7

   III.  The Stay Should Extend to <u>All</u> Class Members, Including Those Who Allegedly Have Waived Reunification. .................................................9

   IV.  The Court Has Jurisdiction to Stay Removals. ..............................9

      A.   The Court Has Equitable Power to Enforce Its Orders. ...........9

      B.   The Provisions Defendants Cite Do Not Strip This Court of Power to Enforce Its Order. ..........................................................10

CONCLUSION....................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. ICE,*
　　510 F.3d 1 (1st Cir. 2007) ................................................................. 11

*Avendano-Ramirez v. Ashcroft,*
　　365 F.3d 813 (9th Cir. 2004) ............................................................. 11

*Chambers v. NASCO, Inc.,*
　　501 U.S. 32 (1991) ........................................................................... 10

*Chhoeun v. Marin,*
　　No. 17-cv-01898, 2018 WL 566821 (C.D. Cal Jan. 25, 2018) .................... 13

*F.J. Henshaw Enters., Inc. v. Emerald River Dev., Inc.,*
　　244 F.3d 1128 (9th Cir. 2001) ........................................................... 10

*Garcia de Rincon v. DHS,*
　　539 F.3d 1133 (9th Cir. 2008) ........................................................... 11

*Kwai Fun Wong v. United States,*
　　373 F.3d 952 (9th Cir. 2004) ............................................................. 11

*Lemon v. Kurtzman,*
　　411 U.S. 192 (1973) ......................................................................... 10

*Mellouli v. Lynch,*
　　135 S. Ct. 1980 (2015) ...................................................................... 11

*Nken v. Holder,*
　　556 U.S. 418 (2009) ......................................................................... 12

*Orantes-Hernandez v. Thornburgh,*
　　919 F.2d 549 (9th Cir. 1990) ............................................................. 10

*Pena v. Lynch,*
　　815 F.3d 452 (9th Cir. 2015) ............................................................. 11

*Plata v. Schwarzenegger,*
　　603 F.3d 1088 (9th Cir. 2010) ........................................................... 10

*Sied v. Nielsen,*
　　No. 17-Cv-06785, 2018 WL 1142202 (N.D. Cal. Mar. 2, 2018) ................ 13

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
　　402 U.S. 1 (1971) ............................................................................. 10

*Travelhost, Inc. v. Blandford,*
　　68 F.3d 958 (5th Cir. 1995) ............................................................... 10

*United States v. Hovsepian,*
　　359 F.3d 1144 (9th Cir. 2004) ........................................................... 13

**Statutes**

8 U.S.C. § 1252 ................................................................. 10, 11, 12, 13

# INTRODUCTION

Defendants are seeking to deport Class Members and their children *immediately* upon reunifying them. In their months of separation, these parents have not spoken to their children for more than several minutes on the phone; many if not most have never spoken to a lawyer. And yet within moments of seeing their kids for the first time, Defendants propose to put them on planes, with no meaningful opportunity to receive legal advice and make a considered family decision about whether their children should remain in the United States without them.

That remarkable proposal is inconsistent with the Court's order that parents make knowing and voluntary decisions about reunification. In designing the election form that this Court approved, Plaintiffs never imagined that Defendants would force Class Members to sign it and then deport them *before* they have a meaningful in-person opportunity to consult with their children and attorneys. And during settlement discussions, Defendants only offered, at best, 2.5 days to consult—an impossible demand, especially given the constraints on attorney access and the unprecedented task of advising hundreds of traumatized families all at once.

Defendants asserted at yesterday's status conference that Plaintiffs' requested relief was based solely on "rumors" of possible removals. To the contrary, prior to requesting relief from this Court, Plaintiffs' counsel sought assurances from Defendants that they would *not* remove reunified Class Members before they had a meaningful chance for counseling about their legal rights and options—assurances which Defendants refused to provide. Even at yesterday's status conference, counsel for Defendants did not deny that the Government intended to remove families immediately upon reunification. More importantly, on the afternoon before Plaintiffs sought a stay, the Government finally revealed its plan to reunite children 5-17 years old, which suggested that Defendants intended to immediately remove reunified families. Dkt. 109-1. If Defendants do not plan on removing families, they

1    should say so. In short, Plaintiffs had no choice but to seek a stay from the Court.[1]

2        As described below, the need for this Court's intervention has only become

3    more clear since Plaintiffs filed their motion. The Court should therefore stay

4    removals until Class Members have had sufficient time to consult about what might

5    be the most consequential decision of their lives. No statute bars the Court from

6    issuing this modest relief to ensure the effectiveness of its reunification order.

7        The Government took children, including babies, from their parents and did

8    not return them for weeks and often many months. As the Court has noted, Ms. C.'s

9    child was not returned for 8 months. And she was not alone. The Government

10   should not now be able to argue that it cannot wait a mere 7 days to remove these

11   families, so that they can be advised on their life-altering decisions.

12   **I.    Settlement Discussions.**

13       Defendants have chosen to inform the Court about the contents of the parties'

14   negotiations. Because negotiations have broken down, Plaintiffs will not dwell on

15   the details of the negotiations, other than to correct a few misrepresentations by

16   Defendants. Most importantly, Defendants misstate the number of days for which

17   they agreed to a stay of removal. As an initial matter, Plaintiffs made clear that

18   Defendants could not begin counting the days from when reunification occurred,

19   since the Government has not been informing Plaintiffs when those reunifications

20   occur. As a result, Plaintiffs would not know when or where to send volunteer

21   attorneys to meet with the family. Consequently, Plaintiffs made clear that the

22   number of days could not begin until the Government had informed Plaintiffs of the

23   time and place where a family was reunified. The Government states that it agreed

24   _____

25   [1] Defendants' most recent class list reveals that Defendants removed one Class
     Member on July 17—the day after the Court's interim stay of removal—and 17
26   more the same day as the stay, on July 16. Defendants have not informed Plaintiffs
     of the exact time of day when those 17 were removed, so it is impossible at this
27   point for Plaintiffs to know if the removals occurred prior to the issuance of the
28   stay.

                                               2                    18cv0428

to 3 days after it provided Plaintiffs with notice of the reunification. While 3 days is not nearly sufficient, Defendants' proposal did not even provide that. As the Government knows, it stated that it would not provide Plaintiffs with notification until 2pm Central time, leaving reunited families at best 2.5 days to find and consult with attorneys. And even that assumes that Plaintiffs' counsel could get volunteer attorneys to meet parents immediately after receiving notice at 2pm, which as explained below is wholly unrealistic.[2]

## II.     A Seven-Day Stay of Removals Is Urgently Needed.

Class Members with final removal orders have had no opportunity to make an informed decision about whether to fight their own removal case, leave their children behind in the United States, or make some other decision. The limited phone contact Plaintiffs had with their children before reunification did not provide them with a meaningful opportunity to assess these options as a family. Nor was the election form adequate to serve this purpose, particularly given the way the forms have been administered. As the attached declarations demonstrate, parents plainly had no idea what they were signing or agreeing to orally.

Moreover, the evidence shows that, after initial reunification has occurred, providing meaningful counsel to Class Members about the decisions they must make will take time. This is particularly so given that hundreds of traumatized families may show up within a few days at one detention center in South Texas, and given the unique obstacles counsel face in advising recently-reunified families. Seven days is thus more than reasonable, especially given the length of time that the government has subjected the families to separation.

_____

[2] In addition, contrary to Defendants' assertion, they never agreed to allow attorney consultations past 8pm. They stated only that they would inquire about extending the hours. Similarly, Defendants never agreed to allow Plaintiffs full access to the Karnes detention facility to conduct attorney-client meetings. Rather, when negotiations ended, they had agreed only to allow Plaintiffs to use the 5 attorney rooms (which, in total, accommodate only 5 attorney-client meetings at a time).

## A. Class Members Cannot Make Knowing and Informed Decisions Concerning Reunification Before Seeing Their Children.

1. <u>The Pre-Reunification Process Was Inadequate</u>. Defendants claim that a 48-hour period after Class Members sign an election—but *before* reunification—is "adequate time to make a sound choice" regarding their reunification rights. Stay Opp., Dkt. 148, at 12. But Plaintiffs never contemplated that Defendants would force Class Members to make this momentous decision concerning whether to be removed without their children before even seeing their children. The opportunity for a brief phone call between parents and their children—to the extent that such communication has even happened—is wholly inadequate. For the government to suggest otherwise (Stay Opp. 13-14) is especially unrealistic given the evidence of the trauma that Class Members continue to experience as a result of the weeks or months of pain and uncertainty without their children *See, e.g.*, Reichlin-Melnick Decl. ¶ 9 (father breaking down in tears as he described son's circumstances, despairing that he did not even know if his child was safe or healthy); Dkt. 13-1 at 96 (Ms. L. describing her depression and inability to sleep or eat).

These problems are exacerbated by the coercive and misleading manner in which Defendants distributed the notice of Class Members' rights and election forms. As illustrated in the attached declarations, the evidence is overwhelming that parents have signed forms they did not understand. Some forms were presented in English to parents who did not speak that language. Shepherd Decl. ¶ 6; Reive Decl. ¶ 5; Reichlin-Melnick Decl. ¶ 11; *see also* Reive Decl. ¶ 11. Some parents with limited or no literacy were not told what they were signing. Suchman Decl. ¶ 6; Reive Decl. ¶ 10; Mwalimu Decl. ¶ 6. Still others thought they had signed papers stating that they *wanted* reunification. Reichlin-Melnick Decl. ¶ 4. Parents who speak an indigenous language were at a particular disadvantage.

There are numerous examples:

- Class Members describe being forced to make an election in a room full of dozens of other parents, with only a few minutes to decide whether or not to leave their children in the United States. Cruz Decl. ¶¶ 6-9; Shepherd Decl. ¶ 8.

- One father signed a form in English, but had no idea what it said because he is completely illiterate and primarily speaks an indigenous language. Reichlin-Melnick Decl. ¶ 8.

- Another father, also an indigenous language speaker, thought he was signing a form that would allow him to be reunited with his son. Reive Decl. ¶ 9.

- Class Members were given incorrect information that their right to reunite was conditioned on giving up their legal claims. Shepherd Decl. ¶ 8-9.

- Two fathers thought they were signing a form that would allow the government to release their children; one of these fathers burst into tears repeatedly out of fear for his son and said he had signed the form under enormous stress and confusion. Reichlin-Melnick Decl. ¶ 10.

- One mother was told that signing a form would lead to her reunification with her son, and was surprised to learn that she had allegedly signed away her right to reunification. Mwalimu Decl. ¶ 5.

- An immigration officer told one father that he would need to pay at least $500 every time he wanted to see an attorney. Shepherd Decl. ¶ 11.

Given these circumstances, it should come as no surprise that numerous Class Members who are on Defendants' list of parents who waived reunification in fact *do* want their kids back. *See, e.g.*, Suchman Decl. ¶ 5 (six parents on "relinquished" list, all want to be reunited with children); Reive Decl. ¶ 3 (nine fathers on "relinquished" list all want reunification with their children); Cruz Decl. ¶ 4 (five fathers on "relinquished" list want reunification); Mwalimu Decl., ¶ 4 (two mothers on "relinquished" list want reunification); Reichlin-Melnick Decl. ¶ 8-11

(four fathers who allegedly waived reunification did not realize they had done so or are afraid they made the wrong decision because of lack of information); Gomez Amaya Decl. ¶ 14, Gilliam Decl. ¶ 5-6 (father on "relinquished" list, does not have a final order, wants reunification).

2. <u>Phone Contact With Children</u>. Defendants assert that Class Members have had sufficient contact with their children by telephone. Stay Opp. at 13-14. But the evidence shows that Class Members have barely had *any* time to speak with their children during the months they have now spent apart. Most have spoken only briefly by phone once or twice. *See* Fluharty Decl. ¶ 21; Reive Decl. ¶ 6, 9, 10; Reichlin-Melnick Decl. ¶ 9, 11; Cruz Decl. ¶ 8; 13; Suchman Decl. ¶ 5. And some of these phone calls occurred weeks or even months ago. *See* Cruz Decl. ¶ 13; Reichlin-Melnick Decl. ¶ 9.

These phone calls allow barely enough time for parents to get basic reassurance that their children are alive and cared for. They are wholly insufficient to allow the parent and child a meaningful opportunity to speak with each other about the grave decision they must make together. And, in any event, they do not allow parents to consult with any *attorney* for their children, leaving their children—in the several minutes they have on the phone—with the impossible task of accurately explaining their own legal options to their parent. That is obviously not sufficient to allow parents to make an informed decision about whether their children should stay behind in the United States alone.

3. <u>Counsel Access</u>. Defendants' counsel access policies have impeded Class Members from speaking with lawyers prior to reunification. Many Class Members have been transferred from facility to facility, sometimes three or four times. *See* Reichlin-Melnick Decl. ¶ 6 (sudden transfers prevented counsel from meeting with eight parents who had allegedly waived reunification rights); Odom Decl. ¶ 7-12; Govindaiah Decl. ¶ 17; Lunn Decl. ¶ 11. Often these transfers occur with no notice to counsel present at the facilities who are trying to meet with the detainees. Odom

Decl. ¶ 11-12, 21.

Even basic phone access has been a problem, preventing detainees from speaking with lawyers. Odom Decl. ¶ 14-15; Rivera Decl. ¶¶ 3-8; Chavla Decl. ¶12. ICE facilities also impose strict visitation policies and long waits for attorney access. *See* Odom Decl. ¶¶ 7-11, 17, 21, 25-27; Reichlin-Melnick Decl. ¶ 6; Gomez Amaya Decl. ¶ 13; Suchman Decl. ¶ 5.

Defendants themselves impeded efforts to get attorneys for Class Members by delaying critical information. Plaintiffs repeatedly asked Defendants to provide a complete list of Class Members who had outstanding removal orders, as well as a list of parents who have allegedly waived reunification, since those groups are obviously at the gravest risk of imminent harm. Defendants waited until Friday, July 20 to provide these lists, preventing Plaintiffs from beginning to arrange counsel for Class Members until the weekend of July 21. *See* JSR, Dkt. 146, at 3.

