# EXHIBIT 58

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

    *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

    *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF LAILA ARAND**

CLASS ACTION

1.     I, Laila Arand, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an Attorney at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.  I am a member in good standing of the bars of New York State and the District of Columbia.  I am an English speaker, and my conversations with the detained parents reflected below were conducted via interpretation by a native Spanish speaker, Juan Jaramillo, a Staff Attorney at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.

3.     I, along with other attorneys from our law firm, in collaboration with attorneys at Annunciation House Legal Program ("AHLP"), have been providing pro bono legal services at the Otero County Processing Center in Chaparral, New Mexico ("Otero") and other detention facilities near El Paso, Texas, where I have been meeting with detained parents who are separated from their children.

**F.G.**

4.     In connection with this work, on July 27, 2018, I met with one such father, F.G., after F.G. placed a call to AHLP that morning.  Mr. Jaramillo and I met with F.G. that afternoon at Otero.

5.     At that meeting, F.G. described an incident that had occurred on the afternoon and evening of July 25, 2018, when he was briefly allowed to spend a few hours with, and then was once again separated from, his 17-year-old son.

6.     F.G. told us that the first time his son was taken from him was in early June 2018, one day after they came together to this country.  He said that at the time of that initial separation, the guards asked his son to come with them but did not tell F.G. or his son that they were being separated.

7.     F.G. said he did not see his son again after that for over fifty days.  On the afternoon of Wednesday, July 25, 2018, they saw each other again for the first

- 1 -

time since their separation at the "*Corralon*"—a commonly used nickname, meaning "corral," for the El Paso Service Processing Center in El Paso, Texas ("EPSPC").  Along with a group of other parents and their children, F.G. and his son boarded a bus.  F.G. told me that the bus then drove away.  When F.G. had been on the bus for approximately eight minutes, a female official on the bus received a phone call.  The bus turned around and returned to EPSPC.

8.     F.G. informed us that the parents and their children then boarded a second bus that remained parked at EPSPC, until several uniformed officials approached the bus, carrying forms, which they then distributed to the parents on the bus.  F.G. observed that the forms were entirely in English, which he could not read, except for a list of three options written in Spanish at the end of the form, which he recalled were:  Option 1: I want to be deported with my children; Option 2: I do not want my child to be deported with me if I lose my case; and Option 3: I want to speak to a lawyer before deciding what to do.  F.G. told us that when he received the form, someone had already pre-marked Option 1—I want to be deported with my children—with a handwritten check mark.  F.G. was not clear on the exact language of the form, as the form was taken away from him after he signed it, and he was not provided with a copy.

9.     F.G. said the officials told him that while there were three options on the form, he had to choose Option 1.  He refused, and he and a group of other parents that refused to sign Option 1 were taken off the bus.

10.    F.G. said that he remembers there being six other detained parents— five fathers and one mother—who refused to sign Option 1.  F.G. explained to the officials that he wanted his son to be safe in the United States even if he himself had to be deported, and so, between Option 1 and Option 2, he viewed Option 2 as the better choice under the circumstances.  F.G. said that when he and the six other parents asked to sign Option 2, the officials became very angry, then talked among

themselves in English before yelling at the parents and insisting in Spanish that they had to sign Option 1.

11.     F.G. told us that eventually, those parents that refused to sign Option 1 were taken away from their children—who remained behind on the bus—to speak with an official inside the EPSPC.  F.G. stated that the official asked him to give his permission for a designated adult in the United States to make medical and educational decisions for his son.  F.G. agreed to this.  F.G. told us that he asked if he could say goodbye to his son, and was told no.  F.G. told us he then asked if he could at least go back to the bus to retrieve his belongings from the storage area underneath the bus, and was told he could do so quickly.  He said that when he went to the bus to do so, his son attempted to come outside the bus to see him, but was unable to do so.

12.     F.G. reported to us that the parents who did sign the form pre-marked with Option 1 were allowed to re-board the bus to join their children and the children of the parents who refused to sign.  F.G. said he watched the bus depart with his son on board, while F.G. remained behind at the EPSPC with the other parents that refused to sign Option 1.  F.G. said he spent two nights in EPSPC before being returned to Otero, and when he returned to Otero he immediately called AHLP.  At the time Mr. Jaramillo and I spoke to F.G., he had not spoken to his son since they were separated at the bus and did not know where he was.

13.     F.G. memorized the names and countries of origin for four of the other detained parents that refused to sign Option 1, which enabled me to locate and meet with three of those parents at Otero later that afternoon.  Those parents are identified here as J.M., C.T., and F.T.

