CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
District Court Section
Office of Immigration Litigation
ANN M. WELHAF
Attorney
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4090
Fax: (202) 616-9366
Email: ann.welhaf@usdoj.gov

*Attorneys for Federal Respondents*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L,, et al.,<br><br>                    Petitioner-Plaintiff,<br><br>        vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>                    Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>NOTICE OF RELATED CASE |

The Government Respondents-Defendants in this case hereby notify the Court that a putative class action was filed Friday that is related to the captioned matter and that seeks to halt the removal of class members and their children.  The case, *M.M.M. v. Sessions*, No. 18-1759 (D.D.C.), appears to have been filed by six *Ms. L* class members on behalf of their children with whom they were recently reunified and a putative class of children who were separated from their parents.  *See* Complaint Caption & ¶¶ 10-16, 72, 78, 86, 93, 99, 103 (filed by six individual "on behalf of . . . minor child[ren]" who are detained at Dilley or Karnes family residential centers and describing reunifications pursuant to *Ms. L* order).

Plaintiffs in the new case seek a temporary restraining order that would halt Defendants from "removing . . . all non-citizen children, and the parents or guardians of such children, who were separated upon entry into the United States."  *M.M.M.*, Proposed Temporary Restraining Order (Attached).  We are attaching the complaint, the request for a class-wide temporary restraining order, and the request for a preliminary injunction.

We are bringing this case to this Court's attention because it appears to have been filed by class members in this case, on behalf of their children, and the relief being sought would be inconsistent with the relief sought by the class in this case with regards to removals after reunification.  Plaintiffs in *M.M.M.* are seeking a TRO

hearing on Tuesday, July 31, 2018.  We intend to promptly ask the district court to

transfer this new matter to this Court.

DATED: July 30, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General
                                        SCOTT G. STEWART
                                        Deputy Assistant Attorney General

                                        */s/ August E. Flentje*
                                        AUGUST E. FLENTJE
                                        Special Counsel
                                        WILLIAM C. PEACHEY
                                        Director
                                        WILLIAM C. SILVIS
                                        Assistant Director

                                        SARAH B. FABIAN
                                        Senior Litigation Counsel
                                        NICOLE MURLEY
                                        Trial Attorney
                                        Office of Immigration Litigation
                                        Civil Division
                                        U.S. Department of Justice
                                        P.O. Box 868, Ben Franklin Station
                                        Washington, DC 20044
                                        (202) 532-4824
                                        (202) 616-8962 (facsimile)
                                        sarah.b.fabian@usdoj.gov

                                        ADAM L. BRAVERMAN
                                        United States Attorney
                                        SAMUEL W. BETTWY
                                        Assistant U.S. Attorney

                                        *Attorneys for Respondents-Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**M.M.M., ON BEHALF OF HIS MINOR CHILD, J.M.A.**
409 FM 1144 Karnes City, TX, 78118

**I.A.T., ON BEHALF OF HIS MINOR CHILD, E.A.H.**
409 FM 1144 Karnes City, TX, 78118

**N.B., ON BEHALF OF HER MINOR CHILD, D.B.G.**
1925 TX-85, Dilley, TX 78017

**P.A.P., ON BEHALF OF HER MINOR CHILD, G.M.A.**
1925 TX-85, Dilley, TX 78017

**G.C.H., ON BEHALF OF HIS MINOR CHILD, A.M.C.**
1925 TX-85, Dilley, TX 78017

**L.C.O, ON BEHALF OF HER MINOR CHILD, L.A.A.**
1925 TX-85, Dilley, TX 78017

**Plaintiffs,**

- v. –

**JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES,**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530;

**CIVIL ACTION NO. _____**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**KIRSTJEN NIELSEN, SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY,**
25 Murray Lane SW
Washington, DC 20528;

**ALEX AZAR, SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
200 Independence Avenue SW
Washington, DC 20201;

**RONALD VITIELLO, ACTING DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,**
500 12th Street SW
Washington, DC 20536;

**L. FRANCIS CISSNA, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES,**
20 Massachusetts Avenue NW
Room 4210, MS: 2120
Washington, DC 20529;

**KEVIN K. MCALEENAN, COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,**
1300 Pennsylvania Avenue NW
MS: 1345
Washington, DC 20229;

**SCOTT LLOYD, DIRECTOR OF THE OFFICE OF REFUGEE RESETTLEMENT,**
Mary E. Switzer Building
330 C Street SW
Washington, DC 20201;

**DANIEL A. BIBLE, DIRECTOR OF ICE SAN ANTONIO FIELD OFFICE,**
1777 NE Loop 410, Floor 15
San Antonio, TX 78217;

2

**U.S. DEPARTMENT OF HOMELAND SECURITY,**
245 Murray Lane SW
Mailstop 0485
Washington, DC 20528;

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,**
500 12th Street SW
Washington, DC 20530;

**U.S. CUSTOMS AND BORDER PROTECTION,**
1300 Pennsylvania Avenue NW
Washington, DC 20229;

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES,**
20 Massachusetts Avenue NW
Washington, DC 20529;

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
200 Independence Avenue SW
Washington, DC 20201;

**OFFICE OF REFUGEE RESETTLEMENT,**
Mary E. Switzer Building
330 C Street SW
Washington, DC 20201,

**Defendants.**

## INTRODUCTION

1.      This case concerns the U.S. government's denial of mandatory asylum procedures to minor migrant children, including Plaintiffs, who were forcibly and unlawfully separated from their parents and have been or will be reunified with them pursuant to the preliminary injunction issued by the court in *Ms. L v. U.S. Immigration and Customs Enforcement ("ICE"); et al.*, Case

No. 18-cv-00428-DMS (MDD) (S.D. Cal. June 26, 2018).  Under the U.S. government's stated policy of immediate removal following reunification, Plaintiffs – and many other child migrants like them – are in imminent danger of being deported back to life-threatening conditions in their home countries, without any final order of removal and without ever having been given the chance to access asylum procedures that are guaranteed by both statute and the Constitution.

2.      Many of the families who were subject to the U.S. government's "zero tolerance" separation policy were apprehended at or near the U.S. border with Mexico after fleeing life-threatening conditions in certain Central American countries, including El Salvador, Guatemala, and Honduras.  Many of these families, including Plaintiffs' families, came to the U.S. seeking refuge, and their forcible separation has caused both parents and children severe trauma and distress.

3.      In its order granting a preliminary injunction against the U.S. government, the district court in *Ms. L.* recently catalogued some of this trauma.  The court there determined that the separation policy likely violated the Due Process Clause of the Fifth Amendment because it was likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency."  *Ms. L. v. U.S. Immigration and Customs Enforcement ("ICE"), et al.*, No. 18cv0428 DMS (MDD), 2018 WL 3129486, at *8, 1165–66 (S.D. Cal., June 26, 2018) (internal quotations omitted).  Given the likely unconstitutionality of the separation policy, the court ordered the U.S. government to stop separating families immediately, and to reunify all families that had already been separated by July 26, 2018.  *See id.* at *12.

4.      Having been ordered to end the unlawful separations, Plaintiffs are informed and believe that Defendants intend to embark on a policy of immediately deporting reunified families in which one of the parents has been given an expedited removal order, without honoring the minor children's individually vested rights to seek asylum.   In furtherance of this policy, immigration officials have presented parents separated from their children with "removal forms" in which they must choose between being deported alone or with their child.   The apparent goal of these forms is to pressure or coerce the parents to abandon not only their own rights, but also their children's rights to seek asylum.   Upon information and belief, the government plans to rely on these waivers to immediately deport children who do not even have a final order of removal.

5.      "A deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself."   *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950).   And as the Supreme Court has recognized, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."   *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (internal quotation omitted).

6.      Here, the planned removal of these minor children and their parents without honoring the children's rights to apply for asylum deprives the children of their fundamental right to due process and to seek asylum prior to repatriation.   Plaintiffs therefore ask this Court to invalidate and enjoin the U.S. government's unlawful policy to remove families before granting Plaintiffs access to the asylum procedures to which they are entitled by law.   Plaintiffs request this relief on behalf of themselves and on behalf of a nationwide class, as set forth below.

## JURISDICTION AND VENUE

7.     This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States.   Specifically, this action arises under the Immigration and Nationality Act ("INA"), the Fifth Amendment to the Constitution, the Administrative Procedure Act ("APA"), and the Mandamus Act.

8.     Venue is proper under 28 U.S.C. § 1391(e) because several of the Defendants reside in this District, and upon information and belief a substantial portion of the relevant facts occurred within this District, including the decision to implement the policy changes challenged in this action.

9.     Jurisdiction and venue also are proper under 8 U.S.C. § 1252(e)(3), insofar as Plaintiffs' claims arise from or relate to the implementation or operation of an expedited removal order under 8 U.S.C. § 1225(b)(1), and/or in the event that the Court is reviewing a decision by the Attorney General to invoke the provisions of that section.   In either case, jurisdiction is proper under 8 U.S.C. § 1252(e)(3) because this action is a systemic challenge to the legal validity of written policies and procedures issued by or under the authority of the Attorney General that have been used to remove migrant children who were forcibly separated from their families upon apprehension at or near the U.S. border with Mexico and who are now reunited with parents who have received expedited removal orders.

**PARTIES**

10.     Each Plaintiff is a minor child and brings this action by and through his or her parent and next friend, in accordance with Federal Rule of Civil Procedure 17(c).

11.     J.M.A. emigrated to the U.S. from Honduras with his father and is currently detained at the Karnes County Residential Center in Karnes, Texas.

12.     E.A.H. emigrated to the U.S. from Honduras with his father and is currently detained at the Karnes County Residential Center in Karnes, Texas.

13.     D.B.G. emigrated to the U.S. from Honduras with her mother and is currently detained at the South Texas Family Residential Center in Dilley, Texas.

14.     G.M.A. emigrated to the U.S. from Honduras with her mother and is currently detained at the South Texas Family Residential Center in Dilley, Texas.

15.     A.M.C. emigrated to the U.S. from Honduras with his mother and is currently detained at the South Texas Family Residential Center in Dilley, Texas.

16.     L.A.A. emigrated to the U.S. from Guatemala with her mother and is currently detained at the South Texas Family Residential Center in Dilley, Texas.

17.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States.  In this capacity, he is responsible for administering U.S. immigration laws pursuant to 8 U.S.C. § 1103 and has the authority to grant non-citizens asylum and other relief.

18.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security.  In this capacity, she directs the sub-agencies within the U.S. Department of Homeland Security: U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, and U.S. Customs and Border Protection.  Secretary

7

Nielsen is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103 and has the authority to grant non-citizens asylum and other relief.

19.     Defendant Alex Azar is sued in his official capacity as the Secretary of the U.S. Department of Health and Human Services.  In this capacity, he is responsible for overseeing the agency charged with enhancing and providing effective health and social services in the United States.

20.     Defendant Ronald Vitiello is sued in his official capacity as the Acting Director of the U.S. Immigration and Customs Enforcement.  In this capacity, he is responsible for civil and criminal enforcement of federal laws governing border control, customs, trade and immigration.

21.     Defendant L. Francis Cissna is sued in his official capacity as the Director of U.S. Citizenship and Immigration Services.  In this capacity, he is responsible for overseeing the officers who conduct applicants' credible fear interviews and adjudicate applicants' asylum claims.

22.     Defendant Kevin K. McAleenan is sued in his official capacity as the Commissioner of U.S. Customs and Border Protection.  In this capacity, he oversees the agency responsible for securing U.S. borders regarding trade, immigration, and agricultural protection.

23.     Defendant Scott Lloyd is sued in his official capacity as the Director of the Office of Refugee Resettlement. In this capacity, he is responsible for the agency that provides care and placement for children who have entered the U.S. without a guardian.  His agency is also responsible for the care of children who were separated from their adult guardians at the U.S. border pursuant to the administration's "zero tolerance" policy.

24.     Defendant Daniel A. Bible is sued in his official capacity as the Director of the San Antonio Field Office of U.S. Immigration and Customs Enforcement.

25.     Defendant U.S. Department of Homeland Security ("DHS") is the government agency responsible for enforcing the immigration laws of the United States.

26.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS responsible for carrying out removal orders and overseeing immigration detention in the United States.

27.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS responsible for the initial processing and detention of non-citizens who are apprehended at or near U.S. borders.

28.     Defendant U.S. Citizenship and Immigration Services ("CIS") is the sub-agency of DHS responsible for conducting interviews of individuals apprehended at the border in order to determine whether those individuals have a credible or reasonable fear of persecution in their home countries and should be permitted to seek asylum in the United States.

29.     Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the Government that has been delegated with authority over "unaccompanied minors."

30.     Defendant Office of Refugee Resettlement ("ORR") is a program of the Administration for Children and Families, an office of HHS responsible for providing care of and placement for "unaccompanied" non-citizen children who come to the United States.

## FACTS

### A. The U.S. Government's Deliberate and New Immigration Policy Forcibly Separated Child Migrants from Their Parents.

31.     Earlier this year, the U.S. government initiated a "zero tolerance" policy on immigration, pursuant to which the U.S. government engaged in a widespread practice of separating migrant families who had been detained after crossing the U.S. border with Mexico.

9

32.     Over the course of several months, the U.S. government, including ICE, forcibly separated or oversaw the forcible separation of *thousands* of child migrants from their parents, dividing families with small children (including infants) who were seeking asylum.   The separated children were transferred to the custody of ORR for placement elsewhere in the United States, in some cases hundreds of miles from their parents who remained in detention.   Many families were separated for months, with little or no ability to communicate with one another.

33.     The express purpose of the "zero tolerance" policy, according to Attorney General Sessions, was to deter migrant families from entering the United States without authorization.[1]

**B.   *A Federal Court Found that the Separation Policy Likely Violates the Parents' Fifth Amendment Right to Family Integrity and Ordered the Federal Government to Reunify Families by July 26.***

34.     On June 26, 2018, Judge Dana Sabraw of the District Court for the Southern District of California issued a preliminary injunction enjoining the U.S. government from detaining migrant parents without and apart from their minor children, and ordered the U.S. government to reverse the effects of its separation policy by reuniting families who had been separated within 30 days, absent a determination that the parent was unfit or presents a danger to the child. *See Ms. L*, 2018 WL 3129486 at *12.

35.     In finding that a preliminary injunction was warranted based on several months of litigation and a robust record before the court, Judge Sabraw determined that the U.S.

---

[1]     U.S. Att'y Gen. Jeff Sessions, *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions. As the Attorney General explained:  "If you cross this border unlawfully, then we will prosecute you.  It's that simple.  If you smuggle illegal aliens across our border, then we will prosecute you. If you are smuggling a child, then we will prosecute you *and that child will be separated from you as required by law. . . .* So if you're going to come to this country, come here legally.  Don't come here illegally."

government's separation policy likely violated the parents' Fifth Amendment right to family integrity because it could be considered:

> so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience, . . . interferes with rights implicit in the concept of ordered liberty, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency.

