Lee Gelernt
Judy Rabinovitz
Anand Balakrishnan
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

    *Petitioner-Plaintiff,*

v.

U.S. Immigration and Customs Enforcement ("ICE"); et al.,

    *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

Date Filed: September 13, 2018

**PLAINTIFFS' BRIEF REGARDING REUNIFICATION OF TWO PARENTS**

Plaintiffs request immediate relief for two parents who have been denied reunification with their young children based on criminal allegations or conduct that are wholly insufficient to justify depriving them of their fundamental right to family integrity. Ms. Q. was separated from her then three-year-old son, J., more than six months ago, after fleeing persecution in El Salvador. Mr. C. was separated from his then nineteen-month-old son, D., four months ago, after running for their lives from gangs in Honduras. Both children recently had birthdays in ORR custody without their parents; J. is now four years old, and D. is now two.

As set forth below, there has been no finding that Ms. Q. and Mr. C. are unfit, neglectful, or dangerous to their children.  In fact, the evidence shows that both children are suffering greatly without the care of their loving parents, and even regressing in their development as a result of their lengthy custody.   J was toilet trained when he came to the United States with his mother, but now he needs diapers after having several accidents.  D., for his part, is a toddler confused about being in a shelter and is struggling to make sense of life without his father.

This Court has explained that the Due Process Clause does not permit the government to separate parents from their children without "a determination that the parent was unfit or presented a danger to the child." Dkt. 83 at 22-23. That is consistent with settled constitutional law, which establishes that the state may not take a child from her parent absent a clear showing that the child is in imminent danger of abuse or neglect. *See, e.g.*, *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (explaining that the Constitution prohibits removal of child from parents absent "reasonable cause to believe that the child is in imminent danger of serious bodily injury"); *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 811 (8th Cir. 2010) (holding that removal of students from their parents violates the Constitution when "the students were not at immediate risk of child abuse or neglect"); *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997) (observing that absent reasonable grounds to suspect abuse,

1

"governmental intrusions of this type are arbitrary abuses of power"); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents.").

As this Court has observed, the mere existence of some criminal history does not justify separating parents from their children.  July 6 Status Conference, Dkt. 93 at 21.  Instead, the Court made clear that it expects the government  to adhere to its policies for evaluating child safety and placement of families in detention centers, *id.*, policies that require ICE personnel to  "investigat[e] whether there is information that causes a concern about the welfare [of] the child, such as the adult having a *significant* criminal history." July 13 Order Following Status Conference, Dkt. 108 at 2 (quotation omitted) (emphasis added).  The government's own policies, as the Court observed, provide that, in the absence of such concerns, or doubts about the parental relationship, parents and their children are "detained at a family residential center or, if appropriate, released to a sponsor or non-governmental organization." *Id.* (quoting Mario Ortiz Declaration, ¶ 3, Dkt. 46-1.)

## I. Ms. Q. and Mr. C.'s Continued Separation from Their Children Violates This Court's Injunction and Due Process.

***Ms. Q.***  Ms. Q. traveled to the United States with her then three-year-old son, J., in March 2018. *See* Declaration of Ms. Q. ("Ms. Q. Decl."), Ex. 63-1, ¶ 44. They encountered U.S. Customs and Border Protection officers near the border and turned themselves in. *Id.*, ¶ 34. They were held in a cramped detention center for a several days; J. fell ill and suffered from diarrhea and vomiting. *Id.*, ¶¶ 43-46.

One morning, officers forcibly took a sleeping J. from Ms. Q.'s arms. *Id.*, ¶ 52. As he was being taken away, he called for his "mama." *Id.* Ms. Q. was taken to the Laredo Processing Center, while J. was sent to an ORR facility in Chicago. Declaration of Gianna Borroto ("Borroto Decl."), Ex. 63-5, ¶ 2. The government has now kept Ms. Q. separated from her son for almost six months. Ms. Q. Decl.,

1    Ex. 63-1, ¶ 44

2          J. was only three years old when he was taken from his mother; he is now

3    four. The independent child advocate appointed to safeguard his interests in his

4    removal proceedings has concluded that it would be in J.'s best interests to be

5    immediately reunited with his mother, and that the separation is causing him high

6    levels of anxiety and deterioration. *See* Declaration of Ms. Q.'s attorney, Katherine

7    Melloy Goettel ("Goettel Decl."), Ex. 63, ¶ 59.

8          The government's sole stated basis for refusing to reunify Ms. Q. with J. is a

9    vague and unsubstantiated Salvadoran warrant dated February 2017, which alleges

10   that Ms. Q. is affiliated with a gang.[1] Goettel Decl., Ex. 63, ¶¶ 13-15. Ms. Q. has

11   not been convicted of gang affiliation, and has never been charged or convicted of

12   another crime. *Id.*, ¶¶ 16-18. Under Texas law—where Ms. Q. and J. were separated

13   and where Ms. Q. is currently detained—an arrest warrant without any evidence of

14   abuse, abandonment, or neglect, would not lead to the temporary removal of a child

15   or the permanent termination of parental rights. *See*, *e.g.*, Tex. Family Code, Title 5,

16   §§ 161.001(b), 262.104.

17         Moreover, an examination of the warrant only confirms that Ms. Q. cannot be

18   denied reunification. The warrant contains no allegation that Ms. Q. engaged in any

19   specific criminal activity, and contains no finding of probable cause. *See* Goettel

20   Decl., Ex. 63, ¶ 17. Ms. Q.'s counsel asked a Salvadoran attorney to review the

21   foreign court record. This Salvadoran attorney found nothing but an unexplained

22   allegation of gang "affiliation," and no evidence linking Ms. Q. to a crime. *Id.*, ¶¶

23   19-23. The warrant was likely issued erroneously after the Salvadoran police raided

24

25   _____

26   [1] Despite the repeated requests of Ms. Q.'s immigration counsel, the government
     only provided a copy of the Salvadoran warrant two business days before her
     scheduled immigration bond hearing. *See* Borroto Decl., Ex. 63-5. ¶ 4. The
27   government states that the warrant was renewed in June 2018, but has not yet
     provided Plaintiffs or Ms. Q.'s lawyers with a copy.  The government does not
28   contest that Ms. Q. is J.'s mother.

the house where Ms. Q. had been renting a room with her son. *Id.* ¶ 21.

In fact, Ms. Q.'s asylum claim—which an asylum officer deemed to establish a "credible fear of persecution"—is based on the persecution she fears from dangerous gang members. Goettel Decl., Ex. 63, ¶ 12. Ms. Q. categorically denies any affiliation with the gang, and attests that she knew nothing about any gang activity in the house where she was staying. Goettel Decl., Ex. 63, ¶ 21; Ms. Q Decl., Ex. 63-1, ¶¶ 18-21. Ms. Q. did speak with police officers after the raid. Goettel Decl., Ex. 63, ¶ 21; Ms. Q. Decl., Ex. 63-1, ¶¶ 18-21. Gang members later beat Ms. Q., presumably in retaliation for her speaking with the police.  As a result of this attack, she was left bloodied and bruised, and feared loss of sight in one eye. Goettel Decl., Ex. 63, ¶ 21; Ms. Q. Decl., Ex. 63-1, ¶¶ 18-21.

Furthermore, one of the government's own immigration judges has reviewed the warrant and found it insufficient to conclude that Ms. Q. poses a danger to the community. At Ms. Q.'s immigration bond hearing, the government presented the Salvadoran warrant as a reason why Ms. Q. could not be released. Borroto Decl, Ex. 63-5, ¶¶ 4-6. Although the immigration judge denied Ms. Q. bond due to flight risk concerns, the judge stated on the record that the government had failed to provide "sufficient evidence or information . . . upon which to find that [Ms. Q.] is a danger to the community."  Borroto Decl, Ex. 63-5, ¶¶ 8-10.

