UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

           Petitioners-Plaintiffs,

vs.

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, et
al.,

           Respondents-Defendants.

Case No. 18cv428 DMS MDD

## DECLARATION OF JONATHAN WHITE

I, Jonathan White, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.    I am a Commander with the United States Public Health Service Commissioned Corps, and have served at the Department of Health and Human Services (HHS) in three successive presidential administrations. I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response (ASPR), and previously served as the Deputy Director of the Office of Refugee Resettlement (ORR).

2.    The following statements are based on my personal knowledge, information acquired by me in the course of performing my official duties,

information supplied to me federal government employees and government
records.

   3.    I have been designated in this case as HHS's agency lead in the UAC
Reunification Coordination Group for removed parents with minor children in
ORR care.  *See* Joint Status Report (Aug. 9, 2018) at pg. 3.

**A. Overview of Current Efforts to Support Contact with Removed Parents**

   4.    In my experience, children in ORR residential care programs are
generally able to contact their parents.    The ORR case manager is pivotal to this
process. A case manager either works with the child to initiate a call to the parent
in the home country, or receives a call from a parent and participates in
discussions with the parent, in some cases other family members, and the child
together.  It is my experience that the case managers in ORR shelters possess
specialized expertise at establishing contact with parents in the home country, as
this is integral to the individualized case management process for the children
with whom they work.

   5.    In this case, I have overseen efforts to ensure that contact information
is being provided to the ACLU. This information has been used by our case
managers to make contact with parents in nearly all cases. In some instances, the
ACLU has indicated that the numbers were not working or they were unable to
reach the parents at the number, and provided a list of the parents with

18cv428 DMS MDD

problematic contact information to Defendants.  In those instances, I directed

ORR federal staff and grantee case managers to provide any additional contact

information that has been helpful to them in maintaining contact with parents in

home country.

6.    Based on the ACLU's reports that it is continuing to face challenges

contacting some parents—including parents who ORR has contacted—I have

further developed enhanced procedures, building on the existing interagency plan,

to ensure the Government provides the ACLU Steering Committee with the best

available information to contact parents and assists where appropriate to ensure

contact occurs.  This is based on the operational goal that we share with the

ACLU that all parents be contacted so that we can receive information needed to

effect reunifications consistent with parents' wishes.

7.    Therefore, in future, where that the ACLU represents it is having

difficulty contacting parents, I have proposed a system of using the ORR grantee

program case managers to broker three-way calls with parents, the case manager,

and the ACLU.  When the ORR grantee case manager initiates a call with a

parent, she or he can dial-in the ACLU at that time, or if the parent initiates a call,

the ORR grantee can dial-in the ACLU. After facilitating this connection, the case

manager would be instructed to discontinue her or his participation in the call so

that Plaintiffs and their Counsel can have an appropriately private conversation.

8.     In addition, the interagency coordination group consolidates information obtained by ICE personnel, including ICE attachés working in the parent's country of origin. This, too, is provided to ACLU in response to queries about difficult-to-contact parents.

**B. Recommended Practices for Contacting Parents in Home Countries**

9.     Based on my own professional experience and that of colleagues who have worked in the ORR UAC Program, the most expeditious and effective means to establish contact with parents in home country is telephonically. The standard ORR process includes contacting other relatives as needed to develop information on the parent to facilitate contact.

10.   Contacting parents in home country is a highly specialized skill set. Many parents are appropriately apprehensive about speaking with strangers about their child who is in the U.S.  This is particularly true in the Central American Northern Triangle, where there is extensive fraud and extortion of parents by individuals requesting funds to facilitate the child's travel in the U.S. or the child's continued safety. For this reason, ORR shelter case managers may likely be able, on the basis of their years of specialized experience working with this population, to engage some parents who may be reluctant to speak with others outside their country. These ORR social workers typically have built a

3                                                    18cv428 DMS MDD

relationship of trust and alliance with the child and the family.  Therefore, parents also often return calls to ORR shelter grantees.

11.  I am aware also that Counsel have discussed other methods of establishing contact with parents in home country, such as radio announcements, billboards, and written notices in local churches in home country.  In addition, the ACLU proposes using cell phones with home country telephone numbers to call from the United States parents in home countries.  In my prior work at HHS, I have not seen those methods deployed effectively.  Based on my experience, to have any chance of being effective, such methods would likely have to be targeted to the specific parent who remains unreachable.

