# Exhibit A

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LESBI NOHEMI MARTINEZ-MARTINEZ,**<br>Port Isabel Service Detention Center<br>27991 Buena Vista Blvd<br>Los Fresnos, Texas 78566;<br><br>**Plaintiff,**<br><br>v.<br><br>**U.S. IMMIGRATION AND CUSTOMS**<br>**ENFORCEMENT ("ICE"),**<br>500 12th Street SW Washington, DC 20530;<br><br>**U.S. DEPARTMENT OF HOMELAND**<br>**SECURITY ("DHS"),**<br>245 Murray Lane SW Mailstop 0485<br>Washington, DC 20528-0075;<br><br>**U.S. CUSTOMS AND BORDER PROTECTION**<br>**("CBP"),**<br>1300 Pennsylvania Ave. NW<br>Washington, DC 20229;<br><br>**U.S. CITIZENSHIP AND IMMIGRATION**<br>**SERVICES ("USCIS"),**<br>20 Massachusetts Avenue NW<br>Washington, DC 20529;<br><br>**THOMAS HOMAN, ACTING DIRECTOR OF**<br>**ICE,**<br>500 12th Street SW Washington, DC 20536;<br><br>**DANIEL BIBLE, SAN ANTONIO FIELD OFFICE**<br>**DIRECTOR, ICE,**<br>San Antonio Field Office<br>1777 NE Loop 410 Floor 15<br>San Antonio, TX, 78217;<br><br>**ANDREW HURON, SAN ANTONIO ASSISTANT**<br>**FIELD OFFICE DIRECTOR, ICE,**<br>San Antonio Field Office<br>1777 NE Loop 410 Floor 15<br>San Antonio, TX, 78217; | Case No. ___1:18-cv-2231___ |

Exhibit A
000014

**KIRSTJEN NIELSEN, SECRETARY OF DHS,**
500 12th Street SW Washington, DC 20536;

**JEFFERSON BEAUREGARD SESSIONS III,**
**ATTORNEY GENERAL OF THE UNITED**
**STATES,**
950 Pennsylvania Avenue NW Washington, DC
20530;

**L. FRANCIS CISSNA, DIRECTOR OF USCIS,**
20 Massachusetts Avenue NW Washington, DC 20529;

**KEVIN K. MCALEENAN, ACTING**
**COMMISSIONER OF CBP,**
1300 Pennsylvania Ave, NW Washington, DC 20229;

**Defendants.**

Exhibit A
000015

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

JURISDICTION ............................................................................................................... 2

VENUE ........................................................................................................................... 3

PARTIES ......................................................................................................................... 3

RELEVANT FACTS ......................................................................................................... 5

CAUSES OF ACTION ................................................................................................... 10

PRAYER FOR RELIEF .................................................................................................. 14

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Wolfish,*
   441 U.S. 520 (1979) ...................................................................................................11

*Ms. L v. U.S. Immigration & Customs Enf't,*
   No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364 (S.D. Cal.
   June 26, 2018) ............................................................................................................8

*Ms. L v. U.S. Immigration & Customs Enf't,*
   No. 3:18-cv-00428-DMS-MDD (S.D. Cal. June 26, 2018) .......................................2, 8, 9, 10

**Statutes**

5 U.S.C. § 706(2)(A) ..........................................................................................................12

8 U.S.C. § 1103 ....................................................................................................................4

8 U.S.C. § 1158 ..............................................................................................................1, 13

8 U.S.C. § 1158(a)(1) ........................................................................................................10

8 U.S.C. § 1225(b)(1) ........................................................................................................10

28 U.S.C. § 1331 ..................................................................................................................2

28 U.S.C. § 1391 ..................................................................................................................3

28 U.S.C. § 2241 ..................................................................................................................2

**Other Authorities**

8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42 .................................................................10

Administrative Procedure Act.............................................................................................12

Executive Order 13841.....................................................................................................6, 8

Immigration and Naturalization Act ....................................................................................7

International Convention on Civil and Political Rights, Art. 17.........................................13

U.S. Constitution Fifth Amendment ...........................................................................*passim*

Exhibit A
000017

United States Constitution Art. I., § 9, cl. 2 ................................................................................2

iii

## PETITION FOR HABEAS CORPUS AND COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Lesbi Nohemi Martinez-Martinez ("Ms. Martinez" or "Plaintiff"), by and through counsel, files this civil action and petition for habeas corpus against Defendants U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); Thomas Homan, Acting Director of ICE; Daniel Bible, San Antonio Field Office Director, ICE; Andrew Huron, San Antonio Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; and Kevin K. McAleenan, Acting Commissioner of CBP; (collectively, "Defendants") to vindicate Ms. Martinez's substantive and procedural due process rights under the Fifth Amendment of the U.S. Constitution and her rights under the International Convention on Civil and Political Rights, and the United Nations Convention Relating to Status of Refugees, 8 U.S.C. § 1158.

### INTRODUCTION

This complaint arises from the United States Government's forcible separation of Ms. Martinez from her young sister, Y.M. Ms. Martinez, a thirty year old Honduran woman, is the sole primary caregiver, legal guardian, and biological sister of Y.M., a fifteen-year old girl who has lived with Ms. Martinez since birth and has been in the sole care of Ms. Martinez since the death of their biological mother.  Ms. Martinez considers Y.M. to be her daughter. Ms. Martinez brings this action to halt her pending deportation until she has a full and fair opportunity to seek asylum in the United States.  That opportunity, guaranteed to her by statute, has been denied by the forcible separation of Ms. Martinez from Y.M. The trauma of that separation rendered Ms. Martinez unable to meaningfully prepare for and participate in

the credible fear interview that formed a part of her asylum proceedings, resulting in an erroneous negative credible fear determination by the Asylum Officer. The forced separation by the Defendants of Ms. Martinez's daughter, in addition to causing substantial emotional distress to both mother and daughter, improperly tainted the credible fear assessment. In the absence of the relief sought in this action, Ms. Martinez will be deported to Honduras without having received a fair asylum proceeding, and she will likely suffer significant injury or death at the hands of the criminal elements that caused Ms. Martinez to flee Honduras with her daughter in the first place.

In addition, Ms. Martinez may be a member of the class certified in *Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD at 17 (S.D. Cal. June 26, 2018) ("*Ms. L*"). Counsel understand that there are formal and informal efforts underway by various counsel to clarify that legal guardians like Ms. Martinez, as well as detained biological parents, are to be afforded a *de novo* credible fear interview if the earlier interview was conducted while the parent was dealing with the raw emotional trauma of being separated from his or her child. If Ms. Martinez is part of the *Ms. L* class, Defendants will be prohibited from deporting her before she is given a de novo and fair credible fear interview. For all the reasons set forth in this Complaint and the accompanying papers, Ms. Martinez's deportation should be stayed until she has been given a fair opportunity to pursue her right to asylum in the United States.

## JURISDICTION

1.      This case arises under the Fifth Amendment to the United States Constitution and other federal statutes cited in this Petition and Complaint. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Art. I., § 9, cl. 2 of the United States Constitution ("Suspension Clause"). Ms. Martinez is in federal custody for purposes of habeas jurisdiction. This Court has

Exhibit A
000020

personal jurisdiction because the official acts giving rise to Plaintiff's harm were directed from federal government agencies headquartered in the District of Columbia.

## VENUE

2.      Venue is proper under 28 U.S.C. § 1391 because at least one of the Defendants is subject to personal jurisdiction in this district with regards to this action.

## PARTIES

3.      Plaintiff Ms. Martinez is a citizen of Honduras. She is the biological sister of, legal guardian of, and sole primary caregiver for, Y.M., who is also a citizen of Honduras. Ms. Martinez is the *de facto* mother of Y.M., who is a 15-year old girl.

4.      Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

5.      Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States and is a department of the executive branch of the Government which has been delegated with authority over certain immigration matters relevant to this action.

6.      Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens apprehended near the U.S. border.

7.      Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals apprehended at the border to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.

3

Exhibit A
000021

8.      Defendant Thomas Homan is sued in his official capacity as the Director of ICE.

9.      Defendant Daniel Bible is sued in his official capacity as Field Office Director, San Antonio Field Office, ICE.

10.     Andrew Huron is sued in his official capacity as Assistant Field Office Director, San Antonio Field Office, ICE.

11.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she has responsibility for each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent Nielsen has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, including laws relating to the credible fear interview process, and is empowered to grant asylum or other relief.

12.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States. At all times relevant to this Petition and Complaint, he had responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, including laws relating to the credible fear interview process, oversaw the Executive Office of Immigration Review, and was empowered to grant asylum or other relief.

13.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

14.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Commissioner of CBP.

4

Exhibit A
000022

## RELEVANT FACTS[1]

15.     Ms. Martinez is a citizen of Honduras. She is the *de facto* mother and biological sister of Y.M., a minor child, and has been Y.M.'s legal guardian and caregiver since their biological mother died in 2016.

16.     In May 2018, Ms. Martinez and Y.M. fled Honduras after death threats were made against them and after Ms. Martinez suffered acts of violence by various criminal elements in her town who the local police and government tacitly support. Among other things, the local police do not become involved in investigating crime or preventing gang violence in Ms. Martinez's town without being paid bribes to do so, and because Ms. Martinez has very little money, the death threats against her and Y.M. (like the other acts of violence Ms. Martinez was subjected to) had no chance of being prevented or investigated, as police and other governmental authorities would have taken no action to prevent potential crimes against Ms. Martinez and Y.M.

17.     Ms. Martinez feared that she and Y.M. would be killed if they stayed in Honduras any longer. Shortly after Ms. Martinez received a death threat from a man who demanded money from her, she and Y.M. fled their home in May 2018 in an effort to obtain asylum in the United States. Ms. Martinez and Y.M. entered the United States on June 1, 2018.

---

[1] The factual information provided herein is drawn from the statements of Ms. Martinez and certain relatives in the United States, and non-privileged factual information from communications between Ms. Martinez and counsel for the Texas Civil Rights Project, the organization that initially made contact with Ms. Martinez and similarly situated immigrants seeking asylum in the United States. These facts are set forth in more detail in Ms. Martinez's Request for Reconsideration of her negative credible fear determination, attached to this Petition and Complaint as Exhibit A. Despite diligent efforts, counsel for Plaintiff have not yet been able to secure a declaration from Ms. Martinez.

Exhibit A
000023

18.     Shortly after Ms. Martinez and Y.M. entered the United States, agents from
Defendant Customs and Border Protection ("CBP") forcibly separated Y.M. from Ms.
Martinez, leaving Ms. Martinez disoriented and in shock at the loss of her child, and causing
substantial and perhaps lasting emotional trauma to both Ms. Martinez and Y.M.   Press
reports indicate that Defendants' policies of "no tolerance" and forced family separations
were intended to cause substantial emotional trauma to immigrants, like Ms. Martinez, who
fled violence to seek asylum in the United States.

19.     On June 20, 2018, President Trump issued Executive Order 13841
("Executive Order"), which ostensibly reversed his administration's policy of forcibly
separating children from their families upon entry into the United States.   Notwithstanding,
the Government continues to keep minor children, such as Y.M., from their detained parents
without any hearings or legal process and without any showing that the minor has suffered
abuse, neglect, or that the parent is unfit.

20.     The Government's forcible separation policy has been widely denounced,
including by mental health professionals.   The American Academy of Pediatrics has
criticized the policy because of the severe trauma that forced separation from parents and
other caregivers causes children.   This is particularly true for those children who are already
traumatized due to conditions in their homeland.    The parents of these children are also
traumatized. The resulting cognitive and emotional damage from such family separations can
be permanent.   The Trump Administration acknowledged as much by ending the practice
with the June 20, 2018 Executive Order.

21.     Ms. Martinez's forcible separation from Y.M. was a devastating event which
caused Ms. Martinez significant psychological and emotional trauma.   Ms. Martinez and
Y.M. continue to suffer every day they are separated from one another and, as a result, Ms.

6

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4181   Page 13 of
Case 1:18-cv-___31-PLF   Document 1   Filed 09/26/___   Page 12 of 20
251

Martinez has received mental health treatment at the Port Isabel Detention Center, where she is being held.

22.     During this period of intense psychological trauma, Ms. Martinez applied for asylum in the U.S.  On June 26, 2018, Defendant USCIS conducted a credible fear interview of Ms. Martinez.

23.     Having been forcibly separated from Y.M. for over three weeks, Ms. Martinez was in severe emotional distress and in a state of shock during her interview. She struggled to focus and respond to the interviewer's questions and was unable to describe fully the threats and governmental neglect that led her to flee Honduras with her daughter. These threats support her credible fear that Ms. Martinez and Y.M. will be killed or seriously harmed if they return to Honduras.

24.     Without a full understanding of the threats against Ms. Martinez and Y.M. that caused them to embark on the dangerous journey to the U.S. border, and having failed to question Ms. Martinez adequately or to sufficiently consider the psychological trauma affecting her, the Asylum Officer found that she lacked a credible fear of persecution. As a result, after an emergency application to stay her deportation was recently denied, Ms. Martinez is now scheduled to be deported, perhaps in the near future.

25.     Ms. Martinez's deportation would further traumatize Y.M., who continues to suffer psychological trauma while apart from Ms. Martinez.

26.     The Due Process Clause of the U.S. Constitution's Fifth Amendment prohibits the Government from separating children from their primary caregivers without justification and adequate process.  This rule is based on the self-evident proposition that forced separation of families is abhorrent, and otherwise contrary to the basic principles of this country.

Exhibit A
000025

27.    Pursuant to federal statutes, including the Immigration and Naturalization Act, the Convention Against Torture, and associated implementing regulations, an asylum applicant's credible fear determination can be made only after a full and fair proceeding. Having been forcibly separated from Y.M. only weeks before her credible fear interview, Ms. Martinez was denied such a right to a full and fair proceeding due to the grief and emotional trauma she was experiencing.

28.    Furthermore, as an adult parent, Ms. Martinez was forcibly separated from her minor child and detained in immigration custody by DHS, Ms. Martinez may be a member of the class certified in *Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364, at *27 (S.D. Cal. June 26, 2018) (ECF No. 82).

29.    This class certified by the *Ms. L* court includes all "adult parents" of separated minor children, and on its face does not exclude legal guardians, like Ms. Martinez. *See Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364, at *27 (S.D. Cal. June 26, 2018) (ECF No. 82).  As an initial matter, the *Ms. L* court repeatedly stated that its order directing Defendants to reunited class members and their minor children was meant to mitigate the suffering of separated families, and not merely biological parents and children. *See id.* at *3-6, *11-15, *22, *25, *27-28.  Further, although the *Ms. L* court expressly excluded certain categories of parents from the class, the court did *not* exclude legal guardians or other non-biological or *de facto* parents.  *Id.* at *17, *28 n.10 (excluding "parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the [President's executive order prohibiting family separations after June 20, 2018].")

30.    In a tentative class settlement reached in *Ms. L*, Defendants have tacitly acknowledged that credible fear interviews conducted by Asylum Officers during the period

8

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4183   Page 15 of
Case 1:18-cv-(    )1-PLF   Document 1   Filed 09/26/(    )   Page 14 of 20
251

in which asylum seekers were traumatized by forced family separation are inherently tainted,

unfair, and contrary to law.  (*See* Putative Settlement Agreement in *Ms. L*, copy attached

hereto as Exhibit B.)  In that regard, the proposed settlement agreement, if approved, will

require ICE to conduct *de novo*, good faith, credible fear interviews to detainees seeking

asylum who, like Ms. Martinez, were suffering from the emotional trauma caused by forced

family separations when their initial credible fear interview was conducted.

31.     It is apparent Defendants do not consider Ms. Martinez a member of the class,

given that Ms. Martinez is presently considered eligible to be deported, but this is a

determination that the *Ms. L* court has not yet made.[2]

32.     The United States District Court for the Southern District of California has

prohibited Defendants from deporting *Ms. L* class members without their children absent the

individual's affirmative, knowing, and voluntary waiver of that right, or a determination that

the parent is unfit.  There has been no such waiver by Ms. Martinez or determination in this

case.

33.     On September 6, 2018, Ms. Martinez filed with ICE an Application for Stay

of Deportation or Removal which argued, among other things, that she was likely a member

of the *Ms. L* class and therefore could not be deported.  On September 20, 2018, Ms.

Martinez filed with the Houston, Texas Asylum Office a properly supported Request for

Reconsideration of the negative finding from Ms. Martinez's earlier credible fear interview.

A copy of the Request for Reconsideration is attached to this Complaint as Exhibit A.  On

September 21, 2018, counsel for Ms. Martinez received from ICE a letter stating that Ms.

---

[2] Undersigned counsel understand that certain legal guardians who received negative credible
fear determinations based on interview conducted while they were emotionally traumatized
from the separation of their children intend to file papers in *Ms. L* seeking clarification that
legal guardians are within the settlement class.

9

Exhibit A
000027

Case 3:18-cv-00428-DMS-MDD Document 282-1 Filed 10/15/18 PageID.4184 Page 16 of
Case 1:18-cv-00431-PLF Document 1 Filed 09/26/18 Page 15 of 20
251

Martinez's Application for Stay of Deportation or Removal was denied. As of the date of filing of this action, undersigned counsel have received no notice regarding any action by ICE or DHS on her Motion for Reconsideration.

34.     As a result of the Defendants' actions in this case, Ms. Martinez is facing imminent deportation, which could potentially be in violation of the injunction issued in the *Ms. L* case, without having had a full and fair opportunity to pursue her asylum claim and forcing her to leave behind her minor child, who suffers each day she continues to be separated from her *de facto* mother.

35.     Given the irreparable and continuous emotional damage caused by Defendants' action, Ms. Martinez requests a stay of her deportation and an order obligating the Asylum Office to conduct a good faith, *de novo* credible fear interview at which counsel for Ms. Martinez may attend. Ms. Martinez seeks no relief from the Court as it relates to the Asylum Office's conclusions from a *de novo* credible fear interview, only that Ms. Martinez be accorded a fair chance to establish her credible fear of persecution in an interview to be conducted in the future at which Ms. Martinez may be represented by counsel.

## CAUSES OF ACTION
### COUNT I
### (Violation of Asylum Statute)

36.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

37.     Under United States law, noncitizens with a credible fear of persecution in their country of origin shall have a fair opportunity to apply for asylum in the United States. See 8 U.S.C. § 1225(b)(1); 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. §

10

Exhibit A
000028

1158(a)(1). Ms. Martinez has a private right of action to vindicate her right to apply for asylum.

38.     Defendants' separation of Ms. Martinez from Y.M. violates federal asylum law, because it impermissibly infringed upon Ms. Martinez's ability to pursue her asylum claim by requiring her to submit to her credible fear interview while she was emotionally traumatized by Defendants' wrongful separation from her daughter.

**COUNT II**
**(Punishment of Civil Detainee in Violation of Due Process)**

39.     The U.S. Constitution's Fifth Amendment prohibits punishment of immigrants held in civil detention. *Bell v. Wolfish*, 441 U.S. 520, 538-39 & n.20 (1979).

40.     At all times after Ms. Martinez entered the United States in June 2018, Defendants and their agents and employees have continuously detained Ms. Martinez pursuant to civil immigration detention statutes.  Defendants have never detained Ms. Martinez as a convicted criminal.  Defendants intend to punish Ms. Martinez by deporting her back to Honduras without her child, to face the very real possibility of death or serious physical injury, without giving her a fair opportunity to establish a credible fear of persecution and otherwise gaining asylum in the United States.

41.     Defendants' foregoing actions that punish Ms. Martinez are patently excessive in relation to any legitimate government objective.

**COUNT III**

**(Family Separation in Violation of Substantive Due Process)**
**(Against All Defendants Except USCIS Defendants in Their Official Capacities)**

11

Exhibit A
000029

42.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

43.     The Due Process Clause of the United States Constitution's Fifth Amendment protects all "persons" on United States soil, including Ms. Martinez.

44.     Ms. Martinez has a liberty interest under the Due Process Clause in remaining together as a family with her daughter Y.M., and the means for mother and daughter to be reunited starts with a good faith, *de novo* credible fear interview that is not tainted by the forced separation of Ms. Martinez from Y.M.

45.     The separation of Ms. Martinez from Y.M. violates substantive due process because it furthers no legitimate purpose, not to mention a compelling governmental interest.

## COUNT IV

### (Administrative Procedure Act—Arbitrary and Capricious Practice)
### (Against All Defendants Except USCIS Defendants)

46.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

47.     The APA prohibits agency action that is arbitrary and capricious and contrary to constitutional right.

48.     Defendants' separation of Ms. Martinez from Y.M. without a compelling justification and without a mechanism, protocol, or system to guarantee that the asylum process, including the opportunity for a fair credible fear interview that is conducted in good faith, is arbitrary and capricious, and in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT V
### Petition for Habeas Corpus Under Treaties of the United States: International Convention on Civil and Political Rights (Claim for Injunctive and Declaratory Relief Against All Defendants in Their Official Capacities)

Exhibit A
000030

49.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

50.     The ICCPR has been signed and ratified by the United States.

51.     Under Article 17 of the ICCPR, "[n]o one shall be subjected to arbitrary or unlawful interference with her privacy, family, home or correspondence, nor to unlawful attacks on her honor and reputation." Article 23 states that "family is the natural and fundamental group unit of society and is entitled to protection by society and the State."

52.     By forcibly separating Ms. Martinez from Y.M., Defendants have subjected Ms. Martinez to arbitrary, unlawful, and unjustified interference with her family in violation of the ICCPR, which improperly tainted her credible fear interview that was conducted while she was traumatized by being separated from her daughter.

## COUNT VI

### Petition for Habeas Corpus Under Laws and Treaties of the United States; United Nations Convention Relating to Status of Refugees and 8 U.S.C. § 1158 (Claim for Injunctive and Declaratory Relief Against All Defendants in Their Official Capacities)

53.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

54.     The United States is party to the 1967 Protocol Relating to the Status of Refugees and key provisions have been incorporated into U.S. law giving individuals a cause for action for litigation. Under federal law, "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158.

13

Exhibit A
000031

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4188   Page 20 of
Case 1:18-cv-(      )31-PLF   Document 1   Filed 09/26/(    )   Page 19 of 20
251

55.     Because the right to seek asylum and the definition of refugee, which stems from an international treaty, is directly incorporated into federal law, it creates a legal cause for action for Ms. Martinez.

56.     Defendants have unlawfully interfered with Ms. Martinez's right to seek asylum and punished her for doing so by traumatically separating her from her daughter and conducting her credible fear interview while she suffered from the emotional trauma of that separation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.     Declare the separation of Ms. Martinez from Y.M. to have unlawfully violated Ms. Martinez's substantive due process rights and interfered with her right to pursue a fair asylum claim in the United States;

B.     Enjoin Defendants from deporting or otherwise removing Ms. Martinez from the United States until she is given a good faith *de novo* opportunity to pursue her asylum claims;

C.     Enter an Order requiring ICE and the Asylum Office to conduct a good faith, *de novo* credible fear interview, at which Ms. Martinez may be accompanied by counsel; and

D.     Order all other relief that is just and proper.

14

Exhibit A
000032

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4189   Page 21 of
Case 1:18-cv-____ 31-PLF   Document 1   Filed 09/26/__   Page 20 of 20
251

Respectfully submitted this 26th day of September, 2018.

/s/ Martin M. McNerney
Martin M. McNerney
DC Bar No. 333161
mmcnerney@kslaw.com

Joshua C. Toll
DC Bar No. 463073
jtoll@kslaw.com

Kathleen L. Benner
DC Bar No. 1046230
*Court admission pending*
kbenner@kslaw.com

King & Spalding, LLP
1700 Pennsylvania Avenue
Suite 200
Washington, DC 20006
(T) 202-737-0500

Naana A. Frimpong
*Pro hac vice to be filed*
nfrimpong@kslaw.com

King & Spalding, LLP
1800 Peachtree Street NE
Atlanta, GA 30309
(T) 1-404-572-4600

*Attorneys for Plaintiff*

Exhibit A
000033

**CIVIL COVER SHEET**

JS-44 (Rev. 6/17 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LESBI NOHEMI MARTINEZ-MARTINEZ,<br>Port Isabel Service Detention Center<br>27991 Buena Vista Blvd<br>Los Fresnos, Texas 78566 | U.S. Immigration and Customs Enforcement; U.S. Department of Homeland Security; U.S. Customs and Border Protection; U.S. Citizenship and Immigration Services; Thomas Homan, Acting Director, U.S. Immigration and |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Cameron**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Martin C. McNerney, Joshua C. Toll, Kathleen L. Benner, and Naana A. Frimpong ((202) 737-0500)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

○ **A.  Antitrust**

☐ 410  Antitrust

○ **B.  Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

○ **C.  Administrative Agency Review**

☐ 151 Medicare Act

Social Security
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.  General Civil (Other)**          OR          ○ **F.  Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

Other Statutes
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 462 Naturalization Application
☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

Exhibit A
000034

Case 1:18-cv-( 31-PLF   Document 1-1   Filed 09/2(   Page 2 of 2

| ⊙ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/Privacy Act* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☒ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

| V. ORIGIN |
|---|
| ⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi-district Litigation    ○ 7 Appeal to District Judge from Mag. Judge    ○ 8 Multi-district Litigation – Direct File |

| VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.) |
|---|
| Violation of Fifth Amendment Due Process, Violation of 8 U.S.C. 1225 |

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐   NO ☒ |

| VIII. RELATED CASE(S) IF ANY | (See instruction) | YES ☒   NO ☐ | If yes, please complete related case form |
|---|---|---|---|

| DATE:   09/26/2018 | SIGNATURE OF ATTORNEY OF RECORD   *[signature]* |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.    CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4192   Page 24 of
251
Case 1:18-cv-0    1-PLF   Document 1-2   Filed 09/26    Page 1 of 215

# Exhibit A
## to the Complaint

Exhibit A
000036

September 20, 2018

**VIA ELECTRONIC MAIL**
USCIS
Houston Asylum Office
16630 Imperial Valley Drive, Suite 200
Houston, TX 77060
rfr.houston.asylum@uscis.dhs.gov

Respondent:     **Lesbi Nohemi Martinez-Martinez**
File Number:     A-215-582-112
Re:                    **Request for Reconsideration**

Dear Sir or Madam:

    King & Spalding represents Lesbi Nohemi Martinez-Martinez (hereinafter "Ms. Martinez") in her effort to seek asylum in the United States, and on her behalf we submit this Request for Reconsideration so that Ms. Martinez can be given a second Credible Fear Interview. As discussed in more detail below, the Government has acknowledged in the proposed settlements in the Ms. L and MMM family separation class action lawsuits that credible fear interviews conducted with immigrant detainee parents after their children were forcibly removed from their care are tainted because of the mental trauma caused by the forced separation, and that fairness requires that such detainees be granted a second credible fear interview, during which the detainee is assisted by counsel. The same fundamental fairness concerns apply in Ms. Martinez' case, and justice requires that she be given a second interview where she is assisted by counsel so that the viable grounds of her asylum claim can be properly heard. A Form G-28, Notice of Entry of Appearance, is attached.

<u>**Basis for Request for Reconsideration and Credible Fear Interview**</u>

    Ms. Martinez respectfully requests that the Asylum Office reconsider the previously issued decision in her credible fear interview and grant a new interview based on (1) her mental health conditions at the time of that interview, in particular the depression and symptoms of severe trauma she suffered from being forcibly separated from her child, each of which show a need to conduct a new credible fear interview, and (2) the fact that she has a viable asylum claim.

## BACKGROUND FACTS

### Ms. Martinez's Legal Guardianship of Mariela

Ms. Martinez has lived continuously with her younger sister Yency Mariela Martinez-Martinez ("Mariela"), for whom she is the legal guardian and considers her daughter, since 2003 when Mariela was born. *See* Certification of Clarissa Moliterno (hereafter Moliterno Cert.) ¶ 3. Ms. Martinez and Mariela lived in Honduras until Ms. Martinez concluded that the constant threats of physical violence against her and Mariela required them to seek asylum in the United States. Following the death of their mother in 2016, Ms. Martinez obtained formal legal guardianship of Mariela who at the time was 13 years old. Exhibit A at 2-4. Ms. Martinez's father, who at the time had moved in with a new girlfriend, agreed that it was in Mariela's best interest for Ms. Martinez to obtain full custody and he signed a document providing his authorization. *Id.* Since obtaining legal guardianship in 2016, Ms. Martinez has acted as Mariela's mother, and called Mariela her daughter. Moliterno Cert. ¶ 4.

### Violent Conditions in Honduras

Honduras, by nearly any metric, is one of the most dangerous countries in the world. The murder rate in Honduras is consistently one of the highest of any peacetime country.[1] Firearms are used in over 80 percent of homicides, which is nearly double the global rate.[2] Many of these murders are linked to Honduras's "powerful criminal groups,"[3] which includes gangs like MS-13 and Barrio 18.[4] These gangs, which the Honduran government refuses or is unable or unwilling to control, often exert influence over "entire neighborhoods," demanding "extortion payments from business and residents," smuggling and selling drugs, and running kidnapping rings.[5]

Honduras is uniquely dangerous for women. According to the U.N., Honduras has the highest rate of "femicide," or the killing of a woman because she is a woman, in the world.[6] The number of women murdered in Honduras has been rising steadily but spiked

---

[1] *See, e.g., International homicides (per 100,000 people)*, THE WORLD BANK, https://data.worldbank.org/indicator/Vc.ihr.PSrc.P5?year_high_desc=true (last accessed Sept. 14, 2018)(listing Honduras's murder rate for 2015 at 64 per 100,000 people); Kuang Keng Kuek Ser, *Map: Here are countries with the world's highest murder rates*, PUBLIC RADIO INTERNATIONAL, June 27, 2016 *available at* https://www.pri.org/stories/2016-06-27/map-here-are-countries-worlds-highest-murder-rates (last accessed Sept. 14, 2018)(listing Honduras's murder rate for 2014 at 74.6 per 100,000 people).

[2] David Gagne, *80% of Homicides in Honduras Result of Gun Violence: Report*, INSIGHT CRIME, July 27, 2016, *available at* https://www.insightcrime.org/news/brief/80-of-homicides-in-honduras-result-of-gun-violence-report/ (last accessed Sept. 14, 2018).

[3] *Id.*

[4] Honduras Profile, INSIGHT CRIME, Aug. 27, 2018, *available at* https://www.insightcrime.org/honduras-organized-crime-news/honduras/ (last accessed Sept. 14, 2018).

[5] *Id.*

[6] Juju Chang, et al., *'Men can do anything they want to women in Honduras': Inside one of the most dangerous places on Earth to be a woman*, ABC NEWS, May 3, 2017, *available at*

2

Exhibit A
000038

after 2010. Within Latin America, Honduras recently ranked third in femicide rates.[7] Femicides in Honduras have spiked since 2006, rising 300 percent from 202 murders in 2006 to 606 in 2012.[8] This, in a country with a population less than that of New York City.[9] Over 96 percent of femicides in Honduras go unpunished, and 40% of women interviewed for a 2015 UNHCR study who fled the country due to violence did not report abuses to police because they "thought it would be useless."[10] In fact, in 2012, femicide was considered the second-highest cause of death for women of reproductive age in Honduras.[11]

Following the 2009 coup in Honduras, government inability or unwillingness to protect low-income women has only grown worse. As explained in one analysis, ten percent of the women interviewed for the UNHCR study (2015) reported that the police or other authorities were directly implicated in harming them.[12]

In general, the police and governmental authorities of Honduras provide little help to the victims of crime. The World Justice Project ranked Honduras 103rd of the 113 countries it surveyed in 2017 for its Rule of Law Index.[13] In other words, Honduras's civil and governmental institutions enable the gang violence because they devote insufficient resources to protect citizens or enforce its laws. Police corruption is rampant. Gift-giving and bribes are widespread, and the enforcement of anti-corruption laws is lacking, resulting in "widespread impunity" for the corrupt officials.[14] As of 2017, nearly half of the 9,000 police officers investigated by the Special Commission for Police Reform Restructuring were removed from duty, often due to their involvement in corruption or crime.[15] The grim result of Honduras's corruption is that most crimes go uninvestigated, particularly crimes against women. In 2014, the United Nations reported that 95 percent of sexual violence and "femicide" cases were never investigated.[16]

---

https://abcnews.go.com/International/men-women-honduras-inside-dangerous-places-earth-woman/story?id=47135328 (last accessed Sept. 14, 2018).

[7] Cecilia Menjívar and Shannon Drysdale Walsh, *The Architecture of Femicide: The State, Inequalities, and Everyday Gender Violence in Honduras*, 52(2) Latin Am. Res. Rev. 221, 226 (2017), *available at* https://doi.org/10.25222/larr.73 (last accessed Sept. 19, 2018) (citing Alvazzi del Frate 2011).

[8] *Id.* at 229.

[9] *Id.*

[10] *Id.* at 228.

[11] *Id.* at 229 (citing IACHR 2013, 388).

[12] *Id.* at 233.

[13] *Rule of Law Index: Honduras*, WORLD JUSTICE PROJECT, *available at* http://data.worldjusticeproject.org/#/groups/HND (last accessed Sept. 14, 2018).

[14] *Honduras Corruption Report*, GAN BUSINESS ANTI-CORRUPTION PORTAL, Aug. 2016, https://www.business-anti-corruption.com/country-profiles/honduras/ (last accessed Sept. 14, 2018).

[15] *Honduras: Events of 2017*, HUMAN RIGHTS WATCH, *available at* https://www.hrw.org/world-report/2018/country-chapters/honduras (last accessed Sept. 14, 2018).

[16] Chang, *'Men can do anything they want to women in Honduras'.*

3

Exhibit A
000039

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4196   Page 28 of
Case 1:18-cv-0   1-PLF   Document 1-2   Filed 09/26   Page 5 of 215
251

The area of Honduras from which Ms. Martinez and her daughter come from is a small village called "El Carril" in Olanchito, Yoro.[17] Moliterno Cert. ¶ 4; Exhibit A. "Yoro' is one Honduras' largest municipalities and is ruled by a violent and corrupt family.[18] Ms. Martinez has also lived for a period of time in another dangerous Honduran city, La Ceiba. Exhibit B at 10. According to the United States Department of State OSAC Bureau of Diplomatic Security in its "Honduras 2018 Crime & Safety Report, "[m]ost of Honduras' major cities (Tegucigalpa, San Pedro Sula, La Ceiba), as well as several Honduran departments (have homicide rates higher than the national average, including. . .[the department capital] Yoro, Yoro."[19] Olanchito has, like other areas in Honduras, suffered from high levels of violence. For example, in the last year, local news has run stories discussing two young men found dead in Olanchito,[20] a couple murdered near Olanchito,[21] and a wave of violence in Olanchito including the murder of a rancher and merchant.[22]

Travel from Honduras to the United State is also very dangerous. Almost seventy percent of immigrants fleeing El Salvador, Guatemala and Honduras report being subjected to violence during their journey, with nearly thirty percent of women reporting sexual abuse. [23] This violence is perpetrated not only by criminal organizations, but by Mexican security forces as well.[24] It is a traumatic and exhausting experience, only to be taken as a measure of last resort, and even for those few who do not directly experience violence, the fear of such events is constant.

## Violence and Persecution Faced by Ms. Martinez and Flight to the United States

The violent murders prevalent in Honduras have touched Ms. Martinez personally. Her uncle was found murdered in their home. Moliterno Cert. ¶ 6. Ms. Martinez's family reported this murder to the police but because they were unable to

---

[17] Steven Dudley and Felipe Puerta, *A Honduras Political Clan and Its Criminal Fiefdom*, INSIGHT CRIME, Oct. 19, 2017, *available at* https://www.insightcrime.org/investigations/honduras-political-clan-criminal-fiefdom/ (last accessed Sept. 19, 2018).

[18] *Id.*

[19] *Honduras 2018 Crime & Safety Report*, UNITED STATES DEPARTMENT OF STATE OFFICE OF DIPLOMATIC SECURITY, Apr. 3, 2018, https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=23798 (last accessed Sept. 19, 2018).

[20] *Encuentran sin vida a dos jóvenes en Olanchito*, EL PAÍS, Oct. 17, 2017, http://www.elpais.hn/2017/10/17/encuentran-sin-vida-dos-jovenes-olanchito/ *(translation available upon request).*

[21] *Identifican a pareja asesinada cerca del río Agalteca, en Olanchito, Yoro*, EL HERALDO, Jan. 23, 2018, https://www.elheraldo.hn/sucesos/1145795-466/identifican-a-pareja-asesinada-cerca-del-r%C3%ADo-agalteca-en-olanchito-yoro *(translation available upon request).*

[22] *Ola de violencia en Olanchito: ganadero y comerciante asesinados*, TIEMPO, Dec. 17, 2017, https://tiempo.hn/ola-de-violencia-en-olanchito-dos-asesinados/ *(translation available upon request).*

[23] *Report: Forced to Flee Central America's Northern Triangle. A neglected humanitarian crisis*, MEDECINS SANS FRONTIERES/DOCTORS WITHOUT BORDERS, May 11, 2017, https://www.doctorswithoutborders.org/what-we-do/news-stories/research/report-forced-flee-central-americas-northern-triangle (last accessed Sept. 15, 2018).

[24] *Id.*

Exhibit A
000040

"pay" authorities for an investigation, none occurred. To date, Ms. Martinez does not know the cause of her uncle's death. Murders, such as that of her uncle, are commonplace in the community where Ms. Martinez was living. *Id.*

Indeed, Ms. Martinez and her family have suffered a long history of abuse in Honduras. She was sexually abused as a seven year old child by her uncle, a trauma for which she has had to seek psychological assistance to attempt to cope. Moliterno Cert. ¶ 10; Exhibit B at 11, 14, 18, 20. Further, over a two year period, she suffered verbal and repeated sexual abuse by her now ex-boyfriend. Moliterno Cert. ¶ 7; Exhibit B at 10-14, 20. After she managed to flee this abusive relationship, her ex-boyfriend stalked her and continued to threaten her. Exhibit B at 14. Ms. Martinez did not report this abuse to the police in Honduras because she did not believe that the authorities would assist her, a poor woman, absent the payment of bribes. Moliterno Cert. ¶ 7. Ms. Martinez fears that should she return to Honduras, her ex-boyfriend will find her and continue to seek to abuse her again. *Id.*

In addition to the sexual violence she experienced as a child, the abuse she suffered at the hands of her boyfriend, and the violent conditions in her community, Ms. Martinez was sexually abused and harassed repeatedly by her employers who sought sexual favors from her. Moliterno Cert. ¶ 8; Exhibit B at 16, 20. Ms. Martinez did not report any of these instances of abuse by her employers to the police because she believed that her former bosses were connected to people in authority in the community, including within the police force. Moliterno Cert. ¶ 8; Exhibit B at 16-17. Ms. Martinez feared that if she reported the abuse, her former supervisors would have her killed. Moliterno Cert. ¶ 8. Ms. Martinez fears that were she to return to Honduras, these former supervisors will attack her again. *Id.*; Exhibit B at 16.

Fearing that she would face further harassment from her supervisors if she sought employment in other companies, Ms. Martinez decided to start selling pastries and tamales with her mother, and later clothes. Moliterno Cert. ¶¶ 5, 9. However, Ms. Martinez was not able to avoid the threats of violence prevalent in her country by changing jobs. Early this year, Ms. Martinez was selling her wares, when a strange man approached her and demanded money. Moliterno Cert. ¶ 5. Ms. Martinez paid the man the sums he demanded on approximately three occasions. *Id.* However, when he approached her the last time, she told him that she had no money to give to him. *Id.*; Exhibit B at 15, 20. He threatened physical violence and death to her and her child if she did not give in to his demand. *Id.* These types of extortion requests are common in Honduras.[25] Fearing for her life and the life of her daughter, Ms. Martinez fled Honduras. *Id.*

## Forced Separation of Ms. Martinez from her Daughter and Resulting Severe Emotional Distress

On or about June 1, 2018, Ms. Martinez and her daughter crossed the border into the United States. Exhibit B at 3. Consistent with the government's "zero tolerance"

---

[25] Honduras Profile, INSIGHT CRIME.

Exhibit A
000041

policy, following their entry into the United States, Ms. Martinez and her child were separated and sent to different detention centers. *See* Certification of Laura Peña (hereafter Peña Cert.) ¶ 2. Ms. Martinez was detained at the Port Isabel Detention Center in Texas, while Mariela was transferred into Office of Refugee Resettlement custody. Peña Cert. ¶ 2. Ms. Martinez's forced separation from her daughter was emotionally devastating. She was incredibly worried about her child, and felt responsible for having subjected her daughter to the trauma of the separation and the detention. Peña Cert. ¶ 2, 3, 6. For many days following the separation, Ms. Martinez could not visit her daughter, did not know where she was, or how she was being treated. Ms. Martinez was in a constant state of worry and anxiety and depression, she was crying repeatedly, and indicated that she felt numb. Peña Cert. ¶ 2, 3; Moliterno Cert. ¶ 4.

On or about June 26, 2018, while still suffering from the emotional toll caused by being forcibly separated from her child, Ms. Martinez was interviewed by an asylum officer and he determined that she did not have a credible fear of returning to Honduras. Exhibit B at 7. On or about July 17, 2018, an Immigration Judge affirmed the asylum officer's credible fear determination and ordered that the matter be returned to the Department of Homeland Security for Ms. Martinez's removal. *Id.* at 22.

Although no official mental health diagnosis was obtained (in the short period of time between her arrival in the United States and her credible fear interview), a lawyer who encountered her during these initial first weeks of separation indicated that she demonstrated symptoms of severe emotional distress and trauma. Peña Cert. ¶ 2, 3, 7 (discussing Ms. Martinez's compromised mental and physical health); Moliterno Cert. ¶ 4. Ms. Martinez has recently been seeing a psychologist in detention who has subsequently provided her some measure of relief, and King & Spalding is in the process of obtaining the medical records regarding Ms. Martinez's treatment. Moliterno Cert. ¶ 4.

## Detrimental Effects of Forced Separation from A Child

### Background on Acute Trauma Reaction, Post-Traumatic Stress Disorder and Depression

There are few events more traumatic for parents than to be forcibly separated from their children. This trauma is amplified for refugees who have already suffered the loss of their homes, jobs, and community support. For many refugees, these events will result in significant psychological distress, including post-traumatic stress and mood disorders.[26] Post-traumatic stress disorder ("PTSD") is "a delayed or protracted response to a stressful event or situation of an exceptionally threatening or catastrophic nature, which is likely to cause pervasive distress in almost anyone."[27] Mood disorders are

---

[26] Elisa Bolton, *PTSD in Refugees*, U.S. DEPARTMENT OF VETERANS AFFAIRS, Feb. 3, 2016, *available at* https://www.ptsd.va.gov/professional/trauma/other/ptsd-refugees.asp (last accessed September 17, 2018).

[27] WORLD HEALTH ORGANIZATION, INT'L STATISTICAL CLASSIFICATION OF DISEASES AND RELATED HEALTH PROBLEMS, 10th Rev. (2016), *available at* http://apps.who.int/classifications/icd10/browse/2016/en#/F30-F39 (last accessed Sept. 15, 2018).

Exhibit A
000042

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4199   Page 31 of
251
Case 1:18-cv-0    1-PLF   Document 1-2   Filed 09/26    Page 8 of 215

mental health conditions characterized by fluctuations in one's emotional state[28] and include mental illnesses such as major depression, dysthymia, and bipolar disorder.

While the specific manifestations of these mental health conditions may be different, both mood disorders and PTSD lead to specific difficulties relevant to court proceedings: flat affect and overgeneral memory.[29] Further, emotional numbing, which is characterized by limited or blunted emotional response, including flat affect, is also a symptom of mood disorders and PTSD.[30] A person with a flat affect may speak in a monotone, have few emotional expressions, and may generally appear apathetic or disinterested. However, these behavioral manifestations may not accurately reflect how the individual actually feels about his or her experiences. Instead, they are often utilized as a means to cope with trauma or other painful and difficult experiences.

Individuals with PTSD or mood disorders may also develop other coping mechanisms to deal with their situations, including how they recall memories. It is a common belief that people have heightened memories of events that occurred during a particularly emotional or intense period. However, this is true only to a limited extent.[31] In reality, particularly for traumatic events, individuals recall the event, but not specific details. Remembering events but failing to recall peripheral facts is referred to as "overgeneral memory."[32] Studies indicate that people with PTSD and depression are more likely to have overgeneral memory.[33] It is theorized that because the recollection of specific facts of traumatic events can be distressing, individuals subconsciously forget details as a means of avoiding these negative and painful feelings.[34]

---

[28] *Id.*

[29] Birgit Kleim, et al., *The Impact of Imprisonment on Overgeneral Autobiographical Memory in Former Political Prisoners*, 26 J. OF TRAUMATIC STRESS 626, 626 (2013).

[30] Richard L. Amdur et al., *Emotional Processing in Combat-Related Posttraumatic Stress Disorder: A Comparison with Traumatized and Normal Controls*, 14 J. ANXIETY DISORDERS 219, 220 (2000).

[31] Anne E. Van Giezen et al., *Consistency of Memory for Emotionally Arousing Events: A Review of Prospective and Experimental Studies*, 25 CLINICAL PSYCH. REV. 935, 936 (2005), ; *cf.* Shamsul Haque, *Autobiographical Memory and Hierarchical Search Strategies in Depressed and Non-Depressed Participants*, 14 BMC PSYCHIATRY 310, 310 (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC4240842/ (last accessed Sept. 15, 2018) (describing how depressed patients retrieved memories more quickly but had less specific recall than non-depressed people).

[32] *Id.*

[33] Kleim, *The Impact of Imprisonment on Overgeneral Autobiographical Memory in Former Political Prisoners*, at 626 (describing this phenomenon).

[34] Haque, *Autobiographical Memory and Hierarchical Search Strategies in Depressed and Non-Depressed Participants*, at 310.

Exhibit A
000043

Because of overgeneral memory, people with depression or PTSD are more likely to confuse names and dates. They become limited in their ability to provide a full narrative and they are unable to recall details. Further, they may have a flat affect that can often give the false impression that they are indifferent to or unaffected by the traumatic or violent events they may have witnesses or experienced. These behaviors are all symptoms of an individual's mental health conditions and reflect the person's impaired ability to advocate on behalf of himself or herself and to participate meaningfully in the asylum process. As a result, providing accommodations is crucial to ensure that people such as Ms. Martinez have a fair opportunity to present their cases in court.

<u>Detrimental Effects of Forced Separation from A Child</u>

There are significant negative long-term and short-term effects on the emotional health of parents who lost their children through detention center separations. In the short-term, severe anxiety brought on by separation results in "an overall decline in daily functioning."[35] Other deleterious effects include impaired memory, a lack of ability to concentrate, and intense and excessive fears,[36] all of which hinder asylum seekers' ability to advocate their claims. In the long-run, this forced separation may cause depression, PTSD, and the loss of will to live from what is regarded by Aurélie Athan, a clinical psychologist who studies motherhood at Columbia University, as "a mental health catastrophe."[37] This mental shut down, resulting from the extreme stress generated by the loss of their children, can create difficulties in recalling the experiences and persecution that motivated the parents to flee their homes and communities originally. Parents may also be subject to what Dr. William R. Klemm, a senior professor of Neuroscience at Texas A&M labels "brain freezes," where "thinking can get so preoccupied with the stress-inducing stimuli that other thoughts cannot emerge."[38] This chronic and extreme mental stress can become so unbearable that some parents may be driven to take their own lives.[39] It is essential that proper safeguards be implemented to assist these parents to overcome the barriers to effective advocacy created by the trauma they have experienced and that they be allowed to appropriately advocate their claims.

---

[35] *Signs & Symptoms of Separation Anxiety*, SHAKER CLINIC, http://www.shakerclinic.com/anxiety/separation-anxiety/symptoms-effects (last accessed Sept. 15, 2018).
[36] *Id.*

[37] Rosa Furneaux, *Forcibly Separating Children From Their Mothers Doesn't Just Hurt the Kids*, MOTHERJONES, Jun. 21, 2018, https://www motherjones.com/politics/2018/06/trump-forced-family-separation-children-devastating-effects-mothers-1/ (last accessed Sept. 15, 2018).

[38] William R. Klemm, *Thwart Stress Effects of Memory*, PSYCHOLOGY TODAY, Dec. 29, 2016, https://www.psychologytoday.com/us/blog/memory-medic/201612/thwart-stress-effects-memory (last accessed Sept. 15, 2018),

[39] Jeffery C. Mays & Matt Stevens, *Honduran Man Kills Himself After Being Separated From Family at U.S. Border, Reports Say*, N.Y. TIMES, Jun. 10, 2018, https://www.nytimes.com/2018/06/10/us/border-patrol-texas-family-separated-suicide.html (last accessed Sept. 15, 2018).

Exhibit A
000044

<u>Basis for Safeguards in the Credible Fear Interview Process</u>
<u>before the Asylum Office</u>

Parents separated from their children can suffer from an array of emotional and mental illnesses, including PTSD and mood disorders, which may significantly impair their mental functioning. While Title 8 does not specifically define "mentally incompetent," the definition of "mental or psychological disorder," found at 6 C.F.R. § 15.3(d)(ii), includes "mental retardation, organic brain syndrome, **emotional or mental illness,** and specific learning disabilities" (emphasis added). Codified in various sections of Title 8 of the Code of Federal Regulations ("C.F.R.") are the legal requirements for dealing with mentally incompetent applicants and although 8 C.F.R. § 1240.4 relates specifically to removal proceedings before Executive Office for Immigration Review, the provision gives useful guidance for the conduct of asylum interviews. In such instances, an attorney, legal representative, legal guardian, near relative, or friend who has been served with a copy of the notice to appear shall be permitted to appear on behalf of the respondent. Allowing an advocate so assist or speak on their behalf as necessary permits traumatized parents an equal opportunity to advocate in an effective and appropriate manner.

## ARGUMENT

I. **Ms. Martinez Was Suffering the Effects of Forced Separation From Her Child During Her Initial Credible Fear Determination and Fundamental Fairness Requires That She Be Afforded a New Interview**

A. **The Asylum Officer Failed to Appropriately Consider Ms. Martinez's Diminished State at the Time of the Interview**

Immigration Judges must ensure that immigration proceedings are fundamentally fair.[40] Thus, Immigration Judges must prescribe safeguards when necessary to ensure that each respondent has an "adequate opportunity to present his or her case during a hearing."[41] The Board of Immigration Appeals requires that immigration courts make accommodations for persons with mental health conditions.[42] Absent such safeguards and accommodations, the testimony of a person with mental health trauma may confuse, rather than clarify, the record.[43] Further, the assigned asylum officer is required to conduct the credible fear interview of an asylum seeker "in a nonadversarial manner, separate and apart from the general public" and "[t]he purpose of the interview shall be to

---

[40] *See* INA § 240(b)(4)(B) (requiring that respondents have a "reasonable opportunity" to examine and rebut evidence against them); *Matter of Tomas*, 19 I&N Dec. 464, 465 (BIA 1987) (describing importance of fundamental fairness of immigration proceedings); and *Matter of Exame*, 18 I&N Dec. 303 (BIA 1982) (same).

[41] *Matter of M-A-M*, 25 I&N Dec. 474, 477–78 (BIA 2011).

[42] *See Matter of J-R-R-A*, 26 I&N Dec. 609, 610–12 (BIA 2015); *Matter of M-A-M*, 25 I&N Dec. 474, 480 (BIA 2011).

[43] *See Matter of J-R-R-A*, 26 I&N Dec. 609, 611–12 (BIA 2015) (describing importance of safeguards for person with cognitive limitations).

9

Exhibit A
000045

elicit *all* relevant and useful information bearing on whether the applicant has a credible fear of persecution…"[44] If, for any reason, the asylum officer who is "conducting the credible fear interview determines that the alien is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview."[45] Given the extreme stress on Ms. Martinez, her asylum officer should have used his discretion to delay her Credible Fear Interview until such a time when she was not impaired, and better able to answer the asylum officer's questions and otherwise articulate her experiences.

In Ms. Martinez's initial Credible Fear Interview, she was unable to convey key facts because the Asylum Officer failed to take into proper account her diminished mental health condition. *See generally*, Exhibit B at 11-13, 15, 17-19. Ms. Martinez was suffering from depression and severe emotional trauma from being separated from her daughter, Mariela, which rendered her unable to recall specific facts or articulate all the reasons why she was seeking asylum. Moliterno Cert. ¶ 5, Peña Cert. ¶¶ 3, 6. However, the Asylum Officer failed to make any attempt to ascertain Ms. Martinez's current mental health status or its potential effect on Ms. Martinez's ability to effectively participate in the interview. *See generally*, Exhibit B at 11-13, 15, 17-19. The Asylum Officer asked briefly about Ms. Martinez's physical health, but she did not ask any follow up questions regarding Ms. Martinez's psychological status or whether she was receiving any, or needed, treatment for her diminished mental health condition. *See generally* Exhibit B. Ms. Martinez's past history of trauma prevented her from remembering or articulating all of the relevant details during her Credible Fear Interview.

When the Asylum Officer asked Ms. Martinez about whether she had been abused by her partner, she appeared confused and found it difficult to answer basic questions. For example, in response to a question "has anyone physically harmed you?" Ms. Martinez responded, "No they just hit me." Exhibit B at 9. Ms. Martinez was also unable to provide a concrete number of occasions when she suffered abuse, nor was able to provide the details of a specific instance of abuse. *Id*. at 11-12. When the Asylum Officer asked Ms. Martinez for details about the man who had threatened her if she did not pay him, she was unable to recall or provide detail, including information that would have been pertinent to her asylum claim. *Id*. at 15, 20. Throughout the interview, the Asylum Officer failed to ask any questions regarding whether Ms. Martinez's fragile emotional state and extreme concern about her daughter would prevent her from fully discussing the events and circumstances that caused Mr. Martinez and her daughter to flee Honduras. *Id*. Indeed, the asylum officer displayed no compassion in the manner in which she interrogated Ms. Martinez, asking her the following question about her sexual assault as a seven year old: [f]or what reasons did your Uncle harm you when you were a child." *Id*. at 18. In response, Ms. Martinez told her that she did not "know the reason." *Id*.

As discussed above, the effects of depression and likely PTSD are well recorded. Persons suffering from depression or PTSD often suffer from "overgeneral memory," a

---

[44] 8 C.F.R. § 208.30(d) (emphasis added).
[45] 8 C.F.R. § 208.30(d)(1).

Exhibit A
000046

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4203   Page 35 of
251
Case 1:18-cv-0?   -PLF   Document 1-2   Filed 09/26/   Page 12 of 215

coping mechanism where the affected person subconsciously avoids negative feelings by forgetting the specific details of past, traumatic events.[46] Because of overgeneral memory, a person suffering from depression or PTSD is more likely to confuse names and dates and is less likely to tell a complete and accurate narrative of past events. The emotional turmoil of parents separated from their children is also well documented. In the short term, separation anxiety causes "an overall decline in daily functioning," including impaired memory, a lack of ability to concentrate, and excessive fears.[47] In the long term, this "mental health catastrophe" may cause depression, PTSD, and the loss of the will to live.[48]

Ms. Martinez manifests the hallmarks of depression and severe emotional trauma due to the Government's forced separation from her daughter Mariela. Ms. Martinez has been crying "non-stop." Peña Cert. ¶ 3. Despite being diabetic, Ms. Martinez was at times not eating, and unable to sleep at night. Peña Cert. ¶ 6. In interviews with counsel, Ms. Martinez has noted that she is suffering depression due to the separation from her daughter. Moliterno Cert. ¶ 4. She feels emotionally numb. *Id.* She notes that she was sad when her mother died, but that emotion was nothing like what she is currently experiencing.

The mental impact of the separation is complicated by Ms. Martinez's own personal history. Prior to being separated from Mariela, Ms. Martinez had been forced to endure repeated abuse. When she was seven, Ms. Martinez was sexually assaulted by her uncle. Moliterno Cert. ¶ 10; Exhibit B at 11, 14, 18, 20. At 14, Ms. Martinez was seeing a psychologist to help cope with the trauma. Moliterno Cert. ¶ 10. From approximately the ages of 18 to 20, Ms. Martinez was routinely abused and assaulted by her then-partner. Moliterno Cert. ¶ 7; Exhibit B at 10-14, 20. During her adult life, Ms. Martinez has faced unwanted sexual advances from her supervisors in two separate jobs. Moliterno Cert. ¶ 8; Exhibit B at 16, 20.

Because the Asylum Officer did not delay Ms. Martinez's interview in light of her diminished mental state or properly account for Ms. Martinez's mental health and anguish during her Credible Fear Interview, Ms. Martinez respectfully requests that she be given a new Credible Fear Interview during which she will be assisted by counsel and that her Request for Reconsideration be granted.

**B.    The Government Acknowledges that a New Credible Fear Determination is Appropriate in these Forced Separation Cases**

In the pending proceedings in the family separation class actions before United States District Court Judge Sabraw in the Southern District of California, including the *Ms. L* lawsuit (Case No. 3:18-CV-0428), the Department of Justice clearly acknowledges that a parent whose child is forcibly removed from their care lacks the requisite mental

---

[46] Sally A. Moore and Lori A. Zoellner, *Overgeneral Autobiographical Memory and Traumatic Events*, 133(3) PSYCHOL BULL. 419 (2007).

[47] *Signs & Symptoms of Separation Anxiety.*

[48] Furneaux, *Forcibly Separating Children From Their Mothers Doesn't Just Hurt the Kids.*

11

Exhibit A
000047

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4204   Page 36 of
251
Case 1:18-cv-0    -PLF   Document 1-2   Filed 09/26/   Page 13 of 215

capacity to present a fair explanation of their credible fear to the Asylum Officer. Specifically, the Department of Justice, the Department of Homeland Security, and Immigration and Customs Enforcement, recognize that a credible fear interview conducted within weeks of asylum-seeking immigrants being separated from their children is impermissibly tainted, due to the mental trauma inflicted upon these parents brought on by taking children away from their parents. In the tentative settlement in the *Ms. L* lawsuit that was the subject of a hearing before Judge Sabraw on September 14, 2018, the Government agreed that parents in government detention who had been separated from their children who did not establish a credible fear in their initial interview will be granted "a de novo review of the credible fear finding . . . to determine if reconsideration of the negative determination is warranted", and that such de novo review shall be conducted in "good faith."[49] Further, the Government agreed that these asylum seekers could have an attorney assist them in these de novo reviews of the credible fear determinations.[50] Ms. Martinez's initial credible fear interview was similarly tainted by her diminished mental state directly caused by the forced separation from her daughter, and fundamental fairness requires a good faith, de novo credible fear interview for Ms. Martinez, with the assistance of counsel.

> **C.**   **There is a "[S]ubstantial and [R]ealistic [P]ossibility" that Ms. Martinez will Establish Eligibility for Asylum and Withholding of Removal**

Federal law provides that an asylum seeker is "found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act."[51] The United States Supreme Court has held that a significant possibility may be established even in instances where there is as little as a 10 percent chance that the individual will be persecuted on account of a protected ground.[52] Per *INS v. Cardoza-Fonseca,* all that is required is that "persecution is a reasonable possibility."[53]

In order to make a credible fear determination, the C.F.R. requires the asylum officer to conduct a "threshold screening interview" of all asylum seekers to determine whether those individuals are "ineligible to apply for asylum."[54] Ms. Martinez, if given an opportunity to present new facts and to recount her experiences in a new screening interview, after she has received treatment for the mental trauma caused by the forced separation from Mariela, will establish a "significant possibility" that she will ultimately prevail on either an asylum claim or a claim of withholding of removal.

---

[49] *Ms. L v. US Immigration and Customs Enforcement*, Case No. 3:18-CV-0428, Docket Entry 220, at p. 3440.

[50] *M.M.M. v. Jefferson B. Sessions*, Case No. 3:18-CV-01832, Docket Entry 65-1, at p. 2-3.

[51] 8 C.F.R. § 208.30(e)(2).

[52] See *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987).

[53] *Id.*

[54] 8 C.F.R. § 208.30(e)(6).

Exhibit A
000048

### 1.   Ms. Martinez has a Significant Possibility of Prevailing on an Asylum Claim

To demonstrate eligibility for asylum, an applicant must show that she is a refugee.[55] That is, that she "is unable or unwilling to" return to the country of her nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[56] Although the INA does not define "persecution," applicable case law has defined it as "a threat to life or freedom or infliction of suffering or harm upon those who differ in a way regarded as offensive."[57] Persecution may also include: serious physical harm,[58] rape or sexual assault,[59] forced abortion,[60] harm to family members and close associates,[61] threats,[62] severe economic harm,[63] extortion,[64] and emotional or psychological harm.[65] *Scheerer v. U.S. Attorney General* held that an asylum seeker can prove refugee status by simply presenting "specific and credible evidence" of either past

---

[55] INA § 1158(b)(1)(B)(I).

[56] *Id.* § 1101(42). *See also, Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006) ("To establish asylum based on past persecution, the applicant must show (1) that she was persecuted, and (2) that the persecution was on account of a protected ground," such as race, religion, nationality, political opinion, or membership in a particular social group."); *Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir. 2001) ("To establish eligibility for asylum based on a well-founded fear of future persecution, the applicant must show (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." *Id.* (emphasis added, citations and quotation marks omitted). "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution. In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." (citation and quotation marks omitted)).

[57] *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985).

[58] *Ndom v. Ashcroft*, 384 F.3d 743, 752 (9th Cir. 2004) (two detentions without formal charges for a combined total of 25 days in a dark crowded cell, where applicant was shackled in cuffs preventing him from straightening his legs and forcing him to urinate on his clothes, constitute persecution); *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir. 1995) (detention and physical torture); *Tarubac v. INS*, 182 F.3d 1114, 1118 (9th Cir. 1999) (being kidnapped, beaten, held without food, and threatened is persecution); *Matter of V-T-S*, 21 I. & N. Dec. 792, 801 (BIA 1997) (kidnapping is persecution).

[59] *See, e.g., Zubeda v. Ashcroft*, 333 F.3d 463, 472 (3d Cir. 2003); *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1097-98 (9th Cir. 2000); *Angoucheva v. INS*, 106 F.3d 781, 793 (7th Cir. 1997); *Lopez-Galarza v. INS*, 99 F.3d 954, 959 (9th Cir.1996).

[60] *See, e.g., Lidan Ding v. Ashcroft*, 387 F.3d 1131, 1139 (9th Cir. 2004).

[61] *See, e.g., Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004); *Navas v. INS*, 217 F.3d 646, 658 (9th Cir. 2000); *Chouchkov* v. INS, 220 F.3d 1077 (9th Cir. 2000); *Matter of A-K-*, 24 I. & N. Dec. 275, 278 (BIA 2007).

[62] *See, e.g., Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011); *Chavarria v. Gonzales*, 446 F.3d 508, 518 (3d Cir. 2006); *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004); *Ruano v. Ashcroft*, 301 F.3d 1155, 1160-61 (9th Cir. 2002).

[63] *See, e.g., Matter of T-Z-*, 24 I. & N. Dec. 163, 173-74 (BIA 2007).

[64] *See, e.g., Silvia Ayala v. Sessions*, 855 F.3d 1012, 1015 (9th Cir. 2016); 807 F.3d 53, 59-60 (4th Cir. 2015).

[65] *See, e.g., Mashiri v. Ashcroft*, 383 F.3d 1112 (9th Cir. 2004); Matter of A-K-, 24 I. & N. Dec 275 (BIA 2007).

Exhibit A
000049

persecution or fear of future persecution "on account of her race, religion, nationality, membership in a particular social group, or political opinion."[66]

### Family Social Group

Ms. Martinez, as a member of her family, is part of a recognized particular social group. The Board of Immigration Appeals held in *Matter of L-E-A-* that "Members of an immediate family may constitute a particular social group. We have long recognized that family ties may meet the requirements of a particular social group depending on the facts and circumstances in the case."[67]

Through her family, she has been subject to persecution and has a well-founded fear of persecution in the future. Ms. Martinez has been battered and sexually abused since the age of seven years when she was assaulted by her uncle. Moliterno Cert. ¶ 10; Exhibit B at 11, 14, 18, 20. He threatened to kill her if she reported the abuse. Exhibit B at 20. Her mother, father, and grandmother were informed of the abuse, but no one reported the sexual abuse of a child and the threats of murder to the police. Exhibit B at 15, 20. In addition, she was repeatedly raped, abused and then stalked by her boyfriend for several years. Moliterno Cert. ¶ 7; Exhibit B at 10-12, 14, 20. He beat her about her face and head and threw her down before abusing her sexually. Exhibit B at 12-13. Cert. In addition to family-based abuse, Ms. Martinez's family has also been targeted by external violence. Her uncle was killed in his home, but no investigation occurred because her family lacked resources to pay the authorities. Moliterno Cert. ¶ 6. *See also* Section I.A, *supra*.

### Low-Income Women Social Group

Ms. Martinez also is a member of a particular social group of low-income women in Honduras. The Board of Immigration Appeals established in *Matter of M-E-V-G-* that applicants must "establish that the group [at issue] is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[68] At home, at work or elsewhere, low-income Honduran women are repeatedly targeted by their family members, supervisors, individuals in authority and numerous criminal gangs and subjected to extortion, physical and sexual violence and even death, while their perpetrators continue to operate with impunity. *See supra* at pages 2-4 (Violent Conditions in Honduras).

Ms. Martinez was repeatedly raped, abused and then stalked by her boyfriend for several years and then repeatedly sexually harassed by her employers. Moliterno Cert. ¶ 7; Exhibit B at 10-14, 20. Ms. Martinez and her family did not report these crimes to the Honduran authorities because of the unwillingness of the authorities to police or even

---

[66] 445 F.3d 1311, 1315 (11th Cir. 2006).

[67] 27 I. & N. Dec. 40, 42 (BIA 2017); *see also Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015).

[68] 26 I. & N. Dec. 227 (BIA 2014); *see also S.E.R.L. v. Sessions*, No. 17-2013, 3rd Cir. (July 3, 2018).

14

Exhibit A
000050

investigate misconduct, absent corrupt facilitating payments. Moliterno Cert. ¶ 7; Exhibit B at 17-18. In fact, Ms. Martinez feared that reporting some of these crimes to the police would lead the perpetrators of her assault have her killed. Moliterno Cert. ¶ 8.

In addition to the sexual violence that Ms. Martinez has endured since childhood, she is a single woman of limited means who was living in a country with a widespread culture of lawless, violence and impunity. As detailed above, country conditions in Honduras are extremely dangerous. In 2015, according to the UN Office on Drugs and Crime identified 63.75 out of every 100,000 Hondurans was killed by intentional homicide and in 2010, the last year for which there was data, 34.8 % of total homicides were victims killed by gangs or organized criminal groups.[69] The city that she calls home is recognized as one of the most dangerous cities in what is already one of the most violent and dangerous countries in the world. The fact that Ms. Martinez's uncle was found murdered in their home, likely as a result of the rampant gang violence, is relevant to Ms. Martinez's own fear of harm and persecution. The Ninth Circuit held "a death threat, violence against family members, vandalism, economic harm, and emotional trauma" amounted to past persecution.[70] It noted in a further case that "Violence directed against an applicant's family members provides support for a claim of persecution and in some instances is sufficient to establish persecution because such evidence 'may well show that [an applicant's] fear of persecution is well-founded.'"[71]

The extortion attempts from the man who threatened her and her daughter with death is yet another example of the violence and lawlessness present in Ms. Martinez's hometown and country and evidence of the fact that as a low-income woman, she was a target. These types of extortion threats, directed primarily at women, are commonplace in Honduras. Courts have held that credible threats to invoke grave physical harm constitute persecution.[72] Furthermore, at least two circuit courts have held that extortion plus the threat of violence can constitute persecution: the Ninth Circuit held that "[t]he IJ committed legal error by holding that extortion could not constitute persecution."[73]; and the Fourth Circuit stated, "Extortion itself can constitute persecution, even if the targeted individual will be physically harmed only upon failure to pay."[74] If extortion occurs on account of a protected ground, an individual qualifies for a grant of asylum.[75] Ms. Martinez was targeted for these extortion payments precisely because she was a poor woman with no recourse. The past persecution Ms. Martinez has suffered at the hands of

---

[69] *See, e.g., Intentional homicide, counts and rates per 100,000 population*, UNODC STATISTICS, https://data.unodc.org/#state:1 (last accessed Sept. 16, 2018); *Intentional homicide victims killed by gangs or organized criminal groups as percentage of total homicide victims by country/territory (2005-2012)*, UNODC STATISTICS, *available at* https://data.unodc.org/#state:1 (last accessed Sept. 16, 2018).

[70] *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004).

[71] *Baballah v. Ashcroft*, 367 F.3d 1067 (9th Cir. 2003) (quoting UNHCR, Handbook at ¶ 43).

[72] *See, e.g., Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011) (providing examples of threats and other nonphysical harm that may constitute persecution).

[73] *Ayala v. Sessions*, 855 F.3d 1012, 1015 (9th Cir. 2016).

[74] *Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015).

[75] *See id.* ("Recognizing that extortion can be a form of persecution, the appropriate inquiry is thus whether the extortion occurred on account of protected grounds.").

15

Exhibit A
000051

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4208   Page 40 of
Case 1:18-cv-0(    )-PLF   Document 1-2   Filed 09/26(    )   Page 17 of 215
251

family members and an intimate partner, as well as her employers and the criminal elements operating in Honduras, creates a substantial and realistic possibility that Ms. Martinez will prevail at a full merits hearing. Since Ms. Martinez can establish she has suffered past persecution, she is "presumed to have a well-founded fear of persecution on the basis of the original claim."[76]

Further, Ms. Martinez fears returning to Honduras because she fears that her extortionist will make good on his promise to kill her and her daughter. Moliterno Cert. ¶ 8; Exhibit B at 15, 16, 20. Ms. Martinez also fears further sexual abuse and violence from her estranged former-boyfriend and her former employers. Moliterno Cert. ¶ 7-8; Exhibit B at 16, 20. As with the prior abuse she has suffered, Ms. Martinez will have no one to turn either to protect her or to hold the perpetrators accountable. These fears, grounded in her past abuse, the credible threats that were directed towards her, and the rampant violence in her home country, amount to a well-founded fear of future persecution, were she to return to Honduras.

Indeed, Ms. Martinez would be eligible for a grant of humanitarian asylum based on her past persecution and the likelihood that she will face other serious harm if returned to Honduras.[77] The Board of Immigration Appeals explained that humanitarian asylum can be granted due to "compelling reasons" associated with the past persecution or the "reasonable possibility" that an applicant who establishes past persecution will face "other serious harm" if returned to his or her country of origin.[78] An analysis of "other serious harm" can include both general country conditions regarding gang violence and economic deprivation, as well as the particular challenges Ms. Martinez faces as a single mother without male protection and as a poor woman with no livelihood and a history of abuse and persecution in Honduras. Therefore "adjudicators considering 'other serious harm' should be cognizant of conditions in the applicant's country of return and should pay particular attention to major problems that large segments of the population face or conditions that might not significantly harm others but that could severely affect the applicant."[79]

### 2. Ms. Martinez has a Significant Possibility of Prevailing on a Claim of Withholding of Removal

Withholding of removal under INA Section 241(b)(3) requires showing that it is more likely than not that the applicant's life or freedom will be threatened on account of one of the five protected grounds in the asylum/refugee definition (above).[80] Given the

---

[76] 8 C.F.R. § 1208.13(b)(1).

[77] See 8 C.F.R. § 1208.13(b)(1)(iii).

[78] Matter of L-S-, 25 I&N Dec. 705 (BIA 2012).

[79] See id. at 714.

[80] Applicants for withholding of removal may argue they only need to establish that a protected characteristic was "a reason" and not "one central reason" motivating their persecution. See Barajas-Romero v. Lynch, 846 F.3d 351, 360 (9th Cir. 2017) (remanding the case to the BIA in light of the finding that because Congress amended the asylum statute to include the REAL ID Act's "one central reason" nexus standard, but did not include similar language to the withholding of removal statute, Congress did

Exhibit A
000052

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4209   Page 41 of
251
Case 1:18-cv-0  .-PLF   Document 1-2   Filed 09/26/   Page 18 of 215

foregoing discussion about the numerous instances of past persecution on account of her membership in a group of low-income women in a country overrun by sexual violence and death, it is fair to say that it is "more likely than not" that Ms. Martinez's life would be threatened if she were to return to Honduras. Ms. Martinez has a significant likelihood of also prevailing on a claim of withholding of removal.

## II.    Conclusion

In conclusion, Ms. Martinez should be granted her Request for Reconsideration and access to a second Credible Fear Interview, with the assistance of counsel. It would be fundamentally unfair, as the Government itself implicitly concedes in the putative settlements in the forced family separation class action litigation before Judge Sabraw, to fail to account for the emotional trauma wrought upon a parent separated from her daughter. This forced separation prevented Ms. Martinez from effectively recounting the circumstances surrounding the past persecution she has faced in Honduras, circumstances which demonstrate that she has a viable asylum claim.

Sincerely,

*Kathleen L. Benner*

**Kathleen L. Benner**
Attorney
KING & SPALDING LLP
1700 Pennsylvania Ave, Suite 200
Washington, DC 20005
(202) 626-5403
kbenner@kslaw.com

---

not intend for the "one central reason" standard to apply to withholding of removal claims). *See also INS v. Stevic*, 467 U.S. 407, 429-30 (1984).

Exhibit A
000053



# Notice of Entry of Appearance
## as Attorney or Accredited Representative
### Department of Homeland Security

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

## Part 1. Information About Attorney or Accredited Representative

**1.** USCIS Online Account Number (if any)

▶ [                    ]

### Name of Attorney or Accredited Representative

**2.a.** Family Name (Last Name)  Benner

**2.b.** Given Name (First Name)  Kathleen

**2.c.** Middle Name  Leslie

### Address of Attorney or Accredited Representative

**3.a.** Street Number and Name  1700 Pennsylvania Ave NW

**3.b.** ☐ Apt. ☑ Ste. ☐ Flr.  200

**3.c.** City or Town  Washington

**3.d.** State  DC  **3.e.** ZIP Code  20006

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country  USA

### Contact Information of Attorney or Accredited Representative

**4.** Daytime Telephone Number  (202) 626-5403

**5.** Mobile Telephone Number (if any)  (202) 394-2995

**6.** Email Address (if any)  k.benner@kslaw.com

**7.** Fax Number (if any)  (202) 626-3737

---

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select all applicable items.

**1.a.** ☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

Licensing Authority

District of Columbia Bar

**1.b.** Bar Number (if applicable)

1046230

**1.c.** I (select only one box) ☑ I am not ☐ I am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

**1.d.** Name of Law Firm or Organization (if applicable)

King + Spalding LLP

**2.a.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

**2.b.** Name of Recognized Organization

**2.c.** Date of Accreditation (mm/dd/yyyy)

**3.** ☐ I am associated with

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

**4.a.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2).

**4.b.** Name of Law Student or Law Graduate

---

Exhibit A
000054

## Part 3. Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

This appearance relates to immigration matters before (select only one box):

**1.a.** ☑ U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

**2.a.** ☐ U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

**3.a.** ☐ U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)
▶

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select only one box):
☐ Applicant   ☐ Petitioner   ☐ Requestor
☐ Beneficiary/Derivative   ☐ Respondent (ICE, CBP)

## Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)

**6.a.** Family Name (Last Name) Martinez-Martinez

**6.b.** Given Name (First Name) Lesbi

**6.c.** Middle Name Nohemi

**7.a.** Name of Entity (if applicable)

**7.b.** Title of Authorized Signatory for Entity (if applicable)

**8.** Client's USCIS Online Account Number (if any)
▶

**9.** Client's Alien Registration Number (A-Number) (if any)
▶ A- 2 1 5 5 8 2 1 1 2

## Client's Contact Information

**10.** Daytime Telephone Number

**11.** Mobile Telephone Number (if any)

**12.** Email Address (if any)

## Mailing Address of Client

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name  1700 Pennsylvania Ave. NW

**13.b.** ☐ Apt.  ☑ Ste.  ☐ Flr.  200

**13.c.** City or Town  Washington

**13.d.** State  DC    **13.e.** ZIP Code  20006

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country
USA

## Part 4. Client's Consent to Representation and Signature

### Consent to Representation and Release of Information

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

Exhibit A
000055

## Part 4. Client's Consent to Representation and Signature (continued)

### Options Regarding Receipt of USCIS Notices and Documents

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery. USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below. You may change these elections through written notice to USCIS.

**1.a.** ☐ I request that USCIS send original notices on an application or petition to the U.S. business address of my attorney or accredited representative as listed in this form.

**1.b.** ☐ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative. If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

**1.c.** ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### Signature of Client or Authorized Signatory for an Entity

**2.a.** Signature of Client or Authorized Signatory for an Entity

➡ _Walton Martinez_

**2.b.** Date of Signature (mm/dd/yyyy)  08/15/2018

## Part 5. Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

**1.a.** Signature of Attorney or Accredited Representative

_Kathleen J. Benner_

**1.b.** Date of Signature (mm/dd/yyyy)  08/30/2018

**2.a.** Signature of Law Student or Law Graduate

**2.b.** Date of Signature (mm/dd/yyyy)

Exhibit A
000056

## Part 6.  Additional Information

If you need extra space to provide any additional information within this form, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper.  Type or print your name at the top of each sheet; indicate the **Page Number, Part Number,** and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name)  *Benner*

**1.b.** Given Name (First Name)  *Kathleen*

**1.c.** Middle Name  *Leslie*

**2.a.** Page Number  *7*
**2.b.** Part Number  *2*
**2.c.** Item Number  *7b*

**2.d.** *Licensing Authority-New York*
*Bar Number - 919251*

**3.a.** Page Number
**3.b.** Part Number
**3.c.** Item Number

**3.d.**

**4.a.** Page Number
**4.b.** Part Number
**4.c.** Item Number

**4.d.**

**5.a.** Page Number
**5.b.** Part Number
**5.c.** Item Number

**5.d.**

**6.a.** Page Number
**6.b.** Part Number
**6.c.** Item Number

**6.d.**

Exhibit A
000057

# Exhibit A

Exhibit A
000058

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4215   Page 47 of
251
Case 1:18-cv-0( )-PLF   Document 1-2   Filed 09/26( )   Page 24 of 215



PATRONATO COMUNAL PRO MEJORAMIENTO
DE LA ALDEA EL CARRIL
OLANCHITO, YORO
PERIODO 2016-2017

## CONSTANCIA

Nosotros el Patronato de la Comunidad de El Carril por medio de la presente HACEMOS CONSTAR QUE LESBI NOHEMI MARTINEZ MARTINEZ con Numero de identidad 1807-1995-01146, es la tutora de la niña YENCY MARIELA MARTINEZ MARTINEZ con No. de identidad 1807-2007-00395, quien nació el 7 de Junio del 2007 ella queda de encargada ya que su madre ONELSA MARGARITA MARTINEZ MARTINEZ con No. de identidad 1807-1972-00050, murió el 17 de Octubre del 2015 y su Padre RAMON EVELIO MARTINEZ RAUDALES con No. de identidad 1807-1954-0068, le dio la guarda cuidado y tutoral legal a la joven LESBI NOHEMI MARTINEZ MARTINEZ quedando como su tutora y encargada.

Y para los fines que los interesados estimen convenientes se le extiende la presente el día Miércoles 19 de Octubre del año 2016.

Atentamente.

Abel Ochoa
Presidente

PERSONADURIA JURIDICA
NO. 042
CON ASIENTO EN TEGUCIGALPA D.C

Exhibit A
000059

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4216   Page 48 of
Case 1:18-cv-0(   )-PLF   Document 1-2   Filed 09/26(   )   Page 25 of 215
251

[emblem]
COMMUNAL BOARD FOR IMPROVEMENT
OF THE VILLAGE OF EL CARRIL
OLANCHITO, YORO,
PERIOD 2016-2017

### CERTIFICATE

We, the Board of the Community of El Carril, hereby STATE THAT: **LESBI NOHEMI MARTINEZ MARTINEZ,** Identity Number 1807-1988-011478, is the guardian of the female child **YENCY MARIELA MARTINEZ MARTINEZ, Identity No. 1807-2007-00399,** who was born on June 7, 2003. She remained in charge, since her mother, **ONELSA MARGARITA MARTINEZ MARTINEZ,** identity No. 1802-1972-00050, died on October 17, 2016 and her father, **RAMON EVELIO MARTINEZ RAUDALES,** Identity No. 1807-1964-0068, entrusted the protection, custody and legal guardianship to the young **LESBI NOHEMI MARTINEZ MARTINEZ,** who remained the custodian in charge thereof.

And for the purposes deemed convenient by the interested parties, this certificate is given to her on Wednesday, October 19, 2016.

**Sincerely,**

[stamp: 2016-2018 illegible]
[signature]
Abel Ochoa
President

LEGAL DEPARTMENT
No. 042
WITH HEADQUARTERS IN TEGUCIGALPA D.C

Exhibit 3
000060

Case 3:18-cv-00428-DMS-MDD  Document 282-1  Filed 10/15/18  PageID.4217  Page 49 of
Case 1:18-cv-0{    }-PLF  Document 1-2  Filed 09/26{    }  Page 26 of 215
251



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"2016 - Legal Guardianship Document"** is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.



Aurora Landman

Sworn to before me this
September 17, 2018

Signature, Notary Public

Stamp, Notary Public

Exhibit 4
000061

## GUARDA Y CUSTODIA.-

Yo, **RAMON EVELIO MARTINEZ RAUDALES**, mayor de edad, hondureño, con N° de identidad, **1807-1964-00681**, con domicilio en la Aldea el Carril Jurisdicción de Olanchito, Departamento de Yoro, la cual autorizo a mi hija **LESBI NOHEMI MARTINEZ MARTINEZ** con No de identidad **1807-1988-01148**, con domicilio en la Aldea el Carril Jurisdicción de Olanchito, Departamento de Yoro, para que haga las gestiones necesarias ante las autoridades competentes y tenga la guarda y custodia de mi menor hija **YENCY MARIELA MARTINEZ MARTINEZ** con No de identidad **1807-2007-00399**.

En fe de lo cual, firmo la presente **GUARDA Y COSTODIA**, en la ciudad de Olanchito, Yoro, **A LOS 03 DIAS DEL MES DE MAYO DEL AÑO 2018**.

RAMON EVELIO MARTINEZ RAUDALES

Exhib. 5
000002

## GUARDIANSHIP AND CUSTODY.-

I, **RAMON EVELIO MARTINEZ RAUDALES**, of legal age, Honduran, with Identity No. **1807-1964-00681**, residing in the Village of El Carrill in the Jurisdiction of Olanchito, Department of Yoro, authorize my daughter **LESBI NOHEMI MARTINEZ MARTINEZ**, with Identity No. **1807-1988-01148**, residing in the Village of El Carrill in the Jurisdiction of Olanchito, Department of Yoro, to make the necessary arrangements before the competent authorities and to hold the guardianship and custody of my underage daughter **YENCY MARIELA MARTINEZ MARTINEZ**, with Identity No. **1807-2007-00399**.

Under oath, I so sign this instrument of **GUARDIANSHIP AND CUSTODY**, in the city of Olanchito, Yoro, **ON MAY 3, 2018.**


[signature] [thumbprint]
RAMON EVELIO MARTINEZ RAUDALES

Exhibit 6
000063

Case 3:18-cv-00428-DMS-MDD  Document 282-1  Filed 10/15/18  PageID.4220  Page 52 of
Case 1:18-cv-0(  )-PLF  Document 1-2  Filed 09/26(  )  Page 29 of 215
251



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, "Martinez_ice_form_i_246_Fina
39" is, to the best of my knowledge and belief and within the given parameters, a true and
accurate translation from Spanish into English.

_____
Aurora Landman

Sworn to before me this

_____
September 13, 2018

_____
Signature, Notary Public

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 80 CITIES WORLDWIDE

Exhibit 7
000064

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4221   Page 53 of
Case 1:18-cv-0( )-PLF   Document 1-2   Filed 09/26/( )   Page 30 of 215
251



Exhibit 8
000005

[logo:]
BAR ASSOCIATION
HONDURAS

[stamp: illegible]

[illegible]
SERIES 'A'

Bar Association of Honduras
Authenticity Certificate

No. 1981983

THE UNDERSIGNED NOTARY PUBLIC MARCIO EDGARDO MUNGUIA PUERTO, DOMICILED
IN THIS CITY, WITH OFFICE LOCATED ONE BLOCK NORTH OF THE DAVIVIENDA BANK, IN
THE NEIGHBORHOOD EL CENTRO OF THIS CITY OF OLANCHITO, AFFILIATED WITH THE
BAR ASSOCIATION OF HONDURAS WITH NUMBER 02450, WITH EXEQUATUR
REGISTRATION OF THE SUPREME COURT OF JUSTICE NUMBER 1130, **CERTIFIES** THAT
THE DOCUMENT OF **GUARDIANSHIP AND CUSTODY** GRANTED BY MR. **RAMON EVELIO
MARTINEZ RAUDALES**, IDENTITY **NO. 1807-1964-00681**, TO MS. **LESBI NOHEMI
MARTINEZ MARTINEZ**, IDENTITY NO. **1807-1988-01148**, IS AUTHENTIC SINCE IT WAS
ISSUED IN MY PRESENCE WHICH I, THE NOTARY, **CERTIFY.**

**OLANCHITO, YORO, MAY 3, 2018**

U.L.
[signature]

Exhibit 9
000066

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4223   Page 55 of
Case 1:18-cv-0{   }-PLF   Document 1-2   Filed 09/26/   Page 32 of 215
251



# TRANSPERFECT

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"Certificate of Authenticity"** is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Aurora Landman

Sworn to before me this
September 17, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 80 CITIES WORLDWIDE

Exhibit 0
000067



PATRONATO COMUNAL PRO-MEJORAMIENTO
DE LA ALDEA EL CARRIL
OLANCHITO, YORO.
PERÍODO 2017-2018

## CONSTANCIA

Nosotros el Patronato de la Comunidad de El Carril por medio de la presente HACEMOS CONSTAR QUE **LESBI NOHEMI MARTINEZ MARTINEZ** con Numero de Identidad 1807-1988-01148, es la tutora de la niña **YENCY MARIELA MARTINEZ MARTINEZ** quien nació el 7 de Junio del 2003, ella quedo de encargada ya que su madre murió y la joven **LESBI NOHEMI MARTINEZ MARTINEZ** quedo como su tutora y encargada de ella.

Y para los fines que los interesados estimen convenientes se le extiende la presente el día Miércoles 2 de Agosto del año 2018.

Atentamente,



Abel Ochoa
Presidente

PERSONADURIA JURIDICA
NO. 042
CON ASIENTO EN TEGUCIGALPA D.C

[emblem]
### COMMUNITY IMPROVEMENT TRUST
### OF THE VILLAGE OF EL CARRIL
### OLANCHITO, YORO.
### TAX YEAR 2017-2018

### CERTIFICATION

We, the Community Trust of El Carrill, herein STATE FOR THE RECORD THAT **LESBI NOHEMI MARTINEZ MARTINEZ**, with Identity Number 1807-1988-01148, is the guardian of the female child **YENCY MARIELA MARTINEZ MARTINEZ**, who was born on June 7, 2003. She remained responsible for this child because her mother passed away and the young woman **LESBI NOHEMI MARTINEZ MARTINEZ** remained as her guardian and person responsible for her.

And for the purposes that the interested parties deem useful, they are issued this certification on Wednesday, August 2, 2018.

Sincerely,

[stamp:] Community Improvement Trust
of the Village of El Carril,
Olanchito, Yoro,
2017-2018, [emblem]

[signature]
**Abel Ochoa**
Chairman

[stamp:] **LEGAL CAPACITY**
**NO. 42**
**WITH OFFICES IN TEGUCIGALPA, CAPITAL DISTRICT**

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4226   Page 58 of
Case 1:18-cv-0   .-PLF   Document 1-2   Filed 09/26/   Page 35 of 215
251



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, "Martinez_ice_form_i_246_Fina
38" is, to the best of my knowledge and belief and within the given parameters, a true and
accurate translation from Spanish into English.

Aurora Landman

Sworn to before me this

September 13, 2018

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 80 CITIES WORLDWIDE

Exhibit 3
000070

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4227   Page 59 of
251
Case 1:18-cv-0    -PLF   Document 1-2   Filed 09/26/    Page 36 of 215

# Exhibit B

Exhibit A
000071

**U. S. Department of Homeland Security**
**U.S. Citizenship and Immigration Services**

**Record of Negative Credible Fear Finding**
**and Request For Review by Immigration Judge**

Alien File Number: . 215 582 112

1.    To be explained to the alien by the asylum officer:

U.S. Citizenship and Immigration Services (USCIS) has determined that you do not have a credible fear of persecution or torture pursuant to 8 CFR 208.30 for the following reason(s):

A. ☒    You have not established a credible fear of persecution in your country of nationality, country of last habitual residence, or a country to which you have been ordered removed because:

    ☐   You have not indicated that you were harmed in the past and you have not expressed fear of future harm.

    ☒   There is no significant possibility that you could establish in a full hearing that the harm you experienced and/or the harm you fear is on account of your race, religion, nationality, political opinion, or membership in a particular social group.

    ☐   You have not indicated that you were harmed in the past, and there is no significant possibility that you could establish in a full hearing that the harm you fear is well founded.

    ☐   There is no significant possibility that you could establish in a full hearing that the harm you experienced or fear was/is sufficiently serious to amount to persecution.

    ☒   There is no significant possibility that you could establish in a full hearing that the entity that harmed you or would harm you was/is an agent of the government or an entity the government was/is unable or unwilling to control.

    **AND**

☒    You have not established a credible fear of torture in a country to which you have been ordered removed because you have not established that there is a significant possibility that:

    ☐   You would suffer severe physical or mental pain or suffering.

    ☐   The harm you fear would be specifically intended to inflict severe physical or mental pain or suffering.

    ☒   The harm you fear would be inflicted by or at the instigation of, or with the consent or acquiescence of, a public official or other person acting in an official capacity.

    ☐   The harm you fear would be inflicted while you are in the custody or physical control of the offender.

    ☐   The harm you fear would not arise only from, would not be inherent in, and would not be incidental to, lawful sanctions.

B. ☐    Considering the totality of the circumstances and all relevant factors, you have not established that your testimony is credible.

Therefore, you are ordered removed from the United States. You may request that an Immigration Judge review this decision.

If you request that an Immigration Judge review this decision, you will remain in detention until an Immigration Judge reviews your case. That review could occur as long as 7 days after you receive this decision.

If you do not request that an Immigration Judge review the decision, you may be removed from the United States immediately.

2.    To be completed by the alien:

☑   Yes, I request Immigration Judge review of the decision that I do not have a credible fear of persecution or torture.

☐   No, I do not request Immigration Judge review of the decision that I do not have a credible fear of persecution or torture.

| Martinez-Martinez | LESBI | Nohemi M. |
|---|---|---|
| Applicant's Last Name/ Family Name (Print) | Applicant's First Name (Print) | Applicant's Signature |
| | | JUN 2 7 2018 |

| Davis | A | |
|---|---|---|
| Asylum Officer's Last Name (Print) | Asylum Officer's First Name. (Print) | Date |

The contents of this form were read and explained to the applicant in the _____ Spanish _____ language.

Interpreter used:

By telephone (list interpreter service/ID number used _____ LANGUAGE LINE 267 913 .

In person (I _____ , certify that I am fluent in both the _____ and English languages. I interpreted the above information completely and accurately to the alien.)

| | |
|---|---|
| Interpreter's Signature | Date |

U. S. Department of Homeland Security      **Notice of Referral to Immigration Judge**

| Date | JUN 2 7 2018 |
|------|-----------|
| A-File | 215 582 112 |

| Name | LESBI NOHEMI MARTINEZ-MARTINEZ | Country of Citizenship | Honduras |
|------|--------------------------------|------------------------|----------|
| Place and Manner of Arrival | Unknown Location; Entered Without Inspection | Date of Arrival | 06/01/2018 |

To immigration judge:

☒ 1. The above-named alien has been found inadmissible to the United States and ordered removed under section 235(b)(1) of the Immigration and Nationality Act (Act). A copy of the removal order is attached. The alien has requested asylum or protection under the Convention against Torture. An asylum officer has reviewed the matter and concluded that the alien does not have a credible fear of persecution or torture. The alien has requested a review of that determination in accordance with section 235(b)(1)(B)(iii)(III) of the Act and 8 CFR § 208.30(g).

☐ 2. The above-named alien arrived in the United States as a stowaway and has been ordered removed under section 235(a)(2) of the Act. The alien has requested asylum or withholding of removal under the Convention against Torture. An asylum officer has reviewed the matter and concluded that the alien does not have a credible fear of persecution or torture. The alien has requested a review of that determination in accordance with section 235(b)(1)(B)(iii)(II) of the Act.

☐ 3. The above-named alien arrived in the United States in the manner described below and has requested asylum or withholding of removal under the Convention against Torture. The matter is referred for a determination in accordance with 8 CFR § 208.2(c). Arrival category (check one):

☐ Crewmember/applicant     ☐ Crewmember/refused     ☐ Crewmember/landed
☐ Crewmember/violator     ☐ VWP/applicant     ☐ VWP/violator
☐ 235(c) order     ☐ S-visa nonimmigrant     ☐ Stowaway: credible fear determination attached

☐ 4. The above-named alien has been ordered removed by an immigration officer under section 235(b)(1) of the Act. A copy of the removal order is attached. In accordance with section 235(b)(1)(C) of the Act, the matter is referred for review of that order. The above-named alien claims to be (check one):

☐ a United States citizen        ☐ a lawful permanent resident alien
☐ an alien granted refugee status under section 207 of the Act    ☐ an alien granted asylum under section 208 of the Act

☐ 5. The above-named alien has been ordered removed under section 238(b) of the Act, or the Department of Homeland Security (DHS) has reinstated a prior exclusion, deportation, or removal order of the above-named alien under section 241(a)(5) of the Act. A copy of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of persecution or torture. An asylum officer has reviewed the claim and concluded that the alien does not have a reasonable fear of persecution or torture. The alien has requested a review of that determination in accordance with 8 CFR §§ 208.31(f) and (g).

☐ 6. The above-named alien has been ordered removed under section 238(b) of the Act, or the DHS has reinstated a prior exclusion, deportation, or removal order of the above-named alien under section 241(a)(5) of the Act. A copy of the removal order and, if applicable, the notice of reinstatement, are attached. The alien has expressed fear of persecution or torture. An asylum officer has reviewed the claim and concluded that the alien has a reasonable fear of persecution or torture. The matter has been referred for a determination in accordance with 8 CFR § 208.31(e).

☐ 7. The Secretary of Homeland Security has determined that the release from custody of the above-named alien who is under a final order of removal would pose a special danger to the public according to the standards set in 8 CFR § 241.14(f)(1). The DHS has therefore invoked procedures to continue the alien's detention even though there is no significant likelihood that the alien will be removed from the United States in the reasonably foreseeable future. The matter is referred to the immigration judge for a review of this determination in accordance with 8 CFR § 241.14(g).

Form I-863 (Rev.08/01/07)

Exhibit 8
000073

U. S. Department of Homeland Security                    **Notice of Referral to Immigration Judge**

---

## NOTICE TO APPLICANT

You are ordered to report for a hearing before an immigration judge for the reasons stated above. Your hearing is scheduled on

<u>To Be Determined</u>         at     <u>To Be Determined</u>
　　　(Date)　　　　　　　　　　　　　(Time)

You are to appear at     San Antonio EOIR, 800 Dolorosa Street, Suite 300, San Antonio, TX 78207
　　　　　　　　　　　　　　　　　(Complete office address)

☒  You may be represented in this proceeding, at no expense to the government, by an attorney or other individual authorized and qualified to represent persons before an Immigration Court. If you wish to be so represented, your attorney or representative should appear with you at this hearing. In the event of your release from custody, you must immediately report any change of your address to the Immigration Court on Form EOIR-33, which is provided with this notice. If you fail to appear for a scheduled hearing, a decision may be rendered in your absence.

☒  You may consult with a person or persons of your own choosing prior to your appearance in Immigration Court. Such consultation is at no expense to the government and may not unreasonably delay the process.

☒  Attached is a list of recognized organizations and attorneys that provide free legal service.

　　　　　　　　　　　　　　　　　　　　　　　　　Christopher Vu
　　　　　　　　　　　　　　　　　　　　　　　　　Supervisory Asylum Officer
　　　　　　　　　　　　　　　　　　　　　　(Signature and title of immigration officer)

---

## CERTIFICATE OF SERVICE

☑  The contents of this notice were read and explained to the applicant in the _____ Spanish _____ language.

☑  The original of this notice was delivered to the above-named applicant by the undersigned on **JUN 2 7 2018** and the alien has been advised of communication privileges under 8 CFR § 236.1(e). Delivery was made:

☑ in person   ☐ by certified mail, return receipt # _____ requested   ☐ by regular mail

　　　　　　　　　　　　　　　　　　　　(Signature and title of immigration officer)

**Attachments** to copy presented to immigration judge:

| | | |
|---|---|---|
| ☐ Passport | ☒ Form I-860 | Alesia Stevenson |
| ☐ Visa | ☒ Form I-869 | Immigration Analyst |
| ☐ Form I-94 | ☐ Form I-898 | |
| ☐ Forensic document analysis | ☐ Asylum Officer's reasonable fear determination worksheet (I-899) | |
| ☐ Fingerprints and photographs | ☒ Asylum officer's credible fear determination worksheet (I-870) | |
| ☐ EOIR-33 | | |

☐  FOR 8 CFR 241.14(f) CASES ONLY: Written statement including summary of the basis for the Secretary's determination to continue the alien in detention, and description of the evidence relied on in finding the alien specially dangerous (with supporting documents attached).

☐  FOR 8 CFR 241.14(f) CASES ONLY: Written notice advising the alien of initiation of proceedings and informing alien of procedures governing the Reasonable Cause Hearing at 8 CFR 241.14(h).

☒  Other (specify):  ___Officer's Notes___

Form I-863 (Rev.08/01.07)

Exhibit 4
000074

| Alien's File Number: | A215 582 112 |
|---|---|

2.19 Does applicant claim to have a medical condition (physical or mental), or has the officer observed any indication that a medical condition exists? If YES, answer questions 2.20 and 2.21 and explain below.  ☒ Yes  ☐ No

Diabetes

2.20 Has applicant notified the facility of medical condition?  ☒ Yes  ☐ No

2.21 Does applicant claim that the medical condition relates to torture?  ☐ Yes  ☒ No

2.22 Does the applicant have a relative, sponsor, or other community ties, including spouse or child already listed above?  ☒ Yes  ☐ No

2.23 If YES, provide information on relative or sponsor (use continuation section, if necessary):

Sara Noehmi Gomez                                    Friend
Name                                                          Relationship

Atlanta, GA                                               678-367-9991
Address                                                      Telephone Number

☐ Citizen   ☐ Legal Permanent Resident   ☒ Other  Unknown

## SECTION III:                    CREDIBLE-FEAR INTERVIEW

The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the asylum officer in making a credible-fear determination and the supervisory asylum officer in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening.

The asylum officer must elicit sufficient information related to both credible fear of persecution and credible fear of torture to determine whether the applicant meets the threshold screening. Even if the asylum officer determines in the course of the interview that the applicant has a credible fear of persecution, the asylum officer must still elicit any additional information relevant to a fear of torture. Asylum officers are to ask the following questions and may use the continuation sheet if additional space is required. If the applicant replies YES to any question, the asylum officer must ask follow-up questions to elicit sufficient details about the claim to make a credible-fear determination.

3.1  a. *Have you or any member of your family ever been mistreated or threatened by anyone in any country to which you may be returned?*

☒ Yes   ☐ No

See Q&A

b. *Do you have any reason to fear harm from anyone in any country to which you may be returned?*

☒ Yes   ☐ No

See Q&A

c. If YES to questions *a* or *b*: *Was it or is it because of any of the following reasons?* (Check each of the following boxes that apply.)

☐ Race   ☐ Religion   ☐ Nationality   ☐ Membership in a particular social group   ☐ Political Opinion

See Q&A

| Alien's File Number: | A215 582 112 |
|---|---|

3.2 ☒ At the conclusion of the interview, the asylum officer must read the following to applicant:

If the Department of Homeland Security determines you have a credible fear of persecution or torture, your case will be referred to an immigration court, where you will be allowed to seek asylum or withholding of removal based on fear of persecution or withholding of removal under the Convention Against Torture. The Field Office Director in charge of this detention facility will also consider whether you may be released from detention while you are preparing for your hearing. *If the asylum officer determines that you do not have a credible fear of persecution or torture, you may ask an Immigration Judge to review the decision. If you are found not to have a credible fear of persecution or torture and you do not request review, you may be removed from the United States as soon as travel arrangements can be made. Do you have any questions?*

3.3 ☒ At the conclusion of the interview, the asylum officer must read a summary of the claim, consisting of the responses to Questions 3.1 a-c and information recorded in the Additional Information/Continuation section, to applicant.

****Typed Question and Answer (Q&A) interview notes and a summary and analysis of the claim must be attached to this form for all negative credible-fear decisions. These Q&A notes must reflect that the applicant was asked to explain any inconsistencies or lack of detail on material issues and that the applicant was given every opportunity to establish a credible fear.

## SECTION IV: CREDIBLE FEAR FINDINGS

### A. Credible Fear Determination:

Credibility

4.1 ☒ ~~There is a significant possibility that the assertions underlying the applicant's claim could be found credible in a full asylum or withholding of removal hearing.~~ Applicant found credible

4.2 ☐ Applicant found not credible because (check boxes 4.3-4.5, which apply):

    4.3 ☐ Testimony was internally inconsistent on material issues.

    4.4 ☐ Testimony lacked sufficient detail on material issues.

    4.5 ☐ Testimony was not consistent with country conditions on material issues.

Nexus

4.6 ☐ Race    4.7 ☐ Religion    4.8 ☐ Nationality    4.9 ☐ Membership in a Particular Social Group

(Define the social group): _____

4.10 ☐ Political Opinion    4.11 ☐ Coercive Family Planning [CFP]    4.12 ☒ No Nexus

Credible Fear Finding

4.13 ☐ Credible fear of persecution established.

    OR

4.14 ☐ Credible fear of torture established.

    OR

4.15 ☒ Credible fear of persecution NOT established and there is not a significant possibility that the applicant could establish eligibility for withholding of removal or deferral of removal under the Convention against Torture.

### B. Possible Bars:

4.16 ☐ Applicant could be subject to a bar(s) to asylum or withholding of removal (check the box(es) that applies and explain on the continuation sheet):

    4.17 ☐ Particularly Serious Crime    4.18 ☐ Security Risk    4.19 ☐ Aggravated Felon

    4.20 ☐ Persecutor    4.21 ☐ Terrorist    4.22 ☐ Firmly Resettled

    4.23 ☐ Serious Non-Political Crime Outside the United States

4.24 ☒ Applicant does not appear to be subject to a bar(s) to asylum or withholding of removal.

| Allen's File Number: | A215 582 112 |
|---|---|

**C.**     **Identity:**

4.25   ☒   Applicant's identity was determined with a reasonable degree of certainty (check the box(es) that applies):

    4.26   ☒   Applicant's own credible statements. (If testimony is credible overall, this will suffice to establish the applicant's identity with a reasonable degree of certainty.)

    4.27   ☐   Passport, which appears to be authentic.

    4.28   ☐   Other evidence presented by applicant or in applicant's file (List): _____

4.29   ☐   Applicant's identity was not determined with a reasonable degree of certainty.  (Explain on the continuation sheet.)

**SECTION V:**          **ASYLUM OFFICER / SUPERVISOR NAMES AND SIGNATURES**

5.1   A Davis, ZHN 770          5.2  _____  5.3   6/26/2018
    Asylum officer name and ID CODE (print)          Asylum officer's signature          Decision date

5.4   Christopher Vu          5.5  _____  5.6   JUN 2 7 2018
    Supervisory Asylum Officer          Supervisor's signature          Date supervisor approved decision

**ADDITIONAL INFORMATION/CONTINUATION**

| |
|---|
| See Q&A |

Exhibit 7
000077

ALIEN NUMBER: 215582112                    DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi            ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                          Transperfect # 14723
ASYLUM OFFICER: ZHN                        START:  8:45    STOP: 10:34

## QUESTIONS & ANSWERS

INTERVIEW INITIATED:  8:45

### OATH ADMINISTERED (Interpreter)
Q. Interpreter, do you swear and affirm that you will truthfully, literally, and fully interpret the questions asked by the asylum officer and the answers given by the applicant; that you will not add to, delete from, comment on, or otherwise change the matter to be interpreted; and that you will immediately notify the officer in this case if you become aware of your inability to interpret in a neutral manner on account of a bias against the applicant or the applicant's race, religion, nationality, membership in a particular social group, or political opinion; and do you swear to keep everything said during this interview today confidential?
A. Yes

*AO-Interpreter, can you introduce yourself to the applicant and make sure he can hear and understand you.*

(Interpreter introduces himself; Applicant and the Interpreter understand each other)

*AO-Good Morning, I'm Officer Davis and I will be conducting your interview today through an interpreter. The interpreter has been placed under oath to completely interpret everything you say and to keep everything you say confidential. We are here today because you have expressed a fear of returning to   Honduras  .*
Q. Are you still afraid to return to Honduras?
A. Yes

*AO-The interpreter will now tell you he purpose of today's interview.  Interpreter please read Paragraph 1.28 to the Applicant.*

### PARAGRAPH 1.28, FORM I-870, READ TO APPLICANT

Q. Do you have any questions about what was just read to you?
A. No

### OATH ADMINISTERED (Applicant )
Q. Now I'm going to put you under oath, please raise your right hand. Do you swear or affirm that all the statements you are about to make today during this interview are the truth, the whole truth and nothing but the truth?
A. Yes.
(thank you, you may lower your right hand)

*AO-Now, I'm going to start by asking some questions about your background information. Please speak loudly and clearly into the phone.*
#### Background and I-870 Information

Q. What is your full name?
A. Lesbi Nohemi Martinez Martinez

Q. Have you ever been known by any other names or aliases?
A. No

Q. Do you have an attorney or consultant?
A. Yes

Q. What is your attorney's name and telephone number?
A. Nancy Cano;

Q. Would you like me to contact your attorney to be present?

Exhibit 8
000078

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
     START:  8:45      STOP: 10:34

A. No, by myself.

Q. To confirm, do you want to continue today without an attorney present?
A. Yes I will continue

Q. Do you have any illnesses or medical conditions that may affect your interview today?
A. Only I found out I had diabetes.

Q. Is the facility aware?
A. Yes

Q. Are you medication?
A. Yes

Q. Will the medication prevent you from continuing or affect your interview today?
A. No

Q. What is your date of birth?
A. 05/23/1988

Q. Have you used any other birth dates?
A. No

Q. In what country were you born?
A. Honduras

Q. Are you a citizen of Honduras?
A. Yes

Q. Are you a citizen of any other country besides Honduras?
A. No

Q. Have you lived in any other countries?
A. No

Q. What languages do you speak fluently?
A. Spanish

Q. What is your race or ethnicity (for example- Caucasian, Black, Hispanic, Indigenous, etc)?
A. White

Q. What is your religion?
A. Evangelical

Q. Have you ever served in any military or armed group or have you ever had military or firearms training of any kind?
A. No

Q. On what date did you leave your country?
A. 05/13/2018

Q. Is it correct that you crossed the border into the United States on 06/01/2018?
A. Yes

Page 2 of 13

Exhibit 9
000079

ALIEN NUMBER: 215582112                     DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi             ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                          Transperfect # 14723
ASYLUM OFFICER: ZHN                        START:  8:45     STOP: 10:34

Q. Have you ever entered or tried to enter the United States before?
A. No

(M-444 received prior to interview)
Q. On 06/13/2018 you were given information regarding the credible fear process along with a list of legal service providers. Do you remember this?
A. Yes

Q. Do you have any questions about that information?
A. No

Q. What is your address in Honduras ?
A. La Ceiba HONDURAS

Q. Are you married, single, living with a partner?
A. Single

Q. Do you have any children?
A. No

Q. Do you have any family or friends in the U.S. who could serve as a contact person for you, or who you would stay with if you were not detained?
A. Yes
        Name: Sara Noehmi Gomez
        Address: Atlanta, GA
        Relationship: Friend
        Telephone: 678-367-9991
        Status: Unknown

Q. What type of work do you do in your country?
A. I worked for a plantation, I measuring the plants.

*AO-Now I'm going to ask you about your fear of returning to Honduras. I will ask you questions, but will also give you the opportunity at the end of the interview to tell me anything else you want me to know.*

### *Substantive Facts Questions*

Q. Why did you leave Honduras ?
A. The first reason is that when I was little someone abused me. The second reason is that when we came to La Ceiba my mother was buying things to resell, a young guy charged me money.

Q. Have you ever been harmed or threatened in Honduras?
A. Harmed psychologically and verbally harmed.

Q. Has anyone ever physically harmed you?
A. No they just hit me.

Q. Ma'am physical harm means causing your body to be hurt in someway, has someone done that to you?
A. Yes

Q. Who has physically harmed you?
A. Nelson Orlando Rojas Garcia.

**Page 3 of 13**

Exhibit 8
000080

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
   START:  8:45    STOP: 10:34

Q. Has anyone other than Nelson ever physically harmed you in Honduras?
A. When I was little someone

Q. Who when you were little?
A. The other is my uncle Ramon Martinez.

Q. Has anyone other than Nelson or Ramon ever physically harmed you in Honduras?
A. In the two jobs I was harassed

Q. Ma'am as we discussed my question is about physical harm, has anyone other than Nelson or Ramon ever physically harmed you in Honduras?
A. No

Q. Who has threatened to cause you harm in Honduras?
A. Well the person that asked me for money.

Q. Do you know this person's name?
A. No.

Q. Do you know if this person belonged to any sort of organization or group?
A. To tell you the truth I don't know.

Q. Other than the man who asked you for money, has any other person at any time threatened you in Honduras?
A. No

Q. Let's start with Nelson, who is Nelson meaning what is his relation to you?
A. He was my partner.

Q. When did you begin a relationship with him?
A. When I was 18 years old.

Q. How long did your relationship last?
A. Three years.

Q. Does that mean your relationship ended when you were 21?
A. Yes

Q. How many times did Nelson harm you?
A. Several times.

Q. What do you mean by several times?
A. Because of the problem that happened to me, he was looking for me to be with him but I didn't want to because of what happened to me

Q. Ma'am as I said before we will discuss what happened as a child in a few moments, my question is what do you mean by several times
A. Many times.

Q. Can you estimate what many means?
A. Many

Q. Ma'am please explain what many means
A. Many you understand that it could be 20 times.

Exhibit A
000081

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
  START:  8:45      STOP: 10:34

Q. Ma'am are you saying 20 times?
A. I'm saying it was several.

Q. Can you explain why you cannot provide me with an estimate?
A. Are you asking how many times?

Q. Can you explain why you cannot provide me with more detail about what you mean when you say many or several times?
A. Well I guess it was about 20 times.

Q. When was the first time he harmed you?
·A. February that month

Q. What year?
A. When I was 18 years old.

Q. How did he harm you?·
A. He was looking for me as man

Q. How did he harm you, meaning what did he do to you?
A. He hit my face and head. He told me I should be a woman.

Q. What did he hit you with?
A. His hand

Q. How many times did he hit you?
A. 20 times.

Q. Did he harm you in any way other than hitting you with his hand the first time?
A. No he just said he hit me because he wanted me to forget what happened to me.

Q. Did you have any injuries?
A. No

Q. Other than telling you that you should be a woman and forget what happened to you, did he say anything else to you the first time?
A. He said I had no value as a woman and he was only with me because he was sorry for me.

Q. Did he say anything else at all?
A. No that's all.

Q. Were you able to report this harm to the police or anyone in authority?
A. No

Q Why not?
A. because I've seen cases that they don't resolve anything.

Q. What do you mean you've seen cases case that they don't resolve anything?
A. I saw cases

Q. Ma'am please provide me with detail about what you mean by cases?
A. I saw and heard cases of woman being mistreated and they didn't do anything

Q. What specifically have you seen and heard?

Exhib* 2
000082

ALIEN NUMBER: 215582112        DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi    ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras           Transperfect # 14723
ASYLUM OFFICER: ZHN        START:  8:45    STOP: 10:34

A. I've heard cases

Q. Can you please provide me with details about what you've heard for example, who are the woman, what happened to them?
A. Silence.

Q. Ma'am did you hear the question?
A. Yes

Q. Can you please answer the question?
A. One is Maria Jolibet Mejia.

Q. What happened?
A. She used to tell me how her partner, the father of her first daughter he hit her.

Q. Did Maria go to the police or make a report in anyway?
A. No

Q. Ma'am my question has been able  examples of what you've seen regarding women going to the police that they would not help?
A. I've just heard that maybe people went over there and the police don't listen.

Q. What did you hear?
A. I just heard it

Q. What is it?
A. That police don't listen

Q. Can you tell me more?
A. No

Q. Who have you heard this from?
A. People Who have gone over there, I don't know who they are, but I know that because we are poor the police don't listen.

Q. When was the worst time Nelson harmed you?
A. The worst time I remember is when he grabbed me and threw me on the bed and abused me sexually because he said I had to serve as a woman.

Q. When you say he abused you sexually do you mean he penetrated you against your wishes?
A. Yes that is right.

Q. What did he say to you other than you had to serve as a woman?
A. That it was for me to forget what happened to me and to take it away.

Q. Did he say anything else at all?
A. No that's it.

Q. When was the last time he harmed you?
A. Around when I was 20 years old and six months.

Q. How did he harm you?
A. Like always maybe because I didn't want to be with him he took me sexually by force.

Exhibit 3
000083

ALIEN NUMBER: 215582112                    DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi           ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                          Transperfect # 14723
ASYLUM OFFICER: ZHN                        START:  8:45      STOP: 10:34

Q. How did your relationship end?
A. I was working for a company and over there my boss gave me advice and told me I had value.

Q. Did you end your relationship with Nelson?
a. Yes

Q. What did Nelson do when he ended it?
A. When I ended it, he sent me two letters and my father received them.

Q. Did he harm or threaten you after you ended the relationship?
A. Well he called me after and told me to leave my family and go with him and I said no.

Q. My question is, Did he harm or threaten you after you ended the relationship?
A. Yes

Q. Did he harm or threaten you?
A. He followed me.

Q. How long did he follow you for?
A. About one month. Because my father told him if he continued following me he would report to the police

Q. When was the last contact?
A. About end of March when I was 21 years.

Q. Were you able to report any of the harm from Nelson to the police or anyone in authority?
A No

Q. Why not?
A. Fear.

Q. Do you know anyone else that has reported harm from a partner to the police?
A. No

Q. When did your uncle Ramon Martinez harm you as a child?
A. When I was around 7 years old.

Q. How did he harm you?
A. I remember that I arrived to his house. He removed all my clothes [crying]

Q. I understand ma'am you don't have to go into details right now, you can only tell me what type of harm?
A. He touched my private parts.

Q. Did he penetrate you?
A. Yes with his fingers

Q. Did this happen on more than one time?
A. No only that time.

Q. Did he live with you?
A. No

Q. Where were your parents when this happened?
A. My mother was at home and my father was at work.

Exhibit 14
000084

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
START:  8:45      STOP: 10:34

Q. Who were you living with at the time?
A. With my parents.

Q. What did he say to you when he did this?
A. He told me if you tell someone I will kill you

Q. Did he say anything else at all?
A. No only that. He didn't do that to me only.

Q. What do you mean by he didn't do that to me only?
A. He did this to another person.

Q. A person in your family or someone else?
A. From another place, not my family, my mother told me.

Q. Did you tell your parents what happened?
A. Yes

Q. Were you able to report the harm to the police or anyone in authority?
A. No, my mother went to look for him but didn't find him.

Q. Did anyone report this to the police or anyone in authority?
A. No

Q. Why not?
A. Because of fear and my grandmother just told him to leave and go away.

Q. When were you  threatened by unknown man who wanted your money?
A. 05/06/2018

Q. What did the man say to you?
A. He asked for my money and I told him I didn't make enough and he said I don't care.

Q. Did he say anything else?
A. That if I didn't continue selling or pay him, he would kill me, because I am responsible for my sister her too to get her.

Q. Did he say anything else?
A. No

Q. For what reason would this man have threatened to kill you?
A. Because I told him I wouldn't continue selling to give him money.

Q. Is there any other reason at all?
A. No

Q. Were you able to report this man to the police or anyone in authority?
A. No because I didn't know his name.

Q. Is there any other reason you didn't report?
A. I would say because fear

Q. Why did you fear reporting this man?
A. He would harm me.

Page 8 of 13

Exhibit 5
000085

ALIEN NUMBER: 215582112                    DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi          ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                        Transperfect # 14723
ASYLUM OFFICER: ZHN                          START:  8:45        STOP: 10:34

Q. Do you know anyone who has reported extortion threats like this to the police?
A. Sincerely no.

**WFF**
Q. What do you think will happen to you if you are returned to Honduras?
A. The man who threatened me because of money will kill me.

Q. For what reason would he kill you?
A. Because I didn't pay him

Q. Any other reason?
A. No

Q. Other than the man who threatened you because of money is there anything else you fear will happen to you?
A. No but in my workplace they harassed me.

Q. Other than the man who threatened you because of money do you fear any other person in Honduras?
A. No only I fear what is happening in my country.

Q. To clarify, you do not fear any other person in your country other than the man who threatened you because of money?
A. Yes.

Q. Other than being killed do you fear anything else will happen to you?
A. The fear is that if I look for a job I will suffer harassment.

Q. Who will harass you?
A. Well any boss

Q. Why would someone harass you at a job?
A. Because that happened already.

Q. What do you mean by harassment?
A. Harassment is when the boss asked a person to go with him to a hotel room.

Q. Why specifically did your boss harass you in this way, meaning for what reason did they harass you in this way as opposed to anyone else?
A. That is the question I ask to myself. I don't know the reason.

Q. For what reason would someone at a job in the future harass you as opposed to anyone else?
A. In Honduras that is what happens. I don't know the reason.

Q. Other than being harassed at your job and being killed is there anything else you fear in Honduras?
A. No

Q. Do you know if anyone has been looking for you in your country since you left?
A. I don't know

Q. Could you live in another part of Honduras?
A. No

Q. Why can't you relocate?
A. I don't know, in my country I don't have an alternative place.

Exhibit 6
000086

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4243   Page 75 of
251
Case 1:18-cv-0⁁   ⁁-PLF   Document 1-2   Filed 09/26/⁁   Page 52 of 215

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
START:   8:45      STOP: 10:34

Q. I understand but is there any other reason you cannot relocate to another part of Honduras?
A. I don't know.

*CAT*

Q. Has anyone who works for the police or the government of Honduras ever threatened or harmed you?
A. No

Q. Have you ever had any problems with the police or government of Honduras?
A. No

Q. Do you fear harm from a public official, or anyone affiliated with the government of Honduras?
A. No

Q. Is there any connection between any of the persons you testified that you feared or that harmed you and the police or government of your country?
A. I don't know.

Q. Do you think anyone from the government of Honduras could protect you?
A. No.

Q. Why do you feel that no one from the government of Honduras can protect you?
A. I don't know.

Q. Do you believe the police would help you if they saw you being harmed?
A. No

Q. What makes you believe that?
A. They don't protect poor people

Q. Why don't they protect poor people?
A. They know everything is money,

Q. How do you know they don't protect poor people?
A. Because if I have a problem you have to look for a lawyer and pay them and we don't have money.

Q. Is there any other way you know the police don't help poor people?
A. Yes

Q. Can you give me an example of what makes you believe the police don't help poor people?
A. In reality I don't know.

Q. Do the police take reports from everyone?
A. No

Q. How do you specifically know the police does not take a report from everyone?
A. I imagine it. And I don't know the rest of it

Q. Can you give me an example?
A. I don't know.

Q. Would the police or government allow someone to harm you in Honduras?
A. I don't know.

**Page 10 of 13**

Exhibit 7
000087

ALIEN NUMBER: 215582112                     DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi          ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                            Transperfect # 14723
ASYLUM OFFICER: ZHN                         START:  8:45     STOP: 10:34

Q. Would the police or government tell someone to harm you in Honduras?
A. I don't know.

### Additional Nexus

Q. Other than what we've discussed about your uncle, have you ever been harmed or threatened by a family member, such as a partner, parents, grandparent, aunt, or uncle?
A. No

Q. Have you ever been harmed or threatened, or do you fear harm in Honduras because of your race?
A. No

Q. Have you ever been harmed or threatened, or do you fear harm in Honduras because of your religion?
A. No

Q. Have you ever been harmed or threatened, or do you fear harm in Honduras because of your nationality?
A. No

Q. Have you ever been harmed or threatened, or do you fear harm in  Honduras because of your political opinion?
A. No

Q. Have you ever been harmed or threatened, or do you fear harm in Honduras for any reason we have not discussed?
A. No

### Follow up:

Q. If you don't know anyone who went to the police for assistance because their significant other harmed them, what makes you believe the police would not be able or willing to help you?
A. I don't know

Q. Can you provide me with an example of why you believe the police will not have helped you report the harm by Nelson?
A. Well I'd say that if we go there they don't follow up

Q. What do you mean by we go there and they don't follow up?
A. If we go report and they take information but not look for person.

Q. Help me understand you said that you never reported Nelson's harm to the police, but now you said we go there and they don't follow up?
A. Well we didn't go report. I just made up an example

Q. Ma'am I'm not asking you to make up an example that has not happened, I'm asking you to provide me with an example that actually happened that makes you believe the police would not have helped you if you reported Nelson?
A. I don't know anything.

Q. For what reason did your Uncle harm you when you were a child?
A. I don't know the reason

Q. Did your uncle ever take care of you?
A. No

Exhibit 8
000088

ALIEN NUMBER: 215582112                       DATE: 06/26/2018
NAME: MARTINEZ-MARTINEZ, Lesbi            ASYLUM OFFICER: Angela Davis, ZHN 770
COUNTRY: Honduras                              Transperfect # 14723
ASYLUM OFFICER: ZHN                            START:  8:45     STOP: 10:34

Q. Did your uncle ever provide you with food, clothing, or shelter?
A. No

Q. Were you only visiting your uncle's house that day?
A. My mama sent me to run an errand there.

Q. Would the police have helped you if you had reported your Uncle's harm?
A. I don't know.

### *End of Interview Questions*

Q. Have you ever persecuted or harmed another person for any reason?
A. No.

Q. Have you ever been arrested in any country?
A. No.

Q. Have you ever committed a crime in the United States or in any other country?
A. No

Q. Have you ever been accused of committing a crime in any country?
A. No

Q. Have you ever been affiliated with, supported or assisted a group or organization that used violence to achieve its goals?
A. No

Q. Have you ever been a member of an armed group or a group that could be considered a terrorist group?
A. No

Q. Have you ever provided any type of support, like food, housing, money, weapons, or transportation, to a person or group who commits armed acts?
A. I gave money to the man who asked me for money

Q. Did he commit armed acts?
A. I don't know if he belongs to a gang.

Q. Have you ever provided any type of support, like food, housing, money, weapons, or transportation, to a person or group who commits armed acts?
A. No

Q. Do you intend to do anything illegal in the US or harmful to the US?
A. No

Q. Did you fully understand the interpreter during this interview?
A. Yes

Q. Did you fully understand my questions today?
A. Yes

Q. Is there anything else that you would like to add that you think we have not covered today?
A. No

Exhibit 9
000089

ALIEN NUMBER: 215582112
NAME: MARTINEZ-MARTINEZ, Lesbi
COUNTRY: Honduras
ASYLUM OFFICER: ZHN

DATE: 06/26/2018
ASYLUM OFFICER: Angela Davis, ZHN 770
Transperfect # 14723
START: 8:45      STOP: 10:34

*OA- Please give me a few moments to put together a summary of what we discussed today. I will read it to you when it is complete.*

You have been harmed by your ex-partner Nelson Orlando Rojas Garcia in Honduras. You were in a relationship with Nelson from the age of 18 to 21. Nelson beat and raped you multiple times. He told you that he wanted you to be a woman and forget what happened to you as a child. He also told you that you had no value as a woman and he was sorry for you. He also told you that you had to serve as a woman. You were not able to report Nelson's harm to the police or anyone in authority because you heard that the police don't listen. You do not know anyone who has reported to the police or other authority about violence from a partner. You don't know what else makes you believe that the police would not help you. You ended your relationship with Nelson when you were 21. He began following you but stopped after your father told him that he would go to the police if Nelson continued. You uncle Ramon Martinez are sexually assaulted you when you were about seven years old. He told you not to tell anyone or he would kill you. He said nothing else. You don't know why your uncle harmed you. You never lived with your uncle but went to his house to run an errand for your mother. Your mother told you that your uncle had sexually harmed another girl as well. No one reported your uncle's harm to the police or authority. You grandmother asked your uncle to leave. You do not know if the police would have helped if you reported the crime. You have also been threatened with death by an unknown man in Honduras. He told you that you had to pay money to him or he would kill you and harm your sister who you cared for. The only reason he threatened you was to get your money. You did not report this threat to the police out of fear. You have also been sexually harassed by your boss in Honduras. He told you that you should come to a hotel with him. You do not know why he sexually harassed you but know it happens in Honduras. You fear that if you return to Honduras you will be killed by the man who extorted money from you. You believe he will kill you because you didn't pay him money. You also fear that you will be sexually harassed in other jobs because it happened before. You do not know why you would be sexually harassed as compared to anyone else. You do not know if anyone has been looking for you since you left Honduras. You do not fear anything else in Honduras

Q. Is that a correct summary of your claim during this interview today?
A. Yes

**PARAGRAPH 3.2, FORM I-870, READ TO APPLICANT**

*AO- Ok, that concludes our interview today. Please do not hang up the phone and go get the officer to bring in the next applicant. Thank you*

INTERVIEW CONCLUDED: 10:34

Page 13 of 13

Exhibit 20
000090

956-704-3105
104

IMMIGRATION COURT
27991 BUENA VISTA BLVD
LOS FRESNOS, TX  78566

TO:

    MARTINEZ-MARTINEZ, LESBI NOHEMI
    C/O PIDC
    27991 BUENA VISTA BLVD
    LOS FRESNOS, TX  78566

FILE: A215-582-112

RE:  MARTINEZ-MARTINEZ, LESBI NOHEMI

NOTICE OF REVIEW OF CREDIBLE FEAR DETERMINATION

PLEASE TAKE NOTE THAT YOUR REQUEST FOR REVIEW OF THE DHS CREDIBLE FEAR
DETERMINATION HAS BEEN SCHEDULED/RESCHEDULED BEFORE THE IMMIGRATION COURT
ON Jul 17, 2018 AT 1:00 P.M. AT THE FOLLOWING ADDRESS:

            27991 BUENA VISTA BLVD
            LOS FRESNOS, TX  78566

YOU MAY CONSULT WITH A PERSON OR PERSONS OF YOUR CHOOSING PRIOR TO THE REVIEW.
SUCH CONSULTATION IS AT NO EXPENSE TO THE GOVERNMENT AND MAY NOT
UNREASONABLY DELAY THE PROCESS.

IN THE EVENT THAT YOU ARE RELEASED FROM CUSTODY, YOU MUST IMMEDIATELY REPORT
ANY CHANGE IN YOUR ADDRESS AND TELEPHONE NUMBER TO THE IMMIGRATION COURT ON
THE ATTACHED FORM EOIR-33.  IF YOU FAIL TO PROVIDE AN ADDRESS, YOUR SCHEDULED
REVIEW MAY BE HELD IN YOUR ABSENCE.

FOR INFORMATION REGARDING THE STATUS OF YOUR CASE, CALL TOLL FREE
1-800-898-7180 OR 240-314-1500.

---

                    CERTIFICATION OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)     PERSONAL SERVICE (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [ ] DHS
DATE:                BY: COURT STAFF
     Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

04

Exhibit A
000091

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4248   Page 80 of
251
Case 1:18-cv-0[   ]-RLF   Document 1-2   Filed 09/26/[   ]   Page 57 of 215

IMMIGRATION COURT
27991 BUENA VISTA BLVD
LOS FRESNOS, TX  78566

In the Matter of:                    Case No:  A215-582-112

MARTINEZ-MARTINEZ, LESBI NOHEMI
                                     IN: CREDIBLE FEAR REVIEW PROCEEDINGS
—————————————
        Respondent

### ORDER OF THE IMMIGRATION JUDGE

On Jul 17, 2018 at 1:00 P.M. a review of the DHS Credible Fear Determination
was held in the matter noted above.  Testimony [X] was  [ ] was not
taken regarding the background of the Applicant and the Applicant's fear
of returning to her country of origin or last habitual residence.

After consideration of the evidence, the Court finds that the Applicant
[ ] has  [X] has not established a significant possibility that she
would be persecuted on the basis of his/her race, religion, nationality,
membership in a particular social group, or because of her political
opinion.

The Court further finds that the Applicant [ ] has [X] has not
established a significant possibility that she would be intentionally
subjected to serious physical or mental harm inflicted by, or at the
instigation of, or with the consent or acquiescence of, a government official
or other person acting in an official capacity.


ORDER:  It is hereby ordered that the decision of the immigration officer is:

    [X] Affirmed, and the case is returned to the DHS for removal of the
        alien.

    [ ] Vacated.

    This is a final order.  There is no appeal available.

DONE and ORDERED this 17th day of July, 2018.

ROBERT L. POWELL
Immigration Judge

—————————————————————————————————————————————————————
### CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)     PERSONAL SERVICE (P)
TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer [ ] ALIEN's ATTORNEY [ ] DHS
DATE: 7-17-18          BY:  COURT STAFF   Pierson-Watkins
      Attachments: [ ] EOIR-33 [ ] EOIR-28 [ ] Legal Services List [ ] Other
—————————————————————————————————————————————————————
                                                                      U2

Exhibit 22
000092

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4249   Page 81 of
251
Case 1:18-cv-0{    .-PLF   Document 1-2   Filed 09/26{    Page 58 of 215

# Certification of Clarissa Moliterno

Exhibit A
000093

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4250   Page 82 of
251
Case 1:18-cv-0(      )-PLF   Document 11-2   Filed 09/26(      )   Page 59 of 215

**CERTIFICATION IN SUPPORT OF
LESBI NOHEMI MARTINEZ-MARTINEZ
A 215-582-112**

My name is Clarissa Estela Silva Moliterno. I am over 18 years of age, of sound mind, and capable of making this certification. The following facts are within my personal knowledge and are true and correct.

1. I am an associate, not yet admitted to practice law in New York, in the New York office of King & Spalding. I am admitted to practice as an attorney in Brazil since 2014. I have a conversational level fluency in Spanish.

2. On September 12, 2018, around 5:30pm, I took part in a phone call conversation with Ms. Lesbi Nohemi Martinez-Martinez ("Lesbi"), conducted by Ms. Laura Peña at the Port Isabel Detention Center (PIDC).

3. During the interview, Lesbi answered questions about her past, her relationship with Yency Mariela ("Mariela") and her health condition. I also reviewed a letter that Lesbi wrote to her lawyers describing her experiences in Honduras. In our September 12th conversation and in her letter, Lesbi said the following:

4. Lesbi is from a small town in Honduras called El Carril in Olanchito, Yoro. Lesbi explained that she has been living together with Mariela since 2003, the year that Mariela was born. Lesbi explained that she sought guardianship of Mariela in 2016, after their mother passed away. Lesbi and Mariela's father is still alive, but according to Lesbi, Mariela and Lesbi were very attached emotionally and, since their father remarried, he agreed that it made sense for Lesbi to assume guardianship of Mariela. Lesbi refers to Mariela as her daughter. When discussing the separation from Mariela, Lesbi had a strong emotional reaction and began to cry. She said that she feels guilty for having caused her and Lesbi's separation. She said that she feels numb emotionally and she is suffering from depression as a result of being separated from her daughter. She said she felt sad when her mother died, but the feeling she is experiencing now is much worse. For a number of days following the separation, Lesbi could not visit Mariela, did not know where she was, or how she was being treated. Lesbi told us that in the prior two weeks, she had consulted with a psychologist on three separate occasions.

5. Lesbi expressed concern about returning to Honduras. She stated that prior to coming to the United States, she was selling clothes when an unknown man approached her and demanded money. The first three times he approached her, Lesbi gave him the money. The last time he approached her, however, she told him she had no money to give him. He responded by telling her that he knew about her daughter and threatened to kill the both of them.

6. Lesbi said that her uncle was killed in his home in 2010, but no investigation ever occurred because her family was unable to "pay" the authorities for an investigation.

Exhibit A
000094

Case 3:18-cv-00428-DMS-MDD  Document 282-1  Filed 10/15/18  PageID.4251  Page 83 of
251
Case 1:18-cv-0(    )-PLF  Document 11-2  Filed 09/26(    )  Page 60 of 215

Lesbi does not know the cause of her uncle's death but she said that these types of murders often occurred in her city.

7.  Lesbi also said that she had been verbally and physically abused by her ex-boyfriend. For approximately 3 years, he repeatedly abused her sexually. She never reported the abuses to the authorities because she thinks the police in Honduras do not listen to those who are unable to pay them to investigate crimes. Lesbi said that the police do not help poor people. Lesbi fears that should she return to Honduras, her ex-boyfriend will find her and continue try and abuse her.

8.  Lesbi also said she suffered sexual harassment from a number of her former employers, but she never reported these instances of harassment to the police because she believed that her supervisors were well-connected to the authorities in her community and that nothing would have kept the bosses from having Lesbi killed for reporting the harassment. Lesbi is afraid to return to Honduras because she believes that these former employers will attempt to attack her again.

9.  Lesbi said that she was afraid to seek further employment because she was afraid of suffering additional sexual harassment at work. So in or about 2014, Lesbi started to sell pastries and tamales with her mother until 2016, when her mother died.

10. Lesbi was also sexually abused by her uncle when she was seven years old. She was traumatized by this experience and at the age of 14, Lesbi was seeing a psychologist to try and cope with her feelings.

This certification is made pursuant to 28 USC § 1746. I certify under penalty of perjury that the foregoing is true to the best of my knowledge.

Executed in New York, New York, this 18th day of September, 2018.

_Clarissa Estela Silva Moliterno_
Clarissa Estela Silva Moliterno

# Certification of Laura Peña

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4253   Page 85 of
Case 1:18-cv-0    -PLF   Document 1-2   Filed 09/26/    Page 62 of 215
251

### CERTIFICATION IN SUPPORT OF
### LESBI NOHEMI MARTINEZ-MARTINEZ
### A 215-582-112

My name is Laura Peña. I am over 18 years of age, of sound mind, and capable of making this certification. The following facts are within my personal knowledge and are true and correct.

1.  I am a licensed Attorney with the Texas Civil Rights Project, a non-profit civil rights organization based in Texas. I have been practicing immigration law for five years, and am a former ICE trial attorney who practiced in Los Angeles and San Diego. Since early May, the Texas Civil Rights project has been committed to assisting families who have been separated by DHS due to the "zero tolerance" enforcement of immigration laws.

2.  In that effort, on or about June 4, 2018, the Texas Civil Rights Project interviewed Lesbi Martinez prior to her criminal prosecution hearing. At that time, she was distraught because she had been separated from her daughter of whom she is the legal guardian.

3.  On or about August 1, 2018, I interviewed Lesbi at the Port Isabel Detention Center (PIDC). She indicated her desire to be reunited with her daughter immediately. She was exhibiting severe emotional trauma, shown by non-stop crying.

4.  During the interview, Lesbi stated that on or around July 17, an officer informed her that she would be reunited with her daughter and released from government custody.  She had been provided documentation for release "bajo palabra" (order of supervisory parole) and provided a Notice to Appear. She provided me a portion of those documents, which are enclosed with this certification. *See* Notice to Alien dated July 6, 2018.

5.  On or around July 27, an officer informed Lesbi that the deadline for reunifications had passed. The officer did not tell her why she would not be reunified with her daughter. The officer took away her documents and re-admitted her into PIDC.

6.  I visited Lesbi again on or around August 29, 2018. During this last meeting, Lesbi indicated that she could no longer eat the food because it was making it her ill. Lesbi is a diabetic, and the type of food at PIDC is high in starches and carbohydrates, which she says is difficult to process. Lesbi further indicated that she is severely depressed about not being reunified with her daughter. She doesn't sleep at night.

7.  Lesbi further indicated her desire to fight her case at all costs to be reunified with her daughter. In that capacity, the Texas Civil Rights Project has identified King & Spalding as a strong partner who has agreed to take on her immigration case in a pro-bono capacity.

8.  I am deeply concerned about the physical health and mental well-being of Lesbi. Not only was she separated from her daughter, for whom she has legal custody, but she was placed under false pretenses by the government that she would be reunified and released.

Exhibit A
000097

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4254   Page 86 of
Case 1:18-cv-0(    )-PLF   Document 1-2   Filed 09/26(    )   Page 63 of 215
251

The trauma that she has undergone is severe, and requires medical attention as soon as possible.

This certification is made pursuant to 28 USC § 1746. I certify under penalty of perjury that the foregoing is true to the best of my knowledge.

Executed in Alamo, Texas, this 31st day of August, 2018.

Laura Peña

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4255   Page 87 of
251
Case 1:18-cv-0     -PLF   Document 1-2   Filed 09/26/     Page 64 of 215

# Conditions in Honduras

Exhibit A
000099

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4256   Page 88 of
Case 1:18-cv-0   -PLF   Document 1-2   Filed 09/26   Page 65 of 215
251

# Conditions in Honduras

Cited in Request for Reconsideration

Table of Contents

| Article | Page |
|---|---|
| International homicides (per 100,000 people) | 3 |
| Map: Here are countries with the world's highest murder rates | 4-8 |
| InSight Crime Report: 80% of Homicides in Honduras Result of Gun Violence | 9-12 |
| InSight Crime: Honduras Profile | 13-25 |
| ABC News Report: 'Men can do anything they want to women in Honduras': Inside one of the most dangerous places on Earth to be a woman | 26-34 |
| The Architecture of Feminicide: The State, Inequalities, and Everyday Gender Violence in Honduras | 35-54 |
| WJP Rule of Law Index: Honduras | 55-58 |
| Honduras Corruption Report | 59-64 |
| Human Right Watch-World Report 2018: Honduras | 65-71 |
| A Honduras Political Clan and Its Criminal Fiefdom | 72-91 |
| Honduras 2018 Crime & Safety Report | 92-104 |
| El País: Encuentran sin vida a dos jóvenes en Olanchito | 105-106 |
| El Heraldo: Identifican a pareja asesinada cerca de | 107-108 |
| Ola de violencia en Olanchito ganadero y comerciante asesinados | 109-111 |
| Doctors Without Borders Report: Forced to Flee Central America's Northern Triangle | 112-117 |
| Intentional homicide, counts and rates per 100,000 population | 118 |
| Intentional homicide victims killed by gangs or organized criminal groups as percentage of total homicide victims by country/territory (2005-2012) | 119 |

Exhibit A
000102

THE WORLD BANK | Data

## Intentional homicides (per 100,000 people)

UN Office on Drugs and Crime's International Homicide Statistics database.
License : CC BY-4.0



### All Countries and Economies

| Country | 1995 | 2016 | |
|---|---|---|---|
| El Salvador | 139 | 83 | |
| Honduras | | 57 | |
| Venezuela, RB | 20 | 56 | |
| Jamaica | 32 | 47 | |

https://data.worldbank.org/indicator/Vc.ihr.PSrc.P5?year_high_desc=true

Exhibit A
000103

   

Conflict

# Map: Here are countries with the world's highest murder rates

*June 27, 2016 · 2:45 PM EDT*

By **Kuang Keng Kuek Ser**



Teresa Munoz mourns over the coffin of her daughter Maria Jose Alvarado during a wake for Maria Jose and her sister Sofia outside their home in Santa Barbara, November 20, 2014. The Honduran beauty queen has been found shot dead in a suspected crime of passion just days before she was due to compete in the Miss World pageant in London, police said.

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND      CLOSE

Exhibit A
000102

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4259   Page 91 of
9/19/2018   Case 1:18-cv-0     -PLF   Document 1-2   Filed 09/26/     Page 68 of 215
251

countries. But the US is not even in the top 100 for annual homicide rates when compared to the rest of the world.



Murder rates by country, 2014 or latest data
*Mouseover or click each dot for more details.*
*Source: United Nations Office on Drugs and Crime*

From the interactive map above, most of the top countries with the highest homicide rates are in Africa and Latin America. The homicide rates, defined as the number of deaths by homicide per 100,000 people, of the top 20 countries are showed in the chart below. The US was ranked 107 out of 218 countries, according to data from the United Nations Office on Drugs and Crime.



The most homicidal countries, 2014 or latest year

| Country | Homicide rate |
|---|---|
| Honduras | |
| El Salvador | |
| Venezuela | 6 |
| Lesotho | 38 |
| Jamaica | 36.1 |
| Belize | 34.4 |
| Saint Kitts and Nevis | 33.6 |
| South Africa | 33 |
| Guatemala | 31.2 |
| Bahamas | 29.8 |
| Colombia | 27.9 |
| Trinidad & Tobago | 25.9 |
| Saint Vincent & the Grenadines | 25.6 |
| Brazil | 24.6 |
| Saint Lucia | 21.6 |
| Guyana | 20.4 |
| Montserrat | 20.4 |
| Tuvalu | 20.3 |
| Puerto Rico | 18.5 |
| Dominican Republic | 17.4 |

Homicide rate (deaths per 100,000 population)

Move your mouse or finger over each bar for more details. Data exclude deaths in war or armed conflict and suicides.

Source: United Nations Office on Drugs and Crime

Kuang Keng Kuek Ser / PRI

The issue of gun control took center stage once again after the Orlando massacre with advocates of more gun control arguing that stricter gun control would help to reduce the number of homicides in the US.

ADVERTISING



The Global Study of Homicide 2013 report by the United Nations Office on Drugs and Crime found that firearms are the most widely used weapons in homicides committed globally in 2012. However, "not all high homicide areas are associated with a high prevalence of firearm homicide."



Weapons used in homicide, 2012 or latest year

| | Firearms | Sharp objects | Others |
|---|---|---|---|
| Global | 41% | 24% | 35% |
| Americas | 66% | 17% | |
| Africa | 28% | 42% | 30% |
| Asia | 28% | 25% | 47% |
| Europe | 13% | 33% | 54% |
| Oceania | 10% | 55% | 35% |

● Others   ● Sharp objects   ● Firearms

'Others' include physical force and blunt objects.

Source: Global Homicide Book 2013

Kuang Keng Kuek Ser / PRI

Exhibit A
000106          4/9

Data in the report shows that although murders committed with guns make up a huge portion of the total homicides in the Americas, including the US, some other regions with higher homicide rates, such as Eastern Europe and Southern Africa, have a relatively low share of homicides by guns.

Similarly, some regions have lower homicide rates but a higher portion of homicides committed by guns like Southern Europe and Northern Africa.

"This seems to confirm that a complex mixture of factors influences homicide levels, the homicide mechanism being only one of many elements that combine to determine homicide levels and trends," the report concluded.

Several countries in Central America like Honduras, El Salvador and Guatemala top the list of homicides in the world. The heightening violence there has forced people to flee their homes and many end up as <u>undocumented migrants</u> in the US.

To stop their children from being <u>recruited by gangs</u>, some parents uproot the whole family and pay smugglers to move to the US. Some choose to send their children to the US, unaccompanied. In a town in El Salvador, the violence has even created a <u>booming coffin-making business</u>.

To put the numbers in perspective, there were 17.4 road traffic deaths for every 100,000 people in Honduras, while the number of murder victims was 74.6 in 2014, more than four times higher. According to a <u>local news site</u>, a total of 6,640 murders happened in El Salvador in 2015, while mass killings in Paris, Brussels and Orlando, combined took 211 lives.

Youth have been the biggest casualty in such violence. The 15-29 and 30-44 age groups account for the vast majority of homicides, but in South America and Central America, the homicide rate for male victims aged 15-29 is more than four times the global average, probably due to higher levels of gang-related homicide, according to the report.

Exhibit A
000108

SECTION   SEARCH

MON, SEP 17, 2018

# 80% of Homicides in Honduras Result of Gun Violence: Report

Written by David Gagne - JULY 27, 2016

Arms Trafficking   Homicides   Honduras

SHARE



*Honduran authorities with seized firearms*

Firearms are reportedly used in more than 80 percent of all homicides in Honduras, almost double the global average, an epidemic fueled in large part by the ease with which criminals can obtain weapons and ammunition.

Of the 48,094 murders registered in Honduras between 2008 and 2015, 39,111 were committed using a firearm, according to data from the Violence Observatory at the National

Exhibit A
000107

1/4

almost twice the worldwide average of
approximately 41 percent (pdf),
according to the Igarapé Institute .

Honduras was at one time the most
violent peacetime nation in the world
and remains among the most
homicidal. Murder rates peaked at over
90 per 100,000 residents in the early
2010s before falling to their current
levels of around 57 per 100,000.

The northern department of Cortés —
home to San Pedro Sula — saw the
most violence during the recent eight-
year stretch, according to the
Observatory, registering 31 percent of
the murders nationwide. Tegucigalpa's
Francisco Morazán and La Ceiba's
Atlántida were the second and third
most violent departments, accounting
for 17 and 8 percent of the total
homicides, respectively.

## InSight Crime Analysis

The high rate of gun deaths is closely
linked to the large black market for
weapons that is supplying Honduras'
powerful criminal groups. In 2014, a
Honduran congressional commission
estimated that over 1 million weapons
were in circulation, and that more
than 700,000 of those were unlicensed.

Exhibit A
000108

SECTION    SEARCH

sourced from Honduras' own security forces, which do not register their weapons with the state, according to an anonymous source consulted by La Tribuna. This lack of regulation facilitates the movement of weapons from police and military stockpiles into the hands of criminal groups.

**SEE ALSO:** Honduras News and Profiles

Ammunition also appears to be inexpensive and in abundant supply. The head of the Violence Observatory, Migdonia Ayestas, noted with alarm that up to 400 bullet casings have been found at some crime scenes, and that bodies are found riddled with as many as 10 bullet wounds. This shows "that the bullets or projectiles would appear to be so cheap that they don't care about using as many as it takes to demonstrate their lethal power," Ayestas told La Tribuna.

To be sure, gun violence is a serious problem across the region. In Central America, firearms are used in 73 percent of all homicides, according to Igarapé, while in South America that number is 53 percent.

SECTION   SEARCH

We encourage readers to copy and
distribute our work for **non-commercial
purposes**, provided that it is **attributed to
InSight Crime in the byline**, with a **link to
the original at both the top and bottom of
the article**. Check the Creative Commons
website for more details of how to share
our work, and please send us an email if
you use an article.

**SHARE**

Exhibit A
000119
4/4

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4267   Page 99 of
251
9/17/2018          Case 1:18-cv-0_____-PLF   Document 1-2   Filed 09/26/___   Page 76 of 215

≡ SECTION    🔍 SEARCH

MON, SEP 17, 2018

# Honduras Profile

### LAST UPDATE AUGUST 27, 2018

Honduras

SHARE



Honduras, long one of the poorest
countries in Latin America, is now also
among the most violent and crime-
ridden. The violence is carried out by
local drug trafficking groups, gangs,
corrupt security forces and
transnational criminal organizations
mainly from Mexico and Colombia.

In recent years, Honduras has become
a strategic transit nation for drugs
moving north to the United States.
Political turmoil following the 2009
coup that ousted then-President
Manuel Zelaya has exacerbated
instability.

Exhibit A
000113          1/13

SECTION   🔍 SEARCH

system is afflicted by political interference and corruption, as well as a lack of capacity and transparency.

The police in Honduras is one of the most corrupt and mistrusted police forces in Latin America, and the country's military has also been accused of engaging in criminal activities. Nonetheless, the ruling National Party, which has maintained control of the presidency since 2009, has increasingly deployed the military for policing functions, particularly in the fight against gangs like the MS13 and Barrio 18.

- Geography
- History
- Criminal Groups
- Security Forces
- Judicial System
- Prisons

## Geography

Honduras, the second-largest country in Central America, is bordered by Guatemala to the west, El Salvador to the southwest and Nicaragua to the southeast. The country has a long Caribbean coastline and access to the Pacific Ocean via a southern gulf.

Exhibit A
000112

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4269   Page 101 of
251
9/17/2018          Case 1:18-cv-0?      -PLF   Document 1-2   Filed 09/26      Page 78 of 215

SECTION   🔍 SEARCH

and boat shipments coming from Colombia, South America's main cocaine producer. Large swathes of the country's forests have been cleared by drug traffickers to build air strips and create money laundering opportunities. Honduras' largely unmanned border with Guatemala is an important crossing point for contraband products and drugs.

Gangs are concentrated in the country's largest urban areas, including the capital Tegucigalpa, the economic hub of San Pedro Sula and the Caribbean coastal city of La Ceiba.

## History

Honduras became an independent country in 1838. Its first half-century of existence was characterized by tensions between political factions. Beginning in the early 1900s, the United States became heavily involved in Honduras, including by deploying US soldiers, as US companies invested heavily in the banana industry, transforming Honduras into a so-called "banana republic."

Political turmoil and severe economic struggles based in large part on the country's reliance on exports fueled a military revolt in 1957, which paved the

Exhibit A
000118          3/13

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4270   Page 102 of
251
9/17/2018                    Case 1:18-cv-0?      .-PLF   Document 1-2   Filed 09/26/    Page 79 of 215
Honduras Profile

SECTION    SEARCH

1970s to the 1990s, Honduras was an island of relative stability in the region as its Central American neighbors — Guatemala, Nicaragua and El Salvador — were rocked by civil wars. But as one of the poorest Latin American countries surrounded by war, Honduras became vulnerable to corruption and organized crime.

Throughout the 1980s, Honduras was used as a trampoline for the movement of all types of illicit goods, from drugs to weapons and contraband — even after the wars ended, these trafficking routes would remain.

The US government, focused on fighting what it considered a burgeoning communist threat in the region, used Honduras as a hub for supporting anti-communist fighters in El Salvador and Nicaragua, even establishing training and attack bases along the country's borders. Honduras became increasingly militarized during this time, setting the stage for traditional economic powers to be eclipsed by a new elite class.

During this time, Honduras' first major international drug trafficker, Juan Ramón Matta Ballesteros, set up an underworld "Honduran bridge" between Mexico's emerging

SECTION      🔍 SEARCH

on ties to the highest levels of power in Honduras, particularly within the military, and owned legitimate businesses in the country. The US government even contracted Matta Ballesteros' airline company to shuttle aid and weapons to Nicaragua's secretly US-funded "Contras," who were fighting against the left-wing Sandinista government.

In 1985, Matta Ballesteros became one of the most-wanted men in the region when he and the Guadalajara Cartel allegedly tortured and killed US Drug Enforcement Administration (DEA) agent Enrique Camarena. In 1988, Matta Ballesteros was arrested by US Marshals in Honduras and extradited to the United States where he was convicted of kidnapping and remains incarcerated.

The 1990s were marred by rising crime and violence, corruption, economic crisis and environmental devastation caused by Hurricane Mitch, one of the worst storms in history to strike the Western hemisphere.

In the early 2000s, Honduras experienced a new surge in drug trafficking and other illicit activity. As Mexican drug trafficking organizations gained more control over the

Exhibit A
000116

≡ SECTION     🔍 SEARCH

Cachiros in the northeastern Caribbean coastal department of Colón, and the Valles in the western Copán province bordering Guatemala. These organizations worked with other Honduran crime bosses such as business magnate and trafficker José Natividad "Chepe" Luna and drug trafficker José Miguel "Chepe" Handal, as well as international groups like the Sinaloa Cartel.

President Manuel Zelaya took office in 2006 with promises to tackle crime and implement social programs. But in 2009, Zelaya was ousted in a military coup after calling for a constitutional referendum to pave the way for his reelection. Criminal groups have taken advantage of the resulting political turmoil, as well as corruption within the country's security forces and elite class, to expand their activities.

In the 2010s, Honduras' homicide rate skyrocketed, peaking in 2011 and slowly declining since. The primary drivers of this violence are gangs like the Barrio 18 and MS13, which concentrate their criminal activities in urban areas and recruit young people, many of whom are suffering from widespread economic inequality and a

Exhibit A
000116

6/13

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4273   Page 105 of
251
9/17/2018              Case 1:18-cv-02...-PLF   Document 12...-filed 09/26/...   Page 82 of 215

SECTION   🔍 SEARCH

order, demanding extortion payments from businesses and residents, and running local drug sales and kidnapping rings.

Since 2003, Honduras has pursued an "iron fist" security strategy against gangs. These policies, which did not address the root causes of gang membership or provide rehabilitation for gang members, have led to an increase in the prison population [and] burdened Honduras' already stumbling penal system.

The National Party has maintained control of the presidency since the 2009 coup, first with President Porfirio Lobo Sosa [and] then with President Juan Orlando Hernández's election in 2013 and controversial re-election in 2017, which was marred by fraud allegations.

In 2010, the United States designated Honduras as a major drug transit country for the first time. Since then, drug trafficking activities have intensified in the region, driven in part by a boom in Andean cocaine production. Honduras has cooperated closely with the United States on combating drug trafficking in recent years. In May 2014, Carlos "El Negro" Lobo became the first Honduran drug

Exhibit A
000117
7/13

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4274   Page 106 of
251
9/17/2018                Case 1:18-cv-0    -PLF   Document 12-2 Filed 09/26    Page 83 of 215
                                             Honduras Profile

SECTION   🔍 SEARCH

provided information to US authorities as part of plea agreements.

This cooperation has at times sparked controversy. In 2012, several anti-drug raids conducted with assistance from US law enforcement allegedly involved unjustified uses of deadly force, including one incident in which a number of civilians were killed.

Widespread anti-corruption protests in 2016 prompted the establishment of the Support Mission Against Corruption and Impunity in Honduras (Misión de Apoyo contra la Corrupción y la Impunidad en Honduras -- MACCIH), which is backed by the Organization of American States (OAS). Honduras' Attorney General's Office has worked with MACCIH to investigate corruption schemes implicating political and economic elites, including President Hernández.

## Criminal Groups

Honduras' most important criminal organizations have largely been dismantled in recent years with the arrests of their top leaders and their extraditions to the United States. The former leader of the Cachiros drug trafficking group,Devis Leonel Rivera Maradiaga, has provided explosive

Exhibit A
000118

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4275   Page 107 of
251
9/17/2018          Case 1:18-cv-0?     ?-PLF   Document 1-2   Filed 09/26/?     Page 84 of 215

SECTION     SEARCH

organization, which allegedly shipped tons of cocaine each month to the United States, has also been nearly entirely dismantled, with many of its members sent to face trial in US courts.

The Atlantic Cartel, whose leader, Wilter Neptalí Blanco Ruíz, was arrested in Costa Rica in November 2016 and later reached a plea agreement with US prosecutors in July 2017, is presumed to have operated with protection from military, police and judicial officials.

Honduras' two biggest gangs are the MS13 and Barrio 18, which operate mainly in urban areas and subsist largely through extortion and local drug dealing.

Various groups and individuals in Honduras also engage in trafficking firearms both into and within the country.

## Security Forces

Honduras has a national police force overseen by the Security Ministry, which had less than 14,000 officers in 2016 with lofty plans to double the force by 2022. The national police is in charge of preventing and investigating crimes in Honduras, and is composed

Exhibit A
000119
9/13

☰ SECTION    🔍 SEARCH

and community policing. The police also coordinate with an anti-crime task force known as FUSINA, which includes prosecutors and soldiers.

Honduras' police force is one of the most corrupt in the region. Honduran police officers have been accused of a wide range of criminal activities, including corruption, sharing information with criminal groups, allowing drug shipments to pass unchecked, and reportedly participating in, and even directing, violent criminal operations. In early 2016, Honduras created a police purge commission following revelations that high-ranking members of the police had participated in the 2009 murder of Honduras' anti-drug czar. Unlike previous purge attempts, the commission made early progress reviewing hundreds of high-ranking officials, and thousands of officers have been removed from the force. Its mandate was renewed in early 2017 to last for at least one more year. But a recent scandal has thrown the commission's legitimacy into question.

Honduras has increasingly militarized the fight against organized crime in recent years, granting soldiers policing powers in 2011 and creating an elite

reportedly fueled human rights
violations, including kidnapping.

As of 2015, Honduras' military,
overseen by the National Defense
Ministry, had around 24,000 active
personnel in its army, air force, navy
and military police. Under Honduras'
constitution, the Security Ministry can
call on the military to cooperate in
operations against terrorism and drug
and arms trafficking. Military officials
have been accused of colluding with
criminal groups to traffic drugs.

## Judicial System

Honduras' highest judicial body is the
Supreme Court of Justice, which
includes chambers for constitutional,
criminal and civil cases. Below this are
an appeals court, first instance trial
courts for criminal and civil cases,
and municipal and district-level
justices of the peace. Honduras has an
Attorney General's Office (Fiscalía
General) that functions as part of the
independent Public Ministry
(Ministerio Publico) and handles
criminal investigations.

Honduras' judiciary is widely
considered to be weak, ineffective and
highly corrupt. The selection processes
for Supreme Court magistrates and

Exhibit A
000123
11/13

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4278   Page 110 of
251
9/17/2018          Case 1:18-cv-0  -PLF   Document 1-2  Filed 09/26/   Page 87 of 215

≡ SECTION     🔍 SEARCH

World Justice Project's 2017-2018 Rule of Law Index ranked Honduras as one of the countries with the most corrupt and least effective criminal justice systems in Latin America and the Caribbean. Given the weakness of Honduras' judiciary, many high-profile drug trafficking suspects have been extradited to the United States.

The internationally-backed MACCIH has supported the Attorney General's Office's investigations into corruption since 2016. But backlash from implicated elites, Congress' so-called "impunity pact" and legal attacks aimed at undermining the commission have made it difficult for these probes to progress.

## Prisons

Honduras' overburdened prison system is administered by the National Directorate of Special Preventive Services (Dirección Nacional de Servicios Especiales Preventivos – DNSEP) and run by the National Police. As of 2017, Honduras' prisons were operating at almost 180 percent their capacity, in spite of 2014 reforms aimed at reducing overcrowding. Pretrial detainees account for more than half of the prison population and

Exhibit A
000122
24
12/13

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4279   Page 111 of
251
9/17/2018          Case 1:18-cv-0⌒-PLF   Document 1-2 Honduras | ...le 09/26/⌒   Page 88 of 215

SECTION   🔍 SEARCH

deplorable conditions, and chronic dysfunction has allowed prisoners to escape. Prisons have become centers of criminal activity for gangs due to authorities' lack of control in many facilities.

## What are your thoughts? Click here to send InSight Crime your comments.

We encourage readers to copy and distribute our work for **non-commercial purposes**, provided that it is **attributed to InSight Crime in the byline**, with a **link to the original at both the top and bottom of the article**. Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

**SHARE**

Exhibit A
000123
13/13
23

abc NEWS

Video
Live
Shows
Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week
The View The View
What Would You Do? What Would You Do?

U.S.
Politics
International
Entertainment
Lifestyle
Health
Virtual Reality
Technology
Sports
Weather
FiveThirtyEight
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Contact UsContact Us
Yahoo!-ABC News Network | © 2018 ABC News Internet Ventures. All rights reserved.

Menu                                                        LOG IN

Search Headlines, News and Video...



۷

I $\phi$ 14, a 19-year-old small town girl named Maria Jose Alvarado catapulted onto the world stage when her brilliant smile and sweet personality won her the Miss Honduras crown. With a freshly minted passport, she v 🍂 et to compete for the prestigious Miss World title in London, a trip which would be the first plane ride of her life.

But her dreams of glamour and glory were never to be. Just a few days before she was set to leave for the competition, Alvarado and her sister, 23-year-old Sofia Trinidad, were brutally murdered. Their bodies were hidden in shallow graves in a riverbank in Santa Barbara, Honduras, discovered after a week-long manhunt

Exhibit A
000124

9/17/2018     'Men aren't anything' to women in Honduras, one of the most dangerous places on Earth for a woman - ABC News

that made international headlines. Their joint funeral was broadcast around the world **and attended by
thousands.**



Maria Jose Alvarado is crowned the new Miss Honduras in San Pedro, Sula, Honduras, on April 26, 2014.

But even their grieving mother Teresa Muñoz knows the bitter truth: the only thing unusual about their
daughter's murders was that police and the media paid attention.

"Here in Honduras, women aren't worth anything," said Muñoz, wiping away tears. She believes that the only
reason her daughters' bodies were found is because of Maria Jose's fame. Otherwise, she says, she would
probably still be looking for answers.

**In El Salvador, the Murder Capital of the World, Gang Violence Becomes a Way of Life**

**Reporter's notebook: How a look inside Venezuela's crumbling health care system got me kicked out of
the country**

The night Maria Jose Alvarado was killed, she tagged along to her sister's boyfriend's birthday party. That
boyfriend, then 32-year-old Plutarco Ruiz, was known as a powerful man in Santa Barbara. The night of his

Exhibit A
000125

9/17/2018        'Men can do anything they want' to women in Honduras: Inside one of the most dangerous places on Earth to be a woman - ABC News

birthday party, authorities say they believe Ruiz shot his girlfriend Sofia after a jealous argument. They say he then turned his gun on Maria Jose as she tried to flee the scene.

"He shot her 12 times in the back," her mother said. "Because of his machismo that this happened."

Much of this gender-based violence, according to Honduran activists like Neesa Medina, is due to a sexist "machismo" culture of gangs, guns, and girls, where a man's power is often measured in bullets. Combine this with a government unable to cope with a relentless tide of drug-related crime, Medina says, you get a culture where women are disposable.

"Men can do anything they want to women in Honduras," said Medina, an analyst with Honduras' Center for Women's Rights. "Because we think that it's common and it's something that you can be expected of, living here."

Violence is part of everyday life in Honduras, one of a triangle of Central American countries wracked by rampant gang warfare, with some of the highest murder rates outside of a war zone. But there is another brutal war raging there, one hidden just below the surface: Honduras has been called the most dangerous place on earth to be a woman. This ranking, due in large part to an epidemic of "femicide," or the murder of a woman because she is a woman. According to Honduras' Center for Women's Rights, one woman is murdered every sixteen hours in this nation, which is barely the size of Ohio. According to the U.N., Honduras has the highest femicide rate in the world.

It is not just murder, it's also the shocking numbers of rape, assault, and domestic violence cases, happening with near-total impunity. In 2014, the United Nations reported that 95 percent of cases of sexual violence and femicide in Honduras were never even investigated.

Exhibit A
000126

9/17/2018        'Men are God anything' ....  women in Honduras' ....  one of the ....  places ...  Earth for a woman - ABC News



*There's a 90 percent impunity rate when it comes to femicide cases,  and  a 96 percent impunity rate with sexua  viol... **more +**

Alvarado  and  her sister Sofia Trinidad's bodies were discovered after a week-long manhunt that made international headlines. Their oldest sister, Cori Alvarado, was there when their bodies were found.

"I kept asking God that it wasn't them," she said, through tears. "But I had to face the fact that it was them".

Police charged Ruiz with the murders, but more than two years later, he still has not been tried  and  maintains his innocence.

While the name Maria Jose Alvarado has become a national symbol for a culture of rampant femicide, her mother  and  surviving sister say they are living in fear, terrified of retaliation from the killer. They are hopeful to one day receive asylum to come to the United States.

The unholy violence of Honduras has propelled a river of women  and  children towards America's southern border, part of what the UN has called an "invisible refugee crisis." Since 2008, the number of asylum seekers from Honduras  and  neighboring El Salvador  and  Guatemala has increased by 500 percent, according to the U.N. For many of the women, it is not about escaping poverty, it may be life  and  death. U.S. government

Exhibit A
000127

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4284   Page 116 of
251
9/17/2018         'Men can do anything they    to a woman in Honduras,' inside a dangerous place on earth for a woman - ABC News

statistics found that, in 2015, 82 percent of female asylum seekers from these three nations had 'credible fear of persecution or violence', the most basic criteria for advancing an asylum claim.



"I remembered he had a machete under the bed. That's when the attack began," said Heydi, 30, San Pedro Sula, Hon... **more +**

Too often, the violence comes from within a woman's own home. Heydi Hernandez, a 30-year-old mother of five, lives with the horrific memories and brutal scars from the night her husband attacked her with a machete after a heated argument. She says her oldest daughter witnessed as he severed both of her feet.

"My legs were badly injured. I remember a part was just attached by a piece of skin," Hernandez said.

She thinks it was her husband's attempt to assert his power by stealing her independence. "[If] he had wanted to kill me, he would have" she added.

It's been over a year since the attack, and Hernandez spirit is indomitable. She walks with donated prosthetics. She has a good job that supports her children and even plays in an all-male wheelchair basketball league.

Exhibit A
000128

Case 1:18-cv-01... tgPDF Document 11-2 Filed 09/26/... Page 94 of 215

"Thank goodness I had the blessing to be alive, because there are others that don't," Hernandez said. "It's time that we move on and... we stop the mistreatment from men."



"When I got to the hospital, a doctor told me, 'you won't ever walk again," said Heydi, 30, San Pedro Sula, Honduras. ",.. more +

Thanks to the rising tide of these kinds of crimes, the Honduran government formed a women's unit of its Public Ministry in the capitol of Tegucigalpa. Yet when the "Nightline" team went to visit, there were only a handful of women there asking for help. According to the Women's District Attorney Maria Mercedes Bustelo, "What these women feel is impotence. The authority has to reach these women. But in Honduras, that's not possible at the moment." She says that filing a complaint can take weeks, police lack basic resources, and that there are many neighborhoods so dangerous, even the cops cannot enter without military backup.

"Many of the women involved in domestic violence with gang members, they can't even report it. They can't seek help from police because that would be a death sentence" Bustelo continued.

Neesa Medina says reporting crimes and obtaining restraining orders often do little to prevent women from being attacked. "How powerful is a bullet? Is a bullet more powerful than a piece of paper?" she said. "We're talking about women who have three, four, or five kids. So if you cannot assure her and her family to be safe,

Exhibit A
000129

9/17/2018        'Men who do anything they want' women in Honduras' one of the most dangerous places on Earth for a woman - ABC News

and the best you can do ... is to show her a piece of paper, that's almost like signing her death sentence right there."

Fear is an ever-present reality of life for so many women here, yet the Honduran government fails to provide shelters or safe houses. So families in the gravest danger are at the mercy of private charities.

Another woman "Nightline" spoke to said she was brutally raped by a powerful man in their small town.

"They left a note saying that if I spoke up they were going to kidnap my daughter, rape her, kill my son and go leave my son's head at the door of my home on a platter," the woman said. "Horrendous things so I was very scared and stayed quiet."

Terrified, she said she stayed quiet and didn't tell her children what had happened, even after she realized she had gotten pregnant with her rapist's child.

"When the baby come to the house I knew it but I feel too scared, sad about my mom," said her young daughter in halting English. "But I know that God is going to help us and I love my brother."

The mother tells us no one would ever suggest she testify against the man who raped her, instead they suggest she leave the country. She says that she believes he had already murdered another woman, but was never arrested for the crime.

The family is currently living in hiding in a shelter run by the Irish charity Trocaire, which is helping her family relocate to another, safer country. But it will be a far cry from her young, English-speaking daughter's dreams of America.

"We want to go there because we know that we're going to have more opportunities," the daughter said.

But the Trump administration's policies will make it more difficult for families like this to ever come to America's shores. His latest executive order cuts the number of refugees the U.S. will accept in half, which includes Honduran woman applying for asylum.

Exhibit A
000139

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4287   Page 119 of
251
9/17/2018          'Men can do anything' - Welcome to Honduras, a 'death zone' for women - ABC News
Case 3:18-cv-00428-...          ...PDF Document 1-2...Filed 09/26/...          Page 8 of 215



The Dolls Clan is a feminist graffiti group led by Mykie Graff, whose feminist raps have made her an internet sensation... **more +**

While so many women are fleeing, Neesa Medina said some young feminists are holding their ground. Tired of being silent, thousands have united under the battle cry, "Ni Una Menos," which translates to "Not One Less Woman." This battle cry has spread across Latin America, from Argentina to Mexico, with widespread protests calling for an end to femicide and other gender-based violence.

Other activists have turned to less traditional protest means. The so-called "Dolls Clan," led by rapper Mayki Graff, uses rap lyrics and graffiti as feminist propaganda.

"Through graffiti many men and women feel identified and feel empowered to say, 'If they can do it we can too,'" Graff said. "It's necessary that if the system imprison us, we can be liberated through rap."

It's all an effort to fight the violence of a "maschismo" culture and even change their country's destiny, so that many women, like Maria Jose Alvarado, will not have to die in vain.

Neesa Medina said she still has hope that change will come to Honduras. "I have to," she said. "If I don't see hope, why would I continue working in this place."

Exhibit A
000131

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4288   Page 120 of 251

9/17/2018    'Men are do anything that to women in Honduras one of the most dangerous places on Earth for a woman - ABC News.

Case 1:18-cv-0        PEF Document 1-2   Filed 09/26/       Page 97 of 215

## Sponsored Stories

Recommended by







**University of Southern California Logo Color Infusion Charm Bangle**
Alex and Ani

**Forget Yoga Pants. These Pants Are The New Go To Item For Women.**
American Giant on WhoWhatWear

**60 Jarring Nature Photos**
History Daily

**[Pics] Repairman Called The Police When He Saw This Buried At Ice Cream Shop's Basement**
Science Glory

Comments

## ADD INTERESTS

Customize your news feed by choosing the topics that interest you.

Hurricane Florence          + Add Interest   Donald Trump                    + Add Interest

| | | | |
|---|---|---|---|
| Sep 17 | 'Some areas haven't seen the worst flooding yet,' NC governor warns | Sep 17 | DeVos: Americans should stop 'hiding behind screens and Twitter handles' |
| Sep 17 | 1-year-old swept away in floodwater among those killed by Florence | Sep 17 | Trump calls Kavanaugh 'one of the finest people' he's ever known |
| Sep 17 | North Carolina residents desperate for supplies | 2h ago | 4 books that rocked the Trump White House |
| Sep 17 | Florence causes 'historic and unprecedented flooding' | 48m ago | Tom Arnold, 'Apprentice' producer scuffle |

# Reporter's notebook: How a look inside Venezuela's crumbling health care system got me kicked out of the country

Exhibit A
000132

**LARR** | LATIN AMERICAN RESEARCH REVIEW

Menjívar, C and Walsh, S D. The Architecture of Feminicide: The State, Inequalities, and Everyday Gender Violence in Honduras. *Latin American Research Review.* 2017; 52(2), pp. 221–240. DOI: https://doi.org/10.25222/larr.73

SOCIOLOGY

# The Architecture of Feminicide: The State, Inequalities, and Everyday Gender Violence in Honduras

Cecilia Menjívar* and Shannon Drysdale Walsh†
* University of Kansas, US
† University of Minnesota, Duluth, US
Corresponding author: Cecilia Menjívar (menjivar@ku.edu)

Increasing exclusion and inequality in Honduras have posed escalating security risks for women in their homes and on the streets. In this article, we examine gender-based violence against women, including gender-motivated murders (feminicides), the everyday acts that can result in their deaths, and impunity for these crimes. Rather than analyzing these murders as interpersonal acts or linking them to economic deprivation, we examine the actions and inactions of the state that have amplified violence in the lives of Honduran women. We distinguish between the state's acts of omission and acts of commission in order to identify the political responsibility and failures that create a fertile ground for these killings. A context of multisided violence that facilitates extreme violence in the lives of women is present in Honduras, especially considering the diminishing power of civil society groups and increased political repression after the 2009 coup. We identify root causes of the wide (and widening) gap between laws on the books—which have been passed mostly to satisfy international and domestic organizations pushing for change—and laws in action, that is, implementation on the ground. Although we focus on Honduras, we note similar experiences of extreme violence in Guatemala, El Salvador, and in other countries in the Latin American region.

## Introduction

> We cannot go back to Honduras. . . . They will kill us. With gangs it is very difficult. . . . The gang members wear the same vests and use the same guns that the police do. How do they get hold of these guns and vests? From the police.
>
> —A woman who has fled Honduras (UNHCR 2015, 24)

For years, Honduras stayed under the radar of international attention, particularly of the US public. This is despite the fact that Honduras has served US interests in Central America in various forms and degrees, playing a key role during the 1980s when it was the staging ground for military operations and training that sustained the wars in that region. However, in recent years, a series of events have thrust Honduras into the limelight, starting with the 2009 coup that ousted the democratically elected president Manuel Zelaya. This event accelerated and exacerbated a security crisis in Honduras and the northern countries of Central America that has resulted in the destabilization of families, worsening of the economy, and increasing violence.[1] The woman quoted above is one among thousands of women fleeing such conditions and seeking refuge in the United States. Thus, while the Latin American region as a whole seems to have entered a new era of openness,

---

[1] The Comisión Interamericana de Derechos Humanos (CIDH) has observed that in post-coup Honduras grave violations of human rights take place, such as killings, arbitrary calls for state of exception, repression of protest through excessive use of force, criminalization of social protest, increased arbitrary detentions, degrading and inhumane treatment of detainees, militarization of the national territory, increase in racial discrimination, violations of women's rights, serious restrictions on free speech, and grave infringement of political rights. The CIDH also noted the inefficacy of the judicial system in protecting human rights (CIDH 2009, paragraph 551).

Exhibit A
000133

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4290   Page 122 of
Case 1:18-cv-01-PLF   Document 51-2   Filed 09/26/1   Page 99 of 215
222                                                                                       Architecture of Feminicide

and many countries have agendas to address inequalities and effect fundamental change, not all countries are aligning with this trend. Some, like Honduras, seem to have stepped back into the 1980s with coups, repression, and political violence that now is almost indistinguishable from "common" crime. Honduras recently had the highest homicide rate in the world. Today that distinction belongs to El Salvador, but these two countries have alternated between the first and second places in the past several years. In Honduras, this rate has steadily gone up with the increased militarization of the state since the 2009 coup d'état.[2] Importantly, in spite of intraregional differences in democratic processes, Latin America as a whole has seen a marked increase in levels of interpersonal violence (PNUD 2013). High levels of violence once again are threatening democracy in the region (Arias and Goldstein 2010).

Increasing exclusion and inequality in Honduras have posed escalating security risks for women in the home and on the streets. Although poverty and marginality affect everyone in the country, these conditions impact women and men differently. Both women and men are robbed, extorted, and killed. However, women suffer qualitatively different and more extreme forms of brutality in the form of feminicide and various other forms of gender violence. In this article, we examine gender-based violence against women, the everyday acts that can result in their deaths, but not as solely interpersonal acts or by linking them primarily to economic deprivation. Rather, we examine the actions and inactions of the state that have served to amplify violence in the lives of Honduran women. While we expose women's poverty-related vulnerabilities, our approach moves beyond income disparities to highlight inequalities in citizenship rights where the state is a key player in perpetuating and reinforcing unequal access to justice and rights. We point to the confluence of factors that facilitate violent conditions for women that can ultimately culminate in their killings, and in doing so we reveal processes by which structural inequality translates into unequal access to safety and justice for Honduran women.[3]

Before we embark on our discussion, a note about terminology is necessary. Killings of women are often referred to as "femicide," that is, the killings of women because they are women (Radford and Russell 1992). We prefer the term "feminicide" because embedded in this term is the role the state plays in these killings. In contexts of impunity such as Honduras, the brutal killings of women denote the complicity of the state through its unwillingness or inability to provide prevention and response mechanisms (see Lagarde 2010). The state also plays a more direct role in violence used to silence women in the political arena. State agents have committed sexualized violence and participated directly in injuring or killing women. This situation compounds inequality, as women become more afraid to engage in public life, which deeply curtails their citizenship rights. Honduras is characterized by Guillermo O'Donnell's conceptualization of "brown areas," that is, areas where the legal state is absent, resulting in a compromised rule of law. In these areas, "whatever formally sanctioned law exists is applied intermittently, if at all" by subnational systems of power (e.g., patrimonial or even gangster-like), with informal legal systems that coexist with national regimes that have formal legal systems and are nominally democratic (O'Donnell 2004, 38–39).

We distinguish between the state's acts of omission and acts of commission in order to identify the political responsibility and failures of the state that create a fertile ground for these killings (see also Sanford, Stefanos, and Salvi 2016). Omission (or inaction) includes indirect mechanisms such as failure to provide prevention, protection, and prosecution. It can also include failure to implement laws to protect women, as when a negligent state "averts its gaze" (Scheper-Hughes 1992) and simply looks the other way. Commission (or action) includes direct actions, such as sexual violence, threats, and the targeting of women leaders for persecution and police harassment.[4] Both types of acts have roots in the same social context that normalizes and sustains violence as well as in profound gender inequalities. This context also shapes the lens through which state actors assess information, justify acts, and implement laws. Decoupling the role of the state into commission and omission allows us to analyze the responsibility of the government in the surge of killings before and after the coup.

---

[2] The 2012 homicide rate for Honduras was 90.4 homicides per 100,000 in the population. The most recent comparable rates available for North and Central America are from 2012, in descending order: El Salvador (41.2), Guatemala (39.9), Mexico (21.5), Panama (17.2), Nicaragua (11.3), Costa Rica (8.5), the United States (4.7) and Canada (1.6) (UNODC 2012). See Figure 2. For the northernmost countries of Central America, the most recent comparable rates are from 2014, as follows: Honduras: 75; El Salvador: 64; Guatemala: 31 (World Bank 2014).

[3] We would like to thank an anonymous reviewer for bringing this point to our attention.

[4] State actors also engage in crimes by directly collaborating with criminal groups, taking bribes, etc. Here, however, we focus only on the formal, licit actions and inactions of the state in relation to violence.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4291   Page 123 of
Case 1:18-cv-0(    1-PLF   Document 2342   Filed 09/26/1(    age 100 of 215
Menjívar and Walsh                                                                                                  223

To be sure, the Honduran government before the coup engaged in actions that disregarded gender-based violence against women and did not take effective steps in addressing it, thus committing acts of omission. These failures have worsened with the post-coup government, which has taken more direct measures that have escalated acts of omission as well as commission in systematically persecuting women leaders and physically and sexually assaulting women. This is perhaps best exemplified by the assassination of environmental activists, such as the killing of indigenous leader Berta Cáceres, who was murdered in March 2016 after receiving multiple threats following her opposition to the construction of a hydroelectric dam. Yet the police alleged her murder had taken place in connection with a robbery. Even if the government is not killing women directly, acts of commission and omission create conditions that promote impunity and increase risks of victimization by normalizing the targeting of women for violence, at home and in the streets. Though acts of omission may not directly involve the state in the killings, inaction can also lead to such killings. Thus, through direct and indirect mechanisms, the post-coup government has exacerbated the context within which women are killed, and impunity is widespread.

Honduras has ratified regional and international conventions and has laws on the books criminalizing intrafamilial violence, rape, and killings of women. However, the police and courts have undermined the aims of these laws by failing to implement them effectively or even by directly assaulting women. We argue that these government actions and inactions are linked to intersections among political, social, and economic exclusion that are a consequence and a cause of gendered inequality, creating a particularly violent context for women. In our conceptualization, the same context that creates conditions for extreme forms of violence also impedes justice as it perpetuates unequal access to the justice system on the basis of gender and, in this way, subverts women's citizenship rights.

The recent spiral of violence in the lives of women and lack of protection can best be understood by examining the political responsibility of the state within a context of multisided violence. This context includes structural, political, symbolic, and everyday violence that reinforces and undergirds the normalization of persistent impunity and violence in the lives of women. This sociopolitical architecture sustains and perpetuates gendered violence and impunity. We argue that the more extreme the context of multisided violence, the higher the probability that states will fail in their responses to violence against women through normalizing and institutionalizing profound gender inequalities and undermining citizenship rights for women. This context is particularly present in Honduras, especially considering the diminishing power of civil society groups and increased political repression after the coup. Past research has linked levels of feminicide to discrimination, poverty, and negative attitudes toward women (Prieto-Carrón, Thomson, and MacDonald 2007). We move past these associations to reveal more systematically how structural and institutional violence creates a context of violence that cannot be reduced to violent individuals; it is embedded in the broader social order, gender inequality, the perpetuation of violence, impunity, and women's diminished rights.

We focus on how broader structures of inequality conjoin with political forces to maintain these structures and intensify their impact. This approach allows us to identify root causes of the wide (and widening) gap between laws on the books—which have been passed mostly to satisfy international and domestic organizations pushing for change—and laws in action, that is, implementation on the ground. This gap diminishes women's citizenship rights and enables the rise of feminicides. A law on the books may not be enough to address an issue if contextual factors do not align with the aims of the law (Eisenberg 2011). And although we focus on Honduras, we note similar experiences of extreme violence in Guatemala, El Salvador, and other countries in the Latin American region (Grupo Guatemalteco de Mujeres 2012; Hume 2009; Menjívar 2011; UN 2011; Walsh 2008).

## Theoretical Framework

To understand how the state responds (or fails to respond) to violence against women in Honduras, we use an analytic perspective that permits us to factor in the social and structural conditions that shape gender violence and within which laws are written and interpreted. A lens of multisided violence includes aspects of structural, symbolic, and political violence that intersect with gender violence (Walsh and Menjívar 2016; Menjívar 2011; Menjívar and Walsh 2016). The layered and interconnected nature of these forms of violence contributes to their normalization and the internalization of frames through which individuals understand and make sense of the social world (Menjívar 2011). A multilayered, normalized context of violence shapes the views, frameworks, and cognitive frames through which individuals (including justice system personnel) view violence, and in this way forms a sociopolitical architecture that orders life and shapes frames of reference. Thus, those who perpetrate violent acts and those in charge of implementing the law to address

Exhibit A
000135

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4292   Page 124 of
Case 1:18-cv-0   1-PLF   Document   Filed 09/26/1   age 101 of 215
224                                                                        Architecture of Feminicide

such acts draw their frameworks, viewpoints, and attitudes about gender roles, women, and violence from the same social "order of things" (see Kleinman 2000). The intersection of various forms of violence results in the kind of increased gender violence and impunity that has become a crisis in Honduras.

### Structural Violence

Structural violence is exerted both systematically and indirectly, often exposing itself in social structures as inequality. It results in oppressive conditions of poverty and lack of opportunity for marginalized sectors of society such as women (Menjívar 2011). The state plays a fundamental direct and indirect role in creating structurally violent conditions for large segments of the population. Who ends up poor is not an accident; it is the outcome of deliberate policy decisions that cause and perpetuate social and economic exclusion. Neoliberal reforms that lead to the displacement of workers, increases in unemployment, underemployment, and insecurity lie at the root of expanded forms of structural violence in the lives of the poor today.

Significantly, structural violence is gendered. Women are disproportionately impoverished on a global scale, and Honduras is no exception. While poverty may not impact initial risks of exposure to physical violence, it puts poor women at extreme risk for repeated victimization and at a disadvantage in exercising their citizenship rights. Structural violence is also built into the structure of the state through policy decisions that have shrunk social spending budgets. Some of the effects on women are manifested in social expectations for women to attend to the needs of their families, secure food for their children, and protect them in the face of danger (Menjívar 2011). The lack of specialized services for women in the police and courts, despite pressure by women's organizations to provide them, exemplifies the structural violence of the state's actions, which maintain women's marginalization and perpetuate it through systemic failures to provide them with prevention, protection, or prosecution of violence. As Ronderos (2011, 2) notes, "In a context of unequal distribution of wealth, scarce resources and weak institutions, impunity prevails within the justice system." Thus, women are kept disproportionately poor through policy design and become even more vulnerable to violence as policies contribute to maintaining impunity.

### Political Violence and State Terror

Although Honduras did not experience an internal armed conflict as did neighboring Central American countries, political violence and state terror prevailed, with gendered expressions. Political violence of the past has been characterized as targeting opposition groups. In contrast, today's state violence concentrates on "common" criminals, often gangs. The violence used in both cases is remarkably similar; repressive tactics used against the opposition in the past are now used to combat gangs and criminal groups. These tactics contribute to the militarization of society, as in the past, when society became accustomed to seeing violent government actions as ordinary and military power structures as natural and accepted. Thus, Enloe (2000) observes, lives become militarized not only through direct means and exposure but also when militarized views and attitudes are taken as natural and unproblematic, with a reciprocal relationship between violence from the state and violence in private spheres (Hay 1992). Structural and political violence interact: the structural violence of neoliberal reforms implemented in deeply unequal societies increases poverty and constrains choices for poor Hondurans, who turn to gang membership in order to survive (Wolseth 2011). In turn, the government responds with aggressive policies to combat gang violence, creating new territories of violence (Gutiérrez Rivera 2013). In a continuum of state violence, there are haunting similarities between signs of gendered violence and sexualized torture found on victims of feminicide today and methods of torture used against women during the civil war years in the region (Sanford 2008). Political violence is maintained and exacerbated through state actions of omission as well as commission—through failing to address issues of impunity for political violence and through committing it directly.

### Symbolic Violence

According to Bourdieu (2004), symbolic violence refers to the internalized humiliations and legitimations of inequality and hierarchy that range from sexism and racism to intimate expressions of class power. A key point in Bourdieu's conceptualization is that the everyday, normalized familiarity with violence renders it unexceptional; power structures are normalized and accepted—always there—and the mechanisms through which violence is exerted recede from conscious knowing.

Perhaps the most powerful form of symbolic violence, in Bourdieu and Wacquant's (2004, 272) conceptualization, comes from "the social order of things." It normalizes mistreatment against vulnerable members of society, and this normalization becomes part of the cognitive frames through which individuals make sense of the world. This social order reinforces and normalizes expectations of gendered behavior,

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4293   Page 125 of
Case 1:18-cv-0⌢⌢1-PLF   Document 1-2   Filed 09/26/1⌢ ⌢age 102 of 215
Menjívar and Walsh                                                                                          225

and thus perpetrators come to expect not to be held accountable for their acts. Impunity then becomes embedded in relations with authorities and the judicial system. The imprint of symbolic violence can be seen in the routinized daily acts of control, humiliations, and stigmatization of women and their bodies, and the naturalized acceptance of women's manifold forms of social exclusion in education, health, and employment. It is also expressed in a general devaluation of poor women's lives, as well as in women's self-recrimination for their own victimization when they fail to meet the norms imposed on them. These expressions do not *cause* Honduran women's murders but cumulatively set the conditions for them, as symbolic violence legitimizes the devaluation of women's lives. Because symbolic violence is constitutive of the social order, it seeps through to permeate state institutions, where it is expressed in the state's acts of omission and commission. For example, the state may fail to promote policies and campaigns that would value the lives of marginalized citizens in general. Further, they may perpetuate this devaluation when judges and police blame victims for the abuses against them by accusing them of failing to "behave well." When women encounter these justifications and dismissals of violence against them, the justice system reinforces abuse as a mechanism of subordination.

### Gender Violence and Gendered Violence

Gender and gendered violence is a transversal aspect of structural, political, and symbolic violence; all of these types of violence have gendered expressions. Hammar (1999) observes that differences in a gender-imbalanced political economy that disadvantage women represent *gender* violence, whereas acts of violence, including physical, psychological and linguistic, constitute *gendered* violence (1999, 91). And it is precisely the expression of gender violence and gendered violence in everyday life (in the home and the streets) that contributes to their normalization—they are always there, part of the way things are. Everyday practices sustain the normalization of gender violence but also justify punishments for deviations from normative gender role expectations. Gendered and gender violence interact with structural, political, and symbolic violence to produce a multilayered system that increasingly hurts women and affects poor and vulnerable women in particular (Menjívar 2011). And gendered and gender violence are maintained and exacerbated through the symbolic violence of state actions of omission and commission. This confluence also sets the conditions for feminicide to occur. In our conceptualization, political exclusion, entrenched gender ideologies, and persistent inequality contribute to escalating security risks for women in Honduras and in other countries that share a similar confluence of factors.

## Data and Methods

In a previous study, we inductively identified mechanisms that create conditions for extreme violence in the lives of women in Guatemala and El Salvador (Menjívar 2011; Walsh and Menjívar 2016) and we adapt this lens to examine the Honduran case. We use the "extreme-case" method, which focuses on case studies with extreme outcomes, like notable successes or failures (Gerring 2007, 101). This method helps to reveal how normalization operates as a causal mechanism in the relationship between the context of multisided violence (the cause) and extreme violence against women and impunity (the outcome).

There are various approaches to data collection that could be used to examine the questions we address, but we opted for assembling different sources of unobtrusive data to address this sensitive topic. One egregious act of omission on the part of the Honduran state post-coup is that it has increasingly failed to maintain databases on crimes against women and, consequently, there has been a dearth of data on violence against women in the post-coup years. Thus, we have resorted to piecing together the data we could find. Rather than using more direct and extensive interviews and surveys, we use other forms of primary and secondary data.

Our primary data are the laws on the books in Honduras that address violence against women, including intrafamilial violence and feminicide, as the state manifests itself in people's lives through law. We also reference a recent United Nations High Commissioner for Refugees report (UNHCR 2015) based on interviews with 160 Central American and Mexican women fleeing the violence; Menjívar assisted in the design of the data collection instrument and in writing the report. Further, we rely on two country expert affidavits presented in court proceedings of Honduran women seeking asylum in the United States, which cover the implementation of laws on violence against women in Honduras.[5] We also use an interview with a Honduran human rights lawyer who is an expert on gender-based violence in her country. Secondary data come from

---

[5] One of these affidavits was shared with permission to cite it by the University of California Hastings College of Law Center on Gender and Refugee Studies. The other was shared with permission by the author. The affidavits are sworn statements by experts on Honduras providing testimony to country conditions with reference to state responsiveness or lack of response to violence against women.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4294   Page 126 of
Case 1:18-cv-0     1-PLF   Document 2512   Filed 09/26/1     age 103 of 215
226                                                                    Architecture of Feminicide

reports by civil society organizations, the Honduran government, the press, and international organizations reporting on the levels and types of violence that women sustain and the advances and limitations of the laws. To complement these sources we make use of country-level statistical data. Culling information from these various sources allows us to triangulate our data and focus on areas of overlapping evidence regarding how women are treated or mistreated in the justice system rather than randomly selecting cases or focusing on outliers.

We examine the laws on the books to identify advances addressing violence against women. We also highlight the laws' limitations given the context in which they are interpreted and implemented. Drawing from testimonies and reports, we analyze how laws operate on the ground where there are multiple obstacles to implementation in the police and courts. This lens allows us to reveal how the structure and application of laws normalizes and reinstantiates violence against women, rather than combating or eradicating it.

## Background and Country Conditions: Foundations for Feminicide

According to the UN Office on Drugs and Crime, Honduras has one of the highest feminicide rates in the world (see **Figure 1** for the trend in 2002–2013). The number of women murdered in Honduras has been rising steadily but spiked after 2010. Within Latin America, Honduras recently ranked third in feminicide rates behind El Salvador (the highest in the world today) and Guatemala (the second highest in Latin America), and had higher rates than Colombia and Bolivia (Alvazzi del Frate 2011).[6] (See **Figure 2** for a comparison of homicide rates in Central and North America, showing a rising rate in Honduras from 2006, which began to exceed murder rates in all other neighboring countries in 2009.)

While the murder rate for women is lower than that for men, the rate for women has been consistently increasing since 2005, when there have been some periods of decline in the murders of men (Memoria Foro Femicidios 2014, 8). As Incháustegui Romero et al. (2012) observed for feminicide cases in Mexico, the murders of men show more elasticity than those of women, as the murders of men tend to respond to events or conditions with which they are associated, such as increases or decreases in organized crime, while the murders of women occur independently of specific contextual events. And whereas the killings of Honduran women before the coup showed an upward trend, the trend accelerated following the coup, demonstrating



**Figure 1:** Number of feminicides in Honduras, 2002–2013. Adapted from Memoria Foro Femicidios 2014, 8.

---

[6] Half of the countries in the world with very high feminicide rates are located in Latin America and the Caribbean region (Hastings 2014, 1).

Menjívar and Walsh                                                                                    227



| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Honduras | 50.9 | 54.8 | 55.8 | 61.4 | 53.8 | 46.6 | 44.3 | 50.0 | 60.8 | 70.7 | 81.8 | 91.4 | 90.4 |
| El Salvador | 39.3 | 36.9 | 37.0 | 36.4 | 45.8 | 67.2 | 64.4 | 57.1 | 51.7 | 70.9 | 64.1 | 69.9 | 41.2 |
| Guatemala | 25.9 | 28.1 | 30.9 | 35.1 | 36.4 | 42.1 | 45.3 | 43.4 | 46.1 | 46.5 | 41.6 | 38.6 | 39.9 |
| Mexico | 10.3 | 9.8 | 9.5 | 9.3 | 8.5 | 9.0 | 9.3 | 7.8 | 12.2 | 17.0 | 21.8 | 22.8 | 21.5 |
| Nicaragua | 9.3 | 10.4 | 10.6 | 11.9 | 12.0 | 13.4 | 13.1 | 12.8 | 13.0 | 14.0 | 13.5 | 12.5 | 11.3 |
| Costa Rica | 6.4 | 6.4 | 6.3 | 7.2 | 6.6 | 7.8 | 8.0 | 8.3 | 11.3 | 11.4 | 11.3 | 10.0 | 8.5 |
| United States | 5.5 | 5.6 | 5.6 | 5.6 | 5.5 | 5.6 | 5.8 | 5.6 | 5.4 | 5.0 | 4.7 | 4.7 | 4.7 |
| Canada | 1.6 | 1.8 | 1.7 | 1.7 | 1.7 | 1.8 | 1.7 | 1.6 | 1.7 | 1.6 | 1.5 | 1.6 | 1.6 |

**Figure 2:** Overall homicide rates in Central and North America. Adapted from Memoria Foro Femicidios 2014, 8.


**Table 1:** Honduran laws addressing forms of violence against women.

| Year | Law |
|---|---|
| 1982 | National Constitution. *Establishes equal rights between men and women and prohibits discrimination on the basis of sex.*** |
| 1997 | Law against Domestic Violence (U.S. Department of State 2015).** |
| 2000 | Law of Equal Opportunities for Women (Ávila 2014, 2).** |
| 2004 | CEDAW: The Convention on the Elimination of All Forms of Discrimination against Women, ratified in October (U.S. Department of State 2015).* |
| 2005 | Inter-American Convention on the Prevention, Punishment, and Eradication of Violence against Women "Convention of Belém do Pará," ratified in March (U.S. Department of State 2015).* |
| 2013 | Femicide Law. Legislative Decree 23, 2013. *Established femicide (killings of women) as a crime punishable with 30–40 years imprisonment.*** |

*International or regional convention.
**Domestic legislation.

that propitious structural conditions for women's killings already existed pre-coup but were exacerbated post-coup. We argue that the state's actions played a key role.

Under pressure from domestic groups and international organizations, pre-coup Honduran governments passed a series of laws that offered measures protecting women from violence and discrimination, including a law against domestic violence (1997) and a law of equal opportunities for women (2000). The post-coup de facto government also passed a femicide law with stronger penalties for the killings of women (2013) (see **Table 1**). Thus, even though Honduras had laws to address violence against women before the coup, they

Exhibit A
000139

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4296   Page 128 of
Case 1:18-cv-0    1-PLF   Document    Filed 09/26/1    Page 105 of 215

228                                                                          Architecture of Feminicide

were not effectively implemented. However, implementation has declined further in the post-coup era, even as rates of violence against women have continued to rise. Normalized views and structures that devalue women's lives and sustain violence against them existed before the coup, but state actions after the coup have amplified these conditions and deepened inequalities.

Thus, despite international recognition of the growing incidence of violence against women in Honduras, over 96 percent of feminicides go unpunished (Inter-American Commission on Human Rights 2011). This impunity, an expression of symbolic and gender violence, sends a powerful message that women's lives are expendable and unimportant, as unresponsive justice system institutions fall short in implementing the law on the books. Forty percent of the women interviewed for the UNHCR study (2015) who fled the country due to violence did not report abuses to the police because they thought it would be useless.

In the 1980s, the United States used Honduras as a staging ground for the Contra War in Nicaragua and a base for US training of Salvadoran troops to fight against the Farabundo Martí National Liberation Front (FMLN) in El Salvador. During this time, US funding for the Honduran military increased dramatically. While domestic political tensions rose, disappearances and murders became commonplace (Booth, Wade, and Walker 2010). Honduras became what scholars call a *democradura*: "a nominally democratic government that is really under military rule" (Mateo 2011, 90). The country started experiencing a crime wave in the 1990s, after the imposition of neoliberal structural adjustment programs increased inequality and repression (Booth, Wade, and Walker 2010). Wages stagnated through the 1980s and 1990s, and the destruction in 1998 by Hurricane Mitch amplified existing poverty and unemployment trends (Booth, Wade, and Walker 2010). Neoliberal economic reforms exacerbated environmental degradation and prompted migration to urban areas, attracted by the increasing presence of *maquila* industry employment (Booth, Wade, and Walker 2010; Boyer and Pell 1999), as well as migration to the United States. Today, more than half of Hondurans live below the poverty line (Mateo 2011).

The crime wave that began in the 1990s became a major theme of the 2001 elections (Booth, Wade, and Walker 2010), as the rhetoric of being tough on crime has been used for political gain in Honduras (as well as in other countries in the region) (Holland 2013; Krause 2014). While the Honduran government has blamed gangs for high murder rates, it is difficult to disaggregate gang activity from other sources of crime, as both are entwined with insecurity, weak and corrupt public institutions, persistent impunity, growing drug trade activity throughout the region, increasing militarization that undermines community ties, widening inequality, and oppressive conditions of poverty (see Mateo 2011, 92, 96). It is also hard to distinguish between common crime, social crime, and political crime in a context of lack of rule of law, corruption, and targeted violence against those identified as resistance members (Hermannsdorfer 2012, 16). All these varied forms of violence coalesce and are expressed in state actions to produce a context that normalizes violence and reproduces inequalities that undermine women's rights.

In 2009, President Manuel Zelaya was overthrown by a right-wing military coup led by Porfirio Lobo, following Zelaya's referendum to propose a constitutional reform. Under the Zelaya government, there were modest advances for women's rights and potential for gains, but these were stunted with the coup. The proposed constitutional changes promoted by women's organizations included equal rights and opportunities, sexual and reproductive health and rights, the right to a life free of violence, sex education in schools, and political participation with the reinforcement of quotas for equitable and just representation in legislative units (Ronderos 2011, 5–6). Ronderos notes, "With the chance to reform the Constitution, women's civil society organizations self-organized in order to agree on a common agenda that would also ensure their participation in national policy debates and consultations" (2011, 4).

Before the coup, there was a core group of progressive women within the National Congress who had the potential to call on the state to be accountable for rights violations, but most of these representatives resigned after the coup (Gell 2012, 1). Many other women's advocates have been removed from their posts in state institutions. Also before the coup, women successfully lobbied the National Congress in 2008 to create specialized policing units to investigate cases of killings of women. Under the post-coup de facto government, these police units were relocated within a year of their creation to attend to general street crime, leading to "a much less favourable context for women" (Ronderos 2011, 6). Thus, the coup deepened divisions between an increasingly militarized state and much of civil society that had been mobilizing to resist it. The reallocation of specialized services represents the state's acts of omission and commission that sustain women's marginalization through institutional failures to respond to violence against women.

Post-coup Honduras also has been characterized by a heightened context of structural violence for women, who are disproportionately poor and face even more constrained opportunities in the job market and increased levels of poverty, conditions that harm especially indigenous and Afro-descendant

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4297   Page 129 of
Case 1:18-cv-0  1-PLF   Document 12   Filed 09/26/1   age 106 of 215
Menjívar and Walsh                                                                              229

populations (UNDP 2010). Honduras's 2013 Gender Inequality Index ranking of 129 (out of 187 countries worldwide) places the loss in potential human development due to gender inequality at 48.2 percent in 2013. Structural conditions commingle with political conditions (in the form of the state's actions and inactions). Concomitantly, gender and gendered violence in post-coup Honduras permeate institutions charged with providing security. While the post-coup era has been characterized by political setbacks and obstacles for women's rights, it has also launched a new wave of violence and state-led repression.

### Feminicides and Violence against Women

Feminicides in Honduras have spiked since 2006, rising 300 percent from 202 murders in 2006 to 606 in 2012. As a basis of comparison, Honduras has a smaller population than New York City (approximately 8.1 vs 8.5 million); Honduras's murder rate would undoubtedly be considered a crisis in New York. In 2012, feminicide was considered the second-highest cause of death for women of reproductive age in Honduras (IACHR 2013, 388). As several data collection activities on gender violence have come to a halt after the coup, there are limited data on the nature of crimes and violence against women in Honduras. But existing reports, such as those from the Autonomous University's Violence Observatory, suggest that prevalence is high, reporting rates are low, state responses are weak, and impunity is rampant.[7] Reported rates of domestic violence averaged 14,000 per year between January 2003 and September 2008 (Freedom House 2010, reporting data from the Honduran Center for Women's Studies, CEM-H). But it was also reported that "few cases of domestic violence are investigated or reach the courts" (Freedom House 2010, para. 31). In 2011, police reported receiving "216 rape cases and other sexually related crimes against women" (Bureau of Democracy 2011, 16). And even though more men than women are killed in the spiral of violence in Honduras, there is an important gender angle to these murders, as they follow qualitatively different patterns by gender.

As in other countries in the region, murders of women are disproportionately committed by intimate partners and have become increasingly brutal and sexualized (IACHR 2013, 288). This is not the case for men. While men may be murdered with a bullet to the head, it is common for women (and rare among men) to also have postmortem signs of sexualized abuse and torture (IACHR 2013, 288). This phenomenon is prevalent in other countries in the region, as has been more widely publicized for Ciudad Juárez, Mexico (Fregoso and Bejarano 2010; Gaspar de Alba and Guzmán 2010; Monárrez Fragoso 2002; Morales Trujillo 2010; Staudt 2008). These distinct gendered patterns and extreme brutality in the killings of women demand an analytical lens that connects the various forms of violence that women face.

Rape was "reportedly a serious and pervasive societal problem and continued to be underreported due to fear of stigma, retribution, and further violence" (Bureau of Democracy 2011, 16). In the Tegucigalpa neighborhoods of Villanueva and Nueva Suyapa, for instance, it was reported that 78 percent of women have experienced some form of violence in public spaces, including sexual and physical assault (UN Women 2013, 1). The stigma associated with sexual violence is pervasive, and often the victims are blamed, a practice that contributes to its normalization and impunity.

Like the women interviewed for the UNHCR report (2015), a representative from the Center for Women's Rights in Honduras noted that "victims do not generally report cases of sexual violence; consequently, it is very difficult to record the statistics that would demonstrate the severity of the problem. And when women do report, they usually withdraw their complaint because they lack financial resources, fear reprisals, feel ashamed or are afraid of what their family, friends and the general public will say" (Quoted in Research Directorate 2006, para. 7). Compounding fears of reporting, it would seem useless to do so given the lack of guarantees for protection, high levels of impunity (e.g., Freedom House 2010; OAS 2011), and the close collaborations between state authorities and members of criminal groups. Thus, even though there have been advances in the laws, there are key limitations in how they are conceptualized, and implementation is limited (or even blocked).

## Laws Addressing Domestic Violence in Honduras and Latin America

The laws that have been passed in Honduras to address violence against women are similar to those created throughout Latin America and suffer from similar problems in their formulation. The 1994 Inter-American Convention on the Prevention, Punishment, and Eradication of Violence against Women (Convention Belém do Pará) established that violence against women constitutes a human rights violation.

---

[7] Portillo (2016) notes that among other strategies that have obstructed data collection, the post-coup government has radically altered the manner in which violent acts are reported. Instead of trained scholars analyzing raw data provided by each police precinct, the data are now aggregated by a central police agency, thus preventing a more accurate analysis of crime statistics.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4298   Page 130 of
Case 1:18-cv-0   1-PLF   Document 2-12   Filed 09/26/18   Page 107 of 215
230                                                                          Architecture of Feminicide

Subsequent laws throughout the region were ostensibly created to harmonize local laws with international norms. However, proposals for laws focusing on violence against women were often met with resistance at the national level. With rare exceptions, governments only passed these laws after redefining the focus from the international norm of protecting women from violence to addressing "intrafamily" violence.[8] This legal move undermined the goal of challenging gender hierarchies (Friedman 2009, 349–351) and did so by "implying that family members are 'equally likely to be perpetrators and victims'" (Craske 2003, 37). In addition, most Latin American countries prosecute offenders in civil or family courts rather than criminal courts and insist on reconciliation or mediation as a first step in legal proceedings (Macaulay 2006, 104).[9] In reconciliation or mediation proceedings, women are often pressured to tolerate or cope with violent situations rather than obtain help to escape them (Jubb and Pasinato Izumino 2002; Jubb et al. 2010). Significantly, these measures are not recommended by the international organizations (IACHR 2007, 16, as noted in Friedman 2009) or by regional and local advocates. Allowing mediation is one way that these legal frameworks and practices undermine advocates' intent of protecting women. It should also be noted that while the Honduran laws and some practices today resemble broader regional patterns, levels of violence and lack of implementation are much more severe in Honduras given the extreme forms of normalized, structural, symbolic, and gender violence, in conjunction with the failure of appropriate state actions.

Consequently, Honduran laws regarding domestic violence, rape, and feminicide have serious limitations. The 1997 Law against Domestic Violence passed by Congress established a mechanism for abused women to obtain a protective order against an abuser (Hermannsdorfer 2012, 20). This law has the status of a "special law," part of neither the civil nor criminal code. However, the way it is written reinforces the normalization of violence in women's lives and the devaluation of their lives and rights, which undermines implementation. For a first offense of domestic abuse, the only legal sanctions are community service and twenty-four-hour preventive detention if the violator is caught in the act (Bureau of Democracy 2012, 15). The maximum sentence for disobeying a restraining order connected with the crime of intrafamilial violence is three years' imprisonment (Bureau of Democracy 2012, 15). Reflecting social expectations of gendered behavior, the law criminalizes rape as a public crime but does not grant the same status to spousal rape (see Menjívar 2016), which is evaluated on a case-by-case basis. In cases of nonspousal rape, a perpetrator can be prosecuted even if the victim does not press charges (Bureau of Democracy 2011). On February 21, 2013, Congress reformed the Criminal Code and added Article 118 A, establishing femicide as a crime for "men who kill women for reasons of gender, with hatred and disdain toward them as women." However, the law seems to be set up to fail, as it is technically challenging to provide legal evidence of hatred and disdain in the minds of perpetrators as a motive even when these feelings exist. Furthermore, the law establishes that one of the following four circumstances must also be met: "sentimental relationship, history of acts of violence, persecution of any kind, or commission with malice" (IACHR 2013, 388), which carries such a heavy burden of evidence that it is almost impossible to apply.

Institutional mechanisms and bureaucratic units have been created to implement laws, but these institutions are generally underfunded and understaffed, reflecting the symbolic and gender violence in the law as it ignores women's lives and suffering. After the Domestic Violence Law was passed, a Special Women's Public Prosecutors Office was created within the Public Ministry in order to enforce it. However, the office had "little power when it came to prosecuting perpetrators of domestic violence" (UNFPA 2009, 39). In 1999, the National Women's Institute was established as the "government agency responsible for the protection and advancement of Honduran women" (Research Directorate 2010, 3). Additional institutions include the Office of the National Human Rights Commissioner and the Interagency Commission on the Law against Domestic Violence (Research Directorate 2010, 3). However, since the coup, many of these agencies have been weakened or dismantled altogether, exacerbating existing trends. And regarding international agreements, Honduras often fails to submit required reports to monitoring bodies, such as the Convention on the Elimination of All Forms of Discrimination against Women (CEDAW) and the Follow-up Mechanism to the Belém do Pará Convention (MESECVI) (Hermannsdorfer 2012: 20). While it is arguably better to have weak and underfunded institutions than none at all, implementation and responsiveness to violence against women have been lagging, nonexistent, or even unenforced by state institutions. The views of women seeking asylum in the United States show that this can have an insidious effect, as they may conclude that

---

[8] As of 2009, only five of these laws in the following four countries in Latin America specifically mentioned women: Ecuador, Guatemala, Honduras, Venezuela (Friedman 2009, 249–351). See table 2 for a list.

[9] The practice of reconciliation privileges the family unit over the rights of abused women, renaturalizing "domestic violence by implying that a couple can, or should, be reconciled even when one systematically abuses the other" (Macaulay 2006, 110; IACHR 2007, 90).

**Table 2:** Honduras: Political responsibility for exacerbating violence against women and impunity.

| | Pre-coup | Post-coup |
|---|---|---|
| Acts of omission | Weak attempts to prevent, protect, and prosecute and to implement laws addressing violence against women in the police and courts | Failure to prevent, protect, prosecute and to implement laws addressing violence against women in the police and courts |
| Acts of commission | Isolated cases of violence and harassment by state agents targeting women | Increasing and systematic violence against women by the state: targeting women leaders for violence; harassment and intimidation by the military; weakening and closing institutions that address violence against women |
| Context of multisided violence | High levels of structural violence, symbolic violence, and history of political violence that impact and marginalize women | Increased levels of structural violence, symbolic violence, and new forms of political violence that further marginalize women |

their lives do not matter when laws exist but are ignored (UNHCR 2015). As these asylum seekers explain, women do not turn to authorities charged with implementing laws and protecting them, since state officials will ignore them. With institutional doors closed, women have nowhere to turn and those who can leave the country in search of security. Having laws on the books is necessary but not sufficient for protection. Obstacles to implementation, which we attribute to a context of multisided and normalized violence in which the police and judiciary operate, is the focus of the upcoming section.

## Pre- and Post-Coup Political Responsibility for Feminicide: State's Acts of Omission

Political responsibility for feminicide operated primarily through omission in the pre-coup era, with some exceptions where the government took direct action to target women. In this section we illustrate the inaction of the police and courts in the pre-coup era, which laid the foundation for a surge in gender-based violence against women, including feminicides, and a post-coup escalation of failures in policing. We then focus on direct acts of post-coup violence initiated or facilitated by the police and courts that have embroiled Honduras in a feminicide crisis today. (See **Table 2** for differences between pre-coup and post-coup acts of omission and commission.) We separate the time periods for analytical purposes, but in reality both stem from the same context that normalizes gender inequalities and shapes the cognitive frames of state actors in charge of writing, passing, and implementing laws.

### Police Inaction and Multisided Violence: Pre-coup and Post-coup

Inaction by the police was prevalent during the pre-coup era but worsened in the post-coup period. The symbolic violence of the state is embedded in these practices, in the police's treatment of domestic abuse as part of "the order of things." Often, officers attribute culpability for abuse to victims instead of abusers, blaming women for failing to avoid maltreatment through altering their behavior and becoming obedient and submissive. This police response further entrenches gender inequality, which is first enforced through abuse and then reinforced (and normalized) by demonstrating that women have no choice but to submit to it. Country expert Claudia Hermannsdorfer (2012) reveals how symbolic and gender violence seep through from the social context to the justice system and shape the cognitive frames through which violence against women is viewed as a normal aspect of relationships. Reporting on police behavior, she notes: "Women who seek help from the police are often told that the issue is a matter for her husband to decide, and that she should go home, be intimate with him, and he will forgive her. Other times, police simply tell the women to stop disobeying their husbands. . . . Honduran police ignore threats made against women, treating them as nothing more than the product of over-excited emotions" (Hermannsdorfer 2012: 11).

Contributing to normalizing violence and the devaluation of women's lives, police divert resources toward the investigation of "more serious" crimes such as drug trafficking. At the structural level, this sidelining of women's interests within the justice system reinforces inequality and sends a message to women (and society) that their lives are unimportant (Hermannsdorfer 2012, 11). Symbolic and gender violence are normalized through the persistent lack of funding for appropriate investigation. Again, Hermannsdorfer observes: "Even if the authorities did want to conduct a sensitive forensic examination in cases of femicide, they lack resources, such as rape kits which are commonly used in other countries, to perform the exam. . . . Thus, in many cases, it is impossible to make an accurate determination of the

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4300   Page 132 of
       Case 1:18-cv-0█ █1-PLF   Documen█2█12   Filed 09/26/1█ █age 109 of 215
232                                                                    Architecture of Feminicide

extent of sexual violence that is so often associated with the violent deaths of women" (Hermannsdorfer 2012, 27).

Resource diversion existed before the coup but worsened after it. Resource diversion is an anticipated outcome if police lack specialized units that focus on violence against women, because such units help to make serving women an institutional aim rather than a discretionary act resting on an officer's choice to ignore or dismiss claims (Walsh 2008). Attempts were made to create a Gender Unit within the police that would help institutionalize responsiveness to violence against women before the coup, but this was dismantled after the coup. Among other things, the Gender Unit was relegated to a warehouse far away from the rest of the police force (Hermannsdorfer 2012). Instead of being a reliable state institution for women to turn to for protection, police have reinforced the generalized and entrenched views of gender inequality that make women vulnerable to abuse and undermine their rights.

Victim blaming is a form of omission that elucidates the persistent commingling of symbolic and gender violence that undergirds impunity. It is a practice with a long history that was present in the pre-coup era and persisted after the coup. A poignant example is the police reaction to the assassination of Blanca Guevara's niece shortly after the coup. Guevara is a labor rights and women's rights activist with the Network of Women against Violence in Choluteca, Honduras. Her twenty-three-year old niece was murdered in 2010 while working on issues of violence against women. Guevara recounts the police's treatment of the case, which exemplifies the symbolic violence embedded in state actors' approach to treating these cases: "When my niece's father filed the report, the director of the National Bureau of Criminal Investigation (DNIC) started blaming the [niece who was the] victim of the assassination. . . . There is an interview with the director of the DNIC who said that 'women walk in places where they should not go'" (Blanca Guevara in Memoria Foro Femicidios 2014, 16–17).

Police reactions and dismissals of the seriousness of violence against women put women at risk for further abuse and even murder. A recent report by the UN High Commissioner for Refugees (UNHCR) quoted women fleeing from violence in Honduras and noted the futility of going to the police, even as police attempted to be helpful:

> In the rare cases where police arrested the perpetrators of abuse, the perpetrators were generally released within a few days. "I reported my husband to the police once," explained a woman from Honduras. "They detained him, but only for 24 hours, and then he was released and was even more angry." Another Honduran woman, whose mother had been abused by the woman's father and later her stepfather, sometimes made official complaints on her mother's behalf. But it was useless, she says. "They put them in jail for 24 hours and then they are out." (UNHCR 2015, 27)

In these circumstances, women are afraid to report their cases to the police for fear of retaliation from perpetrators. In addition, they now fear police violence against them with the increased militarization of the state since the coup.

### Court Inaction and Multisided Violence: Pre-coup and Post-coup

The Honduran court system, pre- and post-coup, has reinforced and perpetuated inequality for women through a persistent lack of institutionalization and specialization of services for women. For example, the Law against Domestic Violence was amended in 2006 to require the creation of specialized domestic violence courts. However, as of 2012, Honduras had not set up this court system, exemplifying the symbolic and gender violence entrenched in the institutional structure of the state.

Feminicide is the most extreme expression of violence against women but has only recently been recognized in the law as an exceptional type of murder through the 2013 Femicide Law, which was passed under international pressure. Before this, Honduran law considered a murder "aggravated" if the victim was a family member or intimate partner, or if the murder was premeditated. This would result in an increased prison term if the law were applied. However, this law was instead applied in favor of men, further exacerbating gender inequalities and the perception that women's lives are expendable. Victim blaming is not restricted to the police but persists in the courts through the dismissal of women's murders as "crimes of passion." These acts of omission exemplify the symbolic violence embedded in cognitive frames throughout justice system personnel who justify the murders of women as a consequence of romance: "Judges tend to consider murders arising from domestic violence as *crimes of passion* which should not be met with additional penalties, resulting in cases being charged as simple homicide—which carries a lighter sentence— or outright dismissed. Additionally, judges often blame female victims, assuming that the woman may have

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4301   Page 133 of
Case 1:18-cv-0___1-PLF   Document2512   Filed 09/26/1___age 110 of 215
Menjívar and Walsh

instigated the murder, and use this as an additional reason not to consider the murder or to dismiss the case" (Hermannsdorfer 2012, 25, emphasis added).

These profound gender inequalities are constitutive of the normalizing cognitive frames that judges and prosecutors deploy in carrying out their work; these frames, which express the symbolic violence of the social milieu, even become an obstacle to initial murder investigations. For example: "When investigators encounter a woman who has obviously been killed by domestic violence, they often reason, 'well, the prosecutor will not fully prosecute this case because this is a crime of passion, so there is no need to conduct an in-depth forensic examination'" (Hermannsdorfer 2012, 14).

Across both the police and the courts, women have encountered manifold obstacles to accessing justice, which increases their risk of violent victimization. In responding to a survey by the Inter-American Court of Human Rights, the Honduran state noted problems throughout its justice system pathway, reporting various practices that discourage victims from following through on a complaint before the justice system, including:

(a) the fact that the woman is revictimized in being compelled to recount the crime she has experienced on several occasions to different people involved in the investigation;
(b) the victim is threatened on an ongoing basis by the suspect, relatives or legal representatives to withdraw the complaint and stop the proceedings, and there is no mechanism in place to guarantee the personal safety of the victim or her next of kin;
(c) the criminal proceeding takes a long time until it reaches the oral public trial stage;
(d) having to travel, in some instances, on her own to different places to receive service . . . and
(e) a lack of confidence in the justice system. (IACHR 2011, para. 369)

Acts of omission on the part of the police and in the courts began before the coup, with the state failing to adequately implement laws. It takes time to set up institutions and train police and judges, but such persistent failures to progress cannot be accounted for by a "learning curve." In fact, omission appears to have worsened since the coup, and disturbing new patterns of commission have emerged, with state actors targeting women for violence.

## Post-Coup Political Responsibility for Feminicide: Increased Acts of Omission and Commission

In the post-coup era, political responsibility for feminicide through omission has intensified, and the government began to more systematically target women and more openly and directly commit acts of violence against them. In addition, increased government inaction to respond to violence against women deteriorated an already acute situation. Together, action and inaction in the context of heightened levels of various forms of violence (e.g., structural, political, everyday, gender) have created a "perfect storm" of structural conditions that sustains government responsibility for creating an environment that not only tolerates routine violence in the lives of women but condones it through its own example. These factors, taken together, help explain the upward spiral in violence against women in the post-coup era.

Violence against women intensified in post-coup Honduras in the context of deteriorating rule of law, escalating repression, and amplified gender-based, state-led violence that has targeted women (Kelly 2011; Morales 2011; Nobel Women's Initiative 2012). At the same time, generalized violence has increased and there is evidence of linkages between the state and armed drug cartels (IACHR 2013, 29). According to the Women's Tribune against Feminicides, state responsiveness to violence against women has weakened, in part because "not only did the administrators of justice fail to respond to human rights violations reported by women, the police themselves actually became the agents of repression and violators of women's rights" (Morales 2011). Ten percent of the women interviewed for the UNHCR study (2015) reported that the police or other authorities were directly implicated in harming them. And in the month following the coup, Oxfam Honduras reported that there was "a 60% rise in the number of feminicides, with the bodies of more than 50 women found in the two largest cities, Tegucigalpa and San Pedro Sula. The Oxfam report accuses the Lobo government, voted in three months after the coup, of inaction and complicity in the growing wave of murders" (quoted in Kelly 2011). It was also post-coup when the UN reported that Honduras had the highest per capita homicide rate in the world as of 2012 (Nobel Women's Initiative 2012, 10).

In addition to feminicides, "numerous cases of sexual violence have been documented during forced evictions, which are rarely reported for fear of retaliation and due to the rampant impunity in situations of violence against women throughout the country" (Jones 2012, 1). This statement is congruent with the women's own voices in the UNHCR (2015) report. Rochelle Jones, of the Association for Women's Rights

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4302   Page 134 of
Case 1:18-cv-0?  ̃1-PLF   Documen251�2   Filed 09/26/1?  ̃age 111 of 215
234                                                                    ⌐rchitecture of Feminicide

in Development (AWID), also notes that the violence is more serious post-coup against women human rights defenders, who also face public accusations that they are going against traditional roles assigned to women, and they are "threatened with death and sexual violence and are criminalized" (Jones 2012, 1). Alicia Reyes, a journalist with Radio Progreso in Honduras, emphasizes how the post-coup military posed a direct threat to women who were considering collective action against the new regime: "From the first day the police and army sent the women a clear warning: 'You'll see what happens to you if you go to the streets'" (Reyes 2009, 2).

One form of state omission has been gender-inimical budgeting, which is rooted in the symbolic violence in women's lives, and has been amplified in the post-coup era. The post-coup government has spent a much higher proportion of the national budget on the military and has failed to allocate funding to the justice sector and women's institutions. This symbolic violence serves to normalize a militarized "order of things" and sends a message to women that there are other more important issues to address. Honduras is not only failing to invest in public security for women but has weakened and even reversed the institutionalization of security for women.[10] In 2012, 11.9 percent of the budget was allocated to Defense and Public Security, while only 0.1 percent went to the National Institute of Women and 1.1 percent to the Public Prosecutor's Office (Memoria Foro Femicidios 2014, 57). Greater militarization and armaments signal an absence of a gender perspective regarding the problem of public security and swells the number of armed men on the streets. Increasing armaments is a direct threat to women, as firearms have been the principal instrument for their killings, constituting 334 murders in 2013 (75 percent of the total).[11]

Another form of post-coup omission has been the government's systematic concealment of statistical information. The Observatory of Violence at the National Autonomous University of Honduras has denounced the government for concealing statistics and information about the homicide rate.[12] Between January and June 2013, the Observatory counted 3,547 cases of homicide, but the Secretary of Security only reported 2,629, a difference of 918.[13]

During the Cold War, Honduras implemented a National Security Doctrine marked by political intolerance, which left at least 179 people disappeared from 1980 to 1993.[14] Forced disappearances were linked to illegal detentions and torture on the part of the police and military. In the post-coup era, these actions appear to be more systematic. From 2008 until 2015, there has been a 281 percent increase in reports of women disappearing, and 697 reports of disappearances were made to the public prosecutor's office between January and September 2014.[15] Political violence in Honduras normalizes its gendered forms and fosters impunity, as state agents commit and fail to mitigate the violence.

Since the coup, the military has been increasingly incorporated into the police, and they have used sexual violence as a form of repression (Menjívar 2017). Thus, the government does not merely turn the other way in the face of gender violence through inaction but becomes an active participant in harming women. Women's rights advocates have criticized the post-coup government's hostility toward women, which includes using rape as a weapon. The popular feminist slogan in Honduras following the 2009 coup was "Ni golpes de estado, ni golpes a las mujeres" (No coups, and no abuse of women), highlighting the close links between political violence and violence against women (Pine 2013, 5–6). But the post-coup militarization behind the escalation of police violence in general also involves collaboration of state actors with members of criminal groups in violent acts against women in particular (see UNHCR 2015). This is how symbolic, political, and enduring state terror as well as gender and gendered violence commingle in the lives of Honduran women today.

In response to the repression against women in the post-coup era, women have created legal statutes for the new opposition party, the National Resistance Front, and have been playing a stronger role in the post-coup resistance movement (Gell 2012, 1). Indeed, it is the investigations by women in the resistance

---

[10] Foro de Mujeres por la Vida, Observatorio Violencia y Seguridad de las Mujeres, Informe contra las Mujeres un problema de Seguridad Humana, 2013, 13.

[11] CDM, Foro de Mujeres por la Vida, Red Nacional de Defensoras, CEM-H, JASS CLADEM, "Honduras: Las mujeres y los mecanismos internacionales de observancia de los derechos humanos," 2015, 12.

[12] "Colombia creará 30 observatorios," El Heraldo, July 7, 2014, http://www.elheraldo.hn/pais/726622-214/colombia-crear%C3%A1-30-observatorios.

[13] "Seguridad quiere excluir casi mil homicidios," El Heraldo, July 4, 2014, http://www.elheraldo.hn/alfrente/566383-209/seguridad-quiere-excluir-casi-mil-homicidios.

[14] Foro de Mujeres por la Vida, Protocolo Norma, "No olvidarlas es el camino para encontrarlas," Campaña contra desaparición forzada de mujeres en Honduras," 2015, 20.

[15] Foro de Mujeres por la Vida, Protocolo Norma, "No olvidarlas es el camino para encontrarlas," Campaña contra desaparición forzada de mujeres en Honduras," 2015, 20.

Case 3:18-cv-00428-DMS-MDD Document 282-1 Filed 10/15/18 PageID.4303 Page 135 of
Case 1:18-cv-0⌒1-PLF Document⌒51-2 Filed 09/26/1⌒ age 112 of 215
Menjívar and Walsh                                                                                              235

movement that have brought to light grotesque uses of force against women by an increasingly militarized state: "Their investigations documented hundreds of women's testimonies relating to numerous forms of post-coup related sexual assaults that included groping and beatings of breasts and vaginas, threats of sexual violence, intimidation tactics with explicit sexist insults, as well as gang rapes by soldiers and police during post-protest detentions, curfew sweeps and night raids" (Gervais and Estevez 2011, 10).

Militarized acts of violence against the resistance have involved sexualized and chauvinistic forms of violence against women. During demonstrations, security forces have verbally abused women participants, insulting them as "whores" and saying, "What they want is for us to rape them," and "Go take care of your children."[16] Some security agents have been reported to have raped women with their police batons and raped women after they were detained for participating in protests.[17]

Meanwhile, the murders of most women have remained unpunished. Some are reported to have been committed by government actors. For example, Margarita Murillo was a member of the National Popular Resistance Front and one of the founders of the National Center of Farmworkers (CNTC). The National Forum of Women for Life reports that she was kidnapped, tortured, and murdered by a death squad.[18] She was shot in the back on August 27, 2014, and her case remains in impunity.[19] And murder investigations seldom produce results. In March 2016, the indigenous activist leader Berta Cáceres was murdered in what the police alleged was a robbery. In October 2016 her case files were stolen from a Supreme Court justice, almost ensuring that the investigation will be dropped. And in July 2016, the body of Lesbia Janeth Urquía, a member of Cáceres's organization, was found brutally assaulted in a garbage dump west of Tegucigalpa. According to police, the motive for the murder was a robbery—of her bicycle. Such declarations (disseminated in the press) trivialize the lives, work, and deaths of these activist women, sending a powerful message to all women that normalizes their socially expected roles and diminishes their contributions to public life and to social justice.

The coup in Honduras exacerbated a context of multisided violence in part by increasing political violence and state terror in ways that amplified gendered and gender violence. Through acts of commission and omission, the state has been responsible for intensifying a multilayered context of violence resulting in increased violence and abuses, and where killings remain suspended in impunity. The coup took what was already a dangerous place for women and escalated the danger further, creating a context where women credibly fear violence not only in their homes and in the streets but also from the very institutions and state agents charged with protecting them.

## Conclusion

Multisided violence encompasses structural, symbolic, political, gender, and gendered forms. We have argued that a context of multisided violence creates conditions for states to fail in their responses to violence against women through normalizing and institutionalizing profound gender inequalities. The symbolic violence of the state serves as a catalyst for acts of omission and commission by shaping the views and actions of state actors in charge of implementing laws.

While acts of omission were prevalent in the pre-coup era, the commission of violent acts has become widespread in the more extreme context of multisided violence after the coup. State actions in post-coup Honduras help explain the upward spiral of violence that citizens in general are suffering, which are manifested in gendered ways. We have called attention to inequalities that are connected to but move beyond income and poverty, as these are manifested in the unequal citizenship rights of women. In doing so, we underscore the central place of the state in perpetuating gender violence.

Along with other countries in northern Central America, Honduras is falling behind its regional neighbors in Latin America in terms of human development, with high levels of extreme poverty, income inequality, and poor access to services (Ronderos 2011; UNDP 2010), as well as increased "common crime," corruption, and insecurity. Structural violence places women, especially poor and vulnerable women, at higher risk of institutional mistreatment (in the form of symbolic violence) and of everyday and routinized abuse (in the form of gender violence and gendered violence). As has been the case in post-coup Honduras, this situation deteriorates further with state repression and increased militarization, which undermine the rule of law.

---

[16] CIDH, Honduras: Derechos Humanos y Golpe de Estado, 2009, Párrafo 525.

[17] CIDH, Honduras: Derechos Humanos y Golpe de Estado, 2009, Párrafo 521.

[18] Foro de Mujeres por la Vida, Historias de defensoras de Derechos Humanos, 2014, 7–10.

[19] "Impunidad a un año de la muerte de Margarit Murillo: DDHH," *La Prensa*, August 27, 2015, http://www.laprensa.hn/sucesos/873443-410/impunidad-a-un-a%C3%B1o-de-la-muerte-de-margarita-murillo-ddhh.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4304   Page 136 of
Case 1:18-cv-0      1-PLF   Document 251      Filed 09/26/1      age 113 of 215

236                                                                                    Architecture of Feminicide

While other countries, such as El Salvador and Guatemala, exhibit extreme levels of multisided violence, they have made relatively more progress than Honduras toward creating specialized services (e.g., Ciudad Mujer in El Salvador, and specialized femicide courts in Guatemala). In Honduras, the coup stunted the development of institutions that aim to address violence against women. Furthermore, post-coup militarization has increased impunity through decreased transparency (as evident in the failure to report statistics on violence against women) and accountability (by failing to hold military personnel and even civilians accountable for violence against women). By contrast, Nicaragua and Costa Rica have relatively lower overall levels of multisided violence and lower levels of feminicide and impunity. Thus, comparatively, the more extreme context of multisided violence in Honduras has resulted in high levels of feminicide and impunity.

Honduran women, as well as those in similar contexts in the region, live in a social milieu where physical and psychological mistreatment become part of the way things are; where women's "private terrors" (Menjívar 2011) are part of life in the home, in the street, and in the workplace. Institutions reinforce and reflect this violent context through neglect and a lack of implementation of the laws. We argue that these are all deeply connected, because those who abuse women, as well as those who write or implement laws, draw on the cognitive frames and lenses through which they view the place of women in society and justify unequal treatment of women from the same social order of things.

Our focus on pre- and post-coup feminicide levels reveals intersections among political, social, and economic exclusion as well as gendered inequality, exacerbating conditions of violence and impunity and culminating in a feminicide crisis in Honduras today. It is the deep-seated symbolic violence in this system that sends a message to women who seek justice in unequal institutions that their lives are not valued and that their complaints are not taken seriously, a message that serves to normalize abuse and gender inequalities but also to silence women. A 2012 study found that less than one-third (29.3 percent) of women told family or friends that they had experienced intimate partner violence in the past year, a low number even compared to El Salvador, where almost two-thirds (66.5 percent) indicated they would share this with family or friends (Bott et al. 2012, 58).

We have demonstrated that passing laws to protect women will not accomplish their goals when this is done without the broader societal changes that could improve conditions for everyone. The content of the laws themselves, the failure to implement them, and the messages that an institutionalized inattention send to women are rooted in a deeply unequal society that devalues women's lives and those of vulnerable people in general. This is made worse when state actions, far from improving conditions, exacerbate existing trends of gender inequalities that disadvantage women seeking justice. We have moved beyond assessing the impact of economic indicators on women's inequality to examining inequalities in the form of citizenship rights as women seek justice for the violence they routinely endure. Examining structural inequality is crucial for understanding broader patterns of inequality in Latin America, as it not only impacts poverty levels and access to material resources but also shapes unequal access to safety and justice.

## Acknowledgements

We thank Karen Mejía and Daniel Alvord for their research assistance and the editors and reviewers for excellent comments. All errors remain ours. Both authors contributed equally to this article.

## Author Information

CECILIA MENJÍVAR is Foundation Distinguished Professor in Sociology at the University of Kansas. Her research falls in two areas: on immigration from Central America to the United States and on violence in Latin America. Her publications include *Fragmented Ties: Salvadoran Immigrant Networks in America* (University of California Press, 2000), *Enduring Violence: Ladina Women's Everyday Lives in Guatemala* (University of California Press, 2011), and *Immigrant Families*, co-authored with Leisy Abrego and Leah Smalzbauer (Polity, 2016). In addition, she has published several edited collections. Her work also has appeared in *Social Problems, Gender & Society, American Journal of Sociology, Social Justice, International Migration Review, Journal of Ethnic and Migration Studies, Ethnic and Racial Studies, and Sociology of Religion*, among other journals. She is a recipient of a John Simon Guggenheim Fellowship and an Andrew Carnegie Fellowship and recently finished her term as vice president of the American Sociological Association.

SHANNON DRYSDALE WALSH is an associate professor at the University of Minnesota Duluth. She was a visiting scholar at the University of North Carolina at Chapel Hill Department of Political Science during the summer and fall of 2015. She was awarded a McKnight Land-Grant Professorship for 2014–2016, an endowed professorship for promising junior faculty in the University of Minnesota system. Her research explains variation in state response to violence against women focusing on Central American countries. In addition,

she produces scholarship on women's policy making, sex trafficking in the United States, and crime in Latin America. She has engaged in advocacy work in rural Guatemala and served as a consultant and expert witness for asylum cases in the United States. She has recently published her work in journals such as the *International Feminist Journal of Politics*; *Politics, Groups, and Identities*; *Human Rights Review*; *Current Sociology*; and *Latin American Politics and Society*. Her research has been awarded competitive external funding from several sources, including the American Association of University Women, National Endowment for the Humanities, and American Council of Learned Societies. She was awarded the 2015 Helen Safa Paper Prize by the Latin American Studies Association Gender and Feminist Studies Section.

## References

Alvazzi del Frate, Anna. 2011. "When the Victim Is a Woman." In *Global Burden of Armed Violence 2011: Lethal Encounters*, 113–144. Cambridge: Cambridge University Press.

Arias, Desmond, and Daniel Goldstein, eds. 2010. *Violent Democracies in Latin America*. Durham, NC: Duke University Press. DOI: https://doi.org/10.1215/9780822392033

Ávila, Jennifer. 2014. "Impunity Encourages Femicides." *Latinamerica Press / Noticias Aliadas*, March 7. http://latinamericapress.org/articles.asp?art=6982.

Booth, John A., Christine J. Wade, and Thomas W. Walker. 2010. *Understanding Central America: Global Forces, Rebellion, and Change*. 5th ed. Boulder, CO: Westview Press.

Bott, Sarah, Alessandra Guedes, Mary Goodwin, and Jennifer Adams Mendoza. 2012. "Violence against Women in Latin America and the Caribbean: a Comparative Analysis of Population Based Data from 12 countries." Pan American Health Organization. Last updated February 28, 2014. http://www.paho.org/hq/index.php?option=com_content&view=article&id=8175%3Aviolence-against-women-in-latin-america-and-the-caribbean&catid=1505%3Asde-about-us&Itemid=1519&lang=en.

Bourdieu, Pierre. 2004. "Gender and Symbolic Violence." In *Violence in War and Peace*, edited by Nancy Scheper-Hughes and Philippe Bourgois, 339–342. Malden, MA: Blackwell.

Bourdieu, Pierre, and Loïc Wacquant. 2004. "Symbolic Violence." In *Violence in War and Peace*, edited by Nancy Scheper-Hughes and Philippe Bourgois, 272–274. Malden, MA: Blackwell.

Boyer, Jeff, and Aaron Pell. 1999. "Mitch in Honduras: A Disaster Waiting to Happen." *NACLA Report on the Americas* 33(2): 36–43. DOI: https://doi.org/10.1080/10714839.2000.11725633

Bureau of Democracy, Human Rights, and Labor, U.S. Department of State. 2011. "2011 Human Rights Report: Honduras." http://www.state.gov/documents/organization/186734.pdf.

Bureau of Democracy, Human Rights, and Labor, U.S. Department of State. 2012. "2012 Human Rights Report: Honduras." http://www.state.gov/documents/organization/204670.pdf.

CIDH (Comisión Interamericana de Derechos Humanos). 2009. "Honduras: Derechos Humanos y Golpe de Estado." December 30, 2009. Organización de los Estados Americanos. http://www.cidh.org/countryrep/Honduras09sp/Indice.htm.

Craske, Nikki. 2003. "Gender, Politics and Legislation." In *Gender in Latin America*, edited by S. Chant with N. Craske, 19–45. New Brunswick, NJ: Rutgers University Press. DOI: https://doi.org/10.3362/9781909013209.002

Eisenberg, Ann Marie. 2011. "Law on the Books vs. Law in Action: Under-Enforcement of Morocco's Reformed 2004 Family Law, the *Moudawana*." *Cornell International Law Journal*, no. 44: 693–728.

Enloe, Cynthia. 2000. Maneuvers: The International Politics of Militarizing Women's Lives. Berkeley: University of California Press.

Freedom House. 2010. "Countries at the Crossroads Report, Honduras." Freedom House. http://www.freedomhouse.org/report/countries-crossroads-2010/Honduras.

Fregoso, Rosa-Linda, and Cynthia Bejarano, eds. 2010. *Terrorizing Women: Feminicide in the Americas*. Durham, NC: Duke University Press.

Friedman, Elisabeth Jay. 2009. "Re(gion)alizing Women's Human Rights in Latin America." *Politics and Gender* 5: 349–375. DOI: https://doi.org/10.1017/S1743923X09990171

Gaspar de Alba, Alicia, with Georgina Guzmán, eds. 2010. *Making a Killing: Femicide, Free Trade, and La Frontera*. Austin: University of Texas Press.

Gell, Fiona. 2012. "Strengthening Governance Programming through Tackling Violence against Women and Girls: RHV in Honduras." OXFAM GB, July 16. http://api.ning.com/files/FsjEpqqsrh03EY4BLPBC-b54waFx2JVDomKha1RKSHliHvCU6mSwFw0*Zj02ZREeO6HDQ8CCCe4iW3IgPFi0BpQHtxrM1w85L/RHVandVAWGHondurasCaseStudy.pdf.

Gerring, John. 2007. *Case Study Research: Principles and Practices*. New York: Cambridge University Press.

Case 3:18-cv-00428-DMS-MDD    Document 282-1    Filed 10/15/18    PageID.4306    Page 138 of
Case 1:18-cv-0   1-PLF    Document 251-2    Filed 09/26/1    Page 115 of 215
238                                                                                                        Architecture of Feminicide

Gervais, Christine, and Betsy Estevez. 2011. "Security through Solidarity: Honduran Women's Post-Coup Strategies of Support and Survival." *Journal of International Women's Studies* 12(4):1–21.

Grupo Guatemalteco de Mujeres. 2012. "Muertes violentas de mujeres según fuente de información: INACIF, PNC y MP." Guatemala City, Guatemala.

Gutiérrez Rivera, Lirio. 2013. Territories of Violence: State, Marginal Youth, and Public Security in Honduras. New York: Palgrave Macmillan.

Hammar, Lawrence. 1999. "Caught between Structure and Agency: The Gender of Violence and Prostitution in Papua New Guinea." *Transforming Anthropology* 8(1–2): 77–96. DOI: https://doi.org/10.1525/tran.1999.8.1-2.77

Hastings, Deborah. 2014. "In Central America Women Killed with Impunity Just Because They're Women." *New York Daily News*, January 10. http://www.nydailynews.com/news/world/femicide-rise-central-america-article-1.1552233.

Hay, Douglas. 1992. "Time, Inequality, and Law's Violence." In *Law's Violence*, edited by Austin Sarat and Thomas B. Kearns, 141–173. Ann Arbor: University of Michigan Press.

Hermannsdorfer, Claudia. 2012. Declaration of Claudia Hermannsdorfer, Expert on Women's Rights in Honduras, November. University of California Hastings College of the Law.

Holland, Alisha C. 2013. "Right on Crime? Conservative Party Politics and Mano Dura Policies in El Salvador." *Latin American Research Review* 48(1): 44–67. DOI: https://doi.org/10.1353/lar.2013.0009

Hume, Mo. 2009. The Politics of Violence: Gender, Conflict and Community in El Salvador. Malden, MA: Wiley-Blackwell.

IACHR (Inter-American Commission on Human Rights). 2007. *Access to Justice for Women Victims of Violence in the Americas*. Washington, DC: Organization of American States.

IACHR (Inter-American Commission on Human Rights). 2011. *Annual Report of the Inter-American Commission on Human Rights 2010*. Washington, DC: Inter-American Commission on Human Rights. http://www.oas.org/en/iachr/docs/annual/2011/TOC.asp.

IACHR (Inter-American Commission on Human Rights). 2013. *Annual Report of the Inter-American Commission on Human Rights 2012*. Washington, DC: Inter-American Commission on Human Rights.

Incháustegui Romero, Teresa, et al. 2012. *Violencia feminicida en México: Características, tendencias y nuevas expresiones en las entidades federativas, 1985–2010*. Mexico City: ONU Mujeres, Entidad de las Naciones Unidas para la Igualdad de Género y el Empoderamiento de las Mujeres; Instituto Nacional de las Mujeres, México.

Jones, Rochelle. 2012. "Human Rights Abuses in Honduras Pose an Ongoing Threat to Women's Human Rights Defenders (WHRDs)." Association for Women's Rights in Development (AWID), December 20. https://www.awid.org/news-and-analysis/human-rights-abuses-honduras-pose-ongoing-threat-womens-human-rights-defenders.

Jubb, Nadine, Gloria Camacho, Almachiara D'Angelo, Kattya Hernández, Ivonne Macassi, Liz Meléndez, Yamileth Molina, Wânia Pasinato, Verónica Redrobán, Claudia Rosas, and Gina Yáñez. 2010. *Women's Police Stations in Latin America: An Entry Point for Stopping Violence and Gaining Access to Justice*. Quito, Ecuador: CEPLAES: Centre for Planning and Social Studies.

Jubb, Nadine, and Wânia Pasinato Izumino. 2002. "Women and Policing in Latin America: A Revised Background Paper." *CERLAC Occasional Paper*, February 2002. http://cerlac.info.yorku.ca/files/2016/09/Jubb.and_.Pasinato_Background-Paper.pdf.

Kelly, Annie. 2011. "Honduran Police Turn a Blind Eye to Soaring Number of 'Femicides.'" *The Guardian*, May 28. http://www.guardian.co.uk/world/2011/may/29/honduras-blind-eye-femicides/print.

Kleinman, Arthur. 2000. "The Violences of Everyday Life: The Multiple Forms and Dynamics of Social Violence." In *Violence and Subjectivity*, edited by Veena Das, Arthur Kleinman, Mamphela Ramphele, and Pamela Reynolds, 226–241. Berkeley: University of California Press.

Krause, Krystin. 2014. "Supporting the Iron Fist: Crime News and Authoritarian Crime Control in Guatemala." *Latin American Politics and Society* 56(1): 98–119. DOI: https://doi.org/10.1111/j.1548-2456.2014.00224.x

Lagarde, Marcela. 2010. "Preface: Feminist Keys for Understanding Feminicide: Theoretical, Political, and Legal Construction." In *Terrorizing Women, Feminicide in the Américas*, edited by Rosa-Linda Fregoso and Cynthia Bejarano, xi–xx. Durham, NC: Duke University Press.

Macaulay, Fiona. 2006. "Judicialising and (de)Criminalizing Domestic Violence in Latin America." *Social Policy and Society* 5 (1): 103–114. DOI: https://doi.org/10.1017/S1474746405002782

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4307   Page 139 of
Case 1:18-cv-0    1-PLF   Document    1   Filed 09/26/1    age 116 of 215
Menjívar and Walsh                                                                                                      239

Mateo, Joanna. 2011. "Street Gangs of Honduras." In *Maras: Gang Violence and Security in Central America*, edited by Thomas Bruneau, Lucía Dammert, and Elizabeth Skinner, 87–103. Austin: University of Texas Press.

Memoria Foro Femicidios. 2014. "Memoria del Foro Femicidios: Análisis desde el Movimiento Feminista de Honduras," March 6, 2014. Tegucigalpa: Centro de Derechos de Mujeres.

Menjívar, Cecilia. 2011. *Enduring Violence: Ladina Women's Lives in Guatemala*. Berkeley: University of California Press. DOI: https://doi.org/10.1525/california/9780520267664.003.0008

Menjívar, Cecilia. 2016. "Normalizing Suffering, Robadas, and Marital Unions among Ladinas in Eastern Guatemala." In *Marital Rape: Consent, Marriage, and Social Change in Global Context*, edited by Kersti Yllö and M. Gabriela Torres, 75–85. New York: Oxford University Press. DOI: https://doi.org/10.1093/acprof:oso/9780190238360.003.0006

Menjívar, Cecilia. 2017. Preface to *Violence and Crime in Latin America: Representations and Politics*. Ed. by Gema Santamaría and David Carey Jr. Norman: University of Oklahoma Press.

Menjívar, Cecilia, and Shannon Drysdale Walsh. 2016. "Subverting Justice: Socio-Legal Determinants of Impunity for Violence against Women in Guatemala." *Laws* 5(3): 1–20. DOI: https://doi.org/10.3390/laws5030031

Monárrez Fragoso, Julia. 2002. "Serial Sexual Femicide in Ciudad Juárez: 1993–2001." *Debate Feminista* 13(25): 1 (April).

Morales, Tacuazina. 2011. "Honduras: Escalada de feminicidios (Honduras: Escalation of Femicides)." *SEMLAC* (News Service on Women in Latin America and the Caribbean).

Morales Trujillo, Hilda. 2010. "Femicide and Sexual Violence in Guatemala." In *Terrorizing Women: Feminicide in the Americas*, 127–137. Durham, NC: Duke University Press.

Nobel Women's Initiative. 2012. "From Survivors to Defenders: Women Confronting Violence in Mexico, Honduras, & Guatemala." ISSUU, June 11. https://issuu.com/nobelwomen/docs/survivors-to-defenders.

OAS (Organization of American States), Inter-American Commission on Human Rights. 2011. "Access to Justice for Women Victims of Sexual Violence in Mesoamerica." OEA/Ser.L/V/II, Doc. 63, December 9. http://www.oas.org/en/iachr/women/docs/pdf/WOMEN%20MESOAMERICA%20eng.pdf.

O'Donnell, Guillermo. 2004. "Why the Rule of Law Matters." *Journal of Democracy* 15 (4): 32–46. DOI: https://doi.org/10.1353/jod.2004.0076

Pine, Adrienne. 2013. "Affidavit of Adrienne Pine." *Country Expert on Honduras*. Redacted court document shared by author.

PNUD (Programa de las Naciones Unidas para el Desarrollo). 2013. "Seguridad Ciudadana con Rostro Humano: Diagnóstico y Propuestas para América Latina." Informe Regional de Desarrollo Humano 2013–2014. New York: PNUD.

Portillo, Suyapa. 2016. "New "Success" in Post-Coup Honduras: Soccer with Assassins?" *Latino Rebels*, August 31. http://www.latinorebels.com/2016/08/31/new-success-in-post-coup-honduras-soccer-with-assassins/.

Prieto-Carrón, Marina, Marilyn Thomson, and Mandy MacDonald. 2007. "No More Killings! Women Respond to Femicides in Central America." *Gender and Development* 15 (1): 26–42. DOI: https://doi.org/10.1080/13552070601178849

Radford, Jill, and Diana E. H. Russell, eds. 1992. *Femicide: The Politics of Woman Killing*. New York: Twayne.

Research Directorate, Immigration and Refugee Board of Canada. 2006. "Honduras: Sexual Violence against Women; Legislation; Attitude of the Authorities and the General Public toward Victims; Organizations that Provide Assistance to Victims," November 3. http://www.refworld.org/docid/45f147412f.html.

Research Directorate, Immigration and Refugee Board of Canada. 2010. "Honduras: Domestic Violence; Legislation and Protection Available to Victim," January 13. http://www.irb-cisr.gc.ca:8080/RIR_RDI/RIR_RDI.aspx?id=452742&l=e.

Reyes, Alicia. 2009. "Resistance with the Scent of a Woman." *Envío*, no. 338, September. http://www.envio.org.ni/articulo/4065.

Ronderos, Katherine. 2011. "Poverty Reduction, Political Violence and Women's Rights in Honduras." *Community Development Journal* 46 (3): 315–326. DOI: https://doi.org/10.1093/cdj/bsr038

Sanford, Victoria. 2008. *Guatemala: Del genocidio al feminicidio*. Guatemala City: F&G Editores.

Sanford, Victoria, Katarina Stefanos, and Cecilia Salvi. 2016. Introduction to *Gender Violence in Peace and War: States of Complicity*, edited by Victoria Sanford, Katerina Stefanos, and Cecilia Salvi, 1–16. New Brunswick, NJ: Rutgers University Press.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4308   Page 140 of
Case 1:18-cv-0␣␣1-PLF   Document 2512   Filed 09/26/1␣␣␣age 117 of 215

240                                                                                          Architecture of Feminicide

Scheper-Hughes, Nancy. 1992. *Death without Weeping: The Violence of Everyday Life in Brazil*. Berkeley: University of California Press.

Staudt, Kathleen. 2008. *Violence and Activism at the Border: Gender, Fear, and Everyday Life in Ciudad Juárez*. Austin: University of Texas Press.

UN (United Nations). 2011. "Report of the Special Rapporteur on Violence against Women, its Causes and Consequences, Rashida Manjoo." Addendum: Follow-Up Mission to El Salvador. Human Rights Council. Seventeenth Session. February 1. Report number A/HRC/17/26/Add.2

UNDP (United Nations Development Program). 2010. "Acting on the Future: Breaking the Intergenerational Transmission of Inequality." Regional Human Development Report for Latin America and the Caribbean 2010, November 15. www.idhalc-actuarsobreelfuturo.org/site/engl/index.php.

UNFPA (United Nations Population Fund). 2009. Programming to Address Violence against Women: 8 Case Studies Volume 2. New York: UNFPA.

UNHCR (United Nations High Commissioner for Refugees). 2015. "Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico." October. New York: United Nations High Commissioner for Refugees.

UNODC (United Nations Office on Drugs and Crime). 2012. "Global Study on Homicide: Homicide Counts and Rates, Time Series 2000–2012." http://www.unodc.org/gsh/en/data.html.

UN Women (United Nations Women). 2013. "Joining Forces with Zonta International to End Violence against Women." United Nations Entity for Equality and the Empowerment of Women, December 19. http://www.unwomen.org/en/news/stories/2013/12/joining-forces-with-zonta-international-to-end-violence-against-women.

U.S. Department of State. 2015. "2014 Country Reports on Human Rights Practices: Honduras." June 25, 2015. http://www.refworld.org/docid/559bd56429.html.

Walsh, Shannon Drysdale. 2008. "Engendering Justice: Constructing Institutions to Address Violence against Women." *Studies in Social Justice* 2 (1): 48–66.

Walsh, Shannon Drysdale, and Cecilia Menjívar. 2016. "Impunity and Multisided Violence in the Lives of Latin American Women: El Salvador in Comparative Perspective." *Current Sociology* 64 (4): 586–602. DOI: https://doi.org/10.1177/0011392116640474

Wolseth, Jon. 2011. Jesus and the Gang: Youth Violence and Christianity in Urban Honduras. Tucson: University of Arizona Press

World Bank. 2014. "Intentional Homicides: Overview per Country." http://data.worldbank.org/indicator/VC.IHR.PSRC.P5 (accessed December 26, 2016).

**How to cite this article:** Menjívar, C and Walsh, S D. The Architecture of Feminicide: The State, Inequalities, and Everyday Gender Violence in Honduras. *Latin American Research Review*. 2017; 52(2), pp. 221-240. DOI: https://doi.org/10.25222/larr.73

**Submitted:** 01 March 2016     **Accepted:** 08 November 2016     **Published:** 16 August 2017

**Copyright:** © 2017 The Author(s). This is an open-access article distributed under the terms of the Creative Commons Attribution 4.0 International License (CC-BY 4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited. See http://creativecommons.org/licenses/by/4.0/.

*Latin American Research Review* is a peer-reviewed open access journal published by the Latin American Studies Association.          **OPEN ACCESS** ♂

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4309   Page 141 of 251
Case 1:18-cv-02...-PLF   Document 1-2   Filed 09/26/...   Page 118 of 215
9/17/2018

# Honduras

| | Overall Score | Regional Rank | Income Rank | Global Rank |
|---|---|---|---|---|
| | 0.4 | 28/30 | 25/30 | 103/113 |
| | Score Change | Rank Change | | |
| | -0.02 ▾ | -1 ▾ | | |

| | | Factor Trend | Factor Score | Regional Rank | Income Rank | Global Rank |
|---|---|---|---|---|---|---|
| 🏛 | Constraints on Government Powers | | 0.39 | 27/30 | 25/30 | 103/113 |
| 💰 | Absence of Corruption | | 0.34 | 27/30 | 22/30 | 98/113 |
| 📋 | Open Government | | 0.43 | 26/30 | 22/30 | 91/113 |
| 👫 | Fundamental Rights | | 0.43 | 29/30 | 22/30 | 97/113 |
| 🔒 | Order and Security | ▲ | 0.61 | 22/30 | 19/30 | 92/113 |
| 📋 | Regulatory Enforcement | | 0.37 | 28/30 | 26/30 | 104/113 |
| ⚖ | Civil Justice | | 0.41 | 25/30 | 21/30 | 99/113 |
| ⚖ | Criminal Justice | | 0.24 | 28/30 | 29/30 | 111/113 |

| ▲ Trending up | ▼ Trending down | Low | Medium | High |
|---|---|---|---|---|

Exhibit A
000153



| | 2017-2018 Score | | 2016 Score |
|---|---|---|---|
| Honduras | Latin America & Caribbean | | Lower Midd e |

## Constraints on Government Powers 🏛

| | | |
|---|---|---|
| 1 1  Limit by l gi l tur | | 0.46 |
| 1.2  Limits by judiciary | | 0.35 |
| 1 3  Ind p nd nt  uditing | | 0.34 |
| 1.4  Sanctions for official misconduct | | 0 28 |
| 1 5  Non gov rnm nt l h  k | | 0.49 |
| 1.6  Lawful transition of power | | 0 41 |

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4311   Page 143 of
251
Case 1:18-cv-02     PLF   Document 1-2   Filed 09/26/     Page 120 of 215
9/17/2018

## Absence of Corruption

| | | |
|---|---|---|
| 2.1 | In the executive branch | 0.37 |
| 2.2 | In the judiciary | 0.38 |
| 2.3 | In the police/military | 0.47 |
| 2.4 | In the legislature | 0.14 |

## Open Government

| | | |
|---|---|---|
| 3.1 | Publicized laws & gov't data | 0.28 |
| 3.2 | Right to information | 0.43 |
| 3.3 | Civic participation | 0.47 |
| 3.4 | Compl int m  h ni m | 0.54 |

## Fundamental Rights

| | | |
|---|---|---|
| 4.1 | No discrimination | 0.39 |
| 4.2 | Right to lif  &   urity | 0.37 |
| 4.3 | Due process of law | 0.31 |
| 4.4 | Fr  dom of  xpr   ion | 0.49 |
| 4.5 | Freedom of religion | 0.60 |
| 4.6 | Right to priv  y | 0.25 |
| 4.7 | Freedom of association | 0.53 |
| 4.8 | L  bor right | 0.48 |

## Order and Security

| | | |
|---|---|---|
| 5.1 | Absence of crime | 0.49 |
| 5.2 | Ab  n  of  ivil  onfli t | 1.00 |
| 5.3 | Absence of violent redress | 0.34 |

## Regulatory Enforcement

| | | |
|---|---|---|
| 6.1 | Eff  tiv  r gul tory  nfor  m  nt | 0.33 |
| 6.2 | No improper influence | 0.44 |

Exhibit A
000166

## Regulatory Enforcement

| | |
|---|---|
| 6.3  No unreasonable delay | 0.39 |
| 6.4  Respect for due process | 0.21 |
| 6.5  No expropriation w/out adequate compensation | 0.50 |

## Civil Justice

| | |
|---|---|
| 7.1  Accessibility & affordability | 0.41 |
| 7.2  No discrimination | 0.37 |
| 7.3  No corruption | 0.39 |
| 7.4  No improper gov't influence | 0.30 |
| 7.5  No unreasonable delay | 0.27 |
| 7.6  Effective enforcement | 0.41 |
| 7.7  Impartial & effective ADRs | 0.68 |

## Criminal Justice

| | |
|---|---|
| 8.1  Effective investigations | 0.14 |
| 8.2  Timely & effective adjudication | 0.27 |
| 8.3  Effective correctional system | 0.08 |
| 8.4  No discrimination | 0.30 |
| 8.5  No corruption | 0.39 |
| 8.6  No improper gov't influence | 0.23 |
| 8.7  Due process of law | 0.31 |

Privacy Policy (https://worldjusticeproject.org/privacy-policy)

Exhibit A
000156

4/5

# GAN BUSINESS ANTI-CORRUPTION PORTAL

ABOUT GAN      RESOURCES      +1 (800) 576-4523      CONTACT US      Q SEARCH

# Honduras

# Honduras Corruption Report

*(Want to receive more corruption report updates? Subscribe here!)*

## Snapshot



Corruption is a major obstacle for businesses investing in Honduras. All sectors of the economy suffer from rampant corruption. Networks of patronage and clientelism dominate the economy, further deteriorating market competitiveness and impeding foreign investors. The government has a legal anti-corruption framework in place through the Penal Code and the Penal Procedures Code. However, enforcement is lacking, and several cases have revealed widespread impunity. Gifts are illegal, yet the practice is widespread, and the use of bribery is an established part of doing business.

Last updated: August 2016
GAN Integrity

Exhibit A
000157

1/7

# Judicial System

Corruption is rife in the judiciary. The institution suffers from underfunding, poorly trained staff, ineffectiveness, high levels of corruption, political influence, and intimidation and pressure from patronage networks (HRR 2015). These factors have also resulted in lengthy judicial proceedings and a trial backlog (HRR 2015). Bribes and irregular payments are often exchanged to obtain favorable court decisions (GCR 2015-2016). The courts are inefficient in settling disputes and challenging government regulations; for example, enforcing a contract in Honduras is time-consuming in comparison to regional averages, taking 920 days (GCR 2015-2016; DB 2016).

Honduras is a member state of the International Centre for Settlement of Investment Disputes (ICSID) and has acceded to the New York Convention 1958 on the Recognition and Enforcement of Foreign Arbitral Awards.

# Police

Corruption and impunity among police officers is a serious impediment to business in Honduras (HRR 2015). Officers often engage in extortion and other abuses of power (FitW 2015). The police cannot be counted on to protect companies from crime or to enforce law and order, and crime and violence create costs for businesses (GCR 2015-2016). In some areas, the high crime rates and violence lead some to abandon their businesses (FitW 2015).

In April 2016, a special commission was created after the president had declared corruption within the police force to be a national security emergency (*Agence France Presse*, May 2016). After just one month, the commission had suspended 30 deputy commissioners from the police for alleged collusion and for links to organized crime (*Agence France Presse*, May 2016).

# Public Services

The public services sector carries a high risk of corruption. Irregular payments and bribes are at times exchanged when applying for utilities (GCR 2015-2016). Corruption is found in almost all municipalities in Honduras and is particularly manifested in the opaque use of funds for community infrastructure (BTI 2016). Bureaucratic hurdles also impede investments, and companies complain of procedural red tape to obtain approval for investment activities (ICS 2016).

Exhibit A
000188

Almost 75% of the labor force works in the informal economy, significantly reducing market competitiveness (BTI 2016). Starting a business requires 12 procedures and takes 14 days, while applying for construction permits requires businesses to go through 15 procedures and takes 82 days (DB 2016).

# Land Administration

Property rights and regulations are well defined by law, but rights are poorly protected (BTI 2016; GCR 2015-2016). A weak and ineffective judiciary has led to many property rights violations, an issue that is a major problem in Honduras (BTI 2016). Registering property is much less time-consuming in Honduras than in neighboring countries, taking 22 days and requiring 6 procedures (DB 2016).

# Tax Administration

The tax administration carries a high risk of corruption; irregular payments and bribes are widespread when meeting tax officials (GCR 2015-2016). Tax rates are ranked as the second most important obstacle to business in Honduras (GCR 2015-2016).

# Customs Administration

The customs administration suffers from rampant corruption. Transparency at the border is very poor, and bribes and irregular payments are widespread when trading across borders (GETR 2014; GCR 2015-2016). Companies are more likely to encounter corruption when importing than when exporting from Honduras (GETR 2014).

# Public Procurement

Public procurement is a very high-risk sector. Bribes and irregular payments plague the process of obtaining contracts and licenses, and favoritism towards well-connected companies taint procurement officials' decisions (GCR 2015-2016). The diversion of public funds due to corruption is also widespread (GCR 2015-2016).

In one case in September 2014, authorities arrested the head of the Honduran Institute of Social Security (IHSS), Mario Zelaya, and several other officials on charges

Exhibit A
000189
3/7

of embezzlement of public funds (FitW 2015). Reportedly, USD 350 million was misappropriated from the IHSS through, among other schemes, the purchase of overpriced medicine (which was stolen and then resold to the IHSS), overpaying USD 400,000 for ten ambulances, and money laundering through sham companies (*The Guardian*, June 2015). Leaked documents connected to the case also revealed that the ruling party had received large sums of money from at least ten sham companies with IHSS contracts (*The Guardian*, June 2015). Zelaya is facing charges that could result in a lifelong prison sentence (BTI 2016).

Companies are strongly recommended to use a specialized due diligence tool on public procurement to mitigate corruption risks associated with public procurement in Honduras.

# Natural Resources

There is little information available on the extent corruption in the extractive industries. Nonetheless, the high levels of corruption in other sectors are likely to have ramifications on the natural resources sector, too. Illegal logging, for instance, is an increasingly important issue in Honduras and can be traced back in part to corruption and poor governance (EIA Honduras, 2016). Companies complain of long waiting periods to obtain environmental permits, a factor that can encourage the occurrence of corruption (ICS 2016).

Honduras has been a candidate country to the Extractive Industries Transparency Initiative since 2013.

# Legislation

Honduras has set up a legal anti-corruption framework, but the laws are poorly implemented (Transparency International, Feb. 2013; HRR 2015). The Penal Code and the Penal Procedures Code criminalize passive and active bribery. Conflicts of interest, post-public employment, and gifts and hospitality are regulated under the Code of Civil Servants Ethics (Transparency International, Feb. 2013). Public officials are subject to financial disclosure laws, yet compliance is lacking (HRR 2015). The Law on Witness Protection provides for the protection of whistleblowers.

The Organization of American States set up the Mission against Corruption and Impunity in Honduras (MACCIH) as a response to the mass protests which have erupted in the country subsequent to the publishing of the IHSS corruption case (mentioned above). The MACCIH is made up of a team of international judges and prosecutors tasked with supervising, advising and supporting Honduran authorities in curbing corruption. Notwithstanding, the MACCIH

Exhibit A
000189

has been met with some criticism in Honduras as the mission is not actively participating in investigations and prosecution; it is only providing support to Honduran judges and prosecutors already susceptible to much political pressure (*New York Times*, Feb. 2016). Honduras has ratified the UN Anti-Corruption Convention and is a member of the Inter-American Convention against Corruption.

# Civil Society

Freedoms of speech and press are provided for by the law; however, some restrictions limit journalists from reporting on government corruption and other abuses and allow authorities to punish those who do so (FotP 2015). Journalists are often victims of threats and violence, and at least two journalists were killed in 2014 due to their reporting (FotP 2015). A few powerful business interests monopolize media ownership (FitW 2015). Access to government information is provided for by law but is limited in practice (FotP 2015). Government interference and intimidation has encouraged self-censorship among journalists (FotP 2015). In addition, corruption among journalists is common; several adjust their reporting to serve the interests of the state (FotP 2015). Access to the internet is generally unrestricted (FitW 2015). The media environment in Honduras is considered "not free" (FotP 2015).

Freedom of assembly is guaranteed under the law but is not consistently respected (HRR 2015; FitW 2015). Activists often face harassment and intimidation (FitW 2015). During the first three months of 2014, the Unit for Registering and Monitoring Civil Associations revoked the licenses of over 10,000 NGOs for failure to submit reports of their finances and programs to the government, but widespread pressure from civil society representatives led authorities to rescind the resolution (FitW 2015).

# Sources

- World Bank & IFC: Doing Business – Laos 2016.
- Bertelsmann Foundation: Bertelsmann Transformation Index – Honduras 2016.
- World Economic Forum: Global Competitiveness Report 2015-2016.
- US Department of State: Investment Climate Statement – Honduras 2016.
- Agence France Presse: 'Honduras fires police officers in corruption purge', 18 May 2016.
- The New York Times: 'An Anti-Corruption Charade in Honduras', 15 February 2016.
- Environmental Investigation Agency: Honduras 2016.
- US Department of State: Human Rights Practice Report – Honduras 2015.

Exhibit A
000183        5/7

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4318   Page 150 of 251

- Freedom House: Freedom in the World  Honduras 2015.
- Freedom House: Freedom of the Press – Honduras 2015.
- The Guardian: 'How hitmen and high living lifted lid on looting of Honduran healthcare system', 10 June 2015.
- World Economic Forum: The Global Enabling Trade Report 2014.
- Transparency International: Overview of Corruption and Anti-Corruption in Honduras, 28 February 2013.

Share This Story, Choose Your Platform!   f   🐦   in   ⌣   t   G+   𝓟   v𝕜   ✉

> *The site provides a wealth of practical anti-corruption resources to support a solid preventative approach, covering subject such as processes, due diligence, practical tools to support compliance program implementation and also compliance and integrity training.*

> *Working with experience for*

## RESOURCES

Compliance Blog

Country Profiles

Compliance Guides

Due Diligence Tools

Anti-Corruption Legislation

Compliance Training

Corruption Dictionary

## ABOUT GAN

GAN provides all-in-one compliance software to help companies of all sizes manage regulatory and legal compliance.

www.ganintegrity.com

 

## COMPLIANCE NEWSLETTER

Subscribe to our compliance newsletter to get a weekly digest of top compliance news and insights delivered to your inbox!

Email *

Email Address

SUBSCRIBE



**WORLD REPORT 2018     ESSAYS          COUNTRIES**

# Honduras

*Events of 2017*

Supporters of Salvador Nasralla, presidential candidate for the Opposition Alliance Against the Dictatorship, argue with military police during a protest to demand the official presidential election results, outside the warehouse of the Supreme Electoral Tribunal in Tegucigalpa, Honduras November 30, 2017.

© 2017 Reuters/Jorge Cabrera

AVAILABLE IN

Violent crime is rampant in Honduras. Despite a downward trend in recent years, the murder rate remains among the highest in the world. Journalists, environmental activists, and lesbian, gay, bisexual, and transgender (LGBT) individuals are among those most vulnerable to violence. Efforts to reform the institutions responsible for providing public security have made little progress. Marred by corruption and abuse, the judiciary and police remain largely ineffective. Impunity for crime and human rights abuses is the norm.

Exhibit A
000163

The Mission to Support the Fight against Corruption and Impunity in
Honduras (MACCIH), established in 2016 through an agreement between the
government and the Organization of American States (OAS), has
successfully promoted the passage of legislation aimed at curbing illegal
funding for political campaigns.

# Police Abuse and Corruption

In January 2017, President Juan Orlando Hernández announced that the
Special Commission for Police Reform Restructuring will extend its mandate
until 2018. As of May, nearly 4,000 of the more than 9,000 police officers
evaluated by the commission had been removed, including many for alleged
involvement in corruption or criminal acts. However, none of the police
officers expelled upon orders of the commission has been convicted to date
for alleged involvement in criminal activities including human rights abuses.

# Judicial Independence

Judges face interference from the executive branch and others, including
private actors with connections in government. On June 30, the former vice-
president of the defunct Judiciary Council, Teodoro Bonilla, was found guilty
of influence peddling. Using his authority as a senior official of the judicial
oversight body, Bonilla pressured two judges into favoring relatives of his
who were charged with illegal weapons possession and money laundering.

Exhibit A
000186

# Attacks on Journalists and Restrictions on Freedom of Expression, Association, and Assembly

Twenty-five journalists were murdered between 2014 and 2016 according to the human rights ombudsman, CONADEH, which also revealed in its 2016 report that 91 percent of killings of journalists since 2001 remain unpunished. Most recently, journalist Carlos William Flores was shot and killed by unidentified gunmen on a motorcycle in Cortes, near the Guatemalan border. Flores directed a television program, "Sin Pelos en la Lengua," which was critical of major agribusiness enterprises linked to deforestation in the area.

In February 2017, Congress approved a new penal code making it a criminal offense—punishable by a four to eight-year prison sentence—for individuals or media outlets to engage in the "apology, glorification, [or] justification" of terrorism. The new legislation also defines as terrorist offenses any form of "illegal association" and acts "causing fear, putting in grave risk, or systematically and indiscriminately affecting the fundamental rights of the population or a part of it, the internal security of the State or the economic stability of the country." These vague and unreasonably broad provisions could conceivably be used to bar peaceful protests and association meetings as terrorism.

The Inter-American Commission for Human Rights (IACHR) and the Office of the UN High Commissioner for Human Rights (OHCHR) both expressed concern about the ambiguous formulation of the law and its potential to arbitrarily restrict freedom of expression and of the press.

Exhibit A
000185                3/10

# Attacks on Lawyers, Human Rights Defenders, and Environmental Activists

Lawyers and human rights defenders suffer threats, attacks, and killings. In 2016, CONADEH registered 16 violent attacks against lawyers, including 13 killings. The IACHR described Honduras in August 2016 as one of the "most hostile and dangerous countries for human rights defenders" in the Americas.

To date, eight men have been charged with the murder in March 2016 of environmental and indigenous rights activist Berta Cáceres, including an army major and the former environment manager of Desarrollo Energético S.A. (DESA), the company behind the Agua Zarca dam project that Cáceres was campaigning against at the time of her death.

The Mechanism for the Protection of Journalists, Human Rights Defenders and Operators of Justice, created in 2015, suffered from a lack of adequate resources and staffing, according to local activists.

# Sexual Orientation and Gender Identity

Homophobic violence is a major problem in Honduras. Several UN agencies working in Honduras have noted that sexual violence against LGBT individuals forces them into "internal displacement" or to flee the country in search of international protection.

In July 2017, David Valle, project coordinator of the Center for LGBTI Cooperation and Development, was stabbed by a stranger in his home in Tegucigalpa. Valle had received repeated threats in the past. He survived the

Exhibit A
000188  4/10

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4323   Page 155 of
251
9/17/2018          Case 1:18-cv-02    PLF  Document 1-2  Filed 09/26/1    Page 132 of 215

attack.

# Women's Sexual and Reproductive Rights

Under the criminal code, abortion is illegal without any exceptions in
Honduras, and women and girls who terminate pregnancies can face
prison sentences of up to six years. On May 5, 2017, the National Congress
of Honduras voted against modifying the existing criminal code to allow
abortion in cases of rape, grave fetal malformations and grave risks to the
health of the woman. The law that remains in force also sanctions abortion
providers and those who assist with procedures.

# Rights of the Child

In July 2017, the Honduran Congress unanimously passed a bill making all
child marriage illegal. The new bill replaces legislation that previously
allowed for girls to marry at 16 with permission from family. According to
UNICEF, a third of Honduran girls are married before 18.

In May 2017, President Juan Orlando Hernández launched an initiative to
revise the criminal code to allow children as young 12 to be prosecuted as
adults, rather than through the existing juvenile justice system, in violation

Exhibit A
000167

of international standards.

# Prison Conditions

Inhumane conditions, including overcrowding, inadequate nutrition, and poor sanitation, are endemic to Honduran prisons. Designed to hold up to 8,000 inmates, the country's penal institutions held more than 17,500 in 2016, the last year for which reliable figures were available. Prison guards at many facilities have effectively relinquished control over the prison grounds to the inmates.

# Key International Actors

At the behest of the Mission to Support the Fight against Corruption and Impunity in Honduras (MACCIH), Congress passed the Law on Clean Politics, which came into force in March 2017. The law created a framework to prevent organized crime from contributing to political campaigns and to hold parties and candidates accountable for financing their campaigns illegally. In July 2017, the MACCIH announced that it would investigate the funding and government concession granted to DESA for the Agua Zarca Dam project for possible corruption and money laundering.

For fiscal year 2017, the US Congress allotted US$95.3 million in bilateral aid to Honduras. Members of Congress reintroduced the "Berta Caceres Human Rights in Honduras Act" (H.R. 1299) on March 2, 2017. The bill would suspend US funding for the country's police and military operations until the Honduras government prosecutes and convicts those who ordered and carried out the murder of Cáceres, in addition to other killings and attacks against other activists; investigate and prosecute members of military and police forces who have allegedly violated human rights; withdraw the military from domestic policing; establish effective protections for human rights defenders; and strengthen rule of law.

In May 2016, after prosecutors filed murder charges against an employee of DESA, the Dutch development bank, FMO, and the Finnish Fund for Industrial Cooperation, Finnfund, announced they would suspend payments of their loans to the Agua Zarca Dam. In June 2017, both funders told the *Guardian* that they would withdraw completely from the Agua Zarca project. The third and largest investor in the project, the Central American Bank of Economic Integration (CABEI), also announced that it would no longer fund the project.

BROWSE COUNTRIES

Choose...

---

# Latest News on Honduras »

**Keynote**

Exhibit A
000189

SECTION      SEARCH

WED, SEP 19, 2018

Home › Investigations

# A Honduras Political Clan and Its Criminal Fiefdom

Written by Steven Dudley and Felipe Puerta* - OCTOBER 19, 2017



Exhibit A
000172                1/20

SHARE

It was around midnight that police in a rural area of the northern department of Olancho first heard the distinctive buzz of a low-flying aircraft. Night duty officers in three municipalities called their division chief and told him the plane was flying "without lights." At 1:15 a.m., the police chief of one of the rural municipalities called the chief again, this time with the news that the plane had crashed. It was June 13, 2012.

A scramble to find the aircraft ensued. Police dispatched several patrols, but residents also called the police and said four pickup trucks packed with heavily armed men wearing ski masks were driving around the area, asking locals if they had seen or heard where the plane might have fallen.

In the end, police said they found the plane at 5 a.m. It had smashed against two trees, was burning and contained the dead bodies of two Colombian nationals who authorities would later say piloted the plane. Shortly thereafter, the police stopped three vehicles that fit the descriptions they had heard from residents, and they detained six men. Inside the cars, they found munitions and firearms.

*This is the second of a three part series on mayors and organized crime in the Northern Triangle. The investigation was done with assistance from the Swedish government.*

Among these men was Miguel Angel Urbina Soto. The Urbina Soto family was already known to law enforcement. Miguel Angel's oldest brother, Carlos Fernando Urbina Soto, had been arrested and convicted for murder before escaping from jail and eventually settling his case out of court. His youngest brother, Mario Urbina Soto, was allegedly involved in local drug dealing in their home municipality of Yoro, in the department that carries the same name. Their mother, Lilian Soto, had also been charged for murder but was later released.

There was little chance that Mario's transgressions would catch up to him though. His father had been mayor of Yoro in the early 1990s, and his other brother, Arnaldo, had been elected mayor of Yoro in 2009, some three years before this incident. His sister, Diana, was an aspiring congresswoman, and Arnaldo was positioning himself to head the National Party in the department of Yoro. Their political tentacles reached to the highest levels, and they held a tight rein on local police and judicial matters in the area.

**SEE ALSO:** Honduras Elites and Organized Crime

Carlos Fernando and Arnaldo had also been connected to drug trafficking in Yoro, according to an Attorney General's Office report issued in the days following the crash. In fact, the family was said to be receiving, storing and transporting drugs arriving via airplanes in both Yoro and the neighboring department of Olancho. But no charges had been filed.

Meanwhile, Arnaldo had used his time as the mayor to consolidate the family's hold on political and underworld power in the region. This power, in part, came from Arnaldo's political post, from which he could control the land titling agency and the office that regulated the wood industry. He could coordinate the public works contracts and would later become the manager of the National Party candidate for president, Juan Orlando Hernández.

In the 2012 case in Olancho, police questioned the six suspects who told them that they were buying "roosters for cockfighting," the Attorney General's Office report says. And even though the Attorney General's Office found that "what they said was unbelievable," they released them.

The aircraft yielded 41 kilograms of cocaine, a surprisingly small load for which to perform such a high-risk landing without lights. In the official reports by both the police and the Attorney General's Office, no one questioned this minuscule amount, and the Attorney General's Office noted that police reported a military helicopter was in the area near where the aircraft had crashed, but "left without knowing if the [helicopter occupants] had taken evidence from the site of the wreckage." In other words, maybe someone took some illegal drugs with them when they ran.

The Attorney General Office's report on the matter ended with a recommendation: "Because of all this, we should continue investigating because the [Urbina Soto family] will probably keep committing crimes."

# A Family Business

Exhibit A
000172          3/20

Yoro is one of the largest municipalities in Honduras. It is a mostly hilly terrain, with a fearsome set of mountains on its northern edge popularly known as "Locomapa" — roughly translated, "crazy map." It has long lived from its fertile soil and timber, but the land-locked area is known more for a natural phenomenon every spring in which it literally "rains fish." (The various explanations for the phenomenon go from the supernatural to the natural — the fish simply wash up from local water sources.)

*(Mountain range known as "Locomapa." Credit: Steven Dudley)*

The lonely paved road leading in and out of the state from the country's northern industrial city of San Pedro Sula is populated mostly by trucks carrying sugar cane and pine wood. There was a time when stretches of this road were also used to land aircraft carrying cocaine, government investigators and local residents say. The drugs were offloaded and guarded by police who accompanied them to their next stop in the multi-partner cocaine distribution chain moving north to Guatemala and eventually the United States. Yoro is in the dead center of the country, connected to Honduras' two largest urban hubs — San Pedro Sula and Tegucigalpa — as well as a host of secondary roads and cities along the border with Guatemala.

Authorities eventually forced these traffickers to move from the highway into Locomapa and its surroundings, which gives way to the northern coast, specifically a road that stretches between La Ceiba, the country's third largest city in Atlántida state, and Tocoa, the capital of the neighboring state of Colón. La Ceiba also connects to San Pedro Sula, the country's industrial and criminal epicenter.

Locomapa is but one of the areas where Carlos Fernando Urbina Soto, alias "Nando," is thought to hide from authorities. Carlos Fernando is frequently referred to in government documents as "the leader" of the Urbina Soto clan.

Exhibit A
000173                    4/20

One investigator who tracked the family for years and spoke to InSight Crime on condition of anonymity said they received testimony that Carlos Fernando once shot a rival, then tied him to his car and dragged him around the city to prove his point.

But there is more than a little crazy to go around the family. The youngest, Mario, alias "soldado," or soldier, is said to be the main distributor of drugs in Yoro. Residents and investigators alike said he arbitrarily dispenses discipline in the streets to anyone who crosses him, and will steal whatever he wants, reportedly including girlfriends of other men.

As with many stories regarding the Urbina Soto clan, it is difficult to separate fact from fiction. The family has long been part legend, part reality in the region. The father of the boys, Dario Urbina Fernández, married Lilian Soto and eventually became mayor of Yoro. Her family resided in Olanchito, the mountainous municipality leading to Colón, where they reportedly had a blood feud with another clan. We could not find the origins of the fight, but Urbina Fernández married into it, and it may have followed him into Yoro's City Hall. In 1992, while he was mayor, he was assassinated, allegedly by a member of the family with which his wife's family was feuding.

Violence continued to swirl around the Urbina Soto family thereafter. Carlos Fernando was reportedly arrested and jailed in Olanchito for an assassination. He escaped, then later allegedly got the charges dismissed. The family matriarch, Lilian Soto, was arrested for murder as well but was released. Yoro now has a neighborhood named after her. Other family members faced accusations but no formal charges.

Despite it all, or perhaps because of it, Arnaldo Urbina Soto ran for mayor. His nickname is "moreno" or "negro," which literally translates as "Blacky," for his slightly darker skin. When he talks, he smiles, and so some in the town have taken to calling him "Smiley," or, as they say in Yoro, "Eh-smigh-lee." He is a lawyer, the only one in the family, and bandies his title around when it suits him. He is approachable and reportedly made himself available to the public, literally opening his door to the people. There is little public record of the 2009 mayoral campaign, but in his first time running, Urbina Soto won with 11,948 votes, beating his closest competitor by over 6,000 votes.

According to three government investigators consulted for this report, the prospect of having a mayor involved in drug trafficking operations led to a deal between the Urbina Soto family and the largest criminal group in the area, the

Exhibit A
000176          5/20

Cachiros. Like the Urbina Soto family, the Cachiros were a family criminal operation that started with small-time activities — in their case, cattle rustling. Beginning around 2005, the Cachiros also started to receive and move large quantities of cocaine through this northern coastal area.

## As with many stories regarding the Urbina Soto clan, it is difficult to separate fact from fiction.

It was in this context that the Cachiros connected with the Urbina Soto family, government investigators told InSight Crime. The two families had something in common: the Urbina Soto family had also gotten their start in theft and resale of cattle, and both had moved into drug trafficking. They made an alliance: the Cachiros would pay the Urbina Soto clan to receive planes loaded with cocaine in their area of influence, store the drugs, and transport them to their next drop point. This included maintenance of the airstrips, lighting and generators, fuel for the aircraft, security teams to meet and guard the merchandise, as well as other services like destroying evidence, if necessary.

The Cachiros were used to dealing with politicians and business elites. From the beginning, they had sold their stolen cattle to the Rosenthals, whose family patriarch, Jaime Rosenthal Oliva, was Honduras vice president in the late 1980s; Rosenthal's son, Yani, served in the cabinet of President Manuel Zelaya and later ran for president himself as a candidate for the Liberal Party. (He lost in the primaries.) The Cachiros also made contact with powerful politicians and families from the country's other major political party, the National Party, including with then President Porfirio Lobo, whom they met while he was running for high office in 2009; Lobo's son, with whom they worked after Lobo had become president; a former governor and two legislators, whom the Cachiros regularly used as intermediaries to secure favors from other national politicians and security forces.

On the local level, the Cachiros had for years allegedly paid for the election of their own mayor in Tocoa, so they understood the benefits of having the local power broker on their side who could steer or even control the police, as well as marshal the resources of the government to support their endeavor or deviate security forces towards a rival. Mayor Urbina Soto in Yoro reportedly did just that — providing the 20-strong police unit with gasoline for their patrol cars and paying for the maintenance of the vehicles, among other things    so they would keep watch over their illicit operations. The Urbina Soto family also made the Cachiros feel welcome in Yoro. They hosted parties for them, which included cockfights, one of the Attorney General's Office investigators told InSight Crime.

Exhibit A
000176

9/19/2018

The Cachiros were generous allies, providing money for drug trafficking services as well as for political ends, government investigators said.

There were a few hiccups. On one occasion, a witness told authorities the Urbina Soto family stole a load of cocaine after an airplane crashed. One of the Cachiros flew a helicopter to Arnaldo's home where he issued a warning: return the cocaine, or the whole family dies. The Urbina Soto family complied, the investigators said.

Through their business and political relationships, the Urbina Soto clan met another powerful trafficking clan with the last names Valle Valle, which complicated their lives. The Valle Valle clan     which had its headquarters in the state of Copán along the Guatemalan border — was part of the cocaine distribution chain. They received shipments via the Cachiros, according to investigators and the testimony of Cachiros leader, but they wanted to control Yoro, where they could field their own aircraft and control more of that distribution chain, which would give them a greater share of the profits.

Tensions built, one investigator said. He said these tensions were also political. Unlike the Cachiros, who interacted regularly with the National Party leaders, the Valle Valle's strongest political patrons were from the rival Liberal Party. The Urbina Soto clan, the investigator said, was literally "in between the two groups," in a geographic, a business and a political sense — the type of political-criminal squabble that may have set the stage for Mayor Arnaldo Urbina Soto's eventual undoing.

# Stealing Land

This criminal activity had a toll on the region. According to statistics from the National University's Violence Observatory, the homicide rate in the department of Yoro rose from 27 murders per 100,000 citizens in 2005, to 86 per 100,000 in 2014. In the municipality of Yoro, the rate was 104 per 100,000, second only to the city of San Pedro Sula, which was then dubbed "the most violent city in the world."

Despite rising criminal activity and violence in the region, the political stock of Yoro Mayor Urbina Soto and his family continued to rise during his first stint in office. And in 2013, he ran for reelection. His sister, Diana, decided to run for congress. The mayor was also tapped to run the presidential campaign in the department for the National Party.

Exhibit A
000178

*(Diana Urbina Soto, Juan Orlando Hernández, and Arnaldo Urbina Soto at campaign event. Credit: Cholusat Sur)*

Then-presidential candidate Juan Orlando Hernández visited the municipality during the campaign. Violence was at its peak in the country, and Hernández was running on a law and order platform. The backdrop made the rally in Yoro, in which the presidential candidate and Urbina Soto paraded down the street together and gave speeches, more than a little ironic.

The visit was not free. According the opposition media Cholusatsur (Canal 36), Diana later said her family provided the presidential campaign with generous financial contributions, and authorities would later find a checkbook in one of the Urbina Soto cars with a receipt for a deposit of $4 million lempiras ($171,000) to the National Party. In the meantime, Arnaldo Urbina Soto kept campaigning, and on November 24, he won reelection, this time with 15,813 votes. His closest competitor got just over 4,000 votes.

President Hernández can claim ignorance, but the family's violent tendencies were well known throughout the region. Numerous testimonies given to the Attorney General's Office during this time period paint a thuggish picture. One particularly brutal case concerns their actions in a town called Rio Abajo, in the area of Locomapa. Witnesses said the Urbina Soto clan and their group of some 50 armed men terrorized the town between 2011 to 2013, stealing land from several families in the area and forcing much of the town to flee.

One witness said that Carlos Fernando Urbina Soto, the so-called "leader" of the clan, killed Nicolás Puente García in 2011. He later shot at Puente's cousin, and began targeting the rest of the Puente clan "since the family was economically the strongest in the community, and he wanted to scare them so they fled and left their lands behind," the witness said.

In 2013, the witness said Carlos Fernando and a group of armed men dressed as policemen entered one of the Puente's homes. They then forced the inhabitants to lay face down on the floor and tortured them. The witness said Carlos Fernando, Mario and a local policeman also burned two houses as a way to scare the rest of the community to leave the area.

Later that same year, the witness stated, Carlos Fernando visited another member of the Puente family and told him he needed to leave because the land was now his. In all, another witness told authorities, they stole over 500 hectares of the Puente's lands. Residents reported that Carlos Fernando then began to bring in "heavy machinery" to sow corn and other crops. That machinery was reportedly municipal property, furnished by the mayor's office.

But the land appropriation process had only just begun. In mid-2013, a different witness said that Carlos Fernando and his men stole dozens of hectares of land from at least three more people. They also took the neighbors' cattle and simply placed it on their stolen property. And they allegedly took an electricity generator that a foreign government had reportedly given to the community. Having the help of the mayor made this process easier, since any appropriation could be legalized by the local land title registry.

The Urbina Soto clan also reportedly occupied the land of another neighbor where several witnesses said they cleared an area for a clandestine runway that they used to receive drug shipments. In September, when a local teacher threatened to go to the authorities, they killed him, the witness said. In October 2013, they allegedly dragged another resident of Yoro from his home for unknown reasons; he appeared dead on the side of the road. Another potential cooperating witness was also killed, as were at least four others in an ambush.

Exhibit A
000128                9/20

*(Timber being loaded on a truck. Credit: Steven Dudley)*

The Urbina Soto family also used the stolen land to harvest timber, in some cases illegally, according to investigators. Timber has long been a mainstay of Yoro, but the trade is taking its toll. The mountain's once-thick cover of pine trees has been noticeably reduced to the point where there are large spaces between them. A report by the National Human Rights Commission (Comisionado Nacional de los Derechos Humanos – CONADEH) on deforestation in Honduras said that Yoro had the highest number of cases of illegal logging in the country.

This illegal activity is due, in part, to the impoverished and corrupted regulatory agencies in Honduras. While the legal framework is in place to combat the trade, the government's operative side faces challenges of corruption and criminal penetration. Indeed, criminal groups are also playing an increasingly

Exhibit A
000179          10/20

9/19/2018

important role in this deforestation process. A recent report in Environmental Research Letters said that between 15 and 30 percent of deforestation over the last decade in Guatemala, Nicaragua and Honduras was caused by drug trafficking interests.

The Urbina Soto family's timber business seems to fit into this pattern. Investigators told InSight Crime that Mayor Arnaldo Urbina Soto personally chose the head of the National Forest Conservation and Development Institute (Instituto Nacional de Conservacion y Desarrollo Forestal – ICF) in the area. That way the clan could control where he gave licenses to harvest and determine how big those harvests could be. The family also strong-armed purchasers to buy from them and determined the prices, the investigators said. When we confronted the current ICF director in the area about these charges, he demurred.

"I don't know," he said. "I don't know anything about the mafia."

The land gave the family more than just areas from which to do business. As Kendra McSweeney and her colleagues point out in an article in the Journal of Latin American Geography, having land would also give families like the Urbina Soto clan protection from rivals and the ability to launder proceeds. It would also give them political and social capital, and it would provide them a way "to neutralize" conservationists, indigenous and squatters who wish to stake claim to the land.

But it all started with the intimidation and murder. As the bodies piled up, the residents took to the mountains, leaving their homes behind and creating what many told us was a "ghost town." Eventually these displaced people    which one local told us numbered 100 families — made their way to San Pedro Sula where an investigator found them on the street begging for food. He brought them to the office to tell their story, and a formal investigation began.

## Guns, Cockfights and a Missing Brother

At 6 a.m. on July 27, 2014, just six months after Yoro Mayor Arnaldo Urbina Soto assumed his post for another four years, 30 members of the government's Counter-narcotics Division (Dirección de Lucha Contra el Narcotráfico – DLCN), 170 members of the Military Police (Policía Militar de Orden Público PMOP), and numerous prosecutors working under the aegis of the government's anti-crime fusion center, the Fuerza Nacional de Seguridad Interinstitucional (FUSINA), raided the municipality.

Exhibit A
000189

11/20

Authorities headed straight to the mayor's house, placed a detonator on his door, and blew it open. There they found Urbina Soto and his wife, as well as three others, including a German national, who were startled by the dramatic entrance. Amidst the melee, the mayor claimed the people in the house worked for him.

*(Arnaldo Urbina Soto's house in Yoro. Credit: Honduras authorities via Twitter)*

Investigators later described the mayor's house as having "stone walls, coffee-colored doors," and "to the side, a space reserved for cockfights." In addition, the home had an elegant pool and there were numerous cars parked on the property, which authorities photographed to share with the press.

There was also a veritable arsenal. In one part of the house, they found a Heckler & Koch HK45 rifle, a Glock pistol, a Ruger rifle, a Star .22 pistol, a CZ pistol, a Remington rifle, a 9 mm Girsan, and a Colt M16 with its serial number filed off. In other parts, they recovered 20,500 lempiras ($876) in cash, as well as dozens of bullets for various other weapons including AK-47 and M16 assault rifles. Curiously, they also found an official case file related to an investigation of a murder near Tegucigalpa.

When they arrived at the house belonging to Arnaldo's brother Miguel Angel, they found him sleeping. On his bed stand were a Glock pistol and a Colt handgun. In his garage, Miguel Angel had four cars and an all-terrain vehicle.

Exhibit A
000183

12/20

And in a room, they found a receipt for payment for wood from a local company for 120,000 lempiras ($5,130).

Authorities captured Mario in his home with a Glock as well, and arrested six others, including the Urbina Soto brothers' uncle and a Mexican national who was allegedly responsible for organizing the cockfights the family regularly hosted. At Carlos Fernando's house, authorities found an AK-47, a military-issued flak jacket and over 100 cattle. But the so-called "leader" of the Urbina Soto gang was gone.

The next day, the nine accused were in court, where their lawyers argued that authorities had no proof and had violated their clients' rights. They noted that Mario and Miguel Angel Urbina Soto each had permits for their weapons, and they said that the mayor was a "servant of society," and should not be taken away from his job.

Fittingly, Mayor Urbina Soto was the only defendant who decided to exercise his right speak at the hearing.

"I am offended by the way my dignity and my family's dignity was trampled," he told the court, referring to the way the authorities had burst into his house. "I've earned all of my possessions because of my hard work in legal businesses, as well as through inheritances...It's not right that you have treated me like a criminal...I am innocent."

Outside the courthouse, hundreds of people who had been transported in some 20 buses protested the mayor's arrest. "Blacky! Blacky!" ("Moreno! Moreno!") they reportedly chanted on what was a brutally hot day. After one of them erroneously reported that the mayor had been freed, they all scrambled for the buses and returned to Yoro.

In the days that followed, however, authorities continued to raid houses and collect damning evidence. Inside several homes in Yoro, they found 16 assault weapons, munitions for these and other weapons including .50 caliber rounds, camouflage outfits, flak jackets, satellite telephones, generators and lights with extension cords, presumably to use when the aircraft landed in the mountains.

Prosecutors eventually claimed the "Urbina Soto Gang," as they called them, had as many as 37 members, and was trafficking drugs, stealing land, selling illegal wood and laundering the proceeds. Citing something Urbina Soto supposedly said, they implicated the group in 137 murders and 45 disappearances, most of these related to land theft and cattle rustling.

Exhibit A
000182              13/20

Authorities also connected the family to ownership of 53 properties worth as much as 30 million lempiras ($1.28 million), many of which were in a neighborhood that went by the name of their mother.

"They have total control of the Yoro Department," one investigator wrote. "It's well known and rumored that they control all of the government entities, and that they have a lot of political influence, which allows them to operate in impunity."

## "They have total control of the Yoro Department."

The arrests came amidst a wave of law enforcement actions against mayors. According to the local watchdog group, the Association for a More Just Society (Asociación para una Sociedad más Justa – ASJ), there are 16 former mayors in Honduras charged with crimes ranging from murder to arms trafficking to corruption to extortion. They are from small and large municipalities and from all political parties. Authorities claim they used their political power to establish criminal enterprises. In one case, the mayor was connected to arms trafficking. In another case, a mayor was allegedly working with the MS13 gang that had bought him a backhoe for a public works contract.

As they have in El Salvador and Guatemala, mayors in Honduras have increasingly taken on a larger role in criminal activities. This is in part due to the decentralization of political power in the country. The physical isolation of mayors and the general corruption that pervades from the national to the local level also fuel this dynamic. Mayors do not control the purse strings of the police, but they provide them with important resources such as gasoline and food, as was reportedly the case in Yoro under Urbina Soto. They can also play a role in the maintenance of police living quarters.

In addition, mayors control important government resources for the construction and maintenance of infrastructure, such as roads, hospitals and schools. Mayors in larger municipalities, such as Yoro, control a disproportionate amount of these resources, since that is often where the bulk of the population resides and because it is so large a geographic space.

The resources create opportunity. Mayors use their influence over the allocation of these resources to create power bases; whoever receives government contracts is beholden to them. They also steal the money. There are few who are keeping watch, and those that do often fall down on the job.

## 'It Was Not Done'

Exhibit A
000188

Mayor Arnaldo Urbina Soto was eventually sent to the jail in San Pedro Sula to await trial. He was held there until October 10, 2017, when he was transferred to the prison in El Progreso, Yoro, along with former San Pedro Sula Governor Óscar Kilgore and hundreds of other prisons, as part of a series of efforts by the Honduran government to tackle the crisis in its penitentiary system.

Lying in the heart of the city, the prison is more of a marketplace. Every day seems like visitors' day, as dozens of people go in and out of the jail to see their relatives, friends and patrons. Many of them have staked claim to spaces inside the prison where they can hawk small items such as soap and toothpaste, or have established restaurants or other service businesses.

*(Arnaldo Urbina Soto, aka "Smiley," outside of court. Credit: El Heraldo)*

Urbina Soto got what is called a "private" room. If he was like any of the other prisoners in that part of the jail, he paid a few thousand dollars to the prison administrator and the prisoner who was the nominal boss of the whole penitentiary to have some prisoners remodel an area in a section adjacent to a corridor that housed many of these small businesses. InSight Crime visited the private section while the mayor was imprisoned there, and one of the prisoners showed us his private quarters, which was complete with a bathroom, a double bed, a plasma television and other amenities not available to the general prison population.

Exhibit A
000186

Urbina Soto refused our overtures to meet and did not speak to us when we were there, but he did, according to prosecutors, meet regularly with his longtime political operators. To be sure, the mayor kept his finger on the pulse of municipal activities for months after he was jailed, maintaining at least one of his illicit schemes. In August 2016, prosecutors executed a surprise raid on his room where they found several copies of checks from the Yoro municipal government to Lenay Urbina Urbina. They also found some Rolex watches, which they say the mayor was hawking as a side business.

The prosecutors said that both before and after he was arrested, Urbina Soto and his cadre were arranging for the municipality to rent heavy machinery from a woman named Lenay Urbina Urbina for public works projects. Urbina Urbina would then cash the checks and hand the money to the mayor or his accomplices. Authorities said the former mayor collected as much as five million lempiras ($214,000) from the scheme even after he was jailed.

In December, judicial authorities raided the mayor's office in Yoro and arrested five others for participating in the fraud, including the then-treasurer, the head of the municipal budget and the former head of the municipal budget. They charged them with abuse of authority and misuse of public funds. Prosecutors also slapped 192 additional charges on Urbina Soto ranging from abuse of his authority to unauthorized use of public funds.

The evidence seemed to be piling up, but prosecuting the Urbina Soto family was difficult. The third-party owner of the heavy machinery, Lenay Urbina Urbina, died before the trial, and the anonymous witness who tipped off the prosecution to the public works fraud was murdered after giving testimony.

In the courtroom, the other charges against the family also unraveled. In one telling exchange, a defense lawyer grilled a government investigator about their proof of illegal activities, their anonymous sources and their method of determining whether something was an illegal runway for drug traffickers to land their airplanes.

Defense Attorney: Did they [the witnesses] see any airplanes land?

Investigator: They mentioned that they had information that planes were landing.

Exhibit A
000185          16/20

Defense Attorney: Tell me when the planes landed, what dates

Investigator: Between May and June.

Defense Attorney: Tell me. You said in your testimony that these people [the Urbina Soto family] were involved in homicides. Tell me, did any of the witnesses see them committing murders?

Investigator: They said they had that information.

Defense Attorney: Did they see anything?

Investigator: One of them said they been a target of the family.

Defense Attorney: Did they see anything?

Investigator: Them, no. They said they have information.

In the exchange, the prosecution also had a hard time sustaining its allegations with any actual proof.

Defense Attorney: What evidence of drugs did you find?

Investigator: Where I investigated, I didn't find any drugs.

By the end of the cross examination, it was clear that much of the government's case was based on hearsay, rumors and innuendo.

Defense Attorney: You said that these people took you to a place called Rio Abajo and that they showed you properties that the Urbina Soto family had stolen from them.

Investigator: They testified to this.

Defense Attorney: They testified that they saw members of the Urbina Soto family taking these properties.

Investigator: They mentioned it.

Defense Attorney: Did you investigate if these properties are registered under the Urbina Soto name?

Investigator: That investigation was not done because of security [concerns].

The follies of the investigation did not end there. During one foray into Locomapa, a police vehicle ruptured a tire. By the time they fixed it, they had to

Exhibit A
000188        17/20

return because of safety concerns. By all appearances, they never went back. When the defense attorney asked the investigator if he had even checked the property records to confirm who owns the land in question, the investigator simply said, "no se hizo," or "it was not done."

With its case unraveling, the prosecution appeared desperate when it added the charge of extortion to the now-former mayor, which ultimately did not stick.

Meanwhile, the Urbina Soto family went on the offensive. Arnaldo Urbina Soto declared on several occasions that the trial was "a media show." The subtext was that the Urbina Soto case was more political than criminal. The former mayor's sister, Congresswoman Diana Patricia, also appeared unapologetic and defiant.

"If we were trying to get revenge, then it's a crime to defend yourself," she told a popular television program. "We are ready. Even if they treat us like bloodthirsty criminals, we will protect ourselves."

Two months after the trial had begun, the government had to switch the brothers to house arrest. And several weeks later, the courts came back with a verdict: Arnaldo was found guilty of money laundering and sentenced to 36 years in prison. Mario and Miguel Angel were found not guilty and released.

## New Boss, Same as the Old

In March, shortly after the verdict, we traveled to Yoro. On the way, we passed numerous trucks carrying large amounts of pine wood exiting the area. The terrain looks depleted in some spots, even along Locomapa, the formidable mountain range to the north that connects Yoro with neighboring Olancho and is the presumed epi-center of criminal activity in the area.

We headed to the mayor's office, a concrete, one-story building just off the main plaza with concrete walls that had recently been painted yellow. The wounds left by the former mayor were still raw, and part of his case was ongoing, giving people pause when we queried them. In addition to the verdict against Urbina Soto, the town was still dealing with the authorities' raid of the mayor's office and the arrest of the former mayor's alleged accomplices in the public works fraud scheme.

What's more, Carlos Fernando, the supposed "leader" of the Urbina Soto Gang, was still at large. Many people supposed he was hiding somewhere in Locomapa. Everyone not from Yoro was viewed with suspicion, and some of the locals seemed to be closing ranks around their own.

Exhibit A
000187

"We were all surprised," José Rigoberto Urbina, the current municipal manager who said he is not related to the ex-mayor's family, told us when we asked about the persistent rumors of the family's criminal activities.

José and others said the former mayor seemed to be paying for the mistakes of his brothers, in particular those of Carlos Fernando. They said the mayor had done infrastructure projects and was considered a politician "of the people." A health center, inaugurated in 2016, two years after his arrest, even carries his name.

"He is still popular," Urbina said. "If he came back, he would get elected in a minute."

Diana Urbina Soto was taking advantage of her brother's popularity. She is on the ballot for mayor in the November 2017 elections, and when we visited, she had placed banners just below one advertizing Honduran President Juan Orlando Hernández, who is running for reelection. Just days before we arrived, she won the National Party's nomination with 8,000 votes, almost double the vote of the losing party candidate in the previous elections.

Exhibit A
000188

*(Campaign posters outside of Yoro. Credit: Steven Dudley)*

The prospect of another Urbina Soto in the mayor's office has some people scared. One opposition politician told us that some of his colleagues were stopped by armed men in Locomapa as they headed to a meeting. He said they were told to turn around, return to town and not bother campaigning in that area. This politician, who did not want to give his name for fear of repercussions, said he was heeding their warning, and added that the leader of his party had left the area because of threats.

"We don't have anyone" that wants to run for office, he said.

*\* This investigation was done with the assistance of Sweden. This is part of a three part series on mayors in the Northern Triangle.*

Elites and Organized Crime    Honduras

## What are your thoughts? Click here to send InSight Crime your comments.

We encourage readers to copy and distribute our work for **non-commercial purposes,** provided that it is **attributed to InSight Crime in the byline,** with a **link to the original at both the top and bottom of the article.** Check the Creative Commons website for more details of how to share our work, and please send us an email if you use an article.

**SHARE**

Exhibit A
000189



UNITED STATES DEPARTMENT OF STATE

BUREAU OF DIPLOMATIC SECURITY

## Honduras 2018 Crime & Safety Report

Travel Health and Safety; Transportation Security; Crime; Cyber; Financial Security; Other; Maritime; Political Violence; NGO; Faith-based Organization; Natural Disasters; Oil & Energy; Economic Espionage

Western Hemisphere > Honduras

4/3/2018

According to the current U.S. Department of State Travel Advisory at the date of this report's publication, Honduras has been assessed as Level 3: reconsider travel.

**Overall Crime and Safety Situation**
U.S. Embassy Tegucigalpa does not assume responsibility for the professional ability or integrity of the persons or firms appearing in this report. The ACS Unit cannot recommend a particular individual or location and assumes no responsibility for the quality of service provided.
The U.S. Department of State has assessed Tegucigalpa as being a **CRITICAL**-threat location for crime directed at or affecting official U.S. government interests.
Please review OSAC's Honduras-specific webpage for proprietary analytic reports, Consular Messages, and contact information.
Tens of thousands of U.S. citizens visit Honduras each year for study, tourism, business, and volunteer work without incident, but the government lacks the resources to address crime and violence fully.
Crime Threats
The U.S. Department of State has issued a Travel Advisory for Honduras since 2012 to caution American travelers about high crime rates. Most resort areas and tourist destinations

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4347   Page 179 of
251
Case 1:18-cv-02   -PLF   Document 1-2   Filed 09/26/1   Page 156 of 215



UNITED STATES DEPARTMENT OF STATE

BUREAU OF DIPLOMATIC SECURITY

have lower levels of crime and violence than other areas of the country, though still high by international standards. While citizen security is the government's highest priority, it continues to face difficult challenges. The majority of serious crimes, including those against U.S. citizens, are never solved. There are no areas in major urban cities that are deemed free of violent crime. Notably dangerous locations in Tegucigalpa include: the area surrounding Suyapa Cathedral and Comayaguela on the outskirts of Tegucigalpa.

Crime and violence are serious problems. The location and timing of criminal activity is unpredictable. There is no information to suggest that criminals specifically target U.S. citizens and other Westerners. Tourists traveling with tour/missionary groups report fewer criminal incidents. However, the San Pedro Sula area has seen armed robberies against tourist vans, minibuses, and cars traveling from the airport to area hotels. Further, NGOs have reported some threats and violence when visiting some rural communities.

Since 2010, Honduras has had one of the highest murder rates in the world. The National Violence Observatory (NVO), an academic research institution based out of Honduras' National Public University, reported the following murder rates over the past six years:

86.5 per 100,000 people

2011

85.5 per 100,000 people

2012

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4348   Page 180 of
251
Case 1:18-cv-02    -PLF   Document 1-2   Filed 09/26/    Page 157 of 215



UNITED STATES DEPARTMENT OF STATE

OSAC

BUREAU OF DIPLOMATIC SECURITY

79.0 per 100,000 people

2013

66.4 per 100,000 people

2014

60.0 per 100,000 people

2015

59.0 per 100,000 people

2016

---

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4349   Page 181 of
251
Case 1:18-cv-02 ·PLF  Document 1-2  Filed 09/26/1  Page 158 of 215



UNITED STATES DEPARTMENT OF STATE

BUREAU OF DIPLOMATIC SECURITY

Not available at printing time

2017

Since 2010, the U.S. Embassy has recorded 52 murders of U.S. citizens; several U.S. citizens have been murdered in San Pedro Sula and La Ceiba shortly after arriving in the country. These murders may have been based on tips from sources at airport arrival areas. In 2017 and through January 2018, there were six murder cases of U.S. citizens.
Most of Honduras' major cities (Tegucigalpa, San Pedro Sula, La Ceiba), as well as several Honduran departments (a geographic designation similar to U.S. states) have homicide rates higher than the national average, including:
DEPARTMENT, CAPITAL
Atlántida, La Ceiba
Colón, Trujillo
Cortés, San Pedro Sula
Francisco Morazan, Tegucigalpa
Yoro, Yoro
Honduran law enforcement frequently report highway assaults and carjacking by criminals posing as Honduran law enforcement, including in remote areas of Choluteca, Olancho, Colon, and Copan departments. Criminals set up road blocks or checkpoints and wear partial police uniforms and equipment that are often mismatched and inconsistent with genuine uniforms.
Several U.S. citizens have reported being robbed while walking on isolated beaches. The effect and threat of violent crime, including in neighborhoods where many Americans live/work, leads to the curtailment of some normal outdoor activities.

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4350   Page 182 of
251
Case 1:18-cv-02   -PLF   Document 1-2   Filed 09/26/1   Page 159 of 215



UNITED STATES DEPARTMENT OF STATE

BUREAU OF DIPLOMATIC SECURITY

Armed robberies, home invasions, and extortion also occur, and closely-guarded officials, business persons, and diplomats are not immune from these attacks. Even in neighborhoods with heightened security, there is street crime.

In January 2017, an U.S. citizen NGO employee was the object of an attempted robbery/kidnapping by four armed individuals in Tegucigalpa while leaving her office.

In April 2017, an Embassy driver was robbed of his personal and official cell phones at gunpoint by a motorcyclist while driving a U.S. government vehicle in traffic, during office hours.

In September 2017, a U.S. government employee waiting at a stoplight in his personal vehicle was robbed of his cell phone and cash at gunpoint by a motorcyclist.

In November 2017, an Embassy employee was robbed of his cell phone at gunpoint while driving his personal vehicle.

Many people report receiving threatening phone calls or extortion attempts, especially during Christmas and Easter holidays. Typically, these are random calls that originate from imprisoned gang members using cell phones.
In a country of approximately eight million people, there are estimated 7,000-10,000 street gang members. The 18th Street and MS-13 ("Mara Salvatrucha") gangs are the most active and powerful. Gangs are not reluctant to use violence and specialize in murder-for-hire, carjacking, extortion, and other violent street crime. They are also known to control some of the taxi services. Violent transnational criminal organizations also conduct narcotics trafficking and other illicit commerce.
Roatan and the Bay Islands are geographically separated from and experience lower crime rates than on the mainland and other Caribbean islands; however, thefts, break-ins, assaults, rapes, and murders do occur.

---

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*



UNITED STATES DEPARTMENT OF STATE

## OSAC

BUREAU OF DIPLOMATIC SECURITY

Credit card skimming is common. Individuals, including Embassy employees, have been victimized at well-known restaurants, hotels, and retailers. There is often a spike in skimming in December. For more information, please review OSAC's Report, "The Overseas Traveler's Guide to ATM Skimmers & Fraud."

Cybersecurity Issues

Extortion threats are made through social engineering. Personal information is sometimes obtained through social media, the internet, or a victim's family member. Some U.S. and other international NGOs reported anonymous attacks via social media in 2017 alleging the civil society actors are engaged in, or supportive of, criminal activity in Honduras.

Other Areas of Concern

The U.S. Embassy has restricted U.S. government personnel travel to Gracias a Dios, due to credible threat information against U.S citizens. U.S. citizens intending to travel to Gracias a Dios should consider postponing travel. There are no reliable crime statistics for the department of Gracias a Dios; however, it is a remote location where narcotics trafficking is frequent and where infrastructure is weak, government services are limited, and police/military presence is scarce.

**Transportation-Safety Situation**

For more information, please review OSAC's Report, "Security in Transit: Airplanes, Public Transport, and Overnights."

Road Safety and Road Conditions

Honduran road conditions differ significantly from those in the U.S., and driving can be very dangerous. Roads are poorly illuminated and marked. Because of a lack of enforcement of traffic laws, drivers must make an extraordinary effort to drive defensively. If traffic signals are working, they are often ignored, and passing on blind corners and curves is common. Vehicles are often driven at night without adequate illumination, and animals/people wander onto the roads at all hours. Traffic signs, even on major highways, are often inadequate, and streets in the major cities are often unmarked. Major cities are connected by an inconsistently maintained, two-lane system of paved roads, and many secondary roads are unpaved. A significant percentage of vehicles are in disrepair, under-powered, beyond their lifecycle, and do not meet U.S. road safety standards. However, the government is in the process of modernizing some of the main transportation road networks to four-lane highways, which can lead to increased travel times due to ongoing construction.

---

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4352   Page 184 of
                    251
        Case 1:18-cv-02   PLF   Document 1-2   Filed 09/26/1   Page 161 of 215



UNITED STATES DEPARTMENT OF STATE

# OSAC

BUREAU OF DIPLOMATIC SECURITY

For these reasons, and because of the high incidence of crime, the U.S. Embassy strongly discourages car and bus inter-city travel after dark. Motorists should avoid traveling long distances at night. For more information on self-driving, please review OSAC's Report "Driving Overseas: Best Practices."

Public Transportation Conditions

Travelers are warned to avoid all public transportation. The public transportation sector is a critical target of extortion and experiences higher levels of homicides than many other sectors. There are multiple incidents of city buses and taxis being destroyed by gang members; passengers are often robbed, assaulted, raped, or kidnapped.

Passengers on public buses are sometimes robbed en route, at roadblocks, and at bus stops, even during daylight hours. Some would-be muggers and gang members are known to keep to a daily schedule, riding city buses from one stop to the next, committing criminal acts with impunity.

Travelers should not use collective taxis, which are taxis that pick up multiple riders.


In 2017, Embassy employees have been robbed, assaulted, and kidnapped while using city taxis and collective taxis (small buses).

Other Travel Conditions

Cruise ship passengers should take safety precautions, avoid unfamiliar areas, and book only with reputable tour companies during their stopover. Cruise lines and port agencies have approved tour companies offering packages. Port agencies have worked to improve taxi service to/from ports. The vast majority of cruise line passengers experience no problems, but incidents of armed robbery and carjacking have been reported.

**Terrorism Threat**

The U.S. Department of State has assessed Tegucigalpa as being a **LOW**-threat location for terrorist activity directed at or affecting official U.S. government interests.

Local, Regional, and International Terrorism Threats/Concerns

The CA-4 agreement among El Salvador, Guatemala, Honduras, and Nicaragua allows for the inspection-free movement of citizens among these countries and reduces overall inspection at land crossings. The limited nature of inspections could facilitate movements of

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4353   Page 185 of
251
Case 1:18-cv-02   -PLF   Document 1-2   Filed 09/26/    Page 162 of 215



UNITED STATES DEPARTMENT OF STATE

BUREAU OF DIPLOMATIC SECURITY

terrorists.

**Political, Economic, Religious, and Ethnic Violence**

The U.S. Department of State has assessed Tegucigalpa as being a **HIGH**-threat location for political violence directed at or affecting official U.S. government interests.
Civil Unrest
Public demonstrations, protests, and strikes are common. Most demonstrations are concentrated in/around city centers, public buildings, and other public areas. Most protests have been peaceful; however, there have been violent confrontations between the police and demonstrators. Additionally, there have been demonstrations and road blockades along key routes, including the road leading to the international airports in Tegucigalpa and San Pedro Sula.
Land titling faces significant challenges and can be a source of conflict. The Bajo Aguan Valley region in Atlantida department has seen serious conflict among agricultural workers and businesses over land rights.

A 13-year old boy was reportedly shot to death in November 2017 while driving a horse carriage, allegedly as retaliation for transporting stolen palm oil fruit to his family.

The Bajo Aguan conflict has reportedly resulted in the death of over 150 people since 2010.
Religious/Ethnic Violence
Indigenous and ethnic communities are frequently located in rural areas with lower levels of criminal activity. However, there can be communal tension over natural resource allocation and exploitation. These tensions have resulted in intense protests and other violence.

Several members of ethnic group organizations such as MILPAH, in the Intibuca/La Paz departments in mid-West Honduras, were killed in 2017 allegedly over their protests against the construction of a hydro electrical dam.

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4354   Page 186 of
251
Case 1:18-cv-02   -PLF   Document 112   Filed 09/26/   Page 163 of 215



UNITED STATES DEPARTMENT OF STATE

# OSAC

BUREAU OF DIPLOMATIC SECURITY

Due to the remote nature of these areas, there is often limited government ability to respond to violence or other problems and limited access to medical facilities.

**Post-specific Concerns**
Environmental Hazards
Honduras can be hit by tropical storms and hurricanes. The rainy season usually runs May-November. There have been approximately nine significant tropical storms/hurricanes that have affected Honduras since 1995. While hurricanes are a concern, much of the damage to infrastructure is a result of flooding and rock/mud slides.
Critical Infrastructure
The limited capacity of the government to enforce international standards related to natural resource exploitation has resulted in higher levels of conflict in the extractive and electrical generation industries. In addition to complying with local laws, companies involved in natural resource extraction or energy generation should ensure that communities are fully consulted in accordance with international standards. Honduras is a signatory to the International Labor Organization's 169 Convention, requiring free, prior, and informed consent from indigenous communities prior to any development projects, but the government has not yet approved a law regulating this process.
Economic Concerns
Patents and trademarks must be registered with the General Directorate of Intellectual Property (DIGEPIH) division of the Honduran Institute of Property. "Notorious" or well-known trademarks are protected under the Pan American Convention (1917), to which Honduras is a party. Illegal registration of a well-known trademark, however, must be contested in court. This regulation favors first registration over first use, and numerous cases have arisen of "squatting" on established trademarks, which the legitimate holder must either purchase or contest in court. Data protection is provided for five years, and Honduras also offers process patent protection.
Cable signal theft and falsified products are the most prevalent violations of intellectual property in Honduras. Falsified products are predominately found in the pharmaceutical and apparel industries but are not limited to these two areas. Falsified medicines are mainly found in the *pulperías* (private home-operated convenience stores) but have also been reported in *Farmacias del Ahorro*.
Counterfeit Honduran lempiras are common, especially in the 100 and 500 denominations.

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*



UNITED STATES DEPARTMENT OF STATE

**OSAC**

BUREAU OF DIPLOMATIC SECURITY

Counterfeit U.S. currency is also not uncommon.

Personal Identity Concerns

Discrimination against ethnic minorities and the LGBTI community has been reported. Members of the LGBTI community have reported violent assaults due to gender identity and sexual orientation.

Some commentators have strongly criticized the Roman Catholic church and Evangelical churches for alleged involvement in politics. Jehovah's Witnesses have reported being refused medical treatment at some government hospitals after requesting treatment in accordance with their religious beliefs.

There are limited facilities for individuals with disabilities.

Drug-related Crimes

Drug trafficking and gang activity, which includes local micro-trafficking of narcotics and extortion, are the main causes of violent crime in Honduras. Penalties for possession, use, or trafficking illegal drugs are strict, and convicted offenders can expect lengthy jail sentences and fines.

Kidnapping Threat

Kidnappings and disappearances affect both the local and expatriate communities, with victims sometimes paying large ransoms for the prospect of release. Reports of kidnappings of U.S. citizens are not common. Since January 1, 2012, five cases of kidnapped U.S. citizens were reported to the U.S. Embassy; all kidnapping victims were released. Since families of kidnapping victims often pay ransoms without reporting these crimes to police out of fear of retribution, kidnapping figures may be underreported. For more information, please review OSAC's Report, "Kidnapping: The Basics."

**Police Response**

The government lacks resources to investigate and prosecute cases, and police often lack vehicles/fuel to respond to calls for assistance. This means police may take hours to arrive at the scene of a violent crime or may not respond at all. As a result, criminals operate with a high degree of impunity.

The government has specially trained police forces in areas frequented by tourists, such as the Copan Mayan ruins and Roatan. The government is implementing similar programs for other locations such as La Ceiba and Trujillo, and major hotels and other tourist installations have increased private and police security. The government has also begun implementing a

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4356   Page 188 of
251
Case 1:18-cv-02___-PLF   Document 112   Filed 09/26/1___   Page 165 of 215



UNITED STATES DEPARTMENT OF STATE
BUREAU OF DIPLOMATIC SECURITY

series of police reforms, such as the creation of an Inter-Agency Security Task Force to combat crime, that it hopes can tackle the crime situation.

The government does have a police investigative unit dedicated to investigating violent crimes against the LGBTI and other vulnerable communities; however, it is has limited resources and functions primarily in the major urban areas.

U.S. citizens are subject to the laws of the country in which they are traveling.

The Honduran National Police, along with the Ministry of Defense Military Police (PMOP), routinely establish checkpoints and review documentation (driver's licenses, vehicle registration). The Honduran National Police wear blue uniforms while the PMOP normally wear green camouflage uniforms. Their uniforms and vehicles are all clearly marked.

How to Handle Incidents of Police Detention or Harassment

U.S. citizens detained by the police should insist on speaking to U.S. Embassy representatives as soon as possible. Detained foreigners are generally treated well by the police. Except in some very rural locations, police are aware of a U.S. citizen detainee's right to contact the Embassy.

Local law allows the police to detain someone for up to 24 hours for administrative processing. This is a common practice for most automobile accidents where personal injury occurs and for cases in which someone is accused of a criminal act. The assistance the Embassy can provide is limited to making sure U.S. citizens are not being mistreated and providing them with a list of local attorneys. Travelers are reminded to seek legal representation before admitting or signing any legal form that acknowledges culpability.

Crime Victim Assistance

If you or someone you know becomes the victim of a crime, you should contact the local police and U.S. Embassy Tegucigalpa. If you are in Tegucigalpa or San Pedro Sula, you can reach the local police by dialing 911; other smaller cities/rural areas have their own local police assistance numbers.

For fire and public safety emergencies, dial 911.

Fire Department Headquarters: (504) 2231-1667 (operations department)

U.S. Embassy, Tegucigalpa, American Citizens Services Unit is open to walk-in services Monday-Friday, 0730-11:00 and can be reached directly at:

Tel: (504) 2236-9320 ext. 4400

After Hours: (504) 2236-9320 ext.4100 or Duty Officer (504) 9990-1372

Email: usahonduras@state.gov

---

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4357   Page 189 of
251
Case 1:18-cv-02    -PLF   Document 112   Filed 09/26/    Page 166 of 215



**Medical Emergencies**
Medical care is limited. Emergency services, even in Tegucigalpa, generally are basic. There are few, if any, U.S.-educated physicians in Tegucigalpa.
Red Cross ambulance: 911, (504) 2227-7474 or (504) 2227-7575. The ambulance does not have paramedics or emergency medical equipment; they function as transport to hospitals.
Bomberos: Fire Department Ambulance is fully equipped with emergency medical supplies and medical staff. Dial 911 for emergency or call (504) 2232-4092.
Contact Information for Available Hospitals/Clinics
For medical assistance, please refer to the Embassy's Medical Assistance page.
Available Air Ambulance Services
Air Ambulance Service: (305) 535-7380
(International SOS, Mount Sinai Hospital, Miami Beach, Florida)
Insurance Guidance
State Department resource for international insurance
Country-specific Vaccination and Health Guidance
The CDC offers additional information on vaccines and health guidance for Honduras.

**OSAC Country Council Information**
The Honduras Country Council meets monthly on a rotating basis in Tegucigalpa and San Pedro Sula. Interested private-sector security managers should contact OSAC's Western Hemisphere team with any questions.

**U.S. Embassy Location and Contact Information**
Embassy Address and Hours of Operation
U.S. Embassy Tegucigalpa
Avenida La Paz
Tegucigalpa
Hours of Operation: Mon-Thur, 0730-1630; Fri, 0800-1500
Embassy Contact Numbers
Tel: (504) 2236-9320
After Hours: (504) 2236-8497
Website: https://hn.usembassy.gov
Nearby Posts

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*



Consular Agency San Pedro Sula:
https://hn.usembassy.gov/u-s-citizen-services/spsca/overview/
Embassy Guidance
U.S. citizens who live in or who are visiting Honduras are strongly encouraged to register with the Smart Traveler Enrollment Program (STEP).
Additional Resources
Honduras Country Information Sheet
Department of Commerce's Country Commercial Guide

*The contents of this (U) presentation in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The presentation was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

# Encuentran sin vida a dos jóvenes en Olanchito

17 octubre, 2017 | 12:04 pm | **Sucesos (http://www.elpais.hn/sucesos/)**

Facebook          Twitter          Pinterest          WhatsApp



**Olanchito, Yoro.**

Este martes fueron encontrados sin vida dos jóvenes en la colonia Ramón Amaya Amador de Olanchito, Yoro zona litoral de Honduras.

Exhibit A
000203                          1/8

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4360   Page 192 of
251
Case 1:18-cv-02   PLF Document 2 Filed 09/26/   Page 169 of 215

9/17/2018

Las víctimas fueron identificadas como; **Roberto Carlos Lozano Chirinos** de 19 años de edad y residente en la colonia El Bíblico. Y, **Ledis Alexander Lozano Ramos**, de 20 años de edad y residente en la colonia Los Maestros.

Hasta el momento se desconocen los motivos del crimen. Según familiares de los fallecidos, ambos salieron a comprar baleadas la noche del lunes a las 8:00 pm, pero no regresaron a sus hogares.

## TEMAS

#Asesinatos en Olanchito (http://www.elpais.hn/tag/asesinatos-en-olanchito/)

#Honduras (http://www.elpais.hn/tag/honduras/)

#portada (http://www.elpais.hn/tag/portada/)

#Yoro (http://www.elpais.hn/tag/yoro/)

## MÁS DE SUCESOS



(http://www.elpais.hn/2018/09/17/capturan-a-mujer-con-

droga-y-dinero-en-choloma/)

Exhibit A
000206

2/8



GRUPO OPSA: LAPRENSA + DIEZ + REVISTA ESTILO + HONDURAS TIPS + ESTRATEGIA Y NEGOCIOS + SUPERCLASIFICADOS + GOTV + EMPLEOS GO

INICIO     PAIS     SUCESOS     DEPORTES     ENTRETENIMIENTO     VIDEOS        f  ♥  ⦿  Q

## Sucesos

# Identifican a pareja asesinada cerca del río Agalteca, en Olanchito, Yoro

Las víctimas se trasladaban en una motocicleta cuando fue interceptada por las personas que les quitaron la vida



FOTOGALERÍA

Santos Rutilio Hernández (38) y María Roxany Reyes son las personas asesinadas de varios disparos cerca del río Agalteca, en Olanchito, Yoro.

**Redacción**
23.01.2018

**Yoro, Honduras**
Como **Santos Rutilio Hernández (38)** y **María Roxany Reyes (17)** fue

EN PORTADA

PAIS
> Narcotraficantes funden oro para asegurar su millonaria fortuna

PAIS
> Las instituciones financieras deben conocer sus clientes

PAIS
> La UNAH recibe este martes a más de 80 mil alumnos

DEPORTES
> Ramos a Griezmann: "La ignorancia es atrevida"

ENTRETENIMIENTO

Exhibit A
000205
1/3

identificada la pareja asesinada la noche del lunes en la comunidad de Medinas, a las cercanías del **río Agalteca, en el municipio de Olanchito.**


Ganadores de los Emmy en las principales

Las victimas se trasladaban en una motocicleta por el sector cuando fueron interceptados por desconocidos que les quitaron la vida.

Al lugar del hecho se hicieron presentes varios familiares de los ahora occisos, sin embargo, dijeron desconocer el motivo del asesinato de sus parientes.

Un equipo de la **Dirección Policial de Investigaciones** (DPI) se trasladó al sector para indagar sobre el móvil del doble crimen. En la escena se encontraron varios casquillos de bala de grueso calibre.

Los cuerpos fueron trasladados hasta medicina legal, donde fueron reclamados la mañana de este martes por sus familiares, según las informaciones preliminares.

**Lea también:** Capturan a tres mujeres en posesión de indumentaria policial

**Relacionadas:**

> Hondureño se quita la vida por deuda con su tarjeta de crédito

> Capturan a tres mujeres con armas e indumentaria policial en colonia Jerusalén de La Lima, Cortés

> Decomisan dos paquetes con 100 mil dólares ocultos en una rastra en Puerto Cortés

> Condenan hombre que asesinó a menor al dispararle por una ventana en Intibucá

LO MÁS VISTO

**1** > Así le devolvieron al uruguayo Tabaré Alonso la bicicleta América - Diario El Heraldo

**2** > Las palillonas más bellas de los desfiles patrios 2018 - Diario El Heraldo

**3** > Las mejores fotos de Georgina Rodríguez en Italia, desde la llegada de Cristiano Ronaldo a la

**4** > PARTE I: Palillonas captadas por EL HERALDO en los desfiles de Honduras 2018 - Diario El

**5** > Reguetonera Natti Natasha revela su admiración por Ozuna

**Tags:**

Sucesos en Honduras   Matan pareja en Olanchito   Asesinatos Olanchito   Pareja asesinada Olanchito

**Te puede interesar:**



FOTOGALERÍA:
Los 15 sucesos más impactantes de esta semana en Honduras



SUCESOS
**Capturan a presunto asesino de mujer que fue decapitada en Choluteca**

SUCESOS
**Capturan en el barrio Guamilito a presunto autor del crimen contra dirigente del**

SUCESOS
**A machetazos matan a dos hombres en aldea de La Masica, Atlántida**

**Comentarios:**

Te puede gustar                          Enlaces Patrocinados por Taboola

**Estos nuevos SUV crossover te dejarán sin aliento**
SUV crossover | Yahoo Search

**Cardiologist: "This Is What Happens When You Eat A Steak"**
Gundry MD

**U.S. Cardiologist: It's Like a Pressure Wash for Your Insides**
Health Headlines

Exhibit A
000208

# Ola de violen___ ___ ___ ___ ___ comerciante asesinados

*Pobladores de Olanchito, ___ ___ ___ ___ ___ en la zona.*

Por **Redaccion Web** · diciembre 17, 2017



*Cortesía de fotografía: Olanchito TV.*

**OLANCHITO, YORO.** Ola de violencia en Olanchito cobra la vida de dos personas en un fin de semana; ganadero y comerciante asesinados en dos hechos aislados y sangrientos en la zona oriental de Honduras.

ADVERTISING

Exhibit A
000207
109

1/3

Los crímenes han trans... ... la de este sábado, dejando como saldo do...

## Ganadero semi de...

Semi decapitado encontraron el cuerpo de **Fernando Mejía** de 55 años de edad, originario de Olanchito, Yoro. El ahora occiso que residía en la comunidad del Juncal, era reconocido por dedicarse al oficio de la ganadería.

Según sus familiares Mejía se conducía la mañana del sábado hacia su centro de trabajo cuando lo atacaron individuos con arma blanca (puñal). Además aseguraron que la muerte de su pariente se originó a raíz de enemistad personal.

Por su parte las autoridades ya se encuentran tras la pista de los posibles hechores del sangriento crimen. El cuerpo sin vida quedó tendido en medio de un solitario camino en donde fue descubierto por vecinos del lugar.

## En pulpería asesinan a comerciante

Como **María Elena Romero** de 55 años, se identificó a la comerciante que fue atacada a balazos por varios individuos en la colonia 8 de febrero.



*La comerciante María Elena Romero, fue asesinada por sujetos desconocidos en su negocio.*

El ataque se habría realizado la noche del pasado viernes. Según investigación policial mientras Romero atendía su negocio, llegaron varios sujetos a comprar refrescos.

La oscuridad de la noche y la soledad de la víctima, favoreció para que los delincuentes dispararan contra su humanidad. Acto seguido los facinerosos huyeron en dirección desconocida transportados en motocicletas.

*Quizás te interesa: Custodio es acusado de evasión por fuga de reos en Atlántida*

Ambos crímenes están siendo investigados por las autoridades policiales. Sin embargo, hasta hoy no hay pistas sobre el paradero de los responsables.

Exhibit A
000208

2/3



Es hora de informarte de todo lo último!

Puedes modificar estas notificaciones en las opciones de tu explorador.

Powered by PushCrew          No por ahora          Sí

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4366   Page 198 of
251
9/17/2018          Case 1:18-cv-00      PLF Document 12   Northern Triangle 09/26/      Page 175 of 225

Home > What we do > News & stories

# Report: Forced to Flee Central America's Northern Triangle

A neglected humanitarian crisis

**MAY 11, 2017**

SHARE THIS

## Executive Summary

An estimated 500,000 people cross into Mexico every year[1]. The majority making up this massive forced migration flow originate from El Salvador, Honduras, and Guatemala, known as the Northern Triangle of Central America (NTCA), one of the most violent regions in the world today.

Since 2012, the international medical humanitarian organization Doctors Without Borders/Médecins Sans Frontières (MSF) has been providing medical and mental health care to tens of thousands of migrants and refugees fleeing the NTCA's extreme violence and traveling along the world's largest migration corridor in Mexico. Through violence assessment surveys and medical and psychosocial consultations, MSF teams have witnessed and documented a pattern of violent displacement, persecution, sexual violence, and forced repatriation akin to the conditions found in the deadliest armed conflicts in the world today[2]

For millions of people from the NTCA region, trauma, fear, and horrific violence are dominant facets of daily life Yet it is a reality that does not end with their forced flight to Mexico Along the migration route from the NTCA, migrants and refugees are preyed upon by criminal organizations, sometimes with the tacit approval or complicity of national authorities, and subjected to violence and other abuses—abduction, theft, extortion, torture, and rape—that can leave them injured and traumatized

Exhibit A
000219

Despite existing legal protections under Mexican law, they are systematically detained and deported. Nearly 98 percent of NTCA citizens were captured by immigration authorities in 2015, with devastating consequences on their physical and mental health.

The findings of this report, based on surveys and medical programmatic data from the past two years, come against the backdrop of heightened immigration enforcement by Mexico and the United States, including the use of detention and deportation. Such practices threaten to drive more refugees and migrants into the brutal hands of smugglers or criminal organizations.

# Read the Report: Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian Crisis

From January 2013 to December 2016, MSF teams have provided 33,593 consultations to migrants and refugees from the NTCA through direct medical care in several mobile health clinics, migrant centers, and hostels—known locally as *albergues*—across Mexico.

Through these activities, MSF has documented the extensive levels of violence against patients treated in these clinics, as well as the mental health impact of trauma experienced prior to fleeing countries of origin and while on the move.

Since the program's inception, MSF teams have expressed concern about the lack of institutional and government support to the people it is treating and supporting along the migration route. In 2015 and 2016, MSF began surveying patients and collecting medical data and testimonies. This was part of an effort by MSF to better understand the factors driving migration from the NTCA, and to assess the medical needs and vulnerabilities specific to the migrant and refugee population MSF is treating in Mexico.

The surveys and medical data were limited to MSF patients and people receiving treatment in MSF supported clinics. Nevertheless, this is some of the most comprehensive medical data available on migrants and refugees from Central America. This report provides stark evidence of the extreme levels of violence experienced by people fleeing from El Salvador, Honduras, and Guatemala, and underscores the need for adequate health care, support, and protection along the migration route through Mexico.

# Video: Fleeing Central America to Survive

Exhibit A
000213          2/6

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4368   Page 200 of
251
9/17/2018          Case 1:18-cv-02          PLF Document 1-2 Northern Triangle          Tiled 09/26/1          Page 197 of 231

In 2015, MSF carried out a survey of 467 randomly sampled migrants and refugees in facilities the organization supports in Mexico. We gathered additional data from MSF clinics from 2015 through December 2016. Key findings of the survey include:

## Reasons for leaving:

- Of those interviewed, 39.2 percent mentioned direct attacks or threats to themselves or their families, extortion, or gang-forced recruitment as the main reason for fleeing their countries.

- Of all NTCA refugees and migrants surveyed, 43.5 percent had a relative who died due to violence in the last two years. More than half of Salvadorans surveyed (56.2 percent) had a relative who died due to violence in this same time span.

- Additionally, 54.8 percent of Salvadorans had been the victim of blackmail or extortion, significantly higher than respondents from Honduras or Guatemala.

## Violence on the Journey:

- Sixty eight point three percent of the migrant and refugee populations entering Mexico reported being victims of violence during their transit toward the United States.

- Nearly one-third of the women surveyed had been sexually abused during their journey.

- MSF patients reported that the perpetrators of violence included members of gangs and other criminal organizations, as well as members of the Mexican security forces responsible for their protection.

## According to medical data from MSF clinics from 2015 through December 2016:

- One-fourth of MSF medical consultations in the migrants/refugee program were related to physical injuries and intentional trauma that occurred en route to the United States.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4369   Page 201 of
251
Case 1:18-cv-02...   :PLP Document 11-2 Northern...   Page 178 of 125
9/17/2018

- Sixty percent of the 166 people treated for sexual violence were raped, and 40 percent were exposed to sexual assault and other types of humiliation, including forced nudity.

- Of the 1,817 refugees and migrants treated by MSF for mental health issues in 2015 and 2016, close to half (47.3 percent) were victims of direct physical violence en route, while 47.2 percent of this group reported being forced to flee their homes.

The MSF survey and project data from 2015-2016 show a clear pattern of victimization—both as the impetus for many people to flee the NTCA and as part of their experience along the migration route. The pattern of violence documented by MSF plays out in a context where there is an inadequate response from governments, and where immigration and asylum policies disregard the humanitarian needs of migrants and refugees.

Despite the existence of a humanitarian crisis affecting people fleeing violence in the NTCA, the number of related asylum grants in the United States and Mexico remains low. Given the tremendous levels of violence against migrants and refugees in their countries of origin and along the migration route in Mexico, the existing legal framework should provide effective protection mechanisms to victimized populations. Yet people forced to flee the NTCA are mostly treated as economic migrants by countries of refuge such as Mexico or the United States.

Less than 4,000 people fleeing El Salvador, Honduras, and Guatemala were granted asylum status in 2016[3]. In addition, the government of Mexico deported 141,990 people from the NTCA. Regarding the situation in the United States, by the end of 2015, 98,923 individuals from the NTCA had submitted requests for refugee or asylum status according to UNHCR[4]. Nevertheless, the number of asylums granted to individuals from the NTCA has been comparatively low, with just 9,401 granted since 2011[5].

As a medical humanitarian organization that works in more than 60 countries, MSF delivers emergency aid to people affected by armed conflict, epidemics, disasters, and exclusion from health care. The violence suffered by people in the NTCA is comparable to the experience in war zones where MSF has been present for decades. Murder, kidnappings, threats, recruitment by non-state armed actors, extortion, sexual violence, and forced disappearance are brutal realities in many of the conflict areas where MSF provides support.

The evidence gathered by MSF points to the need to understand that the story of migration from the NTCA is not only about economic migration, but about a broader humanitarian crisis.

Exhibit A
000218
4/6

While there are certainly people leaving the NTCA for better economic opportunities in the United States, the data presented in this report also paints a dire picture of a story of migration from the NTCA as one of people running for their lives. It is a picture of repeated violence, beginning in NTCA countries and causing people to flee, and extending through Mexico, with a breakdown in people's access to medical care and ability to seek protection in Mexico and the United States.

It is a humanitarian crisis that demands that the governments of Mexico and United States, with the support of countries in the region and international organizations, rapidly scale up the application of legal protection measures—asylum, humanitarian visas, and temporary protected status—for people fleeing violence in the NTCA region; immediately cease the systematic deportation of NTCA citizens; and expand access to medical, mental health, and sexual violence care services for migrants and refugees.

**EDITOR'S NOTE**

This report was updated on June 14, 2017, to include the following corrections and clarifications: On pp. 5 and 21, we noted the number of people detained and deported based on data from 2016, not 2015 as reported earlier. On p. 6, we corrected the list of places where MSF has worked along the migration route to properly identify the respective states. And on p. 27, we changed the final sentence to clarify that the humanitarian crisis is a regional issue involving countries of origin, transit, and destination.

[1] Source: UNHCR MEXICO FACTSHEET. February 2017. Last visited 18 April 2017. Data compiled by UNHCR based on SEGOB and INM official sources.

[2] The Geneva Declaration on Armed Violence and Development. Global Burden of Armed Violence 2015: Every Body Counts, October 2015, Chapter Two,
http://www.genevadeclaration.org/fileadmin/docs/GBAV3/GBAV3_Ch2_pp49-86.pdf

[3] Source: UNHCR MEXICO FACTSHEET. February 2017.

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4371   Page 203 of
251
9/17/2018        Case 1:18-cv-02... PLF Document 12 Northern Triangle... Filed 09/26/... Page 180 of 215

[4] Regional Response to the Northern Triangle of Central America Situation  UNHCR  Accessed on 01/02/2017 at http://reporting      .unhcr.org/sites/default/files/UNHCR%20-%20NTCA%20Situation%20Supplementary%20Appeal%20-%20June%202016.pdf

[5] Source: MSF calculations based on information from United States Homeland Security. Yearbook of Immigration Statistics 2015.


# We rely on our network of supporters to tell the stories of the people we help.
## Help us spread the word.

Case 1:18-cv-02221-PLF  Document 1-2  Filed 09/26/18  Page 181 of 215

## Intentional homicide, counts and rates per 100,000 population

*Definitions: "Intentional homicide" means unlawful death purposefully inflicted on a person by another person. Data on intentional homicide should also include serious assault leading to death and death as a result of a terrorist attack. It should exclude attempted homicide, manslaughter, death due to legal intervention, justifiable homicide in self-defence and death due to armed conflict.*

*Data supplied by countries may not exactly reflect the definition provided by UNODC.*

*Data interpretation: When using the figures, any cross-national comparison should be conducted with caution because of the differences that exist between the legal definitions of offences in countries, the different methods of offence counting and recording and differences in the share of unlisted offences that are not reported to or detected by law enforcement authorities (i.e. the dark figure).*

| Region / Sub-region / Country | | | Count | | | | | | | | Rate per 100,000 population | | | | | | | |

*Notes:*

* Changes in definitions and/or counting rules are reported by the Member State to indicate a break in the time series.

** Iraq (Central Iraq) and Iraq (Kurdistan Region), excluding victims of terrorist attacks.

*** Data refer to offences, not victims, of intentional homicide

**** Data for 2003/2006 refer to offences, data for 2007 onwards refer to victims of intentional homicide

Sep 20, 2016, 5:02 AM

# Intentional homicide victims killed by gangs or organised criminal groups as percentage of total homicide victims by country/territory (2005-2012)

*Intentional homicide is defined as unlawful death inflicted upon a person with the intent to cause death or serious injury.*

**Download Full Dataset**

| Region | Sub Region | Country/ territory | Source | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|--------|-----------|-------------------|--------|------|------|------|------|------|------|------|------|
| Americas | Central America | Honduras | Ministerio Publico | | | 21.1 % | 36.9 % | 33.8 % | 34.8 % | | |

\* no homicide was recorded in the respective year

Sep 20, 2018, 6:03 AM

Exhibit A
000216

# Mental Health Resources

Exhibit A
000218

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4375   Page 207 of
251
Case 1:18-cv-02___-PLF   Document 1-2   Filed 09/26/1___   Page 184 of 215

# Mental Health Materials

Cited in Request for Reconsideration

Table of Contents

| Article | Page |
|---|---|
| PTSD: National Center for PTSD | 3-5 |
| International Statistical Classification of Diseases | 6-11 |
| BMC Psychiatry: Autobiographical Memory and Hierarchical Search Strategies in Depressed and Non-Depressed Participants | 12-20 |
| Specialized Psychiatric Counseling: Signs and Symptoms of Separation Anxiety | 21-26 |
| Mother Jones: Forcibility Separating Children from Their Mothers Doesn't Just Hurt the Kids | 27-28 |
| Psychology Today: Thwart Stress Effects of Memory | 29-30 |
| The New York Times: Honduran Man Kills Himself After Being Separated From Family at U.S. Border | 31-33 |

Exhibit A
000219

VA » Health Care » PTSD: National Center for PTSD » Professional » PTSD In Refugees

# PTSD: National Center for PTSD

## PTSD in Refugees

**Elisa E. Bolton, PhD**

In 2002, the U.S. Committee for Refugees estimated that there were 14.9 million refugees and 22 million internally displaced persons in the world. This escalating international crisis has developed over the past 60 years as organized political violence has increasingly targeted civilian populations(1). These refugees are men, women, and children, from virtually every income level and living arrangement. As refugees they have often left behind their livelihood, their communities, and most of all their possessions. Although a large number of the individuals adjust well, many suffer significant psychological distress as a result of their exposure to traumatic events and the hardships associated with life as a refugee.

### Traumatic events encountered by refugees

Prior to flight, individuals who become refugees may face a wide variety of traumatic events. They may witness fighting and destruction, observe violent acts perpetrated against loved ones, or be subjected to or witness sexual violence. In a survey of individuals presenting to a Dutch clinic specializing in the treatment of traumatized refugees, Kleijn, Hovens, and Rodenburg (2) found that the most commonly reported traumatic event was forced isolation (e.g., imprisonment, separation from others). Although the types of events reported varied with the origin of the refugee group, 37% reported incidents of torture, 37% reported being close to death, and 35% stated that a friend or family member had been killed.

Burnett and Peel (3) reported that the proportion of refugees who had been subjected to torture varied from 5% to 30%, depending on the countries of origin and the definition of torture. In a study of Kosovar Albanian refugees, Cardozo, Vergara, Agani, & Gotway (4) found that approximately 67% of these refugees reported being deprived of water and food, 67% reported being in a combat situation, and 62% reported being close to death. In addition, 40% of the study participants reported experiencing eight or more traumatic events. Cardozo and colleagues also observed that almost all of the people who had been internally displaced had suffered continuous trauma; individuals who became refugees faced similar traumatic events but usually of shorter duration because they were able to escape.

In addition to the often life-threatening stresses experienced immediately prior to flight, refugees frequently experience recurring losses, challenges, and changes during the exile/acculturation and resettlement/repatriation periods(1). Having left their homes, refugees are often forced to confront isolation, hostility, violence, and racism in their new locations. Individuals who are resettled in refugee camps often face living situations that are, at times, over-crowded, rife with the threat of infectious diseases, and primitive in design. Additional chronic stressors that refugees must deal with include socioeconomic disadvantages, poor physical health, and the collapse of social support.

### Measurement issues

Historically, there have been numerous problems with the overall assessment of refugees' psychological distress. For instance, the varied methodologies (random sample within a refugee camp or individuals presenting at a clinic) and the range of measures employed have made it difficult to draw conclusions across studies. Researchers' ability to draw conclusions from the literature is also limited because many evaluation measures have not been adequately translated into the refugees' native languages and are not sensitive to the refugees' cultural norms.

The information that has been collected is controversial. Some individuals seek to qualify and quantify the psychological distress reported by refugees according to standard diagnostic codes. Other individuals feel that this improperly pathologizes the experience of refugees. Thus, relief workers and doctors disagree at times as to who needs mental health services and what type of mental health care is needed.

Fortunately, straightforward, reliable, and culturally validated screening instruments of trauma exposure and psychiatric distress have been created and validated in a variety of refugee communities. Examples of trauma screens include the Harvard Trauma Questionnaire, the Resettlement Stressor Scale, and the War Trauma Scale. Examples of measures of psychological distress that have been adopted for use in the refugee population and that are well described in the literature are the Hopkins Symptom Checklist-25, the Beck Depression Inventory, the Impact of Event Scale, and the Posttraumatic Symptom Scale-30. In addition, some of these instruments, such as the Harvard Trauma Questionnaire, have been validated across a wide variety of cultures and in many different languages (5).

## Prevalence of PTSD

Depending on the sample, the rates of PTSD vary widely within any given refugee population, with prevalence rates ranging from 4% to 86% for PTSD and 5% to 31% for depression (6). Few studies have assessed distress over time, but some have documented that distress is often chronic. For example, Mollica et al. (7) assessed psychological distress in a sample of Bosnian refugees to determine if the distress associated with being a refugee is chronic. They found in their follow-up study that 45% of the study participants who originally met criteria for depression, PTSD, or both continued to meet criteria 3 years later, and an additional 16% met criteria by the time of the follow-up study.

Porter and Haslam (1), in their meta-analysis, demonstrated that across 14 different studies, the general stress of war had a significant impact on everyone. However, displaced persons were significantly more disturbed than nondisplaced controls even when the controls had experienced considerable war stress. The authors noted that these results are in accordance with refugee research groups that indicate that living in institutional refugee camps is more disruptive than living temporarily with family, friends, or in private accommodations. Consistent with other research in the field of traumatic stress, Cardozo, Vergara, Agani, & Gotway (4) found that older adults, those with a prior history of psychiatric distress or chronic health problems, and those who were internally displaced were more likely than others to endorse significant levels of psychiatric distress.

## Treatment

There exists little published treatment-outcome research to inform interventions for refugees. Yule (8) suggested that it would be appropriate to offer group treatment to refugees who have experienced broadly similar events. De Jong, Scholte, Koeter, and Hart (9) recommended that psychosocial interventions focus on strengthening the community and providing support to large groups through population-wide psychoeducation campaigns or the management of therapeutic activity centers.

Alternatively, Mollica, Cui, McInnes, & Massagli (5) reported that treatment is enhanced by targeting psychosocial risk factors. For instance, in their assessment of a sample of Cambodian refugees, they found a significant relationship between work status and depression. This suggested that providing employment in refugee camps would likely reduce rates of depression. Further, Mollica and colleagues (5) found that refugees involved in religious activities were one-third less likely to meet criteria for PTSD than respondents who participated in few or no religious activities. Additional protective factors include the presence of extended family, educational opportunities, the presence of human rights organizations, the availability of self-help groups, small camps, and the opportunity to engage in traditional cultural practices (1). Taken together, these results suggest that in addition to an emphasis on treating the most severely affected individuals, communities hosting refugees can enhance refugees' well-being by addressing psychosocial variables.

## Distinct challenges

There are several challenges that often affect the assessment and treatment of refugees. Individuals may express psychological distress in different ways. And, the stressors that are considered traumatic may be different for different people. For example, being forbidden to live according to one's religion might be highly stressful for some peoples, but not for others (10).

Some refugees are particularly suspicious of people in positions of authority as a result of the conditions under which they fled their home country. In addition, language barriers may exist. Further, even when language is not a barrier because an interpreter is available or because the provider and refugee speak a common language, the exchange is still likely to be influenced by complex religious and ethnic interconnections. As a result, as Weine (11) noted, "talking about trauma through interpreters does not necessarily make for culturally relevant care."

Exhibit A
000221

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4378   Page 210 of
251
Case 1:18-cv-02___-PLF   Document 1-2   Filed 09/26/___   Page 187 of 215

## Conclusions

The number of people living as refugees has grown significantly over the past several decades. Concurrent with this development, recognition of the mental health problems associated with being a refugee has grown. Although some progress has been made in terms of the development of culturally sensitive assessment measures, our ability to assess the mental health needs of individuals living as refugees is still limited, as is our knowledge of effective psychological interventions for refugees.

## References

1. Porter, M., & Haslam, N. (2001). Forced displacement in Yugoslavia: A meta-analysis of psychological consequences and their moderators, *Journal of Traumatic Stress, 14*(4), 817-834.

2. Kleijn, W.C., Hovens, J.E., & Rodenburg, J.J. (2001). Posttraumatic stress symptoms in refugees: Assessments with the Harvard Trauma Questionnaire and the Hopkins Symptom Checklist-25 in different languages. *Psychological Reports, 88,* 527-532.

3. Burnett, A., & Peel, M. (2001). Asylum seekers and refugees in Britain: The health of survivors of torture and organized violence. *British Medical Journal, 322,* 606-609.

4. Cardozo, B.L., Vergara, A., Agani, F., & Gotway, C.A. (2000). Mental health, social functioning, and attitudes of Kosovar Albanians following the war in Kosovo. *Journal of the American Medical Association, 284*(5), 569-577.

5. Mollica, R.F., Cui, X., McInnes, K., & Massagli, M.P. (2002) Science-based policy for psychosocial interventions in refugee camps: A Cambodian example. *Journal of Nervous and Mental Disease, 190*(3), 158-166.

6. Hollifield, M., Warner, T.D., Lian, N., Krakow, B., Jenkins, J.H., Kesler, J., Stevenson, J., & Westermeyer, J. (2002). Measuring trauma and health status in refugees: A critical review. *Journal of the American Medical Association, 288*(5), 611-621.

7. Mollica, R.F., Sarajlic, N., Chernoff, M., Lavelle, J, Vukovic, I.S., & Massagli, M.P. (2001). Longitudinal study of psychiatric symptoms, disability, mortality, and emigration among Bosnian refugees, *Journal of the American Medical Association, 286*(5), 546-554.

8. Yule, W. (2000). From pogroms to "ethnic cleansing": Meeting the needs of war affected children. *Journal of Child Psychology & Psychiatry & Allied Disciplines, 41*(6), 695-702.

9. De Jong, J.P., Scholte, W.F., Koeter, M.W.J., & Hart, A.A. (2000). The prevalence of mental health problems in Rwandan and Burundese refugee camps. *Acta Psychiatrica Scandinavica, 102,* 171-177.

10. Terheggen, M.A., Stroebe, M.S. & Kleber, R.J. (2001). Western conceptualizations and eastern experience: A cross-cultural study of traumatic stress reactions among Tibetan refugees in India. *Journal of Traumatic Stress, 14*(2), 391-403.

11. Weine, S. (2001). From war zone to contact zone: Culture and refugee mental health services. *Journal of the American Medical Association, 285*(9), 1214.

*Date this content was last updated is at the bottom of the page.*

**The National Center for PTSD does not provide direct clinical care, individual referrals or benefits information.**

# ICD-10 Version:2016

Search [_____]          [ Advanced Search ]     **ICD-10**

**Versions - Languages**

## International Statistical Classification of Diseases and Related

**Info**

## Chapter V
## Mental and behavioural disorders
## (F00-F99)

### Mood [affective] disorders
### (F30-F39)

This block contains disorders in which the fundamental disturbance is a change in affect or mood to depression (w
or easily understood in the context of, the change in mood and activity. Most of these disorders tend to be recurre

---

**F30**      **Manic episode**

All the subdivisions of this category should be used only for a single episode. Hypomanic or manic epis

*Incl.:*   bipolar disorder, single manic episode

**F30.0**    **Hypomania**

A disorder characterized by a persistent mild elevation of mood, increased energy and activity, and usu
are often present but not to the extent that they lead to severe disruption of work or result in social re
hallucinations or delusions.

**F30.1**    **Mania without psychotic symptoms**

Mood is elevated out of keeping with the patient's circumstances and may vary from carefree joviality t
sustained, and there is often marked distractibility. Self-esteem is often inflated with grandiose ideas a

**F30.2**    **Mania with psychotic symptoms**

In addition to the clinical picture described in F30.1, delusions (usually grandiose) or hallucinations (us
inaccessible to ordinary communication.

Mania with:
- mood-congruent psychotic symptoms
- mood-incongruent psychotic symptoms

Manic stupor

**F30.8**    **Other manic episodes**

**F30.9**    **Manic episode, unspecified**
Mania NOS

---

**F31**      **Bipolar affective disorder**

A disorder characterized by two or more episodes in which the patient's mood and activity levels are si
and decreased energy and activity (depression). Repeated episodes of hypomania or mania only are cl

*Incl.:*   manic depression
manic-depressive:
- illness
- psychosis
- reaction

Exhibit A
000223

# ICD-10 Version:2016

Search [                                        ]   [ Advanced Search ]   **ICD-10**

Versions -
Languages

Info

**F31**   **Bipolar affective disorder**

A disorder characterized by two or more episodes in which the patient's mood a
and decreased energy and activity (depression). Repeated episodes of hypoman          only are cl

*Incl.:*   manic depression
manic-depressive:
- illness
- psychosis
- reaction

*Excl.:*   bipolar disorder, single manic episode (F30.-)
cyclothymia (F34.0)

**F31.0**   **Bipolar affective disorder, current episode hypomanic**

The patient is currently hypomanic, and has had at least one other affective episode (hypomanic, mani

**F31.1**   **Bipolar affective disorder, current episode manic without psychotic symptoms**

The patient is currently manic, without psychotic symptoms (as in F30.1), and has had at least one oth

**F31.2**   **Bipolar affective disorder, current episode manic with psychotic symptoms**

The patient is currently manic, with psychotic symptoms (as in F30.2), and has had at least one other

**F31.3**   **Bipolar affective disorder, current episode mild or moderate depression**

The patient is currently depressed, as in a depressive episode of either mild or moderate severity (F32.

**F31.4**   **Bipolar affective disorder, current episode severe depression without psychotic symptoms**

The patient is currently depressed, as in severe depressive episode without psychotic symptoms (F32.2

**F31.5**   **Bipolar affective disorder, current episode severe depression with psychotic symptoms**

The patient is currently depressed, as in severe depressive episode with psychotic symptoms (F32.3), ;

**F31.6**   **Bipolar affective disorder, current episode mixed**

The patient has had at least one authenticated hypomanic, manic, depressive, or mixed affective episo

*Excl.:*   single mixed affective episode (F38.0)

**F31.7**   **Bipolar affective disorder, currently in remission**

The patient has had at least one authenticated hypomanic, manic, or mixed affective episode in the pa:
for several months. Periods of remission during prophylactic treatment should be coded here.

**F31.8**   **Other bipolar affective disorders**
Bipolar II disorder
Recurrent manic episodes NOS

**F31.9**   **Bipolar affective disorder, unspecified**
Manic depression NOS

**F32**   **Depressive episode**

In typical mild, moderate, or severe depressive episodes, the patient suffers from lowering of mood, re
disturbed and appetite diminished. Self-esteem and self-confidence are almost always reduced and, ev
so-called "somatic" symptoms, such as loss of interest and pleasurable feelings, waking in the morning
number and severity of the symptoms, a depressive episode may be specified as mild, moderate or sev

Exhibit A
000224

Case 3:18-cv-00428-DMS-MDD  Document 282-1  Filed 10/15/18  PageID.4381  Page 213 of
251
Case 1:18-cv-02  PLF  Document 1-2  Filed 09/26/  Page 190 of 215

# ICD-10 Version:2016

Search [                                        ]          [ Advanced Search ]          **ICD-10**

**Versions -**

**Languages**

**Info**

| F32 | **Depressive episode** |
|---|---|

In typical mild, moderate, or severe depressive episodes, the patient suffers fro
disturbed and appetite diminished. Self-esteem and self-confidence are almost a
so-called "somatic" symptoms, such as loss of interest and pleasurable feelings,
number and severity of the symptoms, a depressive episode may be specified a

**Incl.:**   single episodes of:
- depressive reaction
- psychogenic depression
- reactive depression

**Excl.:**   adjustment disorder (F43.2)
recurrent depressive disorder (F33.-)
when associated with conduct disorders in F91.- (F92.0)

**F32.0   Mild depressive episode**

Two or three of the above symptoms are usually present. The patient is usually distressed by these bu

**F32.1   Moderate depressive episode**

Four or more of the above symptoms are usually present and the patient is likely to have great difficul

**F32.2   Severe depressive episode without psychotic symptoms**

An episode of depression in which several of the above symptoms are marked and distressing, typically

| Agitated depression | |
|---|---|
| Major depression | single episode without psychotic symptoms |
| Vital depression | |

**F32.3   Severe depressive episode with psychotic symptoms**

An episode of depression as described in F32.2, but with the presence of hallucinations, delusions, psyc
delusions may or may not be mood-congruent.

Single episodes of:
- major depression with psychotic symptoms
- psychogenic depressive psychosis
- psychotic depression
- reactive depressive psychosis

**F32.8   Other depressive episodes**
Atypical depression
Single episodes of "masked" depression NOS

**F32.9   Depressive episode, unspecified**
Depression NOS
Depressive disorder NOS

| F33 | **Recurrent depressive disorder** |
|---|---|

A disorder characterized by repeated episodes of depression as described for depressive episode (F32.-
(hypomania) immediately after a depressive episode, sometimes precipitated by antidepressant treatm
depression and endogenous depression. The first episode may occur at any age from childhood to old a
of mania never disappears completely, however many depressive episodes have been experienced. If s

**Incl.:**   recurrent episodes of:

Exhibit A
000225

# ICD-10 Version:2016

Search [_____]          [ Advanced Search ]          **ICD-10**

**Versions -**

**Languages**

F32.9     **Depressive episode, unspecified**
          Depression NOS
          Depressive disorder NOS

**Info**

F33     **Recurrent depressive disorder**

A disorder characterized by repeated episodes of depression as described for depressive episode (F32.-
(hypomania) immediately after a depressive episode, sometimes precipitated by antidepressant treatm
depression and endogenous depression. The first episode may occur at any age from childhood to old a
of mania never disappears completely, however many depressive episodes have been experienced. If s

> **Incl.:**   recurrent episodes of:
> - depressive reaction
> - psychogenic depression
> - reactive depression
> seasonal depressive disorder

> **Excl.:**   recurrent brief depressive episodes (F38.1)

F33.0     **Recurrent depressive disorder, current episode mild**

A disorder characterized by repeated episodes of depression, the current episode being mild, as in F32.

F33.1     **Recurrent depressive disorder, current episode moderate**

A disorder characterized by repeated episodes of depression, the current episode being of moderate se

F33.2     **Recurrent depressive disorder, current episode severe without psychotic symptoms**

A disorder characterized by repeated episodes of depression, the current episode being severe without

Endogenous depression without psychotic symptoms
Major depression, recurrent without psychotic symptoms
Manic-depressive psychosis, depressed type without psychotic symptoms
Vital depression, recurrent without psychotic symptoms

F33.3     **Recurrent depressive disorder, current episode severe with psychotic symptoms**

A disorder characterized by repeated episodes of depression, the current episode being severe with psy

Endogenous depression with psychotic symptoms
Manic-depressive psychosis, depressed type with psychotic symptoms
Recurrent severe episodes of:
- major depression with psychotic symptoms

- psychogenic depressive psychosis
- psychotic depression
- reactive depressive psychosis

F33.4     **Recurrent depressive disorder, currently in remission**

The patient has had two or more depressive episodes as described in F33.0-F33.3, in the past, but has

F33.8     **Other recurrent depressive disorders**

F33.9     **Recurrent depressive disorder, unspecified**
          Monopolar depression NOS

F34     **Persistent mood [affective] disorders**

Persistent and usually fluctuating disorders of mood in which the majority of the individual episodes are

Exhibit A
000226

# ICD-10 Version:2016

Search [_____]   [ Advanced Search ]   | **ICD-10**

**Versions - Languages**

Monopolar depression NOS

**F34**   **Persistent mood [affective] disorders**

Persistent and usually fluctuating disorders of mood in which the majority of the ___ pisodes are
life, they involve considerable distress and disability. In some instances, recurre___ ___manic or d___

**F34.0**   **Cyclothymia**

A persistent instability of mood involving numerous periods of depression and mild elation, none of whi___
patients with bipolar affective disorder. Some patients with cyclothymia eventually develop bipolar affe___

Affective personality disorder
Cycloid personality
Cyclothymic personality

**F34.1**   **Dysthymia**

A chronic depression of mood, lasting at least several years, which is not sufficiently severe, or in whic___

Depressive:
- neurosis
- personality disorder
Neurotic depression
Persistent anxiety depression

***Excl.:***   anxiety depression (mild or not persistent) (F41.2)

**F34.8**   **Other persistent mood [affective] disorders**

**F34.9**   **Persistent mood [affective] disorder, unspecified**

**F38**   **Other mood [affective] disorders**

Any other mood disorders that do not justify classification to F30-F34, because they are not of sufficien___

**F38.0**   **Other single mood [affective] disorders**
Mixed affective episode

**F38.1**   **Other recurrent mood [affective] disorders**
Recurrent brief depressive episodes

**F38.8**   **Other specified mood [affective] disorders**

**F39**   **Unspecified mood [affective] disorder**
***Incl.:***   Affective psychosis NOS

Exhibit A
000227

# ICD-10 Version:2016

Search [_____]   [ Advanced Search ]   **ICD-10**

**Versions -**

**Languages**

**Info**

**F43**   **Reaction to severe stress, and adjustment disorders**

This category differs from others in that it includes disorders identifiable on the leading to continued unpleasant circumstances that result in an adjustment diso importance is not always clear and in each case will be found to depend on indiv arise always as a direct consequence of acute severe stress or continued trauma thus be regarded as maladaptive responses to severe or continued stress, in that they interfere with su

**F43.0**   **Acute stress reaction**

A transient disorder that develops in an individual without any other apparent mental disorder in respo acute stress reactions. The symptoms show a typically mixed and changing picture and include an initi further withdrawal from the surrounding situation (to the extent of a dissociative stupor - F44.2), or by minutes of the impact of the stressful stimulus or event, and disappear within two to three days (often

Acute:
- crisis reaction
- reaction to stress

Combat fatigue
Crisis state
Psychic shock

**F43.1**   **Post-traumatic stress disorder**

Arises as a delayed or protracted response to a stressful event or situation (of either brief or long dura asthenic) or previous history of neurotic illness, may lower the threshold for the development of the sy memories ("flashbacks"), dreams or nightmares, occurring against the persisting background of a sens trauma. There is usually a state of autonomic hyperarousal with hypervigilance, an enhanced startle re latency period that may range from a few weeks to months. The course is fluctuating but recovery can (F62.0).

Traumatic neurosis

**F43.2**   **Adjustment disorders**

States of subjective distress and emotional disturbance, usually interfering with social functioning and (bereavement, separation experiences) or the wider system of social supports and values (migration, r predisposition or vulnerability plays an important role in the risk of occurrence and the shaping of the r anxiety or worry (or mixture of these), a feeling of inability to cope, plan ahead, or continue in the pre feature may be a brief or prolonged depressive reaction, or a disturbance of other emotions and condu

Culture shock
Grief reaction
Hospitalism in children

*Excl.:*   separation anxiety disorder of childhood (F93.0)

**F43.8**   **Other reactions to severe stress**

**F43.9**   **Reaction to severe stress, unspecified**

**F44**   **Dissociative [conversion] disorders**

The common themes that are shared by dissociative or conversion disorders are a partial or complete l remit after a few weeks or months, particularly if their onset is associated with a traumatic life event. N been classified as various types of "conversion hysteria". They are presumed to be psychogenic in origi physical illness would be manifest. Medical examination and investigation do not reveal the presence of relationship to psychological stress, and often appear suddenly. Only disorders of physical functions no classified under somatization disorder (F45.0). The possibility of the later appearance of serious physic

Exhibit A
000228

Haque et al. BMC Psychiatry 2014, **14**:310
http://www.biomedcentral.com/1471-244X/14/310



BMC
Psychiatry

RESEARCH ARTICLE

Open Access

# Autobiographical memory and hierarchical search strategies in depressed and non-depressed participants

Shamsul Haque[1*†], Eka Juliana[2†], Rahmattullah Khan[3†] and Penelope Hasking[4†]

## Abstract

**Background:** There is a growing body of literature showing individuals with depression and other trauma-related disorders (e.g., posttraumatic stress disorder) recall more overgeneral and less specific autobiographical memories compared to normal participants. Although the mechanisms underlying overgeneral memory are quite clear, the search strategy operated within the autobiographical knowledge base, at time of recollection, requires further exploration. The current study aimed to examine the hierarchical search sequence used to recall autobiographical memories in depressed and non-depressed participants, with a view to determining whether depressed participants exhibited truncated search strategies.

**Methods:** Thirteen depressed and an equal number of non-depressed participants retrieved 15 memories each, in response to 15 commonly used cue words. Participants reported the first memory that entered in their mind. All memory descriptions were recorded and later transcribed verbatim for content analysis.

**Results:** Depressed participants retrieved autobiographical memories faster, produced shorter memory descriptions and were less likely to recall positive memories than non-depressed participants. Non-depressed participants were more likely to commence retrieval by accessing lifetime period knowledge followed by general event and event specific knowledge, whereas depressed participants showed a tendency to terminate retrieval at the general event level.

**Conclusions:** It is concluded that depressed participants do adhere to the same hierarchical search strategy as non-depressed participants when retrieving specific autobiographical memories, but that they terminate their search early, resulting in overgeneral memories.

**Keywords:** Autobiographical memory, Self-memory system, Depression, Hierarchical search, Autobiographical knowledge-base

## Background

Since first reported by Williams and Broadbent [1], research interest has focused on examining memory retrieval in people with depression, who have consistently demonstrated a tendency to recall more general, and less specific autobiographical memories [2-5]. Specifically, overgeneral recall has been related to failure to recover from depression [6], severity of depression [7], and is

over-represented in suicide attempters relative to control participants [8,1], even when controlling for depression [9]. This pattern of recollection is consistent across studies irrespective of the methods used to initiate the retrieval process (i.e. free recall or cued recall), and has been observed in adults, college students [10] and children [11]. Research indicates that overgeneral memory (OGM) is a vulnerability factor for depression and posttraumatic stress disorder (PTSD). It predicts the onset and/or recurrence of depression and PTSD [12,13] and a worse course of depression ([14,15] for a meta-analytic review). In early studies, it was also revealed deficiencies in social problem solving [16] and

* Correspondence: shamsul@monash.edu
†Equal contributors
[1]Jeffrey Cheah School of Medicine and Health Sciences, Monash University Malaysia, Jalan Lagoon Selatan, Bandar Sunway, 47500 Subang Jaya, Selangor, Malaysia
Full list of author information is available at the end of the article


BioMed Central

© 2014 Haque et al.; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly credited. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Haque et al. BMC Psychiatry 2014, 14:310
http://www.biomedcentral.com/1471-244X/14/310

feelings of increased hopelessness [17] are associated with OGM.

In considering an explanation for these findings, the majority of researchers rely on the view of memory retrieval proposed by Conway and Pleydell-Pearce [18]. Conway and Pleydell-Pearce's model, which they called *Self-Memory System* (SMS), expanded on earlier proposals that the retrieval of autobiographical memory is a relatively lengthy process (usually 5s-10s) which repeats through cycles of knowledge elaboration, access, and evaluation [19,20]. The SMS is a superordinate memory system in which three sub-ordinate systems (working self, retrieval models, and knowledge base) are coordinated in a task to construct a memory. When an individual is requested to retrieve an autobiographical memory in response to a cue word, a *retrieval model* is first created against which knowledge is accessed, evaluated and elaborated for further search. The *working self* that contains currently active goals and plans of the self operates to create this *retrieval model*. The SMS is also conceptualized as an *emergent* memory system as it occurs only when the working self interacts with the hierarchically organized knowledge base while in retrieval mode [21,22].

The current study is concerned with the hierarchical search within the autobiographical knowledge base that contains lifetime period knowledge, general event knowledge, and event specific knowledge [18]. *Lifetime periods* that form the highest level of hierarchy are the most general, most abstract, or most inclusive types of knowledge and denote time periods typically measured in units of years (e.g. *Living with 'X'; It happened during our liberation struggle in 1971*). *General events* that form the middle level represent more specific types of event knowledge typically measured in units of months, weeks, and days. General events are normally composed of event memories which are either repeated or temporarily extended and thus lack temporal specificity (e.g. *first day at work, working in the office, suffering from tonsillitis*). In contrast, specific events, or *event specific knowledge*, which constitute the bottom level refer to memories of events that occur at one specific point in time and are typically measured in units of seconds, minutes or hours (e.g. *...one of them came very close to me, slapped my face and asked my name*).

It has been proposed that in individuals with depression, the failure to recall specific autobiographical memories is the result of a truncated search strategy - that is a failure of hierarchical search strategies whereby individuals retrieve information early in the hierarchy but fail to retrieve specific examples or events. Three hypotheses have been proposed that are summarized in the CaR-FA-X model to explain how this search may be truncated in depressed individuals: *capture and rumination* (CaR) hypothesis,

*functional avoidance* (FA) hypothesis and *impaired executive control* (X) hypothesis [23]. More recent findings supporting this model have been thoroughly discussed by Sumner [24]. According to the impaired executive control hypothesis, retrieval processes require oversight by the central executive, and working memory capacity to initiate and maintain the search within the autobiographical knowledge structure [18]. Interfering with these processes, by distracting attention or overloading working memory, leads to early termination of search strategies and non-specific, overgeneral autobiographical memories [2].

The functional avoidance hypothesis suggests that people retrieve overgeneral memories as a method of avoiding negative affect [25]. Specifically, retrieval of detailed, especially negative, memories is thought to cause distress, and thus retrieval of overgeneral memories is negatively reinforced. Supporting this, retrieval of negative events has been found to produce less distress in those who tend to recall overgeneral memories, and less specific memory retrieval is associated with a repressive coping style [26].

Finally, capture and rumination, the tendency to dwell upon events and thoughts, is considered to be one reason for overgeneral memory retrieval [27], and may operate in two ways. First, in line with the central executive hypothesis, rumination may monopolise working memory capacity, limiting the availability of resources required to extract specific memories [23]. Secondly, people tend to ruminate about things that concern them. When asked to retrieve memories in response to cue words, these cue words map onto the current concerns of individuals rather than prompting a search for a new memory [28]. This mapping of cues and concerns results in retrieval of abstract, self-related knowledge rather than specific memories [29]. Consequently, rumination results in more recall of negative self-referent memories [30], while rumination about negative events has been shown to lead to more overgeneral memories than positive rumination [31].

Rather than working as separate processes, these three processes may work together to produce overgeneral autobiographical memory among people with depression. As limited attention and rumination are often present in depression it is probable that in a depressed individual, rumination facilitates mapping of cue words onto concerns of the individual and monopolises working memory capacity. Thus the cue word is mapped to the concern rather than activating a new search for a specific memory, and working memory capacity is compromised, limiting the resources available to conduct a search for a specific event. Coupled with a desire to avoid negative affect and limit intrusive memories, the search for specific memories tends to be terminated at an early stage in the search hierarchy.

Overgeneral recall has several consequences for depressed individuals. Most notably, overgeneral memories

Exhibit A
000230

Haque et al. BMC Psychiatry 2014, 14:310
http://www.biomedcentral.com/1471-244X/14/310

have been related to impaired problem solving ability and ability to generate solutions to potential future events [8,23], a concern given the emphasis of coping skills and problem solving in many psychological treatments for depression. However, although ample studies have investigated the specificity of autobiographical memory in depressed patients, and have examined the roles of rumination, affect regulation and attention in the relationship between overgeneral memory and depression, few studies have examined the sequencing of memory retrieval exhibited by depressed individuals, to determine whether they retrieve information in the hierarchical fashion proposed by Conway and Pleydell-Pearce [18]. Specifically, while non-clinical participants have been shown to access life time period knowledge, followed by general event knowledge and event specific knowledge when retrieving an autobiographical memory [32], it is unclear whether depressed individuals also access memories in this manner, or whether the search sequence differs. Understanding how depressed individuals access the knowledge hierarchy may aid in developing more effective methods of enhancing recall of specific memories, and of facilitating effective problem solving in this population.

The present study aimed to compare depressed and non-depressed participants in relation to retrieval of autobiographical memories. Specifically we expected that 1) depressed participants would retrieve more general and less specific autobiographical memories than non-depressed participants; 2) depressed participants would report more negative than positive memories relative to the non-depressed group; 3) depressed participants would terminate their retrieval search earlier in the search hierarchy than non-depressed participants.

## Methods
### Participants
Thirteen depressed patients (7 females, 6 males) and 13 non-depressed individuals (9 females, 4 males) participated in the study. The depressed group consisted of 8 out-patients and 5 in-patients at a large metropolitan hospital in Kuala Lumpur. Twenty five patients were initially invited to participate but 12 declined. All patients were diagnosed by a hospital psychiatrist as meeting the DSM-IV criteria for major depressive disorder [33]. The non-depressed participants were recruited through advertisements posted at a large university campus in Selangor, Malaysia, which invited interested individuals to contact the researchers if they wished to participate in a study regarding how people recall memories for personal events. The recruitment of non-depressed participants was made in such a manner that they were equivalent to the patients in terms of age and education. The average length of schooling was similar in depressed (M = 13.46 years, SD = 1.45) and non-depressed (13.85 years, SD = 1.52)

participants, $t(24) = 0.66$, p = 0.52. The mean chronological ages were also comparable between depressed (36.00 years, SD = 11.97) and non-depressed (36.53 years, SD = 12.32) groups, $t(24) = 0.113$, p = 0.91. Three exclusion criteria were used for both groups; (i) age below 18, (ii) inability to speak Bahasa Malaysia (Malay Language), and (iii) present intoxication with drugs or other addictive substances.

### Materials
#### Autobiographical memory test by cue words
We utilised the cued-recall paradigm first used by Galton [34] and later adopted by Williams and Broadbent [1] in which memory retrieval was cued by words commonly used in everyday life. Fifteen words from five categories (common locations, general objects, positive emotions, negative emotions, and significant others) were chosen from lists of words used in previous autobiographical memory studies [35]. The words were: restaurant, beach, cinema (common locations); car, chair, telephone (general objects); happy, success, satisfaction (positive emotions); sad, guilty, regretful (negative emotions); and father, mother, friends (significant others). The words were administered in Bahasa Malaysia (Malaysian language), and presented in a random order to participants.

#### Beck depression inventory (BDI)
The BDI [36] consists of 21 forced choice items. Participants were asked to mark the items that best described how they felt the previous week. This test was given to the non-depressed participants to ensure that they were not showing any depressive symptoms. The participants scoring above 20 (indicating moderate depression) were excluded from participating in the non-depressed sample.

### Procedure
Use of data previously collected for a postgraduate degree, for the purposes of the current project, was approved by the Monash University Human Research Ethics Committee (CF13/2878 - 2013001547). The process of data collection started with the participants reading an explanatory statement. Participants were also verbally informed of the purpose of the study with an assurance that their participation would be voluntary and confidential, and the data they produce would be used for academic purposes only. Participants were cautioned that they may feel distressed while recalling some of their personal memories, but could withdraw from the study at any time. Interested participants signed a written consent form, prior to data collection.

All participants were tested individually by the second author. The patients were tested at the hospital, while the non-depressed group were tested at the university

Exhibit A
000231

Haque *et al. BMC Psychiatry* 2014, **14**:310
http://www.biomedcentral.com/1471-244X/14/310

campus. After providing written consent, participants completed the Autobiographical Memory Test. Each participant was presented with one cue word at a time and asked to bring to mind a specific memory the word reminded them of. The participants were informed that a specific memory refers to a personally experienced event that happened at a particular time (within one day) and place, and were told the event could be important or trivial. They were also informed that memories could be retrieved from any point of their life, excluding the last month. Particular examples were given to clarify what the term "specific" means; retrieving information such as *"I jog every morning in the park"* in response to the cue word *"park"* would not be appropriate as it does not contain any specific time. However, a response such as *"Two days after we moved to our new house, I, along with my wife, went to the nearest park for a morning walk and surprisingly saw there one of my childhood friends approaching me and smiling"* would be suitable. In order to ensure participants were able to understand their tasks correctly, they completed two practice trials in which two neutral items ("bread" and "grass") were used. If necessary, additional practice trials were arranged until the participants were successful in retrieving a specific memory.

In each trial, a cue word printed in capital letters on a white card was presented. When the participants had a memory in mind they were asked to verbally describe the memory; descriptions were tape-recorded. Participants were given one minute to retrieve a specific memory after each cue was presented. If participants did not recall a memory in the given time, the next cue was presented. A stopwatch was used to measure the retrieval time. Once a memory was retrieved there was no time limit on describing the memory. Total testing time for a participant (both depressed and non-depressed) averaged between one and one-and-a-half hours.

### Statistical analysis

The transcribed memory descriptions were examined for *elements* such as, lifetime period knowledge (LTP), general event knowledge (GE), event specific knowledge (ESK), thought (TH), mixed information (MIX), and other knowledge (OTR) ([37] for similar categorization). The main knowledge types (lifetime period, general event, event specific) were operationalised according to the definitions provided above. The *thoughts* category refers to the elements in which beliefs or conjectures were recalled, rather than specific or general information (e.g. *I feel I was the most stupid student in Cairo um...I mean in my class*). The *mixed* information category refers to the element in which various types of thoughts and information are recalled (e.g. *My father was pleased by such a gift because the person who presented it was actually his disciple and*

now became the administrative head of our district). The *other* category refers to the elements in which no information associated with thought, lifetime period knowledge, general event, and event specific knowledge is reported. The coding for these six types of knowledge was completed by the second author and an external rater. A high level of consistency was observed (90% agreement), with disagreements resolved through discussion.

The memory descriptions were also examined for knowledge sequence as we wanted to see if the two groups varied in terms of overall construction of their autobiographical memories. For this purpose, memories were selected on the basis that they were described with some elaboration and contained any combination of LTP, GE and ESK. Memories in which the participants only reported TH, MIX and/or ORT knowledge were excluded. Each memory was coded according to the knowledge sequence (e.g., LTP > GE > ESK; LTP > ESK; LTP > GE; GE > ESK; and GE > LTP). To examine the consistency of coding, the second author and an external rater coded 30% of the memory protocols (95% agreement). Once the coding was completed, statistical analyses such as independent sample t-tests were performed. Although our sample size is relatively small for parametric tests, independent sample t tests produce error rates close to 5% and are adequately powered when effect sizes are large [38]. As our analyses produced large effect sizes, we feel the use of independent samples t tests in this study is justified.

### Results

A total of 315 memory descriptions were gathered. In 75 trials, most of which were cued by negative emotional words such as *sad, guilt* and *regretful*, participants failed to retrieve a memory. The success of recall was comparable; depressed participants retrieved 156 memories, whereas non-depressed retrieved 159 memories.

### Retrieval time

Retrieval time for all memories produced by each participant (up to 15 memories) was averaged. Since the retrieval times for both groups were approximately normally distributed with no outliers, the data were qualified for independent-sample *t*-test. The results revealed that depressed participants (M = 10.37 seconds, SD = 1.61) were faster in recollection than non-depressed participants (M = 13.55 seconds, SD = 2.67), $t(24) = 3.67$, $p < 0.01$, Cohen's $d = 1.50$.

### Specificity of recollection

Memory descriptions were examined for six types of knowledge as mentioned earlier and counted for quantitative analysis. Consider the following two memories, the first retrieved by a depressed participant and the second by a non-depressed participant in which different

Exhibit A
000232

Haque et al. BMC Psychiatry 2014, 14:310
http://www.biomedcentral.com/1471-244X/14/310

types of knowledge/memory elements have been marked (within parentheses).

*Watching a movie in Malaysian cinema is cheaper than other countries (OTH). However, I rarely go to the cinema (GE). I only go four or five times a year (GE)* (retrieved by a depressed participant in response to the cue, CINEMA)

*It happened during my first year in Cairo...it was in 2001 (LTP). I had just finished my first year final exam (GE). I was not brave enough to see my exam results because I felt it was bad (MIX). I thought I was the most stupid student in Cairo (TH), I mean...in my class (TH). But suddenly, my friend called me. Her name is X. Her house is near em...What's the name... em...Near Y factory...(OTH). She is one of my best friends (OTH). She said "you should see your exam results", I replied "I do not want to see it" (ESK). I thought that I've definitely failed (TH). She said "No! You should see your results... you should come to the campus" (ESK). She told me that I passed with a very good grade, number 11 from the top (ESK)* (retrieved by a non-depressed participant in response to the cue, TELEPHONE)

As can be seen in the first memory, two *GE* and one *OTR* knowledge element were retrieved. In the second memory, one *LTP*, one *GE*, four *ESK*, three *TH*, one *MIX*,

and two *OTR* knowledge elements were reported. Elements were extracted in all 315 memories, then average scores were calculated for LTP, GE, ESK, TH, MIX and OTR for each participant. The means, standard deviation scores and ranges for these memory elements are shown in Table 1. The distributions for memory elements for both samples approached normal distribution and there were no outliers, thus qualifying them for independent sample t-tests. The findings revealed significant differences between depressed and non-depressed for lifetime period, $t(24) = 3.77$, $p < 0.01$, $d = 1.54$, general event, $t(24) = 2.11$, $p < 0.05$, $d = 0.86$, event specific knowledge, $t(24) = 6.44$, $p < 0.01$, $d = 2.63$ and thought, $t(24) = 3.66$, $p < 0.01$, $d = 1.49$. Depressed participants reported less lifetime period knowledge, general event knowledge and event specific knowledge than the non-depressed participants. However, depressed participants were more likely to report thought components than the non-depressed participants. Cohen's $d$ values indicate large effects for all four memory elements.

To see whether the depressed and non-depressed participants varied in terms of the overall length of the memory descriptions, average scores for LTP, GE, ESK, TH, MIX and OTR for each participant calculated for earlier analyses were added. Independent sample t-test showed a significant difference, $t(24) = 6.33$, $p < 0.01$, $d = 2.58$ with depressed participants (M = 3.06, SD = 0.55) being less elaborative in their memory descriptions than the non-depressed participants (M = 4.33, SD = 0.47).

**Table 1 Mean (and standard deviation) scores for depressed and non-depressed participants on memory elements, emotional valence, and retrieval sequence**

| Memory elements | Memory count | Depressed | | Non-depressed | |
|---|---|---|---|---|---|
| | | Mean ± SD | Range | Mean ± SD | Range |
| ESK | | 0.40 ± 0.27 | 0.10-1.08 | 1.40 ± 0.49 | 0.42-2.62 |
| GE | | 0.96 ± 0.41 | 0.23-1.42 | 1.25 ± 0.29 | 0.83-1.69 |
| LTP | 315 | 0.34 ± 0.14 | 0.00-0.55 | 0.53 ± 0.11 | 0.39-0.75 |
| TH | | 0.56 ± 0.21 | 0.27-1.00 | 0.27 ± 0.20 | 0.08-0.73 |
| MIX | | 0.37 ± 0.17 | 0.08-0.62 | 0.45 ± 0.23 | 0.17-0.91 |
| OTR | | 0.41 ± 0.17 | 0.15-0.77 | 0.41 ± 0.16 | 0.15-0.75 |
| *Emotional valence* | | | | | |
| Positive | | 0.14 ± 0.06 | 0.00-0.23 | 0.33 ± 0.07 | 0.18-0.46 |
| Negative | 315 | 0.52 ± 0.12 | 0.33-0.73 | 0.42 ± 0.11 | 0.18-0.58 |
| Neutral | | 0.35 ± 0.12 | 0.09-0.50 | 0.25 ± 0.09 | 0.08-0.39 |
| *Retrieval sequence* | | | | | |
| LTP → GE → ESK | | 0.10 ± 0.11 | 0.00-0.33 | 0.36 ± 0.18 | 0.09-0.73 |
| LTP → ESK | | 0.06 ± 0.11 | 0.00-0.33 | 0.09 ± 0.25 | 0.00-0.90 |
| LTP → GE | 206 | 0.39 ± 0.16 | 0.00-0.60 | 0.16 ± 0.12 | 0.00-0.30 |
| GE → ESK | | 0.32 ± 0.26 | 0.00-1.00 | 0.34 ± 0.14 | 0.13-0.58 |
| GE → LTP | | 0.13 ± 0.12 | 0.00-0.33 | 0.17 ± 0.23 | 0.00-0.80 |

LTP = life time period knowledge; GE = general event knowledge; ESK = event specific knowledge.

Haque *et al. BMC Psychiatry* 2014, **14**:310
http://www.biomedcentral.com/1471-244X/14/310

The memory content was also examined to see whether the depressed patients had a tendency to recall memories containing elements that were predominantly of positive or negative nature. In this case, the memory as a whole rather than its specific elements was considered. All memories were classified as either: positive (e.g., success, satisfaction), negative (e.g. personal failure, accidents), or a neutral memory (i.e. no positive or negative connotations). The second author and an external rater categorised those memories (96% agreement). Consider the following three memory protocols that were coded as positive, negative or neutral.

Positive: *In 2003, I was very happy on the day when I was discharged from the hospital. I felt satisfied because I didn't like to stay there. I liked the doctors who discharged me from the ward. They gave me a lot of advice.* (Cue: HAPPY)

Negative: *It was when I went to the cinema with my husband during Depavali celebration. Before we went to the movie, I saw my husband and my nephew sitting in front of our neighbour's house which I didn't like at all. I was so angry that I couldn't watch the movie, rather I started sleeping. My nephew woke me up and said "aunt, please wake up and watch the movie". I replied negatively. Then my husband came to me who I asked with despair why he sat in front of that house. Why...? We then came out of the cinema and went to a restaurant. They asked me to eat something but I also refused.* (Cue: CINEMA)

Neutral: *When I was about ten...10 years old, I went to a cinema in Penang. I don't remember the name of the cinema. The film was acted by P. Ramli and the title was Anakku Sazali.* (Cue: CINEMA)

The proportion of positive, negative and neutral memories was calculated for each participant. The data fulfilled the requirements of t-tests as they approached normal distribution with no outliers. The results showed depressed and non-depressed participants to vary in all three types of memories; positive, $t(24) = 7.85$, $p < 0.01$, $d = 3.21$, negative, $t(24) = 2.21$, $p < 0.05$, $d = 0.90$, and neutral, $t(24) = 2.44$, $p < 0.05$, $d = 0.97$. Depressed participants recalled fewer positive memories, but more negative and neutral memories compared to their non-depressed counterparts. Both groups retrieved more negative memories than positive or neutral memories (Table 1).

### Accessing the autobiographical knowledge base
To investigate whether the two groups differed in terms of knowledge sequence that they retrieved, 206 memories (77 from depressed and 129 from non-depressed participants) were selected from the total pool of 315 memories.

These are the memories which contained various combinations of LTP, GE and ESK. Five knowledge sequences were identified (see below for examples).

1. LTP > GE > ESK sequence: *When my mother was still alive, I felt like killing her to relieve her pain as she was suffering from cancer (LTP). Um....before she passed away I made a mistake (GE). On one of the Mother's Day...I really felt guilty when I saw that my mother was taking medicine on her own (ESK).* (Cue: GUILTY).
2. LTP > GE sequence: *I visited Washington DC in the USA for the first time in 1984 with my colleagues (LTP). The restaurant in which we ate our dinner was a Chinese restaurant (GE).* (Cue: RESTAURANT).
3. LTP > ESK sequence: *I've never had a birthday party in all my life because I was born in January.....in which month the school has always been open (LTP). In one occasion, I wanted to buy a dress and celebrate my birthday, but my mother refused to organize that and said "one day someone will celebrate for you" (ESK).* (Cue: HAPPY).
4. GE > ESK sequence: *After graduation, I was travelling with my friends (GE). One day we saw a child standing at the corner of a road – very sad and confused (ESK). We stopped and asked what happened, she replied that her mother was sick and they did not have money to visit a doctor (ESK). We quickly decided to visit her house; we saw her mother laying on the bed (ESK). We sent her to a doctor using our own money (ESK).* (Cue: SATISFACTION)
5. GE > LTP sequence: *When I don't feel comfortable and cannot sleep I always lay down on a sofa (GE). I've been doing this since I was a child (LTP).* (Cue: CHAIR).

Memories were counted for all five knowledge sequences for each participant and converted to proportion values. The means, SDs and ranges of those proportion values are presented in Table 1. P-P plots were drawn to check if the distributions were skewed for all five knowledge sequences for both samples. The plots showed the distributions to be approximately normally distributed, fulfilling the requirement for independent sample t-tests. Moreover, there were no outliers detected in any of the distributions. The findings revealed that non-depressed participants retrieved significantly more memories that contained the sequence, LTP > GE > ESK compared to the depressed participants, $t(24) = 4.43$, $p < 0.01$, $d = 1.81$. However, depressed participants retrieved more knowledge sequences of the form LTP > GE compared to their non-depressed counterparts, $t(22.73)^a = 4.05$, $p < 0.01$, $d = 1.70$ [39]. No other differences in retrieval sequences were

Exhibit A
000234

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4391   Page 223 of
251
Case 1:18-cv-02   -PLF   Document 1-2   Filed 09/26/   Page 200 of 215

observed. In order to see if depressed participants retrieved more overgeneral memories, two knowledge sequences, LTP > GE and GE > LTP were examined. In these two sequences, the participants only reported general and abstract knowledge rather than specific details of a particular event. As they represented overgeneral memories, LTP > GE and GE > LTP are combined, which revealed that depressed participants recalled more overgeneral memories (51%) than their non-depressed counterparts (33%).

## Discussion

A substantial amount of research suggests that depressed individuals are impaired in their ability to recall specific autobiographical memories, showing a tendency to be overgeneral in their recall [2–4,1]. According to Conway and Pleydell-Pearce, individuals access specific autobiographical memories utilising a hierarchical search strategy, accessing life time period knowledge first, then general event knowledge and finally event specific knowledge [18]. While this holds true for non-depressed individuals [32], it has been proposed that depressed individuals terminate their search for specific memories early in this hierarchical search. While depressed individuals have previously been shown to report more general level information than non-depressed individuals, to date the sequence in which depressed individuals access autobiographical memories has not been directly tested. This study aimed to examine the

search strategies used by depressed and non-depressed individuals to determine whether depressed individuals adhered to the sequential hierarchical search as proposed by Conway and Pleydell-Pearce [18].

Consistent with previous studies, our results revealed that depressed participants retrieved fewer memories overall, and their descriptions of events were shorter than the descriptions produced by the non-depressed participants. The results also revealed that depressed participants were less likely to retrieve specific event knowledge, and that memories were less likely to be positive in nature. In a novel result for this field, and offering support for Conway and Pleydell-Pearce's model, the depressed participants also showed impairments in their ability to move sequentially through the hierarchy of the knowledge base in order to construct an autobiographical memory. The non-depressed participants retrieved autobiographical memories by first accessing the most abstract knowledge (lifetime periods) followed by less abstract general event knowledge and then specific event knowledge (LTP → GE → ESK). However, while depressed participants began their search by accessing lifetime period knowledge, their search was more likely to terminate at general event knowledge from the intermediate level of the hierarchy (LTP → GE; Figure 1). That depressed participants recalled fewer, less detailed memories might also explain why depressed participants were faster to recall memories in response to cue words.



|  Normal  |  Depressed  |
|---|---|
| Lifetime Period Knowledge | Lifetime Period Knowledge |
| General Event Knowledge | General Event Knowledge |
| Event Specific Knowledge | |
| (a) | (b) |

**Figure 1 Schematic representation of knowledge search sequence by (a) non-depressed (specific memory) and (b) depressed participants (overgeneral memory).**

Exhibit 1A
000235

Haque et al. BMC Psychiatry 2014, 14:310
http://www.biomedcentral.com/1471-244X/14/310

Impaired executive control and rumination may explain the tendency for depressed participants to terminate their search early, and thus report less specific autobiographical memories, a finding which mirrors previous findings in this field [3,40,4,1,5]. Intrusive cognitions about past events are important determinants of overgeneral recall as they consume working memory capacity [40]. Consequently, although beginning their search by accessing lifetime period knowledge and general event knowledge, limited executive control capacity inhibits the ability to continue the search for event specific knowledge. Intrusions also promote rumination about the past and one's self, and as previously mentioned, result in more abstract self-referent memories, rather than specific memories appropriate to the cue word [29,30]. As the depressed participants produced more thought elements in their memory descriptions than non-depressed participants it seems plausible that such thoughts would interrupt the retrieval of specific memories.

Although depressed participants reported fewer positive memories relative to the non-depressed group, both depressed and non-depressed participants were more likely to recall negative than positive memories. Although older adults tend to show a bias toward recalling positive events, numerous studies have shown that younger adults demonstrate a negativity bias [41]. Although spanning a wide age range, the majority of our participants were relatively young, thus a negativity bias is not unexpected. Further research would benefit from an examination of how the hierarchical search for autobiographical memories is affected by aging.

While further understanding of the search strategy used by depressed participants to recall autobiographical memories is important, the results of the study must be viewed in light of the study's limitations. First, the relatively small sample limits the generalisability of the findings. Second, the two groups were recruited based on the presence or absence of major depressive disorder. Yet the two samples may also differ on other variables central to the relationship under investigation. Consideration of individual difference factors, such as rumination, would be informative in future studies examining the sequencing of autobiographical recall. Third, this study did not examine whether positive and negative memories were recalled in a similar fashion across the two groups. Previous research has noted differences in retrieval time for positive and negative memories [8], however examination of whether positive or negative memories are retrieved following the same hierarchical sequence would inform future research in this area. Further, examination of how attention, rumination and affect regulation may differentially affect the search sequence would also be informative. It is possible, for example, that rumination impairs the ability to access lifetime period knowledge, limited working memory capacity impedes access to general event information and that functional avoidance of negative affect might limit access to event specific knowledge. To our knowledge, the differential effect of these three processes on the hierarchical search sequence has not been directly examined. Finally, although our results suggest that depressed individuals are impaired in their ability to systematically search through the knowledge hierarchy to access specific autobiographical memories, it is also possible that depressed participants gave up their search at an intermediate level as they found it difficult or tiring to proceed further. Given the length of the testing session, and the fact that fatigue is commonly associated with depression, future studies should attempt to control for such a possibility.

## Conclusions

Despite the above limitations, the current study provides preliminary support for the notion that depressed individuals do attempt to access specific autobiographical memories following the hierarchical search strategy outlined by Conway and Pleydell-Pearce [18]. However, these participants are more likely to terminate the search at an intermediate level (general event knowledge), thus producing overgeneral memories in response to a request for specific autobiographical memories. Confirmation that the same hierarchical search sequence is attempted in both depressed and non-depressed individuals opens the way for future research to examine specific elements of the sequence in both participant groups.

## Endnote

[a]The assumption of homogeneity of variance was violated for this analysis, thus Satterthwaite [39] approximate degrees of freedom were used.

**Competing Interests**
The authors declare that they have no competing interests.

**Authors' contributions**
SH and EJ conceived the overall project, finalized study design and analysed the data together with PH and RK. PH and RK helped in data interpretation and all four authors were involved in finalizing the manuscript. All authors read and approved the final manuscript.

**Authors' information**
Shamsul Haque is Associate Professor of Psychology in the Jeffrey Cheah School of Medicine and Health Sciences, Monash University Malaysia, and has a particular interest in the construction of autobiographical memory in psychiatric patients.
Eka Juliana is a postgraduate research student at the Department of Psychology, Kulliyyah of Islamic Revealed Knowledge and Human Sciences, International Islamic University Malaysia.
Rahmatullah Khan is a clinical psychologist and his research interests include anxiety, depression and cognitive behavior therapy. He is currently a Professor in the Department of Psychology and Counseling, Sultan Idris Education University, Malaysia.
Penelope Hasking is Associate Professor of Psychology in the School of Psychology and Speech Pathology at Curtin University.

Exhibit 1A
000236

Haque *et al. BMC Psychiatry* 2014, 14:310
http://www.biomedcentral.com/1471-244X/14/310

### Acknowledgments
All participants, both patients and normal controls, are acknowledged for giving valuable data for the study. The authors also thank the Psychiatry Department at Hospital Kuala Lumpur for allowing data collection from the patients. The Department of Psychology at International Islamic University Malaysia is acknowledged for supporting Eka Juliana.

### Author details
[1]Jeffrey Cheah School of Medicine and Health Sciences, Monash University Malaysia, Jalan Lagoon Selatan, Bandar Sunway, 47500 Subang Jaya, Selangor, Malaysia. [2]Department of Psychology, International Islamic University Malaysia, Jalan Gombak, Kuala Lumpur, Selangor, Malaysia. [3]Department of Psychology & Counseling, Sultan Idris Education University, Tanjong Malim, Perak, Malaysia. [4]School of Psychology & Speech Pathology, Curtin University, Perth, Western Australia 6845, Australia.

Received: 17 June 2013 Accepted: 21 October 2014
Published online: 18 November 2014

### References
1. William JMG, Broadbent K: Autobiographical memory in suicide attempters. *J Abnorm Psychol* 1986, 95:144–149.
2. Dalgleish T, Williams JMG, Golden AJ, Perkins N, Barrett LF, Barnard PJ, Yeung AC, Murphy V, Elward R, Tchanturia K, Watkins E: Reduced specificity of autobiographical memory and depression: The role of executive control. *J Exp Psychol Gen* 2007, 136:23–42.
3. Decker AD, Hermans D, Raes F, Eelen P: Autobiographical memory specificity and trauma in inpatient adolescents. *J Clin Child Adolesc Psychol* 2003, 32:22–31.
4. Mackinger HF, Pachinger MM, Leibetseder MM, Fartacek RR: Autobiographical memories in women remitted from major depression. *J Abnorm Psychol* 2000, 109:331–334.
5. Williams JMG, Scott J: Autobiographical memory in depression. *Psychol Med* 1988, 18:69–695.
6. Brittlebank AD, Scott J, Williams JMG, Ferrier IN: Autobiographical memory in depression: State or trait marker? *Br J Psychiatry* 1993, 162:118–121.
7. Peeters F, Wessel I, Merckelbach H, Boon-Vermeeren M: Autobiographical memory specificity and the course of major depressive disorder. *Compr Psychiatry* 2002, 43:344–350.
8. Kaviani H, Rahimi P, Naghavi HM: Iranian depressed patients attempting suicide showed impaired memory and problem-solving. *Arch Iran Med* 2004, 7:1113–1117.
9. Leibetseder MM, Rohrer RR, Mackinger HF, Fartacek RR: Suicide attempts: Patients with and without an affective disorder show impaired autobiographical memory specificity. *Cogn Emotion* 2006, 3/4:516–526.
10. Rekart KN, Mineka S, Zinbarg RE: Autobiographic memory in dysphoric and non-dysphoric college students using a computerised version of the AMT. *Cogn Emotion* 2006, 3/4:506–515.
11. Drummond LE, Dritschel B, Astell A, O'Carroll RE, Dalgleish T: Effects of age, dysphoria, and emotion-focusing on autobiographical memory specificity in children. *Cogn Emotion* 2006, 3/4:488–505.
12. Kleim B, Ehlers A: Reduced autobiographical memory specificity predicts depression and posttraumatic stress disorder after recent trauma. *J Consult Clin Psychol* 2008, 76:231–242.
13. Sumner JA, Griffith JW, Mineka S, Rekart KN, Zinbarg RE, Craske MG: Overgeneral autobiographical memory and chronic interpersonal stress as predictors of the course of depression in adolescents. *Cogn Emotion* 2011, 25:183–192.
14. Hermans D, Vandromme H, Debeer E, Raes F, Demyttenaere K, Brunfaut E, Williams JM: Overgeneral autobiographical memory predicts diagnostic status in depression. *Behav Res Ther* 2008, 46:668–677.
15. Sumner JA, Griffith JW, Mineka S: Overgeneral autobiographical memory as a predictor of the course of depression: A meta-analysis. *Behav Res Ther* 2010, 48:614–625.
16. Goddard L, Dritschel B, Burton A: Role of autobiographical memory in social problem solving and depression. *J Abnorm Psychol* 1996, 105:609–616.
17. Evans J, Williams JMG, O'Loughlin S, Howells K: Autobiographical memory and problem-solving strategies of parasuicide patients. *Psychol Med* 1992, 22:399–405.
18. Conway MA, Pleydell-Pearce CW: The construction of autobiographical memories in the self-memory system. *Psychol Rev* 2000, 107:261–288.
19. Conway MA: Autobiographical memories and autobiographical knowledge. In *Remembering our past: Studies in autobiographical memory*. Edited by Rubin DC. Cambridge, UK: Cambridge University Press; 1996:67–93.
20. Williams DM, Hollan JD: The process of retrieval from very long-term memory. *Cogn Sci* 1981, 5:87–119.
21. Moscovitch M: Recovered consciousness: A hypothesis concerning modularity and episodic memory. *J Clin Exp Neuropsychol* 1995, 17:276–290.
22. Tulving E: *Elements of episodic memory*. Oxford, UK: Clarendon Press; 1983.
23. Williams JMG, Barnhofer T, Crane C, Hermans D, Raes F, Watkins E, Dalgleish T: Autobiographical memory specificity and emotional disorder. *Psychol Bull* 2007, 133:122–148.
24. Sumner JA: The mechanism underlying overgeneral autobiographical memory: An evaluative review of evidence for the CaR-FA-X model. *Clin Psychol Rev* 2012, 32:34–48.
25. Hermans D, Defranc A, Raes F, Williams JMG, Eelen P: Reduced autobiographical memory specificity as an avoidant coping style. *Br J Clin Psychol* 2005, 44:583–589.
26. Raes F, Herman D, Williams JMG, Eelen P: Reduced autobiographical memory specificity and affect regulation. *Cogn Emotion* 2006, 3/4:402–429.
27. Barnard PJ, Watkins ER, Ramponi C: Reducing specificity of autobiographical memory in nonclinical participants: The role of rumination and schematic models. *Cogn Emotion* 2006, 3/4:328–350.
28. Williams JMG, Ellis NC, Tyers C, Healy H, Rose G, MacLeod AK: The specificity of autobiographical memory and imageability of the future. *Mem Cogn* 1996, 24:116–125.
29. Spinhoven P, Bockting CLH, Kremers IP, Schene AH, Williams JMG: The endorsement of dysfunctional attitudes is associated with an impaired retrieval of specific autobiographical memories in response to matching cues. *Memory* 2007, 15:324–338.
30. Moulds ML, Kandris E, Williams AD: The impact of rumination on memory for self-referent material. *Memory* 2007, 15:814–821.
31. Sutherland K, Bryant RA: Rumination and overgeneral autobiographical memory. *Behav Res Ther* 2007, 45:2407–2416.
32. Williams JMG, Chan S, Crane C, Barnhofer T, Eade J, Healy H: Retrieval of autobiographical memories: The mechanisms and consequences of truncated search. *Cogn Emotion* 2006, 3/4:351–382.
33. American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders DSM-5*. 5th edition. Washington, DC: American Psychiatric Publishing; 2013.
34. Galton F: *Inquiries into human faculty and its development*. London: Macmillan; 1883.
35. Haque S, Conway MA: Sampling the process of autobiographical memory construction. *Eur J Cogn Psychol* 2001, 13:529–547.
36. Beck AT, Steer RA: *Beck Depression Inventory: Manual*. Orlando, FL: Harcourt Brace; 1993.
37. Haque S, Conway MA: Direct and generative retrieval of autobiographical memories. *Bangladesh J Psychol* 2000, 18:51–74.
38. DeWinter JCF: Using the Student's t-test with extremely small sample sizes. *Pract Assess Res Eval* 2013, 18:1–12.
39. Satterthwaite FE: An approximate distribution of estimates of variance components. *Biom Bull* 1946, 2:110–114.
40. Kuyken W, Brewin CR: Autobiographical memory functioning in depression and reports of early abuse. *J Abnorm Psychol* 1995, 104:585–591.
41. Ready RE, Weinberger MI, Jones KM: How happy have you felt lately? Two diary studies of emotion recall in older and younger adults. *Cogn Emotion* 2007, 21:728–757.

doi:10.1186/s12888-014-0310-z
**Cite this article as:** Haque *et al*.: Autobiographical memory and hierarchical search strategies in depressed and non-depressed participants. *BMC Psychiatry* 2014 14:310.

Exhibit 28
000237

Specialized Psychiatric Counseling

Admissions

About Us

Careers

Community Resources

Pay My Bill

Shaker Clinic 〉 Leading Anxiety Treatment Center in Cleveland, OH 〉 Separation Anxiety Treatment & Care 〉
Signs & Symptoms of Separation Anxiety

# Signs & Symptoms of Separation Anxiety

**CONTENTS**
- Statistics
- Causes and Risk Factors for Separation Anxiety Disorder
- Signs and Symptoms of Separation Anxiety Disorder
- Effects of Separation Anxiety Disorder
- Co-Occurring Disorders

Separation anxiety disorder is a mental health condition that involves intense and excessive anxiety and fear of being separated from a loved one or ones. The distress experienced by people who are struggling with this disorder often causes a great deal of disruption in their lives and an overall decline in daily functioning. Examples of fears that trigger this form of anxiety can include:

- The possibility of being separated from a loved one
- Ongoing worry that a loved one may suddenly die
- Panic that a loved one will get lost
- Concern that a loved one will be kidnapped
- Trepidation that a loved one will get hurt
- Anxiety that a loved one will become ill

Adults who are suffering from separation anxiety disorder often place their focus on the health, wellbeing, and safety of their children, significant other, or another person with whom there is a strong attachment. Cornerstone to this illness, however, is that the focus placed on another person or persons is distressing and leads to a number of adverse effects. Adults

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4395   Page 227 of
251
Case 1:18-cv-02　 -PLF   Document 1-2   Filed 09/26/1　 Page 204 of 215

with separation anxiety disorder may constantly check on the whereabouts of loved ones, be overly protective of children (regardless of the child's age), or refuse to be alone. Additionally, adults with this condition may report physical pain in the event separation from a loved one is imminent, develop another mental illness if symptoms of this disorder persist, and experience discord among loved ones if appropriate care is not sought. Fortunately, there are treatment options available that can alleviate symptoms, restore functioning, and help these individuals form healthy relationships with loved ones without the distressing symptoms of separation anxiety disorder.

GET CONFIDENTIAL HELP NOW:
# (855) 677-4044
✉ EMAIL US

# Statistics

Studies have determined that separation anxiety disorder is a disorder that typically begins during childhood, yet its symptoms can carry over into adulthood. Researchers estimate that nearly 1% to 2% of adults struggle with this form of anxiety. Experts also believe that this mental health condition affects more women than men.

# Causes and Risk Factors for Separation Anxiety Disorder

Professionals in the field have yet to conclude a single identifiable cause for separation anxiety disorder. However, most in the field of mental health believe that the development of this disorder occurs when certain genetic, physiological, and environmental factors are working together. Additionally, research has concluded that there are some additional risk factors that can make a person more susceptible to developing this form of anxiety. Consider the following explanations:

*Genetic:* Research has found that 73% of individuals who meet diagnostic criteria for separation anxiety disorder have a family history of this mental health condition. Because of this link between family members who suffer from the same mental illness, it can be deduced that separation anxiety disorder can, in fact, be inherited. This case is especially true for individuals with a first-degree relative who have a history of this mental illness.

Exhibit 22
000239

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4396   Page 228 of
251
Case 1:18-cv-02___PLF   Document 1-2   Filed 09/26/1___Page 205 of 215

*Physical:* As with other anxiety disorders, those who are suffering from separation anxiety disorder have been found to have certain chemical imbalances in their brains. Specifically, neurotransmitters that are responsible for regulating mood and impulses are often not regulated in the brains of these individuals and can lead to the onset of anxiety symptoms. When these chemicals are not balanced, a person's ability to respond to stress is hindered and can cause an exacerbated startle response to minor triggers or to perceived fear or danger.

*Environmental:* Experiencing an abrupt life stressor in which a person is separated from his or her child, significant other, or other loved one as a result can ultimately lead to the development of separation anxiety disorder. Examples of life stressors that can trigger this form of anxiety include the unexpected death of loved one, experiencing a disaster in which one is separated from loved ones, and having a personal history of forced separation from primary caregivers during childhood. Lastly, it has been found that those with a history of codependent relationships that are romantic in nature can lead to the onset of symptoms if an individual is not able to adjust when he or she is not around his or her partner.

*Risk Factors:*

- Being female
- Having a family history of separation anxiety disorder or other mental health condition
- Personal history of another mental health condition
- Experiencing the loss of a loved one
- Experiencing an abrupt major life change in which one is separated from a loved one
- Being in an unhealthy, codependent, romantic relationship

# Signs and Symptoms of Separation Anxiety Disorder

While the onset of separation anxiety disorder symptoms typically manifests during childhood, there are a number of signs that can infer that an adult is suffering from this mental health condition. Consider the following behavioral, physical, cognitive, and psychosocial symptoms when trying to deduce if you or a loved one is battling this distressing form of anxiety:

*Behavioral symptoms:*

- Frequently checking up on the whereabouts of children, significant other, or other loved one
- Refusing to leave home

- Missing work
- Social withdrawal or isolation
- Refusing to sleep without or when away from children, significant other, or other loved one
- Avoiding travel
- Ritualistic or repetitive behaviors
- Cyclical thinking
- Pacing
- Restlessness

*Physical symptoms:*

- Labored breathing
- Headaches or migraines
- Stomachaches
- Nausea
- Vomiting
- Frequent urination due to pervasive nervousness
- Dizziness
- Muscle tension
- Disturbed sleep
- High blood pressure
- Increased heart rate
- Appetite changes
- Profuse sweating

*Cognitive symptoms:*

- Nightmares
- Impaired memory
- Compulsions
- Ritualistic thinking
- Difficulty making decisions
- Lack of concentration
- Inability to focus on tasks

*Psychosocial symptoms:*

- Guilty feelings
- Shame
- Irritability
- Derealization

- Ongoing feelings of nervousness
- Agitation
- Elevated levels of anxiety
- Intense and excessive fear

 If you feel that you are in crisis, or are having thoughts about hurting yourself or others, please call 9-1-1 or go to the nearest emergency room immediately.

# Effects of Separation Anxiety Disorder

Someone grappling with the symptoms of separation anxiety disorder should seek treatment immediately as there are a number of adverse effects that are likely to occur. Seeking effective and appropriate treatment can significantly reduce a person's chances of experiencing the following outcomes:

- Social isolation
- Inability to maintain employment
- Financial problems
- Increased conflict in interpersonal relationships
- Development of another mental health condition
- Development of a substance abuse problem or addiction
- Suicidal ideation
- Suicide attempts

# Co-Occurring Disorders

When an adult is suffering from separation anxiety disorder, it is common for that individual to also suffer from another mental health condition. The following psychiatric disorders are known to occur alongside this form of anxiety:

- Specific phobias
- Posttraumatic stress disorder
- Panic disorder
- Generalized anxiety disorder
- Social anxiety disorder
- Agoraphobia
- Obsessive-compulsive disorder

- Personality disorders
- Depressive disorders
- Bipolar disorder

GET CONFIDENTIAL HELP NOW:

# (855) 677-4044

✉ EMAIL US

Depression

Anxiety

Bipolar Disorder

ADHD

PTSD

Psychosis

Schizophrenia

Grief & Loss

Borderline Personality Disorder

Schizoaffective Disorder

Adjustment Disorder

## AFFILIATIONS & RECOGNITION



# MotherJones

## Forcibly Separating Children From Their Mothers Doesn't Just Hurt the Kids

*"I think what we're potentially talking about is a total mental health catastrophe."*

**ROSA FURNEAUX   JUNE 21, 2018 6:00 AM**



Mother Jones Illustration; Gregory Bull/AP

The sounds of sobbing children were still resonating yesterday as President Trump signed an executive order to end family separation at the border. Anger and anguish over Trump's "zero tolerance" immigration policy came to a head this week, after ProPublica obtained and published a recording of distraught kids at a US Customs and Border Control facility. It conveyed the horrifying situation faced by hundreds of immigrant families: a sound few mothers could bear.

The psychological effect of traumatic child-parent separation on children is well documented. Less studied, though, is the impact of that separation on the mothers. Yet the experts I spoke with warn that having a child taken away, especially after a family reaches what is believed to be a safe haven, could have devastating effects, including depression, symptoms of post-traumatic stress syndrome, and the loss of will to live. "I think what we're potentially talking about is a total mental health catastrophe," says Aurélie Athan, a clinical psychologist who studies motherhood at Columbia University.

*"It's as if you lost your child to a motor vehicle crash, and you don't know if they're*

Dr. Patricia De Marco Centeno, a California psychiatrist who specializes in maternal mental health, adds that mothers forcibly separated from their children are likely to suffer from

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4401   Page 233 of
251
Case 1:18-cv-02   PLF   Document 11-2   Filed 09/26/1   Page 210 of 215

*alive or not."*

acute stress reactions such as extreme fear, panic-like episodes, insomnia, poor eating, and poor self-care. "The biggest risk," she says, is that these symptoms may develop into more-serious stress reactions such as PTSD. "What I think perpetuates the problem is the degree of uncertainty in the situation—the fact that there is no end point, the fact that there is no date of reunification. It's as if you lost your child to a motor vehicle crash, and you don't know if they're alive or not."

The researchers point out that many of the mothers separated from their children by American authorities are already dealing with trauma as the result of violence and poverty in their home countries—not to mention the things they go through during the harrowing journey north to the US border. People who experience a sequence of traumatic experiences may end up with a particularly severe type of post-traumatic stress known as Complex PTSD. "It's a lot harder to treat," De Marco Centeno says.

Complex PTSD, according to the Department of Veterans Affairs, is often associated with experiences in which the victim is held in a long-term state of physical or emotional captivity—a concentration camp, for example, or an abusive and violent relationship.

*To leave the women out of the conversation "is to lose 50 percent of the story."*

Despite the lack of research on the mothers, Athan says a mother's and a child's experience are opposite sides of the same coin. To leave the women out of the research, and out of the national conversation around Trump's policy, "is to lose 50 percent of the story," she says. "These are really the mothers at the margins."

To reduce the psychological damage, for both, De Marco Centeno is clear: "Stop and reunite. Stop and reunite. Everything else can be figured out later," she says. The longer families are kept apart, "the more permanent the damage is going to be." But the question of whether reunification will quickly reverse the trauma caused by forced separations is unresolved. "I don't think we're talking about anything that can be cured, or even redressed," Athan told me. "I think what we can talk about is to what degree it can be mitigated."

As it stands, thousands of children have been taken from their families, and while Trump's executive order is intended to halt further separations, Homeland's plan for reuniting families remains unclear. On Monday, *The New Yorker* reported that no protocols have been put in place for keeping track of parents and children concurrently, or for eventually reuniting them. Reports have circulated of parents being deported without their children. Meanwhile, detained parents may be foregoing legitimate claims for asylum by pleading guilty to expedite the return of their children. On Wednesday evening, officials said children already separated from their families would not be immediately reunited in the wake of the executive order.

In an interview with MSNBC, a Salvadoran mother identified as "Christina" who was separated from her 10-year-old son and 16-year-old daughter by US authorities, shook her head when asked if she would have come to America knowing her kids would be taken from her. "You suffer a lot on the journey and you think that it's over when you get here," she said through a translator. "But once you are detained here, that's where the most painful part of the journey begins."

*This article has been revised.*

**ROSA FURNEAUX**

Rosa Furneaux is a Ben Bagdikian editorial fellow in *Mother Jones'* San Francisco office. Find her on Twitter @rosafurneaux or email rfurneaux@motherjones.com.

US

Find a Therapist (City or Zip)                                                                 Verified by Psychology Today


William R. Klemm Ph.D.
Memory Medic

# Thwart Stress Effects of Memory

**Forced retrieval protects against stress-induced impairment of memory.**

Posted Dec 29, 2016

SHARE                    TWEET                    EMAIL                    MORE

It is well known that stress can impair memory. Everyone has had some experience of this kind. For a student suffering test anxiety, grades are likely to suffer. In high-stakes social or business interactions, the stress may well cause memory to fail us, as when presidential candidate Rick Perry forgot the name of the agency he wanted to abolish if elected, or when we forget a friend's name in the process of making a social introduction. How does stress do this? Is there anything we can do about it?

First, we need to know what stressful events do to the body and brain. Brain freezes, like Perry's, probably occur because thinking can get so preoccupied with the stress-inducing stimuli that other thoughts cannot emerge. But other kinds of stress-induced memory impaired come from the well-known "fight or flight" response in which stress activates the release of adrenalin into the bloodstream. Adrenalin has many bodily effects that support fight or flight, such as raising heart rate and blood pressure, and increasing arousal perhaps to the point of anxiety and fear. The increased attentiveness may have a fleeting beneficial effect on memory, as has been demonstrated in laboratory experiments. But the other effects of adrenalin on anxiety and distress are likely to impair memory.

The other thing that happens during stress is the activation of the anterior pituitary gland's release of ACTH, which in turn activates another part of the adrenal gland to dump cortisol into the bloodstream. In the short term, cortisol can have many beneficial effects for combating stress, such as mobilizing white blood cells and enhancing the immune system. But cortisol binds to cells in the brain's hippocampus, the area that converts new experiences into memory. This binding actually disrupts the memory-forming process. Ultimately, if stress continues, the synaptic regions deteriorate, making the impairment permanent.

The effects of both adrenalin and cortisol were revealed in an interesting study of mild social stress. Here, the focus was on a theory of how stress effects on memory might be thwarted by a learning technique called forced retrieval. Prior research with students, had shown, that the usual study technique of re-reading notes or text is not nearly as effective as requiring the learner to actively retrieve the information, as one might do, with flash cards, for example. Just a few months ago, I posted a blog on this forced retrieval phenomenon as a key element in "strategic studying."

This new research was aimed at testing the possibility that forced retrieval might protect learners from the memory deficits caused by stress. In the study on the first day, 120 subjects studied a list of 30 nouns or images of nouns one at a time. Then, one half of the group restudied the items while the other half practiced retrieval by recalling as many items as they could (but without feedback telling them if they got it right). One the next day, half of each group were stressed by being required to solve hard math problems and by giving speeches in front of two judges and three peers. Then they were tested. Twenty minutes later they took a second test on items that had not been tested on the first test. The results revealed that retrieval practice yielded better results.



Source: W. R. Klemm

Science. 354 (2016), 1046-1047

On the first test, we see that the stressed learners who just studied the items the day before had fewer of the items remembered on the first test given immediately after the stress. But there was no such effect on the stressed learners who used retrieval practice during the initial learning. This protective effect of retrieval practice was evident on the second test 25 minutes later. In fact, the retrieval practice effect was better than on the first test, even though different items were tested. You may have noticed that the stressed study group on the second test did worse than they did on the first test. This is attributed to a mild effect of adrenalin, which as mentioned above can have some benefit on memory. Adrenalin's action is immediate and is apparently swamped on the second test by the delayed release of cortisol, which shows up by the second test. Students might note that the magnitude of difference may appear small, but in percentage terms could equal to more than two letter grades (compare the two stressed groups on the delayed test).

To explain why forced retrieval works, the authors speculate that it provides better initial encoding. That is, the new information is registered more strongly if you make yourself try to retrieve it. This is consistent with the everyday experience that most of us have had wherein information that strongly grabs our attention is more likely to be remembered. Forced retrieval is a way to make ourselves pay better attention to what we are trying to lean.

*Readers wanting to learn more about improving memory are urged to check out Memory Medic's books, Memory Power 101 and Better Grades, Less Effort.*

**References**

Klemm, W. R. (2016). Strategic studying. October 9, http://thankyoubrain.blogspot.com/2016/10/strategic-studying.html

Smith, Amy M. et al. (2016). Retrieval practice protects memory against acute stress. Science. 354 (6315), 1046-1047.

SHARE                    TWEET                    EMAIL                    MORE

5 COMMENTS

# The New York Times

# *Honduran Man Kills Himself After Being Separated From Family at U.S. Border, Reports Say*

By Jeffery C. Mays and Matt Stevens

June 10, 2018

A Honduran man who was separated from his family after he had crossed the United States border into Texas with them last month strangled himself in his holding cell, according to Customs and Border Protection officials, public records and media reports.

The man, Marco Antonio Muñoz, crossed the Rio Grande with his wife and 3-year-old son in mid-May near Granjeno, Tex., The Washington Post reported.

In a statement, a Customs and Border Protection spokesman said Mr. Muñoz was apprehended by Border Patrol agents on May 11 for "attempting illegal entry into the United States" and taken to the Rio Grande Valley central processing center.

Once there, Mr. Muñoz and his family said they wanted to apply for asylum, The Post reported; Border Patrol agents then told them they would be separated.



Marco Antonio Muñoz
Starr County Sheriff's Office

While at the processing center, the Customs and Border Protection spokesman said, Mr. Muñoz "became disruptive and combative," so the authorities moved him to a jail in Starr County, Tex. — about 40 miles west of the processing center — for an overnight stay.

Exhibit A
000248

Although the statement did not say whether Mr. Muñoz was with family members at the border, or explain why he became combative, media outlets reported that he grew upset after learning that his family would be split up.

A public report posted by the Texas attorney general says Mr. Muñoz, 39, was booked into the jail the night of May 12. He was "combative and noncompliant" and scuffled with a detention officer, the report said, before being placed in a padded cell late that night.

Throughout the evening, officers checked on Mr. Muñoz every 30 minutes, the report said, but during the morning shift, different officers found Mr. Muñoz dead on the floor.

The death was listed in the report as a suicide by self-strangulation and hanging. Law enforcement officials reviewed video recordings of what happened in the cell overnight, the report said.

"C.B.P. takes every loss of life very seriously and has initiated an internal review to ensure these policies were followed," the agency's statement said, referring to the agency's standards on transport, escort, detention and search.

## Got a confidential news tip?

Do you or does someone you know have information from inside immigration detention centers, such as photos, videos, or audio? If so, please contact us at tips@nytimes.com. If you prefer to share anonymously, please do so by visiting nytimes.com/tips.

Learn More

Representatives from the Starr County Sheriff's Office did not return multiple calls and emails for comment on Saturday. A person who picked up the phone there said staff members were not available on weekends.

On May 7, days before Mr. Muñoz was apprehended at the border, Attorney General Jeff Sessions announced that the Trump administration would criminally prosecute everyone who illegally crosses the Southwest border, in what he called a "zero tolerance" policy intended to deter new migrants, mainly from Central American countries like Honduras.

The policy imposes potential criminal penalties on border-crossers who would have previously faced mainly civil deportation proceedings — and in the process, forces the separation of families crossing the border.

Many who have criticized the policy have focused on its effect on children who are separated from their parents.

Exhibit
000249

Case 3:18-cv-00428-DMS-MDD Document 282-1 Filed 10/15/18 PageID.4406 Page 238 of
Case 1:18-cv-022 PLF Document 1-2 Filed 09/26/1 Page 215 of 215
251

But Justin Tullius, a lawyer at the nonprofit Raices, which works with migrants in Texas, said adults who are detained have also suffered.

"We've worked with parents who have shared suicidal thoughts and who have attempted to take their own lives because of the experience of detention," Mr. Tullius said. "We can't allow policies that traumatize parents and children. Families must be allowed to go through the process of seeking protection in the U.S. together, without unnecessary and harmful separation."

Miriam Jordan contributed reporting.

# Exhibit B

## to the Complaint

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4408   Page 240 of
251
Case 3:18-Case028-DMC   ICPLF Document 201-Bile Filed 08/09/28   age 3234 13 Page 1 of 5

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-
Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-
Plaintiffs*
*Admitted Pro Hac Vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

        Petitioners-Plaintiffs,

vs.

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, et
al.,

        Respondents-Defendants.

Case No. 18cv428 DMS MDD

**NOTICE LODGING
AGREEMENT FOR COURT'S
APPROVAL**

On August 16, 2018, this Court granted the plaintiffs in *M.M.M. v. Sessions*,
No. 18-1832, a temporary restraining order ("TRO") barring Defendants "from
removing [specified persons] from the United States, until the merits of Plaintiffs'
motion for a preliminary injunction is resolved." Order, ECF No. 55 at 15 (Aug. 16,
2018). The Court directed the parties to consider "how they wish to proceed on the
issues of class certification and Plaintiffs' entitlement to asylum proceedings under
§§ 235 or 240," and to "meet and confer and propose a solution—one which follows
the law, and is equitable and reflective of ordered governance." *Id.* at 16. On August
17, 2018, following the status conference in *Ms. L.*, the Court issued a further order
directing that "[t]he parties shall meet and confer on the issue of whether removed
parents have a right to be reunified with their children in the United States. They
shall also meet and confer on class certification in *M.M.M.*, and whether the plaintiffs

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4410   Page 242 of
251
Case 3:18-cv-00428-DMS   IDPL Document 201-1   Filed 08/09/18   Page 3436   Page 3 of 5

1   in that case are entitled to pursue asylum requests under § 235 or § 240." *Ms. L. v.*

2   *ICE*, No. 18-428, Order, ECF No. 196 at 1, (Aug. 17, 2018); *see also Ms. L.* Hearing

3   Tr. 11-22 (Aug. 17, 2018).

4

5        In accordance with the Court's orders and directions, the parties met and

6   conferred, both on the issues directed by the Court and additional issues raised in

7   these and related cases. Those conferrals included counsel for the plaintiffs in

8   *M.M.M.*, counsel for the plaintiffs in *Ms. L*, counsel for the plaintiffs in *Dora v.*

9   *Sessions*, No. 18-1938 (D.D.C.), and counsel for the Defendants in each of those

10  cases. The parties' efforts have produced the attached agreement, which reflects their

11  agreed resolution of the issues identified by the Court as well as other matters.

12

13        The parties identified now respectfully request that the Court approve the

14  attached agreement and lift the TRO/stay in *M.M.M. See M.M.M.*, ECF No. 55 at

15  15. The parties request that the Court add the agreement to the agenda for the next

16  status conference, at which point the parties and the Court can address any

17  procedural steps that may be necessary prior to approval of the agreement.

18

19

20

21

22

23

24

25

26

27

28

Exhibit A
000254

1    DATED: September 12, 2018           Respectfully submitted,

2                                        /s/ Lee Gelernt

3                                        Lee Gelernt*
                                         Judy Rabinovitz*
4                                        Anand Balakrishnan*

5                                        AMERICAN CIVIL LIBERTIES UNION
                                         FOUNDATION
6                                        125 Broad St., 18th Floor
                                         New York, NY 10004
7                                        T:  (212) 549-2660
8                                        F:  (212) 549-2654
9                                        *lgelernt@aclu.org*
                                         *jrabinovitz@aclu.org*
10                                       *abalakrishnan@aclu.org*

11
                                         Bardis Vakili (SBN 247783)
12                                       ACLU FOUNDATION OF SAN DIEGO
13                                       & IMPERIAL COUNTIES
                                         P.O. Box 87131
14                                       San Diego, CA 92138-7131
15                                       T: (619) 398-4485
                                         F: (619) 232-0036
16                                       *bvakili@aclusandiego.org*

17
                                         Stephen B. Kang (SBN 292280)
18                                       Spencer E. Amdur (SBN 320069)
19                                       AMERICAN CIVIL LIBERTIES UNION
                                         FOUNDATION
20                                       39 Drumm Street
                                         San Francisco, CA 94111
21                                       T:  (415) 343-1198
22                                       F:  (415) 395-0950
                                         *skang@aclu.org*
23                                       *samdur@aclu.org*
24
                                         *Attorneys for Petitioners-Plaintiffs*
25                                            **Admitted Pro Hac Vice*
26
27                                                      and
28

Exhibit A
000255

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

4

Exhibit A
000258

## Plan to address the asylum claims of class-member parents and children who are physically present in the United States

The government is willing to agree to the following procedures for addressing the asylum claims of *M.M.M.* agreed class members and the claims of *Ms. L* class members (and *Dora* plaintiffs), other than those class members who agree to waive these procedures (and thus to waive any further claims or relief).[1] (In this document, references to *Ms. L* class members encompass *Dora* plaintiffs.) Class counsel are responsible for determining a class member's intentions related to waiver of the procedures set forth below. Upon approval of this agreed-upon plan by the U.S. District Court for the Southern District of California, *M.M.M.* agreed class members agree to dismiss their pending litigation in the U.S. District Court for the District of Columbia, and to refrain from seeking preliminary injunctive relief in their litigation pending in the U.S. District Court for the Southern District of California; *Dora* plaintiffs agree to dismiss their pending litigation in the U.S. District Court for the District of Columbia; and *M.M.M.* agreed class members and *Ms. L* class members agree to refrain from additional litigation seeking immigration- or asylum-related injunctive, declaratory, or equitable relief that arises from the facts and circumstances set forth in the *Ms. L*, *M.M.M.*, and *Dora* complaints relating to those parents and children covered by this plan, including statutory claims. This plan applies only to *Ms. L* class members and *M.M.M.* agreed class members who have been continuously physically present in the United States since June 26, 2018, and does not set any precedent for any additional group of aliens, and any exercise of legal authority or discretion taken pursuant to this plan is exercised only to effectuate the implementation of this plan in relation to this group of individuals. The Court's approval of this agreement will resolve the pending preliminary-injunction motion in *M.M.M.* and will also lift the TRO issued in that matter. The Court will retain jurisdiction to enforce the provisions of this plan, which represents the substantive terms for the implementation of a settlement agreement and supersedes the prior written or oral communications between the parties regarding this plan.

1.  **a.**   *Ms. L* class members and *M.M.M.* agreed class members who are not currently detained in DHS custody (and are not currently in HHS custody) and who have been issued Notices to

---

[1] The classes of individuals to whom this plan relates include:

*Ms. L* **Class Members and *Dora* Plaintiffs:** All adult alien parents who entered the United States at or between designated ports of entry with their child(ren), and who, on or before the effective date of this agreement: (1) were detained in immigration custody by the DHS; (2) have a child who was or is separated from them by DHS and, on or after June 26, 2018, was housed in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child; and (3) have been (and whose child(ren) have been) continuously physically present within the United States since June 26, 2018, whether in detention or released. The class does not include alien parents with criminal histories or a communicable disease, or those encountered in the interior of the United States.

*M.M.M.* **Agreed Class Members:** All alien children who are under the age of 18 on the effective date of this agreement who: (1) entered the United States at or between designated ports of entry with an alien parent, and who were separated from their parents, on or before the effective date of this settlement agreement; (2) have been or will be reunified with that parent pursuant to the preliminary injunction issued by the Court in *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018); and (3) have been continuously physically present in the United States since June 26, 2018.

All references to a "class" or "class member" in this document refer to the classes described above, as well as alien parents who are not part of the *Ms. L* class due to criminal history or communicable disease, but who the Court has ordered must be reunified.

1

Exhibit A
000257

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4414   Page 246 of
251
Case 3:18-cv-00428-DMS   D-PD Document 260-1-3   Filed 09/02/21   Page 84 of 3 Page 2 of 7

Appear (NTAs) will not be removed by DHS prior to issuance of a final removal order in their resulting removal proceedings conducted under Section 240 of the Immigration and Nationality Act (INA). If a *Ms. L* class member or *M.M.M.* agreed class member was released from DHS or ORR custody, is not currently in Section 240 removal proceedings, and is not subject to a final removal order, that individual can affirmatively apply for asylum before U.S. Citizenship and Immigration Services (USCIS), USCIS will adjudicate such an application regardless of whether an unfiled NTA exists, and USCIS will follow its established procedures concerning a parent's involvement in his or her minor child's asylum application process. If an *M.M.M.* agreed class member (whether currently detained or released) received a final removal order in Section 240 removal proceedings prior to reunification, DHS and HHS will work in good faith with *M.M.M.* counsel to identify such children within 15 days of approval of this agreement, and DHS will join in a motion to reopen those proceedings if requested by the *M.M.M.* agreed class member no later than 45 days from approval of this agreement. *M.M.M.* agreed class members who have not been reunified with their parent(s) as of the effective date of this agreement will be afforded existing procedures for unaccompanied alien children pursuant to governing statutes and regulations, including but not limited to Section 240 removal proceedings, unless and until they are reunified with a parent, in which case the procedures described below will apply.

b. If a detained, reunited *M.M.M.* agreed class member child has been served with an NTA, but the NTA has not been filed with an immigration court, DHS will exercise its discretion under 8 C.F.R. § 239.2(a) to cancel the NTA within 15 days of the Court's approval of this agreement. For such a child who either had an NTA cancelled in this way, or who has never been served with an NTA, if the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, ICE will then initiate expedited removal (ER) proceedings under Section 235 of the INA against the child. Where such a class member child asserts, or has already asserted, an intention to apply for asylum or a fear of persecution or torture, either directly or through counsel, they shall be referred to USCIS for a credible fear determination.

c. If a detained, reunited *M.M.M.* agreed class member child has been issued an NTA that has been filed with an immigration court and the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, DHS will file a motion to dismiss the pending Section 240 proceeding, seeking to do so jointly with the child's immigration attorney of record, as practicable. Such a motion shall be filed within 30 days of the Court's approval of this agreement and shall request expedited consideration by the immigration court. Upon dismissal of the Section 240 proceeding, ICE will initiate expedited removal proceedings under Section 235 of the INA against the child. Where such a class member child asserts, or has already asserted, an intention to apply for asylum or a fear of persecution or torture, either directly or through counsel, they shall be referred to USCIS for a credible fear determination.

d. For *Ms. L* class members who have not been issued an NTA and have final ER orders that have not been cancelled by DHS, USCIS will exercise its discretionary authority to sua sponte conduct in good faith a de novo review of the credible fear finding of the parent to determine if reconsideration of the negative determination is warranted. During that review process for *Ms. L* class members, USCIS will review the parent's case and the information provided and determine whether the individual has a credible fear of persecution or torture.

Exhibit A
000258

For the limited purpose of this settlement agreement, USCIS will speak with the individual again for additional fact-gathering and the individual may present new or additional information at this time, with the assistance of the individual's counsel in-person unless ICE determines in good faith that in-person participation would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, provided that counsel's attendance is at no expense to the government and does not unreasonably delay the process. In determining whether any factual inconsistencies between the original interview and the subsequent fact-gathering impact the credibility of the parent, due consideration will be given to the psychological state of the parent at the time of the initial interview. If the parent establishes that he or she can meet the credible fear standard, as it is described at Section 235(b)(1)(B)(v) of the INA and 8 C.F.R. § 208.30(e)(2) and (3), then DHS will issue and subsequently file an NTA. The children will be treated as the parent's dependents under 8 C.F.R. § 208.30(b). If the parent's credible fear determination remains negative, USCIS will screen the child individually for credible fear. The parent will be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person unless ICE determines in good faith that in-person participation would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government.

e.  For *Ms. L* class members who are currently detained[2] with their *M.M.M.* agreed class member child(ren) at an ICE FRC and are subject to reinstated orders of removal, ICE will initiate ER proceedings under Section 235 against the minor child(ren), upon a determination that the child was initially encountered within 14 days of entry and 100 miles of the border. During those proceedings, the child(ren) will be referred for a credible fear determination if the child(ren) asserts, or has already asserted, a fear of return, either directly or through counsel. The credible fear claim will then be considered under the standards of 8 C.F.R. § 208.30, as described above. USCIS will conduct the credible fear interview of the child(ren) in coordination with a sua sponte review of the reasonable fear determination for the parents to determine whether reconsideration of the negative reasonable fear determination is warranted.

USCIS will review the parent's case and the information provided and determine whether the individual has a reasonable fear of persecution or torture. For the limited purpose of this settlement agreement, USCIS will speak with the individual again for additional fact-gathering and the individual may present new or additional information at this time, with the assistance of the individual's counsel in-person unless ICE determines in good faith that in-person participation is impracticable or would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, provided that counsel's attendance is at no expense to the government and does not unreasonably delay the process. In determining whether any factual inconsistencies between the original interview and the subsequent fact-

---

[2] This agreement does not impact the ability of *Ms. L* class members with reinstated orders of removal who are not detained to pursue any available appeal of such an order under existing law and subject to statutory time periods.

Exhibit A
000259

gathering impact the credibility of the parent, due consideration will be given to the psychological state of the parent at the time of the initial interview. If the parent establishes that he or she can meet the reasonable fear standard, as it is described at 8 C.F.R. § 208.31(c), then DHS will place the parent in withholding-only proceedings. The parent will be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person unless ICE determines in good faith that in-person participation is impracticable or would adversely impact facility security or operations due to facility staffing, configuration, or access, in which case counsel will be permitted to participate telephonically, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government.

f.   If the parent's credible fear or reasonable fear finding remains negative upon review, USCIS will notify the parent in writing that USCIS declines to reconsider the existing negative credible fear or reasonable fear determination. If the child receives a separate negative credible fear determination, the child may seek review by an immigration judge.

g.   For purposes of the reviews and interviews of detained parents and/or children described in this proposal, the government shall provide the parent and/or child with the orientation that is normally provided for credible fear interviews, and shall provide at least 5 days' notice of such orientation. Notice of the orientation shall be provided no later than 3 days following the parent and/or child's execution of a document reflecting his or her decision pursuant to paragraph 8 of this agreement, and the notice shall state the purpose of the notice (orientation for an interview or review) and the date, time, and location of the orientation. Such reviews and interviews will be conducted at least 48 hours after the orientation, with due consideration given to any reasonable requests to continue the interview. The notice and time periods described in this paragraph will not apply if a parent affirmatively requests, in writing, that the review or interview take place on an expedited basis.

2.   In the case of a parent and child(ren) both in ER proceedings under the process described above, if either the parent or the child establishes a credible fear of persecution or torture, USCIS will issue NTAs to both parent and child and place the family in Section 240 removal proceedings. *See* 8 C.F.R. §§ 208.30(f) (positive credible fear finding made by USCIS), 1208.30(g)(2)(iv)(B) (positive credible fear finding made by immigration judge).

3.   In the case of a parent and child(ren) both in ER proceedings under the process described above, if none of the family members establish credible fear of persecution or torture (and in the case of a child who seeks review of the credible fear finding by an immigration judge, such finding is upheld by an immigration judge), the ER orders may immediately be executed.

4.   In the case of a parent who is subject to a reinstated order of removal, if the child(ren) establishes credible fear and the parent does not establish a reasonable fear, the child(ren) would be placed in Section 240 removal proceedings and the parent would at that time be subject to continued detention or release, in DHS's discretion, consistent with paragraph 7 below. DHS will not remove a *Ms. L* class member who received a negative reasonable fear finding while his or her *M.M.M.* agreed class member child goes through the credible

4

fear process and, if applicable, Section 240 removal proceedings. Plaintiffs concede, however, that removal of any *Ms. L* class member with a reinstated removal order under this agreement is significantly likely to occur in the reasonably foreseeable future and that, if a parent initiates legal proceedings challenging their continued detention, DHS may immediately proceed with that *Ms. L* class member's removal, regardless of any injunctive orders issued in *Ms. L* and *M.M.M.*, provided that DHS gives the parent at least 7 days' advance notice to the parent that he or she will be removed.

5. In the case of a parent who is subject to a reinstated order of removal, if the child(ren) establish credible fear and the parent establishes a reasonable fear, the child(ren) would be issued NTAs and placed in Section 240 removal proceedings, and the parent would be referred for withholding-only proceedings pursuant to 8 C.F.R. §§ 1208.2(c)(2) and 1208.31(e).

6. If a *Ms. L.* class member who is currently detained[3] in an ICE FRC with his or her *M.M.M.* agreed class member child is subject to a final removal order issued in proceedings conducted under Section 240 (other than a reinstated order) and the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, ICE would initiate ER proceedings under Section 235 against the child within 7 days of the Court's approval of this agreement, and refer the child for a credible fear interview. While the final order parent would not be a party to the child's credible fear adjudication, the parent would be available to consult with and assist the child in the course of that process. The parent would be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government, and the timing of the interview will be in accordance with Paragraph 1.g. above. If the child establishes a credible fear of persecution or torture, USCIS will place the child in Section 240 removal proceedings, and ICE will move for reopening of the parent's prior removal proceedings and consolidation of the parent's case with the child's before the immigration court. If the child does not establish credible fear of persecution or torture, the removal orders may immediately be executed.

7. Detention and custody decisions for aliens covered by this plan will be made consistent with DHS's authorities under Sections 235, 236, and 241, and the Order Granting Joint Motion Regarding Scope Of The Court's Preliminary Injunction in *Ms. L. v. ICE*, No. 18-428 (S.D. Cal.) (Aug. 16, 2018) (ECF 192) (recognizing that class members may be required to choose whether to waive their own right not to be separated from their minor child(ren) or to waive their child(ren)'s right under the Flores Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program.").

8. *Ms. L* counsel, *M.M.M.* counsel, or *Dora* counsel may identify class members who wish to waive the procedures described herein and be promptly removed to their country of origin.

---

[3] This agreement does not impact the ability of *Ms. L* class members with final removal orders issued in Section 240 removal proceedings, other than a reinstated order of removal, and who are not detained, to pursue individual appeals of such orders under existing law and subject to statutory time periods for challenging any such order.

5

*Ms. L* counsel, *M.M.M.* counsel, and *Dora* counsel will promptly develop a process for obtaining and documenting such a choice through a knowing and voluntary waiver. Defendants will not engage with class members on such matters, but will seek to effectuate such waiver decisions when communicated and documented by *Ms. L* counsel, *M.M.M.* counsel, or *Dora* counsel. Class members may either pursue the relief described in this agreement or elect prompt removal, but may not pursue any other immigration- or asylum-related injunctive, declaratory, or equitable relief based on the allegations or claims made in any of the *Ms. L*, *M.M.M.*, or *Dora* complaints filed in any court accruing as of the date this plan is approved by the Court, including statutory claims. This agreement does not affect the right of *Ms. L* class members to seek reunification under the June 26, 2018 preliminary injunction in *Ms. L.*

### The return of removed parents to the United States[4]

The government does not intend to, nor does it agree to, return any removed parent to the United States or to facilitate any return of such removed parents. The classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph. Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual. Plaintiffs' counsel agree to present any such cases, including all evidence they would like considered by the government within 30 days of the approval of this agreement. In light of plaintiffs' counsel's representation that such cases will be rare and unusual, Defendants agree to provide a reply to any case presented by Plaintiffs within 30 days of receiving Plaintiffs' request to consider the case. Except as specifically set forth herein, the classes agree that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have.

With respect to *M.M.M.* agreed class members who seek asylum and who have removed parents, the government agrees not to oppose requests that the removed parent provide testimony or evidence telephonically or in writing in the child's asylum or removal proceedings and that ICE attorneys appearing in immigration court (1) will not object to the admission of documentary evidence (such as photocopied, scanned, or faxed documents) provided by the removed parent on the grounds that such documentary evidence does not bear an original signature or is not an original copy (ICE reserves the right to object based on other grounds), and (2) will not object to telephonic participation by the parent in the *M.M.M.* agreed class member's Section 240 removal proceedings provided that the alien (and his or her legal representative, if applicable) make appropriate motions to the immigration judge to permit telephonic testimony in advance of any merits hearing, that the alien is responsible for providing accurate contact information to permit the immigration judge to make contact with the parent, and that the parent's unavailability and faulty connections or other technological impediments may not serve as the basis for delaying scheduled hearings. Class

---

[4] For this section of this agreement, the classes are the same as in footnote 1 above except that the requirements of continuous physical presence in the United States do not apply to this section of the agreement, since this section addresses removed parents.

6

Exhibit A
000262

Case 3:18-cv-00428-DMS-MDD   Document 282-1   Filed 10/15/18   PageID.4419   Page 251 of
251
Case 3:18-cv-00428-DMS-MDD   Document 220-1-3 Filed 09/26   Page 134-513 Page 7 of 7

members, however, recognize that ICE has no control over the technology or logistics of the Executive Office for Immigration Review.

Exhibit A
000263