ORIGINAL

1  JULIA ROMANO (SBN 260857)
   *jromano@kslaw.com*
2  KING & SPALDING LLP
3  633 West Fifth Street
   Suite 1700
4  Los Angeles, CA 90071
   Telephone:  +1 213 443 4355
5  Facsimile:  +1 213 443 4310

6  Attorneys for Objector Ms. Egla
7  Arely Velasquez Molina

8  [Additional Counsel Listed On Second Page]

```
┌─────────────────────────────────┐
│           FILED                  │
│                                  │
│         OCT 23 2018              │
│                                  │
│   CLERK, U.S. DISTRICT COURT     │
│ SOUTHERN DISTRICT OF CALIFORNIA  │
│ BY        VEC          DEPUTY    │
└─────────────────────────────────┘
```

9            **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11
12  M.M.M., on behalf of his minor child,     Case No. 3:18-cv-1832-DMS
    J.M.A., et al.
13
            Plaintiffs,
14
15       v.
16  Jefferson Beauregard Sessions, III,
    Attorney General of the United States,
17  et al.,
            Defendants.
18
    ─────────────────────────────────
19  Ms. L, et al.,                            Case No. 18-cv-00428-DMS-MDD
20          Plaintiffs,                        **CLASS ACTION**
21       v.                                    **OBJECTION OF MS. EGLA ARELY**
                                               **VELASQUEZ MOLINA TO THE**
22  U.S. Immigration and Customs              **OCTOBER 5, 2018 SETTLEMENT**
    Enforcement, et al.,                      **AGREEMENT**
23
            Defendants.
24
25
26
27
28



OBJECTION OF MS. EGLA ARELY                        Case No. 18-cv-00428-DMS-MDD
VELASQUEZ MOLINA

1  JOSHUA C. TOLL
   *jtoll@kslaw.com*
2  WINTTA M. WOLDEMARIAM
   *wwoldemariam@kslaw.com*
3  KING & SPALDING LLP
   1700 Pennsylvania Ave, NW
4  Suite 200
   Washington, D.C. 20006-4707
5  Telephone:  +1 202 737 0500
   Facsimile:   +1 202 626 3737
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       Pursuant to the Court's October 5, 2018 Order preliminarily approving the

2 class settlement in this action (the "Settlement"), Ms. Egla Arely Velasquez

3 Molina ("Ms. Velasquez Molina"), a citizen of Honduras seeking asylum in the

4 United States and presently detained at the Port Isabel Detention Center ("PIDC"),

5 files this objection seeking clarification that she is included within the definition of

6 the plaintiff class in the Settlement. The grounds for this objection are set forth

7 below.

8 **I.**    **INTRODUCTION**

9       Ms. Velasquez Molina, a thirty year old citizen of Honduras, is the sole

10 primary caregiver, legal guardian, and biological aunt of E.C., a ten-year old girl

11 who has lived with Ms. Velasquez Molina since the murder of E.C.'s biological

12 father, Ms. Velasquez Molina's biological nephew, and has been in the sole care of

13 Ms. Velasquez Molina since the death of E.C.'s biological father in 2017. Copies

14 of official documents from the Honduran government appointing Ms. Velasquez

15 Molina legal guardian for E.C., together with certified translations, are collectively

16 attached to this Objection as Exhibit A.

17       Ms. Velasquez Molina and E.C. fled Honduras to escape threats of physical

18 violence and death and crossed the U.S. border in June 2018. Pursuant to the

19 Government's "zero tolerance" policy, Ms. Velasquez Molina and E.C. were

20 separated from one another shortly after they crossed the U.S. border. Ms.

21 Velasquez Molina is detained at the Port Isabel Detention Center in Texas, while

22 her *de facto* daughter, E.C., is currently housed at a foster-care facility in San

23 Antonio, Texas.

24       The separation from her daughter caused extreme emotional trauma for Ms.

25 Velasquez Molina, as would be the case with any parent. Ms. Velasquez Molina

26 was in this traumatized state when she was given her credible fear interview as part

27 of the asylum process, which resulted in a negative finding by the Asylum Officer.

28

1       On October 17, 2018, Ms. Velasquez Molina filed a lawsuit in the United

2   States District Court for the District of Columbia seeking, among other things, a *de*

3   *novo* credible fear interview conducted in good faith, which is one element of the

4   relief granted to similarly situated detained immigrants in the Settlement.  A copy

5   of Ms. Velasquez Molina's complaint in her District of Columbia action is attached

6   as Exhibit B to this Objection.  In her complaint, Ms. Velasquez Molina alleges

7   that because she was emotionally traumatized by the Government's forced family

8   separation policy at the time her initial credible fear interview was conducted, she

9   was denied her due process rights guaranteed by the Fifth and Fourteenth

10  Amendments to the U.S. Constitution.

11      There are numerous scholarly articles that describe the devastating

12  emotional harm caused by family separations.  *See, e.g.*, Gaiane Nazarian,

13  "Separation Due to Deportation: Psychological, Emotional, and Economic Affect

14  on Children of Deported Parents," *Cal. State San Bernardino* (2014).  The

15  Settlement in this action is a tacit acknowledgement by Defendants that family

16  separations cause significant emotional damage to all concerned.  The *de novo*

17  credible fear interview provided for in the Settlement is obviously based on the

18  understanding that a credible fear interview administered while the detainee was

19  emotionally traumatized from being separated from her child is inherently unfair

20  and a denial of due process.

21      The Settlement calls for a *de novo* credible fear interview for certain

22  immigrant "parents," a term that is not defined in the Settlement or in the original

23  class certification order from this Court.  *See* Tentative Settlement Agreement,

24  Doc. 247 at 32.  The class certification order and the Settlement expressly exclude

25  certain parents from the class, such as those with criminal histories or with

26  communicable diseases, but do not exclude legal guardians or any other type of

27  parent.  As shown below, Ms. Velasquez Molina is properly included within the

28

1  plaintiff class and should be afforded the relief provided in the Settlement.

2  **II.   MS. VELASQUEZ MOLINA SHOULD BE IN THE SETTLEMENT**

3  **CLASS**

4      **A.   Legal Guardians Should Be Treated The Same As Biological**

5      **Parents Under The Settlement**

6        As shown in the documents attached to this Objection as Exhibit A, Ms.

7  Velasquez Molina is the official legal guardian of her young niece, E.C., and has

8  been her guardian since gang members murdered her father in 2017.  Counsel for

9  Ms. Velasquez Molina have engaged with counsel for the Defendants in Ms.

10  Velasquez Molina's District of Columbia action  seeking their agreement that

11  official legal guardians such as Ms. Velasquez Molina should be within the scope

12  of the Settlement and, therefore, entitled to a *de novo* credible fear interview.  To

13  date, Defendants have not agreed that Ms. Velasquez Molina is within the

14  definition of "parent" in the Settlement, and, in a related case with the same

15  Defendants, Lesbi Nohemi Martinez Martinez v. ICE, et al., Case No. 18-02231-

16  PLF (D.D.C.),[1] have stated their position that the term "parent" does not refer to

17  legal guardians such as Ms. Velasquez Molina.  However, Defendants' position is

18  not only inconsistent with the meaning and spirit of this Court's class certification

19  order, the Settlement Agreement and Defendants' arguments before this Court, it is

20  also inconsistent with federal law and Defendants' own immigration policy.

21        As an initial matter, this Court's June 26, 2018 order certified the following

22  class pursuant to Federal Rule of Civil Procedure 23(b)(2) for purposes of

23  Plaintiffs' substantive due process claim:

24          *All adult parents* who enter the United States at or

25          between designated ports of entry who (1) have been, are,

26

27  [1] Ms. Martinez has filed an objection to the proposed settlement on the same grounds as expressed herein.  See Doc. 282 (October 15, 2018).

28

> or will be detained in immigration custody by the DHS,
> and (2) have a minor child who is or will be separated
> from them by DHS and detained in ORR custody, ORR
> foster care, or DHS custody, absent a determination that
> the parent is unfit or presents a danger to the child."

Doc. 82 at 17 (emphasis added).

This Court provided only one modification to the definition of parent, for purposes of determining class members. Specifically, the Court held that the class "does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the [President's June 20, 2018 Executive Order which reversed the administrations family separation policy]." Pursuant to this Executive Order, the Secretary of Homeland Security is prohibited from "detain[ing] an alien family together when there is a concern that detention of an alien child with the child's alien parent would pose a risk to the child's welfare." Ms. Velasquez Molina's and her daughter's forced separation fell within the class definition. As of the date of the Court's June 26 class certification order, Ms. Velasquez Molina "ha[d] been...detained in immigration custody by the DHS, . . . [she had] a minor child who . . . [wa]s separated from [her] by DHS and [had been] detained in ORR custody, absent a determination that [she was] . . . unfit or present[ed] a danger to [her] child." *See* Order Granting In Part Plaintiffs' Motion for Class Certification (Doc. 82) at 17. The proposed Settlement Agreement largely tracks the certified class definition, referencing "all adult alien parents who entered the United States at . . . designated ports of entry with their child(ren), and . . . before the effective date of the [settlement] agreement . . . were detained in immigration custody by DHS" and "ha[d] a child who was or is separated from them by DHS and, . . . was housed in ORR custody. . ., absent a determination that the parent is unfit or presents a danger to the child." As with the certified class definition, the Settlement Agreement expressly excludes from the class alien parents with criminal histories

1  or a communicable disease. *See* Doc. 247 at 32. Nothing in the terms of the

2  original class definition or in the proposed agreement excludes legal guardians.

3      In an earlier status conference in this case, the Government suggested that

4  non-biological parents could properly be considered to be within the class

5  definition. During the July 6th status conference, in discussing the difficulties that

6  the Government would face in establishing "parentage," and requesting "some

7  relief to allow for that process" given "the inherent delays" in establishing such

8  parentage, the Government said "[t]here are situations, for example in a

9  nonbiological parent situation, where the -- where there may need to be additional

10  review of paperwork, perhaps communications with the consulates." Doc. 93 at 12.

11  The Court noted that "the class is defined to include parents . . . arguably that could

12  mean adoptive parents, nonbiological." *Id.*

13      Further, federal law has defined legal guardianships as "a judicially-created

14  relationship between child and caretaker which is intended to be permanent and

15  self-sustaining as evidenced by the transfer to the caretaker of the following

16  parental rights with respect to the child: protection, education, care and control of

17  the person, custody of the person, and decision-making." 45 C.F.R.

18  § 1355.20(a)(2). The law recognizes that the strong emotional and legal bonds

19  between legal guardians and their minor charges are the same as those between

20  parents and their biological children, thereby granting legal guardians equal or

21  substantially similar rights. For example, when consent is required for treatment of

22  substance abuse by a minor, consent by either a parent or guardian is acceptable

23  under federally funded programs. 42 C.F.R § 2.14(b). Similarly, under the

24  regulations implementing the Health Insurance Portability and Accountability Act,

25  parents and guardians are granted equal authority to make decisions relating to the

26  access to, and release of, protected health information of unemancipated minors.

27  45 C.F.R. § 164.502(g)(3).

28

1    Immigration statutes and policy guidance also treat parents and legal
2  guardians interchangeably, while distinguishing them from individuals with a more
3  distant connection to the minor child.  For example, guidance issued by U.S.
4  Immigration and Customs Enforcement on the "Detention and Removal of Alien
5  Parents or Legal Guardians" makes no differentiation between the two (Exhibit C
6  hereto).  Similarly, the Office of Refugee Resettlement ("ORR"), in its guidance
7  concerning unaccompanied minors, treats parents and legal guardians as similarly
8  situated and distinguishable from other parties (Exhibit C hereto).  Not only does
9  ORR group parents and legal guardians into "Category 1" for purposes of release
10  and the type of background check required, but it also "gives preference to a parent
11  or legal guardian when determining release plans." See U.S. Dep't of Health &
12  Human Services, Office of Refugee Resettlement, Children Entering the United
13  States Unaccompanied, at §§ 2.2.1, 2.5.1 (Jan. 30, 2015) (Exhibit C hereto).
14    Moreover, federal law defines "unaccompanied alien child" to be a minor
15  child without lawful immigration status in the United States who has "no parent or
16  legal guardian . . . available to provide care and physical custody." 6 U.S.C. §
17  279(g)(2).  Defendants forcibly separated Ms. Velasquez Molina's minor child
18  from her, in the same manner in which they separated minor children from their
19  parents in this case, and then deemed Ms. Velasquez Molina's child to be an
20  unaccompanied minor because her legal guardian was no longer available to
21  provide care and physical custody.
22    Defendants' position with respect to the treatment of legal guardians is
23  inconsistent with the underlying zero tolerance policy which resulted in these
24  forced separations.  On June 15, 2018, as the extent of the administration's family
25  separation policy became evident and the national outrage grew, the Department of
26  Homeland Security issued responses to frequently asked questions regarding the
27  administration's zero tolerance policy.  In that document, DHS considers legal
28

1  guardians "parents" for purposes of the zero tolerance policy.  In response to the
2  question "Why are Parents Being Separated from Their Children?" HHS responded
3  that DHS "may separate a parent *or legal guardian* from his or her child for several
4  reasons . . . [including] if a parent *or legal guardian* is referred for criminal
5  prosecution."  Similarly in response to the question "How can I communicate with
6  my child?" HHS responded "for parents *or legal guardians* detained in ICE
7  custody, ICE and HHS will work to schedule regular communication with their
8  children in HHS custody . . ." (*See* Exhibit D hereto) (emphasis added).

9        The similar treatment of parents and legal guardians is not limited to federal
10  law or policy, but is evident under state law as well.  For example, attached as
11  Exhibit E to this Memorandum is a summary of the rights and obligations of legal
12  guardians published by the Judicial Branch of the California State Government.  In
13  that summary, the California Judicial Branch states that legal guardians "have the
14  same legal responsibilities as a parent" in that legal guardians must provide the
15  child with basic needs such as housing, food, and medical care, and also decide
16  where the child lives and attends school.  Legal guardians are also responsible for
17  losses or damages caused by their children for whom they are guardians.  These
18  responsibilities forge bonds between legal guardians and their *de facto* children
19  that are just as strong as those between biological parents and children.  The
20  California Judicial Branch succinctly advises potential legal guardians that "[y]ou
21  will be like the child's parent." (Ex. E, at p. 1).

22        In sum, a fair reading of this Court's narrowly defined class would include
23  Ms. Velasquez Molina and her daughter who were forcibly separated by the
24  Government and detained in separate facilities, causing severe emotional trauma to
25  both parent and child.  Such a reading is consistent with how legal guardians have
26  been viewed under federal law and consistent with Defendants' own immigration
27  policies.

28

1      **B.**     **None of the Other Criteria In Settlement Class Membership**

2               **Should Keep Ms. Velasquez Molina Out Of The Settlement Class**

3      Although the parties' proposed Settlement largely tracks this Court's June

4 26, 2018 class definition, it departs from that definition in two key respects.  First,

5 the Settlement includes a requirement that the minor child who was separated from

6 his/her adult parent be housed in ORR custody, ORR foster care, or DHS custody

7 "on or after June 26, 2018," the date of this Court's class certification order.

8 Second, the proposed Settlement requires that the child and his or her parent "have

9 been continuously present within the United States since June 26, 2018[.]"  Doc.

10 247 at 32.  E.C. is currently housed at an ORR custody in San Antonio, Texas.

11 Moreover, Ms. Velasquez Molina and E.C. have been continuously in the United

12 States since they were apprehended at the border in early June.  Thus, Ms.

13 Velasquez Molina and her daughter fall squarely within the parameters of the class.

14 **III.**    **<u>CONCLUSION</u>**

15      WHEREFORE, Ms. Velasquez Molina  respectfully requests that this Court

16 confirm that she is within the plaintiff class for purposes of the Settlement.

17                           Respectfully submitted,

18                           */s/ Julia Romano*

19                           JULIA ROMANO

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOSHUA C. TOLL
*jtoll@kslaw.com*
WINTTA M. WOLDEMARIAM
wwoldemariam@kslaw.com

KING & SPALDING LLP
1700 Pennsylvania Ave, NW
Suite 200
Washington, D.C. 20006-4707
Telephone:  +1 202 737 0500
Facsimile:   +1 202 626 3737

Attorneys for Objector Ms. Egla Arely
Velasquez Molina

1

**CERTIFICATE OF SERVICE**

2
       I hereby certify that I have this day served the foregoing on all counsel of record by first-

3
class mail.

4

5
                             /s/ *Julia Romano*

6
                             Julia Romano

7

8
Dated: October 22, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

Exhibit A ...........................................................................................12

Exhibit B ...........................................................................................31

Exhibit C ...........................................................................................52

Exhibit D ...........................................................................................81

Exhibit E............................................................................................85

# Exhibit A



REPÚBLICA DE HONDURAS

# TESTIMONIO
## DE LA
## ESCRITURA PUBLICA

### No. 337.

#### GUARDA Y CUSTODIA

*De:* _____

_____

*Otorgada por:* ~~ERLIN YOBANY MOLINA ZELAYA Y SILVIA~~
~~DEL CARMEN CANO GARCIA.~~

*A favor de:* _____

EGLA ARELY VELASQUEZ MOLINA

---

AUTORIZADA POR EL NOTARIO

MARIO AQUILES UCLES HERRERA.

