Catherine Weiss*
(NJ 018582006; NY 2361491)
LOWENSTEIN SANDLER, LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
cweiss@lowenstein.com
*Attorney for Legal Service Providers*
*for Children, Objectors*
*Admitted pro hac vice*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>U.S. Immigration and Customs Enforcement, et al.,<br><br>    Defendants. | Case No. 3:18-cv-428-DMS<br>Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>Jefferson Beauregard Sessions, III, Attorney General of the United States, et al.,<br><br>    Defendants. | Case No. 3:18-cv-1832-DMS<br>Honorable Dana M. Sabraw<br><br>CLASS ACTION<br><br>Final Hearing on Approval of Settlement<br>November 15, 2018 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OBJECTIONS TO PROPOSED SETTLEMENT
ON BEHALF OF CHILDREN IN THE *M.M.M.*-AGREED CLASS
BY LEGAL SERVICE PROVIDERS
THAT DIRECTLY REPRESENT THESE CHILDREN,
INCLUDING CATHOLIC CHARITIES COMMUNITY SERVICES OF
THE ARCHDIOCESE OF NEW YORK,
THE DOOR, INC., AND SAFE PASSAGE PROJECT**

The legal service providers (LSPs) filing these objections collectively represent or have represented more than 170 children who were separated from their parents at the border before June 26, 2018. The lawyers employed by the LSPs have worked with these children over several months, representing both those who are or were in federal custody and those who have been released into the community. The lawyers' reactions to the Proposed Settlement are informed by their extensive experience helping their young clients endure their separation from their parents, navigate the conditions they face or faced in federal custody, assess their options for securing immigration relief, and prepare for the process of reunification with their parents. The LSPs hope to use this opportunity to give voice to the independent concerns of the children who will be bound by the Proposed Settlement and to advocate for their protection from the consequences of decisions that were made without their participation. The LSPs emphasize that their child-clients are often capable of forming and expressing independent judgments about how to manage their immigration cases, and that child-respondents in immigration proceedings have rights of their own.

The LSPs make three objections to the Proposed Settlement. *First*, the Settlement is silent as to whether children have a right to opt out of reunification and what immigration procedures will apply if they do. The decision whether to unwind reunification is inevitably fraught. On the one hand, a child may have pressing reasons to re-separate and a due process right to do so. For example, such a decision may be motivated by a child's desire to avoid prolonged detention, as is the child's right under the settlement in *Flores v. Sessions*. Or a child might re-separate for the purpose of taking his or her best shot at remaining safely in the United States by pursuing independent immigration relief. On the other hand, the

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

decision will involve sacrificing family unity, an interest that is vital to children and also constitutionally protected.  With the guidance of their parents and the advice of their lawyers, if any, the children are entitled to make so important a decision with a full understanding of its consequences.  Given the high stakes, the Settlement should make explicit that a child who re-separates will be treated as unaccompanied and subject to proceedings under Section 240 of the Immigration and Nationality Act ("INA").

The mechanism for which the LSPs advocate is not a general opt-out from the terms of the Proposed Settlement.  On the contrary, the LSPs acknowledge that the overwhelming majority of children reunified with *Ms. L* class-member parents in the United States will decide to remain with their parents and follow the procedures outlined in the Settlement.  A few, however, will choose re-separation .  All have the right to confer with their parents and their lawyers so as to make voluntary and informed decisions, based on a clear understanding of what re-separation will mean for their immigration proceedings.

*Second*, while the Proposed Settlement makes a laudable effort to take into account the varying circumstances of *M.M.M.*-agreed class-member children, the Settlement overlooks a small group of children who face imminent, severe, and unfair immigration consequences because of the Government's decision to separate them from their parents.  These are children who accepted orders for voluntary departure before being reunified with their parents in the United States.  Each of these children is now exposed to penalties, including reentry bars, as well as possible fines and prolonged ineligibility for lawful permanent residency.  The LSPs ask the Court to urge the parties to incorporate into the settlement an appropriate solution for these children.

2

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

*Third*, the LSPs seek clarification of certain ambiguous provisions in the Proposed Settlement.  They suggest alternative language to ensure that the children subject to the Settlement's terms fully understand the agreement being entered on their behalf.

The LSPs ask the Court to urge the parties to consider amending and supplementing the Proposed Settlement as necessary to ensure that the rights of the children are protected.

## ARGUMENT

**I.**  **The LSPs Object to the Proposed Settlement Insofar As It Fails To Make Clear That *M.M.M.*-Agreed Class Members Who Were Reunified with Parents in the United States May Opt out of Reunification and Regain Their Status As Unaccompanied Children.**

As this Court recognized in granting the preliminary injunction in *Ms. L v. ICE*, immigrants have due process rights even when they enter the country illegally.  310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) (holding that separated parents, including those who had entered the United States between border checkpoints, had a likelihood of success on their due process claim to reunification with their children).  Although the scope of protection may differ depending on the immigrant's legal status and ties to the United States, due process entitles all to "notice and an opportunity to be heard, which are the constitutional minimum."  *F.L.B. v. Lynch*, 180 F. Supp. 3d 811, 819 (W.D. Wash. 2016).  Due process protections extend to children as well as adults in removal proceedings.  *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160 (9th Cir. 2004) ("[A]lien minors in deportation proceedings are entitled to the fifth amendment guaranty of due process.") (internal citations and quotations omitted).

3

The children subject to the Proposed Settlement have at least two distinct due process rights at stake. First, those children who were reunified in detention have a right to opt out of reunification if, in consultation with their parents and lawyers, they decide that they cannot tolerate continued confinement. Second, the children have a right to assess and respond to the impact of reunification on their prospects for obtaining immigration relief, with the assistance of both their parents and their lawyers. The rights of these children to make voluntary and informed decisions on these issues are independent of the rights of their parents, at least for those children who have the capacity to formulate and express their own views.

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court set out the test for adjudicating claims of procedural due process. Courts must consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Here, the children have strong interests in avoiding detention and in pursuing legal status in the United States, independently of their parents if they so choose. *Infra* Points I.B.-C. The means to accommodate these interests are ready at hand through appropriate amendments to the settlement, and the administrative burdens will be light because so few children will be willing to re-separate from their parents.

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

## A. Children Have an Independent Right, Within Their Individual Capacities, to Express and Pursue Their Interests.

Children who have the capacity to express independent wishes are entitled to assert their own due process rights, even when their wishes diverge from their parents'. The federal regulation governing the release and detention of immigrant minors acknowledges as much: it explicitly provides for notice to parents and a right for them to be heard when a child's wishes regarding either release from detention or ultimate immigration relief differ from a parent's, but the regulation does not make the parent's wishes determinative. 8 C.F.R. § 236.3(f) (1997) ("If a juvenile seeks release from detention, voluntary departure, parole, or any form of relief from removal, where it appears that the grant of such relief may effectively terminate some interest inherent in the parent-child relationship and/or the juvenile's rights and interests are adverse with those of the parent, and the parent is presently residing in the United States, the parent shall be given notice of the juvenile's application for relief, and shall be afforded an opportunity to present his or her views and assert his or her interest to the district director, Director of the Office of Juvenile Affairs or immigration judge before a determination is made as to the merits of the request for relief.")

The relevant case law also protects children's independent interests in immigration proceedings. In *F.L.B. v. Lynch*, the district court rejected the Government's argument that children have no claim to appointed counsel in removal proceedings when the children's parent is also in removal proceedings and "presumably represents their interests." 180 F. Supp. 3d at 821. On the contrary, the court concluded that "[t]o the extent their mother's interests are not aligned with their interests," the children had a right to assert their claim that "someone

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

other than the mother should be appointed to represent [them]." *Id.* at 823.
Likewise, in *Johns v. Department of Justice*, the Fifth Circuit ordered the
appointment of a guardian ad litem to represent the interests of a nearly five-year-
old girl in removal proceedings, based on findings that neither the couple who had
raised the child nor her biological mother had interests squarely aligned with hers.
624 F.2d 522, 523-24 (5th Cir. 1980).  And in *Polovchak v. Meese*, the Seventh
Circuit explicitly affirmed the independent rights of a seventeen-year-old boy to
seek asylum and avoid removal to the then-Soviet Union, despite the objections of
his parents.  774 F.2d 731, 737-38 (7th Cir. 1985).  The court instructed that his
departure should be conditioned on voluntariness, thereby preserving "family
autonomy" to the greatest extent possible "while still protecting [the boy's]
individual rights." *Id.* at 738.  Thus, courts have long recognized that children
have independent rights in immigration proceedings, rights that "grow more
compelling with age." *Id.* at 737.[1]

---

[1]  The ethical obligations of lawyers for children align with these holdings,
requiring lawyers to ascertain and advance the wishes of their child-clients. *See* 8
C.F.R. § 1003.102(p) (2008) (lawyers representing clients in immigration
proceedings must "abide by a client's decisions concerning the objectives of
representation" and "consult with the client as to the means by which they are to be
pursued"); ABA Comm'n on Immigration, *Standards for the Custody, Placement
and Care; Legal Representation; and Adjudication of Unaccompanied Alien
Children in the United States*, Part V.A.1.b. (August 2004) (whenever possible, the
lawyer should advocate for the child's "expressed wishes"),
https://www.americanbar.org/content/dam/aba/migrated/Immigration/PublicDocu
ments/Immigrant_Standards.authcheckdam.pdf; ABA Model Rules of Professional
Conduct, Rule 1.14(a) (Aug. 16, 2018) (in representing a client with diminished
capacity, including a minor, the lawyer "shall, as far as reasonably possible,
maintain a normal client-lawyer relationship with the client"),

Indeed, this Court recognized the independent rights of children when it temporarily enjoined the impending removal of family units based on removal orders that ran against parents alone. *M.M.M. v. Sessions*, No. 3:18-cv-01832-DMS-MDD at 15 (S.D. Cal. Aug. 16, 2018), ECF No. 55. Noting that children have "separate rights to pursue asylum," *id.* at 10, the Court prevented the Government from removing families before the children had been referred for their own credible fear interviews in accordance with the law, *id.* at 9 (citing 8 U.S.C. § 1225(b)(1)(A)(ii)).

The Settlement should continue in this vein to respect the individual rights of children in the *M.M.M.*-agreed class, especially those older children who are most able to form and express independent views. The LSPs understand that the Proposed Settlement does not address the circumstances under which children may re-separate, and we do not ask for resolution of that issue here. All we seek is clarity that those children who are subject to the settlement and who are considering re-separation will be given time to make voluntary and informed decisions and that those who re-separate will be treated the same as other unaccompanied children and placed back into plenary proceedings under Section 240 of the INA. The LSPs anticipate that few children, having been reunified with their parents, would choose this difficult course, but some will. Declaration of Anthony Enriquez ¶¶ 13, 14, 16 (Nov. 2, 2018); Declaration of Kaavya Viswanathan ¶¶ 18.b., c., d., 19 (Oct. 31, 2018); Declaration of Alexandra L. Rizio ¶¶ 15-16 (Nov. 1, 2018).

