# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. Immigration and Customs Enforcement, et al., <br><br> Defendants. | Case No. 3:18-cv-428-DMS <br> Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Jefferson Beauregard Sessions, III, Attorney General of the United States, et al., <br><br> Defendants. | Case No. 3:18-cv-1832-DMS <br> Honorable Dana M. Sabraw <br><br> CLASS ACTION <br><br> Final Hearing on Approval of Settlement <br> November 15, 2018 |

**DECLARATION OF ANTHONY ENRIQUEZ, ESQ., DIRECTOR OF THE UNACCOMPANIED MINORS PROGRAM OF CATHOLIC CHARITIES COMMUNITY SERVICES OF THE ARCHDIOCESE OF NEW YORK**

I, Anthony Enriquez, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

### Background

1. My name is Anthony Enriquez. I am an attorney in good standing with the New York state bar, admitted in 2014. From 2015 to 2016, I was a judicial law clerk for a federal district court judge in the Southern District of New York. I have previously worked as an attorney for unaccompanied immigrant children and for other detained immigrants at multiple nonprofit organizations in New York City. Over the course of my career, I have represented hundreds of immigrant clients and dozens of immigrant advocacy organizations before state and federal courts, including the federal Courts of Appeals and the Supreme Court.

2. I am currently the Director of the Unaccompanied Minors Program of Catholic Charities Community Services of the Archdiocese of New York (CCCS). I have served as Director since January 2018. The Unaccompanied Minors Program employs more than forty individuals, including attorneys, paralegals, social workers, and administrative staff. Our mission is to protect the rights of young immigrants to make informed decisions about their lives. Our mandate is to represent the expressed wishes of our clients before administrative bodies, courts, and other tribunals charged with making decisions regarding our clients' lives.

3. CCCS is a federally subcontracted legal service provider for unaccompanied minors in the custody of the Office of Refugee Resettlement (ORR) in the New York City area. On an annual basis, CCCS provides Know Your Rights presentations, legal screenings, legal referrals, and direct representation in removal proceedings to thousands of unaccompanied minors detained by ORR in New York State.

4. Beginning in the winter of 2017 and throughout the first half of 2018, CCCS staff observed a sharp increase in the number of unaccompanied minors detained in ORR custody in New York who reported having been separated from a parent at the southern border. Likewise, we increasingly received reports from child welfare staff at ORR facilities that children too young to verbalize had been separated from a parent.

5. By the summer of 2018, CCCS had identified 419 children separated from their parents and sent to ORR facilities in New York. CCCS filed appearances to represent 96 of these children. To ensure maximum access to an attorney for each separated child in New York, CCCS made referrals for the remaining 323 separated children to various nonprofit legal service providers with extensive experience in representing unaccompanied minors. Of CCCS's 96 clients in the cohort separated before this Court issued the preliminary injunction ("PI") in *Ms. L v. ICE* on June 26, 2018, CCCS continues to represent eleven children who remain in shelters in New York. (CCCS now also represents seventeen children who have been separated since the *Ms. L* PI, but we do not address the concerns of these children here.)

6. At no point did the Government provide notice to CCCS attorneys representing separated children of the identity or location of the children's parents. We repeatedly inquired with ICE attorneys in immigration court, who denied knowledge of the location of separated parents. The information we have learned regarding parents of separated children came not from the Government, but rather from interviews with the child, other family members if we are able to reach them, other attorneys who have represented a separated parent in criminal or immigration court, and even third parties such as journalists and doctors who have contacted us.

## The Range of Children and Their Wishes

7. CCCS's child-clients who were separated before the PI in *Ms. L* ranged in age from two to seventeen years old. These children came from El Salvador, Guatemala, Honduras, Mexico, Ecuador, Romania, the United Kingdom, and Hungary. The majority of these children were monolingual Spanish speakers. Some of these children spoke other languages, including Romanian and several indigenous languages such as Akatek, Chuj, Ixil, K'iche', Kaqchikel, Mam, Popti, Q'anjob'al, and Q'eqchi'. For children whose chief language was neither Spanish nor English, we used interpreters to communicate.

8. These children exhibited clear signs of trauma and emotional distress. Most children were unable to concentrate during legal screenings, the majority erupting into sobs, frequently wailing for their parents. When discussing his separated parent, one child clutched his heart and described to us how it hurt to breathe. Some children refused to speak about anything other than a separated parent. Some refused to speak at all. Others exhibited an instant and intense attachment to the lawyer they had just met, begging not to be separated after the conclusion of a legal appointment.

9. Many children were too young to communicate with us about legal matters or otherwise direct their legal representation. In these cases, in recognition of the child's diminished capacity to direct her own representation, we first sought direction from a parent or guardian, if available. But the Government did not provide us with contact information for the parents of our clients, despite repeated requests to ICE counsel in immigration court.

