# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al.,<br>　　　　Plaintiffs,<br>vs.<br><br>U.S. Immigration and Customs Enforcement, et al.,<br>　　　　Defendants. | Case No. 3:18-cv-428-DMS<br>Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al.,<br>　　　　Plaintiffs,<br>vs.<br><br>Jefferson Beauregard Sessions, III, Attorney General of the United States, et al.,<br>　　　　Defendants. | Case No. 3:18-cv-1832-DMS<br>Honorable Dana M. Sabraw<br><br>CLASS ACTION<br><br>Final Hearing on Approval of Settlement<br>November 15, 2018 |

## DECLARATION OF ALEXANDRA L. RIZIO, ESQ., SENIOR STAFF ATTORNEY AT SAFE PASSAGE PROJECT

I, Alexandra L. Rizio, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

### Background

1. My name is Alexandra L. Rizio. I am a Senior Staff Attorney for the Safe Passage Project, a non-profit legal services organization in New York that provides free legal representation to immigrant children. I have been employed by Safe Passage Project since February 2015.

2. Safe Passage Project generally represents unaccompanied children who are facing removal proceedings and live in New York City and Long Island.

3. In June 2018, Safe Passage received a request from Catholic Charities Community Services of the Archdiocese of New York to represent a number of children who had been separated from their parents at the U.S.-Mexico border and relocated to shelters in the New York area contracted by the Office of Refugee Resettlement ("ORR"). At first, Safe Passage was assigned the cases of certain children who were placed in the custody of Cayuga Centers in New York City. By mid-July, Catholic Charities had referred the cases of an additional 50 children who resided in shelters in New York City, Long Island, and the Hudson Valley. All told, Safe Passage Project entered our appearances for 61 separated children referred to us by Catholic Charities.

### Representation and Determination of Client Wishes

4. I served as Attorney of Record for all 61 children, and filed G-28s as soon as the referrals were made. Additional Safe Passage colleagues also served as co-counsel in numerous cases. Our work was limited in scope to representing the children during their detention in ORR custody, and to facilitating the accomplishment of their goals (to reunite with a parent, whether in the United States or in their home country, or to be released to a sponsor).

1  18cv428 DMS (MDD)

5. Over the course of five months, my colleagues and I interviewed 57 of the children, some of them multiple times, at the child welfare agencies that had custody of them (four of the children were transferred out of ORR custody after the referrals were made and after we entered our appearance as their attorneys, but before we could interview them). Our objectives during the interviews were to learn the children's wishes, to gather information about the possible location of their parents, and to gather necessary documents to facilitate the accomplishment of the children's wishes, whether that was to be reunited with the child's parent, either in the community or in detention; to be released to another relative in the United States; or to return to the child's home country.

6. As part of our interview process, we spoke to the children, their ORR case workers, and if possible, their parents and relatives. We spoke to parents in the children's home country, to relatives in the United States who were being considered as ORR "sponsors," and to parents in federal immigration detention or criminal detention facilities.

7. Communication with detained parents to ascertain their wishes for their children was extremely difficult. Often, we did not know where the parents were. Safe Passage Project staff and volunteers searched the Immigration and Customs Enforcement ("ICE") Online Detainee Locator, but it was often not reflective of the parents' actual location. The children often did not know their parent's full name or date of birth. We did not know the parent's assigned Alien Numbers ("A numbers"), and so had to guess using sequential numbering based on the child's A numbers. This was often ineffective. Making calls directly to parents in detention was impossible. We were forced to wait for parents to call the children's case workers or their partners in their home country, and had to pass messages to them through the case workers or partners. This circuitous method of

communication was neither efficient nor confidential, but we were forced to rely on it. Calls to parents' deportation officers went unanswered, or else we were told that we would not be able to speak to the parent directly.

8. Determining the wishes of very young children in detention with limited input of an adult or legal guardian was also extremely challenging. While young children may be able to express their wishes in general terms, it is difficult for them to make more complex legal decisions or to consider multiple eventualities for the purposes of ranking outcomes in order of preference.

9. It was even more difficult to ascertain the wishes of our clients because of the evident trauma they experienced. Though we are not medical professionals, my colleagues and I have experience working with young survivors of trauma. I am confident that many of the children we represented suffer from diagnosable psychological conditions as a result of their separation. Words that my colleagues and I used to describe our separated child-clients include "despondent," "depressed," "sad," "tearful," "angry," "distrustful," and "hopeless."

