# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>U.S. Immigration and Customs Enforcement, et al.,<br><br>        Defendants. | Case No. 3:18-cv-428-DMS<br>Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>Jefferson Beauregard Sessions, III, Attorney General of the United States, et al.,<br><br>        Defendants. | Case No. 3:18-cv-1832-DMS<br>Honorable Dana M. Sabraw<br><br>Final Hearing on Approval of Settlement<br>November 15, 2018 |

**DECLARATION OF KAAVYA VISWANATHAN, ESQ.
PRO BONO MANAGING ATTORNEY
AT THE DOOR'S LEGAL SERVICES CENTER**

I, Kaavya Viswanathan, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

**Background**

1. I am the Pro Bono Managing Attorney at The Door's Legal Services Center. The Door is a non-profit providing free, comprehensive youth development services to New York City youth from the ages of 12 to 21. The Door's Legal Services Center ("LSC") represents youth in matters including family law, housing, public benefits, and immigration. I submit this declaration in support of the objections to the proposed *M.M.M.* class settlement filed by legal services providers that directly represent the children in the class.

2. I joined The Door's LSC in June 2018. In my current position, I manage a team of attorneys who represent immigrant youth in New York family court and immigration proceedings. I also manage the LSC's relationships with pro bono law firms and corporate partners, and supervise pro bono attorneys as they represent immigrant youth. Prior to joining the LSC, I was the Senior Pro Bono Coordinating Attorney at the New York office of Kids in Need of Defense (KIND), where I worked with unaccompanied alien children in removal proceedings.

3. In June 2018, the LSC began representing or supervising the representation of seventeen children who had been separated from a parent at the border[1] and were in the custody of the Office of Refugee Resettlement ("ORR") in the New York City area. The LSC represented five of these children in-house, of which I personally represented four children. The LSC placed the remaining

---

[1] The LSC represented an eighteenth child, who was separated at the border from his older brother. This child, however, is not a member of the *M.M.M.* class.

twelve cases with pro bono attorneys at four law firms. I closely supervised each of these twelve cases.[2]

### The Range of Children and Their Wishes

4. The seventeen children the LSC represented ranged in age from five years old to seventeen years old. Thirteen of the children were fourteen years old or older. Fifteen of the children were from Guatemala, one was from Honduras, and one was from El Salvador.

5. LSC attorneys promptly met with the seventeen children in ORR custody. We executed retainers with each child, committing to full representation in immigration matters for as long as the child remained in the greater New York City area. We filed G-28s for all the children. Some of the children had Immigration Court appearances while in ORR custody, and we filed E-28s with the court in those cases.

6. In our client meetings, the children all asked about their parents. They did not understand why they had been separated, or what was happening to their parents. During initial meetings, many of the children had not yet been able to speak with the parents from whom they were separated. These children were especially anxious, and repeatedly asked us if we could help them find their parents. F., our five-year-old client, kept asking when he would see his mother again. His older brother, who was in ORR custody with him, told F. that their mother was working and would come back soon. Eventually, all our clients were able to speak with their parents, and this made them happier. However, as the children spent more weeks in ORR custody, we noticed other signs of trauma. A.,

---

[2] Going forward, references to the LSC's representation of the children encompass both direct representation and supervision of pro bono representation. Similarly, references to LSC attorneys encompass both attorneys employed by the LSC and attorneys employed elsewhere but supervised by an LSC attorney.

a thirteen-year-old boy, was in ORR custody for three months, waiting to be released to a sponsor after the father with whom he entered the country was deported. When we first met A., he was a gregarious, funny boy. By the end of his time in custody, he was visibly depressed with no affect and spoke very little.

7. When meeting with our clients, we tried to ascertain their first and highest priority: was it to reunify with their parents, to remain in the United States, to be released to another relative in the United States, to return to their home country? Heartbreakingly, but unsurprisingly, our clients did not want to make this choice and instead informed us that they wished to remain in the United States *with* their parents. We ascertained the children's wishes by speaking to them in repeated meetings, and doing our best to explain what was happening and all the potential outcomes. In addition to speaking directly to the children, we contacted (with the children's permission) as many of their relatives as possible. We spoke to parents and other relatives in the children's home countries, to potential sponsors in the United States and, where possible, to the children's separated, detained parents. In almost no cases were we able to speak directly with the detained parents because of restrictions on contacting detention facilities. In some cases, however, we were able to speak to Deportation Officers or legal services providers with information about the detained parents' cases. We also spoke to each child's ORR case manager, to understand the options for release to a sponsor, and to discuss what plan the case manager felt was in the child's best interests.

