JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-
Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-
Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

   Petitioners-Plaintiffs,

 vs.

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, et
al.,

   Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT**

The Court ordered the parties to file a joint status report on December 12, 2018, in anticipation of the status conference scheduled at 1:00pm PST on December 14, 2018. The parties submit this joint status report in accordance with the Court's instruction.

## I. DEFENDANTS' POSITIONS

### A. Update on Reunifications

Defendants have appropriately discharged an additional 14 children since the November 29, 2018 Joint Status Report, for a total of 2,508 children. *See* Table 1: Reunification Update. In addition to the 14 new discharges, the data in Table 1 reflects a slight change in the distribution of discharged children between those discharged through reunification with the separated parent, and those discharged under other appropriate circumstances. Specifically, five children were discharged

through reunification with the separated parent, but were previously reported as discharged under other appropriate circumstances. This change refines the reported numbers and does not change the status of the children.

Of the 14 new discharges, 1 child was discharged by being reunified with a separated parent, and an additional 13 children were discharged under other appropriate circumstances. For each of these 14 children recently discharged, the parent was excluded from the class at the time the child was discharged. Thus, there continue to be 8 children proceeding towards reunification or other appropriate discharge. The current status of these 8 children is as follows:

- <u>2 children</u> in ORR care with a parent who is in the United States and presently in class. One of these children cannot be reunified at this time because the parent is in other federal, state, or local custody (e.g., state criminal detention). Defendants are working to appropriately discharge the remaining child, and to identify any possible barriers to discharge, meeting and conferring with Plaintiffs where appropriate for resolution. *See* Table 1: Reunification Update.

- <u>1 child</u> in ORR care with a parent presently departed from the United States, who has cleared Processes 1 through 3 of the Court-approved reunification plan, and who is proceeding towards reunification with the parent in their home country. *See* Table 2: Reunification of Removed Class

Members. This child is one of the 4 where the Steering Committee has advised that the case will be delayed due to unique circumstances. Defendants have met and conferred with Plaintiffs, and all parties agree that this child's travel to his home country should be arranged on or after December 14, 2018. The government is actively working to arrange this child's travel.

- 5 children in ORR care with parents presently departed from the United States, and for whom the ACLU has not yet provided notice of parental intent regarding reunification (or declination of reunification). Defendants are supporting the efforts of the ACLU to obtain statements of intent from those parents. Once Defendants receive the notices from the ACLU, Defendants will either reunify the children or move them into the TVPRA sponsorship process, consistent with the intent of the parent.

  o For 3 of the 5 children, the Steering Committee has advised that resolution will be delayed due to unique circumstances.

  o The ACLU has been in contact with the parents of 3 of the 5 children for more than 28 days without providing Defendants with notice of parental intent. (Two of these 3 children are included in the group for whom the Steering Committee has advised that resolution will be delayed.)

o For 1 of the 5 children, ORR is working to support the ACLU's efforts to obtain parental intent, and a three-way call was recently completed to connect the ACLU with one of the child's parents.

The current reunification status for the 2,667 children ages 0 through 17 who have been the focus of Defendants' reporting to date is further summarized in Table 1 below. The data in Table 1 reflects approximate numbers on these children maintained by ORR at least as of December 11, 2018. These numbers are dynamic and continue to change as more reunifications or discharges occur.

**Table 1: Reunification Update**

| Description | Phase 1 (Under 5) | Phase 2 (5 and above) | Total |
|---|---|---|---|
| Possible children of potential class members | 103 | 2,564 | 2,667 |
| **Discharged Children** | | | |
| Children discharged from ORR care: | 99 | 2,409 | 2,508 |
| • Children discharged by being reunified with separated parent | 80 | 2,051 | 2,131 |
| • Children discharged under other appropriate circumstances (these include discharges to other sponsors [such as situations where the child's separated parent is not eligible for reunification] or children that turned 18) | 19 | 358 | 377 |
| **Children in ORR Care, Parent in Class** | | | |
| Children in care where the parent is not eligible for reunification <u>or</u> is not available for discharge at this time: | 0 | 8 | 8 |
| • Parent presently outside the U.S. | 0 | 6 | 6 |

| | | | |
|---|---|---|---|
| ○  Steering Committee has advised that resolution will be delayed | 0 | 4 | 4 |
| •  Parent presently inside the U.S. | 0 | 2 | 2 |
| ○  Parent in other federal, state, or local custody | 0 | 1 | 1 |
| ○  Parent red flag case review ongoing – safety and well being | 0 | 0 | 0 |
| **Children in ORR Care, Parent out of Class** | | | |
| Children in care where further review shows they were not separated from parents by DHS | 2 | 26 | 28 |
| Children in care where a final determination has been made they cannot be reunified because the parent is unfit or presents a danger to the child | 2 | 26 | 28 |
| Children in care with parent presently departed from the United States whose intent not to reunify has been confirmed by the ACLU | 0 | 84 | 84 |
| Children in care with parent in the United States who has indicated an intent not to reunify | 0 | 11 | 11 |

