Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al.,<br><br>   *Petitioners-Plaintiffs*,<br><br> v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>   *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: January 25, 2019<br><br>**PLAINTIFFS' MOTION TO REQUIRE RESPONSE TO IG REPORT AND RE-START BRIEFING SCHEDULE**<br><br>NO HEARING DATE |

Plaintiffs write to notify the Court of the possibility of "thousands" of family separations beyond those the government identified in the *Ms. L* litigation, according to a report from the Office of the Inspector General at the U.S. Department of Health and Human Services issued on January 17.  The report, attached as Exhibit A, explains that although it is likely that the Government separated thousands more families than it previously reported, a more precise estimate is not possible because the government did not record information about numerous separations and thus has not accounted for all children it took from their parents.

In light of this information, as well as other findings in the report directly relevant to the enforcement of the preliminary injunction, Plaintiffs request that the Court (1) order the government to respond to the report's findings within 7 days, and (2) to re-start the briefing — and require the government to file its responsive brief within ten days — on the issue of whether the *Ms. L* injunction applies to children separated and released from ORR custody before June 26, 2018, the date this Court issued its injunction.

As the Court is aware, Plaintiffs have a pending a motion seeking to clarify that the *Ms. L* injunction and class includes parents whose separated children were released from ORR custody before June 26, 2018.  Dkt. 335.[1]  At the time Plaintiffs

---

[1] The Motion was filed Dec. 14.  The government's response is stayed as part of the Court's order on Dec. 27, Dkt. 340, staying all deadlines in this case due to the partial government shutdown.

filed this motion, we did not have any reason to believe that the number of families in this category was substantial, and negotiated a stay of removal with the government for the 9 cases of which we were aware.  The report estimates that this group numbers in the thousands, based on interviews with officials from ORR, and from the Office of the Assistant Secretary for Preparedness and Response ("ASPR"), which led the government's reunification efforts.

Without a full accounting of which children were separated from parents and released from ORR care before June 26, neither Plaintiffs nor the Court has any way of knowing whether there are parents who were deported without their children, or who remain in immigration detention without their children.  The report thus raises serious concerns at the heart of Plaintiffs' pending motion for clarification of the Class definition, and makes that motion even more urgent.

In addition, the report, and its included response from the Administration for Children and Families, raises concerns with the implementation of the injunction for those children who were in ORR care <u>on or after</u> June 26, including:

- Even as ORR certified to the Court a list of 2,654 potential separations in July, "some ASPR staff believed that between 50 and 100 additional children should have been included"; the ASPR team "made an internal decision to accept ORR's certification" and to "cease efforts to confirm the number of separations" and instead focus only on the 2,654 separations the government had disclosed;

- At least 218 children have been separated from their parents since the Court's June 26 order; the youngest was under 1;

18cv0428

1
2
3

- When these new separations occur, DHS is often providing insufficient information to ORR for the reason for the separation, thus hampering ORR's ability to decide whether a child can be reunified with their parent;

4
5
6
7

- Some new separations appear to be clearly contrary to the Court's preliminary injunction, according to a breakdown of a subset of 118 separations after the Court's June 26 order: this includes separations on the basis of "immigration history only."

8
9
10
11
12
13
14
15
16

In short, the report casts serious doubt on the accuracy of the government's accounting of separations. It also indicates that there are numerous separated parents who have been denied their rights under the preliminary injunction.  These concerns are underscored by the Government's recent revelation in its last status report that it had recently identified 149 parents who should have been included in the spreadsheets provided to Plaintiffs because the separated child remained in ORR custody on June 26.  Dkt. 334.

17
18
19
20
21
22
23

Accordingly, Plaintiffs respectfully request that the Court (1) order the government to respond to the report's findings within 7 days, and (2) re-start the briefing on the issue of whether the *Ms. L* injunction applies to children separated and released from ORR custody before June 26, 2018 — with Defendants' response to Plaintiffs' Motion (Dkt. 335) due within ten days.

24
25
26
27
28

1   Dated: January 25, 2019        Respectfully Submitted,

2                      */s/ Lee Gelernt*

3   Bardis Vakili (SBN 247783)      Lee Gelernt*
    ACLU FOUNDATION OF SAN     Judy Rabinovitz*

4   DIEGO & IMPERIAL COUNTIES  Anand Balakrishnan*

5   P.O. Box 87131             Daniel Galindo (SBN 292854)
    San Diego, CA 92138-7131     AMERICAN CIVIL LIBERTIES

6   T: (619) 398-4485          UNION FOUNDATION

7   F: (619) 232-0036          IMMIGRANTS' RIGHTS PROJECT
    *bvakili@aclusandiego.org*     125 Broad St., 18th Floor

8                       New York, NY 10004

9   Spencer E. Amdur (SBN 320069)  T: (212) 549-2660
    Stephen B. Kang (SBN 292280)   F: (212) 549-2654

10  AMERICAN CIVIL LIBERTIES    *lgelernt@aclu.org*

11  UNION FOUNDATION       *jrabinovitz@aclu.org*
    IMMIGRANTS' RIGHTS PROJECT  *abalakrishnan@aclu.org*

12  39 Drumm Street          *dgalindo@aclu.org*

13  San Francisco, CA 94111

14  T:  (415) 343-1198
    F:  (415) 395-0950

15  *samdur@aclu.org*
    *skang@aclu.org*

16                     *Admitted Pro Hac Vice*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.

# EXHIBIT A

**U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES**

# OFFICE OF INSPECTOR GENERAL

## HHS OIG Issue Brief • January 2019 • OEI-BL-18-00511

# Separated Children Placed in Office of Refugee Resettlement Care

### Why OIG Did This Review

In the spring of 2018, the Department of Justice (DOJ) and Department of Homeland Security (DHS) implemented a "zero-tolerance policy" for certain immigration offenses.  As a result, DHS separated large numbers of alien families, with adults being held in Federal detention while their children were transferred to the care of the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services (HHS).

On June 26, 2018, in a class action lawsuit, *Ms. L v. U.S. Immigration and Customs Enforcement (ICE),* a Federal District Court ordered the Federal Government to identify and reunify separated families who met certain criteria.

Given the potential impact of these actions on vulnerable children and ORR operations, the Office of Inspector General (OIG) conducted this review to determine the number and status of separated children (i.e., children separated from their parent or legal guardian by DHS) who have entered ORR care, including but not limited to the subset of separated children covered by *Ms. L v. ICE.*  In a separate review, OIG is examining challenges that ORR-funded facilities have faced in reunifying separated children.  On the basis of those findings, OIG plans to recommend solutions to improve ORR program operations.

