JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **DEFENDANTS' RESPONSE REGARDING REPORT BY THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

On January 25, 2019, Plaintiffs asked this Court to require the government to file a response to a January 17, 2019 report from the Office of the Inspector General at the U.S. Department of Health and Human Services ("Report"). ECF No. 344. On January 28, 2019, this Court ordered Defendants to "file a response to that Report on or before February 1, 2019." ECF No. 345. To the extent that Plaintiffs' January 25, 2019 filing raises issues related to the scope of the class definition, Defendants will more fully address those issues on February 6, 2019 in their Opposition to Plaintiffs' Motion to Clarify Scope of the *Ms. L.* Class.

Defendants first point the Court to the comments from the Administration for Children and Families ("ACF")[1] that are appended to the Report. Those comments, authored by Lynn A. Johnson, the Assistant Secretary for Children and Families, contain ACF's formal response to the Report. In addition, to address some of the issues raised by Plaintiffs relating to the report, Defendants submit the attached Declaration of Jonathan White. In general, Defendants dispute the characterizations of the Report made by Plaintiffs, and welcome the opportunity to provide the Court with further information on these issues as this litigation progresses. Should the Court have any additional questions regarding the report, Defendants stand ready to address those questions.

---

[1] The Office of Refugee Resettlement ("ORR") is a division of ACF.

DATED: February 1, 2019          Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

1

**CERTIFICATE OF SERVICE**

2

IT IS HEREBY CERTIFIED THAT:

3

4

      I, the undersigned, am a citizen of the United States and am at least eighteen

5

years of age. My business address is Box 868, Ben Franklin Station, Washington

6

DC 20044. I am not a party to the above-entitled action. I have caused service of

7

the accompanying brief on all counsel of record, by electronically filing the

8

foregoing with the Clerk of the District Court using its ECF System, which

9

electronically provides notice.

10

      I declare under penalty of perjury that the foregoing is true and correct.

11

      DATED: February 1, 2019       *s/ Sarah B. Fabian*
                                  Sarah B. Fabian

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al.<br><br>            Petitioners-Plaintiffs,<br><br>      vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>            Respondents-Defendants. | Case No. 18-cv-428 DMS MDD<br><br>Hon. Dana M. Sabraw |

## **DECLARATION OF JONATHAN WHITE**

I, Jonathan White, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1.     I am a Commander with the United States Public Health Service Commissioned Corps, and have served at the Department of Health and Human Services (HHS) in three successive presidential administrations.  I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response (ASPR), and previously served as the Deputy Director of the Office of Refugee Resettlement (ORR).

2.     I am HHS' agency lead in the Unaccompanied Alien Children (UAC or UACs) Reunification Coordination Group for removed parents with minor children in ORR care. *See* ECF No. 182.

3.     The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties, information supplied to me by federal government employees, and government records.

4.     I am providing this declaration for use in *Ms. L. v. ICE*, No. 18-cv-428 (C.D. Cal.).  Specifically, I am providing it to support HHS compliance with the Court's order that HHS file a response to the HHS OIG report entitled "Separated Children Placed in Office of Refugee Resettlement Care," OEI-BL-18-00511 (January 2019).

1

5. The OIG report includes a response from Lynn Johnson, the Assistant Secretary for Children and Families for HHS. Assistant Secretary Johnson oversees the Administration for Children and Families (ACF). ORR is an ACF program office.

6. I reviewed Assistant Secretary Johnson's response to the OIG report before she submitted it. I concurred generally with her response at that time, and still do.

7. Given that HHS has already responded formally to the OIG report through Assistant Secretary Johnson, my testimony below seeks to answer questions regarding the OIG report that class counsel noted for the Court.

**A. HHS' reporting in July 2018 of possible children of potential class members in ORR care was based on good-faith, reasonable programmatic judgment**

8. This Court granted the Plaintiffs' Motions for Class Certification and Preliminary Injunction on June 26, 2018. *See* ECF Nos. 82 and 83.

