UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al.,<br><br>  Petitioners-Plaintiffs,<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>  Respondents-Defendants. | Case No. 18-cv-428 DMS MDD<br><br>Hon. Dana M. Sabraw |

## DECLARATION OF JONATHAN WHITE

I, Jonathan White, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. I am a Commander with the United States Public Health Service Commissioned Corps, and have served at the Department of Health and Human Services (HHS) in three successive presidential administrations. I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response (ASPR), and previously served as the Deputy Director of the Office of Refugee Resettlement (ORR).

2. I am HHS' agency lead in the Unaccompanied Alien Children (UAC or UACs) Reunification Coordination Group for removed parents with minor children in ORR care. *See* ECF No. 182.

3. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties, information supplied to me by federal government employees, and government records.

4. I am providing this declaration for use in *Ms. L. v. ICE*, No. 18-cv-428 (C.D. Cal.). Specifically, I am providing it to support HHS compliance with the Court's order that HHS file a response to the HHS OIG report entitled "Separated Children Placed in Office of Refugee Resettlement Care," OEI-BL-18-00511 (January 2019).

5. The OIG report includes a response from Lynn Johnson, the Assistant Secretary for Children and Families for HHS. Assistant Secretary Johnson oversees the Administration for Children and Families (ACF). ORR is an ACF program office.

6. I reviewed Assistant Secretary Johnson's response to the OIG report before she submitted it. I concurred generally with her response at that time, and still do.

7. Given that HHS has already responded formally to the OIG report through Assistant Secretary Johnson, my testimony below seeks to answer questions regarding the OIG report that class counsel noted for the Court.

## A. HHS' reporting in July 2018 of possible children of potential class members in ORR care was based on good-faith, reasonable programmatic judgment

8. This Court granted the Plaintiffs' Motions for Class Certification and Preliminary Injunction on June 26, 2018. *See* ECF Nos. 82 and 83.

9. The Court defined the class as "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child *who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody*, absent a determination that the parent is unfit or presents a danger to the child." ECF No. 82 (emphasis added). The Court added that "the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO." *Id.*

10. To comply with the Court's orders, HHS undertook a significant new effort to rapidly identify children in ORR care who had been separated from *Ms. L.* class members and reunify them. As part of that effort, HHS first sought to identify every *possible* child of a *Ms. L.* class member in ORR care as of June 26, 2018.

11. As OIG correctly observed, the effort was challenging because the data that were available for use in identifying possible children of class members were kept by multiple government agencies in different systems. Some of the data were aggregated. Some were not. Indeed, some of the most critical data were individualized.

2

12. By way of example, HHS knew and knows the name, location, and clinical status of each child in ORR care and custody at all times because ORR maintains that data in the individualized case management record for the child in the ORR online case management portal. The case management records on the ORR portal include data about each child that the U.S. Department of Homeland Security (DHS) provided when DHS transferred the child to ORR care. Historically, certain DHS components provided any anecdotal information about their separation of children to ORR on a discretionary, *ad hoc* basis by transmitting the information into the child's record on the ORR portal. For instance, certain Customs and Border Patrol (CBP) stations created notes in the records of children on the ORR Portal, using terms such as "separation" in order to identify separation cases. Sometimes, but not always, such CBP notes described the basis for separations, such as criminality or health problems. When DHS provided such information, ORR generally used it for ordinary program operations, such as identifying and vetting the parents or their close relatives as potential sponsors for the child under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), and consulting and involving the parents in case management decisions for the child.

13. The ORR portal was not originally designed for aggregated tracking of separated children in ORR care. Instead, it was designed to enable ORR to care for children by conducting case management activities for the children. Such activities include: locating children in care; accessing records documenting the status of releases; accessing records and notes relating to specific services and care plans for children; creating and assessing case reviews for each child; and creating and assessing reports regarding health conditions, acts of aggression or violence, or other significant incidents. Historically, the ORR portal did not have the functionality to generate lists of separated children based on the information (if any) transmitted by DHS. To my knowledge, DHS did not track separations of children in an aggregated manner either. So when the Ms. L. Court issued its orders on June 26, 2018, there was not an aggregated list of the children who had been separated by DHS and were then in ORR care.

14. Another complicating factor was that class membership is not static. It can change due to transfers of putative parents from Immigration and Customs Enforcement (ICE) to the Bureau of Prisons (BOP) (or vice-versa). It can also change based on new information related to the health, social, or criminal history of the parent.

