UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al.,<br><br>        Petitioners-Plaintiffs,<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>        Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>**DECLARATION OF JALLYN SUALOG** |

**DECLARATION OF JALLYN N. SUALOG, DEPUTY DIRECTOR FOR CHILDREN'S PROGRAMS, OFFICE OF REFUGEE RESETTLEMENT, ADMINISTRATION FOR CHILDREN AND FAMILIES, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn Sualog, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1. I am presently the Deputy Director for Children's Programs for the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

1. I have held the position of Deputy Director since June of 2018. I have been the Director of Children's Services since September 2013. I have worked at ORR since February of 2007. I have a Masters of Arts in Clinical Psychology. Prior to starting at ORR, I worked as a mental health professional and I managed the child welfare and social services programs for Hawaii's largest non-profit organization.

2. I was personally involved in HHS' efforts to reunify children with class members in compliance with the orders by the Court in the *Ms. L.* case, though I was not a not a member of the Incident Management Team ("IMT"), led by the Assistant Secretary for Preparedness and Response ("ASPR"). The IMT coordinated and managed the data for the *Ms. L.* case. As the IMT begins to de-mobilize, ORR is resuming primary responsibility for reunifying separated children in accordance with the Court's orders, and I am leading ORR's efforts in that regard.

### The HHS Effort to Identify Possible Children of Potential Class Members Required Significant Resources and Time

3. I understand that the Court has defined the plaintiff class as "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child." The court added a footnote, stating: "As discussed in text, *infra*, the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO." *See* ECF No. 82. I understand that Plaintiffs in this case seek to broaden the Court's definition of the class to include parents and legal guardians of alien children whom the Department of Homeland Security ("DHS") separated and transferred to ORR, and whom ORR released from custody before June 26, 2018.

4. When HHS previously identified possible children of potential class members for the Court, HHS applied the Court's current class definition and followed the extensive process described in declarations submitted by Jonathan White. *See* ECF No. 227 and ECF No. 86-1.

5. As explained in Commander White's declarations, the process initially included ORR staff working up to 12-18 hours per day, 7 days per week. However, the Secretary quickly

deployed "surge personnel" from ASPR to assist ORR with reunification efforts, such that ORR could continue performing its core program functions. On June 22, 2018, the Secretary also activated the Secretary's Operation Center, which included activation of a 53-person Incident Management Team ("IMT"), working 12-16 hours per day, 7 days per week, in order to provide necessary logistical and administrative support. The activation of such a large team also allowed ORR to continue to perform core program functions for minors who cross the border without parents (and who far outnumber the separated children in ORR care).

6.   The IMT had the goal of identifying every possible child of a *Ms. L. v. ICE* class member in ORR care as of June 26, 2018. To that end, the IMT conducted a rigorous review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed: manual review of ORR case management records for every child in ORR care (approximately 12,000 at the time); sworn testimony from each ORR grantee on the separated children at the grantee's shelters; and dozens of data sets produced by DHS (approximately 60 data sets in all were reviewed).

7.   DHS apparently collected the large number of data sets from the numerous information systems maintained by its various components, sectors, and offices. As a result, there were many data sets from Customs and Border Patrol ("CBP"), Immigration and Customs Enforcement ("ICE"), and specific sectors or offices of DHS that were neither de-conflicted nor integrated. The IMT therefore had to analyze and reconcile the DHS data sets, together with the information maintained by ORR.

8.   This complex data analysis resulted in an initial list of approximately 3,600 potentially separated children, i.e., children for whom HHS found any information, in any data source reviewed, indicating that the child might have been separated from a parent. Following

the IMT's review of the list of 3,600 children, and further reconciliation and analysis, HHS reported to the Court a total of 2,654 possible children of potential class members.

9. In September 2018, the IMT began a second record review to determine whether any of the other children from the list of 3,600 children who were still in ORR care should be re-categorized as possible children of potential class members. The second record review looked at new information about those children that ORR had received from ORR shelters and DHS through ordinary program operations. On October 25, 2018, HHS reported to the Court that it was re-categorizing 13 of the children in the second record review as possible children of potential class members.

10. In December 2018, ORR then conducted a third record review to determine whether any of the children from the list of 3,600 who were not previously identified as possible children of potential class members, and who were discharged from ORR care before October 25, 2018, should be re-categorized. The third record review looked at new information about the children that ORR had received from ORR shelters and DHS through ordinary program operations before discharge. On December 12, 2018, HHS reported to the Court that it was re-categorizing 149 of the children in the third record review as possible children of potential class members.

11. HHS has also determined through further data analysis and program operations that some children reported to the *Ms. L.* Court as possible children of potential class members were not, in fact, separated from parents. HHS reported to the *Ms. L.* Court on November 29, 2018 that the total number of such children is 79.

12. The experience of HHS in the *Ms. L* case has been that confirming whether a child was separated from a parent by DHS at the border often requires a fact-intensive and time-

consuming analysis that involves the reconciliation of data from multiple sources and the exercise of programmatic judgment to interpret the data.

### HHS Would Have to Deploy Even More Resources to Identify Possible Children of Potential Class Members Under Plaintiffs' Proposed Expansion

13. There is no start date included in Plaintiffs' proposal to expand the scope of the class. So to project the resources that HHS would need to identify possible children of potential class members under Plaintiff's proposed expansion, I used a hypothetical start date of July 1, 2017. And I had my data team pull the number of unaccompanied alien children (UACs) in ORR care and custody for the time period of July 1, 2017 through June 25, 2018. The data team identified a total of 47,083 UACs in ORR care and custody for the period.

