JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

　　　　　Petitioners-Plaintiffs,

　　vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

　　　　　Respondents-Defendants.

Case No. 18cv428 DMS MDD

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CLARIFY SCOPE OF THE *MS. L.* CLASS**

## I.     INTRODUCTION

Plaintiffs ask this Court to declare that the *Ms. L.* class definition includes parents whose children were released from the U.S. Department of Health and Human Service, Office of Refugee Resettlement ("ORR") custody before the June 26, 2018 class-certification order issued. For multiple reasons, the Court should reject this request to "clarify" or amend the class definition.

Plaintiffs' argument squarely conflicts with the plain language of the class definition and with the class-certification order, and indeed it conflicts with the language Plaintiffs themselves proposed, which envisioned only a forward looking class of parents whose children remained in ORR custody. In response to that request by Plaintiffs, this Court certified a class that includes only parents who, on the date the class was certified (June 26, 2018), "have a minor child who ***is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody***." Class-Certification Order, ECF No. 82 at 17 (emphasis added). The class-certification order makes clear that the Court carefully considered the language it used in certifying the class on June 26, 2018. Had the Court intended to include parents whose children were released prior to the date of class certification, it could have done so, but it did not. The considered and clear text of the class definition controls, and that text requires rejection of Plaintiffs' motion. Plaintiffs' arguments to the contrary (*see* Mem. 2) lack merit.

This reading of the Court's order also is a logical and equitable one. At the time the Court certified the class, the Court's concern with regard to the children of class members was that the TVPRA process for releasing children then in ORR care to sponsors was not appropriate in situations where a parent and child had been separated at the border absent a finding that the parent was unfit or a danger to the child. Thus, the certified class was crafted to address that precise issue.

Plaintiffs' proposed expansion of the class would likewise create an adequacy problem, because no named class member at the time class certification was being briefed was in the situation where her child had been released from ORR custody to a sponsor. The complaint in this case also does not contain any allegations or argument regarding the reunification rights of a parent whose child has been released to another family member, which would be distinct from the rights of parents and children who remain in government custody. Notably, children released by ORR to a parent or sponsor are no longer in the custody of ORR, and therefore are not under the custody or control of any government agency. Where a child is not in government custody, the government retains no control over the child and cannot facilitate reunification.

From a child welfare perspective, it is also worth noting that a child released by ORR to a sponsor has gone through the full ORR sponsorship process, which ensures the placement with a responsible adult—normally a family member—who

will care for the child. It is that guardian, and not the Defendants, who is best able to communicate with the child's parents and facilitate any reunification with the parents.

For these reasons, parents whose children were released from ORR custody prior to June 26, 2018 are in a different legal position from that of existing class members. These parents also will be in a completely different array of procedural postures, and many may already have been reunified, having obtained the major form of relief sought in this case. Of course, the parents of children released from ORR custody prior to June 26, 2018 – in conjunction with the sponsors responsible for those children – may well have reunification options outside of this litigation. But the fact remains that the Court's class-certification order appropriately exempted them from the remedies afforded the class in this case.

The course of dealing throughout this litigation also further confirms that neither the parties nor the Court intended the class to include parents whose children were released from ORR custody before the class-certification order was issued. Plaintiffs now claim that they intended no such meaning, but that claim is irreconcilable with their clear acceptance of this interpretation of the class definition for the past eight months through the course of this litigation.

Plaintiffs' remaining arguments are unavailing. Plaintiffs contend that the Court could not have meant to include a date limitation on the class definition

because such a limitation would have excluded the named Plaintiffs Ms. L. and Ms. C. *See* Mem. 2-3. But Plaintiffs' argument misstates the role of the two named plaintiffs in this case. Plaintiffs themselves asserted that the two named plaintiffs were adequate representatives of the proposed forward-looking class, notwithstanding the mootness objections raised by the government. While the Court agreed that the named plaintiffs' claims remained viable for purposes of a forward-looking class, the Court's rejection of the government's mootness argument was not tantamount to the certifying of a backwards-looking class

Plaintiffs also contend that the existing class definition creates an arbitrary distinction between those included in the class, and those who are excluded. *See* Mem. 3. In so arguing, Plaintiffs fail to acknowledge the differing legal issues and procedural postures that affect parents whose children were released prior to the certification of the class. This legal and material distinction means that the line drawn is not arbitrary, and illustrates the reality that, because no class representative is in this category, none of the relevant legal issues have been addressed by the parties or the court. Moreover, Plaintiffs' suggestion that those parents are without a remedy is incorrect; Defendants acknowledge that parents of children released from ORR custody prior to June 26, 2018 may well have reunification options available to them. But their avenues to reunification are not found in the class-wide relief ordered by this Court, which was designed to remedy a different factual and

legal scenario where ORR is charged with authority over the child and can therefore effectuate reunification.

