Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

        *Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement ("ICE"), et al.

        *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

Date Filed: February 13, 2019

**REPLY IN SUPPORT OF MOTION TO CLARIFY SCOPE OF THE *MS. L.* CLASS**

According to the January 2019 OIG Report, ORR officials "estimate that thousands" of additional children may have been separated, and that these separations began in July of 2017, with the El Paso sector pilot program.  OIG Report, Dkt. 344-1 at 3 (El Paso), 6 ("thousands").  The scope of the problem is larger than plaintiffs or the Court previously knew.

The past months have demonstrated that the victims of family separation are in desperate need of assistance.  Parents and children, some of whom were infants, had been lost to each other for months and severely traumatized by Defendants' actions.  The government should be required to identify these pre-June 26 families whom it illegally separated on or after July 1, 2017.  The government should provide that data, along with information about the location of the children and parents, to plaintiffs.  Plaintiffs will then work with partners—in a similar manner to the work done by the Deported Parents Steering Committee—to locate, communicate with, and counsel the families to provide them with the assistance they need.

HHS argues that the burden of simply identifying these families is too great, because they had no internal processes to track the families.  But the government should not be able to avoid its responsibility to the victims of the separation program by hiding behind its institutional failures.  Moreover, as the affidavit submitted with this brief explains, the government is overstating the burden, because HHS need not undertake this task alone; other agencies will have data that will significantly reduce the burden on HHS.  *See* Declaration of Child Advocates, Exh. A ¶ 3.  Additionally, the Court can order that the process proceed in stages, as it has previously done, so that the children who are with very distant relatives or non-relatives are located first.

The government further argues that parents of children who were released before June 26 present different questions of *relief*.  But this confuses the question of relief with the question of liability.  The pre-June 26 children suffered the same harm from the same illegal government policy.  The fact that the children are no longer in

ORR custody may have some effect on the remedies available to the class members, but the government can at a minimum *identify* the children and explain what has happened to them.

The government also suggests plaintiffs should have raised the question of class membership earlier. But plaintiffs do not have access to the government's 60-plus databases or to the officials interviewed in the OIG Report—only to the information from the ground and whatever the government provides. And plaintiffs' counsel acted when it was clear that there were a sizable number of class members unaccounted for and that the government was interpreting the class definition so as to not account for them or provide them with any relief.

Plaintiffs brought this case in March of last year to end the government's unlawful family separation policy and address the harms it inflicted. Plaintiffs' reading of the class definition is fully in line with that goal and the Court's intent in certifying a class to ensure that all the families the government separated are identified so they may receive the help they may need.

**A. The Class Definition Encompasses Parents Separated Prior to June 26.**

The Court defined the Ms. L class as:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

Dkt. 82 at 17 (emphasis added). The definition contains no date. The government nonetheless interprets Clause 2 (the child "is or will be separated . . . and detained") to mean "is or will be separated . . . and detained" on the date the class was certified on June 26. That reading does not square with the purpose of the lawsuit or the problem this Court sought to fix in its ruling. The class is intended to encompass *all* parents whose children were illegally separated.

Inclusion in the class is defined by two criteria. First, the parent must be placed

2

in ICE detention ("have been, are, or will be detained").  Second, the parents must "have a minor child who is . . . separated . . . and detained in ORR custody" absent a best-interests determination.  The relevant date for when the child must have been in ORR custody is not the arbitrary date when this Court issued its decision, but rather the date when a parent was separated, *i.e.*, was the child placed in ORR custody on or after the parent was separated.  Thus, the language "is or will be" refers to the date of the parent's separation, and not the date the Court happened to rule.

The government's reading would mean that—although plaintiffs filed their motion for class certification three and half months earlier, on March 9—those parents whose children had been separated and detained, but released to sponsors during those months, are excluded.  Plaintiffs' reading, in contrast, accords with the history and intent of the litigation and the Court's orders.

When plaintiffs filed this case, plaintiffs did not propose a temporal limitation based on the date a child was released from ORR custody.  Plaintiffs sought to represent *all* the parents injured by the policy.  The Court's June 26 orders aligned with plaintiffs' intent.  The Court's reasoning in its preliminary injunction decision did not draw a distinction between those children who were in ORR custody on that day and those children who had been previously released.  In certifying the plaintiffs' class over the government's opposition, the Court understood that "the crux of this case is the government's practice of separating migrant parents from their minor children and continuing to separate them without any showing the parent is unfit or presents a danger to the child."  Dkt. 82 at 17.  Similarly, in granting the plaintiffs' requested injunctive relief, the Court sought to stop the government's "practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child" and the "lack of any effective procedures or protocols for notifying the parents about their children's whereabouts or ensuring communication

between the parents and children, and the use of children as tools in the parents' criminal and immigration proceeding[.]" Dkt. 83 at 17.

