UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L., et al.,<br>Petitioners-Plaintiffs,<br>vs.<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br>Respondents-Defendants. | Case No. 18cv428 DMS MDD<br><br>Hon. Dana M. Sabraw |

## SUPPLEMENTAL DECLARATION OF JONATHAN WHITE

I, Jonathan White, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my official duties, information supplied to me by federal government employees, and government records.

2. This declaration supplements the declaration that I executed on April 5, 2019, which is attached here as Exhibit 1. The purposes of this declaration are to summarize the case management information that ORR keeps on the UAC Portal, provide additional details about the Government's Proposed Plan to identify members of the expanded class (which would rely on the UAC Portal), and share my concerns about Plaintiffs' proposed plan.

### Individualized Case Management and the UAC Portal

3. ORR administers the Unaccompanied Alien Children (UAC) program through a network of approximately 115 care providers located in 17 states. The care providers are ORR grantees. They help ORR conduct individualized case management of UAC.

4. ORR uses an information system called "the UAC Portal" to administer the UAC program across the ORR care provider network. The main purpose of the UAC Portal is to enable individualized case management of UACs, not population-level analysis of all

1

UACs in ORR care. It consolidates into a single, unified electronic case management record the most relevant information that HHS possesses for each child.

5. The case management process begins when ORR receives a referral of the unaccompanied child from DHS through the UAC Portal. Upon receiving the referral, the ORR Intakes Team uses the UAC Portal to designate a bed for the child at a facility in the ORR care provider network. Once the child arrives at the facility, the care provider staff documents in the UAC Portal all aspects of the UAC's care while in ORR custody. This includes comprehensive assessments of the child's history and family systems, as well as any child needs assessments, youth care services, health care and behavioral health care, significant incident reporting, child protection, and discharge planning for the UAC.

6. The information about the UAC that DHS provides to ORR at the time of referral is captured in the Portal. This would include any information derived from the I-213 or other law enforcement apprehension records which DHS shares with ORR. Any such information conveyed by DHS is included in the Referral section of the Portal and, in that way, becomes part of the child's case management record.

7. The case management record for an individual child on the UAC Portal also includes information entered directly by care provider staff—including case managers (professionals who coordinate discharge planning and family connection services for children), youth care workers (state-certified individuals who provide individual line-of-sight supervision and care to children), clinicians (licensed behavioral health professionals who provide mental health care to children), health care personnel such as doctors and nurses who conduct children's initial medical evaluation and subsequent medical care, teachers who provide classroom educational services to the child, and any other professionals who interact with the child.

8. Additionally, the case management record for an individual child on the UAC Portal includes uploaded documents in portable document format (PDF) for relevant information which was originally on paper (and was not entered directly into the UAC Portal). This includes paper records of health care services delivered, legal documents

related to the child, as well as documents provided by the family relevant for sponsor vetting and discharge, such as birth certificates, printouts related to background checks, employment verification. Significant paper documents related to the child are uploaded into the UAC Portal so as to be available to ORR Federal staff as well as care provider staff.

9. Separate from the case management record for the child, which is entirely contained in the UAC Portal, individual care providers may maintain paper files on each child. In my experience, the paper files kept by care providers are usually duplicative of the uploaded PDFs and other contents of the UAC Portal. In those instances where the paper files contain information beyond what appears on the UAC Portal, such additional information is typically immaterial to the case management process. That is, the additional information is not material to the child's welfare while in ORR care, or the process of identifying and vetting family members to serve as sponsors for the child.

10. In addition, the paper files do not contain critical information that is maintained on the UAC Portal, such as the referral information from DHS.

### The Government's Proposal to Identify Potential Expanded Class Members

11. On April 5, 2019, the Government submitted a Proposed Expanded *Ms. L.* Class Identification Plan that is designed to identify substantially all class members **within 6 months**. The Government recognized that the identification process might take longer to complete, possibly up to 1 to 2 years, if the Government were to instead conduct a randomized or date-ordered manual review of all HHS and DHS records for all of the approximately 47,000 children from the class expansion period. *See* ECF No. 394.

12. The Government seeks to streamline and accelerate the record review—and condense the time period for identifying substantially all class members from 1 to 2 years down to 6 months—by applying a statistical prediction model to the records in the UAC Portal, as developed from an analysis of variables associated with the children of original class members. *See* ECF No. 394. The purpose of the model would be to prioritize the record review based on the likelihood of parental class membership, and front-load the identification of potential class members.

13. To accomplish the plan, the Government would hire and train a team of data scientists and scalable teams of record reviewers on a contract basis. Ordinarily, Federal procurements for services of this type would require approximately three to four months for the Federal acquisition process and an additional thirty days for recruitment of staff. Here, the Government seeks to complete the procurement within six weeks. The contract personnel for record review would arrive with cleared background checks, and would work full-time reviewing and reconciling case management records and other information for the population of children discharged from ORR care during the expansion period.

14. The Government estimates it would take approximately 12 weeks to develop its statistical prediction model and apply it to the approximately 47,000 relevant records. During that time, the Government would conduct concurrent record review for prioritized populations such as the list produced by Customs and Border Protection (CBP) of children separated after April 19, 2018, as well as the informal tracking list of children identified as separated by ORR beginning in 2017. My preliminary assessment is that those two lists combined are likely to yield between 500 and 1,000 children for record review, after the lists are compared against the children who were in ORR care as of June 26, 2018.

