UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Ms. L., *et al.*, <br>     *Plaintiffs,* <br><br> v. <br><br> U.S. Immigration and Customs <br> Enforcement, *et al.*, <br>     *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 3:18-cv-00428-DMS-MDD |

**DECLARATION OF JAY VISCONTI**

I, Jay Visconti, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows, relating to the above-captioned matter:

1. I am an Assistant Chief with the United States Border Patrol (USBP) currently serving in the capacity as a Senior Advisor to the Chief Operating Officer and Senior Official Performing the Functions and Duties of the Commissioner, U.S. Customs and Border Protection (CBP), Department of Homeland Security. I have been in this role since July 2016. In this role, I am responsible for directly supporting and advising the Chief Operating Officer and Senior Official Performing the Functions and Duties of the Commissioner, as well as the Deputy Commissioner, on issues such as USBP's strategic, operational and tactical plans, and policies and procedures governing threats, such as: terrorist organizations, criminal organizations, illegal immigration/human smuggling, narcotics and contraband smuggling, transnational gangs, threats to legitimate trade and travel, and imported consumer products jeopardizing public safety. An additional role that I perform is as the Director of the

    CBP Statistical Tracking and Analysis Team (STAT), which provides high-level analysis and reporting into CBP's immigration and seizure data. Because of my work with the CBP STAT, and my previous position as the Assistant Chief over the USBP's Statistics and Data Integrity (SDI) Branch, I was involved in the previous *Ms. L* reunification efforts, and was again called upon to be the CBP Operational Lead for the government's plan to account for the members of the expanded *Ms. L* class.

2. Prior to serving in this position, I was the Assistant Chief over the USBP SDI Branch, where I provided day to day statistics and analysis to USBP senior leadership and worked to ensure data quality within the USBP data. I have been a U.S. Border Patrol agent since January 2, 1996. The U.S. Border Patrol (USBP) is the operational component of CBP with the responsibility of, among other things, apprehending individuals who enter between the ports of entry. USBP maintains information about individuals in its custody in a system of records known as e3. E3, which is a suite of applications containing multiple modules, contains information that USBP collects and maintains to prevent the illegal entry of people, terrorists, terrorist weapons, and contraband from entering the United States between ports of entry. This information includes, among other things, biographic, biometric, and other enforcement and detention data associated with encounters of individuals between the ports of entry. I am familiar with the development, capabilities and updates to the e3 system. Prior to serving as the Assistant Chief over the USBP SDI Branch, I was the program manager for the requirements gathering, design and development of the e3 suite of applications (Processing, Prosecutions, Biometrics, Assaults, and Detention modules).

3. The Office of Field Operations (OFO) is the operational component of CBP which has responsibility for, among other things, inspecting individuals who present themselves at ports of entry seeking admission. OFO uses a system which is in many way similar to e3, known as SIGMA. I have general familiarity with SIGMA and its capabilities.

4. I am familiar with the *Ms. L* litigation, and have personally participated in CBP efforts related to this litigation. In July 2018, I served as CBP's main point of contact in the interagency effort to identify and reunify the children of *Ms. L* class members. During this role, I worked closely with the Department of Health and Human Services (HHS) and U.S. Immigration and Customs Enforcement (ICE). I worked with the HHS ASPR Data team to reconcile unaccompanied alien children file records identified by HHS as possible separations with the relevant data in CBP's electronic systems of records.

5. I am also familiar with CBP's efforts to record and track family separations in CBP's electronic systems of records, and work closely with relevant individuals in both USBP and OFO on such efforts. I also communicate regularly with my colleagues at ICE Enforcement and Removal Operations (ERO).

6. I am CBP's Operational Lead for the government's plan to identify members of the expanded *Ms. L* class, as identified in the filing submitted to the Court on April 5, 2019. In this role, I am working closely with a team of data experts to review relevant CBP files and provide relevant information to the Data Analysis Team for further review. I provide more detail about this process below.

