Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Dan Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: June 6, 2019 |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | **NOTICE OF MOTION AND MOTION TO ALLOW PARENTS DEPORTED WITHOUT THEIR CHILDREN TO TRAVEL TO THE UNITED STATES** |

1
2
3
4

  Plaintiffs respectfully move that the Court to order the government to allow 21 parents who were separated from their children and deported to travel to the United States to obtain an opportunity to reunify with their children, who remain in the United States.

5
6
7
8
9

  Plaintiffs' Motion is based on this Notice of Motion and Motion and the concurrently-filed Memorandum and exhibits in support; all papers, pleadings, records, and files in this case; all matters of which judicial notice may be taken; and such other arguments and/or evidence as may be presented to this Court at a hearing on this Motion.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

18cv0428

Dated: June 6, 2019

Respectfully Submitted,

*/s/Lee Gelernt*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 2922080)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Admitted Pro Hac Vice*

2

18cv0428

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: June 6, 2019

18cv0428

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
|---|---|
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: June 6, 2019 |
| U.S. Immigration and Customs Enforcement ("ICE"), et al. | **MEMORANDUM IN SUPPORT OF MOTION TO ALLOW PARENTS DEPORTED WITHOUT THEIR CHILDREN TO TRAVEL TO THE UNITED STATES** |
| *Respondents-Defendants*. | |

**INTRODUCTION**

Plaintiffs respectfully request that the Court order the government to allow 21 parents who were separated from their children and deported to travel to the United States to obtain an opportunity to reunify with their children, who remain in the United States.  Each parent has submitted an application under the Settlement Agreement seeking to return to the United States, and the return of each of the 21 parents can be accomplished either by enforcing the Settlement Agreement or by an order of this Court requiring the government to provide travel documents to permit return to the United States.

The 21 parents were separated from their children and deported without receiving a meaningful opportunity to seek asylum.  The relief they seek is limited: they need a pathway to legally travel to the United States, where Defendants can then either provide them with a de novo credible fear interview ("CFI") or simply place them in regular section 240 removal proceedings.

These 21 deported parents are part of the larger group of more than 470 parents deported without their children.  Plaintiffs, the ACLU Steering Committee, and other NGOs carefully screened deported parents to determine which parents (1) were deprived of a meaningful opportunity to seek asylum, (2) are currently in danger, and (3) have bona fide asylum claims.  Plaintiffs concluded that 51 parents fit that description and gave the 51 cases, with affidavits, to the government as part of the procedures set forth in Settlement Agreement.  The government rejected all 51 applications without any individualized explanation.

Subsequently, thirty of the 51 managed to make their way to the U.S.-Mexican border and sought asylum. Notably, all 30 either passed their CFIs or were placed directly into 240 proceedings.  Yet all 30 were previously rejected by the government under the settlement agreement.  The remaining 21 are no different from these 30 but are stranded in their home countries, either because of the danger or prohibitive cost of undertaking the journey without travel documents, or for

other reasons.  Had they been given a meaningful opportunity to seek asylum before being deported, they would almost certainly have passed their CFI and would have been reunified with their children in the United States under the *Ms. L.* injunction.[1]

These parents are in serious danger in their home countries and cannot safely remain there.  For the same reason, they cannot be reunited with their children in their home countries.  Without further relief, these 21 parents have no meaningful redress for the injury Defendants' inflicted.  They were separated from their children and then coerced or misled into losing the meaningful opportunity to seek asylum to which they were entitled.  The only path they have to reunify with their children is in the United States itself.  Accordingly, to obtain the *Ms. L.* relief of reunification, these 21 parents should be permitted to return to exercise their right to apply for asylum.

## I.    Background

### A. The Settlement Agreement

On November 15, 2018, the Court granted final approval of the Class Action Settlement ("Settlement Agreement") of claims arising in several different lawsuits: *M.M.M. v. Sessions*, Case No. 3:18-cv-1832-DMS (S.D. Cal.), *M.M.M. v. Sessions*, Case No. 1:18-cv-1835-PLF (D.D.C.), *Ms. L. v. ICE*, Case No. 3:18-cv-428-DMS (S.D. Cal.), and *Dora v. Sessions*, Case No. 18-cv-1938 (D.D.C.).

The Settlement Agreement requires Defendants to review the "rare and unusual" cases "in which Plaintiffs' counsel believes the return of a particular removed Ms. L. class member may be warranted" to determine if further relief is due.  Specifically, as part of that Agreement, the Parties agreed to the following language in a section entitled "The return of removed parents to the United States":

---

[1] For the Court's reference, the applications of the 21 parents seeking return are included under seal as Addendum 1, Ex. D.  The applications of the 30 parents who have returned are included under seal as Addendum 2, Ex. E.

The government does not intend to, nor does it agree to, return any removed parent to the United States or to facilitate any return of such removed parents.  The classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph.  Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual.  Plaintiffs' counsel agree to present any such cases, including all evidence they would like considered by the government within 30 days of the approval of this agreement.  *In light of plaintiffs' counsel's representation that such cases will be rare and unusual, Defendants agree to provide a reply to any case presented by Plaintiffs within 30 days of receiving Plaintiffs' request to consider the case.*  Except as specifically set forth herein, the classes agree that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have.

Agreement at 6 (emphasis added), ECF No. 220-1.  The Court understood that the Settlement Agreement "speaks to the possibility of those parents being returned to the United States" and provide that Defendants would "consider [Plaintiffs'] requests in good faith."  11/15/18 Tr. at 41.

