Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>   *Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.<br><br>   *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: June 6, 2019<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO ALLOW PARENTS DEPORTED WITHOUT THEIR CHILDREN TO TRAVEL TO THE UNITED STATES** |

# INTRODUCTION

Plaintiffs respectfully request that the Court order the government to allow 21 parents who were separated from their children and deported to travel to the United States to obtain an opportunity to reunify with their children, who remain in the United States. Each parent has submitted an application under the Settlement Agreement seeking to return to the United States, and the return of each of the 21 parents can be accomplished either by enforcing the Settlement Agreement or by an order of this Court requiring the government to provide travel documents to permit return to the United States.

The 21 parents were separated from their children and deported without receiving a meaningful opportunity to seek asylum. The relief they seek is limited: they need a pathway to legally travel to the United States, where Defendants can then either provide them with a de novo credible fear interview ("CFI") or simply place them in regular section 240 removal proceedings.

These 21 deported parents are part of the larger group of more than 470 parents deported without their children. Plaintiffs, the ACLU Steering Committee, and other NGOs carefully screened deported parents to determine which parents (1) were deprived of a meaningful opportunity to seek asylum, (2) are currently in danger, and (3) have bona fide asylum claims. Plaintiffs concluded that 51 parents fit that description and gave the 51 cases, with affidavits, to the government as part of the procedures set forth in Settlement Agreement. The government rejected all 51 applications without any individualized explanation.

Subsequently, thirty of the 51 managed to make their way to the U.S.-Mexican border and sought asylum. Notably, <u>all 30</u> either passed their CFIs or were placed directly into 240 proceedings. Yet all 30 were previously rejected by the government under the settlement agreement. The remaining 21 are no different from these 30 but are stranded in their home countries, either because of the danger or prohibitive cost of undertaking the journey without travel documents, or for

other reasons. Had they been given a meaningful opportunity to seek asylum before being deported, they would almost certainly have passed their CFI and would have been reunified with their children in the United States under the *Ms. L.* injunction.[1]

These parents are in serious danger in their home countries and cannot safely remain there. For the same reason, they cannot be reunited with their children in their home countries. Without further relief, these 21 parents have no meaningful redress for the injury Defendants' inflicted. They were separated from their children and then coerced or misled into losing the meaningful opportunity to seek asylum to which they were entitled. The only path they have to reunify with their children is in the United States itself. Accordingly, to obtain the *Ms. L.* relief of reunification, these 21 parents should be permitted to return to exercise their right to apply for asylum.

## I. Background

### A. The Settlement Agreement

On November 15, 2018, the Court granted final approval of the Class Action Settlement ("Settlement Agreement") of claims arising in several different lawsuits: *M.M.M. v. Sessions*, Case No. 3:18-cv-1832-DMS (S.D. Cal.), *M.M.M. v. Sessions*, Case No. 1:18-cv-1835-PLF (D.D.C.), *Ms. L. v. ICE*, Case No. 3:18-cv-428-DMS (S.D. Cal.), and *Dora v. Sessions*, Case No. 18-cv-1938 (D.D.C.).

The Settlement Agreement requires Defendants to review the "rare and unusual" cases "in which Plaintiffs' counsel believes the return of a particular removed Ms. L. class member may be warranted" to determine if further relief is due. Specifically, as part of that Agreement, the Parties agreed to the following language in a section entitled "The return of removed parents to the United States":

---

[1] For the Court's reference, the applications of the 21 parents seeking return are included under seal as Addendum 1, Ex. D. The applications of the 30 parents who have returned are included under seal as Addendum 2, Ex. E.

2

> The government does not intend to, nor does it agree to, return any removed parent to the United States or to facilitate any return of such removed parents. The classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph. Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual. Plaintiffs' counsel agree to present any such cases, including all evidence they would like considered by the government within 30 days of the approval of this agreement. *In light of plaintiffs' counsel's representation that such cases will be rare and unusual, Defendants agree to provide a reply to any case presented by Plaintiffs within 30 days of receiving Plaintiffs' request to consider the case.* Except as specifically set forth herein, the classes agree that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have.

Agreement at 6 (emphasis added), ECF No. 220-1. The Court understood that the Settlement Agreement "speaks to the possibility of those parents being returned to the United States" and provide that Defendants would "consider [Plaintiffs'] requests in good faith." 11/15/18 Tr. at 41.

