# Ex. B

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Dan Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioner-Plaintiff*
*\*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*samdur@aclu.org*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.,<br><br>*Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: June 6, 2019<br><br>**DECLARATION OF ERIKA PINHEIRO** |

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am a U.S. licensed attorney practicing in the areas of immigration law and international human rights. I am barred by the State of California and am over the age of 18.

3. I have over sixteen years of experience in the immigration arena, including over a decade of work with Central American asylum seekers. From 2011 to 2015, I administered Department of Justice-funded legal access programs for immigrant adults and children in ICE detention facilities, county jails, and Office of Refugee Resettlement shelters, as well as managed a government-funded legal orientation program for unaccompanied children following their release from government custody. Previously, I managed representation programs for Unaccompanied Children and oversaw completion of hundreds of cases. I have provided technical assistance and training to numerous Los Angeles County agencies, Federal Public Defender offices, the California State Bar, and have trained dozens of attorneys on Central American asylum claims.

4. In 2017, I was a New America California Fellow, and my organization, Al Otro Lado, has received numerous awards and commendations, including the 2018 Courageous Luminaries Award from the National Immigration Law Center, the YWCA Pasadena 2018 Racial Justice Award, and a 2017 commendation from Los Angeles County Supervisor Hilda Solis.

5. Since 2017, I have served as the Director of Litigation and Policy at Al Otro Lado, a non-profit, binational legal services organization incorporated in California. Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles and San Diego, California, and Tijuana, Mexico. Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in immigration proceedings, to seek redress for civil

rights violations, and to connect deportees, refugees, and other indigent immigrants with legal, mental health, medical, and social services.

6. Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops in Tijuana, Mexico, and provides representation to detained asylum seekers in Southern California. We engage over 1,000 volunteers to provide legal orientation to asylum seekers and monitor for rights violations on the California border. Our Border Rights Project began documenting family separations at the San Ysidro Port of Entry in May of 2017, and has represented dozens of parents who were separated from their children.

7. Al Otro Lado is a transnational organization with established partnerships throughout Mexico and Central America, making us uniquely suited for the task of assisting parents who were separated from and deported without their children. I established Al Otro Lado's Family Reunification Project in August of 2018 to assist deported parents whose children remained in the United States by marshalling resources to provide them with legal, medical, mental health, and other services during the process of reunification.

8. Al Otro Lado began coordinating with the *Ms. L* Steering Committee to receive referrals of class members who had been deported without their children, and whose cases presented a protection concern. Al Otro Lado also received referrals from Federal Public Defender officers, nonprofit legal service organizations, and others. Between August and November of 2018, Al Otro Lado interviewed parents who had been separated from and deported without their children.

9. With the help of Justice in Motion, Al Otro Lado traveled to Honduras, Guatemala, and El Salvador to conduct in-person interviews with parents who expressed a desire to return to the United States to seek asylum and reunify with their children. We worked for months with on-the-ground partners to complete

declarations, gather supporting evidence, and obtain signatures for record requests and other legal documents.

10. Al Otro Lado gathered information to determine the reasons parents traveled with their children to the United States, their situation post-deportation, and any other rights violations suffered while in government custody. Al Otro Lado analyzed each case to determine whether the parents had a potentially viable asylum claim, whether they had been unlawfully deprived of their right to seek asylum, and whether they waived reunification in the home country due to safety concerns for their children.

11. After further screening, the ACLU submitted applications from 43 parents represented by Al Otro Lado as cases warranting further relief from the government.

12. Although our 43 clients had been apprehended at diverse points along the US-Mexico border, they recounted similar facts regarding their separation and deportation.

13. Almost 90% of the deported parents we represent who applied for further relief never received a Credible Fear or Reasonable Fear Interview, even after telling CBP and ICE officials multiple times that they feared return to their countries. Clients processed at different Border Patrol stations and housed at different ICE detention facilities reported hearing identical responses from CBP and ICE officials when being denied their right to a Credible or Reasonable Fear interview. Officials told our clients that "the rules had changed," "there was no more asylum for Central Americans," and that their "children could stay" in the United States, but they would be deported.

14. Customs and Border Protection officers only referred five of our clients for a Credible/Reasonable fear interview, even though all expressed a fear of return. Two parents did not pass the interview due to the severe emotional trauma of separation from their children; neither had received any information about the

whereabouts of their child from the time of separation to the time of the interview. The parents also report that unsanitary and violent conditions of detention affected their ability to focus on their claims at their interviews. For example, one of the fathers who did not pass his Reasonable Fear Interview witnessed a violent exchange between a cellmate and an officer shortly before his interview. He reports being verbally abused by officers, and seeing them drag and beat his cellmate. He and many other parents report being verbally abused by CBP officers and mocked for crying about being separated from their children.

15. Three of our clients passed their Credible/Reasonable Fear Interviews, but were coerced into abandoning their claims due to the trauma of continued separation. One separated mother was unable to communicate with her daughter while detained, was denied bond, and received an individual hearing date almost a year after she submitted her application for asylum. Another separated father passed his Reasonable Fear Interview, but was told by ICE officials that he could only talk to his son once per month while detained. He staged a hunger strike to call attention to his situation and was punished with solitary confinement.

16. All of the deported parents reported being profoundly traumatized by their separation from their children. All were separated from their minor children within 24 to 72 hours after turning themselves over to Border Patrol officials. Several parents reported having their children physically ripped from their arms, including a father of a six-year old boy who was threatened with violence and criminal prosecution when he resisted CBP officers as they violently separated him from his son. Almost all parents reported being mocked and threatened by CBP and ICE officials when they asked about the whereabouts of their children. Others were told that their children were being taken to change clothes or bathe, and then never saw their children again.

