Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*
*dgalindo@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>      *Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.<br><br>      *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: July 5, 2019<br><br>**REPLY BRIEF IN SUPPORT OF MOTION TO ALLOW PARENTS DEPORTED WITHOUT THEIR CHILDREN TO TRAVEL TO THE UNITED STATES** |

# INTRODUCTION

Plaintiffs seek relief for a small number of parents who were separated from their children, unlawfully deprived a meaningful opportunity to seek asylum, and deported. These parents are desperate to reunite with their children, but cannot bring their children to their home countries because of the danger they face there.

Plaintiffs carefully screened hundreds of cases of deported parents to identify and present fifty-one involving rare and unusual facts: a bona fide claim for asylum that was abandoned or lost due to coercion or trauma, and an inability to reunify in the country of origin because of persecution. Plaintiffs are now seeking relief for less than two dozen, out of more than 400 parents who were deported, and more than 2,700 that were separated.

Defendants contend that these cases are not rare and unusual, and so the families must remain separated. But Defendants do not explain what they believe would be a rare and unusual case. Defendants certainly cannot mean it was a regular occurrence for DHS to separate families and then deprive parents of their statutory rights to apply for asylum.

Defendants also suggest that Plaintiffs did not seriously screen the Class Members, but Plaintiffs' affidavits establish otherwise. Moreover, thirty screened individuals who managed to get to the border on their own and claim a fear either passed their credible fear screenings or were placed into full 240 asylum hearings by the government, thereby proving that they were indeed wrongly denied asylum. There is thus little question that Plaintiffs engaged in rigorous screening.

At bottom, the government is arguing that they looked at all the applications and that that is all Plaintiffs were entitled to under the terms of the Agreement. But simply looking at the applications and then rejecting all of them in one sentence, without any explanation, is not what the Agreement required.

Apart from the Agreement, the Court always has the power to permit Plaintiffs to return to provide a meaningful remedy to these parents. That is clear

1

under controlling Ninth Circuit law, which the government does not even address.

Plaintiffs are not asking that they be given asylum, just the meaningful opportunity to *apply* for asylum. Plaintiffs are not asking that the government even pay for their travel to the U.S., just that they be permitted to return to the U.S. at their own expense, in the hopes that they can reunite with their children. That is a modest request, given that the government unlawfully and brutally took their children away and then deprived them of the right to seek asylum.

Had these parents been able to pursue their asylum claims in the United States last year, they would not have been deported, and would have benefitted from the Court's reunification order. They should not be deprived of that reunification because they were doubly wronged—first, by being initially separated from their children and, then, by being deported without a meaningful opportunity to seek asylum.

## ARGUMENT

### I.  The Deported Parents Warrant Relief Under the Agreement.

Defendants argue that the cases Plaintiffs have identified are not sufficiently "rare and unusual" to qualify for relief, but Defendants do not explain what cases would qualify as "rare and unusual" in their view, and their blanket denial of all the submissions suggests they consider no case would merit relief.

In contrast, Plaintiffs have explained the criteria they employed: (1) that the parent has a bona fide claim for asylum; (2) that the asylum claim was abandoned or lost due to coercion or trauma inflicted by the family separation policy; and (3) that the family is unable to reunify in their home country because of their fear of harm to themselves and their children.

Defendants assert that Plaintiffs' criteria are either inconsistent with the Agreement, or are invalid because they are not explicitly included in the text of the Agreement. But the Agreement must be understood in its context. This litigation has focused on the need to provide the victims of Defendant's "brutal" and

2

"offensive" family separation policy relief in the form of reunification. Dkt. 71 at 23. Relief for these thousands of families has been administered in stages. At each stage, the mechanism for reunification has been tailored to ensure that the right to reunify was meaningful. Consistent with this purpose, Plaintiffs identified only those deported parents whose reunification requires additional, limited relief.

The initial stage was the speedy reunification of more than 2000 separated families who were in the United States on the date of the injunction. The next stage was the reunification of parents deported from the United States who sought to reunify pursuant to the Reunification Plan. From the moment that Plaintiffs learned that Defendants had deported almost 500 Class Members without their children, Plaintiffs have maintained that a small group of these parents could require additional relief. That group consisted of parents who could not safely reunite with their children in their country of origin, and who may have been coerced or misled into relinquishing their asylum claims.

The Reunification Plan thus provided a default option of reunification in the country of origin, but did not prohibit Plaintiffs from seeking additional relief for parents for whom that default option was impossible. The Plan explicitly deferred the question of further relief to a later stage:

> The Plan does not address or resolve the right of removed parents to be reunified with their children in the United States. . . . However, some separated families can only be made whole by returning the parent to the United States. For example, in some cases, removed parents may not have availed themselves of their right to seek asylum because they were misled or coerced into believing that asserting their asylum claim would delay or preclude reunification. . . . A subset of these parents may wish to reinstate their right to seek asylum by returning to the United States.

