UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
MS. L., ET AL.,                         )
                                        )   CASE NO. 18CV0428-DMS
              PETITIONERS-PLAINTIFFS,   )
                                        )
VS.                                     )
                                        )
                                        )
                                        )
                                        )
U.S. IMMIGRATION AND CUSTOMS            )   SAN DIEGO, CALIFORNIA
ENFORCEMENT ("ICE"), ET AL.,            )   FRIDAY, JULY 12, 2019
                                        )    1:00 P.M. CALENDAR
              RESPONDENTS-DEFENDANTS.   )
----------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY, ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           ANAN BALAKRISHNAN
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004


FOR DEFENDANT:             SCOTT STEWART, ESQ.
(TELEPHONICALLY)           SARAH B. FABIAN, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044


ALSO APPEARING:            COMMANDER JONATHAN WHITE
                           JEAN-MICHAEL VOLTAIRE,ESQ.
                           ZACHARY BEST, ESQ.
                           SIRINE SHEBAYA, ESQ.
                           STEVEN HERZOG,ESQ.
                           CATHERINE WEISS, ESQ.
                           LINDA DAKIN-GRIMM,ESQ.
```

1    <u>SAN DIEGO, CALIFORNIA — FRIDAY, JULY 12, 2019 — 1:05 P.M.</u>

2                          *   *   *

3            **THE CLERK:**  NO. 21 ON CALENDAR, CASE NO. 18CV0428,

4    MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ET

5    AL.; ON FOR MOTION HEARING AND STATUS CONFERENCE.

6            **THE COURT:**  GOOD AFTERNOON.

7            I HAVE A COUPLE OF ATTORNEYS PRESENT IN COURT.  CAN

8    I HAVE YOUR APPEARANCES?

9            **MR. GELERNT:**  LEE GELERNT FOR MS. L.

10           **MR. BALAKRISHNAN:**  ANAN BALAKRISHNAN FOR MS. L.

11           **THE COURT:**  THANK YOU.  AND GOOD AFTERNOON.

12           AND THEN I HAVE ON THE TELEPHONE SARAH FABIAN, SCOTT

13   STEWART, JEAN-MICHEL VOLTAIRE.  FOR THE DORA PLAINTIFFS SIRINE

14   SHEBAYA.  MMM, MR. ZACHARY BEST.  I HAVE COMMANDER WHITE FROM

15   HHS.  STEVEN HERZOG FOR THE STEERING COMMITTEE.  AND CATHERINE

16   WEISS.

17           SO ALL OF YOUR APPEARANCES ARE NOTED.

18           LET'S GO AHEAD AND ADDRESS THE STATUS REPORT FIRST.

19           AND, MR. GELERNT, WHEN YOU SPEAK IF YOU COULD SPEAK

20   DIRECTLY INTO THE MICROPHONE SO THAT COUNSEL ON THE TELEPHONE

21   CAN HEAR YOU AS WELL.

22           LET'S JUST RUN THROUGH THAT REPORT.

23           IT SEEMS ON THE ORIGINAL CLASS, EVERYTHING IS IN

24   ORDER.

25           **MR. GELERNT:**  I THINK THAT IS RIGHT, YOUR HONOR.

1          **THE COURT:**  THERE IS THE REFERENCE TO THE ONE CHILD

2     WHO THE STEERING COMMITTEE DID NOT OBTAIN PARENTAL PREFERENCE.

3     THAT IS THE SAME CHILD WE HAVE BEEN TALKING ABOUT FOR SOME

4     TIME NOW?

5          **MR. GELERNT:**  THAT IS MY UNDERSTANDING, YOUR

6     HONOR.  BUT MR. HERZOG CAN CORRECT THAT IF I AM

7     MISUNDERSTANDING.

8          **MR. HERZOG:**  THAT IS INDEED THE SAME CHILD WE HAVE

9     BEEN TALKING ABOUT.

10         **THE COURT:**  SO I AM ASSUMING, THEN, THAT AS TO THIS

11    ORIGINAL CLASS EVERYTHING IS IN ORDER, AND WE ARE REALLY DOING

12    WELL AND IN GOOD SHAPE THERE.

13         AND WE WILL SIMPLY MOVE TO THE NEXT GROUP, WHICH

14    HERE, ON PAGE 6, THAT'S THE MMM GROUP.  THERE IS SOME

15    DISCREPANCY IN THE NUMBERS.  MR. BEST HAS SET OUT, AT PAGE 15

16    OF THE REPORT, SLIGHTLY DIFFERENT NUMBERS.  IT SEEMS THAT

17    THAT'S A MATTER THAT THE PARTIES WILL WORK THROUGH.

18         MR. BEST, WERE YOU SIMPLY -- SEEMS LIKE YOU WERE

19    FOOTNOTING THAT BUT CONTENT TO CONTINUE TO WORK WITH

20    GOVERNMENT COUNSEL TO ENSURE THAT AT SOME POINT IN THE NOT TOO

21    DISTANT FUTURE THOSE NUMBERS WOULD BE SQUARED UP?

22         **MR. BEST:**  HI, YOUR HONOR.  THIS IS MR. BEST.

23         YES, ABSOLUTELY.  WE WOULD HAPPILY LIKE TO CONTINUE

24    TO WORK WITH THE GOVERNMENT ON THAT AND HOPEFULLY REACH A

25    RESOLUTION, SOONER RATHER THAN LATER GIVEN THE LENGTH OF TIME

1    THAT THIS ISSUE HAS BEEN OUTSTANDING.  AND SO WE ARE HOPING

2    THAT THE GOVERNMENT WILL CONTINUE TO WORK WITH US, AND WE CAN

3    RUN THAT TO GROUND WITHOUT FURTHER COURT INVOLVEMENT.  BUT WE

4    DID SIMPLY WANT TO -- WE WANTED TO NOTE THIS ISSUE FOR THE

5    COURT'S ATTENTION.

6              **THE COURT:**  THANK YOU.

7              I ALSO NOTE THAT THE MOTION, PLAINTIFFS' MOTION

8    FILED AT ECF 342, WOULD BE WITHDRAWN AT THIS TIME IN LIGHT OF

9    THE PARTIES WORKING THROUGH THAT MATTER, CORRECT?

10             **MS. SHEBAYA:**  YOUR HONOR, THIS IS SIRINE SHEBAYA FOR

11   THE DORA PLAINTIFFS.  YES, THAT IS CORRECT.

12             **THE COURT:**  VERY GOOD.

13             STAYING WITH THE MMM CLASS FOR A MOMENT.  THE

14   GOVERNMENT HAS INDICATED AT PAGE 8 THAT THERE ARE 165

15   ABSCONDERS, NUMBER OF PARENTS WHO ABSCONDED FROM ENROLLMENT IN

16   ALTERNATIVES TO DETENTION.

17             MS. FABIAN OR MR. STEWART, CAN YOU ENLIGHTEN ME ON

18   THAT?  HOW MANY PARENTS ARE WE TALKING ABOUT TOTAL, AND WHAT

19   PERCENTAGE WOULD THIS NUMBER REPRESENT?

20             **MR. STEWART:**  SURE, YOUR HONOR.  ACTUALLY -- I SEE.

21   MS. FABIAN, I THINK, HAS THE LATEST INFORMATION ON THAT.  I

22   WILL LET HER TAKE IT.

23             **THE COURT:**  OKAY.

24             **MS. FABIAN:**  HI.  GOOD AFTERNOON, YOUR HONOR.

25             THAT NUMBER IS -- I ACTUALLY DON'T KNOW THE TOTAL

1   THAT THAT IS OUT OF, BUT THAT IS OUT OF THE INDIVIDUALS WHO

2   WERE FAMILIES WHO WERE REUNIFIED AND RELEASED ON ALTERNATIVES

3   TO DETENTION.

4            AND ICE IS JUST NOTING THAT NUMBER FOR THE PURPOSES

5   OF WHEN WE ARE TALKING ABOUT ON THE MMM FRONT, YOU KNOW,

6   LOCATING FOLKS AND MAKING SURE THAT THEY GET THEIR SETTLEMENT

7   PROCEDURES.

8            THOSE ARE INDIVIDUALS WITH WHOM THE GOVERNMENT HAS

9   LOST CONTACT AND DOESN'T HAVE CONTINUED INFORMATION AND SO

10  DOESN'T HAVE THE CONTINUED ABILITY TO CONTACT THOSE FOLKS.

11       **THE COURT:**  SO WOULD THIS POOL THEN ENCOMPASS --

12  THERE WERE ABOUT 2100 OR SO PARENTS WHO WERE IN COUNTRY THAT

13  WERE REUNIFIED WITH THEIR CHILDREN.  IS THAT THE POOL WE ARE

14  TALKING ABOUT?

15       **MS. FABIAN:**  IT WOULD BE, YES, YOUR HONOR.

16       I AM NOT SURE IT WOULD ENCOMPASS THAT ENTIRE GROUP,

17  IT WOULD BE LIMITED TO THOSE WHO WERE RELEASED ON ALTERNATIVES

18  TO DETENTION.  I THINK SOME OF THAT GROUP MAY HAVE BEEN

19  RELEASED UNDER OTHER SUPERVISION OR JUST ON NOTICES TO APPEAR,

20  SO I CAN'T SAY THAT THAT'S THE TOTAL NUMBER.  BUT, YES,

21  ULTIMATELY, YOU KNOW, THIS IS -- THIS IS A SUBSET OF THAT

22  NUMBER.

23       **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU.

24       THERE APPEARS TO BE A LOT OF BACK AND FORTH ON THE

25  MEET AND CONFER ON THE PROPOSED GOVERNMENT PROCESSES,

1    PROCEDURES AND TRACKING FOR, I THINK, THE REUNIFICATION

2    PROTOCOLS AND THE SEPARATION PROTOCOLS.  IT APPEARS ON JULY

3    11, YESTERDAY, THE GOVERNMENT PROVIDED A COMPREHENSIVE

4    RESPONSE TO THE PLAINTIFFS' COMMENTS.

5             HOW IS THIS LOOKING?  ARE WE GETTING CLOSE?

6             **MR. GELERNT:**  YOUR HONOR, I THINK THERE IS TWO

7    ISSUES THAT WE ARE CONCERNED ABOUT.  ONE IS THE ONE YOU JUST

8    NOTED WHICH IS WHAT ARE GOING TO BE THE INFORMATION-SHARING

9    PROTOCOLS FOR ONGOING SEPARATIONS TO THE EXTENT THERE ARE

10   GOING TO BE ONGOING SEPARATIONS.

11            WE JUST GOT THE GOVERNMENT'S RESPONSE BACK YESTERDAY

12   AFTERNOON.  IT DOES NOT, UNFORTUNATELY, LOOK LIKE WE ARE THAT

13   CLOSE.  WE ARE HOPING TO MEET WITH THE GOVERNMENT THIS WEEK,

14   BUT I AM NOT OPTIMISTIC, GIVEN THE RESPONSE.  IT HAS TAKEN A

15   WHILE FOR THE GOVERNMENT TO RESPOND.  WE ARE GOING TO LOOK AT

16   IT MORE CLOSELY SINCE IT JUST CAME IN YESTERDAY, BUT AT THIS

17   POINT I AM NOT OVERLY OPTIMISTIC.

18            THE SECOND ISSUE, WHICH IS EQUALLY OF CONCERN TO US,

19   IS THAT THERE ARE NOW HUNDREDS AND HUNDREDS OF SEPARATIONS

20   SINCE THE INJUNCTION.  AND THOSE ARE BASED ON THE GOVERNMENT'S

21   DETERMINATION THAT THEY BELIEVE THE PARENT IS A DANGER AND/OR

22   SOME CRIMINAL HISTORY.

23            WE HAVE ASKED THE GOVERNMENT TO CLARIFY THE STANDARD

24   THEY ARE USING AND GIVING THEM SPECIFIC EXAMPLES.  THAT HAS

25   BEEN SITTING WITH THEM FOR A WHILE.  WE HOPE THIS WEEK, AS

1   PART OF THE SAME MEET AND CONFER ON THE INFORMATION-SHARING

2   PROTOCOLS, WE CAN GET SOME CLARITY ON IT.  BUT I HAVE A

3   FEELING, BASED ON PAST DISCUSSIONS, WE MAY NOT GET CLARITY.

4   AND WE INTEND TO FILE A MOTION RIGHT AFTER THAT MEET AND

5   CONFER UNLESS THERE IS SATISFACTORY RESOLUTION.  BECAUSE I

6   THINK FOR US AND ADVOCATES WHO ARE DEALING WITH THE CHILDREN

7   OUT THERE ON THE GROUND, IT HAS BECOME A VERY CONCERNING

8   ISSUE; NOT JUST THAT THERE ARE SO MANY BUT THE TYPES OF CRIMES

9   FOR WHICH FAMILIES ARE BEING SEPARATED BASED ON THE

10  GOVERNMENT'S CHART, THINGS AS SMALL AS TRAFFIC VIOLATIONS.

11  AND THERE ARE VERY YOUNG CHILDREN, BABIES AND TODDLERS, BEING

12  SEPARATED FOR THOSE REASONS.

13          SO AS UNFORTUNATE AS IT MAY BE, I THINK WE ARE GOING

14  TO HAVE TO BRING THAT TO THE COURT ABSENT SOME CLEAR

15  RESOLUTION THIS WEEK WITH THE GOVERNMENT.

16          **THE COURT:**  ALL RIGHT.

17          MR. STEWART, ANYTHING IN ADDITION ON THAT, OR DO YOU

18  WANT TO JUST WAIT AND SEE WHERE YOU ARE?

19          **MR. STEWART:**  YOUR HONOR, I AM WILLING TO WAIT AND

20  SEE.

21          I WOULD RESPECTFULLY SUBMIT THAT IT IS INAPPROPRIATE

22  FOR MR. GELERNT TO MAKE -- TO PLANT, KIND OF AGGRESSIVELY,

23  PRO-PLAINTIFF FACTUAL AVERMENTS, TO JUST SORT OF DROP THEM IN

24  AND SPRINKLE THEM INTO THIS ARGUMENT WHEN THERE IS NO SUCH

25  MOTION BEFORE THIS COURT, WHEN ANY MEET AND CONFER IS STILL,

1  YOU KNOW, UPCOMING.

2          AND FOR HIM TO KIND OF CHERRY PICK SOMETHING THAT

3  GIVES HIM A GOOD HEADLINE IS, WITH RESPECT, I WOULD SUBMIT,

4  INAPPROPRIATE, PARTICULARLY WHEN HE KNOWS THAT A NUMBER OF

5  THOSE SORTS OF CHARACTERIZATIONS ARE QUITE LIKELY TO BE

6  DISPUTED BY THE GOVERNMENT.

7          SO THE GOVERNMENT IS WILLING TO MEET AND CONFER AND

8  WILL TAKE IT FROM THERE.

9          **THE COURT:**  ALL RIGHT.  THEN --

10         **MS. WEISS:**  YOUR HONOR, I AM SORRY TO INTERRUPT.

