Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al. <br><br> *Respondents-Defendants.* | Case No. 18-cv-00428-DMS-MDD <br><br> Date Filed: July 30, 2019 <br><br> **MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

I.  The Court's Orders Regarding Separations Based on Criminal History ...... 3

II.  Defendants Are Now Separating Hundreds of Parents Based on Criminal
History and Other Allegations. ..................................................................... 6

    A.  Parents Separated Due to Minor Criminal History. ............................. 7
    B.  Even Tender-Age Children Including Babies Are Being Separated
Based on Minor Criminal History. ...................................................... 9
    C.  Parents Separated Due to Allegations of Unfitness or Insufficient
Proof of Parentage. ............................................................................ 10
    D.  Parents Separated Due to Alleged Gang Affiliation. .......................... 13

III.  The Parties' Recent Meet and Confers Concerning the Standard for
Ongoing Separations. .................................................................................. 15

IV.  Information-Sharing Protocols. .................................................................... 16

ARGUMENT ...................................................................................................... 17

I.  The Court Should Enjoin the Government from Separating Families
Without Objective and Concrete Evidence that the Parent Is Unfit or a
Danger to the Child. ..................................................................................... 18

    A.  Due Process and the Preliminary Injunction Prohibit the Government
from Separating Families Absent a Determination that the Parent Is
Unfit or Presents a Danger to the Child. ............................................ 18
    B.  Defendants Are Separating Children from Their Parents for
Unjustified Reasons. .......................................................................... 19
        1. Separations Based on Minor Crimes. ............................................. 20
        2. Separations Based on Dubious Unfitness Allegations or
Doubts Concerning Parentage. ........................................................ 22
        3. Separations Based on Questionable Allegations of Gang
Affiliation. ....................................................................................... 24
        4. Separations of Very Young Children. ............................................. 26

    C.  The Government's Overbroad Use of Family Detention Standards as a
Justification for Separations Should Be Rejected. ............................. 27

CONCLUSION .................................................................................................. 29

i

# TABLE OF AUTHORITIES

**Cases**

*Brokaw v. Mercer,*
235 F.3d 1000 (7th Cir. 2000)..................................................................24
*Croft v. Westmoreland Cty. Children & Youth Servs.,*
103 F.3d 1123 (3d Cir. 1997)............................................................17, 24
*Demaree v. Pederson,*
887 F.3d 870 (9th Cir. 2018)..................................................................27
*Franz v. Lytle,*
997 F.2d 784 (10th Cir. 1993)..................................................................24
*Halley v. Huckaby,*
902 F.3d 1136 (10th Cir. 2018)..................................................................21
*Heartland Acad. Cmty. Church v. Waddle,*
595 F.3d 798 (8th Cir. 2010)..................................................................17
*Hurlman v. Rice,*
927 F.2d 74 (2d Cir. 1991)..................................................................22
*Jacinto-Castanon de Nolasco v. ICE,*
319 F. Supp. 3d 491 (D.D.C. 2018) ............................................17, 22
*Keates v. Koile,*
883 F.3d 1228 (9th Cir. 2018)..................................................................17
*Ram v. Rubin,*
118 F.3d 1306 (9th Cir. 1997)............................................................21, 24
*Rogers v. San Joaquin,*
487 F.3d 1288 (9th Cir. 2007)..................................................................23
*Saravia for A.H. v. Sessions,*
905 F.3d 1137 (9th Cir. 2018)..................................................................25
*Saravia v. Sessions,*
280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................................25, 26
*Vasquez v. Rackauckas,*
734 F.3d 1025 (9th Cir. 2013)..................................................................25
*W.S.R. v. Sessions,*
318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................................17, 22
*Youth Justice Coal. v. City of Los Angeles,*
264 F. Supp. 3d 1057 (C.D. Cal. 2017) ..............................................25

**Statutes**

8 U.S.C. 1232(c)(6) ..................................................................21
8 U.S.C. 1325..................................................................22
8 U.S.C. 1326..................................................................22

**Regulations**

74 Fed. Reg. 56547 (Nov. 2, 2009) ..............................................23

**INTRODUCTION**

This motion raises issues of pressing concern regarding ongoing separations since this Court's preliminary injunction ruling in June 2018. The government is systematically separating large numbers of families based on minor criminal history, highly dubious allegations of unfitness, and errors in identifying bona fide parent-child relationships. The meet and confer has not been successful, and the government's position is that, under the injunction, Defendants may legally separate on the basis of any criminal history, no matter how minor. Plaintiffs ask the Court to provide further guidance on the permissible criteria to separate families based on criminal history or parental fitness, and to reaffirm the basic premise of this Court's preliminary injunction: that children should not be taken from their parents absent a determination that the parent is genuinely unfit or presents a true danger based on objective facts. Plaintiffs also respectfully request that the Court hold an in-person hearing as soon as practicable.

When this Court issued its preliminary injunction, it carved out of the Class those parents with criminal histories (except immigration offenses). The Court did so for a very specific reason: to expedite the immediate reunification of the bulk of the separated families, so that the parties' disagreements about criminal history cases would not slow down the initial reunification process. The Court made clear, however, that it was not blessing separations based on *any* criminal history, regardless of gravity. Rather, the Court's decision relied on traditional due process and child custody standards, which permit the drastic step of separating a child and parent only where the criminal history is so significant that it bears on whether the parent is a danger to the child or is an unfit parent. The Court further clarified that Defendants must provide information regarding these separations so that Plaintiffs and affected families could assess and, if necessary, challenge Defendants' separation decisions under the preliminary injunction.

The Court later addressed this issue in two cases from the original Class and upheld the separations based on criminal history. Dkt. 236. But, in doing so, the Court stressed that it was upholding those two separations because *at that time* only 29 families had been separated based on criminal history, and Defendants appeared to the Court to be carefully choosing which families to separate from the original Class. *Id.* at 3. The Court thus chose, at that time, not to revisit its decision to allow a carve out from the original class of parents with a criminal history, as there was no signal that Defendants were separating numerous parents based on criminal history, no matter how minor, old, or unproven.

The situation has dramatically changed. From June 28, 2018, through June 29, 2019, Defendants have now separated more than *900 children*—including numerous babies and toddlers—based on criminal history, Defendants' unilateral, unsupported determination that the parent is unfit or a danger, or mistakes about the identity of the adult as the child's parent. And Defendants have clarified that their position is that the injunction did not just allow them to separate members of the original class based on any criminal history, but that it also allows them to continue to separate families on an ongoing basis, no matter how insignificant the crime (save certain immigration offenses).

Defendants claim that although the injunction permits them to separate regardless of the severity of the criminal history, in practice they are exercising their discretion and not doing so. But the evidence strongly suggests that any discretion the government may be exercising is not sufficient. Indeed, as explained below and in the declarations submitted with this motion, Defendants are even separating young children based on such offenses as traffic violations, misdemeanor property damage, and disorderly conduct violations. Some of the separations are for offenses that took place many years ago. And some are for mere allegations or arrests without convictions. Additionally, providers are reporting that parents are even being separated based on Defendants' assertion that the parent does not appear

to be doing a proper job parenting or on the most dubious assertions that the parent has not sufficiently proven his or her relationship to the child.

Given the ongoing and potentially permanent harm to these children, Plaintiffs request that the Court make clear that Defendants may not separate based on criminal history regardless of the severity of that history or the extent to which it bears on the parent's fitness, and that Defendants must take more careful steps to verify parentage. Plaintiffs do not now ask the Court to rule on the propriety of all 900 plus separations. Instead, Plaintiffs request that the Court set guiding principles and work with the parties to create a process for resolving disputes about ongoing separations, whether that be via a child custody expert consultant, a monitor, or some other means.

As shown in the numerous declarations filed by advocates of children and parents, this issue has reached a critical juncture. Hundreds of children, some literally just babies, are being irreparably damaged because their parent may have committed a minor offense in the past, even a traffic offense.

## BACKGROUND

### I. The Court's Orders Regarding Separations Based on Criminal History

On June 26, 2018, the Court issued a preliminary injunction prohibiting Defendants from separating families in the Initial Class "absent a determination that the parent is unfit or presents a danger to the child . . . ." Dkt. 82 at 6-7; Dkt. 83 at 8 & n.7. The Court simultaneously certified a nationwide class of parents separated from their children (now known as the "Initial Class"). Dkt. 82. The preliminary injunction directed Defendants to reunify all Initial Class members with their children under five years of age within 14 days, and the remaining Class members within 30 days. Dkt. 83 at 23.

To aid swift reunification, the Court "carved out" of the Initial Class parents with a criminal history, which the Court noted "comes in all gradations, from minor misdemeanors to violent felony offenses." Dkt. 82 at 10. The Court observed that

3

"[s]ome types of criminal history would clearly justify separation of the parent, while other criminal history might not—and the exercise of governmental discretion to separately detain that individual might be challenged." *Id.*

At the time, the Court made clear that it wanted the parties to focus on reunifying the Initial Class Members with their children and not get sidetracked arguing about individual cases involving criminal history. The need for swift reunification was then particularly imperative, given that families had been separated for many months and that there were more than 2700 children in the Initial Class. The Court stressed that leaving certain individuals with criminal history out of the class for the time being was needed "given the urgency [and] press of time." July 6, 2018 Transcript, at 21:21-25; *id.* at 19:22-20:1 (explaining that Court "narrowly defin[ed] the class" for purpose of "provid[ing] injunctive relief . . . in an efficient, quick manner").[1]

The Court, however, set this carve-out "without prejudice to redefining the class on a more fulsome record." Dkt. 82 at 11. And the Court repeatedly emphasized its willingness to revisit the exclusion of individuals with criminal histories in the future. *See* July 13, 2018 at 1 PM Transcript at 35:11-35:14 (Court: "If there is a criminal history issue, [it] can be addressed at a later time, after the bulk of reunifications occur. And it could be by way of modifying the scope of the class.").

Over the next several months, the parties frequently discussed the circumstances of parents denied reunification due to criminal history. Plaintiffs stressed that they needed additional information concerning criminal history to assess whether Defendants' information was erroneous or insufficient to warrant separation. *See, e.g.*, July 6, 2018 Transcript at 41:8-15 (Plaintiff's counsel: stating that where the Government wants to separate based criminal convictions, "we would like to see whether they are serious convictions and take those up

---

[1] The excerpts of all court transcripts cited in this brief are appended as Exhibit R.

4

individually" as needed); July 9, 2018 Transcript at 20:18-21:1 (Plaintiffs' counsel asking Defendants "to indicate which type of convictions individuals have, because . . . there are sometimes mistakes"); July 13, 2018 at 1 PM Transcript at 36:1-14 (Plaintiffs' counsel stating "the reason we are asking for specific information is because people on the ground are saying . . . we don't think this person is actually ineligible.  So if we could . . . have enough information to check accuracy . . . ."); August 3 Transcript at 23:16-24:8 (Plaintiffs noting that Defendants' existing lists gave "hardly [] enough information to contest" criminal history designations); *id.* at 19:12-21:25 (Plaintiffs observing "specific information" was needed to determine whether offense was "type of serious conviction that would bear on someone's fitness to be a parent").

Notwithstanding its concern with quick reunification, the Court noted, even at that time, that some procedure was necessary to determine whether Defendants had properly denied reunification to parents based on alleged criminality. The Court thus ordered Defendants to provide Plaintiffs with more detailed information concerning parents denied reunification based on criminal grounds or allegations. *See, e.g.*, August 3, 2018 Transcript at 23:16-24:10 (Court and Plaintiffs discussing concerns regarding criminal history information); Dkt. 162 at 1 ("Defendants shall provide to Plaintiffs a list of parents that were excluded from the Class, and the reasons for those exclusions"); Dkt. 175 at 2 (ordering Defendants to "provide to Plaintiffs additional pertinent information in its possession about these parents' criminal histories"). The Court then directed the parties to "meet and confer in an effort to resolve those disputes" concerning parents with criminal histories, and that "[i]f counsel are unable to resolve those disputes, Plaintiffs may raise the issue with the Court." Dkt. 175 at 2.

In September 2018, the parties brought two such cases—of Ms. Q and Mr. C—to the Court after unsuccessful meet and confers. Both cases involved tender-aged children. The Court upheld Defendants' denial of reunification as to those

parents, but cautioned that it expected Defendants to "make these exceptions in a reasonable manner." The Court also was reassured that only a handful of parents (29) had been denied reunification out of 2,700-plus members of the Initial Class. Dkt. 236 at 3. The Court thus concluded that it would not reassess its decision to carve out from Initial Class those parents with criminal histories at that time.

## II. Defendants Are Now Separating Hundreds of Parents Based on Criminal History and Other Allegations.

In late 2018, after the bulk of reunifications were well underway, advocates and legal services providers began reporting that separated children continued to appear in ORR facilities. Advocates expressed concern that the numbers of such children were increasing, and they were having trouble obtaining timely information concerning why these children were separated. In December 2018, Plaintiffs requested that Defendants meet and confer concerning the reasons for the ongoing separations. *See* Dkt. 334 at 15, 17-18; Dkt. 349 at 10-11.

In the February 20, 2019, JSR, Defendants disclosed "245 new separations of children and parents that occurred between June 27, 2018 and January 31, 2019," Dkt. 360 at 11-12, and that 225 of those 245 new separations were based on criminal allegations. *Id.* at 13.

Shortly thereafter, Defendants began providing Plaintiffs with lists of ongoing separations. Defendants have provided updates to their list of ongoing separations approximately once a month, at the time of the JSRs. These lists have a lag of approximately two to three weeks, meaning that, e.g., the list provided on July 19, 2019, showed separations through June 29, 2019. The spreadsheets state a cryptic, summarized reason for the separation—often just a few words or a line of text—that states the allegations against the parent, such as "Previous immigration conviction/processed for felony re-entry. Public Peace Arrest." Sometimes the entry will simply be "due to parent's criminal history," with no further explanation. Declaration of Brooke Watson, Ex. A, ¶¶ 18-21 (describing level of generality of criminal history information provided).

Per Defendants' reports, the total number of families separated after June 26, 2018 has steadily increased over time; each report from Defendants added approximately 150 families. On July 19, 2019, Defendants provided their most recent report of ongoing separations, which listed 911 child separations from June 26, 2018 (the date of the preliminary injunction) through June 29, 2019. Per Plaintiffs' analysis, 678 of these separations were based on allegations of criminal conduct. Watson Decl., ¶ 9. The remaining separations were based on a range of reasons, including alleged gang affiliation (71 parents); allegations of unfitness or child safety concerns (20 parents); "unverified familial relationship" (46 parents) or parent illness (24 parents). Watson Decl, Ex. A, ¶¶ 10-14.

### A. Parents Separated Due to Minor Criminal History.

Defendants have provided only minimal criminal history information for each case. For numerous parents, Defendants' spreadsheet does not state the nature of the alleged criminal history at all. For many others, the spreadsheet does not state whether the alleged criminal history was a conviction or merely a charge. Watson Decl., Ex. A, ¶ 18. In most cases, the spreadsheet fails to indicate the age of the charge or conviction. *Id.*, ¶ 16. In over 75 percent of the cases, the spreadsheet does not even specify whether the crime was a felony or misdemeanor. *Id.*, ¶ 19.

For instance, Defendants' spreadsheet shows 44 separations based on "assault" allegations, excluding those where assault was combined with more serious charges. For 11 of those cases, Defendants' spreadsheet does not show whether the charge resulted in a conviction; in 34 cases, the spreadsheet does not indicate the severity of the offense, such as whether the allegation was a misdemeanor or felony. *Id.*, ¶ 24.

More fundamentally, even without detailed information, the spreadsheet on its face shows that Defendants have justified separation based on the most minor or nonviolent criminal history. For example:

- 3 parents were separated due to DUI offenses alone, *id.*, ¶ 22.a

- 14 parents were separated based on immigration convictions combined with DUI or unspecified traffic offenses; for instance, one parent was separated due to "illegal entry. dui and traffic offense convictions," *id.*, ¶ 22.a;
- 15 parents were separated due to drug possession convictions alone, *id.*, ¶ 21.a;
- 6 parents were separated due to marijuana possession convictions alone, *id.*, ¶ 21.b;
- 8 parents were separated due to fraud and forgery offenses alone, *id.*, ¶ 23.a;
- 8 parents were separated due to fraud and forgery offenses combined with criminal immigration convictions, *id.*, ¶ 23.b.

Other unique examples similarly show separations based on minor offenses:

- One parent was separated due to "Malicious destruction of property value $5," for which the father received a six-day jail sentence with six months of probation.
- One parent was separated due to "theft by shoplifting" and "driving without a license."
- One parent was separated due to a 2009 conviction for "resisting or obstructing an officer," for which he got "17 Days Time Served."
- One parent was separated due to a charge of "Obstruct Administration of Law Misdemeanor."

Watson Decl., Ex. A, ¶ 35.

Those cases where Defendants' provide information concerning the date of the offense show that many of the separations are based on stale allegations. Of the 179 cases where any reliable date information is provided at all, the most recent dated charge was on average 10 years old. Watson Decl., ¶ 16. In 15 cases, the most recent charge was more than 20 years old. *Id.* For example:

- One parent was separated based on a 27-year-old drug possession conviction from January 1992, *id.*, ¶ 17.

- Another child was separated from their parent for a single "false police report / hit and run" conviction from 26 years ago, *id.* ¶ 17;

- One parent was separated based on a 3-day jail sentence for misdemeanor assault from 20 years ago, *id.*, ¶ 17.

Defendants' list also exhibits ongoing uncertainty concerning their treatment of parents with federal *immigration* convictions. Even from the Initial Class, the Court did not want parents carved out because of immigration violations. Yet Defendants' list of separations reports hundreds of cases that include such convictions as part of the reasons for separation, including cases where the unlawful entry or reentry conviction was combined with other minor offenses, such as DUIs or traffic offenses. Watson Decl., Ex. A, ¶¶ 32-34. Approximately 48 parents have a 1325 or 1326 conviction as the *only* listed basis for separation. *Id.*, ¶ 33.[2]

## B. Even Tender-Age Children Including Babies Are Being Separated Based on Minor Criminal History.

Of the 911 separations reported on Defendants' most recent list, 185 are under five years of age. Watson Decl., Ex. A, ¶ 29. This comprises over 20 percent of the ongoing separations. Thirteen of these children were younger than a year old at the time they were separated from their parents. *Id.*, ¶ 30. The average age of all separated children is nine years old; over half of the 911 children were less than ten years old at time of separation. *Id.*, ¶ 28.

Of the tender-aged separations, dozens were separated based on minor criminal allegations, including DUI, immigration charges, fraud/forgery, drug

---

[2] Plaintiffs recognize that the preliminary injunction does not prohibit Defendants from prosecuting parents for federal criminal offenses, during which time they may be temporarily separated from their children. However, the Court has also made clear that where the *only* charge is an immigration conviction, the family must be promptly reunified. Defendants' spreadsheet shows that some parents with immigration convictions were evidently deported without their children, and that some families remain in DHS and ORR custody, yet are not reunified. Watson Decl., Ex. A, ¶¶ 32-34.

possession, and "harassment and trespass." Others were based on minor or unclear criminal history. For example:

- A two-year-old child was separated from his father based on "Public Intoxication Arrests and a DUI."

- A two-year-old child was separated from her father for DUI and felony reentry.

- A child who is currently eight months old was separated from his father for "fictitious or fraudulent statement or representation arrest."

- One four-year-old child was separated from his father due to "criminal history involving a felony."

Watson Decl., Ex. A, ¶ 36.

### C. Parents Separated Due to Allegations of Unfitness or Insufficient Proof of Parentage.

Twenty of the separations in Defendants' most recent list were based on allegations that the parent is unfit or child safety concerns; another 24 were separated due to "Health issue/hospitalization." Watson Decl., ¶¶ 10-11. Providers report grave errors in these determinations as well. For example, a father was separated from his three young daughters because the father has HIV. Despite requests, Defendants have not explained why they believe an HIV diagnosis rendered the father dangerous to his own children. Supplemental Declaration of Christina E. Turner, Ex. B, ¶ 7.

In another example, a mother broke her leg at the border and was briefly hospitalized for emergency surgery. Declaration of Anthony Enriquez, Ex. C, ¶ 20. While she was in surgery, her five-year-old child was separated from her and taken to an ORR facility in New York. *Id.* ORR refused to release the child to her mother even after the mother's discharge from the hospital into the community. *Id.* The child's lawyers prepared a motion for the child's release and notified Plaintiffs,

10

which in turn informed Defendants of the imminent filing, prompting release of the child after a 79-day separation. *Id.*

Defendants' determinations of abuse and neglect are also highly suspect. For example, E.R.R. and J., a father and his one-year-old infant daughter, were apprehended by CBP and put in a facility where some of the families with whom they were detained had sick children. J. began to cough and get a fever. E.R.R. immediately informed the guards and sought medical attention for his daughter; J. went to the hospital on two occasions for treatment for a high fever. J.'s health began improving, and E.R.R. personally gave her medicine and Gatorade. *See* Declaration of Nicolas Palazzo, Ex. D, ¶¶ 3-15.

One day, while J. was sleeping in E.R.R.'s arms, she wet her diaper. Because J. was still recovering from illness, E.R.R. wanted to let her sleep instead of waking her to change her diaper. A female guard took his daughter out of E.R.R.'s arms, criticized him for not changing the diaper, and called him a bad father. The guard then separated E.R.R. and his infant. The government's own documents show that E.R.R. has no other criminal history. *Id.*

In another case, CBP sent a two-year-old girl for medical care because of fever and diaper rash. Medical personnel raised concerns that the child was underdeveloped and malnourished; the girl was having some trouble standing or crawling on her own. CBP, apparently without investigation, blamed the father for neglect, separated the family, and deported the father. Declaration of Jennifer Nagda, Ex. E, ¶ 38.a.

But if CBP had conducted a meaningful inquiry, they would have learned that the family came from an extraordinarily impoverished community in Guatemala with very high malnutrition rates. Also, the girl was carried for most of her life, since in her community it is not uncommon for mothers to carry babies on their backs until age three or four, which explained why she was not walking. The child advocate conducted a home study of the family and found that despite their

11

poverty, they clearly loved their child. *Id.*; *see also id.*, ¶ 38.b (twelve-year old boy separated due to father's alleged mental health problems; child advocates later determined father's indigenous language may led to wrong mental health concern).

In other cases, Defendants separate based on abuse allegations that cannot be substantiated. One lawyer reports that she worked with two families separated based on allegations of serious abuse, but in both cases, the children denied any abuse had taken place, and clinical staff serving the children could not find any evidence of abuse. Declaration of Marion Donovan-Kaloust, Ex. F, ¶ 6. In one of those cases, an ICE officer claimed that he had documentation from the child's home country alleging sexual abuse of the child. Despite the lawyer's repeated requests, however, DHS has never produced those documents to ORR workers or the child's appointed advocate. *Id.*, ¶ 7. In the other case, when the attorney reviewed the immigration arrest report, the alleged abuse allegations appeared to be referring to an abuser who was *not* the parent. *Id.*, ¶¶ 8-9.

Other families have been separated due to Defendants' unjustified doubts about the familial relationship between the parent and child. For example:

- A three-year-old girl was separated from her father due to CBP's allegation that he was not a parent. Although the father's name does not appear on the child's birth certificate, he presented other documentation showing parentage, and requested a DNA test. DHS ignored his request and separated the family. After counsel intervened, the family took a DNA test, which confirmed paternity. Meanwhile, the daughter was sexually abused while in ORR care and appears to be severely regressing in development. Declaration of Michelle Lapointe, Ex. G, ¶¶ 3-17.

- A nine-year-old child was separated from her father because of an apparent clerical error. CBP wrote the name of a different immigrant on the father's intake form, despite using the father's correct A-number, then separated the family due to parentage doubts. Enriquez Decl., Ex. C, ¶ 23.

- A four-year-old boy was separated because the father's speech impediment prevented the father from answering CBP's questions. The child advocate reported the father presented a birth certificate, which includes the father's name, but the family was separated anyway. Enriquez Decl., Ex. C, ¶ 23.

- A two-year-old girl was separated from her father, despite his presenting a birth certificate. CBP alleged the document was fraudulent and did not provide the father, who speaks an indigenous language, with an interpreter. The father's lawyer contacted the consulate, which immediately confirmed the birth certificate's authenticity. The family was reunified only after a DNA test confirmed parentage. Declaration of Efren Olivares, Ex. H, ¶¶ 22-28.

**D. Parents Separated Due to Alleged Gang Affiliation.**

Defendants' spreadsheet shows that they have separated at least 44 parents based on allegations of gang affiliation, absent any other criminal history. But the spreadsheet consistently says nothing about the nature of the allegations or supporting evidence. Several additional parents were separated due to gang allegations combined with immigration convictions. Watson Decl., Ex. A, ¶ 14. Yet these gang designations are often based on flawed evidence that Defendants cannot or will not substantiate. For example:

- Ms. R was separated from her three-year-old son, M., due to alleged gang affiliation and her "criminal record." Ms. R's counsel obtained a document from the Salvadoran Ministry of Justice and Public Security stating that "[Ms. R.] has no criminal record . . . ." After counsel gave this document to DOJ, the family was reunified and released, with no explanation for Defendants' reversal, but only after a three-year-old child had been separated for more than three months. After they reunited, the son did not appear to recognize his mother. Declaration of Lisa Koop, Ex. I, ¶ 5.b.

- Ms. A. was separated from her two children based on her alleged gang affiliation. In March 2008, she was detained for three days by Salvadoran

13

authorities when she ate at a restaurant frequented by gang members, but released with no charges. She subsequently became a police officer and was targeted by gang members. Ms. A.'s counsel provided DOJ with a document from the Salvadoran government showing Ms. A had no criminal record, and she was released and reunified with her son, but only after two months of separation. Koop Decl., Ex, I, ¶ 5.c.

- Ms. E. was separated from her child, apparently because she was once held for a few days after she exited a store while a group of gang members were being arrested nearby. Ms. E. later passed her credible fear interview, and was released from detention and reunified with her son. Defendants never explained their change in position. Koop Decl., Ex. I, ¶ 5.a.

- A four-year-old child was separated from her father based CBP's allegation of his gang affiliation. But an immigration court bond hearing, the government did not produce any evidence supporting the allegation, and the immigration judge ordered the father's release. ORR cited CBP's allegations and refused to release the girl to her father, and only relented after the child's attorneys threatened litigation. Enriquez Decl., Ex. C, ¶ 19.

- One three-year-old girl was separated from her mother due to her alleged gang ties and criminal record. The child's advocate determined that this was incorrect—the mother fled El Salvador to escape abuse by a gang member. The mother's son was forced to watch his mother be raped and abused, and while she was in the hospital, a gang member held her son and threatened to kill him if she reported her abuse. Nagda Decl., Ex. E, ¶ 37.e.

- Mr. A was separated from his 9- and 11-year-old children due to allegations that he was an MS-13 member who had committed crimes in in Honduras, even though Mr. A had never been to Honduras. He asked for evidence supporting the accusation, but DHS provided no response. Mr. A's counsel later got a background check from El Salvador showing that another person

with a similar name and birthday had a criminal record. An immigration judge later released Mr. A on bond, and he reunified with his children after over six months of separation. Olivares Decl., Ex. H, ¶¶ 7-13.

### III.      The Parties' Recent Meet and Confers Concerning the Standard for Ongoing Separations.

In June 2019, Plaintiffs initiated a meet-and-confer process to clarify Defendants' position on the reunification rights of parents separated post-injunction, and to determine whether Defendants believed it was entitled to separate based on any criminal history, regardless of severity. Defendants asked for more information concerning Plaintiffs' concerns, and specifically that Plaintiffs frame their request for clarification by reference to "an actual identifiable person who has a concrete issue." They also stated that "the discussion of the criminal exclusion in the class certification order is based on the ICE FRC [family detention facilities] placement standards, Defendants' operational practices reflect this, and the Court has affirmed Defendants' approach."

On June 10, Plaintiffs gave Defendants a list of 18 examples drawn from Defendants' then-most recent report, requesting further information regarding the separations.  Some cases were requests for further information, since Defendants' spreadsheet indicated reasons for separation such as: "Father's criminal history," "Other," and "Minor will be separated due to criminal history involving a felony."

In ten cases, Plaintiffs requested that Defendants explain their reasons for the separation, specifically requesting whether the allegations make the parent unfit or a danger to the child within the meaning of the PI order, and if not, whether the reason for the family separation is that the parent could not be housed in a family residential center. These cases included separations for "Drive with expired license for more than 6 months, subject claims to have been convicted and sentenced to 30 days in jail, re entry;" "marijuana possession;" "Public intoxication arrests and a DUI;" "driving without valid license." In one additional case, the mother was

separated "due to mother's gang affiliation (MS-13)," and Plaintiffs asked how Defendants had determined the mother was a gang member.

On Monday, July 8, 2019, not having a heard a response on these 18 cases, Plaintiffs informed Defendants that they intended to file a motion with this Court. On July 18, the parties met and conferred concerning the criteria for ongoing separations. Defendants stated that they would not be providing additional information concerning the examples that Plaintiffs had provided, and took the position that those separations were proper under the Court's class certification decision. Defendants reiterated that their position was that *any* criminal history (save a Section 1325 illegal entry conviction) justified a parent's exclusion from the Class, but that Defendants sometimes exercised discretion to reunify notwithstanding a parent's criminal history. Defendants also cited their family detention standards as a reason for justifying separation.

## IV.      Information-Sharing Protocols.

This motion does not address the creation of an integrated database or information-sharing protocols, because the parties continue to meet and confer on that subject.[3] However, those information-sharing issues are related to the instant motion because neither Plaintiffs not service providers can contest the separations if they do not have sufficient information about them, or even the fact that a child has been separated. Nor can providers for the children properly represent the children in their immigration proceedings without knowing if the child has been separated and where to locate the parent.

Presently, Plaintiffs note only that numerous providers report significant

---

[3] The February 20, 2019 JSR contained an outline of Defendants' proposed information-sharing protocol for ongoing separations. Dkt. 360 at 14-17. After further meet and confers, and consultation with the Steering Committee and other stakeholders, Plaintiffs provided their counterproposal on May 28, 2019, to which Defendants responded on July 11, 2019. The parties then met on July 19, after which Plaintiffs submitted several questions in writing to Defendants. Defendants responded to those questions on July 26 and Plaintiffs are currently reviewing those responses.

problems obtaining timely and accurate information from Defendants concerning ongoing separations, including whether the child was separated, the location of the separated parent, and the reason for separation. *See*, *e.g.*, Supp. Turner Decl., Ex. B, ¶¶ 9-19; Enriquez Decl., Ex. C, ¶¶ 4-18; Donovan-Kaloust Decl., Ex. F, ¶¶ 4-5; Declaration of Camila Trefftz, Ex. J, ¶¶ 5-16; Supplemental Declaration of Michelle Brané, Ex. K, ¶¶ 3-12; Declaration of Derek Loh, Ex. L, ¶¶ 4-13.

## ARGUMENT

Throughout this case, the Court has emphasized that the Constitution forbids Defendants from separating children from their parents "absent a determination that the parent is unfit or presents a danger to the child." Dkt. 83 at 22-23. This standard is drawn from decades of constitutional law. *See*, *e.g.*, *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (explaining that Constitution forbids removal of child from parents absent "reasonable cause to believe that the child is in imminent danger of serious bodily injury"); *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 811 (8th Cir. 2010) (holding that removal of students from parents violates Constitution when "the students were not at immediate risk of child abuse or neglect"); *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997) (similar).[4]

Yet Defendants' own tracking charts, along with the testimony of lawyers and advocates throughout the country, show that Defendants are systematically separating children from fit parents in violation of this standard. A number of the separations are for traffic violations, misdemeanor property damage, disorderly conduct offenses, and fraud and forgery offenses. Some are for mere allegations or arrests, not convictions. Still more are for offenses that took place years ago.

---

[4] Other courts addressing the lawfulness of Defendants' separation practices have adopted this standard. *See*, *e.g.*, *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1125 (N.D. Ill. 2018) (government has no interest in separating child from detained immigrant parent "absent parental unfitness or danger to the child"); *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 501 (D.D.C. 2018) (concluding "easily" that mother's constitutional rights were violated by separation "absent a determination that [she] is either an unfit parent or presents a danger to her sons").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**I.    The Court Should Enjoin the Government from Separating Families Without Objective and Concrete Evidence that the Parent Is Unfit or a Danger to the Child.**

**A. Due Process and the Preliminary Injunction Prohibit the Government from Separating Families Absent a Determination that the Parent Is Unfit or Presents a Danger to the Child.**

The Court has already set the benchmarks that should guide Defendants' ongoing separation decisions. The Court properly described the applicable constitutional due process standards, and enjoined Defendants from separating families "absent a determination that the parent is unfit or presents a danger to the child." Dkt. 83 at 22-23; *id.* at 13 (observing "absent a finding the parent is unfit or presents a danger . . . it is unclear why separation of Ms. L or similarly situated parents would be necessary"); Dkt. 71 at 22-23 (noting that "arbitrarily tear[ing] at the sacred bond between parent and child" shocks conscience).

The Court has also explained that "[c]riminal history comes in all gradations." Dkt. 82 at 10. The Court emphasized that the proper inquiry is not whether the parent would "be a good sponsor," but rather "whether the parent is unfit or a danger." July 10 Transcript at 12:17-22.

Moreover, the Court has stressed that separation decisions must be based on objective criteria, rather than subjective judgments. Dkt. 83 at 11 ("Objective standards are necessary, not subjective ones, particularly in light of the history of this case."). And the Court has underscored that separation decisions should made consistent with previous methods for evaluating child safety and placing families in detention centers. *See* Dkt. 108 at 2 (describing ICE's "previous procedures" for "ensuring child safety and welfare"); *see also* Dkt. 233-1 (former ORR Director testifying concerning pre-2017 bases of separating families); Dkt. 83 at 23 n.11.

Although the Court's initial class certification order provisionally excluded individuals with criminal histories, this decision was made in light of the exigent

18

need to swiftly reunify the separated families in the Initial Class. Dkt. 83 at 6-7; 84 at 8 & n.7. "[G]iven the urgency of press of time," including the tight reunification deadlines set forth in the Court's preliminary injunction, the Court "elected to exclude from the Class parents with criminal history." July 6, 2018 Transcript, at 21:21-25; *see also id.* at 19:22-20:1 (explaining that Court "narrowly defin[ed] the class" for purpose of "provid[ing] injunctive relief . . . in an efficient, quick manner"). The Court's sequencing of the reunification process was reinforced by the relatively small number of parents who were excluded from the Initial Class, which at the time numbered only a few dozen. *See* Dkt. 236 at 3 (observing that Defendants' exercise of discretion was reasonable "given the relatively small number of children whose parents have been excluded").

Yet, a year after the preliminary injunction, Defendants are no longer exercising their judgment consistent with these admonitions. If Defendants' position is that parents with *any* criminal history (save immigration violations) are excluded from the class, then the Court should clarify that such parents must be placed back into the class if their criminal history does not render them unfit or a danger. Alternatively, Defendants can initially include all parents in the class regardless of criminal history and then remove them if they are objectively determined to be unfit or a danger. Whatever the mechanics, Defendants' separation decisions must focus on whether the parent is unfit or a danger. The Court has never sanctioned the separation of all parents with *any* alleged criminal history—no matter how minor, old, or unproven.

### B. Defendants Are Separating Children from Their Parents for Unjustified Reasons.

Defendants are systematically separating children from parents based on criteria that fail these standards. Defendants' own charts show the range of conduct that they use to justify separations, including many minor crimes or questionable allegations of parental unfitness. Furthermore, providers report that Defendants'

1    consistently separate based on allegations they cannot substantiate when pressed.

