1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

Ms. L.; et al.,

Case No.:  18cv0428 DMS (MDD)

12

Petitioners-Plaintiffs,

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO ALLOW PARENTS DEPORTED WITHOUT THEIR CHILDREN TO TRAVEL TO THE UNITED STATES**

13

v.

14

U.S. Immigration and Customs Enforcement ("ICE"); et al.,

15

16

Respondents-Defendants.

17

18

    Plaintiffs bring the present motion to allow a small group of migrant parents who

19

were separated from their minor children at the border, and then deported without their

20

children, to travel to the United States so they may be reunited with their children and

21

pursue their asylum claims as provided by law.  These parents are members of the *Ms. L.*

22

Class, which was certified by this Court on June 26, 2018.  That Class included over 2,800

23

parents who were forcibly separated from their children at the United States-Mexico border

24

under the Administration's immigration policies.  (*See* 8/14/19 Joint Status Report, ECF

25

No. 444.)[1]  Thereafter, the children were detained in government-run facilities throughout

26

_____

27

28

[1] On March 8, 2019, the Court modified the class definition to include parents who entered the United States with their children beginning on July 1, 2017.  (*See* ECF No. 386.)

the United States.  Pursuant to this Court's orders, all of these children have now been accounted for and more than 2,300 of them have been reunified with at least one of their parents.  But during the chaotic and unprecedented practice of separating these migrant families, 471 of the parents were deported without their children.  (ECF No. 382 at 7.)[2]  All of these parents have now been found through the herculean efforts of the parties.[3]  Many of the parents were located in remote villages in the recesses of Central America, and nearly all of them have now made the difficult decision either to reunify with their children in their home countries or to waive reunification and allow their children to remain in the United States to pursue their own claims for asylum in accordance with established law.

Thirty of the 471 parents returned to the United States without permission and sought asylum upon apprehension.  According to Plaintiffs, all thirty of these parents either passed a credible fear interview or were placed directly into immigration proceedings before an immigration judge, and were subsequently reunified with their children.  Eighteen other parents,[4] who are the subject of the present motion, are also seeking to return to the United

_____

Defendants, led admirably by Commander Jonathan White of the Department of Health and Human Services, are currently working to identify how many children of these parents went through government custody, and how many additional parents will be included in the Class.  These additional numbers are not included in the approximately 2,800 parents referenced here.

[2]  Defendants have identified 471 parents "who were removed from the United States without their children, and without being given the opportunity to elect or waive reunification in accordance with the [June 26, 2018] preliminary injunction."  (*Id.*)  The enlarged class of *Ms. L.* parents, as defined in the Court's March 8, 2019 Order, may include many more parents who were removed without their children.  *See* n.1, *supra*.

[3]  Plaintiffs established a steering committee comprised of volunteers and non-governmental organizations ("NGOs").  Mr. Steven Herzog and his law firm, Paul, Weiss, Rifkind, Wharton & Garrison, devoted hundreds of hours of pro bono legal services.  NGOs such as Justice in Motion and Kids in Need of Defense ("KIND") also devoted countless hours toward the important and unprecedented effort of locating parents in Central America who had been separated from their minor children.

[4]  Plaintiffs originally sought relief on behalf of twenty-one parents but have now limited the request to eighteen parents.  *See, infra,* at 9-10.

States, but rather than doing so unilaterally, they are requesting that the Court order the Government to allow them to return so they, too, may be reunited with their children and pursue their asylum claims under existing law and procedures.

Plaintiffs argue they are entitled to this relief under a Settlement Agreement entered into between the parties in this case, as well as under Ninth Circuit law that provides for the return of an alien who is wrongfully removed.  Defendants oppose the motion.  The matter has been fully briefed and argued.  For the reasons discussed below, the Court finds eleven of the parents are entitled to the relief requested under Ninth Circuit law and seven are not, those parents having failed to meet their burden of proving they were wrongfully removed.

I.

DISCUSSION

On June 26, 2018, this Court certified the *Ms. L.* Class of parents and generally included in the Class those parents who were (1) separated from their minor children at the border pursuant to the Administration's immigration policies and (2) did not have criminal history (with limited exceptions), were not unfit and did not present a danger to their children.  The Court also issued on the same day a preliminary injunction prohibiting Defendants from further separating parents and their children at the border as there was a likelihood that conduct violated the parents' Fifth Amendment due process rights to family integrity under the United States Constitution.  The preliminary injunction also ordered Defendants to reunite the families that had already been separated.  There is no dispute the eighteen parents at issue fall within the *Ms. L.* Class.

The circumstances of the eighteen parents' immigration and removal proceedings vary widely.  Twelve of the eighteen parents were removed before this Court issued its class certification order and preliminary injunction.  Two other parents were removed after those orders issued, but before this Court issued a stay of any further removals.  Three parents were removed after the stay, and it is unclear when the remaining parent was removed.

