JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| MS. L, et al., | Case No. 18cv428 DMS MDD |
|---|---|
| Petitioners-Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** |
| vs. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

1

## <u>**TABLE OF CONTENTS**</u>

2    I.    INTRODUCTION ..... …………………………..……… ..........1

3    II.   PROCEDURAL BACKGROUND ... …………………………… ..........1

4    III.  FACTUAL BACKGROUND …………………………………….. ..........5

5          a.  Separations Based on Criminal History…………………………….......5

6          b.  Separations for Lack of Fitness. ………………………………… ..........8

7          c.  Separations Based on Concerns about Parentage………………………… 11

8          d.  Separations Based on a Parent's Gang Affiliation……..……….….... ........13

9          e.  Separations of Younger Children ………………………………………14

10   IV.   ARGUMENT ........................................................................................14

11         a.  Plaintiffs' Motion Conflicts with the Plain Language of the
             Class Certification Order to the Extent it Asks this Court to
12           Order Relief for Non-Class Members ...............................................14

13         b.  The Government's Separation Decisions are reasonable
             Exercises of the Governments' Discretion with Which
14           This Court Should not Interfere...........................................................17

15             i.   The Government has Shown Good Faith by
                   Providing Injunctive Relief to Parents With
16                 Criminal History Who are Otherwise Excluded
                   from the Class Definition...........................................................17
17
               ii.  The Government has Reasonably Exercised Its Discretion
18                 in Making Separation Decisions for Reasons Other Than
                   Criminal History.......................................................................21
19
                       1.  Unfitness ......................................................................21
20
                       2.  Parentage......................................................................23
21
                       3.  Gang Affiliation...........................................................23
22
                       4.  Very Young Children ...................................................25
23
               iii. The Court Should Not Interfere With DHS's Discretionary
24                 Detention Authority ...............................................................25

25   V.    CONCLUSION...................................................................................26

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

*Comm. of Cent. Am. Refugees v. I.N.S.*,
  795 F.2d 1434 (9th Cir. 1986)..................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...............................................................................16

## STATUTES

8 U.S.C. § 1182(d)(5)(A) ............................................................................6

8 U.S.C. § 1232(b) ................................................................................10, 21

## REGULATIONS

8 C.F.R. § 212.5(b) ....................................................................................6

8 C.F.R. § 235.3(b)(2)(iii)............................................................................6

8 C.F.R. § 235.3(b)(4)(ii).............................................................................6

## RULES

Fed. R. Civ. P. 23` ....................................................................................16

Fed. R. Civ. P. 23(a)(2)..............................................................................15

Fed. R. Civ. P. 23(b)(2).............................................................................15

## EXECUTIVE MATERIAL

Exec. Order No. 13841 83 FR 29435 Affording Congress and Opportunity to
  Address Family Separation, § 1, 2018 WL 3046068 (June 20, 2018)..................... *passim*

## OTHER AUTHORITIES

*Class Certification in the Age of Aggregate Proof*,
  84 N.Y.U. L. Rev. 97 (2009).......................................................................16

Interim Guidance on Preliminary Injunction in
  *Ms. L. v. ICE, No. 18-428 (C.D. Cal. June 26, 2018)*............................................6

U.S. Customs and Border Protection, Southwest Border Migration FY 2019
  https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018................................5

U.S. Customs and Border Protection, Southwest Border Migration FY 2019
  https://www.cbp.gov/newsroom/stats/sw-border-migration................................5

## I.     INTRODUCTION

Plaintiffs' Motion to Enforce, ECF No. 439, should be denied. First, Plaintiffs are improperly asking this Court to order relief—in the form of standards developed by the Court with the input of Plaintiffs' experts—on behalf of individuals who are excluded from the class in this case by the plain language of the class definition. Second, Plaintiffs rely on vague and unsupported examples of a very small number of cases to ask this Court to second-guess the manner in which the U.S. Department of Homeland Security (DHS) exercises its discretion to make law enforcement decisions, including decisions regarding who may be housed in a U.S. Immigration and Customs Enforcement (ICE) family residential center (FRC). The Court cannot and should not enjoin DHS's discretionary authority in this regard. Finally, Plaintiffs fail to establish that the cases in which DHS has separated a parent from his or her children between June 27, 2018 and July 20, 2019— cases that make up less than .4% of the overall number of individuals entering the United States as members of a family unit over almost the same time period—have been unreasonable, improper, or without justification. In fact, DHS has carefully made its separation decisions based on clear, objective standards that constitute reasonable exercises of the agency's discretion. For all of these reasons this Court should decline to order the relief requested by Plaintiffs.

## II.     PROCEDURAL BACKGROUND

On June 6, 2018, this Court denied Defendants' motion to dismiss Plaintiffs' substantive-due-process claim in this case. In denying that motion, the Court looked at whether the government's policies and practices related to the separation of alien parents from their children "shock the conscience" and violate the right to family integrity. Order, June 6, 2018, ECF No. 71, at 20-23. The Court rejected Plaintiffs' contention that "they have '[s]tated a substantive due process claim' simply by alleging facts that show the government is separating children from their parents 'absent a clear demonstration that the parent is unfit or is otherwise endangering the child.'" *Id.* at 20 (quoting Plaintiffs' Opposition to Defendants' Motion to Dismiss at 15-16). Rather, over Plaintiffs' objection,

the Court "applie[d] the 'shocks the conscience' standard to determine whether Plaintiffs ha[d] alleged sufficient facts to state a plausible claim for violation of their substantive due process rights." *Id.* at 21. The Court did then conclude that Defendants' separations of the named Plaintiffs from their children violated substantive due process, but it did so not only because they were separated without a finding that they were unfit or a danger to their children, but also because—taking the allegations in Plaintiffs' complaint as true—they were separated "for 'no legitimate purpose' and in furtherance of a wide-spread government practice that soon may become 'national policy.'" *Id.* at 22 (quoting Plaintiffs' Am. Compl. ¶¶ 31, 34b). The Court further concluded that the allegations in Plaintiffs' complaint "sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child," and that "[s]uch conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency." *Id.* at 23. Accordingly, the Court denied Defendants' motion to dismiss Plaintiffs' substantive-due-process claim.

On June 26, 2018, this Court certified a class in this case. Order Granting in Part Plaintiffs' Motion for Class Certification, June 26, 2018, ECF No. 82 ("Class Certification Order"). The Court certified the class as follows:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

Class Certification Order at 17. The Court also noted that the class definition contained certain "exceptions," as discussed in the Order. *Id.* Specifically, "the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the [Executive Order]."[1] *Id.* at 17 n.10.[2]

---

[1] On June 20, 2018, the President of the United States signed an Executive Order that requires preservation of the "family unit" by keeping alien parents and children together during criminal and immigration proceedings to the extent permitted by law, while also maintaining rigorous enforcement of immigration laws. *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).

