Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel Galindo*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org


*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | Date Filed: September 18, 2019 |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants*. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ..........................................................................................4

I.   Defendants' Attempt to Recharacterize the Issue as a Class Certification Problem Is Misguided. ........................................................................................4

II.  Defendants' Exercises of Discretion Are Not Reasonable, as Their Own Evidence and Admissions Confirm. ...........................................................................6

  A. Defendants' Efforts to Downplay the Numbers of Families They Have Separated Are Not Convincing. .................................................................................6

  B. Defendants Have Not Refuted Plaintiffs' Evidence Concerning Widespread Flawed Separations. .........................................................................................8

    1.  Parents separated based on criminal history ...................................8

    2.  Parents separated based on allegations of abuse ...........................10

    3.  Parents separated based on parentage doubts ...............................12

    4.  Parents separated based on allegations of gang affiliation ............13

    5.  Parents separated from very young children...................................14

    6.  Parents separated based in part on unlawful reentry convictions .................14

III. Defendants' Family Detention Standards Result in Unlawful Separations. ......14

CONCLUSION ......................................................................................16

i

# TABLE OF AUTHORITIES

**Cases**

*B.K. by next friend Tinsley v. Snyder*,
 922 F.3d 957, (9th Cir. 2019) ...................................................................13

*Brokaw v. Mercer*,
 235 F.3d 1000, (7th Cir. 2000) ...............................................................11

*Franco-Gonzales v. Napolitano*,
 No. 10-cv-02211, 2011 WL 11705815, *1 (C.D. Cal. Nov. 21, 2011) ....................6

*Gorbach v. Reno*,
 181 F.R.D. 642, (W.D. Wash. 1998) ...........................................................6

*Grassroots Leadership, Inc. v. Texas Dept. of Family and Protective Services*,
 2016 WL 9234059 (Tex. Dist., Dec. 16, 2016), *rev'd by* 2018 WL 6187433, at *1
 (Tex. App. Nov. 28, 2018).........................................................................15

*Halley v. Huckaby*,
 902 F.3d 1136, (10th Cir. 2018) ...............................................................10

*Krakauer v. Dish Network L.L.C.*,
 311 F.R.D. 384, (M.D.N.C. 2015) ...............................................................5

*Parsons v. Ryan*,
 754 F.3d 657, (9th Cir. 2014) .....................................................................5

*Powers v. Stuart-James Co.*,
 707 F. Supp. 499, (M.D. Fla. 1989).............................................................5

*Rogers v. San Joaquin*,
 487 F.3d 1288, (9th Cir. 2007) .................................................................11

*Santosky v. Kramer*,
 455 U.S. 745, (1982)................................................................................13

*Spain v. Procunier*,
 600 F.2d 189, (9th Cir. 1979) ...................................................................13

*Unknown Parties v. Johnson*,
 163 F. Supp. 3d 630, (D. Ariz. 2016) ..........................................................5

*Walters v. Reno*,
 145 F.3d 1032, (9th Cir. 1998) ...................................................................5

**Other Authorities**

Customs Border Protection, *Southwest Border Migration FY 2019*,
 https://tinyurl.com/y65pwj8a...................................................................7

ii

# PRELIMINARY STATEMENT

To clarify the scope of this Motion, Plaintiffs reiterate that they do not ask this Court to determine whether each of the approximately 1000 children separated since the injunction were lawfully taken from their parents. Rather, Plaintiffs seek the following rulings from this Court:

(1) a ruling that the government has incorrectly interpreted this Court's prior rulings and that they may not separate based on any criminal history, regardless of severity.

(2) that the Court reiterate that the standard for separating a child is the traditional due process standard used in the child welfare context: whether there is objective evidence to believe that the parent is genuinely unfit or a danger to her child. As Plaintiffs' experts have explained, even serious criminal history does not automatically permit separation. Rather, the test is whether that criminal history suggests the parent will be a danger to her *child*.

(3) At this stage, Plaintiffs do not ask the Court to definitively decide the standards for who may be housed in a family detention facility or whether there are alternative means to keep the family together other than family detention. Instead, Plaintiffs ask only that the Court clarify that, given the stakes for parent and child, Defendants must use objective risk assessment tools and may not automatically and routinely separate based on the view that a parent with a criminal history cannot be housed in a family detention facility. As the Court preliminarily observed at the August 16 status hearing, this issue would benefit from the opinions of experts, including those who have thus far submitted declarations in support of Plaintiffs' Motion.

(4) While the parties continue to meet and confer concerning Defendants' information-sharing systems, Plaintiffs presently emphasize two things:

(a) Plaintiffs cannot agree to receive lists on the sporadic basis they are coming now. *Contra* Dkt. 464 at 17 n.4. Plaintiffs' information is now two

months behind. Advocates for class members rely heavily on these lists to glean useful information regarding Defendants' ongoing separation justifications. Without frequently updated numbers, Plaintiffs cannot work effectively with separated families.

(b) Any information- sharing *must* include the lawyers and advocates for both children and parents. Without this information, those advocates could not have advocated successfully for the reunification of numerous wrongly separated families.

## SUMMARY OF ARGUMENT

In opposing Plaintiffs' limited request for relief, Defendants' brief makes several key concessions and is conspicuous in what it does not dispute. First, Defendants confirm that under their reading of this Court's orders, *any* criminal history (no matter how minor or old) can serve as a basis for separation, because such individuals are categorically excluded from the Class. Dkt. 464 at 3-4. Second, Defendants concede that some of their separation decisions were incorrect, even under their own permissive standards. *See*, *e.g.*, Dkt. 464 at 9 n.3, at 22 n.9.

Most importantly, Defendants do not contest that they have separated numerous children based on minor offenses, including thefts of $5, minor convictions that resulted in no jail time, and DUI convictions or charges. Instead, Defendants cherry-pick a few cases to dispute. Defendants' factual version of those few cases is incorrect or incomplete, but the salient point is that Defendants do not contest that their separations are not limited to cases of serious criminal history, much less cases where there is reason to believe the parent is a danger to her child. Nor could they, given that Plaintiffs' claims are based on Defendants' *own* chart listing the reasons for separation.

Instead, Defendants attempt to minimize their conduct by noting that although they have now separated approximately 1000 children (including around 200 under the age of five), that number is small compared to the overall number of families who have sought to

migrate through the southern border this past year. Setting aside flaws in Defendants' statistical presentation (discussed below), Defendants cannot claim that the separation of approximately 1000 children is a trifling concern, especially given so many of them are of tender age. As this Court has repeatedly emphasized throughout the litigation, aggregate statistics cannot obscure the irreparable harm *each individual* child suffers from separation.

Defendants also claim that although they believe the Court's prior rulings allow them to separate for *any* criminal offense, they are in fact applying "clear, objective standards that constitute reasonable exercises of the agency's discretion." Dkt. 464 at 1. Defendants' own chart of separations shows that is not so. Under no conceivable standard is it reasonable to separate young children based on such minor crimes as misdemeanor thefts.

Finally, Defendants again invoke their need to preserve safety and order in their family detention facilities as a basis for their separation decisions. But it is critical that Defendants first determine whether the parent and child should be separated because the parent presents a danger to the child. If the parent presents no danger to the child, Defendants must then make a careful decision guided by objective criteria as to whether the parent can be released or placed in the family facility, thereby avoiding the trauma of separation. While the Court can await further expert guidance on this issue, it should make clear that Defendants may not continue to routinely exclude parents with a criminal history from the facility, regardless of whether an objective risk assessment would indicate about the parent.

Defendants' position is that they should be trusted to exercise their discretion, without oversight. But their track record shows that even if such trust were warranted before, it is not now.[1]

---

[1] Plaintiffs submit two corrected declarations with this brief. The first is from Anthony Enriquez, as his original declaration inadvertently contained a factual error concerning the reasons Catholic Charities uncovered for separation in the case he describes in

# ARGUMENT

## I. Defendants' Attempt to Recharacterize the Issue as a Class Certification Problem Is Misguided.

Defendants contend that Plaintiffs' Motion is inconsistent with this Court's class certification decision. According to Defendants, "[t]he plain language of the Court's class certification order [] establishes an exclusion from the class that is *absolute as to all parents with any criminal history*." Dkt. 464 at 15 (emphasis added). Under Defendants' view, then, any criminal history—no matter how minor, old, or irrelevant to a parent's ability to care for the child—is an "absolute" license to separate, because such parents are without recourse under this Court's orders.

But, as Plaintiffs have explained, this sweeping reading of the class certification Order is at odds with the history of this litigation, where the Court has made abundantly clear that such parents are part of this case. *See* Dkt. 439-1 at 3-6. This Court's preliminary injunction order similarly made clear separation is prohibited absent a finding that the parent is a danger or unfit. *Id.*

More fundamentally, Defendants' effort to characterize Plaintiffs' Motion as requiring amendment of the class definition is beside the point. Plaintiffs' core claim is that Defendants' separation decisions are not based on the due process and child welfare principles this Court laid out in the preliminary injunction, and that further guidance from the Court is thus required. What Plaintiffs seek at this stage is for this Court to reiterate and enforce the standard for separation it has already identified. Whether the Court chooses to do so by further clarifying the preliminary injunction standard or by amending the class definition is not the critical issue.

