UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____ )
MS. L., ET AL.,                   )
                                  )   CASE NO. 18CV0428-DMS
           PETITIONERS-PLAINTIFFS,)
                                  )
VS.                               )
                                  )
                                  )
                                  )
                                  )
U.S. IMMIGRATION AND CUSTOMS      )   SAN DIEGO, CALIFORNIA
ENFORCEMENT ("ICE"), ET AL.,      )  FRIDAY SEPTEMBER 20, 2019
           RESPONDENTS-DEFENDANTS.)     1:00 P.M. CALENDAR
----------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING


REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY, ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           STEPHEN KANG, ESQ.
                           DANIEL GALINDO, ESQ.
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004


FOR DEFENDANT:             SCOTT STEWART, ESQ.
                           SARAH B. FABIAN, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044



 ALSO APPEARING:           COMMANDER JONATHAN WHITE
(TELEPHONICALLY)           VICTOR SUH,ESQ.
                           ZACHARY BEST, ESQ.
                           SIRINE SHEBAYA, ESQ.
                           STEVEN HERZOG,ESQ.
                           CATHERINE WEISS, ESQ.
                           LINDA DAKIN-GRIMM,ESQ.
```

1   <u>**SAN DIEGO, CALIFORNIA — FRIDAY, SEPTEMBER 20, 2019 — 1:05 P.M.**</u>

2                              *   *   *

3           **THE CLERK:**  NO. 20 ON CALENDAR, CASE NO. 18CV0428,

4   MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

5   MOTION HEARING AND STATUS CONFERENCE.

6           **THE COURT:**  GOOD AFTERNOON.

7           I HAVE PRESENT TODAY —— AND FOR THE BENEFIT OF

8   COUNSEL ONLINE —— I HAVE PRESENT IN PERSON MR. LEE GELERNT,

9   MR. STEPHEN KANG, AND MR. DANIEL GALINDO.  AND FOR THE

10  GOVERNMENT, MS. SARAH FABIAN, MR. SCOTT STEWART.

11          GOOD AFTERNOON.  NICE TO SEE COUNSEL AGAIN IN

12  PERSON.

13          AND FOR THE COUNSEL ON THE TELEPHONE I HAVE, IN THE

14  DORA CASE, SIRINE SHEBAYA.  MMM, ZACHARY BEST.  COMMANDER

15  WHITE IS WITH US.  STEVEN HERZOG FOR THE STEERING COMMITTEE.

16          I BELIEVE I ALSO HAVE VICTOR SUH FOR HHS, AND LINDA

17  DAKIN, AS WELL AS CATHERINE WEISS.

18          HAVE I MISSED ANYONE?

19          HEARING NO FURTHER COMMENT, THOSE WILL BE THE

20  APPEARANCES FOR TODAY'S HEARING.

21          PERHAPS WE CAN START WITH THE JOINT STATUS REPORT

22  AND RUN THROUGH THAT WHILE WE HAVE THE BENEFIT OF COMMANDER

23  WHITE.

24          THE INITIAL CLASS, THE REUNIFICATION APPEARS TO BE

25  IN ORDER.  I DON'T HAVE ANY QUESTIONS OR COMMENTS ON THE


                          SEPTEMBER 20, 2019

1   INITIAL CLASS.

2          DO WE NEED ANY DISCUSSION ON THAT?

3          **MR. GELERNT:**  NOT FROM PLAINTIFFS, YOUR HONOR.

4          **THE COURT:**  OKAY.

5          ON THE EXPANDED CLASS, LET'S MOVE TO THAT BEFORE WE

6   GET TO THE MMM DISCUSSION.

7          AND ALSO, PRIOR TO THAT, THE GOVERNMENT HAS LISTED

8   ON PAGE 8 THE NUMBER OF ABSCONDERS, 173.  DO WE KNOW WHAT

9   PERCENTAGE THAT IS OR OUT OF HOW MANY INDIVIDUALS THAT

10  INVOLVES?

11         **MS. FABIAN:**  I APOLOGIZE, YOUR HONOR.  YOU ASKED

12  THAT PREVIOUSLY AND I HAD SAID I WOULD FIND OUT, AND I FORGOT

13  TO DO THAT.  BUT I WILL DO THAT BEFORE THE NEXT STATUS

14  CONFERENCE, OR PUT A NOTE IN OUR NEXT JSR.

15         **THE COURT:**  ALL RIGHT.  THANK YOU.

16         LET'S GO TO THE EXPANDED CLASS.

17         HERE, COMMANDER WHITE, I THINK IT HAS BEEN HELPFUL

18  WHEN YOU SIMPLY GIVE US THE OVERVIEW.  CAN YOU BRING US UP TO

19  DATE?

20         **COMMANDER WHITE:**  OF COURSE, YOUR HONOR.  JONATHAN

21  WHITE.  I AM GLAD TO HELP.

22         AS EVERYONE IS WELL AWARE, THE PROCESS FOR THE

23  GOVERNMENT HAS BEEN A MULTI-STEP INTERAGENCY PROCESS THAT

24  RESULTS, AT THE END OF THAT INTERAGENCY PROCESS, IN A DATA SET

25  SENT ON A ROLLING BASIS TO THE PLAINTIFFS' COUNSEL.


                    SEPTEMBER 20, 2019

```
 1              WE AT HHS COMPLETED IN JULY ALL OF THE HHS LEVEL
 2   REVIEW OF EVERY CHILD WHO WAS REFERRED AND DISCHARGED DURING
 3   THE TIMEFRAME THAT WE ARE DISCUSSING, WHICH, AS A REMINDER,
 4   WAS JUST UNDER 33,000 CHILDREN.
 5              FOR EVERY CHILD WHERE THERE WAS ANY PRELIMINARY
 6   INDICATION OF SEPARATION, ERRING ALWAYS ON THE SIDE OF
 7   INCLUSIVENESS, WE TRANSMITTED THOSE TO CBP FOR THE NEXT STEP
 8   IN THE PROCESS.  THEY THEN CONDUCTED THEIR OWN MANUAL REVIEW.
 9   AND WHEN THEY ARE COMPLETED THEY TRANSMIT THAT TO ICE, WHO
10   HAVE A MANUAL REVIEW OF THEIR OWN TO DO.
11              IT THEN COMES BACK TO HHS, AGAIN DATA SET, FOR US TO
12   THEN FORWARD THOSE CHILDREN, PASS THROUGH THAT DATA LIST THEN
13   TO PROVIDE ADDITIONAL INFORMATION ON THE SPONSORS AND ANY
14   CONTACT INFORMATION THAT WE MIGHT HAVE ON PARENTS.
15              THAT THEN GOES INTO AN INTERAGENCY CLEARANCE
16   PROCESS, AND THEN IS TRANSMITTED BY MS. FABIAN, DEPARTMENT OF
17   JUSTICE, ON TO THE PLAINTIFFS' COUNSEL.
18              IN DOING OUR HHS REVIEW WE PRODUCED 11 DISTINCT DATA
19   SETS.  THIS WAS -- THIS WAS FIRST ASSESSED WHERE WE HAD
20   PRELIMINARY INDICATION OF SEPARATION, BUT THEN A LATER GROUP
21   OF DATA SETS THAT RESULTED FROM MY DECISION TO HAVE DE NOVO
22   REVIEW OF EVERY CASE THAT HAD COME BACK NEGATIVE THE FIRST
23   TIME BY A DIFFERENT REVIEWER, JUST TO ENSURE THAT WE HAD
24   COMPLETELY CAPTURED THE SET OF THOSE WHO HAD ANY PRELIMINARY
25   INDICATION OF SEPARATION.


                      SEPTEMBER 20, 2019
```

```
1              OF THOSE 11 SETS, I WOULD LIKE TO SUMMARIZE WHERE
2   EACH OF THEM IS.  THIS WILL BE, I THINK, THE BEST WAY TO GET A
3   SENSE OF WHERE WE ARE IN THE PROCESS.
4              OF THOSE 11 DATA SETS -- WHICH I SHOULD SAY ARE NOT
5   ALL EQUAL IN SIZE.  THE SMALLEST, WHEN IT WAS PRODUCED BY HHS,
6   HAD 15 CHILDREN ON IT.  THE LARGEST OF THEM HAD JUST SHY OF
7   1,000 CHILDREN ON IT, 997 CHILDREN.  THAT IS AT THE POINT OF
8   HHS PRELIMINARY INDICATION OF SEPARATION.
9              OF THOSE 11 LISTS, AS OF THIS MORNING, I UNDERSTAND,
10  SEVEN HAVE GONE ALL THE WAY THROUGH THE INTERAGENCY PROCESS
11  AND THE RESULTING DATA SETS OF POSSIBLE CHILDREN OF POTENTIAL
12  CLASS MEMBERS AND SEPARATED CHILDREN COVERED BY AN APPLICABLE
13  EXCLUSION UNDER YOUR ORDERS, YOUR HONOR, THOSE SEVEN LISTS
14  HAVE BEEN SHARED WITH THE ACLU.
15             THAT LEAVES FOUR.  LET ME SUMMARIZE WHAT EACH OF
16  THOSE FOUR IS.
17             TWO OF THE FOUR ARE IN THE LAST STAGE PRIOR TO GOING
18  TO THE ACLU, THE INTERAGENCY CLEARANCE STAGE.  AND I WOULD
19  ANTICIPATE, YOU KNOW, BARRING ANYTHING TRULY UNEXPECTED, THOSE
20  SHOULD BE IN THE HANDS OF THE PLAINTIFFS' COUNSEL IN THE NEXT
21  FEW DAYS.
22             ONE IS IN THE ICE -- ONE OF THE LISTS IS IN THE ICE
23  MANUAL REVIEW STAGE.  AND BASED ON MY MOST RECENT
24  COMMUNICATIONS WITH ICE, ALTHOUGH I AM NOT PRIVY TO THEIR
25  INTERNAL PROCESS, IN SPEAKING, AS I REGULARLY DO, WITH MY
```

SEPTEMBER 20, 2019

1   COUNTERPART AT ICE, I AM ADVISED THAT THEY BELIEVE THAT AT
2   MONDAY OR TUESDAY OF THIS COMING WEEK THAT IS EXPECTED TO EXIT
3   ICE AND COME TO US IN HHS FOR THE NEXT STAGE.

4   THE LAST OF THE 11 DATA SETS IS STILL IN THE CBP
5   MANUAL FILE REVIEW PROCESS, WHICH IS THE SECOND STAGE.  AND MY
6   COUNTERPART AT CBP ADVISES THAT HE BELIEVES IT WILL EXIT THAT
7   STAGE AND ENTER THE NEXT STAGE, WHICH IS THE ICE REVIEW STAGE,
8   LIKELY BY THE END OF THE COMING WEEK.

9   EACH OF THESE LISTS IS DIFFERENT, NOT ONLY BECAUSE
10  OF THE NUMBER OF CHILDREN BUT ALSO WE HAVE SEEN THAT THEY
11  REQUIRE DIFFERENT AMOUNTS OF TIME TO RUN DOWN THE DETAILS,
12  JUST BECAUSE OF THE RANGE OF COMPLEXITIES OF THOSE INDIVIDUAL
13  CHILDREN'S CASES WHO ARE ON IT.

14  NONETHELESS, BASED ON WHERE WE ARE, I REMAIN -- IT
15  REMAINS MY -- I WOULD STILL ANTICIPATE, I SHOULD SAY, THAT WE
16  WILL PROVIDE ALL 11 TO THE PLAINTIFFS PRIOR TO YOUR HONOR'S
17  DEADLINE OF THE 25TH OF OCTOBER.  IT MAY BE THAT FOR THE LAST
18  ONE OR TWO OF THESE WE NEED THAT FULL TIMEFRAME, BUT I HAVE
19  EVERY CONFIDENCE IT CAN BE DONE, AND SHOULD AND WILL BE DONE,
20  WITHIN THE TIMEFRAME BY OCTOBER 25TH.

21  THAT IS WHERE -- THAT IS WHERE THOSE LISTS ARE.

22  BECAUSE OF THE PROCESS THAT I KNOW WE USED IN HHS
23  FOR THE VERY FIRST STAGE, THAT OF THE HHS MANUAL FILE REVIEW,
24  I HAVE A VERY HIGH DEGREE OF CONFIDENCE THAT THESE 11 LISTS DO
25  CONTAIN WITHIN THEM ALL OF THE CHILDREN -- OR SUBSTANTIALLY

SEPTEMBER 20, 2019

1   ALL OF THE CHILDREN WHO MIGHT BE EITHER POSSIBLE CHILDREN OF

2   POTENTIAL CLASS MEMBERS OR SEPARATED CHILDREN COVERED BY AN

3   APPLICABLE EXCLUSION, SIMPLY BECAUSE OF THE INTENSITY OF THE

4   REVIEW THAT WE DID ON THE FRONT END AND OUR COMMITMENT OF WHEN

5   THERE WAS AMBIGUITY WE WOULD INCLUDE THEM FOR OUR PARTNERS TO

6   DRILL DOWN ON THE FACTS OF APPREHENSION.

7           SO I WOULD BE GLAD TO ANSWER ANY QUESTIONS THAT YOU

8   HAVE, YOUR HONOR, THAT ANY OF THE COUNSEL ON THE PHONE HAVE.

9   BUT THAT IS WHERE I THINK WE ARE, SIR.

10          **THE COURT:**  OF THE FOUR LISTS THAT REMAIN, TWO OF

11  THE LISTS CONTAIN CLOSE TO 1,000 FILES EACH?  IS THAT CORRECT?

12          **COMMANDER WHITE:**  YES, YOUR HONOR.

13          ONE OF THEM CONTAINS 915 AND -- WELL, I SHOULD SAY

14  AT THE HHS STAGE CONTAINS 915 CHILDREN.  AND THE OTHER, WHEN

15  IT WAS IN THE HHS STAGE, CONTAINED 990 CHILDREN.

16          AS A REMINDER, THOSE NUMBERS WILL FALL, OR HAVE

17  ALREADY FALLEN, WHILE IN THE CBP STAGE.  EVERY LIST PRODUCED

18  BY HHS HAS INCLUDED A NUMBER OF CHILDREN WHO PROVED TO BE

19  FALSE POSITIVES, WHO WERE NOT IN FACT APPREHENDED WITH AND

20  SEPARATED FROM A PARENT.

21          **THE COURT:**  YOU MENTIONED THAT TWO OF THE FOUR

22  REMAINING LISTS WILL BE PRODUCED OVER TO PLAINTIFFS AND THEIR

23  STEERING COMMITTEE IN THE NEXT FEW DAYS.  DO THOSE TWO LISTS

24  CONTAIN THESE LARGER GROUPS, 915 AND 990 RESPECTIVELY, OR ARE

25  THEY THE SMALLER LISTS?


                    SEPTEMBER 20, 2019

1      **COMMANDER WHITE:**  YOUR HONOR, THE TWO THAT ARE IN
2  THE LAST STAGE ARE BOTH VERY SMALL.  THE TWO BIGGER ONES,
3  PRECISELY BECAUSE OF THEIR SIZE, HAVE MOVED MORE SLOWLY
4  THROUGH THE INTERAGENCY PROCESS.
5      BUT I REMAIN CONFIDENT THAT WE CAN MEET YOUR
6  DEADLINE BASED ON MY CONVERSATIONS WITH MY COLLEAGUES IN THE
7  OTHER TWO AGENCIES ABOUT WHERE THEY ARE IN THOSE RESPECTIVE
8  PROCESSES.
9      **THE COURT:**  THE TWO SMALLER LISTS THAT ARE COMING
10 OVER SOON, HOW MANY ARE IN THOSE LISTS?
11     **COMMANDER WHITE:**  I DON'T HAVE IN FRONT OF ME HOW
12 MANY WERE IN -- HOW MANY WERE IN THEM BY THE TIME THEY HAD
13 GONE THROUGH CBP AND ICE.  I CAN MAKE REFERENCE TO HOW BIG
14 THEY WERE WHEN THEY EXITED HHS.
15     **THE COURT:**  YES.
16     **COMMANDER WHITE:**  ONE OF THEM HAD -- AT THE POINT
17 WHERE IT EXITED HHS HAD 98 CHILDREN ON IT, THE OTHER HAD 21
18 CHILDREN ON IT.  SO BETWEEN THEM THEY HAVE RIGHT AT 120 KIDS
19 OR CLOSE TO THAT.
20     **THE COURT:**  WHEN YOU SAY 120 OR CLOSE TO THAT
21 CHILDREN, THOSE ARE CONFIRMED SEPARATIONS?
22     **COMMANDER WHITE:**  NO, YOUR HONOR.  THAT WAS THE
23 NUMBERS AT THE POINT WHERE THEY LEFT HHS, SO SOME OF THOSE
24 WILL HAVE BEEN DETERMINED FACTUALLY NOT TO HAVE BEEN SEPARATED
25 BY CBP.


                    SEPTEMBER 20, 2019

1      **THE COURT:**  OKAY.

2      **COMMANDER WHITE:**  THEN, OF THOSE DETERMINED

3   FACTUALLY TO BE SEPARATIONS, WHAT THE PLAINTIFFS WILL RECEIVE

4   IS THEN THOSE DIVIDED FURTHER SO THAT THEY HAVE A LIST OF

5   POSSIBLE CHILDREN OF POTENTIAL CLASS MEMBERS AND A LIST OF THE

6   EXCLUSION CASES.

7      **THE COURT:**  ON THE TWO LARGER LISTS, DO YOU HAVE AN

8   ESTIMATION AS TO WHEN, PERHAPS, THE SOONEST OR THE NEXT LIST

9   WOULD ROLL OUT OF EITHER THE 915 OR 990, APPROXIMATE TIMEFRAME

10  ON THAT?

11     **COMMANDER WHITE:**  I WOULD EXPECT THAT IT WILL BE IN

12  THE -- THAT IT WILL BE IN THE MIDDLE TO SECOND HALF OF

13  OCTOBER; SO, IN OTHER WORDS, IT WILL BE PRIOR TO YOUR

14  DEADLINE, BUT I THINK BOTH OF THOSE WILL BE CLOSE TO YOUR

15  DEADLINE, SIMPLY BASED ON THE LIKELY -- ON THE LIKELY

16  PROCESSING TIME FOR THE -- FOR EACH OF THEM FOR THE REMAINING

17  PIECES.  AND BASED ON THE ESTIMATES PROVIDED TO ME BY MY ICE

18  AND CBP COLLEAGUES ABOUT THE DATES THAT THEY BELIEVE FOR EACH

19  OF THEM THEY WILL ENTER THE NEXT STAGE OF THE PROCESS.

20     I DO TRACK EACH LIST THROUGH EVERY STEP IN THE

21  PROCESS BY DATE, AND IT HELPS ME FORECAST WHEN I THINK THEY

22  WILL BE DONE.

23     **THE COURT:**  ARE YOU ABLE TO ROLL OUT SOME OF THE

24  NAMES AND TELEPHONE NUMBERS FOR SPONSORS OR PARENTS, OR IS THE

25  SYSTEM SUCH THAT YOU REVEAL TO THE PLAINTIFFS THE ENTIRE LIST

SEPTEMBER 20, 2019

11

1  AT ONE TIME?  SO SAY THE -- TAKE THE 915 LIST, IF THERE ARE IN

2  FACT 915 CONFIRMED SEPARATIONS DO YOU JUST PROVIDE ALL OF THAT

3  INFORMATION AT THE SAME TIME?

4          **COMMANDER WHITE:**  YOUR HONOR, OUR PROCESS -- ONE OF

5  THE CONSTRAINTS OF THE PROCESS THAT WE HAVE IS WE PRETTY MUCH

6  ONLY PROVIDE ALL OF IT AT ONCE.  BECAUSE UNTIL THE COMPLETION

7  OF THE PROCESS WE DON'T DEFINITIVELY KNOW, FOR EXAMPLE, WHICH

8  CHILDREN ARE IN WHICH OF THE POTENTIAL BUCKETS.  BUT ALSO

9  BECAUSE ONE OF THE LAST STEPS IN THE PROCESS IS FOR IT, WHEN

10 IT COMES BACK TO HHS, IT WILL NEED TO HAVE O.R.R. COLLEAGUES

11 PROVIDE THE SPONSOR INFORMATION AND ANY CONTACT INFORMATION

12 THAT IS IN THE PORTAL OF THE -- THE O.R.R. UAC PORTAL ON

13 PARENTS.

14          SO ONE OF THE CONSTRAINTS OF OUR PROCESS IS WE KIND

15 OF HAVE TO DO A COMPLETE LIST.

16          **THE COURT:**  ALL RIGHT.

17          AS OF SEPTEMBER 11 THERE WERE 986 CONFIRMED CHILDREN

18 WHO HAD BEEN SEPARATED FROM THEIR PARENTS.  DO YOU HAVE AN

19 UPDATE ON THAT NUMBER?

20          **COMMANDER WHITE:**  SO ON MY LIST -- AND I PREPARE TO

21 BE CORRECTED BECAUSE THE ONE CAVEAT I HAVE TO SAY, I DO THE

22 DEDUPLICATIONS MYSELF, SO THE POSSIBILITY FOR MATHEMATICAL

23 ERROR IS REAL ANY TIME I DO SOMETHING MYSELF.

24          MY MATH TELLS ME THAT THE CURRENT TOTAL OF UNIQUE

25 POSSIBLE CHILDREN OF POTENTIAL CLASS MEMBERS IS 989.  AND THE

SEPTEMBER 20, 2019

12

1   CURRENT TOTAL OF UNIQUE SEPARATED CHILDREN COVERED BY AN

2   APPLICABLE EXCLUSION IS 353.

3           BUT THE PLAINTIFF HAVE THE EXACT SAME LISTS THAT I

4   DO.  AND IT MAY BE THAT THEY HAVE A SLIGHTLY DIFFERENT NUMBER

5   IN WHICH CASE THEY ARE ALMOST CERTAINLY RIGHT, BECAUSE ONE OF

6   THE THINGS I DON'T HAVE CONFIDENCE IN IN MYSELF VERY MUCH IS

7   MY MATH SKILLS.

8           **THE COURT:**  ALL RIGHT.

9           AND AS YOU LOOK AT THE REMAINING LISTS, THE FOUR, DO

10  YOU HAVE ANY ESTIMATE AS TO HOW MANY SEPARATIONS THERE MAY BE,

11  OR ARE YOU UNABLE TO GIVE THAT OPINION?

12          **COMMANDER WHITE:**  I COULDN'T GIVE A VERY INFORMED

13  OPINION THERE.  I HAVE GONE BACK AND LOOKED AT THE LISTS THAT

14  HAVE COMPLETED THE PROCESS AND THEY DO NOT HAVE -- THEY DO NOT

15  HAVE COMPARABLE RATES OF FALSE POSITIVES IN THEM.  SO I HAVE

16  TO ASSUME THAT SOME OF THAT IS THAT THEY WERE ACTUALLY SORT OF

17  STARTED FROM DIFFERENT KINDS OF DATA, BUT THERE IS NOTHING I

18  COULD USE TO EXTRAPOLATE.

19          OVERALL I THINK WE HAVE SEEN THAT THE FALSE POSITIVE

20  RATE IS -- VARIES FROM ABOUT A THIRD TO POTENTIALLY BETWEEN

21  FIVE TO HALF, BUT IT HAS BEEN MUCH LOWER.  I WOULD BE REALLY

22  LOATH TO SPECULATE BECAUSE THERE AREN'T GOOD MEANS TO

23  EXTRAPOLATE.

24          **THE COURT:**  ALL RIGHT.  THANK YOU.

25          MR. GELERNT, ANY QUESTIONS?


                    SEPTEMBER 20, 2019

1          **MR. GELERNT:**  NO, YOUR HONOR.

2          **THE COURT:**  MR. STEWART, MS. FABIAN?

3          **MR. STEWART:**  JUST TO THANK COMMANDER WHITE, YOUR

4    HONOR, FOR CLARIFYING THE SIX VERSUS THE 11.  I APOLOGIZE FOR

5    THE CONFUSION AT THE LAST HEARING ON THAT, AND I APPRECIATE

6    THAT HE WAS ABLE TO EXPLAIN IT.

7          **THE COURT:**  YES.  THANK YOU.

8          COMMANDER WHITE, THANK YOU VERY MUCH.  YOU ARE FREE

9    TO GO OR YOU CAN STAY ON THE LINE, WHATEVER YOU DESIRE.

10         WE APPRECIATE ALL OF THE INFORMATION, AND THANK YOU

11   AGAIN FOR ALL OF YOUR GOOD WORK.  AND I AM CONTINUING TO URGE

12   ALL PARTICIPANTS TO KEEP WORKING DILIGENTLY SO THAT WE CAN

13   MEET THE OCTOBER 25 TIMEFRAME.

14         I DO HAVE PARTICIPANTS FROM HHS, MR. SUH AND MAYBE

15   PERHAPS LINDA DAKIN.  I DON'T WANT TO CUT YOU OFF.

16         DO YOU HAVE ANYTHING TO ADD, OR HAS COMMANDER WHITE

17   COVERED IT ALL?

18         **MS. FABIAN:**  YOUR HONOR, MR. SUH IS HHS COUNSEL, HE

19   IS JUST THERE TO ASSIST COMMANDER WHITE.

20         I DON'T BELIEVE MS. DAKIN -- SHE IS NOT AN HHS

21   EMPLOYEE.

22         **THE COURT:**  OKAY.  VERY GOOD.  THANK YOU.

23         LET'S KEEP GOING WITH THE JOINT STATUS REPORT.

24         GOING TO PAGE 10, 9 AND 10, THERE IS A NICE

25   DISCUSSION ABOUT THE PARTIES' EFFORTS TO MEET AND CONFER ON


                    SEPTEMBER 20, 2019

14

 1   THIS ISSUE WITH RESPECT TO THE DATA AND INFORMATION SHARING.

 2              ARE WE CLOSE?  ARE YOU OPTIMISTIC?

 3         **MS. FABIAN:**  YOUR HONOR, WE BELIEVE WE HAVE MADE A

 4   LOT OF PROGRESS ON THIS, AND I THINK WE HAVE SHARED ALL OF THE

 5   INFORMATION THAT WE BELIEVE IS APPROPRIATE WITH THE

 6   PLAINTIFFS.  WE WILL CONTINUE TO HAVE THOSE DISCUSSIONS.

 7         I BELIEVE THE LAST COMMUNICATION WAS THAT WE HAD

 8   ASKED SOME QUESTIONS AND ARE WAITING FOR SOME FOLLOW-UP, AND

 9   IT MAY HAVE GOTTEN SIDELINED A LITTLE WITH SOME OF THE

10   PROCESSING ON THE CURRENT MOTION.  BUT WE WILL DEFINITELY

11   CONTINUE THOSE COMMUNICATIONS.

12         IT IS OUR FEELING THAT WE HAVE A GOOD PROCESS IN

13   PLACE.  A FEW MORE PIECES OF THE PROCESS HAVE BEEN PUT INTO

14   PLACE SINCE WE EVEN SUBMITTED THIS.  I THINK WE NOTED THAT THE

15   TEAR SHEET WAS GOING TO BE ROLLED OUT, AND SOME OTHER PIECES

16   OF THE PROCESS.

17         SO IT IS MOVING FORWARD ON OUR END.  AND WE BELIEVE

18   THAT IT IS A GOOD PROCESS THAT IS ALIGNED FOR INTERAGENCY

19   COMMUNICATION ABOUT THE DATA AND THE INFORMATION.

20         **THE COURT:**  ALL RIGHT.

21         **MR. GELERNT:**  YOUR HONOR, I INTEND TO ADDRESS A FEW

22   OF THESE ISSUES ON INFORMATION SHARING AS PART OF THE LARGER

23   QUESTION OF THE SEPARATIONS THAT HAVE BEEN GOING ON SINCE THE

24   INJUNCTION.

25         I WOULD SAY THAT WE HAVE BEEN CONFERRING AND WE

SEPTEMBER 20, 2019

15

1   WOULD LIKE TO CONTINUE TO CONFER, BUT I THINK WE HAVE HIT A

2   FEW ROADBLOCKS ON A FEW ISSUES THAT ARE PARTICULARLY

3   IMPORTANT.  AND SO I WOULD LIKE TO BRING THOSE UP AS THEY

4   RELATE TO THE SUBSTANTIVE STANDARDS ON SEPARATION.  BUT WE

5   WILL ALSO CONTINUE TALKING WITH THE GOVERNMENT.  BUT I DO WANT

6   TO ALERT YOU TO SOME OF THOSE.

7           **THE COURT:**  IT APPEARS THERE HAS BEEN A LOT OF BACK

8   AND FORTH AND EXCHANGE OF INFORMATION BETWEEN THE PARTIES.

9   ARE YOU OPTIMISTIC THAT THERE IS GOING TO BE A RESOLUTION, OR

10  IS IT TOO SOON TO TELL?

11          **MR. GELERNT:**  I THINK THAT THERE IS GOING TO BE A

12  RESOLUTION ON SOME ISSUES BUT NOT ON OTHER ISSUES THAT ARE

13  IMPORTANT.

14          AND I THINK SOME OF WHAT MS. FABIAN WAS TALKING

15  ABOUT IS INTERAGENCY SHARING, AND I THINK WHERE OUR CONCERNS

16  COME UP ARE WHAT INFORMATION IS SHARED WITH US AND THE

17  CHILDREN'S ADVOCATES.  AND THERE WE MAY BE HITTING A

18  ROADBLOCK.

19          SO I AM OPTIMISTIC SOME OF THE ISSUES WILL GET

20  SETTLED.  I AM NOT NECESSARILY OPTIMISTIC, GIVEN THE

21  GOVERNMENT'S LATEST ANSWERS, THAT WE ARE GOING TO SETTLE ALL

22  OF THOSE.  SO THOSE MAY BE ISSUES THAT I WANT TO FLAG IN THE

23  CONTEXT OF THESE SUBSTANTIVE SEPARATION DECISIONS AND ALERT

24  THE COURT.

25          AND IT MAY BE THAT WE CAN GET FURTHER PROGRESS WITH

SEPTEMBER 20, 2019

1   THE GOVERNMENT OR IT MAY BE AT SOME POINT WE ARE GOING TO NEED
2   THE COURT'S INTERVENTION.  I DO WANT TO ALERT YOU TO A COUPLE
3   OF THEM.

4            **THE COURT:**  AND WHAT ABOUT THE AREA OF THIS
5   CENTRALIZED DATA COMMUNICATION BETWEEN AND AMONG THE VARIOUS
6   GOVERNMENT AGENCIES, IS THERE GOOD PROGRESS THERE?

7            **MS. FABIAN:**  YOUR HONOR, I THINK, AS WE HAVE SAID
8   BEFORE, I WOULDN'T NECESSARILY DESCRIBE IT AS A CENTRALIZED
9   DATABASE, BUT THERE HAS BEEN IMPROVEMENTS IN THE PROCESS BY
10  WHICH THE AGENCIES ARE SHARING INFORMATION AND MAKING SURE
11  THAT IT IS PASSED ON IN A TIMELY MANNER BETWEEN DHS AND HHS.
12  AND THERE HAVE BEEN COMMUNICATIONS WITH THE U.S. MARSHALS
13  SERVICE AND THE BUREAU OF PRISONS TO MAKE SURE THAT THERE IS
14  ALSO COMMUNICATION THERE.  SO THAT HAS CONTINUED TO MOVE
15  FORWARD.

16            LIKE I SAID, WE DID -- WE HAD MENTIONED, I THINK IN
17  OUR REPORT, AND CERTAINLY TO PLAINTIFFS, THAT THERE IS A TEAR
18  SHEET PROCESS, A TEAR SHEET THAT HAS BEEN DEVELOPED.  IT IS
19  WILL BE -- IT IS NOT -- IT IS BEING WORKED ON BEING UPLOADED
20  INTO ACTUALLY -- ACTUALLY INTO THE SYSTEM SO THAT IT CAN BE
21  USED IN AN ELECTRONIC MANNER.  BUT IT IS DESIGNED TO PROVIDE
22  INFORMATION TO PARENTS WHO ARE SEPARATED AND TO ACTUALLY GIVE
23  THEM THAT INFORMATION IN A STANDARDIZED FORM.  SO THAT HAS
24  ACTUALLY BEEN ROLLED OUT IN THE LAST WEEK OR SO, I BELIEVE,
25  AND IT IS NOW IN USE.


                    SEPTEMBER 20, 2019

