**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L.; et al.,<br><br>                    Petitioners-Plaintiffs,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); et al.,<br><br>                    Respondents-Defendants. | Case No.:  18cv0428 DMS (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** |

Plaintiffs bring the present motion to enforce this Court's June 26, 2018 preliminary injunction.  That injunction was directed at the Trump Administration's practice of separating migrant parents and their minor children when they crossed the United States-Mexico border and its failure to reunify those families in accordance with the United States Constitution.  The Administration's practice of separating these families was formally abandoned on June 20, 2018, when the President of the United States issued Executive Order No. 13841, which reestablished a policy to "maintain family unity," and directed that alien families be detained together "during the pendency of any criminal improper entry or immigration proceedings involving their members."  However, the Executive Order did not provide any guidance on reunifying families, and did not provide any guidance on future family separations, other than stating that parents and children would

not be detained together if Defendants had "concerns" that the parent posed "a risk to the child's welfare."

This Court's injunction addressed those two issues.  Specifically, it required Defendants to reunify within thirty days parents and minor children who had been separated under the Administration's practices, and prohibited Defendants from separating migrant parents and their minor children in the future absent a determination that the parent was unfit or presented a danger to his or her child or had a criminal history or communicable disease.

The day after this Court issued its preliminary injunction and accompanying order granting class certification, Defendants implemented new guidelines and procedures in an attempt to comply with those orders.  Nevertheless, in the year following issuance of the preliminary injunction, Defendants have separated nearly 1,000 migrant families at the border.  Given these numbers, Plaintiffs fear the Administration has returned to "systematic" separation of families, prompting the present motion.  It is undisputed that prior Administrations separated families at the border based on fraudulent claims of parentage, or evidence of child trafficking or other dangers to the child or community. Defendants argue their practices now are no different from prior Administrations.  They point out that the number of separations at issue represents a small fraction of the number of individuals entering the border at the time in question, some 524,294 parents and children, and reflects careful exercise of discretion consistent with the Court's orders.

Considering the Administration's return to family unity, Defendants' implementation of guidelines immediately following the Court's preliminary injunction, Defendants' authority to secure the Nation's borders, and the scope of the class and need to avoid individualized determinations, the Court finds Defendants are generally exercising their discretion to separate families at the border consistent with Plaintiffs' rights to family integrity and the Court's orders, with one exception regarding DNA testing and one clarification regarding separations based on family residential center standards.

/ / /

# I.

## BACKGROUND

In July of 2017, the Trump Administration embarked on an unprecedented policy of separating migrant families at the border to deter immigration.  The policy started quietly and was implemented by the Department of Homeland Security ("DHS") through Customs and Border Protection ("CBP") officials at border facilities in Texas.  *See* Department of Homeland Security, Office of the Inspector General, DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families, Rep. No. OIG-20-06 (Nov. 2019) ("OIG DHS Report (11/25/19)"), at 5 (stating DHS began a "prosecution initiative … in the El Paso Sector to deter illegal border crossings by increasing prosecutions, which resulted in an increase in family separations.").  Eventually, the policy would be made public on May 7, 2018, when the Attorney General of the United States announced the Administration's "zero tolerance policy," in which all migrant parents entering illegally between ports of entry with their minor children would be criminally prosecuted and separated from their children.  In practice, the policy resulted in the indiscriminate separation of thousands of migrant parents and children, most of whom were seeking asylum from countries in Central America and many of whom entered the United States lawfully at designated ports of entry.  In addition, parents who were prosecuted for unlawful entry for entering between ports of entry were not reunified with their children after serving brief criminal sentences because DHS did not have adequate systems in place to keep track of the children, let alone any plan to reunify the families.  As a result, migrant parents remained separated from their children for months while the parents pursued their asylum claims and other relief from removal.  Many of the parents were deported back to Central America without their children after exhausting their challenges to removal.

In response to this situation, Plaintiffs filed the present case seeking to enjoin family separations on constitutional and statutory grounds.  The focus of Plaintiffs' Complaint was not the zero tolerance policy, but rather a broader family separation practice that was being applied to families crossing into the United States both legally at designated ports of

entry and illegally between ports of entry.  In response to the Complaint, Defendants filed a motion to dismiss, which the Court denied.  In the June 6, 2018 order on that motion, the Court found Plaintiffs had stated a legally cognizable claim that this broader family separation practice violated the right to family integrity and association under the Due Process Clause of the Fifth Amendment to the United States Constitution.  The Court also found Plaintiffs' allegations that Defendants' practice of separating parents for prosecution for improper entry (zero tolerance) and failing to reunify those families after the parent completed his or her sentence without a determination the parent was unfit or presented a danger to the child stated a claim for violation of the right to family integrity.

Thereafter, on June 20, 2018, the President of the United States abandoned the zero tolerance policy in favor of a "policy of th[e] Administration to maintain family unity" by way of the Executive Order, *see* Exec. Order No. 13841, 83 Fed. Reg. 29435 (June 20, 2018), but did not address reunification or set out specific standards for separating family units in the future.[1]  This Court then issued its order on class certification and the preliminary injunction on June 26, 2018.  Pursuant to those orders, the Court certified a class that included adult parents who entered the United States at or between ports of entry who were detained in immigration custody and had a minor child who was separated from them and placed in the custody of the Department of Health and Human Services ("HHS"), Office of Refugee Resettlement ("ORR").  Specifically, the Court certified the following class ("*Ms. L.* class") on Plaintiffs' due process claim arising out of the Administration's family separation practices:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them

