JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0473
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

               Petitioners-Plaintiffs,

    vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

              Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT**

      The Court ordered the parties to file a joint status report (JSR) by 3:00 pm on March 4, 2020, in anticipation of the status conference scheduled at 1:00 pm on March 6, 2020. The parties submit this joint status report in accordance with the Court's instruction.

## I.  DEFENDANTS' POSITIONS

### A. Update on Reunifications for the Original Class Period

      As of February 28, 2020, Defendants have discharged 2,797 of 2,815 possible children of potential class members for the original class period. That is, Defendants have discharged 2,797 of the 2,815 possible children of potential class members who were in the care of the Office of Refugee Resettlement (ORR) as of June 26, 2018. *See* Table 1: Reunification Update. This is an increase of three discharges reported in Table 1 since the JSR filed on January 15, 2020. See ECF No. 511. Of the three,

one child was reunified with a separated parent (see paragraph below), and two children were discharged under other appropriate circumstances.[1]

There are currently zero children of class members in ORR care whose parents elected to reunify. Previously, the Government had reported one child for whom the Steering Committee was still seeking resolution of parental preference. The Steering Committee has resolved this case, and the child was reunified with the separated parent.

The current reunification status for the 2,815 children ages 0 through 17 for the original class period, who have been the focus of Defendants' reporting to date, is further summarized in Table 1. The data in Table 1 reflects approximate numbers on these children maintained by ORR at least as of February 28, 2020. These numbers are dynamic and continue to change as more reunifications, determinations on class membership, or discharges occur.

---

[1] In Table 1, the total number of children reunified with a separated parent actually decreased compared to the previous JSR, from 2168 to 2166. This is because, since the last reporting, the Government found three cases in which children were incorrectly categorized as having been separated from, and reunified with, a parent. In fact, these children had not been separated from a parent. As a result, for this reporting, the count of children discharged by being reunified with a separated parent was decreased by three, and the count of children discharged under other appropriate circumstances was increased by three. Table 1 reflects these updates, plus the three new discharges that occurred since the last reporting.

18cv428 DMS MDD

**Table 1: Reunification Update**

| Description | Phase 1 (Under 5) | Phase 2 (5 and above) | Total |
|---|---|---|---|
| Total number of possible children of potential class members | 107 | 2708 | 2815 |
| **Discharged Children** | | | |
| Total children discharged from ORR care: | 107 | 2690 | 2797 |
| • Children discharged by being reunified with separated parent | 81 | 2085 | 2166 |
| • Children discharged under other appropriate circumstances (these include discharges to other sponsors [such as situations where the child's separated parent is not eligible for reunification] or children that turned 18) | 26 | 605 | 631 |
| **Children in ORR Care, Parent in Class** | | | |
| Children in care where the parent is not eligible for reunification or is not available for discharge at this time: | 0 | 0 | 0 |
| • Parent presently outside the U.S. | 0 | 0 | 0 |
|    o Steering Committee has advised that resolution will be delayed | 0 | 0 | 0 |
| • Parent presently inside the U.S. | 0 | 0 | 0 |
|    o Parent in other federal, state, or local custody | 0 | 0 | 0 |
|    o Parent red flag case review ongoing – safety and well being | 0 | 0 | 0 |
| **Children in ORR Care, Parent out of Class** | | | |
| Children in care where further review shows they were not separated from parents by DHS | 0 | 3 | 3 |
| Children in care where a final determination has been made they cannot be reunified because the parent is unfit or presents a danger to the child | 0 | 6 | 6 |
| Children in care with parent presently departed from the United States whose intent not to reunify has been confirmed by the ACLU | 0 | 8 | 8 |

| | | | |
|---|---|---|---|
| Children in care with parent in the United States who has indicated an intent not to reunify | 0 | 0 | 0 |
| Children in care for whom the Steering Committee could not obtain parental preference | 0 | 1 | 1 |

## B. Update on Removed Class Members for the Original Class Period

The current reunification status of removed class members for the original class period is set forth in Table 2 below. The data presented in this Table 2 reflects approximate numbers maintained by ORR as of at least February 28, 2020. These numbers are dynamic and continue to change as the reunification process moves forward.

