Lee Gelernt
Judy Rabinovitz
Anand Balakrishnan
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioner-Plaintiff*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.,

        *Petitioner-Plaintiff,*

v.

U.S. Immigration and Customs Enforcement
("ICE"); et al.,

        *Respondents-Defendants.*

Case No. 18-cv-00428-DMS-MDD

Date Filed: March 10, 2020

**PLAINTIFFS' NOTICE OF
FILING OF MARCH 2020
REPORT OF HHS OFFICE OF
INSPECTOR GENERAL**

1   Pursuant to the parties' discussion at the March 6, 2020 status conference,

2   Plaintiffs hereby submit the recently-published report of the U.S. Department of

3   Health and Human Services' Office of Inspector General, titled "Communication

4   and Management Challenges Impeded HHS's Response to the Zero-Tolerance

5   Policy." The report can also be found on the HHS website at

6   https://oig.hhs.gov/oei/reports/oei-BL-18-00510.asp

7

8   Dated: March 10, 2020                    Respectfully Submitted,

9                                            */s/Lee Gelernt*
    Bardis Vakili (SBN 247783)               Lee Gelernt*
10  ACLU FOUNDATION OF SAN                   Judy Rabinovitz*
    DIEGO & IMPERIAL COUNTIES                Anand Balakrishnan*
11  P.O. Box 87131                           Daniel A. Galindo (SBN 292854)
    San Diego, CA 92138-7131                 AMERICAN CIVIL LIBERTIES
12  T: (619) 398-4485                        UNION FOUNDATION
    F: (619) 232-0036                        IMMIGRANTS' RIGHTS PROJECT
13  *bvakili@aclusandiego.org*               125 Broad St., 18th Floor
                                             New York, NY 10004
14  Stephen B. Kang (SBN 2922080)            T:  (212) 549-2660
    Spencer E. Amdur (SBN 320069)            F:  (212) 549-2654
15  AMERICAN CIVIL LIBERTIES                 *lgelernt@aclu.org*
    UNION FOUNDATION                         *jrabinovitz@aclu.org*
16  IMMIGRANTS' RIGHTS PROJECT               *abalakrishnan@aclu.org*
    39 Drumm Street
17  San Francisco, CA 94111
    T:  (415) 343-1198                       *Admitted Pro Hac Vice*
18  F:  (415) 395-0950
    *samdur@aclu.org*

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2020, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt

Lee Gelernt, Esq.

Dated: March 10, 2020

18cv0428



U.S. Department of Health and Human Services

**Office of Inspector General**

# Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy

**OEI-BL-18-00510**
March 2020

oig.hhs.gov

**Christi A. Grimm**
**Principal Deputy**
**Inspector General**



**Report in Brief**
March 2020
OEI-BL-18-00510

**U.S. Department of Health and Human Services**
# Office of Inspector General



## Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy

### What OIG Found

Interagency communication failures and poor internal management decisions left HHS unprepared for the zero-tolerance policy. Specifically, interagency channels for coordinating immigration policy across Federal departments were not used to notify HHS of the zero-tolerance policy in advance. Meanwhile, key senior HHS officials did not act on staff's repeated warnings that family separations were occurring and might increase.

HHS's lack of planning for the possibility of larger-scale family separations left the Department unable to provide prompt and appropriate care for separated children when the zero-tolerance policy was implemented. Without sufficient bed capacity, HHS could not always place separated children in care provider facilities within 72 hours (as required by law), leaving hundreds inappropriately detained in Department of Homeland Security (DHS) custody. Care provider facilities facing an unexpected increase in young, separated children encountered numerous challenges to meeting their unique needs. Further, because no procedures or systems had been established to track separated families across HHS and DHS for later reunification, HHS struggled to identify separated children. HHS also experienced challenges coordinating the reunification effort under overlapping court-imposed requirements.

Additionally, OIG found that care provider facilities faced significant operational challenges at every stage of the reunification process. Facilities encountered difficulties locating and communicating with parents in DHS or Department of Justice (DOJ) custody as well as determining whether parents and children could be safely reunified. Facilities also reported that guidance and directives from HHS related to separated children were poorly communicated.

HHS has taken steps to improve tracking of separated children, but the procedures rely on manual processes that are vulnerable to error. HHS also continues to experience difficulties obtaining information from DHS about parents' criminal backgrounds, impeding HHS's ability to provide appropriate care and identify sponsors to whom children can be safely released.

### Key Takeaways

- Poor interagency communication and internal management decisions that failed to protect children's interests left HHS unprepared for the zero-tolerance policy

- This lack of preparation impeded HHS's ability to identify, care for, and reunify separated children

- Care provider facilities faced significant operational challenges at every stage of reunification, causing additional stress to children

- HHS has taken steps to improve tracking and placement of separated children, but vulnerabilities remain

### Why OIG Did This Review

Within HHS, the Unaccompanied Alien Children (UAC) Program serves minors who have no lawful immigration status in the United States and do not have a parent or legal guardian available in the United States to provide care and physical custody. A network of more than 100 HHS-funded care provider facilities furnish housing, food, medical care, mental health services, educational services, and recreational activities for such children until HHS can identify an appropriate sponsor (typically a parent or close relative) to take custody.

In 2017 and 2018, DOJ and DHS took steps to increase enforcement of immigration laws, culminating in the spring 2018 implementation of a zero-tolerance policy for some immigration offenses. Under that policy, large numbers of families entering the United States without authorization were separated by DHS. Typically, adults were held in Federal detention while their children were placed in HHS custody and provided care through the UAC Program.

On June 26, 2018, a Federal district court halted further family separations (subject to some exceptions) and ordered the Federal Government to quickly reunify separated families who met certain criteria.

Given the impact of the zero-tolerance policy on vulnerable children and families, OIG conducted this review to examine challenges that HHS and care provider facilities faced in responding to the policy and carrying out the court-ordered reunification effort. We also sought to identify actions that HHS can take to improve program operations.

**Report in Brief** *continued*
Report No. OEI-BL-18-00510

## What OIG Recommends

HHS confronted significant challenges to its ability to respond effectively to the zero-tolerance policy and reunify children separated from their parents by immigration authorities.  HHS was not responsible for separating families, but HHS's inadequate communication, management, and planning made the situation worse for many separated children.  OIG's review focused on challenges related to the zero-tolerance policy, but many issues we identified speak to broader management concerns.  To address these challenges and improve program operations, OIG recommends the following:

**HHS should take steps to ensure that children's interests are prioritized and represented in decisions affecting the UAC Program, both internally and when engaging with interagency partners.**  As the UAC Program is called to adapt to changes in policy and immigration trends beyond its control, HHS leadership must ensure that the Department centers children's interests in its internal decision-making as well as in the information and recommendations it provides to interagency partners.  Internally, HHS leadership should ensure that potential risks to children are explicitly assessed, ensure that staff are permitted to document concerns about children's well-being, and communicate to officials and staff at all levels that concerns about potential harm to children in HHS custody should be expressed and will be taken seriously.

**HHS should modify or pursue formal agreements with DHS and DOJ to ensure that it is receiving information that supports its operation of and ability to provide care for children in the UAC Program.**  These agreements should include specific mechanisms and timeframes to enable effective interagency notification about changes to immigration policy and enforcement initiatives that may foreseeably affect HHS's responsibilities.  Additionally, the agreement with DHS should ensure that DHS is fully responsive to HHS's informational needs, including information about parents' locations in detention and their criminal histories, so that HHS and its facilities can provide optimal care and release children to suitable sponsors.  HHS should also explore with DHS options for data system improvements to enable more efficient and accurate information-sharing to support the UAC Program mission.  With respect to DOJ, the agreement should ensure HHS access to information about parents in U.S. Marshals' custody.

**HHS should improve communication to care provider facilities regarding interim guidance, operational directives, and other instructions that are not immediately available in published policy documents.**  Given the ongoing potential for changes in policy affecting the UAC Program, HHS will likely have future need to communicate information to its network of facilities quickly, accurately, and in such a manner that facility staff can easily determine what guidance is active.

**HHS should further improve its ability to identify and track separated children by reducing reliance on manual processes.**  HHS should streamline its procedures for tracking separated children to reduce reliance on manual, multistep processes that are inherently vulnerable to error.  In particular, HHS should identify and resolve barriers to automating exchange of separation information between DHS and HHS.

### How OIG Did This Review

This report synthesizes information from interviews with, and written responses from, senior HHS officials and HHS staff (see page 10 for definitions of these terms); interviews with staff at 45 care provider facilities; case reviews for a purposive sample of separated children; and more than 5,000 documents obtained through requests to the Department, from facility staff, and from interview respondents.  We reviewed documents internal to HHS as well as interagency correspondence and records that involved HHS senior officials and staff.

We analyzed interview and documentary data to identify significant challenges that HHS and facilities faced in responding to the zero-tolerance policy and reunifying separated children, as well as factors that contributed to those challenges.  Regarding factors affecting HHS, we identified themes across multiple respondents and sought to corroborate their statements with other interviewees and documentation.  Regarding challenges faced by facilities, we sought to identify the most significant challenges reported by facility staff and Federal field specialists.  Each of the key challenges we discuss was reported by the majority of facilities in our review.

We also reviewed internal HHS documents as well as public materials such as court filings to establish specific facts (e.g., dates and topics of meetings); to confirm timelines (e.g., dates of guidance communications); and, when possible, to verify interview responses (e.g., by identifying emails or memos consistent with interviewees' statements).

Full report can be found at oig.hhs.gov/oei/reports/oei-BL-18-00510.asp.

# TABLE OF CONTENTS

BACKGROUND                                                                              1

    Methodology                                                       9

FINDINGS

    Part I: Factors That Affected HHS's Ability To Respond to the Zero-Tolerance Policy and        13
    Manage the Reunification Effort

        Interagency channels intended to facilitate coordination were not used to notify HHS        14
        of the zero-tolerance policy in advance

        Key senior HHS officials failed to act on repeated warnings from staff; as a result, HHS        15
        did not plan for family separation

        The lack of planning for zero-tolerance hindered HHS's ability to provide prompt and        20
        appropriate care for separated children

        The lack of planning also contributed to data limitations, complicating efforts to        22
        identify separated children

        HHS experienced challenges coordinating the reunification effort under overlapping        23
        court-imposed requirements

    Part II: Factors That Affected Care Provider Facilities' Ability To Reunify Separated Children        24
    With Their Parents

        Care provider facilities experienced difficulties in locating and communicating with        25
        parents of separated children

        Care provider facilities encountered challenges to determining whether parents and        27
        children could be safely reunified

        Care provider facilities described coordination problems that impeded efforts to        30
        reunify separated children with their parents

        Care provider facilities reported that guidance and directives from ORR were poorly        32
        communicated and caused confusion

    Part III: Factors Affecting HHS's Ongoing Efforts To Improve Tracking and Placement of        36
    Separated Children

        Despite efforts to improve tracking of separated children, current procedures rely on        37
        manual processes that are vulnerable to error

        HHS does not consistently receive complete information from DHS about parents'        38
        criminal backgrounds

## CONCLUSION AND RECOMMENDATIONS

HHS should take steps to ensure that children's interests are prioritized and represented in decisions affecting the UAC Program, both internally and when engaging with interagency partners ........... 39

HHS should modify or pursue formal agreements with DHS and DOJ to ensure that it is receiving information that supports its operation of and ability to provide care for children in the UAC Program ........... 40

HHS should improve communication to care provider facilities regarding interim guidance, operational directives, and other instructions that are not immediately available in published policy documents ........... 42

HHS should further improve its ability to identify and track separated children by reducing reliance on manual processes ........... 42

## AGENCY COMMENTS AND OIG RESPONSE ........... 43

## APPENDICES

A: Timeline of Key Events ........... 45

B: Previous Related Office of Inspector General Work ........... 47

C: Lines of Authority Over the Unaccompanied Alien Children Program During the Period of Review ........... 48

D: Care Provider Facilities Visited by OIG ........... 49

E: Detailed Methodology ........... 53

F: Timeline of Key Guidance to Care Provider Facilities Regarding Separated Children ........... 58

G: Agency Comments ........... 61

## ACKNOWLEDGMENTS ........... 65

# BACKGROUND

### Objectives

1. To identify challenges that the Department of Health and Human Services (HHS) faced in responding to the zero-tolerance policy

2. To identify challenges that HHS and care provider facilities faced in reunifying separated children with their parents as directed by a Federal district court

In 2017 and 2018, the Department of Justice (DOJ) and Department of Homeland Security (DHS) took steps to increase enforcement of immigration laws, culminating in the spring 2018 implementation of a "zero-tolerance" policy for certain immigration offenses. Under that policy, large numbers of families entering the United States without authorization were separated by DHS. Typically, adults were held in Federal detention while their children were transferred to the care of the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services (HHS or Department). A June 20, 2018, Executive Order curtailed the policy but did not address reunification of families already separated. On June 26, 2018, a Federal district court issued a preliminary injunction prohibiting family separations (subject to some exceptions) and ordered the Federal Government to quickly reunify separated families who met certain criteria.

Given the impact of the zero-tolerance policy on vulnerable children and families, the Office of Inspector General (OIG) conducted this review to examine challenges that HHS and care provider facilities faced and identify opportunities for program improvement.

## Background

### ORR Care of Unaccompanied Alien Children (UAC)

ORR, a program office of the Administration for Children and Families (ACF) within HHS, manages the UAC Program. Children referred to the UAC Program are minors who have no lawful immigration status in the United States and do not have a parent or legal guardian available in the United States to provide care and physical custody.[1] In Federal fiscal year 2018, the UAC Program received appropriations of $1.6 billion and cared for at least 49,100 children.[2,3]

The UAC Program serves children who arrive in the United States unaccompanied, as well as children who are separated from their parents or legal guardians by immigration authorities within DHS after entering the country (separated children). By law, DHS must transfer unaccompanied children to ORR within 72 hours from the determination that the child is a UAC unless there are exceptional circumstances.[4] A child remains in ORR

custody until an appropriate sponsor (usually a parent or close relative) is located in the United States who can assume custody, the child turns 18 years old and ages out of the UAC Program, or the child's immigration status is resolved.[5]

Federal law requires the safe and timely placement of children in the least restrictive setting that is in the best interest of the child.[6]  To that end, ORR funds a network of more than 100 care provider facilities (facilities) that furnish temporary care for children until they are released to a sponsor or otherwise leave ORR custody.  These facilities, generally, are State-licensed and must meet ORR requirements.[7]  Facilities provide housing, food, medical care, mental health services, educational services, and recreational activities.

### ORR Identification and Assessment of Sponsors

ORR is responsible for identifying a suitable sponsor in the United States who can care for the child when he or she leaves ORR custody.  Most sponsors are a parent or close relative of the child.[8, 9]  When ORR cannot identify a suitable, safe sponsor, children will remain in a facility or may be placed in long-term foster care, including community-based foster care or a group home.  Children who turn 18 years old while in ORR care are typically transferred to DHS custody.

The process for releasing a child in ORR's care to a sponsor includes:

*Identifying a sponsor.*  Staff at the facility where the child resides interview the child, parents, legal guardians, or other family members (including those in their home country) to identify potential sponsors in the United States.

*Sponsor submission of application for release.*  The potential sponsor must complete and submit a variety of documents, including a Sponsor Care Agreement and documentation to verify identity, address, and relationship to the child.

*Background checks.*  ORR requires a background check of potential sponsors and adult members of a sponsor's household.  These may include a public records check, sex offender registry check, State child abuse and neglect registry check, immigration status check, and a Federal Bureau of Investigation (FBI) criminal history check (based on fingerprints).[10]  ORR conducts additional checks (such as a State-based criminal history and local police checks) on a case-by-case basis.

*Home study.*  Facility staff review each child's case to determine whether to recommend a home study of the potential sponsor.  Federal law requires a home study when the child is a victim of trafficking or physical or sexual abuse, when the child has a disability, or when the proposed sponsor presents a risk to the child.[11]

*Release decision.*  Facility staff consider all relevant information and make a recommendation to ORR regarding the child's release to a potential sponsor.  ORR staff then make one of the following determinations:

- approve the release,
- approve with post-release services,
- require a home study before making a decision,
- deny the release, or
- remand for further information.

**ORR and Facility Staff Roles and Responsibilities**

ORR and facility staff are responsible for ensuring quality of care for children in ORR custody as they await release to a sponsor or judicial resolution of their immigration status.  Key staff include:

*Federal Field Specialists.*  Federal field specialists are ORR employees who serve as local ORR liaisons to one or more facilities within a region.  They are responsible for providing guidance and technical assistance to facilities and approving or denying children's transfer between ORR facilities and release to sponsors.

*Program Directors.*  Program directors are senior facility staff who manage facility employees and oversee facility operations.

*Medical Coordinators.*  Medical coordinators are facility staff who arrange care from external providers, coordinate other services related to children's medical and mental health care, and manage medication.

*Mental Health Clinicians.*  Mental health clinicians are facility staff who are responsible for providing in-house mental health care for children in the facility.

*Case Managers.*  Case managers are facility staff who coordinate assessments of children, individual service plans, and efforts to release children to sponsors.

*Youth Care Workers.*  Youth care workers are facility staff who provide around-the-clock monitoring of children.  Youth care workers have direct and frequent contact with children and are the staff primarily responsible for their supervision.

## Coordination Between HHS and DHS

Federal law and two Memoranda of Agreement (MOAs) between HHS and DHS formally delineate each agency's responsibilities with respect to children eligible for the UAC Program:

- Federal laws broadly describe the Agencies' roles as they relate to notification, transfer, placement, sponsor assessment, and postrelease activities.[12]

- An MOA signed in February 2016 establishes a framework for interagency coordination on establishing procedures and shared

**Exhibit 1. Family Separation and Reunification: Key Events**

**March 2017**
DHS Secretary states publicly that DHS might separate families who enter the United States without authorization; weeks later, he announces DHS will not pursue the policy.

**April 2017**
Attorney General issues memorandum prioritizing prosecution of immigration offenses.

**July 2017**
El Paso sector of CBP implements policies resulting in increased family separations.

**February 2018**
*Ms. L v. ICE* lawsuit is filed.

**April 2018**
Attorney General issues memorandum instituting zero-tolerance policy at DOJ.

**May 2018**
DHS adopts zero-tolerance; the Attorney General publicly announces the policy's implementation at DOJ and DHS.

**June 2018**
President Trump issues Executive Order directing DHS to detain alien families together.

**June 2018**
Court orders Federal Government to cease most family separations and reunite eligible families.

**July 2018**
HHS identifies 2,654 separated children under *Ms. L v. ICE.*

**December 2018**
After multiple revisions, HHS reports a new total of 2,737 separated children under *Ms. L v. ICE.* (See Endnote 28.)

