**United States Government Accountability Office**



## Report to Congressional Requesters

**February 2020**

# SOUTHWEST BORDER

# Actions Needed to Improve DHS Processing of Families and Coordination between DHS and HHS



# GAO Highlights

Highlights of GAO-20-245, a report to congressional requesters

**February 2020**

# SOUTHWEST BORDER

## Actions Needed to Improve DHS Processing of Families and Coordination between DHS and HHS

## Why GAO Did This Study

In fiscal year 2019, CBP reported apprehending more than 527,000 noncitizen family unit members at or between U.S. ports of entry along the southwest border—a 227 percent increase over fiscal year 2018. In April 2018, the U.S. Attorney General issued a memo on criminal prosecutions of immigration offenses, which DHS officials said led to an increase in family separations.

GAO was asked to review issues related to DHS's processing of family units. This report examines (1) CBP data on apprehended family unit members; the extent to which (2) CBP and (3) ICE developed and implemented policies and procedures for processing family units; and (4) how DHS and HHS share information about UAC. GAO analyzed record-level DHS and HHS data and documents; interviewed DHS and HHS officials; and visited DHS locations in California and Texas where CBP apprehensions of family units increased in 2017.

## What GAO Recommends

GAO is making eight recommendations to DHS and one to HHS. Among them, CBP should develop and implement additional controls to ensure that Border Patrol agents accurately record family unit separations in data systems. GAO also recommends that ICE systematically track in its data system the family units ICE separates. Further, DHS and HHS should collaborate about information sharing for UAC. DHS and HHS concurred with the recommendations.

GAO-20-245. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Data from the Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP) indicate that apprehensions of family unit members (noncitizen children under 18 and their parents or legal guardians) grew from about 22 percent of total southwest border apprehensions in fiscal year 2016 to about 51 percent of such apprehensions during the first two quarters of fiscal year 2019—the most current data available. During this period, CBP data indicated that most apprehensions of family units—about 76 percent—occurred between ports of entry by the U.S. Border Patrol (Border Patrol). With regard to family separations, from April 2018 through March 2019, CBP data indicate it separated at least 2,700 children from their parents, processing them as unaccompanied alien children (UAC) and transferring them to the Department of Health and Human Services (HHS).

**U.S. Customs and Border Protection's (CBP) Number of Southwest Border Apprehensions and Family Unit Member Apprehensions, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**



Number of CBP apprehensions (in thousands)

Source: GAO analysis of Border Patrol and OFO data. | GAO-20-245

Notes: GAO used "number of apprehensions" rather than "number of family unit members apprehended" as the unit of analysis because an individual may have been apprehended multiple times in the same year. GAO determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of the analysis. Hence, GAO could not independently confirm these records as reliable and excluded them from the analysis. Numbers are also rounded.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juveniles accompanied by their parent(s) or legal guardian(s).

CBP developed some policies and procedures for processing family units but does not have sufficient controls to ensure effective implementation. For example, CBP policy requires that Border Patrol agents and officers track apprehended

family unit members and, if applicable, subsequent family separations in agency data systems. GAO's analysis of Border Patrol documents and data indicates that its agents have not accurately and consistently recorded family units and separations. Specifically, GAO examined a nongeneralizable sample of 40 HHS records for children involved in family separations between June 2018 and March 2019 and matched them to Border Patrol apprehensions data for these children. GAO found Border Patrol did not initially record 14 of the 40 children as a member of a family unit (linked to a parent's record) per Border Patrol policy, and thus did not record their subsequent family separation. GAO found an additional 10 children among the 40 whose family separations were not documented in Border Patrol's data system as required by CBP policy during this period. Border Patrol officials were unsure of the extent of these problems, and stated that, among other things, data-entry errors may have arisen due to demands on agents as the number of family unit apprehensions increased. Thus, it is unclear the extent to which Border Patrol has accurate records of separated family unit members in its data system. Further, Border Patrol agents inconsistently recorded information about the reasons for and circumstances surrounding family separations on required forms. Developing and implementing additional controls would help Border Patrol maintain complete and accurate information on all family separations.

DHS's U.S. Immigration and Customs Enforcement (ICE) is, among other things, responsible for detaining and removing those family units apprehended by CBP. ICE officers are to determine whether to accept or deny a referral of a family unit from CBP for detention in one of ICE's family residential centers, release family unit members into the interior of the United States, or remove family unit members (who are subject to final orders of removal) from the United States. ICE has procedures for processing and releasing family units from ICE custody. However, with regard to family unit separations, ICE relies on a manual process to track separations that occur in ICE custody (generally at one of ICE's family residential centers) and does not systematically record this information in its data system. Without a mechanism to do so, ICE does not have reasonable assurance that parents whom ICE separated from their children and are subject to removal are able to make arrangements for their children, including being removed with them, as provided in ICE's policy for detained parents.

In 2018, DHS and HHS developed written interagency agreements regarding UAC. However, DHS and HHS officials stated they have not resolved long-standing differences in opinion about how and what information agencies are to share related to the care and placement of those children, including those referred to HHS after a family separation. GAO found that DHS has not consistently provided information and documents to HHS as specified in interagency agreements. HHS officials also identified additional information they need from DHS, about those adults apprehended with children and later separated, to inform their decisions about placing children with sponsors and reunifying separated families, when necessary. Increased collaboration between DHS and HHS about information sharing would better position HHS to make informed and timely decisions for UAC.

# Contents

| Letter | | 1 |
| --- | --- | --- |
| | Background | 7 |
| | Number of CBP Apprehensions of Family Unit Members Was Greater in the First Two Quarters of Fiscal Year 2019 Than in All of Fiscal Year 2018 | 15 |
| | CBP Developed Some Policies and Procedures for Processing Family Units but Does Not Have Sufficient Controls to Ensure Effective Implementation | 28 |
| | ICE Developed Procedures for Processing Family Units, But Does Not Systematically Track ICE's Family Unit Separations in Its Data System | 51 |
| | DHS and HHS Have Interagency Agreements with Roles and Responsibilities Regarding UAC, but Long-Standing Information Sharing Gaps Remain | 58 |
| | Conclusions | 67 |
| | Recommendations for Executive Action | 69 |
| | Agency Comments | 70 |
| Appendix I | Objectives, Scope, and Methodology | 72 |
| Appendix II | U.S. Customs and Border Protection (CBP) Apprehensions and U.S. Immigration and Customs Enforcement (ICE) Detentions of Family Units | 83 |
| Appendix III | Comments from the Department of Homeland Security | 100 |
| Appendix IV | Comments from the Department of Health and Human Services | 107 |
| Appendix V | GAO Contact and Staff Acknowledgments | 109 |

Tables

Table 1: Key Department of Homeland Security (DHS) and Department of Health and Human Services (HHS)

Components' Roles and Responsibilities in Processing Family Units at the Southwest Border  9

Table 2: Location, Capacity, and Operating Time Frames of U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers  11

Table 3: U.S. Customs and Border Protection's (CBP) Apprehensions of Children in Family Units at the Southwest Border by Age, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019  22

Table 4: U.S. Customs and Border Protection's (CBP) Separations of Children in Family Units, April 19, 2018 through March 31, 2019  25

Table 5: U.S. Border Patrol Separations of Family Unit Members (Adults and Children) by Separation Reason, April 19, 2018, through March 31, 2019  26

Table 6: Office of Field Operations (OFO) Separations of Children in Family Units by Separation Reason, June 30, 2018 through March 31, 2019  27

Table 7: Varying Definitions of and Guidance on Processing Family Units from Selected U.S. Customs and Border Protection (CBP) and U.S. Border Patrol Policy and Training Documents  31

Table 8: Options for Family Separation Reasons in U.S. Border Patrol and Office of Field Operations (OFO) Data Systems, as of April 2019, Compared with 2018 U.S. Customs and Border Protection (CBP) Policy on Family Separations  45

Table 9: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members at the Southwest Border, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019  84

Table 10: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members and Total Apprehensions at the Southwest Border, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019  85

Table 11: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members at the Southwest Border by Nationality, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019  86

Table 12: U.S. Customs and Border Protection's (CBP) Apprehensions of Family Unit Members at the Southwest

Border by Adult and Child Gender, Fiscal Year 2016
through the Second Quarter of Fiscal Year 2019 ............ 86

Table 13: U.S. Border Patrol Apprehensions of Family Units at the
Southwest Border by Adult Gender, Fiscal Year 2016
through the Second Quarter of Fiscal Year 2019 ............ 87

Table 14: U.S. Border Patrol Apprehensions of Family Unit
Members at the Southwest Border by Sector, Fiscal Year
2016 through the Second Quarter of Fiscal Year 2019 ....... 88

Table 15: Office of Field Operations (OFO) Apprehensions of
Family Unit Members at the Southwest Border by Port of
Entry, Fiscal Year 2016 through the Second Quarter of
Fiscal Year 2019 ..................................... 89

Table 16: U.S. Customs and Border Protection's (CBP) U.S.
Border Patrol and Office of Field Operations (OFO)
Processing Dispositions for Apprehended Family Unit
Members at the Southwest Border, Fiscal Year 2016
through the Second Quarter of Fiscal Year 2019 ........... 90

Table 17: U.S. Customs and Border Protection (CBP) Separations
of Children in Family Units Apprehended at the Southwest
Border by Child Gender, April 19, 2018 through March 31,
2019 ............................................... 91

Table 18: U.S. Customs and Border Protection's (CBP)
Separations of Children in Family Units Apprehended at
the Southwest Border by Age and Period, April 19, 2018,
through March 31, 2019 ............................... 92

Table 19: U.S. Customs and Border Protection's (CBP)
Separations of Children in Family Units Apprehended at
the Southwest Border by Nationality, April 19, 2018,
through March 31, 2019 ............................... 93

Table 20: U.S. Border Patrol Separations of Family Units
Apprehended at the Southwest Border by Family Size and
Parent Gender, April 19, 2018 through March 31, 2019 ...... 94

Table 21: U.S. Border Patrol Separations of Adult Family Unit
Members Apprehended at the Southwest Border with
Prior Apprehensions, April 19, 2018, through March 31,
2019 ............................................... 94

Table 22: Total Family Unit Members Detained, by Age Group, in
U.S. Immigration and Customs Enforcement (ICE) Family
Residential Centers, Fiscal Years 2015 through 2018 ....... 95

Table 23: Family Unit Members Detained by U.S. Immigration and
Customs Enforcement (ICE) at Family Residential

Centers by Age, Fiscal Year 2015 through Fiscal Year
2018                                                                          96

Table 24: Selected Outcomes of Family Unit Members after Being
Detained by U.S. Immigration and Customs Enforcement
(ICE) at Family Residential Centers                                          99

Figures

Figure 1: Key Documented Actions in Response to U.S. Attorney
General's April 2018 Zero Tolerance Policy                                    13

Figure 2: U.S. Customs and Border Protection's (CBP) Southwest
Border Apprehensions of Family Unit Members, Fiscal
Year 2016 through the Second Quarter of Fiscal Year
2019                                                                          17

Figure 3: U.S. Customs and Border Protection's (CBP) Number of
Southwest Border Apprehensions and Family Unit
Member Apprehensions, Fiscal Year 2016 through the
Second Quarter of Fiscal Year 2019                                            18

Figure 4: Selected Locations of U.S. Customs and Border
Protection (CBP) Apprehensions of Family Unit
Members, Fiscal Year 2016 through the Second Quarter
of Fiscal Year 2019                                                           19

Figure 5: U.S. Customs and Border Protection (CBP)
Apprehensions of Family Unit Members, by Nationality,
Fiscal Year 2016 through the Second Quarter of Fiscal
Year 2019                                                                     21

Figure 6: Key U.S. Immigration and Customs Enforcement (ICE)
Procedures for Processing Family Units Apprehended
along the Southwest Border                                                    52

Figure 7: Family Unit Members Detained by U.S. Immigration and
Customs Enforcement (ICE), by Gender and Age Group,
Fiscal Year 2015 through Fiscal Year 2018                                     97

Figure 8: Family Unit Members Detained by U.S. Immigration and
Customs Enforcement (ICE), by Nationality, Fiscal Year
2016 through Fiscal Year 2018                                                 98

**Abbreviations**

| | |
|---|---|
| Border Patrol | U.S. Border Patrol |
| CBP | U.S. Customs and Border Protection |
| DHS | Department of Homeland Security |
| Flores Agreement | *Flores v. Reno* Settlement Agreement |
| Form I-213 | Form I-213, *Record of Deportable/Inadmissible Alien* |
| HHS | Department of Health and Human Services |
| ICE | U.S. Immigration and Customs Enforcement |
| OFO | Office of Field Operations |
| ORR | Office of Refugee Resettlement |
| UAC | unaccompanied alien child (or children) |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

February 19, 2020

The Honorable Ron Johnson
Chairman
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Bennie Thompson
Chairman
Committee on Homeland Security
House of Representatives

The Honorable Zoe Lofgren
Chairwoman
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

In fiscal year 2019, the Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP) reported apprehending[1] almost 527,000 individuals at or between U.S. ports of entry along the southwest border who were members of noncitizen family units (parents and children under 18 years old)—a 227 percent increase over fiscal year 2018.[2] In July 2019, the Acting DHS Secretary testified that the majority of individuals apprehended by CBP in fiscal year 2019 were family units

---

[1]CBP's U.S. Border Patrol apprehends families between ports of entry, and the Office of Field Operations (OFO) encounters families that arrive at ports of entry. According to CBP officials, OFO encounters aliens (instead of apprehending them) because individuals do not enter the United States at ports of entry until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol's and OFO's first interactions with family units at the border. In addition, while OFO refers to its officers as "CBP officers," for clarity in differentiating between Border Patrol and OFO in this report, we use the term "OFO officers."

[2]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to a "noncitizen parent(s) or legal guardian(s)."

or unaccompanied alien children (UAC).[3] In addition, he stated that CBP's U.S. Border Patrol and Office of Field Operations (OFO) were apprehending increasingly larger groups at and between ports of entry, straining CBP's resources to process these individuals. For example, in May 2019, Border Patrol apprehended a group of more than 1,000 individuals (900 of whom were identified as members of family units) in its El Paso sector, the largest group ever apprehended by Border Patrol.[4]

CBP may hold family units, in the short-term, in facilities for general processing and determining, in coordination with DHS's U.S. Immigration and Customs Enforcement (ICE), the next appropriate course of action, such as release into or removal from the United States.[5] ICE maintains custody of family units in long-term detention facilities, known as family residential centers, and monitors those released into the country to await their immigration removal proceedings before an immigration judge. If DHS determines that noncitizen children should be separated from their parents, DHS then considers the children to be UAC—children who (1) have no lawful immigration status in the United States, (2) have not attained 18 years of age, and (3) have no parent or legal guardian in the United States available to provide care and physical custody.[6] DHS then refers the UAC to the custody of the Office of Refugee Resettlement (ORR) within the Department of Health and Human Services (HHS), consistent with federal law.[7]

---

[3]The Homeland Security Act of 2002 defines a UAC as a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

[4]Along the southwest border, Border Patrol divides responsibility for border security operations geographically among nine sectors that include border stations, and four of OFO's 20 field offices are responsible for inspecting pedestrians, passengers, and cargo at land ports of entry along the southwest border.

[5]CBP holding facilities are designated as "short term holding facilities," which is defined as 72 hours or less. See 6 U.S.C. § 211(m).

[6]See 6 U.S.C. § 279(g)(2).

[7]Specifically, under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Trafficking Victims Protection Reauthorization Act), UAC in the custody of any federal department or agency, including DHS, must be transferred to ORR within 72 hours after determining that they are UAC, except in exceptional circumstances. 8 U.S.C. § 1232(b)(3).

In April 2018, the U.S. Attorney General issued a memorandum on criminal prosecutions of immigration offenses, which, according to DHS officials, resulted in a considerable increase in the number of minor children who were separated from their parents or legal guardians.[8] On June 26, 2018, a federal judge ordered the government to reunify certain separated families.[9] In 2018, we reported on DHS and HHS processes for tracking and reunifying families that DHS separated at the southwest border in fiscal year 2018.[10]

You asked us to review issues related to noncitizen family units arriving at the southwest border. This report examines (1) what CBP data indicate about the numbers and characteristics of family units apprehended along the southwest border, (2) the extent to which CBP has developed and implemented policies and procedures for processing family units apprehended along the southwest border, (3) the extent to which ICE has developed and implemented policies and procedures for processing family units apprehended along the southwest border, and (4) how DHS and HHS share information about UAC, including children who initially arrived with and were separated from their parents or other adults.[11]

[8]Office of the Attorney General, *Memorandum for Prosecutors Along the Southwest Border: Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)* (Apr. 6, 2018).

[9]For parents covered by the June 2018 order, the court ruled that the government may not detain parents apart from their minor children, subject to certain exceptions. The order enjoined DHS from detaining parents covered by the June 2018 order apart from their minor children "absent a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child." Additionally, the order noted that "fitness" is an important factor in determining whether to separate parent from child and that "in the context of this case, and enforcement of criminal and immigration laws at the border, 'fitness' could include a class member's mental health, or potential criminal involvement in matters other than 'improper entry' under 8 U.S.C. § 1325(a), among other matters." Ms. L. v. U.S. Immigration & Customs Enforcement (Ms. L. v. ICE), No. 18-0428 (S.D. Cal. June 26, 2018) (order granting preliminary injunction); see also orders certifying and amending the class certification on June 26, 2018, and March 8, 2019 (recognizing exclusions from the class for "migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to [Executive Order 13841]); and order granting in part and denying in part plaintiffs' motion to enforce preliminary injunction on January 13, 2020. As of February 2020, this litigation was ongoing.

[10]GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163 (Washington, D.C.: Oct. 9, 2018).

[11]We also issued an additional report related to this work. GAO, *Southwest Border: Actions Need to Address Fragmentation in DHS's Processes for Apprehended Family Members,* GAO-20-274 (Washington, D.C.: Feb. 19, 2020).

To address these objectives and observe agents and officers processing families, we conducted site visits at Border Patrol stations and OFO ports of entry in Arizona, California, and Texas, from July 2018 to October 2018. We also visited ICE family detention facilities, known as family residential centers, in Dilley and Karnes City, Texas, in February 2019. During these site visits, we interviewed Border Patrol, OFO, and ICE officials, observed agents and officers processing families, and toured CBP and ICE facilities, among other activities. To select these locations, we reviewed CBP data on Border Patrol and OFO apprehensions along the southwest border, including family unit apprehensions, and identified specific locations that had the greatest increase in the number of apprehensions from fiscal years 2016 to 2017. We also considered the geographical proximity of multiple CBP and ICE facilities to maximize observations. Our observations during site visits are not generalizable to all Border Patrol, OFO, and ICE operations along the southwest border, but provided us the opportunity to learn more about how policies and procedures for processing families are conducted and how CBP and ICE coordinate their efforts.

In addition, to address all of our objectives, we interviewed DHS and HHS officials. Specifically, we met with officials from CBP's Office of the Commissioner and Office of Chief Counsel, Border Patrol's Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate, OFO's Admissibility and Passenger Programs office, ICE's Enforcement and Removal Operations and Office of the Principal Legal Advisor, as well as HHS officials from the offices of the Assistant Secretary for Preparedness and Response and ORR.

To address the first objective, we reviewed record-level data from Border Patrol and OFO on their apprehensions of individuals determined to be inadmissible or potentially subject to removal. Specifically, we collected and analyzed data from fiscal year 2016 through the second quarter of fiscal year 2019, because Border Patrol and OFO began to systematically collect data on individuals who arrived as part of a family unit in fiscal year 2016. The second quarter of fiscal year 2019 was the most current data available at the time of our review. To assess the reliability of CBP data, we completed a number of steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for Border Patrol agents and OFO officers who use agency data systems; and (3) discussing data entry issues and data limitations with Border Patrol and OFO officials. We also received demonstrations on the data

systems from Border Patrol and OFO officials at headquarters. We determined that the Border Patrol and OFO data were sufficiently reliable to generally describe the number and demographic characteristics of family units apprehended by CBP along the southwest border. Due to data reliability issues discussed in the report, we rounded numbers presented on family separations.

To address the second objective, we reviewed CBP, Border Patrol, and OFO policy documents, training materials, and other guidance documents. For example, we reviewed CBP's 2015 *National Standards on Transport, Escort, Detention, and Search* policy, as well as Border Patrol's data system processing guidance and Border Patrol and OFO policies and procedures on how agents are to record family separations in agency data systems, among other documents.[12] We compared CBP, Border Patrol, and OFO policies and procedures to *Standards for Internal Control in the Federal Government* related to identifying, analyzing, and responding to change; designing control activities to achieve objectives and identify risks; and using quality information to achieve objectives.[13] We compared Border Patrol processes for tracking family units and family unit separations against CBP and Border Patrol policy. To evaluate how Border Patrol recorded its processing of family units apprehended from June 28, 2018, through March 31, 2019, we also selected a random, nongeneralizable sample of ORR records for UAC involved in family separations and compared them to Border Patrol apprehensions data for the same children.[14]

To address the third objective, we reviewed ICE policy documents, training materials, and other guidance documents, including ICE's Juvenile and Family Residential Management Unit Field Office Juvenile Coordinator Handbook. We also compared ICE's processes against federal internal control standards related to designing information systems and related control activities to achieve objectives and respond to risks.[15] To report on family members apprehended by CBP and

---

[12]U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (October 2015).

[13]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[14]App. I includes additional details about the methods we used for this analysis.

[15]GAO-14-704G.

detained in ICE's family residential centers, we reviewed ICE detention data from June 2014 through fiscal year 2018. We collected data beginning in June 2014—when ICE opened its first family residential center on the southwest border—through fiscal year 2018—the most recent data available at the time of our review. To assess the reliability of ICE's data, we completed a number of steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussing data entry issues and data limitations with ICE officials. We also received demonstrations on ICE's data system from officials at headquarters. We determined that the data were sufficiently reliable to describe the numbers and demographic characteristics of family members who were apprehended by CBP and detained by ICE at a family residential center.

To address the fourth objective, we reviewed DHS and HHS interagency agreements, including the April 2018 information sharing memorandum of agreement and July 2018 Joint Concept of Operations, which provide expectations for interagency information sharing and procedures for the care and custody of UAC. Additionally, we interviewed DHS and HHS officials at headquarters and DHS officials at locations along the southwest border. We also compared DHS and HHS information sharing practices to leading practices for collaboration among federal agencies.[16] For more information about our scope and methodology, see appendix I.

We conducted this performance audit from July 2018 to February 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[16]GAO, *Results-Oriented Government: Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies*, GAO-06-15 (Washington, D.C.: Oct. 21, 2005), and *Managing for Results: Key Considerations for Implementing Interagency Collaborative Mechanisms*, GAO-12-1022 (Washington, D.C.: Sept. 27, 2012).

# Background

## Federal Agencies' Roles and Responsibilities for Processing Family Units

After Border Patrol agents or OFO officers apprehend noncitizen family units, they are to interview each individual, using interpreters if needed, and collect personal information such as their names, countries of nationality, and age. Agents and officers also collect biometric information, such as photographs and fingerprints, from certain individuals, including those in family units.[17] Border Patrol agents and OFO officers use fingerprints to run records checks against federal government databases to determine whether individuals have any previous immigration or criminal history. Agents and officers are to enter information about the individuals in the appropriate automated data system as soon as possible, in accordance with CBP policy.

According to Border Patrol and OFO officials, if noncitizens are determined to be ineligible for admission into the United States, agents and officers must determine whether to place them, including those arriving in family units, into full or expedited immigration removal proceedings, consistent with the Immigration and Nationality Act.[18] In full removal proceedings, individuals have the opportunity to present evidence to an immigration judge to challenge their removal from the country and apply for various forms of relief or protection, including asylum.[19] In expedited removal proceedings, the government can order individuals removed without further hearing before an immigration judge unless they express the intent to apply for asylum or a fear of persecution

---

[17]See 8 C.F.R. § 236.5. According to Border Patrol and OFO officials and documents, CBP does not typically collect fingerprints for children under the age of 14. However, on a case by case basis, CBP may fingerprint children under age 14 in certain instances, such as when they suspect the child may be the victim of trafficking or involved in smuggling.

[18]See 8 U.S.C. §§ 1225(b), 1229a.

[19]Individuals physically present within the United States, whether or not at a designated port of arrival, may be granted asylum if they are found to be unable or unwilling to return to their home country because of past persecution, or a well-founded fear of future persecution based on their race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1158; 8 U.S.C. § 1101(a)(42)A).

or torture if returned to their home country.[20] Most arriving family units are eligible to be placed into expedited removal proceedings, with certain exceptions, according to Border Patrol and OFO officials.[21] A 2015 CBP policy requires CBP's agents and officers to record such decisions for each family unit member in agency data systems.

Further, Border Patrol agents and OFO officers print copies of the information they enter into data systems to create a paper file, known as an "A-file," for each family unit member they apprehend. One of the key required DHS forms in the A-file is Form I-213, *Record of Deportable/Inadmissible Alien* (Form I-213). Among other things, this form captures biographic information and includes a narrative section for agents and officers to capture details about the circumstances of the apprehension. According to Border Patrol and OFO headquarters officials, each family unit member's A-file is reviewed and approved by a supervisor.

