JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0473
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **JOINT STATUS REPORT** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

The Court ordered the parties to file a joint status report (JSR) by 3:00 pm on May 27, 2020, in anticipation of the status conference scheduled at 12:00 pm on May 29, 2020. The parties submit this joint status report in accordance with the Court's instruction.

///

///

///

# I.    DEFENDANTS' POSITIONS

### A. Update Regarding Government's Implementation of Settlement Agreement

| SETTLEMENT PROCESS[1] | DESCRIPTION | NUMBER |
|---|---|---|
| **Election Forms[1]** | Total number of executed election forms received by the Government | **437 (256 Parents/181 Children)[2]** |
| | • Number who elect to receive settlement procedures | **274 (152 Parents/122 Children)** |
| | • Number who waive settlement procedures | **163 (104 Parents/59 Children)[3]** |
| **Interviews** | Total number of class members who received interviews | **164[4]** |
| | • Parents who received interviews | **86** |
| | • Children who received interviews | **78** |
| **Decisions** | Total number of CFI/RFI decisions issued for parents by USCIS | **69[5]** |

---

[1] The number of election forms reported here is the number received by the Government as of April 24, 2020.

[2] The number of children's election forms is lower than the number of parent election forms because in many instances a parent electing settlement procedures submitted an election form on his or her own behalf or opposing counsel e-mailed requesting settlement implementation for the entire family, but no separate form was submitted on behalf of the child.

[3] The number of children's waivers is lower because some parents have submitted waivers only for themselves and some parents who have waived reunification also waived settlement procedures and have therefore not provided a form for the child.

[4] Some individuals could not be interviewed because of rare languages; these individuals were placed in Section 240 proceedings. This number includes credible fear and reasonable fear interviews, as well as affirmative asylum interviews.

[5] This number is the aggregate of the number of parents whose negative CFI/RFI determinations were reconsidered, number of parents whose negative CFI/RFI determination was unchanged, and individuals who were referred to Section 240 proceedings without interview because of a rare language. This number excludes 12 cases where a parent already had an NTA from ICE or was already ordered removed by an IJ

| | | |
|---|---|---|
| | • Number of parents determined to establish CF or RF upon review by USCIS | **68[6]** |
| | • Number of parents whose CF or RF finding remains negative upon review by USCIS | **1** |
| | Total number of CFI decisions issued for children by USCIS | **73[7]** |
| | • Number of children determined to establish CF by USCIS | **73[8]** |
| | • Number of children determined not to establish CF by USCIS | **0** |
| | Total number of affirmative asylum decisions by USCIS | **20** |
| | • Number of parents granted asylum by USCIS | **2** |
| | • Number of parents referred to immigration court | **5** |
| | • Number of children granted asylum by USCIS | **3[9]** |
| | • Number of children | **10** |

(which are included in the interview totals).

[6] This number includes parents who received positive CF/RF determinations upon reconsideration, parents who received a Notice to Appear based on their child's positive CF determination, and parents who were placed in Section 240 proceedings due to a rare language.

[7] This number is the aggregate of the number of children who received a positive CF determination, the number of children who received a negative CF determination, and children who were referred to Section 240 proceedings without interview because of a rare language.

[8] This number includes children who received a positive CF determination, children who received a Notice to Appear as a dependent on their parent's positive CF determination, and children who were placed in Section 240 proceedings due to a rare language.

[9] This number includes children granted asylum as a dependent on their parent's asylum application.

| | | |
|---|---|---|
| | referred/returned to immigration court | |
| **Removals** | Number of class members who have been returned to their country of origin as a result of waiving the settlement procedures | **104 Parents**[10] |

## B. Expanded Class Members

On April 25, 2019, the Court approved Defendants' Plan for identifying members of the expanded class. In advance of the Court's October 25, 2019 deadline, Defendants completed the process of identifying members of the expanded class and produced spreadsheets identifying those individuals to Plaintiffs' counsel. On November 6, 2019, the Steering Committee notified Defendants that in the 11 batches there were 149 individuals who had been identified by the government as being both children of potential expanded class members and "exclusions." On December 13, 2019, Defendants provided Plaintiffs with their completed review and reconciliation of the 149 individuals with inconsistent labels.

On February 7, 2020, Defendants reached out to Plaintiffs to request that Plaintiffs provide Defendants with an update regarding their efforts to locate and reunify members of the expanded class. Noting that this Court has encouraged the sharing of information between the parties, Defendants asked that for each

---

[10] This number is as of May 16, 2020.

expanded class member that Defendants identified for Plaintiffs, the Steering Committee provide Defendants with the following information:

- Has the Steering Committee made contact with the expanded class member: Y/N

- Did the expanded class member request assistance with reunification: Y/N

  - If so, has the Steering Committee been able to facilitate reunification: Y/N
    - If not, does the Steering Committee anticipate that reunification will be possible: Y/N
      - provide the reason/any updates

  - If not, why not (if known)
    - Was the expanded class member already reunified with his or her children at the time he or she was contacted by the Steering Committee: Y/N

On February 19, 2020, Plaintiffs responded and declined to provide any information to Defendants, stating that the preparation of the requested information would impose unnecessary burden on the Steering Committee. On February 21, 2020, Defendants responded and asked Plaintiffs some additional questions about the Steering Committee's efforts to contact and reunify expanded class members, including whether Plaintiffs are tracking any information about these efforts, if so, whether that tracking is being done in any systematic or centralized way, and why Plaintiffs could not provide Defendants with at least some of the requested information in whatever manner it is being tracked by the Steering Committee. Relatedly, Defendants asked the Steering Committee to explain the number of cases

for which it intended to seek assistance from the government, and in what manner the Steering Committee intended to seek such assistance.

