ETHAN P. DAVIS
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

1
2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

3
4

MS. L, et al.,

Case No. 18cv428 DMS MDD

5

Petitioners-Plaintiffs,

6

vs.

**JOINT STATUS REPORT**

7
8

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

9
10

Respondents-Defendants.

11
12

The Court ordered the parties to file a joint status report (JSR) by 3:00 pm on

13

August 19, 2020, in anticipation of the status conference scheduled at 11:30 am on

14
15

August 21, 2020. The parties submit this joint status report in accordance with the

16

Court's instruction.

17

///

18
19

///

20
21

///

22
23
24
25
26
27
28

# I.   DEFENDANTS' POSITIONS

### A. Update Regarding Government's Implementation of Settlement Agreement

| SETTLEMENT PROCESS[1] | DESCRIPTION | NUMBER |
|---|---|---|
| Election Forms[1] | Total number of executed election forms received by the Government | 440 (258 Parents/182 Children)[2] |
| | • Number who elect to receive settlement procedures | 278 (155 Parents/123 Children) |
| | • Number who waive settlement procedures | 162 (103 Parents/59 Children)[3] |
| Interviews | Total number of class members who received interviews | 166[4] |
| | • Parents who received interviews | 87 |
| | • Children who received interviews | 79 |
| Decisions | Total number of CFI/RFI decisions issued for parents by USCIS | 69[5] |

---

[1] The number of election forms reported here is the number received by the Government as of August 13, 2020.

[2] The number of children's election forms is lower than the number of parent election forms because in many instances a parent electing settlement procedures submitted an election form on his or her own behalf or opposing counsel e-mailed requesting settlement implementation for the entire family, but no separate form was submitted on behalf of the child.

[3] The number of children's waivers is lower because some parents have submitted waivers only for themselves and some parents who have waived reunification also waived settlement procedures and have therefore not provided a form for the child.

[4] Some individuals could not be interviewed because of rare languages; these individuals were placed in Section 240 proceedings. This number includes credible fear and reasonable fear interviews, as well as affirmative asylum interviews.

[5] This number is the aggregate of the number of parents whose negative CFI/RFI determinations were reconsidered, number of parents whose negative CFI/RFI determination was unchanged, and individuals who were referred to 240 proceedings without interview because of a rare language. This number excludes 12 cases where a parent already had an NTA from ICE or was already ordered removed by an IJ (which are included in the interview totals).

| | | |
|---|---|---|
| | • Number of parents determined to establish CF or RF upon review by USCIS | **68[6]** |
| | • Number of parents whose CF or RF finding remains negative upon review by USCIS | **1** |
| | Total number of CFI decisions issued for children by USCIS | **73[7]** |
| | • Number of children determined to establish CF by USCIS | **73[8]** |
| | • Number of children determined not to establish CF by USCIS | **0** |
| | Total number of affirmative asylum decisions by USCIS | **20** |
| | • Number of parents granted asylum by USCIS | **2** |
| | • Number of parents referred to immigration court | **5** |
| | • Number of children granted asylum by USCIS | **3[9]** |
| | • Number of children referred/returned | **10** |

[6] This number includes parents who received positive CF/RF determinations upon reconsideration, parents who received a Notice to Appear based on their child's positive CF determination, and parents who were placed in Section 240 proceedings due to a rare language.

[7] This number is the aggregate of the number of children who received a positive CF determination, the number of children who received a negative CF determination, and children who were referred to 240 proceedings without interview because of a rare language.

[8] This number includes children who received a positive CF determination, children who received a Notice to Appear as a dependent on their parent's positive CF determination, and children who were placed in Section 240 proceedings due to a rare language.

