Lee Gelernt*
Daniel A. Galindo (SBN 292854)
Anand Balakrishnan*
Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
*lgelernt@aclu.org*
*dgalindo@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0783
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for* Ms. L. *Plaintiffs*
*\*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al. <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-AHG <br><br> Date Filed: May 12, 2025 <br><br> **RENEWED MOTION TO ENFORCE SETTLEMENT AGREEMENT REGARDING PROVISION OF LEGAL SERVICES AND MEMORANDUM IN SUPPORT** |

# RENEWED MOTION TO ENFORCE SETTLEMENT AGREEMENT REGARDING PROVISION OF LEGAL SERVICES AND MEMORANDUM IN SUPPORT

Plaintiffs respectfully renew their Motion to enforce the Settlement Agreement in light of Defendants' recent decision to end the legal services contract discussed at length in Plaintiffs' filings and below.

Plaintiffs and Defendants met and conferred on May 9 and did not reach a resolution.

Plaintiffs thus respectfully ask the Court to order a continuation of the current contract to provide legal services to minimize any interruption and harm, and order further relief as the Court finds appropriate. Should the government wish later to pursue alternatives with an orderly transition and no breach of Settlement obligations, the Court should order that any plan, with operational details, be submitted sufficiently in advance of the end of the contract date to allow Plaintiffs to assess and, if needed, contest its sufficiency.

## MEMORANDUM OF LAW

Broadly speaking, the Settlement provides for two distinct buckets of legal services. The first is general legal services. That means services unrelated to the particular facts and needs of an individual client, for instance, a help desk or group presentations about how the immigration courts work and other general facts, *not assistance* with an individual case.

The second and *far more* important service is individual legal consultation and advice: what rights and benefits an individual may have under the settlement based on their particular circumstances; how to pursue those rights and benefits given their circumstances; the deadlines relevant to their case; assistance in submitting any necessary documents in their case; strategic decisions about their case; and how to prepare for any upcoming interviews or hearings. In short, a

lawyer to provide individualized advice and assistance for a class member or qualifying family member.

The government has discussed how they intend to provide the general legal services through EOIR. Plaintiffs have doubts that even this less important service can be provided by the government. Regardless, there is no question that the government cannot provide the second service, the critical individualized legal advice to class members.

The Settlement makes a core promise: "Defendants will ensure that the [Legal Access] Program is *adequately resourced and funded to provide services for all unrepresented* Ms. L. *Settlement Class members*." Settlement § IV.B.2.c.i.(d) (emphasis added). This promise has already been broken. The evidence shows that Defendants have no plan in place, let alone in operation, to provide the legal services they agreed to in the Settlement. Nor has the meet-and-confer process produced any assurance that the government will honor the terms of the Settlement.

Recognizing that the Executive Office for Immigration Review (EOIR)—the agency that oversees the immigration courts—cannot provide legal advice to litigants who appear before it, Defendants have sought to cobble together the semblance of a program to take the place of the services funded through Acacia, which were extensive and developed and implemented over many months. Those services included providing legal advice based on individualized consultations, preparation for interviews before the Asylum Office, and preparation of documents for submission to the United States Citizenship and Immigration Service (USCIS) and the immigration courts—to be available to every unrepresented class member.

In place of these mandatory funded services, Defendants apparently intend simply to refer individuals to a pre-existing list of nonprofit organizations, organizations that were not even aware they were being held up as a resource to

2

18cv00428

serve the class. The government has committed no funding to enable these organizations to do this work. Perversely, many have recently faced dire funding cuts by the same government that now proposes to rely on them to offer free services that Defendants are obligated to pay for under the Settlement. Extensive evidence submitted with this motion shows that the legal immigration organizations on the government's proffered list cannot carry this additional load, meaning that the individualized legal advice guaranteed by the Settlement will not occur.

While mandatory legal services remain unfunded and unavailable and pro bono placement is stymied, class members are reaching deadlines for parole, re-parole, and work authorization, among others. Without parole, they will be vulnerable to detention, re-separation, and removal. Meanwhile, assistance with asylum applications, the only prospect of permanent immigration relief offered through the Settlement, has barely begun because the Acacia subcontractors and others providing legal advice to class members have had to prioritize urgent steps that are precursors to filing for asylum, such as preparing parole and re-parole applications and motions to dismiss removal proceedings and rescind removal orders.

