Lee Gelernt*
Daniel A. Galindo (SBN 292854)
Anand Balakrishnan*
Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
*lgelernt@aclu.org*
*dgalindo@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0783
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for* Ms. L. *Plaintiffs*
*Admitted Pro Hac Vice

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"), et al. <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-AHG <br><br> Date Filed: May 30, 2025 <br><br> **RESPONSE IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT REGARDING PROVISION OF LEGAL SERVICES** |

# INTRODUCTION

Defendants concede that have not engaged a private contractor to handle re-parole and EAD renewals but contend that the Settlement never contemplated a private contractor handling these functions. But the Settlement says that a private contractor will handle all parole and EAD requests that are "necessary," and Defendants cannot plausibly argue that re-parole is not necessary for a family who would otherwise be subject to deportation and re-separation in the absence of parole (or unable to support themselves).

The government's attempt to substitute a federally run "referral" system to handle the remaining tasks for which families will need legal assistance is a clear breach of the Settlement. The evidence over the past month leaves no doubt that Defendants cannot adequately secure pro bono placement and mentors for the thousands of cases in which assistance will be needed to ensure that the Settlement's promise is secured for all the families who were subjected to one of the most horrific episodes in U.S. history.

Indeed, it appears that Defendants recognize that they have little chance of securing enough pro bono lawyers and mentors, so they have switched tactics. Defendants now appear to be suggesting that there may not be a need for so many pro bono placements and mentors because not very many families will want assistance beyond group sessions. But Defendants acknowledge that over the past month they have contacted fewer than 70 class members and qualifying family members, combined. More remarkably, Defendants seek to support their astounding claim by stating that although "54 class members and QAFMs have asked for help applying for re-parole, EAD renewal, or responding to RFEs . . . [n]o class members or QAFMs have specifically requested a referral to a pro bono attorney." Third Suppl. Decl. of Stephanie Gorman ¶ 9 (May 23, 2025), ECF No. 782-2. Of course not. They don't know to do so. That is why Acacia, unlike Defendants, carefully went over each case with a family and explained that they were entitled to free legal assistance. Not

surprisingly, Acacia encountered few families who did not want assistance navigating these complex issues—issues that, if handled incorrectly, could have lifetime consequences including the repeat loss of their children.

I. **Defendants Have Breached the Settlement by Failing to Maintain an Independent Contractor to Assist with All Aspects of "Necessary" Applications for Parole and Work Authorization Including Re-Parole and EAD Renewals.**

The Settlement commits the government to "continue to contract with an independent contractor to . . . assist *Ms. L.* Settlement Class members and Qualifying Additional Family Members with *necessary* parole and employment authorization applications." Settlement § IV.B.2.c.iii.(a) (emphasis added), ECF No. 721-1. The Settlement then goes on to describe what constitutes a "necessary" parole application in the renewal context. Applications for "additional parole periods" are "necessary" so long as the applicant demonstrates "a continued need to promote family well-being and unity or to continue behavioral health services under this Settlement Agreement." *Id.* § IV.C.1. (at 17). The "showing of continued need" by a re-parole applicant "may be based on the same or similar evidence that supported the initial application but must demonstrate that the need is ongoing." *Id.* Further, "[i]f the *Ms. L.* Settlement Class member or Qualifying Additional Family Member's re-parole request is approved, the applicant may apply for employment authorization . . . to align with the period of re-parole." *Id.* (at 18). Thus, the Settlement establishes a test for necessity, specifies what evidence may be submitted, and explains how to show the need.

Defendants make much of the use of the term "re-parole" in this section of the Settlement. Defs.' Suppl. Opp. at 3–4 (May 23, 2025) (quoting Section IV.C.1.), ECF No. 782. But Section IV.C.1. is the provision that authorizes additional parole periods; the Settlement had to make a distinction between initial and re-parole in this section to make clear that class members were not limited to a single period of parole. The use of the term "re-parole" in this context says nothing about the scope of the reference to

"necessary" parole in Section IV.B.2.c.iii.(a). There, the point is to ensure that an independent contractor will be available to assist with "necessary" parole applications, and that term is broad enough to encompass parole applications at all phases of the process, including renewals, that meet the Settlement's definition of necessity in Section IV.C.1. In fact, the Settlement's authorization of re-parole and renewal of work authorization for the same period, subject to the same fee waivers, and based on the same proofs as apply to initial parole demonstrate that the Parties considered the additional period every bit as "necessary" as the initial one.

