<pre>
 1
 2
 3
 4
 5
 6
 7
 8                       UNITED STATES DISTRICT COURT
 9                     SOUTHERN DISTRICT OF CALIFORNIA
10
11   Ms. L.; et al.,                        Case No.: 18cv0428 DMS (AHG)
12                     Petitioners-Plaintiffs,
                                            ORDER GRANTING PLAINTIFFS'
13   v.                                     RENEWED MOTION TO ENFORCE
                                            SETTLEMENT AGREEMENT
14   U.S Immigration and Customs            REGARDING PROVISION OF
     Enforcement ("ICE"); et al.,           LEGAL SERVICES
15
                      Respondents-Defendants.
16
17
</pre>

This case returns to the Court on Plaintiffs' renewed motion to enforce their Settlement Agreement with Defendants, specifically, the sections regarding the provision of legal services to Ms. L. Settlement Class Members and Qualifying Additional Family Members ("QAFM"). Plaintiffs filed their initial motion on April 23, 2025, (ECF No. 754), after learning that Defendants were not going to renew their contract with Acacia Center for Justice, the independent contractor that had been providing legal services since April 2024. Because the Acacia contract had not yet expired, the Court found there was no breach and denied the motion. (ECF No. 770.) The Court also ordered the parties to meet and confer on the issues discussed during oral argument, and invited Plaintiffs to renew their motion if those issues could not be resolved. Unfortunately, the issues were not resolved, and the present motion ensued. Each side thoroughly briefed the issues and

submitted supporting evidence. On June 4, 2025, the Court heard argument from counsel. After full consideration of the parties' arguments, the record, and the relevant case law, the Court grants Plaintiffs' motion for the reasons set out below.

## I.
## BACKGROUND

This case stems from the first Trump Administration's policy to deter migration from Mexico by separating migrant families after they crossed into the United States. The policy resulted in the separation of thousands of parents from their minor children, many of whom remain separated to this day. The policy caused lasting, excruciating harm to these families, and gratuitously tore the sacred bond that existed between these parents and their children.

Shortly after taking office in January 2021, former President Biden established the Family Reunification Task Force, which was comprised of representatives from various federal agencies, including the Defendants in this case. (ECF No. 711.) Thereafter, in March 2021, the parties began negotiations to settle this case. More than two years later, after "extensive, wide-ranging, and arms-length negotiations" involving multiple government agencies and consultations with numerous stakeholders and advocates working with separated families and children, the parties settled the case. (*Id.*) The settlement provided three types of relief to Class members: (1) relief designed to reunify separated families and help them reestablish themselves after reunification, including parole and work authorization, (2) a process for handling Class members' asylum applications, and (3) programs intended to facilitate legal help for Class members, in addition to outreach programs designed to contact Class members and inform them of their rights and reunification options. (*Id.*) The Court preliminarily approved the settlement on October 23, 2023, and ordered that notice of the settlement be provided to class members. (ECF No. 717.) Notice was delivered, no objections were received, and the Court granted final approval on December 12, 2023. (ECF No. 727.)

///

The final settlement agreement ("Settlement Agreement") is a painstaking, 46-page document that covers the topics set out above in specific detail. (ECF No. 721-1.) The provisions at issue here are found in Section IV.B.2.c of the Settlement Agreement, which governs Defendants' obligations to provide Ms. L. Settlement Class Members and QAFMs[1] with certain immigration legal services. (*Id.* at 10-13.) Those services include "Legal Access Services for Reunified Families," (*id.* at 10-11), a "Program to Place Cases with Pro Bono Representatives," (*id.* at 12), and "Assistance Outside EOIR[2] Proceedings." (*Id.* at 12-13.)

Under the "Legal Access Services" provision, EOIR was to provide certain services to Class members through its Immigration Court Helpdesk Program ("ICH") "or a separate similar program ('Program')[.]" (*Id.* at 10.) EOIR opted not to use ICH and instead created "the Legal Access Services for Reunified Families ('LASRF') Program." (Decl. of Stephanie Gorman in Supp. of Opp'n to Mot. ¶ 3, ECF No. 765-1.) To carry out the LASRF Program's duties, the Department of Justice issued a task order under an Indefinite Delivery, Indefinite Quantity ("IDIQ") Contract it had with Acacia Center for Justice. (Decl. of Sara Van Hofwegen in Supp. of Mot. to Enforce Settlement Agreement ¶¶ 3-4, Ex. A, ECF No. 762-1.) The task order period was May 1, 2024 to April 30, 2025, and included a one-year extension option for the period May 1, 2025 to April 30, 2026. (*Id.* ¶ 4.)

