Lee Gelernt*
Dan Galindo (SBN 292854)
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
425 California Street, 7th Floor
San Francisco, CA 94111
T: (415) 343-0783
skang@aclu.org
samdur@aclu.org

*Attorneys for Petitioners-Plaintiffs*    *Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L., et al., | Case No. 3:18-cv-428-DMS |
| Plaintiffs, | Honorable Dana M. Sabraw |
| v. | Date Filed: June 30, 2025 |
| U.S. Immigration and Customs Enforcement, et al., | **SECOND SUPPLEMENTAL DECLARATION OF KELLY ALBINAK KRIBS** |
| Defendants. | CLASS ACTION |

I, Kelly Albinak Kribs, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

**Background**

1.      I am an attorney and the Co-Director of the Technical Assistance Program for the Young Center for Immigrant Children's Rights (Young Center), where I have worked for more than nine years. The Young Center is a national non-profit organization whose mission is to protect and advance the rights and best interests of immigrant children in accordance with state, federal, and international law. Since 2004, the Young Center has been appointed by the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services to serve as the independent Child Advocate, akin to a best interests guardian *ad litem*, for unaccompanied and separated immigrant children in federal custody.

2.      In 2017 and 2018, the Young Center was appointed as the independent Child Advocate for hundreds of children who were separated from their parents at the border before and during "zero tolerance," and who were designated as unaccompanied children and transferred to ORR custody. During this time, I was appointed Child Advocate for a number of detained children who had been separated from their parents, and I advocated for their reunification with their parents.

3.      In my current role co-directing the Young Center's Technical Assistance Program, I consult with various attorneys and social services providers on complex matters impacting immigrant family unity, including reunifications of *Ms. L.* class members.

4.      From June 2022 until June 2025, the Young Center served as a subcontractor to Seneca Family of Agencies ("Seneca"), the national mental health organization that provided outreach and behavioral health case management services

to *Ms. L.* class members through its program called Todo Por Mi Familia ("TPMF"). I understand TPMF had both an initial outreach component and, for those class members who elected to enroll in services, a behavioral health case management component.

5.     Through our subcontract, my Young Center colleagues and I provided technical assistance, meaning case consultation and connection to resources, to Seneca's behavioral health case managers ("Seneca Case Managers"). The Seneca Case Managers worked with *Ms. L.* class members who opted into services upon receiving the initial outreach. We partnered with Seneca Case Managers as they supported families through complex reunifications, for example, where a child no longer wishes to reunite with the parent they have been separated from for years or where another family member obtained a custody order for a separated child with whom a parent now wishes to reunify. The Young Center also supported Seneca Case Managers in their work connecting class members to the legal and other supportive services under the *Ms. L.* settlement.

6.     When we first began our partnership with Seneca in June 2022, the Young Center conducted a case staffing meeting every other week to discuss complex matters with Seneca Case Managers. As Seneca began to work with more class members, and additional settlement benefits were operationalized, we needed to increase the frequency of our meetings. Therefore, for almost the last two years, my Young Center colleagues and I met weekly with Seneca Case Managers and supervisors to collaborate on complex cases.

7.     In the three years I closely partnered with the Seneca Case Managers, I witnessed them accompany many immigrant families through stressful, heart-

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

wrenching circumstances as they navigated reunification in the United States and began to piece their lives back together.

8.     I observed Seneca Case Managers provide class members with culturally sensitive support and connection to resources in a trauma-informed manner. They provided their case management services through a clinical lens, consistently striving to understand the lived experience of, and impact of trauma on, the families they served. They invested time and energy in building rapport and earning the trust of families who had every reason to be mistrustful.

9.     Not all family reunifications were joyful reunions, and Seneca Case Managers managed delicate family dynamics with patience and sensitivity. For example, they invested hours in supporting a parent who was deported without their young child and who was able to return years later  as a result of the settlement, only to be reconnected with a child they no longer knew, an adolescent who was reluctant to uproot the life they had established in order to reunite with a parent from whom they had been estranged. With grace and compassion, Seneca Case Managers supported parents and children to rebuild the bonds ruptured by government separations of their families.

10.     Seneca Case Managers' work to connect families to mental health services was critical to these reunification efforts. Over the years that they supported separated families, Seneca cultivated a vast network of bilingual mental health practitioners across the country to whom they could refer separated parents and children for both individual and family therapy. For many families, this was their first experience accessing therapeutic services, and at first, some were hesitant to do so. Seneca Case Managers, who were bilingual and trained in culturally sensitive

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

methods of engagement, gently supported families in accessing these services to help them navigate the lasting impact of the trauma they had experienced.

11.    In addition to mental health services, Seneca Case Managers assisted class members in connecting to other services—from legal to medical to housing and other services—that have been critical to families' ability to reunify, stabilize, and begin to heal.

12.    Over the past year, Seneca Case Managers referred hundreds of class members to the legal support services offered through Acacia's Legal Access Services for Reunifying Families program (LASRF) so that class members could renew parole and work authorizations, reopen removal orders, terminate removal proceedings, and explore more permanent pathways to status.  As most of those class members were placed on LASRF waitlists, Seneca Case Managers helped class members manage their anxiety about when and whether they would receive the legal services necessary to help ensure their family remained safe and reunified.

