Lee Gelernt*
Dan Galindo (SBN 292854)
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Stephen Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94111
T: (415) 343-0783
skang@aclu.org
samdur@aclu.org

*Attorneys for Petitioners-Plaintiffs*        *Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L. et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); et al, <br><br> *Respondents-Defendants*. | Case No. 18-cv-00428-DMS-MDD <br><br> Date Filed: July 11, 2025 <br><br> Hearing Date: July 17, 2025 <br><br> **FIFTH SUPPLEMENTAL DECLARATION OF SARA VAN HOFWEGEN** <br><br> CLASS ACTION |

I, Sara Van Hofwegen, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Managing Director at Acacia Center for Justice (Acacia), a non-profit, non-governmental organization that administers programs that provide legal access and representation services to immigrants facing removal through a national network of legal service providers. As part of my role at Acacia, I oversee the Legal Access Program for Reunified Families (LASRF), along with other legal orientation programs funded by the Department of Justice (DOJ).

2. I have previously submitted declarations to this court dated April 17, 2025, April 24, 2025, May 10, 2025, and May 23, 2025. I submit this supplemental declaration in response to the Rule 60(b) Motion filed by DOJ on July 3, 2025.

3. DOJ awarded Acacia an "Indefinite Delivery Indefinite Quantity" (IDIQ) contract in 2022 after a competitive bidding process, in which DOJ determined that Acacia was best suited to provide the services under the scope of the IDIQ. As part of the IDIQ bidding process, DOJ issued a Request for Proposals (RFP), which was open to proposals for about five weeks. Acacia does not know how many proposals were submitted; however, other organizations did ask questions regarding the RFP during the question-and-answer process. After the RFP closed, DOJ and Acacia engaged in negotiations about the terms for approximately three months before DOJ awarded the IDIQ to Acacia. As part of the IDIQ award process, Acacia and DOJ negotiated labor rates for services provided under the contract. Notably, DOJ issued a single award IDIQ solely to Acacia; it could have awarded an IDIQ to multiple contractors and thus been able to issue task orders to multiple contractors, but it chose not to do so.

4. DOJ issued Acacia a new task order in April 2024 to launch and operate the LASRF program. My previous declarations explained the

individualized services provided to class members of qualifying additional family members (QAFMs) under the task order.

5. Prior to the issuance of Acacia's LASRF task order and pursuant to the process outlined in the IDIQ, DOJ sent a draft statement of work with Acacia and requested that Acacia submit a pricing proposal to complete the work. Acacia did so and negotiated with DOJ until Acacia and DOJ agreed upon the terms of the statement of work and the pricing for the LASRF program. All costs to DOJ were negotiated and agreed upon before the task was issued.

6. During LASRF task order negotiations, DOJ informed Acacia that it would be using a "firm fixed price" pricing model where DOJ paid a set, predetermined price for services. Acacia's other orientation program task orders under the IDIQ have operated under a "time and materials" pricing model, where Acacia billed DOJ for time and other costs of services performed.

7. DOJ decided the pricing structure for the contract, and chose to enter into a firm fixed price task order for LASRF, and Acacia negotiated a set price for the services provided under the contract. Under the terms of the contract, DOJ agreed to pay Acacia a flat fee[1] for legal services to a base number of 785 participants. In addition to legal services, the contract provided for other costs including translation and interpretation services and transportation stipends for participants, called direct costs. Finally, DOJ agreed to fixed fee for programmatic staff to manage legal service provides and data scientists to comply with the significant reporting requirements of the task order, reporting requirements imposed by DOJ. That fixed fee was $1.05 million. All of these costs were agreed upon by both parties and included as terms in the task order. The only unknown was the number of participants above 785 that would receive services, but the rate per participant was agreed upon. For each participant

---

[1] The numbers provided in Sirce Owen's declaration do not reflect a budget modification that was made slightly lowering costs. The numbers in this declaration are the final numbers agreed upon by the parties and invoiced by Acacia.

served above the base number of 785, the contract provided for a flat rate of $2,771.52 per additional participant (this agreed-upon cost per additional case served was referred to as "surge pricing" to reflect that more participants than expected required services, and thus a higher fee was appropriate because those served might otherwise exceed the capacity of the provider network).

