| | |
|---|---|
| Lee Gelernt* <br> Dan Galindo (SBN 292854) <br> Judy Rabinovitz* <br> Anand Balakrishnan* <br> AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT <br> 125 Broad St., 18th Floor <br> New York, NY 10004 <br> T: (212) 549-2660 <br> *lgelernt@aclu.org* <br> *dgalindo@aclu.org* <br> *jrabinovitz@aclu.org* <br> *abalakrishnan@aclu.org* | Stephen Kang (SBN 292280) <br> Spencer E. Amdur (SBN 320069) <br> AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT <br> 425 California Street, 7th Floor <br> San Francisco, CA 94111 <br> T: (415) 343-0783 <br> *skang@aclu.org* <br> *samdur@aclu.org* |

*Attorneys for Petitioners-Plaintiffs*        *Admitted Pro Hac Vice

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al., <br><br>          Plaintiffs, <br><br> v. <br><br> U.S. Immigration and Customs Enforcement, et al., <br><br>          Defendants. | Case No. 3:18-cv-428-DMS <br> Honorable Dana M. Sabraw <br><br> Date Filed: July 11, 2025 <br><br> **THIRD SUPPLEMENTAL DECLARATION OF KELLY ALBINAK KRIBS** <br><br> CLASS ACTION |

I, Kelly Albinak Kribs, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct:

## Background

1. I am an attorney and the Co-Director of the Technical Assistance Program for the Young Center for Immigrant Children's Rights (Young Center), where I have worked for more than nine years. The Young Center is a national non-profit organization whose mission is to protect and advance the rights and best interests of immigrant children in accordance with state, federal, and international law. Since 2004, the Young Center has been appointed by the Office of Refugee Resettlement (ORR) within the U.S. Department of Health and Human Services to serve as the independent Child Advocate, akin to a best interests guardian *ad litem*, for unaccompanied and separated immigrant children in federal custody.

2. In 2017 and 2018, the Young Center was appointed as the independent Child Advocate for hundreds of children who were separated from their parents at the border before and during "zero tolerance," and who were designated as unaccompanied children and transferred to ORR custody. During this time, I was appointed Child Advocate for a number of detained children who had been separated from their parents, and I advocated for their reunification with their parents.

3. In my current role co-directing the Young Center's Technical Assistance Program, I consult with various attorneys and social services providers on complex matters impacting immigrant family unity, including reunifications of *Ms. L.* class members.

4. From June 2022 until June 2025, the Young Center served as a subcontractor to Seneca Family of Agencies ("Seneca"), the national mental health organization that provided outreach and behavioral health case management services

to *Ms. L.* class members through its program called Todo Por Mi Familia ("TPMF"). During that time, my Young Center colleagues and I provided technical assistance, meaning case consultation and connection to resources, to Seneca's behavioral health case managers ("Seneca Case Managers"). We partnered with Seneca Case Managers as they supported families through complex reunifications. The Young Center also supported Seneca Case Managers in their work connecting class members to the legal and other supportive services under the *Ms. L.* settlement.

5. Many of our case consultations were grounded in the legal needs of class members. When Acacia launched its Legal Access Services for Reunifying Families (LASRF) program in the summer of 2024, Seneca Case Managers were eager to have this specialized resource designed to meet the unique legal needs of *Ms. L.* class members. From late summer 2024 through the end of the LASRF program on April 30, 2025, Seneca Case Managers referred hundreds of class members to the legal support services offered by the LASRF program.

6. In my experience, many private immigration lawyers are largely unfamiliar with the *Ms. L.* settlement benefits. In a number of my consultations with Seneca Case Managers, I identified a need to connect with a private immigration attorney retained by a class member to ensure the attorney's awareness of their client's *Ms. L.* class member status and the benefits that accompany that status. In my experience, most class members do not fully understand their *Ms. L.* class membership status or know how to explain it to others, and most private attorneys do not screen for *Ms. L.* class membership.

7. The critical importance of having specialized legal support for *Ms. L.* class members is demonstrated by a recent situation I encountered where an attorney

with limited *Ms. L.* experience made a minor error in an application that has had a significant impact on a class member and former separated father, H.

