Lee Gelernt*
Daniel A. Galindo (SBN 292854)
Anand Balakrishnan*
Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
*lgelernt@aclu.org*
*dgalindo@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0783
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for* Ms. L. *Plaintiffs*
*\*Admitted Pro Hac Vice*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al.,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"), et al.<br><br>*Respondents-Defendants*. | Case No. 18-cv-00428-DMS-AHG<br><br>Date Filed: October 14, 2025<br><br>**DECLARATION OF S.M.B.C.**<br><br>CLASS ACTION |

Pursuant to 28 U.S.C. § 1746, I, SMBC, declare that the following is true and correct. I make this declaration based on my personal knowledge, except where I have indicated otherwise.

**I Was Forcibly Separated from My Five-Year-Old Daughter by the U.S. Government in May 2018.**

1.      I was born in Limon, Colon, Honduras. I have three children, SGB, age 12, DJRB, age 14, and JBC, age 6. SGB and DJRB were born in Honduras; JBC is a U.S. citizen.

2.      In May 2018, U.S. government officials forcibly separated me from my then-five-year-old daughter, SGB, when we sought asylum at the U.S.-Mexico border.

3.      During my detention, I expressed my fear of returning to Honduras, but during my credible fear interview, I was told I did not pass. I requested a review from an Immigration Judge and on July 17, 2018, an Immigration Judge informed me that I was being released for humanitarian reasons, and that I would be reunited with my daughter and required to attend ICE check-ins. I was never given a court date, a decision in my asylum case, or notice of a removal order.

4.      After my reunification with SGB, we complied with yearly ICE check-in appointments. My case was repeatedly referred to as "special," but I was never told why. I was never told that I had a deportation order or about steps I needed to take in my immigration case.

5.      In 2024, my children and I received parole and work permits valid through July 2027. For the first time since our forcible separation, I believed I had lawful stability in the U.S.

**After Complying with ICE Check-in Requirements for Nearly Seven Years, These Requirements Drastically and Suddenly Changed in 2025.**

6.      On January 6, 2025, during my annual ICE check-in, officers told me that my prior order to be released on humanitarian grounds no longer mattered and even though I had not had any contact with law enforcement and had been complying with

1

my check-ins, officers told me I was being placed on the Intensive Supervision Appearance Program (ISAP).

7.     My first ISAP check-in was scheduled for May 27, 2025. As that date approached, I felt waves of anxiety and stress. Media reports about people being detained during check-ins filled me with fear and became my biggest nightmare. The thought of being detained and having my children taken from me was unbearable.

8.     I paid to consult with an attorney, who told me I did not have a removal order and should attend my ICE check-in, but could not offer further support. On May 22, 2025, I asked the International Organization for Migration (IOM) help desk for legal assistance with my upcoming ISAP check-ins and they sent me a flyer for legal services for reunified families provided by EOIR (Executive Office for Immigration Review). On May 22 and 23, I repeatedly called EOIR and left voicemails, but I received no assistance beyond a link for an orientation, which I was unable to access because the link would not work on my phone which prevented me from registering and attending the orientation.

9.     On May 27, 2025, I attended my first ISAP check-in with SGB and JBC, my U.S. citizen son, who is 6 years old. SGB was terrified given her experience during our prior separation. I felt I had no choice but to take her with me, as ICE had instructed. During the check-in, an officer told me for the first time that I had a deportation order in my case, fitted me with an ankle monitor, and explained my new strict reporting requirements.

10.     The officer told me I had an order of voluntary departure without a specific removal date. But I never signed any document requesting my deportation or communicated that I wanted to return to Honduras. I told the officer that my two oldest children and I had parole valid until 2027, but the officer said that my parole did not matter, asked if my children and I had passports, and told me to buy plane tickets to self-deport. The officer also required me to sign a form that she told me indicated

whether I wanted my children to be removed with me if I were ever deported. I checked yes because I could not risk being separated from my children ever again.

11.    My daughter, SGB, was so terrified during the ankle monitor fitting that she urinated on herself. SGB then started crying, terrified that the officers were going to take me away from her again. JBC and I started crying, too. After this check-in, SGB started frequently urinating herself, especially when she heard sirens or saw police officers.

12.    Later that same day, I was fired from my job because of my new ISAP requirements; my employer said they did not want employees who might ever have to miss work for check-ins, or who had to wear ankle monitors. I desperately searched for work but other employers refused to hire me once they saw the ankle monitor.

**I Attempted to Assert My Rights under Ms. L.**

13.    I reached out to IOM again, telling them about this check-in and what the ICE officer had told me. IOM confirmed that my parole was still valid until 2027, and suggested language I use to contact EOIR again.

14.    I again reached out to EOIR. In early June, EOIR called back and told me they could not give me legal advice but that I could attend an orientation by registering through a link. My telephone did not have enough data to access the orientation and I tried again the following week but could not log in to the session.

15.    On June 5, 2025, I also emailed Together & Free, who provided me with a letter for my next ISAP check-in explaining I was a Ms. L class member with valid parole and to reach out to the ACLU with any questions about what this meant.

16.    On June 17, 2025, I attended my ISAP appointment in person with my children's attorney. When the attorney tried to explain our parole status, the children's pending applications for legal status, and ask questions, ISAP told her she was not allowed to. ISAP made a copy of the Together and Free letter but did not otherwise acknowledge or respond to it.

