```
------------------------------------------------------------------x
```

M.R.L.,                                :              ATTORNEY AFFIRMATION
                                                     IN SUPPORT OF M.R.L.

A *Ms. L* Class Member

```
------------------------------------------------------------------x
```

STATE OF MISSOURI    )
COUNTY OF ST. LOUIS  )  ss.:

MOLLY KAMMIEN, ESQ., under penalty of perjury, hereby affirms:

1. I am a Senior Attorney at Kids in Need of Defense's ("KIND") New York office. KIND has represented M.R.L., a 19-year-old *Ms. L* class member, in his immigration matters since approximately 2019.

2. M.R.L. was recently detained by ICE for over two months from October 6, 2025 to December 5, 2025.  ICE initiated removal proceedings against M.R.L., which spurred revocation his work permit and other lawful protections, only to eventually reverse course and release him. The reasons why ICE chose to detain M.R.L. remain unclear to this day, and our advocacy for M.R.L. was hampered by not knowing the basis for detention. The detention compounded the harm M.R.L. suffered as a result of his initial separation, and he has once again been traumatized as a result of being detained and separated from family. Furthermore, ICE took all forms of identification that M.R.L. lawfully obtained prior to this detention, making it nearly impossible for M.R.L. to leave the house for fear of another detention.

<u>Background</u>

3. M.R.L. is 19 and was born in Honduras. His mother died when he was young, and his father and brother currently live in Honduras.

4. M.R.L. and his father traveled to the United States in 2019, when M.R.L. was 12. Upon arrival to the U.S. border, M.R.L. and his father were detained and separated. His father was deported and remains in Honduras. They have not seen each other since 2019. M.R.L. currently lives with an aunt in Houston and has lived with that family for the past year, after several years in other living arrangements.

5. Through the course of our representation, KIND assisted M.R.L. in applying for Special Immigrant Juvenile Status, which was granted on October 8, 2022. At that time, USCIS also granted M.R.L. deferred action, which allowed him to apply for a work permit and social security card. At the time, M.R.L's *Ms. L* class membership had not yet been

confirmed. On November 1, 2024, the Executive Office of Immigration Review granted a joint motion with ICE to dismiss M.R.L.'s removal proceedings based on his approved petition for Special Immigrant Juvenile Status with deferred action.

6. For the past year, M.R.L. worked with authorization in a tree trimming business with his uncle and cousin in Houston. On October 6, 2025, M.R.L., his uncle, his cousin, and his boss were pulled over near Houston, Texas, at a gas station while in their work vehicle. The police asked for identification documents. To the best of my knowledge, this was the first contact M.R.L. had had with law enforcement since the time he was separated from his father. The police notified other officers, who arrived a few minutes later. M.R.L. said that the officers who arrived later did not display any badges or identify themselves as ICE, so he did not know if they were bounty hunters or actual ICE agents.

7. M.R.L. presented his work permit and told the officers he had permission to be in the country. He called me, as his attorney, from the roadside, and I told him to pass the phone to the officers so I could explain that he had approved Special Immigrant Juvenile Status with deferred action. The officers refused to speak with me and hung up the call. M.R.L. said that the officers immediately handcuffed the other men who were in the truck, but that they debated if they should take M.R.L. too. M.R.L. told me that eventually someone said "just take him," and they handcuffed M.R.L.  and took him into detention.

8. On the day after his arrest, USCIS terminated M.R.L.'s deferred action status and issued a notice of intent to revoke his work permit. The government did not include any legal basis for revocation of his status in the notice of termination or make any allegations against M.R.L. of illegal activity or any change in factual circumstances. This termination and revocation appeared to be based solely on his detention by ICE.

9. KIND worked with a local attorney who helped file a Motion to Terminate based on M.R.L.'s approved petition for Special Immigrant Juvenile Status and lack of criminal history. ICE's Office of the Principal Legal Advisor ("OPLA") (ICE's prosecution office) opposed the motion. Their opposition alleged no new facts or changed circumstances since the November 1, 2024 order terminating M.R.L.'s initial removal proceedings—an order for which OPLA had jointly moved. Now OPLA asserted that because M.R.L. could not immediately adjust his status to permanent lawful residence – a fact that existed at the time his initial removal proceedings were terminated —  he should be removed. The immigration judge denied the Motion to Terminate.

10. Over the course of M.R.L.'s detention, I tried repeatedly to get in touch with an ICE officer in charge of his case. I called the detention center multiple times, and my calls were either disconnected or rang without an answer. At no point during M.R.L.'s arrest, detention, and removal proceedings did anyone from the government provide any explanation as to why M.R.L. had been detained, or why the government was now actively seeking his removal.

The inability to ascertain on what basis the government had detained him and whether they were making any allegations against him stymied our attempts to assist M.R.L. and craft the legal strategy that led to his release. Without knowing why the government believed he should be detained, we as legal representatives were at a loss as to how to make the strongest efforts to secure his release.

11. In the face of unresponsive government personnel at the detention center, I made the decision to reach out to an OPLA contact who might be familiar with the *Ms. L* settlement agreement, even if they were not the appropriate OPLA attorney assigned to deal with M.R.L.'s detained case. Eventually and again without explanation, OPLA changed course, and agreed to join us in a motion to dismiss proceedings, which they had originally opposed.

12. On Friday, December 5, 2025, the immigration judge granted the motion and signed an order granting dismissal of proceedings. M.R.L. was released from ICE detention that day.

13. M.R.L. has been deeply re-traumatized by the experience of being detained again (the first time when he was separated from his father at 12) and placed in adult detention at only 19. Throughout his immigration case, he has proceeded as required by law and was on the way to lawful status. He has been building a life in Houston, gaining work experience, and being with family after years of instability. While in detention, he expressed feeling depressed, not being able to remember things, and feeling trapped. He lost his appetite and had trouble sleeping. He reported a despair and confusion over why this had happened when he had done nothing wrong and had been following the legal path laid out before him with no missteps. No explanation has ever been provided to M.R.L. or his counsel as to the basis of his detention, beyond the standard allegation of "present without a visa" made in his Notice to Appear.

14. On November 17, 2025, KIND filed a "parole in place" application for M.R.L. while he was detained. That application is still pending before USCIS, at least in part because his detention.  has created additional hurdles to completing the biometrics necessary for parole even after his release that continue to date. Attendance at a USCIS biometrics appointment requires a photo ID. ICE took his Employment Authorization Document and state identification at the time of his detention and did not return them upon his release. In addition to the fear M.R.L now experiences at the idea of leaving his house without any documentation that might help him avoid re-detention, this has created the very practical hurdle of making it difficult for him to complete the biometrics necessary to have his *Ms. L* parole approved.

15. Now, M.R.L. feels relieved to be reunited with his aunt in Texas. He hopes that his parole application will be approved so he can continue to work lawfully here in the U.S. until he is

able to adjust status to lawful permanent resident through his Special Immigrant Juvenile Status.

Dated:    January 26, 2026

_____
Molly Kammien
Kids in Need of Defense (KIND)
*Pro Bono Immigration Attorney for M.R.L.*