**B. After Reunification, Lawyers Need Time to Counsel Parents and Children Effectively.**

Plaintiffs have requested a 7-day stay from the time they are notified of a reunification. That time is necessary because of the unique challenges presented by Defendants' separation policy. To begin, the reunification itself is an incredibly emotional and difficult experience. Parents are seeing their children for the first time in weeks or even months. Sometimes initial meetings are too difficult because the parents are too traumatized to even receive basic advisals. *See* Govindaiah Decl. ¶¶ 29-30; Connell Decl. ¶ 10; Fluharty Decl. ¶ 19. Other parents cannot focus on legal advice because they cannot move past their fear of separation; one parent responded to every statement by asking whether he could stay with his son. Govindaiah Decl. ¶ 29. Parents and children do not want to leave each others' sides, which can hinder their parents' ability to discuss persecution or other events that could support asylum claims. Govindaiah Decl. ¶ 25; Fluharty Decl. ¶ 23.

Even if a lawyer could assuage these emotional barriers, other practical

barriers make these cases unusually difficult. Most families who come to family detention facilities have all their proceedings conducted in that facility, which makes it relatively simple for counsel to track their clients' cases. Connell Decl. ¶ 7-9. In contrast, the Class Members here have frequently been moved from facility to facility, and have started their immigration cases hundreds or thousands of miles away. They often come without paperwork about their immigration cases. Fluharty Decl. ¶¶ 11-13; Govindaiah Decl. ¶ 15. And so they often do not know the status of their immigration cases, which their lawyers must then investigate. Fluharty Decl. ¶ 11; Govindaiah Decl. ¶¶ 14, 18. Critically, moreover, the children's immigration cases have proceeded in a separate track this whole time. Effectively advising the entire family therefore requires retracing not only the parent's case, but also the child's. Connell Decl. ¶ 7. Advising families about all of this takes significant time. Govindaiah Decl. ¶¶ 21-22.

Moreover, Defendants' counsel access policies make it difficult to do group presentations or meet with numerous clients at once. Connell Decl. ¶¶ 21-22. At Karnes, there are only five confidential meeting rooms, only four of which have phones. Space constraints prevent more than about 17 lawyers from meeting with clients at any given time. Govindaiah Decl. ¶ 37. Counsel at Defendants' family detention facilities do not receive advance notice of arrivals, so it can take days to connect with services. Connell Decl. ¶ 20; *see also* Fluharty Decl. ¶¶ 4-7.

Compounding the difficulty of each individual case is the sheer scale at which these services will have to be provided. The Government's most recent status report indicates that there are hundreds of Class Members with removal orders who may be reunited at Karnes in the coming days. The facility has never had to absorb such an influx of uniquely complicated cases. It will take time for providers on the ground to provide even basic advice to these families. *See* Govindaiah Decl. ¶ 45; Fluharty Decl. ¶ 23.

### III. The Stay Should Extend to <u>All</u> Class Members, Including Those Who Allegedly Have Waived Reunification.

Defendants propose carving out of the stay any parents who Defendants claim have made a knowing choice not to be reunified with their children. But the point of the stay is that parents cannot be forced to make that complex and consequential election *before* they see their children and speak to an attorney. Nothing in Plaintiffs' opening brief carved out these Class Members. And as the declarations make clear, many of the parents on Defendants' waiver list in fact *do* want their children back and did not remotely understand their rights. As already discussed above, numerous Class Members report being rushed to sign the election form before reunification, with no legal advice, no time to think, and sometimes without translation. Not surprisingly, therefore, many parents whom Defendants list as knowingly waiving reunification in fact want *the opposite*: to be reunited with their children. *See* Reichlin-Melnick Decl. ¶¶ 4-11; Reive Decl. ¶¶ 4-14; Cruz Decl. ¶¶ 4-6, 12-14; Mwalimu Decl. ¶¶ 4-6; Gomez Amaya Decl. ¶¶ 7, 14; Suchman Decl. ¶¶ 4-9; Shepherd Decl. ¶¶ 4, 8, 10. Indeed, many are not even aware that they signed a form relinquishing their right to reunification. And still others supposedly knowingly waived reunification even though they do *not* have removal orders, and therefore would be reunified and *released* with their child under the Government's published reunification procedures. *See* Dkt. 109-1, at 3, ¶ P.

### IV. The Court Has Jurisdiction to Stay Removals.

Defendants do not address this Court's clear equitable authority to ensure that its orders are properly effectuated. And none of the statutes Defendants invoke affects the Court's inherent power to enforce its own orders. *See* Scholars Amicus Brief in Support of Stay.

#### A. The Court Has Equitable Power to Enforce Its Orders.

The government nowhere addresses the fundamental principle that federal courts have inherent power to issue all relief necessary to render their orders

effective. *See* Stay Mot. at 7. The broad discretion of the district courts to provide a remedy for constitutional wrongs is well-recognized. *See Lemon v. Kurtzman*, 411 U.S. 192 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power. . . . Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable."); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 14 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) ("Once plaintiffs establish they are entitled to injunctive relief, the district court has broad discretion to fashion a remedy."). And courts have particularly broad inherent authority "to ensure obedience to their orders." *F.J. Henshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)); *see Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) ("Courts possess the inherent authority to enforce their own injunctive decrees.").

Because this power is so central to the judiciary's inherent authority, Congress must issue an especially clear statement if it seeks to limit this power. *See, e.g., Plata v. Schwarzenegger*, 603 F.3d 1088, 1093-94 (9th Cir. 2010) (recognizing the government's "high burden" to show that Congress restrained courts' traditional equitable powers); Stay Mot. at 9-10. Here, the Government cannot come close to making the necessary showing to strip this Court of its inherent powers to ensure that its injunction is properly implemented.

**B. The Provisions Defendants Cite Do Not Strip This Court of Power to Enforce Its Order.**

None of the statutory provisions Defendants invoke remotely contains the necessary clear statement to strip this Court of its historic power to enforce its injunction.

18cv0428

1    1. <u>Section 1252(a)(2)(A)(i).</u> The Government contends that 8 U.S.C. §

2    1252(a)(2)(A)(i) divests this Court of jurisdiction to grant a short stay of removal

3    for Class Members with expedited removal orders. Stay Opp. at 18-20. But this

4    provision, like the other provisions on which the Government relies, concerns cases

5    involving a challenge to an order of removal. Indeed, the provisions on which the

6    Government relies all appear in § 1252 of the Immigration and Nationality Act,

7    which is entitled "Judicial Review of Orders of Removal."

8    The text of § 1252(a)(2)(A)(i) bars review only over a "cause or claim arising

9    from or relating to the implementation or operation of an [expedited removal]

10   order." But Plaintiffs' claims for relief are based on their constitutional right to

11   reunification with their children; in this motion, Plaintiffs have not brought a "cause

12   or claim" attacking their removal orders. The Court is simply being asked to use its

13   standard equitable powers to enforce a previously-issued injunction.[3]

14   The Government cites a handful of expedited removal cases. *See* Stay Opp. at

15   19-20 (citing *Garcia de Rincon v. DHS*, 539 F.3d 1133, 1140 (9th Cir. 2008);

16   *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 818 (9th Cir. 2004); *Pena v. Lynch*,

17   815 F.3d 452, 455 (9th Cir. 2015)). But, unlike the instant request for relief, these

18   cases all involved challenges to the expedited removal order itself.

19   The far more analogous case is *Kwai Fun Wong v. United States*, 373 F.3d

20   952 (9th Cir. 2004), where the plaintiff was not bringing a "challenge to her

21   expedited removal." *Id* at 965. The Ninth Circuit held that, as a result, none of the

22
23   [3] Defendants rely on dicta from *Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007), to
     support a sweeping interpretation of "relating to" in § 1252(a)(2)(A)(i). Dkt. 148 at
24   19-20. But *Aguilar* did not even involve § 1252(a)(2)(A)(i), and actually found
     jurisdiction over the plaintiffs' substantive due process claims. In any event, the
25   Supreme Court has cautioned that the words "relating to" would "stop nowhere" if
     they "extended to the furthest reach of their indeterminacy," and that "context . . .
26   may tug in favor of a narrower reading." *Mellouli v. Lynch*, 135 S. Ct. 1980, 1990
27   (2015) (alterations omitted). In light of the courts' longstanding power to grant
     relief to enforce their own orders, context here favors a narrower reading.
28

                                                                                    18cv0428

claims "implicate[d] actions covered by Section 1252(a)(2)(A)." *Id.* Similarly, Plaintiffs' claims here do not "arise from or relate to" their expedited removal orders. Rather, they concern the Government's decision to separate them unlawfully from their children.

As *Kwai Fun Wong* makes clear, the provisions on which the Government relies could not possibly divest this Court of jurisdiction to remedy other types of constitutional violations. If they could, it would mean that the Government could simply remove individuals before a federal court could remedy a host of constitutional violations that are independent of the removal process.[4]

The Government also cites 8 U.S.C. § 1252(e)(1). But that provision likewise appears in a section of the statute about review of removal orders. Moreover, the Supreme Court has distinguished between injunctions and stays, explaining that the former "direct[s] the conduct of a particular actor," whereas the latter merely "operates upon the judicial proceeding itself . . . by temporarily divesting an order of enforceability." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (vacating lower court's order denying a stay of removal). All Plaintiffs seek here is a limited stay *before* Defendants enforce their expedited removal orders, to avert the risk that they gave up their rights or their kids' without being informed of their options under the injunction.

2. Section 1252(g). Plaintiffs have already addressed Defendants' contentions about § 1252(g). Stay Mot. at 8-10. In a footnote, Defendants attempt to distinguish clear, on-point Ninth Circuit case law (*Walters* and *Barahona*) that rejects the Government's reading of § 1252(g). Stay Opp. at 21 n.7. Defendants point to the 2005 REAL ID Act's addition of the phrase "statutory or non-statutory" to §

---

[4] Suppose, for instance, an immigrant were tortured in detention and brought a classic civil rights case. Under the Government's view, a federal court would be powerless to keep the individual in the country for even a brief period to allow him to pursue his claim, even if he were not challenging his ultimate removal.

1252(g), but they do not explain why that undermines the Ninth Circuit's reasoning, which distinguished between a court's equitable relief to enter a stay of removal, and the court's jurisdiction over a "cause or claim . . . arising from" a decision to execute the removal order. Here, the cause or claim that Plaintiffs raised is a challenge to their family separation, not to the validity of their removal orders. As in *Walters* and *Barahona*, the relief Plaintiffs are seeking is necessary to effectuate the injunctive relief. In those case, as in this case, the Court issued a stay of removal to enforce the injunction. And, as in this case, the injunctions in those cases involved constitutional violations unrelated to a challenge to a removal order.

The Government also does not grapple with the Ninth Circuit's en banc decision in *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004). *See* Stay Mot. at 10. There, the Ninth Circuit held that § 1252(g) only applies to discretionary decisions. Here, Plaintiffs are enforcing a *non*-discretionary constitutional right. As *Hovsepian* made clear, § 1252(g) was not directed to a case like the instant one. Rather, it was directed at cases where there was no legal violation and a plaintiff was simply challenging the Government's discretionary decision to execute a removal order at a particular time. *See id.* at 1155 (explaining that § 1252(g) "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.").

Defendants also attempt distinguish the decision of Judge Carney in *Chhoeun v. Marin*, No. 17-cv-01898, 2018 WL 566821 (C.D. Cal Jan. 25, 2018), and the similar case of *Sied v. Nielsen*, No. 17-Cv-06785, 2018 WL 1142202 (N.D. Cal. Mar. 2, 2018). In both of those cases, the court issued a stay of removal and rejected the Government's § 1252(g) argument, stressing that the § 1252(g) does not apply to non-discretionary constitutional claims. And notably, in both of those cases, the plaintiffs were seeking to challenge their removal orders. The Government has no answer to these cases other than to assert that the instant case, unlike those cases, does involve a discretionary decision. But that is flatly wrong, as

already discussed. It involves a constitutional right to family unity and fair notice. The very basis of *Chhouen* and *Sied* was that the government's discretion does not include the discretion to violate the law. Here, the government's removal of Plaintiffs will contravene the Court's injunctive order that their constitutional right to reunification be exercised independently of their right to raise asylum claims and be waived only in a knowing, intelligent, and voluntary fashion.

In sum, Defendants seek to use jurisdictional provisions that are designed to regulate judicial review of removal orders. Those provisions do not do the extraordinary work claimed by Defendants: strip a federal court of power to enforce its own orders involving an independent constitutional violation.

## CONCLUSION

For the foregoing reasons, the Court should enjoin Defendants from removing parents until 7 days after notice of reunification.

Dated: July 25, 2018                               Respectfully Submitted,

                                                    */s/Lee Gelernt*
 Bardis Vakili (SBN 247783)                         Lee Gelernt*
ACLU FOUNDATION OF SAN                              Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES                           Anand Balakrishnan*
P.O. Box 87131                                      AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131                            UNION FOUNDATION
T: (619) 398-4485                                   IMMIGRANTS' RIGHTS PROJECT
F: (619) 232-0036                                   125 Broad St., 18th Floor
*bvakili@aclusandiego.org*                          New York, NY 10004
                                                    T: (212) 549-2660
Stephen B. Kang (SBN 2922080)                       F: (212) 549-2654
Spencer E. Amdur (SBN 320069)                       *lgelernt@aclu.org*
AMERICAN CIVIL LIBERTIES                            *jrabinovitz@aclu.org*
UNION FOUNDATION                                    *abalakrishnan@aclu.org*
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111                             *Admitted Pro Hac Vice*
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2018, I electronically filed the foregoing with

the Clerk for the United States District Court for the Southern District of California

by using the appellate CM/ECF system. A true and correct copy of this brief has

been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: July 25, 2018

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' MOTION FOR STAY AND OTHER RELIEF**

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| 43 | Declaration of Aaron Reichlin-Melnick | 17-22 |
| 44 | Declaration of Luis Cruz | 23-28 |
| 45 | Declaration of Sofia Reive | 29-34 |
| 46 | Declaration of E. Gail Suchman | 35-39 |
| 47 | Declaration of Charles Mwalimu | 40-43 |
| 48 | Declaration of Kathryn E. Shepherd | 44-48 |
| 49 | Declaration of Lauren Connell | 49-61 |
| 50 | Redacted Declaration of H.G.A. | 62-69 |
| 51 | Declaration of Shalyn Fluharty | 70-78 |
| 52 | Redacted Declaration of Susanne Gilliam | 79-82 |
| 53 | Declaration of Maria Odom | 83-91 |
| 54 | Declaration of Leah Chavla | 92-96 |
| 55 | Redacted Declaration of Laura Rivera | 97-104 |
| 56 | Declaration of Laura P. Lunn | 105-108 |
| 57 | Declaration of Manoj Govindaiah | 109-122 |

18cv0428

# EXHIBIT 43

1  Lee Gelernt*
   Judy Rabinovitz*
2  Anand Balakrishnan*
   AMERICAN CIVIL LIBERTIES
3  UNION FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
4  125 Broad St., 18th Floor
   New York, NY 10004
5  T:  (212) 549-2660
   F:  (212) 549-2654
6  lgelernt@aclu.org
   jrabinovitz@aclu.org
7  abalakrishnan@aclu.org

8  *Attorneys for Petitioners-Plaintiffs*
   *Additional counsel on next page*
9

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

      *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

      *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF AARON
REICHLIN-MELNICK**

CLASS ACTION

1.    I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.    I am an attorney employed at the American Immigration Council in Washington, DC. I am a member of the New York State Bar. I have previously been admitted *pro hac vice* before this Court in *Al Otro Lado v. Nielsen*, 3:17-cv-02366-BAS-KSC.