**J.M.**

14.     J.M. is a parent of a 17-year-old son.  He recounted the same experience of boarding a bus on the afternoon of July 25, 2018, and the bus turning

- 3 -

back—he recalled that the woman who answered the phone call was a female official he described as approximately 40 to 50 years old, white, and with curly hair.  J.M. further recalled that a man he described as large and Hispanic approached the parents shortly after they boarded the second bus and said to them (in Spanish) that he was the "*jefe*" (boss) and that the detained families on the bus would be going to an "*albergue*" (shelter)—a statement that J.M. said initially provided him with comfort that all would be well.

15.    J.M. told us that sometime after that, however, officials wearing the badge of U.S. Immigration and Customs Enforcement ("ICE") arrived with forms. J.M. recalled being presented with the same three options in Spanish on a form that was otherwise in English: that if he lost his case and had to be deported, the first option would require his child to be deported with him, the second option would allow him to be deported alone while leaving his child in the United States, and the third option was to consult a lawyer.  J.M. confirmed that the forms he received had the first option pre-selected in handwritten ink.

16.    J.M. noted that it seemed inappropriate to him that ICE officers were asking the parents to sign these forms on a parked bus instead of in a building. J.M. told us that because his son was his priority, he chose the second option, but that he also wanted a judge to hear his own case.  J.M. said an ICE officer responded that J.M. had already lost his case when he came into this country, and so there was nothing for a judge to decide.  J.M. told us that the ICE officers were shouting and that he felt pressured to sign Option 1.  J.M. reported that after that after he signed Option 2, the ICE officer returned with a new copy of the form, again with Option 1 pre-selected, and the ICE officer again insisted that he sign Option 1, which J.M. again refused to do.  J.M. added that the ICE officers yelled at him in English, and said to him in Spanish words to the effect of, "what do you

think you are, a lawyer?"  J.M. also demonstrated to us a physical gesture used by the ICE officers in which they pointed their finger at him aggressively.

17.    J.M. further described being taken inside and meeting with an official who collected information about his son.  J.M. said he was then permitted to retrieve some items from below the bus, but the children remained on the bus, and had to wave goodbye to their parents through the bus windows.

18.    J.M. said that after spending two nights at EPSPC, he was handcuffed, chained, and bussed back to Otero even though he had not been handcuffed or chained on the previous trip.  J.M. said that he has not been able to speak with his son since they were separated.

**C.T.**

19.    C.T. recounted the same experience of a bus ride with his 17-year-old son that was diverted back to EPSPC, and further recalled being told initially that the bus would take them to the airport for a three-hour airplane ride to an "*albergue*" (shelter).  C.T. likewise similarly described ICE officials arriving on a second bus with a form that included an English language portion, and noted that nobody explained the English part of the form to him.  He added that of the above-described three options in Spanish, the first one—consent to deportation of his child in the event he is deported—was pre-marked with a "v" shape.

20.    C.T. also said that the ICE officials' statements when they insisted that he sign Option 1 included: (1) that he had already lost his case and had to be deported, (2) that if he did not sign a form with Option 1, he would be immediately deported, and (3) that if he did not sign a form with Option 1, he would never see his child again.  C.T. recalled that throughout this encounter, the ICE officers were yelling in an angry tone.

21.    C.T. said that he does not know where his son is or how to contact him now.  He said that, at that time, he chose Option 2 because he wanted his son

to be able to stay and be safe from the dangers in his home country, even if C.T. was not allowed to.  He said that being separated from his son the first time was hard, but being separated again after seeing his child for only few hours, thinking they were going to be together, was harder.

**F.T.**

22.    F.T. recounted similar facts as the other three detainees—he told us about the aborted bus ride, the initial promise that they were being taken on an airplane to a shelter (F.T. added he heard there may have been a mechanical issue with the plane), the arrival of ICE officials who insisted that he sign a form pre-marked with Option 1 (but who did not explain why he had to choose that option) and who were visibly and audibly angry when he refused.  F.T. explained that he selected Option 2 out of the options given to him because he was concerned for the welfare of his 16-year-old son.  F.T. added that one ICE official told him in Spanish that although he might want his son to stay here, all of them were going to be deported anyway, and F.T.'s son might be deported first.  F.T. also said that ICE agents came back three separate times to try to get him to choose Option 1.

23.    F.T. told us that several of the other detained parents that did sign a form with Option 1 were crying as they did so because "*se rindieron*" (they gave up), and they just wanted to be with their children.  F.T. said he had not spoken with his son since the separation and was not sure where he was.

24.    None of the four individuals I met with were allowed to keep a copy of the form they signed.

25.     I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge.  Executed in El Paso, Texas on July 28, 2018.

*Laila Arand*

Laila Arand