*Id.* at \*8

36.     In evaluating whether the migrant parents would suffer irreparable injury without an injunction, Judge Sabraw also found that "the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them," and that "separating children from their parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." *Id* at 9–10 (internal quotations omitted).

37.     Finally, Judge Sabraw noted his disappointment with the U.S. government's actions: "The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making.  They belie measured and ordered government, which is central to the concept of due process enshrined in our Constitution.  This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children." *Id.*

38.     Unfortunately, these same words continue to describe the U.S. government's actions following the reunification of families, as described in more detail below.

### C. *In the Wake of the* **Ms. L** *Order, Defendants Are Attempting to Effectuate the Immediate Deportation of Hundreds of Reunified Families Through Unlawful Measures.*

39.     Pursuant to the preliminary injunction entered in *Ms. L*, Defendants were supposed to reunify all separated families by July 26, 2018.  Although Defendants are still in the

process of reunification, as ordered, it is apparent that Defendants intend to follow a policy to immediately remove any reunified families in which a parent has received an expedited removal order under 8 U.S.C. § 1225(b)(1), without giving the child access to procedures that are required by statute and the Constitution.

40.     This policy, which is demonstrated by the statements made by the U.S. government officials and other sources discussed below, is being carried out in two steps. First, the U.S. government has pressured parents with final removal orders into waiving their children's right to remain in removal proceedings under Section 240 of the INA, so that the U.S. government can extract the children from Section 240 proceedings and deport them under a pretense of voluntary return. Second, once reunited with their parents in detention, the U.S. government has refused to give children access to asylum procedures under Section 235. With these two steps—both of which are illegal—the U.S. government is preparing to deport the families forthwith, without ever giving the child the chance to seek asylum.

41.     The U.S. government's recent statements on reunification, including statements from the president himself, show that Defendants' goal is to deport these reunified families as soon as possible. On June 23, 2018, DHS released a Fact Sheet entitled "Zero-Tolerance Prosecution and Family Reunification," which lays out the agency's plans for family reunification. By its own terms, the DHS Fact Sheet makes clear that the reunification process is designed "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal*."[2] The Fact Sheet makes no provision for migrant children who are entitled to—but have never received—an interview with an asylum officer prior to being deported, or a hearing before an immigration judge under Section 240. Rather, it explicitly states

---

[2]     *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (emphasis added).

that "ICE will seek to reunite verified family units and *link their removal proceedings* so that *family units can be returned to their home countries together*."[3]

42.     As the court in *Ms. L* described it, "the Fact Sheet focuses on reunification 'at time of removal[,]' stating that the parent slated for removal will be matched up with their child at a location in Texas *and then removed*." *Ms. L*, 2018 WL 3129486, at *5 (emphasis added and internal citations omitted).  Indeed, the *Ms. L* court noted that "it is undisputed ICE has no plans or procedures in place to reunify the parent with the child *other than arranging for them to be deported together after the parent's immigration case is concluded*." *Id.* (emphasis added and internal quotation marks omitted).  There is no mention of whether a *child's* rights to their own immigration and asylum procedures will be upheld prior to removal.

43.     Perhaps most tellingly, on June 24, 2018, President Trump tweeted that "[w]hen somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[4]  As Judge Michael Simon of the District Court for the District of Oregon put regarding this statement, "[t]he position of the United States Government appears to be that aliens are not entitled to due process in immigration proceedings." *Innovation Law Lab v. Nielsen*, ___ F. Supp. 3d___ , No. 3:18-CV-01098-SI, 2018 WL 3114530, at *6 (D. Or. June 25, 2018).

44.     The policy of immediately deporting these families upon reunification is also reflected in recent filings in *Ms. L*.  In the ACLU's Motion for Stay of Removal and Emergency TRO Pending Ruling on the Stay Motion, the ACLU cites "persistent and increasing rumors – which Defendants have refused to deny – that mass deportations may be carried out imminently and immediately upon reunification." Pls.' Reply in Supp. of Mot. for Stay of Removal at 1, *Ms.*

---

[3]     *Id.* (emphasis added).
[4]     Donald J. Trump (@realDonaldTrump), Twitter, (June 24, 2018 8:02 AM), https://twitter.com/realDonaldTrump/status/1010900865602019329.

*L. v. U.S. Immigration & Customs Enforcement*, No. 18-0428 (S.D. Cal. July 25, 2018), ECF No. 154.

45.     In fact, Defendants' policy includes attempting to get parents to waive their children's legal rights in order to facilitate families' immediate removal.  On June 24, 2018, a DHS official told MSNBC Correspondent Jacob Soboroff that parents separated from their children "were quickly given the option to sign paperwork leading to deportation.  Many chose to do so."[5]  On the same day, the *Washington Post* reported comments from an interview with a senior administration official who declined to be identified:

> [O]fficials never intended to send busloads of children to [the Port Isabel detention facility] for a massive reunion.  Instead, the official said, they plan to reunite families on an individual basis once a parent has lost his or her deportation case.  *Parents may ask for their children to join them so that they can be deported together,* the official said.[6]

46.     Indeed, following the reunification order in *Ms. L*, ICE began providing parents subject to final orders of removal with a "Separated Parent's Removal Form" (the "Removal Form") that offered them two choices: (1) reunification with their minor children "for the purpose of repatriation to" the parent's country of citizenship, or (2) repatriation without reunification.  *See* Exhibit 1 (Separated Parent's Removal Form).  The forms do not recognize that the children have independent rights to seek asylum, and a right to be accompanied by their parent(s) pending the outcome of those proceedings.   The only opportunity for family reunification afforded by the Removal Form requires parents to consent to repatriation together. As such, the Removal Form coerces parents into choosing the second option of being deported

---

[5]     Jacob   Soboroff   (@jacobsoboroff),   Twitter   (June   24,   2018,   5:29   AM), https://twitter.com/jacobsoboroff/status/1010862394103328771.

[6]     Maria Sacchetti et al., *Sen. Warren visit detention center, says no children being returned to   parents   there,*   The   Washington   Post   (June   24,   2018), https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html?utm_term=.7a9ca477bddd (emphasis added).

together, unknowingly and unlawfully waiving their children's legal right to pursue asylum. These coercive forms are thus meant to facilitate the immediate deportation of reunified families in which the parent has received (or will receive) an expedited removal order.

47.     In their Reply in Support of the Motion for Stay of Removal in *Ms. L*, the ACLU identified at least 27 instances in which parents who wished to be reunited with their children were pressured and/or misled into signing Removal Forms.  These parents were instructed to sign the English-language Removal Forms without being told that they would waive their right to be reunited with their children.  In one instance, a Guatemalan father, a native Acateco speaker who speaks only limited Spanish and cannot read or write in any language, signed a Removal Form in English that he was told would allow his daughter to be released to family members in the United States without knowing that he was waiving his right to be reunited with her.  Pls.' Reply in Supp. of Mot. for Stay of Removal at 20-21, *Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 18-0428 (S.D. Cal. July 25, 2018), ECF No. 154.  In another instance, a father who was afraid to return his daughter to Guatemala was told that the only way she could remain in the United States was if he signed an English-language Removal Form, which he did not understand.  *Id.* at 31-32.  The entire interaction lasted approximately one minute, and he was not given the opportunity to review the document or ask questions about it.  *Id.* at 32.  He was later told to sign a Spanish-language document acknowledging that he understood the Removal Form, which he signed because he believed he had no choice if he wanted his daughter to remain in the United States.  *Id.*

48.     Upon information and belief, the U.S. government is treating the selection of reunification and deportation as a waiver of the child's independent rights to seek asylum in proceedings under Section 240 of the INA.   Indeed, prior to their reunification, the U.S.

15

government had classified separated minors as "unaccompanied" minors. An unaccompanied child migrant is defined as a person who, among other things, is under age 18 and "with respect to whom there is no parent or legal guardian in the United States." *See* 6 U.S.C. § 279(g). Unaccompanied child migrants are not subject to the same expedited removal proceedings under Section 235 and are instead afforded direct access to an asylum officer for removal proceedings pursuant to Section 240 of the INA. *See* 8 U.S.C. § 1158(b)(3)(C). This process reflects a policy decision that "unaccompanied minors should not be placed in expedited removal proceedings, but should instead be entitled to the procedural safeguards of a full removal hearing under INA § 240." *Representing Minors in Removal Proceedings – Training Materials*, Center for Human Rights and Constitutional Law (Nov. 18, 2016), https://www.centerforhumanrights.org/PDFs/11-18-16 Handout_Minors_in_Removal_Proceedings.pdf.

49.     After Plaintiffs and other separated children became "unaccompanied," they were transferred to the custody of the ORR, and at least some were issued Notices to Appear (NTAs) in immigration court for removal proceedings under Section 240, separate and apart from their parents' expedited removal proceedings under Section 235. Consistent with the INA and their due process rights, these removal proceedings under Section 240 would have (and should have) afforded the minors the opportunity to petition for any and all forms of immigration relief before the immigration court, and would have entitled them to certain procedural protections while doing so, such as the right to be represented by counsel.

50.     However, the U.S. government has since reversed course, revoking NTAs or simply never filing them with the immigration court, presumably on the basis of the parental "waivers" discussed above. The parents do not have the legal authority to waive their child's rights to seek asylum under the INA, particularly under these circumstances. Parents have been

coerced or mislead into signing the waivers under the threat of permanent separation from their

children, to waive rights the parents do not understand, for children who have rights *independent*

of the parents' rights under the INA.   Parents are not executing the waiver knowingly,

intelligently, and voluntarily.   As another judge on this Court concluded just last week: "Simply

put, the form is not worth the paper it is written on."   Mem. Op. and Order at 5, *M.G.U. v.*

*Kirstjen Nielsen*, Case No. 1:18-cv-1458-PLF (D.D.C. July 16, 2018) ECF No. 44.

51.      Nevertheless, by revoking or never filing the NTAs, the U.S. government has

effectively and unlawfully terminated the children's removal proceedings under Section 240, and

the access to asylum procedures that Section 240 provides.   Thus, through the operation of the

improper waiver forms, separated minors have been stripped of the opportunity to petition for

asylum through Section 240 proceedings.

### D.   *The Government is Also Denying Children Access to Alternative Asylum Procedures Guaranteed by Statute and the Constitution.*

52.      Having improperly removed Plaintiffs and other reunified children from

proceedings under Section 240, the U.S. government is even denying them access to asylum

procedures under Section 235, effectively leaving them without access to asylum procedures at

all.   As a result, the minor children in these families – many of whom came to the U.S. to escape

horrifying violence that they themselves face – have been completely deprived of the right to

seek asylum, even though their individual right to seek asylum is guaranteed by Sections 235 and

240 of the INA and the Fifth Amendment of the Constitution.

53.      Prior to the U.S. government's separation policy, Plaintiffs and other children

would have been subject to proceedings under Section 235.   These procedures – referred to as

"expedited removal proceedings" and reserved for migrants who are detained within 100 miles

of the boarder and within 14 days of their entry – allow for expedited removal without appearing

before an immigration judge. However, as part of the expedited removal process, Section 235 of the INA *requires* an immigration officer to refer a migrant to an asylum officer if the migrant indicates either intent to apply for asylum or fear of persecution in his or her home country. *See* 8 U.S.C. § 1225(b)(1)(A).

54.     The asylum officer must then conduct a "credible fear" interview. If the asylum officer determines that the migrant has a "credible fear" of persecution, the migrant *cannot* be deported pursuant to an expedited removal order under Section 235; instead, the migrant "shall be detained for further consideration of the application for asylum" pursuant to full removal proceedings under Section 240, including a hearing before an immigration judge. *Id*. at § 1225(b)(1)(B)(ii); *see also* 8 C.F.R. § 208.30(f); 8 U.S.C. § 1229a.

55.     In preparing for a "credible fear" interview with an asylum officer, the migrant may consult with persons of his or her choosing. *See* 8 U.S.C. § 1225(b)(1)(B)(iv). If a migrant detained at the border demonstrates a "credible fear" of persecution, then the spouse and children of the migrant who arrived with them in the United States are included in that determination and permitted full removal proceedings under Section 240, and the ability to petition for asylum that comes with it. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.30(b). Likewise, if a child migrant independently demonstrates a "credible fear," that positive finding is imputed to the parent, and the entire family is permitted full removal proceedings under Section 240.

56.     Thus, for families subject to expedited removal, the credible fear interview is the family's sole access point to asylum.

57.     Here, however, Plaintiffs and other minor children who were taken from their families under the U.S. government's separation policy have been completely foreclosed from ever receiving a credible fear interview, even where their entitlement to such an interview has

been triggered.  Nor were they able to participate in any credible fear interviews received by their parents.

58.     Instead, following separation from their families, the minor children were placed in their own immigration proceedings under Section 240 of the INA discussed above, separate and apart from those against their parents.

59.     Following reunification with their parents, and after the children's NTAs for Section 240 proceedings were withdrawn or never filed, the U.S. government failed to afford them even expedited rights under Section 235 to seek asylum.  Children in this position are being denied "credible fear" interviews, even if they triggered the statutory provision entitling them to such an interview.  For example, ICE has completely failed to respond to requests for "credible fear" interviews made on behalf of at least four of the Plaintiffs in writing.  And CIS, the sub-agency responsible for conducting credible fear interviews, confirmed in writing that Plaintiffs J.M.A. and E.A.H. have not been referred for credible fear interviews.  Accordingly, these minor children are in imminent danger of being deported without ever having the opportunity to access statutory asylum procedures required by law.  Indeed, J.M.A.'s father and E.A.H.'s father were contacted by the Honduran consulate, which informed them that they would be deported "soon."

60.     Moreover, many younger children and infants can only access the credible fear process through their parents, who participate in the credible fear interview on the family's behalf.  A positive result in a parent's credible fear interview is imputed to the whole family, and a parent may testify on behalf of his or her child.  But many of these parents – including Plaintiffs' parents – were in such emotional distress following separation from their children that they were too distraught to meaningfully participate in their credible fear interviews, and thus received a negative decision.  *See, e.g.*, Angelina Chapin, *Separated Parents Are Failing Asylum*

*Screenings Because They're So Heartbroken*, Huffington Post (June 30, 2018), https://www.huffingtonpost.com/entry/separated-parents-too-grief-stricken-to-seek-asylum-experts-say_us_5b379974e4b08c3a8f6ad5d9.   In many circumstances, their children could have provided compelling evidence of the basis for the whole family's credible fear.   Yet these parents are not being granted new "credible fear" interviews following reunification.   Thus, many young children have been denied access to asylum because their parents' interviews were tainted by the unlawful separation and therefore fundamentally unfair.

61.     In light of the foregoing, Plaintiffs and other child migrants have been unlawfully denied the opportunity to apply for asylum.   The U.S. government's policy of denying these children access to the credible fear process and seeking to deport them with their parents as soon as possible violates the INA and their Constitutional rights.