Finally, Professor Martin Guggenheim has reviewed the government's reasons for refusing to reunify Ms. Q. with J., and has confirmed that the warrant's "conclusory" allegations provide no basis "from which a court could infer that her child would be exposed to any kind of risk if returned to her custody." Guggenheim Decl., Ex. 65, ¶ 8.

In sum, Ms. Q.'s warrant from El Salvador provides no basis for concluding that she is unfit or would present a danger to her child.

***Mr. C.***  Mr. C. and his son, D., came to the United States in late April, having fled Honduras to escape imminent danger to their lives. *See* Declaration of Carolyn

Silane ("Silane Decl."), Ex. 64, ¶ 2.  At the time, D. was only one year old.  *Id.*
Gang members had kidnapped and held Mr. C. at gunpoint, threatening both him
and D.; other gang members have killed members of Mr. C.'s extended family.  *Id.*
Mr. C. has cared for D. since the child's birth, and became his formal, legal parent
with the blessing of D.'s biological mother.[2]  *Id.*, ¶ 8.

After father and son came to the United States, Border Patrol officers
approached and Mr. C. informed them of his fear of returning to Honduras. *Id.*, ¶ 3.
After a few days in detention, immigration officials accused Mr. C. of being a
criminal, and told him to say goodbye to his son. *Id.*, ¶ 4.  Mr. C. cried as he
watched officials separate him from D.; his son was nineteen months old at the
time. *Id.*, ¶ 4.  Mr. C. has not seen or heard from him since May 2018. *Id.*  He was
not there when D. turned two in ORR care recently.  *Id.*, ¶ 6.

While detained, Mr. C. was transferred to a jail near D. and told by officials
that he would be reunified with his son.  *Id.*, ¶ 7.  He was later told he would not be
reunified because he is not the son's biological father.  *Id.*  However, after showing
he was the child's legal parent, the government continued to refuse reunification,
this time based on a criminal conviction from eight years ago for which he received
less than 2 months of jail time. *Id.*, ¶ 8.

This conviction—a misdemeanor for aggravated assault from 2010—cannot
support the requisite finding that Mr. C. is an unfit parent or a danger to his child.
No children were involved in that incident.  *Id.*  Mr. C. served a sentence of only 48
days.  *Id.*  He has no other criminal history. *Id.*  Yet this conviction is the
government's sole basis for refusing to reunite Mr. C. with his young son.

As Professor Guggenheim's earlier declaration in this litigation explains,

_____

[2] The government previously refused to reunify Mr. C. and D. because of doubts
about parentage.  Silane Decl., Ex. 64, ¶ 7.  Mr. C.'s attorneys then provided the
government with documentary proof that Mr. C. is D.'s legal father. *Id.*  The
government has now told Mr. C.'s lawyers and Plaintiffs' counsel that they are no
longer refusing to reunify Mr. C. because of parentage concerns.  *Id.*

"criminal history is not a dispositive factor in determining whether remaining with a parent is in the best interest of a child." Guggenheim Decl., ¶ 9, Dkt. 78. This rule holds "even when a criminal conviction is for the most serious crimes." *Id.*, ¶ 8. Professor Guggenheim has reviewed information concerning Mr. C.'s conviction, and observed that hundreds of thousands of people with felony criminal convictions retain the right to the care and custody of their children. Guggenheim Decl., Ex. 65, ¶ 9. Mr. C.'s conviction, a misdemeanor, on its face does "nothing to support the inference that he would be a danger to his child at the present time or that reunification with his son would not be in the son's best interests." *Id.*

That conclusion finds further support in the recommendation of the independent child advocate for Mr. C.'s son, D., who has investigated the facts of the separation and has strongly urged that D.'s best interests require him to be reunified with his father. D.'s child advocate observed that prior to their separation, Mr. C. and his son were "very close," that the separation is "devastating" to D., and that there is no indication that Mr. C. had abused or neglected his son. *See* Young Center Supplemental Best Interests Recommendation for D ("Young Center D. BIR"), Ex. 64-1, at 2. The child advocate further notes that "no family member or ORR foster care staff members have expressed any concern that Mr. [C.] had abused or neglected his son." *Id*. Thus, "[s]o long as this separation keeps D. from living and growing under his father's care, D.'s health, safety, and well-being will continue to suffer and will likely worsen." *Id.*

Even if Mr. C.'s sole conviction bore any relevance to his fitness as a parent, which it does not, any claimed relevance is foreclosed by its staleness. The conviction occurred eight years ago, six years before D.'s birth, and cannot support a *current* finding that D. "is in imminent danger of abuse." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000). Nor could it support a finding that reunification with Mr. C. would not be in his son's best interests. *See In re Baby Girl M.*, 135 Cal. App. 4th 1528, 1542 (Cal. Ct. App. 2006) (finding three felony

drug and burglary convictions did not warrant termination of parental rights); *see also In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App. 2002) ("Although appellant's criminal history is a factor in determining the best interest of the children, it is not dispositive.").

## II.    There Is No Barrier to Reunifying Ms. Q. or Mr. C., Either by Releasing the Families or Placing Them in Family Residential Centers.

The Government appears to acknowledge that the mere presence of a criminal history, or allegations against a parent, does not render a parent per se dangerous.[3] It has nevertheless suggested that even if governing law would not justify the separation of parents like Ms. Q. and Mr. C. from their children, they cannot be reunited because their purported criminal histories render them inappropriate for family residential centers.

The government could address this issue by simply exercising its discretion to release both families from custody. *See* Dkt. 83 at 20 (emphasizing that government retains "discretion in matters of release and detention consistent with law"). But even if reunification in detention were the only option, neither Ms. Q. nor Mr. C. can reasonably be viewed as inappropriate for placement in family residential centers. Neither parent remotely presents danger concerns. Ms. Q. has never been convicted of any crime. The only allegations against her are thin and conclusory, contained in a foreign warrant that contains no finding of probable cause, and alleges mere criminal "affiliation" while failing to cite any facts that might indicate she has engaged in criminal conduct. And Mr. C. was convicted of a misdemeanor offense eight years ago, which surely cannot bar him from detention

---

[3] In fact, the government can only point to an unsubstantiated warrant for Ms. Q., which does not meet any fair definition of "criminal history." For example, in the U.S. Sentencing Guidelines, an individual's "criminal history" does not include unexecuted arrest warrants or even arrests. *See* U.S.S.G. § 4A1.1 (outlining the types of convictions that can add points to an individual's sentencing score).

1    with his child.[4]

2        In fact, both parents have been detained in DHS adult immigration detention

3    centers for months, without causing any disruption at those facilities. Goettel Decl.,

4    Ex. 63, ¶; Silane Decl., Ex 64, ¶ 11.  The government has not put forth any evidence

5    (other than their criminal histories) that they would be dangerous to their own

6    children, much less to other individuals. Ms. Q. and Mr. C. should satisfy any

7    reasonable standards that may apply to the government's decisions to place families

8    in family detention centers.  Where so much is at stake for these young children and

9    parents, the government cannot refuse to reunify based on unproven concerns about

10   danger.

11       **III.    Immediate Reunification Is Required to Prevent Continued**

12               **Irreparable Injury.**

13       Both families are suffering irreparable harm as a result of their separation. As

14   Ms. Q. herself testifies, she has recently suffered an anxiety attack brought on by

15   fears about J. and has been crying so much about his absence that her body aches.

16   Ms. Q. Decl., Ex. 63-1, ¶ 32.  J.'s child advocate states that when he first came to

17   ORR custody, he was crying and asking for his mother, and had crying fits that

18   lasted for two days. Goettel Decl., Ex. 63, ¶ 34.