12.  For example, billboards are unlikely to be effective if they are deployed in areas where the parents are not known to have resided.  Likewise, cell phones with home country telephone numbers are unlikely to be effective if the home country telephone numbers are associated with geographic areas where the parents are not known to have resided (as numbers associated with different home country areas might still raise fraud or extortion concerns for parents).

13.  In my opinion, parental contact will be achieved more quickly—and governmental and private resources will be put to their best use—if the parties continue to focus on exhausting efforts to contact removed parents telephonically.  If specific parents remain unreachable after such efforts are fully exhausted, then

18cv428 DMS MDD

the parties can make better informed, individualized determinations about what further steps, if any, can and should be undertaken to facilitate and maintain contact with the remaining removed parents.

## C. Overview of Coordinated Reunification Efforts for Removed Parents

14.   To facilitate safe reunification of children with their parents in home country, the interagency operations group has established close contact with the governments of the countries in which parents reside.

15.   To that end, I have met in person and am in regular telephonic and email contact with senior officials at the Embassies of the governments of El Salvador, Guatemala, Honduras, and Mexico. In most cases, I am speaking to the Deputy Chief of Mission, the senior operational official for those foreign governments in the United States. We provide each foreign government lists, updated multiple times each week, of minors who have completed Process 3 in the government's interagency plan approved by the Court, and advise them in advance of these children's imminent return to home country.  The foreign governments then identify any specific needs that the parents might have in regards to reunification in home country, so that the interagency operations group can work with the foreign government to address those specific needs. In this ongoing consultation and collaboration with the foreign governments, we also work to identify any logistical barriers or constraints which would impede safe

18cv428 DMS MDD

reunification in home country and address them proactively, leveraging the capabilities of the governments for activities in their own territory.

16.   ICE colleagues are coordinating in each child's case with consular officials to obtain travel documents as well. The purpose of these engagements is to receive the assistance as needed of these governments in facilitating the parents' presence for physical reunification at sites close to the airport, operated by those governments or trusted non-governmental organizations (NGOs). These reception sites are appropriate for family reunification—and transfer of the minor to the care of his or her parent—because they are safe and help to streamline the complicated logistics of home country reunification.  This process utilizes the existing procedures developed between the governments of the four countries— and ICE attachés working in those countries—for the safe and orderly repatriation of children and families in the ordinary removal context (as opposed to the reunification context of the *Ms. L.* case).

17.   I am aware that the Plaintiffs' Steering Committee has asked the Government to "designate an Ombudsman to work out of the U.S. Embassies/Consulates in Guatemala and Honduras to assist with efforts to locate parents and repatriate children."

18.   I am not personally aware of the Plaintiffs' Steering Committee previously raising concerns about the operational effectiveness of the interagency

18cv428 DMS MDD

operations group (as presently configured) in assisting with efforts to repatriate specific children and reunify them with their parents in their home countries. Indeed, most of the reunifications completed to date have occurred in the United States, and the smaller number of reunifications in home countries have, to my knowledge, been completed effectively.

19.   Based on the information known to me at this time, my opinion is that the appointment of an Ombudsman would likely add another layer of complexity to the work of the interagency operations group, without remedying a specific, identified operational problem related to repatriation of children and reunification with parents in home country.  If such Ombudsmen were appointed, they would have to be integrated into the existing partnerships between the United States Government and the governments of Guatemala and Honduras.  As sovereign nations, Guatemala and Honduras already work with the parents who are their citizens on logistical and travel issues pursuant to their own laws.  The integration of Ombudsmen could potentially disrupt those partnerships by infringing on the prerogatives of the governments of Guatemala and Honduras. At a minimum, it would necessitate structural changes to the existing, well-established operational relationships that would divert time and resources away from ongoing repatriation and reunification efforts.

18cv428 DMS MDD

20.   My opinion is that the better approach for ensuring effective and swift reunification in home country would be for the NGOs working with Plaintiffs' Steering Committee to communicate their specific operational concerns to the interagency operations group, so that we can partner with them (and with the governments of Guatemala and Honduras) to try to address the concerns.

21.   I reserve the right to amend my opinions based on any new information that becomes known to me in the future.

Executed on September 13, 2018.

Jonathan White