CATACAMAS 04 _____ MAYO _____ 16
          DE                    DEL 20



PAPEL ESPECIAL
NOTARIAL
VEINTE LEMPIRAS
2016-2019

N° 2117932

## TESTIMONIO

INSTRUMENTO PUBLICO NUMERO TRESCIENTOS TREINTA Y SIETE (337).
En la ciudad de Catacamas, Departamento de Olancho, Siendo las Nueve de la mañana
(9:00 A.M.) del día Viernes Cuatro (04) del mes de Mayo del año Dos Mil Dieciseis
(2016).- Ante mi, MARIO AQUILES UCLES HERRERA, Abogado y Notario Publico,
del domicilio de Tegucigalpa, Municipio del Distrito Central, Departamento de Francisco
Morazán, con Despacho Jurídico en la Avenida Miguel Cervantes, Edificio San Cayetano
3er nivel, cubículo N° 304, Tegucigalpa, M.D.C., con carnet numero cero nueve cero seis
(N° 0906), del Colegio de Abogados de Honduras, y Exequatur Ochocientos ochenta y seis
(N° 886) de la Honorable Corte Suprema de Justicia, con teléfono 2220-0034,
transitoriamente por esta Ciudad, Comparecen personalmente los señores ERLIN
YOBANY MOLINA ZELAYA, mayor de edad, Soltero, Hondureño y con domicilio en la
Ciudad de Catacamas, Departamento de Olancho, quien actúa por si y en su propio nombre
SILVIA DEL CARMEN CANO GARCIA, Mayor de Edad, Soltera, Hondureña y con
domicilio en la Ciudad de Catacamas, Departamento de Olancho, quien actúa por si y en su
propio nombre y EGLA ARELY VELASQUEZ MOLINA, mayor de edad, soltera,
Bachiller en Ciencias y Letras, Hondureña, con domicilio en la Ciudad de Catacamas,
Departamento de Olancho; Quienes asegurandome encontrarse en el pleno goce y ejercicio
de sus derechos civiles, libre y espontaneamente manifiestan: PRIMERO: Los
comparecientes señores ERLIN YOBANY MOLINA ZELAYA y SILVIA DEL
CARMEN CANO GARCIA, Declaran que son los Padres Biológicos de la menor
EYARIN BRIYANA MOLINA CANO, de nacionalidad Hondureña, quien nació el día
Ocho (08) del mes de Junio del año Dos Mil Ocho (2008) en el Municipio de

Acta de Nacimiento No. 1503-2009-00769, ubicada en el folio ___ del Tomo ___ del año 2009.- SEGUNDO: Continúan manifestando los comparecientes señores ERLIN YOBANY MOLINA ZELAYA y SILVIA DEL CARMEN CANO GARCIA, Que a travez de este acto le vienen a otorgar de manera voluntaria la GUARDA Y CUSTODIA de su menor hijo EVARIN BRIYANA MOLINA CANO a la compareciente EGLA ARELY VELASQUEZ MOLINA, en virtud de vemos obligados por motivo de trabajo permanecemos mucho tiempo fuera de la Ciudad, y siendo que la compareciente EGLA ARELY VELASQUEZ MOLINA, es la persona que ha estado al cuidado de la menor desde su nacimiento, ya que es nuestra pariente mas cercana y es totalmente digna de nuestra confianza le cedemos entre otros derechos y obligaciones el de Representarla Legalmente ejercer su Guarda y Cuidado; alimentarla, asistirla, educarla y administrar sus bienes de ser necesario, así mismo para que pueda realizar cualquier movimiento Migratorios.- Dicho otorgamiento es por TIEMPO INDEFINIDO.- TERCERO.- Por su parte la compareciente EGLA ARELY VELASQUEZ MOLINA manifiesta Que es totalmente cierto lo anteriormente expuesto por los comparecientes señores ERLIN YOBANY MOLINA ZELAYA y SILVIA DEL CARMEN CANO GARCIA, y que acepta todas y cada una de las OBLIGACIONES Y DERECHOS a ella conferidos.- De todo lo cual, del conocimiento, edad, estado civil, profesion u oficio, nacionalidad y vecindad de uno y otras.- Así como de la advertencia que les hice de la obligacion que tienen de hacer la inscripcion del presente Instrumento en el Instituto de la Propiedad Inmueble y mercantil Correspondiente y de haber tenido a la vista los siguientes documentos a) Antecedente de Dominio del bien inmueble objeto de la Donacion b) Documentos personales de los comparecientes que por su orden son Tarjeta de Identidad ___ CERO GUION UNO NUEVE NUEVE DOS GUION CERO CERO ___



PAPEL ESPECIAL
NOTARIAL
VEINTE LEMPIRAS
2018-2019

N° 2106917

NUEVE OCHO NUEVE GUION CERO DOS TRES OCHO CERO (1503-1989-023380) y UNO CINCO CERO TRES GUION UNO NUEVE OCHO OCHO GUION CERO CERO CUATRO OCHO SIETE (1503-1988-00487). DOY FE. FIRMA Y HUELLA DIGITAL DE ERLIN YOBANY MOLINA ZELAYA, FIRMA Y HUELLA DIGITAL DE SILVIA DEL CARMEN CANO GARCIA, FIRMA Y HUELLA DIGITAL DE EGLA ARELY VELASQUEZ MOLINA, FIRMA Y SELLO NOTARIAL MAYLO AQUILES UCLES HERRERA y a requerimiento de la compareciente EGLA ARELY VELASQUEZ MOLINA, libro, sello y firmo esta primera copia en el mismo lugar y fecha de su otorgamiento en el papel sellado correspondiente y con los timbres de ley debidamente cancelados ajustándose al original con el que concuerda bajo el número preinserto de mi protocolo del corriente año en donde anote este libramiento. DOY FE.



REPUBLIC OF HONDURAS

[logo]

# TRANSCRIPT

# OF

# PUBLIC DEED

No. 337.

*Of:*                         CARE AND CUSTODY

*Granted by:*   ERLIN YOBANY MOLINA ZELAYA AND SILVIA DEL CARMEN CANO GARCIA.

*In favor of:*   EGLA ARELY VELASQUEZ MOLINA

**AUTHORIZED BY NOTARY**

MARIO AQUILES UCLES HERRERA.

CATACAMAS, 04 MAY 2016

Exhibit A
000017

SUPREME COURT OF JUSTICE
REPUBLIC OF HONDURAS, CENTRAL AMERICA

[logo:] SPECIAL NOTARIAL PAPER

[stamp:] COLLEGE OF ATTORNEYS OF MORAZAN

TWENTY LEMPIRAS
2016-2019

[illegible] [signature] 5.00 LEMPIRAS

[stamp:] [illegible]

No. 2117932

## RECORD

PUBLIC INSTRUMENT NUMBER THREE HUNDRED AND THIRTY-SEVEN (337),

In the city of Catacamas, Department of Olancho, at nine o'clock in the morning (9:00 A.M.) on Friday, the fourth (04) of the month of May of the year Two Thousand and Sixteen (2016) – In my presence, **MARIO AQUILES UCLES HERRERA**, Attorney and Notary Public, residing in Tegucigalpa, Municipality of the Central District, Department of Francisco Morazan, with his Legal Office located at Avenida Miguel Cervantes, Edificio San Cayetano, 3rd level, cubicle No. 304, Tegucigalpa, M.D.C. [Municipality of the Central District], with identification card number zero nine zero six (No. 0906), of the College of Attorneys of Honduras, and Exequatur Eight hundred and eighty-six (No. 886) of the Honorable Supreme Court of Justice, with telephone number 2220-0024, of this City for the time being, appearing personally before me Messrs. **ERLIN YOBANY MOLINA ZELAYA**, of legal age, single, Honduran, and with his address in the City of Catacamas, Department of Olancho, acting on his own behalf and in his own name, **SILVIA DEL CARMEN CANO GARCIA**, of Legal Age, Single, Honduran, and with her address in the City of Catacamas, Department of Olancho, acting on her own behalf and in her own name and **EGLA ARELY VELASQUEZ MOLINA**, of legal age, single, high school graduate in Arts and Sciences, Honduran, and with her address in the City of Catacamas, Department of Olancho; Who assure me that they are in full enjoyment of exercise of their civil rights, freely and spontaneously declare -- **FIRST:** The agreeing parties **ERLIN YOBANY MOLINA ZELAYA** and **SILVIA DEL CARMEN CANO GARCIA,** declare that they are the Biological Parents of the minor **EYARIN BRIYANA MOLINA CANO,** of Honduran nationality, who was born on the Eighth (8th) day of the month of June of the year Two Thousand and Eight (2008) in the Municipality of CATACAMAS, Department of OLANCHO, as stated in the Certification of

Exhibit A
000018

Birth Certificate No. **1503-2009-00769**, located in folio **082**, of Volume **00643**, of the year **2009** – **SECOND**: The agreeing parties **ERLIN YOBANY MOLINA ZELAYA** and **SILVIA DEL CARMEN CANO GARCIA** manifest That by means of this Act they grant in a voluntary manner the **CARE AND CUSTODY** of their minor child **EYARIN BRIYANA MOLINA CANO** to the appearing party **EGLA ARELY VELASQUEZ MOLINA,** in virtue of finding ourselves obligated to do so due to work, we are out of the City for long periods of time, and given that the appearing party **EGLA ARELY VELASQUEZ MOLINA** is the person who has taken care of the minor since her birth, since she is our closest relative and is entirely worthy of our trust we grant her among other rights and obligations that of Representing her Legally to exercise her Care and Custody; feed her, take care of her, educate her and manage her wellness as necessary, as well as being able to perform any Migratory movements. – The aforesaid granting is for an **INDEFINITE PERIOD OF TIME**. – **THIRD**: Conversely, the appearing party **EGLA ARELY VELASQUEZ MOLINA** states That the aforesaid statements of the appearing parties **ERLIN YOBANY MOLINA ZELAYA** and **SILVIA DEL CARMEN CANO GARCIA** are entirely true, and that she accepts each and every one of the **OBLIGATIONS AND RIGHTS** conferred onto her – All of which, of the knowledge, age, marital status, profession or trade, nationality and legal residence of one and the others. – As well as the notification of the obligations that they have to fulfill, the registration of this Instrument in the Corresponding Institute of the Registry of Deeds and Commercial Property and having viewed the following documents: a) Background of the Domain of the real estate property that is the object of the Donation. b) Personal documents of the appearing parties which, as ordered, are the Identification Document ONE FIVE TWO ZERO DASH ONE NINE NINE TWO DASH ZERO ZERO TWO FIVE FOUR **(1520- 1992-00254)**, ONE FIVE ZERO THREE DASH ONE

*SUPREME COURT OF JUSTICE*
*REPUBLIC OF HONDURAS, CENTRAL AMERICA*

[logo:] SPECIAL NOTARIAL PAPER
TWENTY LEMPIRAS
2016-2019

No. 2106917

**NINE EIGHT NINE DASH ZERO TWO THREE EIGHT ZERO (1503-1989-02380) and
ONE FIVE ZERO THREE DASH ONE NINE EIGHT EIGHT DASH ZERO ZERO
FOUR EIGHT SEVEN (1503-1988-00487) I ATTEST.**

**SIGNATURE AND FINGERPRINT OF ERLIN YOBANY MOLINA ZELAYA,**

**SIGNATURE AND FINGERPRINT OF SILVIA DEL CARMEN CANO GARCIA,**

**SIGNATURE AND FINGERPRINT OF EGLA ARELY VELASQUEZ MOLINA,**

**SIGNATURE AND NOTARIAL STAMP** [of] **MARIO AQUILES UCLES HERRERA**
AND as per the requirement of the appearing party **EGLA ARELY VELASQUEZ MOLINA,** I
grant, stamp and sign this first copy in the same place and date of its granting on the
corresponding stamped document, and with the duly settled legal stamps, verifying its original
copy with the one that corresponds to my pre-inserted protocol number of the current year in
which I recorded this release. **I ATTEST.**

[stamp in left margin:] [illegible]

[signature]
[stamp:] MARIO AQUILES UCLES HERRERA
NOTARY
[illegible]
HONDURAS, CENTRAL AMERICA



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"Transcript of Public Deed"** is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Aurora Landman

Sworn to before me this
September 24, 2018

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

Exhibit A
000021

Case 1:18-cv-...392   Document 1-1   Filed 10/17/1...   Page 11 of 19



**SECRETARÍA DE EDUCACIÓN**
**DIRECCIÓN DEPARTAMENTAL DE EDUCACIÓN**
**C.E.B "CONCEPCIÓN AMADOR"**
**CATACAMAS OLANCHO**
**TEL. 2799-5445**

## CONSTANCIA

El suscrito Director Del Centro de Educación Básica Concepción Amador del barrio San Francisco municipio de Catacamas Departamento de Olancho.

Por medio de la presente hace constar que la alumna **EYARIN BRIYANA MOLINA CANO** estuvo bajo la tutela de **EGLA ARELY VELASQUEZ MOLINA** en el tiempo que estudio en la institución.

Y para constancia firmo la presente a los 24 días del mes de Agosto del año 2018.

**DIRECTOR**
**MARTIN ZELAYA**

[logo]
MINISTRY OF EDUCATION
DEPARTMENTAL OFFICE OF EDUCATION
C.E.B. [Centro de Educación Básica (Basic Education Center)] "CONCEPCIÓN AMADOR"
CATACAMAS OLANCHO
TEL. 2799-5445

## CERTIFICATION

The undersigned Director of the Concepción Amador Basic Education Center of the district of San Francisco, municipality of Catacamas, Department of Olancho,

Hereby certifies that the student **EYARIN BRIYANA MOLINA CANO** was under the guardianship of **EGLA ARELY VELASQUEZ MOLINA** at the time of her studies in the institution.

And in witness whereof, this document is signed on the 24th day of the month of August of the year 2018.

[stamp:] MINISTRY OF EDUCATION
BASIC EDUCATION CENTER
DIRECTORATE
CONCEPCIÓN AMADOR
CATACAMAS

[signature]
DIRECTOR
MARTIN ZELAYA



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"DEPARTMENTAL OFFICE OF EDUCATION- CERTIFICATION"** is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Aurora Landman

Sworn to before me this
September 24, 2018



Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE



**REPÚBLICA DE HONDURAS**
**REGISTRO NACIONAL DE LAS PERSONAS**
**REGISTRO CIVIL MUNICIPAL**

N° 5557787

# CERTIFICACIÓN DE ACTA DE NACIMIENTO

El infrascrito Registrador Civil Municipal CERTIFICA que en el Archivo de registros que se tiene en esta oficina se encuentra el acta de nacimiento número: | 1 | 8 | 0 | 3 | - | 2 | 0 | 0 | 9 | - | 0 | 0 | 7 | 1 | 2 | ubicada en el tomo _02_ del Año _009_ del Año _2009_ y que pertenece a :

a) **MOLINA**
Primer Apellido

b) **CANO**
Segundo Apellido

c) **EYARIN BRIYANA**
Nombre

SEXO F [X] M [ ]

Y cuya información es la siguiente:

1 ) Lugar, fecha y orden de nacimiento

a) **CATACAMAS**
Municipio

b) **OLANCHO**
Departamento

c) **HONDURAS**
País

d) **OCHO**
Día

e) **JUNIO**
Mes

f) **2001**
Año

2 ) Número de identidad, apellidos, nombre y nacionalidad del padre:     N- Identidad 1428-1992-00254

a) **MOLINA**
Primer Apellido

b) **ZELAYA**
Segundo Apellido

c) **ERLIN YOBANY**
Nombre

d) **HONDUREÑA**
Nacionalidad

3 ) Número de identidad, apellidos, nombre y nacionalidad de la madre:     N- Identidad 1501-1987-02589

a) **CANO**
Primer Apellido

b) **GARCIA**
Segundo Apellido

c) **SILVIA DEL CARMEN**
Nombre

d) **HONDUREÑA**
Nacionalidad

4 ) Notas marginales autorizadas:

**NINGUNA**

Extendida en **CATACAMAS**
Municipio

**OLANCHO**
Departamento

a los **DIECISIETE**     días del mes de **JULIO**

del DOS MIL **DIECIOCHO**

*FIRMA Y SELLO DEL REGISTRADOR CIVIL*

EXHIBIT A
000825

[logo:] RNP

**REPUBLIC OF HONDURAS**
**NATIONAL REGISTRY OF PERSONS**
**MUNICIPAL CIVIL REGISTRY**

No. 59577875

**CERTIFICATION OF BIRTH CERTIFICATE**
[QR code]

The undersigned Municipal Civil Registrar CERTIFIES that a birth certificate with number:

| 1 | 5 | 0 | 3 | - | 2 | 0 | 0 | 9 | - | 0 | 0 | 7 | 6 | 9 |

*Identification Number*

is in the Archives of Births of this office located on folio 082 of volume 00643 for the year 2009 and it belongs to:

a) _____ *MOLINA* _____                    b) _____ *CANO* _____
      First Last Name                              Second Last Name

c) _____ *EVARIN BRIYANA* _____     SEX    F ☒          M ☐
            First Name

and whose information is the following:

1) Place, date and order of birth

a) _____ *CATACAMAS* _____    b) _____ *OLANCHO* _____    c) _____ *HONDURAS* _____
           City                              Department                            Country

d) _____ *EIGHT* _____    e) _____ *JUNE* _____    f) _____ *2008* _____
          Day                            Month                           Year

2.) Identity number, last names, first name and nationality of the father:    *Identity No.: 1520-1992-00254*

a) _____ *MOLINA* _____                    b) _____ *ZELAYA* _____
      First Last Name                              Second Last Name

c) _____ *ERLIN YOBANY* _____          d) _____ *HONDURAN* _____
            Name                                    Nationality

3.) Identity number, last names, first name and nationality of the mother:    *Identity No.: 1503-1989-02380*

a) _____ *CANO* _____                      b) _____ *GARCIA* _____
      First Last Name                              Second Last Name

c) _____ *SILVIA DEL CARMEN* _____   d) _____ *HONDURAN* _____
            Name                                    Nationality

4.) Authorized marginal notes:

_____ NONE _____

_____

_____

_____

Issued in _____ *CATACAMAS* _____           _____ *OLANCHO* _____
                      City                                  Department

on the: _____ *SEVENTEENTH* _____ day of the month of    _____ *JULY* _____

of TWO THOUSAND _____ *EIGHTEEN* _____

[logo:]                                        [signature]
                                               [stamp:] [NATIONAL REGISTRY OF PERSONS – RNP
                                               DIRECTORATE 15 03]

[RNP]                                          _____
[illegible]                                    *Signature and Seal of Director General*

[watermark: illegible]

*SIGNATURE AND STAMP OF CIVIL REGISTRAR*



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"Birth Certificate- EYARIN BRIYANA CANO"** is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Aurora Landman

Sworn to before me this
September 24, 2018



Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

Exhibit A
000027



Case 1:18-cv-____392   Document 1-1   Filed 10/17/____   Page __ of __

REPÚBLICA DE HONDURAS
REGISTRO NACIONAL DE LAS PERSONAS
REGISTRO CIVIL MUNICIPAL



# CERTIFICACIÓN DE ACTA DE NACIMIENTO

El infrascrito Registrador Civil Municipal CERTIFICA que en el Archivo de nacimiento que se lleva en esta oficina se encuentra el acta de nacimiento número: 1 5 0 3 1 9 8 8 - 0 0 4 8 7 ubicada en el libro 127 del Año 1988 y que pertenece a:

a) _VELASQUEZ_
Primer Apellido

b) _MOLINA_
Segundo Apellido

c) _EGLA ARELY_
Nombre

SEXO: H ☐  M ☒

y cuya información es la siguiente:

1.) Lugar, fecha y orden de nacimiento

a) _CATACAMAS_
Municipio

b) _OLANCHO_
Departamento

c) _HONDURAS_
País

d) _VEINTIDOS_
Día

e) _FEBRERO_
Mes

f) _1988_
Año

2.) Número de identidad, apellidos, nombre y nacionalidad del padre:

a) _VELASQUEZ_
Primer Apellido

b) _VARELA_
Segundo Apellido

c) _SILVERIO_
Nombre

d) _HONDUREÑA_
Nacionalidad

3.) Número de identidad, apellidos, nombre y nacionalidad de la madre:

a) _MOLINA_
Primer Apellido

b) 
Segundo Apellido

c) _MARIA CLEMENTINA_
Nombre

d) _HONDUREÑA_
Nacionalidad

4.) Notas marginales autorizadas:

_NINGUNA_

Extendido en _CATACAMAS_    _OLANCHO_
Municipio    Departamento

a los _DIECISIETE_    días del mes de _JULIO_

del DOS MIL _DIECIOCHO_

FIRMA Y SELLO DEL REGISTRADOR CIVIL

EXHIBIT A
000928

[logo:] RNP

**REPUBLIC OF HONDURAS**
**NATIONAL REGISTRY OF PERSONS**
**MUNICIPAL CIVIL REGISTRY**

No. 59577696

**CERTIFICATION OF BIRTH CERTIFICATE**
[QR code]

The undersigned Municipal Civil Registrar CERTIFIES that a birth certificate with number:

| 1 | 5 | 0 | 3 | – | 1 | 9 | 8 | 8 | – | 0 | 0 | 4 | 8 | 7 |

*Identification Number*

is in the Archives of Births of this office located on folio **137** of volume **06164** for the year **1988** and it belongs to:

a) _____**VELASQUEZ**_____      b) _____**MOLINA**_____
       *First Last Name*            *Second Last Name*

c) _____**EGLA ARELY**_____   SEX   F ☒     M ☐
      *First Name*

and whose information is the following:

1) Place, date and order of birth

a) _____**CATACAMAS**_____   b) _____**OLANCHO**_____   c) _____**HONDURAS**_____
     *City*        *Department*        *Country*

d) _____**TWENTY-TWO**_____   e) _____**FEBRUARY**_____   f) _____**1988**_____
     *Day*        *Month*        *Year*

2.) Identity number, last names, first name and nationality of the father:

a) _____**VELASQUEZ**_____      b) _____**VARELA**_____
     *First Last Name*           *Second Last Name*

c) _____**SILVERIO**_____      d) _____**HONDURAN**_____
     *Name*           *Nationality*

3.) Identity number, last names, first name and nationality of the mother:

a) _____**MOLINA**_____      b) _____
     *First Last Name*           *Second Last Name*

c) _____**MARIA CLEMENTINA**_____   d) _____**HONDURAN**_____
     *Name*           *Nationality*

4.) Authorized marginal notes:

_____NONE_____

Issued in _____**CATACAMAS**_____          _____**OLANCHO**_____
          *City*               *Department*

on the: _____**SEVENTEENTH**_____ day of the month of _____**JULY**_____

of TWO THOUSAND _____**EIGHTEEN**_____

[logo:]

[signature]
[stamp:] [NATIONAL REGISTRY OF PERSONS – RNP
DIRECTORATE 15 03]

[RNP]
[illegible]

_____
*Signature and Seal of Director General*

[watermark: illegible]

*SIGNATURE AND STAMP OF CIVIL REGISTRAR*



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, **"Birth Certificate- EGLA
ARELY MOLINAN"** is, to the best of my knowledge and belief, a true and accurate
translation from Spanish into English.

Aurora Landman

Sworn to before me this
September 24, 2018

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

Exhibit A
000030

Exhibit B

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

**EGLA ARELY VELASQUEZ MOLINA,**
Port Isabel Service Detention Center
27991 Buena Vista Blvd
Los Fresnos, Texas 78566;

**Plaintiff,**

v.

**U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT ("ICE"),**
500 12th Street SW Washington, DC 20530;

**U.S. DEPARTMENT OF HOMELAND
SECURITY ("DHS"),**
245 Murray Lane SW Mailstop 0485
Washington, DC 20528-0075;

**U.S. CUSTOMS AND BORDER PROTECTION
("CBP"),**
1300 Pennsylvania Ave. NW
Washington, DC 20229;

**U.S. CITIZENSHIP AND IMMIGRATION
SERVICES ("USCIS"),**
20 Massachusetts Avenue NW
Washington, DC 20529;

**THOMAS HOMAN, ACTING DIRECTOR OF
ICE,**
500 12th Street SW Washington, DC 20536;

**DANIEL BIBLE, SAN ANTONIO FIELD OFFICE
DIRECTOR, ICE,**
San Antonio Field Office
1777 NE Loop 410 Floor 15
San Antonio, TX, 78217;

**ANDREW HURON, SAN ANTONIO ASSISTANT
FIELD OFFICE DIRECTOR, ICE,**
San Antonio Field Office
1777 NE Loop 410 Floor 15
San Antonio, TX, 78217;

Case No. ___18-cv-02392___

**KIRSTJEN NIELSEN, SECRETARY OF DHS,**
500 12th Street SW Washington, DC 20536;

**JEFFERSON BEAUREGARD SESSIONS III,**
**ATTORNEY GENERAL OF THE UNITED**
**STATES,**
950 Pennsylvania Avenue NW Washington, DC
20530;

**L. FRANCIS CISSNA, DIRECTOR OF USCIS,**
20 Massachusetts Avenue NW Washington, DC 20529;

**KEVIN K. MCALEENAN, ACTING**
**COMMISSIONER OF CBP,**
1300 Pennsylvania Ave, NW Washington, DC 20229;

**Defendants.**

# **TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................. 1

JURISDICTION.................................................................................................................... 2

VENUE .................................................................................................................................. 3

PARTIES................................................................................................................................ 3

RELEVANT FACTS ............................................................................................................ 5

CAUSES OF ACTION ...................................................................................................... 11

PRAYER FOR RELIEF..................................................................................................... 15

Exhibit B
000034

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ...........................................................................................12

*Ms. L v. U.S. Immigration & Customs Enf't,*
  No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364 (S.D. Cal.
  June 26, 2018) ...........................................................................................2, 9, 10

**Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................................13

8 U.S.C. § 1103 ...........................................................................................4

8 U.S.C. § 1158 ...........................................................................................1, 14

8 U.S.C. § 1158(a)(1) ...........................................................................................11

8 U.S.C. § 1225(b)(1) ...........................................................................................11

28 U.S.C. § 1331 ...........................................................................................2

28 U.S.C. § 1391 ...........................................................................................3

28 U.S.C. § 2241 ...........................................................................................2

**Other Authorities**

8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42 ...........................................................................................11

Administrative Procedure Act ...........................................................................................13

Executive Order 13841 ...........................................................................................7

Immigration and Naturalization Act ...........................................................................................8

International Convention on Civil and Political Rights, Art. 17 ...........................................................................................1, 13

U.S. Constitution Fifth Amendment ........................................................................................... *passim*

United States Constitution Art. I., § 9, cl. 2 ...........................................................................................3

Exhibit B
000035

**PETITION FOR HABEAS CORPUS AND COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

    **Egla Arely Velasquez Molina** ("Ms. Velasquez Molina" or "Plaintiff"), by and through counsel, files this civil action and petition for habeas corpus against Defendants U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); Thomas Homan, Acting Director of ICE; Daniel Bible, San Antonio Field Office Director, ICE; Andrew Huron, San Antonio Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; and Kevin K. McAleenan, Acting Commissioner of CBP; (collectively, "Defendants") to vindicate Ms. Velasquez Molina's substantive and procedural due process rights under the Fifth Amendment of the U.S. Constitution and her rights under the International Convention on Civil and Political Rights, and the United Nations Convention Relating to Status of Refugees, 8 U.S.C. § 1158.

**INTRODUCTION**

    This complaint arises from the United States Government's forcible separation of Ms. Velasquez Molina from her young niece, E.C. Ms. Velasquez Molina, a thirty year old Honduran woman, is the sole primary caregiver, legal guardian, and biological aunt of E.C., a ten-year old girl who has lived with Ms. Velasquez Molina since the death of E.C.'s biological father, Ms. Velasquez Molina's biological nephew, and has been in the sole care of Ms. Velasquez Molina since the death of E.C.'s biological father in 2017. Ms. Velasquez Molina considers E.C. to be her daughter. Ms. Velasquez Molina brings this action to halt her pending deportation until she has a full and fair opportunity to seek asylum in the United States. That opportunity, guaranteed to her by statute, has been denied by the forcible separation of Ms.

Velasquez Molina from E.C.  The trauma of that separation rendered Ms. Velasquez Molina unable to meaningfully prepare for and participate in the credible fear interview that formed a part of her asylum proceedings, resulting in an erroneous negative credible fear determination by the Asylum Officer.  The forced separation by the Defendants of Ms. Velasquez Molina's daughter, in addition to causing substantial emotional distress to both mother and daughter, improperly tainted the credible fear assessment.  In the absence of the relief sought in this action, Ms. Velasquez Molina will be deported to Honduras without having received a fair asylum proceeding, and she is likely to suffer death at the hands of the criminal elements that caused Ms. Velasquez Molina to flee Honduras with her daughter in the first place.

In addition, Ms. Velasquez Molina may be a member of the class certified in *Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364 (S.D. Cal. June 26, 2018) at 17 ("*Ms. L*").  A legal guardian who in the same posture as Ms. Velasquez Molina has filed an objection to the proposed settlement in the Ms. L case seeking to clarify that legal guardians are included.  If Ms. Velasquez Molina is part of the *Ms. L* class, Defendants will be prohibited from deporting her before she is given a de novo and fair credible fear interview.   For all the reasons set forth in this Complaint and the accompanying papers, Ms. Velasquez Molina's deportation should be stayed until she has been given a fair opportunity to pursue her right to asylum in the United States.

## JURISDICTION

1.     This case arises under the Fifth Amendment to the United States Constitution and other federal statutes cited in this Petition and Complaint. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Art. I., § 9, cl. 2 of the United States Constitution ("Suspension Clause"). Ms. Velasquez Molina is in federal custody for purposes of habeas jurisdiction.  This Court

has personal jurisdiction because the official acts giving rise to Plaintiff's harm were directed from federal government agencies headquartered in the District of Columbia.

## VENUE

2.      Venue is proper under 28 U.S.C. § 1391 because at least one of the Defendants is subject to personal jurisdiction in this district with regards to this action.

## PARTIES

3.      Plaintiff Ms. Velasquez Molina is a citizen of Honduras. She is the biological aunt of, legal guardian of, and sole primary caregiver for, E.C., who is also a citizen of Honduras. Ms. Velasquez Molina is the *de facto* mother of E.C., who is a 10-year old girl.

4.      Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

5.      Defendant U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States and is a department of the executive branch of the Government which has been delegated with authority over certain immigration matters relevant to this action.

6.      Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens apprehended near the U.S. border.

7.      Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its Asylum Officers, conducts interviews of certain individuals apprehended at the border to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.

8.      Defendant Thomas Homan is sued in his official capacity as the Director of ICE.

9.      Defendant Daniel Bible is sued in his official capacity as Field Office Director, San Antonio Field Office, ICE.

10.     Andrew Huron is sued in his official capacity as Assistant Field Office Director, San Antonio Field Office, ICE.

11.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the Department of Homeland Security.  In this capacity, she has responsibility for each of the component agencies within DHS: ICE, USCIS, and CBP.  As a result, Respondent Nielsen has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, including laws relating to the credible fear interview process, and is empowered to grant asylum or other relief.

12.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States.  At all times relevant to this Petition and Complaint, he had responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, including laws relating to the credible fear interview process, oversaw the Executive Office of Immigration Review, and was empowered to grant asylum or other relief.

13.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

14.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Commissioner of CBP.

## RELEVANT FACTS[1]

15.     Ms. Velasquez Molina is a citizen of Honduras. She is the *de facto* mother of E.C., a minor child, and has been E.C.'s legal guardian and caregiver since 2016, when E.C.'s biological parents, Erlin Giovanni Molina Zelaya (Mr. Molina Zelaya) and Sylvia Del Carmen Cano Garcia, placed her in Ms. Velasquez Molina's care out of fear for their lives. A copy of the Legal Guardianship is attached to this Complaint as Exhibit A.   Shortly thereafter, E.C.'s parents' fears were realized, when gang members, whom the Honduran government is unable to control and whom the local police tacitly support, murdered E.C.'s father. E.C. is the biological daughter of Ms. Velasquez Molina's now-deceased nephew.

16.     In April 2018, Ms. Velasquez Molina began receiving death threats and demands for ransom payments via text messages from the individuals responsible for Mr. Molina Zelaya's murder. Specifically, Ms. Velasquez Molina was told she needed to give up 50% of her earnings, or she would be killed. One such threat included a picture of her deceased nephew's body. Moreover, on at least one occasion, an individual appeared at Ms. Velasquez Molina's workplace, demanded to know if she received these threatening messages, including the image of her murdered nephew's corpse, and attempted to terrorize her into compliance.

17.     As a result of that encounter, Ms. Velasquez Molina did not return to work out of fear for her life. Ms. Velasquez Molina was a particular target of these threats given her steady job and reliable income. Ms. Velasquez Molina took these death threats seriously

[1] The factual information provided herein is drawn from the statements of Ms. Velasquez Molina and non-privileged factual information from communications between Ms. Velasquez Molina and counsel for the Texas Civil Rights Project, the organization that initially made contact with Ms. Velasquez Molina and similarly situated immigrants seeking asylum in the United States.

because this was the same way her nephew and many other people in her town were murdered.

18.     Fearing a similar fate, and knowing that the local police and government tacitly support various criminal elements in her town, Ms. Velasquez Molina decided to flee Honduras.  Among other things, the local police do not become involved in investigating crime or preventing gang violence in Ms. Velasquez Molina's town without being paid bribes, so police and other governmental authorities would have taken no action to prevent potential crimes against Ms. Velasquez Molina and E.C. because it would occur at the financial detriment of the police.

19.     Between April and May 2018, Ms. Velasquez Molina continued to receive threatening text messages.  Ms. Velasquez Molina feared that she and E.C. would be killed if they stayed in Honduras any longer.  Therefore, she and E.C. fled their home in late May 2018 in an effort to obtain asylum in the United States.  Ms. Velasquez Molina and E.C. entered the United States on June 12, 2018.

20.     Shortly after Ms. Velasquez Molina and E.C. entered the United States, agents from Defendant Customs and Border Protection ("CBP") forcibly separated E.C. from Ms. Velasquez Molina, leaving Ms. Velasquez Molina disoriented and in shock at the loss of her child, causing substantial and lasting emotional trauma to both Ms. Velasquez Molina and E.C., particularly given the recent brutal murder of E.C.'s father by gang members and Ms. Velasquez Molina's pledge to keep her safe.  While Ms. Velasquez Molina is detained in Los Fresnos, Texas, E.C. is currently housed at a foster-care facility in San Antonio, Texas, and their contact is limited to no more than one telephone call per week.

21.     Press reports indicate that Defendants' policies of "zero tolerance" and forced family separations were intended to cause substantial emotional trauma to immigrants, like Ms. Velasquez Molina, who fled violence to seek asylum in the United States.

22.     On June 20, 2018, Donald Trump issued Executive Order 13841 ("Executive Order"), which ostensibly reversed his administration's policy of forcibly separating children from their families upon entry into the United States. Notwithstanding, the Government continues to keep minor children, such as E.C., from their detained parents without any hearings or legal process and without any showing that the minor has suffered abuse or neglect, or that the parent is unfit.

23.     The Government's forcible separation policy has been widely denounced, including by mental health professionals. The American Academy of Pediatrics has criticized the policy because of the severe trauma that forced separation from parents and other caregivers causes children. This is particularly true for those children who are already traumatized due to conditions in their homeland. The parents of these children are also traumatized. The resulting cognitive and emotional damage from such family separations can be permanent. The Trump Administration acknowledged as much by ending the practice with the June 20, 2018 Executive Order.

24.     Ms. Velasquez Molina's forcible separation from E.C. was a devastating event that caused Ms. Velasquez Molina significant psychological and emotional trauma. Ms. Velasquez Molina and E.C. continue to suffer every day they are separated from one another.

25.     During this period of intense psychological trauma, Ms. Velasquez Molina applied for asylum in the U.S. On July 15, 2018, Defendant USCIS conducted a credible fear interview of Ms. Velasquez.

26.     Having been forcibly separated from E.C. for weeks, Ms. Velasquez Molina was in severe emotional distress and in a state of extreme shock and grief during her interview.  She struggled to focus and respond to the interviewer's questions and was incapable of describing fully the threats and governmental neglect that led her to flee Honduras with her daughter.  These threats support her credible fear that Ms. Velasquez Molina and E.C. will be killed if they return to Honduras.

27.     Without a full understanding of the threats against Ms. Velasquez Molina and E.C. that caused them to embark on the dangerous journey to the U.S. border, and having failed to question Ms. Velasquez Molina adequately or to sufficiently consider the psychological trauma affecting her, the Asylum Officer found that she lacked a credible fear of persecution.  As a result, given that a request for reconsideration of the negative credible fear determination was recently denied, Ms. Velasquez Molina is now scheduled to be deported, perhaps in the near future.  Because defendants refuse to provide assurance that they will not deport Ms. Velasquez Molina pending a determination by Judge Sabraw regarding whether legal guardians are included in the *Ms. L* case, and Ms. Velasquez Molina fears her imminent deportation, an emergency motion for a restraining order is filed herewith.

28.     Ms. Velasquez Molina's deportation would further traumatize E.C., who continues to suffer psychological trauma while apart from Ms. Velasquez Molina.

29.     The Due Process Clause of the U.S. Constitution's Fifth Amendment prohibits the Government from separating children from their primary caregivers without justification and adequate process.  This rule is based on the self-evident proposition that forced separation of families is abhorrent, and otherwise contrary to the basic principles of this country.

30.     Pursuant to federal statutes, including the Immigration and Naturalization Act, the Convention Against Torture, and associated implementing regulations, an asylum applicant's credible fear determination can be made only after a full and fair proceeding. Having been forcibly separated from E.C. only weeks before her credible fear interview, Ms. Velasquez Molina was denied such a right to a full and fair proceeding due to the grief and severe emotional trauma she was experiencing.

31.     Furthermore, as an adult parent who was forcibly separated from her minor child and detained in immigration custody by DHS, Ms. Velasquez Molina may be a member of the class certified in *Ms. L v. U.S. Immigration & Customs Enf't*, No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364, at *27 (S.D. Cal. June 26, 2018) (ECF No. 82).

32.     This class certified by the *Ms. L* court includes all "adult parents" of separated minor children, and on its face does not exclude legal guardians, like Ms. Velasquez Molina. *See Ms. L v. U.S. Immigration & Customs Enf't,* No. 3:18-cv-00428-DMS-MDD, 2018 U.S. Dist. LEXIS 107364, at *27 (S.D. Cal. June 26, 2018) (ECF No. 82).  As an initial matter, the *Ms. L* court repeatedly stated that its order directing Defendants to reunite class members and their minor children was meant to mitigate the suffering of separated families, and not merely biological parents and children. *See id.* at *3-6, *11-15, *22, *25, *27-28. Further, although the *Ms. L* court expressly excluded certain categories of parents from the class, the court did *not* exclude legal guardians or other non-biological or *de facto* parents. *Id.* at *17, *28 n.10 (excluding "parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the [President's executive order prohibiting family separations after June 20, 2018].").