---

https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_14_client_with_diminished_capacity/.

**B.     Due Process Entitles Children Who Were Reunified in Detention to Opt out of Reunification If They Decide They Cannot Tolerate Further Confinement.**

The children have a due process right to object to prolonged detention.  The Supreme Court has long held that "[f]reedom from imprisonment – from government custody, detention, and other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (to avoid constitutional infirmity, construing provision of the Immigration and Nationality Act to contain an implicit six-month limit on detention of certain immigrants who have been ordered removed).  Due process protections apply to immigration as well as criminal detention. *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (upholding preliminary injunction requiring new bond hearings for certain immigrants).  And children, although they are "always in some form of custody, [] retain a strong interest in being free from unnecessary government interference with their liberty." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1195 (N.D. Cal. 2017) (juvenile immigrants who were rearrested and detained after having been released to sponsors by the Office of Refugee Resettlement (ORR) had due process right to a prompt hearing to challenge their arrest and detention).

The settlement in *Flores v. Reno*, No. 2:85-cv-04544-DMG-AGR at ¶ 11 (C.D. Cal. Jan. 17, 1997), ECF No. 101, Ex. 1 [hereinafter *Flores* Settlement], is predicated on the stipulation that minors in the custody of immigration officials are entitled to be detained "in the least restrictive setting appropriate to the minor's age and special needs."  The benefits of the settlement run to a class defined as "[a]ll minors who are detained in the legal custody of the INS [now DHS]," *id.* ¶ 10, and it "unambiguously" includes both "accompanied and unaccompanied minors,"

8

*Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). Thus, children now detained with their parents following reunification are members of the *Flores* class. The *Flores* Settlement explicitly gives "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility" the right "to challenge that placement determination" in any federal district court with appropriate jurisdiction and venue. *Flores* Settlement ¶ 24.B.

At the time of the children's reunification, their lawyers generally had no notice of whether they were headed into detention or for how long. Enriquez Decl. ¶¶ 18-23; Rizio Decl. ¶¶ 20-23; Viswanathan Decl. ¶ 18.[2] Therefore, the lawyers could not advise their clients about or advocate for any child's right to opt out of reunification in detention. The parents also had insufficient information about the possibility and timing of the family's release to assess the potential effects of detention on their children and to advise them accordingly. On information and belief, many children in the *M.M.M.*-agreed class are now in detention with their parents.

Prolonged detention threatens harm to the children, and this harm accumulates. As this Court found, separation from their parents risked, and indeed caused, profound trauma for many children in the *M.M.M.*-agreed class. *Ms. L*, 310

---

[2] The exception to this rule was at the Legal Aid Society of New York (LASNY), which sued to obtain notice of where a child was to be reunified. *N.T.C. v. ICE*, No. 1:18-cv-06428-JMF (S.D.N.Y. July 17, 2018), ECF No. 9 (temporarily enjoining removal of separated children represented by LASNY without 48 hours' notice to children and their lawyers). Even the LASNY lawyers, however, were given incomplete and uncertain information about how long their child-clients might remain in detention. *N.T.C. v. ICE*, No. 3:18-cv-1626-DMS-JLB, Order re: Pls.' Notice of Defs.' Non-compliance at 2-3 (S.D. Cal. Aug. 16, 2018), ECF No. 51.

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

F. Supp. 3d at 1146-47 (citing Children's Defense Fund and Professor Martin Guggenheim on the psychological sequelae for children of forced family separation). This trauma was compounded by months in federal custody without their parents. Enriquez Decl. ¶ 8; Viswanathan Decl. ¶ 6; Rizio Decl. ¶ 9. For some children, additional months of detention, even in the company of their parents, could deepen the trauma. *See Saravia*, 280 F. Supp. 3d at 1200 ("[T]he longer children remain in confinement, the more likely they are to experience lasting negative mental health repercussions."); Enriquez Decl. ¶ 13 (describing children who had an especially difficult time in detention).

Under previous orders of this Court, the parents are entitled either (1) to waive their children's rights under the *Flores* settlement to be released or placed in the least restrictive setting, or (2) to waive their own rights to reunification, allowing the child to be released. *Ms. L v. ICE*, No. 3:18-cv-00428-DMS-DDD, Order Granting Joint Motion Regarding Scope of the Court's Preliminary Injunction at 1-2 (S.D. Cal. Aug. 16, 2018), ECF No. 192. If the parent allows the child to be released, "the government could transfer the child to HHS custody for placement and to be otherwise treated as an unaccompanied child." *Id.* at 2. The Proposed Settlement makes reference to this earlier order, Proposed Settlement ¶ 7, but it is unclear whether the Settlement contemplates that parents will continue to be allowed to waive reunification and that the Government will then treat released children as unaccompanied.

Moreover, this Court's earlier order, issued on behalf of only the *Ms. L* parent class, says nothing about whether the children themselves may assert their *Flores* rights to be released, even if that must be without their parents. Likewise, orders issued by the *Flores* court have not determined whether reunified children

10

retain their rights to object to continued detention.  When the Government asked the court enforcing the *Flores* Settlement to allow the indefinite detention of families reunified pursuant to the *Ms. L* injunction, the *Flores* court observed that "detained parents who are entitled to reunification under the *Ms. L* Order may 'affirmatively, knowingly, and voluntarily decline[] to be reunited' with their children, and all parties admit that these parents may also affirmatively waive their children's rights to prompt release and placement in state-licensed facilities." *Flores v. Sessions*, No. 2:85-cv-DMG-AGR at 6 (C.D. Cal. July 9, 2018), ECF No. 455 (citations omitted).  Neither this Court nor the *Flores* court was then presented, however, with separate claims from the children asserting their rights under the *Flores* Settlement, including their right to disagree with and challenge their placements. *Flores* Settlement ¶ 24.B.  No doubt parents have a right to waive their child's right to avoid prolonged detention, so long as the parent and child both opt for reunification over freedom for the child.  But neither this Court's earlier decisions nor the decisions in the *Flores* litigation strip a child of the right to object to continued detention even if the parent has opted for reunification.  Nor do these earlier decisions determine what should happen if the parent and child agree, or come to agree after experiencing indefinite detention together, that the child should seek release.  *See* Enriquez Decl. ¶ 24 (describing child who has grown "desperate in detention" following reunification).

The LSPs respectfully ask the Court to urge the parties to make clear that children who re-separate from their parents for the purpose of seeking relief from ongoing confinement are entitled to be treated as unaccompanied and placed in Section 240 proceedings.

C.     **Due Process Entitles the Children to Make Voluntary and Informed Decisions About Whether to Pursue Independent Immigration Relief Even at the Price of Re-Separation.**

In a range of contexts, the federal courts have held that due process entitles children to make voluntary and informed decisions about their immigration proceedings, and to receive assistance in doing so. In *Perez-Funez v. Distict Director, I.N.S.*, 619 F. Supp. 656, 664-66 (C.D. Cal. 1985), for example, the court prohibited the Government from presenting immigrant children with voluntary departure forms, through which they would concede removability and agree to be returned to their home countries, unless and until the children had had an opportunity to confer with a lawyer, parent, or other adult relative or friend. *See also* 8 C.F.R. § 236.3(g) (1997) (codifying this process). In *Flores-Chavez v. Ashcroft*, 362 F.3d at 1157, the Ninth Circuit required the Government to serve notice of upcoming immigration hearings on both the juvenile and the adult responsible for his or her care to ensure that children would have adult assistance in such hearings.[3] And in *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1034 (9th Cir. 2004), the Ninth Circuit allowed an immigrant child who had been denied effective assistance of counsel to reopen his case, holding that "[a]bsent a minor's knowing, intelligent, and voluntary waiver of the right to counsel, the IJ [immigration judge] may have to take an affirmative role in securing representation by competent

---

[3] This decision remains binding in the Ninth Circuit even though the Board of Immigration Appeals has held that, outside the Ninth Circuit, notice of immigration proceedings must be served on the responsible adult as well as the minor only when the minor is under fourteen years old. *In re Chajon-Mejia*, No. AXXX XX3 083, 2018 WL 3045840, *1 (B.I.A. 2018). Thus, the B.I.A. treats minors fourteen and older as competent, independent immigration respondents. *See supra* Point I.A.

counsel." *Accord J.E.F.M. v. Lynch*, 837 F.3d 1026, 1037 (9th Cir. 2016). These cases stand for the proposition that children facing removal have a right to make informed decisions with the assistance of trusted adults.

Yet the children subject to the Proposed Settlement were reunified with their parents without receiving any advice – from either their parents or their lawyers – about how reunification would affect their ability to remain legally in the United States. The lawyers who represented the children while they were separated and in federal custody had little if any notice of the children's imminent reunification, and no opportunity to review with their child-clients the potential legal consequences of the decision to reunify. Enriquez Decl. ¶¶ 18-23; Rizio Decl. ¶¶ 20-23; Viswanathan Decl. ¶ 19. Nor could these lawyers have understood the consequences during July, August, and early September when most of the children were reunified. *See Ms. L v. ICE*, No. 3:18-cv-00428-DMS-DDD, Joint Status Report at 1 (S.D. Cal. Sept. 20, 2018), ECF No. 238 (representing that, by September 20, 2,251 children had been discharged from ORR custody). The Proposed Settlement, establishing the course the children's cases will follow, was not filed until September 12. *Id.*, Proposed Settlement, Sept. 12, 2018, ECF No. 220. The parents – lacking both legal expertise and a means to engage in regular and reliable communication with their children – were in an even worse position to advise their children on the immigration ramifications of reunification.

These ramifications are significant. A separated child who chose not to reunify with a parent, or whose parent declined reunification, retained his or her status as an unaccompanied child, subject to removal proceedings under Section

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

240 of the INA.[4]  Such a child is free to assert any and all defenses to removal in plenary proceedings.  For example, one fifteen-year-old boy from Honduras, represented by Catholic Charities Community Services of the Archdiocese of New York, chose not to reunify with his father because "his father drank heavily, regularly beat his mother, siblings and him, and taunted him with cruel remarks regarding his gender identity."  Enriquez Decl. ¶ 14.  This child was screened as potentially eligible for Special Immigrant Juvenile Status (SIJS).  SIJS is available to children who have been abused, neglected, abandoned, or similarly mistreated by one or both parents and whose best interests militate against return to their home country.  8 U.S.C. § 1101(a)(27)(J).  SIJS does not depend on a fear of persecution or torture – the issues in a credible fear determination – but rather on competent findings by a state juvenile court that at least one of the child's parents is unfit and that the child's best interests would be undermined by repatriation.  A significant number of the separated children had family histories that would qualify them for this form of relief.  Enriquez Decl. ¶ 14 (reporting that 20% of separated child clients screened as eligible for SIJS); Viswanathan Decl. ¶ 10 (detailing instances of parental abuse and neglect); Rizio Decl. ¶ 18 (recounting case of

---

[4] As this Court's order preliminarily certifying the settlement classes recognizes, such children are not members of the *M.M.M.*-agreed class if they are never reunified with a *Ms. L* class-member parent.  *Ms. L v. ICE*, No. 3:18-cv-00428-DMS-DDD , Order at 3 (S.D. Cal. Oct. 9, 2018), ECF No. 256 (defining *M.M.M.* class to include children who "have been or will be reunified with" a *Ms. L* class-member parent).  Children who may yet be reunified with a parent (presumably meaning a *Ms. L* class-member parent, *see infra* Point IV.C.), remain in Section 240 proceedings as Unaccompanied Alien Children "unless and until" such reunification.  Proposed Settlement ¶ 1.a.