10. In some cases we were able to make contact with separated parents by seeking out their public defenders in criminal proceedings for illegal entry or reentry. In cases where we were unable to make contact with a separated parent,

we sought out the non-separated parent, either residing in the child's country of origin or in the United States.

11. In cases where we were unable to make contact with a parent of a child too young to direct us, we looked to American Bar Association guidance on the ethical representation of children with diminished capacity. That guidance instructed us to pursue family reunification and release from detention.

12. For children old enough to communicate with us about their immigration cases, we accepted direction to pursue a variety of wishes. These children were able to understand that they had been separated from their parent by the Government and that they had the right to pursue an independent immigration case as an unaccompanied minor. Most of these children wished to reunify with their separated parent, no matter the place or circumstances of the reunification.

13. Yet some children were adamant that they did not wish to reunify if it meant they would be detained indefinitely. A thirteen-year-old child from El Salvador expressed great anxiety over the possibility of reunification in detention. He had a family member in the United States who was prepared to act as his sponsor (assuming physical custody of him), but he felt responsibility for his father's detention and worried that his choice to pursue family sponsorship would harm his father. In several of our conversations with him, he wept uncontrollably over the possibility of indefinite detention if he were reunified with his father. Ultimately, he was reunified with his separated father in detention without notice to his CCCS attorney. Another fifteen-year-old child from Honduras was certain that he did not want to reunify with his separated mother in detention, but instead wished to pursue an independent immigration case in the United States. He was released to a sponsor before the court set a deadline for reunification with a separated parent.

14. Further, several children did not wish to reunify with a separated parent, but instead sought to pursue an independent immigration case in the United States. One of these children was fifteen years old and from Honduras. In his initial meeting with us, he did not reveal that he had been separated from his father. After three meetings, he disclosed to us that had he been separated, but did not desire reunification because his father drank heavily, regularly beat his mother, siblings and him, and taunted him with cruel remarks regarding his gender identity. This child is currently enrolled in long term foster care through ORR, pursuing an immigration case independent of his father. This child, along with about 20 percent of the separated children we met, was screened as eligible for Special Immigrant Juvenile Status (SIJS), an immigration status for children who have been abused, abandoned, or neglected by one or both of their parents. To qualify for SIJS, an individual does not need to show a well-founded fear of persecution.

15. In some cases, a child's wish to pursue sponsorship directly contradicted her separated parent's wish to reunify. We represented two siblings who had been separated from their father, but wished to reunify with their mother, who had been residing in the United States prior to the arrival of the siblings. The mother promptly fulfilled the sponsorship requirements, but ORR refused to release them to her because the father wished to pursue reunification over both the children's and mother's wishes. The children spent more than four months in ORR detention, isolated from family, until the Government finally relented and ORR released the children to their mother's care.

16. Among those children CCCS represented who have been reunified with parents, we anticipate that few will be willing to endure another separation. Some, however, may be so badly affected by prolonged detention or so fearful of return to their home countries that they would rather be separated from their

parents once again than remain in detention or lose their best chance of regularizing their immigration status and staying in the United States.

### The Reunification Process

17. Reunification occurred in two phases, in accordance with the *Ms. L* court's order establishing two deadlines for children in different age groups. Both phases proceeded without prior notice to CCCS attorneys.

18. The first phase, involving children younger than five, occurred in New York. The Department of Homeland Security flew parents of children to detention centers in New Jersey and Goshen, New York, and ICE transported them to New York City Immigration Court, the local site of reunification. ORR then transported children from a shelter to the court.

19. CCCS did not receive notice of this plan. In anticipation of potential reunifications, we checked a daily government census that reports discharges from ORR custody. We compared the census to an independently maintained list of separated children. We then called the shelters to inquire as to the location of discharged separated children. Shelter staff themselves did not have definite answers. In one case, we were told that a number of reunifications were to occur that day at New York City Immigration Court. We sent lawyers on site. But instead, the shelter drove several children in a van for hours, circling the immigration court without parking. Because ICE had failed to transport parents from a local detention center to the court, ORR returned the children to the shelter.

20. The second phase of reunifications, involving children five and older, also occurred without advance notice to CCCS attorneys. Once again, CCCS checked the daily census for notice that a child had exited ORR custody. But this method of verification could only be carried out the day after a child had already

been discharged. Further, the census revealed only that a child was no longer in ORR custody. It did not report where or to whom a child had been released.

21. Several days after a separated child's release, in some cases as many as five, we received release documents from ORR that reported the location where a child had been released. But this information was unreliable as to a child's actual location, because it stated only that a child had been released to ICE custody in an adult immigration detention center. In reality, many of the families reunified in detention were subsequently released into the community and made their way to addresses unknown to us. We have repeatedly asked ICE attorneys in immigration court for this address information. They have not provided it.