10. Despite these challenges, my colleagues and I employed multiple strategies to determine the wishes of our clients. We drew pictures and charts, spoke in non-legal terms, and offered "if/then" scenarios that we helped our clients rank in order of preference. For example, we would say, "If your parent has to go back to Guatemala, do you want to go back to Guatemala with them? Or do you want to live somewhere else?" "Do you want to see your mom again as soon as possible, even if that means living in a detention facility, or would you rather live with your aunt, even if your mom would not be there?"

11. Several of the children did not speak Spanish as a first language, but rather spoke an indigenous language or dialect. In one case, we believed that a child spoke the Chuj language of Guatemala, but the child was so young and

3                                18cv428 DMS (MDD)

traumatized that he was practically non-verbal. To this day, I am not sure if we correctly identified the child's native language, or if he was simply unable to speak.

12. Despite these challenges, my coworkers and I were able to determine, to the best of our abilities, the wishes and goals of our clients. The children's goals fell into three general categories: 1) Reunite with their parents anywhere, including in immigration detention; 2) seek release to an ORR sponsor because the parent had already been deported or the child did not wish to reunite with the parent in immigration detention; 3) repatriate with or without the separated parent.

## Outcomes

13. As of October 19, 2018, 45 of the 61 children we represent or had represented were reunited with their parents according to their wishes. We were unable to determine the wishes of four of the children for whom we entered our appearance because they were reunited with their parents or released to an ORR sponsor before Safe Passage could conduct an intake interview. Of the 49 children who were reunited with family members (parents or ORR sponsors), we believe that 44 were released from immigration detention, whereas four remain in immigration detention. At least one reunited parent-child pair has repatriated since being reunited in immigration detention; it is possible that more families out of the 49 reunited pairs have repatriated, but Safe Passage is not aware of it.

14. Safe Passage Project helped facilitate voluntary departure for four of our clients: One reunited with a parent in immigration detention before repatriating, and three were forced to travel back to their country of origin without a parent, because the parent had already been removed.

15. Eight of our 61 clients expressed more complex wishes. While they all strongly desired to be reunited with their parents, they did not wish to reunite if

it meant indefinite detention in an immigration facility. Others did not wish to reunite if the reunification was a precursor to, or a result of, accepting voluntary departure. Therefore, based on the information available to them about their parent's situation and the possibility of indefinite detention or repatriation, these children chose to pursue release to an ORR sponsor.

16. For example, one client, F.C.A., age sixteen, expressed fear of returning to Guatemala because of rampant violence, and because he was targeted by evangelicals for being Catholic. Safe Passage Project conducted an intake interview of F.C.A. at the ORR shelter in New York State where he resided at the time. According to the Safe Passage staff attorney who conducted the interview, F.C.A. appeared despondent and depressed. Several times during the intake, he put his head in his hands and cried. Even though he was, at the time of the interview, in the less-restrictive setting of ORR custody, he still clearly expressed that he wanted to be free from detention entirely. He specifically and emphatically stated that, though he wanted to see his father again, he did not want to reunite if it meant staying in detention. Instead, he would rather be released to an ORR sponsor so as to be free from detention. Shortly after our initial interview, F.C.A. was transferred from the ORR shelter in New York back to immigration detention near the border before we were able to file anything to effectuate his wishes of preventing prolonged detention.

17. As of October 19, 2018, of those eight who expressed their wish to be released to an ORR sponsor, seven have been released to a sponsor, and their parents were deported; one (F.C.A., paragraph 18, above) was reunited with his parent in immigration detention against his wishes, and to my knowledge he remains there.

18. At least one client who was released to an ORR sponsor is seeking Special Immigrant Juvenile Status. The father of client J.A.T.M. (523) was deported soon after they crossed the border together. Safe Passage Project conducted an initial interview of J.A.T.M. at his ORR shelter on July 3, 2018. Shortly after, he was released to the care of his uncle in Queens, NY, and Safe Passage Project accepted J.A.T.M.'s case for full representation because he now lives in the geographic area we serve. Represented by a Safe Passage Project staff attorney, J.A.T.M. obtained the underlying family court orders based on his mother's abandonment and neglect: his mother left him when he was an infant and had no role in his upbringing. In September 2018, J.A.T.M. filed an I-360 Petition for Special Immigrant Juvenile Status with U.S. Citizenship and Immigration Services. His visa petition remains pending.