8. In its June 26, 2018, ruling, this Court gave the Government until July 26, 2018, to reunify all children age five and older with the parent from whom they had been separated. However, the Government did not provide our attorneys with any information as to what reunification would look like, or how the children's immigration cases would proceed after reunification. Given this complete lack of

information, we were unable to meaningfully review with our clients the potential legal consequences of the decision to reunify with a parent.

9. We explained to our clients that we did not know what would happen if and when they were reunified with their parents—we had no information as to whether reunification would mean: 1) reunification and release of both parent and child; 2) reunification and continued detention of both parent and child; 3) reunification and deportation of both parent and child; or 4) some other combination of events. We explained to the children that, based on the limited information we had at the time, their best chance of remaining in the United States and pursuing any independent claim to immigration relief meant declining reunification and instead remaining in ORR custody and seeking release to a sponsor.

10. The thirteen children who were fourteen years old or older were able to understand their circumstances and, after some consideration, stated that their priority was to remain in the United States, even if that meant continued separation from their parents. One thirteen-year-old client also stated that he wished to remain in the United States, even if that meant continued separation. These clients feared returning to their countries of origin and/or wanted to pursue the hope of a better life in the United States. Some of the children had previously been the victims of violent attacks by gang members. Another child had been abused by his father and had watched his father viciously abuse his mother. One child had been abandoned by his father at a young age. Many children had been forced to drop out of school in order to work and support their families. Based on our meetings with the children, we believed that many had colorable claims for asylum and Special Immigrant Juvenile Status. These clients all sought release to a sponsor in the United States.

11. Two twelve-year-old clients were unable to definitively respond to the choice of reunification versus remaining in the United States, and stated at various times that they: 1) wished to remain in the United States with their parents; 2) wished to reunify with their parents, whether in the United States or their country of origin; and 3) would do whatever their parents told them to do.

12. The five-year-old client was unable to articulate his wishes, but was in ORR custody with his then-fifteen-year-old brother, who stated that as long the siblings remained together, they wished to remain in the United States.

13. Ultimately, eight of the children we represented did not have to make the choice of reunification versus remaining in the United States because the Government deported their parents before the court-ordered reunification deadline. After learning that their parents had been deported, seven of these children decided that they wished to remain in the United States and be released to a sponsor, rather than reunifying with their parents in their home countries. The eighth child, a twelve-year-old girl, wished to reunify with her father, and we helped her obtain voluntary departure and return to Guatemala.

14. Prior to the court-ordered reunification deadline, the Government released the parents of three children from detention. These three children were then released from ORR custody and reunited with their parents in the community.

### The Reunification Process

15. As the reunification deadline approached, we represented six children, ranging in age from twelve to seventeen, who were still in ORR custody and whose parents remained detained in the United States.

16. We asked the Government to give us at least 48 hours' notice before any child was to be moved from the New York area. We also asked the Government to tell us where and how the children would be reunified with their

parents, and what would happen to them after reunification, specifically whether and for how long the children might be detained.

17. Two of the children were reunified with their parents, and both parent and child were promptly released into the community.

18. Reunification for the remaining four children happened as follows:

   a. S. is a twelve-year-old boy from Guatemala who was separated from his father. S. was unable to decide whether he wished to reunify with his father if it meant returning to Guatemala, or remain separated from his father if it meant remaining in the United States. On July 27, 2018, I received an email from S.'s ORR case manager, informing me that, as of July 26, 2018, S. had been released from ORR custody and was in transit to be reunified with his father. This after-the-fact email was the first notification I received of S.'s release and transfer. I had no meaningful opportunity to speak with S. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. I was given no further information about S.'s reunification plan. A few days later, by searching the online ICE Detainee Locator system and following up with Texas-based legal services providers, I determined that S. had been reunified with his father, and that they were both detained at Karnes in Texas. After approximately one month in family detention, during which RAICES represented and advocated for S.'s father, and I continued to represent and advocate for S., both S. and his father were released.

   b. H. is a fourteen-year-old boy from Honduras who was separated from his father. H. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father. H.'s attorneys understood that H.'s father agreed with his son's wish. H.'s attorneys repeatedly contacted ORR and advocated that H. remain in ORR custody in New York, rather than be reunified with his father. Nonetheless, on Sunday July 22, 2018 at 9:22 p.m., H.'s attorneys received an email from ORR, informing them that, in the next 48 hours, H. would be transferred from New York to reunify with his father at the El Paso Processing Center in El Paso, Texas. The attorneys were given no further information about H.'s reunification plan. The attorneys were able

to meet with H. before his scheduled transfer from New York, and during that meeting, H. changed his mind and decided that he did wish to reunify with his father. However, H.'s attorneys were unable to give him any information as to whether reunification would mean prolonged detention, or what impact reunification might have on his immigration case. H. was reunified with his father, and they both remain detained at Karnes in Texas.