## B. Update on Removed Class Members

The current reunification status of removed class members is set forth in Table 2 below. The data presented in this Table 2 reflects approximate numbers maintained by ORR as of at least December 11, 2018. These numbers are dynamic and continue to change as the reunification process moves forward.

| REUNIFICATION PROCESS | REPORTING METRIC | NO. | REPORTING PARTY |
|---|---|---|---|
| **STARTING POPULATION** | Children in ORR care with parents presently departed from the U.S. | 90 | Def's. |
| **PROCESS 1: Identify & Resolve** | Children with no "red flags" for safety or parentage | 90 | Def's. |

| | | | |
|---|---|---|---|
| **Safety/Parentage Concerns** | | | |
| | | | |
| **PROCESS 2: Establish Contact with Parents in Country of Origin** | Children with parent contact information identified | 90 | Def's. |
| | Children with no contact issues identified by plaintiff or defendant | 90 | Def's. & Pl.'s |
| | Children with parent contact information provided to ACLU by Government | 90 | Def's. |
| | | | |
| **PROCESS 3: Determine Parental Intention for Minor** | Children for whom ACLU has communicated parental intent for minor: | 85 | Pl's. |
| | • Children whose parents waived reunification | 83 | Pl's. |
| | • Children whose parents chose reunification in country of origin | 1 | Pl's. |
| | • Children proceeding outside the reunification plan | 1 | Pl's. |
| | Children for whom ACLU has not yet communicated parental intent for minor: | 5 | Pl's. |
| | • Children with voluntary departure orders awaiting execution | 0 | Def's. |
| | • Children with parental intent to waive reunification documented by ORR | 0 | Def's. |
| | • Children whose parents ACLU has been in contact with for 28 or more days without intent determined | 3 | Pl's. |
| | | | |

| PROCESS 4: Resolve Immigration Status of Minors to Allow Reunification | Total children cleared Processes 1-3 with confirmed intent for reunification in country of origin | 1 | Pl's. |
|---|---|---|---|
| | • Children in ORR care with orders of voluntary departure | 0 | Def's. |
| | • Children in ORR care w/o orders of voluntary departure | 1 | Def's. |
| | ○ Children in ORR care whose immigration cases were dismissed | 1 | Def's. |

## C. ORR is Re-Categorizing 149 Children Discharged from ORR Care

During the last status conference, the Court indicated that it wanted ORR to provide updated, final numbers in this Joint Status Report. Consistent with both the Court's statements and ORR's ongoing efforts to continually re-evaluate and refine the numbers that it reports to the Court, ORR is re-categorizing certain children who were in its care on June 26, 2018 and subsequently discharged to sponsors. As explained in the October 25, 2018 Joint Status Report, ORR regularly amasses new case management information in the ordinary course of program operations. This re-categorization is based on a re-review of case-management records to ensure continuing accuracy in reporting to the Court.

ORR has determined that 149 children who were in ORR care on June 26, 2018, and who were subsequently discharged to sponsors on or between June 26,

2018 and the October 25, 2018 Joint Status Report, should be re-categorized as possible children of potential class members.

One hundred and thirty one of the 149 children were discharged on or between June 26, 2018 and approximately July 10, 2018, when Defendants determined the total number of possible children of potential class members that they originally reported to the Court. The remaining 18 children were discharged on or between approximately July 10, 2018, and the re-categorization in the October 25, 2018 Joint Status Report of children who remained in ORR care.

Eleven of the 149 children have parents with criminal histories (which disqualify the parents from membership in the class). Of those 11 children, 1 was discharged under the Trafficking Victims Protection Reauthorization Act (TVPRA) to a Category 1 sponsor (a parent or legal guardian), 8 were discharged to Category 2 sponsors (an immediate relative, *e.g.*, a brother, sister, aunt, uncle, or grandparent), and 1 was discharged to a Category 3 sponsor (a distant relative or unrelated adult individual). In addition, 1 of the children aged out of ORR care.