### What OIG Found

- In the summer of 2017, prior to the formal announcement of the zero-tolerance policy, ORR staff and officials observed a steep increase in the number of children who had been separated from a parent or guardian by DHS ("separated children") and subsequently referred to ORR for care.[1]  Officials estimated that ORR received and released thousands of separated children prior to a June 26, 2018, court order in *Ms. L v. ICE* that required ORR to identify and reunify certain separated children in its care as of that date.

- In July 2018, ORR certified a list of 2,654 children that ORR believed to be separated from parents who met the *Ms. L v. ICE* class definition.  ORR determined that an additional 946 children had some indication of separation in one or more data sources used to compile the certified list but did not meet all criteria for inclusion at that time.

- Between July and December 2018, ORR staff received new information indicating that some children who had been in ORR's care as of June 26, 2018, and whom ORR had not included on the certified list had, in fact, been separated from a parent.  In October and December 2018, ORR conducted formal reviews that resulted in adding 162 children to the list reported to the *Ms. L v. ICE* court; ORR

> **Key Takeaway**
>
> The total number of children separated from a parent or guardian by immigration authorities is unknown. Pursuant to a June 2018 Federal District Court order, HHS has thus far identified 2,737 children in its care at that time who were separated from their parents. However, thousands of children may have been separated during an influx that began in 2017, before the accounting required by the Court, and HHS has faced challenges in identifying separated children.

**How OIG Did This Review**

We analyzed HHS internal data and reviewed court filings and other public documents.  We also conducted multiple interviews with HHS senior leadership, agency officials, and staff.

also determined that 79 previously reported children had not actually been separated from a parent, for a new total of 2,737 separated children of class members.

- From July 1 through November 7, 2018, ORR received at least 118 children identified by DHS as separated when referring the child to ORR care.  However, DHS provided ORR with limited information about the reasons for these separations, which may impede ORR's ability to determine appropriate placements.

**What OIG Concludes**

- HHS faced significant challenges in identifying separated children, including the lack of an existing, integrated data system to track separated families across HHS and DHS and the complexity of determining which children should be considered separated.  Owing to these and other difficulties, additional children of *Ms. L v. ICE* class members were still being identified more than five months after the original court order to do so.

- It is not yet clear whether recent changes to ORR's systems and processes are sufficient to ensure consistent and accurate data about separated children, and the lack of detail in information received from DHS continues to pose challenges.

- OIG encourages continued efforts to improve communication, transparency, and accountability for the identification, care, and placement of separated children.

# BACKGROUND

Exhibit 1.  Family Separation and Reunification: Key Events

**April 2017**
Attorney General issues memorandum prioritizing prosecution of immigration offenses

**July 2017**
El Paso sector of CBP implements policies resulting in increased family separations

**February 2018**
*Ms. L v. ICE* lawsuit filed

**April 2018**
Attorney General issues memorandum instituting zero-tolerance policy

**May 2018**
Attorney General gives speech reiterating DHS and DOJ implementation of zero-tolerance policy

**June 2018**
President issues Executive Order directing DHS to detain alien families together

**June 2018**
Judge Sabraw orders Federal Government to cease certain family separations and reunite eligible families

**July 2018**
HHS certifies list of 2,654 separated children of potential class members to be reunited

**October 2018**
HHS adds 13 children to the list reported to the Court

**December 2018**
HHS adds 149 children to the list reported to the Court

*Source: OIG Analysis of Memoranda, Court Filings, and Other Public Documents, 2018*

## ORR Care of Unaccompanied Alien Children (UAC)

ORR, a Program Office of the Administration for Children and Families (ACF) within HHS, manages the UAC Program.  A UAC is a minor who has no lawful immigration status in the United States (U.S.) and does not have a parent or legal guardian in the country available to provide care and physical custody.[2]  ORR funds a network of over 100 shelters for UAC; these facilities provide housing, food, medical care, mental health services, educational services, and recreational activities.

Federal law requires the safe and timely placement of UAC in the least restrictive setting that is in the best interest of the child.[3]  ORR is also charged with identifying suitable "sponsors" living in the U.S. who can care for the child when he or she leaves ORR custody.  Most sponsors are a parent or close relative of the child.[4]  Where no appropriate sponsors are found, children remain in ORR custody and may be placed in long-term foster care, including community-based foster care or a group home.  Children who turn 18 years old while in ORR care are transferred to DHS custody.[5]  Regardless of where they are placed, UAC await judicial resolution of their immigration status.

The majority of children referred to ORR have surrendered to or been apprehended by immigration authorities while entering the U.S. without a parent or legal guardian.  However, some children are referred to ORR after being separated by DHS from a parent or legal guardian with whom the child arrived.  Historically, these separations were rare and occurred because of circumstances such as the parent's medical emergency or a determination that the parent was a threat to the child's safety.[6]  ORR is not a law enforcement agency and has no role in the decision to separate families or prosecute immigration law violations.

## Federal Policies Resulting in Family Separation

In recent years, the Department of Justice (DOJ) and DHS have taken a variety of actions to increase enforcement of immigration laws.  (See Exhibit 1.)  On April 11, 2017, the Attorney General issued a memorandum instructing Federal prosecutors to prioritize prosecution of certain immigration offenses.[7]  From July through November 2017, the El Paso sector of Customs and Border Protection (CBP), an agency within DHS, implemented new policies that resulted in 281 individuals in families being separated.[8]  On April 6, 2018, the Attorney General formally instituted a "zero-tolerance policy" for offenses under 8 U.S.C. § 1325(a), which addresses attempts by an individual who is not a U.S. citizen to enter the country at an improper time or place.[9]  The Attorney General described  this

policy in a May public speech, announcing that DHS was now referring all adults making illegal Southwest Border crossings to DOJ for prosecution and that DOJ would accept those cases.[10]

Under these policies, when a child and parent were apprehended together by immigration authorities, DHS separated the family, with the parent being placed in the custody of the U.S. Marshals Service within DOJ to await prosecution for immigration offenses.  With the detained parent unavailable to care for his or her child, the child was treated as a UAC and transferred to ORR.

In June of 2018, two actions resulted in curtailment of the zero-tolerance policy.  First, on June 20, 2018, the President issued Executive Order 13841, directing DHS to detain alien families together whenever "appropriate and consistent with the law and available resources."[11]  Second, on June 26, 2018, District Court Judge Dana Sabraw preliminarily enjoined the Federal Government from detaining parents in immigration custody without their minor children and required reunification of families already separated on that date, provided they met the Court's criteria.[12]

## Ms. L v. ICE

Judge Sabraw's June 26, 2018, order was issued in response to a class action lawsuit—*Ms. L v. ICE*—filed in February of 2018 in Federal District Court in California.  The class was defined as:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child.[13]

Parents are excluded from the class if they have a criminal history or communicable disease.