9. The Court defined the class as "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child *who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody*, absent a determination that the parent is unfit or presents a danger to the child." ECF No. 82 (emphasis added). The Court added that "the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO." *Id.*

10. To comply with the Court's orders, HHS undertook a significant new effort to rapidly identify children in ORR care who had been separated from *Ms. L.* class members and reunify them. As part of that effort, HHS first sought to identify every *possible* child of a *Ms. L.* class member in ORR care as of June 26, 2018.

11. As OIG correctly observed, the effort was challenging because the data that were available for use in identifying possible children of class members were kept by multiple government agencies in different systems. Some of the data were aggregated. Some were not. Indeed, some of the most critical data were individualized.

2

12.     By way of example, HHS knew and knows the name, location, and clinical status of each child in ORR care and custody at all times because ORR maintains that data in the individualized case management record for the child in the ORR online case management portal.  The case management records on the ORR portal include data about each child that the U.S. Department of Homeland Security (DHS) provided when DHS transferred the child to ORR care.  Historically, certain DHS components provided any anecdotal information about their separation of children to ORR on a discretionary, *ad hoc* basis by transmitting the information into the child's record on the ORR portal.  For instance, certain Customs and Border Patrol (CBP) stations created notes in the records of children on the ORR Portal, using terms such as "separation" in order to identify separation cases.  Sometimes, but not always, such CBP notes described the basis for separations, such as criminality or health problems.   When DHS provided such information, ORR generally used it for ordinary program operations, such as identifying and vetting the parents or their close relatives as potential sponsors for the child under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), and consulting and involving the parents in case management decisions for the child.

13.     The ORR portal was not originally designed for aggregated tracking of separated children in ORR care.  Instead, it was designed to enable ORR to care for children by conducting case management activities for the children. Such activities include:  locating children in care; accessing records documenting the status of releases; accessing records and notes relating to specific services and care plans for children; creating and assessing case reviews for each child; and creating and assessing reports regarding health conditions, acts of aggression or violence, or other significant incidents. Historically, the ORR portal did not have the functionality to generate lists of separated children based on the information (if any) transmitted by DHS.  To my knowledge, DHS did not track separations of children in an aggregated manner either.  So when the Ms. L. Court issued its orders on June 26, 2018, there was not an aggregated list of the children who had been separated by DHS and were then in ORR care.

14.     Another complicating factor was that class membership is not static.  It can change due to transfers of putative parents from Immigration and Customs Enforcement (ICE) to the Bureau of Prisons (BOP) (or vice-versa).  It can also change based on new information related to the health, social, or criminal history of the parent.

15.     To overcome these challenges—and exhaust all reasonable efforts to comply with the Court's orders—HHS conducted a rigorous, forensic data review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed the following: more than 60 sets of aggregated data regarding potentially separated children provided by DHS; ORR case management records for *every* child in ORR care as of June 26, 2018; and sworn testimony from each ORR grantee on the separated children at the grantee's shelters as of June 26, 2018.

16.     HHS initially identified approximately 3,600 children in ORR care as of June 26, 2018 for whom there was at least some information, in any data source reviewed, that indicated potential separation from a parent.  On July 10, 2018, following further data analysis, ORR certified internally that the number of possible children of potential class members was 2,654—comprised of 103 children aged zero to four, and 2,551 children aged five to seventeen.  The 2,551 children aged five to seventeen were reported to the Court in the Joint Status Report filed on July 19, 2018. *See* ECF No. 124.

17.     Class counsel points out that the OIG report states that "even as ORR certified this list, some ASPR staff believed that between 50 and 100 additional children should have been included."  My best recollection is that some ASPR staff believed that the available data supported the inclusion of additional children in the count of children that HHS reported to the Court in July 2018.  The data, however, were sometimes ambiguous and open to different interpretations.  ORR's decision to include some children but not others in the count was a good-faith, reasonable exercise of programmatic judgment under the circumstances (which included the need to begin quickly reunifying thousands of children nationwide within the Court's deadlines).  Indeed, that is why the leadership of ASPR (including me) accepted ORR's internal certification of the count.