15. To overcome these challenges—and exhaust all reasonable efforts to comply with the Court's orders—HHS conducted a rigorous, forensic data review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed the following: more than 60 sets of aggregated data regarding potentially separated children provided by DHS; ORR case management records for *every* child in ORR care as of June 26, 2018; and sworn testimony from each ORR grantee on the separated children at the grantee's shelters as of June 26, 2018.

16. HHS initially identified approximately 3,600 children in ORR care as of June 26, 2018 for whom there was at least some information, in any data source reviewed, that indicated potential separation from a parent. On July 10, 2018, following further data analysis, ORR certified internally that the number of possible children of potential class members was 2,654—comprised of 103 children aged zero to four, and 2,551 children aged five to seventeen. The 2,551 children aged five to seventeen were reported to the Court in the Joint Status Report filed on July 19, 2018. *See* ECF No. 124.

17. Class counsel points out that the OIG report states that "even as ORR certified this list, some ASPR staff believed that between 50 and 100 additional children should have been included." My best recollection is that some ASPR staff believed that the available data supported the inclusion of additional children in the count of children that HHS reported to the Court in July 2018. The data, however, were sometimes ambiguous and open to different interpretations. ORR's decision to include some children but not others in the count was a good-faith, reasonable exercise of programmatic judgment under the circumstances (which included the need to begin quickly reunifying thousands of children nationwide within the Court's deadlines). Indeed, that is why the leadership of ASPR (including me) accepted ORR's internal certification of the count.

4

The professional debate about the count within HHS was consistent with a rigorous forensic data analysis and robust administrative process.

18. Moreover, any lingering internal debates about the count of possible children of potential class members from July 2018 was fully resolved by subsequent reviews of the data, including new data that ORR received after July 10, 2018. Those subsequent reviews are discussed below.

### B. HHS updated its reporting of possible children of potential class members after considering new information and re-categorizing 162 children

19. After counting 2,654 possible children of potential class members in July 2018, HHS amassed new case management information regarding children who were in ORR care as of June 26, 2018. It collected some of the new information in the ordinary course of ORR program operations (*e.g.*, case management at ORR shelters). In addition, HHS received new information through DHS, class counsel and other plaintiffs' attorneys, and other reports (*e.g.*, the September 2018 report issued by the DHS OIG).

20. As OIG noted, HHS has twice updated its reporting of possible children of potential class members after considering new information. These two re-categorizations of children were for only the limited purpose of litigation reporting to the Court. It is critical to understand that HHS knew the identity, location, and clinical condition of all re-categorized children at all times during their stays in ORR shelters. HHS did not "lose" any of them. The OIG found no evidence to the contrary.

21. First, as explained in the Declaration of Jallyn Sualog (attached hereto as Exhibit 1), HHS conducted a data analysis to determine whether any children from its initial list of approximately 3,600 children who were not included in the count of 2,654 children—and who were still in ORR care as of October 1, 2018—should be re-categorized as possible children of potential class members.

22. There was a delta of approximately 946 children between the initial list of approximately 3,600 children and the count of 2,654. Of those approximately 946 children, 176 children remained in ORR care as of October 1, 2018. HHS reviewed its

5

updated data for all 176 children and determined that it should re-categorize 13 (7.39%) as possible children of potential class members. My understanding from the ORR staff is that many of re-categorizations resulted from ORR grantees changing their prior conclusions after determining through the case management process that the children were likely separated. HHS reported the re-categorization of the 13 children to the Court in the October 25, 2018 Joint Status Report. *See* ECF No. 291.

23. Second, HHS conducted a data analysis to determine whether children from its initial list of approximately 3,600 children who were not included in the count of 2,654 children—and who were discharged to sponsors before October 25, 2018—should be re-categorized as possible children of potential class members. Based on that analysis, HHS re-categorized 149 discharged children as possible children of potential class members. My understanding from the ORR staff is that some re-categorizations occurred after ORR grantees changed their conclusions and found, in hindsight, that the children were likely separated. In some cases, the re-categorizations occurred after DHS provided new information to HHS. HHS reported the 149 re-categorizations to the Court on December 12, 2018. *See* ECF No. 334.

24. One hundred and thirty one (131) of the 149 re-categorized children (87.92%) were discharged to sponsors on or between June 26 and July 10, 2018, when HHS was still determining the initial count of possible children of potential class members (2,654), and during which time the inter-agency reunification plans that provided detailed frameworks for compliance with the Court's orders were evolving.