14. During the hypothetical class period (July 1, 2017 through June 25, 2018), DHS did not consistently report potential separations to ORR using a specified data field that automated the tracking of potential separations by ORR. Rather, DHS reported anecdotal information regarding potential separations to ORR on an *ad hoc* basis by entering it into any one of the potentially relevant fields in the UAC's case management record on the ORR online portal. ORR conducted informal, manual tracking of any potential separations indicated in the ORR online portal. But such tracking was for program operations purposes only. ORR did not conduct forensic data analyses of potential separations for legal or public reporting purposes because at that time, there was no legal obligation or programmatic reason to do so.

15. To identify possible children of potential class members under Plaintiffs' expanded class definition, ORR would have to conduct a forensic data analysis of all 47,083 UACs in ORR care and custody during the period of June 17, 2017 to July 25, 2018. That is, ORR would have to conduct an analysis similar to what the IMT did for the 12,000 children in ORR care as of June 26, 2018. And ORR would have to conduct that analysis on a population of

UACs four times as large, while still executing all the day-to-day program operations required to care for the many thousands of children presently in ORR custody.

16. First, ORR would have to review each case management record for each one of the 47,083 UACs to identify any indicators of potential separation. Then ORR would have to try to collect corroborating information from ORR grantees, as well as data sets from DHS, and reconcile that data with what ORR obtains from UAC case management records.

17. It is difficult to provide an exact estimate of how long it would take to manually pull the case management records for each child from the portal in order to determine whether there are indicia of separation. At a minimum, logging on to the portal and then accessing the page for a particular minor takes approximately 15 to 30 minutes, as the analyst must access the online data system, locate the child and then start downloading document files. To analyze indicia of separation, I would expect our analysts to download such documents as: the intakes page, the 30-day case review for each minor, the individualized assessment, the assessment for risk, the significant incident reports, and then individualized documentation housed in a special part of the portal (this might include psychological records, home studies, and other more individualized documents where a report would have noted a separation). Analysts would most likely need to look through 10 to 20 documents per child. I expect that each document would take approximately 5 to 15 minutes to download (with some downloads taking as long as 30 minutes), and then approximately 15 to 30 minutes to review. Compiling the data for the individual UAC in a spreadsheet would take another 15 to 30 minutes.

18. Assuming that the work described above takes 4 to 8 hours per UAC case management record, it would take 188,332 to 376,664 hours (4 to 8 hours per case multiplied by 47,083 children in ORR care between July 1, 2017 and June 25, 2018) for ORR analysts to

review all of the UAC case management records for indicia of separation. This would translate into 100 ORR analysts working 8 hours per day, for between 235 and 471 consecutive calendar days, before they could even begin reconciling the information from the UAC case management records with any testimony from grantees or data sets from DHS. In my judgment, ORR does not have the requisite staff for such a project. ORR has approximately 150 contract and federal staff in the "division for children's services," some of whom are devoted to the refugee, and not the UAC program.

19. Factors that could increase the time it takes for ORR to identify possible children of potential class members include any: testimony received from grantees; data sets received from DHS; additional work required to verify the parent-child relationship.

20. Further class membership analysis may be necessary in some cases, and would impose additional burden on ORR. Such analysis may include: review of criminal history and parental fitness or dangerousness; and determination of the parent's wishes regarding reunification.

Plaintiffs' Proposed Expansion of the Class Presents Child Welfare Concerns

21. The vast majority of minors released from ORR custody are released to relatives. For example, in fiscal year 2017, ORR released 93 percent of children to a sponsor. Of those, ORR released 49 percent to parents, 41 percent to close relatives such as an aunt, uncle, grandparent, or adult sibling, and 10 percent to more distant relatives such as a cousin or non-relatives such as a family friend. *See* https://www.hhs.gov/about/agencies/asl/testimony/2018-07/oversight-of-immigration-enforcement-and-family-reunification-efforts.html

22. "Once a child is released to a sponsor, ORR's custodial relationship with the child terminates." *See* ORR Guide, Children Entering the United States Unaccompanied at § 2.8.3

(available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.8.3). ORR would have no authority to require or force a sponsor to transfer custody of a child to a separated parent to effectuate reunification. Nor would ORR have the field personnel needed to forcibly transfer and reunify the child.

23. Even if ORR had the authority and resources to intervene in the familial relationship between the sponsor and child, doing so would be disruptive and harmful to the child (especially if the intervention was contrary to the sponsor's or the child's wishes). Disrupting the family relationship is not a recommended child welfare practice.

24. The child welfare concerns presented by Plaintiffs' proposed expansion of the class are significant given the potentially large number of children involved.

Conclusion

25. Even if performing the analysis Plaintiffs seek were within the realm of the possible, it would substantially imperil ORR's ability to perform its core functions without significant increases in appropriations from Congress, and a rapid, dramatic expansion of the ORR data team. ORR would not have the authority or resources to forcibly reunify minors who are no longer in ORR custody. Finally, reunification of minors already residing with close relatives, parents or family friends could interfere with the child's routine and currently established relationships.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 17, 2019.

Jallyn Sualog, ORR Deputy Director