Plaintiffs also do not address the fact that expanding the class in the manner requested by Plaintiffs would make it nearly impossible to ascertain the class with any level of certainty. This changed definition contains no date limitations, and would cover individuals in a wide variety of circumstances. Identifying members of this new, broader class that Plaintiffs propose would require Defendants to conduct an entirely new, and burdensome, review to identify whether there are new class members who meet the expanded criteria. Given the extremely broad parameters that would apply to this expanded class definition, such a review is not "administratively feasible" and therefore would lead to a class definition that does not meet the ascertainability requirement for class-certification.

Finally, Plaintiffs ask the Court in the alternative to modify the class definition to include parents whose children were released from ORR custody prior to June 26, 2018. *See* Mem. 4. Plaintiffs provide no support for their assertion that such amendment would be appropriate. In fact, the amendment would not be appropriate for all of the reasons discussed above. Moreover, given the ascertainability problem presented by the expanded class, the Court should neither "clarify" the class definition, as requested by Plaintiffs, nor should it accede to Plaintiffs' alternative request to affirmatively modify and expand the class definition in this regard.

The government has worked hard and in good faith over the last eight months to comply with the Court's orders and to facilitate the reunification process for class members. The Court should deny Plaintiffs' attempts move the goal posts at this late date.

## II.   PROCEDURAL BACKGROUND

On June 26, 2018, this Court certified a class defined as:

All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who *is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody*, absent a determination that the parent is unfit or presents a danger to the child.

Class-Certification Order, ECF No. 82 at 17 (emphasis added). The class definition further excludes "migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO." *Id.* at 17 n.10.

Immediately after the Court issued the class-certification order, and in accordance with the order's plain language, Defendants determined class membership by identifying whether parents of children in ORR custody fell within the definition, and explained the process to the Court and to Plaintiffs. *See* Declaration of Jonathan White, July 5, 2018, ECF No. 86-1 ¶ 14 ("Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage."); *id.* ¶ 18 ("To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has

had each grantee at one of ORR's approximately 110 shelters certify the separated

children who the grantee reasonably believes are in its care."); *id.* ¶ 19 ("As of July

5, 2018, we have identified approximately 101 minors under age 5, within ORR care,

whose records contain indicia of separation. Class membership analysis for putative

class members associated with the larger group of minors 5 through 18 is ongoing.");

*see also* July 6, 2018 Hearing Tr., ECF No. 93, at 43-46 (discussing HHS's

identification of class members by identifying children in ORR custody who

possibly were separated from a parent, the Court stated that "as a matter of enforcing

the injunction, I would stand on the class definition, the objective standards that are

set out therein").

Recently, in this case and the *M.M.M.* litigation, the parties entered into a

settlement agreement in which the sub-classes of parents covered by the settlement

were coextensive with the class of parents in *Ms. L. See* Unopposed Motion for

Preliminary Approval of Proposed Settlement, Oct. 5, 2018, ECF No. 247, at 16

("All parent classes are sub-classes of the certified *Ms. L.* class."). And in reaching

that agreement the parties explicitly agreed that the covered agreed-upon class of

parents consists of:

> adult alien parents who entered the United States at or between designated
> ports of entry with their child(ren), and who, on or before the effective date of
> this agreement: (1) were detained in immigration custody by the DHS;
> (2) have a child who was or is separated from them by DHS and, ***on or after
> June 26, 2018, was housed in ORR custody, ORR foster care, or DHS
> custody***, absent a determination that the parent is unfit or presents a danger to

the child; and (3) have been (and whose child(ren) have been) continuously physically present within the United States since June 26, 2018, whether in detention or released. The class does not include alien parents with criminal histories or a communicable disease, or those encountered in the interior of the United States.

Notice Lodging Agreement for Court's Approval, Sept. 9, 2018, ECF No. 220-1 at n.1 (emphasis added).

Defendants also have made clear in their joint reports to the Court since the very beginning that they are reporting on the progress of reunifications based on the numbers of children identified in ORR custody. *See, e.g.,* July 19 Status Report, ECF No. 124 (reporting on the reunification possibilities for 2,551 possible children of potential class members ages 5-17). Plaintiffs have never objected to Defendants' identification of class members in this manner, and they did not raise the issue to the Court until the November 29, 2018 Joint Status Report, ECF No. 329. The Court then ordered briefing on this issue.