The government argues that parents whose children were released before June 26 present "entirely separate legal concerns than those with which the Court and the parties were concerned at the time of class-certification." Dkt. 351 at 13, 16. But both groups share the same legal claim: whether the family separation policy violated due process. The necessary injunctive relief is also the same: families must be provided the option to reunify. The mechanics by which the relief is provided to the pre-June 26 group may be different. But the Court has already approved different protocols to reunify separated parents who remain in ICE detention, separated parents who were released from ICE detention into the interior, and separated parents who were deported. In each context, the framework is the same: the government must identify families who were separated and then, through the use of appropriate systems, the families must be located and counseled as to their options for reunification. And Plaintiffs are once again prepared to undertake that task.

**B. Defendants' Assertion that Plaintiffs Somehow Assented to Their Interpretation of the Class Definition is Misguided.**

The government argues that plaintiffs shared its interpretation of the class definition for months before raising this issue, and that these children and parents have thus forfeited their right to be together. But even assuming plaintiffs were on notice of the government's view of the class as early as July, the revelation that thousands of children were separated and released from ORR custody prior to June 26 must be the paramount consideration.

Moreover, the government overlooks the fact that this litigation has proceeded in stages based on the urgent need to effectuate reunifications as swiftly as possible. The first phase focused on reunifying dozens of children in ORR custody under the age of five, a process marked by substantial chaos and confusion because of the

government's failure to create any systems to facilitate reunification.  The next phase focused on the reunification of the remaining 2000-plus children who remained in ORR custody—a number that was constantly fluctuating during July through August and, indeed, changed in December with the addition of 149 more children who were separated.  Throughout this process, information about parents was fluid.  plaintiffs were reacting to limited, chaotic and oftentimes conflicting information from the government as to the number of class members and their identities, and acted to clarify the class definitional question once it was clear from on the ground advocates there were a number of cases presenting a need for further intervention from the Court.  Neither plaintiffs, nor this Court, could possibly have known the true scale of the problem, and the government never reported it.

### C. The Class Representatives are Adequate and Clarification Would Not Make the Class Unascertainable.

The government contends that clarifying the class definition would "create an adequacy problem" because neither Ms. L nor Ms. C had children released from ORR custody to a sponsor.  Dkt. 351 at 2.  The adequacy inquiry focuses on whether the named plaintiffs would protect the interests of absent class members, and "a sharing of interests between representatives and absentees." *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998).  The government cannot genuinely claim that Ms. L and Ms. C would fail to vigorously prosecute this action, in light of their performance as class representatives to date.  As plaintiffs have explained, Ms. L and Ms. C have suffered the same injury—the unlawful separation of parents from their children.  Any purported differences going to remedy between the existing class representatives and members of the clarified class "have no bearing on the class representatives' abilities to pursue the class claims vigorously and represent the interests of the absentee class members." *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998).  Indeed, "the government's argument is particularly weak in light of the fact that the class representatives have been so successful in their efforts to obtain relief for the *entire*

class." *Id* (emphasis added).[1] For instance, the class representatives have been successful in representing the interests of *deported* parents, even though neither Ms. L nor Ms. C was deported prior to reunification.

The government also suggests that clarifying the class definition would render the class "impossible to ascertain . . . with any level of certainty." Dkt. 351 at 17.[2] But the government does not seriously claim that the clarified class definition lacks objective criteria. If the government is concerned about reaching too far back into the past, the Court can simply use the beginning of the El Paso pilot family separation project (or the beginning of this Administration) as the relevant starting date.

Nor does the government convincingly argue that identifying the class members would literally be impossible—to the contrary, their own declarant describes in detail the steps required to perform the analysis. *See* Dkt. 351-1, ¶¶ 13-20 (explaining ORR's methods of identifying class members). Rather, the government's main argument is that that the work of identifying class members would be too "burdensome." Dkt. 351 at 5.[3]

---

[1] Should the Court find that Ms. L and Ms. C are not adequate class representatives for this group, Plaintiffs will substitute new class members to serve this purpose.

[2] The government concedes that the Ninth Circuit has squarely held that Rule 23 contains no discrete "ascertainability" requirement. Dkt. 351 at 17 n.2. And imposing such a requirement would be particularly inappropriate in the context of a Rule 23(b)(2) class action that involves injunctive relief only. *See id.* at 1127 n.7 (recognizing that Third Circuit had declined to extend its "ascertainaibility" rule to Rule 23(b)(2) classes); *see also* Fed.R.Civ.P. 23 advisory committee's note (1966) (stating that "illustrative" examples of Rule 23(b)(2) classes "are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration*") (emphasis added).

[3] As in earlier phases of this case, multiple courts have certified Rule 23(b)(2) classes where a review of the defendant's files, sometimes supplemented by other information, would identify class members. *See Des Roches v. California Physicians'*

The government concedes, however, that it already possesses the information necessary to identify class members in its own files. Although the government will need to review its files to determine which parents were separated from their children, the government has already used a similar process to identify class members.