15. My professional opinion is that the statistical analysis is essential to the rapid and accurate identification of possible children of potential class members for the expanded class period. Nevertheless, the process of record review can be initiated with prioritized populations prior to the completion of the statistical analysis process.

16. I anticipate that record review of the two prioritized populations would begin on a limited basis within 10 days. While finalizing the procurement of contract personnel, the Government would deploy specialized Federal personnel from the U.S. Public Health Service Commissioned Corps to conduct record review. The Federal personnel would be trained by ORR subject matter experts and overseen directly by me.

17. The initial focus of the record review would be on factual indicia of separation. If the record review team were to find an indicator of separation, then it would reconcile that indicator with the other information in the child's case management record. If the

record review team were to conclude that the child was likely separated, it would obtain any additional, available information about the child's parent from DHS. Such information would be used to determine potential class membership. The Government would provide lists of potential class members to Plaintiffs on a rolling basis.

18. The Government used a similar process to identify possible children of potential class members in 2018. The key difference is that the Government does not have custody of the children for the expansion class period and cannot speak with them directly. The information that the Government obtained from children in ORR care in 2018 was critical to identifying separations on an expedited basis. Without that information, the reconciliation of indicia of separation becomes all the more critical.

**Concerns With Plaintiffs' Proposal**

19. On April 15, 2019, Plaintiffs objected to the Government's proposal, and claimed that U.S. Immigration and Customs Enforcement ("ICE") already had a list of children separated from their parents and released from ORR custody between April and June 2018. (ECF No. 397). I have no knowledge of such a list. Since April 15, CBP has produced to me a list of children who were potentially separated between April and June 2018. We are in the process of comparing that list against the children who were in ORR care as of June 26, 2018, to determine which children should undergo record review.

20. Plaintiffs also made recommendations on how to identify class members for the expansion period. Some of those recommendations—such as reviewing records during the first 90 days of the work—are part of the Government's plan. Other recommendations would decrease the accuracy or speed of the process, or possibly harm ORR's current operations and ability to care for the UACs presently in custody.

21. For example, Plaintiffs recommended that case managers review ORR care providers' paper files to identify class members during the expansion period. This would require a redeployment of case managers from 115 facilities to search for, retrieve, and review the paper files at a time when ORR is operating at approximately 97% of its bed capacity, and facing an influx of UACs across the Southern Border. ORR needs all case

managers fully engaged in day-to-day case management to achieve a discharge rate that keeps pace with the rate of UAC referrals. If discharges were to fall below referrals due to a redeployment of case managers to paper file reviews, ORR might exhaust its bed capacity. The result would be backups of UACs at CBP border stations, which are short-term holding facilities not suitable for children for stays of longer than 72 hours.

22. My professional opinion is that pulling even a few case managers away from their normal duties to conduct or support a paper file review would slow the discharge rate for all UACs, and create a risk of a backup at CBP Border Stations. As the person who led the UAC Program's emergency operations in past influx events in 2012, 2014, 2016, and 2017, I am deeply opposed to any proposal to take case managers away from their urgent mission of safe and timely discharge of children currently in care.

23. Plaintiffs' approach is also problematic because the UAC Portal is a better tool for quickly identifying possible children of potential class members. The UAC Portal contains the information from the paper files that the case managers themselves deemed material to the case management process. Plus, it contains highly relevant information that does not appear in the paper files, such as the referral information from DHS. The UAC Portal is the natural starting point for any review because it already aggregates the most relevant information available to the Government. Plaintiffs' proposal to review all paper records at all care providers' facilities across the country would result in a duplicative, wasteful, and slower process than review of the UAC Portal online. The far better approach is to review the UAC Portal, and expand the analysis to paper records on a case-by-case basis when there is a specific, identified reason to do so.

24. Plaintiffs request that the Government review DHS I-213s and Event ID numbers. As indicated in my previous declaration, *see* ECF No. 394-2 at ¶ 20, the Government plans to review available DHS records that bear on class membership. I envision that the record review team will identify children who were likely separated. The names and Alien Numbers of the children will be conveyed on a rolling basis to CBP and ICE, which will conduct reviews within their own information systems on those Alien

Numbers, including the DHS I-213s and information corresponding to the Event ID. This DHS analytic process would inform the development of the lists of potential class members which will be provided to the Plaintiffs on a rolling basis.

25. Plaintiff's proposed three-month timeframe for the Government to complete the identification of potential class members is unrealistic. Plaintiff's proposal assumes the Government could simply replicate its extraordinary mobilization of resources from last summer. But, at that time, the children were in ORR custody, and the Government was able to reconcile its records quickly by asking the children whether they were separated from their parents. Plus, a similar mobilization would jeopardize current ORR operations given the influx of UACs across the Southern Border.

**Conclusion**

26. It is my belief based upon my experience that it is possible to accelerate the accurate identification of potential class members. The timeframe of 1 to 2 years is accurate as an outer bound, and the plan proposed by the Government is intended to compress that timeframe to 6 months. Because this effort would be unprecedented, I cannot guarantee a specific timeframe, but it is my firm belief that the Government's plan is the fastest means available to identify potential class members for the expansion period. I am fully committed to working in good faith with the Court and Plaintiffs to implement the plan.

Executed on April 24, 2019.

_____
Jonathan White