7. I make this declaration in order to explain the efforts that CBP has already undertaken as part of the government's plan to identify the members of the expanded class, and to explain CBP's role in the process.

*Identifying Children Separated between April 19 and June 26, 2018*

8. Following the expansion of the *Ms. L* class on March 8, 2019, I became CBP's Operational Lead for the government's plan to identify members of the expanded class.

9. CBP's USBP began tracking separations in our electronic systems of record starting on April 19, 2018. I understand that OFO took steps to identify separations prior to June 29, 2018, when the system was updated. Thus, I determined that CBP would provide Commander White and his team with the data reflecting all separations documented by CBP between April 19 and June 26, 2018. This information is not a final list of class members, but it is important data that can be used in the process of identifying the children of potential expanded *Ms. L* class members. CBP maintained this information in USBP and OFO's electronic system of records.

10. In the past week, using the separations data from this time period, USBP and OFO have pulled the relevant cases out of their electronic systems of records, as well as information that was manually tracked, and compiled that data into lists contained in spreadsheets. These lists included all separations of children from their parents or legal guardians recorded from April 19, 2018 through June 26, 2018, regardless of the reasons for the separation. I provided Commander White with the OFO list on April 17, 2019 and with the USBP list on April 19, 2019. The OFO list reflected data

retrieved through June 28, 2018, but no separations were recorded after June 26, 2018.

11. It is my understanding that Commander White and his team will use this and other data to prioritize HHS case files for review to identify possible children of potential class members. Once Commander White and his team have finished their review of their own case files and identified these possible children of potential class members, both CBP and ICE will review its own data to make a determination regarding the circumstances of any separation and to assess class membership. The Data Analysis Team expects that this review will be an iterative, collaborative process.

*CBP's General Role in the Government's Identification Plan*

12. In general, as described in the government's April 5th filing, the government's plan is intended to be a collaborative, interagency review process, with each agency reviewing their own respective data and exchanging relevant data on a rolling basis. The government's ultimate goal is to identify members of the *Ms. L* class with as much accuracy as possible.

13. Specifically, I expect that CBP will regularly receive information from HHS about children whose file revealed some indicia of separation. CBP will then search its electronic systems of record to determine whether there is a record of the child being encountered with a parent, whether there is a record of the child being separated from that parent, and the reason for such a separation. CBP will generally conduct this review by searching for the child's Alien File number (A-number), and then reviewing all relevant records relating to that particular child's encounter.

14. For instance, CBP may search a child's A-number and find that the child was encountered as part of a group of individuals. It would then be possible for CBP to look through other members of this group to determine whether the child's parent was also part of that group, or whether the child entered the country unaccompanied. CBP will also review the child's documentation in its systems of records, as well as the documentation of any accompanying parent, to attempt to determine the reason for any separation. CBP will then send relevant information about the parent, and the reason for the separation, to both HHS and ICE for further review and an ultimate determination of class membership.

15. Without having information from HHS about which children to search for, however, it would not be practical to simply review every file in a particular event. Some events may reflect the apprehension of hundreds of individuals at one time, all of whom would have the same event number. Thus, without knowing whether there is some indicia that a child in that group was separated from a parent, such a search would not, in my opinion, be likely to lead to information about potential family separations.

16. This is particularly true given the number of individuals that CBP encounters at the southwest border. In FY 2018, for instance, CBP apprehended or deemed inadmissible more than 520,000 individuals at the southwest border. In FY 2019 to date (through the end of March), CBP has apprehended or deemed inadmissible over 422,000 individuals. The records for all of these encountered are contained in two different systems of records, e3 for USBP and SIGMA for OFO, and there are multiple records related to each individual. Thus, without some method of targeting

CBP's review, such as HHS' determination that there is indicia of separation, manual review of these records would require extensive time, resources, and effort, which would dramatically increase the time it would take for the government to complete its complete accounting of the expanded *Ms. L* class.

17. I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 25th day of April, 2019.

_____
Jay Visconti
Senior Advisor
U.S. Customs and Border Protection