**B. Plaintiffs Presented 51 Cases to Defendants Under the Terms of the Agreement**

Plaintiffs, the ACLU Steering Committee, and NGOs thoroughly vetted the deported parents from the original *Ms. L.* class to identify parents who were deprived of a meaningful ability to seek asylum, who have bona fide asylum claims, and who cannot reunify with their children in their home countries because of the danger to them and their children.  Beginning in August 2018, after the Court approved the Reunification Plan, the *Ms. L.* Steering Committee began the process of contacting each deported parent and screening them for these criteria.  Herzog Dec., Ex. A ¶¶ 5-7.  Volunteer attorneys then continued the work of screening cases, both by reviewing all available records and through additional phone and in-person interviews with deported parents in Guatemala, Honduras, and El Salvador.

3

Herzog Dec. ¶ 7; Pinheiro Dec., Ex. B ¶¶ 8-11.  These attorneys also spoke to federal defenders' offices who had represented separated parents in their illegal entry prosecutions and legal services organizations to identify parents who had expressed a fear of persecution.  Pinheiro Dec. ¶ 8.

Through this vetting process, Plaintiffs identified 51 deported parents who they believed warranted return under the Settlement.[2]  On December 15, 2018, Plaintiffs submitted applications for return for these 51, with declarations attesting to the trauma of separation and the coercion that prevented the parent from applying for, or pursuing, legitimate asylum claims.  *See generally* Pinheiro Dec., Ex. B, ¶¶ 12-23 (summarizing testimony of 43 applicants).  Most of the parents never received a credible fear hearing, despite explaining that they feared return to their home countries.  Many were actively misled by government officials to unknowingly sign away relief.  Others simply gave up, because they were separated and did not think they would ever be reunited in the United States.

Plaintiffs explained in their submission to the government that:

> Under the Settlement, Plaintiffs are required to submit "all evidence they would like considered by the government."  As previously noted, given that the relief being sought is a renewed opportunity to apply for asylum, many details of the parents' claims for protection are not included in these declarations.  Instead, the focus [is] on the ways in which these parents were denied a fair opportunity to pursue their claim to such protection.
>
> . . .
>
> We look forward to the Government's reply, and would request the opportunity to discuss any case the government believes does not warrant return.

*See* December 15, 2018 Email, attached as Ex. 1 to Galindo Dec., Ex. C.

On February 20, 2019,[3] Defendants denied all the applications Plaintiffs

---

[2] Of this initial group of 51 parents, 4 are members of the expanded *Ms. L.* class, as their children had been released from ORR custody before June 26, 2018.

[3] Defendants' deadline to respond to the applications was reset in light of the

submitted in a single email that stated only that the applications were "insufficient." The response provided no explanation as to what further evidence would be sufficient, or what standard the Defendants used in screening these applications for return. Defendants wrote:

> As of the deadline of December 15, 2018, the Department of Justice (DOJ) had received the affidavits (and, where provided, supporting materials) submitted for 52 [sic] individuals ("Applicant Pool"), which it subsequently provided to ICE. ICE has now reviewed all materials submitted and advised that the documents submitted for the Applicant Pool did not provide sufficient information to permit adjudication. In keeping with the spirit of the Agreement, ICE is offering members of the Applicant Pool the opportunity to submit additional information in support of their respective requests for parole.

*See* Feb. 20, 2019 Email, attached as Ex. 2 to Galindo Dec, Ex. C. Defendants invited Plaintiffs to apply for further relief under the humanitarian parole process, pursuant to 8 U.S.C. § 1182(d)(5). *Id.*

Plaintiffs asked Defendants to clarify why the applications were deemed "insufficient" and how to cure that alleged insufficiency. Plaintiffs further objected to Defendants' proposal that Plaintiffs apply for parole as inconsistent with the terms of the Agreement. The parole statute provides the Attorney General authority to "parole [a noncitizen applying for admission] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. . . ." 8 U.S.C. § 1182(d)(5). But the humanitarian parole process is extremely burdensome, was not referenced in the Settlement, and was never mentioned to Plaintiffs when they were compiling the 51 affidavits. More fundamentally, the parole application process is not designed to account for the unique circumstances of the government's unlawful practice of separating immigrant families, or to provide the relief to members of the *Ms. L.* class to which they are specifically entitled pursuant to this action.

government shutdown and stay of pending *Ms. L.* deadlines.

Despite Plaintiffs' blanket objection to Defendants' referral to the parole process, three deported Class members who had attorneys with sufficient resources to submit parole applications did so pursuant to the government's new request.[4] Each was summarily denied without individualized explanation.  Addendum 3, Ex. F at 25, 30, 31.

## C. Thirty Applicants Return To The United States And Are Now Reunited With Their Children.

Thirty of the 51 applicants returned to the United States.  The majority of the 30 did so with the aid of lawyers.  These 30 undertook the same perilous journey that they took months before, this time in order to reunify with the children who had been taken from them.  *See* Pinheiro Dec. ¶¶ 23-26 (describing return and reunification of 28 deported clients).  With the exception of one as yet unresolved case, Defendants either placed these parents directly in full removal proceedings and released them from detention, or, in the majority of cases, gave them new credible fear interviews.  *Every parent* who received a CFI passed and was then placed into full removal proceedings.  *Id.* ¶ 26.  In other words, those parents whose return requests were summarily rejected by the government as "insufficient" under the settlement showed—when not misled or under coercion—that they merited release and a full asylum hearing before an immigration judge.[5]  *Id.* ¶ 27.

Twenty-nine of the thirty returnees have been reunified with their children. The sole exception is a mother who traveled from Central America to the Mexican border, by land, and arrived the day after her son had been deported.