**B. Plaintiffs Presented 51 Cases to Defendants Under the Terms of the Agreement**

Plaintiffs, the ACLU Steering Committee, and NGOs thoroughly vetted the deported parents from the original *Ms. L.* class to identify parents who were deprived of a meaningful ability to seek asylum, who have bona fide asylum claims, and who cannot reunify with their children in their home countries because of the danger to them and their children. Beginning in August 2018, after the Court approved the Reunification Plan, the *Ms. L.* Steering Committee began the process of contacting each deported parent and screening them for these criteria. Herzog Dec., Ex. A ¶¶ 5-7. Volunteer attorneys then continued the work of screening cases, both by reviewing all available records and through additional phone and in-person interviews with deported parents in Guatemala, Honduras, and El Salvador.

Herzog Dec. ¶ 7; Pinheiro Dec., Ex. B ¶¶ 8-11.  These attorneys also spoke to federal defenders' offices who had represented separated parents in their illegal entry prosecutions and legal services organizations to identify parents who had expressed a fear of persecution.  Pinheiro Dec. ¶ 8.

Through this vetting process, Plaintiffs identified 51 deported parents who they believed warranted return under the Settlement.[2]  On December 15, 2018, Plaintiffs submitted applications for return for these 51, with declarations attesting to the trauma of separation and the coercion that prevented the parent from applying for, or pursuing, legitimate asylum claims.  *See generally* Pinheiro Dec., Ex. B, ¶¶ 12-23 (summarizing testimony of 43 applicants).  Most of the parents never received a credible fear hearing, despite explaining that they feared return to their home countries.  Many were actively misled by government officials to unknowingly sign away relief.  Others simply gave up, because they were separated and did not think they would ever be reunited in the United States.

Plaintiffs explained in their submission to the government that:

> Under the Settlement, Plaintiffs are required to submit "all evidence they would like considered by the government."  As previously noted, given that the relief being sought is a renewed opportunity to apply for asylum, many details of the parents' claims for protection are not included in these declarations.  Instead, the focus [is] on the ways in which these parents were denied a fair opportunity to pursue their claim to such protection.
>
> . . .
>
> We look forward to the Government's reply, and would request the opportunity to discuss any case the government believes does not warrant return.

*See* December 15, 2018 Email, attached as Ex. 1 to Galindo Dec., Ex. C.

On February 20, 2019,[3] Defendants denied all the applications Plaintiffs

---

[2] Of this initial group of 51 parents, 4 are members of the expanded *Ms. L.* class, as their children had been released from ORR custody before June 26, 2018.

[3] Defendants' deadline to respond to the applications was reset in light of the

submitted in a single email that stated only that the applications were "insufficient." The response provided no explanation as to what further evidence would be sufficient, or what standard the Defendants used in screening these applications for return. Defendants wrote:

> As of the deadline of December 15, 2018, the Department of Justice (DOJ) had received the affidavits (and, where provided, supporting materials) submitted for 52 [sic] individuals ("Applicant Pool"), which it subsequently provided to ICE. ICE has now reviewed all materials submitted and advised that the documents submitted for the Applicant Pool did not provide sufficient information to permit adjudication. In keeping with the spirit of the Agreement, ICE is offering members of the Applicant Pool the opportunity to submit additional information in support of their respective requests for parole.

*See* Feb. 20, 2019 Email, attached as Ex. 2 to Galindo Dec, Ex. C.  Defendants invited Plaintiffs to apply for further relief under the humanitarian parole process, pursuant to 8 U.S.C. § 1182(d)(5). *Id.*

Plaintiffs asked Defendants to clarify why the applications were deemed "insufficient" and how to cure that alleged insufficiency. Plaintiffs further objected to Defendants' proposal that Plaintiffs apply for parole as inconsistent with the terms of the Agreement. The parole statute provides the Attorney General authority to "parole [a noncitizen applying for admission] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit. . . ." 8 U.S.C. § 1182(d)(5). But the humanitarian parole process is extremely burdensome, was not referenced in the Settlement, and was never mentioned to Plaintiffs when they were compiling the 51 affidavits. More fundamentally, the parole application process is not designed to account for the unique circumstances of the government's unlawful practice of separating immigrant families, or to provide the relief to members of the *Ms. L.* class to which they are specifically entitled pursuant to this action.

---

government shutdown and stay of pending *Ms. L.* deadlines.

Despite Plaintiffs' blanket objection to Defendants' referral to the parole process, three deported Class members who had attorneys with sufficient resources to submit parole applications did so pursuant to the government's new request.[4] Each was summarily denied without individualized explanation. Addendum 3, Ex. F at 25, 30, 31.