17. Following their separation from their children, all of the parents report being held in crowded, unsanitary conditions with little to no information about their

children. The deported parents described being held in freezing rooms or cages with anywhere from 50 to 200 other migrants, being given very little food, and not being able to bathe, brush their teeth, or lay in a bed for as long as two weeks. Several parents report that they became ill due to being provided with rotten food. Several report not being provided with any water, except for water from a sink attached to a toilet being used by several dozen people. There were multiple reports of substandard medical care, painful collective punishment, and sustained verbal abuse from CBP and ICE officials. One mother reported slipping and falling in a CBP facility and seriously injuring her shoulder, only to be deported days later without her son and without having received any medical care. She continues to require medical treatment for this injury to the present day.

18.  Generally, the deported parents could not meaningfully communicate with their children during their detention. Some reported speaking with their child once or twice, while others had no communication with and no information regarding their child the entire time they were detained by U.S. authorities. A few parents were provided with the ORR hotline number or another ORR contact, but were unable to obtain any information, if they were able to call from detention at all. Several parents were separated from children with disabilities, including a father separated from his deaf daughter.  Several parents, in separate facilities and on separate occasions, participated in or observed hunger strikes staged by parents protesting the lack of information about their separated children.

19.  In at least eight of the deported parents cases represented by AOL, the parents who petitioned the government for return do not speak any Spanish and were never provided with an interpreter during their time in U.S. detention. These parents report being unable to understand the reasons offered for their separation from their children, and unable to communicate with officials to obtain information about their children. Many indigenous clients describe being prosecuted for illegal entry and deported without ever having received an

1 explanation of the proceedings or deportation paperwork in their native language. Two indigenous clients report being forcibly injected with medication at ICE detention facilities without receiving an explanation in their native language as to the nature of the medical treatment. At least six clients reported being unable to read or write in any language, and not being provided an explanation of what they were signing.

20. All of our clients were coerced, tricked, or forced into being removed from the United States without their children. The few who willingly accepted deportation were coerced into doing so because they were unable to effectively communicate with their children while detained, or received no information about their children while detained. Parents who were tricked into signing removal documents were told that the United States was no longer giving asylum, or that they were actually signing a document for their release. Some were threatened with additional criminal prosecution and prison time if they refused to sign.  At least eight of our clients report being told that their child would be waiting for them on the plane, or that their child would be removed with them the same day. Two report having to be physically forced onto the plane by ICE officials once they learned that their children would not be removed with them.

21. After they were deported without their children, several parents suffered attempts on their lives; one father was shot and injured, another was shot at but not hit, and several others were threatened with firearms or other weapons. Others received direct death threats after being deported, and at least six of the parents fled their home countries again almost immediately after being deported due to imminent danger of persecution or death.

22. All of the deported parents reported that their children were deeply traumatized by their separation. Several of the children suffered severe trauma-related mental harm, including two children who were hospitalized for behavioral health issues and one child who made multiple attempts on her life. The parents

also reported experiencing severe trauma-related mental illness. Almost all of the parents we interviewed reported suffering symptoms such as memory loss, nightmares, anxiety, depression, and intrusive memories of their traumatic separation from their children. Several fathers told me on separate occasions, "I will never be the same again" due to the trauma of separation.

23. Of Al Otro Lado's clients, twenty-eight parents returned to the United States on March 2, 2019 by reporting to the Calexico Port of Entry.

24. Eleven of the returning parents were issued notices to appear, released by CBP within a week and reunified with their children shortly thereafter.

25. Seventeen of the parents were detained at the Imperial Regional Detention Facility for forty two days. Between March 2 and March 28, 2019, I sent well over fifty messages to ICE ERO and the Arlington Asylum Office in an attempt to schedule the Credible Fear Interviews so that my clients could be reunified with their children. On March 28, 2019, I was informed that the Asylum Office Headquarters had instructed them not to schedule the Credible Fear Interviews for these separated parents. After intervention from a member of Congress, the interviews finally moved forward during the first week of April 2019.

26. All of the parents passed their Credible Fear Interviews, and all were released on April 12, 2019.

27. All of the deported parents who have returned to the United States have been reunified with their children, except for one. One mother, an indigenous language speaker, was separated from her son in late 2017 and deported. Her son, also an indigenous language speaker with extremely limited Spanish competency, aged out of ORR custody in 2018 and was transferred to adult detention, after which his mother was unable to speak with him. She knew nothing about his whereabouts for five months. She submitted a petition for return and reunification through the *Ms. L* settlement on December 15, 2018, while our organization attempted to locate and make contact with her son. We were finally able to contact him in early

February 2019, at which time we discovered that he had requested voluntary departure through an attorney. Al Otro Lado timely submitted an appeal, but our client's son was removed to Guatemala. Our client is now in the United States and we are assisting her son with a Motion to Reopen his case.

28.  The rest of the parents who returned to the United States on March 2, 2019 have since reunified with their children.  Based on my experience in representing reunified families, I have observed that the longer children are separated from their parents, the more traumatized they become, which makes reunification a complex process. Parents who have recently reunified with their children consistently report that their children display a host of behavioral issues, including frequent anger, sadness, or an inability to concentrate. Younger children are terrified to leave their parents' side, often refusing to go to school or engage in other outside activities. Older children often express resentment toward their parents for "abandoning" them in a detention system that was, at times, cruel and dehumanizing. Our clients have expressed that they and their children have a critical need for mental health services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Tijuana, Baja California, Mexico on June 4, 2019.

*Erika Pinheiro*

Erika Pinheiro