Aug. 16, 2018 Notice Regarding Defendants' Plan for Reunifying Removed Parents, Dkt. 190 at 1-2. *See also id.* at n.1 ("The parties expressly agreed that this issue would be resolved by the court and that the current agreement is contingent on that issue being decided by the Court."). Plaintiffs specifically explained the

rationale for leaving this issue open:

> MR. GELERNT: . . . I do want to reserve the right that we would maybe come back to you and take up your offer to potentially brief and argue this issue [regarding reunification in the U.S.]
>
> [W]e believe that there may . . . be specific individuals who were misled or coerced into thinking the only way they could get their children back was to accept removal.
>
> We don't think there [will] ultimately [] be that many individuals who want to come back. . . . But we do think, especially with the indigenous speakers, that there may be individuals who only understood that they could get their children back by accepting removal. And under those circumstances we do believe that there would be a strong argument for bringing them back.

Aug. 17, 2018 Tr. at 15. While the Court provided "tentative observations" on the relief available to deported parents, it noted that it would keep an "open mind and be subject to briefing by the parties," *id.* at 12, and "reserv[ed] on this issue of whether some parents who have been removed should be returned to the United States to pursue their asylum claims with their children." *Id.* at 20.

At issue at this third stage is whether a small number of separated families will have the opportunity to receive the basic relief this Court has extended to the rest of the Class: a meaningful opportunity to reunify. In overruling an objection that the Agreement was not sufficiently protective of deported parents, the Court recognized it "speaks to the possibility of those parents being returned to the United States" and expressed confidence that Defendants would abide by its agreed-upon responsibility to review applications in "good faith." Nov. 15, 2018 Tr. at 40-41.

Plaintiffs' criteria are consistent with the core goal of reunification. Defendants, on the other hand, do not explain how the parents identified by Plaintiffs can, in fact, reunify with their children absent further relief. They cannot, for example, explain how D.J.M.C.—who lives in hiding in Honduras, and whose

4

separation and removal was followed by the murder of his relatives and the shooting of his family home by gangs—can bring his five-year old son to such conditions. *See* Dkt. 418 at 8. Nor can they explain how D.X.C.—an indigenous Guatemalan who fled gang violence with his eight-year-old son—can safely reunite with his child when he is living in hiding. *Id.* Nor how B.L.S.P.—a survivor of sexual assault whose abuse and separation has left her unable to function and fearful to even leave her house—can ever reunite with her child in their home country. *Id.*

Defendants next claim that Plaintiffs' criteria do not sufficiently identify "rare and unusual" cases because the evidence of coercion is "not dissimilar to claims made in other cases by individuals alleging they did not have a fair opportunity to seek asylum," Dkt. 428 at 15. Defendants apparently believe that parents whom they separated from children as young as five are simply "dissatisfied by the outcome of the immigration proceedings. . . ." *Id.* at 16-17. Defendants ignore that this case is about the harm of their illegal family separation policy, and that the relief is necessary to remedy the harm of separation. Put simply, had these Class Members been given fair asylum hearings, they would not have been deported and would have benefited from this Court's reunification remedy. That certainly is not true of other cases.

Defendants' suggestion that the illegal treatment and coercion of detained asylum seekers is not "rare and unusual" is shocking. Even so, Plaintiffs are not seeking relief for *all* deported parents whose proceedings were tainted by the trauma of separation, misleading statements by Defendants' agents, and the fear that seeking asylum would expose them to years of detention while separated. Plaintiffs identified only those who have *bona fide* asylum claims, and who cannot safely reunite in their home countries.

Defendants speculate as to the thoroughness of Plaintiffs' screening, insinuating that it "highly dubious" that Plaintiffs raised only cases who present

"rare and unusual circumstances," and "that the standard applied in making these initial assessments was very broad" and not "meaningful." Dkt. 428 at 15. But Plaintiffs have provided detailed declarations as to both process and substance. The Herzog Declaration, for example, states that the Steering Committee reached 365 parents in the first instance, who were then subject to further screening. Dkt. 418-2 at ¶ 5. Plaintiffs have attested to the intensive, time-consuming steps of telephonic and in-country interviews, and multiple layers of evaluation by expert immigration non-profit organizations, law firm attorneys experienced in immigration, and Plaintiffs' counsel. *Id.* ¶¶ 6-9; Dkt. 418-3 at ¶¶ 8-12.

The treatment of the separated parents who managed to return to the United States on their own and claimed a fear of persecution underscores the reliability of Plaintiffs' screening. When provided with a fair process, 30 parents who returned and claimed a fear either passed their credible fear hearings, or were placed in full 240 proceeding, confirming Plaintiffs' assessment of their cases.