11  THIS IS CATHERINE WEISS.

12         AS YOU KNOW, I HAVE ASKED TO BE INCLUDED IN THESE

13  CONVERSATIONS BECAUSE OF MY CONTINUED REPRESENTATION OF THE

14  LEGAL SERVICE PROVIDERS WHO REPRESENT CHILDREN IN NEW YORK

15  CITY.

16         **THE COURT:**  YES.

17         **MS. WEISS:**  AND I WILL JUST SAY THAT I WAS -- I WANT

18  TO SUPPORT THE STATEMENTS THAT MR. GELERNT MADE IN THAT THIS

19  HAS BECOME AN EXTREMELY SERIOUS PROBLEM IN THAT THERE ARE

20  HUNDREDS OF KIDS NEWLY SEPARATED SINCE THE INJUNCTION IN THE

21  SYSTEM, INCLUDING VERY, VERY YOUNG CHILDREN.  AND BOTH THE

22  INFORMATION SHARING AS TO THESE CHILDREN AND THE BASIS UPON

23  WHICH SOME OF THE SEPARATIONS APPEAR TO BE BEING MADE ARE

24  CAUSING GRAVE CONCERN AMONG THE LEGAL SERVICE PROVIDERS

25  REPRESENTING THESE CHILDREN.

 1             **THE COURT:**  OKAY.  OBVIOUSLY THIS IS AN IMPORTANT
 2   AREA.  I WOULD SIMPLY RESERVE ON IT, INVITE THE PARTIES TO
 3   CONTINUE TO MEET AND CONFER IN GOOD FAITH.  AND THEN,
 4   ABSENT SOME AGREEMENT, I WILL WAIT FOR ANY MOTION THAT MAY BE
 5   FILED.
 6             **MR. GELERNT:**  ABSOLUTELY.  THANK YOU, YOUR HONOR.
 7             **THE COURT:**  RELATEDLY, THE PARTIES CONTINUE TO MEET
 8   AND CONFER ON THE REUNIFICATION PROTOCOL.  AM I CORRECT?
 9             **MR. GELERNT:**  ON THE REUNIFICATION OF THE INITIAL
10   CLASS OR THE EXPANDED CLASS?  I AM SORRY, YOUR HONOR.
11             **THE COURT:**  WELL, BOTH.  THERE WAS DISCUSSION, OVER
12   TIME, ABOUT THE FACT THAT THE GOVERNMENT WILL CONTINUE TO
13   SEPARATE FAMILIES, OSTENSIBLY FOR GOOD CAUSE SHOWN.  AND THEN
14   THERE HAS TO BE A MECHANISM IN PLACE TO, AT THE APPROPRIATE
15   TIME, WHEN A PARENT, FOR EXAMPLE, HAS COMPLETED THEIR CRIMINAL
16   CUSTODY OR WHATEVER THE CASE MAY BE, FOR THE EXECUTIVE BRANCH,
17   WHETHER IT IS ICE OR B.O.P. OR HHS, TO REUNIFY THE FAMILIES.
18             **MR. GELERNT:**  YES, YOUR HONOR.  I APOLOGIZE.  THAT'S
19   ABSOLUTELY RIGHT.  AND I THINK, FOR US, WE WILL TALK WITH THE
20   GOVERNMENT.  IT IS COMING UNDER THE UMBRELLA OF THE
21   INFORMATION SHARING.
22             SO I THINK THAT IS ONE OF THE THINGS WE ARE TALKING
23   ABOUT IS TO MAKE SURE THE RELEVANT AGENCIES HAVE THAT
24   INFORMATION IMMEDIATELY WHEN SOMEONE MAY GET OUT OF CUSTODY OR
25   THE HOSPITAL, AND THEN FURTHER.  SO I THINK THAT WE WILL WRAP

1   THAT UP AS PART OF THE INFORMATION SHARING.

2           **THE COURT:**  OKAY.

3           **MR. GELERNT:**  HOPEFULLY.

4           **THE COURT:**  ALL RIGHT.  SO I WILL -- WE WILL DEFER

5   ON THAT.  AND AGAIN, I ASK THE PARTIES TO CONTINUE TO MEET AND

6   CONFER ON THAT IMPORTANT ISSUE, AS WELL.  AND THEN WE CAN

7   ADDRESS IT AT THE NEXT STATUS CONFERENCE.

8           I DON'T HAVE ANY OTHER QUESTIONS AS FAR AS THE

9   STATUS REPORT GOES.  ARE THERE ANY COMMENTS BY ANY OTHER

10  COUNSEL OR PARTICIPANTS WITH RESPECT TO THE JOINT STATUS

11  REPORT?

12          **MR. STEWART:**  YOUR HONOR, COULD I MAKE ONE NOTE ON

13  THE JOINT STATUS REPORT?

14          **THE COURT:**  YES.

15          **MR. STEWART:**  I AM FOCUSING ON A PARAGRAPH HERE ON

16  PAGE 9.  THIS IS A PARAGRAPH THAT MENTIONS WORK ON REMAINING

17  LISTS.  THE LAST -- SORT OF THE LINES 21 TO 22.  WE SAID IN

18  THE STATUS REPORT THAT ICE REPORTS IT HAS RECEIVED EACH OF THE

19  REMAINING FOUR LISTS OF POTENTIAL CLASS MEMBERS AND IS

20  REVIEWING THOSE LISTS.

21          THAT WAS A LITTLE ERROR ON MY PART IN SAYING

22  REMAINING FOUR LISTS.  ORIGINALLY THERE WERE SIX LISTS.  DUE,

23  AS I UNDERSTAND IT, TO SOME FURTHER REVIEW BY COMMANDER WHITE

24  AND HIS COLLEAGUES, THERE ARE SOME ADDITIONAL SHORTER LISTS

25  THAT JUST, YOU KNOW, KIND OF -- THAT CAME FROM THE RE-REVIEW

1   AND DE NOVO CHECK PROCESSES.

2          SO THERE ARE A FEW MORE LISTS THAN THAT.  THEY ARE,

3   AGAIN, I BELIEVE, SHORTER, BUT I JUST WANTED TO LET THE COURT

4   KNOW ABOUT THAT, AND I AM SORRY FOR THE ERROR.

5          **THE COURT:**  YES.  THANK YOU FOR MENTIONING THAT.

6          I MEANT TO SAY I DIDN'T HAVE ANY MORE QUESTIONS WITH

7   RESPECT TO THE INITIAL CLASS AND MS. L., AND MMM AND DORA.

8   BUT I DO HAVE SOME QUESTIONS ABOUT THE ENLARGED CLASS AND THE

9   REPORT IN THAT REGARD.  SO PERHAPS I CAN INQUIRE OF COMMANDER

10  WHITE AT THIS TIME.

11         **MS. SHEBAYA:**  YOUR HONOR, SORRY.  THIS IS MS.

12  SHEBAYA FOR THE DORA PLAINTIFFS.

13         I DID WANT TO RAISE ONE ISSUE THAT HAS COME UP FOR

14  THE DORA AND MMM CLASSES.

15         **THE COURT:**  YES.

16         **MS. SHEBAYA:**  WE REFERENCE THIS IN THE STATUS REPORT

17  A PAGE 13.  WE ARE TRYING TO OBTAIN SOME INFORMATION FROM THE

18  GOVERNMENT ABOUT HOW IT PLANS TO IDENTIFY ANY DORA OR MMM

19  CLASS MEMBERS IN THE COURSE OF SOME PLANNED ICE RAIDS THAT

20  TARGET FAMILIES WITH FINAL ORDERS OF REMOVAL.

21         WE WANTED TO RAISE THIS ISSUE IN THE CONTEXT OF THIS

22  STATUS CONFERENCE BECAUSE WE DO BELIEVE THERE MAY BE A

23  SUBSTANTIAL NUMBER OF DORA AND MMM CLASS MEMBERS WHO COULD BE

24  IMPACTED BY THOSE RAIDS.  ESPECIALLY BECAUSE WE ARE CONTINUING

25  TO WORK THROUGH THE LIST TO MAKE SURE THAT WE HAVE REACHED ALL

1   RELEASED CLASS MEMBERS THAT DO NOT -- YOU KNOW, ARE NOT YET

2   ABLE TO ENSURE THAT THAT IS THE CASE.

3           WE ARE CONCERNED THAT DORA AND MMM CLASS MEMBERS MAY

4   BE ARRESTED OR PICKED UP IN THE COURSE OF THOSE RAIDS.  AND WE

5   JUST WANT TO KNOW WHAT THE GOVERNMENT'S PLANS ARE WITH RESPECT

6   TO ENSURING THAT SUCH CLASS MEMBERS ARE NOT DEPORTED BEFORE

7   BEING PROVIDED WITH NOTICE OF THE SETTLEMENT AGREEMENT AND

8   THEIR RIGHTS UNDER THAT AGREEMENT, AND WITHOUT BEING GIVEN AN

9   OPPORTUNITY TO TAKE ADVANTAGE OF THOSE RIGHTS SHOULD THEY

10  CHOOSE TO DO SO.

11          **THE COURT:**  MR. STEWART.

12          **MR. STEWART:**  YES, YOUR HONOR.  ICE HAD PREVIOUSLY

13  COMMITTED TO HAVING PROCEDURES IN PLACE TO PROTECT ANY CLASS

14  MEMBER PICKED UP FOR REMOVAL.  AND ICE TOLD ME, VERY -- YOU

15  KNOW, RECONFIRMED VERY SHORTLY AGO THAT THEY ARE STILL

16  COMMITTED TO THOSE PROCEDURES.

17          THAT IS KIND OF AS FULL AS I CAN SAY.  BUT THAT --

18  MY UNDERSTANDING IS THAT ALL REMAINS IN PLACE.

19          **THE COURT:**  ALL RIGHT.  I NOTED THAT DISCUSSION ON

20  THE JOINT STATUS REPORT AT PAGES 13 AND 14, AND I HAD MADE THE

21  ASSUMPTION, AS MR. STEWART HAS JUST CONFIRMED, THAT THE

22  GOVERNMENT, AND ICE SPECIFICALLY, ARE MINDFUL OF THE

23  SETTLEMENT AGREEMENT AND HAVE PROCEDURES IN PLACE TO ENSURE

24  THAT THE RIGHTS OF POTENTIAL -- THAT CLASS MEMBERS WHO MAY BE

25  PICKED UP, THAT THEIR RIGHTS ARE HONORED.

1          BUT THIS IS A MATTER THAT STILL HAS YET TO OCCUR.

2     WE HAVE ALL READ THE REPORTS ABOUT WHAT MIGHT OCCUR, AND SO

3     FROM THE COURT'S PERSPECTIVE I CAN ONLY WAIT AND SEE WHAT

4     HAPPENS.  AND IF THERE, IN FACT, ARE INDIVIDUALS WHO ARE

5     PICKED UP PURSUANT TO THESE ICE SWEEPS, THEN I WILL SIMPLY

6     WAIT AND SEE IF THERE ARE ANY ISSUES THAT ARISE.  AND I WOULD

7     EXPECT TO HEAR FROM COUNSEL IF THERE IS ANY NEED TO ADDRESS

8     ANY ISSUE WITH RESPECT TO ANY OF THESE CLASS MEMBERS.

9          **MS. SHEBAYA:**  THANK YOU, YOUR HONOR.

10          **THE COURT:**  YOU ARE WELCOME.

11          LET'S MOVE TO THE ENLARGED CLASS.  AND HERE, THE

12     LAST STATUS REPORT WAS ON JUNE 7.  AND I JUST HAD SOME

13     QUESTIONS FOR CLARIFICATION, PERHAPS OF COMMANDER WHITE.

14          COMMANDER WHITE, YOU HAD INDICATED IN JUNE THAT OF

15     THE FIRST TWO LISTS THERE WERE APPROXIMATELY 1200 FILES WITH

16     INDICATIONS OF SEPARATION.  AND YOU WERE CAREFUL TO STATE THAT

17     THE ACTUAL NUMBER OF FAMILY SEPARATIONS MAY BE SMALLER, AND IT

18     TURNS OUT THAT IT IS.  BASED ON THE CURRENT STATUS REPORT IT

19     APPEARS THOSE TWO LISTS HAVE GENERATED 791 SEPARATIONS.  AM I

20     CORRECT?

21          **COMMANDER WHITE:**  YES, YOUR HONOR.  AND I TRUST YOU

22     CAN HEAR ME.  I GUESS SOMEONE WILL SAY SOMETHING IF I AM NOT

23     AUDIBLE.

24          BUT, YES, YOUR HONOR.  THOSE FIRST TWO LISTS

25     RESULTED -- IF YOU WILL INDULGE ME, LET ME JUST BREAK IT

1    OUT INTO THE THREE PIECES BECAUSE IT IS NOT INTUITIVE AT

2    ALL.

3            WHAT WAS TRANSMITTED TO THE PLAINTIFFS AS BATCH ONE

4    IS 189 CONFIRMED POSSIBLE CHILDREN OF POTENTIAL CLASS MEMBERS,

5    WHICH WAS DERIVED FROM CBP'S POST APRIL 19TH SEPARATIONS LIST.

6    WHAT WAS CONVEYED AS BATCH TWO WAS DERIVED FROM O.R.R.'S

7    INFORMAL LIST OF EXPECTED SEPARATIONS.  THAT ONE -- THERE

8    WERE, LIKE, ON THE ORDER OF ALMOST 140 KIDS WHO ACTUALLY WERE

9    ON BOTH OF THOSE LISTS.  SO THE COMBINED TOTAL OF UNIQUE

10   POSSIBLE CHILDREN OF POTENTIAL CLASS MEMBERS WAS JUST UNDER

11   800, IT IS THE 791 NUMBER THAT YOU MENTIONED BEFORE.

12           ADDITIONALLY THERE ARE SOME CHILDREN THAT WERE IN

13   THOSE INITIAL HHS GENERATED LISTS, A SMALL NUMBER WHO ARE

14   STILL IN DIFFERENT -- ARE IN OTHER STAGES OF INTERAGENCY

15   REVIEW BECAUSE WE IDENTIFIED THINGS THAT WOULD MAKE US LOOK

16   A LITTLE MORE DEEPLY AT THEM.  THAT IS A FAIRLY SMALL

17   HANDFUL.

18           THERE ARE A TOTAL OF 11 LISTS THAT HHS HAS PROVIDED

19   TO CBP AND ICE AND THAT ARE IN VARIOUS STAGES NOW IN THE

20   PIPELINE.  I WILL BE ABLE TO UPDATE YOU MORE WHERE WE ARE IN

21   THE PROCESS.

22           THAT IS CORRECT, YOUR HONOR.  OUT OF THAT INITIAL

23   ROUGHLY 1200, WHICH THEN INCLUDES SOME DUPLICATIVE CASES,

24   THERE WERE 791 UNIQUE POSSIBLE CHILDREN OF POTENTIAL CLASS

25   MEMBERS.

1          **THE COURT:**  I THOUGHT WE HAD A TOTAL OF SIX LISTS.