2        **1. Separations Based on Minor Crimes.**

3        Defendants' own report reveals that they have separated numerous parents

4    based on minor crimes. *See supra*. Dozens of parents have been separated due to

5    traffic violations, DUI offenses, drug possession, and fraud or forgery offenses. In

6    many cases it is unclear whether the parent was even convicted for the relevant

7    offense, or merely charged. *See supra*; Watson Decl., Ex. A, ¶¶ 15-20.

8        Numerous other parents have been separated based on potentially minor or

9    stale crimes. For instance, Defendants have separated 34 parents for "assault"

10   charges; Defendants' chart frequently omits whether the offense was merely

11   charged or resulted in a conviction, and frequently omits the seriousness or the age

12   of the assault allegations. Watson Decl., ¶ 24. One parent's assault took place 20

13   years ago, and was a misdemeanor offense for which the father served three days'

14   confinement. *Id.*, ¶ 24.d.

15       As Professor Martin Guggenheim explains, evidence of criminality—

16   particularly stale allegations—cannot, standing alone, justify interference in the

17   relationship between a child and parent. *See* Declaration of Prof. Martin

18   Guggenheim, Ex. M, ¶¶ 2-7. This standard is reflected in all the states' child

19   welfare statutes, which uniformly demand a showing of "circumstances . . . that

20   endanger the life and well-being of the child"—not just any criminal allegation at

21   all. Dkt. 17-3 at 4-6 (brief of amici curiae collecting statutes). Professor

22   Guggenheim has reviewed the list of reasons offered by the government for the

23   ongoing separations and explains that, with perhaps the exception of two or three

24   percent of the cases, the criminal histories listed in Defendants' spreadsheets would

25   not supply a basis for separation in any state child welfare system. Guggenheim

26   Decl. Ex. M, ¶¶ 11-12. Even in those cases involving more serious criminal

27   allegations, state child welfare authorities would conduct further investigation,

28   rather than peremptorily remove the child based on criminal history alone. *Id.*, ¶ 14.

Child advocates appointed to promote separated children's best interests concur. The Young Center, which is currently the sole organization appointed to provide child advocates for children in ORR custody, has worked with over 120 children separated after June 26, 2018. Nagda Decl., Ex. E, ¶ 32; *id.*, ¶¶ 4-17 (describing background on Young Center and child advocate system).[5] Approximately 46 percent (55 children) were five years or younger at time of separation. *Id.* Under their appointments, the child advocates determine the child's best interests and work with the agencies to advance those interests. The Young Center recommended against reunification in only four of their 121 cases. *Id.*, ¶ 41. Confirming Professor Guggenheim's analysis, the Young Center's experience shows that Defendants' separations are rife with error.

Consistent with Professor Guggenheim's expertise and the Young Center's determinations, courts have repeatedly stated that the inquiry focuses not on the seriousness of the parent's prior record, but on whether that record suggests an *imminent* risk to the child. For instance, in *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), police officers received an anonymous tip that a six-year-old's father had prior drug and gun possession convictions, as well as a history of drug abuse. The police officers removed the child from school to interview him, and then returned the child. The Tenth Circuit explained that, even taking these allegations as true, the officers had no basis to take the child into custody:

> The caller did not say that J.H. was suffering abuse at the hands of his father, or that abuse was likely to happen soon. Instead, the caller only expressed concern because J.H.'s father was a drug abuser who had been arrested for possessing drugs and a firearm. This was not enough for a reasonable officer to suspect J.H. was in imminent danger.

*Id.* at 1146. Even in cases where the prior conviction is related to child abuse, the child cannot be taken from the parent's care absent evidence of *imminent* risk. *See Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997) (holding that emergency

---

[5] *See* 8 U.S.C. 1232(c)(6) (authorizing appointment of child advocates for children in ORR care).

removal based on two-year-old dismissed indictment of child sexual abuse was unconstitutional); *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991) (holding that grandfather's prior conviction for giving grandson "documents of a sexual nature" did not justify removal of child without objective evidence of current child abuse).

And despite the Court's clear instruction that Defendants cannot deny reunification due to federal immigration convictions,[6] Defendants' report suggests that, at a minimum, some parents are not being reunified promptly after their release from federal criminal custody. Watson Decl., Ex. A, ¶¶ 43-45. Either that, or Defendants are using the immigration conviction, coupled with some other allegation, as reason for exclusion from the Class. For example, Defendants' listed reasons for separation include a 1326 conviction combined with a misdemeanor DUI offense for which the parent received probation. *Id.*, ¶ 45.b.

## 2. Separations Based on Dubious Unfitness Allegations or Doubts Concerning Parentage.

Defendants' chart shows that they have also separated families based on allegations that the parent was unfit, without evidence of other criminal history. *See supra*. The evidence indicates that DHS officers consistently make highly questionable fitness determinations.

In one case, a father was caring for his fever-ridden, one-year-old infant in a DHS facility containing other sick children. *See* Palazzo Decl., Ex. D, ¶¶ 3-6. The

---

[6] The Court has specifically noted that convictions for unlawful entry or reentry under 8 U.S.C. 1325 and 1326 cannot alone justify separation. *See* Dkt. 83 at 23 n.11; July 16, 2018 Transcript at 53:13-18 ("Based on what I have been hearing, especially from Commander White today, that I would be making the assumption that 1325, 1326 collectively would not exclude [parents from reunification]."); *see also Jacinto-Castanon*, 319 F. Supp. 3d at 501 (parent's 1325 conviction does not serve as basis for denying reunification); *W.S.R.*, 318 F. Supp. 3d at 1125 (same). Defendants recently clarified in a July 26, 2019 email that they would reunify families if a parent's only criminal history was a conviction for unlawful reentry. However, Defendants' spreadsheets consistently list immigration convictions as an apparent reason for separation, frequently combined with other offenses. Watson Decl., Ex. A, ¶¶ 32-34. In addition, the Chief of U.S. Border Patrol testified before Congress that Section 1326 convictions, because they are felony convictions, justify separating children from their parents. Testimony of Carla Provost, Feb. 26, 2019, House Judiciary Committee hearing on Migrant Family Separation Policy, https://cs.pn/2LPyFkG at 3:33:38.

father did what he could to care for his child while detained, asking DHS to take the infant to the hospital when she was ill and giving her medicine and Gatorade. *Id.* ¶¶ 3-10. But a CBP officer took the baby from the father on the ground that the father was neglectful in allowing the baby to get extra rest and waiting to change the diaper when she was awake, which is a choice that numerous parents of infants would likely make under the circumstances. *See id.*, ¶¶ 10-15.

In another instance, CBP wrongly blamed a parent for his daughter's malnutrition and supposed underdevelopment, when the daughter's health issues were due to her community's deep poverty, not parental neglect. Nagda Decl., Ex. E, ¶ 35.b. In yet another case, a father was separated from his three young daughters due to his HIV diagnosis, with no allegations of criminality or unfitness. To date, and despite the requests of Plaintiffs and legal services providers, Defendants have not explained why an HIV diagnosis compels separation.[7] Supp. Turner Decl., Ex. C, ¶ 7.

Even where Defendants allege serious sexual abuse, they fail to present evidence of the assertion when asked, and what evidence they present is equivocal or even exculpatory. Donovan-Kaloust Decl., Ex. F, ¶¶ 6-9 (discussing case where parent's arrest record suggested *another* adult had abused child).

Such separations do not satisfy settled constitutional standards, since they do not demonstrate risk to the child. *See Rogers v. San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007) (holding that "neither bottle rot nor malnutrition is the type of condition" that justified immediate removal of child, particularly where child "is

---

[7] To the extent Defendants claim the "communicable disease" exception applies here, that would be undermined by the agencies' prior acknowledgement that HIV is not "communicable" through regular contact between family members. *See* 74 Fed. Reg. 56547 (Nov. 2, 2009) (HHS regulation removing HIV from list of communicable diseases of public health significance); USCIS, *HIV Removed from CDC List of Communicable Diseases of Public Health Significance*, https://www.uscis.gov/archive/archive-news/human-immunodeficiency-virus-hiv-infection-removed-cdc-list-communicable-diseases-public-health-significance (archived USCIS webpage FAQ acknowledging that HIV will no longer make individual inadmissible to United States) (last updated July 15, 2015).

both alert and active"); *Brokaw v. Mercer*, 235 F.3d 1000, 1011 (7th Cir. 2000) (stating that "in rare circumstances allegations of neglect may be so credible and severe that they justify a pre-investigation and pre-hearing removal," but "unspecified allegations" were insufficient). And there is a need for particular care when law enforcement officers make child welfare determinations because of their relative lack of expertise. *See Franz v. Lytle*, 997 F.2d 784, 792 & n.17 (10th Cir. 1993) (denying qualified immunity to officer who entered home and searched young girl due to allegations of abuse, in part because officer "had stepped out-of-bounds and overreached from his area of expertise into one he knew little about").

Mere allegations, without corroborating evidence, are typically insufficient to demonstrate imminent risk to the child. *See, e.g.*, *Croft*, 103 F.3d at 1126 (state required "reasonable and articulable evidence" of abuse or imminent danger, and that removal based on "anonymous tip" with no direct evidence was unlawful); *Ram*, 118 F.3d at 1311 (holding that temporary removal could not be justified by allegations "that twice had been investigated and found unconfirmed"). ORR's former director similarly has testified that in the rare cases where families were separated prior to 2017, "there was credible evidence that the parent was a serious danger to their own child." Dkt. 233-1, ¶ 8 (giving example of parent allegedly involved in sex-trafficking own child).

Defendants' parentage determinations are also prone to error. As providers have documented, multiple children—some as young as four—have been separated based on Defendants' suspect challenges to the family's relationship. *See, e.g.*, Enriquez Decl., Ex. C, ¶ 23. In some cases, Defendants have separated families where DNA testing later confirmed parentage. *See* Lapointe Decl., Ex. G, ¶¶ 3-17; Olivares Decl., Ex. H, ¶¶ 22-28; Dkt. 71 at 3-4 (describing Ms. L's positive DNA match with her daughter).

### 3. Separations Based on Questionable Allegations of Gang Affiliation.

Defendants are separating increasing numbers of parents based on alleged

gang affiliation, relying on highly equivocal or problematic evidence. Defendants' chart shows that approximately 71 parents have been separated since June 26, 2018, due to gang allegations; 37 were separated due to gang allegations alone, without any other evidence of criminality or unfitness. Watson Decl., Ex. A, ¶ 14.

Legal services providers report that Defendants frequently allege gang membership based on erroneous criteria. In some cases, mothers the government labels as gang members are in fact *victims* of gang violence. One mother was a former police officer who experienced gender-based violence at the hands of gang members; another was forced to be the girlfriend of a gang member. Koop Decl., Ex. I, ¶¶ 5.b-c. Yet another mother was brutally raped by a gang member, who forced her son to watch the assault. Nagda Decl., Ex. E, ¶ 34.e. One mother was in the wrong place at the wrong time—she was arrested while leaving a store near where gang members were arrested. Koop Decl., Ex. I, ¶¶ 5.c.

Accusations of gang membership are particularly problematic because such affiliation is easy to allege, but hard to disprove. As the Ninth Circuit has explained, "[d]etermining whether an individual is an active gang member presents a considerable risk of error. The informal structure of gangs, the often fleeting nature of gang membership, and the lack of objective criteria in making the assessment all heighten the need for careful factfinding." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1046 (9th Cir. 2013); *see also Youth Justice Coal. v. City of Los Angeles*, 264 F. Supp. 3d 1057, 1069 (C.D. Cal. 2017) (discussing experts testifying that gang criteria such as "close association, joint criminal activity, and even self-admissions" are "unreliable and depend upon subjective assessment of facts and witness credibility"). Although the criteria Defendants use to make gang determinations are not clear, DHS has a demonstrated history of relying on highly questionable metrics. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1199 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (explaining that "DHS sometimes makes an inference of gang membership

from conduct, clothing, or associations that are far from unequivocal evidence").[8]

The experiences of legal services providers confirm that Defendants consistently cannot back their allegations with actual evidence. For instance, one lawyer handling several gang separation cases worked with lawyers in the mothers' home countries to obtain official documents showing they had no criminal record and other evidence that disproves gang involvement. After the lawyer gave this evidence, DHS decided to release several of the parents from custody, suggesting that the gang allegations had little, if any, merit. Koop Decl., Ex. I, ¶¶ 5.a-c; *see also* Olivares Decl., Ex. H, ¶¶ 7-13 (DHS accused father of gang activity in Honduras, even though father was Salvadoran and had never been to Honduras). In another case, ORR refused to release a girl to her father based on gang affiliation, yet caved in response to a litigation threat. Enriquez, Decl., ¶ 19.

In addition, Defendants consistently rely on reports that the parent was involved in gang activities back in their home countries. Yet one expert testifies that law enforcement officers in El Salvador, for instance, employ questionable gang identification methods, such as assuming that anyone in proximity to a gang member is also involved in illicit activities. Declaration of Jeanne Rikkers, Ex. N, ¶¶ 4-5. A common Salvadoran law enforcement tactic is to arrest mass numbers of people in a raid for dressing like gang members, or being in a neighborhood associated with gang activity. Some arrestees are processed for "resisting arrest" or "illicit association," although such charges are often dropped. *Id.*, ¶ 7.

### 4. Separations of Very Young Children.

A concerning feature of the ongoing separations is that a high proportion of them involve very young children, even babies and toddlers. Approximately 20% of the ongoing separations involve children under five years old. Watson Decl., Ex. A, ¶¶ 25-31. (In stark contrast, only about 4% of the separations in the Initial Class

---

[8] DHS labeled one minor in the *Saravia* litigation a gang member based on criteria such as writing "503"—the country code for El Salvador—on a school notebook. *See Saravia*, 280 F. Supp. 3d at 1199.

involved children under five.) This data is consistent with the experiences of legal services providers, who are seeing significant numbers of separations involving young children. *See* Supp. Turner Decl., Ex. B, ¶ 5 (18 of 50 separated children KIND is serving are under 5); Nagda, Ex. E, ¶ 32 (almost half of 121 children child advocates work with are five or younger).

The impact of separation can be particularly devastating for young children. As a leading medical expert on child development explains:

> [B]eyond the distress we see on the outside, separating a child—particularly a young child—from her parents triggers a massive biological stress response inside the child. This response remains activated until the parent returns and provides comfort. Continuing separation removes the most important resource a child can possibly have to prevent long-term damage—a responsive adult who is totally devoted to the child's well-being.
>
> From a scientific and medical perspective, both the initial separation and the lack of rapid reunification are indefensible. Forcibly separating children from their parents is like setting a house on fire. Prolonging that separation is like preventing the first responders from doing their job and letting the fire continue to burn.

Declaration of Dr. Jack Shonkoff, Ex. O, ¶¶ 7-8.[9]

"For small children especially, being taken from a home and family by a stranger is a profoundly frightening and destabilizing experience, even if that home and family are flawed." *Demaree v. Pederson*, 887 F.3d 870, 889 (9th Cir. 2018) (Berzon, J., concurring). Legal services providers report that even where they succeed in reunifying the family, the young child often appears changed by the experience. *See, e.g.*, Koop Decl., Ex. I, ¶ 5.a (after reunification, four-year-old boy was withdrawn and apparently did not recognize own mother); Lapointe Decl., Ex. G, ¶ 10 (four-year-old girl is regressing developmentally due to separation).

### C. The Government's Overbroad Use of Family Detention Standards as a Justification for Separations Should Be Rejected.

Defendants have tried to justify many of these separations as necessary to

---

[9] Plaintiffs previously submitted declarations from other medical professionals with their preliminary injunction motion. Plaintiffs submit Dr. Shonkoff's declaration because he is one of the foremost experts in the world on the effects to children of separation from a parent.

ensure the safety of its family detention centers. But family detention standards provide no reason to excuse compliance from clear Due Process requirements.

As an initial matter, for those many families whom Defendants release on bond or parole, concerns about family detention do not apply. And for those families whom the government refuses to release, Defendants cannot plausibly argue that all of the hundreds of families they have separated are too dangerous to house in the family facility and that it is necessary to inflict severe trauma on the children by taking them away from their parents, even when they are babies and toddlers. Dr. Dora Schriro, an expert on correctional facilities who used to work at DHS on immigration detention and has overseen multiple correctional systems, has reviewed Defendants' list of separations and concluded that she does "not believe [their] placement decisions comport with evidence-based determinations of risk." Declaration of Dr. Dora Schriro, Ex. P, ¶¶ 2-6, 9-11. Parents without violent criminal histories—those who have been convicted of traffic violations, illegal reentry, theft, and other crimes; or whose convictions are decades old; or who have no convictions at all—are generally not a danger to other children, just as they are no danger to their own. *See* Guggenheim Decl., Ex. M, ¶ 14 (explaining "many of the parent's criminal histories listed on Defendants' spreadsheet would also not bear on their dangerousness to the children of *other families* if . . . housed together"); Shonkoff Decl., Ex. O, ¶ 25 ("[T]he child's need for the care and responsiveness of the parent does not diminish merely because the parent may have a prior criminal history'). That is all the more true given that parents in family detention are known to exhibit especially good behavior in order to stay with their own children. *See* Austin Decl., Ex., Q, ¶¶ 9-10.

Indeed, as Dr. James Austin—an expert who has developed detention classification systems for dozens of correctional systems—testifies, "it is crucial to look carefully at the age and severity of any past offenses," as well as other demographic factors, when evaluating risk. Declaration of James Austin, Ph.D., Ex.

Q, ¶ 8; Schriro Decl., Ex. P, ¶¶ 7-8 (same). Such careful evaluations would never lead to a parent's exclusion from family detention based on many of the criminal histories Defendants cite—especially for parents with minor, old, unproven, or non-violent criminal histories. *See* Schriro Decl., Ex. P, ¶¶ 7-11; Austin Decl., Ex. Q, ¶¶ 11-18. As Dr. Schriro explains, a more rigorous risk evaluation process "would not generate so many rejections." Schriro Decl., Ex. P, ¶ 11.

Defendants have never provided their current family detention standards to Plaintiffs or the Court. If needed, Plaintiffs' experts state in their declarations that they could participate in a process to set standards that ensure the safety of DHS facilities while not arbitrarily taking children away from fit parents in violation of due process. Finally, and critically, even assuming that a limited number of parents may not be eligible for family detention, that is of course no reason to take children away from the far greater number of parents.

## CONCLUSION

The Court should clarify the standard for ongoing separations to ensure that children may not be separated from their parents absent an objective reason to believe the parent is unfit or a danger.

Dated: July 30, 2019

Respectfully Submitted,

*/s/Lee Gelernt*
Bardis Vakili (SBN 247783)          Lee Gelernt*
ACLU FOUNDATION OF SAN              Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES           Anand Balakrishnan*
P.O. Box 87131                      Daniel A. Galindo (SBN 292854)
San Diego, CA 92138-7131            AMERICAN CIVIL LIBERTIES
T: (619) 398-4485                   UNION FOUNDATION
F: (619) 232-0036                   IMMIGRANTS' RIGHTS PROJECT
*bvakili@aclusandiego.org*          125 Broad St., 18th Floor
                                    New York, NY 10004
Stephen B. Kang (SBN 2922080)       T: (212) 549-2660
Spencer E. Amdur (SBN 320069)       F: (212) 549-2654
AMERICAN CIVIL LIBERTIES            *lgelernt@aclu.org*
UNION FOUNDATION                    *jrabinovitz@aclu.org*
IMMIGRANTS' RIGHTS PROJECT          *abalakrishnan@aclu.org*
39 Drumm Street                     *dgalindo@aclu.org*
San Francisco, CA 94111
T: (415) 343-1198                   *Admitted Pro Hac Vice*

F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: July 30, 2019

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| A | Declaration of Brooke Watson, Senior Data Scientist, ACLU | 34-47 |
| B | Supplemental Declaration of Christina E. Turner, Kids in Need of Defense | 48-56 |
| C | Declaration of Anthony Enriquez, Catholic Charities of the Archdiocese of New York | 57-70 |
| D | Declaration of Nicolas Palazzo, Las Americas Immigrant Advocacy Center | 71-75 |
| E | Declaration of Jennifer Nagda, Young Center for Immigrant Children's Rights | 76-95 |
| F | Declaration of Marion Donovan-Kaloust, Immigrant Defenders Law Center | 96-100 |
| G | Declaration of Michelle Lapointe, Southern Poverty Law Center | 101-105 |
| H | Declaration of Efren Olivares, Texas Civil Rights Project | 106-113 |
| I | Declaration of Lisa Koop, National Immigrant Justice Center | 114-122 |
| J | Declaration of Camila Trefftz, Michigan Immigrant Rights Center | 123-130 |
| K | Supplemental Declaration of Michelle Brané, Women's Refugee Commission | 131-135 |
| L | Declaration of Derek Loh, Immigrant Defenders Law Center | 136-139 |

| M | Supplemental Declaration of Prof. Martin Guggenheim | 140-145 |
| N | Declaration of Jeanne Rikkers | 146-150 |
| O | Declaration of Dr. Jack P. Shonkoff | 151-159 |
| P | Declaration of Dr. Dora Schriro | 160-165 |
| Q | Declaration of James Austin, Ph.D. | 166-169 |
| R | Excerpts of Transcripts of Status Conferences of July 6, 2018; July 9, 2018; July 10, 2018; July 13, 2018 at 1 PM; July 16, 2018; August 3, 2018 | 170-215 |

# EXHIBIT A

1  Lee Gelernt*
   Judy Rabinovitz*
2  Anand Balakrishnan*
   Daniel A. Galindo (SBN 292854)
3  AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
4  125 Broad St., 18th Floor
   New York, NY 10004
5  T:  (212) 549-2660
   F:  (212) 549-2654
6  lgelernt@aclu.org
   jrabinovitz@aclu.org
7  abalakrishnan@aclu.org
   dgalindo@aclu.org
8

9

   *Attorneys for Petitioners-Plaintiffs*
10 *Admitted Pro Hac Vice*

11

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

12

13

14 Ms. L., et al.,

15          *Petitioners-Plaintiffs*,

16      v.

17 U.S. Immigration and Customs Enforcement
   ("ICE"), et al.,

18          *Respondents-Defendants*.

19

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF BROOKE
WATSON**

20

21

22

23

24

25

26

27

28

Exhibit A, Page 35

I, Brooke Watson, upon my personal knowledge, hereby submit this declaration and, if called to testify to these facts, could and would do so competently.

1.     I am a Senior Data Scientist at the American Civil Liberties Union national office, where I conduct quantitative analyses, perform statistical hypothesis tests, and use standard data science and machine learning techniques to study the impacts of government policies on populations. Prior to my current role, I worked as Research Scientist at the nonprofit organization EcoHealth Alliance, where I used mathematical models and statistical techniques to research infectious disease emergence. I hold a Master's degree in Epidemiology from the London School of Hygiene and Tropical Medicine and a Bachelor's degree in Microbiology from the University of Tennessee.

**Defendants' List of Family Separations Since the June 28, 2018 Preliminary Injunction Order**

2.     To analyze the numbers of ongoing family separations set forth in in this declaration, I used the Excel table provided by Defendants reporting data on ongoing family separations from June 26, 2018, through June 29, 2019. My understanding is that Defendants provided this latest spreadsheet to Plaintiffs on July 19, 2019.

3.     The government's disclosures are given to Ms. L counsel in an Excel spreadsheet. Each row in that spreadsheet lists a child that the government separated, and columns list basic details about the child, such as when they were apprehended, their date of birth, whether they are still in ORR care or, if released, to whom they were released. Each child's separated parent is also identified, along with information such as the parent's relationship to the child, whether the parent is still in government custody, and —if the parent has been released from custody—the date of release.

4.     On the spreadsheet, Defendants assign one or more pre-defined "general reasons for separation" to each individual: "Parent criminal history"; "Parent criminal history and immigration history"; "Parent cartel/gang affiliation"; "Referred for

prosecution"; "Communicable disease"; "Health issue/hospitalization"; "Parent fitness (other than for hospitalization)/child danger concerns"; "Unverified Familial Relationship/ Fraud"; and "Other."

5.     In a second column, titled "additional information," details—if any—about the reasons for separation are listed. For example, the most detailed disclosures about criminal history specifically identify all offenses associated with an individual, when and where any charges were brought, and the disposition of the charges (e.g., a conviction, a conviction to a lesser charge, dismissal). The least detailed examples simply repeat the general category (e.g. "parent has a criminal history" with nothing further), or leave the additional information column blank.

6.     I used the "general reason for separation" and "additional information" columns to determine how many children were separated for various kinds of charges. Additionally, I used the columns for apprehension date, date of release (if available), and child's date of birth to calculate the age of the children, the average length of detention, and the number of new separations each month.

7.     A more detailed explanation of the statistical analysis programs and methods I used to analyze Defendants' spreadsheets, and to account for various typographical errors and anomalies in the spreadsheet, is described in Appendix 1 to this declaration, which I incorporate herein.

**Reasons for Separation**

8.     From Defendants' recently-provided spreadsheet, I identified 911 unique children separated from 844 unique parents between June 28, 2018 and June 29, 2019.

9.     678 children (74.4%) were separated from their parents for a "general reason for separation" that included the parents' alleged criminal history. The majority of these were separated for either criminal history (300) or both criminal history and immigration history (306). The remainder include a combination of criminal history and other categories listed above.

10.     20 children were separated based on "Parent fitness (other than for hospitalization)/child danger concerns" or "Child safety." Additional details provided for these separations included such descriptions as "Father displayed unusual and erratic behavior" and "Father may be danger to minor child and demonstrated lack of fitness."

11.     24 children were separated due to "Health issue/hospitalization."

12.     46 children were separated due to "unverified familial relationship/ fraud." The additional information column was blank for 3 of these children.

13.     26 children were separated for a general reason of "Other." For 9 of these children, "other" was the only additional information given in the additional information column.

14.     71 children (7.2%) were separated for a general reason that included alleged gang affiliation. 22 of these 71 had criminal history also listed as a reason for separation. The remaining 49 children were separated for parents' gang affiliation alone (37), "gang affiliation and immigration history" (7), or for "gang affiliation" and some kind of criminal "prosecution" (5).

**Separations Based on Criminal History and Gang Allegations**

15.     As noted above, 678 children (74.4%) were separated from their parents for reported reasons that included the parents' alleged criminal history. The majority of these were separated for either criminal history (300) or both criminal history and immigration history (306).

16.     179 of the 678 separations based on alleged criminal history included some information in the "Additional Information" column about the dates of the allegations, arrests, or dispositions. Among these 179, the most recent dated charge was, on average, 10 years old. In 15 cases, the most recent dated charge is more than 20 years old.

Exhibit A, Page 38

17.     For example, one parent's only listed crime is 27 years old—a drug possession conviction from January of 1992. Another child was separated from their parent for a single "false police report / hit and run" conviction that occurred 26 years ago, in 1993. A third parent was separated based on a three-day jail sentence for a misdemeanor assault conviction twenty years ago.

18.     Of the 678 separations whose general reason for separation includes an alleged criminal history, only half (340) include any indication of a conviction in the "Additional Information" column. The remainder either affirmatively indicate that a charge was dismissed or, more commonly, fail to provide information on any conviction, guilty plea, or sentence resulting from the allegations.

19.     76.5% of the separations whose general reason for separation includes alleged criminal history (519 of 678 separations) do not explicitly state whether any of the charges, convictions, or allegations are felony or misdemeanor charges.

20.     For 40 children, the government's disclosures say they separated the children because of their parents' criminal history, but the government's spreadsheet says nothing further—these entries commonly say "due to parent's criminal history" without any other information about any conviction, arrest, warrant, or allegation, or the nature of the history.

21.     I identified 38 children were separated from their parents due in whole or in part based on a drug possession conviction or arrest. I identified these children after excluding charges for drug trafficking, manufacture, or sale; assault; resisting arrest; driving under the influence; and more serious offenses such as homicide, aggravated assault; and child abuse charges.[1] Of those 38 children:

             a.     15 were separated based on drug possession offenses alone;

[1] A list of the offenses excluded from all of these categories can be found in Appendix 1.

Exhibit A, Page 39

b.    6 were separated based on marijuana-related possession offenses alone

22.    I identified 47 children who were separated due to their parents' traffic or driving-related violations. I identified these children after excluding charges for drug trafficking, manufacture, or sale; driving violations or offenses that included death or injury; assault; resisting officer; gang allegations; the exclusions listed in Appendix 1; and all individuals listed in paragraph 21. Of these 47 children:

a.    3 were separated based on DUI offenses or convictions alone;

b.    14 were separated based on immigration-related convictions combined with DUI and/or unspecified traffic offenses. For example, one parent's additional information column only says "illegal entry. dui and traffic offense convictions."

23.    I identified 19 children who were separated due to their parents' fraud or forgery violations. I identified these children after excluding all charges for drug trafficking, manufacture, or sale; assault; resisting arrest; traffic violations that resulted in injury; the exclusions listed in Appendix 1; and all individuals listed in paragraphs 21 and 22 above. Of these 19 children:

a.    8 were separated based on fraud or forgery offenses or convictions alone. For example, one parent was separated for an arrest for "fictitious or fraudulent statement or representation."

b.    8 were separated based on fraud or forgery offenses or convictions combined with immigration re-entry offenses or convictions.

24.    I identified 44 children who were separated due to their parents' alleged assault offenses, I identified these children after excluding charges for DUI; drug

trafficking, manufacture, or sale; smuggling of persons; assault or battery of a police or a federal officer; and the offenses listed in Appendix 1. Of these children:

> a. 77% (34) were separated because of "assault" without any specification as to the severity of the assault. One individual's additional information simply says "assault" with no other information.

> b. 11 cases do not indicate whether the assault offense was a merely a charge or resulted in a conviction. For example, one individual's additional information column simply says, "subject has a police arrest in El Salvador for assault on august 2003."

> c. 31 cases do not include any information about the date of the charge.

> d. Of the 13 cases in which the date of the most recent assault charge can be determined, 5 took place over 10 years ago. The oldest assault-related separation was for an misdemeanor assault charge that took place 20 years ago. "father's criminal history: assault causes bodily inj- misdemeanor disposition 7/12/99 convicted; 3 days confinement"

**Age and Current Status of Separated Children**

25.   Of the 911 separated children described in this spreadsheet, 567 have been released from ORR custody. Only 17% (97) of those 567 children are listed as having been reunified with their separated parent. The range of people to whom children have been released includes 40 children who have been released to an "Other Distant Relative" or an "Unrelated Sponsor".

26.   The median length of separation among those reunited with a parent is 85 days. Two one-year-old babies were separated for more than five months before being reunified with their separated parent.

27.     The average length of detention among all newly separated children was more than two months (68 days) as of June 29, 2019. Four children who are still detained have been separated for more than 300 days.

28.     The mean and median age of all 911 children was 9 years old. More than half of the children being separated—481 children—were under the age of 10 when separated.

29.     There has been an increase in how many children under 5 are being separated, when compared to the original June 26 Ms. Class. 185 children in the group of 911 separations were under the age of 5 when separated (20.3% of all the ongoing separations).

30.     13 of the 911 separated children were younger than one year old when separated from their parents.

31.     72 of the children under 5 years of age were still detained as of the latest data update on June 29, 2019. They have spent, on average, more than 59 days away from their parents.

**Separations That May be Based In Part on Criminal Immigration Convictions**

32.     In 382 cases, the government's spreadsheet lists an immigration-related conviction as a partial basis for separation in the "Additional Information" column.

33.     48 children were separated from parents whose sole reason for separation in the "Additional Information" column is illegal entry (1325) or felony re-entry (1326). The government's spreadsheet reports that some of those parents remain in US Marshal's Custody. However, of these 48 cases:

a.     In 8 cases the parent is in ICE custody and the child is still detained, but the parent is not reunified with their child. In 4 cases the parent is in ICE custody and the child has been released to a sponsor.

Exhibit A, Page 42

b.    In 9 cases the parent is departed from the country but the child is still in the United States.

34.    A number of cases show instances where the "Additional Information" column lists a 1325 or 1326 conviction combined with a low-level or non-violent charge. For example:

a.    One parent was separated based on "moving traffic violation," combined with 1325 and "two prior removal orders." The parent is listed as departed, and the child is listed as still in ORR custody.

b.    Two parents were separated on a single DUI conviction each, plus 1326. Both children are still in ORR. One parent is listed as departed, while the other is in ICE custody.

c.    One parent was separated based on a 15-year-old conviction for cocaine distribution, for which he served 12 months of jail time and paid a $555 fine, plus 1326. The parent is in ICE custody, while the child is with a sponsor.

d.    One parent was separated based on making "false/misleading statements to a public servant," for which he served two days of jail and paid a $5000 fine, of which $4500 was suspended, plus 1326. The parent is listed as deported, while the child is with a sponsor in the United States.

**Unique Examples of Separations**

35.    Plaintiffs' brief describes a number of unique examples of separations, which I recount here based on my review of the spreadsheet Defendants provided:

a. One parent was separated due to "Malicious destruction of property value $5," for which the father received a six-day jail sentence with six months of probation.

b. One parent was separated due to "theft by shoplifting" and "driving without a license."

c. One parent was separated due to a 2009 conviction for "resisting or obstructing an officer," for which he got "17 Days Time Served," and was referred for prosecution for "re-entry."

d. One parent was separated due to a charge of "Obstruct Administration of Law Misdemeanor."

36. Plaintiffs' brief also describes a number of unique examples of separations of children under five years old, which I recount here based on my review of the spreadsheet:

a. A one-year-old child was separated from his father based on "Public Intoxication Arrests and a DUI."

b. A two-year-old child was separated from her father for DUI and felony reentry.

c. A child who is currently eight months old was separated from his father for "fictitious or fraudulent statement or representation arrest;" I also refer to that case above.

d. One four-year-old child was separated from his father due to "criminal history involving a felony."

I declare under penalty of perjury and under the laws of the United States and New York that the foregoing is true and correct to the best of my knowledge. Executed in New York, New York on July 30, 2019.

1

BROOKE WATSON

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Appendix 1: Methods for Analyzing the List of Ongoing Family Separations Defendants Provided Plaintiffs on July 12, 2019**

I used the statistical programming software, called R, to combine the two tabs of the provided Excel spreadsheet, check the spreadsheet for duplicates, and tabulate distributions and frequencies of the variables provided by the government. I calculated age at separation by subtracting the child's date of birth from the apprehension date, provided by the Defendants.

I calculated length of detention by subtracting the apprehension date from discharge date provided by the Defendants. For children who have not yet left custody, I used the date of the most recent data update (June 29, 2019) to calculate the length of detention at the time of data sharing.

To calculate the age of the most recent charges or allegations, I used Regular Expressions (RegEx) to extract all text from the "additional information" column that was formatted as a date (for example, "July 25 2019," "7/25/19," and "2019-07-25" would all be extracted into the same machine readable date.) I excluded dates that could not be definitively interpreted due to data entry errors, or that seemingly occurred in the future (e.g. "7/25/209," "7/25/29").

To tabulate further numbers on the criminal history and gang allegations separations, I used standard programming practices to extract relevant strings from the text of the "additional information" section. I searched for relevant terms to detect whether the additional information included details about the class of any charges (misdemeanor or felony), or any evidence of a conviction, sentence, or guilty plea.

To calculate the number of individuals with different categories of criminal offense, I used an iterative process to detect keywords associated with different offense types.  To find the total number of individuals whose most serious allegation, charge, or conviction was a non-violent crime, I removed all individuals with

keywords associated with one of the following offense types: homicide offenses, offenses of a sexual nature, domestic violence-related offenses, robbery offenses, kidnapping offenses, burglary offenses, or weapons-related offenses.