3

Of the twelve parents who were removed before issuance of the Court's class certification order and preliminary injunction, two subsequently returned to the United States illegally, and were again removed without their children.  It appears these two parents fell outside the scope of the court-approved Settlement Agreement in this case, (*see* ECF No. 321), and thus were subject to removal, because they were not "continuously physically present in the United States since June 26, 2018[.]"  (ECF No. 220-1 at 1.[5])

Sixteen of the eighteen parents entered the United States illegally at the southern border with Mexico, while two of the parents entered legally through designated ports of entry.  And although the majority of those entering illegally were transferred to criminal custody and prosecuted under the Administration's "zero tolerance policy"[6] before being returned to immigration custody, it appears others were not charged with a crime and were detained only in immigration custody.

Waiver forms executed by the parents, purporting to waive the parents' rights to be reunified with their children prior to removal, also varied.  One parent signed the court-approved form that was supposed to be attached to the Class Notice.  Others signed a form provided by Defendants prior to the Court's approval of the Class Notice.  And still others signed forms of unknown origin.

Finally, the length of each parent's separation from their child varied considerably. One parent was separated from his child for nine days, while another parent was separated from her child for nearly seven months.  And although each parent suffered the same injury,

---

[5]  The page numbers cited here and throughout this Order correspond to the page numbers assigned by the Court's CM/ECF filing system.

[6]  On May 7, 2018, the Attorney General of the United States announced a zero tolerance policy, in which all adults entering the country illegally would be criminally prosecuted. In accordance with that policy, parents who crossed between ports of entry with their minor children were separated from their children and prosecuted.  Many of those parents were returned to immigration custody after serving their criminal sentence and then deported without their children.

namely separation from their child, the effect of that injury on each parent and their respective immigration case was different.

Despite these varying circumstances, Plaintiffs move the Court to allow all eighteen parents to return to the United States as a group. Plaintiffs are not asking the Court to order Defendants to pay for or otherwise arrange travel for these parents to the United States. (ECF No. 434 at 49-50.) Rather, they are moving the Court for an order directing Defendants to allow the parents to return to the United States so they can be reunified with their children and proceed with their asylum claims. (*Id.* at 50.) As noted, Plaintiffs argue the Court has authority to grant this relief pursuant to either the court-approved Settlement Agreement in this case or the Court's inherent authority under Ninth Circuit law. Defendants dispute that the Settlement Agreement gives the Court authority to grant the requested relief. Indeed, they argue the Settlement Agreement forecloses the Court's ability to do so. Aside from the Settlement Agreement, Defendants also assert the Court lacks jurisdiction to order the relief requested here. Each argument is addressed in turn.

**A.    Settlement Agreement**

The entirety of the relevant provision of the Settlement Agreement is found under the heading, "The return of removed parents to the United States." It provides:

> The government does not intend to, nor does it agree to, return any removed parent to the United States or to facilitate any return of such removed parents. The classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph. Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed Ms. L class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual. Plaintiffs' counsel agree to present any such cases, including all evidence they would like considered by the government within 30 days of the approval of this agreement. In light of plaintiffs' counsel's representation that such cases will be rare and unusual, Defendants agree to provide a reply to any case presented by Plaintiffs within 30 days of receiving Plaintiffs' request to consider the case. Except as specifically set forth herein, the classes agree

that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have.

(ECF No. 315-2 at 7.)[7]  There is no dispute this provision sets out a procedure for the parties to follow in the event Plaintiffs believe that return to the United States is warranted for an individual *Ms. L.* class member.  Under that procedure, Plaintiffs agree to present any cases warranting return to Defendants, and Defendants agree to provide a response within thirty days of receiving Plaintiffs' request.  Other than these two requirements, however, the Agreement fails to set out any specifics.  For instance, while the Agreement reflects Plaintiffs' belief that such cases will be "rare and unusual," it does not set out the criteria by which Plaintiffs will decide that return to the United States is warranted.  Nor does the Agreement set out the criteria by which Defendants will review Plaintiffs' requests.  Defendants argue that return to the United States would be warranted only in "rare and unusual" cases, whatever that might mean.  But the Court reads that portion of the Agreement simply to reflect a good faith standard: Plaintiffs' belief that individual cases warranting return will be "rare and unusual," not that only "rare and unusual" cases will warrant return.

On its face, the Agreement does little more than outline procedures the parties will follow in the event Plaintiffs' counsel believe "the return of a particular removed Ms. L class member may be warranted."  (*Id.*)  Both parties have complied with these general procedures.  But the Agreement does not provide for any further relief if Plaintiffs' requests for return are rejected.  Thus, Plaintiffs' motion to the extent it relies on the Settlement Agreement is denied.