[2] On March 8, 2019, the Court granted Plaintiffs' motion asking the Court to amend the class definition, and thus expanded the class as follows:

> All adult parents who entered the United States at or between designated ports of entry on or after July 1, 2017, who (1) have been, are, or will be detained in immigration custody

Also on June 26, 2018, the Court issued an order granting Plaintiffs' request for a preliminary injunction. Order, June 26, 2018, ECF No. 83. The Court concluded that Plaintiffs had established a likelihood of success on the merits of their substantive-due-process claim. As it had in its order denying Defendants' motion to dismiss, the Court looked again at whether the conduct of the government in separating alien parents from their children "shocks the conscience" so as to constitute a substantive due process violation. *Id.* at 12. The Court concluded that "the context and circumstances in which [Defendants'] practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim." *Id.* at 13. The Court then issued an injunction precluding Defendants "from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody." *Id.* at 23.

At a status conference on July 7, 2018, the Court addressed the criminal history exclusion from the class definition, and confirmed that the Court's intention was to carve out parents with criminal history from the class definition, stating:

> Some criminal history, I understand, does not result in separate detention of the parent and thus separation of the family; other criminal history could. I simply carved out criminal history from the class definition because I think it is within the government's prerogative to determine what kind of criminal history might properly effect separation

July 6, 2018, Hearing Tr. 21:1-7. Government counsel sought to further clarify the issue and stated, "as I read the order, there is—the exclusion of any parent with a criminal history, as whole, would exclude them—would exclude them from the class regardless of

---

by the DHS, and (2) have a minor child who has been, is or will be separated from them by DHS and has been, is or will be detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

Order, March 8, 2019, ECF No. 386, at 14. This class "as modified is subject to the same qualifications as the originally certified class with respect to, for example, criminal history and communicable disease." *Id.* at 14 n.6.

1  that—whether that was the basis for the separation." *Id.* at 21:17-20. The Court responded,

2  "Yes." *Id.* at 21:21.

3      Issues regarding separations following the preliminary injunction—including the

4  "criminal history" exclusion in the class definition—have also been briefed and decided by

5  this Court previously. On September 13, 2018, Plaintiffs filed a brief asking the Court to

6  order the reunification of two adults who were excluded from the class on the basis of their

7  criminal histories. ECF No. 221. In that brief, as they do here, Plaintiffs contended that

8  separation is never appropriate, even for parents with a criminal history, "without 'a

9  determination that the parent was unfit or presented a danger to the child.'" *Id.* at 2 (quoting

10  ECF No. 83 at 22-23). For each of the two individuals at issue, Plaintiffs argued that

11  separation violated the preliminary injunction as well as due process because, Plaintiffs

12  contended, DHS did not have a sufficient basis to find that either parent was unfit or a

13  danger to his or her child. *Id.* at 2-6.

14      The Court denied Plaintiffs' request to order reunification of the two individuals,

15  concluding that "Defendants have exercised their statutorily prescribed discretion in a

16  reasonable manner." Order, Sept. 19, 2018, ECF No. 236, at 3. The Court noted that

17  Defendants were excluding certain individuals from the class based on their criminal

18  history, and that "[c]oncerns about [the criminal history] exception have been percolating

19  since before the Court issued its orders granting Plaintiffs' motions for class certification

20  and for preliminary injunctive relief." *Id.* at 1-2. The Court further made clear that "[i]n

21  carving out this exception, the Court was mindful of the parties' positions on this issue . .

22  . , and ultimately found the balance weighed in favor of Defendants." *Id.* at 2-3. The Court

23  stated that "[i]n reaching that conclusion, the Court expected Defendants to exercise their

24  discretion to make these exceptions in a reasonable manner, and it appears they have done

25  so given the relatively small number of children whose parents have been excluded from

26  the class on this basis." *Id.* at 3. The Court then denied Plaintiffs' request that it revisit

27  Defendants' determinations regarding the two adults in question, and concluded that

28  "[t]hese determinations certainly can be debated, but the Court is persuaded that

Defendants have exercised their statutorily prescribed discretion in a reasonable manner. The Court has consistently held that matters of detention and release are peculiarly within the province of the executive branch, and for prudential and other reasons that exercise of discretion ought not to be disturbed under these circumstances." *Id.*

Plaintiffs filed a "Motion to Enforce Preliminary Injunction" on July 30, 2019, asking this Court to look behind the government's exercises of discretion in making separation decisions. Background regarding the government's exercises of discretion—and relevant separations—is addressed next.

## III.   FACTUAL BACKGROUND

Reporting provided by Defendants to Plaintiffs reflects that between June 27, 2018 and July 20, 2019, DHS has separated 955 children from an accompanying parent on the basis of criminal history, communicable disease, fitness, dangerousness, questions of parentage, criminal prosecution, and/or for purposes of material witness custody. *See* Declaration of Jallyn Sualog (Sualog Decl.) ¶ 3 (attached hereto as Ex. 1). During an almost overlapping timeframe, from July 1, 2018 through July 30, 2019, publicly available U.S. Customs and Border Protection (CBP) data reflects that 524,294 individuals have crossed the southwest border at or between ports of entry as a member of a family unit (defined as a parent or legal guardian accompanied by one or more minor child). *See* U.S. Customs and Border Protection, Southwest Border Migration FY 2019, available at: https://www.cbp.gov/newsroom/stats/sw-border-migration; *see also* U.S. Customs and Border Protection, Southwest Border Migration FY2018, available at: https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018. Roughly estimating the rate of separation based on these numbers gives an overall rate of separation that is less than .4%.

### a.   Separations Based on Criminal History

While the Court's order excludes from the class ***all*** parents with criminal history, as a matter of policy and practice, DHS has not automatically separated all parents with criminal history. As the Court's class-certification order recognizes, the fact that a parent

has a criminal history requires DHS to make a variety of individualized determinations regarding that parent to determine if separation may be required, or if, following a separation for any reason, the parent may be treated as a class member. Class Certification Order at 10.