Finally, Defendants are incorrect that the Court cannot, if it chooses, deal with these issues by amending the class definition. Defendants contend that the issues are not

---

Paragraph 22. Plaintiffs previously informed Defendants of the error shortly after it was discovered, and notified Defendants they would submit a corrected declaration with this brief. The second is from Derek Loh, which includes a proper execution and oath. *See* Dkt. 466 at 9 n.8.

susceptible to class treatment because they involve individualized determinations. But Plaintiffs' Motion does not seek individualized and fact-specific determinations from this Court on whether each of the approximately 1000 individual separations were lawful or constitutional. Rather, Plaintiffs seek clarification and enforcement of the substantive standards and procedures that must guide individual separations, which plainly present issues susceptible of class treatment. As this Court has already found, the constitutional *standard* governing Defendants' separation practices is common to the *entire* Class, regardless of their individualized circumstances:

> The circumstances of Plaintiffs and their children in this case and the situations described in the declarations submitted in support of this motion are evidence there is a common practice at issue here, namely separating migrant parents and children and failing to reunite them without a showing the parent is unfit or presents a danger to the child.

Dkt. 82 at 12.

Courts routinely treat the articulation of the applicable legal *standards* as amenable to classwide treatment. *See, e.g, Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 637 (D. Ariz. 2016) ("[T]he question of whether Defendants have violated the applicable legal standard with respect to the treatment of immigration detainees held overnight in [CBP facilities] unquestionably lends itself to classwide resolution"); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 396 (M.D.N.C. 2015) ("The question of what legal standard applies . . . is a common question of law."); *Powers v. Stuart-James Co.*, 707 F. Supp. 499, 502 (M.D. Fla. 1989) (ruling that "[t]he legal standards to be applied" is common issue); *see also Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (upholding Rule 23(b)(2) class where "policies and practices of statewide and systemic application expose all inmates in [] custody to a substantial risk of serious harm").

Likewise, questions of process can also be resolved on a class-wide basis, as the Ninth Circuit and numerous other courts have recognized. *See, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998) (holding that question of "whether the nationwide procedures used by INS in document fraud proceedings sufficiently apprise aliens of their

constitutional right to a hearing" was appropriate for classwide resolution); *Gorbach v. Reno*, 181 F.R.D. 642, 644 (W.D. Wash. 1998) (certifying nationwide class of persons contesting validity of administrative denaturalization proceedings); *Franco-Gonzales v. Napolitano*, No. 10-cv-02211, 2011 WL 11705815, *1 (C.D. Cal. Nov. 21, 2011) (certifying class of detained immigrants with serious mental disabilities who face removal pro se).

In short, the specific mechanism for addressing the proper standards and procedures for separating families is secondary. Dkt. 439-1 at 19. The critical issue for present purposes is that this Court's intervention is required to ensure that Defendants are making separation decisions based on criteria that conform to the settled constitutional principles set out in the preliminary injunction decision.[2]

## II. Defendants' Exercises of Discretion Are Not Reasonable, as Their Own Evidence and Admissions Confirm.

### A. Defendants' Efforts to Downplay the Numbers of Families They Have Separated Are Not Convincing.

Defendants seek to minimize their separation practices by focusing on the number of families who came to the border during the last year; in comparison to that number, they say, their "overall rate of separation is .4%." Dkt. 461 at 1, 5, 20. This number is misleading in several respects: the statistical evidence shows that the monthly *rate* of separation has been increasing steadily over the last year, even accounting for the number of families who come to the border every month. *See* Supplemental Declaration of Brooke Watson (Supp. Watson Decl.), Ex. A, ¶¶2-7 (showing that rate of separation from July 2018 to June 2019 was over two times greater than expected, even accounting for differences in numbers of families migrating). Notably, moreover, Defendants rely on

---

[2] Defendants suggest that the Court's "shocks the conscience" analysis does not extend to parents separated due to criminal histories or abuse allegations. Dkt. 464 at 2-3, 16. That is not consistent with this Court's instructions, which explained that due process is violated where the parent's criminal history does not present a danger to the child. Dkt. 439-1 at 18-19 (describing Court's decisions).

6

figures that count the number of *individuals* apprehended, rather than families apprehended. *See* Customs Border Protection, *Southwest Border Migration FY 2019*, https://tinyurl.com/y65pwj8a (defining "Family Unit" as "the number of *individuals* (either a child under 18 years old, parent, or legal guardian) apprehended with a family member"). If all individuals in the family are to be tallied, then the number separated is not 955 (which is the number of separated *children*), but approximately twice that, as each of these children arrived with a parent.

As importantly, Defendants have not provided evidence of the number of families who had a criminal history that the government did *not* separate because they deemed the history too minor. Without that baseline, it is impossible to assess how Defendants have exercised their discretion. Indeed, given the examples of the minor crimes that Defendants have deemed a cause for separation, it is difficult to conceive of what crimes they have identified as insufficient to warrant separation.

Moreover, Defendants' efforts to minimize their unlawful conduct ring hollow in light of the sheer number of families they have separated in the last year. That number was 955 as of July 20, 2019, according to the most recent list Defendants provided. The number has now likely climbed well over 1000 families. And hundreds of these families include very young children who have now likely suffered permanent trauma. *See, e.g.,* Shonkoff Decl., Ex. O to Dkt. 439-1, ¶¶7-8. This figure is also likely an undercount, as Plaintiffs consistently receive reports of families who do not appear on Defendants' lists. *See, e.g.*, Corrected Declaration of Anthony Enriquez (Corr. Enriquez Decl.), Ex. E, ¶17.

Finally, Defendants state that they have reunified approximately 125 of the more than 900 children they separated. Dkt. 464 at 19 (citing Sualog Decl. ¶4). But as Defendants themselves acknowledge, most of these reunifications were "for purposes of removal." *Id.* at 7. Defendants' willingness to reunify families for this purpose underscores that the separations were not based on any determination that the parent posed a danger to the child. *Id.* (stating that families are reunified for removal "unless ORR

determines the parent is unfit"). As to those few families who have been reunified in the United States, Plaintiffs' declarations show that many of those are attributable to zealous advocacy on the part of lawyers and representatives for the families, who sometimes resorted to litigation threats to compel Defendants to act reasonably. *See, e.g.*, Corr. Enriquez Decl., Ex. E, ¶¶19-21; Dkt. 439-1, Ex. D (Palazzo Decl.), ¶15; Ex. E (Nagda Decl.), ¶37.a, 37.f; Ex. H (Olivares Decl.), ¶12; Ex. I (Koop Decl.), ¶6.a-d.[3]

Even if some families were eventually reunified, it was only after weeks or months of time apart—time that is likely to inflict life-changing scars. Rather than favoring Defendants, these 125 reunifications are evidence that without oversight of their decisions, families will continue to endure needless trauma.

## B. Defendants Have Not Refuted Plaintiffs' Evidence Concerning Widespread Flawed Separations.

Plaintiffs identified hundreds of examples of problematic separations from Defendants' own lists, and described dozens in the declarations of the attorneys and advocates.[4] Yet Defendants only address a handful of these cases, in some instances conceding that they separated families in error, even under their own cursory standards. *See, e.g.*, Dkt. 464 at 9 n.3, at 22 n.9.

Defendants apparently have few direct answers for the remaining cases, despite opportunity to investigate them. *See* Dkt. 466 at 8-9. It is clear that Defendants are separating for minor offenses, and there is a pressing need for this Court to reinforce the proper standards.

### 1. Parents separated based on criminal history

Defendants cannot dispute what their own lists show, which is that they have

---

[3] Such advocacy is impossible without knowing the basis for the separation. Plaintiffs reiterate that such information *must* be shared systematically and timely with class counsel and advocates for the children and parents.

[4] Defendants fault Plaintiffs for only discussing in their declarations some of the hundreds of cases listed in Defendants' charts. Dkt. 464 at 22, 23. But Plaintiffs could not have possibly located all such cases, nor was there any reason to do so given that Defendants themselves supplied the reason for the separations.

separated numerous parents based on crimes as minor as vehicle offenses, traffic infractions, drug possession convictions (including marijuana), shoplifting, destruction of small amounts of property, and resisting arrest. Dkt. 439-1 at 8; *id.*, Ex. A (Watson Decl.), ¶¶15-24, 35-36. They also do not deny that they have separated based on stale crimes (sometimes decades old), or vague allegations of "criminal history" not disclosed to Plaintiffs. *Id.* at 8-9. And they confirm their view that criminal history is as an "absolute" justification for separation, because in their opinion such parents have no rights in this case. Dkt. 464 at 19.