```
 1              THE OTHER ISSUE THAT MR. GELERNT RAISES HAS TO DO
 2    MORE WITH INFORMATION SHARING BETWEEN O.R.R. AND COUNSEL FOR
 3    THE CHILDREN.  THERE IS SOME BREAKDOWN THERE BECAUSE COUNSEL
 4    FOR THE CHILDREN ARE NOT COUNSEL IN THIS CASE AND THE CHILDREN
 5    ARE NOT CLASS MEMBERS.
 6              SO PART OF THE PROCESS HAS BEEN, OF COURSE, TO
 7    IMPROVE THE INFORMATION SHARING THERE.  BUT TO THE EXTENT THAT
 8    THERE ARE DISPUTES ABOUT HOW O.R.R. IS SHARING INFORMATION ON
 9    THAT FRONT, I THINK OUR POSITION TO SOME EXTENT IS THAT THAT
10    IS NOT PART OF THIS CASE, THAT THAT MAY BE AN ISSUE THAT
11    COUNSEL FOR THE CHILDREN WILL NEED TO RAISE SEPARATELY.
12              SO THERE MAY JUST BE A DISPUTE ABOUT HOW FAR DOWN
13    THAT ROAD WE CAN GO, BUT WE THINK WE HAVE MADE PROGRESS AND
14    IMPLEMENTED BETTER PROCEDURES.  AND BELIEVE THAT THE
15    INFORMATION SHARING HAS IMPROVED THERE, NONETHELESS.
16              THE COURT:  ALL RIGHT.
17              AND THEN JUST FOCUSING ON THE INTERAGENCY
18    COMMUNICATION, DO YOU FEEL YOU ARE MAKING PROGRESS THERE?
19              SO, IN OTHER WORDS, WE TALKED FOR SOME TIME ABOUT
20    DOJ, ICE, CBP AND O.R.R. COMMUNICATING SO THAT THERE IS
21    EFFECTIVE WAYS TO PROMPTLY REUNIFY AND FOR PARENTS AND CHILD
22    TO COMMUNICATE WHILE SEPARATED.
23              MR. GELERNT:  I THINK THAT THERE HAS BEEN PROGRESS
24    ON THAT FRONT.  I THINK THERE ARE STILL SOME REMAINING
25    QUESTIONS THAT WE WANT TO FOLLOW UP WITH THE GOVERNMENT.  BUT
```

SEPTEMBER 20, 2019

1    I THINK THAT IS WHERE MORE PROGRESS HAS BEEN MADE.

2              **THE COURT:**  OKAY.  THANK YOU.

3              **MS. WEISS:**  YOUR HONOR, THIS IS CATHERINE WEISS.

4              **THE COURT:**  YES.

5              **MS. WEISS:**  I JUST, ON BEHALF OF LEGAL SERVICE

6    PROVIDERS, WANT TO SPEAK TO THE LAST POINT THAT MS. FABIAN

7    MADE, IF THAT IS ALL RIGHT?

8              **THE COURT:**  YES.

9              **MS. WEISS:**  THE GOVERNMENT HAS TAKEN THE POSITION

10   THAT O.R.R. IS PROVIDING GUIDANCE TO ITS PERSONNEL ABOUT HOW

11   INFORMATION WILL BE SHARED WITH THE COUNSEL AND ADVOCATES FOR

12   THE CHILDREN IN CUSTODY; BUT THE GOVERNMENT WON'T SHARE WHAT

13   O.R.R.'S GUIDANCE TO ITS PERSONNEL ARE.

14             AND SO THE COUNSEL AND ADVOCATES FOR THE CHILDREN

15   ARE STILL HAVING ENORMOUS DIFFICULTY GETTING ACCURATE

16   INFORMATION ABOUT THE BASIS FOR THE SEPARATION, WHICH MAKES IT

17   EXTREMELY DIFFICULT TO ASSESS WHETHER THERE IS A SOUND BASIS

18   OR NOT.

19             AND THAT, I THINK, MR. GELERNT IS GOING TO ADDRESS

20   MORE IN THE CONTEXT OF THE MOTION.  BUT I JUST WANTED TO SAY

21   THAT I THINK THERE HAS BEEN SOME BREAKDOWN, AS MS. FABIAN

22   SAID, ON THAT SCORE.

23             **THE COURT:**  OKAY.  THANK YOU.  I APPRECIATE THE

24   FLAGGING THE ISSUE.

25             **MS. FABIAN:**  YOUR HONOR, I JUST WANT TO SAY ON THAT

SEPTEMBER 20, 2019

19

```
1   POINT, I THINK WE HAVE -- WE HAVE A PROCESS IN PLACE AND WE
2   HAVE PUT OUT GUIDANCE.  AND WE HAVE, WE BELIEVE, RESPONDED TO
3   THE CONCERNS AS FAR AS WHAT INFORMATION IS AVAILABLE AND HOW
4   THE INFORMATION IS BEING SHARED.
5             I THINK WHERE THIS BREAKS DOWN IS THE EXPECTATION
6   THAT WE WOULD BE SORT OF SHARING THIS AND THAT THERE WOULD BE
7   FEEDBACK NOW PROVIDED FROM COUNSEL FOR THE CHILDREN, AND THAT
8   THIS IS GOING TO BE A BACK AND FORTH PROCESS SORT OF LAYING
9   THE GROUNDWORK FOR THEM TO EVENTUALLY BE ABLE TO CHALLENGE OUR
10  PROCESS DOWN THE LINE.  WE ARE NOT SURE THAT IS THE PURPOSE OF
11  THIS PROCESS.  WE ARE, OF COURSE, OPEN HEARING CONTINUED
12  CONCERNS.
13            AS MENTIONED, WE ROLLED OUT GUIDANCE.  WE HAVE
14  IMPROVED THE INFORMATION FLOW OUT TO THE FIELD, WE BELIEVE.
15  WE WOULD LIKE TO HEAR FEEDBACK ON -- IF IT CONTINUES TO BE
16  SAID THAT ADVOCATES STILL FEEL THAT THEY ARE NOT RECEIVING
17  INFORMATION, WE WOULD LIKE TO HEAR EXAMPLES OF THAT SO WE CAN
18  SEE IF THERE IS A BREAKDOWN IN WHAT WE BELIEVE THAT THE
19  PROCESS WE HAVE PUT IN PLACE TO FIX THAT.
20            BUT I THINK TO THE EXTENT IT IS SORT OF THIS
21  PREDISCOVERY -- OR DISCOVERY PRIOR TO CHALLENGING A SEPARATE
22  ISSUE THAT IS NOT PART THIS CASE, I THINK WE ARE RESISTANT TO
23  THAT.  BUT WE ARE -- WE DO BELIEVE WE PUT A PROCESS IN PLACE,
24  WE WANT THAT PROCESS TO WORK.
25            OF COURSE, MS. WEISS' PARTICIPATION IN THE PROCESS
```

SEPTEMBER 20, 2019

```
 1   IS VALUABLE TO THE EXTENT SHE CAN GIVE US EXAMPLES, AND WE

 2   WILL CONTINUE TO TAKE A LOOK AT THAT.

 3              THE COURT:  OKAY.  THANK YOU.

 4              MS. WEISS:  I JUST -- OKAY.  I WOULD JUST SAY IN

 5   RESPONSE THAT THIS IS NOT ABOUT PRE-LITIGATION DISCOVERY, THIS

 6   IS ABOUT GETTING BASIC INFORMATION INTO THE HANDS OF THE

 7   LAWYERS FOR THE CHILDREN ABOUT THE BASICS FOR THE SEPARATIONS

 8   SO THEY CAN UNDERSTAND WHETHER AND HOW TO SEEK REUNIFICATION

 9   AND HOW BEST TO REPRESENT THE CHILDREN IN THEIR IMMIGRATION

10   PROCEEDINGS.

11              AND THAT HAS BEEN THE CONTEXT IN WHICH THESE

12   CONVERSATIONS HAVE GONE ON, AND THE INFORMATION SHARING WITH

13   THE LAWYERS AND ADVOCATES FOR THE CHILDREN CONTINUE TO BE

14   INSUFFICIENT AND PROBLEMATIC.

15              THE COURT:  THAT'S OBVIOUSLY AN ISSUE WE CAN'T

16   RESOLVE TODAY, SO I JUST ENCOURAGE THE PARTIES TO KEEP WORKING

17   THROUGH IT.  AND THEN IF THERE IS A POINT AT WHICH THE COURT

18   NEEDS TO BE INVOLVED, I WILL DEFER TO COUNSEL AS TO WHETHER

19   THAT ISSUE IS BROUGHT UP IN MS. L. OR MMM, OR WHATEVER THE

20   CONTEXT OR SETTING MIGHT BE.

21              LET'S MOVE THROUGH THE STATUS REPORT.

22              MR. HERZOG, IT LOOKS LIKE, IF MY MATH IS CORRECT,

23   THERE WERE 722 FAMILIES OR SPONSORS REACHED OUT OF 853

24   CHILDREN WHO HAVE BEEN SEPARATED.  THE LISTS HAD BEEN PROVIDED

25   TO YOU AND YOU REACHED 91 PERCENT, OR 661, SPONSORS AND
```

SEPTEMBER 20, 2019

1   PARENTS.  IS THAT CORRECT?

2           **MR. HERZOG:**  GOOD AFTERNOON, YOUR HONOR.

3           NO, THAT IS ACTUALLY -- THOSE NUMBERS ARE THE

4   NUMBERS OF FAMILIES THAT WE HAVE BEEN TRYING TO REACH AND, YOU

5   KNOW, HAVE BEEN ACTIVELY CALLING.  WE HAVE NOT YET REACHED

6   QUITE THAT MANY.

7           WE HAVE BEEN SUCCESSFUL, I THINK, AT THIS POINT IN

8   REACHING I THINK -- LET ME JUST LOOK AT THIS.

9           SOME OF THE NUMBERS ARE -- THEY ARE EITHER FAMILIES

10  THAT WE HAVE REACHED OR WE HAVE EXHAUSTED OUR EFFORTS TO

11  REACH.  I THINK THE 542 SPONSORS, FOR EXAMPLE, ARE SPONSORS

12  THAT WE HAVE EITHER BEEN SUCCESSFUL IN REACHING OR WE HAVE

13  MADE THE NUMBER OF CALLS THAT WE DESIGNATE AS -- I THINK IT IS

14  AT LEAST FIVE CALLS AS EITHER -- UNSUCCESSFUL IN REACHING.

15          SO WE ARE -- AND THESE NUMBERS, I SHOULD SAY, HAVE

16  INCREASED A FAIR AMOUNT IN THE PAST WEEK.  SO WE HAVE BEEN

17  WORKING DILIGENTLY.  WE ACTUALLY HAVE JUST PUT ON A WHOLE

18  GROUP OF ADDITIONAL LAWYERS TO MAKE CALLS.  BUT WE ARE WORKING

19  TO MAKE THESE CALLS, AND QUICKLY.

20          YOU KNOW, THERE ARE A GOOD NUMBER WE ARE NOT

21  REACHING, AND WE ARE STARTING TO CONSIDER WHAT THE NEXT STEP

22  OF THE PROCESS IS, IN WORKING WITH OUR NGO PARTNERS,

23  ORGANIZING JUSTICE IN MOTION TO START TO FIND SOME OF THE

24  FAMILIES, WE HOPE, ON THE GROUND IN THEIR COUNTRIES OF ORIGIN.

25          YOU KNOW, WE ARE STILL CALLING AND WE ARE STARTING


SEPTEMBER 20, 2019

1   TO SORT OF LOOK BEYOND CALLING AT THIS POINT IN TIME, AS WELL.

2           **THE COURT:**  I WAS INFERRING, FROM THE NUMBERS YOU

3   HAVE PROVIDED, THAT THERE ARE MANY PARENTS WHO HAVE BEEN

4   REMOVED, SO THEY ARE SOMEWHERE IN CENTRAL AMERICA?

5           **MR. HERZOG:**  YES.  I DON'T HAVE AN EXACT NUMBER, BUT

6   IT IS A SUBSTANTIAL PORTION.

7           **THE COURT:**  DO YOU HAVE AN ESTIMATE OF THE NUMBERS

8   OF CHILDREN AND PARENTS AND SPONSORS YOU TRIED TO CONTACT SO

9   FAR, WHAT THAT PERCENTAGE MIGHT BE?

10          **MR. HERZOG:**  I WOULD SAY, A GUESSTIMATE, MAYBE IN

11  THE ABOUT HALF RANGE, BUT THAT IS REALLY A GUESS AT THIS POINT

12  IN TIME.  I DON'T HAVE THE NUMBERS IN FRONT OF ME.

13          **THE COURT:**  OKAY.  THANK YOU.

14          **MR. HERZOG:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  THANK YOU.  I APPRECIATE ALL OF THE

16  EFFORTS YOU AND YOUR FIRM AND THE OTHER ATTORNEYS ARE MAKING

17  IN THIS REGARD.

18          **MR. HERZOG:**  THANK YOU VERY MUCH.  IT TAKES A LARGE

19  TEAM OF PEOPLE, I THINK THAT DESERVE CREDIT, AND I CAN'T THANK

20  EVERYONE HERE.  BUT WE HAVE GOT A LOT OF PEOPLE, OUR NGO

21  PARTNERS AND PEOPLE AT MY FIRM THAT ARE WORKING ON IT.

22          **THE COURT:**  THE LAWYERS WHO ARE VOLUNTEERING, ARE

23  THEY ALL FROM YOUR FIRM OR ARE YOU RECRUITING OTHERS?

24          **MR. HERZOG:**  IT IS -- WELL, THEY ARE LAWYERS EITHER

25  FROM MY FIRM OR FROM OUR NGO PARTNERS.


                    SEPTEMBER 20, 2019

 1          **THE COURT:**  OKAY.  VERY GOOD.  THANK YOU.

 2          **MR. HERZOG:**  THANK YOU.

 3          **THE COURT:**  LET'S MOVE TO THE MMM -- WELL, BEFORE WE

 4   DO THAT, STAY WITH THE MS. L. CASE.

 5          THE RELIEF FOR DEPORTED PARENTS, THE COURT ISSUED AN

 6   ORDER TWO OR THREE WEEKS AGO.  WHAT'S THE STATUS THERE?  SO

 7   THERE WERE 11.

 8          **MS. FABIAN:**  YOUR HONOR, WE WERE -- PLAINTIFFS HAD

 9   REACHED OUT A COUPLE OF TIMES AND WERE LOOKING FOR THE

10   PROCESS.  DHS HAS BEEN WORKING DILIGENTLY ON PULLING THAT

11   PROCESS TOGETHER.

12          I THINK LAST NIGHT I WAS ABLE TO SEND OVER TO

13   PLAINTIFFS SORT OF THE BEGINNINGS OF THAT PROCESS.  I THINK

14   THE PRIMARY PIECE OF THAT IS THAT WE WOULD LIKE TO COORDINATE

15   WITH A SINGLE POINT OF CONTACT FOR PLAINTIFFS.  AND DHS WILL

16   THEN PROVIDE THAT POINT OF CONTACT WITH A LIST OF INFORMATION

17   THAT WE NEED FOR EACH PERSON SEEKING TO RETURN, THE NECESSARY

18   FORMS.  AND WILL COORDINATE -- I THINK THERE IS AN ISSUE OF

19   COORDINATING WHICH PORT OF ENTRY THEY WILL ARRIVE AT AND SORT

20   OF HOW CBP WILL PROCESS THEM AFTERWARDS.

21          SO WHAT WE REQUESTED LAST NIGHT IS THAT PLAINTIFFS

22   PROVIDE US WITH A SINGLE POINT OF CONTACT, AND WE WILL THEN

23   WORK WITH THAT POINT OF CONTACT TO COORDINATE EACH STEP OF THE

24   PROCESS FOR THE PARENTS WHO HAVE BEEN ORDERED RETURNED.

25          **THE COURT:**  ALL RIGHT.


                        SEPTEMBER 20, 2019

1      **MR. GELERNT:**  YES, YOUR HONOR.

2           AS MS. FABIAN MENTIONED, WE HAVE BEEN ASKING THE

3   GOVERNMENT NOW FOR A PROCESS, AND SO WE WILL EVALUATE WHAT THE

4   GOVERNMENT SENT OVER LATE LAST NIGHT.  WE ARE HAPPY TO HAVE

5   ONE POINT OF CONTACT, BUT WE DO WANT TO HOPEFULLY MOVE THIS

6   QUICKLY.

7           THANK YOU.

8      **THE COURT:**  THANK YOU.

9           FINALLY, ON MS. L., THE ONLY OTHER AREA, I THINK,

10  THAT DESERVES SOME DISCUSSION WAS ON THE UPDATED LISTS OF

11  TRACKING OF CONTINUING SEPARATIONS.

12          I THINK THE GOVERNMENT HAD PROPOSED 30 DAYS.

13          AND, MR. GELERNT, YOU INDICATED THAT THAT IS NOT

14  SUFFICIENT, YOU WOULD REQUEST EVERY WEEK.

15     **MR. GELERNT:**  YES, YOUR HONOR.

16          SO THAT WAS ONE OF THE OTHER INFORMATION SHARING

17  POINTS THAT I THINK THE TWO OF THEM ARE CRITICAL.  ONE IS

18  ENSURING THAT THE CHILDREN'S ADVOCATES ARE GETTING INFORMATION

19  TO PRESS BACK ON SEPARATIONS THEY DON'T BELIEVE WERE LAWFUL.

20          THE REASON I WAS GOING TO BRING THAT UP AS PART OF

21  THE LARGER MOTION IS BECAUSE I THINK EVEN THE GOVERNMENT

22  ADMITS THAT THERE HAVE BEEN SOME MISTAKES WITH PARENTS BEING

23  SEPARATED.  AND SO THAT IS WHY WE DO THINK IT IS CRITICAL THAT

24  THE CHILDREN'S ADVOCATES GET INFORMATION.

25          THE OTHER POINT IS EXACTLY THE ONE YOU BROUGHT UP,


SEPTEMBER 20, 2019

1    WHICH IS THAT WE ARE GETTING THE LISTS ROUGHLY AT THE TIME OF
2    THE JSR'S WHICH AT THE BEGINNING OF THE CASE, AS YOUR HONOR
3    KNOWS, WERE VERY FREQUENT, AND NOW THEY ARE APPROXIMATELY A
4    MONTH APART.
5            THAT IS, WE BELIEVE, FAR TOO LONG A GAP, ESPECIALLY
6    BECAUSE WHAT WE GET IS ALREADY A FEW WEEKS BEHIND.  SO IF
7    THERE ARE MISTAKES THE CHILD HAS ALREADY BEEN POTENTIALLY FOUR
8    TO SIX WEEKS IN O.R.R. CUSTODY BY THEMSELVES.
9            AND SO WE WOULD LIKE THEM ONCE A WEEK.  WE DON'T
10   THINK THAT SHOULD BE PROBLEMATIC.  THE GOVERNMENT UPDATES
11   THEIR OWN LIST TWICE A WEEK.
12           NOW, I UNDERSTAND THAT THEY HAVE SENSITIVE
13   INFORMATION ON THERE THAT THEY WOULD PREFER TO REDACT BEFORE
14   THEY GIVE IT TO US, BUT IT SEEMS AS IF THEY ARE DOING IT TWICE
15   A WEEK, THEY CAN REDACT IT ONCE A WEEK AND GIVE US THAT LIST.
16           AND THEN -- BECAUSE AT THIS POINT WE ARE NOW, IF WE
17   ARE GOING TO CORRECT MISTAKES IN SEPARATION, THE CHILD MAY
18   HAVE ALREADY BEEN SEPARATED TWO TO THREE MONTHS, INCLUDING
19   LITTLE CHILDREN.  SO WE DO BELIEVE THAT THAT IS A CRITICAL
20   PART OF THIS.
21           **MS. FABIAN:**  YOUR HONOR, THE PROCESS OF PREPARING
22   LISTS TO GO OUT TO PLAINTIFFS IS PRETTY EXTENSIVE.  THERE IS A
23   LOT OF INTERAGENCY BACK AND FORTH TO MAKE SURE THAT THE
24   INFORMATION IS ACCURATE AND READY TO SHARE, AND THAT ANY
25   EXCLUSIONS -- ANY EXCLUSIONS ARE CONSIDERED.


SEPTEMBER 20, 2019