---

[1]  Prior Administrations attempted to maintain family unity at the border.  *See* CBP, National Standards on Transport, Escort, Detention, and Search ("TEDS"), October 2015, at § 1.9 Family Unity (stating "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation.")

by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

(ECF No. 82 at 17.)  The Court excluded from the class "parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to" the Executive Order.  (*Id.*)  The preliminary injunction ordered the reunification of class members with their children and prohibited Defendants from separating parents from their minor children at the border "absent a determination that the parent is unfit or presents a danger to the child."  (ECF No. 83 at 22-23.)[2]

The day after the Court issued its injunction, Defendants distributed a Memorandum to CBP employees providing "initial direction on compliance with" the Court's orders. (Opp'n to Mot., Ex. 4 (Memorandum from Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection, to Carla L. Prevost, Chief, U.S. Border Patrol, and Todd C. Owen, Exec. Asst. Commissioner, Office of Field Operations (June 27, 2018)) ("Memorandum" or "CBP Interim Guidance Memorandum").  The Memorandum directs that parents "who enter the United States illegally as part of a family unit … should not be referred for prosecution for [improper entry under] 8 U.S.C. § 1325."  (*Id.*)  In addition, it states that a parent should not be separated from his or her minor child unless he or she has a criminal conviction for "violent misdemeanors or felonies[,]" presents a danger to the child, has a communicable disease, or presents a fraudulent claim of parental relationship. (*Id.*)  The Memorandum emphasizes that "any questions about what constitutes a violent misdemeanor or felony should be referred to the local Office of Chief Counsel[,]" and that

/ / /

---

[2] At the time the preliminary injunction issued on June 26, 2018, 2,814 children had been separated from their parents ("*Ms. L.* class members") and were then in the custody of ORR in facilities throughout the country.  Through the parties' reunification efforts, every one of these families was accounted for and nearly every child was reunified with a parent either in the United States or in their country of origin or placed with a sponsor in the United States to pursue asylum, in accordance with law and the parents' wishes.

"any questions about how to comply with the court order should be raised through the appropriate chain of command for contact with local Office of Chief Counsel." (*Id.*)

In November 2018, after the majority of class members had been reunited with their children, Plaintiffs notified the Court that Defendants were interpreting the class certification order to include only those parents whose children were in ORR custody on or after June 26, 2018. Given Plaintiffs' allegations that the family separation practice had been in effect well before the announcement of the zero tolerance policy, Plaintiffs filed a motion to clarify that the class include parents who had been separated from their children prior to June 26, 2018, and whose children had been released from ORR custody prior to that date. While that motion was pending, the Office of Inspector General for HHS confirmed that Defendants began separating families in July of 2017, and that potentially thousands of additional children may have been through ORR custody before the preliminary injunction issued. *See* Department of HHS, Office of the Inspector General, Separated Children Placed in Office of Refugee Resettlement Care, HHS OIG Issue Brief No. OEI-BL-18-0051 (Jan. 2019). After that report was issued, the Court granted Plaintiffs' motion to modify the class definition to include those parents who had been separated from their children at the border beginning on July 1, 2017, and whose children were released from ORR custody prior to June 26, 2018. As with the original class, the expanded class is subject to the same exclusions for criminal history and communicable disease.[3]

/ / /

---

[3] After the Court modified the class definition, it ordered Defendants to conduct an accounting of possible children of members of the expanded *Ms. L.* class. That accounting was completed on October 25, 2019, and revealed an additional 1,556 separated children. It appears the majority of parents in the expanded class were deported to Central America without their children. Finding them will involve the same painstaking process that was used to locate the 471 parents who were removed without their children in the original class of 2,814 parents. The reunification effort is presently underway and is being monitored by the Court through monthly status conferences with the parties.

1    Consistent with the Court's class certification orders and preliminary injunction,
2  Defendants have continued to separate parents and children crossing the border when there
3  are concerns about parentage, the parent has a criminal history or communicable disease
4  (or long-term medical need), or the parent is unfit or presents a danger to his or her child
5  or others.   During the initial reunification process of approximately 2,814 families,
6  Plaintiffs reported Defendants had excluded only twenty-nine parents from the class based
7  on the factors identified in the Court's orders.   Plaintiffs assert the number of parents who
8  have since been excluded from the class in the year following issuance of the preliminary
9  injunction stands at approximately 1,000.[4]

10    Given the number of family separations and the expectation that more parents will
11  be excluded from the class in the future, Plaintiffs filed the present motion to enforce the
12  Court's preliminary injunction.   The Court heard argument on the motion on September
13  20, 2019.   In response to the Court's invitation during oral argument, counsel in *MMM v.*
14  *Sessions*, Case No. 18cv1832, and *Dora v. Sessions*, Case No. 18cv1938, who represent
15  the settlement class of children of *Ms. L.* class members, filed a supplemental letter brief
16  to address whether parents convicted of illegal reentry under 8 U.S.C. § 1326 are entitled
17  to class membership.   Defendants filed a response to that brief on October 16, 2019.   During
18  a subsequent status conference, Plaintiffs requested an opportunity to file a supplemental
19  brief directed to Defendants' then-recently produced separation protocols and practices set
20  out in the CBP Interim Guidance Memorandum and other documents, which the Court
21  granted.   The Court also gave Defendants an opportunity to file a supplemental response
22  / / /

---

25  [4] When the present motion was filed on July 30, 2019, the number of exclusions was 911:
26  678 based on allegations of criminal conduct, seventy-one (71) based on gang affiliation,
   twenty (20) based on lack of fitness or child safety concerns, forty-six (46) based on
27  "unverified familial relationships," and twenty-four (24) based on illness.   (Mot. at 7.)   In
   the reply brief, filed on September 18, 2019, Plaintiffs assert the number was then
28  "approximately 1,000[.]"   (Reply at 1.)