### Table 2: Reunification of Removed Class Members

| REUNIFICATION PROCESS | REPORTING METRIC | NO. | REPORTING PARTY |
|---|---|---|---|
| STARTING POPULATION | Children in ORR care with parents presently departed from the U.S. | 9 | Defs. |
| PROCESS 1: Identify & Resolve Safety/Parentage Concerns | Children with no "red flags" for safety or parentage | 9 | Defs. |
| PROCESS 2: Establish Contact with Parents in Country of Origin | Children with parent contact information identified | 9 | Defs. |
| | Children with no contact issues identified by plaintiff or defendant | 9 | Defs. & Pls. |
| | Children with parent contact information provided to ACLU by Government | 9 | Defs. |
| PROCESS 3: Determine | Children for whom ACLU has communicated  parental intent for minor: | 8 | Pls. |

| **Parental Intention for Minor** | • Children whose parents waived reunification | 8 | Pls. |
|---|---|---|---|
| | • Children whose parents chose reunification in country of origin | 0 | Pls. |
| | • Children proceeding outside the reunification plan | 0 | Pls. |
| | Children for whom ACLU has not yet communicated parental intent for minor: | 0 | Pls. |
| | • Children with voluntary departure orders awaiting execution | 0 | Defs. |
| | • Children with parental intent to waive reunification documented by ORR | 0 | Defs. |
| | • Children whose parents ACLU has been in contact with for 28 or more days without intent determined | 0 | Pls. |
| | Children whose parents steering committee could not obtain parental preference | 1 | PIs |
| **PROCESS 4: Resolve Immigration Status of Minors to Allow Reunification** | Total children cleared Processes 1-3 with confirmed intent for reunification in country of origin | 0 | Pls. |
| | • Children in ORR care with orders of voluntary departure | 0 | Defs. |
| | • Children in ORR care w/o orders of voluntary departure | 0 | Defs. |
| | • Children in ORR care whose immigration cases were dismissed | 0 | Defs. |

## C. Update Regarding Government's Implementation of Settlement Agreement

| SETTLEMENT PROCESS | DESCRIPTION | NUMBER |
|---|---|---|
| Election Forms[2] | Total number of executed election forms received by the Government | **433 (255 Parents/178 Children)[3]** |
| | • Number who elect to receive settlement procedures | **272 (152 Parents/120 Children)** |
| | • Number who waive settlement procedures | **161 (103 Parents/58 Children)[4]** |
| Interviews | Total number of class members who received interviews | **164[5]** |
| | • Parents who received interviews | **86** |
| | • Children who received interviews | **78** |
| Decisions | Total number of CFI/RFI decisions issued for parents by USCIS | **69[6]** |
| | • Number of parents determined to | **68[7]** |

[2] The number of election forms reported here is the number received by the Government as of February 26, 2020.

[3] The number of children's election forms is lower than the number of parent election forms because in many instances a parent electing settlement procedures submitted an election form on his or her own behalf or opposing counsel e-mailed requesting settlement implementation for the entire family, but no separate form was submitted on behalf of the child.

[4] The number of children's waivers is lower because some parents have submitted waivers only for themselves and some parents who have waived reunification also waived settlement procedures and have therefore not provided a form for the child.

[5] Some individuals could not be interviewed because of rare languages; these individuals were placed in Section 240 proceedings. This number includes credible fear and reasonable fear interviews, as well as affirmative asylum interviews.

[6] This number is the aggregate of the number of parents whose negative CFI/RFI determinations were reconsidered, number of parents whose negative CFI/RFI determination was unchanged, and individuals who were referred to Section 240 proceedings without interview because of a rare language. This number excludes 12 cases where a parent already had an NTA from ICE or was already ordered removed by an IJ (which are included in the interview totals).

[7] This number includes parents who received positive CF/RF determinations upon reconsideration, parents

| | | |
|---|---|---|
| | establish CF or RF upon review by USCIS | |
| | • Number of parents whose CF or RF finding remains negative upon review by USCIS | 1 |
| | Total number of CFI decisions issued for children by USCIS | 73[8] |
| | • Number of children determined to establish CF by USCIS | 73[9] |
| | • Number of children determined not to establish CF by USCIS | 0 |
| | Total number of affirmative asylum decisions by USCIS | 20 |
| | • Number of parents granted asylum by USCIS | 2 |
| | • Number of parents referred to immigration court | 5 |
| | • Number of children granted asylum by USCIS | 3[10] |
| | • Number of children referred/returned to immigration court | 10 |

who received a Notice to Appear based on their child's positive CF determination, and parents who were placed in Section 240 proceedings due to a rare language.