**March 2019**
Court expands the *Ms. L* class to include parents who entered the United States on or after July 1, 2017, with children from whom they were separated.

**October 2019**
HHS identifies an additional 1,556 separated children under the expanded *Ms. L* class.

Source: OIG analysis of memoranda, court filings, and other public documents, 2019.

goals.  Under the 2016 MOA, the Agencies also agree to develop a Joint Concept of Operations.[13]

- A second MOA, signed in April 2018, sets out expectations and general processes for sharing information between DHS and ORR at the time of a child's referral, while the child is in ORR care, while vetting potential sponsors for the child, and upon the child's release from ORR care.[14]  Among other provisions, the MOA stipulated that ORR will provide DHS with biographic information and fingerprints of potential sponsors and all adult members of their households, which DHS will use to ascertain criminal and immigration history for these individuals.  (ORR subsequently modified its policy to require fingerprints only for certain categories of sponsors.)[15]  The 2016 MOA also remains in effect and is not superseded by the 2018 MOA.

Federal law, the 2016 MOA, and the 2018 MOA do not specifically define or address separated children as distinct from children who arrive in the United States without a parent or legal guardian.  Additionally, although the 2018 MOA specifies that DHS will provide HHS with a variety of biographic, immigration, and criminal history about children at the time of transfer, the agreement does not extend to identifying information about, or criminal histories of, family members apprehended with children.

On July 31, 2018 (after issuance of the zero-tolerance policy and the subsequent Executive Order and court order limiting further family separations), HHS and DHS finalized the Joint Concept of Operations described in the 2016 MOA.  The Joint Concept of Operations provides field guidance and standardization of interagency policies, procedures, and guidelines related to UAC.  For example, it states that the referring DHS agency—Customs and Border Protection (CBP) or Immigration and Customs Enforcement (ICE)—should review and verify children's medical and disability information, criminal records, languages spoken, other family with whom the child was traveling, and those family members' contact information.  If a child has been separated from a parent or legal guardian, the referring DHS agency is directed to enter that information into ORR's online case management system, known as the UAC Portal.

## Federal Policies and Practices Resulting in Family Separation

In recent years, DOJ and DHS have taken a variety of actions to increase enforcement of immigration laws.  (See Exhibit 1.  Also, see Appendix A for a detailed list of events relevant to family separation and reunification.)  On April 11, 2017, the Attorney General issued a memorandum instructing Federal prosecutors to prioritize prosecution of certain immigration offenses, including offenses under 8 U.S.C. § 1325(a), which addresses attempts by an individual who is not a U.S. citizen to enter the country at an unauthorized time or place.[16]  From July through November 2017, the El Paso sector of CBP conducted a prosecution initiative that resulted in increased family separations; CBP has stated that 283 parents were referred

for prosecution under this initiative, but the number of children separated from those parents and referred to ORR has not been reported.[17]  On April 6, 2018, the Attorney General issued a memorandum directing U.S. Attorney's Offices along the Southwest border to immediately adopt a "zero-tolerance policy" for all offenses referred for prosecution under 8 U.S.C. § 1325(a).[18]  On May 5, 2018, DHS also adopted the zero-tolerance policy.[19]  On May 7, 2018, the Attorney General announced the joint DOJ and DHS implementation of the zero-tolerance policy, stating that DHS would now refer all illegal Southwest border crossings to DOJ for prosecution, and that DOJ would accept those cases.[20]

Under the zero-tolerance policy, similar to the more limited El Paso sector initiative that preceded it, when a child and parent were apprehended together by immigration authorities, DHS separated the family and the parent was placed in Federal custody to await prosecution for illegal entry. With the detained parent unavailable to care for his or her child, the child was treated as unaccompanied and transferred to ORR.  This represented a significant departure from previous practices: historically, separations were rare and occurred only when the parent posed a danger to the child or was medically unable to care for the child.

On June 20, 2018, the President issued Executive Order 13841, which directed DHS to detain alien families together whenever "appropriate and consistent with the law and available resources."  The Executive Order did not address reunification of families already separated.[21]

## Judicial Actions Affecting Family Separation and Reunification

Federal policies and practices resulting in family separation have led to multiple lawsuits.  Court orders in these lawsuits have curtailed the separation and deportation of families apprehended by immigration authorities and have required the Government to reunify separated parents and children, subject to certain conditions and deadlines.

Most prominent—and with the most substantive consequences for the Federal Government—is the class action lawsuit *Ms. L v. ICE*.  A June 26, 2018, preliminary injunction order in this case reshaped policy and requirements around family separations in two important ways.  First, the court preliminarily enjoined DHS from continuing to separate families, subject to certain exceptions, ruling that the Government likely violated plaintiffs' Fifth Amendment due process rights to family integrity.[22, 23]  Second, for those *Ms. L v. ICE* class members who were separated from their children and the children were still in ORR custody as of the date of the ruling, the court ordered the Federal Government to reunify class members with their minor children within 14 days for children younger than 5 years old and 30 days for those aged 5 to 17 years.[24]  On March 8, 2019, the court expanded the *Ms. L v. ICE* class definition to include parents who were separated from their children, and whose children were referred to and discharged from ORR custody, from July 1, 2017, through June 25, 2018.[25]

Several other lawsuits have been filed on behalf of separated parents or children in various courts around the country. Actions in these lawsuits have sometimes also affected children of *Ms. L* class members. For example, in *N.T.C. v. ICE,* a Federal court in New York ordered that separated children in ORR care in New York State may not be moved to a different State unless the Government provided 48 hours' advance notice to the child and his or her attorneys.[26]

## Efforts To Identify and Reunify Separated Children

In June 2018, HHS and DHS did not routinely collect and share the information necessary to identify, track, or connect families separated by DHS. Compliance with the *Ms. L v. ICE* court order of June 26, 2018, therefore required both HHS and DHS to undertake a significant new effort to rapidly identify children in ORR care who had been separated from their parents and reunify them. To facilitate this effort, the HHS Secretary (Secretary) directed the Office of the Assistant Secretary for Preparedness and Response (ASPR), a staff division within the Office of the Secretary with experience in crisis response and data management, to lead the reunification effort for HHS. (See Exhibit 2 for a summary of Federal entities' roles in the court-ordered reunification effort.)

**Exhibit 2. Key Federal Entities Involved in the Court-Ordered Reunification Effort**

| HHS | DHS |
|---|---|
| • **ASPR:** Leads HHS medical and public health preparedness for and response to disasters and public health emergencies. Established Incident Management Team (IMT) to lead the reunification effort. | • **CBP:** Provides border security at and between ports of entry; apprehends, processes, and temporarily detains individuals who enter the United States without authorization, including children; may refer adults entering the United States without authorization for criminal prosecution. Provided HHS with data to assist in identifying separated children under *Ms. L.* |
| • **U.S. Public Health Service**: Responds to public health needs. U.S. Public Health Service Commissioned Corps officers were deployed across the country to assist with the reunification effort. | • **ICE:** Enforces immigration law; is responsible for detention and removal of non-citizens; transfers children to ORR. Provided HHS with data to assist in identifying separated children under *Ms. L;* oversaw ICE detention centers that served as reunification sites. |
| • **ORR:** As a program office within ACF, manages the UAC Program to ensure care and safe placement of children; provides guidance to care provider facilities. Worked with ASPR, including contributing staff to the IMT, to coordinate reunification effort. | **DOJ** |
|     o ***Care provider facilities:*** As ORR-funded grantees or contractors, provide care for children in ORR custody. Managed individual separated children's cases, including locating and contacting parents and facilitating reunification. | • **U.S. Marshals Service:** Takes custody of individuals referred by CBP for prosecution by U.S. Attorneys' Offices in Federal court and remanded by a judge; transports them and houses them in Federal, State, or local jails pending outcome of criminal proceedings. Individuals prosecuted for illegal entry usually are referred back to ICE until they are removed or receive immigration relief. |

Source: OIG analysis, 2019.

**Interagency Plan for Reunification Under *Ms. L v. ICE***

HHS coordinated closely with DHS and DOJ to develop a joint plan outlining the Agencies' response to the court order in *Ms. L v. ICE*.  The plan, dated July 18, 2018, describes processes to reunify *Ms. L* class members with their children.[27]  These steps include conducting background checks of the parent, confirming parentage, assessing parental fitness and child safety (including a home study if warranted), conducting a parent interview, and reunification with the parent if eligible.  According to the plan, examples of criteria that would preclude reunification with the parent from whom the child was separated include:

- the parent is in the custody of the U.S. Marshals Service or in a State jail;
- the parent is being treated for a communicable disease;
- the child has already been reunified with the other parent; or
- the parent has a criminal record and may pose a safety risk to the child.

Reunification was not pursued if the parent declined to be reunified with the child, as evidenced by signing a voluntary Letter of Designation consenting to the child's placement with a sponsor.

This reunification process was a more streamlined version of ORR's standard procedure for vetting a sponsor.  For example, in summer 2018, ORR's standard process required a prospective sponsor to submit a Sponsor Care Plan and required an FBI fingerprint background check on all adults who would reside in a household with the child being released from ORR care.  However, for *Ms. L v. ICE* class members, the court ruled that those procedures were designed for children who had entered the United States unaccompanied and were unnecessarily onerous when applied to parents and children who were apprehended together but separated by Government officials.[28]

If ORR determined that a child subject to the *Ms. L v. ICE* reunification order could not be reunified with the parent from whom he or she was separated (e.g., due to parental unfitness or danger to the child), ORR followed its usual sponsorship procedures for unaccompanied children.  For all placements, ORR prioritizes parents and close relatives when selecting sponsors.

**Role of the Incident Management Team**

Within HHS, ASPR created an IMT to directly oversee the reunification mission.  The IMT utilized the Secretary's Operation Center, a command center that can operate 24 hours per day, 365 days per year, and is designed for operations with complex communication and data analysis needs.  At its peak, the IMT included more than 60 staff in Washington, DC, and more than 250 field staff, including approximately 140 contractors.

The IMT worked closely with interagency partners to identify separated families, develop the interagency reunification plan described above, and to establish logistical processes for reunification.  An interagency data team was tasked with analyzing multiple data sources to identify separated children covered by the court order.  The IMT then collaborated with DHS, DOJ, and the Department of State to reunify children with parents in ICE custody (subject to an HHS determination that reunification would not pose a danger to the child), with DHS and HHS transporting separated parents and children, respectively, to selected ICE detention centers that served as reunification sites.  At the reunification sites, HHS transferred custody of separated children to ICE, which then facilitated physical reunification of the family.  The IMT developed separate processes to reunify children with parents who had been released into the interior of the United States, as well as those who were no longer in the United States—a particularly complex endeavor that required coordination across Federal agencies and with the consulates and embassies of children's home countries, as well as with legal counsel for the *Ms. L* class.

**Status of the Reunification Effort**

As of January 2020, HHS and DHS reported to the *Ms. L* court that 2,168 children had been reunited with the parent from whom they had been separated, and that an additional 626 children had been discharged under other circumstances, such as being released to a sponsor or after turning 18 (which typically results in transfer to DHS custody).  HHS reported that only one separated child of a *Ms. L* class member (as the class was originally defined in June 2018) still remained in ORR care; that child's parent is presently not in the United States, and efforts are being made to establish whether the parent wishes for the child to be reunified and repatriated or placed with a qualified sponsor in the United States.  An additional 20 children originally identified as possible children of potential *Ms. L* class members remain in ORR care, but HHS has determined that their parents are not in fact class members (e.g., because of criminal history or because the parent chose to decline reunification so that their child may remain in the United States with a sponsor).  Together, these children represent all 2,815 potential children of possible *Ms. L* class members who were in ORR care as of June 26, 2018, the date of the original court order requiring reunification for this population.[29]  Prior court filings noted that 2,737 children in this group were confirmed to have been separated; for transparency, HHS has continued to report the status of all 2,815 identified to the court as potential children of class members, including those later determined not to have been separated from a parent.

As a result of the recent expansion of the *Ms. L* class to encompass parents who entered the United States on or after July 1, 2017, HHS recently identified 1,556 additional separated children under the expanded class criteria.  These children were discharged from HHS care (e.g., to sponsors)

prior to June 26, 2018.  Efforts to contact their parents are ongoing, under the leadership of a court-appointed Steering Committee.

### Related HHS OIG Work

In January 2019, OIG found that the total number of separated children placed in ORR care as a result of DHS practices to increase immigration enforcement (including but not limited to the subset of separated children covered by the *Ms. L v. ICE* litigation) was unknown but likely significantly more than the 2,737 separated children of *Ms. L v. ICE* class members who were identified by HHS as of the time of our review.[30]  Additionally, OIG found that some separations have continued since the court order.  Subsequent court filings by the Government have confirmed both findings.

In September 2019, OIG found that facilities struggled to address the mental health needs of children who had experienced intense trauma, including separated children, and had difficulty accessing specialized treatment for children who needed it.  Facilities also reported that challenges employing mental health clinicians resulted in high caseloads and limited their effectiveness in addressing children's needs.

In another September 2019 review, OIG found that facilities generally met a range of background checks and qualification requirements designed to keep individuals who may pose a risk to the safety and well-being of children from having direct access to children.  However, some facilities did not have evidence of the required FBI fingerprint or Child Protective Services check results and did not always ensure that out-of-State Child Protective Services checks were conducted.

OIG is currently conducting additional reviews of the safety of children and facility security in ORR's UAC Program.  See Appendix B for a complete list of previous OIG work related to the UAC Program.

## Methodology

### Scope

To identify opportunities for program improvement, this review focused on challenges that affected HHS's response to the zero-tolerance policy, including challenges HHS and facilities encountered in reunifying separated children with their parents.

The heightened enforcement of immigration laws beginning in 2017 and culminating in the spring 2018 zero-tolerance policy, which was then curtailed by Executive Order and enjoined by the courts, involved DOJ, DHS, and HHS.  Although this work focuses on HHS, given the involvement of these departments, the inspectors general at each agency and the Government Accountability Office have kept one another apprised of our planning efforts, the status of our ongoing work, and the impending release of our reports.

## Overview

To identify challenges that HHS and care provider facilities faced in responding to the zero-tolerance policy and reunifying separated children with their parents, we interviewed numerous senior HHS officials and HHS staff and conducted site visits to 45 facilities. We also reviewed both internal HHS documents and publicly available information to confirm and expand upon information provided in interviews. We analyzed these data to establish facts, confirm timelines, and identify internal and external factors that affected the Department's response to the zero-tolerance policy.

## Data Sources

This report synthesizes information from a wide array of sources, including extensive interviews with, and written responses from, senior HHS officials and HHS staff in the Office of the Secretary, the Office of the Assistant Secretary for Financial Resources (ASFR), ASPR, ACF, and ORR; interviews with staff at 45 care provider facilities; case reviews for a purposive sample of separated children; and thousands of documents obtained through requests to the Department, from facility staff during site visits, and from interview respondents.

**Interviews.** OIG conducted numerous interviews with senior HHS officials in the Office of the Secretary, ASFR, ASPR, ACF, and ORR. We submitted written questions to, and received written responses from, the Secretary and Deputy Secretary. Additionally, we interviewed HHS staff in ASPR, ACF Office of Legislation and Budget, and ORR.

In this report, "senior official" means a Presidential appointee under the Executive Schedule, a non-career appointee to the Senior Executive Service (SES), or a non-career Schedule C appointee. "Staff" means career employees at or below the SES level, including career U.S. Public Health Service Commissioned Corps Officers. Throughout the report, certain individuals are referred to by their titles *at the time of the events being described.* Please note that the individuals who held the positions of Counselor to the Secretary for Human Services Policy (within the Office of the Secretary), Acting Assistant Secretary for ACF, ORR Director, and ORR Deputy Director during the periods those roles are discussed—primarily, 2017 through mid-2018—are no longer in those positions as of the date of this report. See Appendix C for further detail on these positions as they relate to the UAC Program and to the Office of the Secretary.

**Site visits.** OIG conducted site visits to 45 ORR-funded care provider facilities in operation across the country. All site visits lasted 2 to 3 days and occurred in August or September 2018, with the majority taking place in August, shortly after the court-established deadline for reunifying separated children with their parents. The 45 sites were selected purposively to achieve wide coverage of facilities participating in the UAC Program and to

include a variety of facility types, sizes, populations in care, and geographic locations.  Combined, the 45 sites that we visited included facilities that cared for 72 percent of the children in ORR custody at the time of our review.  See Appendix D for information about the 45 facilities we visited and the children in their care.

During our site visits, we interviewed program directors and case managers knowledgeable about the facility's experiences with the reunification of separated children.  At the time of OIG's site visits, we had obtained from HHS child-specific data about separated children who were covered by the *Ms. L v. ICE* lawsuit and who had been placed in 35 of the 45 facilities in our review.  For each of those 35 sites, we purposely selected up to 5 separated children.  Our case selection prioritized children who had not yet been reunified at the time of our site visits and sought to illustrate a range of ages and circumstances.  We reviewed their cases onsite with their case manager to better understand factors affecting their reunification.[31]

**Documents.**  OIG conducted an extensive review of HHS documents related to family separation, the zero-tolerance policy, and the reunification of separated children with their parents, as well as documents reflecting interactions between HHS and other Federal agencies regarding immigration policy more broadly.  In total, OIG reviewed more than 5,000 documents encompassing memoranda, letters, emails, spreadsheets, meeting agendas, meeting summaries, and other records created or received by HHS employees related to these matters, primarily from early 2017 through mid-2018.  We reviewed documents internal to HHS, communications between HHS and care provider facilities, and interagency correspondence and records that involved HHS senior officials and staff.  Consistent with OIG's statutory role, we reviewed both privileged documents (e.g., legal opinions, interagency deliberative correspondence, and draft memoranda) as well as non-privileged documents (e.g., correspondence about operational matters, guidance transmittals to facilities, and final memoranda).

OIG reviewed HHS's procedures for identifying and collecting documents responsive to OIG's request and confirmed that they were sufficient to identify potentially relevant material.

## Analysis

We conducted qualitative analysis of interview and documentary data to identify critical facts, dates, and activities related to HHS's awareness of, communication about, and response to the zero-tolerance policy and the reunification of separated children.  We also conducted qualitative analysis to identify significant challenges that HHS and facilities faced and key factors that contributed to those challenges.