If CBP or ICE determines that a family separation is warranted, agents or officers process the child or children as UAC, according to Border Patrol,

---

[20]Individuals in expedited removal who express a fear of return, fear of persecution or torture, or intent to apply for asylum are referred to DHS's U.S. Citizenship and Immigration Services (USCIS) for a credible fear screening. Through these screenings, officers determine whether these individuals have a credible fear of persecution or torture if returned to their country and the likelihood they can establish in a hearing before an immigration judge that these threats exist. See 8 U.S.C. § 1225(b)(1)(E). If the officer determines that the individual has established a credible fear of persecution or torture, or in cases subject to the third-country transit asylum bar, a reasonable fear of persecution or torture, he or she will place the individual into full removal proceedings. In the event of a negative determination, individuals can request a review of their case by an immigration judge within the Department of Justice Executive Office for Immigration Review. See 8 C.F.R. § 208.30. We have conducted work addressing DHS's and the Department of Justice's roles in the credible and reasonable fear process. See GAO, *Immigration: Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings,* GAO-20-250 (Washington, D.C.: Feb. 19, 2020).

[21]With some exceptions, including UAC, noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal. See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to 2 years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019, and, as of February 2020, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D.D.C. Sept. 27, 2019) (order granting preliminary injunction).

OFO, and ICE officials. ICE's Office of Enforcement and Removal Operations is generally responsible for transferring these children, including those separated from a parent, as appropriate, to ORR. Under the Trafficking Victims Protection Reauthorization Act of 2008, children must be transferred to ORR within 72 hours after determining that they are UAC, except in exceptional circumstances.[22] Table 1 provides additional details about DHS and HHS roles in processing family units.

**Table 1: Key Department of Homeland Security (DHS) and Department of Health and Human Services (HHS) Components' Roles and Responsibilities in Processing Family Units at the Southwest Border**

| Agency or component | Selected roles and responsibilities |
| --- | --- |
| *DHS: Apprehends family units and makes processing decisions* | |
| U.S. Customs and Border Protection's (CBP) U.S. Border Patrol and Office of Field Operations (OFO) | Among other things, Border Patrol agents and OFO officers determine the validity of family unit relationships (as needed), whether an adult family member is eligible to be referred for criminal prosecution, and whether a family unit separation is warranted. |
| | Border Patrol agents and OFO officers generally have the authority to release family units into the United States while their immigration proceedings are pending after completing processing; however, according to DHS officials, CBP has traditionally referred family units to U.S. Immigration and Customs Enforcement (ICE) for release or longer-term detention. |
| U.S. Immigration and Customs Enforcement (ICE) | ICE, among other things, is responsible for detaining and removing those family units that are in the United States in violation of U.S. immigration law. According to ICE officials, ICE officers have the authority to accept or deny a referral of a family unit from CBP for detention in one of ICE's family residential centers. ICE officers are to determine whether to detain, release, or remove family unit members based on a variety of factors, including statutory requirements, medical considerations, and the availability of space at one of its family residential centers.[a] |
| *HHS: Shelters and identifies sponsors for Unaccompanied Alien Children (UAC)* | |
| Office of Refugee Resettlement (ORR) | If CBP or ICE officials determine a child or children should be separated from an accompanying parent or another adult, the child is classified as a UAC and transferred to ORR custody. ORR provides interim care for UAC at its shelters and identifies qualified sponsors in the United States to take custody of the child while awaiting immigration proceedings.[b] To assess the suitability of potential sponsors, including parents, ORR staff collects information from potential sponsors to establish and identify their relationship to the child. For example, ORR screening of potential sponsors includes various background checks. ORR is also the primary agency responsible for coordinating reunification of separated family units if DHS and HHS determine it is appropriate, or if the adult is later determined by a federal court to be a class member in the ongoing *Ms. L. v. ICE* litigation, related to family separations.[c] |

Source: GAO analysis of DHS and HHS documents and interviews with agency officials. | GAO-20-245

Note: CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3).

[a]While DHS has broad authority to detain adult aliens, children, whether accompanied or UAC, must be detained according to standards established in the Homeland Security Act of 2002, the Trafficking

[22]8 U.S.C. § 1232(b)(3).

Victims Protection Reauthorization Act of 2008, and the 1997 Flores v. Reno Settlement Agreement (Flores Agreement). See Pub. L. No. 107-296, tit. IV, subtit. D, § 441, 116 Stat. 2135, 2192; Pub. L. No. 110-457, 112 Stat. 5044; Stipulated Settlement Agreement, Flores v. Reno, No. 85-4544 (C.D. Cal. Jan. 17, 1997). Litigation related to the Flores Agreement and a rulemaking published by DHS that would replace the agreement is ongoing and, as of November 2019, the Flores Agreement remains in effect. See Flores v. Barr, No. 85-4544 (C.D. Cal. Sept. 27, 2019) (order permanently enjoining the regulations entitled "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Children," 84 Fed. Reg. 44,392).

[b]See 8 U.S.C. § 1232(b)(3); 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). Qualified sponsors are adults—usually parents or other relatives in the country—who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. Release to a sponsor does not grant UAC lawful immigration status; rather, UAC live with their sponsors in the United States as they await their immigration court proceedings, which will determine if they will be removed from the United States or granted immigration relief.

[c]For parents covered by the June 26, 2018, order, the court ruled that the government may not detain parents apart from their minor children, subject to certain exceptions. The order enjoined DHS from detaining parents covered by the order apart from their minor children "absent a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child." Additionally, the order noted that "fitness" is an important factor in determining whether to separate parent from child and that "in the context of this case, and enforcement of criminal and immigration laws at the border, 'fitness' could include a class member's mental health, or potential criminal involvement in matters other than 'improper entry' under 8 U.S.C. § 1325(a), among other matters." Ms. L. v. U.S. Immigration & Customs Enforcement (Ms. L. v. ICE), No. 18-0428 (S.D. Cal. June 26, 2018) (order granting preliminary injunction); see also orders certifying and amending the class certification on June 26, 2018, and March 8, 2019 (recognizing exclusions from the class for "migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to [Executive Order 13841]); and order granting in part and denying in part plaintiffs' motion to enforce preliminary injunction on January 13, 2020. As of February 2020, this litigation was ongoing.

DHS officials told us that CBP typically holds family units together for a limited time before transferring them together to ICE, in accordance with CBP policy.[23] During that time, agents and officers decide on a case-by-case basis whether to place each family unit in expedited or full immigration proceedings, according to Border Patrol and OFO officials. Individuals, including family unit members, placed in expedited removal proceedings and who express a fear of persecution or torture are generally subject to mandatory detention under the Immigration and Nationality Act pending a final credible fear determination.[24] As a result, Border Patrol and OFO officials stated that its agents and officers typically determine whether ICE has space in its family residential centers before processing family units into expedited removal proceedings. From June

---

[23]CBP's *National Standards on Transport, Escort, Detention and Search* policy states that CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation. The CBP policy also states that individuals should generally not be held for longer than 72 hours at CBP facilities. U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (October 2015).

[24]8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

2014 through October 2019, ICE, during various periods, operated four family residential centers in Texas, Pennsylvania, and New Mexico for family units who may be subject to removal while they await the resolution of their immigration cases or who have been ordered removed from the United States. As of October 2019, ICE maintains three family residential centers—in Dilley, Texas; Karnes City, Texas; and Leesport, Pennsylvania—with a cumulative capacity of 3,326 beds. For information about these facilities, see table 2.

**Table 2: Location, Capacity, and Operating Time Frames of U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers**

| ICE family residential center | Location | Capacity | Time frames for facility operating as a family residential center |
|---|---|---|---|
| Berks County Residential Center | Leesport, Pennsylvania | 96 | March 2001 to present |
| Karnes County Residential Center | Karnes City, Texas | 830 | July 2014 to March 2019; October 2019 to present |
| South Texas Family Residential Center | Dilley, Texas | 2,400 | November 2014 to present |
| Artesia Family Residential Center | Artesia, New Mexico | 700 | June 2014 to November 2014 (facility was subsequently closed) |

Source: GAO analysis of ICE information. | GAO-20-245

## Timeline of Family Separation Policies

CBP has historically separated children apprehended in family units from their parent(s) in specific circumstances, such as if the parental relationship could not be confirmed, if there was reason to believe the adult was participating in human trafficking, or if the parent was otherwise a threat to the safety of the child. As we reported in October 2018, ORR officials began observing an increase in the percentage of children in its care who were separated from their parents beginning in 2017.[25] ORR officials stated they saw a continued increase in separated children in their care in the first few months of calendar year 2018.

In April 2018, the U.S. Attorney General directed federal prosecutors to implement a zero-tolerance policy along the southwest border for immigration offenses and to accept all improper entry cases referred for

---

[25]GAO-19-163.

prosecution to the extent practicable.[26] According to DHS officials, after the Attorney General's April 2018 memo, CBP began referring a greater number of adults apprehended at the border to the Department of Justice for criminal prosecution, including parents who were apprehended with minor children. CBP generally then separated the family unit, and after processing the children as UAC, CBP transferred them to ORR custody. According to CBP headquarters officials, the goal of the zero tolerance policy was to deliver a consequence to those crossing the border illegally by charging and convicting them of a crime, specifically a criminal conviction for improper entry, which is generally a misdemeanor. This could then lead to escalating criminal consequences for subsequent apprehensions, since noncitizens—in this case, adults in family units—entering the United States illegally for a second time could be charged with illegal reentry after removal from the United States, a felony offense.[27]

On June 20, 2018, the President issued an executive order directing that alien families generally be detained together.[28] On June 26, 2018, a federal judge ruled in the *Ms. L. v. ICE* case, which was filed by the American Civil Liberties Union on behalf of certain parents (referred to as class members) who had been separated from their children.[29] The June 2018 court order stated that certain separated parents must be reunited

---

[26]Office of the Attorney General, *Memorandum for Prosecutors Along the Southwest Border: Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)*. 8 U.S.C. § 1325(a) establishes criminal penalties for improper entry into the United States by an alien, including for (1) entering or attempting to enter at any time or place other than as designated by an immigration officer, (2) eluding examination or inspection by immigration officers, or (3) attempting to enter or obtaining entry through misrepresentation. Generally, a first offense under section 1325(a) is a criminal misdemeanor, with a maximum sentence of 6 months.

[27]See 8 U.S.C. § 1326.

[28]Exec. Order No. 13841, 83 Fed. Reg. 29,435 (June 25, 2018). The executive order was announced on June 20, 2018, and published in the *Federal Register* on June 25, 2018.

[29]This case was initially filed by an individual plaintiff, but was later amended to a class action (class referring to individuals with a shared legal claim who are covered by the lawsuit). See Ms. L. v. ICE, No. 18-0428 (S.D. Cal. March 9, 2018) (amended complaint).

with their minor children, barring certain disqualifying criteria.[30] On June 27, 2018, the CBP Commissioner issued a policy memorandum to provide direction on complying with the court order, to include potential reasons why a family separation may still be warranted. Figure 1 describes key actions since the Attorney General's April 2018 memo that have influenced how DHS determines when family separations are warranted.

**Figure 1: Key Documented Actions in Response to U.S. Attorney General's April 2018 Zero Tolerance Policy**



**April 6th**

The U.S. Attorney General instructs federal prosecutors to implement a zero-tolerance policy along the southwest border and to accept all improper entry cases referred for prosecution to the extent practicable.[a]

**May 4th**

In response, the Secretary of Homeland Security approves prosecuting all adults apprehended crossing the border illegally, including those apprehended with minors, at the recommendation of leaders of U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services.

**June 20th**

The President issues an executive order that, among other things, directs the Secretary of Homeland Security to maintain custody of alien families during any criminal improper entry or immigration proceedings involving their members, to the extent possible.[b] That same day, U.S. Border Patrol issues guidance directing agents to halt any prosecution referrals of members of alien families for criminal violations of improper entry.

**June 26th[c]**

A federal court order prohibits the government from detaining class members in Department of Homeland Security (DHS) custody apart from their minor children and orders the government to reunite class members with their children, absent a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunified with the child.

**June 27th**

CBP issues guidance that outlines reasons family units[d] may be separated, including cases where the parent has criminal convictions for violent misdemeanors or felonies, presents a danger to the child, has a communicable disease, or CBP plans to refer the parent for a felony prosecution.

Source: GAO analysis of DHS and Department of Justice documents, Executive Order 13841, and federal court documents from Ms. L. v. ICE, No. 18-0428 (S.D. Cal. Aug. 23, 2018).  |  GAO-20-245

[a]Office of the Attorney General, *Memorandum for Prosecutors Along the Southwest Border: Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)* (Apr. 6, 2018). 8 U.S.C. § 1325(a) establishes criminal penalties for improper entry into the United States by an alien, including for (1) entering or attempting to enter at any time or place other than as designated by an immigration officer, or (2)

[30]Ms. L. v. ICE, No. 18-0428 (S.D. Cal. Aug. 23, 2018) (order granting preliminary injunction); see also orders certifying and amending the class certification on June 26, 2018, and March 8, 2019 (recognizing exclusions from the class for "migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to [Executive Order 13841]); and order granting in part and denying in part plaintiffs' motion to enforce preliminary injunction on January 13, 2020. Specifically, the federal court order prohibits the government from detaining class members in DHS custody apart from their minor children and orders the government to reunite class members with their children, absent a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunified with the child. As of February 2020, this litigation was ongoing.

eluding examination or inspection by immigration officers, or (3) attempting to enter or obtaining entry through misrepresentation. Generally, a first offense under section 1325(a) is a criminal misdemeanor, with a maximum sentence of 6 months.

[b]Exec. Order No. 13841, 83 Fed. Reg. 29,435 (June 25, 2018). The executive order was announced on June 20, 2018, and published in the *Federal Register* on June 25, 2018.

[c]For parents covered by the June 26, 2018, order, the court ruled that the government may not detain parents apart from their minor children, subject to certain exceptions, including a determination that the parent is unfit. Additionally, the order noted that "fitness" is an important factor in determining whether to separate parent from child and that "in the context of this case, and enforcement of criminal and immigration laws at the border, 'fitness' could include a class member's mental health, or potential criminal involvement in matters other than 'improper entry' under 8 U.S.C. § 1325(a), among other matters." Ms. L. v. U.S. Immigration & Customs Enforcement, No. 18-0428 (S.D. Cal. June 26, 2018) (order granting preliminary injunction); see also orders certifying and amending the class certification on June 26, 2018, and March 8, 2019 (recognizing exclusions from the class for "migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to [Executive Order 13841]); and order granting in part and denying in part plaintiffs' motion to enforce preliminary injunction on January 13, 2020. As of February 2020, this litigation is ongoing.

[d]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3).

On July 10, 2018, the court approved reunification procedures for the class members covered by the June 2018 court order.[31] At that time the approved class included those adult parents separated from their children by DHS whose children were in ORR custody as of June 26, 2018, barring certain disqualifying criteria. Subsequently, on March 8, 2019, the court ordered an expansion of the class members to include all adult parents, subject to the same disqualifying criteria, who entered the United States at or between designated ports of entry on or after July 1, 2017, and were separated from their children by DHS.[32] As of January 15, 2020, the government provided to the plaintiffs 11 lists identifying a total of

[31]See Ms. L. v. ICE, No. 18-0428 (S.D. Cal. July 10, 2018) (order following status conference); see also Ms. L. v. ICE, No. 18-0428 (S.D. Cal. July 13, 2018) (defendants' status report regarding plan for compliance and order following status conference); Ms. L. v. ICE, No. 18-0428 (S.D. Cal. July 15, 2018) (notice from defendants).

[32]See Ms. L. v. ICE, No. 18-0428 (S.D. Cal. March 8, 2019) (order granting plaintiffs' motion to modify class definition). Specifically, the modified class includes "all adult parents who entered the United States at or between designated ports of entry on or after July 1, 2017, who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child." As previously discussed, the court noted in the class certification order that "the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the June 25, 2018, Executive Order. See *id.*

1,556 children of potential expanded class members.[33] This brought the total number of possible separated children of potential class members to 4,370.

## Number of CBP Apprehensions of Family Unit Members Was Greater in the First Two Quarters of Fiscal Year 2019 Than in All of Fiscal Year 2018

CBP data indicate that the number of CBP apprehensions of family unit members was greater in the first two quarters of fiscal year 2019 than in all of fiscal year 2018. In addition, apprehensions of family unit members increased from approximately 22 percent of all southwest border apprehensions in fiscal year 2016 to approximately 51 percent of all such apprehensions in the second quarter of fiscal year 2019. The data also indicate that the majority of CBP apprehensions of family unit members were Central American nationals and the majority of apprehensions of children in family units were for children under the age of 12. Further, the data indicate that CBP placed family unit members in full removal proceedings before immigration courts at an increasing rate, and most were released into the United States to await their immigration court proceedings. Finally, CBP data indicate that CBP separated at least 2,700 children from their parents from April 2018 through March 2019.

---

[33]See Ms. L. v. ICE, No. 18-0428 (S.D. Cal. Jan. 15, 2020) (joint status report). According to the report, the parties continue to evaluate whether individuals identified as potential expanded class members are excluded from class membership.)

## CBP's Apprehensions of Family Unit Members Increased to Approximately 51 Percent of All Southwest Border Apprehensions in Second Quarter Fiscal Year 2019

CBP data indicate that the number of apprehensions of family unit members along the southwest border increased from about 120,400 apprehensions in fiscal year 2016 to about 160,400 apprehensions in fiscal year 2018.[34] Further, CBP apprehensions of family unit members reached about 213,400 during the first two quarters of fiscal year 2019 alone—approximately a 33 percent increase over the entire previous fiscal year. Cumulatively, along the southwest border, CBP apprehensions of family unit members reached about 599,000 apprehensions from fiscal year 2016 through the second quarter of fiscal year 2019 (see fig. 2).

---

[34]We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. Our analysis of apprehensions of family unit members includes individuals in family units CBP later separated (for reasons other than concerns about validity of the family relationship). According to our analysis of OFO data, OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. Hence, we could not independently confirm these records as reliable and excluded them from our analyses. Therefore, we rounded all OFO data in this report, including any CBP analyses that include OFO data. We also rounded any Border Patrol data within a CBP data analysis in this report for consistency. We describe OFO's efforts to improve its data system for collecting information about apprehensions later in this report. App. I provides additional details about our methodology for assessing limitations to OFO's data and making rounding decisions. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

**Figure 2: U.S. Customs and Border Protection's (CBP) Southwest Border Apprehensions of Family Unit Members, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**



Number of CBP apprehensions of family unit members (in thousands)

Office of Field Operations (OFO)

U.S. Border Patrol (Border Patrol)

Source: GAO analysis of Border Patrol and OFO data.  |  GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. Hence, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

As shown in figure 3, CBP data indicate that apprehensions of family unit members grew from about 22 percent of total southwest border apprehensions in fiscal year 2016 to about 51 percent of such apprehensions during the first two quarters of fiscal year 2019.

**Figure 3: U.S. Customs and Border Protection's (CBP) Number of Southwest Border Apprehensions and Family Unit Member Apprehensions, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**



Source: GAO analysis of Border Patrol and OFO data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. Hence, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that, during this period, OFO apprehensions of family unit members at U.S. ports of entry accounted for approximately 24 percent of all such CBP apprehensions.[35] Border Patrol apprehensions of family unit members between ports of entry accounted for approximately 76 percent of all such CBP apprehensions. About 63 percent of CBP's total family unit member apprehensions occurred in just three Border Patrol sectors in Texas and Arizona (see fig. 4).

**Figure 4: Selected Locations of U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**



Source: GAO analysis of Border Patrol and OFO data and information; MapInfo (map).  |  GAO-20-245

[35]During this period, some OFO ports of entry began managing the number of individuals it processes using what OFO refers to as "queue management," otherwise known as "metering." OFO headquarters and field officials stated ports of entry have limits on the number of individuals who can be processed and held each day, and most ports of entry are not equipped with beds, showers, and other amenities needed to hold individuals overnight. According to OFO headquarters officials, whether individuals are admitted into a port of entry using queue management depends upon the physical and operational capacity of a port of entry to process and hold individuals, as well as the number of individuals without documents sufficient for lawful entry into the United States.

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. CBP's October 2015 National Standards on Transport, Escort, Detention, and Search defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. Office of Field Operations (OFO) data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

## The Majority of CBP Apprehensions of Family Unit Members Were Central American Nationals, and the Majority of Children in Family Units Were under Age 12

CBP data indicate that most apprehensions of family unit members from fiscal year 2016 through the second quarter of fiscal year 2019 were of Central American nationals and that the majority of children in family units were under the age of 12. Figure 5 shows that from fiscal year 2016 through the second quarter of fiscal year 2019, the vast majority of these apprehensions—about 82 percent—were nationals of Guatemala, Honduras, or El Salvador. Additionally, about 10 percent of apprehensions of family unit members were of Mexican nationals and approximately 7 percent were nationals of other countries.

**Figure 5: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members, by Nationality, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**



Source: GAO analysis of CBP's U.S. Border Patrol and Office of Field Operations data.  |  GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that the Office of Field Operations (OFO) did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. Hence, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s)."

From fiscal year 2016 through the first two quarters of fiscal year 2019, CBP apprehensions of children in family units totaled approximately 327,600. About 72 percent of these apprehensions were of children under the age of 12 when apprehended by CBP, and about 32 percent were under age 5 (see table 3).

**Table 3: U.S. Customs and Border Protection's (CBP) Apprehensions of Children in Family Units at the Southwest Border by Age, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | Apprehensions of children in family units by CBP, ages 0–4 | | Apprehensions of children apprehended in family units by CBP, ages 5–11 | | Apprehensions of children in family units by CBP, ages 12–17 | |
|---|---|---|---|---|---|---|
| | U.S. Border Patrol | Office of Field Operations (OFO) | Border Patrol | OFO | Border Patrol | OFO |
| 2016 | 14,800 | 9,700 | 16,200 | 10,000 | 11,200 | 5,800 |
| 2017 | 13,400 | 6,600 | 16,100 | 6,800 | 11,400 | 4,000 |
| 2018 | 18,200 | 10,000 | 23,900 | 12,200 | 17,600 | 6,800 |
| 2019 (first two quarters) | 26,700 | 4,500 | 41,100 | 5,800 | 31,800 | 3,000 |
| **Total (approximate)** | **73,100** | **30,800** | **97,300** | **34,800** | **72,000** | **19,600** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that the Office of Field Operations (OFO) did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. Hence, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Border Patrol also maintains information in its data system that allowed us to analyze the composition of family units, that is, whether the family unit was headed by a male or female and how many children were in the family unit.[36] Most family units apprehended by Border Patrol—about 85 percent—consisted of a single parent travelling with a single child. Most family units were led by a single female in fiscal year 2016; however, the number of households led by single males increased and, for the first two quarters of fiscal year 2019, accounted for almost half of the family units Border Patrol apprehended. Appendix II contains additional information about the composition of family units, including the immigration history of adult family members.

---

[36]OFO tracks individuals who are apprehended as part of a family unit, but does not assign family units unique identifying numbers in its data system, as we discuss later in this report. That is, OFO officers cannot track family units in its aggregated data, and, therefore, we are unable to report on the composition of family units that OFO encountered.

## CBP Placed Family Unit Members in Full Removal Proceedings before Immigration Court at an Increasing Rate and Most Were Released Into the United States to Await Proceedings

From fiscal year 2016 through the first two quarters of fiscal year 2019, CBP placed an increasing percentage of family unit members into full removal proceedings. Specifically, CBP data indicate that around 46 percent of all apprehensions of family unit members in fiscal year 2016 resulted in the family unit members receiving Notices to Appear before an immigration court, which initiate full removal proceedings; around 88 percent received Notices to Appear during the first two quarters of fiscal year 2019.[37] Conversely, CBP data indicate that CBP placed a decreasing percentage of all apprehensions of family unit members into expedited removal proceedings during this period. Specifically, the percentage declined from about 42 percent of all apprehensions of family unit members in fiscal year 2016 to about 6 percent during the first two quarters of fiscal year 2019. CBP officials stated that, since the volume of family units apprehended at the border increased in 2018, they have placed fewer family unit members into expedited removal proceedings, for which detention is generally mandatory, due to limited space for family units in ICE's family residential centers.

While ICE generally has the authority to detain individuals for the duration of their full removal proceedings, CBP and ICE officials stated that ICE faces constraints that typically prevents it from doing so for family units. Specifically, the limited amount of space at family residential centers is reserved for those family units placed in expedited removal. Therefore, according to ICE and CBP officials, with few exceptions, during the period of our review, family units placed into full removal proceedings were released into the United States to await their court proceedings. According to ICE officials, even if there was more detention space for family units, there are other constraints that would prevent ICE from detaining family unit members (placed into full removal proceedings at any point) for the duration of their court proceedings. Specifically, children may generally only be held in federal immigration detention for 20 days

**Department of Homeland Security's (DHS) Migrant Protection Protocols**

In January 2019, DHS introduced the Migrant Protection Protocols, also referred to as the "Remain in Mexico" program, at selected ports of entry and, as of March 2019, within certain Border Patrol sectors. Under this policy, CBP issues eligible individuals, including family unit members, Notices to Appear before an immigration court, thereby initiating full removal proceedings. After CBP agents and officers complete processing duties, DHS officials stated that CBP returns the individuals to Mexico to await their court proceedings, rather than releasing them into the interior of the United States. According to CBP officials, through the end of fiscal year 2019, CBP processed approximately 44,200 individuals—among which about 30,100 individuals, or 68 percent, were family unit members—using the Migrant Protection Protocols.