On March 14, 2020, Plaintiffs provided some of the information that Defendants requested, and they supplemented that production on April 17, 2020. Plaintiffs' spreadsheet includes three categories of information:

- Parent (or Parent's Attorney) Contacted?

- Parent Unreachable via Government-Provided Phone Number

- Further Government Action Necessary at this Time

The third category was blank for all individuals reflected in the reporting.

Defendants remain concerned that Plaintiffs are refusing to provide information about the current status of any reunification efforts. Without this information, the government cannot tell where the efforts of the Steering Committee currently stand, or whether the Steering Committee is making bona fide progress. Further, the government cannot anticipate whether Plaintiffs intend to raise issues regarding this process because Plaintiffs are keeping all information about this process and any progress to themselves, and are unilaterally choosing what to tell the Court and what to withhold. The Court has emphasized the importance of transparency, and Defendants believe that the requested information is important so that if Plaintiffs intend to raise any outstanding issues related to the expanded class, those issues can be resolved in a fair and expeditious manner. If Plaintiffs are willing

18cv428 DMS MDD

to confirm that they will not raise any issues regarding expanded class members, then Defendants are willing to withdraw this request.

### C. Government Processes, Procedures, and Tracking, for Separations Since June 26, 2018.

*Data Requested by Plaintiffs*.  Defendants continue to provide Plaintiffs updated reports containing information regarding parents and children separated since the Court's June 26, 2018 Order on a monthly basis.

*Processes and Procedures*.

The parties have met and conferred extensively on this issue for over a year. Defendants have continued to respond to all questions raised by Plaintiffs during this ongoing meet and confer process and have provided a significant amount of information in response to Plaintiffs' continued inquiries. For almost one year of this meet and confer process, Plaintiffs' inquiries  have been focused almost exclusively on issues related to the government's communication of information to counsel for parents and their children. On that topic, Plaintiffs sent their most recent list of follow up questions on May 4, 2020, and the government expects to provide responses this week. As Plaintiffs note in their letter filed with the Court on May 22, 2020, ECF No. 533, the parties continue to make progress on this issue.

Notably, since July 2019, Plaintiffs have raised almost no issues or questions regarding interagency information sharing, other than as that issue relates to the issue of making information available to counsel. Nonetheless, despite not having raised

this issue since last year, Plaintiffs now complain in their May 22, 2020 letter that "it is difficult for Plaintiffs to have direct knowledge of how the agencies are sharing information among themselves[,]" and state that "it would be extremely helpful to have someone designated to oversee this issue, to ensure that Plaintiffs and the Court are provided with the relevant information and have the appropriate input into the processes that are developed." ECF No. 533. In short, Plaintiffs are complaining about not having information that they have not made an effort to obtain, and seeking oversight of government processes about which they have not sought to meet and confer with Defendants. Plaintiffs do not explain what entitlement they have to information regarding information sharing processes developed by and between government agencies at this stage of the litigation. Given Plaintiffs' failure to meaningfully engage with Defendants on this issue, and the fact that discovery is not appropriate at this stage of the litigation—nor does Plaintiffs' request for oversight constitute a properly-served request for discovery—the Court should not order additional oversight of these government functions.

To the extent that the Court seeks a report from the government about how it is implementing Paragraph 5 of the preliminary injunction, ECF No. 83 at 24, ¶ 5, Defendants provide updated information below.

<u>Updated Report Regarding Agency Information Sharing</u>

In the February 20, 2019 Joint Status Report, Defendants provided an outline of the processes, procedures, tracking, and communication between the agencies that had been adopted since June 26, 2018, in accordance with Court's preliminary injunction order. ECF No. 360 at 15-17. On July 11, 2019, in response to comments from Plaintiffs, Defendants provided to Plaintiffs the attached comprehensive description of CBP, ICE, and HHS processes at the time of initial separation and following separation. *See* Exhibit A, attached hereto. These processes and procedures generally remain in place with some changes and improvements as discussed below.

<u>CBP Tear Sheet</u>: In September 2019, CBP began providing separated parents with the Information for Parents tear sheet.  This tear sheet provides a separated parent with an explanation of the reason for the separation, an explanation of the next steps in the process, information on how the parent can contact his or her child(ren), and a reference to the ICE email box referenced below, through which a parent can submit additional information to the government. CBP guidance provides that this tear sheet should be provided to all separated parents at the time of separation and placed in the parent's A-file.

<u>Allowing Parents to Submit Additional Information to ICE</u>: ICE has established a process through which parents can submit additional information

9

regarding separation. Through the Family Separation Supplemental Information Form (FSSIF), which was set to the field offices on October 4, 2019, separated parents can submit additional information to ICE regarding their separation. FSSIFs are available to ICE detainees in all detainee housing units. ICE Field Offices collect completed FSSIFs, and any supporting documentation, in the same manner as a traditional Detainee Request Form. ICE officers are required to email the FSSIFs and supporting documentation to a dedicated email address specific to this process. Use of the form has allowed ICE to determine that in some cases separation was no longer warranted. Additionally, ICE produced fliers for posting in all of its detention facilities to explain how parents can request to contact their children or provide supplemental information regarding the basis of their separation. ICE also created a direct email inbox for legal representatives of adult detainees to communicate directly with the ICE team dedicated to tracking these families.

///

///

///

<u>Collaborative Interagency Efforts to Improve Information Sharing</u>: The agencies have worked collaboratively in three primary ways to improve interagency information sharing practices.[11]

*1. Improvements to Existing Agency Tracking Systems*

In July 2018, HHS/ORR updated the Portal referral page to include a checkbox to indicate whether an unaccompanied alien child (UAC) was separated from a parent. The checkbox should be marked by DHS at referral for all separated children, and allows ORR to generate data reports regarding separated children who are in care or who have been released.