[9] This number includes children granted asylum as a dependent on their parent's asylum application.

| | to immigration court | |
|---|---|---|
| **Removals** | Number of class members who have been returned to their country of origin as a result of waiving the settlement procedures | **103 Parents**[10] |

## B. Expanded Class Members

On April 25, 2019, the Court approved Defendants' Plan for identifying members of the expanded class. In advance of the Court's October 25, 2019 deadline, Defendants completed the process of identifying members of the expanded class and produced spreadsheets identifying those individuals to Plaintiffs' counsel. On November 6, 2019, the Steering Committee notified Defendants that in the 11 batches there were 149 individuals who had been identified by the government as being both children of potential expanded class members and "exclusions." On December 13, 2019, Defendants provided Plaintiffs with their completed review and reconciliation of the 149 individuals with inconsistent labels.

On February 7, 2020, Defendants reached out to Plaintiffs to request that Plaintiffs provide Defendants with an update regarding their efforts to locate and reunify members of the expanded class. Following multiple meet and confer discussions, on July 5, 2020, Plaintiffs provided Defendants with an updated spreadsheet containing information regarding members of the expanded class, and

---

[10] This number is as of August 8, 2020.

identifying members of that class who Plaintiffs currently believe might require further action by Defendants. Defendants reviewed the information provided and asked Plaintiffs some follow-up questions, to which Plaintiffs responded on August 6, 2020. Defendants are considering Plaintiffs' responses, and propose that the parties should meet and confer again in the near future to determine whether any outstanding issues can be resolved, or whether intervention of the Court will be required.

**C. Government Processes, Procedures, and Tracking, for Separations Since June 26, 2018.**

*Data Requested by Plaintiffs*.   Defendants continue to provide Plaintiffs updated reports containing information regarding parents and children separated since the Court's June 26, 2018 Order on a monthly basis.

*Processes and Procedures*.

In the May 27, 2020 Joint Status Report, Defendants provided the court with updated reporting regarding the various steps it has taken to implement Paragraph 5 of the preliminary injunction, ECF No. 83 at 24, ¶ 5, and improve the processes and procedures for information sharing between the agencies related to family separations. Following the July 10, 2020 status conference, the Court ordered that "Defendants shall provide a declaration from the Assistant Commissioner of OIT or other appropriate designee setting out the status of the development of the UIP and estimated completion date. The declarant should also address the Court's concerns

about how the UIP will enable parents in criminal custody access to their children's location information and how the UIP will assist in reunification efforts when a parent is transferred from criminal custody to immigration custody." ECF No. 543 at 2. In accordance with the Court's order, Defendants provide the attached declaration. Defendants also direct the Court to their prior submissions regarding the tear sheet and processes by which separated parents are given information that will allow them to locate and communicate with their children.

**D. Implementation of DNA Testing**

In its January 13, 2020 order, this Court ordered that Defendants "must conduct DNA testing before separating an adult from a child based on parentage concerns." Order at 11-12. The Court further stated that "[s]ubjective concerns about parentage—or inability to validate documentation—are an insufficient basis for separation when those concerns can be definitively addressed through use of readily accessible, inexpensive and accurate scientific testing." *Id.* at 12. In reaching this decision, the Court relied on the "relatively few" number of separations based on "unverified familial relationship," the existence of the Rapid DNA pilot program at certain locations along the southwest border, and the assumption that "if testing is not available at a particular facility, Defendants can transfer the family to a facility where that testing is available, or take swabs from the parent and child and send the swabs for testing, as they did with Ms. L. and her daughter." *Id.* at 11.

In the March 4, 2020 JSR, Defendants provided information regarding their efforts to comply with this provision of the Court's order. The Court directed the parties to meet and confer on this issue, and the parties have met and conferred by telephone regarding this issue multiple times. In the latest call, Defendants reported to Plaintiffs that they have resolved the issues identified in their March 4, 2020 submission, and now believe that they will be able to fully implement the Court's order with regard to DNA testing. The parties agreed that this resolves this issue. Plaintiffs agreed that if they had any additional follow up questions they would provide those questions to Defendants' counsel by email. To date, no such questions have been shared and Defendants therefore believe this issue to have been resolved.