**ARGUMENT**

The undisputed evidence demonstrates that Defendants have breached the Settlement Agreement by failing to develop or present to this Court any credible plan to provide the legal services it promised.

I. **The Preponderance of the Evidence Standard Applies to this Motion.**

Courts have inherent power to enforce settlements between the parties in cases pending before them. *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). Here, the Parties jointly acknowledged that the Court would "maintain the ability to monitor good faith compliance with the Agreement." Joint Mot. for Final

3

18cv00428

Approval of Class Action Settlement at 5 (Dec. 1, 2025), ECF No. 721. Thus, the Settlement provides that the Court has exclusive jurisdiction to enforce its provisions and will retain such jurisdiction until December 11, 2029. Settlement § VII.D. ("The Court shall have the power to award such relief and issue such judgments as the Court deems necessary for enforcement of the Settlement Agreement."); *see also id.* § VII.B.

"The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (internal citations and quotation marks omitted); *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 704, 709 (9th Cir. 1989) ("Under California law, settlement agreements are governed by general principles of contract law. . . . The motion to enforce the settlement agreement essentially is an action to specifically enforce a contract.").

Under California state law, courts apply the preponderance of the evidence standard to motions to enforce settlement agreements. *See Buss v. Superior Court*, 16 Cal. 4th 35, 54 (1997) (preponderance of the evidence standard applies to "contractual causes of action") (citations omitted); *see also Flores v. Sessions,* 394 F. Supp. 3d 1041, 1049 (C.D. Cal. 2017) (applying preponderance of the evidence standard).

No showing of irreparable harm is required. *Flores*, 394 F. Supp. 3d at 1049. Even if a showing of irreparable harm were required, however, Plaintiffs need not wait for the harm to occur: "[A] plaintiff must demonstrate immediate *threatened* injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis added). The evidence submitted here shows that irreparable has occurred and continues to occur as deadlines pass for parole, work authorization, and other intermediate relief designed to keep class members safe. *Infra* Point III.

## II. Defendants Have Breached the Legal Services Provisions.

The evidence submitted with this motion establishes that Defendants have no workable plan to provide the legal services required under the Settlement. As noted, the Settlement provides for two general buckets of services: help on matters of general relevance and individualized legal advice. Specifically, the Settlement obligates the government to offer three distinct types of assistance: "Legal Access Services for Reunified Families," Settlement § IV.B.2.c.i., "Program to Place Cases with Pro Bono Representatives," *id.* § IV.B.2.c.ii., and "Assistance Outside EOIR Proceedings," *id.* § IV.B.2.c.iii. Defendants are failing in all three areas.

### A. Legal Access Services for Reunified Families are mandatory and involve individualized legal advice.

The legal access services formerly provided through Acacia and outlined in this part of the Settlement are mandatory. The Settlement makes that clear in two ways. First, it states: "*In addition to* the group information sessions, individual information sessions, and self-help workshops that EOIR's Immigration Court Helpdesk Program (ICH) offers, *EOIR, through ICH or a separate similar program ("Program"), shall also provide* assistance to *Ms. L.* Settlement Class members, short of full representation, including . . ." *Id.* § IV.B.2.c.i. (emphasis added). "Shall" denotes a mandate in contractual terms. *See California Clovis, LLC v. Sierra Vista Realty LLC*, 634 F. Supp. 3d 881, 889 (E.D. Cal. 2022); *Woodbury v. Brown-Dempsey*, 108 Cal. App. 4th 421, 433, 134 Cal.Rptr.2d 124 (2003) ("Ordinarily, the word 'may' connotes a discretionary or permissive act; the word 'shall' connotes a mandatory or directory duty."); *Barber v. Citimortgage, Inc.*, 2014 WL 12561627, at *6 (C.D. Cal. Sept. 19, 2014) (citing *Woodbury* to interpret contract terms). Second, it states: "Defendants *will ensure* that the Program is adequately resourced and funded to provide services for *all unrepresented* Ms. L.