Given the passage of time, hundreds of class members and their qualifying family members are facing imminent expirations and will need to file applications for re-parole and renewal of work authorization in the coming months "to promote family well-being and unity" or to continue to access "behavioral health services." *Id.* § IV.C.1. (at 17); Third Suppl. Decl. of Sara Van Hofwegen ¶ 6 (May 22, 2025), ECF No. 783-7 ("More than 200 individuals on Acacia's referral list have parole expiration dates in May, June, and July.").[1]

The Settlement demands that these services be made available through an independent contractor. The history of the Settlement's implementation supports this reading. In 2021, the International Organization for Migration (IOM) began assisting with the humanitarian parole process for class members who were not in the United

---

[1] Acacia's referral list includes only class members and QAFMs the Acacia network has reached out to or served. The numbers of people with imminent parole expiration dates on this list are therefore lower than on the DOJ list, which includes all known class members and QAFMs. *Compare* Second Suppl. Decl. of Sara Van Hofwegen ¶ 4 (May 10, 2025), ECF No. 771-35 ("The February 10, 2025, class member list provided by DOJ shows 414 class members and [Qualifying Additional Family Members] QAFMs with parole expiration dates in May 2025."); *see also* Second Suppl. Decl. of Anilú Chadwick ¶ 2 (May 10, 2025), ECF No. 771-34 (442 class members listed in Together.gov—not counting QAFMs—will have expiring parole expiration dates in May–July).

States. Decl. of Nan Schivone ¶ 5 (May 28, 2025). When the parole-in-place process opened up to class members in the United States in 2022, IOM assisted with that as well. *Id.* ¶ 6. When re-parole first became necessary for some class members in May 2024, as the earliest parole grants started to expire, IOM assisted with re-parole. *Id.* ¶ 7. Then, when the Acacia network launched services in July 2024, IOM began referring both re-parole and responses to Requests for Evidence to Acacia for assignment out to the subcontractors, while continuing to assist with simpler initial parole applications itself. *Id.*; Third Suppl. Decl. of Sara Van Hofwegen ¶ 7 (May 22, 2025), ECF No. 783-7. The government's brief omits that re-parole assistance was initially provided by IOM, then transitioned to Acacia. *See* ECF No. 782 at 3. In other words, from the outset until the government's revisionist history in its latest submissions to this Court, the Parties understood that independent contractors would assist class members and their families with all necessary applications for parole and employment authorization, including renewals, and that is exactly what happened.

Finally, even if the Court were to conclude that this particular provision of the Settlement does not require a private contractor for re-parole and EAD renewals, Defendants would still be required to provide individualized legal assistance for these tasks. But as shown below, Defendants cannot plausibly secure pro bono placements and mentors to handle the thousand of cases where families need assistance with re-parole, EAD renewals, and applying for asylum under the Settlement.

II. **Defendants Have Breached the Settlement by Failing to Make Mandatory Legal Services Available to All Class Members.**

Defendants do not even pretend to have a system in place to provide all unrepresented class members with the mandatory legal services outlined in the Settlement. Having conceded that they cannot and will not directly offer one-on-one legal advice—including individualized consultations, assistance with document preparation and submission, and preparation for asylum interviews, Settlement §

4

18cv00428

IV.B.2.c.i.—Defendants say that such individualized services will be offered instead through pro bono referrals. Defendants plan to "make referrals to these volunteers indiscriminately as such referrals will not be based on any prescreening of the substantive merits of a class member's potential claim." Gorman Third Suppl. Decl. ¶ 11, ECF No. 782-2.

Defendants' own evidence shows that this has not been working and cannot work. Plaintiffs' evidence likewise shows that Defendants' "referral" plan has not ensured and cannot ensure competent legal assistance to all unrepresented class members who need such services. First, there are simply not enough pro bono attorneys to take the potentially thousands of cases that Acacia has and would have handled. Second, Defendants will not be able to secure supervision and mentorship for all the cases, even assuming Defendants could place all the cases in the first instance.