> Under the Statement of Work issued for the LASRF program, Acacia subcontracted with nine regional service providers and a national pro bono provider to provide legal services to Ms. L. Class Members and their Qualified Additional Family Members ("QAFM"), including individual counseling and consultations, legal advice, pro se workshops, Friend of the Court Services, and pro bono placement and mentoring assistance with parole applications

---

[1] The Ms. L. Settlement Class is defined in Section II of the Settlement Agreement and is referred to in this Order as "Class members."

[2] EOIR stands for the Executive Office for Immigration Review, which is part of the Department of Justice.

and renewals, applications and renewals or employment authorization documents (EADs), or hearing preparation from the LASRF Program.

(*Id.* ¶ 6.) In addition to the regional service providers, Acacia also employed "[m]ore than 20 full-time equivalent attorneys and support staff[.]" (Third Supp. Decl. of Sara Van Hofwegen ¶ 3, ECF No. 783-7.)

"The LASRF task order provided a 90-day period to launch the LASRF program and launch services." (*Id.* ¶ 4.) The Program launched on July 22, 2024, and from that date until April 30, 2025, Acacia delivered legal services to "nearly 1,200 Class members and QAFMs[.]" (*Id.* ¶ 5.) "Of these nearly 1200 participants, more than 70 class members and QAFMs were placed with pro bono attorneys for legal representation[.]" (*Id.*)

Additionally, for these nearly 1200 participants, the LASRF network conducted more than 1600 individual consultations and more than 250 group services. As part of these services, the Acacia subcontractors gave parole advice and assistance to more than 1100 individuals and provided employment authorization information and support to more than 925 individuals.

(*Id.*)

Ms. Van Hofwegen estimates:

that Acacia received approximately 50 new referrals per month. … Many of the referrals from [the International Organization for Migration, or IOM[3]] were for individuals with urgent deadlines in their cases, often because they required assistance with re-parole or received requests for additional evidence (RFEs) in their initial or renewal parole applications.

(*Id.* ¶ 7.) Acacia's subcontractors also conducted outreach to Class members. (*Id.* ¶ 9.) After making contact, the subcontractors "would first schedule the class member for an

---

[3] In 2021, IOM was granted a federal contract to support the reunification of Ms. L. Class members. (Third Supp. Decl. of Anilú Chadwick ¶ 2, ECF No. 783-6.) IOM does not have permission to assist Class members with re-parole or requests for evidence. (*Id.* ¶ 3; Third Supp. Decl. of Sara Van Hofwegen ¶ 7, ECF No. 783-7.)

individual consultation: a one-on-one appointment during which the subcontractor would conduct a legal screening of the participant to fully understand their immigration situation and identify urgent deadlines. Initial consultations included provision of tailored legal advice." (*Id.*) Acacia subcontractors also placed cases with pro bono attorneys. (*Id.* ¶ 12.)

> Before placing a case with a pro bono volunteer, the referring subcontractor performed an in-depth legal screening to understand the individual's immigration situation, deadlines, avenues for relief, and unique circumstances. … After placement, the LASRF program provided ongoing mentorship to the pro bono attorney, including guidance, advice, training, and review of documents submitted to the court.

(*Id.*)

Despite Acacia's successful implementation of the LASRF Program and its delivery of services to nearly 1,200 Class members over the course of approximately eight months, Defendants terminated Acacia's contract in April of this year. (Supp. Decl. of Sara Van Hofwegen, Attachment 1, ECF No. 766-2.) The administrative record surrounding this termination indicates the contract was canceled at the request of President Trump's "Department of Government Efficiency," also known as DOGE. (*Id.* at AR 1-2, 8.)