13.    In instances where class members had retained private counsel, Seneca Case Managers, in partnership with the Young Center, often played a central role in orienting attorneys to the existence of the *Ms. L.* settlement agreement and educating them about the unique benefits available to class members. In my experience, most class members do not know how to explain their *Ms. L.* class member status to attorneys, and most private attorneys do not screen for *Ms. L.* class membership, so Seneca Case Managers often played a critical role in ensuring private counsel were aware of parents' and children's class membership status.

14.    Seneca Case Managers also facilitated class members' access to the medical benefits guaranteed under the settlement agreement. When parents and children had health needs, whether related to general healthcare, acute illness, or

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

chronic conditions, Seneca Case Managers identified local federally qualified health centers, assisted class members in making appointments, and ensured that class members were reimbursed for copayments. Seneca Case Managers also helped class members plan for future appointments and medication refills and connect to public health insurance programs when they were available (which varies greatly from state to state).

15.    Seneca Case Managers were also principally responsible for connecting class members to ORR for purposes of accessing the housing benefits, including up to six months of rental assistance, provided under the settlement agreement. Though it is my understanding that another service provider for class members, the International Organization for Migration (IOM), also has the authority to make referrals to ORR for housing benefits on class members' behalf, in practice, Seneca handled the bulk of these referrals.

16.    Time and time again, Seneca Case Managers went above and beyond in identifying resources and supports for class members. They connected countless class members with services. For example, Seneca Case Managers helped families identify food banks when they struggled to put food on the table, educational supports when a separated child faced challenges enrolling in school, and childcare services so that a separated parent would have the capacity to work and provide for their family.

17.    Moreover, Seneca Case Managers were often the first to sound the alarm when a class member was detained by ICE. For instance, it was a Seneca Case Manager that connected me to a separated father and class member who was detained when he was a passenger in a car stopped by local law enforcement in Florida in late April 2025. As set forth in greater detail in my prior declarations, I advocated with

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

ICE over the course of nearly two weeks to ensure they were aware of this father's class membership and to push for his release. Fortunately, he was ultimately freed. However, to achieve that result, it was critical that (1) his family trusted his Seneca Case Manager enough to alert the Case Manager to his detention and (2) the Case Manager was quick to notify advocates who could fight for his release. Without this support, it is very likely that this father would have been deported.

18.     Similarly, it was Seneca that alerted me in May 2025 to another case where a qualifying additional family member (QAFM)—the adult daughter of a formerly separated father who is part of the class—was deported despite having valid parole status under the settlement agreement. The adult daughter, I., had a removal order from 2018 but had been granted parole in 2024 under the benefits provided to QAFMs of *Ms. L.* class members in the settlement agreement. I reached out to I. to better understand what happened to her. She told me that in late March 2025, ICE called her and asked her to present for a check-in in early April. She complied with the request, attending the check-in with her two youngest children. She was detained and, three days later, deported with her two children.

19.     I have been working with immigrant children and their families for nearly a decade, and the Seneca Case Managers were among the most competent, compassionate, relentless, and creative case managers I have ever had the pleasure of collaborating with. They centered the needs and voices of the families in everything they did, and their commitment to supporting the families on a path to healing was unparalleled.

20.     In June 9, 2025, I learned that Seneca's contract had not been renewed. This was extremely disruptive, as it happened suddenly and with little opportunity to transition the families to other supports.

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

21.    As a subcontractor, I had been provisionally informed in late May that the government intended to renew Seneca's contract for at least four months beyond its June 9, 2025, end date.

22.    On Friday, June 6, 2025, however, I learned from various Seneca staff that Seneca had not made any progress toward renewing the contract, and they were quickly preparing to end services on Monday, June 9, 2025. In other words, Seneca Case Managers who had been supporting families for months and maintaining families' connections to myriad services under the settlement agreement, had only a few days to try to ethically and intentionally wind down services.

23.    Now, without the support of the Seneca Case Managers, no one is liaising between class members and all other service providers established under the settlement agreement. No agency is tasked with referring class members to legal services, which means class members are unable to access support with parole and work authorization renewals, reopening of removal proceedings, termination of proceedings, and pursuit of more permanent status. In this extraordinarily heightened immigration enforcement environment, the inability to connect to legal services has caused class members considerable fear and anxiety.

24.    Without support from Seneca Case Managers, class members are also unable to access the other benefits under the settlement agreement. For example, even where a class member was already connected with therapy services, it is unclear how they could continue attending therapy without Seneca case management in place to pay for the services. Likewise, class members have no way of accessing the medical or housing benefits under the settlement agreement.

25.    Shortly after Seneca's services ended, I received a call from a class member seeking support in refilling his prescription medications. He explained to

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs

me that his Seneca Case Manager had previously helped him refill his medication to help manage his diabetes and his high blood pressure. Since the Case Manager had to stop working with him abruptly, he had run out of his medications and did not know how to access refills where he lives in Georgia. I have not yet been able to connect him with any additional support to meet his medical needs.

26.     The Young Center and Seneca Case Managers have worked with countless other families—including some whose reunification had not yet been effected—who are now left in limbo. Over the last several years, I have borne witness to how class members have come to rely on the steadfast support of the Seneca Case Managers who have accompanied and supported them and their families on their journey to healing. It has been destabilizing, alarming, and distressing for families to be stripped of that trusted support, especially at this uniquely uncertain time.

*     *     *     *     *     *     *     *     *     *

27.     I declare under penalty of perjury that the foregoing is true and correct.

Date: June 30, 2025        _____

                           [Kelly Albinak Kribs]

18cv428 DMS (AHG)
Second Supplemental Declaration of Kribs