8. Acacia initially proposed serving a higher number of participants than 785 as part of the base program rate, which could have avoided the need for "surge pricing"; DOJ countered with a lower numbers of participants. Because 414 additional class members and qualifying additional family members required legal help, beyond the 785, Acacia billed DOJ $1,147,409.28 for these participants as negotiated by DOJ. Throughout the course of the task order, Acacia sent monthly invoices to DOJ, reflecting the monthly firm fixed price for services. Acacia had to notify the government when it reached 70, 80, and 90 percent of the 785 participant baseline number, and did so each time. For example, within the month of December 2024, we reached the 70 and 80 percent thresholds and told the government on each occasion.

9. In early January 2025 the government asked for an estimate about when we would reach the 785 baseline and thus would begin to serve participants under surge pricing. On January 13, Acacia told the government we would reach the 785 baseline in February and that we anticipated serving about 400 participants over the baseline figure. The government requested identifying information about the participants served under surge pricing; no government official expressed concerns about the estimate of 400 participants who would be served under surge pricing. In April 2025, Acacia submitted a final invoice to DOJ reflecting the additional 414 participants served.

10. Prior to DOJ notifying Acacia of its decision not to issue a new task order to Acacia, the parties had begun negotiations for renewing the task order. DOJ sent Acacia a draft statement of work, and Acacia responded with minor

edits. DOJ also told Acacia of its intent to change the pricing structure to "time and materials," a structure Acacia had originally proposed for the first task order, and in response Acacia provided a proposed time and materials budget in addition to the firm fixed price structure that was already built into the base year task order.

11. DOJ has issued more than five task orders under the IDIQ. It is Acacia's experience that a new task order can be issued relatively quickly, faster than the 45 days stated by DOJ counsel in their motion. Acacia is willing to agree to a task order that is substantially similar to the prior task order, limiting the need for extensive negotiations. Moreover, prior to the government's notification that they would not be renewing the task order, Acacia already sent an alternate budget to the government (at its request) and responded to a new statement of work, that included changes made by DOJ. Acacia is awaiting communication from the government Contracting Officer about a potential new task order.

12. Indeed, in April 2025, the government and Acacia entered into a contract reinstating services less than 30 days after being ordered to resume legal services to unaccompanied children. In *CLSEPA v. HHS,* the court for the Northern District of California, ordered HHS to resume legal services to unaccompanied children on April 1, 2025. The resulting reinstated contract began on April 30.

13. Acacia has not received any communication from our assigned government Contracting Officer about a new LASRF task order since this Court's Order on June 10, 2025. On July 1, 2025, I received an email from Daniel Schutrum-Boward, a trial attorney for DOJ. Mr. Schutrum-Boward attached a document to this email which he referred to as "a proposed Term Sheet regarding the provision of legal services to *Ms. L.* Settlement Class members and Qualifying Additional Family Members." Mr. Schutrum-Boward

did not include any government Contracting Officer on this email. A true and accurate copy of this email is attached to this declaration as Exhibit A, and a true and accurate copy of the proposed term sheet attached to this email is attached to this declaration as Exhibit B.

14. Under federal contracting rules and Acacia's IDIQ contract with the DOJ, only the government Contracting Officer can take action on Acacia's IDIQ contract, and the negotiation of a new task order must be initiated by the Contracting Officer or their representative as named in the contract. Because of this, Acacia cannot engage in any substantive conversation with DOJ's trial counsel or take any action with respect to the proposed term sheet trial counsel provided without receiving communication from our Contracting Officer. Acacia relayed the above information to counsel for DOJ and asked that the communication come from the contracting officer. We did not receive a response from counsel for DOJ.

15. Even if Acacia could respond substantively to DOJ's trial counsel regarding the proposed term sheet, the term sheet trial counsel provided lacked sufficient detail for Acacia to evaluate the proposed terms and respond. The term sheet did not provide the duration of the period of performance under the proposed task order or information about expected costs and pricing and did not request a price proposal.

16. Acacia's General Counsel forwarded Mr. Schutrum-Boward's email to our Contracting Officer at DOJ informing her that Acacia is willing to negotiate a new task order and that we are waiting for her instructions. As of the date of this declaration, Acacia has not received a response from our Contracting Officer.

17. The IDIQ has an end date of August 2027 and nothing prevents the government from issuing new task orders under the IDIQ provided the

government does not terminate the IDIQ at any earlier date. The IDIQ can remain active even if there are no active task orders.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 11th day of July 2025, in Los Angeles, California.