8. In 2018, H. was separated from his then 11-year-old son at the border. At the time, I served as the federally appointed Child Advocate for E., H.'s son, and I advocated for their release from detention and reunification. During the first three months E. and H. were separated and detained, they had no communication with each other. After the fourth month of separation, they were both finally released and able to hug each other for the first time in what must have felt like an eternity. We have maintained contact ever since.

9. In July 2022, with the assistance of legal counsel, H. applied for parole. He was granted parole and issued an Employment Authorization Document (EAD). At some point thereafter, the lawyer who helped him file for parole left the organization for whom the lawyer worked, and H.'s case was transferred to a new attorney who was less familiar with the *Ms. L.* settlement agreement.

10. When H. reached out to the new attorney in late 2024 to ask how he could renew his work authorization that was set to expire in July 2025, the new attorney began preparing the renewal paperwork. However, as I later learned, she did not fully understand H.'s *Ms. L.* class membership, his parole status, and that because his EAD stemmed from his parole status, it was designated a category c(11) EAD.

11. Instead, because H. had a pending asylum application, the attorney evidently assumed that his EAD stemmed from that application, which would designate the category for his EAD as c(8). She therefore submitted an application seeking renewal of a category c(8) EAD instead of a c(11) EAD.

12.     This minor error has had significant consequences for H.  First, H. had to pay roughly $500 in fees to submit the category c(8) EAD renewal application—fees that are waived for *Ms. L.* class members seeking renewal of parole and category c(11) EADs. Second, the attorney did not file to renew H.'s parole status—a critical safeguard against detention at a time when even asylum applicants are being swept up in heightened immigration enforcement actions. Third, U.S. Citizenship and Immigration Services (USCIS) processes the category c(8) EADs much more slowly than the *Ms. L.* category c(11) EADs. The current estimated processing time for a c(8) EAD renewal is nine months. Typically, that does not present an issue for asylum applicants with category c(8) EADs because USCIS also auto-extends the validity of those EADs for 540 days to allow for the lengthier processing time. However, because H. does not have a category c(8) EAD, he is not eligible for the auto-extension. His parole and EAD will expire on July 19, 2025.

13.     H. contacted me in June 2025 for assistance with ascertaining the status of his EAD. He was worried because his parole and EAD were about to expire. His employer had told him that he would be let go if he could not produce an updated EAD by July 19, 2025. H. was concerned about losing his income, which was his sole means of supporting E.

14.     After reviewing his documents, I discovered the error regarding his EAD category. At that time, services through Acacia's LASRF program were no longer available.  Had Acacia's LASRF services been in place at the time, I would have quickly referred him to Acacia for LASRF services. In my experience, attorneys providing LASRF services are experienced in serving *Ms. L.* class members, trained in the nuances of the *Ms. L.* settlement agreement benefits, and

uniquely well-equipped to assess class members' time-sensitive legal needs, such as preparing and filing parole and EAD renewals.

15. Since Acacia's LASRF services were not in place, I had to scramble to identify other supports for H. and E. Though I was ultimately able to support them in filing parole and EAD renewal applications, I remain concerned as to whether those applications will be granted before their current status expires on July 19, 2025. If H.'s applications are not granted by then, he will likely lose his job.

16. H. and E. are two of dozens, if not hundreds, of class members and qualifying additional family members who have faced the expiration of their parole and EAD statuses in the more than two months that class members have been without access to the individualized legal services to which they are entitled under the *Ms. L.* settlement. Without parole, these families have fewer protections from detention and therefore are at greater risk of another re-traumatizing separation. Without work authorization, parents like H. are losing their ability to work and provide for their families. Every day that passes, more class members and qualifying additional family members fall out of status.

17. When Acacia's LASRF services were in place, I routinely consulted on cases in which Acacia's providers worked not only to renew parole and EAD status, but to support class members seeking to negotiate and file motions to reopen with the U.S. Department of Homeland Security, to seek termination of their removal proceedings, to respond to complicated Requests for Evidence on parole applications, to offer individualized screenings to class members to help them understand their long-term prospects for permanent immigration status, and to support class members with planning for their family's future accordingly.

18. Right now, immigrant families in this country are facing an unprecedented threat of detention and deportation. I fear for all the *Ms. L.* class members who currently do not have access to legal services or to a Seneca case manager, and who are therefore without critical supports when they need them most.

   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

19. I declare under penalty of perjury that the foregoing is true and correct.

Date: July 11, 2025

_____
[Kelly Albinak Kribs]