18cv00428

**ICE Repeatedly Told Me to Self-Deport, and My ISAP Requirements Became Debilitating.**

17.     ISAP scheduled many check-ins in a short amount of time: I had at least eleven check-ins between June 10 and August 5. ISAP would also change the date of my check-in often a day before or the same day. This was extremely stressful for me as I feared each check-in would lead to removal, and the abrupt changes made me feel as though I was outside of my body for days leading up to them.

18.     These check-ins, along with GPS monitoring and the ankle monitor, made me feel like a prisoner in my own home. There came a point when I reached deep desperation, and felt I was now reliving the trauma from when they took SGB from me in 2018. I was devastated to realize this, having worked so hard to overcome the trauma of separation with the help of a psychologist.

19.     During my June 10, 2025 check-in, an officer again told me I had an order of voluntary departure without a specific removal date. Again, I told the officer that I had parole, but the officer told me that my parole did not matter. I told the officer I did not want to return to Honduras.

20.     The officer demanded passports from my children and me, along with proof of JBC's U.S. citizenship. When I told them I needed authorization from my children's father to obtain the passports, they told me they would obtain them from the Honduran consulate if I did not provide them. Feeling as though I had no option, I got our passports, using donations from my church to pay the passport fees.

21.     The ankle monitor, GPS surveillance, and frequent check-ins caused me to spiral into stress and depression. I lost a lot of weight and my hair started to fall out. I still could not find work and food was running out at home.

22.     Since our May 27 check-in, SGB refused to leave my side. SGB continued urinating herself when she heard sirens, started having frequent nightmares, and refused to leave my side for even a second, just like she did after we were forcibly separated.

4

18cv00428

23.    By this point, my phone was disconnected and the food was running out at home. Since May, I had lost nearly 40 pounds, developed insomnia, and lived in constant fear of being separated from my children again. My children also lost weight due to the fear and anxiety they suffered from during this time. We were behind on rent and my landlord told me we had until July 15, 2025, to pay the overdue rent or be evicted.

24.    Under immense stress and feeling hopeless, I broke down during my July 1, 2025, telephonic check-in that I was able to attend only by using my sister's wifi. I said I wanted to give up and return to Honduras only because I increasingly felt that I could not survive in the U.S. under these conditions. The officer gave me a moment to collect myself and then asked if I was actually going to leave. After regaining my composure, I informed the officer that I had thought it over and in fact did not want to leave. The officer understood but still demanded that I give them our passports at the next appointment if I did not "return voluntarily."

25.    On July 8, 2025, I surrendered my children's passports as instructed. The officer told me that if I did not self-deport, "ISAP would decide for me" because they had the passports and I already had a deportation order. My children's attorney was allowed to enter with me under a G-28 but, again, was not permitted to speak. ISAP said that an Immigration Judge or USCIS would decide whether I was deported, since I had a removal order and I did not qualify for asylum. The officer told us that if I were deported, my children would go to foster care or adoption.

26.    On July 14, 2025—they day before my landlord said they would evict us if I couldn't pay what I owed—ISAP officers came for a home visit. One officer said they would facilitate my voluntary departure if I was not planning to deport on my own. Overwhelmed, depressed and frustrated, I told the officers that they might as well "send me back" because I had no other options here. The officers told me to get our suitcases together and I complied and started packing. My youngest child, JBC, saw me packing

5

18cv00428

and started to cry, saying that he did not want to go to Honduras. At that point, I told the officers that I did not actually want to go back to my home country and that I had never signed any kind of document or order for voluntary departure. The officer wanted me to sign a document but I refused. This did not seem to make any difference to these officers—they took me and my children to a motel and removed my ankle monitor. They detained us for three days and then removed us to Honduras.

**Following Our Deportation to Honduras, I Am Afraid for My Family's Safety**

27.    My children and I cannot safely return to my family home in Limon, Honduras, because of death threats by my stepfather, who previously burned down the home. We now live in hiding. Recently, gang members broke into my mother's house while we were inside, and the police took no report.

28.    JBC, my U.S. citizen son, cannot enroll in school or access healthcare without applying for Honduran citizenship, which I cannot afford. I still owe rent and bills in the U.S. and cannot work safely in Honduras while my children and I are in hiding.

29.    JBC cries a lot and is depressed because he is not in the only country he has ever known. He does not understand why he had to leave the U.S. as a U.S. citizen. He is mad at me, and I do not have the words to comfort him.

30.    SGB and DJRB were not accepted into school mid-year and are losing half a year of their education. SGB is struggling more than ever because she cannot read or write in Spanish.

31.    Had I been properly informed of my rights as a *Ms. L.* class member and had access to effective legal representation, I do not believe I would have been removed from the U.S. against my wishes.

                    *    *    *    *    *    *    *    *    *

The statement has been translated back to me in Spanish, and I declare

6

18cv00428

1 | under penalty of perjury under the laws of the United States of America that the

2 | foregoing is true and correct, to the best of my knowledge.

3 |

4 | Executed this 14 day of October 2025, in La Ceiba, Honduras.

5 |

6 | Date: October 14, 2025                    /s/ *S.M.B.C.*

7 |                                              S.M.B.C.

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

18cv00428

1

**CERTIFICATE OF TRANSLATION**

2      My name is Anilú Chadwick, and I hereby swear under penalty of perjury under

3  the laws of the United States of America that I am fluent in English and Spanish. I

4  certify that I have read this statement to S.M.B.C. in the Spanish language, in which she

5  is fluent, and that she stated that she agreed with and understood perfectly its contents

6  in their entirety.

7

8  Executed this 14th day of October, 2025, in Brooklyn, New York.

9

10  Date: October 14, 2025                    /s/ *Anilú Chadwick*

11                                           Anilú Chadwick

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18cv00428