3.    Since Monday, July 16, 2018, I have been present in El Paso both screening detained parents who were separated from their children, as well as coordinating multiple teams of volunteers who are conducting additional screenings. I have screened detained parents at the West Texas Detention Facility in Sierra Blanca, the Otero County Processing Center in Chaparral, New Mexico, and the El Paso Processing Center in El Paso, Texas.

4.    I have personally interviewed roughly 30 parents who were separated from their children. In total, volunteers under my supervision met with and interviewed over 90 parents who were separated from their children, including 52 parents who the government has identified as having relinquished their right to reunification. Many of these individuals indicated that they felt coerced into relinquishing their rights. Still others appeared totally unaware that they had done so. Indeed, some individuals were adamant that they had signed a paper that said they chose to be reunited with their children.

5.    On Sunday, July 22, we attempted to meet with an additional eight parents who the government has identified as having relinquished their right to reunification. However, we were unable to do so, as they had been transferred from the El Paso Processing Center to the South Texas Family Residential Center, which is over 500 miles from El Paso. Four other individuals were transferred from the Otero County Processing Center to the El Paso Processing Center mid-day on Sunday,

preventing us from meeting with them as planned. Of these last four individuals, we were eventually able to meet with three of them on Monday, July 23.

6.     There are many logistical difficulties involved in interviewing and screening those parents who were separated from their children who are detained in the El Paso area. Only one detention center, the El Paso Processing Center, permits contact visits for attorneys. Neither the Otero County Processing Center nor West Texas Detention Facility were able to provide contact visitation rooms for attorneys conducting screenings. As a result, all screenings had to be conducted through plexiglass windows, which limits attorneys' ability to build a rapport with a potential client. In addition, issues involved in clearance process for interpreters prevented us from using an interpreter who could translate Qanjobal to English. Finally, the West Texas Detention Facility is located roughly 1.5 hours from El Paso, which inherently makes visitation more difficult.

7.     On Sunday, July 22, 2018, I met with eight fathers detained at the Otero County Processing Center who the government has identified as having relinquished their right to reunification.

8.     One of those fathers is an indigenous Guatemalan man who primarily speaks Akatek (Acateco). He came to the United States with his 8-year-old daughter and was separated from her after crossing the border sometime in May. Since being separated, he has only talked with his daughter three times. He passed a credible fear interview in June and is currently in removal proceedings. I have met with this father two times, and I believe that his Spanish is quite limited. He appears to understand very little of what is happening in his case and has expressed that he is very confused. Roughly two to three weeks ago, some immigration officials came to talk to him about his daughter. They asked him to sign a form that would allow his daughter to be released to family members in the United States. He has no idea what this paper said as he is completely illiterate, and the form was in English. Although language was a

barrier when talking to him, this father was extremely clear that he wishes to be reunited with his daughter. He expressed confusion at the concept that he may have signed a paper relinquishing reunification.

9.      I talked to another father who was also an indigenous man from Guatemala. He came to the United States with his 14-year-old son in May 2018. His primary language is Poqomchi', but he is fluent in Spanish as well. He has only talked to his son a single time since being separated on May 28, 2018. The last time he talked to his son was over a month ago. This father remembers signing some form, that was in English, about agreeing to have his son sent to live with family in the United States. However, he said that he signed the form under enormous amounts of stress and confusion. He is extremely worried for his son's wellbeing and burst into sobs repeatedly throughout our interview when he expressed how horrible the separation has made him feel. He wishes to be reunited with his son but indicated that he does not know his son's wishes or what options he has. Because the last time he had spoken with his son was a month ago, he is extremely afraid that he might have made the wrong decision because of lack of information.

10.     A third father I talked to twice attempted to lawfully present at the El Paso Port of Entry and ask for asylum. Both times, CBP officers stationed at the U.S.-Mexico border line refused to inspect and admit him, rebuffed his repeated entreaties to be processed for asylum, and ordered him to return to Mexico. The following day, May 18, he entered the United States without inspection along with his 7-year-old son. CBP officers then separated him from his son. He has recently passed a credible fear interview and has been placed into removal proceedings. This father stated that some time ago, immigration officials asked him to sign paperwork in English that he understood allowed them to release his son from detention to go live with his family. He has no recollection of signing paperwork relinquishing his rights to reunification and indicated a strong desire to be reunified with his son.

11.     A fourth father I spoke to is an indigenous Guatemalan man who was separated from his 8-year-old son on May 18. His first language is Chuj, and he is fluent in Spanish. Since they were separated, he has talked with his son only two times. He has passed a credible fear interview and has been placed in removal proceedings. Some time ago, officials came to him and told him that he had two options: reunification, or relinquishing his right to reunification and agreeing to leave his son with a family member in the United States. When he said he wanted to be reunified with his son, he was given a paper in English and told that if he signed that paper he would be reunified with his son. He is adamant that he did not agree to relinquish his right to reunification and that he still wants to reunify with his son.

12.     I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge. Executed in El Paso, TX on July 23, 2018.

_____
AARON REICHLIN-MELNICK

# Exhibit 44

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

   *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

   *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF LUIS CRUZ**

CLASS ACTION

1.     I, Luis Cruz, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an Attorney at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.  I am a member of the New York State Bar.  I am a native Spanish speaker.

3.     I, along with other attorneys from our law firm, have been volunteering at the Otero County Processing Center in Chaparral, New Mexico ("Otero"), where I have been meeting with detained parents who were separated from their children.

4.     In connection with this work, I was provided with a list of parents who the government has identified as having relinquished their right to reunify with their children.  On July 22, 2018, I met with five fathers who had been placed on this so-called "relinquishment list," but who told me that they did not understand the implications of what they were signing.  All of the five fathers wish to be reunited with their children.

5.     All of the five fathers told me that they were not able to read or write in Spanish nor English.  One of the fathers told me that he was only shown the form that he signed in English with no explanation; as such, he was surprised to learn that it may have relinquished his rights to reunification with his son.

6.     Four of the fathers told me that they signed the form in a large group of other fathers in detention, many of whom described signing the form in a group of 30-50 people in a room that is used as a Church at Otero (the "Church").  All five told me they felt intimidated when they signed this form.

7.     The first father told me that he was taken to the Church with a group of 50 fathers in detention on or around July 17, 2018.  He said that the process of being addressed and signing the form lasted no more than 4 minutes.  He described not having spoken to a lawyer, and that he has not been in front of a judge or court.  He

has received an order of removal dated June 4, 2018. He said he wants to be reunited with his son.

8.      The second father, who came to the United States with two children, told me that he was also taken to the Church with a group of approximately 50 other fathers in detention. He said that there was no explanation of the form that he signed at this time. He said that he has no way to contact his children and has only spoken to them one time since he detained on May 28, 2018. He told me that he has a court date on July 26, 2018, but that he does not know what it is for. He has not received an order of removal. He told me he wants to stay in the United States with his children.

9.      The third father said that he was taken to the Church with around 25-30 other fathers in detention. He said that there were more people coming in after he left. He said that he was given a form, that it was not explained to him, and that the entire process lasted no more than three minutes. He said that he felt sad and intimidated during this process. He expressed that he believed he had no choice but to sign the form. He said he has not received a final order of removal, and he does not know what the status of his case is. In fact, he has received an order of removal which is dated June 3, 2018.

10.      The fourth father described signing something at the Cibola Detention Center before being transferred to Otero. He signed this form with three other fathers in detention. He said this process was very quick, no more than a few minutes, and that he was frightened. He said that the official intimidated him and told him where to sign, even though he did not know what it was he was signing. He told me that he has not spoken to a judge or been to court and he does not know what the status of his case is. He has not received an order of removal. He said that he wants to be reunified with his son, and that he wants to fight his case.

11.      The fifth father described signing two forms while in a detention facility in Yuma, Arizona before being transferred to Otero. He said that the forms were in

English both times, that they were not explained to him. He said that an official made him sign both forms. He expressed surprise and concern to me when he understood from my questions that these forms may have had to do with not reunifying with his son. He said that he had a court appearance on July 12 in which he was told he could proceed with an appeal, but that he would need an attorney. He told me that he cannot afford an attorney and does not understand where his case stands. He has not received an order of removal. He told me that he wants to stay in the United States with his son.

12.    Based on my discussion with these fathers, it appears that none were told the implications of what they were signing or had an understanding of what they were signing. Each of the fathers told me that they were not given the opportunity to ask questions. The manner in which they signed these forms was universally described as intimidating and very stressful. Each described feeling hopeless and believing that they had no alternative but to sign the form.

13.    Finally, none described having the option to discuss the form with their separated children before signing. Indeed, none reported having communicated with their children on more than one or two occasions since their separations, some as much as two months ago. One described his despair because he did not know even if his child was safe and healthy; another broke down in tears as he described not having spoken to his son in 25 days and being unsure of his location.

14.    None of the fathers I spoke with said that they had been furnished with a copy of the form, or forms, that they signed. Thus it was difficult for both myself and for them to understand what exactly they signed. Each expressed confusion and visible distress because they do not know when they might be able to see their children again.

15.   I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge.  Executed in El Peso, Texas on July 23, 2018.


_____
LUIS CRUZ

# Exhibit 45

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

        *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

        *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF SOFIA REIVE**

CLASS ACTION

1. I, Sofia Reive, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2. I am an Associate with the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP. I am a member of the New York Bar. I am a native Spanish speaker.

3. I, along with other attorneys from our law firm, have been volunteering at the Otero County Processing Center in Chaparral, New Mexico ("Otero"), where I have been meeting with detained parents who were separated from their children.

4. In connection with this work, I was provided with a list of parents who the government has identified as having relinquished their right to reunify with their children. During the weekend of July 21–22, 2018, I met with nine fathers who had been placed on this so-called "relinquishment list." Every one of these fathers told me that they did not want to be deported; they had no idea that they had signed a document that relinquished any rights to be reunited with the children. Every father I met with wants to be reunified with his children and remain in the United States.

5. One of these fathers on the relinquishment list, a man from Guatemala, has not received an order of removal, and was told that he had passed his credible fear interview—he has a court date scheduled for August 7. He told me that he was taken to a room at Otero approximately 10 days ago to meet with immigration officials. The officials told him he was definitely going to be deported and then asked him whether he wished to be deported with his daughter or by himself—the officials did not ask him if he wished to be reunified with his daughter in the United States. The father told them that he wished for his daughter to remain in the United States—this is because, as he told me, it is not safe for his daughter to return to Guatemala due to extreme and specific threats from a powerful and dangerous man who has demanded to "buy" her. The officials then gave him a document in English (which he does not understand), and told him that the only way his daughter could stay in the United

States was if he signed this document. He had no opportunity to review the document or ask any questions about it. He told me that he signed this document because he felt pressured to do so and because he felt like he had no other choice. This entire interaction lasted approximately one minute.

6. Later, officials told him to sign another document in Spanish acknowledging that he had understood the contents of the English document that he had previously signed. He told me that he signed this document because he again felt pressured to do so and because he wanted his daughter to be able to remain in the United States, even though he had in fact not understood the English document he previously signed. He told me that, about two days later, officials informed him that he had passed his credible fear interview. He has a pending court date. He has only spoken with his daughter twice since they were separated. He told me that he wants to be reunified with his daughter in the United States.

7. Lastly, I spoke with a father on the relinquishment list who told me that, about 20 days ago, officials told him that he was going to be deported, and to choose whether to be deported with his daughter or be deported alone and his daughter would remain in the United States. At that time, he was not given the option to be reunited with his daughter in the United States. He recalled selecting the option that allowed his daughter to remain in the United States, but that he later changed his mind and now wants to be reunified with her even if he is to be deported. He has not had a credible fear interview, and has not appeared before an immigration judge. He received an order of removal on June 17, 2018. He wishes to be reunified with his daughter in the United States, but told me that if he is deported he wants his daughter to come with him.

8. I also met with four fathers on the relinquishment list who speak limited Spanish, and whose first language is an indigenous language.

9. One of these fathers on the relinquishment list told me that he has only spoken to his son twice since they were separated two months ago. The last time he spoke to his son was approximately 20 days ago. He told me that he signed a paper that he thought would allow him to be reunited with his son. He also told me, however, that he cannot read or write. His first language is Mam, but he has not been provided with an interpreter who speaks Mam while detained. He has had two court dates, but both times his hearing was adjourned because no Mam interpreter was available. He has not received an order of removal. He told me that he does not want to be deported—he wants to be reunified with his son and remain in the United States.

10. I met twice with another one of these fathers on the relinquishment list. He speaks extremely limited Spanish. He had difficulty communicating with me in Spanish given his limited knowledge of the language. His first language is Mam. He also told me that he cannot read or write. This father told me that he signed a document that he thought would allow him to be reunited with his son. He could not, however, understand the document because he is illiterate and no interpreter was provided to explain its contents to him in Mam. He has only spoken to his son twice and he does not know where his son is presently located. He has not received an order of removal. This father told me that he wants to remain in the United States with his son.

11. Lastly, I spoke with a father on the relinquishment list whose first language is Mam—he speaks limited Spanish. He also appeared to me to be unable to read or write. This father told me that he was asked to sign a document in Spanish, but was unable to explain to me what he had signed. This father told me that he wants to remain in the United States with his son. He told me he has not a credible fear interview, and he had not appeared before a judge. He has not received an order of removal. He told me that he submitted a request to ICE stating that, in the event that he is deported, he wants to be reunified with his son.

12.     None of the fathers I spoke with claimed to have been furnished with a copy of the form, or forms, that they signed.  Thus it was difficult both for me and for them to understand what exactly they had signed.