62.     Upon information and belief, and based on facts stated above, DHS, ICE, and other Defendants promulgated, at some point after in June, 2018, internal written directives implementing the reunification order in *Ms. L* and Executive Order 13841.   *See* Executive Order 13841, Affording Congress an Opportunity to Address Family Separation, 83 Fed. Reg. 29,435 (June 20, 2018) (stating that it is "the policy of this Administration to maintain family unity, including detaining alien families together where appropriate and consistent with law and available resources."). These directives ordered DHS and ICE personnel to effectuate the deportation of families as soon as practically possible following reunification by securing the parent's agreement to be deported with their child, extracting the child from removal proceedings under Section 240, and placing the child back in the custody of the parent so that they could be prepared for immediate deportation.   These directives apply to all members of reunified families, including to minor children who do not have final orders of removal and have indicated either an

intention to apply for asylum or who have expressed a fear of persecution; these directives do not provide for such children to remain in removal proceedings under Section 240 with the assistance of their parent (where they would have the opportunity to petition for asylum) or to have an interview with an asylum officer prior to being deported, as required by law.  These written directives have been implemented for the first time in the last 60 days and are within the sole possession and control of Defendants.

63.     Upon information and belief, the only impediment currently preventing the immediate deportation of hundreds of families – including Plaintiffs – is the temporary stay imposed by the court in *Ms. L* on July 16, 2018.  Order Granting Pls.' Mot. for Emergency TRO Pending Ruling on Mot. to Stay and Amending July 13, 2018 Order Following Status Conference, *Ms. L v. ICE*, No. 18cv0428 DMS (MDD) (S.D. Cal. July 16, 2018), ECF 116.  The *Ms. L* court ordered a temporary halt to deportations of reunited families at the request of the ACLU, and is holding a second hearing on the stay today, July 27, 2018.  If the court does not continue the stay, upon information and belief, the U.S. government will immediately begin to deport reunited families pursuant to removal orders that have been issued individually to the parents.

### E.   *The Conditions in Countries From Which Plaintiffs Fled Are Particularly Violent.*

64.     Five of the six Plaintiffs, and many other migrant children like them, fled Honduras with their parents.  Honduras is characterized by constant violence, a destabilizing government, and official corruption.  It is a particularly dangerous place for young people.  In 2017, it was listed as the single most violent country for children under nineteen years old with a

homicide rate of more than thirty children per 100,000 inhabitants – about ten times higher than the global average.[7]

65.     Two rival gangs, Mara Salvatrucha ("MS-13") and the 18th Street Gang, fight for control over territory and recruits in urban and rural areas of Honduras alike.[8]  These gangs often target children as their weapons of war because national anti-gang legislation carries less severe penalties for minors involved in gang activity than for adults.[9]  These young recruits are often forced to collect "taxes" or sell drugs, and those who refuse are often killed.[10]

66.     Children living in these gang-riddled areas are doubly targeted, not only by gangs but by law enforcement officers who regard them as potential criminals or gang members.[11]  And corruption among Honduran law enforcement has been widely reported; police officers who do not target young males as suspected gang members are often themselves working with the gangs.[12]

67.     These conditions are by no means limited to Honduras.  They extend to Guatemala, El Salvador, and throughout Central America as well.[13]

---

[7]     Parker Asmann, *Ten Countries with Highest Child Homicide Rates All in LatAM: Report*, InSight Crime (June 6, 2017), https://www.insightcrime.org/news/brief/ten-countries-highest-child-homicide-rates-all-latam-report/.

[8]     *See, generally*, *Gangs in Honduras*, Insight Crime (Apr. 21, 2016), http://bit.ly/2nl8ov0.

[9]     U.S. Dep't of State, Honduras 2016 Human Rights Report, 28 (2016) https://www.state.gov/documents/organization/265808.pdf..

[10]     UN Human Rights Council, *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions on his Mission to Honduras* at 6, A/HRC/35/23/Add.1 (June 2017).

[11]     *Id.* at 14.

[12]     Sarah Chayes, Carnegie Endowment for International Peace, *When Corruption is the Operating System: The Case of Honduras*, 29 (May 2017) https://carnegieendowment.org/files/Chayes_Corruption_Final_updated.pdf (stating "[o]f greater concern are the reports we heard in interviews of collusion between police and the youth gangs whose depredations it is their job to curb.").

[13]     *See* UN High Commissioner for Refugees (UNHCR), *Eligibility Guidelines for Assessing the International Protection Needs of asylum-seekers from Guatemala* at 7, HCR/EG/GTM/18/01 (Jan. 2018), http://www.refworld.org/docid/5a5e03e96.html [accessed 26 July 2018]; UN High Commissioner for Refugees (UNHCR), *UNHCR Eligibility Guidelines for*

### F. Plaintiffs Seek Asylum in the United States, But Defendants Are Depriving Them of Their Rights and Opportunity to Pursue Their Claims.

68.     J.M.A. is a 13 year-old child seeking asylum in the United States.  J.M.A. is from Honduras and traveled to the United States to seek asylum because of threats of violence and mortal danger made against him and his father by the 18th Street Gang.  Indeed, J.M.A.'s father bears scars from a previous knife attack.  J.M.A.'s native language is Spanish.

69.     J.M.A. and his father were apprehended by border patrol agents around Eagle Pass, Texas on or about May 20, 2018.  J.M.A. and his father were initially detained together in the *hielera*, or "ice box," with other migrants for approximately 8 – 10 hours, where J.M.A.'s father was fingerprinted and photographed.  J.M.A.'s father and other parents were then taken from the room.  When he returned, J.M.A.'s father informed J.M.A. that the two would be separated, and that he did not know where J.M.A. would be taken.  J.M.A. and his father shared a tearful goodbye before J.M.A. was then taken from the room, loaded into a van with other migrant children, and transported to a separate facility.

70.     When J.M.A. asked officials about his father, they told J.M.A. simply that he was "going to another place."  J.M.A. was not permitted to bathe or change clothes, and officials subjected him to security screenings for weapons.  Upon separation, J.M.A. was deemed and treated as an "unaccompanied minor." On May 21, 2018, J.M.A. was issued an NTA for proceedings under Section 240 of the INA.  J.M.A. was taken first to another "ice box" for children, where the children were grouped by gender and age, then to a shelter in San Antonio, Texas where he was detained for 58 days.  While detained, J.M.A. had some telephonic contact with his family.

*Assessing the International Protection Needs of Asylum-Seekers from El Salvador* at 4–6, HCR/EG/SLV/16/01 (Mar. 15, 2016), http://www.refworld.org/docid/56e706e94.html [accessed 26 July 2018]

23

71.     J.M.A. suffered tremendous fear, anxiety, and uncertainty during this detention. For the duration, J.M.A. did not know whether he would ever see his father again, and officials would not inform him of his father's status.   Indeed, J.M.A. was detained for over a month before being permitted a brief, two-minute phone call with his father.  While J.M.A. was relieved to hear his father's voice following such prolonged silence, whether the two would ever see each other again remained unclear.

72.     On July 17, 2018, per the court order in *Ms. L*, J.M.A. was reunified with his father.  Since being reunified he does not want to leave his father's side and is afraid of being separated from his father again.  By the time J.M.A. and his father were reunified, J.M.A.'s father had already independently sat through a credible fear interview.   On May 22, 2018, J.M.A.'s father was issued an expedited order of removal.

73.     After reunification, and through an attorney, J.M.A. requested the opportunity to explain his fear of returning to Honduras to immigration or asylum officers, but J.M.A. has not received a response to that request.  J.M.A. is not independently subject to an expedited order of removal and is not named on the order issued to his father.  Nevertheless, upon information and belief, Defendants intend to imminently deport J.M.A. along with his father.  J.M.A.'s father was contacted by the Honduran consulate, which told him that they would be deported "very soon."

74.     J.M.A. is afraid to return to Honduras because he and his father might be threatened, assaulted, or killed by the 18th Street Gang – the same gang that has previously threatened them, and maimed J.M.A.'s father in a knife attack.

75.     E.A.H. is a six year-old child seeking asylum in the United States.  E.A.H. is from Honduras.  He and his father traveled to the United States to seek asylum because gangs were

threatening his father's life. E.A.H.'s native language is Spanish. E.A.H. and his father were apprehended by U.S. border patrol agents in McAllen, Texas on or about June 12, 2018.

76.     On June 13, 2018, E.A.H. was forcibly separated from his father. On that day, E.A.H.'s father was told he was going to court and that E.A.H. would be there waiting for him afterwards. When he returned, however, E.A.H. had already been taken away, and officers could not tell him where his son had gone or what would happen to him. E.A.H. was taken to Harlingen, Texas where he was detained for 33 days. While detained, E.A.H. had only very limited contact with his family. Upon separation, E.A.H. was deemed and treated as an "unaccompanied minor." On June 15, 2018, E.A.H. was issued an NTA for proceedings under Section 240 of the INA.

77.     E.A.H. and his father were separated for 33 days. They were not allowed to speak to each other until nine or ten days after they were first separated. When E.A.H.'s father started speaking to E.A.H., the child started crying uncontrollably. His father tried to calm him down, but said it was too painful for him to hear his son so upset and not be able to hug him or console him or do anything but talk. E.A.H.'s father asked the guard to end the phone call early because he could not bear it and did not want to put his son through so much pain any longer. He stated he had no idea if he would ever see his son again.

78.     On July 16, 2018, per the court order from *Ms. L*, E.A.H. was reunified with his father. By that time, however, E.A.H.'s father had already independently sat through the credible fear interview. He was not able to consult with E.A.H. prior to the interview. In addition, E.A.H.'s father was not able to concentrate on the questions during the credible fear interview because he was so worried about E.A.H., and could not think of anything but his son

and where he was. He also did not understand what information he was expected to share in the interview. On June 13, 2018, E.A.H.'s father was issued an expedited order of removal.

79.    E.A.H.'s father signed a document indicating that he wanted to be repatriated to Honduras with his son if it were so ordered. He picked that option because the person that presented him with the document said that if he picked that option, he could be reunited with his son that same day. He did not understand the form well.

80.    After being reunified with his father, and through their attorney, E.A.H. requested the opportunity to explain his fear of returning to Honduras to immigration or asylum officers, but E.A.H. has not received a response to that request. E.A.H. is not independently subject to an expedited order for removal and is not named on the order issued to his father. He has never had a court hearing or seen an immigration judge. Nevertheless, upon information and belief, Defendants intend to deport E.A.H. along with his father very soon.

81.    E.A.H. is afraid to return to Honduras because he and his father might be harmed by the same gangs that previously targeted E.A.H.'s father for violence, or by the national political party that has threatened his father for refusing to support them.

82.    D.B.G. is a twelve year-old child seeking asylum in the United States. D.B.G. is from Honduras and traveled to the United States to seek asylum because she is scared to return to Honduras. D.B.G. fled from Honduras because a gang in Honduras threatened to kill her to retaliate against her mother, who made a police report after the gang murdered her second cousin. D.B.G. is also scared to return to Honduras because her father is physically and emotionally abusive and threatened to kill her. D.B.G.'s native language is Spanish.

83.    D.B.G. and her mother were apprehended by immigration officers in Texas on May 25, 2018, the day they entered the United States. Upon apprehension and any time

26

thereafter, D.B.G. was never asked whether she feared returning to Honduras. From the time of apprehension, D.B.G. was forcibly separated from her mom.

84.     For approximately three days after apprehension, D.B.G. was kept in a cell at a building that she refers to as the "ice box, or *hielera*" because it was freezing. D.B.G. shared the cell in the *hielera* with more than 40 girls, between 8 and 17 years of age. The cell had no windows and the lights were kept on at all times, making it impossible to know whether it was night or day. The cell had concrete floors, and no tables or chairs. There was one toilet inside the cell, without a door. D.B.G. was not given a change of clothes, a tooth brush, or anything else.

85.     After approximately three or four days, D.B.G. was loaded into a car with her mother, and driven to another place called the dog pound, or *perrera*. She was placed in a cage with lots of other girls, who like her, came to the United States with their parents. Many of the guards in the *perrera* only spoke English and could not understand D.B.G. when she would ask them where her mother was. They would laugh at her, and then walk away. D.B.G. spent approximately seven or eight days in the *perrera*. From the *perrera*, D.B.G. was taken on an airplane to Miami, Florida. She was not told where she was going until they landed in Miami. D.B.G. had never been on a plane before. She was then taken to a shelter for children who do not have parents. The shelter was filled with termites.

86.     D.B.G. was separated from her mother for approximately 52 days, from approximately May 25, 2018 through July 17, 2018. She spent all of those days in Miami, alone, without her mother. After she was taken away from her mother, she did not have contact with her for over a month. She was sad and scared, and cried almost every day. While she was separated from her mother, D.B.G. was only given the chance to speak with her mother by phone two or three times, for about five minutes each time. A case manager at the shelter was present

and listened to every conversation she had with her mother. On July 17, 2018, per the court order from *Ms. L*, D.B.G. was reunified with mother. D.B.G. and her mom are now detained together in Dilley, Texas.

87.     D.B.G. has never received any paperwork from any immigration officers. She does not remember signing any documents regarding immigration. She has never been to immigration court, or had an interview with any asylum officer. During the time D.B.G. was separated from her mother, D.B.G.'s mother independently sat through the credible fear interview, which resulted in a negative finding, and she was issued an expedited order of removal. At the time of her interview, and because of the forcible separation from her daughter, D.B.G's mother was suffering from emotional distress so severe that she was unable to participate meaningfully in her interview. She was also denied the ability to consult with D.B.G. prior to the interview.

88.     After D.B.G. and her mother were reunified in Dilley, D.B.G. requested, through her attorney, the opportunity to explain their fear of returning to Honduras to immigration or asylum officers. D.B.G. and her attorney have not received a response to that request. D.B.G. is not independently subject to an expedited order for removal and is not named on the order issued to her mother. Nevertheless, upon information and belief, Defendants intend to deport D.B.G. along with her mother very soon.

89.     D.B.G. is afraid to return to Honduras because both a gang threatened to kill her to retaliate against her mother, who made a police report after the gang murdered D.B.G.'s second cousin. D.B.G. is also afraid of her father, who beat her, threatened to kill her and emotionally abused her, her entire life. D.B.G.'s mother came to the United States for the same reasons – she fears being killed by D.B.G.'s father and the gang.

90.     G.M.A. is a nine-year-old child seeking asylum in the United States.  G.M.A. is from Honduras and traveled to the United States to seek asylum based on religious persecution. G.M.A.'s native language is Spanish.  G.M.A. and her mother were apprehended and detained by border patrol agents when they crossed the border on June 12, 2018.  Upon apprehension, G.M.A.'s mother expressed fear of returning to Honduras.  Upon questioning, G.M.A.'s mother told an immigration official that she and G.M.A. were afraid to return to Honduras.  The official did not ask G.M.A. any questions.

91.     G.M.A and her mother were taken to a place called the *perrera*, or dog pound, on June 14, 2018.  G.M.A. was told that she had to be separated from her mother so her mother could "go to court."  G.M.A. began to cry, and was made to stand in a line with other crying children.  That day, G.M.A. was forcibly separated from her mother.  G.M.A. was told that she would be separated from her mother for only two days.  But G.M.A. would not see her mother for nearly forty days.