19       J.'s immigration counsel reports that he has regressed significantly during his

20   time in ORR custody, and now exhibits significant speech and developmental

21   problems. For example, when he came to the United States with his mother he was

22   toilet trained, but now, at four years old, he needs diapers after having several

23   accidents. *See* Declaration of Colleen Kilbride ("Kilbride Decl."), Ex. 63-6, ¶ 4.

24   Unlike other children his age, J. currently cannot pronounce words and can only

25   _____

26   [4] The government may claim that its policies render parents with criminal histories
     per se ineligible for placement in family detention. Plaintiffs are aware of no such
27   policy, and in fact, there are cases of parents with criminal histories who have been
     detained in DHS family residential facilities. *See* Declaration of Manoj Govindaiah,
28   Ex. 66.

mimic noises. *Id.*, ¶¶ 5-6. Even more troubling, he no longer recognizes his mother's voice. Ms. Q. Decl., Ex. 63-1, ¶ 59.

Similarly, prior to their separation, Mr. C. spent every day with D.  Silane Decl., Ex. 64, ¶ 6.  Each time Mr. C. speaks with his attorneys, he is desperate to know how D. is doing and when he can see him again.  *Id.*, ¶ 5.  Mr. C. has difficulty keeping his voice from shaking when he explains that "papa" was one of the few words D. knew how to say at the time they were separated.  *Id.*  He now takes daily medication for depression since being detained, and suffers increasingly severe stomach pains and chest pains from anxiety over when he will see D. again. *Id.* at ¶ 11.  D. had his second birthday in ORR detention, apart from his father, *id.*, ¶ 6; his condition worsens with each additional day beyond the 134 he has already spent in custody, *see* Young Center D. BIR, at 1.  D.'s child advocate reports that he is confused, and understandably "struggle[s] to make sense of life in an ORR shelter." *Id.* at 2. The advocate fears that "[s]o long as this separation keeps [D.] from living and growing under his father's care, [D.'s] health, safety, and well-being will continue to suffer and will likely worsen." *Id.*

## IV.    Conclusion

The government has no reasonable justification for keeping Ms. Q. and Mr. C. apart from their children. For the reasons above, this Court should order their immediate reunification.

Dated: September 13, 2018                    Respectfully Submitted,

*/s/Lee Gelernt*
Bardis Vakili (SBN 247783)          Lee Gelernt*
ACLU FOUNDATION OF SAN              Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES           Anand Balakrishnan*
P.O. Box 87131                      AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131            UNION FOUNDATION
T: (619) 398-4485                   IMMIGRANTS' RIGHTS PROJECT
F: (619) 232-0036                   125 Broad St., 18th Floor
*bvakili@aclusandiego.org*          New York, NY 10004
                                    T:  (212) 549-2660
Stephen B. Kang (SBN 2922080)       F:  (212) 549-2654
Spencer E. Amdur (SBN 320069)       *lgelernt@aclu.org*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org

jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Admitted Pro Hac Vice

18cv0428

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2018, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt

Lee Gelernt, Esq.

Dated: September 13, 2018

18cv0428

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' SUPPLMENTAL MEMORANDUM IN SUPPORT OF CLASS-WIDE PRELIMINARY INJUNCTION**

**REDACTED TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---|---|---|
| 63 | Declaration of Katherine Melloy Goettel | 13-21 |
| 63-1 | Affidavit of Ms. Q–Under Seal | |
| 63-2 | Credible Fear Worksheet–Under Seal | |
| 63-3 | El Salvador Warrant and English Translation–Under Seal | |
| 63-4 | Report of El Salvador Attorney–Under Seal | |
| 63-5 | Redacted Declaration of Gianna Borroto | 22-25 |
| 63-6 | Redacted Declaration of Colleen Kilbride | 26-28 |
| 63-7 | Redacted Young Center Report | 29-32 |
| 64 | Declaration of Carolyn A. Silane | 33-37 |
| 64-1 | Redacted Best Interests Recommendation | 38-41 |
| 65 | Supplemental Declaration of Martin Guggenheim | 42-46 |
| 66 | Supplemental Declaration of Manoj Govindaiah | 47-50 |

# EXHIBIT 63

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

*Attorneys for Petitioners-Plaintiffs*         *\*Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: September 13, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE") et al., | |
| *Respondents-Defendants.* | **DECLARATION OF KATHERINE E. MELLOW GOETTEL** |
| | Class Action |
| | **NO HEARING DATE** |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## DECLARATION OF KATHERINE E. MELLOY GOETTEL

I, Katherine Melloy Goettel, pursuant to 28 U.S.C. § 1746, swear under penalty of perjury that the following statement is true and correct to the best of my knowledge.

1.      My name is Katherine Melloy Goettel and I am a Senior Litigation Attorney at the National Immigrant Justice Center (NIJC) in Chicago, Illinois.  I have worked at NIJC since June 2017.  I previously worked for eight years in the Department of Justice's Office of Immigration Litigation.

2.      This declaration is based on my own knowledge and that of other NIJC staff members and is supported, as applicable, by the exhibits attached hereto.

3.      The NIJC is a non-profit legal organization that operates an Immigrant Children's Protection Project.  The project provides legal services to thousands of unaccompanied immigrant children held in Chicago-area shelters each year.  In this capacity, NIJC attorneys began representing Ms. Q.'s son, J., who was transferred to a Chicago-area shelter after his separation from his mother, Ms. Q., at the border.

4.      NIJC and *pro bono* attorneys from Gibson, Dunn & Crutcher LLP also serve as joint counsel to Ms. Q.

## A.      Ms. Q. and J.'s Immigration to the United States

5.      Ms. Q. is a native of El Salvador and the mother of her four-year-old son, J., who was only three years old when they entered the United States in March 2018. *See* Ex. 1, Ms. Q. Decl. at ¶ 34.  Ms. Q. entered the United States with J. to seek asylum in the United States.  *Id.* at ¶ 3.  Her claim for protection in the United States stems from gender violence by multiple perpetrators, gang-related violence, and false accusations of gang affiliation by the Salvadoran government.  *Id.* at ¶ 21-25.

6.      On March 22, 2018, Ms. Q. and J. entered the United States following an arduous journey from El Salvador.  *Id.* at ¶ 34; Ex. 2, Credible Fear Worksheet.

7.      Ms. Q. and J. quickly encountered by U.S. Customs and Border Protection (CBP) officers.  Ex. 1, Ms. Q. Decl. at ¶ 42.  The officers interviewed Ms. Q., arrested her and J., and transported them to a CBP holding station.  *Id.* at ¶ 43.  The

officers took Ms. Q. and J. to a small cell, which was crowded with other parents and their children. *Id.* at ¶ 44.

8.      A day or so later, immigration officers moved Ms. Q. and J. to a chain-linked holding cell, which was akin to a cage. *Id.* at ¶ 46.  In the cage, J. began to vomit and had diarrhea. *Id.*  Because of his vomiting and diarrhea, Ms. Q. told the officers J. was sick, but they would not give him any medical attention. *Id.*

9.      Ms. Q. provided the officers with J.'s birth certificate. *Id.* at ¶ 51.  The birth certificate lists Ms. Q. as J.'s mother.   The officers did not question that Ms. Q. is J.'s biological mother.