33.     In a tentative class settlement reached in *Ms. L*, Defendants have acknowledged that credible fear interviews conducted by Asylum Officers during the period in which asylum seekers were traumatized by forced family separation are inherently tainted, unfair, and contrary to law. (*See* Putative Settlement Agreement in *Ms. L*, copy attached hereto as Exhibit B). In that regard, the proposed settlement agreement, if approved, will require ICE to conduct *de novo*, good faith, credible fear interviews to detainees seeking asylum who, like Ms. Velasquez Molina, were suffering from the severe emotional trauma caused by forced family separations when their initial credible fear interview was conducted.

34.     It is apparent Defendants do not consider Ms. Velasquez Molina a member of the class, given that Ms. Velasquez Molina is presently considered eligible to be deported, but this is a determination that the *Ms. L* court has not yet made.[2]

35.     The United States District Court for the Southern District of California has prohibited Defendants from deporting *Ms. L* class members without their children absent the individual's affirmative, knowing, and voluntary waiver of that right, or a determination that the parent is unfit. There has been no such waiver by Ms. Velasquez Molina or determination in this case.

36.     On August 27, 2018, Ms. Velasquez Molina filed with the Houston, Texas Asylum Office a properly supported Request for Reconsideration of the negative finding from Ms. Velasquez Molina's earlier credible fear interview. On October 5, 2018, counsel for Ms. Velasquez Molina received a letter from USCIS stating that reconsideration was not warranted in her case. A copy of the Request for Reconsideration and USCIS letter in response are attached to this Complaint as Exhibits C & D.

---

[2] Undersigned counsel understand that certain legal guardians who received negative credible fear determinations based on interviews conducted while they were emotionally traumatized from the separation of their children intend to file papers in *Ms. L* seeking clarification that legal guardians are within the settlement class.

37.    As a result of the Defendants' actions in this case, Ms. Velasquez Molina is facing imminent deportation, which could potentially be in violation of the injunction issued in the *Ms. L* case, without having had a full and fair opportunity to pursue her asylum claim and  forcing her to leave behind her minor child, who suffers each day she continues to be separated from her *de facto* mother.

38.    Given the irreparable and continuous emotional damage caused by Defendants' actions, Ms. Velasquez Molina requests a stay of her deportation and an order obligating the Asylum Office to conduct a good faith, *de novo* credible fear interview at which counsel for Ms. Velasquez Molina may attend.  Ms. Velasquez Molina seeks no relief from the Court as it relates to the Asylum Office's conclusions from a *de novo* credible fear interview, only that Ms. Velasquez Molina be accorded a fair chance to establish her credible fear of persecution in an interview to be conducted in the future, at which Ms. Velasquez Molina is represented by counsel.

## CAUSES OF ACTION
### COUNT I
### (Violation of Asylum Statute)

39.    All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

40.    Under United States law, noncitizens with a credible fear of persecution in their country of origin shall have a fair opportunity to apply for asylum in the United States. *See* 8 U.S.C. § 1225(b)(1); 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. § 1158(a)(1).  Ms. Velasquez Molina has a private right of action to vindicate her right to apply for asylum.

41.     Defendants' separation of Ms. Velasquez Molina from E.C. violated federal asylum law, because it impermissibly infringed upon Ms. Velasquez Molina's ability to pursue her asylum claim by requiring her to submit to her credible fear interview, while severely emotionally traumatized by the wrongful separation from her daughter.

## COUNT II
### (Punishment of Civil Detainee in Violation of Due Process)

42.     The U.S. Constitution's Fifth Amendment prohibits punishment of immigrants held in civil detention. *Bell v. Wolfish*, 441 U.S. 520, 538-39 & n.20 (1979).

43.     At all times after Ms. Velasquez Molina entered the United States in June 2018, Defendants and their agents and employees have continuously detained Ms. Velasquez Molina pursuant to civil immigration detention statutes. Defendants have never detained Ms. Velasquez Molina as a convicted criminal. Defendants intend to punish Ms. Velasquez Molina by deporting her back to Honduras without her child, to face the very real possibility of death, without giving her a fair opportunity to establish a credible fear of persecution and otherwise gaining asylum in the United States.

44.     Defendants' foregoing actions that punish Ms. Velasquez Molina are patently excessive in relation to any legitimate government objective.

## COUNT III
### (Family Separation in Violation of Substantive Due Process)
### (Against All Defendants Except USCIS Defendants in Their Official Capacities)

45.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

46.     The Due Process Clause of the United States Constitution's Fifth Amendment protects all "persons" on United States soil, including Ms. Velasquez Molina.

47.    Ms. Velasquez Molina has a liberty interest under the Due Process Clause in remaining together as a family with her daughter E.C., and the means for mother and daughter to be reunited starts with a good faith, *de novo* credible fear interview that is not tainted by the forced separation of Ms. Velasquez Molina from E.C.

48.    The separation of Ms. Velasquez Molina from E.C. violates substantive due process because it furthers no legitimate purpose, much less a compelling governmental interest.

## COUNT IV
### (Administrative Procedure Act—Arbitrary and Capricious Practice)
### (Against All Defendants Except USCIS Defendants)

49.    All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

50.    The APA prohibits agency action that is arbitrary and capricious and contrary to constitutional right.

51.    Defendants' separation of Ms. Velasquez Molina from E.C. without a compelling justification and without a mechanism, protocol, or system to guarantee that the asylum process, including the opportunity for a fair credible fear interview that is conducted in good faith, is arbitrary and capricious, and in violation of the APA.  5 U.S.C. § 706(2)(A).

## COUNT V
### Petition for Habeas Corpus Under Treaties of the United States: International Convention on Civil and Political Rights (Claim for Injunctive and Declaratory Relief Against All Defendants in Their Official Capacities)

52.    All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

53.    The ICCPR has been signed and ratified by the United States.

54.     Under Article 17 of the ICCPR, "[n]o one shall be subjected to arbitrary or unlawful interference with her privacy, family, home or correspondence, nor to unlawful attacks on her honor and reputation." Article 23 states that "family is the natural and fundamental group unit of society and is entitled to protection by society and the State."

55.     By forcibly separating Ms. Velasquez Molina from E.C., Defendants have subjected Ms. Velasquez Molina to arbitrary, unlawful, and unjustified interference with her family in violation of the ICCPR, which improperly tainted her credible fear interview that was conducted after she was traumatized by the separation of her daughter.

## COUNT VI

### Petition for Habeas Corpus Under Laws and Treaties of the United States: United Nations Convention Relating to Status of Refugees and 8 U.S.C. § 1158 (Claim for Injunctive and Declaratory Relief Against All Defendants in Their Official Capacities)

56.     All of the foregoing allegations are repeated and re-alleged as though fully set forth herein.

57.     The United States is party to the 1967 Protocol Relating to the Status of Refugees and key provisions have been incorporated into U.S. law giving individuals a cause of action for litigation.  Under federal law, "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158.

58.     Because the right to seek asylum and the definition of refugee, which stems from an international treaty, is directly incorporated into federal law, it creates a legal cause of action for Ms. Velasquez Molina.

59.     Defendants have unlawfully interfered with Ms. Velasquez Molina's right to seek asylum and have punished her for doing so by traumatically separating her from her daughter and conducting her credible fear interview while she suffered from the severe emotional trauma of that separation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.      Declare the separation of Ms. Velasquez Molina from E.C. to have unlawfully violated Ms. Velasquez Molina's substantive due process rights and interfered with her right to pursue a fair asylum claim in the United States;

B.      Enjoin Defendants from deporting or otherwise removing Ms. Velasquez Molina from the United States until she is given a good faith, *de novo* opportunity to pursue her asylum claims;

C.      Enter an Order requiring ICE and the Asylum Office to conduct a good faith, *de novo* credible fear interview, at which Ms. Velasquez Molina may be accompanied by counsel; and

D.      Order all other relief that is just and proper.

Respectfully submitted this 17th day of October, 2018.

*/s/ Joshua C. Toll*
Joshua C. Toll
DC Bar No. 463073
jtoll@kslaw.com

Wintta M. Woldemariam
DC Bar No. 1025108
wwoldemariam@kslaw.com

King & Spalding, LLP
1700 Pennsylvania Avenue
Suite 200
Washington, DC 20006
(T) 202-737-0500

*Attorneys for Plaintiff*

# Exhibit C

Exhibit C
000052

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**Policy Number 11064.2:** **Detention and Removal of Alien Parents or Legal Guardians**

| | |
|---|---|
| **Issue Date:** | **August 29, 2017** |
| **Effective Date:** | **August 29, 2017** |
| **Superseded:** | ICE Policy 11064.1: Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities (Aug. 23, 2013) and ICE Policy 11031.1: Juveniles Encountered During Fugitive Operations (Aug. 24, 2007). |
| **Federal Enterprise Architecture Number:** | 306-112-002b |

1. **Purpose/Background.** This Directive provides guidance regarding the detention and removal of alien parents and legal guardians of a minor child(ren), to include those who have a direct interest in family court or child welfare proceedings in the United States. It is intended to complement the detention standards and policies that govern the intake, detention, and removal of alien parents or legal guardians.

2. **Policy.** U.S. Immigration and Customs Enforcement (ICE) personnel are responsible for the prompt and faithful execution of U.S. immigration laws. In pursuing the enforcement of these laws against alien parents and legal guardians of a minor child(ren), or who have a direct interest in family court or child welfare proceedings involving a minor child(ren) in the United States, ICE personnel should remain cognizant of the impact enforcement actions may have on a lawful permanent resident (LPR) or U.S. citizen (USC) minor child(ren). This Directive in no way limits the ability of ICE personnel to make individual enforcement decisions on a case-by-case basis. The security and safety of any ICE employee, detainee, ICE detention staff, or member of the public will be paramount in the exercise of the procedures and requirements of this Directive.

3. **Definitions.** The following definitions apply for the purposes of this Directive only.

3.1. **Family Court or Child Welfare Proceeding.** A proceeding in which a family or dependency court or child welfare agency adjudicates or enforces the rights of parents or minor child(ren) through determination or modification of parenting plans, child custody, visitation, or support, or the distribution of property or other legal obligations in the context of parental rights.

4. **Responsibilities.**

4.1. The **Enforcement and Removal Operations (ERO) Executive Associate Director** is responsible for:

    1) Ensuring ERO employees comply with this Directive; and

---

Guidance on the Detention and Removal of Alien Parents or Legal Guardians

Exhibit C
000053

2) Designating a Child Welfare Coordinator.

**4.2.** **Field Office Directors (FOD)** are responsible for designating a coordinator at the supervisory level in his or her Field Office to serve as the Field Point of Contact (POC) for the provisions listed in this Directive for his/her area of responsibility (AOR).

**4.3.** The **Child Welfare Coordinator** is responsible for:

1) Serving as the primary point of contact and subject matter expert for all ICE personnel regarding child welfare issues related to detained aliens;

2) With the assistance of ERO divisions responsible for data collection and analysis, evaluating, on an ongoing basis, information collected from ENFORCE, the Risk Classification Assessment, and other relevant ICE information technology systems regarding detained alien parents or legal guardians and sharing appropriate information with FODs and Field POCs on an ongoing basis; and

3) Providing guidance to FODs and Field POCs on:

   a) Appropriate initial placement and transfer decisions for detained alien parents or legal guardians;

   b) Appropriate provisions for escorted trips to family court or child welfare proceedings for detained alien parents or legal guardians;

   c) Appropriate visitation within ICE facilities; and

   d) Appropriate efforts, to the extent practicable, to allow a detained alien parent or legal guardian to make arrangements for their minor child(ren), including through increased access to counsel, consular officials, family and dependency courts, child welfare authorities' personnel, and/or family members or friends in order to arrange guardianship, or to obtain travel documents or otherwise make necessary travel arrangements, for his or her minor child(ren).

4) Coordinating as necessary with relevant ERO program offices, FODs, state or local family court or child welfare authority personnel, consular officials, and others to facilitate the timely response to issues or complaints received by ICE regarding the child welfare issues of detained aliens.

**4.4.** The **ERO Field POCs** are responsible for:

1) Addressing public inquiries related to the family ties of detained alien parents or legal guardians of a minor child(ren); and

2) Communicating with the Child Welfare Coordinator and completing all relevant training.

---

Guidance on the Detention and Removal of Alien Parents or Legal Guardians

Exhibit C
000054

**5.      Procedures/Requirements.**

**5.1.    Minor Child(ren) Encountered During Enforcement Actions.**

1)  ICE personnel should not take custody of or transport a minor child(ren) they encounter during an enforcement action who is either a USC or LPR, or who is otherwise not removable from the United States.

2)  Absent indications of child abuse or neglect, ICE personnel should accommodate, to the extent practicable, an alien parent or legal guardian's efforts to make alternative care arrangements for his or her minor child(ren).  ICE personnel should document the alien parent or legal guardian's request for transfer of custody of a USC or LPR minor child(ren) to a verifiable third party.

3)  If the alien parent or legal guardian cannot make an alternative care arrangement for the minor child(ren), or if there is an indication that the minor child(ren) has been subject to abuse or neglect by a parent or other adult who may be asked to take custody of the minor child(ren), ICE personnel should contact the local child welfare authority or law enforcement agency to take custody of the minor child(ren).

4)  Once a detained alien has been determined to be a parent or legal guardian of a USC or LPR minor child(ren), ICE personnel should enter this information in ENFORCE Alien Removal Module (EARM), or its successor system.

**5.2.    Initial Detention Placement and Subsequent Transfers of Detained Alien Parents or Legal Guardians.**

1)  If the alien's minor child(ren) or family court or child welfare proceedings are within the AOR of initial apprehension, the FOD must refrain from making an initial placement or from subsequently transferring the alien outside of the AOR of apprehension, unless deemed operationally necessary and otherwise consistent with applicable ICE policies.

**5.3.    Participation in Family Court or Child Welfare Proceedings by Detained Alien Parents or Legal Guardians.**

1)  Where practicable, the FOD must arrange for a detained alien parent or legal guardian's in-person appearance at a family court or child welfare proceeding when the detained alien parent or legal guardian's presence is required in order for him or her to maintain or regain custody of his or her minor child(ren) and:

   a)  The detained alien parent or legal guardian, or his or her attorney or other representative, timely requests with reasonable notice an opportunity to participate in such hearings;

---

b) The detained alien parent or legal guardian, or his or her attorney or other representative, has produced evidence of a family court or child welfare proceeding, including but not limited to, a notice of hearing, scheduling letter, court order, or other such documentation;

c) The family court or child welfare proceedings are located within a reasonable driving distance of the detention facility where the detained alien parent or legal guardian is housed;

d) Transportation and escort of the detained alien parent or legal guardian would not be unduly burdensome on Field Office operations; and

e) Such transportation and/or escort of the detained alien parent or legal guardian to participate in family court or child welfare proceedings does not present security and/or public safety concerns.

2) If it is impracticable to transport the detained alien parent or legal guardian to appear in-person in a family court or child welfare proceeding, the FOD should accommodate the detained alien parent or legal guardian's appearance or participation through video or standard teleconferencing from the detention facility or the Field Office to the extent that it is technologically feasible and approved by the family court or child welfare authority. The detained alien parent shall have the responsibility for obtaining approval from the family court or child welfare agency.

3) All actions taken pertaining to a detainee's participation in family court or child welfare proceedings should be documented in EARM, or its successor system.

4) In all cases, if the detained alien parent or legal guardian does not wish to attend and/or participate in a family court or child welfare proceeding, ICE will not interfere with the detained alien parent or legal guardian's decision, which shall be documented in the detainee's Alien-File (A-File).

## 5.4. Visitation.

1) In the event an alien parent or legal guardian is detained, ICE will facilitate a means of regular visitation between the parent and minor child(ren).

2) Pursuant to ICE detention standards, at facilities where there is no provision for visits by minors, upon request, FODs must arrange for a visit by minor child(ren), step-child(ren), child(ren) under legal guardianship, and/or foster child(ren) within the first 30 days. After that time, upon request, ICE must consider a request for transfer, when practicable, to a facility that will allow such visitation. Upon request, FODs must continue monthly visits, if transfer is not approved, or until an approved transfer can be effected.[1]

---

[1] *See* National Detention Standards 2000 (Section H.2.d); Performance-Based National Detention Standards

3) In some cases, parent-child visitation may be required by the family court or child welfare authority in order for a detained alien parent or legal guardian to maintain or regain custody of his or her minor child(ren). If a detained alien parent or legal guardian, or his or her family member, attorney, or other representative produces documentation (e.g., a reunification plan, scheduling letter, court order, or other such documentation) of such a requirement, FODs must facilitate, to the extent practicable, the required visitation between the detained alien parent or legal guardian and his or her minor child(ren).

   a) Such special visitation may include contact visitation, within the constraints of safety and security for both facility staff and detainees.

   b) These special arrangements must not limit or otherwise adversely affect the detained alien parent or legal guardian's normal visitation rights under the relevant detention standards, or the safe and efficient operation of the detention facility.

4) If in-person visitation is not practicable, FODs may permit parent-child visitation through video or standard teleconferencing from the detention facility or the Field Office to the extent it is technologically feasible and approved by the family court or child welfare authority when visitation is court-ordered.

5) All actions documenting parent-child visitation should be recorded in EARM or its successor system. Copies of visitation orders will be placed in the A-File.

**5.5.   Coordinating Care or Travel of Minor Child(ren) Pending Removal of a Parent or Legal Guardian.**

1) Where detained alien parents or legal guardians who maintain their parental rights are subject to a final order of removal and ICE is effectuating their removal, FODs or their appropriate designees should accommodate, to the extent practicable, the detained parent or legal guardian's individual efforts to make arrangements for their minor child(ren). Such provisions may include the parent or legal guardian's attempt to arrange guardianship for his or her minor child(ren) to remain in the United States, or to obtain travel documents for the minor child(ren) to accompany them to their country of removal.

2) FODs must coordinate, to the extent practicable, within their local detention facilities and within the Field Office to afford detained alien parents or legal guardians access to counsel, consulates and consular officials, courts and/or family members in the weeks preceding removal in order to execute signed documents (e.g., powers of attorney, passport applications, appointments of guardians, or other permissions), purchase airline tickets, and make other necessary preparations prior to removal.

---

2008 (Section H.2.d); Performance-Based National Detention Standards 2011 (Section 1.2.b).

---

3) In addition, the FOD may, subject to security considerations, provide sufficient notice of the removal itinerary to the detainee or through the detained alien's attorney or other representative so that coordinated travel arrangements may be made for the alien's minor child(ren).

**6.     Recordkeeping.**

**6.1.**   Court documentation, visitation orders, and family law case files will be maintained as part of the A-File. A-Files will be retained permanently and transferred to the National Archives after 100 years in accordance with the U.S. Citizenship and Immigration Services A-File records schedule (N1-566-08-011).