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

separated child about whom state juvenile court has already made findings of neglect and abandonment).

Under the Proposed Settlement, however, a reunified child will not have the opportunity to pursue SIJS unless the child or the parent first passes a credible fear interview. Proposed Settlement ¶¶ 1.a.-d.[5] Under the Settlement, a child will typically go into expedited removal proceedings alongside the parent, and the only way for them to proceed to a full defense to removal in immigration court is first to obtain a positive credible fear determination. 8 U.S.C. § 1225(b)(1)(B)(iii). Yet some children have strong claims for relief that do not depend on a credible fear of persecution or torture. Enriquez Decl. ¶ 14; Viswanathan Decl. ¶ 18.c. (child neglected by mother may be eligible for SIJS but unable to assert a credible fear of return to his country). Neither the children nor their lawyers nor their parents understood or could have known at the time of reunification that the subsequent Proposed Settlement would narrow a child's prospects for relief in this way.

Every reunified child who has realistic hopes of qualifying for lawful status on any ground unrelated to a fear of torture or persecution is in the same position. Now that the children, their parents, and their lawyers understand the deal that was struck in the Proposed Settlement, they should have an opportunity to confer and reach an informed decision about whether to remain reunified or to allow the child to be placed elsewhere.

Again, the Settlement should make explicit that a re-separated child regains unaccompanied status, along with the opportunity to pose any and all available

---

[5] Children will have credible fear interviews even when parents are subject to reinstated orders of removal and must therefore undergo a more challenging "reasonable fear interview." Proposed Settlement ¶¶ 1.e.-f.

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

defenses to removal. A sentence might be added at the end of Paragraph 1.a. as follows:

> *M.M.M.* agreed class members who are reunified with their parent(s) as of the effective date of this agreement, but who re-separate from their parent(s) before USCIS makes a final credible or reasonable fear determination or re-determination for either the parent or the child in accordance with the procedures described below, will be afforded existing procedures for unaccompanied alien children pursuant to governing statutes and regulations, including but not limited to Section 240 removal proceedings.

II.   **The LSPs Object to the Proposed Settlement Insofar As It Fails To Protect *M.M.M.*-Agreed Class Members Who Were Reunified with Parents in the United States After the Children Had Accepted Orders for Voluntary Departure.**

As this Court is aware, after removing children from their parents, the Government placed them in federal custody, designated them as unaccompanied children, and generally initiated Section 240 removal proceedings against them, independent of their parents. As this Court is also aware, these separations began in late 2017 and early 2018, months before this Court entered the preliminary injunction in *Ms. L* on June 26, 2018. Even after that injunction was entered, lawyers for ICE continued to represent to lawyers for the children that their parents had been or would be deported imminently. Enriquez Decl. ¶ 27. For these reasons, many of the children accepted voluntary departure orders in the belief that this would be the fastest or only way to reunify with their parents.

A voluntary departure order serves as an alternative to a removal order and allows an immigrant who concedes removability to agree to repatriate without incurring a bar to reentry. *See generally* 8 C.F.R. § 1240.26 (2003). The judge

sets a departure deadline on a specified date; for those, like the children here, who accept voluntary departure before the conclusion of removal proceedings, the departure date must fall within 120 days of the entry of the order. 8 C.F.R. § 1240.26(b)(3)(ii), (e) (2003). Unaccompanied children who agree to voluntary departure are repatriated at no cost to themselves; the Government arranges and pays for their travel. 8 U.S.C. § 1232(a)(5)(D)(ii).

If the child overstays a voluntary departure deadline, serious consequences ensue. When an immigration judge enters an order for voluntary departure, he or she concurrently enters "an alternate order of removal." 8 C.F.R. § 1240.26(d) (2003). If the child does not leave the country on time:

- The alternate removal order automatically takes effect, barring the child from reentry, typically for five or ten years, depending on the circumstances of the removal. 8 U.S.C. § 1182(a)(9)(A).

- The child becomes ineligible for various forms of immigration relief, including adjustment of status to lawful permanent residency, for a period of ten years. 8 U.S.C. § 1229c(d); 8 C.F.R. § 1240.26(a) (2003).

- A fine in the amount of $1,000-$5000 (typically $3000) is levied against the child. 8 U.S.C. § 1229c(d); 8 C.F.R. § 1240.26(j) (2008).

The first of these consequences applies even if the child moves to reopen or reconsider during the period allowed for voluntary departure. In that case, "the grant of voluntary departure shall be terminated automatically, and the alternate order of removal will take effect immediately," bringing with it a five- or ten-year bar on reentry. 8 C.F.R. § 1240.26(b)(1)(iii), (e) (2003); 8 U.S.C. § 1182(a)(9)(A). The other penalties – the bar on adjustment of status and the fine – do not apply if

17

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

the child moves to reopen or reconsider within the departure period, but do apply if the child so moves after this period has expired.  8 C.F.R. § 1240.26(e) (2003).

The vast majority of the children who accepted voluntary departure orders have left the United States to be reunified with their parents in their home countries.  Enriquez Decl. ¶ 28; Rizio Decl. ¶ 14.  A small number, however, were reunified with their parents in the United States and are presumably now with them either in detention or in the community.  Enriquez Decl. ¶¶ 29, 31.  The LSPs filing this brief have identified six children who accepted voluntary departure orders while they were separated from their parents in federal custody and who are now reunified with their parents in this country.  Enriquez Decl. ¶ 31.  For each of them, the clock is ticking.  Their departure deadlines range from October 16, 2018, to November 14, 2018.  *Id.*  Most of these dates have already passed; all will pass before the Proposed Settlement is finally approved.  Yet the children's noncompliance with their voluntary departure orders has been entirely beyond their control.  The children did not arrange for their reunification with their parents in the United States.  The children did not make the decision to seek to remain in the United States.  The children are not responsible for arranging and paying for their repatriation; that responsibility lies with the Government, 8 U.S.C. § 1232(a)(5)(D)(ii), and on information and belief, the Government has taken no steps toward this end.

Moreover, compliance with the voluntary departure orders would deprive the children of the benefits of the Proposed Settlement.  Under the Settlement, their parents are entitled to obtain review of any possible negative credible fear determinations; if the parents fail these reviews, the children are entitled to credible fear interviews, followed by judicial review as needed.  Proposed Settlement ¶¶

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

1.b.-1.g, 2-6. Yet each of these steps will be futile for a child who has not complied with the terms of a voluntary departure order, as that child will already be subject to a final removal order, a ten-year bar on eligibility to apply for lawful permanent residency, and a fine based on his or her failure to depart. 8 C.F.R. § 1240.26(a), (d), (e) (2003), (j) (2008).

Because of the seriousness of these consequences, the LSPs filing these objections have made extraordinary efforts to locate the children they represented in obtaining orders for voluntary departure who were then reunified with parents in the United States. The lawyers then sought the children's permission to file motions to reopen, even though these motions would cause the alternate removal order and associated reentry bar to take effect. 8 C.F.R. § 1240.26(b)(1)(iii), (e) (2003); 8 U.S.C. § 1182(a)(9)(A). To date, the LSPs have filed motions to reopen for their three clients. Enriquez Decl. ¶ 31. The lawyers for the other three children appear not to have filed motions to reopen before the children's departure deadlines. *Id.* These children are now subject to fines and ten-year bars on adjustment to lawful permanent residency. 8 U.S.C. § 1229c(d); 8 C.F.R. § 1240.26(a) (2003), (j) (2008).

The LSPs respectfully ask the Court to urge the parties to reach an agreement to address the needs of these children. Under the Proposed Settlement, if a child received a final removal order in Section 240 proceedings before reunification, the Government agrees to work with class counsel to identify the child and to join a motion to reopen proceedings upon the child's request. Proposed Settlement ¶ 1.a. This provision does not apply to children who accepted voluntary departure orders before reunification because such orders are not final removal orders, and the alternate final removal orders were triggered, or will be

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

triggered, after reunification.  Still, this provision could serve as a model for an additional provision, which might read as follows:

> If an *M.M.M.*-agreed class member accepted a voluntary departure order before reunification with his or her parent in the United States, DHS and HHS will work in good faith with *M.M.M.* counsel to identify such children within 15 days of approval of this agreement.  If no motion to reopen has been filed for such a child, DHS will file such a motion upon the child's request, within 45 days of approval of this agreement, and will ask the immigration court to vacate the voluntary departure order and hold the child harmless from all consequences of failure to abide by that order.  If a motion to reopen has been filed for such a child, DHS will, within 15 days of approval of this agreement, join in that motion to reopen, and in the child's requests to vacate the voluntary departure order and to hold the child harmless from all consequences of failing to abide by that order.

Such a provision is necessary to protect the few children who were reunified with their parents in the United States after accepting voluntary departure orders.  The children accepted these orders believing that voluntary departure would allow them to reunify with parents whom they were told faced imminent removal.  The orders of this Court forestalled some of those removals and led to reunifications in this country.  The LSPs object to approval of the Proposed Settlement unless the parties cooperate to shield the children from penalties they should not face and to allow them to take advantage of the Settlement, if it is approved.

## III.   The LSPs Seek Clarification of Certain Terms and Provisions in the Proposed Settlement.

The LSPs seek to ensure that they understand how the Proposed Settlement will affect the rights of the children who are bound by it.  In particular, the LSPs

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

propose clarifications of the waiver contained in Paragraph 8; the scope of the first sentence in Paragraph 1.a., allowing some children to remain in Section 240 proceedings; and the meaning of the word "parent" in the last sentence of Paragraph 1.a., pertaining to future reunifications.

### A.      The Scope of the Waiver

The LSPs ask the Court to urge the parties to add the following bolded language to the waiver provision in Paragraph 8 of the Proposed Settlement:

> Class members may either pursue the relief described in this agreement or elect prompt removal, but may not pursue any other immigration- or asylum-related injunctive, declaratory, or equitable relief based on the allegations or claims made in any of the *Ms. L*, *M.M.M.*, or *Dora* complaints filed in any court accruing as of the date this plan is approved by the Court, including statutory claims. **Class members who are or will be in Section 240 proceedings in accordance with this agreement shall not, however, be limited with respect to the defenses they may assert.**

The bolded sentence avoids a reading of the waiver provision that would preclude any child in the *M.M.M.*-agreed class, who is in or will be in Section 240 proceedings in accordance with the terms of the Settlement, from posing whatever defenses would be lawfully available to any respondent in such proceedings.