22. In the time between the *Ms. L* PI and the actual reunification, we attempted to counsel our clients about the legal consequences of reunification and the possible manners in which they would be reunified. This task was difficult because without individualized notice of the Government's plan for our clients, we could not reliably predict when or how reunification would occur or the legal consequences it would bring.

23. Children asked us if they would be reunified in a detention center or released with their parents. Children asked us if they would be immediately deported or if they would have an opportunity to see a judge after they were reunified. Ultimately, we could only answer that we did not know, and then discuss the ramifications of every possible scenario so as to best prepare our clients to respond to each situation. For younger children, especially, this was a confusing time that produced additional anxiety.

24. Because several months have passed since reunifications occurred, we now know which of our clients remain in detention and which were released into the community. For those who continue in detention with their parents, we have made referrals to local legal service providers. Through contact with one of these

providers, we know that at least one of our clients, a teenaged boy whom we had screened as eligible for immigration relief and who had conveyed to us his desire to pursue an independent case, has become desperate in detention and now wishes to repatriate to his country of origin.

## Voluntary Departure

25. Of the 96 separated children that CCCS represented or represents from the pre-PI cohort, many received an order of voluntary departure.

26. CCCS counseled children to apply for voluntary departure in order to expeditiously reunify with a separated parent who had already been deported, a separated parent who we were told faced imminent removal, or a non-separated parent or family member who remained in the country of origin. An order of voluntary departure protects a client from some of the legal and financial consequences of an order of deportation. We began to pursue this remedy for separated children before this Court had enjoined the Government from removing the separated parents without their children.

27. Even after the PI was entered, however, the ICE lawyers who prosecuted the immigration cases against our child-clients continued to represent to both us and the New York Immigration Court that particular parents had been or would soon be deported pursuant to removal orders that had been issued after the parents failed credible or reasonable fear interviews. Having no independent information about these parents, we accepted these representations and counseled a few of our child-clients to accept voluntary departure even after the PI had been entered.

28. At least 23 orders of voluntary departure we received for separated children have been executed. These children have been repatriated to their

countries of origin to reunify with their separated parents or other family members in their home countries.

29. At least three orders of voluntary departure received by CCCS clients remain unexecuted because the Government reunified our clients with a parent within the United States prior to effectuation of the voluntary departure order. The Government then released the family unit, but failed to provide address information that would allow us to contact our clients.

30. Separated children with unexecuted orders of voluntary departure will be subject to converted orders of removal if they do not depart the country before their departure deadlines. In addition, they will be subject to five- or ten-year reentry bars, ten years of ineligibility to become lawful permanent residents, and fines of up to $5000 each. To protect clients against these outcomes, CCCS has moved to reopen the cases of its three clients in immigration court. CCCS located and received permission for the motion to reopen from one of those clients; CCCS could not locate the other two, but filed the motions anyway, explaining to the Immigration Court that the motions were filed without the children's knowledge but to protect their legal interests. By law, such motions automatically convert the children's orders of voluntary departure to orders of removal. The motions are still pending with the immigration court.

31. I have communicated with the larger network of federally subcontracted legal services providers to determine if they also have clients with unexecuted orders of voluntary departure. On September 6, 2018, and again on October 9, 2018, I sent emails over a listserv of federally subcontracted ORR legal service providers inquiring whether any provider had received an order of voluntary departure for a client who was subsequently reunified within the United States prior to the order's effectuation. To date, I have received information that six reunified children, including the three represented by CCCS, have unexecuted

orders of voluntary departure that have converted or will convert to orders of removal. On information and belief, this is not a complete list of children in this predicament. A list of the children known to me, using de-identified information, is below. I will provide identifying information if the Government agrees to assist in seeking to prevent the serious adverse immigration consequences that will otherwise befall these children.

| First Name | Last 3 Digits of A-Number | Departure Deadline | Motion to Reopen Filed? |
|---|---|---|---|
| Aura | 192 | 10/17/18 | Yes |
| Danilo | 549 | 10/16/18 | None known; child may have been repatriated with parent |
| Ever | 872 | 10/31/18 | No |
| Jessica | 360 | 10/26/18 | Yes |
| Kleverson | 440 | 10/16/18 | Yes |
| Yesica | 249 | 11/14/18 | None known |

32. We know of only a few of these children. They badly need the help of the parties and the court to avoid unfair and severe penalties.

11/2/18
Date

Anthony Enriquez, Esq.
Director of the Unaccompanied Minors Program
Catholic Charities Community Services
of the Archdiocese of New York