19. A chart showing outcomes for each of Safe Passage Project's separated-child-clients is attached as Exhibit A. I use the children's initials and the last three digits of their A numbers to avoid identifying them.

### The Reunification Process

20. The process by which children were reunited with their parents was inconsistent. Safe Passage Project sometimes received notice from children's ORR case managers 12-24 hours in advance of a child's relocation. Other times, we would learn that a child had been relocated after the fact. Even with this occasional advanced notice, we did not have an opportunity to discuss with the children whether or not they would remain in detention after reunification, because we usually did not know. Moreover, we had no idea at the time of reunification how that process would affect the child's opportunity to remain in the United States. The Proposed Settlement, which clarifies what course the children's

immigration cases will take, had not been filed when most of the reunifications occurred, during July and August.

21. In various cases, a child's ORR case manager relayed to me that the child had been moved, but the case manager did not know where. I then had no idea where my client was until I reached out to non-profit organizations working in various immigration detention facilities, which were able to confirm that my client was present.

22. In the most jarring example, we learned that a child was reunified with his father in detention a full five days after the reunification. We only learned about the reunification because the pro bono attorneys of the father, with whom we had been in contact, spotted the father with a child in the facility's cafeteria, and contacted us to ask if the two had been reunited. We then reached out to ICE, which confirmed that reunification had in fact occurred.

23. The Government (ORR, DHS) did not provide Safe Passage Project with forwarding information for any of our clients who were reunified with their parents and subsequently released from detention. Safe Passage Project obtained contact information for as many of these families as possible by completing our own investigations and connecting with nonprofits and pro bono attorneys who provided services to these families in detention or upon release. But there are at least fourteen clients with whom we have lost contact since their release.

24. For children who were released to ORR sponsors, we have more concrete contact information because Safe Passage Project was already working closely with the proposed sponsor to facilitate the child's release. On some occasions, ORR would send Safe Passage the Verification of Release and associated discharge paperwork once a child was released to a sponsor.

25. I know of at least two clients (H.Y.V.B., 952, and F.C.A., 417) who were reunited with their parents, who remain detained, and who want to be released from detention. F.C.A., described in paragraph 16, above, did not want to reunite with his father if it meant living in detention, and he expressed fears of repatriating due to rampant violence and harassment on account of his Catholic religion. He preferred to be released to an ORR sponsor, but F.C.A. was moved back to immigration detention near the border before we were able to stop his transfer.

26. H.Y.V.B., age seven, wanted to reunite with his father, but did not want to remain in detention. Subsequent conversations with H.Y.V.B. and his father confirmed that they remained in detention until the pair repatriated together in October 2018.

27. Most of our 61 clients are no longer in our jurisdiction. Safe Passage is, where possible, making targeted referrals to legal services organizations and will send letters to all clients formally terminating our representation.

Nov. 1, 2018
Date

Alexandra L. Rizio, Esq.
Senior Staff Attorney
Safe Passage Project
185 West Broadway
New York, NY 10013

## Safe Passage Project Exhibit A
## Client List by Client Goals and Current Status

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent anywhere** | | | |
| 1 | S.A.H.C. | 901 | Reunified with parent, released (*location unknown) |
| 2 | J.L.R. | 062 | Reunified with parent, detained |
| 3 | E.E.R.B. | 512 | Reunified with parent, released |
| 4 | P.G.M. | 519 | Reunified with parent, released (*location unknown) |
| 5 | M.A.C.S. | 945 | Reunified with parent, released |
| 6 | L.D.M.H. | 953 | Reunified with parent, released |
| 7 | M.A.E.L. | 789 | Reunified with parent, released (*location unknown) |
| 8 | V.G.M. | 246 | Reunified with parent, detained |

|    | Initials | Last 3 digits of A# | Status, per information and belief |
|----|----------|---------------------|-------------------------------------|
| 9  | F.P.X.   | 788                 | Reunified with parent, released |
| 10 | S.J.D.M. | -451                | Reunified with parent, detained |
| 11 | I.G.G.   | -489                | Reunified with parent, released (*location unknown) |
| 12 | D.E.A.L. | -702                | Reunified with parent, released (*location unknown) |
| 13 | A.D.A.M. | -832                | Reunified with parent, released |
| 14 | M.R.B.P. | -567                | Reunified with parent, released |
| 15 | J.F.B.P. | -568                | Reunified with parent, released |
| 16 | E.E.C.A. | -903                | Reunified with parent, released |
| 17 | A.N.C.M. | -203                | Reunified with parent, released |
| 18 | C.A.C.M. | -204                | Reunified with parent, released |
| 19 | L.F.O.   | -200                | Reunified with parent, released |