c. G. is a seventeen-year-old boy from Guatemala who was separated from his father. G. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father. G. wanted to be released to an uncle in the United States. G.'s uncle confirmed that he was willing to act as a sponsor. The attorneys also spoke to G.'s mother in Guatemala, who stated that she wished for her son to remain in the United States and live with his uncle. G.'s attorneys were not able to directly reach G.'s father in detention, but based on conversations with other relatives, they understood that G.'s father agreed that his son should remain in the United States with a sponsor. G.'s attorneys repeatedly contacted ORR and advocated that G. remain in ORR custody in New York, rather than be reunified with his father. Nonetheless, on Tuesday July 24, 2018, at 8:22 p.m., G.'s attorneys received an email from ORR, informing them that G. would be transported to El Paso, Texas, for processing that same day. This was the first notification G.'s attorneys received of his transfer. They had no meaningful opportunity to speak with G. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. They were given no further information about G.'s reunification plan. G.'s attorneys had prepared a waiver of reunification form, and were in the process of sending it to G.'s father to sign, when G. was abruptly transferred from New York. A few days later, by reaching out to Texas-based legal services providers, G.'s attorneys determined that G. had been reunified with his father. They both remain detained at Karnes in Texas. G. may be eligible for Special Immigrant Juvenile Status because it is not viable for him to reunify with his mother, who neglected him by allowing him to drop out of school in the 6th grade to work, and who is extremely ill and unable to properly care for him. In meetings with his attorneys, G. did not expressed a fear of returning to Guatemala. Under the terms of the settlement, if neither G. nor his

father passes a credible fear interview, G. will be unable to pursue Special Immigrant Juvenile Status.

    d. W. is a fifteen-year-old boy from Guatemala who was separated from his father. W. informed his attorneys that he wished to remain in the United States even if it meant continued separation from his father. W. also specifically stated that he did not want to go back into detention, and wanted to be released to a sponsor as soon as possible. Based on conversations with both W. and his ORR case manager, W.'s attorneys understood that W.'s father agreed with his son's wishes. W.'s attorneys repeatedly contacted ORR and advocated that W. remain in ORR custody in New York, rather than be reunified with his father. Nonetheless, on Tuesday July 24, 2018 at 6:57 p.m., W.'s attorneys received an email from ORR, informing them that W. would be transported to El Paso, Texas, for processing that same day. This was the first notification W.'s attorneys received of his transfer. They had no meaningful opportunity to speak with W. prior to his transfer, and no opportunity to discuss the consequences of reunification with him. They were given no further information about W.'s reunification plan. A few days later, by reaching out to Texas-based legal services providers, W.'s attorneys determined that W. had been reunified with his father, and that they were both detained at Karnes. When W.'s attorneys spoke to him in detention, W. was clear that he wished to leave detention and that he wanted to remain in the United States, even if it meant re-separation from his father. W.'s father agreed. W.'s attorneys advocated with ICE and the DOJ, and ultimately succeeded in having W. transferred back to ORR custody and released to a sponsor. W. is now classified as an Unaccompanied Alien Child and is in Section 240 removal proceedings. W. is potentially eligible for Special Immigrant Juvenile Status based on parental neglect, as he dropped out of school after the 6th grade and began working in agriculture.

19. H., G., and W. are examples of children who wished to opt out of reunification in order to remain in the United States and pursue independent immigration relief, but were reunified against their will. The children's attorneys received minimal notice of the reunifications. Additionally, the children were moved from New York late at night, thereby minimizing the attorneys' ability to

seek injunctive relief preventing the moves. The children's attorneys had no opportunity to review with their clients the potential legal consequences of the decision to reunify. Even if the attorneys had received sufficient notice and opportunity to meet with their clients, they would have been unable to provide complete and accurate legal advice, as the true legal consequences of reunification only became apparent in September 2018, upon the filing of the Proposed Settlement.

20.  Thanks to his attorneys' tireless efforts, W. has now been released to a sponsor and is able to pursue any available avenue of immigration relief in INA § 240 proceedings. H. and G. do not currently have this option.

Dated: October 31, 2018
New York, NY

Kaavya Viswanathan, Esq.
Pro Bono Managing Attorney
The Door's Legal Services Center
121 Avenue of the Americas,
3rd Floor
New York, NY 10013
Phone: 212-941-9090 ext. 3409
E-mail: kviswanathan@door.org