One hundred and thirty eight of the 149 children have parents who do not have criminal histories. Of those 138 children, 52 were discharged under the TVPRA to Category 1 sponsors, 71 were discharged to Category 2 sponsors, and 9 were discharged to Category 3 sponsors. In addition, 1 child aged out of ORR care, and 5 children were discharged through voluntary departure.

All sponsors who received one of the 149 discharged children passed rigorous vetting for child safety and well-being under the TVPRA.

These re-categorizations increase the total number of possible children of potential class members from 2,667 to 2,816. The re-categorized children will be added to Table 1 in the next Joint Status Report. The addition of the re-categorized children to Table 1 will increase the total number of children "discharged under other appropriate circumstances" from 377 to 526. Defendants will further adjust their categorizations of children to the extent it becomes appropriate.

**D. Update Regarding Government's Implementation of Settlement Agreement**

**Settlement Agreement Implementation**

| SETTLEMENT PROCESS | DESCRIPTION | NUMBER |
|---|---|---|
| **Election Forms** | Total number of executed election forms received by the Government | **298 (189 Parents/109 Children)[1]** |
| | • Number who elect to receive settlement procedures | **153 (101 Parents/52 Children)** |

---

[1] The number of children's election forms is lower than the number of parent election forms because in many instances a parent electing settlement procedures submitted an election form on his or her own behalf or opposing counsel e-mailed requesting settlement implementation for the entire family, but no separate form was submitted on behalf of the child.

| | | |
|---|---|---|
| | • Number who waive settlement procedures | **145 (88 Parents/57 Children)[2]** |
| **Interviews** | Total number of class members who received interviews | **127[3]** |
| | • Parents who received interviews | **65** |
| | • Children who received interviews | **62** |
| **Decisions** | Total number of CFI/RFI decisions issued by USCIS | **128[4]** |
| | • CFI/RFI decisions issued by USCIS for parents | **59** |
| | • CF decisions issued by USCIS for children | **69** |

---

[2] The number of children's waivers is lower because some parents have submitted waivers only for themselves and some parents who have waived reunification also waived settlement procedures and have therefore not provided a form for the child.

[3] Some individuals could not be interviewed because of rare languages; these individuals were placed in Section 240 proceedings.

[4] This number is the aggregate of the number of parents whose negative CFI/RFI determinations were reconsidered, the number of parents whose negative CFI/RFI determination was unchanged, the number of children who established a credible fear, the number of children determined not to have a credible fear, and individuals who were referred to 240 proceedings without interview because of a rare language. This number excludes 10 cases where a parent already had an NTA from ICE, and 1 case where the parent was ordered removed by an IJ (which were included in the last JSR).

Defendants respectfully submit that the categories of numbers reported above appropriately and fully reflect the process covered by the settlement agreement and the progress made under the agreement. Defendants' reporting in this section reflects the government's efforts to report the information requested by Plaintiffs in a manner that is consistent with (and fully accounts for the burdens involved in) how implementation is actually occurring. These are numbers that Defendants believe that they can regularly report consistent with their efforts to complete reunification and implement the settlement agreement's procedures. Those efforts involve, as the Court knows, a significant amount of important work. Defendants believe that, although it would be possible to provide additional information, the categories of numbers set forth above strike the right balance between the interest in transparency and the paramount interest in reunification and settlement implementation.

Plaintiffs have identified at least two additional areas of information about which they request that Defendants report. Specifically, Plaintiffs have asked Defendants to report regarding the results of interviews conducted under the settlement agreement processes, and the removals of individuals who waive these processes. For reasons largely set forth above, Defendants respectfully submit that they should not be required to report this information. Defendants' existing reporting shows that the agreed-to procedures are being provided under the agreement. Despite

requests by Defendants, Plaintiffs have provided no explanation as to why this additional information would assist them in confirming that the required procedures are being provided given that these decisions or removals occur after the required procedures are completed. Moreover, reporting these additional pieces of the process places a significant burden on Defendants because they must be tracked on an individual basis by the same individuals who are already responsible for implementing and tracking the processes required by the agreement itself. Imposing additional and unnecessary reporting burdens on these individuals could slow down and undermine implementation. It would also hamper the government's ability to respond to the many additional requests for information that Plaintiffs make daily, as discussed more fully below. Defendants' proposed reporting, by contrast, accounts for those burdens, promotes the shared interest in implementation, and provides information that is important to the Court and others in assessing the parties' progress.