With respect to this open-ended class, the Court preliminarily enjoined DHS from continuing to separate families, subject to certain exceptions.  A preliminary injunction is a temporary order prohibiting a party from specified actions; it is intended to maintain the status quo until the issues at trial are resolved.  For those *Ms. L v. ICE* class members who were separated from their children as of the date of the ruling, Judge Sabraw ordered the Federal Government to reunify class members with their minor children in ORR custody within 14 days for children under the age of 5 and 30 days for those aged 5-17.  Reunification is not required if there is a determination that the parent is unfit or presents a danger to their child or if the parent voluntarily declines to be reunited with the child.  Parties to the lawsuit file regular joint status updates with the Court describing progress of the

reunification effort and an ongoing count of the number of possible children of potential class members who have been identified, the number of children whose parents have been found to be class members, and the number of children reunified or otherwise discharged from ORR care.[14]

## HHS Efforts to Identify and Reunify Separated Children

In June of 2018, no centralized system existed to identify, track, or connect families separated by DHS.  Compliance with the *Ms. L v. ICE* court order therefore required HHS and DHS to undertake a significant new effort to rapidly identify children in ORR care who had been separated from their parents and reunify them.  To facilitate this effort, the Office of the Assistant Secretary for Preparedness and Response (ASPR) led a reunification Incident Management Team within HHS, drawing on ASPR's experience in crisis response and data management and analysis, to assist ORR in identifying and reunifying separated children.

Under ASPR's direction, HHS coordinated closely with DHS and DOJ to develop a Tri-Department Plan, submitted to the Court on July 18, 2018, which describes ongoing processes to reunify *Ms. L v. ICE* class members with their children.  These steps include conducting and reviewing background checks of the parent, confirming parentage, assessing parental fitness and child safety, conducting a parent interview, and reuniting the family.[15]  This process, as directed by the Court, is a more streamlined version of ORR's standard procedure for vetting a sponsor for a UAC.  For example, ORR conducts background checks on all adults who will reside in a household with a UAC and requires a prospective sponsor to submit a Sponsor Care Plan.  For *Ms. L v. ICE* class members, Judge Sabraw ruled that those procedures were designed for children who had entered the U.S. unaccompanied and were unnecessarily onerous when applied to parents and children who were apprehended together but separated by Government officials.[16]

If ORR determines that a child subject to the *Ms. L v. ICE* reunification order cannot be reunified with the parent from whom he or she was separated (for example, due to parental unfitness or danger to the child), ORR follows its usual sponsorship procedures for UACs.  For all placements, ORR prioritizes parents and close relatives when selecting sponsors.

# RESULTS

**In the summer of 2017, ORR officials observed a steep increase in the number and proportion of separated children referred from DHS**

According to ORR officials and staff, in the summer of 2017, staff observed a significant increase in the number and proportion of separated children (i.e., children separated from their parent or legal guardian by DHS) relative to other UACs.  Staff had begun informally tracking separations in 2016, recognizing that additional information and effort was required to locate parents of separated children.  Although this tracking was not comprehensive, it provided adequate information to alert ORR intake staff to significant trends.  ORR officials noted that, according to this tracking, the proportion of separated children rose from approximately 0.3 percent of all UAC intakes in late 2016 to 3.6 percent by August 2017.

The increase in separated children posed operational challenges for the UAC program.  In a November 2017 email that OIG reviewed, an ORR official stated that separated children were often very young, that these younger children required placement at specially licensed facilities, and that "the numbers of these very young UAC resulting from separations has on some dates resulted in shortfalls of available beds."

Due to these operational concerns, ORR staff continued to informally track separations.  For example, staff initially recorded separated children on an Excel spreadsheet if they were identified by DHS as separated at intake; this was later replaced by a SharePoint database with greater ability to incorporate information from field staff, including reports from shelters when they identified separated children in their care.  However, use of these tools was not formalized in procedures, and access was limited.

Overall, ORR and ASPR officials estimate that thousands of separated children entered ORR care and were released prior to the June 26, 2018, court order.  Because the tracking systems in use at that time were informal and designed for operational purposes rather than retrospective reporting, ORR was unable to provide a more precise estimate or specific information about these children's placements (for example, whether the children were released to sponsors who were relatives, sponsors who were nonrelatives, foster care, etc.).  These children did not have parents covered by the court order; therefore, they were not included in the *Ms. L v. ICE* reunification process.[17]  Rather, in general, placement and release decisions would have followed the same procedures as for other UAC, i.e., ORR seeks to identify a qualified sponsor, including a parent or other close relative if one can be located and vetted in a timely way.

**In July 2018, ORR certified 2,654 children of potential *Ms. L v. ICE* class members; an additional 946 children had some indication of separation but did not meet all criteria**

In the absence of an existing, integrated HHS-DHS system to identify and track separated families, the HHS Incident Management Team leading the reunification effort took three approaches to collecting information about this population, with the goal of identifying every possible child of a *Ms. L v. ICE* class member in ORR care as of June 26, 2018.  First, an ASPR-led data team (with the support of ORR, other HHS operating and staff divisions, and DHS sub-agencies) mined more than 60 DHS and HHS databases to identify indicators of possible separation, such as an adult and child with the same last name apprehended on the same day at the same location.[18]  Additionally, ORR and other HHS staff, agency officials, and senior leadership manually reviewed case files for all of the approximately 12,000 children in ORR care at that time.  Finally, ORR asked all ORR-funded shelters to attest to any separated children that grantees reasonably believed to be in their care.  This effort resulted in an initial list of 3,600 potentially separated children, i.e., children for whom HHS found any information, in any data source reviewed, indicating that the child had been separated from a parent.

On July 11, 2018, after conducting additional reviews to resolve inconsistencies, ORR certified for the Court a list of 2,654 possible children of potential *Ms. L v. ICE* class members.[19]  However, an ASPR official explained that even as ORR certified this list, some ASPR staff believed that between 50 and 100 additional children should have been included.  At the same time, the Court's deadline for reunification was only 2 weeks away and extensive effort would be needed to comply.  On July 15, the ASPR team made an internal decision to accept ORR's certification of 2,654 children, cease efforts to confirm the number of separations, and focus on the time-sensitive task of reuniting the 2,654 children with their parents.

Overall, from the initial list of 3,600 potentially separated children, 946 were not included on the list that ORR certified in July.  Of these, approximately 300 were excluded because they had been released through normal ORR procedures between the date of the Court order (June 26, 2018) and the date that ORR certified the list (July 11, 2018).  OIG's analysis of ORR data showed that approximately 90 percent of these children were released to sponsors, who are usually close relatives.[20]

ORR officials provided 3 other reasons why children may have appeared in the initial count of 3,600 potentially separated children but not the certified list reported to the Court in July:

- Some children were apprehended with and separated from a nonparent relative, such as a grandparent or older sibling.  These children appeared on the initial list of 3,600 because CBP identified these scenarios as family unit separations.  However, the *Ms. L v. ICE* court order applies only to separations of parents from their children.