1  The professional debate about the count within HHS was consistent with a rigorous
2  forensic data analysis and robust administrative process.

3      18.   Moreover, any lingering internal debates about the count of possible children
4  of potential class members from July 2018 was fully resolved by subsequent reviews of
5  the data, including new data that ORR received after July 10, 2018.  Those subsequent
6  reviews are discussed below.

7  **B. HHS updated its reporting of possible children of potential class members**
8  **after considering new information and re-categorizing 162 children**

9      19.   After counting 2,654 possible children of potential class members in July
10 2018, HHS amassed new case management information regarding children who were in
11 ORR care as of June 26, 2018.  It collected some of the new information in the ordinary
12 course of ORR program operations (*e.g.*, case management at ORR shelters).  In addition,
13 HHS received new information through DHS, class counsel and other plaintiffs' attorneys,
14 and other reports (*e.g.*, the September 2018 report issued by the DHS OIG).

15     20.   As OIG noted, HHS has twice updated its reporting of possible children of
16 potential class members after considering new information. These two re-categorizations
17 of children were for only the limited purpose of litigation reporting to the Court.  It is
18 critical to understand that HHS knew the identity, location, and clinical condition of all re-
19 categorized children at all times during their stays in ORR shelters.  HHS did not "lose"
20 any of them.  The OIG found no evidence to the contrary.

21     21.   First, as explained in the Declaration of Jallyn Sualog (attached hereto as
22 Exhibit 1), HHS conducted a data analysis to determine whether any children from its
23 initial list of approximately 3,600 children who were not included in the count of 2,654
24 children—and who were still in ORR care as of October 1, 2018—should be re-
25 categorized as possible children of potential class members.

26     22.   There was a delta of approximately 946 children between the initial list of
27 approximately 3,600 children and the count of 2,654.  Of those approximately 946
28 children, 176 children remained in ORR care as of October 1, 2018.  HHS reviewed its

1  updated data for all 176 children and determined that it should re-categorize 13 (7.39%) as
2  possible children of potential class members.  My understanding from the ORR staff is
3  that many of re-categorizations resulted from ORR grantees changing their prior
4  conclusions after determining through the case management process that the children were
5  likely separated.  HHS reported the re-categorization of the 13 children to the Court in the
6  October 25, 2018 Joint Status Report. *See* ECF No. 291.

7        23.    Second, HHS conducted a data analysis to determine whether children from
8  its initial list of approximately 3,600 children who were not included in the count of 2,654
9  children—and who were discharged to sponsors before October 25, 2018—should be re-
10 categorized as possible children of potential class members.  Based on that analysis, HHS
11 re-categorized 149 discharged children as possible children of potential class members.
12 My understanding from the ORR staff is that some re-categorizations occurred after ORR
13 grantees changed their conclusions and found, in hindsight, that the children were likely
14 separated.  In some cases, the re-categorizations occurred after DHS provided new
15 information to HHS.  HHS reported the 149 re-categorizations to the Court on December
16 12, 2018. *See* ECF No. 334.

17       24.    One hundred and thirty one (131) of the 149 re-categorized children
18 (87.92%) were discharged to sponsors on or between June 26 and July 10, 2018, when
19 HHS was still determining the initial count of possible children of potential class members
20 (2,654), and during which time the inter-agency reunification plans that provided detailed
21 frameworks for compliance with the Court's orders were evolving.

22       25.    Eleven (11) of the 149 children had parents who were excluded from the *Ms.*
23 *L.* class due to criminal history.  HHS reported to the Court that one hundred and twenty
24 three (123) of the remaining 137 children (89.78%) were discharged by ORR to a parent
25 or a close relative (*e.g.*, aunt or uncle).  Returning the child to the family system is a
26 positive child welfare outcome, consistent with the best interests of the child, as a parent
27 or close relative vetted to the TVPRA standard by ORR has been determined to be capable

28

1   of providing for the needs of the child and is in a strong position to facilitate contact with
2   other members of the family system (including any separated parent).