25. Eleven (11) of the 149 children had parents who were excluded from the *Ms. L.* class due to criminal history. HHS reported to the Court that one hundred and twenty three (123) of the remaining 137 children (89.78%) were discharged by ORR to a parent or a close relative (*e.g.*, aunt or uncle). Returning the child to the family system is a positive child welfare outcome, consistent with the best interests of the child, as a parent or close relative vetted to the TVPRA standard by ORR has been determined to be capable

of providing for the needs of the child and is in a strong position to facilitate contact with other members of the family system (including any separated parent).

26. Altogether, HHS concluded that a total of 162 children who were in ORR care as of June 26, 2018, but whom HHS did not initially count as possible children of potential class members in July 2018, should be re-categorized and added to the count of possible children of potential class members. This increased the total to 2,816 possible children of potential class members, which is a complete and accurate reporting of those who were in ORR care as of June 26, 2018. The reporting is complete and accurate because HHS has now reviewed both original and new data for children who were in ORR care as of June 26, 2018.

### C. HHS has not tried to identify separated children who were discharged by ORR before June 26, 2018 for good reasons

27. Class counsel posits that OIG concluded that "it is likely that the Government separated thousands more families than it previously reported." Class counsel seems to suggest that HHS' reporting to the Court is inaccurate.

28. The OIG states in its report only that "the total number of children separated from a parent or guardian by immigration authorities is unknown," and "thousands of children may have been separated during an influx that began in 2017, before the accounting required by the Court."

29. HHS has not tried to determine the "total number of children separated from a parent or guardian by immigration authorities," much less reported such a total to the Court. HHS has reported the possible children of potential class members to the Court, and the class (as I understand it) includes only certain parents of separated children in ORR care on or after June 26, 2018. The parents of separated children who ORR discharged before June 26, 2018 are not members of the *Ms. L.* class.

30. In my view, the OIG's statements do not bear on the accuracy of HHS' reporting because the parents of children separated by DHS and discharged by ORR "before the accounting required by the Court" are not *Ms. L.* class members.

31. I have reviewed Jallyn Sualog's attached declaration regarding the burden associated with trying to identify the separated children who ORR discharged before June 26, 2018. I concur generally with her testimony.

32. It also bears noting that the identification of separated children in ORR care as of June 26 required a time-intensive and coordinated effort within HHS and with DHS. It was operationally feasible because the children were still in ORR custody, and ORR grantees were able to talk with them about separation and share the information with HHS. HHS has no statutory authority over discharged children, much less routine contact with all of them. ORR grantees would face significant hurdles if they tried to collect information from separated children who were discharged before June 26, 2018.

33. Regardless of how many separated children ORR discharged before June 26, 2018, ORR would have discharged each of them within the framework established by the Homeland Security Act of 2002 and the TVPRA. That framework protects child welfare by: prioritizing releases to closely related sponsors; requiring safety and suitability assessments of sponsors, including criminal and sexual abuse background checks; and providing for home studies.

34. My understanding from the ORR staff is that in FY 2018, 86% of children discharged were released to an individual sponsor. Of those, ORR discharged 42% to parents, 47% to close relatives, and 11% to more distant relatives or family friends. Similarly, in FY 2019, 89% of children discharged were released to an individual sponsor. Of those sponsors, 46% were parents, 45% were close relatives, and 9% were more distant relatives or family friends. These statistics suggest that if a separated child who ORR discharged before June 26, 2018 remains in the United States then he or she is probably with their family.

35. HHS has no statutory authority to resume custody over a discharged child absent a referral from another federal government agency. Typically, such referrals come from DHS. To reunify a discharged child with their separated parent, HHS would have to obtain the consent of the sponsor or the discharged child (or both), or intervene over their

objections. A forcible intervention would likely have to involve DHS because neither ACF nor ASPR is a law enforcement agency, and both lack the field personnel required to separate the child from the sponsor, reassume custody of the child, and reunify the child with their separated parent.

36. Moreover, my professional opinion as a social worker, and based on my years of experience working with the UAC population, is that entering households to remove previously-separated minors, bring them back into ORR custody, and reunify them with separated parents would present grave child welfare concerns. It would destabilize the permanency of their existing home environment, and could be traumatic to the children. The option more consistent with the best interest of the child would be to allow the child to remain with their sponsor, and focus instead on the ongoing work of reunifying parents with separated children presently in ORR care.

37. I reserve the right to amend my opinions based on any new information that becomes known to me in the future.

Executed on February 1, 2019.

_____
Jonathan White