## III.   ARGUMENT

Plaintiffs ask this Court to "clarify" that the class definition in *Ms. L.* includes parents whose children were released from ORR custody prior to the issuance of the June 26, 2018 class-certification order. *See* Mem. 2-3. The Court should decline to do so and should enforce the class definition as written and as certified.

**First**, Plaintiffs' argument is irreconcilable with the plain language of the class definition. The Court's June 26, 2018 order includes parents who on the date

of certification "have a minor child who *is or will be* *separated from them by DHS*

*and detained in ORR custody, ORR foster care, or DHS custody*." Class-

Certification Order at 17. On its face, this language includes parents of children who

are in ORR custody on June 26, 2018, or who will be in ORR custody after that date,

and it excludes those children who were in ORR custody prior to that date but who,

as of June 26, 2018, were there no longer. These definitional limits accord with the

Court's explanations throughout this litigation that its orders were designed to

prospectively address and remedy a constitutional flaw it identified. And, ORR

custody is likewise critical to remedying the injuries the Court found when children

were placed in government custody apart from their parents.

When "a court . . . interprets an existing class definition, the court . . . construes

the language of the class definition in much the same way that a court might construe

the language of a contract or a statute." *In re Cement and Concrete Antitrust*

*Litigation*, 817 F.2d 1435, 1443 (9th Cir. 1987). Thus, "[t]he court must consider the

plain language of the class certification and the apparent intent of the parties and the

court defining the class at the time of certification." *Valdivia v. Schwarzenegger*,

2007 WL 3096168, *4 (E.D. Cal. Oct. 22, 2007) (citing *In re. Cement*, 817 F.2d at

1443); *see also id.* at *1 ("When interpreting the parameters of a class, a district

court should be guided by the plain language of the class definition."). Here, the

plain language used by the Court should govern the interpretation of the class

definition, and clearly excludes parents whose children were released from ORR custody prior to the issuance of the June 26, 2018 class-certification order.

That the language "is or will be" was intended to read as it appears also is apparent from the fact that immediately prior to that provision, the Court defined the scope of parents as those who "***have been, are, or will be*** detained in immigration custody by the DHS." Class-Certification Order at 17 (emphasis added). In that clause, the Court made clear that the scope reached further with respect to parents, by including in the class parents who "have been" in custody. By contrast, the Court did not include such broader language in the clause regarding the children. It would be nonsensical to read these two clauses, which use different language, to mean the same thing.

Moreover, it is clear that the Court carefully considered the language it used in certifying the class on June 26, 2018. As the Court noted, Plaintiffs' proposed class definition would have included "All adult parents nationwide who (1) ***are or will be*** detained in immigration custody by the Department of Homeland Security, and (2) have a minor child who ***is or will be*** separated from them by DHS ***and detained in ORR custody***, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child." Class-Certification Order at 5 (emphasis added). The Court, in its final class certification language, expanded this language with regard to the parents to include those parents who "have been, are, or will be detained

in immigration custody by the DHS." *Id.* at 17. Thus, the Court intentionally used these two different phrases in the two separate clauses, further reflecting a clear intent by the Court that the two phrases be read differently and that the scope of the class not include parents of children who were no longer in government custody. Had the Court intended to include children who previously had been released to a sponsor, it could have done so, but it did not. Thus, the plain language of the class-certification order is clear that the class includes parents who were in DHS custody either before or after the June 26, 2018 certification date, but does not include parents whose children were no longer in ORR custody as of June 26, 2018. Plaintiffs therefore are incorrect to claim that "there is no evidence that the Court ever intended to exclude from the class" parents whose children left ORR custody before June 26, 2018. Mem. 2.[1]

Notably, Plaintiffs themselves have recognized the Court's careful use of language when it suited their purposes. When Defendants raised objections to the

---

[1] Plaintiffs contend that the government's reading should be rejected because the government did not "argue for that limitation in opposing class certification." Mem. 2. But the government had no reason to argue for that limitation since the certified language was part of the language proposed by Plaintiffs for the class definition in the first place – which proposed only a forward-looking class comprising the parents of children who "*[are] or will be* . . . detained in ORR custody." It was always clear that if the Court certified the class proposed by the Plaintiffs then it would include parents of children who were in ORR custody on or after the date of certification. Thus, Defendants had no reason to make any such argument in their class certification briefing.