Additionally, the government's declarants do not acknowledge that the burdens on ORR could be mitigated with the help of other relevant agencies, most importantly DHS and its various components. The aid of other agencies would significantly alleviate ORR's burden: Commander White testified before Congress last week that "[w]e absolutely do know to whom we have discharged every child who has been in our care," and that ORR could report in detail on where a child was released with a list identifying pre-June 26 separations.[4] "[I]f someone cared to give us that list," White testified, "we could walk through it." Feb. 7, 2019 Congressional Hearing at 2:07:51. This is corroborated by the declarations of experts with substantial expertise and insight into government agencies that interact with immigrant children, who state that multiple agencies working together could feasibly identify all the clarified class

---

*Serv.*, 320 F.R.D. 486, 512 (N.D. Cal. 2017) (rejecting "administrative feasibility" arguments where "Defendants can determine which claims are denied . . . by reviewing the relevant files"); *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 WL 3895764, at *8 n.12 (N.D. Cal. Sept. 6, 2017) (class could be identified using defendant's database, combined with cross-checks with other relevant lists); *see also Schneider v. Chipotle Mexican Grill, Inc.*, No. 16-CV-02200-HSG, 2018 WL 4700353, at *16 (N.D. Cal. Sept. 29, 2018) (certifying Rule 23(b)(3) class and recognizing that existence of "some difficulty in identifying all class members is not dispositive").

[4] On February 7, 2019, the House Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce held a hearing on "Examining the Failures of the Trump Administration's Inhumane Family Separation Policy," available at https://www.c-span.org/video/?457545-1/gao-hhs-officials-testify-migrant-family-separation-policy. The quoted excerpt can be found at timestamp 2:07:03.

members. Child Advocates Decl., Exh. A ¶¶ 2, 3.  Adopting the government's burden defense would improperly reward the government for its institutional failures.  This systemic deficiency is a central finding of the HHS OIG report.  *See, e.g.*, Dkt. 344-1 at 6 (finding no meaningful tracking system).  The government should not now be allowed to use this deficiency as a defense to class certification.  Such a ruling would create perverse incentives—government agencies could enact unlawful policies against large groups, fail to keep any records or documentation concerning the affected individuals, and then later claim that finding them is not "feasible."

There is no doubt that the government can undertake this task if required to do so.  As Commander White pointedly told Congress:

> "[W]e were able to successfully reunify thousands of children with their parents because Judge Sabraw in the Southern District of California created a pathway through his orders for us to do that. We could not have effected the reunification of children with their parents in ICE custody absent his providing a way to do that."

Feb. 7, 2019 Congressional Hearing at 1:57:42.

## C. Relief For The Pre-June 26 Group Is Needed and Feasible

The government states that aggregate statistics about ORR "suggest that if a separated child who ORR discharged before June 26 remains in the United States then he or she is *probably* with their family."  Dkt. 347-1 ¶ 34 (emphasis added).  But that does not mean that all the children are "probably" with their parents, only that they are probably with a family member.  Moreover, according to the government's own figures, about 10 percent of all children are released from ORR care to "distant" relatives or people to whom the children are not even related.  Dkt. 347-1 ¶ 34.  *See also* Child Advocates Decl., Exh. A ¶ 7.

The government also suggests that it might better for the children not to be located because the process would require ICE "entering households to remove

8

previously-separated minors" to re-detain them and then reunify them with separated parents. *Id.* ¶ 36. But there is absolutely no reason to take that path: plaintiffs agree that, having traumatized children once, the government should not do so again. The correct option, as a member of Congress noted last week, is to "determine where the children went, who they were separated from, [and] make sure their parents and guards know where they are." Feb. 7, 2019 Congressional Hearing at 2:09:22. That outcome, Commander White testified, is important and feasible if ordered by the court: "We are eager to comply, as we have thus far, with whatever [the Court] determines that we need to do," he testified. "And I think it's very important that people know the full story." Feb. 7, 2019 Congressional Hearing at 2:09:28.

Plaintiffs stand ready to create a Steering Committee, similar to that dealing with the sensitive issue around the reunification of children with their deported parents. The first step is for the government to identify the parents and children whom they illegally separated and provide relevant information from files to plaintiffs—just as was done for the deported parents. From there, plaintiffs will work with experts, the Court and the government, to implement an appropriate plan to contact and counsel parents and children as to their choices about reunification and enable reunification where requested when it is in the child's best interests. Child Advocates Decl., Exh. A ¶ 6. The stakes for these families are too high for the government to wash its hands of the problem.

## CONCLUSION

Plaintiffs' motion should be granted.