Accordingly, only 21 deported parents of the original group of 51 remain who have not been able to make the difficult journey to the U.S.-Mexican border.

---

[4] Excerpts from these three parole applications are included as Addendum 3, Ex. F.
[5] In one case, a parent was released from detention but has neither been provided with a new CFI nor issued a notice to appear in 240 proceedings.

18cv0428

## II.   The Twenty-One Deported Parents Should Be Allowed To Return To The United States, Either Under the Settlement Or By Court Order.

Without further relief, the right to reunify will be a hollow one for the 21 deported parents.  They cannot bring their children back to face the violence and persecution that they fled.  But without the ability to travel legally to the United States, they have no opportunity to present the asylum claims that they could not meaningfully present when they were previously in the United States, and separated from their children by Defendants.

The experience of the 30 parents who returned to the United States—most notably, their uniform success at credible fear hearings—underscores the bona fides of these parents' asylum claims and the dangers that prevent reunification abroad. It also demonstrates Defendants' failure to meaningfully review their settlement submissions.  Indeed, after categorically deeming their applications "insufficient," Defendants own officers later found their claims for asylum were legitimate.

Defendants' family separation policy created the dual injuries these parents are facing: their separation from their children and their unlawful removal to the violence they fled.  The relief they need to remedy this harm is limited: a legal path to travel back to the United States.  Once in the United States, Defendants can choose what immigration process to provide them, as they did for those who already returned: either issue them Notices to Appear, or provide them with new credible fear hearings.

### A. The Twenty-One Applicants Are "Rare and Unusual" Under the Settlement Agreement And Warrant Relief.

The 21 deported parents who are seeking further relief are "rare and unusual" by any definition of those terms.  Plaintiffs screened hundreds of known deported Class Members to presented only those cases that meet three specific criteria:  First, they present a bona fide claim for asylum; second, their asylum claim was abandoned or lost due to coercion or trauma inflicted by the family separation policy; and third, they are unable to reunify in their home country because of their

7

fear of harm to themselves and their children.[6]  Herzog Dec. ¶¶ 7-9.

These 21 parents' declarations and additional evidence demonstrates that these three criteria are met.  For example:

- B.L.S.P. traveled to the United States with her son, after she suffered severe sexual abuse and they were both threatened with death.  After she was separated in November of 2017, she believed she would never be allowed to see her son again. After her separation, she began to suffer episodes of facial paralysis.  Despite the trauma, she passed a credible fear interview.  However, she was told she would have to wait nearly a year for her asylum hearing, and that she would be detained, without her child, through that process.  She withdrew her claim for relief on May 23, 2018, and was deported on June 18, 2018.  A former asylum officer describes her as "one of the most traumatized and vulnerable persons that I have ever interviewed."  Since her deportation, she freezes in public and cannot leave her house unaccompanied.  *See* Application of B.L.S.P, Addendum 1, Ex. D at 6-10.

- D.J.M.C. came to the United States with his then four-year old son from Honduras after being threatened by gangs; his brother was shot, his cousin was murdered, and he feared for his life, and the life of his son.  When he was separated from his son, his son "cried because in Honduras police take people and kill them."  He was never told where his son went and never spoke to his son after he was deported.  Though he expressed a fear of persecution in Honduras, he never received a fear hearing, and was deported in June 2018.  Since then, he has been living in hiding; his family home has been shot at; and another relative has been murdered.  An assessment of his child by the Young Center states that he "remains scared" and now blames his father for the separation, thinking his father abandoned him.  *See* Application of D.J.M.C., Addendum 1, Ex. D at 31-42, 57-62.

- D.X.C. is from an indigenous community in Guatemala and traveled with his eight year old child to flee a gang who had threatened him and his family, and assaulted and tortured him. When he was separated from his child, he was told that if he persisted in his asylum claim, he would spend two years in detention apart from his son.  He never received a credible fear interview despite expressing a fear of return.  Since his deportation,

---

[6] And the deported Class Members are, of course, a subset of the overall number of more than 2700 parents who were separated.

8

18cv0428

he continues to live in hiding from the gang that threatened him.  *See* Application of D.X.C., Addendum 1, Ex. D. at 71-79.  His son spent over a year in an ORR shelter, because D.X.C. did not have relatives in the U.S. to sponsor his son, but also could not have his son returned to face threats.  *See* Cohen Dec., Ex. G, at ¶ 12.  His son was eventually released to non-family sponsors in late April, but has been struggling emotionally and psychologically in the absence of his father.  *See* Cohen Dec., Ex. G, at ¶¶ 23-28 (describing continuing psychological and developmental harm to child after release to sponsors).

- O.U.R.M. fled Guatemala with his son after he and his family were targeted for assaults, death threats, and kidnappings.  After separating him from his son, immigration officials repeatedly told him to sign papers in English, even though he cannot read or understand the language.  Depressed, and feeling like he had no choice, he did so.  At the time of his deportation, he had still not spoken to his son.  The first time he spoke to him was after his deportation.  Since his deportation, he has been threatened, and has had had to move away from his home to protect himself and his family.  *See* Application of O.U.R.M., Addendum 1, Ex. D at 126-128.