### C. Thirty Applicants Return To The United States And Are Now Reunited With Their Children.

Thirty of the 51 applicants returned to the United States. The majority of the 30 did so with the aid of lawyers. These 30 undertook the same perilous journey that they took months before, this time in order to reunify with the children who had been taken from them. *See* Pinheiro Dec. ¶¶ 23-26 (describing return and reunification of 28 deported clients). With the exception of one as yet unresolved case, Defendants either placed these parents directly in full removal proceedings and released them from detention, or, in the majority of cases, gave them new credible fear interviews. *Every parent* who received a CFI passed and was then placed into full removal proceedings. *Id.* ¶ 26. In other words, those parents whose return requests were summarily rejected by the government as "insufficient" under the settlement showed—when not misled or under coercion—that they merited release and a full asylum hearing before an immigration judge.[5] *Id.* ¶ 27.

Twenty-nine of the thirty returnees have been reunified with their children. The sole exception is a mother who traveled from Central America to the Mexican border, by land, and arrived the day after her son had been deported.

Accordingly, only 21 deported parents of the original group of 51 remain who have not been able to make the difficult journey to the U.S.-Mexican border.

---

[4] Excerpts from these three parole applications are included as Addendum 3, Ex. F.
[5] In one case, a parent was released from detention but has neither been provided with a new CFI nor issued a notice to appear in 240 proceedings.

## II. The Twenty-One Deported Parents Should Be Allowed To Return To The United States, Either Under the Settlement Or By Court Order.

Without further relief, the right to reunify will be a hollow one for the 21 deported parents. They cannot bring their children back to face the violence and persecution that they fled. But without the ability to travel legally to the United States, they have no opportunity to present the asylum claims that they could not meaningfully present when they were previously in the United States, and separated from their children by Defendants.

The experience of the 30 parents who returned to the United States—most notably, their uniform success at credible fear hearings—underscores the bona fides of these parents' asylum claims and the dangers that prevent reunification abroad. It also demonstrates Defendants' failure to meaningfully review their settlement submissions. Indeed, after categorically deeming their applications "insufficient," Defendants own officers later found their claims for asylum were legitimate.

Defendants' family separation policy created the dual injuries these parents are facing: their separation from their children and their unlawful removal to the violence they fled. The relief they need to remedy this harm is limited: a legal path to travel back to the United States. Once in the United States, Defendants can choose what immigration process to provide them, as they did for those who already returned: either issue them Notices to Appear, or provide them with new credible fear hearings.

### A. The Twenty-One Applicants Are "Rare and Unusual" Under the Settlement Agreement And Warrant Relief.

The 21 deported parents who are seeking further relief are "rare and unusual" by any definition of those terms. Plaintiffs screened hundreds of known deported Class Members to presented only those cases that meet three specific criteria: First, they present a bona fide claim for asylum; second, their asylum claim was abandoned or lost due to coercion or trauma inflicted by the family separation policy; and third, they are unable to reunify in their home country because of their

7

fear of harm to themselves and their children.[6]  Herzog Dec. ¶¶ 7-9.

These 21 parents' declarations and additional evidence demonstrates that these three criteria are met.  For example:

- B.L.S.P. traveled to the United States with her son, after she suffered severe sexual abuse and they were both threatened with death.  After she was separated in November of 2017, she believed she would never be allowed to see her son again. After her separation, she began to suffer episodes of facial paralysis.  Despite the trauma, she passed a credible fear interview.  However, she was told she would have to wait nearly a year for her asylum hearing, and that she would be detained, without her child, through that process.  She withdrew her claim for relief on May 23, 2018, and was deported on June 18, 2018.  A former asylum officer describes her as "one of the most traumatized and vulnerable persons that I have ever interviewed."  Since her deportation, she freezes in public and cannot leave her house unaccompanied. *See* Application of B.L.S.P, Addendum 1, Ex. D at 6-10.

- D.J.M.C. came to the United States with his then four-year old son from Honduras after being threatened by gangs; his brother was shot, his cousin was murdered, and he feared for his life, and the life of his son.  When he was separated from his son, his son "cried because in Honduras police take people and kill them."  He was never told where his son went and never spoke to his son after he was deported.  Though he expressed a fear of persecution in Honduras, he never received a fear hearing, and was deported in June 2018.  Since then, he has been living in hiding; his family home has been shot at; and another relative has been murdered.  An assessment of his child by the Young Center states that he "remains scared" and now blames his father for the separation, thinking his father abandoned him.  *See* Application of D.J.M.C., Addendum 1, Ex. D at 31-42, 57-62.