Finally, Defendants claim that they have performed all their obligations under the Agreement by looking at, then summarily denying, all the applications within the specified time frames. But despite Plaintiffs' requests, Defendants have explained neither the standard they used when reviewing the applications, nor what additional evidence would meet their standard. Instead, Defendants erroneously state that Plaintiffs' "submissions were merely restatements of their asylum claims." Dkt. 428 at 12. But the applications, all of which are lodged with the Court, all attest to the reasons that they did not receive a fair credible fear hearing, or relinquished their asylum claims, due to trauma or coercion. Defendants' assertion otherwise suggests Defendants did not, in fact, meaningfully review any of the submissions. A good faith review requires more than such cursory treatment.

Indeed, it is difficult to understand what case could ever meet Defendants' unstated standards. Among the parents seeking relief are a father of an eight year old who has no biological family in the United States, who spent a year in ORR

custody before being released to strangers in the U.S. because it is too dangerous for him in Guatemala, and who continues to cope with the psychological harm of separation, Dkt. 418 at 8-9; a Honduran father who was tortured, lives in hiding from his torturers, and whose five-year old son has come to blame him for what he perceives as his abandonment, *Id.* at 8; a Guatemalan father who felt forced to sign papers in English, a language he cannot read or understand, and who has been fleeing death threats since his deportation, *Id.* at 9.

**II.  This Court Has Jurisdiction to Order Class Members' Return to the United States Apart From The Settlement.**

Defendants assert that "[t]his Court lacks the jurisdiction" to order the Class Members' return to the United States, Dkt. 428 at 12, but they are plainly mistaken.[1] Defendants do not engage at all with the multiple cases—including controlling Ninth Circuit decisions—that have remedied legal violations by directing the return of deported individuals. *See* Dkt. 418 at 12 (citing, inter alia, *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998); *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir. 1977), and *Singh v. Waters*, 87 F.3d 346, 350 (9th Cir. 1996)).

Instead, Defendants cite general language from wholly inapposite cases addressing the federal government's "power to admit and exclude aliens 'without judicial intervention,'" Dkt. 428 at 17-18, but almost all of Defendants' cited cases address the political branches' authority to confer or deny *lawful status*—in other words, their power to set criteria for the legal admission of immigrants into the country. *See Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (rejecting challenge to immigration laws giving preference to natural mothers of illegitimate children); *Kleindienst v. Mandel*, 408 U.S. 753, 754 (1972) (addressing First Amendment

---

[1] Defendants misleadingly state that the Agreement "does not include any specific language that would allow them to ask the Court to conduct the currently requested review." Dkt. 428 at 15. The course of negotiations underscores the parties' understanding that the Agreement did not preclude Plaintiffs from seeking further relief from this Court, and the Agreement is explicit that "existing law . . . address all interests that such parents or their children may have." Agreement at 6.

attack on statute denying visa eligibility based on advocacy for Communism or totalitarianism); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 547 (1950) (upholding immigrant's denial of entry based on national security grounds); *Noel v. Chapman*, 508 F.2d 1023, 1026 (2d Cir. 1975) (rebuffing challenge to INS policy that treated certain Western Hemisphere immigrants married to lawful permanent residents differently from those married to U.S. citizens).[2] And notably, these cases addressed and rejected the plaintiffs' challenges *on the merits*, not for lack of jurisdiction.

In contrast, the Class Members seek only to come back to the U.S. for the opportunity to apply for asylum that the immigration statutes already give them—an opportunity they were wrongly denied by Defendants' family separation practices. *See generally* 8 U.S.C. § 1225; 8 U.S.C. § 1158. Defendants can give them that opportunity by either affording them new credible fear interviews, *see* 8 U.S.C. § 1225(b)(1)(B), or by putting them directly into regular removal proceedings before an immigration judge, *see* 8 U.S.C. § 1229a. Defendants followed these very paths for 30 deported Class Members who returned to this country on their own and claimed a fear of return. *See* Dkt. 418 at 6.

After the Class Members return, asylum officers and the immigration courts can then determine the Class Members' entitlement to asylum or other forms of lawful status. The deported Class Members just want a fair shot at making their claims. *See Walters*, 145 F.3d at 1051 (ordering return to United States so that

---

[2] Defendants' remaining cases are similarly irrelevant. Defendants cite *Lem Moon Sing v. United States*, 158 U.S. 538 (1895), which addressed the application of the Chinese Exclusion Act to an immigrant merchant. But as the Supreme Court explained less than a decade later, that case does not mean that "administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution." *Kaoru Yamataya v. Fisher*, 189 U.S. 86, 100 (1903). *Arizona v. United States*, 567 U.S. 387, 395 (2012) concerned federal preemption of state laws involving immigration, and is totally inapposite.