2    ARE THERE 11?
3          **COMMANDER WHITE:**  YES, YOUR HONOR.  AND I THINK THAT
4    IS WHAT MR. STEWART WAS TALKING ABOUT EARLIER.  HE HAD SAID --
5    AT ONE POINT WE DID HAVE SIX LISTS, AND THAT WAS WHAT
6    APPEARED IN THERE.  BUT THE TOTAL IS ACTUALLY 11, AND I SHOULD
7    CLARIFY.
8          WE COMPLETED -- OF THE 32,972 TOTAL CHILDREN WHO
9    WERE REFERRED AND DISCHARGED IN THAT TIME PERIOD, THE TEAM
10   WORKING FOR ME COMPLETED REVIEWS OF ALL OF THOSE MANUAL CASE
11   FILES SEVERAL WEEKS AGO.  I INSTRUCTED THE TEAM, HOWEVER, TO
12   DO BASICALLY A DE NOVO REVIEW, LIKE A SECOND LOOK BY A
13   DIFFERENT PERSON ON EVERY ONE OF THE CASES THAT HAD COME BACK
14   NEGATIVE.  IN FACT WE DID FIND THAT IN AN AVERAGE OF SEVEN OUT
15   OF EVERY 1,000 CASES THAT HAD BEEN VIEWED AS NEGATIVE THE
16   FIRST TIME, WHEN SOMEONE ELSE LOOKED AT IT IT CAME BACK
17   POSITIVE.
18         SO WE HAVE LATER LISTS.  AND THE LISTS MOST RECENTLY
19   ARE QUITE SMALL, ONE IS AFFECTING 14 CHILDREN, ONE IS 15
20   CHILDREN, ONE IS 21 CHILDREN.  WE HAVE COMPLETED -- FOR ALL
21   32,972 HHS HAS COMPLETED ITS CASE REVIEW, AND EVERY CHILD WHO
22   CAME BACK AS NEGATIVE HAS BEEN RE-REVIEWED, SO WE DID A 100
23   PERCENT RE-REVIEW ON THE NEGATIVE CASES.  THAT HAS RESULTED IN
24   11 LISTS.
25         **THE COURT:**  OKAY.  THANK YOU FOR THAT CLARIFICATION.

1       YOU ALSO INDICATED AT THE JUNE STATUS REPORT THAT OF

2  THE REMAINING LISTS, AT THAT TIME WE WERE TALKING ABOUT FOUR

3  REMAINING LISTS, THAT THERE WERE INITIAL INDICATIONS OF

4  SEPARATION INVOLVING 2500 FAMILIES.  DID I GET THAT RIGHT?

5  AND IF SO, WHAT'S THE CURRENT ESTIMATE?

6       **COMMANDER WHITE:**  THAT SOUNDS RIGHT, YOUR HONOR.  I

7  SHOULD SAY, I WOULDN'T -- ANY NUMBERS I GIVE, ANY OF THE HHS

8  NUMBERS, THEIR UNIT OF MEASURE WILL BE CHILDREN, IT WON'T

9  MATCH UNIFORMLY TO FAMILIES.  MY RECOLLECTION IS YOU ARE

10 RIGHT, YOUR HONOR, IT WAS AROUND 2500.

11      HAVING COMPLETED THE 11 LISTS AND DONE THE FULL CASE

12 FILE REVIEW OF ALL OF THE CHILDREN IN THE TIMEFRAME, WE

13 IDENTIFIED A TOTAL OF 3,929 CASES WITH SOME PRELIMINARY

14 INDICATION OF SEPARATION.  THAT INCLUDES, OF COURSE, MANY THAT

15 HAVE ALREADY BEEN DETERMINED TO NOT TO HAVE BEEN FACTUALLY

16 SEPARATED.  BUT OUR NUMBER WAS 3929.  AND SO THAT'S WHAT HAS

17 GONE TO CBP AND ICE FOR THEM TO DRILL DOWN MORE IN MORE DETAIL

18 WHAT THEY HAVE.

19      **THE COURT:**  SO THAT 3,929, THAT COMES FROM THE

20 REMAINING FOUR LISTS, OR IS THAT ALL OF THE LISTS?

21      **COMMANDER WHITE:**  THAT IS ALL LISTS COMPREHENSIVELY,

22 YOUR HONOR.  THAT IS EVERYTHING THAT HAS ALREADY GONE THROUGH

23 THE PROCESS AND GONE TO THE PLAINTIFFS, AND ALL OF THE THINGS

24 THAT HAVE LEFT HHS AND ARE SOMEWHERE IN THE DHS PIPELINE.

25 THAT IS THE TOP-LINE NUMBER OF ALL OF THE CASES THAT WE HAD A

1   PRELIMINARY INDICATION OF SEPARATION.

2           WE ALREADY KNOW THAT HUNDREDS OF THOSE WERE FALSE

3   POSITIVES BECAUSE THEY HAVE ALREADY GONE ALL THE WAY THROUGH

4   THE PROCESS.  I EXPECT THAT MANY OF THEM WILL BE FALSE

5   POSITIVES.

6           AND I DON'T VIEW FALSE POSITIVES AS A SIGN THAT

7   ANYTHING BAD HAS HAPPENED.  I ONLY WORRY ABOUT FALSE

8   NEGATIVES, BECAUSE IF WE MISS ONE THEN NO ONE ELSE WILL EVER

9   LOOK AT IT.  SO THAT IS WHY IT IS SO IMPORTANT TO ME TO

10  HAVE EVERY ONE LOOKED AT TWICE AND PREVENT ANY FALSE

11  NEGATIVES.

12          **THE COURT:**  THE FIRST TWO LISTS GENERATED 791

13  CHILDREN.  THAT WAS, AS I RECALL, THE HIGHEST PROBABILITY OF

14  SEPARATIONS WOULD COME OUT OF THOSE TWO LISTS.  SO IS THAT

15  STILL TRUE, OR IS IT YOUR BELIEF THESE REMAINING LISTS, EVEN

16  THOUGH THERE APPEARS TO BE A FEW THOUSAND, THAT THE NUMBER IS

17  GOING TO BE, OF ACTUAL SEPARATIONS, MUCH SMALLER THAN THAT?

18          **COMMANDER WHITE:**  I AM NOT COMFORTABLE PREDICTING

19  THE NUMBERS BUT IT WOULD CERTAINLY BE MY EXPECTATION THAT THE

20  HIGHEST PROBABILITY THAT A POSITIVE RESULT PROVES TO BE A TRUE

21  ONE WOULD BE IN THOSE INITIAL LISTS BECAUSE -- JUST BECAUSE OF

22  THE MANNER IN WHICH THOSE CASES WERE IDENTIFIED.

23          BUT I DON'T WANT TO PREJUDGE IT.  WE MIGHT LEARN

24  THAT ONE OF THESE LATER LISTS JUST ENDS UP HAVING AN EQUALLY

25  HIGHER PROBABILITY.  WE WON'T KNOW UNTIL THE PROCESS IS

1    COMPLETED.  AND I THINK ONE OF THE THINGS THAT I LOOK FORWARD

2    TO, AND WE ALL DO, IS WHEN WE ARE DONE WITH THE PROCESS WE

3    WILL KNOW, WE WILL REALLY KNOW.

4            **THE COURT:**  THE SECOND LIST THERE WAS SOME DELAY.  I

5    THINK YOU WERE OPTIMISTIC THAT THOSE TWO LISTS COULD BE

6    PRODUCED INITIALLY BY JUNE 14.  AND THEN IT APPEARS ONE LIST

7    WAS PRODUCED ON JUNE 14, THE SECOND LIST CAME OUT TWO DAYS

8    AGO, AND THERE WERE SOME PROBLEMS, APPARENTLY.

9            CAN YOU EXPAND ON THAT, LET US KNOW WHAT THOSE

10   PROBLEMS WERE AND WHETHER THEY HAVE BEEN WORKED OUT?

11           **COMMANDER WHITE:**  YES, YOUR HONOR.

12           SO AS I THINK I HAVE SAID A FEW TIMES, WE WILL LEARN

13   BY DOING WHERE THE CHALLENGES ARE.  ONE OF THE THINGS THAT WE

14   LEARNED BY DOING, WHAT BECAME BATCHES ONE AND TWO, IS THAT WE

15   LEARNED IN DOING THEM THAT WE NEEDED TO CHANGE OUR PROCESS

16   SPECIFICALLY AS REGARDS WHEN IN THE PROCESS THE RESEARCH

17   REGARDING FACTS RELATED TO EXCLUSIONS WOULD OCCUR, AND WE HAVE

18   PUSHED THAT BACK TO EARLIER IN THE PROCESS.  IT TURNS OUT THAT

19   THAT RESEARCH PROCESS IS -- SEEMS TO BE SORT OF THE LONG POLE

20   IN THE TENT.

21           AND SO I DID NOT UNDERSTAND -- WHEN I SPOKE TO YOU

22   AT OUR LAST HEARING, YOUR HONOR, I DID NOT YET UNDERSTAND THAT

23   WE HAD RECEIVED CASES FOR WHICH THAT ANALYSIS HAD NOT BEEN

24   DONE, AND THAT ANALYSIS HAD TO BE DONE BY MY DHS COLLEAGUES.

25   MOVING EXTRAORDINARILY QUICKLY WE WERE ABLE TO GET THE FIRST

1  BATCH OUT.  THEN WE DISCUSSED IT, THEY COULDN'T GET THE SECOND

2  BATCH OUT.

3        WE HAVE MET, THE OPERATORS MET, AFTER WE MADE THAT

4  DISCOVERY AND SIMPLY REARTICULATED THE PROCESS TO ENSURE THAT

5  BEFORE CBP TRANSMITS RECORDS TO ICE, CBP WILL HAVE DONE ITS

6  PART OF THE CRIMINALITY CHECKS OF PARENTS, THAT ICE IS DOING

7  ITS PART ON THOSE, SO THAT WHEN SOMETHING COMES BACK TO ME

8  FROM MY COUNTERPART AT ICE ALL OF THOSE ELEMENTS OF EXCLUSIONS

9  HAVE BEEN -- DHS WOULD IDENTIFY HAVE ALREADY BEEN DONE.

10        SO I THINK WE HAVE LEARNED THAT THE WHOLE CYCLE --

11  CBP, TO ICE, BACK TO HHS AND THEN ON TO THE DEPARTMENT OF

12  JUSTICE -- WE HAVE LEARNED THAT THE CYCLE TIME IS LONGER THAN

13  WE THOUGHT.  WE HAVE ADJUSTED TO ENSURE THAT WE ARE STILL

14  DOING IT IN THE OPTIMAL TIME REQUIRED.

15        I THINK THE GOOD NEWS IS WE HAVE GOT SO AHEAD OF

16  SCHEDULE THAT HHS WOULD USE THAT I DON'T SEE THE ADDITIONAL

17  CYCLE TIME AS -- I WOULDN'T ANTICIPATE THAT IMPERILING OUR

18  ABILITY TO MEET YOUR OCTOBER 25TH DEADLINE.

19        **THE COURT:**  ALL RIGHT.  SO ICE NOW HAS -- DO THEY

20  HAVE ALL OF THE REMAINING LISTS?  I THINK MR. STEWART WAS

21  CLARIFYING THAT.  I WANT TO MAKE SURE I HAVE THAT RIGHT.

22        **COMMANDER WHITE:**  SOME WILL BE ICE, I THINK SOME ARE

23  STILL WITH CBP.  ONE WITHIN THE LAST HOUR CAME OUT OF ICE AND

24  BACK TO ME FOR US TO BEGIN OUR FOURTH-STAGE REVIEW, THAT WILL

25  BE BATCH THREE.

1          SO THERE ARE, AT THIS POINT, I THINK LISTS IN EVERY

2    STAGE IN THE PROCESS.  THE LAST FEW LISTS IN THE SEQUENCE ARE

3    SO MUCH SHORTER THAN THEIR PREDECESSORS THAT I THINK THE TAIL

4    END WILL MOVE QUICKLY.

5          **THE COURT:**  WHEN WILL THE NEXT ROLLOUT BE TO MR.

6    GELERNT AND HIS TEAM?

7          **COMMANDER WHITE:**  I AM A LITTLE GUN-SHY AFTER MY

8    LAST EXPERIENCE BUT I -- MY CURRENT PLANNING ESTIMATE IS THAT

9    FOUR WORKING DAYS AFTER RECEIPT OF AN ICE PACKAGE HHS SHOULD

10   BE ABLE TO HAVE ONE REVIEWED BY THE AGENCY.  SO I WOULD

11   ANTICIPATE, THEN, THAT AROUND THIS TIME NEXT WEEK THERE WILL

12   BE ANOTHER BATCH, BARRING SOME TECHNICAL PROBLEM THAT, YOU

13   KNOW, SURFACES IN BETWEEN NOW AND THEN.

14         **THE COURT:**  THEN WILL IT BE A WEEKLY ROLLOUT

15   THEREAFTER?

16         **COMMANDER WHITE:**  I REALLY DON'T KNOW.  I SUSPECT IT

17   WILL BE MORE RAGGED THAN THAT.  IT IS ENTIRELY -- THERE MIGHT

18   BE WEEKS WITHOUT ANY AND THEN A COUPLE IN A WEEK, BECAUSE

19   INCREASINGLY NOW WE ARE GETTING INTO A PERIOD WHERE THE LISTS

20   ARE OF VERY UNEQUAL LENGTH.  AND I AM SORT OF RELUCTANT TO --

21   I DON'T HAVE A LOT OF CONFIDENCE IN ANY PROJECTION I COULD

22   GIVE EXCEPT THAT I STILL RETAIN VERY HIGH CONFIDENCE THAT THE

23   DEADLINE WILL BE MET.

24         **THE COURT:**  ALL RIGHT.