I then conducted a manual review of the resulting subset of cases to remove any individuals who had crimes that were not filtered out through the above keyword search. Finally, I iteratively filtered for individuals who had one of the following offense types: drug possession, DUI and traffic offenses, fraud or forgery, assault, and illegal entry or felony re-entry.

This process is necessarily somewhat imprecise because of the information provided in the "Additional Information" column. The information is not provided in a consistently formatted way, and contains typos or misspellings that may result in certain fields not turning up in searches. For example, throughout the "Additional Information" column, "assault" is varyingly spelled "asault," "assauylt," "assult," and "assaault". I sought to account for such errors using multiple search terms—e.g. "marij" to catch all instances where a marijuana-related offense was a basis for separation.

To double check my tabulations, I, with the assistance of Plaintiffs' counsel, also conducted a manual review of the resulting list of individuals with each offense type.

# EXHIBIT B

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
|     *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
|   v. | **SUPPLEMENTAL** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | **DECLARATION OF CHRISTINA E. TURNER** |
|     *Respondents-Defendants*. | |

1.   I, Christina E. Turner, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.   I am currently employed as the Deputy Director for Special Programs at Kids in Need of Defense (KIND), a nonprofit organization whose mission focuses on legal services and advocacy for immigrant and refugee children.  I have been employed by KIND for over five years and have focused my work on the representation of unaccompanied children in immigration legal proceedings during this time.

3.   KIND is currently working with more than 250 children who were forcibly separated by U.S. government officials upon entry to the United States in the last two years.  In my capacity as Deputy Director for Special Programs, I oversee a team of attorneys handling these cases.

4.   The majority of separated children that KIND is working with entered the U.S. during the period of the "Zero Tolerance" policy, from April to late June 2018, when the Preliminary Injunction issued.

5.   In late 2018 and early 2019, however, KIND again began to receive referrals to provide legal services for newly-separated children. We began to discern some concerning trends from these new separations.  As of this date, since June 26, 2018, KIND has received more than 50 referrals for children separated from their parents upon entry to the U.S.  Eighteen of these recently referred children have been under the age of 5.  The youngest child KIND is working with is two years old.

**Examples of Flawed or Problematic Separations**

6.   In several cases referred to KIND, children have been separated from their parents due to minor criminal violations or unsubstantiated charges.  In the case of one six-year-old child, the father was separated from his child due to a DUI charge that resulted in one day in jail and a small fine.  When a KIND attorney met with the

child, the child had had no communication with his father for nearly 20 days. The father had been swiftly deported to his home country following the separation. During this time, the child became ill and the father was not informed regarding his child's health or the reasons why he could not talk to his son.

7.     In February of this year, KIND received a referral for three young sisters who were separated from their father upon entry in November 2018. A KIND attorney communicated with the Office of Refugee Resettlement ("ORR") sponsor for the girls, the father's sister, who had spoken to the father while he was detained and relayed the information that he was told he had been separated from his girls on account of his HIV positive status. The girls' father was deported from the U.S. in March. The three sisters and their father had fled their country due to significant threats and their mother had died of AIDS when the girls were very little. One sister reported to a KIND staff member that during her stay in a Border Patrol station, an official insinuated that she was lying about her mother's death.

8.     In one case involving a 12-year-old child separated from his father and in ORR custody in New York, the apparent reason for the separation was an alleged outstanding warrant for robbery from 2008 in the father's home country of Honduras. As far as KIND is aware, there was no other indication or information to show that this father was not a fit parent or somehow a danger to his child. A KIND attorney learned of the reason for the separation through contacting the Immigration and Customs Enforcement ("ICE") parental interests email inbox. The attorney was then able to track down the father in custody at a remote ICE facility in Texas and eventually reach him by phone. The father contended that the more than 10-year-old warrant was a case of mistaken identity and he had never been involved in any robbery. The KIND attorney worked to connect the father with legal counsel and attorneys are now trying to obtain a police clearance for the father in Honduras to clear his name. An attorney who met with the father relayed to the KIND attorney

that the father was not told of the reason for separation for around 15 days. This father and his child have now been separated for over three and a half months with no indication of when they might be reunified.

**Problems Obtaining Timely Information Concerning Separation Cases**

9.     In these cases, it is exceedingly challenging to obtain information, facilitate communication between the child and the child's parent, assist the child in their legal case, and coordinate possible reunification with the child's parent. The parents are generally in adult immigration detention far from where the child has been placed. In the majority of these cases, it has only been possible to coordinate reunification of the child and their parent when seeking joint repatriation of the parent and child to their home country, and even then, the process of getting both on the same flight, together, has involved numerous stakeholders, government agencies, and logistical hurdles.

10.     The reasons for separation have frequently been unclear or difficult to determine when working directly with the child. Information regarding the reason for separation is sometimes, but not always, provided in the case file or the initial referral. Information regarding the location of the child's parent is frequently not included in the case file notes or referral. In cases where ORR did not provide the information, the partner legal services organization that refers the case to KIND has learned of the separation and flagged it, but that can be time-consuming and difficult.

11.     To KIND's knowledge, there is no singular system or method available to legal services providers to easily coordinate, track, and match separated children to their parents. After receiving the initial referral, a KIND attorney generally attempts to locate the parent through a variety of means, which may include: emailing the ORR Case Manager for additional contact information for the parent if available, checking the Immigration and Customs Enforcement (ICE) detainee locator, conducting a PACER search to locate a parent if in U.S. Marshal's custody, calling the family in

home country to discern whether they have information regarding the separated parent's whereabouts, and emailing the ICE parental interests email inbox for information. If the separated parent is still detained in the U.S., a KIND attorney generally then coordinates a phone call with the parent through either prison wardens or deportation officers, depending on the detention facility.

12.     If KIND is able to connect with a parent and reach them by phone at a detention facility, the KIND attorney then generally asks the parent what they were told was the basis for separation, or, in cases where a reason is listed within the child's file, to confirm that information with the parent's understanding. The alleged reasons have included the parent's health status, a prior criminal charge, warrant, or conviction, doubt surrounding parentage, or previous immigration violations. In some cases, no reason at all was provided to the parent or listed in the child's file.

13.     From start to finish, I estimate that it generally takes at least approximately 2-3 weeks to locate the parent and obtain meaningful information that permits us to properly represent the child and may eventually help us dispute the separation.

14.     Parents that have been informed of a reason for separation have told KIND that this information has been communicated only verbally to them by Border Patrol agents or ICE officials, and sometimes only several days after the separation. The verbal communication is frequently a quickly-worded statement to the parent regarding a prior arrest, immigration violation, or other criminal issue appearing in a database when agents run a background check. In some cases, parents report that they were told they needed to go to criminal court, and children are not permitted there. Parents have not reported to KIND that they were told by officials that they needed to be separated from their children because they posed a danger to them, or for other child welfare concerns.

15.    To KIND's knowledge and based on our interviews with dozens of separated parents and children, there is no written document provided to the parent or child stating the government's basis for separating the child from the parent.  Parents are given no immediate opportunity to correct misinformation or confusion on behalf of Border Patrol agents, nor are they given the opportunity to challenge allegations against them before they are forcibly separated and moved hundreds or thousands of miles away from each other.

**Examples of Cases Where Lack of Timely Information Impedes Advocacy and Reunification**

16.    Even when KIND is able to locate and communicate with a separated child's parent, many parents and children are not able to communicate regularly with each other by phone or video.  Without consistent communication between child and parent, it has been difficult for KIND's attorneys to provide separated children with adequately informed legal counsel.  In KIND's experience, it is common for adults to shield their children from information regarding the reasons for the family's flight from their home country; therefore, obtaining information from the parent is often critical to the child's legal case.  For example, in one case involving a 12-year-old child, due to a lack of communication, the child was unable to articulate any claim for legal relief or understand his options when first screened by a legal service provider.  When a KIND attorney received the case and located and communicated with the child's father, however, she learned that the family was fleeing death threats in their home country and had a viable asylum claim.

17.    In another case involving a six-year-old child separated from his father upon entry in March 2019, it is not at all clear why the child was separated.  Based on our evaluation of the case, KIND attorneys suspect that Border Patrol officials were confused about the parentage of the child, which was likely compounded by the fact that the father and child spoke an indigenous Mayan language.  In addition, the child,

his father, and an accompanying uncle all had similar names, which may have exacerbated the confusion.  The child was then sent nearly 3,000 miles away to a shelter in New York, while the child's father remained detained in California.  By the time KIND received the referral for the case, the child had been moved to an ORR facility closer to California.  However, a KIND attorney then discovered that ORR caseworkers in that new facility did not know that the child had been separated from his father and had not facilitated communication with either of the child's parents.  Moreover, the confusion following the separation resulted in ORR staff calling the child by the wrong name for the majority of the time he was in custody.  After substantial intervention by advocates, including KIND, and an attorney representing the child's father, the parent was re-classified as a *Ms. L* class member, and the parent and child were reunified.

18.    In the above example, the coordination required to reunify the parent and child was substantially aided by the fact that the detained parent was also working with an attorney.  By contrast, in the vast majority of cases of detained, separated children who we have served in the last four months, the detained parent has lacked access to legal counsel.  Separated parents tend to be detained in ICE detention facilities in remote areas of Texas, Arizona, Louisiana, and New Mexico where there are few free and affordable immigration legal service providers.

19.    In one case of a recently separated two-year-old detained in ORR custody in New York, communication between the child and his father, detained in an ICE facility in New Mexico, from whom he was separated allegedly due to the father's prior DUI charges, was very limited.  The father reported to a KIND attorney that he was unable to speak to his child for approximately two months.  The two-year-old was recently hospitalized due to breathing problems.  Troublingly, the father reported to a KIND attorney that he had not been receiving updates regarding the child's wellbeing from any government officials.  The father's only source of information about his

child's hospitalization was through phone calls from the KIND attorney and the child's mother in home country. After the child was discharged from the hospital, ORR staff emailed the ICE facility to attempt to arrange a video call with the child's father. The ICE facility—in a remote area in New Mexico—replied that video was not possible due to bad internet reception and service. A phone call was eventually arranged between the child and his father after several emails to set up a date and time. The toddler and his father were able to hear each other's voices, and the two-year-old, according to the ORR caseworker, said "Papa daddy" during the call.

I declare under penalty of perjury, under the laws of the United States and Washington, DC, that the foregoing is true and correct to the best of my knowledge and understanding. Executed on July 25th, 2019, in Washington, DC.

CHRISTINA E. TURNER

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L, et al.,<br><br>                Plaintiffs,<br><br>vs.<br><br>U.S. Immigration and Customs Enforcement,<br>et al.,<br><br>                Defendants. | Case No. 3:18-cv-428-DMS<br>Honorable Dana M. Sabraw |
| M.M.M., on behalf of his minor child, J.M.A., et al.,<br><br>                Plaintiffs,<br><br>vs.<br><br>Jefferson Beauregard Sessions, III, Attorney General of the United States, et al.,<br><br>                Defendants. | Case No. 3:18-cv-1832-DMS<br>Honorable Dana M. Sabraw<br><br>CLASS ACTION |

**DECLARATION OF ANTHONY ENRIQUEZ, ESQ., DIRECTOR OF THE UNACCOMPANIED MINORS PROGRAM OF CATHOLIC CHARITIES COMMUNITY SERVICES OF THE ARCHDIOCESE OF NEW YORK IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION**

I, Anthony Enriquez, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

## Background

1.     I am an attorney in good standing with the New York state bar, admitted in 2014.  From 2015 to 2016, I was a judicial law clerk for a federal district court judge in the Southern District of New York.  I have previously worked as an attorney for unaccompanied immigrant children and for other detained immigrants at multiple nonprofit organizations in New York City.  Over the course of my career, I have represented hundreds of immigrant clients and dozens of immigrant advocacy organizations before state and federal courts, including the federal Courts of Appeals and the Supreme Court.

2.     I am currently the Director of the Unaccompanied Minors Program of Catholic Charities Community Services of the Archdiocese of New York (CCCS).  I have served as Director since January 2018.  The Unaccompanied Minors Program employs more than forty individuals, including attorneys, paralegals, social workers, and administrative staff.  Our mission is to protect the rights of young immigrants to make informed decisions about their lives.  Our mandate is to represent the expressed wishes of our clients before administrative bodies, courts, and other tribunals charged with making decisions regarding our clients' lives.

3.     CCCS is a federally subcontracted legal service provider for unaccompanied minors in the custody of the Office of Refugee Resettlement (ORR) in the New York City area.  On an annual basis, CCCS provides Know Your Rights presentations, legal screenings, legal referrals, and direct representation in removal proceedings to thousands of unaccompanied minors detained by ORR in New York State.

**Post-Injunction Family Separations**

4.      Since the winter of 2017, CCCS staff have observed a sharp increase in the number of unaccompanied minors in ORR custody in New York who report having been separated from a parent at the southern border.  Likewise, we have increasingly received reports from child welfare staff at shelters under contract with ORR that children too young to talk had been separated from a parent.

5.      These separations have continued, even after this Court preliminarily enjoined Defendants, by order of June 26, 2018, "from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child . . . ." *Ms. L v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018).  From entry of the preliminary injunction to the date of this declaration, CCCS has seen approximately 308 children separated from their parents and placed in New York shelters or foster homes.  This amounts to more than a third of the total number of separated children—911—identified by the government during this period.  Of these 308 children, 65 (21%) were five years old or younger.

6.      This affidavit addresses some of the cases we have seen where the reported grounds for separation do not show that the parent is unfit or a danger.  It also addresses difficulties that continue to prevent the reunification of children who were separated from their parents after the entry of this Court's preliminary injunction.  It describes how Defendants still do not share information regarding separated families in a timely and effective manner—both within their own agencies and with attorneys for separated children.  It focuses on difficulties in communication with several different entities: the Department of Homeland Security (DHS), the Department of Justice (DOJ), ORR, and the private shelters and foster agencies contracted by ORR to provide temporary care for separated children.

7.      We typically meet all separated and unaccompanied children within seven to ten days of their placement by ORR with a private shelter or foster agency in New York City.  Generally, we rely on firsthand reports from the children themselves about whether immigration officials separated them from a parent after the family crossed the border.  Often, however, the children are too traumatized and fearful to speak to us about family separation at our first meeting.  In some cases it takes several meetings before a child reveals to us that he or she has been separated from a parent.

8.      In addition, many children placed in New York are too young to explain their circumstances.  Because New York City has a large number of Spanish-speaking foster homes, New York has received dozens of preverbal children separated since the PI was issued.  We have seen 65 children under six in this cohort in New York City.  When a child is preverbal or otherwise non-communicative, we ask staff at the shelter if the child has been separated from a parent at the border.  Some of the case workers at the shelters affirmatively inform us whenever they know that a child was separated from a parent, but other case workers provide no information until we ask.  Staff at the private shelters tell me that the shelter staff themselves are not always provided information from ORR regarding separated children, including even the fact of the separation itself, much less other important details, such as the location of a parent and reasons for separation.

9.      In these ongoing separations, even when shelter staff share information with us, they rarely have any information beyond the fact that the child was separated.  For example, shelter staff respond to our inquiries by saying they do not know either the location of the child's parent or the reason for the separation.  These two pieces of information are critical to enable us to do our job in advising and representing these children.

10.    We need to know the location of the parent for a few key reasons.

- First, the child is nearly always desperate to know. Before separated children can discuss the decisions they face, they need to learn where their parent is and whether the parent is safe. We frequently meet with children who have not spoken to their parents since the separation, even when the separation occurred weeks earlier, and we frequently meet with children who have not spoken to their parents in many weeks, even if they have been in touch since the separation.

- Second, most children tell us not to take any action in their removal proceedings (and nearly all of them are in removal proceedings) until we find out what their parent is doing. If mom or dad is headed back to the family's home country, the child usually (though not always) wants to go with him or her. If the parent is pursuing a defense to removal, the child usually wishes to stay and be reunited with the parent here in the United States. Thus, we cannot effectively assist our clients in making decisions about their own immigration cases, or about whether to pursue or accept placement with family-member sponsors who may step forward to assume physical custody of them, until we have information about the separated parent's immigration case.

- Third, with preverbal or non-communicative children who lack the capacity to direct their own representation, it is our ethical obligation to try to reach their parents or primary caregivers and seek direction from them. *See* N.Y. Rules of Professional Conduct 1.14(b); *see also* ABA Comm'n on Immigration, *Standards for the Custody, Placement and Care; Legal Representation; and Adjudication of Unaccompanied Alien Children in the United States*, Part V.A.1.f. (August 2018) ("If

the Child does not express the objectives of representation," it may be appropriate "to consider the opinions of a Child's Adult Family Member.").  We work hard with young children to understand their wishes, but some are just too young to offer any real guidance, and in that case, we have an urgent need to speak to their parent.

Because the government does not routinely provide us information about the location of the parent, we are left to try to search for this information ourselves so as to properly advise and assist our young clients.

11.   When we learn that a child is separated, we inquire with several sources about the basis for separation, the location of the parent, and the status of the parent's immigration case (for example, whether the parent has already been deported without his or her child).  Such sources include the online ICE detainee locator; case workers at the private shelters that contract with ORR to accept immigrant children; ORR staff who oversee these shelters; the DHS trial attorney prosecuting the child's removal proceedings in immigration court; ICE agent Jessica Jones, who has been specially designated as a liaison for family separation cases; and Defendants, through class counsel at the ACLU.  Responses from each of these sources vary from outright silence to information that is so general that it is insufficient to enable us adequately to defend the children's right to be with their parents.

12.   The ICE detainee locator is an online database for locating an individual in ICE custody through searches based on the individual's A number or name and nationality.  Because we do not receive any information from the government regarding the separated parent's immigration case, we typically guess what the parent's A# is by varying one digit above or below the A# of the child. Sometimes, this method returns no result and we are left unsure as to whether we used the incorrect number or the parent has already been deported or otherwise

released from DHS custody.  As an alternative, the locator requires exact matches for the parent's first and last name.  Very young children often cannot supply this information.  We can extrapolate from the child's name, based on Spanish language naming conventions, but this is far from foolproof, and the correct and properly spelled first name is also necessary.  Because of these difficulties, we cannot always find parents through the locator.

13.    Some of the shelter case workers we interact have told us that they are not regularly informed by DHS or ORR of a parent's location, projected date of transfer to immigration custody from criminal custody, eligibility for placement in DHS family detention, or release from immigration detention.  Regarding reasons for the separation, sometimes the shelter case worker is informed of a general justification, such as "criminal history," without further specification.  Just as often, the case worker has no information on the basis for the separation.

14.    Most of our communication with ORR regarding separated children is mediated through case workers at the shelters.  But on a few occasions, where we have learned that a separated parent is immediately available to take custody of his or her separated child, we have inquired directly with ORR for information on the continued basis for separation.  In these cases, we have sent an email directly to the federal field specialist, the ORR official charged with oversight and approval of release decisions concerning unaccompanied and separated children.  Our inquiries have never been answered directly by ORR.

15.    DHS trial attorneys in immigration court never share any information regarding separation.  They refuse to share information on parents with the children or the children's attorneys. In some instances they have stated that they cannot provide the information due to privacy concerns for the parent.  In other instances they have said that they do not have any information regarding the parents.

16.     ICE agent Jessica Jones sometimes shares information regarding a parent's location, if the parent is in criminal or immigration custody or has been deported, but not if the parent has been released on parole or bond within the United States.  To my knowledge, she typically shares this information with shelter case workers, only upon request and on a case-by-case basis.  The shelter case workers then share it with us, in response to our request.  We have also contacted her directly for information regarding parents.  The information we have received in return is of the same general type shared with shelter case workers.

17.     We have also received information about separated parents through *Ms. L* class counsel.  For example, on May 20, we provided the ACLU a list of 92 separated children in federal custody in New York City, 27 of whom were five years old or younger.  *Ms. L* counsel had information about the reasons for separation for 56 of the 92 children.  On June 20, 2019, we sent the ACLU a list of 68 separated children in federal custody in New York about whom we still lacked any information on the basis for the separations.  Nineteen of these children were five years old or younger (the youngest was thirteen months old).  The ACLU had separation information about only 23 of these 68 children.  On July 29, we asked about 80 children for whom we still lacked information on the basis for the separation (15 were five years old or younger; the youngest was ten months old), and we received information about 45 of these children.  Thus, in total, we received information about only 124 of the 214 children about whom we made specific inquiries.[1]  The information transmitted through this process was often the first that we or our child clients received about the basis for the separation.

---

[1] Twenty-six children appeared on more than one list because the ACLU did not have the information from the government the first time around; that is why the total number of unique children is 214 rather than 240, which is the sum of all the names on the three lists.

18.     In some cases, even the information the ACLU had from the government was at so high a level of generality as to offer little guidance about whether or how to pursue reunification for our clients.  For example, the government reported that the parent had "criminal history in home country" or "criminal charges (warrant) in Guatemala" or "gang affiliation" or "Arrest Date: 05/11/08."  None of the allegations was accompanied by further explanation or description of any evidence in support of the allegations.  Nor have we ever been given any number to call or address to email to raise questions or provide contrary information about the government's stated basis for a separation, in those cases where we learn of such a basis.

19.     In some cases, we have received information about separated parents through sheer luck.  For example, last fall, a reporter contacted our office because she had been following the story of a separated father in immigration court.  We learned from her that one of our clients was that father's son.  At four years old, he was too young to tell us that he'd been separated from his father, and the government had not informed us either.  It turned out that the separation, effectuated in September 2018, was based on his father's alleged gang affiliation, but the immigration court ordered the father released on bond because the government did not produce proof of this allegation.  Despite our direct request, ORR refused to release the child to his father.  According to the case worker at the shelter where the child was held, ORR cited CBP's allegations in refusing to clear the child for release to his father.  ORR agreed to release him after the ACLU informed Defendants' counsel, on our behalf, that we intended to file a motion in court the following day.  The boy was sent back to his father two weeks after his father was released on bond and eleven weeks after they were separated.

20.     In another case, an attorney on our staff was contacted by a personal friend who worked in a law office in another city that had contact with a separated

parent.  The mother had been hospitalized in California after injuring her leg at the border.  While she was in emergency surgery, in September 2018, the government flew her almost-six-year-old daughter across the country to a shelter in New York.  The mother was swiftly released from the hospital into the community.  We sent ORR a letter requesting immediate release.  The case worker responded that ORR believed that the parent was not a *Ms. L* class member because she had been separated on the basis of illness and therefore ORR would not release the daughter until the mother had gone through the standard sponsorship process.  Again, we prepared to go to court for the child, and again, ORR released her to her mother after we had notified Defendants, through the ACLU, of our intention to file the next day.  She had been separated from her mother for 79 days.

21.     In a third case, CBP separated a father from his ten-year-old son on the basis of the father's alleged criminal history in his country of origin.  The child was an indigenous-language speaker, and he was separated from his father for more than six months, beginning in November 2018.  During this separation, the boy began to forget his family's native language, and he suffered extreme isolation because of his inability to speak Spanish, English, or any language common in the shelter.  His father was detained by ICE.  The father's counsel requested a bond hearing in immigration court, where the lawyer provided evidence that the father had no knowledge of or involvement in the incidents alleged in a mass arrest order aimed at 52 members of the small indigenous community from which the family had fled.  While DHS apparently believed that this mass order accused the father of sexual abuse of a minor, this was incorrect.  The mass arrest order made no such allegation against the father.  The order listed a charge of "sexual assault" without specifying any particular alleged perpetrators.  Later proceedings in the home country revealed that the charge was made by an adult woman against three unrelated men, not the father in question.  The mass order also included an

accusation of "mistreatment of underage persons," apparently based on the presence of children in the location where the events allegedly took place.  There was no allegation that children were touched, let alone sexually abused.  Moreover, the evidence at the bond hearing showed that the mass arrest order was issued as part of a long-term effort by local officials to harass the indigenous community and deprive them of their hereditary rights to land ownership.  There was never a shred of evidence that the father presented a danger to his son, and the child's appointed advocate unequivocally recommended immediate reunification.  The immigration court ordered the father to be released on bond.  Once again, however, despite our direct request, ORR refused to release the child to his father, citing CBP's allegations.  Only after we prepared to go to court, and notified Defendants through the ACLU, did ORR agree to release the boy to his father.

22.   Based on the information the government provided us through the ACLU, in many cases the children we represent appear to have been separated because of the parents' minor or unsubstantiated criminal histories.  For example, during the winter, a girl who had just turned 17 entered a NY shelter after being separated from her father.  The government described his crime as "malicious destruction of property value $5."  The child was reunified with her mother through the sponsorship process after nearly four months in custody.  There are currently four children in NY shelters—an eleven-year-old who has been in custody more than four months, an eight-year-old who has been in custody nearly three months, a five-year-old who has been in custody nearly four months, and a three-year-old who has been in custody since mid-June—whose fathers' only criminal history, as reported by the government, is illegal entry or reentry.  If any of these fathers has been released from criminal to immigration custody, the government has neither informed us nor initiated any attempt at reunification.  A seven-year-old girl who has been in shelter since early June was separated from her

father, again per the government's information, because he has a conviction for driving without a license and had entered the United States before.  And an eleven-year-old girl was separated from her father because of an illegal reentry charge and a conviction for disorderly conduct.  She spent two months in the shelter before agreeing to move in with an uncle as her sponsor.

23.     Sometimes, we see children who have been separated from their biological parents because CBP failed to identify the parent as such.  For example, we had a nine-year-old client in one of the New York shelters until July 8, 2019, who appears to have been separated from her father because of a clerical error.  According to the child advocate appointed to protect the child's best interest, CBP wrote the name of a different immigrant on the father's intake form (while using the father's actual A#), and then separated the family on the ground that the father was not related to the child.  That father remains in detention in an adult facility in Texas, and ORR released the child to her aunt in New York.  Similarly, we have a four-year-old boy in shelter in New York at this time because his father, who crossed the border with him, has a speech impediment and could not intelligibly answer the questions posed by CBP.  Again, according to the appointed child advocate, the father presented the child's birth certificate, which includes the father's name, but the family was separated anyway.  The father is detained at the Florence SPC Detention Center in Phoenix, and the child remains in New York, although the father's sister is in Florida and prepared to take them both in.

24.     Among the 308 children CCCS has represented who were separated after this court issued a preliminary injunction, the only ones reunified with parents in the United States (other than through the sponsorship process) are the three described above, each of whom had to threaten litigation to secure his or her release to a parent in the community.  None has been reunified with parents in family detention centers.  185 have been released through the sponsorship process,

1  and some proportion of these sponsors were parents, although not the parent from

2  whom the child was separated.  Another 33 children either accepted voluntary

3  departure or had their Notices to Appear (the charging document to initiate

4  removal proceedings) withdrawn so that they could reunify with a parent for the

5  purpose of repatriation.  Some of these children remain in New York today

6  because even after a child accepts repatriation, the process of reunification for this

7  purpose generally takes weeks.  Thus, the government appears to be willing to

8  reunify these parents and children for the purpose of sending them home (despite

9  the government's allegations that the parent presented a danger to the child) but not

10  for the purpose of enabling the family to pursue immigration relief in the United

11  States together.

12      25.    The continuing failure of the government to adopt a standard for

13  separation that comports with due process and to provide clear and complete

14  information to us, as counsel to the children, continues to harm our clients and

15  impair our ability to represent them at a time when they are already profoundly

16  traumatized by their separation from the adults who are closest to them.


18      I declare, under penalty of perjury, that the foregoing is true and correct.


20  July 30, 2019                         _____

21                                        Anthony Enriquez, Esq.

22                                        Director of the Unaccompanied Minors Program
                                          Catholic Charities Community Services

23                                           of the Archdiocese of New York

# EXHIBIT D

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF NICOLAS PALAZZO** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | CLASS ACTION |

1.      I, Nicolas Palazzo, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am a staff attorney at the Las Americas Immigrant Advocacy Center, which is based in El Paso, Texas. I have practiced immigration law for five years. My practice focuses on the removal defense of detained noncitizens. Our office collectively represents a number of parents and other relatives separated from minor children.

3.      On January 24, 2019, our office made contact with E.R.R. At the time, he was detained in the El Paso Service Processing Center. E.R.R. reported the following facts to me concerning the circumstances of his separation from his daughter. E.R.R. is a native indigenous language (Kanjobal) speaker from Guatemala, and I spoke to him in Spanish. Although his Spanish was not perfect, we were able to communicate reasonably effectively.

4.      E.R.R. and his daughter were apprehended by Customs and Border Patrol officers on December 16, 2018, near El Paso Texas. J. was only one year old at the time.

5.      E.R.R. recalled that he and his daughter were initially placed in a facility with several other families with children. He and his daughter were then transferred to another facility, where he noticed several of the children detained there were visibly sick. The children were coughing, wheezing, and had runny noses.

6.      J. also began to cough and develop a fever due to proximity to the other children. E.R.R. immediately informed the CBP guard stationed at the facility, and asked for he and his daughter to be taken to a hospital. J. had to be taken to the hospital a second time the next day for further treatment.

7.      J.'s health began significantly improving after treatment. CBP guards saw E.R.R. personally administer cough medicine to J. every day. Because J. has lactose

intolerance, E.R.R. gave her Gatorade every day to make sure she was properly hydrated.

8.      On December 25, 2018, Christmas Day, it had been approximately five or six days after J.'s release from the hospital. E.R.R. was holding his daughter in his arms while she was sleeping. At that moment, her diaper was wet because of the fluids he had given her to keep her hydrated. He did not want to change her diaper at that time because he did not want to interrupt her sleep. Because J. was still recovering from her fever, E.R.R. thought it was important that she slept well.

9.      A guard suddenly came up to him and took his daughter from his arms without asking E.R.R.'s permission. The guard checked J.'s wet diaper and told E.R.R., "You are a bad father." The guard also asked him, "Why did you bring your daughter here?"

10.     After the guard said this, the guard took E.R.R.'s daughter away.  E.R.R. was never told where or with whom his daughter would be. J. was still only one year old at the time CBP separated the family. They remained separated for approximately three and a half months.

11.     The government has given us inconsistent reasons for why E.R.R. and J. were separated. On February 20, 2019, another attorney in our office appeared in immigration court with E.R.R. I was present in the courtroom that day as well. That day, the ICE trial attorney, who was prosecuting E.R.R.'s removal case, told us that their position was that E.R.R. was not J.'s father. This was the first time we had heard of any allegation that E.R.R. was not J.'s parent.

12.     In contrast, I am informed by counsel for the Ms. L Plaintiffs that E.R.R. and J. appear on the Government's list of separated families, and that the reason for their separation is listed as child safety, not lack of proof of parentage.

13.     In addition, I have reviewed a copy of E.R.R.'s I-213, which is an arrest record a CBP officer completed after his apprehension. This record states that E.R.R. has no criminal history. The I-213 states that DHS officers believed that E.R.R. was

"detached and unsympathetic for the condition of his own child," and criticized him for "not know[ing] when and how to change a diaper or basic hygiene." The I-213 also alleged that "the child appears neglected and underdeveloped."

14.    But as stated above, E.R.R. sought medical care for his daughter when she was sick, and DHS officers saw him caring for his child to the extent he could given their conditions of detention. In addition, he did not want to change his baby's diaper because she needed sleep.

15.    After E.R.R. was ordered removed in March 2019, I was able to negotiate for his child to be repatriated with him to Guatemala. DHS did not raise any issue with returning J. to E.R.R.'s care for the purpose of repatriation.

16.    I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and Texas, based on my personal knowledge.  Executed in El Paso, Texas, on July 25, 2019.


/s/ Nicolas Palazzo
NICOLAS PALAZZO

# EXHIBIT E

1  Lee Gelernt*
   Judy Rabinovitz*
   Anand Balakrishnan*
2  Daniel A. Galindo (SBN 292854)
   AMERICAN CIVIL LIBERTIES
3  UNION FOUNDATION
   125 Broad St., 18th Floor
   New York, NY 10004
4  T:  (212) 549-2660
   F:  (212) 549-2654
5  lgelernt@aclu.org
   jrabinovitz@aclu.org
   abalakrishnan@aclu.org
6  dgalindo@aclu.org

7  *Attorneys for Petitioners-Plaintiffs*
   *Admitted Pro Hac Vice*
8

9

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

10

**UNITED STATES DISTRICT COURT**

11

**SOUTHERN DISTRICT OF CALIFORNIA**

12

13   Ms. L., et al.,

14                    *Petitioners-Plaintiffs,*

15          v.

16

17   U.S. Immigration and Customs Enforcement
     ("ICE"), et al.,

18                    *Respondents-Defendants.*

19

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF JENNIFER NAGDA**

20

21

22

I, Jennifer Nagda, hereby declare, pursuant to 28 U.S.C. § 1746:

1.     I am the Policy Director for the Young Center for Immigrant Children's Rights (hereinafter "Young Center"). I have been employed by the Young Center since November 2008.

2.     This declaration is based on my own knowledge and that of other Young Center staff at programs across the country.

3.     The Young Center is a registered 501(c)(3) organization based in Chicago with programs in seven additional locations including: Harlingen, Texas; Houston, Texas; San Antonio, Texas; Phoenix, Arizona; Los Angeles, California; Washington, D.C.; and New York, New York.

4.     The Young Center was created in 2004 as a pilot project of the federal Office of Refugee Resettlement, Department of Health and Human Services (hereinafter "ORR") to create a program to provide best interests guardians *ad litem* (Child Advocates) for trafficking victims and other vulnerable unaccompanied children. Young Center attorneys and social workers are appointed as Child Advocates alongside trained, bilingual volunteers.

5.     The role of the Child Advocate is to advocate for the best interests of the child. Child Advocates identify a child's best interests by considering the child's expressed wishes, safety, and right to family integrity, liberty, developmental needs and identity. These "best interests factors" are well-established in the child welfare laws of all 50 states and in international law, including the Convention on the Rights of the Child.

6.     Child Advocates play a critical role when a child is pre-verbal, or otherwise unable to express her wishes; when her expressed wishes would endanger her life (for example, a child so frustrated with the conditions of custody that she asks to return to her trafficker rather than waiting for her application for protection to be

1  adjudicated, and where her attorney (if she has one) must represent her expressed

2  wish to repatriate); when there is uncertainty about whether a decision is in her

3  best interests or when various best interests factors conflict (for example, when two

   different adults step forward to sponsor the child's release from custody); or when

4  there is a risk that the government will not consider or will not give appropriate

5  weight to the child's best interests when making a decision (for example, when the

6  child faces prolonged detention, or faces unsafe repatriation).

7  7.      Beginning in 2004, ORR assigned Young Center staff and volunteers as
   Child Advocates for unaccompanied children in ORR custody.

8  8.      In 2008, Congress passed and President George W. Bush signed into law the

9  Trafficking Victims Protection Reauthorization Act ("TVPRA") which authorizes

10 the Secretary of Health and Human Services to appoint "independent child

   advocates" to identify and advocate for the best interests of child trafficking

11 victims and other vulnerable unaccompanied children.[1] In 2013, Congress

12 expanded the Child Advocate program from the original programs in Chicago and

13 Harlingen to the eight locations listed above.

14 9.      Since its founding, the Young Center has served as the independent Child

   Advocate for more than 2,000 children in government custody. We are the only

15 organization authorized by ORR to serve in that capacity.

16 10.     As the Child Advocate, we submit best interests recommendations on behalf

17 of unaccompanied children in government custody to federal agencies including

   the Executive Office for Immigration Review within the Department of Justice,

18 Immigration and Customs Enforcement within the Department of Homeland

19 Security, and ORR. The Child Advocates' recommendations are grounded in

20 federal and domestic best interests law.