Defendants argue the only relief available to Plaintiffs is under the Settlement Agreement, and that relief does not include the return of these parents once Defendants

---

[7]  The Settlement Agreement was filed in both this case and in a related class action case involving the minor children of the *Ms. L.* class members.  *See M.M.M. v. Jefferson Sessions, et. al.*, Case No. 18cv1832 DMS (MDD).

have evaluated and rejected Plaintiffs' requests.  In support, Defendants rely on the language of the Settlement Agreement that states "[t]he classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph." (ECF No. 315-2 at 7.)  However, the Agreement also provides that "the classes agree that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have." (*Id.*) Plaintiffs are pursuing relief under existing law.  The Court, therefore, declines to find that the Settlement Agreement provides the only basis for the relief requested in the present motion.

**B.   Ninth Circuit Law**

As an alternative to the Settlement Agreement, Plaintiffs argue the Court may grant the requested relief pursuant to its "remedial authority to effectuate its injunction and ensure a meaningful opportunity for reunification." (Mem. of P. & A. in Supp. of Mot. at 11.)  In support, Plaintiffs rely on a series of Ninth Circuit cases involving the court-ordered return of aliens who were wrongfully deported.  *See Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998); *Singh v. Waters*, 87 F.3d 346 (9th Cir. 1996); *Mendez v. Immigration and Naturalization Service*, 563 F.2d 956 (9th Cir. 1977).  Defendants do not address these cases, relying instead on the argument that the Court lacks jurisdiction to order Defendants to allow the return of these parents. (*See* Opp'n to Mot. at 17-19.)  Defendants cite a number of cases that speak to the power of the legislative and executive branches of the federal government "over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).  But none of the cases cited by Defendants addresses the specific issue raised here, which is whether the Court may order Defendants to allow parents who were separated from their children at the border pursuant to a nationwide policy, and who were subsequently deported without their children, to travel back to the United States so they may be reunified with their children and have a renewed opportunity to request asylum free from the trauma of that separation.  Indeed, given the unprecedented nature of this situation, there are no cases directly on point.

7

However, the Ninth Circuit cases cited by Plaintiffs are instructive. *See Walters*, 145 F.3d 1036 (reviewing permanent injunction requiring INS to parole class members into the United States as a result of due process violations during immigration proceedings); *Singh*, 87 F.3d at 346-50 (reviewing denial of habeas petition filed by deported alien alleging unlawful deportation); *Mendez*, 563 F.2d at 957-59 (reviewing challenge of deported alien to deportation order where alien was deprived of right to counsel in immigration proceeding). In each of the foregoing cases, the court rejected the defendant's argument that the court lacked authority to order return of the alien to the United States. *See Walters*, 145 F.3d at 1050-51 (rejecting argument "that the district court exceeded its authority in requiring the INS to grant parole to these individuals, as a matter of both recent statutory developments and of circuit precedent."); *Singh*, 87 F.3d at 347 (holding district court had jurisdiction over habeas petition seeking petitioner's return to the United States); *Mendez*, 563 F.2d at 958-59 (rejecting jurisdictional challenge to appeal of immigration orders). In light of these cases, the Court rejects Defendants' jurisdictional argument and finds it has authority to grant the requested relief if a parent was wrongfully deported.

The circumstances of each parent's case must therefore be examined, and Plaintiffs carry the burden of proving that each parent was unlawfully or improperly removed.[8] Plaintiffs, however, argue the group as a whole should be allowed to return to the United States because they meet three criteria: (1) they present bona fide claims for asylum, (2) their asylum claims were abandoned or lost due to coercion or trauma inflicted by the family separation policy, and (3) they are unable to reunify in their home country because of fear of harm to themselves and their children. (Mem. in Supp. of Mot. at 7-8.) There is no legal authority establishing these criteria as a basis for the relief sought. Rather, Ninth Circuit case law provides that the relief sought here, primarily, the parents' return to the United States, depends on a finding that the parents were unlawfully deported. *See Walters*,

---

[8] During the August 16, 2019 status conference, Plaintiffs' counsel conceded that Plaintiffs bear the burden to show that any removals were unlawful. (ECF No. 452 at 28.)

145 F.3d at 1050-51 (upholding parole into United States as remedy for due process violation in immigration proceedings); *Singh*, 87 F.3d at 347 (holding petitioner's unlawful deportation entitled him to habeas relief, including return to the United States); *Mendez*, 563 F.2d at 958 (stating issue was whether the "departure was 'legally executed' [] when effected by the government.")

Plaintiffs initially argued the parents' deportations were illegal based on "the trauma of family separation, in conjunction with statutory and regulatory violations[.]"  (Pls.' Supp. Br. in Supp. of Mot. at 3.)   During a subsequent status conference, however, Plaintiffs made clear their lead argument was that the deportations of these parents were unlawful based solely on their separation from their children.  (ECF No. 452 at 28-29.)  As traumatic and unlawful as the separations may have been, the Court declines to find that separation of the family—standing alone—renders the subsequent removal of the parent unlawful.  Rather, to be entitled to the relief sought here, the circumstances surrounding the separation of each parent from his or her child must have caused the deportation or removal to be unlawful, *e.g.*, the separation must have affected the voluntariness of the parent's decisions in the immigration proceedings, or there must have been a statutory or regulatory violation in the immigration process independent of the separation, *e.g.*, a failure to provide a credible fear interview in the face of a credible fear claim.  This inquiry must be addressed on an individual basis, not to the group as a whole.  *See Walters*, 145 F.3d at 1051 (discussing individual nature of parole decision).