When making the decision as to whether separation may be appropriate at the time of encounter, DHS considers the severity of the parent's criminal history. *See* Declaration of Lloyd Easterling (Easterling Decl.) ¶¶ 12-23 (attached hereto as Ex. 2); Declaration of Carrie Davison (Davison Decl.) ¶¶ 5-6 (attached hereto as Ex. 3); CBP Interim Guidance on Preliminary Injunction in *Ms. L. v. ICE, No. 18-428 (C.D. Cal. June 26, 2018* (Interim Guidance), June 27, 2018, at 1 (attached hereto as Ex. 4). DHS also may consider whether, as an exercise of discretion, the parent may be released from custody. *See, e.g.,* 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ."); *see also* 8 C.F.R. §§ 212.5(b), 235.3(b)(2)(iii) & 235.3(b)(4)(ii) (parole of aliens in who are awaiting a credible fear determination or who have not expressed a fear of return "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective."). If so, then DHS may determine that it is appropriate for the parent and child to be released together. If DHS does not release the parent and child, then DHS will examine the parent's fitness, dangerousness, and criminal history, and must consider whether the parent's criminal history permits DHS to house the family together in an ICE FRC. *See* Ex. 2, Easterling Decl. ¶¶ 12-23; Ex. 3, Davison Decl. ¶¶ 5-6; Ex. 4, Interim Guidance at 1; Declaration of Mellissa Harper (Harper Decl.) ¶ 6 (attached hereto as Ex. 5). The family residential standards governing ICE FRCs as well as applicable licensing rules prohibit ICE from detaining in an FRC any individual who has a criminal history, but allow for consideration of individuals with non-violent misdemeanors on a case-by-case basis. *See* Ex. 5, Harper

Decl. ¶ 9. Accordingly, if DHS determines that a parent is excluded from detention at an ICE FRC and must be detained, then DHS will separate the parent and child, and the child will be sent to ORR, unless another parent or legal guardian is available to provide care and custody. *Id*.; Ex. 3, Davison Decl. ¶ 9.

Even if a parent is separated, DHS may reunify the family for purposes of removal if requested unless ORR determines the parent is unfit. *See* Ex. 5, Harper Decl. ¶ 12. If the parent is later released while the child remains in ORR custody, then the parent and child may still be reunified so long as ORR does not determine that continued separation is necessary based on any dangerousness or fitness concerns with the parent. *See* ECF No. 360 at 17.

It is important to note that, in all cases, the decision as to whether separation is warranted at the time of initial encounter is based on the information available to CBP at the time of encounter. *See* Ex. 2, Easterling Decl. ¶ 5. Given the nature of CBP facilities, and specifically the fact that they were not designed to hold individuals for an extended period of time, as well as the fact that CBP encounters individuals shortly after they make entry to the United States, CBP often must make its decision based on more limited information than may later be available to ICE or ORR. *Id.*

As outlined in CBP's the Interim Guidance, separation may occur when the parent has a domestic conviction for a felony or a violent misdemeanor (such as assault, battery, or hit and run). *See* Ex. 5, Interim Guidance; Ex. 2, Easterling Decl. ¶ 16. In general, a separation would not be warranted for minor criminal offenses such as a driving while intoxicated, unless there are other aggravating factors. *See* Ex. 2 Easterling Decl. ¶ 16; Ex. 3, Davison Decl. ¶ 5; Ex. 4, Interim Guidance. When determining the severity of a parent's criminal history, U.S. Border Patrol agents generally review the parent's RAP sheet and other relevant documentation. *See* Ex. 2, Easterling Decl. ¶ 17. If a parent has engaged in criminal activity in a foreign country, CBP considers the severity of the criminal history, including through the use of records checks, biometric checks, and other information received from the foreign government. *See id.* at ¶¶ 18-21. In accordance with CBP's

guidance, a decision to separate must be reviewed and approved by a supervisor. *See* Ex. 4, Interim Guidance. CBP's Office of Chief Counsel also is often involved in a separation decision. *See* Ex. 2, Easterling Decl. ¶¶ 13-14.

### b.    Separations for Lack of Fitness

Plaintiffs allege that DHS separated twenty parents based on findings of unfitness or safety concerns, and twenty-four more due to health concerns or hospitalization. Motion at 13. Approximating the rate of separation using the numbers discussed above, this means that less than .02% of individuals who entered the United States as part of a family unit during the applicable timeframe were separated on these bases.

A parent's fitness or danger is a factor both in the initial decision as to whether separation is appropriate, and as to whether a class member who was previously separated for some other reason may be reunified with his or her child. *See* ECF No. 360 at 14-17. In other words, a parent may be separated based on an initial determination of fitness and/or danger, based on the facts available at the time of separation, but that same parent may later, based on changed circumstances or additional fact-finding, be determined no longer to be unfit or pose a danger. *Id.* This possibility of reassessment is important because at the time of initial encounter, CBP officers and agents generally have to make determinations regarding a parent and child in a relatively quick time frame, and often based on limited information. *See* Ex. 2, Easterling Decl. ¶ 5.

The determination that a parent is unfit or a danger to his or her child is made based on an evaluation of the particular circumstances of an individual case. For instance, agents and officers may make the decision on a review of any available records about the parent, as well as observations made while the parent and child are in DHS custody, including immediately following the initial encounter with that family, and the views of medical professionals available to the officers and agents. *See* Ex. 2, Easterling Decl. ¶¶ 25-29; Ex. 3, Davison Decl. ¶ 8.

An example of a separation based on records of past conduct is a separation in which the adult was determined to have a record of being involved in the smuggling of minors for

the purpose of prostitution. *See* Ex. 2, Easterling Decl. ¶ 29. Other examples of separations based on concerns about danger to the child include situations in which DHS employees notice signs of abuse, or when a child herself claims that her parent abused her. *Id.* ¶¶ 28-29; Ex. 3, Davison Decl. ¶ 8.

Separations also may occur based on concerns about the physical or mental health of the parent that provide reason to believe that the parent may not be able to care for the child. *See* Ex. 2, Easterling Decl. ¶¶ 26-28. These decisions generally are made based on the observations of DHS employees, and sometimes based on evaluations by medical professionals. *Id.* For instance, in one case cited by Plaintiffs, L.R.H., a father was separated from his son based on the father's "odd behavior which prompted a medical evaluation. Medical staff . . . performed a mental evaluation and deemed the subject to be mentally unstable." Declaration of Christopher D. Foster (Foster Decl.) (attached hereto as Ex. 6), *see* Motion, Ex. H. Medical staff recommended that the father be referred for an additional evaluation. *Id.* CBP thus determined that the father posed a potential risk to his child and to himself, and so the son was referred to ORR. *Id.* In another case, CBP separated a parent who had been diagnosed with schizophrenia, which raised concerns about the parent's ability to provide adequate care for the child. *See* Ex. 2, Easterling Decl. ¶ 27.

For cases such as these, if the health condition causing the fitness concern is temporary, then the parent and child generally will be reunified upon its conclusion. *See* ECF No. 360 at 16-17; Ex. 1, Sualog Decl. ¶ 5.[3] Additionally, CBP generally works with

---

[3] Plaintiffs cite a case in which a mother was separated from her child because she required emergency surgery for a broken leg, but was not immediately reunified even though she was released into the community after her surgery. *See* ECF No. 439-1 at 70. In that case, the ORR case manager mistakenly informed the child's attorney that the parent had to undergo the Trafficking Victims Protection Reauthorization Act (TVPRA) release process in order for reunification to occur. As the child was referred to ORR in September 2018, when *Ms. L.* reunification procedures were already established, the mother should have been reunified with the child under the *Ms. L.* procedures once she was discharged from the hospital. ORR now has guidance and processes in place to prevent similar situations from recurring, including periodic trainings to its field staff to refresh their understanding of *Ms. L.* reunification protocols. As part of the interagency new separations reporting process, ORR also keeps track of those separations occurring on the basis of potentially temporary reasons (e.g., hospitalizations), and regularly requests updated information regarding such parents from ICE in order to effect reunifications where appropriate. *See* Ex. 1, Sualog Decl. ¶ 5 n.1.