Rather than explaining why any of these separations was constitutionally proper, Defendants claim that they are making "a variety of individualized determinations" that are allegedly consistent with various newly-revealed guidance and criteria. Dkt. 464 at 6-7. To begin, Defendants are disclosing the existence of the guidance and policies for the first time in the context of this Motion, despite Plaintiffs' repeated requests for the standards Defendants are applying to determine parental fitness or danger to the child. Consequently, it is far from clear when Defendants formally adopted these practices or began consistently applying them in the field, in light of Defendants' previous resistance to producing them.

In any event, there are two flaws with Defendants' argument. First, the guidance produced to the Court is vague and overbroad, allowing separations where the parent "has a criminal conviction(s) for violent misdemeanors or felonies." Dkt. 464-4. But as Plaintiffs' experts have explained, long-settled child welfare and due process standards would never permit separations based on any felony or any violent misdemeanor. Rather, there must be a determination of the parent's *current* danger *to the child*. *See* Dkt. 439-1, Ex. M (Guggenheim Decl.), ¶3 (explaining that "criminal convictions are relevant only insofar as they bear on the fitness of the parent, and even then must be considered in combination with a totality of factors that go to the best interests of the child," even "for the most serious crimes"); Ex. E (Nagda Decl.), ¶ 30 ("No state allows for a best interests

9

determination to rest solely on a parent's criminal history."). Thus, even if Defendants were faithfully following their own guidance, it would lead to unlawful separations.

Second, the undisputed evidence shows that Defendants are not even following their own criteria. DHS official Lloyd Easterling offers a list of crimes that would "generally" *not* warrant separation, such as "[s]imple thefts, fraud crimes, minor drug or traffic crimes, or driving while intoxicated." Dkt. 464-2, ¶ 16; *see also id.* (averring that multiple DUI offenses would not justify separation). But again, that is not consistent with the evidence, which shows that Defendants *have* separated numerous families on precisely these bases. *See* Dkt. 439-1, Ex. A (Watson Decl.), ¶¶ 15-24, 35-36. And notably, the CBP supervisor in the Tucson sector does not include even the limited details concerning separation standards that Easterling discusses. *See generally* 464-3. The undisputed evidence indicates either that Defendants' officers are not applying their own guidance, or that Defendants are using a definition of "violent offenses" untethered from any ordinary understanding of that term. Moreover, Defendants admit to separations based on mere allegations and warrants, Dkt. 464 at 13, 23–25, although the guidance only permits separations based on certain criminal *convictions*, Dkt. 464-4.

Defendants alternatively argue that even if they are wrongly separating families, they should be excused from settled standards because they are making decisions based on limited knowledge at the time of initial detention. Dkt. 464 at 7. Yet Plaintiffs' contention is precisely that even when examined from the perspective of the officer *at the time*, Defendants' separations are unlawful under the settled constitutional principles this Court relied on to issue the PI. Vanishingly few of Defendants' criminal history separations would have been justified at the time of separation. *See Halley v. Huckaby*, 902 F.3d 1136, 1147 (10th Cir. 2018) (prior drug possession and drug convictions did not show imminent risk to child).

### 2. Parents separated based on allegations of abuse

Defendants concede that a number of their separations based on supposed parental

unfitness have turned out to be unfounded. Dkt. 464 at 9 n.3 (reunification did not occur after mother's temporary hospitalization ended); *id.* at 22 n.9 (wrongly separating based on HIV diagnosis).

Even Defendants' justifications in the cases they *do* dispute only underscore how problematic their determinations are. For L.R.H., Defendants claim that the separation was justified because the parent was "mentally unstable." Dkt. 464 at 9. Yet all the I-213 says is that medical staff recommended "further evaluation;" there is no reason given, or any specific facts provided, as to why this further evaluation necessitated separation. Dkt. 464-1, Ex. H at 68. *See Brokaw v. Mercer*, 235 F.3d 1000, 1011 (7th Cir. 2000) (stating that "unspecified allegations" of neglect were insufficient to justify separation). Defendants similarly suggest that a mere diagnosis of a psychiatric disability can serve as a basis for separation, *see* Dkt. 464-5, ¶ 27 (parents were separated because of schizophrenia diagnosis), but again their decisions must be based on specific, articulable reasons why the child is in danger, not stereotypes about mental illness. *See* August 16, 2019 Tr. at 20 ("COURT:  As we know with mental health, I think the science shows that the vast majority of people with . . . mental illnesses are not dangerous and may not present a risk to themselves or others.").

Defendants also dispute E.R.R.'s case, who was separated after he was criticized for not changing his baby's diaper. Dkt. 464 at 10; compare Dkt. 439-1, Ez. D (Palazzo Decl.). But Defendants account largely corroborates the parent's, since it shows that CBP officers cited the parent for "not know[ing] how to change a diaper" and lacking "basic hygiene" knowledge. Dkt. 464-1, Ex. B at 13. And although Defendants' documents assert the father was neglectful, the declaration of his attorney makes clear that E.R.R. did everything he could while detained to ensure his daughter got medical care, and that he reasonably allowed his sick child to get extra sleep rather than wake her to change her diaper. Dkt. 439-1 (Palazzo Decl.), ¶¶ 5-15. *See Rogers v. San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007) (holding that social worker's evaluation of neglect must show

11

"imminence of the threat" to justify emergency removal).

### 3.  Parents separated based on parentage doubts

Defendants' justifications for their separations based on parentage doubts fare no better. In fact, their heavy reliance on I-213s and other unverified statements by immigration officers echo their responses to the claims of named Plaintiff Ms. L., who immigration officers said was not the mother of her daughter. *See* Dkt. 46-1, ¶ 5 (ICE officer testifying to contents of Ms L.'s A-file, which stated that "[f]amily makeup is questionable at best"); Dkt. 44 (DNA results for Ms. L).

In the cases Defendants dispute on the facts, their evidence does not actually contradict the parents' stories, and merely omits facts that do not favor them. For instance, in Mr. P.D.'s case, while the I-213 says the father admitted to fraudulently claiming his niece was his daughter, Dkt. 464-1, Ex. I, Defendants say nothing about the Guatemalan consulate's confirmation of the birth certificate's authenticity, nor do Defendants dispute that his DNA test came back positive. Dkt. 439-1, Ex. H (Olivares Decl.), ¶¶ 22-28. And in Mr. A.B.'s case, Defendants suggest that they discredited Mr. A.B.'s notarized document showing a family relationship because the Honduran consulate could not immediately verify it. Dkt. 464 at 12; Dkt. 464-1, Ex. J at 81. Yet the I-213 nowhere mentions the separate document Mr. A.B. presented explaining why his name does not appear on the birth certificate, and Defendants do not deny that the DNA test confirmed parentage. *See* Dkt. 439-1, Ex. G, ¶¶ 4, 15 (Lapointe Decl.). In another example, Defendants allege that a father presented a fraudulent birth certificate for his child, but (yet again) a DNA test verified parentage and Defendants do not deny that they eventually agreed to reunification. *See* Dkt. 464 at 9; Dkt. 439-1, Ex. B (Turner Decl.) ¶ 17.

Perhaps recognizing that numerous of their parentage separations were disproven by DNA results, Defendants claim that "operational concerns" block them from broader use of DNA testing. Dkt. 464 at 11; Dkt. 464-7. But fiscal or administrative concerns are not a defense to a constitutional claim for injunctive relief, especially where the stakes are

so high. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (observing that "even if abating two or more unconstitutional policies is impossible with limited funds," court can order state to "expand the pool of existing resources"); *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (explaining that "cost or inconvenience of providing adequate facilities is not a defense" to Eighth Amendment claim).

More to the point, Defendants make clear that they put the onus on the parent to meet some unstated burden of proof on parentage, and that Defendants will separate if that unstated burden is not met. Dkt. 464 at 11 ("Where these steps are unable to resolve an existing doubt about parentage, CBP will generally separate a child from an adult."). That is exactly backwards—*Defendants* must bear the burden of articulating facts that justify taking a child from his parent. *Cf. Santosky v. Kramer*, 455 U.S. 745, 768 (1982) (state must bear clear and convincing burden to sever parental rights).

### 4. Parents separated based on allegations of gang affiliation

Two points are critical about the gang affiliation cases. First, Defendants do not challenge any of the facts set forth in Plaintiffs' declarations concerning parents separated based on false gang affiliation claims, which show that many of Defendants' accusations turned out to be wrong. Dkt. 464 at 13, 23. Their half-hearted defense is that they have "only" separated 44 parents on this basis, Dkt. 464 at 13, yet that is cold comfort to the dozens of families who may have been separated on baseless and untested evidence. These cases exemplify why it is critical that Defendants provide the underlying information to the parents and advocates for the children, which would prevent these erroneous separations.

Second, as Plaintiffs' experts explain, mere suspicion of gang "affiliation," without more, is not a sufficient basis to separate a child. And (as explained further below), such suspicions also do not render parents categorically too dangerous for family detention facilities. Supplemental Declaration of Dora Schriro (Supp. Schriro Decl.), Ex C, ¶¶ 6, 8. That is particularly so in cases from Central America, where an individual may have been

forced against his or her will into the gang but not have committed any actual crimes. Given the stakes for these children, there must be an individualized assessment.