```
 1            I UNDERSTAND THAT MR. GELERNT IS CONCERNED WITH THE
 2    PACING OF THE PRODUCTION.  I SPOKE TO MY CLIENTS ABOUT THAT
 3    THIS WEEK, AND WE HAVE -- THEY ARE WORKING TOGETHER ON COMING
 4    UP WITH A PROCESS OF A -- BECAUSE THE JSR IS NOW SORT OF ON AN
 5    UNEVEN SCHEDULE THAT WE WOULD IDENTIFY A MONTHLY DATE.  I
 6    THINK THEY HAD SORT OF TENTATIVELY PROPOSED IT WOULD BE THE
 7    SECOND FRIDAY OF EACH MONTH WE WOULD PRODUCE THE MATERIAL --
 8    THE LIST FOR THE PRIOR MONTH.  THAT WILL GIVE -- AND THEN WE
 9    WILL WORK -- WORKING BACK FROM THERE WORK TOGETHER TO HAVE A
10    PROCESS BY WHICH THEY CAN COMPLETE THE PROCESS BY THE DATE WE
11    SELECT.
12            I AM NOT -- THAT DATE MAY CHANGE SLIGHTLY BUT IT IS
13    INTENDED TO PROVIDE A PROCESS WHERE WE WILL PROVIDE IT ON A
14    REGULAR BASIS FOLLOWING THE COMPLETION OF EACH PRIOR MONTH,
15    AND ALLOW ENOUGH TIME TO COMPLETE THE INTERAGENCY PROCESS BUT
16    GIVE PLAINTIFFS ENOUGH SPECIFICITY ON WHEN THEY WILL RECEIVE
17    THE LISTS, AND IT WILL BE CLOSER IN TIME.
18            I DO RECOGNIZE THAT THE LIST WE PRODUCED THAT WAS AT
19    THAT POINT FOR DATA THAT WAS A MONTH OLD.  THIS WOULD AVOID
20    THAT ISSUE.
21            THE COURT:  ALL RIGHT.
22            MS. FABIAN:  SO WE HAVE MOVED FORWARD ON THAT
23    PROCESS.  AND I EXPECT TO BE ABLE TO START PRODUCING THOSE
24    MONTHLY, HOPEFULLY AS SOON AS NEXT MONTH.  BUT I AM HAPPY TO
25    TALK TO MR. GELERNT FURTHER ABOUT THAT.


                        SEPTEMBER 20, 2019
```

```
 1              TO DO IT EVERY WEEK WOULD NOT BE FEASIBLE IN TERMS
 2   OF THE AMOUNT OF BACK AND FORTH BETWEEN THE AGENCIES THAT IS
 3   REQUIRED.  THERE ARE UPDATES THAT ARE MADE AND INFORMATION
 4   THAT IS BEING EXCHANGED BETWEEN THE AGENCIES INTERNALLY, BUT
 5   BECAUSE THE AGENCIES CAN GO BACK BETWEEN EACH OTHER AND DOUBLE
 6   CHECK THAT, TO THE EXTENT IT IS NEEDED TO BE USED, IT IS SORT
 7   OF -- THAT INFORMATION ISN'T JUST AT THE STAGE WHERE IT CAN BE
 8   PROVIDED TO PLAINTIFFS ON THAT SORT OF REGULAR BASIS.
 9              THE COURT:  AND TO BE CLEAR, THE LISTS WE ARE
10   TALKING ABOUT ARE FOR SEPARATIONS THAT ARE ONGOING OR FORWARD
11   LOOKING, AS FAMILIES COME IN AND THE GOVERNMENT DETERMINES TO
12   SEPARATE.
13              MS. FABIAN:  CORRECT.  IT IS SEPARATIONS SINCE THE
14   JUNE 26, 2018.
15              THE COURT:  ALL RIGHT.
16              MR. GELERNT:  YOUR HONOR, SO WE APPRECIATE THAT IT
17   WOULD BE ON A MORE REGULAR BASIS AND NOT AT THE JSR, WHICH IS
18   NOT NECESSARILY AT REGULAR INTERVALS.  BUT WE DO THINK THAT A
19   MONTH IS FAR TOO LONG, BECAUSE THEY ARE ALREADY BACKWARD
20   LOOKING.
21              SO I THINK THIS IS ONE OF THOSE SITUATIONS, LIKE
22   WITH THE EXPANDED LIST, THAT IF YOUR HONOR WERE TO SAY THEY
23   SHOULD BE PRODUCED AT LEAST EVERY TWO WEEKS, THEN, IF YOUR
24   HONOR IS NOT WILLING TO DO ONE WEEK.
25              BUT A MONTH IS A VERY LONG TIME BECAUSE IT ALREADY


                         SEPTEMBER 20, 2019
```

1    IS THREE WEEKS OUT OF DATE WHEN WE GET IT.  AND THAT SEEMS --
2    YOU KNOW, I WOULD SAY THAT IT IS HARD FOR US TO KNOW EXACTLY
3    WHAT IS HAPPENING WITH THE INTERAGENCY PROTOCOLS.  I THINK WE
4    ARE MAKING PROGRESS.  BUT TO THE EXTENT THAT IT TAKES SO LONG
5    TO PRODUCE THESE ONGOING LISTS, THAT MIGHT BE A WINDOW INTO
6    THE CENTRALIZED DATABASE THAT YOUR HONOR WAS HOPING FOR IS NOT
7    REALLY COMING TOGETHER, BECAUSE IF ALL OF THE INFORMATION IS
8    BEING ENTERED IN REAL TIME IT SHOULD NOT TAKE THEM AN ENTIRE
9    MONTH TO GET US THE SEPARATIONS.
10            I DON'T KNOW IF YOUR HONOR WANTS TO TAKE THIS UNDER
11   SUBMISSION, BUT WE DO THINK A MONTH IS TOO LONG.  IF A WEEK IS
12   NOT FEASIBLE, THEN SOME KIND OF COMPROMISE.
13            **THE COURT:**  ALL RIGHT.
14            **MS. FABIAN:**  YOUR HONOR, I DO WANT TO NOTE THAT THE
15   PROCESS THAT WE HAVE PUT IN PLACE, AS THE PERSON WHO AT LEAST
16   UNTIL RECENTLY WAS THE RECIPIENT OF SORT OF ALL QUESTIONS
17   ABOUT NEW SEPARATIONS, I CAN SAY THAT THE VAST MAJORITY THAT I
18   EXPERIENCED CAME FROM OUTSIDE OF PLAINTIFFS' COUNSEL FROM
19   OTHER INDIVIDUAL COUNSEL FOR SEPARATED PARENTS.
20            WE HAVE NOW -- WITH THE TEAR SHEET IN PLACE BEING
21   PROVIDED TO EVERY SEPARATED PARENT, AND WE HAVE SET UP A
22   MAILBOX THAT DOES ALLOW FOR DIRECT SUBMISSION OF ANY
23   INFORMATION THAT COUNSEL OR A PARENT WOULD LIKE THE DHS TO
24   CONSIDER IF THEY ARE CONCERNED ABOUT THE BASIS FOR THEIR
25   SEPARATION.


                    SEPTEMBER 20, 2019

1          SO THERE IS REALLY A PROCESS IN PLACE WHERE PARENTS

2    SHOULD BE -- WILL BE INFORMED MORE IN REAL TIME OF THE BASIS

3    FOR THE SEPARATION AND HAVE THE ABILITY TO SUBMIT INFORMATION

4    TO CHALLENGE THAT SEPARATION IF THEY BELIEVE THE INFORMATION

5    IT WAS BASED ON IS INCORRECT.

6          AND THAT THE PROCESS HAS OCCURRED TO DATE THROUGH

7    ME, AND IT WILL NOW BE ABLE TO OCCUR SORT OF CUTTING OUT THE

8    MIDDLEMAN DIRECTLY TO DHS.

9          SO THAT PROCESS IS ONGOING AND DOES SOMEWHAT ALLOW

10   FOR -- MINIMIZE THE NEED FOR PLAINTIFFS TO BE INFORMED, NOTING

11   THAT THESE ARE INDIVIDUALS WHO ARE EXCLUDED FROM THE CLASS BUT

12   TO THE EXTENT THAT THAT MINIMIZES THE NEED FOR THE REPORTING

13   TO BE QUITE SO FREQUENT.

14        **THE COURT:**  OKAY.  LET ME RESERVE ON THAT, AND WE

15   CAN COME BACK TO IT IF NECESSARY OR I WILL TAKE IT UNDER

16   ADVISEMENT AND ADDRESS IT DOWN THE ROAD.

17        LET'S CLOSE OUT THE DISCUSSION ON THE STATUS REPORT

18   WITH THE MMM CASE.

19        THERE WAS A DISCREPANCY IN THE NUMBERS.  AND, MR.

20   BEST, DID YOU GET THAT WORKED OUT, OR IS THERE STILL A

21   DISCREPANCY?

22        **MR. BEST:**  GOOD AFTERNOON, YOUR HONOR.  THIS IS MR.

23   BEST.

24        WE DID RECEIVE SOME INFORMATION FROM THE GOVERNMENT

25   YESTERDAY, VIA EMAIL, REGARDING THEIR COMPARISON BETWEEN OUR


                         SEPTEMBER 20, 2019

1   NUMBERS AND THEIR NUMBERS.

2           AND WHILE I THINK THE PARTIES NEED TO MEET TO

3   DISCUSS SOME OF THE DETAILS OF THAT, IT DOES LOOK LIKE THE

4   INFORMATION THAT THEY HAVE PROVIDED AT LEAST EXPLAINED THE

5   DIFFERENCE BETWEEN OUR RESPECTIVE MEMBERS.

6           I DON'T THINK THERE IS ANYTHING FOR YOU TO DO TODAY,

7   YOUR HONOR, AND THE PARTIES WILL JUST CONTINUE TO TALK ABOUT

8   THAT.  I THINK JUST THE QUESTION —— THE QUESTION GOING FORWARD

9   WILL JUST BE WHAT THE IMPLICATION IS FOR ONGOING REPORTING IN

10  THE FUTURE.  BUT, AS I SAID, I DON'T THINK THERE IS ANYTHING

11  FOR YOU TO RESOLVE TODAY ON THAT.

12          **THE COURT:**  OKAY.  VERY GOOD.  THANK YOU.

13          THEN, WITH THAT, WHY DON'T WE MOVE TO THE MOTION TO

14  ENFORCE THE PRELIMINARY INJUNCTION.

15          AND HERE AGAIN I WOULD INDICATE TO COUNSEL ON THE

16  LINE WHO WANT TO DROP OFF THE CALL, YOU ARE WELCOME, OR OF

17  COURSE YOU ARE WELCOME TO STAY ON THE LINE.

18          ON THIS MOTION, I GUESS THE FIRST AREA OF INQUIRY I

19  WOULD HAVE WOULD BE OF MR. GELERNT.

20          I AM TRYING TO ACCURATELY CHARACTERIZE THE MOTION,

21  WHETHER IT IS A MODIFICATION OF THE CLASS DEFINITION, THE

22  SCOPE OF IT, AN INVITATION FOR THE COURT TO TINKER WITH

23  CRIMINAL HISTORY AND WHAT THAT MEANS, OR IS IT A MOTION FOR

24  THE COURT TO SET, MORE PLAINLY, OBJECTIVE STANDARDS AND

25  CRITERIA FOR SEPARATIONS AFTER JUNE OF 2018.


                    SEPTEMBER 20, 2019

1          **MR. GELERNT:** RIGHT.  WE THINK THE LATTER, YOUR

2    HONOR.  WE DON'T THINK YOU ACTUALLY NEED TO NECESSARILY MODIFY

3    THE CLASS UNLESS THE GOVERNMENT IS GOING TO CONTINUE TO TAKE

4    THE POSITION THAT THESE INDIVIDUALS ARE NOT PART OF THE CLASS

5    AND THEREFORE THEY DON'T HAVE ANY OBLIGATION.

6          BUT WE THINK -- ULTIMATELY WE DON'T THINK IT MATTERS

7    WHICH WAY YOU DO IT.  WE THINK BOTH WAYS ARE OPEN TO YOU.  WE

8    CERTAINLY THINK YOU COULD MODIFY THE CLASS, THAT THIS IS THE

9    CLASSIC ISSUE THAT WOULD BE AMENABLE TO CLASS.  WE ARE NOT

10   ASKING YOU TO APPLY THE STANDARD TO EACH INDIVIDUAL CASE, WE

11   ARE ASKING YOU JUST TO SET THE STANDARD.  THAT IS, OF COURSE,

12   EXACTLY WHAT CLASS ACTIONS ARE FOR.

13         BUT WE DON'T NECESSARILY THINK YOU NEED TO DO THAT.

14   WE THINK IF YOU WANTED TO SIMPLY CLARIFY THAT WHEN YOU ISSUED

15   THAT -- THOSE ORDERS TOGETHER, THE CLASS ACTION OF PRELIMINARY

16   INJUNCTION YOU MEANT FOR THE PRELIMINARY INJUNCTION STANDARD

17   TO HAVE THE FOLLOWING CRITERIA, AND THAT IS FOR THE ONGOING.

18   AND THEN WHAT YOU WERE DOING WITH THE CLASS CERTIFICATION

19   MOTION WAS ACTUALLY JUST TRYING TO RESOLVE THE ISSUE BEFORE

20   YOU WHICH WAS, OF COURSE, TIME SENSITIVE.

21         AND AS I UNDERSTAND WHAT YOU WERE DOING BACK THEN,

22   YOUR HONOR, YOU WERE SAYING, LOOK, WE CAN'T HAVE THESE

23   INDIVIDUAL FIGHTS ABOUT CRIMINAL CASES WHILE WE ARE TRYING TO

24   REUNITE THESE 2500 CHILDREN WHO HAVE BEEN SEPARATED

25   POTENTIALLY FOR A YEAR, LET'S PUT THAT OFF SO THEY ARE NOT


SEPTEMBER 20, 2019

```
1    PART OF THE CLASS FOR RIGHT NOW.  AND THEN WE CAN --
2              BUT WE DIDN'T UNDERSTAND YOUR HONOR TO BE SAYING ON
3    AN ONGOING BASIS THAT THESE CHILDREN ARE NOT PART OF THE
4    CLASS.
5              BUT ULTIMATELY WE THINK YOU CAN DO IT EITHER WAY.  I
6    THINK FOR US THE CRITICAL THING IS THAT YOU CLARIFY THAT YOU
7    WEREN'T SAYING ANY CRIMINAL CASE CAN BE EXCLUDED FROM, AND THE
8    CRITERIA HAS TO BE IS THE PARENT A DANGER TO THE CHILD UNDER
9    THE STANDARD DUE PROCESS CRITERIA USED BY THE STATES.
10             THE COURT:  LET ME OFFER THESE, I GUESS, THOUGHTS,
11   AND ULTIMATELY THE QUESTION TO YOU.
12             THE CLASS CERTIFICATION ORDER IS VERY CLEAR, AND IT
13   DOES SIMPLY CARVE OUT CRIMINAL HISTORY.  SO IT SEEMS TO ME THE
14   GOVERNMENT IS ENTITLED TO LOOK AT THAT ORDER AND SAY IT CARVES
15   OUT CRIMINAL HISTORY.
16             THERE IS A LAYER OF CONFUSION TO THIS BECAUSE THEN
17   WHEN THE PRELIMINARY INJUNCTION ORDER ISSUED WE WERE
18   ADDRESSING NOT ONLY REUNIFICATION BUT SEPARATION IN THE
19   FUTURE.  SO PART OF THE P.I. ORDER WAS REACTIVE --
20             MR. GELERNT:  RIGHT.
21             THE COURT:  -- LOOKING AT A DEFINED, RELATIVELY
22   SMALL GROUP, WHEN ONE LOOKS AT THE TOTAL NUMBER OF FAMILY
23   UNITS, APPROXIMATELY WHAT WE NOW KNOW AS 2814, I BELIEVE.
24             MR. GELERNT:  RIGHT.
25             THE COURT:  AND TRYING TO REUNIFY THEM RAPIDLY.  AND
```

SEPTEMBER 20, 2019