18cv0428 DMS (MDD)

to Plaintiffs' brief, which Defendants did on October 31, 2019.  The motion has been fully briefed and argued and is now granted in part and denied in part as discussed below.

## II.

## DISCUSSION

Read together, the orders on class certification and preliminary injunction set out five criteria to be considered by DHS before an adult may be separated from his or her child at the border: lack of parentage or fitness, criminal history, communicable disease, and danger to the child.[5]  Plaintiffs argue Defendants' application of these factors is resulting in exclusion from the *Ms. L.* class and continued, unconstitutional separations of parents from their minor children.  Plaintiffs also assert Defendants' standards for placement in family residential centers ("FRCs") are causing unconstitutional separations of fit parents who pose no danger to their children.

Before turning to the five factors identified above, the Court first clarifies the standard for separating parents and children at the border, as that standard informs the remaining discussion.  Since the beginning of this case, Plaintiffs have argued the right to family integrity is protected by the Due Process Clause of the Constitution, and the government may not separate a parent from his or her child absent a showing the parent is unfit or presents a danger to the child.  The first of these arguments is not disputed.  As stated in the Court's order denying Defendants' motion to dismiss, "it has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association."  (ECF No. 71 at 14.)  What is disputed is whether, and to what extent, that right applies to the facts presented here, namely, to immigrant families taken into government custody while crossing the United States-Mexico border.

_____

[5]  The preliminary injunction prohibits separation absent a finding the parent is unfit or presents a danger to the child, while the class certification orders limit application of the preliminary injunction to certain individuals: adult parents at the border who do not have a criminal history or communicable disease.

In the order on Defendants' motion to dismiss, the Court found Plaintiffs had alleged sufficient facts to state a due process claim under the circumstances of this case, and further found the standard applicable to this claim was whether the government conduct at issue, namely the separation of parents and children at the border based on a nationwide policy or practice to deter illegal immigration, "shocks the conscience."[6]   In the present motion, Plaintiffs urge the Court, as they have done throughout this case, to adopt a different standard, namely, that the separation of a parent from his or her minor child violates due process absent a showing the parent is unfit or presents a danger to the child.   In support, Plaintiffs cite *Quilloin v. Wolcott,* 434 U.S. 246, 255 (1978) (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-863 (1977)), which states "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family … without some showing of unfitness[.]'"   *See also Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft* v. *Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.").   In other words, Plaintiffs argue these two factors, fitness and danger, are the only valid government interests justifying the separation of a parent from his or her child.

However, this approach ignores that "the jurisprudence of substantive due process is an exercise that is 'highly dependent on context and detail.'"   *Aguilar v. U.S. Immigration and Customs Enforcements Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 22 (1st Cir. 2007)

---

[6] The Court also found the "shocks the conscious" standard applied to Defendants' practice of separating parents for prosecution for improper entry and failing to reunify those families after the parent completed his or her criminal sentence and was returned to immigration detention.  In that context, the initial separation of the parent for prosecution is lawful but the continued separation after completion of the criminal sentence is not unless the parent is determined to be unfit or a danger to the child.  The present motion focuses on the initial separation of parents from their children at the border for reasons unrelated to prosecution for improper entry.

(quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005)).  Here, the context is an international border between the United States and Mexico, which hundreds, if not thousands, of people cross every day.  In this context, the government interests go well beyond just the fitness and danger that a parent may present to his or her own child.  Rather, the government interests extend to securing the Nation's borders and enforcing the Nation's criminal and immigration laws, and all that those interests entail, including detention and parole determinations for migrants taken into custody.

Plaintiffs' approach, by contrast, is based on the context of state child welfare investigations.  (*See* Reply at 1) (asking Court to "reiterate that the standard for separating a child is the traditional due process standard used in the child welfare context:  whether there is objective evidence to believe that the parent is genuinely unfit or a danger to her child.")  In that context, child protective service agencies are typically responding to concerns for an individual child's welfare and are tasked with determining whether an individual parent or guardian is unfit or presents such a danger to their child that the child should be removed from the parent's custody.  There, the state's primary concern is the best interests of the child.  There are no national security concerns or concerns about immigration or criminal law enforcement, and no concerns about detaining or paroling into the community families and children without lawful status in the United States.

The unique circumstances of this case, namely the intersection of national security at the border and the fundamental right to family integrity, do not lend themselves to Plaintiffs' approach.  Rather, other factors besides fitness and danger must be taken into consideration when deciding whether to separate parents and children in the context of this case.  This Court has determined those factors include parentage, criminal history and communicable disease, in addition to fitness and danger.

With these principles in mind, the Court considers whether Defendants' application of these factors is consistent with this Court's orders.  Plaintiffs argue Defendants are separating parents from their children for unjustified reasons, including dubious concerns about parentage, arbitrary determinations regarding parents with emergency medical needs

or treatable illness, minor crimes and questionable allegations of gang affiliation, dubious fitness and danger determinations, and overbroad use of family detention standards as a justification to separate families.  Defendants respond that their application of the factors has been consistent with the Court's orders, and that further Court intervention is unnecessary and unwarranted.  Each of these arguments is discussed below.

**A.    Parentage**

The first factor, of course, is parentage, and here, Plaintiffs state Defendants have separated forty-six (46) parents based on "unverified familial relationship[s]."  (Mot. at 7.)  Specifically, Plaintiffs identify two cases in which parents were separated from their children for this reason, only to be reunified after a DNA test confirmed parentage.  While these cases are relatively few, they raise two significant issues.  The first is whether Defendants are required to use DNA testing before separating a parent and child based on doubts about parentage.  The second concerns the burden of proof.