[8] This number is the aggregate of the number of children who received a positive CF determination, the number of children who received a negative CF determination, and children who were referred to Section 240 proceedings without interview because of a rare language.

[9] This number includes children who received a positive CF determination, children who received a Notice to Appear as a dependent on their parent's positive CF determination, and children who were placed in Section 240 proceedings due to a rare language.

[10] This number includes children granted asylum as a dependent on their parent's asylum application.

18cv428 DMS MDD

| Removals | Number of class members who have been returned to their country of origin as a result of waiving the settlement procedures | **103 Parents[11]** |
|---|---|---|

### D. Parents Who ICE Records Reflect Have Absconded After Being Released

| Absconders | Number of Parents who absconded from enrollment in ATD (Alternatives To Detention) | 208[12] |
|---|---|---|

### E. Expanded Class Members

On April 25, 2019, the Court approved Defendants' Plan for identifying members of the expanded class. In advance of the Court's October 25, 2019 deadline, Defendants completed the process of identifying members of the expanded class and produced spreadsheets identifying those individuals to Plaintiffs' counsel. On November 6, 2019, the Steering Committee notified Defendants that in the 11 batches there were 149 individuals who have been identified by the government as being both children of potential expanded class members and "exclusions." On December 13, 2019, Defendants provided Plaintiffs with their completed review and reconciliation of the 149 individuals with inconsistent labels.

---

[11] This number is as of February 24, 2020.

[12] This number is as of February 21, 2020.

On February 7, 2020, Defendants reached out to Plaintiffs to request that Plaintiffs provide Defendants with an update regarding their efforts to locate and reunify members of the expanded class. Noting that this Court has encouraged the sharing of information between the parties, Defendants asked that for each expanded class member that Defendants identified for Plaintiffs, the Steering Committee provide Defendants with certain information regarding their progress in making contact and facilitating reunification. Plaintiffs have agreed to provide some of the information that Defendants requested. Defendants will continue to confer with Plaintiffs regarding this information-sharing request after they have reviewed the information that Plaintiffs have agreed to provide.

Defendants believe that without adequate information-sharing by the Steering Committee, the government and the public cannot tell where the efforts of the Steering Committee stand or whether the Steering Committee is making bona fide progress. The Court has emphasized the importance of transparency, and Defendants believe that the information they have requested from Plaintiffs is important to ensure that if Plaintiffs intend to raise any outstanding issues related to the expanded class, then those issues can be resolved in a fair and expeditious manner. Defendants also believe that it would be inappropriate—and inconsistent with the Court's guidance—for Plaintiffs to unfairly surprise Defendants and the

public based on information in Plaintiffs' sole possession, and that Plaintiffs therefore need to keep Defendants informed of their progress.

### F. MMM Settlement Forms—Discrepancies

Defendants have heard nothing from the MMM Plaintiffs regarding this issue since the last Joint Status Report and therefore believe this issue to have been resolved.

### G. Government Processes, Procedures, and Tracking, for Separations Since June 26, 2018.

*Data Requested by Plaintiffs*.  Defendants are providing Plaintiffs updated reports containing information regarding parents and children separated since the Court's June 26, 2018 on a monthly basis.

*Processes and Procedures*.  Defendants provided a summary outline to the Court and to Plaintiffs memorializing the processes, procedures, tracking, and communication between the agencies that have been adopted by the agencies since June 26, 2018.  The outline also included an overview of the options for separated parents and children to obtain information about reunification options. The parties have met and conferred since then regarding the government's proposals. Defendants have held several internal telephonic meetings, and have spoken with representatives for the Bureau of Prisons and the U.S. Marshals Service to ensure that those entities are included in discussions regarding these processes and procedures.

18cv428 DMS MDD

Defendants also have now implemented the use of a tear sheet for families that are separated that provides information about the separation to the separated parent, as well as information about how to locate their children.  The tear sheet includes an email address by which separated parents can provide information to DHS that they wish to have considered. This email address has also been provided to Plaintiffs' counsel and other interested counsel.