Regarding information from facilities, we sought to identify the most significant challenges affecting facilities' reunification efforts as reported by

facility management, case managers, and Federal field specialists.  Each of the key challenges affecting facilities that we discuss in this report (locating and communicating with parents, confirming whether reunification could safely occur, transporting children to be reunified, and unclear guidance from ORR) was reported by more than half of facilities in our review.  Throughout the review we sought to verify interview responses with documentary evidence wherever possible.  See Appendix E for a detailed methodology.

## Limitations

We were not able to independently verify all information provided by HHS or facility staff.  However, wherever possible, we compared interviewees' statements to facts we could determine from our review of correspondence, memos, and numerous other documents; as appropriate, we also requested documentation from interviewees to support their statements.  We confirmed certain information about DHS IT systems directly with DHS staff.

The facilities we visited and the case files we reviewed were purposively selected and may not represent all facilities' experiences.  Likewise, the exhibits included in this report were selected to illustrate how various factors affected children's reunification cases; they do not necessarily represent the experiences of all facilities or all separated children.

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# FINDINGS, PART I

# Factors That Affected HHS's Ability To Respond to the Zero-Tolerance Policy and Manage the Reunification Effort

### Key Takeaway

Poor interagency communication and management decisions that failed to protect children's interests left HHS unprepared for the zero-tolerance policy, adversely affecting both the Department's immediate response to the policy as well as later efforts to identify and reunify separated children as directed by a Federal district court.

# FINDINGS

**Interagency channels intended to facilitate coordination were not used to notify HHS of the zero-tolerance policy in advance**

On the basis of interviews with and written responses from senior HHS officials, as well as a review of correspondence and interagency meeting records, OIG found no evidence that HHS was notified in advance by either DOJ or DHS that the zero-tolerance policy would be implemented. In fact, senior HHS officials generally reported that they first learned of the spring 2018 implementation of zero-tolerance when it was reported by the media.

This lack of communication occurred despite a variety of channels that exist to facilitate high-level interagency coordination and engagement on immigration issues. These include direct communication between Agency executives; interagency principals and deputies meetings or calls on immigration; and interagency Policy Coordination Committee (PCC)[32] and sub-PCC meetings. These meetings usually include officials representing DOJ and DHS as well as other Federal agencies. Additionally, the 2016 MOA between HHS and DHS states, "Each Party will make all reasonable efforts to notify the other about upcoming changes in UAC policy and procedures that may impact the other agency's policies or operations (absent exigent circumstances)."[33] However, the MOA does not specify the mechanism or timeline by which such notification should occur.

The Counselor to the Secretary for Human Services Policy and the ORR Director, both of whom typically represented HHS at PCC meetings on immigration, did not recall being informed of plans for the zero-tolerance policy prior to its implementation. The Counselor to the Secretary for Human Services Policy recalled discussion of family separation in interagency forums in early 2017. However, after the DHS Secretary publicly announced in March 2017 that DHS would not pursue such a policy, she understood the idea to have been dismissed. OIG reviewed PCC-related records and likewise found no reference to the zero-tolerance policy until mid-April 2018, more than a week after the Attorney General instituted the policy at DOJ. DHS's intention to immediately begin implementing the policy was also noted; however, there was no mention of coordination with HHS or how zero-tolerance would affect the UAC Program.

Further, senior HHS officials indicated that even when they did become aware of the Attorney General's memorandum implementing the zero-tolerance policy at DOJ in April 2018, they did not initially understand how it would be carried out by DHS or its implications for HHS. The Acting Assistant Secretary for ACF noted that because DHS may detain families and children together for up to 20 days, it was not immediately clear that increased prosecution of adults in family units—as the policy was initially framed during interagency meetings—would necessarily result in family separation, with children transferred to ORR care. The Counselor to the Secretary for Human Services Policy indicated a similar understanding.

However, the Attorney General's May 7, 2018, public announcement of the zero-tolerance policy clarified that family separation would indeed occur.

**Key senior HHS officials failed to act on repeated warnings from staff; as a result, HHS did not plan for family separation**

For months before the zero-tolerance policy was announced, the Counselor to the Secretary for Human Services Policy, the Acting Assistant Secretary for ACF, and the ORR Director disregarded specific, repeated warnings from ORR staff regarding the possibility that DHS would implement family separation.  Beginning in mid-2017, ORR staff saw indications that atypically large numbers of separated children were entering ORR care.  In early 2018, ORR staff received information suggesting that DHS might implement a policy resulting in larger-scale family separation.  ORR staff believed that the UAC Program lacked the bed capacity to accommodate a large increase in separated children and were also concerned about the trauma such a policy would inflict on children.  At several points before the zero-tolerance policy was implemented, ORR staff shared these concerns with the ORR Director, the Acting Assistant Secretary for ACF, and the Counselor to the Secretary for Human Services Policy.

OIG found no evidence that these three senior HHS officials took action to protect children's interests in response to the information and concerns raised by ORR staff.  For example, we found no evidence that senior HHS officials directed ORR to plan for a possible increase in separated children, pressed the topic in PCC meetings or other interagency forums, or elevated the matter to the Deputy Secretary or Secretary to pursue at higher levels.  By statute, HHS through its Office of Refugee Resettlement is responsible for ensuring that an unaccompanied child's interests are considered in decisions and actions affecting his or her care and custody.[34]

### ORR staff reported raising information and concerns about separation to key senior officials on multiple occasions in 2017 and 2018

*"I said ORR was seeing much higher levels of separation, and that those separations were impacting particularly babies and young children.  I said this so many times that I was called a broken record."*

-(Former) ORR Deputy Director for Children's Programs

**In late 2017, ORR staff raised concerns about a significant increase in the number of separated children.**  In summer 2017, ORR staff noticed an increase in the number of separated children entering ORR care; such separations were historically rare.[35]  By August 2017, the proportion of separated children compared to other children entering the UAC Program had risen to 3.6 percent of all intakes, a more than tenfold increase from the 0.3 percent of intakes that ORR staff had observed in late 2016.  Although separated children represented a small proportion of those in ORR care, the UAC Program faced challenges in serving this atypical and high-need population, especially the infants and very young children who required placement at a limited number of specially licensed facilities.

As a result of these difficulties, in November 2017, ORR's then-Deputy Director for Children's Programs—a senior ORR career employee responsible for managing the UAC Program[36]—alerted the ORR Director to

challenges with infant placements due primarily to separations, noting, "We had a shortage last night of beds for babies." Approximately 1 week later, the Deputy Director contacted senior officials in CBP and ICE to express concern about the increase in separated children and consequent operational burden on the UAC Program.[37]  The CBP and ICE officials acknowledged the communication but did not directly respond to the issue of family separation.

*"I told them it was going to traumatize children to separate them unnecessarily. I said that to anyone I could."*

*-ORR staff member*

The Deputy Director also reported to OIG that he elevated information and concerns about family separation to the ORR Director, the Acting Assistant Secretary for ACF, and the Counselor to the Secretary for Human Services Policy.  Specifically, he reported that in meetings with those individuals at several points in 2017 and early 2018, he stated that the UAC Program would not have sufficient bed capacity if DHS implemented larger-scale family separations and expressed that separation would harm children and was inconsistent with the UAC Program's responsibility to protect children's interests.  Other ACF and ORR staff who were present at these discussions corroborated the Deputy Director's statements.  Additionally, two other ORR employees reported that they also had raised concerns to the ORR Director and the Acting Assistant Secretary for ACF regarding the impact of separation on children's well-being.  The Deputy Director explained to OIG that in repeatedly raising his concerns, he hoped that senior HHS officials would "fight against" any DHS family separation policy and "enlist the Secretary" in doing so.

In interviews with OIG, the Counselor to the Secretary for Human Services Policy and the Acting Assistant Secretary for ACF did not recall having received information about increasing numbers of separated children in 2017, nor did they recall discussions of child welfare concerns related to separation.  The ORR Director confirmed that he was informed of the increase in separated children in 2017 and was copied on the November 2017 outreach to CBP and ICE about that issue.

**ORR staff continued to raise concerns about family separation as additional warning signs emerged.**  In January 2018, the ORR Deputy Director for Children's Programs learned from DHS staff that DHS had developed, and planned to submit to the Office of Management and Budget, a projection of the number of children who would be referred to ORR under an enforcement policy that would increase the prosecution of adults in family units and refer their children to ORR.  In addition to his pre-existing concerns about the impact of separations on children's well-being, he believed that the number of beds DHS had predicted would be required under a such a policy was unrealistically low.  He conveyed that assessment directly to DHS staff and engaged the ORR Director as well as ACF's Office of Legislation and Budget in an attempt to address the issue internally.  Additionally, he verbally informed the Acting Assistant Secretary for ACF

and the Counselor to the Secretary for Human Services Policy of these events during their weekly meetings on UAC Program matters.

## Key senior HHS officials failed to act on information from ORR staff

Based on our review of available documents, interviews with senior HHS officials and HHS staff, and written responses from the Deputy Secretary and Secretary, OIG found no evidence that the Counselor to the Secretary for Human Services Policy, the Acting Assistant Secretary for ACF, or the ORR Director took or directed proactive steps to prepare the UAC Program for a future situation in which DHS routinely separated families, as ORR staff warned was likely and as ultimately did occur under the zero-tolerance policy. We also found no evidence that these senior HHS officials attempted to raise ORR staff's information and concerns about family separation in the PCC or similar interagency forums to seek clarity about what might occur. Finally, we found no evidence that these senior officials elevated these issues to the Deputy Secretary or Secretary.

Key factors that contributed to this failure to act include concurrent pressure to finalize an MOA with DHS regarding the UAC Program, senior HHS officials' doubts that DHS would implement larger-scale family separations, senior HHS officials' reluctance to advocate for the HHS mission in immigration policy discussions, and a lack of awareness about challenges that separated children pose for the UAC Program.

*"If conversations occurred referring to separated children, it did not have the context of meaning it was children separated from parents...I either missed it in reporting or it was not reported up to me."*

-(Former) Counselor to the Secretary for Human Services Policy

**Key senior HHS officials were focused on finalizing an MOA with DHS.** In early 2018, senior HHS officials within the Office of the Secretary, ACF, and ORR were heavily involved in finalizing an MOA between HHS and DHS regarding the UAC Program under which both agencies accepted new information-sharing responsibilities. The Counselor to the Secretary for Human Services Policy described finalizing and implementing the MOA as "the core issue for HHS" during spring 2018.

Among other changes, the MOA stipulated that HHS would obtain fingerprints from potential sponsors and their household members and provide that biographic data to ICE within DHS. ICE would then provide HHS with a summary of criminal and immigration history about those individuals, to the extent it was available to ICE.

HHS also anticipated that ICE would use this biographic information to take enforcement actions against potential sponsors, which would ultimately deter sponsors from coming forward. That, in turn, was expected to increase the length of time children remained in ORR care before discharge, requiring substantially greater overall bed capacity. The Acting Assistant Secretary for ACF acknowledged to OIG that the MOA was expected to increase the length of time that children remained in ORR care, but maintained that the MOA was also of value to HHS's ability to evaluate potential sponsors. (The new fingerprinting provisions were later largely withdrawn by ORR after it was determined that the requirements had

extended children's stay in ORR custody without significantly improving their safety.)[38]

**Key senior HHS officials were unconvinced that DHS would implement larger-scale family separations.** As previously noted, the zero-tolerance policy was not addressed at high-level interagency immigration policy meetings attended by the Counselor to the Secretary for Human Services Policy and the ORR Director until its implementation was underway. The ORR Director stated that he expected DHS would notify HHS of any forthcoming policy change, but that DHS had not done so. The Deputy Director for Children's Programs reported that, in response to the information and concerns he conveyed in late 2017 and early 2018, the Counselor to the Secretary for Human Services Policy and the ORR Director reiterated to him on multiple occasions that DHS was not implementing a family separation policy.

> "...we didn't know what was going on. I just sort of expected lines of communication with DHS that, if there was a formal policy change, we would hear about it from DHS."
>
> -(Former) ORR Director

**Key senior HHS officials were reluctant to intercede in immigration law enforcement policies.** ACF's mission includes "providing Federal leadership...for the compassionate and effective delivery of human services"; additionally, by statute, the ORR Director is responsible for "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child."[39] In some cases, HHS's responsibilities intersect with DHS's and DOJ's law enforcement priorities—such as when enforcement initiatives affect the number of children in ORR care.

However, some senior HHS officials expressed reluctance to advocate for the HHS mission in interagency forums where such policy conflicts could potentially be addressed. The Counselor to the Secretary for Human Services Policy acknowledged tension between HHS and law enforcement agencies stemming from their differing statutory responsibilities, noting that HHS suggestions regarding immigration policy were sometimes interpreted as obstructing law enforcement efforts. She explained to OIG that interagency meetings on immigration were primarily focused on enforcement issues and that in her view, HHS was a "minor participant." The Acting Assistant Secretary for ACF stated that HHS should not seek to affect immigration policy regardless of its impact on the UAC Program; rather, HHS should adapt to whatever policies are put in place.

> "Our participation in immigration policy is very limited and well-defined. Our job is to have a bed available for the next child that is brought to us by ICE or CBP. That is what our role is and what we focus on. Our role is limited to that."
>
> -(Former) Acting Assistant Secretary for ACF

Additionally, senior HHS officials did not necessarily share ORR staff's alarm about family separation. Some senior HHS officials expressed to OIG that trauma to children caused by separation should be weighed against the benefit of preventing families from attempting the potentially dangerous journey to the United States in the first place. For example, the Acting Assistant Secretary for ACF stated that he had believed the zero-tolerance policy would have a deterrent effect, resulting in fewer children entering ORR care. The Counselor to the Secretary for Human Services Policy stated that "it is not great for children to be separated from their parents," but "I

do not know what the moral right thing to do is in this situation," noting that children are also placed at risk when their parents bring them to the United States without authorization.

Ultimately, HHS took a supportive public stance toward the zero-tolerance policy once enacted.  In late May 2018, after the policy had been in effect for several weeks, HHS issued a fact sheet stating: "Anyone who crosses the border illegally is subject to Federal criminal prosecution....  If parents do not wish to be separated from their children, they should not violate the laws of the United States or endanger minors through criminal smuggling."

*"A real lesson for me is that I need to ask more questions.  I think, sure, in retrospect, I could have probed more.  It is hard to know what to ask when you do not know what you do not know."*

-(Former) Acting Assistant Secretary for ACF

**Key senior HHS officials did not understand the magnitude and nature of challenges that separated children posed for the UAC Program.**  The UAC Program was established to provide care for minors who arrive in the United States unaccompanied; its processes and facilities were not designed to accommodate large numbers of children who were brought to the United States by a parent or guardian and then unexpectedly separated from that adult.  As more separated children began entering ORR care, ORR staff became aware of significant needs and challenges associated with such cases.  In addition to their general concerns about these children's wellbeing, ORR staff reported, and contemporaneous emails describe, practical and logistical concerns such as problems locating parents of separated children to ensure appropriate placement; the possibility that parents might be deported without their children; and difficulties ensuring sufficient bed capacity, especially for very young children.

Nonetheless, the ORR Director reported to OIG that "a child that comes into ORR's care as a separated child is treated the same as any child referred to the program.  By definition, all children are experiencing some sort of separation."  Similarly, the Acting Assistant Secretary for ACF stated that in his view, separated children are not "materially different" from other children entering ORR care.  He also stated that absent the *Ms. L v. ICE* court order and deadlines, separated children would not have posed difficulties for ORR.  Given this perspective, he and other senior HHS officials may have discounted the importance of warnings from ORR staff.

### Key senior HHS officials' failure to act hindered ORR staff's ability to plan for family separation

In the absence of any directive from the ORR Director or his superiors to plan for the possibility of increased separations, the UAC Program was left in the position of reacting to changes as they occurred rather than taking proactive measures that might mitigate risk to children.  ORR staff noted that typically, procedures operationalize policy; ORR staff could not, on their own, develop and promulgate formal plans and procedures that appeared to contradict official policy on family separation.  Without centralized leadership and coordination on the issue, ORR staff began independently monitoring intakes of separated children—through informal methods that

were unconnected to the UAC Portal—and sought to coordinate with DHS offices at the local level.

### Communication about family separation was impeded by an organizational culture that discouraged putting potentially controversial information in writing

Some ORR staff described an organizational culture that discouraged putting potentially controversial information in writing, including but not limited to information about separated children.  Although such cautions may sometimes be reasonable—for example, to warn HHS personnel against creating an inaccurate factual record—ORR staff reported more pervasive warnings to limit documentation related to sensitive topics.  For example, ORR staff recalled receiving repeated, general reminders to be cautious about putting information in writing, as well as being instructed to provide verbal-only briefings and offer verbal-only comments on certain matters.  Some ORR staff also reported that they were criticized for documenting certain topics.  For example, one ORR employee recalled that immediately after sending an email that included concerns about family separation, a superior within ORR verbally advised the employee that those concerns should not have been put in an email.

Collectively, these repeated reminders to limit written information may have had a chilling effect on frank discussion about the possibility that larger-scale family separation would occur, impeding the UAC Program's ability to prepare.  The lack of documentation may also have contributed to senior HHS officials' ability to dismiss staffs' concerns about capacity and children's well-being rather than squarely address them.  Additionally, the lack of written records on these topics hampers subsequent efforts to determine what occurred and how HHS could better respond to similar challenges in the future.

## The lack of planning for zero-tolerance hindered HHS's ability to provide prompt and appropriate care for separated children

In the absence of comprehensive, coordinated planning for the possibility of larger-scale family separations, ORR was unprepared for the surge in separated children—and particularly very young children—after zero-tolerance was formally implemented in May 2018.  Insufficient bed capacity led to delays in placing children in ORR facilities, including delays past the 72-hour legal limit for such transfers to occur.  Additionally, facilities struggled to meet the significant and unique needs of this especially vulnerable population.

### Insufficient bed capacity delayed children's transfers from DHS to HHS care

After the zero-tolerance policy was announced on May 7, 2018, the number of separated children grew sharply.  This drove overall intakes higher at a time when ORR was already receiving significantly more children than had

entered care the prior year.  From January through April 2018, new referrals to ORR hovered between 3,000 and 4,000 per month.  However, in May 2018, new intakes rose to 6,127.  Similarly, the proportion of children ages 0 to 12 rose from approximately 14 percent of all intakes in March and April 2018 to 24 percent in May 2018.