Source: GAO analysis of CBP data and DHS documents. | GAO-20-245

---

[37]As previously described, when CBP agents and officers place individuals in full removal proceedings, they issue the individuals a notice to appear before an immigration court, wherein they have the opportunity to present evidence to challenge their removal from the country and apply for various forms of relief or protection, including asylum.

pursuant to the Flores Agreement.[38] Due to the duration of full removal proceedings, most full removal proceedings take longer than 20 days.[39]

## CBP Separated at Least 2,700 Children from Their Parents from April 2018 through March 2019

According to Border Patrol and OFO data, CBP separated at least 2,700 children from April 19, 2018, through the second quarter of fiscal year 2019.[40] As we discuss later in this report, CBP may have separated additional children from their parents during this period and not recorded this information in its data systems. As a result, we are reporting approximate, rounded figures on family separations. Specifically:

- Border Patrol updated its data system to track family unit separations on April 19, 2018, and issued written guidance to its agents about these changes on May 7, 2018, and August 2, 2018. From April 19, 2018, through March 31, 2019, Border Patrol data indicate that agents separated at least 2,670 children.

- OFO updated its data system to track family unit separations on June 26, 2018, and issued guidance on these changes to its officers on June 29, 2018. From June 30, 2018, through March 31, 2019, OFO data indicate officers separated at least 30 children.

As shown in table 4, CBP data indicate that the number of family unit separations was highest between April 19, 2018 and June 27, 2018, due to DHS's response to the U.S. Attorney General's April 2018 zero

---

[38]See Stipulated Settlement Agreement, Flores v. Reno, No. 85-4544 (C.D. Cal. Jan. 17, 1997). This agreement has been overseen by the district court for the Central District of California since 1997, and the judge in that case has issued multiple orders to clarify the agreement as it has been implemented by the federal government, including orders related to the 20-day time frame. For example, in a 2015 district court order, the court acknowledged that the 20-day time frame could fall within the parameters of the existing agreement, which requires that children be released "without unnecessary delay" if, as the defendants asserted at the time, "20 days is as fast as defendants in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear." See *Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015).

[39]See GAO, *Immigration Courts: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*, GAO-17-438 (Washington, D.C.: June 1, 2017).

[40]These were the most current record-level CBP data available at the time of our review.

tolerance policy (see table 4).[41] CBP data also indicate that a small percentage of all children that arrived in family units—fewer than 2 percent—were separated from their parents during these time frames. Appendix II provides additional information about the characteristics of family units separated by CBP.

**Table 4: U.S. Customs and Border Protection's (CBP) Separations of Children in Family Units, April 19, 2018 through March 31, 2019**

| Period | Number of children separated by U.S. Border Patrol | Number of children separated by Office of Field Operations (OFO) | Total number of children separated by CBP (approximate) |
|---|---|---|---|
| April 19–June 27, 2018 | 2,490 | — | **2,490** |
| June 28, 2018–March 31, 2019 | 180 | 30 | **210** |
| **Total (approximate)** | **2,670** | **30** | **2,700** |

Source: GAO analysis of Border Patrol and OFO data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, CBP issued a policy memo to provide direction on complying with a court order, including reasons that may warrant a family separation going forward. We analyzed OFO data on family separations beginning on June 30, 2018, the day after OFO issued guidance to its officers on the system updates it made to better track family separations. These were the most current record-level CBP data available at the time of our review.

We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the full period of our review—fiscal year 2016 through the second quarter of fiscal year 2019. Hence, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO separations.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore, the table provides rounded numbers of Border Patrol separations.

Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

---

[41]As we describe in more detail later in this report, Border Patrol did not track family separations in its data system prior to April 19, 2018, and OFO did not collect enough information to reliably track family separations prior to June 29, 2018. As previously described, DHS's then-Secretary approved CBP referring parents who arrived with children for criminal prosecution of immigration-related offenses on May 4, 2018, which led to an increase in family separations. On June 27, 2018, CBP issued a policy memorandum to provide direction on complying with the court order, including reasons that may warrant a family separation going forward. This policy memo did not include referral for criminal prosecution of improper entry, which is generally a misdemeanor, as a reason warranting separation.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Border Patrol and OFO data indicate that the reasons for these family unit separations varied. Regarding Border Patrol, as of April 19, 2018, agents were able to record a family separation and select from options to explain the reason for it in Border Patrol's automated data system. Border Patrol data indicate that the reasons that 97 percent of the adults and children separated from April 19 through June 27, 2018, were because agents referred the parent to the Department of Justice for criminal prosecution on charges for criminal history or other reasons, or due to a prior immigration violation(s) and a removal order. Table 5 shows the reasons for family separations indicated in Border Patrol data from April 19, 2018 through March 31, 2019.

**Table 5: U.S. Border Patrol Separations of Family Unit Members (Adults and Children) by Recorded Separation Reason, April 19, 2018, through March 31, 2019**

| Period | Family unit members separated to prosecute a family member for criminal history or other reasons, or for prior immigration violations[a] | Family unit members separated for other reasons[b] | Total number of family units separated (approximate) |
|---|---|---|---|
| April 19–June 27, 2018 | 4,780 | 5 | 4,785 |
| June 28, 2018–March 31, 2019 | 190 | 160 | 350 |
| **Total (approximate)** | **4,970** | **165** | **5,135** |

Source: GAO analysis of Border Patrol data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, U.S. Customs and Border Protection (CBP) issued an updated policy on family separations, and the potential reasons that may warrant them. These were the most current record-level CBP data available at the time of our review. We found limitations to the accuracy of Border Patrol's data on family separations; therefore the table provides rounded numbers of Border Patrol separations. Data for fiscal year 2018 are current as of January 2019; data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]Our analysis reflects the separation reasons agents recorded in Border Patrol's data systems. These reasons may not reflect the information that DHS has reported in related litigation, such as *Ms. L. v. ICE*, which is based on a manual review of multiple federal datasets and include categories required by the litigation.  For more information about our scope and methodology, see appendix I. Beginning on April 19, 2018, Border Patrol's data system included, among several other options, the separation reason "family member—prior immigration violation(s) and order of removal," and on August 2, 2018, Border Patrol removed this reason from its system. This reason was listed for about160 family unit members separated from April 19, 2018 through June 27, 2018, and according to Border Patrol

officials was to be used in situations when Border Patrol intended to prosecute the parent for illegal reentry after a prior deportation order, but the parent was ultimately not prosecuted by the Department of Justice.

[b]On August 2, 2018, Border Patrol began tracking the separation reasons only for separated adults, and the system automatically assigned separated children the reason "family member juvenile—lead separated." Children with that separation reason accounted for about 115 of the 165 individuals separated between June 28, 2018 and March 31, 2019. Other reasons assigned to adults during this period included that a family member was hospitalized (about 10 individuals), had a gang affiliation (about 25 individuals), or had an extraditable warrant (about 10 individuals).

Regarding OFO, as of June 30, 2018, officers were to record the reason for any family unit separation with the child's record in OFO's automated data system. From June 30, 2018 to March 31, 2019, OFO data indicate that about 50 percent of adults and children were separated due to the criminal history of the adult or a child safety concern. Table 6 shows the reasons for family separations indicated in OFO data from June 30, 2018 through March 31, 2019.

**Table 6: Office of Field Operations (OFO) Separations of Children in Family Units by Recorded Separation Reason, June 30, 2018 through March 31, 2019**

| Children in family units separated due to criminality of parent / legal guardian or child safety concern | Children in family units separated to prosecute parent / legal guardian | Children in family units separated due to a medical emergency | Children in family units separated at the request of U.S. Immigration and Customs Enforcement | Total number of children separated (approximate) |
|---|---|---|---|---|
| 15 | 5 | Fewer than 5 | 5 | 30 |

Source: GAO analysis of OFO data. | GAO-20-245

Notes: We analyzed OFO data on family separations beginning on June 30, 2018, the day after OFO issued guidance to its officers on the system updates it made to better track family separations. These were the most current record-level U.S. Customs and Border Protection (CBP) data available at the time of our review. Our analysis reflects the separation reasons officers recorded in OFO's data systems.

We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review—fiscal year 2016 through the second quarter of fiscal year 2019. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO family unit separations.

Data for fiscal year 2018 and the first quarter of fiscal year 2019 are current as of February 2019; data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

# CBP Developed Some Policies and Procedures for Processing Family Units but Does Not Have Sufficient Controls to Ensure Effective Implementation

## Border Patrol and OFO Have Policies and Procedures for Collecting Data on Family Units, and OFO Is Updating Its Data System to Link Parents' and Children's Records

Since 2015, Border Patrol and OFO have issued policies and updated procedures regarding the information to be collected about family units and family separations, increasing the amount of data collected for family units. For example, Border Patrol and OFO have updated their data systems to better track the number of individuals apprehended as part of family units and to record when and why family separations occur. Specifically, Border Patrol updated its data system in October 2015 to track whether individuals were apprehended as members of a family unit and again in 2018 to track family separations. On October 2, 2015, the Chief of the Border Patrol issued policy guidance requiring agents to process family units together in its data system with a unique identifier called a "family unit number," which links the records of parents and children apprehended together. Border Patrol updated its system on April 19, 2018 and on August 2, 2018, to track the number of separated adults and children and the reasons for the separations, and issued guidance to its agents about these updates.[42] New Border Patrol agents also receive mandatory training on, among other topics, recording information into agency data systems, including procedures specific to family units.

---

[42] Between April 19 and August 2, 2018, the family unit number was no longer visible to agents in the system if they separated a family unit, according to Border Patrol officials. The August 2018 system updates enabled agents to view the family unit number even after a family unit separation. The ability to view this number is important because agents can use it to search for the associated adult's or child's records in the automated system after a family unit separation.

OFO updated its data system to track whether children under the age of 18 arrived as part of a family unit and whether they were separated from a parent (or other family member) with whom they arrived. OFO headquarters officials stated the updates were made during fall 2015.[43] On June 29, 2018, OFO issued a policy memorandum that, among other things, required officers to track family separations in OFO's data system, and announced system updates to allow officers to select a separation reason. This and subsequent data system updates allowed officers to identify which separations were temporary (in which the family was reunited while still in OFO custody), and which were permanent (resulting in OFO referring a child to ORR), according to OFO officials.[44] All OFO officers hired as of March 2011 receive mandatory training on certain processing procedures, including recording information into agency data systems.

As of October 2019, OFO's data system does not have the capability—such as by using a family unit number—to link the records of noncitizen parents and children apprehended together and thus cannot determine the total number of adults involved in family separations. OFO is implementing a new data system across all ports of entry that includes a function to link the records of parents and children in family units using a unique identifier. According to OFO officials, OFO began developing the new data system in August 2017 and, as of October 2019, has implemented it at 90 ports of entry, none of which are land ports of entry along the southwest border. In June 2019, OFO officials stated they planned to train OFO officers on the new data system at land ports of entry along the southwest border in late summer 2019, but as of October 2019 that timeline had been delayed due to the high volume of family units apprehended that summer. According to OFO headquarters officials, they expected to deploy the new system to locations along the

---

[43]Officials stated the data system also allows for officers to document the relationships of and separations from any family members with whom the children arrived, including relationships other than parents.

[44]A temporary separation might occur, for example, when one family member requires short-term medical care at a hospital, while the rest of the family members remain at an OFO facility until the family is reunited, according to OFO officials. OFO tracks temporary separations using two separation reasons available in a drop-down menu. Since OFO issued guidance to its officers about the system updates on June 29, 2018, we analyzed family separations beginning on June 30, 2018. Since OFO did not track separation reasons in its data system prior to June 2018, OFO cannot reliably determine whether the separations recorded in data from 2016 through June 29, 2018, were temporary or permanent, and thus we excluded them from our data analyses.

southwest border on an ongoing basis as conditions allow. It is too soon to determine whether the new data system will enable OFO to link children apprehended at ports of entry to their parents and allow for OFO to track the total number of family members separated in its aggregated data. It is also too soon to determine whether the new system will provide OFO officers with more readily available information that could help reunify separated family units, if necessary.

## Border Patrol Updated Policy Documents for Processing Family Units in April 2019, but Border Patrol and OFO Training Materials Still Include Inconsistent Definitions of Family Units

Since October 2015, some Border Patrol and OFO documents have included inconsistent guidance on how agents are to define a family unit for processing purposes. CBP's 2015 policy defines a family unit to include one or more non-U.S. citizen juvenile(s) accompanied by his or her parent(s) or legal guardian(s), which Border Patrol agents confirmed is the agency's official definition that should guide how its agents process family units.[45] However, as shown in table 7, certain Border Patrol policy documents since October 2015 have also stated that "all members of the apprehended family unit must be non-criminal and/or non-delinquent and have no history of violence or substance abuse." As a result, individuals in family units that Border Patrol considered criminal, delinquent, or to have a history of violence or substance abuse may not have been included in Border Patrol's aggregated data on apprehended family units and family separations (once the agency began tracking separations in April 2018), because agents did not define and process them as family units.

---

[45]U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search*. Specifically, CBP policy defines a family unit as "a group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by their parent(s) or legal guardian(s), whom the agency will evaluate for safety purposes to protect juveniles from sexual abuse and violence."

**Table 7: Varying Definitions of and Guidance on Processing Family Units from Selected U.S. Customs and Border Protection (CBP) and U.S. Border Patrol Policy and Training Documents**

| Issuance date | Description of selected policy and training documents | Excerpt from or summary of selected policy and training documents |
|---|---|---|
| October 2, 2015 | Policy guidance issued by the Chief of the Border Patrol on processing family units | To track the number of family units apprehended, adults and children in a family unit will be assigned a unique family unit number. |
| | | A family unit is narrowly defined and must include a non-U.S. citizen child or children under the age of 18 accompanied by their parent(s) or legal guardian(s). All members of the apprehended family unit must be non-criminal and/or non-delinquent and have no history of violence or substance abuse. |
| | | An example provided in the policy of people who would not meet this definition would be an adult father who is going to be prosecuted, but is traveling with his child. In this instance, the father and child would not be considered a family unit, but would be classified as a single adult and a UAC. |
| October 5, 2015 | CBP National Standards on Transport, Escort, Detention and Search | A family unit is a group of detainees that includes one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s), whom the agency will evaluate for safety purposes to protect juveniles from sexual abuse and violence. |
| October 2017 | E3 Processing Guide (Border Patrol training on data system for all newly hired agents) | A family unit includes a non-U.S. citizen child or children under the age of 18 accompanied by their parent(s) or legal guardian(s). All members of the family unit must be non-criminal and non-delinquent and have no history of violence or substance abuse. |
| | | An example provided in the training document of people who would not meet this definition would be an adult father who is going to be prosecuted, but is traveling with his child. In this instance, the father and child would not be considered a family unit, but would be classified as a single adult and a UAC. |
| May 7, 2018 | Policy guidance issued by the Chief of the Border Patrol on processing family separations | A family unit is a group of aliens that include only a non-U.S. citizen child or children under the age of 18 accompanied by a parent(s) or legal guardian(s). |
| July 2, 2018 | Policy guidance issued by the Chief of the Border Patrol on updates to the data system | To ensure accurate reporting, it is imperative that all family units be recorded in the Border Patrol data system, and any changes to a family unit should be recorded with the correct reason selected. |
| | | This guidance does not define who constitutes a family unit. |
| August 1, 2018 | Border Patrol's Enforcement System Division guidance on data system updates and processing family separations | A family unit must include only a non-U.S. citizen child or children under the age of 18 accompanied by their parent(s) or legal guardian(s). All members of the apprehended family unit must be non-criminal and/or non-delinquent, and have no history of violence or substance abuse. |

Source: GAO analysis of CBP and Border Patrol documents. | GAO-20-245

We raised these inconsistencies to Border Patrol headquarters officials in April 2019, and they acknowledged that certain policy and training documents contained inaccurate definitions and guidance, which could have led some agents to process certain parents and children separately, without a family unit number to link their records. Specifically, they stated that the language requiring that "all members of the family unit must be non-criminal and/or non-delinquent, and have no history of violence or

substance abuse" should not be included in Border Patrol's definition of a family unit. In addition, officials noted that any guidance directing agents to process a family unit separately in the data system, as a single adult and UAC rather than linked together with a family unit number, due to a planned prosecution referral is inconsistent with Border Patrol's processing procedures. They stated this was an oversight and not an intentional change to the agency's official definition as indicated in CBP's 2015 policy. The Border Patrol headquarters officials were unsure of how often the inconsistent definitions and guidance may have led agents to incorrectly process family units.

On the basis of our analysis of Border Patrol and ORR data, we found evidence that agents processed some family units separately, as single adults and UAC, without a family unit number or record of their separation. Specifically, for children apprehended from June 28, 2018 through March 31, 2019, we compared ORR numbers on UAC involved in family separations to Border Patrol apprehension data on separated children. During that period, ORR records indicated that DHS separated 396 children, while Border Patrol apprehensions data indicated that it separated 180 children.[46] Border Patrol headquarters officials confirmed that the discrepancy we identified between Border Patrol data and ORR records may be attributable, in part, to the agents processing family units incorrectly and separately, without assigning them a family unit number.[47]

To better understand the discrepancy between the ORR and Border Patrol data, we selected a random, nongeneralizable sample of 40 ORR records for UAC involved in family separations from June 28, 2019 through March 31, 2019, and found matches for each of the children in Border Patrol apprehensions data. In 14 of the 40 selected ORR records,

---

[46]ORR officials stated that, according to the data they collect and maintain, approximately 95 percent of UAC are referred to them by Border Patrol, 4 percent from OFO, and 1 percent from ICE. The officials estimated the same percentages apply to UAC involved in family separations, based on their review of referral information. As a result, we limited our comparison of the ORR data to Border Patrol data. According to ORR officials, it began tracking potential family separations in 2017 after noticing an increase in UAC referred to their care with an indication of separation from a parent, and as of October 2019 ORR continues to maintain a spreadsheet of potential family separations.

[47]The officials also acknowledged that another potential reason for the discrepancy between the number of family separations in ORR and Border Patrol records could be due to an additional user error, in which agents assigned the family a family unit number, but failed to track their subsequent separation. We discuss this type of error in more detail later in the report.

Border Patrol data indicated the agent had not recorded the child as a member of a family unit linked to a parent's record with a family unit number.[48] Thus, Border Patrol agents had not recorded the subsequent separation when agents referred the children to ORR as UAC. A Border Patrol headquarters official stated that it is also likely that some agents were processing family units separately, rather than linking them with a family unit number, from May to June 2018 when agents were referring parents for criminal prosecution in response to the April 2018 zero-tolerance policy. The official stated that agents may not have realized that assigning a family unit number was necessary to track the separation in the Border Patrol data.

During the course of our audit, we discussed this issue with Border Patrol and, as a result, Border Patrol issued new guidance to its sectors in April 2019 with an updated definition of family units consistent with CBP policy.[49] According to Border Patrol officials, Border Patrol also removed previous policy documents, with the incorrect definitions and guidance, from a website accessible to all Border Patrol agents. However, as of late November 2019, Border Patrol training materials still direct agents to process a parent and child separately, without a family unit number, if a family member has a history of criminality, delinquency, violence, or substance abuse, or if Border Patrol plans to prosecute the parent. This definition and guidance, inconsistent with CBP policy, has been included in training provided to all new agents at Border Patrol's basic training program since at least October 2017. According to officials from the Border Patrol Academy, which is responsible for updating training materials in coordination with program officials, they plan to update the training materials in 2020. In the meantime, since September 2019, the Border Patrol Academy has been providing trainees with a handout that includes a definition of family units consistent with CBP policy.[50]

Regarding OFO, we also found that since 2012, training materials for new officers have included a definition of a family that is inconsistent with CBP

---

[48]Our findings cannot be used to estimate the extent of the problem for the total population of family units processed by Border Patrol during this period because we used a small, nongeneralizable random sample to conduct our analysis rather than a representative sample.

[49]The updated definition includes "a group of aliens that include only non-U.S. citizen child or children under the age of 18 accompanied by a parent(s) or legal guardian(s)."

[50]Specifically, the handout defines a family unit as a "group of aliens that include only non-U.S. citizen children under the age of 18 accompanied by a parent(s) or legal guardian(s)."

and OFO policy. Specifically, OFO training materials issued in January 2012—and in use as of November 2019—define a "family group" as "a juvenile who is accompanied by closely related adults (parent, grandparent, brother, sister, or legal guardian)" and considers the juvenile to be UAC if "the juvenile is accompanied by relative(s) not closely related." The training document does not include a definition for "family unit." However, other key OFO policy documents issued subsequently define family units in a way that is consistent with CBP policy—namely, a February 2016 memo on processing family units in OFO's data system and a June 2018 memo on tracking family separations. We raised the discrepancy in OFO's training materials with OFO headquarters officials in June 2019. OFO officials were unsure whether this definition had led any officers to incorrectly process adults and children as family units when they did not meet CBP's definition of a family. OFO headquarters officials stated the training materials were inconsistent with CBP and OFO policy, and officials from CBP's Office of Training and Development stated they updated the training materials and provided them to OFO in late November 2019. However, as of December 2019, CBP had not provided us with the updated materials to verify that the revisions are consistent with CBP policy.

*Standards for Internal Control in the Federal Government* states that management should design control activities, including by providing the right training tools to achieve operational success.[51] In addition, in GAO's *Guide for Strategic Training and Development Efforts,* we have reported that senior managers need to continually observe and assess how changes, such as in policies or practices, may affect the agency's training needs. This is one way, among others, to help ensure that the agency has a framework to achieve its mission.[52] Border Patrol and OFO officials acknowledged the need to update training materials with definitions and guidance, consistent with CBP policy; they explained that they had not yet done so due to the considerable time and coordination it requires. Issuing updated training materials that reflect CBP policy would help CBP ensure that Border Patrol agents and OFO officers are processing family units appropriately and tracking all separations.

---

[51] GAO-14-704G.

[52] GAO, *Human Capital: A Guide for Assessing Strategic Training and Developmental Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: March 2004).

## CBP Has Policies and Procedures to Address Concerns about the Validity of Family Unit Relationships but Does Not Have Sufficient Guidance to Ensure Cases Are Well Documented

CBP has policies and procedures for assessing the validity of family units, but does not have written guidance to help ensure that these cases are well documented, as required by CBP policy.

### Assessing the Validity of Family Relationships

CBP has policies and procedures for assessing the validity of family unit relationships.[53] During processing, Border Patrol and OFO officials said that it is standard practice for agents and officers to assess whether (1) adults and children apprehended together meet CBP's definition of a family unit and (2) whether agents and officers deem the claimed family relationships to be potentially invalid.[54] A CBP policy issued on June 27, 2018, states that "fraudulent claims of family relationships" should be processed under "current CBP policies and procedures."[55] In practice, this means that agents and officers are to consider the validity of family relationships on a case-by-case basis with the information they have available at that time, according to Border Patrol and OFO headquarters officials. For example, these officials stated that agents and officers

---

[53]We reviewed CBP policies and procedures in effect from October 2015 through December 2019. A January 13, 2020 court order in *Ms. L. v. ICE* held that the government "bear[s] the burden to prove lack of parentage before making a separation decision" and that "subjective concerns about parentage—or inability to validate documentation—are an insufficient basis for separation when those concerns can be definitively addressed through use of readily accessible, inexpensive and accurate scientific testing." Ms. L. v. ICE, No. 18-0428 (S.D. Cal. Jan. 13, 2020) (order granting in part and denying in part plaintiffs' motion to enforce preliminary injunction). Any policies and procedures issued by CBP in response to this order were not included in the scope of our review.

[54]In this report, we use the terms "potentially invalid family relationships" and "potentially invalid family units" to describe situations in which adults may be falsely claiming to be the parent of a child under the age of 18.

[55]The policy also stipulates that these fraud cases, in which CBP determines family relationships to be invalid, should be processed in accordance with the Trafficking Victims Protection Reauthorization Act of 2008.

- review any available documentation, such as birth certificates, presented by individuals;[56]

- monitor interactions between adults and children to assess whether interactions are typical of that of a parent and child; and

- generally use their law enforcement training, such as interviewing skills, to help assess the validity of family relationships.

Border Patrol and OFO officials noted that, in some instances, individuals have admitted to falsely posing as a family, while other times agents and officers have to make an assessment based on the totality of the information available to them. In accordance with CBP policy, Border Patrol and OFO are to generally hold individuals no longer than 72 hours, so Border Patrol and OFO officials stated they must assess the validity of the family units based on available information during the time they have individuals in custody. According to Border Patrol and OFO officials and documents, they have observed cases in which (1) a family unit claims a child is under 18 years of age, but agents suspect the child is older, and thus they do not meet CBP's definition of a family unit, or (2) the adult claims to be the parent, but Border Patrol has concerns that the adult is another family relation, such as an aunt or older sibling, or the adult is not related to the child at all. In June 2019, the Acting Secretary of Homeland Security testified that CBP identified "almost 4,800 migrants this year" in family units that CBP agents and officers determined to be "fraudulent" in nature.[57]

In cases when Border Patrol agents or OFO officers, with approval from their respective supervisors, assess that the relationship of a family unit may not be valid, the child is to be processed as a UAC and transferred to ORR. Specifically, according to Border Patrol and OFO officials and documents, agents and officers are to indicate in their data systems that the adult and child were separated and the reason why, and then refer the child to ORR as a UAC. For Border Patrol, this process involves

---

[56]Border Patrol and OFO officials said that agents and officers may also consult with foreign consulate officials to assess the authenticity of birth certificates or other documents.