Likewise, DHS has made substantial gains in its ability to process and track family units that are encountered at the border. ICE has modified its technology systems to receive flags on cases identified as separated family units by CBP, greatly

---

[11] Notably, many of these improvements have occurred after the period of time examined by the Office of Inspector General (OIG) and Government Accountability Office (GAO) reports referenced by Plaintiffs in their letter, and in some cases in response to recommendations made in those reports. DHS concurred with the five recommendations in the DHS OIG report and generally committed to timelines for their implementation. Likewise, HHS has responded to its OIG that it concurs with all the recommendations made in the HHS OIG report, and is coordinating responsive actions in preparation for sending a status update to the OIG. Specifically with respect to the recommendation on data processes, HHS notes its work to upgrade the UAC Portal discussed more fully below. HHS also responded to the GAO in concurrence with its recommendations as they related to HHS, stating that it continues to engage with DHS. As discussed more fully below, both agencies are participating in interagency discussions regarding a uniform database system for information sharing, specifically relying on the recommendations of both agencies' OIGs to develop the functionality of the planned system. Congress has appropriated funds for this unified system and has requested status updates regarding its progress. Thus, there is existing oversight over the actions being taken by both agencies in response to the recommendations made in these reports, and Defendants respectfully submit that additional court-ordered oversight over these administrative policy-making processes is neither necessary nor proper.

18cv428 DMS MDD

enhancing ICE's ability to track separated family units among the agencies and to coordinate with CBP and HHS on the exchange of information and coordination of reunifications where appropriate. CBP also has made several enhancements to its electronic systems of record to include new features for recording any separation of family units and the reasons for such separations, as well as tracking the time that UACs spend in CBP custody. These modifications, which include the tracking of additional data points pertaining to family units, increased auto-population of certain key data fields, and updates to the codes documenting the reasons for separations, have increased system controls, improved data quality and enhanced user visibility of subject status. CBP continues to evaluate the process for tracking separations in its electronic systems of records, and make enhancements or updates accordingly. Additionally, CBP continues to share separation data with ICE on a regular basis as part of the regular process of reconciling and reporting separations.

   2. *Interagency Tracking and Reporting Efforts*

   Approximately every week since February 2019, CBP, ICE, and ORR data teams have jointly updated a rolling list of all new separations (that is, family separations that occurred after the original class certification date of June 26, 2018). Through this process, the government is able to reconcile any discrepancies in agencies' family separation data to create a single reconciled list. ORR also is able to request weekly updates from DHS about the detention status of parents reported

in previous updates. Such updates are particularly important in those cases where DHS separated parents from their children on a temporary basis (e.g., illness, injury, communicable disease, hospitalization, material witness custody). Where any temporary basis for separation no longer applies (e.g., a hospitalized parent was discharged from the hospital), there is no other basis for separation, and the parent has been released from ICE custody, ORR will proceed with reunification efforts.

The government has improved the new separations reconciliation process over time. For example, as of April 2019, the agencies implemented a standardized list of reasons for separation that would appear as a dropdown menu for agency staff to select from when entering that information. Previously, the agencies' staff manually entered the reason for separation, so this update improved the functionality of the spreadsheet by making it more reliably searchable. Also, through iterating this process for over a year and becoming familiar with ORR's information needs, DHS has consistently been providing information regarding the general reason for separation as well as detailed additional information. This information has helped to address an information gap identified by the GAO and OIG reports, which found that ORR care provider staff frequently lacked sufficient information to perform effective case management for separated children. As a result, ORR reports that it is generally able to obtain the information necessary for case management purposes in a timely manner.

18cv428 DMS MDD

Where ORR requires additional information from DHS not contained in the reporting or through the information provided at referral, ORR staff are able to reach out directly to a regular point of contact at ICE to request the information. In these situations, which often involve nuance, an automated data transfer system would not necessarily provide the information ORR requests. As noted in HHS' response to the OIG report, a degree of manual data entry in interagency information sharing is unavoidable. A virtue of the current process is that its iterative, multi-step nature builds in data quality control measures—whereas mere reliance on an IT system (which will still rely on a data operator manually entering data at the front end) would not necessarily receive the same level of scrutiny.

3. *Development of New Technology*

To address the HHS OIG report's overall recommendation that ORR reduce its dependence on manual processes, ORR currently is engaged in updating its UAC case management system (the UAC Portal). The planned new system (dubbed the UAC Path) will incorporate the current system's functionality, and will add new functionality. The ORR team responsible for developing the UAC Path is also participating in an interagency effort to develop a Unified Immigration Portal (UIP). The UIP, which Congress has allocated funds to develop, is a technical solution that will connect relevant data from multiple agencies to enable a more complete understanding of an individual's journey through the immigration process. Whereas

14

currently, as noted in the GAO and HHS OIG reports, an agency may lack information that is available only in another agency's data system, the UIP will serve as a central clearinghouse for DOJ, DHS, and HHS to share certain information about individuals in the immigration process, including separated families. Through this approach, each agency maintains ownership of its own data, no changes are required to an agency's systems of record, and each agency will determine what types of information it shares through the UIP.

Interagency discussions regarding the UIP have already started involving CBP, USCIS, ICE, DOJ, and HHS. The interagency process has identified the GAO and OIG report recommendations as reference points to demonstrate the kinds of information and functionality required of the UIP. For example, the UIP team will coordinate all interagency agreements (e.g., memoranda of agreement) as necessary, to allow data sharing. In addition, the UIP team is discussing implementing the ability to share not just data, but also documents through its system. By connecting the UAC Path to the UIP, HHS/ORR foresees that it will be able to retrieve information about separated parents' identities and locations, as well as receive data regarding a child's separation status, in a more automated manner. Finally, the UIP is anticipated to include a UAC Coordination Dashboard to help HHS users anticipate resource demands by providing near real-time access to key metrics for UAC placement. The UIP team has aligned development work with HHS's work on

the UAC Path in an effort to accelerate data-sharing between DHS and HHS. The initial focus is on automating the UAC placement process so that relevant information can be shared in real-time between agencies.