## II.  *MS. L.* PLAINTIFFS' POSITION

### A. Steering Committee Outreach to Sponsors and Parents of Children of Expanded Class Members

The government has provided eleven lists identifying 1,556 children of potential expanded class members. Plaintiffs have focused on reaching children whose membership in the class is not contested, and for whom the government has provided at least one phone number for a sponsor or for the child's parent.[11]

---

[11] The eleven lists identify a total of 1,556 unique children, 1,134 of which have been confirmed by the government as being children of potential expanded class members. For 104 of these 1,134 children of potential class members, the government has not provided a phone number. Parents of the 422 children who have not been identified by the government as potential expanded class members have been categorized as "exclusions". The Steering Committee also intends to reach individuals the government has categorized as excluded from the class, and Plaintiffs reserve the right to contest those exclusions.

As of August 19, the Steering Committee has attempted to reach the families of all of these 1,030 children, and has successfully reached the parents (or their attorneys) of 438 children, an increase of two children since the last status report.

As a result, 592 children remain for whom the Steering Committee has not yet reached the separated parent, approximately two-thirds (69%) of whom are believed on the basis of the last information available from the government, to be in their respective countries of origin.  Of these 592, the Steering Committee believes, on the basis of its unsuccessful attempts to reach the family telephonically, that parents of 517 will not be reached using the telephone numbers provided by the government.  For these families, the Steering Committee has commenced or intends to commence additional efforts to locate the separated parent, as discussed below.

As reported in the last Joint Status Report, the Steering Committee's additional efforts to locate separated parents have been hampered since March of this year due to COVID-19.

The Steering Committee has conducted and continues to conduct further outreach to families who have tentatively indicated that they are not satisfied with the current separation from their child and who may want their child returned to their country of origin. Following discussions with these parents, the Steering Committee has yet to identify any families that definitively seek to have their child returned to their respective countries of origin. Our outreach to these families continues and we will advise the government if and when any cases arisen in which a parent seeks to have their child returned, prior to bringing any such cases requiring further assistance to the attention of the Court. As noted above, the Steering Committee has experienced delays and anticipates further delays in being able to obtain and provide this information to the government as a result of the outbreak of the novel coronavirus and its continued spread across the United States

18cv428 DMS MDD

and various Central American countries, but will continue to keep the government and the Court informed of its progress.

**B. <u>Steering Committee Progress Contacting "Unreachable" Parents</u>**

As noted in previous Joint Status Reports, the Steering Committee has commenced extensive efforts to locate the "unreachable" parents in their respective countries of origin, a group now comprised of the parents of 517 children. Over the last several months, the Steering Committee has continued its additional outreach initiatives in an attempt to reach these parents.

First, as previously reported, the Steering Committee has engaged in time-consuming and arduous on-the-ground searches for parents in their respective countries of origin. As noted above, physical on-the-ground searches are currently suspended as a result of the outbreak of the novel coronavirus, in order to protect the health of personnel working with the Steering Committee, and to prevent the spread of COVID-19 into vulnerable communities, and due to the uncertain timeline of the progression of COVID-19 and governmental responses aimed at curbing the spread of the disease, such searches will continue to be suspended until safe conditions are restored.  Prior to the suspension of these searches, defenders with Justice in Motion had commenced on-the-ground efforts to locate the "unreachable" parents of 281 children, and had successfully located the parents of 135 of those children.  During this time, the Steering Committee has used contact information obtained by Justice in Motion's defenders to communicate with, and ascertain the reunification preferences of, parents who had formerly been designated as "unreachable". The Steering Committee has also used this time to plan future searches for families within the *Ms. L.* class to ensure that Justice in Motion's defenders are able to commence such searches promptly upon the restoration of safe searching conditions, and since the last status conference has

assigned all remaining "unreachable" parents to Justice in Motion's defenders in parents' respective countries of origin in order to continue "virtual" (*i.e.*, telephonic) searches and in preparation for physical on-the-ground searches once they are safe to resume.