*Settlement Class members . . . .*" *Id.* § IV.B.2.c.i.(d) (emphasis added). The language of obligation could not be clearer.

Several of these mandatory services involve individualized lawyer-client consultation about the particular facts and procedural history of the class member's case.

*First*, the Settlement requires that the Program provide

> legal advice, such as individualized consultations and counseling about relief for which *Ms. L.* Settlement Class members may be eligible, and the steps necessary to apply for such relief, as well as preparation for any interviews before USCIS . . . .

*Id.* § IV.B.2.c.i.(a) (emphasis added). Given the confidentiality guarantees that apply when a lawyer gives a client legal advice (including in a context short of full representation), individualized consultation is an inherent part of the process. Model Rules of Prof. Conduct r. 1.6. A lawyer assisting a class member in accordance with this provision would need to know, for example, whether the class member has parole and, if so, when it expires; has entered the United States more than once; has prior history with immigration enforcement; has had any encounters with the police, or has a standing removal order that needs to be rescinded before an affirmative asylum application may be filed with USCIS under the Settlement. Only an understanding of these and many similar questions can equip an attorney to advise a class member on what steps are necessary to obtain relief or to prepare a client to be interviewed by USCIS.

*Second*, the "Program" must provide

> assistance with document preparation, including preparing immigration-related legal documents for submission to DHS (including USCIS), and EOIR pursuant to EOIR's limited appearance regulations . . . .

*Id.* § IV.B.2.c.i.(a). Again, preparation of documents for class members requires detailed knowledge of the facts and history of their cases, and the preparer must file a limited appearance with EOIR if the documents are filed in immigration court or the Board of Immigration Appeals. 8 C.F.R. §§ 1003.17(b), 1003.38(g)(2).

*Third*, the "Program" must provide

> Friend of the Court services, where allowed by the immigration court, to facilitate the flow of information in the courtroom, including informing noncitizens of their rights and obligations and calling attention to law or facts that may be helpful to the immigration court.

*Id.* § IV.B.2.c.i.(a). This role, too, requires particularized familiarity with the class member's case.[1]

It is these services that the Acacia network provided through individualized legal assistance. And that has been what has been eliminated.

### B. EOIR cannot provide such services.

EOIR acknowledges that it cannot provide these services in place of the Acacia network. Its own practice manuals prohibit its staff from offering legal advice. Immigration Court Practice Manual, ch. 1.6(c)(2) ("Court Administrators and other staff members are prohibited from providing any legal advice and . . . no information provided by Court Administrators or other staff members may be construed as legal advice."); Board of Immigration Appeals Practice Manual, ch. 1.6(b)(1)(A) ("[C]lerks, like all Board staff, are prohibited from providing any legal advice, and . . . no information provided by the Clerk's Office may be construed as legal advice."). Federal ethics regulations similarly forbid federal employees, including those at EOIR, from providing legal advice to parties who may appear

---

[1] This provision of the Settlement demands other services that it is not clear how or whether the government will provide, including "trauma-informed interpretation" and travel stipends for in-person legal services and court appearances. *Id.*

7

18cv00428

before the agency. 5 C.F.R. §§ 2635.101(b)(8) ("Employees shall act impartially and not give preferential treatment to any private organization or individual.") 2635.101(b)(14) ("Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part.").

The new flyer EOIR has posted on its website to inform the public about the "federalized" program lists only three "available legal services": "group orientations, group workshops, pro bono referral"—none of the one-on-one services enumerated above is included except by way of "pro bono referral," discussed further below. EOIR, Legal Access Servs. for Reunified Fams. Program (April 2025), https://www.justice.gov/eoir/media/1398751/dl?inline.

As to "Friend of the Court Services," the government takes the position that they "are no longer permitted at EOIR." Suppl. Decl. of Stephanie E. Gorman ¶ 13 (April 30, 2025), ECF No. 768.1 (citing EOIR Policy Memorandum 25-18, Cancellation of Director's Memorandum 22-06 and Reinstatement of Policy Memorandum 20-05 (Feb. 4, 2025)). Reinstated Policy Memorandum 20-05 does not in fact bar the immigration courts from allowing the appearance of friends of the court; the Memorandum expressly reserves that question. EOIR Pol. Mem. 20-05 at 3 n.7 (Nov. 21, 2019), https://www.justice.gov/eoir-operational-status/media/1388336/dl?inline. Instead, the Memorandum delineates a limited role for a friend of the court as "an aid to the court . . . and not as an advocate on behalf of an individual." *Id.* To the extent that an immigration court authorizes such a neutral friend of the court to appear in a class member's case, this service remains on offer under the Settlement. Nevertheless, EOIR staff cannot appear before their own agency.