1. The Settlement envisions that there will be individualized legal services for all class members who wish those services *as well as* a pro bono program. Settlement §§ IV.B.2.c.i, ii. The government purports to shift to the pro bono program the onus of covering all individualized services required as part of the legal access program—itself a clear breach of the settlement as those services are mandatory and pro bono placement is not. In any event, there are nowhere near enough volunteers to handle the load of the mandated services formerly provided by full-time attorneys employed by Acacia's subcontractors. Van Hofwegen Third Suppl. Decl. ¶¶ 3, 5 ("More than 20 fulltime equivalent attorneys and support staff" in the Acacia network reached out to 1800 class members and family members, "conducted more than 1600 individual consultations," "gave parole advice and assistance to more than 1100 individuals," provided "employment authorization information and support to more than 925 individuals," and offered more than 250 group services—all in the first eight months of operation.), ECF No. 783-7.

As Plaintiffs have previously explained, competent counsel will simply not take a case sight unseen *See, e.g.,* Decl. of Steven H. Schulman ¶¶ 5–8 (May 23, 2025) (pro bono partner at Akin Gump explaining that law firm pro bono programs rely on careful screening of clients and ongoing mentorship by legal services organizations), ECF 783-1; Chadwick Second Suppl. Decl. ¶¶ 15–22, ECF No. 771-34; Suppl. Decl. of Kayleen Hartman ¶¶ 13–14 (May 12, 2025), ECF No. 771-16. Thus, contrary to Defendants' wishful thinking, they will not able simply to "make referrals to these volunteers indiscriminately" without "any prescreening of the substantive merits of a class member's potential claim." Gorman Third Suppl. Decl. ¶ 11, ECF No. 782-2.

Moreover, there are not enough pro bono attorneys out there, even if they were willing to take a case without prescreening. Defendants state that "72 representatives have expressed interest in pro bono representation." Gorman Third Suppl. Decl. ¶ 11, ECF No. 782-2. That could mean anything. It could mean these representatives could potentially take a few cases of a certain kind. Or that they could potentially take a case if there is proper supervision. Or it could mean simply that they responded with questions and expressed an interest in learning more about what the government has in mind. Indeed, several staff members from legal services organizations received follow-up recruitment e-mails from Defendants thanking them for their "interest in volunteering to provide representation to *Ms. L.* Class members" even though all they had done was reply to EOIR's initial email with a series of questions. Second Suppl. Decl. of Kayleen R. Hartman ¶¶ 5–7 (May 29, 2025). In fact, they had *not* expressed interest in volunteering but had only asked about whether certain supports would be available to potential volunteers, including funding, thorough client screening in advance of a referral, and ongoing mentorship. *Id.* ¶¶ 5–8.

In short, there is no realistic prospect that the in-some-cases-illusory volunteers will be able to perform mandated legal services for thousands of class members and their qualified family members. Indeed, even Acacia's network of full-time

immigration lawyers employed by the subcontractors to serve the class could not meet the demand for mandatory services but had to create waiting lists. Van Hofwegen Third Suppl. Decl. ¶ 6, ECF No. 783-7. And despite its large network and experience with pro bono management, Acacia was able to place only just over 70 cases with pro bono attorneys. *Id.* ¶ 5, ECF No. 783-7. And that is where Acacia, unlike Defendants, engaged in "pro bono placement through in-depth individualized consultations of *Ms. L.* Settlement Class members." Settlement § IV.B.2.c.ii.(b).

Importantly, Defendants will also not be able to fulfill the Settlement's requirement for "mentors to advise and consult with [pro bono volunteers] throughout the case." Settlement § IV.B.2.c.ii.(b). In its follow-up email presumably addressed to the 72 individuals who responded to the first email, EOIR asked "[w]hether you would be willing to serve as a mentor attorney or resource for a fellow attorney or accredited representative providing pro bono services to *Ms. L.* Class members." Hartman Second Suppl. Decl. ¶ 6 (quoting May 27th email from Ms.L.Volunteers@usdoj.gov). But recruiting mentors from a group of random individuals who responded to a mass email cannot fulfill the terms of the Settlement, which requires ongoing mentorship for every pro bono volunteer and obviously contemplates that mentors would be qualified to provide expert guidance (otherwise, why bother having mentors?). *Id.* ¶ 9. The government is not free to discard unilaterally whatever provisions of the Settlement do not mesh with its decision to run the legal services program in house. It is simply unrealistic that Defendants will find a sufficient number of pro bono lawyers to take the cases *and* mentors for all these attorneys.