When the contract expired, "Acacia maintained a list of nearly 300 referrals awaiting services by a legal service subcontractor." (Third Supp. Decl. Sara Van Hofwegen ¶ 6, ECF No. 783-7.) More than 200 individuals on that referral list had parole expiration dates that have either already expired or that expire this month or next. (*Id.*)

Since Acacia's contract expired on April 30, 2025, EOIR has assumed management and control over the LASRF Program. (Supp. Decl. of Stephanie Gorman ¶ 3, ECF No. 768-1.) To facilitate delivery of services under the new "federalized" program, "EOIR distributed an outreach flyer to DHS and the U.S. Department of Health and Human

///
///
///
///

Services (HHS) to share with IOM and Seneca[4]." (Second Supp. Decl. of Stephanie Gorman ¶ 7, ECF No. 774-1.) EOIR has also launched a webpage for Class members and QAFMs, which includes access to the flyer, "a list of upcoming group orientation sessions, resources for class members and [QAFMs], and instructions for volunteer attorneys and representatives seeking to represent class members." (*Id.* ¶ 8.) EOIR has also launched a LASRF hotline, which Class members and QAFMs can call to request legal services. (*Id.* ¶ 9.) EOIR has also set up an email address "to centralize communications from the LASRF Program to class members, [QAFMs], and organizations seeking to refer cases for LASRF services." (*Id.* ¶ 10.) In addition to these "outreach" efforts, EOIR has been providing "virtual group orientations" for Class members on the legal services available under the LASRF Program, including re-parole and employment authorization renewal, requests for evidence, notices of intent to deny, and denial notices. (*Id.* ¶ 15.) EOIR has also been conducting outreach to its "pro bono network … to inform them about the opportunity to represent class members before EOIR and DHS." (*Id.* ¶ 16.)

Although numerous Class members have been referred to EOIR and some have requested services under the new "federalized" Program,[5] (*see* Fifth Supp. Decl. of Anilú Chadwick ¶¶ 3-5, 7, ECF No. 789-1; Fourth Supp. Decl. of Stephanie Gorman ¶ 3, 6-7), there is no evidence that any of those services have actually been provided. (Fifth Supp. Decl. of Anilú Chadwick ¶¶ 3-5, 7, ECF No. 789-1.)

///

---

[4] Until June 9, 2025, the Government had a contract with Seneca Family of Agencies to provide case management and behavioral health services to Class members. (Fifth Supp. Decl. of Anilú Chadwick ¶ 10, ECF No. 789-1.)

[5] Despite being referred to EOIR, at least one Class member reports "being afraid of retribution for seeking EOIR's assistance." (Fifth Supp. Decl. of Anilú Chadwick ¶¶ 7.c, ECF No. 789-1.) Another Class member is "concerned that [their] ongoing attempts to access EOIR legal services may jeopardize [their] immigration case. [They] fear[ ] that [their] fervent pursuit of support could lead to [their] detention by ICE, adding to the anxiety of an already challenging situation." (*Id.* ¶ 7.d.)

## II.

## LEGAL STANDARD

"Once a case has been dismissed, a proceeding to enforce a settlement agreement requires an independent basis for jurisdiction." *Pruco Life Ins. Co. v. California Energy Dev. Inc.*, No. 3:18-cv-02280-DMS-AHG, 2021 WL 2453280, at *4 (S.D. Cal. June 16, 2021) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). In this case, the Settlement Agreement specifically states "that any action or proceeding to enforce the terms of this Agreement shall be brought exclusively to the Court in the Ms. L. case." (Settlement Agreement at 43, ECF No. 721-1.) That provision goes on to state: "The Court shall have the power to award such relief and issue such judgments as the Court deems necessary for enforcement of the Settlement Agreement." (*Id.*) This provision confers jurisdiction on this Court to hear the present dispute. *See Pruco*, 2021 WL 2453280, at *4 (citing *Kokkonen*, 511 U.S. at 382) (stating "[i]f the district court expressly retains jurisdiction over the settlement agreement or incorporates the terms of the settlement agreement into the dismissal order, then the Court may exercise ancillary jurisdiction over a motion to enforce the agreement.")

In resolving the present dispute, the Court looks to "principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (internal citations and quotation marks omitted). Under California law, the preponderance of the evidence standard applies to motions to enforce settlement agreements. *See Buss v. Superior Court*, 16 Cal. 4th 35, 54 (1997) (holding preponderance of the evidence standard applies to "contractual causes of action").

## III.

## DISCUSSION

Plaintiffs argue Defendants are in breach of several provisions of Section IV.B.2.c of the Settlement Agreement. Each of these provisions is discussed below.