*s/ Sara Van Hofwegen*
Sara Van Hofwegen
Acacia Center for Justice
Svanhofwegen@acaciajustice.org

# Exhibit A

**From:** "Schutrum-Boward, Daniel R. (CIV)" <Daniel.R.Schutrum-Boward@usdoj.gov>
**Date:** July 1, 2025 at 7:43:57 PM EDT
**To:** Svanhofwegen@acaciajustice.org
**Cc:** "Silvis, William (CIV)" <William.Silvis@usdoj.gov>, "Parascandola, Christina (CIV)" <Christina.Parascandola@usdoj.gov>
**Subject: Ms. L. - Proposed Term Sheet Regarding Provision of Legal Services**

Dear Ms. Van Hofwegen,

Pursuant to the Court Order of June 27, 2025, in *Ms. L, et al. v. ICE, et al.*, 3:18-cv-00428 (S.D. Cal.), please find attached a proposed Term Sheet regarding the provision of legal services to *Ms. L.* Settlement Class members and Qualifying Additional Family Members.

The Government notes that this Term Sheet is nonbinding, and the Government intends to seek relief from the Court's requirement that it reinstate any Task Order with Acacia. The Government would like to pursue potential engagement with alternative vendors to provide the legal services required under the *Ms. L.* Settlement Agreement.

Respectfully,

Daniel

**Daniel Schutrum-Boward**

Trial Attorney

U.S. Department of Justice, Civil Division

Office of Immigration Litigation

General Litigation and Appeals Section

P.O. Box 878, Ben Franklin Station

Washington, DC 20044

Phone: 202-919-1670

Email: Daniel.R.Schutrum-Boward@usdoj.gov

*This communication, including any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, the reader is hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this in error, please reply immediately to the sender and delete this message.*

# Exhibit B

# Executive Office for Immigration Review
# Public Resources and Communications Division
# Legal Access Services for Reunified Families Program

The U.S. Department of Justice, Executive Office for Immigration Review (EOIR), created the Legal Access Services for Reunified Families (LASRF) Program pursuant to the Settlement Agreement in *Ms. L., et al. v. U.S. Immigration and Customs Enforcement, et al.*, 18-cv-00428-DMS-AHG (S.D. Cal. Oct. 16, 2023) ("Settlement Agreement").

## I. DEFINITIONS

a. "Class Members" – Individuals the U.S. Department of Homeland Security (DHS) or a United States Federal Court confirm as a *Ms. L.* Settlement Class member under the Settlement Agreement.

b. "Qualifying Additional Family Members" – Individuals DHS determines to meet the definition of a Qualifying Additional Family Members under the Settlement Agreement.

c. "Program Participants" – Class Members and Qualifying Additional Family Members who receive services as part of the LASRF Program.

## II. SERVICE LOCATIONS

The Contractor must provide the services from at least eight regional offices and one national provider for pro bono mentoring.

## III. SERVICES TO PROVIDE

To perform its obligations under this contract, the Contractor must:

a. Provide legal assistance, not including legal representation as defined under 8 C.F.R. § 1001.1(m), to unrepresented Program Participants, including:

   i. Individualized Consultations and Counseling.

   ii. Pro Bono Matching and Mentorship.

b. The Contractor must accept case referrals from EOIR and use the contact information contained in the referrals to schedule Program Participants for individualized legal services as described in this Section. The exchange of this information is limited to the extent permissible under law and subject to rules concerning the distribution of personally identifiable information.

## IV. ADDITIONAL RESPONSIBILITIES

In performing the above services, the Contractor must:

a. Conduct LASRF services in the language most appropriate for the Program Participant. If the Program Participant does not understand the language in which the services are conducted, the Contractor must provide trauma-informed interpretation.

b. Ensure that all LASRF service providers, including presenters and consultants, are attorneys, DOJ Accredited Representatives with full accreditation, or other Contractor staff working under the direct supervision of an attorney or DOJ Accredited Representative with full accreditation, with reasonable exceptions to be approved by the Contracting Officer's Representative. Direct supervision means that an attorney or DOJ Accredited Representative with full accreditation is present at the site on the day of services to consult with LASRF staff or, in the event of emergent circumstances preventing on-site presence at the location, is reachable by telephone to consult with LASRF staff prior to the completion of LASRF services on the day the guidance is requested. However, if the Contractor is providing services via remote technology, direct supervision means that an attorney or DOJ Accredited Representative with full accreditation is available to the LASRF staff by phone within five minutes of LASRF staff sending notice of a need for contact.