13.     Each father expressed confusion and visible, extreme emotional distress because they do not know when they will see their children again.  Almost all of the fathers I met with wept as they told me about being separated from their children.

14.     Two of the fathers I met with told me that they are not being provided with enough food at Otero, and that they are hungry.

15.     I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge. Executed in El Peso, Texas on July 23, 2018.

SOFIA REIVE

# Exhibit 46

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*


Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Diego, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*


*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

              *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF E. GAIL
SUCHMAN**

CLASS ACTION

1.     I, E. Gail Suchman, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am a partner at the law firm of Stroock & Stroock & Lavan LLP.  I am a member of the New York State Bar.

3.     I have been volunteering at the El Paso Processing Center in El Paso, Texas, where I have been meeting with detained parents who were separated from their children.

4.     Between July 20 and 22, 2018, I met with at least four mothers and two fathers who were separated from their children and who have been identified by the government as having relinquished their right to be reunified with their children.   All of them wish to be reunited with their children.

5.     One of the mothers came from El Salvador on or about June 1, 2018, with her 17 year old son.  She was apprehended after crossing the border and, after a day, she was separated from her son and taken to federal prison in El Paso in handcuffs and chains.  Since then, she has been moved to three other detention centers, ending up in the El Paso Processing Center on July 19, 2018.  She was not told where her child was located for at least a month.  She spoke to him once two weeks ago and now the phone number she was given does not work.  She believes she had a Credible Fear Interview on July 5, 2018, and has not heard anything in response. According to the government's list, she does not have a final removal order.

6.     While this mother was in detention, an agent gave her a paper to sign and she was told it said that she wishes her son to stay in the United States.  The paper was in English and she does not speak or read English.  She also demonstrated difficulty writing her name, even in Spanish.  She said she does not want her son to go back to El Salvador because he is very dark skinned and suffered a great deal of

discrimination there. She wants to be reunited with her son but is afraid the government will not reunite her with him.

7. Another mother from Guatemala crossed into the United States on May 22, 2018, with her 13 year old son. They were picked by border patrol within five minutes and were brought to the "hielera." The next day, she was separated from her son and sent to another detention facility. She did not sign anything. She came to the El Paso Processing Center on June 22 or 23, 2018, where she said an ICE agent told her she could not ask for asylum because of where she crossed: it was too far from a Port of Entry. The agent said she had no options. She did not want to sign anything but believed she had no option. She signed a paper that the agent told her would allow her son to stay here if she were to be deported. However, as far as she knows, she has no final removal order. And according to the government's list, she does not have a final removal order. She wants to be considered for asylum and to be reunited with her son while she pursues her case.

8. Another mother from Honduras crossed the border with her two children, ages 14 and 9, on June 4, 2018. They were picked up by border patrol and taken to the immigration office. The next day the mother was separated from her children and taken to a detention facility. She believes her children were taken to a shelter in New York. She has spoken with them only twice. On June 27, 2018, at the El Paso Processing Center, she was given a paper to sign and was told it was about her asylum claim. She signed. She said she was told she had a Credible Fear Interview scheduled for 15 days ago but it never happened. She does not have a final removal order. She has heard nothing about being reunited with her children but she wants to be reunified while she pursues her asylum claim.

9. Another mother from Honduras arrived in the United States on May 16, 2018, crossing at Laredo with her daughter (10 years old) and son (6 years old). They were picked up by border patrol and stayed together in the "icebox" for 5 days. After

Laredo, she was taken to two more detention facilities.  On May 21, 2018, the mother was taken to immigration court and was told she would be deported with her children. She was asked to sign a form but refused and was then represented by counsel.  She had a Credible Fear Interview on June 20, 2018, which she passed.  She wants to be reunified with her children while she pursues her asylum claim.

10.    I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge.  Executed in New York, New York, on July 23, 2018.


*E. Gail Suchman*

E. Gail Suchman
Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038
212-806-6656
gsuchman@stroock.com

# Exhibit 47

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF CHARLES MWALIMU** |
| U.S. Immigration and Customs Enforcement ("ICE"); et al., | CLASS ACTION |
| *Respondents-Defendants*. | |

1.  I, Charles Mwalimu, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.  I am an Associate at the law firm Freshfields Bruckhaus Deringer LLP. I am a member of the New York State Bar.

3.  I, along with other attorneys from our law firm, have been volunteering at the Western Texas Detention Facility at Sierra Blanca, where I have been meeting with detained parents who were separated from their children.

4.  On July 22, 2018, I met with two mothers who had signed a form relinquishing their right to reunification, but who were not told what they were signing. Both of them wish to be reunited with their children.

5.  One of the mothers came from Honduras with her 16 year-old son. She was apprehended after crossing the border, and her child was taken away from her. She said that while in custody, government officers told her to sign a form, which they explained would lead her to be reunified with her son. She could not read the form herself because her Spanish literacy is minimal. Only later did she learn that she had signed away her right to be reunified with her child. She said that she wants her son to be returned to her.

6.  The other mother came from Guatemala in May 2018. Her native language is Q'anjob'al. She was apprehended after crossing the border, and her son was taken away. She said that government officers later gave her a form to sign, but they did not read it to her, and so she did not know what she was signing. She now wants to reunite with her child, but because of the form she signed, she is worried that she will be deported without him.

7.    I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge. Executed in El Paso, Texas on July 22, 2018.

CHARLES MWALIMU

# Exhibit 48

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

        *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

        *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF KATHRYN E. SHEPHERD**

CLASS ACTION

1.     I, Kathryn E. Shepherd, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am National Advocacy Counsel for the Immigration Justice Campaign, a joint initiative between the American Immigration Council and the American Immigration Lawyers Association. I focus on legal advocacy and policy related to individuals held in ICE custody and asylum-seeking women and children detained in family detention centers around the country. I am a member of the State Bars of New York and Texas.

3.     I, along with two other volunteers from our organization, spent four days from Monday, July 9, 2018, through Thursday, July 12, 2018, meeting with parents separated from their children. These individuals were detained in the West Texas Detention Facility in Sierra Blanca, Texas ("Sierra Blanca"); the Otero County Facility ("Otero") and the Otero Prison in Chaparral, New Mexico; and the El Paso Service Processing Center in El Paso, Texas.

4.     I personally interviewed approximately 15 separated parents during this time period. Many of these individuals stated that they had signed paperwork they did not understand concerning their right to reunification with their children. None of the parents with whom we met were given a copy of the paperwork they were asked to sign. One father was told that if he didn't sign the form presented to him, then he would not see his daughter again.

5.     A typical scenario relayed to me by detained parents was that ICE officers told the parents that in order to see their children, they had to sign the form that was presented in front of them. The parents reported that they were not permitted to ask any questions regarding the forms they were being asked to sign.

6.     Some parents do not read or write in Spanish.  One parent reported that ICE officers read the form to him in English (not Spanish), even though he could read and write in Spanish, but not English.

7.      For example, I interviewed one asylum-seeking parent from Guatemala who does not read or write in any language. At the time that an ICE officer approached her to sign paperwork regarding her deportation and relinquishment of the opportunity to reunify with her child, the parent had not yet spoken to her child or know the child's whereabouts. When an ICE officer presented the deportation and relinquishment form to her, the officer did not read the form aloud to her. The parent told the officers that she wanted to apply for asylum, but the ICE officer responded that applying for asylum would take six to eight months and that she would not see her daughter during that time period. Because the parent could not bear being separated from her daughter and detained for so many additional months, the parent signed the form. The next day, officers from the Department of Health and Human Services (HHS) met with her and gave her information about where her daughter was, and gave her numbers where she could reach her daughter.

8.      Some parents were also told about their rights to reunification in large group presentations by ICE.  Just before I visited the Otero Facility on July 12, 2018, a large group of fathers had been transferred in the prior day or two to Otero from Sierra Blanca. According to at least three transferred fathers with whom we met in Otero, a large group of fathers in Sierra Blanca had been called together by ICE on July 11, 2018 and instructed to sign paperwork. By one man's account, about 63 men were called, though they were broken up into smaller groups. The men were told that they had three options: (a) be removed without their child; (b) be removed with their child; or (c) continue to fight their claims for asylum.

9.      Critically, these parents were not clearly informed and did not actually understand that they could both continue to fight their asylum claims *and* be reunified with their children.

10.      I, along with other members of our team, heard from multiple parents at Otero that ICE officers and detention center guards at Otero and Sierra Blanca told them that

they had no rights; that it would take at least six to eight months to fight their asylum claims; that they would not see their children during this entire time; and that they would be deported when they lost.

11.     One father also told us that an ICE officer told him that if he wished to fight his asylum case, that it would cost him at least $500 every time he wished to see any attorney.

12.     Several parents told us that they did not apply for asylum or related forms of protection, despite having a fear of return to their home country, because they were told by ICE or Customs and Border Protection officials that they were not allowed to apply due to having had been deported from the United States in the past.

13.     I declare under penalty of perjury under the laws of the United States of America and the District of Columbia that the foregoing is true and correct, based on my personal knowledge. Executed in Washington, D.C. on July 23, 2018.


KATHRYN E. SHEPHERD

# Exhibit 49

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Attorneys for Petitioners-Plaintiffs     *Admitted Pro Hac Vice
Additional counsel on next page

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                 *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE; Adrian P. Macias, El Paso
Field Director, ICE; Frances M. Jackson, El Paso
Assistant Field Office Director, ICE; Kirstjen
Nielsen, Secretary of DHS; Jefferson Beauregard
Sessions III, Attorney General of the United
States; L. Francis Cissna, Director of USCIS;
Kevin K. McAleenan, Acting Commissioner of
CBP; Pete Flores, San Diego Field Director,
CBP; Hector A. Mancha Jr., El Paso Field
Director, CBP; Alex Azar, Secretary of the
Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

                 *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF LAUREN
CONNELL**

CLASS ACTION

Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*samdur@aclu.org*

1.      I, Lauren Connell, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am a licensed attorney and Pro Bono Counsel at the law firm Akin Gump Strauss Hauer & Feld LLP, based out of New York.  In 2014, I was seconded by Akin Gump for four months to our San Antonio office to work full-time counseling families detained at the Karnes County Residential Center, which at the time had recently opened as an immigrant family detention facility housing women and children. After returning to New York at the end of 2014, I have made several trips to the Karnes facility in the intervening years to counsel detained families.

3.      My most recent trip took place last week, from July 17 to July 20, 2018. During that trip I saw a level of disarray that I have not seen since my initial days at the facility when it first opened in 2014.

4.      Just prior to my arrival, the family reunification process had led to a mass transfer of hundreds of women and children out of Karnes in order to make space to reunify families who had been separated.  Throughout the week, the facility was repopulated in waves with men being reunited with their children in detention at Karnes.  Any women remaining at the facility during the week were swiftly transferred out with no notice to counsel.  Then, inexplicably, at the end of the week, a new group of women without children were brought to the facility.

5.      The upending of the Karnes population due to family reunification has created a multitude of challenges for pro bono attorneys providing legal services to the families detained at the facility.  The pro bono legal program at Karnes is run by an organization RAICES with the help of volunteer attorneys such as myself.  That program was designed to serve families who recently entered the country and remained together throughout the length of their detention.  This meant that we were able to advise the women from the outset and, in most cases, before they were given a credible fear interview.

6.      In the typical case we previously saw at Karnes, the parents were all at an early stage of their immigration proceedings and had not yet received credible fear interviews. Therefore, it was easy to hold group intake sessions for the parents where we gathered biographical information and immigration history and to determine whether the detained parents had been scheduled for a credible fear interview.  These group intake sessions lasted for approximately 30 to 45 minutes, depending on the size of the group.  From there, the next step was to counsel families individually on how to prepare for their upcoming credible fear interview.  All told, we spent perhaps 30 minutes to an hour consulting with each individual parent in the typical Karnes case.

7.      The new families being relocated to Karnes, on the other hand, are in a completely different situation.  These families are comprised of fathers and their

children who had been present in the United States for several weeks or months prior to entering Karnes, which meant that we were not seeing them at the outset of their legal proceedings. All but one of the fathers I met with had already been given a credible fear interview without first having a chance to consult with a lawyer and had been found not to have a credible fear of returning to their home country. Since their children had been separated from them, the children's cases were bifurcated from that of their parents, which does not happen if the families remain intact during detention. Complicating matters further, these families endured the recent trauma of being forcibly separated after entering the United States.

8.     Advising these reunified families is a much more time-intensive undertaking than the representation of the women and children who typically are detained at Karnes.

9.     Since these families entered the country at varying times and are at different stages of expedited removal, we were not able to do group intake sessions for these families. Some parents may not have had credible fear interviews; others may have been found by asylum officers not to have a credible fear of return so were awaiting review by an immigration judge; others have even had their negative credible fear finding affirmed by an immigration judge. We therefore had to meet individually with each family to do an intake. This intake was far more time-intensive than in the typical Karnes case. At a minimum, these intakes lasted for several hours. But a

number of factors can lead the intake process to extend over a period of days: level of trauma, language abilities, complexity of the case, whether families have paperwork, and the sophistication of the clients.

10. First, the parents with whom I met last week seemed even more traumatized and disoriented than the parents I met during my other visits, most likely due to their recent separation from their children. As a result, I needed to spend time at the outset of each meeting building rapport to make sure they trusted me and felt comfortable.

11. Second, we needed to spend additional time reviewing all legal documents in the family's possession to ascertain the stage of their legal proceedings. Some parents and children may have come to the facility with paperwork, but have to go back to their living quarters to get it – increasing the amount of time for an intake considerably. Given facility security requirements, moving between visitation areas and personal space can take 15 to 20 minutes. Additional time may be needed if, as with last week, men were required to be escorted individually by GEO staff members due to the presence of women in the facility. But, it is also possible that men do not have their paperwork as they may have not been able to bring it when transferred. Or, they may have some paperwork, but it is incomplete. In these situations, this will extend the period of an intake even longer, as lawyers have to make a request to the government to obtain the documents. This, again, is markedly different from the

typical Karnes case we saw before because we usually saw those parents before they had received many immigration documents or paperwork.