92.     G.M.A. remained in the *perrera* for four days after being separated.  She then was taken to a shelter in New York where she was detained for 32 days.  While detained, G.M.A. did not have contact with her mother for many days.  While in New York, G.M.A. had a foster mother and foster siblings.  But her foster siblings hit her.  Her foster mother's cousin yelled at her and told her she would never see her mother again.  G.M.A. cried often, and didn't know if she would ever see her mother again.  During this time, and upon information and belief, G.M.A. was deemed and treated as an "unaccompanied minor."  As an unaccompanied minor she would have been issued an NTA for proceedings under Section 240 of the INA.  Although G.M.A. remembers signing various papers, nobody explained what the papers meant, and she did not understand them.

29

93.     On July 17, 2018, per the court order from *Ms. L*, G.M.A. was reunified with her mother.  By that time, however, G.M.A.'s mother had already independently sat through a credible fear interview and received an expedited order of removal.  At the time of her interview, G.M.A.'s mother was suffering from emotional distress so severe that she was unable to participate meaningfully in her interview.  She was also denied the ability to consult with G.M.A. prior to the interview.

94.     Through her attorney, G.M.A. requested the opportunity to explain her fear of returning to Honduras to immigration or asylum officers, but G.M.A. and her attorney have not received a response to that request.  G.M.A. is not independently subject to an expedited order for removal and is not named on the order issued to her mother.  Nevertheless, upon information and belief, Defendants intend to deport G.M.A. along with her mother as soon as possible.

95.     G.M.A. and her mother are Mormons.  G.M.A. is afraid to return to Honduras because her mother was harmed by "bad people" because of their religion.  The same "bad people" have also threatened to hurt G.M.A.  The people who hurt G.M.A.'s mother believe that she reported them to the police.  G.M.A. feels that she and her mother will be in danger if they have to return to Honduras.

96.     A.M.C. is a seven year-old child seeking asylum in the United States.  A.M.C. is from Honduras and traveled to the United States to seek asylum because he and his mother fear for their safety in Honduras.  A.M.C.'s native language is Spanish.

97.     A.M.C. and his mother were apprehended by border patrol agents upon entry into the United States.  Upon apprehension, A.M.C. and his mother were taken to a place called the *hielera,* or ice box.  He and his mother were kept at the *hielera* for many days.  There was no bed in the *hielera*, and he was cold and hungry the entire time he was there.  A.M.G. was with his

mother in the *hielara,* and she hugged him to keep him warm, but he remained cold.  One day, an

official took him and his mother out of their cell, and asked his mother some questions.  A.M.C.

is unaware of the questions his mother was asked, and he was not asked any questions himself.

98.     After that, A.M.C. and his mother were taken to the *perrera,* or dog pound, where

they were put into a cage together.  They slept on the floor of the cage for four days.  One day in

May, A.M.C. was separated from his mother.  He was driven to a shelter in Texas by a man and

a woman.  He did not see his mother again for 50 days.  While at the shelter, A.M.C. did not

speak to his mother for many days.  He was eventually allowed to speak to her on the telephone

and ask her why she did not come to visit him.  At the shelter, there were women that the

children called "Miss" who took care of A.M.C. and the others children.  A.M.C. felt sad and

missed his mother while they were apart.

99.     On July 17, 2018 (a day before his seventh birthday), per the court order from *Ms.*

*L*, A.M.C. was reunified with his mother.  A.M.C. was provided with a lot of paperwork when he

was placed in the shelter but he does not know what those papers were, nor does he know how to

locate those papers.  The papers were taken away from A.M.C., and he does not know how to get

them back.  A.M.C.'s mother has been issued an expedited order of removal as a result of a

negative finding from her credible fear interview.  Through their attorney, A.M.C. requested the

opportunity to explain their fear of returning to Honduras to immigration or asylum officers, but

A.M.C. has not received a response to that request.  A.M.C. is not independently subject to an

expedited order for removal.  Nevertheless, upon information and belief, Defendants intend to

deport A.M.C. along with his mother.

100.    A.M.C. is afraid to return to Honduras because he fears for his life.  Before

fleeing Honduras, individuals shot bullets at his house and threw a bomb at his house, in an

attempt to kill his family. A.M.C. is also afraid to return to Honduras because his father abuses him and he does not feel safe living with him.

101.  L.A.A. is a 10-year-old child seeking asylum in the United States. L.A.A. is from Guatemala and traveled to the United States seeking safety because a gang attempted to kill her and her mother after her mother complained to the police about L.A.A. being sexually abused by her grandfather. L.A.A.'s native language is Spanish.

102.  L.A.A. and her mother were apprehended at the border on June 14, 2018, and placed in the *hielera*. L.A.A. and her mother were hungry, tired, cold, and afraid. L.A.A. told an immigration officer that she was afraid to go back to Guatemala. The officer yelled at her and did not believe her. Later that same day, an immigration official told her they were going to put L.A.A. up for adoption. Two days later, L.A.A. was forcibly separated from her mother and taken to the *perrera*. She was afraid and she cried. L.A.A. was taken to Raymondville, TX where she was detained for 35 days with minimal contact from her mother. L.A.A. felt sick being separated from her mother. Upon information and belief, L.A.A. was deemed and treated as an "unaccompanied minor" as of the time of her separation. Upon information and belief, she was issued an NTA for removal proceedings under Section 240.

103.  On July 23, 2018, per the court order from *Ms. L*, L.A.A. was reunified with mother in Dilley. Even still, L.A.A. is afraid every day that someone will take her mother away. By the time of their reunification, L.A.A.'s mother had already sat through the credible fear interview and was issued an expedited order of removal. Through their attorney, L.A.A. requested the opportunity to explain their fear of returning to Guatemala to immigration or asylum officers, but L.A.A. has not received a response to that request. It is very hard for L.A.A.

to talk about everything that has happened to her. When someone asks her why she is afraid, she starts to cry and cannot stop. She needs her mother to explain everything for her.

104.   L.A.A. is not independently subject to an expedited order for removal and is not named on the order issued to her mother. Nevertheless, upon information and belief, Defendants intend to deport L.A.A. along with her mother. L.A.A. is afraid to return to Guatemala. She wants to stay in the United States where she and her mother will be safe from the gang and from her grandfather. She wants to apply for asylum.

105.   Each of the above Plaintiffs faces an immediate threat of irreparable harm from Defendants' imminent removal of Plaintiffs – without the opportunity to exercise their rights under the INA to seek asylum, and without due process – to a country where they face a real fear of persecution. Defendants' unlawful conduct should be enjoined.

<u>**CLASS ACTION ALLEGATIONS**</u>

106.   Plaintiffs bring this lawsuit challenging the Government's policy of denying migrants the right to pursue asylum individually and on behalf of a proposed nationwide class under Federal Rules 23(b)(2) and 23(c)(4) consisting of all non-citizens under the age of 18 who were separated from their parents or guardians upon (or after) entry into the United States and who are, have been, or will be detained by the U.S. government at any time since January 1, 2018.

107.   The proposed class consists of hundreds of children detained throughout the United States, rendering it impracticable to join all class members before the Court. There are substantial questions of law or fact common to all class members, including the particular issue of whether class members have a statutory and constitutional right to apply for asylum in the

United States.  The requested injunctive and declaratory relief is appropriate respecting the class as a whole because all class members have these rights to apply for asylum.

## CAUSE OF ACTION

### COUNT I
### (Violation of Due Process under the Fifth Amendment to the Constitution)
### (Against All Defendants)

108.   Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 107 above, as though fully set forth herein.

109.   "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. at 693 (internal quotation omitted).  Thus, the Due Process Clause applies to Plaintiffs.

110.   Thus, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to . . . due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).  Here, Defendants are preparing to expel Plaintiffs and other minor children like them without affording them any process at all.  Indeed, none of Plaintiffs even has a final order of removal.

111.   In addition, "an alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum and a statutory procedural due process right to a meaningful or fair evidentiary hearing." *Gutierrez-Rogue v. Immigration & Naturalization Serv.*, 954 F.2d 769, 772-73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. Immigration & Naturalization Serv.*, 865 F.2d 328, 332–33 (D.C. Cir. 1989)).  As explained above, Plaintiffs have been afforded no process through which to seek asylum.  Defendants initially decided to place Plaintiffs in removal proceedings under Section

240, and the process that Section 240 provides for seeking asylum.  But the U.S. government revoked that opportunity on the basis of the parents' invalid waivers.  Thus, Plaintiffs received no process under Section 240.

112.    Now that Plaintiffs and other children have been reunified with their parents, who separately went through expedited removal proceedings under Section 235, Defendants have even denied Plaintiffs the opportunity to their own credible fear interview under Section 235. Thus, Plaintiffs have been foreclosed from any ability to be heard on their asylum claim.  This plainly violates their Fifth Amendment right to procedural due process.

113.    Moreover, minor children who are too young to participate in the credible fear process rely on their parents to seek asylum on their behalf, and all minor children are entitled to the benefit of a parent's positive result, through the "linking" of cases, in a credible fear interview.  Thus, many children access these asylum procedures through their parents.  However, separated parents were forced to undergo credible fear interviews while under incredible emotional distress caused by the forcible separation from their children.  And separated parents were denied the ability to consult with their children in preparation for credible fear interviews, to obtain any information that is relevant to the parents' claim of fear.  These realities rendered the parents' credible fear interviews fundamentally unfair.  Because many children's access to asylum procedures derives from their parents, the unfairness of the parents' interviews violates the procedural due process rights of the child.

114.    Plaintiffs' due process rights are further implicated by the involuntary, uninformed and unknowing nature in which the U.S. government has secured "waivers" of Plaintiffs' rights, as neither Plaintiffs nor their parents fully understood the Removal Form and

Plaintiffs parents were coerced into completing the form in order to regain their rightful custody of their child.

115.    The Supreme Court has clearly stated that aliens "may be expelled only after proceedings conforming to . . . due process of law." *Mezei*, 345 U.S. at 212.   The planned deportations fail that test because the U.S. government has foreclosed all avenues for Plaintiffs to petition for asylum under the.

**COUNT II**
**(Petition for a Writ of Mandamus, 28 U.S.C. § 1361)**
**(Against All Defendants)**

116.    Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 115 above, as though fully set forth herein.

117.    Under U.S. law, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

118.    Obtaining a writ of mandamus requires satisfaction of three elements: (1) the plaintiff has a clear right to the relief sought, (2) the defendant has a duty to do the act in question, and (3) no other adequate remedy is available. *Id.*

119.    Section 235 of the INA sets forth non-discretionary procedures that the Attorney General must follow before removing a non-citizen who has been in the United States for fewer than 14 days and who was apprehended fewer than 100 miles from the United States border.  8 U.S.C. § 1225(b)(1)(A)(ii).

120.    Specifically, Section 235 states that if a non-citizen indicates either intent to apply for asylum or expresses a fear of persecution, the immigration officer "shall" refer the non-citizen for a credible fear interview before an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii).  If

the asylum officer determines that the non-citizen does, in fact, have a credible fear of persecution in his or her home country, the non-citizen is granted the right to access meaningful procedures through which to apply for asylum in the United States in Section 240 proceedings.

121.    The word "shall" as used in INA Section 235 establishes a mandatory, non-discretionary duty. *See Iddir v. Immigration & Naturalization Serv.*, 301 F.3d 492, 499 (7th Cir. 2002) ("[t]he term 'shall' denotes a clear directive, a command, as opposed to the terms 'may' or 'in his discretion.'").  As such, Plaintiffs have a clear right to a credible fear interview if they express either an intent to apply for asylum or a fear of persecution in their country; and if they successfully establish a credible fear in that interview, Plaintiffs have a right to seek asylum through proceedings under INA Section 240.  Moreover, Defendants have a mandatory, non-discretionary duty to provide Plaintiffs with a credible fear interview if they have indicated an intent to apply for asylum or a fear of persecution.

122.    Defendants have failed to carry out that duty.  They have failed to provide Plaintiffs with a credible fear interview, even though Plaintiffs have triggered the non-discretionary duty outlined at INA Section 235.  Now, upon information and belief, Defendants are preparing to deport these children without ever giving them access to the credible fear procedures to which they are legally entitled.

123.    Because Plaintiffs have a clear right to access the credible fear process, Defendants have a non-discretionary duty to provide them access to that process.  Moreover, there is no adequate remedy apart from ordering Defendants to carry out their duty under the INA.  Accordingly, Plaintiffs are entitled to mandamus relief.

### COUNT III
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a))
### (Against All Defendants)

124.    Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 123 above, as though fully set forth herein.

125.    Under the APA, federal courts have the authority to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5. U.S.C. § 706(2)(A). A court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

126.    Removal of Plaintiffs and other minor children from proceedings under Section 240 on the basis of coercive and misleading waiver forms was "arbitrary, capricious, [and] an abuse of discretion," and it was "not in accordance with law." Apart from the invalidity of the waivers themselves, there is no statutory or regulatory authority for Defendants to remove a minor child from proceedings under Section 240 and then deport such minor with no final order of removal. After Defendants placed Plaintiffs in removal proceedings under Section 240, Plaintiffs were entitled to remain in such proceedings and be reunited with their parents pursuant to *Ms. L.*

127.    Even assuming *arguendo* that Defendants could lawfully remove Plaintiffs from proceedings under Section 240, Plaintiffs are at least entitled to the procedural protections outlined in Section 235 of the INA prior to being deported. Section 235 contains non-discretionary procedures that the Attorney General must follow before expeditiously removing certain adult aliens and families. Specifically, Section 235 states that if an alien "indicates either an intention to apply for asylum . . . or a fear of persecution, the officer *shall* refer the alien for an interview by an asylum officer" for a credible fear interview. 8 U.S.C. § 1225(b)(1)(A)(ii)

(emphasis added).  Thus, U.S. government officials have a non-discretionary duty to refer an alien for a credible fear interview if he or she indicates an intent to apply for asylum or fear of persecution.

128.     Here, Plaintiffs have expressed a fear of repatriation or indicated a desire to apply for asylum, thereby triggering the credible fear interview process.  As described above, Plaintiffs have not been given access to such interviews.  Upon information and belief, the U.S. government is currently preparing to deport Plaintiffs and their parents without giving Plaintiffs access to the credible fear interview process or other process afforded them by law under either Section 235 or 240 of the INA.

129.     Defendants' policy of denying credible fear interviews to Plaintiffs, and their plan to deport Plaintiffs without such interviews or any final removal orders, is "not in accordance with" the procedures mandated by the INA and this Court is authorized to set this policy aside. 5. U.S.C. § 706(2)(A).

130.     The U.S. government's denial of access to required asylum proceedings, and current plans to imminently deport Plaintiffs without any further proceedings, constitutes "final agency action" reviewable by the Court.  Such actions are not tentative or interlocutory and, once executed, preclude the children from seeking or obtaining any other form of relief or review of the decision.

## COUNT IV
### (Judicial Review of Expedited Removal Policy)
### (Against All Defendants)

1.     Plaintiffs re-allege and incorporate each and every allegation contained in Paragraphs 1 through 130 above, as though fully set forth herein.