10.      Approximately the next morning, J. was sleeping in Ms. Q's arms when the officers asked that Ms. Q and J. come together to see the officers. *Id.*  One of the officers told Ms. Q. to give J. to a woman who appeared to be a Government employee. *Id.* at ¶ 52.  Ms. Q. pleaded with them not to take J. *Id.*  The officers said, "don't force us to take him." *Id.*  Ms. Q. hugged J. tightly but they seized him from her arms. *Id.*  The officers then put J. on the ground and forced him to stand up. *Id.* He woke up and said "mama." *Id.*  The officers then took her away from J. *Id.*

11.      Soon after, Ms. Q. was lined up with other immigrants to be transported to the Laredo Processing Center. *Id.* at ¶ 53.  On her way out, Ms. Q. saw J. sitting alone in a cage. *Id.*  He was looking around, as if trying to find her. *Id.* at ¶ 53.  Ms. Q. tried to hide herself so that J. would not be frightened by seeing the officers take her away. *Id.*  This was the last time Ms. Q. saw her son.

12.      Approximately a day after ICE transferred Ms. Q. to the Laredo Processing Center, an asylum officer interviewed her to determine if she had a "credible fear of persecution" if she was returned to El Salvador, which is the prefatory step to obtain asylum. *Id.* at ¶ 57.  The asylum officer found that Ms. Q. had a credible fear of persecution in El Salvador, meaning she had a "significant possibility" of asylum eligibility. *See* 8 U.S.C. § 1225(b)(1)(B)(v); Ex. 2, Credible Fear Worksheet.

**B.     The Government's Denial of Reunification to Ms. Q.**

13.     Ms. Q. was not reunited with J. by the fourteen-day deadline set out in the Court's preliminary injunction order.

14.     On July 12, 2018, in an email from an ICE officer to NIJC counsel, ICE stated that Ms. Q. would not be reunited with J. because of a foreign warrant alleging gang affiliation.  The Government did not provide any other basis for finding that Ms. Q. was unfit or a danger to her child.

15.     This was the first time that NIJC counsel learned the reason why the Government had refused to reunite Ms. Q. and J.  The Government had never previously indicated to Ms. Q. or counsel that it intended to deny her reunification. Nor had it provided Ms. Q. or her counsel with a copy of the warrant or any underlying evidence supporting the warrant or any factual details about her alleged "criminal history."

**C.     Ms. Q.'s Immigration Court Proceedings and the Illegitimacy of the**
**        Salvadoran Arrest Warrant**

16.     After repeated requests for the Government to provide a copy of the arrest warrant, ICE finally provided a copy of the warrant to NIJC on July 20, 2018.  Ex. 5, Borroto Decl. at ¶ 5.  The Government provided no other evidence of her alleged criminal history.

17.     The one-page warrant alleges the nebulous charge of "terrorist organizations."[1]  Ex. 3, El Salvador Warrant and English Translation.  The warrant does not allege that Ms. Q. engaged in any specific criminal activities, nor does it offer specific dates, times, or places of such alleged activity, or cite any evidence to support the charge.  *Id.*  The warrant does not state any finding of probable cause.  *Id.*

---

[1]  The warrant cites to the Salvadoran Special Law Against Terrorist Acts ("LECAT"), which classifies MS as a terrorist organization in El Salvador. Though the warrant contains no further details relating to the charge, the "terrorist organization" charge appears to reference unsubstantiated allegations of gang affiliation.

18.     Ms. Q. has never been convicted of any crime, either in El Salvador or the United States.

19.     Ms. Q.'s counsel retained a licensed attorney in El Salvador to examine the allegation that she committed the offense of "terrorist organizations."  Ex. 4, Report from El Salvador Attorney.  *Id.*  The attorney reviewed the evidence submitted in conjunction with the arrest warrant.  *Id.*

20.     The evidence did not contain any specific information about Ms. Q.  *Id.* Rather, the evidence related only to a larger anti-gang operation that involved an incident at the house in El Salvador where Ms. Q. had been renting a room for herself and J.  *Id.*  Ms. Q. did not know the other occupants of the house very well, and she tended to keep to herself.  Ex. 1, Ms. Q. Decl. at ¶ 18.  Ms. Q. never saw or suspected any gang activity was taking place in the house.  *Id.*

21.     The warrant appears to arise from an incident in July 2016, when Ms. Q. was at home with her son and heard commotion outside the house.  *Id.* at ¶ 21.  People were running near the house while she heard the sounds of cars and police officers outside.  *Id.*  Ms. Q. took J. in her arms and stayed in her room.  The police officers came in the house, guns drawn, and began searching the house.  *Id.*  They yelled at her, telling her to go outside, and kept the guns pointed at her and her son, who was still in her arms.  *Id.*  They asked Ms. Q. questions about whether she was involved in a gang, and if she knew where the gang members were.  Ms. Q. told them that she has never been affiliated with a gang.  *Id.*  The police officers questioned her, saved a copy of her identification, and photographed her.  *Id.* at ¶ 21-22.

22.     The Salvadoran attorney found no evidence suggesting that Ms. Q. had ever engaged in gang-related activity.  Ex. 4, Report from El Salvador Attorney; Ex. 1, Ms. Q. Decl. at ¶ 33.  To the contrary, her entanglement in the case appears to be based solely on the fact that she rented a room in a house where gang activity allegedly occurred.  Ex. 1, Ms. Q. Decl. at ¶ 33.

23.     Days after the raid, Ms. Q. was attacked and physically beaten in the face by people who appeared to be gang members. *Id.* at ¶ 24-25. Ms. Q. believes she was beaten by the gang because they were aware she talked to police at the house that had been raided. *Id.* As a result of the attack, Ms. Q.'s face turned purple and blood came out of her nose, mouth, and one of her eyes. *Id.* at ¶ 26. She had trouble seeing out of that eye for a long time and feared she was going blind. *Id.*

24.     In connection with her asylum proceedings, Ms. Q. had a bond hearing before an immigration court on July 31, 2018. *See* Ex. 5, Borroto Decl. at ¶ 7. Before the hearing, Ms. Q.'s counsel submitted the Salvadoran attorney's report, as well as country conditions reports explaining that false accusations of gang activity by police are common in El Salvador. *Id.*

25.     At the July 31 immigration court hearing, ICE offered no explanation, context, or evidence to support the arrest warrant. *Id.* at ¶ 8. ICE made no witness available for Ms. Q. to cross-examine about the origins of the arrest warrant. *Id.*

26.     After hearing argument and reviewing the evidence, which included the El Salvador arrest warrant and the report from the Salvadoran attorney, the immigration judge found that Ms. Q. was not a danger to the community. *Id.* at ¶¶ 9-10. He stated, "I don't find that she is a danger. I do not have sufficient evidence or information in front of me upon which to find that she is a danger to the community." *Id.* ¶ 10.

27.     The immigration judge nevertheless denied her bond based on a perceived flight risk, despite the fact that Ms. Q. has a sponsor willing and able to receive her and her son. Ex. 5, Borroto Decl. at ¶ 9. Accordingly, Ms. Q. remains detained and still has not been reunified with her son. *Id.* at ¶ 11.

28.     On August 15, 2018, at the request of Ms. Q., *Ms. L.* class counsel asked the Department of Justice (DOJ) to reconsider its decision not to reunify Ms. Q. and her son, J., and provided DOJ counsel with the evidence submitted to the immigration

court, as well as an affidavit documenting the immigration judge's "no danger" finding.

29.     On August 28, 2018, DOJ counsel responded that DHS would not reconsider its decision.  DOJ counsel further stated that the arrest warrant was renewed in June 2018 based on the same factual information.  Despite requests on August 23 and 28, 2018, DOJ counsel has not provided a copy of the renewed arrest warrant to Ms. Q. or her counsel.  Nevertheless, the Government continues to separate Ms. Q. from her son based on an untested arrest warrant.