**6.2.**   Information related to minor child(ren) encountered during enforcement actions and family court or child welfare proceedings will be stored in the Enforcement Integrated Database and retained for 75 years in accordance with DHS records schedule Biometric with Limited Biographical Data (DAA-0563-2013-001) item 6, Law Enforcement.

**7.     Authorities/References.**

**7.1.**   Executive Order 13,768, "Enhancing Public Safety in the Interior of the United States," 82 Fed. Reg. 8799 (Jan. 30, 2017).

**7.2.**   Memorandum from DHS Secretary John Kelly, "Enforcement of the Immigration Laws to Serve the National Interest" (Feb. 20, 2017).

**7.3.**   2011 Performance-Based National Detention Standards.

**7.4.**   2008 Performance-Based National Detention Standards.

**7.5.**   2000 National Detention Standards.

**8.     Attachments.** None.

**9.     No Private Right Statement.** This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

---

Guidance on the Detention and Removal of Alien Parents or Legal Guardians

6

Exhibit C
000058

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

## Children Entering the United States Unaccompanied: Section 2
Safe and Timely Release from ORR Care

Published: January 30, 2015

**Categories: Unaccompanied Children's Services**

### 2.1 Summary of the Safe and Timely Release Process

The Office of Refugee Resettlement (ORR) has policies and procedures in place to ensure the care and safety of children who are apprehended in the United States without a parent or legal guardian available to provide care and custody and without immigration status. These policies require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as "sponsors." Safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children.

ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as the law requires ORR to protect children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity. The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including: the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release.

*Posted 1/27/15*

### 2.2 Application for the Safe and Timely Release of an Unaccompanied Alien Child from ORR Care

ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care. Parents, other relatives, or close family friends can apply to have the child released to their care.

*Posted 1/27/15*

### 2.2.1 Identification of Qualified Sponsors

**The care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)**, the ORR funded facility that cares for the child, interviews the child as well as parents (see the section below on how ORR confirms relationship with child), legal guardians, and/or family members to identify qualified custodians ("sponsors"). If a child is either too young or there are other factors that prohibit the care provider from obtaining potential sponsor information from the unaccompanied alien child, the care provider may seek assistance from the child's home country consulate in collaboration with the **ORR Federal Field Specialist (ORR/FFS) (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** or from a reputable family tracing organization. Finding a sponsor for the child is an ongoing process that continues during the unaccompanied alien child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved.

ORR releases children to a sponsor in the following order of preference:[1] parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody. ORR has grouped these release options into the following categories.[2]

- **Category 1:** Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
- **Category 2:** An immediate relative—a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
- **Category 3:** Other sponsor, such as distant relatives and unrelated adult individuals
- **Category 4:** No sponsors identified

Although ORR gives preference to a parent or legal guardian when determining release plans, there are instances when ORR would not release an unaccompanied alien child to a parent or legal guardian. These include:

Exhibit C
000059

- There has been a court ordered termination of parental rights over the child.
- There is substantial evidence that the child would be at risk of harm if released to the parent or legal guardian.

In some cases, an unaccompanied alien child enters the United States with her biological child. In those cases, ORR will identify a sponsor for the unaccompanied alien child as well as for the infant or toddler. In most instances, it is in the best interest of the unaccompanied alien child and her biological child to be released to the same sponsor. When that occurs, the sponsor is assigned the same category for the infant as for the UAC mother. This is true even if the potential sponsor would be assigned a different category (based on their relationship status) if he or she were to sponsor the infant alone.

*Revised 4/11/16*

### 2.2.2 Contacting Potential Sponsors

The child's **care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)** is responsible for implementing safe screening methods when contacting and communicating with potential sponsors. These methods are to ensure that a potential sponsor does not pose a risk to the unaccompanied alien child, to other children in the care provider facility or to care provider staff.
These safe screening methods include:

- Use of appropriate interpreters
- Identity of the sponsor is obtained
- Verification of family relationships
- Coordination with the unaccompanied alien child's parents, legal guardians, or closest relatives prior to contacting non-relative adult potential sponsors
- Screening for exploitation, abuse, trafficking, or other safety concerns
- Engaging the child to communicate openly with care provider staff about his or her own sense of safety

*Posted 1/27/15*

### 2.2.3 The Application for Release

All potential sponsors must complete an application in order for a child to be released to them from ORR custody (the "Family Reunification Application").

Within 24 hours of identification of a potential sponsor for a child or youth, the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents (called the Family Reunification Packet or FRP).

The application package includes the following documents:

- A flyer with contact information on organizations offering a Legal Orientation Program for Custodians (LOPC)
- Family Reunification Packet Cover Letter
- Authorization for Release of Information
- Family Reunification Application
- Sponsor Care Agreement
- Sponsor Declaration
- Fingerprint instructions
- Sponsor Handbook
- (If parent or legal guardian wishes to specify) Letter of Designation for Care of a Minor
- Privacy Notices

The care provider is available to help the potential sponsor complete the application. The care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the deadlines for completing the forms. The sponsor may also receive assistance in completing the application at some fingerprinting locations.

*Revised 6/7/18*

### 2.2.4 Required Documents for Submission with the Application for Release

In addition to completing and signing the Family Reunification Application (FRA) and the *Authorization for Release of Information*, potential sponsors must provide documentation of identity, address, and relationship to the child they seek to sponsor (see also **The Family Reunification Checklist for Sponsors (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)**).[3] Potential sponsors must also submit documentation verifying the identity of the children they seek to sponsor, and evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan. In addition to their use as evidence of the foregoing, all documentation submitted under this section is used as part of the overall sponsor assessment process. See **Section 2.4 Sponsor**

10/12/2018                    Children entering the United States Unaccompanied: Section 2 | Office of Refugee Resettlement | ACF

Assessment Criteria and Home Studies (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4). As a result, ORR may in its discretion require potential sponsors to submit additional documentation beyond the minimums specified below.

### Proof of Sponsor Identity

To verify their identity, all potential sponsors must submit original versions or legible copies of government-issued identification documents. They may present either one selection from List A or two or more documents from List B. If a potential sponsor presents selections from list B, at least one selection must contain a legible photograph. Expired documents are acceptable for the purpose of establishing identity.

## LIST OF ACCEPTABLE DOCUMENTS

| LIST A |
| --- |
| U.S. Passport or U.S. Passport Card |
| Permanent Resident Card or Alien Registration Receipt Card (Form I-551) |
| Foreign Passport that contains a photograph |
| Employment Authorization Document that contains a photograph (Form I-766) |
| U.S. Driver's License or Identification Card |

OR

| LIST B |
| --- |
| U.S. Certificate of Naturalization |
| U.S. Military Identification Card |
| U.S. Social Security Card |
| Birth Certificate |
| Marriage Certificate |
| Court order for name change |
| Foreign national identification card |
| Consular passport renewal receipt that contains a photograph |
| Mexican consular identification card |
| Foreign driver's license that contains a photograph |
| Foreign voter registration card that contains a photograph |
| Canadian border crossing card that contains a photograph |
| Mexican border crossing card that contains a photograph with valid Form I-94 |
| Refugee travel document that contains a photograph |
| Other similar documents |

### Proof of identify of adult household members and adult care givers identified in a sponsor care plan

All potential sponsors must submit documentation verifying the identity of non-sponsor adults in their household or in a sponsor care plan. For all such adults, potential sponsors must submit at least one identification document that contains a photograph. The document may be from either List A or List B above, and may be an original version or a legible copy of the document. Expired documents are acceptable for the purpose of establishing identity. In addition, potential sponsors may submit an original version or legible copy of an ORR Verification of Release Form, but only to verify the identity of adults under the age of 21, and only if the form contains a photograph. ORR will not accept a Verification of Release as proof of identity if it does not contain a photograph, and/or is for anyone 21 and older.

### Proof of Address

All potential sponsors must submit at least one form of documentation verifying their current address. Acceptable forms of documentation include original versions or legible copies of:

- A current lease or mortgage statement dated within the last two months before submission of the FRA;
- A utility bill, addressed in the sponsor's name and dated within the last two months before submission of the FRA;
- A bank statement dated within the last two months before submission of the FRA;
- A payroll check stub issued by an employer, dated within the last two months before submission of the FRA;
- A piece of mail from a county, state, or federal agency (with the exception of ORR) with the sponsor's name and residential address and dated within the last two months before submission of the FRA;
- A notarized letter from a landlord on the business stationary of the real property owner confirming the sponsor's address; and
- Other similar documents reliably indicating that the sponsor resides at the claimed address, dated within the last two months before submission of the FRA.

Exhibit C
000061

ORR may use alternative methods to verify address. For example, ORR may send a letter containing specific instructions to the address given by the sponsor, and provide a timeline by which the sponsor must comply with the instructions.

**Proof of Child's Identity**

The potential sponsor or child's family must provide the unaccompanied alien child's birth certificate or a legible copy of the child's birth certificate.

**Proof of Sponsor-Child Relationship**

The potential sponsor must provide at least one form of evidence verifying the relationship claimed with the child.[4] Acceptable documents include original versions or legible copies of:

- Birth certificates;
- Marriage certificates;
- Death certificates;
- Court records;
- Guardianship records;
- Hospital records;
- School records;
- Written affirmation of relationship from Consulate; and
- Other similar documents.

Category 3 potential sponsors who are unable to provide verifiable documentation of a familial relationship with the unaccompanied alien child must submit evidence that reliably and sufficiently demonstrates a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States. Care providers must attain sufficient corroboration to be confident that they have received needed verification of the relationship between the potential sponsor and the child or child's family. In the absence of sufficient evidence of a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States, the child will not be released to that individual.

If a potential sponsor has been charged with or convicted of any crime or investigated for the physical abuse, sexual abuse, neglect, or abandonment of a minor, he or she must provide related court records and police records, as well as governmental social service records or proof of rehabilitation related to the incident.

If a sponsor, household member, or adult caregiver provides any false information in the application of release and/or accompanying documents or submits fraudulent documents for the purposes of obtaining sponsorship of the child, ORR will report the incident to HHS/Office of the Inspector General (OIG) and to U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI). Fraudulent documents include documents on which the address, identity, or other relevant information is false or documents that have been manufactured or altered without lawful authorization. ORR will deny release if it is determined that fraudulent documents were submitted during the application of release process.

*Revised 11/14/16*

## 2.2.5 Legal Orientation Program for Custodians

All potential sponsors of children and youth under the care of ORR should attend a presentation provided by the Legal Orientation Program for Custodians (LOPC). The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The program also provides information about possible free legal counsel (pro bono legal services) for the youth or child during the immigration court process.

The Office of Legal Access Programs (OLAP), within the Executive Office for Immigration Review (EOIR) at the U.S. Department of Justice, manages the LOPC and contracts with legal service organizations around the country to provide LOPC services to potential sponsors in their local communities or in metropolitan areas served by the program. EOIR is the entity in the federal government that is also responsible for adjudicating immigration cases by fairly, expeditiously, and uniformly interpreting and administering the nation's immigration laws.

The unaccompanied alien child's **case manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**is responsible for informing potential sponsors about all procedures related to the child's case--including attendance at an LOPC presentation. The Family Reunification Packet (FRP) that goes to each potential sponsor includes an *Authorization for Release of Information* that the sponsor must sign before the case manager may schedule an appointment for LOPC services. All potential sponsors should submit the *Authorization for Release of Information* immediately and prior to submitting the complete FRP to ensure timely scheduling of their LOPC session.

Upon receipt of the *Authorization*, the case manager schedules an appointment for a potential sponsor to attend a presentation with one of the LOPC providers around the country. Alternatively, the case manager contacts the **LOPC National Call Center at (888) 996-3848** and arranges for the Call Center to schedule an LOPC appointment for the potential sponsor or mail an LOPC Information Packet to the sponsor.

When evaluating family members and other potential sponsors, ORR considers whether they have attended an LOPC presentation. Attendance at an LOPC presentation is a factor in the release assessment.

10/12/2018                     Children ⌒ g the United States Unaccompanied: Section 2 | Offi ⌒ Refugee Resettlement | ACF

*Revised 12/4/17*

### 2.2.6 Additional Questions and Answers about this Topic

**Q: Will sponsors receive the Family Reunification Packet through the mail or electronically?**
A: Case managers will work with sponsors to identify the best way to get the packets to them, whether electronically or by fax transmission or postage paid overnight mail.

**Q: Do sponsors need assistance from an attorney or a paid representative to complete the packet?**
A: No. The unaccompanied alien child's case manager will be able to help the potential sponsor complete the form and explain the process.

**Q: Is it possible for an unaccompanied alien child's spouse to be a sponsor?**
A: ORR considers release to an unaccompanied alien child's adult spouse on a case by case basis.

**Q: Is it possible for family members in the United States to proactively contact ORR about children who may have entered the country unaccompanied?**
A: Yes. Family members may call the ORR National Call Center, at (800) 203-7001.

*Posted 1/27/15*

## 2.3 Key Participants in the Release Process

ORR's sponsor assessment and release decision process requires coordination among care provider staff, nongovernmental third-party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders, and Child Advocates, where applicable.

**Case Managers (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)** communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator. **Case Coordinators (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)** concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation. Once Case Managers and Case Coordinators agree on a particular recommendation for release, the recommendation will be sent to the **ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** for a final release decision. If the Case Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to the ORR/FFS for further guidance.

*Revised 8/1/16*

### 2.3.1 ORR/Federal Field Specialists (ORR/FFS)

ORR/FFS are ORR's field staff located regionally throughout the country and are assigned to a group of care providers within a region. They have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services, policies, and procedures are properly provided and implemented; and serve as a liaison to local stakeholders, including other Federal agencies, local legal service providers, local communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers.

With regard to the release process, ORR/FFS oversee individual unaccompanied alien children cases and review Case Manager, Case Coordinator, and Child Advocate recommendations; and make final release and transfer decisions for ORR. ORR/FFS also make final decisions whether home studies are conducted and/or post-release services are provided.[5] ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies.

*Revised 8/1/16*

### 2.3.2 Case Managers

Care provider Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody. (The care provider provides a range of services through other trained staff that are described in Section 3: Services.)

The role of the Case Manager within the release process is to initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the child or youth. When communicating with the potential sponsor, the Case Manager may:

- Provide direct assistance on completing the sponsor application packet and ensuring provision of supporting documentation;
- Involve the sponsor in making a plan for individualized services for the unaccompanied alien child, as appropriate;
- Keep the sponsor informed of the child's progress and current functioning;
- Provide the sponsor with detailed information about the child's needs in order to fully assess the sponsor's ability to provide care and services, including completing a sponsor care plan, when necessary;

Exhibit C
000063                    5/22

- Discuss services that are available in the sponsor's community for the child; and
- Share relevant information on the unaccompanied alien child in accordance with applicable privacy and information-sharing policies and in collaboration with the unaccompanied alien child and the child's clinician in a way that best serves the child's safety and well-being.

The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process. The Case Manager provides weekly status updates to the unaccompanied alien child's Case Coordinator and ORR/FFS on the progress in achieving a safe and timely release with family members as well as potential challenges that may delay a release. The Case Manager provides weekly status updates (monthly for children in LTFC) to the UAC on the child's case and provision of services, preferably in person. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates, post-release and home study providers, and other Federal agencies. Case Managers, in collaboration with the ORR/FFS and Case Coordinator, will also work with law enforcement officials regarding an unaccompanied alien child's pending release if the minor has outstanding criminal charges or other issues.

*Revised 6/7/18*

## 2.3.3 Case Coordinators

Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff. The Case Coordinator is responsible for integrating all areas of assessment from the Case Manager, Child Advocates, where applicable, and other stakeholders into a release plan that will provide for the unaccompanied alien child's physical and mental well-being. After staffing and reviewing a case, Case Coordinators and Case Managers must agree on a release recommendation. If there is a disagreement or a particularly complex case, then the case will be elevated to the ORR/FFS for further guidance.

- Providing timely review and assessment of potential sponsors and unaccompanied alien children to make recommendations for release to ORR in conjunction with the Case Manager;
- Assisting ORR in ensuring that children are placed in the least restrictive setting while receiving all appropriate services;
- Meeting with individual unaccompanied alien children and care provider staff at designated ORR-funded care provider sites;
- Providing targeted child welfare-based assistance to care provider staff, as directed by ORR staff;
- Making recommendations for home study and post-release services for at-risk children;
- Making placement recommendations for children who require more specialized levels of care, such as long-term foster care and residential treatment centers;
- Participating in collaborative meetings with local stakeholders; and
- Participating in staffing of cases with care providers and designated ORR staff.

*Revised 8/1/16*

## 2.3.4 Child Advocates

ORR may appoint **Child Advocates (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Child Advocate)** for victims of trafficking and other vulnerable children. Child Advocates are third parties who make independent recommendations regarding the best interests of a child. Their recommendations are based on information that is obtained from the child and other sources (e.g., the child's parents, potential sponsors, government agencies, and other stakeholders). Child Advocates formally submit their recommendations to ORR and/or the immigration court in the form of Best Interest Determinations (BIDs). ORR considers BIDs when making decisions regarding the care, placement, and release of unaccompanied alien children, but it is not bound to follow BID recommendations.

As required by the TVPRA, ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working. After providing proof of appointment, Child Advocates have access both to their clients and to their clients' records. Child Advocates may access their clients' entire original case files at care provider facilities, or request copies from care providers.[6] Further, they may participate in case staffings.

Child Advocates and ORR maintain regular communication, informing each other of considerations or updates that impact service provision and release planning.

Child Advocates' duties include:

- Client Visits: The Child Advocate meets with the unaccompanied alien child regularly and speaks with the child's care provider staff in order to understand the child's background and current situation.
- Decision Making: The Child Advocate helps the unaccompanied alien child understand legal and care-related issues, explains the consequences of decisions made in response to those issues, and assists the child in making decisions when the child requests such help.
- Best Interests Advocacy: The Child Advocate develops a service plan containing best-interest recommendations with respect to the care, placement, and release options; and keeps the care provider, ORR, and the legal service provider or attorney of record apprised of the plan and advocacy efforts.

Exhibit C
000064

- Case updates: The Child Advocate collaborates and regularly communicates with the care provider, ORR, and other stakeholders in the planning and performance of advocacy efforts. For children who have been released from ORR care, Child Advocates provide timely updates as appropriate or as requested by ORR.

In most cases, ORR appoints Child Advocates while children are in its custody. However, in its discretion, ORR may appoint Child Advocates for unaccompanied alien children after their release from ORR care.