### B.      The Children Allowed to Remain in Section 240 Proceedings

The LSPs ask the Court to urge the parties to revise Paragraph 1.a. of the Proposed Settlement as shown below:

> **When a** *Ms. L* class members **parent** and **that parent's** *M.M.M.* agreed class members ~~who~~ **child** are not currently detained in DHS **or HHS** custody ~~(and are not currently in HHS custody)~~ and ~~who~~ **both** have been issued Notices to Appear (NTAs)**, neither** will ~~not~~ be

21

> removed by DHS prior to issuance of a final removal
> order in ~~their~~ **his or her** resulting removal proceedings
> conducted under Section 240 of the Immigration and
> Nationality Act (INA).

The LSPs found the original sentence ambiguous, in that it seemed potentially to allow any child who had been released to the community after receiving an NTA to remain in Section 240 proceedings. While this would be a welcome reading of the sentence, this reading seems to conflict with Paragraph 1.d. of the Proposed Settlement. Under Paragraph 1.d., if a child had an NTA issued against him or her, but the parent did not, and both are released, the parent will be entitled to review of any negative credible fear determination, and if the parent fails, the child will be entitled to a credible fear determination. The revisions are meant to make clear that the quoted sentence in Paragraph 1.a. applies only to families where *both* the children and the parents have had NTAs issued against them and then been released. The revision should thus eliminate any confusion about the relationship between Paragraphs 1.a. and 1.d.

### C.    The Meaning of the Word "Parent" with Regard to Future Reunifications

The LSPs ask the Court to urge the parties to further revise Paragraph 1.a. of the Proposed Settlement as shown below:

> *M.M.M.* agreed class members who have not been
> reunified with their *Ms. L* **class member** parent(s) as of
> the effective date of this agreement will be afforded
> existing procedures for unaccompanied alien children
> pursuant to governing statutes and regulations, including
> but not limited to Section 240 removal proceedings,
> unless and until they are reunified with a *Ms. L* **class
> member** parent, in which case the procedures described
> below will apply.

22                    18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

A significant number of children who had been separated from *Ms. L* class-member parents have reunified, and others may yet reunify, with a parent who is not in the *Ms. L* class but who resides in the United States.  Such children are not in the *M.M.M.*-agreed class if they never reunify with a *Ms. L* class-member parent.  Order Preliminarily Certifying the Settlement Classes at 3, Oct. 9, 2018, ECF No. 256.  A child awaiting reunification with a *Ms. L* class-member parent should remain in Section 240 proceedings unless and until such reunification under the clarified language above.

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

**CONCLUSION**

For these reasons, the LSPs ask the Court not to approve the Proposed Settlement unless and until the parties agree:

- To make explicit that children who are considering re-separation will be given time to make voluntary and informed decisions and that those who re-separate will be treated the same as other unaccompanied children and placed back into plenary proceedings under Section 240 of the INA;
- To protect children who accepted voluntary departure orders from the consequences of failing to abide by those orders; and
- To clarify certain ambiguous provisions.

Respectfully submitted,

Catherine Weiss
LOWENSTEIN SANDLER, LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
cweiss@lowenstein.com
*Attorney for Legal Service
Providers for Children,
Objectors*
*\*Admitted pro hac vice*

24

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

## CONCLUSION

For these reasons, the LSPs ask the Court not to approve the Proposed Settlement unless and until the parties agree:

- To make explicit that children who are considering re-separation will be given time to make voluntary and informed decisions and that those who re-separate will be treated the same as other unaccompanied children and placed back into plenary proceedings under Section 240 of the INA;
- To protect children who accepted voluntary departure orders from the consequences of failing to abide by those orders; and
- To clarify certain ambiguous provisions.

November 2, 2018

Respectfully submitted,

Catherine Weiss
LOWENSTEIN SANDLER, LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
cweiss@lowenstein.com
*Attorney for Legal Service*
*Providers for Children,*
*Objectors*
*\*Admitted pro hac vice*

24

18cv428 DMS (MDD)
Objection of Legal Service Providers
for Children

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al., | Case No. 3:18-cv-428-DMS |
|              Plaintiffs, | Honorable Dana M. Sabraw |
| vs. | |
| U.S. Immigration and Customs Enforcement, et al., | |
|              Defendants. | |
| M.M.M., on behalf of his minor child, J.M.A., et al., | Case No. 3:18-cv-1832-DMS |
|              Plaintiffs, | Honorable Dana M. Sabraw |
| vs. | CLASS ACTION |
| Jefferson Beauregard Sessions, III, Attorney General of the United States, et al., | Final Hearing on Approval of Settlement |
|              Defendants. | November 15, 2018 |

**DECLARATION OF ANTHONY ENRIQUEZ, ESQ., DIRECTOR OF THE UNACCOMPANIED MINORS PROGRAM OF CATHOLIC CHARITIES COMMUNITY SERVICES OF THE ARCHDIOCESE OF NEW YORK**

I, Anthony Enriquez, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

### Background

1.     My name is Anthony Enriquez.  I am an attorney in good standing with the New York state bar, admitted in 2014.  From 2015 to 2016, I was a judicial law clerk for a federal district court judge in the Southern District of New York.  I have previously worked as an attorney for unaccompanied immigrant children and for other detained immigrants at multiple nonprofit organizations in New York City.  Over the course of my career, I have represented hundreds of immigrant clients and dozens of immigrant advocacy organizations before state and federal courts, including the federal Courts of Appeals and the Supreme Court.

2.     I am currently the Director of the Unaccompanied Minors Program of Catholic Charities Community Services of the Archdiocese of New York (CCCS).  I have served as Director since January 2018.  The Unaccompanied Minors Program employs more than forty individuals, including attorneys, paralegals, social workers, and administrative staff.  Our mission is to protect the rights of young immigrants to make informed decisions about their lives.  Our mandate is to represent the expressed wishes of our clients before administrative bodies, courts, and other tribunals charged with making decisions regarding our clients' lives.

3.     CCCS is a federally subcontracted legal service provider for unaccompanied minors in the custody of the Office of Refugee Resettlement (ORR) in the New York City area.  On an annual basis, CCCS provides Know Your Rights presentations, legal screenings, legal referrals, and direct representation in removal proceedings to thousands of unaccompanied minors detained by ORR in New York State.

4.     Beginning in the winter of 2017 and throughout the first half of 2018, CCCS staff observed a sharp increase in the number of unaccompanied minors detained in ORR custody in New York who reported having been separated from a parent at the southern border.  Likewise, we increasingly received reports from child welfare staff at ORR facilities that children too young to verbalize had been separated from a parent.

5.     By the summer of 2018, CCCS had identified 419 children separated from their parents and sent to ORR facilities in New York.  CCCS filed appearances to represent 96 of these children.  To ensure maximum access to an attorney for each separated child in New York, CCCS made referrals for the remaining 323 separated children to various nonprofit legal service providers with extensive experience in representing unaccompanied minors.  Of CCCS's 96 clients in the cohort separated before this Court issued the preliminary injunction ("PI") in *Ms. L v. ICE* on June 26, 2018, CCCS continues to represent eleven children who remain in shelters in New York.  (CCCS now also represents seventeen children who have been separated since the *Ms. L* PI, but we do not address the concerns of these children here.)

6.     At no point did the Government provide notice to CCCS attorneys representing separated children of the identity or location of the children's parents.  We repeatedly inquired with ICE attorneys in immigration court, who denied knowledge of the location of separated parents.  The information we have learned regarding parents of separated children came not from the Government, but rather from interviews with the child, other family members if we are able to reach them, other attorneys who have represented a separated parent in criminal or immigration court, and even third parties such as journalists and doctors who have contacted us.

## The Range of Children and Their Wishes

7.      CCCS's child-clients who were separated before the PI in *Ms. L*
ranged in age from two to seventeen years old.  These children came from El
Salvador, Guatemala, Honduras, Mexico, Ecuador, Romania, the United Kingdom,
and Hungary.  The majority of these children were monolingual Spanish speakers.
Some of these children spoke other languages, including Romanian and several
indigenous languages such as Akatek, Chuj, Ixil, K'iche', Kaqchikel, Mam, Popti,
Q'anjob'al, and Q'eqchi'.  For children whose chief language was neither Spanish
nor English, we used interpreters to communicate.

8.      These children exhibited clear signs of trauma and emotional distress.
Most children were unable to concentrate during legal screenings, the majority
erupting into sobs, frequently wailing for their parents.  When discussing his
separated parent, one child clutched his heart and described to us how it hurt to
breathe.  Some children refused to speak about anything other than a separated
parent.  Some refused to speak at all.  Others exhibited an instant and intense
attachment to the lawyer they had just met, begging not to be separated after the
conclusion of a legal appointment.

9.      Many children were too young to communicate with us about legal
matters or otherwise direct their legal representation.  In these cases, in recognition
of the child's diminished capacity to direct her own representation, we first sought
direction from a parent or guardian, if available.  But the Government did not
provide us with contact information for the parents of our clients, despite repeated
requests to ICE counsel in immigration court.

10.     In some cases we were able to make contact with separated parents by
seeking out their public defenders in criminal proceedings for illegal entry or
reentry.  In cases where we were unable to make contact with a separated parent,

we sought out the non-separated parent, either residing in the child's country of origin or in the United States.

11.    In cases where we were unable to make contact with a parent of a child too young to direct us, we looked to American Bar Association guidance on the ethical representation of children with diminished capacity.  That guidance instructed us to pursue family reunification and release from detention.

12.    For children old enough to communicate with us about their immigration cases, we accepted direction to pursue a variety of wishes.  These children were able to understand that they had been separated from their parent by the Government and that they had the right to pursue an independent immigration case as an unaccompanied minor.  Most of these children wished to reunify with their separated parent, no matter the place or circumstances of the reunification.

13.    Yet some children were adamant that they did not wish to reunify if it meant they would be detained indefinitely.  A thirteen-year-old child from El Salvador expressed great anxiety over the possibility of reunification in detention. He had a family member in the United States who was prepared to act as his sponsor (assuming physical custody of him), but he felt responsibility for his father's detention and worried that his choice to pursue family sponsorship would harm his father.  In several of our conversations with him, he wept uncontrollably over the possibility of indefinite detention if he were reunified with his father. Ultimately, he was reunified with his separated father in detention without notice to his CCCS attorney.  Another fifteen-year-old child from Honduras was certain that he did not want to reunify with his separated mother in detention, but instead wished to pursue an independent immigration case in the United States.  He was released to a sponsor before the court set a deadline for reunification with a separated parent.

14.     Further, several children did not wish to reunify with a separated parent, but instead sought to pursue an independent immigration case in the United States.  One of these children was fifteen years old and from Honduras.  In his initial meeting with us, he did not reveal that he had been separated from his father.  After three meetings, he disclosed to us that had he been separated, but did not desire reunification because his father drank heavily, regularly beat his mother, siblings and him, and taunted him with cruel remarks regarding his gender identity.  This child is currently enrolled in long term foster care through ORR, pursuing an immigration case independent of his father.  This child, along with about 20 percent of the separated children we met, was screened as eligible for Special Immigrant Juvenile Status (SIJS), an immigration status for children who have been abused, abandoned, or neglected by one or both of their parents.  To qualify for SIJS, an individual does not need to show a well-founded fear of persecution.