|    | Initials   | Last 3 digits of A# | Status, per information and belief |
|----|------------|---------------------|-----------------------------------|
| 20 | M.M.M.Z.   | -192                | Reunified with parent, released (*location unknown) |
| 21 | S.J.M.S.   | -673                | Reunified with parent, released |
| 22 | L.R.O.     | -199                | Reunified with parent, released |
| 23 | A.R.M.     | -256                | Reunified with parent, released |
| 24 | Y.A.T.G.   | -639                | Reunified with parent, released (*location unknown) |
| 25 | E.A.R.A.   | -592                | Reunified with parent, released |
| 26 | J.B.B.     | -947                | Reunified with parent, released |
| 27 | A.D.S.S.   | -899                | Reunified with parent, released |
| 28 | D.J.B.S.O. | -637                | Reunified with parent, released |
| 29 | R.M.P.     | -996                | Reunified with parent, released |
| 30 | H.Y.B.B.   | -952                | Reunified with parent, subsequently repatriated |
| 31 | J.E.R.S.   | -733                | Reunified with parent, released |
| 32 | N.D.D.M.   | -218                | Reunified with parent, released (*location unknown) |
| 33 | A.E.M.     | -968                | Reunified with parent, released (*location unknown) |

|    | Initials | Last 3 digits of A# | Status, per information and belief |
|----|----------|---------------------|------------------------------------|
| 34 | O.G.T.   | -097                | Reunified with parent, released (*location unknown) |
| 35 | C.D.L.D. | -475                | Reunified with parent, released |
| 36 | H.D.L.D. | -476                | Reunified with parent, released |
| 37 | E.A.M.M. | -610                | Reunified with parent, released |
| 38 | J.L.N.P. | -060                | Reunified with parent, released (*location unknown) |
| 39 | E.R.G.   | -491                | Reunified with parent, detained |
| 40 | R.V.S.   | -227                | Reunified with parent, released |
| 41 | I.B.J.   | -184                | Reunified with parent, released (*location unknown) |
| 42 | A.J.L.M. | -597                | Reunified with parent, released (*location unknown) |
| 43 | A.A.M.O. | -664                | Reunified with parent, released |
| 44 | B.J.P.L. | -559                | Reunified with parent, released |
| 45 | S.L.P.H. | -944                | Reunified with parent, released |

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent despite knowing that would mean return to country of origin (COO)** | | | |
| 46 | J.Y.J.M. | -570 | Accepted voluntary departure while father was detained but had a removal order; reunified en route to COO |
| 47 | R.G.H. | -946 | Accepted voluntary departure after father deported; reunified in COO |
| 48 | L.D.G.S. | -603 | Accepted voluntary departure after father deported; reunified in COO |
| 49 | B.M.J. | -585 | Accepted voluntary departure after father deported; reunified in COO |

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| **Goal: Reunify with parent, but not in detention or via repatriation** | | | |
| 50 | R.J.C.A. | -403 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 51 | N.O.O.Y. | -709 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 52 | W.O.S.L. | -720 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 53 | F.C.A. | -417 | Reunified with parent and currently detained, against child's wishes |
| 54 | C.L.D.M. | -076 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 55 | H.D.E.M. | -026 | Released to ORR sponsor, not reunified with parent (parent deported) |

|  | Initials | Last 3 digits of A# | Status, per information and belief |
|---|---|---|---|
| 56 | J.A.T.M. | -523 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 57 | V.C.C. | -062 | Released to ORR sponsor, not reunified with parent (parent deported) |
| **Other: child transferred before intake interview conducted** | | | |
| 58 | A.N.F.L. | -831 | Reunified with parent, released |
| 59 | J.A.C. | -194 | Released to ORR sponsor, not reunified with parent (parent deported) |
| 60 | E.B.A.H. | -117 | Reunified with parent, released |
| 61 | O.A.A.D. | -030 | Reunified with parent, released (*location unknown) |

18cv428 DMS (MDD)
Exhibit A to Declaration
of Alexandra L. Rizio