Accordingly, Defendants ask that the Court decline to require additional reporting proposed by Plaintiffs. To the extent that additional reporting may become necessary as implementation of the agreement continues to move forward, the government proposes that the parties meet and confer regarding the information to be reported.

### E. Information Sharing Regarding Settlement Agreement

Defendants respectfully ask the Court to urge Plaintiffs' counsel to coordinate in prioritizing and making information requests from the government.

In addition to the requests for additional reporting discussed above, counsel for *MMM* and *Dora* class members have made several requests for information from Defendants, some of which relate to the implementation of the settlement agreement, and some of which relate to other issues. After recently receiving multiple such requests by several separate emails over the course of a few hours in a single day, Defendants asked counsel to consolidate and prioritize their requests into a single email, sent at regular intervals, in the same manner adopted by counsel for the *Ms. L.* Plaintiffs, and used by the parties throughout the reunification process. Adopting this approach for reunification enabled the government to more successfully provide the information that the *Ms. L.* plaintiffs were seeking consistent with the *Ms. L.* Plaintiffs' priorities, and to keep track of outstanding requests. As Defendants have explained, Defendants have limited capacity to investigate and respond to individualized inquiries regarding class members and other issues, some of these inquiries are extremely time- and resource-intensive, and those who must investigate Plaintiffs' inquiries are often the same individuals who are responsible for implementing the reunification and settlement processes.

Given these considerations—and the paramount interest in reunification and settlement implementation, rather than bare information-sharing—Defendants respectfully ask the Court to urge *MMM* and *Dora* counsel to coordinate with *Ms. L.* counsel to adopt a unified system for requesting additional information consistent with the one that has worked for the parties to date.

## F. Defendants' Report on Meet and Confer Issues From November 15, 2018 Settlement Status Conference

Defendants understand that Objectors Lesbi Nohemi Martinez-Martinez and Egla Arely Velasquez Molina intend to pursue their claims in the U.S. District Court for the District of Columbia, and not before this Court. ECF No. 333.

With regard to the objections of the legal service providers, on the issue of children with voluntary departure orders, the government and the legal service providers have made progress on this issue and continue to work toward final resolution.

Information-sharing: When lawyers have presented notices of appearance for children who were reunified with parents in the United States after accepting voluntary departure orders, the government has provided these lawyers information on the whereabouts of such children.  The government has also provided the names of four additional children in this position, and counsel for the legal service providers has identified and tried to make contact with the lawyers for those children.

Government Response to Motions to Reopen: The government and the legal service providers have agreed that the Department of Homeland Security will file nothing in response to a motion to reopen filed on behalf of a child who overstayed a voluntary departure order if the child is unaware of the motion because the child's representative cannot locate the child. The government and the legal service providers continue to negotiate what position the Department of Homeland Security will take on motions to reopen for children in this position who have authorized the motion. The legal service providers and the government will provide an update on this issue in the next joint status report.

### G. Information Sharing With *Ms. L.* Plaintiffs Regarding Family Separations Going Forward.

Plaintiffs' counsel recently reached out to Defendants to discuss the issue of information sharing regarding family separations that have occurred since the June 26, 2018 preliminary injunction order. Defendants are discussing the issue internally and intend to meet and confer with Plaintiffs on this issue shortly. Defendants expect to report on these discussions in the next joint status report.

### H. Agency Coordination Regarding the Tracking of Family Separations.

Defendants continue to coordinate with the agencies to ensure the any separations of parents and children are tracked appropriately. The below information incorporates and supplements the information provided by Defendants' last week on this issue.

18cv428 DMS MDD

Starting in April 2018, CBP enhanced data fields within its own electronic systems of record to better account for separations of family units. Specifically, if a family unit must be separated, agents and officers will indicate that fact, as well as the reason for the separation, into the electronic system of record. In other words, if a child who was originally encountered as part of a family unit is separated, the fact of that separation and the reasons for the separation will be documented in the electronic system of record, for both the parent and the child. ICE has access to information entered into CBP's electronic systems of record. Additionally, as explained in the last JSR, both ICE and CBP's U.S. Border Patrol have direct access to HHS' UAC Portal, and so information from those systems will be transferred directly to HHS at the time of a referral to HHS. CBP's Office of Field Operations also provides relevant information about a separated child and his or her parent when referring the child to HHS. In addition, CBP generally provides HHS with both the child's A-number and the separated parent's A-number at the time of referral.