- Some children were found to have a fraudulent birth certificate or other evidence indicating that the adult with whom they were apprehended had made a fraudulent claim of parentage.

- Some children had conflicting or unclear information in their case file. These cases were elevated to the ORR Director, who made a determination, in consultation with senior ORR staff, as to whether the balance of evidence supported including the child on the certified list.

ORR was not able to provide OIG with the specific number of children excluded from the certified list for each of the above reasons.

**Between July and December 2018, ORR determined that 162 children not previously reported should be recategorized as possible children of potential *Ms. L v. ICE* class members**

In the months after the list of 2,654 children was certified in July 2018, ORR staff became aware of new information indicating that some children who were not on the list had, in fact, been separated from a parent by DHS. In October and December 2018, ORR conducted two formal reviews of subsets of children and, as a result, added 162 children to the list reported to the *Ms. L v. ICE* court. Additionally, ORR determined that 79 children previously reported to the Court had not actually been separated from a parent; accordingly, the total number of separated children of *Ms. L v. ICE* class members currently stands at 2,737.

**Between July and October 2018, ORR Staff Learned of "Fewer Than 50" Separated Children Not Included on the *Ms. L v. ICE* List.** In an October interview, ORR staff stated that since July, they had sometimes received new information indicating that some children who had been excluded from the certified list for *Ms. L v. ICE* had, in fact, been separated from a parent by DHS. For example, in some cases, children who had not previously been willing to speak about their situations became more comfortable with shelter staff and reported that they had been separated. In other cases, parents' legal representatives contacted ORR regarding children that they believed to be separated.

ORR staff stated that as a result of this new information, between July and October 2018, they had become aware of "fewer than 50" children who had been in ORR care as of June 26 and were not included on the list reported to the Court in July, but whom ORR now believed to be separated. ORR was not able to provide an exact number or list of these children, and at the time of our interview, these children had not been formally determined to be children of class members or reported in joint status updates to the Court. However, ORR staff explained, and an ASPR official reiterated, that efforts to reunite these children with their parents were pursued on a case-by-case basis.

OIG could not determine whether the 50-100 children about whose status ASPR staff had expressed concern in July (described in the previous finding) encompassed the "fewer than 50" that ORR staff said they identified, because ORR was not able to provide a list of these children.  However, an ASPR official we interviewed stated that it is likely these groups overlap.

**In October 2018, HHS Added 13 Children to the List Reported to the *Ms. L v. ICE* Court.**  On October 1, 2018, at the request of the HHS Office of the General Counsel (OGC), ASPR asked ORR to conduct an additional review of 170 children who:

- had appeared on the initial list of 3,600 potentially separated children, but not the July 11 certified list, and

- were still in ORR care as of October 2018.

ASPR, ORR, and HHS-OGC officials we spoke to cited several reasons for initiating this new review.  These included continued concerns from staff regarding the accuracy of the July 2018 list of separated children reported to the Court for *Ms. L v. ICE*, new CBP data, and the September 2018 publication of a DHS OIG report on family separations that included numbers that differed from those that HHS had reported to the Court.

Based on the October review, ORR recategorized 13 additional children as possible children of potential *Ms. L v. ICE* class members, bringing the total to 2,667.  Information about these children was first included in a joint status update to the Court on October 25, 2018.[21]  The following month, in a November 29, 2018, joint status update, HHS reported that it had determined that 79 of the 2,667 previously reported children had not, in fact, been separated from a parent.

**In December 2018, HHS Added 149 Children to the List Reported to the *Ms. L v. ICE* Court.**  On December 12, 2018, HHS reported to the Court that ORR had conducted an additional review of case management records for some children who had been in ORR's care on June 26, 2018.  According to court filings and HHS-OGC staff, the new review concerned children who:

- had appeared on the initial list of 3,600 potentially separated children but not the July or October lists reported to the Court, and

- had been released from ORR's care on or between June 26 and October 25, 2018.

Because the December 12, 2018, joint status update to the Court was filed as OIG was finalizing our report, we were unable to obtain and review any underlying data HHS relied upon in generating the update.  However, we note that the joint status update was filed approximately one week after OIG first shared with HHS our draft report on this topic, including our finding that approximately 300 potentially separated children had been discharged between the date of the Court order and the date that the *Ms. L v. ICE* list was reported to the Court (as described on page 7).

As a result of the December review, ORR determined that 149 additional children should be re-categorized as possible children of potential *Ms. L v. ICE* class members, for a new total of 2,816 children reported to the Court, of whom 2,737 had been separated from a parent.  ORR also determined that 11 of the 149 children had parents with criminal histories, which would have precluded reunification.  Of the remaining 138 children, whose parents did not have criminal histories and so may have been eligible for reunification if identified before they were discharged:

- 52 had been released to a sponsor who was a parent or legal guardian;

- 71 had been released to a sponsor who was an immediate relative, such as a sibling or grandparent;

- 9 had been released to sponsors who were distant relatives or unrelated adults;

- 5 had been discharged through voluntary departure to their country of origin; and

- 1 had turned 18 while in ORR's care, which typically results in transfer to DHS custody.

**As of December 2018, Most Separated Children of Class Members Had Been Reunified.**  On December 12, 2018, HHS reported to the Court that of the 2,816 possible children of potential *Ms. L v. ICE* class members (including 79 whom HHS ultimately determined not to have been separated), 2,131 children had been reunified with a separated parent, and 526 children had been released under other circumstances, typically to a sponsor.  Another 159 children remained in ORR care.  Of these 159 children in care, 8 were categorized as children of class members and proceeding towards reunification or other appropriate discharge.  ORR determined that the other 151 children in care were either not, in fact, children of class members or were otherwise not eligible for reunification.  Specifically:

- for 95 children, the parent declined to be reunified;

- for 28 children, ORR determined that the child had not been separated from a parent by DHS; and

- for 28 children, ORR determined that the parent was unfit or posed a danger to the child.

For these 151 children, ORR is pursuing placement through its usual sponsorship procedures for UAC.  (See Exhibit 2 on page 11.)

Exhibit 2.  Status of Children Included in *Ms. L v. ICE* Court Filings as of December 2018



♦ *Includes 2,737 children separated from a parent and 79 children whom HHS has determined were not separated from a parent.  As of December 2018, HHS continues to report to the Court on the status of all 2,816 children.*
\*Includes children released to sponsors or remanded to DHS custody after turning 18.*
†*Includes children found to have entered the U.S. unaccompanied, separated from a nonparent relative, or otherwise determined not to have been separated from a parent.*
Source: OIG Analysis of *Ms. L v. ICE Court Filings, 2018*

**From July 1 through November 7, 2018, ORR received at least 118 newly separated children; DHS has provided ORR with limited information about the reasons for these separations**

According to ORR tracking documents that we reviewed, ORR received at least 118 children separated by DHS and referred to ORR care from July 1 through November 7, 2018.  This number includes only children identified by DHS as separated at the time the child was transferred to ORR care.