3       26.    Altogether, HHS concluded that a total of 162 children who were in ORR
4   care as of June 26, 2018, but whom HHS did not initially count as possible children of
5   potential class members in July 2018, should be re-categorized and added to the count of
6   possible children of potential class members. This increased the total to 2,816 possible
7   children of potential class members, which is a complete and accurate reporting of those
8   who were in ORR care as of June 26, 2018. The reporting is complete and accurate
9   because HHS has now reviewed both original and new data for children who were in ORR
10  care as of June 26, 2018.

11  **C. HHS has not tried to identify separated children who were discharged by ORR**
12  **before June 26, 2018 for good reasons**

13      27.    Class counsel posits that OIG concluded that "it is likely that the Government
14  separated thousands more families than it previously reported." Class counsel seems to
15  suggest that HHS' reporting to the Court is inaccurate.

16      28.    The OIG states in its report only that "the total number of children separated
17  from a parent or guardian by immigration authorities is unknown," and "thousands of
18  children may have been separated during an influx that began in 2017, before the
19  accounting required by the Court."

20      29.    HHS has not tried to determine the "total number of children separated from
21  a parent or guardian by immigration authorities," much less reported such a total to the
22  Court. HHS has reported the possible children of potential class members to the Court,
23  and the class (as I understand it) includes only certain parents of separated children in
24  ORR care on or after June 26, 2018. The parents of separated children who ORR
25  discharged before June 26, 2018 are not members of the *Ms. L.* class.

26      30.    In my view, the OIG's statements do not bear on the accuracy of HHS'
27  reporting because the parents of children separated by DHS and discharged by ORR
28  "before the accounting required by the Court" are not *Ms. L.* class members.

31.   I have reviewed Jallyn Sualog's attached declaration regarding the burden associated with trying to identify the separated children who ORR discharged before June 26, 2018.  I concur generally with her testimony.

32.   It also bears noting that the identification of separated children in ORR care as of June 26 required a time-intensive and coordinated effort within HHS and with DHS. It was operationally feasible because the children were still in ORR custody, and ORR grantees were able to talk with them about separation and share the information with HHS.  HHS has no statutory authority over discharged children, much less routine contact with all of them.  ORR grantees would face significant hurdles if they tried to collect information from separated children who were discharged before June 26, 2018.

33.   Regardless of how many separated children ORR discharged before June 26, 2018, ORR would have discharged each of them within the framework established by the Homeland Security Act of 2002 and the TVPRA.  That framework protects child welfare by: prioritizing releases to closely related sponsors; requiring safety and suitability assessments of sponsors, including criminal and sexual abuse background checks; and providing for home studies.

34.   My understanding from the ORR staff is that in FY 2018, 86% of children discharged were released to an individual sponsor.  Of those, ORR discharged 42% to parents, 47% to close relatives, and 11% to more distant relatives or family friends. Similarly, in FY 2019, 89% of children discharged were released to an individual sponsor. Of those sponsors, 46% were parents, 45% were close relatives, and 9% were more distant relatives or family friends.  These statistics suggest that if a separated child who ORR discharged before June 26, 2018 remains in the United States then he or she is probably with their family.

35.   HHS has no statutory authority to resume custody over a discharged child absent a referral from another federal government agency.  Typically, such referrals come from DHS. To reunify a discharged child with their separated parent, HHS would have to obtain the consent of the sponsor or the discharged child (or both), or intervene over their

1  objections.   A forcible intervention would likely have to involve DHS because neither
2  ACF nor ASPR is a law enforcement agency, and both lack the field personnel required to
3  separate the child from the sponsor, reassume custody of the child, and reunify the child
4  with their separated parent.