scope of this language at a hearing on July 6, 2018, counsel for Plaintiffs argued, "I think [the Court was] very clear in saying have been, are, or will be in DHS custody." July 6, 2018 Hearing Tr. at 35:21-23. And the Court agreed, noting that Plaintiffs' counsel was "correct," and that "that terminology was added in light of the briefing that came in, I think on the Monday morning before the preliminary injunction issued." *Id.* at 35:24-36:3. Thus, in that context, the Court agreed with Plaintiffs that it purposefully included the "have been" language with regard to parents, and that the class therefore included parents who had previously been in DHS custody (including parents already removed). Having relied on the Court's carefully selected language to their advantage in the past, Plaintiffs should not now be permitted to argue that the Court's language does not, in fact, mean precisely what it says.

**Second**, Defendants' reading of the Court's order is a logical and equitable one in light of the Court's expressed concerns at the time. Specifically, the Court expressed concern that the TVPRA process for releasing children to sponsors was not appropriate in situations where a parent and child had been separated at the border absent a finding that the parent was unfit or a danger to the child. *See* Order Granting Preliminary Injunction, June 26, 2018, ECF No. 83, at 16-17. The Court's certified class and preliminary injunction order provide a remedy for this precise situation about which the Court was primarily concerned.

Moreover, the scope of the class certified by the Court avoids a scenario that would implicate entirely separate legal concerns than those with which the Court and the parties were concerned at the time of class-certification. Specifically, children released from ORR custody to another parent or sponsor are no longer in the custody of ORR, and are not under the custody or control of any government agency; thus, the government retains no control over the child in that situation and cannot independently facilitate reunification. *See, e.g.,* Declaration of Jallyn Sualog, attached hereto, ¶¶ 21-24; *see also* Declaration of Jonathan White, ECF No. 347-1, ¶¶ 27-36. This situation—of children released from ORR custody—raises different legal issues and concerns with regard to reunification from those relating to class members whose children remained within the custody of ORR at the time that the class was certified, and whose reunifications could be effectuated by the government under the Court's orders.

Defendants do not dispute that parents of children released from ORR custody prior to June 26, 2018 may well have reunification options outside of this litigation, and Defendants have demonstrated good faith in attempting to reunify or otherwise accommodate non-class members with similarly situated factual or legal scenarios. But the different legal issues involved in those cases, and the interests that may arise with respect to sponsors (including potentially the child's other parent), preclude

13

their inclusion in this class, and would render unworkable the remedies imposed by the Court's preliminary injunction order.

**Third**, the course of dealing throughout this litigation confirms that neither the parties nor the Court intended the class to include parents whose children were released from ORR custody prior to the issuance of the June 26, 2018 class-certification order. Plaintiffs sought only a forward-looking class definition, and provide no explanation for why they have never before raised this assertion at any time over the last eight months, even as the government has been very clear since the very beginning as to how it was interpreting the class definition and identifying class members. *See* July 19 Status Report, ECF No. 124 (reporting on the reunification possibilities for 2,551 possible children of potential class members ages 5-17); Declaration of Jonathan White, ECF No. 86-1 at 3-5 (explaining the process of identifying class members based on separated children in ORR custody); *see generally* July 6, 2018 Hearing Tr., ECF No. 93. Moreover, not only did Plaintiffs propose the forward-looking class this Court adopted, Plaintiffs did not object to—and again adopted—the explicit inclusion of language in the settlement agreement defining "*Ms. L* Class Members" as "adult alien parents who entered the United States at or between designated ports of entry with their child(ren), and who, on or before the effective date of this agreement: (1) were detained in immigration custody by the DHS; (2) have a child who was or is separated from them by DHS

and, **on or after June 26, 2018**, was housed in ORR custody, ORR foster care, or DHS custody . . . ." Settlement Agreement, ECF No. 220-1, at 1 n.1 (emphasis added). Where Plaintiffs proposed, have not objected to, and expressly adopted this limitation on the class definition throughout the course of this litigation for a period of almost six months, they should not now be allowed to argue that the parties and the Court actually intended otherwise.