Dated: February 13, 2019

Respectfully Submitted,

*/s/Lee Gelernt*
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*
*dgalindo@aclu.org*

*Admitted Pro Hac Vice*

 Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 2922080)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*samdur@aclu.org*

10

### CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: February 13, 2019

11

EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"), et al. | Date Filed: February 13, 2018 |
| *Respondents-Defendants*. | **DECLARATION OF CHILD ADVOCATES** |

### Declaration of Child Advocates Michelle Brané, Maria Odom, and Scott Shuchart

1.      We are employed by organizations that, among other missions, advocate for children seeking asylum in the United States. Declarant Michelle Brané is Director of the Migrant Rights and Justice program at the Women's Refugee Commission (WRC). Declarant Maria Odom is the Vice President for Legal Services at Kids in Need of Defense (KIND). Declarant Scott Shuchart is a legal services consultant for KIND. Each of the declarants previously worked in one or more of the government agencies involved in administering the asylum and immigration system: Brané at the Department of Justice's Executive Office of Immigration Review, and Odom and Shuchart at the Department of Homeland Security (DHS). Shuchart left DHS in August 2018 and is generally familiar with its immigration data systems. WRC and KIND have previously submitted declarations in this case.

2.      As organizations with longstanding experience and knowledge in working with unaccompanied children and families seeking protection at our borders, WRC and KIND recognize that regardless of the potential complications in doing so, the

1

identification of all parents and children separated at the U.S./Mexico border is critical to identifying children at risk of permanent separation from their parents and is a potentially life-saving exercise.

3.      We recognize that the Department of Health and Human Services (HHS) is claiming that it would require extensive resources to identify separated children discharged before June 26, 2018.  However, as noted above, we believe that this effort should be undertaken.  We also wish to stress that the burden would be significantly lessened if HHS did not have to undertake this task alone, and had cooperation from the other agencies involved in family separation.

3.      It is reasonable to require the various agencies involved in the separation of families to collaborate and share information for the identification of families that had been separated by the government.

4.      We do not endeavor to set out all the ways in which the agencies can work together to identify the families.  We note a few possible approaches involving information sharing and coordination between the agencies:

a.      Family unit identifier numbers. It is our understanding that CBP may have some way of accessing these numbers, which were codes created in a CBP database when family units were apprehended together. It is our understanding that this code was erased (or overwritten) by computer systems when Defendants separated family members. We believe CBP may still have some access to this number in its live system. If not, it would be reasonable for this data to have been backed up, and CBP could be directed to examine data backups for places where the identifier number was recorded before it was erased.

b.      Reviewing apprehension records for all children transferred from CBP to ORR during the period in question to identify adults apprehended and processed at the same time and in the same place. In many, perhaps nearly all, cases, the parent and child will have been given consecutive alien identification numbers ("A-

2

numbers"). At a minimum, it should be a relatively simple matter for DHS to cross-walk the A-numbers of the children apprehended and transferred to ORR with consecutive A-numbers issued to adults at the same time and place, and from that list identify possible family members.

c.      For any adults who were separated from a child and who remain in ICE custody or under ICE supervision today, ICE has full ability to communicate with them. ICE could be directed to ask all adult detainees apprehended by CBP during a particular time period whether they were apprehended with a child who was separated from them.

d.      In an April 20, 2018 article, the *New York Times* reported on a list of 700 separated children HHS had already prepared. This list could be used to identify possible additional separations. *See* C. Dickerson, "Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border," *N.Y. Times* (April 20, 2018), *available at* https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

e.      We understand that case workers at ORR and its contractors have identified cases of separated families and contacted ICE to put the separated children in touch with their parents while the parent was in ICE or Bureau of Prisons custody. ICE should have records of any such cases brought to its attention and could be directed to review those records.

6.      We agree with Cmdr. White that ICE should not visit the homes of sponsors of separated, traumatized children.  Our experience working with this population indicates that with appropriate communication between child, sponsor, and parent, the best interest of the child could be realized without re-traumatization, and without requiring the direct participation of the government. Our organizations would be willing to participate in a steering committee, information process, or other facilitation role, at the Court's direction, to ensure that parents and children

3

who remain separated can be in contact and the parent enabled to make an appropriate decision about reunification.

7.     The government says that most children were probably released to family.  But not *all* will have been released to family, as the government concedes.  Moreover, while ORR's procedures for discharge to more distant relatives are generally appropriate, the Court should appreciate that many of those relatives are strangers to the children affected. The children were mostly raised in foreign countries and may never have met their father's brother, mother's cousin, or sister's fiancé before the ORR placement process. Even the best efforts of a collateral-relative sponsor cannot substitute for the practical knowledge a custodial parent has of his or her child's best interests.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 13, 2019.

_____/s_____
Michelle Brané
_____/s_____
Maria Odom
_____/s_____
Scott Shuchart

4