The 21 declarations reflect a consistent pattern of coercion and misinformation that accompanied the underlying trauma of separation.  Parents were separated from their children without any warning or explanation.[7]  They were provided little to no information as to where there children were, or what would happen to them.[8]  They were then transferred between multiple detention centers.  They started in border facilities, where they slept on the floor with dozens of other

---

[7] *See, e.g.,* Appendix 1 at 104 (E.L.D.H. Application ¶5) ("officers came in and took my son while I was sleeping.  I woke up and called out to my son and looked around the room, but I did not see my son. Other people in the room told me that my son was taken while I was sleeping."); *Id.* at 112 (J.A.A. Application ¶5) ("I did not have a chance to say goodbye. I felt a weight in my chest that was so heavy I could barely breathe.  I was in shock because I did not expect to be separated from my daughter.")

[8] *See, e.g.,* Appendix 1 at 12 (C.A.C. Application ¶10) ("I constantly asked the officers where my child was, and if he was ok; they dismissed my requests and would always answer that they didn't know.  I was desperate to find out where he was.")

adults.[9]  All were transferred multiple times, between facilities for weeks or months, before they were deported, some without warning.  Some parents never spoke to their children until after they were deported.  The separation, confusion, and fear took a psychological and physical toll on the parents.[10]

In some cases, officials told parents that they had no right to asylum.[11] Other parents were told that seeking asylum would only extend their separation from their children.[12]  Many signed papers given to them by officials that they could not understand simply because of confusion, coercion, or a sense of futility.[13]  Few

---

[9] *See, e.g.,* Appendix 1 at 93 (E.C.C. Application ¶6) ("I was held in a cell with about 50 other men.  We were not able to bathe or brush or teeth for days, and we were not given enough food or water to be comfortable. I did not know what was happening and I had no idea where my son was"); *Id.* at 131 (R.A.R.A. Application ¶6) ("The cell where I was held was crowded with about 90 men.  We slept on the floor and I was not able to bathe or brush my teeth the entire time I was held there. I felt afraid and did not know what would happen to me").

[10] *See, e.g.,* Appendix 1 at 65 (D.P.F. Application ¶10) ("I was frustrated from feeling I could not help or protect [my daughter].  I got sick for a couple of days; my blood pressure dropped and I had to get medical attention"); *Id.* at 123-24 (M.L.D.A. Application ¶11) (a mother describes how "being separated from my daughter caused me to suffer epileptic seizures.  I suffer from epilepsy, and did not have any seizures for 3 years—until I came to the detention center").

[11] *See, e.g,* Appendix 1 at 113 (J.A.A. Application ¶7) ("The official told me there was a new policy of zero tolerance towards migrants and that they were no longer giving out asylum); *Id.* at 137 (S.A.C. Application ¶8) (Officer "told me that there was no asylum for Central Americans in the U.S.").

[12] *See, e.g.,* Appendix 1 at 104 (E.L.D.H. Application ¶6) ("The officer told me that if I were to stay in the United States and fight for asylum that I could be in detention without my son for over a year.")

[13] *See, e.g*., Addendum 1 at 29 (D.J.M. Application ¶11) (describing signing document he could not read or understand because "I do not understand what other options I had and I did not think I had a choice"); *Id.* at 93 (E.C.C. Application ¶9) ("officials asked me to sign some documents in English that I could not read or understand. I do not speak or read English. They wanted me to hurry and they were very aggressive. I was afraid to ask these officials to help me understand the documents, and I felt I had no choice but to sign. I was exhausted and confused").

recall being provided a fear interview, even though they fled to the United States to seek asylum and expressed a fear of return to officials.

Absent the coercion and trauma of separation, these parents would have passed their CFIs and remained in the United States, with their children. The experience of the 30 parents who returned to the United States demonstrate this clearly.

**B. The Court Should Provide Relief Either Through the Settlement Agreement Or Ordering Parents' Return.**

The Court has authority to provide relief for the twenty-one parents through the Settlement Agreement, or by ordering that Defendants provide parents with a pathway to travel legally to the United States.

The Court can order Defendants to meaningfully comply with the Settlement Agreement and allow the 21 class members to return, since there is no good faith basis for concluding that these 21 cases do not fit the criteria. *See Nehmer v. U.S. Dep't of Veterans' Affairs*, 494 F.3d 846, 856 (9th Cir. 2007) ("[W]hen a district court incorporates he terms of a settlement agreement or a stipulation into an order, it retains subject matter jurisdiction to interpret and enforce the contents of that order."). This is simply an application of the Court's broad inherent authority "to ensure obedience to [its] orders." *F.J. Henshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001).

Alternatively, the Court should order the relief that the parents are seeking. That is fully consistent with the Court's remedial authority to effectuate its injunction and ensure a meaningful opportunity for reunification. Such relief is well within the "court's equitable powers to remedy past wrongs" and its "broad discretion to fashion a remedy." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 14 (1971); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990). As this Court has already recognized, it has substantial "authority to issue orders necessary to ensure implementation of its injunction." *M.M.M.* Dkt. 55, at 6 (rejecting jurisdictional objections to order staying removals).

1    Facilitating parents' return to the United States is fully consistent with this

2    Court's remedial authority.  The Ninth Circuit has repeatedly upheld orders to

3    return injured parties to the United States.  In *Walters v. Reno*, 145 F.3d 1032 (9th

4    Cir. 1998), for instance, the district court had ordered the government to parole

5    removed class members into the United States, because they had been subjected to

6    procedures that violated due process.  *Id*. at 1050-51.  The Ninth Circuit affirmed

7    the return order, explaining that parole was necessary "to permit an alien to take

8    advantage of procedures to which [he] was entitled."  *Id*. at 1051.  Similarly, in

9    *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir. 1977), the Ninth Circuit ordered the

10   INS to "admit appellant into the United States [and] grant[] him the same status he

11   held prior to his . . . deportation," because "he was deported without notice to

12   counsel."  And in *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996), the Ninth

13   Circuit ordered the government to "permit Singh to return to the United States for

14   the purpose of appearing at a hearing before the immigration judge."  *Cf. Estrada-*

15   *Rosales v. INS*, 645 F.2d 819, 820-22 (9th Cir. 1981) (ordering return); *Grace v.*

16   *Sessions*, 2018 WL 3812445, at *1 (D.D.C. Aug. 9, 2018) (same); *Ying Fong v.*

17   *Ashcroft*, 317 F. Supp. 2d 398, 404-05, 408 (S.D.N.Y. 2004) (same); *Dennis v.*

18   *I.N.S.*, No. CIV.A. 301CV279SRU, 2002 WL 295100, at *4 (D. Conn. Feb. 19,

19   2002) (same).