- D.X.C. is from an indigenous community in Guatemala and traveled with his eight year old child to flee a gang who had threatened him and his family, and assaulted and tortured him. When he was separated from his child, he was told that if he persisted in his asylum claim, he would spend two years in detention apart from his son.  He never received a credible fear interview despite expressing a fear of return.  Since his deportation,

---

[6] And the deported Class Members are, of course, a subset of the overall number of more than 2700 parents who were separated.

    he continues to live in hiding from the gang that threatened him. *See* Application of D.X.C., Addendum 1, Ex. D. at 71-79. His son spent over a year in an ORR shelter, because D.X.C. did not have relatives in the U.S. to sponsor his son, but also could not have his son returned to face threats. *See* Cohen Dec., Ex. G, at ¶ 12. His son was eventually released to non-family sponsors in late April, but has been struggling emotionally and psychologically in the absence of his father. *See* Cohen Dec., Ex. G, at ¶¶ 23-28 (describing continuing psychological and developmental harm to child after release to sponsors).

- O.U.R.M. fled Guatemala with his son after he and his family were targeted for assaults, death threats, and kidnappings. After separating him from his son, immigration officials repeatedly told him to sign papers in English, even though he cannot read or understand the language. Depressed, and feeling like he had no choice, he did so. At the time of his deportation, he had still not spoken to his son. The first time he spoke to him was after his deportation. Since his deportation, he has been threatened, and has had had to move away from his home to protect himself and his family. *See* Application of O.U.R.M., Addendum 1, Ex. D at 126-128.

The 21 declarations reflect a consistent pattern of coercion and misinformation that accompanied the underlying trauma of separation. Parents were separated from their children without any warning or explanation.[7] They were provided little to no information as to where there children were, or what would happen to them.[8] They were then transferred between multiple detention centers. They started in border facilities, where they slept on the floor with dozens of other

---

[7] *See, e.g.,* Appendix 1 at 104 (E.L.D.H. Application ¶5) ("officers came in and took my son while I was sleeping. I woke up and called out to my son and looked around the room, but I did not see my son. Other people in the room told me that my son was taken while I was sleeping."); *Id.* at 112 (J.A.A. Application ¶5) ("I did not have a chance to say goodbye. I felt a weight in my chest that was so heavy I could barely breathe. I was in shock because I did not expect to be separated from my daughter.")

[8] *See, e.g.,* Appendix 1 at 12 (C.A.C. Application ¶10) ("I constantly asked the officers where my child was, and if he was ok; they dismissed my requests and would always answer that they didn't know. I was desperate to find out where he was.")

adults.[9] All were transferred multiple times, between facilities for weeks or months, before they were deported, some without warning. Some parents never spoke to their children until after they were deported. The separation, confusion, and fear took a psychological and physical toll on the parents.[10]

In some cases, officials told parents that they had no right to asylum.[11] Other parents were told that seeking asylum would only extend their separation from their children.[12] Many signed papers given to them by officials that they could not understand simply because of confusion, coercion, or a sense of futility.[13] Few

---

[9] *See, e.g.,* Appendix 1 at 93 (E.C.C. Application ¶6) ("I was held in a cell with about 50 other men. We were not able to bathe or brush or teeth for days, and we were not given enough food or water to be comfortable. I did not know what was happening and I had no idea where my son was"); *Id.* at 131 (R.A.R.A. Application ¶6) ("The cell where I was held was crowded with about 90 men. We slept on the floor and I was not able to bathe or brush my teeth the entire time I was held there. I felt afraid and did not know what would happen to me").

[10] *See, e.g.,* Appendix 1 at 65 (D.P.F. Application ¶10) ("I was frustrated from feeling I could not help or protect [my daughter]. I got sick for a couple of days; my blood pressure dropped and I had to get medical attention"); *Id.* at 123-24 (M.L.D.A. Application ¶11) (a mother describes how "being separated from my daughter caused me to suffer epileptic seizures. I suffer from epilepsy, and did not have any seizures for 3 years—until I came to the detention center").

[11] *See, e.g,* Appendix 1 at 113 (J.A.A. Application ¶7) ("The official told me there was a new policy of zero tolerance towards migrants and that they were no longer giving out asylum); *Id.* at 137 (S.A.C. Application ¶8) (Officer "told me that there was no asylum for Central Americans in the U.S.").

[12] *See, e.g.,* Appendix 1 at 104 (E.L.D.H. Application ¶6) ("The officer told me that if I were to stay in the United States and fight for asylum that I could be in detention without my son for over a year.")

[13] *See*, *e.g*., Addendum 1 at 29 (D.J.M. Application ¶11) (describing signing document he could not read or understand because "I do not understand what other options I had and I did not think I had a choice"); *Id.* at 93 (E.C.C. Application ¶9) ("officials asked me to sign some documents in English that I could not read or understand. I do not speak or read English. They wanted me to hurry and they were very aggressive. I was afraid to ask these officials to help me understand the documents, and I felt I had no choice but to sign. I was exhausted and confused").

recall being provided a fear interview, even though they fled to the United States to seek asylum and expressed a fear of return to officials.