8

wrongly deported class member can "take advantage of the procedures to which he is entitled"); *Singh*, 87 F.3d at 350 (ordering return so that petitioner could "appear[] at a hearing before an immigration judge" to seek adjustment of status); *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir. 1977) (directing return so noncitizen could "pursue any administrative and judicial remedies to which he is lawfully entitled").

As another court explained in response to a similar argument by Defendants that it lacked authority to return unlawfully deported individuals, "plaintiffs have availed themselves of the 'framework under which aliens may enter the United States,'" and the court "'possesses the power Congress gives it to review Executive action taken within that framework.'" *Grace v. Whitaker*, 344 F. Supp. 3d 96, 145 (D.D.C. 2018) (quoting and distinguishing *Kiyemba v. Obama*, 555 F.3d 1022, 1045-46 (D.C. Cir. 2009)).[3]  Likewise, the deported Class Members here are entitled to the procedures that Congress gave them, but that Defendants unlawfully blocked them from receiving.

Defendants also argue that Plaintiffs "are in effect seeking review of a decision . . . to deny a parole application packet," Dkt. 428 at 18-19, but Plaintiffs are not seeking review of parole applications.  Plaintiffs simply want a proper and effective remedy for the injury they have suffered.  *See* Dkt. 418 at 7-10.  If the Court orders their return for this purpose, Defendants certainly could choose to effectuate that remedy by means of the parole process. *See Walters*, 145 F.3d at 1051 (affirming injunction that "[did] not *require* the government to parole individual class members," and instead left "the government with the option of

---

[3] The government's reliance on *Kiyemba* is misplaced.  That case involved individuals determined to be enemy combatants held in Guantanamo Bay. 555 F.3d at 1024, *vacated*, 559 U.S. 131, *reinstated in amended form*, 605 F.3d 1046 (D.C. Cir. 2010). They requested entry into the United States, despite their failure "to comply with the immigration laws governing a migrant's entry into the United States." *Grace*, 344 F.Supp. 3d at 144.

9

establishing other procedures to achieve the same result"). But that does not mean that Plaintiffs are challenging any parole denials.

Even if Plaintiffs were seeking parole into the United States, the law is clear that the Court could order such relief if it were necessary to remedy the constitutional violation. *See Walters*, 145 F.3d at 1051 (expressing serious doubt at whether statutes governing parole "impose limits on the federal courts' ability to remedy constitutional violations," but noting that federal courts could order parole as remedy).

Defendants also assert that 8 U.S.C. § 1252(a)(2)(B)(ii) bars Plaintiffs' request for relief, Dkt. 428 at 19, but that argument again misapprehends Plaintiffs' claims. Plaintiffs are not seeking review of parole denials, nor are they requesting waivers under the various admissibility statutes Defendants cite. They just want restoration to the position they would have occupied but for Defendants' unconstitutional conduct, which for them means return to this country for fair evaluations of their asylum claims. And even if Section 1252(a)(2)(B)(ii) had any relevance here, this Court has already explained that "claims of constitutional violations are not barred" by that statute. *See* Dkt. 71 at 13 n.5 (citing *Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004)). *Cf. Walters*, 145 F.3d at 1053 (holding that because "district court clearly had jurisdiction to hear the claims regarding constitutional violations, it had jurisdiction to order adequate remedial measures, including injunctive provisions that ensure that the effects of the violation do not continue").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion seeking relief for the deported parents should be granted.

| | | |
|---|---|---|
| 1 | Dated: July 5, 2019 | Respectfully Submitted, |
| 2 | | */s/Lee Gelernt* |
| | Bardis Vakili (SBN 247783) | Lee Gelernt* |
| 3 | ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES | Judy Rabinovitz* |
| | P.O. Box 87131 | Anand Balakrishnan* |
| 4 | San Diego, CA 92138-7131 | Daniel Galindo (SBN 292854) |
| | T: (619) 398-4485 | AMERICAN CIVIL LIBERTIES |
| 5 | F: (619) 232-0036 | UNION FOUNDATION |
| | *bvakili@aclusandiego.org* | IMMIGRANTS' RIGHTS PROJECT |
| 6 | | 125 Broad St., 18th Floor |
| | Stephen B. Kang (SBN 2922080) | New York, NY 10004 |
| 7 | Spencer E. Amdur (SBN 320069) | T: (212) 549-2660 |
| | AMERICAN CIVIL LIBERTIES | F: (212) 549-2654 |
| 8 | UNION FOUNDATION | *lgelernt@aclu.org* |
| | IMMIGRANTS' RIGHTS PROJECT | *jrabinovitz@aclu.org* |
| 9 | 39 Drumm Street | *abalakrishnan@aclu.org* |
| | San Francisco, CA 94111 | dgalindo@aclu.org |
| 10 | T: (415) 343-1198 | |
| | F: (415) 395-0950 | *Admitted Pro Hac Vice* |
| 11 | *samdur@aclu.org* | |

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: July 5, 2019