25         LAST MEETING YOU WERE ESTIMATING THAT YOU WERE 92

1   DAYS AHEAD ON THE HHS SIDE.  WHERE ARE YOU NOW?

2          **COMMANDER WHITE:**  SO WHEN WE COMPLETED THAT HHS

3   PRELIMINARY REVIEW -- WHICH WOULD HAVE BEEN SUNDAY AFTERNOON

4   OF LAST WEEK THAT WAS COMPLETED -- I CALCULATED IT THEN THAT

5   WE WERE -- WE HAD FINISHED AT 82 DAYS AHEAD OF MY SCHEDULE FOR

6   THAT.  OF COURSE, WE HAVE LEARNED THAT THE CYCLE TIME GOING

7   THROUGH DHS IS LONGER, SO IT IS VERY IMPORTANT, FRANKLY, THAT

8   WE DO FINISH THE HHS, ALL THE HHS FIRST-PHASE WORK SO MUCH

9   AHEAD OF SCHEDULE BECAUSE WE KNOW IT TOOK LONGER THAN WE

10  THOUGHT IT WOULD FOR THE DHS STAGE OF THE CYCLE.

11         **THE COURT:**  FROM YOUR PERSPECTIVE, COMMANDER

12  WHITE -- IT SEEMS LIKE THE LAST FEW WEEKS HAVE BEEN VERY

13  PRODUCTIVE IN WORKING THROUGH SOME OF THE SPEED BUMPS HERE.

14  IT LOOKS LIKE THINGS SHOULD ROLL ALONG PRETTY SMOOTHLY.  AM I

15  CORRECT?

16         **COMMANDER WHITE:**  I AM ALWAYS RELUCTANT TO JINX

17  SOMETHING BY SAYING IT.  I AM NOT AWARE OF -- I DON'T HAVE

18  ANYTHING THAT I WOULD ANTICIPATE BECOMING PROBLEMATIC.  THERE

19  MAY YET BE ADDITIONAL PROBLEMS TO SURFACE.

20         GENERALLY THE ROUGHEST PATCH IN ANYTHING LIKE THIS

21  IS THE ROLLOUT, WHICH IS WHAT WE HAVE GOTTEN THROUGH IN THE

22  FIRST TWO LISTS WITH ACTUALLY RUNNING SOMETHING THROUGH THE

23  CYCLE.

24         I DON'T ANTICIPATE ADDITIONAL PROBLEMS, I WILL LOOK

25  TO COMMUNICATE IF I SEE THEM.  BUT IT REMAINS, I THINK, BOTH

1  THE INTENTION AND THE REALISTIC PLAN TO PROVIDE SUBSTANTIALLY

2  ALL OF THE KIDS AND THEIR PARENTS' INFORMATION TO THE

3  PLAINTIFFS BY THE DEADLINE.

4          **THE COURT:**  ALL RIGHT.  THANK YOU.

5          MR. GELERNT, YOU HAVE INDICATED THAT -- I KNOW YOU

6  WILL HAVE SOME COMMENTS, BUT I HAVE A QUESTION HERE.

7          YOU GOT CONTACT INFORMATION FOR THESE, I THINK THE

8  189.  AND YOU HAVE BEEN ABLE TO REACH 38 PARENTS.

9          **MR. GELERNT:**  38 PARENTS.  AND 90, AS I BELIEVE IS

10  ACCURATE, 90 -- ON THE CHILDS' SIDE, 90 SPONSORS.  WE ARE

11  TRYING TO REACH BOTH SIMULTANEOUSLY.

12          **THE COURT:**  SO 128 TOTAL NOW, WITH PARENTS AND

13  SPONSORS?

14          **MR. GELERNT:**  NO.  I THINK THERE IS OVERLAP BETWEEN

15  THE 38 AT THE 90, SO IN SOME CASES WE HAVE REACHED THE PARENT

16  AND THE CHILD.

17          **THE COURT:**  OKAY.

18          **MR. GELERNT:**  AND I DON'T KNOW IF MR. HERZOG HAS

19  THIS PRECISE FIGURE.  IF HE DOES, MAYBE HE CAN JUMP IN.  BUT I

20  DON'T KNOW, OF THE 90 AND 38, HOW MANY ARE OVERLAPPING.  I

21  THINK PROBABLY A GOOD AMOUNT OF THEM.

22          WE ARE HAVING TROUBLE REACHING -- WE HAVE ONLY

23  GOTTEN PHONE NUMBERS FOR SIX OF THOSE PARENTS.  WE HAVE GOTTEN

24  PHONE NUMBERS FOR 183 OF THE SPONSORS.  WE ARE HAVING TROUBLE

25  REACHING PEOPLE, PARTICULARLY THE PARENTS.  WE HAVE CALLED ALL

1  189 NUMBERS WE HAVE.  WE WILL CONTINUE TO DO SO.

2          AND I THINK, LIKE LAST TIME, WE NEED TO CONTINUE

3  WORKING WITH THE GOVERNMENT TO TRY AND GET MORE AND MORE

4  CONTACT INFORMATION, OR WHATEVER THEY HAVE.  IT MAY ULTIMATELY

5  BE, I THINK, THAT WE ARE GOING TO HAVE TO GO ON FOOT AND TRY

6  AND REACH PEOPLE, BOTH IN THE U.S. AND CENTRAL AMERICA.

7          **MR. HERZOG:**  THIS IS STEVE HERZOG.

8          **THE COURT:**  YES.

9          **MR. HERZOG:**  JUST TO CLARIFY.

10          MR. GELERNT IS CORRECT.  I MEAN, MOST OF THE PARENTS

11  THAT WE HAVE BEEN ABLE TO REACH ARE BECAUSE WE FIRST HAVE

12  GOTTEN IN TOUCH WITH THE SPONSOR AND WE HAVE BEEN ABLE TO GET

13  PARENT INFORMATION FROM THE SPONSOR.  OF COURSE IF THE

14  GOVERNMENT HAS PARENT INFORMATION FOR ANY OF THE PARENTS THAT

15  WE DON'T HAVE NUMBERS FOR, WE WOULD GREATLY APPRECIATE THAT.

16          **THE COURT:**  SO WHAT IS THE NUMBER PRESENTLY?  OF THE

17  189 HOW MANY, MR. HERZOG, HAVE YOU REACHED, AS PARENTS AND

18  SPONSORS?

19          **MR. HERZOG:**  I BELIEVE -- I DON'T HAVE THE PRECISE

20  NUMBER.  WE HAVE REACHED PARENTS OF 38.  AND I THINK MOST OF

21  THOSE PARENTS, IF NOT ALL OF THEM, HAVE BEEN -- YOU KNOW,

22  PARENTS ARE REACHED BECAUSE OF THE SPONSORS, AND WE REACHED, I

23  THINK, APPROXIMATELY 90 SPONSORS.  SO IT IS SOME NUMBER

24  GREATER THAN 90 AND LESS THAN 128.  IT IS PROBABLY -- I WOULD

25  SAY PROBABLY LESS THAN 100, BUT I AM ESTIMATING THERE.

1          **THE COURT:**  OKAY.  AS FAR AS ADDITIONAL INFORMATION
2    DO YOU HAVE A PROPOSAL?  IT SEEMS YOU COULD JUST WORK
3    INFORMALLY WITH MR. STEWART OR COMMANDER WHITE.
4          **MR. GELERNT:**  I THINK THAT IS RIGHT, YOUR HONOR.  WE
5    REACHED OUT TO THE GOVERNMENT BECAUSE THE INITIAL LIST OF 189
6    DID NOT HAVE MANY PHONE NUMBERS.  WE REACHED OUT TO THE
7    GOVERNMENT INFORMALLY, THEY WERE ABLE TO GIVE US MORE PHONE
8    NUMBERS.  BUT AS MR. HERZOG SAID, TO THE EXTENT THAT THEY HAVE
9    MORE PHONE NUMBERS FOR THE PARENTS, THAT WOULD BE GREATLY
10   APPRECIATED.
11         **THE COURT:**  ALL RIGHT.
12         THEN OF THE PARENTS AND SPONSORS YOU HAVE REACHED,
13   HOW IS THIS LOOKING?  ARE THEY IN COUNTRY, OUT OF COUNTRY, DO
14   YOU HAVE AN ESTIMATE?
15         **MR. GELERNT:**  IT IS A MIX AT THIS POINT, YOUR HONOR,
16   ESPECIALLY SINCE WE HAVE ONLY REACHED 38 PARENTS.  WE HAVE
17   SOME WHO, THROUGH SELF-HELP, A VERY FEW, WHO HAVE MANAGED TO
18   GET BACK WITH THEIR CHILDREN AND ARE IN COUNTRY.  WE HAVE A
19   BUNCH OF PARENTS WHO ARE OUT OF THE COUNTRY AND THEIR CHILDREN
20   ARE STILL IN THE COUNTRY.
21         WE ARE RELUCTANT, I THINK, TO EXTRAPOLATE TOO MUCH
22   FROM SUCH A SMALL BATCH, BUT RIGHT NOW THERE IS A MIX.  THERE
23   IS DEFINITELY A SIGNIFICANT NUMBER OF PARENTS WHO ARE OUTSIDE
24   OF THE COUNTRY WITHOUT THEIR CHILDREN.  BUT WHETHER THEY ARE
25   OKAY WITH THAT STATUS QUO BECAUSE -- NOT OKAY BUT THAT'S WHERE

1   THEY ARE GOING TO LEAVE IT BECAUSE IT IS TOO DANGEROUS TO
2   BRING THEIR CHILDREN BACK, YOU KNOW, THAT MAY BE.
3            BUT WHAT WE ARE TRYING TO DO IS DO THIS IN A COUPLE
4   OF STAGES, EVEN IF IT SLOWS IT DOWN A TINY BIT, IS THE
5   INITIAL -- TO TRY TO MAKE INITIAL CONTACT AS SOON AS POSSIBLE
6   WITH EVERY FAMILY WE RECEIVE FROM THE GOVERNMENT SO THAT WE
7   CAN NAIL DOWN PHONE NUMBERS.  TELL THEM THAT WE ARE GOING TO
8   WANT TO CALL THEM BACK AND HAVE A MORE IN-DEPTH CONVERSATION
9   ABOUT WHAT THEIR OPTIONS MAY BE.  SO WE HAVEN'T REALLY GOTTEN
10  TOO IN DEPTH WITH EACH PARENT.
11           SOMETIMES -- AND I THINK THERE IS A LITTLE BIT OF,
12  WHO ARE YOU, ACTUALLY?  WHEN YOU ARE CALLING.  SO THERE HAS
13  BEEN A LITTLE BIT OF THAT.  SO I THINK IT IS GOING TO TAKE A
14  SECOND AND THIRD PHONE CALL TO REALLY FIGURE OUT WHAT THE
15  SITUATION IS.  RIGHT NOW WE ARE TRYING TO LOCK IN A
16  COMMUNICATION CHANNEL WITH THEM.
17           **THE COURT:**  THEN THESE -- I ASSUME THESE PARENTS AND
18  SPONSORS, THEY ARE GOING TO BE -- TO THE EXTENT THEY ARE IN
19  COUNTRY THEY ARE GOING TO BE ALL OVER THE COUNTRY.
20           **MR. GELERNT:**  THAT IS ABSOLUTELY RIGHT, YOUR HONOR.
21  THE GOVERNMENT HAS GIVEN US ADDRESSES FOR THE SPONSORS AND
22  FROM THE 189 -- I APOLOGIZE IF MY RECOLLECTION IS INCORRECT --
23  BUT I BELIEVE THERE WERE 33 STATES.
24           SO I THINK TO -- IF WE CAN'T REACH THEM BY PHONE IT
25  IS GOING TO BE A FAIRLY BIG -- IT IS GOING TO BE A NATIONWIDE

1   TASK, I THINK, TO GO VISIT THEM.  WE ARE PREPARED TO DO THAT.

2   BUT I DO EXPECT THAT A GOOD NUMBER OF THE PARENTS WILL BE OUT

3   OF THE COUNTRY, AS WELL.

4           **THE COURT:**  AND HOW DO YOU DO THAT STAFFING WISE?

5   THROUGH MR. HERZOG AND HIS GROUP, AND NGO'S AND OTHERS?

6           **MR. GELERNT:**  THAT'S RIGHT, YOUR HONOR.

7           SO WHAT WE ARE TRYING TO FIGURE OUT -- AND I THINK

8   IT IS GOING TO DEPEND A LITTLE ON HOW BIG THE LISTS BECOME.

9   WE JUST FOUND OUT, OBVIOUSLY, IN THE LAST DAY, IT IS NOW UP TO

10  791.

11          I THINK, DEPENDING ON HOW BIG IT IS, WE MAY HAVE TO

12  EXPAND THE STEERING COMMITTEE.  I THINK RIGHT NOW PAUL WEISS

13  IS OBVIOUSLY SHOULDERING AN ENORMOUS BURDEN, AND WE COULDN'T

14  BE MORE APPRECIATIVE.  BUT WHETHER THEY CAN -- IF THE LIST

15  GETS TOO BIG WHETHER THEY CAN CONTINUE DOING THAT I THINK IS

16  SOMETHING WE ARE CONTINUING TALKING ABOUT.

17          THE NGO'S ON THE STEERING COMMITTEE ARE HELPING.

18  WHETHER WE NEED TO BRING IN ADDITIONAL NGO'S AND MORE PRIVATE

19  LAW FIRM HELP I THINK IS WHAT WE ARE WORKING THROUGH.  WE

20  TRIED TO GET A SENSE WHAT IS GOING TO BE NEEDED THROUGH THE

21  FIRST 189.  WE ARE GOING TO START WITH THE 791 IMMEDIATELY.

22          IF MR. HERZOG WANTS TO JUMP IN, HE CAN SPEAK TO PAUL

23  WEISS'S CAPACITY GOING FORWARD.  BUT I THINK IT IS POSSIBLE

24  THAT THE STEERING COMMITTEE WILL HAVE TO BE EXPANDED.  AND IF

25  IT IS EXPANDED IN A FORMAL WAY WE WILL OBVIOUSLY LET YOU KNOW.

```
 1    IF WE ARE USING HELP FROM DIFFERENT PEOPLE THROUGHOUT THE
 2    COUNTRY OR IN CENTRAL AMERICA IN A MORE INFORMAL WAY, I DON'T
 3    KNOW THAT YOUR HONOR WOULD NEED TO KNOW THAT.
 4              THE COURT:  ALL RIGHT.
 5              MR. HERZOG, ANYTHING IN ADDITION?
 6              MR. HERZOG:  AT THIS POINT I THINK WE ARE MOVING
 7    FORWARD AND MAKING THE CALLS, AND I THINK WE ARE IN A POSITION
 8    TO KEEP DOING THAT.
 9              OBVIOUSLY, IF WE ARE UNABLE TO CONTACT MANY OF THE
10    PARENTS I THINK BY TELEPHONE, AND DEPENDING ON HOW LARGE THAT
11    GROUP IS, I THINK THEN THAT'S WHEN WE ARE GOING TO HAVE TO
12    CONFRONT, YOU KNOW, HOW ARE WE GOING TO DO THIS, HOW ARE WE
13    GOING TO FIND THESE PEOPLE.  OBVIOUSLY WE ARE WORKING ON THAT.
14    BUT I THINK MR. GELERNT AND MYSELF AND OUR COMMITTEE WILL GET
15    TOGETHER AND FIGURE OUT WHAT WE NEED TO DO TO DO THAT.
16              THE COURT:  ALL RIGHT.
17              MR. GELERNT, ANYTHING IN ADDITION ON THIS STATUS
18    REPORT?
19              MR. GELERNT:  NO, YOUR HONOR.
20              THE COURT:  OKAY.
21              MR. STEWART, ANYTHING IN ADDITION BEFORE WE MOVE TO
22    THE PENDING MOTION?
23              MR. STEWART:  I DON'T THINK SO, YOUR HONOR.
24              THE COURT:  OKAY.  THANK YOU.
25              LET'S GO TO THE MOTION TO ALLOW PARENTS DEPORTED
```

1    WITHOUT THEIR CHILDREN TO PURSUE THE ASYLUM PROCESS IN THE

2    UNITED STATES.

3             AND I MIGHT ADD HERE THERE ARE A NUMBER OF ATTORNEYS

4    WHO ARE NOT INVOLVED ON THIS PARTICULAR ISSUE, SO I WILL NOT

5    BE OFFENDED IF YOU WANT TO DROP OFF THE CALL, THIS WOULD BE

6    THE OPPORTUNITY.

7             I WILL FOCUS MY QUESTIONS HERE TO MR. GELERNT AND

8    MR. STEWART.

9             LET ME START --

10           **MR. GELERNT:**  YOUR HONOR, I AM SORRY TO INTERRUPT

11   YOU.

12           **THE COURT:**  YES.