21
   _____
   [1] 8 U.S.C. § 1232(c)(6) (2013).
22

11.     In July 2019, the Young Center was called to testify before Congress about our work with immigrant children, including those separated from their parents after this Court's July 26, 2018 order.

**Federal Government Appointment of Child Advocates**

12.     As specified in the TVPRA, child trafficking victims and other vulnerable unaccompanied children may be appointed an independent Child Advocate.[2]

13.     The role of the Child Advocate is to identify the child's best interests, and to advocate with government agencies to consider the child's best interests in all decisions. Young Center Child Advocates submit best interests recommendations (in writing and orally) on issues including the child's placement in ORR custody, services for the child in ORR custody, the child's release from custody, family reunification, and the child's permanency—whether it is in the child's best interests to be granted protection in the United States or whether the child can be safely repatriated.

14.     The Young Center depends upon stakeholders—ORR officials, staff at ORR-contracted facilities, staff at ORR-contracted legal services providers, immigration judges, asylum officers, ICE trial attorneys and other DHS officials— to identify vulnerable, unaccompanied children and refer them to the Young Center for the appointment of a Child Advocate.

15.     When the Young Center receives a referral, we determine whether we have the capacity to accept the referral. We then submit the referral to ORR Headquarters either approving appointment or declining the referral, using the "Child Advocate Recommendation and Appointment Form, OMB Control No. 0970-0498" (hereinafter "Appointment Form").

[2] *Id.*

16.     When ORR approves a referral to be appointed, it returns the completed Appointment Form to the Young Center and we begin work on the case.

17.     To the best of my knowledge, ORR has never declined our request to be appointed as the independent Child Advocate for an unaccompanied or separated child in the agency's custody.

**Domestic Child Welfare Framework Guiding Child Advocate Recommendations**

18.     In all of our advocacy on behalf of unaccompanied and separated children, the Young Center relies on state child welfare laws as guidance on standards for the placement, care, and protection of children.

19.     The right of parents to the care and custody of their children is a fundamental right protected by the Constitution and the child welfare laws of all 50 states.[3]

20.     As the U.S. Department of Health and Human Services has explained, the government generally cannot remove a child from the care and custody of the parent absent "imminent danger" to the child's safety.[4]

---

[3] *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (holding that the Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children . . . and that the right to care for one's child is "perhaps the oldest of the fundamental liberty interests recognized by [the] Court.").

[4] Children's Bureau, Admin. for Children & Families, U.S. DEP'T OF HEALTH & HUMAN SERVS., *How the Child Welfare System Works* 4 (Feb. 2013), https://www.childwelfare.gov/pubPDFs/cpswork.pdf#page=3&view=What%20Happens%20When%20Possible%20Abuse%20or%20Neglect%20Is%20Reported (a child must be at risk of "immediate danger" before a state can remove that child from the custody of his caregiver.).

21.     As recently as February 2018, Congress passed and the President signed into law the Family First Prevention Services Act (FFPSA), which is intended to decrease the removal of children—including children subjected to maltreatment—from their families.

22.     Under the FFPSA, federal funds previously available only for the purposes of supporting children in foster care can now be used for preventative services for children who are at risk of being removed from their families and placed into foster care—in other words, federal funds can be applied toward services designed to keep children with their families even in situations where there is a history or risk of abuse and neglect by the parent.[5]

23.     In those cases where the government removes a child from the care and custody of a parent, parents and children are entitled to protections including a prompt hearing before an independent judge, often within 48 hours. The vast majority of states appoint counsel for parents, given the parents' fundamental right to the care and custody of their children.[6]

24.     In California, a child may only be removed from her parents without a warrant when there is reasonable cause to believe that the child has an "immediate need for medical care, or the minor is in immediate danger of physical or sexual

[5] Family First Prevention Services Act, 42 U.S.C. § 622 (2018); *The Family First Prevention Services Act*, NAT'L CONF. FOR STATE LEGISLATURES (June 27, 2019), http://www.ncsl.org/research/human-services/family-first-prevention-services-act-ffpsa.aspx; Susan Schmidt, *Trauma Inflicting, Not Trauma Informed*: *The U.S. Federal Government's Double Standard toward Migrant Children*, 64 SOCIAL WORK 91–93 (2019).

[6] *See, e.g.*, TEX. FAM. CODE ANN. §§ 262.102, 105 (1995) (stating that parents have a right to counsel at a family court hearing); N.Y. FAM. CT. ACT § 261 (Mckinney 1975) (stating that parents have a constitutional right to counsel in family court proceedings that may infringe on their interests and rights); ARIZ. REV. STAT. ANN. § 8-824 (2014) (stating that parents are have a right to counsel during preliminary protective hearings, including appointed counsel if they are indigent).

abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety."[7] After removal, written notice must be given to the caregiver,[8] and a social worker must "immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services."[9] The child must be immediately reunited with her caregiver unless the social worker finds that "continued detention of the child is a matter of immediate and urgent necessity for the protection of the child and there are no reasonable means by which the child can be protected in his or her home or the home of a relative"[10] and files a petition with the court.[11] A hearing must then be held the next day.[12] If the caregiver desires counsel but cannot afford counsel, the court will appoint counsel.[13] The child shall also be appointed counsel whose primary responsibility is to "advocate for the protection, safety, and physical and emotional well-being of the child."[14] The court must consider whether adequate efforts were made to prevent the removal of the child and if there are services available that would prevent the need for further detention.[15]

25.    Under Illinois law a child can be separated from a caregiver on an emergency basis only where there is an "immediate danger of moderate to severe harm" to the child, such as suspected or documented abuse or neglect of the

---

[7] CAL. WELF. & INST. CODE § 305(a) (West 1976).
[8] Id. §§ 307.4(a), 308(a).
[9] § 309(a).
[10] § 309(a)(2).
[11] § 311(a).
[12] § 315.
[13] § 317(a)(1).
[14] § 317(c)(1), (2).
[15] § 319(f)(1).

child.[16] Moreover, an Illinois court could only authorize the ongoing separation of a child from a caretaker beyond a period of 48 hours where it found "probable cause of abuse, neglect, or dependency."[17]

26.     Pursuant to Texas law, a child may be removed from a parent on an emergency basis only if "there is an immediate danger to the physical health or safety of the child." To meet this standard, the government must seek a court hearing within one business day of the separation and provide an affidavit showing "immediate danger to the physical health or safety of the child" at the time of the separation—or that the child "was a victim of sexual abuse or trafficking," or that the parent's current use of a controlled substance "constituted an immediate danger to the child," or that the parent "permitted the child to remain on the premises used for the manufacture of methamphetamine"—and that reasonable efforts were made "to prevent or eliminate the need for removal of the child."[18]

27.     Similarly, in Arizona, the government is prohibited from separating a parent and child absent exigent circumstances, which are limited to situations "where there is probable cause to believe the child is likely to suffer serious harm in the time it would take to obtain a court order for removal" and "there is no less obtrusive alternative to taking temporary custody of the child that would reasonably and sufficiently protect the child's health and safety" or the child herself (not another child or adult) "is suspected to be a victim of sexual abuse or abuse involving serious physical injury that can be diagnosed only by a physician . . . or a health care provider who is licensed . . . and who has specific training in

[16] Ill. Dep't of Children and Family Servs., Child Endangerment Risk Assessment Protocol: Safety Determination Form, CFS 1441 (May 2013) https://www2.illinois.gov/dcfs/aboutus/notices/Documents/cfs_1441_child_endang erment_risk_assessment_protocol_(fillable).pdf.
[17] 705 ILL. COMP. STAT. 405/2-10 (2018).
[18] TEX. FAM. CODE ANN. §§ 262.104, 105 (1995) (emphasis added).

evaluations of child abuse." A child taken into temporary custody for a medical examination must be returned to their parent or guardian within 12 hours "unless the examination reveals abuse." If the examination reveals abuse and the child will not be returned within the 12-hour period, the state must either file a dependency petition or release the child within 72 hours.[19]

28.     In New York, the emergency separation of a child from her parent is permitted only if remaining with the parent presents an "imminent danger to the child's life or health." A petition must be filed by the next court day, and a hearing must be held by the next court day after the petition was filed.[20]

29.     Every state, the District of Columbia and Puerto Rico require courts to consider the "best interests of the child" when making "placement and custody determinations, safety and permanency planning, and proceedings for termination of parental rights."[21] The "importance of family integrity and the preference for avoiding removal of the child from his/her home" is one of the most frequently-stated guiding principles in state statutes setting forth factors to consider in any best interests analysis.[22]

30.     No state allows for a best interests determination to rest solely on a parent's criminal history. Only five states (Delaware, Georgia, Kentucky, Montana and Tennessee) explicitly permit the consideration of a parent's criminal history in determining whether a placement is in a child's best interests, and even in those states the criminal history may be limited to convictions or particular crimes.[23]

[19] ARIZ. REV. STAT. ANN. §§ 8-821, 823 (1997) (emphasis added).
[20] N.Y. FAM. CT. §§ 1024, 1026 (McKinney).
[21] Children's Bureau, Admin. for Children and Families, U.S. DEP'T OF HEALTH & HUMAN SERVS., *Child Welfare Information Gateway: Determining the Best Interests of the Child* (Mar. 2016), https://www.childwelfare.gov/pubpdfs/best_interest.pdf.
[22] *Id.*
[23] *Id.*

**Young Center Advocacy on Behalf of Children Separated After June 26, 2018: Separations Unjustified under State Law and Contrary to Child's Best Interests**

31.    From the fall of 2017 through the fall of 2018, the Young Center was appointed as the independent Child Advocate for hundreds of children who were separated from their parents at the border before and during "zero tolerance," and who were designated as unaccompanied children and transferred to ORR custody.

32.    Additionally, since this court issued its order halting family separation on June 26, 2018, the Young Center has been appointed to 121 children who were separated from their biological parents and who appear on the protected list of cases provided by the government to the parties in this litigation.

33.    The average age of these 121 children is 6.87 years old.

34.    Fifty-five of the 121 children (approximately 46 percent) were five years old or younger at the time they were separated from their parents.

35.    In nearly all of the 121 cases the separated child could have safely remained in the parent's care while concerns about the child's long-term safety (based on allegations of criminal conduct by the parent, or possible abuse or neglect by the parent) were investigated to determine if separation was actually necessary and would be consistent with domestic child welfare laws.

36.    Of the 121 cases, we did not identify any situations in which a biological parent was determined to pose a risk of trafficking to his or her child.

37.    We have been appointed to children who were allegedly separated because of the parent's criminal history; in nearly every case, we found that the parent's alleged or actual criminal history would not have been enough to justify separating the parent and child under our state child welfare laws, the parent did not pose a threat to the child's safety, and separation was contrary to the child's best interests. Following are illustrative and representative examples:

*Allegations of "criminal history"*

    a. Five-year-old "KL" was apprehended with his father in October 2018. The information provided by the government in this litigation does not provide any indication that KL was in imminent danger or the reason that KL was separated from his father; it states only that they were separated "due to Father's criminal history." Our Child Advocate subsequently learned that KL's father had a 2001 conviction for carrying a concealed knife and for sale of marijuana. KL's father was deported before he was reunified with his young son. KL spent 228 days—nearly eight months—in federal custody before he was returned to his family, including the father from whom he was originally separated.

    b. Five-year-old "EY" was apprehended with her father in December 2018, separated from him and rendered unaccompanied. Her father was charged under 8 U.S.C. § 1326 for re-entry after removal. His sole criminal history was identified as a controlled substance offense ("manufacturing, distributing or disbursing of any controlled substance"). There is no indication that the father was ever charged with endangering the welfare of a child. EY spent 144 days in custody—nearly five months—before she was reunified with her father so that they could be deported together. DHS facilitated their joint repatriation.

    c. Seventeen-year-old "DR" was apprehended with and separated from his father in April 2019. His father was charged under 8 U.S.C. § 1326 for re-entry after removal. His criminal history was identified as multiple driving under the influence charges. There is no indication that the father was ever charged with endangering the welfare of a

1    child. DR was held in custody for more than 50 days before he was
2    released to a family member.

3    d.   Two-year-old "YJ" was separated from her father on February 26,
4    2019. Her father had previous charges involving misdemeanor theft
     and misdemeanor driving under the influence. After their separation,
5    YJ's father was released from immigration detention. Baby YJ was
6    separated from her father for 78 days.

7    ***Allegations of "gang involvement"***

8    e.   Three-year-old "MA" was apprehended with his mother in February
9    2019. Government records are consistent with what we were first told
     about MA's mother when we were appointed to his case: that she had
10   alleged gang ties and a criminal record in her home country
11   ("Separated due to the mother's affiliation with the 18th St Gang and
     her criminal record in El Salvador."). We determined that this
12   information was incorrect. MA's mother was a victim of extreme
13   violence at the hands of MA's father; she was beaten so badly that she
14   gave birth to MA two months early, when she was just 15 years old.
15   MA's mother left MA's father before fleeing El Salvador but was
16   sexually, verbally, and physically abused by a gang member; her son
     was forced to watch as she was raped and when she was hospitalized,
17   a gang member held her son and threatened to kill him if she disclosed
18   what had happened to her. At one point, her abuser was arrested while
19   they were together; and MA's mother was arrested along with him,
     and then released with no charges. MA's mother fled El Salvador
20   because of this violence and to protect her son. We obtained
21   documentation from the El Salvadoran government confirming that

22

Exhibit E, Page 88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

MA's mother had "no criminal history." MA was in federal custody for 43 days before he was released to a relative he had never met. MA's mother remains in federal custody.

    f.   Six-year-old "EE" was apprehended with his mother in August 2018. They were separated on the basis of his mother's alleged gang affiliation. However, EE's mother had been coerced into participating in gang activities, and she was granted a finding of credible fear by immigration authorities. Despite this positive recognition of the threat she faced in home country, EE's mother sought voluntary departure so that she could be reunited with her son as quickly as possible. In total, EE spent more than 100 days in federal custody, separated from his mother, before returning to home country with her; in their case, DHS also approved their joint repatriation.

38.    In a limited number of cases, the government separated children from parents based on purported concerns about the parent's ability to care for the child. We found that the concerns that led to separation were typically unfounded or unsupported, or reflected an inability to make effective assessments of the child's safety. For example:

    a.   In December 2018, two-year-old "JA" and her father were apprehended and separated. J and her father belong to the Q'anjob'al Maya community in Huehuetenango, Guatemala. Upon entry, U.S. immigration authorities referred JA for medical attention due to fever and a diaper rash. Medical personnel raised concerns that JA appeared underdeveloped and malnourished. JA was unable to stand or crawl, and her weight and height were below standard. DHS—without additional inquiry—attributed these issues to parental neglect and took the infant from her father's care. JA's father was deported.

1

2    In order to determine the basis for JA's underdevelopment and

3    determine if JA could be safely repatriated, the Young Center

4    conducted a home study of JA's home in Guatemala. The Young

5    Center retained a licensed psychologist and social worker competent

     in both the language and culture of Q'anjob'al, to conduct a study of

6    JA's home. The assessment showed that while J's family lived in

7    extreme poverty, JA's family provided a loving home, and that one of

     the reasons that JA's father had brought his daughter to the U.S. was

8    to try and obtain medical care for her. The home study also revealed

9    that JA, like most Maya babies, was carried continuously by her

10   mother—cast upon her back in a Maya wrap. In Maya indigenous

     cultures, it is not uncommon to carry babies on their mother's backs

11   until the child reaches three or four years of age. This cultural practice

12   may impact the ability of a child to reach developmental milestones

13   based on American norms.

14   Prior to leaving for the United States, JA's father had made her a

     beautiful wooden walker to facilitate her ability to stand and,

15   eventually, to walk. The Young Center recommended JA's

16   expeditious return to her family, as our primary concern was her

17   length of separation from her father and primary caregiver. All of our

     work to ensure her safe return to home country could have been done

18   while JA remained safely in the care and custody of her father, who

19   presented no risk to her safety and well-being.

20   b.   Twelve-year-old "LR" was apprehended and separated from his father

          in October 2018. The government alleged that his father had mental

21        health concerns and was unfit to care for his son. We received no

22

Exhibit E, Page 90

information indicating that a child welfare or mental health expert made this determination. Our work led us to believe that an inability to understand the father's indigenous language may have created concerns about his mental health. We identified no reasons that LR could not be safely reunified with his father; but because his father had been quickly deported and the family feared for LR's safety in home country, LR was released to a sponsor while he pursued his claim for protection.

39.     In a number of cases to which we were appointed, DHS permitted a child it had previously separated due to alleged safety concerns to be reunified with the separated parent—but only for the sole purpose of repatriation, such as the cases of "EY" at paragraph 37(b), and "EE" at paragraph 37(f).

a.   Similarly, six-year-old "AT" was apprehended with and separated from her father in February 2019. Her father's prior criminal history consisted of breach of peace and assault charges. DHS nevertheless agreed to AT's reunification with her father for the sole purpose of their joint return to home country. In all, AT spent more than 121 days—almost four months—separated from her father before they were jointly repatriated.

40.     In sum, in nearly every case, the Young Center determined that purported reasons for the separation were insufficient under child welfare laws to justify the children's separation and that the separations were contrary to the children's best interests. In most of those cases, we recommended reunification with the parent from whom the children were separated. There were cases in which the child could not be reunified with the separated parent because the parent faced prolonged government custody or because the parent(s) believed it would be unsafe for the child to return to home country. In those cases, we recommended reunification

1  with the child's other parent or another family member. But those

2  recommendations to release the child to another parent or safe individual does not

3  mean that the original separation was necessary for the child's safety or otherwise

   in the child's best interests. Rather, in these cases it was determined that it was in

4  the child's best interests not to be detained.

5  41.    To date, of the 121 cases, the Young Center recommended <u>against</u> the

6  reunification of the child with the separated parent for safety reasons in just four

7  cases. In those specific cases, evidence that the parent posed a risk to the safety of

   the child if they were to be reunified was as follows:

8          a.  The child alleged abuse by the parent and did not wish to be reunified

9              with him (one instance).

10         b.  The parent was cited for the neglect of a child resulting in substantial

               harm to the child (one instance).

11         c.  The non-accompanying parent filed a report indicating that the parent

12             accompanying the child had kidnapped the child (two instances).

13 42.    One case involved an adult who claimed to be a parent but who lacked

14 sufficient evidence such that we recommended against the child's reunification

   with the adult; and in that case, continued separation was consistent with the

15 child's wishes.

16 43.    In nine of the 121 cases, we cannot determine whether the concerns that led

17 to the separation were sufficient based on limited information. For example, in at

   least two of those nine cases, the parent exhibited signs of emotional or mental

18 distress while in custody, after which DHS separated the child from the parent. We

19 do not have the information necessary to know whether the distress was related to

20 the family's detention or fears of separation (which could have been mitigated

   without separation) or whether the child was in imminent danger due to the

21 parent's distress.

22

**The decision to separate a family in DHS custody can take months to reverse with serious harm to the child as a result of the prolonged separation.**

44.    In the state child welfare system, when there is a concern that a parent poses a risk to the child's safety, an employee of the state child protection agency evaluates the child and makes the decision to separate.  Those decisions are governed by child welfare laws, which permit separation only if the child is in imminent danger. Before making the decision to separate, caseworkers will visit the child's home, speak to caregivers or other adults in the child's life, speak with the child, and review relevant records.

45.    To the best of my knowledge, CBP officials, not child welfare officials, make the decision to separate children from their parent in immigration custody. The information they have provided about the reasons for separation do not include evidence of a threat to the child's safety if the child remains with the parent.

46.    State child welfare officials who make the decision to separate a child from a parent must bring their concerns and evidence to a state court, where the basis for the separation is reviewed by an independent judge in a matter of days and where the child must be returned to the parent if reasonable measures can ensure the child's safety while remaining in the parent's custody.

47.    In the cases of children separated from their parents by CBP officials, we have found that children spend months in government custody without their parents, without any court review of the basis of the separation.

48.    In the 121 cases we identified for the purposes of this affidavit, the average length of custody for the separated children was over 115 days—nearly four months. As a point of comparison, the most recent, publicly available information

states that the average length of stay for children in ORR custody was just 44 days.[24]

49.    A child's separation from his parents is a deeply traumatizing experience and can carry significant physical and emotional consequences well beyond the period of separation.[25]

a.  The American Psychological Association has raised grave concerns that the sudden and unexpected separation of a child from his or her parent can cause severe emotional trauma, noting that "the longer that parents and children are separated, the greater the reported symptoms of anxiety and depression are for children."[26]

b.  A Past President of the American Academy of Pediatrics (AAP) cautions: "[H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of

[24] Miriam Jordan, *Migrant Children are Spending Months 'Crammed' in a Temporary Florida Shelter*, NY TIMES (June 26, 2019), https://www.nytimes.com/2019/06/26/us/homestead-migrant-children-shelter.html (stating that in May 2019, the average length of stay for children in ORR was 44 days).

[25] Letter to Department of Homeland Security Secretary Kirstjen M. Nielsen, Renewed Appeal from Experts in Child Welfare, Juvenile Justice and Child Development to Halt the Separation of Children from Parents at the Border (June 7, 2018) (a letter from over 200 child-centered organizations opposed to family separation on the grounds that it "disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness" even after reunification),  https://www.childrensdefense.org/wp-content/uploads/2018/08/child-welfare-juvenile.pdf.

[26] See Letter to Former Department of Homeland Security Secretary John F. Kelly, AMERICAN PSYCHOLOGICAL ASSOC. (Apr. 5, 2017), http://www.apa.org/advocacy/immigration/separating-families.pdf.

prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[27]

   c.  The World Health Organization (WHO) agrees: "Parent-child separation has a direct and immediate impact on a child's physical, cognitive, mental and emotional well-being."[28]

50.   In the experience of Young Center Child Advocates, children separated from their parents exhibit a range of responses that demonstrate their deep distress and the emotional and physical harm of separation.

Signed:

_____

Jennifer Nagda
July 29, 2019

[27] Colleen Kraft, AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx.
[28] Catherine Jan et al., *Improving the Health and Well-Being of Children of Migrant Workers*, BULLETIN OF THE WORLD HEALTH ORG. 850, 850 (2017), http://www.who.int/bulletin/volumes/95/12/17-196329.pdf.

# EXHIBIT F

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| Ms. L., et al., | |
|---|---|
| Petitioners-Plaintiffs, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF MARION DONOVAN-KALOUST** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| Respondents-Defendants. | |

1. I, Marion Donovan-Kaloust, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C § 1746 that the following is true and correct:

2. I am a Managing Attorney with Immigrant Defenders Law Center ("ImmDef"), a non-profit organization headquartered in Los Angeles that provides *pro bono* representation and legal services to immigrants in removal proceedings.  We serve both adults and children in removal proceedings, as well as separated families.

3. In my role as Managing Attorney, I supervise ImmDef's Detained Youth Empowerment Project at three local licensed-non-secure or transitional foster care facilities. Specifically, I oversee our representation of clients, and provision of Know Your Rights Presentations, legal screenings, friend of court services, referrals, and other legal services to children detained in Office of Refugee Resettlement ("ORR") custody.  In this capacity, I manage a team of five staff who regularly visit the facilities we serve—David and Margaret Youth and Family Services ("David and Margaret Shelter") in La Verne, CA; Florence Crittenton Services of Orange County, Inc. Shelter ("Crittenton Shelter") in Fullerton, CA; and Nuevo Amanecer Latino ("NAL") Foster Family Agency transitional foster care program in Los Angeles, CA.  Our team visits each of these facilities at least once a week, and more if an exigent need arises.

4. Through my work at ImmDef, I have encountered approximately 115 children in the shelters we serve who have been separated from their parents since November 2017.  Of those children, approximately 37 were separated from their parents after June 26, 2018.  According to information received from the Office of Refugee Resettlement, the Immigration and Customs Enforcement ("ICE") juvenile coordinator, and the children's case managers, at least five of the last 37 children were separated due to allegations of parental criminal history or unfitness. By the time the child enters ORR custody, the decision to separate the child has already been made by the Department of Homeland Security.

5.  I represent many of these separated children in their immigration matters.  As part of my representation, I must investigate whether reunification with their parent is in my client's interest.   To do that, it is imperative that I obtain detailed information and documentation from the U.S. Government related to the allegations against the parent that led to the initial separation. However, obtaining the information has proven difficult if not impossible. We have typically been unable to obtain any documents or specific explanation regarding the allegations against the parents from the Department of Homeland Security. Often, even the ORR Federal Field Specialists who oversee the shelters we serve and decide whether and when to reunify children with their families do not have complete information about the reasons for the separation.

6.  For example, in two such cases, the Government alleged serious abuse on the part of the parent.  However, in both cases, the children denied that any abuse had taken place, and clinical staff working with the children did not find any evidence of the children having been abused.

7.  In one of these cases, the ICE Juvenile Coordinator stated that he had reviewed criminal documents from the child's home country alleging that the father had been sexually abusing the child.  However, despite repeated requests, the Government has not provided these documents to me, to the ORR Field Specialist, or to the ORR-Appointed Child Advocate (a neutral, independent child-welfare specialists who investigate and make recommendations to government entities (such as CBP, ORR, the Immigration Court, ICE, and U.S. Citizenship and Immigration Services) regarding the child's best interests). I have filed a FOIA request on my client's behalf, but I have not yet received any response.

8.  In the second case mentioned above, the child allegedly made a border statement accusing her father of sexual abuse.  The child later repeatedly and consistently denied ever having made such a statement, and denied that any abuse had ever occurred. Despite repeated requests, the Government refused to provide me any further

information, and it denied my request to see a copy of the I-213 so that I could verify the statement about abuse.

9. Finally, after approximately six weeks, I was able to obtain a courtesy copy of the I-213 from the DHS Office of Chief Counsel once it had been filed with the immigration court. The I-213 did include information about the allegation, but the same paragraph also included information suggesting that the allegation was not about my client: It stated that she was being referred for a credible fear interview, but because my client is an unaccompanied child, she is not subject to the credible fear process. Therefore, it appears that the abuse allegation reported in the I-213 may have been about a different person altogether. I again filed a FOIA request, but it has been pending many weeks and my client's father has since been removed.

10. As the children's attorney, it is exceedingly important for me to be able to get information about these types of allegations, or to at least fully understand the Government's basis for making the determination that the parent is a danger. In my experience, the Government often makes mistakes in these situations. But without a full understanding of the basis for the allegation, it is impossible for me to verify its accuracy or advocate for reunification—or, if the parent is indeed a danger, to explore safe and appropriate alternatives to parental reunification. In short, without some actual information from the government, I am impeded from determining which course of action is in my clients' interests and advocating on their behalf.

Executed this 29th day of July, 2019.


   /s/ Marion Donovan-Kaloust
   Marion Donovan-Kaloust

# EXHIBIT G

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br>        *Petitioners-Plaintiffs*, <br><br>    v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al., <br><br>        *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **DECLARATION OF MICHELLE LAPOINTE** <br><br><br> CLASS ACTION |

1.      I, Michelle Lapointe, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      I am a senior attorney at the Southern Poverty Law Center's Immigrant Justice Project in Decatur, Georgia. I am an active member of the State Bar of Georgia. Our Project serves individuals detained at various ICE detention centers in the Southeast, including parents separated from their children.

3.      We represent a father, M.A.B., who was separated from his three year old daughter at the border in Texas in March 2019. Immigration officials told him that they had to take the girl, M., away because they did not believe that he was her father.

4.      Although Mr. A.B. is M.'s father, his name does not appear on M.'s birth certificate. However, he brought two notarized documents from M.'s mother in Honduras: one attesting that M.A.B. was M.'s father and explaining the reasons why his name does not appear on the birth certificate, and another providing Mr. A.B. guardianship over M. The documents were accompanied by the Honduran identification card of M.'s mother. Mr. A.B. showed these documents to immigration officials shortly after he and M. were apprehended and detained near the border.

5.      Immigration officials ignored the documents and said told Mr. A.B. he was not M.'s father, and that they had to take M. away from him. Mr. A.B. requested that officials perform a DNA test to confirm that he is M.'s father. The immigration official ignored his request and forcibly separated him from his daughter. Officials sent to M. to New York City and transported Mr. A.B. to ICE detention in Mississippi.

6.      I have reviewed the ORR case file for M. Some of the following information is from that file.

7.      On March 11, 2019, the case manager for M. at the Cayuga Centers facility in New York City noted that she had contacted M.'s mother in Honduras, and the mother

had confirmed that Mr. A.B. was M.'s father. The next day, on March 12, 2019, a caseworker noted in M.'s case file that Mr. A.B. "may be the minor's father, but he does not appear on her birth certificate, therefore; relationship cannot be established." The worker went on to "suggest [ ] DNA testing *if he is released*." (emphasis added).

8.      For over two months after their separation, Mr. A.B. had no contact with M. His first call with M. occurred on or about May 10, 2019, from ICE detention. M's ORR case notes reflect that during the call, "[M.] was adamant she did not want to speak with him because she was mad at him. [M.] screamed numerous times."

9.      M. turned four while in ORR custody.

10.     M. has suffered greatly in ORR custody. Records reflect that another child residing the same foster home made M. touch her private parts and kiss her on the lips—behavior the foster parent discovered after hearing a disturbance in the middle of the night. In addition, M. regressed in toilet training and the foster parent observed that M. was "not chewing or being able to drink properly."

11.     While in ICE custody in Mississippi, Mr. A.B. had a credible fear interview, which he passed. He was placed in full removal proceedings, and transferred to ICE detention in Richwood, Louisiana. As the weeks and months passed without any sign that he would reunify with his daughter, Mr. A.B. grew increasingly desperate. He continued to request a DNA test to confirm that he was M.'s father, but his requests were ignored. His telephonic contact with M. was limited.

12.     In early June, during an immigration court hearing via videoconference from New York state, Mr. A.B.—proceeding pro se—asked the judge for an order of voluntary departure. The judge granted his request and ordered voluntary departure to Honduras.

13.     Mr. A.B. retained SPLC on June 27, 2019 for assistance with reunification with his daughter. On June 28, I sent a letter to DHS, ORR, and Cayuga Centers officials requesting a DNA test to prove Mr. A.B.'s paternity of M. On June 29, the DNA test

was performed on Mr. A.B. In early July, Mr. A.B. was transferred to the Catahoula Correctional Center in Harrisonburg, Louisiana.

14.     An immigration judge in New York City granted voluntary departure to M. in early July. M.'s advocates strongly recommended that she be jointly repatriated with her father to avoid causing her additional trauma.

15.     On July 11, our office was informed that the DNA test results had come in, confirming that Mr. A.B. is M.'s father. In the meantime, Mr. A.B.'s desperation to be released from detention increased. Although he preferred to be sent back to Honduras with his daughter, he could not bear to remain in detention indefinitely without any assurance of when or whether the U.S. government would allow him to repatriate with his daughter. He eventually requested to be returned to Honduras as soon as possible.

16.     Mr. A.B. and M. have been apart for nearly five months.

17.     Mr. A.B. was repatriated to Honduras on July 19, 2019. His daughter M. remains in ORR custody in New York City, awaiting repatriation to Honduras on a flight without her father.

18.     I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and Georgia, based on my personal knowledge. Executed in Decatur, Georgia, on July 30, 2019.


/s/ Michelle Lapointe
MICHELLE LAPOINTE

# EXHIBIT H

1   Lee Gelernt*                          Bardis Vakili (SBN 247783)
    Judy Rabinovitz*                      ACLU FOUNDATION OF SAN
2   Anand Balakrishnan*                   DIEGO & IMPERIAL COUNTIES
    Daniel A. Galindo (SBN 292854)        P.O. Box 87131
3   AMERICAN CIVIL LIBERTIES              San Diego, CA 92138-7131
    UNION FOUNDATION                      T: (619) 398-4485
4   IMMIGRANTS' RIGHTS PROJECT            F: (619) 232-0036
    125 Broad St., 18th Floor             bvakili@aclusandiego.org
5   New York, NY 10004
    T:  (212) 549-2660
6   F:  (212) 549-2654
    lgelernt@aclu.org
7   jrabinovitz@aclu.org
    abalakrishnan@aclu.org
8                                         *Admitted Pro Hac Vice
    Attorneys for Petitioners-Plaintiffs
9   Additional counsel on next page

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

|   |   |
|---|---|
| Ms. L. et al.,<br><br>                 *Petitioners-Plaintiffs*,<br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement,<br><br>                 *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: July 30, 2019<br><br>**DECLARATION OF EFREN OLIVARES**<br><br>Class Action<br><br>**NO HEARING DATE** |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

1.      I, Efrén C. Olivares, hereby declare, pursuant to 28 U.S.C. 1746:

2.      I am an attorney and the Director of the Racial and Economic Justice Program at the Texas Civil Rights Project.

3.      Since May 2018, I and a team under my supervision have interviewed over 500 parents at the federal courthouse in McAllen, Texas, who were separated from their children at the border. We interview these parents in the minutes before their criminal hearings for illegal entry or illegal re-entry.

4.      In addition, we represent or coordinate representation for over one-hundred separated parents who have sought or are still seeking to reunite with their children, including coordinating representation for more than ten wrongfully parents separated from their children after the Court's June 26, 2018 preliminary injunction order.

5.      We have noted recurring difficulties in representing parents separated after the preliminary injunction.  These difficulties are surely exacerbated for parents who are not represented.

6.      We have interviewed adults who have been separated from their biological children on the basis of gang affiliation or allegations of criminal activity, but parents and their lawyers are not provided with evidence to review or a method to contest the allegations.

        Mr. A.

7.      One example is Mr. A., a father from El Salvador, who was separated from his then-9 and 11 year old children.

8.      In early November 2018, Mr. A. was separated from his children by CBP officers based on allegations that he was a member of the MS-13 gang, and that he had engaged in criminal activity with that gang in Honduras. Despite his request, the agents did not provide Mr. A. any evidence of his alleged gang membership or activity. Nor did the government provide his immigration attorney with information

about the alleged gang membership or activity, even after repeated requests to ICE and the filing of a Freedom of Information Act request.

9.      When my team interviewed Mr. A., he assured us that he had never been a gang member, and that he had never even been to Honduras.

10.     Mr. A.'s family members in San Salvador sought a background check from Salvadoran authorities.  Their search uncovered that another man with the same first and paternal last name and the same date of birth did have a criminal record in El Salvador.  This other man had a different maternal surname and thus should not have been confused with Mr. A.

11.     After the government refused to provide any evidence of the alleged gang membership and reunite Mr. A. and his children, my office partnered with a law firm and filed a lawsuit on behalf of Mr. A. in the U.S. District Court for the District of Columbia, seeking reunification with his children.  We requested a temporary restraining order seeking immediate reunification and a second credible fear interview, and presented our evidence that the criminal allegation was erroneous.

12.     The court issued a temporary stay of removal before hearing oral arguments. Before the court could rule, the government agreed to grant Mr. A. a second credible fear interview.  Mr. A. passed this CFI.

13.     ICE denied Mr. A.'s request for release on bond despite evidence that he was neither a danger to society or a flight risk. Following a bond hearing, an immigration judge granted the bond request, and Mr. A. was released on bond. He was reunited with his two children after 184 days of separation.

        Mr. C.C.

14.     A second example is Mr. C.C., a Guatemalan father whom CBP officers separated from his ten-year-old child in January 2019 due to an unsubstantiated arrest warrant in Guatemala, a warrant that is an important part of the father's asylum claim.

15.     Mr. C.C. and his son G. C. C. fled Guatemala to seek asylum in the United States for reasons related to their indigenous background, namely Mr. C. C.'s activism defending his indigenous community's ancestral lands from a European hotel developer.