Since the parties did not frame the issue in these individual terms, the Court requested supplemental briefing from the parties and ordered Defendants to produce the parents' immigration records to fully develop the facts of each parent's case.  (*See* ECF No. 437.)[9]  In the course of the supplemental briefing, Defendants agreed to return one of

_____

[9]  Defendants produced approximately 245 pages relating to the immigration proceedings of the eighteen parents.  Although Defendants also had an opportunity to submit their own

the twenty-one original parents to the United States because he was removed without first receiving a credible fear interview in violation of law.  It also appears another parent is already in the United States with "pending INA § 240 proceedings" before an immigration judge.  In addition, Plaintiffs indicated they would not be pursuing relief as to another one of the twenty-one original parents, leaving only the eighteen parents at issue.  The Court has now reviewed the records of each parent and makes the following findings.

## C.   Findings

**A.D.G.** – The records reflect A.D.G. and his daughter were apprehended by Border Patrol agents on May 30, 2018, near Hidalgo, Texas.  (ECF No. 448 at 6.)  A.D.G.'s Form I-213[10] includes a notation that A.D.G. was part of a family unit.  (*Id.* at 5.)  It also includes a statement that A.D.G. did not fear being returned to his country of origin.  (*Id.* at 8.)  In A.D.G.'s Declaration submitted in support of this motion, he states, "I told officials on several occasions that I was afraid to return to [my country of origin]."  (ECF No. 430 at 4.)  It is unclear, however, whether those claims were made to an immigration officer, as required.  The relevant statute provides that if an alien indicates to an "immigration officer" either an intention to apply for asylum or a fear of persecution, that officer shall refer the alien for an interview by an asylum officer.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii).[11]  Based on the evidence submitted and other court records, it appears A.D.G. was at some point transferred to criminal custody, and it appears his claims may have been made to a federal

-------

declarations in response to the parents' declarations, they did not do so.  Thus, the findings herein are based on the parents' declarations and the documents produced by the parties.

[10]  Plaintiffs state the Form I-213 "is the form that Customs and Border Patrol agents complete soon after initially apprehending an individual."  (Pls.' Supp. Br. in Supp. of Mot. at 4 n.3.)

[11]  The statute provides: "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)."  8 U.S.C. § 1225(b)(1)(A)(ii).

correctional officer rather than an immigration officer.  In light of the evidence, it is unclear whether A.D.G. was entitled to a credible fear interview pursuant to § 1225(b)(1)(A)(ii). Furthermore, although A.D.G. attests to the emotional distress he suffered as a result of being separated from his daughter, he fails to explain how that distress affected his deportation proceedings.  Based on the present record, Plaintiffs have not met their burden to show that A.D.G. was unlawfully deported.

**B.L.S.P.** – The evidence reflects B.L.S.P. and her son were apprehended by Border Patrol agents on November 20, 2017, in Presidio, Texas.  (ECF No. 448 at 19.)  Although B.L.S.P.'s Form I-213 states she did not fear persecution or harm should she be returned to her country of origin, (*id.* at 19-20) (B.L.S.P. "stated she does  not fear persecution or harm should she be returned to native country …."), she in fact was later provided a credible fear interview.  (ECF No. 430 at 10.)  It is unclear exactly how long B.L.S.P. was separated from her son before her credible fear interview, but it may have been anywhere from one to four months.  During that time, B.L.S.P. "was constantly crying." (*Id.* at 9.)

> For a month, B.L.S.P. had no information about where her son was, and she felt that she could faint from the pain she was feeling. … B.L.S.P. was so stressed by the separation from her son that part of her face became paralyzed for 2-3 days.  It was extremely swollen and very painful.  … B.L.S.P. felt powerless, overwhelmed by depression from the abrupt separation from her son, all her past traumas resurfaced, and she had difficulties getting through the days.

(*Id.* at 9-10.)   B.L.S.P. passed her credible fear interview and was referred to an immigration judge ("IJ").  (*Id.* at 10.)  Two months passed, however, before B.L.S.P.'s hearing before the IJ.  (*Id.*)  By that point, B.L.S.P. had been separated from her son for nearly six months.  During the hearing, the IJ told B.L.S.P. that it would be another five months before her asylum hearing would be scheduled.  (*Id.* at 11.)