ORR to try to have the child placed in a facility near his or her parent to simplify reunification in these cases. *See* Ex. 2, Easterling Decl. ¶ 26.

Plaintiffs also challenge one separation that occurred based on CBP's observations of the parent and child that raised concerns about the parent's ability to care for the child (Plaintiffs' allegations appear to address two separate cases, but review of the case files reveals that both situations Plaintiffs discuss pertain to the same parent and child). Such separations are rare. *See* Ex. 2 Easterling Decl. ¶¶ 28, 29. In this particular case, the separation occurred after the 1-year old child was hospitalized with a high fever (up to 106 degrees), dehydration, mycrocitic anemia, and diaper rash. *See* Ex. 6, Foster Decl., Ex. B. Medical staff noted that the father "appear[ed] detached and unsympathetic for the condition of his own child. He does not know when and how to change a diaper or basic hygiene. Medical professionals have noted that the child appears neglected and underdeveloped." *Id.* Based on these observations and the medical condition of the child, CBP made the decision to separate the parent and child, and the child was transferred to ORR. *Id.*

Notably, as described above, DHS's initial separations based on fitness must be made in a relatively limited timeframe. *See* Ex. 2, Easterling Decl. ¶ 5. But the processes provided by the TVPRA still allow for further assessment of any such fitness concerns by ORR, who has expertise in making these assessments and therefore were designated by Congress as the agency responsible for making such evaluations. *See* 8 U.S.C. § 1232(b). Thus, if a parent who is separated on this basis is later released from custody, she may apply to ORR to have her child released to her, and ORR will further evaluate her fitness under expedited release procedures or as part of the sponsorship process, as appropriate. *See* ECF No. 360 at 17. Likewise, if DHS determines that the basis for the original separation decision no longer exists, the parent will be reunified in accordance with the preliminary injunction. *Id.*

### c.   Separations Based On Concerns About Parentage

Plaintiffs complain about four cases in which, they allege, DHS separated a parent and child based on "unjustified" doubts about parentage. Motion at 15. As an initial matter the extremely small number of separations on this basis, and even smaller number of cases which Plaintiffs choose to challenge in their Motion, give good reason to find that DHS is making reasonable and careful decisions when separating on this basis.

DHS evaluates parentage based on the information available to it at the time of the encounter, which, as described above, may be limited, given the nature of CBP facilities. *See* Ex. 2, Easterling Decl. ¶ 5. CBP does, however, take several steps to evaluate parent-child relationships to determine if they are genuine, including the review and authentication of documents, as well as interviews and observation of the relationship between the parent and child. *Id.* ¶¶ 10, 34-36. Where these steps are unable to resolve an existing doubt about parentage, CBP will generally separate a child from an adult. *Id.* ¶ 36.

More recently, ICE Homeland Security Investigations has begun a pilot program using Rapid DNA technology, which allows for comparison of DNA profiles in approximately 90 minutes to identify cases where an adult is fraudulently posing as a family unit with an unrelated minor. *See* Declaration of Selwyn Smith (Smith Decl.) ¶¶ 3-5 (attached hereto as Ex. 7). This Rapid DNA technology has been used in limited pilot investigations in McAllen, TX, El Paso, TX, San Diego, CA; Calexico, CA; Las Cruces, NM; Eagle Pass, TX; and Yuma, AZ. *See* Ex. 7, Smith Decl. ¶ 5. However, there are operational concerns that would have to be worked out before Rapid DNA testing could be implemented more broadly in CBP facilities. *See* Declaration of Brian Hastings (Hastings Decl.) ¶ 4 (attached hereto as Ex. 8). Conducting DNA swabs and waiting for results could encumber the orderly processing of individuals, causing longer detention times in CBP custody. *Id.* ¶ 6. CBP also would need to implement procedures to ensure accurate documentation of biographical information associated with DNA testing and to ensure that the testing complies with applicable laws related to safety and privacy. *Id.* ¶¶ 7, 9-11. Moreover, DHS currently does not have the equipment necessary for broad-scale

implementation of Rapid DNA testing, and significant increases in funding and personnel also would be required for implementation of this program to be expanded. *Id.* ¶ 8; Ex. 7, Smith Decl. ¶ 6.

In some of the cases Plaintiffs cite, the facts identified in CBP records show that Plaintiffs' assertions are, at best, incomplete. For instance, in the case of Mr. A.B., Plaintiffs assert that he was separated from his child based on the fact that DHS "did not believe that he was [his child's] father." Motion, Exhibit G ¶ 3. Plaintiffs claim that "immigration officials ignored [notarized documents explaining why his name did not appear on his daughter's birth certificate]." *Id.* But CBP records show that, despite the adult's presentation of a notarized document "stating that the mother of the child had given the subject custody of the juvenile," "no familial relationship could be established between any of the children and the subject" following records checks. *See* Ex. 6, Foster Decl., Ex. J.

Similarly, Plaintiffs claim that another child was separated because CBP did not verify the authenticity of the birth certificate presented by the adult, and erroneously told the child that the adult she was traveling with was her uncle. Motion, Exhibit H ¶¶ 29-30. In fact, records show that this adult and child were separated based on the fact that the document the adult presented purporting to show that he was the child's father was fraudulent, and the child herself "freely admitted she was traveling with her uncle and not her father." Ex. 6, Foster Decl. Ex. F. The child also admitted that "her mother was the one that bought the fraudulent [document]," and that her mother and sister had previously entered the United States. *Id.* The child stated that "smugglers told her to lie to immigration officials so that they could also be released from immigration custody into the United States." *Id.* Mr. P.D., Motion, Ex. H, ¶¶ 22-28, similarly admitted, upon questioning in Spanish, that the child he had initially claimed to be his daughter was, in fact, his niece, and that her birth certificate was a fraudulent document provided by a smuggler. Ex. 6, Foster Decl. Ex. I.