### 5. Parents separated from very young children

Nearly twenty percent of the separations since the preliminary injunction were of children under five. Defendants respond that merely because children are young does not mean they cannot be separated from their parents if truly warranted. Dkt. 464 at 25. But, of course, that was not Plaintiffs' point. Plaintiffs noted the cases of young children to show that the trauma to these babies and toddlers is that much greater. *See* Dkt. 439-1 at 26-27.

### 6. Parents separated based in part on unlawful reentry convictions

Finally, Defendants admit (in a long and opaque footnote) that they have not been reunifying parents with their children when the parent has been prosecuted for a Section 1326 illegal reentry offense. Dkt. 464 at 18 n. 6. They ask the Court to belatedly create an alternate procedure for such families, but one that only appears to provide for removal at the time of repatriation. *See id.* at 19 n.7 (describing "endeavor[ing]" to move promptly to remove parent convicted of 1326 and then "anticipat[ing] using reasonable efforts to reunify at the time of removal"). Defendants also do not say whether they are separating parents with a 1326 conviction from a *prior* (rather than the most recent) apprehension.

Plaintiffs' position—consistent with this Court's guidance—remains that all parents convicted (at any time) of illegal reentry are not barred from reunification with their children. The Court should reject Defendants' proposal and reiterate, as had been clear from prior proceedings, that "1325, 1326 collectively would not exclude." July 16, 2018 Tr. (Dkt. 439, Ex. R at 209:18).

## III.   Defendants' Family Detention Standards Result in Unlawful Separations.

There are two analytically distinct determinations that must be made as to each family. The first is whether the parent is unfit or a danger to her child, such that separation would be warranted even if the parent and child were not detained. The second is whether

the parent can be released or detained in a family residential facility, such that separation will occur *de facto* even if the parent is not a danger. It is critical that the Court clarify the standards governing the first determination and that Defendants distinguish between the two determinations. Otherwise, if a family is separated because the government determines that the parent cannot be released or housed in a family detention facility or other appropriate setting, the child could remain separated even *after* the parent is released from adult detention.

While Plaintiffs believe it is critical in this Motion to clarify the standards for the first determination, the Court might benefit from further expert testimony on the standards for housing parents in family detention, or whether alternatives to family facilities might be a reasonable possibility, assuming release does not occur. Presently, Plaintiffs make only the following brief points.

*First*, Defendants suggest that they must comply with state detention guidelines. But, as Defendants know, those guidelines currently do not apply to ICE family facilities in Texas.[5] The Texas Court of Appeals decision that Defendants cite is stayed pending a petition for rehearing, and the state trial court's order—which enjoined the licensing of Texas family facilities—remains in effect. *See Grassroots Leadership, Inc. v. Texas Dept. of Family and Protective Services*, 2016 WL 9234059 (Tex. Dist., Dec. 16, 2016), *rev'd by* 2018 WL 6187433, at *1 (Tex. App. Nov. 28, 2018), Rule 53.7(f) motion for rehearing filed, Jan 25, 2019.

*Second*, while Defendants may be entitled to a certain amount of deference at their family facilities, any such deference is premised on Defendants' use of objective, established risk assessment tools to make detention decisions and the need to remain within the constitutional boundaries governing family unity. As Plaintiffs' experts note, no

---

[5] The Pennsylvania regulations Defendants cite, Harper Decl., Dkt. 464-5 at ¶ 9 n.3, do not by their own terms regulate what parents may be placed into Berks, but only provide for background checks for employees charged with the care of children. *See* 55 P.A. Code § 3800.51 (criminal history check requirement applies to "staffing.")

proper risk assessment would have excluded individuals with the minor or stale offenses at issue in hundreds of these cases.

*Third*, with so much at stake for these children, Defendants may not simply declare that they will bar from these facilities virtually all parents with even minor crimes or mere allegations. Parents in family residential facilities are intensively monitored and scrutinized at all times, and the facilities are capable of housing parents with criminal histories that do not warrant separation. Supp. Schriro Decl. ¶¶4-6. Defendants' declarant portrays the facilities as "non-secure" and "open-movement environments" where families are "free to move" or even simply leave. Harper Decl., Dkt. 464-5 ¶¶4,5, 11. That is far from the reality. Families in both Dilley and Berks are closely supervised and monitored. Supp. Schriro Decl. ¶4, Declaration of Bridget Cambria (Cambria Decl.), Ex. B, ¶¶ 9-19 (describing security and monitoring at Berks); Declaration of Shalyn Fluharty (Fluharty Decl.), Ex. C, ¶¶5-14 (same at Dilley). Movement is closely observed. No parent or child can move between building areas without staff permission. Doors are electronically locked and opened only by guards. Cambria Decl. ¶14; Fluharty Decl. ¶10. Families are permitted in outside recreation areas only for limited periods, and with guard escorts and observation. Cambria Decl. ¶16; Fluharty Decl. ¶10. Parents must also remain with their children at all times, with limited exceptions when the children are monitored by staff. Cambria Decl. ¶12; Fluharty Decl. ¶7. In short, both facilities are prison-like and thus able to safely and securely house the parents whom Defendants are separating. Supp. Schriro Decl. ¶4; Cambria Decl. ¶6; Fluharty Decl. ¶5. In addition, many other types of settings may work.

## CONCLUSION

The Court should grant Plaintiffs' Motion to Enforce.

Dated: September 18, 2019              Respectfully Submitted,

                                       */s/Lee Gelernt*
 Bardis Vakili (SBN 247783)            Lee Gelernt*

16

ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 2922080)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*samdur@aclu.org*

Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*
dgalindo@aclu.org

*Admitted Pro Hac Vice*

17

# CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2019, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt, Esq.
Dated: September 18, 2019

*Ms. L. et al., v. U.S. Immigration and Customs Enforcement, et al.*

**EXHIBITS TO PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

| EXHIBIT | DOCUMENT | PAGES |
|---------|----------|-------|
| A | Supplemental Declaration of Brooke Watson, Senior Data Scientist, ACLU | 20 |
| B | Declaration of Bridget Cambria | 24 |
| C | Declaration of Shalyn Fluharty | 30 |
| D | Supplemental Declaration of Dora Schriro | 36 |
| E | Corrected Declaration of Anthony Enriquez, Catholic Charities of the Archdiocese of New York | 41 |
| F | Corrected Declaration of Derek Loh, Immigrant Defenders Law Center | 55 |

# EXHIBIT A

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., <br><br>     *Petitioners-Plaintiffs*, <br><br>   v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al., <br><br>     *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> **SUPPLEMENTAL DECLARATION OF BROOKE WATSON** <br><br> CLASS ACTION |

I, Brooke Watson, upon my personal knowledge, hereby submit this supplemental declaration and, if called to testify to these facts, could and would do so competently.

1.     From     Defendants'     recently-provided     spreadsheet,     entitled "ACLU_exchange_through7_20_updated_8_12_2019_newrun v2 (8.20.19).xlsx", I identified 955 unique children separated from 888 unique parents between June 28, 2018 and July 20, 2019, for a total of 1,843 individuals.

2.     Using the apprehension dates provided in Defendants' spreadsheet, I tabulated the number of individuals separated in July 2018, the earliest full month after the Court's preliminary injunction, and the number of individuals separated in June 2019, the most recent full month for which the government has provided complete data.

3.     For the months of July 2018 and June 2019, I additionally obtained data from the Customs and Border Protection's website[1] on the total number of "family units" (which CBP calls "FAMUs") who either were apprehended between ports of entry on the Southwest Border, or who were deemed inadmissible at a port of entry. Although CBP refers to "family units," they actually define a "family unit" as an *individual* apprehended with a family member: "Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol."[2]

4.     In July 2018, the first full month following the injunction, CBP reported that 12,904 individuals who were members of a family unit (FAMU) were apprehended at the Southwest border or deemed inadmissible at ports of entry. According to CBP, 60,980 FAMU individuals were apprehended at the Southwest border or were deemed

---

[1] Sources: https://www.cbp.gov/newsroom/stats/sw-border-migration and https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2018. Last accessed 17 September, 2019.

[2] Source: https://www.cbp.gov/newsroom/stats/usbp-sw-border-apprehensions

inadmissible at a port of entry in June 2019. This represents a 4.7-fold increase in total apprehensions and inadmissible presentations between those two time periods.

5.     In July of 2018, the government separated 23 FAMUs. In June 2019, the government separated 238 FAMUs. This is more than a 10.3-fold increase in separations between those two time periods.

6.     The rate of family separations between June of 2019 and July of 2018 when comparing only apprehensions and inadmissible presentations of family unit individuals is 2.19 times greater than would be expected based on the overall FAMU apprehension and inadmissible rate.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and New York, based on my personal knowledge. Executed in New York, NY, on September 18, 2019.

*/s/ Brooke Watson*
BROOKE WATSON

# EXHIBIT B

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

   *Petitioners-Plaintiffs*,

  v.