```
 1   SO THE CLASS DEFINITION WAS SET OUT IN THAT CONTEXT.
 2           AND THEN IN THAT CONTEXT THE PARTIES WERE REALLY
 3   MOTIVATED TO REUNIFY.  SO THERE WAS AN INCENTIVE BY EVERYONE,
 4   THE GOVERNMENT AND PLAINTIFFS, TO PERHAPS BE GENEROUS IN THE
 5   INTERPRETATION OF THE CLASS ORDER AND TO PROMOTE REUNIFICATION
 6   WITH THE IDEA THAT THESE PARENTS, UNDER THE COURT'S ORDER, IF
 7   THE PLAINTIFFS HAD MADE A SHOWING OF LIKELIHOOD OF SUCCESS
 8   THAT THEY WERE UNLAWFULLY SEPARATED, SO LET'S GET THEM BACK
 9   TOGETHER.
10           AND THAT WAS THE MINDSET.  AND THAT ALLOWED THE
11   GOVERNMENT TO DO WHAT IT DID, AND IT REALLY WAS -- IT
12   EXERCISED A GREAT DEAL OF DISCRETION AND REUNIFIED MANY
13   PARENTS WITH CRIMINAL HISTORY, EVEN THOUGH THE CLASS
14   CERTIFICATION ORDER PERMITTED A COMPLETE CARVE OUT.
15           MR. GELERNT:  THE ONLY THING I WOULD SAY, YOUR
16   HONOR, IS WE ARE NOT SURE EXACTLY HOW MANY THEY REUNITED WITH
17   CRIMINAL HISTORY.  BUT THAT IS A SIDE NOTE.  YOUR
18   HONOR'S POINT, THE LARGER POINT, IS CORRECT.
19           THE COURT:  AND THEN WE WERE HAVING DISCUSSIONS A
20   COUPLE OF TIMES A WEEK, AS I RECALL.  AND THERE WAS SOME MORE
21   CLARIFICATION WHERE JUST THROUGH, I THINK DISCUSSION, AND THE
22   GOVERNMENT INTERPRETED, I THINK, FOOTNOTE 11 IN THE P.I. ORDER
23   TO MEAN THAT 1325'S WERE CRIMINAL HISTORY THAT SHOULDN'T BE
24   USED TO EXCLUDE.  THERE WAS SOME, I THINK, AMBIGUITY ABOUT
25   1326'S, AND THAT AMBIGUITY REMAINS.
```

                        SEPTEMBER 20, 2019

1        BUT JUST THROUGH DISCUSSION AND IMPLEMENTATION OF

2   REUNIFICATION THE GOVERNMENT HAS BEGUN TO CONSISTENTLY CARVE

3   OUT CERTAIN THINGS LIKE 1325'S AND APPARENTLY A NUMBER OF

4   1326'S.

5        SO THAT'S ONE PIECE OF INFORMATION THAT THE P.I.

6   ORDER, LOOKING IN THE PAST TOWARD REUNIFICATION AND THE

7   PARTIES CONDUCTING THEMSELVES ACCORDINGLY.

8        THE SECOND PART OF THE INJUNCTION WAS TO PRECLUDE

9   FAMILY SEPARATION ABSENT CERTAIN CRITERIA.

10        **MR. GELERNT:**  RIGHT.

11        **THE COURT:**  IT IS THE SAME CLASS DEFINITION, BUT AS

12   YOU LOOK FORWARD AND DEAL WITH ONGOING SEPARATIONS, THE

13   GOVERNMENT'S POSITION IS:  WE ARE NO LONGER SEPARATING AS A

14   MATTER OF POLICY, WE ARE COMPLYING WITH THE COURT'S ORDER.  WE

15   ARE ONLY SEPARATING WHEN THESE OVERARCHING CRITERIA ARE MET

16   WITHIN THE EXERCISE OF THEIR DISCRETION.

17        SO THERE IS -- WHAT I AM STRUGGLING WITH IS, DOES

18   THE CLASS DEFINITION ACTUALLY -- BECAUSE THIS IS A CLASS --

19        **MR. GELERNT:**  RIGHT.

20        **THE COURT:**  -- CERTIFICATION, AND THE INJUNCTION IS

21   TETHERED TO THAT.

22        **MR. GELERNT:**  I THINK YOU PUT YOUR FINGER ON IT,

23   YOUR HONOR, THAT I THINK THE CONTEXT OF THE CLASS DEFINITION

24   WAS ABOUT LOOKING BACKWARD AND REUNIFYING, BUT THE PRELIMINARY

25   INJUNCTION STANDARD WAS, OF COURSE, BOTH BACKWARDS -- LOOKING


                    SEPTEMBER 20, 2019

 1   BACKWARD AND FORWARD.

 2          SO IT MAY BE THAT YOU DO WANT TO MODIFY THE CLASS

 3   DEFINITION AND SIMPLY SAY THAT GOING FORWARD, WITH ONGOING

 4   SEPARATIONS, THE STANDARD IS THE GOVERNMENT MAY SEPARATE IF

 5   THE PARENT IS A DANGER TO THE CHILD OR UNFIT.  THE STANDARD

 6   YOU LAID OUT NICELY IN THE PRELIMINARY INJUNCTION ORDER.  AND

 7   JUST TO AVOID ANY FURTHER CONFUSION.

 8          AND WE WOULD SIMPLY SAY THAT THAT SEEMS LIKE A

 9   FAIRLY EASY MODIFICATION, GIVEN THE CONTEXT OF THIS CASE,

10   GIVEN THE CONTEXT IN WHICH YOU ISSUED THAT CLASS CERTIFICATION

11   ORDER.

12          AND WE SEE NOTHING THAT WOULD PREVENT YOU FROM DOING

13   THAT, CERTAINLY NOT THE FACT THAT THERE ARE GOING TO HAVE TO

14   BE INDIVIDUAL APPLICATIONS OF THE STANDARD.  I MEAN, THAT IS

15   ALL CLASS ACTIONS.  THE COURT LAYS DOWN A STANDARD AND THEN

16   THE PARTIES APPLY IT.  AND IF THERE IS ANY DISPUTES IN

17   INDIVIDUAL CASES WE MIGHT COME TO YOU, OR MAYBE THERE IS GOING

18   TO HAVE TO BE SOMEONE ELSE WE GO TO.

19          BUT ULTIMATELY WE THINK, MAYBE GIVEN WHAT YOU HAVE

20   IDENTIFIED AS SOMEWHAT OF A DISCREPANCY BETWEEN THE

21   PRELIMINARY INJUNCTION ORDER AND THE CLASS CERTIFICATION, IT

22   MIGHT MAKE SENSE TO MODIFY THE CLASS CERT ORDER.

23          BUT I THINK ULTIMATELY WE THINK THAT THE CRITICAL

24   THING IS FOR YOU TO LAY DOWN THE SUBSTANTIVE STANDARD.  HOW

25   YOU CHOOSE TO DO IT, WE ARE OKAY WITH EITHER ONE.


                    SEPTEMBER 20, 2019

 1            **THE COURT:**  ON THAT ISSUE, THEN, ON THAT REQUEST,

 2    LET'S TAKE THE CONTEXT OF THIS CASE; THAT IS, A CLASS ACTION

 3    WITH A FINDING, BASED ON A PRELIMINARY INJUNCTION STANDARD,

 4    THAT THE GOVERNMENT UNLAWFULLY SEPARATED FAMILIES IN VIOLATION

 5    OF THE FIFTH AMENDMENT DUE PROCESS AND THE RIGHT TO FAMILY

 6    INTEGRITY.

 7            THE CASE LAW MAKES CLEAR THAT THE APPLICATION OF THE

 8    FIFTH AMENDMENT, THE CONSTITUTIONAL RIGHT TO FAMILY INTEGRITY,

 9    HAS TO BE APPLIED ACCORDING TO THE CIRCUMSTANCES OF THE CASE.

10    SO AS I UNDERSTAND THE CASE LAW, THERE IS A THRESHOLD QUESTION

11    OF WHETHER OR NOT THE FIFTH AMENDMENT APPLIES IN THE CONTEXT

12    OF THE CASE.  AND THEN, IF IT DOES, HAS THE GOVERNMENT

13    VIOLATED THAT FIFTH AMENDMENT RIGHT THROUGH ITS CONDUCT, AND

14    THAT MIGHT BE THE SHOCK-THE-CONSCIENCE STANDARD.

15            SO IF WE ASSUME THAT THIS IS THE STANDARD IN THIS

16    CASE, DOESN'T THE COURT HAVE TO APPLY THE FIFTH AMENDMENT IN

17    THIS UNIQUE CONTEXT?

18            IN OTHER WORDS, THIS IS NOT LIKE SEPARATING FAMILIES

19    OF U.S. CITIZENS IN THE INTERIOR OF THE COUNTRY, IT IS

20    SEPARATING FAMILIES OF MIGRANTS WHO ARE CROSSING THE BORDER,

21    LEGALLY OR ILLEGALLY.  AND IT IS IN AN ARENA WHERE THE

22    GOVERNMENT IS DEALING WITH NATIONAL SECURITY, BORDER SECURITY,

23    IMMIGRATION POLICY, PROSECUTION, DETENTION, ALL OF THOSE AREAS

24    WHICH UNDER THE LAW THERE ARE VERY ROBUST CARVE OUTS FOR

25    GOVERNMENTAL DISCRETION.


                        SEPTEMBER 20, 2019

1          SO IT IS NOT TO SAY THE FIFTH AMENDMENT DOESN'T
2    APPLY, IT DOES IN THE CONTEXT OF THIS CASE.  BUT DOESN'T IT
3    HAVE TO BE APPLIED IN THE CIRCUMSTANCE OF THIS UNIQUE ISSUE
4    BEFORE THE COURT?
5          **MR. GELERNT:**  RIGHT.  YOUR HONOR, I THINK IN OUR
6    VIEW THERE ARE TWO DISTINCT DETERMINATIONS.  I MEAN, THERE IS
7    THE FIRST ONE WHICH YOUR HONOR HAS PASSED IN THE PRELIMINARY
8    INJUNCTION, DOES THE FIFTH AMENDMENT APPLY TO NONCITIZENS AT
9    THE BORDER.  AND YOUR HONOR HAS FOUND THAT, AND THAT CERTAINLY
10   DOESN'T NEED TO BE RECONSIDERED.
11         BUT ONCE YOU GET TO THAT, I THINK -- WE BELIEVE
12   THERE ARE TWO TYPES OF DETERMINATIONS.  THE FIRST IS, WELL,
13   WHAT IS THE CRITERIA FOR TAKING A PARENT FROM A CHILD.  AND,
14   THAT CRITERIA, WE BELIEVE, IS THE STANDARD DUE PROCESS
15   STANDARD THAT IS USED IN ALL CHILD WELFARE CONTEXTS:  IS THE
16   PARENT A DANGER TO THE CHILD?
17         BUT THEN THE SECOND DETERMINATION, WHICH I THINK
18   YOUR HONOR'S QUESTION GOES TO IS, WELL, HOW DO WE IMPLEMENT
19   THAT DUE PROCESS RIGHT?
20         SO AT THAT POINT THEN THE DISCUSSIONS WOULD BE,
21   WELL, THE PARENT IS NOT A DANGER TO THE CHILD BUT THE
22   GOVERNMENT DOESN'T WANT TO PUT THEM IN A FAMILY DETENTION
23   CENTER, SO ARE THERE ALTERNATIVES WHERE THE GOVERNMENT SAYS
24   THERE IS NO OTHER APPROPRIATE PLACEMENT FOR THEM OR THE
25   GOVERNMENT SAYS THEY DON'T WANT TO RELEASE.


                      SEPTEMBER 20, 2019

1          BUT WE THINK THOSE ARE VERY DIFFERENT

2    DETERMINATIONS, AND WE DON'T BELIEVE THAT THIS CONTEXT

3    REQUIRES A DIFFERENT THRESHOLD DETERMINATION ABOUT WHEN YOU

4    CAN TAKE A CHILD FROM THEIR PARENT.

5          WHERE THOSE CONSIDERATIONS COME IN WE BELIEVE, YOUR

6    HONOR, IS AT THE LATTER STAGE OF, WELL, HOW ARE YOU GOING TO

7    IMPLEMENT THIS DUE PROCESS RIGHT?

8          BECAUSE OTHERWISE YOU HAVE LITTLE CHILDREN, AND NOW

9    WE ARE HAVING MORE AND MORE BABIES BEING TAKEN AWAY, WHERE

10   THEIR PARENT IS NOT A DANGER AT ALL.

11          AND WE BELIEVE, ON THAT SECOND DETERMINATION, I

12   THINK YOUR HONOR WOULD BENEFIT FROM HEARING FROM EXPERTS ABOUT

13   WHO CAN ACTUALLY BE IN A FAMILY DETENTION CENTER, WHAT OTHER

14   APPROPRIATE SETTINGS ARE THERE.  AND SOME OF THAT IS LAID OUT

15   IN THE DECLARATIONS WE SUBMITTED, BUT I THINK THERE ARE MANY

16   OTHER EXPERTS THAT THE COURT MIGHT BENEFIT FROM.

17          BUT WE DO NOT BELIEVE THAT THE THRESHOLD

18   DETERMINATION OF LETTING THE GOVERNMENT TAKE A PARENT AND

19   CHILD AND SEPARATE THEM FOR MINOR CRIMES SHOULD BE RELEVANT AT

20   THAT THRESHOLD.  THE KIND OF CONCERNS THAT YOU LAID OUT, THAT

21   THAT HAS TO BE IN THE IMPLEMENTATION NOT IN LAYING DOWN A

22   STANDARD THAT CHILDREN AND PARENTS CAN BE SEPARATED FOR ANY

23   TYPE OF CRIMINAL OFFENSE.

24          **THE COURT:**  WHAT ABOUT IF WE DO AN ANALOGY, FOR

25   EXAMPLE, TO THE FIFTH AMENDMENT RIGHT AGAINST


                    SEPTEMBER 20, 2019

1    SELF-INCRIMINATION, SO SAME AMENDMENT BUT DIFFERENT

2    CONSTITUTIONAL RIGHT.

3            THE COURT, IN MIRANDA, SAID YOU CAN'T COMPEL

4    SOMEBODY TO MAKE A STATEMENT, YOU HAVE GOT TO GET THESE

5    ADMONITIONS.  AND IT SETS OUT AN OVERARCHING STANDARD, THE

6    MIRANDA ADMONITIONS.

7            BUT THE COURT DOESN'T GO BEYOND THAT AND TELL THE

8    GOVERNMENT HOW IT MUST DO THAT, THE CIRCUMSTANCES UNDER WHICH

9    IT MUST PROVIDE THE MIRANDA RIGHTS.  IT DOESN'T SPELL OUT ALL

10   OF THE DETAILS.  IT GIVES THE OVERARCHING EDICT THAT THERE IS

11   A FIFTH AMENDMENT RIGHT, AND THAT THERE ARE CERTAIN RULES THAT

12   HAVE TO BE COMPLIED WITH.  HERE, BY ANALOGY, IT WOULD BE YOU

13   CAN'T SEPARATE UNLESS YOU HAVE MADE FITNESS AND DANGER

14   DETERMINATIONS, THOSE KINDS.

15           BUT THE COURT, HISTORICALLY, DOESN'T GO BEYOND THAT,

16   BECAUSE ISN'T THAT WITHIN THE PROVINCE OF THE EXECUTIVE BRANCH

17   TO IMPLEMENT IT?  AND THEN IF SOMEONE FEELS THE GOVERNMENT IS

18   NOT IMPLEMENTING IT CORRECTLY, THEN THEY CAN BRING SUIT.

19           BUT IT SEEMS TO ME IT WOULD BE MORE OF AN

20   INDIVIDUALIZED DETERMINATION OF, IN THIS CASE, A VIOLATION OF

21   FIFTH AMENDMENT FAMILY INTEGRITY.

22           **MR. GELERNT:**  YOUR HONOR, I THINK CERTAINLY AT THE

23   VERY END OF THE PROCESS IF SOMEONE THOUGHT THAT THEY WERE NOT

24   GETTING WHAT THE STANDARD -- GETTING WHAT THEY WERE ENTITLED

25   TO UNDER THE STANDARDS THE COURT LAID OUT, THERE COULD BE


                         SEPTEMBER 20, 2019

1   INDIVIDUAL LAWSUITS.

2           BUT I THINK, YOU KNOW, PICKING UP ON YOUR HONOR'S

3   ANALOGY.  I THINK WHAT WE WOULD SAY IS WHAT THE COURT OUGHT TO

4   DO IS CONTINUE WITH THE DUE PROCESS STANDARD, PARENTS AND

5   CHILDREN NEED TO REMAIN TOGETHER UNLESS THE PARENT IS SHOWN TO

6   BE A DANGER OR UNFIT.  AND THEN WE CAN TALK ABOUT, WELL, HOW

7   IS THE GOVERNMENT GOING TO IMPLEMENT IT.  AND THAT IS WHERE I

8   THINK YOUR DISCRETION POINT COMES IN.

9           BUT WE DON'T BELIEVE -- I MEAN, THIS IS LATER WHEN

10  YOU HEAR FROM EXPERTS.  BUT WE DON'T BELIEVE THE GOVERNMENT

11  CAN THEN SAY, WE ARE GOING TO IMPLEMENT IT IN THIS WAY, THAT

12  BASICALLY IS A BACK DOOR AROUND THE INITIAL DETERMINATION OF

13  WHETHER THE PARENT IS UNFIT OR A DANGER SUCH THAT THE PARENT

14  IS FOUND NOT TO BE A DANGER TO THE CHILD, BUT THEN THE

15  GOVERNMENT IMPLEMENTS IT IN A WAY THAT EVERYONE GETS

16  SEPARATED.

17          BECAUSE AT THE END OF THE DAY, WHAT WE ARE LOOKING

18  AT NOW, THE NUMBERS WE GOT AFTER WE SUBMITTED OUR REPLY BRIEF

19  THE GOVERNMENT GAVE US THE LATEST NUMBERS, AND WE ARE LOOKING

20  AT OVER 1,000, 1050 ACTUALLY, SEPARATIONS SINCE THE

21  INJUNCTION.  WE ARE MOVING TOWARD THE 2500 NOW.

22          AND, AS YOUR HONOR KNOWS, THESE ARE THE MOST MINOR

23  CRIMES THAT NO CHILD EXPERT -- YOU COULD CALL ANY CHILD EXPERT

24  FROM ANYWHERE IN THE COUNTRY AND THEY WOULD TELL YOU THAT

25  THESE PARENTS ARE NOT A DANGER TO THE CHILD.  AND OF COURSE WE


                    SEPTEMBER 20, 2019

1    HAVE PUT IN DECLARATIONS FROM EXPERTS WHO HAVE LOOKED AT THIS.

2    AND SO WHAT WE HAVE NOW ARE LITTLE CHILDREN BEING TAKEN AWAY

3    WHERE THEIR PARENT IS NOT A DANGER.

4            WE CAN TALK WITH EXPERTS ABOUT HOW TO IMPLEMENT IT

5    AND WHERE THE FAMILY SHOULD BE HOUSED, WHETHER THEY CAN BE

6    RELEASED, WHETHER THERE IS OTHER APPROPRIATE SETTINGS.  BUT I

7    THINK THERE IS NOTHING ABOUT THIS CONTEXT THAT WOULD SAY THE

8    GOVERNMENT CAN SIMPLY TAKE A CHILD AWAY BASED ON THE PARENT

9    HAVING A MINOR CRIME IN THE PAST.

10           **THE COURT:**  WHAT ABOUT THE GOVERNMENT'S RECENT

11   SUBMISSION.  AND, AS I UNDERSTAND, IT WAS NEWS TO YOU, IN THE

12   OPPOSITION WHERE THEY DISCLOSED THE INITIAL GUIDELINES THAT IS

13   BEING USED, I THINK IT IS IN THE RGV SECTOR, TEXAS.

14           **MR. GELERNT:**  SO WHAT WE HAVE IS ONLY THE INITIAL

15   NATIONAL GUIDANCE.  APPARENTLY RGV AND TUCSON MAY HAVE THEIR

16   OWN GUIDANCE, WE HAVEN'T SEEN IT, WHICH SUGGESTS THAT MAYBE

17   THIS ISN'T UNIFORM ACROSS THE COUNTRY, WHICH IS ALSO, I THINK,

18   A PROBLEM.

19           WE HAVE ONLY SEEN THAT INITIAL NATIONAL GUIDANCE,

20   WHICH WAS ISSUED ONE DAY AFTER YOUR INJUNCTION.  IT IS BARE

21   BONES, AS YOUR HONOR SAW, AND DOESN'T GIVE ANY GUIDANCE ABOUT

22   WHAT IT MEANS.

23           I THINK WHAT IS WRITTEN -- IT IS WRITTEN ON THE

24   ASSUMPTION THAT YOUR HONOR -- THIS GOES BACK TO OUR

25   CONVERSATION EARLIER.


                         SEPTEMBER 20, 2019

42

```
 1          IT IS WRITTEN ON THE ASSUMPTION THAT YOUR HONOR
 2   SANCTIONED THEM REMOVING ANYBODY WITH A CRIMINAL VIOLATION
 3   REGARDLESS OF SEVERITY.  AND SO I THINK THAT IS WHAT IS
 4   HAPPENING NOW AROUND THE COUNTRY IS THEY ARE SAYING ANY
 5   FELONY -- ANY FELONY -- AND ANY VIOLENT MISDEMEANOR REQUIRES
 6   SEPARATION.
 7          SO YOUR HONOR HAS SEEN THE TYPES OF CRIMES FOR WHICH
 8   THEY ARE SEPARATING.  YOU WOULD NEVER, IN THE CHILD CONTEXT,
 9   HAVE ANYBODY SAY THE PARENT IS A DANGER.
10          I THINK THAT HAS TO BE THE THRESHOLD QUESTION:  IS
11   THIS PARENT A DANGER TO THE CHILD?  AFTER THAT IT IS ABOUT
12   IMPLEMENTING THAT DUE PROCESS RIGHT.
13          BUT TO SAY WE ARE GOING TO TAKE THIS LITTLE CHILD
14   AWAY BECAUSE THE PARENT 27 YEARS AGO HAD SOME KIND OF THEFT
15   OFFENSE, I THINK WE ARE LOOKING AT -- YOU KNOW, I THINK WE ARE
16   LOOKING AT THE BIGGEST MOMENT IN THIS CASE SINCE THE
17   BEGINNING, BECAUSE WE ARE TALKING ABOUT NOW ONGOING
18   SEPARATIONS THAT COULD BE 1,000 A YEAR FOR THE MOST MINOR
19   CRIMINAL CONVICTIONS.
20          AS YOUR HONOR KNOWS, FULL WELL, WE ARE TALKING ABOUT
21   PERMANENT TRAUMA TO THESE CHILDREN FOR NO REAL REASON.  I
22   MEAN, IT CAN'T BE THAT THE GOVERNMENT IS GOING TO STAND UP AND
23   SAY, WE THINK A PARENT'S THEFT OFFENSE FROM TEN YEARS AGO
24   MAKES THAT PARENT A DANGER TO THE CHILD.
25          SO WHAT WE HAVE ARE PARENTS LOSING THEIR CHILDREN
```

SEPTEMBER 20, 2019