On the first issue, Defendants explain that DHS has implemented a pilot program using Rapid DNA technology, which can determine parentage in approximately ninety *minutes*.  (Opp'n to Mot. at 11.)  This program has been implemented in seven locations along the border, but Defendants state "operational concerns" have prevented a wholesale adoption of this program across the entire border.  (*Id.*)  It is unclear exactly what these "operational concerns" are, especially when it appears Defendants are preparing for DNA testing of immigrants being held in detention centers across the country.  *See* Daniella Silva, *Trump admin to broadly expand DNA collection of migrants in custody*, NBC News (October 2, 2019, 12:51 PM),  https://www.nbcnews.com/news/us-news/trump-admin-broadly-expand-dna-collection-migrants-custody-n1061471.  Nevertheless, if testing is not available at a particular facility, Defendants can transfer the family to a facility where that testing is available, or take swabs from the parent and child and send the swabs for testing, as they did with Ms. L. and her daughter.  Given the right at issue here, the harm that parents and children suffer when they are separated, and the undisputed speed, accuracy and availability of DNA testing, the Court finds Defendants must conduct DNA testing

before separating an adult from a child based on parentage concerns.  Such testing, in service to the fundamental right at issue, is clearly warranted.  It is also an efficient and definitive way to resolve any concerns about fraudulent documentation.  (*See* Opp'n to Mot., Ex. 2 (Decl. of Lloyd Easterling, Div. Chief, U.S. Border Patrol, RGV Sector ("Easterling Decl.") ¶¶ 34-36 (explaining CBP concerns about fraudulent documentation and child trafficking, efforts to verify validity of documents through the consulate and other law enforcement agencies, and transfer of child to ORR when parentage "cannot be validated within a reasonable period of time.")

The answer to the second issue follows logically from the first: Defendants bear the burden to show that an adult is not the parent before removing the child from the adult's custody.  While Defendants' guidelines provide that CBP must "clearly establish[] that the familial relationship is not bonafide" before making a separation decision, (*see* ECF No. 489 (Memorandum from Todd A. Hoffman, Executive Director, Office of Field Operations to Directors, Field Operations (Oct. 1, 2018)), it appears that guideline is not being followed when parentage "cannot be validated" in a reasonable period.

As discussed, the personal right at issue here, to family integrity and familial association, is "constitutionally protected[,]" *Quilloin*, 434 U.S. at 255, and finds its source "in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'"  *Smith v. Org. of Foster Families for Equality and Reform*, 431 U.S. 816, 845 (1977) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977)).  When the importance of this right is combined with the circumstances in which these parents find themselves, namely an unfamiliar custodial setting without access to resources other than their own paperwork, if any, and where Defendants have the ability to resolve any concerns about parentage quickly and inexpensively through the use of DNA testing, Defendants, not Plaintiffs, bear the burden to prove lack of parentage before making a separation decision.  Subjective concerns about parentage—or inability to validate documentation—are an insufficient basis for separation when those concerns can be definitively addressed through use of readily accessible, inexpensive and accurate scientific testing.

**B.     Communicable Disease**

The next factor is communicable disease, and here Plaintiffs state Defendants have separated twenty-four (24) parents due to "illness." Of these twenty-four, Plaintiffs point out two cases of concern. First, they complain about a father who was separated from his child because he has HIV. (Mot. at 10.) Defendants acknowledge that parent was excluded from the class "in error." (Opp'n to Mot. at 22 n.9.)

Second, Plaintiffs complain about a mother who was hospitalized for emergency surgery and whose child was placed in ORR custody as a result. (Mot. at 10.) Plaintiffs complain that when the mother was released from the hospital into the community, she was not reunified with her child in a timely manner, and the mother and her child were only reunified after Plaintiffs informed Defendants that the child's lawyer had prepared a motion for the child's release to the mother. (*Id.* at 10-11.) Here, again, Defendants concede error. Specifically, they state the mother was mistakenly informed she would have to go through the typical ORR screening process designed for "unaccompanied alien children" set out in the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), rather than the "Ms. L. reunification protocols" set out by the Court, to regain custody of her child. (Opp'n to Mot. at 9 n.3.) The child also was not placed in an ORR facility near the mother's hospital. (*Id.* at 21.) Defendants explain the measures they have taken to avoid any recurrence of that situation. (*Id.* at 9 n.3.) They also explain that when a parent is hospitalized, DHS and ORR have been "work[ing] together to make efforts to place the child in ORR custody near the location where the parent is hospitalized to allow for reunification," and that the situation described here was an anomaly. (*Id.* at 21.) These efforts are consistent with Defendants' interim guidelines. (*See* Opp'n., Ex. 4 (CBP Interim Guidance Memorandum) (stating where parent "has an urgent medical need that is not a communicable disease, officers and agents should attempt to keep the family together in CBP custody, or parole both for medical care or contact the local Office of Chief Counsel."))

/ / /

1   While each of the above cases resulted in unwarranted separations, they also reflect
2   Defendants' efforts to ensure those mistakes are not repeated and the importance of
3   Plaintiffs' oversight.  These two cases also demonstrate what can be accomplished when
4   the parties exchange information and work together.  Based on the present record, the Court
5   declines to find Defendants are in violation of the Court's orders with respect to the
6   communicable disease factor.