Following the November 8 Status Conference, the Court directed the parties to continue to meet and confer on the information-sharing protocols between the government agencies involved in family separations, and between the government and Plaintiffs and the legal service providers. On November 19, 2019, the parties met and conferred regarding the information sharing protocols.  On November 22, 2019, Defendants provided Plaintiffs, pursuant to the Protective Order, with the Office of Refugee Resettlement's draft guidance to its field staff regarding new separations.  Defendants asked Plaintiffs to share with them any specific problems they were aware of regarding the information sharing protocols. On December 2, 2019, Plaintiffs sent Defendants initial questions and requests for clarification about the protocols to which Defendants provided a response on December 19. On January 2, Plaintiffs asked that they be allowed to share the Office of Refugee Resettlement's draft guidance with legal services providers and advocates.  Defendant ORR agreed that the draft guidance could be provided to Catherine Weiss. In addition, Defendant

ORR provided a summary of the document, to be shared with Ms. Weiss and the legal service providers and advocates more broadly, for the purpose of facilitating discussions about information sharing.

On February 7, 2020, Defendants reached out to Plaintiffs asking whether Plaintiffs had any remaining questions or issues related to Defendants' practices or procedures for information sharing, and asking that if so, Plaintiffs please send a list of those questions or issues by February 14, 2020, so that the parties could attempt to reach final resolution of all information-sharing matters before the next Joint Status Report. On February 20, 2020, Plaintiffs responded by sending an extensive list of additional questions. Defendants are reviewing these questions and will provide responses in due course.

**H. Implementation of DNA Testing**

In its January 13, 2020 order, this Court ordered that Defendants "must conduct DNA testing before separating an adult from a child based on parentage concerns." Order at 11-12. The Court further stated that "[s]ubjective concerns about parentage—or inability to validate documentation—are an insufficient basis for separation when those concerns can be definitively addressed through use of readily accessible, inexpensive and accurate scientific testing." *Id.* at 12. In reaching this decision, the Court relied on the "relatively few" number of separations based on "unverified familial relationship," the existence of the Rapid DNA pilot program at

certain locations along the southwest border, and the assumption that "if testing is not available at a particular facility, Defendants can transfer the family to a facility where that testing is available, or take swabs from the parent and child and send the swabs for testing, as they did with Ms. L. and her daughter." *Id.* at 11.

Defendants submit the following information to provide the Court with an update regarding its efforts to implement this provision of the Court's order. As an initial matter, Defendants note that, in Fiscal Year 2020 to date, U.S. Customs and Border Protection ("CBP") has separated 88 purported family units based on fraud.[13] These separations are made by considering all of the information available at the time of encounter, and are based on articulable, specific facts, including, for instance, information obtained during interviews, observed behaviors that are inconsistent with the behavior of an actual family, or a reasonable belief that the same child(ren) has (have) been encountered on multiple occasions with different adults or claimed family members. It also includes DNA testing, when available and appropriate.

Rapid DNA testing is performed by U.S Immigration and Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") under a pilot

---

[13] Defendants note that, as discussed below, not all of these cases are documented as separations in CBP's systems of record.

program, and is not conducted by CBP.[14] Rapid DNA testing currently is conducted only when the individuals at issue consent to such testing. DHS lacks the operational resources to conduct DNA testing in all locations prior to separation. ICE HSI currently maintains forty-four Rapid DNA machines in eleven locations along the southern border. Ten of those machines are located in CBP facilities. It is projected that it would cost approximately $15 to $17 million to extend the contract for an additional five years to maintain the same capability in the current eleven locations.

In locations in which ICE HSI has Rapid DNA testing capability, CBP complies with the Court's order by referring suspected fraudulent family units to ICE HSI for Rapid DNA testing.[15] Given the current locations in which Rapid DNA technology is located, Defendants can, in most locations on the southern border, conduct a Rapid DNA test if they encounter a purported family unit that they believe to be fraudulent. Where the machines are located in CBP facilities, ICE HSI conducts the test at the CBP facility. In CBP locations without a Rapid DNA machine, CBP

---

[14] Rapid DNA technology involves comparing DNA swabs from two individuals. The swabs are placed into cartridges, and the machine provides a yes/no result as to whether the two individuals at issue are parent and child within, generally, 90 minutes. Over 99.5% of all samples result in a conclusive result. In approximately 80% of cases, the yes/no result is apparent on the first run. Twenty percent of samples require additional interpretation by the contractor who operates the machines. While the result of the test is documented, the individual samples are purged from the machines within twenty-four hours.