*"[Thirty-three percent] of all referrals yesterday were age 12 or under—most of these were separations. I'm very concerned about having sufficient tender age capacity if this is the trend moving forward."*

- May 10, 2018, email from ORR staff member to her supervisor

ORR struggled to adapt to the sudden increase in children, and especially the increase in young children.  In an internal email from May 10, 2018, shortly after DHS formally adopted the zero-tolerance policy, ORR staff cited the large numbers of young, separated children referred that day and expressed concern about whether the UAC Program would have sufficient capacity moving forward.  Ultimately, it did not: a September 2018 review by the DHS-OIG found that during the period that zero-tolerance was in effect, more than 800 children inappropriately remained in CBP custody for more than 72 hours before being transferred to HHS.[40]  (DHS is generally required by law to transfer children to HHS within 72 hours of determining that they are unaccompanied.)  The review also found that CBP officials attributed these delays to HHS's inability to promptly accept referrals.  By the time the *Ms. L v. ICE* court ordered the Government to cease most family separations, the UAC Program was caring for approximately 12,000 children in total; nearly 1 in 4 of those children was in ORR care because he or she had been separated from a parent.

To address the need to rapidly expand capacity, on June 14, 2018, ORR opened an emergency influx care facility in Tornillo, TX.  Such shelters are exempt from some licensing requirements and are generally more expensive to operate compared to standard shelter facilities.  In December 2018, OIG found two significant vulnerabilities at the Tornillo shelter— limited background checks of staff and an insufficient number of staff clinicians to provide adequate mental health care—that could compromise children's health and safety.  In January 2019, HHS announced that the influx shelter at Tornillo would be closed.

### Care provider facilities struggled to meet separated children's needs without advance notice or preparation

*"The abruptness of the 'no tolerance' policy made this challenging... [We] were now bombarded with kids who had these needs related to being very recently separated... now [we] had to dedicate staff to learn about how to provide services to an entirely different kind of client."*

- Facility program director

As reported in a previous OIG review, facilities described a variety of challenges to meeting separated children's needs in the immediate wake of zero-tolerance implementation.  Faced with an unexpected and dramatic increase in young, separated children, staff reported feeling challenged to care for children who presented different needs from the unaccompanied teenagers they typically served.  One program director noted that prior to the zero-tolerance policy, they had no children younger than 10 years old; after its implementation, they received 70 such children within the space of 1 month.

Facilities also reported that addressing the unique mental health needs of separated children was particularly challenging.  According to program

directors and mental health clinicians, separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated.  Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents after their arrival in the United States.  For example, some separated children expressed acute grief that caused them to cry inconsolably.[41]

**The lack of planning also contributed to data limitations, complicating efforts to identify separated children**

The lack of effective interagency information-sharing about separated families significantly impeded the Department's ability to identify separated children eligible to be reunified under *Ms. L v. ICE*.  At the time of the court order, HHS was unable to produce an accurate list of separated children who had entered ORR's care.  ORR had been informally monitoring intake of separated children since late 2016, but this tracking was designed for monitoring purposes rather than the retrospective accounting and reporting eventually required by the court, and staff could not rely on its accuracy.  An ASPR official and ASPR staff closely involved in the effort to identify separated children reported that DHS had likewise not maintained reliable data about this population, noting that what DHS provided to HHS for use in the reunification effort was inconsistent and decentralized.  A recent DHS-OIG report confirmed that DHS lacked information technology (IT) systems to reliably track separated families during the time that the zero-tolerance policy was in effect, leading to "widespread errors" in DHS data about these families.[42]

Because HHS and DHS did not systematically collect, share, and track information about separated children across both agencies, the effort to identify separated children ultimately required analysis of more than 60 HHS and DHS datasets and a manual review of more than 12,000 case files. Senior HHS officials, including the Secretary, worked alongside hundreds of HHS staff to review children's files to identify indicators of separation.  Court filings described the effort as "a fact-intensive and time consuming analysis that involves the reconciliation of data from multiple sources and the exercise of programmatic judgment to interpret the data."[43]  Due, in part, to these complications, HHS was still identifying separated children of *Ms. L* class members in December 2018, more than 5 months after the court order.

*"I am working with [DHS staff] to figure this out, but in short, no, we do not have any linkages from parents to UAC, save for a handful…We have a list of parent alien numbers but no way to link them to children."*

*- June 23, 2018, email from ASPR staff member to senior DHS official*

A March 2019 ruling expanded the *Ms. L v. ICE* class to include parents who entered the United States on or after July 1, 2017, and were then separated from their children, who were placed in ORR care and released (e.g., to a sponsor) before the June 26, 2018, original order.  HHS has identified 1,556 such children.

**HHS experienced challenges coordinating the reunification effort under overlapping court-imposed requirements**

ORR staff reported that court orders in multiple lawsuits required ORR to adopt new procedures and create multiple pathways for children's reunification with their parents, depending upon which lawsuits applied to their cases.  For example, although ORR initially followed its standard process for vetting sponsors—including parents from whom a child had been separated—the *Ms. L v. ICE* court ultimately ruled that some aspects of that process were unduly burdensome when applied to families included in the class.  As a result, ORR needed to change, on multiple occasions, its procedures related to reunifying or otherwise placing separated children with sponsors.  This sometimes led to confusion about what process should be followed for a given child.  Similarly, children covered by the *N.T.C. v. ICE* lawsuit could not be transferred out of New York State—including for reunification under *Ms. L v. ICE*—without 48 hours prior notice to the child and their legal counsel, requiring ORR to incorporate that notice into their release procedures for those children.

ORR staff also reported difficulties in reuniting children and parents who were affected by multiple lawsuits.  In those cases, children sometimes had multiple groups of attorneys representing their interests; their parents might also have separate legal representation.  ORR staff stated that necessary coordination among these groups sometimes caused confusion, delaying children's release from ORR care.  In October 2018, when approximately 130 children were yet to be reunified as directed by the June 2018 *Ms. L v. ICE* court order, ASPR staff noted that "the limiting factors right now are not operational—they are legal reasons as to why they are not reunified.  It's about the confluence of different lawsuits."

*"So what happened was you had to obtain notification from the attorney, sometimes multiple groups of attorneys, before you could release the kid. That became confusing. The release had more layers.  It was confusing as all get-out."*

- ORR staff member

Officials and staff also cited the reunification deadlines imposed by the June 2018 *Ms. L v. ICE* court order as a significant operational challenge.  Specifically, the court required children of class members to be reunified with their parents within 14 days for children younger than 5 years old and 30 days for children aged 5 to 17 years.  The ORR Director noted that staff worked 18- to 20-hour days, with some staff working 45 days straight, to meet the court-ordered reunification timeframes.  These deadlines also led ORR to make extremely short-turnaround directives to facilities caring for separated children.

# FINDINGS, PART II

# Factors That Affected Care Provider Facilities' Ability To Reunify Separated Children With Their Parents

**Key Takeaway**

Care provider facilities faced significant operational challenges at every stage of the reunification process, complicated by poorly communicated guidance from ORR.

# FINDINGS

**Care provider facilities experienced difficulties in locating and communicating with parents of separated children**

Facilities, working closely with ORR Federal field specialists, played a critical role in reunifying separated children with their parents. Facilities commonly indicated that they encountered difficulties when trying to locate parents in DHS or DOJ custody, a necessary first step to establishing communication and eventually reunifying the family. Locating parents who were no longer in the United States presented different challenges.

## Care provider facilities reported difficulties locating and communicating with parents in DHS detention centers

Facilities reported difficulty obtaining accurate, real-time data on parents' locations; specifically, some facility staff noted that the online ICE parent locator tool they were instructed to consult was often inaccurate or out of date. Facility staff explained that it was especially difficult to locate parents during the first days after a child was separated and referred to ORR care, because little information was available while the parent was initially being processed by DHS. The problem was particularly acute for younger children, because they were often not able to provide full names, birth dates, or phone numbers of parents or relatives inside or outside the United States.

*"...the facility called [the DHS detention center] every day seeking the parents of an 11-year-old child. They could not reach anyone. The child cried every day."*

    - Facility program director

As a result, facility staff found that the most effective—but time-consuming—way to locate parents in DHS detention was to call detention centers directly to ask whether they had custody of a given parent. One program director noted that their staff had successfully located parents of separated children this way in the past, when such children were rare, but that the task was much more difficult when faced with the large number of separated children who entered ORR care in May and June 2018. Several facilities reported to OIG that in some cases, no one at the DHS detention center would answer their calls. In one case, the Associate Director of a facility reported that a DHS detention center blocked her phone number because she had called so many times attempting to get information about parents of separated children. When ORR staff gathered information from facilities about their initial efforts to establish contact with parents in detention, they found that, of 371 attempts on a given day, 159 had been unsuccessful; the most common reason given was that the detention center did not answer the phone.

*"Sometimes it's easier to find a parent in a rural village in Guatemala than to find them in detention."*

    - ORR staff member

A program director estimated that overall, it took an average of 2 weeks to locate parents and then an additional 3 to 7 days to arrange a phone call between the parent and child, a necessary first step before reunification could be pursued. A case manager indicated that these delays sometimes led children to lose trust in facility staff.

Some facility staff noted that these problems were most severe near the

beginning of the reunification effort.  ORR took several steps to address the problem, including providing direct assistance from Federal field specialists and compiling and distributing spreadsheets with contact names and numbers at DHS detention centers.  Some facilities reported that these measures improved their ability to locate parents in DHS detention.

## Care provider facilities described difficulties in locating parents detained by the U.S. Marshals Service

*"Not knowing what happened to their parents haunted the children.  We couldn't tell them whether they would ultimately be reunited.  It was challenging.  We weren't notified initially about how to connect parents with their kids. The kids had lots of questions, but we had no answers for them."*

*- Facility lead mental health clinician*

In some cases, parents of separated children were in custody of the U.S. Marshals Service (within DOJ) rather than in DHS detention.  Facility staff reported that U.S. Marshals Service staff told them it did not have the same obligations as DHS to share information about parents with ORR.  As of April 2019, ORR staff reported that the UAC Program continued to experience significant difficulties obtaining information about parents who were in U.S. Marshals Service custody.  Several court filings in *Ms. L* have included the statement that "defendants also have reached out to representatives for the Bureau of Prisons and the U.S. Marshals Service to ensure that those entities are included in discussions regarding…processes and procedures" related to children in ORR care.  However, it is not clear what, if any, specific actions have been taken.[44]

## Some parents were repatriated before ORR could locate and establish contact with them

In some cases, parents were repatriated (returned to their home country through deportation or voluntary departure) before facility staff were able to locate and contact them.  Facilities reported that locating repatriated parents was difficult because they sometimes had no information about parents' whereabouts until the parent contacted the ORR facility.  In a March 2019 court filing, the Government stated that it had identified 471 original *Ms. L v. ICE* class members who had been repatriated without their children, and without being given the opportunity to elect or waive reunification.  Exhibit 3 illustrates how difficulties facilities faced in obtaining current information about parents' locations affected one child's reunification case.

**Exhibit 3.  How difficulties obtaining information about parents' locations affected one child's reunification**

"B" is 4 years old and was separated from her father.  Her case manager sent an inquiry to ICE about her father's location but did not receive a response.  B's referral information from CBP did not include a phone number for her mother.  The case manager eventually obtained a phone number for another relative, who was able to connect B to her mother, after which the facility arranged regular phone calls.  Approximately 1 month after B arrived at the facility, they learned from B's mother that B's father had been repatriated.  B's parents have requested that B also be repatriated to her home country through voluntary departure, which requires a court order.  At the time of our site visit, B had been in ORR care for approximately 120 days.

## Care provider facilities encountered challenges to determining whether parents and children could be safely reunified

To ensure children's safety, facilities sought to confirm parentage and collect necessary information from and about parents (and alternate sponsors when appropriate).  However, communication difficulties, problems obtaining documentation, and issues related to fingerprint-based background checks impeded their efforts and delayed children's release from ORR care.

### Care provider facilities encountered challenges to confirming the relationship between parent and child

In accordance with ORR policy and procedures to ensure children's safety—and because the *Ms. L v. ICE* court order limited class membership to parents—facility staff and Federal field specialists reported that they sought to confirm parental relationships by reviewing birth certificates, conducting DNA tests (under certain circumstances), and consulting with consulates about the authenticity of documents.  However, these efforts were sometimes hampered by lack of documentation or information from the child.  Unlike unaccompanied children, who often arrive prepared to provide ORR with information about relatives, children separated from parents by immigration officials were less likely to have this information, and very young children could not communicate basic facts needed to confirm relationships.

**Facilities reported that documentation to verify the parent-child relationship was not always available.**  Several facilities discussed cases in which parents did not have birth certificates to verify their relationship to the child.  In other instances, facilities had to consult with embassies or consulates of children's home countries to authenticate documentation provided by the parents.  Facilities reported that they sometimes needed to locate another relative in the child's home country to obtain the necessary documentation or to confirm the parent-child relationship (e.g., verifying facts relayed by the parent or child).

*"She was 5 [years old] so that was harder too... Where they lived, who with, where they were going; she was unable to provide us with that info."*

*- Facility case manager*

**Facilities reported that confirming the parent-child relationship was more challenging for young children.**  Very young children were less able (or in the case of preverbal children, unable) to confirm the identity of their parents.  To address this, ORR initially instructed its facilities to conduct DNA testing for children younger than 5 years old and their parents; this guidance changed after the *Ms. L v. ICE* court deemed routine DNA testing unnecessary for those parents covered by the June 2018 court order.

### Care provider facilities had difficulty obtaining necessary information about parents' backgrounds

ORR's process requires that facility staff complete an assessment for each potential sponsor to gather information necessary to ensure the child's safety upon release; these assessments were also conducted for parents separated from their children and potentially eligible for reunification under *Ms. L v. ICE.*  In addition, sponsors—including parents—were, until March

2019, required to undergo a fingerprint-based background check.[45] Facilities reported challenges to completing these tasks for parents of separated children, which extended the time that children were in ORR care.

**Care provider facility staff experienced challenges in completing assessments for parents in detention.**  Facility staff reported two main challenges to completing assessments for parents in detention: limited time to speak with parents and lack of access to necessary documents. Completing the necessary assessment typically requires 1 to 3 hours on the phone with the potential sponsor (in these cases, the detained parent). Facilities reported that it was difficult to schedule calls with detained parents and, once scheduled, each call was restricted by the detention center to 10 to 15 minutes.  This restriction limited the amount of information gathered during each call and required multiple calls to complete the assessment. Getting necessary documentation was also challenging.  Facilities reported that parents in detention did not always have the right documentation and needed case managers to help them obtain the documents.

*"ICE would only allow parents 10-minute phone calls and parents would want to talk to their children as long as possible, so this would not leave much time for case managers to talk to parents and complete the assessment."*

*- Facility program director*

HHS and facilities took various measures to complete sponsor assessments more quickly.  In late June 2018, the ASPR-led IMT deployed U.S. Public Health Service personnel to some detention centers to assist with assessments.  Additionally, facilities reported that staff at some DHS detention centers assisted with completing sponsor assessments; however, some facilities reported that assessments conducted by DHS staff were not usable or took too long to complete due to the high volume of separated parents in custody.  Based on guidance documents provided to OIG, ORR does not appear to have provided instructions to facilities about DHS staff conducting parent assessments or how facilities should coordinate with DHS detention centers in that regard.

In mid-July 2018, in response to a court order in *Ms. L v. ICE* directing HHS to streamline its process for vetting parents who are *Ms. L* class members, ORR directed facilities to cease gathering additional information, including the sponsor assessment, from such parents.  Instead, for parents covered by *Ms. L*, ORR instructed care provider facilities to rely on any identification documents that the parent had available, background check information gathered by ICE, and any information that ORR or the facility had already gathered at that point.

**Children's releases were delayed by long wait times for ORR to process fingerprint-based background checks.**  On June 7, 2018, ORR implemented a provision of the April 2018 MOA between DHS and HHS by instituting a new policy requiring fingerprints from not only all potential sponsors, including parents, but also all adult members of their households.[46]  The implementation of the new fingerprinting policy coincided with a peak period for processing separated children's cases as a result of the zero-tolerance policy, leading to significant delays in receiving background check results.

On July 10, 2018, the *Ms. L* court ruled that parents in the class should not be subject to the same level of background check as other sponsors, noting in particular that background checks of household members were unnecessary.[47]  However, fingerprint-related backlogs continued to delay discharges for all children in ORR care throughout the summer, increasing the total number of children in ORR care at the same time shelters were attempting to carry out the time-sensitive and challenging reunification effort.  Overall, by November 2018, the average length of stay for a child in ORR care was 93 days, compared to an average of 64 days for fiscal year 2018.[48]  Care provider facilities reported that longer lengths of stay resulted in deteriorating mental health for some children and increased demands on staff.

After the period of OIG's site visits, senior ACF officials reported that HHS had increased the resources and technology available for processing fingerprints and stated that, as of November 2018, the backlog had been eliminated.  Additionally, between December 2018 and June 2019, ORR implemented a series of policy changes that significantly reduced the number of individuals required to obtain fingerprints as part of the sponsorship process.[49]

**Care provider facilities had greater difficulty resolving cases with "red flags."**  Facilities reported that it was challenging to resolve cases that were red-flagged due to safety concerns for the child.  Examples of red flags included cases in which parentage was uncertain, as well as cases in which there were allegations that the parent had abused or could be a danger to the child.  For all red-flag cases, facility staff provided information to ORR staff so that they could decide whether the child could be safely reunified with their parent.  Due to the complex circumstances of red-flagged cases, facilities reported that these children remained in ORR care for longer periods while ORR made a final decision on how to resolve each case.  Exhibit 4 on the following page illustrates how red flags affected two children's reunification cases.

**Exhibit 4.  How red flags affected two children's reunifications**

"P" is 13 years old.  P's father would like to be reunified with his son and is in a DHS detention center waiting for a court date.  DHS informed facility staff that P's father had a suspected criminal disqualification (one type of red flag) preventing reunification.  However, the case manager reports that DHS never disclosed the exact charges.  In the meantime, facility staff attempted to vet three potential sponsors.  Two sponsors were denied, and one withdrew.  Facility staff requested a lawyer for P to counsel him on his options (e.g., voluntary departure or long-term foster care in the United States) if he is not able to reunify with his father.  At the time of our site visit, P had been in ORR care for approximately 90 days.

"J" is 12 years old.  J was ready for potential reunification with his father.  However, the process was interrupted after ICE identified red flags purportedly stemming from J's father's gang-related background.  The case manager said that the facility's Federal field specialist became involved to gather more information about the red flags.  ORR sent a series of emails to DHS in an attempt to identify the right person to speak with regarding the red flags.  In the end, no gang-related background was found and J's father's background check was cleared.  At the time of our site visit, J had been in ORR care for approximately 90 days and was scheduled to be reunified with his father the following day.