[57]*DHS Legislative Proposals: Hearing Before the S. Comm. on the Judiciary,* 116th Cong. (2019) (statement of Kevin McAleenan, Acting Sec'y, U.S. Dep't of Homeland Sec.). The DHS Acting Secretary did not indicate in his written testimony the exact period during which CBP identified the 4,800 migrants.

removing the family unit number linking their records.[58] Border Patrol and OFO do not consider these cases to be family separations, since CBP assessed that the individuals may not be part of a valid family unit. According to CBP's June 2018 policy, if a child arrives with an adult claiming to be the child's parent, a supervisory-level OFO or Border Patrol official must give approval before an agent or officer transfers a child to ORR as a UAC.[59]

According to Border Patrol and OFO headquarters officials, if an adult wishes to appeal CBP's assessment, the adult may raise the issue with ICE officers when transferred to an ICE detention facility. Border Patrol headquarters officials tell us that its agents generally explain to the adults that Border Patrol is processing them separately from the children they arrived with due to concerns about the validity of the family relationship. OFO headquarters officials told us that OFO does not generally notify adults when processing the adults and children in potentially invalid family units because they stated they do not want to jeopardize the safety of the child if they suspect fraud, smuggling, or trafficking. According to Border Patrol and OFO officials, they may separate adults and children who they are concerned might not be valid family units to ensure the safety of the child—for example, if agents and officers cannot be certain that the child has not been a victim of trafficking by the accompanying adult. Further, Border Patrol, OFO, and ICE officials stated that ICE and ORR are better positioned to further investigate these cases if an adult refutes CBP's assessment that the family unit was invalid, because CBP must generally hold individuals for a short period. In addition, ICE and ORR are the agencies most involved in reunifying family units, when appropriate.

## Documenting Cases of Potentially Invalid Family Relationships

CBP began tracking the number of potentially invalid family units in 2018. On April 19 and June 29, 2018, Border Patrol and OFO, respectively, issued guidance about updates to agency data systems and issued guidance to enable agents and officers to record potentially invalid family units. That is, if the appropriate Border Patrol and OFO managers give approval, agents and officers separate potentially invalid family units, and record the separation and the reason for it in agency data systems,

---

[58]According to Border Patrol officials and data, the deleted family unit number is saved in Border Patrol's database.

[59]The memorandum specifies the approving official must be a Border Patrol watch commander or an OFO GS-14 watch commander, port director, or equivalent position.

according to Border Patrol and OFO officials and documents. More specifically:

- Border Patrol agents are to delete the family unit number from the parents' and children's records, and indicate the reason from options that include "child is over the age of 18," "no family relationship," or "no family relationship–prosecuted."[60]

- OFO officers are to indicate that a child was separated from the adult with whom they arrived, and are to indicate the reason as "fraudulent relationship."

Border Patrol and OFO officials noted observing cases of potentially invalid family units, and Border Patrol data indicate an increase in the number since Border Patrol began tracking the cases in April 2018. Specifically, during our fall 2018 visits to ports of entry and border stations in Texas and California, Border Patrol and OFO officials stated they have observed suspected or confirmed cases of adults falsely claiming to be a child's parent, including occasional instances of seeing the same child apprehended multiple times, but with different adults claiming to be their parents. From April 19, 2018 through March 31, 2019, CBP data indicate that CBP referred at least 921 children to ORR (918 by Border Patrol and 3 by OFO) due to CBP's concerns that the family relationships were potentially invalid.[61] During the same period, Border Patrol data also indicated that 2,245 adults were processed separately from the children with whom they were apprehended due to concerns about the validity of the family relationships.[62] By comparison, Border Patrol data indicated that agents processed 256,743 adults and children in valid family units during this period. However, from July 1, 2018 through March 31, 2019, the number of individuals Border Patrol assessed as part of potentially invalid family units grew at a faster rate than the number of individuals

---

[60]Border Patrol's "no family relationship–prosecuted" is meant to indicate that the adult was referred by Border Patrol for criminal prosecution, but does not indicate the type of criminal charge, according to Border Patrol officials.

[61]We selected this time frame based on the availability of CBP data. Specifically, on April 19, 2018, Border Patrol began tracking those adults and children initially processed as a family unit, then subsequently separated due to Border Patrol's concerns they were a potentially invalid family unit. OFO issued guidance about tracking these cases on June 29, 2018. CBP data through the second quarter of fiscal year 2019 (ending on March 31, 2019) was the most current available data at the time of our review.

[62]OFO's data system does not link parents' and children's records, so OFO data do not systematically capture the number of adults assessed to be part of a family unit officers determined may not be valid.

apprehended in valid family units.[63] Specifically, the average monthly increase in adults and children Border Patrol assessed to be in potentially invalid family units rose by about 70 percent per month, on average, during this period. Meanwhile, Border Patrol data indicate the rate of increase for adults and children in valid family units was about 53 percent per month, on average.

However, some of the family units that CBP assessed to be potentially invalid are subsequently found to be valid, according to ORR and ICE officials. According to ORR officials and records of UAC involved in family separations from June 28, 2018 through June 28, 2019, ORR was aware of only 46 cases in which CBP referred a child to ORR care because CBP had assessed the family unit to be invalid.[64] In at least 10 of those cases, the family was later determined to be valid and the child reunited with his or her separated parent, according to ORR officials, as of June 2019. Anecdotally, ICE headquarters officials stated that there are occasionally cases in which CBP referred a child to ORR because agents or officers assessed the family to be an invalid family unit, but ICE or ORR later determined the family was valid and eligible to be reunified. For example, ORR's records on family separations included instances in which the validity of family relationships was determined through DNA testing.

ICE officials stated that its officers are able to conduct additional research about the validity of family relationships, as needed, once an adult has been transferred to its custody and the child to ORR. However, ICE does not track how often potentially invalid family units are later assessed to be valid and reunited, and, therefore, could not provide an exact number of how often this has occurred. DHS and ICE officials have tracked the outcomes of some deployments of ICE officers to help CBP assess the validity of family relationships. Specifically, the Acting Secretary of Homeland Security testified before the Committee on Oversight and Government Reform in the House of Representatives on July 18, 2019 that CBP agents and officers referred 2,475 family unit members they

---

[63]We analyzed Border Patrol's apprehensions data beginning in July 1, 2018, which was the first full month after CBP issued guidance related to "fraudulent claims of a parental or legal guardian relationship."

[64]ORR officials provided us with a spreadsheet of family separations that occurred during this period, which they use to track and confirm family separations in collaboration with ICE and CBP officials. According to ORR officials, they became aware of some of the cases after the June 2018 to June 2019 period, and were aware of 46 of these cases as of September 23, 2019.

suspected had invalid family relationships to go through an additional assessment by ICE officers who, among other training and skills, have specialized forensic interviewing skills.[65] The ICE officers assessed 352 of the 2,475 individuals—approximately 14 percent—to be invalid family members. Additionally, an ICE official also testified before the Senate Committee on Homeland Security and Governmental Affairs on June 26, 2019, and described a May 2019 pilot that involved voluntary rapid DNA testing for some individuals. According to this official, 16 of the 84 family units tested, around 19 percent, proved not to be the parent of the child with whom they arrived.[66] According to ICE officials, those family units it determined to have valid family relationships while still in CBP custody, based on the available evidence, remained together as a family unit and were not separated.

On June 27, 2018, the CBP Commissioner issued a policy memorandum requiring that "fraudulent claims of parental or legal guardianship relationship" should be "well-documented to support such claims"; however, CBP does not have guidance to clarify how agents and officers are to fulfill that requirement. Border Patrol and OFO headquarters officials indicated that taking the aforementioned steps to record information in agency data systems meets the CBP policy requirement for documentation. In addition, according to Border Patrol and OFO officials, agents and officers also record details of the apprehension on the Form I-213, which is required for all individuals. However, neither Border Patrol nor OFO has guidance about whether or what details about a family unit being assessed as potentially invalid should be included on the Form I-213. Learning about the details of these cases and why CBP made its

---

[65]See *Acting Secretary Kevin K. McAleenan: Hearing Before the House Committee on Oversight and Government Reform*, 116th Cong. (2019).

[66]On June 26, 2019, an official from ICE's Homeland Security Investigations testified before the Senate Committee on Homeland Security and Governmental Affairs that this ICE office has deployed teams of special agents, intelligence analysts, forensic interview specialists, and document fraud examiners to interview individuals CBP suspected were part of invalid family units. Between mid-April and June 21, 2019, the ICE Homeland Security Investigations team identified "316 fraudulent family units, 599 fraudulent documents, and presented 629 individuals for criminal violations." See *The Exploitation of Migrants Through Smuggling, Trafficking, and Involuntary Servitude: Hearing Before S. Comm. on Homeland Sec. and Gov'tl Affairs* 4 (2019) (statement of Gregory C. Nevano, Assistant Dir., Homeland Sec. Investigations, U.S. Immigration and Customs Enforcement). According to the testimony, the Rapid DNA testing pilot occurred from May 6 through May 10, 2019, in two locations in Texas with the highest rates of family unit apprehensions along the southwest border to assess the prevalence of potentially invalid family units.

assessment is important to ICE officials in the event an adult refutes the assessment and ICE must take additional steps to determine the validity of the family relationship.

ICE officials can view the information CBP agents and officers record on the Form I-213, since ICE officers can access the form in a database it shares with CBP. However, the headquarters official responsible for coordinating ICE's family and juvenile programs stated that the level of detail included in the forms varies by location and the narrative often does not include details about the reason why CBP considered a family unit potentially invalid. ORR officials also stated this information would be helpful to ORR because it may be relevant to the decisions ORR staff make for UAC, such as selecting sponsors. ORR intake staff told us that the documents they receive from CBP accompanying UAC referrals typically do not contain narrative information about agents' or officers' concerns about potentially invalid family relationships.

While CBP tracks cases on potentially invalid family units in its data systems, this tracking does not (1) document the circumstances to support the assessment of invalidity or (2) provide complete and timely information for ORR and ICE to help them to fulfill their responsibilities, including to review cases in which CBP initially determined a family to be invalid but further investigation is needed. Rather, CBP's data systems only track the assessment of invalidity by allowing agents to select that as a reason from a set of options, but do not track the circumstances to support that assessment. However, CBP policy directs that these cases be "well-documented to support such claims." *Standards for Internal Control in the Federal Government* state that management should use quality information to achieve the entity's objectives.[67] In doing so, management should identify the information needed to achieve objectives and address risks, and should consider the expectations of both internal and external users. Providing guidance on what narrative information Border Patrol agents and OFO officers are to document on a child's and the accompanying adult's Forms I-213 about potentially invalid family units could help better ensure that the events are well-documented to support such assessments, in accordance with CBP policy. Further, this could help ensure that ICE and ORR officials have relevant details they need to make decisions for adults and children in their custody, including

---

[67]GAO-14-704G.

reuniting valid family units, where appropriate, before adults are removed from the United States.

## CBP Developed Policies and Procedures for Family Separations, but Border Patrol and OFO Do Not Have Sufficient Controls to Ensure Information Is Accurately and Consistently Captured

CBP, Border Patrol, and OFO have developed policies and procedures for those agents and officers responsible for recording and approving family separations; however, Border Patrol and OFO do not have sufficient controls to ensure (1) Border Patrol agents are accurately and consistently recording family separations in their data systems, (2) Border Patrol and OFO's data systems accurately capture separation reasons that are consistent with CBP policy, and (3) required forms include sufficient details about the circumstances of the separations.

Regarding policies and procedure for family separations, according to CBP's June 2018 policy, a Border Patrol watch commander, or equivalent position, must approve every family separation.[68] Border Patrol and OFO officials told us that higher-level officials, such as Border Patrol sector chiefs or Port Directors, are often involved in decisions to separate family units. A 2015 CBP policy requires that agents and officers record family separations in agency data systems. Further, after updating data systems to track family separations in 2018, as previously described, Border Patrol and OFO issued written guidance to agents and officers with specific instructions on how to record family separations in its data systems. For example, Border Patrol issued guidance about how to record family separations in its data system in May 2018, August 2018, and April 2019.[69]

In addition, Standards for Internal Control in the Federal Government state that management should use quality information to achieve the entity's objectives, and identify the information needs to address risks.[70] In doing so, managers should also consider the expectations of both internal and external users when collecting information. Further, changes in conditions affecting the entity and its environment often require

---

[68]The memorandum specifies the approving official must be a Border Patrol watch commander or an OFO GS-14 watch commander, port director, or equivalent position.

[69]Some of Border Patrol's written guidance also included instructions on how to record temporary separations, in which family units are reunited while still in Border Patrol custody, and these temporary separations can be distinguished from permanent separations in Border Patrol's aggregated data, according to Border Patrol officials.

[70]GAO-14-704G.

managers to revise the internal control system, on a timely basis to maintain effectiveness.

**Recording Border Patrol's Family Separations**

Our analysis of Border Patrol and ORR data indicates that Border Patrol agents have not accurately and consistently recorded family separations in the data systems. Specifically, we reviewed a random, nongeneralizable sample of 40 ORR records for UAC involved in family separations between June 28, 2018, and March 31, 2019 and found matches for all 40 of the children in Border Patrol apprehensions data.[71] Among the 40 records, we identified cases in which agents had not documented the family separation in Border Patrol's data system, as required by CBP and Border Patrol policy.[72] Specifically, Border Patrol data indicated the agent had not processed the separation in the Border Patrol data system for 10 of the 40 UAC involved in family separations. That is, in these cases, Border Patrol agents processed the parents and children together with a family unit number, but did not take the necessary steps in the system to separate them and document the reason why the separation occurred.

We shared the results of our analysis with Border Patrol officials, and these officials acknowledged that the discrepancy between Border Patrol and ORR data on family separations may be attributable, in part, to human error—that agents had not correctly recorded family separations in Border Patrol's data system. However, the officials were unsure of the extent of the problem. Thus, it is unclear whether Border Patrol has accurate records of all separated parents and children in its automated data system.

Border Patrol officials stated that data entry errors may have grown with increased processing demands and strained resources faced by Border Patrol as the volume of family units apprehended increased in fiscal years 2018 and 2019. However, as mentioned, federal internal control standards provide that changes in conditions—such as increased

---

[71]As described previously, we reviewed the sample of records after finding a discrepancy between the number of potential family separations recorded by ORR and family separations recorded by Border Patrol. Our findings cannot be used to estimate the extent of the problem for the total population of family units processed by Border Patrol during this period because we used a small, nongeneralizable random sample to conduct our analysis rather than a representative sample.

[72]These errors are different than those previously described in this report, which were also found during this analysis.

processing demands agents faced during periods of increased apprehensions of family units—often require managers to revise the internal control system. Developing and implementing additional controls to ensure that Border Patrol agents accurately record family separations in the data system, consistent with CBP and Border Patrol policies, would better enable Border Patrol to maintain complete and accurate information on all family separations. For example, an additional control could be to require Border Patrol or OFO managers conducting supervisory review of each apprehension to check that family separations have been accurately recorded in the data system.

**Recording Reasons for Family Separations in Border Patrol and OFO Systems**

CBP, Border Patrol, and OFO have policies and procedures in place for those agents and officers responsible for approving family separations and recording the reasons in agency data systems. On June 27, 2018, the CBP Commissioner issued a memorandum to the Chief of the Border Patrol and to the Executive Assistant Commissioner of OFO to provide direction on complying with the June 26, 2018, federal court order in *Ms. L. v. ICE* that generally prohibits the government from separating parents from their children, to include potential reasons that may warrant continued family separations. Specifically, the memorandum states that separations may occur only for the following reasons: (1) the parent has criminal convictions for violent misdemeanors or felonies, (2) CBP plans to refer the parent for a felony prosecution, (3) the parent poses a danger to the child, or (4) the parent has a communicable disease. On June 29, 2018, OFO issued a policy memorandum reiterating the potential separation reasons included in CBP's June 27, 2018 policy memorandum. According to Border Patrol headquarters officials, Border Patrol did not issue any further implementing guidance.

Border Patrol and OFO officials stated that agents and officers are to use all available information to determine whether a family separation is warranted. Such information may include available birth certificates, personal observations of the family unit's behavior, results of background checks for criminal and immigration history, and results from available medical assessments. In some instances, Border Patrol and OFO officials stated that agents and officers may not always have complete information, such as when a database indicates a parent's arrest but does not indicate whether he or she was convicted of the charge, but that agents and officers are to weigh the totality of the circumstances. For situations in which agents and officers are unsure whether to separate a

family, CBP's policy states that agents and officers should contact their local Office of Chief Counsel for guidance.[73]

Although Border Patrol and OFO data systems allow agents and officers to select among options to indicate the reason for a family separation, the reasons available in the systems do not fully align with CBP policy. For example, Border Patrol's data system does not include an option that indicates the parent poses a danger to the child—one of the reasons articulated in the Commissioner's June 2018 memorandum. Table 8 shows how the separation reasons available in Border Patrol and OFO data systems compared with the potential separation reasons established in CBP's June 2018 family separations policy.

**Table 8: Options for Family Separation Reasons in U.S. Border Patrol and Office of Field Operations (OFO) Data Systems, as of April 2019, Compared with 2018 U.S. Customs and Border Protection (CBP) Policy on Family Separations**

| Reason for family separation identified in June 2018 CBP policy[a] | Options for family separation reason in OFO data system[b] | Options for family separation reason in Border Patrol data system[c] | GAO examples of how reasons in Border Patrol and OFO data systems do not fully align with CBP policy |
|---|---|---|---|
| *Parent / legal guardian presents a danger to the child* | Criminality of parent / legal guardian–child safety concern | Not applicable | Border Patrol does not have a separation reason that indicates the parent is a danger to the child. |
| *CBP refers the parent / legal guardian for prosecution of a felony* | Prosecution of parent / legal guardian | Family member prosecuted for criminal history | It is unclear from these Border Patrol separation reasons and OFO's separation reason "prosecution of parent / legal guardian" whether the family unit was separated due to plans to prosecute a family unit member for a felony or due to a previous criminal conviction for a felony or violent misdemeanor, as established in CBP policy. |
| *Parent / legal guardian has a criminal conviction for violent misdemeanors or felonies* | Criminality of parent / legal guardian–child safety concern | Family member prosecuted for other reasons | |
| *Parent / legal guardian has a communicable disease* | Long-term medical emergency–family separated | Family member hospitalized | Border Patrol's and OFO's reasons are broader than the reason included in CBP policy. |

Source: GAO analysis of CBP, Border Patrol, and OFO documents. | GAO-20-245

[a]U.S. Customs and Border Protection, *Interim Guidance on Preliminary Injunction in Ms. L. vs. ICE*, No. 18-428 (C.D. Cal. June 26, 2018) (June 27, 2018).

[b]OFO's data system also includes "at the request of U.S. Immigration and Customs Enforcement" as an option to explain why family separations occur. OFO officials explained that occasionally ICE denies a referral from OFO to accept custody of a family unit, as ICE has determined the family unit is not suitable to be detained at a family residential center or released into the United States, due to, for example, a parent's criminal history. In these cases, if OFO officers decide to separate the family unit,

[73]For example, the memorandum states that any questions about what constitutes a violent misdemeanor or felony should be referred to the local Office of Chief Counsel.

they are to select this reason in the OFO data system. While this situation is not covered as a potential separation reasons in CBP policy, OFO officials stated that having this option allows them to track how often these situations occur. Prior to April 1, 2019, OFO's had a separation reason of "medical emergency," which was not detailed enough to indicate whether the family separation was temporary or permanent. On April 1, 2019, OFO updated its separation reasons to make that distinction.

<sup>c</sup>As of August 2, 2018, agents select from a menu of separation reasons for separated adults, and for children, the Border Patrol system automatically assigns the separation reason "family member juvenile–lead separated" for each child the agent separates, according to Border Patrol headquarters officials and documents. Prior to that time, agents selected separation reasons for children from the same menu of options that is used for adults. Border Patrol's data system also includes "family member–gang affiliation" and "family member–extraditable warrant" as options to explain why family separations occur. While these situations are not covered as potential separation reasons in CBP policy, Border Patrol officials stated that agents encounter these situations and, therefore, it is valuable to track how often family units are separated as a result. The data system also has an option for "family member–terrorist" but this reason did not appear in the data provided by Border Patrol. Between April 19, 2018, and August 2, 2018, Border Patrol's data system included the separation reason "family member–prior immigration violation(s) and order of removal." This reason was listed for about 160 family unit members separated from April 19, 2018, through June 27, 2018, and according to Border Patrol officials was to be used when Border Patrol intended to prosecute the parent for illegal reentry after a prior deportation order, but the parent was ultimately not prosecuted by the Department of Justice.

Border Patrol and OFO headquarters officials stated they were unsure why the separation reasons available in the data systems do not fully align with CBP policy on family separations, but stated that the data system reasons have an implicit link to CBP policy. They stated that Border Patrol and OFO officials review and approve each family separation to ensure it meets CBP policy. In addition, OFO headquarters officials stated that it issued guidance in June 2018 that reiterated CBP's policy on potential reasons for family separations. However, as illustrated in table 8, it is sometimes not clear how separation reasons in Border Patrol's and OFO's data systems align with CBP policy. For example, Border Patrol's option for "family member prosecuted for other reasons" does not provide enough information to determine whether Border Patrol is referring a parent for the prosecution of a felony, as required by CBP policy.

Both Border Patrol and OFO have previously changed separation reasons in agency data systems, and in June 2019 Border Patrol officials stated they continue to analyze the need for updates.[74] As of October 2019, these officials stated that Border Patrol and OFO do not have any current plans to update the separation reasons in their data system. CBP officials who conduct supervisory review of files and approve family

---

[74]As noted in table 8, in August 2018 and April 2019, Border Patrol and OFO, respectively, adjusted the separation reasons available to agents and officers in agency data systems.

separations rely, in part, on the information agents and officers record in Border Patrol and OFO data systems, in conducting reviews and sharing information, according to Border Patrol and OFO officials. Updating Border Patrol's and OFO's data systems to ensure that options for separation reasons clearly align with CBP policy could help ensure that CBP makes decisions about family separations in accordance with CBP policy and that data CBP collects reflects that.

**Recording Information about Family Separations on Border Patrol's Form I-213**

CBP's policies related to family separations do not include written requirements that agents and officers record a description of the family separation. However, Border Patrol and OFO officials stated that they expect agents and officers to record the circumstances surrounding family separations on a narrative section of each family member's Form I-213. Yet we found that Border Patrol agents are not consistently recording detailed information about family separations on the Form I-213—the official record of the apprehension.

Specifically, we analyzed a nongeneralizable sample of Forms I-213 for family units whom Border Patrol separated and found that, for most of the family separation cases, one or more of the selected forms had missing or inconsistent information in the narrative descriptions. Specifically, we reviewed a sample of Forms I-213 for 23 family separation cases, involving 27 children and 25 parents.[75] These separations occurred across each of the Border's Patrol's nine southwest border sectors between June 28, 2018 and March 30, 2019.[76] In particular, we assessed (1) whether the forms included a reason for the separation, (2) whether the descriptions of the cases provided enough information to determine

---

[75]Two of the separation cases involved family units with two parents. In these instances, one of the parents was separated and the other remained with the child or children. As a result, Border Patrol did not refer the children to ORR, according to Border Patrol officials.

[76]We reviewed a sample of Forms I-213 prepared by Border Patrol agents, because approximately 95 percent of UAC are referred to ORR by Border Patrol, while OFO and ICE refer the remaining 5 percent, according to ORR officials. The officials estimated the same percentages apply to UAC involved in family separation, based on their review of referral information. Thus, we did not review a sample of Forms I-213 prepared by OFO officers. We asked Border Patrol to provide us with the three most recent family separations during the period of June 28, 2018 through March 30, 2019, in each of Border Patrol's nine sectors. Two of the sectors only had one family separation during that period, so we reviewed a total of 23 family separations.

whether or not the reason met CBP policy,[77] and (3) whether the information recorded for each separation case was consistent across the parents' and children's forms. On the basis of our review of the forms, we found there was missing or inconsistent information on one or more of the family members' forms for 18 of the 23 separated family units. Specifically, we found

- for three of the 23 family separations, there was no indication that a separation had occurred on one or more of the family members' forms; for 20 of the 23 family separations, all of the family members' forms included some indication of a family separation;

- Seven of the 25 parents' forms and seven of the 27 children's forms did not contain a narrative description explaining why the separation occurred; and

- 17 of the 25 parents' forms included sufficient narrative information to determine whether the separation met CBP policy; 12 of the 27 children's forms included enough information to make that determination.

In addition, even among those forms with sufficient information to determine whether the reason met CBP policy, we found inconsistencies. For example:

- Three parents' and four children's forms included information that implied that the parent could potentially present a danger to the child, but the actual separation reason noted on the form was something different, such as the parents' criminal history. For example, the criminal history information provided on one parent's Form I-213 included information about an arrest for kidnapping, but did not include evidence that the arrest resulted in a conviction, making it difficult to determine whether the separation aligned with CBP policy and, in particular, what reason the separation would fall under.