**D. Implementation of DNA Testing**

In its January 13, 2020 order, this Court ordered that Defendants "must conduct DNA testing before separating an adult from a child based on parentage concerns." Order at 11-12. The Court further stated that "[s]ubjective concerns about parentage—or inability to validate documentation—are an insufficient basis for separation when those concerns can be definitively addressed through use of readily accessible, inexpensive and accurate scientific testing." *Id.* at 12. In reaching this decision, the Court relied on the "relatively few" number of separations based on "unverified familial relationship," the existence of the Rapid DNA pilot program at certain locations along the southwest border, and the assumption that "if testing is not available at a particular facility, Defendants can transfer the family to a facility where that testing is available, or take swabs from the parent and child and send the swabs for testing, as they did with Ms. L. and her daughter." *Id.* at 11.

In the March 4, 2020 JSR, Defendants provided information regarding their efforts to comply with this provision of the Court's order. At the March 6, 2020, status report, the Court ordered the parties to meet and confer regarding this issue. On March 13, 2020, Plaintiffs sent a list of questions based on Defendants' JSR

submission to facilitate the parties' discussion. On April 20, 2020, the parties held a call to discuss resolution of this issue. Defendants are internally discussing the requests for further information made by Plaintiffs during this call, and will follow up with Plaintiffs on this issue shortly.

Defendants note that this process continues to be delayed because Defendants' resources have been focused on the government's response to the COVID-19 pandemic and implementation of the CDC's *Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists*, available at https://www.cdc.gov/quarantine/order-suspending-introduction-certain-persons.html (last visited April 15, 2020). As a result of the pandemic and the CDC order, the number of individuals in DHS custody generally has decreased, which has resulted in a significant reduction of the number of individuals who would be subject to the DNA testing contemplated in the order prior to separation. Defendants have only recorded one separation based on a parentage concerns since the implementation of the CDC Order. A DNA test was conducted prior to separation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   *MS. L.* PLAINTIFFS' POSITION

### A.   Steering Committee Outreach to Sponsors and Parents of Children of Expanded Class Members

The government has provided eleven lists identifying 1,556 children of potential expanded class members. Plaintiffs have focused on reaching children whose membership in the class is not contested, and for whom the government has provided at least one phone number for a sponsor or for the child's parent. There are 1,030 children that meet that description.[12]

As of May 27, the Steering Committee has attempted to reach the families of all of these 1,030 children, and has successfully reached the parents (or their attorneys) of 434 children, either by reaching the parent directly through a parent phone number provided by the government, or a number provided by a child's sponsor, or finding the parent via on-the-ground efforts, or by inbound phone calls to the Steering Committee's toll-free numbers from family members who received a mailing from the Steering Committee. As a result, 596 children remain for whom the Steering Committee has not yet reached the separated parent, approximately two-thirds (69%) of whom are believed on the basis of the last information available from the government to be in their respective countries of origin.  Of these 596, the Steering Committee believes, on the basis of its unsuccessful attempts to reach the family telephonically, that parents of 520 will not be reached

---

[12] The eleven lists identify a total of 1,556 unique children, 1,134 of which have been confirmed by the government as being children of potential expanded class members.  For 104 of these 1,134 children of potential class members, the government has not provided a phone number. Parents of the 422 children who have not been identified by the government as potential expanded class members have been categorized as "exclusions". The Steering Committee also intends to reach individuals the government has categorized as excluded from the class, and Plaintiffs reserve the right to contest those exclusions.

using the telephone numbers provided by the government.  For these families, the Steering Committee has commenced or intends to commence additional efforts to locate the separated parent, as discussed below.

As reported in the last Joint Status Report, the Steering Committee's additional efforts to locate separated parents have been hampered for the last several months due to COVID-19. In particular, our efforts to reach families on-the-ground—including attempts to establish initial contact with families through searches by Justice in Motion defenders, which represent the most promising method of establishing contact with "unreachable" families, as well as attempts to conduct follow-up communication with previously-contacted families to determine their reunification preferences and ascertain whether the assistance of the government will be required—remain suspended in order to protect the health of personnel working with the Steering Committee and to prevent the inadvertent spread of COVID-19 into vulnerable communities. The spread of COVID-19 has also hampered some additional Steering Committee efforts, such as the dissemination of our toll-free phone numbers, as the Steering Committee has had difficulty during the public health crisis engaging third parties such as media outlets to disseminate this information, while their focus has been on the COVID-19 health crisis. The Steering Committee has continued to encounter similar challenges since the last Joint Status Report, and anticipates experiencing similar delays until governments in the affected regions permit us to continue our searches and the Steering Committee believes it safe to proceed.  During this time, the Steering Committee has continued to use its resources to assist separated families in the ways our resources permit, including by continuing to attempt telephone contact with parents who have not yet been reached, speaking telephonically with families previously contacted to ascertain their reunification preferences, and

1   monitoring voicemail boxes reachable via the Steering Committee's toll-free

2   numbers.

3       As of May 26, the Steering Committee has spoken to a number of parents

4   who have indicated tentatively that they are not satisfied with the current

5   separation from their child and who may want their child returned to their country

6   of origin.  The Steering Committee has conducted and continues to conduct further

7   outreach to families who may not be satisfied with the reunification status quo.