Also as previously reported, the Steering Committee has established toll-free telephone numbers in the United States, Guatemala, Honduras, Mexico and El Salvador to receive inbound phone calls from potential members of the expanded class.  The Steering Committee has distributed this number both by email and U.S. Mail to a number of non-governmental organizations and other community organizations in the United States, who may be able to help us locate parents because they work in the communities these parents are likely to have contact with. In addition, the Steering Committee sent letters in Spanish and English to approximately 1,600 addresses provided by the government for the potential class members that the Steering Committee has not yet reached. These letters explain our role in this action and invite parents to contact the Steering Committee to call these toll-free numbers. The Steering Committee continues to monitor voicemail boxes reachable via these toll-free numbers.

Additionally, as previously reported, the Steering Committee has commenced broad-based media outreach efforts to publicize the toll-free phone numbers created by the Steering Committee in Spanish language media. As noted in the last several Joint Status Reports, outreach efforts to these third-party media outlets have not yet resulted in broad dissemination of the Steering Committee's toll-free numbers, which the Steering Committee believes to be due in large part to the continuing effects of the novel coronavirus. While new inbound calls to the toll-free numbers have slowed considerably, the Steering Committee is working to identify opportunities to broadly disseminate the toll-free numbers through various media to maximize visibility to potential *Ms. L.* class members, including most

recently by seeking to collaborate on such media outreach initiatives with other non-profit organizations.  The Steering Committee will continue to update the court on these efforts.

Finally, also as previously reported, the Steering Committee is in communication with Seneca Family of Agencies ("Seneca"), a non-profit organization that has contracted with the Department of Health and Human Services to connect certain *Ms. L.* class members in the United States with mental health providers, pursuant to a preliminary injunction in *Ms. J.P., et al.* v. *William P. Barr, et al.* (2:18-cv-06081-JAK-SK, C.D. Cal.).  The Steering Committee remains hopeful that this work will enable the Steering Committee to obtain contact information for currently unreachable parents in the *Ms. L.* class, and to locate such parents, particularly those believed to be within the United States and thus within the scope of Seneca's work.  The Steering Committee intends to use this information to conduct further outreach to class members to ascertain their preferences with respect to reunification.

C. **Information Sharing Regarding Expanded Class Progress**

As discussed at the July 10 Status Conference, the government had requested additional information regarding efforts to contact the expanded *Ms. L* class and the relief that expanded class members may seek. On June 26, the parties met and conferred telephonically, agreed upon the content of the additional information to be shared and, on July 5, the Steering Committee delivered to the government a spreadsheet which the Steering Committee believes is consistent with the parties' June 26 meet and confer.

On July 29, the government contacted the Steering Committee with follow-up questions and, on August 6, the Steering Committee provided responses and proposed a meet and confer on the issue of further relief.  The Steering Committee

intends to continue working with the government concerning any additional questions and, as previously reported, the Steering Committee has agreed to discuss any further requests for class member relief with the government in good faith before bringing any such cases to the attention of the Court.

**D.** **Information Sharing Between the Government and Plaintiffs and Child Advocates**

Plaintiffs and child advocates have summarized issues regarding information sharing between government agencies and children, families, and their advocates that they believe have been resolved with the government, as well as the few remaining issues that are not resolved. They submitted that summary to the government on July 13, and requested that the government respond if they disagreed with Plaintiffs' characterizations of common points of agreement, and respond to the few unresolved issues Plaintiffs highlighted, so that the parties can determine which issues will not be able to be resolved by agreement. Plaintiffs will update the Court when they receive a response.

On the separate issue of how government agencies share information among themselves, Plaintiffs await the government's update on those efforts, per the Court's Order after the last status conference, ECF No. 543.