EOIR's disqualification from offering individualized legal advice is further evidenced by its lack of assurances to Plaintiffs or this Court that it will keep

confidential the information it would learn from class members if it were to engage in private consultations. So long as EOIR does not consider itself strictly bound to keep client confidences, it cannot and should not provide individualized legal consultations. *See* Model Rules of Pro. Conduct r. 1.6.

### C. Pro bono placement is no substitute for mandatory funded legal services, and the government has no plan to implement pro bono placement in any event.

The Settlement includes a separate and distinct provision describing the pro bono placement program. Through the "Legal Access Services for Reunified Families" Program described above, *supra* Point II.A., Acacia did provide essential individualized legal advice for class members, but the Settlement did not fund Acacia to provide full legal representation for a class member throughout their immigration proceedings. Accordingly, in recognition that some class members would need full legal representation, the Settlement also created a pro bono placement program.

Critically, however, unlike the legal access program, which is meant to reach "all unrepresented *Ms. L.* Settlement Class members," Settlement § IV.B.2.c.i.(d), the pro bono placement program explicitly cautions that "EOIR cannot ensure that it can find a pro bono representative for every family," *id.* § IV.B.2.c.ii. On this basis alone, the pro bono placement program cannot cover the services enumerated in the legal access program provisions—the legal access services are guaranteed, and a pro bono representative is not.

The Declaration of Ms. Gorman, Acting Assistant Director of Policy for EOIR, reinforces that the government understands the pro bono placement program as offering services only on an as-available basis; she states that EOIR will "leverage its existing pro bono network, including those listed on the EOIR Pro

9

Bono List,"[2] and will "*refer* all interested class members for pro bono representation." Gorman Suppl. Decl. ¶ 11, ECF No. 768-1 (emphasis added). This is no guarantee, nor could it be. Thirty-one representatives of the nonprofit organizations on the proffered government list have filed declarations in support of this motion.[3] These organizations offer free and low-cost legal services to immigrants from New York to California, Louisiana to Illinois, and everywhere in between. They had no prior notice that Defendants were planning to "leverage" them as part of a pro bono network available to offer legal services to *Ms. L.* class members. *E.g.*, Kraft Decl. ¶ 3; Mansori Decl. ¶ 4; Kusuda Decl. ¶ 4.

Most attest that they cannot offer services to *Ms. L.* class members at all; none is able to accept a significant number of these cases without additional funding and support. *See, e.g.*, Yang Decl. ¶¶ 8-12 (unable to offer services at all); De La O Decl. ¶¶ 8-12 (same); McNulty Decl. ¶¶ 7-10 (same); Chung Decl. ¶¶ 7-12 (same); *see also, e.g.*, Jang Decl. ¶¶ 7-10 (cannot accept significant number of cases without additional funding and support); Bryant Decl. ¶¶ 7-11 (same). Indeed, the government itself has drastically reduced their capacity through a series of funding cuts and contract cancellations that have prompted mass layoffs. As the legal director of the Northwest Immigrant Rights Project, the sole pro bono provider on the EOIR list offering services in Washington State, explains: "It simply defies all logic for the federal government to allegedly rely on our organization to provide these additional services while at the same time it has eliminated a significant portion of our resources for representing our existing clients." Adams Decl. ¶¶ 3, 8; *see also, e.g.,* Fisher Flores Decl. ¶ 8 ("The stop-work orders, termination orders, and other related directives issued by the federal

---

[2] This list is available at https://www.justice.gov/eoir/file/probonofulllist/dl.
[3] *See* Summary Chart of Declarations From Legal Services Organizations.

government caused and continue to cause significant negative impacts on ProBAR's mission, staffing, resources, and morale.").