**2.** Appearing to recognize that they will never be able to find enough pro bono attorneys or mentors, Defendants make the remarkable suggestion that there may not be all that many class members or family members who actually need legal assistance beyond group sessions and recordings of group sessions. Defendants candidly admit that, even when a class member or QAFM asks for assistance with mandatory services

such as parole assistance and EAD renewal, they do not intend to make a referral unless the individual "specifically request[s] a referral to a pro bono attorney." Gorman Third Supp. Decl. ¶ 9, ECF No. 782-2. But class members and their families do not know that free individualized legal help is theoretically available, so they do not know to ask. Nor is EOIR informing class members and their families that individualized legal assistance is available. Suppl. Decl. of Kelly Albinak Kribs ¶ 14 (May 22, 2025) (class member who attended an EOIR group session reported that "at no point did the government worker offer to connect him with an attorney or with an individualized case consultation"), ECF No. 783-4; Fourth Suppl. Decl. of Anilu Chadwick ¶¶ 2–7 (May 30, 2025) (describing repeated requests from class member for individualized assistance with re-parole after attending EOIR group session that did not prepare the class member to proceed on his own). The upshot is that, despite the hundreds of class members with expiring parole and work authorization in this month alone, the government concedes "[n]o cases have yet been placed with a pro bono representative." Gorman Third Supp. Decl. ¶ 12.

The current system of waiting for class members and their families to ask for a pro bono lawyer stands in stark contrast to how the Acacia network handled outreach. While the government protests that it "cannot compel a class member to receive legal assistance," Gorman Third Suppl. Decl. ¶ 15, ECF No. 782-2, this is hardly the issue. The Acacia subcontractors required consent from class members and their family members before providing them with legal services. Fourth Suppl. Decl. of Sara Van Hofwegen ¶ 3 (May 28, 2025). The person conducting outreach would typically begin by confirming that the individual was unrepresented. *Id.* The provider would then explain the available legal services, starting with a consultation to help the class member or family member understand their immigration case, and offer an appointment. *Id.* During the initial consultation, the lawyer and client would discuss and agree upon what further legal services were necessary. Not surprisingly, very few class members or

family members—estimated at less than 5%—declined this initial individualized consultation or the further legal assistance that followed from it. *Id.*

The alternative of placing the onus on the class member or family member to ask for services they do not even know are on offer simply cannot satisfy the Settlement's requirement that the mandatory legal services program be "adequately resourced and funded to provide services for all unrepresented *Ms. L.* Settlement class members." Settlement § IV.B.2.c.iii.(d).

## Conclusion

The Settlement requires the government to contract with an independent contractor to assist with all phases and steps of "necessary" applications for parole and work authorization; to provide individualized legal advice and specified services to all unrepresented class members (except of course any who decline assistance offered to them); and to manage a pro bono program that includes individualized client screening before placement and mentoring throughout a pro bono representation. The government is reneging on all these promises.

Plaintiffs therefore respectfully request that the Court order Defendants to reinstate the Acacia contract until they can demonstrate that they have devised an alternative that complies with the Settlement. Plaintiffs request further that the deadlines set out in Section V.C.3. of the Settlement be extended by one year, given the time that has been and will be wasted as a result of the government's breaches of the Settlement. Having been deprived of legal services for what will end up being months, class members cannot be expected to meet the current deadlines for applying for asylum, the earliest of which now fall in December 2025. Finally, Plaintiffs request that the Court extend the order requiring notice when any class member or qualifying additional family member is detained by ICE. Only if Plaintiffs have this information can they assist by asserting the rights of the detained individual under the Settlement.

DATED: May 30, 2025            Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Daniel A. Galindo (SBN 292854)
Anand Balakrishnan*
Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
*lgelernt@aclu.org*
*dgalindo@aclu.org*
*abalakrishnan@aclu.org*
*jrabinovitz@aclu.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0783
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Ms. L Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

# CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2025, I electronically filed the foregoing with the Clerk for the United States District Court for the Southern District of California by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ Lee Gelernt

Lee Gelernt