/ / /

/ / /

A. **Section IV.B.2.c.i**

Section IV.B.2.c.i concerns "Legal Access Services for Reunified Families." (Settlement Agreement at 10, ECF No. 721-1.) This Section requires Defendants to provide and "adequately resource[ ] and fund[,]" a variety of legal services to Class members, including among other things, counseling about relief to which Class members may be entitled, steps necessary to pursue such relief, and preparation for any interview with USCIS. (*Id.* at 11.) Specifically, Subsection IV.B.2.c.i.(a) states:

> In addition to the group information sessions, individual information sessions, and self-help workshops that EOIR's Immigration Court Helpdesk Program (ICH) currently offers, EOIR, through ICH or a separate program ('Program'), shall also provide assistance to Ms. L. Settlement Class members, short of full representation, including:
> - legal advice, such as individualized consultations and counseling about relief for which Ms. L. Settlement Class members may be eligible, and the steps necessary to apply for such relief, as well as preparation for any interviews before USCIS;
> - assistance with document preparation, including preparing immigration-related documents for submission to DHS (including USCIS), and EOIR pursuant to EOIR's limited appearance regulations; and
> - Friend of the Court services, where allowed by the immigration court, to facilitate the flow of information in the courtroom, including informing noncitizens of their rights and obligations and calling attention to law or facts that may be helpful to the immigration court. Where permitted by the immigration court, EOIR will facilitate remote or in-person access for Friend of Court services as appropriate given language needs or location of the participating family and legal services provider.

(*Id.* at 10-11.)

Plaintiffs argue Acacia was providing all these services to Ms. L. Settlement Class members before its contract with Defendants expired. The Declaration of Sara Van Hofwegen, the Managing Director at Acacia, supports that argument. (*See* Decl. of Sara Van Hofwegen in Supp. of Mot. to Enforce Settlement Agreement ¶ 6, ECF No. 762-1.) In that Declaration, Ms. Hofwegen states:

> Under the Statement of Work issued for the LASRF program, Acacia subcontracted with nine regional service providers and a national pro bono provider to provide legal services to Ms. L. Class Members and their Qualifying Additional Family Members (QAFM), including individual counseling and consultations, legal advice, pro se workshops, Friend of the Court Services, and pro bono placements and mentoring and assistance with parole applications and renewals, applications and renewals or employment authorization documents (EADs), or hearing preparation from the LASRF Program.

(*Id.*) Plaintiffs argue since Acacia's contract expired, Defendants have not been providing any of these services to Class members, and they are therefore in breach of this provision.

Defendants respond that they are complying with this provision by conducting outreach to Ms. L. Settlement Class members, updating the together.gov and juntos.gov websites, creating a webpage for Class members, launching and staffing a telephone hotline for Class members, setting up and monitoring an email address for Class members and making phone calls to Class members who inquire through the email address, calling Class members on the Acacia waiting list, and providing services to Class members through referrals to pro bono attorneys. None of these efforts, however, actually delivers the services set out in Section IV.B.2.c.i.(a). Indeed, Defendants concede EOIR and its personnel cannot provide these services directly. (Opp'n to Renewed Mot. at 3, ECF No. 774) (recognizing that since EOIR evaluates applications for immigration relief it cannot also provide legal advice to the same individuals seeking such relief).

Absent an ability to provide these services directly, Defendants contend they are fulfilling their contractual obligations by referring Class members to pro bono attorneys, who will, in turn, provide the necessary services. (*See*, *e.g.*, Second Supp. Decl. of Stephanie Gorman ¶ 18, ECF No. 774-1) (stating "EOIR will engage with volunteer attorneys and representatives to fulfill the individualized services specified under section IV.B.2.c.i.(a).") However, the Settlement Agreement itself states "EOIR cannot ensure that it can find a pro bono representative for every family." (Settlement Agreement at 12, ECF No. 721-1.) And the evidence currently before the Court reflects that since the

expiration of Acacia's contract on April 30, 2025, and despite requests from and referrals of Class members to EOIR, (*see* Fourth Supp. Decl. of Stephanie Gorman ¶¶ 3, 6, 7; Fifth Supp. Decl. of Anilú Chadwick ¶¶ 2-5, 7.(a)-(d), 10), EOIR has not placed a single Class member with pro bono counsel.  (*See* Third Supp. Decl. of Stephanie Gorman ¶ 12, ECF No. 782-2) (stating, as of May 23, 2025, "No cases have yet been placed with a pro bono representative.")