12.     Third, we then needed to counsel the clients on next steps for their legal case. We discovered that most of the recently-reunited parents already had received credible fear interviews and were found not to have a credible fear of return.  We also found that, for many of these men, their paperwork reflected that they had not requested to have this decision reviewed by an immigration judge.  We therefore had to explain the process of immigration judge review and answer the client's questions.  I found that the clients I saw had not previously met with a lawyer and had been given misinformation about the process before reaching me, so I had to correct these misunderstandings.  Also, I believe that the trauma they endured from the recent separations likely led to skepticism that caused them to ask additional questions. After this lengthy conversation, if the client decides that he wants an immigration judge review, this causes another scramble to notify the government and get paperwork re-served on the client that properly reflects his preference for an immigration judge review, leading to a delay of at least a day.

13.     Fourth, we had to collect the typical biographical information and immigration history that we traditionally had collected from clients.

14.    Fifth, we needed to collect information about the circumstances of their separation, so that we could be sensitive to their needs and best counsel them given the trauma endured.

15.    Sixth, we needed to meet with the children separately from their fathers to understand the procedural posture of their cases and ensure that their interests were aligned with that of their parents.

16.    After this lengthy intake was completed, we generally dismissed the family for the day so that we could move on to serve other families.  Then, the next day, for those fathers who had negative credible fear interviews, we had to start the process of preparing a declaration to use as supporting evidence in their review hearing before the immigration judge.  This has to be done immediately, because once you request a hearing before an immigration judge, the hearing by regulation should be scheduled within 7 days and it is hard to delay.  This means that time and space in the facility will have to be dedicated to more complete interviewing of a parent and child. The declarations are multiple pages in length and describe why they fear returning to their country and the reasons they found it difficult to express themselves in their credible fear interview.

17.    These declarations usually take two days to draft and finalize assuming there are no unforeseen delays. This is because they require at least two client meetings each lasting 1 to 2 hours, as well as a period of time away from the client to develop a

working draft of the declaration.  The declarations require a high level of detail, and it has been my experience that clients who have undergone trauma have a more difficult time expressing themselves articulately and remaining focused when asked to recount traumatic events.  Therefore, after the initial meeting where we gather information from the clients, we often need to have a follow-up meeting to clarify details and finalize the declaration.  Sometimes, even a third meeting is required.

18.     Then, once the declaration is drafted, another multi-hour meeting is needed to prepare the client for the hearing before the immigration judge.

19.     Creating additional delays is the fact that client meetings must be spaced out to give traumatized clients time to recover between meetings and to give pro bono attorneys time to meet with the multitude of clients at the facility.  Moreover, meetings are frequently interrupted due to meal times, appointments with GEO, appointments with consular officials and other unforeseen circumstances.

20.     Moreover, legal representation can only begin once the client is connected to pro bono legal services, which may take up to 2 days after they arrive at Karnes.   The recent shifting population at Karnes means that it is harder than usual for pro bono attorneys to know who is in the facility and to ensure that the recent arrivals are aware that free legal services are available.  Even in typical circumstances, it is challenging to effectively communicate the availability of pro bono legal services since the facility

does not provide a list of recently-arrived detainees to RAICES. Frequent turnover only compounds this fundamental issue.

21.     Moreover, this timeline assumes that there is sufficient space and an adequate number of pro bono attorneys in the facility to serve these families. Space for attorney-client meetings at Karnes is extremely limited. The visitation area has only five private rooms available for attorney-client meetings. These private rooms are located off of a larger general visitation area, which contains a few tables with hard plastic chairs, a children's play area, a television, and a desk which is manned at all times by a GEO employee. At times, there are family members of detained immigrants at some of these tables visiting with their loved ones. If the private rooms are full, we are forced to meet with clients in this general area, where there is no privacy and considerable background noise from other meetings, children playing, the television in the background, intercom announcements and noise from GEO staff's walkie-talkies. Meetings that take place in the general area simply take longer due to these distractions.

22.     These space constraints place a hard limit on the number of attorneys who are able to enter the facility and provide counsel to these families. Last week, the space constraints were exacerbated by the arbitrary decision that attorneys could not meet with men and women in the visitation area at the same time, which is the type of

unforeseen circumstance that can add a day or more to the timeline to provide adequate legal representation.

23.     Moreover, with the Karnes population expected to swell by hundreds of families over the next few days, additional days will need to be accounted for in the timeline because pro bono attorneys will not have sufficient time each day to hold these lengthy meetings with every family that needs to be served.  Even if lawyers held group meetings with recently-reunified families, which would not be appropriate in these circumstances given the personalized nature of these intakes and the level of trauma experienced by these families, at most 30 detainees can fit in the general visitation space at any given time.  Even if one or two of these large groups could be processed per day in this manner, with an influx of hundreds of families at one time, it would take a period of several days for every family to have some sort of meaningful interaction with an attorney.

24.     Because of these unique challenges in representing reunited families in detention, at least 7 days to meet with these families once they arrive at Karnes is crucial in order to ensure that these families have access to counsel so that they can understand their rights and adequately articulate their claims for protection in the United States.  However, this is the bare minimum amount of time that would be needed, and additional days to meet with these families would be helpful to ensure effective counseling of these families.

25.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in New York, New York, on July 24, 2018.

LAUREN CONNELL

# Exhibit 50

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*          *Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

          *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE; Adrian P. Macias, El Paso
Field Director, ICE; Frances M. Jackson, El Paso
Assistant Field Office Director, ICE; Kirstjen
Nielsen, Secretary of DHS; Jefferson Beauregard
Sessions III, Attorney General of the United
States; L. Francis Cissna, Director of USCIS;
Kevin K. McAleenan, Acting Commissioner of
CBP; Pete Flores, San Diego Field Director,
CBP; Hector A. Mancha Jr., El Paso Field
Director, CBP; Alex Azar, Secretary of the
Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

          *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF H█████
G██████ A█████**

CLASS ACTION

1  Spencer E. Amdur (SBN 320069)
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
2  IMMIGRANTS' RIGHTS PROJECT
3  39 Drumm Street
   San Francisco, CA 94111
4  T:  (415) 343-1198
   F:  (415) 395-0950
5  *samdur@aclu.org*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. I, H███ G███ A███, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2. My name is H███ G███ A███. I am a national of Honduras. I am 51 years of age.

3. I speak and read Spanish. I do not speak or read English.

4. I currently suffer from serious vision problems and because of this I can no longer read any papers that are put in front of me. I have never had glasses and I have not been provided any glasses while in detention. Because of this the only way that I am confident in what a document says is if someone I trust reads the document to me.

5. When I crossed the border on June 1, 2018, I was accompanied by my son, M███ N███ G███ A███, who is 17 years of age. I turned myself in to the border patrol immediately and asked for asylum. Immigration officers told me soon after that they were going to separate me from my son.

6. I am currently fighting my case for asylum. On Saturday, July 21, 2018, I had a credible fear interview. I do not have any results yet.

7. I have talked to my son three times while I have been detained. We have discussed whether we want to be reunified with each other, and we both agree that being together as a family is the most important thing for us. We do not wish to separate, and I do not want to be apart from him any longer.

8.    Some time ago, immigration officials came and asked me whether or not I wanted to be reunified with my son. They showed me a form and told me that I needed to sign the form so that I could be reunified with my son. I told them about my vision problems and that I could not read the form. The officers then read the form to me out loud. However, because I did not trust the officials, I do not know if they were reading the form accurately to me.

9.    I asked the officials who wanted me to sign the form if I could call my son right then to consult with him. They did not allow me to call him. As a result, I refused to sign the paper. However, I made sure to tell the officials that I wanted to be reunified.

10.    Some time after that, a different group of officials came to ask me again about reunification with my son. They showed me a form and told me I needed to sign this form. The officials told me that the purpose of the form to was to allow information to be shared with another agency so that I could be reunified with my son. However, I was suspicious that it was the same form from before.

11.    When I asked them to read the form to me, they did so. However, because I still did not trust these officials and could not confirm they were telling the truth, I did not sign this form either. I also told them for a second time that I want to be reunified with my son.

12.    A third time, the officials came to talk to me. These officials told me that if the person I designated as a sponsor "did not qualify," then I would have to find another

sponsor. I did not have any other individuals that I could think of who I wanted my son to live with, so I was not able to give them any other names. Again, I did not sign anything and I told the officials I wanted to be reunited with my son.

13.    I have never been told that I could have a lawyer with me. I wish to have a lawyer for myself and for my son, and I do not want to sign anything from the government without a lawyer who can tell me what the form is.

14.    I wish to be reunited with my son. He is incredibly important to me and we want to be together. This has always been my wish and continues to be so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed on 23 of July, 2018.



CERTIFICATE OF TRANSLATION

1. My name is *Rosa M Garcia*, and I am fluent in Spanish and English.

2. I translated the foregoing document from English to Spanish and read it to the declarant, H███████████████ in Spanish before it was signed.

3. H███████████████ affirmed that the contents of the declaration were true and correct to the best of his/her knowledge.

I declare under penalty of perjury of the laws that the foregoing is true and correct. Executed this *23rd* day of July, 2018 in El Paso, TX.

_____
TRANSLATOR'S SIGNATURE

*Ms. L v. ICE* Waiver

I authorize that information I provide and my written testimony may be shared with the American Civil Liberties Union and used in connection with the litigation in *Ms. L, et al. v. ICE, et. al.*, 3:18-cv-00428. An interpreter or other individual has read this waiver to me in a language that I understand.

Signed: H██████████████████████████

Date: 7) 23 - 18

Location El Paso Processing Center

Interpreter Signature: _[signature]_

Date: 7/23/2018

Location: El Paso Processing Center

# Exhibit 51

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*       *Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: June 25, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF SHALYN FLUHARTY** <br><br> Class Action |
| *Respondents-Defendants*. | |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

1.     I, Shalyn Fluharty, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am the Managing Attorney of the Dilley Pro Bono Project ("DPBP"), where I provide pro bono representation to families who are detained at the South Texas Family Residential Center ("Dilley") in Dilley, Texas. DPBP represents the overwhelming majority of families who are detained in Dilley, with the assistance of a rotating weekly group of between 30 and 45 volunteers. I oversee approximately seven full-time employees and supervise and train a national network of volunteers.

3.     On or around Thursday, July 19, 2018 reunited mothers and children arrived at Dilley for the first time. As of the end of the day on July 23, there were 31 families detained in Dilley.

4.     We did not receive any notice that these families were going to arrive. We were not informed after they arrived.

5.     We only heard about the reunified mothers and children because our existing clients at the facility told us. Our clients said that they were seeing families with different kinds of institutional shoes, a sign that they had been transferred from elsewhere. They informed us the newly arrived families were separated from the rest of the general population, and placed in an area of the facility alone, far from the other detained families. This meant that it was likely harder for these families to get learn about legal services.

6.     When we heard about the families, we wanted to find them and help them. Because we did not know their names or their identities, we had to ask our clients for help. Our clients then tracked down the reunified parents, told them about our services, and where they could go to speak with us.

18cv0428

7.      My best guess is that it took at least 24 hours, if not more, between the arrival of a family and when we heard about them, and then additional time before we were even able to meet with the family to begin counseling them.

8.      I still do not know whether these families will be joined by others over the course of the next twenty-four hours. At points over the past week, I have heard rumors that hundreds of families will be moved here. But I still do not know when they will arrive, or how many, let alone their identities.

9.      This lack of notice makes it difficult to plan on how to deploy volunteer and pro bono attorneys to assist in representation. Counseling these reunified families is very challenging. It requires a different allocation of our resources and the use of different intake and counseling strategies.

10.     Counseling these reunited families is unlike anything and far more difficult than anything I have encountered during the more than two years that I have represented families detained in Dilley.

11.     As an initial matter, it has been challenging – if not impossible – to determine the procedural posture of each mother and child's case. Mothers and children are profoundly confused. Most arrive with no documents from any prior proceedings. Mothers are unable to confirm whether they spoke with an asylum officer, or immigration judge. Some mothers who can confirm seeing an asylum officer or immigration judge were transferred before they were issued a decision in their case, and do not know whether or not they received a positive or negative fear determination. Many report being told by immigration officials they would be deported, even though they do not appear to have final orders of removal.

12.     Mothers report being forced to sign documents in English that they did not understand, and not being given a copy. Some mothers state their legal paperwork was taken away from them, either in transit, or upon arrival to Dilley.

13.     The same is true for children. Most have arrived to meet with us without their own case files. Many say their paperwork was taken away from them when

they arrived to Dilley. Thus, we do not know what stage the children's case was in, nor do they have information as to whether they had a lawyer previously, or even the name of the lawyer or child advocate at the ORR facility where they were previously held.

14.     The scant paperwork that parents and children do have only creates more confusion. Some children have copies of Notices to Appear in removal proceedings. However, when I call the automated immigration court system hotline, it states the child's A# is not in the system. Many parents have copies of signed documents confirming they will be released on their own recognizance from detention with a Notice to Appear. However, rather than being released, the mothers were transferred to Dilley and then placed in detention.

15.     Finding out the status of these families' cases is extremely important. In fact, it is a basic part of counseling these families. More than half of the reunited mothers we have seen in the past few days do not have final orders of removal. Some are waiting for CFI or IJ decisions (or, more troublingly, may be the subject of a decision that they do not know of). Some may have never known to request a CFI determination. Some of them report having signed documents in English which may have waived their right to an IJ review of a negative credible fear determination, a right that they wish to reinstate while they are with their children.

16.     Because lawyers cannot get this information from clients, a single meeting is not enough. Instead lawyers have to then spend time tracking down the child's lawyer or advocate, or the mother's previous attorney, and try to speak to them. IN a few cases, we are waiting for records to be sent to us from other lawyers across the country who have decided to terminate their representation of a mother or child because they have been transferred far away from where the lawyer is able to provide services.

17.     I have made a written request for every reunited child to ICE, requesting a copy of the child's A file, including any and all removal orders and charging

documents. These written requests have gone unresponded to. I have spoken personally with our local Assistant Field Office Director, requesting that all documents confiscated from my clients upon entry to the facility be returned to them. It has been nearly a week, and we have not seen the documents returned. We have also sent emails requesting clarification regarding the procedural posture of numerous mother's cases, and have yet to receive a response.

18.    Trauma and lack of trust have created additional impediments to providing legal assistance. Mothers state they have been lied to, coerced, and threatened while in government custody. Daily, mothers receive new disclosures from their children regarding their experiences in government shelters throughout the country. Children have expressed being deprived food, experiencing physical violence, and suffering ongoing depression during their separation from their parents. Some parents state they did not recognize their child upon reunification, because their child lost so much weight.

19.    These realities require, as a part of our assistance, considerable time, and deliberate and focused efforts to build rapport and trust with each mother and child.