2.     The U.S. government's policy of denying Plaintiffs their rights to pursue asylum in the United States is inconsistent with Section 240 and/or Section 235 of the INA and is otherwise in violation of the law.  That policy is reflected in written statements and directives including but not limited to the DHS Fact Sheet, which states that the reunification process is designed "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal*."[14]

3.     Pursuant to this policy, Plaintiffs' requests for credible fear interviews have been unlawfully denied, and Plaintiffs face an imminent threat of deportation without access to asylum proceedings.  Plaintiffs are entitled to relief from Defendants' unlawful policy under 8 U.S.C. 1252(e)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask that this Court to grant the following relief:

a)  A temporary restraining order that preserves the status quo by enjoining Defendants from deporting any reunified families until Plaintiffs' and the putative class' claims are adjudicated on the merits;

b)  Issuance of an Order declaring that Defendants' actions violate the APA, INA, and/or Fifth Amendment Due Process Clause because of Defendants' unlawful refusal to provide

---

[14]     Dep't of Homeland Security, *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (emphasis added).

Plaintiffs and the putative class the right to pursue or have heard their individual asylum claims or to be consulted in their families' joint claims;

c)  Issuance of an Order declaring that Plaintiffs and the putative class have a right to pursue their own asylum claims in removal proceedings under INA Section 240 with the assistance of a parent or guardian and, in addition, that Plaintiffs and the putative class have a right to a credible fear interview under INA Section 235 with the assistance of a parent or guardian;

d)  Issuance of an Order declaring that Plaintiffs and the putative class have a right to their parent or guardian receiving a fundamentally fair credible fear interview free from the distress of family separation and with the ability to consult with their child before the interview;

e)  Issuance of a writ of mandamus requiring Defendants' compliance with the terms of Section 235 of the INA, including requiring that Defendants provide Plaintiffs and the putative class access to credible fear interviews to pursue their asylum claims;

f)   Determination that this action may be maintained as a class action pursuant to Federal Rules 23(b)(2) and 23(c)(4); direction that reasonable notice be provided to the class pursuant to Federal Rule 23(c)(2); a declaration that Plaintiffs are representatives of the class; and a declaration that Plaintiffs' counsel are class counsel;

g)  Such other and further relief as this Court may deem just and appropriate, including but not limited to the mental health treatment, alternatives to detention, and other compensation or equitable relief necessary to restore Plaintiffs and the putative class to their position but for Defendants' unlawful conduct.

Dated: July 27, 2018                              Respectfully submitted,

                                                  **HOGAN LOVELLS US LLP**

By: _____

Justin W. Bernick (DC Bar No. 988245)
*T. Clark Weymouth
*Zachary W. Best
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com
t.weymouth@hoganlovells.com
zachary.best@hoganlovells.com

*Ira M. Feinberg
*Oliver J. Armas
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
oliver.armas@hoganlovells.com
ira.feinberg@hoganlovells.com

*Katherine A. Nelson
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 454-7300
Facsimile: (303) 899-7333
katherine.nelson@hoganlovells.com

* *admission pro hac vice to be sought*

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

M.M.M., on behalf of his minor child, J.M.A., *et al.*,

**Plaintiffs,**

**v.**

Jefferson Beauregard Sessions, III, Attorney General of the United States, *et al.*,

**Defendants.**

CIVIL ACTION NO. _____

## PLAINTIFFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND  PRELIMINARY INJUNCTION

Plaintiffs hereby move this Court, pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 65.1 to enter an immediate Temporary Restraining Order ("TRO") against Defendants' policy of removing children from the United States before permitting them the opportunity seek asylum pursuant to their rights under the Immigration and Nationality Act ("INA") (including 8 U.S.C. §§ 1158, 1225, or 1229a), the Fifth Amendment of the Constitution, and the Mandamus Act (the "Policy"), pending a full hearing before this Court on, and this Court's adjudication of, Plaintiffs' Motion for a Preliminary Injunction.  Plaintiffs further move this Court, pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65.1, to preliminary enjoin the Policy and order Defendants to provide all non-citizen children who were separated from their parents or guardians upon (or after) entry into the United States with their rights to

petition for asylum under Section 240 and Section 235 of the INA following reunification with, and in consultation with, their parents or guardians, until such proceedings are terminated.

For the reasons more fully set forth in the accompanying Memorandum of Law in Support of Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, Plaintiffs are entitled to a temporary restraining order and a p reliminary injunction because (1) they can demonstrate a substantial likelihood of success on the merits of their claims for a permanent injunction against the Policy; for a declaratory judgment that the Policy violates the INA, the Administrative Procedure Act, and the Fifth Amendment to the Constitution; and/or for a Writ of Mandamus to compel Defendants to comply with the INA; (2) they will suffer irreparable harm if they are removed from the United States without being provided with their constitutional and statutory right to seek asylum; and (3) issuance of a temporary restraining order and/or preliminary injunction is in the public interest and the balance of equities favors Plaintiffs, because it protects Plaintiffs' rights under the Fifth Amendment to the Constitution and under the INA to pursue asylum based on Plaintiffs' well-founded fear of persecution and life-threatening violence in their country of origin.

Plaintiffs request a hearing on their Motion for Preliminary Injunction pursuant to Local Rule 7(f). For the reasons stated in the accompanying Motion to Request Expedited Hearing on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs request a hearing on or before August 9, 2018.

Proposed orders and the certificate of counsel in accordance with Local Rule 65.1 accompany this Motion.

Respectfully submitted,

Date:   July 27, 2018

_____

Justin W. Bernick (DC Bar No. 988245)
*T. Clark Weymouth
*Zachary W. Best
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com
t.weymouth@hoganlovells.com
zachary.best@hoganlovells.com

*Oliver J. Armas
*Ira M. Feinberg
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3020
Facsimile: (212) 918-5310
oliver.armas@hoganlovells.com
ira.feinberg@hoganlovells.com

*Katherine A. Nelson
**HOGAN LOVELLS US LLP**
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 454-2539
Facsimile: (303) 899-7333
katherine.nelson@hoganlovells.com

*\* admission pro hac vice to be sought*

*Attorney for Plaintiffs*

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

M.M.M., ON BEHALF OF HIS
MINOR CHILD, J.M.A., ET AL.

Plaintiffs,

CIVIL ACTION NO. _____

- v. –

JEFFERSON BEAUREGARD SESSIONS,
III, ATTORNEY GENERAL OF THE
UNITED STATES, ET AL.

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

ARGUMENT ......................................................................................................... 9

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE
        U.S. GOVERNMENT WRONGLY DEPRIVED THEM OF THE
        OPPORTUNITY TO SEEK ASYLUM IN THE UNITED STATES .................. 10

        A.      Defendants' Policy of Denying Plaintiffs the Right to Pursue Asylum
                is Unlawful Under the INA..................................................................... 10

        B.      Plaintiffs' Removal from the United States Without Allowing Them
                to Petition for Asylum Violates their Fifth Amendment Rights....... ....... 11

        C.      Plaintiffs' Removal from the United States Without Allowing Them
                to Petition for Asylum Violates the APA. ................................................. 14

                i.      The U.S. government has denied Plaintiffs the right to pursue
                        their asylum claims under the INA. ............................................... 14

                ii.     The U.S. government denied Plaintiffs the right to a credible
                        fear determination for their entire family under the INA. ............ 16

                iii.    The other requirements of the APA are met. ............................... 17

                        a.      The U.S. Government's Policy of Refusing to Give
                                Plaintiffs a Credible Fear Interview Constitutes a Final
                                Agency Action. .............................................................. 18

                        b.      Plaintiffs Have No Adequate Remedy. ............................ 19

                        c.      The U.S. Government's Failure to Permit Plaintiffs to
                                Seek Asylum is Reviewable ............................................. 20

        D.      Plaintiffs Will Likely Prevail on Their Mandamus Claim to Compel
                the U.S. Government to Allow Them to Seek Asylum. .......................... 20

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE
        RELIEF IS NOT GRANTED. .............................................................................. 23

III.    THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES FAVOR
        GRANTING THE TRO AND PRELIMINARY INJUNCTION. ........................ 26

CONCLUSION...................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES:

*Al-Fayed v. Central Intelligence Agency*,
   254 F.3d 300 (D.C. Cir. 2001) ................................................................................. 10

*Ali v. Ashcroft*,
   213 F.R.D. 390 (W.D. Wash. 2003) .......................................................................... 25

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) .................................................................................. 21

*Aracely, R. v. Nielsen*,
   Civ. A. No. 17-1976 (RC), 2018 WL 3243977 (D.D.C. July 3, 2018) ............. 15, 18

*Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Fed. Emergency Mgmt.
   Agency (FEMA)*,
   463 F. Supp. 2d 26 (D.D.C. 2006) ............................................................................ 26

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................. 18

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) .................................................................................................. 19

*Chhoeun v. Marin*,
   306 F. Supp. 3d 1147 (C.D. Cal. 2018) .................................................................... 24

*Damus v. Nielsen*,
   Civ. A. No. 18-578-JEB, 2018 WL 3232515 (D.D.C. July 2, 2018) ....................... 23

*Davis v. District of Columbia .*,
   158 F.3d 1342 (D.C. Cir. 1998) ................................................................................ 23

*Davis v. Pension Benefit Guaranty Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ................................................................................ 10

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human
   Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005) ................................................................................ 19

*Gutierrez-Rogue v. Immigration & Naturalization Serv.*,
   954 F.2d 769 (D.C. Cir. 1992) .................................................................................. 13

*Iddir v. Immigration & Naturalization Serv.*,
    301 F.3d 492 (7th Cir. 2002) ................................................22

*Innovation Law Lab v. Nielsen*,
    No. 3:18-CV-01098-SI, 2018 WL 3114530 (D. Or. June 25, 2018) ................................25, 26

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 21, 43–44 (D.D.C. 2017) ................................24

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ................................25

*Lofton v. District of Columbia*,
    7 F. Supp. 3d 117 (D.D.C. 2013) ................................10

*Lujan v. Nat'l Wildlife Fed'n*,
    97 U.S. 871 (1990) ................................18

*Maldonado-Perez v. Immigration & Naturalization Serv.*,
    865 F.2d 328 (D.C. Cir. 1989) ................................13

*Mills v. D.C.*,
    571 F.3d 1304 (D.C. Cir. 2009) ................................23

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................25

*P.K. v. Tillerson*,
    302 F. Supp. 3d 1 (D.D.C. 2017) ................................20

*R.I.L–R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................27

*Ramirez v. U.S. Immigration & Customs Enf't*,
    Civ. A. No. 18-508 (RC), 2018 WL 1882861 (D.D.C. Apr. 18, 2018) ................15, 18, 20

*Reid v. Hood*,
    No. 1:10 CV2842, 2011 WL 251437 (N.D. Ohio Jan. 26, 2011) ................................27

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ................................24

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) ................................11

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................10

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ........................................................................................2, 11

*United States v. Raya-Vaca,*
  771 F.3d 1195 (9th Cir. 2014) .................................................................................12

*United States v. Wilbur,*
  283 U.S. 414 (1931) ........................................................................................21, 22

*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981) ........................................................................................25, 27

*Walters v. Reno,*
  145 F.3d 1032 (9th Cir. 1998) ...........................................................................24, 25

*Winter v. Natural Res. Def. Counsel,*
  555 U.S. 7 (2008) ...................................................................................................10

*Xie v. Kerry,*
  780 F.3d 405 (D.C. Cir. 2015) ................................................................................20

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ........................................................................................11, 12

**STATUTES:**

5 U.S.C. § 551(13) ....................................................................................................18

5 U.S.C. § 701(a) ......................................................................................................17

5 U.S.C. § 704 ...........................................................................................................17

5 U.S.C. § 706(2)(A) .................................................................................................14

6 U.S.C. § 279(g) ................................................................................................3, 16

8 U.S.C. § 1101 ...........................................................................................................1

8 U.S.C. § 1158(b)(3)(A), (C) ..............................................................................3, 16

8 U.S.C. § 1225(b)(1) ........................................................................................*passim*

8 U.S.C. § 1229a ..................................................................................................3, 14

8 U.S.C. § 1252(a)(2)(A)(iii) ...............................................................................19, 22

28 U.S.C. § 1361 ...............................................................................................20, 21

**FEDERAL REGULATIONS:**

8 C.F.R. § 208.30 ...................................................................................................3, 14, 16

8 C.F.R. § 235.3(b) .................................................................................................3, 19, 21, 22

**RULES:**

Fed. R. Civ. P. 65 ...........................................................................................................9

**OTHER AUTHORITIES:**

Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018); *Affording Congress an Opportunity to Address Family Separation* § 1, 2018 WL 3046068 ...............................................................................................................6

Plaintiffs submit this Memorandum of Law in support of their Application for Temporary Restraining Order and for Preliminary Injunction barring Defendants from deporting them from the United States without being afforded the procedures to which they are entitled under the Immigration and Nationality Act, 8 U.S.C. §§ 1101, et seq. ("INA") and the Due Process Clause of the Constitution.

## **INTRODUCTION**

When the U.S. government began separating migrant families under its "zero tolerance" policy, it departed from the statutory procedures set forth in the INA that permit migrants to seek asylum.  This policy created a situation in which thousands of children were denied the opportunity to seek asylum, even when they expressed a fear of returning to their home country, or their parents would have done so on their behalf.  Notwithstanding that these children have been denied this right to seek asylum — which is guaranteed both by statute and by the Constitution — the U.S. government now seeks to deport these children as quickly as possible.

Plaintiffs are part of a large group of migrant children who were separated from their parents at the border, and are now set to be deported without the opportunity to seek asylum. These children were initially placed into proceedings under INA Section 240 through which they should have been able to seek asylum, but have since been removed from these proceedings. Forced to reunify families through court order in a different case, the U.S. government now seeks to deport entire families without affording the children with any right to seek asylum under the statutory process to which they are entitled, under either Section 240 or through a "credible fear" interview under section 235.  Their experiences illustrate the harmful consequences of the U.S. government's family separation policy.

Plaintiffs are likely to succeed on the merits of their claims.  As discussed below, the INA and the Constitution entitle Plaintiffs the opportunity to seek asylum through full removal proceedings, which the U.S. government initiated and should continue, with the benefit of their parents' presence.  At the very least, the INA entitles Plaintiffs to an interview in which they can articulate whether they have a credible fear of returning to their home country.  If there is a positive finding of credible fear, the U.S. government must allow them to pursue asylum in immigration court and may not deport them or their parents until their asylum application has been adjudicated and any appeals exhausted.

The Constitution requires that Plaintiffs be granted these statutory rights.  All persons present in the United States are entitled to due process under the Fifth Amendment, even if they are non-citizens and are here without any lawful status.  Due process requires that Plaintiffs receive all procedural protections conferred by Congress to non-citizens.  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).  Denying migrants procedural protections afforded by statute or regulation therefore violates the Fifth Amendment.  *See id.*  If the U.S. government deports Plaintiffs without affording them the right to seek asylum, Plaintiffs will suffer irreparable harm because they will be prevented from seeking asylum from the violence and persecution they have traveled so far to escape.