30.     Ms. Q. has not caused any problems while she has been in Government custody.

**D.     Ms. Q. and Her Son, J., Continue to Irreparably Suffer Every Day They Remain Apart**

31.     As of the date of this declaration, Ms. Q. has been separated from J. for more than five months.

32.     The effect of the separation on both Ms. Q. and J. is profound.  Ex. 1, Ms. Q. Decl. at ¶ 60.  Ms. Q. has had significant trouble sleeping and cannot stop thinking about her son.  *Id.*  On September 3, 2018, Ms. Q. had an anxiety attack.  *Id.*  Her blood pressure rose, her lips got swollen, and she was trembling.  *Id.*  Ms. Q. also reports that she has been crying so much her body aches.  *Id.*

33.     Ms. Q. has had very limited opportunities to communicate with J.  About a month after Ms. Q. arrived at the Laredo Processing Center, she was finally given the opportunity to speak with J. on the phone.  *Id.* at ¶ 58.  The first conversation lasted about ten minutes.  *Id.*  J. said "mama," but could not say much beyond that.  *Id.*  J.'s shelter caseworker told Ms. Q. not to cry on the call because it would upset J., so Ms. Q. sang a song with J. and told him she loved him and would see him soon.  *Id.*  Ms. Q. has only been able to speak with J. over the phone in a limited number of other instances and he shows signs of deterioration.  *Id.* at ¶ 58.  On recent calls, J. has been

confused and angry and has not recognized his mother's voice.  Ex. 1, Ms. Q. Decl. at ¶ 59.

34.    J. is suffering irreparably.  Once toilet trained, he has reverted to having to wear diapers after repeatedly having accidents.  Ex. 6, Kilbride Decl. at ¶ 4; *see also* Ex. 1, Ms. Q. Decl. at ¶ 59.  He is also suffering from developmental delays, and a psychiatrist has diagnosed him with a mild expressive and receptive language disorder. Kilbride Decl. at ¶¶ 4, 6; Ex. 7, Young Center Decl. at p. 3.  A federally appointed child advocate from the University of Chicago's Young Center for Immigrant Children's Rights has recommended that J.'s best interest is to be reunified with his mother.  Ex. 7, Young Center Decl. at p. 2.

35.    To this day, Ms. Q. remains detained in Laredo, Texas.  J. remains at an Office of Refugee Resettlement shelter for unaccompanied children in Chicago, Illinois.

Executed in Chicago, Illinois, on September 13, 2018.

Katherine Melloy Goettel
Senior Litigation Counsel
National Immigrant Justice Center
208 S. LaSalle St., Ste. 1300
Chicago, IL  60604
Telephone:  (312) 660-1370

7

# EXHIBIT 63-5

Exhibit 63-5 Page 22

## Declaration of Gianna Borroto

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury as follows:

1. My name is Gianna Borroto. I am a supervising attorney at the National Immigrant Justice Center (NIJC) in Chicago, Illinois. NIJC is the Legal Services Provider for unaccompanied immigrant children detained in Office of Refugee Resettlement (ORR) care in the Chicago area.

2. In the course of my work with NIJC's Immigrant Children's Protection Project, I learned of the case of J███████ ████████████████████ (A ███████044), a four year old boy currently detained at the ███████████ ██████████████████ ORR shelter in Chicago. Through communications with the shelter and ORR, I learned J███████ was separated from his mother ███████████ Q███████ ██████ (A ████-043), who is currently detained at the Laredo Contract Detention Center in Laredo, Texas.

3. I currently represent both Ms. Q███████ ██████ and J███████ in their immigration proceedings.

4. In my communications with ORR and Immigration and Customs Enforcement (ICE), I learned that ██████ and J███████ would not be reunified under Judge Sabraw's order in the *Ms. L v. ICE* case because of a Salvadoran warrant for Ms. Q███████ ██████ arrest.

5. Despite NIJC's efforts to obtain a copy of the warrant, ICE did not produce the warrant until July 20, 2018, when Assistant Chief Counsel Mark Miller emailed me a copy of the warrant, two business days before Ms. Q███████ ██████ scheduled bond hearing on July 24, 2018.

6. On July 24, 2018, I represented Ms. Q███████ ██████ at her master calendar hearing before the San Antonio Immigration Court. Immigration

DECLARATION OF GIANNA BORROTO - 1

Exhibit 63-5, Page 23

Judge Justin Adams granted Ms. Q███████ a continuance until July 31, 2018.

7. On July 31, 2018, I represented Ms. Q███████ at her bond hearing before Judge Adams. During the hearing, I explained that the Salvadoran warrant for Ms. Q███████ arrest is unreliable because it contains internal inconsistencies, incorrect biographical information, and comes from an unknown source. I submitted a report written by ██████████████, a Salvadoran attorney who reviewed Ms. Q███████'s court file in El Salvador. I explained that Mr. ████████ found nothing in the record to connect Ms. Q███████ to gang-related activity, apart from the fact that she lived in a house where gang activity allegedly occurred.

8. At the July 31 hearing, ICE offered no explanation, context, or evidence to support the arrest warrant. ICE made no witness available for Ms. Q█████ to cross-examine about the origins of the arrest warrant.

9. At the conclusion of the hearing, Judge Adams stated that he did not find Ms. Q███████ to be a danger. However, Judge Adams declined to issue Ms. Q███████ a bond based on flight risk concerns.

10. Upon request, the San Antonio immigration court provided me the audio files from Ms. Q███████'s July 31 bond hearing. I listened to the audio files and confirmed that Judge Adams stated, "I don't find that she is a danger. I do not have sufficient evidence or information in front of me upon which to find that she is a danger to the community."

11. To date, Ms. Q███████ and her son have not be reunified, despite Judge Adams's finding that Ms. Q███████ is not a danger.

DECLARATION OF GIANNA BORROTO - 2

Exhibit 63-5, Page 24

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on September 13, 2018, in Chicago, Illinois.


Gianna Borroto
Supervising Attorney
National Immigrant Justice Center

DECLARATION OF GIANNA BORROTO - 3

Exhibit 63-5, Page 25

# EXHIBIT 63-6

Exhibit 63-6, Page 26

## Affidavit of Mary Colleen Kilbride

I, Mary Colleen Kilbride, under penalty of perjury of law, hereby declare the following:

1. My name is Mary Colleen Kilbride. I am a staff attorney at the National Immigrant Justice Center (NIJC) in Chicago, Illinois. NIJC is the Legal Services Provider for unaccompanied immigrant children detained in Office of Refugee Resettlement (ORR) care in the Chicago area.

2. In the course of my work with NIJC's Immigrant Children's Protection Project, I learned of the case of J█████████████████████ (A █████044), a now four year old boy currently detained at the █████████████████████ORR shelter in Chicago. Through communications with the shelter and ORR, I learned J██████was separated from his mother█████████Q██████████(A█████-043), who is currently detained at the Laredo Contract Detention Center in Laredo, Texas.

3. I currently assist my supervising attorney, Gianna Borroto, who represents both Ms. Q████████████and J████████in their immigration proceedings.

4. In my communications with Ms. Q████████████, I learned that ORR shelter staff informed her that J██████needs to be seen by a specialist for his developmental delays. The ORR shelter staff stated that J██████still requires diapers on a daily basis due to continued bathroom related accidents and that his speech capabilities are noticeably underdeveloped for his age.

5. Ms. Q████████████is understandably concerned for her son's physical, mental, and social development. She is acutely distraught over her inability to parent her son as needed. She is desperate to seek the crucial behavioral and speech attention for her son and to implement necessary educational training as his mother and first teacher.