*Posted 8/1/16*

## 2.4 Sponsor Assessment Criteria and Home Studies

As noted in the **Section 2.2 Application for Safe and Timely Release of an Unaccompanied Alien Child from ORR Care**, the application process for release of an unaccompanied alien child involves a number of steps, including background checks (see **Section 2.5 ORR Policies on Requesting Background Checks**) and submission of the application by the sponsor. This section describes the criteria ORR uses to assess each potential sponsor's ability to provide for the physical and mental well-being of the unaccompanied alien child, and the role of home studies in the process.

The sponsor assessment reviews a sponsor's strengths, resources, risk factors and special concerns within the context of the unaccompanied alien child's needs, strengths, risk factors, and relationship to the sponsor. ORR also determines whether to conduct a home study, as required by the law or as necessary to ensure the welfare of the child

*Revised 3/15/16*

### 2.4.1 Assessment Criteria

ORR considers the following factors when evaluating family members and other potential sponsors:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.
- The sponsor's motivation for wanting to sponsor the child or youth.
- The unaccompanied alien child's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian has designated a sponsor).
- The child or youth's views on the release and whether he or she wants to be released to the individual.
- The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.
- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.
- The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's attendance at a Legal Orientation Program for Custodians (LOPC) presentation. See section **2.2.5**.
- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.
- The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.
- The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

*Revised 12/4/17*

### 2.4.2 Home Study Requirement

The care provider screens each case to determine whether to conduct a home study of the potential sponsor as required under the **Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) (http://www.gpo.gov/fdsys/pkg/BILLS-110hr7311enr/pdf/BILLS-110hr7311enr.pdf)**. Information about the child is collected during initial placement into an ORR facility and throughout his or her stay. The care provider then uses the information collected about and from the child in conjunction with the sponsor assessment process to determine whether to conduct a **home study (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Home Study)**. The TVPRA requires home studies under the following circumstances:

1. The child is a victim of a severe form of trafficking in persons;
2. The child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102);
3. The child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or
4. The child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence.

Exhibit C
000065         7/22

ORR also requires a home study before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR requires a home study for children who are 12 years and under before releasing to a non-relative sponsor.

In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and Case Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child. See **Footnote 5**.

The care provider must inform the potential sponsor whenever a home study is conducted, explaining the scope and purpose of the study and answering the potential sponsor's questions about the process. In addition, the home study report will be provided to the potential sponsor if the release request is denied. See also Section **2.7.7**.

### Home Study Report and Final Recommendation

A home study consists of interviews, a home visit, and a written report containing the home study case worker's findings. A home study assesses the potential sponsor's ability to meet the child's needs, educates and prepares the sponsor for the child's release, and builds on the sponsor assessment conducted by the care provider staff to verify or corroborate information gathered during that process. The home study is conducted as a collaborative psycho-educational process in which the home study case worker identifies areas where additional support, resources, or information are needed to ensure a successful sponsorship, and provides corresponding psycho-educational assistance. The final recommendation must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and address any additional information that emerges during the course of the home study regarding the sponsor, the sponsor's household or the child.

The home study provider must contact the care provider within 24 hours of home study referral acceptance, and must also contact the sponsor to schedule the home visit within 48 hours of referral acceptance. The home study provider makes a recommendation to ORR about release with the sponsor. The ORR Federal Field Specialist takes the home study provider's recommendation into consideration when making a release decision. ORR has final authority on release decisions.

The home study provider submits the written report within 10 business days of receipt of the referral. Any requests by the home study provider to extend beyond 10 business days or to cancel a home study must be submitted in writing to the ORR Federal Field Specialist for consideration.

All releases following home studies require post-release services.

### Must a child receive a Trafficking Eligibility or Interim Assistance Letter from HHS prior to being referred for a TVPRA-mandated home study under #1 above?

No, a child does not need to receive a Trafficking Eligibility Letter from HHS prior to being referred for a home study. A care provider may refer a child for a home study under #1 above if, during the assessment for trafficking, the care provider determines the child is a victim of a severe form of trafficking in persons.

### In determining whether a TVPRA-mandated home study is required under #3 above, care providers consider the following questions:

### What is physical abuse?

Physical abuse is an act that results in physical injury, such as red marks, cuts, welts, bruises, broken bones, missing or broken teeth or muscle strains. Acts of physical abuse include but are not limited to punching, beating, kicking, biting, hitting (with a hand, stick, strap or other object), burning, strangling, whipping, or the unnecessary use of physical restraint.

### Is physical abuse intentional?

Generally, physical abuse is intentional; however, physical abuse can occur when physical punishment goes too far. In other words, an accidental injury of a child may be considered physical abuse if the act that injured the child was done intentionally as a form of punishment.

### Must a child have physical injuries to meet the standard for physical abuse under #3?

No, in some cases, a child may not have physical injuries at the time the care provider makes an assessment. Children may be in various stages of the healing process or thoroughly healed from the physical abuse by the time they arrive in ORR care.

### For the purposes of #3, who can physically or sexually abuse a child?

A parent, legal guardian, caregiver or other adult with a special relationship to the child can physically or sexually abuse a child.

### Who is considered to be a caregiver or adult with a special relationship?

A caregiver is defined as any person who is entrusted with the child's care and who lives with the child. Other adults with a special relationship to the child could include a teacher, priest, or health care provider.

Exhibit C
000066

**What is sexual abuse?**

Sexual abuse of a child by a parent, legal guardian, caregiver or other adult with a special relationship to the child includes any of the following acts, with or without the consent of the child or youth:

- Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
- Contact between the mouth and the penis, vulva, or anus;
- Contact between the mouth and any body part where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks where the intent is to abuse, arouse, or gratify sexual desire;
- Any attempt, threat, or request by the adult to engage in the activities described above;
- Any display by the adult of his or her uncovered genitalia, buttocks, or breast in the presence of the child; and
- Voyeurism.

State laws on statutory rape are not the standard in assessing whether a youth has been sexually abused for the purposes of #3. Care providers use the definition from the ORR rule concerning sexual abuse and harassment; however, for the purposes of determining when a home study is required, the perpetrator is limited to a parent, legal guardian, caregiver or other adult with a special relationship to the child.

**Under what circumstances is a child's health or welfare considered to have been significantly harmed or threatened?**

Care providers assess the totality of the circumstances in determining whether a child's health or welfare has been significantly harmed or threatened. In evaluating a specific case, care providers take into consideration not only the definitions of physical and sexual abuse listed

above, but also the circumstances surrounding the incident and any behaviors that the child or youth exhibits as a result of the abuse. Circumstances to consider include but are not limited to: the amount of time that has passed since the abuse, the period of time in which the abuse occurred, the cultural context in which the abuse occurred, the age of the child or youth at the time of the abuse, and the relationship between the youth and the perpetrator.

Care providers take into consideration the situations and behaviors listed below, but do not make a determination based solely on the presence or absence of one of them.

- The child experiences on-going medical issues from physical injuries.
- The child exhibits negative or harmful behaviors, thoughts or emotions, such as, but not limited to, excessive hostility or aggression towards others, fire setting, cutting, depression, eating disorders suicidal ideation or substance abuse.

In evaluating difficult cases, the care provider should consult with their ORR/FFS.

*Revised 1/9/17*

### 2.4.3 Additional Questions and Answers on This Topic

**Q: What happens if a new sponsor is identified during the sponsor assessment process?**
A: If there are multiple potential sponsors, the ORR-funded care provider will exhaust all efforts to facilitate a release to a parent or legal guardian while also contacting and evaluating other potential sponsors concurrently. ORR has release order preferences and will evaluate sponsors concurrently in accordance with the preference orders to determine the best placement for the child.

*Posted 1/27/15*

## 2.5 ORR Policies on Requesting Background Checks of Sponsors

In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA of 2008, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints, and provided a copy of a valid government issued photo identification. ORR transmits the fingerprints to the Department of Homeland Security to perform criminal and immigration status checks on ORR's behalf.  DHS then submits the results to ORR.

ORR also conducts additional background checks without going through DHS.  Depending on the circumstances, these checks may involve background checks on criminal history (including through the FBI) and child abuse/neglect checks (CA/N)

Adult care givers identified in a sponsor care plan also require background checks, as provided in the chart at section 2.5.1.

*Revised 6/7/18*

Exhibit C
000067

10/12/2018                Children ( ing the United States Unaccompanied: Section 2 | Off ( Refugee Resettlement | ACF

## 2.5.1 Criteria for Background Checks

All potential sponsors and adult household members undergo a background check for criminal history and immigration status using fingerprints. These checks are conducted by the Department of Homeland Security on behalf of ORR and DHS then submits the results to ORR.

In addition, ORR independently conducts background checks without going through DHS. This independent background check process varies, depending in part on the relationship of the potential sponsor to the unaccompanied alien child:

- Parents and legal guardians (Category 1)
- Other immediate adult relatives, such as brother, sister, aunt, uncle, grandparent or first cousin (Category 2)
- Distant relatives and unrelated adults (Category 3)

As a part of this independent background check process, all potential sponsors must undergo a public records check.

The following indicates the **minimum** requirements for the process for sponsors. ORR may require additional checks, verifications, or procedures for sponsors in any category if there are any unresolved issues or questions related to the well-being of the child.

The following table lists the types of background checks performed, and explains when they are performed, based on the potential sponsor's relationship to the unaccompanied alien child and other release considerations. The chart identifies when DHS performs the check on ORR's behalf. (See also Section **2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, listing findings barring release)

| Type of Background Check | Purpose | Persons Checked | When Performed |
|---|---|---|---|
| Public Records Check | Identifies arrests or convictions of sponsors, adult household members, or others. If a check reveals a criminal record or safety issue, it will be used to evaluate the sponsor's ability to provide for a child's physical and mental well-being. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Sex Offender Registry Check, conducted through the U.S. Department of Justice National Sex Offender Public Website | Identifies sponsors and others that have been adjudicated as sex offenders through a national search and, if available, a local public registry search. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Immigration Status Check conducted by the Department of Homeland Security using fingerprints | Provides information about immigration court actions and immigration statuses, including information about orders of removal. The information is also used to determine whether a sponsor care plan is required for release (see Section 2.7.6). | Potential Sponsors in Categories 1-3. Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| National (FBI) Criminal History Check, based on digital fingerprints or digitized paper prints | Determines whether a sponsor or adult household member has a criminal history, has been convicted of a sex crime, or has been convicted of other crimes that compromise the sponsor's ability to care for a child. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study |
| DHS criminal history check, based on digital fingerprints or digitized paper prints. | Determines whether a sponsor or adult household member has a criminal history, including: biographic criminal check of the national databases, a biographical check for wants and warrants. | Potential Sponsor in Categories 1-3. Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a | Where a public records check reveals |

Exhibit C
000068                10/22

| | | | |
|---|---|---|---|
| | | sponsor care plan. | possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| Child Abuse and Neglect (CA/N) Check, obtained on a state by state basis as no national CA/N check repository exists | Checks all localities in which the sponsor or household member has resided in the past 5 years. | Potential Sponsors in Categories 1-2. | In cases that require a home study, and cases where a special concern is identified. |
| | | Potential Sponsors in Category 3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In any case where a sponsor is required to undergo a CA/N check. |
| State Criminal History Repository Check and/or Local Police Check | Assists in locating police or arrest records, or other criminal offense details, as needed. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Used on a case-by-case basis when there is an unresolved criminal arrest or issue that is still in process. |

*Revised 6/7/18*

### 2.5.2 Results of Background Checks on Release Decisions

As an entity providing for the health and well-being of children and youth, ORR uses the results from background checks to determine whether release to a potential sponsor is safe. A potential sponsor may be denied a release request, based on the results of a background check, and a release decision may remain undecided until ORR obtains the results of a potential sponsor's criminal history, immigration background checks, or child abuse and neglect reports.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

**Criminal History**
In the event that a background check of a potential sponsor or, if applicable, adult household member, reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request the potential sponsor to provide any additional information that may demonstrate the potential sponsor's ability to provide for the child's physical and mental well-being.

If release is not barred by Section **2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, the decision to release a child or youth to a sponsor in these circumstances is based on all the following considerations:

- The severity of the criminal and/or child abuse/neglect history;
- The length of time that has passed since the criminal act or child abuse/neglect allegation occurred;
- The relationship of the potential sponsor and other adult household members to the child or youth; and
- The evidence, if any, of rehabilitation since the criminal act or child abuse/neglect allegation occurred.

In cases where the proposed sponsor or other adult household member has been charged with, but not convicted of, a crime, ORR may postpone a final release decision until the legal issue is resolved.

If the sponsor has an outstanding order of removal, or a pending order of removal that is related to an underlying criminal act, the decision to release a child or youth to a sponsor in these circumstances is based on the considerations described above.

**Sponsor Immigration Status**
ORR does not disqualify potential sponsors on the basis of their immigration status. ORR uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States. (See Section **2.6 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.6) Effect of Sponsor Immigration Status on Release of Unaccompanied Alien Children)**

**Summary Table of Results of Background Checks and Next Steps**
The following table shows procedures following the results of background checks.

| Background Check Results | Next Steps |
|---|---|
| No arrest record; check completed | Proceed with release decision-making process. See Section **2.7 Recommendations and** Exhibit C |

| | Decisions on Release. |
|---|---|
| Criminal arrest record and/or substantiated adverse child welfare findings; check completed | Determine whether release is barred. See Section 2.7.4 Deny Release Request. If release is not barred, elevate safety issues for third party review. For any findings that could affect safe release, care provider and/or ORR will obtain additional documents to determine current situation (e.g. sponsor is on probation, criminal charges are resolved, etc.). Final release decision shall take into account the criminal records and all other relevant information that is available. |
| Immigration status concern (e.g. out of status, no legal status, prior order of removal, or no immigration record for non-citizen) | Review FBI record and DHS report, and/or Department of Justice/Executive Office of Immigration Review's case status hotline for information related to possible unresolved immigration issues. |
| Pending results; check not complete | ORR/FFS will provide instructions to care provider |

*Revised 6/7/18*

### 2.5.3 Additional Questions and Answers on This Topic

**Q1: Where can a sponsor get his or her fingerprints taken?**
A1: ORR funds a network of digital fingerprint providers at locations that are not affiliated with law enforcement entities. Sponsors may also go to any local police department for paper fingerprinting services in the event a digital fingerprint provider is not conveniently located near a sponsor's location. Fingerprinting services are not available at ORR headquarters and offices.

**Q2: Is there a deadline for complying with a fingerprinting request?**
A2: Yes. When required, fingerprints should be provided within 3 business days of the request. Release may be delayed if fingerprints are not provided promptly.

**Q3: Are potential sponsors required to disclose to the care provider that they have a record of a criminal charge or child abuse?**
A3: Yes. The sponsor must immediately advise the care provider of this situation and gather detailed documentation of the charges, dispositions, police reports, and evidence of rehabilitation.

**Q4: What happens if a public records or sex offender registry check returns disqualifying findings for a sponsor, adult household member, or adult caregiver identified in the sponsor care plan?**
A4: The Case Manager informs the sponsor, and provides the sponsor with a copy of the results. The sponsor and household member/adult care giver may dispute the results, and provide further evidence or information that a check was not performed correctly (e.g., the wrong date of birth was used, the individual's name was spelled incorrectly, etc.). The Case Manager will rerun the check using the corrected information. If further information is required, such as additional background checks, the Case Manager will work with the sponsor and household member/adult caregiver to obtain the information, or make other arrangements so that the safety risk to the unaccompanied alien child is mitigated (e.g., taking steps so that the household member no longer resides in the sponsor's home, identifying a new adult care giver, etc.).

**Q5: What happens if an adult household member refuses to cooperate with a background check?**
A5: ORR denies release when an adult household member refuses to have a background check.

*Revised 6/7/18*

## 2.6 Sponsor Immigration Status and Release of Unaccompanied Alien Children

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR does seek immigration status information, but this is used to determine if a sponsor care plan will be needed if the sponsor needs to leave the United States; it is not used as a reason to deny a family reunification application.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

*Revised 6/7/18*

### 2.6.1 Application Process

**How does ORR obtain information about immigration status?**
ORR asks potential sponsors and adult household members for their Alien Registration Number on the Authorization for Release of Information form. In

addition, as described below, ORR requires sponsors to provide fingerprints for background checks, and those checks may produce information about the individual's immigration status. During the sponsor assessment process, case managers also ask sponsors about their immigration status.

*Revised 6/7/18*

**2.6.2 Fingerprints**

**Who must provide fingerprints as part of the release process?**
All individuals seeking to sponsor a UAC and adults in their household are subject to fingerprinting requirements.

**What does ORR use the fingerprints for?**
Using digital fingerprints or digitized paper prints, the HHS PSC, on behalf of ORR, conducts a check of the FBI national criminal history and state repository records. ORR also transmit fingerprints to the Department of Homeland Security to search criminal and immigration databases on ORR's behalf and transmit the results to ORR.

*Revised 6/7/18*

**2.6.3 Other Background Checks Related to Immigration**
**Reserved.**

*Revised 6/7/18*

**2.6.4 Results of Immigration-Related Checks**

**What does ORR do with the results of the FBI fingerprint and DHS checks?**
The information may be used to determine if a sponsor care plan will be needed in the event that the sponsor needs to leave the United States. In addition, if the basis for an immigration action is underlying criminal activity, ORR and its grantee will review the underlying criminal activity to determine if it is reason to disqualify the potential sponsor, as ORR does when evaluating other criminal activity uncovered during the fingerprint process, but unrelated to immigration actions.

**Who else may have access to the results of the FBI fingerprint checks?**
ORR does not release the results of the FBI fingerprints to outside organizations or individuals, other than ORR grantees that are caring for the children. The FBI and DHS databases contain overlapping records, and the FBI system automatically initiates a notification to the DHS system if a particular record has been searched.

**What is in a sponsor care plan?**
A sponsor care plan identifies the individual that will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child, **see Section 2.7.6**.

*Revised 6/7/18*

## 2.7 Recommendations and Decisions on Release

ORR care providers must make a recommendation to release a child to a potential sponsor after the care provider has evaluated the sponsor, completed the background checks, and collected necessary documentation to prove the sponsor's identity and relationship to the child or youth. The recommendation must take into consideration all relevant information, including the report and recommendations from a home study, if conducted; laws governing the process; and other factors in the case. The ORR care provider makes a recommendation for release if the care provider concludes that the release is safe and the sponsor can care for the physical and mental well-being of the child.

- The care provider **Case Manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**and the **Case Coordinator  (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)**must make a recommendation to the **ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** on the release of the unaccompanied alien child to a particular sponsor. If the Case Manager and Case Coordinator cannot agree on a particular recommendation, or if the case is particularly complicated, they may refer the case directly to an ORR/FFS for guidance on how to proceed.
- After receiving the recommendation, the **ORR/FFS  (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** or other **ORR/Headquarters staff (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Headquarters Staff)**reviews the recommendation.
- The ORR/FFS makes a release decision in consideration of the recommendations from the care provider, the Case Coordinator, and other stakeholders, including the home study provider and the Child Advocate, where applicable.