15.     In some cases, a child's wish to pursue sponsorship directly contradicted her separated parent's wish to reunify.  We represented two siblings who had been separated from their father, but wished to reunify with their mother, who had been residing in the United States prior to the arrival of the siblings.  The mother promptly fulfilled the sponsorship requirements, but ORR refused to release them to her because the father wished to pursue reunification over both the children's and mother's wishes.  The children spent more than four months in ORR detention, isolated from family, until the Government finally relented and ORR released the children to their mother's care.

16.     Among those children CCCS represented who have been reunified with parents, we anticipate that few will be willing to endure another separation.  Some, however, may be so badly affected by prolonged detention or so fearful of return to their home countries that they would rather be separated from their

parents once again than remain in detention or lose their best chance of
regularizing their immigration status and staying in the United States.

### The Reunification Process

17.     Reunification occurred in two phases, in accordance with the *Ms. L*
court's order establishing two deadlines for children in different age groups.  Both
phases proceeded without prior notice to CCCS attorneys.

18.     The first phase, involving children younger than five, occurred in New
York.  The Department of Homeland Security flew parents of children to detention
centers in New Jersey and Goshen, New York, and ICE transported them to New
York City Immigration Court, the local site of reunification.  ORR then transported
children from a shelter to the court.

19.     CCCS did not receive notice of this plan.  In anticipation of potential
reunifications, we checked a daily government census that reports discharges from
ORR custody.  We compared the census to an independently maintained list of
separated children.  We then called the shelters to inquire as to the location of
discharged separated children.  Shelter staff themselves did not have definite
answers.  In one case, we were told that a number of reunifications were to occur
that day at New York City Immigration Court.  We sent lawyers on site.  But
instead, the shelter drove several children in a van for hours, circling the
immigration court without parking.  Because ICE had failed to transport parents
from a local detention center to the court, ORR returned the children to the shelter.

20.     The second phase of reunifications, involving children five and older,
also occurred without advance notice to CCCS attorneys.  Once again, CCCS
checked the daily census for notice that a child had exited ORR custody.  But this
method of verification could only be carried out the day after a child had already

1   been discharged.  Further, the census revealed only that a child was no longer in

2   ORR custody.  It did not report where or to whom a child had been released.

3        21.    Several days after a separated child's release, in some cases as many

4   as five, we received release documents from ORR that reported the location where

5   a child had been released.  But this information was unreliable as to a child's actual

6   location, because it stated only that a child had been released to ICE custody in an

7   adult immigration detention center.  In reality, many of the families reunified in

8   detention were subsequently released into the community and made their way to

9   addresses unknown to us.  We have repeatedly asked ICE attorneys in immigration

10  court for this address information.  They have not provided it.

11       22.    In the time between the *Ms. L* PI and the actual reunification, we

12  attempted to counsel our clients about the legal consequences of reunification and

13  the possible manners in which they would be reunified.  This task was difficult

14  because without individualized notice of the Government's plan for our clients, we

15  could not reliably predict when or how reunification would occur or the legal

16  consequences it would bring.

17       23.    Children asked us if they would be reunified in a detention center or

18  released with their parents.  Children asked us if they would be immediately

19  deported or if they would have an opportunity to see a judge after they were

20  reunified.  Ultimately, we could only answer that we did not know, and then

21  discuss the ramifications of every possible scenario so as to best prepare our clients

22  to respond to each situation.  For younger children, especially, this was a confusing

23  time that produced additional anxiety.

24       24.    Because several months have passed since reunifications occurred, we

25  now know which of our clients remain in detention and which were released into

26  the community.  For those who continue in detention with their parents, we have

27  made referrals to local legal service providers.  Through contact with one of these

28                                        7                    18cv428 DMS (MDD)

1  providers, we know that at least one of our clients, a teenaged boy whom we had

2  screened as eligible for immigration relief and who had conveyed to us his desire

3  to pursue an independent case, has become desperate in detention and now wishes

4  to repatriate to his country of origin.

**Voluntary Departure**

5

6      25.    Of the 96 separated children that CCCS represented or represents

7  from the pre-PI cohort, many received an order of voluntary departure.

8      26.    CCCS counseled children to apply for voluntary departure in order to

9  expeditiously reunify with a separated parent who had already been deported, a

10  separated parent who we were told faced imminent removal, or a non-separated

11  parent or family member who remained in the country of origin.  An order of

12  voluntary departure protects a client from some of the legal and financial

13  consequences of an order of deportation.  We began to pursue this remedy for

14  separated children before this Court had enjoined the Government from removing

15  the separated parents without their children.

16      27.    Even after the PI was entered, however, the ICE lawyers who

17  prosecuted the immigration cases against our child-clients continued to represent to

18  both us and the New York Immigration Court that particular parents had been or

19  would soon be deported pursuant to removal orders that had been issued after the

20  parents failed credible or reasonable fear interviews.  Having no independent

21  information about these parents, we accepted these representations and counseled a

22  few of our child-clients to accept voluntary departure even after the PI had been

23  entered.

24      28.    At least 23 orders of voluntary departure we received for separated

25  children have been executed.  These children have been repatriated to their

26

27

28                                            8                         18cv428 DMS (MDD)

countries of origin to reunify with their separated parents or other family members in their home countries.

29.    At least three orders of voluntary departure received by CCCS clients remain unexecuted because the Government reunified our clients with a parent within the United States prior to effectuation of the voluntary departure order.  The Government then released the family unit, but failed to provide address information that would allow us to contact our clients.

30.    Separated children with unexecuted orders of voluntary departure will be subject to converted orders of removal if they do not depart the country before their departure deadlines.  In addition, they will be subject to five- or ten-year reentry bars, ten years of ineligibility to become lawful permanent residents, and fines of up to $5000 each.  To protect clients against these outcomes, CCCS has moved to reopen the cases of its three clients in immigration court.  CCCS located and received permission for the motion to reopen from one of those clients; CCCS could not locate the other two, but filed the motions anyway, explaining to the Immigration Court that the motions were filed without the children's knowledge but to protect their legal interests.  By law, such motions automatically convert the children's orders of voluntary departure to orders of removal.  The motions are still pending with the immigration court.

31.    I have communicated with the larger network of federally subcontracted legal services providers to determine if they also have clients with unexecuted orders of voluntary departure.  On September 6, 2018, and again on October 9, 2018, I sent emails over a listserv of federally subcontracted ORR legal service providers inquiring whether any provider had received an order of voluntary departure for a client who was subsequently reunified within the United States prior to the order's effectuation.  To date, I have received information that six reunified children, including the three represented by CCCS, have unexecuted

orders of voluntary departure that have converted or will convert to orders of removal.  On information and belief, this is not a complete list of children in this predicament.  A list of the children known to me, using de-identified information, is below.  I will provide identifying information if the Government agrees to assist in seeking to prevent the serious adverse immigration consequences that will otherwise befall these children.

| First Name | Last 3 Digits of A-Number | Departure Deadline | Motion to Reopen Filed? |
|---|---|---|---|
| Aura | 192 | 10/17/18 | Yes |
| Danilo | 549 | 10/16/18 | None known; child may have been repatriated with parent |
| Ever | 872 | 10/31/18 | No |
| Jessica | 360 | 10/26/18 | Yes |
| Kleverson | 440 | 10/16/18 | Yes |
| Yesica | 249 | 11/14/18 | None known |

32.   We know of only a few of these children.  They badly need the help of the parties and the court to avoid unfair and severe penalties.

11/2/18
_____
Date

_____
Anthony Enriquez, Esq.
Director of the Unaccompanied Minors Program
Catholic Charities Community Services
of the Archdiocese of New York

|   | |   |
|---|---|---|
| 1 | | **UNITED STATES DISTRICT COURT** |
| 2 | | **SOUTHERN DISTRICT OF CALIFORNIA** |
| 3 | | |

|   | | |
|---|---|---|
| 4 | Ms. L, et al., | Case No. 3:18-cv-428-DMS |
| 5 | Plaintiffs, | Honorable Dana M. Sabraw |
| 6 | vs. | |
| 7 | U.S. Immigration and Customs | |
| 8 | Enforcement, et al., | |
| 9 | Defendants. | |
| 10 | | |
| 11 | M.M.M., on behalf of his minor child, J.M.A., et al., | Case No. 3:18-cv-1832-DMS |
| 12 | Plaintiffs, | Honorable Dana M. Sabraw |
| 13 | vs. | CLASS ACTION |
| 14 | Jefferson Beauregard Sessions, III, | Final Hearing on Approval of |
| 15 | Attorney General of the United States, et al., | Settlement |
| 16 | Defendants. | November 15, 2018 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | **DECLARATION OF ALEXANDRA L. RIZIO, ESQ.,** |
| 21 | | **SENIOR STAFF ATTORNEY AT SAFE PASSAGE PROJECT** |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

I, Alexandra L. Rizio, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

### Background

1.     My name is Alexandra L. Rizio.  I am a Senior Staff Attorney for the Safe Passage Project, a non-profit legal services organization in New York that provides free legal representation to immigrant children.  I have been employed by Safe Passage Project since February 2015.

2.     Safe Passage Project generally represents unaccompanied children who are facing removal proceedings and live in New York City and Long Island.

3.     In June 2018, Safe Passage received a request from Catholic Charities Community Services of the Archdiocese of New York to represent a number of children who had been separated from their parents at the U.S.-Mexico border and relocated to shelters in the New York area contracted by the Office of Refugee Resettlement ("ORR").  At first, Safe Passage was assigned the cases of certain children who were placed in the custody of Cayuga Centers in New York City.  By mid-July, Catholic Charities had referred the cases of an additional 50 children who resided in shelters in New York City, Long Island, and the Hudson Valley. All told, Safe Passage Project entered our appearances for 61 separated children referred to us by Catholic Charities.

### Representation and Determination of Client Wishes

4.     I served as Attorney of Record for all 61 children, and filed G-28s as soon as the referrals were made.  Additional Safe Passage colleagues also served as co-counsel in numerous cases.  Our work was limited in scope to representing the children during their detention in ORR custody, and to facilitating the accomplishment of their goals (to reunite with a parent, whether in the United States or in their home country, or to be released to a sponsor).

5.      Over the course of five months, my colleagues and I interviewed 57 of the children, some of them multiple times, at the child welfare agencies that had custody of them (four of the children were transferred out of ORR custody after the referrals were made and after we entered our appearance as their attorneys, but before we could interview them).  Our objectives during the interviews were to learn the children's wishes, to gather information about the possible location of their parents, and to gather necessary documents to facilitate the accomplishment of the children's wishes, whether that was to be reunited with the child's parent, either in the community or in detention; to be released to another relative in the United States; or to return to the child's home country.