ORR maintains information on UACs in its UAC Portal. The USBP record database is able to push referral information on UACs directly into the UAC Portal's referral page. ICE also has access to the UAC Portal referral page and directly enters UAC information into the system. In the summer of 2018, ORR added a checkbox to the UAC Portal's referral page to indicate whether a child has been separated from family. The referral page also has a "notes" section where USBP and ICE can type

in the name and other information of the separated family member, including their alien number. Additionally, USBP and ICE can enter this information into the parent/relative information section of the referral. ORR also has a data team responsible for maintaining information on children of potential class members. ORR's data team receives data from ICE weekly on potential class members in ICE custody with children in ORR care, including the location of the parent.

Defendants also have reached out to Plaintiffs to discuss this issue, and believe that the best way to address this issue at this stage is for Plaintiffs to raise their specific concerns regarding Defendants' tracking of families to Defendants, and for the parties to meet and confer to see if resolution of those concerns can be reached. Defendants do not believe that it is necessary to set a briefing schedule on this issue.

## II.   *MS. L.* PLAINTIFFS' POSITION

### A.  The Creation of a Centralized Database

The parties continue to meet and confer regarding the need for a centralized inter-agency database to track future separations.  Plaintiffs expect the government to provide an update on its progress in the Joint Status Report.  If there is a need for further briefing after plaintiffs review the government's submission, the parties will inform the court of an agreed-upon briefing schedule at the Status Conference.

### B. Information Regarding Parents Separated from Children After June 26

The media and legal services providers have reported continued separation of parents from children at the border even after this Court issued its preliminary injunction.  See, e.g., Colleen Long, *Family separations at border down, but dozens still affected*, AP News, Dec. 6, 2018 available at https://bit.ly/2UEzQVd; Ginger

Thompson, *Families Are Still Being Separated at the Border, Months After "Zero Tolerance" Was Reversed*, Nov. 27, 2018, available at https://bit.ly/2zxD3gb.

In light of these reports, Plaintiffs have requested from the government a list of parents separated from their children after June 26 (the date of the PI Order), along with the reasons why the family was separated. This is the same information the government provided to Plaintiffs of class members who were separated as of June 26. The parties continue to meet and confer on this issue and will inform the Court as to the status of these negotiations at the December 14 Status Conference.

## C. **Steering Committee Progress**

The Steering Committee has successfully contacted and confirmed the preferences of nearly all removed parents with respect to reunifications. The government reported that, as of December 7, 95 children with removed parents remained in ORR custody. The Committee has delivered preferences for the parents of 88[5] of those children, and those children are awaiting either reunification with their parents or placement with sponsors in accordance with their parents' submitted preferences. The status of each of the final seven remaining cases is specified below, in Part I.D., and as noted in that section, only one case remains outstanding for the purposes of the submission of reunification preferences within the ordinary course pursuant to the Plan.

The status of efforts based on the government's December 7 list of 95 children in ORR custody with removed parents appears in the table immediately below.

---

[5] As discussed at the October 25 Status Conference, in this Joint Status Report Plaintiffs are reporting a set of detailed numbers based only on the government's most recent list of children in ORR custody with removed parents. As requested by the Court at the November 30 Status Conference, Plaintiffs are working with the government to confirm the total number of parents who were removed following separation from their children, to be able to provide the Court with a full accounting. *See* Part I.E.3, *infra*.

| | |
|---|---|
| Removed parents identified by the government to the Steering Committee as of 12/7/18 | 95 |
| • Removed parents identified by the government as of 10/20/18 | 91 |
| • Removed parents newly identified by the government on 10/26/18 | 4 |
| Steering Committee called phone number for parent (using a government-provided number or a number otherwise obtained by the Steering Committee) | 95 |
| • Parents successfully reached (by phone or through NGO efforts) | 92 |
| • Parents not reached (by phone or through NGO efforts) | 3 |
| ○ Contact efforts ongoing – see Part I.D. below | 1 |
| ○ Cases that the Steering Committee and government have agreed should be set aside – see Part I.D. below | 2 |
| Parents successfully reached (by phone or through NGO efforts) | 92 |
| • Parent's final preference has been communicated to the government | 88 |
| ○ Parent has elected reunification in Country of Origin | 1 |
| ○ Parent has elected to waive reunification in Country of Origin | 87 |
| • Parent's final preference has not yet been communicated to the government, but the Steering Committee is actively seeking the parent's preference | 0 |
| • Cases that the Steering Committee has indicated to the government should be set aside—see Part I.D. below | 4 |