The proportion of separated children increased steadily from 0.47 percent in July 2018 to 0.91 percent in the first week of November 2018.  (See Exhibit 3 on page 12.)  Overall, 0.69 percent of all ORR intakes from July 1 through November 7, 2018, were separated children.  This is more than twice the rate that ORR observed in 2016, but far lower than the peak of the zero-tolerance policy.

The newly separated children ranged in age from under 1 year old to 17 years old.  Of the 118 children, 82 were under the age of 13 when transferred to ORR care, including 27 who were under the age of 5.

As previously noted, DHS sometimes separates children from parents for the child's safety and well-being, such as when the parent is found to pose a danger to the child or cannot care for the child because of illness or injury.  Based on our review of ORR tracking data, DHS reported to ORR that 65 of the 118 children were separated because the parent had a criminal history.  In some cases, DHS did not provide ORR with details about the nature of the criminal history.  Other reasons DHS provided to explain the family separation included the parent's gang affiliation (18 children), illness or hospitalization (13 children), immigration history only (3 children), or other factors (19 children), such as a parent presenting a fraudulent passport or an

adult claiming to be a legal guardian without proof; in some cases, little detail was provided.[22]  The reason for separation is pertinent to *Ms. L v. ICE*, because the June 26, 2018, Court order preliminarily enjoined separations of parents from minor children except for specific reasons.

Exhibit 3.  Separated Children Referred from DHS to ORR, July 1–November 7, 2018

| Month | All Children Entering ORR Care | Number of Newly* Separated Children | Proportion of Separated Children |
|---|---|---|---|
| July | 3,864 | 18 | 0.47% |
| August | 3,773 | 25 | 0.66% |
| September | 4,059 | 29 | 0.71% |
| October | 4,339 | 36 | 0.83% |
| November 1–7 | 1,104 | 10 | 0.91% |
| Total | 17,139 | 118 | 0.69% |

* Indicates children separated by DHS and referred to ORR care from July 1 through November 7, 2018.
Source:  OIG Analysis of ORR Data, 2018

Incomplete or inaccurate information about the reason for separation, and a parent's criminal history in particular, may impede ORR's ability to determine the appropriate placement for a child.  When a proposed sponsor (including a parent) has a criminal history, ORR policy is to evaluate the severity and type of crime and the length of time that has passed since the criminal act, along with any mitigating factors.  ORR officials and staff noted that from a child welfare perspective, not all criminal history rises to a level that would preclude a child from being placed with his or her parent. ORR officials stated that when DHS provided insufficiently detailed explanations for a child's separation, ORR staff would contact DHS for followup information.  However, the spreadsheet we reviewed indicated that DHS did not always respond to these requests for followup information.

ORR staff noted that although the spreadsheet OIG reviewed included only separations reported by DHS, ORR's tracking procedures have evolved to incorporate information from other sources.  In July 2018, ORR modified its online case management system to include an indicator that staff can use to record that a child was separated, regardless of whether that information came from DHS or was reported by a facility caring for the child.  ORR staff stated that from November 2018 onward, the tracking spreadsheet would include all children with the separation indicator.

# CONCLUSION

The total number and current status of all children separated from their parents or guardians by DHS and referred to ORR's care is unknown.  As a result of the *Ms. L v. ICE* lawsuit, there has been an extensive public accounting of the status of 2,737 separated children whose parents meet the class definition for this litigation.  HHS devoted considerable resources to this effort but faced significant challenges in identifying separated children, including the lack of an existing, integrated data system to track separated families across HHS and DHS and the complexity of determining which children should be considered separated.  Owing to these and other difficulties, additional children of *Ms. L v. ICE* class members were still being identified more than five months after the original court order to do so.

There is even less visibility for separated children who fall outside the court case.  The Court did not require HHS to determine the number, identity, or status of an estimated thousands of children whom DHS separated during an influx that began in 2017 and whom ORR released prior to *Ms. L v. ICE*. Additionally, efforts to identify and assess more recent separations may be hampered by incomplete information.

ORR staff and officials cited efforts to improve tracking of separated children, such as modifying ORR's online case management system to more easily identify such children and creating a consolidated spreadsheet to track separated children.  Maintaining accurate and comprehensive information about separated children would improve ORR's ability to monitor for future influxes and to ensure the most appropriate placement for these particularly vulnerable children.  However, it is not yet clear whether ORR's recent changes are sufficient to ensure consistent and accurate data about separated children, and the lack of detail in information received from DHS continues to pose challenges.  OIG encourages continued efforts to improve communication, transparency, and accountability for the identification, care, and placement of separated children.

OIG is conducting a review to explore challenges that ORR-funded facilities have faced in reunifying separated children.  On the basis of those findings, OIG plans to recommend solutions to improve program operations.  In addition, OIG is engaged in multiple reviews to assess the care and well-being of children residing in ORR-funded facilities.  Future work will address facilities' efforts to protect all children in their care from harm and to provide needed physical and mental health services, including efforts to address trauma.

## Agency Comments and OIG Response

In its comments on OIG's draft report, ACF stated that it generally agrees with OIG's findings regarding the number of separated children that HHS reported to the court in *Ms. L v. ICE*. ACF asserted that HHS has now identified all separated children who were in ORR care when the *Ms. L* court issued its preliminary injunction and whose parents are potential *Ms. L* class members. OIG notes that HHS has revised this number several times since the initial certification to the Court in July, most recently adding 149 children in December 2018.

ACF noted that the scope of OIG's review was broader than the subset of separated children covered by *Ms. L v. ICE* and stated that statutes governing ORR operations do not define or require ORR to track separated children. ACF also stated that the Court has never instructed ORR to determine the number of separated children whom ORR received and discharged before the June 26, 2018, Court order.

ACF stated that ORR's processes for identifying and tracking newly separated children "are effective and continuing to improve," citing changes to ORR's online case management system and its case management process. In particular, ACF stated that ICE and CBP staff can now directly enter information about a child into ORR's online case management system when referring the child to ORR, including marking a "checkbox" to indicate that a child has been separated.

ACF also provided updated information regarding the number of newly separated children. Specifically, ACF stated that as of December 26, 2018, ORR has identified a total of 218 children who were separated by DHS and transferred to ORR care after June 26, 2018. OIG notes that this number is significantly higher than the 118 separated children listed in the tracking documents we reviewed for the period of July 1 through November 7, 2018.