5      36.    Moreover, my professional opinion as a social worker, and based on my
6  years of experience working with the UAC population, is that entering households to
7  remove previously-separated minors, bring them back into ORR custody, and reunify
8  them with separated parents would present grave child welfare concerns.   It would
9  destabilize the permanency of their existing home environment, and could be traumatic to
10 the children.   The option more consistent with the best interest of the child would be to
11 allow the child to remain with their sponsor, and focus instead on the ongoing work of
12 reunifying parents with separated children presently in ORR care.

13     37.    I reserve the right to amend my opinions based on any new information that
14 becomes known to me in the future.

15
16
Executed on February 1, 2019.
17
18
19
20                                          _____
21                                          Jonathan White
22
23
24
25
26
27
28

9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | **DECLARATION OF** |
| vs. | **JALLYN SUALOG** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

**DECLARATION OF JALLYN N. SUALOG, DEPUTY DIRECTOR
FOR CHILDREN'S PROGRAMS, OFFICE OF REFUGEE RESETTLEMENT,
ADMINISTRATION FOR CHILDREN AND FAMILIES, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn Sualog, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and

depose as follows, based on my personal knowledge and information provided to me in the

course of my official duties:

1.      I am presently the Deputy Director for Children's Programs for the Office of

Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families

("ACF"), U.S. Department of Health and Human Services ("HHS").

1.      I have held the position of Deputy Director since June of 2018.  I have been

the Director of Children's Services since September 2013.  I have worked at ORR since

February of 2007.  I have a Masters of Arts in Clinical Psychology.  Prior to starting at ORR,

I worked as a mental health professional and I managed the child welfare and social services

programs for Hawaii's largest non-profit organization.

2.      I was personally involved in HHS' efforts to reunify children with class members

in compliance with the orders by the Court in the *Ms. L.* case, though I was not a not a member

of the Incident Management Team ("IMT"), led by the Assistant Secretary for Preparedness and

Response ("ASPR"). The IMT coordinated and managed the data for the *Ms. L.* case.  As the

IMT begins to de-mobilize, ORR is resuming primary responsibility for reunifying separated

children in accordance with the Court's orders, and I am leading ORR's efforts in that regard.

### The HHS Effort to Identify Possible Children of Potential Class Members Required Significant Resources and Time

3.      I understand that the Court has defined the plaintiff class as "All adult parents

who enter the United States at or between designated ports of entry who (1) have been, are, or

will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be

separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody,

absent a determination that the parent is unfit or presents a danger to the child." The court added

a footnote, stating: "As discussed in text, *infra*, the class does not include migrant parents with

criminal history or communicable disease, or those who are in the interior of the United States or

subject to the EO."  *See* ECF No. 82.  I understand that Plaintiffs in this case seek to broaden the

Court's definition of the class to include parents and legal guardians of alien children whom the

Department of Homeland Security ("DHS") separated and transferred to ORR, and whom ORR

released from custody before June 26, 2018.

4.      When HHS previously identified possible children of potential class members for

the Court, HHS applied the Court's current class definition and followed the extensive process

described in declarations submitted by Jonathan White.  *See* ECF No. 227 and ECF No. 86-1.

5.      As explained in Commander White's declarations, the process initially included

ORR staff working up to 12-18 hours per day, 7 days per week. However, the Secretary quickly

deployed "surge personnel" from ASPR to assist ORR with reunification efforts, such that ORR could continue performing its core program functions. On June 22, 2018, the Secretary also activated the Secretary's Operation Center, which included activation of a 53-person Incident Management Team ("IMT"), working 12-16 hours per day, 7 days per week, in order to provide necessary logistical and administrative support. The activation of such a large team also allowed ORR to continue to perform core program functions for minors who cross the border without parents (and who far outnumber the separated children in ORR care).

6.      The IMT had the goal of identifying every possible child of a *Ms. L. v. ICE* class member in ORR care as of June 26, 2018. To that end, the IMT conducted a rigorous review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed: manual review of ORR case management records for every child in ORR care (approximately 12,000 at the time); sworn testimony from each ORR grantee on the separated children at the grantee's shelters; and dozens of data sets produced by DHS (approximately 60 data sets in all were reviewed).