**Fourth**, Plaintiffs' further arguments for their own position lack merit. Plaintiffs assert that the Court could not have meant to include the above-described limitation on the class definition because such a limitation would have excluded the named Plaintiffs, Ms. L. and Ms. C., from the class at the time that the class was certified. *See* Mem. 2-3. Plaintiffs' argument misstates the role of the two named plaintiffs in this case. The two named plaintiffs were both reunited with their children before the Court's class-certification and preliminary-injunction orders, and so did not benefit from those orders. At the time the government's brief on class certification was filed, both named class members had been released from custody, and ORR had released Ms. L.'s child into her custody. The government pressed that their claims were moot, and that they were no longer adequate class representatives. At Plaintiffs' urging, the Court concluded otherwise, ruling that the voluntary cessation exception to mootness applied, and holding that mootness therefore did not render the named plaintiffs inadequate as class representatives. Thus, the Court

long ago understood that the named plaintiffs were situated differently than those who were meant to benefit from the Court's class-certification and preliminary-injunction orders. However, this does not alter the Court's plain intent to issue forward looking relief. Moreover, the named plaintiffs are not cannot be adequate class representatives for the expanded class Plaintiffs now urge the Court to adopt because neither of their children were released to other sponsors, and both of them sought reunification with their child directly from ORR. Accordingly, nothing about the two named plaintiffs should affect the plain reading of the class certification order excluding parents whose children were released before June 26, 2018

Plaintiffs also contend that the limitation at issue creates an arbitrary distinction between those included in the class, and those who are excluded. *See* Mem. 3. But as an initial matter, for the reasons discussed above, the line drawn is not arbitrary but is logically related to the differing legal issues involved between parents whose children were in ORR custody at the time of the order – in other words, a child where the government is continuing to assert custodial authority over the child -- and those whose children had been released. Parents of children released from ORR custody prior to June 26, 2018 could possibly have a separate legal claim, but such a claim would require a plaintiff experiencing the alleged harm and a complaint laying out the injury being caused by the government and the appropriate remedy given the fact that the child is no longer in ORR custody.  Those avenues

are not found in the allegations in this complaint, in the class definition, or in the class-wide relief ordered by this Court, which was designed to remedy a different factual and legal scenario.

Moreover, it is a fundamental rule of class certification that "[a] class definition should be precise, objective, and presently ascertainable." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotations omitted). "While the identity of the class members need not be known at the time of certification, class membership must be clearly ascertainable. The class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) (internal citations omitted)).[2] Expanding the class in the

---

[2] The Ninth Circuit recently held that Rule 23 does not contain a separate "ascertainability" element requiring movants to proffer an administratively feasible way to identify putative class members at the motion for class-certification stage. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124, n.4 (9th Cir. 2017). The court of appeals recognized, however, that other objections to class certification sometimes referred to under the rubric of "ascertainability" were still valid. The Court explained that "we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . , through analysis of Rule 23's enumerated requirements." *Id.* at 1124, n.4. Relevant here is that the court of appeals did not abandon the "definitional deficiencies" and policy considerations underlying the concept of "ascertainability;" it simply chose to address them under the rubrics of the express requirements of Rule 23. *See id.*; *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (recognizing that a class must not be vaguely defined and must be "sufficiently definite to conform to Rule 23")).

manner requested by Plaintiffs would create a class that is boundless in time, and would make it nearly impossible to ascertain the class with any level of certainty.

As noted above, Defendants have been clear with the Court and with Plaintiffs that they relied heavily on the element of the class definition limiting the class to parents whose child "is or will be" in ORR custody as of June 26, 2018 when they identified class members at the outset of the reunification process. *See* Declaration of Jallyn Sualog, attached hereto, at ¶¶ 4-8. Under the proposed expansion of the class definition, HHS would have to conduct an entirely new review using entirely different parameters to identify class members who meet this new expanded definition. *Id.* ¶¶ 13-16. Given the extremely broad parameters that would apply to this expanded class definition, such a review is not "administratively feasible." *Id.* ¶¶ 17-20; *see also* Declaration of Jonathan White, ECF No. 347-1, ¶¶ 27-36. This means that the proposed expanded class definition does not meet the ascertainability requirement for class certification.

Finally, Plaintiffs ask the Court in the alternative to modify the class definition to include parents whose children were released from ORR custody prior to June 26, 2018. *See* Mem. 4. Plaintiffs contend that such modification would be appropriate, and would meet the requirements of Rule 23. *Id.* Plaintiffs provide no explanation for their assertion that such amendment would be appropriate, and in fact it would not be for all of the reasons discussed above. Most notably, the named plaintiffs

could not meet the adequacy, commonality, or typicality requirements for these individuals who would be members of the expanded class because they are in a vastly different factual and legal situation. *See* Rule 23(a). Moreover, the fact that this expanded reading of the class definition would render it impossible to ascertain class membership not only gives reason why the Court should not "clarify" the class definition as requested by Plaintiffs, but also further gives reason why the Court should not accede to Plaintiffs' alternative request that the Court affirmatively modify the class definition in this regard.[3]

## IV.   CONCLUSION

For all of the above reasons, the Court should deny Plaintiffs' request to clarify or modify the class definition in this case.