## CONCLUSION

20   For the foregoing reasons, the Court should order Defendants to provide a

21   pathway for the 21 deported class members to return to the United States to seek

22   asylum.

23

24

25

26

27

28

18cv0428

Dated: June 6, 2019

Respectfully Submitted,

*/s/Lee Gelernt*
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*
dgalindo@aclu.org

*Admitted Pro Hac Vice*

 Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 2922080)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: June 6, 2019

18cv0428

# Ex. A

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Dan Galindo
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioner-Plaintiff*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs,* | |
| v. | Date Filed: June 6, 2019 |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants.* | **DECLARATION OF STEVEN C. HERZOG** |

1        1.      I make this declaration based on my personal knowledge except where I

2   have indicated otherwise.  If called as a witness, I would testify competently and truthfully to

3   these matters.

4        2.      I am a licensed attorney in the State of New York, and am over the age of

5   18.

6        3.      I am Counsel at the law firm of Paul, Weiss, Rifkind, Wharton &

7   Garrison LLP ("Paul, Weiss"), where I maintain a practice in a broad range of areas of civil

8   litigation, with an emphasis on antitrust, intellectual property, corporate governance, securities

9   and other complex commercial matters.  Throughout my career, I have also always maintained a

10  substantial pro bono practice.

11       4.      In August of 2018, Paul, Weiss was asked by the American Civil Liberties

12  Union ("ACLU") to head the Ms. L Steering Committee.  Since that time, I have led the Paul,

13  Weiss effort, supervising a team of attorneys and staff at the firm.

14       5.      Beginning in August of 2018, Paul, Weiss attorneys—along with

15  employees of our three Steering Committee non-profit partners (Kids in Need of Defense,

16  Women's Refugee Commission, and Justice in Motion) —contacted by telephone (and, in some

17  cases, in person) parents identified by the government as Ms. L class members who were

18  removed from the United States following separation from their children.  In all, we successfully

19  reached 365 parents.

20       6.      Our initial focus as a Steering Committee was to determine the

21  preferences of parents with respect to their children: specifically, did the parent want their child

22  repatriated as soon as possible or did the parent want their child to remain in the United States to

23  pursue his or her own immigration case.

24       7.      Once this immediate task was largely complete, and a settlement reached

25  among parties clarifying the options available to parents, we turned our focus to screening

26  parents for protection needs.  Where it was not clear from our prior outreach, we reached out

27  again to parents to determine whether the parent was currently living in fear, and, if so, whether

28

1  they were interested in being further screened for a potential asylum claim and for potential

2  return to the United States.

3          8.      For those parents living in fear and seeking potential return, we and our

4  Steering Committee partners assessed cases to identify those that presented potential asylum

5  claims and indicia of coercion during their separation from their children that prejudiced their

6  ability to present such claims.  We made these preliminary determinations based on the

7  information collected from parents during phone calls between parents and attorneys and

8  employees working on behalf of the Steering Committee, and subsequently upon a review of that

9  information by a small team of attorneys at Paul, Weiss that have assisted me in leading the

10 firm's family separation effort.  This smaller team has a background in asylum law and was thus

11 better positioned to make the triaging decisions required.

12         9.      We referred the majority of these parents to Al Otro Lado for on-the-

13 ground assessment and, as applicable, representation.  After further screening by the Steering

14 Committee, Al Otro Lado then prepared declarations on behalf of a subset of these parents,

15 which we reviewed and helped to finalize for submission.

16         10.     The Steering Committee separately determined that three additional

17 parents had potential asylum claims, and prepared declarations reflecting their experiences,

18 which declarations the ACLU subsequently submitted to the government.

19         11.     Five additional parents were separately represented by attorneys or

20 organizations.  These individual attorneys or organizations prepared declarations and supporting

21 papers on behalf of their client parents.

22         12.     The declarations and other supporting materials were all then provided to

23 the ACLU.  On December 15, 2018, the ACLU submitted these materials to the government,

24 pursuant to the provisions of the Settlement Agreement filed on September 12, 2018, and

25 approved by the Court November 15, 2018, seeking an opportunity for the parents to return to

26 the United States to seek asylum and be reunited with the children.

27

28

1        I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on June 5, 2019.

3

4                                                   Steven C. Herzog

# Ex. B

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Dan Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioner-Plaintiff*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

              *Petitioners-Plaintiffs,*

v.

U.S. Immigration and Customs Enforcement
("ICE"), et al.,

              *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

Date Filed: June 6, 2019

**DECLARATION OF ERIKA PINHEIRO**

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.      I am a U.S. licensed attorney practicing in the areas of immigration law and international human rights.  I am barred by the State of California and am over the age of 18.