Absent the coercion and trauma of separation, these parents would have passed their CFIs and remained in the United States, with their children. The experience of the 30 parents who returned to the United States demonstrate this clearly.

### B. The Court Should Provide Relief Either Through the Settlement Agreement Or Ordering Parents' Return.

The Court has authority to provide relief for the twenty-one parents through the Settlement Agreement, or by ordering that Defendants provide parents with a pathway to travel legally to the United States.

The Court can order Defendants to meaningfully comply with the Settlement Agreement and allow the 21 class members to return, since there is no good faith basis for concluding that these 21 cases do not fit the criteria. *See Nehmer v. U.S. Dep't of Veterans' Affairs*, 494 F.3d 846, 856 (9th Cir. 2007) ("[W]hen a district court incorporates he terms of a settlement agreement or a stipulation into an order, it retains subject matter jurisdiction to interpret and enforce the contents of that order."). This is simply an application of the Court's broad inherent authority "to ensure obedience to [its] orders." *F.J. Henshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001).

Alternatively, the Court should order the relief that the parents are seeking. That is fully consistent with the Court's remedial authority to effectuate its injunction and ensure a meaningful opportunity for reunification. Such relief is well within the "court's equitable powers to remedy past wrongs" and its "broad discretion to fashion a remedy." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 14 (1971); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990). As this Court has already recognized, it has substantial "authority to issue orders necessary to ensure implementation of its injunction." *M.M.M.* Dkt. 55, at 6 (rejecting jurisdictional objections to order staying removals).

Facilitating parents' return to the United States is fully consistent with this Court's remedial authority. The Ninth Circuit has repeatedly upheld orders to return injured parties to the United States. In *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998), for instance, the district court had ordered the government to parole removed class members into the United States, because they had been subjected to procedures that violated due process. *Id*. at 1050-51. The Ninth Circuit affirmed the return order, explaining that parole was necessary "to permit an alien to take advantage of procedures to which [he] was entitled." *Id*. at 1051. Similarly, in *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir. 1977), the Ninth Circuit ordered the INS to "admit appellant into the United States [and] grant[] him the same status he held prior to his . . . deportation," because "he was deported without notice to counsel." And in *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996), the Ninth Circuit ordered the government to "permit Singh to return to the United States for the purpose of appearing at a hearing before the immigration judge." *Cf. Estrada-Rosales v. INS*, 645 F.2d 819, 820-22 (9th Cir. 1981) (ordering return); *Grace v. Sessions*, 2018 WL 3812445, at *1 (D.D.C. Aug. 9, 2018) (same); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 404-05, 408 (S.D.N.Y. 2004) (same); *Dennis v. I.N.S.*, No. CIV.A. 301CV279SRU, 2002 WL 295100, at *4 (D. Conn. Feb. 19, 2002) (same).

## CONCLUSION

For the foregoing reasons, the Court should order Defendants to provide a pathway for the 21 deported class members to return to the United States to seek asylum.

| | |
|---|---|
| Dated: June 6, 2019 | Respectfully Submitted, |
| | */s/Lee Gelernt* |
| Bardis Vakili (SBN 247783)<br>ACLU FOUNDATION OF SAN<br>DIEGO & IMPERIAL COUNTIES<br>P.O. Box 87131<br>San Diego, CA 92138-7131<br>T: (619) 398-4485<br>F: (619) 232-0036<br>*bvakili@aclusandiego.org* | Lee Gelernt*<br>Judy Rabinovitz*<br>Anand Balakrishnan*<br>Daniel Galindo (SBN 292854)<br>AMERICAN CIVIL LIBERTIES<br>UNION FOUNDATION<br>IMMIGRANTS' RIGHTS PROJECT<br>125 Broad St., 18th Floor<br>New York, NY 10004<br>T:  (212) 549-2660<br>F:  (212) 549-2654<br>*lgelernt@aclu.org*<br>*jrabinovitz@aclu.org*<br>*abalakrishnan@aclu.org*<br>dgalindo@aclu.org |
| Stephen B. Kang (SBN 2922080)<br>Spencer E. Amdur (SBN 320069)<br>AMERICAN CIVIL LIBERTIES<br>UNION FOUNDATION<br>IMMIGRANTS' RIGHTS PROJECT<br>39 Drumm Street<br>San Francisco, CA 94111<br>T:  (415) 343-1198<br>F:  (415) 395-0950<br>*samdur@aclu.org* | *Admitted Pro Hac Vice* |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: June 6, 2019