13           **MR. GELERNT:**  WITH THE COURT'S PERMISSION, MR.

14   BALAKRISHNAN, MY COLLEAGUE, WILL BE HANDLING THIS MOTION.

15           **THE COURT:**  YES.

16           **MR. BALAKRISHNAN:**  THANK YOU, YOUR HONOR.

17           **THE COURT:**  I WILL START WITH YOU, THEN.

18           THE MOTION, IT IS BASED BOTH ON THE SETTLEMENT

19   AGREEMENT AND NINTH CIRCUIT LAW.  THE GOVERNMENT MAKES THE

20   ARGUMENT THAT THE SETTLEMENT AGREEMENT SIMPLY PROVIDES A

21   MECHANISM BY WHICH PLAINTIFFS CAN RAISE THE ISSUE WITH THE

22   COURT, BUT THERE IS NOTHING TO ENFORCE UNDER THE SETTLEMENT

23   AGREEMENT.  THERE ISN'T A TERM OR AN AGREED-UPON PROVISION

24   THAT THE GOVERNMENT HAS BREACHED OR IS ARGUABLY IN VIOLATION

25   OF, THE GOVERNMENT'S PERSPECTIVE.

1          SO AS I UNDERSTAND THE PLAINTIFFS' MOTION, IT IS

2     MORE THAT THE SETTLEMENT AGREEMENT PROVIDES FOR A MECHANISM

3     FOR PLAINTIFFS TO RAISE THIS ISSUE, VIA THIS MOTION TO THE

4     COURT.  BUT THE REAL AUTHORITY FOR THE COURT TO GET INVOLVED

5     IN THIS ISSUE AND MAKE THIS ORDER WOULD COME FROM THE NINTH

6     CIRCUIT CASE LAW.  IS THAT CORRECT?

7          **MR. BALAKRISHNAN:**  THAT'S ALMOST ENTIRELY CORRECT,

8     YOUR HONOR.  I WOULD JUST ADD ONE NUANCE TO THAT, IS THAT I

9     THINK WHAT WE WANTED TO PRESENT IN THE MOTION WAS THE FACT

10    THAT THIS COURT REALLY HAS JURISDICTION TO PROCEED IN TWO

11    DIFFERENT WAYS.

12         ONE IS WHAT YOUR HONOR JUST POINTED OUT, WHICH IS

13    THAT IT IS CLEAR UNDER NINTH CIRCUIT LAW THAT THE COURT DOES

14    HAVE THE JURISDICTION TO ORDER THE RELIEF IN THE FIRST

15    INSTANCE, WHICH IS TO ORDER THE GOVERNMENT TO PROVIDE THESE 21

16    PARENTS A PATH TO COME BACK TO THE UNITED STATES AND GET, YOU

17    KNOW, THE ASYLUM PROCESS THAT THEY WERE DENIED IN THE FIRST

18    INSTANCE.  HOWEVER, THE ALTERNATE PATH IS TO DIRECT THE

19    GOVERNMENT TO RE-REVIEW THE APPLICATIONS USING THE STANDARD

20    THAT PLAINTIFFS HAVE PROPOSED.  BECAUSE I THINK THROUGHOUT

21    THIS PROCESS WE HAVE BEEN CONSISTENT IN EXPLAINING WHAT

22    STANDARD WE THINK SHOULD GOVERN THIS VERY SMALL NUMBER OF

23    CASES WHERE SOME ADDITIONAL RELIEF IS NEEDED.

24         THE GOVERNMENT, THROUGHOUT THE MEET AND CONFER

25    PROCESS AND ALSO IN THEIR PAPERS ON THIS MOTION, WHILE THEY

1  HAVE DENIED ALL OF OUR APPLICATIONS HAVE NEVER COME FORWARD TO

2  EXPLAIN WHAT STANDARD THEY THINK WOULD WARRANT FURTHER RELIEF

3  OR EVEN WHAT FURTHER INFORMATION THEY WOULD NEED.

4          SO I WOULD SAY THAT THERE ARE CURRENTLY TWO

5  DIFFERENT PATHS THAT THIS COURT COULD OPERATE UNDER.

6          **THE COURT:** FOCUSING FOR A MOMENT ON THE NINTH

7  CIRCUIT CASES THAT YOU CITED, MENDEZ IS, I THINK, WHERE IT ALL

8  STARTS, INTERPRETS 8 USC SECTION 1105(A).  THAT'S THE

9  PROVISION THAT PROHIBITS A COURT FROM REVIEWING AN ORDER OF

10  DEPORTATION IF THE INDIVIDUAL HAS ALREADY DEPARTED THE U.S.

11  PURSUANT TO A DEPORTATION ORDER.

12          MENDEZ SAYS THAT THAT PROVISION HAS ESSENTIALLY A

13  CONDITION PRECEDENT, AND THAT IS THAT THE DEPARTURE HAS TO BE

14  LAWFULLY EXECUTED, HAS TO BE IN ACCORDANCE WITH THE

15  GOVERNMENT'S LAWS AND REGULATIONS.  AND SO IT ASSUMES THAT AN

16  INDIVIDUAL HAS BEEN DEPORTED IN ACCORDANCE WITH GOVERNMENT

17  PROCEDURE AS SET OUT BY CONGRESS IN VARIOUS STATUTES AND THEN

18  IN ANY REGULATORY SCHEME.

19          ARE YOU -- I HAVE READ ALL OF THE DECLARATIONS, THE

20  21.  ARE YOU MAKING THE ARGUMENT THAT ALL OF THE 21 PARENTS AT

21  ISSUE MEET THIS CRITERIA SIMPLY BECAUSE OF A SEPARATION THAT

22  YOU WOULD ARGUE WAS UNLAWFUL, NOT CONSTITUTIONAL, AND THAT

23  THAT SEPARATION THEN DEPRIVED THE FAMILY UNIT OF PURSUING A

24  CREDIBLE FEAR INTERVIEW?

25          I THINK IN THE PRIOR BRIEFING IN THE MMM LITIGATION

1    IT BECAME CLEAR THAT PERSONS IN THE UNITED STATES, WHETHER

2    HERE LAWFULLY OR NOT, MAY PURSUE ASYLUM AND ARE ENTITLED TO A

3    CREDIBLE FEAR INTERVIEW.

4              SO IS IT YOUR ARGUMENT --

5              AND THE GOVERNMENT, WE KNOW FROM THE PRIOR BRIEFING,

6    PRIOR TO THE FAMILY SEPARATION POLICY WOULD GIVE FAMILY UNITS

7    CREDIBLE FEAR INTERVIEWS TOGETHER, PARENT AND CHILD TOGETHER.

8              IS IT YOUR ARGUMENT THAT THIS -- THE SEPARATION IS

9    UNLAWFUL, THE FAILURE TO REUNIFY EXACERBATES THAT SITUATION,

10   AND THEREFORE EVERY ONE OF THESE 21 PARENTS WAS REMOVED IN AN

11   IRREGULAR FASHION SUCH THAT THE COURT CAN PROVIDE THIS RELIEF.

12   SO THEY ESSENTIALLY GET ANOTHER OPPORTUNITY, OR AN OPPORTUNITY

13   IN THE FIRST INSTANCE, TO PURSUE THEIR ASYLUM OR CREDIBLE

14   FEAR?

15             **MR. BALAKRISHNAN:**  YES, YOUR HONOR.  I THINK THAT --

16   YOU KNOW, JUST TWO POINTS.

17             FIRST I THINK WHAT YOU JUST DESCRIBED IS ABSOLUTELY

18   CORRECT, WHICH IS THAT THESE ARE ALL FAMILIES THAT WERE

19   SEPARATED, AND HAD THEY REMAINED IN THE UNITED STATES, YOU

20   KNOW, WHEN THIS COURT HAD ISSUED ITS INJUNCTION AND STAYED THE

21   REMOVALS, THEY WOULD HAVE ALL BEEN, YOU KNOW, EXACTLY, YOU

22   KNOW, SIMILARLY SITUATED TO THE CLASS MEMBERS WHO ARE IN THE

23   UNITED STATES.  THEY WOULD HAVE BEEN ABLE TO PURSUE ASYLUM

24   WITH THEIR FAMILIES HERE.  AND THAT UNDERLYING HARM IS THE

25   HARM THAT WE ARE TRYING TO ADDRESS.

1          BUT I THINK THAT THERE IS TWO NUANCES TO THAT AS

2    WELL, WHICH IS THAT THE WAY THAT WE ALSO FRAMED THE

3    APPLICATIONS FOR THE RELIEF TO THIS COURT IS NOT THAT ALL OF

4    THE 420 DEPORTED PARENTS THAT WE KNEW ABOUT AT THE TIME THAT

5    WE ENTERED INTO THE AGREEMENT AND STARTED SCREENING THESE

6    CASES, YOU KNOW, ARE PEOPLE THAT WE THINK WARRANT THIS RELIEF.

7          WE HAVE GONE BEYOND THAT TO SAY THAT IT IS NOT ONLY

8    THE SEPARATION AND THE DENIAL OF THE RIGHT TO PROCEED THROUGH

9    ASYLUM PROCEEDINGS AS A FAMILY UNIT, BUT ALSO THAT THESE

10   FAMILIES PRESENT BONA FIDE CLAIMS, BY OUR SCREENING.  AND ALSO

11   ARE IN PARTICULARLY DANGEROUS SITUATIONS, NOT JUST FOR THE

12   PARENTS BUT ALSO SUCH THAT THEY REALLY JUST CAN'T REASONABLY

13   BE EXPECTED, IF THEY ARE THEMSELVES IN HIDING, TO BRING A

14   FIVE-YEAR-OLD BACK TO JOIN THEM.

15          AND I THINK THAT THE UNDERLYING SORT OF FRAMEWORK

16   THAT YOUR HONOR PROVIDED IS ABSOLUTELY CORRECT, BUT WE HAVE IN

17   FACT GONE BEYOND THAT TO SORT OF NARROW IT TO SAY THAT THIS

18   RELIEF SHOULD ONLY BE AFFORDED TO SORT OF EVEN A SUBSET OF THE

19   TOTAL PARENTS.

20          AND I JUST WANT TO ADD ONE MORE POINT, IS THAT YOUR

21   HONOR STARTED WITH DISCUSSING, THE CASE MENDEZ.  I THINK THAT

22   THE BETTER CASE TO LOOK AT HERE, BECAUSE IT IS MORE RECENT, IS

23   WALTERS.

24          THE UNDERLYING STATUTE THAT YOUR HONOR CITED IN

25   MENDEZ WAS REPEALED IN 1996, AND WALTERS SORT OF ADDRESSES ALL

1   OF THE CURRENT STATUTORY LAW THAT, YOU KNOW, GOVERNS FEDERAL

2   COURT JURISDICTIONS OVER THIS RELIEF.  AND I THINK THAT

3   WALTERS IS ENTIRELY CLEAR THAT THIS COURT DOES HAVE THE

4   JURISDICTION TO ORDER THIS RELIEF.

5          IN FACT, THE FACTS ARE VERY SIMILAR, YOU KNOW, IN

6   THAT THERE PARENTS WERE ORDERED DEPORTED WITHOUT ANY -- NOT

7   PARENTS BUT PEOPLE WERE ORDERED DEPORTED WITHOUT ANY

8   MEANINGFUL PROCESS.  AND THE NINTH CIRCUIT SAID THAT WHERE

9   NECESSARY, IN ORDER TO AFFORD THEM FULL RELIEF, THE COURT CAN,

10  OF COURSE, ORDER THEM BACK TO THE COUNTRY.

11        AND I THINK HERE THE CIRCUMSTANCES ARE EVEN MORE

12  EGREGIOUS THAN IN WALTERS.

13        **THE COURT:**  THERE ARE TWO WALTERS.  THERE IS A SINGH

14  VERSUS WALTERS AND WALTERS VERSUS RENO.

15        **MR. BALAKRISHNAN:**  WALTERS VERSUS RENO.

16        **THE COURT:**  ALL RIGHT.

17        THE GOVERNMENT POINTS OUT, AMONG OTHER THINGS, THAT

18  SOME OF THESE DECLARANTS, THESE 21, ALREADY HAD A CREDIBLE

19  FEAR INTERVIEW, AND I THINK ONE EVEN HAD A HEARING BEFORE AN

20  I.J.  BUT THE ARGUMENT, AS I UNDERSTAND IT, IS THAT SOME OF

21  THESE PARENTS ALREADY HAD A HEARING, AND WERE DENIED THE

22  RELIEF OR THERE WAS NOT A CREDIBLE FEAR FINDING.  AND WHAT THE

23  PLAINTIFFS ARE ASKING FOR IS A DO-OVER.

24        **MR. BALAKRISHNAN:**  YES, I THINK THAT IS CORRECT.

25        JUST TO BE CLEAR, I THINK THE NUMBERS ARE THAT 19 OF

THEM HAD NO CREDIBLE FEAR INTERVIEW AT ALL.  THAT IS OUR
UNDERSTANDING.  AND, OF COURSE, THE GOVERNMENT HAS THE FILES
AND IS IN A BETTER POSITION TO DOUBLE CHECK THAT.  WE ARE
RELYING, OF COURSE, ON THE TESTIMONY AND RECOLLECTION OF THE
PARENTS WHO HAVE BEEN DEPORTED.  BUT IT IS OUR UNDERSTANDING
THAT 19 NEVER HAD A HEARING IN THE FIRST PLACE.