16.     According to Mr. C. C., the arrest warrant was issued as part of the hotel developer's campaign to discredit anyone who opposed his project, through corruption and his influence on the Guatemalan prosecutors. The arrest warrant in Guatemala was for breaking and entering, among other alleged crimes. Mr. C.C. was not arrested in Guatemala.

17.     CBP officers relied on this arrest warrant to separate Mr. C.C. from his son – without taking into account evidence that the arrest warrant—which accused 52 people of the same array of crimes—was baseless, as retaliation by Mr. C.C.'s persecutors in Guatemala, and was in fact part of the evidence that formed the basis of his asylum claim, as it showed that the Guatemalan government could not protect him.

18.     Furthermore, when separating Mr. C.C. and his son, CBP officers failed to provide the family an interpreter even though their primary language is Q'eqchi'.

19.      My colleague visited and met with Mr. C.C., found him pro bono immigration attorneys to take his asylum case, and assisted in his immigration representation. An immigration judge released Mr. C.C. on bond after he passed his CFI, pending his asylum case, and ORR released his son to his father after deciding that Mr. C.C. did not pose a danger to his child.

20.     However, father and son endured approximately five months of separation – during which time Mr. C.C. was especially concerned for his son's well-being given the isolation and additional hurdles the son would experience due to the language barrier.

21.     In several cases, separation has been based on unfounded questions about parentage.

Mr. P. D.

22.    In early July 2019, CBP agents separated Mr. P. D., a father from Guatemala, from his 2-year old daughter, alleging that he was not her father. Mr. P. D. had a copy of his daughter's birth certificate, but CBP agents alleged that the document was fraudulent.

23.    Mr. P.D. is not fluent in Spanish, and his native tongue is Mam, an indigenous language. CBP agents did not provide Mr. P. D. with a Mam interpreter during his processing or at any time leading up to the separation.

24.    CBP officers did not contact the Guatemalan consulate to confirm whether the document was authentic. I personally contacted the Guatemalan consulate, which promptly confirmed that the document was authentic.

25.    But DHS officials still refused to reunite Mr. P. D. and his daughter.

26.    Meanwhile, his daughter was sent to El Paso and placed with a temporary foster family.

27.    I visited Mr. P. D. while he was detained, and communicated with him through an interpreter. Eventually, Homeland Security Investigations (HSI) got involved in this case, and the agent conducting the investigation told me and my colleague by phone that HSI intended to conduct DNA tests of Mr. P. D. and his daughter, and that if the test came back negative, the Government would charge him with smuggling.

28.    The DNA test came back positive, confirming that Mr. P. D. had been telling the truth all along and he was in fact his daughter's father. After approximately one month of being separated, Mr. P. D. and his daughter were reunited.

Mr. J. A. F. H.

29.In February 2019, CBP officers separated Mr. F.H. from his 12-year-old biological daughter, F.H., on the allegation that he had presented a fake birth certificate.

30. When CBP officers claimed that Mr. F.H. presented a fake birth certificate on behalf of his daughter, they did not take steps to verify the authenticity of the birth certificate or the parent child relationship. Furthermore, they caused the child additional psychological harm by claiming, in front of the child, that her father was actually her uncle. The government criminally prosecuted Mr. F.H. for his initial entry into the United States and then deported him without his daughter. His daughter was subsequently reunified with her mother in the United States.

31. I declare that the foregoing is true and correct to the best of my knowledge.

Signed this 29th day of July, 2019.

Efrén C. Olivares

# EXHIBIT I

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al., <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **DECLARATION OF LISA KOOP** |

1.     I, Lisa Koop, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an associate director of legal services at the National Immigrant Justice Center (NIJC), based in Chicago, Illinois. NIJC is the legal service provider for unaccompanied immigrant children detained in Office of Refugee Resettlement (ORR) custody in the Chicago area.  NIJC also provides legal services to detained adults.  Since 2018, NIJC has maintained a Family Integrity Project (FIP), with the objective of providing advocacy and legal representation to families who were separated at the border.  I am the managing attorney for both NIJC's Children's Protection and FIP projects.

3.     NIJC represents separated mothers who are or were detained at the Webb County Detention Center in Laredo, Texas, and is currently monitoring the cases of twelve separated mothers detained in Laredo, Texas, whom the Department of Homeland Security (DHS) has excluded from the Ms. L class.

4.     In addition to these cases in Laredo, Texas, NIJC has initiated legal representation of more than 110 separated children and parents since June 2018.

5.     NIJC has represented the following asylum seeking mothers who were separated from their children specifically because DHS alleged that the mother was a gang member and excluded them from the Ms. L class.  In nearly all these cases, the women were victims of severe gang violence and not actual gang members.  NIJC was eventually able to disprove the allegations of gang membership.

   a. Ms. E is the Salvadoran mother of eighteen-year-old L.  They entered the United States on June 27, 2018.  Before fleeing to the United States, Ms. E was arrested by Salvadoran government officials when she was exiting a store while a group of gang members were being arrested nearby.  She was held for a few days and then released with no charges.  Nonetheless,

when she arrived in the U.S., DHS separated her from her son.  Through our own efforts, we were never provided the specific basis of the separation.  We were recently informed by Ms. L class counsel that she was separated due to an alleged arrest for gang affiliation.  Her son was transferred to ORR custody.  Despite having experienced severe gender violence perpetrated by multiple persecutors, DHS initially found that she did not possess a "credible fear" in July of 2018 and she languished in detention away from her son for months with no action taken on her case.  In January 2019, following legal intervention by NIJC, Ms. E was given a second credible fear interview and this time she was promptly found to have credible fear.  In March of 2019, after about eight months of separation from her son, she was released from detention and they were reunified.  The government never explained why it changed its position on her eligibility for release.

b.  Ms. R is a Salvadoran mother who entered the United States with her three-year-old old son, M, on February 25, 2019.  DHS separated Ms. R from M soon thereafter, seemingly because Ms. R was briefly held in El Salvador in late 2018 or early 2019 for "resisting arrest" when the gang member who was forcing her to be his girlfriend was arrested.  Ms. R's son was taken into ORR custody.  We were informed by counsel for the Ms. L. class that the government was citing her alleged gang affiliation and "criminal record" as the reason for the separation.  NIJC obtained for Ms. R a document from the Salvadoran Ministry of Justice and Public Security that stated, "according the search in the Criminal Records System, Prison Information System, and general information provide in this request, as of this date the citizen [Ms. R], has no criminal record…" Following submission of this document to the Department of Justice, Ms.

R was released and reunified with her son.  They were separated for more than three months.  When they reunified at an airport in Virginia, Mr. R's son was withdrawn and did not appear to recognize his mother.

c.  Ms. A, is a Salvadoran mother who entered the United States on April 10, 2019 with her two children, A and R, who are 17 and 12 years old respectively.  Ms. A was separated from her children because in about March of 2008 she was temporarily detained by Salvadoran authorities when she was eating at a restaurant frequented by gang members.  She was released after about three days and has no criminal convictions.  Ms. A subsequently became a police officer in El Salvador and experienced severe gender harm when she refused to comply with gang demands that she cooperate with them.  We were informed by Ms. L class counsel that the U.S. government was citing her alleged gang membership as the reason for the separation.  After NIJC provided the Department of Justice with an official clearance document from the Salvadoran government, Ms. A was released from detention and reunified with her children.  They were separated for more than two months.

d.  Ms. U is a Salvadoran mother who entered the United States on April 11, 2019 with her children O and S, who are seven and four years old respectively.  DHS separated Ms. U from her children because she was falsely accused of collaborating with a gang.  She was held in pretrial detention in El Salvador for approximately one year before she was found not guilty and released.  We were informed by Ms. L class counsel that the government was citing her alleged gang membership as the reason for the separation.  On June 28, 2019, NIJC provided the Department of Justice with official Salvadoran government document establishing she has no criminal conviction but DHS has not yet released

her, nor have they provided the reasons for her continued detention and separation from her children.  She has been separated from her children for more than three months.

6.    In addition to cases where false gang allegations appear to have triggered improper family separations, NIJC has seen matters where DHS uses unsubstantiated allegations of terrorist activity and criminal convictions of dubious origins to justify separations.

a. Ms. M is an Angolan mother who entered the United States on April 1, 2019 with her children M and K, who are seven and five years old respectively.  Ms. M was separated from her children because the U.S. government appears to be asserting that her participation in peaceful demonstrations in support of human rights (including running water, better roads, electricity, and educational opportunities in her community) render her subject to the terrorism related grounds of inadmissibility. Notably, the ICE trial attorney did not raise these grounds as a potential bar to asylum at Ms. M's most recent hearing before the immigration court in Laredo, Texas on June 18, 2019.  DHS also did not indicate "danger to the community" or any other concerns when denying her parole on July 10, 2019.  Ms. M is seeking asylum based on severe gender violence by government soldiers against her in Angola.  She remains detained and has been separated from her children, who remain in ORR custody in Chicago, for more than three months.  Ms. M has been experiencing significant medical issues while detained, which could be pelvic inflammatory disease.

b. Ms. V is a Salvadoran mother who entered the United States on March 2, 2019 with her daughter, A, who turned two years old on the day she was separated from her mother, March 9, 2019.  She was still nursing at that

time.  Ms. V was separated from her child because in about 2014 in El Salvador, she was forced under extreme duress to deliver a small amount of marijuana – about 33 grams – to an imprisoned gang member who was ordering subordinate gang members to stalk, menace, and threaten Ms. V. He had, on prior forced jail visits, repeatedly raped and beaten Ms. V. Rather than deliver the marijuana to the gang member, Ms. V surrendered the drugs to Salvadoran authorities and pleaded for help from guards at the jail.  Instead of helping her, government officials arrested and prosecuted her.  After about 17 months of pre-trial detention, Ms. V explained the circumstances of her arrest to a judge, who found her guilty of simple possession and sentenced her to time served plus community service.  Unbeknownst to Ms. V, the government appealed the judge's decision.  Ms. V was never notified, despite inquiries to government officials.  Ms. V's public defender failed to respond and the conviction for possession was overturned and converted to a trafficking charge.  As a result of this sham appellate process, Ms. V now faces a prison sentence of ten years upon return to El Salvador.  Ms. V's daughter was released from ORR custody to the care of a family friend in Iowa.  The caregiver reports that Ms. V's daughter is inconsolable most nights and cries for her mother.  On one occasion, the caregiver woke in the middle of the night to find the two-year-old had sleepwalked into her room and was attempting to nurse by sucking on the caregiver's arm.  On July 11, 2019, Ms. V was found credible by an immigration judge at her asylum hearing, but nonetheless denied asylum on other grounds.  Ms. V has appealed the decision to the Board of Immigration Appeals.

7.    When NIJC represents a separated parent, we find that they are sometimes given some verbal indication at their credible fear interviews of the basis

for the separation, but no specific details or documentation.  As attorneys for separated parents, NIJC has asked numerous government officers, including ICE Deportation Officers, USCIS Asylum Officers, ICE Trial Attorneys, and attorneys from the Department of Justice, for documentation to substantiate allegations of gang affiliation or criminal history.  In all but one case, the government has refused to provide us with documentation reflecting the reason or justification for the separation.

8.     The time it takes NIJC to determine the reason for the separation and then obtain documents refuting the basis of the separation extends the separations of parents from their children by a minimum of several weeks.  In order to ascertain possible reasons for separation, NIJC interviews detained separated parents, most of whom have extremely limited telephone access.  We obtain contact information for family members in the separated parent's country of origin and seek to communicate via WhatsApp or other social media with those contacts.  We then coordinate with these family members as they seek exoneration documents and/or certified dispositions for their detained family members.  In some instances, NIJC has worked with attorneys in the client countries of origin to obtain such documents.  In other instances, we have worked with consulates in the U.S. to determine the criminal histories – or lack thereof – of our clients.

9.     Most of the separated children are too young to provide any information about themselves, much less an explanation for the separation from their parent.  As with the parents, when NIJC is able to obtain information regarding the alleged basis for the separation, no documentation is provided to support the allegation and frequently, any available evidence contradicts the allegation.  For example, in at least two cases, a prior criminal conviction in the United States was provided as the reason for the separation.  However, when the government provided NIJC with the criminal case number for the alleged criminal conviction, the case related to a person other than the child's parent.

10.     In other cases, when NIJC has been told by DHS that the separation was due to concerns about the validity of the parent-child relationship, no evidence of these concerns has been provided.  For example, in one case, a teenage Guatemalan boy was separated from his father because the government allegedly did not believe they were related even though they had presented a valid birth certificate establishing their relationship.  The government never provided any other evidence to contradict the birth certificate, but when the father – who had fled to the United States to seek asylum – could no longer bear being separated from his child and made the difficult decision to be jointly repatriated rather than remain separated, the government agreed that they could repatriate together, no longer disputing the validity of their relationship.

11.     In nearly every case NIJC has handled, including the cases described above, the government has not coordinated phone calls or other communication between separated parents and their children.  In at least once instance, the DHS parental interests team has not been able to locate a child's separated parent and has recommended NIJC contact the CBP watch commander for information.  Where parent/child telephone calls are facilitated, it is most often only after significant advocacy by NIJC.  In most instances, the communication does not happen at all or happens only very irregularly while children remain in ORR custody.

I declare under penalty of perjury under the laws of the United States and Indiana that the foregoing is true and correct.  Executed on July 20, 2019, in Goshen, Indiana.

s/ Lisa Koop
LISA KOOP

# EXHIBIT J

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

     *Petitioners-Plaintiffs,*

     v.

U.S. Immigration and Customs Enforcement
("ICE"), et al.,

     *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF CAMILA TREFFTZ**

1.     I, Camila Trefftz, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am the Unaccompanied Children's Program Coordinator at the Michigan Immigrant Rights Center ("MIRC"), which has offices throughout Michigan state. I am based in Kalamazoo, Michigan. My work focuses on the representation of unaccompanied children in removal proceedings and other immigration matters. I am an Accredited Representative with the U.S. Department of Justice Executive Office for Immigration Review, which means that I am authorized to represent noncitizens in removal proceedings before the immigration courts.

3.     At MIRC, I help coordinate the work approximately 21 individuals, including attorneys, accredited representatives, and legal assistants, to represent unaccompanied children in immigration matters. Our office collectively has represented and currently represents minor children who have been separated from parents and other relatives. I estimate that our office has collectively worked with 118 children who were separation cases.

4.     MIRC is the primary legal services provider for children detained in the custody of Bethany Christian Services ("BCS"), which runs several ORR facilities and shelters for unaccompanied children in Michigan. MIRC meets with all children detained in BCS facilities and provides basic services, including a know-your-rights orientation and a legal screening. We also represent all children in BCS care who are separated from their parents. All our cases involving separated children come as referrals from BCS.

**Problems Receiving Timely Information Concerning Separation**

5.     MIRC has encountered numerous barriers obtaining timely and meaningful information concerning separated children. Our primary source of information

concerning separation cases, including the basis for separation, is BCS, which refers cases to our office.

6.      Based on conversations with BCS staff, our understanding is that BCS initially learns that a child in its care was separated in two ways. The first is that CBP supplies a form (typically included when CBP refers the case to ORR) flagging a separation. The second is that BCS learns of the separation during their own screening process.

7.      In addition to the above mechanisms, BCS may also learn of separation-related information from contacts at CBP or ORR. However, it is not clear to us that BCS consistently receives separation-related information from the federal government, and in at least some cases appears to receive no information at all.

8.      When we receive a list of new cases from BCS, they generally flag for us whether they consider the case to be a separation case. However, when they do so, the information BCS provides is very basic and does not include any information concerning the basis for the separation.

9.      Our understanding is that BCS also sometimes learns information concerning the reasons for the separation by contacting families, sponsors, and detained parents of the child. Likewise, in light of the lack of consistent information, MIRC staff must typically conduct our own efforts to ascertain information concerning the reasons for the separation.

10.      Even though BCS is not a reliable source of information concerning separations, it is nevertheless a better source of information than DHS or ORR. The Detroit Field Office is the DHS office with responsibility over Michigan, and they generally refuse to provide us with any information or documentation concerning a child's case unless that office receives the child's child's A-file. But it typically takes the Field Office months to receive the file.

11.     Similarly, when we attempt to request separation information from ORR, the agency directs us to file a UC Case File request, which can take weeks or months to process.

12.     We occasionally attempt to obtain separation information from the ORR Federal Field Specialist ("FFS") that has jurisdiction over BCS facilities. However, we find that the FFS generally directs us back to BCS, saying that they have the most information. We have also heard from other providers that the DHS Office for Civil Rights and Civil Liberties can occasionally get separation-related information for certain cases, but our requests to that office have not yet resulted in meaningful information.

13.     The limited separation information we do receive is frequently insufficient to meaningfully help the child. For example, in two recent cases, the children were flagged as separated by BCS, but we were not provided the identities, locations, or even the names of the separated parents. The parents may or may not be detained, and if they are, we do not know where. We are attempting to get in contact with the families of the children to obtain more information.

14.     The process of investigation can be very time consuming. If the kids are old enough to remember their potential sponsor's phone number, we receive family contact information directly from the children. However, for tender age or non-verbal kids, we are completely dependent on BCS's willingness to share family contact information in order to speak with relatives. They sometimes refuse to share contact information for potential sponsors, meaning we have virtually no way of contacting a child's family to learn more on the separation.

15.     We sometimes use the online ICE Detainee Locator System, making guesses at the parent's A-number by adding or subtracting from the last digit of the child's A-number. If the parent cannot be found on the detainee locator, we look through PACER to see if they are in the custody of the U.S. Marshal. If and when we are able

to locate parents, we are forced to navigate systems that do not allow us to directly called detained parents, and often face significant delays in being able to speak with parents directly.

16.     In over 90 percent of our separation cases, neither ORR nor BCS gives us any reason for the separation, even after we ask. We are therefore left to conduct our own investigation concerning the reasons why the family was separated. We sometimes receive information from the ACLU, as class counsel in the Ms. L. litigation, who we understand receives some information from the government concerning the reasons why a particular parent was separated from her child. But the information they have is quite limited, and sometimes we see potential separation cases about whom they have no information at all.

**Flawed Separation**

17.     Of the few cases where we have been able to ascertain the basis for the separation, we are aware of at least one where the government's alleged basis turned out to be misleading and based on partially incorrect information. In March 2019, a four-year-old girl named B. appeared in BCS care. B. informed me that she had been separated from her father at our initial meeting, but did not know the reason why they had been separated. BCS was able to provide contact information for B.'s mother, but not her father. When I asked the BCS caseworker if DHS had given a reason for the separation, the caseworker told me that her father had been flagged as a gang member.

18.     I contacted B.'s mother, who confirmed with me on several occasions that the father did not have any gang affiliations. She also told me that in El Salvador, the father had been previously charged with a homicide that took place near his workplace. But all charges were dropped and he was released from jail; another person was later arrested for the crime. B.'s mother also provided me with documentation from El Salvador showing that the charges had been dropped.

19.   We were later contacted by attorneys from the Texas Civil Rights Project, who were working with the father, called W. W. was at one point in federal criminal custody for immigration charges. TCRP had learned that B. was in Michigan, and helped connect us with her father and his public defender. We spoke with W., who told us that DHS had never given him a reason for being separated from B.

20.   W.'s public defender informed us that W. was charged with illegal reentry. Other than the above false accusation, W. lacks any criminal record. We attempted to get information underlying the gang allegations, but could not do so, despite asking BCS and speaking with the family.

21.   We were able to negotiate joint repatriation for B. and W. with the federal government. However, this process took significant effort. None of the relevant agencies coordinated with us, despite our representation of B.

22.   As B.'s representative, and also the person who was in possession of B.'s passport at that time, it was imperative for me to be informed about travel arrangements. I reached out to our local DHS officers three separate times and did not receive a response regarding travel arrangements. I also contacted W.'s deportation officer on several occasions to obtain information about the status of his deportation and received no information. In addition, I reached out to BCS and ORR several times regarding reunification plans, but received very little information until the day of B.'s departure. ORR made plans to reunify and repatriate the family without informing us. Luckily, the family was eventually sent back to their home country together, but the communication between the agencies—and with us—was deficient in numerous respects.

23.   *Ms. L* Class Counsel informed me on July 19, 2019, after the family was repatriated, that the family appeared on a list provided by the government. I was informed that the alleged reason for separation was W.'s alleged gang affiliation, as well as his referral for criminal prosecution for the immigration charge.

24.    I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge.  Executed in Kalamazoo, Michigan, on July 24, 2019.

CAMILA TREFFTZ

# EXHIBIT K

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Attorneys for Petitioners-Plaintiffs
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al., <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **SUPPLEMENTAL DECLARATION OF MICHELLE BRANÉ** |

1.     I, Michelle Brané, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.     I am an attorney and the Director of the Migrant Rights and Justice Program at the Women's Refugee Commission ("WRC"). I have previously submitted multiple declarations in this case. *See*, *e.g.*, Dkt. 397-1; 357-1; 172-1. My background, qualifications, and work with separated children and families are set forth in greater detail at Dkt. 78, and I incorporate that declaration herein. WRC also participates in the Steering Committee in this case.

3.     As part of our work advocating on behalf of separated children and parents, WRC continues to track separations that have taken place since June 26, 2018, when this Court issued its preliminary injunction. Through contacts with government agencies, lawyers, advocates, community members, and our visits to various detention facilities, we have learned of or discovered numerous families that have been separated since the Court's order.

4.     We frequently attempt to investigate the separations and discern what is happening with the family's immigration cases, where the families are detained, and why the separation has occurred in addition to assisting in the reunification of families. We also survey providers and lawyers who work with separated families to discern broader patterns in how these separations are taking place, and what systems the government agencies have put in place to document or address them.

5.     These investigations have revealed numerous problems in the ways the agencies are currently tracking ongoing separations.

6.     Our understanding is that Customs and Border Protection ("CBP") is using a system in which they place a "banner" or flag on a separation case in its database when it transfers over to ICE. CBP is also supposed to input notes from the I-213 containing information concerning separations that include, where they were

arrested, and the basic reasons for any separation. This information is only available in a notes section and there is no guarantee that all relevant information is noted.

7.     We have learned of cases in which either ORR, ICE or both, do not receive critical information about a separation – including whether a separation occurred in the first place. In our experience and based on reports we have received from the field, CBP is not consistently following the protocols, and in some cases the protocols themselves are insufficient. As far as I am aware, CBP also employs no quality control or review mechanisms for ensuring that individual CBP officers adhere to these information tracking practices.

8.     We have learned that in some cases, ICE has learned that a parent was separated after a parent calls the hotline, when an attorney or advocate contacts ICE with inquiries, or when ORR reaches out.  In some of these cases, there was no banner or incomplete information regarding the separation.

9.     ORR does not have access to the CBP I-213.  CBP is also supposed to input notes from the I-213 into documents shared with ORR, containing information concerning separations that include, where they were arrested, and the basic reasons for any separation. Only some of the information from this I-213 is transferred to ORR who needs at a minimum, the basic information that a separation occurred, why, and where the separation occurred, in order to make appropriate decisions about the child's placement.

10.     For example: We have been told that CBP inputs information about the location of the separation in a drop down menu that lists only border patrol stations and not ports of entry.  While many separations do occur with border patrol, there are separations taking place at ports of entry.  This means that in some cases, critical information is either inaccurate or not included.

11.     Because CBP is usually the agency that is effectuating the separation, and because ORR does not have access to the CBP database, if CBP fails to flag the case

or include information in documents that are transferred to ORR, no other agency that is connected to the parent or child has any information either. As a result, ORR frequently does not receive information from DHS when a family is separated. ORR frequently does not even know whether a child that is referred to its custody is separated at all, much less the location and identity of the parent, the reason for the separation, or any other pertinent information.

12.    In some cases, ORR learns of a separation on its own when its agency personnel or care providers interview the child and discover that the child was separated from a parent. But because of the lack of systemic and consistent documentation by CBP, and the inability of ORR to get timely and meaningful information, ORR does not know why the separation occurred or what basis the government is using to justify the separation. And even if ORR is aware the child was separated, it routinely lacks other crucial pieces of information necessary to fully investigate the situation, such as the location or contact information of the parent.

13.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on July 20, 2019, in Hyattsville, MD.


_____

MICHELLE BRANÉ

# EXHIBIT L

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
| v. | **DECLARATION OF DEREK LOH** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | |

I, Derek Loh, hereby declare as follows, and would competently testify to these matters if called to do so:

1. I am an attorney licensed to practice law in the States of New York and California. I am a Managing Attorney at Immigrant Defenders Law Center ("ImmDef"). ImmDef provides *pro bono* removal defense to respondents at the immigration courts in Los Angeles, Adelanto, and San Diego, California. In response to the Trump Administration's family separations, ImmDef expanded its services and began advocating for the reunification of separated, asylum-seeking families.

2. ImmDef was retained to represent Mr. B in July of 2018 while he was detained at the Adelanto ICE Processing Center. While ImmDef no longer represents Mr. B, I was the primary attorney assigned to his case and worked directly with Mr. B.

3. Mr. B, a non-citizen of the United States, presented himself at the Calexico Point of Entry on March 30, 2018 with his then 2-year-old daughter, M. They sought asylum and were detained by CBP.

4. Shortly thereafter, CBP agents separated Mr. B and M because they claimed they could not immediately confirm that he is her biological father. M was transferred to an Office of Refugee Resettlement facility in the Midwest. Mr. B was eventually transferred to Adelanto. The government then administered DNA tests that confirmed with 99.99 percent certainty that Mr. B is M's biological father.

5. Despite confirming their biological relationship, the government refused to reunify Mr. B and M, either outside of detention or within a family detention facility, due to Mr. B's criminal history.

6. At some point during their separation, Mr. B passed a reasonable fear interview and was placed in removal proceedings.

7. During a client meeting with Mr. B in August of 2018, he provided me with a copy of his FBI rap sheet. Mr. B told me that the rap sheet was given to him by the Immigration Judge during what I assume was a master calendar hearing.

8. Based on the FBI rap sheet that I reviewed, I determined that Mr. B's criminal history consisted of the following incidents:
   a. Two California charges from 2002 for assault and disorderly conduct; Mr. B was acquitted of both charges.
   b. A 2005 conviction in Arizona for an open container of alcohol violation.
   c. Two 2006 convictions in Arizona 2006 for a DUI and driving without a license.

9. Mr. B also had immigration violations: two from 2007, one from 2017, and one from 2018.

10. On August 10, 2018, I submitted an application for parole to ICE. Our submission included a written recommendation from M's official child advocate, who was appointed by EOIR. The child advocate determined that it was in M's best interest to be reunified with her father. Concerned with the continued separation of Mr. B and

his daughter, Senator Kamala Harris wrote a letter in support of their reunification, and this letter was submitted to ICE with our parole letter. On August 21, 2018, ICE informed me that the request for parole was denied.

11. On September 10, 2018, the ACLU informed me that Mr. B's name appeared on a list of parents who were denied reunification because of criminal history. My understanding is that government counsel in *Ms. L* provided no detailed information about the criminal history or underlying evidence to any parties about Mr. B's criminal history.  Our understanding of Mr. B's criminal history, therefore, was only a consequence of the documents that were eventually filed during his removal proceedings.

12. Due to his limited criminal record and its remoteness in time, Mr. B was sad, frustrated, and angry that the government refused to reunite him with M and instead intended to permanently separate him from his child.

13. On September 25, 2018, Mr. B was granted bond by an Immigration Judge who examined his criminal history and concluded that he was not a danger to the community. The Immigration Judge concluded that he was not a danger because his crimes were nonviolent and his alcohol violations were remote in time. After paying bond, Mr. B and his daughter were reunited outside of detention about two weeks later.

Executed this 29th day of July, 2019 in Los Angeles, California.


   __/s/ Derek Loh_____
      Derek Loh

Exhibit L, Page 139

# EXHIBIT M

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Attorneys for Petitioners-Plaintiffs
Additional counsel on next page

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org


Spencer E. Amdur (SBN 320069)
Stephen B. Kang (SBK 292280)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
samdur@aclu.org
skang@aclu.org

*Admitted Pro Hac Vice

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>          *Petitioners-Plaintiffs*,<br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>          *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br><br>**SUPPLEMENTAL DECLARATION OF MARTIN GUGGENHEIM**<br><br>CLASS ACTION<br><br><br>No Hearing Date |

I, Martin Guggenheim, hereby declare, pursuant to 28 U.S.C. § 1746:

1.   I am the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and a Founding Board Member of the Center for Family Representation.  I have submitted three declarations in this case, Dkt. No. 48-1, Dkt. No 78, Dkt. 221, Ex. 59, and incorporate those declarations herein.

2.   I have previously explained that the presence of a parent's criminal record does not displace the general rule that "[a]bsent a finding of unfitness, it is presumed that children are best served by remaining with their natural parents." *In re Termination of Parental Rights to Max G.W.*, 716 N.W.2d 845, 857 (Wis. 2006) (citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982)). *See* Dkt. 221, Ex. 59, ¶ 3.

3.   Under the states' child welfare systems, criminal convictions are relevant only insofar as they bear on the fitness of the parent, and even then must be considered in combination with a totality of factors that go to the best interests of the child. This general principle holds true even where a criminal conviction is for the most serious crimes. *See* Dkt. No 78, ¶ 8; Dkt. 221, Ex. 59, ¶¶ 5-9.

4.   This principle applies with even greater force when the government is seeking to remove a child from her parent's care and custody on an emergency basis. There is a uniform consensus under both state child welfare law and federal constitutional law that, absent an adversarial hearing before a neutral decisionmaker where the parent has a full and fair opportunity to dispute the allegations against her, a child can only be taken from a parent's care based on a particularized showing that keeping or reuniting a child with her parent would place the child at imminent risk of danger. The word "imminent" in that prior sentence deserves particular emphasis, since it means that an emergency removal cannot be justified based on stale allegations or long-past parental misconduct.

5.   Moreover, an emergency removal can only be based on concrete, objective evidence of imminent harm, not the subjective evaluations or opinions of law

enforcement officers or child welfare workers. The evidence must also be individualized to the parent and child's circumstances, rather than based on generalized or overbroad criteria.

6. Under this framework, criminal history, standing alone, would never supply a categorical basis to justify emergency separation of parent from child. The inquiry, once again, must focus on whether there is *imminent risk* to the child. As I have testified before, hundreds of thousands of parents with seemingly serious criminal convictions—even felony convictions—retain their constitutionally-protected right to care for their children once they have served their sentences and are released from custody. *See* Dkt. 221, Ex. 59, ¶ 9.

7. There may be certain narrow categories of convictions that could bear on whether the child is at imminent risk, such as where the parent was convicted of abusing the child in question. But even in such cases, a child welfare worker or law enforcement officer would have to conduct a meaningful and individualized investigation into the family's circumstances, and could not remove the child from the parent's case absent a determination, based on objective and concrete evidence, that the child was in danger.

8. For example, in *In re Afton C.*, 17 N.Y.3d 1, 950 N.E.2d 101, (N.Y. 2011), New York State's highest court addressed the case of a father who had pleaded guilty to rape in the second degree, engaging in sexual intercourse with a person less than 15 years of age, and patronizing a prostitute in the third degree. The father was sentenced to one year imprisonment. He was also adjudicated a level three sex offender under the Sex Offender Registration Act (SORA).

9. After prison, the father returned home where he lived with his wife and their five children between the ages of 4 and 14. The local child welfare agency then filed neglect petitions against both the father and mother, alleging that the father was an untreated sex offender whose presence in the home placed his children at imminent

risk of harm. The New York Court of Appeals eventually affirmed the dismissal of the child neglect petitions and stressed two key points: First, that to separate a family, "there must be 'proof of actual (or imminent danger of physical, emotional or mental impairment to the child," 17 N.Y.3d at 9, 950 N.E.2d at 104; and second, that neglect proceedings must focus on serious harm or potential harm to the child, *not just on what might be deemed undesirable parental behavior*.'" (Emphasis supplied). *Id.* Notably, in the child welfare framework, if the father's criminal history could not be used as the foundation for a neglect petition, then it also could not, standing alone, justify taking the children on an emergency basis.

10. Plaintiffs' counsel in this case has provided me with the spreadsheet list of cases documenting the families Defendants have separated since June 26, 2018. The spreadsheet I reviewed contained separations that had taken place up through June 29, 2019. The majority of these separations were apparently based on the parent's prior criminal records, and a minority were based on allegations of unfitness or child welfare concerns.

11. In my opinion, almost none—perhaps 2 or 3%—of the separations documented in this spreadsheet would, under state child welfare law, or established federal constitutional principles, even trigger the need for further assessment of the parent. Indeed, dozens of the parents were separated based on remarkably minor charges— including public intoxication, driving under the influence, disorderly conduct, or traffic charges.

12. Dozens, if not hundreds of other parents were apparently separated on the basis of convictions or charges that took place months (or in many cases, years) prior to the separations. Many of these convictions or charges were for nonviolent offenses, such as drug possession or fraud/forgery. Others were for assault charges, some of which occurred years prior. Conduct that took place years ago does not generally bear on whether the child is *currently* at imminent risk of abuse or neglect.

13.A narrow few of the asserted bases for the separation on the government's spreadsheet *could theoretically* bear on whether the child is at risk. But even in that narrow set of cases, the state or federal officer must conduct a meaningful investigation to ascertain whether there is any objective evidence—beyond the fact of the conviction itself—that justifies emergency separation.

14.Based on my familiarity with state child welfare systems and federal constitutional standards governing parental rights, as well as my years representing parents accused of abuse or neglect, many of the parent's criminal histories listed on Defendants' spreadsheet would also not bear on their dangerousness to the children of *other families* if the families were housed together. Numerous parents with criminal histories, even ones that sound seemingly serious to lay observers, would never harm children, even those who are not related to them. Again, the inquiry should focus on whether there is concrete, objective evidence that the particular parent would pose a danger or imminent risk to children.

15.I declare under penalty of perjury that to the best of my knowledge the above facts are true and correct. Executed this 24th day of July, 2019, in New York, New York,

*Martin Guggenheim*

MARTIN GUGGENHEIM

# EXHIBIT N

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | **DECLARATION OF JEANNE RIKKERS** |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | |

## <u>DECLARATION OF JEANNE RIKKERS</u>

I, Jeanne Rikkers, make the following declaration based on my personal knowledge and declare under the penalty of perjury that the following is true and correct:

1.      I have been living and working in El Salvador since May 1992. Since 2007, I have been directly involved in research and training on human rights and citizen security in El Salvador, focusing on criminal justice and gangs. I have worked with the Foundation for the Study and Application of the Law (FESPAD), International Peacebuilding Alliance (Interpeace) and Cristosal, a human rights organization, where I direct the education and research program on human rights and security. My work focuses on violence prevention and the role of the State in guaranteeing access to justice and due process.

2.      In 2011, I was on the FESPAD team hired by the government of El Salvador to evaluate institutional programs and strategies to address violence against women. In 2012-2013, I led a regional team researching gender-based violence against adolescents and youth as part of an Interpeace program to generate policy debate and proposals. In the past decade I have published research on gender violence and gang life as well as worked extensively in training family members of gang-affiliated incarcerated youth and young men. I was the field researcher for a 2015 study at FESPAD on policing, due process and human rights violations. The current research focus in Cristosal is on internal forced displacement due to violence, violence against LGBTIQ persons and serious human rights violations by law enforcement and other State actors.

3.      My work in El Salvador with violence prevention and human rights organizations has required intensive study of the phenomenon of violence and state reactions to crime, especially related to gang violence. I have published articles and research in both English and Spanish. I have participated in and held workshops on criminal justice and related policy, gender and violence, human rights, security, and youth violence.