> B.L.S.P. was overwhelmed and traumatized by the ongoing and indefinite separation from her child.  Faced with potentially almost a year before her asylum claim could be heard and the prospect of ongoing separation from her child throughout this time, she felt defeated, hopeless and unable to remain separated nor to focus on her asylum claim. … B.L.S.P. was so distraught at the idea of being separated from her child for what would be closer to a year

> by the time her next hearing was scheduled that she decided she could not take the suffering anymore and she withdrew her application and asked to go back to [her country of origin].

(*Id.*)

In B.L.S.P.'s case, the issue for the Court is whether her decision to withdraw her application for asylum and withholding of removal was voluntary.  *See* 8 C.F.R. § 235.4 (stating alien's "decision to withdraw his or her application for admission must be made voluntarily[.]")[12]   The evidence presented clearly warrants a finding that B.L.S.P.'s withdrawal of her claims was not voluntary.   When B.L.S.P. and her son entered immigration detention on November 20, 2017, they were separated, and the following day B.L.S.P. awoke and found "her son was gone."   (ECF No. 430 at 9.)   She remained separated from her son for several months, and for a month, "had no information about where her son was[.]"   (*Id.*)   She was thereafter allowed only limited phone contact with her son, and during the time they were separated, she suffered not only emotional harm, but physical harm as well.   (*Id.* at 9-10.)   After nearly six months of separation, and being told that she would remain separated from her son for another five months, "[s]he chose to abandon her claim rather than continue the punishment of separation from her child."   (*Id.* at 11.)   The Court cannot say B.L.S.P.'s decision to withdraw her applications was the product of a free and deliberate choice, particularly when she made her decision as a result of the continued separation from her child.   B.L.S.P.'s subsequent removal based on the alleged voluntary withdrawal of her claim was therefore unlawful.

---

[12]  The same standard applies to B.L.S.P.'s decision to waive her appeal of the IJ's decision. *United States v. Mendoza-Lopez*, 481 U.S. 828, 840 (1987).  *See also Garcia v. Lynch*, 786 F.3d 789, 792 (9th Cir. 2015) (quoting *In re Rodriguez-Diaz*, 22 I. & N. Dec. 1320, 1322 (BIA 2000)) (stating waiver of appeal of IJ decisions must be "'knowingly and intelligently made.'"); *Ali v. Mukasey*, 525 F.3d 171, 173-74 (2d Cir. 2008) (stating waiver of appeal of IJ decision must be "knowing and voluntary").

**C.A.C.** – The circumstances surrounding C.A.C.'s removal raise yet other issues. Specifically, C.A.C. executed the court-approved Form that was supposed to be provided to class members along with the Class Notice.  C.A.C. chose the following option: "If I lose my [immigration] case and am going to be removed, I do NOT want to take my child with me."  (ECF No. 448 at 29.)  That Form was approved by the Court on July 10, 2018. (*See* ECF No. 103.)  It appears C.A.C. signed the Form on July 13, 2018.  (ECF No. 448 at 29.)  He was then removed on July 20, 2018.  (*Id.* at 22.)

The problem with C.A.C.'s removal is that on July 16, 2018, this Court granted Plaintiffs' motion to stay the removal of class members pending full briefing on that issue. (ECF No. 117 at 4.)  It appears that C.A.C.'s removal was in violation of that Order, and therefore unlawful.  *See Singh*, 87 F.3d at 349 (finding removal unlawful where alien was deported after stay of deportation had been issued by immigration judge).

Two other parents appear to have suffered a similar fate: **E.A.S.M.** and **E.F.A.R.** These parents appear to have been removed in violation of the Court's stay order.  (*See* ECF No. 448 at 101, 124) (indicating removal of E.A.S.M. on July 16, 2018, and removal of E.F.A.R. on August 22, 2018).  Indeed, E.F.A.R. was removed not only after the Court's stay order, but after the Court issued a temporary restraining order prohibiting Defendants from removing Class Members.  Accordingly, the removals of these two additional parents were also unlawful.

**C.P.E.** – C.P.E. presents circumstances similar to those of A.D.G. in that the parties dispute whether he made a credible fear claim.  C.P.E. claims he did, (*see* ECF No. 430 at 19) ("I told the officials that I was afraid to go back to [my country of origin], but they ignored me."), but his Form I-213 reflects he did not.  (ECF No. 448 at 34) ("the subject does not [ ] claim fear persecution or torture if returned to the subject's country of citizenship.")  As with A.D.G., it is unclear when and to whom C.P.E. allegedly made his credible fear claim.  Plaintiffs have not met their burden to show C.P.E.'s removal was unlawful.