Lastly, in the case of another parent who was separated based on concerns about parentage, Plaintiffs stated that they "suspect that Border Patrol officials were confused about the parentage of the child, which was likely compounded by the fact that the father and child spoke an indigenous Mayan language." Motion, Ex. B, ¶ 17. But CBP records reflect that the parent presented a birth certificate that would have shown the son to be approximately seven years old. Ex. 6, Foster Decl., Ex. C. Upon observation, however, the child appeared, based on both mental and physical appearance, to be approximately two or three; the child even held up three fingers when asked how old he was. *Id.* Based on this discrepancy, Border Patrol agents conducted an interview with both the adult and the child, who were in separate rooms. *Id.* The adult and child gave conflicting answers to basic questions. *Id.* For instance, the adult said he had four children, but the child said he had no siblings. *Id.* The child also indicated several times that the adult was not his father, but his uncle. *Id.* Agents then used extensive efforts to verify the identity of the adult, including contacting the adult's nephew in the United States, and brother, who was also in U.S. Border Patrol custody. *Id.* Following this investigation, agents determined that the adult was the child's uncle. *Id.* While DNA results later confirmed that the adult *was*, in fact, the father, the decision to separate here was not based on any "confusion" or lack of investigation. *Id* .

### d.    Separations Based on a Parent's Gang Affiliation

Plaintiffs assert that DHS has separated "at least 44 parents" based on allegations of gang membership. Motion at 16. Even if true, this would mean that less than .02% of the individuals who entered as members of family units during the applicable timeframe were separated on this basis. CBP makes determinations of gang membership based on records checks, information received from foreign countries, and sometimes on statements made by the parent during questioning. *See* Ex. 2, Easterling Decl. ¶¶ 18, 20. Because ICE generally cannot house individuals who are identified as gang members in an ICE FRC, a determination that a parent is a gang member generally will result in separation if DHS determines that the parent must be detained. *See* Ex. 5, Harper Decl. ¶ 10.

### e. Separations of Younger Children

DHS separation decisions, in general, are based on information about the parent and are not based on considerations of the age of the child. *See* Interim Guidance.

## IV.   ARGUMENT

Plaintiffs filed their "Motion to Enforce Preliminary Injunction" on July 30, 2019, and once again ask this Court to look behind the government's exercises of discretion in making separation decisions. Plaintiffs do not confront the plain language of the class certification order, which creates a blanket exclusion from the class definition for parents with criminal history, on the basis that criminal histories raise individualized concerns that cannot be resolved on a class-wide basis. *See* Class Certification Order at 10. Plaintiffs instead try to circumvent the class definition by contending that "the Court's initial class certification order *provisionally* excluded individuals with criminal histories," Motion at 21, but they do not seek to amend or clarify the class definition in this regard. Plaintiffs then contend that the government is separating parents and children for reasons that, according to Plaintiffs, are unjustified. *Id.* at 22-30. Specifically, Plaintiffs complain about separations that they allege are based on "minor" crimes, "dubious" concerns about fitness or parentage, or "questionable" allegations of gang affiliation. *Id.* at 22-29. They also, without explanation, assert that DHS should be prohibited from separating parents from "very young children," but do not provide an indication of what age they consider to be "very young," nor do they explain how the age of the child would or should impact the separation determination. Finally, Plaintiffs ask the Court to reject, as a blanket matter, DHS's discretionary determinations about who can be housed in an ICE FRC, and instead to impose "objective" standards proposed by Plaintiffs and their experts. *Id.* at 29-32.

### a. <u>Plaintiffs' Motion Conflicts With the Plain Language of the Class Certification Order to the Extent it Asks This Court to Order Relief For Non-Class-Members.</u>

In its class certification order, this Court excluded from the class "migrant parents with criminal history or communicable disease." Class Certification Order at 17 n.10. In explaining this exclusion for criminal history, the Court stated:

> [A]t oral argument Government counsel set forth another scenario that could result in family separation, namely parents with criminal history that prevents them from being released into the community along with their child or housed together in a detention center with other families. Obviously, these parents would be situated differently from Ms. L. and Ms. C., neither of whom presented this situation. Unlike with Ms. L. and Ms. C., the Government would have a legitimate interest in continuing detention of individuals who posed a flight risk or danger to the community or others in a family detention facility because of that person's criminal history.

*Id.* at 10. The Court further explained: "Criminal history comes in all gradations, from minor misdemeanors to violent felony offenses. Some types of criminal history would clearly justify separate detention of the parent, while other criminal history might not—and the exercise of governmental discretion to separately detain that individual might be challenged. Whether separate detention of such parents violates substantive due process could raise individualized inquiries." *Id.*

The plain language of the Court's class certification order thus establishes an exclusion from the class that is absolute as to all parents with any criminal history, because criminal history by its nature will result in the need for individualized inquiries and thus those cases cannot be resolved on a class-wide basis. As discussed throughout this brief, in operationalizing the Court's preliminary injunction DHS went above and beyond any requirements imposed by this litigation, and developed standards for making separation decisions that—in good faith and in an exercise of discretion—take into account the severity of the criminal history and other factors when making such decisions. In some cases then, a parent who is excluded from the class under this bright line exception may nonetheless not be separated from his or her accompanying child based on DHS's good faith standards and reasonable exercises of discretion.

Plaintiffs' Motion seeks to use DHS's good-faith efforts against them because Plaintiffs now ask this Court to order DHS to exercise discretion in a particular manner towards individuals who are not class members in this case, and to provide Plaintiffs' counsel with extensive information about such non-class-members. This request goes against the purposes of class certification. Rule 23(b)(2) of the Federal Rules of Civil Procedure states that class certification requires that "declaratory relief is available to the

class as a whole" and that the challenged conduct is "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Rule 23(a)(2) likewise requires that Plaintiffs establish that "there are questions of law or fact common to the class." Thus, litigants seeking class certification must show that a court would be able to fairly and efficiently resolve the issue raised by the class "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).

The Court has recognized these limitations of Rule 23 in its rulings in this case. The Court acknowledged that where an individual has a criminal history, those "parents would be situated differently" from the named Plaintiffs in this case, and there are necessarily individualized issues that will affect the government's detention decisions regarding that individual. ECF No. 82 at 10. These individualized determinations thus required that such individuals be excluded from the class that was certified in this case. *Id.* The Court has also made clear that the "shocks the conscience" standard must be applied in evaluating whether the separation of a parent and child constitutes a substantive due process violation. Applying this standard, the Court concluded that it is not simply the separation of a parent and child that constitute a due process violation, but that the separations of class members were "without justification." ECF No. 71 at 21-23. The Court thus concluded that detaining adults without criminal history for whom there is no bar to detention in an ICE FRC without their children *did* shock the conscience. But this conclusion does not uniformly apply to individuals with a criminal history, who require individualized determinations related to their release and custody. Thus, Rule 23 would preclude class-wide resolution of their claims. The Court has recognized this already, and should continue to do so.