U.S. Immigration and Customs Enforcement ("ICE"), et al.,

   *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF BRIDGET CAMBRIA**

CLASS ACTION

I, Bridget Cambria, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      My name is Bridget Cambria, Esq. and I am an attorney licensed to practice in the State of Pennsylvania since May of 2007. I submit this declaration in support of Plaintiffs' Motion to Enforce Preliminary Injunction in this case.

2.      I am a graduate of the Roger Williams School of Law, where my studies focused on immigration and public interest law. For more than 12 years, I have exclusively practiced immigration law, working with children, families and adults, both in detained and nondetained settings. In my practice, I have represented immigrants, children and families before the immigration courts, the Board of Immigration Appeals, federal district courts, and the Third Circuit.

3.      Prior to law school, in or about 2002, I was employed by the County of Berks as a staff member at the Berks County Residential Center ("Berks"), which is one of the facilities that detains families in federal immigration custody.

4.      Currently, I am an attorney with and the Executive Director of Aldea – The People's Justice Center ("Aldea"), a non-profit located in Reading, Pennsylvania. Aldea provides representation to all families detained at Berks. In the last five years, I and other attorneys and staff at Aldea have represented more than one thousand parents and children who have been detained in family detention in the Berks.

5.      In the course of my work at Berks, I have become very familiar with the policies and practices of U.S. Immigration and Customs Enforcement ("ICE") with respect to families detained there. I have visited the facility on numerous occasions to work with clients and am therefore familiar with its operations and protocols.

6.      This declaration describes my experiences and observations working with clients detained at Berks. I have also reviewed the declaration of Melissa Harper, which Defendants submitted in support of their opposition to the Motion to Enforce in

this case, and my testimony addresses some of the factual assertions made in that declaration concerning Berks.

7.     The declaration of Melissa Harper states that people detained in family facilities are "not escorted under guard and are free to leave and move around." Dkt. 464-5, ¶ 11. In my opinion, that is not consistent with my observations or the experiences of families detained at Berks.

8.     Families detained at Berks are closely supervised and monitored. Movement of every child or parent is observed within the facility. No parent or child can move from one area of the building to another—for example, from the sleeping area to the legal visitation area—without permission from staff.

9.     Estimated times when the detained families are permitted in outside recreation areas are 8:30 AM to 11:30 AM, 1:30 PM to 4:30 PM, and 6:30PM until the sun begins to set. But they are not permitted outside without a guard escort or observation. At 8:00 PM each day, all detained families are restricted to the second floor and no longer permitted free movement through the rest of the facility, even if they are supervised.

10.     At times, guards have further restricted movement throughout the facility as a punishment. For example, mothers detained at Berks have previously gone on hunger strikes or filed numerous complaints about their treatment in the facility. In response, facility staff have restricted their movements which include being forbidden from going outside, even under supervision.

11.     After 8:00 PM, families are sometimes subjected to 15-minute invasive bed checks, where members of the BCRC staff will enter each room, shine a flashlight in the room and check to see that each resident is accounted for. This can interrupt a family's sleep. Sometimes guards perform bed checks on the same family multiple times in a single night.

12.     Doors throughout the facility are equipped with scanning keycard locks and are locked and unlocked by Berks personnel only. Guards monitor all areas of the facility and permit detained families to access only certain areas of the facility at certain times. Residents are not allowed free movement throughout the facility or outside at various times, including after 8 PM, and during all eating periods.

13.     The declaration of Melissa Harper also states that family detention facilities are "non-secure" and "[have] doors that do not lock for purposes of egress," and that "[i]f a resident wishes to leave, employees are instructed to allow them to do so." Dkt. 464-5, ¶ 11. Again, this is not consistent with my observations and the experiences of families detained at Berks, and gives an incomplete picture of the restrictions on exit.

14.     To leave the building into the outside yard a child or parent must be escorted or observed throughout their time outside. There are signs posted on exit doors instructing detained families that they cannot exit. There are guards posted at exits during which time movement in those areas is permitted.

15.     Families have asked what would happen if they left the facility grounds. They have been told that they will be followed and face federal charges for escape from the facility. So even if a parent felt bold enough to just walk out of the facility, and guards and employees did not directly stop them, this parent would likely be arrested after leaving the facility and charged with misconduct. The statements of Berks staff suggest they could even be charged with criminal offenses for escaping arrest. Thus, parents do not feel free to simply leave and return to the facility at will.

16.     Further, I have seen the Berks County Residential Handbook in the course of my work. This Handbook is provided to detained families to inform them of facility policies. The Handbook expressly discusses "Escape," which it characterizes as a "Major Offense" within the facility, in the same category of offenses as Arson, Rape, Sexual Assault, Hostage Taking, or causing the Death of a Person. The Handbook

therefore suggests that a person who sought to escape the facility would be subject to a high level of discipline.

17.    Movement is even restricted preventing families from visiting with their attorney when that attorney is present in the facility. Most recently the Berks facility has forbidden visits between counsel and two or more clients at one time, despite expressly permitting such visits in the legal visit protocols. Therefore, our clients are not even free to enter the legal visit room, upon their request, when we are present on site. If movement was unrestricted, certainly our clients would be free to enter the legal visit room to consult with their attorney at any time. Our families are not.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and Pennsylvania, based on my personal knowledge. Executed in Reading, Pennsylvania, on September 18, 2019.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and New York, based on my personal knowledge. Executed in New York, NY, on September 18, 2019.

*/s/ Bridget Cambria*
BRIDGET CAMBRIA

# EXHIBIT C

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., *et al.*,

       *Petitioners-Plaintiffs*,

    v.

U.S. Immigration and Customs Enforcement ("ICE"), *et al.*,

       *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF SHALYN FLUHARTY**

CLASS ACTION

I am an attorney licensed to practice law in the State of California since 2010. My practice has focused on representing detained unaccompanied immigrant children, and detained immigrant families, before the Executive Office of Immigration Review and the Department of Homeland Security. I currently serve as the Managing Attorney of the Dilley Pro Bono Project ("DPBP") in Dilley, Texas. I am above the age of 18 years and not a party to this action.  I make this affidavit of my own personal knowledge, and could and would competently testify to the matters contained herein if called upon to do so.

1.     In the course of my work providing pro bono legal representation to families detained at the South Texas Family Residential Center ("STFRC") in Dilley, Texas I have become very familiar with the police and practices of U.S. Immigration and Customs Enforcment ("ICE") with respect to the families detained there. I have worked with families detained at STFRC since March 2016 and am therefore familiar with ICE's operations and protocols within the facility.

2.     I have also reviewed the declaration of Melissa Harper, which Defendants submitted in support of their opposition to the Motion to Enforce in this case, and my declaration addresses some of the factual assertions made in that declaration concerning Dilley.

3.     STFRC is not a licensed childcare facility in the state of Texas. It also does not comply with *Flores* standards, and thus ICE has not been able to legally hold families with minor children at this facility for more than twenty days

4.     The facility is a secure detention facility that operates much like a secure prison. Visitors must go through a metal detector, empty their bags, and place all their items through an X-ray machine before entering the facility. Visitors are not permitted to leave the visitation trailer, and cannot send messages or phone calls to detainees who are not physically present in the visitation space. Video cameras are used to

monitor all spaces in the facility. Detainees must pay for phone calls.  All aspects of movement within the facility are controlled and monitored by guards.

5.      The declaration of Melissa Harper states that people detained in family facilities are "not escorted under guard and are free to move around." In my opinion, that is not consistent with my observations or the experiences of families detained at Dilley.

6.      Families detained at Dilley are closely supervised and monitored. Movement of every child or parent is observed within the facility, both by guards who are physically present and by video cameras. Families are able to move only within certain designated areas of the facility. They can be summoned to mandatory facility appointments at any time and are escorted to these appointments by guards; they may even be extracted from the middle of their legal consultations to attend these appointments. Families can also be placed in medical isolation, where they may be confined for many consecutive days without the ability to communicate with the outside world.

7.      Children are to be supervised by their parents at all times, unless they have been left at the "school" or "daycare" facilities during their hours of operation. Additionally, children are monitored by guards at Dilley at all times.

8.      After 8:00 PM, families are frequently subjected to 15-minute invasive bed checks, where employees of CoreCivic, the private prison company contracted by ICE to operate STFRC, shine a flashlight in the room and check to confirm that each resident is accounted for.

9.      Doors throughout the facility are equipped with scanning keycard locks and are locked and unlocked by CoreCivic and ICE personnel. Guards monitor all areas of the facility and permit detained families to access only certain areas of the facility at certain times. Residents are not allowed free movement throughout the facility or outside at various times, including after 8 PM, and during all eating periods.

10. The declaration of Melissa Harper also states that family detention facilities are "non-secure" and "[have] doors that do not lock for purposes of egress," and that "[i]f a resident wishes to leave, employees are instructed to allow them to do so." Again, this is not consistent with my observations and the experiences of families detained at Dilley, and gives an incomplete picture of the restrictions on exit.

11. Clients who have attempted to leave through the wrong exit in the visitation trailer, heading in the direction of the security building, have been immediately intercepted, yelled at, and stopped by staff. I have personally observed this on many occasions.