```
 1   WHEN THEY ARE PERFECTLY CAPABLE AND -- TO TAKE CARE OF THE
 2   CHILD AND NOT DANGEROUS.
 3            THE COURT:  WHAT ABOUT THE DECLARATION OF LLOYD
 4   EASTERLING.  IT IS VERY DETAILED.  AND HE DECLARES THAT UNDER
 5   THE INTERIM GUIDANCE, ASSUMING THERE IS NOT PERMANENT GUIDANCE
 6   THAT IT IS STILL THE INTERIM GUIDANCE, BUT UNDER THAT BARE
 7   BONES CHECKLIST THEY ACTUALLY ARE EXERCISING A GREAT DEAL OF
 8   DISCRETION.
 9            HE IS CLAIMING THAT THEY DON'T SEPARATE FAMILIES
10   UNLESS IT IS AN AGGRAVATED MISDEMEANOR.  AND IF IT IS A MINOR
11   MISDEMEANOR THEY DON'T DO THAT UNLESS THERE ARE OTHER INDICIA
12   OF FITNESS OR DANGER.  DO YOU DISPUTE THAT?
13            I KNOW THE GOVERNMENT CONCEDES SOME MISTAKES.
14            MR. GELERNT:  RIGHT.
15            THE COURT:  BUT AS A MATTER OF POLICY, DO YOU
16   DISPUTE --
17            MR. GELERNT:  I AM GLAD YOU ASKED ABOUT THAT, YOUR
18   HONOR.  I THINK THERE IS TWO RESPONSES.
19            ONE IS WE DO DISPUTE HOW THEY ARE APPLYING THEIR OWN
20   CURSORY GUIDANCE.  I THINK, YOU KNOW, WE LAID THAT OUT IN THE
21   REPLY BRIEF.  AND JUST TO GIVE YOU SOME EXAMPLES:  MALICIOUS
22   DESTRUCTION OF PROPERTY, THE GOVERNMENT SAYS, OF $500 FROM 16
23   YEARS AGO.  THREE PARENTS WITH DUI ALONE.  14 PARENTS WITH
24   IMMIGRATION OFFENSES AND DUI OR TRAFFIC OFFENSES.  SIX PARENTS
25   WITH MARIJUANA POSSESSION CONVICTIONS ALONE, INCLUDING A CHILD
```

SEPTEMBER 20, 2019

44

1   UNDER ONE YEARS OLD.  16 FRAUD AND FORGERY CONVICTIONS.

2          SO WE DO DISPUTE THAT, BUT I THINK THE LARGER POINT

3   IS THE SECOND ONE I WANT TO MAKE, IS THE CRITERIA IS NOT

4   PROPER.

5          AND THIS IS WHAT I THINK SOMETIMES GETS LOST IN

6   THESE DISCUSSIONS IS WE ARE NOT SAYING THAT THESE CRIMES

7   SHOULD BE VIEWED AS, WELL, FINE, TRIVIAL, DON'T PROSECUTE,

8   DON'T SEND THEM TO JAIL.

9          I MEAN, THE PARENTS GO TO JAIL, THERE IS CRIMINAL

10  PROSECUTION.  THAT IS A VERY DIFFERENT THING THAN CONCLUDING

11  THE PARENT IS A DANGER TO THEIR OWN CHILD.

12         AND THAT IS WHY IN THE STATES, ALL 50 STATES, AND

13  ANY CHILD WELFARE EXPERT YOU WANT TO BRING HERE, YOUR HONOR,

14  WOULD TELL YOU THAT TAKING AWAY A CHILD IS THE MOST EXTREME

15  THING YOU CAN DO WITH A FAMILY.  AND SO THE CRIME HAS TO BE

16  PROBATIVE THAT THE PARENT IS A DANGER TO THE CHILD, NOT THAT

17  THE PARENT IS A PERFECT PERSON WHO SHOULD NEVER HAVE GONE TO

18  JAIL.

19         AND THAT IS WHY EVEN FROM PEOPLE WHO HAVE COMMITTED

20  MURDER AND GONE TO JAIL AND COME OUT, THEY GET THEIR CHILDREN

21  BACK.  BECAUSE WHAT EXPERTS WILL TELL YOU IS, IT DOES ANY

22  RELATIONSHIP BETWEEN THE CRIME AND BEING A DANGER TO THE

23  CHILD.

24         AND OBVIOUSLY IF THE PARENT HAS CONVICTIONS FOR

25  CHILD ABUSE, I MEAN, YOU KNOW, MAYBE THAT IS A PRO SE -- OR A

SEPTEMBER 20, 2019

1  PER SE CATEGORICAL EXEMPTION.  BUT ANYTHING ELSE IS JUST NOT
2  PROBATIVE.
3          SO IT IS NOT A MATTER OF DECLARING THE PARENT
4  PERFECT, IT IS A MATTER OF DO YOU TAKE THIS MOMENTOUS STEP OF
5  TAKING A CHILD AWAY.
6          AND THE GOVERNMENT IS SIMPLY SAYING, WE ARE GOING TO
7  TAKE AWAY CHILDREN BECAUSE THE COURT SAID WE COULD, NOT WE
8  BELIEVE THAT THIS PAST FRAUD MAKES THE PARENT A DANGER TO THE
9  CHILD.
10          I WOULD JUST SAY IN TERMS OF WHERE THEY ARE
11 EXERCISING THEIR DISCRETION.  THEY PROVIDED ONE EXAMPLE.  IT
12 IS A PARENT NOT -- WITHOUT A CONVICTION, JUST A WARRANT FOR A
13 THEFT OFFENSE WITH A SEVEN-MONTH-OLD CHILD.  THAT IS THE ONE
14 EXAMPLE THEY SHOWED.
15          I MEAN, I WOULD HOPE THAT WOULD HAVE BEEN A
16 NO-BRAINER FOR THEM.  THAT IS THE ONE EXAMPLE THEY GAVE YOU.
17          BUT ULTIMATELY, EVEN IF THEY WERE BEING CONSISTENT
18 IN APPLYING THEIR OWN STANDARD, IT CAN'T BE THAT ANY FELONY OR
19 VIOLENT MISDEMEANOR MAKES THE PARENT A DANGER TO THE CHILD.  I
20 JUST DON'T THINK YOU WOULD EVER FIND AN EXPERT, I DON'T THINK
21 THE GOVERNMENT COULD EVER BRING AN EXPERT HERE WHO WOULD SAY
22 THAT YOU SHOULD TAKE THE CHILD AWAY FROM THE PARENT.
23          AND, OF COURSE, WE PUT IN AFFIDAVITS FROM PROFESSOR
24 GUGGENHEIM, WHO IS THE NATION'S LEADING EXPERT ON THIS.  ALSO
25 FROM JENNIFER NAGDA, WHO BY STATUTE IS APPOINTED TO REVIEW


                    SEPTEMBER 20, 2019

46

1    CASES OF CHILDREN AT O.R.R. AND HAS LOOKED THROUGH THE LIST

2    AND SAID YOU CANNOT TAKE A CHILD AWAY FROM THIS PARENT.

3            NOW, EVERYONE HAS AGREED THAT YOUR HONOR MAY NEED TO

4    HEAR EXPERTS ON HOW DO WE IMPLEMENT THIS, WHO CAN BE IN FAMILY

5    DETENTION.  ARE THERE DIFFERENT WINGS IN THE FAMILY DETENTION

6    CENTER, ARE THERE ALTERNATIVE PLACEMENTS.  THOSE ARE TRICKY

7    ISSUES THAT I THINK YOUR HONOR WOULD BENEFIT FROM EXPERT

8    TESTIMONY.  BUT CERTAINLY NOT ON THE THRESHOLD QUESTION.

9            **THE COURT:**  ON THE GOVERNMENT'S NUMBERS, THEY

10   INDICATE 524,294 INDIVIDUALS HAVE CROSSED SINCE THE P.I. ORDER

11   ISSUED AND UP TO, I THINK, THE END OF JULY OF THIS YEAR.

12           AS I UNDERSTAND IT, YOU ARE SUGGESTING THAT THAT

13   NUMBER IS REALLY HALF IF YOU JUST COUNT FAMILY UNITS AS

14   OPPOSED TO INDIVIDUALS?

15           **MR. GELERNT:**  I THINK WHAT IT WOULD MEAN IS THAT

16   INSTEAD OF 1,050 IT WOULD DOUBLE TO 2100, BECAUSE IT IS SORT

17   OF AN ODD -- AND I THINK THE GOVERNMENT WILL AGREE THAT THE

18   WAY THEY USE THE TERM FAMILY -- NOT THE GOVERNMENT LAWYERS BUT

19   THE AGENCY USE THE TERM FAMILY UNITS IT IS ACTUALLY

20   INDIVIDUALS.  SO IF YOU ARE USING FAMILY UNIT THEN IT WOULD

21   BE -- WE WOULD HAVE DOUBLE THE NUMBER OF SEPARATIONS, TO THE

22   EXTENT THAT MAKES ANY SENSE.

23           **THE COURT:**  THE 524,000, THAT REPRESENTS FAMILY

24   UNITS.

25           **MR. GELERNT:**  THAT'S RIGHT, WHICH MEANS INDIVIDUALS.


                        SEPTEMBER 20, 2019

```
 1              AND, I KNOW, IT IS -- IT IS NOT MY TERM, YOUR HONOR.
 2   BUT THAT IS WHAT -- THE 524,000, THEY SAY FAMILY UNITS, YOU
 3   WOULD THINK THAT MEANT THE WHOLE FAMILY, WHAT IT MEANS IS
 4   INDIVIDUALS.  SO IF YOU HAVE A FATHER AND SON COME OVER, THEY
 5   CALL THAT -- THAT IS TWO FAMILY -- THAT IS TWO PEOPLE.  BUT
 6   THE -- RIGHT.
 7              THE GOVERNMENT CAN TELL YOU THE ORIGINS OF THAT
 8   TERM, BUT THAT IS WHAT --
 9              YOU KNOW, AND I KNOW THE GOVERNMENT HAS STRESSED THE
10   NUMBER AND THAT OBVIOUSLY IS ON EVERYONE'S MIND ABOUT THE
11   NUMBERS OF FAMILIES CROSSING.
12              AND, YOU KNOW, THERE CAN BE DEBATES ABOUT SORT OF
13   WHAT, YOU KNOW, DIFFERENT THINGS ABOUT WHAT PEOPLE GET WHEN
14   THEY CROSS THE BORDER.  BUT HERE WE ARE TALKING ABOUT THE MOST
15   FUNDAMENTAL -- THE MOST FUNDAMENTAL RIGHT.
16              AND AS YOUR HONOR HAS NOTED REPEATEDLY THROUGHOUT
17   THIS CASE, ULTIMATELY WE CAN'T LET AGGREGATE STATISTICS
18   OBFUSCATE THE HUMAN DIMENSION OF EACH LITTLE CHILD WHO IS
19   BEING SEPARATED.
20              THE COURT:  ALL RIGHT.  THANK YOU.
21              MAYBE I CAN INQUIRE OF COUNSEL.  ON THE INTERIM
22   GUIDANCE, IS THERE A PERMANENT GUIDANCE SHEET?  IS THE INTERIM
23   GUIDANCE SHEET, IF THAT IS WHAT REMAINS, IS THAT LIMITED TO
24   THE RGV SECTOR AND TUCSON?
25              MR. STEWART:  THAT IS NATIONAL GUIDANCE, YOUR HONOR,
```

SEPTEMBER 20, 2019

1   THAT'S THE GUIDANCE THAT I UNDERSTAND TO BE IN PLACE NOW ON A

2   NATIONAL SCALE.

3          THE RGV GIVES A NICE DESCRIPTION OF HOW THAT SIZABLE

4   SECTOR IS OPERATIONALIZING THAT.  AND I THINK IT DOES VERY

5   WELL TO HIT SOME OF YOUR POINTS ABOUT CONTEXT, YOUR HONOR.

6          YOUR HONOR EMPHASIZED, I THINK VERY WELL, THAT WE

7   ARE NOT DEALING WITH A NORMAL U.S. CITIZEN DOMESTIC FAMILY

8   CONTEXT HERE, WE ARE DEALING WITH AN INTERNATIONAL BORDER IN

9   AN ENFORCEMENT CONTEXT.  DIFFICULT DECISIONS ABOUT LAW

10  ENFORCEMENT DISCRETION, BOTH CRIMINAL AND IMMIGRATION

11  DISCRETION, DETENTION AUTHORITY.  IN A CASE OF THE CBP IN

12  PARTICULAR THE NEED TO MAKE QUICK JUDGMENTS ACCOUNTING FOR

13  DANGER, ENFORCEMENT PRIORITIES.  DOUBTS, LIMITS OF

14  INFORMATION.  AND IT IS THAT CONTEXT IN WHICH THIS REALLY

15  ARISES, YOUR HONOR.

16         AND I THINK THE RGV, THE EASTERLING DECLARATION DOES

17  A VERY GOOD ACCOUNT OF WHAT A GOOD WAY IS TO OPERATIONALIZE

18  THINGS IN THIS CONTEXT.  YOU KNOW, LOOK, THIS IS GENERALLY OUR

19  APPROACH, WE GENERALLY SEPARATE FOR THESE KIND OF THINGS,

20  THESE IMPORTANT OFFENSES.  WE GENERALLY DON'T FOR THESE OTHER

21  KIND OF OFFENSES.  YOU KNOW, HERE IS HOW, YOU KNOW, SOME

22  CONCRETE THINGS ABOUT HOW THESE WOULD PLAY OUT.

23         AND I THINK IT DOES WELL TO REALLY ILLUSTRATE AND

24  REALLY HIT HOME THE POINT OF CONTEXT IN A WAY THAT THE NORMAL

25  DOMESTIC BEST INTEREST STANDARD REALLY DOESN'T APPLY, YOUR

SEPTEMBER 20, 2019

1    HONOR.

2              I THINK IT IS USEFUL TO JUST SEE CONCRETELY.  I

3    THINK THIS IS SOMETHING THAT YOUR HONOR RECOGNIZED IN RAISING

4    THE DEFINITION OF MODIFYING THE CLASS SCOPE.  IT IS IMPORTANT

5    TO EMPHASIZE HOW SIGNIFICANT A SHIFT IN THE CASE THIS WOULD BE

6    AND HOW AWESOME OF A POSITION MY FRIENDS HAVE TAKEN IN THIS

7    CASE.

8              THIS COURT, AS YOUR HONOR RECOGNIZED BOTH IN THE

9    CERTIFICATION ORDER ITSELF AND LATER, AROUND THIS TIME ABOUT A

10   YEAR AGO WHEN WE HAD A SIMILAR FIRST MOTION ALONG THESE LINES,

11   YOUR HONOR EXCLUDED CRIMINAL HISTORY WITHOUT REGARD TO

12   SEVERITY, RECOGNIZING THE CONTEXT AND THAT SORT OF THING.

13             WHAT MY FRIENDS ARE NOW CLAIMING NEEDS TO BE THE

14   APPROACH IS THAT -- THEY VARIOUSLY SAY, YES, DANGER AND

15   FITNESS ARE IMPORTANT.

16             BUT IT IS NOT DANGER AND FITNESS THAT -- AS THIS

17   COURT RECOGNIZED IT, IT IS RATHER, AS THEY DESCRIBED IT,

18   IMMINENT OR EMERGENCY DANGER ONLY TO THE CHILD AT ISSUE.  AND

19   THAT EVEN A VERY, VERY SERIOUS CONVICTION DOES NOT FORM A

20   BASIS FOR EXCLUDING SOMEONE FROM THE CLASS, THERE NEEDS TO BE

21   FURTHER INVESTIGATION.

22             I NOTE -- I NOTICED THAT MR. GELERNT EMPHASIZED AND

23   EMBRACED, AS HE DID IN HIS -- BOTH HIS MOTION PAPERS AND HIS

24   REPLY BRIEF, THE GUGGENHEIM DECLARATION.

25             AND I THINK THE GUGGENHEIM DECLARATION, YOUR HONOR,


                        SEPTEMBER 20, 2019

50

1    REALLY DOES EMPHASIZE THE PROBLEMS WITH THE APPROACH, AND

2    REALLY JUST THE ASTONISHING, CANDIDLY, IRRESPONSIBILITY OF THE

3    APPROACH, YOUR HONOR.

4            THE GUGGENHEIM DECLARATION, AT PARAGRAPHS 8 TO 9,

5    ACTUALLY TAKE THE POSITION THAT A MAN WHO RAPES A CHILD SHOULD

6    NOT BE SEPARATED ON THAT GROUND, THERE NEEDS TO BE A SEPARATE

7    DETERMINATION AS TO WHETHER THAT PERSON PRESENTS AN IMMINENT

8    EMERGENCY DANGER TO THE CHILD.

9            THAT IS AN ASTONISHING POSITION, BUT THAT IS INDEED

10   THE POSITION THAT MR. GELERNT HAS EMBRACED HERE.  THAT CBP

11   PRESUMPTIVELY CANNOT SEPARATE THE RAPIST OF A CHILD, AND

12   PRESUMPTIVELY WOULD BE REQUIRED TO PUT THAT PERSON, WITH HIS

13   OWN CHILDREN AND WITH OTHER CHILDREN, IN A FAMILY RESIDENTIAL

14   CENTER.

15           THAT IS AN ASTOUNDING, ASTONISHING POSITION.  IT IS

16   NOT THE POSITION THAT YOUR HONOR ADOPTED.  YOUR HONOR REJECTED

17   A VERY SIMILAR APPROACH WHEN YOUR HONOR REJECTED, MONTHS AGO,

18   THE PROPOSITION OF SOMEBODY WHO WIELDED A MACHETE AT HIS -- I

19   BELIEVE IT WAS EITHER HIS WIFE OR HIS GIRLFRIEND, AND AN MS-13

20   GANG MEMBER.

21           BUT THIS IS EVEN MORE EXTREME THAN THAT, YOUR HONOR.

22   THIS IS NOT JUST MERE DANGER OR FITNESS, THIS IS ONLY IF THE

23   PARENT PRESENTS AN EMERGENCY IMMINENT DANGER TO HIS OWN CHILD;

24   WHICH APPARENTLY, ACCORDING TO PROFESSOR GUGGENHEIM, WHO MR.

25   GELERNT IS BRANDING A MAJOR EXPERT AND HAS EMBRACED FULLY,


                          SEPTEMBER 20, 2019

1    APPARENTLY THE RAPIST OF A CHILD, THAT WOULD NOT QUALIFY FOR
2    SEPARATION UNDER THE PLAINTIFFS' VIEW.
3          AS YOU CAN TELL, YOUR HONOR, IT IS TRULY ASTONISHING
4    TO ME.  I KIND OF WAS AMAZED WHEN I READ IT.  BUT IT IS NOT
5    THE POSITION THAT SHOULD BE ADOPTED, IT IS NOT THE ONE THAT
6    THIS COURT EMBRACED.
7          AND I THINK THAT MR. EASTERLING DOES A VERY GOOD JOB
8    OF SAYING, LOOK, THIS IS THE CONTEXT, THIS IS A TOUGH
9    CIRCUMSTANCE.  WE MAKE JUDGMENT CALLS.  YOU KNOW, WE TRY TO
10   BE, YOU KNOW, CAREFUL, CONSIDER THE INDIVIDUAL CIRCUMSTANCES.
11         BUT THESE CRIMINAL, YOU KNOW, VIOLENT MISDEMEANORS,
12   THESE OTHER SERIOUS OFFENSES, THEY PRESENT REAL CHALLENGES IN
13   THIS ENFORCEMENT CONTEXT WHERE WE OFTEN HAVE TO DETAIN PEOPLE,
14   WE HAVE TO DETAIN FAMILIES, WE HAVE TO WORK WITHIN THE
15   CONFINES OF OUR STATUTORY DUTIES.
16         AND WHEN YOUR HONOR REJECTED A SIMILAR MOTION ABOUT
17   A YEAR AGO YOUR HONOR RIGHTLY RECOGNIZED THESE KINDS OF
18   POINTS.  AND THE GOVERNMENT HAS APPROPRIATELY EXERCISED ITS
19   DISCRETION IN THAT TIME.
20         THE NUMBERS ARE LARGER.  THERE ARE SOME ANECDOTES,
21   THERE HAVE BEEN A COUPLE, YOU KNOW, A NUMBER OF MISTAKES.  WE
22   ACKNOWLEDGE THAT.  YOUR HONOR WILL, GIVEN YOUR EXPERIENCE,
23   GIVEN WHAT YOU HAVE SEEN FROM, YOU KNOW, JUST DIFFERENT LAW
24   ENFORCEMENT CONTEXTS, THERE ARE ALWAYS GOING TO BE ERRORS.
25         IT TOOK ABOUT A YEAR FOR MR. GELERNT TO COLLECT ALL

SEPTEMBER 20, 2019

```
 1   OF THESE ERRORS, AND HE DOES HAVE EPISODES IN A NUMBER OF
 2   DECLARATIONS, AND THE VAST BULK OF THE DECLARATIONS DO
 3   DOCUMENT EPISODES.
 4          BUT THE DEFENDANTS HERE HAVE PUT INTO EFFECT A GOOD
 5   SYSTEM THAT SOUNDLY ACCOUNTS FOR THE TREMENDOUS DIFFICULTIES
 6   WHILE RESPECTING YOUR HONOR'S RULING.
 7          SO I THINK -- I WANTED TO EMPHASIZE THAT I THINK
 8   YOUR HONOR WAS EXACTLY RIGHT TO EMPHASIZE THE IMMIGRATION AND
 9   LAW ENFORCEMENT AND BORDER CONTEXT HERE.  AND I THINK THE
10   EASTERLING DECLARATION AND DAVISON DECLARATIONS DO WELL TO
11   UNDERSTAND -- TO SHOW THAT THE DEFENDANTS HERE ARE
12   APPROPRIATELY OPERATIONALIZING YOUR HONOR'S DECISIONS.
13          THE COURT:  YOU HAD MENTIONED A NATIONAL STANDARD
14   THAT IS IN PLACE.  I GUESS IT TAKES OFF FROM THE INTERIM
15   GUIDANCE OF THE RGV SECTOR.  HAS THAT NATIONAL GUIDANCE
16   STANDARD BEEN PRODUCED?
17          MR. STEWART:  I BELIEVE IT -- IT IS THAT DOCUMENT --
18   I BELIEVE IT IS OUR EXHIBIT D TO THAT DECLARATION, YOUR HONOR.
19          THE COURT:  IT IS NOT -- THERE IS AN EXHIBIT 4.
20   THAT'S THE INTERIM GUIDANCE.
21          MR. STEWART:  RIGHT.  THAT IS THE GUIDANCE, YOUR
22   HONOR.  THAT IS THE NATIONAL GUIDANCE.
23          THE COURT:  OKAY.
24          MR. STEWART:  IT IS AN INTERIM GUIDANCE.  I THINK --
25   I CAN'T BE FOR SURE ON THIS, BUT I THINK IT IS INTERIM IN THE
```

SEPTEMBER 20, 2019

1  SAME WAY A PRELIMINARY INJUNCTION IS INTERIM, THAT SORT OF

2  THING.  IT DOESN'T MEAN IT IS SORT OF LIKE, YOU KNOW, NOT IN

3  EFFECT OR SOMETHING LIKE THAT.  I WOULD LIKEN IT TO THAT, BUT

4  IF I AM MISTAKEN I CAN LET YOU KNOW.

5           **THE COURT:**  YOUR REPRESENTATION IS THAT EXHIBIT 4,

6  THE GUIDANCE ON PRELIMINARY INJUNCTION IN THE MS. L. CASE,

7  APPLIES THROUGHOUT THE BORDER, SO THAT WOULD INCLUDE

8  CALIFORNIA, ARIZONA, NEW MEXICO, AND TEXAS.

9           **MR. STEWART:**  YES.  THAT IS MY UNDERSTANDING, YOUR

10  HONOR.

11           **THE COURT:**  AND THERE IS A REFERENCE IN THE

12  DECLARATION FROM MR. EASTERLING THAT THERE IS, IN ADDITION,

13  STANDARDIZED PROCEDURES THAT ARE FOLLOWED.  ARE THOSE

14  PROCEDURES IN WRITING?

15           HE MAKES THAT STATEMENT, I THINK AT PARAGRAPH 13.

16  IT SAYS ADDITIONALLY, CONSISTENT WITH THE INTERIM GUIDANCE,

17  THERE ARE STANDARDIZED PROCEDURES THAT ARE FOLLOWED.

18           **MR. STEWART:**  I DON'T KNOW THE ANSWER TO THAT, YOUR

19  HONOR.  I AM SORRY, I DON'T HAVE THE ANSWER.

20           **THE COURT:**  AND IF THEY -- SO I AM ASSUMING THERE IS

21  A WRITING SOMEWHERE THAT WOULD APPLY TO ALL PORTS OF ENTRY AND

22  ALL OF THE BORDER ENFORCEMENT AREAS ALONG ALL OF THE STATES

23  ALONG THE BORDER, THAT IT WOULD BE IN WRITING AND PRODUCIBLE.

24           **MR. STEWART:**  I CAN CHECK ON THAT, YOUR HONOR.  I

25  DON'T HAVE THE ANSWER FOR YOU NOW, BUT LET ME CHECK ON THAT.


SEPTEMBER 20, 2019

1    **THE COURT:**  ALL RIGHT.

2         SO THAT I AM CLEAR, THAT EXHIBIT 4 IS INTERIM

3    GUIDANCE BUT YOU ARE SUGGESTING THAT IS ACTUALLY THE GUIDANCE.

4    **MR. STEWART:**  THAT'S THE OPERATIVE GUIDANCE IS MY

5    UNDERSTANDING, AND THAT IS THE NATIONAL GUIDANCE, YOUR HONOR.

6    YOU KNOW HOW LINGO CAN GO.

7    **THE COURT:**  THERE IS A LOT OF DISCUSSION IN THE

8    DECLARATION FROM CBP ABOUT PLACEMENT FOR LIMITED TIMES, AND

9    THERE ARE LEGAL CONSTRAINTS ON CBP AND ICE WITH RESPECT TO

10   PLACEMENT OF CHILDREN INCLUDING UNDER THE TVPRA AND FLORES.

11        DOES FLORES APPLY TO THIS CLASS?  I REMEMBER THERE

12   WAS A SETTLEMENT AGREEMENT EARLY ON.  SO DOES IT CARVE OUT ALL

13   OF THE CLASS MEMBERS HERE, OR WAS IT ONLY FOR A LIMITED

14   PORTION?  OR IS FLORES AND THE 20-DAY TIMEFRAME APPLICABLE AS

15   WE GO FORWARD?

16   **MR. STEWART:**  I BELIEVE THAT IS STILL --

17        LET ME CONFER FOR ONE MINUTE, MAKE SURE.

18        **(DISCUSSION OFF THE RECORD)**

19   **MR. STEWART:**  IT WOULD APPLY TO THIS CLASS, YOUR

20   HONOR.  THAT IS STILL AN ONGOING THING.  THERE ARE RECENT

21   REGULATIONS THAT ARE OF COURSE ABOUT TO -- YOU KNOW, ARE BEING

22   LITIGATED AND TAKING EFFECT.  BUT THAT WOULD APPLY HERE,

23   SUBJECT OF COURSE TO THE AGREEMENT AS TO ONE ASPECT OF FLORES

24   IN THIS CASE.

25   **THE COURT:**  DO YOU AGREE, MR. GELERNT?


SEPTEMBER 20, 2019

55

1          WHAT WAS THAT CARVE OUT?  THERE WAS A SETTLEMENT

2     AGREEMENT EARLY ON WHERE PARENTS AGREED TO WAIVE THE

3     CHILDREN'S FLORES RIGHTS, WAS THAT --

4          **MR. GELERNT:**  I THINK IT WAS FOR INDIVIDUAL CASES

5     WHAT A PARENT COULD DO IN TERMS OF WAIVER.  BUT I THINK THE

6     GENERAL VIEW IS THAT -- THE GENERAL POINT IS THAT FLORES DOES

7     APPLY TO THE CLASS.

8          **THE COURT:**  OKAY.

9          THESE STANDARDIZED PROCEDURES THAT ARE REFERENCED,

10    ALONG WITH THIS GUIDANCE, DOES ICE HAVE SIMILAR GUIDELINES?  I

11    THINK THERE WAS A REFERENCE THAT O.R.R. DOES.  I DON'T KNOW

12    WHAT THOSE GUIDELINES ARE, BUT O.R.R. HAS ITS OWN GUIDELINES,

13    WRITTEN POLICIES.

14         **MR. STEWART:**  I BELIEVE -- AS FAR AS WRITTEN

15    GUIDANCE, YOUR HONOR?

16         **THE COURT:**  YES.  STANDARDS UNDER WHICH FAMILIES

17    WILL BE SEPARATED OR PERHAPS REUNIFIED.

18         **MR. STEWART:**  I BELIEVE, YOUR HONOR, THE ICE

19    STANDARDS THAT WE PRESENT ARE THE ONES IN THE HARPER

20    DECLARATION ABOUT FAMILY RESIDENTIAL STANDARDS AND THOSE KINDS

21    OF CONTEXTS.

22         O.R.R. ISN'T MAKING SEPARATION DECISIONS, BUT WILL

23    MAKE, YOU KNOW, FITNESS DETERMINATIONS ON REMOVAL AND THAT

24    SORT OF THING.

25         **THE COURT:**  O.R.R. HAS A RESPONSIBILITY OF

SEPTEMBER 20, 2019

1   REUNIFYING.  SO SAY THE PARENT IS CRIMINALLY PROSECUTED, IS IN
2   CRIMINAL CUSTODY FOR A MONTH, THEN O.R.R. HAS TO REUNIFY.  AS
3   I UNDERSTAND THEY HAVE CERTAIN STANDARDS.  MAYBE IT IS THE
4   TVPRA, OR I AM WONDERING IF THEY HAVE UNIQUE MS. L. STANDARDS.
5          **MR. STEWART:**  I BELIEVE O.R.R. DOES HAVE A POLICY
6   GUIDE TO GENERAL -- YOU KNOW, STANDARDS FOR REUNIFYING IN THAT
7   CASE, YOUR HONOR.  WE HAVEN'T FILED THAT.  THOSE ARE, I
8   BELIEVE, PUBLIC AND AVAILABLE.
9          **THE COURT:**  IT SEEMS TO ME THAT -- WELL, IF THE
10  COURT WERE TO ORDER THE PRODUCTION OF ALL OF THESE POLICIES
11  AND PROCEDURES THAT ARE REFERENCED OF CBP, ICE, AND O.R.R.,
12  YOU CAN GET THAT, WHATEVER DOCUMENTATION EXISTS, AND PRODUCE
13  IT WITHOUT OBJECTION?  OR AT A MINIMUM AT LEAST IN CAMERA TO
14  THE COURT.
15         **MR. STEWART:**  I BELIEVE WE PRESENTED THOSE, YOUR
16  HONOR.  I BELIEVE WE E-MAILED THEM TO THE COURT, THOUGH I
17  DON'T BELIEVE THEY ARE ON THE DOCKET.
18         **THE COURT:**  I THINK THOSE WERE THE FRC STANDARDS.  I
19  DON'T THINK THERE WERE ANY OTHER STANDARDS.
20         **MR. STEWART:**  WE CAN CHECK ON THAT, YOUR HONOR, AND
21  LET YOU KNOW IF THERE WOULD BE OBJECTION.  I KNOW, THAT AS
22  YOUR HONOR IS AWARE, THERE COULD BE ISSUES.
23         **THE COURT:**  OKAY.
24         **MR. STEWART:**  ISSUES WITH PRODUCING, AND WE CAN
25  IDENTIFY THOSE.


SEPTEMBER 20, 2019