7   **C.   Criminal History**

8   The next factor is criminal history, which is of primary concern to Plaintiffs, likely
9   because it has resulted in the largest number of family separations: nearly 750 from June
10  26, 2018, through June 29, 2019.  On this factor, there are three primary disputes: (1)
11  whether the criminal history exclusion applies to *any* criminal history or only criminal
12  history bearing on a parent's fitness or danger; (2) whether a conviction for illegal reentry
13  under 8 U.S.C. § 1326 may be a basis for exclusion from the class; and (3) the standards
14  for separating a parent and child based on gang affiliation.

15  1.   Scope of the Criminal History Exclusion

16  Although Plaintiffs concede that parents with criminal history were excluded from
17  the class, they argue that exclusion was limited to criminal history bearing on the parent's
18  fitness and danger, not just any criminal history.   Defendants disagree with that
19  interpretation of the Court's orders.  They assert any criminal history may be a basis for
20  excluding a parent from the class.   Notably, however, Defendants state they are not
21  excluding parents with any criminal history.  Rather, they are excluding only those parents
22  "whose criminal history, in a good-faith discretionary determination by DHS, would
23  generally prevent them from being released into the community and from being housed in
24  an ICE FRC." (Opp'n to Mot. at 18.)  In other words, Defendants state they are including
25  many parents in the class even though they have minor criminal history.  That assertion is
26  consistent with CBP guidelines.  (*See* Opp'n to Mot., Ex. 4 (CBP Interim Guidance
27  / / /
28  / / /

14

Memorandum) (directing that a parent should not be separated from his or her minor child unless he or she has a criminal conviction for "violent misdemeanors or felonies."[7]))

The present motion is not the first time the Court has been asked to decide a dispute over exclusions from the class based on criminal history.  Shortly after the initial reunification efforts were completed, Plaintiffs filed a motion concerning two parents who had been excluded from the class, and therefore denied reunification with their children, based on their criminal history.  (*See* ECF No. 221.)  In that motion, Plaintiffs argued Defendants' interpretation of the criminal history exclusion was too broad, and that the criminal histories at issue—an arrest warrant out of El Salvador for being a member of the MS-13 gang, and an eight year old misdemeanor domestic violence conviction for swinging a machete at his spouse—were insufficient bases for exclusion.  In the order on that motion, the Court noted the parties had debated the criminal history exclusion prior to issuance of the class certification order, with Plaintiffs expressing concern that "Defendants would abuse their discretion and exclude parents with minor misdemeanors, while Defendants were concerned with their ability to make detention decisions for 'individuals who posed a flight risk or danger to the community or others in a family detention facility because of that person's criminal history.'"  (ECF No. 236 at 2 (citation omitted).)  The Court further noted the well-established principle that matters of detention and parole are within the province of the Executive Branch.  (*Id.*)  *See, e.g.*, 8 U.S.C. § 1231(g)(1) (stating the "Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.");  *Comm. Of Cent. Am Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir. 1986) (stating Attorney General has broad discretion in deciding where to house deportable aliens).  Ultimately, the Court denied

---

[7] "Violent misdemeanors" generally include offenses such as "assault, battery, burglary, resisting arrest, hit and run, and disorderly conduct." (*See* Opp'n. to Mot., Ex. 2 (Easterling Decl.) ¶ 16.)  "Simple thefts, fraud crimes, minor drug or traffic crimes, or driving while intoxicated (without an aggravating factor) are examples of offenses that would not generally justify separation." (*Id.*)

Plaintiffs' motion to include these parents in the class, and declined to interfere with Defendants' determination that the two parents had "disqualifying criminal history that precludes reunification with the children and either release into the community or detention in a family residential center." (ECF No. 236 at 3.)

As with Plaintiffs' previous motion on this issue, the Court again agrees with Defendants that parents may be excluded from the class based on any criminal history, not just criminal history that bears on a parent's fitness or danger. Plaintiffs' approach ignores the context of this case. This case does not involve individual issues of child welfare that typically confront child protective service agencies. Rather, the system at issue in this case involves CBP officers making decisions about hundreds, sometimes thousands, of people crossing daily at the border. Given the large number of migrant families arriving at the border and the inherent limitations placed on CBP facilities at the border,[8] Defendants must be able to use criminal history as an objective metric not only to assess the parent's fitness and danger to the child, but also risk of flight, danger to others and suitability for release into the community or placement in an FRC with other families. Factually, this case is not amenable to Plaintiffs' proposed approach.

The procedural posture of the case also fails to lend support to Plaintiffs' approach. Procedurally, this case is proceeding as a class action on Plaintiffs' substantive due process

---

[8] (*See* Opp'n. to Mot., Ex. 2 (Easterling Decl.) ¶ 5) (stating "Border Patrol stations are designed for short-term custody. For multiple reasons (a high number of individuals arrested on a daily basis; time-in-custody requirements imposed by the [TVPRA]; the *Flores* Stipulated Settlement Agreement; the need to ensure that individuals referred for prosecution are promptly presented before a Magistrate Judge; and the general fact that Border Patrol Stations were not designed to hold individuals—particularly children—for a long period of time) Border Patrol Agents process all individuals as expeditiously as possible and make every effort to transfer them to facilities that are more appropriate for longer-term detention (such as those run by … [ICE and ORR]). Therefore, agents must often make processing determinations based on the limited information available to them at the time of encounter.")

claim.  In granting class certification, the Court excluded from the class parents with criminal history because including them would have destroyed the commonality requirement.  That requirement was met based on Defendants' practice or policy of family separation to deter immigration, not individual decisions about a parent's criminal history. Plaintiffs' approach ignores the criminal history carve out, and jeopardizes the class's status because it invites individualized determinations about the reasons for family separations rather than focusing on the common policy.