[15] CBP notes that it generally does not refer a case to ICE HSI for DNA testing if an adult admits, upon questioning, to not being the child's biological parent. In such a case, the adult and child will be separated. Such a case would not be documented as a separation in CBP's systems of record because the adult has admitted to not being the parent of the accompanying child.

is generally able to transport the individuals to a location which has a Rapid DNA machine within several hours following the articulation of the fraud concern. Thus, for the majority of cases on the southern border, CBP is able to use the existing available Rapid DNA technology to comply with the Court's order.

However, there are some remote locations along the southern border where transportation to a facility with Rapid DNA testing may not be possible within a reasonable period of time of the identification of a fraud concern. Additionally, on the northern and coastal borders, as well as at airports in the interior of the county, Defendants do not have access to Rapid DNA machines and Rapid DNA testing.

At this time, given the significant costs associated with Rapid DNA technology in the locations in which it currently exists, Defendants have not sought additional funding to expand Rapid DNA testing to these additional locations, particularly because the need for Rapid DNA testing at these locations is relatively low. Defendants note that, based on current cost estimates provided by vendors, a machine costs between $150,000-$250,000. To operate the machines, Defendants would also need to account for the costs of logistical support from the vendors, information technology support for the machines, as needed, as well as the cost of training employees and contractors on the use of the machines. The burden of these expenses must be weighed against the relatively low need for DNA testing at these

locations, and counsels against the expansion of Rapid DNA testing to these locations.

CBP has also considered other options that it could use when it encounters a potentially fraudulent family unit in these locations. For instance, CBP could store cartridges in these locations, collect DNA swabs when a parentage concern arises, and mail those swabs to a location where they could be tested on Rapid DNA machines. This option, however, raises significant operational issues. Specifically, CBP would need to pay to store DNA samples in these locations, which would cost approximately $300,000 per 1200 samples. CBP also would need to provide training for agents and officers on the collection of DNA samples. Additionally, the individuals would need to remain in CBP custody until the samples could be tested and results communicated back to CBP. This would likely dramatically increase the length of time that those individuals would need to remain in CBP custody. Lastly, there are safety concerns inherent in leaving a child with an adult who CBP has a reasonable belief is not that child's parent during the length of time it would take to receive such results, as that child could be a trafficking victim or otherwise in danger with that adult.

Given the operational concerns and the costs described above, Defendants propose an alternative that they believe is consistent with the goals of the Court's order, while also ensuring that this relatively small number of individuals who

require DNA tests at these locations do not stay in CBP custody longer than appropriate. Specifically, Defendants propose that if CBP has concerns about an adult's purported parentage of a particular child, and if that adult and child are located in a facility where it is not possible to conduct a Rapid DNA test within 48 hours of encounter, CBP will temporarily separate that adult and child, based on the parentage concerns. CBP will notify ICE and the U.S. Department of Health and Human Services ("HHS") of the separation, the basis for the separation, and all relevant facts justifying the separation.  ICE and HHS will conduct appropriate DNA tests on both the adult and the child as expeditiously as possible, and will reunify the adult and child quickly, consistent with existing policies and procedures, if the test results indicate there is a biological parental relationship between the adult and the child. CBP expects that this option would be necessary in a relatively small number of cases, and believes that this approach can be developed consistent with the Court's order.

## II.     *MS. L.* PLAINTIFFS' POSITION

### A. Steering Committee Outreach to Sponsors and Parents of Children of Expanded Class Members

As of the date of this report, the government has provided eleven lists identifying 1,556 children of potential expanded class members. Plaintiffs have initially focused on reaching children whose membership in the class is not contested, and for whom the government has provided at least one phone number

for a sponsor or for the child's parent. There are 1,030 children that meet that description.[16]

As of March 4, the Steering Committee has attempted to reach the families of all of these 1,030 children, and has successfully reached 395 parents or their attorneys, either by reaching the parent directly through a parent phone number provided by the government, via an initial call with the child's sponsor who provided the Steering Committee with a working phone number for the parent, directly to the parent via on-the-ground efforts, or by inbound phone calls to the Steering Committee's toll-free numbers from family members who received a mailing from the Steering Committee.