## Care provider facilities described coordination problems that impeded efforts to reunify separated children with their parents

Under *Ms. L v. ICE,* the Government was required to reunify parents in the original class with their children by July 10, 2018 (for children younger than 5 years old) or July 26, 2018 (for children aged 5 years and older).  To accomplish this, the IMT worked with DHS to develop a process whereby DHS would transport parents to a limited number of DHS detention centers, and HHS would then direct facilities to bring separated children to those same detention centers to be reunified with their parents.  Facilities described a variety of coordination problems that impeded this process, including issues with transporting children and long waits to be processed at some DHS centers serving as reunification sites.  Reunification with parents who were no longer in the United States presented special challenges because of the need for coordination with the court system.

### Facilities encountered challenges in transporting children to reunification sites

Facilities described several obstacles to efficient transportation of separated children to reunification sites.  For example, facility staff stated that they received short notice from ORR's transportation contractor about flight arrangements; they sometimes were informed late in the evening, which necessitated waking children up and transporting them that same night.  In one case, a final approved list of children to be reunified and their flight arrangements was provided to a facility at 1 a.m. for airport dropoff times as early as 6 a.m. the same morning.  Some of the children on the list had been placed in foster homes, and so the facility was unable to gather all the minors in time; as a result, three children who had been cleared for

reunification missed their flight.  Additionally, facility staff reported that the lack of time to prepare children for reunification sometimes caused the children distress.

Facilities also reported instances in which children were transported to the reunification site as directed, but the parent was not there.  In other cases, children were transported to detention centers for reunification but could not reunify with their parents for various reasons and had to be transported back to an ORR shelter.  Additionally, facilities described two cases in which minors were released to ICE for reunification, in accordance with the established process, but ended up being detained at the DHS location by themselves without being reunited with their parents.

### Facilities reported long wait times at some DHS detention centers serving as reunification sites

Some facilities reported that separated children experienced long wait times—from 8 hours to multiple days at or near DHS detention centers—before being reunified with their parents.  Facility staff stayed with children during this time, sometimes waiting in vans in detention center parking lots.  In some cases, staff needed to find hotel rooms and follow safeguards for overnight stays (e.g., ensuring that female staff were available to stay with girls and male staff with boys).  Facilities also began sending staff and children with food and blankets to accommodate them during the long wait.  Facilities reported having staff sleep in shifts so that someone was always supervising the children and so that the children would not lose their place in line to be processed at the DHS detention center.  ORR facilities reported that these long waits led to significant stress for children and caseworkers.

OIG also independently reviewed emails sent from facilities to ORR, as well as internal emails sent among ORR and ASPR staff, describing these issues.  For example, on July 15, 2018, shortly before 10 p.m., a facility contacted HHS to report the significant delays they were experiencing at the Port Isabel detention center.  In the email, facility staff explained that the 37 children they had brought to the site had been waiting for 8 hours with no progress and noted that vans of children from other facilities were waiting as well.  On July 19, 2018, staff from a different facility contacted HHS to report that the DHS official at the El Paso detention center had informed them that no more reunifications could take place that day, leaving approximately 20 children waiting and in need of overnight accommodations.  The following day, facility staff contacted HHS again, stating that the El Paso detention center had announced they would soon be ceasing reunifications for that day, this time with approximately 50 children still waiting.  Exhibit 5 illustrates how coordination problems affected one child's reunification.

*"[The] computer system at the detention center said R's father was there, but he was not reunified with his dad.  R was in the detention center for 3 weeks without a family member.  [The ORR facility] believes his dad is not in the detention center because R never saw his father during the 3 weeks.  R is now back at [the ORR facility] and [we are] working to unite him with a sponsor."*

- Facility program director

**Exhibit 5.  How coordination problems affected one child's reunification**

"D" is 11 years old.  He was separated from his father, who was in ICE custody.  Approximately 45 days after arriving at the facility, the case manager requested D's transfer for reunification.  Two weeks later, D was on a manifest list to be transported to the DHS facility where D and his father would be reunified.  The case manager and D arrived at the DHS facility after midnight and waited 6 hours before they were able to enter the facility.  D's father was not yet at the facility and arrived 2 hours later.  The case manager said the required transfer of custody paperwork took additional hours to complete.  On the date that D and his father were reunified, D had been in ORR care for approximately 60 days.

### Lack of coordination of parents' and children's immigration court cases delayed some children's reunification

Facilities also reported delays in reunification because immigration court dates (which are determined by DOJ) were not coordinated for parents and their children as a family unit.  Instead, some parents were deported while their children remained in ORR care awaiting their own court hearings.  In cases where the deported parent wanted the child to return to the home country, ORR facilities reported that children remained in their care for several months pending the court date to approve the child's repatriation.

## Care provider facilities reported that guidance and directives from ORR were poorly communicated and caused confusion

Facilities receive guidance and policy from ORR through a variety of mechanisms.  When ORR needed to frequently update facilities with rapidly changing guidance about separated children in response to court orders, it relied primarily on emails.  The resulting high volume of changing instructions from a variety of sources contributed to confusion among facility staff.  Further, facility staff reported that ORR guidance they received regarding separated children was not sufficiently detailed.  Facility staff reported that these issues sometimes impeded their efforts to reunify children with their parents.

ORR staff reported that because the reunification effort was led by the IMT, in collaboration with other Federal agencies and under the requirements of the *Ms. L* court, facility staff did not have full visibility into the reunification effort and the reasons for atypical processes and changing guidance.  ORR staff acknowledged that the program relies on email to convey certain types of guidance but believed the confusion facility staff expressed was a result of unusual circumstances rather than indicative of a pervasive communication problem.  However, OIG notes that if ORR continues to provide critical instructions to facilities by email, such confusion is likely to recur in any future situations requiring rapidly changing guidance.

## ORR relies on email to provide certain guidance and operational directives to its care provider facilities; these instructions are not archived in a central, searchable location

ORR provides guidance, including policies and operational directives, to its network of care facilities through the following channels:

- The *ORR Guide: Children Entering the United States Unaccompanied* (*Guide)* is publicly available on the ACF website and includes a change log to help users determine when policies have been altered.
- The *UAC Manual of Procedures* (*Manual*) is accessible only to ORR staff, contractors, and grantees and provides additional guidance.
- ORR headquarters staff send emails to all Federal field specialists with instructions to convey certain guidance and operational directives to facilities.
- ORR headquarters staff send emails to facilities to directly convey certain guidance and operational directives.

Formal ORR policies are centrally maintained and accessible in the *Guide* and the *Manual.* ORR provides other types of guidance by email. Specifically, ORR staff reported that they use email to provide time-sensitive policy updates before they are published in the *Guide,* as well as to provide guidance that ORR views as temporary and which will therefore not be included in the *Guide* or the *Manual* as formal policy. Guidance that ORR conveys by email is not catalogued or accessible in a central and searchable location.

*"We did not have one central repository for all directives... It would just be archived in emails."*

*- ORR staff member*

Although communicating by email allows for rapid updates, it can also create confusion about what guidance is active. To confirm the most current set of instructions, facility staff must locate the most recent email they have received on a topic, which may have come from a central UAC policy account, any of several ORR employees' individual accounts, or the facility's Federal field specialist.

**Guidance about separated children changed rapidly, and care provider facility staff were often unsure which instructions to follow.** As the number of separated children entering ORR care grew, and particularly after the June 2018 court order in *Ms. L,* ORR frequently emailed facilities to provide new or changed procedures required by court orders or other needs of the reunification effort. Because these were temporary and situation-specific instructions that would not be memorialized in the *Guide* or *Manual,* they were provided only by email, supplemented by conference calls. As with emailed guidance in general, these instructions were not archived in a central, searchable location. Below are examples of the changing guidance that facilities received about reunifying separated children:

- On June 14, 2018, ORR directed facilities to conduct a specialized parent assessment for all separation cases; 12 days later, ORR discontinued that requirement.

- On July 2, 2018, ORR instructed facilities to use DNA tests to confirm parentage for separated children younger than 5 years old; on July 9, ORR instructed facilities to also conduct DNA testing for separated children aged 5 to 17 years.  On July 10, ORR instructed facilities to discontinue DNA testing, following a *Ms. L v. ICE* court order determining that routine DNA testing of parents was unnecessarily burdensome.

- On July 9, 2018, ORR provided guidance to facilities that birth certificates for separated children should be authenticated by the home country consulate.  ORR retracted that guidance July 10.  On July 13, ORR distributed a guidance document with information about the reunification process and requirements, but the document did not specifically address authentication of birth certificates.  On July 14, ORR reinstated guidance to authenticate separated children's birth certificates.

(See Appendix F for a detailed description of guidance that ORR provided to facilities regarding separated children.)

Facility staff reported that the constantly changing guidance and consequent confusion delayed reunification efforts.  A program director stated that "the guidance changed frequently and in a manner that made it difficult to comply without inefficiencies."  A case manager explained that the facility staff "would begin to plan to reunify with family members, but the policy changed and they couldn't."  Another case manager described cases as becoming stagnant through the uncertainty and "back and forth" of changing guidance.

*"One time there were three or four policy changes via email in one day...it's hard to keep up."*

*- Facility program director*

Additionally, the high volume of messages originating from multiple sources within ORR led to confusion about what guidance was active.  Facilities frequently emailed ORR staff with questions about what guidance to follow.  Responding to those many questions constituted an additional, time-consuming task for ORR staff who were already working long hours to coordinate the reunification effort.  Additionally, emails containing time-sensitive guidance were sometimes sent to incorrect or outdated addresses at facilities, creating opportunities for miscommunication or delays in providing important information.  A facility program director stated that that reunification of children was sometimes delayed because the facility was wondering which guidance to follow.

The timelines and directives associated with the court-ordered reunification undoubtedly exacerbated problems associated with guidance provided by email.  However, OIG notes that these vulnerabilities are likely to recur in any future situation calling for rapid or changing instructions to facilities,

including future litigation or future DHS or DOJ policy changes that affect ORR operations.

## Care provider facilities reported that ORR guidance about separated children was not sufficiently detailed

Facilities and ORR field staff reported that guidance from ORR Headquarters staff was vague and did not address the full range of children's situations. For example, a Federal field specialist stated that ORR provided insufficient guidance regarding separated children whose parents were in DHS custody and wished the child to be placed with someone else (e.g., a sponsor residing in the United States).  Facility staff told OIG that they were continuing to attempt to identify and vet potential sponsors for such children, but that a child could not be discharged until ORR advised facility staff that the child could be legally released to someone other than the parent with whom he or she had entered the United States.  Similarly, a case manager described a lack of guidance for cases in which the child's parent had been deported and the child did not wish to voluntarily depart to be reunified with the parent.  Facility staff also recounted instances in which they attempted to get clarification about ORR guidance from their Federal field specialist or other ORR staff, but the individuals they contacted could not answer their questions.  Some staff indicated that they believed ORR did not understand the difficulties being imposed on facilities, leading to stress and frustration among facility staff attempting to comply with ORR guidance and directives.

*"The facility relies heavily on ORR guidance.  Without clear, consistent, and specific guidance during the enforcement of the zero-tolerance policy, the facility's resources were greatly strained and challenges were added to an already delicate system."*

- Facility program director

# FINDINGS, PART III

## Factors Affecting HHS's Ongoing Efforts To Improve Tracking and Placement of Separated Children

**Key Takeaway**

HHS has taken steps to improve tracking of separated children, but the procedures include manual processes that are vulnerable to error; additionally, ORR continues to experience difficulties obtaining specific information from DHS about parents' criminal backgrounds, impeding ORR's ability to provide appropriate care and placement.

# FINDINGS

**Despite efforts to improve tracking of separated children, current procedures rely on manual processes that are vulnerable to error**

In the wake of *Ms. L v. ICE*, ORR made several changes to its procedures for identifying and tracking separated children. Notably, ORR added an indicator to children's records in the UAC Portal to record that a child was separated before his or her referral to ORR. This indicator can then be used to create a list of all separated children at any given time.

However, ORR staff explained that a lack of coordination between the UAC Portal and CBP's IT system prevents this indicator from operating as ideally intended. Currently, most referral data are automatically transmitted from CBP's IT system to the UAC Portal, eliminating the need to manually re-enter basic information. However, data about separation are not automatically transmitted: when a child is flagged as separated in CBP's system, the "separated" indicator in the UAC Portal is not triggered.

Based on emails that OIG reviewed, CBP attempted to enable automatic transfer of separation data from the CBP system to the UAC Portal in October 2018. However, they were informed by ACF IT staff that no changes could be made to the UAC Portal and that separation information would have to be entered manually. Some CBP staff have the ability to log into the UAC Portal directly to manually trigger the "separated" indicator, but according to ORR staff, they are not typically doing so.

As a result, identification and tracking of separated children currently relies on multiple manual steps. CBP staff may enter narrative information relevant to a child's separated status in any of several possible sections of the referral form, including a Notes section and a Parent/Relative section. In some cases, the narrative information is not included in the form but is emailed to ORR separately. ORR intake staff must then review any narrative information provided about the child—either on the referral form or by email—and mark the separation indicator as appropriate. If adequate narrative information has not been conveyed at the time of referral, the ORR intake staff may not know that a child was separated.

To facilitate centralized tracking of separated children, ORR now maintains a consolidated spreadsheet of separated children referred to ORR. ORR staff reported that to create this spreadsheet, they use the "separated" indicator to pull relevant records from the UAC Portal and then manually reconcile this information with another spreadsheet maintained by intake staff as well as another list provided by CBP and confirmatory information from ICE. The consolidated spreadsheet is updated weekly. This represents a significant improvement over the informal systems ORR used in the past but still relies on manual processes that are inherently vulnerable to error, raising questions about the accuracy of current data on separated children.

**HHS does not consistently receive complete information from DHS about parents' criminal backgrounds**

In a prior review, OIG reported that, as of November 2018, ORR was receiving limited information from DHS about the reasons for family separations. A tracking spreadsheet that OIG reviewed containing data on separated children who were referred to ORR from July 1 through November 9, 2018, included numerous instances in which the reason given for separation was "criminal history" with minimal or no further information about the nature of the criminal history.[50] When a proposed sponsor (including a parent) has a criminal history, ORR policy is to evaluate the severity and type of crime and the length of time that has passed since the criminal act, along with any mitigating factors. To that end, ORR officials stated that when DHS provided insufficiently detailed explanations for a child's separation, ORR staff would contact DHS for followup information. However, the spreadsheet we reviewed indicated that DHS did not always respond to these requests for followup information.

According to a September 2019 court filing, DHS separated 955 children from an accompanying parent between June 27, 2018, and July 20, 2019.[51] In an earlier court filing, the Government stated that "DHS will communicate the basis for separation to HHS, and will, as soon as practicable, provide HHS with available and appropriate information about the reason for the separation (taking into account any restrictions on the sharing of such information). DHS and HHS have designated points of contact to assist HHS in obtaining information about the reasons for the separation."[52]

However, as of April 2019, ORR staff reported that they continue to face challenges in obtaining information from DHS regarding parents of separated children, including complete information about parents' criminal histories; further, they reported that in some cases, key identifying information such as the parent's name or alien registration number is also omitted. Staff reported that they still sometimes have difficulty locating parents in DHS custody, describing efforts to improve this function as "a work in progress." Staff noted that the information they receive for newly referred children varies across CBP sectors, with some sectors more receptive than others to ORR's requests for followup information. ORR staff explained that complete and accurate information about criminal history is critical to their ability to provide appropriate case management and to determine what placement will best serve the child, regardless of whether that child is ultimately reunified with a parent or placed with a different sponsor.

# CONCLUSION AND RECOMMENDATIONS

Poor interagency communication and internal management decisions that failed to prioritize and protect children's interests left HHS unprepared for the zero-tolerance policy.  HHS was not responsible for separating families, but HHS's inadequate communication, management, and planning made the situation worse for many separated children.  For example, insufficient bed capacity left hundreds of children in CBP detention centers for extended periods before transfer to ORR's care provider facilities, delaying their receipt of age-appropriate care and case management.  Additionally, data limitations impeded HHS's ability to quickly and accurately identify separated children, complicating efforts to promptly reunify separated children with their parents.  Further, with no way to link children's and parents' information, facilities were unable to provide many children with timely information about or contact with their parents.  Facilities also faced numerous operational challenges in carrying out their role in the court-ordered reunification effort under short timeframes and with unclear Federal guidance.  ORR has made recent changes to improve its tracking of newly separated children, but it relies on multistep, largely manual processes that are inherently vulnerable to error.

OIG's review focused on factors affecting HHS's response to the zero-tolerance policy and the reunification of separated children as directed by the *Ms. L v. ICE* court.  However, many of the problems we identified speak to broader communication and management concerns.  For example, we noted management decisions that did not appropriately weigh risk to children, poor coordination between HHS and other Federal agencies, and inadequate information-sharing across HHS and DHS.  Additionally, vulnerabilities in ORR's methods of providing guidance to facilities, if left unaddressed, will hamper ORR's ability to carry out its child welfare mission. In a quickly changing policy landscape, clear lines of communication—both across Federal agencies and within HHS—are vital to the Department's ability to adapt and respond effectively to new developments.

To address these management challenges and improve UAC Program operations, OIG recommends the following:

## HHS should take steps to ensure that children's interests are prioritized and represented in decisions affecting the UAC Program, both internally and when engaging with interagency partners

HHS is charged with ensuring that children's interests are considered in decisions and actions related to the care and custody of unaccompanied children.  As the UAC Program is called to adapt to changes in immigration policy, enforcement, and trends beyond its control, HHS leadership across

the Office of the Secretary, ACF, and ORR must ensure that HHS centers children's interests in its internal decision-making as well as in its interactions with interagency partners.  To do so, HHS leadership should:

- direct ACF and ORR leadership to ensure that potential risks to children are explicitly assessed and considered in decisions about policies affecting unaccompanied children, including by proactively representing these children's interests in interagency policy discussions;
- direct ACF and ORR leadership to ensure that staff are not prevented from documenting concerns about children's well-being; and
- clearly communicate to ACF and ORR leadership and staff that they are empowered and expected to elevate information, perspectives, and recommendations necessary to protect children's interests and that concerns about potential harm to children in HHS custody will be taken seriously.

These directives should be provided through both written and oral communication to support an organizational culture that aligns with the Agency's mission.

Regarding internal communication about separated children specifically, we recommend that ORR use its "separated" indicator in the UAC Portal to add information about separated children to regular reports provided to senior ACF officials about ORR operations.  This indicator would provide ACF officials with greater awareness and information about ongoing separations and put them in a better position to address any concerns, such as the flow of information between DHS and HHS about separated children and their parents or legal guardians.