- For nine of the 23 family separations, the separation reason was listed as the parent's criminal history on one of the family member's forms, but there was missing or inconsistent information on the other family members' forms. For example, in one instance, the father's Form I-213 indicated he had been convicted of sexually assaulting a 12-year-

---

[77]For this analysis, we did not assess whether the separation itself met CBP policy, but rather whether the Forms I-213 documented information about the circumstances surrounding the separation that could be used to assess whether the separation aligned with the reasons outlined in CBP policy.

old child, but there was no separation reason and no information about the parent's criminal history provided on the child's form.

According to ICE officials responsible for monitoring family separations, and reunifying family units where necessary, the narrative information on the Form I-213 is ICE officers' primary source of information about the circumstances of a family separation. ICE officers need detailed information, according to officials, to help conduct additional research to confirm whether a separation was warranted or respond to requests for information from ORR. In addition, ORR officials told us that they would benefit from CBP recording certain information on a child's Form I-213—such as the type and timing of a parent's criminal conviction or whether the parent may pose a danger to the child—and sharing that information, to better inform ORR's decisions about where and with whom to place UAC when they leave ORR custody.

However, CBP has not issued guidance on what descriptive details surrounding family separations agents and officers are to record on the Form I-213, based on our review of CBP documents. In addition, Border Patrol officials stated that they do not have written guidance for agents about what information should be captured on the Form I-213. Conversely, OFO issued guidance stating that the Form I-213 must be annotated with the reason for the family separation, the name of the approving manager, and, at a minimum, the biographical information and "A-number"—a unique identifier for noncitizens apprehended by CBP—of the parent(s) and children.[78] Border Patrol and OFO headquarters officials acknowledged that the level of detail documented on the Form I-213 about separations may vary by agent or officer, and rely on their supervisory review process to ensure that family separations are consistent with CBP policy.

Border Patrol headquarters officials attributed missing separation reasons or inconsistent information about the circumstances of the family separations on the Forms I-213 to multiple factors. Specifically, they acknowledged that Border Patrol has not issued guidance specifying what descriptive details agents should include on the forms, and does not

---

[78]In addition, in June 2019, OFO headquarters officials stated that they expected officers to include details, such as the location of the adult (e.g., the federal detention facility where the adult is being held) or information about the parent's criminal history if that is the reason for the separation, on the child's Form I-213. However, these additional expectations are not documented in written guidance, according to OFO headquarters officials.

have, for example, specific information that supervisors check for during their review of each individual's file. In addition, Border Patrol headquarters officials noted that there have been great demands placed on Border Patrol agents to expedite processing during periods of high numbers of family units apprehended and crowding at Border Patrol facilities. However, as noted previously, federal internal control standards state that changes in conditions affecting the entity and its environment—like an increase of family units apprehended along the southwest border—often require management to change the entity's internal control system, as existing controls may not be effective for meeting objectives or addressing risks under changed conditions.

As of October 2019, Border Patrol and OFO had no plans to (1) implement additional controls to ensure that reasons for family separations are included on individuals' Form I-213 or (2) issue guidance to agents and officers about what descriptive information about family separations they should record on the forms. Developing and implementing additional controls to ensure that Border Patrol agents and OFO officers include a reason for the family separations on the parent's and child's Forms I-213 could help CBP ensure its agents and officers are separating family units in accordance with CBP policy. For example, an additional control could be to require the Border Patrol or OFO manager reviewing the information recorded on the Form I-213 to check that certain information, such as the specific separation reason with relevant details, has been included. In addition, without additional guidance on what specific details Border Patrol agents and OFO officers are to include in the narrative information about the family separation events on the parent's and child's Forms I-213, ICE and ORR do not have complete or consistent information to use in determining when it may be necessary to reunify family units in accordance with the *Ms. L. v. ICE* court order.

# ICE Developed Procedures for Processing Family Units, But Does Not Systematically Track ICE's Family Unit Separations in Its Data System

## ICE Developed Procedures for Processing Family Units Referred from CBP

ICE has procedures for processing family units whom CBP apprehended and for releasing family units from ICE custody (see fig. 6).

**Figure 6: Key U.S. Immigration and Customs Enforcement (ICE) Procedures for Processing Family Units Apprehended along the Southwest Border**

Legend

→ Typical processing step

┈┈▶ Processing step only if determined necessary

Source: GAO analysis of ICE information. | GAO-20-245

Notes: CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3).

[a]In addition to the availability of space, ICE officers consider whether the family unit is suitable for detention, and eligible for expedited removal proceedings. According to ICE officials, the vast majority of individuals detained at ICE's family residential centers have been placed into expedited removal proceedings.

[b]This screening only applies to those family units placed into expedited removal proceedings. With some exceptions, including unaccompanied alien children (UAC), noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days, may be placed into expedited removal. See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to 2 years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on

September 27, 2019; as of February 2020, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D.D.C. Sept. 27, 2019) (order granting preliminary injunction). Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individuals indicate either an intention to apply for asylum or a fear of persecution or torture, in which case they are to be referred to DHS's USCIS for a credible fear screening. See 8 U.S.C. § 1225(b); 8 C.F.R. §§ 208.30.

[c]Family units may seek review of a negative credible fear determination by an immigration judge. See 8 C.F.R. §§ 208.30(g), 1208.30(g). Additionally, family units may withdraw their credible fear claims with an asylum officer. ICE removes family units that withdraw their credible fear claims from the United States.

[d]If USCIS ~~DHS~~ does not make a credible fear determination within 20 days, ICE officers typically release the family unit with a notice to appear before an immigration court, pursuant to the 1997 Flores v. Reno Settlement Agreement. See Stipulated Settlement Agreement, Flores v. Reno, No. 85-4544 (C.D. Cal. Jan. 17, 1997). This agreement has been overseen by the district court for the Central District of California since 1997 and the judge in that case has issued multiple orders to clarify the agreement as it has been implemented by the federal government, including orders related to the 20-day time frame and the agreement's application to accompanied children and UAC.

[e]When ICE releases family units from its custody to await immigration court proceedings, ICE officers generally enroll the family unit's head-of-household in its Alternatives to Detention program. The program uses technology, such as ankle monitoring devices, to track the movement of the adult family unit members whom it releases to the interior of the United States. In addition, most family units are also released on orders that require the head-of-household to report telephonically or in-person to ICE officers once they reach their destination in the United States.

## Procedures for Taking Family Units into Custody from CBP

According to ICE field office officials, upon referral by CBP, ICE officers generally review the family unit's files to ensure that CBP agents and officers completed the forms sufficiently and, if not, ICE officers can return the case to CBP. For example, ICE officers typically ensure that the appropriate family unit member signed his or her copies of paperwork provided by CBP. Additionally, according to ICE field office officials, ICE officers have the discretion to decline the transfer of a family unit that they determine is not suitable for detention in a family residential center or for release.

When ICE accepts CBP's referral of a family unit and receives custody from CBP, ICE officers are to enter information about each family unit member in ICE's data system, both for family units that ICE plans to detain and those it plans to release. ICE's data system pulls some information from CBP's data systems. For example, ICE officers can find basic biographic information about individual family unit members apprehended by Border Patrol by searching for an individual by his or her "A-number," a unique identifier. In addition, ICE officers are to enter new information, such as the location(s) where officers detained or released the individual family unit members and the documents officers served to them, among other things. For information about the family unit members that ICE detained at its family residential centers, see appendix II.

| Procedures for Releasing Family Units from ICE Custody | Family units placed into expedited removal by CBP and detained in ICE family residential centers—who express an intention to apply for asylum, a fear of persecution or torture, or a fear of return—undergo screenings conducted by an asylum officer.[79] These screenings occur during detention and are to determine whether one or more family unit members have a credible fear of persecution or torture. The outcome of the screening (and review by an immigration judge, if requested after the screening) determines whether ICE will remove the family unit from the United States or release the family unit into the interior of the country to pursue immigration relief or protection in full immigration proceedings. Additionally, as stated previously, children may generally only be held in federal immigration detention for 20 days pursuant to the Flores Agreement.[80] Thus, if members of the family unit do not receive a credible fear determination within 20 days, ICE generally releases the family unit into the interior of the United States with a notice to appear before an immigration court, which initiates full immigration proceedings. |
|---|---|

From fiscal year 2015 through fiscal year 2018, ICE data indicate that 99 percent of family unit members who were detained in one of ICE's family residential centers were subsequently released by ICE into the interior of

---

[79]Current and former USCIS refugee officers and USCIS asylum officers who work in other divisions of the agency on detail to the asylum office also screen credible fear cases at ICE's family residential centers. According to USCIS officials, all detailees receive credible fear training and are supervised by a supervisory asylum officer who has substantial experience adjudicating asylum applications. In addition, beginning in September 2019, Border Patrol agents on assignment to USCIS began conducting credible fear screenings at ICE's family residential center in Dilley, Texas. Border Patrol agents conducting credible fear screenings are to receive credible fear training from USCIS before conducting reviews and are to be supervised by a supervisory asylum officer who has substantial experience adjudicating asylum applications in order to satisfy the statutory definition of an asylum officer. See 8 U.S.C. § 1225(b)(1)(E).

[80]If DHS does not make a credible fear determination within 20 days, ICE officers typically release the family unit with a notice to appear before an immigration court, consistent with ICE's parole authority and policy and the 1997 Flores v. Reno Settlement Agreement. See 8 U.S.C. § 1182(d)(5); Stipulated Settlement Agreement, Flores v. Reno, No. 85-4544 (C.D. Cal. Jan. 17, 1997). This agreement has been overseen by the district court for the Central District of California since 1997, and the judge in that case has issued multiple orders to clarify the agreement as it has been implemented by the federal government, including orders related to the 20-day time frame and the agreement's application to accompanied children and UAC.

the United States.[81] For additional information about the outcomes for family unit members detained in ICE family residential centers, see appendix II.

According to ICE headquarters and field office officials, while a family unit is at a family residential center, ICE officers typically assist family units with their post-release plans by asking heads-of-household to identify contacts in the United States, such as relatives, that the family unit can stay with after leaving ICE custody. These contacts pay for the family unit's travel expenses if the family cannot purchase bus tickets, for example, and ICE officers help coordinate these plans and typically drive the family unit to the bus station upon release, according to ICE officials. For family units who are not placed in a family residential center, ICE's procedures for assisting them with their post-release plans have varied based on local conditions.[82] ICE headquarters and field office officials explained that, prior to October 2018, when the volume of family units arriving at the southwest border began to increase significantly, ICE officers sometimes coordinated post-release plans for family units that did not stay at a family residential center. However, officials stated ICE has not had the resources to help family units with post-release plans since that time and instead has generally relied on nongovernmental organizations for this assistance.

When ICE releases family units from its custody to await immigration court proceedings, ICE officers generally enroll the family unit's head-of-household in its Alternatives to Detention program. The program uses technology, such as ankle monitoring devices, to track the movement of the adult family unit members. ICE field office officials stated that the availability of ankle monitoring devices and the volume of family units arriving at the southwest border can impact whether or not ICE enrolls a

---

[81]ICE's detention data are not a complete record of information about what happened to family units that it released to the interior of the United States or removed from the United States. For example, some family units that ICE released from the United States in fiscal year 2015 may have eventually been removed from the United States in a subsequent fiscal year, but that information would not appear in ICE's fiscal year 2015 detention data.

[82]For example, if ICE is serving release paperwork prepared by CBP, ICE officers would typically release family units to nongovernmental organizations which, among other things, help family units identify contacts and coordinate the travel to their destination in the United States. However, in some locations, CBP is serving release paperwork and releases family units to nongovernmental organizations directly.

family head-of-household in its Alternatives to Detention program.[83] In addition to ankle monitoring devices, most family units are also released on orders that require heads-of-household to report telephonically or in-person to ICE officers once they reach their destination in the United States. ICE officials stated the level of continued supervision by ICE officers is at the discretion of the ICE officer in charge of the family unit's case and may also be dependent on a variety of factors, such as whether the family unit entered the United States at or between ports of entry, whether the family unit received a positive credible fear determination, and the head-of-household's prior criminal and immigration record.

## ICE's Automated Data System Does Not Track Family Unit Separations That Occur in ICE Custody

ICE relies on a manual process to track family unit separations that occur in ICE custody, but does not systematically record this information in its data system.[84] ICE officers are to report all separations that occur in ICE custody to the headquarters office responsible for coordinating family and juvenile programs. ICE headquarters officials in that office compile the information received from the field offices to populate a spreadsheet, which they use to track all separations that occur in ICE custody.[85] In addition, according to ICE officials at headquarters, officers are to include narrative information about the separation and the approving official's name in a comments field in the parent's and children's records in the data system. According to ICE officials, the narrative information in the

---

[83]For example, officials told us that if there is a limited supply of ankle monitoring devices, ICE officers would prioritize enrolling heads-of-household with criminal histories and prior removal orders because ICE believes they are more likely to fail to appear at scheduled immigration court proceedings. Additionally, ICE does not fit pregnant women or adults with medical conditions with ankle monitoring devices.

[84]According to ICE headquarters and field office officials, since the *Ms. L. v. ICE* court order, ICE has rarely separated family units in its custody. However, ICE headquarters and field office officials have acknowledged that there are some exceptions, including in the San Antonio Field Office, where ICE officers at the family residential centers may learn additional details about a parent's criminal history or determine that a family unit is invalid after a credible fear screening, for example.

[85]The spreadsheet includes the names and dates of birth of the separated parents and children, where the separation took place, and the reason for the separation, among other information. According to the spreadsheet, ICE separated 38 children from their parents from July 18, 2018, through September 30, 2019, mostly due to the criminal history of the parent with whom the child arrived. Additionally, ICE processed nine children separately from the adults with whom they arrived due to ICE officers' concerns that the family relationship was not valid. We could not independently verify the number of children ICE separated and the number of children ICE processed separately due to concerns that the family relationship was not valid because ICE does not track family separations systematically in its data system.

comment field is not searchable within ICE's data system and ICE does not have a mechanism, such as a drop-down menu, to systematically record a family unit separation or the reasons for any separations that occur in ICE custody. Thus, ICE cannot pull data from its system to track such separations. ICE headquarters officials stated that these methods are not an efficient and effective means to have readily available data on family separations that occurred in ICE custody.

According to ICE policy for detained parents, detained parents maintain their parental rights during removal proceedings. In particular, if ICE is removing a parent from the United States, field office directors or their designees are to accommodate, to the extent practicable, the detained parent's efforts to make arrangements for his or her minor child or children, including for the children to be removed with the parent. As such, before removing an adult from the United States, ICE officers are to check the individual's paper A-file, and specifically the individual's Form I-213, for any indication the adult arrived with a child, according to ICE headquarters officials. In addition, according to ICE officials, ICE officers are to review the individual's record in ICE's data system where ICE officers would be alerted to whether the individual had ever been separated from a child.

Given the limitations in ICE's data system, officers would need to know to review the narrative information in the comments field within the individual's records to determine whether he or she had been separated from a child in ICE custody; however, none of ICE's guidance documents explain that officers are to look for such information in the narrative comments field. Further, ICE officials told us that officers are not required to check the spreadsheet maintained at ICE headquarters or contact headquarters officials prior to removing adults from the United States. As of November 2019, ICE headquarters officials stated they are working with the ICE data unit to create a new module that would enhance ICE's ability to link and track family units in its data system, including capturing information on families that ICE separates. According to ICE officials, ICE has established a project team for this effort and hopes to deploy the updates in the fourth quarter of fiscal year 2020. However, ICE did not provide documentation with details, such as a project plan with time frames for deploying these system updates, to verify these plans.

*Standards for Internal Control in the Federal Government* states that management designs the entity's information system and related control activities to achieve objectives and respond to risks. Further, management designs the entity's information system and the use of

information technology by considering the defined information requirements for each of the entity's operational processes.[86] Given that ICE did not provide documentation with details about planned changes to ICE's data system, it is too early to determine whether and when ICE's planned system enhancements will include a mechanism that allows ICE officers to systematically track family separations that occur in ICE custody. Without a mechanism in its data system to systematically track the family units it separates, ICE is unable to ensure that separated parents who are subject to removal are able to make arrangements for their minor child or children (including being removed with them), as provided in ICE policy .

## DHS and HHS Have Interagency Agreements with Roles and Responsibilities Regarding UAC, but Long-Standing Information Sharing Gaps Remain

DHS and HHS have developed interagency agreements for the transfer and placement of UAC between the two departments; however, information sharing gaps remain. In 2015, we reported that the interagency process to refer UAC from DHS to HHS was inefficient and vulnerable to errors because it relied on emails and manual data entry.[87] In addition, each DHS component (Border Patrol, OFO, and ICE) submitted referrals for UAC to HHS's ORR in a different way. To increase the efficiency and improve the accuracy of the interagency referral and placement process for UAC, we recommended the Secretaries of Homeland Security and Health and Human Services jointly develop and implement a documented interagency process with clearly defined roles and responsibilities for all agencies involved in the referral and placement of UAC in HHS shelters. DHS and HHS concurred with our recommendation. Since our 2015 report, DHS and HHS developed two documents to guide interagency procedures related to the processing of UAC. Specifically, in April 2018, HHS and DHS established a memorandum of agreement regarding information sharing for UAC. In addition, on July 31, 2018, DHS and HHS issued a Joint Concept of Operations to memorialize interagency policies, procedures, and guidelines related to the processing of UAC.

According to the April 2018 memorandum of agreement, among other things ICE and CBP are to provide ORR with information at the time of the referral and documents when the child is transferred to ORR,

---

[86] GAO-14-704G.

[87] GAO, *Unaccompanied Alien Children: Actions Needed to Ensure Children Receive Required Care in DHS Custody,* GAO-15-521 (Washington, D.C.: July 14, 2015).

including whether the child was traveling with other individuals and the Form I-213, so that ORR can make informed decisions for the child. Specifically, once a child has been transferred to ORR, the agency begins the process of identifying a potential sponsor for the child and, when a potential sponsor is identified, ORR requests information about that sponsor. At this step, according to the memorandum of agreement, ICE is to conduct a screening of the potential sponsor that includes, at a minimum, a biographic criminal check of national databases, a check for warrants of arrest, and an immigration status check.[88] DHS is to provide HHS with information necessary to conduct suitability assessments for sponsors, including that which HHS would not otherwise have access. In addition, to the extent permitted by law, and consistent with policy, DHS is to report to ORR the results of any investigations it conducts that are relevant to ORR's determinations concerning the care and placement of UAC.

According to the July 2018 Joint Concept of Operations, ICE or CBP should use ORR's data system to refer UAC to ORR whenever feasible. If ORR's data system is not available, DHS may email ORR a referral form along with any supporting documentation. DHS is also to provide ORR with specific documents, including the Form I-213, when the child is transferred to ORR. In the event a child is separated from a parent or legal guardian, CBP or ICE is to enter this information into ORR's data system, according to the Joint Concept of Operations. CBP or ICE is also to include contact information for parents, legal guardians, or adult relatives, as this information can assist in ORR's reunification process, if needed. ORR is to contact the child's family to, among other things, determine whether the child has a potential sponsor who resides in the United States, and to facilitate visitation and contact with family members, regardless of their immigration status. Finally, DHS is to preserve the unity of families during repatriation, according to the Joint Concept of Operations.

The memorandum of agreement and Joint Concept of Operations state the roles and responsibilities of DHS and HHS and their components and describe some of the information to be shared between the agencies

---

[88]ORR policy documents indicate that, for some potential sponsors, ORR also obtains fingerprints and DHS runs background checks using this biometric information. ORR issued directives from December 2018 through June 2019 with updates on ORR's processes for assessing potential sponsors, including limiting the use of fingerprint background checks for adult household members of any sponsor category.

regarding the placement of UAC, among other things. However, DHS and HHS officials' statements indicate that, in practice, they have not resolved long-standing differences in opinion about whether and how agencies are to share information, and what type of information is needed to inform decisions about the care and placement of UAC, including those processed as UAC after separation from a parent. We found that DHS has not consistently provided information and documents to ORR as specified in the memorandum of understanding and the Joint Concept of Operations. Further, ORR officials identified additional information they believe ORR needs from DHS at the time of referral (or soon thereafter) to inform their decisions about placing children with sponsors and reunifying separated families, when necessary.

## Information Sharing Processes as Described in the Interagency Agreements

With regard to information sharing expectations established in the interagency agreements, as of September 2019, we found that certain documents were not being shared or mechanisms for sharing information were not being used consistently. For example, Border Patrol has taken steps since our 2015 report to improve its referral process, so that Border Patrol's referral information is uploaded directly into ORR's data system, in keeping with Joint Concept of Operations requirements.[89] However, the referral screens in Border Patrol and ORR data systems do not fully align, which has required ORR headquarters staff to manually enter some required information into the ORR data system. That is, Border Patrol's referral screen does not include many of the fields—areas to input specific information—included in ORR's referral screen.

Border Patrol and ORR officials offered different perspectives on why the information on the referral screens in the data systems do not align. Specifically, ORR officials stated that Border Patrol has not updated its referral screen to match updates that ORR has made. For example, in July 2018, ORR added a checkbox in its data system for DHS agencies to indicate whether a UAC had been separated from a parent, as necessary. Border Patrol took steps in October 2018 to similarly update its referral screen, so the indication of a family separation would be automatically uploaded to ORR's data system with the referral. However, additional steps must be taken by ORR for its data system to upload the

---

[89]In October 2018, we described how updates Border Patrol made to its data systems were intended to automatically input referral information into ORR's data system, which, according to Border Patrol officials in February 2019, was meant to minimize data entry error. See GAO-19-163.

information, according to Border Patrol officials. Meanwhile, if ORR staff see some indication of a family separation in the Border Patrol referral form, such as in a narrative text field, ORR staff will typically add that information to the records in their data system manually.[90] Border Patrol has not taken additional steps to update other parts of its system's referral screen to align with ORR's data system because ORR's data system does not comply with DHS security standards, according to Border Patrol officials. ORR officials said they had not been made aware of any security concerns. However, concern about system security standards is a long-standing issue that we noted in our 2015 report. As of October 2019, Border Patrol and ORR did not have any plans to collaborate further to improve automated referrals for UAC.

Further, as of October 2019, ORR officials told us that ICE and OFO officials are not consistently accessing the ORR data system to submit a referral for a UAC. Specifically, ICE and OFO officers in certain locations use ORR's data system to submit a referral infrequently and instead use a form, which ORR last updated in 2013, that they attach to emails to refer UAC. However, ORR officials stated their expectation is that email referrals are to be used only occasionally, such as if DHS officials encounter technical problems using ORR's data system. ICE and OFO stated that their officers only rarely make referrals to ORR and sometimes face constraints that prohibit them from using ORR's data system to submit the referral. For example, ICE officials stated that officers generally use ORR's data system for referrals, but that, on some occasions, the officer's password to access ORR's data system has expired due to infrequent use, and they must email the referral. In addition, OFO and ICE officials stated that their officers who have access to the ORR data system to make referrals are not always available, so in those instances, other officers must email a referral form to ORR.

OFO and ICE headquarters officials were unsure how often their officers used email to send ORR referrals, rather than directly accessing ORR's data system. ORR officials also stated that even when ICE and OFO use ORR's data system to submit the referral, consistent with the Joint Concept of Operations, the officers are not consistently marking the separations checkbox in ORR's data system for those children involved in

---

[90]According to Border Patrol headquarters officials, agents are to indicate on its referral form if there was a family separation and the reason for the separation in a general comment box. However, this information does not automatically upload into the family separation checkbox in ORR's data system, according to ORR officials.

family separations. As a result of these challenges, ORR officials said they must often manually enter referral information from ICE or OFO into the ORR data system, including any indication of a family separation or that the child was apprehended with an adult.

ORR officials also stated that DHS—CBP and ICE—is not routinely submitting the child's Form I-213 to ORR, as specified by both interagency agreements. Border Patrol and OFO headquarters officials stated they have concerns about sharing sensitive information, including in referral forms or on the Form I-213, with ORR headquarters or contracted shelter staff because they are not law enforcement officers. ORR headquarters officials stated that they have worked with other federal partners to ensure that only ORR officials with the proper authorization receive sensitive materials. These officials said they are interested in working with DHS to set up a similar process so ORR can receive the information it needs to make decisions for UAC. For example, ORR headquarters officials stated that they would explore options for updating DHS and HHS data systems so the child's Form I-213 could be shared directly between data systems. This would help ensure that only ORR staff who have the proper authorization will have access to them, according to HHS officials.

In addition, DHS and HHS provided different perspectives on the expected information sharing procedures included in the interagency agreements. For example, ORR headquarters officials stated they interpret existing interagency agreements to apply to information sharing on all UAC, regardless of whether they were apprehended alone or with an adult. By contrast, Border Patrol headquarters officials stated that the interagency agreements apply to UAC involved in family separations, but not those children referred to ORR after Border Patrol assessed a family relationship to be invalid. In addition, ICE headquarters officials stated that the interagency agreements were drafted to reflect the circumstances of children apprehended alone, not separated children or those CBP assesses to have invalid family relationships. ICE officials also stated they no longer believe the April 2018 memorandum of agreement is valid

for any UAC, because it was developed to address a process ORR no longer requires.[91]

## Additional Information Sharing Needs Identified by ORR

ORR identified additional information sharing needs—some not covered by existing interagency agreements—to inform decisions regarding the care and placement of UAC. Specifically, this information includes details about the circumstances of family separations, and information about adults who were apprehended with children (who subsequently were designated as UAC). ORR officials stated that ORR and ICE require this information, collected by DHS, to (1) assess potential sponsors for placement of UAC and (2) to reunify eligible separated families.