8   Following those discussions, the Steering Committee has yet to identify any

9   families that definitively seek to have their child returned to their respective

10  countries of origin. Our outreach to these families continues and we will advise the

11  government if and when any cases arisen in which a parent seeks to have their

12  child returned. As noted above, the Steering Committee has experienced delays

13  and anticipates further delays in being able to provide this information to the

14  government as a result of the outbreak of the novel coronavirus, but will continue

15  to keep the government and the Court informed of its progress.

16  **B. Steering Committee Progress Contacting "Unreachable" Parents**

17      As noted in previous Joint Status Reports, the Steering Committee has

18  commenced extensive efforts to locate the "unreachable" parents in their respective

19  countries of origin, a group now comprised of the parents of 520 children. Over the

20  last several months, the Steering Committee has continued its additional outreach

21  in an attempt to reach these parents.

22      First, as previously reported, the Steering Committee has engaged in time-

23  consuming and arduous on-the-ground searches for parents in their respective

24  countries of origin. As noted above, these searches are currently suspended as a

25  result of the outbreak of the novel coronavirus, in order to protect the health of

26  personnel working with the Steering Committee, and to prevent the spread of

27  COVID-19 into vulnerable communities, and due to the uncertain timeline of the

28

progression of COVID-19 and governmental responses aimed at curbing the spread of the disease, such searches will continue to be suspended until safe conditions are restored.  Prior to the suspension of these searches, defenders with Justice in Motion had commenced on-the-ground efforts to locate the "unreachable" parents of 281 children, and had successfully located the parents of 135 of those children.[13] During this time, the Steering Committee is using contact information obtained by Justice in Motion's defenders to communicate with, and ascertain the reunification preferences of, parents who had formerly been designated as "unreachable". The Steering Committee is also using this time to plan future searches for families within the *Ms. L.* class to ensure that Justice in Motion's defenders are able to commence such searches promptly upon the restoration of safe searching conditions.

Also as previously reported, the Steering Committee has established toll-free telephone numbers in the United States, Guatemala, Honduras, Mexico and El Salvador to receive inbound phone calls from potential members of the expanded class.  The Steering Committee has distributed this number both by email and U.S. Mail to a number of non-governmental organizations and other community organizations in the United States, who may be able to help us locate parents because they work in the communities these parents are likely to have contact with. In addition, the Steering Committee sent letters in Spanish and English to approximately 1,600 addresses provided by the government for the potential class members that the Steering Committee has not yet reached. These letters explain our role in this action and invite parents to contact the Steering Committee to call

---

[13] In the last Joint Status Report, this number was reported as 148.  That figure included 13 children whose parents have been located by Justice in Motion defenders in their respective home countries, but who the government has indicated are "excluded" from the *Ms. L* class, and are therefore excluded from the numbers reported in this Joint Status Report based on the group defined in Section A.

these toll-free numbers. The Steering Committee continues to work to communicate with potential *Ms. L.* class members identified through this method regarding the possibility of reunification.

Additionally, as previously reported, the Steering Committee has commenced broad-based media outreach efforts to publicize the toll-free phone numbers created by the Steering Committee in Spanish language media. As noted in the last Joint Status Report, outreach efforts to these third-party media outlets have not yet resulted in broad dissemination of the Steering Committee's toll-free numbers, which the Steering Committee believes to be due in large part to the outbreak of the novel coronavirus. The Steering Committee is working to broadly disseminate these toll-free numbers through various media to maximize visibility to potential *Ms. L.* class members and will provide the Court with further updates on its efforts.

Finally, also as previously reported, the Steering Committee has commenced communication with Seneca Family of Agencies ("Seneca"), a non-profit organization that has contracted with the Department of Health and Human Services to connect certain *Ms. L.* class members in the United States with mental health providers, pursuant to a preliminary injunction in *Ms. J.P., et al.* v. *William P. Barr, et al.* (2:18-cv-06081-JAK-SK, C.D. Cal.).  The Steering Committee is hopeful that this work will enable the Steering Committee to obtain contact information for currently unreachable parents in the *Ms. L.* class, and to locate such parents, particularly those believed to be within the United States and thus within the scope of Seneca's work.

**C. Information Sharing**

The parties have narrowed their disputes and continue to make progress on the issue of sharing of information between the government and Plaintiffs and

child advocates. Plaintiffs sent the government a series of questions and requests for clarification on this issue on May 4.

On the separate issue of how government agencies share information among themselves, Plaintiffs notified the Court on May 22 that Plaintiffs agree with the Court's suggestion to appoint either "a committee or a specific person" to oversee resolving problems with this type of information sharing, including problems noted in multiple governmental reports.

**D.    DNA Testing**

The parties continue to make progress on the issue of DNA testing when the government has doubts about the parentage of an adult and child in its custody. The parties have met and conferred and Plaintiffs expect to send to the government further information and proposals on this issue next week.

**III.    *MMM-Dora* Plaintiffs' Report Regarding Settlement Implementation**

The parties continue to work together to implement the settlement agreement approved on November 15, 2018. Class counsel are providing the Government with signed waiver forms as they are received from class members, and class counsel are continuing to work on outreach efforts to class members who may qualify for relief under the settlement. The parties continue to meet and confer on issues related to settlement implementation as they arise.