**E.** **DNA Testing**

On July 16, the government informed Plaintiffs that they were withdrawing the concerns they had raised to the Court about DNA testing before separations based on parentage doubts. The parties are conferring about improvements to information-sharing when the government separates based on parentage; Plaintiffs do not have any matters to raise with the Court on this issue at this time.

### III.    *MMM-Dora* Plaintiffs' Report Regarding Settlement Implementation

The parties continue to work together to implement the settlement agreement approved on November 15, 2018. Class counsel are providing the Government with signed waiver forms as they are received from class members, and class counsel are continuing to work on outreach efforts to class members who may qualify for relief under the settlement. The parties continue to meet and confer on issues related to settlement implementation as they arise.


DATED: August 19, 2020                    Respectfully submitted,


                                          /s/ Lee Gelernt
                                          Lee Gelernt*
                                          Judy Rabinovitz*
                                          Anand Balakrishnan*
                                          AMERICAN CIVIL LIBERTIES UNION
                                          FOUNDATION
                                          125 Broad St., 18th Floor
                                          New York, NY 10004
                                          T:  (212) 549-2660
                                          F:  (212) 549-2654
                                          *lgelernt@aclu.org*
                                          *jrabinovitz@aclu.org*
                                          *abalakrishnan@aclu.org*

                                          Bardis Vakili (SBN 247783)
                                          ACLU FOUNDATION OF SAN DIEGO
                                          & IMPERIAL COUNTIES
                                          P.O. Box 87131
                                          San Diego, CA 92138-7131
                                          T: (619) 398-4485
                                          F: (619) 232-0036
                                          *bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*


ETHAN P. DAVIS
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
Sarah.B.Fabian@usdoj.gov

ADAM L. BRAVERMAN

United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MS. L., *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | CASE NO. 18cv428 DMS MDD |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS | ) | |
| ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DECLARATION OF ROBERT J. COSTELLO

I, Robert J. Costello, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows, relating to the above-captioned matter:

1.  I am currently an Executive Director with the Office of Information Technology (OIT), Enterprise Service, U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS).  I am currently serving on detail to the Border Enforcement and Management Systems Directorate since March of 2017, and concurrently in the permanent role of the Executive Director of Enterprise Networks and Technology Support. I have served as an Executive Director of OIT since August of 2017. Prior to this, I was the Deputy Executive Director of Field Support within OIT.  have over twenty-five years of information technology leadership experience as a senior information technology executive in federal government and private sector, including at the U.S Immigrations and Customs Enforcement (ICE) and the U.S Air Force.

1

2.     As Acting Border Enforcement and Management Systems' Executive Director, I am responsible for management and oversight of the programs assigned to my directorate which includes the Unified Immigration Portal (UIP).  I am familiar with the development of the UIP and meet daily with the program team as well as participate in bi-weekly briefs to the Assistant Commissioner of Office of Information and Technology (OIT) and agency leadership on the progress of the Unified Immigration Portal.

3.     I understand that, in following the July 10, 2020 status conference in this case, the Court issued an order requesting that the Assistant Commissioner of OIT, or other appropriate designee, provide a declaration regarding "the status of the development of the UIP) and estimated completion date,"  as well as "how the UIP will enable parents in criminal custody access to their childrens' [sic] location information and how the UIP will assist in reunification efforts when a parent is transferred from criminal custody to immigration custody."  I have prepared this declaration in accordance with the Court order because the AC determined that I was the appropriate designee to provide the requested information.

4.     As outlined in previous filings in this case, CBP OIT, working with its partners in ICE; U.S. Citizenship and Immigration Services; the U.S. Department of Justice (DOJ), Executive Office for Immigration Review; and the U.S. Department of Health and Human Services (HHS), is developing the UIP.  Congress has allocated funding for the UIP. Specifically, CBP was allocated $32 million in the Pub. L. No 116-26, *Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019*, for the development of the UIP.