An over-taxed, under-resourced network of nonprofits cannot possibly provide all unrepresented class members with the mandatory individual consultations, interview preparation, document preparation, and other services the government represents will be referred to them. That is why the Settlement requires the government to "ensure that the [Legal Access] Program is adequately resourced and funded . . . with the ability to increase funding to meet projected needs as determined by Defendants, taking into account information about needs provided by Plaintiffs." Settlement § IV.B.2.c.i.(d). The elimination of funded, mandatory legal access services in favor of aspirational pro bono referrals is a breach of the Settlement, and that would be so even if most such referrals were likely to lead to actual legal assistance, which the evidence shows they are not. *See supra*.

Moreover, even if under the Settlement the pro bono program could substitute for the legal access program previously run by Acacia, the government misapprehends the terms of the Settlement describing the pro bono placement program. To avoid any suggestion that it would be sufficient merely to give class members a list of organizations to contact, the Settlement outlines what a pro bono placement program involves:

> The Program would identify cases for pro bono placement through in-depth individualized consultations of *Ms. L.* Settlement Class members. These cases would then be placed on an online pro bono platform to help match potential pro bono representatives with reunified families. The Program will provide pro bono attorneys with mentors to advise and consult with them throughout the case.

Settlement § IV.B.2.c.ii.(b). The Settlement calls for additional support for pro bono volunteers, including model hearing programs, referral for free psychological evaluations for clients, and trainings on "substantive and procedural immigration

11

18cv00428

law issues, education on working with vulnerable populations, trauma-informed care, and child protection." *Id.* §§ IV.B.2.c.ii.(a), (c), (d). These provisions reflect the Parties' understanding that making pro bono matches and recruiting and supporting pro bono volunteers from the private bar, including many who lack immigration experience, involves extensive, ongoing time and resources. Second Suppl. Decl. of Anilú Chadwick ¶¶ 13–25 (May 10, 2025); Suppl. Decl. of Kayleen Hartman ¶¶ 13–15 (May 12, 2025). The Acacia subcontractors did this work. Decl. of Sara Van Hofwegen ¶ 6 & Ex. A § VI.(1)d. (Statement of Work description of pro bono program) (Apr. 17, 2025), ECF No. 762-1. In short, the government cannot fulfill the pro bono program simply by handing class members a list of organizations.

Yet EOIR can no more run the kind of pro bono program the Settlement demands than it can offer the kind of legal advice outlined in the legal access program provision. EOIR cannot conduct "in-depth individualized consultations" with class members to match them with appropriate volunteer lawyers, and it cannot mentor whatever pro bono volunteers may step forward. Class member consultations and pro bono mentoring inevitably involve the sharing of confidential client information. Second Suppl. Chadwick Decl. ¶¶ 13–25; Suppl. Hartman Decl. ¶ 14. Especially when the client has significant risk factors, a pro bono volunteer will need advice and counsel from an experienced immigration mentor who knows the *Ms. L.* Settlement. Second Suppl. Chadwick Decl. ¶¶ 13–25; Suppl. Hartman Decl. ¶ 14. EOIR cannot assure client confidentiality in these circumstances and cannot be seen to coach a respondent's counsel. Nor does EOIR plan to do so. Ms. Gorman represents that EOIR will provide "a library of resources for pro bono attorneys" and "further develop and provide additional Model Hearing Program materials," Gorman Suppl. Dec. ¶ 12, ECF No. 768.1, but she does not say that EOIR will conduct in-depth client consultations to ensure sound matches between

class members and pro bono counsel, nor does she offer EOIR staff as mentors. That is because EOIR cannot serve these functions.

Once again, that leaves the network of nonprofit legal immigration organizations to come to the rescue. Not only does the government expect them to absorb for free the previously funded services mandated through the legal access program under Section IV.B.2.c.i., but also to administer the comprehensive pro bono program prescribed under Section IV.B.2.c.ii. The declarations submitted by members of this network establish the impossibility of this supposed solution, and the government, having recently slashed the funding these organizations rely on to represent their existing clients, has every reason to know this is impossible. Defendants have therefore also breached the pro bono provisions of the Settlement.

### D. The government has offered no assurances about how it will meet the need for legal assistance outside EOIR proceedings.