This difficulty in finding pro bono counsel for Class members is not specific to Defendants.  During the one-year term of its contract, and out of a group of nearly 1200 Class members who received services, Acacia was only able to place approximately 70 Class members with pro bono counsel.  (Third Supp. Decl. of Sara Van Hofwegen ¶ 5, ECF No. 783-7.)  Since Acacia's contract expired, the pro bono landscape has only deteriorated because of funding cuts and staffing shortages.  (*See*, *e.g.*, Decl. of Alicia de la O ¶ 8, ECF No. 771-2) (stating American Bar Association Commission of Immigration "is experiencing significant staffing and resource challenges due to the recent notice of termination leading to a loss of funding for the LOP services offered through the Information Hotline.")  Thus, although Defendants intend to provide the services set out in Section IV.B.2.c.i.(a) through pro bono counsel, the current landscape strongly suggests Defendants' placement rate, which is presently zero, is not likely to improve.  Unless or until those placements are actually made, Defendants are not providing Class members with the services required by Section IV.B.2.c.i.(a) of the Settlement Agreement.  Defendants are therefore in breach of this provision.

**B.    Section IV.B.2.c.ii**

Section IV.B.2.c.ii is entitled, "Program to Place Cases with Pro Bono Representatives."  Subsections (a) and (b) of this Section state:

> (a) EOIR cannot ensure that it can find a pro bono representative for every family.  However, the Program will leverage its existing pro bono referral efforts, and provide additional funding, to recruit, train, mentor, and match pro bono attorneys to represent Ms. L. Settlement Class members.  EOIR will

    facilitate Model Hearing Programs in connection with provider training for new pro bono representatives, where available.

    (b) The Program would identify cases for pro bono placement through in-depth individualized consultations of Ms. L. Settlement Class members. These cases would then be placed on an online pro bono platform to help match potential pro bono representatives with reunified families. The Program will provide pro bono attorneys with mentors to advise and consult with them throughout the case.

(Settlement Agreement at 12, ECF No. 721-1.)

    Plaintiffs argue Defendants are in breach of subsection (b) of this provision. Specifically, they assert Defendants cannot conduct individualized consultations of Ms. L. Settlement Class members prior to pro bono referrals because, as noted, EOIR's practice manuals and federal ethics regulations prohibit them from doing so. (Renewed Mot. at 7-9, ECF No. 771.) Defendants do not dispute this argument. In fact, Defendants state all Class Members who request individualized assistance will be referred to pro bono counsel, therefore there is no need for individualized consultations in the first instance. (Opp'n to Renewed Mot. at 5, ECF No. 774.) (stating "in-depth individualized consultations will not be needed because the individual facts and circumstances of a case will not inform whether the class member receives pro bono assistance or how they are matched with a volunteer.")

    The problem with Defendants' argument, however, is the Settlement Agreement requires those "individualized consultations." (*See* Settlement Agreement at 12, ECF No. 721-1) (stating the Program would "identify cases for pro bono placement through in-depth individualized consultations of Ms. L. Settlement Class members.") Having agreed to that requirement, Defendants cannot just simply disregard it. As stated by the California Court of Appeal:

    Why negotiate an agreement if either party can disregard its provisions? What point would there be in reducing it to writing, if the terms of the contract were of no legal consequence? Why submit the agreement to the governing body for determination, if its approval were without significance? What integrity would be left in government if government itself could attack the integrity of its own agreement?

*Chula Vista Police Officers' Ass'n v. Cole*, 107 Cal. App. 3d 242, 247-48 (1980) (quoting *Glendale City Employees Ass'n, Inc. v. City of Glendale*, 15 Cal. 3d 328, 336 (1975)).