20.    Conversations regarding separation have proven unbearable for many of our clients. The topic itself produces overwhelming emotion, prohibitive of discussing the potential options a mother or child may have, such that they can make an informed decision regarding how they would like their case to proceed. Even benign questions – like the question asking mothers to list the names and locations of their children on our intake form – produce tears and paralysis.  The trauma not only ends a meaningful conversation regarding the mother and child's decision-making in their case, but also impedes their ability to accurately recount basic events in their legal cases.

21.    It is nearly impossible to interview parents and children separately because they have only been reunited for such a short period of time, and have a palpable fear they will soon be separated yet again. This presents a barrier to fact-gathering

regarding the mother and child's underlying asylum claims. Parents need to be able to describe the harm they have experienced before coming to the United States so that lawyers know if they have a claim for asylum, or if that claim was waived in the belief that waiver was necessary for reunification to occur. Speaking to an asylum seeker about the physical and sexual violence they have fled is difficult enough. Parents are understandably reluctant to speak about these subjects in the presence of their children. But these families are seeing each other for the first time after months apart. They fear separation, and is a struggle to make a family comfortable enough that a child is willing to leave their parent's presence, and vice versa.

22.     The families have not even been able to meaningfully discuss their legal options with each other. They do not yet understand their own cases or rights, and are therefore incapable of making a decision together. The phone calls that some of the mothers and children had with each other before being reunified was simply inadequate for that purpose. Furthermore, the calls that were facilitated while the families were separated were monitored by officials, preventing disclosures of important information. Mothers have said that they were able to speak to their children once or twice, for very short periods of times. They were so overwhelmed with emotion that making informed legal decisions was simply not possible.

23.     In some cases, mothers were represented by lawyers prior to their transfer, however, they were transferred in the middle of the night away from their facilities and their lawyers to Dilley. In these cases, because they are still represented, I am limited in my ability to interact or counsel the client until I am able to contact the prior attorney and get their consent, which – again – takes time.  At least a day will be lost as we speak to the prior attorney and then, again, call a client back for another legal meeting.

24.     Under these conditions, counseling these families as to the decisions they have to make is extraordinarily difficult. Even *if* we had access to their

immigration files and were able to easily ascertain basic information such as whether a parent had requested a credible fear hearing, had received a negative decision, or had requested or waived review before an Immigration Judge, we still need to speak to the child's advocate or lawyer, the parent's lawyer if they had one, or at the very least access the records. Even then, we would have to spend time with extremely traumatized families to explain their choices and rights. It is challenging to find time to meet with the client while also tracking down records and advocates, especially because we are prohibited from bringing cell phones into the facility and are therefore unable to receive call backs from lawyers and advocates with whom we urgently need to communicate about a case.

25.    The advocates at Dilley are committed to ensuring that every family gets the counseling they need. Given the state that these families are in when they arrive, without any notice, or any information, in the facility, this process will require time. Even seven days from the time when we first meet with the family (as opposed to when the family arrives, unbeknownst to us) presents challenges. Less time runs the risk that these families will be deported or separated without any understanding of their rights or those rights they may have been led to unknowingly or involuntarily waive.

26.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge.

Executed in Dilley, Texas on July 25, 2018.

_____

Shalyn Fluharty

# Exhibit 52

1   Lee Gelernt*
    Judy Rabinovitz*
2   Anand Balakrishnan*
    AMERICAN CIVIL LIBERTIES
3   UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
4   125 Broad St., 18th Floor
    New York, NY 10004
5   T: (212) 549-2660
    F: (212) 549-2654
6   lgelernt@aclu.org
    jrabinovitz@aclu.org
7   abalakrishnan@aclu.org

8   *Attorneys for Petitioners-Plaintiffs*
    *Additional counsel on next page*
9

    Bardis Vakili (SBN 247783)
    ACLU FOUNDATION OF SAN
    DIEGO & IMPERIAL COUNTIES
    P.O. Box 87131
    San Diego, CA 92138-7131
    T: (619) 398-4485
    F: (619) 232-0036
    bvakili@aclusandiego.org

    Stephen B. Kang (SBK 292280)
    Spencer E. Amdur (SBN 320069)
    AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
    39 Drumm Street
    San Francisco, CA 94111
    T: (415) 343-1198
    F: (415) 395-0950
    skang@aclu.org
    samdur@aclu.org

    *Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

                    *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

                    *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF SUSANNE GILLIAM**

CLASS ACTION

1.    I, Susanne Gilliam, make the following declaration based on my personal

knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that

the following is true and correct:

2.    I am a solo practitioner and member of the state bars in Massachusetts

and New Hampshire.

3.    I have been volunteering since Friday July 20, 2018, at the El Paso

Processing Center and have been meeting with detained parents who were separated

from their children.

4.    On July 22, 2018, and July 23, 2018, I met with H█ G█ A█,

a father from Honduras who is on the list of parents who have purportedly

relinquished their right to reunify with their children. Mr. G█ A█ and his 17-

year-old son, M█ N█, crossed the border and turned themselves in to the border

patrol on or about June 1, 2018. Immigration officials then separated him from his

son.

5.    Mr. G█ A█ appears on a government list as having relinquished

his child but not having executed a letter of designation for the child. Mr. Gomez

Amaya is adamant that he wants to be reunited with his son, even if he were

ultimately to be removed from the country. He is also adamant that he has always told

immigration officials that he wishes to be reunited with his son.

6.    Mr. G█ A█ had his credible fear interview on Saturday, July 21.

He does not have a final order of removal. He had not consulted with any lawyer prior

to my meeting with him on July 22, 2018.

7.    Mr. G█ A█ has told me that various times since his detention,

immigration officials have come and presented him with a form and told him to sign

that form to be reunified with his son. Mr. G█ A█ has told me that he cannot

read the forms and did not trust the immigration officials; thus he did not sign such

forms when they were presented to him. He denies ever having expressed any desire to relinquish reunification with his son.

8.    From my conversation with Mr. G███ A███ it is readily apparent that he cannot see well and cannot even read normal-sized print. He does read Spanish, but could not read a privacy form that I showed him that was in Spanish and had normal-sized print; he required instead that my interpreter read the form to him. He is thus utterly dependent on the person reading a form to him to tell him its contents.

9.    I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge. Executed in El Paso, Texas on July 24, 2018.



SUSANNE GILLIAM

# Exhibit 53

1   Lee Gelernt*
    Judy Rabinovitz*
2   Anand Balakrishnan*
    AMERICAN CIVIL LIBERTIES
3   UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
4   125 Broad St., 18th Floor
    New York, NY 10004
5   T: (212) 549-2660
    F: (212) 549-2654
6   lgelernt@aclu.org
    jrabinovitz@aclu.org
7   abalakrishnan@aclu.org

8   Attorneys for Petitioners-Plaintiffs
    Additional counsel on next page
9

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF MARIA ODOM** |
| U.S. Immigration and Customs Enforcement ("ICE"); et al., | |
| *Respondents-Defendants*. | CLASS ACTION |

1.   I, Maria Odom, make the following declaration based on my personal knowledge and information relayed to me by my staff, and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my belief and understanding:

2.   I currently serve as Vice President for Legal Services at Kids in Need of Defense (KIND). KIND is a national non-profit organization with ten field offices providing free legal services to unaccompanied immigrant children who face removal proceedings in Immigration Court.

3.   I previously submitted a Declaration in this litigation, dated July 15, 2018. Since then, I have continued to supervise teams of KIND attorneys in locating and counseling parents and children separated by the government. Our effort has also been in collaboration with other volunteer attorneys on the ground in Texas, to whom we have helped provide technical assistance and support.

4.   Our work with separated parents has continued to focus on those held by Immigration and Customs Enforcement (ICE) at Port Isabel Service Detention Center (Port Isabel) in Texas. Our teams have met with over 200 separated parents in Port Isabel. I have personally met with at least five separated parents held at Port Isabel.

5.   In addition, a team of KIND attorneys and staff based in New York has met with 98 separated children who were referred to KIND.

6.   KIND attorneys and other volunteers also had a brief opportunity to meet with reunited parents and children released from Port Isabel to the Basilica of Our Lady of San Juan del Valle, operated by Catholic Charities and located at 400 N. Virgen de San Juan Boulevard, in San Juan, Texas 78589.

7.   The difficulties accessing and counseling parents and children described in my July 15, 2018 Declaration remain as of today, July 24, 2018. Government practices have not ameliorated or improved the conditions relating to challenges in communicating with detainees, and, have in some instances, created additional

barriers described below. It continues to be difficult to locate and meet with parents at Port Isabel, as parents are constantly arriving in transfers from other facilities, and Port Isabel does not provide lists of new arrivals to compare against any lists from the government of Class Members. We thus continue to rely on lists compiled by private and nonprofit attorneys in the area, detainees referring separated parents to us, or inquiries from media and other advocates.

8.     Beginning approximately Tuesday, July 17, 2018, guards at Port Isabel began to notify volunteer attorneys requesting to meet with detainees that many of the detainees were no longer present at the facility. When attorneys asked where the detainees were located, the Port Isabel staff did not provide that information. When volunteer attorneys asked for clarification whether the detainees were released from detention or transferred to another ICE facility, Port Isabel staff would not or could not provide that information.

9.     When KIND and volunteer attorneys would look up detainees that the Port Isabel staff described as no longer present at Port Isabel, in some instances the online ICE detainee locator would indicate the detainee was still present at Port Isabel, and in other instances would have no information regarding the detainee at all. This lack of clear information regarding the location of detainees made it extremely difficult, and at times, impossible to locate the detainee and provide follow-up legal guidance or information about that detainee's rights in their legal process.

10.     KIND attorneys met with parents that were notified that they would be reunified with their child on Monday July 16th, and still have not been reunified as of July 22nd, without receiving an explanation or reason for the delay.

11.     A volunteer attorney collaborating with KIND met with a detainee moments before his departure from the facility. During that meeting the detainee indicated that the government did not provide any information as to where he was going, who he would be seeing, or whether or not he was leaving the facility for deportation. He

begged the attorney to explain what was happening, but due to the lack of information available, the attorney could neither explain where the detainee was going nor the legal or procedural ramifications of the next steps in his legal process. This is one example of a larger pattern commonly observed by KIND and volunteer attorneys throughout the week of July 16 to 22, undermining the effectiveness of the one-on-one legal consultations during that time period.

12.    Further, KIND attorneys met with detainees at Port Isabel who the government had processed for apparent release from the facility. These individuals wore plain clothes and not the jumpsuits issued to detainees at Port Isabel. The KIND attorneys reviewed Orders of Release on Recognizance issued to those individuals by the U.S. Department of Homeland Security. While those documents are normally issued upon departure from ICE custody, they were issued to the detainees earlier in the week even though they still remained without freedom to leave the detention facility. Separated parents in these circumstances were at times told that they could not be released until their children arrived but were not provided reasons or explanations as to any delay in reunifications and release. The ICE detainee locator would in some instances indicate that these parents were not at Port Isabel and, in others, indicate the parent was still at the facility.

13.    KIND attorneys spoke directly with at least 8 separated parents in plain clothes that were supposedly already processed for release at Port Isabel who indicated negative treatment and deteriorating conditions upon receiving release paperwork, including:

   a.   Telephone access revoked;

   b.   Commissary account revoked;

   c.   Denied access to showers;

   d.   Towels for drying taken away; and

   e.   Revocation of daily 1-hour recess to which other detainees are entitled.

14.     The lack of telephone access for detainees in limbo prior to departure to an unknown location under unknown circumstances was particularly troubling to the detainees and creates significant, material barriers to accessing counsel at a critical step in the process.

15.     KIND attorneys and other volunteers serving Port Isabel from approximately July 17th through July 22nd, 2018, also received an influx of requests from advocates all over the country representing both separated parents and children noting that contact with their clients, which had previously been regular, was suddenly and noticeably absent.

16.     The documents provided to detainees upon release, including, but not limited to, the Orders of Release on Recognizance, and Notices to Appear in Immigration Court are provided in English only.  Separated parents both inside Port Isabel and those released at the Basilica confirmed with KIND attorneys that they received those documents, but that no one explained the nature and content of the documents to them.

17.     There is no group legal orientation or coordinated opportunity for counsel to explain the legal ramifications of the release, reunification, or transfer of the separated parents at Port Isabel. There is also no designated area where volunteer counsel may keep open office hours for separated parents to "drop in" to seek advice. We understand that this model exists in at least one ICE-contracted detention facility.

18.     KIND attorneys or volunteers met with a number of individuals at Port Isabel or the Basilica who were issued Orders of Supervision or Orders of Release on Recognizance requiring them to report to ICE offices within the coming several weeks. Most were instructed to report to ICE offices in Harlingen, Texas, even though the detainees' final destinations were clearly far outside the Harlingen area and spread throughout the U.S.

19.     KIND attorneys and other volunteer lawyers were present at the Basilica release site for one afternoon on Thursday, July 19th to provide post-release legal orientation

and change of address and change of venue assistance. In that afternoon, KIND attorneys reviewed the documents of approximately 14 families and explained what they said, the dates and locations of upcoming hearings and appointments, and offered *pro se* change of address and change of venue forms. A KIND attorney also provided oral group legal orientation presentations to approximately 40 individuals.

20.     KIND attorneys and other volunteers requested to return to the Basilica Friday morning, July 20th, to continue post-release legal assistance and KIND was denied access to return to the Basilica by the administrator of the facility due to stated concerns for solicitation by attorneys seeking money from the families. Counsel's access to clients at the Basilica continues to be extremely limited, severely restricting the opportunity to offer legal assistance to the families before they are scheduled to leave on buses and airplanes to final destinations all around the United States.

21.     Without knowing when or where a separated parent or child is going to be released or transferred, and without access to the documents issued upon release, attorneys cannot provide meaningful counsel to the separated parents or children about a number of critical rights and processes, including, but not limited to: the status of any requests for immigration relief, the consequences of documents they may have signed, the next step in the immigration process, any required upcoming ICE check-ins, the next steps in the reunification process, and the relationship between the parents' case and the children's case.

22.     The continued confusion and lack of transparency has a particularly grave impact on those separated parents who remain in detention who see large numbers of detainees around them leaving, without an explanation or understanding as to why they remain detained. The separated parents are experiencing severe stress, uncertainty and concern about their children, such that it is impacting their mental and physical health. KIND attorneys met with separated parents who reported the

following medical issues: incapacitating headaches, severe depression, blood sugar imbalances, and changes in blood pressure.