## BACKGROUND

The INA sets forth specific procedures for migrants who have not been admitted to the United States.  Any non-citizens who enter or attempt to enter the United States without having been admitted, and who cannot show that they were physically present in the United States for the previous two years, may be subject to expedited removal proceedings under Section 235 of

the INA.  8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b).  In particular, under Section 235, if a migrant expresses fear of persecution or a desire to apply for asylum during the migrant's inspection by an immigration officer, the officer must refer the migrant to an asylum officer for an interview.  *See* 8 U.S.C. § 1225(b)(1)(A).  If the asylum officer then determines that the migrant has a "credible fear" of persecution, the migrant "shall be detained for further consideration of the application for asylum" pursuant to full removal proceedings under Section 240, including a hearing before an immigration judge.  *Id*. at § 1225(b)(1)(B); *see also* 8 C.F.R. § 208.30(f); 8 U.S.C. § 1229a.  In preparing for a "credible fear" interview with an asylum officer, the migrant is entitled to consult with persons of the migrant's choosing.  *See* 8 U.S.C. § 1225(b)(1)(B)(iv).  If the migrant demonstrates a "credible fear" of persecution, then the migrant's spouse or children who arrived with the migrant can be included in that determination and are entitled access to full removal proceedings under Section 240.  *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.30(b).  A spouse or child may also have his or her credible fear determination made separately, if he or she desires.  8 C.F.R. § 208.30(b).

Unaccompanied child migrants are not subject to the same expedited removal proceedings under Section 235.  Instead, they are afforded direct access to an asylum officer and full removal proceedings under Section 240.  8 U.S.C. § 1158(b)(3)(C).  Once in Section 240 proceedings administered by an immigration judge, a migrant is entitled to be represented by counsel and to seek relief from removal through an asylum application.  8 U.S.C. §§ 1229a(b)(4), 1229a(c)(4).  An unaccompanied child migrant is defined as a person who, among other things, is under age 18 and "with respect to whom there is no parent or legal guardian in the United States."  6 U.S.C. § 279(g).

3

Numerous migrants, like Plaintiffs, seek asylum in the United States because they fear persecution in their countries of origin, including threats of physical violence or even death. *See, e.g.*, Ex. 1 (Declaration of L.A.A.) at ¶ 2 (fear of sexual assault and death); Ex. 2 (Declaration of I.A.T.) at ¶¶ 2, 7 (fear of extortion and gang violence); Ex. 3 (Declaration of G.M.A.) at ¶ 2 (threat of religious persecution); Ex. 4 (Declaration of D.B.G.) at ¶¶ 2, 14 (fear of emotional abuse and death); Ex. 5 (Declaration of M.M.M.) at ¶ 2 (fear of abuse and gang violence); Ex. 6 (Declaration of J.J.M.A.) at ¶ 10 (fear of gang violence). Earlier this year the U.S. government implemented a "zero tolerance" policy whereby all adult non-citizens entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be separated from the parent, even if the migrants intended to seek asylum in the United States.[1] The U.S. government even separated families who presented themselves lawfully at a port of entry seeking asylum.[2] In so doing, the U.S. government separated families who had arrived seeking asylum together, sending thousands of parents and children to separate detention facilities, sometimes hundreds of miles apart. *See, e.g.*, Ex. 1 at ¶¶ 7-8; Ex. 2 at ¶¶ 3-4; Ex. 3 at ¶¶ 6-12; Ex. 4 at ¶¶ 3-11; Ex. 5 at ¶¶ 6-7; Ex. 6 at ¶¶4-7. Arriving families often had no notice that they would be forcibly separated, or for how long, causing immense fear, anxiety, and emotional harm to parents and children alike. *Id.*

---

[1] *See* U.S. Att'y Gen. Jeff Sessions, *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[2] *See* Order Granting Pls.' Mot. for Classwide Prelim. Inj. at 3, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-0428 (S.D. Cal. June 26, 2018), ECF No. 83 [hereinafter "*Ms. L* Order"].

In the chaos of these family separations, the U.S. government departed from statutory and regulatory procedures intended to ensure that all arriving non-citizens have an opportunity to express a fear of persecution and seek asylum. Parents were put into expedited removal proceedings under Section 235 of the INA. *See* Ex. 7 (Declaration of M. Govindaiah) at ¶¶ 8-9; Ex. 8 (Declaration of Shalyn Fluharty) at ¶ 5. However, many parents who were permitted credible fear interviews received a negative determination: They could not articulate their grounds for asylum because they were so distressed and distracted with frantic concern about the safety and whereabouts of their children, and did not have their children present to provide further support for their claims. Ex. 7 at ¶¶ 8-9; Ex. 8 at ¶ 5-6. Prevented from effectively presenting their asylum claims, these parents received negative credible fear determinations, and expedited orders of removal. Ex. 7 at ¶¶ 8-9; Ex. 8 at ¶ 5-6. Separately, the U.S. government classified the children as unaccompanied minors and issued them Notices to Appear ("NTAs") in immigration court for removal proceedings under Section 240. Ex. 7 at ¶ 4; Ex. 8 at ¶ 2. These removal proceedings would have afforded the children the right to petition an immigration court for asylum, and would have entitled them to be represented by counsel.

In February 2018, the American Civil Liberties Union ("ACLU") challenged the practice of family separation in a class action before Judge Dana Sabraw of the Southern District of California in *Ms. L. v. U.S. Immigration and Customs Enforcement*, No. 18-0428 (S.D. Cal.). After intense media scrutiny and public pressure, on June 20ʹ 2018, the President reversed course and signed an Executive Order to "maintain family unity" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while maintaining "rigorous[] enforce[ment] of immigration laws." But the Executive Order did not address

reunification of approximately 2,000 children already separated from their parents.[3]   Six days

later, Judge Sabraw granted the plaintiffs' motion for a preliminary injunction.  *See Ms. L* Order.

In his order, Judge Sabraw mandated the U.S. government to stop detaining migrant parents

apart from their minor children absent a finding that the parent is unfit or presents a danger to the

child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the

child.  *Id.* at 22–23.   Judge Sabraw also ordered the U.S. government to reunify all class

members with their children under age five by July 10, and children older than five by July 26,

2018. *Id.* at 23.

The U.S. government has since struggled to reunify parents and children in accordance

with the Court's timetable.  But the U.S. government has also communicated its intent to deport

the reunified families as quickly as possible.  On June 23, the Department of Homeland Security

released a Fact Sheet entitled "Zero-Tolerance Prosecution and Family Reunification," which

laid out the agency's plans for family reunification.   By its own terms, the Administration's

process is designed "to ensure that those adults who are subject to removal are reunited with their

children *for the purposes of removal.*"[4]   The next day, on June 24, 2018, a DHS official told

MSNBC Correspondent Jacob Soboroff that parents separated from their children "were quickly

given the option to sign paperwork leading to deportation.  Many chose to do so."[5]

---

[3] Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018); *Affording Congress an Opportunity to Address Family Separation* § 1, 2018 WL 3046068.

[4] *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification (emphasis added).

[5] Jacob Soboroff (@jacobsoboroff), Twitter (June 24, 2018, 5:29 AM), https://twitter.com/jacobsoboroff/status/1010862394103328771.

On or about July 2, 2018, ICE began providing parents subject to final orders of removal with a "Separated Parent's Removal Form" that offered them two choices:  (1) reunification with their minor children "for the purpose of repatriation to" the parent's home country, or (2) repatriation without reunification, leaving their children behind.[6]  *See* Ex. 7 at ¶ 11; Ex. 8 at ¶ 8.  The first option puts the parents in the position of purportedly waiving their children's independent asylum and other statutory protection rights, and would purport to agree to their children's repatriation without any opportunity for them to pursue asylum or other immigration relief on their own.  *See* Ex. 7 at ¶ 11; Ex. 8 at ¶ 8.  The second option is simply unthinkable to many parents, and would also deprive the child of the assistance that the parent can offer the child in the asylum process.  *Id.*  The form says nothing about any other option that the parent and child are lawfully entitled to — the option for parent and child to be reunited and for the parent to remain to assist the child in the asylum process.  *See* Ex. 7 at ¶ 11; Ex. 8 at ¶ 8.[7]  As a result, because the only opportunity for family reunification afforded by the Separated Parents Removal Form requires parents to consent to removal, the U.S. government's form coerces parents into waiving their own rights, and those of their children, to pursue asylum.

The waivers the U.S. government obtained were not knowing, intelligent, or voluntary. Many parents were told that they needed to sign the Separated Parents Removal Form in order to be reunited with their children, but were not told of the consequences.  Ex. 2 at ¶ 11; *see* Ex. 8 at ¶ 8,9.  Moreover, in some cases, the form was provided in English when most migrant parents

---

[6] Angelina Chapin, *ICE Officials Are Pressuring Separated Parents To Sign Deportation Forms*, Huffingtonpost.com (July 4, 2018), https://www.huffingtonpost.com/entry/immigration-officials-pressure-separated-parents-deportation-form_us_5b3c060ee4b09e4a8b28656e.

[7] Some forms also provided a third option of being able to speak to a lawyer, but many parents elected to be deported with their children because they were so desperate to be reunited and believed it as the only way to be reunited, or at least the quickest way.  Ex. 8 at ¶ 9.

speak only Spanish or indigenous languages.  Defendants have been using similarly coercive tactics to pressure parents with pending asylum claims to waive their rights and consent to removal for themselves and their children in exchange for reunification.[8]  Several parents have been told by U.S. immigration officials that they will be reunited with their children faster if they agree to withdraw their asylum applications and accept deportation.[9]

Presumably on the basis of these "waivers," the U.S. government revoked the separated children's NTAs, or never filed them with immigration court.  *See* Ex. 7 at ¶ 4; Ex. 8 at ¶¶ 2, 9. In so doing, the U.S. government effectively terminated the children's removal proceedings under Section 240, and the access to asylum procedures that Section 240 provides.  The separated minors were therefore denied the opportunity to petition for asylum through Section 240 proceedings before being reunified with their parents.  Many of the parents now have expedited removal orders under Section 235.  But the U.S. government is not permitting separated children to have their own credible fear determinations under Section 235 either.  In so doing, the U.S. government has impermissibly blocked the children from seeking asylum relief under either Section 240 or Section 235.

Despite this omission, the U.S. government has not denied that it intends to carry out mass deportations imminently upon reunification.  *See* Pls.' Reply in Supp. of Mot. for Stay of

---

[8] *See ICE Officials Are Pressuring Separated Parents To Sign Deportation Forms*, https://www.huffingtonpost.com/entry/immigration-officials-pressure-separated-parents-deportation-form_us_5b3c060ee4b09e4a8b28656e

[9] *See* Dara Lind, *Trump will reunited separated families – but only if they agree to deportation*, Vox.com (June 25, 2018), https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump; Molly Hennessy-Fiske, *'If you want to see your kids, agree to leave': detained parents told*, The Sydney Morning Herald (June 26, 2018), https://www.smh.com.au/world/north-america/if-you-want-to-see-your-kids-agree-to-leave-detained-parents-told-20180626-p4znp8.html.

Removal at 1, *Ms. L. v. U.S. Immigration & Customs Enf't*, No. 18-0428 (S.D. Cal. July 25, 2018), ECF No. 154. In particular, Plaintiffs understand that, despite the fact that they have been denied a credible fear interview, they will be deported with their parents among hundreds of other children in similar circumstances. *See, e.g.,* Ex. 1 at ¶¶ 13-16; Ex. 2 at ¶¶ 10-13; Ex. 3 at ¶¶ 17-20; Ex. 4 at ¶¶ 15-19; Ex. 5 at ¶¶ 12-14; Ex. 6 ¶¶ 14, 17; Ex. 7 at ¶¶ 5-6, 12-14; Ex. 8 at ¶¶ 10-11. Indeed, Plaintiffs have requested credible fear interviews and have received no response from the U.S. government. *Id.*

On July 16, 2018 the ACLU moved before Judge Sabraw to prohibit removal of families until seven days after reunification, so that parents have time to evaluate the best options for their children. *See* Pls.' Mot. for Stay of Removal and Emergency TRO Pending Ruling on the Stay Mot. at 1, *Ms. L. v. U.S. Immigration & Customs Enf't*, No. 18-00428 (S.D. Cal. July 16, 2018), ECF No. 110. That same day, Judge Sabraw granted a temporary stay of deportations only until he resolves the motion. *See* Order Granting Pls.' Mot. for Emergency TRO Pending Ruling on Mot. to Stay and Amending July 13, 2018 Order Following Status Conference, *Ms. L. v. U.S. Immigration & Customs Enf't*, No. 18-00428 (S.D. Cal. July 16, 2018), ECF No. 116. The U.S. government filed their opposition to the ACLU's Motion for Stay on July 24, 2018, and the ACLU filed its reply on July 25, 2018. *See id.,* ECF Nos. 148, 153. Judge Sabraw has scheduled a hearing on the motion to stay today, July 27, 2018. If the stay of removal is lifted, families that have been reunified could be removed from the United States imminently.

## **ARGUMENT**

Rule 65 of the Federal Rules of Civil Procedure authorizes a plaintiff to seek a preliminary injunction or temporary restraining order. Fed. R. Civ. P. 65. "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008). The standards for issuing a temporary restraining order and a preliminary injunction are the same. *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 120 (D.D.C. 2013); *see also Al-Fayed v. Central Intelligence Agency*, 254 F.3d 300, 303 n.2 (D.C. Cir. 2001).

The Court may weigh these factors on a "sliding scale," where the movant must show that the four factors, taken together, weigh in favor of the injunction. *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). "If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.*; *see also Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (acknowledging circuit split regarding sliding-scale analysis but not overruling the practice).

I.  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE U.S. GOVERNMENT WRONGLY DEPRIVED THEM OF THE OPPORTUNITY TO SEEK ASYLUM IN THE UNITED STATES**

This Court should grant Plaintiffs' request for a TRO and preliminary injunction because they are likely to succeed on the merits of their claims under the INA, the Fifth Amendment of the Constitution, the Administrative Procedures Act ("APA"), and the Mandamus Act.

A.  **Defendants' Policy of Denying Plaintiffs the Right to Pursue Asylum is Unlawful Under the INA.**

The INA specifically contemplates judicial review of orders of removal by the United States District Court for the District of Columbia, including challenges to the "validity of the system" as a whole where a Government policy violates the law. *See* 8 U.S.C. § 1252(e)(3).

10

Here, the Government's policy of denying Plaintiffs their rights to pursue asylum in the United States is inconsistent with Section 240 and/or Section 235 of the INA and is otherwise in violation of the law. That policy is reflected in written statements and directives discussed above and set forth in Plaintiffs' complaint, including but not limited to the DHS Fact Sheet, which states that the reunification process is designed "to ensure that those adults who are subject to removal are reunited with their children *for the purposes of removal*."[10]

Pursuant to Defendant's unlawful policy, Plaintiffs' requests for credible fear interviews have been unlawfully denied and Plaintiffs face an imminent threat of deportation without access to asylum proceedings. Plaintiffs are likely to succeed on the merits of their claims that Defendant's policy violates the INA and therefore should be permanently enjoined.