1

Exhibit 63-6, Page 27

6. On August 27th, 2018, I spoke with ORR shelter director, Ms. ██████████, where J█████ resides. Ms. ██████ confirmed the shelter referred J█████ to the program psychiatrist, Dr.█████ due to J█████'s behavioral and speech developmental delays. Ms.█████ reported that J█████ is significantly delayed in speech and bathroom development as compared to typically developed children his own age. The program psychiatrist recommended support and training for Ms. Q██████████ so that she can effectively teach the necessary speech, behavioral, and life skills J█████ lacks.

7. Ms.█████ reported that typical four year olds are potty-trained and speak in basic sentences. Ms. █████ stated that J█████cannot pronounce words; he can only mimic noises at this stage.

8. Ms.█████ reported the ORR shelter is working to connect J█████ with a speech therapist, but that finding a provider has been challenging given obstacles within ORR and insurance. Ms.█████ highlighted J█████'s need for speech therapy, but explained he is not yet receiving speech therapy recommended by the program psychiatrist.

I swear under penalty of perjury that the above declaration is true and correct to the best of my ability.

_M Colleen Kilbride_                              _8/28/2018_

Mary Colleen Kilbride                              Date

2

Exhibit 63-6, Page 28

# EXHIBIT 63-7

Exhibit 63-7, Page 29

**THE YOUNG CENTER FOR IMMIGRANT CHILDREN'S RIGHTS**
**CHICAGO OFFICE**

*via electronic mail*

August 24, 2018

Julissa Portales Banzon
Federal Field Specialist
Administration for Children and Families
Mary E. Switzer Building
330 C. Street, SW
Washington, DC 20201
Julissa.Banzon@acf.hhs.gov

Officer Geoffrey Pepple                          Officer Francisco J. Esqueda Jr.
Field Office Juvenile Coordinator               Deportation Officer
Enforcement & Removal Operations                Enforcement & Removal Operations
101 West Congress Parkway, Suite 4000           4702 East Saunders
Chicago, IL 60605                               Laredo, TX 78041
Geoffrey.T.Pepple@ice.dhs.gov                   Francisco.Esqueda@ice.dhs.gov

Re:    **Best Interests Recommendation for Separated Child** ██████████████████
       ██████████**, A#** █████**-044, son of** ████████ **Q**████████**, A#** █████**-043**

Dear Ms. Banzon, Officer Pepple, and Officer Esqueda:

The Young Center for Immigrant Children's Rights serves as the federally-appointed Child Advocate
for J██████ ████████████████████ a detained unaccompanied child, pursuant to the William
Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA).[1] J████████ is currently in
ORR custody at the ██████████████████ facility in Chicago. J████████ entered the
United States with his mother, ████████ Q████████, on or around March 22, 2018. At that
time, DHS officials improperly separated J████████ from his mother. As of today, J████████ has been
separated from his mother for 151 days.

Four-year-old[2] J████████ was taken from his mother at a moment of intense vulnerability after a journey
from El Salvador that ended with their joint apprehension. The care, protection, and love of a parent
during periods of transition or heightened anxiety is both a fundamental need—and right—of children.
Moreover, there is no reason to believe that Ms. Q████████████ poses any threat to her son's
welfare. **Thus, we have determined that it is in J**████████**'s best interests to be reunified with his
mother and immediately released from detention. As long as J**████████ **and his mother remain
separated, we recommend that ORR and ICE ensure that they regularly communicate via video
calls.**

---

[1] 8 U.S.C. § 1232(c)(6) (Westlaw through Pub. L. No. 115-182) (authorizing the Secretary of Health and Human Services "to
appoint independent child advocates for child trafficking victims and other vulnerable unaccompanied alien children"). The
role of the Child Advocate, much like a guardian ad litem, is to identify and represent the best interests of the child, and to
develop recommendations pertinent to the child's custody, detention, release, legal representation and repatriation. A copy of
the Child Advocate Recommendation and Appointment Form is attached.
[2] J████████'s date of birth is ████████ 2014.

Exhibit 63-7, Page 30

As J█████'s Child Advocate, we are charged with recommending a course of action that will safeguard his best interests. The Young Center grounds its best interests advocacy in federal, state, and international law. Specifically, we draw upon the Convention on the Rights of the Child and its proclamation that "[i]n all actions concerning children, . . . the best interests of the child shall be a primary consideration."[3] We also rely upon the TVPRA which requires that each child in ORR custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child."[4]

In this case, ongoing separation is likely to severely harm both J█████ and Ms. Q█████████ and undermine J█████'s best interests. A large body of scientific evidence has shown that "separating children from their mothers or fathers leads to serious, negative consequences to children's health and development."[5] The American Psychological Association cautions that the longer a child is separated from a parent, the more likely she is to experience depression and anxiety.[6]

Moreover, the United States Supreme Court has consistently recognized the importance of the family unit and the right of parents to care for their children.[7] Specifically, the Supreme Court has declared that the Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[8] Indeed, the fundamental right to care for one's child is "perhaps the oldest of the fundamental liberty interests recognized by [the] Court."[9] This fundamental right was affirmed on June 28, 2018, when the United States District Court, Southern District of California, issued a preliminary injunction ordering the federal government to stop all parent-child separations absent a finding that the parent is unfit or presents a danger to the minor.[10]

J█████'s best interests—his health, well-being, and permanency—depend upon his prompt reunification with his mother and their immediate release from detention. J█████'s separation from his mother has already taken its toll.  When he arrived in care, the ████████ program psychiatrist evaluated J█████ and noted that J█████ was crying and asking for his mother. His crying fits lasted for two days. The psychiatrist's evaluation suggests a diagnosis of adjustment disorder-anxious mood. That diagnosis is further substantiated by the fact that ████████ staff has observed that J█████ continues to

---

[3] G.A. Res. 44/25, Convention on the Rights of the Child, art. 3 (Nov. 20, 1989).

[4] 8 U.S.C. § 1232(c)(2)(A) (Westlaw).

[5] Letter to Kirstjen M. Nielsen, Sec'y, U.S. Dep't of Homeland Sec. 2 (Jun. 7, 2018), https://static1.squarespace.com/static/597ab5f3bebafb0a625aaf45/t/5b196fbf70a6ade9adfb3377/1528393664012/REV_2018_06_07_Child+Welfare+Juvenile+Justice+Opposition+to+Parent+Child+Separation+%281%29.pdf (citing *Parents and Caregivers are Essential to Children's Healthy Development*, AM. PSYCHOLOGICAL ASS'N, http://www.apa.org/pi/families/resources/parents-caregivers.aspx).

[6] Letter to John F. Kelly, Former Sec'y, U.S. Dep't of Homeland Sec. 1 (Apr. 5, 2017), http://www.apa.org/advocacy/immigration/separating-families.pdf.

[7] *See, e.g.*, Santosky v. Kramer, 455 U.S. 745, 767 (1982) (declaring that a state "registers no gain toward its declared goals when it separates children from the custody of fit parents") (quoting Stanley v. Illinois, 405 U.S. 645, 652 (1972)).

[8] Troxel v. Granville, 530 U.S. 57, 66 (2000).

[9] *Id.* at 65. Undocumented immigrant parents also enjoy the fundamental right to care for their children—to the same extent as parents who are citizens or lawful immigrants. As the Supreme Court has made clear: "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

[10] Ms. L. v. United States Immigration & Customs Enf't, No. 18 CVO 428, 2018 WL 3129486, at *22-23 (S.D. Cal. June 06, 2018). The Court further ordered the government to reunify all separated children under the age of five within 14 days and all other separated children within 30 days. *Id.* at *23.

Exhibit 63-7, Page 31

present with a high level of anxiety. So long as this separation keeps J███████ from living and growing under his mother's care, his health, safety, and well-being will continue to suffer and likely will worsen.