Exhibit C
000071

13/22

Only ORR (or ACF) has the authority to make the final decision on a release. The Case Manager, Case Coordinator, and other stakeholders have an important role in making recommendations. In some cases, the ORR/FFS may send a case back to the Case Coordinator and Case Manager to obtain additional information before he/she makes a release decision.

The ORR/FFS makes one of the following release decisions:

- Approve release to sponsor
- Approve release with post-release services
- Conduct a home study before a final release decision
- Deny release
- Remand for further information

*Revised 06/29/18*

## 2.7.1 Approve Release Decisions

A recommendation for a release without a home study or post-release services is made after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth are taken into consideration. The ORR/FFS makes this release decision when he/she determines that the release is a safe release, the sponsor can care for the health and well-being of the child, and the sponsor understands that the child is to appear for all immigration proceedings.

*Posted 1/27/15*

## 2.7.2 Approve Release with Post-Release Services

The ORR/FFS may approve a release with post-release services when the release is determined to be safe and appropriate, but the unaccompanied alien child and sponsor need additional assistance to connect them to appropriate resources in the community or to address other concerns, such as mental health or other needs that could benefit from ongoing assistance from a social welfare agency. The sponsor must consent before services may be provided and may withdraw his or her consent at any time after services have begun, since post-release services are a voluntary service. These services are provided for 6 months after the unaccompanied alien child is released to the sponsor, unless ORR determines that services should be provided for a shorter or longer period of time. Post- release services do not continue under any circumstances beyond an unaccompanied alien child's 18th birthday.

*Posted 1/27/15*

## 2.7.3 Conduct a Home Study Before a Final Release Decision Can Be Made

The Case Manager and Case Coordinator will recommend to the ORR/FFS that a home study be conducted prior to making a release recommendation. If the ORR/FFS agrees, he/she will approve that a home study be conducted before a final release decision can be made. The home study provider uses a standardized template to complete the review; however, the provider may include any additional supporting documentation regarding the sponsor or the child or youth, as applicable.

Once the Case Manager and Case Coordinator receive the home study results, they will review the case in light of the home study and make a release recommendation to the ORR/FFS. (See Section 2.4.2 Home Study Requirements. (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4.2))

*Posted 1/27/15*

## 2.7.4 Deny Release Request

ORR *will* deny release to a potential sponsor if any one of the following conditions exists:

- The potential sponsor is not willing or able to provide for the child's physical or mental well-being;
- The physical environment of the home presents risks to the child's safety and well-being; or
- Release of the unaccompanied alien child would present a risk to him or herself, the sponsor, household, or the community.

ORR may deny release to a Category 1 potential sponsor, and will deny release to a Category 2 or Category 3 potential sponsor, if any one of the following conditions exists:[8]

- The potential sponsor or a member of the potential sponsor's household:
  - Has been convicted of (including plea of no contest to) a felony involving child abuse or neglect, spousal abuse; a crime against a child or children (including child pornography); or a crime involving violence, including rape, sexual assault or homicide;
  - Has been convicted within the last five years of a felony involving physical assault, battery, or drug-related offenses;
  - Has been convicted of a misdemeanor for a sex crime, an offense involving a child victim, or a drug offense that compromises the sponsor's ability to ensure the safety and well-being of the child;
  - Has been convicted of alien smuggling or a crime related to trafficking in persons; or

Exhibit C
000072

  - Has other criminal history or pending criminal charges or child welfare adverse findings from which one could reasonably infer that the sponsor's ability to ensure the safety and well-being of the child is compromised;

or

- A potential sponsor or a member of the potential sponsor's household has one of the following substantiated adverse child welfare findings:[9]
  - Severe or chronic abuse or neglect;
  - Sexual Abuse or other sexual offenses;
  - Abuse or neglect of other children in the household;
  - Long-term mental illness or deficiency;
  - Long-term alcohol or drug induced incapacity; or
  - Involuntary termination of the parental rights to another child.

*Revised 3/15/16*

## 2.7.5 Remand Release Request – Decision Pending

The ORR/FFS may remand the release request, which means that the ORR/FFS is sending the recommendation back to the Case Manager for additional information or additional actions before a final release decision can be made. ORR records the date of the remand and the decision will be pending further review until the documentation is provided or actions are taken.

*Posted 1/27/15*

## 2.7.6 Issues Related to Recommendations and Decisions

### Safety Plan

Case managers, in consultation with Case Coordinators, will prepare a safety plan, as needed, to address any outstanding needs the child may have after he/she is released and to ensure the child's safe and successful integration into the sponsor family unit and community. The goal of the safety plan is to ensure the child's safety. The safety plan also has guidance for sponsors on participating in post-release services and on other areas of care critical to the child's adjustment in the family and the community, such as maintaining mental health services for the unaccompanied alien child, accessing any needed special education, helping the child avoid drugs and alcohol, and using appropriate parenting techniques.

### Sponsor Care Plan

A sponsor care plan identifies an adult care giver who will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child. ORR requires a sponsor care plan for sponsors who may leave the United States, including all sponsors who are not U.S. citizens or lawful permanent residents (green card holders). The goal is to ensure an unaccompanied alien child has a caregiver, despite any complications resulting from the sponsor's immigration situation.
The plan:

- Identifies an adult care giver, and their relationship to the UAC and sponsor, if any;
- Includes copies of the adult care giver's vetting information (background check results, identifying documentation, etc.);
- Includes the adult care giver's contact information;
- Discusses how the adult care giver is notified that a transfer of care is required, if required;
- Provides that the adult care giver will abide by the terms of the *Sponsor Care Agreement*;
- Includes the date the UAC's Case Manager discusses the plan with the child's sponsor and the adult care giver identified in the plan; and,
- Includes additional information and materials (e.g., a Safety Plan), as appropriate or when required by ORR.

A copy of the sponsor care plan is maintained in the UAC's case file, provided to the sponsor, and to the adult care giver identified in the plan.

*Revised 6/7/18*

## 2.7.7 Notification of Denial

If the ORR Director denies the reunification application of an unaccompanied alien child's parent or legal guardian, the ORR Director notifies the parent/legal guardian by sending a denial letter to the parent/legal guardian within 30 business days of receiving all the required information and documentation in a specific case.  If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the ORR Director sends a copy of the denial letter to the child.

The denial letter includes:

- An explanation of the reason(s) for the denial;
- Instructions on how to obtain the child's case file;
- The supporting materials and information that formed the basis for ORR's decision; and

Exhibit C
000073                    15/22

- An explanation of the process for requesting an appeal of the denial (see Section **2.7.8 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.8))**. The explanation also informs the prospective sponsor that he or she may submit additional information to support an appeal request.

If ORR denies sponsorship to a potential sponsor who is not the parent or legal guardian of the child, the care provider notifies the potential sponsor, providing the reasons for the denial verbally. If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the Director notifies the child in writing of the reason for denial as described above.

*Revised 5/2/17*

### 2.7.8 Appeal of Release Denial

The parent/legal guardian may seek an appeal of the ORR Director's denial decision by submitting a written request to the Assistant Secretary for Children and Families within 30 business days of receipt of the final decision from the ORR Director. The appeal request must state the basis for seeking the appeal, and may include any additional information that the requester believes is relevant to consideration of the request. The request may seek an appeal without a hearing or may seek a hearing.

Without a Hearing: If the requester seeks an appeal without a hearing, the Assistant Secretary will consider only the denial letter and the information referenced therein, as well as the appeal request and any additional supporting materials or information submitted by the requester. The Assistant Secretary will notify the requester of a decision within 30 business days of receiving the request. If more information is needed to make a decision, or for good cause, the Assistant Secretary may stay the request until he or she has the information needed. In these cases, the Assistant Secretary will send a written explanation to the parent/legal guardian, communicating a reasonable process and timeframe for addressing the situation and making a determination.

With a Hearing: If the requester seeks a hearing, the Assistant Secretary will schedule a teleconference or video conference, per the requester's preference, at which time the requester (or the requester's representative) may explain the reasons why he or she believes the denial was erroneous. The Assistant Secretary will consider the testimony and evidence presented at the hearing, in addition to the original denial letter and information referenced therein, to make a determination. The Assistant Secretary will notify the requester of the decision in writing within 30 business days following the hearing.

The Assistant Secretary makes a determination based on the relevant law, regulations, and policies concerning release decisions (see Section **2.7.4 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)** for the basis of a release denial). Any evidence submitted to the Assistant Secretary by ORR is shared with the requester in compliance with privacy protections. The Assistant Secretary conducts a de novo review and may affirm or overturn the ORR Director's decision, or send the case back to ORR for further action. Appeals are recorded, and the requester may request a copy of the recording. The Assistant Secretary's decision to affirm or overrule the ORR Director's decision to deny release to a parent/legal guardian is the final administrative decision of the agency on the application that had been under consideration. However, if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew.

**Denial for sole reason that the unaccompanied alien child is a danger to himself/herself or the community**

If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the unaccompanied alien child may seek an appeal of the denial as described above, provided the parent/legal guardian is not seeking an appeal. If the child expresses a desire to seek an appeal, ORR appoints a child advocate to assist the unaccompanied alien child in seeking the appeal. The unaccompanied alien child may seek such appeal at any time after denial of release while the child is in ORR custody.

*Revised 5/2/17*

## 2.8 Release from Office of Refugee Resettlement (ORR) Custody

Release from the ORR custody is a three-step process:

- After care planning, which occurs during the entire safe and timely release process.
- Transfer of physical custody of the child, which occurs as soon as possible once an unaccompanied alien child is approved for release.
- Closing the case file, which occurs within 24 hours of the unaccompanied alien child's discharge.

*Posted 1/27/15*

### 2.8.1 After Care Planning

Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to:

Exhibit C
000074          16/22

10/12/2018                      Children ( ...ng the United States Unaccompanied: Section 2 | Off... Refugee Resettlement | ACF

- Prepare them for post-ORR custody
- Assess the sponsor's ability to access community resources
- Provide guidance regarding safety planning, sponsor care plans, and accessing services for the child

Once the sponsor assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to comply with the following provisions (see **Sponsor Care Agreement**) **(https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors):**

- Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
- For those who are not the child's parent or legal guardian, make best efforts to establish legal guardianship with the local court within a reasonable time.
- Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.
- Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.**10 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#foot10)** A "change of venue" is a legal term for moving an immigration hearing to a new location.)
- Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at **http://www.uscis.gov/ (http://www.uscis.gov/ar-11)ar-11 (http://www.uscis.gov/ar-11)**Visit **(https://www.acf.hhs.gov/disclaimers) disclaimer page (https://www.acf.hhs.gov/disclaimers).**
- Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.
- Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.
- Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)
- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)
- Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)
- In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the **Sponsor Care Agreement.**
- In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

The agreement includes the notice that the release of the unaccompanied alien child to the sponsor's care does not grant the child any legal immigration status and that the child must present himself or herself for immigration court proceedings.
The care provider also provides the sponsor with a Sponsor Handbook that outlines the responsibilities in caring for the unaccompanied alien child's needs for education, health, obtaining legal guardianship, finding support to address traumatic stress, keeping children safe from child abuse and neglect and from trafficking and exploitation. The handbook reiterates the importance of continuing with immigration proceedings and includes links to EOIR's website and forms. The handbook discusses laws related to employment, such as the Federal law prohibiting minors under the age of 18 from working in hazardous occupations.
After care planning includes the care provider explaining the following to the unaccompanied alien child and the sponsor:

- The U.S. child abuse and neglect standards and child protective services that are explained on the Administration for Children and Families **Child Welfare Information Gateway (https://www.childwelfare.gov/)** website.
- Human trafficking indicators and resources
- Basic safety and how to use the 9-1-1 number in emergency situations.

The care provider notifies all stakeholders of the child's discharge date and change of address and venue, as applicable. Where applicable, ORR also provides Child Advocates with access to their clients' documents and forms, and helps child advocates to remain informed about their clients' after-care plans and legal proceedings. The care provider coordinates with the legal service provider or attorney of record to help complete the necessary legal forms. Stakeholders notified of the change of address and, if applicable, request for change of venue for the immigration case include the U.S. Immigration and Customs Enforcement (ICE) Office of Chief Counsel and the U.S. Executive Office for Immigration Review (EOIR) Immigration Court Administrator.

10/12/2018      Children ( ) g the United States Unaccompanied: Section 2 | Off ( ) Refugee Resettlement | ACF

*Revised 6/7/18*

## 2.8.2 Transfer of Physical Custody

Once ORR approves an unaccompanied alien child for release, the care provider collaborates with the sponsor to ensure physical discharge happens as quickly as possible (within 3 calendar days after ORR approves the release). The care provider notifies DHS prior to the physical release to allow DHS an opportunity to comment on the imminent release as well as time to prepare any DHS paperwork for the ICE Chief Counsel's office.

The care provider ensures that all the child's belongings—including those he or she had at the time they entered ORR custody and any they acquired during their stay—are given to the child and sponsor at time of release. The care provider also makes sure that the child and sponsor have copies of files or papers needed for the child to obtain medical, educational, legal or other services following release.

Whenever possible, sponsors are expected to come to the care provider or to an offsite location designated by the care provider for the transfer of physical custody of the child.

Under extenuating circumstances (e.g., a sponsor cannot travel due to a medical condition), ORR may approve an unaccompanied alien child to be escorted to a sponsor. Similarly, if a sponsor pick-up would result in delay of a timely release of the child, ORR may approve an escort for an unaccompanied alien child.

If an unaccompanied alien child's final destination involves air travel and the sponsor will not be traveling with the child, the care provider must follow the procedures in the table below concerning care provider escorts and airline escorts.

Unaccompanied alien children who are under the age of 14 years old traveling via air may only be escorted by care provider staff, unless an ORR/FFS Supervisor has approved the use of an airline escort in advance.

The sponsor is responsible for the unaccompanied alien child's transportation costs and, if the care provider is escorting the child, for the care provider's transportation or airfare. If an airline escort is used, the sponsor is responsible for paying the airline's unaccompanied alien minor service fee.

Under no circumstances will ORR pay for the sponsor's airfare.

The following table summarizes procedures for each method of transfer.

| Method of Transfer | Pre-transfer Steps | At point of Transfer |
|---|---|---|
| Sponsor pick-up at care provider facility | • Case manager collaborates with the sponsor on selecting a date and time for the sponsor to pick-up the child<br>• Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP (see Section 2.2.4) | • Care provider checks the sponsor's identification upon arrival by comparing it to the identification previously submitted by the sponsor in the FRP (see Section 2.2.4)<br>• If the sponsor's identification matches the identification previously submitted, care provider gives the sponsor the unaccompanied alien child's release documents and personal possessions<br>• Care provider advises the sponsor, if traveling by airplane, to check in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear<br>• Care provider may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. |
| Care provider escort to offsite transfer location | • Case manager collaborates with the sponsor in selecting a time and location for transfer, and flights for the child and care provider escort<br>• Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP to the transfer location<br>• Case manager arranges for the sponsor to pay for the child and care provider escort's transportation costs, including airline tickets where applicable<br>• Case manager prepares a copy of the sponsor's identification that was submitted in the FRP, for the care provider escort to take to the transfer location | • If traveling by air, at the departure airport, care provider escort checks in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear<br>• At the transfer location, care provider escort compares the sponsor's identification with the copy previously submitted by the sponsor in the FRP. If the identification documents correspond, care provider escort releases the child to the sponsor and provides the sponsor with the release documents and the child's personal effects and papers<br>• Care provider escort may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. If the sponsor does not produce valid identification, if the care provider escort has concerns regarding the sponsor's identity, or if the care provider escort has concerns regarding the safety of the situation upon meeting the sponsor, the care provider escort will return with the child to the care provider facility |

Exhibit C
000076

| Travel via airline's unaccompanied alien minor escort policy (only for youth 14 years of age and older) | • Case manager contacts the airline to obtain information on airline escort requirements, in order to ensure that they are adequate to protect the safety of the child, and to ensure that both the sponsor and the care provider can meet the requirements<br>• Case manager arranges for the sponsor to pay for the child's airplane ticket and for the airline unaccompanied alien minor escort fee<br>• Case manager ensures that the government issued photo identification submitted by the sponsor in the FRP will be acceptable to the airline to complete custody transfer<br>• The care provider instructs the sponsor to meet the unaccompanied alien child and escort at the airport with the identification they submitted in the FRP, and to follow the requirements of the airline's unaccompanied alien minors escort policy | • At the departure airport, care provider checks in the unaccompanied alien child at the ticket counter with a copy of the DHS form I-862, Notice to Appear, and a copy of the approved identification of the sponsor picking up the child<br>• At the departure airport, care provider gives the child their personal possessions and documents and a copy of the sponsor's approved identification, and mails an additional copy of the release documents to the sponsor<br>• At the destination airport, the sponsor arrives two hours before the child's arrival time, and contacts the care provider immediately to check in.<br>• The airline follows its standard procedures for escorting a child traveling alone to the designated parent or guardian<br>• The care provider contacts the sponsor shortly after the child's scheduled arrival time to confirm the child's transfer from the airline representative to the sponsor<br>• If the sponsor fails to arrive at the airport or fails to contact the care provider upon arrival at the airport, the care provider will notify the ORR/FFS and the Project Officer, and the child will either be returned to the care provider or taken to another nearby care provider facility. |
|---|---|---|

When arranging for children to travel with airline escorts, care providers should also refer to the U.S. Department of Transportation recommendations for unaccompanied alien minors traveling by air ("When Kids Fly Alone").

*Revised 3/14/16*

## 2.8.3 Closing the Case File

The care provider completes a Discharge Notification form within 24 hours of the physical discharge of a youth, and then emails the form to DHS and other stakeholders. Once a child is released to a sponsor, ORR's custodial relationship with the child terminates.

Although the custodial relationship ends, the care provider keeps the case file open for 30 days after the release date in order to conduct the Safety and Well Being Follow Up Call (see Section **2.8.4**) and document the results of the call in the case file. The care provider closes the case file record after completing the Safety and Well Being Follow Up Call.

*Revised 3/14/16*

## Section 2.8.4 Safety and Well Being Follow Up Call

Care providers must conduct a Safety and Well Being Follow Up Call with an unaccompanied alien child and his or her sponsor 30 days after the release date. The purpose of the follow up call is to determine whether the child is still residing with the sponsor, is enrolled in or attending school, is aware of upcoming court dates, and is safe. The care provider must document the outcome of the follow up call in the child's case file, including if the care provider is unable to contact the sponsor or child after reasonable efforts have been exhausted. If the follow up call indicates that the sponsor and/or child would benefit from additional support or services, the care provider must refer the sponsor or child to the ORR National Call Center and provide the sponsor or child the Call Center contact information. If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

*Revised 3/14/16*

## 2.8.5 Post-Release Services for UAC with Zika Virus Disease or Infection

### Testing

ORR follows CDC guidance and recommendations for Zika virus laboratory testing. CDC recommends testing for all pregnant UAC without symptoms, but who are from or traveled through areas with ongoing Zika virus transmission and are within 2–12 weeks of arrival in the United States. Other UAC who develop two or more symptoms consistent with Zika may be tested for Zika virus upon consultation with a healthcare provider.