6.      As part of our interview process, we spoke to the children, their ORR case workers, and if possible, their parents and relatives.  We spoke to parents in the children's home country, to relatives in the United States who were being considered as ORR "sponsors," and to parents in federal immigration detention or criminal detention facilities.

7.      Communication with detained parents to ascertain their wishes for their children was extremely difficult.  Often, we did not know where the parents were.  Safe Passage Project staff and volunteers searched the Immigration and Customs Enforcement ("ICE") Online Detainee Locator, but it was often not reflective of the parents' actual location.  The children often did not know their parent's full name or date of birth.  We did not know the parent's assigned Alien Numbers ("A numbers"), and so had to guess using sequential numbering based on the child's A numbers.  This was often ineffective.  Making calls directly to parents in detention was impossible.  We were forced to wait for parents to call the children's case workers or their partners in their home country, and had to pass messages to them through the case workers or partners.  This circuitous method of

communication was neither efficient nor confidential, but we were forced to rely on it. Calls to parents' deportation officers went unanswered, or else we were told that we would not be able to speak to the parent directly.

8.    Determining the wishes of very young children in detention with limited input of an adult or legal guardian was also extremely challenging. While young children may be able to express their wishes in general terms, it is difficult for them to make more complex legal decisions or to consider multiple eventualities for the purposes of ranking outcomes in order of preference.

9.    It was even more difficult to ascertain the wishes of our clients because of the evident trauma they experienced. Though we are not medical professionals, my colleagues and I have experience working with young survivors of trauma. I am confident that many of the children we represented suffer from diagnosable psychological conditions as a result of their separation. Words that my colleagues and I used to describe our separated child-clients include "despondent," "depressed," "sad," "tearful," "angry," "distrustful," and "hopeless."

10.   Despite these challenges, my colleagues and I employed multiple strategies to determine the wishes of our clients. We drew pictures and charts, spoke in non-legal terms, and offered "if/then" scenarios that we helped our clients rank in order of preference. For example, we would say, "If your parent has to go back to Guatemala, do you want to go back to Guatemala with them? Or do you want to live somewhere else?" "Do you want to see your mom again as soon as possible, even if that means living in a detention facility, or would you rather live with your aunt, even if your mom would not be there?"

11.   Several of the children did not speak Spanish as a first language, but rather spoke an indigenous language or dialect. In one case, we believed that a child spoke the Chuj language of Guatemala, but the child was so young and

traumatized that he was practically non-verbal. To this day, I am not sure if we correctly identified the child's native language, or if he was simply unable to speak.

12.     Despite these challenges, my coworkers and I were able to determine, to the best of our abilities, the wishes and goals of our clients. The children's goals fell into three general categories: 1) Reunite with their parents anywhere, including in immigration detention; 2) seek release to an ORR sponsor because the parent had already been deported or the child did not wish to reunite with the parent in immigration detention; 3) repatriate with or without the separated parent.

**Outcomes**

13.     As of October 19, 2018, 45 of the 61 children we represent or had represented were reunited with their parents according to their wishes. We were unable to determine the wishes of four of the children for whom we entered our appearance because they were reunited with their parents or released to an ORR sponsor before Safe Passage could conduct an intake interview. Of the 49 children who were reunited with family members (parents or ORR sponsors), we believe that 44 were released from immigration detention, whereas four remain in immigration detention. At least one reunited parent-child pair has repatriated since being reunited in immigration detention; it is possible that more families out of the 49 reunited pairs have repatriated, but Safe Passage is not aware of it.

14.     Safe Passage Project helped facilitate voluntary departure for four of our clients: One reunited with a parent in immigration detention before repatriating, and three were forced to travel back to their country of origin without a parent, because the parent had already been removed.

15.     Eight of our 61 clients expressed more complex wishes. While they all strongly desired to be reunited with their parents, they did not wish to reunite if

it meant indefinite detention in an immigration facility. Others did not wish to reunite if the reunification was a precursor to, or a result of, accepting voluntary departure. Therefore, based on the information available to them about their parent's situation and the possibility of indefinite detention or repatriation, these children chose to pursue release to an ORR sponsor.

16. For example, one client, F.C.A., age sixteen, expressed fear of returning to Guatemala because of rampant violence, and because he was targeted by evangelicals for being Catholic. Safe Passage Project conducted an intake interview of F.C.A. at the ORR shelter in New York State where he resided at the time. According to the Safe Passage staff attorney who conducted the interview, F.C.A. appeared despondent and depressed. Several times during the intake, he put his head in his hands and cried. Even though he was, at the time of the interview, in the less-restrictive setting of ORR custody, he still clearly expressed that he wanted to be free from detention entirely. He specifically and emphatically stated that, though he wanted to see his father again, he did not want to reunite if it meant staying in detention. Instead, he would rather be released to an ORR sponsor so as to be free from detention. Shortly after our initial interview, F.C.A. was transferred from the ORR shelter in New York back to immigration detention near the border before we were able to file anything to effectuate his wishes of preventing prolonged detention.

17. As of October 19, 2018, of those eight who expressed their wish to be released to an ORR sponsor, seven have been released to a sponsor, and their parents were deported; one (F.C.A., paragraph 18, above) was reunited with his parent in immigration detention against his wishes, and to my knowledge he remains there.

18cv428 DMS (MDD)

18.     At least one client who was released to an ORR sponsor is seeking Special Immigrant Juvenile Status. The father of client J.A.T.M. (523) was deported soon after they crossed the border together. Safe Passage Project conducted an initial interview of J.A.T.M. at his ORR shelter on July 3, 2018. Shortly after, he was released to the care of his uncle in Queens, NY, and Safe Passage Project accepted J.A.T.M.'s case for full representation because he now lives in the geographic area we serve.  Represented by a Safe Passage Project staff attorney, J.A.T.M. obtained the underlying family court orders based on his mother's abandonment and neglect: his mother left him when he was an infant and had no role in his upbringing.  In September 2018, J.A.T.M. filed an I-360 Petition for Special Immigrant Juvenile Status with U.S. Citizenship and Immigration Services.  His visa petition remains pending.

19.     A chart showing outcomes for each of Safe Passage Project's separated-child-clients is attached as Exhibit A.  I use the children's initials and the last three digits of their A numbers to avoid identifying them.

**The Reunification Process**

20.     The process by which children were reunited with their parents was inconsistent.  Safe Passage Project sometimes received notice from children's ORR case managers 12-24 hours in advance of a child's relocation.  Other times, we would learn that a child had been relocated after the fact.  Even with this occasional advanced notice, we did not have an opportunity to discuss with the children whether or not they would remain in detention after reunification, because we usually did not know.  Moreover, we had no idea at the time of reunification how that process would affect the child's opportunity to remain in the United States.  The Proposed Settlement, which clarifies what course the children's

18cv428 DMS (MDD)

immigration cases will take, had not been filed when most of the reunifications occurred, during July and August.

21.    In various cases, a child's ORR case manager relayed to me that the child had been moved, but the case manager did not know where. I then had no idea where my client was until I reached out to non-profit organizations working in various immigration detention facilities, which were able to confirm that my client was present.

22.    In the most jarring example, we learned that a child was reunified with his father in detention a full five days after the reunification. We only learned about the reunification because the pro bono attorneys of the father, with whom we had been in contact, spotted the father with a child in the facility's cafeteria, and contacted us to ask if the two had been reunited. We then reached out to ICE, which confirmed that reunification had in fact occurred.

23.    The Government (ORR, DHS) did not provide Safe Passage Project with forwarding information for any of our clients who were reunified with their parents and subsequently released from detention. Safe Passage Project obtained contact information for as many of these families as possible by completing our own investigations and connecting with nonprofits and pro bono attorneys who provided services to these families in detention or upon release. But there are at least fourteen clients with whom we have lost contact since their release.

24.    For children who were released to ORR sponsors, we have more concrete contact information because Safe Passage Project was already working closely with the proposed sponsor to facilitate the child's release. On some occasions, ORR would send Safe Passage the Verification of Release and associated discharge paperwork once a child was released to a sponsor.

25.     I know of at least two clients (H.Y.V.B., 952, and F.C.A., 417) who were reunited with their parents, who remain detained, and who want to be released from detention.  F.C.A., described in paragraph 16, above, did not want to reunite with his father if it meant living in detention, and he expressed fears of repatriating due to rampant violence and harassment on account of his Catholic religion.  He preferred to be released to an ORR sponsor, but F.C.A. was moved back to immigration detention near the border before we were able to stop his transfer.

26.     H.Y.V.B., age seven, wanted to reunite with his father, but did not want to remain in detention.  Subsequent conversations with H.Y.V.B. and his father confirmed that they remained in detention until the pair repatriated together in October 2018.

27.     Most of our 61 clients are no longer in our jurisdiction.  Safe Passage is, where possible, making targeted referrals to legal services organizations and will send letters to all clients formally terminating our representation.

Nov. 1, 2018
Date

Alexandra L. Rizio, Esq.
Senior Staff Attorney
Safe Passage Project
185 West Broadway
New York, NY 10013

8                       18cv428 DMS (MDD)

**Safe Passage Project Exhibit A**
**Client List by Client Goals and Current Status**

| | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent anywhere** | | | |
| 1 | S.A.H.C. | 901 | Reunified with parent, released (*location unknown) |
| 2 | J.L.R. | 062 | Reunified with parent, detained |
| 3 | E.E.R.B. | 512 | Reunified with parent, released |
| 4 | P.G.M. | 519 | Reunified with parent, released (*location unknown) |
| 5 | M.A.C.S. | 945 | Reunified with parent, released |
| 6 | L.D.M.H. | 953 | Reunified with parent, released |
| 7 | M.A.E.L. | 789 | Reunified with parent, released (*location unknown) |
| 8 | V.G.M. | 246 | Reunified with parent, detained |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| 9 | F.P.X. | 788 | Reunified with parent, released |
| 10 | S.J.D.M. | -451 | Reunified with parent, detained |
| 11 | I.G.G. | -489 | Reunified with parent, released (*location unknown) |
| 12 | D.E.A.L. | -702 | Reunified with parent, released (*location unknown) |
| 13 | A.D.A.M. | -832 | Reunified with parent, released |
| 14 | M.R.B.P. | -567 | Reunified with parent, released |
| 15 | J.F.B.P. | -568 | Reunified with parent, released |
| 16 | E.E.C.A. | -903 | Reunified with parent, released |
| 17 | A.N.C.M. | -203 | Reunified with parent, released |
| 18 | C.A.C.M. | -204 | Reunified with parent, released |
| 19 | L.F.O. | -200 | Reunified with parent, released |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