## D. **The Remaining Cases**

There are seven parents, of the 95 parents in the government's December 7 list of children in ORR custody with removed parents, for whom the Steering Committee has not yet submitted to the government a final reunification preference. One case of the seven remains outstanding for the purposes of the submission of reunification preferences to the government within the ordinary course pursuant to the Plan. The Steering Committee has advised the government

1  that the remaining six out of the seven cases require special treatment: two are

2  parents not yet reached, and four are parents that have been reached.

3  • With respect to the six cases requiring special treatment:

4  ○ Two are cases that the parties have agreed should be set aside because

5  they involve complex and individualized circumstances that

6  necessitate treatment outside of the Plan's usual process.

7  ○ Four are cases that the Steering Committee has advised the

8  government will require additional time to resolve because they too

9  involve complex and individualized circumstances, but which

10  circumstances do not necessitate treatment outside of the Plan.  The

11  government has agreed with the Steering Committee's proposed

12  approach with respect to three of these cases; we await the

13  government's response as to the fourth.  This number has increased

14  from three to four since the parties' last Joint Status Report; the fourth

15  parent is one who the Steering Committee recently met with in her

16  home country.  That parent has decided to seek to return to the United

17  States to pursue asylum, and thus resolution of this parent's case will

18  take additional time.

19  • The remaining case involves a parent who was first identified to the Steering

20  Committee on October 25 as a result of the government's "re-

21  categorization."  The Steering Committee has been unable to make initial

22  contact with this parent using contact information provided by the

23  government or independently obtained by the Steering Committee.

24  However, the Steering Committee is actively pursuing on-the-ground efforts

25  to locate the parent, and has successfully met with and spoken to both the

26  child's other parent, and other close family members in the parent's country

27

28

of origin.  The Steering Committee continues to actively search for the parent.

E. **Information-Sharing**

- **Children of Parents with Submitted Preferences Still Detained**

At the November 30 Status Conference, in light of the Steering Committee's concern about the number of children who remain in ORR care after their deported parents waived reunification, the Court requested the government monitor the pace of release and provide the Steering Committee with information regarding the status of releases.

The government provided generalized information on December 11, without details about particular cases or a report on the number of children who have recently been placed with sponsors.  The Steering Committee will continue to meet and confer with the government' on this issue, including to identify any roadblocks to expeditious release.[6]

- **Parents First Contacted 28 Days Or More Ago**

As discussed in Part I.D. above, the Steering Committee and the government have agreed that five cases should be treated differently and the Steering Committee has also proposed that a sixth case be included in that group. Accordingly, such cases have been removed from the list of parents with whom the Steering Committee first made contact 28 days ago, and for whom the government has not yet received the parent's reunification preference.  Setting those cases

---

[6]     The Steering Committee has submitted to the government 87 final reunification preferences indicating a waiver of reunification, and of these 87 final preferences, 78 were submitted to the government by the Steering Committee 60 or more days ago as of Wednesday, December 12.  Furthermore, of these 78 final preferences that were submitted 60 or more days ago, 62 identify a specific sponsor in the United States for ORR purposes.  These 62 children remain in ORR custody.

aside, there are no parents with whom the Steering Committee first made contact 28 days ago, for whom the government has not yet received the parent's reunification preference.

- **Removals from Government Lists and Development of Agreed-Upon Baseline of Removed Parents.**

At the November 30 Status Conference, the Court requested the parties to agree upon a baseline of the total number of parents who were removed following separation from their children, so as to provide the Court with a complete accounting of the reunification process.  The Steering Committee continues to meet and confer with the government to clarify the bases on which children and parents have been removed from the government's lists so as to reach an agreed-upon baseline for future reporting purposes.

## III.   _MMM_ Plaintiffs' Report Regarding Settlement Implementation

### A. General Status of Implementation

The settlement agreement has largely been implemented with respect to reunified class members detained at family residential centers.  Plaintiffs understand that the agreement has been implemented as to all or nearly all reunified class members detained at family residential centers at the time the agreement was reached, and it continues to be implemented as new families are reunified and brought to the family residential centers.   Plaintiffs continue to provide the government with signed election forms as they are received from class members (detained and released).  The parties are working together on implementation for non-reunified parents in detention and for released families.