In response to OIG's finding that DHS has provided ORR with limited information regarding the reasons for family separations, ACF offered comments with respect to family separations attributed to parental criminal history. Specifically, ACF cited the *Ms. L* court's determination that parents with criminal history are not entitled to reunification and stated that ACF defers to and accepts DHS's attestations of criminal history. ACF also stated that in cases in which DHS initially omitted confirmation of parental criminal history, DHS has provided confirmation upon request. ACF did not describe the level of detail that DHS has provided in these instances, and OIG notes that the tracking documents we reviewed in November 2018 included multiple cases in which DHS had not responded to ORR intake staff requests for additional information about a child's separation. We further note that the utility of criminal history information is not limited to meeting the requirements of *Ms. L v. ICE*. ORR's policy for assessing potential sponsors includes evaluating the severity and type of any criminal history; sufficient

detail about criminal history is therefore necessary to inform placement decisions.

ACF concluded by stating that the Agency agrees with OIG that continued efforts to improve communication, transparency, and accountability for the identification, care, and placement of separated children are warranted. OIG will continue to monitor ORR operations and conduct future reviews as appropriate.  (See Appendix A for the full text of ACF's comments.)

# METHODOLOGY

We reviewed data compiled by ASPR and ORR in August, September, and November 2018 to facilitate the reunification effort, as well as followup data produced by those agencies in response to OIG requests. We analyzed these data to identify the numbers of children with certain characteristics (for example, discharge date, type of release, and inclusion on the list of children reported to the Court for *Ms. L v. ICE*).

We reviewed ORR tracking data for children identified by DHS as separated and transferred to ORR care from July 1 through November 7, 2018, including information that DHS provided to ORR regarding reasons for family separation. We analyzed these data to determine the number of separated children recorded by ORR and the primary reasons DHS provided ORR to explain the separations.

Between September and December 2018, we conducted multiple interviews with ASPR, ORR, and HHS-OGC officials and staff, and with HHS senior leadership. We conducted qualitative analysis of these interviews to identify key issues and events and to clarify our understanding of the data that HHS provided.

We reviewed public documents regarding the reunification effort, including legal documents filed for *Ms. L v. ICE* from March through December 2018, congressional testimony by HHS and DHS officials, and relevant reports issued by DHS-OIG and GAO.

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# APPENDIX A

## COMMENTS FROM THE ADMINISTRATION FOR CHILDREN AND FAMILIES



**ADMINISTRATION FOR**
**CHILDREN & FAMILIES**
**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, DC 20201 | www.acf.hhs.gov

January 3, 2019

Ms. Ann Maxwell
Assistant Inspector General for Evaluation and Inspections
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dear Ms. Maxwell:

I am writing to thank the Office of Inspector General (OIG) for its work on the report entitled *Separated Children Placed in ORR Care* (OEI-BL-18-00511), and to submit the formal response of the Administration for Children and Families (ACF) to the report.

ACF is committed to the accurate and transparent reporting of data on the programs operated by the Office of Refugee Resettlement (ORR). For that reason, ACF welcomed the opportunity to cooperate with OIG's investigation into the number of alien children who the U.S. Department of Homeland Security (DHS) has separated and transferred to ORR care. ACF also appreciated OIG's willingness to consider ACF's prior technical comments on the report.

ACF generally agrees with OIG's findings regarding the number of separated children which the U.S. Department of Health and Human Services (HHS) reported to the Court in *Ms. L. v. ICE*, No. 18-0428 (S.D.Cal.). Nevertheless, ACF believes that further explanation of the differences between OIG's investigation and HHS' reporting in *Ms. L.* may enhance the public's understanding of OIG's findings. Further explanation of ORR's new processes for newly-separated children may likewise help the public to understand the effectiveness of those processes. ACF's views on these three issues are detailed below.

1. HHS has reported all separated children who were in ORR care when the *Ms. L.* Court issued its preliminary injunction, and whose parents are potential *Ms. L.* class members

In its report, OIG discusses the federal policies that have resulted in family separation, and the procedural history of *Ms. L. v. ICE*. OIG then makes findings regarding the number of separated children which HHS reported to the *Ms. L.* Court.

ACF generally agrees with OIG that:

- ORR "is not a law enforcement agency and has no role in the decision to separate families or prosecute immigration law violations." Rather, ORR is "a Program Office of [ACF]" that "funds a network of over 100 shelters for [Unaccompanied Alien Children (UACs)]," which in turn "provide housing, food, medical care, mental health services, educational services, and recreational activities" to UACs.

Page 2 – Maxwell

- On June 26, 2018, the *Ms. L.* Court "preliminarily enjoined the Federal Government from detaining parents in immigration custody without their minor children and required reunification of families already separated on that date, provided they met the Court's criteria." The Court set forth its criteria in its class definition: "'All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child.'" Parents with criminal histories or communicable diseases are outside the class.

- To comply, HHS had "to undertake a significant new effort to rapidly identify children in ORR care who had been separated from their parents and reunify them."

- The HHS Incident Management Team (IMT) staffed by the Office of the Assistant Secretary for Preparedness and Response (ASPR) and ORR spearheaded the new effort for HHS. The IMT had "the goal of identifying every possible child of a *Ms. L. v. ICE* class member in ORR care as of June 26, 2018." To that end, the IMT conducted a rigorous review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed: ORR case management records for every child in ORR care; sworn testimony from each ORR grantee on the separated children at the grantee's shelters; and dozens of data sets from DHS.

- In July 2018, the IMT completed its review and HHS reported 2,654 possible children of potential class members to the *Ms. L.* Court.[1]

- ORR continued caring for the other children who were in ORR custody as of June 26, 2018. In September 2018, the IMT began a second record review of all such children who still remained in ORR care to determine whether HHS should re-categorize any of them as possible children of potential class members. The second record review looked at new information about the children that ORR had received from ORR shelters and DHS through ordinary program operations.

- On October 25, 2018, HHS reported to the *Ms. L.* Court that it was re-categorizing 13 of the children in the second record review as possible children of potential class members. This increased the total number of possible children of potential class members to 2,667.

- The *Ms. L.* Court indicated that it wanted ORR to provide updated, final numbers of separated children. So ORR conducted a third record review to determine whether any of the children in ORR care as of June 26, 2018 who were not previously identified as possible children of potential class members, and who were discharged to sponsors before October 25, 2018, should be re-categorized. The third record review looked at new information about the children that ORR had received from ORR shelters and DHS through ordinary program operations before discharge.

---

[1] The ASFR and ORR career staffs maintain that this number was certified internally on July 10, 2018.

Page 3 – Maxwell

- On December 12, 2018, HHS reported to the *Ms. L.* Court that it was re-categorizing 149 of the discharged children in the third record review as possible children of potential class members. This increased the total number of possible children of potential class members to 2,816.

During the course of the Ms. L. litigation, HHS has determined that some children categorized as possible children of potential class members were not separated from parents.  HHS reported to the Ms. L. Court on November 29, 2018 that the total number of such children is 79.[2]  Thus, 2,737 of the 2,816 possible children of potential class members were separated from parents.