7.      DHS apparently collected the large number of data sets from the numerous information systems maintained by its various components, sectors, and offices. As a result, there were many data sets from Customs and Border Patrol ("CBP"), Immigration and Customs Enforcement ("ICE"), and specific sectors or offices of DHS that were neither de-conflicted nor integrated. The IMT therefore had to analyze and reconcile the DHS data sets, together with the information maintained by ORR.

8.      This complex data analysis resulted in an initial list of approximately 3,600 potentially separated children, i.e., children for whom HHS found any information, in any data source reviewed, indicating that the child might have been separated from a parent. Following

the IMT's review of the list of 3,600 children, and further reconciliation and analysis, HHS reported to the Court a total of 2,654 possible children of potential class members.

9.     In September 2018, the IMT began a second record review to determine whether any of the other children from the list of 3,600 children who were still in ORR care should be re-categorized as possible children of potential class members.  The second record review looked at new information about those children that ORR had received from ORR shelters and DHS through ordinary program operations. On October 25, 2018, HHS reported to the Court that it was re-categorizing 13 of the children in the second record review as possible children of potential class members.

10.     In December 2018, ORR then conducted a third record review to determine whether any of the children from the list of 3,600 who were not previously identified as possible children of potential class members, and who were discharged from ORR care before October 25, 2018, should be re-categorized.  The third record review looked at new information about the children that ORR had received from ORR shelters and DHS through ordinary program operations before discharge. On December 12, 2018, HHS reported to the Court that it was re-categorizing 149 of the children in the third record review as possible children of potential class members.

11.     HHS has also determined through further data analysis and program operations that some children reported to the *Ms. L.* Court as possible children of potential class members were not, in fact, separated from parents.  HHS reported to the *Ms. L.* Court on November 29, 2018 that the total number of such children is 79.

12.     The experience of HHS in the *Ms. L* case has been that confirming whether a child was separated from a parent by DHS at the border often requires a fact-intensive and time-

consuming analysis that involves the reconciliation of data from multiple sources and the exercise of programmatic judgment to interpret the data.

### HHS Would Have to Deploy Even More Resources to Identify Possible Children of Potential Class Members Under Plaintiffs' Proposed Expansion

13.     There is no start date included in Plaintiffs' proposal to expand the scope of the class. So to project the resources that HHS would need to identify possible children of potential class members under Plaintiff's proposed expansion, I used a hypothetical start date of July 1, 2017. And I had my data team pull the number of unaccompanied alien children (UACs) in ORR care and custody for the time period of July 1, 2017 through June 25, 2018. The data team identified a total of 47,083 UACs in ORR care and custody for the period.

14.     During the hypothetical class period (July 1, 2017 through June 25, 2018), DHS did not consistently report potential separations to ORR using a specified data field that automated the tracking of potential separations by ORR.   Rather, DHS reported anecdotal information regarding potential separations to ORR on an *ad hoc* basis by entering it into any one of the potentially relevant fields in the UAC's case management record on the ORR online portal.  ORR conducted informal, manual tracking of any potential separations indicated in the ORR online portal. But such tracking was for program operations purposes only.  ORR did not conduct forensic data analyses of potential separations for legal or public reporting purposes because at that time, there was no legal obligation or programmatic reason to do so.

15.     To identify possible children of potential class members under Plaintiffs' expanded class definition, ORR would have to conduct a forensic data analysis of all 47,083 UACs in ORR care and custody during the period of June 17, 2017 to July 25, 2018.  That is, ORR would have to conduct an analysis similar to what the IMT did for the 12,000 children in ORR care as of June 26, 2018.  And ORR would have to conduct that analysis on a population of

UACs four times as large, while still executing all the day-to-day program operations required to care for the many thousands of children presently in ORR custody.