---

[3] If the Court were to modify the class definition as requested by Plaintiffs, then the introduction of new legal issues in this case would require the Court to reconsider whether the relief afforded in its preliminary injunction is appropriate as to the newly-added class members. Defendants submit that it would not, because Defendants are not able to facilitate reunifications of children who are not within their custody and control in the same way that they could for the children of existing class members. Thus, were the Court to order the modification of the class definition requested by the Plaintiffs, then Defendants would request that the Court stay any application of the preliminary injunction order as to the newly-added class members and provide the opportunity for briefing as to what, if any, relief would be appropriate for these individuals.

DATED: February 6, 2019                Respectfully submitted,

                                       JOSEPH H. HUNT
                                       Assistant Attorney General
                                       SCOTT G. STEWART
                                       Deputy Assistant Attorney General
                                       WILLIAM C. PEACHEY
                                       Director
                                       WILLIAM C. SILVIS
                                       Assistant Director

                                       */s/ Sarah B. Fabian*
                                       SARAH B. FABIAN
                                       Senior Litigation Counsel
                                       NICOLE MURLEY
                                       Trial Attorney
                                       Office of Immigration Litigation
                                       Civil Division
                                       U.S. Department of Justice
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, DC 20044
                                       (202) 532-4824
                                       (202) 616-8962 (facsimile)
                                       sarah.b.fabian@usdoj.gov

                                       ADAM L. BRAVERMAN
                                       United States Attorney
                                       SAMUEL W. BETTWY
                                       Assistant U.S. Attorney

                                       *Attorneys for Respondents-Defendants*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is Box 868, Ben Franklin Station, Washington, DC 20044. I am not a party to the above-entitled action. I have caused service of the accompanying **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CLARIFY SCOPE OF THE *MS. L.* CLASS** on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: February 6, 2019          *s/ Sarah B. Fabian*
                                 Sarah B. Fabian

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al.,<br><br>                   Petitioners-Plaintiffs,<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS<br>ENFORCEMENT, et al.,<br><br>                   Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>**DECLARATION OF<br>JALLYN SUALOG** |

**DECLARATION OF JALLYN N. SUALOG, DEPUTY DIRECTOR
FOR CHILDREN'S PROGRAMS, OFFICE OF REFUGEE RESETTLEMENT,
ADMINISTRATION FOR CHILDREN AND FAMILIES, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Jallyn Sualog, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1.     I am presently the Deputy Director for Children's Programs for the Office of Refugee Resettlement ("ORR"), an Office within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

1.     I have held the position of Deputy Director since June of 2018.  I have been the Director of Children's Services since September 2013.  I have worked at ORR since February of 2007.  I have a Masters of Arts in Clinical Psychology.  Prior to starting at ORR, I worked as a mental health professional and I managed the child welfare and social services programs for Hawaii's largest non-profit organization.

2.      I was personally involved in HHS' efforts to reunify children with class members

in compliance with the orders by the Court in the *Ms. L.* case, though I was not a not a member

of the Incident Management Team ("IMT"), led by the Assistant Secretary for Preparedness and

Response ("ASPR"). The IMT coordinated and managed the data for the *Ms. L.* case.  As the

IMT begins to de-mobilize, ORR is resuming primary responsibility for reunifying separated

children in accordance with the Court's orders, and I am leading ORR's efforts in that regard.

The HHS Effort to Identify Possible Children of Potential Class Members Required
Significant Resources and Time

3.      I understand that the Court has defined the plaintiff class as "All adult parents

who enter the United States at or between designated ports of entry who (1) have been, are, or

will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be

separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody,

absent a determination that the parent is unfit or presents a danger to the child." The court added

a footnote, stating: "As discussed in text, *infra*, the class does not include migrant parents with

criminal history or communicable disease, or those who are in the interior of the United States or

subject to the EO." *See* ECF No. 82.  I understand that Plaintiffs in this case seek to broaden the

Court's definition of the class to include parents and legal guardians of alien children whom the

Department of Homeland Security ("DHS") separated and transferred to ORR, and whom ORR

released from custody before June 26, 2018.

4.      When HHS previously identified possible children of potential class members for

the Court, HHS applied the Court's current class definition and followed the extensive process

described in declarations submitted by Jonathan White. *See* ECF No. 227 and ECF No. 86-1.