3.      I have over sixteen years of experience in the immigration arena, including over a decade of work with Central American asylum seekers. From 2011 to 2015, I administered Department of Justice-funded legal access programs for immigrant adults and children in ICE detention facilities, county jails, and Office of Refugee Resettlement shelters, as well as managed a government-funded legal orientation program for unaccompanied children following their release from government custody. Previously, I managed representation programs for Unaccompanied Children and oversaw completion of hundreds of cases.  I have provided technical assistance and training to numerous Los Angeles County agencies, Federal Public Defender offices, the California State Bar, and have trained dozens of attorneys on Central American asylum claims.

4.      In 2017, I was a New America California Fellow, and my organization, Al Otro Lado, has received numerous awards and commendations, including the 2018 Courageous Luminaries Award from the National Immigration Law Center, the YWCA Pasadena 2018 Racial Justice Award, and a 2017 commendation from Los Angeles County Supervisor Hilda Solis.

5.      Since 2017, I have served as the Director of Litigation and Policy at Al Otro Lado, a non-profit, binational legal services organization incorporated in California.  Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles and San Diego, California, and Tijuana, Mexico.  Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in immigration proceedings, to seek redress for civil

rights violations, and to connect deportees, refugees, and other indigent immigrants with legal, mental health, medical, and social services.

6.     Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops in Tijuana, Mexico, and provides representation to detained asylum seekers in Southern California. We engage over 1,000 volunteers to provide legal orientation to asylum seekers and monitor for rights violations on the California border. Our Border Rights Project began documenting family separations at the San Ysidro Port of Entry in May of 2017, and has represented dozens of parents who were separated from their children.

7.     Al Otro Lado is a transnational organization with established partnerships throughout Mexico and Central America, making us uniquely suited for the task of assisting parents who were separated from and deported without their children. I established Al Otro Lado's Family Reunification Project in August of 2018 to assist deported parents whose children remained in the United States by marshalling resources to provide them with legal, medical, mental health, and other services during the process of reunification.

8.     Al Otro Lado began coordinating with the *Ms. L* Steering Committee to receive referrals of class members who had been deported without their children, and whose cases presented a protection concern. Al Otro Lado also received referrals from Federal Public Defender officers, nonprofit legal service organizations, and others.  Between August and November of 2018, Al Otro Lado interviewed parents who had been separated from and deported without their children.

9.     With the help of Justice in Motion, Al Otro Lado traveled to Honduras, Guatemala, and El Salvador to conduct in-person interviews with parents who expressed a desire to return to the United States to seek asylum and reunify with their children. We worked for months with on-the-ground partners to complete

declarations, gather supporting evidence, and obtain signatures for record requests and other legal documents.

10.    Al Otro Lado gathered information to determine the reasons parents traveled with their children to the United States, their situation post-deportation, and any other rights violations suffered while in government custody. Al Otro Lado analyzed each case to determine whether the parents had a potentially viable asylum claim, whether they had been unlawfully deprived of their right to seek asylum, and whether they waived reunification in the home country due to safety concerns for their children.

11.    After further screening, the ACLU submitted applications from 43 parents represented by Al Otro Lado as cases warranting further relief from the government.

12.    Although our 43 clients had been apprehended at diverse points along the US-Mexico border, they recounted similar facts regarding their separation and deportation.

13.    Almost 90% of the deported parents we represent who applied for further relief never received a Credible Fear or Reasonable Fear Interview, even after telling CBP and ICE officials multiple times that they feared return to their countries. Clients processed at different Border Patrol stations and housed at different ICE detention facilities reported hearing identical responses from CBP and ICE officials when being denied their right to a Credible or Reasonable Fear interview. Officials told our clients that "the rules had changed,"  "there was no more asylum for Central Americans," and that their "children could stay" in the United States, but they would be deported.

14.    Customs and Border Protection officers only referred five of our clients for a Credible/Reasonable fear interview, even though all expressed a fear of return. Two parents did not pass the interview due to the severe emotional trauma of separation from their children; neither had received any information about the

whereabouts of their child from the time of separation to the time of the interview. The parents also report that unsanitary and violent conditions of detention affected their ability to focus on their claims at their interviews. For example, one of the fathers who did not pass his Reasonable Fear Interview witnessed a violent exchange between a cellmate and an officer shortly before his interview. He reports being verbally abused by officers, and seeing them drag and beat his cellmate. He and many other parents report being verbally abused by CBP officers and mocked for crying about being separated from their children.

15.    Three of our clients passed their Credible/Reasonable Fear Interviews, but were coerced into abandoning their claims due to the trauma of continued separation. One separated mother was unable to communicate with her daughter while detained, was denied bond, and received an individual hearing date almost a year after she submitted her application for asylum. Another separated father passed his Reasonable Fear Interview, but was told by ICE officials that he could only talk to his son once per month while detained. He staged a hunger strike to call attention to his situation and was punished with solitary confinement.

16.    All of the deported parents reported being profoundly traumatized by their separation from their children. All were separated from their minor children within 24 to 72 hours after turning themselves over to Border Patrol officials. Several parents reported having their children physically ripped from their arms, including a father of a six-year old boy who was threatened with violence and criminal prosecution when he resisted CBP officers as they violently separated him from his son. Almost all parents reported being mocked and threatened by CBP and ICE officials when they asked about the whereabouts of their children. Others were told that their children were being taken to change clothes or bathe, and then never saw their children again.