        I BELIEVE THAT IN ONE OF THE CASES WHERE THEY DID
GET A HEARING THEY PASSED, BUT THEN SUBSEQUENTLY DECIDED TO
WITHDRAW THEIR APPLICATION FOR ASYLUM, BECAUSE THIS IS A
MOTHER WHO HAD SUFFERED SEXUAL ASSAULT IN HER HOME COUNTRY,
SHE HAD BEEN SEPARATED FROM HER KID FOR APPROXIMATELY SEVEN
MONTHS.  AND THEN ESSENTIALLY IN MAY OF LAST YEAR, BEFORE THIS
COURT ENTERED ITS INJUNCTION, DECIDED TO GIVE UP BECAUSE SHE
COULDN'T, YOU KNOW, STAY IN THE PROCESS ANY LONGER.

        THIS IS -- I DO THINK THAT, YOU KNOW, FOR THE 19 WHO
DIDN'T RECEIVE ANY HEARING AT ALL, I DO THINK THAT A NEW
CREDIBLE FEAR HEARING IS APPROPRIATE RELIEF.  OF COURSE, IN
THE ALTERNATIVE THE COURT -- THE GOVERNMENT ALSO HAS THE
DISCRETION TO JUST ORDER THEM PLACED INTO FULL NORMAL REMOVAL
PROCEEDINGS, WHICH IS WHAT THEY DID WITH SOME OF THE 30 WHO
HAVE PREVIOUSLY COME BACK.

        BUT I DO THINK THAT IT IS IMPORTANT THAT EVEN FOR
THOSE WHO DID PASS A CREDIBLE FEAR HEARING THAT THEY ALSO GET
THE NECESSARY RELIEF.  BECAUSE IN THOSE CASES THE COERCION AND
TRAUMA INFECTED THE ENTIRETY OF THE PROCESS AND THE

1  ENTIRETY -- AND, YOU KNOW, IMPEDED SORT OF THE PARENTS'
2  ABILITY TO ACCESS THE STATUTORY RIGHT TO ASYLUM.
3          BUT I THINK FOR THOSE, AGAIN, THE OPTIONS ARE A NEW
4  CREDIBLE FEAR HEARING, START THEM OVER FROM THE PLACE THEY
5  WOULD HAVE BEEN WITHOUT THE SEPARATION.  OR, ALTERNATIVELY,
6  THE GOVERNMENT CAN ALWAYS PUT THEM INTO FULL REMOVAL
7  PROCEEDINGS.
8          **THE COURT:**  AND FOR THOSE TWO, APPARENTLY, WHO HAD A
9  CREDIBLE FEAR HEARING AND THEN FOR WHATEVER REASON GAVE UP,
10 YOUR ARGUMENT IS THAT THEY, TOO, SHOULD BE PERMITTED TO RETURN
11 TO THE UNITED STATES TO PURSUE MEANINGFUL RELIEF BECAUSE OF
12 THE SEPARATION AND FAILURE TO REUNIFY AND THE TRAUMA THAT WAS
13 CAUSED BY THAT EVENT.
14         **MR. BALAKRISHNAN:**  THAT IS ABSOLUTELY CORRECT.
15         **THE COURT:**  ALL RIGHT.
16         **MS. DAKIN-GRIMM:**  YOUR HONOR, IF I MIGHT INTERRUPT.
17 I AM SORRY I WAS LATE.  I AM LINDA DAKIN-GRIMM, PRO BONO
18 ATTORNEY FROM MILBANK.  I REPRESENT THE OTHER ONE OF THOSE
19 TWO, AND WOULD BE HAPPY TO ADDRESS THE CIRCUMSTANCES OF THE
20 SO-CALLED CREDIBLE FEAR INTERVIEW THAT MY CLIENT OBTAINED.  IT
21 WAS NOT A MEANINGFUL INTERVIEW.
22         **THE COURT:**  ALL RIGHT.  THANK YOU FOR THE
23 APPEARANCE.  AND WE MAY RETURN TO THAT.
24         **MS. DAKIN-GRIMM:**  THANK YOU, YOUR HONOR.
25         **THE COURT:**  ALL RIGHT.

1          MR. STEWART, MS. FABIAN, LET'S FOCUS ON THE NINTH

2    CIRCUIT LAW.  AND DO YOU DISPUTE THAT IF THE LAWS OR

3    REGULATIONS ARE VIOLATED IN SOME MANNER WITH RESPECT TO AN

4    INDIVIDUAL WHO HAS BEEN DEPORTED THAT THE NINTH CIRCUIT

5    PERMITS OR HAS INTERPRETED THE STATUTES AT ISSUE TO ALLOW THE

6    COURT TO PROVIDE SOME RELIEF, SOME LIMITED RELIEF, TO ALLOW

7    THAT INDIVIDUAL TO RETURN AND PURSUE THE OPPORTUNITY OF

8    ASYLUM?

9          **MR. STEWART:**  YES, YOUR HONOR, WE DO.

10          I WOULD EMPHASIZE, FIRST AND FOREMOST, YOUR HONOR,

11   IS THAT I DON'T THINK WE REALLY GET THERE.  I DON'T THINK THIS

12   IS A SITUATION WHERE YOU LOOK AT THE SETTLEMENT AND SOMEBODY

13   IS UNHAPPY WITH THE SETTLEMENT AND THEN YOU TURN TO REMEDIAL

14   POWERS TO SEE WHAT YOU DO BASED ON UNHAPPINESS WITH THE

15   SETTLEMENT.

16          WE DON'T EVEN GET TO THE NINTH CIRCUIT LAW.  THAT IS

17   KIND OF A BACK-UP ALTERNATIVE POINT HERE BECAUSE WE HAVE A

18   CAREFULLY, THOROUGHLY NEGOTIATED SETTLEMENT THAT LAYS OUT ALL

19   OF THE RELIEF AVAILABLE, AND THERE IS REALLY NO WAY TO FAIRLY

20   DISPUTE THAT THE GOVERNMENT HAS SATISFIED THE LETTER AND

21   SPIRIT OF THAT AGREEMENT, YOUR HONOR.  SO I DON'T THINK WE GET

22   TO WALTERS OR THOSE OTHER CASES.  AND I DON'T SEE THOSE CASES

23   AS REALLY RELEVANT TO THE KEY -- THE KEY THRESHOLD KIND OF

24   MOTION DEFEATING INQUIRY HERE, WHICH IS DOES THIS SETTLEMENT

25   AGREEMENT -- IS THERE ANY CLAIM UNDER THE SETTLEMENT AGREEMENT

1    OR VIOLATION UNDER THE SETTLEMENT AGREEMENT AT ALL.

2              **THE COURT:**  OKAY.  THEN GIVE ME THE GOVERNMENT'S

3    POSITION ON THE SETTLEMENT AGREEMENT AND WHY PLAINTIFFS DON'T

4    GET BEYOND IT.

5              **MR. STEWART:**  SURE, YOUR HONOR.  JUST A FEW POINTS.

6              THE FIRST IS THAT THE GOVERNMENT HAS PLAINLY

7    SATISFIED THE LETTER AND THE SPIRIT OF THE AGREEMENT.  THERE

8    REALLY SEEMS TO BE NO DISPUTE ABOUT THE LETTER OF THE

9    AGREEMENT, YOUR HONOR.  THE AGREEMENT HERE IS PRETTY CONCISE,

10   IT IS A KEY PARAGRAPH, AND IT SAYS THE PLAINTIFFS WILL PRODUCE

11   WHATEVER INFORMATION THEY WANT THE GOVERNMENT TO CONSIDER, THE

12   GOVERNMENT WILL GET THAT INFORMATION AND THEN IT WILL GIVE

13   PLAINTIFFS A RESPONSE.

14             THE COURT RECOGNIZED THAT THE GOVERNMENT -- YOU

15   KNOW, YOU WOULD EXPECT THE GOVERNMENT TO ACT IN GOOD FAITH.

16   HERE THE GOVERNMENT DID THAT.  IT RECEIVED THE INFORMATION, IT

17   CONSIDERED THE INFORMATION.  IT PROVIDED A RESPONSE ABOUT ITS

18   DECISION WITH RESPECT TO SEEK INFORMATION BASED ON ITS REVIEW

19   OF WHAT IT RECEIVED.

20             DESPITE THAT ALONE SATISFYING EVERYTHING, YOUR

21   HONOR, THE GOVERNMENT THEN WENT BEYOND THAT AND PROVIDED A

22   MODIFIED PROCESS, FEES WAIVED AND OTHER GUIDANCE, A SPECIAL IN

23   BOX AND ALL OF THIS SORT OF THING, TO GIVE THESE FOLKS YET

24   ANOTHER OPPORTUNITY TO MAKE A SHOWING THAT COULD JUSTIFY THE

25   EXTRAORDINARY -- EXTRAORDINARY RELIEF BEING ORDERED BACK INTO

1   THE COUNTRY OR RETURNED BACK INTO THE COUNTRY DESPITE A
2   REMOVAL ORDER.
3           I SAY, YOUR HONOR, THAT, AS I SAID, THERE IS NOTHING
4   THAT CAN REALLY BE SAID TO SAY THE GOVERNMENT HAS NOT MET THE
5   LETTER OF THE AGREEMENT.
6           WITH RESPECT TO THE SPIRIT OF THE AGREEMENT, YOUR
7   HONOR, THERE IS NO BASIS TO QUESTION THE GOVERNMENT'S GOOD
8   FAITH.  I NOTE THE COURT HAS REALLY EMPHASIZED, YOU KNOW, THIS
9   CASE HAS BEEN CRITICALLY DEPENDENT ON AND PROGRESS IN THIS
10  CASE HAS BEEN CRITICALLY DEPENDENT ON, YOUR HONOR, THE
11  GOVERNMENT'S GOOD FAITH.  THE COURT HAS THEREFORE RIGHTLY
12  ACKNOWLEDGED THE GOOD FAITH, THE GOVERNMENT'S IMPORTANCE OF
13  THE GOOD FAITH.  IT IS THAT GOOD FAITH AND WILLINGNESS TO
14  CONFER THAT LED TO THIS SETTLEMENT AGREEMENT THAT HAS LED TO
15  GREAT PROGRESS ON REUNIFICATIONS.  THE GOVERNMENT -- THE COURT
16  HAS INVOKED THE GOVERNMENT'S DISCRETION ON OTHER POINTS THAT
17  KIND OF PLAY INTO GOOD FAITH.
18          NOTABLY, YOUR HONOR, THE PLAINTIFFS HERE HAVE NO
19  REAL COMPLAINT WHEN THEY ARE HAPPY WITH THE RESULTS OF THE
20  GOVERNMENT.  I MEAN, THIS VERY JSR POINTS TO ALL OF THESE
21  FAVORABLE TO, YOU KNOW, CLASS MEMBERS AND CHILDREN OF CLASS
22  MEMBERS OR, LIKE, JUST FAVORABLE DETERMINATIONS FOR
23  RE-INTERVIEWS FOR CREDIBLE FEAR, REASONABLE FEAR.  YOU KNOW,
24  WHEN THOSE GO WELL EVERYBODY, YOU KNOW, EVERYBODY ON THE OTHER
25  SIDE, ON THE PLAINTIFFS' SIDE, IS HAPPY.  IT IS ONLY WHEN THEY

1   DON'T LIKE THE RESULT OF THE AGREED-UPON PROCESS THAT THEY

2   CLAIM BAD FAITH.

3          AND HERE, GIVEN THE ENTIRETY OF WHAT HAS BEEN GOING

4   ON OVER THE PAST YEAR IN THE COURSE OF THE LITIGATION, ALL

5   THAT THE GOVERNMENT HAS DONE, THERE IS REALLY NO BASIS TO

6   QUESTION THE GOVERNMENT'S GOOD FAITH; EVEN THOUGH IT HAD

7   DOUBTS ABOUT THE PLAINTIFFS' APPROACH WHEN THE PLAINTIFF

8   SUBMITTED, BASICALLY, APPLICATIONS FROM ONE OUT OF EVERY EIGHT

9   REMOVED FAMILY MEMBERS, DESPITE AGREEING TO RARE AND UNUSUAL

10  CIRCUMSTANCES.  THE GOVERNMENT DID NOT SAY, LOOK, WE ARE NOT

11  GOING TO CONSIDER THESE OR YOU BREACHED THE AGREEMENT OR THIS

12  IS BAD FAITH.  IT SAID, LOOK, WE SAID, YOU KNOW, WE CONSIDERED

13  THAT.  WE WENT THROUGH THEM, WE DID WHAT WE AGREED TO DO.  AND

14  THEN WE DID EVEN MORE THAN THAT.

15         SO I THINK THINGS REALLY JUST END THERE, YOUR HONOR.

16  THIS IS A CAREFULLY NEGOTIATED, COURT-APPROVED SETTLEMENT

17  AGREEMENT, AND WE HAVE SATISFIED THE LETTER AND SPIRIT OF THE

18  AGREEMENT.  AND THERE IS NO BASIS TO GRAFT UPON SOME NEW

19  REQUIREMENTS OR SOME NEW KIND OF REMEDIES THAT WAS NOT

20  NEGOTIATED BASED ON ANY KIND OF REMEDIAL POWER.  THEY JUST

21  DON'T PLAY IN HERE, AND ARISE IN A DIFFERENT CONTEXT.

22         IF I CAN HIT ONE OR TWO MORE KIND OF BIGGER ISSUES.

23  YOU KNOW, YOUR HONOR, I DON'T WANT TO GO ON FOR TOO LONG, BUT

24  I WANT TO MAKE SURE I REALLY HIT SOME IMPORTANT THEMES HERE,

25  BECAUSE I THINK THIS IS A BIG-DEAL MOTION AND REQUEST FOR

1    RELIEF AND JUST THE EXTRAORDINARY NATURE OF THAT, IS THAT THE

2    MOTION, YOUR HONOR, IT IS REALLY A TEST BY THE PLAINTIFFS OF

3    THIS COURT'S COMMITMENT TO NEGOTIATED RESOLUTION OF DISPUTES.

4            I THINK YOUR HONOR HAS VERY EFFECTIVELY ENCOURAGED

5    THE PARTIES TO RESOLVE DISPUTES OUTSIDE OF NORMAL MOTIONS

6    PRACTICE OR ADVERSARIAL LITIGATION.  THAT PRODUCED MAJOR

7    MILESTONES HERE.  IT IS THE COURT'S STRONG ENCOURAGEMENT AND

8    INTEREST IN THAT THAT HAS, YOU KNOW, LED TO THIS WEEKS-LONG

9    NEGOTIATION AND THIS THOROUGHLY, CAREFULLY NEGOTIATED

10   AGREEMENT THAT WAS REALLY HASHED OUT EXTENSIVELY WHERE, YOU

11   KNOW, IF THERE WAS A PROCEDURE OR AN ENTITLEMENT, IT IS SET

12   FORTH IN THE AGREEMENT.

13           AND THERE IS REALLY JUST NO WAY TO RULE FOR THE

14   PLAINTIFFS HERE, YOUR HONOR, AND SIMULTANEOUSLY PROMOTE THE

15   NEGOTIATED RESOLUTIONS ON MAJOR ISSUES THAT YOUR HONOR HAS

16   EMPHASIZED AND HAS FOUND SO IMPORTANT AND THAT THERE HAS BEEN