4.      My research on criminal justice policy and policing in El Salvador has shown that policy is based primarily on the assumption that anyone in proximity to a gang member, interacting

with them—even under duress—or related to them as family is automatically suspected of criminal activity. This leads to policing and investigative procedures that end up causing arbitrary and unlawful arrests and even prison sentences for "illicit association", even though evidence is not presented that the person has committed a crime.

5.      The Salvadoran State continues to rely heavily on witness identification of supposed gang members which then leads to arrests without objective evidence of involvement in any particular crime. However, these witnesses are often accused or convicted of crimes themselves, and are asked to provide lists of gang members in exchange for leniency. Some of these witnesses are even told how many names they must provide in order to qualify for a "deal".

6.      At the community level, I have witnessed police officers and interaction with police and young people, both gang-affiliated and not, in ways that demonstrate an "assumption of guilt" for living in a particular area. For example, youth are regularly stopped, frisked and asked to produce receipts for anything they own. Their bags are emptied and often their photos are taken on cellphones. Police procedural law prohibits this kind of action, but it is rarely seen as out of order. Photos taken in these stop and frisks are later shown to community members who are pressured to tell police whether the young person in the photo a gang member. I have personally seen these photo albums and can attest that the method used is unreliable as many of the photos were taken in less than ideal settings.

7.      For many years the police have also used mass arrests to bring people who appear to be gang members—by their dress or address--in and to presumably process or register them with photos and personal information. Sometimes they are processed for "resisting arrest" or "illicit association" though often these charges are dropped after the first hearing in front of judge. In other cases, the person is let go with no charges. This practice is so common that people in communities will ask after young people are arrested whether they were just going to "fichar" (take their picture and register) them or if there was an actual charge against them.

8.      Another way in which an individual is identified as a gang member or sympathizer is if they are arrested for a crime they commit under threat or coercion from the gang. For example,

I have known a number of cases of young women who were forced to collect extortion money or conduct other activities so that if they were caught they would go to prison instead of the men in the gang who committed and ordered these crimes. Another common practice in mass arrests is to pick up so many people that inevitably someone with nothing to do with the gang at all gets taken in, housed in a gang sector of the jail or prison and eventually labelled a gang member with no affiliation at all.

9.     Because of these very common practices, it is my belief that many people in El Salvador who have not committed any crime nor joined a gang are regularly registered or seen by the criminal justice systems as "gang members" or "gang sympathizers" which puts lives and futures at risk both from unscrupulous law enforcement as well as the real gang members.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Signed on July 29, 2019 in San Salvador, El Salvador.


_____

Jeanne Rikkers

# EXHIBIT O

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Attorneys for Petitioners-Plaintiffs          *Admitted Pro Hac Vice
Additional counsel on next page

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. et al.,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement,<br><br>*Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: September 13, 2018<br><br>**DECLARATION OF DR. JACK P. SHONKOFF**<br><br>Class Action<br><br>**NO HEARING DATE** |

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

1.      I, Dr. Jack P. Shonkoff, hereby declare, pursuant to 28 U.S.C. 1746:

2.      I am the Julius B. Richmond FAMRI Professor of Child Health and Development at the Harvard T.H. Chan School of Public Health and the Harvard Graduate School of Education, a Professor of Pediatrics at Harvard Medical School and Boston Children's Hospital, and Research Staff at Massachusetts General Hospital. I am also the Founding Director of the university-wide Center on the Developing Child at Harvard.

3.      I serve as chair of the National Scientific Council on the Developing Child, a group of distinguished scholars whose mission is to bring credible science to bear on public policy affecting young children. I also chair the JPB Research Network on Toxic Stress, which is developing new knowledge and measurement capacity to assess the biological, behavioral, and health consequences of excessive stress system activation.

4.      I completed my A.B. at Cornell University and my M.D. degree at New York University School of Medicine.

5.      This testimony provides a science-based analysis of the U.S. government's policy of separating children from their parents at the U.S.-Mexico border. It is based on strong scientific consensus supported by extensive research across multiple disciplines.

6.      Almost a century of countless studies across the behavioral and social sciences provide extensive evidence of the consequences of separating children from their parents, especially if that separation is unexpected, abrupt, or in a frightening context. Recent advances in 21st-century biology now provide a deeper understanding of the disruptions that occur in the developing brain and other biological systems when separation occurs.

7.      As described below, beyond the distress we see on the outside, separating children—particularly young children—from their parents triggers a massive biological stress response inside the child. This response remains activated until the

parent returns and provides comfort. Continuing separation removes the most important resource a child can possibly have to prevent long-term damage—a responsive adult who is totally devoted to the child's well-being.

8. From a scientific and medical perspective, both the initial separation and the lack of rapid reunification are indefensible. Forcibly separating children from their parents is like setting a house on fire. Prolonging that separation is like preventing the first responders from doing their job and letting the fire continue to burn.

9. The results of thousands of studies converge on two core scientific concepts pertinent to this context:  First, a strong foundation for healthy development in young children requires a stable, responsive, and supportive relationship with at least one parent or primary caregiver. Second, when children are removed from their parents, and especially when placed in institutional settings, high and persistent levels of stress activation can disrupt the architecture of the developing brain and other biological systems with serious negative impacts on learning, behavior, and both physical and mental health.

**The Critical Importance of the Parent-Child Relationship**

10. Nurturing and stable relationships with caring adults are essential to healthy development beginning from birth. These relationships affect virtually all aspects of development—intellectual, social, emotional, physical, and behavioral—and their quality and stability in the early years lay the foundation that supports a wide range of later outcomes. These outcomes include self-confidence and sound mental health, motivation to learn, achievement in school and later in the workplace, the ability to control aggressive impulses and resolve conflicts in nonviolent ways. Many of these characteristics and behaviors affect health risks, lifelong physical and mental health outcomes, and the capacity to develop and sustain friendships and close relationships. They ultimately affect the ability of the child to grow up into a responsible adult and successful parent of the next generation.

11.     "Serve and return" interactions (i.e., mutually responsive vocalizing, facial expressions, and gestures back and forth between young children and the adults who care for them) build sturdy brain architecture, beginning at birth, and create strong relationships in which the child's experiences are affirmed and new abilities are nurtured.

12.     The stability and predictability of the caregiving environment affects the health and development of young children through its effect on the consistency, quality, and timing of daily routines which shape developing regulatory systems. Beginning in the earliest weeks of life, the predictability and nature of these experiences influence the most basic biological rhythms related to waking, eating, eliminating, and sleeping. When eating and being put to bed occur at different times each day and when comforting occurs unpredictably, the organization and consolidation of sleep-wake patterns and self-soothing responses do not develop well, and biological systems do not "learn" healthy routines and self-regulation.

13.     Just as early experiences affect the architecture of the developing brain, they also shape the development of other biological systems that are important for both physical and mental health. For example, responsive caregiving—the natural dynamic in which a caregiver responds to the child's expressions and actions— plays a key role in the normal maturation of the neuroendocrine system.

14.     Regulatory mechanisms that manage stress also influence the body's immune and inflammatory responses, which are essential for defending against disease.

**The Impact of Neglect on Stress and Development**

15.     Because responsive relationships—like those between a parent and child— are developmentally expected and biologically essential, their absence signals a serious threat to child wellbeing, particularly during the earliest years. This absence activates the body's stress response systems.

16.     When decreased responsiveness persists, the lost opportunities associated with diminished interaction can be compounded by the adverse impacts of

excessive stress. The physiological effects of this stress can have lifelong consequences.

17.     Extensive evidence indicates that deprivation or neglect—defined broadly as the ongoing disruption or significant absence of responses from caregivers—can cause more harm to a young child's development than overt physical abuse. The clearest findings that support this conclusion come from studies of children who have experienced severe neglect while being raised in institutions.

18.     There is extensive evidence that severe neglect is associated with abnormalities in the structure and functioning of the developing brain. Children who experience extreme levels of social neglect early in life show diminished electrical activity in the brain, as measured through electroencephalography (EEG). Children reared in institutions in particular show differences in the neural reactions that occur when looking at faces to identify different emotions. These findings are consistent with behavioral observations that neglected children struggle to correctly recognize different emotions in others.

19.     Children who experience severe neglect also exhibit decreased brain metabolism and poorer connections among different areas of the brain that are important for focusing attention and processing information, thereby increasing the risk for emotional, cognitive, and behavioral disorders later in life.

20.     Early adversity can affect long-term health and development by chemically altering the expression of genes, also known as "the epigenome." Research has shown that there are many environmental factors and experiences that have the power to chemically mark genes and control their functions. These influences create a new genetic landscape, which scientists call the epigenome.

21.     The modified chemical reactions caused by stress during early childhood affect how well or poorly human beings respond to stress as adults. They can also result in increased risk of adult disease. Human studies have found connections between highly stressful experiences in childhood and increased risk for later

mental illnesses, including generalized anxiety disorder and major depressive disorder. Atypical stress responses over a lifetime can also result in increased risk for physical ailments, such as asthma, hypertension, heart disease and diabetes.

22.     Children who have experienced serious deprivation in infancy are at risk for abnormal physical development and impairment of the immune system. Severe neglect is associated with significantly delayed growth in head circumference (which is directly related to brain growth) during infancy and into the toddler years. In particular, children who are raised in institutional settings also have more infections and are at greater risk of premature death than children who live in supportive homes. One possible explanation for these findings is that chronically disrupted cortisol levels suppress immunologic reactivity and physical growth, thereby leading to a greater risk for infection and chronic, stress-related disease throughout life.

23.     Biology also indicates that children who have already experienced previous harm from adversity—such as, for example, the traumas associated with a long and disruptive migration journey, or threats of violence—are likely to suffer heightened negative effects from separation. The pile-up of stressor upon stressor shifts the odds against the child even further. The intentional withholding of the most powerful healing intervention available—the care and protection of a parent when the child is in danger—goes against everything science tells us.

24.     These effects also intensify the longer the child is separated. Scientific studies clearly demonstrate that toxic stress is like a ticking clock that inflicts increasingly greater harm as each week passes.

25.     Children's need for the care and responsiveness of their parents does not diminish merely because the parent may have a prior criminal history. Particularly if the alleged misconduct took place long ago, the child may not even be aware of the parent's history. All the child knows is that there is an adult caregiver in her life who is dedicated to her well-being, protects her from danger, and comforts her

when she is upset. Those are all functions that are crucial to a child's development, and the child's need for them does not reduce based on whatever conduct the parent may have engaged in prior to—or even during—the relationship.

I declare under penalty of perjury, under the laws of the United States and Maine, that to the best of my knowledge the above facts are true and correct. Executed this July 29, 2019, in Biddeford, Maine

_____
DR. JACK P. SHONKOFF

# EXHIBIT P

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | |
| | Case No. 18-cv-00428-DMS-MDD |
| Petitioners-Plaintiffs, | |
| | **DECLARATION OF DR. DORA B. SCHRIRO** |
| v. | |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| Respondents-Defendants. | |

1.      I, Dr. Dora B. Schriro, hereby declare, pursuant to 28 U.S.C. 1746:

2.      I have worked in the fields of corrections and law enforcement over the past 40 years.  During that time, I have led three state agencies, two city systems, and one federal office. Throughout my career I have published extensively about the administration and reform of civil and criminal systems and taught graduate-level criminal justice and law courses.

3.      Most recently, I served from 2014 to 2018 as Connecticut's Commissioner for the Department of Emergency Services and Public Protection, which encompasses six agencies including the Connecticut State Police and the Connecticut Division of Emergency Management and Homeland Security. Concurrently, from 2016 through 2018, I served as the state's Homeland Security Advisor. Before that, from 2009 to 2014, I was the Commissioner of the New York City Department of Correction, the country's second largest jail system with 100,000 admissions annually, and one with a residential nursery for women who had given birth while incarcerated. Before that, I served as the Director of the Arizona Department of Corrections from 2003 to 2009, with 21,000 admissions to state prison and 11,500 parole case openings annually, as the Commissioner of the St. Louis City jail system, from 2001 to 2003, with 9,000 jail admissions and 63,000 police bookings, and as the Director of the Missouri Department of Corrections, from 1993 to 2001, with 35,000 admissions to state prison and 72,000 probation and parole case openings. Prior to that, I was Warden in the St. Louis City jail system from 1989 to 1993, and Assistant Commissioner in the NYC Department of Correction from 1985 to 1989.

4.      In 2009, I served as Senior Advisor to DHS Secretary Napolitano on Civil Detention and Removal, and then as the founding Director of ICE's Office of Detention Policy and Planning. During my tenure at DHS, I analyzed ICE's detention policy and practices and authored the DHS report, "ICE Detention Policies and Practices: A Recommended Course of

Action for Systems Reform." One section of the report addressed special populations, which included families in detention.

5.      Over the past ten years I have continued to work on immigration detention issues. Among the activities in which I have been involved, in 2015, I was appointed by DHS Secretary Johnson to ICE's Advisory Committee on Family Residential Centers, whose 2016 report I co-authored. I also served on the American Bar Association Commission on Immigration, for which I co-authored a report in 2015 entitled "Family Immigration Detention: The Past Cannot Be Prologue."

6.      Based on my years of experience assessing and administering criminal and civil detention systems, I am very familiar with the distinctively different population that each serve, and with the unique challenges of housing parents with their children.

7.      Correctional systems ensure the safety and wellbeing of inmates and staff alike by individually assessing each new arrival's propensity for violence and flight risk at intake and periodically thereafter.  The research has established that the most accurate assessments are objective evaluations of relevant, verifiable information such as one's criminal record, employment history, military service, family relationships, and other community ties. The criminal-history aspect of this assessment generally considers the recency, frequency, and seriousness of criminal activity, bona-fide gang affiliation, and institutional conduct if previously incarcerated. In general, the age of the criminal activity matters more than its severity or its frequency.   Typically, the analysis is accomplished by means of an algorithm which is validated specifically for the population undergoing assessment, and then periodically recalibrated to ensure its continuing accuracy. The same holds true for risk assessments of immigrant detainees.

8.      Risk assessment has several applications. For those people who remain in correctional custody, it informs housing assignments and the overall level of supervision. Inmates with low risk of harm to others and for flight are housed together in facilities that afford more freedom of movement and greater opportunity for interaction with one another. Inmates with elevated risk levels are assigned to more restricted housing and have less freedom of movement and interaction with others. For those who are eligible for release, risk assessment informs the conditions of release commensurate with assessed risk, from minimal reporting to intensive supervision.

9.      In the Ms. L case, I have reviewed the lists of parents who were separated from their children because of their criminal history before and after January 31, 2019. Most explanations are incomplete, lack specificity, reference allegations or acts that are frequently quite old, and often concern charges only but no convictions.  This is not consistent with preferred risk assessment practices.

10.     In the correctional context, generally, mothers who have no history of violence or child abuse, are permitted to return to the prison with their newborn baby and to reside in the facility's residential nursery. When I led the New York City Department of Correction, the residential nursery in the women's jail also applied these principles.

11.     Based on the information the government has provided to Plaintiffs, I do not believe its placement decisions comport with evidence-based determinations of risk. It appears a number of the parents had committed traffic violations, illegal reentry, and other minor offenses; others have no convictions at all; and where there were convictions, a number appear to have occurred some time ago, indicative of its extremely limited predictive value as to future risk. Other convictions may be serious enough to exclude the parent from further consideration of

placement in family detention with their children, but it is unlikely to approach the growing number that ICE has rejected. The basis for many of ICE's decisions is unclear, but it is unlikely that a validated risk assessment process would generate so many rejections.

12.     Over the course of my career, including during my appointments at DHS, I have developed risk assessment processes and classification systems, and designed specialty housing programs for detained parents and their children. If called upon, I could assist in the development, and support the implementation, of the requisite policy and practice.

I declare under penalty of perjury, under the laws of the United States and New York, that to the best of my knowledge the above facts are true and correct. Executed this July 29, 2019 in Bronx, New York.

DR. DORA B. SCHRIRO

# EXHIBIT Q

**Declaration of James Austin, Ph.D.**

1. I am currently employed by the JFA Institute, a not-for-profit research organization that I founded in 2003. I have previously served as the Director of the Institute of Crime, Justice and Corrections at the George Washington University (1999 to 2003); and as the Executive Vice President for the National Council on Crime and Delinquency (1982 – 1998). From 1970 – 1975 I was employed by the Illinois Department of Corrections at the Stateville and Joliet prisons as a correctional sociologist. I received my Ph.D. in sociology from the University of California, at Davis.

2. I have implemented detention classification systems for juvenile and adult correctional facilities in over 40 local and state correctional systems. Since 1980, I have been retained by the National Institute of Corrections (NIC), which is part of the U.S. Department of Justice, to design and implement objective inmate classification systems. Most of the NIC publications on the topic of prison and jail classification systems are either authored or co-authored by me.

3. In 1991, I was named by the American Correctional Association as its recipient of the Peter P. Lejin's Research Award. In 1999, I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology. In 2009, I was the Recipient of the Marguerite Q. Warren and Ted B. Palmer Differential Intervention Award, American Society of Criminology, Corrections and Sentencing Division.

4. I authored the National Institute of Corrections (NIC) publication titled "Objective Jail Classification Systems: A Guide for Jail Administrators", February 1998, Accession Number 014373. That publication outlines the standards that need to be met in implementing a jail classification system.

5. I also participated in the development of the ICE custody classification system which is now in place in ICE's detention facilities.

6. All corrections facilities must undertake the task of deciding where each inmate should be housed. In deciding whether an adult is placed in a detention center, in particular, facility administrators must assess whether the adult poses an undue level of risk to the other detainees, and whether the person would pose a management problem for the correctional facility. This is a common issue across all detention centers. To make this determination, detention centers generally use what is called an "objective detention classification" assessment instrument. These classification systems consist of an initial classification component completed at admission, and a reclassification component completed after some period of confinement.

7. While all of these instruments include criteria that reflect the person's current charge(s) and prior convictions, those two factors constitute a small portion of the entire criteria for classification. Other factors include demographic items (current age, gender), prior escape

Exhibit Q, Page 167

history, stability factors (marital status employment, education and substance abuse, gang membership), and most importantly prior conduct if previously incarcerated.

8.  In objective evaluations of risk assessment tools, a person's current offense severity and prior criminal record have not been found to be good predictors of institutional conduct. Consequently, basing a dangerousness classification on only these factors would produce a very high risk of over-classification for danger.  In making risk assessments, research has shown that it is crucial to look carefully at the severity and age of any past offenses, and at a person's other demographic, social, and historical factors.

9.  The other important consideration in detention classification is the management of the facility itself.  Researchers have found that facilities with sufficient staffing and resources serve to significantly impact the detainee's behavior in a positive manner.  In other words, inmates who are closely supervised by staff behave much better due to the management of the facility.

10. Finally, detention classification systems are designed to provide a strong incentive for the person to comply with the rules and regulations of the facility. In the case of family detention, there is a very strong incentive for the detainees to comply with facility rules while their petition for asylum is being processed. For families, this pressure to comply with the facility's rules and regulations are even more powerful as parents deeply desire to remain intact as a family, and they know that misbehavior will imperil their ability to be with their children.

11. In the Ms. L case, I understand that the government is separating children from their parents because of the parents' criminal record, including a variety of non-violent convictions, charges without convictions, and other allegations that have not even resulted in the filing of criminal charges.  My understanding is that the government may claim that these parents were separated because the government determined, based on the parent's criminal record, that the parent could not be placed in an ICE family detention center for safety reasons.

12. Based on the information I understand the government has provided about its separations based on criminal history, I do not believe its custody decisions are consistent with the industry standards for classifying detainees in U.S. correctional and other family detention facilities.

13. It is unclear what, if any, risk assessment the government is using.  Some of the convictions may be serious enough to exclude the parent from family detention, although I would want additional information to assess the accuracy and specifics of the cases.  But I understand that a substantial number of the parents have much more minor criminal histories—such as traffic violations and non-violent misdemeanors, among others.

14. People charged or having prior convictions for such offenses would be classified as minimum custody in local jails, prisons, or other ICE facilities, unless there were other factors that would suggest a potential for violence or serious misconduct.

15. This suggests that the government is unnecessarily excluding parents from family detention— and thereby separating them from their children—simply because they have *any* criminal record whatsoever.

16. That kind of blanket exclusion policy is inconsistent with widespread risk-assessment practices. Jails and prisons across the country use risk assessment tools that account for the severity and age of any criminal history, and that account for both criminal history and other, observable aspects of each detainee. These risk-assessment tools have been developed and refined over many decades, and most facilities in the country use them. Family detention facilities typically do not exclude every adult or even most adults who has ever been charged or convicted of any crime, no matter how minor.

17. Based on my experience observing local jail detention and ICE detention centers, very few persons with misdemeanor convictions or charges but no convictions are being classified as a danger to others in those facilities.

18. For family detention centers in the immigration context, one would expect the same results in most cases regardless of the detainee's prior conviction record alone. These parents know that they must behave well in family detention in order to remain with their children. The government can also use other standard tools for risk assessment. For instance, when families arrive at the border at are taken into custody, the government has several days to observe their behavior and conduct before making a classification assessment about whether to place them in family detention. That is commensurate with the normal observational component of most detainee classification system, where the assessment is designed to occur 2-3 days after admission.

19. In my capacity as a consultant for the U.S. Department of Justice and DHS, I have created numerous risk-assessment tools in the past. If called upon, I could provide or help create one that would provide a more comprehensive, reliable, and valid risk assessment instrument for DHS to use to ensure family detention facilities are safe and the extent of family separation to minimized.

20. Pursuant to 28 U.S.C. 1746, I swear under the penalty of perjury under the laws of the United States and South Carolina that the foregoing is true and correct.

James Austin

July 29, 2019
Camden, South Carolina

3

# EXHIBIT R

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                          )
MS. L. AND MS. C.,                        )
                                          )CASE NO. 18CV0428-DMS
          PETITIONERS-PLAINTIFFS,         )
VS.                                       )
                                          )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS              ) FRIDAY JULY 6, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT      ) 12:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.        )
CUSTOMS AND BORDER PROTECTION ("CBP");    )
U.S. CITIZENSHIP AND IMMIGRATION          )
SERVICES ("USCIS"); U.S. DEPARTMENT       )
OF HEALTH AND HUMAN SERVICES ("HHS");     )
OFFICE OF REFUGEE RESETTLEMENT ("ORR");   )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;     )
GREG ARCHAMBEAULT, SAN DIEGO FIELD        )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS,   )
EL PASO FIELD DIRECTOR, ICE; FRANCES M.   )
JACKSON, EL PASO ASSISTANT FIELD          )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN,   )
SECRETARY OF DHS; JEFFERSON BEAUREGARD    )
SESSIONS III, ATTORNEY GENERAL OF THE     )
UNITED STATES; L. FRANCIS CISSNA,         )
DIRECTOR OF USCIS; KEVIN K.               )
MCALEENAN, ACTING COMMISSIONER OF         )
CBP; PETE FLORES, SAN DIEGO FIELD         )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,      )
EL PASO FIELD DIRECTOR, CBP;              )
ALEX AZAR, SECRETARY OF THE               )
DEPARTMENT OF HEALTH AND HUMAN            )
SERVICES; SCOTT LLOYD, DIRECTOR           )
OF THE OFFICE OF REFUGEE RESETTLEMENT,    )
                                          )
          RESPONDENTS-DEFENDANTS.         )
-------------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**STATUS CONFERENCE**

```
COUNSEL APPEARING:

FOR PLAINTIFF:                    LEE GELERNT, ESQ.
                                 ANAND VENKATA BALAKRISHNAN, ESQ.
                                 ACLU IMMIGRANT RIGHTS PROJECT
                                 125 BROAD STREET 18TH FLOOR
                                 NEW YORK, NEW YORK 10004

                                 BADIS VAKILI, ESQ.
                                 ACLU FOUNDATION OF SAN DIEGO
                                 AND IMPERIAL COUNTIES
                                 P.O. BOX 87131
                                 SAN DIEGO, CALIFORNIA 92138

FOR DEFENDANT:                   SARAH B. FABIAN, ESQ.
                                 SCOTT G. STEWART, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
                                 OFFICE OF IMMIGRATION LITIGATION
                                 P.O. BOX 868
                                 BEN FRANKLIN STATION
                                 WASHINGTON, DC 20044




REPORTED BY:                     LEE ANN PENCE,
                                 OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY, ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101
```

```
1   SAN DIEGO, CALIFORNIA – FRIDAY, JULY 6, 2018 – 12:00 P.M.

2                              *   *   *

3            THE CLERK:  CALLING NO. 9 ON CALENDAR, CASE

4   NO. 18CV0428, MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS

5   ENFORCEMENT; ON FOR STATUS HEARING.

6            THE COURT:  GOOD AFTERNOON.  MAY I HAVE APPEARANCES,

7   PLEASE?

8            MS. FABIAN:  YOUR HONOR, SARAH FABIAN WITH THE

9   DEPARTMENT OF JUSTICE ON BEHALF OF THE DEFENDANTS.

10           I HAVE WITH ME TODAY SCOTT STEWART AS WELL, ALSO

11  WITH THE DEPARTMENT OF JUSTICE.

12           THE COURT:  YES.  THANK YOU.  GOOD AFTERNOON.

13           MR. GALERNT:  GOOD AFTERNOON, YOUR HONOR.  LEE

14  GELERNT FOR ACLU FOR PLAINTIFFS.

15           MR. BALAKRISHNAN:  GOOD AFTERNOON, YOUR HONOR.

16  ANAND BALAKRISHNAN FROM THE ACLU FOR PLAINTIFFS.

17           MR. VAKILI:  GOOD AFTERNOON, YOUR HONOR.  BARDIS

18  VAKILI FROM THE ACLU SAN DIEGO.

19           THE COURT:  THANK YOU.  GOOD AFTERNOON, AND WELCOME.

20           IT IS MY UNDERSTANDING THAT WE HAVE ABOUT 55 CALLERS

21  ON THE LINE, MEDIA AND OTHERS.  AND SO AGAIN I WILL ASK

22  COUNSEL TO SPEAK DIRECTLY INTO THE MICROPHONE SO THAT THEY CAN

23  HEAR CLEARLY.

24           A GENTLE REMINDER TO ALL WHO ARE PARTICIPATING

25  TELEPHONICALLY THAT THERE IS NOT ANY RECORDING OR BROADCASTING
```

1  SOUGHT A STAY AS FAR AS THE REUNIFICATION PROCESS.  THAT IS

2  NOT UNDERWAY.  SO GIVEN THE TIMING I FEEL THAT IS NOT

3  SOMETHING THAT EVEN COULD OCCUR WITHIN THAT TIME FRAME NOW.

4  BUT I CAN'T GIVE AN ANSWER AS TO THE APPEAL BECAUSE THAT IS A

5  DECISION ENTIRELY WITHIN THE PURVIEW OF THE SOLICITOR

6  GENERAL'S OFFICE.

7        **THE COURT:**  WHAT I DON'T WANT TO OCCUR IS, AT THE

8  INVITATION OF THE GOVERNMENT, FOR THE COURT TO MAKE SOME

9  INDICATION ABOUT THE SCOPE OF THE PRELIMINARY INJUNCTION AND

10  THEN TO USE THAT AS A BASIS TO APPEAL.

11        THE OVERARCHING OBJECTIVE HERE IS TO REUNITE.  AND

12  SO THE WAY I HEAR THE GOVERNMENT TODAY AND RECEIVED THE

13  BRIEFING IS SIMPLY FOR WHAT YOU ARE STATING; AND THAT IS

14  CLARIFICATION, HOW BEST CAN WE PROCEED BEING IN COMPLIANCE

15  WITH THE COURT'S ORDER AND ACHIEVE REUNIFICATION.

16        AM I MAKING A CORRECT ASSUMPTION?

17        **MS. FABIAN:**  I THINK I AGREE WITH THAT.  IF WHAT

18  YOUR HONOR IS SAYING THAT IT IS A COMMITMENT NOT TO APPEAL AT

19  ALL, I CAN'T SAY THAT.  BUT I WOULD AGREE -- AND I HAVE WITH

20  ME HERE FROM OUR FRONT OFFICE SOMEONE WITH EVEN MORE ABILITY

21  TO MAKE THAT COMMITMENT.

22        SO I -- WHAT I WOULD SAY IS I -- WE ARE NOT SEEKING

23  TO SNEAK AROUND THE INJUNCTION HERE AND GET AN ORDER THAT WE

24  CAN, YOU KNOW, BETTER GET OUT FROM UNDER THE COURT'S ORDER, WE

25  ARE SEEKING CLARIFICATION FOR THE PURPOSE OF COMPLYING WITH

```
1   THE REUNIFICATION PROVISIONS OF THE ORDER.  IF WE APPEAL THEM
2   ON A DIFFERENT BASIS THAT REMAINS TO BE SEEN AND IS WITH THE
3   OFFICE OF THE SOLICITOR GENERAL.
4            THE COURT:  I WOULD MAKE THIS TENTATIVE OBSERVATION,
5   THEN, AND THEN COUNSEL CAN WEIGH IN.
6            MY UNDERSTANDING, BASED ON WHAT HAS JUST BEEN
7   REPRESENTED, IS THE O.R.R. POLICIES, THEY ARE NOT IN THE
8   CFR'S, IT IS NOT RULE-MAKING, IT DOESN'T HAVE THE SAME FORCE
9   AND EFFECT AS FEDERAL PROVISIONS OR STATUTES.  THEY ARE SIMPLY
10  INTERNAL POLICIES OR PROCEDURES THAT O.R.R. USES TO ENSURE
11  THAT WHEN THEY RELEASE THE CHILD TO A CUSTODIAN THAT THE CHILD
12  IS BEING RELEASED TO A RESPONSIBLE, SAFE CUSTODIAN.
13           IF THAT'S THE CASE, THEN I WOULD BE PREPARED TO
14  INDICATE THAT THE O.R.R., HHS SHOULD NOT FEEL OBLIGATED TO
15  COMPLY WITH THOSE INTERNAL PROCEDURES BECAUSE THIS CASE IS SO
16  DIFFERENT, IT INVOLVES SEPARATION OF MINOR CHILDREN FROM
17  PARENTS.  AND THE CLASS DEFINITION IS IMPORTANT.  IT INVOLVES
18  THE PARENT, NOT A RELATIVE OR A CUSTODIAN THAT MIGHT SUFFICE
19  BUT THE PARENT.  AND CARVED OUT FROM THE CLASS IS CRIMINAL
20  HISTORY, IS CONTAGIOUS DISEASE.  AND THERE ARE A NUMBER OF
21  FACTORS THAT ARE SET OUT IN NARROWLY DEFINING THE CLASS.
22           AND THE PURPOSE OF THAT WAS TO DEFINE A CLASS AND
23  PROVIDE INJUNCTIVE RELIEF THAT IS CONSISTENT, AS FAR AS
24  REUNIFICATION GOES, WITH THE TVPRA.  AND TO DO IT IN AN
25  EFFICIENT, QUICK MANNER; BUT OF COURSE NEVER LOSING SIGHT OF
```

```
 1    THE SAFETY OF THE CHILDREN.
 2              AND AS INDICATED IN THE COURT'S ORDER, THE ATTORNEY
 3    GENERAL MAKES HIS OWN DETERMINATIONS AS TO WHETHER OR NOT TO
 4    DETAIN OR TO PAROLE OR RELEASE.  THIS ORDER DOESN'T IMPACT
 5    THAT IN ANY WAY.
 6              OBVIOUSLY THE ATTORNEY GENERAL HAS TO MAKE THOSE
 7    DETERMINATIONS CONSISTENT WITH LAW, BUT THIS IS AN ORDER THAT
 8    DEALS WITH SEPARATION IN ONE INSTANCE AND THE CIRCUMSTANCES
 9    UNDER WHICH THAT MIGHT OCCUR, AND THEN REUNIFICATION IN THE
10    CIRCUMSTANCE WHERE FAMILIES HAVE ALREADY BEEN SEPARATED.
11              SO I WANT TO BE CLEAR THAT I STAND ON THE ORDER, AND
12    MY COMMENTS HERE TODAY DON'T IN ANY WAY SUGGEST THAT THE
13    ATTORNEY GENERAL MUST RELEASE OR MUST DETAIN OR WHEN HE CAN
14    RELEASE OR DETAIN.  THOSE ARE WITHIN THE GOVERNMENT'S
15    PREROGATIVE, CONSISTENT WITH LAW.
16              MS. FABIAN:  AND I THINK AS I UNDERSTAND WHAT YOUR
17    HONOR JUST SAID, IF THE CLARIFICATIONS THAT WE ARE ASKING FOR
18    FIT EXACTLY WITHIN WHAT THE COURT HAS JUST SAID, WHICH IS
19    FIRST -- I MENTIONED THE CRIMINAL HISTORY.  IF THE COURT DID
20    INTEND TO EXCLUDE CLASS MEMBERS WITH ANY CRIMINAL HISTORY THEN
21    I THINK THAT THAT IS A CLARIFICATION WE WOULD -- WE WOULD
22    WELCOME FROM THE COURT THAT WOULD BEAR DOWN ON THIS.
23              THE COURT:  YES.  AND OF COURSE ALL OF THIS ASSUMES
24    GOOD FAITH.  IT ASSUMES THAT THE GOVERNMENT IS USING THE
25    CRITERIA THAT IT PROPERLY USED BEFORE WITH RESPECT TO CRIMINAL
```

1   HISTORY.  SOME CRIMINAL HISTORY, I UNDERSTAND, DOES NOT RESULT

2   IN SEPARATE DETENTION OF THE PARENT AND THUS SEPARATION OF THE

3   FAMILY; OTHER CRIMINAL HISTORY COULD.

4          I SIMPLY CARVED OUT CRIMINAL HISTORY FROM THE CLASS

5   DEFINITION BECAUSE I THINK IT IS WITHIN THE GOVERNMENT'S

6   PREROGATIVE TO DETERMINE WHAT TYPE OF CRIMINAL HISTORY MIGHT

7   PROPERLY EFFECT SEPARATION.

8          SO I DON'T INTEND TO INTERVENE IN THAT.  THAT'S AN

9   ISSUE THAT WOULD NEED SEPARATE BRIEFING AND CONSIDERATION.

10  AND HERE AGAIN IT ASSUMES ABSOLUTE GOOD FAITH ON THE PART OF

11  THE GOVERNMENT THAT IF IT ELECTS TO SEPARATE A FAMILY BASED ON

12  CRIMINAL HISTORY THAT IT IS DOING IT UNDER ITS CRITERIA THAT

13  IT ORDINARILY FOLLOWS.

14         **MS. FABIAN:**  I THINK, AS I UNDERSTAND IT, THE --

15  WHAT THE COURT IS SAYING IS THAT YOU READ THE CRIMINAL HISTORY

16  EXCLUSION TO BE PART OF THE SEPARATION DECISION RATHER THAN --

17  BECAUSE, AS I READ THE ORDER, THERE IS -- THE EXCLUSION OF ANY

18  PARENT WITH A CRIMINAL HISTORY, AS A WHOLE, WOULD EXCLUDE

19  THEM -- WOULD EXCLUDE THEM FROM THE CLASS REGARDLESS OF THAT

20  -- WHETHER THAT WAS THE BASIS FOR THE SEPARATION.