**D.C.C.** – D.C.C. presents circumstances similar to those of A.D.G. and C.P.E. in that there is a dispute about whether he made a credible fear claim.  Unlike A.D.G. and C.P.E., D.C.C. appears to allege he made a credible fear claim during his screening interview with an immigration officer.  (*See* ECF No. 430 at 24, ¶ 6.)  Defendants submit a Form I-213, which refutes D.C.C.'s assertions and states, "Subject made a statement claiming no fear of being returned to his country of origin."  (ECF No. 448 at 41.)  But there is more to D.C.C.'s case.  D.C.C. provides evidence he was subject to coercion and misrepresentations by the immigration officer.  (ECF No. 430 at 24.)  For instance, D.C.C. states the immigration officer told him his "papers were already completed" and that he "had to return" to his country of origin.  (*Id.*)  The officer said he "had to sign the paper, that there was no choice."  (*Id.*)  He stated that if D.C.C. "didn't sign the papers, he would sign for me, so I signed."  (*Id.*)  The officer also said in response to D.C.C.'s claim of fear that D.C.C. "was not allowed to stay in the United States because the President had changed the law and only [D.C.C.'s] son could stay."  (*Id.*)  These circumstances sufficiently demonstrate D.C.C.'s removal was based on an involuntary waiver of his rights as a result of the officer's actions.  Plaintiffs have therefore met their burden to show D.C.C.'s removal was unlawful.

**D.J.M.** – D.J.M.'s case also presents a dispute about whether he made a credible fear claim.  In his Declaration, D.J.M. states "[t]he agents did not ask me if I was afraid to return to [my country of origin]."  (ECF No. 430 at 31.)  D.J.M. states, "I tried to explain that I could not go back to [my country of origin] but it was difficult without [an] interpreter."  (*Id.*)  While D.J.M. states he had difficulty communicating, he does not state he was unable to do so.  And D.J.M's Form I-213 states he "claimed no fear of persecution or torture if he is returned to his native country …."  (ECF No. 446 at 45-46.)  As with the others discussed above, Plaintiffs have not met their burden to show D.J.M.'s removal was unlawful.

**D.P.F.** – D.P.F. also presents a dispute about whether he made a credible fear claim. In his Declaration, he states an officer asked him and his daughter if they were afraid to

return to their country of origin, and they replied "yes, and told the officer why [they] were afraid to return."  (ECF No. 430 at 65.)  However, D.P.F.'s Form I-213 states, "Subject made a statement claiming no fear of being returned to his country of origin."  (ECF No. 448 at 90.)  As with the others discussed above, Plaintiffs have not met their burden to show D.P.F.'s removal was unlawful.

**D.X.C.** – D.X.C. also presents a dispute about whether he made a credible fear claim, but unlike the individuals discussed above, his case also presents issues about voluntariness.  In his Declaration, he states that after he and his 8-year-old son turned themselves in to immigration officials, he "asked the official for protection and asylum[.]"  (ECF No. 430 at 79.)   D.X.C. states he repeated that claim the following day, and "explained to the official that [he] had been attacked and feared returning to [his country of origin] with [his son]."  (*Id.*)  D.X.C. states that during this exchange, the official asked D.X.C. to sign a document, but he refused and persisted with his credible fear claim.  (*Id.*)  After he refused to sign the document,

> [t]he officer left and a few minutes later came back with another officer.  The second officer told me that if I persisted in my asylum claim they would have to separate [my son] and I.  He told me that government rules would not allow for me to be released while I asked for asylum, that I would be held for at least two years while my asylum claim was heard by a judge, and that I would be separated from [my son] during that time.  He told me that if I asked for asylum, [my son] would be placed for adoption because he could not stay with me in an adult detention center.  The officer further told me that I could avoid being separated from [my son] only if I signed the document in front of me which he said would allow for us to be deported together.  Otherwise, he said I would be held and [my son] taken from me and put up for adoption.  I felt crushed with fear and [my son] began to cry.  Fearing the permanent loss of [my son] in a foreign land to an unknown American family was too much for me to bear.  As a result, I was forced to sign the paper in front of me that I could not read, and agreed to be deported in order not to lose my 8-year-old son to adoption.

(*Id.*)   D.X.C. states that despite the representations of the immigration officials, "[i]mmediately after I signed the document, [my son] was separated from me, and the officers placed my hands and feet in shackles."  (*Id.* at 80.)  D.X.C.'s Form I-213 is silent

as to this exchange, but appears to confirm that D.X.C. was separated from his son.  (ECF No. 448 at 97.)  As for credible fear, the Form states, "the subject does not [ ] claim fear persecution or torture if returned to the subject's country of citizenship."  (*Id.*)

As stated, 8 C.F.R. § 235.4 states that an alien's "decision to withdraw his or her application for admission must be made voluntarily[.]"  D.X.C.'s Declaration reflects he did not voluntarily withdraw his claim.  Rather, it reflects the immigration officials coerced him to drop his asylum claim.  *See Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 372-74 (C.D. Cal. 1982) (discussing "coercive tactics to cause members of the class to accept 'voluntary departure' to El Salvador"); *see also United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (finding officers' warning to parent, including that parent "might not see … two-year-old child for a while … patently coercive.")  Specifically, after the initial officer was unable to persuade D.X.C. to sign the document, another officer was brought into the interview room.  The second officer then threatened that if D.X.C. "persisted in [his] asylum claim, they would have to separate" him from his son, that the separation could last "for at least two years[,]" and that his son would be put up for adoption.  (ECF No. 430 at 79.)  Given these facts, the Court finds D.X.C.'s decision to withdraw his credible fear claim was involuntary and his subsequent removal was unlawful.