For all of these reasons, Plaintiffs' motion as it pertains to parents with criminal history is asking the Court to order DHS to provide injunctive relief to non-class-member

parents with criminal history (and to specify the manner in which DHS must provide that relief) and to provide them information about non-class-members.[4] The Court should decline to do so. And, in fact, the Court cannot do so, unless Plaintiffs first somehow establish that the parents for whom they are seeking relief are class members who fall within the class definition and within the Court's preliminary injunction. To do that, Plaintiffs must file a motion to amend the class definition and must explain how the individualized issues involved in those cases can be resolved on a class-wide basis so that those parents can reasonably be included within the class in this case. Having not done so, Plaintiffs cannot ask this Court to order relief as to individuals whom the Court has specifically excluded from the class, and this Court should decline to entertain Plaintiffs' request for such relief.[5]

**b.** **The Government's Separation Decisions Are Reasonable Exercises of the Government's Discretion With Which This Court Should Not Interfere.**

**i.** **The Government Has Shown Good Faith by Providing Injunctive Relief to Parents With Criminal History Who Are Otherwise Excluded From The Class Definition**

As the government has explained, despite the exclusion of parents with criminal history from the class in this case, DHS has not treated this exclusion as an absolute for purposes of operationalizing the preliminary injunction. Plaintiffs complain that Defendants' reporting shows 678 total separations based on allegations of criminal conduct, but, using the approximations described above for evaluating the rate of separations, this number would mean that only approximately .25% of the total number of individuals who crossed as members of a family unit during the applicable timeline were

---

[4] To the extent that Plaintiffs complain about the frequency and content of the information that they are being provided, Plaintiffs' complaints are misplaced for the reasons discussed above, and also do not take into consideration the interagency efforts that go into compiling the data in a manner that can be shared with Plaintiffs. *See* Declaration of Dawnisha Helland ¶¶ 4-9 (attached hereto as Ex. 9). Although, in general, this reporting concerns non-class-members, Defendants have offered to Plaintiffs to continue to provide this reporting on a monthly basis. The parties continue to meet and confer on this issue.

[5] Should the Court be inclined to consider Plaintiffs' Motion as a request that the Court amend the class definition in this case, then Defendants request the opportunity to brief the class-certification issues before the Court orders any amendment to the existing class definition.

separated based on criminal history. And Plaintiffs have provided no reason to question the fact that DHS has excluded from injunctive relief only those whose criminal history, in a good-faith discretionary determination by DHS, would generally prevent them from being released into the community and from being housed in an ICE FRC. *See* Ex. 4, Interim Guidance; Ex. 2, Easterling Decl. ¶¶ 13-23; Ex. 3, Davison Decl. ¶¶ 4-6; Ex. 5, Harper Decl. ¶¶ 6-10; *see also* ECF No. 360 at 13-17 (Criminal history also may be considered in determining whether a parent is unfit or a danger to the child, and that determination may go either to class membership or eligibility for reunification, depending on when it is made.).[6]

---

[6] Defendants continue to work to comply with this Court's orders regarding the separation and reunification of class members with their minor children. The Court's class-certification order specifically excepted from the class "parents with criminal history." ECF No. 82 at 11, 17 n.10. The preliminary-injunction order indicated that a conviction under section 1325 alone would not exclude someone from injunctive relief, ECF No. 83 at 23 n.11, so Defendants have treated parents with such convictions as class members eligible for relief under the preliminary injunction. According to the plain text of the class-certification order, however, parents with section 1326 convictions (a felony and a serious immigration offense) are excluded from the class. In response to the Court's later suggestion that parents with section 1326 convictions were not excluded from the class, the government indicated that it was willing to confer with Plaintiffs about the matter. *See* July 16, 2018 Tr. 53:13-18. After conferring with Plaintiffs, the government conveyed in a July 26, 2019 email that where separations occur for prosecution of section 1326 violations alone, the parents are considered to be class members who are temporarily unavailable due to criminal prosecution. It further represented that, when those parents had completed their sentences—if their children were still in ORR care—DHS and HHS would work to facilitate their reunifications as appropriate.

DHS reports that, at that time, it was not treating individuals with a section 1326 conviction alone as entitled to relief under the preliminary-injunction order, and that it instead considered them for reunification at the time of removal as appropriate. That treatment was consistent with the plain text of the Court's orders and the fact that section 1326 offenses are felonies, as well as barriers to housing aliens with felony convictions in an ICE family residential center. For separations occurring after July 26, 2019, the government agrees to work to facilitate reunification as explained *infra* note 7.

To clarify the above, the government respectfully suggests that the Court modify its class-certification order and to the extent warranted, the preliminary injunction order, to clearly state that individuals separated on or after July 26, 2019, for a section 1326 prosecution and any resulting conviction and sentence—with no other reason for exclusion from the certified class—are entitled to the treatment described in footnote 7. The treatment in footnote 7 is critical to the government's agreement because this population, felons with a confirmed history of failure to comply with immigration law who cannot appropriately be housed in an FRC, presents a unique flight risk. Defendants believe that it is important for the Court to modify the class-certification order not only to provide clarity concerning the scope of relief ordered by the Court, but also to make clear that persons separated for a prosecution and any subsequent conviction under section 1326 are being treated in this manner by the Court's direction. That is important to ensure that the treatment of section 1326 convictions in this case does not in any way undermine the government's strong interest in prosecuting section 1326 offenses. In particular, clarifying the order should make clear that the approach here is limited to this case, has no effect on the way the government will treat section 1326 convictions in any other context, and implies no carve out from the class for parents with any other criminal convictions.

Any parent who is separated from his or her child, but who is not a *Ms. L.* class member because of the "criminal history" exclusion from the class definition, may nonetheless be reunified with his or her child if the government finds that reunification is appropriate under existing processes and law governing the custody of both the parent and child.[7] Indeed, to date, 125 of the 955 separated children identified in Defendants' reporting have been reunified with the separated parent. *See* Ex. 1, Sualog Decl. ¶ 4. If a parent is excluded from the class and/or is not eligible for reunification, and if he believes that the government is relying on incorrect information or if he has additional information that he would like the government to consider, then the government has implemented a process for a parent to submit supplemental information for the government to consider.[8]

If a parent is excluded from the class or is not eligible to be reunified under the terms of this Court's Orders, and is similarly not reunified through existing processes, and wishes to challenge the decision not to reunify, then he or she would need to file an individual action seeking reunification under his or her particular circumstances. For the reasons

---

[7] As Plaintiffs recognize, the Court's preliminary injunction permits separations if a parent is referred for prosecution for any offense. Following service of any sentence for a section 1326 conviction, Defendants will endeavor to promptly complete the removal process consistent with applicable law, including processing the parent for reinstatement of removal under 8 U.S.C. § 1231(a)(5). Should the parent become subject to an executable removal order (e.g., no pending reasonable fear claim or withholding only proceedings before the Executive Office for Immigration Review), the government anticipates offering the parent the choice whether to be removed with his or her child or to allow the child to remain in the United States to pursue any immigration claims that the child may have. If the parent elects removal with the child, DHS anticipates using reasonable efforts to reunify at the time of removal. To facilitate that process, DHS anticipates taking all reasonable steps to complete the reinstatement of removal process and consideration of any fear claims of the parent while the parent is serving his or her sentence for a section 1326 conviction. If DHS is unable to process such fear claims while the parent is serving his or her sentence, DHS will make reasonable efforts to assess them as promptly as practicable upon resuming custody of the parent after completion of the sentence.