12. Families who have asked what would happen if they left the facility grounds have been told that they will be followed and face federal charges for escape from the facility. Accordingly, even if a parent felt bold enough to just walk out of the facility, and guards and employees did not directly impede their path, this parent would likely be immediately arrested after leaving the facility and charged with misconduct. Thus, parents do not feel free to leave and return to the facility at will, and indeed, are not permitted to do so.

13. ICE's Family Residential Center standards indicate that access to each part of the facility will be controlled by metal keys or electronic key pads. No resident is permitted to have access to any keys at any time. (See ICE/DRO Residential Standards, "Key and Lock Control.") The Family Residential Standards instruct facilities to develop contingency plans in the event of an "escape," which include "immediately notify[ing] local, State, and Federal law enforcement agencies of the escape" and "deploy[ing] staff to primary, secondary, and directional escape posts." These "escape posts" are to be equipped with, "at minimum," "(a) Flashlight, (b) Restraints (handcuffs and/or flex-cuffs), (c) Packet containing post location, map(s), fact sheet highlighting arrest authority, search procedures, apprehension techniques, etc., (d) radio; (e) Binoculars (if applicable)." (See ICE/DRO Residential Standards,

"Emergency Plans.") The Family Residential Standards thus clearly indicate that families are not free to move inside the facility and are not free to leave the facility without permission.

14.     Based on these observations, there is no reason why individuals with criminal records or alleged gang connections could not be held at Dilley, which is functionally a secure facility. Individuals in medical isolation or who are still undergoing initial processing are already housed apart from the general population.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States and Texas, based on my personal knowledge.  Executed in Pearsall, TX, on September 18, 2019

*/s/ Shaylyn Fluharty*
SHAYLYN FLUHARTY

# EXHIBIT D

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

      *Petitioners-Plaintiffs*,

    v.

U.S. Immigration and Customs Enforcement
("ICE"), et al.,

      *Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF DORA SCHRIRO**

CLASS ACTION

1.      I previously submitted a declaration in this case, Dkt. 439-1 at 161.  My credentials and background are set out in that declaration, as well as my C.V., a true and correct copy of which was submitted at ECF Dkt. 466 at 58-62.

2.      I have reviewed the Declaration of Mellissa Harper, ECF 464-5, stating that ICE Family Residential Facilities "promote a unique, non-secure, open-movement environment which permits parents and children to live in a dorm-like setting with access to education, recreational opportunities, and health care on-site."  Harper Decl. ¶ 4.

3.      These conditions of confinement are not unique to family detention facilities, but apply more generally to lower custody adult ICE detention and adult correctional facilities as well. Lower custody adult immigration detainees and pretrial and sentenced inmates are also assigned to dormitories and can move about their housing units and onto the recreation yard during lock-out hours and do so without harm to others.

4.      Family Residential Centers are as secure facilities as lower-custody adult ICE detention and criminal correctional facilities. Further, ICE Family Residential Standards' seven components – Safety, Security, Order, Care, Activities, Justice, and Administration and Management – are the same as those for its adult detention facilities. All ICE immigration detention facilities including family residential centers must maintain a secure perimeter, account for the individuals in ICE custody by means of counts and roving patrols, conduct searches, illuminate the grounds and facility throughout the night, regulate visitation, use physical control and restraints when necessary, enforce facility rules and regulations when detainees including children 12 years of age and older  warrant such an intervention, identify and prohibit both nuisance and dangerous contraband, and secure all cash, checks and other means of tender as well as personal items of value throughout any detainee's time in detention.

5.      In short, these facilities are secure, there is considerable supervision, and a family cannot simply walk out of one of them.

6.      The Harper declaration also states that the facilities will house only "non-violent misdemeanor convictions" (Dilley) or "non-violent minor offenses" (Berks). Based on my familiarity with the immigration detained population, both Family Residential Facilities—the South Texas Family Residential Center ("Dilley") and the Berks County Residential Center—can, in my view, safely and securely house families with various criminal histories and gang affiliation, as do its adult detention facilities, based on an individualized assessment, and need not be limited to only non-violent misdemeanors or minor offenses.

7.      ICE has a Custody Classification System standard, PBNDS 2.2., which includes a risk assessment, that is used to ascertain the custody classification level for each newly admitted adult detainee as well as to determine their suitability for release to community supervision. The risk assessment produces two scores, risk to public safety, the individual's propensity for violence, and flight risk, the individual's likelihood of escape or absconding. ICE also uses the risk assessment to reassess detainees periodically throughout their time in detention. It is unclear whether ICE uses its risk assessment instrument to ascertain a parent's suitability for assignment to a family residential facility with his or her children. There is no reason that ICE could not use a modified form of this tool to objectively inform its decision-making about families.

8.      An objective assessment of risk by ICE in combination with the initial observation of families by CBP while in its custody, is comparable to the custody classification process of newly admitted inmates employed by jail and prison systems.

9.      I have also reviewed the June 26 Interim Guidance, and the Easterling Declaration both of which summarize CBP's process for determining familial relationships and the parents' present suitability to care for their children.  Neither of

these provides a comprehensive and objective evaluation of relevant information that is a necessary part of the risk evaluation that is used in correctional settings, and that can be used to provide an individualized assessment of whether it is necessary to remove a parent from their child because they cannot be securely housed in a family detention center.  As set out in my prior declaration, such a risk assessment will turn on the recency, frequency, and seriousness of criminal activity, as well as the recency and rationale of any gang affiliation.

10.     Finally, neither the Harper and Easterling declarations nor the Interim Guidance acknowledges families' motivation to comply with the conditions of detention so as to remain intact and to secure the relief they seek. The incentives to cooperate are significant, and the cost of failure is catastrophic.

I declare under penalty of perjury, under the laws of the United States and New York, that to the best of my knowledge the above facts are true and correct. Executed this September 17, 2019, in Bronx, New York.


*/s/ Dora B. Schriro*
DR. DORA B. SCHRIRO

# EXHIBIT E

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioners-Plaintiffs*, | |
| v. | **CORRECTED DECLARATION OF ANTHONY ENRIQUEZ, ESQ., DIRECTOR OF THE UNACCOMPANIED MINORS PROGRAM OF CATHOLIC CHARITIES COMMUNITY SERVICES OF THE ARCHDIOCESE OF NEW YORK** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
| *Respondents-Defendants.* | |
| | CLASS ACTION |

I, Anthony Enriquez, Esq., pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

### Background

1.     I am an attorney in good standing with the New York state bar, admitted in 2014.  From 2015 to 2016, I was a judicial law clerk for a federal district court judge in the Southern District of New York.  I have previously worked as an attorney for unaccompanied immigrant children and for other detained immigrants at multiple nonprofit organizations in New York City.  Over the course of my career, I have represented hundreds of immigrant clients and dozens of immigrant advocacy organizations before state and federal courts, including the federal Courts of Appeals and the Supreme Court.

2.     I am currently the Director of the Unaccompanied Minors Program of Catholic Charities Community Services of the Archdiocese of New York (CCCS). I have served as Director since January 2018.  The Unaccompanied Minors Program employs more than forty individuals, including attorneys, paralegals, social workers, and administrative staff.  Our mission is to protect the rights of young immigrants to make informed decisions about their lives.  Our mandate is to represent the expressed wishes of our clients before administrative bodies, courts, and other tribunals charged with making decisions regarding our clients' lives.

3.     CCCS is a federally subcontracted legal service provider for unaccompanied minors in the custody of the Office of Refugee Resettlement (ORR) in the New York City area.  On an annual basis, CCCS provides Know Your Rights presentations, legal screenings, legal referrals, and direct representation in removal proceedings to thousands of unaccompanied minors detained by ORR in New York State.

## Post-Injunction Family Separations

4. Since the winter of 2017, CCCS staff have observed a sharp increase in the number of unaccompanied minors in ORR custody in New York who report having been separated from a parent at the southern border.  Likewise, we have increasingly received reports from child welfare staff at shelters under contract with ORR that children too young to talk had been separated from a parent.

5. These separations have continued, even after this Court preliminarily enjoined Defendants, by order of June 26, 2018, "from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child . . . ."  *Ms. L v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018).  From entry of the preliminary injunction to the date of this declaration, CCCS has seen approximately 308 children separated from their parents and placed in New York shelters or foster homes.  This amounts to more than a third of the total number of separated children—911—identified by the government during this period.  Of these 308 children, 65 (21%) were five years old or younger.

6. This affidavit addresses some of the cases we have seen where the reported grounds for separation do not show that the parent is unfit or a danger.  It also addresses difficulties that continue to prevent the reunification of children who were separated from their parents after the entry of this Court's preliminary injunction.  It describes how Defendants still do not share information regarding separated families in a timely and effective manner—both within their own agencies and with attorneys for separated children.  It focuses on difficulties in communication with several different entities: the Department of Homeland Security (DHS), the Department of Justice (DOJ), ORR, and the private shelters and foster agencies contracted by ORR to provide temporary care for separated children.