```
 1              MS. FABIAN:  CAN I ASK JUST A CLARIFYING POINT?
 2              THE COURT:  YES.
 3              MS. FABIAN:  CAN YOU JUST CLARIFY WHAT THE REQUEST
 4    WOULD BE AS FAR AS STANDARDS.  I THINK WHAT WE PRODUCED ON
 5    AUGUST 30TH WAS THE STANDARDS THAT -- AND I CAN'T REMEMBER
 6    YOUR EXACT LANGUAGE BUT IT WAS THE STANDARDS THAT GOVERN
 7    SEPARATIONS.
 8              THE COURT:  YES.
 9              MS. FABIAN:  AND THAT WOULD BE FROM THE CBP INTERIM
10    GUIDANCE, WHICH IS THE NATIONAL GUIDANCE FOR CBP.  AND THEN
11    THE ICE FAMILY RESIDENTIAL STANDARDS WHICH GO TO WHAT
12    LIMITS -- HOW ICE WOULD SUBSEQUENTLY POTENTIALLY MAKE THEIR
13    SEPARATION DECISION BASED ON ICE.
14              THE COURT:  YES.
15              MS. FABIAN:  FRS.
16              THE COURT:  YES.
17              MS. FABIAN:  IF YOU ARE ASKING ABOUT O.R.R.
18    STANDARDS THOSE WOULDN'T GO TO SEPARATION, BUT O.R.R., IF AN
19    INDIVIDUAL IS INITIALLY EXCLUDED THAT PERSON COULD STILL SEEK
20    REUNIFICATION.
21              THE COURT:  RIGHT.
22              MS. FABIAN:  SO I THINK WHAT YOU ARE ASKING IS WHAT
23    GUIDES O.R.R. STANDARDS, AND I THINK THAT THAT IS THE TVPRA
24    PROCESS THAT WE DISCUSSED EXTENSIVELY MUCH EARLIER IN THE
25    CASE.


                    SEPTEMBER 20, 2019
```

1          IF THAT IS WHAT YOU ARE ASKING ABOUT, IT WOULD BE
2     THE POLICY GUIDE, BUT WE CAN CERTAINLY SHARE THAT WITH YOU.
3     IT IS ON THE WEBSITE.  IT WOULD BE QUITE EASY.

4          BUT IF THERE IS SOMETHING MORE SPECIFIC AND YOU WANT
5     THAT, WE CAN CONSIDER THAT AS WELL.  I JUST WANT TO MAKE SURE
6     I UNDERSTAND EXACTLY WHAT YOU ARE LOOKING FOR.

7          **THE COURT:**  IT WOULD INCLUDE O.R.R., AS YOU
8     MENTIONED.  AND THEN WHETHER ICE HAS ANYTHING IN ADDITION TO
9     THE FRC STANDARDS THAT RELATE TO CIRCUMSTANCES UNDER WHICH
10    FAMILIES CAN BE SEPARATED.

11         AND THEN CBP.  IT IS NOT CLEAR TO ME WHETHER
12    EVERYTHING HAS BEEN PRODUCED FROM CBP BECAUSE WHEN I REVIEWED
13    THE DECLARATION AT PARAGRAPH 13 OF MR. EASTERLING IT APPEARS
14    THERE IS MORE.

15         **MS. FABIAN:**  I THINK YOU WOULD FIND THAT FOR
16    FOLLOWING UP ON THE CBP NATIONAL GUIDANCE, CBP THEN TENDS
17    TO -- BORDER PATROL SECTORS MAY OPERATIONALIZE THE GUIDANCE AS
18    MR. STEWART SAID.  THAT WON'T NECESSARILY BE IN A SPECIFIC
19    WRITTEN GUIDANCE DOCUMENT, BUT IT IS ROLLED OUT IN VARIOUS
20    WAYS IN THE DIFFERENT SECTORS, DEPENDING SORT OF ON THE
21    VARIANCES OF THE SECTORS.

22         **THE COURT:**  OKAY.  SO I MAY ASK THE GOVERNMENT TO
23    PRODUCE WHAT IT HAS, OR AT LEAST TO ARTICULATE THE FORMAT OF
24    THESE VARIOUS STANDARDIZED PROCEDURES.

25         **MS. FABIAN:**  UNDERSTOOD.  I CAN TALK TO THEM ABOUT


SEPTEMBER 20, 2019

```
 1   THAT.
 2                THE COURT:   OKAY.
 3                MR. STEWART, SO IF WE ASSUME, IN THE CONTEXT OF THIS
 4   CASE, THAT THERE IS A FIFTH AMENDMENT RIGHT, CONSTITUTIONAL
 5   RIGHT TO FAMILY INTEGRITY THAT APPLIES TO THESE CLASS MEMBERS,
 6   THAT, OF COURSE, IS A ROBUST CONSTITUTIONAL RIGHT.   THE
 7   GOVERNMENT CANNOT INTERRUPT THAT RIGHT UNLESS CERTAIN CRITERIA
 8   ARE MET WHICH RELATE GENERALLY TO FITNESS AND DANGER.   AND
 9   THEN CRIMINAL HISTORY, OF COURSE, RELATES TO FITNESS AND
10   DANGER.   IT IS A WAY, I THINK, OF DETERMINING WHETHER THE
11   PARENT IS FIT OR A DANGER.   IT IS ONE OF THE CRITERIA THAT
12   AUTHORITIES LOOK TO.   AND THEN, OF COURSE, IN THE CONTEXT OF
13   THIS CASE, WHETHER THE ADULT IS A PARENT.
14                SO IF WE ASSUME THIS FIFTH AMENDMENT RIGHT EXISTS,
15   THE GOVERNMENT, EVEN IN THE CONTEXT OF THE BORDER AND ALL OF
16   ITS IMPORTANT DUTIES RELATING TO IMMIGRATION AND PROSECUTION
17   AND DETENTION, CAN'T INTERFERE WITH THAT RIGHT WITHOUT
18   DETERMINING FITNESS AND DANGER AND PARENTAGE.
19                DOESN'T THE GOVERNMENT HAVE TO DO MORE WITH RESPECT
20   TO PARENTAGE?
21                IN A DECLARATION MR. EASTERLING SETS OUT ALL OF THE
22   INQUIRIES THAT ARE MADE ON THE GROUND TO DETERMINE WHETHER
23   THERE IS A PARENT, BUT ULTIMATELY WHAT HE STATES IS IF WE HAVE
24   A GOOD FAITH CONCERN THAT THIS IS NOT THE PARENT THEN WE
25   SEPARATE.   IF WE ARE NOT ABLE TO, AS WE DRILL DOWN THROUGH THE
```

SEPTEMBER 20, 2019

60

DOCUMENTS AND HAVE CONCERNS ABOUT THE AUTHENTICITY OR WHETHER
THESE DOCUMENTS ARE FRAUDULENT, AND AS WE INTERVIEW THE PARENT
AND THE CHILD, OR THE ADULT AND THE CHILD, WE HAVE A CONCERN
THAT IT IS THE PARENT, WE SEPARATE.

IF THERE IS A CONSTITUTIONAL RIGHT INVOLVED
SHOULDN'T THE GOVERNMENT AT LEAST HAVE AN OBLIGATION TO, SINCE
THERE IS A SCIENTIFIC, QUICK MANNER TO DETERMINE PARENTAGE
SHOULDN'T IT BE OBLIGATED TO DO THAT?

SO RATHER THAN PUT THE ONUS ON THE PARENT TO
ESTABLISH PARENTAGE, IF THE GOVERNMENT HAS A CONCERN PRIOR TO
SEPARATING, IF IT WOULD DO THESE QUICK DNA TESTS THAT TAKE A
MATTER OF HOURS AND IT IS DEFINITIVE.  THEN IT ADDRESSES THAT
ISSUE CONCRETELY.

SO MUCH OF WHAT WE ARE WRESTLING WITH IS HOW DO WE
DETERMINE, REALLY, WHETHER THE PERSON IS A DANGER OR FIT.  BUT
ON THIS ISSUE OF PARENTAGE THERE IS A SCIENTIFIC AVENUE THAT
IS VIRTUALLY CERTAIN.  IT APPEARS TO BE QUICK AND RELATIVELY
INEXPENSIVE.  AND EXPENSE REALLY TAKES A FAR BACK SEAT WHEN
YOU ARE DEALING WITH THE INTERRUPTION OF A CONSTITUTIONAL
RIGHT.

SO THE QUESTION IS:  WHY SHOULDN'T THE GOVERNMENT
HAVE THE DNA TESTING AT EVERY AVAILABLE PORT OR STATION WHERE
THESE DECISIONS ARE MADE?

**MR. STEWART:**  I THINK HERE IS WHAT I WOULD SAY, YOUR
HONOR.  AND I RECOGNIZE THAT THE SPEED WITH WHICH DNA TESTING

SEPTEMBER 20, 2019

```
 1    CAN WORK IN DETERMINING THOSE THINGS, IT IS A VERY ATTRACTIVE
 2    OPTION.  SO I DO UNDERSTAND THE DRAW THERE.
 3              THE POINTS I WOULD RAISE, YOUR HONOR, ARE THE
 4    FOLLOWING.
 5              AS YOU HAVE SEEN IT, RAPID DNA IS -- I BELIEVE IT IS
 6    TWO OF THE LATER DECLARATIONS WE SUBMITTED, I BELIEVE IT IS
 7    DECLARATIONS 7 AND 8, THE HASTINGS AND SMITH DECLARATIONS, SAY
 8    THAT THIS HAS BEEN DEPLOYED -- RAPID DNA IN THE CBP CONTEXT
 9    HAS BEEN DEPLOYED IN A LIMITED WAY IN A PILOT PROGRAM UNDER
10    CERTAIN PROGRAMS, YOU KNOW, PRESENTED BY CONGRESS.  IT IS KIND
11    OF UNDERWAY.
12              I THINK IT IS A TRICKY THING TO FIT INTO THE
13    OPERATIONAL CONTEXT, THE OPERATIONAL MISSION WITHOUT, I WOULD
14    SAY, THE DELIBERATIVE AND INVESTIGATORY HAND THAT CONGRESS
15    SORT OF HOLDS, YOUR HONOR.
16              WITH PARENTAGE MORE GENERALLY, THOUGH, YOUR HONOR, I
17    THINK THE BEST INDICATOR THAT IT IS -- THAT PARTICULAR PRONG
18    IS NOT PRESENTING A PROBLEM IS JUST THE RARITY OF THE CASES
19    WITH WHICH IT COMES UP.
20              YOU CAN SEE FROM SOME OF THESE I213'S, YOU KNOW,
21    THAT CBP IS FACED WITH A TOUGH THING.  THEY ARE OFTEN WITH
22    FOLKS WITH BAD DOCUMENTS, THEY ARE RELATED BUT MAYBE THEY ARE
23    AN UNCLE.  THEY HAVE TO DO WHAT THEY CAN TALKING TO BOTH THE
24    CHILD AND THE PARENT.  SOMETIMES THEY GET DIFFERENT
25    INFORMATION, AND IN ONE CASE TURNED OUT, EVEN WHEN THEY GOT
```

SEPTEMBER 20, 2019

1   DIFFERENT INFORMATION, TURNED OUT INDEED TO BE THE PARENT BUT
2   THEY DIDN'T KNOW THAT UNTIL LATER INFORMATION.

3          AND MY CONCERN IS, YOUR HONOR, THAT IT WOULD BE
4   TAKING SORT OF A BATTERING RAM TO JUST A SMALL ASPECT OF THE
5   PROBLEM IN A WAY THAT I THINK YOUR HONOR HAS TRIED TO BE
6   PRETTY CALCULATED -- TARGETED IN HOW YOU CALCULATE REMEDIES OR
7   APPROACHES TO THESE DIFFERENT THINGS.  AND WE JUST DON'T HAVE
8   THE SHOWING THAT DNA WOULD BE NEEDED OR KIND OF APT TO THE
9   PROBLEM HERE.

10         I THINK IT IS JUST A CHALLENGE THAT, YOU KNOW, IN
11  SOME SMALL NUMBER OF CASES THAT THE PLAINTIFFS HAVE PRESENTED
12  THERE ARE ISSUES, THERE ARE DIFFICULTIES, THERE ARE
13  CHALLENGES.  CBP TRIES TO CAREFULLY ACCOUNT FOR THOSE AND IT
14  NEEDS TO, UNFORTUNATELY, ACCOUNT FOR THE REALITIES OF
15  SMUGGLERS AND BAD INFORMATION AND JUST THE RISKS OF VERY
16  TENDER-AGED CHILDREN, YOU KNOW, GOING OFF WITH SOMEONE WHO IS
17  NOT IN FACT A PARENT WITH THEIR BEST INTERESTS AT HEART.

18         SO THAT RESPONSE I JUST -- I PRESENT TO YOU THOSE
19  DECLARATIONS SAYING DNA, IT IS SOMETHING THAT AS A REMEDY OR
20  AN APPROACH, IT IS BEST -- IT IS BEST DEPLOYED IN KIND OF A
21  CONGRESSIONAL CONTEXT, YOUR HONOR, AND AFTER WE KIND OF GET
22  MORE INFORMATION ON HOW TO DO IT BEST.  AND IT IS KIND OF IN A
23  PILOT STAGE NOW.  AND I DON'T THINK WE ARE QUITE AT THE KIND
24  OF FLICK A SWITCH AND WE KNOW THAT THAT WOULD GET AT THE
25  PROBLEM HERE.


                    SEPTEMBER 20, 2019

1          I THINK THE BEST THING WE CAN DO IS HAVE CBP

2   CONTINUE TO DO THEIR DILIGENCE AND DO THE BEST THEY CAN, WHICH

3   WE TRIED TO SHOW THEY ARE DOING.

4          **THE COURT:**  ALL RIGHT.

5          A RELATED QUESTION INVOLVING O.R.R.  IF A FAMILY IS

6   SEPARATED PROPERLY, SO WE ASSUME PERHAPS THE PARENT HAS AN

7   ILLNESS AND IS HOSPITALIZED AND IS NECESSARILY SEPARATED, THE

8   CHILD IS THEN, UNDER THE TVPRA, DEEMED UNACCOMPANIED AND IS

9   SENT OFF TO O.R.R.

10          IT APPEARS O.R.R. IS THEN USING THIS VERY DETAILED

11  PROCESS UNDER THE TVPRA TO REUNITE WHEN, HERE AGAIN, IF THERE

12  IS A CONSTITUTIONAL RIGHT WE ARE NOT DECIDING WHETHER THE

13  PARENT IS A GOOD PARENT OR A MEDIOCRE PARENT OR EVEN A POOR

14  PARENT, BUT WHETHER THEY ARE REALLY A DANGER AND UNFIT.

15          AND SO IT WOULD SEEM TO ME THAT O.R.R. WOULD JUST

16  HAVE AN OBLIGATION TO REUNIFY UNDER THE MS. L. TYPE OF

17  STANDARDS THAT WE HAVE DEVELOPED; NOT THE TVPRA, WHICH IS A

18  VERY LABORIOUS PROCESS THAT JUST DOESN'T FIT THE CONTEXT OF

19  THIS CASE.

20          **MR. STEWART:**  I THINK YOUR HONOR DECIDED THAT WITH

21  RESPECT TO CLASS MEMBERS.  BY HYPOTHESIS HERE AGAIN WE ARE

22  TALKING ABOUT NOT CLASS MEMBERS, FOLKS -- CRIMINAL HISTORY,

23  WHATEVER, THAT DO, I THINK, CALL FOR -- EVEN WHEN THERE IS

24  PARENTAGE AND THERE IS NO DOUBT OF THAT, YOUR HONOR, ACCOUNT

25  FOR SOME -- ACCOUNT FOR SOME MORE DILIGENCE.


                      SEPTEMBER 20, 2019

```
 1              AND TAKING THE APPROACH OF KIND OF AN EXPEDITED
 2    PROCESS SOMEWHERE BETWEEN THE MS. L. INJUNCTION AND THE TVPRA
 3    WOULD CREATE ANOTHER TIER THAT I DON'T THINK IS WARRANTED WITH
 4    THESE FOLKS WHO ARE INDEED EXCLUDED FROM THE CLASS;
 5    PARTICULARLY AGAIN BECAUSE WE JUST DON'T HAVE THE SHOWING THAT
 6    ANY -- THAT SORT OF DRASTIC MOVE IS WARRANTED HERE, YOUR
 7    HONOR.
 8              WHEN YOU HAVE A CONTEXT OF -- AND I THINK, FRANKLY,
 9    YOUR HONOR, I DON'T KNOW THERE ARE REALLY -- THE TVPRA PROCESS
10    IS A DILIGENT PROCESS SO IT TAKES SOME TIME, SO OF COURSE
11    THERE ARE GOING TO BE ALWAYS COMPLAINTS OF, YOU KNOW, IT IS
12    TAKING LONG FOR SOME PEOPLE.
13              BUT THERE IS NO INDICATION THAT -- OR I AM NOT
14    SEEING ANY INDICATION THAT IT IS NOT REALLY WORKING OR DOING
15    ITS JOB, OR THAT SORT OF THING.  I DON'T REALLY TAKE THAT TO
16    BE MUCH OF WHAT PLAINTIFFS ARE PRESSING HERE.
17              THAT WOULD BE WHAT I RESPOND.
18         THE COURT:  THE LAST QUESTION I HAVE, I THINK IT HAS
19    TO DO WITH THE SCOPE OF THE CLASS OR THE SCOPE OF THE
20    INJUNCTIVE ORDER.  IN FOOTNOTE, I THINK IT IS 6 AND 7 OF THE
21    GOVERNMENT BRIEF, THERE IS THE 1326 ISSUE.  AND THAT RELATES
22    TO THE SCOPE OF THE CLASS, I THINK.
23              AND SO I GUESS THE FIRST QUESTION I WOULD HAVE IS,
24    MR. GELERNT IS INVITING THE COURT, I BELIEVE, TO ENLARGE THE
25    SCOPE OF THE CLASS TO INCLUDE CRIMINAL HISTORY.
```

SEPTEMBER 20, 2019

```
 1            AND SO WOULD THE GOVERNMENT BE OPPOSED TO REDEFINING
 2   CRIMINAL HISTORY CONSISTENT WITH, FOR EXAMPLE, THE STANDARD
 3   THAT IS SET OUT IN THE EASTERLING DECLARATION, WHICH BASICALLY
 4   HAS -- I FORGOT THE TERM HE USED -- BUT IT IS LIKE SERIOUS
 5   MISDEMEANORS AND ANY FELONY, WITH THE EXCEPTION, PERHAPS OF
 6   1326'S.
 7            MR. STEWART:  WE WOULD OPPOSE THAT, YOUR HONOR,
 8   AGAIN BECAUSE IT IS -- IT WOULD, I THINK, LEAD TO A LOT OF THE
 9   PROBLEMS WE IDENTIFIED IN OUR MOTION.  IT IS A HIGHLY
10   INDIVIDUALIZED SET OF DETERMINATIONS, TENTATIVE STEPPING ON OF
11   THE PROPERLY EXERCISED DISCRETION.
12            I THINK WHAT WE ARE SAYING IN FOOTNOTE 6 TO 7 IS
13   THAT THIS GROUP WITH SECTION 1326 CONVICTIONS, IT IS A REALLY
14   CHALLENGING GROUP.  YOU KNOW, IT IS IMMIGRATION VIOLATIONS BUT
15   THEY ARE FELONIES.  THEY ARE SERIOUS.  IT IS A POPULATION THAT
16   IS SUBJECT TO REINSTATEMENT OF REMOVAL, AND THEREFORE PRETTY
17   PROMPT REMOVAL, YOUR HONOR.  BARS ON ASYLUM, THAT KIND OF A
18   THING.  BECAUSE THEY HAVE FELONIES, YOU KNOW, AND IN A NUMBER
19   OF OTHER CASES OTHER CRIMINAL HISTORY, THEY ARE JUST A REALLY,
20   REALLY CHALLENGING GROUP.
21            SO WHAT WE ARE KIND OF SAYING HERE, IT IS, LIKE,
22   LOOK, HERE IS OUR PROPOSAL FOR THIS GROUP.  WE ARE TRYING TO
23   KIND OF ACCOMMODATE THE DIFFERENT FACTORS.  WE HAVE KIND OF
24   THIS UNIQUE WAY TO TREAT THIS REALLY, REALLY DIFFICULT,
25   CHALLENGING GROUP, AND WE WOULD CAP THINGS AT THAT.