Defendants' focus on violent misdemeanors and felonies when evaluating a parent's criminal history and determining whether a parent should be separated from his or her child indicates good faith and compliance with the Court's orders.  For these reasons, the Court declines to adopt Plaintiffs' approach to the scope of the criminal history exclusion.

2. 8 U.S.C. § 1326

Turning to the next issue, the parties agree there is one exception to the criminal history exclusion: illegal entry into the United States under 8 U.S.C. § 1325.  (*See* Opp'n to Mot. at 18 n.6) (stating Defendants have been treating parents with section 1325 convictions "as class members eligible for relief under the preliminary injunction.")) *See also* Exec. Order No. 13841, § 3 (stating the Secretary of Homeland Security shall "to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry [§ 1325] or immigration proceedings involving their [family] members."); OIG DHS Report (11/27/19) (stating prior to zero tolerance policy, "in most instances, family units either remained together in family detention centers operated by ICE while their civil immigration cases were pending, or they were released into the United States with orders to appear in immigration court at a later date.")  The parties do not agree, however, on whether convictions for illegal reentry under 8 U.S.C. § 1326 qualify for an exception. This issue first came up during a July 16, 2018 hearing.  (*See* ECF No. 117 at 53.)  During that hearing, Plaintiffs sought clarification from Defendants on whether parents with § 1326 violations were being excluded from the class.  Based on testimony at that hearing,

the Court made "the assumption that 1325, 1326 collectively would not exclude[,]" but left counsel to meet and confer on that issue.  (*Id.*)

In their opposition to the present motion, Defendants propose the following for parents with § 1326 convictions:

> [During or immediately following] service of any sentence for a section 1326 conviction, Defendants will endeavor to promptly complete the removal process consistent with applicable law, including processing the parent for reinstatement of removal under 8 U.S.C. § 1231(a)(5).  Should the parent become subject to an executable removal order (e.g., no pending reasonable fear claim or withholding only proceedings before the Executive Office for Immigration Review), the government anticipates offering the parent the choice whether to be removed with his or her child or to allow the child to remain in the United States to pursue any immigration claims that the child may have.

(*Id.* at 19 n.7.)

Plaintiffs urge the Court to reject this proposal, and instead "reiterate" that § 1326 convictions, like § 1325 convictions, are not a basis for exclusion from the class.  (Reply at 14.)  Counsel for the settlement class of children in the *MMM/Dora* cases also object to Defendants' proposal on the ground it could "prevent[ ] separated children and their parents from meaningfully exercising their rights to seek relief from removal."  (ECF No. 480 at 1.)  They propose an alternate process for parents with § 1326 convictions "in which parents and children jointly decide on reunification, and have the option to reunify for a joint reasonable fear and credible fear screening, [which] would avoid violating parents' and childrens' right to seek relief from removal."  (*Id.*)  Alternatively *MMM/Dora* counsel request that the Court defer ruling on this issue so the parties can continue to meet and confer.  (*Id.* at 2.)

This issue has been percolating for well over a year now despite the parties' efforts to come to an agreement, so the Court addresses it now.  At first glance, it appears § 1326 convictions should be treated the same as § 1325 convictions for purposes of this case because both statutes criminalize the same general conduct, namely illegal entry into the

United States. But there are differences, and some of them are significant. Section 1325 is charged as a misdemeanor with up to six months imprisonment for the first improper entry offense and may be charged as a felony with up to two years imprisonment for a second improper entry offense, while § 1326 is only chargeable as a felony and carries a statutory maximum sentence of two, ten or twenty years imprisonment depending on a person's immigration and criminal history. Also, unlike § 1325, which concerns unlawful entry and no prior removal, § 1326 concerns unlawful *reentry*, which indicates a prior removal (deportation) and often other criminal history. A § 1326 conviction also impacts a person's options under the immigration laws. (*See* Defs.' Resp. to *MMM* Br. at 3) (stating "violation of section 1326 is a serious felony and those who illegally re-enter and whose previous orders of removal are reinstated are barred from seeking asylum"). Thus, although § 1325 and § 1326 convictions concern the same conduct in the abstract, the repetitive nature of the conduct underlying § 1326, including prior removal(s) and possible prior conviction(s), calls for different treatment of that offense in this case.

Defendants are therefore justified in excluding from the class parents who are separated from their children at the border as a result of the parent being charged, convicted and sentenced under § 1326, as well as parents who have a prior § 1326 conviction.[9] Absent membership in the class, these parents would not be entitled to the relief provided by the Court's orders in *Ms. L.* and *MMM/Dora.* Nevertheless, Defendants agree that if these

_____

[9] It appears the exclusion of parents with a prior illegal reentry offense from the *Ms. L.* class may impact relatively few. If a parent "has criminal history consisting only of a prior conviction for 8 U.S.C. § 1326 …, RGV Sector [Texas] does not, in general, separate the parent from the child." (*See* Opp'n. to Mot., Ex. 2 (Easterling Decl.) ¶ 21.) An "alien parent's prior immigration history, standing alone, is not used as a basis to justify separation from an alien child." (*Id.* ¶ 4.) In addition, the number of cases the U.S. Attorney's Office elects to prosecute for § 1326 of parents crossing with their children appears to be relatively small. (*Id.* ¶ 21) (stating in "fiscal year 2019 (through August 27, 2019), RGV Sector processed 10,809 parents accompanying children for reinstatement of removal because of prior removal orders. CBP's statistics reflect that only 140 of these parents (1.3%) were actually prosecuted for illegal reentry under 8 U.S.C. § 1326.")

parents become subject to an executable removal order, they will offer these parents "the choice whether to be removed with [their] child or to allow the child to remain in the United States to pursue any immigration claims the child may have." (Opp'n to Mot. at 19 n.7.) Although Plaintiffs and *MMM/Dora* counsel object to this proposal, it is consistent with the Court's orders in this case.