As a result, 635 children remain for whom the Steering Committee has not yet reached the separated parent, approximately half of whom are believed on the basis of the last information available from the government, to be in their respective countries of origin.  Of these 635, the Steering Committee believes, on the basis of its unsuccessful attempts to reach the family telephonically, that parents of 598 will not be reached using the telephone numbers provided by the government.  For these families, the Steering Committee has commenced or intends to commence additional efforts to locate the separated parent, as discussed below.

For the remaining 37 of the 635, the Steering Committee has successfully established contact with an individual related to the parent or their child (for

---

[16] The eleven lists identify a total of 1,556 unique children, 1,135 of which have been confirmed by the government as being children of potential expanded class members.  For 105 of these 1,135 children of potential class members, the government has not provided a phone number.  The 421 children who have not been identified by the government as children of potential expanded class members have been categorized as "exclusions".  The Steering Committee also intends to reach individuals the government has categorized as excluded from the class, and Plaintiffs reserve the right to contest those exclusions.

example, a sponsor of the child or an attorney for either the sponsor, parent or child), and the Steering Committee remains in the process of attempting to contact the parent, or working to obtain information that will assist with on-the-ground attempts to locate the parent.

As of March 4, the Steering Committee has spoken to a number of parents who have indicated tentatively that they are not satisfied with the current separation from their child.  The Steering Committee has conducted and continues to conduct further outreach to families who may not be satisfied with the reunification status quo.  Our outreach to these families continues and we will advise the government if and when any cases arise in which further action from the government is required.

**B. <u>Steering Committee Progress Contacting "Unreachable" Parents</u>**

As noted in previous Joint Status Reports, the Steering Committee has commenced extensive efforts to locate the "unreachable" parents in their respective countries of origin, a group now comprised of the parents of 598 children. Over the last several months, the Steering Committee has commenced a variety of additional outreach initiatives in an attempt to reach these parents.

First, as previously reported, the Steering Committee has engaged in time-consuming and arduous on-the-ground searches for parents in their respective countries of origin. As of March 4, Steering Committee members had commenced on-the-ground efforts to locate the "unreachable" parents of 301 children, and had successfully located the parents of 151 of those children.  As parents are located on-the-ground by members of the Justice in Motion Defender Network, the defenders interview parents (where time and resources permit), or obtain working contact information for the parent and relay that information back to Steering Committee members working in the United States, who subsequently conduct follow-up telephonic outreach to those parents. Once parents are located, the

1  Justice in Motion defenders continue searching for additional "unreachable"

2  parents.

3      Also as previously reported, the Steering Committee has established toll-free

4  telephone numbers in the United States, Guatemala, Honduras, Mexico and El

5  Salvador to receive inbound phone calls from potential members of the expanded

6  class.  The Steering Committee has distributed this number both by email and U.S.

7  Mail to a number of non-governmental organizations and other community

8  organizations in the United States, who may be able to help us locate parents

9  because they work in the communities these parents are likely to have contact with.

10  In addition, the Steering Committee sent letters in Spanish and English to

11  approximately 1,600 addresses provided by the government for the potential class

12  members that the Steering Committee has not yet reached.  These letters explain

13  our role in this action and invite parents to contact the Steering Committee to call

14  these toll-free numbers.  As of March 4, 480 of these letters had been returned to

15  the Steering Committee undeliverable, but the Steering Committee had also

16  received 51 inbound phone calls from individuals regarding various family

17  separation inquiries.  The Steering Committee is communicating with those callers

18  to determine whether they are or are related to members of the *Ms. L.* class, and

19  whether the Steering Committee is able to assist them with reunification.