### HHS should modify or pursue formal agreements with DHS and DOJ to ensure that it is receiving information that supports its operation of and ability to provide care for children in the UAC Program

HHS has active agreements with DHS regarding the UAC Program generally, but these documents do not fully address the coordination challenges that OIG identified, as evidenced by the lack of communication in advance of the zero-tolerance policy and the difficulties that ORR and facilities encountered—and still encounter—in obtaining information about parents of separated children.  Meanwhile, HHS has no formal agreement with DOJ regarding locating children's family members in DOJ custody.[53]  Therefore, we recommend that HHS work with DHS and DOJ to address the following concerns:

- Formal agreements (such as an MOA or its functional equivalent) with both agencies should include **specific mechanisms and timeframes to enable effective interagency notification** about

any changes to immigration policy or enforcement initiatives that may foreseeably affect ORR's responsibilities. Notice should be sufficiently in advance of the policy or initiative to allow ORR to prepare for the changes and minimize adverse impact on children.

- Formal agreements with both agencies should include **commitments to ensure that DHS, DOJ, and their subagencies are fully responsive to ORR's informational needs** so that ORR and facilities can provide optimal care for vulnerable children. ORR should receive complete, timely, and accurate information about parents' locations, parents' criminal history, and other background information (subject to legal constraints on law enforcement sensitive information). Communication with parents (e.g., about their own background, relatives in the United States, and children's medical history) is also vital to enable ORR and facility staff to provide care and make appropriate placement decisions.

  With regard to DHS, current operational guidance documents support the sharing of certain information between DHS and HHS at the time of referral, but HHS should pursue agreements that require DHS to improve the completeness and accuracy of the information provided to ORR. It is important that ORR and facilities are able to identify parents or guardians who remain in DHS custody and link that information to children in ORR care; determine parents' or guardians' locations in DHS custody; and receive sufficiently detailed information about parents' or guardians' criminal histories. Additionally, HHS should work with DHS to improve systems and procedures for collecting and sharing data, with the goal of ensuring that HHS receives complete, accurate, timely, and secure information about children referred to its care.

  With regard to DOJ, no current agreement requires DOJ to coordinate with ORR or provide information about parents' locations, which has led to ongoing difficulties locating parents in U.S. Marshals' custody. An MOA or other formal agreement should be pursued to improve ORR's access to this information.

- Consistent with OIG's recommendation above, formal agreements with both agencies should **protect the interests of children who are or will be in HHS custody**. HHS should ensure that interagency agreements affecting the UAC Program are consistent with its humanitarian mission.

OIG recognizes that effective collaboration requires effort and responsiveness from all parties and that HHS cannot compel other Federal agencies to modify or enter into agreements. Nonetheless, HHS has a responsibility to diligently pursue interagency agreements and information-sharing to the extent that they can support the HHS mission and serve the interests of children in HHS custody. OIG notes that greater interagency

coordination around separated children has been occurring in the context of *Ms. L v. ICE* and other litigation.  HHS should take steps to continue and formalize this increased coordination after the litigation resolves.

### HHS should improve communication to care provider facilities regarding interim guidance, operational directives, and other instructions that are not immediately available in published policy documents

ORR was placed in the difficult position of needing to frequently send updated information and guidance to its facility network about separated children.  Given the ongoing potential for changes in policy and other emerging issues that affect the UAC Program, it is likely that ORR will have future need to communicate information to its network of facilities quickly, accurately, and in such a manner that both ORR and facility staff can easily determine what directives should be followed at any given time.  To that end, we recommend that ORR ensure that any instructions they expect facilities to follow—including temporary, interim, and operational guidance—are archived and available in a searchable location with clear issuance and effective dates.  In addition to improving facilities' access to critical guidance, such a system would also reduce the need for ORR Headquarters staff to respond to requests for information and clarification from facilities.

### HHS should further improve its ability to identify and track separated children by reducing reliance on manual processes

In the wake of the zero-tolerance policy and the court-ordered reunification effort, ORR made several changes to its systems and procedures for identifying and tracking separated children.  OIG recognizes these significant improvements.  However, information about children's separated status is still conveyed through manual, multistep processes that are inherently vulnerable to error.  ORR should streamline its procedures to reduce reliance on these manual processes.  As part of this effort, ORR should identify and resolve barriers to automating exchange of the "separated" data element between the CBP IT system and the UAC Portal.

# AGENCY COMMENTS AND OIG RESPONSE

ACF concurred with all of our recommendations.

In response to our first recommendation, ACF generally concurred but noted limitations to HHS's statutory authority regarding the formulation and implementation of immigration law enforcement policy. ACF indicated that it is committed to ensuring that children's interests are prioritized while in ORR's care and custody and acknowledged its statutory obligation to consider children's interests when making certain decisions. ACF did not describe actions it would take to address the specific steps OIG recommended to ensure that children's interests are prioritized. We encourage HHS to issue internal directives and related communications as we recommended to support an organizational culture that aligns with the Agency's mission.

In response to our second recommendation, ACF generally concurred but stated that its ability to modify or enter into agreements is dependent on a variety of factors, including the actions of other Federal agencies. We recognize that HHS cannot unilaterally implement interagency agreements but recommend that HHS pursue, to the best of its ability, agreements that support UAC Program operations and are consistent with the interests of children in the Department's custody.

ACF also stated that interagency agreements are not legally enforceable. However, as ACF affirmed, interagency agreements are nonetheless a useful tool to define each parties' expectations and clarify consensus practices. We note that MOAs can include mechanisms to address parties' failure to adhere to the agreement.

ACF also described two planned actions that address interagency coordination. First, ORR will engage with DHS regarding updates to the *Unaccompanied Alien Children Joint Concept of Operations.* Second, ORR will establish annual meetings of ORR and grantee leadership along with interagency partners to discuss field operations, policy and procedure formulation, and best practices.

ACF concurred with our third recommendation and described steps taken and planned to improve communication with care provider facilities. Specifically, ORR has made training and other resources available to facilities, and ORR's UAC separations team will support the UAC policy team in developing procedures regarding communication of new guidance, directives, and instructions to facilities. Additionally, ORR is working with other HHS components to implement an October 2019 Executive Order that, among other provisions, requires each agency to establish a searchable database of all guidance documents in effect.

ACF concurred with our fourth recommendation and described steps taken and planned to improve its ability to identify and track separated children. ACF stated that ORR is undertaking a modernization of the UAC Portal that will reduce reliance on manual processes to track separated children.

Please see Appendix G for the full text of ACF's comments.

# APPENDIX A: Timeline of Key Events

| | |
|---|---|
| **January 25, 2017** | President Trump issues "Executive Order: Border Security and Immigration Enforcement Improvements," directing the DHS Secretary to issue guidance ending "catch and release" policies and calling for a more stringent detention and removal policy. |
| **February 9, 2017** | Jeff Sessions is sworn in as U.S. Attorney General. |
| **February 10, 2017** | Tom Price is sworn in as Secretary of HHS. |
| **February 20, 2017** | DHS Secretary John Kelly issues memorandum titled, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies," which calls for an end to policies known as "catch and release." |
| **March 7, 2017** | DHS Secretary Kelly publicly confirms the possibility of separating families as a deterrence policy. |
| **March 29, 2017** | DHS Secretary Kelly publicly states that DHS will not pursue a policy of family separation. |
| **April 11, 2017** | Attorney General Sessions issues a memorandum titled, "Renewed Commitment to Criminal Immigration Enforcement," which directs Federal prosecutors to prioritize prosecution of certain immigration offenses. |
| **July 2017** | El Paso sector of CBP begins prosecution initiative resulting in family separations. |
| **July 31, 2017** | Former DHS Secretary Kelly becomes White House Chief of Staff; Elaine Duke is designated Acting Secretary of DHS. |
| **September 29, 2017** | HHS Secretary Price resigns; Don J. Wright is designated Acting Secretary of HHS. |
| **October 6, 2017** | Eric D. Hargan is sworn in as Deputy Secretary of HHS. |
| **October 10, 2017** | Eric D. Hargan is designated Acting Secretary of HHS. |
| **December 6, 2017** | Kirstjen Nielsen is sworn in as Secretary of DHS. |
| **January 29, 2018** | Alex M. Azar II is sworn in as Secretary of HHS. |
| **February 26, 2018** | *Ms. L v. ICE* lawsuit is filed. |
| **April 6, 2018** | President Trump issues memorandum "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement." |
| **April 6, 2018** | Attorney General Sessions issues memorandum "Zero-Tolerance Policy for Offenses under 8 U.S.C. § 1325(a)," directing prosecutors to accept all referrals of improper entry offenses from DHS for criminal prosecution. |

| | |
|---|---|
| **April 13, 2018** | HHS and DHS sign MOA establishing new information-sharing responsibilities, effective 30 days from the date of signature. |
| **May 7, 2018** | Attorney General Sessions announces DOJ and DHS implementation of the zero-tolerance policy in a public speech. |
| **June 7, 2018** | ORR revises policy on fingerprint-based background check requirements, implementing a key provision of the April 2018 MOA. |
| **June 20, 2018** | President Trump issues "Executive Order: Affording Congress an Opportunity To Address Family Separation," which directs DHS to detain families together whenever possible. |
| **June 26, 2018** | A Federal district court rules in *Ms. L v. ICE* that the Federal Government must cease separations (with some exceptions) and must reunify parents with their minor children who are in ORR care on that date. |
| **July 10, 2018** | Court-ordered deadline for reunification of *Ms. L v. ICE* class members with their children younger than 5 years old. |
| **July 26, 2018** | Court-ordered deadline for reunification of *Ms. L v. ICE* class members with their children aged 5 to 17 years. |
| **November 7, 2018** | Attorney General Sessions resigns; Matthew Whitaker is designated Acting Attorney General. |
| **February 14, 2019** | William Barr is sworn in as Attorney General. |
| **April 7, 2019** | DHS Secretary Kirstjen Nielsen resigns; Kevin McAleenan is designated Acting Secretary of DHS. |
| **March 8, 2019** | The *Ms. L v. ICE* court expands the class definition to include parents who entered the United States on or after July 1, 2017. |

Source: OIG analysis of public and internal HHS documents, 2019.

# APPENDIX B: Previous Related Office of Inspector General Work

Additional information on OIG's work on this topic, including reports prior to 2018, can be found on our Unaccompanied Children webpage.  Below is a list of recent OIG reports on unaccompanied children.

| Title | Report Number | Date Issued |
|---|---|---|
| Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody | OEI-09-18-00431 | September 2019 |
| Unaccompanied Alien Children Care Provider Facilities Generally Conducted Required Background Checks but Faced Challenges in Hiring, Screening, and Retaining Employees | A-12-19-20001 | September 2019 |
| Southwest Key Programs Did Not Always Comply With Health and Safety Requirements for the Unaccompanied Alien Children Program | A-06-17-07005 | August 2019 |
| Southwest Key Did Not Have Adequate Controls in Place To Secure Personally Identifiable Information Under the Unaccompanied Alien Children Program | A-18-18-06001 | August 2019 |
| The Children's Village, Inc., an Administration for Children and Families Grantee, Did Not Always Comply With Applicable Federal and State Policies and Requirements | A-02-16-02013 | April 2019 |
| Lincoln Hall Boys' Haven, an Administration for Children and Families Grantee, Did Not Always Comply with Applicable Federal and State Policies and Requirements | A-02-16-02007 | February 2019 |
| Separated Children Placed in Office of Refugee Resettlement Care | OEI-BL-18-00511 | January 2019 |
| BCFS Health and Human Services Did Not Always Comply With Federal and State Requirements Related to the Health and Safety of Unaccompanied Alien Children | A-06-17-07007 | December 2018 |
| The Tornillo Influx Care Facility: Concerns About Staff Background Checks and Number of Clinicians on Staff | A-12-19-20000 | November 2018 |
| Florence Crittenton Services of Orange County, Inc., Did Not Always Claim Expenditures in Accordance With Federal Requirements | A-09-17-01002 | October 2018 |
| Heartland Human Care Services, Inc., Generally Met Safety Standards, but Claimed Unallowable Rental Costs | A-05-16-00038 | September 2018 |
| Florence Crittenton Services of Orange County, Inc., Did Not Always Meet Applicable Safety Standards Related to Unaccompanied Alien Children | A-09-16-01005 | June 2018 |
| BCFS Health and Human Services Did Not Always Comply With Federal Requirements Related to Less-Than-Arm's-Length Leases | A-06-16-07007 | February 2018 |

# APPENDIX C: Lines of Authority Over the Unaccompanied Alien Children Program During the Period of Review



Source: OIG Analysis, 2019.

# APPENDIX D: Care Provider Facilities Visited by OIG

During August and September 2018, OIG staff conducted site visits to 45 facilities across 10 States.



## Number and Type of Facilities Visited

| | | |
|---|---|---|
| **28** | **Shelter** | Most common type of residential care facility; provides housing, food, medical care, mental health and educational services, and recreational activities. |
| **9** | **Staff Secure** | Provides close supervision to children who exhibit disruptive behavior, are a flight risk, or display gang affiliation. This includes the only therapeutic staff secure facility that ORR funded at the time of our site visit, which provides a combination of close supervision and intensive support and clinical services (e.g., in-depth counseling). |
| **2** | **Secure** | Provides care for children who pose a danger to self or others, or who have been charged with a crime. |
| **2** | **Residential Treatment Center** | Provides children who need more intensive mental health treatment with subacute therapeutic care through a structured 24-hour-a-day program and services that are highly customized to individual needs. |
| **2** | **Influx** | Provides children with temporary emergency shelter and services; used when ORR experiences an influx of children. |
| **2** | **Transitional Foster Care** | Provides short-term foster care for children younger than 13 years old, siblings, pregnant and parenting teens, or those with special needs; services provided in the community. |

Source: OIG analysis of ORR and facility data, 2019.

# Facilities Visited

The table below lists and describes the 45 facilities that OIG visited.

| Facility Name | Facility Type | Number of Children in Care* | Licensed To Care for Younger Children** | Cared for Separated Children*** |
|---|---|---|---|---|
| **Arizona (4)** | | | | |
| SWK Campbell | Shelter | 126 | ● | ● |
| SWK Casa Phoenix | Shelter | 385 | | ● |
| SWK Estrella | Shelter | 295 | ● | ● |
| SWK Hacienda del Sol | Shelter | 139 | ● | ● |
| **California (3)** | | | | |
| BCFS Fairfield | Staff Secure | 11 | | |
| SWK Pleasant Hill | Shelter | 26 | | ● |
| Yolo County | Secure | 19 | | |
| **Florida (1)** | | | | |
| Homestead | Influx | 1,347 | | ● |
| **Illinois (4)** | | | | |
| Heartland CRC IRC | Shelter | 193 | ● | ● |
| Heartland Casa Guadalupe | Shelter | 47 | ● | ● |
| Heartland IYC | Staff Secure | 6 | | |
| Heartland SCIY | Shelter | 5 | | ● |
| **Maryland (1)** | | | | |
| Board of Child Care | Shelter | 42 | ● | ● |
| **New York (7)** | | | | |
| Abbott House | Shelter | 51 | ● | ● |
| Cayuga Centers | Transitional Foster Care | 609 | ● | ● |
| Children's Village | Shelter | 167 | | ● |
| Children's Village | Staff Secure | 26 | | |
| MercyFirst | Residential Treatment Center | 9 | | ● |
| Leake and Watts/ Rising Ground | Shelter | 47 | | ● |
| Lincoln Hall | Shelter | 184 | | ● |
| **Oregon (1)** | | | | |
| Morrison Paso | Staff Secure | 11 | | |

(Continued on next page)

| Facility Name | Facility Type | Number of Children in Care* | Licensed to Care for Younger Children** | Cared for Separated Children*** |
|---|---|---|---|---|
| **Texas (20)** | | | | |
| BCFS Baytown | Shelter | 216 | ● | ● |
| BCFS Harlingen | Shelter | 576 | ● | ● |
| BCFS Raymondville | Shelter | 50 | ● | ● |
| BCFS San Antonio | Shelter | 110 | ● | ● |
| BCFS San Antonio | Staff Secure | 26 | | |
| BCFS San Antonio | Transitional Foster Care | 119 | ● | ● |
| BCFS Tornillo | Influx | 665 | | ● |
| Shiloh Treatment Center | Residential Treatment Center | 23 | | ● |
| SWK Antigua | Shelter | 276 | | ● |
| SWK Casa Houston | Shelter | 71 | | ● |
| SWK Montezuma | Shelter | 209 | | ● |
| SWK Casa Padre | Shelter | 1,398 | | ● |
| SWK Casa Quetzal | Shelter | 246 | | ● |
| SWK Casita del Valle | Shelter | 84 | ● | ● |
| SWK Combes | Shelter | 73 | ● | ● |
| SWK Mesa | Staff Secure | 7 | | |
| SWK El Presidente | Shelter | 372 | ● | ● |
| SWK Nueva Esperanza | Shelter | 290 | | ● |
| SWK Processing Center | Staff Secure | 16 | | |
| SWK Rio Grande | Shelter | 225 | | ● |
| **Virginia (2)** | | | | |
| Shenandoah Valley Juvenile Center | Secure | 20 | | ● |
| Youth for Tomorrow | Shelter | 111 | | ● |
| **Washington (2)** | | | | |
| Friends of Youth | Staff Secure | 11 | | ● |
| Selma Carson | Staff Secure | 14 | | ● |

Source: OIG analysis of ORR and ASPR data, 2019.

* Data on the number of children in care as of August 30, 2018.

** Younger children include those who were 9 years old or younger.

*** We obtained from ORR and ASPR data on separated children that were part of the *Ms. L v. ICE* lawsuit.  Our analysis identified that 37 of the 45 facilities had children covered by the lawsuit.

# Children's Demographics at Facilities Visited



**Almost 9,000 children***
were in ORR's care at facilities visited. This represents 72% of all children in ORR's care at the time of the visits.

**71% Boys**
**29% Girls**

**UAC Age Range**

**85% Age 13–17**

**13% Age 6–12**

**2% Age 0–5**

**UAC Country of Origin**

| | |
|---|---|
| 50% | Guatemala |
| 28% | Honduras |
| 11% | El Salvador |
| 3% | Mexico |
| 3% | India |
| 2% | Bangladesh |
| 1% | Nicaragua |
| 1% | Other |

Source: OIG analysis of ORR and facility data, 2019.