- **Assessing Potential Sponsors.** ORR officials stated that ORR needs additional information about parents and other adults accompanying a child (who is later designated as a UAC) at the time of apprehension to assess all potential sponsors with whom UAC will be placed as they await immigration proceedings in the United States. However, the Joint Concept of Operations contains limited details about what information should be shared between DHS and HHS about relevant adults. For example, the agreement states that ICE and CBP will provide ORR with contact information for parents, legal guardians, or adult relatives. However, the agreement does not, for example, require DHS to share the details of an adult's criminal history information to ORR. In addition, Border Patrol headquarters officials stated that agents typically would not alert ORR to any concerns about invalid family relationships, as they do not believe that information is relevant. ORR officials stated they need detailed information about an accompanying adult to assess whether they could potentially pose a danger to the child, and this is not addressed

---

[91]Specifically, the April 2018 memorandum of agreement includes a process in which ORR obtained fingerprints for potential sponsors for UAC, which ICE used to provide ORR with summary immigration and criminal history for potential sponsors and all adult members of the potential sponsor's household. Beginning in December 2018, ORR issued several directives updating its procedures on conducting background checks for potential sponsors, and in February 2019 Congress generally restricted DHS from using information obtained from HHS to initiate immigration enforcement actions against potential sponsors. See Pub. L. No. § 116-6, § 224, 133 Stat. 13, 24-25 (2019). The agreement states if its contents becomes inconsistent with a law, regulation, or DHS or HHS directives, that that portion becomes invalid, but the remaining terms and conditions of the agreement remain in effect.

in the Joint Concept of Operations.[92] However, ORR officials stated that this information is often not included in DHS's referrals for UAC, and ORR sometimes learns about an accompanying adult from a child after placement in an ORR shelter.

- **Reunifying Eligible Separated Family Units.** To ensure compliance with the federal court injunction in the *Ms. L. v. ICE* litigation, ORR officials stated that they need to know enough details about (1) family separations or (2) situations in which CBP had concerns a family relationship was invalid, to determine whether there are any family units potentially eligible for reunification. If DHS and HHS determine that a parent will be reunified with a child, ORR is responsible for (1) verifying the validity of the family relationship and (2) determining whether the parent is fit or poses a danger to the child, according to ORR officials.[93] For family unit reunifications, ORR has relied, in part, on the determinations made by DHS when the family was separated, according to these officials. However, ORR officials stated the information DHS provides about family separations is generally limited or provided inconsistently, often without enough detail for ORR to assess whether the family unit may be eligible for reunification. For example, the referral might state a family separation is due to the parent's criminal history, but ORR must follow up with ICE to specify the charge, determine whether the adult was convicted, or learn the date of the event.

In addition, ORR may conduct family reunifications in accordance with ORR policies and procedures in other situations.[94] For example, there have been cases in which families were separated, but DHS later dropped criminal charges against a parent it planned to prosecute, or a parent has completed a hospitalization that required the parent to be

---

[92]The memorandum of agreement includes more detailed information about information sharing expectations at the time of referral between DHS and HHS, but ORR stated that DHS is not adhering to the agreement and ICE officials stated they believe the agreement no longer applies to UAC.

[93]According to ORR officials, if they must confirm the relationship between a child and an adoptive parent or legal guardian, the adult must provide a government-issued court document verifying the adult's relationship to the child. ORR officials stated they have only encountered these situations on rare occasions.

[94]ORR headquarters officials stated that among family separations that have occurred since June 27, 2018, 106 UAC have been reunited with separated parents. These family unit reunifications include both those pursuant to the *Ms. L. v. ICE* court, as well as those conducted in accordance with ORR policies and procedures, according to ORR headquarters officials.

separated from his or her child. According to ICE policy, when ICE is removing a parent from the United States, that parent has the right to determine whether a minor child will be removed with him or her. ORR officials stated that, according to ORR policies and procedures, if the child is to be removed with the parent, ORR must assess whether (1) the family relationship is valid and (2) whether the parent presents a danger to the child.[95] However, ORR officials stated that if this information was not provided at the time of referral, they must reach out to ICE officials to collect it. Further, ORR headquarters officials stated that ICE has removed adults from the United States who wished to be removed with their child or children in ORR custody, before ORR could complete its assessment. However, neither ICE nor ORR could determine exactly how often that had occurred or in exactly what time frame these removals had occurred.

DHS and HHS officials provided different perspectives on these information sharing challenges not covered within existing interagency agreements. ORR takes additional steps to collect information from ICE and CBP that ORR is not routinely receiving at the time of referral. This can extend the time that children spend in ORR custody, according to ORR officials. If ORR staff conducting intake duties have questions about UAC and any accompanying adults, ORR headquarters officials told us they typically first contact the local CBP officials who processed the apprehension.

In April and August 2019, ORR officials said that some Border Patrol sectors are more responsive than others and that limited and inconsistent information sharing by DHS about separated children has led to delays in placement and release decisions for UAC. ORR staff also reach out to ICE's field office juvenile coordinators or ICE headquarters officials responsible for juvenile and family management. For example, ORR and ICE headquarters coordinate on a weekly basis via email to assess whether family separations are in compliance with federal court orders in the ongoing *Ms. L. v. ICE* litigation. Specifically, since February 2019, ORR and ICE have shared a spreadsheet tracking UAC who may have been involved in a family separation, according to ORR and ICE headquarters officials. Further, ICE officials said they gather additional information, such as more details about the reason for a family separation

---

[95]ORR officials are required by the Trafficking Victims Protection Reauthorization Act of 2008 to conduct these assessments. 148 U.S.C § 1232(b)(3).

from the Form I-213 or by reaching out to CBP officials. They provide some of this information to ORR, as ICE officials noted that they recognize ORR needs such information to assist in its decision-making for UAC. ICE headquarters officials noted that they have found ways to provide more detailed information to ORR without sharing sensitive law enforcement information. It is through this vetting process that ICE and ORR assess potential family separations to reach a confirmed number of cases and the reasons for them, according to ICE and ORR officials.

ORR headquarters officials stated that, from their perspective, it would be more efficient if CBP or ICE provided this information directly into ORR's data system at the time of referral, where possible, rather than sharing a spreadsheet via email. Specifically, ORR headquarters officials stated that they have experienced delays in releasing a child to a sponsor due to missing information about a parent or the inability to notify a parent in ICE detention about sponsorship decisions. By contrast, Border Patrol and OFO headquarters officials noted concerns about sharing sensitive information with ORR, particularly for adults apprehended with UAC. Border Patrol officials stated, for example, that Border Patrol does not share sensitive law enforcement information with a third party such as ORR.

According to ICE headquarters officials, sometimes ICE officers conduct additional research after a child is referred to ORR, such as if CBP was unable to collect certain information before making a separation decision.[96] ICE officials stated that, for their purposes, the current information sharing procedures in place are sufficient, but noted that ICE has added staff resources to keep up with the demands of current information sharing procedures. Specifically, until May 2019, there was one ICE headquarters official, 2in the juvenile and family management unit, responding to all of ORR's requests, and that ICE added another staff person to assist in responding to ORR's requests. As of October 2019, there were no plans to discuss further these information sharing concerns, according to ORR, CBP, and ICE officials.

Leading practices of high-performing organizations include fostering collaboration both within and across organizational boundaries to achieve

---

[96]For example, ICE officials may have to call local jurisdictions to confirm whether an adult had been convicted of a charge if that information was not available in the results from CBP's background check, to ensure that the separation is consistent with CBP policy and the federal court injunction in the *Ms. L. v. ICE* litigation.

results. Further, agencies should work together to establish a shared purpose and goals; develop joint strategies or approaches that complement one another; and ensure the compatibility of policies, procedures, and other means to operate across agency boundaries.[97] We have previously reported that written agreements, such as a memorandum of understanding or interagency agreements, can help facilitate collaboration by articulating roles and responsibilities, among other things.[98] These types of written agreements are most effective when they are regularly updated and monitored, as we reported in 2012.

While issuing the April 2018 memorandum of agreement and July 2018 Joint Concept of Operations were important steps toward addressing the weaknesses we identified in our 2015 report, additional actions are needed to fully address our recommendation and increase the efficiency and improve the accuracy of the interagency referral and placement process for all UAC. In addition, further DHS and HHS collaboration about information sharing methods and ways to enhance interagency agreements would better position ORR to make informed and timely decisions for UAC, including those separated from adults with whom they were apprehended.

# Conclusions

As the number of CBP apprehensions of family units has risen markedly in recent years, DHS has developed policies and procedures for processing family units. For example, since 2015 CBP has introduced policies and procedures for collecting information about family units, which has increased the data it collects, including on family separations. However, DHS continues to face challenges in ensuring that it accurately and consistently tracks information about family units, including those it separates. Specifically, CBP training includes definitions of and guidance for processing family units that are inconsistent with CBP policy. Issuing updated training materials with correct definitions of and guidance for processing family units would help CBP ensure that its agents and officers are accurately tracking family units and, where applicable, family separations. In addition, CBP has policies and procedures related to concerns about the validity of a family unit, but it does not have written requirements about what information on these cases Border Patrol agents and OFO officers are to record. Without additional guidance about what

[97]GAO-06-15.

[98]GAO-12-1022.

details CBP agents and officers are to record on the required Form I-213, these cases will not be well documented, as required by CBP policy. Further, ICE and ORR officials do not have sufficient information to make decisions for the adults and children involved, including determining when reuniting valid family units is necessary.

CBP has developed policies and procedures related to family separations, but additional controls would help Border Patrol and OFO ensure that information about these cases is accurately and consistently captured. By developing and implementing additional controls for tracking family separations—such as requiring checks during supervisory review that separations were documented properly—Border Patrol could better ensure it has accurate information about these cases, consistent with CBP and Border Patrol policies. Further, some of the options for separation reasons in Border Patrol's and OFO's data systems do not fully align with CBP policy. Without updating the reasons agents and officers have available to select from, CBP is not well positioned to determine whether its officials are separating family units for reasons consistent with CBP policy.

In addition, during our review of selected Forms I-213 for a sample of separated family units, we found that agents did not always include the reason for the separation or include a detailed description of the circumstances of the case. Developing and implementing additional controls to check that Border Patrol agents document family separations and why they occurred in family unit members' Forms I-213 could help Border Patrol ensure its agents are separating family units in accordance with CBP policy. Additionally, without additional guidance on what specific information about the circumstances of the family separations Border Patrol agents and OFO officers are to include on the parent's and child's Forms I-213, ICE and ORR do not have sufficient information to determine, among other things, when family reunifications are required.

During our review of ICE's policies and procedures for processing family units, we found that it does not systematically track the family units it separates in its data system. By updating its data system to do so, ICE would be better able to ensure that separated parents, who are subject to removal, are able to make arrangements for their minor child or children, including being removed with them, consistent with ICE policy.

While DHS and HHS have developed written interagency agreements related to the transfer and care of UAC, as we recommended in 2015, we found that information sharing gaps between the two agencies remain. As

such, continuing their efforts to address our prior recommendation to jointly develop and implement a documented interagency process for all agencies involved in the referral and placement of UAC could help DHS and HHS increase the efficiency and improve the accuracy of these processes for UAC. Moreover, additional DHS and HHS collaboration about information sharing would help provide ORR with additional information, including about accompanying adults, to make informed and timely decisions for UAC.

# Recommendations for Executive Action

We are making a total of nine recommendations, including six to CBP and one each to ICE, DHS, and HHS. Specifically:

The CBP Commissioner should issue updated Border Patrol and OFO training materials that reflect the correct definition of a family unit and guidance for recording that information. (Recommendation 1)

The CBP Commissioner should provide written guidance to Border Patrol agents and OFO officers about what narrative information should be recorded on the child's and the accompanying adult's Forms I-213 to document cases in which CBP determines that a parent–child relationship may be invalid. (Recommendation 2)

The CBP Commissioner should develop and implement additional controls to ensure that Border Patrol agents accurately record family unit separations in its data system. (Recommendation 3)

The CBP Commissioner should update Border Patrol's and OFO's data systems to ensure data captured on family unit separation reasons clearly align with CBP policy. (Recommendation 4)

The CBP Commissioner should develop and implement additional controls to ensure that Border Patrol agents include a narrative description of a family unit separation on the parent's / legal guardian's and child's Forms I-213, including the reason for the separation. (Recommendation 5)

The CBP Commissioner should provide guidance to Border Patrol agents and OFO officers on the narrative information they are to include about family unit separation events on the parent's / legal guardian's and child's Forms I-213. (Recommendation 6)

The ICE Director should develop and implement a mechanism to systematically track in its data system the family units ICE separates. (Recommendation 7)

The Secretary of Homeland Security, jointly with the Secretary of Health and Human Services, should collaborate to address information sharing gaps identified in this report to ensure that ORR receives information needed to make decisions for UAC, including those apprehended with an adult. (Recommendation 8)

The Secretary of Health and Human Services, jointly with the Secretary of Homeland Security, should collaborate to address information sharing gaps identified in this report to ensure that ORR receives information needed to make decisions for UAC, including those apprehended with an adult. (Recommendation 9)

# Agency Comments

We provided a draft of this report to DHS and HHS for review and comment. DHS and HHS provided formal, written comments, which are reproduced in full in appendixes III and IV, respectively. DHS and HHS also provided technical comments on our draft report, which we incorporated, as appropriate.

DHS concurred with our recommendations and described actions planned or underway to address them. For example, in response to several of our recommendations that CBP provide additional or revised guidance and training to agents and officers, DHS stated that Border Patrol issued a memo in January 2020 to clarify what information agents are to record for family unit members, potentially invalid family units, and subsequent separations, if applicable. DHS also described planned updates to OFO data systems to automatically record certain information in family unit members' Form I-213, such as the names and identifying information of all family members apprehended together. Regarding our recommendation that CBP should update Border Patrol's and OFO's data systems to ensure the options for family separation reasons clearly align with CBP policy, DHS provided documentation of guidance that OFO and Border Patrol issued about data system updates. DHS requested that we consider the recommendation implemented. We will review the information and documents DHS provided to assess the extent to which CBP fully addressed this recommendation. Regarding our recommendation that ICE develop and implement a mechanism to track its separations in its data system, DHS stated that ICE has efforts

underway to enable ICE officers to track separations and reunifications in its data system throughout ICE's immigration enforcement process.

DHS and HHS also both concurred with our recommendations that the agencies collaborate to address information sharing gaps identified in this report, and described plans to coordinate and reach agreement on information sharing practices. We will review the agencies' actions and planned efforts, including any documentation provided by DHS and HHS, and the extent to which they address each of our nine recommendations.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from its issue date. At that time, we will send copies of this report to the appropriate congressional committees, the Acting Secretary of Homeland Security, and the Secretary of Health and Human Services. In addition, the report is available at no charge on the GAO website at https://gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Key contributors to this report are listed in appendix V.

Rebecca Gambler
Director, Homeland Security and Justice

# Appendix I: Objectives, Scope, and Methodology

The objectives of this report were to examine (1) what U.S. Customs and Border Protection (CBP) data indicate about the numbers and characteristics of family units[1] who have been apprehended along the southwest border, (2) the extent to which CBP has developed and implemented policies and procedures for processing family units apprehended along the southwest border, (3) the extent to which U.S. Immigration and Customs Enforcement (ICE) has developed and implemented policies and procedures for processing family units apprehended along the southwest border, and (4) how the Department of Homeland Security (DHS) shares information with the Department of Health and Human Services (HHS) about unaccompanied alien children (UAC), including those children who initially arrived with and were separated from their parents or other adults.[2]

To address these objectives and to observe agents and officers processing families, we conducted site visits at U.S. Border Patrol stations and Office of Field Operations (OFO) ports of entry in Arizona, California, and Texas, from July 2018 to October 2018. We also visited ICE family detention facilities, known as family residential centers, in Dilley and Karnes City, Texas in February 2019. Specifically, in Tucson, Arizona we visited Border Patrol's Tucson sector headquarters and OFO's Tucson Field Office headquarters and the Nogales port of entry. In the San Diego, California region, we visited Border Patrol's San Diego sector headquarters and Imperial Beach station and the San Ysidro port of entry. In the Rio Grande Valley, Texas region, we visited CBP's Central Processing Center, Border Patrol's McAllen station, and the Hidalgo and Brownsville ports of entry. In the San Antonio, Texas region, we visited ICE's San Antonio field office headquarters, South Texas Family Residential Center, and Karnes County Residential Center. During these

---

[1]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to a "noncitizen parent(s) or legal guardian(s)."

[2]The Homeland Security Act of 2002 defines a UAC as a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

site visits, we interviewed Border Patrol, OFO, and ICE officials, observed agents and officers processing families, and toured CBP and ICE facilities, among other activities. To select these locations, we reviewed CBP data on Border Patrol and OFO apprehensions along the southwest border, including family unit apprehensions, and identified specific locations that had the greatest increase in the number of apprehensions of individuals from fiscal year 2016 to 2017. We also considered the geographical proximity of multiple CBP and ICE facilities to maximize observations. Our observations during site visits are not generalizable to all Border Patrol, OFO, and ICE operations along the southwest border, but provided us the opportunity to learn more about how policies and procedures for processing families are conducted and how CBP and ICE coordinate their efforts.

In addition, to address all of our objectives, we interviewed DHS and HHS officials. Specifically, we met with DHS officials from CBP's Office of the Commissioner and Office of Chief Counsel; Border Patrol's Law Enforcement Operations Directorate and Strategic Planning and Analysis Directorate; OFO's Admissibility and Passenger Programs office; ICE's Enforcement and Removal Operations (including the Juvenile Family and Residential Management Unit, Field Operations, Alternatives to Detention, and Law Enforcement Systems and Analysis) and ICE's Office of the Principal Legal Advisor. We also interviewed HHS officials from the offices of the Assistant Secretary for Preparedness and Response and Office of Refugee Resettlement (ORR).

To address our first objective and describe what CBP data indicate about the numbers and characteristics of family units who have been apprehended along the southwest border, we reviewed record-level apprehensions data from CBP's Border Patrol and OFO for individuals determined to be inadmissible or potentially subject to removal. We collected data for fiscal year 2016 through the second quarter of fiscal year 2019 because Border Patrol and OFO began to systematically collect data on individuals apprehended as part of a family unit in fiscal year 2016. The second quarter of fiscal year 2019 was the most current data available at the time of our review. We used "number of apprehensions" rather than the "number of individuals or family unit members" as the unit of analysis we reported because an individual may have been apprehended multiple times in the same year. The data we report on apprehensions of family unit members include individuals in family units CBP later separated (for reasons other than concerns about validity of the family relationship) from April 19, 2018, when Border Patrol and OFO began collecting data on family separations, through the first

two quarters of fiscal year 2019. The record-level data we analyzed are current as of the date Border Patrol or OFO provided it to us. Specifically, Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through 2018 are current as of February 2019; OFO data for the first two quarters of fiscal year 2019 are current as of June 2019.

We grouped the ages of apprehended children in family units (e.g. ages 0–4, 5–11, and 12–17) according to key agency and court documents.[3] While most of our analysis was conducted on the apprehensions of individuals in family units, we were also able to analyze the composition of family units (i.e., as a group rather than individuals) apprehended by Border Patrol. Specifically, Border Patrol uses a "family unit number" to link the records of adult(s) and children processed as a family unit. As a result, we analyzed whether the family unit was headed by an adult male or adult female and how many children were in the family unit. We could not conduct a similar analysis for the family units apprehended by OFO, because OFO does not assign family units unique identifying numbers to link family members in its data system. As a result, we were unable to report on the composition of family units that OFO encountered.

As part of our analysis of CBP data, we determined the number of family unit members Border Patrol and OFO data indicated as separated from April 19, 2018 through March 31, 2019. We selected this time frame because Border Patrol began to systematically collect data on family separations in its data systems on April 19, 2018, and the second quarter of fiscal year 2019 was the most current data available at the time of our

---

[3]Specifically, CBP's definition of family units includes children under the age of 18. Also, children under the age of 12 are considered to be of "tender age" by the Department of Health and Human Services, and receive different care than children ages 13–17. Court rulings in *Ms. L. vs. ICE*, contains special directives for children ages 4 and under who had been or will be separated from a parent while in federal custody. See, for example, Ms. L. v. U.S. Immigration & Customs Enforcement (Ms. L. v. ICE), No. 18-0428 (S.D. Cal. June 26, 2018) (order granting preliminary injunction).

review.[4] Our analysis of the reasons for family separations is based on the data recorded by agents and officers in Border Patrol's and OFO's data systems. During the period of our review, Border Patrol's and OFO's data systems included options for agents and officers to choose from to explain the reason for the separation, including, for example, "family member prosecuted – criminal history" and "family member prosecuted – other reasons." These reasons, and the numbers of separations for each reason, reflect CBP data and may not match the information about separations (including numbers of, reasons for, and timeframes of separations) that DHS reported to a federal court in response to related litigation, such as *Ms. L. v. ICE*. According to court filings, the information provided in response to that litigation was based on a manual review of multiple federal datasets and reflect categories as required by the litigation.[5]

We excluded family separations indicated in CBP data as temporary from our analysis. We also reported separately on the number of adults and children who were apprehended together, but whom CBP assessed to have potentially invalid family relationships and thus processed separately, as CBP does not consider these family separations. To assess the reliability of CBP data, we completed a number of steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for Border Patrol agents and OFO officers who use agency data systems; and (3) discussing data entry issues and data limitations with Border Patrol and OFO officials. We also received demonstrations on the data systems from Border Patrol and OFO officials at headquarters. The limitations and determinations of reliability for the Border Patrol and OFO data are discussed in more detail below.

---

[4]While Border Patrol began to systematically collect data on family separations on April 18, 2018, OFO did not begin to systematically collect data on family separations until June 26, 2018, and provided guidance to its officers about the added capability on June 29, 2019. We also evaluated the number of separations before and after June 27, 2018, the date the CBP Commissioner issued a policy memorandum to provide direction on complying with a federal court order to reunite certain separated families, which also included potential reasons to warrant a family separation going forward.

[5]See, e.g., Ms. L. v. ICE, No. 18-0428 (S.D. Cal. Apr. 5, 2019) (defendants' proposed expanded *Ms. L. v. ICE* class identification plan summary); *id.* (July 5, 2018) (respondents' notice regarding compliance and request for clarification and/or relief); *id.* (July 6, 2018) (declaration of Robert Guadian).

**Border Patrol data.** We identified a small number of Border Patrol apprehension records that had the same date of apprehension and unique identifier, known as the "A-number." It is possible that these apprehension records represented one apprehended individual that Border Patrol agents processed as two apprehensions. These records constituted less than 1 percent of the almost 2.4 million apprehension records we analyzed. We included these apprehension records in our analysis because Border Patrol considers them unique apprehensions and because their small number does not materially affect our analysis.

We did not include a small number of records (less than 1 percent of apprehensions of family unit number) that had a family unit number but did not meet CBP's definition of a family unit in our analysis of records of family unit members. For example, a small number of family unit member records did not include a date of birth, so we could not determine whether the individual was an adult or child (i.e., under or over the age of 18 years).

For our analysis of the reasons for family separations, we found a small number (18) of Border Patrol records that included more than one separation reason, so we could not distinguish which reason led to a permanent family separation. Thus, we excluded these records from our analysis of the reasons for family separations.

According to Border Patrol headquarters officials and documents, in situations in which only one of the adults in a two-parent family was separated, the child or children would remain with the other adult as an intact family unit (and the child would not be designated a UAC and transferred to the custody of ORR). As such, in these situations, we included the separated adults in our reported numbers of separated family unit members, but did not include associated remaining family units in our analysis of separated family units.

We found 18 records for family units that included one adult and one child, with one of the family unit members separated. According to Border Patrol's procedures, in the event a family separation occurs, both family unit members are to be processed in the data system as "separated." We included these records in the number of family unit members, but did not include them in our analysis of separated family unit members, as it was unclear from the records whether or not the family unit was separated.

We identified data reliability issues with Border Patrol's data on family separations, as described in our report. When reporting these data, we

Appendix I: Objectives, Scope, and Methodology

rounded down to the nearest increment of five, and described relevant data using modifiers such as "at least" because of possible missing information. This enabled us to report on the Border Patrol data that we determined were sufficiently reliable for our purposes.

**OFO data.** For the OFO data, we excluded approximately 11 percent of all apprehension records (including single adults, UAC, and parents and children that arrived as part of a family unit) from our analyses because we could not confirm an A-number, for those apprehensions. Among the apprehension records missing an A-number, 44 percent were cases in which OFO officers paroled the individuals and, according to OFO officials, officers are not required to assign an A-number to these individuals.[6] In addition, 47 percent of the records with a missing A-number were cases that involved individuals withdrawing their applications for admission into the United States, in which OFO officers have discretion whether or not to assign an A-number.[7] According to OFO officials, additional records with missing A-numbers may be due to human error during data entry or problems with the data system saving this information in the database that OFO used to pull the data. Finally, we collapsed 153,025 apprehension records into 71,986 apprehension records because we determined that they were duplicate records for the same individual and the same apprehension, based on factors such as A-number, birth date, and date and time of apprehension.[8]

As a result, we determined that we could not present precise figures for analyses that include OFO data and instead provided approximations throughout the report. We rounded all data and figures on OFO apprehensions, including where OFO's data inform CBP-data and figures, down to the hundreds place.[9] As an exception, for the much-smaller

---

[6]Parole may be granted on a case-by-case basis for certain reasons, such as urgent humanitarian reasons, and generally refers to permitting an individual to temporarily enter or remain in the United States for a limited purpose, such as to allow an individual to receive medical treatment or to apply for asylum.