DATED: May 27, 2020                    Respectfully submitted,


                                        /s/ Lee Gelernt
                                        Lee Gelernt*
                                        Judy Rabinovitz*
                                        Anand Balakrishnan*
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION
                                        125 Broad St., 18th Floor
                                        New York, NY 10004
                                        T:  (212) 549-2660
                                        F:  (212) 549-2654
                                        *lgelernt@aclu.org*
                                        *jrabinovitz@aclu.org*
                                        *abalakrishnan@aclu.org*

                                        Bardis Vakili (SBN 247783)
                                        ACLU FOUNDATION OF SAN DIEGO
                                        & IMPERIAL COUNTIES
                                        P.O. Box 87131
                                        San Diego, CA 92138-7131
                                        T: (619) 398-4485
                                        F: (619) 232-0036
                                        *bvakili@aclusandiego.org*

                                        Stephen B. Kang (SBN 292280)
                                        Spencer E. Amdur (SBN 320069)
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION
                                        39 Drumm Street
                                        San Francisco, CA 94111
                                        T:  (415) 343-1198
                                        F:  (415) 395-0950
                                        *skang@aclu.org*
                                        *samdur@aclu.org*

                                        *Attorneys for Petitioners-Plaintiffs*
                                        *Admitted Pro Hac Vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOSEPH H. HUNT
Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
Sarah.B.Fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

# **DEFENDANTS' EXHIBIT A**

## Response to Plaintiffs' Information Sharing Proposal

### *General Principles*

- There is no free-standing category of "separation information" maintained by the government and shared between its agencies.  By default, given the various legal authorities of each agency involved, information relating to a particular separation or parent and child is compiled from CBP, ICE, and HHS.  In other words, CBP may have some information, ICE may have additional information, and HHS will have additional information.  This information is all stored in various ways and is subject to varying degrees of protection and access rights, depending on the information and the database in which it is stored.  Also, information often changes or develops over time.  So, it is not operationally feasible (nor legally permissible) for that information to all be stored in any one place or by any one agency.
  - The government commits to documenting all relevant information, and to sharing all appropriate information with other agencies, but this information must be documented and shared in accordance with existing legal, privacy, and operational requirements.
  - In order to facilitate intragovernmental information sharing, which will benefit all involved in this effort, DHS and HHS are seeking to enhance communications with the Bureau of Prisons and Marshal's Service.
  - So, while for legal and operational reasons a consolidated database with comprehensive stored information that is fully accessible within the interagency and to the public is not feasible, DHS and HHS are working to enhance information-sharing capability where feasible.
- In the same vein, DHS cannot share all information from its systems of records with HHS.  Plaintiffs seem to be envisioning that all DHS information would be entered into the HHS portal, and that LSPs and other outside entities could then gain access to that information.  DHS cannot agree to do this, for several reasons:
  - HHS is not a law enforcement entity, and therefore is not able to receive or store law enforcement sensitive (LES) information.  Specifically, the UAC portal is not equipped to store such information with appropriate protections.  Thus, DHS cannot share LES information with HHS.  This is particularly true if information entered into the HHS portal will be made available to NGOs and outside entities.
  - LSPs do not have access to the HHS portal, even for purposes of representing UACs in removal proceedings. Rather, individual attorneys submit case file information requests to ORR in order to obtain children's records. To provide LSPs or the public with Portal access would compromise the privacy and security of the children in ORR custody. Further, information regarding a child's separation from their parent may be relevant in some cases to the child's removal proceedings, it may not be relevant in all cases (and, it may be that only certain information is relevant).  Thus, in many cases, the LSPs may not have an official need to know this information.  The government is limited in the personal information that it can share about any individual to representative counsel and

1

cannot share information about an individual alien to entities who do not represent the alien. So, DHS and HHS do not agree to provide access to the Portal to outside entities that have no need to know this information. That is, as described above, particularly important for DHS' LES information.

- For many of the reasons articulated above, the government does not agree to provide parents with the underlying evidence supporting a separation. Much of this information may be deliberative, privileged, or LES. Additionally, the decision to separate is, as Judge Sabraw has noted, one that the government can make in the exercise of its discretion. While DHS has agreed to provide information to parents about why they are separated, the government does not agree that the parents are entitled to a full, evidentiary-style process of *challenging* that decision.

### *What DHS and HHS Currently Do*

#### *Initial Separation Decision*

- At the time of initial encounter/apprehension of a family unit or a group purporting to be a family unit (or at any time the family unit or purported family unit remains in CBP custody), CBP will determine, based on the information available at the time, whether the particular group is, in fact, a family unit. A family unit is defined as an alien parent(s) or legal guardian(s) accompanied by his/her/their alien minor children.
  - o If CBP determines that a particular group is not a family unit, separation of a child from an adult in the group is warranted in the following situations:
    - ▪ A child is accompanied by an adult relative who is not a parent or legal guardian; or
    - ▪ An adult claiming to be a child's parent or legal guardian is determined to not be that child's parent or legal guardian. In this situation, if CBP suspects fraud, smuggling, and/or human trafficking, CBP will coordinate, as appropriate, with other law enforcement agencies for any appropriate action against the adult.
- If a child is separated from an adult who is not a parent or legal guardian, the child will be referred to HHS as an Unaccompanied Alien Child (UAC).
  - o This type of referral will not be documented in CBP's systems of record as a family unit separation.
  - o In situations in which the child was accompanied by a relative (e.g., aunt, uncle, grandparent, sibling), CBP will endeavor to provide HHS with relevant information about the accompanying adult.
  - o CBP may, in an exercise of discretion, provide the accompanying adult information relating to the basis for the separation. CBP will not generally provide reasons to the adult if doing so would create a risk to the child's safety or would not otherwise be in the child's best interests, and will not do so in situations in which CBP suspects fraud, smuggling, and/or trafficking.
- If CBP determines that a purported family unit is, in fact, a family unit, separation may still be warranted based on a parent's: 1) criminal history; 2) communicable disease; 3)

unfitness or dangerousness (including hospitalizations); or 4) some other reason that may not exclude the parent from being treated as a *Ms. L.* class member at a later point in time (i.e., referral for criminal prosecution or as a material witness).

- In all cases in which separation is warranted, HHS will accept the child and consider reunification under either expedited *Ms. L.* procedures or procedures consistent with the TVPRA, as applicable.