5.     The UIP is intended to be a technological platform where authorized users within the U.S. government can access relevant immigration-related data from multiple agencies through

a single interface, to enable a more complete understanding of an individual's journey throughout the immigration system.  In other words, the UIP will serve as a centralized location for agencies to share certain information about individuals in the immigration process.  The relevant information shared across the UIP may include, for instance, biographical information, details of an individual's encounter by CBP or ICE (e.g., data from a Form I-213), and the current location of an individual (e.g., whether that individual is in CBP, ICE or HHS custody).  In compliance with its respective legal, privacy, and operational requirements, each agency will maintain its ownership of its own data and will be able to control what types of information it shares through the UIP.  Therefore, certain information is restricted from being shared outside of the respective agencies, and not all users of the UIP will have the same access to information.  For example, HHS is not a law enforcement entity and therefore does not have access to law enforcement sensitive information through the UIP.  However, authorized users will have real-time access to all relevant information to which they have access.

6.     Currently, the UIP development team is continuing its ongoing efforts to work with its federal partners to establish the UIP as expeditiously as possible.  The team has already completed several important steps, such as developing and setting user access controls and establishing connection capabilities to enable users to log into the UIP system.  CBP and HHS also continue to work to develop the UAC Coordination Dashboard, which provides HHS users with a way to view information about unaccompanied alien children (UACs) in CBP custody, in order to help facilitate the transfer of those UACs from CBP to HHS.  Additionally, ICE also has access to data in the UIP concerning individuals in CBP's

custody, so that CBP and ICE can better coordinate regarding the transfer of an individual from CBP to ICE.

7.     The UIP development team is utilizing a flexible buildout to adapt to shifting business and operational needs, providing a fluid timeline, and thus the UIP is being implemented in phases.

8.     As previously discussed, the UIP will enable select information sharing between authorized users within the U.S. government.  The UIP is intended to be, and is designed to be, an internal U.S. government system that government users can utilize to obtain real-time access to relevant information about an individual's journey through the immigration system.  For instance, the UIP will permit HHS to view certain information, maintained in CBP databases, about the apprehension of a particular adult and child, including, in some cases, information about why that adult and child were separated.  The UIP will also permit HHS to view information maintained in CBP's electronic systems of records regarding the date on which a separation occurred.  The UIP will also permit both ICE and HHS to access relevant information about both an adult and child that may be helpful in determining whether reunification is appropriate.

9.     The UIP is an internal government system, and is not designed for or intended for use by individuals outside of the U.S. government.   Thus, individuals outside of the U.S. government will not be permitted to access the data in the UIP.  This requirement is critical to ensure that the system complies with all relevant legal, privacy, and operational requirements of the individual agencies that own the data in the system. In other words, aliens in DHS custody, or in criminal custody (including with U.S. Marshals Service (USMS) or the Federal Bureau of Prisons (BOP)) – including separated parents – will not

be able to access the UIP or the data within the system (nor are they provided access to any DHS databases).  Similarly, attorneys or advocates representing separated parents or children (or any alien) are not able to access the UIP (nor are they generally provided access to other DHS databases).

10.    The current iteration of the UIP is not designed to facilitate the sharing of information about aliens in criminal custody.  Specifically, the UIP does not currently contain information from the USMS or BOP.  However, if a parent and child were separated based on a parent's referral for prosecution, that information would be included in the UIP.

11.    As described above, the information contained with the UIP may be helpful in facilitating reunification efforts, if appropriate, once an alien is released from criminal custody to DHS custody.  The UIP will enable DHS and HHS to timely share information about a parent in DHS custody, including a parent who was transferred from criminal custody to DHS custody, which will help facilitate reunification efforts, when appropriate.

12.    I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 19th day of August, 2020.

*Robert J Costello*
_____
Robert J. Costello
Executive Director
Office of Information Technology
Enterprise Services
U.S. Customs and Border Protection