The final category of legal services guaranteed by the Settlement is "Assistance Outside EOIR Proceedings." Settlement § IV.B.2.c.iii. This provision requires the retention of "an independent contractor to communicate with *Ms. L.* Settlement Class members and assist [them] and Qualifying Additional Family Members with necessary parole and employment authorization applications." Settlement § IV.B.2.c.iii.(a). Among other things, this contractor must also operate a call center to "conduct *affirmative outreach* to identify and screen people and refer them to services." *Id.* § IV.B.2.c.iii.(b) (emphasis added). Because the Settlement expressly calls for an "independent contractor," EOIR may not provide the enumerated services directly.

Previously, the work under this provision has been divided among several contractors, including Acacia, Seneca, and the International Organization for Migration (IOM). With the termination of the Acacia contract, a key provider of assistance with parole and employment authorization applications fell away. *See*

13

Van Hofwegen Decl. ¶ 6 & Ex. A § VI.(1)b. (providing that as the contractor, Acacia will assist "class members and Qualifying Additional Family Members . . . with the necessary parole and employment authorization applications"), ECF No. 762-1; Suppl. Decl of Sara Van Hofwegen ¶ 9 (Apr. 28, 2025) (describing referrals from IOM and Seneca to Acacia to assist class members in responding to Requests for Evidence from USCIS concerning their applications for parole or re-parole), ECF No. 766-2. There was a waiting list for these services even before the termination of the Acacia contract. Suppl. Decl. of Anilú Chadwick ¶¶ 9–10 (Apr. 28, 2025), ECF 766-1. The government has offered no explanation of what contractor, or what contract expansion, will fill the gap.

**III. Class Members Face Immediate Irreparable Harm Resulting from Defendants' Breach of the Settlement.**

While Plaintiffs need not show irreparable harm to prevail on a motion to enforce the Settlement, *supra* Point I, they have nevertheless shown that irreparable harm is immediately threatened and ongoing. Based on the class member list EOIR provided in February 2025, Acacia estimates that 414 class members and qualifying additional family members have parole expiration dates in May 2025 alone, including 89 individuals whose parole status will have expired between May 1 and 15. Second Suppl. Decl. of Sara Van Hofwegen ¶ 4 (May 10, 2025). Counting only class members, Together & Free has identified 187 whose parole expires in May, followed by 113 in June and 142 in July, based on a review of data drawn from Together.gov, the government website for the registration of class members. Chadwick Second Suppl. Decl. ¶ 2 (May 10, 2025). Without parole, these class members have no lawful status in the United States and are therefore subject to ICE arrest, detention, and removal. Any class member who is arrested and detained will be re-separated from their family. Further, parole provides the basis for work authorization for many class members, meaning that when they lose

one, they will lose the other. See 8 C.F.R. § 274a.12(c)(11). Loss of lawful employment authorization invites a host of irreparable harms, including difficulties meeting basic subsistence needs for oneself and one's family.

Perhaps even more at risk are class members who still have standing removal orders. They are a high priority for immigration enforcement, and if arrested, they face deportation without further notice or hearing. See 8 U.S.C. 1231(a)(1)(A). Together & Free is tracking 114 of these class members, a small fraction of the probable total. Chadwick Second Suppl. Dec. ¶ 7. What is more, these class members cannot take steps toward asylum until their removal orders are rescinded in accordance with the terms of the Settlement, and this process requires expert legal assistance which is now unavailable. *Id.* ¶¶ 7–10; Settlement § IV.C.2.d. *See, e.g.*, Decl. of Kelly Albinak Kribs ¶ 5 (May 10, 2025) (explaining the work that goes into stopping a single removal and the critical need for individualized legal advice in these cases).

Thousands of class members are in vulnerable positions. They face immediate, irreparable harm because of the government's breach of the Settlement.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion.

DATED: May 12, 2025                     Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Daniel A. Galindo (SBN 292854)
Anand Balakrishnan*
Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660

*lgelernt@aclu.org*
*dgalindo@aclu.org*
*abalakrishnan@aclu.org*
*jrabinovitz@aclu.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0783
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Ms. L Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

# CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2025, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt
Lee Gelernt