Although the language of the contract is clear, the requirement for individualized consultations also makes sense for both the pro bono attorneys and the Class members. As set out in the Declaration of Steven H. Schulman, the process of referring and accepting pro bono cases "is a match-making one[.]" (Decl. of Steven H. Schulman in Supp. of Renewed Mot. ¶ 5, ECF No. 783-1.) Most referrals come from nonprofit legal services organizations that "interview[ ] potential clients and draft[ ] detailed, deidentified case summaries." (*Id.*) The pro bono professionals then "review these summaries and consider who in the firm may have the interest, availability, and capacity to take on the matter described." (*Id.*) Indeed, this is what Acacia did when trying to place Class members with pro bono counsel. (*See* Third Supp. Decl. of Sara Van Hofwegen ¶ 12, ECF 783-7) (stating before placing a case with a pro bono volunteer, "the referring subcontractor performed an in-depth legal screening to understand the individual's immigration situation, deadlines, avenues for relief, and unique circumstances.") The referring entity then "screened potential pro bono attorneys to ensure they had the capacity and training necessary to take the case." (*Id.*)

Here, the individualized consultations required by the Settlement Agreement are the starting point for a successful pro bono referral process, and they are particularly important in this case, where Class members will undoubtedly need different kinds of legal advice. For instance, certain Class members may need assistance with parole and work authorization applications. Other Class members may need assistance with their asylum applications. Other Class members may need assistance with pending removal proceedings. And some Class members may need assistance in all three areas. Defendants' failure to conduct the individualized consultations dooms the possibility of placing Class members with pro bono counsel, (*see* Schulman Decl. in Supp. of Renewed Mot. ¶ 5) (stating "[l]aw firms with pro bono professionals rarely (if ever) accept pro bono matters without knowing anything about the facts or law involved. That is because it is all but

impossible to recruit volunteers without offering accurate and clear information about what they are volunteering to do."), and as relevant to the present motion, is a breach of Section IV.B.2.c.ii.(b) of the Settlement Agreement.

**C.     Section IV.B.2.c.iii**

Section IV.B.2.c.iii governs "Assistance Outside EOIR Proceedings." Subsections (a) and (b) of this Section state:

> (a) To ensure Ms. L. Settlement Class members have the ability to reunify through the process set out in Section IV.C.1, and as part of the governmental assistance to Qualifying Additional Family Members in Section IV.C.1, Defendants will continue to contract with an independent contractor to communicate with Ms. L. Settlement Class members and assist Ms. L. Settlement Class members and Qualifying Additional Family Members with necessary parole and employment authorization applications.
>
> (b) Defendants will, under the Protective Order, ensure that contact information of Ms. L. Settlement Class members is provided to the contractor, and establish links between the contractor and other organizations that work with, or have potential access to, Ms. L. Settlement Class members to facilitate referrals to the Program. This would include a call center (e.g., 'hotline' or telephonic help desk) that will conduct affirmative outreach to identify and screen people and refer them to services."

(Settlement Agreement at 12-13, ECF No. 721-1.)

Plaintiffs argue Defendants are in breach of subsection (a), in particular the provision that requires Defendants "to contract with an independent contractor to communicate with Ms. L. Settlement Class members and assist Ms. L. Settlement Class members and Qualifying Additional Family Members with necessary parole and employment authorization applications." (*Id.* at 12.) Plaintiffs interpret "necessary parole and employment authorization applications" to include the initial applications and any renewal applications, and they argue that since Acacia's contract expired, Defendants have not contracted with an independent contractor to assist Class members with those renewal applications.

/ / /

Defendants do not dispute that they have not contracted with an independent contractor to assist Class members with renewal applications. Instead, they argue this provision only requires them to contract with an independent contractor for initial parole and employment authorization applications, which they did. Defendants also assert Plaintiffs have failed to provide any "persuasive evidence that any class member who has not yet reunified needs to request re-parole or employment authorization renewal." (Supp. Br. in Opp'n to Renewed Mot. at 3-4, ECF No. 782.) Defendants also contend that to the extent any Class members need assistance with these tasks, Defendants will refer those Class members to "volunteer attorneys." (*Id.*)

Given the parties' arguments, the Court turns first to the proper interpretation of "necessary" parole and employment authorization applications. In interpreting this term, the Court "must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798 (citing *Oceanside 84, Ltd. v. Fidelity Federal Bank*, 56 Cal. App. 4th 1441, 1448 (1997)). Plaintiffs argue "necessary" means the parole and employment authorization applications are needed to "promote family well-being and unity[.]" (Settlement Agreement at 17, ECF No. 721-1.) Defendants do not rely on a specific provision of the Settlement Agreement to support their interpretation of "necessary." Instead, they cite to other provisions of the Agreement that recite "additional parole periods" and "re-parole," and argue these provisions reflect the parties were aware of the distinction between parole and re-parole and did not include that distinction in Section IV.B.2.c.iii.(a).