23.     The strain upon separated detained parents is also affecting their decisions regarding seeking immigration relief. For example, a KIND attorney met with one detainee, a mother, who reported that fear of continued separation from her child along with coercion by a Deportation Officer caused her to withdraw her request for a Reasonable Fear Interview, even though she does fear returning to her home country.

24.     Further, beginning on or around July 18th KIND and other volunteer attorneys began hearing from detainees at Port Isabel that staff at the facility began widely distributing documents for detainees to sign agreeing to deportation. The detainees reported that the document was not explained to them and that many officers encouraged them to sign it if they wanted to see their child again.

25.     In addition, KIND attorneys representing separated children in New York and Seattle have experienced similar difficulties remaining in contact with child clients once they leave the Office of Refugee Resettlement (ORR) shelters and are transferred to adult ICE facilities or family detention facilities.

26.     Some children have apparently been transferred through Port Isabel; however, attorneys are not able to meet with children at Port Isabel and it is unclear how long they are remaining at that facility prior to release or transfer.

27.     Coordinating communication between the attorney for the child and the attorney for the parent is extremely difficult under these circumstances.

28.     KIND attorneys, both through direct interaction with detainees and those recently released, as well as through communication with other attorneys assisting separated families across the United States, are not able to ascertain a clear pattern with regard to which detainees (parents and children) may expect release, which may expect transfer to another facility, and which may expect imminent deportation. That

lack of clarity and transparency makes it very difficult to provide clear and accurate counsel to the class members.

29.    The result of these continuing – and in some cases, new – complications described above is that attorneys will continue to need significant time to locate and counsel all parents who have been separated from their children.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 24th day of July 2018, in Washington, D.C.

MARIA ODOM

# Exhibit 54

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*     *Admitted Pro Hac Vice*
*Additional counsel on next page*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: June 25, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF LEAH CHAVLA**<br><br>Class Action |
| *Respondents-Defendants*. | |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

1.	I, Leah Chavla, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.	I am a lawyer and a Policy Advisor with the Migrant Rights and Justice program of the Women's Refugee Commission.

3.	I recently counseled reunited families at the South Texas Family Residential Center ("Dilley") in Dilly, Texas.

4.	Counseling these families about their rights is one of the most challenging tasks I have undertaken as an attorney.

5.	The families I met with arrived in Dilley without paperwork. They are disoriented and overwhelmed from a rapid reunification with a child they have not seen for months and an equally rapid transfer. They do not even know what stage their cases are at.

6.	For example, many families had not had credible fear interviews, and believed that they were waiting to receive an interview even though they were detained for over a month. One mother I spoke with said she was asked to sign a document she could not read. She could not remember everything that was explained to her about the document, only that she refused in that moment to be deported without being reunified with her son. However, I do not have the ability to confirm this with DHS or to quickly get a copy of the paperwork that she was given.

7.	It is necessary to spend hours with families to determine even what stage their cases are at. Because of the family's trauma, it is difficult to get even this basic information from them.

8.	For example, in one case I met with a mother and her eleven year old son. The boy would barely speak through the entire interview, only sometimes slightly nodding or shaking his head to answer simple - yes or no - questions. He only

stared forward with an intent expression that looked like he was concentrating so as to not cry.  His mother repeatedly told him to speak to us, but he could not speak.

9.      The children I spoke to were difficult to counsel because they were still processing the separation and reunification with their mothers. The interviews were very emotional.

10.     Communication between children and parents during their separation was difficult and not conducive to anything more than simple expressions of care and loss.

11.     One mother explained that another mother at the facility where she was held had been put in touch with a child who was not hers when she called.  The mother kept saying to the child that he did not sound like her son until she realized she was, in fact, talking to a different child.  After hearing this story, the mother I spoke with said that on the two occasions she spoke with her child during their two-months' separation, she first asked for him to tell her his middle name and his siblings' names to be sure she was speaking with her child.

12.     Some parents reported only having spoken to their child only once.  ORR facilities do not accept collect calls, the time period for any call is limited, and calls are expensive.

13.     Counseling these families is a very time consuming process that must account for delays as interviews end because of the family's trauma, or because the lawyer needs to call and request information from other sources.

14.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge.

_____
LEAH CHAVLA

# Exhibit 55

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Attorneys for Petitioners-Plaintiffs          *Admitted Pro Hac Vice
Additional counsel on next page

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

Petitioners-Plaintiffs,

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE; Adrian P. Macias, El Paso
Field Director, ICE; Frances M. Jackson, El Paso
Assistant Field Office Director, ICE; Kirstjen
Nielsen, Secretary of DHS; Jefferson Beauregard
Sessions III, Attorney General of the United
States; L. Francis Cissna, Director of USCIS;
Kevin K. McAleenan, Acting Commissioner of
CBP; Pete Flores, San Diego Field Director,
CBP; Hector A. Mancha Jr., El Paso Field
Director, CBP; Alex Azar, Secretary of the
Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

Respondents-Defendants.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF LAURA
RIVERA**

CLASS ACTION

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Attorneys for Petitioners-Plaintiffs     *Admitted Pro Hac Vice
Additional counsel on next page

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Ms. L., et al.,

Petitioners-Plaintiffs,

v.

U.S. Immigration and Customs Enforcement
("ICE"); U.S. Department of Homeland Security
("DHS"); U.S. Customs and Border Protection
("CBP"); U.S. Citizenship and Immigration
Services ("USCIS"); U.S. Department of Health
and Human Services ("HHS"); Office of
Refugee Resettlement ("ORR"); Thomas
Homan, Acting Director of ICE; Greg
Archambeault, San Diego Field Office Director,
ICE; Joseph Greene, San Diego Assistant Field
Office Director, ICE; Adrian P. Macias, El Paso
Field Director, ICE; Frances M. Jackson, El Paso
Assistant Field Office Director, ICE; Kirstjen
Nielsen, Secretary of DHS; Jefferson Beauregard
Sessions III, Attorney General of the United
States; L. Francis Cissna, Director of USCIS;
Kevin K. McAleenan, Acting Commissioner of
CBP; Pete Flores, San Diego Field Director,
CBP; Hector A. Mancha Jr., El Paso Field
Director, CBP; Alex Azar, Secretary of the
Department of Health and Human Services;
Scott Lloyd, Director of the Office of Refugee
Resettlement,

Respondents-Defendants.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF LAURA RIVERA**

CLASS ACTION

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*samdur@aclu.org*

I, Laura Rivera, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a Staff Attorney at the Southern Poverty Law Center's Immigrant Justice Project ("SPLC"). I am an active member of the State Bar of Georgia.

2.      My office represents several fathers who were transferred from Folkston Processing Center in Folkston, Georgia, to Port Isabel Detention Center ("PIDC") in Los Fresnos, Texas, to be reunited with their children.

3.      On Tuesday, 7/17/18, and Thursday, 7/19/18, I called PIDC's main number (956-547-1700).  I was prompted to press "6."  I spoke with an operator in the control center.  Each time, I requested instructions for scheduling a legal phone call with a client. Each time, the response was that PIDC does not have a process to schedule legal phone calls.  Instead, the operator informed me, the control center operator on duty would take my name and phone number and have a guard pass it along to the detainee.  Then the detained person would have to call me from any of the phones inside the housing units, which are all monitored and/or recorded.  The operator said the only alternative for a confidential conversation is an in-person visit.

4.      At least two of our clients have told us they cannot place phone calls to us from the detention center. On Tuesday, 7/17/18, SPLC got a call from client and class member A.G.F. He said that of the dozen or so men in his housing unit that had been

moved from Folkston to PIDC, he was the only one who was able to place calls. He said many had tried to place calls using their own Personal Identification Numbers ("PINs"), but did not succeed. Mr. F. passed the phone to another client and class member, J.C.A.A., who told me that he had been unable to call me because of the restrictions on phone calls in the facility. On Thursday, 7/19/18, SIFI received a call from client and class member A.F. He told SIFI that he had placed the call by using another person's PIN, because he was unable to place calls using his own.

5.      On Thursday, 7/19/18, my colleague Gracie Willis attempted to speak with an ICE officer regarding a client and class member, J.P.E., concerning whether he had a final removal order.  She dialed the main facility number (956-547-1700) and pressed the option "3" for lawyers, and "6" for inquiring about a detainee.  After several attempts, she was not able to connect with anyone.  She then dialed the control center number (956-547-1765).  The operator connected her to the extension 1800, where there was no option to leave a voicemail.  She called the control center again, and the operator connected her to the extension for Mr. P.E.'s deportation officer, Officer Robert Cantú.  She left a message with Mr. P.E.'s name, A-number, her name, and a call-back number, along with a request that if a G28 was not immediately available to the DO, she would send one upon request.  She has yet to receive a return call.  Mr. P.E. was released with no notice to Ms. Willis.

6.     On Thursday, 7/19/18, Ms. Willis requested that another attorney, Jodi Goodwin, near PIDC, meet with client and class member J.V.S. to collect paperwork necessary for an emergency filing with the immigration court in Stewart Detention Center.  Ms. Goodwin was told that he was in processing to be released and that he could not be brought to the lawyer's area.  Ms. Goodwin returned on Friday, 7/20/18, and attempted to meet with Mr. V.S. again.  She was told he would not be released, but was being processed to be moved to Karnes County Residential Center with his child, and that he could not be brought to the lawyer's area.  On Monday 7/23/18, Ms. Willis received a reply email from the ICE Office of Chief Counsel in San Antonio indicating that Mr. V.S. had been released on Saturday 7/21/18 without notice to Ms. Willis.

7.     On Thursday, 7/19/18, I contacted the ICE Field Office in San Antonio to report the problem detainees had placing phone calls from inside PIDC. The officer told me there is no way that only some of the detainees were having trouble with their PINs – outgoing calls were either disabled or not, but it would apply to all detainees. I then spoke with a guard in a housing unit at PIDC, who told me PIDC was having some problems with outgoing calls, and they had sent for someone to address the issue.

8.      On Tuesday, 7/24/18, SPLC received a phone call from a class member, E.R.L., who said that he had been transferred from Folkston and unable to use his PIN. He said he was using someone else's PIN. He told us he had not spoken to his 6-year-old child in 20 days and had not been given any information about reunification. He has been given a piece of paper to sign in English and told it was his voluntary deportation. He believed he was going to be removed without his child.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Atlanta, Georgia, on July 25, 2018.

_Laura E Ri_

_____

LAURA RIVERA

# Exhibit 56

1  Lee Gelernt*
   Judy Rabinovitz*
2  Anand Balakrishnan*
   AMERICAN CIVIL LIBERTIES
3  UNION FOUNDATION
   IMMIGRANTS' RIGHTS PROJECT
4  125 Broad St., 18th Floor
   New York, NY 10004
5  T: (212) 549-2660
   F: (212) 549-2654
6  lgelernt@aclu.org
   jrabinovitz@aclu.org
7  abalakrishnan@aclu.org

8  *Attorneys for Petitioners-Plaintiffs*
   *Additional counsel on next page*
9

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org

10
11
12                              *Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
13            ## SOUTHERN DISTRICT OF CALIFORNIA

14  Ms. L., et al.,

15                    *Petitioners-Plaintiffs*,        Case No. 18-cv-00428-DMS-MDD

16  v.

17  U.S. Immigration and Customs Enforcement
    ("ICE"); et al.,

18
                     *Respondents-Defendants*.         **DECLARATION OF**
19
                                                       **LAURA P. LUNN**
20

21
22                                                     CLASS ACTION

23

24

25

26

27

28

I, Laura P. Lunn, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Detention Program Managing Attorney at Rocky Mountain Immigrant Advocacy Network. I am an active member of the State Bar of Oregon. I

2.      My office represents, pro bono, two parents who were transferred from the Denver Contract Detention Facility located in Aurora, Colorado to Port Isabel Detention Center ("PIDC") in Los Fresnos, Texas, to be reunited with their children.

3.      My office placed about a dozen cases with pro bono counsel of other parents who were at the Denver Contract Detention Facility who are designated class members. Those Class Members were also transferred to the Port Isabel Detention Center.

4.      On July 19, 2018 I attended a master calendar hearing before the Executive Office for Immigration Review with my client, who is a Class Member. The Immigration Judge notified me that the Department of Homeland Security had filed a notice indicating that the Department intended to transfer my client on July 20, 2018. I was not told where my client would be transferred. I subsequently spoke to Enforcement and Removal Operations for Immigration and Customs Enforcement, asking them not to transfer my client.

5.      On the evening of July 19, 2018, I met with my client as well as a second client who is impacted by the family separation policy and is a designated class member. I provided them with my cell phone number and asked them to call me as soon as they had the opportunity.

6.      On July 20, 2018, I called the Denver Contract Detention Facility and was told I could not speak to my client because she was no longer there. I then asked to speak with my second client and was informed that she was no longer at the Denver Contract Detention Facility. I confirmed with the Department of Homeland Security

18cv0428

on the ground. At 3:00 am on July 24, 2018, she was awakened and taken to reunite with her son.

11.    Today is July 25, 2018 and I have yet to speak with my second client since she was taken from the Denver Contract Detention Facility. The last time we spoke was on July 19, 2018 when I warned her that she may be transferred. On July 24, 2018, an attorney attempted to visit her at the Port Isabel Detention Center, but he was told that she was no longer detained. I then checked the ICE detainee locator, which said she was still located at the Port Isabel Detention Center. I also confirmed with the Office of Chief Counsel that she is still detained in Port Isabel. The pro bono attorney who I asked to visit my client intends to visit her today. I have tried reaching her on two separate phone numbers listed for Enforcement and Removal Operations in Port Isabel, but no one answers the phone and the mailbox is full. I am unable to leave a voicemail requesting that my client be permitted to contact me. I have received no updates about her procedural posture, about the Department of Homeland Security's intentions regarding her continued detention or possible release, and I have yet to connect with her son's case worker to determine his whereabouts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Westminster, Colorado, on July 25, 2018.

Laura Patricia Lunn

# Exhibit 57

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*          *Admitted Pro Hac Vice*
*Additional counsel on next page*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: June 25, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **DECLARATION OF MANOJ GOVINDAIAH** Class Action **NO HEARING DATE** |
| *Respondents-Defendants*. | |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

1.     I, Manoj Govindaiah, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an attorney and the Director of Family Detention Services at RAICES. I oversee a staff of approximately 10 employees and supervise all of RAICES' immigrant family detention work. RAICES runs the Karnes Pro Bono Project, a nationwide pro bono project that provides legal services to families detained in ICE custody at the Karnes County Residential Center ("Karnes detention center" or "Karnes"), in Karnes City, Texas. We represent approximately 90% of the families at Karnes.