> **B.     Plaintiffs' Removal from the United States Without Allowing Them to Petition for Asylum Violates their Fifth Amendment Rights.**

Plaintiffs seek only to receive the opportunity to seek asylum to which they are entitled under the INA. The U.S. government's plans to remove Plaintiffs without the opportunity to seek asylum violates the procedural and substantive due process rights guaranteed to Plaintiffs and hundreds of others who are similarly situated.

The due process clause of the Fifth Amendment applies to "all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 679 (2001). Thus, non-citizens who have entered the United States, even illegally, may legally be removed from the United States only "after

---

[10]     *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, Dep't of Homeland Security (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

11

proceedings conforming to . . . due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). This requirement applies with equal force to individuals subject to expedited removal proceedings. *United States v. Raya-Vaca*, 771 F.3d 1195, 1202–03 (9th Cir. 2014) (citing *Zadvydas*, 533 U.S. at 693). "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff*, 338 U.S. at 544.

The INA unequivocally provides migrants with the opportunity to seek asylum. When migrants are in full removal proceedings under Section 240, they are entitled to apply for relief for removal, including through seeking asylum, before the immigration judge. 8 U.S.C. §§ 1229a(b)(4); 1229a(c)(4). The U.S. government separated Plaintiffs and others like them from their families, re-labeled them — contrary to law — as "unaccompanied minors," and placed them into removal proceedings under Section 240. These proceedings, if permitted to proceed, would have provided Plaintiffs with the right to petition for asylum or other legal status in the United States before an immigration judge. However, the U.S. government has since reversed course and removed them from these proceedings by revoking or failing to file their NTAs. After reunification, Plaintiffs are now set to be deported pursuant to their parents' expedited orders of removal. The U.S. government has therefore denied Plaintiffs their right to pursue asylum before an immigration judge under Section 240.

In addition, the U.S. government denied Plaintiffs the right to a credible fear interview in Section 235 proceedings. Migrants subject to expedited removal proceedings under Section 235 of the INA are entitled to have a credible fear interview before an asylum officer if they express fear of persecution or seek to apply for asylum. 8 U.S.C. § 1225(b)(1)(A). If migrants receive a positive credible fear determination, then they are entitled to pursue asylum in full proceedings

before an immigration judge. *Id.* at § 1225(b)(1)(B). Therefore, since the INA permits migrants to seek asylum, a migrant has a Fifth Amendment procedural due process right to petition the U.S. government for asylum, and a statutory procedural due process right to a meaningful or fair evidentiary hearing. *Gutierrez-Rogue v. Immigration & Naturalization Serv.*, 954 F.2d 769, 772–73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. Immigration & Naturalization Serv.*, 865 F.2d 328, 332–33 (D.C. Cir. 1989)).

The U.S. government's plan to remove Plaintiffs immediately upon reunification violates their due process rights under Section 235 of the INA. The U.S. government has failed to provide Plaintiffs with credible fear interviews, to which they are entitled under Section 235 of the INA, after expressing fear of persecution or a desire to seek asylum. Plaintiffs' parents cannot waive these rights on Plaintiffs' behalf. Plaintiffs' parents may have signed the removal form, but many parents did so under a belief that signing the paper would be the only way to see their children again. Many parents could not read or understand the form, much less understand the legal implications of signing it. The waivers were not knowing or voluntary and cannot bar Plaintiffs' due process claims.

The U.S. government has effectively prevented Plaintiffs from any avenue to present their case for asylum, contrary to their rights under Sections 235 and 240 of the INA and due process rights under the Constitution. *Mezei* and the cases that follow it are unanimous that no one on American soil, even an individual in the country unlawfully, can be deported lawfully without an opportunity to petition the U.S. government for asylum. The U.S. government's actions here do just that.

### C.  Plaintiffs' Removal from the United States Without Allowing Them to Petition for Asylum Violates the APA.

The APA requires that courts "hold unlawful and set aside any agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  As set forth below, the U.S. government's anticipated issuance of expedited removal orders without affording Plaintiffs the opportunity to pursue asylum violates the INA.  Therefore Plaintiffs are entitled to relief under the APA.

### i.  The U.S. government has denied Plaintiffs the right to pursue their asylum claims under the INA.

Pursuant to Section 240 of the INA, a person in removal proceedings may pursue his or her claims for asylum before an immigration judge.  8 U.S.C. § 1229a(c)(4).  Under Section 235 of the INA, a person who requests asylum by expressing a fear of persecution in his or her home country has the right to be interviewed by an asylum officer to determine whether that individual has a credible fear to returning to their home country.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii) (stating that if an individual expresses fear of persecution or an intention to seek asylum, the immigration officer "shall" refer them for an interview with an asylum officer).  If the individual demonstrates a credible fear of persecution in his or her country — meaning there is a "significant possibility" that the individual is eligible for asylum — during an interview with an asylum officer, he or she is entitled to a hearing before an immigration judge to adjudicate the asylum claim.  *See id.* § 1225(b)(1)(B)(ii) (stating that if there is a credible fear of persecution in the home country, the individual "*shall* be detained for further consideration" of his or her asylum application) (emphasis added); *see also* 8 C.F.R. § 208.30(f).

14

Despite this clear and controlling law, the U.S. government has denied Plaintiffs the opportunity to seek asylum. Plaintiffs are non-citizens who have expressed a fear of persecution in their home country or an intention to seek asylum in the United States. When they were separated from their parents and initially placed into Section 240 proceedings, they were entitled to pursue their asylum claims in front of an immigration judge. The U.S. government's termination of those Section 240 proceedings violates Plaintiffs' rights to pursue asylum and is therefore contrary to law under the APA.

Now that the U.S. government has improperly revoked Plaintiffs' Section 240 status, Plaintiffs also have, at a minimum, an independent right under Section 235 of the INA to be interviewed by an asylum officer to determine whether they have a credible fear of returning to their home country, and if they do, to remain in the United States until their asylum application is processed. The U.S. government cannot deport Plaintiffs from the United States without affording them this right. However, Plaintiffs understand that the U.S. government intends to begin mass deportations of families shortly after reunification, without providing Plaintiffs with an opportunity to seek asylum. Indeed, Plaintiffs have requested — and been denied — such interviews. The U.S. government's policy to deny Plaintiffs their right to pursue asylum under Section 235 also is "not in accordance with" the INA and therefore violates the law under the APA. *See Aracely, R. v. Nielsen*, ___ F.Supp.3d___, Civ. A. No. 17-1976 (RC), 2018 WL 3243977, at *25 (D.D.C. July 3, 2018) (finding likelihood of success on merits of APA claim where plaintiffs showed that ICE failed to consider agency guidance when adjudicating parole request); *Ramirez v. U.S. Immigration & Customs Enf't*, ___ F.Supp.3d___, Civ. A. No. 18-508 (RC), 2018 WL 1882861, at *16–17 (D.D.C. Apr. 18, 2018) (finding likelihood of success on

merits of APA claim where plaintiffs showed that ICE did not comply with INA requirements when placing them in adult detention centers).

ii.    **The U.S. government denied Plaintiffs the right to a credible fear determination for their entire family under the INA.**

If *any* member of a migrant family detained at the border demonstrates a "credible fear" of persecution, then the *entire* family is included in that determination and permitted full removal proceedings under Section 240. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.30(b). Moreover, in preparing for a "credible fear" interview with an asylum officer, the migrant may consult with persons of the migrant's choosing, including the migrant's family and attorneys. *See* 8 U.S.C. § 1225(b)(1)(B)(iv).

The U.S. government's "zero tolerance" policy separated children from their parents and treated such children as unaccompanied minors, even though they were accompanied by a parent into the United States and therefore should not have been considered unaccompanied as a matter of law. *See* 6 U.S.C. § 279(g). After children and parents were separated, parents were coerced into signing waivers that purportedly gave up their rights — and those of their separated children — to seek asylum under the INA in exchange for reunification with their children. The court in *Ms. L* has already found that the plaintiffs in that case had a likelihood of success on their claim that the U.S. government's separation of parents from their children is unconstitutional. *See Ms. L* Order at 17, 22.

The U.S. government's actions violated Plaintiffs' rights under the INA. As a threshold matter, by denying parents consultation with the rest of their family prior to credible fear interviews, the U.S. government has denied Plaintiffs the benefit of a full and fair credible fear determination under the INA. Plaintiffs should have had the benefit of their parents' credible

fear determination, and that determination should have been made with the benefit of Plaintiffs' consultation with their parents, free from the coercive pressure and anguish associated with separation. The U.S. government's removal of Plaintiffs prior to affording these rights violates the INA and therefore is contrary to law under the APA.

Moreover, the INA provides children with the benefit of a *favorable* credible fear determination made with respect to their parents, but also gives them the right to an independent credible fear determination. The INA does not permit children to be removed without an independent credible fear determination simply because their parents have been given an *unfavorable* credible fear determination (or purportedly waived a credible fear interview altogether under duress). Put differently, the INA creates a one-way ratchet that *benefits* children if their parents demonstrate a credible fear. The U.S. government's policy has, contrary to law, imposed a converse one-way ratchet that *harms* children if their parents do not receive a credible fear finding, or if their parents signed a waiver electing reunification. The U.S. government had placed Plaintiffs in full Section 240 removal proceedings, which entitled them to a hearing on their asylum claims irrespective of their parents' credible fear determinations. The U.S. government cannot now reverse course and deprive Plaintiffs of that right — under either Section 235 or Section 240 — simply because of their parents' conduct. Plaintiffs are entitled to an independent credible fear interview under the INA and cannot be removed simply because of their parents' unfavorable credible fear determination or their parent's coerced waiver of the right to such a determination.

### iii.   The other requirements of the APA are met.

Under the APA, a court may set aside and enjoin unlawful agency action that is:  (1) a "final agency action," and (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" or "agency action is committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704.  None of these criteria prevents this Court from enjoining the U.S. government from deporting Plaintiffs without first being accorded credible fear determinations.

### a.   The U.S. Government's Policy of Refusing to Give Plaintiffs a Credible Fear Interview Constitutes a Final Agency Action.

An agency action is "final" when it meets two requirements:  (1) it is the "consummation of the agency's decision-making process"; and (2) it is one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).  Failure to act may also be considered an "action" under the APA.  *See* 5 U.S.C. § 551(13).  Further, "an agency action is reviewable 'to the extent that, specific, 'final agency action' has an actual or immediately threatened effect.'"  *Aracely, R.*, 2018 WL 3243977, at *16 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990)).  "Even discrete agency actions are reviewable by a court under the APA only if they are final."  *Ramirez*, 2018 WL 1882861, at *9 (finding ICE's failure to follow statutory requirements when detaining plaintiffs to be a final action reviewable under the APA).

Here, the U.S. government's failure to afford Plaintiffs an opportunity to seek asylum is a "final" act reviewable under the APA.  It is the culmination of the U.S. government's decision-making process with respect to whether Plaintiffs may remain in the United States to seek asylum.  The U.S. government consummated its decision-making process with respect to Plaintiffs when it (1) presented their parents with the waiver that permitted reunification only

upon deportation, thus depriving the children of the ability to seek asylum; (2) revoked or failed to file Plaintiffs' NTAs, thus removing them from Section 240 proceedings, and (3) transferred reunified families to detention centers for the purpose of swift deportation.   The U.S. government's denial of an opportunity to seek asylum is also an action that will result in immediate and serious consequences:  If not set aside, Plaintiffs' deportation is imminent.

### b.       Plaintiffs Have No Adequate Remedy.

The no "other adequate remedy" limitation on the APA should be reviewed narrowly and "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed that the generous review provisions of the APA must be given a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.") (internal quotations and citations omitted).

Here, there is no other remedy available to Plaintiffs.  They have no avenue through the immigration system to appeal the U.S. government's decision to remove them from Section 240 proceedings or deny them a credible fear determination.  They also have no way to appeal an expedited order of removal.   *See* 8 U.S.C. § 1252(a)(2)(A)(iii) (depriving any court of jurisdiction to review expedited orders of removal).   Nor is an expedited order of removal appealable through an administrative process.  8 C.F.R. § 235.3(b)(2)(ii) (aliens subject to expedited orders of removal are not entitled to hearings and appeals before an immigration judge or the Board of Immigration Appeals).  Instead, the only remedy that will correct the U.S.

government's statutory and constitutional violations is to require that the U.S. government provide them with the procedures to seek asylum to which they are legally entitled.

### c. The U.S. Government's Failure to Permit Plaintiffs to Seek Asylum is Reviewable.

No statute prohibits judicial review of Plaintiffs' claims. This is especially true because Plaintiffs are not disputing the *outcome* of any specific determination by the U.S. government, but rather challenging the U.S. government's unlawful policy of denying Plaintiffs the opportunity to seek asylum. Indeed, this Court permitted a similar challenge to the INA in *Ramirez* on the grounds that seeking to compel the agency to take "discrete and concrete action of considering statutorily specified factors" was permissible. 2018 WL 1882861, at *8. *See also Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015) (finding a challenge to delaying review of visa applications actionable under the APA).

\* \* \*

Because the U.S. government's decision to deport Plaintiffs without affording them an opportunity to seek asylum (either individually or with their entire family) is a final agency action that is not in accordance with the law, and one for which there is no adequate alternative remedy, Plaintiffs have a strong likelihood of prevailing on the merits of their APA claim.

### D. Plaintiffs Will Likely Prevail on Their Mandamus Claim to Compel the U.S. Government to Allow Them to Seek Asylum.

Plaintiffs also have a likelihood of success on the merits on their mandamus claim. Plaintiffs seek a writ of mandamus to compel the U.S. government to afford them with the opportunity to seek asylum. Mandamus relief is an appropriate remedy to compel an

20

administrative agency to act when, as here, it has failed to perform a non-discretionary, ministerial duty. *See P.K. v. Tillerson*, 302 F. Supp. 3d 1, 8–9 (D.D.C. 2017) (ordering the Department of State to reserve visa numbers for plaintiff's visa application).

Section 1361 of Title 28 of the U.S. Code provides:

> "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

28 U.S.C. § 1361. Mandamus relief is proper when a plaintiff demonstrates "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Each of these elements is met here.

*First,* Plaintiffs have a clear right to the relief they seek. When they were placed into Section 240 proceedings, Plaintiffs were entitled to adjudicate their asylum claims in front of an immigration judge. And as described above, Congress, through Section 235 of the INA, has determined that all non-citizens who request asylum or express a fear of returning to their home country must be provided certain procedural rights, including the right to a determination on whether their fear of return to the home country is credible. 8 U.S.C. § 1225(b)(1)(A)(ii). At a minimum, Section 235 clearly applies to Plaintiffs because they are migrants who entered the United States without having been admitted, who could not show that they were physically present in the United States for the previous two years, and who have expressed a fear of returning to their home country. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b).