The psychiatrist also diagnosed J██████ with mild expressive and receptive language disorder provisionally and recommended speech therapy. However, he has not yet been connected to the services he requires. Therefore, J███████'s prolonged detention prevents him from accessing appropriate language and developmental services.

We therefore urge ORR and ICE to work together to promptly reunify and release J███████ and his mother. We further recommend that, until the government reunifies J███████ with his mother, ORR and ICE should coordinate to ensure that J███████ regularly communicates with his mother via video calls.[11]

If you have any questions or concerns, please do not hesitate to contact us at 312-882-0571 or mchumil@theyoungcenter.org.

Sincerely,

Marisa Chumil, LCSW
Child Advocate Supervisor

Kelly Albinak Kribs, Esq.
Staff Attorney

Encl.

cc:     DHS Office for Civil Rights and Civil Liberties
        Marivic Fields, Senior Advisor for Child Well-being and Safety, Administration for Children and Families
        ███████████████ Director, ██████████████████
        Gianna Borroto, Supervising Attorney, National Immigrant Justice Center
        Jennifer Nagda, Policy Director, The Young Center for Immigrant Children's Rights

---

[11] *See* U.S. IMMIGRATION AND CUSTOMS ENF'T, POLICY NO. 11064.2, DETENTION AND REMOVAL OF ALIEN PARENTS OR LEGAL GUARDIANS § 5.4 (2017) ("In the event an alien parent or legal guardian is detained, ICE will facilitate a means of regular visitation between the parent and minor child(ren).").

Exhibit 63-7, Page 32

# EXHIBIT 64

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al.,<br><br>     *Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); ,<br><br>     *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: September 13, 2018<br><br>**DECLARATION OF CAROLYN A. SILANE**<br><br>Class Action |

I, Carolyn A. Silane, declare and state pursuant to 28 U.S.C. § 1746:

1.  I am an attorney licensed to practice law in the States of New York and California. I am an Associate at Morgan, Lewis & Bockius LLP (the "Firm"). The Firm was retained to represent Mr. C. on July 13, 2018.  I have been the primary

attorney assigned to the case and have worked with Mr. C. directly since that day.  I make this affidavit of my own knowledge, conversations with my client, and government officials, and could and would competently testify to the matters contained herein if called upon to do so. I submit this affidavit in support of Petitioner-Plaintiff' Brief Regarding Reunification of Two Parents.

2.   On April 30, 2018, Mr. C. and his then 19-month old son, D, arrived in the United States after fleeing Honduras to escape explicit death threats from members of gangs that had kidnapped and held Mr. C. at gun point; threats against his and his baby's lives; and threats from other gang members that had already killed multiple members of Mr. C's extended family.

3.   Immediately upon encountering border patrol officers on April 30, Mr. C. informed them of his fear of returning to Honduras.  Mr. Coto spent his first few days in the United States in detention huddling together with D, who was 19 months old at the time, just to stay warm.  Mr. C. described the holding facility as being "like a freezer," leaving him and D. shivering and shaking with only thin aluminum blankets to keep them warm.

4.   On the third day in detention, immigration officials accused Mr. C. of being a criminal, and told him to say "goodbye" to his son because they were "taking him away."  Mr. C. cried as he watched officials take his 19-month old baby away from him.  May 2, 2018 was the last time Mr. C. saw, or heard from, his son.  Prior to that time, Mr. C. had spent every day with D.

5.   Each time Mr. C. speaks with me, he asks desperately about how D. is doing and when he can see him again.  Talking about D. recently, Mr. C. had a hard time keeping his voice from shaking when explaining that calling him "papa" was one of the few words D. knew how to say at the time they were separated.

6.   D was nineteen months old when they were separated, and has turned two recently while in ORR custody.

7.   While detained, Mr. C. was transferred from a detention facility in Texas to

one in New Jersey, close to where D. is in ORR care.  He was told by detention officers that he would be reunified with D, but later was told he would not be reunified because he was not D's biological father.

8.  In fact, Mr. C. adopted D, with the blessing of D's biological mother, and is D's legal father under Honduran law.  He has seen and cared for D. every day since the day D. came home from the hospital, taking him to parks, bathing and feeding him.  After our office provided proof that Mr. C is D's legal father, the government continued to deny reunification on the basis of his criminal history.

9.  The government's sole cited reason for refusing to reunite Mr. C. and D. now is Mr. C's 2010 misdemeanor conviction for aggravated assault, for which he received 48 days of jail time. Mr. C. has no other criminal history.  No children were involved in the incident that led to Mr. C's conviction.  The government has informed me that it no longer contests Mr. C's parentage, but will not reunify the family based on security concerns at family detention centers.

10.  D has a federally-appointed Child Advocate, who has evaluated D's best interests, including his safety and well-being, and concluded that D. should be immediately reunified with Mr. C.  That Best Interests Recommendation is attached as an Exhibit A to my declaration.

11.  I have spoken to Mr. C. many times during my representation.  He has been suffering extreme anxiety in custody out of concern for his son, and in the last few weeks has been experiencing increasingly severe stomach pains and, recently, chest pains due to the anxiety about when he will ever see his child again.  Mr. C takes daily medication for depression since being detained, and often cries when he is alone in his cell, overwhelmed with concern for his son.

12.  It is my understanding and belief that Mr. C. has not had any issues while in detention, has conducted himself a model way, and attends an informal prayer group each day.

13.  On August 23, 2018, I was present for Mr. C.'s reasonable fear interview

during which a USCIS official found that Mr. C. has a reasonable fear of return to Honduras.

Executed this 13th day of September 2018, in New York, NY.

*s/Carolyn A. Silane*
Carolyn A. Silane

# EXHIBIT 64-1

Exhibit 64 Page 38

Priscilla Monico Marín, Esq.                    Elizabeth Frankel, Esq.
Staff Attorney, Child & Family Rights Project   Associate Director

Encl.

cc:   Marivic Fields, Office of Refugee Resettlement
      Jill Volovar, Office of Refugee Resettlement
      Alexa Mutt, Case Manager, LSSNY
      Carolyn Silane, Esq., Morgan Lewis, Attorney for D███████████ and ███████G███

Exhibit 64-1, Page 39

**Mr. C██ is D███'s legal parent under Honduran law.** Mr. C██ signed D███'s birth certificate, which the Honduran Consulate has verified. Moreover, no other adult male has come forward to claim parentage of D██. In Honduras, there is no further steps for the father to legally adopt the child.[3] When a Honduran child is adopted, the child's original birth certificate is canceled and a new one is issued without any annotation that an adoption has taken place.[4] D███'s mother has been clear that Mr. C██ is D███'s father. There is no additional legal documentation that Mr. C██ or Ms. ████████ can or should need to provide regarding Mr. C██s parentage beyond D███ birth certificate.

**Both of D███'s parents believe it is in his best interest to be reunified with his father, Mr. C██, and such reunification presents no safety concerns.** Mr. C██ and Ms. ████████ are a couple and are raising D██ together. As D███'s parents, they jointly decided that Mr. C██ would travel with D██ to the United States. Since the Young Center was appointed on this case, we have had the opportunity to speak in detail with both of D██'s parents. D███'s mother reports that D██ and his father are very close and that D██'s continued separation from his father is harmful and devastating to D██. Mr. C██ has been present in D███'s life since birth and has acted as one of his primary caretakers. Mr. C██ has also assumed financial responsibility for D██ and has assumed the cost of his care. Moreover, no family member or ORR foster care staff members have expressed any concern that Mr. C██ had abused or neglected his son. Furthermore, there is no evidence that raises trafficking concerns in this case.