### Post-Release Referrals

Pregnant UAC who are diagnosed with Zika virus disease, have laboratory results compatible with Zika virus infection, or have laboratory results that cannot rule out Zika virus infection will be referred for post-release services. Similarly, UAC who delivered while in ORR care will be referred for post-

release services if they were diagnosed with Zika virus disease, had laboratory results compatible with Zika virus infection, or had laboratory results that cannot rule out Zika virus infection while pregnant.

In some cases, asymptomatic pregnant UAC are released pending lab results. In those cases, ORR will communicate their test results to them and their new healthcare provider. If their results are compatible with Zika virus infection or if Zika virus infection cannot be ruled out, ORR will refer them for post-release services.

**Post-Release Services**

Post-release services for eligible UAC described above include the full range of post-release services with a focus on connecting the UAC to prenatal care and maternal-child resources.

For more information about the Zika virus, please go to the CDC website at: **www.cdc.gov/zika/index.html (http://www.cdc.gov/zika/index.html)**

*Posted 5/2/16*

### 2.8.6 Release for Children with Legal Immigration Status

Some unaccompanied alien children may obtain legal immigration status while in ORR care.  ORR may also discover during the process of placing and providing services to a child that he or she already has legal immigration status or is a U.S. citizen. By law, ORR is not authorized to have custody of children with legal immigration status or U.S. citizenship. Therefore, these children cannot remain in ORR's care, and ORR must release them from ORR-funded care provider facilities.

As soon as ORR determines that an unaccompanied alien child may be eligible for legal status, ORR begins development of a Post Legal Status Plan. The case manager develops the plan, and ORR approves it, tailoring it to the needs and pending immigration status of the child.

As is the case for all UAC, ORR continually makes efforts to reunify children who have promising immigration cases with family members. However, if no parent, legal guardian, relative, or other suitable adult is available, ORR and the care provider, as part of the development of the Post Legal Status Plan, identify alternative placements for the child, including specialized programs, state or county entities or licensed nonprofit organizations that will take custody of the child. In limited circumstances, children with certain types of immigration status may be eligible for release into ORR's Unaccompanied Refugee Minors (URM) Program. Placement in the URM Program is limited by type of immigration status and the availability of appropriate placement options. ORR will not release children on their own recognizance under any circumstances.

*Posted 5/8/17*

### 2.9 Bond Hearings for Unaccompanied Alien Children

Consistent with the Ninth Circuit Court of Appeals decision in Flores v. Sessions, unaccompanied alien children have the opportunity to seek a bond hearing with an immigration judge.

In a bond hearing, an immigration judge decides whether the child poses a danger to the community.[11] For the majority of children in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these children, a bond hearing is not beneficial.

The burden is on the requestor to demonstrate that the child can be released because he or she is not a danger to the community. An immigration judge's decision that the unaccompanied alien child is not a danger to the community supersedes an ORR determination on that question, unless the immigration judge's decision is overturned by the Board of Immigration Appeals (BIA). However, even if an immigration judge decides the child is eligible for bond (meaning the child does not pose a danger to the community and need not remain in an ORR facility for that reason), in all cases release from ORR custody cannot occur until ORR has identified, evaluated and approved an appropriate sponsor in accordance with **Section 2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2)** of this policy guide.  An immigration judge does not rule on any of the following:

- release to a sponsor;
- the unaccompanied alien child's placement or conditions of placement while in ORR custody; or,
- releasing the child on his or her own recognizance.

ORR also takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement.[12]

Although these hearings are known as "bond hearings," ORR does not require payment of any money in the event a court grants bond.

**Requesting a Bond Hearing**

A request for a bond hearing may be made by the child in ORR care, by a legal representative of the child, or by parents/legal guardians on their children's behalf. These parties may submit a written request for a bond hearing to the care provider using the ORR form, *Notice of Right to Request a Bond Hearing,*

Exhibit C
000078

10/12/2018                    Children [  ] g the United States Unaccompanied: Section 2 | Off [  ] Refugee Resettlement | ACF

or through a separate written request that provides the information requested in the form. ORR provides the *Notice of Right to Request a Bond Hearing* to UAC in secure and staff secure facilities.

A request for a bond hearing must minimally include:

- The full name and alien registration number ("A number") of the child;
- If a parent or legal guardian, or an appointed legal representative, is making the request, the parent/legal guardian's or legal representative's name;
- The location of the care provider facility;
- The date of the request; and
- The signature(s) of the requesting child, the parent/legal guardian, and/or legal representative.

There is no filing fee to submit a request for a bond hearing to the care provider.

A child (or his or her legal representative) may also request a bond hearing by making an oral request in immigration court.

**Bond Hearings Proceedings**

Bond hearings are usually held at the immigration court where the request for a bond hearing is filed.

If the immigration judge finds an unaccompanied alien child eligible for bond, and ORR does not appeal, then ORR follows its sponsor assessment and release procedures as described in **Section 2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2)** of this policy guide.

**Appeals**

Either party may appeal the immigration judge's decision to the BIA. Because ORR cannot release a child until it identifies a suitable sponsor, an immigration judge's finding that the unaccompanied alien child is not a danger to the community does not necessarily result in a release of the child while an appeal is pending.

**Age Outs**

If an unaccompanied alien child becomes 18 years old during the pendency of a bond hearing or bond hearing appeal, ORR forwards the request for a bond hearing and any relevant information to the local DHS/ICE Office of Chief Counsel's office.

**Further Requests for Bond Hearing**

If an immigration judge (or BIA, when appealed) determines that an unaccompanied alien child is ineligible for bond, such decision is final unless the child can demonstrate a material change in circumstance to support a second request for a bond hearing.

*Revised 7/19/17*

---

**Footnotes**

1. As per the release order preference outlined in Flores v. Reno Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan 17, 1997).

2. These categories were created for program use, to help identify potential sponsors. They are not intended to replace the legal order of preference established in Flores.

3. The care provider may offer assistance to potential sponsors in securing necessary documentation, but it is ultimately the potential sponsor's responsibility to find and submit them.

4. Verification of the potential sponsor's relationship to the child is a minimum step required by the TVPRA to determine a potential sponsor's suitability and capability of providing for the child's physical and mental well-being. See 8 U.S.C. § 1232. As a result, as stated above, ORR may in its discretion require the submission of multiple forms of evidence.

5. ORR/FFS Supervisors are the final authority for approving discretionary home studies (See Section **2.4.2**)

6. Child advocates must keep the information in the case file, and information about the child's case, confidential from non-ORR grantees, contractors, and Federal staff.

7. An *Authorization for Release of Information* is not required for sponsors, adult household members, or adult care givers identified in a sponsor care plan undergoing a sex offender registry check. An *Authorization for Request of Information* also is not required for sponsors, adult household members and

Exhibit C
000079

adult caregivers identified in a sponsor care plan undergoing a public records check. However, sponsors will receive notice that public records and sex offender registry checks will be performed, and will have an opportunity to explain the results of these checks to ORR. ORR will also provide a method for disputing the results of checks.(See Section **2.5.3 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.5.3)**, Q4).

8. ORR will also reject any sponsor care plans that identify an adult care giver who has any of the disqualifying criteria.

9. See U.S. Dept. of Health and Human Services, Children's Bureau. *Grounds for involuntary termination of parental rights*, at 2. Washington, DC: Child Welfare Information Gateway, Jan. 2013.

10. The Change of Venue motion must contain information specified by the Immigration Court. A Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at **www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm (http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm)**. For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: **www.justice.gov/eoir/formslist.htm (http://www.justice.gov/eoir/formslist.htm)**.

11. Immigration judges also consider risk of flight. However, ORR does not make a determination of flight risk for the purpose of deciding whether a child is released. If an immigration judge offers an opinion about a youth's risk of flight, ORR takes the judge's opinion into consideration when assessing the child's placement and conditions of placement, but the decision does not affect release.

12. Please see footnote above concerning risk of flight.

**<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1) - Next (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3)>**

Last Reviewed: July 27, 2018

Exhibit C
000080          22/22

# Exhibit D

 Official website of the Department of Homeland Security

 U.S. Department of Homeland Security.gov

Enter Search Term

# Frequently Asked Questions: Zero Tolerance Immigration Prosecutions

**Release Date:** June 15, 2018

The Attorney General directed United States Attorneys on the Southwest Border to prosecute all amenable adults who illegally enter the country, including those accompanied by their children, for 8 U.S.C. § 1325(a), illegal entry. Children whose parents are referred for prosecution will be placed with the Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR). The following are Frequently Asked Questions regarding Zero Tolerance Immigration Prosecutions.

## Why Are Parents Being Separated From Their Children?

The Department of Homeland Security (DHS) may separate a parent or legal guardian from his or her child for several reasons, including situations where DHS cannot ascertain the parental relationship, when DHS determines that a child may be at risk with the presumed parent or legal guardian, or if a parent or legal guardian is referred for criminal prosecution, including for illegal entry.

## Where Are Children Going?

Alien children who are separated from their parents or legal guardians will be transferred to the Department of Health and Human Services, Office of Refugee Resettlement (HHS ORR).

Exhibit D
000082

# What Happens to Children in HHS Custody?

HHS ORR provides care for all alien children in its custody, to include medical care, mental health care, educational services, and other services. HHS also works to locate a sponsor (parent, guardian, other adult relative, or foster care provider) for the children in its custody, for purposes of releasing the child from government custody.

# What Happens After Criminal Prosecution?

Parents or legal guardians who are charged with illegal entry will be transferred from DHS to the Department of Justice, where they will be presented to a judge for a hearing on their criminal case. After completion of criminal proceedings, they will be transferred to U.S. Immigration and Customs Enforcement (ICE) for immigration proceedings.

Any individual who is subject to removal may, in the course of immigration proceedings, seek asylum or other relief or protection from removal. The fact that an individual was prosecuted for illegal entry does not affect this right.

HHS and ICE can take steps to facilitate family reunification, for purposes of removal, if the potential sponsor is capable of providing for the physical and mental well-being of the child..and comports with the wishes of the parent or legal guardian.

Children may also present an individual claim for asylum or other relief or protection from removal, and depending on the circumstances, may undergo separate immigration proceedings.

# How Can I Communicate With My Child?

For parents or legal guardians detained in ICE custody, ICE and HHS will work to schedule regular communication with their children in HHS custody, through telephone and/or video conferencing.

Exhibit D
000083

Additionally, individuals may locate and communicate with their children through the following methods:

- HHS Parent Hotline (24 hours a day, 7 days a week, in both English and Spanish):
  - If calling from outside an ICE detention facility, call 1-800-203-7001.
  - If calling from an ICE detention facility, dial 699# on the free call platform.
  - Please note that you will need to provide the child's full name, date of birth, and country of origin.  It is also helpful to provide the child's alien registration number, if you know it.

- Email ORR at information@ORRNCC.com (mailto:information@ORRNCC.com)

Individuals may also obtain information about a particular immigration case (including their child's), or information about reunifying with their children, through the following methods:

- ICE Call Center (Monday-Friday, 8 am-8 pm EST):
  - If calling from outside an ICE detention facility, call 1-888-351-4024.
  - If calling from an ICE detention facility, dial 9116# on the free call platform.

- Email ICE at Parental.Interests@ice.dhs.gov (mailto:Parental.Interests@ice.dhs.gov)

Topics:  Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords:  Border Security (/keywords/border-security) , Family detention (/keywords/family-detention) , southwest border (/keywords/southwest-border)

Last Published Date: June 15, 2018

Exhibit D
000084

# Exhibit E

Cancel   Print

# CALIFORNIA COURTS
### THE JUDICIAL BRANCH OF CALIFORNIA

## Duties of a Guardian

### Duties of a Guardian of the Person

Before you decide to become a guardian, ask yourself these questions:

1. **Do you want legal responsibility for the child?**
   You will have the same legal responsibilities as a parent, including responsibility for intentional damages the child may cause or for negligent supervision of the child. As guardian, you must also manage the child's finances, keep careful records, give the court reports and ask the court for permission to handle certain financial matters.

2. **How will the guardianship affect you and your family?**
   You will be like the child's parent. This can affect your relationship with other family members. Think about your time, energy, and health to decide if you want to be, or can be, a guardian.

3. **Do you have enough money?**
   The child may get income from social security, public assistance, child support from the parents, or an inheritance from a deceased parent. But child support does not always arrive, even if it is ordered by the court, and the money you get for the minor may not be enough. You may have to spend your own money to raise the child.

4. **Will there be problems with the child's relatives?**
   If the child's parents are alive, will they support you as guardian, or will they be angry with you and try to interfere? Some parents may fight the guardianship, or the court may say that they can have regular visitation.

### Rights and responsibilities of guardians

As guardian of the person, you will have these responsibilities:

You decide where the child lives. If you move, you must tell the court in writing right away. If you want to move out of California, you have to get the court's permission.

You decide where the child goes to school. You must stay involved in the child's education, and help the child get any special services, like tutoring, that he or she needs.

You must take care of the child's medical and dental needs, making sure he or she gets proper care. In most cases, you can also make decisions about any medical treatment the child needs.

You must get the child counseling or other mental health services if the child needs them. But you cannot place the child in a mental health institution without a court order unless the child agrees.

At least once a year, you will turn in a status report to the court. You must also meet with any court investigators or social workers sent by the court and come to court when the court tells you to. The court can also order you to take on other duties or can place special conditions on you as guardian, if needed.

Also:

In most cases, guardians, like parents, are responsible for harm or damages the child causes, including graffiti or getting in a car accident. Like a parent, a guardian is responsible for the intentional acts of the minor,

Exhibit E
000086
10/11/2018

and also for negligent supervision of the minor or the negligent entrustment of a motor vehicle (giving the child access to a car when he or she is unlicensed or otherwise not capable of handling the responsibility).

You cannot let the child live with his or her parents or anyone else. The child must live with you unless the judge says otherwise. You can let the child stay with other people for visits or short periods of time without a court order, as long as the child continues to primarily live with you, the guardian.

The parents may be able to visit and see their child, but you (or the court) decide when and how often. The parents may get custody of their child back in the future if the court decides that the child no longer needs to have a guardian.

You will have the right to make these decisions affecting the child:

You may give the child permission to apply for a driver's license. Or you may choose to not give him or her permission.

If you let the child apply for a license, you must also get car insurance for the child.
If the child has an accident while driving your car, you may be responsible for any damages caused by the accident.

You may give the child permission to enlist in the military.

If the child enters into active duty with the armed forces, the guardianship will end. California law will consider the child to be an adult (emancipated).

Both you and the court must give permission for the child to get married.

If the child gets married, the guardianship will end. California law will consider the child to be an adult (emancipated).

## Help for guardians

If, as guardian of the child, you need help, there may be resources to help you:

**Financial help**

You may be able to get child support from the parents or help from the government, like TANF (Temporary Aid to Needy Families), CalWorks, social security, Department of Veterans Affairs, or Indian Child Welfare Act benefits.

For more information, call:

| Social Security Administration 1-800-772-1213 TTY 800-325-0778 | |
|---|---|
| Department of Veterans Affairs 1-800-827-1000 TTY 800-829-4833 | |
| Department of Child Support Services 1-866-249-0773 (toll free) TDD 1-866-223-9529 (toll free) | |

You can also contact your local child support agency     . Or find your local county social services or human services department   .

*Remember:* Any money you get for the child must be used for the child's benefit. The court may ask you to file reports from time to time showing how much money you received for the child and how it was spent. This is called "an accounting."

Exhibit E
000087
10/11/2018

### Help if the child is having problems

Every county has agencies to help children who come from troubled homes. Some children have physical or learning disabilities. Some have been abused. Some may need counseling or other services. Try to meet the special needs of the child in your care and get them the services they need.

Ask the court, or the child protective services agency near you, to tell you where you can get help.

Find your county's child protective services agency    and check your county's website. You can also check the county listings in your telephone book.

### Duties of a Guardian of the Estate

As a guardian of the estate of the minor, you owe the highest duty the law recognizes to protect the assets of the child's estate. This duty is called a *fiduciary duty*. It is easy to violate this duty if you do not have special training or a probate lawyer giving you advice. For this reason, it is better to have a lawyer represent you when you are asking the court to appoint you guardian of the estate. The lawyer's fees are paid for by the estate, and must be approved by the court so there is protection for the minor.

· Within 90 days after being appointed guardian, you must file financial reports with the court, including an inventory and appraisal signed by a referee showing the value of the assets in the estate. You must:

   Collect and make a list of all the child's property and find, get, and protect all money and property that are part of the estate; then
   Put all property in the estate's name; and,
   Record copies of the *Letters of Guardianship* (Form GC-250    ) with the County Recorder in every county where the child owns real property (land, houses or buildings).

To determine the value of the child's property, first, get a court-appointed referee, called a "probate referee," who will figure out how much the property was worth when you were appointed.

   You must do this unless the court specifically tells you not to.
   You, not the probate referee, have to figure out the value or worth of certain "cash items."

Managing the child's estate

   Keep all the child's money and property separate from everyone else's money and property, including your own. Unless there is a court order, a guardian cannot:

      Pay him or herself or his or her lawyer with the estate's funds;
      Give away any part of the estate;
      Borrow money from the estate; or
      Spend the estate's money.

   If the child has a parent who is still alive, or the child gets money or can get support from elsewhere, then you need the court's permission to use the estate money to pay for the child's support, maintenance, or education. You can file a petition explaining why you need to use the estate's money to support the child. Generally, the court can give you permission to use the minor's money for less than a year and for specific things.
   Keep complete and accurate financial records, including records of every transaction that has to do with the estate. Write down all of the money that comes in and all money that goes out, and keep receipts for everything you buy using estate money.
   Get and/or keep insurance coverage on the child's property.
   Prepare a report, called an "accounting," of:

      All money collected and all interest earned;

Exhibit E
000088
10/11/2018

All money you spent and for what;
The date of every transaction;
The purpose of every transaction; and
What is left after the estate's expenses are paid. (See Probate Code section 1061      for what the
accounting must say.)

File an accounting 1 year after you become guardian. After that, you must file a report every 2 years, unless:

The estate is worth less than $7,000 and there is less than $1,000 per month income from sources other
than public assistance.
All guardianship funds are in blocked accounts.
If you do not file the accounting, the court could order you to do so or could remove you as the guardian.
If you believe you fall within an exception to the requirement for an accounting, you can file a motion
with the court asking that you be relieved of the duty to file an annual accounting. You must file one
unless the court orders that you do not have to.

Exhibit E
000089
10/11/2018