|     | Initials  | Last 3 digits of A# | Status, per information and belief |
|-----|-----------|---------------------|-------------------------------------|
| 20  | M.M.M.Z.  | -192                | Reunified with parent, released (*location unknown) |
| 21  | S.J.M.S.  | -673                | Reunified with parent, released     |
| 22  | L.R.O.    | -199                | Reunified with parent, released     |
| 23  | A.R.M.    | -256                | Reunified with parent, released     |
| 24  | Y.A.T.G.  | -639                | Reunified with parent, released (*location unknown) |
| 25  | E.A.R.A.  | -592                | Reunified with parent, released     |
| 26  | J.B.B.    | -947                | Reunified with parent, released     |
| 27  | A.D.S.S.  | -899                | Reunified with parent, released     |
| 28  | D.J.B.S.O.| -637                | Reunified with parent, released     |
| 29  | R.M.P.    | -996                | Reunified with parent, released     |
| 30  | H.Y.B.B.  | -952                | Reunified with parent, subsequently repatriated |
| 31  | J.E.R.S.  | -733                | Reunified with parent, released     |
| 32  | N.D.D.M.  | -218                | Reunified with parent, released (*location unknown) |
| 33  | A.E.M.    | -968                | Reunified with parent, released (*location unknown) |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

|    | Initials | Last 3 digits of A# | Status, per information and belief |
|----|----------|---------------------|-----------------------------------|
| 34 | O.G.T.   | -097                | Reunified with parent, released (*location unknown) |
| 35 | C.D.L.D. | -475                | Reunified with parent, released |
| 36 | H.D.L.D. | -476                | Reunified with parent, released |
| 37 | E.A.M.M. | -610                | Reunified with parent, released |
| 38 | J.L.N.P. | -060                | Reunified with parent, released (*location unknown) |
| 39 | E.R.G.   | -491                | Reunified with parent, detained |
| 40 | R.V.S.   | -227                | Reunified with parent, released |
| 41 | I.B.J.   | -184                | Reunified with parent, released (*location unknown) |
| 42 | A.J.L.M. | -597                | Reunified with parent, released (*location unknown) |
| 43 | A.A.M.O. | -664                | Reunified with parent, released |
| 44 | B.J.P.L. | -559                | Reunified with parent, released |
| 45 | S.L.P.H. | -944                | Reunified with parent, released |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent despite knowing that would mean return to country of origin (COO)** |  |  |  |
| 46 | J.Y.J.M. | -570 | Accepted voluntary departure while father was detained but had a removal order; reunified en route to COO |
| 47 | R.G.H. | -946 | Accepted voluntary departure after father deported; reunified in COO |
| 48 | L.D.G.S. | -603 | Accepted voluntary departure after father deported; reunified in COO |
| 49 | B.M.J. | -585 | Accepted voluntary departure after father deported; reunified in COO |

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent, but not in detention or via repatriation** | | | |
| 50 | R.J.C.A. | -403 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 51 | N.O.O.Y. | -709 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 52 | W.O.S.L. | -720 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 53 | F.C.A. | -417 | Reunified with parent and currently detained, against child's wishes |
| 54 | C.L.D.M. | -076 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 55 | H.D.E.M. | -026 | Released to ORR sponsor, not reunified with parent (parent deported) |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| 56 | J.A.T.M. | -523 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 57 | V.C.C. | -062 | Released to ORR sponsor, not reunified with parent (parent deported) |
| **Other: child transferred before intake interview conducted** |  |  |  |
| 58 | A.N.F.L. | -831 | Reunified with parent, released |
| 59 | J.A.C. | -194 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 60 | E.B.A.H. | -117 | Reunified with parent, released |
| 61 | O.A.A.D. | -030 | Reunified with parent, released (*location unknown) |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L, et al., | |
|               Plaintiffs, | |
| vs. | Case No. 3:18-cv-428-DMS |
| U.S. Immigration and Customs Enforcement, et al., | Honorable Dana M. Sabraw |
|               Defendants. | |
| M.M.M., on behalf of his minor child, J.M.A., et al., | |
|               Plaintiffs, | Case No. 3:18-cv-1832-DMS |
| vs. | Honorable Dana M. Sabraw |
| Jefferson Beauregard Sessions, III, Attorney General of the United States, et al., | Final Hearing on Approval of Settlement |
|               Defendants. | November 15, 2018 |

**DECLARATION OF KAAVYA VISWANATHAN, ESQ.**
**PRO BONO MANAGING ATTORNEY**
**AT THE DOOR'S LEGAL SERVICES CENTER**

I, Kaavya Viswanathan, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

## Background

1.     I am the Pro Bono Managing Attorney at The Door's Legal Services Center.  The Door is a non-profit providing free, comprehensive youth development services to New York City youth from the ages of 12 to 21.  The Door's Legal Services Center ("LSC") represents youth in matters including family law, housing, public benefits, and immigration.  I submit this declaration in support of the objections to the proposed *M.M.M.* class settlement filed by legal services providers that directly represent the children in the class.

2.     I joined The Door's LSC in June 2018.  In my current position, I manage a team of attorneys who represent immigrant youth in New York family court and immigration proceedings.  I also manage the LSC's relationships with pro bono law firms and corporate partners, and supervise pro bono attorneys as they represent immigrant youth.  Prior to joining the LSC, I was the Senior Pro Bono Coordinating Attorney at the New York office of Kids in Need of Defense (KIND), where I worked with unaccompanied alien children in removal proceedings.

3.     In June 2018, the LSC began representing or supervising the representation of seventeen children who had been separated from a parent at the border[1] and were in the custody of the Office of Refugee Resettlement ("ORR") in the New York City area.  The LSC represented five of these children in-house, of which I personally represented four children.  The LSC placed the remaining

---

[1] The LSC represented an eighteenth child, who was separated at the border from his older brother.  This child, however, is not a member of the *M.M.M.* class.

twelve cases with pro bono attorneys at four law firms. I closely supervised each of these twelve cases.[2]

## The Range of Children and Their Wishes

4.     The seventeen children the LSC represented ranged in age from five years old to seventeen years old. Thirteen of the children were fourteen years old or older. Fifteen of the children were from Guatemala, one was from Honduras, and one was from El Salvador.

5.     LSC attorneys promptly met with the seventeen children in ORR custody. We executed retainers with each child, committing to full representation in immigration matters for as long as the child remained in the greater New York City area. We filed G-28s for all the children. Some of the children had Immigration Court appearances while in ORR custody, and we filed E-28s with the court in those cases.

6.     In our client meetings, the children all asked about their parents. They did not understand why they had been separated, or what was happening to their parents. During initial meetings, many of the children had not yet been able to speak with the parents from whom they were separated. These children were especially anxious, and repeatedly asked us if we could help them find their parents. F., our five-year-old client, kept asking when he would see his mother again. His older brother, who was in ORR custody with him, told F. that their mother was working and would come back soon. Eventually, all our clients were able to speak with their parents, and this made them happier. However, as the children spent more weeks in ORR custody, we noticed other signs of trauma. A.,

---

[2] Going forward, references to the LSC's representation of the children encompass both direct representation and supervision of pro bono representation. Similarly, references to LSC attorneys encompass both attorneys employed by the LSC and attorneys employed elsewhere but supervised by an LSC attorney.

a thirteen-year-old boy, was in ORR custody for three months, waiting to be released to a sponsor after the father with whom he entered the country was deported. When we first met A., he was a gregarious, funny boy. By the end of his time in custody, he was visibly depressed with no affect and spoke very little.

7.     When meeting with our clients, we tried to ascertain their first and highest priority: was it to reunify with their parents, to remain in the United States, to be released to another relative in the United States, to return to their home country? Heartbreakingly, but unsurprisingly, our clients did not want to make this choice and instead informed us that they wished to remain in the United States *with* their parents. We ascertained the children's wishes by speaking to them in repeated meetings, and doing our best to explain what was happening and all the potential outcomes. In addition to speaking directly to the children, we contacted (with the children's permission) as many of their relatives as possible. We spoke to parents and other relatives in the children's home countries, to potential sponsors in the United States and, where possible, to the children's separated, detained parents. In almost no cases were we able to speak directly with the detained parents because of restrictions on contacting detention facilities. In some cases, however, we were able to speak to Deportation Officers or legal services providers with information about the detained parents' cases. We also spoke to each child's ORR case manager, to understand the options for release to a sponsor, and to discuss what plan the case manager felt was in the child's best interests.

8.     In its June 26, 2018, ruling, this Court gave the Government until July 26, 2018, to reunify all children age five and older with the parent from whom they had been separated. However, the Government did not provide our attorneys with any information as to what reunification would look like, or how the children's immigration cases would proceed after reunification. Given this complete lack of

information, we were unable to meaningfully review with our clients the potential legal consequences of the decision to reunify with a parent.

9.     We explained to our clients that we did not know what would happen if and when they were reunified with their parents—we had no information as to whether reunification would mean: 1) reunification and release of both parent and child; 2) reunification and continued detention of both parent and child; 3) reunification and deportation of both parent and child; or 4) some other combination of events.  We explained to the children that, based on the limited information we had at the time, their best chance of remaining in the United States and pursuing any independent claim to immigration relief meant declining reunification and instead remaining in ORR custody and seeking release to a sponsor.

10.     The thirteen children who were fourteen years old or older were able to understand their circumstances and, after some consideration, stated that their priority was to remain in the United States, even if that meant continued separation from their parents.  One thirteen-year-old client also stated that he wished to remain in the United States, even if that meant continued separation.  These clients feared returning to their countries of origin and/or wanted to pursue the hope of a better life in the United States.  Some of the children had previously been the victims of violent attacks by gang members.  Another child had been abused by his father and had watched his father viciously abuse his mother.  One child had been abandoned by his father at a young age.  Many children had been forced to drop out of school in order to work and support their families. Based on our meetings with the children, we believed that many had colorable claims for asylum and Special Immigrant Juvenile Status.  These clients all sought release to a sponsor in the United States.

11.     Two twelve-year-old clients were unable to definitively respond to the choice of reunification versus remaining in the United States, and stated at various times that they: 1) wished to remain in the United States with their parents; 2) wished to reunify with their parents, whether in the United States or their country of origin; and 3) would do whatever their parents told them to do.

12.     The five-year-old client was unable to articulate his wishes, but was in ORR custody with his then-fifteen-year-old brother, who stated that as long the siblings remained together, they wished to remain in the United States.

13.     Ultimately, eight of the children we represented did not have to make the choice of reunification versus remaining in the United States because the Government deported their parents before the court-ordered reunification deadline. After learning that their parents had been deported, seven of these children decided that they wished to remain in the United States and be released to a sponsor, rather than reunifying with their parents in their home countries.  The eighth child, a twelve-year-old girl, wished to reunify with her father, and we helped her obtain voluntary departure and return to Guatemala.

14.     Prior to the court-ordered reunification deadline, the Government released the parents of three children from detention.  These three children were then released from ORR custody and reunited with their parents in the community.

### The Reunification Process

15.     As the reunification deadline approached, we represented six children, ranging in age from twelve to seventeen, who were still in ORR custody and whose parents remained detained in the United States.

16.     We asked the Government to give us at least 48 hours' notice before any child was to be moved from the New York area.  We also asked the Government to tell us where and how the children would be reunified with their

parents, and what would happen to them after reunification, specifically whether and for how long the children might be detained.