The parties have also been discussing a process for determining class membership for individuals who request interviews, for situations where there may be uncertainty about whether the individual is covered by the settlement. Class Counsel have submitted requests for interviews on behalf of a number of individuals who the Government believes are not class members. The parties have discussed and agreed that the Government will report back to Class Counsel on individuals who request interviews but where the Government takes the position that they are not class members. The Government has provided information to Class Counsel on an initial list of such individuals, and Class Counsel are following up to determine whether the parties are in agreement, whether Class Counsel has different information, and/or whether the parties should meet and confer on any individual cases. Class Counsel understand that this process will continue for other individuals.

**B. Categories for Ongoing Reporting**

The parties have not reached an agreement on the categories of information to be reported on an ongoing basis with respect to settlement implementation. In addition to the categories the government reported in the last joint status report, Plaintiffs request that the government be required to report the following pieces of information on an ongoing basis at this time:[7]

---

[7] Plaintiffs reserve the right to seek additional reporting if any additional considerations come to light as implementation progresses.

(1) The results of interviews provided to class members pursuant to the settlement agreement;

(2) The number of class members who have been returned to their country of origin as a result of waiving the settlement procedures; and

(3) Information regarding settlement class members who have *not* submitted executed waiver forms, including:

    (a) The number of interviews provided to such class members;
    (b) The results of those interviews

Each of these categories goes to basic transparency about how the agreement is being implemented.  And none of them seem particularly burdensome to compile and report.  Remarkably, however, the government has not agreed to report any of the above categories.  During meet and confers, the government claimed that categories (1) and (2) do not need to be reported because the government does not owe class members any particular duty with respect to the interview results or following through on waiver requests.  That is, the government asserts that once the government has provided an interview, or once it has recorded a waiver, its obligations under the settlement agreement have been fulfilled.

The government's position is inconsistent with the steps required for implementation of the settlement.  The interviews that have been provided to class members have been provided pursuant to the settlement agreement, and are part and parcel of settlement implementation.  The agreement obligates the government to conduct these interviews "in good faith."  *See, e.g.*, *M.M.M. v. Sessions*, 3:18-cv-

1832, ECF No. 95, Ex. 1 (Settlement Agreement) Paragraph 1(d).  Reporting on the results of the interviews provide insight into whether the government is upholding that obligation.  Additionally, the result of the interviews matters to the mechanics of implementation.  If a parent's interview remains negative, then the government is obligated to interview the child.  *Id.*  And if either the parent's or the child's results in a positive credible fear determination, then the government is obligated to issue the family a Notice to Appear in immigration court.  Settlement Agreement, Paragraph 2.  Thus, the government's obligations with respect to implementation do not end once it has provided an interview.  Even more fundamentally, Plaintiffs advocated for these interviews in the settlement because the government was required to provide them in the first place.  The results of the interviews make a significant difference in the lives of class members, and the Court, the public, and Class Counsel deserve to know what they are.  The government is in the best position to know what those results are in the aggregate, and it should thus be required to report them.

Likewise, the government's obligations regarding waivers under the agreement do not end once the government has recorded a class member's waiver.  A waiver requires the government to "promptly" return to the class member to his or her country of origin.  Settlement Agreement, Paragraph 8.  Again, this is a straightforward matter of transparency.  Reporting on the number of waiving class

members who have been returned as of the status report will provide insight into whether and the extent to which the government is holding up its end of the bargain. The parties' recent dealings illustrate the need for transparency.  Indeed, Plaintiffs recently had to press the government about a number of class members who they were told remained in detention for several weeks after providing their waiver forms. Class counsel only became aware of the delay because of individual complaints from local counsel who represented the waiving class members.  Class counsel, the Court, and the public should not have to rely on individual complaints to ensure that the government is implementing the agreement consistent with its promises.  Reporting will reduce the reliance on those complaints.

Finally, as explained in the prior status report, the government's reporting should not be limited to individuals who have submitted election forms.  The agreement makes clear that submitting a waiver form is necessary to *waive* the settlement procedures.  Settlement Agreement, Paragraph 8.  But nothing in the settlement agreement requires class members to affirmatively *opt in* to those procedures.[8]  The agreement states that, for certain class members, USCIS "will" conduct a good faith review of the parent's credible fear finding.  Indeed, the agreement requires USCIS provide this review "sua sponte."  *See, e.g.*, Paragraph

---

[8] The form was designed to record a waiver.  The alternative option available on the form – remain in the United States to seek relief from removal – was included so that class members would understand that waiver was not the *only* option available to them and would not sign the form in error.