HHS' data reporting to the *Ms. L.* Court has now accounted for all separated children who were in ORR care as of June 26, 2018, and whose parents are potential *Ms. L.* class members.  That is, HHS has accounted publicly for all children who were separated from a parent at the border by DHS, and who were in ORR care as of June 26, 2018, regardless of whether they are still in ORR care or have been reunified with their parent or otherwise appropriately discharged.

ACF agrees with OIG that "HHS has faced challenges in identifying separated children."  The "significant new effort" undertaken by HHS was complex, fast-moving, and resource-intensive. OIG's report provides a window into the herculean work of the HHS career staff to "rapidly identify children in ORR care who had been separated from their parents and reunify them."  ACF greatly appreciates the career staff's work in response to the challenges noted by OIG.

In addition, ACF is pleased that OIG's report identifies *no evidence whatsoever* suggesting that ORR lost track of children in its care.  OIG's report corroborates what HHS has said all along: HHS can determine the location and status of any child in ORR care at any time by accessing the case management records for the child on the ORR online portal.

2. The scope of OIG's investigation is broader than HHS' reporting to the *Ms. L.* Court

OIG indicated in its report that it investigated a larger population of children than HHS reported to the *Ms. L.* Court.  OIG Report at page 1 ("OIG conducted this review to determine the number and status of separated children (i.e., children separated from their parent or legal guardian by DHS) who have entered ORR care, including but not limited to the subset of separated children covered by *Ms. L. v. ICE*").  ACF understands that OIG looked at children who DHS separated from a parent or legal guardian at any time, regardless of whether the separation occurred at the border, and regardless of whether (or when) ORR discharged the child.

The scope of OIG's investigation is important for the public to understand because the Trafficking Victims Protection Reauthorization Action (TVPRA)—which governs ORR operations—does not define the term "separated children."  Nor does it set forth a statutory requirement to track the number of children who DHS separates from a putative parent or guardian and transfers to ORR.

The Court in *Ms. L. v. ICE* did not define the term "separated children" either.  As discussed above, the Court defined the *Ms. L.* class to include parents whose children were separated by DHS at the border and were in ORR care as of June 26, 2018.  After class certification, ORR reported the

---

[2] Subsequent court filings reported that smaller numbers of such children were in ORR care at the times of those filings due to discharges.

Page 4 – Maxwell

number of possible children of potential class members to the *Ms. L.* Court, as well as the results of ORR's analyses of class membership, and completed reunifications and other appropriate discharges. The *Ms. L* Court has never instructed ORR to determine the number of children who DHS separated and ORR discharged before June 26, 2018. Nor has ORR tried to make such a determination, as ORR has only limited resources, and counting prior DHS separations would take away from ORR's primary focus on caring for the children currently in ORR care and promptly discharging them to appropriate sponsors.

Moreover, even if ORR were to invest a substantial part of its limited resources in a count of prior DHS separations, the count would not fulfill any current operational needs or enable HHS to provide any form of relief to discharged children. ORR's custodial authority over a child ends when ORR discharges the child to a sponsor. ORR does not have authority over the sponsor either. Even if ORR did have such authority, most sponsors are parents, legal guardians, or close family members. Any intervention by ORR after discharge would run the risk of disrupting the child's home environment, which is not a recommended child welfare practice.

For these reasons, ACF is pleased that OIG has not recommended that ORR devote its limited resources to conducting a count of prior DHS separations.

3. ORR's processes for newly-separated children are effective and continuing to improve.

Historically, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) have been responsible for most referrals of UACs to ORR. CBP's database has pushed referral information on UACs directly into the ORR portal's referral page. ICE has had access to the referral page, and has directly entered UAC information into it.

As OIG notes in its report, ORR has now added a checkbox to the ORR portal's referral page so that the referring DHS sub-agency can indicate whether a child has been separated from a putative adult family member. And the referral page now has a "notes" section where CBP and ICE can type in the name and other information of the separated adult, including their alien number. CBP and ICE can also enter this information into the parent/relative information section of the referral. These new features enable ORR to identify potentially separated children promptly upon referral from DHS.

To help ensure that all potentially separated children are identified promptly, ORR has also modified its case management process. The case managers at ORR care provider facilities are now using interviews of children during the admissions and case assessment process to look for any indicators of potential separation. If the case manager finds such indicators during the interview—or at any time thereafter in the case management process—they may now flag the potential separation in the ORR portal using a checkbox. The upshot is that potential separations are captured in the ORR portal in the ordinary course of program operations, regardless of whether DHS or HHS has the information about the potential separation.

As OIG also notes, ORR now has data personnel responsible for consolidating and tracking the individualized information on potentially separated children that resides in the ORR portal. In addition, ORR receives weekly data from ICE on potential *Ms. L.* class members who are in ICE custody and who have children in ORR care. ORR reviews this data together with the consolidated

Page 5 – Maxwell

tracking information from the ORR portal when analyzing whether the criteria for class membership and reunification in *Ms. L* are met.

In its report, OIG raises concerns about the parental criminal history information that DHS provides to ORR. At present, such information is not an operational constraint for ORR because the *Ms. L.* Court has stated that "the class of parents entitled to reunification with their children pursuant to this Court's orders does not include parents with criminal history." Order on Reunification of Ms. Q and Mr. C., *Ms. L. v. ICE*, No. 18-0428 (S.D. Cal. Sept. 18, 2018), ECF No. 236. So long as DHS attests that the parent has criminal history, ORR defers to DHS' law enforcement judgment. When DHS has omitted confirmation of the parent's criminal history in its referral, DHS has provided ORR with such confirmation upon request.

As of December 26, 2018, ORR has identified 218 children who were separated by DHS and transferred to ORR care after June 26, 2018. One hundred fifty-three of the 218 children are in ORR custody, while ORR has appropriately discharged 65.

ACF believes that ORR's new processes and operations are compliant with the *Ms. L.* Court's orders. Nevertheless, ACF agrees with OIG that "continued efforts to improve communication, transparency, and accountability for the identification care, and placement of separated children" are always warranted. ORR will continue to look for opportunities to improve inter-departmental data-sharing and operations with DHS.

***

Thank you again for OIG's thorough investigation and reporting on this important issue. Please direct any follow-up inquires to Scott Logan in our Office of Legislative Affairs and Budget at (202) 401-4529.

Sincerely,

*Lynn A. Johnson*

Lynn A. Johnson
Assistant Secretary
 for Children and Families

# ACKNOWLEDGMENTS

Louise Schoggen, Assistant Regional Inspector General in the Baltimore regional office, served as the team leader for this study.  Others in the Office of Evaluation and Inspections who conducted the study include Bahar Adili, Heather Barton, Michael Kvassay, Seta Hovagimian, and Brianna So.