16.     First, ORR would have to review each case management record for each one of the 47,083 UACs to identify any indicators of potential separation.  Then ORR would have to try to collect corroborating information from ORR grantees, as well as data sets from DHS, and reconcile that data with what ORR obtains from UAC case management records.

17.     It is difficult to provide an exact estimate of how long it would take to manually pull the case management records for each child from the portal in order to determine whether there are indicia of separation.  At a minimum, logging on to the portal and then accessing the page for a particular minor takes approximately 15 to 30 minutes, as the analyst must access the online data system, locate the child and then start downloading document files.  To analyze indicia of separation, I would expect our analysts to download such documents as: the intakes page, the 30-day case review for each minor, the individualized assessment, the assessment for risk, the significant incident reports, and then individualized documentation housed in a special part of the portal (this might include psychological records, home studies, and other more individualized documents where a report would have noted a separation).  Analysts would most likely need to look through 10 to 20 documents per child.  I expect that each document would take approximately 5 to 15 minutes to download (with some downloads taking as long as 30 minutes), and then approximately 15 to 30 minutes to review.  Compiling the data for the individual UAC in a spreadsheet would take another 15 to 30 minutes.

18.     Assuming that the work described above takes 4 to 8 hours per UAC case management record, it would take 188,332 to 376,664 hours (4 to 8 hours per case multiplied by 47,083 children in ORR care between July 1, 2017 and June 25, 2018) for ORR analysts to

review all of the UAC case management records for indicia of separation. This would translate into 100 ORR analysts working 8 hours per day, for between 235 and 471 consecutive calendar days, before they could even begin reconciling the information from the UAC case management records with any testimony from grantees or data sets from DHS. In my judgment, ORR does not have the requisite staff for such a project. ORR has approximately 150 contract and federal staff in the "division for children's services," some of whom are devoted to the refugee, and not the UAC program.

19.     Factors that could increase the time it takes for ORR to identify possible children of potential class members include any: testimony received from grantees; data sets received from DHS; additional work required to verify the parent-child relationship.

20.     Further class membership analysis may be necessary in some cases, and would impose additional burden on ORR. Such analysis may include: review of criminal history and parental fitness or dangerousness; and determination of the parent's wishes regarding reunification.

Plaintiffs' Proposed Expansion of the Class Presents Child Welfare Concerns

21.     The vast majority of minors released from ORR custody are released to relatives. For example, in fiscal year 2017, ORR released 93 percent of children to a sponsor. Of those, ORR released 49 percent to parents, 41 percent to close relatives such as an aunt, uncle, grandparent, or adult sibling, and 10 percent to more distant relatives such as a cousin or non-relatives such as a family friend. *See* https://www.hhs.gov/about/agencies/asl/testimony/2018-07/oversight-of-immigration-enforcement-and-family-reunification-efforts.html

22.     "Once a child is released to a sponsor, ORR's custodial relationship with the child terminates." *See* ORR Guide, Children Entering the United States Unaccompanied at § 2.8.3

(available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.8.3).  ORR would have no authority to require or force a sponsor to transfer custody of a child to a separated parent to effectuate reunification.  Nor would ORR have the field personnel needed to forcibly transfer and reunify the child.

23.     Even if ORR had the authority and resources to intervene in the familial relationship between the sponsor and child, doing so would be disruptive and harmful to the child (especially if the intervention was contrary to the sponsor's or the child's wishes). Disrupting the family relationship is not a recommended child welfare practice.

24.     The child welfare concerns presented by Plaintiffs' proposed expansion of the class are significant given the potentially large number of children involved.

Conclusion

25.     Even if performing the analysis Plaintiffs seek were within the realm of the possible, it would substantially imperil ORR's ability to perform its core functions without significant increases in appropriations from Congress, and a rapid, dramatic expansion of the ORR data team. ORR would not have the authority or resources to forcibly reunify minors who are no longer in ORR custody.  Finally, reunification of minors already residing with close relatives, parents or family friends could interfere with the child's routine and currently established relationships.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 17, 2019.

Jallyn Sualog, ORR Deputy Director