5.      As explained in Commander White's declarations, the process initially included

ORR staff working up to 12-18 hours per day, 7 days per week. However, the Secretary quickly

deployed "surge personnel" from ASPR to assist ORR with reunification efforts, such that ORR could continue performing its core program functions. On June 22, 2018, the Secretary also activated the Secretary's Operation Center, which included activation of a 53-person Incident Management Team ("IMT"), working 12-16 hours per day, 7 days per week, in order to provide necessary logistical and administrative support. The activation of such a large team also allowed ORR to continue to perform core program functions for minors who cross the border without parents (and who far outnumber the separated children in ORR care).

6.      The IMT had the goal of identifying every possible child of a *Ms. L. v. ICE* class member in ORR care as of June 26, 2018. To that end, the IMT conducted a rigorous review to identify any and all indicators of potential separation for every child in ORR care as of June 26, 2018. The review encompassed: manual review of ORR case management records for every child in ORR care (approximately 12,000 at the time); sworn testimony from each ORR grantee on the separated children at the grantee's shelters; and dozens of data sets produced by DHS (approximately 60 data sets in all were reviewed).

7.      DHS apparently collected the large number of data sets from the numerous information systems maintained by its various components, sectors, and offices. As a result, there were many data sets from Customs and Border Patrol ("CBP"), Immigration and Customs Enforcement ("ICE"), and specific sectors or offices of DHS that were neither de-conflicted nor integrated. The IMT therefore had to analyze and reconcile the DHS data sets, together with the information maintained by ORR.

8.      This complex data analysis resulted in an initial list of approximately 3,600 potentially separated children, i.e., children for whom HHS found any information, in any data source reviewed, indicating that the child might have been separated from a parent. Following

the IMT's review of the list of 3,600 children, and further reconciliation and analysis, HHS reported to the Court a total of 2,654 possible children of potential class members.

9.      In September 2018, the IMT began a second record review to determine whether any of the other children from the list of 3,600 children who were still in ORR care should be re-categorized as possible children of potential class members.  The second record review looked at new information about those children that ORR had received from ORR shelters and DHS through ordinary program operations. On October 25, 2018, HHS reported to the Court that it was re-categorizing 13 of the children in the second record review as possible children of potential class members.

10.      In December 2018, ORR then conducted a third record review to determine whether any of the children from the list of 3,600 who were not previously identified as possible children of potential class members, and who were discharged from ORR care before October 25, 2018, should be re-categorized.  The third record review looked at new information about the children that ORR had received from ORR shelters and DHS through ordinary program operations before discharge. On December 12, 2018, HHS reported to the Court that it was re-categorizing 149 of the children in the third record review as possible children of potential class members.

11.      HHS has also determined through further data analysis and program operations that some children reported to the *Ms. L.* Court as possible children of potential class members were not, in fact, separated from parents.  HHS reported to the *Ms. L.* Court on November 29, 2018 that the total number of such children is 79.

12.      The experience of HHS in the *Ms. L* case has been that confirming whether a child was separated from a parent by DHS at the border often requires a fact-intensive and time-

consuming analysis that involves the reconciliation of data from multiple sources and the exercise of programmatic judgment to interpret the data.

### HHS Would Have to Deploy Even More Resources to Identify Possible Children of Potential Class Members Under Plaintiffs' Proposed Expansion

13.     There is no start date included in Plaintiffs' proposal to expand the scope of the class.  So to project the resources that HHS would need to identify possible children of potential class members under Plaintiff's proposed expansion, I used a hypothetical start date of July 1, 2017.  And I had my data team pull the number of unaccompanied alien children (UACs) in ORR care and custody for the time period of July 1, 2017 through June 25, 2018. The data team identified a total of 47,083 UACs in ORR care and custody for the period.

14.     During the hypothetical class period (July 1, 2017 through June 25, 2018), DHS did not consistently report potential separations to ORR using a specified data field that automated the tracking of potential separations by ORR.   Rather, DHS reported anecdotal information regarding potential separations to ORR on an *ad hoc* basis by entering it into any one of the potentially relevant fields in the UAC's case management record on the ORR online portal.  ORR conducted informal, manual tracking of any potential separations indicated in the ORR online portal. But such tracking was for program operations purposes only.  ORR did not conduct forensic data analyses of potential separations for legal or public reporting purposes because at that time, there was no legal obligation or programmatic reason to do so.