17.    Following their separation from their children, all of the parents report being held in crowded, unsanitary conditions with little to no information about their

children. The deported parents described being held in freezing rooms or cages with anywhere from 50 to 200 other migrants, being given very little food, and not being able to bathe, brush their teeth, or lay in a bed for as long as two weeks. Several parents report that they became ill due to being provided with rotten food. Several report not being provided with any water, except for water from a sink attached to a toilet being used by several dozen people. There were multiple reports of substandard medical care, painful collective punishment, and sustained verbal abuse from CBP and ICE officials. One mother reported slipping and falling in a CBP facility and seriously injuring her shoulder, only to be deported days later without her son and without having received any medical care. She continues to require medical treatment for this injury to the present day.

18.   Generally, the deported parents could not meaningfully communicate with their children during their detention. Some reported speaking with their child once or twice, while others had no communication with and no information regarding their child the entire time they were detained by U.S. authorities. A few parents were provided with the ORR hotline number or another ORR contact, but were unable to obtain any information, if they were able to call from detention at all. Several parents were separated from children with disabilities, including a father separated from his deaf daughter.  Several parents, in separate facilities and on separate occasions, participated in or observed hunger strikes staged by parents protesting the lack of information about their separated children.

19.   In at least eight of the deported parents cases represented by AOL, the parents who petitioned the government for return do not speak any Spanish and were never provided with an interpreter during their time in U.S. detention. These parents report being unable to understand the reasons offered for their separation from their children, and unable to communicate with officials to obtain information about their children. Many indigenous clients describe being prosecuted for illegal entry and deported without ever having received an

explanation of the proceedings or deportation paperwork in their native language. Two indigenous clients report being forcibly injected with medication at ICE detention facilities without receiving an explanation in their native language as to the nature of the medical treatment. At least six clients reported being unable to read or write in any language, and not being provided an explanation of what they were signing.

20.     All of our clients were coerced, tricked, or forced into being removed from the United States without their children. The few who willingly accepted deportation were coerced into doing so because they were unable to effectively communicate with their children while detained, or received no information about their children while detained. Parents who were tricked into signing removal documents were told that the United States was no longer giving asylum, or that they were actually signing a document for their release. Some were threatened with additional criminal prosecution and prison time if they refused to sign.  At least eight of our clients report being told that their child would be waiting for them on the plane, or that their child would be removed with them the same day. Two report having to be physically forced onto the plane by ICE officials once they learned that their children would not be removed with them.

21.     After they were deported without their children, several parents suffered attempts on their lives; one father was shot and injured, another was shot at but not hit, and several others were threatened with firearms or other weapons. Others received direct death threats after being deported, and at least six of the parents fled their home countries again almost immediately after being deported due to imminent danger of persecution or death.

22.     All of the deported parents reported that their children were deeply traumatized by their separation. Several of the children suffered severe trauma-related mental harm, including two children who were hospitalized for behavioral health issues and one child who made multiple attempts on her life. The parents

also reported experiencing severe trauma-related mental illness. Almost all of the parents we interviewed reported suffering symptoms such as memory loss, nightmares, anxiety, depression, and intrusive memories of their traumatic separation from their children. Several fathers told me on separate occasions, "I will never be the same again" due to the trauma of separation.

23.    Of Al Otro Lado's clients, twenty-eight parents returned to the United States on March 2, 2019 by reporting to the Calexico Port of Entry.

24.    Eleven of the returning parents were issued notices to appear, released by CBP within a week and reunified with their children shortly thereafter.

25.    Seventeen of the parents were detained at the Imperial Regional Detention Facility for forty two days. Between March 2 and March 28, 2019, I sent well over fifty messages to ICE ERO and the Arlington Asylum Office in an attempt to schedule the Credible Fear Interviews so that my clients could be reunified with their children. On March 28, 2019, I was informed that the Asylum Office Headquarters had instructed them not to schedule the Credible Fear Interviews for these separated parents. After intervention from a member of Congress, the interviews finally moved forward during the first week of April 2019.

26.    All of the parents passed their Credible Fear Interviews, and all were released on April 12, 2019.

27.    All of the deported parents who have returned to the United States have been reunified with their children, except for one. One mother, an indigenous language speaker, was separated from her son in late 2017 and deported. Her son, also an indigenous language speaker with extremely limited Spanish competency, aged out of ORR custody in 2018 and was transferred to adult detention, after which his mother was unable to speak with him. She knew nothing about his whereabouts for five months. She submitted a petition for return and reunification through the *Ms. L* settlement on December 15, 2018, while our organization attempted to locate and make contact with her son. We were finally able to contact him in early

February 2019, at which time we discovered that he had requested voluntary departure through an attorney. Al Otro Lado timely submitted an appeal, but our client's son was removed to Guatemala. Our client is now in the United States and we are assisting her son with a Motion to Reopen his case.

28.    The rest of the parents who returned to the United States on March 2, 2019 have since reunified with their children.  Based on my experience in representing reunified families, I have observed that the longer children are separated from their parents, the more traumatized they become, which makes reunification a complex process. Parents who have recently reunified with their children consistently report that their children display a host of behavioral issues, including frequent anger, sadness, or an inability to concentrate. Younger children are terrified to leave their parents' side, often refusing to go to school or engage in other outside activities. Older children often express resentment toward their parents for "abandoning" them in a detention system that was, at times, cruel and dehumanizing. Our clients have expressed that they and their children have a critical need for mental health services.

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct, based on my personal knowledge.

3    Executed in Tijuana, Baja California, Mexico on June 4, 2019.

4

5

6    Erika Pinheiro

7

8

9

10

11    ———

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

18cv0428

# Ex. C

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Dan Galindo
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioner-Plaintiff*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs,* | |
| v. | Date Filed: June 6, 2019 |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants.* | **DECLARATION OF DANIEL GALINDO** |

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.      I am a licensed attorney in the State of New York and in the State of California, and am over the age of 18.