17   A LOT OF SUCCESS ON.

18           SO I WOULD EMPHASIZE THOSE POINTS, YOUR HONOR.

19           I WOULD ALSO EMPHASIZE THAT IT REALLY IS A HECK OF A

20   PROPOSITION, REALLY AN ASTONISHING ONE BY PLAINTIFFS TO TAKE

21   THE POSITION THAT ALL THEY HAVE TO DO IS SUBMIT A DECLARATION

22   AND THEN THE GOVERNMENT IS REQUIRED TO TAKE THE EXTRAORDINARY

23   ACTION OF RETURNING OR FACILITATING THE RETURN OF A PERSON WHO

24   HAS, IN THE GOVERNMENT'S VIEW, BEEN VALIDLY REMOVED.  I MEAN,

25   THAT IS THE UPSHOT OF THEIR POSITION.

```
1              AND THEY HAVE BROUGHT TO THE COURT EVERY SINGLE CASE
2    THAT THEY BROUGHT TO THE GOVERNMENT.  THIS WAS NOT, YOU KNOW,
3    LIKE SELECTIVE AT ALL.  THEY ARE JUST GETTING -- SEEKING A
4    SECOND OR A THIRD SHOT FOR THE RESULTS THEY DON'T LIKE, EVEN
5    THOUGH THE GOVERNMENT HAS APPLIED A GOOD FAITH APPROACH.
6              AND I WOULD JUST ADD, YOUR HONOR, THE GOVERNMENT IS
7    TOTALLY -- THE AGENCY WAS TOTALLY REASONABLE IN JUST
8    EVALUATING THESE AND CONCLUDING THAT THESE ARE -- DO NOT MEET
9    THE STANDARD.  IT ACTED IN GOOD FAITH THE WAY IT HAS WITH
10   OTHER THINGS.
11             AND THIS APPROACH THAT THE PLAINTIFFS TAKE, YOU
12   HONOR, IT IS JUST GROSSLY UNFAIR THAT THE PLAINTIFFS ARE
13   TAKING THIS
14   HEADS-THE-PLAINTIFFS-WIN-TAILS-THE-GOVERNMENT-LOSES APPROACH,
15   WHERE THEY CAN GO THROUGH THE PROCESS THEY AGREED TO.  IF THE
16   PROCESS GETS THEM THE RESULTS THEY LIKE IT IS GREAT; BUT IF
17   THE PROCESS DOES NOT GET THE RESULTS THEY LIKE FOR A
18   PARTICULAR PERSON THEY GET TO GET ANOTHER CRACK AT IT WITH THE
19   COURT.
20             THAT IS TOTALLY INAPPROPRIATE.  IT IS UNFAIR TO THE
21   GOVERNMENT.  IT DOES NOT GIVE THE GOVERNMENT THE FINALITY AND
22   RESOLUTION THAT WE BARGAINED FOR.
23             AND I JUST EMPHASIZE, YOUR HONOR.  ON THE REMEDIAL
24   POWERS POINT, I REALLY HAVE TO SAY THAT IT IS QUITE TELLING IN
25   THE PLAINTIFFS', YOU KNOW, OPENING BRIEF WHERE THEY SPEND
```

1   VERY, VERY LITTLE LANGUAGE ON THE -- VERY, VERY LITTLE
2   ATTENTION ON THE LANGUAGE OF THE ACTUAL AGREEMENT ITSELF,
3   WHICH GIVES VERY CLEAR THAT IT DOES NOT PROVIDE ANY RIGHT OF
4   RETURN OR REQUIRE THE GOVERNMENT TO RETURN A PARTICULAR
5   PERSON.  AND FOR THE GOVERNMENT TO BASICALLY -- OR FOR THE
6   PLAINTIFF TO BASICALLY GLOSS OVER THAT LANGUAGE AND MOVE SO
7   SWIFTLY TO REMEDIAL POWERS, IT REALLY SHOWS THAT THIS
8   AGREEMENT DOES NOT PROVIDE WHAT THEY ARE NOW CLAIMING.
9           AND THAT IS WHY THEY ARE TRYING TO GRAFT SOMETHING
10  ON LATER, BECAUSE THEY WANT A RESULT THAT IS OTHER THAN THE
11  ONE THE AGREEMENT PROVIDES.  AND THAT IS JUST PROFOUNDLY
12  UNFAIR AND IT IS REALLY AT ODDS WITH THE ENTIRE PURPOSE OF AN
13  EXTENSIVELY CAREFULLY HARD-FOUGHT NEGOTIATION THAT PRODUCED
14  GOOD RESULTS FOR ALL SIDES.
15          THE ONLY FAIR AND EQUITABLE WAY TO RESOLVE THIS
16  MOTION, YOUR HONOR, IS TO DENY IT BECAUSE THE GOVERNMENT
17  COMPLIED FULLY, AND THEN SOME, WITH ITS SETTLEMENT AGREEMENT
18  OBLIGATIONS.
19          **THE COURT:**  THERE IS AN INDICATION HERE THAT
20  POTENTIALLY 19 OF 21 OF THESE INDIVIDUALS HAD RECEIVED NO
21  CREDIBLE FEAR INTERVIEW.  IF THAT IS TRUE, DOES THAT HAVE ANY
22  EFFECT ON THE ARGUMENT THAT YOU MADE?  BECAUSE THEN OF COURSE
23  THE PLAINTIFFS' ARGUMENT WOULD BE THAT THESE INDIVIDUALS DID
24  NOT RECEIVE WHAT CONGRESS HAS PROVIDED; AND THAT IS A
25  STATUTORY RIGHT TO A CREDIBLE FEAR INTERVIEW, WHETHER THEY

1   CAME ON U.S. SOIL LEGALLY OR ILLEGALLY.

2            **MR. STEWART:**  YOUR HONOR, THE CLAIMS HERE, I MEAN,

3   THESE ARE CLAIMS THAT I BELIEVE THE PLAINTIFFS KNEW THAT THEY

4   WANTED TO RAISE PREVIOUSLY, AND THEIR POSITION IS OF THIS

5   SORT.

6            AGAIN, I MEAN, MY UNDERSTANDING OF THE -- YOU KNOW,

7   PEOPLE RAISE ALL SORTS OF CLAIMS WHEN THEY DON'T GET THE

8   RELIEF THEY LIKE IN IMMIGRATION PROCEEDINGS.  AND IT IS, YOU

9   KNOW, HIGHLY QUESTIONABLE -- I THINK SOME OF THE DECLARATIONS

10  I SAW WERE QUITE VAGUE.  SO I JUST -- I DON'T THINK IT

11  ESTABLISHES ANY SORT OF VIOLATION.

12           AND AGAIN, THERE IS NO SHOWING THAT THERE IS -- THAT

13  THIS KIND OF CLAIM -- AGAIN, WE WOULD DISPUTE -- YOU KNOW, WE

14  CERTAINLY DON'T CONCEDE THAT THE FACTUAL AVERMENTS STATED, WE

15  DON'T CONCEDE THAT THOSE THINGS HAPPENED.  WE WOULD NOT -- WE

16  WOULD SUGGEST THOSE ARE NOT THE SORTS OF THINGS THAT HIT THAT

17  RARE AND UNUSUAL MARKER, BECAUSE THE KINDS OF -- YOU KNOW, THE

18  KINDS OF CLAIMS THAT PLAINTIFFS ARE PRESSING ARE ONES THAT

19  THEY PRESS ALL OF THE TIME.  I MEAN, JUST CLAIMS THAT THE

20  ASYLUM PROCESS IS FUNDAMENTALLY UNFAIR SIMPLY BECAUSE -- OR

21  SIMPLY AFTER SOMEBODY DOES NOT GET THE RELIEF THEY WANTED, I

22  MEAN, THAT IS NOT UNCOMMON.

23           **THE COURT:**  THE SETTLEMENT AGREEMENT, THIS PROVISION

24  IS SET OUT ON PAGE 6.  AND THE GOVERNMENT MAKES CLEAR, IT IS

25  THE FIRST SENTENCE, THAT IT DOES NOT INTEND TO NOR DOES IT

1    AGREE TO RETURN ANY REMOVED PARENT TO THE UNITED STATES OR TO

2    FACILITATE ANY RETURN OF SUCH REMOVED PARENTS.

3            AND THEN THE PARAGRAPH GOES ON TO DISCUSS A PROCESS

4    BY WHICH THE PARTIES WILL MEET AND CONFER AND SEE IF THEY CAN

5    AGREE UPON SOME OF THESE MATTERS.  AND WE ARE LEFT HERE WITH

6    THESE 21.

7            IS IT YOUR POSITION, MR. STEWART, THAT THIS

8    SETTLEMENT AGREEMENT TAKES AWAY FROM PLAINTIFFS THE AVENUE OF

9    SEEKING THE COURT'S EXERCISE OF POWER THAT MAY BE AFFORDED

10   UNDER THE NINTH CIRCUIT LAW WITH RESPECT TO THESE 21

11   INDIVIDUALS, THAT THE SETTLEMENT AGREEMENT, IN EFFECT, IS AN

12   AGREEMENT TO PROVIDE A PROCESS BY WHICH THESE 21 WILL ABIDE.

13   AND THEN IF THEY LOSE, THEY ARE DONE, THEY HAVE WAIVED ANY

14   OTHER STATUTORY RIGHTS OR OTHER RIGHTS THAT THEY MIGHT PURSUE

15   WITH THE COURT?

16           **MR. STEWART:**  I THINK, YOUR HONOR -- I MEAN, I

17   THINK, YOUR HONOR, YOUR HONOR PREVIOUSLY EXPRESSED DOUBTS AS

18   TO JUST THE ABILITY ABOUT THE RIGHT TO RETURN AND THAT SORT OF

19   THING, WHICH IS WHAT LED TO THE SETTLEMENT TALKS AND KIND OF

20   PUT US IN THIS GENERAL POSITION WHERE PEOPLE DO NOT HAVE A

21   RIGHT TO RETURN, AND WE DON'T AGREE THAT ANYBODY WILL BE ABLE

22   TO RETURN, BUT, LOOK, WE ARE WILLING TO AGREE TO SOME PROCESS

23   AND, YOU KNOW, TO ALLOW THAT.  SO WE THINK THAT THE SETTLEMENT

24   AGREEMENT, I THINK, FULLY, YOU KNOW, ADDRESSES ANY ISSUES.

25           **THE COURT:**  ALL RIGHT.

1          ANY RESPONSE?

2          **MR. BALAKRISHNAN:**  YEAH.  THANK YOU, YOUR HONOR.

3   JUST VERY BRIEFLY I WANT TO MAKE THREE POINTS.

4          THE FIRST IS THAT I THINK IT IS CLEAR THROUGH THE

5   COURSE OF THE NEGOTIATIONS -- AND THIS WAS SPECIFICALLY

6   COMMUNICATED BETWEEN COUNSEL -- THAT NOTHING IN THE AGREEMENT

7   PRECLUDED US FROM COMING TO THE COURT TO SEEK RELIEF FOR THOSE

8   CASES THAT WE HAVE PRESENTED AS RARE AND UNUSUAL IF WE WERE

9   UNABLE TO COME TO AGREEMENT WITH THE GOVERNMENT.  AND I THINK

10  THAT THE GOVERNMENT IS NOT DENYING THAT AT THIS POINT.  AND

11  THAT IS ABSOLUTELY CLEAR.

12         **MR. STEWART:**  YOUR HONOR, I OBJECT TO THIS, AND

13  RESERVE THE RIGHT TO RESPOND AFTER HE IS FINISHED.  I THINK IT

14  IS HIGHLY INAPPROPRIATE THAT MR. BALAKRISHNAN IS TRYING TO

15  BRING IN HIS REPRESENTATIONS FROM CONVERSATIONS THAT ARE NOT

16  EMBODIED IN THE SETTLEMENT AGREEMENT.

17         I RESERVE THE RIGHT TO ADDRESS THAT IN DUE COURSE.

18         **THE COURT:**  ALL RIGHT.  YOU CAN RESPOND.  LET MR.

19  BALAKRISHNAN FINISH THEN YOU CAN RESPOND.

20         **MR. BALAKRISHNAN:**  YES.  TWO BRIEF -- TWO ADDITIONAL

21  BRIEF POINTS.

22         I THINK, FIRST, YOU KNOW, WE SET THIS OUT IN THE

23  DECLARATIONS OF BOTH, YOU KNOW, MR. HERZOG FROM THE STEERING

24  COMMITTEE AND THE HEAD OF AL OTRO LADO, ANOTHER LAWYER THAT

25  SCREENED MANY OF THESE CASES.  BUT THE DECLARATIONS THAT WE

1   PROVIDED WERE THE PRODUCT OF LITERALLY THOUSANDS OF HOURS OF

2   SCREENING AND INTERVIEWS, NOT JUST BY THE LAWYERS AND THE

3   STEERING COMMITTEE, MULTIPLE IMMIGRATION LAWYERS AT LAW FIRMS,

4   BUT ALSO ADDITIONAL PRIVATE BAR ATTORNEYS.  AND THOSE WENT

5   THROUGH MULTIPLE ROUNDS OF SCREENING TO ENSURE THAT THEY MET

6   HIGH STANDARDS BECAUSE WE UNDERSTOOD THAT WE WERE NOT BRINGING

7   EVERY CASE OF A DEPORTED PARENT FOR CONSIDERATION FOR RETURN,

8   BUT ONLY THOSE THAT ABSOLUTELY NEEDED IT AND ABSOLUTELY MET

9   THE STANDARDS THAT WE HAD SET OUT.

10          FINALLY, I THINK THAT IT IS TELLING THAT AT NO

11  POINT, AND STILL THE GOVERNMENT -- EVEN THE GOVERNMENT SAYS

12  THAT IT HAS REVIEWED ALL OF THE DOCUMENTS.  WE HAVE NO REASON

13  TO DENY THAT.  BUT THE GOVERNMENT HAS STILL NOT EXPLAINED WHAT

14  STANDARD THEY BELIEVE WOULD APPLY TO BRING ANY OF THESE CASES

15  BACK.

16          AND WHEN, YOU KNOW, WHEN 30 OF THE PARENTS WERE ABLE

17  TO COME TO THE COUNTRY ON THEIR OWN AND MAKE A VERY HARROWING

18  AND VERY DANGEROUS JOURNEY, THE GOVERNMENT DID END UP

19  PROVIDING THEM WITH THE RELIEF THAT WE ARE NOW SEEKING.

20          WHAT WE ARE TRYING TO DO AT THIS POINT IS VERY

21  MINIMAL, WHICH IS REALLY JUST TO BRIDGE THE GAP AND GIVE

22  EVERYONE ELSE A SAFE AND LEGAL PATH TO COME TO THE UNITED

23  STATES, TO HAVE THE BARE MINIMUM OF THEIR STATUTORY RIGHTS

24  RESPECTED.

25          **THE COURT:**  ALL RIGHT.