21         **THE COURT:**  YES.  AND I MADE CLEAR THAT IF

22  PLAINTIFFS WANTED TO MODIFY THE SCOPE OF THE CLASS THEY COULD

23  DO THAT, BUT GIVEN THE URGENCY AND PRESS OF TIME I SIMPLY

24  ELECTED TO EXCLUDE FROM THE CLASS PARENTS WITH CRIMINAL

25  HISTORY.

```
 1          MR. GALERNT:  YOUR HONOR, I WOULD JUST SAY WITH THE
 2   100 KIDS UNDER FIVE, OR 101 KIDS, I AM NOT SURE I UNDERSTAND
 3   THE GOVERNMENT'S POSITION THAT THERE IS NOT SOME DISCERNIBLE
 4   OBJECTIVE CRITERIA.  WE KNOW THE PARENTS WHO HAVE BEEN REMOVED
 5   ARE PART OF THE CLASS.  WE HAVE JUST SAID THAT WE WILL WORK
 6   WITH THEM IF THEY NEED MORE TIME.  CERTAINLY THE PARENTS WHO
 7   ARE RELEASED FROM DETENTION ARE WITHIN THE CLASS.
 8          SO I THINK YOUR HONOR'S SUGGESTION THAT THERE BE, BY
 9   MONDAY MORNING, A LIST.  AND IF THE GOVERNMENT WANTS TO SAY,
10   LOOK, THESE FIVE ARE NOT GOING TO BE REUNITED, WE FOUND
11   CRIMINAL CONVICTIONS, THEN THAT COMES OUT OF YOUR CLASS
12   DEFINITION AND THAT IS -- WE SAY, OKAY, NOW WE UNDERSTAND
13   ABOUT THOSE FIVE.  WE BELIEVE IF THERE -- WE WOULD LIKE TO SEE
14   WHETHER THEY ARE SERIOUS CONVICTIONS AND TAKE THOSE UP
15   INDIVIDUALLY.
16          BUT WE, RIGHT NOW, ARE COMPLETELY IN THE DARK.  THE
17   GOVERNMENT HOLDS ALL OF THE INFORMATION.  THE 19 RELEASED
18   INDIVIDUALS, I MEAN, WE CERTAINLY CAN HELP THE GOVERNMENT TRY
19   AND TRACK IT DOWN.  BUT I JUST DON'T UNDERSTAND WHY YOUR
20   CRITERIA AND THE CLASS ARE NOT OBJECTIVE AND DISCERNIBLE.  I
21   THINK YOUR HONOR USED THOSE CRITERIA PRECISELY, AS YOUR HONOR
22   SAID IN THE OPINION, BECAUSE OF THAT.
23          SO I WOULD HOPE ON MONDAY MORNING WE COULD -- THE
24   GOVERNMENT IS GOING TO REUNITE EVERYONE THEY CAN REUNITE.  AND
25   BY MONDAY MORNING IF THEY THINK THERE IS INDIVIDUALS THEY
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

```
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
            PETITIONERS-PLAINTIFFS,     )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            ) MONDAY JULY 9, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    ) 10:00 A.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
            RESPONDENTS-DEFENDANTS.     )
----------------------------------------
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

```
COUNSEL APPEARING:

FOR PLAINTIFF:                   LEE GELERNT, ESQ.
                                 ACLU IMMIGRANT RIGHTS PROJECT
                                 125 BROAD STREET 18TH FLOOR
                                 NEW YORK, NEW YORK 10004

                                 BADIS VAKILI, ESQ.
                                 ACLU FOUNDATION OF SAN DIEGO
                                 AND IMPERIAL COUNTIES
                                 P.O. BOX 87131
                                 SAN DIEGO, CALIFORNIA 92138

                                 STEPHAN B. KANG, ESQ.
                                 ACLU OF NORTHERN CALIFORNIA
                                 39 DRUMM STREET
                                 SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:                   SARAH B. FABIAN, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
                                 OFFICE OF IMMIGRATION LITIGATION
                                 P.O. BOX 868
                                 BEN FRANKLIN STATION
                                 WASHINGTON, DC 20044

                                 ADAM L. BRAVERMAN
                                 INTERIM UNITED STATES ATTORNEY
                                 BY:  SAM BETTWY
                                 ASSISTANT U.S. ATTORNEY
                                 880 FRONT STREET
                                 SAN DIEGO, CALIFORNIA 92101




REPORTED BY:                     LEE ANN PENCE,
                                 OFFICIAL COURT REPORTER
                                 UNITED STATES COURTHOUSE
                                 333 WEST BROADWAY, ROOM 1393
                                 SAN DIEGO, CALIFORNIA 92101
```

```
 1      SAN DIEGO, CALIFORNIA — MONDAY, JULY 9, 2018 — 10:07 A.M.

 2                          *   *   *

 3           THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 08CV0428,

 4    MS. L. VERSUS IMMIGRATION AND CUSTOMS ENFORCEMENT; STATUS

 5    CONFERENCE.

 6           THE COURT:  GOOD MORNING.

 7           MR. GELERNT:  GOOD MORNING, YOUR HONOR.  LEE

 8    GELERNT, FROM THE ACLU, FOR PLAINTIFFS.

 9           MS. FABIAN:  GOOD MORNING, YOUR HONOR.  SARAH FABIAN

10    WITH THE DEPARTMENT OF JUSTICE FOR THE DEFENDANTS.

11           THE COURT:  GOOD MORNING.

12           MS. FABIAN:  ALL OTHER COUNSEL WERE PRESENT AT LAST

13    FRIDAY'S SESSION.

14           MR. GELERNT:  YOUR HONOR, WE HAVE ONE NEW COUNSEL.

15    DO YOU WANT HIM TO STATE HIS APPEARANCE?

16           THE COURT:  YES, PLEASE.

17           MR. KANG:  STEVE KANG, FROM THE ACLU, FOR

18    PLAINTIFFS.

19           THE COURT:  THANK YOU, AND GOOD MORNING.

20           MR. GELERNT, PERHAPS WE CAN START WITH YOU.  AND IF

21    YOU CAN GIVE A STATUS AS TO WHAT WAS ACCOMPLISHED OVER THE

22    WEEKEND AND WHAT WE EXPECT BY TOMORROW, AND A STATUS GOING

23    FORWARD.

24           MR. GELERNT:  YES, YOUR HONOR.  THE GOVERNMENT

25    SHOULD CORRECT ME IF -- WE HAVE BEEN NEGOTIATING ALL WEEKEND.
```

JULY 9, 2018

```
 1              MR. GELERNT:  RIGHT.

 2              MS. FABIAN:  I THINK WE CAN DISCUSS THAT TODAY AND

 3    WORK SOMETHING OUT.  I AGREE WITH THE POINT AND HAPPY TO SEE

 4    WHAT WE CAN WORK OUT.

 5              THE COURT:  MR. GELERNT, FROM YOUR STANDPOINT

 6    REPRESENTING CLASS MEMBERS IS THE GOVERNMENT IN FULL

 7    COMPLIANCE TO THE EXTENT IT CAN BE, UNDERSTANDING THAT THERE

 8    ARE SOME AREAS WHERE IT WILL BE IMPOSSIBLE TO MEET THE

 9    DEADLINE.  BUT TO THE EXTENT THE GOVERNMENT CAN AND IS ABLE TO

10    REUNITE, IS IT YOUR CONSIDERED JUDGMENT THAT THE GOVERNMENT IS

11    IN COMPLIANCE?

12              MR. GELERNT:  WELL, LET ME PUT IT THIS WAY.

13              I THINK THE GOVERNMENT, IN THE LAST 48 HOURS SINCE

14    WE SAW YOU FRIDAY, HAS MADE SIGNIFICANT -- TAKEN SIGNIFICANT

15    STEPS.  I DON'T BELIEVE THAT THERE ARE -- I BELIEVE THAT THEY

16    CAN STILL REUNITE SOME INDIVIDUALS BY TOMORROW.  AND ONE OF

17    THE HOLDUPS IS, OF COURSE, THEIR CONTINUED INSISTENCE ON USING

18    A LONGER REUNIFICATION PROCESS THAT IS GENERALLY FOR TRUE

19    UNACCOMPANIED KIDS.  SO I THINK THAT IS ONE POINT WHERE WE

20    WOULD DISAGREE.

21              I THINK THE OTHER POINT IS JUST HOW MUCH EFFORT --

22    WE JUST DON'T KNOW HOW MUCH EFFORT THE GOVERNMENT HAS MADE TO

23    FIND THE RELEASED PARENTS OR DEPORTED PARENTS, SO I DON'T KNOW

24    IF I WOULD WANT TO PUT IT IN TERMS OF -- THEY CERTAINLY

25    HAVEN'T REUNITED ALL OF THE KIDS AND PARENTS WHO ARE
```

JULY 9, 2018

```
1    NONCRIMINALS AND DON'T FALL OUT OF THE CLASS, SO IN THAT SENSE
2    I DON'T THINK THERE HAS BEEN FULL COMPLIANCE.  BUT WE
3    RECOGNIZE WE ARE WHERE WE ARE.
4            SO I THINK WHAT WE WOULD ASK YOUR HONOR IS THAT WE
5    SUBMIT THE DISPUTE ABOUT THE STREAMLINED PROCEDURE, THAT IS
6    SOMETHING YOU COULD RULE ON.  AND THEN AFTER THAT WE HAVE
7    SPECIFIC DEADLINES FOR THE INDIVIDUALS WHO HAVEN'T BEEN
8    REUNITED.  AND SO I THINK FOR THE RELEASED PARENTS IF YOUR
9    HONOR WAS GOING TO USE STREAMLINED PROCEDURES WE WOULD SAY 48
10   HOURS AFTER MAKING CONTACT WITH THEM, THAT SHOULD BE ENOUGH
11   TIME BECAUSE THEY ARE RIGHT HERE IN THE U.S., AFTER THE
12   GOVERNMENT HAS BEEN PUT IN TOUCH WITH THEM.  AND ONE WEEK FOR
13   THE REMOVED INDIVIDUALS, ASSUMING THEY ACTUALLY WANT THEIR
14   CHILD SENT TO THEM.
15           SO I THINK -- I GUESS WE COULD PROBABLY SUBMIT THOSE
16   DEADLINES.  AND IF WE HAVE DISAGREEMENT ABOUT THE DEADLINES
17   SUBMIT COUNTERPROPOSALS ABOUT THAT.
18           THE OTHER THING I WOULD SAY, YOUR HONOR, IS THAT WE
19   WOULD ASK THE GOVERNMENT TO INDICATE WHICH TYPES OF
20   CONVICTIONS INDIVIDUALS HAVE, BECAUSE WE RECOGNIZE THAT YOUR
21   HONOR HAS TAKEN THEM OUT OF THE CLASS, BUT WE ALSO RECOGNIZE
22   THAT THERE ARE SOMETIMES MISTAKES.  I THINK SOME OF THE
23   INFORMATION COMES FROM INTERPOL OR OTHER DATABASES AND THERE
24   COULD BE MISTAKES.  AND SO WE WOULD LIKE THE OPPORTUNITY TO
25   OBVIOUSLY DOUBLE CHECK THAT IT IS NOT SOMEONE WITH A DIFFERENT
```

JULY 9, 2018

```
 1    MIDDLE INITIAL THAT ACTUALLY HAS THE CRIMINAL CONVICTION.
 2              MS. FABIAN:  I CAN GIVE THAT INFORMATION NOW, YOUR
 3    HONOR.  ONE OF THEM WAS A --
 4              MR. GELERNT:  I DON'T MEAN THE TYPE OF CRIME, I JUST
 5    MEAN THAT WE ARE GOING TO DOUBLE CHECK THAT THEY ACTUALLY HAD
 6    THE CONVICTIONS GOING FORWARD.
 7              AND THEN THE ONLY OTHER THING I WOULD SAY, YOUR
 8    HONOR, IS WE -- AND THIS MAY BE SOMETHING THAT IS TOO MUCH IN
 9    THE WEEDS FOR YOUR HONOR RIGHT NOW, BUT ON THE 12 DEPORTED --
10              WE HAD 12 DEPORTED PARENTS, AND I THINK YOU HAVE
11    NINE.  IT MAY BE THAT YOU TOOK OUT THREE BECAUSE THE CHILD HAS
12    BEEN GIVEN TO A SPONSOR?  IS THAT CORRECT?
13              MS. FABIAN:  I DON'T BELIEVE THAT IS THE CASE.  I
14    WOULD HAVE TO CHECK WHERE THEY MOVED.  I THINK THERE WERE
15    THREE THAT HAD PREVIOUSLY -- BEEN NOTED ON OUR PREVIOUS CHART
16    AS WE BELIEVED THE PARENT HAD BEEN REMOVED AND IT MAY HAVE
17    BEEN THAT AFTER FURTHER CONFIRMATION WE FOUND THAT THAT WAS
18    NOT THE CASE.  BUT I WOULD HAVE TO CONFIRM HOW THOSE THREE
19    MOVED CATEGORIES.
20              THE COURT:  ALL RIGHT.
21              MS. FABIAN:  AND I AM HAPPY TO DO THAT.
22              THE COURT:  WHAT IS BEING REQUESTED NOW IS THAT
23    COUNSEL HAVE THE OPPORTUNITY TO CONTINUE TO MEET AND CONFER
24    TODAY, TO CONTINUE TO MAKE GOOD PROGRESS.  AND TO PUT IN
25    WRITING LATER TODAY WHERE WE ARE WITH REGARD TO HOW MANY WILL
```

JULY 9, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
           PETITIONERS-PLAINTIFFS,      )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            )TUESDAY JULY 10, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    ) 11:00 A.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
           RESPONDENTS-DEFENDANTS.      )
----------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

```
COUNSEL APPEARING:

FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004

                           BADIS VAKILI, ESQ.
                           ACLU FOUNDATION OF SAN DIEGO
                           AND IMPERIAL COUNTIES
                           P.O. BOX 87131
                           SAN DIEGO, CALIFORNIA 92138

                           STEPHAN B. KANG, ESQ.
                           ACLU OF NORTHERN CALIFORNIA
                           39 DRUMM STREET
                           SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:             SARAH B. FABIAN, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044

                           ADAM L. BRAVERMAN
                           INTERIM UNITED STATES ATTORNEY
                           BY:  SAM BETTWY
                           ASSISTANT U.S. ATTORNEY
                           880 FRONT STREET
                           SAN DIEGO, CALIFORNIA 92101




REPORTED BY:               LEE ANN PENCE,
                           OFFICIAL COURT REPORTER
                           UNITED STATES COURTHOUSE
                           333 WEST BROADWAY, ROOM 1393
                           SAN DIEGO, CALIFORNIA 92101
```

```
1        SAN DIEGO, CALIFORNIA – TUESDAY, JULY 10, 2018 – 11:07 A.M.

2                             *   *   *

3              THE CLERK:  NO. 1 ON CALENDAR, CASE NO.18CV0428,

4    MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

5    STATUS CONFERENCE.

6              THE COURT:  GOOD MORNING.

7              MAY I HAVE APPEARANCES, PLEASE?

8              MR. GELERNT:  GOOD MORNING, YOUR HONOR.  LEE

9    GELERNT, FROM THE ACLU, FOR PLAINTIFFS.

10             MR. KANG:  STEPHAN KANG, YOUR HONOR, FOR PLAINTIFFS.

11             MR. BALAKRISHNAN:  GOOD MORNING, YOUR HONOR. ANAND

12   BALAKRISHNAN FOR PLAINTIFFS.

13             THE COURT:  THANK YOU.

14             MR. VAKILI:  GOOD MORNING, YOUR HONOR.  BARDIS

15   VAKILI FOR PLAINTIFFS.

16             MS. FABIAN:  GOOD MORNING, YOUR HONOR.  SARAH

17   FABIAN, WITH THE DEPARTMENT OF JUSTICE, FOR DEFENDANTS.

18             MR. STEWART:  GOOD MORNING, YOUR HONOR.  SCOTT

19   STEWART FOR THE DEPARTMENT OF JUSTICE.

20             THE COURT:  THANK YOU.  AND GOOD MORNING.

21             I HAVE READ ALL OF THE BRIEFING THAT WAS SUBMITTED,

22   WHICH I APPRECIATE.

23             WHAT I WOULD LIKE TO DO IS PROVIDE A NUMBER OF

24   RULINGS FROM THE BENCH SO THAT THE PARTIES HAVE THE BENEFIT OF

25   THE COURT'S DETERMINATIONS AND CAN PROCEED ACCORDINGLY.  AND
```

JULY 10, 2018

```
 1   OF PARENTAGE, AND SO THAT MAY BE THE GROUP THAT THIS DNA
 2   TESTING RELATES TO.
 3           BUT AS TO THAT AREA OF DISPUTE, I WOULD PERMIT DNA
 4   TESTING, WHEN NECESSARY, WHEN THERE IS A LEGITIMATE, GOOD
 5   FAITH CONCERN ABOUT PARENTAGE, OR IF THERE IS A LEGITIMATE
 6   CONCERN THAT THE GOVERNMENT WILL NOT MEET THE REUNIFICATION
 7   DEADLINE, AND THAT MAY BE THE SITUATION WE ARE HERE IN TODAY.
 8   THEN THE GOVERNMENT, WITH THE CONSENT OF THE PARENT, CAN TAKE
 9   A DNA SAMPLE, SUBJECT TO THE PROTECTIVE ORDER THAT IS PROPOSED
10   BY THE PARTIES.
11           I THINK THE PROTECTIVE ORDER COMPLETELY PROVIDES THE
12   NECESSARY PROTECTION WITH RESPECT TO HOW DNA SAMPLING MAY BE
13   USED.  THERE HAS TO BE CONSENT BY THE PARENT, AND THEN THE
14   SAMPLING IS DESTROYED WITHIN SEVEN DAYS AND IT IS NOT USED FOR
15   ANY OTHER PURPOSE.
16           SO WITH THAT, IT SEEMS TO ME THAT IF THE GOVERNMENT
17   IS USING THE DNA TESTING ONLY WHEN NECESSARY AND/OR WHEN
18   NECESSARY TO MEET COURT-IMPOSED DEADLINES, THAT IT MAY BE
19   DONE, SUBJECT TO THE PROTECTIVE ORDER.
20           MS. FABIAN:  CAN I ASK A POINT OF CLARIFICATION?
21           THE COURT:  LET ME RUN THROUGH THESE, AND THEN WE
22   CAN GO BACK AND CLARIFY AS NECESSARY.
23           THE SECOND AREA RELATES TO RESTRICTIONS ON HHS
24   INFORMATION-GATHERING ABOUT CHILD WELFARE.
25           HERE, I WOULD ADOPT A STREAMLINE APPROACH, NOT THE
```

JULY 10, 2018

```
 1   TVPRA STANDARD.  THAT, IN THIS CONTEXT, IS BACKWARDS, BECAUSE
 2   THE TVPRA, FROM ITS INCEPTION, IS ALL ABOUT A CUSTODIAN
 3   APPLYING AND SEEKING APPROVAL TO BE A SPONSOR OR A RECOGNIZED
 4   CUSTODIAN; THIS IS NOT THAT SITUATION.
 5          THE GOVERNMENT HAS AN OBLIGATION TO REUNIFY CHILD
 6   WITH PARENT.  THE IDEA OF AN APPLICATION PROCESS DOESN'T FIT
 7   IN THIS CONTEXT.  THE PARENT HAS A RIGHT TO BE REUNIFIED AND
 8   IT IS THE GOVERNMENT'S OBLIGATION TO MAKE IT SO, UNLESS THERE
 9   ARE ISSUES OF FITNESS OR DANGER.
10          SO ON ADDITIONAL INFORMATION-GATHERING, THAT WOULD
11   NOT BE NECESSARY IN THE UNIQUE CONTEXT OF THIS CASE.  THIS IS
12   NOT THE ORDINARY TVPRA TYPE OF CASE.
13          IN ADDITION, IF THE GOVERNMENT IS AWARE OF
14   INFORMATION BEFORE THE COURT-IMPOSED DEADLINE THAT RAISES
15   ISSUES OF FITNESS OR DANGER -- AND THERE ARE MANY EXAMPLES
16   THAT HAVE BEEN SET OUT IN THE PARTIES' FILINGS TODAY OF
17   PARENTS THAT PRESENT ISSUES OF FITNESS OR DANGER --
18   REUNIFICATION DOES NOT HAVE TO OCCUR TODAY.  THE GOVERNMENT
19   CAN WITHHOLD REUNIFICATION, AGAIN ASSUMING ABSOLUTE GOOD FAITH
20   AND ARTICULABLE REASONS FOR IT.  AND THAT INFORMATION IS
21   THEN -- WILL THEN BE IMMEDIATELY PROVIDED TO PLAINTIFFS'
22   COUNSEL SO THAT THEY HAVE AN OPPORTUNITY TO CONTEST THE
23   GOVERNMENT'S DETERMINATION.
24          AND I WILL COME TO THE PROCESS BY WHICH WE WILL
25   RESOLVE ANY OF THESE DISPUTES, BUT I AM OPTIMISTIC THAT MOST
```

JULY 10, 2018

1   ALL WILL RESOLVE THROUGH THE MEET-AND-CONFER PROCESS.

2            THE THIRD AREA RELATES TO BACKGROUND CHECKS ON OTHER

3   ADULTS IN THE HOUSEHOLD.  THIS GOES TO THIS IDEA OF IF WE ARE

4   GOING TO PLACE AN UNACCOMPANIED MINOR WHO SHOWED UP ON HIS OWN

5   AND WAS APPREHENDED, WE ARE NOT GOING TO PUT HIM OR HER IN A

6   HOME UNLESS WE KNOW ABOUT EVERYONE IN THE HOME.

7            THAT IS VERY DIFFERENT FROM THE GOVERNMENT NEEDING

8   TO RETURN A CHILD TO HIS OR HER PARENT, ASSUMING THE PARENT IS

9   FIT AND NOT A DANGER.  THESE PARENTS ARE RESPONSIBLE FOR THEIR

10  OWN CHILDREN, AND MANY OF THESE DETERMINATIONS, WE MUST

11  ASSUME, ARE SUBJECT TO THE PARENTS' JUDGMENT AND

12  CONSIDERATION.

13           SO I WOULD ADOPT A STREAMLINE APPROACH HERE.

14           AND THERE MAY BE INDIVIDUALS -- THE GOVERNMENT HAS

15  IDENTIFIED SEVERAL PUTATIVE CLASS MEMBERS WHO HAVE CRIMINAL

16  HISTORY:  ONE IS ALIEN SMUGGLING, ANOTHER IS CHILD

17  ENDANGERMENT, ANOTHER IS NARCOTICS TRAFFICKING, ANOTHER HAS A

18  PENDING OR AN ALLEGED HOMICIDE.  THESE INDIVIDUALS FALL

19  OUTSIDE OF THE CLASS.  SO THE CLASS DEFINITION WILL

20  NECESSARILY ADDRESS MANY OF THE GOVERNMENT'S LEGITIMATE

21  CONCERNS ABOUT PROTECTING THE WELFARE OF CHILDREN.

22           AND IF THE GOVERNMENT HAS SPECIFIC INFORMATION THERE

23  IS -- FOR EXAMPLE, THERE IS AN IDENTIFICATION OF A PARENT, A

24  SITUATION WHERE AN INDIVIDUAL IN ONE OF THE HOUSEHOLDS HAS AN

25  OUTSTANDING WARRANT FOR AGGRAVATED CRIMINAL SEXUAL ABUSE.  THE

JULY 10, 2018

1   GOVERNMENT HAS A LOT OF INFORMATION, A LOT OF RESOURCES

2   AVAILABLE.  WHEN THAT KIND OF INFORMATION COMES FORWARD THERE

3   IS NOT A NEED TO REUNIFY.  THAT WOULD BE AN EXAMPLE OF THE

4   GOVERNMENT PROPERLY WITHHOLDING REUNIFICATION, ADDRESSING IT

5   WITH PLAINTIFFS' COUNSEL.  AND THEN, IF NECESSARY, IF IT

6   CANNOT BE RESOLVED BETWEEN THE PARTIES, BRINGING IT TO THE

7   ATTENTION OF THE COURT FOR RESOLUTION.

8           BUT THE TVPRA PROCESS OF THE FULL BACKGROUND CHECK

9   OF EVERYONE IN THE HOUSEHOLD IS NOT NECESSARY UNDER THESE

10  UNIQUE CIRCUMSTANCES.

11          NUMBER FOUR IS PROOF OF ADDRESS, SPONSOR CARE PLANS,

12  AND ALTERNATE CAREGIVERS.  THERE IS NO OBJECTION.  MANY OF

13  THESE AREAS ARE NOT OBJECTED TO IN PART.  HERE THERE IS NO

14  OBJECTION TO PROVIDING PROOF OF ADDRESS BUT THERE IS OBJECTION

15  TO A SPONSOR CARE PLAN.  AND I WOULD AGREE OR SUSTAIN THAT

16  OBJECTION.

17          HERE AGAIN, THE PARENTS ARE NOT APPLYING FOR -- THEY

18  DON'T HAVE TO PROVE THAT THEY ARE GOING TO BE A GOOD SPONSOR.

19  WHAT THE GOVERNMENT HAS TO LOOK TO IS WHETHER THE PARENT IS

20  UNFIT OR A DANGER, SO IT IS GOING ABOUT IT A DIFFERENT WAY.

21          THE TVPRA, WITH RESPECT TO THESE INDIVIDUAL CLASS

22  MEMBERS, IS BACKWARDS.  AND FOR THOSE REASONS I WOULD AGREE

23  WITH PLAINTIFFS ON A STREAMLINED APPROACH.

24          AND HERE AGAIN, IF THERE IS ANY INFORMATION THAT THE

25  GOVERNMENT HAS THAT GIVES CONCERNS, IT CAN BE PROPERLY BROUGHT

JULY 10, 2018

Exhibit R, Page 191

1   TO THE ATTENTION OF PLAINTIFFS' COUNSEL AND THE COURT AT A
2   LATER TIME.
3           THE FIFTH AREA RELATES TO LEGAL ORIENTATION AND
4   SPONSOR CARE AGREEMENT.  THERE IS NO OBJECTION TO ATTENDING
5   LEGAL ORIENTATION PROGRAMS AND/OR SIGNING A SPONSOR CARE
6   AGREEMENT SO LONG AS IT DOES NOT DELAY REUNIFICATION.  AND I
7   AGREE WITH THAT.
8           SO REUNIFICATION WOULD BE PRIMARY, AND THEN SIGNING
9   ON TO LEGAL ORIENTATION AND SPONSOR CARE AGREEMENTS CAN BE
10  DONE AT A LATER TIME, AFTER REUNIFICATION.
11          THE FINAL AREA IS WHERE A CHILD MAY PRESENT A DANGER
12  TO HIM OR HERSELF OR TO OTHERS.
13          THIS IS NOT A CONCERN FOR CHILDREN UNDER AGE FIVE,
14  IT IS A CONCERN FOR CHILDREN OVER AGE FIVE.  AND PROBABLY THE
15  TARGET GROUP HERE WOULD BE CHILDREN OVER AGE 12.  BUT I WOULD
16  INVITE THE PARTIES TO MEET AND CONFER ON THAT.
17          HERE AGAIN, IF THE GOVERNMENT HAS ARTICULABLE
18  REASONS OF A CHILD -- AND WHAT COMES TO MIND WOULD BE A
19  TEENAGER WHO PRESENTS A DANGER TO HIMSELF OR OTHERS.  THE
20  GOVERNMENT OUGHT TO BE FREE TO MAKE THOSE DETERMINATIONS,
21  PROPERLY SO, AND TO KEEP THAT CHILD IN SECURE CUSTODY, NOT BE
22  REUNIFIED.
23          BUT HERE AGAIN WHAT I WOULD EXPECT IS THE PARTIES
24  MEET AND CONFER.  THERE WOULD LIKELY BE AGREEMENT.  IF NOT,
25  THE PARTIES CAN BRING THE MATTER TO THE COURT'S ATTENTION.

JULY 10, 2018

```
 1    AND AS FAR AS THE PROCESS, I WOULD LIKE THE PROCESS TO
 2    CONTINUE, OF COURSE, AS EXPEDITIOUSLY AS IT HAS BEEN.  AND OF
 3    COURSE WITH A PARAMOUNT FOCUS BEING ON THE CHILDREN'S WELFARE.
 4    BUT THAT CAN BE DONE IN THE MANNER WHICH THE COURT HAS
 5    ADDRESSED THESE ISSUES.
 6              IT IS IMPORTANT THAT COUNSEL BE AVAILABLE FROM HERE
 7    THROUGH THE REUNIFICATION PROCESS.  THE COURT WILL BE
 8    AVAILABLE.  I WOULD LIKE TO CONTINUE TO HAVE REGULAR STATUS
 9    REPORTS AND STATUS CONFERENCES.  AND I WOULD LIKE TO DO THAT
10    IN OPEN COURT.
11              IT DOESN'T HAVE TO BE YOU, MS. FABIAN, OR YOU, MR.
12    GELERNT, IT COULD BE SOME OF THESE ABLE BODIES NEXT TO YOU.
13    BUT I WOULD LIKE A PERSON IN COURT WHO CAN STAND UP AND MAKE
14    REPRESENTATIONS, AND OTHERS CAN PARTICIPATE TELEPHONICALLY.
15    BUT I WOULD LIKE TO DO THAT ON A REGULAR BASIS.
16              THERE IS A LOT OF WORK TO DO WITH RESPECT TO THE
17    OVER-FIVE GROUP.  AND I AM ANTICIPATING THAT A LOT OF THAT
18    WORK IS WELL UNDERWAY, AND IT WILL CONTINUE ALONG THE LINES
19    THAT WE HAVE SET OUT HERE WITH THE UNDER-FIVE GROUP.
20              WHAT I AM CONTEMPLATING IS THAT AS WE GO THROUGH
21    THIS PROCESS -- AND IT WOULD START WITH BOTH THE UNDER-FIVE
22    AND THEN THE OVER-FIVE GROUP -- IS WHERE THE PARTIES MEET AND
23    CONFER.  IF THERE IS SOME DISPUTE, YOU CAN SUBMIT BRIEFING UP
24    TO FIVE PAGES.  IT DOESN'T HAVE TO BE FANCY, IT CAN BE A
25    LETTER BRIEF.  IT CAN JUST GET RIGHT TO THE ISSUES SETTING OUT
```

JULY 10, 2018

```
 1   THE PARTIES' BASIC POSITIONS.  I WOULD REQUEST A JOINT FILING
 2   ON ANY DISPUTE, SO UP TO TEN PAGES TOTAL, FIVE AND FIVE.
 3            AND THE COURT WOULD EITHER CONVENE A STATUS
 4   CONFERENCE TELEPHONICALLY OR I WOULD SIMPLY RULE ON THE BRIEF
 5   THAT IS SUBMITTED, AND WE CAN GO CASE BY CASE.
 6            BUT I AM VERY OPTIMISTIC THAT THAT WILL BE SELDOMLY
 7   USED.  THAT WOULD BE MY EXPECTATION.  EVERYONE IS ROWING IN
 8   THE SAME DIRECTION HERE, AND IT IS JUST A MATTER OF, I THINK,
 9   STREAMLINING THE PROCESS AND PROVIDING CLEAR DIRECTION AS TO
10   HOW THE GOVERNMENT WILL PROCEED.
11            I HAVE JUST A FEW FINAL COMMENTS, AND THEN WE CAN
12   ANSWER ANY QUESTIONS OR NEED FOR CLARIFICATION.
13            THERE ARE, DEPENDING ON HOW ONE COUNTS, EITHER 101
14   OR 102 IN THIS UNDER-FIVE GROUP.  BY MY COUNT, BASED ON
15   TODAY'S SUBMISSION, 75 OF THIS GROUP ARE ELIGIBLE FOR
16   REUNIFICATION.  63 ARE ELIGIBLE FOR REUNIFICATION TODAY.
17            14 PARENTS ARE NOT IN THE CLASS.  EIGHT HAVE
18   CRIMINAL HISTORY THAT PRECLUDES THEM, FIVE ARE NOT THE
19   PARENTS, AND ONE THE GOVERNMENT CLAIMS IT HAS CREDIBLE
20   EVIDENCE OF CHILD ABUSE AND IS THEREFORE A DANGER OR UNFIT AND
21   WOULD FALL OUTSIDE OF THE CLASS.  THAT'S 14.
22            THERE ARE 12 OTHERS THAT FALL -- WELL, THERE ARE TWO
23   OTHERS THAT PRESENTLY FALL OUT OF THE CLASS.  ONE IS
24   CHARACTERIZED AS PRESENTING A DANGER, ONE AS HAVING A
25   COMMUNICABLE DISEASE.  THE ONE WITH THE COMMUNICABLE DISEASE,
```

JULY 10, 2018

```
 1   THE PARTIES RECOGNIZE WHEN THAT MATTER IS ADDRESSED, HOPEFULLY
 2   SUCCESSFULLY FROM A MEDICAL STANDPOINT, THEN REUNIFICATION CAN
 3   OCCUR AT AN APPROPRIATE TIME.
 4        TEN MEMBERS OF THE CLASS ARE IN CRIMINAL CUSTODY,
 5   STATE OR FEDERAL.  THEY ARE NOT ELIGIBLE FOR REUNIFICATION AT
 6   THIS POINT IN TIME, BUT THEY WOULD BE ONCE THEY ARE RELEASED
 7   TO ICE DETENTION.  SO THEY WOULD HAVE TO WAIT.
 8        THERE ARE 12 THAT HAVE BEEN REMOVED.  THEY ARE PART
 9   OF THE CLASS, THEY WOULD BE SUBJECT TO REUNIFICATION, BUT AT A
10   LATER TIME.  THAT REQUIRES A SEPARATE DISCUSSION, AND THERE
11   ARE MORE COMPLICATING ISSUES THAT HAVE TO BE ADDRESSED WITH
12   THOSE 12.  BUT THEY ARE PART OF THE CLASS AND THEY DO DESERVE
13   TO BE REUNITED, ABSENT THEIR CONSENT OTHERWISE.
14        SO THAT LEAVES 63.
15        THE GOVERNMENT HAS INDICATED -- AND TO RESTATE THIS.
16   OF THE GROUP OF 101 OR 102, 75 ARE SUBJECT TO BEING REUNITED.
17   12 OF THOSE ARE REMOVED AND WILL TAKE SOME TIME.
18        THERE ARE 63 THAT I WOULD LIKE TO FOCUS ON TODAY.
19        THE GOVERNMENT HAS INDICATED THAT 34 ARE READY, AND
20   THEY WILL BE REUNITED TODAY.
21        THERE ARE 17 OTHERS THAT ARE IN ICE DETENTION.  16
22   NEED CONFIRMATION OF PARENTAGE, AND ONE HAS CRIMINAL HISTORY
23   PENDING.
24        AND IT SEEMS TO ME WITH THE PROCEDURES SET OUT TODAY
25   THAT THOSE 17 CAN BE ADDRESSED AND REUNITED TODAY, OR WITHIN
```

JULY 10, 2018

1   THE IMMEDIATE PROXIMITY OF TODAY.

2          THERE ARE EIGHT THAT HAVE BEEN RELEASED FROM ICE,

3   AND IT SEEMS TO ME THAT THEY CAN BE REUNITED TODAY, AS WELL.

4          AND SO IN THAT REGARD WHAT I WOULD LIKE TO DO IS

5   MEET AGAIN THIS FRIDAY AT 1:00 O'CLOCK, WITH THE PARTIES TO

6   SUBMIT A STATUS REPORT THURSDAY BY 3:00 P.M., PACIFIC TIME,

7   GIVING AN UPDATE ON COMPLIANCE WITH THE UNDER-FIVE GROUP AND

8   GIVING A STATUS ON THE OVER-FIVE GROUP, WHICH IS -- THAT'S

9   GOING TO BE A SIGNIFICANT UNDERTAKING.  AND WE NEED TO HAVE

10  CONCRETE INFORMATION BY THURSDAY SO THAT MR. GELERNT AND

11  OTHERS CAN MAKE INTELLIGENT AND INFORMED DECISIONS AS TO

12  WHETHER THERE IS COMPLIANCE AND WHAT NEEDS TO BE DONE TO MAKE

13  REUNIFICATION HAPPEN.

14          WE NEED ANOTHER LIST OF THE OVER-FIVE GROUP.  THAT'S

15  GOING TO BE A SIGNIFICANT UNDERTAKING.  IT MAY BE AN

16  INDIVIDUAL LIST, IT MAY BE BY CATEGORY.  I WILL JUST SIMPLY

17  HAVE THE PARTIES MEET AND CONFER IN THAT REGARD.

18          IF THERE IS A FAILURE TO COMPLY WITH THE UNDER-FIVE

19  GROUP THEN, MR. GELERNT, WHAT I ASK THAT YOU DO IS PUT THAT IN

20  THE THURSDAY SUBMISSION AND WE CAN ADDRESS IT ON FRIDAY.  AND

21  IF YOU BELIEVE THERE IS A FAILURE TO COMPLY -- AND HERE I AM

22  REALLY FOCUSING ON THE 63.

23          **MR. GELERNT:**  RIGHT.