**E.C.C.** – Like many of the other parents, E.C.C. states he made a credible fear claim when he originally surrendered to immigration officials, and again thereafter.  (*See* ECF No. 430 at 94-95.)  Defendants contend E.C.C. did not make a credible fear claim, but they fail to submit any evidence to support that contention.  Based on the evidence presently before the Court, E.C.C. made a credible fear claim, and was not provided with a credible fear interview in violation of § 1225(b)(1)(A)(ii).  E.C.C.'s removal was unlawful.

**J.A.A.** – Other than J.A.A.'s Declaration, there is limited information about the circumstances surrounding his removal.  Defendants assert he was removed pursuant to a June 18, 2018 Order of an IJ, (*see* ECF No. 448 at 135-36), and they submit a "Separated

16

18cv0428 DMS (MDD)

Parent's Removal Form." (*Id.* at 137.)[13]  The Form is undated, so it is unclear whether J.A.A. executed the Form before or after the IJ's Order.  However, J.A.A.'s Declaration suggests he signed the Form before his hearing with the IJ. (*See* ECF No. 430 at 115.)

The circumstances surrounding J.A.A.'s execution of this particular form are unclear, but J.A.A. describes the circumstances surrounding the execution of "three [other] documents." (*Id.*)  He states that after being separated from his daughter for more than two weeks, during which time he had no information about her whereabouts and was not able to speak with her, he was taken to a room with "an official wearing a red shirt" who asked him if he "was going to ask for asylum." (*Id.*)  J.A.A.:

> tried to explain that [he] was fleeing violence in [his country of origin]: that [his] older brother was murdered and that [he and his daughter] had been attacked in the same town where [his] brother was killed.  The official told [him] that there was a new policy of zero tolerance towards migrants and that they were no longer giving out asylum.

(*Id.*)  The official asked J.A.A. if he had a lawyer, and when he said no, the official "told [him] to sign three documents but did not explain what they were." (*Id.*)  J.A.A. says the documents were in English, and he "signed them because [he] felt like there was no other choice." (*Id.*)  He states: "During this meeting, I felt like I was not thinking clearly because I was so distressed by not knowing what was happening with my daughter." (*Id.*)

It is unclear whether the Form submitted to the Court was one of the three documents J.A.A. signed during that meeting.  However, assuming the Form was one of the three documents, the Court cannot say J.A.A.'s execution of it was voluntary.  Rather, the official who handed him the Form misrepresented that the United States "was no longer giving out asylum." (*Id.*)  That undisputed misrepresentation, combined with the distress J.A.A. was suffering as a result of being separated from his daughter, not knowing her whereabouts

---

[13]  The Separated Parent's Removal Form was used by Defendants before the Court's approval of the Class Notice. (*See M.M.M. v. Sessions*, Case No. 18cv1832, ECF No. 32.)

and not being able to speak with her, is sufficient to show J.A.A.'s execution of the Form was not voluntary.  J.A.A.'s removal was therefore unlawful.

**L.R.M.** – Like certain of the parents discussed above, L.R.M. presents a dispute about whether he made a credible fear claim.  In his Declaration, he states that in conjunction with being fingerprinted, he told an official he was afraid to go back to his country, but the official did not respond.  (*Id.* at 120.)  However, L.R.M.'s Form I-213 states, "The subject denied having fear of persecution or torture if returned" to his country of origin.  (ECF No. 448 at 145.)  As with the other parents discussed above, Plaintiffs have not met their burden to show L.R.M.'s removal was unlawful.

**O.U.R.M.** – Defendants contend O.U.R.M. was lawfully removed pursuant to an expedited removal order.  (Defs.' Supp. Br. at 2.)  They assert he received a negative credible fear finding, and that he did not pursue review by an IJ.  (*Id.*)  Notably, Defendants fail to submit any evidence reflecting that O.U.R.M. had a credible fear interview, or the results of that interview, such as a Form I-869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge.  *See* 8 C.F.R. § 208.30(g)(1).  This kind of evidence is important and ought to exist.  "If an alien is found not to have a credible fear of persecution of torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I-869[.]"  *Id.* § 208.30(g)(1).  Further, if the alien refuses to indicate whether he or she desires such review, "the alien … shall be considered [to have made] a request for review."  *Id.*

O.U.R.M's Declaration describes a telephone conversation he had while in detention, which may have been his credible fear interview, but the evidence is inconclusive.  That conversation took place approximately three weeks after O.U.R.M. was separated from his son, during which time O.U.R.M. did not know his son's whereabouts nor have an opportunity to speak with him.  (ECF No. 430 at 130.)  O.U.R.M. states,

> The conversation lasted about 10 minutes in total, and this person asked me about my reasons for leaving [my country of origin].  She advised me that I

18

needed a lot of proof to win my case, that I would spend six to seven months in detention, and that it was best for me to ask for voluntary departure. What she said made me think that I did not have a case and that my only option was to return to [my country of origin]. I was extremely depressed and could not think clearly about anything. I just wanted to see my son.