DHS notes that the child, if rendered an unaccompanied alien child, as defined in 6 U.S.C. § 279(g)(2), by the parent's criminal incarceration, would have been transferred to the custody of HHS ORR and potentially released by HHS ORR to a sponsor. Once a child has been placed with a sponsor, reunification at the time of removal may not be practicable in every circumstance.

[8] Specifically, DHS has set up an email inbox to which this information may be submitted. DHS will review this information and provide a response within 30 days. Separated parents will be provided a sheet upon separation that includes information about their separation, and provides the email address. DHS has recently finalized this process and expects to begin providing these information sheets to parents separated on or after September 16, 2019. While this process was developed and finalized, separated parents have been able to request such review by emailing the information to Defendants' counsel who has facilitated review of the information by DHS.

discussed above, this process is consistent with the Class Certification Order, because "[c]riminal history comes in all gradations, from minor misdemeanors to violent felony offenses. Some types of criminal history would clearly justify separate detention of the parent, while other criminal history might not—and the exercise of governmental discretion to separately detain that individual might be challenged. Whether separate detention of such parents violates substantive due process could raise individualized inquiries." ECF No. 82 at 10.

In any event, Plaintiffs are incorrect in their assertion that the government is not reasonably exercising its discretion in separating parents based on criminal history. As noted above, the rate of separations based on criminal history is approximately .25% of the total number of individuals who entered the United States as part of a family unit over the same time period. Moreover, as described above, the separations about which Plaintiffs complain are based on reasonable exercises of DHS's discretion with regard to the severity of the criminal history, who may be appropriately released, and who can be held in an ICE FRC under the standards that exist for the safety of all residents at those facilities. *See* Ex. 4, Interim Guidance; Ex. 2, Easterling Decl. ¶¶ 13-23; Ex. 3, Davison Decl. ¶¶ 4-6; Ex. 5, Harper Decl. ¶¶ 6-10.

Nothing has changed since the Court last expressed approval of the government's processes here. Order, Sept. 19, 2018, ECF No. 236. In that Order, the Court noted "[i]n carving out [the criminal history] exception, the Court was mindful of the parties' positions on this issue . . . , and ultimately found the balance weighed in favor of Defendants." *Id.* at 2-3. The Court also explained that "[i]n reaching that conclusion, the Court expected Defendants to exercise their discretion to make these exceptions in a reasonable manner, and it appears they have done so given the relatively small number of children whose parents have been excluded from the class on this basis." *Id.* at 3. As described above, the overall rate of separations for ***all*** reasons, including criminal history, is still less than .4%. Plaintiffs have provided no new reasons why this Court should second-guess DHS's reasonable exercises of discretion with regard to the detention and release of parents with

criminal history who, in any event, are not class members in this case. Therefore, the Court should once again decline to interfere with the government's exercises of discretion in this regard.

### ii. The Government Has Reasonably Exercised Its Discretion in Making Separation Decisions For Reasons Other Than Criminal History.

#### 1. Unfitness

Plaintiffs argue that DHS's separation decisions based on fitness are "highly questionable," and contend that DHS should not be able to separate a parent from a child based on fitness based only on "mere allegations, without corroborating evidence." Motion at 25-27. These arguments fail. First, for the reasons discussed in Defendants' motion to strike, ECF No. 461, this Court should decline to consider Plaintiffs' subjective and vague factual assertions to the extent that they are based on inadmissible evidence.

Second, even if the Court considers Plaintiffs' factual allegations, they do not provide good reason for this Court to second-guess the decisions made by DHS regarding potential fitness concerns that arise during the brief time when an alleged parent and child are in DHS custody at the border. Plaintiffs assert that twenty of the separations made since June 26, 2018, were based on determinations of unfitness, and twenty-four are based on health issues or hospitalizations. Motion at 13. For individuals separated based on health issues or hospitalization, the separation will continue only so long as the health condition or hospitalization necessitates continued separation. *See* ECF No. 360 at 14-17; Ex. 2, Easterling Decl. ¶ 26; Ex. 1, Sualog Decl. ¶ 5. DHS and ORR have worked together to make efforts to place the child in ORR custody near the location where the parent is hospitalized to allow for reunification. Ex. 2, Easterling Decl. ¶ 26. Plaintiffs point to only one instance where this did not occur, which Defendants acknowledge was in error. *See* Motion at 13-14; *see also supra* note 3. This single occurrence, however, does not establish

that Defendants are in any way failing to reasonably exercise their discretion when separating parents based on health concerns or hospitalizations.[9]

Plaintiffs then assert that beyond separations for health reasons, there have been twenty separations based on concerns of parental fitness. Motion at 13. As an initial matter, given that more than 500,000 individuals crossed the border as part of a family unit over a similar time period, the fact that there are only twenty such separations provides good reason to presume that CBP is properly exercising its discretion when it separates a parent and child based on fitness concerns. Moreover, Plaintiffs appear to assert—based in some cases only on vague second-hand descriptions from declarants who discuss facts gathered long after the initial separation—that in only five of those twenty cases were parents improperly separated. Motion at 14-15. Plaintiffs' assertions that DHS was incorrect in these cases are in reality just second-guessing and alternative explanations for the concerns that CBP personnel articulated while the parent and child were in their custody. CBP's articulated concerns—a father who appeared unable to care for his infant, a father responsible for his child's severe malnutrition, a parent with mental health issues—are reasonable bases upon which CBP could determine that the parent was not fit to remain with his or her child. *See* Section III.b, *supra*.

It also bears emphasis that, in these instances CBP is not, in general, making a decision to permanently remove a child from his or her parent. *See* Ex. 5, Harper Decl. ¶ 12. Rather, in a situation that is unique to the immigration context and that is consistent with the purpose behind the TVPRA, such a separation generally results in the transfer of the child to ORR custody, which is statutorily responsible for making determinations of fitness for potential sponsors. *See* 8 U.S.C. § 1232(b). Moreover, the parent still may seek

---

[9] Plaintiffs also discuss a case in which a parent was excluded from the class under the "communicable disease" exception based on his HIV diagnosis. This exclusion was in error. The government's position is that a diagnosis of HIV, standing alone, is not a basis for separation (as it is not a communicable disease). *See* July 18, 2019 testimony of Acting Secretary of Homeland Security Kevin McAleenan before the House Oversight Committee. Defendants note, however, that HIV might present additional considerations that could result in separation, such as, for instance, if a parent required hospitalization related to that diagnosis.

to be reunified with his or her child by providing additional information to DHS. *See* Ex. 5, Harper Decl. ¶ 12. Alternatively, ORR may discover new relevant information while providing care for the separated child, which it will forward to DHS for further review. *See* ECF No. 360 at 16-17. Given the extremely low number of separations that occur on this basis, and the fact that all of the cases challenged by Plaintiffs were, on the facts known to DHS at the time of separation, reasonable bases for separation, this Court should not use hindsight to second-guess the process that CBP is applying in making such separations.