7.     We typically meet all separated and unaccompanied children within seven to ten days of their placement by ORR with a private shelter or foster agency in New York City.  Generally, we rely on firsthand reports from the children themselves about whether immigration officials separated them from a parent after the family crossed the border.  Often, however, the children are too traumatized and fearful to speak to us about family separation at our first meeting.  In some cases it takes several meetings before a child reveals to us that he or she has been separated from a parent.

8.     In addition, many children placed in New York are too young to explain their circumstances.  Because New York City has a large number of Spanish-speaking foster homes, New York has received dozens of preverbal children separated since the PI was issued.  We have seen 65 children under six in this cohort in New York City.  When a child is preverbal or otherwise non-communicative, we ask staff at the shelter if the child has been separated from a parent at the border.  Some of the case workers at the shelters affirmatively inform us whenever they know that a child was separated from a parent, but other case workers provide no information until we ask.  Staff at the private shelters tell me that the shelter staff themselves are not always provided information from ORR regarding separated children, including even the fact of the separation itself, much less other important details, such as the location of a parent and reasons for separation.

9.     In these ongoing separations, even when shelter staff share information with us, they rarely have any information beyond the fact that the child was separated.  For example, shelter staff respond to our inquiries by saying they do not know either the location of the child's parent or the reason for the separation.  These two pieces of information are critical to enable us to do our job in advising and representing these children.

10.   We need to know the location of the parent for a few key reasons.

- First, the child is nearly always desperate to know.  Before separated children can discuss the decisions they face, they need to learn where their parent is and whether the parent is safe.  We frequently meet with children who have not spoken to their parents since the separation, even when the separation occurred weeks earlier, and we frequently meet with children who have not spoken to their parents in many weeks, even if they have been in touch since the separation.

- Second, most children tell us not to take any action in their removal proceedings (and nearly all of them are in removal proceedings) until we find out what their parent is doing.  If mom or dad is headed back to the family's home country, the child usually (though not always) wants to go with him or her.  If the parent is pursuing a defense to removal, the child usually wishes to stay and be reunited with the parent here in the United States.  Thus, we cannot effectively assist our clients in making decisions about their own immigration cases, or about whether to pursue or accept placement with family-member sponsors who may step forward to assume physical custody of them, until we have information about the separated parent's immigration case.

- Third, with preverbal or non-communicative children who lack the capacity to direct their own representation, it is our ethical obligation to try to reach their parents or primary caregivers and seek direction from them.  *See* N.Y. Rules of Professional Conduct 1.14(b); *see also* ABA Comm'n on Immigration, *Standards for the Custody, Placement and Care; Legal Representation; and Adjudication of Unaccompanied Alien Children in the United States*, Part V.A.1.f. (August 2018) ("If

the Child does not express the objectives of representation," it may be appropriate "to consider the opinions of a Child's Adult Family Member."). We work hard with young children to understand their wishes, but some are just too young to offer any real guidance, and in that case, we have an urgent need to speak to their parent. Because the government does not routinely provide us information about the location of the parent, we are left to try to search for this information ourselves so as to properly advise and assist our young clients.

11. When we learn that a child is separated, we inquire with several sources about the basis for separation, the location of the parent, and the status of the parent's immigration case (for example, whether the parent has already been deported without his or her child). Such sources include the online ICE detainee locator; case workers at the private shelters that contract with ORR to accept immigrant children; ORR staff who oversee these shelters; the DHS trial attorney prosecuting the child's removal proceedings in immigration court; ICE agent Jessica Jones, who has been specially designated as a liaison for family separation cases; and Defendants, through class counsel at the ACLU. Responses from each of these sources vary from outright silence to information that is so general that it is insufficient to enable us adequately to defend the children's right to be with their parents.

12. The ICE detainee locator is an online database for locating an individual in ICE custody through searches based on the individual's A number or name and nationality. Because we do not receive any information from the government regarding the separated parent's immigration case, we typically guess what the parent's A# is by varying one digit above or below the A# of the child. Sometimes, this method returns no result and we are left unsure as to whether we used the incorrect number or the parent has already been deported or otherwise

released from DHS custody.  As an alternative, the locator requires exact matches for the parent's first and last name.  Very young children often cannot supply this information.  We can extrapolate from the child's name, based on Spanish language naming conventions, but this is far from foolproof, and the correct and properly spelled first name is also necessary.  Because of these difficulties, we cannot always find parents through the locator.

13.    Some of the shelter case workers we interact have told us that they are not regularly informed by DHS or ORR of a parent's location, projected date of transfer to immigration custody from criminal custody, eligibility for placement in DHS family detention, or release from immigration detention.  Regarding reasons for the separation, sometimes the shelter case worker is informed of a general justification, such as "criminal history," without further specification.  Just as often, the case worker has no information on the basis for the separation.

14.    Most of our communication with ORR regarding separated children is mediated through case workers at the shelters.  But on a few occasions, where we have learned that a separated parent is immediately available to take custody of his or her separated child, we have inquired directly with ORR for information on the continued basis for separation.  In these cases, we have sent an email directly to the federal field specialist, the ORR official charged with oversight and approval of release decisions concerning unaccompanied and separated children.  Our inquiries have never been answered directly by ORR.

15.    DHS trial attorneys in immigration court never share any information regarding separation.  They refuse to share information on parents with the children or the children's attorneys. In some instances they have stated that they cannot provide the information due to privacy concerns for the parent.  In other instances they have said that they do not have any information regarding the parents.

16.     ICE agent Jessica Jones sometimes shares information regarding a parent's location, if the parent is in criminal or immigration custody or has been deported, but not if the parent has been released on parole or bond within the United States.  To my knowledge, she typically shares this information with shelter case workers, only upon request and on a case-by-case basis.  The shelter case workers then share it with us, in response to our request.  We have also contacted her directly for information regarding parents.  The information we have received in return is of the same general type shared with shelter case workers.

17.     We have also received information about separated parents through *Ms. L* class counsel.  For example, on May 20, we provided the ACLU a list of 92 separated children in federal custody in New York City, 27 of whom were five years old or younger.  *Ms. L* counsel had information about the reasons for separation for 56 of the 92 children.  On June 20, 2019, we sent the ACLU a list of 68 separated children in federal custody in New York about whom we still lacked any information on the basis for the separations.  Nineteen of these children were five years old or younger (the youngest was thirteen months old).  The ACLU had separation information about only 23 of these 68 children.  On July 29, we asked about 80 children for whom we still lacked information on the basis for the separation (15 were five years old or younger; the youngest was ten months old), and we received information about 45 of these children.  Thus, in total, we received information about only 124 of the 214 children about whom we made specific inquiries.[1]  The information transmitted through this process was often the first that we or our child clients received about the basis for the separation.

---

[1] Twenty-six children appeared on more than one list because the ACLU did not have the information from the government the first time around; that is why the total number of unique children is 214 rather than 240, which is the sum of all the names on the three lists.

18.     In some cases, even the information the ACLU had from the government was at so high a level of generality as to offer little guidance about whether or how to pursue reunification for our clients.  For example, the government reported that the parent had "criminal history in home country" or "criminal charges (warrant) in Guatemala" or "gang affiliation" or "Arrest Date: 05/11/08."  None of the allegations was accompanied by further explanation or description of any evidence in support of the allegations.  Nor have we ever been given any number to call or address to email to raise questions or provide contrary information about the government's stated basis for a separation, in those cases where we learn of such a basis.

19.     In some cases, we have received information about separated parents through sheer luck.  For example, last fall, a reporter contacted our office because she had been following the story of a separated father in immigration court.  We learned from her that one of our clients was that father's son.  At four years old, he was too young to tell us that he'd been separated from his father, and the government had not informed us either.  It turned out that the separation, effectuated in September 2018, was based on his father's alleged gang affiliation, but the immigration court ordered the father released on bond because the government did not produce proof of this allegation.  Despite our direct request, ORR refused to release the child to his father.  According to the case worker at the shelter where the child was held, ORR cited CBP's allegations in refusing to clear the child for release to his father.  ORR agreed to release him after the ACLU informed Defendants' counsel, on our behalf, that we intended to file a motion in court the following day.  The boy was sent back to his father two weeks after his father was released on bond and eleven weeks after they were separated.

20.     In another case, an attorney on our staff was contacted by a personal friend who worked in a law office in another city that had contact with a separated

parent.  The mother had been hospitalized in California after injuring her leg at the border.  While she was in emergency surgery, in September 2018, the government flew her almost-six-year-old daughter across the country to a shelter in New York.  The mother was swiftly released from the hospital into the community.  We sent ORR a letter requesting immediate release.  The case worker responded that ORR believed that the parent was not a *Ms. L* class member because she had been separated on the basis of illness and therefore ORR would not release the daughter until the mother had gone through the standard sponsorship process.  Again, we prepared to go to court for the child, and again, ORR released her to her mother after we had notified Defendants, through the ACLU, of our intention to file the next day.  She had been separated from her mother for 79 days.