                       SEPTEMBER 20, 2019
```

```
 1              I THINK THAT IS WHY WE EMPHASIZED, YOUR HONOR, IS
 2    THAT -- AND WHY WE PROPOSED THE WAY TO DEAL WITH THIS AND
 3    PROPOSED ACTION ON YOUR HONOR'S PART, IS WE JUST WANT TO MAKE
 4    CLEAR THAT THIS IS, LIKE, A SINGLE CONTEXT IN WHICH WE ARE
 5    DOING THIS TO TRY TO BEST ACCOMMODATE JUST VARIOUS COMPETING
 6    INTERESTS.
 7              SO THAT IS WHAT I WOULD SAY THERE, YOUR HONOR.
 8              BUT I THINK YOUR HONOR HAD IT JUST, YOU KNOW, JUST
 9    RIGHT IN YOUR PRIOR ORDER ON THOSE TWO CASES ABOUT A YEAR AGO
10    WHEN YOU SAID, LOOK, WE -- YOU KNOW, I EXCLUDED CRIMINAL
11    HISTORY FROM THE CLASS.  TO THEIR CREDIT THE GOVERNMENT HAS
12    BEEN CAREFUL IN EXERCISING DISCRETION.
13              THAT IS, I THINK, STILL OPERATIVE.  IT IS THE
14    APPROPRIATE APPROACH HERE.  AND I THINK YOUR HONOR SHOULD JUST
15    CONTINUE ON THAT, RECOGNIZING THAT THERE WILL BE EXAMPLES THAT
16    SEEM VERY UNFORTUNATE.
17              AGAIN, WE DON'T CONCEDE A LOT OF THOSE EXAMPLES.  WE
18    WOULD WANT TO TEST THOSE.  WE HAVE MAJOR EVIDENTIARY CONCERNS,
19    FOUNDATION CONCERNS ON A LOT OF THOSE.  BUT YOU CAN ALWAYS
20    FIND ANECDOTES AND EXAMPLES OVER THE COURSE OF THE YEAR.
21              WHAT WE HAVE DESCRIBED HERE, YOUR HONOR, IS A GLOBAL
22    KIND OF APPROACH OF REASONABLENESS THAT IS APT TO THE CONTEXT
23    AND RECOGNIZES THE VERY, VERY REAL DIFFICULTIES WHILE ALSO
24    RESPECTING VERY MUCH YOUR HONOR'S CONCERNS, THE POTENCY AND
25    POINTS MADE IN YOUR PRELIMINARY INJUNCTION ORDER AND CERTAIN
```

SEPTEMBER 20, 2019

1   CERTIFICATION ORDERS.

2          THAT IS WHAT I WOULD SAY THERE, YOUR HONOR, IS THAT

3   WE FOUND A GOOD WAY TO STRIKE A BALANCE IN WHAT IS NOT AN EASY

4   TASK.  THIS IS NOT SORT OF AN INJUNCTION WHERE IT IS JUST, YOU

5   KNOW, STOP IMPLEMENTING ONE POLICY AND, YOU KNOW, JUST KIND OF

6   SAY, HEY, STOP IT, IT IS DONE.

7          IT IS A LOT OF JUDGMENT, IT IS AN ONGOING CONTEXT.

8   AND AS WE HAVE KIND OF SHOWN IN OUR DECLARATIONS AND IN OUR

9   PAPERS, WE ARE REALLY TRYING TO DO WHAT WE CAN TO GET THIS

10  RIGHT.  IT IS NOT EASY, AND WE ARE GOING TO HAVE EXAMPLES THAT

11  CAN KIND OF TUG AT THE HEART, BUT IT IS THE RIGHT APPROACH IN

12  THIS CIRCUMSTANCE.

13          **THE COURT:**  ON THE 1326 ISSUE, SO IF THERE IS A

14  CARVE OUT FOR 1326'S, DOES THIS MEAN, TOO, THAT THEY WILL BE

15  REUNIFIED?  AND THEN ONCE THEY ARE REUNIFIED, AREN'T THEY THEN

16  SUBJECT TO THE MMM PROVISIONS WHERE THE CHILDREN MAY BE

17  PURSUING ASYLUM RIGHTS SO THERE CANNOT BE AN IMMEDIATE REMOVAL

18  OF THE FAMILY UNIT?

19          **MR. STEWART:**  I THINK WE DESCRIBED THE APPROACH WE

20  PROPOSED TAKING THERE IN THE FOOTNOTE THERE, YOUR HONOR, THAT,

21  YOU KNOW, AN ELECTION SHOULD BE MADE UPON REUNIFICATION, THAT

22  SORT OF THING.

23          **THE COURT:**  THAT WOULD BE CONSISTENT WITH MMM, WOULD

24  IT NOT?  IN OTHER WORDS, THE PARENT COULD SAY, I ELECT TO

25  REMAIN HERE WITH MY CHILD PURSUING HIS OR HER ASYLUM RIGHTS.


                    SEPTEMBER 20, 2019

1          **MR. STEWART:**  I HADN'T LOOKED AT THE MMM -- MMM, IT

2     DOESN'T APPLY TO NEW SEPARATIONS, YOUR HONOR.  THAT ONE IS

3     CAPPED IN TIME.

4          **THE COURT:**  OKAY.  UNDER THE GOVERNMENT'S PROPOSAL,

5     THESE PARENTS, GOING FORWARD AFTER JUNE OF 2018 AND NOT

6     SUBJECT TO MMM, WOULD BE REUNIFIED.  THE 1326 WOULD BE A CARVE

7     OUT.  BUT THEY WOULD BE SUBJECT, THE FAMILY UNIT, TO IMMEDIATE

8     REMOVAL.

9          **MR. STEWART:**  IMMEDIATE REMOVAL, I WOULD SAY THE

10    DATE WE PROPOSED, YOUR HONOR, IS JULY 26.  WE CONVEYED TO THE

11    PLAINTIFFS, YOU KNOW, THIS IS OUR APPROACH.

12          AND WE WOULD ALSO -- I WOULD WANT TO MAKE CLEAR THAT

13    -- I WANT TO BE CAREFUL NOT TO SHORTHAND IT, YOUR HONOR.  I

14    APOLOGIZE FOR THE LENGTH OF THE FOOTNOTES, BUT WE HAVE TRIED

15    TO SAY, LIKE, HEY, THESE ARE THE KEY KIND OF IMPORTANT THINGS

16    HERE.

17          IT REALLY IS A TOUGH GROUP.  SO THE DATES WE PUT IN

18    THERE, I WOULD JUST TRY TO HEW VERY CLOSELY TO WHAT WE TRIED

19    TO LAY OUT THERE.

20          **THE COURT:**  DOESN'T THAT THEN FIRE UP MR. BEST, AND

21    HE WOULD WANT TO BRING THE SAME, MAYBE ENLARGE THE SCOPE OF

22    THE MMM CLASS?  WOULDN'T THEY BE MAKING THE SAME ARGUMENT,

23    THAT THE GOVERNMENT CAN'T REUNIFY AND REMOVE THE FAMILY UNIT

24    BECAUSE IT RUNS OVER THE CHILD'S ASYLUM RIGHTS?

25          **MR. STEWART:**  I THINK -- I MEAN, I THINK WE ARE


                    SEPTEMBER 20, 2019

1   SAYING THAT THE PARENT CAN ELECT REMOVAL WITH THE CHILD OR LET

2   THE CHILD REMAIN TO PURSUANT AN IMMIGRATION CLAIM, YOUR HONOR.

3           I MEAN, IT IS -- THE PARENT, REALLY, IN THIS CONTEXT

4   HAS NO RIGHT TO REMAIN HERE.  I MEAN, IT IS A REINSTATED

5   REMOVAL TYPE OF SITUATION IN AT LEAST THE VAST BULK IF NOT --

6   THE VAST BULK OF THESE, I WOULD THINK.

7           SO I AM NOT SURE WHAT MMM OR OTHER PLAINTIFFS WOULD

8   SAY ABOUT THAT, BUT WE WOULD SAY THERE IS NO ENTITLEMENT

9   THERE.

10          **THE COURT:**  ALL RIGHT.

11          MR. GELERNT.

12          **MR. BEST:**  YOUR HONOR, THIS IS MR. BEST.  I AM STILL

13  ON THE LINE LISTENING IN.  AND I CONFESS THAT I AM NOT REALLY

14  IN THE WEEDS AND IN THE DETAILS ON THIS ISSUE, THIS PARTICULAR

15  ISSUE THAT YOU ALL ARE DISCUSSING AT THE MOMENT.  BUT WE

16  WOULD -- NOW THAT YOU FLAGGED THAT, WE WOULD LIKE TO GIVE THAT

17  SOME THOUGHT.

18          **THE COURT:**  YES.

19          **MR. BEST:**  WE WILL GET IN TOUCH WITH MR. GELERNT AND

20  HIS TEAM.

21          **THE COURT:**  YES.  AND IF YOU WANT TO BRIEF THAT

22  ISSUE, MAYBE CONTACT THE COURT AND LET US KNOW.

23          IT IS A VERY BEEFY SET OF FOOTNOTES, 6 AND 7.  SO I

24  INVITE YOU TO STUDY THEM, AND THEN IF IT IS SOMETHING YOU WANT

25  TO BRIEF SEPARATELY OR THROUGH MR. GELERNT, LET US KNOW.


                    SEPTEMBER 20, 2019

```
 1              MR. STEWART:  ONE THING I WOULD FLAG, YOUR HONOR, IS
 2    THAT -- I DON'T SEE HOW THE GOVERNMENT COULD AGREE TO ANY
 3    TREATMENT OF SECTION 1326 AS CLASS MEMBERS IF THEY WOULD BE
 4    OBLIGED TO INDEFINITELY STAY IN THE UNITED STATES BY
 5    BOOTSTRAPPING ONTO THE CHILDREN.  I JUST CAN'T SEE THAT.  I
 6    MEAN, THESE ARE, LIKE WE SAID, REPEAT -- REPEAT OFFENDERS,
 7    FELONS WITH -- YOU KNOW, UNLESS THEY MAKE A VERY, VERY HIGH
 8    SHOWING OF RELIEF HAVE NO ABILITY TO STAY IN THE COUNTRY
 9    LEGALLY.
10              THE COURT:  IT IS A THORNY ISSUE.
11              MR. STEWART:  YEAH.  THANK YOU, YOUR HONOR.
12              THE COURT:  MR. GELERNT.  YOU DON'T HAVE TO SAY
13    ANYTHING.
14              (LAUGHTER)
15              MR. GELERNT:  NO, I HAVE PLENTY TO SAY.
16              YOUR HONOR, I THINK THIS IS ONE OF THOSE MOMENTS IN
17    THE LONG HISTORY OF THIS CASE THAT I WANT TO BE AS CLEAR AS
18    POSSIBLE THAT THERE IS AN ENORMOUS AMOUNT AT STAKE.  I MEAN,
19    WE ARE TALKING ABOUT OVER 1,000 CHILDREN.
20              I RECOGNIZE THAT THERE ARE A LOT OF FAMILIES COMING,
21    BUT WE ARE TALKING ABOUT LITTLE CHILDREN.  AND SO I WANT TO
22    ADDRESS ALL THE GOVERNMENT'S POINTS AND BE VERY SPECIFIC ABOUT
23    IT.
24              THE FIRST THING I WANT TO START WITH IS THE
25    GOVERNMENT TROTTING OUT PROFESSOR GUGGENHEIM'S DECLARATION.
```

SEPTEMBER 20, 2019

```
 1    AS THE COURT MAY KNOW, HE IS, OF COURSE, ONE OF THE NATION'S
 2    LEADING EXPERTS.
 3            BUT PUTTING THAT ASIDE, THE GOVERNMENT HAS JUMPED ON
 4    ONE OF THE PARAGRAPHS IN HIS DECLARATION WHERE THEY ARE SAYING
 5    PROFESSOR GUGGENHEIM IS SANCTIONING THE REUNIFICATION OF A
 6    PARENT AND CHILD WHERE THE PARENT HAS RAPED THE CHILD.
 7            LET'S JUST BE CLEAR.  THE DECLARATION IS DESCRIPTIVE
 8    OF A STATE COURT RULING BY THE HIGHEST COURT IN NEW YORK, A
 9    UNANIMOUS DECISION.  IT WAS A STATUTORY RAPE CASE WHERE THE
10    FATHER ONLY GOT, I BELIEVE, ONE YEAR IMPRISONMENT.  SO
11    NOTWITHSTANDING THE GOVERNMENT'S DRAMA ABOUT IT, HE IS JUST
12    BEING DESCRIPTIVE TO SHOW WHAT THE LAW IS IN THE STATES.
13            BUT THE LARGER POINT I WANTED TO MAKE ABOUT THE
14    GOVERNMENT TROTTING OUT PROFESSOR GUGGENHEIM'S EXAMPLE THERE
15    IS THAT THE GOVERNMENT'S ARGUMENT IS REALLY THEY DON'T
16    ACTUALLY AGREE WITH THE STATE STANDARD, RIGHT?  I MEAN,
17    BECAUSE THEY ARE SAYING HOW COULD PROFESSOR GUGGENHEIM AGREE
18    WITH THAT NEW YORK COURT OF APPEALS DECISION, UNANIMOUS
19    DECISION.
20            THAT'S THE LAW IN EVERY SINGLE STATE.  SO REALLY
21    WHAT THE GOVERNMENT, ITS ARGUMENT PROVES TOO MUCH.  THEY ARE
22    REALLY JUST DISAGREEING WITH HOW THIS LAW HAS DEVELOPED OVER
23    THE LAST HUNDRED YEARS IN EVERY SINGLE STATE.
24            THE SECOND POINT I WOULD MAKE IS THAT THE RGV
25    GUIDANCE, WE HAVE NOT SEEN IT.  WE DO NOT THINK THAT'S THE
```

SEPTEMBER 20, 2019

1   KIND OF GUIDANCE THAT SHOULD BE SENSITIVE.  WE REALLY WOULD
2   NEED TO SEE THAT.
3           I MEAN, AS YOUR HONOR HAS POINTED OUT, INTERIM HAS
4   NOW BECOME PERMANENT, AND IT IS ONE-PAGER FROM THE DAY AFTER
5   THE INJUNCTION.  BUT IT -- AND THIS IS WHERE I WANT TO BE, YOU
6   KNOW, AS CLEAR AS POSSIBLE.
7           THE RGV GUIDANCE SAYING VIOLENT MISDEMEANORS OR ANY
8   FELONY WOULD SWEEP IN VIRTUALLY ANY CRIME THAT WOULD NOT BE
9   PROBATIVE OF WHETHER A PARENT IS A DANGER.
10          YOUR HONOR PUT IT EXACTLY RIGHT.  CRIMINAL HISTORY
11  IS NOT IRRELEVANT BUT IT IS ALWAYS JUST PROBATIVE.  AND THAT
12  IS WHY A PAST CRIMINAL CONVICTION IS NEVER THE BASIS, EXCEPT
13  IN THE RAREST SITUATIONS, A BASIS FOR AUTOMATIC SEPARATION.
14  AND CERTAINLY NOT ANY FELONY OR VIOLENT MISDEMEANOR.
15          A FATHER WHO HAS HAD A FIGHT WITH SOMEONE ELSE, AN
16  ASSAULT, THAT DOESN'T SAY HE IS A DANGER TO THE CHILD.  THAT
17  IS WHY YOU COULD NOT FIND ANY EXPERT TO COME IN AND SAY.
18          AND SO ULTIMATELY WHAT THIS IS COMING DOWN TO IS ALL
19  OF THE STUFF ABOUT THE BORDER, IS HOW ARE WE GOING TO
20  IMPLEMENT THIS, BECAUSE THE BRIGHT LINE RULE IS YOU DON'T
21  SEPARATE FOR A CRIMINAL CONVICTION.  THAT IS THE EASIEST WAY
22  FOR THEM TO IMPLEMENT IT.  NOT FOR DHS PERSONNEL, WHO ARE NOT
23  EXPERTS IN CHILD WELFARE, TO TRY AND EXERCISE THEIR
24  DISCRETION; WELL, THIS CRIME SEEMS MORE SERIOUS THAN THIS
25  CRIME.  IT IS TO SAY PAST CRIMINAL HISTORY IS NOT A BASIS FOR


SEPTEMBER 20, 2019

1    SEPARATION.  THAT'S THE EASIEST WAY.

2              NOW, THEN WE WOULD BRING IN EXPERTS TO TALK ABOUT,

3    WELL, THE PARENT MAY NOT BE A DANGER TO THE CHILD BUT MAYBE

4    THEY ARE TOO DANGEROUS TO BE IN A PARTICULAR FACILITY, SO HOW

5    ARE WE GOING TO ACCOMMODATE?  CAN WE ACCOMMODATE?  AND THAT IS

6    AT THE BACK END.

7              BUT TO SAY THAT THE GOVERNMENT CAN TAKE AWAY A

8    PARENT, AND SEPARATE A PARENT AND CHILD BASED ON ANY FELONY OR

9    VIOLENT MISDEMEANOR, WOULD GO AGAINST EVERYTHING, THE STATES

10   AND DUE PROCESS, EVERY EXPERT WHO DEALS WITH THIS.

11             AND I THINK WE WOULD BE BACK HERE NEXT YEAR WITH A

12   1,000 MORE CASES.  LITTLE CHILDREN, THE RATE OF SEPARATION IS

13   INCREASING.  THE CHILDREN ARE BECOMING YOUNGER AND YOUNGER.

14   THE CRIMES ARE VERY SMALL.

15             AND, YOU KNOW, WITHOUT BEING TOO DRAMATIC, I THINK

16   THAT WE ARE TALKING ABOUT SEPARATION AND IT HAS GOTTEN

17   SOMEWHAT ANTISEPTIC.  YOU KNOW, WHAT EVERY CHILD EXPERT I TALK

18   TO, WHAT EVERY MEDICAL PROFESSIONAL, WHAT DR. SHONKOFF AT

19   HARVARD WHO HAS REALLY DEVELOPED THE SCIENCE, IT IS BASICALLY

20   CHILD ABUSE.  YOU ARE TERRORIZING THESE LITTLE CHILDREN.  SO

21   IT HAS TO BE THAT WE DON'T SEPARATE UNLESS IT IS ABSOLUTELY

22   RIGHT.  THAT THE CONSTITUTIONAL STANDARD HAS TO MEAN

23   SOMETHING.

24             **THE COURT:**  WHAT ABOUT WHEN YOU FACTOR IN --

25   CRIMINAL HISTORY, I THINK, HAS A UNIQUE APPLICATION IN THIS


                         SEPTEMBER 20, 2019

1   CONTEXT IN THAT THE GOVERNMENT HAS TO DETERMINE WHETHER TO

2   HOUSE FAMILIES TOGETHER.

3           **MR. GELERNT:**  RIGHT.  AND THAT'S -- THAT'S THE RIGHT

4   QUESTION TO ASK, YOUR HONOR.  ABSOLUTELY.  I THINK THAT'S THE

5   SECOND DETERMINATION.

6           WHAT WE ARE LOOKING FOR IN THIS MOTION, AS WE TRIED

7   -- AS WE SAID IN THE REPLY BRIEF AND THE OPENING IS FOR YOU TO

8   SET THE STANDARD FOR SEPARATION.

9           THEN I THINK WHAT YOUR HONOR WOULD DO, I THINK IF HE

10  WANTS TO DO, IS SAY, OKAY, LET'S HEAR FROM EXPERTS, INCLUDING

11  CORRECTIONAL EXPERTS, WHO HAVE DEALT ON THE DHS SIDE, LIKE MS.

12  SCHRIRO PUT IN A DECLARATION, WELL, WHO CAN ACTUALLY BE HOUSED

13  IN A FAMILY DETENTION CENTER.  ARE THERE DIFFERENT WINGS, ARE

14  THERE OTHER APPROPRIATE SETTINGS.

15          AND IT MAY BE AT THAT POINT, YOUR HONOR, THAT THE

16  GOVERNMENT IS NOT GOING TO BE ABLE TO REUNITE ALL OF THE

17  FAMILIES BECAUSE THERE ARE GOING TO BE DE FACTO REASONS FOR

18  SEPARATION.

19          WE HOPE THE GOVERNMENT, WITH ALL OF ITS VAST

20  RESOURCES, WILL KEEP FAMILIES TOGETHER WHERE THE PARENT IS NOT

21  A DANGER TO THE CHILD.  BUT I THINK THAT IS ULTIMATELY AT THE

22  BACK END.

23          BUT TO ALLOW THE GOVERNMENT TO JUST SEPARATE AND

24  SAY, LOOK, WE ARE DECLARING THE PARENT A DANGER OR UNFIT

25  BECAUSE OF THESE CRIMES, WOULD REALLY BE A SERIOUS, SERIOUS

SEPTEMBER 20, 2019