### 3.   Gang Affiliation

Of the nearly 750 parents separated from their children based on criminal history, Plaintiffs contend thirty-seven (37) of them have been separated based on gang affiliation alone. (Mot. at 25.) As noted, the issue of gang affiliation came before the Court on Plaintiffs' previous motion to reunify a parent who had been separated from her child based on a warrant out of El Salvador alleging she was affiliated with a violent gang. (*See* ECF No. 221 at 4.) There, Plaintiffs disputed the allegation, but the Court declined to order reunification, and deferred to Defendants' determination that the mother's criminal history precluded reunification with her child and either release into the community or detention in a family residential center. (ECF No. 236 at 3.)

Here, Plaintiffs argue that Defendants are separating parents and children based solely on unsupported allegations of gang affiliation, and that evidence collected after the separations demonstrates those initial determinations of gang affiliation are incorrect. The record does not support Plaintiffs' first argument that these decisions are being made on speculation of gang affiliation. Rather, the record reflects that as part of the intake process, border patrol agents may receive information "from foreign governments and other law enforcement databases" indicating "that an individual has been identified as affiliated with a criminal gang[.]" (Opp'n. to Mot., Ex. 2 (Easterling Decl.) ¶ 20.) Although Plaintiffs complain about the reliability of this evidence, Defendants are relying on objective evidence, not allegations or intuition.

Although the initial evidence of gang affiliation may turn out to be inaccurate, border officials have limited information during the intake process and limited time to further investigate at that stage. (*Id.* ¶18.) The record also reflects that when the families or their

attorneys have subsequently obtained evidence refuting or qualifying allegations of gang affiliation, Defendants have reunified the parents and children when appropriate.  On this record, where Defendants are relying on foreign records or other law enforcement databases, and not subjective concerns about gang affiliation, and where the parties have successfully resolved disputed cases, the Court declines to find Defendants are violating the Court's preliminary injunction with respect to gang affiliation.

**D.    Fitness and Danger**

The next area of dispute concerns fitness and danger.  Plaintiffs assert that during the timeframe in question Defendants have separated twenty (20) families based on "dubious" and "questionable" determinations of fitness and danger.  Defendants assert they are exercising their discretion and judgment in a reasonable manner, and that the Court should decline to second-guess those determinations.

According to Defendants, the determination that a parent is unfit or presents a danger to his or her child is made after evaluating the particular circumstances of an individual case.  (Opp'n to Mot. at 6.)  As for the substantive decision, Defendants state:

> [A]gents and officers may make the decision on a review of any available records about the parent, as well as observations made while the parent and child are in DHS custody, including immediately following the initial encounter with the family, and the views of medical professionals available to the officers and agents.

(*Id.* at 6.)  In addition, decisions to separate must be reviewed and approved by a supervisor, and CBP's Office of Chief Counsel is often involved.  (*Id.* at 7-8.)

The factual circumstances under which these initial determinations are made do not lend themselves to micromanagement by the Court.  This is especially so given the class action nature of this case.  Defendants must be allowed discretion to make these decisions based on the available information.  Concerns about lack of fitness and danger to a child often overlap and include many scenarios that are difficult to assess under ideal circumstances, let alone at the border: mental disorders, active users of illicit controlled substances, odd behavior (*e.g.,* climbing cell fencing and feigning passing out), and

potential criminal activity, including child trafficking, sexual abuse and physical abuse. (*See* Opp'n., Ex. 2 (Easterling Decl.) ¶¶ 25-29).  The Court expects that field officers and agents and medical professionals will exercise their discretion in a reasonable manner based on the evidence then available, and that the reasonableness of those decisions will be reviewed by appropriate supervisors before separation decisions are made.  It is expected the parties will meet and confer on disputed findings of fitness and danger, as they have been doing on the issues of communicable disease and gang affiliation.  Given the intensely factual nature of these decisions and the processes now in place for parents to challenge such decisions, (*see* ECF No. 489 (Memorandum from Carla L. Prevost, Chief, U.S. Border Patrol to All Chief Patrol Agents and All Directorate Chiefs (Sep. 16, 2019) ("Prevost Memo") (explaining and attaching "Tear Sheet," which informs a parent who has been separated from his or her child of the reasons for separation, how to contact their child and how to contest separation from their child)),[10] the Court declines to find Defendants are violating the injunction with respect to this factor.

## E.   FRC Standards

The final issue is Defendants' standards for placement in FRCs.  Specifically, Plaintiffs assert those standards are vague and inconsistent, and result in unconstitutional separations of parents and children.

Notably, the claims in this case do not challenge Defendants' FRC standards. Rather, this case has always focused on Defendants' general practices of separating parents and children at the border for reasons other than the FRC standards.  In other words, the

---

[10] The Tear Sheet advises parents: "If you believe that your separation from your child was improper and would like to provide the government with additional information, you may submit that information to SeparationSupplementalInformation@ice.dhs.gov.  DHS will review any information submitted within 30 days and, if DHS determines some further action is appropriate, you will be so informed."  The "Separation Supplemental Information Form" informs the parent how to challenge the separation decision and request reunification.