20      Finally, the Steering Committee has commenced broad-based media

21  outreach efforts to publicize the toll-free phone numbers created by the Steering

22  Committee in Spanish language media. The Steering Committee anticipates that

23  this outreach will result in an increase in the number of inbound calls to the

24  Steering Committee's toll-free phone numbers, and will report in the next Joint

25  Status Report the number of class members identified through this method.

26

27

28

## C. <u>Steering Committee Progress for June 26 Initial Class</u>

The Steering Committee has successfully contacted and confirmed the preferences of nearly all removed parents with respect to reunifications. As previously reported in the last Joint Status Report, most recently on October 21, the government reported that 13 children with removed parents remained in ORR custody. The Steering Committee has advised the government that no preference will be forthcoming for one of those parents due to complex and individualized family circumstances, leaving 12 children with removed parents in the operative group. The Steering Committee has delivered preferences for 11 parents of those children.  The Steering Committee has not received a further update from the government regarding children with removed parents who remain in ORR custody.

The parent of the remaining child sought and was granted the opportunity to return to the United States pursuant to the Court's September 4 Order, and after returning to the United States looks forward to commencing the process to be reunified with her son.

## D. <u>Information Sharing</u>

The parties continue to meet and confer regarding information sharing among government agencies, and from the government to parents and children whom the government has separated.

As noted in the prior JSR, the government agreed to share their guidance document with Catherine Weiss, and agreed to share a letter discussing that guidance with the Steering Committee and other legal services providers and advocates who work with separated children. Plaintiffs then evaluated the government's guidance and explanatory letter, and conferred extensively with Ms. Weiss, the Steering Committee, and the legal services providers on their reactions to the explanatory letter.

18cv428 DMS MDD

On February 20, 2020, Plaintiffs and Ms. Weiss sent a detailed response describing their questions concerning the guidance and the government's current information-sharing protocols, as well as proposing certain alterations that would facilitate information exchange with legal services providers. That response is pending with the government.

Additionally, on February 14, the Steering Committee received from the government a request for individualized information regarding the Steering Committee's efforts with respect to locating and communicating with potential class members.  The Steering Committee is committed to information sharing efforts that facilitate parents' ability to obtain relief in this action, and is actively communicating with the government to determine the scope of the information to be prepared, to ensure that the information provided is helpful to parents and the government, without posing an undue resource burden on the Steering Committee's efforts to locate parents and discern their reunification wishes.

## E. **Deported Parents**

On September 4, 2019, the Court granted in part the Plaintiffs' Motion seeking relief for deported parents, ordering the return of a subset of the separated parents.  On January 22, 2020, 9 of the parents traveled back to the United States and were reunited with their children.

## III.   *MMM-Dora* **Plaintiffs' Report Regarding Settlement Implementation**

The parties continue to work together to implement the settlement agreement approved on November 15, 2018. Class counsel are providing the Government with signed waiver forms as they are received from class members, and class counsel are continuing to work on outreach efforts to class members who may qualify for relief

1  under the settlement. The parties continue to meet and confer on issues related to
2  settlement implementation as they arise.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

23

1 DATED: March 4, 2020                    Respectfully submitted,

2                                         /s/ Lee Gelernt

3                                         Lee Gelernt*

4                                         Judy Rabinovitz*
                                          Anand Balakrishnan*
5                                         AMERICAN CIVIL LIBERTIES UNION
                                          FOUNDATION
6                                         125 Broad St., 18th Floor
7                                         New York, NY 10004
                                          T:  (212) 549-2660
8                                         F:  (212) 549-2654
9                                         *lgelernt@aclu.org*
                                          *jrabinovitz@aclu.org*
10                                        *abalakrishnan@aclu.org*
11
                                          Bardis Vakili (SBN 247783)
12                                        ACLU FOUNDATION OF SAN DIEGO
13                                        & IMPERIAL COUNTIES
                                          P.O. Box 87131
14                                        San Diego, CA 92138-7131
15                                        T: (619) 398-4485
                                          F: (619) 232-0036
16                                        *bvakili@aclusandiego.org*
17
                                          Stephen B. Kang (SBN 292280)
18                                        Spencer E. Amdur (SBN 320069)
19                                        AMERICAN CIVIL LIBERTIES UNION
                                          FOUNDATION
20                                        39 Drumm Street
21                                        San Francisco, CA 94111
                                          T:  (415) 343-1198
22                                        F:  (415) 395-0950
23                                        *skang@aclu.org*
                                          *samdur@aclu.org*
24
25                                        *Attorneys for Petitioners-Plaintiffs*
                                          *Admitted Pro Hac Vice*
26
27
28

                                          24                    18cv428 DMS MDD

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
Sarah.B.Fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*