* According to ORR data, on August 30, 2018, a total of 12,409 children were in ORR care. Of those, 8,953 children were at the facilities that OIG visited; the percentages of boys and girls are based on this number. The percentages on age range and country of origin are based on data collected directly from the facilities that we visited. We reviewed age and country of origin data that facilities provided to OIG. Because some facilities provided data for a point-in-time (i.e., specific date) while other facilities provided data over a specific timeframe (i.e., 3-month period), the total number of children between these two data points differs. Age range is based on data from 5,835 children; country of origin is based on data from 7,081 children. Because of rounding, the total percentage for country of origin does not add up to 100 percent.

# APPENDIX E: Detailed Methodology

To identify challenges that HHS and care provider facilities faced in responding to the zero-tolerance policy and reunifying separated children with their parents, we interviewed numerous senior HHS officials and HHS staff and conducted site visits to 45 facilities.  Additionally, we reviewed both internal HHS documents and publicly available information to confirm and expand upon information provided in interviews.  We analyzed these data to establish facts, confirm timelines, and identify internal and external factors that affected the Department's response to the zero-tolerance policy.

## Overview of Data Sources

This report synthesizes information from a wide array of sources, including extensive interviews with, and written responses from, senior HHS officials and HHS staff in the Office of the Secretary, ASFR, ASPR, ACF, and ORR; interviews with staff at 45 care provider facilities; case reviews for a purposive sample of separated children; and thousands of documents obtained through requests to the Department, from facility staff, and from interview respondents.  These data sources are described in detail below.

## Interviews With Senior HHS Officials and HHS Staff

Our work draws on numerous interviews with senior HHS officials and HHS headquarters and regional staff.  In this report, "senior official" means a Presidential appointee under the Executive Schedule, a non-career appointee to the Senior Executive Service (SES), or a non-career Schedule C appointee.  "Staff" means career employees at or below the SES level, including career U.S. Public Health Service Commissioned Corps Officers. We selected respondents to include offices and individuals who played key leadership or operational roles before and during the zero-tolerance policy's implementation and during the subsequent court-ordered reunification.  Specifically:

- We interviewed seven senior officials in the HHS Office of the Secretary, ASFR, ASPR, ACF, and ORR between September 2018 and August 2019.  Some officials were interviewed more than once.

- We submitted questions in writing to the Secretary and Deputy Secretary, who provided written responses.

- We interviewed 16 staff in ASPR, ACF, and ORR Headquarters between September 2018 and August 2019.  These interviewees included ACF staff with expertise in budget formulation; ORR staff with expertise in policy, data, intakes, and other matters relevant to our review; and ASPR staff in both leadership and support positions assigned to the reunification mission.  Some staff were interviewed

individually, while others were interviewed as a group.  Some staff were interviewed more than once.

- We interviewed 28 ORR Federal field specialists (field staff) who are responsible for providing guidance and technical assistance to facilities and approving or denying children's transfer and release.

Throughout the report, certain individuals are referred to by their titles *at the time of the events being described.*  Please note that the individuals who held the positions of ORR Director, Acting Assistant Secretary for ACF, Counselor to the Secretary for Human Services Policy, and ORR Deputy Director during the periods those roles are discussed are no longer in those positions as of the date of this report.

## Site Visits to Care Provider Facilities

OIG conducted site visits to 45 ORR-funded facilities in operation across the country.  All site visits lasted 2 to 3 days and occurred in August or September 2018, with the majority taking place in August.  Site visits included more than 100 interviews with facility leadership and staff as well as case reviews of selected separated children.

**Site selection.**  The 45 sites were selected purposefully to achieve wide coverage of facilities participating in the UAC Program and to include a variety of facility types, sizes, populations in care, and geographic locations. Combined, the 45 sites that we visited included facilities that cared for 72 percent of the children in ORR custody at the time of our review.  Of the facilities we visited, approximately two-thirds (28) were shelter facilities, the most common type of facility in ORR's network.  We also visited every residential treatment center (2), staff-secure (9), secure (2), and influx (2) facility in ORR's network at that time.  Additionally, at least 37 facilities that we visited cared for at least one separated child whom HHS had identified, as of August 2018, as a possible child of a potential *Ms. L v. ICE* class member.  Other facilities may also have cared for separated children who were not part of this litigation or who were identified under *Ms. L v. ICE* after the time of our review.  See Appendix B for information about the 45 facilities we visited and the children in their care.

**Site visit protocol.**  Multidisciplinary teams of OIG staff conducted each site visit.  Each team consisted of at least one evaluator, auditor, investigator, and lawyer.  These teams were trained in advance regarding their responsibilities specific to this fieldwork.

This report is focused on challenges that HHS and facilities faced in their efforts to reunify separated children.  To that end, at each of the 45 facilities, we interviewed facility leadership, including the program director, as well as case managers involved in the reunification effort.[54]  We interviewed these key personnel in private by using standardized interview protocols.

Additionally, at most facilities, we reviewed the cases of up to five separated children selected purposively to represent a range of ages and situations affecting their cases. Specifically, at the time of OIG's site visits, we had obtained from HHS child-specific data about separated children who were covered by the *Ms. L v. ICE* lawsuit and who had been placed in 35 of the 45 facilities in our review. For each of those 35 sites, we purposively selected up to 5 separated children and reviewed their cases onsite with their case manager to better understand factors affecting their reunification, including factors contributing to delays in reunification.[55] In total, we interviewed 80 case managers and completed 89 case reviews for analysis.

Criteria used to select children for case review included:

1. *Children who had not yet been reunified*. When the facility housed separated children who had not yet been reunified, we selected from among those children's files first.

2. *Age*. We sought to represent children of different ages; children in our case review ranged in age from 1 to 17 years.

3. *Reasons they had not been reunified*. We sought to represent a range of factors affecting children's ability to be reunified, such as a parent having been deported, a parent having a red flag on their file, difficulty locating the parent, parent declining reunification, etc.

Because our case selections prioritized separated children who remained in ORR care at the time of our site visits—which occurred after the *Ms. L v. ICE* deadline to reunify separated children—they are not representative of the universe of separated children. The five case examples provided in our report are intended to illustrate the complexity of some separated children's situations and the many factors that could impede reunification.

## Document Review

OIG conducted an extensive review of HHS documents related to family separation, the zero-tolerance policy, and the reunification of separated children with their parents, as well as documents reflecting interactions between HHS and other Federal agencies regarding immigration policy more broadly. In total, OIG reviewed more than 5,000 documents encompassing memoranda, letters, emails, spreadsheets, meeting agendas, meeting summaries, and other records created or received by HHS employees related to these matters, primarily from early 2017 through mid-2018. We reviewed documents internal to HHS as well as interagency correspondence and records that involved HHS senior officials and staff. Consistent with OIG's statutory role, we reviewed both privileged documents (e.g., legal opinions, interagency deliberative correspondence, and draft memoranda) as well as non-privileged documents (e.g., correspondence about operational matters, guidance transmittals to facilities, and certain final memoranda).

OIG requested and received documents from the following sources:

- documents provided by interview respondents, including facility staff, to corroborate or expand upon interview responses;

- documents provided by HHS containing guidance and operational directives that ORR transmitted to facilities regarding separated children;

- documents originally compiled by HHS staff to prepare senior officials for congressional testimony related to the zero-tolerance policy; and

- documents retrieved by HHS staff from senior officials' and staff members' computers and paper files through a broader Departmental effort to identify all documents relevant to family separation as well as other ORR issues.

Regarding the Department's efforts to identify and retrieve all documents relevant to family separation, staff within the Office of the General Counsel, with contractor support, constructed an extensive database of documents to respond to requests from OIG, Congress, and outside litigants. The full database covered issues related to family separation as well as other ORR topics beyond the scope of OIG's review. OIG reviewed HHS's procedures for identifying and collecting documents responsive to OIG's request and confirmed that they were sufficient to identify potentially relevant material. For example, the Department collected all emails and documents on computers and shared drives for HHS senior officials and staff with extensive involvement in ORR; additionally, the Department used automated processes with topic-specific search terms to retrieve potentially relevant documents from the computers and shared drives of senior HHS officials with portfolios encompassing ORR as well as other program offices within ACF and other HHS operating divisions. From this larger database, OIG identified documents by using search terms and dates pertinent to our objectives. Artificial intelligence software was employed to identify the most relevant documents for review.

## Analysis

We conducted qualitative review and analysis of interview data to identify significant challenges that HHS and facilities faced in responding to the zero-tolerance policy and reunifying separated children, as well as key factors that contributed to those challenges. Regarding factors affecting HHS, we identified key themes across multiple respondents and sought to corroborate key statements with other interviewees. Regarding challenges faced by facilities, we sought to identify the most significant challenges reported by facility management, case managers, and Federal field specialists. Each of the key challenges we discuss (locating and communicating with parents, confirming whether reunification could safely

occur, transporting children to be reunified, and unclear guidance from ORR) was reported by the majority of facilities in our review.

Additionally, we conducted content-based review of internal HHS documents as well as public materials such as court filings to establish specific facts (e.g., dates and topics of meetings); to confirm timelines (e.g., dates of guidance communications); and, when possible, to verify interview responses (e.g., by identifying emails or memos consistent with interviewees' statements).

## Limitations

We were not able to independently verify all information provided by HHS or facility staff.  Whenever possible, we compared interviewees' statements to facts we could determine from the extensive documentary record; as appropriate, we also requested documentation from interviewees to support their statements.  We confirmed certain information about DHS IT systems directly with DHS staff.

The facilities we visited and the case files we reviewed were purposively selected and do not necessarily represent the experiences of all facilities or all separated children.  Likewise, the exhibits included in this report were selected to illustrate how various factors affected children's reunification cases; they do not necessarily represent the experiences of all facilities or all separated children.

# APPENDIX F: Timeline of Key Guidance to Care Provider Facilities About Separated Children

| | |
|---|---|
| **April 6, 2018** | Attorney General issues memorandum "Zero-Tolerance for Offenses under 8 U.S.C. § 1325(a)," directing prosecutors to accept all referrals of improper entry offenses from DHS for criminal prosecution. |
| **April 11, 2018** | ORR issues guidance for reunifying separated children with parents (including those in DHS custody but expected to be released, and those in removal proceedings) or placing such children with an alternative sponsor.  Guidance stipulates that Federal field specialists will confirm familial relationships, verify criminal history background check, and gather other information before initiating procedures to release the child to the parent upon the parent's release from detention.  For children who will not be reunified with their parent, the Federal field specialist will seek to contact the parent in detention to gather information about alternate sponsors. |
| **April 21, 2018** | ORR instructs facilities to file a Significant Incident Report (SIR) for any future cases of children identified as separated from biological parents that DHS had not previously reported as separated when transferring the child to ORR. |
| **May 7, 2018** | Attorney General makes public speech announcing that the zero-tolerance policy has been implemented at both DOJ and DHS. |
| **May 9, 2018** | ORR discontinues the process established in April 2018 for reunifying separated children with parents in ICE custody.  Facilities are instructed that in cases in which the child does not have a sponsor, they should wait for the immigration judge to issue a voluntary departure order for returning to their country of origin. |
| **May 14, 2018** | ORR issues guidance to facilities on establishing swift contact between separated children and parents in detention, noting that all ORR responsibilities for screening children and adults remain in place.  Case managers and clinicians are to notify their Federal field specialist immediately if a parent requests to return to their country of origin with their child.  ORR issues guidance on the transfer of separated children to DHS in cases when a parent or legal guardian requests reunification with the child for repatriation.  The Federal field specialist can approve the transfer after meeting all safety requirements, including confirming the parent-child relationship and that the parent does not pose a risk to the child. |
| **June 4, 2018** | ORR expands SIR guidance to require that facilities submit a SIR for any child separated from a parent if that separation was not already reported, and for any child who was previously reported as separated but the facility has determined was not actually separated. |

| June 20, 2018 | President Trump issues "Executive Order: Affording Congress an Opportunity to Address Family Separation," which directs DHS to detain families together wherever possible. |
|---|---|
| June 26, 2018 | A Federal district court rules in *Ms. L v. ICE* that the Federal Government must cease separations (with some exceptions) and must reunify parents with their minor children in ORR care. |
| June 28, 2018 | ORR instructs facilities to compile a list of separated children and to log efforts to establish contact between separated children and their parents, noting that the Federal field specialist can provide a list of detention centers and contact numbers needed to locate and establish contact with a parent in detention. |
| July 2, 2018 | ORR instructs facilities to conduct DNA testing on all separated children aged 0 to 4 years to determine parentage. |
| July 3, 2018 | ORR informs facilities of a new requirement that parents whose separated children have an identified alternative sponsor must sign a "Letter of Designation for Care of a Minor" before ORR will release the child to the sponsor. |
| July 9, 2018 | ORR instructs facilities that all birth certificates must be authenticated by the consulate.  Additionally, separated children aged 5 to 17 years and their parents must now be DNA tested. |
| July 10, 2018 | *Ms. L v. ICE* court deadline to reunify children younger than age 5 with their parents |
| July 10, 2018 | ORR issues guidance that birth certificates no longer need to be authenticated.  Further, parents of separated children will no longer be DNA tested. |
| July 13, 2018 | ORR instructs facilities to only reunify children with parents in ICE detention and to await guidance on reunifying children with potential sponsors or parents who are in the United States.  ORR provides to facilities a document with guidance on reunification of separated children subject to the *Ms. L v. ICE* litigation, including requirements for reunification, the limited circumstances under which DNA testing will be completed, and how the process differs from the standard ORR process (e.g., *Ms. L v. ICE* class members need not sign sponsor care agreements or attend a legal orientation program). |
| July 14, 2018 | ORR provides guidance to facilities that all separated children must have authenticated birth certificates before release.  ORR also instructs facilities to temporarily stop reunifying separated children cleared for release to parents in DHS custody.  Later that day, ORR instructs facilities to resume reunification efforts for separated children cleared for release to ICE custody if they have a verified birth certificate and meet other requirements.  ORR also provides guidance and forms for the transfer of custody to DHS for the purpose for reunification. |

| July 15, 2018 | ORR provides guidance on transferring separated children to ICE detention centers and adds protocols for discharge to parents already released from ICE custody. The guidance instructs facilities to complete release requests and manifests with information on transport logistics, medical clearance, and verification of birth certificates.  ORR also authorizes full payments for transport of children to detention centers for reunification or to released parents for reunification. |
|---|---|
| July 18, 2018 | ORR updates guidance on transferring separated children to ICE detention centers to include notification to the child's legal service provider or attorney about the date and time of the child's departure. |
| July 26, 2018 | *Ms. L v. ICE* court deadline to reunify all children of class members with their parents |

Source: OIG analysis of public and internal HHS documents, 2019.

# APPENDIX G: Agency Comments



**ADMINISTRATION FOR**
**CHILDREN & FAMILIES**

Office of the Assistant Secretary | 330 C Street, S.W., Suite 4034
Washington, D.C. 20201 | www.acf.hhs.gov

Christi A. Grimm
Principal Deputy Inspector General
Office of Inspector General
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

Dear Ms. Grimm:

The Administration for Children and Families (ACF) of the U.S. Department of Health and Human Services (HHS) thanks the Office of Inspector General (OIG) for the opportunity to respond to the OIG report entitled, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* (OEI-BL-18-00510). ACF is committed to transparency in policy and operations, as well as continuous improvement of all aspects of the unaccompanied alien children (UAC) Program, including how the program works with interagency and external partners. Accordingly, ACF generally concurs with OIG's recommendations and is already taking steps toward implementing many of the recommended changes.

Before discussing those steps, however, ACF believes that it would help to provide further context for some of the observations made by OIG in the report.

HHS is committed to prioritizing the interests of UAC in matters concerning their care and custody after referral from the U.S. Department of Homeland Security (DHS). When HHS is invited to participate in interagency discussions about upstream immigration enforcement policy, HHS advocates vigorously for the downstream child welfare mission and programmatic equities of the Office of Refugee Resettlement (ORR) of ACF. HHS, however, does not have a direct role in shaping upstream immigration enforcement policy because ORR does not have any statutory authority over immigration enforcement policy or implementation. In some instances, the Department of Justice (DOJ) or DHS may not communicate with HHS for law enforcement or other legitimate legal or policy reasons. The context for evaluating HHS should include the statutory authorities, historical agency practices, and institutional prerogatives of DOJ and DHS because all of those factors drive inter-agency communications about the UAC program.

Also, the report refers to "a family separation policy." From ACF's perspective, the family separations described in the report were the result of two immigration enforcement policies: the DOJ Zero Tolerance Policy (ZTP) and the DHS referral policy. The decisions to implement those policies were committed to the heads of DOJ and DHS, respectively, which enforce United States immigration law. ORR has a narrower child welfare mission that it fulfills by sheltering and then safely releasing UAC to suitable sponsors. ORR child welfare policy has always favored family unification with suitable sponsors. No HHS component has ever had "a family separation policy."

The following are ACF's specific responses to each of OIG's recommendations:

Page 2 – Principal Deputy Inspector General

**Recommendation 1:**  HHS should take steps to ensure that children's interests are prioritized and represented in decisions affecting the UAC Program, both internally and when engaging with interagency partners.

**Response:**  ACF generally concurs with this recommendation, though the steps that HHS may take may be constrained by the statutory authorities and institutional equities of other departments in decisions that may affect the UAC program.

ACF staff is committed to ensuring that children's interests are prioritized while in ORR's care and custody.  Indeed, ACF is statutorily obligated to consider UAC's interests when making certain decisions.  For instance the Homeland Security Act of 2002 states that "the Director of the Office of Refugee Resettlement shall be responsible for . . . ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child." 6 U.S.C. § 279(b)(1)(B).  The Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 directs that, "[c]onsistent with section 279 of title 6, and except as otherwise provided under subjection (a), the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1).  Accordingly, ORR operations are informed by child welfare principles.

Currently, ORR reports information about separated children, including newly separated children to ORR, ACF, and HHS leadership.  ORR represents the interests of UAC by providing comments on proposed rules, responding to Congressional inquiries, and drafting testimony to Congress.

Nevertheless, HHS's statutory authority does not extend to the formulation and implementation of immigration enforcement policy or interagency law enforcement initiatives.  While HHS has limited visibility into Executive Branch activities concerning immigration enforcement policy, HHS is committed to providing technical assistance to its interagency partners on the child welfare impacts of immigration enforcement policy options when possible.  The expansion of HHS's role beyond the care and custody of UAC to upstream decisions regarding the many immigration enforcement or foreign policy issues that can ultimately impact the UAC Program would implicate the statutory authorities and institutional equities of other departments, and likely require an adjustment to the existing statutory framework.