[7]OFO officials stated that officers have discretion as to whether or not they assign an A-number for those individuals who have withdrawn their application for admission into the United States so that the apprehension event does not affect the individual's future applications for admission to the United States.

[8]OFO officials knowledgeable about OFO's data system told us that OFO officers sometimes created new records in OFO's data system instead of opening and modifying already-created records, which led to duplicate records for the same apprehension event.

[9]Additionally, for CBP data and figures (which include both OFO and Border Patrol data), we rounded Border Patrol data for consistency.

number of OFO family separations, as compared with total apprehensions, we rounded the figures by increments of five, and described relevant data using modifiers such as "at least" because of possible missing information. This enabled us to report on the OFO data that we determined were sufficiently reliable for our purposes.

With the previously described modifications, we determined that the Border Patrol and OFO data were sufficiently reliable to generally describe the number and demographic characteristics of family units apprehended by CBP along the southwest border.

To address the second objective, on the extent to which CBP has developed and implemented policies and procedures for processing family units—including how CBP defines family units, assesses the validity of family relationships, and determines whether family separations are warranted—we reviewed CBP, Border Patrol, and OFO policy documents, training materials, and other guidance documents in effect from October 2015 through December 2019. For example, we reviewed CBP's 2015 *National Standards on Transport, Escort, Detention, and Search* policy, as well as Border Patrol's data system processing guidance and Border Patrol and OFO policies and procedures on how agents are to record family separations in agency data systems, among other documents.[10] We compared CBP, Border Patrol and OFO policies and procedures to *Standards for Internal Control in the Federal Government* related to identifying, analyzing, and responding to change; designing control activities to achieve objectives and identify risks; and using quality information to achieve objectives.[11] We also compared Border Patrol definitions for family units, and processes and guidance for tracking family units, invalid family units, and family unit separations against CBP and Border Patrol policy.

To evaluate how Border Patrol recorded information for family units apprehended from June 28, 2018 through March 31, 2019, we also selected a sample of ORR records for UAC involved in family separations and compared them to Border Patrol apprehensions data for the same

---

[10]U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (October 2015).

[11]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

children.[12] Specifically, we selected a small, random, nongeneralizable sample of 40 ORR records for UAC involved in family separations. We then matched all 40 selected records to Border Patrol apprehensions data, using unique identifiers.[13] Our findings are not generalizable due to the size of our sample, so we cannot use our findings to assess the magnitude of the issues we identified in Border Patrol data. We limited the records from which we selected our sample to those ORR records that included an A-number, a unique identifier, for the adult separated from the child in ORR custody, since Border Patrol tracks its separation reasons in the adult's records. Finally, we compared this information with CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* policy, which states that family separations must be documented in the appropriate data systems. We also assessed information against federal internal control standards, which call for management to identify and use quality information to achieve the entity's objectives and address risks, among other control activities.[14]

To describe how Border Patrol agents document the reasons for and circumstances of each family separation case, we reviewed a nongeneralizable sample of the DHS Form I-213, *Record of Deportable/Inadmissible Alien* (Form I-213), which is a form that agents are required to complete for each individual CBP apprehends. Specifically, Border Patrol provided us with Forms I-213 for the adults and children involved in the three most recent instances of family separation from June 28, 2018 through March 30, 2019, in each of Border Patrol's nine sectors along the southwest border. Two of the sectors only had one family separation during that period, so we reviewed the forms for a total of 23 family separations. We reviewed a sample of Forms I-213 prepared by Border Patrol agents, as Border Patrol separated approximately 95 percent of the family separations indicated in CBP data during the period we reviewed. We did not review a sample of Forms I-213 prepared by OFO officers, given the relatively smaller number of families separated by OFO. In addition, we reviewed a sample of forms for cases of family separations only, and did not review forms for cases in which Border

---

[12]On June 27, 2018, CBP issued a policy memorandum that included guidance on family separations and that CBP data through the second quarter of fiscal year 2019 (ending on March 31, 2019) was the most current available data at the time of our review.

[13]According to ORR officials, approximately 95 percent of UAC are referred to ORR by Border Patrol, and the remaining 5 percent by OFO and ICE.

[14]GAO-14-704G.

Patrol determined the family relationship was invalid because Border Patrol officials told us that they do not record information about assessments of invalid family relationships on the Form I-213. Finally, we compared this information with a 2015 CBP policy that states that family separations must be documented in the appropriate data systems; a June 2018 CBP policy that includes potential reasons to warrant family separations; and federal internal control standards, which call for management to identify and use quality information to achieve the entity's objectives and address risks, among other control activities.[15]

To address the third objective, and examine the extent to which ICE has developed and implemented policies and procedures for processing families apprehended along the southwest border, we reviewed ICE policy documents, training materials, and other guidance documents. For example, we reviewed ICE's Juvenile and Family Residential Management Unit Field Office Juvenile Coordinator Handbook, ICE's Family Residential Standards, ICE's data system training manual, and ICE's detained parent policy.[16] We compared ICE's processes against ICE policies and procedures and federal internal control standards, which call for management to design the entity's information system and related control activities to achieve objectives and respond to risks.[17]

**ICE data.** To report on family members apprehended by CBP and detained in ICE family residential centers, we reviewed ICE detention data from June 2014, when ICE opened its first family residential center on the southwest border, through fiscal year 2018, the most current data available at the time of our review.[18] The data for all fiscal years is current as of May 2019, when ICE provided us with record-level data to analyze.

---

[15] GAO-14-704G.

[16] ICE's detained parent policy calls for ICE officers to accommodate, to the extent practicable, the detained parent's individual efforts to make arrangements for their minor child or children. ICE, Policy Number 11064.2: *Detention and Removal of Alien Parents or Legal Guardians* (August 29, 2017).

[17] GAO-14-704G.

[18] From June 2014 through October 2019, ICE, during various periods, operated four family residential centers in Texas, Pennsylvania, and New Mexico for family units who may be subject to removal while they await the resolution of their immigration cases or who have been ordered removed from the United States, including in Dilley, Texas (South Texas Family Residential Center); Karnes City, Texas (Karnes County Residential Center); Artesia, New Mexico (Artesia Family Residential Center); and Leesport, Pennsylvania (Berks County Family Shelter).

To assess the reliability of ICE's data, we completed a number of data reliability steps, including (1) performing electronic testing for obvious errors in accuracy and completeness, such as running logic tests; (2) reviewing existing information about the data and the systems that produced them, such as relevant training materials for the ICE officers who use them; and (3) discussing data entry issues and data limitations with ICE officials. We also received demonstrations on ICE's data system from officials at headquarters. We determined that the data were sufficiently reliable to describe the numbers and demographic characteristics of family members who were apprehended by CBP and detained by ICE at one of its family detention facilities.

Additionally, we collected and reviewed data on the families whom ICE separated from July 2018 through September 2019. We selected this time frame because July 2018 is when ICE began to require its field offices to report all instance of family separations to headquarters, which tracks the information on a spreadsheet, and September 30, 2019, the end of the fiscal year. We reported the total number of family separations from the spreadsheet, but could not independently verify the number of separations in ICE's spreadsheet because ICE does not track family separations systematically in its data system. As a result, we reported the total number of family separations, according to ICE, for context to demonstrate that most family separations occur when family units are in CBP custody.

To describe how DHS shares information with HHS about UAC, including those involved in family separations, we reviewed DHS and HHS interagency agreements, including the April 2018 information sharing memorandum of agreement and July 2018 Joint Concept of Operations. Additionally, we interviewed DHS and HHS officials at headquarters and DHS officials at locations along the southwest border. We compared the information we gathered with DHS and HHS interagency agreements, which provide expectations for interagency information sharing and procedures for the care and custody of UAC. We also compared DHS and HHS information sharing practices to leading practices for collaboration among federal agencies.[19]

---

[19]GAO, *Results-Oriented Government: Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies*, GAO-06-15 (Washington, D.C.: Oct. 21, 2005), and *Managing for Results: Key Considerations for Implementing Interagency Collaborative Mechanisms*, GAO-12-1022 (Washington, D.C.: Sept. 27, 2012).

**Appendix I: Objectives, Scope, and Methodology**

We conducted this performance audit from July 2018 to February 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: U.S. Customs and Border Protection (CBP) Apprehensions and U.S. Immigration and Customs Enforcement (ICE) Detentions of Family Units

This appendix provides additional information about apprehensions of noncitizen family units by CBP's U.S. Border Patrol and Office of Field Operations (OFO) at or between U.S. ports of entry from fiscal year 2016 through the second quarter of fiscal year 2019.[1] It also provides additional information about family unit members who were apprehended by CBP and subsequently detained by U.S. Immigration and Customs Enforcement (ICE) at a family residential center at some point from fiscal year 2015 through fiscal year 2018.[2]

---

[1]CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s). Therefore, in this report, we generally use the term "noncitizen" to refer to individuals who would meet the definition of "alien." The Immigration and Nationality Act defines the term "alien" as "any person not a citizen or national of the United States." See 8 U.S.C. § 1101(a)(3). In addition, for the purposes of this report, we use the term "parent" to refer to a "noncitizen parent(s) or legal guardian(s)." CBP's Border Patrol apprehends families between ports of entry, and OFO encounters families that arrive at ports of entry. According to CBP officials, OFO encounters aliens instead of apprehending them because the aliens have not entered the United States at ports of entry until OFO officers have processed them. For the purposes of this report, we use the term "apprehend" to describe both Border Patrol and OFO's first interactions with family units at the border.

[2]Since June 2014, ICE has operated four family residential centers in Texas, Pennsylvania, and New Mexico for family units who may be subject to removal while they await the resolution of their immigration cases or who have been ordered removed from the United States. As of October 2019, ICE is currently operating three family residential centers in Dilley, Texas; Karnes City, Texas; and Leesport, Pennsylvania. These facilities have the combined capacity to detain 3,326 family members.

**Appendix II: U.S. Customs and Border Protection (CBP) Apprehensions and U.S. Immigration and Customs Enforcement (ICE) Detentions of Family Units**

# Demographic Information and CBP Processing Decisions for Family Units

The following tables contain information on the demographics of CBP apprehensions of noncitizen family units and family unit members and the processing decisions that CBP agents and officers made for them.[3] CBP data indicate that Border Patrol was responsible for the majority of the overall number of family unit member apprehensions by CBP from fiscal year 2016 through the second quarter of fiscal year 2019 (see table 9).

**Table 9: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members at the Southwest Border, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | Number of U.S. Border Patrol apprehensions | Number of Office of Field Operations (OFO) apprehensions | Total number of CBP apprehensions (approximate) |
|---|---|---|---|
| 2016 | 77,500 | 42,900 | **120,400** |
| 2017 | 75,500 | 29,300 | **104,800** |
| 2018 | 112,000 | 48,400 | **160,400** |
| 2019 (first two quarters) | 189,900 | 23,500 | **213,400** |
| **Total (approximate)** | **454,900** | **144,100** | **599,000** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years

[3]We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We assessed that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analyses. Therefore, all data and figures for OFO are rounded, including in CBP data and figures (which includes both OFO and Border Patrol). Additionally, for consistency, we rounded Border Patrol data included in CBP data and figures. We also rounded Border Patrol's data on family separations, given our findings regarding limitations in the accuracy of separations data included in this report. App. I of this report provides additional details about our methodology for assessing limitations to OFO's data and making rounding decisions. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that family unit member apprehensions grew as a percentage of total CBP apprehensions from fiscal year 2016 through the second quarter of fiscal year 2019 (see table 10). For example, CBP data indicate that apprehensions of family unit members grew from about 22 percent of total southwest border apprehensions in fiscal year 2016 to about 51 percent of such apprehensions during the first two quarters of fiscal year 2019.

**Table 10: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members and Total Apprehensions at the Southwest Border, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | Number of U.S. Border Patrol apprehensions | | Number of Office of Field Operations (OFO) apprehensions | | Total number of CBP apprehensions (approximate) | |
|---|---|---|---|---|---|---|
| | Family unit members | All apprehensions | Family unit members | All apprehensions | Family unit members | All apprehensions |
| 2016 | 77,500 | 408,800 | 42,900 | 136,200 | 120,400 | 545,000 |
| 2017 | 75,500 | 303,900 | 29,300 | 90,600 | 104,800 | 394,500 |
| 2018 | 112,000 | 396,500 | 48,400 | 104,900 | 160,400 | 501,400 |
| 2019 (first two quarters) | 189,900 | 361,300 | 23,500 | 53,200 | 213,400 | 414,500 |
| Total (approximate) | 454,900 | 1,470,500 | 144,100 | 384,900 | 599,000 | 1,855,400 |

Source: GAO analysis of CBP data. | GAO-20-245

Note: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that most apprehensions of family unit members from fiscal year 2016 through the second quarter of fiscal year 2019 were nationals of Central American countries (see table 11).

**Appendix II: U.S. Customs and Border Protection (CBP) Apprehensions and U.S. Immigration and Customs Enforcement (ICE) Detentions of Family Units**

**Table 11: U.S. Customs and Border Protection (CBP) Apprehensions of Family Unit Members at the Southwest Border by Nationality, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | El Salvador | Guatemala | Honduras | Mexico | All other countries |
|---|---|---|---|---|---|
| 2016 | 31,700 | 29,900 | 24,200 | 21,300 | 13,000 |
| 2017 | 28,300 | 30,900 | 26,200 | 9,700 | 9,300 |
| 2018 | 17,500 | 64,600 | 49,000 | 19,800 | 9,200 |
| 2019 (first two quarters) | 18,300 | 93,900 | 76,000 | 11,800 | 12,800 |
| **Total (approximate)** | **95,800** | **219,300** | **175,400** | **62,600** | **44,300** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that the Office of Field Operations (OFO) did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded U.S. Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention*, and Search defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that the majority of apprehensions of adult family unit members by CBP were females, while the majority of children were male (see table 12).

**Table 12: U.S. Customs and Border Protection's (CBP) Apprehensions of Family Unit Members at the Southwest Border by Adult and Child Gender, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| | Number of apprehensions of female adults | | Number of apprehensions of male adults | | Number of apprehensions of female children | | Number of apprehensions of male children | |
|---|---|---|---|---|---|---|---|---|
| Fiscal year | U.S. Border Patrol | Office of Field Operations (OFO) | Border Patrol | OFO | Border Patrol | OFO | Border Patrol | OFO |
| 2016 | 27,000 | 13,500 | 8,000 | 3,700 | 19,400 | 12,100 | 22,800 | 13,400 |
| 2017 | 25,200 | 9,300 | 9,200 | 2,400 | 18,700 | 8,300 | 22,300 | 9,000 |
| 2018 | 30,400 | 14,300 | 21,900 | 4,800 | 25,700 | 13,500 | 33,900 | 15,600 |
| 2019 (first two quarters) | 45,000 | 6,600 | 45,000 | 3,500 | 42,600 | 6,300 | 57,200 | 6,900 |
| **Total (approximate)** | **127,600** | **43,700** | **84,100** | **14,400** | **106,400** | **40,200** | **136,200** | **44,900** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Border Patrol's data system collects information about the family units it apprehends. Border Patrol's data indicate that family units that agents apprehended were generally headed by females, although the number of family units headed by males and two-parent family units increased from fiscal year 2016 through the first two quarters of fiscal year 2019 (see table 13).

**Table 13: U.S. Border Patrol Apprehensions of Family Units at the Southwest Border by Adult Gender, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | Number of apprehensions of family units headed by female adults | Number of apprehensions of family units headed by male adults | Number of apprehensions of family units with two-adults |
|---|---|---|---|
| 2016 | 26,863 | 7,838 | 196 |
| 2017 | 25,118 | 9,159 | 83 |
| 2018 | 30,107 | 21,592 | 312 |
| 2019 (first two quarters) | 41,670 | 41,697 | 3,357 |
| **Total** | **123,758** | **80,286** | **3,948** |

Source: GAO analysis of Border Patrol data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family units apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. Data for fiscal years 2016 through 2018 are current as of January 2019; data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Border Patrol's data indicate that most Border Patrol apprehensions of family unit members occurred in just three sectors (Rio Grande Valley,

Texas; El Paso, Texas; and Yuma, Arizona from fiscal year 2016 through the second quarter of fiscal year 2019 (see table 14).[4]

**Table 14: U.S. Border Patrol Apprehensions of Family Unit Members at the Southwest Border by Sector, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Sector | Number apprehended in fiscal year 2016 | Number apprehended in fiscal year 2017 | Number apprehended in fiscal year 2018 | Number apprehended in fiscal year 2019 (first two quarters) | Number apprehended in all fiscal years |
|---|---|---|---|---|---|
| Big Bend, Texas | 1,051 | 940 | 869 | 646 | 3,506 |
| Del Rio, Texas | 3,547 | 2,452 | 3,021 | 8,412 | 17,432 |
| Laredo, Texas | 1,629 | 863 | 601 | 483 | 3,576 |
| El Centro, California | 1,591 | 1,788 | 3,551 | 5,840 | 12,770 |
| El Paso, Texas | 5,617 | 8,607 | 13,701 | 53,662 | 81,587 |
| Rio Grande Valley, Texas | 51,917 | 49,867 | 64,983 | 79,147 | 245,914 |
| San Diego, California | 2,861 | 2,939 | 4,427 | 10,733 | 20,960 |
| Tucson, Arizona | 3,124 | 2,034 | 5,080 | 6,762 | 17,000 |
| Yuma, Arizona | 6,166 | 6,068 | 15,826 | 24,273 | 52,333 |

Source: GAO analysis of Border Patrol data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. Data for fiscal years 2016 through 2018 are current as of January 2019; data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

OFO data indicate that most OFO apprehensions of family unit members occurred in just four ports of entry (San Ysidro, California; El Paso, Texas; Hidalgo, Texas; and Nogales, Arizona) from fiscal year 2016 through the second quarter of fiscal year 2019 (see table 15).[5]

---

[4]Along the southwest border, Border Patrol divides responsibility for border security operations geographically among nine sectors that include border stations.

[5]Four of OFO's 20 field offices are located along the southwest border. OFO's field offices are responsible for overseeing all types of ports of entry—air, sea, and land—within their area of responsibility. OFO officers at land ports of entry are responsible for inspecting pedestrians, passengers, and cargo.

**Table 15: Office of Field Operations (OFO) Apprehensions of Family Unit Members at the Southwest Border by Port of Entry, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Port of entry | Number apprehended in fiscal year 2016 | Number apprehended in fiscal year 2017 | Number apprehended in fiscal year 2018 | Number apprehended in fiscal year 2019 (first two quarters) | Number apprehended in all fiscal years |
|---|---|---|---|---|---|
| Progreso (Texas) | 300 | 400 | 100 | 100 | 900 |
| Hidalgo (Texas) | 6,200 | 3,800 | 3,100 | 1,400 | 14,500 |
| Brownsville (Texas) | 2,300 | 2,100 | 1,900 | 800 | 7,100 |
| Calexico (California) | 1,200 | 1,800 | 1,600 | 900 | 5,500 |
| Laredo (Texas) | 3,500 | 2,300 | 3,200 | 2,600 | 11,600 |
| Douglas (Arizona) | 700 | 200 | 300 | 600 | 1,800 |
| Eagle Pass (Texas) | 400 | 700 | 1,600 | 1,100 | 3,800 |
| El Paso (Texas) | 7,700 | 6,600 | 11,300 | 4,000 | 29,600 |
| Roma (Texas) | 300 | 700 | 1,600 | 100 | 2,700 |
| Tornillo (Texas) | 200 | 0 | 0 | 0 | 200 |
| Rio Grande City (Texas) | 0 | 0 | 200 | 0 | 200 |
| Nogales (Arizona) | 2,000 | 3,100 | 5,500 | 2,500 | 13,100 |
| Otay Mesa (California) | 1,900 | 100 | 600 | 100 | 2,700 |
| Presidio (Texas) | 200 | 200 | 200 | 300 | 900 |
| San Luis (Arizona) | 1,300 | 2,300 | 2,800 | 800 | 7,200 |
| San Ysidro (California) | 13,600 | 3,600 | 12,100 | 6,200 | 35,500 |
| Santa Teresa (New Mexico) | 100 | 300 | 1,200 | 500 | 2,100 |
| **Total (approximate)** | **41,900** | **28,200** | **47,300** | **22,000** | **139,400** |

Source: GAO analysis of OFO data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. Data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that the majority of apprehensions of family unit members resulted in the family unit members being released into the interior of the United States with a notice to appear before an immigration court, which became increasingly common from fiscal year 2016 through the second quarter of fiscal year 2019 (see table 16).

**Table 16: U.S. Customs and Border Protection's (CBP) U.S. Border Patrol and Office of Field Operations (OFO) Processing Dispositions for Apprehended Family Unit Members at the Southwest Border, Fiscal Year 2016 through the Second Quarter of Fiscal Year 2019**

| Fiscal year | Number of family unit members CBP provided with a notice to appear before an immigration court[a] | | Number of family unit members CBP placed into expedited removal proceedings[b] | | Number of family unit members CBP provided with other processing dispositions[c] | |
|---|---|---|---|---|---|---|
| | Border Patrol | OFO | Border Patrol | OFO | Border Patrol | OFO |
| 2016 | 34,200 | 20,500 | 36,900 | 13,600 | 5,300 | 8,700 |
| 2017 | 44,000 | 15,000 | 26,300 | 9,900 | 4,400 | 4,200 |
| 2018 | 65,400 | 31,700 | 37,300 | 14,500 | 5,200 | 2,100 |
| 2019 (first two quarters) | 164,100 | 21,400 | 11,600 | 1,100 | 11,500 | 900 |
| **Total (approximate)** | **307,700** | **88,600** | **112,100** | **39,100** | **26,400** | **15,900** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: We used "number of apprehensions" rather than "number of family unit members apprehended" as our unit of analysis because an individual may have been apprehended multiple times in the same year. We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the period of our review. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the figure provides rounded numbers of OFO apprehensions. We also rounded Border Patrol numbers for consistency. Border Patrol data for fiscal years 2016 through 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]In full removal proceedings, individuals have the opportunity to present evidence to challenge their removal from the country and apply for various forms of relief or protection, including asylum. See 8 U.S.C. § 1229a. These individuals are issued a notice to appear before an immigration court and are generally released into the interior of the United States to await their full court proceedings.

[b]Individuals placed into expedited removal are to be ordered removed from the United States without further hearing unless the individual indicates either an intention to apply for asylum or a fear of persecution, in which case they are to be referred to DHS's U.S. Citizenship and Immigration Services for credible fear of persecution screening. See 8 U.S.C. § 1225(b); 8 C.F.R. §§ 208.30-31.With some exceptions, noncitizens present in the United States without being admitted or paroled who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the United States continuously for 14 days may be placed into expedited removal. See 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004); see also 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child"). DHS published a notice designating additional noncitizens as eligible for expedited removal on July 23, 2019, including eliminating the 100 air miles requirement and expanding the 14-day time frame to 2 years. See 84 Fed. Reg. 35,409 (July 23, 2019). This rulemaking was enjoined by the district court for the District of Columbia on September 27, 2019; as of February 2020, litigation was ongoing. Make the Road New York v. McAleenan, No. 19-2369 (D.D.C. Sept. 27, 2019) (order granting preliminary injunction).

[c]Other processing dispositions can include paroling an individual into the United States for humanitarian reasons or the voluntary return of the individual to their home country, among other outcomes.

**Appendix II: U.S. Customs and Border Protection (CBP) Apprehensions and U.S. Immigration and Customs Enforcement (ICE) Detentions of Family Units**

# Family Units CBP Separated at the Border

The following tables contain information on family units that CBP separated at the border. CBP data indicate that the majority of children that CBP separated from their parents from April 19, 2018 through March 31, 2019 were male (see table 17).

**Table 17: U.S. Customs and Border Protection (CBP) Separations of Children in Family Units Apprehended at the Southwest Border by Child Gender, April 19, 2018 through March 31, 2019**

| Agency | Number of male children separated | Number of female children separated | Total number of children separated (approximate) |
|---|---|---|---|
| U.S. Border Patrol | 1,705 | 960 | **2,665** |
| Office of Field Operations (OFO) | 20 | 10 | **30** |
| **Total (approximate)** | **1,725** | **970** | **2,695** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, CBP issued an updated policy on family separations, and the potential reasons that may warrant them. We analyzed Office of Field Operations (OFO) data on family separations beginning on June 30, 2018, the day after OFO issued guidance to its officers on the system updates it made to better track family separations. These were the most current record-level CBP data available at the time of our review.

We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the full period of our review—fiscal year 2016 through the second quarter of fiscal year 2019. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO separations.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore, the table provides rounded numbers of Border Patrol separations.

Border Patrol data for fiscal year 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that CBP separated children that ranged in age from less than 1 year old to 17 years old from their parents from April 19, 2018 through March 31, 2019, and the majority of separated children were age 12 and over (see table 18).