*Procedures at Initial Separation of Family Units*

**DHS:**

- At the time of a separation, CBP generally provides, during processing, an explanation to both parent and child of what is occurring, and, if appropriate, the reasons for the separation. Parents and children generally remain together during processing, and so the separation generally is explained to both of them at the same time.
  - Due to existing legal obligations regarding language access (and in accordance with the DHS and CBP Language Access Plans), CBP provides translation services to the family.
  - The degree of detail provided is determined on a case-by-case basis, taking into account the reason for the separation, the age and maturity level of the child, and other relevant factors.
    - Given the nature of CBP facilities, a parent and child who are being separated (even on the basis of the parent's purported danger to the child) may remain in close physical proximity during their time in CBP custody. Thus, CBP will not reveal information that would put that child in increased danger during their time in CBP custody.
    - Additionally, it may not be appropriate to tell a very young child the detailed reasons behind the separation.
- CBP documents the separation in its electronic systems of records, and on both the parent and the child's Form I-213.
  - The parent's Form I-213 will contain the parent's name, A-number, date of encounter, circumstances of encounter, child's name (and A number), records checks (criminal and immigration), and the reason for the separation.
  - The child's Form I-213 will contain the child's name, A-number, date of encounter, circumstances of encounter, parent's name (and A-number), records checks, and the fact of separation.
    - The child's Form I-213 does not always contain the reason for the separation (depending on the specific reason and the supporting information).
- CBP will also generally include relevant paper records (e.g., criminal records, conviction documents (when available), FBI hits) in the A-file. Birth certificates remain with the parent, and are treated as other personal property is treated.
- CBP refers the child to HHS.

- o At the time of referral, HHS receives the child's Form I-213, the child's biographic information and apprehension/encounter information, and general information about the reasons for the separation. CBP provides HHS with the parent(s)'s biographical information (name, A-number, DOB) and the Form I-216 showing the location to which the parent was initially transferred, as well as general information about the reason for separation.
    - ▪ United States Border Patrol ("USBP") enters information directly into the UAC Portal. In some locations, the Office of Field Operations ("OFO") also enters information directly into the UAC Portal. The portal has a checkbox that indicates a parent-child separation. In addition, the portal has a free text narrative box, in which agents and officers can also enter other relevant information.
- o CBP provides HHS with copies of any publically available documentation related to the child which may impact that child's placement (e.g., publically available documentation describing any criminal activity or gang affiliation of the child). CBP does not provide HHS with (LES information about either the parent or child, such as non-publically available criminal history records, certain records evidencing gang membership, or other sensitive records from a foreign government. As law enforcement agencies, CBP and ICE are able to access certain non-public information originating with or owned by other U.S. government entities or foreign governments, and maintains its own LES data. The storage, use, and dissemination of such information is governed by various authorities that generally prohibit the sharing of such information with non-law enforcement entities and the public. Because HHS is not a law enforcement entity, CBP and ICE cannot share this information with HHS.
- CBP refers the parent to ICE or another agency (e.g., the U.S. Marshals Service), as appropriate.
    - o ICE receives the parent's Form I-213, as well as all supporting documentation.
- If the separation is based on a parent's hospitalization, that information will be provided to HHS. This permits HHS to facilitate local placement, if such placement is possible.
    - o CBP may also directly request a local HHS placement for the child.

*Procedures Following Separation*

**HHS**

- Once separated children have been referred to ORR, ORR care providers initiate efforts to establish communication between children and their separated parents, who may be in DHS or Marshals custody, if appropriate.
- As explained below, DHS and HHS confer weekly to maintain a running list of all separations that occurred after June 26, 2018, which includes updates relevant to potential reunifications.
- In consultation with the ORR Federal Field Specialist ("FFS," who has access to the running list of separations, the ORR case manager is able to ascertain basic information

about separated parents and children, and share with attorneys representing separated children who contact them with information requests.

- Where separation is based on communicable disease or a determination of unfitness based on hospitalization: For all situations in which a parent has been separated based on communicable disease or unfitness based on hospitalization, if a parent completes medical treatment or the communicable disease is resolved while remaining in DHS custody, DHS will notify HHS.  If the child has not already been released to a sponsor by HHS, then DHS will work with HHS to facilitate reunification.  Such cases are identified and shared between DHS and HHS operators on a separations list. The agencies update the separations list weekly, to the extent possible (see below, "Interagency Information Sharing Regarding Separations"). Where the conditions giving rise to determinations of communicable diseases or parental fitness persist, ICE will make efforts to coordinate reunification upon removal of the parent, if appropriate, dependent on HHS determinations of what is best for the child.

- Where the separation is based on a transfer to criminal custody for a criminal prosecution or as a material witness:  HHS will maintain custody of the child during the course of that parent's criminal custody so as to effect reunification with the parent, if appropriate. When the parent returns to DHS custody, if there is no continued basis for separation, then ICE will work with HHS to facilitate reunification.  Such cases are identified and shared between DHS and HHS operators on the separations list.

- For parents who are separated because of: 1) criminal history, 2) communicable disease, or 3) a determination of unfitness (other than hospitalization) or dangerousness by DHS: ICE will make a detention determination for the parent. These cases are identified and shared between DHS and HHS operators on the separations list.  If the adult is detained, then ICE will work with HHS to facilitate communication between the parent and child, subject to any operational limitations or child safety or welfare concerns that prevent or advise against such communications, when both the parent and child remain in DHS and HHS custody, respectively.

  o ICE provides all parents, even those who may not be class members or eligible for reunification, with a "Notice of Potential Rights for Certain Detained Alien Parents Separated from their Minor Children" form on which they may elect to be reunified with their child upon removal of the parent if it is feasible and in the best interests of the child.  If a parent who is not a class member (e.g., separated based on criminal history or communicable disease, and the factual basis for the separation remains) requests reunification for removal, ICE and HHS will consider such requests on a case-by-case basis, notwithstanding the fact that the parent remains excluded from the *Ms. L.* class.  A parent who is separated on the basis of unfitness (including hospitalization) or dangerousness and who remains in DHS custody is not entitled to be reunified in DHS custody with their child, so long as the factual basis for the original unfitness or dangerousness determination remains in place.  If ICE becomes aware that such factual basis no longer exists, then it will notify and work with HHS to reassess whether reunification at an ICE FRC is appropriate and, if appropriate, facilitate reunification. To the extent that

such factual basis no longer exists, and ICE determines that the parent will be released from ICE custody, ICE also will notify HHS so that HHS can assess whether reunification is appropriate.  These cases are identified and shared between DHS and HHS operators on a weekly separations list.