Although the Settlement Agreement recites both "parole" and "re-parole," (*id.*), the Court is not persuaded that the absence of "re-parole" in Section IV.B.2.c.iii.(a) means "re-parole" is not "necessary." Indeed, in the paragraph cited by Defendants, the Settlement Agreement appears to use "parole" and "re-parole" interchangeably. (*See id.*) ("Requests for re-parole will be determined on a case-by-case basis and parole is not guaranteed based on this Settlement Agreement.")

/ / /

Contrary to Defendants' argument, the paragraph they cite, which is also cited by Plaintiffs, provides more support for Plaintiffs' interpretation of "necessary." That paragraph states:

> Ms. L. Settlement Class members and Qualifying Additional Family Members who are in the United States may request additional parole periods (i.e., re-parole) with USCIS prior to the expiration of their authorized parole period and prior to the Termination Date if there is a continued need to promote family well-being and unity or to continue behavioral health services under this Settlement Agreement. This showing of continued need may be based on the same or similar evidence that supported the initial application but must demonstrate that the need is ongoing. If approved for re-parole, the authorized period of parole will be for the period needed to achieve the stated purpose, up to an additional thirty-six months.

(*Id.*) Considered in its entirety, this passage clearly contemplates that "necessary" parole applications may include applications for re-parole. This interpretation is also consistent with the broader framework of the Settlement Agreement, which sets out an extremely detailed and specific process for Class members to apply for asylum in the United States, and which process, generally, "can take years to conclude." *Asylum in the United States,* Am. Immigr. Council, https://www.americanimmigrationcouncil.org/research/asylum-united-states (May 9, 2025). Given the complex and lengthy immigrations processes addressed in the Settlement Agreement, it should be commonplace that many Class members will have a "continued need to promote family well-being and unity," which can only be accomplished through the parole and re-parole processes.

This interpretation of "necessary" is also clearly supported by the parties' actual course of conduct. *See* Cal. Civ. P. Code § 1856(c) ("The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.") Although Defendants argue the Settlement Agreement does not require them to contract with an independent contractor to assist Class

///
///
///

members with re-parole and applications for renewal of employment authorization,[6] it is undisputed Acacia was providing precisely those services to Class members during the term of its contract and without Defendants' objection. (*See* Third Supp. Decl. of Sara Van Hofwegen ¶ 7, ECF 783-7) (stating many referrals to Acacia "were for individuals with urgent deadlines in their cases, often because they required assistance with re-parole or received requests for additional evidence (RFEs) in their initial or renewal parole applications.")  When combined with the analysis above, the Court finds the term "necessary" includes both initial applications for parole and employment authorization and applications for re-parole and work authorization renewal.

Under this interpretation of the Settlement Agreement, there is no dispute Defendants are in breach as they do not have a contract with an independent contractor to "assist Ms. L. Settlement Class members and Qualifying Additional Family Members with necessary parole and employment authorization applications." (Settlement Agreement at 12, ECF No. 721-1.)  Neither Defendants' provision of group orientation sessions nor their intent to refer Class members to pro bono attorneys satisfies the "independent contractor" requirement.  Thus, Defendants are in breach of this provision, as well.[7]

---

[6] At the hearing, Defendants reframed this argument to say the Settlement Agreement does not create a continuing obligation on their part to provide assistance with re-parole and applications for renewal of work authorization. However, the issue is not whether the Settlement Agreement created a continuing obligation on Defendants' part. Rather, the issue is the scope of Defendants' initial obligation to Class members, and whether that obligation to contract with an independent contractor to provide assistance with "necessary" parole applications and employment authorizations included only the initial applications or subsequent applications, as well.

[7] In their Supplemental Opposition Brief, Defendants seemed to suggest that even if they were in breach of this provision, Plaintiffs have not provided any evidence of a Class member either needing or requesting assistance with an application for re-parole or renewed work authorization and Defendants' failure to provide that assistance. (Supp. Opp'n at 3-4, ECF No. 782.) But there is evidence in the record to that effect. In the Fifth Supplemental Declaration of Anilú Chadwick, she lists two Class members who have reached out to EOIR for assistance and received no response. (*See* Fifth Supp. Decl. of

Given the breaches identified above, the only remaining issue is the remedy. Plaintiffs request the remedy of specific performance in the form of a Court order requiring Defendants to reinstate their contract with Acacia to provide the services set out in the Settlement Agreement. Defendants argue the Settlement Agreement does not require them to contract with a third party at all, much less Acacia.