3.     Since the Karnes detention center opened in August 2014, it has exclusively held mothers and children, most of whom had been recently apprehended and had never been separated. That changed on or about July 15, 2018, when families who had been separated and were now being reunified pursuant to the *Ms. L* injunction began arriving at the Karnes detention center. These families included mothers reunified with their children, as well as fathers reunified with their children. On or about July 17, all of the mothers and their children were transferred to the family detention center in Dilley, Texas. As of yesterday, we are aware of approximately 55 families (fathers reunified with their children) held at Karnes.

4.     We received no notice from ICE that these reunited families had arrived in the facility.  We only knew about their arrival because of our presence in the facility.

5.     We are now anticipating the arrival of hundreds of reunited families at Karnes.  Beyond this general sense, we have received <u>no</u> specific information about who will arrive, how many people, when, or the procedural posture of the parents' or children's cases.

6.     I want to be clear:  We at RAICES are ready to work around the clock to represent these families, and can depend on the commitment of pro bono support

18cv0428

from across the United States. We have recruited and trained large numbers of pro bono attorneys who are standing by and awaiting our word as to their involvement. However, no matter how many competent or experienced lawyers we have, without sufficient time it is simply impossible for these families to get the advice and counsel they need, given the space constraints in the detention facility and the unique and complex needs of this population.

7. In the past week, we have better learned the needs of reunited families and the effect that the trauma of these separations has on a lawyer's ability to efficiently and accurately advise families to ensure that they have accurately understood their rights under the injunction.

8. Based on our recent experience, I am concerned that not even seven days will be sufficient to meet with and advise the hundreds of detained families that we are expecting to arrive at Karnes.

9. When we first learned that some subset of reunified families would potentially be sent to Karnes, while other reunified families would be reunified and released, we believed that most of these families sent to Karnes would have final orders of expedited removal – having failed a credible fear interview and a subsequent IJ review of that decision. We therefore believed that for most parents the principal remaining legal option, should they want to challenge removal, would be to request reconsideration of their credible fear denial (i.e., the opportunity for a new interview). Moreover, we did not know the extent to which parents had made unknowing or involuntary waivers of their rights to immigration relief, or their children's rights to relief.

10. The past week has demonstrated a very different picture. First, many of the families who are being moved to Karnes are not at a final stage of the CFI process. And second, many have not made a knowing, intelligent, and voluntary waiver of their right to seek asylum.

11.     Of full intakes of 18 reunified families done on Friday July 20, 2018, 10 had never even begun the CFI process, and 4 had not yet completed the IJ review process, because they believed they had to waive their right to review in order to speed up reunification with their children. Only 3 class members were actually at the request for reconsideration stage. The final class member had already been placed in removal proceedings, outside of the expedited removal process.

12.     This immediately changed the nature of the counseling that the population would require and the time such counseling would reasonably be expected to take.

13.     *First*, the relative complexity of the parents' immigration cases -- coupled with their lack of paperwork and knowledge about their cases -- creates significant delays in the counseling process.

14.     The fact that parents fall in different stages of expedited removal proceedings (or even 240 proceedings, as in one case), makes it more difficult to advise parents to their rights.  It creates a greater set of options that the parent must understand.  At the most basic level, both the parent and lawyer need to know what stage of the process family members are in.  Our experience over the past week has demonstrated that most parents do not have a clear understanding of the procedural history of their cases and often do not even know if they received a credible fear hearing, or an Immigration Judge hearing.

15.     Compounding the confusion, many parents do not have any paperwork from either their or their children's proceedings, and if they do, it is incomplete or outdated. Parents have said that while they did have the paperwork at some point in the past, they either lost it or it was taken from them in the course of transfers. Many children do not have any paperwork or records from their time separated from their parents.

16.     The confusion and lack of records creates significant delays in counseling, because lawyers cannot rely on a family's recollection about their proceedings, but instead must perform independent investigation.

17.     This is compounded by the fact that most of the parents who have arrived at Karnes for reunification have not met with lawyers before.  Indeed, because many have been transferred multiple times between detention centers, it would have been difficult for a lawyer to meet with them, and then keep in communication with them.

18.     For example, a RAICES staff member asked one father – who did not have any paperwork with him when he was reunified – if he had seen an immigration judge or asylum officer, and he said yes.  Later, when our staff was able to get a copy of his immigration records, we learned that he had not seen an immigration judge or an asylum officer, but had been criminally prosecuted for illegal entry, and was confusing his criminal case and his immigration case.  Without our having found his immigration files, no lawyer could have accurately advised him as to his rights whether under immigration law or this court's injunction.

19.     Another father told us he had his credible fear interview in Spanish, even though he speaks Mam, but we later confirmed that he had actually already concluded the credible fear process and the event he believed was an interview was in fact a master calendar hearing in removal proceedings.

20.     Our investigation of a case's procedural history typically requires a detailed interview of the individual, and contacting both ICE and USCIS.  Because ICE and USCIS offices at Karnes are only open between 8 A.M. and 3 P.M., this work can only be done on weekdays, and not weekends. And because interviews must be interrupted and then begun again after receiving relevant and accurate information, the time necessary to counsel families expands.

21.     *Second*, because parents and children have separate proceedings, this creates a need for additional time.  Lawyers for the family must consult with the child's lawyer or prior child advocate, who may be in another part of the United States. After finding the child's lawyer or advocate and consulting with them, the lawyers must then explain the child's choices to the parent. Because of the varying

proceedings and procedural postures, our staff at Karnes also needs to speak with the children in addition to their parents, to fully uncover the child's wishes.

22.     Multiple parents have told me that they were only able to speak to their children once on the phone before being reunited transferred to Karnes.  Even where there was a second or even third call over a two month period of separation, they were short – sometimes less than five minutes in length – and parents spent them comforting their children.  These calls were recorded, and so some parents did not even feel comfortable speaking openly with their child.

23.     *Third*, the trauma of separation, and the emotions that these families are experiencing immediately upon reunification, creates an atmosphere where legal advisals require even more time.

24.     I want to provide a snapshot of what providing legal advice looks like after families have been reunified in detention, drawn from my experiences on July 22 when I personally counseled families who been reunified and detained at the Karnes detention center for at least two days.

25.     The first thing I noticed was that children did not want to leave their father's side. Typically when families enter the visitation room, the children go to one side of the open space where there are toys, books, and a television, while we meet with the parent in one of the private visitation rooms. The ability to interview the parent by themselves is crucial for our provision of legal services since parents are typically unlikely to fully disclose abuse, trauma or persecution that they have experienced in front of their children. Without even knowing if they have this information, it is impossible to even advise them as to whether they can raise a credible fear claim, if they haven't, or if they should exercise their right to challenge a credible fear denial.

26.     On July 22, however, nearly all the children refused to play with the toys or watch television. They wanted to stay with their fathers at all times. Several young boys—between ages 6-8—sat on their father's laps at various points of our

meetings despite them having their own seat in the visitation room. Another boy, I believe age 13, asked numerous questions of me, many focused on whether he would be separated from his dad.

27.    The relationship between parents and their children has clearly been complicated by separation.  Parents have reported to us that their children look different than before.  They have said that their children have grown, are thinner, don't act the same. I have seen children that have appeared angry at their fathers, but simultaneously relieved to be with them.  This means that we are attempting to talk to a family at the same time they are relearning how to communicate with each other.

28.    The experience of separation has also inculcated families with skepticism and distrust to a level that far exceeds any that I have previously experienced with our clients.  Many fathers needed extended coaxing in order to believe that I was not there to take their children away from them.  One father asked me multiple times to prove who I was (when I introduced myself as a lawyer from RAICES), and showing him my bar card, my business card, and my driver's license was insufficient. It was only when I went through our database and listed the names of all the RAICES staff and volunteers that I believe he had previously met with that he appeared to believe I was who I said I was. At the conclusion of our meeting, when I asked him why he was distrustful of me at first, he said something along the lines of since he and his son entered this country, they have been lied to, that he doesn't know who is government and who isn't, and now that he has his son back, he will not let his son go anywhere without him.

29.    Trauma has made it difficult for parents to even comprehend or focus on what lawyers advise.  One father could not comprehend anything I was saying. Any statement I made would elicit a response of "but my son and I can stay together, right?"  When we discussed his legal options, his repeated response was "but as long as I'm with my son, I'll be ok. I'll be with my son that whole time,

right?" The meeting ended without any meaningful information being developed from the client or advice being provided because the father could not move past his fear of re-separation.

30.     Meetings with at least two fathers ended unproductively because they were too emotional to continue. In one case, we had been discussing the complicated procedural posture of the father's and his son's cases, that he had received a negative expedited removal order and was facing deportation, while his son could still apply for asylum. When he asked for clarification of what that meant, I explained that it could result in his son remaining in the United States without him. We could not complete our meeting because his crying prevented us from effectively discussing his legal case. We of course scheduled another meeting, but without a second visit, I cannot say that these families understand their choices.

31.     The trauma these families have experienced as a result of the separation cannot be underestimated. Typically, we can proceed through an initial meeting with a detained family relatively quickly; this process includes asking basic intake questions, assessing their legal options, and educating them about the credible fear process.

32.     With these families, the complexity of the case and the trauma have combined to create a very slow process. Each dad appears to be in a unique procedural posture, and each child is in a different procedural posture. Many of the parents have indicated that they may have initially agreed to deportation, but only because they incorrectly believed it was the fastest way to get their children back. Others had all but given up hope of fighting their cases, until they had an opportunity to be reunited with their children, and now want to pursue their cases.

33.     But these decisions are taking time: families are just reacquainting themselves with their children after weeks or months of separation, and – on top of the confusion and lack of information about the legal system – are having difficulty focusing on the decisions they have to make.

34.     These discussions cannot occur over a single meeting in many instances, and decisions are taking more than a meeting, and are stretching over multiple days.

35.     Space constraints make this slow process even slower. In the visitation area at Karnes, there is an open visitation room with several tables and chairs where we can meet with clients. However meeting with clients in the open area means that no conversations are confidential, since other detainees and GEO staff are regularly present and nearby in the open area. ICE staff may also be present in the visitation area and may overhear conversations.

36.     Within the larger visitation area, there are five confidential meeting rooms, and only 4 have telephones. Karnes has placed an occupancy restriction on the private rooms--three rooms are limited to four people (so that means parent and child, plus an attorney, and you are already at 3. If there is a team of attorneys, or law students or in person interpreters helping, that may not be permissible). Two of the confidential meeting rooms allow for up to 7 people.

37.     Generally, the maximum number of pro bono attorneys and volunteers and RAICES staff that can be accommodated in the visitation area (including individual visitation rooms and the group area) is around 17.  Any more than that and the lack of meeting space, especially confidential meeting space, becomes very apparent. Without sufficient phones or meeting space, it is difficult to use pro bono attorneys and volunteers in an efficient manner.

38.     Language difficulties compound the space issues.  Although our staff is bilingual in English and Spanish, some Ms. L class members speak indigenous languages. We are currently working with Ms. L class members who speak Mam, Ixil, Lxil, and Kiche. We therefore need to arrange for interpreters in these languages, often by phone. Given that there are only 4 confidential meeting rooms with phones, if we are working with telephonic interpreters often we have no confidential meeting space to meet with any of our remaining clients.

39.     Even *if* the entirety of Karnes is used only for Ms. L class members, there will be space issues.  This will come, in part, because the counseling of the hundreds of families will have to happen in parallel with whatever representation occurs of parents who choose to reinstate their rights to challenge removal.

40.     For example, we have seen parents who have waived their right to a credible fear hearing or an IJ review of a negative credible fear determination only to want to reinstate those rights after being reunified with their child and learning for the first time that they can remain reunified while they seek to stay in the United States.  In these cases, after we determine that the parent wishes to continue to litigate their immigration case, and we alert the asylum office (as to a credible fear claim) or the immigration court, those families may remain detained at Karnes.

41.     Once a request for a CFI or IJ hearing is made, an individual's removal is stayed until the process ends.  If the person remains detained through the stay, then lawyers will work to represent them in their credible fear proceedings and IJ reviews, as we do with all of other detained family clients outside of the Ms. L injunction.  Because of the trauma separated families have experienced, representation is more important – without significant time developing their testimony and overcoming the emotions resulting from separation, a fair hearing will be extremely difficult.  Representation through this process requires drafting detailed declarations with the class member and potentially their family, gathering country conditions documents, and often putting together written arguments.

42.     These must be done in in-person meetings in the facility itself, and they must be done quickly.  For example, a credible fear hearing is typically scheduled within 3 or 4 days of the request being made.  And pursuant to 8 U.S.C. § 1225(b)(1)(B)(iii)(III), IJ review must take place within 7 days of the detainee's receipt of a negative credible fear finding.

43.     The lawyers who are working to represent families in their actual immigration proceedings will be "competing" for space with the lawyers who are

doing the screening and counseling the reunified families to determine what their options are under the Ms. L injunction.

44.     These problems are compounded by the fact that we do not get notice of when a reunified family arrives at Karnes, and that it usually takes more than a day between a family's arrival and when we hear about them and can arrange for a legal consultation.   Part of the delay is attributable to the fact that when families arrive at Karnes, there are put through an institutional intake process that involves medical screenings and orientations that can take several hours.  Thus, if families arrive on a Thursday morning it will not be until sometime on Friday that we will even be able to speak to them.

45.     There are many factors involved in projecting how long it will take to advise the hundreds of reunified families who are arriving at Karnes.  Some of these are legal:  The relatively complex procedural histories of parents, the separate proceedings of the children, the lack of documentation and confusion about where parents are in the expedited removal process, and the recurring pattern that parents have not pursued their rights to relief in the belief that to do so would delay reunification.  Some of the factors are personal to the families who have gone through separation and reunification:  the need for parents and children to reacclimatize to their relationships after months spent apart, and the sequelae of the trauma, which interferes with the counseling process.  Others are specific to the space that lawyers and advocates have to work with in a detention center.  When taken together, it is unlikely that even a period of seven days will allow for adequate counseling to ensure that the Court's injunction has been implemented as intended and that families have made choices with a proper understanding of their rights.

Antonio, Texas.

_____
MANOJ GOVINDAIAH