*Second,* the INA gives the U.S. government a clearly defined duty to provide Plaintiffs the relief they seek. A writ of mandamus "will issue only where the duty to be performed is

21

ministerial and the obligation to act peremptory and plainly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." *United States v. Wilbur*, 283 U.S. 414, 420 (1931). The law that Plaintiffs seek to enforce — an opportunity to pursue their asylum claims under Section 240 or at least engage in the credible fear determination process under Section 235 of the INA — is clear and non-discretionary. The word "shall" in Section 235 establishes a non-discretionary duty to provide all non-citizens who express either a fear of persecution in their home country or an intention to seek asylum access to the credible fear process. *See Iddir v. Immigration & Naturalization Serv.*, 301 F.3d 492, 499 (7th Cir. 2002) ("The term 'shall' denotes a clear directive, a command, as opposed to the terms 'may' or 'in his discretion'" used in other immigration statutes). The U.S. government's duty under the statute is "clear and undisputable," *Wilbur*, 283 U.S. at 420, yet the U.S. government has failed to execute that duty.

*Third*, Plaintiffs have no other adequate remedy available to them. Plaintiffs have no way to appeal the U.S. government's decision to withhold a credible fear determination and deny them the opportunity to seek asylum. The INA does not provide any mechanism for appealing an expedited order of removal to a court. *See* 8 U.S.C. § 1252(a)(2)(A)(iii) (depriving any court of jurisdiction to review expedited orders of removal). Nor is an expedited order of removal appealable through an administrative process. 8 C.F.R. § 235.3(b)(2)(ii) (aliens subject to expedited orders of removal are not entitled to hearings and appeals before an immigration judge or the Board of Immigration Appeals). Additionally, if the U.S. government is allowed to execute these expedited orders of removal, Plaintiffs will be deported from the United States and their claim for a writ will be moot. Therefore, the only remedies available to Plaintiffs are those

22

available through this Court.  For these reasons, Plaintiffs are likely to prevail on the claim for a writ of mandamus.

* * *

Plaintiffs are likely to succeed on the merits of their claims under the Fifth Amendment, the APA, and the Mandamus Act.  Section 235 and Section 240 of the INA provide them with a clear right to a credible fear determination before they can be deported, and procedural due process requires that they be given the opportunity to petition for asylum in some manner.  The U.S. government's actions have clearly violated these rights.  Therefore, Plaintiffs are likely to succeed on the merits of their case.

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED

To establish irreparable harm, a party must demonstrate that its injury is:  (i) imminent, establishing a clear and present need for equitable relief; (ii) actual, rather than theoretical; and (iii) incapable of remediation.  *Damus v. Nielsen*, Civ. A. No. 18-578-JEB, 2018 WL 3232515, at *17 (D.D.C. July 2, 2018).  Plaintiffs meet that burden here: Without this Court's immediate relief, Plaintiffs will be denied any chance to assert their rights guaranteed by the INA and the Constitution, and will be denied the opportunity to seek asylum from persecution.

Plaintiffs are suffering imminent and actual harm from the deprivation of their rights under the INA and Constitution.  Plaintiffs are statutorily entitled, and have a due process right, to seek asylum because Congress has granted Plaintiffs these procedural rights in the INA.  The U.S. government's threat to remove Plaintiffs without affording them this mandatory procedural protection warrants this Court's intervention.  It is well established that "the loss of constitutional

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see also Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[A] prospective violation of a constitutional right constitutes irreparable injury" for the purposes of seeking equitable relief.).   Harm suffered from the deprivation of their statutory and constitutional rights is incapable of remediation because Plaintiffs would have no way to seek asylum or retroactively challenge their removals once they've been deported.   Absent equitable relief, Plaintiffs will lose the opportunity to seek asylum and will be permanently deprived of their statutory and constitutional rights.

Indeed, this Court has enjoined government policies that "block[] access to an existing avenue for avoiding removal." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 43–44 (D.D.C. 2017).   Other courts have done the same. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (enjoining INS procedures allowing for deportation of aliens without a hearing as violative of constitutional due process); *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1162 (C.D. Cal. 2018) (finding irreparable harm from deprivation of opportunity to contest removal). *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) ("[T]his Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.'").

Plaintiffs will suffer imminent harm beyond the loss of their statutory and constitutional rights if this Court does not grant relief because they have a well-founded fear of persecution upon return to their home countries.   Returning to their home countries could be a death sentence. *See, e.g.,* Ex. 1 at ¶ 2 (fear of sexual assault and death); Ex. 4 at ¶¶ 2, 14 (fear of emotional abuse and death). The U.S. government's plan to remove Plaintiffs would cast them

back into this violence, causing imminent, actual harm.   It would also be incapable of remediation, since there would be no way to remove the peril of being forced to return to an environment of persecution and mortal danger.

Courts consistently recognize that the likelihood of violence is relevant to a finding of irreparable harm, and this Court should do the same.   *See, e.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (granting stay of removal and noting "the likelihood of [violence] . . . should be part of the irreparable harm inquiry" in the asylum context); *Innovation Law Lab v. Nielsen*, ___ F.Supp.3d___, No. 3:18-CV-01098-SI, 2018 WL 3114530, at *8 (D. Or. June 25, 2018) (recognizing importance of due process at the credible fear interview stage due to the "serious harm—including persecution, torture, and death—that may result if asylum is improperly denied."); *Ali v. Ashcroft*, 213 F.R.D. 390, 400 (W.D. Wash. 2003), *aff'd*, 346 F.3d 873 (9th Cir. 2003), *op. withdrawn on denial of reh'g sub nom. Ali v. Gonzales*, 421 F.3d 795 (2005), *as am. on reh'g* (2005) ("Petitioners' fears of persecution and torture . . . are certainly relevant to a finding of irreparable harm.").   Courts further recognize this harm cannot be remedied at law.   *See Walters*, 145 F.3d at 1048 ("There is no way to calculate the value of such a constitutional [due process] deprivation [as deportation without a hearing] or the damages that result from erroneous deportation.").

25

### III. THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES FAVOR GRANTING THE TRO AND PRELIMINARY INJUNCTION

To obtain the equitable relief sought, Plaintiffs must demonstrate the injunction would serve the public interest and that the balance of equities favors granting this relief. These factors "merge when the Government is the opposing party." *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (articulating standard in the stay context).

The public has an interest in preserving statutory and constitutional rights. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Innovation Law Lab*, 2018 WL 3114530, at *9. Accordingly, the D.C. Circuit "has clearly articulated that the public has an interest in the government maintaining procedures that apply with constitutional requirements." *Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Fed. Emergency Mgmt. Agency (FEMA)*, 463 F. Supp. 2d 26, 36 (D.D.C. 2006). Because the U.S. government's plan to deport Plaintiffs without sufficient process violates both the Constitution and the INA, the public interest counsels in favor of granting Plaintiffs' injunction. *See ACORN*, 463 F. Supp. 2d at 36 (holding that where government procedures "do not comport with the Due Process Clause of the Constitution, the interest of the public weighs strongly in favor of a preliminary injunction.").

The balance of equities also favors granting Plaintiffs' injunctive relief. As discussed above, if relief is not granted Plaintiffs will suffer the loss of their rights to pursue their asylum claims and be returned to life-threatening conditions despite their well-founded fear of persecution. Conversely, Defendants will suffer no cognizable harm if the injunctive relief is granted, because the INA imposes the duty to permit a noncitizen to pursue asylum claims in Section 240 proceedings, or in grant a credible fear interview to any noncitizen in Section 235 proceedings who expresses a fear of persecution. To the extent Defendants cite to the burden

26

associated with conducting so many interviews and reconciling disparate statuses among family members, that burden is self-created, and pales in comparison to the risks to Plaintiffs. *See Innovation Law Lab*, 2018 WL 3114530, at *9 (holding an injunction which requires the government to abide its own statutes or regulations cannot pose an undue burden on the government's time, resources, or personnel, and further noting "any such burden . . . is more than justified by the need to ensure fulfillment of Plaintiffs' constitutional rights and to prevent the improper denial of meritorious asylum claims."). Moreover, as this Court previously noted, the U.S. government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted).

This is precisely the situation in which injunctive relief is warranted: when "the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined, then there is cause to preserve the status quo." *Reid v. Hood*, No. 1:10 CV2842, 2011 WL 251437, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Allowing Plaintiffs to remain in the United States so that they can pursue their asylum claims does just that.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to: (1) enter an immediate Temporary Restraining Order against Defendants to prevent them from removing from the United States all non-citizen children, and the parents or guardians of such children, who were separated upon entry into the United States, including but not limited to Plaintiffs and

their parents or guardians, pending a full hearing and this Court's adjudication of Plaintiffs'

pending Motion for a Preliminary Injunction; and (2)  preliminary enjoin Defendants' policy of

removing children from the United States before permitting them the opportunity seek asylum

pursuant to their rights under the INA, the Fifth Amendment of the Constitution, and the

Mandamus Act and order Defendants to provide all non-citizen children who were separated

from their parents or guardians upon (or after) entry into the United States with their rights to

petition for asylum under Section 240 and Section 235 of the INA following reunification with,

and in consultation with, their parents or guardians, until such proceedings are terminated.


July 27, 2018                                      **HOGAN LOVELLS US LLP**

                                                  Justin W. Bernick (DC Bar No. 988245)
                                                  *T. Clark Weymouth
                                                  *Zachary W. Best
                                                  555 Thirteenth Street, NW
                                                  Washington, DC 20004
                                                  Telephone: (202) 637-5600
                                                  Facsimile: (202) 637-5910
                                                  justin.bernick@hoganlovells.com
                                                  t.weymouth@hoganlovells.com
                                                  zachary.best@hoganlovells.com

                                                  *Oliver J. Armas
                                                  *Ira M. Feinberg
                                                  875 Third Avenue
                                                  New York, NY 10022
                                                  Telephone: (212) 918-3000
                                                  Facsimile: (212) 918-3100
                                                  oliver.armas@hoganlovells.com
                                                  ira.feinberg@hoganlovells.com

                                                  *Katherine A. Nelson
                                                  1601 Wewatta Street, Suite 900

28

Denver, CO 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333
katherine.nelson@hoganlovells.com

*\* admission pro hac vice to be sought*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 27, 2018, this motion and the accompanying memorandum in support were filed by hand delivery upon the Clerk of the Court.  A service copy of this filing will be sent by first class mail, postage pre-paid, to all Defendants' at the addresses listed below:

Jefferson Beauregard Sessions III,
Attorney General of the United
States of America,
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Kirstjen Nielsen, Secretary of the
United States Department of
Homeland Security,
245 Murray Lane, SW
Washington, DC 20528

Alex Azar, Secretary of the
Department of Health and Human
Services,
200 Independence Avenue, SW
Washington, DC 20201

Ronald Vitiello, Acting Director of
United States Immigration and
Customs Enforcement,
500 12th Street, SW
Washington, DC 20536

L. Francis Cissna, Director of United
States Citizenship and Immigration
Services,
20 Massachusetts Avenue, NW
Room 4210 MS: 2120
Washington, DC 20529

Kevin K. McAleenan, Commissioner
of United States Customs and Border
Protection,
1300 Pennsylvania Avenue, NW
MS: 1345
Washington, DC 20229

Scott Lloyd, Director of the Office of
Refugee Resettlement,
Mary E. Switzer Building
330 C Street, SW
Washington, DC 20201

Daniel A. Bible, Director of ICE
San Antonio Field Office
1777 NE Loop 410, Floor 15
San Antonio, TX 78217

United States Department of
Homeland Security,
245 Murray Lane, SW
MS: 0485
Washington, DC 20528

United States Immigration and
Customs Enforcement,
500 12th Street, SW
Washington, DC 20530

United States Customs and Border
Protection,
1300 Pennsylvania Avenue, NW
Washington, DC 20229

1

United States Citizenship and
Immigration Services,
20 Massachusetts Avenue, NW
Washington, DC 20529

U.S. Department of Health and
Human Services,
200 Independence Avenue SW
Washington, DC 20201

Office of Refugee Resettlement,
Mary E. Switzer Building
330 C Street, SW
Washington, DC 20201

Date:   July 27, 2018

Justin W. Bernick (DC Bar No. 988245)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
justin.bernick@hoganlovells.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| M.M.M., on behalf of his minor child, J.M.A., *et al.*, | CIVIL ACTION NO. _____ |
| **Plaintiffs,** |  |
| v. | [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER |
| Jefferson Beauregard Sessions, III, Attorney General of the United States, *et al.*, |  |
| **Defendants.** |  |

Upon consideration of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, and other submissions filed in support thereof, the Court finds that:

1. Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims for a permanent injunction against Defendants' policy of removing children from the United States before permitting them the opportunity seek asylum pursuant to their rights under the Immigration and Nationality Act ("INA") (including 8 U.S.C. §§ 1158, 1225, or 1229a), the Fifth Amendment of the Constitution, and the Mandamus Act (the "Policy"); for a declaratory judgment that the Policy violates the INA, the Administrative Procedure Act, and the Fifth Amendment to the Constitution; and/or for a Writ of Mandamus to compel Defendants to comply with the INA.

2. Plaintiffs have demonstrated that immediate and irreparable injury will result to Plaintiffs in this action if a Temporary Restraining Order is not entered against Defendants because the Policy would result in removal of Plaintiffs and other migrant children in violation of the Fifth Amendment to the Constitution under circumstances where Plaintiffs and other migrant children have a well-founded fear of persecution and life-threatening violence in their country of origin.

3. Plaintiffs have demonstrated that issuance of a Temporary Restraining Order will not cause substantial harm to Defendants, since it will only maintain the status quo pending resolution of the merits of this case.

4. Plaintiffs have demonstrated that issuance of a Temporary Restraining Order is in the public interest and that the balance of equities favors Plaintiffs, because it protects Plaintiffs' rights under the Fifth Amendment to the Constitution and under the INA to pursue asylum based on Plaintiffs' well-founded fear of persecution and life-threatening violence in their country of origin.

For these reasons and those set forth in the accompanying opinion, it is hereby

**ORDERED** that the Motion for a Temporary Restraining Order is **GRANTED**. Defendants and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them are hereby **TEMPORARILY RESTRAINED** from removing from the United States all non-citizen children, and the parents or guardians of such children, who were separated upon entry into the United States, including but not limited to Plaintiffs and their parents or guardians, until the merits of Plaintiffs' motion for a preliminary injunction is resolved.

2

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to any persons or entity that may be subject to any provision of this Order, including their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them or have any involvement in the removal of individuals from the Unites States. Within two (2) business days of receipt of this Order, Defendant shall submit to counsel for Plaintiffs a truthful sworn statement identifying those persons and/or entities to whom this Order has been distributed.

**IT IS FURTHER ORDERED**, pursuant to Fed. R. Civ. P. 65(b) and Local Rule 65.1(c) that Defendants are required to respond to Plaintiffs' pending Motion for Preliminary Injunction within seven (7) days of this Order.  Plaintiffs reply shall be due three (3) days after any opposition is filed.  This Order shall stay in effect until such time as the Court rules on Plaintiffs' pending motion for a preliminary injunction.

**IT IS SO ORDERED**, at _____ am/pm on this _____ day of _____, 2018.

_____
**UNITED STATES DISTRICT JUDGE**

3