**Continued separation is likely to cause irreparable harm to this young child.** D███'s separation from his father has taken a significant toll on the toddler's health and well-being. D███ is confused, and he struggles to make sense of life in an ORR shelter. D██ needs his father to love, comfort, and guide him. So long as this separation keeps D██ from living and growing under his father's care, D██'s health, safety, and well-being will continue to suffer and will likely worsen.

For all these reasons, we urge ORR and ICE to work together and reunify D██ with Mr. C██, his father, without delay. This is what both parents want for their child. We further recommend that, until the government reunifies D██ with his father, ORR and ICE coordinate to ensure that D██ regularly visits Mr. C██ in person.[5] **Given the urgency of this case and the child's prolonged separation from father, we respectfully request a staffing to discuss this matter immediately.**

If you have any questions or concerns, please do not hesitate to contact us at 718-354-5490 or PMonicoMarin@theyoungcenter.org.

Sincerely,

---

[3] U.S. Dep't of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/us-visas/Visa-Reciprocity-and-Civil-Documents-by-Country/Honduras.html (last visited July 26, 2018).

[4] *Id.*

[5] *See* U.S. IMMIGRATION AND CUSTOMS ENFOR'T, POLICY NO. 11064.2, DETENTION AND REMOVAL OF ALIEN PARENTS OR LEGAL GUARDIANS 4 (2017) ("In the event an alien parent or legal guardian is detained, ICE will facilitate a means of regular visitation between the parent and minor child(ren).").

Exhibit 64-1, Page 40

Priscilla Monico Marín, Esq.     Elizabeth Frankel, Esq.
Staff Attorney, Child & Family Rights Project  Associate Director

Encl.

cc: Marivic Fields, Office of Refugee Resettlement
  Jill Volovar, Office of Refugee Resettlement
  Alexa Mutt, Case Manager, LSSNY
  Carolyn Silane, Esq., Morgan Lewis, Attorney for D███████████ and ████████Q███

3

Exhibit 64-1, Page 41

# EXHIBIT 65

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*
*skang@aclu.org*

*\*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>                    *Petitioners-Plaintiffs*,<br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>                    *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br><br>**SUPPLEMENTAL DECLARATION OF MARTIN GUGGENHEIM**<br><br>CLASS ACTION<br><br>No Hearing Date |

I, Martin Guggenheim, hereby declare, pursuant to 28 U.S.C. § 1746:

1.  I am the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and a Founding Board Member of the Center for Family Representation.  I have already submitted two declarations in this case, Dkt. No. 48-1, Dkt. No 78, and incorporate those declarations herein.

2.  I have previously explained that the presence of a criminal record does not displace the general rule that "[a]bsent a finding of unfitness, it is presumed that children are best served by remaining with their natural parents." *In re Termination of Parental Rights to Max G.W.*, 716 N.W.2d 845, 857 (Wis. 2006) (citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)). Criminal convictions are relevant only insofar as they bear on the fitness of the parent, and even then must be considered in combination with a totality of the factors that go to the best interests of the child.

3.  This general principle holds true even where a criminal conviction is for the most serious crimes. *See* Dkt. No 78, ¶ 8.

4.  I understand from Plaintiffs' counsel that two of the parents in this case, Ms. Q and Mr. C, have been denied reunification with their young children based on their criminal histories. Plaintiffs' counsel has provided me the following information concerning these parents' criminal records.

5.  My understanding is that Ms. Q has been denied reunification on the basis of a criminal warrant from El Salvador, which alleges that she has "committ[ed] the offense of terrorist organizations." I have reviewed a redacted and translated copy of the Spanish language warrant dated February 2017; my understanding is that this warrant was renewed in June 2018. The warrant appears to contain no specific allegations of criminal activity, beyond the charge of "terrorist organizations." My understanding is that the government has refused to reunify Ms. Q with her son on the sole basis of this outstanding warrant, and that she has no other criminal history.

6.  My understanding is that in 2010, Mr. C was convicted of misdemeanor aggravated assault under Louisiana law, for which he received a sentence of 48 days in jail. My understanding is that the government has refused to reunify Mr. C with his son on the sole basis of this criminal conviction, and that he has no other criminal history.

7.  In my opinion, neither Mr. Q nor Mr. C's criminal histories justifies separating them from their children. Considerably more would have to be alleged to deny parents their constitutionally protected right to the care and custody of their children. In the United States, under both federal and state law in all jurisdictions, there is no lawful basis to deny parents custody of their children based on the parents' alleged criminal activities without a particularized showing that keeping or reuniting a child with her parent would place the child at imminent risk of serious harm. In these two instances, neither parent's criminal histories, standing alone, would even permit a finding that reunification with the parent is not in the child's best interests, much less justify their removal from their parents in the first instance.

8.  In Ms. Q.'s case, the El Salvadoran warrant is entirely conclusory, lacking any facts from which a court could infer that her child would be exposed to any kind of risk if returned to her custody. The warrant does not come close to supporting a reasonable suspicion that she would endanger her son or is unfit to care for him.

9.  Nor could Mr. C.'s his eight-year-old misdemeanor conviction possibly serve as a basis for denying him and his child their reciprocal constitutional rights to live together as a family. Hundreds of thousands of people with felony convictions in the United States have the constitutional right to the care and custody of their children once they served their sentences and are released from custody. To deny a father the same right for behavior that warranted a 48 day jail sentence would be manifestly unsupportable under the law governing this context. There simply is

nothing to support the inference that he would be a danger to his child at the present time or that reunification with his son would not be in the son's best interests.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 13th day of September, 2018, in New York, New York,

/s/ Martin Guggenheim

MARTIN GUGGENHEIM

# EXHIBIT 66

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioners-Plaintiffs*        *Admitted Pro Hac Vice*
*Additional counsel on next page*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L. et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: September 13, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **SUPPLEMENTAL DECLARATION OF MANOJ GOVINDAIAH**<br><br>Class Action<br><br>**NO HEARING DATE** |
| *Respondents-Defendants*. | |

1

2   Stephen Kang (SBN 292280)
    Spencer E. Amdur (SBN 320069)
3   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    IMMIGRANTS' RIGHTS PROJECT
4   39 Drumm Street
    San Francisco, CA 94111
5   T:  (415) 343-1198
    F:  (415) 395-0950
6   *skang@aclu.org*
    *samdur@aclu.org*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      I, Manoj Govindaiah, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am an attorney and the Director of Family Detention Services at RAICES. I oversee a staff of approximately 17 employees and supervise all of RAICES' immigrant family detention work. RAICES runs the Karnes Pro Bono Project, a nationwide pro bono project that provides legal services to families detained in ICE custody at the Karnes County Residential Center ("Karnes detention center" or "Karnes"), in Karnes City, Texas. We represent approximately 90% of the families at Karnes.

3.      I have previously submitted three declarations in this case, at Dkt. 78, Ex. 36; Dkt. 110, Ex. 40; and Dkt. 153, Ex. 57.

4.      I am aware of parents detained at the Karnes detention center with their children, where the parents have some kind of criminal history. I describe two examples here.

5.      One father entered the United States this year and was separated from his son. He was subsequently reunited with his son pursuant to the *Ms. L* injunction and they were sent to Karnes. I understand that he has a drunk driving charge or a conviction. A background check also showed that he has an outstanding warrant for an armed robbery from Honduras, although the father denies this allegation.

6.      Another father was previously charged or convicted of drinking and driving on two different occasions. He and his child entered the United States together this year and were sent to Karnes for detention.

7.      Based on my representation of fathers in the Karnes detention facility, and my recollection of the cases described above, my understanding is that DHS sometimes places fathers with criminal histories in the facility with their children. These fathers are not segregated in any way from the general population at the facility.

I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 12th day of September, 2018, in San Antonio, Texas.

/s/ Manoj Govindaiah
MANOJ GOVINDAIAH