17.   Two of the children were reunified with their parents, and both parent and child were promptly released into the community.

18.   Reunification for the remaining four children happened as follows:

a.   S. is a twelve-year-old boy from Guatemala who was separated from his father.  S. was unable to decide whether he wished to reunify with his father if it meant returning to Guatemala, or remain separated from his father if it meant remaining in the United States.  On July 27, 2018, I received an email from S.'s ORR case manager, informing me that, as of July 26, 2018, S. had been released from ORR custody and was in transit to be reunified with his father.  This after-the-fact email was the first notification I received of S.'s release and transfer.  I had no meaningful opportunity to speak with S. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. I was given no further information about S.'s reunification plan.  A few days later, by searching the online ICE Detainee Locator system and following up with Texas-based legal services providers, I determined that S. had been reunified with his father, and that they were both detained at Karnes in Texas.  After approximately one month in family detention, during which RAICES represented and advocated for S.'s father, and I continued to represent and advocate for S., both S. and his father were released.

b.   H. is a fourteen-year-old boy from Honduras who was separated from his father.  H. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father.  H.'s attorneys understood that H.'s father agreed with his son's wish.  H.'s attorneys repeatedly contacted ORR and advocated that H. remain in ORR custody in New York, rather than be reunified with his father.  Nonetheless, on Sunday July 22, 2018 at 9:22 p.m., H.'s attorneys received an email from ORR, informing them that, in the next 48 hours, H. would be transferred from New York to reunify with his father at the El Paso Processing Center in El Paso, Texas.  The attorneys were given no further information about H.'s reunification plan.  The attorneys were able

to meet with H. before his scheduled transfer from New York, and during that meeting, H. changed his mind and decided that he did wish to reunify with his father. However, H.'s attorneys were unable to give him any information as to whether reunification would mean prolonged detention, or what impact reunification might have on his immigration case. H. was reunified with his father, and they both remain detained at Karnes in Texas.

c.  G. is a seventeen-year-old boy from Guatemala who was separated from his father. G. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father. G. wanted to be released to an uncle in the United States. G.'s uncle confirmed that he was willing to act as a sponsor. The attorneys also spoke to G.'s mother in Guatemala, who stated that she wished for her son to remain in the United States and live with his uncle. G.'s attorneys were not able to directly reach G.'s father in detention, but based on conversations with other relatives, they understood that G.'s father agreed that his son should remain in the United States with a sponsor. G.'s attorneys repeatedly contacted ORR and advocated that G. remain in ORR custody in New York, rather than be reunified with his father. Nonetheless, on Tuesday July 24, 2018, at 8:22 p.m., G.'s attorneys received an email from ORR, informing them that G. would be transported to El Paso, Texas, for processing that same day. This was the first notification G.'s attorneys received of his transfer. They had no meaningful opportunity to speak with G. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. They were given no further information about G.'s reunification plan. G.'s attorneys had prepared a waiver of reunification form, and were in the process of sending it to G.'s father to sign, when G. was abruptly transferred from New York. A few days later, by reaching out to Texas-based legal services providers, G.'s attorneys determined that G. had been reunified with his father. They both remain detained at Karnes in Texas. G. may be eligible for Special Immigrant Juvenile Status because it is not viable for him to reunify with his mother, who neglected him by allowing him to drop out of school in the 6th grade to work, and who is extremely ill and unable to properly care for him. In meetings with his attorneys, G. did not expressed a fear of returning to Guatemala. Under the terms of the settlement, if neither G. nor his

father passes a credible fear interview, G. will be unable to pursue Special Immigrant Juvenile Status.

d. W. is a fifteen-year-old boy from Guatemala who was separated from his father. W. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father. W. also specifically stated that he did not want to go back into detention, and wanted to be released to a sponsor as soon as possible. Based on conversations with both W. and his ORR case manager, W.'s attorneys understood that W.'s father agreed with his son's wishes. W.'s attorneys repeatedly contacted ORR and advocated that W. remain in ORR custody in New York, rather than be reunified with his father. Nonetheless, on Tuesday July 24, 2018 at 6:57 p.m., W.'s attorneys received an email from ORR, informing them that W. would be transported to El Paso, Texas, for processing that same day. This was the first notification W.'s attorneys received of his transfer. They had no meaningful opportunity to speak with W. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. They were given no further information about W.'s reunification plan. A few days later, by reaching out to Texas-based legal services providers, W.'s attorneys determined that W. had been reunified with his father, and that they were both detained at Karnes. When W.'s attorneys spoke to him in detention, W. was clear that he wished to leave detention and that he wanted to remain in the United States, even if it meant re-separation from his father. W.'s father agreed. W.'s attorneys advocated with ICE and the DOJ, and ultimately succeeded in having W. transferred back to ORR custody and released to a sponsor. W. is now classified as an Unaccompanied Alien Child and is in Section 240 removal proceedings. W. is potentially eligible for Special Immigrant Juvenile Status based on parental neglect, as he dropped out of school after the 6th grade and began working in agriculture.

19.    H., G., and W. are examples of children who wished to opt out of reunification in order to remain in the United States and pursue independent immigration relief, but were reunified against their will. The children's attorneys received minimal notice of the reunifications. Additionally, the children were moved from New York late at night, thereby minimizing the attorneys' ability to

seek injunctive relief preventing the moves.  The children's attorneys had no opportunity to review with their clients the potential legal consequences of the decision to reunify.  Even if the attorneys had received sufficient notice and opportunity to meet with their clients, they would have been unable to provide complete and accurate legal advice, as the true legal consequences of reunification only became apparent in September 2018, upon the filing of the Proposed Settlement.

20.  Thanks to his attorneys' tireless efforts, W. has now been released to a sponsor and is able to pursue any available avenue of immigration relief in INA § 240 proceedings.  H. and G. do not currently have this option.

Dated: _October 31_, 2018
New York, NY

Kaavya Viswanathan, Esq.
Pro Bono Managing Attorney
The Door's Legal Services Center
121 Avenue of the Americas,
3rd Floor
New York, NY 10013
Phone: 212-941-9090 ext. 3409
E-mail: kviswanathan@door.org

9

18cv428 DMS (MDD)

Catherine Weiss*
(NJ 018582006; NY 2361491)
LOWENSTEIN SANDLER, LLP
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
cweiss@lowenstein.com
*Attorney for Legal Service Providers
for Children, Objectors*
*Admitted pro hac vice

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al.,<br><br>                    Plaintiffs,<br><br>vs.<br>U.S. Immigration and Customs Enforcement,<br>et al.,<br><br>                    Defendants. | Case No. 3:18-cv-428-DMS<br>Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al.,<br><br>                    Plaintiffs,<br><br>vs.<br>Jefferson Beauregard Sessions, III, Attorney General of the United States, et al.,<br><br>                    Defendants. | Case No. 3:18-cv-1832-DMS<br>Honorable Dana M. Sabraw<br><br>CERTIFICATION OF SERVICE |

I, Denise Panzer, being of full age, hereby certify that on this date I caused one copy of the

following documents:

- Objections to Proposed Settlement on Behalf of Children in the *M.M.M.*-Agreed Class by

  Legal Service Providers That Directly Represent These Children, Including Catholic

Charities Community Services of the Archdiocese of New York, The Door, Inc., and Safe Passage Project;

- Supporting Declarations of Anthony Enriquez, Kaavya Viswanathan, and Alexandra L. Rizzio; and

- Certification of Service

to be delivered by regular mail to parties on the attached Service List.

Dated:  November 2, 2018

_Denise Panzer_
Denise Panzer

# Service List

**ADAM L. BRAVERMAN**
United States Attorney
**SAMUEL WILLIAM BETTWY**
Assistant U.S. Attorney
U.S. Attorney's Office Southern District of California
Civil Division
880 Front Street
Suite 6253
San Diego, CA 92101
Telephone:  (619)557-5662
Efile.dkt.civ@usdoj.gov
Samuel.Bettwy@usdoj.gov

**AUGUST EDWARD FLENTJE**
**SCOTT GRANT STEWART**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 3613
Washington, DC 20530
Telephone:  202-514-3309
august.flentje@usdoj.gov
scott.g.stewart@usdoj.gov

**JOSEPH H. HUNT**
Assistant Attorney General
**SCOTT G. STEWART**
Deputy Assistant Attorney General
**WILLIAM C. PEACHEY**
Director
**WILLIAM C. SILVIS**
Assistant
**SARAH B. FABIAN**
Senior Litigation Counsel
**NICOLE N. MURLEY**
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington, DC 20044
Telephone:  202-532-4824
sarah.b.fabian@usdoj.gov
Nicole.Murley@usdoj.gov

**LEE GELERNT**
**ANAND VENKATA BALAKRISHNAN**
**JUDY RABINOVITZ**
**DANIEL ANTONIO GALINDO**
ACLU Immigrants' Rights Project
125 Broad Street
18th Floor
New York, NY 10004
Telephone:  212-549-2618
dgalindo@aclu.org
abalakrishnan@aclu.org
JRabinovitz@aclu.org
lgelernt@aclu.org

**STEPHEN B. KANG**
ACLU Foundation of Northern California
**SPENCER E. W. AMDUR**
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-343-0070 x0783
skang@aclu.org
samdur@aclu.org

**BARDIS VAKILI**
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 232-2121
bvakili@aclusandiego.org

**Carol T. McClarnon**
**Wilson G. Barmeyer**
Eversheds Sutherland (US) LLP
700 6th Street NW
Suite 700
Washington, DC 20001
Telephone:  202-383-0946
carolmcclarnon@eversheds-sutherland.com
wilsonbarmeyer@eversheds-sutherland.com

**JOHN H. FLEMING**
Eversheds Sutherland (US) LLP
999 Peachtree Street NE
Suite 2300
Atlanta, GA 30309
Telephone:  404-853-8000
johnfleming@eversheds-sutherland.com

**Charles D. Reiter**
Simpson Thacher & Bartlett LLP
1999 Avenue of the Stars
Floor 29
Los Angeles, CA 90067
Telephone:  310-407-7500
charles.reiter@stblaw.com

**JOHNATHAN JAMES SMITH**
**SIRINE SHEBAYS**
Muslim Advocates
P. O. Box 34440
Washington, DC 20043
Telephone: 202-897-2622
johnathan@muslimadvocates.org
sirine@muslimadvocates.org

**SIMON YEHUDA SANDOVAL-MOSHENBERG**
**SOPHIA LETICIA GREGG**
Legal Aid Justice Center
6066 Leesburg Pike
#520
Falls Church, VA 22041
Telephone:  703-720-5605
simon@justice4all.org
sophia@justice4all.org

**AARON M. OLSEN**
Haeggquist & Eck, LLP
225 Broadway
Suite 2050
San Diego, CA 92101
Telephone:  (619) 342-8000
aarono@haelaw.com

**JULIA ROMANO**
King & Spaulding
633 West Fifth Street
Suite 1700
Lost Angeles, CA 90071
Telephone: 213-433-4355
jromano@kslaw.com