1(d).  And the waiver form itself – which the government agreed to – states that "Failure to return this form will not be construed as a waiver of your rights under the Settlement Agreement."  *See M.M.M. v. Sessions*, 3:18-cv-1832, ECF No. 73-1 at 3. Accordingly, the government is obligated to provide the settlement procedures to qualifying class members, regardless of whether they have submitted any form. Given this obligation, the number of interviews provided to class members who have not executed forms, and the results of those interviews, should be reflected in the ongoing reporting.  Class counsel would not have any contact with class members who do not provide executed forms, and therefore must rely on the government to report this information.

In light of the foregoing, the Plaintiffs respectfully ask the Court to require reporting of the foregoing categories by the government, on an ongoing basis, so that the Court, the public, and class counsel have a complete view of how the settlement is being implemented.

## C. Status of Meet and Confers Regarding Legal Service Provider Objections

### 1.  Children with Voluntary Departure Orders

The government and Catholic Charities appear to have made progress on this issue and continue to work towards final resolution.  The parties and/or Catholic Charities will provide an update on this issue in the next joint status report.

### 2.  Clarification of Paragraph 1(a) of the Settlement

The first sentence of Paragraph 1(a) of the settlement agreement reads as follows: "*Ms. L* class members and *M.M.M.* agreed class members who are not currently detained in DHS custody (and are not currently in HHS custody) and who have been issued Notices to Appear (NTAs) will not be removed by DHS prior to issuance of a final removal order in their resulting removal proceedings conducted under Section 240 of the Immigration and Nationality Act (INA)."  Catholic Charities requested clarification on the meaning of this term.

The parties and Catholic Charities have conferred regarding Paragraph 1(a) and offer the following clarification.  Due to the various circumstances that could be present, clarification is offered through a variety of hypotheticals.[9]

Hypothetical #1: A parent and child are reunited in the community.  The child was issued an NTA while in shelter.  The parent was not issued an NTA because the parent was released for reunification before having a credible fear interview.  Does the child remain in Section 240 proceedings?

Clarification #1: Yes.

---

[9] The parties are currently discussing a separate clarification that arose during the course of communications regarding the meaning of Paragraph 1(a).  If appropriate, Plaintiffs will report on the result of those discussions in the next status report.

Hypothetical #2: A parent and child are reunited in the community.  The child was issued an NTA while in shelter.  The parent was not issued an NTA because the parent failed a credible fear interview and has not yet had the adverse determination reviewed under the settlement procedures.  Does the child remain in Section 240 proceedings?

Clarification #2: No.  The parent would have the adverse credible fear determination reviewed pursuant to Paragraph 1(d) of the settlement agreement.  The child would be reprocessed for expedited removal so that the child can be interviewed with the parent and treated as the parent's dependent.  If credible fear is found for either the parent or the child, both would be placed in 240 proceedings.

Hypothetical #3: A parent and child are reunited in the community.  The child was issued an NTA while in shelter.  The parent was not issued an NTA because the parent failed a credible fear interview, but the parent has appealed the negative credible fear determination to an immigration judge.  Does the child remain in Section 240 proceedings?

Clarification #3: Yes.  If the parent's negative credible fear determination is pending review by an immigration judge then the parent does not yet have a final expedited removal order and Paragraph 1(d) of the settlement does not apply.  The child would remain in section 240 proceedings.  If the parent's negative credible fear determination is affirmed by the immigration judge following

reunification, the child would remain in section 240 proceedings (Paragraph 1(d) would not apply because the expedited removal order was not final prior to reunification). If the parent subsequently seeks review of the negative credible fear finding under the settlement agreement, then Paragraph 1(d) would apply as described above.

Hypothetical #4: A parent and child are reunited in the community. The child was issued an NTA while in shelter. The parent was issued an NTA after passing a credible fear interview in an initial determination or redetermination under the settlement or on review by an immigration judge. Would both parent and child stay in 240 proceedings?

Clarification #4: Yes.

DATED: December 12, 2018          Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Nicole N. Murley*
NICOLE MURLEY
Trial Attorney
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*