We would also like to acknowledge the contributions of other Office of Inspector General staff, including Laura Canfield, Blaine Collins, Abigail Cummings, Amitava Mazumdar, Diana Merelman, Mike Novello, Lyndsay Patty, and Jessica Swanstrom.

This report was prepared under the direction of David Tawes, Regional Inspector General for Evaluation and Inspections.

To obtain additional information concerning this report or to obtain copies, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.

# ENDNOTES

[1] The term "separated children" is not defined in Federal law, and no law stipulates when a family separation must occur.  Because there is no fixed legal definition, OIG cannot be certain that the term was used identically by all individuals we interviewed and in all documents we reviewed.  We were advised that, in practice, ORR uses the term to mean children who are separated from a parent or legal guardian.  The *Ms. L. v. ICE* class is narrower, applying only to children separated from a parent who meets the class definition.  Where possible, we have specified the scope of the term as we use it throughout the report.

[2] 6 U.S.C. § 279(g)(2).

[3] 8 U.S.C. § 1232(c).

[4] *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan. 17, 1997).  This Stipulated Settlement Agreement sets out an order of priority for sponsors with whom children should be placed.  The first preference is for placement with a parent, followed by a child's legal guardian, then other adult relatives.

[5] 6 U.S.C. § 279(g)(2), in part, defines UAC as a child who "has not attained 18 years of age."  *Also see,* Office of Refugee Resettlement, *ORR Guide:  Children Entering the United States Unaccompanied*, Introduction.  Accessed at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied on November 18, 2018.

[6] No statute dictates the circumstances under which families must be separated upon apprehension by immigration authorities, and no historical records of the number or cause of family separations exist.  However, the Government Accountability Office (GAO) reports that Border Patrol officials stated that some family separations not related to prosecutions of violations of 8 U.S.C. § 1325(a) have always occurred, such as in cases in which the parent could be a threat to the health and safety of the child or the adult may not be the child's parent.  (See GAO, *Unaccompanied Children:  Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163, October 9, 2018, p. 13.  Accessed at https://www.gao.gov/assets/700/694918.pdf on November 18, 2018.)  ORR staff we interviewed confirmed that historically, ORR had received small numbers of separated children, citing reasons such as the parent experiencing a medical problem that precluded caring for their child.

[7] *Memorandum for All Federal Prosecutors.  Renewed Commitment to Criminal Immigration Enforcement.*  Office of the Attorney General, April 11, 2017.  Accessed at https://www.justice.gov/opa/press-release/file/956841/download on November 18, 2018.

[8] GAO, *Unaccompanied Children:  Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163, October 9, 2018, p. 14-15.  Accessed at https://www.gao.gov/assets/700/694918.pdf on November 18, 2018.

[9] *Memorandum for Prosecutors Along the Southwest Border.  Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a).*  Office of the Attorney General, April 6, 2018.  Accessed at https://www.justice.gov/opa/press-release/file/1049751/download on November 18, 2018.

[10] DOJ Office of Public Affairs, *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, May 7, 2018.  Accessed at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions on November 18, 2018.

[11] Exec. Order 13841, 83 Fed Reg 29435, dated June 20, 2018, and published on June 25, 2018.

[12] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. June 26, 2018) (Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction).

[13] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. June 26, 2018) (Order Granting in Part Plaintiffs' Motion for Class Certification)

[14] On November 15, 2018, Judge Sabraw entered an order approving a final settlement of a portion of the *Ms. L* litigation, as well as two other cases challenging the DHS family separation practice.  The settlement establishes procedures for how separated parents and their children may apply for asylum and ensures that those families will remain together pending the outcomes of immigration proceedings.  The settlement did not lift the ongoing preliminary injunction ordered in *Ms. L* on June 26, 2018.  Thus, the preliminary injunction against involuntarily separating families unless the parent is unfit or a danger to the child remains in place.  *Ms. L v. ICE*, No. 18-0428 (S. D. Cal., November 15, 2018) (Order Granting Final Approval of Class Action Settlement).

[15] HHS, DHS, DOJ, *The Tri-Department Plan for Stage II of Family Reunification,* July 18, 2018.  Accessed at https://www.hhs.gov/sites/default/files/UAC-Tri-Department-Process.pdf on November 18, 2018.

[16] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. July 10, 2018) (Order Following Status Conference).

[17] On December 14, 2018, Plaintiffs in the *Ms. L* case filed a motion to expand the scope of the class in that litigation to include parents whose separated children were released from ORR custody <u>before</u> June 26, 2018.  As of release of this report, the Government has not responded to this Motion and the Court has not ruled.  See *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. December 14, 2018) (Motion to Clarify Scope of the *Ms. L* Class).

[18] According to ASPR officials, the large number of databases was primarily due to DHS's decentralized information systems.  For example, CBP and ICE provided ASPR with separate data, and datasets were often specific to one sector or office.

[19] HHS continued to refer to "possible children of potential class members" even after the list of children was certified, because the Agency might later determine that some parents or children did not qualify.  For consistency, OIG uses the same terminology in this report.

[20] Examples of other types of releases include transfer to DHS after turning 18 and voluntary departure to country of origin.

[21] The joint status update filed on October 25, 2018, states that HHS had identified and recategorized 14 children.  However, the Agency later determined that one of those 14 was already included on the certified list reported to the Court in July 2018 and corrected the number to 13 in the November 8, 2018, joint status update.  *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. November 8, 2018) (Joint Status Report at footnote 2).

[22] HHS-OIG has referred these data to DHS-OIG for followup as appropriate.

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*
*\*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*
*skang@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al.,<br><br>        *Petitioners-Plaintiffs*,<br><br>    v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>        *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: January 25, 2019<br><br>**[PROPOSED] ORDER REQUIRING RESPONSE TO IG REPORT, RE-STARTING BRIEFING SCHEDULE**<br><br>NO HEARING DATE |

The Court hereby orders as follows:

(1) Defendants shall respond within seven days of this order to the findings contained in the Jan. 17, 2019 report by the U.S. Department of Health and Human Services Office of the Inspector General ("Separated Children Placed in Office of Refugee Resettlement Care"), including but not limited to the findings highlighted by Plaintiffs in their Motion to the Court, Dkt. 344; and

(2) The Court hereby re-starts the briefing as to the issue of whether the Ms. L injunction applies to children separated and released from ORR custody before June 26, 2018.  Defendants' response to Plaintiffs' Motion (Dkt. 335) is due within ten days of this order.

**IT IS SO ORDERED.**

Dated: _____

_____
Hon. Dana M. Sabraw
United States District Judge

Dated: January 25, 2019                    Respectfully Submitted,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBN 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*
*skang@aclu.org*

*/s/ Lee Gelernt*
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*
*dgalindo@aclu.org*


*Admitted Pro Hac Vice*