15.     To identify possible children of potential class members under Plaintiffs' expanded class definition, ORR would have to conduct a forensic data analysis of all 47,083 UACs in ORR care and custody during the period of June 17, 2017 to July 25, 2018.  That is, ORR would have to conduct an analysis similar to what the IMT did for the 12,000 children in ORR care as of June 26, 2018.  And ORR would have to conduct that analysis on a population of

UACs four times as large, while still executing all the day-to-day program operations required to care for the many thousands of children presently in ORR custody.

16.     First, ORR would have to review each case management record for each one of the 47,083 UACs to identify any indicators of potential separation.  Then ORR would have to try to collect corroborating information from ORR grantees, as well as data sets from DHS, and reconcile that data with what ORR obtains from UAC case management records.

17.     It is difficult to provide an exact estimate of how long it would take to manually pull the case management records for each child from the portal in order to determine whether there are indicia of separation.  At a minimum, logging on to the portal and then accessing the page for a particular minor takes approximately 15 to 30 minutes, as the analyst must access the online data system, locate the child and then start downloading document files.  To analyze indicia of separation, I would expect our analysts to download such documents as: the intakes page, the 30-day case review for each minor, the individualized assessment, the assessment for risk, the significant incident reports, and then individualized documentation housed in a special part of the portal (this might include psychological records, home studies, and other more individualized documents where a report would have noted a separation).  Analysts would most likely need to look through 10 to 20 documents per child.  I expect that each document would take approximately 5 to 15 minutes to download (with some downloads taking as long as 30 minutes), and then approximately 15 to 30 minutes to review.  Compiling the data for the individual UAC in a spreadsheet would take another 15 to 30 minutes.

18.     Assuming that the work described above takes 4 to 8 hours per UAC case management record, it would take 188,332 to 376,664 hours (4 to 8 hours per case multiplied by 47,083 children in ORR care between July 1, 2017 and June 25, 2018) for ORR analysts to

review all of the UAC case management records for indicia of separation.  This would translate into 100 ORR analysts working 8 hours per day, for between 235 and 471 consecutive calendar days, before they could even begin reconciling the information from the UAC case management records with any testimony from grantees or data sets from DHS. In my judgment, ORR does not have the requisite staff for such a project. ORR has approximately 150 contract and federal staff in the "division for children's services," some of whom are devoted to the refugee, and not the UAC program.

19.     Factors that could increase the time it takes for ORR to identify possible children of potential class members include any:  testimony received from grantees; data sets received from DHS; additional work required to verify the parent-child relationship.

20.     Further class membership analysis may be necessary in some cases, and would impose additional burden on ORR.  Such analysis may include:  review of criminal history and parental fitness or dangerousness; and determination of the parent's wishes regarding reunification.

<u>Plaintiffs' Proposed Expansion of the Class Presents Child Welfare Concerns</u>

21.     The vast majority of minors released from ORR custody are released to relatives. For example, in fiscal year 2017, ORR released 93 percent of children to a sponsor. Of those, ORR released 49 percent to parents, 41 percent to close relatives such as an aunt, uncle, grandparent, or adult sibling, and 10 percent to more distant relatives such as a cousin or non-relatives such as a family friend. *See* https://www.hhs.gov/about/agencies/asl/testimony/2018-07/oversight-of-immigration-enforcement-and-family-reunification-efforts.html

22.     "Once a child is released to a sponsor, ORR's custodial relationship with the child terminates." *See* ORR Guide, Children Entering the United States Unaccompanied at § 2.8.3

(available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.8.3).  ORR would have no authority to require or force a sponsor to transfer custody of a child to a separated parent to effectuate reunification.  Nor would ORR have the field personnel needed to forcibly transfer and reunify the child.

23.     Even if ORR had the authority and resources to intervene in the familial relationship between the sponsor and child, doing so would be disruptive and harmful to the child (especially if the intervention was contrary to the sponsor's or the child's wishes). Disrupting the family relationship is not a recommended child welfare practice.

24.     The child welfare concerns presented by Plaintiffs' proposed expansion of the class are significant given the potentially large number of children involved.

Conclusion

25.     Even if performing the analysis Plaintiffs seek were within the realm of the possible, it would substantially imperil ORR's ability to perform its core functions without significant increases in appropriations from Congress, and a rapid, dramatic expansion of the ORR data team. ORR would not have the authority or resources to forcibly reunify minors who are no longer in ORR custody.  Finally, reunification of minors already residing with close relatives, parents or family friends could interfere with the child's routine and currently established relationships.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 17, 2019.

_____

Jallyn Sualog, ORR Deputy Director