3.       I am a Staff Attorney at the American Civil Liberties Union Immigrants' Rights Project, and counsel to Plaintiffs in this case.

4.      Attached hereto as exhibits are true and correct copies of the following:

Exhibit 1:    December 15, 2018 Email from Lee Gelernt, "Ms. L Submission re deported parents (1 of 6)"

Exhibit 2:    February 20, 2019 Email from Sarah Fabian to Counsel for Plaintiffs, "Response to Class Member Requests for Return Under the Settlement Agreement."


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in New York, NY, on June 5, 2019.


Daniel Galindo

# Ex. 1

| From: | Lee Gelernt |
|---|---|
| To: | Stewart, Scott G. (CIV) (Scott.G.Stewart@usdoj.gov); Fabian, Sarah B (CIV) (Sarah.B.Fabian@usdoj.gov); Murley, Nicole (CIV) (Nicole.Murley@usdoj.gov) |
| Cc: | Daniel Galindo; Stephen Kang; Anand Balakrishnan |
| Subject: | Ms. L submission re deported parents (email 1 of 6) |
| Date: | Saturday, December 15, 2018 5:17:17 PM |
| Attachments: | Submission 1 [8 Declarations].zip |
| | List of Declarations - 12.15.2018.XLSX |

Nicole, Sarah, Scott,

Pursuant to the *Ms. L* Final Settlement Agreement, I have attached a list of deported parents who we believe were denied a meaningful opportunity to present his or her claim for asylum or protection and for whom we believe return is warranted.  Supporting evidence—generally in the form of signed declarations—is also attached here.  Five subsequent emails with the additional declarations will immediately follow and additional declarations may be forthcoming.

Under the Settlement, Plaintiffs are required to submit "all evidence they would like considered by the government."  As previously noted, given that the relief being sought is a renewed opportunity to apply for asylum, many details of the parents' claims for protection are not included in these declarations.  Instead, the focus on the ways in which these parents were denied a fair opportunity to pursue their claim to such protection.  Pursuant to 8 C.F.R. § 208.6, the information contained in these declarations is to be kept confidential and not disclosed to third parties without the express written permission of the declarant.

We look forward to the Government's reply, and would request the opportunity to discuss any case the government believes does not warrant return.

Thanks,

Lee

# Ex. 2

| | |
|---|---|
| **From:** | Fabian, Sarah B (CIV) |
| **To:** | Lee Gelernt |
| **Cc:** | Anand Balakrishnan; Stephen Kang; Stewart, Scott G. (CIV); Murley, Nicole (CIV) |
| **Subject:** | Response to Class Member Requests for Return Under the Settlement Agreement |
| **Date:** | Wednesday, February 20, 2019 6:31:20 PM |

Lee:

As you are aware, pursuant to the Settlement Agreement (Agreement), filed on September 12, 2018, and approved by the Court November 15, 2018, U.S. Immigration and Customs Enforcement (ICE) has agreed to consider cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted in "rare and unusual" circumstances.  As of the deadline of December 15, 2018, the Department of Justice (DOJ) had received the affidavits (and, where provided, supporting materials) submitted for 52 individuals ("Applicant Pool"), which it subsequently provided to ICE.  ICE has now reviewed all materials submitted and advised that the documents submitted for the Applicant Pool did not provide sufficient information to permit adjudication.  In keeping with the spirit of the Agreement, ICE is offering members of the Applicant Pool the opportunity to submit additional information in support of their respective requests for parole.  Each should include:

- Completed Form I-131, Application for Travel Document, for each beneficiary.

- Detailed explanation, as well as supporting documentation, of the reasons parole is being requested for the beneficiary. (See Submitting Evidence and Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests.)  **This must include evidence of the relationship between the applicant and the child or children currently in the United States.  Any documents requiring translation must include both the original and the certified translation.**

- Completed Form I-134, Affidavit of Support (PDF, 461 KB), for each beneficiary to show how each beneficiary will be financially supported in the United States.  If there is more than one sponsor, each sponsor must submit a Form I-134, Affidavit of Support (PDF, 461 KB).

- Completed Form G-28, Notice of Entry of Appearance as Attorney or Representative, for DHS to communicate with the attorney or representative about the applicant's case.

Also to keep with the spirit of the agreement, members of the Applicant Pool will not be required to submit the $575.00 filing fee for all parole applicants or the $85.00 biometrics fee for applicants 14-79 years of age.

Additionally, although humanitarian parole applications must normally be submitted in hard copy, ICE has agreed to accept electronic applications from members of the Applicant Pool. However, ICE reserves the right to request original documents if adjudicators believe that it

would be necessary to properly adjudicate the application.

In order to facilitate processing, ICE has created an electronic mailbox for the submission of application packages for the 52 members of the Applicant Pool: mslparoleapplications@ice.dhs.gov.  **No other humanitarian parole applications sent to this mailbox will be adjudicated.**

It is **highly recommended** that you review the information regarding humanitarian parole available at the following link: https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-individuals-outside-united-states

In keeping with the deadlines established in the settlement agreement, **please submit this additional information within 30 days**. Once ICE has received humanitarian parole packages from members of the Applicant Pool and processing has been initiated, ICE will send letters notifying you/your clients of that fact and, if necessary, requesting additional information or documentation.  These letters are not guarantees that particular parole applications will be approved.  Parole is an exercise of discretion that may not be appropriate in all cases.

Best,
Sarah


Sarah B. Fabian
Senior Litigation Counsel
Office of Immigration Litigation – District Court Section
Department of Justice
PO Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824