1        MR. STEWART.

2        **MR. STEWART:**  YES.  THANK YOU, YOUR HONOR.

3        I DO MAINTAIN MY OBJECTION TO MR. BALAKRISHNAN'S

4   CHARACTERIZATION OF SETTLEMENT NEGOTIATIONS.  I DO THINK THAT

5   IS INAPPROPRIATE.

6        THE LAST POINT OR TWO I WANTED TO HIT, YOUR HONOR,

7   IS THESE ARE NOT RARE AND UNUSUAL CASES.  LOOK, THE GOVERNMENT

8   RESERVED THAT RIGHT SO WE CAN -- SO THAT WE COULD CONSIDER

9   TRULY EXTRAORDINARY CASES, NOT THE KINDS OF CASES THAT PEOPLE,

10  YOU KNOW, MAKE CLAIMS OF ALL THE TIME.

11       I THINK JUST LOOKING AT THE PLAINTIFFS' CRITERIA,

12  YOUR HONOR, SHOWS THAT THESE ARE REALLY NOT RARE AND UNUSUAL.

13  I MEAN, ONE OF THE KEY THINGS THEY EMPHASIZE IS THE FACT OF

14  SEPARATION.  I MEAN, THAT FACT, BY ITS NATURE, CATCHES

15  EVERYBODY IN THE CLASS.

16       THE PLAINTIFFS' NEXT THING THAT THEY EMPHASIZE, YOUR

17  HONOR, IS THE IDEA OF A BONA FIDE ASYLUM CLAIM.  IT SEEMS

18  VERY, VERY, VERY CLEAR THAT THEY HAVE AN EXTRAORDINARILY LOW

19  BAR FOR THAT.  I MEAN, THEY BASICALLY CLASS IT AS ANYONE WHO

20  THEY THINK CAN PASS A CREDIBLE FEAR SCREENING.

21       THERE IS A VERY, VERY HIGH PASSAGE RATE FOR CREDIBLE

22  FEAR SCREENINGS, YOUR HONOR.  THERE IS A BIG DIFFERENCE

23  BETWEEN THAT AND ULTIMATE ENTITLEMENT TO ASYLUM RELIEF.  SO

24  HAVING THAT SCREENING OR EVEN BEING PLACED IN SECTION 240

25  PROCEEDINGS, WHICH CAN BE DONE FOR A NUMBER OF REASONS, YOUR

1   HONOR, DOES NOT SHOW THAT SOMEBODY HAS A TRULY MEANINGFUL
2   ASYLUM CLAIM.  AND IT CERTAINLY DOESN'T DISTINGUISH THEM FROM
3   A GREAT, GREAT MANY OF OTHER PEOPLE IN THE WAY THAT WOULD MAKE
4   THEM IN A RARE AND UNUSUAL CATEGORY.
5           AND FINALLY, YOUR HONOR, ABOUT THE CLAIMS OF
6   VIOLENCE IN HOME COUNTRIES OR HARMS IN HOME COUNTRIES, AGAIN,
7   THESE ARE THE KINDS OF CLAIMS THAT BY THEIR NATURE ARE MADE
8   JUST ALL THE TIME.  I MEAN, THESE ARE THE KINDS OF CLAIMS THAT
9   THESE VERY COUNSEL, YOU KNOW, WHO ARE ARGUING THIS MOTION,
10  LIKE THESE ARE THE CLAIMS, THE TYPES OF ASSERTIONS THEY MAKE
11  ALL THE TIME FOR A GREAT JUST MULTITUDE OF CLIENTS.
12          THESE ARE NOT RARE AND UNUSUAL CASES.  THESE ARE THE
13  CASES THAT HAPPEN TO BE LEFT OVER AFTER, YOU KNOW, A GOOD
14  NUMBER OF PEOPLE SHOWED UP IN THE COUNTRY, YOUR HONOR.  BUT
15  THE APPROACH THAT PLAINTIFFS ARE ADOPTING IS A VALID APPROACH,
16  IT DOES NOT ADHERE TO THE RARE AND UNUSUAL LIMITATION IN THE
17  AGREEMENT.
18          AND I RESPECTFULLY MAINTAIN, YOUR HONOR, THAT MOTION
19  SHOULD BE DENIED.  THE GOVERNMENT FULLY COMPLIED WITH THE
20  SETTLEMENT AGREEMENT, AND ITS TERMS SHOULD, AS THE COURT
21  RECOGNIZED IN APPROVING THE AGREEMENT, BE HONORED, AS SHOULD
22  THE GOVERNMENT'S GOOD FAITH.
23          THANK YOU, YOUR HONOR.
24          **THE COURT:**  THANK YOU.
25          WHAT SPECIFICALLY ARE YOU ASKING FOR?  WHAT WOULD BE

1    THE ORDER?  YOU ARE NOT ASKING THAT THE COURT ENTER AN ORDER

2    THAT THE GOVERNMENT NOT ONLY ALLOW THE RETURN BUT PAY FOR THE

3    RETURN, OR YOU ARE SIMPLY ASKING FOR AN ORDER THAT WOULD

4    REQUIRE THE GOVERNMENT TO PERMIT THESE 21 TO HAVE A MEANINGFUL

5    REVIEW.

6         **MR. BALAKRISHNAN:**  THAT IS ABSOLUTELY CORRECT, YOUR

7    HONOR.  I THINK THAT -- AGAIN, THAT IS PRECISELY RIGHT.  ALL

8    WE ARE SEEKING IS AN ORDER THAT DIRECTS THE GOVERNMENT TO

9    ALLOW THEM TO RETURN TO THE COUNTRY SO THEY CAN HAVE A

10   MEANINGFUL REVIEW OF THEIR ASYLUM CLAIMS.

11        **MR. STEWART:**  YOUR HONOR, I RESPECTFULLY DON'T

12   UNDERSTAND WHAT THAT MEANS, AS WE HAVE SAID IN OUR MOTION.

13        **MR. BALAKRISHNAN:**  I THINK, TO BE MORE SPECIFIC, THE

14   ORDER COULD -- THE ORDER COULD STATE THAT THE GOVERNMENT IS

15   DIRECTED TO ALLOW THESE 21 PARENTS TO TRAVEL TO THE UNITED

16   STATES.  AND TO AT THAT POINT PROVIDE THEM WITH A NEW FEAR

17   SCREENING, A DE NOVO FEAR SCREENING IN THE SAME MANNER THAT

18   THERE WAS A FEAR SCREENING PROVIDED FOR THE DORA CLASS MEMBERS

19   WHO WERE IN THE UNITED STATES OR, IN THE ALTERNATIVE, TO

20   CHOOSE TO PUT THEM IN FULL REMOVAL PROCEEDINGS.  SO THEREFORE

21   THE GOVERNMENT WOULD HAVE THE ULTIMATE DISCRETION AS TO WHICH

22   PATH TO GO DOWN.  AND I THINK THAT THAT SHOULD PROVIDE THE

23   SPECIFICS FOR THE GOVERNMENT TO FOLLOW.

24        **THE COURT:**  MR. STEWART, ARE YOU ABLE TO DETERMINE,

25   IN THIS SETTING, WHETHER THE INDICATION THAT MR. BALAKRISHNAN

```
 1   MADE THAT 19 OF 21 RECEIVED NO CREDIBLE FEAR INTERVIEW IS
 2   ACCURATE?  DO YOU HAVE ANY INFORMATION IN THAT REGARD OTHER
 3   THAN WHAT THE PLAINTIFFS HAVE PROVIDED IN THEIR DECLARATION?
 4         MR. STEWART:  I DON'T HAVE INFORMATION ON THAT, YOUR
 5   HONOR.  I AM NOT AWARE THAT I CAN GET IT.
 6         THE COURT:  AND FROM THE PLAINTIFFS' PERSPECTIVE,
 7   YOU HAVE GIVEN THE COURT ALL OF THE INFORMATION YOU HAVE.
 8         MR. BALAKRISHNAN:  YOUR HONOR, YES.  WE PROVIDED ALL
 9   OF THE INFORMATION WE WERE ABLE TO GET FROM OUR DECLARANTS
10   ABOUT THIS SPECIFIC PROCESS.  THE GOVERNMENT MAY HAVE
11   ADDITIONAL INFORMATION IN ITS FILES.
12         BUT IF THE COURT HAS SPECIFIC QUESTIONS ABOUT ANY OF
13   THE DECLARANTS WE CAN, AND WILL, OF COURSE, SPEAK TO THEM
14   AGAIN IN AN ATTEMPT TO GET MORE DETAILED INFORMATION FOR YOU.
15   IF IT IS ABOUT THE SPECIFICS OF WHAT HAPPENED IN THEIR
16   PROCEEDINGS, WE CAN, OF COURSE, GO BACK AND DOUBLE CHECK THAT
17   AND SUBMIT THAT TO THE COURT.
18         THE COURT:  OKAY.  AND WE HAVE ONE COUNSEL HERE, AT
19   LEAST, FOR ONE OF THE 21.
20         ARE ALL 21, ARE THEY REPRESENTED IN SOME MANNER AT
21   THIS TIME?
22         MR. BALAKRISHNAN:  AT THIS POINT ALL 21 ARE
23   REPRESENTED.  THEY, OF COURSE, WERE NOT REPRESENTED WHEN THEY
24   FIRST CAME TO THE COUNTRY AND WERE SEPARATED, BUT WE DO HAVE
25   -- YOU KNOW, EACH INDIVIDUAL HAS A LAWYER WHO IS REPRESENTING
```

1    THEM IN THIS PROCESS, IN ADDITION TO US AS CLASS COUNSEL.

2           **MR. STEWART:**  YOUR HONOR, CAN I ASK A QUESTION?  I

3    AM STILL VERY CONFUSED ABOUT THE RELIEF.

4           MR. BALAKRISHNAN SAYS THE RELIEF HE IS SEEKING IS AN

5    ORDER ALLOWING THESE 19 TO TRAVEL TO THE UNITED STATES.  I AM

6    NOT EXACTLY CLEAR AS TO WHAT HE CLAIMS IS THE GOVERNMENT'S

7    IMPEDIMENT TO THEM DOING THAT AND PRESENTING AT A PORT OF

8    ENTRY.  I DON'T UNDERSTAND WHAT THE RELIEF SOUGHT IS IF ALL HE

9    IS SEEKING IS TO HAVE PEOPLE TRANSIT MEXICO TO PRESENT AT A

10   PORT OF ENTRY.  I AM JUST NOT FOLLOWING.

11          **MR. BALAKRISHNAN:**  YOUR HONOR, ESSENTIALLY WE WANT

12   THEM TO BE ABLE TO FLY TO THE UNITED STATES AND NOT HAVE TO

13   TRAVEL OVER MULTIPLE BORDERS THROUGH VERY DANGEROUS

14   TERRITORIES WHERE THEN WHEN THEY COME TO THE UNITED STATES

15   THEY MAY STILL BE RETURNED TO MEXICO THROUGH THE GOVERNMENT'S

16   NEW RETURN TO MEXICO PROGRAM.

17          SO ESSENTIALLY WHAT WE ARE LOOKING FOR IS AN ORDER.

18   YOU KNOW, THE ORDER IN WALTERS V. RENO, FOR EXAMPLE, WAS AN

19   ORDER SPECIFICALLY DIRECTING THE GOVERNMENT TO EITHER PAROLE

20   PEOPLE BACK INTO THE UNITED STATES OR OTHERWISE RETURN THEM.

21          THAT'S FINE WITH US.  THAT IS MORE BURDENSOME ON THE

22   GOVERNMENT THAN WHAT WE ARE TRYING TO DO, WHICH IS HAVE THE

23   ORDER SUCH THAT THE GOVERNMENT DOESN'T HAVE TO SPEND THE MONEY

24   TO FLY THESE FAMILIES BACK.

25          BUT, YOU KNOW, THE BASELINE IS THAT THE ORDER IN

1   WALTERS, THE SAME ORDER THAT THE NINTH CIRCUIT AFFIRMED IN

2   WALTERS V. RENO WOULD GET THE JOB DONE, BUT WE WOULD BE -- BUT

3   THE INDIVIDUAL PARENTS WOULD HAVE TO PAY THEIR OWN WAY TO GET

4   ON THE PLANE.

5            **THE COURT:**  ALL RIGHT.  OKAY.  I AM GOING TO TAKE

6   THIS UNDER SUBMISSION, AND ISSUE AN ORDER IN DUE COURSE.  I DO

7   APPRECIATE THE BRIEFING AND THE ARGUMENT.

8            I WOULD LIKE TO MEET AGAIN ON A STATUS REPORT IN

9   THREE OR FOUR WEEKS.  I WILL ISSUE A FOLLOW-UP ORDER, PROBABLY

10  EARLY NEXT WEEK, SETTING OUT THOSE DATES.  IT WILL PROBABLY BE

11  A MONTH FROM TODAY, WITH A STATUS REPORT A DAY OR TWO BEFORE.

12           AND I URGE EVERYONE TO KEEP PUSHING, PARTICULARLY

13  COMMANDER WHITE AND THE EXECUTIVE BRANCH AGENCIES.  AND I WILL

14  LOOK FORWARD TO THE NEXT STATUS REPORT.

15           AND HERE, AGAIN, I WILL TAKE THIS MATTER UNDER

16  SUBMISSION AND ISSUE AN ORDER SHORTLY.

17           THANK YOU.

18           **MR. STEWART:**  ONE REQUEST ON THE STATUS REPORT.

19           **THE COURT:**  YES.

20           **MR. STEWART:**  MY UNDERSTANDING IS THERE MAY BE, FOR

21  SOME OF THE GOVERNMENT AGENCIES, A PROBLEM WITH THE WEEK OF

22  AUGUST 5TH, AND I SEE IT IS ABOUT THAT MONTH RANGE.  IF

23  POSSIBLE, I WOULD BE GRATEFUL IF WE COULD WORK AROUND THAT.  I

24  JUST WANTED TO FLAG THAT.

25           **THE COURT:**  WOULD YOU PREFER AUGUST 2ND OR AUGUST

16, THOSE FRIDAYS, NOT THE 9TH?

        **MR. STEWART:**  I THINK SO YOUR HONOR, I THINK THAT WOULD BE VERY, VERY HELPFUL.  AUGUST 16TH, IN PARTICULAR, WOULD BE TERRIFIC.

        **THE COURT:**  OKAY.  VERY GOOD.  ALL RIGHT.

        THANK YOU.  HAVE A GOOD WEEKEND.

        **MR. GELERNT:**  THANK YOU, YOUR HONOR.

        **MR. STEWART:**  THANK YOU, YOUR HONOR.

        **THE COURT:**  THANK YOU.


                    *   *   *

        I CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
IN THE ABOVE-ENTITLED MATTER.

        S/LEEANN PENCE                    7/13/2019
        LEEANN PENCE, OFFICIAL COURT REPORTER   DATE