24          **THE COURT:**  IF THERE IS A FAILURE TO COMPLY I WOULD

25  LIKE TO KNOW WHAT IT IS AND WHAT YOU ARE SEEKING BY WAY OF

JULY 10, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

```
_____
                                        )
MS. L. AND MS. C.,                      )
                                        ) CASE NO. 18CV0428-DMS
            PETITIONERS-PLAINTIFFS,     )
                                        )
VS.                                     )
                                        ) SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            )  FRIDAY JULY 13, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    )   1:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
            RESPONDENTS-DEFENDANTS.     )
----------------------------------------
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

COUNSEL APPEARING:

FOR PLAINTIFF:                     LEE GELERNT, ESQ.
                                   ACLU IMMIGRANT RIGHTS PROJECT
                                   125 BROAD STREET 18TH FLOOR
                                   NEW YORK, NEW YORK 10004

                                   BADIS VAKILI, ESQ.
                                   ACLU FOUNDATION OF SAN DIEGO
                                   AND IMPERIAL COUNTIES
                                   P.O. BOX 87131
                                   SAN DIEGO, CALIFORNIA 92138

                                   SPENCER AMDUR, ESQ.
                                   ACLU OF NORTHERN CALIFORNIA
                                   39 DRUMM STREET
                                   SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:                     SARAH B. FABIAN, ESQ.
                                   U.S. DEPARTMENT OF JUSTICE
                                   OFFICE OF IMMIGRATION LITIGATION
                                   P.O. BOX 868
                                   BEN FRANKLIN STATION
                                   WASHINGTON, DC 20044

REPORTED BY:                       LEE ANN PENCE,
                                   OFFICIAL COURT REPORTER
                                   UNITED STATES COURTHOUSE
                                   333 WEST BROADWAY, ROOM 1393
                                   SAN DIEGO, CALIFORNIA 92101

```
 1        SAN DIEGO, CALIFORNIA - FRIDAY, JULY 13, 2018 - 1:07 P.M.

 2                              *   *   *

 3            THE CLERK:  NO. 23 ON CALENDAR, CASE NO. 18CV0428,

 4   MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

 5   A STATUS CONFERENCE.

 6            THE COURT:  GOOD AFTERNOON.

 7            MAY I HAVE APPEARANCES, PLEASE?

 8            MR. GELERNT:  GOOD AFTERNOON, YOUR HONOR.  LEE

 9   GELERNT, FOR PLAINTIFFS, FROM THE ACLU.

10            MR. AMDUR:  GOOD AFTERNOON.  SPENCER AMDUR FROM

11   ACLU.

12            MR. VAKILI:  GOOD AFTERNOON, YOUR HONOR.  BARDIS

13   VAKILI FOR PLAINTIFFS.

14            THE COURT:  THANK YOU.

15            MS. FABIAN:  GOOD AFTERNOON, YOUR HONOR.  SARAH

16   FABIAN FROM THE DEPARTMENT OF JUSTICE FOR THE DEFENDANTS.

17            THE COURT:  GOOD AFTERNOON.

18            I HAVE READ THE JOINT STATUS REPORT, AND I HAVE A

19   COUPLE COMMENTS TO MAKE BASED ON THE JOINT STATUS REPORT, AND

20   THEN WE WILL GET INTO THE DETAILS.

21            FIRST, THE GOVERNMENT ISSUED A PRESS RELEASE

22   YESTERDAY, WHICH I SAW, INDICATING THAT THE ADMINISTRATION HAD

23   COMPLETE REUNIFICATION FOR ELIGIBLE CHILDREN UNDER AGE FIVE.

24   THERE WAS CAREFUL VETTING, THE GOAL IS THE WELL-BEING OF THE

25   CHILD.  AND THAT THEY WILL CONTINUE TO WORK IN A GOOD FAITH
```

JULY 13, 2018

```
 1    MAY HAVE A CRIMINAL HISTORY AND THAT UNDER A STRICT READING OF
 2    THAT DEFINITION WOULD NOT BE INCLUDED.
 3              THE COURT:  THAT'S CORRECT.
 4              MS. FABIAN:  SO WE HAVE MADE A DISCRETIONARY
 5    DETERMINATION TO BE OVER-INCLUSIVE.
 6              I THINK THAT SUBJECTING THAT TO A CASE-BY-CASE
 7    REVIEW BY PLAINTIFFS TO SAY, YOU KNOW, THAT THEY DISAGREE WITH
 8    THAT ASSESSMENT PUTS A LAYER ON THAT PROCESS THAT IS GOING --
 9    THAT IS UNFAIR AS FAR AS THE CLASS DEFINITION REQUIREMENT HERE
10    AND JUST IS NOT HELPFUL TO THE PROCESS.
11              THE COURT:  I AGREE.  THAT ISSUE, IF THERE IS A
12    CRIMINAL HISTORY ISSUE, CAN BE ADDRESSED AT A LATER TIME,
13    AFTER THE BULK OF REUNIFICATIONS OCCUR.  AND IT COULD BE BY
14    WAY OF MODIFYING THE SCOPE OF THE CLASS.
15              MR. GELERNT:  RIGHT.  AND, YOUR HONOR, JUST TO BE
16    CLEAR, BECAUSE I THINK MAYBE I WASN'T CLEAR.
17              I AM NOT SUGGESTING THAT BY THE DEADLINE WE WOULD
18    NEED TO RESOLVE DISPUTES, MUCH LESS BURDEN YOU.  BUT, FOR
19    EXAMPLE, IF WE TOLD THE GOVERNMENT, YOU KNOW, THIS FATHER HAS
20    BEEN WAITING FOR HIS CHILD AND HE ACTUALLY HAS THE ADOPTION
21    PAPERS IN HIS HAND AND HHS JUST TOOK A COPY.  AND I WERE TO
22    CALL COUNSEL FOR THE GOVERNMENT AND SAY, LET'S NOT HAVE A
23    DISPUTE, LET'S JUST -- CAN YOU LOOK INTO IT?
24              THEY CALL AND SAY, OH, YEAH, WE DO HAVE THE ADOPTION
25    PAPERS, SORRY, WE WOULD PUT THEM BACK IN.
```

JULY 13, 2018

1              LIKEWISE, IF IT WAS JOSE R. MARTINEZ RATHER THAN

2   JOSE S. MARTINEZ HAD A WARRANT OUT IN GUATEMALA, THEN WE WOULD

3   SAY, LET'S AGREE TO PUT HIM BACK IN.

4              BUT IF THE INFORMATION WAS ACCURATE AND IT WAS JUST

5   A DISPUTE ABOUT WHETHER THIS IS A SUFFICIENT CRIME, OR WHETHER

6   THE PERSON'S ADOPTION PAPERS GENUINELY ARE LEGAL UNDER THOSE

7   COUNTRY'S LAWS, THEN I THINK THOSE DISPUTES WOULD HAVE TO BE

8   PUSHED OUT.

9              SO THE REASON WE ARE ASKING FOR SPECIFIC INFORMATION

10  IS BECAUSE PEOPLE ON THE GROUND ARE SAYING, WAIT, WE DON'T

11  THINK THIS PERSON IS ACTUALLY INELIGIBLE.

12             SO IF WE COULD AT LEAST HAVE ENOUGH INFORMATION TO

13  CHECK ACCURACY.  IF IT IS ACCURATE, THEN I THINK THE DISPUTES

14  ARE GOING TO HAVE TO GET PUSHED OUT.

15        **THE COURT:**  ALL RIGHT.

16        **MS. FABIAN:**  YOUR HONOR, I AGREE WITH THAT.  ONE

17  THING I WANT TO ADD, THOUGH, IS IT IS DIFFICULT FOR US.  IN

18  COURT I THINK WE HAVE HEARD A FEW DIFFERENT STATEMENTS FROM

19  PLAINTIFFS.  THERE HAVE BEEN STATEMENTS PUT INTO THEIR --

20  ABOUT THINGS THEY ARE EXPERIENCING, FOR EXAMPLE THE DNA

21  TESTING.  I REPRESENTED TO PLAINTIFFS YESTERDAY ABSOLUTELY

22  THAT WE ARE NOT REQUIRING FOLKS TO PAY FOR DNA.  THEY PUT IT

23  IN THEIR REPORT SAYING THAT WE MAY BE.

24             I HAVE ASKED FOR SPECIFIC EXAMPLES OF ANY

25  INDIVIDUALS THAT THEY ARE AWARE OF WHO HAVE BEEN ASKED TO PAY


JULY 13, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

```
_____
                                          )
MS. L. AND MS. C.,                        )
                                          ) CASE NO. 18CV0428-DMS
           PETITIONERS-PLAINTIFFS,        )
                                          )
VS.                                       )
                                          ) SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS              ) MONDAY JULY 16, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT      )  9:30 A.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.        )
CUSTOMS AND BORDER PROTECTION ("CBP");    )
U.S. CITIZENSHIP AND IMMIGRATION          )
SERVICES ("USCIS"); U.S. DEPARTMENT       )
OF HEALTH AND HUMAN SERVICES ("HHS");     )
OFFICE OF REFUGEE RESETTLEMENT ("ORR");   )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;     )
GREG ARCHAMBEAULT, SAN DIEGO FIELD        )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS,   )
EL PASO FIELD DIRECTOR, ICE; FRANCES M.   )
JACKSON, EL PASO ASSISTANT FIELD          )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN,   )
SECRETARY OF DHS; JEFFERSON BEAUREGARD    )
SESSIONS III, ATTORNEY GENERAL OF THE     )
UNITED STATES; L. FRANCIS CISSNA,         )
DIRECTOR OF USCIS; KEVIN K.               )
MCALEENAN, ACTING COMMISSIONER OF         )
CBP; PETE FLORES, SAN DIEGO FIELD         )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,      )
EL PASO FIELD DIRECTOR, CBP;              )
ALEX AZAR, SECRETARY OF THE               )
DEPARTMENT OF HEALTH AND HUMAN            )
SERVICES; SCOTT LLOYD, DIRECTOR           )
OF THE OFFICE OF REFUGEE RESETTLEMENT,    )
                                          )
           RESPONDENTS-DEFENDANTS.        )
------------------------------------------
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

```
COUNSEL APPEARING:

FOR PLAINTIFF:               LEE GELERNT, ESQ.
                             ACLU IMMIGRANT RIGHTS PROJECT
                             125 BROAD STREET 18TH FLOOR
                             NEW YORK, NEW YORK 10004

                             SPENCER AMDUR, ESQ.
                             ACLU OF NORTHERN CALIFORNIA
                             39 DRUMM STREET
                             SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:               SARAH B. FABIAN, ESQ.
                             U.S. DEPARTMENT OF JUSTICE
                             OFFICE OF IMMIGRATION LITIGATION
                             P.O. BOX 868
                             BEN FRANKLIN STATION
                             WASHINGTON, DC 20044

                             SCOTT G. STEWART,
                             BRIAN STIMSON,
                             OFFICE OF IMMIGRATION LITIGATION
                             950 PENNSYLVANIA AVENUE NW
                             WASHINGTON, DC 20530


ALSO PRESENT:                COMMANDER JONATHAN WHITE



REPORTED BY:                 LEE ANN PENCE,
                             OFFICIAL COURT REPORTER
                             UNITED STATES COURTHOUSE
                             333 WEST BROADWAY, ROOM 1393
                             SAN DIEGO, CALIFORNIA 92101
```

3

```
 1  ‖  SAN DIEGO, CALIFORNIA — MONDAY, JULY 16, 2018 — 9:35 A.M.

 2  ‖                          *   *   *

 3  ‖          THE CLERK:  NO. 1 ON CALENDAR, CASE NO. 18CV0428,

 4  ‖  MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

 5  ‖  STATUS CONFERENCE.

 6  ‖          THE COURT:  GOOD MORNING.

 7  ‖          MAY I HAVE APPEARANCES, PLEASE?

 8  ‖          MR. GELERNT:  LEE GELERNT FROM THE ACLU, YOUR HONOR,

 9  ‖  FOR PLAINTIFFS.  GOOD MORNING.

10  ‖          THE COURT:  GOOD MORNING.

11  ‖          MR. AMDUR:  GOOD MORNING.  SPENCER AMDUR FOR ACLU

12  ‖  FOR PLAINTIFFS.

13  ‖          THE COURT:  THANK YOU.  GOOD MORNING.

14  ‖          MR. STEWART:  SCOTT STEWART FOR THE DEFENDANTS, YOUR

15  ‖  HONOR.  GOOD MORNING.

16  ‖          MR. STIMSON:  SARAH FABIAN, DEPARTMENT OF JUSTICE,

17  ‖  FOR THE DEFENDANTS.

18  ‖          THE COURT:  THANK YOU, AND GOOD MORNING.

19  ‖          MR. STEWART:  IN ADDITION, YOUR HONOR, MAY I ALSO

20  ‖  MENTION -- AND I WILL BE HAPPY TO GIVE A MORE FULSOME

21  ‖  DESCRIPTION.  BUT IN LINE WITH YOUR HONOR'S MOST RECENT ORDER

22  ‖  WE ALSO HAVE COMMANDER JONATHAN WHITE WITH HHS HERE TO

23  ‖  PERSONALLY APPEAR AND ADDRESS QUESTIONS, CONCERNS, WHATEVER.

24  ‖  I CAN GIVE MORE BACKGROUND AS APPROPRIATE, YOUR HONOR.

25  ‖          THE COURT:  THANK YOU, AND GOOD MORNING.  WELCOME.
```

JULY 16, 2018

```
 1   KNOW THAT THEY HAVE A 42-HOUR BLOCK IN WHICH TO BE EXPECTING
 2   SOMEBODY TO SHOW UP.  WE CAN WORK WITH THAT.
 3            MS. FABIAN:  I THINK WE CAN WORK WITH THAT, YOUR
 4   HONOR.
 5            COMMANDER WHITE IS NODDING.
 6            THE COURT:  THANK YOU.
 7            MR. GELERNT:  THANK YOU, YOUR HONOR.
 8            WE JUST HAD A FEW VERY QUICK CLARIFYING QUESTIONS,
 9   AND MAYBE THEY ARE FOR COMMANDER WHITE AND MAYBE THEY ARE FOR
10   GOVERNMENT COUNSEL.
11            I WAS WONDERING IF COMMANDER WHITE KNEW ABOUT HOW
12   MANY CHILDREN HAVE BEEN REUNIFIED UP TO THIS POINT.  I MEAN,
13   THOSE ARE INDIVIDUALS WE DID NOT GET 12 HOURS' NOTICE FROM.
14   AND MAYBE THAT IS NOW, YOU KNOW, UNDER THE --
15            BUT IF, COMMANDER, YOU KNEW HOW MANY HAVE BEEN
16   REUNIFIED UP TO THIS POINT WE WOULD BE INTERESTED IN KNOWING,
17   OR IF COUNSEL COULD PROVIDE IT TO US LATER TODAY.  BUT
18   PRESUMABLY YOU DO KNOW THAT NUMBER.
19            MR. STEWART:  WE CAN TRY TO GET THE LATEST NUMBERS,
20   YOUR HONOR.
21            THE COURT:  OKAY.
22            MR. GELERNT:  THE TWO OTHER CLARIFYING QUESTIONS I
23   HAD WERE, I THINK THAT THERE SEEMS -- WE WERE INTERESTED IN
24   WHETHER THE GOVERNMENT IS EXCLUDING FROM THE CLASS INDIVIDUALS
25   WHO HAVE AN ILLEGAL ENTRY VIOLATION UNDER 8, USC, 1326.  YOUR
```

JULY 16, 2018

 1   HONOR SPECIFICALLY CARVED OUT 8, USC, 1325 OF ILLEGAL ENTRY.

 2   AND I THINK THAT MAY HAVE BEEN BECAUSE THE PARTIES WERE

 3   TALKING ABOUT 1325.  BUT WE TAKE THE SPIRIT OF YOUR ORDER TO

 4   BE ILLEGAL ENTRY SHOULD NOT CARVE OUT PEOPLE.

 5          AND SO INDIVIDUALS CAN BE CHARGED UNDER ILLEGAL

 6   ENTRY UNDER BOTH 1325 OR 1326.  1326 IS USUALLY A SECOND TIME,

 7   BUT IT IS STILL ILLEGAL ENTRY.  AND IT COULD BE EVEN AN

 8   ILLEGAL ENTRY FROM DECADES AGO.

 9          WE WERE JUST INTERESTED IF THE GOVERNMENT IS

10   INCLUDING WITHIN THE CLASS ALL INDIVIDUALS WITH ILLEGAL ENTRY

11   VIOLATIONS, WHETHER THEY ARE 1325 OR 1326.

12          THAT MAY BE A QUESTION FOR MS. FABIAN.

13          **MR. STEWART:**  I BELIEVE, YOUR HONOR, TO THE BEST OF

14   MY KNOWLEDGE, THAT THIS IS THE FIRST WE HAVE HEARD OF THAT,

15   BUT WE CAN LOOK INTO IT AND ALSO WORK WITH MR. GELERNT.

16          **THE COURT:**  BASED ON WHAT I HAVE BEEN HEARING,

17   ESPECIALLY FROM COMMANDER WHITE TODAY, THAT I WOULD BE MAKING

18   THE ASSUMPTION THAT 1325, 1326 COLLECTIVELY WOULD NOT EXCLUDE.

19          **MR. GELERNT:**  RIGHT.

20          **THE COURT:**  BUT I THINK COUNSEL CAN ADDRESS THAT.

21          **MR. GELERNT:**  THANK YOU, YOUR HONOR.

22          AND THEN THE FINAL QUESTION I JUST HAD, I THINK THIS

23   MAY ALSO BE FOR COUNSEL, NOT FOR COMMANDER WHITE, IT MAY GO

24   BEYOND COMMANDER WHITE.

25          WE TAKE IT THAT THE REMOVALS THAT ARE OCCURRING, THE

JULY 16, 2018

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
          PETITIONERS-PLAINTIFFS,       )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            )FRIDAY AUGUST 3, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    )  1:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
          RESPONDENTS-DEFENDANTS.       )
----------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
TELEPHONIC STATUS CONFERENCE

```
COUNSEL APPEARING TELEPHONICALLY:

FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004


FOR DEFENDANT:             SARAH B. FABIAN, ESQ.
                           SCOTT G. STEWART, ESQ.
                           AUGUST FLENTJE, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044


ALSO APPEARING:            JENNIFER LEVY, ESQ.



REPORTED BY:               LEE ANN PENCE,
                           OFFICIAL COURT REPORTER
                           UNITED STATES COURTHOUSE
                           333 WEST BROADWAY, ROOM 1393
                           SAN DIEGO, CALIFORNIA 92101
```

3

<u>**SAN DIEGO, CALIFORNIA – FRIDAY, AUGUST 3, 2018 – 1:00 P.M.**</u>

1

2                              *   *   *

3          **THE CLERK:**  NO. 16 ON CALENDAR, CASE ONE 18CV0428,

4   MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

5   STATUS CONFERENCE.

6          **THE COURT:**  GOOD AFTERNOON.  THIS IS JUDGE SABRAW.

7          CAN I HAVE COUNSELS' APPEARANCES, PLEASE?

8          **MR. GELERNT:**  GOOD AFTERNOON, YOUR HONOR.  THIS IS

9   LEE GELERNT FOR PLAINTIFFS.

10          **MR. STEWART:**  YOUR HONOR, THIS IS SCOTT STEWART FOR

11   THE DEFENDANTS.  AUGUST FLENTJE IS WITH ME AS WELL, AND MS.

12   FABIAN IS ON THE LINE AS WELL.

13          **THE COURT:**  THANK YOU FOR THE STATUS REPORT.  LET'S

14   GET RIGHT INTO THAT.

15          FIRST, IT SEEMS TO ME THAT WHAT IS ABSOLUTELY

16   ESSENTIAL, GIVEN THE STATUS REPORT, IS THAT THE GOVERNMENT

17   IDENTIFY A SINGLE PERSON, OF THE SAME TALENT AND ENERGY AND

18   ENTHUSIASM AND CAN-DO SPIRIT AS COMMANDER WHITE, TO HEAD UP

19   THE REUNIFICATION PROCESS OF THE REMAINING PARENTS WHO HAVE

20   BEEN REMOVED OR RELEASED IN COUNTRY AND HAVE NOT BEEN LOCATED.

21          IN REVIEWING THE STATUS REPORT IT APPEARS THAT ONLY

22   12 OR 13 OF CLOSE TO 500 PARENTS HAVE BEEN LOCATED, WHICH IS

23   JUST UNACCEPTABLE AT THIS POINT.  AND IT APPEARS, GIVEN THE

24   COMPETING PRESENTATIONS, THAT THERE IS NOT A PLAN IN PLACE.

25          SO THE STATUS REPORT THAT WAS FILED WITH THE COURT

AUGUST 3, 2018

19

```
1            THEN I THINK WE CAN SPEAK A LOT MORE INTELLIGENTLY
2   ON ADDITIONAL ORDERS THAT MAY BE REQUIRED.  WE CAN SPEAK MORE
3   INTELLIGENTLY, I THINK, ON DEADLINES, REUNIFICATION PROCESS,
4   THOSE KIND OF DETAILS.  BUT I THINK RIGHT NOW THERE IS REALLY
5   NOTHING IN PLACE.  AND SO WHAT'S SO IMPORTANT IS TO IDENTIFY
6   THE KEY LEADERSHIP SO THAT THEY CAN REPORT TO THE COURT AND
7   MEANINGFUL ORDERS CAN BE PUT IN PLACE TO MAKE THIS
8   REUNIFICATION HAPPEN AS QUICKLY AS POSSIBLE.
9            ON THE STATUS REPORT ITSELF AND DISCOVERY OF
10  INFORMATION, ARE THERE ANY OTHER MATTERS WE NEED TO DISCUSS AT
11  THIS POINT?
12           MR. GELERNT:  YOUR HONOR, THIS IS MR. GELERNT.
13           THE ONLY OTHER -- AND I THINK YOU TOUCHED ON THIS --
14  IS FOR THE EXCLUSIONS OF -- BASED ON CRIMINAL CONVICTIONS OR
15  OTHER.  I THINK WE NEED -- I THINK YOU TOUCHED ON THIS, WE
16  NEED MUCH MORE SPECIFIC INFORMATION.
17           AND I AM ASSUMING YOUR HONOR IS TALKING ABOUT A PLAN
18  NOT JUST FOR DEPORTED PARENTS BUT FOR PARENTS WHO WERE
19  EXCLUDED FOR OTHER REASONS.  IF THAT IS TRUE, THEN WE CAN
20  LEAVE IT ALONE NOW.
21           BUT IT DOES APPEAR THAT SOME OF THE CONVICTIONS, OR
22  EVEN SOME OF THEM ARE JUST CHARGES, ARE NOT THE TYPE OF
23  SERIOUS CRIME THAT WOULD WARRANT TAKING SOMEONE'S CHILD AWAY.
24           BUT IF THE PLAN THAT YOU ARE ENVISIONING, YOUR
25  HONOR, FOR OUR TEAM PERSON AND THE GOVERNMENT'S, IS TALKING
```

AUGUST 3, 2018

1   ABOUT MORE THAN JUST DEPORTED PARENTS, THEN WE CAN LEAVE IT

2   ALONE NOW.

3           **THE COURT:**  THERE ARE THE PARENTS, OF COURSE, THE

4   ELIGIBLE PARENTS WHO WERE REUNIFIED, AND THEN THERE WERE A

5   NUMBER OF PARENTS WHO WERE NOT REUNIFIED BECAUSE THE

6   GOVERNMENT DEEMED THEM INELIGIBLE DUE TO CRIMINAL HISTORY OR

7   OTHER FITNESS CONSIDERATIONS.

8           SO THAT IS THE INFORMATION YOU ARE REQUESTING,

9   CORRECT?

10          **MR. GELERNT:**  YES, YOUR HONOR.  AND OUR

11  UNDERSTANDING IS THAT YOU SET UP A SORT OF TWO-STAGE PROCESS

12  WHERE TO MEET THE INITIAL DEADLINE THE GOVERNMENT COULD TAKE

13  OUT PEOPLE WHO HAD A CRIMINAL CONVICTION AND THERE WOULDN'T

14  HAVE TO BE THE BACK-AND-FORTH BETWEEN PLAINTIFFS AND

15  DEFENDANTS.

16          BUT AT THIS POINT NOW I THINK YOUR HONOR ENVISIONED

17  REUNIFICATION OF PEOPLE WITH CRIMINAL CONVICTIONS AS LONG AS

18  IT WASN'T THE TYPE OF SERIOUS CONVICTION THAT WOULD BEAR ON

19  SOMEONE'S FITNESS TO BE A PARENT.  SO I THINK WE NEED THAT

20  KIND OF SPECIFIC INFORMATION.

21          AND IT APPEARS FROM WHAT WE HAVE, VERY LIMITED

22  INFORMATION FROM THE GOVERNMENT, THERE MAY BE 30 PEOPLE IN

23  THAT CATEGORY.  AND SOME OF THEM APPEAR TO BE LIMITED TYPE

24  CRIMES OF THEFT FROM 12 YEARS AGO IN THEIR OWN COUNTRY.

25          SO I THINK THE PLAN -- IT WOULD BE, I THINK, HELPFUL

AUGUST 3, 2018

```
1   IF THE PLAN ALSO INCLUDED SOMETHING ABOUT REUNIFYING THOSE
2   FAMILIES AS WELL, NOT JUST THE DEPORTED PARENTS.
3            THE COURT:  ALL RIGHT.  AS OPPOSED TO -- I JUST WANT
4   TO BE CLEAR.
5            ARE YOU ASKING THE COURT TO ORDER THE GOVERNMENT TO
6   PRODUCE ADDITIONAL INFORMATION SO THAT YOU CAN RAISE THESE
7   ISSUES WITH THE COURT SO THAT IT CAN DETERMINE WHETHER TO
8   REUNIFY; OR ARE YOU SUGGESTING THAT WHOEVER HEADS UP THIS NEXT
9   PHASE OF REUNIFICATION WOULD BE ADDRESSING THESE ISSUES, AS
10  WELL?
11           MR. GELERNT:  I THINK EITHER IS FINE WITH US, YOUR
12  HONOR.  AT THIS POINT WE MAY WANT TO CONTEST -- WE MAY BELIEVE
13  WE HAVE ENOUGH INFORMATION TO CONTEST IT WITH THE COURT BUT WE
14  WOULD FIRST BRING IT TO THE GOVERNMENT TO SEE WHETHER THEY
15  AGREE.
16           I WAS JUST SUGGESTING THAT THE GOVERNMENT OUGHT TO
17  PROVIDE US WITH MORE INFORMATION ABOUT THE CRIMINAL EXCLUSIONS
18  BECAUSE WE DON'T HAVE INFORMATION NOW ABOUT ALL 30, AND WE
19  CERTAINLY DON'T HAVE ENOUGH INFORMATION RIGHT NOW TO CONTEST
20  OR NOT CONTEST.
21           SO I THINK THAT WOULD BE THE FIRST STEP, WHETHER
22  THAT HAPPENS THROUGH THE PERSON WHO IS GOING TO HEAD THE
23  DEPORTED PARENTS REUNIFICATIONS OR NOT I THINK I WOULD LEAVE
24  TO YOU OR THE GOVERNMENT, BUT WE CERTAINLY NEED MORE
25  INFORMATION.
```

AUGUST 3, 2018

 1          **THE COURT:**  SO ON THOSE 30 OR SO, YOU HAVE THE NAME

 2    AND IDENTIFYING INFORMATION SO YOU CAN LET THE GOVERNMENT KNOW

 3    WHO THOSE INDIVIDUALS ARE AND WHAT ADDITIONAL INFORMATION YOU

 4    NEED.

 5          **MR. GELERNT:**  YES.  WE ONLY HAVE -- AS FAR AS I AM

 6    AWARE, WE HAVE VIRTUALLY NOTHING ON 18 OF THE 30, AND WE HAVE

 7    SOME BASIC INFORMATION ABOUT 12, BUT THAT IS BARELY -- ONE OF

 8    THEM, FOR EXAMPLE, SAYS ARRESTED FOR ILLEGAL -- QUOTE,

 9    UNQUOTE, ILLEGAL GROUPS 23 YEARS AGO.  ANOTHER SAYS ARRESTED

10    12 YEARS AGO FOR THEFT IN THEIR HOME COUNTRY.  THAT KIND OF

11    THING.  SO WE CERTAINLY NEED MORE INFORMATION.

12          IF THAT IS THE ONLY INFORMATION THE GOVERNMENT HAS,

13    THEN I THINK WE WOULD ASK THEM TO REUNIFY.  AND IF THEY

14    DISAGREE I THINK THAT IS THE KIND OF CASE WE MIGHT BRING TO

15    THE COURT.  RIGHT NOW WE NEED SOME INFORMATION ABOUT 18 OF THE

16    30, AND MUCH MORE ABOUT THE 12 THAT WE HAVE BEEN GIVEN LIMITED

17    INFORMATION ABOUT.

18          SO WE CAN WORK WITH THE GOVERNMENT NOW ABOUT THAT.

19    I DON'T KNOW THAT THAT HAS TO BE ENFOLDED INTO THE LARGER

20    PLAN, BUT I THINK THAT IS AN ADDITIONAL ISSUE OUT THERE THAT

21    REMAINS.

22          **THE COURT:**  OKAY.

23          MR. STEWART.

24          **MR. STEWART:**  I AM HAPPY TO WORK WITH THE PLAINTIFFS

25    ON THAT.  I WOULD NOT AGREE THAT -- WITH THE CHARACTERIZATION

AUGUST 3, 2018

```
 1   OF US GIVING LIMITED INFORMATION.  AND WE -- YOU KNOW, IN THE
 2   STATUS REPORT THE PLAINTIFFS SUGGEST THAT, YOU KNOW, WHAT
 3   ESSENTIALLY THEY GOT IN A BUNCH OF PLACES WAS JUST SOMETHING
 4   THAT SAID CRIMINAL HISTORY OR, YOU KNOW, PERIOD, FULL STOP.
 5   WE GAVE THEM PRETTY DETAILED INFORMATION, DATES OTHER
 6   INFORMATION.  AND I DO THINK MR. GELERNT IS RIGHT WHEN HE SAYS
 7   THAT, YOU KNOW, HE HAS SOME INFORMATION.
 8           IF THEY HAVE DOUBTS BASED ON THAT INFORMATION THEY
 9   SHOULD BRING THEM TO US AND EXPLAIN WHY THIS PERSON, YOU KNOW,
10   WOULD FALL INTO THE CLASS EVEN THOUGH THE CLASS EXCLUDES
11   PEOPLE WITH CRIMINAL HISTORY PRETTY CLEARLY.
12           THAT DOES SEEM TO BE AN INTERESTING, OR, YOU KNOW,
13   IMPORTANT FEATURE THAT THE PLAINTIFFS SHOULD, YOU KNOW,
14   PRESENT TO US AND EXPLAIN WHY SOMEBODY WITH SOME SIGNIFICANT
15   CRIMINAL HISTORY SHOULD BE INCLUDED NONETHELESS.
16           MR. GELERNT:  YOUR HONOR, I DON'T KNOW THAT WE NEED
17   TO GO BACK AND FORTH ON THIS, BUT I THINK YOUR HONOR WAS
18   EXTREMELY CLEAR THAT THEY WERE EXCLUDED FROM THE CLASS FOR
19   PURPOSES OF MEETING THE DEADLINE, BUT THAT THEY WERE -- THE
20   GOVERNMENT WAS CERTAINLY NOT OFF THE HOOK FOR REUNITING THESE
21   FAMILIES IF THE CHARGE -- IF THE CRIMINAL HISTORY DID NOT
22   AMOUNT TO SOMETHING SERIOUS TO WARRANT SEPARATION.  SO I THINK
23   IN THAT RESPECT YOUR HONOR WAS ABSOLUTELY CLEAR.
24           AND WE CERTAINLY COULD GIVE YOU THE CHART, BUT FOR
25   MANY OF THEM -- FOR 18 I THINK WE HAVE IT SAYS, QUOTE,
```

AUGUST 3, 2018

```
1   UNQUOTE, RED FLAG, QUOTE, UNQUOTE, RED FLAG, MOST SERIOUS

2   CHARGE, OR RED FLAG, CRIMINAL HISTORY.  THAT HARDLY IS ENOUGH

3   INFORMATION TO CONTEST.  SO WE WILL HAVE TO WORK WITH THE

4   DEFENDANTS.

5            BUT TO THE EXTENT THE DEFENDANTS ARE BELIEVING IT IS

6   A UNILATERAL DECISION WHAT IS A SERIOUS CRIME, I THINK YOUR

7   HONOR HAS MADE CLEAR THAT WE ARE -- IT IS APPROPRIATE TO COME

8   TO THE COURT IF THERE IS ANY DISAGREEMENTS.

9            THE COURT:  I HAVE THAT ISSUE IN MIND, AND I WILL

10  ADDRESS IT IN THE ORDER THAT FOLLOWS TODAY.

11           THE ONLY OTHER ISSUE I HAVE IS I HAVE SPOKEN WITH

12  JUDGE FRIEDMAN FROM WASHINGTON DC, AND HE HAS THE OTHER

13  RELATED CASE.

14           I HAVE HELD OFF ON THE PARTIES' PENDING MOTION TO

15  STAY THE DEPORTATION OR REMOVAL OF THE CLASS PARENTS, AND SO I

16  AM STILL IN A HOLD PATTERN THERE.

17           I EXPRESSED TO JUDGE FRIEDMAN, AND WOULD EXPRESS TO

18  COUNSEL NOW, THAT I DID NOT INTEND TO MAKE ANY RULING UNTIL

19  JUDGE FRIEDMAN MAKES A DECISION.  HE AND I BOTH AGREE THAT THE

20  COURT, AS AN INSTITUTION, NEEDS TO WORK WITH A SINGLE VOICE.

21  SO WHETHER HE OR I SPEAKS TO THE ISSUE REMAINS AN OPEN

22  QUESTION.  BUT IT IS HIS CASE, AND I AM STILL WAITING TO SEE

23  WHAT HE DETERMINES, THAT IS WHETHER HE WILL RULE ON THE TRO ON

24  BEHALF OF CLASS MEMBER CHILDREN OR WHETHER HE WILL TRANSFER

25  THE CASE.
```

AUGUST 3, 2018