(*Id.* at 129.) O.U.R.M.'s case is similar to that of B.L.S.P., D.C.C., D.X.C. and J.A.A. in that it raises issues of voluntariness, and the reasoning of those cases applies equally here. Based on that reasoning, O.U.R.M.'s removal was not voluntary.

**R.A.R.A.** – R.A.R.A. presents yet another dispute about whether a credible fear claim was made to an immigration officer. Defendants assert R.A.R.A. did not make such a claim, (Defs.' Supp. Br. at 2), but they fail to provide a copy of his Form I-213, or any other evidence, to support that assertion. R.A.R.A., by contrast, states he told officials he "was afraid to return to [his] country[.]" (ECF No. 430 at 134.) Based on this evidence, R.A.R.A. was removed without first being provided with a credible fear interview, rendering his removal unlawful.

Defendants argue R.A.R.A. is ineligible for asylum because he subsequently reentered the United States illegally. (Defs.' Supp. Br. at 4.) However, they concede he may be eligible for withholding of removal. (*Id.*) Defendants fail to explain how R.A.R.A.'s removal was lawful in light of the evidence discussed above and his eligibility for withholding of removal. Accordingly, Defendants' argument does not deprive R.A.R.A. of the relief sought here.

**S.A.C.** – S.A.C. made a credible fear claim, (ECF No. 448 at 174), and it appears he was provided a credible fear interview. (ECF No. 430 at 138-39.) Defendants assert that interview resulted in a negative credible fear finding, and S.A.C. did not pursue review of that finding. But Defendants fail to provide any evidence to support either of these assertions. *See* 8 C.F.R. § 208.30(g)(1). The only evidence they provided, apart from the Form I-213 and the Notice and Order of Expedited Removal, was a "Separated Parent's Removal Form," (ECF No. 448 at 170), yet Defendants do not appear to be relying on that Form as the basis for S.A.C.'s removal. Absent evidence to support Defendants' assertion

19

that S.A.C. failed to request review by an IJ, and S.A.C.'s Declaration stating that he refused to sign one document and was coerced to sign other documents, (ECF No. 430 at 139) (stating while he "was detained in Atlanta, immigration officials told me again to sign documents.  I asked what the documents said and they said 'you sign.'  They would not explain what they wanted me to sign and they did not speak Spanish[ ]"), the Court finds S.A.C.'s removal was unlawful.

**S.T.S.** – S.T.S. presents the same situation as certain other parents discussed above, namely a dispute about whether he made a credible fear claim.  In his Declaration, S.T.S. states he "tried to explain that [he] wanted to enter the United States because [he] was afraid to go back to [his country of origin]."  (ECF No. 430 at 143.)  However, S.T.S.'s Form I-213 states, "Subject made a statement that he DID NOT fear his return to his country."  (ECF No. 448 at 180.)  As with the other parents discussed above, Plaintiffs have not met their burden to show S.T.S.'s removal was unlawful.

**S.X.C.** – The last parent at issue in this motion is S.X.C.  S.X.C. entered the United States with his son at a designated port of entry.  (ECF No. 430 at 148.)  S.X.C. states that at the port of entry, he and his son "told immigration officials that we were afraid to return to [our country of origin]."  (*Id.*)  However, S.X.C.'s Form I-213 states he "was questioned if he had any fear of returning to his home country … using CBP Forms I-867A&B. [S.X.C.] stated he did not fear returning to his home country … but that he would prefer not to go back."  (ECF No. 448 at 186.)  As with the other parents discussed above, Plaintiffs have not met their burden to show S.X.C.'s removal was unlawful.

## II.

## CONCLUSION

In light of the above discussion and the evidence presently before the Court, Plaintiffs have met their burden to show the removals of the following parents were unlawful:  B.L.S.P., C.A.C., D.C.C., D.X.C., E.C.C., E.F.A.R., E.A.S.M., J.A.A., O.U.R.M., R.A.R.A. and S.A.C.  Accordingly, Plaintiffs' motion is granted as to these

parents.  Plaintiffs have not met their burden as to A.D.G., C.P.E., D.J.M., D.P.F., L.R.M., S.T.S. and S.X.C.  Therefore, the motion is denied without prejudice as to these parents.

**IT IS SO ORDERED**.

Dated:  September 4, 2019

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)