## 2. *Parentage*

Plaintiffs assert that DHS's separations based on questions of parentage are "prone to error." Motion at 27. In sum, Plaintiffs' argument appears to be that because, in a very small number of cases DHS's parentage concerns were later determined to be incorrect, DHS is not properly separating on that basis. *Id.* at 15-16, 27. As Defendants have described above, DHS has a pilot program that allows for limited Rapid DNA testing, but does not currently have the ability to expand that pilot program. *See* Ex. 7, Smith Decl. ¶¶ 4-6; Ex. 8, Hastings Decl. ¶¶ 4-11. In any event, the cases cited by Plaintiffs are all good faith determinations made by DHS based on the evidence before them at the time, that were only later determined, based on additional evidence, to be incorrect. *See* Section III.c, supra. This does not establish that DHS's determinations are "prone to error," but rather that in some cases they may be aided by additional evidence that simply cannot be obtained in the short time period that CBP generally has to make a separation determination. *Id.*

## 3. *Gang Affiliation*

Plaintiffs assert that DHS is improperly separating parents and children based on allegations of the parent's gang affiliation. Motion 16-18, 27-29. Plaintiffs' Motion contains conflicting assertions about the numbers of individuals that they contend the government has separated for gang affiliation. *See* Motion at 16 (forty-four separations); Motion at 28 (asserting seventy-one parents separated for gang allegations, with thirty-seven for gang allegations alone). But in support of their contention that these separations are improper, Plaintiffs provide examples of only a small number of cases in which they

assert the government's determination was flawed, and therefore was not a proper basis for separation. *Id.* Plaintiffs' arguments again fail.

First, for the reasons discussed in Defendants' motion to strike, ECF No. 461, this Court should decline to consider Plaintiffs' subjective and vague factual assertions to the extent they are based on inadmissible evidence. Second, as a general matter, Plaintiffs' assertion—that a small number of separations based on gang membership were improper— does not establish that DHS is improperly separating parents from children on the basis of the parent's gang affiliation. While the number that Plaintiffs are alleging is unclear, it is well below 1% of all individuals crossing the border in family units during the same time period.

Finally, even if the Court does consider Plaintiffs' allegations as to why they contend DHS's separations in these cases were improper, the Court should conclude that Plaintiffs' arguments fail. This Court has already found that a separation based on substantially similar information as those cases now being challenged by Plaintiffs was a reasonable exercise of the government's discretion. *See* Order, Sept. 19, 2019, ECF No. 236, at 3. As the Court noted there, DHS's determination that an individual with allegations of gang membership has a "disqualifying criminal history that precludes reunification with their children and either release into the community or detention in a family residential center is entitled to deference." *Id.* Nothing that Plaintiffs raise now give any reason for this Court to revisit its prior determination.

In any event, even if Plaintiffs' factual assertions are accepted as true, what Plaintiffs describe are situations where later-obtained evidence and further evaluation may have called into question CBP's initial determination of gang membership. This does not make CBP's initial determinations unreasonable, particularly because when investigating gang affiliations, DHS often must obtain and evaluate information from foreign governments in a short timeframe. Ex. 2, Easterling Decl. ¶ 18. That later acquired evidence may call that initial determination into question in a limited number of cases does not mean that CBP's initial determinations, made based on the information available at the time, are

1  unreasonable. At best, it means that these cases are best resolved through an individualized

2  evaluation of the evidence of the type that this Court has recognized is not amenable to

3  class resolution.

4       Because Plaintiffs have failed to establish—or even contend—that DHS is making

5  any error as to an objective standard to be applied to separations based on gang affiliation,

6  this Court should decline to find that DHS's separations on this basis are in error.

### 4.  Very Young Children

8       Plaintiffs do not explain what they are asserting is DHS's wrongdoing with regard

9  to their allegations that DHS is separating "very young children" from their parents. *See*

10 Motion at 29-30. Plaintiffs contend that 185 of the children separated since June 26, 2018

11 are under the age of five. Motion at 12. Plaintiffs then assert—based on evidence that

12 Defendants contend is inadmissible as presented—that separations are particularly harmful

13 for younger children. Motion at 29-30. DHS takes seriously the separation of children of

14 any age, *see* Interim Guidance, and as described above, DHS separates only a very small

15 percentage of families crossing the border and they do so only on the basis of reasonable

16 exercises of their discretionary authority, and reasonable determinations of danger to the

17 child or to others. That some of these separations involve young children does not change

18 DHS's positions as to the reasonableness of their separation decisions.

### iii.  The Court Should Not Interfere With DHS's Discretionary Detention Authority.

21      Plaintiffs complain that this Court should not give deference to DHS's determination

22 about who can be housed in an ICE FRC. Motion at 30-32. But this Court has repeatedly

23 reaffirmed the government's authority to make discretionary decisions regarding detention,

24 where the authority to do so has been expressly given to it by Congress in the Immigration

25 and Nationality Act. *See* Order, ECF No. 83 at 3 (June 26, 2018) ("This Order does not

26 implicate the Government's discretionary authority to enforce immigration or other

27 criminal laws, including its decisions to release or detain class members."); *see also N.T.C.*

28 *v. ICE*, No. 18-1626, Order, ECF No. 51 (Aug. 16, 2018) ("This Court has made clear in

*Ms. L.* that matters of release and detention, and enforcement of criminal and immigration laws are ordinarily within the sound discretion of the Attorney General. The Ninth Circuit has also made that clear.") (citing *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1439-40 (9th Cir. 1986) (stating "prudential considerations preclude[] interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be detained)); Order, Sept. 19, 2018, ECF No. 236, at 3 ("The Court has consistently held that matters of detention and parole are peculiarly within the province of the executive branch, and for prudential and other reasons that exercise of discretion ought not to be disturbed under these circumstances.").

In accordance with this Court's order, ECF No. 450, and as discussed above, DHS has produced to the Court and to Plaintiffs their standards for determining who may be housed in an ICE FRC. To the extent that Plaintiffs are asking this Court to review these standards or to impose new standards approved by Plaintiffs and their experts, Plaintiffs are asking this Court to reverse course and interfere with the government's discretionary authority, and this Court should decline to do so.

## V.   CONCLUSION

For all of the above reasons, the Court should deny Plaintiffs' motion.

DATED: September 10, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

## <u>**CERTIFICATE OF SERVICE**</u>

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is Box 868, Ben Franklin Station, Washington, DC 20044. I am not a party to the above-entitled action. I have caused service of the accompanying **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: September 10, 2019                    *<u>s/ Sarah B. Fabian</u>*

                                                              Sarah B. Fabian