21.    In a third case, CBP separated a father from his ten-year-old son on the basis of the father's alleged criminal history in his country of origin.  The child was an indigenous-language speaker, and he was separated from his father for more than six months, beginning in November 2018.  During this separation, the boy began to forget his family's native language, and he suffered extreme isolation because of his inability to speak Spanish, English, or any language common in the shelter.  His father was detained by ICE.  The father's counsel requested a bond hearing in immigration court, where the lawyer provided evidence that the father had no knowledge of or involvement in the incidents alleged in a mass arrest order aimed at 52 members of the small indigenous community from which the family had fled.  While DHS apparently believed that this mass order accused the father of sexual abuse of a minor, this was incorrect.  The mass arrest order made no such allegation against the father.  The order listed a charge of "sexual assault" without specifying any particular alleged perpetrators.  Later proceedings in the home country revealed that the charge was made by an adult woman against three unrelated men, not the father in question.  The mass order also included an

accusation of "mistreatment of underage persons," apparently based on the presence of children in the location where the events allegedly took place. There was no allegation that children were touched, let alone sexually abused. Moreover, the evidence at the bond hearing showed that the mass arrest order was issued as part of a long-term effort by local officials to harass the indigenous community and deprive them of their hereditary rights to land ownership. There was never a shred of evidence that the father presented a danger to his son, and the child's appointed advocate unequivocally recommended immediate reunification. The immigration court ordered the father to be released on bond. Once again, however, despite our direct request, ORR refused to release the child to his father, citing CBP's allegations. Only after we prepared to go to court, and notified Defendants through the ACLU, did ORR agree to release the boy to his father.

22.    Based on the information the government provided us through the ACLU, in many cases the children we represent appear to have been separated because of the parents' minor or unsubstantiated criminal histories. For example, during the winter, a girl who had just turned 17 entered a NY shelter after being separated from her father. The government described his crime as "malicious destruction of property value $5." The child was reunified with her mother through the sponsorship process after nearly four months in custody. There are currently four children in NY shelters—an eleven-year-old who has been in custody more than four months, an eight-year-old who has been in custody nearly three months, a five-year-old who has been in custody nearly four months, and a three-year-old who has been in custody since mid-June—whose fathers' only criminal history, as reported by the government, is illegal entry or reentry. If any of these fathers has been released from criminal to immigration custody, the government has neither informed us nor initiated any attempt at reunification. A seven-year-old girl who has been in shelter since early June was separated from her

father, again per the government's information, because he has a forgery

conviction, had fled at some point to avoid prosecution, and had entered the United

States before.  And an eleven-year-old girl was separated from her father because

of an illegal reentry charge and a conviction for disorderly conduct.  She spent two

months in the shelter before agreeing to move in with an uncle as her sponsor.

23.     Sometimes, we see children who have been separated from their

biological parents because CBP failed to identify the parent as such.  For example,

we had a nine-year-old client in one of the New York shelters until July 8, 2019,

who appears to have been separated from her father because of a clerical error.

According to the child advocate appointed to protect the child's best interest, CBP

wrote the name of a different immigrant on the father's intake form (while using

the father's actual A#), and then separated the family on the ground that the father

was not related to the child.  That father remains in detention in an adult facility in

Texas, and ORR released the child to her aunt in New York.  Similarly, we have a

four-year-old boy in shelter in New York at this time because his father, who

crossed the border with him, has a speech impediment and could not intelligibly

answer the questions posed by CBP.  Again, according to the appointed child

advocate, the father presented the child's birth certificate, which includes the

father's name, but the family was separated anyway.  The father is detained at the

Florence SPC Detention Center in Phoenix, and the child remains in New York,

although the father's sister is in Florida and prepared to take them both in.

24.     Among the 308 children CCCS has represented who were separated

after this court issued a preliminary injunction, the only ones reunified with parents

in the United States (other than through the sponsorship process) are the three

described above, each of whom had to threaten litigation to secure his or her

release to a parent in the community.  None has been reunified with parents in

family detention centers.  185 have been released through the sponsorship process,

1   and some proportion of these sponsors were parents, although not the parent from
2   whom the child was separated.  Another 33 children either accepted voluntary
3   departure or had their Notices to Appear (the charging document to initiate
4   removal proceedings) withdrawn so that they could reunify with a parent for the
5   purpose of repatriation.  Some of these children remain in New York today
6   because even after a child accepts repatriation, the process of reunification for this
7   purpose generally takes weeks.  Thus, the government appears to be willing to
8   reunify these parents and children for the purpose of sending them home (despite
9   the government's allegations that the parent presented a danger to the child) but not
10  for the purpose of enabling the family to pursue immigration relief in the United
11  States together.

12      25.   The continuing failure of the government to adopt a standard for
13  separation that comports with due process and to provide clear and complete
14  information to us, as counsel to the children, continues to harm our clients and
15  impair our ability to represent them at a time when they are already profoundly
16  traumatized by their separation from the adults who are closest to them.

17
18      I declare, under penalty of perjury, that the foregoing is true and correct.

19
20  September 4, 2019
21                        Anthony Enriquez, Esq.
22                        Director of the Unaccompanied Minors Program
                          Catholic Charities Community Services
23                            of the Archdiocese of New York

24
25
26
27
28

# EXHIBIT F

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

     *Petitioners-Plaintiffs*,

    v.

U.S. Immigration and Customs Enforcement ("ICE"), et al.,

    *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

**CORRECTED DECLARATION OF DEREK LOH**

CLASS ACTION

I, Derek Loh, hereby declare as follows, and pursuant to 28 U.S.C. 1746, would competently testify to these matters if called to do so:

1. I am an attorney licensed to practice law in the States of New York and California. I am a Managing Attorney at Immigrant Defenders Law Center ("ImmDef"). ImmDef provides *pro bono* removal defense to respondents at the immigration courts in Los Angeles, Adelanto, and San Diego, California. In response to the Trump Administration's family separations, ImmDef expanded its services and began advocating for the reunification of separated, asylum-seeking families.

2. ImmDef was retained to represent Mr. B in July of 2018 while he was detained at the Adelanto ICE Processing Center. While ImmDef no longer represents Mr. B, I was the primary attorney assigned to his case and worked directly with Mr. B.

3. Mr. B, a non-citizen of the United States, presented himself at the Calexico Point of Entry on March 30, 2018 with his then 2-year-old daughter, M. They sought asylum and were detained by CBP.

4. Shortly thereafter, CBP agents separated Mr. B and M because they claimed they could not immediately confirm that he is her biological father. M was transferred to an Office of Refugee Resettlement facility in the Midwest. Mr. B was eventually transferred to Adelanto. The government then administered DNA tests that confirmed with 99.99 percent certainty that Mr. B is M's biological father.

5. Despite confirming their biological relationship, the government refused to reunify Mr. B and M, either outside of detention or within a family detention facility, due to Mr. B's criminal history.

6. At some point during their separation, Mr. B passed a reasonable fear interview and was placed in removal proceedings.

7. During a client meeting with Mr. B in August of 2018, he provided me with a copy of his FBI rap sheet. Mr. B told me that the rap sheet was given to him by the Immigration Judge during what I assume was a master calendar hearing.

8. Based on the FBI rap sheet that I reviewed, I determined that Mr. B's criminal history consisted of the following incidents:
   a. Two California charges from 2002 for assault and disorderly conduct; Mr. B was acquitted of both charges.
   b. A 2005 conviction in Arizona for an open container of alcohol violation.
   c. Two 2006 convictions in Arizona 2006 for a DUI and driving without a license.

9. Mr. B also had immigration violations: two from 2007, one from 2017, and one from 2018.

10. On August 10, 2018, I submitted an application for parole to ICE. Our submission included a written recommendation from M's official child advocate, who was appointed by EOIR. The child advocate determined that it was in M's best interest to be reunified with her father. Concerned with the continued separation of Mr. B and

his daughter, Senator Kamala Harris wrote a letter in support of their reunification, and this letter was submitted to ICE with our parole letter. On August 21, 2018, ICE informed me that the request for parole was denied.

11. On September 10, 2018, the ACLU informed me that Mr. B's name appeared on a list of parents who were denied reunification because of criminal history. My understanding is that government counsel in *Ms. L* provided no detailed information about the criminal history or underlying evidence to any parties about Mr. B's criminal history.  Our understanding of Mr. B's criminal history, therefore, was only a consequence of the documents that were eventually filed during his removal proceedings.

12. Due to his limited criminal record and its remoteness in time, Mr. B was sad, frustrated, and angry that the government refused to reunite him with M and instead intended to permanently separate him from his child.

13. On September 25, 2018, Mr. B was granted bond by an Immigration Judge who examined his criminal history and concluded that he was not a danger to the community. The Immigration Judge concluded that he was not a danger because his crimes were nonviolent and his alcohol violations were remote in time. After paying bond, Mr. B and his daughter were reunited outside of detention about two weeks later.

I declare under the penalty of perjury under the laws of the United States and California that the foregoing is true and correct. Executed this 16th day of September, 2019 in Los Angeles, California.


    /s/ Derek Loh
    Derek Loh

Exhibit F, Page 58