```
 1   MATTER.
 2              SO WE WOULD IMPLORE YOU NOT TO GO DOWN THAT ROUTE.
 3   AND ALL OF YOUR CONCERNS ABOUT DISCRETION, NATIONAL SECURITY,
 4   THE BORDER, TO SAY, WELL, THOSE ARE GOING TO BE RELEVANT TO
 5   WHERE THE FAMILIES GET HOUSED.
 6              AND YOU NEED TO HEAR FROM EXPERTS, BECAUSE THERE
 7   REALLY ARE EXPERTS WHO HAVE DEALT WITH THIS ISSUE FROM BOTH
 8   INSIDE AND OUTSIDE DHS.
 9              BUT THE RGV STANDARD IS JUST MADE UP OUT OF NOWHERE.
10   IT HAS NOTHING -- NO CONNECTION TO CHILD WELFARE.  VIOLENT
11   MISDEMEANOR, THAT SOUNDS ALL WELL AND GOOD IF YOU ARE DECIDING
12   WHO SHOULD GET A PARTICULAR JOB.  BUT IT HAS NO CONTEXT, IT
13   HAS NO CONNECTION TO A CHILD'S WELFARE.
14              THE OTHER POINT I WOULD MAKE, WHICH IS RELATED,
15   WHICH HASN'T COME UP BUT I KNOW YOUR HONOR IS AWARE OF.  THERE
16   ARE CASES WHERE THE PARENT IS LOSING THE CHILD BECAUSE OF
17   NEGLECT.  SO WHAT IS HAPPENING IS THE FATHER DOESN'T SEEM TO
18   BE CHANGING THE DIAPERS QUICK ENOUGH, OR IT SEEMS NEGLECT.
19              WELL, WE ARE TALKING ABOUT FATHERS WHO ARE IN
20   DETENTION.  I MEAN, YOU CANNOT TAKE A CHILD AWAY FOR THAT
21   REASON, ESPECIALLY BECAUSE IN THE FAMILY DETENTION CENTER THEY
22   ARE WATCHED ALL THE TIME.  IF THE PARENT NEEDS HELP CHANGING A
23   DIAPER, SO BE IT.  BUT THE PARENT DOESN'T LOSE HIS CHILD
24   BECAUSE SOMEBODY IN DHS, WHO IS NOT EVEN QUALIFIED, SAYS,
25   WELL, HE LOOKS A LITTLE DETACHED.
```

SEPTEMBER 20, 2019

1          YOU KNOW, IT IS ONE THING FOR THE CBP OFFICER TO SEE

2     A PARENT HITTING THE CHILD OR SOMETHING LIKE THAT, BUT IT IS A

3     WHOLE OTHER THING FOR THESE SORT OF RANDOM, QUICK HIT

4     DECISIONS BY OFFICERS IN A DETENTION FACILITY SAYING, WELL,

5     THAT PARENT DOESN'T LOOK PARTICULARLY GREAT, LET'S TAKE THE

6     CHILD AWAY.

7          I MEAN, THAT CANNOT CONTINUE TO HAPPEN.

8          AND ON THE PARENTAGE SIDE I THINK YOUR HONOR HIT IT.

9     THE CONSTITUTIONAL RIGHT IS TOO GREAT HERE.  THE COST OF DOING

10    THE DNA TOO SMALL.

11         THE GOVERNMENT DOESN'T HAVE TO TEST EVERYONE FOR

12    DNA.  I MEAN, THEY ARE SAYING, WELL, LOOK AT THE NUMBERS.

13         WELL, THEY ONLY HAVE DOUBTS ABOUT A FEW PARENTS

14    EVERY ONCE IN A WHILE SO THEY SHOULD USE THE DNA, ESPECIALLY

15    BECAUSE A LOT OF THE REASON THEY ARE SAYING THE PARENT IS NOT

16    REALLY THE PARENT IS INFORMATION FROM A LITTLE CHILD.

17         THE CHILD DOESN'T KNOW WHAT IS GOING ON.  HE IS SO

18    SCARED.  I MEAN, THE GOVERNMENT POINTS OUT THAT HE HELD UP THE

19    WRONG NUMBER FINGERS IN THEIR BRIEF, BUT THEY DON'T POINT OUT

20    IN THE DECLARATION THAT THE CHILD HELD UP DIFFERENT NUMBERS OF

21    FINGERS EACH TIME.

22         THE CHILD IS JUST PANICKING.  IT IS A LITTLE CHILD

23    THERE.

24         THERE HAS TO BE, AS YOUR HONOR SAID, A SCIENTIFIC

25    WAY.  WE CAN'T MAKE MISTAKES ABOUT PARENTAGE WHEN THE SCIENCE


                        SEPTEMBER 20, 2019

1    IS THERE.

2            YOU KNOW, I WOULD JUST -- I REALIZE THAT I AM GOING

3    OVER SOME OF THE SAME MATERIAL, BUT I DO THINK WE ARE IN ONE

4    OF THESE SITUATIONS WHERE A COURT SANCTIONING THE GOVERNMENT

5    TAKING AWAY CHILDREN BECAUSE OF THESE KIND OF MINOR CRIMES

6    WOULD BE REALLY UNPRECEDENTED AND DANGEROUS.

7            I THINK YOUR HONOR IS RIGHT TO POINT OUT THE

8    CONTEXT, BUT I THINK THAT CONTEXT IS AT THE BACK END.  OKAY,

9    THIS PARENT AND CHILD ARE NOT -- THE PARENT IS NOT A DANGER TO

10   THE CHILD BUT WHERE ARE WE GOING TO HOUSE THEM.

11           THAT IS WHERE YOUR HONOR WOULD NEED EXPERTS AND THAT

12   IS WHERE ALL OF THOSE CONCERNS NEED TO BE TAKEN INTO ACCOUNT.

13   BUT NOT IN ALLOWING DHS TO JUST CREATE THE OWN GUIDES.

14           IT SEEMS TO EVEN BE LOCALIZED, RGV HAS ONE GUIDANCE,

15   TUCSON HAS ONE GUIDANCE.  AND THEY ARE JUST DECIDING

16   WILLY-NILLY, OH, OF THESE CRIMES MAKE THE PARENT A DANGER,

17   THESE DON'T.

18           THAT CAN'T BE.  THAT CAN'T BE, YOUR HONOR.

19           SO UNLESS YOUR HONOR HAS QUESTIONS, I WILL SIT DOWN.

20           **THE COURT:**  ALL RIGHT.  THANK YOU.

21           MR. STEWART, YOU HAVE THE FINAL WORD.

22           **MR. STEWART:**  THANK YOU, YOUR HONOR.  I WOULD JUST

23   LIKE TO HIT A FEW POINTS.

24           MR. GELERNT HAS TRIED TO PUMP UP THE RHETORIC HERE.

25   I MEAN, THE GOVERNMENT APPRECIATES THE GRAVITY OF ALL OF THE

SEPTEMBER 20, 2019

1   ISSUES HERE, WHICH IS WHY WE KEEP EMPHASIZING THE CONTEXT.  WE

2   HAVE SHOWN THE REASONABLENESS.  WE APPRECIATE THE FAMILY AND

3   FAMILY UNITY CONTEXT, AND HAVE MADE THESE DETERMINATIONS IN

4   LINE WITH THAT.

5           A DECISION TO SEPARATE AT THE BORDER IS ONE THAT

6   NEEDS TO BE MADE BASED ON JUDGMENT, THE KIND OF FACTORS WE

7   HAVE SAID.  IT IS NOT A PERMANENT -- IT IS NOT A GUARANTEE

8   THAT SOMEBODY IS LOSING THEIR CHILD, NO PARENTAL RIGHTS

9   FOREVER.  IT IS A DETERMINATION THAT NEEDS TO BE MADE AT THE

10  TIME BASED ON THE INFORMATION AVAILABLE, AND MINDFUL OF THE

11  LAW ENFORCEMENT, IMMIGRATION CONTEXT IN WHICH IT IS MADE.

12          THINGS CAN CHANGE, MORE INFORMATION CAN COME IN,

13  CORRECTIONS CAN BE MADE.  OTHER THINGS CAN HAPPEN, AS YOUR

14  HONOR WELL KNOWS.  AND THE AGENCY'S APPROACH, I THINK,

15  APPROPRIATELY ACCOUNTS FOR THOSE VERY GRAVE AND IMPORTANT

16  MATTERS.

17          I NEED TO EMPHASIZE AGAIN THE GUGGENHEIM

18  DECLARATION, YOUR HONOR.

19          ONE OTHER OBSERVATION THAT MR. GUGGENHEIM MAKES THAT

20  I THINK IS QUITE TELLING IS HE SAYS, IN PARAGRAPH 11 OF HIS

21  DECLARATION, THAT ALMOST NONE, HE SAYS PERHAPS 2 OR 3 PERCENT,

22  HE GIVES US, OF THE GOVERNMENT'S DOCUMENTED SEPARATIONS WOULD

23  EVEN TRIGGER THE NEED FOR ASSESSMENT OF THE PARENTS.

24          THESE ARE FOLKS WITH SERIOUS FELONY OFFENSES, YOUR

25  HONOR, THAT HE IS SAYING ALMOST NONE.


                    SEPTEMBER 20, 2019

```
 1              AND, AGAIN, THIS IS WHOM THE ACLU HAS FULLY EMBRACED
 2     HERE, THAT THEY HAVE SAID HE IS A FOREMOST -- I BELIEVE IT --
 3     FOREMOST EXPERT OR ONE OF THE MAIN EXPERTS, HOWEVER THEY
 4     PHRASED IT.  AND THEY ARE SAYING THAT PERHAPS NONE OF THESE
 5     FOLKS WHO HAD SOME VERY, VERY SEVERE CONVICTIONS -- AND PUT
 6     ASIDE EVEN JUST ONE'S AFFILIATIONS OR CHARGES OR THINGS THAT
 7     HAVE NOT LED TO CONVICTIONS, YOUR HONOR, HE IS SAYING ALMOST
 8     NONE.  AND THAT IS TRULY ASTONISHING.
 9              AND I WOULD JUST PROPOSE, YOUR HONOR, IT IS A
10     QUESTION OF WHOSE APPROACH ARE YOU GOING TO TAKE, THE
11     REASONABLE ONE ADOPTED IN THE IMMIGRATION CONTEXT BY THE
12     AGENCIES AND ACTORS WHO CONGRESS HAS DESIGNATED AND AUTHORIZED
13     TO MAKE THESE VERY MOMENTOUS DECISIONS, MR. EASTERLING, MS.
14     DAVISON, MS. HELLAND, MS. HARPER.  THESE FOLKS WHO HAVE, YOU
15     KNOW, A LOT OF EXPERIENCE, EXPERTISE.  HAVE EXPLAINED THEIR
16     APPROACH, HAVE EXPLAINED THE ISSUES IN FAMILY FACILITIES.
17              OR ARE YOU GOING TO TAKE THE WORD OF FOLKS WHO ARE
18     SAYING, EH, ALMOST NONE OF THESE SHOULD EVEN WARRANT FURTHER
19     ASSESSMENT.  OR A REGISTERED SEX OFFENDER, THAT IS NOT ENOUGH
20     TO SEPARATE SOMEONE.  OR, YOU KNOW, THE ASSURANCES OF, HEY,
21     YOU KNOW, GANG AFFILIATION THINGS ARE OFTEN WRONG, AND
22     THEREFORE, LIKE THE SUSPICION OF BEING A MEMBER OF VERY, VERY
23     VIOLENT GANG, LIKE MS-13 OR THE 18TH STREET GANG, ISN'T ENOUGH
24     TO WARRANT A SEPARATION.
25              YOU KNOW, AGAIN, THESE 2 TO 3 PERCENT, THE SEX
```

SEPTEMBER 20, 2019

1    OFFENDER APPROACH.  I MEAN, THESE ARE THE TWO CHOICES THAT

2    YOUR HONOR IS BEING PRESENTED WITH.

3              AND I THINK THE GOVERNMENT HAS NOT TAKEN AN EXTREME

4    POSITION.  IT IS NOT SOME DIAMETRICALLY OPPOSITE APPROACH OF

5    SOMETHING, IT IS THE APPROPRIATE ALTERNATIVE THAT BALANCES AND

6    KIND OF RUNS THE GAMUT OF THE DIFFICULT SITUATIONS.

7              JUST A COUPLE MORE POINTS, YOUR HONOR.

8              A BIG QUESTION HERE, AND WE EMPHASIZE RULE 23, AND

9    YOUR HONOR I THINK EMPHASIZED -- TOUCHED UPON SOME OF THE

10   THEMES HERE ON JUST THE CLASS CERTIFICATION CONTEXT.  A BIG

11   PART OF THE QUESTION HERE IS WHETHER A CLASS ACTION IS THE

12   PROPER VEHICLE TO DEAL WITH A SMALL NUMBER OF FOLKS WHO THE

13   PLAINTIFFS HAVE HIGHLIGHTED.  AND IT IS JUST NOT.

14             AND YOUR HONOR WAS JUST RIGHT WHEN YOUR HONOR SAID

15   PREVIOUSLY, LOOK, THERE COULD BE INDIVIDUALIZED

16   DETERMINATIONS, YOU KNOW, THAT IS NOT EXACTLY WHAT WE ARE

17   DEALING WITH HERE.  WE NEED, YOU KNOW, AN APPROACH THAT IS

18   ADMINISTRABLE IN A CLASS ACTION CONTEXT, AND IT IS ONE THAT --

19   YOU KNOW, WE HAVE MAPPED OUT THE WAYS TO DEAL WITH THIS IN

20   FORMAL WAYS, YOU KNOW, FURTHER LITIGATION ON AN INDIVIDUAL

21   BASIS IF NEED BE.  AND THERE MAY BE OTHER WAYS TO REUNIFY.

22   BUT THESE IMPORTANT MOMENTOUS DECISIONS THAT ARE BEING MADE IN

23   GOOD FAITH SHOULD NOT BE CAST ASIDE IN THIS CONTEXT,

24   PARTICULARLY GIVEN THE REASONABLENESS WITH WHICH -- WITH THE

25   APPROACH THAT THE GOVERNMENT IS TAKING.


                         SEPTEMBER 20, 2019

1        THE LAST POINT I WILL MAKE HERE, YOUR HONOR, IS ONE
2   THAT I KIND OF EMPHASIZED BEFORE.  IT IS -- THE PLAINTIFFS
3   HAVE PROPOSED AN ASTONISHING, IRRESPONSIBLE APPROACH, I JUST
4   HAVE TO SAY.  I MEAN, ONE WHERE ONLY APPARENT AN IMMINENT
5   EMERGENCY DANGER TO THE PARTICULAR CHILD OF THE PARENT WOULD
6   JUSTIFY SEPARATION.  IT IS JUST JAW DROPPING.

7        AND THE GOVERNMENT HAS TAKEN A REASONABLE APPROACH.
8   AND WE ASK YOUR HONOR THAT WHATEVER RULING YOU MAKE ON THIS,
9   WE REALLY NEED CLEAR GUIDANCE.  YOU KNOW, IT IS IMPORTANT --
10  YOU KNOW, IF INDEED YOUR HONOR IS GOING TO ORDER THAT VIOLENT
11  FELONS CAN'T BE SEPARATED, WE NEED TO KNOW THAT.

12       BECAUSE IF IT IS JUST -- SOMETIMES MR. GELERNT FALLS
13  BACK ON, OH, YOU KNOW, WE JUST NEED CONCRETE OBJECTIVE
14  EVIDENCE OF NO DANGER OR FITNESS.

15       THAT IS WHAT THE AGENCY IS DOING.  THAT IS THE
16  APPROACH -- OUR POSITION IS THAT THAT IS WHAT WE ARE DOING AND
17  THAT IS WHAT WE EXPLAINED.

18       AND IF WE ARE BEING ASKED TO TRULY ADOPT THE
19  POSITION THAT MR. GELERNT AND HIS MANY ADVOCATE DECLARANTS ARE
20  ARGUING, WE REALLY NEED TO KNOW THAT SO THAT WE CAN EVALUATE
21  PROPERLY HOW TO DO THAT.

22       AGAIN, I DON'T BELIEVE, BASED ON THE HISTORY OF THIS
23  CASE, THE COURT'S PRIOR RULINGS, A LOT OF THE THEMES THE COURT
24  HAS HIT TODAY AND COURT'S RECOGNITION OF THE CONTEXT WE ARE
25  DEALING WITH, THAT IS WHAT THE COURT HAS INTENDED.  BUT WE


                        SEPTEMBER 20, 2019

1   NEED CLARITY, ONE WAY OR ANOTHER, BECAUSE WE ARE TALKING ABOUT

2   VERY, VERY IMPORTANT DECISIONS THAT THE AGENCY TAKES

3   SERIOUSLY, AND IT NEEDS TO KNOW WHAT IS BEING DIRECTED IN

4   DOING.

5          WITH THAT, THANK YOU, YOUR HONOR.

6          **THE COURT:**  THANK YOU.

7          IT IS A VERY SIGNIFICANT ISSUE, AND THAT IS WHY WE

8   HAVE BEEN SPENDING SOME TIME ON IT.  AND IT IS A UNIQUE

9   CONTEXT, SO THE PARTIES ARE ASKING THE COURT FOR CLEAR

10  GUIDANCE IN A UNIQUE SETTING.

11         I WOULD MAKE THIS OBSERVATION, AND THEN I WILL LET

12  MR. GELERNT HAVE THE LAST WORD SINCE HE IS THE PLAINTIFF.

13         BUT CRIMINAL HISTORY IS AN OBTUSE WAY OF DETERMINING

14  FITNESS AND DANGER, BUT CRIMINAL HISTORY HAS A UNIQUE

15  APPLICATION IN THE CONTEXT OF THIS CASE.  SO IF YOU HAVE, FOR

16  EXAMPLE, A FATHER WHO HAS A PC 245, ASSAULT WITH A DEADLY

17  WEAPON, IN CALIFORNIA.  BEAT ANOTHER MAN NEARLY TO DEATH,

18  SENTENCED TO FEDERAL PRISON.  THAT MAN MIGHT BE THE MOST

19  LOVING PROTECTIVE FATHER, ABSOLUTELY NO DANGER TO HIS CHILD.

20  WE SEE THAT TIME AND AGAIN.  MAYBE THAT MAN IS A HANDFUL IF HE

21  IS DEALING WITH OTHER MEN OR IF HE IS OUT DRINKING, BUT THAT

22  HAS NO APPLICATION TO WHETHER OR NOT HE IS A GOOD FATHER.

23         BUT THAT SAME KIND OF CONVICTION IS PROBABLY A BAR

24  TO A FAMILY RESIDENTIAL CENTER.  THAT MAN DOESN'T BELONG IN A

25  FACILITY WITH A LOT OF OTHER LITTLE KIDS AND PARENTS IF HE HAS


SEPTEMBER 20, 2019

 1   TEMPER ISSUES OR ALCOHOL, WHATEVER THEY MIGHT BE.  SO THAT IT
 2   IS A UNIQUE CONTEXT.
 3           AND WHEN THE PARTIES ASK THE COURT TO SET DOWN
 4   RULES, OR NOT SET DOWN RULES AND LEAVE THINGS GENERAL, FROM
 5   THE GOVERNMENT'S PERSPECTIVE, THOSE ARE THE ISSUES THAT ARE
 6   DIFFICULT.  AND THAT'S WHAT I STRUGGLE WITH AND THAT IS WHY I
 7   APPRECIATE THE BRIEFING AND THE ARGUMENT.
 8           **MR. GELERNT:**  RIGHT, YOUR HONOR.  AND I WILL TAKE
 9   THE PREROGATIVE OF THE PLAINTIFF JUST TO HAVE 30 SECONDS MORE.
10           I THINK YOUR HONOR'S HYPOTHETICAL ABOUT THAT MAN WHO
11   COMMITTED MURDER PUTS IT EXACTLY RIGHT.  THE INITIAL
12   DETERMINATION THAT HE COMMITTED THIS MURDER DOES NOT SAY THAT
13   HE IS A DANGER TO HIS CHILD, BUT THEN AT THE BACK END WHERE
14   ARE WE GOING TO PUT THIS FAMILY IF HE IS NOT A DANGER TO HIS
15   CHILD.  THAT IS WHERE I THINK THERE COULD BE BRIEFING AND
16   EXPERT TESTIMONY.  WE REALLY HAVEN'T HAD THAT.
17           I THINK WHERE THE GOVERNMENT IS SETTING THE LINE ON
18   THE RESIDENTIAL FACILITIES OF ONLY MINOR, MINOR MISDEMEANORS
19   CAN'T BE.  AND I THINK YOU WILL HEAR FROM MULTIPLE
20   CORRECTIONAL EXPERTS TO SAY THE FACILITY CAN HANDLE MORE THAN
21   THAT, AND THERE ARE OTHER APPROPRIATE SETTINGS.
22           AND I WOULD JUST CLOSE ON THIS POINT, THAT MR. --
23   THAT THE GOVERNMENT WENT BACK TO PROFESSOR GUGGENHEIM'S
24   DECLARATION, WHICH I REALIZE IS GETTING A LOT OF PLAY HERE.
25   AND THEY ARE SAYING, WHOSE WORD ARE YOU GOING TO TRUST, HIS OR


                    SEPTEMBER 20, 2019

```
 1   MR. EASTERLING?
 2            WELL, PROFESSOR GUGGENHEIM IS JUST BEING DESCRIPTIVE
 3   OF WHAT THE STANDARDS ARE IN THE STATES.  MR. EASTERLING
 4   PROBABLY HAS NO MORE EXPERTISE ON THE CHILD WELFARE STANDARDS
 5   THAN ANYBODY.  THAT IS NOT HIS JOB.  THAT IS WHY DHS SHOULD
 6   NOT BE MAKING THESE DETERMINATIONS.
 7            WHERE HIS EXPERTISE WILL COME IN, ALONG WITH ICE, IS
 8   EXACTLY THE POINT YOU MADE, WHICH IS WHERE ARE WE GOING TO PUT
 9   THESE FAMILIES.  MAYBE THIS MAN WHO HAS A TEMPER, HAS AN
10   ALCOHOL PROBLEM, CAN'T BE IN THIS PARTICULAR FACILITY.  THAT
11   IS WHERE THE EXPERTISE IS.
12            BUT THE GOVERNMENT HAS NOT, NOTABLY, PUT IN A SINGLE
13   EXPERT ON CHILD WELFARE STANDARDS ABOUT WHAT PARENTS ARE
14   DANGEROUS TO THEIR CHILDREN, BECAUSE NO EXPERT WOULD EVER SIGN
15   OFF ON THE STANDARD FOR SEPARATION.
16            IF YOUR HONOR WANTS TO SCHEDULE FOR EXPERTS ON WHERE
17   DO WE PUT THESE FAMILIES, THAT CAN HAPPEN.  BUT WE WOULD ASK
18   THAT THE INITIAL DETERMINATION BY YOU ABOUT WHEN A PARENT IS A
19   DANGER TO THEIR CHILD BE MADE NOW BECAUSE IT IS RELEVANT IN A
20   VERY PRACTICAL WAY.
21            SO, FOR EXAMPLE, SUPPOSE RIGHT NOW THEY SEPARATE THE
22   PARENT AND THE CHILD, AND THEY SEND THE PARENT TO AN ADULT
23   DETENTION CENTER AND THE CHILD GOES TO O.R.R.
24            WELL, IF THE GOVERNMENT DOESN'T COME FORWARD WITH
25   ANY EVIDENCE THAT THE PARENT IS ACTUALLY A DANGER, THE
```

SEPTEMBER 20, 2019

1    IMMIGRATION JUDGES ARE RELEASING.  BUT THEY ARE NOT BEING

2    REUNIFIED AUTOMATICALLY EXCEPT WHEN THE GOVERNMENT WANTS TO

3    REMOVE THEM BECAUSE THEY DEEM THE PARENT A DANGER TO THE CHILD

4    BASED ON ANY TYPE OF A FELONY.

5          SO IT IS RELEVANT, IRRESPECTIVE OF WHETHER EVEN THAT

6    INITIAL SEPARATION CAN HAPPEN BECAUSE THERE MAY NOT BE A

7    FACILITY THE GOVERNMENT DEEMS APPROPRIATE.

8          AND I AM JUST GOING TO CLOSE ON THIS NOTE.

9          THE GOVERNMENT IS MORE THAN HAPPY TO TAKE THESE

10   PARENTS THEY DEEM A DANGER TO THEIR CHILD AND REMOVE THEM

11   TOGETHER, SO THEY ARE MORE THAN HAPPY TO PUT THEM TOGETHER

12   WHEN IT MEANS GETTING RID OF THEM.

13         THESE ARE ASYLUM SEEKERS, THEY ARE DESPERATE.  THEY

14   ARE COMING, THEY HAVE LITTLE CHILDREN.  AND SO WE WOULD ASK

15   THE COURT TO RULE ON THE THRESHOLD QUESTION OF WHEN A PARENT

16   CAN BE DEEMED A DANGER TO THEIR CHILD, THE PARENTAGE ISSUE,

17   THE ABUSE ISSUE.  AND SCHEDULE A FURTHER HEARING AND BRIEFING

18   WITH EXPERTS ON WHERE CAN THESE PARENTS BE PLACED IF MAYBE

19   THEY ARE A DANGER TO OTHER PEOPLE BUT NOT THEIR CHILD.

20         THANK YOU, YOUR HONOR.

21         **THE COURT:**  THANK YOU.

22         WE DO HAVE TO CLOSE THE HEARING.  AND I REALLY

23   APPRECIATE SEEING COUNSEL AND HAVING THE BENEFIT OF BRIEFING

24   THE ARGUMENT.

25         DO EXPECT SOME KIND OF AN ORDER SOON ABOUT THE


                    SEPTEMBER 20, 2019

1    DISCOVERY.  IF THESE PROTOCOLS EXIST I WOULD REALLY BENEFIT

2    FROM RECEIVING THEM.  SO WE WILL ISSUE SOMETHING ALONG THOSE

3    LINES.  AND THEN I WILL TAKE THIS UNDER SUBMISSION.

4              THANK YOU VERY MUCH.  HAVE A GOOD WEEKEND.

5              **MR. GELERNT:**  THANK YOU, YOUR HONOR.

6              **MR. STEWART:**  THANK YOU, YOUR HONOR.

7

8                          *   *   *

9              I CERTIFY THAT THE FOREGOING IS A CORRECT
               TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
10             IN THE ABOVE-ENTITLED MATTER.

11             S/LEEANN PENCE                    9/22/2019
               LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        SEPTEMBER 20, 2019