FRC standards are not the basis for Plaintiffs' claims, nor have they been the subject of this Court's previous orders.  Defendants must be able to consider danger to others and risk of flight in addition to fitness and danger of a parent to his or her own child.  (*See* Opp'n to Mot., Ex. 5 (Decl. of Melissa Harper) ¶¶6-7, 10 (stating parents with criminal history or gang affiliation are generally excluded from FRCs because of risk of flight and harm to families, though in exceptional cases a parent with a non-violent misdemeanor offense may be admitted.))[11]  Careful assessment of all of these factors is necessary in the context of this case and may result in separation of a parent who is otherwise fit and not a danger to his or her own child but poses an unacceptable risk to others or of flight.  Given the scope of this case and the statutory framework providing discretion to Executive Branch officials in matters of detention and parole, *see* 8 U.S.C. § 1231(g)(1), the Court declines to wade into the constitutionality of the FRC standards on the present record.

Plaintiffs also argue that by using any criminal history, Defendants can take a parent out of the class and absolve themselves "of any obligation to immediately reunify the family when the parent is released from an adult detention center [by an immigration judge] (which happens frequently when the government cannot show that the parent is a flight risk or danger [to others]")."  (*See* Suppl. Br. at 1-2.)  Plaintiffs argue that parents who are excluded from FRCs but later released from immigration detention are not being reunified with their children during the pendency of their immigration proceedings.   The Court agrees with Plaintiffs that if a parent who is separated from his or her child due to FRC standards is subsequently released from custody, then Defendants should reunify that parent with his or her child in the same way they are reunifying families with resolved

---

[11]  Defendants assert FRCs are governed by standards that are designed to "promote a unique, non-secure, open-movement environment which permits parents and children to live in a dorm-like setting with access to education, recreational opportunities, and health care on site."  (*See* Opp'n to Mot., Ex. 5 (Harper Decl. ¶ 4.))  The safety of family residents is also regulated by state licensing requirements that impose "legal prohibitions on criminal individuals living, visiting or working at such licensed facilities."  (*Id.* ¶¶ 8-9.)

communicable diseases or long-term illnesses.  (*See* ECF No. 489 (Prevost Memo, Tear Sheet) (informing parents that "following the conclusion of any criminal custody or hospitalization" the parent will be transferred to ICE custody and DHS and ICE "will take steps to determine whether you may be reunified with your child or children.")) This clarification does not interfere with Defendants' discretion in matters of parole or detention.  CBP's initial determination to detain the parent remains undisturbed until another Executive Branch officer (an immigration judge) decides later based on additional information to release the parent on bond or other appropriate conditions pending their removal proceedings.  Should Defendants fail to reunify parents under these circumstances, parents can also now avail themselves of the "Tear Sheet"  process, by which they can make application for and be reunified with their children.  Except for this clarification, the Court declines to intervene further on this issue.

## III.

## CONCLUSION

Plaintiffs assert Defendants have returned to systematically separating families at the border.  However, the evidence before the Court does not support that assertion. Although family separations have not stopped entirely, the number of family separations compared to the number of family units crossing the border appears to be less than one percent.[12]  Furthermore, the Executive Order abandoned the zero tolerance policy in favor of a policy to maintain family unity, and Defendants have implemented policies and

---

[12]  Defendants represent that the number of parents separated from their children between June 27, 2018, and July 20, 2019, is less than .4% of the overall number of individuals entering the United States as members of a family unit over the same time period.  (Opp'n to Mot. at 1.)  Defendants state that during "an almost overlapping timeframe, from July 1, 2018 through July 30, 2019, … CBP data reflects that 524,294 individuals have crossed the southwest border at or between ports of entry as a member of a family unit[.]"  (*Id.* at 5.)  *See also Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (noting that for several months in 2018, approximately 2,000 migrants were "arriving at the Nation's southern border on a daily basis").

procedures that are largely consistent with this Court's orders prohibiting family separation in the absence of the factors discussed above.  Defendants have also gone beyond the scope of the Court's injunction and implemented additional practices related to family separations, such as the Tear Sheet, which provide parents with the reasons for any separations and information on how to challenge any separation decisions.

In the present motion, Plaintiffs invite the Court to engage in prospective oversight of Defendants' separation decisions, but that invitation warrants caution.  It is an invitation that is potentially massive in scope, invades an area that is particularly within the province of the Executive Branch to secure the Nation's border, and goes beyond this Court's class certification and preliminary injunction orders, which were focused on the Administration's practice of separating families at the border for the purpose of deterring immigration, and failing to reunify those families.[13]  The Court is satisfied that the factors discussed above provide an appropriate balance between the constitutional right to family integrity and the government's interests in border security and criminal and immigration law enforcement.  *See J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)) (stating evaluation of party's "substantive due process rights require[s] a 'balancing [of the party's] liberty interests against the relevant state interests.'")  Except for DNA testing and the clarification regarding FRC standards, Defendants' application of these factors has generally been

/ / /

---

[13]  Although the Court previously examined Defendants' conduct in determining compliance with the preliminary injunction, that scrutiny occurred in a limited context—*i.e.,* whether Defendants' exclusion of parents from the original class of 2,814 was proper based on their criminal history.  That examination was retrospective, confined to two parents, and concerned reunification.  In contrast, Plaintiffs' present motion invites the Court to set out additional "guidelines" for DHS to use before separating a family unit and, if necessary, to appoint a monitor to oversee DHS's exercise of discretion in making those decisions for hundreds of thousands of migrant families arriving at the border.  That is unwarranted on the present record.

consistent with this Court's orders and thus Plaintiffs' motion to enforce the preliminary injunction is otherwise respectfully denied.

**IT IS SO ORDERED**.

Dated:  January 13, 2020

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)