**Recommendation 2:**  HHS should modify or pursue formal agreements with DHS and DOJ to ensure that it is receiving information that supports its operation of and ability to provide care for children in the UAC Program.

**Response:**  ACF generally concurs with this recommendation, though the ability of HHS to modify existing interagency agreements and enter into new ones is limited by the statutory authorities, agency practices, and institutional prerogatives of other federal departments, as well as the interagency process more broadly.

The information provided by HHS's interagency and external partners is vital to ensuring that ORR has the ability to make informed decisions that are in the best interest of each child in its care and custody.  To that end, ORR intends to engage with its counterparts on the DHS policy team in June 2020 to consider updates to the *Unaccompanied Alien Children Joint Concept of Operations* regarding the information that is shared between agencies.  ORR is also working to re-institute an annual meeting of ORR staff and grantee leadership to exchange information about field operations,

Page 3 – Principal Deputy Inspector General

implementation and formation of policies and procedures, and best practices. ORR intends to include interagency partners in the meeting as appropriate.

ACF agrees that it would be beneficial to ORR's operations for any future interagency agreements to set forth the shared expectations of all participating departments. But it is important to keep in mind that interagency agreements are statements of interdepartmental practice. They are not legally enforceable.[1] While interagency agreements may be a useful tool for clarifying consensus interdepartmental practices, their effectiveness is contingent on the participating departments agreeing and adhering to consensus practices in the first instance.

OIG's recommendation seems to contemplate a unilateral information sharing arrangement, under which other departments would be obligated to provide certain information to HHS. While HHS is committed to pursuing information sharing that furthers ORR's child welfare mission, formal interagency agreements are typically multilateral. And in the case of the UAC program, there are legislative limitations on multilateral information sharing that may constrain interdepartmental practices and, by extension, the development of formal interagency agreements.

**Recommendation 3:** HHS should improve communication to care provider facilities regarding interim guidance, operational directives, and other instructions that are not immediately available in published policy documents.

**Response:** ACF concurs with this recommendation.

In the highly dynamic environment of overlapping court orders and sometimes conflicting information—as discussed with regard to the previous recommendation—ACF acknowledges it faced a challenge to provide clear, consistent, and timely direction. ACF recognizes that the pace and frequency of communication required to comply with the *Ms. L* Court's reunification orders were potentially overwhelming to some shelter staff, and takes as lessons learned the need to improve its communication with shelter facilities and their staff.

With respect to reunification, the UAC separations team currently shares guidance with the field telephonically as needed. That guidance is reviewed by the UAC policy team to ensure it is not in conflict with current UAC MAP procedures or litigation expectations. ORR's UAC separations team will continue to support the UAC policy team in developing procedures for the UAC MAP regarding dissemination of and communication about new guidance, directives, and instructions to care provider facilities. Additionally, ORR has instituted routine training from its Division of Policy and Procedures, and regularly maintains and monitors a resource mailbox for all questions or concerns about policy, procedures, and guidance. It encourages care provider partners to use these resources whenever questions or confusion arise.

In addition, ORR is working closely with other components of HHS to develop regulations complying with the recent Executive Order on Promoting the Rule of Law Through Improved Agency Guidance Documents (Oct. 9, 2019), which requires each agency to issue regulations

---

[1] Indeed, the 2016 HHS-DHS MOA states expressly that it does not create legally enforceable obligations. *See* 2016 HHS-DHS MOA, at p.4, para. 7 ("This MOA does not and is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person or entity in any matter . . . . This MOA . . . is not intended to be legally binding on either Party.").

Page 4 – Principal Deputy Inspector General

setting forth its processes and procedures for issuing guidance documents, and to establish a single, searchable, indexed database containing all guidance documents from that agency that are in effect.

**Recommendation 4:**  HHS should further improve its ability to identify and track separated children by reducing reliance on manual processes.

**Response:**  ACF concurs with this recommendation.

ACF is committed to continuously improving all aspects of ORR operations.  ORR is currently undertaking significant efforts to modernize the UAC portal in order to, among other things, improve ORR's ability to identify and track separated UAC with minimal reliance on manual processes.  However, it is important to note that the identification and tracking of separated UAC will always involve some element of manual data entry for three reasons.  First, there are always likely to be at least some incompatibilities between HHS's data systems and those of its interagency partners.  Second, there likely will also be a continued need to vet certain information received from interagency partners due to conflicting legal standards, or interpretations of those standards.  Third, ORR case managers frequently compile new information about UAC after UAC arrive at ORR shelters.  Data entry for case management is necessarily an iterative, manual process that continues throughout the stays of UAC in ORR shelters.

***

Again, thank you for the opportunity to review this report.  ACF takes it responsibilities to ensure the safety and well-being of the UAC in ORR care seriously.  We look forward to continuing to improve all aspects of the UAC Program, including communication and information sharing with HHS's internal and external partners.  Please direct any follow-up inquiries on this response to Scott Logan, Office of Legislative Affairs and Budget, at (202) 401-4529.

Sincerely,

*Lynn A. Johnson*

Lynn A. Johnson,
Assistant Secretary for Children and
Families

# ACKNOWLEDGMENTS

Louise Schoggen served as team leader for this study. Other Office of Evaluation and Inspections staff who conducted the study and were primary contributors include Bahar Adili, Heather Barton, Louis Day, Seta Hovagimian, Michael Kvassay, Zunara Naeem, and Brianna So. Key advisors included Laura Canfield, Blaine Collins, Abigail Cummings, Lonie Kim, Carla Lewis, Diana Merelman, and Peter Taschenberger, with support from Lyndsay Patty.

We would also like to acknowledge other significant contributors without which this effort would not have been successful. Staff from each Office of Inspector General component contributed, including the Office of Audit Services, the Office of Counsel, the Office of Evaluation and Inspections, the Office of Investigations, the Office of Management and Policy, and the Immediate Office of the Inspector General. Contributions included planning and conducting fieldwork, data and administrative support, and report production and distribution.

This report was prepared under the direction of Dave Tawes, Regional Inspector General for Evaluation and Inspections.

To obtain additional information concerning this report or to obtain copies, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.

# ABOUT THE OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## Office of Audit Services

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## Office of Investigations

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## Office of Counsel to the Inspector General

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

# ENDNOTES

[1] 6 U.S.C. § 279(g)(2).

[2] HHS, ACF, *Justification of Estimates for Appropriations Committees*, Fiscal Year 2020, pg. 6. Accessed at https://www.acf.hhs.gov/sites/default/files/olab/acf_congressional_budget_justification_2020.pdf on June 20, 2019.

[3] ACF, *Fact Sheet: Unaccompanied Children Program*, December 2018.  Accessed at https://www.acf.hhs.gov/sites/default/files/orr/unaccompanied_alien_children_program_fact_sheet_december_2018.pdf on April 26, 2019.  DHS referred 49,100 children to ORR, although additional children may have been referred by other agencies.

[4] 8 U.S.C. § 1232(b)(3).

[5] In fiscal year 2018, 42 percent of children released to sponsors were released to a parent. *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. Feb. 1, 2019) (Declaration of Jonathan White).

[6] 8 U.S.C. § 1232(c)(2)(A).

[7] Influx care facilities are subject to different requirements than other types of shelters. Specifically, an influx care facility provides temporary emergency shelter and services for children during an influx or emergency.  Because of the temporary and emergency nature of influx care facilities, they may not be licensed or they may be exempt from licensing requirements.  In addition, influx care facilities may be opened on federally owned or leased properties, in which case the facility is not subject to State or local licensing standards.

[8] Overall, in fiscal year 2018, 86 percent of children discharged were released to an individual sponsor.  Of those, 42 percent were discharged to a parent, and another 47 percent were discharged to a close relative. *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. Feb. 1, 2019) (Declaration of Jonathan White).

[9] *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan. 17, 1997), Stipulated Settlement Agreement, setting out an order of priority for sponsors with whom children should be placed.  The first preference is for placement with a parent, followed by a child's legal guardian, then other adult relatives.

[10] The specific background checks required have varied over time, as ORR adjusted policies to balance timely release with safety concerns.  For example, before June 2018, ORR required all potential sponsors who were not parents or legal guardians of the child to submit fingerprints for processing by the FBI.  Parents or legal guardians (who comprise a large percentage of sponsors) and adult household members were required to submit fingerprints only in particular circumstances, such as when there was documented risk to the safety of the child.  In June 2018, ORR changed its background check policies to require fingerprint-based FBI criminal history checks of all potential sponsors and their adult household members in all circumstances; additionally, fingerprints and other identifying information would be shared with ICE, which was not prohibited from using this information for immigration enforcement purposes.  In December 2018, ORR changed its policy to eliminate the requirement of fingerprint checks for adult household members, except in limited instances.  In March 2019, it further modified its policy, removing the required fingerprint checks for parents and legal guardians, except in limited circumstances.  In June 2019, ORR again modified the policy, so that immediate relatives—a sibling or grandparent or other close relatives who previously served as the child's primary caregiver—are not required to submit fingerprints in most situations. See, generally, *Office of Refugee Resettlement, ORR Guide: Children Entering the United States Unaccompanied, § 2.5.*  Accessed at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied on November 23, 2019.  As of February 2019, Federal appropriations law prohibited DHS from using any data submitted by ORR for immigration enforcement purposes, except in limited circumstances.  This prohibition is also contained in the fiscal year 2020 DHS appropriation and appears to be time-limited.  See section 224 of the Consolidated

Appropriations Act, 2019, P.L. No. 116-6 (Feb. 15, 2019) and section 216 of Consolidated Appropriations Act, 2020, P.L. No. 116-93 (Dec. 20, 2019).  Additionally, beginning in July 2019, Federal appropriations law prohibited ORR from reversing the changes to the fingerprint policies made in December 2018, March 2019, and June 2019, unless the Secretary provides a written justification to Congress and the HHS Inspector General demonstrating that such changes are necessary to prevent UACs from being placed in danger.  The HHS Inspector General must provide an assessment the Secretary and Congress that such changes are necessary.  See section 403 of the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, P.L. No. 116-26 (July 1, 2019) and section 231 of Further Consolidated Appropriations Act, 2020, P.L. No. 116-94 (Dec. 20, 2019).

[11] 8 U.S.C. § 1232(c)(3)(B).

[12] Homeland Security Act of 2002, P.L. No. 107-296 §462 (Nov. 25, 2002); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, P.L. No. 110-457 §235 (Dec. 23, 2008).

[13] Memorandum of Agreement Between the Department of Homeland Security and the Department of Health and Human Services Regarding Unaccompanied Alien Children, Feb. 22, 2016.

[14] Memorandum of Agreement Among the Office of Refugee Resettlement of the U.S. Department of Health and Human Services and U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection of the U.S. Department of Homeland Security Regarding Consultation and Information Sharing in Unaccompanied Alien Children Matters, April 13, 2018.

[15] See Endnote 10.

[16] *Memorandum for All Federal Prosecutors.  Renewed Commitment to Criminal Immigration Enforcement.*  Office of the Attorney General, April 11, 2017.  Accessed at https://www.justice.gov/opa/press-release/file/956841/download on November 18, 2018.

[17] *Letter from CBP Commissioner McAleenan to Senator Wyden*, January 18, 2019.  Accessed at https://www.finance.senate.gov/imo/media/doc/2018-01-19%20CBP%20Response.pdf on April 15, 2019.

[18] *Memorandum for Federal Prosecutors Along the Southwest Border.  Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a).*  Office of the Attorney General, April 6, 2018.  Accessed at https://www.justice.gov/opa/press-release/file/1049751/download on November 18, 2018,

[19] DHS OIG, *DHS Lacked Technology Needed To Successfully Account for Separated Migrant Families,* OIG-20-06, November 2019.  Available at https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[20] DOJ Office of Public Affairs, *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, May 7, 2018.  Accessed at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions on November 18, 2018.

[21] Exec. Order 13841, 83 Fed. Reg. 29435, dated June 20, 2018; published on June 25, 2018.

[22] A preliminary injunction is a temporary order prohibiting a party from specified actions; it is intended to maintain the status quo until the issues at trial are resolved.

[23] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. June 26, 2018) (Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction).

[24] Parents are excluded from the class if they have a criminal history or communicable disease or are in the interior of the country.  Also, the court's order does not apply to parents for whom there is a determination that the parent is unfit or presents a danger to the child.  Parents may also decline reunification. *Id.*

[25] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. March 8, 2019) (Order Granting Plaintiffs' Motion to Modify Class Definition).

[26] *N.T.C. v. ICE*, No. 18-06428 (S.D. N.Y. July 17, 2018) (Order).  The court extended the temporary restraining order and transferred the case to the Southern District of California, where *Ms. L. v. ICE* was being litigated, in recognition of the strong policy favoring the

litigation of related claims in the same forum. *N.T.C. v. ICE*, No. 18-06428 (S.D.N.Y. July 19, 2018) (Memorandum Opinion and Order). The plaintiffs voluntarily dismissed the action on December 21, 2018. *N.T.C. v. ICE*, No. 18-01626 (S.D. Cal. Dec. 21, 2018) (Notice of Voluntary Dismissal).

[27] HHS, DHS, DOJ, *The Tri-Department Plan for Stage II of Family Reunification,* July 18, 2018. Accessed at https://www.hhs.gov/sites/default/files/UAC-Tri-Department-Process.pdf on November 18, 2018.

[28] *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. July 10, 2018) (Order Following Status Conference).

[29] HHS had previously reported 2,816 possible children of potential class members; however, in March 2019, ORR determined that two of those children entered ORR care in July 2018, after the date of the original court order, leaving 2,814 possible children of potential class members. (Both children have been discharged from ORR care.) In January 2020, HHS reported to the court that it had identified another potentially separated child of a class member, but that after further review, had determined the child was not actually separated from a parent. In the interest of transparency HHS nonetheless included the child in its reporting to the court, bringing the total number of possible children of potential class members to 2,815.

[30] As of December 2018, HHS had identified 2,816 possible children of potential *Ms. L v. ICE* class members but had also determined that 79 of those children had not, in fact, been separated by DHS, leaving a total of 2,737 separated children who had been in ORR custody as of the June 26, 2018, court order. Thus, the total number of separated children who had been in ORR care as of the *Ms. L v. ICE* court order was 2,737. (See Exhibit 1.)

[31] At least 2 additional sites among the 45 OIG visited had also cared for separated children, but OIG's site visits to those facilities took place before the date we received data about separated children, and so reunification case reviews were not conducted at those sites.

[32] The PCC is a committee of the National Security Council, Border and Transportation Security Directorate, Office of Management and Budget, and Domestic Policy Council.

[33] Memorandum of Agreement between the Department of Homeland Security and the Department of Health and Human Services Regarding Unaccompanied Alien Children, Feb. 22, 2016.

[34] 6 USC § 279(b)(1)(B)

[35] No statute dictates the circumstances under which families must be separated upon apprehension by immigration authorities, and no historical records of the number or cause of family separations exist. ORR staff we interviewed stated that historically, ORR had received small numbers of separated children, because families were separated only in rare instances such as the parent experiencing a medical problem that precluded caring for their child. See also: HHS OIG, *Separated Children Placed in Office of Refugee Resettlement Care,* OEI-BL-18-00511, January 2019, available at https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf. DHS OIG also reports that separations of families rarely occurred. DHS OIG, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families,* OIG-20-06, November 2019. Available at https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[36] OIG's general policy is not to identify career staff by name or title in our public reports. However, the individual who held the position of ORR Deputy Director for Children's Services until March 15, 2018, has provided extensive public testimony as to his role in the events discussed in this report. For that reason, and with that individual's permission, OIG is making an exception to our policy to provide readers with greater clarity about patterns of communication within HHS in 2017 and early 2018 about family separation.

[37] The Acting Assistant Secretary for ACF and the Counselor to the Secretary for Human Services Policy reported to OIG that it was not unusual for experienced ORR staff to communicate directly with senior CBP and ICE officials.

[38] See Endnote 10.

[39] 6 U.S.C. § 279(b)(1)(B).

[40] DHS OIG determined that 18.4 percent of separated children had remained in DHS custody for 5 or more days before transfer to ORR care.  DHS OIG, *Special Review—Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84, September 2018.  Available at https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[41] HHS OIG, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, OEI-09-18-00431, September 2019.  Available at https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[42] See: DHS OIG, *DHS Lacked Technology Needed To Successfully Account for Separated Migrant Families*, OIG-20-06, November 2019.  Available at https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[43] *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. Feb. 1, 2019) (Declaration of Jallyn Sualog).

[44] For example, please see *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. Apr 12, 2019) (Joint Status Report); *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. June 6, 2019) (Joint Status Report); *Ms. L v. ICE*, No. 18-0428 (S.D. Cal. Sep 11, 2019) (Joint Status Report).

[45] See Endnote 10.

[46] See Endnote 10.

[47] *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. July 10, 2018) (Order Following Status Conference).

[48] As described in a previous OIG report, facilities attributed longer stays for children to ORR's new sponsor screening requirements.  Facilities reported that it became more difficult to identify sponsors willing to accept children after the new fingerprinting requirements were implemented, which delayed placing children with sponsors, adding further stress and uncertainty.  See: HHS OIG, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children  in HHS Custody*, OEI-09-18-00431, September 2019.  Available at https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[49] See Endnote 10.

[50] On July 30, 2019, Plaintiffs in *Ms. L v. ICE* filed a motion to enforce the preliminary injunction, in which they asked the court to clarify the standard for ongoing separations (i.e., the bases on which families may be separated for criminal history or parental fitness) to ensure that children may not be separated from their parents absent an objective reason to believe the parent is unfit or a danger.  As of the date of this report, the court has not yet ruled on the motion.

[51] *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. Sep. 10, 2019) (Defendants' Opposition to Plaintiffs' Motion to Enforce Preliminary Injunction).

[52] *Ms. L v. ICE*, No. 18-0428. (S.D. Cal. Feb. 2, 2019) (Joint Status Report).

[53] A 2016 MOU between HHS and DOJ addresses procedures for referral and investigation of incidents of possible sexual abuse of children in facilities.  The MOU does not address issues related to locating parents in DOJ custody.  HHS and DOJ, *Interagency Memorandum of Understanding Between the Department of Health and Human Services and the Department of Justice Regarding Procedures for Referral and Investigation of Incidents of Possible Sexual Abuse of Unaccompanied Alien Children in Federal Grantee or Contract Facilities.*

[54] As part of the larger review, OIG teams also interviewed the lead mental health clinician, other mental health clinicians who had regular interaction with children, facility medical coordinators, and youth care workers.

[55] See Endnote 29.