**Table 18: U.S. Customs and Border Protection's (CBP) Separations of Children in Family Units Apprehended at the Southwest Border by Age and Period, April 19, 2018, through March 31, 2019**

| Period | Number of children separated ages 0–4 | | | Number of children separated ages 5–11 | | | Number of children separated ages 12–17 | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. Border Patrol | Office of Field Operations (OFO) | CBP total | Border Patrol | OFO | CBP total | Border Patrol | OFO | CBP total |
| April 19–June 27, 2018 | 40 | — | 40 | 1,135 | — | 1,135 | 1,310 | — | 1,310 |
| June 28, 2018–March 31, 2019 | 40 | 5 | 45 | 70 | 10 | 80 | 65 | 10 | 75 |
| **Total (approximate)** | **80** | **5** | **85** | **1,205** | **10** | **1,215** | **1,375** | **10** | **1,385** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, CBP issued an updated policy on family separations, and the potential reasons that may warrant them. We analyzed OFO data on family separations beginning on June 30, 2018, the day after OFO issued guidance to its officers on the system updates it made to better track family separations. These were the most current record-level CBP data available at the time of our review.

We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the full period of our review—fiscal year 2016 through the second quarter of fiscal year 2019. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO separations.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore the table provides rounded numbers of Border Patrol separations.

Border Patrol data for fiscal year 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

CBP data indicate that the majority of children that CBP separated from April 19, 2018, through March 31, 2019, were nationals from Central American countries and that more than half were Guatemalan nationals (see table 19).

**Table 19: U.S. Customs and Border Protection's (CBP) Separations of Children in Family Units Apprehended at the Southwest Border by Nationality, April 19, 2018, through March 31, 2019**

| | Children from El Salvador separated | Children from Guatemala separated | Children from Honduras separated | Children from Mexico separated | Children from all other countries separated |
|---|---|---|---|---|---|
| U.S. Border Patrol | 230 | 1,400 | 935 | 40 | 50 |
| Office of Field Operations (OFO) | 5 | Fewer than 5 | 5 | 10 | 0 |
| **Total (approximate)** | **235** | **At least 1,400** | **940** | **50** | **50** |

Source: GAO analysis of CBP data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, CBP issued an updated policy on family separations, and the potential reasons that may warrant them. We analyzed OFO data on family separations beginning on June 30, 2018, the day after OFO issued guidance to its officers on the system updates it made to better track family separations. These were the most current record-level CBP data available at the time of our review.

We determined that OFO did not have a unique identifier for approximately 11 percent of all of its apprehension records during the full period of our review—fiscal year 2016 through the second quarter of fiscal year 2019. As such, we could not independently confirm these records as reliable and excluded them from our analysis. Therefore, the table provides rounded numbers of OFO separations.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore the table provides rounded numbers of Border Patrol separations.

Border Patrol data for fiscal year 2018 are current as of January 2019; Border Patrol data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019. OFO data for fiscal years 2016 through the first quarter of 2019 are current as of February 2019; OFO data for the second quarter of fiscal year 2019 are current as of June 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

Border Patrol data indicate that the majority of family units that Border Patrol separated from April 19, 2018 through March 31, 2019 were headed by males who were apprehended with a single child (see table 20).

Appendix II: U.S. Customs and Border
Protection (CBP) Apprehensions and U.S.
Immigration and Customs Enforcement (ICE)
Detentions of Family Units

**Table 20: U.S. Border Patrol Separations of Family Units Apprehended at the Southwest Border by Family Size and Parent Gender, April 19, 2018 through March 31, 2019**

| Period | Number of two-parent family units in which both adults were separated[a] | | Number of family units with male adults separated | | Number of family units with female adults separated | |
| | Family units with one child | Family units with two or more children | Family units with one child | Family units with two or more children | Family units with one child | Family units with two or more children |
|---|---|---|---|---|---|---|
| April 19–June 27, 2018 | Fewer than 5 | 0 | 1,430 | 30 | 725 | 120 |
| June 28, 2018–March 31, 2019 | 0 | 0 | 140 | 5 | 20 | Fewer than 5 |
| **Total (approximate)** | **Fewer than 5** | **0** | **1,570** | **35** | **745** | **At least 120** |

Source: GAO analysis of Border Patrol data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018, CBP issued an updated policy on family separations, and the potential reasons that may warrant them. These were the most current record-level Border Patrol data available at the time of our review.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore, the table provides rounded numbers of Border Patrol separations.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]According to Border Patrol headquarters officials, in situations in which only one of the adults in a two-parent family was separated, the child or children would remain with the other parent and would not be transferred to the custody of the Office of Refugee Resettlement.

Border Patrol data indicate that most adults that were separated from their children by Border Patrol from April 19, 2018, through March 31, 2019, had not been previously apprehended by CBP (see table 21).

**Table 21: U.S. Border Patrol Separations of Adult Family Unit Members Apprehended at the Southwest Border with Prior Apprehensions, April 19, 2018, through March 31, 2019**

| Period | Adults separated with prior apprehensions | Adults separated without prior apprehensions | Total number of adults separated (approximate) |
|---|---|---|---|
| April 19–June 27, 2018 | 265 | 2,055 | **2,320** |
| June 28, 2018–March 31, 2019 | 45 | 140 | **185** |
| **Total (approximate)** | **310** | **2,195** | **2,505** |

Source: GAO analysis of Border Patrol data. | GAO-20-245

Notes: Border Patrol began collecting data on family separations on April 19, 2018. On June 27, 2018 CBP issued an updated policy on family separations, and the potential reasons that may warrant them. These were the most current record-level Border Patrol data available at the time of our review.

We found limitations to the accuracy of Border Patrol's data on family separations; therefore, the table provides rounded numbers of Border Patrol separations.

Data for fiscal year 2018 are current as of January 2019; data for the first two quarters of fiscal year 2019 and selected fields for all fiscal years are current as of April 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

# Demographic Information and ICE Processing Decisions for Family Units Detained at ICE Family Residential Centers

The following tables and figures contain information about the noncitizen family unit members apprehended by CBP and detained by ICE at ICE's family residential centers from fiscal year 2015 through fiscal year 2018.[6]

ICE data indicate that from fiscal year 2015 through fiscal year 2018, ICE detained 139,098 family unit members at its family residential centers (see table 22).[7]

**Table 22: Total Family Unit Members Detained, by Age Group, in U.S. Immigration and Customs Enforcement (ICE) Family Residential Centers, Fiscal Years 2015 through 2018**

| Fiscal year | Number of children (ages 0 to 17) detained | Number of adults (ages 18+) detained | Number of family unit members (children and adults) detained |
|---|---|---|---|
| 2015 | 6,865 | 5,676 | 12,541 |
| 2016 | 23,658 | 19,505 | 43,163 |
| 2017 | 20,310 | 17,180 | 37,490 |
| 2018 | 24,446 | 21,458 | 45,904 |
| Total[a] | **75,279** | **63,819** | **139,098** |

Source: GAO analysis of ICE detention data. | GAO-20-245

Notes: Data are current as of May 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]Some family unit members were detained across 2 fiscal years and were counted in each fiscal year.

[6]ICE's family residential centers are long-term detention facilities for family units. ICE data for all fiscal years are current as of May 2019.

[7]From June 2014 through September 30, 2014, a partial fiscal year, ICE also detained 2,047 family unit members at its family residential centers.

**Appendix II: U.S. Customs and Border
Protection (CBP) Apprehensions and U.S.
Immigration and Customs Enforcement (ICE)
Detentions of Family Units**

ICE data indicate that most child family unit members (ages 0 to 17) detained in ICE detention facilities were under the age of 13 (see table 23).

**Table 23: Family Unit Members Detained by U.S. Immigration and Customs Enforcement (ICE) at Family Residential Centers by Age, Fiscal Year 2015 through Fiscal Year 2018**

| Fiscal year | Number of family unit members ages 0 to 4 | Number of family unit members ages 5 to 12 | Number of family unit members ages 13 to 17 | Number of family unit members ages 18 and up |
|---|---|---|---|---|
| 2015 | 2,298 | 3,618 | 949 | 5,676 |
| 2016 | 8,159 | 12,049 | 3,450 | 19,505 |
| 2017 | 7,363 | 10,017 | 2,930 | 17,180 |
| 2018 | 8,464 | 12,685 | 3,297 | 21,458 |
| **Total[a]** | **26,284** | **38,369** | **10,626** | **63,819** |

Source: GAO analysis of ICE detention data. | GAO-20-245

Notes: Data are current as of May 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]Some family unit members were detained across 2 fiscal years and were counted in each fiscal year.

ICE data indicate that the majority of adults detained at ICE's family residential centers were female, and the gender of children detained was relatively equal between male and female (see fig. 7).

**Figure 7: Family Unit Members Detained by U.S. Immigration and Customs Enforcement (ICE), by Gender and Age Group, Fiscal Year 2015 through Fiscal Year 2018**



Source: GAO analysis of ICE detention data.  |  GAO-20-245

Notes: Data are current as of May 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

ICE data indicate that the majority of family unit members detained at ICE's family residential centers were from El Salvador, Guatemala, and Honduras, as well as Mexico (see fig. 8).

**Appendix II: U.S. Customs and Border
Protection (CBP) Apprehensions and U.S.
Immigration and Customs Enforcement (ICE)
Detentions of Family Units**

**Figure 8: Family Unit Members Detained by U.S. Immigration and Customs
Enforcement (ICE), by Nationality, Fiscal Year 2016 through Fiscal Year 2018**



Source: GAO analysis of ICE detention data.  |  GAO-20-245

Notes: Data are current as of May 2019.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a
"family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or
legal guardian(s).

ICE data indicate that the vast majority of family unit members who were
detained in one of ICE's family residential centers were subsequently
released by ICE into the interior of the United States (see table 24).[8]

---

[8]According to ICE officials, ICE's detention data are not a complete record of information
about what happened to family units that were detained and then either removed from the
United States or released to the interior of the United States with a notice to appear before
an immigration court. For example, some family units that ICE released from the United
States in fiscal year 2015 may have eventually been removed from the United States in a
subsequent fiscal year, but that information would not appear in ICE's fiscal year 2015
detention data.

**Table 24: Selected Outcomes of Family Unit Members after Being Detained by U.S. Immigration and Customs Enforcement (ICE) at Family Residential Centers**

| Fiscal year | Number of family unit members released into the interior of the United States by ICE | Number of family unit members removed from the United States by ICE[a] |
|---|---|---|
| 2015 | 12,194 | 333 |
| 2016 | 42,571 | 576 |
| 2017 | 37,047 | 427 |
| 2018 | 45,328 | 555 |
| Total[b] | 137,140 | 1,891 |

Source: GAO analysis of ICE detention data. | GAO-20-245

Notes: Data are current as of May 2019.

In addition to the data provided in the table, the data indicate that 67 family unit members detained by ICE at a family residential center during fiscal years 2015 through 2018 received other detention outcomes, including transfer of custody to the U.S. Marshal Service for adults or Deferred Action for Childhood Arrivals for children, among other outcomes.

CBP's October 2015 *National Standards on Transport, Escort, Detention, and Search* defines a "family unit" to include one or more non-U.S. citizen juvenile(s) accompanied by their parent(s) or legal guardian(s).

[a]The number of family unit members removed from the United States by ICE also includes family unit members that voluntarily returned to their home country, among other outcomes wherein the family unit members left the United States.

[b]Some family unit members were detained across 2 fiscal years and were counted in each fiscal year.

# Appendix III: Comments from the Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

January 27, 2020

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:     Management Response to Draft Report GAO-20-245, "SOUTHWEST BORDER:
          Actions Needed to Improve DHS Processing of Families and Coordination
          between DHS and HHS"

Dear Ms. Gambler:

Thank you for the opportunity to review and comment on this draft report. The U.S.
Department of Homeland Security (DHS) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing
this report.

DHS performs an essential role in securing our Nation's borders at and between ports of
entry and enforcing U.S. immigration law within the interior of the country. U.S.
Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE)
officers and agents continually uphold the utmost professionalism while performing
essential border security operations. In addition, DHS is devoted to the care and
processing of the individuals in our custody with the utmost dignity and respect.

DHS has taken steps to ensure an elevated standard of care in response to the current
humanitarian crisis. CBP saw a nearly 340 percent increase in family unit apprehensions
at the Southwest Border (SWB) from fiscal year (FY) 2016 to FY 2019. In FY 2019,
there were 1,148,024 enforcement actions taken by CBP primarily at the SWB: 859,501
apprehensions made by CBP U.S. Border Patrol Agents and 288,523 inadmissible cases
processed by CBP Officers. The Department is pleased with the efforts CBP has made to
improve its processing and reporting capabilities of family units and unaccompanied
alien children (UAC) on the SWB, while managing the humanitarian crisis. Amidst the
crisis on the SWB, CBP was able to issue policies, guidance, and implement a new

secondary processing system to strengthen processing and address reporting gaps identified as a result of the unprecedented migrant surge.

In addition, CBP and ICE share information with the Department of Health and Human Services (HHS) Office of Refugee Resettlement (ORR) regarding UAC to assist with ORR's reunification efforts. As acknowledged in the draft report, ICE and ORR headquarters coordinate on a weekly basis to share data on UAC. ICE has also added staff resources to support information sharing and respond to ORR requests.

DHS and its components remain committed to continuing collaborative efforts with major stakeholders to improve the processing of family units and collection of data, while safeguarding the American people, our homeland, and our values.

The draft report contained nine recommendations, including eight for DHS, with which the Department concurs. Attached find our detailed response to each recommendation. DHS previously submitted technical comments under a separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Sincerely,

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Attachment:  Management Response to Recommendations
Contained in GAO-20-245**

GAO recommended that the CBP Commissioner:

**Recommendation 1:**  Issue updated Border Patrol and OFO training materials that reflect the correct definition of a family unit and guidance for recording that information.

**Response:**  Concur.  CBP's Office of Field Operations (OFO) issued a muster through the Systems, Enforcement, Admissibility Liaison program to each Field Office on April 1, 2019, entitled:  "Documenting Family Units and Properly Recording Separations," which states the correct definition of a family unit when recording the information in the OFO Secondary Processing System [e.g., Secure Integrated Government Mainframe Access (SIGMA) or Unified Secondary (USEC)].

In December 2019, OFO reviewed an update of Enterprise Services, Office of Training and Development (OTD), Field Operations Academy (FOA) training materials, covering areas including lessons related to the definition and processing of family units.  During the review, OFO requested that the training material be updated so that it will reflect the correct definition of a family unit and guidance for recording that information.  OFO anticipates that the revised training materials, based on the April 1, 2019, muster, will be available for use by the OTD FOA and Field Trainers providing Post Academy training no later than July 31, 2020.

On April 25, 2019, CBP's U.S. Border Patrol (USBP) updated definitions and removed incorrect definitions for PowerPoint training in its e3 processing system.  Furthermore, the updated definitions and family separation guidance were distributed to all USBP sectors on January 7, 2020.  USBP also provided documentation corroborating these actions to GAO under a separate cover.  Estimated Completion Date (ECD):  July 31, 2020.

**Recommendation 2:**  Provide written guidance to Border Patrol Agents and OFO officers about what narrative information should be recorded on the child's and the accompanying adult's Forms I-213 to document cases in which CBP determines that a parent-child relationship may be invalid.

**Response:**  Concur.  On January 7, 2020, USBP issued a memorandum to all USBP sectors updating guidance and PowerPoint training detailing the information USBP Agents are to document within the narrative portions of both the parent, non-relative or fraudulent claim of relationship, and the child or UAC. USBP also provided documentation corroborating this action to GAO under a separate cover.  USBP will continue to coordinate with HHS counterparts to discuss and revise the current

3

Memorandum of Agreement (MOA) between CBP and the HHS ORR.  This coordination will allow all parties to determine the appropriate information that will assist HHS in reuniting children with parents or guardians, as needed.  Based on the outcome of these discussions, USBP will make additional updates to PowerPoint training for Agents, as appropriate.

OFO will work with CBP's Office of Information and Technology (OIT) to automate the narrative section of Form I-213 that will include the names, A-File numbers, and relationships for all members of a family who present themselves for inspection at the same time in the SIGMA and USEC systems when the CBP Officer enters information for all members of the family unit into the narrative section.  In cases of a family separation, the reason(s) and authorizing official for the family separation will also print into the narrative section of Form I-213.  Creating this automation will require significant programming resources from OIT to translate data already captured into the narrative section of Form I-213 and will necessitate OFO coordination with OIT and OTD FOA to update training materials.

| Interim Milestones | ECD: |
| --- | --- |
| Provide proposal to OIT to address recommendation. | March 31, 2020 |
| OIT will incorporate family listing into the narrative section of Form I-213 and OFO will muster CBPOs for updated narrative of Form I-213. | September 30, 2020 |
| OFO and OIT will review and ensure changes were successful. | November 30, 2020 |
| OFO and OIT will coordinate with OTD to revise training materials. | January 29, 2021 |
| Complete changes and submit documentation to GAO. | March 31, 2021 |

Overall ECD:  March 31, 2021.

**Recommendation 3:**  Develop and implement additional controls to ensure that Border Patrol agents accurately record family unit separations in data systems.

**Response:**  Concur.  USBP will add enhancements to its e3 processing system that will prompt Agents to create family units within the system, when applicable.  Upon completion of the enhancements, training will be provided to USBP Agents to describe the enhancements that will help ensure family units are recorded when necessary.  ECD: September 30, 2020.

4

**Recommendation 4:** Update U.S. Border Patrol's and OFO's data systems to ensure
data captured on family unit separation reasons clearly align with CBP policy.

**Response:** Concur.  CBP's OFO and USBP updated their processing systems to ensure
data captured on the family unit separation reasons align with CBP policy.  On April 1,
2019, an OFO muster addressed capturing this data in the Secondary Processing Systems.
USBP also updated the family separation reasons contained within the e3 processing
system on January 13, 2020.  CBP also provided documentation corroborating these
actions to GAO under separate cover.

We request that the GAO consider this recommendation resolved and closed, as
implemented.

**Recommendation 5:** Develop and implement additional controls to ensure that Border
Patrol agents include a narrative description of a family unit separation on the
parent's/legal guardian's and child's Forms I-213, including the reason for the separation.

**Response:** Concur.  On January 7, 2020, USBP issued updated guidance and PowerPoint
training to all USBP sectors detailing the information USBP Agents are to document
within the narrative portions of both the parent, non-relative or fraudulent claim of
relationship, and the child or UAC.  USBP also provided documentation corroborating
this action to GAO under separate cover.  USBP will continue to coordinate with HHS
counterparts to discuss and revise the current MOA between CBP and HHS ORR.  This
coordination will allow all parties to determine appropriate information that will assist
HHS in reuniting children with parents or guardians, as needed.  Based on the outcome of
these discussions, USBP will make additional updates to PowerPoint training for Agents,
as appropriate.  ECD:  September 30, 2020.

**Recommendation 6:** Provide guidance to Border Patrol agents and OFO officers on the
narrative information they are to include about family unit separation events on the
parent's/legal guardian's and child's Forms I-213.

**Response:** Concur.  On January 7, 2020, USBP issued updated guidance and PowerPoint
training to all USBP sectors detailing the information USBP Agents are to document
within the narrative portions of both the parent, non-relative or fraudulent claim of
relationship, and the child or UAC.  USBP also provided documentation corroborating
this action to GAO under separate cover.  USBP will continue to coordinate with HHS
counterparts to discuss and revise the current MOA between CBP and HHS ORR.  This
coordination will allow all parties to determine appropriate information that will assist
HHS in reuniting children with parents or guardians, as needed.  Based on the outcome of
these discussions, USBP will make additional updates to PowerPoint training for Agents,
as appropriate.

5

OFO will work closely with OIT to ensure the data captured while processing family units is printed into the narrative section of Form I-213. Each member of the family unit will have an individual line listing name, relationship, A-file number, and country of citizenship on each person's Form I-213. This data is already captured in the Secondary Processing System. In the case where there are articulable facts that the parent-child relationship may be invalid, those reasons will also be listed in the narrative section. After the system changes are completed, OFO will issue a memorandum (also known as a muster) to describe and demonstrate the system changes. Once the muster is issued, the FOA will revise training materials to reflect the system changes, as appropriate. This process will require significant programming resources from OIT to translate data that is already captured into the narrative section of Form I-213 and will necessitate OFO coordination with OIT and OTD FOA to update training materials.

| Interim Milestones | ECD: |
|---|---|
| Provide proposal to OIT to address recommendation. | March 31, 2020 |
| OIT will incorporate family listing into the narrative section of Form I-213 and OFO will muster CBPOs for updated narrative of Form I-213. | September 30, 2020 |
| OFO and OIT will review and ensure changes were successful. | November 30, 2020 |
| OFO and OIT will coordinate with OTD to revise training materials. | January 29, 2021 |
| Complete changes and submit documentation to GAO. | March 31, 2021 |

Overall ECD: March 31, 2021.

GAO recommended that the ICE Director:

**Recommendation 7:** Develop and implement a mechanism to systematically track in its data system the family units ICE separates.

**Response:** Concur. ICE established an Integrated Project Team (IPT) consisting of representatives from the ICE Enforcement and Removal Operations (ERO) Juvenile and Family Residential Management Unit, Information Technology Management Unit, and the Office of the Chief Information Officer to address the requirement of tracking family units. The IPT finalized the business requirements and the technical approach for systematically tracking separated family units, to be implemented in two phases. The first phase, completed on August 2, 2018, consisted of incorporating CBP family information (e.g., CBP unique identifier) into the ERO ENFORCE Alien Removal Module (EARM) and integrating the data with ICE detention data, thereby enabling ICE

6

to link family members in ICE custody.  EARM users now see a banner on the record of a detainee that functions as a flag identifying subjects CBP identified as members of a family unit or as separated family members to a member in ICE custody.  In the second phase of this effort, which is underway, ERO is creating a module within EARM to enable ICE to track separations and reunifications throughout ERO's immigration enforcement process.  ECD:  September 30, 2020.

GAO recommended that the Secretary of Homeland Security:

**Recommendation 8:**  Collaborate jointly with the Secretary of HHS to address information sharing gaps identified in this report to ensure that ORR receives information needed to make decisions for UAC, including those apprehended with an adult.

**Response:**  Concur.  The DHS Office of Strategy, Policy, and Plans is working with ICE, CBP, and HHS ORR to document current information sharing practices, to validate remaining information sharing gaps, and to draft a joint plan between DHS and HHS to ensure that ORR receives information needed to make decisions for UAC, including those apprehended with an adult.  ECD:  December 31, 2020.

7

# Appendix IV: Comments from the Department of Health and Human Services



DEPARTMENT OF HEALTH & HUMAN SERVICES

OFFICE OF THE SECRETARY

Assistant Secretary for Legislation
Washington, DC 20201

JAN 2 4 2020

Rebeca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street NW
Washington, DC  20548

Dear Ms. Gambler:

Attached are comments on the U.S. Government Accountability Office's (GAO) report entitled, *"Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination between DHS and HHS"* (GAO-20-245).

The Department appreciates the opportunity to review this report prior to publication.

Sincerely,

Sarah Arbes
Acting Assistant Secretary for Legislation

Attachment

**GENERAL COMMENTS FROM THE DEPARTMENT OF HEALTH & HUMAN
SERVICES ON THE GOVERNMENT ACCOUNTABILITY OFFICE'S DRAFT
REPORT ENTITLED – "SOUTHWEST BORDER: ACTIONS NEEDED TO IMPROVE
DHS PROCESSING OF FAMILIES AND COORDINATION BETWEEN DHS AND
HHS" (GAO-20-245)**

The U.S. Department of Health & Human Services (HHS) appreciates the opportunity from the
Government Accountability Office (GAO) to review and comment on this draft report titled,
*Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination
between DHS and HHS* (GAO-20-245)

Recommendation 8:  The Secretary of DHS, jointly with the Secretary of HHS, should
collaborate to address information sharing gaps identified in this report to ensure that ORR
receives information needed to make decisions for UAC, including those apprehended with an
adult.

Recommendation 9:  The Secretary of HHS, jointly with the Secretary of DHS, should
collaborate to address information sharing gaps identified in this report to ensure that ORR
receives information needed to make decisions for UAC, including those apprehended with an
adult.

HHS concurs with GAO's recommendation. The information DHS shares with HHS is vital in
ensuring that ORR has the ability to make informed decisions that are in the best interest of each
child in its care and custody. HHS continuously engages with DHS in matters of information
sharing and has implemented several information sharing agreements between HHS and DHS in
the past several years. HHS also recognizes the importance of reassessing the effectiveness of
current information sharing practices. To that end, in June 2020, ORR intends to reach out to its
counterparts within DHS's policy office to discuss periodic updates to the *Unaccompanied Alien
Children Joint Concepts of Operations.*

# Appendix V: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Rebecca Gambler, (202) 512-8777 or gamblerr@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Kathryn Bernet (Assistant Director), Leslie Sarapu (Analyst in Charge), Hiwotte Amare, James Ashley, Kathleen Donovan, Michele Fejfar, Cynthia Grant, Michael Harmond, Eric Hauswirth, Stephanie Heiken, Jan Montgomery, Heidi Nielson, Kevin Reeves, and Jonathan Still made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: Website: https://www.gao.gov/fraudnet/fraudnet.htm Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.