### *Interagency Information Sharing Regarding Separations*

- o  ICE and CBP exchange information regarding separations on a weekly basis, to the extent possible. The ICE information includes information regarding parents in Marshals (and by extension BOP) custody, which the Marshals provide to ICE regularly. (But note, previously reported individuals may have since changed location.)
- o  The DHS list of separations is provided to ORR, which incorporates information regarding the separated children, and adds to the list any separations it discovers in its own data.
- o  The agencies then reconcile their data (e.g., separations identified by ORR that were not identified in CBP's initial list). At this point, the data operators from ORR, ICE, and CBP communicate and share information about separations as they are able (some information may be LES). They also provide updates on previously reported separations where appropriate (e.g., ICE provides updates on previously reported separations that occurred for temporary reasons such as hospitalizations). This process takes at least a few days.
- o  A version of this list is provided to the ACLU on the Friday of any week the Court orders a JSR. This version is also maintained as an internal, restricted access document by ORR for its field staff.
- o  This process repeats weekly, to the extent possible. However, due to the lag in reporting and the need to reconcile data, finalized updates regarding new separations generally reflect information that is two weeks old.
- o  Note, through this process, ORR is able to request weekly updates from DHS about the detention status of parents reported in previous updates. Such updates are particularly important in those cases where DHS separated parents from their children on a temporary basis (e.g., illness, injury, hospitalization). Where any temporary basis for separation no longer applies (e.g., a hospitalized parent was discharged from the hospital), and there is no other basis for separation, ORR will proceed with reunification efforts in coordination with ICE, with the participation of the Marshals and BOP where appropriate.

### *Additional Steps the Government is Pursuing to Enable or Enhance the Sharing of Information with Separated Parents and Counsel*

**DHS:**

- •  Providing parents with the written reason for the separation.
  - o  DHS is developing an updated tear sheet, which will be provided to separated parents at the time of the initial separation.  The tear sheet will include the reason for which the parent is being separated, as well as information about how to locate their child following the separation.

6

- A process by which a detained separated parent may submit additional information to DHS regarding their separation.
  - The tear sheet will also explain that, should parents have additional information regarding the separation that they would like the government to consider, they may submit that information to ICE ERO.  ICE will create a detainee request form specifically for separated parents to submit such inquiries directly.  For those parent detainees wishing to submit documentation addressing the basis of separation, unrepresented parents may submit a Separated Parent Detainee request form to ERO and it will be routed to HQ.  ERO will also accept electronic inquiries submitted to a mailbox by a parent's representative counsel. ERO will then review the information and/or question submitted and provide a response.
    - Counsel for represented aliens may submit an e-mail to a designated ICE mailbox, SeparationSupplementalInformation@ice.dhs.gov, with a completed G-28, and any additional information or documentation that they wish to have the agencies consider.  ERO is willing to coordinate with CBP and HHS if/as needed to facilitate reunification in situations where supplemental documentation submitted by detained, separated parents adequately addresses the basis for separation.
- ICE will also create, publish and deploy instructional posters in each of its facilities explaining how detained separated parents and their counsel may pursue the above mechanisms for submitting additional information or questions.  The posters will be in English and Spanish.
  - This is ___not___ a process for parents to challenge their separation.  It is a process by which the parent may submit additional information for DHS to consider in the exercise of its discretion.
- CBP is exploring the idea of developing more formalized procedures with HHS to expedite placement of children for short-term separations based on the medical necessity of the parent (i.e., parent needs to be temporarily hospitalized and the child is transferred to HHS).

**HHS:**

- ORR is internally discussing providing both a verbal and written explanation of the basis for separation to separated children as soon as it has the information; however, written notifications in a language children understand may be difficult to implement for certain languages.
- Case managers at individual care provider grantees would be ORR's main points of contact for attorneys for separated children seeking information.
- ORR plans to channel and document all attorney requests for information about family separations through a centralized resource email box (UAC_Separations@acf.hhs.gov). Case managers must forward all requests they receive to this resource box. And attorneys may contact UAC_Separations@acf.hhs.gov directly. When the inbox receives a request for information from an attorney who represents a separated child, it will forward it to the appropriate FFS, who will then coordinate a response with the case manager.

### *Examples of Situations Where Providing the Reason for the Separation Could be Harmful to the Child*

- Plaintiffs have asked for examples of cases in which the government determined that it would be harmful to the child to provide the reason for the separation. DHS provides the following examples of the types of factual situations it has encountered in which it would not be in the child's best interests to provide the child with the reason for the separation:
  - o A father with an outstanding warrant in his home country for murder arrived with his nine-year old daughter. In such a situation, it would not be in the child's best interest to know the details of her father's history.
  - o A mother with mental health issues attempted to harm her toddler while in CBP custody. The toddler and the toddler's older sister were separated from their mother for their safety. In such a situation, it would not be in the older sister's interest to know the details of her mother's actions.
  - o In situations in which a parent traveling with two siblings has sexually abused the older child, it would not be appropriate to provide that information to the younger sibling.