Contrary to Defendants' argument, and consistent with the Court's discussion above, the Settlement Agreement does require Defendants to "contract with an independent contractor to communicate with Ms. L. Settlement Class members and assist Ms. L. Settlement Class members and Qualifying Additional Family Members with necessary parole and employment authorization applications." (Settlement Agreement at 12, ECF No. 721-1.) Although the Department of Homeland Security apparently had a contract with IOM to provide Class members with assistance with their initial parole and work authorization applications, (Supp. Opp'n to Mot. at 2, ECF No. 782), there is no evidence before the Court that Defendants have a contract with an independent contractor to assist with applications for re-parole or additional applications for work authorization. Because the Settlement Agreement specifically requires Defendants to have such a contract in place, the Court grants Plaintiffs' request for specific performance, and under Section VII.D. of the Settlement Agreement, (*see* Settlement Agreement at 43, ECF No. 721-2) (stating "[t]he Court shall have the power to award such relief and issue such judgments as the

/ / /

/ / /

---

Anilú Chadwick ¶ 7.a-b.) The first Class member reached out because their parole expired on May 26, 2025, (*id.* ¶ 7.a), and the second Class member reached out because their parole is set to expire in October. (*Id.* ¶ 7.b.) Stephanie Gorman, the Acting Assistant Director of Policy for the Executive Office of Immigration Review, also confirms that at least three Class members reached out to EOIR for assistance with re-parole and/or employment authorization renewals, and as of June 4, 2025, were awaiting placement with a pro bono attorney. (Fourth Supp. Decl. of Stephanie Gorman ¶¶ 3, 6, 7, ECF No. 788-1.)

Court deems necessary for enforcement of the Settlement Agreement."), orders Defendants to reinstate their LASRF task order[8] with Acacia so it can provide those services.

The Court also grants Plaintiffs' request for specific performance of Section IV.B.2.c.i.(a) of the Settlement Agreement. As discussed, Defendants' attempts to place Class members with pro bono attorneys does not satisfy the Settlement Agreement's mandate that these services "shall" be provided. (Settlement Agreement at 10, ECF No. 721-1.) And while Defendants continue these attempts, more than 200 Class members have parole dates that have either expired or will expire by the end of July, (Third Supp. Decl. of Sara Van Hofwegen ¶ 6, ECF No. 783-7), and the deadline for Class members to apply for asylum begins in December. (Resp. in Supp. of Mot. at 9, ECF No. 787.) Because Defendants will be reinstating their contract with Acacia, as set out above, Acacia shall also provide the services set out in Section IV.B.2.c.i.(a).

The final area of breach concerns the "individualized consultations" requirement set out in Section IV.C.2.c.ii.(b). Here, there is no dispute that Defendants cannot satisfy this requirement themselves. Thus, along with the services set out above, Acacia will resume these "individualized consultations" to identify cases for pro bono placement." (Settlement Agreement at 12, ECF No. 721-1.)

## IV.
## CONCLUSION

For the reasons set out above, the Court grants Plaintiffs' renewed motion to enforce the Settlement Agreement. Consistent with the Court's prior orders, and given the Court's "power to award such relief and issue such judgments as the Court deems necessary for enforcement of the Settlement Agreement[,]" (*id.* at 43, ECF No. 721-2), the Court continues its order requiring the Government to inform Plaintiffs' counsel within 24 hours if it detains a member of the Ms. L. Class or other QAFMs defined in the Settlement

---

[8] This task order is attached as Exhibit A to the Declaration of Sara Van Hofwegen, ECF No. 762-1.

Agreement. The information provided to Plaintiffs' counsel shall include, but is not limited to, the identity of the detained person, his or her A-file number, and place of detention. Because the Court is granting Plaintiffs' request for specific performance, the Court defers Plaintiffs' additional request to extend the deadlines set out in the Settlement Agreement.

A status conference will be held on **June 27, 2025**, at **1:30 p.m.** to discuss the parties' progress in meeting their obligations under the Settlement Agreement and this Order. The parties shall file a Joint Status Report on that progress or before **June 25, 2025**.

**IT IS SO ORDERED**.

Dated: June 10, 2025

Hon. Dana M. Sabraw
United States District Judge